**United States District Court For The Western District of Virginia—Charlottesville Division**

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED

JAN 30 2018

JULIA C DUDLEY, CLERK
BY:
DEPUTY CLERK

Case No. 3:17-cv-00072-NKM
Hon. Norman K. Moon

Elizabeth Sines, et al.
*Plaintiffs*

V.

Jason Kessler, et al.
*Defendants*

# Memorandum In Support of Motion to Dismiss Of Defendant Richard Spencer

Defendant Richard Spencer, *Pro Se*, submits this memorandum in support of his motion to dismiss Plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## Factual Accusations As To Richard Spencer

The complaint contains no plausible allegations that Richard Spencer did anything unlawful or engaged in any behavior or activity that is not fully protected by the First and Second Amendments to the United States Constitution.

The essence of the complaint is a "conspiracy theory" in the true sense of the

word:

> The events of August 11 and 12—now commonly referred to simply as "Charlottesville"—were part of Defendants' coordinated campaign to intimidate, harass, incite, and cause violence to people based on their race, religion, ethnicity, and sexual orientation in violation not only of the values that thousands of American soldiers have died for, but also numerous state and federal laws. (§6, p. 3)

The rally was, in the Plaintiffs' telling, not really a rally, but a ruse, planned in order to promote harassment and assaults against citizens based on race and ethnicity. (The word "rally" is, in fact, treated with "scare quotes" throughout the complaint.)

Below are the scattered and conclusory allegations that involve Spencer (repetitive claims are omitted for readability). Many of them did not occur, and none of them is a crime; the Plaintiffs' case is based on the assumption and attachment of sinister motives and plans within plans. Even if the Court were to accept each and every claim has factually true, the Case should be dismissed with regard to Richard Spencer.

§40, p. 17: Spencer wrote a philosophical essay entitled "The Charlottesville Statement," in which he outlined his political and social beliefs.

§49, p.19: Spencer invited people to attend the Unite The Right rally.

§52, p. 20: In May of 2017, Spencer organized and participated in a rally in

which he said, "What brings us together is that we are white, we are a people. We will not be replaced."

§64, p. 24: Spencer had drinks with Evan McLaren at the Trump Hotel in Washington, SC, where they discussed the upcoming Charlottesville event.

§78, p. 28: A participant (known as "Caerulus Rex") in a an online forum (Discord) intended for discussion of the Unite The Right even has been a frequent bodyguard of Spencer.

§85, p. 29: In an essay, Spencer criticized the term "Judeo-Christian values" and claimed that racially and ethically homogenous nation-states are "legitimate and necessary."

§87, p. 30: *AltRight.com*, a Website owned and operated by Spencer, published a boast that Spencer's ideas "dominate the Internet" and might soon be equally persuasive in the real world. The site also stated its opposition to the U.S. political establishment.

§92, p. 32: Spencer's website published a boast that the Website *The Daily Stormer* will convince many people to attend the Unite The Right rally.

§108, p. 36: Another party (not a defendant) claimed that Spencer agreed with the assertions that attendees should bring bodily protection and weapons within the confines of the laws of the United States and the Commonwealth of

Virginia.

§120, p. 43: Spencer asked for help from attorneys on his website.

§141, p. 48-49: On the social network website Twitter, Spencer posted a photograph of a restaurant that featured a flyer critical of the Unite The Right rally.

§143, p. 50: Spencer co-organized the August 11, 2017, torchlight procession through The Lawn on the University of Virginia's campus.

§149, p. 51: Spencer and Defendants illegally carried and encouraged others to carry open flames on the University of Virginia's campus (in this case, Citronella-based Tiki Torches).

§153, p. 52: Spencer tipped off a reporter that he should be near Nameless Field on the night of August 11, in order to report on the torchlight procession.

§158, p. 53: Spencer and Defendants deliberately walked through the cultural center of the University of Virginia's campus, The Lawn, in order to scare people.

§164, p. 54: Spencer and hundreds of others charged towards a group of counter-protestors assembled around a statue of Thomas Jefferson in order to scare yet more people.

§175, p. 57: During the march, Spencer made recourse to such heated language as "We own these streets!"

§184, p. 59: Spencer retweeted a tweet by Defendant Jason Kessler that read, "Incredible moment for white people who've had it up to here & aren't going to take it anymore. Tomorrow we #UniteThe Right #Charlottesville."

§229, p. 73: An altercation occurred at a park at which Spencer and Defendant Peinovich assembled after the rally was ended by the police.

§230, p. 73: Spencer called counter-protestors an unkind name ("savages").

§260, p. 81: At 12:30 PM on August 12, Spencer tweeted, "My recommendation: Disperse. Get out of Charlottesville city limits. State of emergency has been called."

§273, p. 86: Spencer told the New York Times that Unite The Right was a "huge moral victory."

§297, p. 94: Spencer announced that he will return to Charlottesville for more activism and political demonstrations.

§312, 313, 314, pp. 97-98: The Defendants formed a conspiracy to incite racial and religious harassment and violence. Spencer met with Evan McLaren privately for yet more conspiring.

§327, p. 99: Spencer was featured in a promotional flyer for Unite The Right.

§333, p. 100: Spencer "directed" acts of violence, whatever that might mean.

5

**Argument**

**1. Lawfare And The First Amendment**

This lawsuit is an example of what has come to be known as "lawfare," that is, an attempt to use the legal system to intimidate, silence, financially damage, or generally harass defendants—often for political or personal motives. As such, it is an affront to this Court and the ideal of justice under law.

Three recent Supreme Court cases demonstrate why this complaint should be dismissed: *Bell Atlantic* v. *Twombly,* 550 U.S. 544 (2007), *Ashcroft* v. *Iqbal,* 556 U.S. 662 (2009), and *Snyder* v. *Phelps,* 562 U.S. 443 (2011).

The Court in *Iqbal* summarized the new pleading standard it had earlier adopted in *Twombly:*

> As the Court held in *Twombly,* 550 U.S. 544, the pleading standard· Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.,* at 555 ....A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U. S., at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of"further factual enhancement." *Id,* at 557. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id,* at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id,* at 556. The

plausibility standard . . . it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.,* at 557 (brackets omitted). (Iqbal, 556 U.S. at 665.)

And further:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.,* at 556. Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief." (Iqbal, 556 U.S. at 665.)

*Twombly* and *Iqbal* can be directly applied to the plaintiffs' complaint in this case.

First, as to all the defendants, but especially as to Spencer, the complaint contains nothing but conclusory statements, naked assertions, labels ("racist," "hateful"), and "'the-defendant-unlawfully harmed-me" accusations.

Second, the *Twombly* and *Iqbal* decisions emphasize that context and common sense are critical in evaluating the complaint's allegations. The obvious context in this case is the defendants' participation in classic First Amendment activity: marching, speeches in parks, carrying signs, expressing political protests, etc. Plaintiffs complain that the defendants' activities were highly offensive. Such

a claim is highly subjective: the damage done by language, even heated language, cannot be measure or verified.

Moreover, being that Spencer is a public figure, who has appeared in major newspapers and news reports and whose public statements are widely available on the Internet and social media, one must ask: Why are only his actions and words related to Charlottesville be singled out for legal action? Since they are of a kind of his other statements and actions, does not every video or essay he produces, every other protest he is involved in, inflict similar "emotional distress" and "trauma"? Furthermore,

Most importantly, the Supreme Court has often noted that it is precisely offensive speech that requires First Amendment protection, indeed, *special protection*, because it is precisely controversial statements and actions that are likely to elicit counter-protests ("lawfare," for example). As the Supreme Court stated in *Snyder v. Phelps*:

> The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open. " *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270 (1964). That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana, 319* U.S. 64, 74-75 (1964). Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers,* 461 U. S. 138, 145 (1983) (internal quotation marks omitted).

\*\*\*

Given that Westboro's speech was at a public place on a matter of public concern, that speech is entitled to "special protection" under the First Amendment. Such speech cannot be restricted simply because it is upsetting or arouses contempt. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson,* 491 U. S. 397, 414 (1989). Indeed, "the point of all speech protection ... is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U.S. 557,574 (1995).

The jury here was instructed that it could hold Westboro liable for intentional infliction of emotional distress based on a finding that Westboro's picketing was "outrageous." "Outrageousness," however, is a highly malleable standard with "an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression." *Hustler,* 485 U.S., at 55 (internal quotation marks omitted). In a case such as this, a jury is "unlikely to be neutral with respect to the. content of [the] speech," posing "a real danger of becoming an instrument for the suppression of . . . 'vehement, caustic, and sometimes unpleasan[t]'" expression. *Bose Corp.,* 466 U.S., at 510 (quoting *New York Times,* 376 U. S., at 270). Such a risk is unacceptable; "in public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate 'breathing space' to the :freedoms protected by the First Amendment." *Boos* v. *Barry,* 485 U. S. 312, 322 (1988) (some internal quotation marks omitted). What Westboro said, in the whole context of how and where it chose to say it, is entitled to "special protection" under the First Amendment, and that protection cannot be overcome by a jury finding that the picketing was outrageous.

Plaintiffs' affront to First Amendment principles is all the more egregious given that they seek not only damages—most likely substantial damages—but "[i]njunctive relief enjoining Defendants from future violations of rights guaranteed by state and federal law," that is, an injunction that will intimidate defendants from ever again stepping outside the narrow confines of political orthodoxy.

Third, as the Court stated in *Iqbal,* "[w]here a complaint pleads facts that are

'merely consistent with' a defendant's liability, it 'stops short of the line between

possibility and plausibility of "entitlement to relief."' Even assuming (contrary to

fact) that the defendants' conduct as alleged in the complaint could somehow be

viewed as actionable, that conduct is also manifestly subject to being viewed as

activity protected by the First and Second Amendments.

Accordingly, the alleged conduct "stops short of the line between possibility

and plausibility" that it must reach under *Twombly* and *Iqbal*. The facts and

holding in *Twombly* are instructive: there, where the alleged Sherman Act

conspiracy could be viewed as actionable but also as nonactionable, the motion to

dismiss was granted.

Fourth, the Court in *Twombly* rejected the "just let the case go to discovery

and summary judgment"' rationale that the plaintiffs will undoubtedly invoke in

this case. The Court stated :

> It is no answer to say that a claim just shy of a plausible entitlement to relief an, if
> groundless, be weeded out early in the discovery process. through careful case
> management . . . given the common lament that the success of judicial supervision in
> checking discovery abuse has been on the modest side. *See, e.g.,* Easterbrook, *Discovery
> as Abuse,* 69 B. U. L. Rev. 635, 638 (1989) (Judges can do little about impositional
> discovery when parties control the legal claims to be presented and conduct the discovery
> themselves). And it is self-evident that the problem of discovery abuse cannot be solved
> by careful scrutiny of evidence at the summary judgment stage, much less lucid
> instructions to juries; the threat of discovery expense will push cost-conscious defendants
> to settle even anemic cases before reaching those proceedings. Probably, then, it is only
> by taking care to -require aUegations that reach the level suggesting conspiracy that we
> can hope to avoid the potentially enormous expense of discovery in cases with no
> reasonably founded hope that the [discovery] process will reveal relevant evidence to

support a 61 claim.

The plaintiffs in this case have enormous resources at their disposal. Several major law firms, likely working pro bono, with probably dozens of attorneys and deep pockets for depositions and other discovery expenses, are lined up to represent them. Spencer, by contrast, has searched for legal help, and has not been able to find a lawyer licensed in Virginia to take his case, despite the supposed but apparently illusory ethical obligation lawyers have to represent unpopular clients and to assure at least a semblance of a fair trial. Massive, expensive, drawn out, and invasive discovery will in itself be a huge *in theorem* victory for the plaintiffs, and probably the only realistic victory they hope to achieve, given the indigence of most of the defendants.

## 2. Language and Emotional Injury

Nowhere in the complaint is Richard Spencer accused of directly inflicting harm on anyone (e.g., assaulting a Plaintiff or directly calling for another to assault a Plaintiff). The complain includes many conclusory statements regarding how Spencer *desired* harm to be inflicted, or *planned* on harm being inflicted. But no plausible evidence is offered.

Most of the claims of damage—and all those directly related to Spencer— are emotional in nature: "emotional injury" (§12, p. 5), "emotional distress and

shock" (§15, p.6), "emotion trauma" (§18 p. 7), etc. Claims that Plaintiffs suffered

from "difficulty sleeping" and "chest pain" (§11, p.4) are the only borderline

physical ailments that could be plausibly associated with Spencer.

As discussed above, the Supreme has been clear in its special protection of

controversial speech—and this includes protection of "lawfare," that is, suits

designed to suppress speech or financially damage controversial figures.

Inspecting the Plaintiffs claims in detail reveals a *modus operandi*: They

quote controversial and contentious statements published by Spencer; they inject

sinister motivations; they then conclude that he is somehow responsible for

violence that took place at Charlottesville by other parties.

According to the Plaintiffs,

> Spencer organizes his followers to act in furtherance of his ideology, calling for an
> "ethnic cleansing." (§21, pp. 8-9)

Spencer has never demanded "ethnic cleansing," that is, direct assault, by

governments, individuals, or groups, in order to force a minority population from a

territory. He has never done this at Charlottesville or any other venue. He did,

however, discuss this controversial subject, at a 2013 conference, in a speech

entitled "Facing the Future As A Minority." (Obviously, his lecture was

completely unrelated to the Charlottesville event, which occurred some four years

later.) In this speech, Spencer delved into  the historical context of the First World

War and its aftermath:

> [L]iberals have a history of adopting "national determination" and even "ethno-
> nationalism" as their cause. In 1919, following the Great War, world's statesman met in
> Paris to, for lack of a better term, re-map the world after the dissolution of the defeated
> empires. New countries were invented (the Kingdom of Croats, Serbs, Slovenes), old
> ones were reborn (Poland), and ethnicities got their day in the Sun
> (Czechoslovakia). Related to this process was the Balfour Declaration and British
> mandate for a homeland for the Jews in Palestine. Nationalists of many different stripe
> had captured the hearts and minds of political actors.

> Today, in the public imagination, "ethnic-cleansing" has been associated with civil war
> and mass murder (understandably so). But this need not be the case. In 1919, we have a
> real example of successful ethnic redistribution—done by fiat, we should remember, but
> done peacefully.

Such language does not even approach a call to violence, and is patently

protected by the First Amendment of the Constitution.

Furthermore, Spencer's language regarding demographics and his reasons

for activism have been consistently *defensive* in nature, as revealed in the

Plaintiffs's own choice of quotations:

> At a lunch before the event, Spencer . . . explained: "What brings us together is that we
> are white, we are a people. We will not be replaced" (§52, p. 20).

The Plantiffs cite as evidence of Spencer's motivation to inflict harm an

essay Spencer wrote on the eve of the rally, entitled "The Charlottesville

Statement."

> "Judeo-Christian values" might be a quaint political slogan, but it is a distortion of the
> historical and metaphysical reality of both Jews and Europeans." […]

> Nations must secure their existence and uniqueness and promote their own development

13

and flourishing. . . . Racially or ethnically defined states are legitimate and necessary."
(§85, p. 29)

The plaintiffs might very well disagree with the argument in this citation;

they might even be offended by it or it might make them angry or sad. But such

emotions can form the basis of criminal or civil lawsuit.

The Plaintiffs' *modus operandi* continues in their discussion of Spencer's

activity on social media.

Spencer actively promoted the Unite the Right "rally" on Saturday to his numerous
followers on social media and encouraged and incited intimidation and violence based
racial, religious, and ethnic animosity.(§21, p.9)

As an example of "incitement of intimidation and violence," the Plaintiffs

state the following:

Spencer tweeted a picture of Commonwealth Restaurant, which had a sign in the window
reading: "If equality & diversity aren't for you then neither are we." (§141, 48-49)

The Plaintiffs' are apparently equating the sharing of information with an

instigation of violence. This is an insinuation lacks grounding—for the

Commonwealth Restaurant was never unlawfully attacked. According to the

Plaintiffs own reports, the restaurant received threatening letters, that is, speech

that is clearly protected by the First Amendment. If one were to accept the premise

that Spencer's retweeting of an image of flyer on restaurant was a "call to action, it

is speech that resembles public declarations that are part of a vibrant marketplace

of ideas: e.g., "Call your Congressman and tell him what you think about this new tax bill!" or "Cancel your Netflix subscription!"

Furthermore, the Plaintiffs factual claims of his activity social media can only be read as exculpatory.

> At 12:30 PM on August 12, Spencer tweeted, "My recommendation: Disperse. Get out of Charlottesville city limits. State of emergency has been called." (§260, p. 81)

This tweet occurred after the Governor of Virginia issued a State of Emergency and the activists were cleared out of Emancipation Park, the proposed site of the Unite The Right; it was issued *before* the chaotic violence took place in the center of Charlottesville.

In conclusion, the Plaintiffs—who are represented by law firms famed for legal success and deep pockets—have, no doubt, scoured the Internet, social media, and Spencer's numerous publications for calls for violence and encouragement to inflict harm; they found none.

## The Second Amendment, Weapons, and Antifa

Unfortunately, violence took place during the events of August 11 and 12. Small scuffles, without serious injuries, occurred at the Torchlight March on August 11. On the afternoon of Saturday, August 12, the City of Charlottesville descended into chaos: fisticuffs and battles with improvised weapons took place; a

woman, Heather Hyer, died, apparently as a result of Defendant James Fields's car crashing into protestors; and two police officers died in helicopter accident.

Moreover, firearms were presents. Weapons were brandished, by Unite The Right and counter-protestors alike, and one shot was reportedly fired by a Unite The Right participant. (That said, Governor Terry McAuliffe's claim that "80 percent of the people here had semi-automatic weapons" (§195, p. 63) can only be read as patently absurd.)

In the Commonwealth of Virginia, open carry of firearms for citizens over the age of 18 is permitted (Virginia Statutes §15.2-915.2, §18.2-287.4, and §18.2-282). Concealed-carry licenses are granted on a "shall issue" basis (Virginia statutes §18.2-308).

The Plaintiffs do not claim that Spencer or any other Defendant either carried or brandished weapons illegally or possessed illegal weapons, or encouraged others to do so (quite to the contrary).

The Plaintiffs' discussion of the use of weaponry is remarkably exculpatory of Spencer and the defendants.

> @everone Bring as much gear and weaponry as you can within the confines of the law. I'm serious. . . . This isn't just Anticom. Spencer, organizers, everyone are behind this. (108, p. 36)

Spencer followed Virginia and U.S. law and encourage others to do so. How

could Spencer be held accountable for outside actions when he explicitly demanded that laws be followed?

Moreover, the presence of firearms at the Unite The Right rally must be understood in its proper context. In the past Spencer has organized and participated in many conferences, rallies, and public gathering that were completely peaceful in nature. (Indeed, most were "suit-and-tie" affairs.) Violence and threats thereof have begun to appear—as well as resultant efforts at self-protection—at events controversial political events associated with Spencer due to the rise of so-called "Antifa."

The self-described "antifacists"—a loose network of devoted anarchists and communists—are known for their all-blacks attire, masks, and propensity to engage in violence and vandalism. Antifa take it upon themselves to attack almost anyone associated with the Right or conservatives; they are especially dedicated to attacks or silencing supporters of Donald Trump as well as the Alt-Right, a movement led by Spencer. The Unite The Right rally was thus destined to attack the ire of Antifa agitators. Since 2016, the FBI and Department of Homeland Security have warned local officials of antifa protests, and DHS has described their activities as "domestic terrorist violence." On June 12, 2017, shortly before the United The Right rally, the State of New Jersey formally labelled the group "domestic terrorists." Unite The Right participants could reasonably expect the

presence of Antifa and thus could be reasonably be expected to prepare to protect themselves from violence. Spencer committed no crime, nor was he seeking to unlawfully intimate anyone, by endorsing the recommendation that participants "[b]ring as much gear and weaponry as you can *within the confines of the law*." [Emphasis added]

Moreover, it is the responsibility of police forces of the City and Commonwealth to protect law-abiding citizens from dangerous groups such as Antifa, which desire to silence speech and expression.

An independent report by the law firm Hunton & Williams, which was commissioned by the City of Charlottesville, concluded that the police force was severely derelict in its duties. Joe Heim of the *Washington Post* summarizes the findings:

> The Charlottesville Police Department was ill-prepared, lacked proper training and devised a flawed plan for responding to the white supremacist rally that rocked the city in August, leading to "disastrous results," including the death of a counterprotester and many injuries, according to an independent review commissioned by the city. . . . (December 1, 2017)

Harsh and bold words, as well as scuffles, are simply a reality of political protests, which are, by their very nature, contentious and controversial. Free societies, not only in the United States but around the world, accept this as a cost of free assembly and maintaining a vibrant political culture, which are ends in themselves.

## The Torchlight March

The Plantiff's claim, "Spencer planned and led the violent torchlight rally at his alma mater on Friday evening (21, p. 9)." (This is factually untrue: Spencer was not an organizer of either the August 11 or 12 events; he was an invited as speaker and participant; but in this motion for dismissal, factual claims will not be disputed.)

The August 11 procession was based on an earlier event that Spencer co-organized on May 14, 2017 (which has come to be known as Charlottesville 1.0). Spencer organized another torchlight rally in Emancipation Park on October 7 (Charlottesville 3.0). At both of these events, no violence, or even major confrontations, occurred. In Spencer's words, "We came in peace."

Regardless, the Plantiff's description on the evening of August 11 is highly misleading:

> Hundreds of neo-Nazis and white supremacists, including Kessler and Spencer, charged toward a small group of fewer than 30 people, mostly students and community members, including Plaintiff John Doe and Jane Doe 1, who had locked arms around the statue of Thomas Jefferson. (§164, p. 54)

Much like Charlottesvilles 1.0 and 3.0, the Unite The Right torchlight procession was not announced publicly; indeed, participants were told to keep it secret, particularly from the most violent and dedicated counter-protestors, the antifa. Only a few dozen antifa learned about the profession and arrived to counter-

demonstrate. If the object of the procession were to generate violence, then one must ask: Why was it kept secret? Why was it not announced publicly, with special invitations to antifa and other counter-protestors? One can only logically conclude, contrary to the Plantiff's claims, that the goal of the torchlight procession was to hold a torchligh procession—that is, create a striking visual and mystical atmosphere.

Spencer was near the front of procession for most of the evening. As the grouping walked down the steps of the Rotunda to the statue of Thomas Jefferson, the designated endpoint, they encountered a small antifa/counter-protestor grouping at the base of the statue. The procession surrounded the statue, and, no doubt harsh words were shared between the Unite The Right attendees and the counter-protestors, and some scuffles took place. But again, the depiction by the Plaintiffs is tendentious and misleading:

> After the fact, one of the students tweeted: "They surrounded us at the statue / They wouldn't let us out"; Defendant Spencer retweeted this, adding "Fact check: true." (§166, p. 54)

But the antifa *were* able to get out. Indeed, shortly after the statue was reached and surrounded, the procession concluded, and participants dispersed. As Spencer observed at a press conference on August 14, since the Unite The Right participants outnumbered the Antifa on a scale of 10-to-1, if the participants had desired to engage in a brutal assault, they easily could have done so and inflicted

great damage. This simply did not happen.

The Plantiffs write,

> Defendants and their co-conspirators climbed to the top of the Thomas Jefferson statue and waved their torches high in the air, yelling, "Hail Spencer! Hail victory!" Spencer spoke briefly to the crowd, saying, "We own these streets! We occupy this ground!" He told the crowd that they were "risking their lives" for their future. (§175, p. 57)

"Owning" or "occupying" an area is hyperbole, a rhetorical flourish used by many activists. And, unquestionably, Unite The Right attendees were taking some risk to bodily harm by attending the gathering.

The suggestion that the defendants "conspired" to organize the few random scuffles that occurred—and to hold them accountable for matters outside their control—is  simply not supported by how events unfolded and the evidence cited by the Plaintiffs.

## Conclusion

The complaint in this case is a spurious, albeit well financed, act of lawfare that should shame any attorney who has a genuine respect for principles of free speech and assembly. Its aim is to intimidate and financially harm the defendants, and its authors care little if they damage the First Amendment in the process. The complaint should be dismissed immediately as to Spencer and all other defendants.

Spencer adopts and incorporates the motions to dismiss and supporting

memoranda filed by defendants League of the South, Michael Peinovich, and

Matthew Parrott.

Respectfully submitted,

**Richard Spencer**

*Pro Se*

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express™ shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP13F © U.S. Postal Service; July 2013; All rights reserved.

PRESS FIRMLY TO SEAL

SEAL

# PRIORITY MAIL EXPRESS™

PRIORITY MAIL EXPRESS™

**UNITED STATES POSTAL SERVICE** ®

PRIORITY ★ MAIL ★ EXPRESS™

U.S. POSTAGE PAID ALEXANDRIA, VA 22320 JAN 26, 18 AMOUNT $24.70 R2304E106374-09

EL 325451905 US

1007 22902

## CUSTOMER USE ONLY
**FROM:** (PLEASE PRINT) PHONE (571) 527-0027

Richard Spencer
1001 N King St.
Alexandria, VA 22314

**PAYMENT BY ACCOUNT** (if applicable)

USPS® Corporate Acct. No.     Federal Agency Acct. No. or Postal Service™ Acct. No.

**DELIVERY OPTIONS** (Customer Use Only)
☐ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.
Delivery Options
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
☐ 10:30 AM Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

**TO:** (PLEASE PRINT) PHONE (434) 296-9284

255 W. Main St.
Room 304
Charlottesville, VA
ZIP + 4® (U.S. ADDRESSES ONLY) 2 2 9 0 2 -

WRITE FIRMLY WITH BALL POINT PEN ON HARD SURFACE TO MAKE ALL COPIES LEGIBLE.

## ORIGIN (POSTAL SERVICE USE ONLY)

| PO ZIP Code | Day | ☐ 2-Day | ☐ Military | ☐ DPO |
|---|---|---|---|---|
| 22320 | 1-27-18 | | | |

Date Accepted (MM/DD/YY) 1-26-18
Scheduled Delivery Date (MM/DD/YY) 1-27-18
Postage $24.70

Time Accepted 425 ☐ AM ☐ PM
Scheduled Delivery Time ☐ 10:30 AM ☐ 3:00 PM
Insurance Fee $
COD Fee $

Weight lbs. 4.9 ☐ Flat Rate
10:30 AM Delivery Fee $ ☐ 12 NOON
Return Receipt Fee $
Live Animal Transportation Fee $

Acceptance Employee Initials [signature]
Sunday/Holiday Premium Fee $
Total Postage & Fees $24.70

## DELIVERY (POSTAL SERVICE USE ONLY)

Delivery Attempt (MM/DD/YY) Time ☐ AM ☐ PM     Employee Signature
Delivery Attempt (MM/DD/YY) Time ☐ AM ☐ PM     Employee Signature

LABEL 11-B, SEPTEMBER 2015     PSN 7690-02-000-9996     1-ORIGIN POST OFFICE COPY

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

• For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
• $100.00 insurance included.

FOR INTERNATIONAL DESTINATIONS, A CUSTOMS DECLARATION MAY BE REQUIRED.

OD: 12.5 x 9.5