CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED

JAN 31 2018

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

# UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA CHARLOTTESVILLE DIVISION

**ELIZABETH SINES, ET AL.,**                  Case No. 3:17-cv-00072-NKM

**Plaintiffs,**                                              | Hon. Norman K. Moon

| v. |

**JASON KESSLER, ET AL.,**

**Defendants.** |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS BY DEFENDANT MICHAEL PEINOVICH

Defendant Michael Peinovich, Pro Se, submits this memorandum in support of his motion to dismiss Plaintiffs' amended complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## FACTUAL ALLEGATIONS AS TO MICHAEL PEINOVICH

Though Plaintiffs, in a transparent lawfare tactic to try to intimidate, bankrupt, and silence defendant Peinovich and other defendants, have filed a 110 page amended complaint, the complaint contains no plausible allegations that Peinovich did anything unlawful or not fully protected by the First and Second Amendments to the United States Constitution. Here are the few, sparse, and conclusory allegations that even mention Peinovich:

Page 1 – Peinovich's name appears in the list of defendants.

Page 17, paragraph 42 – Peinovich's name appears in a paragraph describing who he is and where he is from.

Page 19, paragraph 50 – Peinovich's name appears in a list of people that attended the May 13, 2017 demonstrations in Charlottesville. This paragraph makes no allegations of illegal activity.

1

Page 20, paragraph 52 – Peinovich's name appears in a paragraph describing the May 13th event, also making no allegations of wrongful actions.

Page 24, paragraph 63 – Peinovich's name appears in a list of people that allegedly planned and coordinated supposedly "unlawful acts" in Charlottesville on Aug 12, 2017.

Page 33, paragraph 96 - This paragraph includes an out of context and heavily edited quote from an unnamed guest on Peinovich's podcast. The date, episode number and timestamp of the quote are not provided. Even if we take this quote at face value, it nonetheless represents First Amendment protected free speech and is not a credible cause of action, evidence of a conspiracy, or even necessarily related to this complaint or to Unite the Right in any way. It is simply something someone said on the internet.

Page 46, paragraph 129 - This paragraph alleges that Peinovich and another person announced a general legal fund and gave advice on getting transportation to the event. Here plaintiffs make an absurd insinuation that there is something illegal or harmful about completely normal activity.

Page 48, paragraph 141- This paragraph alleges that Peinovich made a threatening tweet to the business owners in Charlottesville. This is a deliberately obtuse misinterpretation. Peinovich intended this tweet to warn business owners in Charlottesville that they will likely not be spared violence and intimidation from Antifa thugs even if they "virtue signal" by putting signs declaring their support for communism or other left wing causes in their shop windows.

Page 61, paragraph 187 - This paragraph alleges that on Aug 12, 2017 Peinovich and others "executed" a supposed plan to carry out ethnic/religious based violence, yet again making an overly conclusory claim with no factual enhancement to lend it credibility.

2

Page 67, paragraph 207 - This paragraph alleges that Peinovich together with his security team took a van ride into Charlottesville and approached Lee Park on foot on the afternoon of Aug 12, 2017. Yet again, any claim of actual wrongdoing is entirely absent.

Page 73, paragraph 229 - This paragraph speaks of Peinovich being in McIntire park at 1:00pm August 12, 2017. It then talks about a violent incident that allegedly happened there that Peinovich neither witnessed nor ever heard about anywhere else.

Page 73, paragraph 230 - This paragraph alleges Peinovich gave a speech in McIntire park and called the counter-protesters savages. Here is a video of Peinovich's speech: https://www.youtube.com/watch?v=anevSVP-Ckl. As the video makes clear, although Peinovich was rightfully critical of the violence threatened and inflicted by the counter-protestors, his speech emphasized the importance of the pro-monument demonstrators peacefully exercising their First Amendment rights and expressing only positive messages about white Americans and not disparaging any other group of people.

Page 96, paragraph 310 - This paragraph alleges that in the aftermath of the demonstration Peinovich had several phone conversations with defendant Cantwell while Cantwell was held in the Albemarle county jail, and that these conversations were published to the internet. It also alleges that Peinovich assisted Cantwell in fundraising efforts for his legal case. Once again one scratches their head looking for an allegation of any activity that is not entirely legal and consistent with the normal behavior of online political personalities.

Page 99, paragraph 326 - This paragraph alleges Peinovich arranged for legal representation and transportation for people attending the rally in order to supposedly engage in "unlawful acts." The overly conclusory claim of "unlawful acts" is once again tacked on at the end in an offhand

3

and sloppy manner, as if the plaintiffs realized at the last minute that they had to at least try to make their complaint appear serious.

Page 99, paragraph 327 - This paragraph alleges Peinovich appeared on a promotional poster for the event. Again, one shrugs one's shoulders looking for any allegations of wrongdoing and wonders why plaintiffs would waste the Court's valuable time with such trivialities.

## REQUESTS FOR JUDICIAL NOTICE

Peinovich respectfully requests the Court to take judicial notice, as highly relevant background to this case, that Jason Kessler, one of the defendants on whom the plaintiffs' amended complaint primarily focuses, on August 11, 2017 sought and obtained an injunction from this Court (Judge Conrad) after the City of Charlottesville improperly and unconstitutionally denied Kessler a permit to conduct a pro monument demonstration.  See this link:  http://www.nbc29.com/story/36115819/judge-grants-injunction-jason-kessler-can-have-unite-the-right-rally-at-emancipation-park.  Thus, although the amended complaint attempts to portray the defendants as lawless, violence-prone fanatics, in reality the pro-monument demonstrators fully and painstakingly complied with the legal requirements for conducting the demonstration;  it was the City of Charlottesville that acted in violation of the law.  Moreover, the Antifa who formed such a large proportion of the counter-demonstrators have openly proclaimed and repeatedly shown their willingness to engage in violence to censor and destroy the free speech of those groups the Antifa regards as their political enemies. See, for example, this link, describing Antifa throwing smoke and projectiles at police in a recent demonstration:  http://fxn.ws/2vOaJ5p.   See also this link, which discloses that the New Jersey Office of Homeland Security and Preparedness has declared the Antifa an "anarchist

4

extremist" group repeatedly linked to violence: https://www.njhomelandsecurity.gov/
analysis/anarchist-extremists-antifa. And this link, in which Antifa openly declares its intent
to prevent the National Policy Institute from exercising its constitutional right to peacefully
assemble at the Ronald Reagan Building in Washington, D.C.: http://idavox.com/
index.php/2016/11/21/antifa-comes-for-national-policy-institute-in-
washington-dc/.

     Peinovich also respectfully requests judicial notice of a report prepared by Timothy J.
Heaphy, former United States Attorney, and his law firm of Hunton and Williams, who were
hired by the City of Charlottesville to prepare an official independent investigation of the
demonstration. See this link: http://www.charlottesville.org/home/showdocument?id=59615
According to this report, the Charlottesville police failed to respond when violence broke out at
the demonstration; instead of intervening, the police pulled back to a safe zone behind
barricades while protesters and counterprotesters fought in the streets. Further, the Charlottesville
police commanders did not give adequate training to officers. The report specifically accuses
Charlottesville Police Chief Alfred Thomas of trying to limit the scope of the investigation,
deleting text messages that were relevant and falsifying a document to make it look like the
department had adequately prepared for a mass disturbance.

## ARGUMENT

     One thing about the plaintiffs' complaint should be made crystal clear at the outset — this
complaint, and indeed this entire case, is nothing more than a threadbare pretext for trampling on
the First Amendment rights of the defendants and by extension the rights of all Americans. The
plaintiffs themselves do not take their claims seriously, they do not take the First Amendment

5

rights of Americans seriously, and they do not take the Court seriously. The plaintiffs see the Court as merely a vehicle for pushing their agenda of political censorship and personal destruction. Concepts of free speech, good faith, a marketplace of ideas and open public debate are foreign to them, and they wish to stamp out any political thought and speech that is outside the mainstream. The plaintiffs wish to intimidate, bankrupt and drive the defendants from the public square so they can no longer freely express their views. That is the purpose of this cynical and mendacious complaint, not to redress certain unspecified damages or fabricated violations of the plaintiffs' rights.

In plaintiffs' amended complaint they have not corrected the failure of their previous complaint to set forth any causes of action or credible allegations against defendant Peinovich that go beyond mere recitals of the elements of a cause of action. Plaintiffs' previous claim that defendant Peinovich took part in planning or directing "illegal acts" has all the merit of a mere claim that "so and so harmed me" without further, and required, factual enhancement. Under *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a plausible cause of action must do more than rely on conclusory references to "conspiracies" and "illegal acts." The plaintiffs seem to think their lack of plausible claims can be covered over with flowery language, name calling, and bloodcurdling, alarmist rhetoric. Both the original and the amended complaint consist essentially of disparaging and opinionated descriptions of political views and protest actions, that while perhaps offensive to the sensibilities of the plaintiffs are nonetheless entirely legal and well within the American tradition of free speech and political protest. If plaintiffs want to write an opinion piece about the political views of those who attended the Unite the Right rally, or even express their opinion of defendant Peinovich himself,

6

they are free to do so, but it is not clear why such opinions should concern the Court. In their attempt to give a false semblance of factual detail to their conclusory and implausible allegations, plaintiffs have merely listed factual allegations about defendants' actions that are entirely consistent with planning a legally permitted political rally and simple participation in an online forum.

In an effort to frame the actions of the defendants as an unlawful conspiracy, plaintiffs rely on transcripts of a Discord server (page 27, paragraph 76), various internet "meme" images shared by defendants and others (pages 37 and 38, among others), as well as propaganda images, logos, stickers, flyers and other free speech materials associated with some defendants and related organizations (page 33, paragraph 95). Defendant Peinovich was not an active participant in this Discord server, and only logged in to it once, and there are no credible claims in the amended complaint alleging otherwise. However, even had defendant Peinovich been an active participant in the server, this could not reasonably be framed as participation in an unlawful conspiracy. The plaintiffs' attempt to frame participation in a Discord planning server, the organization of transportation to the rally, requests for donations for transportation, and the setting up of a general legal fund as part of an unlawful conspiracy, when such acts are not only legal in themselves, but are also consistent with event planning, does not pass the test of what is required for a credible cause of action. The Unite the Right rally was legally permitted, so presumably planning, organization and transport to it are legal and participation in such activity cannot in itself be used as evidence of any unlawful conspiracy. While it is certainly possible to frame any action that involves two or more people working together as an evil conspiracy, one

7

would have to be extraordinarily dishonest and disrespectful of the intelligence of other people to attempt to do so.

The plaintiffs' attempt to frame idle chit chat, edgy jokes, memes and conversations about the possibility of violence from Antifa thugs as a coordinated plan to attack the residents of Charlottesville defies credibility and common sense. Edgy humor and memes are part of internet subculture, and while some may not understand them, and some may find them offensive, the sharing of such jokes and memes cannot credibly be seen as evidence of a conspiracy to commit violence. To interpret the sharing of potentially offensive memes on the internet as evidence of violent intent would have a chilling effect on free speech, and potentially tie up millions of Americans in frivolous legal actions like the one brought by plaintiffs here. Plaintiffs pretend not to recognize coarse humor, sarcasm, and satire and ask the Court to suspend its own ability to recognize such things.

Plaintiffs similarly ask us to suspend our ability to understand context and nuance when talking about the slogans and rhetoric associated with Unite the Right, and political protest generally. They take slogans such as "Fight until the last drop" as literal calls to violence, when such statements have long been used as calls to nonviolent political action. The language surrounding political activism is full of metaphors for violence and military action. A "campaign" is itself a military term, yet we do not literally think that in her campaign for President, Hillary Clinton was engaged in a military assault on all 50 states of the Union. Plaintiffs rely here on the hope that others will abandon common sense and accept their overly literal and totally dishonest framing of obvious political slogans that cannot reasonably be interpreted as direct calls for immediate violence. To lend any credibility to the plaintiffs'

8

preposterous interpretation of political slogans as calls to immediate violence would have a chilling effect on free speech. This should not surprise us considering that the suppression of free speech is one of the major goals of the plaintiffs in bringing this action in the first place.

The plaintiffs once again underscore their mendacity and lack of seriousness by including what are obviously joke memes taken from the internet as if they are serious threats of violence. This is insulting to everyone's intelligence. For example, an image of defendant Tim "Baked Alaska" Gionet (see page 38, top) that has clearly been altered to make it appear as if Gionet were holding a gun and pointing it at the viewer, was included in the amended complaint as if it were evidence of violent intentions. The image is clearly photoshopped, and is also clearly meant as a joke. While plaintiffs have no sense of humor themselves, it defies credibility that they are totally unable to even recognize a joke. To include such an image in a formal legal complaint demonstrates this amended complaint's lack of merit as well as plaintiffs' lack of respect for the Court.

Defendants' and others' discussions on Discord and other internet forums of their fears of violence from Antifa thugs, and discussions of how to engage in legal self defense from such violence, were not only legal, but entirely warranted considering recent history. As Tim Heaphy stated in his independent report, there were in fact left wing agitators engaging in violence that day, and the police failed to keep them separate from the legally permitted Unite the Right rally. Defendants Peinovich and Spencer, along with other defendants have been speakers and attendees at many other political events and rallies around the country, and none of those events have been marred by violence. Antifa is a group that openly states their intention to use violence to attack free speech, and has in the past started riots, broken windows, and lit fires in the street

9

in order to shut down speaking events. For example, conservative pundits Milo Yiannopolous and Ann Coulter have recently had events in Berkeley California shut down by these thugs. (see http://abc7chicago.com/news/protesters-shut-down-milo-yiannopoulos-appearance-at-berkeley/1732726/ and https://www.washingtonpost.com/news/grade-point/wp/2017/04/26/ann-coulter-speech-canceled-at-uc-berkeley-amid-fears-for-safety/?utm_term=.74dee762631d ) Given this history, any conversations about encountering and reacting to such violence are not only entirely warranted and legal but cannot reasonably be seen as evidence of a conspiracy to initiate violence.

Claims that Peinovich came to Charlottesville with the intention of harassing people based on religion, ethnicity or race are put to the lie by the only public statement made that day in Charlottesville by Peinovich in which he clearly states that his purpose was not to attack any other group, but to express love for white people and European descended peoples. A video of this speech can be seen here. https://www.youtube.com/watch?v=I4MmvRxfwWI. Other than vague claims of emotional distress that do not meet any legal standard for a cause of action, see *Snyder v. Phelps*, 562 U.S. 443 (2011), these damages remain unspecified.

Plaintiffs claim that Peinovich and others violated their right under the Thirteenth amendment and 42 U.S.C. § 1982 to be free of the "badges and incidents" of slavery (page 102, paragraph 342). The term "badges and incidents of slavery" has been the subject of a highly politicized legal debate over interpretation. Some have sought to use an overly broad definition of this phrase to limit free speech rights by proposing so called "hate speech" legislation, arguing that any speech that may be offensive to African Americans can be interpreted as a reminder of slavery. This argument is not in keeping with any rulings of the Supreme Court concerning so-

10

called "offensive" speech. It seems likely that the plaintiffs are here engaged in an underhanded attempt to legislate through the Courts by arguing that right wing speech, or "hate speech" as they call it, is a violation of the Thirteenth Amendment rights of African Americans and using the speech of those attending Unite the Right as an example. They hope to set a Court precedent that will limit not just the rights of the defendants, but of all Americans. The fact that plaintiffs would introduce such an argument into this complaint speaks to the overall nature of this case as an agenda driven political tool rather than an honest attempt to seek relief for wrongs done to them.

The phrase "badges and incidents of slavery" must be looked at in its historical context, otherwise bullies and tyrants will twist it to their advantage in order to attack free speech. Historically "badges" meant just that, badges that identified slaves. Peinovich certainly agrees that all people have a right to be free of such badges, and to claim that he literally attempted to attach such badges to residents of Charlottesville on Aug 12 is stretching things to an absolutely comical level. There are no allegations or reports of Peinovich or any other defendants attempting to put badges on people against their will. In terms of "incidents" this refers to any laws that were a part of the slave system itself, laws that came out of and enhanced the system of slavery, and were oppressive to slaves even after they were freed. A good example would be a law prohibiting property ownership for former slaves. Peinovich respects all persons' property rights, and to claim that he attempted to enact such legislation or engaged in acts that threatened the property rights of anyone on Aug 12th in Charlottesville is simply farcical. If plaintiffs have in mind a different interpretation of the phrase "badges and incidents" it is nowhere to be found in their complaint. Like many of plaintiffs' other claims and arguments, this one seems to be thrown in at the last minute in a rather hasty and thoughtless manner. The claim that anyone's

11

Thirteenth Amendment rights were violated shows not only the absurdity of the plaintiffs' claims, but the fact that this is a cynical case being used as a vehicle for a political agenda.

As if to remove any doubt about their duplicitous motives in bringing this spurious complaint, plaintiffs have issued a request for documents to the defendants (see Plaintiffs' First Set of Document Requests and Plaintiffs' First Set of Interrogatories) that includes all digital communications between defendants and their online friends and followers on all social media accounts and platforms stretching back to 2015. This absurdly broad request is far outside any reasonable scope of discovery, and underscores the fact that this complaint is nothing more than a political witchhunt in which plaintiffs seek to not only harass and intimidate the defendants, but to gain information about the friends, family and associates of the defendants with an intent to target them for future intimidation and harassment.

## ARGUMENT

Seven cases, five of them from the United States Supreme Court cases, demonstrate why this harassing, mendacious, and un-American amended complaint should be dismissed: *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Snyder v. Phelps*, 562 U.S. 443 (2011); *Terminiello v. City of Chicago*, 337 U.S. 934 (1949); *Brandenburg v. Ohio*, 395 U.S. 444 (1969); *Bible Believers, et al. v. Wayne County, Michigan*, 805 F.3d 228 (6th Cir. 2015) (en banc); and *Zurich American Insurance Co. v. Turbyfill*, 2010 WL 4065527 (W.D. Va. 2010)

The Court in *Iqbal* summarized the new pleading standard it had earlier adopted in *Twombly:*

> As the Court held in *Twombly*, 550 U. S. 544, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned,

the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555 . . . . A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U. S., at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.*, at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556. The plausibility standard . . . it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).

*Iqbal*, 556 U.S. at


And further:

 Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . . Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.*, at 556. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief."

*Iqbal*, 556 U.S. at

The *Twombly* and *Iqbal* cases and the standards they adopt have a direct application to the

plaintiffs' amended complaint in this case.

First, as to all the defendants, but particularly as to Peinovich, the amended complaint

contains nothing but conclusory statements, naked assertions, labels, and "the-defendant-

unlawfully-harmed-me accusations."

13

Second, the *Twombly* and *Iqbal* decisions emphasize that context and common sense are critical in evaluating the amended complaint's allegations. The obvious context in this case is the defendants' participation in classic First Amendment activity: marching, speeches in parks, carrying signs, expressing political protests. Plaintiffs complain that the defendants' activities were highly offensive, but the Supreme Court has often noted that it is precisely offensive speech that requires First Amendment protection. As the Supreme Court stated in *Snyder v. Phelps*:

> The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U. S. 254, 270 (1964). That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U. S. 64, 74–75 (1964). Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers,* 461 U. S. 138, 145 (1983) (internal quotation marks omitted).

> * * *

> Given that Westboro's speech was at a public place on a matter of public concern, that speech is entitled to "special protection" under the First Amendment. Such speech cannot be restricted simply because it is upsetting or arouses contempt. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U. S. 397, 414 (1989). Indeed, "the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 574 (1995).

> The jury here was instructed that it could hold Westboro liable for intentional infliction of emotional distress based on a finding that Westboro's picketing was "outrageous." "Outrageousness," however, is a highly malleable standard with "an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression." *Hustler*, 485 U. S., at 55 (internal quotation marks omitted). In a case such as this, a jury is "unlikely to be neutral with respect to the content of [the] speech," posing "a real danger of becoming an instrument for the suppression of . . . 'vehement, caustic, and sometimes unpleasan[t]'" expression. *Bose Corp.*, 466 U. S., at 510 (quoting *New York

14

*Times*, 376 U. S., at 270). Such a risk is unacceptable; "in public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate 'breathing space' to the freedoms protected by the First Amendment." *Boos v. Barry*, 485 U. S. 312, 322 (1988) (some internal quotation marks omitted). What Westboro said, in the whole context of how and where it chose to say it, is entitled to "special protection" under the First Amendment, and that protection cannot be overcome by a jury finding that the picketing was outrageous.

Plaintiffs' affront to First Amendment principles is all the more egregious given that they seek not only damages – no doubt huge damages – but "[i]njunctive relief enjoining Defendants from future violations of rights guaranteed by state and federal law," i.e., an injunction that will intimidate defendants from ever again stepping outside the narrow confines of political orthodoxy.

Third, as the Court stated in *Iqbal*, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" Even assuming, contrary to fact, that the defendants' conduct as alleged in the amended complaint could somehow be viewed as actionable, that conduct is also manifestly subject to being viewed as activity protected by the First and Second Amendments. Accordingly, the alleged conduct "stops short of the line between possibility and plausibility" that it must reach under *Twombly* and *Iqbal*. The facts and holding in *Twombly* are instructive: there, where the alleged Sherman Act conspiracy could be viewed as actionable but also as nonactionable, the motion to dismiss was granted.

Fourth, the Court in *Twombly* rejected the "just let the case go to discovery and summary judgment" rationale that the plaintiffs will undoubtedly invoke in this case. The Court stated:

15

It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management . . . given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side. *See, e.g.*, Easterbrook, *Discovery as Abuse*, 69 B. U. L. Rev. 635, 638 (1989) (Judges can do little about impositional discovery when parties control the legal claims to be presented and conduct the discovery themselves). And it is self-evident that the problem of discovery abuse cannot be solved by careful scrutiny of evidence at the summary judgment stage, much less lucid instructions to juries; the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings. Probably, then, it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the [discovery] process will reveal relevant evidence to support a ß1 claim.

The Supreme Court's decisions in *Terminiello* and *Brandenburg* exemplify our nation's profound commitment to robust free expression. In *Terminiello,* Terminiello spoke to an auditorium filled to capacity; outside, an angry and turbulent crowd of over a thousand gathered to protest the speech. Terminiello "condemned the conduct of the crowd outside and vigorously, if not viciously, criticized various political and racial groups." 337 U.S. at 2. Terminiello was convicted of breach of the peace. In an opinion written by Justice Douglas, the Supreme Court reversed the conviction, Justice Douglas stating:

> The right to speak freely and to promote diversity of ideas and programs is therefore one of the chief distinctions that sets us apart from totalitarian regimes.
>
> Accordingly a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, *Chaplinsky v. New Hampshire*, supra, 315 U.S. at pages 571-572, . . . is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. . . . There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups.

In *Brandenburg*, the Supreme Court reaffirmed our national commitment to vigorous free expression, even – indeed especially – of offensive and unpopular views. In that case, after a Ku Klux Klan leader made highly offensive statements at a rally, he was convicted under the Ohio Criminal Syndicalism Act of advocating violence and terrorism. Reversing the conviction, the Supreme Court stated (395 U.S. at 447):

> [The Supreme Court's] later decisions have fashioned the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.

While *Terminiello* and *Brandenburg* involved criminal charges, they nonetheless illustrate how free expression occupies the highest rung in our national hierarchy of values. To allow plaintiffs in cases such as the present one to subvert those values by claims of emotional distress from the content of classic First Amendment marching and protesting is essentially to give such persons a heckler's veto. As the Sixth Circuit recently underscored in its *Bible Believers* decision, "the First Amendment does not permit a heckler's veto":

> The First Amendment offers sweeping protection that allows all manner of speech to enter the marketplace of ideas. This protection applies to loathsome and unpopular speech with the same force as it does to speech that is celebrated and widely accepted. The protection would be unnecessary if it only served to safeguard the majority views. In fact, it is the minority view, including expressive behavior that is deemed distasteful and highly offensive to the vast majority of people, that most often needs protection under the First Amendment. . . . Accordingly, "[t]he right to free speech . . . includes the right to attempt to persuade others to change their views, and may not be curtailed simply because the speaker's message may be offensive to his audience." *Hill v. Colorado*, 530 U.S. 703, 716 (2000). Any other rule "would effectively empower a majority to silence dissidents simply as a matter of personal predilections," *Cohen v. California*, 403 U.S. 15, 21 (1971), and the government might be inclined to "regulate" offensive speech as "a convenient guise for banning the expression of unpopular views." *Id.* at 26. We tolerate the speech with which we disagree. When confronted by offensive, thoughtless, or

17

baseless speech that we believe to be untrue, the "answer is [always] more speech." *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1684 (2015) (Kennedy, J., dissenting).

* * * * *

The Supreme Court, in *Cantwell, Terminiello, Edwards, Cox, and Gregory*, has repeatedly affirmed the principle that "constitutional rights may not be denied simply because of hostility to their assertion or exercise." *Watson v. City of Memphis*, 373 U.S. 526, 535 (1963) (citations omitted). If the speaker's message does not fall into one of the recognized categories of unprotected speech, the message does not lose its protection under the First Amendment due to the lawless reaction of those who hear it. Simply stated, the First Amendment does not permit a heckler's veto.

Plaintiffs' primary tactic for avoiding American First Amendment doctrine is to allege "conspiracies." Their obvious aim is try to make at least one claim of wrongdoing stick against at least one person, and then destroy every other pro-monument person who attended the demonstration by linking them to the wrongdoer via conspiracy allegations. But as this Court made clear in *Zurich Insurance*, there can be no conspiracy to do an act that the law allows. *Id.* at *6. Moreover, mere parallel conduct does not support an inference of unlawful conspiracy. *Id.* Accordingly, as the pro-monument demonstrators had a First Amendment right to demonstrate – indeed, this Court had enjoined the City of Charlottesville to allow the demonstration – the mere fact that some of the defendants prepared to attend and did attend the demonstration together or in proximity to each other does not support an inference of an unlawful conspiracy.

The plaintiffs in this case have enormous resources on their side. Several major law firms, no doubt working pro bono, with probably dozens of attorneys and deep pockets for depositions and other discovery expenses, are lined up to represent them. Peinovich, by contrast, has not been able to find a single lawyer licensed in Virginia to take his case, despite the

18

supposed but apparently illusory ethical obligation lawyers have to represent unpopular clients and to assure at least a semblance of a fair trial. Massive, expensive, drawn out, and invasive discovery will in itself be a huge *in terrorem* victory for the plaintiffs, and probably the only realistic victory they hope to achieve, given the indigence of most of the defendants.

## CONCLUSION

The amended complaint in this case is a spurious, albeit well financed, act of lawfare that should shame any attorney who has a genuine respect for principles of free speech and assembly. Its aim is to intimidate and bankrupt the defendants, and its authors care little if they damage the First Amendment in the process. The complaint should be dismissed immediately as to Peinovich and all other defendants.

Peinovich adopts and incorporates the motions to dismiss and supporting memoranda filed by defendants League of the South and Michael Hill and by Matthew Parrott.

Respectfully submitted,

Michael Peinovich, Pro Se

19

## CERTIFICATE OF SERVICE

On this 26th day of January, 2017, I Michael Peinovich certify that I mailed copies of this memorandum in support and the accompanying motion to:

**Alan Levine**
Cooley LLP
1114 Avenue of the Americas, 46th Floor
New York, NY 10036

**Christopher Bradford Greene**
**Julie Eden Fink**
**Roberta Ann Kaplan**
**Seguin Layton Strohmeier**
Kaplan &amp; Company, LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118

**David E. Mills**
Cooley LLP
1299 Pennsylvania Avenue, NW,
Suite 700
Washington, DC 20004

**Joshua James Libling**
**Philip Matthew Bowman**
**Yotam Barkai**
Boies Schiller Flexner, LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022

**Karen Leah Dunn**
**William Anthony Isaacson**
Boies Schiller Flexner, LLP
1401 New York Avenue, NW
Washington, DC 20005

**Robert T. Cahill**

20

Cooley LLP
11951 Freedom Drive
Reston, VA 20190

**Elmer Woodard**
5700 US Hwy 29
Blairs, VA 24527

**Justin Saunders Gravatt**
Duane, Hauck, Davis & Gravatt, P.C.
100 West Franklin Street, Suite 100
Richmond, VA 23220

**Bryan Jeffrey Jones**
Bryan J. Jones, Attorney at law
106 W. South Street, Suite 211
Charlottesville, VA 22902

Michael Peinovich