AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Western District of Virginia

| | | |
|---|---|---|
| Sines et al | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 3:17-cv-00072-NKM |
| Kessler et al | ) | |
| *Defendant* | ) | |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Cloudflare Inc.,
101 Townsend St, San Francisco, CA 94107

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See Exhibit A- Cloudflare Subpoena

| Place: Boies Schiller Flexner LLP, 1999 Harrison Street, Suite 900, Oakland, CA 94612 | Date and Time: 03/15/2018 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 02/14/2018

*CLERK OF COURT*

OR

_____           _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Sines et al
_____, who issues or requests this subpoena, are:

Phillip Bowman, BSF LLP, 575 Lexington Ave, 7th Fl, NY, NY 10022, pbowman@bsfllp.com, (212) 446-2300

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
 **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
 **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
 **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

ELIZABETH SINES, SETH WISPELWEY, MARISSA BLAIR, TYLER MAGILL, APRIL MUNIZ, HANNAH PEARCE, MARCUS MARTIN, NATALIE ROMERO, CHELSEA ALVARADO, and JOHN DOE,

                    Plaintiffs,

v.

JASON KESSLER, RICHARD SPENCER, CHRISTOPHER CANTWELL, JAMES ALEX FIELDS, JR., VANGUARD AMERICA, ANDREW ANGLIN, MOONBASE HOLDINGS, LLC, ROBERT "AZZMADOR" RAY, NATHAN DAMIGO, ELLIOT KLINE a/k/a/ ELI MOSELY, IDENTITY EVROPA, MATTHEW HEIMBACH, MATTHEW PARROTT a/k/a DAVID MATTHEW PARROTT, TRADITIONALIST WORKER PARTY, MICHAEL HILL, MICHAEL TUBBS, LEAGUE OF THE SOUTH, JEFF SCHOEP, NATIONAL SOCIALIST MOVEMENT, NATIONALIST FRONT, AUGUSTUS SOL INVICTUS, FRATERNAL ORDER OF THE ALT-KNIGHTS, MICHAEL "ENOCH" PEINOVICH, LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN, and EAST COAST KNIGHTS OF THE KU KLUX KLAN a/k/a EAST COAST KNIGHTS OF THE TRUE INVISIBLE EMPIRE,

                    Defendants.

**Civil Action No.** 3:17-cv-00072-NKM

**JURY TRIAL DEMANDED**

## PLAINTIFFS' SUBPOENA FOR DOCUMENTS TO CLOUDFLARE, INC.

1

YOU ARE HEREBY COMMANDED, pursuant to Fed. R. Civ. P. 45, to produce the documents and things designated herein for inspection at the offices of Boies Schiller Flexner LLP, 1999 Harrison Street, Suite 900, Oakland, CA 94612, within 30 days of service, as provided under the Federal Rules of Civil Procedure.  This subpoena for documents, including each individual Request for Documents (collectively, the "Requests"), shall be read and interpreted in accordance with the definitions and instructions identified below.

## DEFINITIONS AND INSTRUCTIONS

Plaintiffs incorporate by reference all the instructions, definitions, and rules contained in the Federal Rules of Civil Procedure, and for purposes of this Subpoena, the following instructions and definitions shall apply:

1.      The singular of each word shall be construed to include its plural and vice-versa, and the root word and all derivations (*e.g.*, "ing," "ed") shall be construed to include each other. The words "and" as well as "or" shall be construed both conjunctively and disjunctively.

2.      The present tense shall be construed to include the past tense and vice-versa. Where it is necessary to bring within the scope of these Requests information that might otherwise be construed to be outside their scope, the use of a verb in any tense shall be recognized as the use of that verb in all other tenses.

3.       If the requested documents are maintained in a file, the file folder is included in the request for production of those documents.

4.      The word "any" shall be construed to include "all" and vice-versa.

5.      The term "concerning" means "relating to," "referring to," "describing," "evidencing," or "constituting."

6.     The terms "communication" and "communications" are defined to include any document, snail mail, email, phone call, text message, Facebook message, Facebook post, tweet on Twitter, direct message on Twitter, chat or message on any social media platform, and any other means used to convey information from one person to any other person or persons in any form.

7.     The term "snail mail" is defined as written communication delivered by the United States Postal Service, Federal Express, or United Parcel Service.

8.     The terms "document" and "documents" are defined to be synonymous in meaning and equal in scope to the usage of the term "documents" in Fed. R. Civ. P. 34(a)(1)(A). The terms "document" and "documents" are defined to include all writings of every kind and all electronically stored information ("ESI"), including but not limited to videos, photographs, sound recordings, images, charts, maps, records, memoranda, correspondence, handwritten or typewritten notes, calendars, diaries, telephone messages, data or data compilations, emails, attachments to emails, instant messages, PowerPoint presentations, spreadsheets, all other writings in hard copy or in electronic form, and all other material stored on computers, computer discs, CDs, DVDs, Blackberry or smartphone devices, tablets, personal digital assistants, USB "thumb" drives, electronic calendars, and telephone systems.

9.     A draft of a non-identical copy is considered a separate document.

10.     The terms "electronically stored information" and "ESI" are defined to be synonymous in meaning and equal in scope to the usage of "electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A).    "ESI" includes data on all servers, including IP addresses, MAC addresses, active data, archived data, deleted data, and legacy data, as well as data on removable

electronic media and in any other location where documents relevant to the Requests may be found.

11.     The terms "you" and "your" include the person(s) to whom these Requests are addressed, and all of that person's agents, representatives, and attorneys.

12.     The term "including" shall be construed as "including, but not limited to."

13.     You should construe negative terms to include the positive, and vice-versa.  For example, you should construe the word "preference" to mean "preference or lack of preference."

14.     The term "Defendants" refers to the following individuals and entities: Jason Kessler, Richard Spencer, Christopher Cantwell, James Alex Fields, Jr., Vanguard America, Andrew Anglin, Moonbase Holdings, LLC, Robert "Azzmador" Ray, Nathan Damigo, Elliot Kline a/k/a Eli Mosely, Identity Evropa, Matthew Heimbach, Matthew Parrott a/k/a David Matthew Parrott, Traditionalist Worker Party, Michael Hill, Michael Tubbs, League of the South, Jeff Schoep, National Socialist Movement, Nationalist Front, Augustus Sol Invictus, Fraternal Order of the Alt-Knights, Michael "Enoch" Peinovich, Loyal White Knights of the Ku Klux Klan, and East Coast Knights of the Ku Klux Klan a/k/a East Coast Knights of the True Invisible Empire.

15.     In producing documents, you are requested to produce the original of each document requested together with all non-identical copies and drafts of that document.  If the original of any document cannot be located, a copy shall be provided in lieu thereof, and shall be legible and bound or stapled in the same manner as the original.  In any circumstance in which an agreement is reached to allow the production of copies of documents rather than originals, you shall retain all of the original documents for inspection or copying throughout the pendency of this case, any appeal(s), and any related proceedings.

16.     Any alteration of a responsive document, including any marginal notes, handwritten notes, underlining, date stamps, received stamps, endorsed or filed stamps, drafts, revisions, modifications, and other versions of a document, is a responsive document in its own right and must be produced.

17.     Any reference to a person that is a business entity and is not otherwise defined includes that person's predecessors (including any pre-existing person that at any time became part of that entity after merger or acquisition), successors, parents, divisions, subsidiaries, affiliates, franchisors and franchisees; each other person, directly or indirectly owned or controlled by any of them; each partnership or joint venture to which any of them is a party; all present and former directors, officers, employees, agents, consultants, controlling shareholders (and any entity owned by any such controlling shareholder), and attorneys of any of them; and any other person acting for or on behalf of any of them.

18.     Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition, except where such words have a usual custom and usage definition in your trade or industry, in which case they shall be interpreted in accordance with such usual custom and usage definition of which you are aware.

19.     Pursuant to Rule 34(b) of the Federal Rules of Civil Procedure, documents shall be produced either (a) as they are kept in the usual course of business (in which case they shall be produced in such fashion as to identify the department, branch or office in whose possession it was located and, where applicable, the natural person in whose possession it was found or the server or central file in which it was found, and the address of each document's custodian(s)), or

(b) segregated as responsive to a specific Request enumerated in these Requests, with such specific Request identified.

20.     All documents shall be produced in the file folder, envelope, or other container in which the documents are kept or maintained.  If, for any reason, the container cannot be produced, produce copies of all labels or other identifying marks.

21.     Documents attached to each other should not be separated.

22.     If identical copies of a document are in the possession, custody or control of more than one natural person or other document custodian, a copy of that document shall be produced from each such natural person or other document custodian.

23.     In instances where two or more exact duplicates of any document exist, the most legible copy shall be produced.

24.     If you file a timely objection to any portion of a Request, definition, or instruction, provide a response to the remaining portion.

25.     If you are unable to produce a document that is responsive to a Request, so state and indicate whether the document ever existed or whether the document once existed but cannot be located.  If any responsive document once was, but is no longer, in your possession, custody or control, state the whereabouts of such document when last in your possession, custody or control, state the date and manner of its disposition and identify its last known custodian.  To the extent that any responsive document was lost or destroyed, produce any document that supports your assertion that the document was lost or destroyed, and provide the date when each such document was lost or destroyed.

26.     The time period to which these Requests refer is from January 1, 2017 to the present.  If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to any of the Requests.

27.     These Requests are continuing and require supplemental responses in accordance with the requirements of Federal Rule of Civil Procedure 26(e).

28.     The terms defined above and used in each of the Requests should be construed broadly to the fullest extent of their meaning in a good-faith effort to comply with the Federal Rules of Civil Procedure.

## **DOCUMENTS TO BE PRODUCED**

**Document Request No. 1**

All documents concerning the above-captioned litigation or any of the events described in the First Amended Complaint in the above-captioned litigation, including any communications by email or snail mail with any of the Defendants.

**Document Request No. 2**

All documents, communications and ESI concerning "dailystormer.com", "dailystormer.wang", or any other domain with "dailystormer" in its domain name that is managed by Andrew Anglin, Andrew Anglin, Moonbase Holdings, LLC, and affiliated individuals or entities, including:

a.      All contact information for such individuals or entities (including any other individuals affiliated with such entities), including such individuals or entities' names, email addresses, phone numbers, and mailing addresses; and

b.      All logs for "dailystormer.com", "dailystormer.wang", or any other domain with "dailystormer" in its domain name that is managed by Andrew Anglin, from

August 1 to 19, 2017, including information for each visitor, such as time, IP address, and MAC address.

**Document Request No. 3**

All documents, communications and ESI concerning "altright.com", or any other domain with "altright" in its domain name that is managed by Richard Spencer, including:

    a.    All contact information for such individuals or entities (including any other individuals affiliated with such entities), including such individuals or entities' names, email addresses, phone numbers, and mailing addresses; and

    b.    All logs for "altright.com" or any other domain with "altright" in its domain name that is managed by Richard Spencer, from August 1 to 19, 2017, including information for each visitor, such as time, IP address, and MAC address.

**Document Request No. 4**

All documents and communications concerning Richard Spencer, Daniel Friberg, Christoffer Dulny, Vincent Law, Andy Nowicki, and affiliated individuals or entities, including, all contact information for such individuals or entities (including any other individuals affiliated with such entities), including such individuals or entities' names, email addresses, phone numbers, and mailing addresses.

**Document Request No. 5**

All documents, communications and ESI concerning "therightstuff.biz", or any other domain that includes "therightstuff" in its domain name that is managed by Mike Peinovich, including:

    a.      All contact information for such individuals or entities (including any other individuals affiliated with such entities), including such individuals or entities' names, email addresses, phone numbers, and mailing addresses; and

    b.      All logs for "therightstuff.biz", or any other domain that includes "therightstuff" in its domain name that is managed by Mike Peinovich, from August 1 to 19, 2017, including information for each visitor, such as time, IP address, and MAC address.

**Document Request No. 6**

All documents and communications concerning Mike Peinovich, Sacco Vandal (formerly Scott C. Wurgler), John Ramondetta, and affiliated individuals or entities, including all contact information for such individuals or entities (including any other individuals affiliated with such entities), including such individuals or entities' names, email addresses, phone numbers, and mailing addresses.

Dated: February 14, 2018
       New York, New York

*/s/ Philip M. Bowman*
Philip M. Bowman
BOIES SCHILLER FLEXNER LLP
575 Lexington Ave.
New York, NY 10022
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: pbowman@bsfllp.com

*Counsel for Plaintiffs*

## Text of Federal Rule of Civil Procedure 45(d) and (e)

(d) PROTECTING A PERSON SUBJECT TO A SUBPOENA; ENFORCEMENT.

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv)    subjects a person to undue burden.

(B)    *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i)    disclosing a trade secret or other confidential research, development, or commercial information; or

(ii)    disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

(C)    *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i)    shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii)    ensures that the subpoenaed person will be reasonably compensated.

(e) DUTIES IN RESPONDING TO A SUBPOENA.

(1)    *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A)    *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B)    *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C)    *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D)    *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that

showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2)     *Claiming Privilege or Protection.*

(A)     *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i)     expressly make the claim; and

(ii)     describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B)     *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

# Exhibit B

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

| | |
|---|---|
| ELIZABETH SINES, SETH WISPELWEY, MARISSA BLAIR, TYLER MAGILL, APRIL MUNIZ, HANNAH PEARCE, MARCUS MARTIN, NATALIE ROMERO, CHELSEA ALVARADO, and JOHN DOE,<br><br>    Plaintiffs,<br><br>v.<br><br>JASON KESSLER, RICHARD SPENCER, CHRISTOPHER CANTWELL, JAMES ALEX FIELDS, JR., VANGUARD AMERICA, ANDREW ANGLIN, MOONBASE HOLDINGS, LLC, ROBERT "AZZMADOR" RAY, NATHAN DAMIGO, ELLIOT KLINE a/k/a/ ELI MOSLEY, IDENTITY EVROPA, MATTHEW HEIMBACH, MATTHEW PARROTT a/k/a DAVID MATTHEW PARROTT, TRADITIONALIST WORKER PARTY, MICHAEL HILL, MICHAEL TUBBS, LEAGUE OF THE SOUTH, JEFF SCHOEP, NATIONAL SOCIALIST MOVEMENT, NATIONALIST FRONT, AUGUSTUS SOL INVICTUS, FRATERNAL ORDER OF THE ALT-KNIGHTS, MICHAEL "ENOCH" PEINOVICH, LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN, and EAST COAST KNIGHTS OF THE KU KLUX KLAN a/k/a EAST COAST KNIGHTS OF THE TRUE INVISIBLE EMPIRE,<br><br>    Defendants. | Civil Action No. 3:17-cv-00072-NKM<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

Plaintiffs, by their undersigned attorneys, allege upon knowledge as to themselves and their own actions and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      Over the weekend of August 11 and 12, 2017, hundreds of neo-Nazis and white supremacists traveled from near and far to descend upon the college town of Charlottesville, Virginia, in order to terrorize its residents, commit acts of violence, and use the town as a backdrop to showcase for the media and the nation a neo-nationalist agenda.

2.      Plaintiffs in this action are University of Virginia undergraduates, law students and staff, persons of faith, ministers, parents, doctors, and businesspersons—white, brown, and black; Christian and Jewish; young and old.  While Plaintiffs come from different backgrounds, they share a deep love of this country, their city, and our values.  They also share a fierce determination to defend those values.  Each Plaintiff in this action was injured as a result of the events in Charlottesville on August 11 and 12.  One Plaintiff suffered a stroke.  Three plaintiffs were struck in a car attack.  Others suffered and continue to suffer deep and debilitating psychological and emotional distress that prevents them from resuming their former lives or from enjoying the basic sense of peace, safety, and tranquility that most in this country can take for granted.

3.      Defendants are the individuals and organizations that conspired to plan, promote, and carry out the violent events in Charlottesville.  They are neo-Nazis, Klansmen, white supremacists, and white nationalists.  They embrace and espouse racist, anti-Semitic, sexist, homophobic, and xenophobic ideologies.  Defendants brought with them to Charlottesville the imagery of the Holocaust, of slavery, of Jim Crow, and of fascism.  They also brought with them semi-automatic weapons, pistols, mace, rods, armor, shields, and torches.  They chanted "Jews will not replace us," "blood and soil," and "this is our town now."  Starting at least as early as the beginning of 2017 and continuing through today, they have joined together for the purpose of

2

inciting violence and instilling fear within the community of Charlottesville and beyond, wherever their messages are received.

4.      There is one thing about this case that should be made crystal-clear at the outset— *the violence in Charlottesville was no accident*.  Under the pretext of a "rally," which they termed "Unite the Right," Defendants spent months carefully coordinating their efforts, on the internet and in person.  They exhorted each other:  "If you want to defend the South and Western civilization from the Jew and his dark-skinned allies, be at Charlottesville on 12 August," and, "Next stop:  Charlottesville, VA.  Final stop:  Auschwitz."  In countless posts on their own websites and on social media, Defendants and their co-conspirators promised that there would be violence in Charlottesville, and violence there was.  As Defendant Eli Mosley, one of the lead organizers for the rally, declared:  "We are [] going to Charlottesville.  Our birthright will be ashes & they'll have to pry it from our cold hands if they want it.  They will not replace us without a fight."

5.      The violence, suffering, and emotional distress that occurred in Charlottesville was a direct, intended, and foreseeable result of Defendants' unlawful conspiracy.  It was all according to plan—a plan they spent months working out and whose implementation they actively oversaw as events unfolded on the ground.

6.      The events of August 11 and 12—now commonly referred to simply as "Charlottesville"—were part of Defendants' coordinated campaign to intimidate, harass, incite, and cause violence to people based on their race, religion, ethnicity, and sexual orientation in violation not only of the values that thousands of American soldiers have died for, but also numerous state and federal laws.  As the Utah Senator Orrin Hatch said:  "We should call evil by

3

its name.  My brother didn't give his life fighting Hitler for Nazi ideas to go unchallenged here at home."

7.      By this lawsuit, Plaintiffs seek to challenge Defendants' actions under the laws of the United States of America and the Commonwealth of Virginia.  Plaintiffs seek compensatory and injunctive relief.  The aim of this lawsuit is to ensure that nothing like this will happen again at the hands of Defendants—not on the streets of Charlottesville, Virginia, and not anywhere else in the United States of America.

## JURISDICTION AND VENUE

8.      The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

9.      Venue is properly in the Western District of Virginia pursuant to 28 U.S.C. § 1391(b) because Plaintiffs' claims arose in Charlottesville, Virginia, which is located in the Western District of Virginia.

## THE PARTIES

**A.      Plaintiffs**

10.      Plaintiff Tyler Magill is a resident of the Commonwealth of Virginia and an employee at the library of the University of Virginia ("UVA").  He lives in Charlottesville with his wife and child.  On August 11 and 12, Magill participated in non-violent protests of Defendants' planned events.  Following the events of the weekend, Magill collapsed at his place of work and suffered a trauma-induced stroke.  Magill spent two days in the hospital and may never fully recover from the resulting brain injuries.  Magill has not been able to return to his job at the UVA library.

11.      Plaintiff Reverend Seth Wispelwey was born and raised in Charlottesville and attended UVA.  He moved back to Charlottesville four years ago with his wife and daughter.

4

Wispelwey has worked at numerous non-profit organizations that advocate for human rights, including as the head of an organization protecting victims of human trafficking.  Wispelwey is an ordained Minister with the United Church of Christ and the Directing Minister of Restoration Village Arts.  He is also the co-founder of a membership organization for clergy of different faiths from across the country, called Congregate, which organized numerous trainings in non-violent protest for residents of Charlottesville leading up to the events of August 11 and 12.  As a result of Defendants' intentional and coordinated plans to commit violence against those who stood up for minority residents in Charlottesville, Wispelwey was harassed, intimidated, and assaulted by Defendants and their co-conspirators.  Since the events of the weekend, Wispelwey has suffered extreme emotional distress that has manifested in physical symptoms including constricted chest pain, difficulty sleeping (including nightmares concerning the events of August 11 and 12), and the inability to return full-time to work.

12.     Plaintiff April Muñiz is a Mexican-American resident of the Commonwealth of Virginia.  Before the events of August 12, she was the Director of Clinical Operations at a company that helps develop new treatments for patients suffering from incurable diseases.  On August 12, Muñiz peacefully protested Defendants' planned event.  As a result of Defendants' intentional and coordinated plans to commit violence against minority residents, Muñiz was intimidated and harassed on multiple occasions on August 12.  Among other things, Muñiz was close to being hit by the car that Defendant Fields intentionally drove into a crowd of protestors in an act of domestic terrorism.  Muñiz has suffered severe emotional injury, has been diagnosed with acute stress disorder and trauma, and was unable to return to work for months.  She has suffered economic loss as a result of her injuries.

5

13.     Plaintiff John Doe is an African-American resident of the Commonwealth of Virginia and a student at UVA.  On August 11, John Doe peacefully protested Defendants' planned event.  On the basis of his race, John Doe was intimidated, harassed, assaulted, and sprayed with caustic substances.

14.     Plaintiff Hannah Pearce is a dermatologist who lives in Charlottesville with her husband and four children.  Pearce and her family are active members of Congregation Beth Israel.  On August 12, Pearce and her son peacefully protested Defendants' planned event.  On the basis of her religion, Pearce was threatened, harassed, intimidated, and physically assaulted. Subsequently, a few days after the Unite the Right "rally," Defendants Andrew Anglin and Moonbase Holdings, LLC's website, Daily Stormer, intending to intimidate Pearce and her son, posted their picture online.

15.     Plaintiff Elizabeth Sines, a resident of the Commonwealth of Virginia, is a second-year law student at UVA Law School, and a graduate of Cornell University.  On August 11 and 12, Sines peacefully protested Defendants' planned events.  As a result of witnessing the events of the weekend, including the domestic terrorist attack on August 12 where Defendant Fields drove a car into a crowd, Sines has suffered from severe emotional distress and shock.

16.     Plaintiff Marissa Blair is a multi-racial resident of the Commonwealth of Virginia. She works as a paralegal.  On August 12, Blair was peacefully protesting when Defendant Fields drove his car into a crowd of protestors, killing Blair's co-worker and friend, Heather Heyer. Fields's car narrowly missed Blair only because her fiancé, Plaintiff Marcus Martin, pushed her out of the way before being hit himself.  Blair suffered physical injuries and continues to suffer from severe emotional distress as a result of Defendants' actions.

6

17.     Plaintiff Marcus Martin is an African-American resident of the Commonwealth of Virginia.  He works as a landscaper.  On August 12, Martin was peacefully protesting the Unite the Right "rally."  He was struck by Defendant Fields, who drove his car into a crowd of protestors in an act of domestic terrorism.  Martin pushed his fiancée out of the way of the speeding car, but he was severely injured by the attack, including sustaining a broken leg and ankle that required surgery.  He continues to suffer severe emotional distress as a result of Defendants' actions.

18.     Plaintiff Natalie Romero is a Colombian-American undergraduate at UVA.  On August 11, Romero was one of a group of community members and students who were surrounded by torch-bearing neo-Nazis and white supremacists at the Rotunda.  On August 12, Romero peacefully protested Defendants' planned event.  Romero was on Fourth Street when Defendant Fields intentionally drove a car into the crowd of protestors in an act of domestic terrorism.  Romero was struck by the vehicle driven by Fields and sustained many injuries.  The car knocked her unconscious, fracturing her skull and leaving her with a concussion.  The car also fractured the root of one tooth and left severe contusions across her body.  Romero continues to suffer vertigo and debilitating headaches.  It is unclear when Romero's symptoms will subside.  In addition to her physical injuries, Romero also suffered severe emotional distress as a result of the planned event and terrorist attack on August 12, and has feared returning to the UVA campus.  As a result of her physical and emotional trauma, Romero has already missed a semester of school.

19.     Plaintiff Chelsea Alvarado is a resident of Richmond, Virginia.  She works as a crisis counselor for the homeless and mentally ill.  On August 12, Alvarado peacefully protested Defendants' planned event.  She was struck by Defendant Fields when he drove his car down

7

Fourth Street into a crowd of protestors.  She narrowly missed being hit again by Fields when he

drove his car backwards up the street.  The car knocked Alvarado to the ground, causing her to

suffer serious injuries, including a concussion and severe contusions on her legs.  Alvarado

continues to experience side-effects of the concussion including confusion, forgetfulness, and

difficulty processing normal conversations.  Alvarado has also suffered severe emotional distress

as a result of the August 12 events.

**B.**     **Defendants**

20.     Defendant Jason Kessler is a white nationalist and a member of the Proud Boys.

A resident of Charlottesville, Virginia, Kessler uses the handle "MadDimension" on Discord and

@The_MadDimension on Twitter.  Together with Defendant Mosley, Kessler led the organizing

efforts for the Unite the Right "rally" in Charlottesville.  Kessler is also the president and

founder of Unity and Security for America, a grassroots organization that claims it is dedicated

to "defending Western civilization" and is a contributor to websites like VDare.com, a

xenophobic, nativist publication, and the Daily Caller, a conservative news outlet.  Kessler was

the lead organizer for the Unite the Right "rally" and was one of the names featured on a

promotional poster for the "rally."  In January 2017, Kessler attacked a man in downtown

Charlottesville while collecting signatures for his petition to remove the African-American vice

mayor, Wes Bellamy, from the Charlottesville City Council.  In April, Kessler pleaded guilty to

a misdemeanor charge for the assault and was then charged with felony perjury for lying to the

police in connection with the assault.

21.     Defendant Richard Spencer, a resident of the Commonwealth of Virginia who

attended UVA, is the head of the white nationalist "think tank," National Policy Institute.  In

2010, Spencer created an online publication called altright.com.  Spencer organizes his followers

8

to act in furtherance of his ideology, calling for an "ethnic cleansing." Spencer planned and led the violent torchlight rally at his alma mater on Friday evening. Spencer actively promoted the Unite the Right "rally" on Saturday to his numerous followers on social media and encouraged and incited intimidation and violence based on racial, religious, and ethnic animosity.

22.     Defendant Christopher Cantwell is a resident of New Hampshire and is a white nationalist and a self-proclaimed fascist. He hosts "Radical Agenda," a podcast and YouTube show streamed live multiple times a week, and runs the website christophercantwell.com. Cantwell has stated that once he "realized that [Jewish people] were responsible for the communism," he decided, "let's fucking gas the kikes and have a race war." He has written: "I think chemical and biological weapons can do a great deal of good for mankind. Releasing nerve gas or some kind of lethal virus into a left wing protest could prepare the bodies for physical removal without making a big scene for the cameras or destroying anything of value." In connection with the Unite the Right "rally" in Charlottesville on August 11 and 12, Cantwell was charged with two felony counts of illegal use of tear gas and one felony count of malicious body injury by means of a caustic substance. He was indicted on December 4 on a felony charge of illegal use of tear gas.

23.     Defendant James Alex Fields, Jr., a resident of Ohio, is a member of Defendant Vanguard America. Motivated by racial, religious, and ethnic animosity, and in furtherance of Defendants' conspiracy, on August 12, Fields committed an act of domestic terrorism by driving a Dodge Challenger into a crowd of protesters, injuring dozens and killing a 32-year old woman, Heather Heyer. On December 18, he was indicted on one count of first degree murder, three counts of malicious wounding, three counts of aggravated malicious wounding, two counts of felonious assault, and one count of hit and run (leaving the scene of an accident).

9

24.     Defendant Vanguard America is an unincorporated association pursuant to Virginia Code § 8.01-15.  Members of Vanguard America voluntarily join for the common purpose of promoting white nationalism and believe that people with "white blood" have a special bond with "American soil."  It was formed in California in 2015 and is comprised of twelve chapters across the country.  The group's website states that to join the group, a person must be "of at least 80% white/European heritage."  Defendant Fields is a member of Defendant Vanguard America; he wore their uniform and carried a Vanguard America shield at the Unite the Right event on August 12.

25.     Defendant Andrew Anglin is a resident of Ohio, a neo-Nazi, and the founder of Daily Stormer—an organization that operates through a website that Anglin publishes.  Daily Stormer has called its website the "world's most genocidal" website.  Daily Stormer was named after Der Stürmer, a Nazi propaganda tabloid known for virulently anti-Semitic caricatures and published by Julius Streicher, who was later convicted of crimes against humanity at Nuremberg. Until recently, Daily Stormer had a website at www.dailystormer.com.  Anglin and his associates at Daily Stormer, including Defendant Robert "Azzmador" Ray, use Daily Stormer "as a hardcore front for the conversion of masses into a pro-white, Anti-Semitic ideology," to "sell [] global white supremacy," and to "make a racist army."  The website, which became the most visited hate site on the Internet in 2016, includes sections entitled "Jewish Problem" and "Race War."  The Chief Technical Officer of Daily Stormer has posited that Daily Stormer "has been effective at what [it is] doing" by "the manifestation of our people on the ground in the real world."  Followers of Anglin and Daily Stormer, who call themselves "Stormers," communicate on the website's forum, which is moderated by Anglin and accessible only with a special "dark web" tor browser.  On Anglin's orders and under his continuing supervision, Stormers have

10

formed local chapters, called "Stormer Book Clubs," as part of Anglin's plan to "build an invisible empire."  Anglin uses the Daily Stormer forum to actively monitor the Book Clubs and uses the website to issue orders on how to organize.  "Official Operations" of Stormer Book Clubs include firearms training, organizing for protests, and being ready to respond to "challenges" issued by Anglin.  Daily Stormer established "meet ups" and chat rooms that co-conspirators and attendees used throughout the August 11 and 12 weekend to coordinate their violence.  The Daily Stormer released its own poster promoting the "rally" that read, "UNITE THE RIGHT/ Join Azzmador and the Daily Stormer to end Jewish influence in America," accompanied by a Nazi-like figure wielding a hammer, ready to smash a Jewish star.  For months before the Unite the Right events on August 11 and 12, Anglin organized his followers to attend and prepared them to commit racially motivated violent acts in Charlottesville.  Although Anglin did not attend the rally himself because he is currently in hiding to evade service in connection with a separate lawsuit relating to events in Whitefish, Montana, Anglin orchestrated the movements of Daily Stormer followers and incited them to violence on a live feed that streamed contemporaneously with the events as they occurred on August 11 and 12 in Charlottesville. Moreover, Anglin uses the Daily Stormer to entice his followers to harass and intimidate "Jew/feminist/etc." individuals by mandating in its "style guide" that the authors always include the targeted individuals' social media accounts because "[w]e've gotten press attention before when I didn't even call for someone to be trolled but just linked them and people went and did it."

26.     Defendant Moonbase Holdings, LLC is an Ohio, for-profit, limited-liability corporation registered by Defendant Anglin that operates the Daily Stormer's website. Defendant Anglin has encouraged readers to financially support the Daily Stormer by sending

11

donations using bitcoin, checks, and credit cards, noting that "it won't say 'Daily Stormer' on your credit card bill, but will instead say 'Moonbase Holdings,' which either sounds like a hobby shop or a multi-level marketing scheme run by reptoids.  Anyway, it looks innocuous on your statement."

27.     Defendant Robert "Azzmador" Ray, a resident of Texas, is a neo-Nazi and a writer for Daily Stormer's website.  He has held himself out as a representative of Daily Stormer, and served as an agent of Daily Stormer in organizing the Unite the Right events.  He is the leader of the "Dallas Fort Worth Stormer Book Club," which is one of many local Daily Stormer groups across the country.  In his articles published on Daily Stormer's website, Ray encouraged extremists to attend the events in Charlottesville on August 11 and 12 and incited them to violence.  Ray attended the "rally" himself and had a planning meeting with certain other Defendants in Charlottesville on August 11.

28.     Defendant Nathan Damigo, a resident of California, is a white nationalist and the founder of a white supremacist organization, Defendant Identity Evropa.  Defendant Damigo was arrested on April 15, 2017 for assaulting a woman at the "Battle for Berkeley" rally, which Damigo described as a test run for the "rallies" in Charlottesville.  Defendant Spencer has stated that Damigo and his group, Identity Evropa, took the lead in organizing white supremacist participation among people from outside Charlottesville in connection with the events on August 11 and 12.

29.     Defendant Eli Mosley, who is a resident of Pennsylvania, is a white supremacist and was the leader of Identity Evropa from August to November 2017.  He is also a co-founder with Defendant Richard Spencer of Operation Homeland, a new organization that aims to take white nationalist activism "to the next level."  He has described himself as the "command soldier

12

major of the 'alt-right'" and as the organizer of the Unite the Right "rally."  On certain social

media networks, Mosley has used the handles @NotEliMosley and @ThatEliMosley.  Mosley

was one of the key figures who planned and led the events of August 11 and 12.

30.     Defendant Identity Evropa is an unincorporated association pursuant to Virginia

Code § 8.01-15.  Members of Identity Evropa voluntarily joined for the common purpose of

promoting a "white American identity."  It was founded in March 2016 by Defendant Damigo,

and on August 27, 2017, Defendant Mosley succeeded him as "chief executive officer."  The

group is currently led by Patrick Casey, Identity Evropa's former Chief of Staff.  The group

adopted and popularized the white supremacist slogan, "You will not replace us" that Defendants

and co-conspirators chanted as they marched on August 11 and 12.

31.     Defendant Matthew Heimbach, a resident of Indiana, is the chairman of

Defendant Traditionalist Worker Party ("TWP").  In 2013, Heimbach and Defendant Matthew

Parrott founded the neo-Nazi Traditionalist Youth Network, a white nationalist group that

promotes a racist interpretation of Christianity.  Alongside Defendant Jeff Schoep, the leader of

National Socialist Movement ("NSM"), Heimbach co-chairs the Nationalist Front, an umbrella

organization of approximately twenty white supremacist organizations, including racist skinhead

crews, Klan groups, and neo-Nazi groups.  He has said, "Of course we look up to men like Adolf

Hitler . . . as inspirations for what we can achieve."  Heimbach organized and led marchers from

TWP on August 12.

32.     Defendant Matthew Parrott, a resident of Indiana, is the co-founder of the

Traditionalist Youth Network along with his stepson-in-law, Defendant Heimbach.  He is

currently the Chief Information Officer and Director of Defendant TWP.  On August 12, Parrott

refused to leave Emancipation Park after a state of emergency was declared and was arrested by

13

the police for failing to disperse.  Parrott wrote an account of his experiences at the Unite the

Right "rally," in "Catcher in the Reich: My Account of my Experiences in Charlottesville."  In it,

he wrote that Defendants TWP, League of the South, NSM, and other Nationalist Front groups

joined together to "help create two shield walls" for "the fight."

  33.  Defendant Traditionalist Worker Party ("TWP") is an unincorporated association

pursuant to Virginia Code § 8.01-15, and a national political party committee registered with the

Federal Election Commission since 2015.  Members of TWP voluntarily joined for the common

purpose of promoting anti-Semitism.  According to Defendant Heimbach, the TWP has three

dozen active chapters and an estimated 500 members across the country.  The TWP was created

by Defendants Heimbach and Parrott.  The TWP has said:  "Trust nobody who fails to name the

Jew, who fails to explicitly and consistently oppose the Jew, and who preaches cleverness or

nuance on the JQ [Jewish Question]."  Members of the TWP prompted, attended, and fully

participated in the events in Charlottesville on August 11 and 12, including by engaging in

violence.

  34.  Defendant Michael Hill, a resident of Alabama, is the co-founder and President of

Defendant League of the South, a white nationalist organization.  In 2014, Hill and the League of

the South announced the formation of an armed, paramilitary unit dubbed "the Indomitables,"

tasked with advancing southern secession by any means necessary.  In May 2015, Hill published

an article in which he asserted:  "We Southern nationalists do not want a race war (or any sort of

war).  But if one is forced on us, we'll participate. . . .  Southern whites are geared up and armed

to the teeth. . . .  So if negroes think a "race war" in modern America would be to their

advantage, they had better prepare themselves for a very rude awakening."  Hill, whose name

was featured on a promotional poster for the "rally," encouraged League of the South followers

14

to attend by urging them not to "miss out on the fun" in dealing with counter-protestors—their purported enemies.  On August 12, League of the South, led by Hill, marched through Charlottesville after Vanguard America.  Like Vanguard America, they marched with coordinated shields and flags and carried rods and other weapons.

35.     Defendant Michael Tubbs, a resident of Florida, is the "Chief of Staff" of Defendant League of the South.  Tubbs is captured on a video from August 12 ordering League of the South to attack by yelling "charge!"  After receiving this command, the group streamed past him to attack counter-protestors.  Defendant Hill later boasted that "Mr. Tubbs was everywhere the chaos was."  Tubbs previously served a four-year prison sentence for planning to bomb Jewish- and black-owned businesses in Florida.

36.     Defendant League of the South, a privately held company located in Alabama, is a white supremacist group that advocates Southern secession.  Prior to the events on August 11 and 12, Defendant Hill posted in the League's Facebook group that he wanted "no fewer than 150 League warriors, dressed and ready for action, in Charlottesville, Virginia, on 12 August." Numerous members of the League of the South participated in Saturday's violent events together with co-defendants.

37.     Defendant Jeff Schoep, a resident of Michigan, is the leader of Defendant National Socialist Movement, the largest neo-Nazi coalition in the United States.  On April 22, 2016, Schoep formed the Aryan Nationalist Alliance, later renamed the Nationalist Front, which is the umbrella organization for hate groups such as the TWP, the Aryan Terror Brigade, and many regional factions of the Ku Klux Klan.  Schoep has said that if he could meet Adolf Hitler today, he would say, "Thank you for your sacrifice, and I hope we have honored you in some small way by carrying on the fight."  Schoep participated actively in the events of August 11 and

15

12 and tweeted afterwards that, "It was an Honor to stand with U all in C'Ville this weekend. NSM, NF, TWP, LOS, VA, ECK, CHS, and the rest, true warriors!"[1]

38.     Defendant National Socialist Movement ("NSM") is an unincorporated association pursuant to Virginia Code § 8.01-15.  Members of NSM voluntarily joined for the common purpose of promoting a "greater America" that would deny citizenship to Jews, non-whites, and LGBT persons.  Located in Michigan, NSM is paramilitary in structure; its members claim to be lieutenants, sergeants, or other military ranks.  Defendant Schoep, the head of NSM, has served as its "Commander" since 1994.  Chapters of the groups are termed "units."  NSM maintains a business through NSM88 Records LLC selling neo-Nazi flags, swastikas, gear, etc. Members of NSM participated in the violence that took place in Charlottesville on August 11 and 12.

39.     Defendant Nationalist Front is an unincorporated association pursuant to Virginia Code § 8.01-15, whose members voluntarily joined for the common purpose of promoting white nationalism and white supremacy.  Formerly known as the Aryan National Alliance, Nationalist Front is an umbrella organization consisting of white supremacist and white nationalist groups, including neo-Nazi and Klan groups.  The Nationalist Front is led by Defendants Schoep, Heimbach, Hopper, and Hill.  The Nationalist Front was conceived to be "the thread that would unite white supremacist and white nationalist circles."  Various members of the Nationalist Front engaged in acts of violence and intimidated residents of Charlottesville on August 11 and 12.

40.     Defendant Augustus Sol Invictus, formerly Austin Mitchell Gillespie, a resident of Florida, is a white nationalist, a white supremacist, and a member of Defendant Fraternal

---

[1] This tweet refers to Defendants Nationalist Front, TWP, League of the South, Vanguard America, and East Coast Knights.

16

Order of Alt-Knights ("FOAK"), the "military wing" of the Proud Boys, a group described as a "'pro-Western fraternal organization' for men who 'refuse to apologize for creating the modern world.'"  He has said that a violent, second Civil War is necessary in order to preserve "Western civilization."  On August 14, 2017, Invictus announced his candidacy as a Republican for the 2018 Senate election in Florida.  Invictus, whose name was featured on a promotional poster for the "rally," drafted the "Charlottesville statement" along with Spencer and others, and participated in the torchlit rally on August 11 with co-Defendants.

41.    Defendant Fraternal Order of the Alt-Knights ("FOAK") is an unincorporated association pursuant to Virginia Code § 8.01-15 and is self-described as the "tactical defensive arm" of Proud Boys, formed to focus on "street activism, preparation, defense, and confrontation."  Defendant Invictus is second in command at FOAK and FOAK attended the "rally" in part to provide security to him.

42.    Defendant Michael "Enoch" Peinovich, a resident of New York, is the founder of the blog and website The Right Stuff and a co-host of the Daily Shoah podcast.  On social media, Peinovich has at various times used the handles @NotMikeEnoch and @mikeenochsback.  Peinovich frequently appears at events alongside Defendant Spencer.  Peinovich was featured on a promotional poster for the "rally."  On August 12, in the immediate aftermath of the car attack, Spencer and Peinovich spoke to their followers at McIntire Park.

43.    Defendant Loyal White Knights of the Ku Klux Klan ("Loyal White Knights") is an unincorporated association pursuant to Virginia Code § 8.01-15.  Members of Loyal White Knights voluntarily joined for the common purpose of promoting white nationalism and white supremacy.  Based in Pelham, North Carolina, the association only accepts "native-born white American Citizen[s]" as members.  Following the events in Charlottesville on August 11 and 12,

17

the Loyal White Knights changed their outgoing voicemail message to say: "Nothing makes us more proud at the KKK than when we see white patriots such as James Fields, Jr., age 20, taking his car and running over nine communist anti-fascist, killing one nigger-lover named Heather Heyer.  James Fields hail victory.  It's men like you that have made the great white race strong and will be strong again."

44.     Defendant East Coast Knights of the Ku Klux Klan a/k/a East Coast Knights of the True Invisible Empire ("East Coast Knights") is an unincorporated association pursuant to Virginia Code § 8.01-15.  Members of East Coast Knights voluntarily join for the common purpose of promoting white nationalism and white supremacy.  It is active in several states, and has a subdivision or "klavern" in the state of Maryland.  Tom Larson is the imperial wizard of the East Coast Knights of the True Invisible Empire.  The East Coast Knights, using the handles @tightrope33_6 and @Tightrope336, frequently tweets racist images and comments; on September 19, 2017, it tweeted pictures of burning crosses, labeled an image of lynched black men as "Alabama wind chimes," and tweeted a cartoon of a Klansman using two black men hung from trees as a hammock in which to read the newspaper and drink an iced tea.  The East Coast Knights was a key participant in the July 8 Klan rally, and conspired with the Nationalist Front and other Defendants to organize and participate in the violent events of August 12.

## FACTS

45.     Defendants are white supremacist, white nationalist, and neo-Nazi organizations and individuals, who have as part of their mission to engage in racial, religious, and ethnically motivated violence, threats, intimidation, and harassment.  The events in Charlottesville are part of Defendants' recent concerted efforts to move from the shadows of anonymous, disassociated,

online chatrooms and into a more open, organized, physical presence in our parks and on our streets.  Defendants are co-conspirators with each other and others unnamed.

**I.   Defendants And Unnamed Co-Conspirators Conspired To Commit Acts Of Violence, Intimidation, And Harassment Against The Citizens Of Charlottesville, Virginia**

**A.   <u>Defendants Targeted Charlottesville in the Months Prior to August 11 and 12 ("the Summer of Hate")</u>**

> When the Jews took over our society and turned it into a kiked-out living hell, they marked their achievement by declaring a "Summer of Love." . . . They took everything away from us.  That age is ending now.  We are taking back our birthright.  This summer, a Black Sun will pass over America. . . .  I am declaring the summer of 2017 the Summer of Hate.

> *Defendant Andrew Anglin*

46.    In furtherance of their above-stated goal, Defendants plotted to target Charlottesville, Virginia as part of what they called the "Summer of Hate."

47.    Defendants selected Charlottesville because, among other things, the city was engulfed at the time in a debate over the statue of General Robert E. Lee in a small city park.  In February 2017, the Charlottesville City Council voted to remove the Lee statue and, in June 2017, it voted to rename the park in which it stood from Lee Park to Emancipation Park.

48.    Defendants used the planned removal of the Lee statue as a rallying cry for their followers, seeking to preserve its place in the park, and use the debate about the statue as a means to stir up violence and harass, threaten, and intimidate the residents of Charlottesville.

49.    For example, Defendants Kessler and Spencer invited white supremacist groups to visit and hold events around the statue with the intent of intimidating nonwhite and Jewish individuals and their allies.

50.    On May 13, 2017, hundreds of neo-Nazis and white supremacists carried lit torches and surrounded the statue of Robert E. Lee, in an event organized and planned by, among

19

others, Defendants Kessler, Spencer, Damigo, Peinovich, Heimbach, Identity Evropa, Vanguard America, TWP, and League of the South.  Defendants and participants carried altright.com-branded signs[2] reading "we will not be replaced."  They chanted "you will not replace us" and "blood and soil."  "Blood and soil" is a translation of "Blut und Boden," a German nationalist philosophy that lay at the heart of Nazi policies.  The slogan expresses the idealization of a racially defined national body ("blood") unified with a settlement area ("soil").  It is inextricably linked with the contemporary German idea of *Lebensraum*—the belief that the German people needed to reclaim historically German areas of Eastern Europe into which they could expand—which was the driving ideology behind Hitler's invasion of neighboring countries and the mass murder of their citizens.

51.     The May 13 event was planned and intended to intimidate, threaten, and harass Charlottesville residents on the basis of race, religion, and ethnicity.  Defendant Kessler said he hoped that the May event would be a "fantastic first event" in a "cultural 'civil war.'"  Defendants' avowed goal was to promote and create an atmosphere of religious and racial subordination on the streets of Charlottesville, ideally through the infliction of violence or emotional distress.

52.     At a lunch before the event, Defendant Spencer—sharing a podium with Defendants Damigo, Peinovich, and Kessler, as well as co-conspirator Sam Dickson—explained: "What brings us together is that we are white, we are a people.  We will not be replaced."

53.     Defendants later acknowledged the success of their careful, deliberate, and months-long planning.  The Daily Stormer's website reported that "[t]he 200+ honorable whites

---

[2] Altright.com is Defendant Spencer's website.

marched to the base of the statue as they carried torches reminiscent of the 3rd Reich." In an essay about the May 13 event, entitled "Why We Fight," Vanguard America explained:

> "The purpose of the gathering was not simply over some metal sculpture atop a pedestal in a small Southern City. It was about defending the images of white history, white heroes, and white America. . . .
>
> [T]he greatest spectacle of the event came as we lit our torches for the night march. As we approached Lee Park for the last time, our footsteps shook the whole city. . . . This movement must begin as a spiritual movement. . . . To quote a wise /pol/lak, "If you want to gas the Jews, you must first gas the Jew within yourself."
>
> After a few words from Spencer and Dickson, we blew out our torches, our spiritual cups filled for perhaps the first time in all of our lives and once again shouted our deafening chants, shaking the entire city with our might.
>
> There will be many more of these events. This march on Charlottesville was just the beginning of the inevitable Revolution of our people.
>
> Hail Victory!

54. This May event would later be referred to by conspirators as "Charlottesville 1.0."

55. Capitalizing on the perceived success of the May event, and motivated by the same desire to achieve racial and religious subordination of city residents, Defendants began planning for additional events in Charlottesville. On May 30, Kessler submitted an application for a permit to hold the Unite the Right "rally" on the weekend of August 11 and 12.

56. In June, Defendant Kessler invited Defendants and others to come to Charlottesville for a "Proud Boys" event, which was designed to promote violence and

intimidate minority residents in advance of the Unite the Right "rally."[3]  As one of the Proud

Boys in attendance noted, the group wanted to bait protestors because "a lot of us kinda like to

see them bleed."  Another Proud Boy reminded others:  "This of course is just the beginning.

There are also bigger [ ] events planned for . . . Charlottesville on August 12."

     57.     On July 8, 2017, a third white supremacist event was held in Charlottesville, this

time by Defendant Loyal White Knights.  Nearly fifty Klansmen marched through the streets

shouting "white power," and carrying signs that read:  "Jews are Satan's children."  Some wore

white Klan robes, and many carried guns.

     58.     Plaintiff Romero peacefully protested at the July 8, 2017 Klan march.  Following

July 8, Romero received the first of four harassing phone calls from a member of the Klan.  In

the first call, the man explained that as a member of the Klan, he loved going to Charlottesville

to demonstrate the organization's power, and asked Romero if she understood that white people

are the superior race.  As described in paragraphs 274 and 275 below, the later calls, which

occurred after Romero was seriously injured by Fields's act of domestic terror on August 12,

were more threatening.

     59.     Kessler attended and live-streamed the Klan march on Twitter.  He shared a tweet

with his followers:  "#UniteTheRight against these shitlibs in Charlottesville on August 12th is

going to be so much fun.  You've got a month to be there."

---

[3] As part of the weekend, Kessler was beaten in an alley in Charlottesville by Proud Boys members until he could name five breakfast cereals. This "cereal beat-in" is the "second degree" of initiation into the Proud Boys. The first degree is a declaration of allegiance to the Proud Boys. The second degree is the cereal beat-in and a renouncement of masturbation (although Proud Boys "Pope" Dante Nero has framed the rule as requiring that a man should only ejaculate within a yard of a woman).  The third degree involves getting a tattoo and the fourth degree requires a "major fight for the cause," meaning you "kick the crap out of antifa" and possibly get arrested.

**B.**     **Defendants Planned and Coordinated a Scheme to Incite Violence, Threaten, Intimidate, and Harass Charlottesville Residents on August 11 and 12**

> The age of ultraviolence is coming.  I don't know when, but I know that most of you will live to see it.
>
> There is rapidly approaching a time when in every white Western city, corpses will be stacked in the streets as high as men can stack them.
>
> And you are either going to be stacking or getting stacked . . .
>
> There will be leaders.  You need to be prepared to recognize them for who they are, and you need to be prepared to do whatever they tell you to do, exactly as they tell you to do it . . .
>
> *Defendant Andrew Anglin*

60.     Defendants and their co-conspirators conspired to incite violence and to threaten, intimidate, and harass the civilian population of Charlottesville, and in particular, racial, ethnic or religious minorities, and to commit other unlawful acts as described herein.  For weeks, Defendants acted on the basis of racial, religious, and/or ethnic animus, and with the intention to deny Jewish people and people of color, as well as people advocating for the rights of Jewish people and people of color, equal protection and other rights that they are guaranteed under state and federal law.  Defendants' conspiracy ultimately achieved its stated goals and did in fact repeatedly, systematically, and unmistakably violate the rights of religious and racial minorities in Charlottesville.

61.     The application for the Unite the Right permit submitted by Defendant Kessler claimed that the event would be a protest of the removal of the Lee monument, but Defendants also intended that the rally would instill fear in Charlottesville's minority population and cause violence.  They wanted to use the events of the weekend to intimidate the broader civilian population and recruit more followers to Defendants' groups.

23

62.     An article by Defendants Anglin and Ray published on the Daily Stormer's website on August 8 explained that the purpose of the "rally" had shifted from being "in support of the Lee Monument, which the Jew Mayor and his Negroid Deputy have marked for destruction" to "something much bigger than that . . . .  It is now an historic rally, which will serve as a rallying point and battle cry for the rising Alt-Right movement."

63.     Defendants Kessler, Spencer, Anglin, Ray, Cantwell, Mosley, Damigo, Invictus, Peinovich, Heimbach, Parrott, Hill, Tubbs, Fields, and Schoep, on behalf of themselves and the groups to which they belong, and Defendants Identity Evropa, FOAK, Vanguard America, TWP, League of the South, NSM, Nationalist Front, Loyal White Knights, and East Coast Knights, along with Daily Stormer (Defendant Moonbase Holdings), through their leadership and members, all agreed and coordinated with and among each other to plan, organize, promote, and commit the unlawful acts that injured Plaintiffs and countless others in Charlottesville.  They also coordinated with numerous named and unnamed co-conspirators.

64.     Defendant Spencer and co-conspirator Evan McLaren, a member of Defendant Identity Evropa, met in person at the Trump Hotel in Washington, D.C. to organize and direct the "rally" in Charlottesville, with the purpose and result of committing acts of violence, intimidation, and harassment against the citizens of Charlottesville.

65.     Defendants Cantwell and Kessler met in Charlottesville on August 9 to plan and direct the unlawful acts of violence, intimidation, and denial of equal protection of law.

66.     Defendants Ray, Cantwell, and Mosley and co-conspirator David Duke attended another in-person meeting on August 11 to plan and direct the unlawful acts of violence, intimidation, and the denial of equal protection of law.

24

67.     Defendants Nationalist Front, NSM, TWP, League of the South, Vanguard America, East Coast Knights, and "other allies," coordinated their attendance as a "joint operation" in advance of August 12 to plan, direct, and prepare for unlawful acts of violence, intimidation, harassment, and denial of equal protection to Charlottesville citizens.

68.     Defendants also frequently coordinated the illegal acts planned for the Unite the Right event online.  They made use of websites, social media (including Twitter, Facebook, 4chan, and 8chan), chat rooms, radio, videos, and podcasts to communicate with each other and with their co-conspirators, followers and other attendees and did so to plan the intended acts of violence, intimidation, and the denial to citizens of the equal protection of laws.

69.     For years, Defendants and others unnamed have used the Internet to, in Defendant Anglin's terms, "solidify a stable and self-sustaining counter-culture."  Use of the Internet is part of the ways, manner, and means of how Defendants' conspiracy operated and operates.

70.     Defendants and co-conspirators coordinated by posting articles on their own websites, and by using social media to send and share messages for the "rally" and to encourage attendance and the commission of illegal acts.  They interviewed one another about the plans for the "rally," and shared those messages on podcasts or other video-streaming services.  They agreed to mobilize their respective members and followers to attend and be violent and suppress the equal rights of Charlottesville citizens.  According to Spencer, for example:  "Damigo and his group [Identity Evropa] took the lead to organize white supremacist participation among people from outside Charlottesville."

71.     One Internet tool Defendants used extensively to plan and direct illegal acts was the chat platform Discord.  Originally developed as a messaging platform for group "game play," Discord is set up as a series of private, invite-only servers, each providing a space for real-time

25

group discussion.  Each server is organized into "channels," indicated by a "#" before the name.
Participants in the chat use "handles" or nicknames to identify themselves.  Participants can
request to be "tagged" as a member of a group.   Once tagged, the participants can read and
participate in that group's chats.

72.    A "Charlottesville 2.0" server was established on Discord in June 2017.  This
server was used to direct and plan unlawful acts of violence, intimidation, and denial of equal
protection of law at the Unite the Right "rally."  One user explained that Discord was "for
closed, top super secret communications intended for the elite inner circle of the alt-right."[4]
Defendants used Discord as a tool to promote, coordinate, and organize the Unite the Right
"rally," and as a means to communicate and coordinate violent and illegal activities "in secret"
during the actual events of that weekend.

73.    Discord was moderated, reviewed, directed, and managed by Defendants Kessler
and Mosley, along with their co-conspirators.  As moderators of the group, they were able to
view all of the posts, invite or reject participants, and delete messages they did not condone.  The
group was "invite only" and not open to the public.

74.    Individual Defendants, including Heimbach, Parrott, Cantwell, and Ray, were all
participants on Discord, and participated in the direction, planning, and inciting of unlawful and
violent acts through Discord.

75.    These Defendants and their co-conspirators used Discord for regular "leadership"
meetings through which they shared information and plans.  Defendants also used Discord to
distribute what they called "Orders" to co-conspirators and attendees.  One document posted by

---

[4] Another user explained, "unless Jason or Eli made this server public without telling me. . .  this isn't a public
server. It's invite only through our trusted, pre-vetted alt-right servers. Not sure who told you it's public."

26

Defendant Mosley was entitled "General Orders" for "Operation Unite the Right Charlottesville

2.0."

76.     There were at least 43 channels set up on Discord as a means of sharing specific

information.  Those channels included:

| | | |
|---|---|---|
| #announcements | #news | #ma_ct_ri |
| #dixie-lyrics | #safety_planning | #vt_nh_me |
| #mod_help | #alex_jones_chat | #great_lakes_region |
| #confirmed_participants | #pictures_and_video | #midwest_region |
| #shuttle_service_information | #beltway_bigots | #ky_tn |
| #code_of_conduct | #voice_chat | #tx_ok |
| #self_promotion | #friday-night | #florida |
| #flags_banners_signs | #sunday-night | #georgia |
| #promotion_and_cyberstrike | #chants- | #carolinas |
| #gear_and_attire | #virginia_laws | #california_pacific_nw |
| #antifa_watch | #lodging | #carpool_available |
| #demonstration_tactics | #lodging_wanted | #ny_nj |
| #sponsors_only | #lodging_available | #pennsylvania |
| #i_need_a_sponsor | #carpool_wanted | #dc_va_md |

77.     They also had a channel called #questions_for_coordinators, where participants

could ask questions of the organizers, and a channel for the "leadership," reserved for

conversations among the main organizers of the event about "planning" and "infrastructure," as a

leader of Defendant Vanguard America later described it.  With the permission of a moderator,

individuals could be "tagged" as members of certain organizations.  Defendants Vanguard

America, Identity Evropa, TWP, and League of the South, as well as Daily Stormer (Moonbase

Holdings) and its "book club" chapters, all had "private organization channel[s]" on the

Charlottesville 2.0 Discord server that allowed their tagged members to participate in private

group communications in advance of the "rally."

78.     Defendants enlisted other co-conspirators to coordinate and organize the "rally,"

through Discord and other means.  For example, one individual, using the Discord handle

"Tyrone" (hereinafter Tyrone), agreed with Defendant Kessler that he would coordinate

27

transportation for attendees on August 12.  Others were tasked with helping Defendants Kessler

and Mosley moderate the Discord server.  Another individual, using the Discord handle

"Caerulus Rex," was the coordinator between various "security details" that were established by

Defendants and their co-conspirators.  "Caerulus Rex" has also been identified as a frequent

bodyguard of Defendant Spencer.

79.    Promotional materials, often promoting and inciting violence, were added to

Discord in order to be shared and utilized more broadly.

80.    Defendants also used Discord to coordinate how they would communicate on

other social media.  For example, they told followers to use #UniteTheRight and #Charlottesville

on Twitter, so that they and their followers could closely communicate during the weekend of the

"rally."  They shared that hashtag through Discord.

81.    Additional Discord servers were used by Defendants and co-conspirators to

spread the word about the events in Charlottesville and to encourage followers to show up and be

prepared for violence.[5]  For example, Defendant Vanguard America has at least one Discord

server, called Southern Front, which was established for members of the group living in southern

states.  Vanguard America leaders, who were active on the Charlottesville 2.0 Discord server,

used the Southern Front server to coordinate attendance of additional Vanguard members and to

provide channels of communication between Vanguard members and the main organizers of the

Charlottesville event.

82.    Certain co-conspirators in a self-styled "anti-Antifa" group, called

"Anticom,"which purports to provide defensive violence at white supremacist events like the

---

[5] In this First Amended Complaint, references to "Discord" are to the Charlottesville 2.0 Discord server, except where otherwise indicated.

28

"Battle for Berkeley," organized in their own Discord server.  The leader of Anticom was active on the Charlottesville 2.0 server, and then used the Anticom server to tell followers to attend the event and bring weapons, pursuant to the directives of the "rally" organizers.

83.     Although certain posts on the Charlottesville 2.0, Southern Front, and Anticom Discord servers have been made public, numerous other Discord servers and channels were used along with the aforementioned servers to plan and coordinate attendance and violent acts at the events of August 11 and 12.  These additional servers and channels have not yet been made public.  Likewise, the #leadership channel on the Charlottesville 2.0 server remains undisclosed.[6]

84.     Defendants Anglin and Ray likewise established "meet ups" and chat rooms through the Daily Stormer's website that co-conspirators and attendees were told to use throughout the weekend to coordinate their actions.

85.     A "Charlottesville Statement" was distributed by Defendant Spencer, setting out the philosophy and ideology underlying the "rally."  He was aided in drafting his manifesto by Defendant Invictus, co-conspirator McLaren, and others.  Among other things, the Charlottesville Statement holds that "'Judeo-Christian values' might be a quaint political slogan, but it is a distortion of the historical and metaphysical reality of both Jews and Europeans" and that "Nations must secure their existence and uniqueness and promote their own development and flourishing. . . . Racially or ethnically defined states are legitimate and necessary."

**C.     Defendants Promoted Attendance, Violence, and Imagery Designed to Threaten, Intimidate and Harass**

[T]his will clearly be an earth-shaking day that will go
down in the history books . . . our time has come.

---

[6] One co-conspirator, an organizer of the Unite the Right event and leader of Defendant Vanguard America, who was active on the Southern Front and Charlottesville 2.0 Discord servers, posted in the Southern Front server in response to reports that certain Discord conversations had been made public:  "We have been aware of that. The chat logs were released to unicorn riot. They have months of conversations. It was the general chat not the leadership though so they got very little in the way of planning or infrastructure."

29

> August 12, 2017 is going to be a shot heard around the world . . . .  There will be before Charlottesville 2.0, and there will be after Charlottesville 2.0.  there is no way to exaggerate the significance of this.  We can make all the noise on the internet that we want, and this is great, but our real power will come only from numbers in the streets. . . .
>
> [T]hanks to the magnitude of this event, I truly believe— more than I ever did before—that we will eventually win this struggle and secure the existence of our people and future for white children.  It is our destiny.  **Next stop: Charlottesville, VA.  Final stop:  Auschwitz**.  See ya there, faggots.

*Daily Stormer*

86.    Defendant Anglin, through Daily Stormer, told followers:  "We are angry . . . There is a [sic] atavistic rage in us, deep in us, that is ready to boil over.  *There is a craving to return to an age of violence.  We want a war*."  He advised followers that "the hardcore message is what sells" and told them to "[b]e ready to die for [the fight]."

87.    On Defendant Spencer's website, altright.com, one article on the upcoming August "rally" explained:  "Our ideas dominate the internet . . .  Now it's time to dominate the streets. . . . You might think it's just a rally, but really, it's so much more . . . .  We are telling the anti-White establishment and it's [sic] attack dogs that we are not going to give another inch . . . And now we have come to the tipping point."

88.    Defendant Ray declared:  "We are stepping off the Internet in a big way. . . .  We have been organizing on the Internet.  And so now they are coming out.  We have greatly outnumbered the anti-white, anti-American filth.  At some point we will have enough power that we will clear them from the streets forever . . . you ain't seen nothing yet."[7]  In an interview

---

[7] Vice released a 22-minute documentary following Defendants throughout the day. The video can be found at https://news.vice.com/story/vice-news-tonight-full-episode-charlottesville-race-and-terror.

during the torchlight rally, Defendant Ray also stated that Defendants' goal was to "stop" the "usurp[ation]" of "our country" "by a foreign tribe called the Jews."

89.     Defendant Mosley tweeted:  "We are [] going to Charlottesville.  This is our country and it is our right that me and thousands fought for already . . .  Our birthright will be ashes & they'll have to pry it from our cold dead hands if they want it.  They will not replace us without a fight."

90.     One promotional image created by Defendant TWP and distributed on Discord stated:  "This is not an attack on your heritage this is an attack on your racial existence.  FIGHT BACK OR DIE."

91.     The Daily Stormer released its own poster, which was later shared by Defendant Vanguard America:

31



92.     Using Daily Stormer's website, Defendants Anglin and Ray commanded the

Daily Stormer community to attend ("You must make it there!").  They told their members:

"[w]e need to do everything we can to get as many people to attend this rally as possible. . . .

There is a rising nationalist movement in America and it is not going away.  Having thousands of

nationalists come out for this rally will put the fear of god into the hearts and minds of our

enemies."  A writer on Spencer's website, altright.com, enthused that Daily Stormer was "going

to bring a lot of young new cadres to the rally," including Identity Evropa.

93.     Anglin also urged his followers:  "We are now taking these [Stormer Book Clubs]

to the next level . . . We are going to have challenges (which will include getting you in fit and

32

fighting shape and learning useful masculine skills) . . . .  We are going to build an invisible empire.  This has all been worked out in my mind a long time ago, and this summer, the Summer of the Black Sun, is when we are going to bring it all together."  On Defendant Vanguard America's Southern Front Discord server, Defendant Ray told Vanguard members in July 2017, "You don't think the [Daily Stormer Book Clubs] have anything to do with books do you? . . . Think boots, not books."

94.    Defendant Hill encouraged followers of Defendant League of the South to attend by urging them not to "miss out of the fun" in dealing with their purported enemies.  Defendant East Coast Knights exhorted individuals to attend:  "We will be there!  Join us!"

95.    Another co-conspirator on Discord posted an image of a raised fist holding a dagger by its blade, dripping blood, over the words "FIGHT UNTIL THE LAST DROP."



96.    Defendants' intent to engage in violence, to ensure that others engaged in violence, and to orchestrate and direct that violence against racial and religious minorities was open and explicit.  For example, on a podcast run by Defendant Peinovich, the Daily Shoah, a co-conspirator, discussing the "rally," asked: "Now come on, beating up the wrong negro . . . is that even a possibility?  Beat up the wrong nigger . . . ."  A member of Defendant Vanguard

33

America blithely asked on Discord, "When can we gas the reprobates. . . ." Tyrone, a co-conspirator, wrote: "Most efficient is how you get six million Jews in a Cadillac. 3 in the front 3 in the rear 5,999,994 in the ash tray."

97.     On Discord, moderated and controlled by Defendants Kessler and Mosley, there were countless exhortations to violence, including:

- "I'm ready to crack skulls."

- "If you don't have a flame thrower you're wrong,"

- "It's going to get wild. Bring your boots."

- "Studies show 999/1000 niggers and feminists fuck right off when faced with pepper spray."

- "Bringing women to a protest/rally where we expect violence is fucking retarded . . . even if you aren't expecting violence you should prepare for it."

- "Let there be no mistake – these two side have irreconciable [sic] differences that will never reach compromise – the only question is the level of conflict to decide the victor."

- "You have a week, bros. Best spend it having four or five of your friends simulate jumping you. Go light, don't get injured before the event, and focus on blocking and pushing back in ways that don't look like assault."

- "Let's make this channel great again. The Carolinas (kind of) started the Revolutionary War and the Civil War, so why not add the Race War / Second Civil War to the list?"

98.     Defendants took no steps to prevent any violence. To the contrary, consistent with their conspiracy to encourage and enable violence, Defendants and co-conspirators reinforced a false narrative of a larger—necessarily violent—racial and religious war in which Unite the Right events were a critical moment. This strategy was intended to—and foreseeably resulted in—violence directed at the racial and religious minorities.

34

99.    For example, Defendant Hill tweeted on July 24:  "If you want to defend the South and Western civilization from the Jew and his dark-skinned allies, be at Charlottesville on 12 August."

100.    Defendant Mosley published "General Orders" for the "rally" which divided attendees into "Friendlies" and "Enemies/Counter Protesters."  Individuals opposed to the ideas advanced by the Unite the Right "rally" were described as "hostile."

101.    The General Orders further instructed co-conspirators and attendees that if they ended up losing their permit to gather in the park then they may "have to initiate plan red or have to take the ground by force with plan yellow."  Plan Red was described as "incredibly dangerous" and called for meeting early at a rally point and marching to the park.  The General Orders also promised that there would be "security forces . . . to reduce the threat" presented by "hostiles."

102.    Co-conspirators on Discord incited attendees to bring weapons and engage in violence.  This incitement was known to and promoted by Defendants.

103.    Tyrone posted a quote from Hitler's close associate and "Reich Plenipotentiary for Total War," Paul Joseph Goebbels, on Discord: "Whoever can conquer the street will one day conquer the state, for every form of power politics and any dictatorship-run state has its roots in the street."

104.    Defendants expressly acknowledged that their false narrative of "self-defense" was merely a pretext for violence.  Tyrone, for example, had the following exchange on Discord:

> Tyrone:  "What if we are sociopathic and want [antifa] to show up, for . . . self defense purposes?"
>
> Americana – MD:  If you're concerned about antifa showing up and being violent I present you 2 valid options.  1.  Don't attend [emoji of a woman] or 2.  Be better

35

at violence than they are.

Tyrone:  It's not just about you (collective you not personal) violence like this is a team game.

Tyrone then told others:  "The best defense is a good offense, my grandpappy taught me."

105.    One Discord participant told people to "purchase self defense insurance," while another quipped that the ability to make out a self-defense claim "[d]epends how much of a jew your lawyer is."

106.    Using Discord and other mediums, Defendants gave orders to each other, co-conspirators, and followers in advance of the Unite the Right weekend, including what weapons to bring, what protective armor to wear, and instructions for uniforms.  In particular, they advised other participants to bring firearms or improvised weapons.  They engaged in these acts with the intention that they and their co-conspirators would in fact engage in violence and harassment against racial and religious minorities and threaten the broader Charlottesville population.

107.    Defendant Cantwell expressly "encourage[d]" Radical Agenda followers "to carry a concealed firearm."

108.    One co-conspirator, who was active on the Charlottesville 2.0 Discord server as the "Head Representative" of Anticom on the server, told his followers in the Anticom server on August 7:  "@everyone Bring as much gear and weaponry as you can within the confines of the law. I'm serious. . . .  You still have a few days to get some protection from Home Depot and bring any guns you have . . .  This isn't just Anticom.  Spencer, organizers, everyone are behind this."  He added: "This is the time to get off Discord and take action."  On August 8, he simultaneously posted on the Charlottesville 2.0 and Anticom servers the a photograph of himself in tactical gear carrying a rifle (see images below from the Charlottesville 2.0 server,

36

left, and Anticom server, right).  He told his followers:  "I wasn't kidding when I made an

announcement to bring as much weaponry as legally feasible. . .  This was discussed with the

organizers."  An Anticom follower responded: "Yeah I also recommended crowdfunding a 50

dollar campaign to hand out pepper spray to fellow goers."




109.    Defendants and co-conspirators posted photos of themselves posing with

automatic weapons and tactical gear, and boasted about the weapons they were bringing.

Tyrone, for example, bragged on the Charlottesville 2.0 server that he would be bringing

"Mosin-Nagants with bayonets attached," referring to military rifles used by Russian and Soviet

armed forces, which "will shoot clean through a crowd at least four deep."  Tim "Baked Alaska"

Gionet, a co-conspirator and attendee of the events of August 11 and 12, posted the following on

Twitter:

37



110.    Defendant Ray wrote on Discord: "Well I also come barehanded and barefisted, bc officers don't duck lol.  But my guys will be ready with lots of nifty equipment."

111.    One co-conspirator on Discord posted a fake advertisement for a product that looked like pepper spray called "Nig-Away"—"a no-fuss, no-muss 'nigger-killer,'" promised to "kill[] on contact . . . dissolv[ing] all tissue, leav[ing] only bone matter" in order to "rid the area of niggers."  He commented beneath the photo, "stock up now."

38



Discord was rife with discussions by co-conspirators of weapons and the use of everyday objects to inflict harm:

- "I'm conceal carrying."

- "[A] real man knows how to make a shield a deadly weapon."

- "[K]nives and guns are more legal than blunt weapons or batons, but its [sic] better to only carry what would only be perceived as a defensive tool.  I figure knives would cause the police more alarm over a can of pepper spray or a rugged and abrasive shield."

- "[G]et standard OC spray.  I personally use Fox Labs."

- "[R]emember that newspapers can be your greatest ally / toss a few pennies in there, roll it up and fold it and bam."

- "[A]void batons . . . just get hardwood dowel (that fits in your hand) from a store and cut it to size."

- "If you get PVC get schedule 80 for thicker thumping."

- "Don't carry anything that's explicitly a weapon.  Flag poles and signs work, but openly carrying obvious weaponry is probably not a good idea."

- "A wrench with a wrist lanyard gets the same job [as a blackjack/billyclub] accomplished."

39

● "Just carry a pocket full of rocks.  They can be in a sock or something."



112.    On June 7, 2017, Kessler posted in the #announcement channel of the

Charlottesville 2.0 Discord server, "@everyone . . . I recommend you bring picket sign post,

shields and other self-defense implements which can be turned from a free speech tool to a self-

defense weapon should things turn ugly."

113.    One co-conspirator on Discord posted a link to his store, Resistance Tools, along

with a coupon code (UNITETHERIGHT2017), and wrote "FOR PEOPLE NOT CONCEALED

CARRYING IN C'VILLE:  I sell stun guns, tasers, pepper spray, batons, and other self-defense

stuff."

114.    Defendant Vanguard America, through its leaders and members, encouraged its

members to attend the rally on its own Discord server, Southern Front.  An individual with the

username "Thomas Ryan," on information and belief Thomas Ryan Rousseau, a leader of

Vanguard America, repeatedly urged members to contact him directly if they planned to attend

the "Unite the Right" event and if they wanted to travel together in a "hate bus," saying:  "This

event is a **BIG DEAL** and offers a chance to link up Vanguard Guys from across the

nation."  He also issued orders on the proper Vanguard uniform for the event.

40

115.     Defendant Vanguard America members were instructed to arrive at the rally in matching khaki pants and white polos, about which one member on the server commented: "I like the polos. it's a good fighting uniform."  Rousseau also told his Vanguard America co-conspirators, "Self defense items are not listed on the gear list, some individuals will have concealed carry, some will not."  On August 7, one co-conspirator asked: "Serious question, why are they saying not to bring fire arms?"  Another replied, "Sounds like they are scared lol . . . I always carry a collapsible baton now it's my new favorite."  "Thomas Ryan" replied:  "It's concealed carry only . . . Concealed knives have dozens of laws around them. Open knives do not, but it looks really dumb to carry an open large knife so we're not doing that . . . Not sure about batons."

116.     Defendant Ray, a "good friend" of Defendant Vanguard America, according to their leader Rousseau, also used the Southern Front server to encourage Vanguard America members to attend the rally, posting a link to the Daily Stormer article "Charlottesville:  Why You Must Attend and What to Bring and Not to Bring!"  A Vanguard America member responded to Ray's post with a violent drawing of Defendant Heimbach wearing a shirt bearing Nazi and Defendant TWP symbols and the words "nigger killer" above a tally of "communists killed," smiling in front of decapitated black men wearing logos associated with anti-fascist movements:

41



117.    One member of Defendant Vanguard America explained on the Southern Front server after the event that Vanguard America had coordinated with Defendant National Socialist Movement because the Charlottesville event was about violence:  "In cville we needed numbers, NSM fought so hard regardless of their optics.  Do we need them at normie events?  No.  We need them in a fight?  Yes."

118.    In addition to directives being circulated on Discord, Defendants Ray and Anglin issued directives using Daily Stormer's website in advance of the Unite the Right weekend.  In articles titled "Operational Security for Right Wing Rallies" and "Charlottesville:  Why You

42

Must Attend and What to Bring and Not to Bring!," "Stormers" were told that they were required to bring tiki torches and should also bring pepper spray, flag poles, flags, and shields.

119.    Indeed, the evidence that Defendants were planning to arm themselves in advance of the "rallies" was so pervasive that the Charlottesville Police Department received private threat assessments from the Federal Bureau of Investigation indicating that "Unite The Right supporters would bring bats, batons, flag sticks, knives, and firearms to confront their political opponents."

120.    Defendants and co-conspirators provided guidance and instructions to co-conspirators and participants about how to try to avoid the legal ramifications of their violence. For example, they set up a channel on Discord devoted to understanding Virginia law, where one co-conspirator suggested that rallygoers buy self-defense insurance.  Defendants also assured co-conspirators that they would be protected when they engaged in violent acts intended, incited, strategized, and encouraged by Defendants.  The "General Orders" told attendees that if they found themselves arrested, there would be "money and a legal team set aside for you after."  Defendant Spencer put out a call for attorneys on his website, altright.com.  Daily Stormer advised attendees:

> [I]f you end up in some heavy stuff and are not yet charged with anything, use your moments of freedom to get really difficult to find. Do not wait around for bad processes to begin against you. Exit from any risky situation as quickly as you can. If you make yourself easy to serve with legal process, legal process will be likely be served to you.

121.    Defendants and co-conspirators told each other to bring shields, uniforms, flags, and signs decorated with iconography that would instill fear along racial and religious lines, while also identifying rallygoers with the hate groups to which they belong.  The Texas and

43

Louisiana chapters of Defendant Vanguard America, for example, planned to have shields with their logos painted on.

122.    Defendants also discussed and intended for followers to come with paraphernalia bearing racist and anti-Semitic imagery.  Defendant Kessler, for example, explained:  "The Confederate flag is THE BEST optics because it's beloved by legions of Southerners who are on the doorstep of becoming just like us if we can move them beyond 'heritage not hate.'"

123.    The "official" poster for the event contained Nazi and confederate iconography, including imperial eagles reminiscent of Nazi Germany's national emblem, confederate flags and monuments, and confederate soldiers in formation.



D.    **Defendants Coordinated Funding, Logistics, Transportation, and Legal Support For Co-Conspirators and Attendees**

124.    Defendants furthered their conspiracy and its illegal, injurious objectives by coordinating attendance at the rally through Discord, the Daily Stormer website, and other media.

125.    On Discord, Defendants established the #sponsors_only and #i_need_a_sponsor channels to provide financial support to others who wanted to travel to Charlottesville.

44

Defendants also used channels like #carpool_wanted and #carpool_available to organize carpools in "Hate Van[s]" and "full blown hate convoy[s]."[8]

126.   On the Daily Stormer website, attendees were advised:  "If you want to come but can't find a way, get on the BBS [a Daily Stormer forum] and ask for help.  Go to the Book Club section and find the nearest book club to you and post in that thread that you want to go but need assistance.  If you happen to have hit a dead thread, start a thread in General Discussion asking for help.  If you are going and have an extra seat or seats, start a thread to offer a ride."

127.   Cantwell asked listeners of his Radical Agenda podcast and readers of his website to send money to him if they "want[ed] to help," but could not attend the "rally."

128.   RootBocks, and WeSearchr—sites that were set up to raise money for hate-based causes—facilitated the attendance of co-conspirators.  On July 28, for example, RootBocks tweeted "@BakedAlaska was banned from @GoFundMe so go help him out here."  Baked Alaska a/k/a Tim Gionet has advocated racial and religious based violence, including by circulating an image of a Jewish woman in a gas chamber.  David Duke also tweeted, "Help my friend Baked Alaska get to the #UniteTheRight rally. Please donate to make this happen. rootbocks.com/projects/get-b . . ."

---

[8] The "Hate Van" and "hate convoy" suggested by conspirators in this case has historical precedent. During the Civil Rights Era, George Lincoln Rockwell, the founder of the American Nazi Party, and his supporters drove a two-vehicle caravan that included a blue and white van dubbed the "Hate Bus" through the South.  The exterior of the van was plastered with the words "LINCOLN ROCKWELL'S HATE BUS" and the phrases, "WE DO HATE RACE MIXING" and "WE HATE JEW-COMMUNISM."  Rockwell pledged solidarity with the Klansmen who attacked the Freedom Riders (black and white civil rights activists who rode interstate busses in a campaign of desegregation) and hoped to confront the "Communist, nigger-loving" Riders when they arrived in New Orleans. In New Orleans, they demonstrated with signs that read "America for Whites, Africa for Blacks" and "Gas Chamber for Traitors."  After Rockwell's assassination in 1967, the American Nazi Party broke into two factions, one of which became the Defendant NSM, run by Defendant Schoep.  See RAYMOND ARSENAULT, FREEDOM RIDERS: 1961 AND THE STRUGGLE FOR RACIAL JUSTICE 195 (1961).

129.     On the August 8 "Charlottesville Unite the Right Announcement Special" podcast with Defendant Peinovich, Defendant Mosley told listeners that they'd be setting up a general legal fund using Rootbocks.  On that same program, Mosley told listeners how to get help with transportation.

130.     Defendants and co-conspirators also coordinated travel for the day of the "rally" on Saturday.  After consulting with Defendant Kessler, Tyrone took responsibility for helping organize shuttles.  One co-conspirator instructed Discord participants:  "Nobody is going to the park on their own.  We will be arriving as a group."

**E.     When Plaintiffs and Others Sought to Prepare for the Events of August 12, They Were Targeted for Additional Threats and Harassment**

131.     Plaintiffs and community members understood that August 12 could be (and ultimately was) the largest public gathering of hate groups in decades.

132.     Anticipating a need for a designated, separate space for peaceful protesters, a UVA professor received permits for McGuffey Park and Justice Park for the periods during which the Unite the Right "rally" was to take place.

133.     A broad group of concerned citizens, including Plaintiff Wispelwey, recognized the need to organize community members in advance of the rally weekend in order to provide a sense of solidarity for Charlottesville and give guidance on non-violent protest.

134.     Wispelwey, an ordained minister, co-created a membership-organization, "Congregate," to join interfaith clergy from around the country to "stand against white supremacy and bear witness to love and justice."  Congregate's goal was to bring 1000 clergy-members to Charlottesville to stand up for equality and against hate.  Working with other religious leaders and community organizers and organizations, Congregate planned an interfaith service for August 11 at St. Paul's Memorial Church on University Avenue ("St. Paul's"), the

46

night before Defendants' permit to gather in Emancipation Park.  Congregate also helped plan an interfaith "sunrise service" for August 12 at the African-American First Baptist Church on West Main Street so that community members could gather, feel supported, and pray.

135.    As a result of its work in support of the Charlottesville community, Congregate was targeted.  Defendant Kessler advised his followers of Congregate's work in a video released prior to the Unite the Right weekend.  In doing so, Kessler intended to have others threaten, and potentially cause violence to, the organization—a practice that is not uncommon among Defendants and co-conspirators.  For example, after a photograph was published of a young woman giving the middle finger to a man in a confederate army uniform, a prominent member of the East Coast Knights tweeted out the young woman's home address and wrote:  "We will be having a rally at this address next week.  Bring your own torch."

136.    On August 2, one co-conspirator posted on Discord screenshots from a Facebook event for an upcoming community "Back to School Block Party" in Charlottesville.  He commented: "Negro block party about 1 mile SW of Lee park."  Following that post, one Discord participant suggested that a white supremacist group "go to the bloc party after and beat them at kick ball."  Another replied, asking, "What happens if we lose?  I hear niggers are pretty good at sports ball."  A third replied, "We shank them."

137.    Defendant Kessler along with other co-conspirators posted various photographs on Discord and provided names and identifying information of individuals planning to protest in Charlottesville, as well as the community groups organizing the protest.  On August 10, Kessler, Defendant Mosley, and others hosted a voice chat on Discord, during which an unidentified voice offered a "solid gold medal" to any person who would shave the "Bearded Lady," referring to a photograph of an expected protestor.

47

138.     Congregation Beth Israel, the synagogue to which Plaintiff Pearce belongs, also learned of Defendants' online, public threats to Charlottesville's Jewish population.  In reasonable fear and apprehension of Defendants and their co-conspirators, the Temple made the painful decision to move and hide its sacred Torah scrolls off site in advance of the weekend. Among the Torahs at the Synagogue was one salvaged from a neighborhood of Eastern European Jews who were massacred during the Holocaust that is displayed in a glass cabinet. Unfortunately, that Holocaust Torah could not be moved because of its fragile condition. Plaintiff Pearce thought at the time of how ironic it was that a Torah that managed to survive the Holocaust was again being threatened by Nazis.

139.     The Temple also decided it needed to move its Saturday Shabbat services up an hour, so that it could close in the afternoon when Defendants and other neo-Nazis and white supremacists were expected to be in Charlottesville.  The Temple took further safety precautions, including hiring a security guard, to keep the congregation safe while they were there for services, re-directing substantial resources.

140.     Stores, restaurants, and bars around town created signs that they posted in their windows showing the businesses' support for equality and diversity.  Those stores and restaurants were also targeted by Defendants.

141.     In June, for example, Defendant Kessler encouraged Discord participants to obtain the names of local businesses whose owners signed a petition to ask the government to cancel Kessler's permit.  In August, co-conspirator Griffin tweeted about targeting a local restaurant, Brazos Tacos.  Defendant Mosley also tweeted about targeting several restaurants, namely Brazos Tacos, Cinema Taco, Commonwealth Restaurant and Skybar, Mudhouse, and the Whiskey Jar.  Defendant Spencer tweeted a picture of Commonwealth Restaurant, which had a

48

sign in the window reading: "If equality & diversity aren't for you then neither are we." On August 10, Defendant Peinovich tweeted, "Do these white business owners and shitlibs in CVille think that their virtue signaling mean they will be spared somehow? Lol."

142. By identifying these businesses, Defendants intended that their co-conspirators and followers would threaten these businesses. A number of these businesses thereafter received in person and mailed threats:



49

II.     **On August 11 and 12, Defendants Successfully Implemented the Violence and Intimidation They Had Planned**

A.     **Friday, August 11, 2017**

1)     The "Secret" Torch Parade

143.     Defendants, including Mosley, Spencer, Kessler, Ray, Anglin, Cantwell, and Invictus, along with their co-conspirators, organized a torchlight march through campus culminating at the statue of Thomas Jefferson near the Rotunda on August 11 at the Grounds at UVA.

144.     The permit Defendant Kessler applied for and received was for the following day, August 12, in Emancipation Park.  Defendants did not publicly disclose the time or location for the August 11 torch parade "because it was a secret arrangement."

145.     The torch parade was the result of weeks of planning by Defendants and co-conspirators.  They had established a #friday_night channel on Discord to coordinate attendance, dress code, and plans.  They advised co-conspirators that the event was intended to be a secret and that they should bring torches.

146.     For example, the Daily Stormer website stated:

> Tiki Torches:  Yes – required.  Pick up tiki torches before you leave your hometown.  There will be a torchlight ceremony and the tiki torches will all be gone from the shelves of the local stores.  Dollar stores are your best bet.  Wal-Mart has them cheap as well.  Make sure and get some tiki torch fuel/oil too.  Otherwise they won't burn.

147.     On a planning call conducted through Discord, Defendant Mosley instructed Defendants and co-conspirators:  "We are doing a torch light event on Friday. . . . Anyone who doesn't have tiki stuff now should go out and get it tonight or tomorrow morning and if you could get extras that would be great."  Defendant Kessler ordered attendees to buy torches for

50

Friday, but to do so outside of Charlottesville, so that they would not "tip our enemy off."  He instructed that people "buy extras for those who are flying in or unprepared."

148.     Defendant Mosley ordered individuals to arrive at Nameless Field, a large area behind UVA's Memorial Gymnasium, at 9:30 p.m., so that they could march once darkness fell at 9:47 p.m.  He told them not to arrive earlier to avoid tipping off counter-protestors, and stressed that "it's extremely important that nobody mention this outside our circle."

149.     While planning their torchlight march, Defendants were aware of the fact that open fires are illegal on UVA's campus without authorization.  Nearly one month before the planned torchlight march, a Discord participant posted a link to UVA's guidelines against open fires.  A co-conspirator, and moderator on Discord, "pinned" the regulation to the chat, meaning that it was highlighted for participants.

150.     The choice to use lit torches was a deliberate decision to harass and intimidate the people of Charlottesville and counter protesters, especially people of color and Jewish people. Defendants and co-conspirators intentionally drew on the history of torch-bearing mobs, and in particular, the Ku Klux Klan's use of torches in the late 1800s and in the twentieth century, and the Nazi's use of torches in their rallies in the 1930s.  In both historical cases, just as with cross-burning, the use of torches was connected with racial violence; torches were chosen by Defendants and co-conspirators as part of a deliberate plan to evoke fear of the same kind of violence.  As one co-conspirator on Discord explained:  "Tiki torches are the last stand of implicit whiteness."  Defendant Ray explained the purpose of the torch parade as follows:  "Our country is being usurped by a foreign tribe, called the Jews.  We are going to stop it." Defendant Invictus explained to a reporter, "Somebody forgot the pitchforks at home, so all we got is torches."

51

151.    On the morning of August 11, Defendant Cantwell and other co-conspirators gathered at a Walmart outside of Charlottesville.  Cantwell then travelled to McIntire Park to prepare for the evening.  In an interview with a reporter from *Vice*, Cantwell said:  "I'm trying to make myself more capable of violence. . . .  I'm here to spread ideas, talk, in the hopes that somebody more capable will come along and do that."

152.    On Friday evening, using Discord, Defendant Mosley alerted co-conspirators that they should go to UVA:  "Everyone can start assembling at nameless field right now with your torches to start staging.  We will step off from the field at 10 pm."

153.    Starting around 7:30 p.m., approximately 300 neo-Nazis and white supremacists—Defendants and their co-conspirators—began arriving at Nameless Field.  They carried unlit tiki torches, and many wore khaki pants and white polo shirts (the uniform of Defendant Vanguard America) and pins marking their affiliations with different hate groups.  A little after 8:00 p.m., Defendant Spencer texted a reporter:  "I'd be near campus tonight, if I were you.  After 9:00 p.m., Nameless field."

154.    By early evening, Plaintiff Wispelwey was inside St. Paul's Church, along with an overflow crowd of an estimated 1,000 people.  Dozens of local and national clergy members visiting Charlottesville for the weekend participated and spoke at the service.

155.    Plaintiff John Doe, along with other UVA students, peacefully walked to the Rotunda where Defendants were believed to be holding their event.

156.    Plaintiff Natalie Romero had spent the afternoon of August 11 painting banners and posters for use during the planned peaceful protest of the August 12 "rally."  Romero then learned that Defendants would be holding a rally on the UVA campus at the Rotunda.  With a group of other UVA students, Romero peacefully made her way to the Rotunda.

52

157.    At the same time, at Nameless Field, Plaintiff Magill observed Defendants and their co-conspirators barking and grunting loudly, making sounds that resonated for blocks. Defendants Cantwell, Kessler, Ray, and other co-conspirators were issuing orders to the other white supremacists and neo-Nazis, telling them to get in specific formations and assigning people either to march with a torch or on the side as "security."

158.    Defendants and their co-conspirators filled their tiki torches with fuel, formed a long column, and lit the flames.  They then started marching two-by-two from Nameless Field to the Rotunda, and down to the Jefferson Statue.  Defendants and co-conspirators deliberately took a circuitous route that included marching through student housing on the Lawn, which Plaintiff Sines observed, and which was intended to threaten, intimidate, and harass as many bystanders as possible.

159.    Defendants marched in an organized, coordinated fashion.  Organizers, including Defendant Cantwell, wore earpieces, carried radios, and shouted specific orders at the marchers. They shouted to keep pace, avoid gaps, stay in line "two-by-two," and march alongside a "security guard."  Defendant Invictus said it was a "tight operation" and, in his live video feed, frequently enthused "high T!," meaning high testosterone.

160.    Defendant Cantwell marched on the outside of the column, along with other "guards" who were selected for their willingness to "get physical" with counter-protestors.

161.    Plaintiffs Sines and Romero heard the marchers chanting slogans chosen for their intimidating and racially harassing effect.  These slogans included, "You will not replace us!" "Jews will not replace us!" "Blood and soil!" "White lives matter!" and "This is our town now!" Romero also heard the marchers chant "go back to where you came from," an apparent reference to Romero's Hispanic heritage.

53

162.     The marchers also barked like dogs and performed Nazi salutes.  Again, these actions were intentionally chosen for their racially threatening, intimidating, and harassing effect.

163.     Defendants intended to send a clear message through the torch parade:  Jewish people, black people, and their allies should be afraid for their safety, livelihoods, and lives.

2)     The Attack at the Rotunda

164.     The torch march eventually reached the steps on the far side of the Rotunda. Hundreds of neo-Nazis and white supremacists, including Defendants Kessler and Spencer, charged toward a small group of fewer than 30 people, mostly students and community members, including Plaintiffs John Doe and Romero, who had locked arms around the statue of Thomas Jefferson.

165.     As Defendants and their co-conspirators rushed down the steps that surround the Rotunda and streamed toward the Jefferson statue, they continued to shout "Blood and soil," "Jews will not replace us," and "You will not replace us," and to bark like dogs.  They also made monkey noises at the black protesters.  Plaintiff John Doe, one of the few African-American men present, was terrified and feared for his life.  Plaintiff Romero, one of the few Hispanic-Americans present, had never been more afraid in her entire life.

166.     As they reached the statue, Defendants and co-conspirators stood shoulder to shoulder and encircled the students to trap them.  Seeing the mob surround the students, Plaintiff Magill, who had followed the white supremacists and was warning others to steer clear, ran through the crowd and locked arms with the small group, which included Plaintiffs John Doe and Romero.  One co-conspirator yelled, "we need some more people to fill in this way to block these people off."  After the fact, one protestor tweeted:  "They surrounded us at the statue / They wouldn't let us out"; Defendant Spencer retweeted this, adding "Fact check:  true."

167.    One co-conspirator on Defendant Vanguard America's Southern Front Discord server posted a tweet from Hatewatch, saying "Anti fascists are surrounded by hundreds of fascists at Jefferson statue.  No police."  Another replied: "DO IT . . . TIME TO PHYSICALLY REMOVE THEM"

168.    Defendants and co-conspirators began to kick and punch the protesters around the statue, using their torches as weapons, and to beat individuals onto the ground.  Defendant Ray claimed that the group of white supremacists "went through [the protestors] like shit through a goose!"

169.    From the crowd, Defendants, co-conspirators, and others threw an unidentified fluid at the peaceful protesters around the statue, including on Plaintiffs Magill, John Doe, and Romero.  Looking down at the fluid on their clothing, which they feared was fuel or other flammable liquid, and the hundreds of lit torches around them, Magill and John Doe believed that they might be killed.  Co-Conspirators and others then threw their lit torches through the air, aimed and directed at many of the protesters around the statue. At one point, Defendant Ray shouted, "The heat here is nothing compared to what you're going to get in the ovens!"

170.    Plaintiff Sines witnessed co-conspirators throwing fuel and tiki torches at the peaceful protestors around the statute.

171.    Plaintiff Romero witnessed co-conspirators removing their helmets and swinging them at peaceful protestors.  Romero was also spit on by co-conspirators.

172.    Defendants and co-conspirators, including Defendant Cantwell, attacked the protestors with mace. The Daily Stormer included the below photo of Cantwell spraying a protestor in the eyes in its live feed with the caption ". . . might be the greatest photo I've ever

55

seen."  The same photo was retweeted by Defendant Mosley under a caption:  "He protect / He

atack / But most importantly he got your back."



173.    Due to Defendants' conduct, and consistent with their intention to terrorize,

Plaintiff John Doe feared that he was in imminent danger.  Encircled by Defendants and co-

conspirators, John Doe felt trapped and did not believe that he could escape safely.  He knew that

as an African-American man, if he had tried to escape before the group dispersed, he would have

been attacked.  For approximately ten minutes, he remained in place, and while confined within

the circle of Defendants and co-conspirators, was sprayed with mace.

174.    Fearing for their lives, Plaintiffs John Doe, Romero, and the other protesters

struggled to escape the mob.  Once away from the mob, Romero attempted to wash off the mace

that had been sprayed in her eyes and all over her shoulders by Defendants and co-conspirators.

After the trauma of the torchlight rally, Romero had trouble sleeping that night.

56

175.     Defendants and their co-conspirators climbed to the top of the Thomas Jefferson statue and waved their torches high in the air, yelling, "Hail Spencer! Hail victory!"  Defendant Spencer spoke briefly to the crowd, saying, "We own these streets!  We occupy this ground!"  He told the crowd that they were "risking their lives" for their future.  This was consistent with the unlawful plan developed by Defendants through their conspiratorial acts in the weeks and months preceding these events, and as operationalized and modified by Defendants in response to developments on the ground.

176.     These acts of violence were not isolated or unplanned incidents.  The torch rally was planned with the specific intent of engaging in racially-motivated violence, threats, intimidation, and harassment.  The attacks upon the students were coordinated both in advance and on the day that they occurred.  Defendants and co-conspirators intentionally formed a circle trapping the students and either directly participated in the ensuing violence or continued to incite it—including through the chants described above—as the violence was occurring.

3)     St. Paul's Memorial Church

177.     During the attack at the Rotunda, hundreds of people were across the street at St. Paul's Church, listening to civil rights and religious leaders speak of peace and equality.  At least one white supremacist, Defendants' co-conspirator, was within the church, live-streaming the interfaith service to his followers.

178.      Some of the individuals within the church, including Plaintiff Wispelwey, along with people who had volunteered to serve in a security role outside the church, could see and hear the mob charging through the Rotunda, chanting and wielding torches.

179.     After seeing the mob surround and attack the peaceful protestors at the Rotunda, Plaintiff Wispelwey and others were reasonably afraid that the mob would come

57

towards the church to cause violence to the building and the individuals inside, particularly given the racial and religious make-up of the assembled group and the fact that Defendant Kessler had specifically targeted Congregate, in advance, for harassment and intimidation.

180.    At around 10:00 p.m., when the service at St. Paul's ended, the organizers asked everyone in attendance to leave in groups through the back doors to avoid the neo-Nazis and white supremacists.  However, after learning more details of the violence occurring at the Rotunda, Plaintiff Wispelwey reasonably apprehended that force would be used against those still within the church if they went outside.  The church was filled with children and elderly individuals who were particularly vulnerable to any violence that could occur.  Accordingly, a few minutes later, everyone at St. Paul's was asked to return to their seats.  They remained in the church for nearly an hour after the service was supposed to end.

181.    After the church re-opened its doors, Plaintiff Wispelwey drove some of his fellow clergy back to their hotels to make sure they were safe.  From his car, Wispelwey saw co-conspirators carrying baseball bats and torches—carried for the purpose of threatening, intimidating, and harassing residents.

182.    Directly outside of the Graduate Hotel, Plaintiff Wispelwey saw Defendant August Invictus harass and intimidate a friend.  Invictus then walked towards Wispelwey, who was wearing a collar, until they were mere inches apart.  Invictus kept moving forward even as Wispelwey pulled back.  Once he was directly face-to-face with Wispelwey, Invictus began demanding, in a challenging and highly aggressive tone, that Wispelwey reveal what church he belongs to.  Defendant Augustus Invictus then asked "What the hell are you doing," and continued hounding Wispelwey to state his church denomination.

58

4)   Defendants Celebrated the Torch Parade as an Advertisement for the "Unite the Right" Rally the Following Day

183.   David Duke, the former Grand Wizard of the Ku Klux Klan, and co-conspirator, posted the following:



184.   Co-conspirator McLaren posted a photo of the march and tweeted: "White peoples never agreed to become minorities in their own lands, in numbers and spirit." Defendant Kessler tweeted a picture of the torchlight marchers surrounding the protestors at the statue and wrote: "Incredible moment for white people who've had it up to here & aren't going to take it anymore. Tomorrow we #UniteTheRight #Charlottesville." Spencer retweeted that tweet.

59



185.    Co-conspirator Thomas Ryan Rousseau, a leader of Defendant Vanguard America, kept his co-conspirators informed on the Southern Front Discord server, posting "All VA members safe and accounted for," while another co-conspirator wrote "I had a lot of fun tonight.  Can't wait for the big event tomorrow."

186.    Defendant Invictus told watchers of his livestream to come on Saturday to the most important "rally" of the year.  Anticipating and strategizing violence, Defendant Anglin wrote on his Daily Stormer website that people should "be at Lee Park by noon, preferably by 11:00."  Although he wouldn't be there, Anglin said that he had given Defendant Ray words to relay to the crowd.  He told readers:  "Make sure you're with a crew.  Don't park alone, don't walk to your car alone . . .  If you wanna stay up all night with Stormers, or arrange to travel to the park together tomorrow, get in this thread and start sending people PMs."  He signed off for the evening saying "[w]e are on the verge of breaking through into a whole other realm."

60

B.     **Saturday, August 12, 2017**

1)     Defendants Intentionally Planned A Violent Confrontation With Counter-Protesters

187.     On August 12, Defendants, their co-conspirators, and others acting at their direction executed their plan to carry out racial, religious, and ethnic violence, intimidation, and harassment.  Defendants Kessler, Cantwell, Mosley, Heimbach, Hill, Invictus, Ray, Spencer, Damigo, Peinovich, Fields, Parrott, Tubbs, the Nationalist Front, League of the South, NSM, TWP, Vanguard, the East Coast Knights, the Loyal White Knights, FOAK, and hundreds of Stormers (many of them from Stormer Book Clubs) all participated in the violent events of the day together with co-conspirators, including Duke and the Proud Boys.

188.     Defendants and co-conspirators planned to arrive early and anticipated and encouraged the use of violence to assist the rally.  As one co-conspirator explained:  "Me, the rest of TWP and LS [League of the South] have been to more than one rodeo. / And shit NSM will be there early too / Those guys are nuts / In a good way."  Defendant Kessler promised that there would be hundreds of members of TWP and League of the South at the park as early as 8:00 a.m.

189.     Defendants Mosley, Kessler, and co-conspirators exhorted rallygoers to arrive before the park opened to form "a white bloc barrier or square around the entire statue + podium . . . . given that they know we're coming, we'll all need as many people as possible to be there right when the park opens."

190.     Defendant Kessler told Discord participants:  "EVERYONE needs to get to the park as early as possible and defend our territory."  He suggested that camping out at the monument the night before would give them "[t]he most extremely prepared position."  In these

61

remarks, Kessler referred to (and actively encouraged) preparation for violence against racial and religious minorities and anyone who supported their cause.

191.    A co-conspirator asked the Discord group:  "So are we going to occupy very early?  Or try and force this commie scum out after the fact?  I'm good with either."  Another participant responded, "We will be fine as long as we have bodies there and willing to remove whoever is in our way.  Vanguard is fabricating 20 additional shields.  We should have a good amount between organizations.  We just need to make sure we have bodies there ready to rock."

192.    Consistent with the conspiracy's effort to organize and maximize violent acts, a co-conspirator and moderator on Discord told participants "we'll be putting out a video for basic formation, roles, and commands to all of the group leaders shortly," and posted a "Shields & Shield Tactics Primer" made by the "Detroit Right Wings," as well as a video illustrating shield fighting techniques, to be studied by participants.  Defendant Mosley said:  "I run this [the Unite the Right "rally"] as a military operation . . . I was in the army."

193.    Defendants took no steps to prevent, or aid in preventing, the intimidating, threatening, and otherwise illegal conduct they knew was being planned and coordinated.

    2)    The Events On August 12 Were Intentionally Violent In Accordance with Defendants' Planning

194.    According to former Charlottesville Police Chief Al S. Thomas, Jr., Defendants refused to follow a plan that had been worked out to keep them separated from the counter-protesters.  For example, instead of entering the park from one entrance, they came in from all sides.

195.    Most of the Defendant groups arrived in military formations, armed like paramilitary forces—carrying, among other things, guns, shields, protective gear, flags, and rods.  They shouted commands at their groups to "move forward" or "retreat."  Governor Terry

62

McAuliffe stated that "80 percent of the people here had semiautomatic weapons . . . you saw the militia walking down the street, you would have thought they were an army."

196.    Four members of Defendants Nationalist Front, League of the South, NSM, TWP, and Vanguard America met at a pre-set location in order to march to Emancipation Park in formation.

197.    Defendant Vanguard America marched to the Park first, chanting "Blood and soil!"  Members of the group were in uniforms, as instructed, dressed in helmets, white or black polos, and khakis, and wielded matching shields and flags.  Defendant Fields (who was wearing the uniform white polo, khakis and carrying a black shield with the Vanguard logo) marched with Vanguard America.

198.    Defendant League of the South, led by defendant Michael Hill, followed.  Like Defendant Vanguard America, they marched with coordinated shields and flags and carried rods and other weapons.

63

 **Michael Hill**
@MichaelHill51



The truth. The League of the South.



6:59 PM - 24 Aug 2017

199.    One member of Defendant League of the South explained that he attended the Unite the Right "rally" because:  "I intend to stand for the South and die for it if need be.  They will not replace us."

200.    Defendant TWP marched behind Defendant League of the South, and Defendant Parrott marched with TWP.  Defendant Heimbach guided the group, wearing a black combat helmet with a bodyguard close on his heels.

201.    As the Nationalist Front groups and other Defendants and co-conspirators marched towards Emancipation Park, they shouted threatening, harassing, and intimidating language at Charlottesville residents and protesters on the basis of their race, religion, and ethnicity or their support for people of different races, religions, and ethnicities.  These included

64

statements like, "Get the fuck out of our country, bitches! Yeah, come up to me! Come up to me, bitch!"

202.    Marching down Jefferson Street, Defendants and co-conspirators passed the synagogue where Plaintiff Pearce is a member.  During the Shabbat services, three co-conspirators in uniforms and semi-automatic rifles stood across from the temple.  As others paraded past, they shouted, "There's the synagogue!" followed by chants of "Sieg Heil" and other anti-Semitic language.  Some carried flags with swastikas and other Nazi symbols. Defendant Ray, intending to threaten, intimidate, and harass Charlottesville's Jewish population, carried a banner (later posted on Daily Stormer's website) that read "Gas the kikes, race war now!"[9] Defendant Ray also told a woman to "put on a fucking burka" and called her a "sharia whore."  He ended by proclaiming: "Hitler did nothing wrong."  These acts were fully consistent with the broader campaign of racial and religious suppression at the heart of Defendants' conspiracy.

203.    Later that day, in a thread with Daily Stormer, co-conspirators suggested meeting at 3:00 p.m. to "torch those Jewish monsters."  After seeing their exchange, the Charlottesville mayor made a frantic appeal to the Secretary of Public Safety asking for police protection at the Temple.

---

[9] As made clear in the Daily Stormer "style guide," references like this are only meant to seem hyperbolic to the uninitiated.  The Daily Stormer is aware that "[m]ost people are not comfortable with material that comes across as vitriolic, raging, non-ironic hatred," and so "[t]he undoctrinated should not be able to tell if we are joking or not. There should also be a conscious awareness of mocking stereotypes of hateful racists."  But according to Defendant Andrew Anglin, who drafted the style guide, "[t]his is obviously a ploy and I actually do want to gas kikes."

65



204.    By contrast, Plaintiff Wispelwey had organized a 6:00 a.m. interfaith prayer "sunrise" service that was held at the historical African-American First Baptist Church on West Main Street.

205.    After the service, a number of community members left the church to hold a peaceful march from the nearby Jefferson School African American Heritage Center to McGuffey Park.  Others, including Plaintiff Wispelwey, silently marched with other clergy members directly from the sunrise service to Emancipation Park.

66



206.    When Plaintiff Wispelwey and his fellow clergy arrived at Emancipation Park, around 8:00 a.m., they were confronted by heavily armed militiamen and extremists, many in full military attire with semiautomatic rifles and pistols.  Plaintiff Wispelwey and other clergy members locked arms and knelt before them.

207.    As they had planned, Defendants and their co-conspirators approached Emancipation Park in coordinated waves of passenger vans.  Defendant Peinovich, flanked by his "security team," approached Emancipation Park in the "third or the fourth wave."

208.    Consistent with their elaborate planning and lessons in battlefield tactics, Defendants and their co-conspirators charged through the peaceful clergy when they arrived at the park.  Many of the clergy were pushed to the ground, and Plaintiff Wispelwey was knocked into a bush.  A co-conspirator stood staring Plaintiff Wispelwey directly in the eyes and repeatedly shouting "fuck you, faggot" at him.

67

209.    The violence by the Defendants at the entrance to Emancipation Park followed a consistent pattern according to their pre-set plan.  The Defendants would "use shields, flags, or fists" to break through the blockade of counter-protestors, would succeed in entering the park, and then another wave would arrive.  In between each wave, counter-protestors would attempt to reassemble before the next arrived.  This played out at least half a dozen times.

210.    After the being assaulted, Plaintiff Wispelwey and other clergy were afraid that they could get seriously injured or would suffer another, more serious attack.  As a result of Defendants' and their co-conspirators' actions, and as the violence escalated, Plaintiff Wispelwey was forced to end his peaceful protest and leave the park where he and others were lawfully standing.

211.    Plaintiff Romero experienced a similar attack by Defendants and their co-conspirators.  Having linked arms with a group of women facing Defendants and co-conspirators, who were clad in shields and helmets outside Emancipation Park, Romero was pushed against a police car as the Defendants and co-conspirators sought to move through Romero's group.  During this assault, Romero was also spit on.

212.    Defendants bragged about their violence after the fact.  Defendant Parrott, for example, wrote an account of the Unite the Right "rally" in "Catcher in the Reich:  My Account of my Experience in Charlottesville."  He wrote that Defendants TWP, League of the South, NSM, and other Nationalist Front groups joined together "to help create two shield walls" for "the fight."  He explained, "While most of the Identity Evropa men were occupied on other fronts, they sent a detachment of fighters to assist us and to relay intelligence to Jason Kessler and other organizers.  They offered more fighters, but we had our positions amply covered."  He further said, in an interview with the *Los Angeles Times*:

68

With a full-throated rebel yell, the League broke through the wall of degenerates and TradWorker managed to enter the Lee Park venue itself while they were largely still reeling. Michael Tubbs, an especially imposing League organizer towered over and pushed through the antifa like a Tyrannosaurus among raptors as league fighters with shields put their training to work.

213.    Defendant Hill later exclaimed that: "Mr. Tubbs was everywhere the chaos was."



214.    By around 10:00 a.m., having charged through protesters, pushing and shoving them with their shields and rods, Defendants TWP, NSM, and League of the South lined up inside Emancipation Park, led by, among others, Defendants Schoep, Hill, Heimbach, and Parrott. Defendant Parrott explained that they had "stuck with the original plan to define and secure the event perimeter."

215.    Once inside the Park, Defendants' racial, religious, and ethnically motivated violence did not stop. It escalated.

216.    As they had planned, Defendants used their shields and rods to plow through people and knock them over. They used rods and flags to assault protesters.

69

217.     Defendants also encouraged violence by others.  Over the course of the morning, Daily Stormer, through a livefeed maintained by Defendants Anglin and Ray and other Daily Stormer staff on the ground, encouraged followers to organize in groups and deliberately incited them to engage in violent acts.  Among other exhortations, they told followers: "WHITE SHARIA NOW!" and "WE HAVE AN ARMY! THIS IS THE BEGINNING OF A WAR!"

218.     Members of Defendant Vanguard America also communicated over the Southern Front server, sharing live feed streams and encouraging co-conspirators on the ground in Charlottesville to "Just incite a riot already."  One co-conspirator on the Anticom Discord server, reported to the group: "Vanguard shields are holding the line."

219.     Having witnessed the events of Friday and the anti-Semitic chants of defendants and their co-conspirators, Plaintiff Pearce struggled with whether she should attend the peaceful protest and whether she should identify herself as Jewish.  On the one hand, she believed that it was important to peacefully protest, but she also feared for her safety.  As she left her house, she made a Star of David out of duct tape and attached it to her shirt which bore a Hebrew letter in rainbow colors to show her support for the LGBT community.  She went to Emancipation Park to peacefully protest the neo-Nazis and white supremacist presence in Charlottesville.

220.     One of the rallygoers, a co-conspirator, saw Plaintiff Pearce on the street, pointed at her, and, shouted: "Oh good, they are marking themselves for us, so it is easy to find them."  At the Park, Pearce was joined by her son, who also wore a Star of David and carried a rainbow flag.

221.     While Plaintiff Pearce was standing, peacefully, outside of the Park, expressing her solidarity with other Jewish and non-white members of her community, another white-supremacist and co-conspirator threw an open bottle filled with a foul liquid at her—a common

70

tactic of Defendants and their co-conspirators.  Indeed, in advance of the rally, co-conspirators had encouraged others to "[p]ee in balloons and throw them at communists / In self defense," and to "[f]eel free to urinate and defacate on your nearest antifa terrorist faggot pussy."  The bottle struck Pearce on her leg and she could smell the foul liquid on her body.

222.    In short order, peaceful protesters, including Plaintiffs Wispelwey and Pearce, were forced to leave the area of Emancipation Park as Defendants and co-conspirators attacked people with clubs, smoke bombs, and pepper spray, in fulfillment of their premeditated strategy of inflicting injury.

3)    The Authorities Declared the Rally an Unlawful Assembly and Defendants and Co-Conspirators Intentionally Spread the Violence Outside Emancipation Park

223.    By 11:22 a.m., before the permit for the "rally" even began, Charlottesville officials declared the gathering in Emancipation Park an unlawful assembly, defined under Virginia law as "whenever three or more persons assembled share the common intent to advance some lawful or unlawful purpose by the commission of an act or acts of unlawful force or violence likely to jeopardize seriously public safety, peace or order."

224.    At 11:28 a.m., Governor McAuliffe declared a state of emergency, stating: "It is now clear that public safety cannot be safeguarded without additional powers, and that the mostly out-of-state protestors have come to Virginia to endanger our citizens and property.  I am disgusted by the hatred, bigotry and violence these protestors have brought to our state over the past 24 hours."

225.    Daily Stormer wrote shortly thereafter: "Someone is getting gassed! . . .  LET'S HOPE IT'S JEWS!"

226.    Jason Kessler and other Defendants directed the mob to move to McIntire Park. Some Defendants and co-conspirators, loaded into white vans, and Defendants Cantwell and Ray

71

shared one van.  In his interview with *Vice* that day, Ray explained:  "We're showing to this parasitic class of anti-white vermin that this is our country.  This country was built by our forefathers.  It was sustained by us.  It's going to remain our country."

227.    Daily Stormer encouraged its followers to go to McIntire Park and assemble "behind" Defendants Ray and Cantwell, and incited the crowd to violence:

**12:42 PM:**

STREETS BELONG TO US!

COPS WON'T INTERVENE!

> Clash between protesters and counter protesters. Police says "We'll not intervene until given command to do so." #Charlottesville
> pic.twitter.com/UkRDINn2mv
>
> — ACLU of Virginia (@ACLUVA) August 12, 2017

**GET TO MCINTIRE PARK NOW AND FIND AZZMADOR, CANTWELL OR SACCO VANDAL! STAY IN THE GROUP! DO NOT SEPARATE ONCE YOU ARE BEHIND ONE OF THESE THREE MEN!**
12:33 PM:

# EVERYONE GO TO MCINTIRE PARK!

GOOGLE MAP COORDINATES HERE!

**12:31 PM:**

FUCK YOU FAGGOTS!

228.    Among those who followed their direction was Defendant Vanguard America.

Defendant Schoep also marched to McIntire Park, attacking protestors along the way.  He explained, "I was offered a ride to safety and declined to leave until the women and others were safe, so we just marched back through antifa . . . We went right through [antifa] like warriors."

Defendant Parrott refused to leave Emancipation Park and was arrested by the police for failing to disperse.  Parrott described his detention as being "a political prisoner for about 20 minutes."

72

229.    By 1:00 p.m., Defendants Spencer and Peinovich, and their followers, had mostly reassembled in McIntire Park. Violence again broke out.  One woman protesting Defendants' message was choked by co-conspirator Steven Balcaitis, who was wearing a t-shirt advertising a white nationalist and anti-Semitic website, Red Ice.  As he grabbed her neck, he looked at a bystander and said, "Don't save her."

230.    Defendants Spencer and Peinovich spoke to their followers at McIntire Park. Peinovich called the counter-protestors "savages."

231.    Defendants at McIntire Park discussed returning to Emancipation Park in defiance of police orders.  Defendant Mosley sought people with guns:  "I need shooters," he said. "We're gonna send 200 people with long rifles back to that statue."  According to a Defendant NSM twitter account, Defendant Schoep "led a group of 40 back the 1.3 miles from the 2nd park back to Lee Park, through Antifa and police interference!"  They jeered:  "So much respect for my Commander Jeff Schoep.  I will go into battle with you anytime Sir 83/88!"

232.    A few minutes after 1:00 p.m., Daily Stormer posted:

> **1:08 PM:**
>
> Apparently everyone is getting kicked out of McIntire park.
>
> Everyone is getting kicked out of everywhere.
>
> My advice is this:
>
> # HOLD YOUR FUCKING GROUND WHEREVER YOU ARE.
>
> **12:56 PM:**
>
> > Daily Stormer reccomendation: HOLD YOUR FUCKING GROUND.
> > DON'T RETREAT. DON'T GIVE AN INCH. https://t.co/rYIXmSBidS
>
> > — Daily Stormer Status (@rudhum) August 12, 2017

233.     Defendants took no steps to prevent, or aid in preventing, the violent actions that they knew was being planned.

234.     Some Defendants and co-conspirators stayed in the parks while others dispersed and began to terrorize residents in the downtown area of Charlottesville, near the pedestrian mall. Muñiz, wearing a t-shirt with a representation of women of color, witnessed the marchers walk back to town from McIntire Park and then followed herself to join a group of peaceful counter-demonstrators.

235.     On the mall, Defendants and co-conspirators again brought violence.  One co-conspirator, for example, was caught on video punching two peaceful counter-protestors directly in the face.

4)     The Car Attack

236.     "Run Them Over" is a popular anti-Black Lives Matter and anti-racial justice protest catchphrase and shows up in memes and comments across the Internet.[10]  In late January 2017, Fox Nation, the opinion website operated by Fox News, tweeted out a "Reel Of Cars Plowing Through Protestors Trying To Block The Road."  The author of the video piece, which originally appeared on the Daily Caller, wrote: "Here's a compilation of liberal protesters getting pushed out of the way by cars and trucks" and "Study the technique; it may prove useful in the next four years."  On Facebook, the author bragged about the popularity of the piece, boasting that he "[m]ade a profit for the company today. Went from 400,000 to 2 million views in a 24 hour timespace #winning."

---

[10] Over the past two years, the imagery of running protestors over with a car has gained currency among Defendants and others.  Defendant Heimbach encouraged a police car to mow down peaceful protestors.  An article reports that Heimbach was walking near the parade route when he encountered a group of demonstrators holding signs about water preservation.  A black SUV with police plates drove up and stopped in front of the demonstrators.  An officer leaned out the window and asked them to step aside so that they could pass. "Don't stop, officer," shouted Heimbach as the SUV made its way through the group, "Fucking step on the gas!"

74

237.    The same trope was used as part of planning for the Unite the Right "rally."  On Discord, for example, in response to a post from Tyrone that if "something happens . . . adjustments will have to be made to remove people from the scene," co-conspirator "AltCelt(IL)" responded with an image from a famous scene in the movie *Dawn of the Dead*, in which the protagonists retrofit buses with chainsaws and barbed wire to escape a mall by running over thousands of swarming zombies.  AltCelt(IL) added a "crying laughing" emoji and wrote "This will be us."



238.    Tyrone replied with picture of a John Deere tractor captioned "Introducing John Deere's new multi-lane protestor digestor" and commented, "I know NC law is on the books that driving over protesters blocking roadway isn't an offense… Sure would be nice."

75



239.    On the same day (July 17, 2017), Tyrone asked the #virginia_laws channel, "*Is it legal to run over protestors blocking roadways? I'm NOT just shitposting. I would like clarification. I know it's legal in NC and a few other states. I'm legitimately curious for the answer.*"  Two participants reacted to this post with red heart emojis.

240.    Another co-conspirator on Discord, using the #virginia_laws channel, posted a photo of an armored military tank and wrote:  "Is this legal in VA?"  Eleven participants responded with emojis expressing approval.

241.    Similarly, when Defendant Kessler asked the #demonstration_tactics channel for advice on planning a march, one co-conspirator, "PrimitveXaoc," encouraged the use of sidewalks because "straight through the streets like they did a few weeks ago for the 'community defense' March was awful (Antifa)."  He posted several photos from that march and wrote: "These fools had babies and children in the streets dragging banners over cars blocking their

76

view and such.  Too bad the civilians didn't just make new speed bumps for some of these scum."

242.    At approximately 1:40 p.m., in furtherance of the conspiracy, Defendant Fields drove his Dodge Challenger onto Fourth Street, idled for a moment while his vehicle faced the peaceful protesters, and then deliberately accelerated into the crowd.

243.    Plaintiffs Martin, Blair, Sines, Muñiz, Alvarado, and Romero were marching up Fourth Street when Fields attacked.  Plaintiff Muñiz had walked to the front of the crowd when it was at the intersection of Fourth Street and Water Street to take a picture of the gathering.  When the crowd turned left onto Fourth Street, Muñiz was still towards the front of the crowd.

244.    Plaintiffs Martin and Blair were approaching the same intersection, walking up Fourth Street towards the downtown mall, with their friend, Heather Heyer.  As he saw the car speeding down the road, Martin pushed Blair out of the path of the moving car.  She fell to the ground and sustained injuries, including a hematoma on her left side and a gash on her right arm. Martin was hit directly by the car, sustaining serious injuries, including a broken leg, fractured ankle, and multiple bruises.

245.    He is pictured below, flying through the air after the car slammed into his body.



246.    Looking for Martin on the street, Blair saw people lying on the ground and bleeding.  She stepped over them looking for Martin.

247.    Blair found Martin on the ground, where people were trying to help him.  Fifteen minutes after the attack, Martin was taken to the hospital and Blair rode in the ambulance with him.  Blair did not receive immediate treatment for her injuries because she was looking after Martin.

248.    While waiting in the hospital, Blair learned that a woman had died in the car attack.  She feared that she knew who it was, and began asking everyone around her if they knew who it was.  Eventually she learned that it was her friend, Heather Heyer, who had been struck and killed.

78

249.    Plaintiff Romero was hit directly by Defendant Fields's car.  The impact threw her against a parked car, which she hit before falling to the ground.  Plaintiff Romero recalls wanting to lie down and close her eyes, but she thought that if she closed her eyes and gave up, she would die.  She attempted to get up, but struggled and was told by a bystander to sit back down.

250.    Romero is pictured below receiving initial care from bystanders:



251.    Covered in blood from a skull fracture sustained during the attack, Romero was carried to an ambulance, where a medic informed her that she had been unconscious as they helped her down Fourth Street.  Before falling unconscious, Romero had begged bystanders to call her mother, as she had lost her phone when struck by Fields's car.

252.    Plaintiff Alvarado, who attended the events with Plaintiff Romero, was also hit by Defendant Fields's car.  The impact of the car knocked her to the ground.  Initially filled with

79

adrenaline, she immediately picked herself up and looked for her friend Romero, who had been hit.  Alvarado then watched as Defendant Fields drove his car in reverse into the crowd she was standing in.  Fields narrowly missed hitting Alvarado again because she was able to press closer to the adjoining wall.  Alvarado continued to fear that the car would come back down the street.

253.    Plaintiff Alvarado then went to assist Plaintiff Romero.  She supported Romero as they walked up the street until Romero was put into the ambulance.  Alvarado was subsequently directed to the medical tent, where she was treated for her injuries.

254.    Plaintiffs Muñiz and Sines narrowly escaped being struck by the car.  They witnessed belongings and bodies flying in the air.  When they saw Defendant Fields speed his car in reverse—backing over many of the bodies he already hit—they were sure that he was going to come charging back into the crowd.  Plaintiff Muñiz feared that the cars would be coming from all directions.

255.    Plaintiff Muñiz ran away and collapsed on the side of the road.  She suffered an acute stress reaction.   Plaintiff Sines ran into an alleyway and was so shocked that she had difficulty forming any words.  Fearing other attacks, she ran to her closest friend's house downtown.

256.    Plaintiff Muñiz saw volunteer medics arriving.  Muñiz was shaken and terrified and could not stand up.  Muñiz feared that the incident was no longer over.  Finally, when Muñiz felt that no other attack was forthcoming, the medic got Muñiz to her feet and walked her to the trauma center.

257.    Plaintiff Wispelwey was not at Market Street when the car attack occurred.  When he learned of what happened, he sprinted to the site with other clergy to provide assistance, to support victims, and to help control the crowds so that medical vehicles could reach victims.

80

258.    Plaintiff Pearce also rushed to the scene to provide care and, with the help of her son, tried to suppress the crowds so that medical vehicles could reach those injured.

259.    But as Plaintiffs mourned and tried to care for one another, Defendants and co-conspirators celebrated and encouraged others to leave town immediately, before they found themselves in trouble.

260.    Defendant Spencer tweeted "My recommendation:  Disperse.  Get out of Charlottesville city limits."  Defendant Kessler retweeted him.  At 2:25 pm, Defendant Hill tweeted "The League of the South had a good day in Charlottesville, Virginia.  Our warriors acquitted themselves as men.  God be praised!"

261.    Concluding its live feed for the day, Daily Stormer posted: "THE STREET WAR HAS ENDED.  WE WON.  WE SHOWED THAT OUR IDEAS HAVE TO BE SHUT DOWN WITH VIOLENCE."

    5)    <u>After the Fact, Defendants Celebrated Their Successful Plan to Incite Violence</u>

262.    As news about the car attack spread, Defendants celebrated what they believed was their "victory" and mocked the death of Heather Heyer.

263.    Only one hour after the car attack, Defendant East Coast Knights's prominent member "Kneuss" tweeted:  "At least nobody important got hurt. #Charlottesville," followed by another tweet stating, "Dirty apes playing in the street gotta learn the hard way #Charlottesville."[11]  Both tweets were liked by the East Coast Knights Twitter account.

---

[11] Kneuss, who uses the handle "@realDRKNEUSS" on Twitter, interacts frequently with the East Coast Knights on Twitter and they retweet each other frequently; often they are each other's only retweet.  On August 12, at 3:43 p.m., Kneuss tweeted "Big shout out to League of the South, TWP, and NSM the East Coast Knights greatly appreciate you and everything you do. #Charlottesville."  The East Coast Knights' Twitter account retweeted this tweet.  On September 19, Kneuss tweeted a stylized image saying ECK 33/6, which is a reference to the East Coast Knights.

81

264.    Later that evening, Defendant Anglin posted a message:  "Roadkill Nights Powered by Dodge.  It's going down Saturday Aug. 12th from 11am to 10 pm."

265.    The following day, Discord participants posted memified photos of Defendant Fields driving his car into the crowd, one labeling the car "RESPECT" and the crowd "WOMEN." Another meme circulated online labeled the image "BACK TO THE FHURER."



82



266.   In Southern Front, the Discord server set up for southern members of Vanguard America, and the organization to which Defendant Fields belonged, members posted similar memes, such as a picture of Plaintiff Martin flying through the air with the caption "Can't Dodge This" and another labeling Fields a "USA Patriot."  One co-conspirator wrote: "I don't think we should hand out shields anymore @everyone . . . We should hand out dodge challengers instead."

83



267.     Daily Stormer encouraged followers to find out the details of Heather Heyer's

funeral and to attend.  A tweet from Defendant Kessler's account referred to Heather Heyer as a

communist and said:  "Communists have killed 94 million.  Looks like it was payback time."

Kessler claimed he was on a mixture of prescription drugs and alcohol when he wrote that

message and did not remember it; an agent of Daily Stormer claimed credit for hacking Kessler's

account and posting the tweet.

268.     Defendant Heimbach said of the rally:  "We achieved all of our objectives.  We

showed that our movement is not just online, but growing physically.  We asserted ourselves as

the voice of white America.  We had zero vehicles damaged, all our people accounted for, and

84

moved a large amount of men and materials in and out of the area.  I think we did an incredibly

impressive job."

269.    White supremacists debriefed on Discord, celebrating that protesters "got btfo

[blown the fuck out] by all objective measures / only people who moved us a single inch were

the zog-cops."  "Kneuss" of the Defendant East Coast Knights celebrated:  "3 fatalities in

#Charlottesville.  How many WN's [white nationalists]?  NOT 1.  Fuck the left, Fuck commies,

and all kayaks belong in ovens.  Amen."  This tweet was liked by the East Coast Knights'

official Twitter account.

270.    A Vanguard America co-conspirator posted a Daily Stormer article on the

Southern Front Discord server and wrote: "This was the biggest victory for our movement

history.  It was glorious. https://www.dailystormer.com/charlottesville-complete-victory-event-

debriefing/" they celebrated, "We fucked up many commies . . .  We hospitalized dozens . . .  We

got our guys out, without police help.  We won. . . .  Now you make the next rally and fight for

your people."  After the Saturday events, Thomas Ryan Rousseau, a leader of Vanguard

America, reassured co-conspirators on the Southern Front Discord server:  "I'm safe, with a

dozen or so guys hanging out at a hotel sharing stories of the day."

271.    Defendant Schoep tweeted:  "It was an Honor to stand with U all in C'Ville this

weeknd.  NSM, NF, TWP, LOS, VA, ECK, CHS, and the rest, true warriors!"  "Kneuss" and

other co-conspirators retweeted and liked this.  A co-conspirator posted on Facebook: "Don't feel

ashamed of Cville.  This is your future.  This is the enemy."

272.    Speaking of Charlottesville in an interview, the Grand Dragon for Defendant

Loyal White Knights, said:  "I'm sorta glad that them people got hit and I'm glad that girl died.

They were a bunch of Communists out there protesting against somebody's freedom of speech,

so it doesn't bother me that they got hurt at all." Defendant Loyal White Knights also changed their outgoing voicemail message to say: "Nothing makes us more proud at the KKK than we see white patriots such as James Fields, Jr, age 20, taking his car and running over nine communist anti-fascist, killing one nigger-lover named Heather Heyer. James Fields hail victory. It's men like you that have made the great white race strong and will be strong again."

273.   Likewise, Defendant Spencer told the *New York Times* that August 12 was "a huge moral victory." Defendant Cantwell told a *Vice* reporter: "I'd say it was worth it. Nobody on our side died . . . none of our people killed anybody unjustly . . . our rivals are just a bunch of stupid animals who don't pay attention that couldn't just get out of the way of the car." Speaking of counter-protesters like Plaintiffs, he said: "These people want violence and the right is just meeting market demand."

274.   In addition to celebrating the August 12 "rally" as a success, Plaintiff Romero continued to be harassed and intimidated. Following her release from the hospital, Romero received three more phone calls from the same Klansman who had harassed her in July. On these phone calls, the man explained that he was trying to sell silver Dodge Challengers—the color, make, and model used by Defendants Fields in his car attack—in Charlottesville. Five minutes after Romero hung up, he called again with the same foreboding pitch.

275.   Later, Romero received a fourth call, again from the same individual, in which the caller said, "Don't you hate it when there are random pedestrians blocking the road, and shit like that? There was one girl named Natalie Romero, she got caught in the accident? She should have died in the hospital." These calls terrified Romero and she continues to worry about her safety.

86

276.     Plaintiff Romero, and several other of the Plaintiffs, also appeared on a list purporting to identify "members of Antifa" who had attended the August 12 "rally."  The list identified who had been injured, and who among those "members of Antifa" were "known to be violent."[12]  None of the Plaintiffs were identified on the list as among those "known to be violent."  The list was created by a former member of Defendant Identity Evropa, who then joined Vanguard America in July 2017 and became an active participant on its Southern Front Discord server, bragging "I really can help track most Antifa" and "[m]y info is good and I will do everything I can to help VA [Vanguard America]."

277.     The list he created was circulated on Gab, a Twitter-like social media site where neo-Nazis and white supremacists, many of who mhave been kicked off of traditional social media platforms, share and post information.  On Gab, at least one distribution of the purported "Antifa" list was directed to Defendant Cantwell, among others.

## III.    Defendants' Actions Have Caused and Will Continue to Cause Damage to Plaintiffs

### A.    The Unlawful Acts By Defendants, Co-Conspirators, and Others Acting at Their Direction Caused Serious Injury, Including To Plaintiffs

#### 1)    Defendants' Actions Caused Serious Bodily Injury and Damage to Property

278.     The planned violence brought about by Defendants in Charlottesville on August 11 and 12 left an indelible mark on Plaintiffs, Charlottesville, and the rest of the country. Three innocent people lost their lives:  a peaceful protestor, Heather Heyer, and two state law enforcement officers, Lieutenant H. Jay Cullen and Trooper Pilot Berke M.M. Bates.  At least 34 individuals, including Plaintiffs, were injured and countless others were victims of assault. Hundreds, if not thousands, were subjected to verbal abuse, threats, harassment, and intimidation

---

[12] Defendants considered any individual opposing their "rally" as being "Antifa," regardless of whether they were violent or intended to be violent.

87

when Defendants, co-conspirators, and their followers chanted and shouted overtly anti-Semitic, racist, xenophobic, and homophobic messages.

279.    Countless public officials, including Virginia's governor Terry McAuliffe, Attorney General Jeff Sessions, and Senators Cory Gardner, Ted Cruz, and Ron Wyden, have recognized that the Unite the Right "rallygoers" were motivated by racism, xenophobia, and anti-Semitism, that the "rallygoers" engaged in hate-based violence, and that the events that unfolded were properly characterized as domestic terrorism.

280.    On September 12, 2017, Congress passed a unanimous and bipartisan joint resolution "rejecting white nationalists, white supremacists, the Ku Klux Klan, neo-Nazis, and other hate groups," recognizing that they engaged in a "horrific and violent display of bigotry" in Charlottesville, and condemning "the violence and domestic terrorist attack that took place during events between August 11 and August 12, 2017."

281.    The joint resolution also documented that the hate-based groups are "organizing similar events" around the country, and urged the President to "speak out against hate groups that espouse racism, extremism, xenophobia, anti-Semitism, and white supremacy," and address "the threats posed by those groups," which are currently growing within the United States.

282.    President Trump signed the resolution, and issued a signing statement "oppos[ing] hatred, bigotry, and racism in all forms."

2)      Plaintiffs Suffered And Continue To Suffer Serious Injuries

283.    Plaintiff Magill:  Magill suffered permanent physical injury from a stroke that was caused by the trauma of the events of August 11 and 12.  Four days after the "rally," on Tuesday, August 15, Magill collapsed at UVA library.  He began losing his vision and speech and could

88

barely speak words to tell someone to call an ambulance.  Thankfully, he was able to motion to someone in the library to call for help, and he was rushed to the hospital.

284.    Magill was admitted to the emergency room at 10:00 a.m. on Tuesday where doctors found that his carotid artery had torn and two blood clots were released to his brain, causing a stroke.  Medical professionals maintain that Magill's stroke was a result of trauma to his neck as a result of the events during the weekend.

285.    Magill spent two days in the hospital and according to medical professionals, will never fully recover from the resulting brain injuries.  He has lost aspects of his vision and speech and has difficulty writing and reading for long periods of time.  He has incurred significant medical expenses, and will continue to do so.  He will need continued medical care.  Magill has not yet been able to return to work.

286.    <u>Plaintiff Martin</u>:  As a result of the car attack, Martin was diagnosed with a shattered tibia in his left leg, a fractured ankle, and significant ligament damage.  He underwent surgery and had two screws placed in his ankle.  He experienced swelling in both ankles, and he could not walk for 3 or 4 days.  He has been told to expect swelling in his left ankle for at least a year.  Due to the nature of his job, he will not be able to work for at least 8-9 months.  He has suffered severe emotional distress that includes having mental flashbacks to the events of the "rally." Martin is going to mental counseling twice a week to seek support for his emotional trauma.

287.    <u>Plaintiff Blair</u>:  For days after the attack, Blair found herself short of breath, shaking, and crying uncontrollably at times.  To this day she has trouble focusing, including at work, and finds herself often uncharacteristically angry.  She is scared of Dodge challengers and loud noises.  She is also experiencing flashbacks.  She is withdrawn and reticent in ways she

89

never was before.  She has lost about ten pounds since the attack due to lack of appetite.  She cannot walk by the location of the attack.

288.   <u>Plaintiff Romero</u>:  As a result of her assault and false imprisonment at the torchlight rally, Romero experienced burning in her eyes and on her shoulders, and the fear and anxiety she felt that night prevented her from sleeping.  The car attack the following day left Romero with severe physical injuries and emotional trauma.  Romero suffered a skull fracture, concussion, severe contusions, a fractured tooth, and scratches all over her body.  She suffers from severe vertigo and experiences debilitating headaches that prevent her from leaving the house.  She also cannot be exposed to bright light or look at white paper without experiencing pain.  Her doctors are unsure of when these symptoms will subside.  In addition to her physical injuries, Romero suffered severe emotional trauma as a result of the torchlight rally and car attack.  Romero did not return to campus for classes this fall because of anxiety and fear associated with her assaults on August 11 and 12.

289.   <u>Plaintiff Alvarado</u>:  The car attack on August 12 caused Alvarado serious physical injuries and emotional trauma.  Alvarado suffered a concussion and severe contusions to her legs.  As a result of her concussion, she continues to experience confusion, forgetfulness, and difficulty processing conversations.  In addition to her physical injuries, the car attack also left her with severe emotional trauma.  Alvarado suffers from depression, which has led to weight gain, isolation from her family and friends, and an inability to do daily tasks.

290.   <u>Plaintiff Wispelwey</u>:  Wispelwey continues to suffer from emotional distress.  Wispelwey's emotional distress has manifested in physical symptoms including constricted chest pain, difficulty breathing, and chronic sleep issues.  He regularly wakes up with night terrors recalling the events of August 11 and 12 and has had to take time off from his work in order to

cope with the trauma of the weekend.  He has seen a trauma-informed therapist, has been

proscribed with sleep medication, and diagnosed with acute stress disorder.  Wispelwey has also

become hyper-vigilant, especially in crowds.

291.   Plaintiff Muñiz:  After experiencing the car attack, and being verbally harassed on

August 12, Muñiz has suffered severe emotional injury.  For the first week following the attack,

Muñiz could not drive a car.  She was afraid even to be a passenger without covering her left

eye, because the sight of oncoming traffic was terrifying.  Muñiz has since experienced

triggers—moments where she relives the fear of that day and she shakes and trembles.  She has

suffered a few episodes, in which she has fallen to the ground in a catatonic state and can do

nothing but cry and drool for long periods.  She has been sleeping erratically, has suffered short

term memory issues, and has become socially withdrawn.  She has been unable to obtain medical

care for other conditions due to her stress, so she continues to suffer from other ailments.  She is

seeing a therapist multiple times per week and has started therapy for post-traumatic stress.  At

work, Muñiz used to manage a department of around twenty people, with two managers beneath

her.

292.   Unable to return to work, Muñiz was on leave for disability during which time she

was paid 70% of her pay, and has lost other financial benefits, such as tuition reimbursement.

She returned to work on a reduced schedule on November 1, but her company made a decision

that she is not capable of doing that job anymore so she was placed in a new role with less

responsibility.  Medical professionals have diagnosed Muñiz with acute stress disorder.  Muñiz

returned to work full-time on January 2, although in her new role with less responsibility.  She is

undergoing weekly therapy for her symptoms.

91

293.   <u>Plaintiff John Doe:</u>  As a result of being barked at, yelled at, and physically assaulted, John Doe has suffered numerous emotional injuries.  He has had difficulty focusing in school and is constantly recalling the trauma of Friday evening.  When he walks past the Thomas Jefferson statue on his campus, he is immediately triggered by the recollection of the events on August 11.  Since the "rally," John Doe has had difficulty sleeping and has developed a heightened, anxious, sense of awareness in public spaces.  John Doe also had to miss two weeks of work.

294.   <u>Plaintiff Sines:</u>  Upon witnessing the car attack and nearly being hit, Sines suffered extreme emotional distress and shock.  She often wakes up with nightmares of the car attack and her academic performance has suffered in law school as a result.  Sines is unable to focus, and has missed classes due to her emotional distress.  Sines is also now hyper-vigilant, and afraid in her own home.

295.   <u>Plaintiff Pearce:</u>  In addition to the physical and verbal, religious-based assault Pearce experienced on August 12, she continues to suffer serious emotional distress.  In his Hebrew school class, Pearce's son was asked to answer several writing prompts.  In response to the question, "what makes me uncomfortable about being Jewish," he wrote "neo Nazis."



Since August 12, and in response to threats made against it by Defendants and co-conspirators, Pearce's synagogue Beth Israel has adopted a new, elaborate security protocol that limits parents' ability to pick up their children from Hebrew school.  Whereas prior to August 11, student pick up was a relaxed, joyful process during which parents would chat and children would play, parents must now enter a code to a locked, secure door, after which they are permitted to wait quietly inside the door for their child to be retrieved.  Moreover, Plaintiff Pearce is now afraid for her safety and for the safety of her family at the Synagogue.  And since

93

the attack, she has had to explain to her son why there are always police officers standing guard outside the synagogue.

**B.** **Defendants Will Continue to Cause Violence and Intimidation Unless Restrained: "We Will Be Back"**

296.    In the weeks after the "rally" and the mass of injuries in Charlottesville, Defendants not only claimed "victory," but swore that they would return.  Already, they have followed through on their promise.

297.    Defendant Spencer said:  "To Mayor Mike Signer and Wes Bellamy and all these little creeps of this little town who don't understand who they're dealing with—the local little losers—we are never backing down.  We are going to be back."

298.    Defendant Anglin wrote on August 14:  "As for media rumors that the [Daily Stormer] site will be shut down . . . .  You should know better.  It's going to take bullets to stop us."

299.    Co-conspirator McLaren tweeted:  "Brothers & sisters across the Alt Right—this is a taste of how it feels to be the tip of the spear entering our civilizational crisis." A few days later, he tweeted:  "If you were there in #Charlottesville, you're amused at the pronouncements of the Alt Right's death.  We are only just beginning."

300.     "There's no way in hell I'm not going back to Charlottesville," Defendant Spencer declared at a press conference with Defendant Damigo.  Defendant Mosley told the Huffington Post:  "Our people are feeling real good right now…This day was a milestone pushing us into our next stage.  We had a large turnout.  We're coming back to Charlottesville."

301.    The Daily Stormer also vowed that it would hold similar events "soon."  A post on the website read: "We are going to start doing this nonstop.  Across the country . . . We are

going to go bigger than Charlottesville.  We are going to go huge."  Furthermore, it told readers

that "[w]e are now at war," and promised to "take over the country."

302.    Defendant Kessler promised:  "We're going to have bigger and bigger events in

Charlottesville."

303.    Defendants plan for these other events to be violent.  After the Unite the Right

"rally," Defendant Cantwell explained, "I came pretty well prepared for this thing today," while

pulling out three pistols, two semi-automatic machine guns, and a knife.  Of the next "alt-right

protest," he said, "it's going to be tough to top but we're up to the challenge . . . I think a lot

more people are going to die before we're done here, frankly."

304.    Following his release on bond for the offenses committed on August 12,

Defendant Cantwell remarked that after his stint in prison, he wants to "turn it up to 11."

305.    One week after the Unite the Right "rally," Richard Spencer's website, Vincent

Law, published "The Alt-Right is Finished Debating:  No More Words, Only Preparation Now":

> Now, what happens next?  Our side certainly isn't ready for
> mass action . . . yet.  And there are no street actions planned for the
> near future.  Still, the lines have been drawn.  Think about those
> brave young men at Charlottesville.  There is no going back for
> them. . . .
>
> The public will see very soon that debate is pointless.
> There are no principles at play anymore.  Only our tribe and theirs.
> And only one group out there has drawn a line in the clay and
> decided to make a stand for what is theirs by birth, by blood and
> by the will of God.  The Alt-Right is finished debating, negotiating,
> surrendering.  We're ready to close ranks and fight for what is ours.
> Post-Charlottesville our fleet lies at the bottom of a deep and
> troubled sea and we can only march on forward like Cortez once
> did.  And like him, we stand poised to conquer the continent.

306.    On Saturday, October 7, Defendant Spencer and other co-conspirators returned to

Charlottesville.  The called the event "Charlottesville 3.0."  Again, they carried tiki torches, and

again they chanted "You will not replace us."  But this time, they added: "We will be back, we will be back."

307.    On November 27, 2017, Defendant Kessler filed an application for a permit to hold another "rally" in Charlottesville.  Although that application was denied, Kessler has indicated that it will proceed nonetheless.  It is scheduled to occur on August 11 and 12, 2018.

C.  **Defendants Continue Their Efforts of Mutual Support and Coordination**

308.    Using many of the same platforms the Defendants used to fund their pre-"rally" coordination and planning, Defendants have since provided mutual support to defray the costs associated with their unlawful conduct.

309.    Defendant Cantwell posted bail in connection with his felony indictment by crowdfunding on white-supremacist supportive sites Hatreon and GoyFundMe.  Cantwell's GoyFundMe page solicited donations for the "1433 Justice Fund," a personalized version of the popular white supremacist numeric symbol "1488."  The "14" stands for the 14 Words slogan, which is the heart of Cantwell and his co-conspirators' ideology:  "We must secure the existence of our people and a future for white children."  In place of the usual "88," which is shorthand for "Heil Hitler" (H being the 8th letter of the alphabet), "33" is a stand-in for "CC" or "Chris Cantwell."

310.    While in prison, Defendant Cantwell continued to broadcast his podcast Radical Agenda with the assistance of Defendant Peinovich.  Moreover, Peinovich assisted Cantwell in his fundraising by distributing recordings of phone calls from jail in which Cantwell makes pleas for donations.

311.    Similarly, Defendant Damigo, founder of co-Defendant Identity Evropa, established a purported "Identity Evropa Defense Fund," and solicited donations for himself,

96

Defendant Mosley, and Defendant Identity Evropa.  Mosley and Damigo also appeared together with Defendant Spencer on "Red Ice TV" to solicit donations.

## **CONSPIRACY ACTS**

312.    As detailed above, all Defendants had an agreement and understanding to engage in, promote, and incite racial, religious, and ethnicity-based harassment and violence.  They did so through, among other things, using and encouraging the use of weapons and caustic substances, military-style marches, burning torches, intimidating iconography, and threats of violence.  They did so in order to (a) injure black and Jewish residents of Virginia by denying them the equal privileges and immunities of citizenship, and the use, benefits and privileges of property and/or contractual relationships, (b) further Defendants' cause of recruiting new followers to engage in racial, religious, and ethnically-motivated violence referenced above both at the Unite the Right "rally" and in the future, and (c) compel the city of Charlottesville to maintain the statue of Robert E Lee in Emancipation Park as a means of furthering their aforementioned goals.

313.    All Defendants, with the exception of Defendant Fields, on behalf of themselves or the organizations for which they are agents, planned and coordinated the Unite the Right "rally," encouraged attendance, actively organized followers to attend, coordinated logistical support to attendees, promoted the "rally" as violent, and encouraged attendees to prepare for and commit violent acts.

314.    Among other things, they used online and media platforms to encourage attendance at the Unite the Right "rally," to discuss and promote causing harm to Jewish people and people of color, and to promote violence.

97

315.    Defendant Spencer and co-conspirator McLaren met in person to plan unlawful acts of violence, intimidation, and denial of equal protection for the Unite the Right events.

316.    Defendants Cantwell and Kessler met in person in Charlottesville to plan unlawful acts of violence, intimidation, and denial of equal protection for the Unite the Right events.

317.    Defendants Ray, Cantwell, and Mosley and co-conspirator David Duke attended an in-person planning meeting on August 11 to plan unlawful acts of violence, intimidation, and denial of equal protection at the Unite the Right events.

318.    Defendants Anglin and Ray (using, among other things, Daily Stormer's website), Hill, and East Coast Knights organized and caused others to attend the Unite the Right events and commit acts of violence, intimidation, and denial of equal protection.

319.    Defendants Nationalist Front, NSM, TWP, League of the South, Vanguard America, East Coast Knights, and "other allies," coordinated their attendance as a "joint operation" in advance of August 12, in order to plan unlawful acts of violence, intimidation, and denial of equal protection at the Unite the Right events.

320.    Defendant Damigo and his group Identity Evropa took a lead role in organizing white supremacist participation among people from outside Charlottesville to engage in unlawful acts of violence, intimidation, and denial of equal protection at the Unite the Right events.

321.    Defendants Kessler and Mosley organized the "rally" and coordinated logistics, along with co-conspirator Tyrone, for attendees on August 12 in Charlottesville so that they would engage in unlawful acts of violence, intimidation, and denial of equal protection at the Unite the Right events.

98

322.    Defendant Kessler and Mosley moderated, reviewed, and managed the Charlottesville discussion forum on the application named Discord to direct and plan unlawful acts of violence, intimidation, and denial of equal protection at the Unite the Right events. Along with Kessler and Mosley, Defendants Heimbach, Parrott, Cantwell, Ray, an agent of Daily Stormer (and, hence, Defendants Anglin and Moonbase Holdings), and co-conspirator Tyrone were all participants in Discord and in the direction, planning, and inciting of such unlawful acts through Discord, including the use of weapons and objects to inflict harm and intimidate. Defendants Vanguard America, Identity Evropa, TWP, League of the South, and Moonbase Holdings (through Daily Stormer) all had members on the Discord channel.

323.    Defendants Cantwell, Ray, and Anglin, among others, advised rallygoers on bringing weapons.

324.    Using Discord, Defendants Kessler and Mosley set up a channel for co-conspirators to coordinate unlawful acts at the Unite the Right events, including acts of violence, intimidation, and denial of equal protection.

325.    Defendants Anglin, Ray, and, through Daily Stormer, Moonbase Holdings, set up a channel for co-conspirators to coordinate unlawful acts, including acts of violence, intimidation, and denial of equal protection, at the Unite the Right events.

326.    Defendants Cantwell, Kessler, Mosley, Anglin, Ray, and Peinovich, and others, raised funds, planned for legal support, and arranged travel for the participants who engaged in unlawful acts of violence, intimidation, and denial of equal protection at the Unite the Right events.

327.    Defendants Peinovich, Invictus, Kessler, Spencer, Cantwell, Heimbach, and Hill were featured in the promotional poster for the Unite the Right "rally."

99

328.    Defendants Cantwell, Mosley, Spencer, Kessler, Ray, Anglin, and co-conspirators planned and organized a "secret" torch parade at UVA for August 11, with a plan and intent to intimidate, threaten and harass Charlottesville residents, particularly Jews, blacks, and other minority residents.

329.    Defendants Cantwell, Mosley, Spencer, Kessler, Ray and Invictus attended and participated in the violent August 11 torch parade, and directed and incited physical assaults and violence, the use of open flames, and the intimidation of minority residents and those who advocate for equal rights for minority citizens.

330.    Defendant Cantwell assaulted peaceful protestors with mace, a caustic substance, during the August 11 march.

331.    Co-conspirators attended the torchlight march on August 11 and engaged in acts of intimidation, harassment, and violence.

332.    All Defendants, with the exception of Anglin, attended and participated in the Unite the Right "rally" on August 12, during which they threatened, intimidated, and harassed protestors and minority residents, and incited and engaged in violence.  Defendant Fields attended with Vanguard America, wearing the uniform white polo and khakis, and carrying a black shield with the Vanguard logo.

333.    All Defendants, with the exception of Defendant Fields, directed and incited acts of violence and intimidation at the Unite the Right "rally" on August 12.

334.    Co-Conspirators attended the Unite the Right "rally" on August 12 and engaged in acts of intimidation, harassment, and violence.

335.    Defendant Fields deliberately drove his Dodge Challenger into a crowd of peaceful protestors on August 12, intending to instill fear in the community and to cause injuries on a mass scale.

### CAUSES OF ACTION

### COUNT I: 42 U.S.C. § 1985(3)

### (By All Plaintiffs Against All Defendants)

336.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

337.    Defendants plotted, coordinated, and executed a common plan to engage in violence and intimidation in the streets of Charlottesville.

338.    In furtherance of a conspiracy to violate the rights of Plaintiffs and other black and Jewish people and their supporters, Defendants repeatedly engaged in campaigns of violence, threats, and intimidation at Lee Park and throughout the city of Charlottesville.

339.    Defendants have committed numerous overt acts in furtherance of the conspiracy to violate Plaintiffs' rights, which are set forth in the paragraphs above.  Defendants have sought to create an atmosphere of violence against Plaintiffs, and to violate Plaintiffs' equal rights, including those under U.S.C. § 1982.

340.    Co-conspirators whose identities are not known committed numerous additional acts in furtherance of the conspiracy to violate Plaintiffs' rights, including those alleged herein.

341.     The illegal activities described were undertaken by Defendants, their agents, and co-conspirators as express overt acts pursuant to an unlawful conspiracy, the purpose of which was and is to discriminatorily deprive black, Jewish, nonwhite individuals, and their white supporters, of their rights to the equal protection of the laws and their rights to the equal

101

enjoyment of the privileges and immunities of citizens of the United States guaranteed by the Constitution and laws, because of their race, religion, and open and obvious advocacy for the rights of nonwhite individuals.

342.   As a result of the acts set out in the above paragraphs committed in furtherance of this conspiracy, Plaintiffs suffered injuries to their person or property and/or suffered the discriminatory deprivation of one or more of their rights or privileges guaranteed by the Constitution or laws because of one or more of the illegal overt acts of Defendants and their agents.  These rights include but are not limited to their rights to be free of the badges and incidents of slavery pursuant to the Thirteenth Amendment, as well as their rights protected by 42 U.S.C. § 1982.

343.   Because of Defendants' violation of Plaintiffs' rights, Plaintiffs have suffered numerous and various injuries, including bodily injury, injuries to property, lost income, and severe emotional distress.

## COUNT II: 42 U.S.C. § 1986

### (By All Plaintiffs Against All Defendants)

344.   Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

345.   Defendants all possessed actual knowledge of the Section 1985(3) anti-civil rights conspiracy described in this complaint that was planned and then undertaken against the class of American citizens described—including a number of the Plaintiffs named herein.

346.   Defendants, as organizers, planners, promoters, and leaders of the conspiracy, were each in a position and had the power to have stopped the anti-civil rights conspiracy or to aid in stopping it.

347.     Each of the Defendants failed and refused to take any steps to attempt to stop this conspiracy or any of the overt acts committed in furtherance of the conspiracy so as to stop the injuries which occurred to Plaintiffs or to other members of the class of citizens targeted by the anti-civil rights conspiracy described.

348.     The failure of Defendants to take any steps to aid in preventing the actions described herein, by informing the lawful authorities or otherwise, violated the command of 42 U.S.C. § 1986.

349.     Plaintiffs suffered their injuries as a result of the individual Defendants' failure to stop the described conspiracy.

## COUNT III: CIVIL CONSPIRACY

### (By All Plaintiffs Against All Defendants)

350.     Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

351.     Each Defendant conspired together and combined with one or more other persons to accomplish, through the concerted action described above, unlawful and tortious acts, including:

a.   Subjecting persons to acts of intimidation or harassment, motivated by racial, religious, or ethnic animosity, in violation of Virginia Code § 8.01-42.1.

b.   Directing violence at another person, motivated by racial, religious, or ethnic animosity, in violation of Virginia Code § 8.01-42.1.

c.   Directing vandalism at a person's real or personal property, motivated by racial, religious, or ethnic animosity, in violation of Virginia Code § 8.01-42.1.

d.   Causing or producing a riot, in violation of Virginia Code § 18.2-408.

103

e. Directing, inciting, or soliciting other persons participating in a riot to acts of force or violence in violation of Virginia Code § 18.2-408.

f. Causing public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof in violation of Virginia Code § 18.2-415.

g. Assembling a collection of people for the purpose and with the intention of committing, and actually committing, an assault or battery on another person, in violation of Virginia Code §§ 18.2-38, 18.2-42, and 18.2-42.1.

h. Assembling a collection of people for the purpose and with the intention of committing, and actually committing, an act of violence (as defined in Virginia Code § 19.2-297.1), in violation of Virginia Code §§ 18.2-38, 18.2-42, and 18.2-42.1.

i. Maliciously causing another person bodily injury by use of any explosive or fire, in violation of Virginia Code § 18.2-52.

j. Burning an object with the intent to intimidate on a highway or other public place in a manner having a direct tendency to place another person in reasonable fear of apprehension of death or bodily injury, in violation of Virginia Code § 18.2-423.01.

k. Burning an object with the intent to intimidate on the private property of another without permission, in violation of Virginia Code § 18.2-423.01.

l. Committing an act of violence with the intent to intimidate a civilian population at large, or influence the conduct or activities of a government through intimidation, in violation of § 18.2-46.5.

m.  Possessing, using, selling, giving, distributing, or manufacturing a weapon or imitation weapon that could cause serious bodily harm in connection with an act of terrorism in violation of Virginia Code § 18.2-46.5.

n.  Inviting, soliciting, recruiting, encouraging, or otherwise causing another to participate in an act of terrorism in violation of Virginia Code § 18.2-46.5.

o.  Knowingly providing material support to an individual or organization whose primary objective is to commit an act of terrorism, with the intent to further the individual or organization's objectives, in violation of Virginia Code § 18.2-46.5.

p.  Engaging in an overt act intended to inflict bodily harm, or intended to place the victim in fear or apprehension of bodily harm (assault).

q.  Committing an unwanted touching that was neither consented to, excused, or justified (battery).

r.  Causing reasonable apprehension that force will be used unless a person willingly submits and causing him to submit to the extent that he is denied freedom of action (false imprisonment).

352.  Each of the Plaintiffs suffered damages resulting from acts committed in furtherance of the conspiracy.

353.  As co-conspirators, Defendants are civilly liable to Plaintiffs for the actions of all individuals who acted in pursuit of the common conspiratorial scheme.

## COUNT IV: NEGLIGENCE PER SE

### (By Plaintiffs Muñiz, Sines, Blair, Martin, Alvarado, and Romero Against Defendant Fields)

354.  Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

105

355.     Pursuant to Virginia Code 18.2-46.5, any person who commits or conspires to commit or aids and abets the commission of an act of terrorism is guilty of a felony.

356.     Virginia Code 18.2-46.4 defines an "act of terrorism" as, among other things, an act of violence committed with the intent to intimidate the civilian population at large.

357.     Virginia Code 18.2-46.5 was enacted to protect the civilian population from acts of terrorism and violence.

358.     Fields intentionally drove his vehicle into a group of civilians and counter-protestors with the intent to murder, injure, and intimidate the civilian population at large, in violation of Virginia Code § 18.2-46.5.

359.     Plaintiffs, as members of the civilian population, belong to the class of persons for whose benefit Virginia Code § 18.2-46.5 was enacted and the violation of the Statute constitutes negligence per se.

360.     The injuries suffered by Plaintiffs were the type of harm against which Virginia Code 18.2-46.5 was designed to protect.

361.     Defendant's violation of Virginia Code § 18.2-46.5 directly and proximately caused the Plaintiffs harm.

### COUNT V: VIOLATION OF VIRGINIA CODE § 8.01-42.1
### CIVIL ACTION FOR RACIAL, RELIGIOUS, OR ETHNIC HARASSMENT

### (By Plaintiffs Wispelwey, Magill, Muñiz, John Doe, Sines, Blair, Martin, Alvarado, and Romero Against Defendants Fields, Mosley, Spencer, Kessler, Ray, Cantwell, and Invictus)

362.     Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

363.     Virginia Code 8.01-42.1 creates a civil cause of action for any person who is subjected to the following if motivated by racial, religious, or ethnic animosity: (1) acts of

106

intimidation or harassment; (2) violence directed at his or her person; or (3) vandalism directed against his or her real or personal property.

364.    Plaintiffs Wispelwey, Magill, Muñiz, John Doe, Sines, Blair, Martin, Alvarado, and Romero were subjected to acts of intimidation and/or harassment, violence directed at their persons, and/or vandalism directed against their real and/or personal property.

365.    These acts were motivated by Defendants' racial, religious, or ethnic animosity.

## COUNT VI: ASSAULT AND BATTERY

### (By Plaintiffs Muñiz, Sines, Blair, Martin, Alvarado, and Romero Against Defendant Fields)

366.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

367.    As a result of the intentional and unlawful acts of Defendants as described herein, Plaintiffs Muñiz, Sines, Blair, Martin, Alvarado, and Romero were placed in apprehension of harmful and/or offensive bodily contact, and suffered harmful, offensive bodily touching which was neither consented to, excused, or justified.

## COUNT VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (By Plaintiffs Muñiz, Sines, Blair, Martin, Alvarado, and Romero Against Defendant Fields)

368.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

369.    Defendant Fields intentionally and/or recklessly drove his car into a crowd of counter-protestors with the intent to murder, severely injure, and intimidate a civilian population.

370.    As a result of Defendant Fields's outrageous and extreme actions, Plaintiffs

Muñiz, Blair, Martin, Alvarado, and Romero suffered severe emotional distress that no

reasonable person could be expected to endure.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request an award of the following relief:

371.    A declaratory judgment that the actions described herein deprived Plaintiffs of

their rights under federal and state law.

372.    Injunctive relief enjoining Defendants from future violations of rights guaranteed

by state and federal law.

373.    Compensatory and statutory damages in an amount to be determined at trial.

374.    Punitive damages in an amount to be determined at trial.

375.    Such other relief as the Court deems necessary and just.

Respectfully submitted,

*s/ Robert T. Cahill*
Robert T. Cahill (VSB 38562)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
Email: rcahill@cooley.com

*Of Counsel for all Plaintiffs:*

Roberta A. Kaplan (*pro hac vice*)
Julie E. Fink (*pro hac vice*)
Christopher B. Greene (*pro hac vice*)
Seguin L. Strohmeier (*pro hac vice*)
KAPLAN & COMPANY, LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: (212) 763-0883
Email: rkaplan@kaplanandcompany.com
Email: jfink@kaplanandcompany.com
Email: cgreene@kaplanandcompany.com
Email: sstrohmeier@kaplanandcompany.com

Karen L. Dunn (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Telephone: (202) 237-2727
Fax: (202) 237-6131
Email: kdunn@bsfllp.com
Email: wisaacson@bsfllp.com

Philip M. Bowman (*pro hac vice*)
Joshua J. Libling (*pro hac vice*)
Yotam Barkai (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
575 Lexington Ave.
New York, NY 10022
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: pbowman@bsfllp.com
Email: jlibling@bsfllp.com
Email: ybarkai@bsfllp.com

109

Alan Levine (*pro hac vice*)
COOLEY LLP
1114 Avenue of the Americas, 46th Floor
New York, NY 10036
Telephone: (212) 479-6260
Fax: (212) 479-6275
Email: alevine@cooley.com

David E. Mills (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Fax: (202) 842-7899
Email: dmills@cooley.com

*Of Counsel for Plaintiff Natalie Romero:*

Kenneth D. Bynum (VSB: 23177)
BYNUM & JENKINS, PLLC
1010 Cameron Street
Alexandria, Virginia 22314
(703) 549 7211 Direct Dial
(703) 549 7701 Fax
KBynum@BynumAndJenkinsLaw.com

Pleasant S. Brodnax, III (VSB: 26477)
1701 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C. 20006
Telephone: (202) 462-1100
Fax:  (202) 204-5165
www.pleasantbrodnax.com

110

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2018 I filed the foregoing with the Clerk of Court

through the CM/ECF system, which will send a notice of electronic filing to:

Justin Saunders Gravatt
David L. Hauck
David L. Campbell
Duane, Hauck, Davis & Gravatt, P.C.
100 West Franklin Street, Suite 100
Richmond, VA 23220
jgravatt@dhdglaw.com
dhauck@dhdglaw.com
dcampbell@dhdglaw.com

*Counsel for Defendant James A. Fields, Jr.*

Bryan Jones
106 W. South St., Suite 211
Charlottesville, VA 22902
bryan@bjoneslegal.com

*Counsel for Defendants Michael Hill, Michael Tubbs, and League of the South*

Elmer Woodard
5661 US Hwy 29
Blairs, VA 24527
isuecrooks@comcast.net

James E. Kolenich
Kolenich Law Office
9435 Waterstone Blvd. #140
Cincinnati, OH 45249
jek318@gmail.com

*Counsel for Defendants Jeff Schoep, Nationalist Front, National Socialist Movement, Matthew Parrott, Matthew Heimbach, Robert Ray, Traditionalist Worker Party, Elliot Kline, Jason Kessler, Vanguard America, Nathan Damigo, Identity Europa, Inc. (Identity Evropa), and Christopher Cantwell*

I further hereby certify that on January 5, 2018, I also served the following non-ECF participants, via U.S. mail, First Class and postage prepaid, addressed as follows:

Loyal White Knights of the Ku Klux Klan
a/k/a Loyal White Knights Church of the
Invisible Empire, Inc.
c/o Chris and Amanda Barker
P.O. Box 54
Pelham, NC 27311

Richard Spencer
1001-A King Street
Alexandria, VA 22314

Michael Peinovich
a/k/a Michael "Enoch" Peinovich
PO Box 1069
Hopewell Junction, NY 12533

Moonbase Holdings, LLC
c/o Andrew Anglin
6827 N. High Street, Suite 121
Worthington, OH 43085

Andrew Anglin
6827 N. High Street, Suite 121
Worthington, OH 43085

East Coast Knights of the Ku Klux Klan
a/k/a East Coast Knights of the True
Invisible Empire
26 South Pine St.
Red Lion, PA 17356

Fraternal Order of the Alt-Knights (c/o
Proud Boys)
c/o LegalCorp Solutions, LLC
11 Broadway, Suite 615
New York, NY 10004

Augustus Sol Invictus
206 N. Mills Avenue
Orlando, FL 32801

_s/ Robert T. Cahill_____
Robert T. Cahill (VSB 38562)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
Email: rcahill@cooley.com

_Counsel for Plaintiffs_

2