# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

ELIZABETH SINES, SETH WISPELWEY, MARISSA BLAIR, TYLER MAGILL, APRIL MUNIZ, HANNAH PEARCE, MARCUS MARTIN, NATALIE ROMERO, CHELSEA ALVARADO, and JOHN DOE,

                           Plaintiffs,

v.

JASON KESSLER, RICHARD SPENCER, CHRISTOPHER CANTWELL, JAMES ALEX FIELDS, JR., VANGUARD AMERICA, ANDREW ANGLIN, MOONBASE HOLDINGS, LLC, ROBERT "AZZMADOR" RAY, NATHAN DAMIGO, ELLIOT KLINE a/k/a/ ELI MOSLEY, IDENTITY EVROPA, MATTHEW HEIMBACH, MATTHEW PARROTT a/k/a DAVID MATTHEW PARROTT, TRADITIONALIST WORKER PARTY, MICHAEL HILL, MICHAEL TUBBS, LEAGUE OF THE SOUTH, JEFF SCHOEP, NATIONAL SOCIALIST MOVEMENT, NATIONALIST FRONT, AUGUSTUS SOL INVICTUS, FRATERNAL ORDER OF THE ALT-KNIGHTS, MICHAEL "ENOCH" PEINOVICH, LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN, and EAST COAST KNIGHTS OF THE KU KLUX KLAN a/k/a EAST COAST KNIGHTS OF THE TRUE INVISIBLE EMPIRE,

                           Defendants.

**Civil Action No. 3:17-cv-00072-NKM**

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

RELEVANT FACTUAL BACKGROUND ............................................................................. 5

I.      THE HIGHLY COORDINATED VIOLENCE OF CHARLOTTESVILLE 2.0 .............. 5

        A.      Friday Night: The "Secret" Torch Parade ................................................................. 5

        B.      Saturday Morning: The Siege of Emancipation Park ............................................. 7

        C.      Saturday Afternoon: McIntire Park ....................................................................... 9

        D.      The Car Attack ................................................................................................... 11

II.     THE CONSPIRACY TO VIOLENTLY ADVANCE WHITE SUPREMACY ............... 12

        A.      Defendants Conspired in Advance of Charlottesville 2.0 ..................................... 12

        B.      Consistent with Their Plan, Defendants Actively Coordinated the Violence and
                Intimidation that Occurred in Charlottesville on August 11 and 12 ..................... 18

        C.      The Conspirators Celebrated Charlottesville 2.0 as a Success ............................. 20

        D.      Defendants and Their Co-Conspirators Inflicted Injuries on Plaintiffs ............... 21

STANDARD OF REVIEW .................................................................................................. 22

ARGUMENT ....................................................................................................................... 22

I.      PLAINTIFFS HAVE STATED A CLAIM UNDER 42 U.S.C. § 1985(3) ..................... 22

        A.      Existence of a Conspiracy .................................................................................... 24

        B.      The Object of the Conspiracy: Deprivation of the Equal Enjoyment of Rights
                Secured by the Law to All ................................................................................... 31

                1.      Thirteenth Amendment ............................................................................. 31

                2.      42 U.S.C. § 1982 ....................................................................................... 34

II.     PLAINTIFFS HAVE STATED A CLAIM UNDER 42 U.S.C. § 1986 .......................... 36

III.    PLAINTIFFS HAVE STATED A CLAIM OF COMMON LAW CIVIL
        CONSPIRACY ............................................................................................................. 36

IV.     INDIVIDUAL PLAINTIFFS HAVE STATED CLAIMS AGAINST CERTAIN
        INDIVIDUAL DEFENDANTS UNDER VIRGINIA CODE § 8.01-42.1 ..................... 40

i

V.       DEFENDANTS' CONSTITUTIONAL OBJECTIONS ARE MERITLESS .................. 41

      A.      The First Amendment Does Not Protect Defendants' Violent Conspiracy .......... 41

      B.      The Second Amendment Does Not Protect Defendants' Use of Weapons .......... 44

CONCLUSION ......................................................................................................................... 45

Case 3:17-cv-00072-NKM-JCH   Document 231   Filed 02/20/18   Page 3 of 56   Pageid#: 1402

## TABLE OF AUTHORITIES

**Cases**

*Antonio* v. *Sec. Servs. of Am., LLC*,
   701 F. Supp. 2d 749 (D. Md. 2010) ........................................................ 31

*Ashcroft* v. *Free Speech Coal*,
   535 U.S. 234 (2002) ............................................................................. 42

*Ashcroft* v. *Iqbal*,
   556 U.S. 662 (2009)............................................................................... 22

*Bell Atl. Corp.* v. *Twombly*,
   550 U.S. 544 (2007)........................................................................ 22, 24

*Bergman* v. *United States*,
   551 F. Supp. 407 (W.D. Mich. 1982) ............................................... 22, 23

*Berry* v. *Target Corp.*,
   214 F. Supp. 3d 530 (E.D. Va. 2016) ................................................... 40

*Brandenburg* v. *Ohio*,
   395 U.S. 444 (1969)........................................................................ 41, 42

*Bray* v. *Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993)............................................................................... 31

*Brown* v. *Hartlage*,
   456 U.S. 45 (1982)........................................................................... 2, 43

*CaterCorp, Inc.* v. *Catering Concepts, Inc.*,
   246 Va. 22 (1993) ................................................................................ 36

*Coleman* v. *Boeing Co.*,
   No. 2:16-CV-1451, 2017 WL 2992526 (D.S.C. June 22, 2017) ............. 36

*Commercial Bus. Sys., Inc.* v. *BellSouth Servs., Inc.*,
   249 Va. 39 (1995) ...................................................................... 36, 37, 38

*Dogs Deserve Better, Inc.* v. *Terry*,
   No. 3:14-cv-591, 2015 WL 1288324 (E.D. Va. Mar. 20, 2015) ............. 36

*Frazier* v. *Cooke*,
   No. 4:17-cv-54, 2017 WL 5560864 (E.D. Va. Nov. 17, 2017) ........ passim

*Geinosky* v. *City of Chicago*,
   675 F.3d 743 (7th Cir. 2012) .......................................................... 25, 29

*Giboney* v. *Empire Storage & Ice Co.*,
    336 U.S. 490 (1949)..................................................................... 2, 42, 43

*Goldfarb* v. *Mayor & City Council of Balt.*,
    791 F.3d 500 (4th Cir. 2015) ........................................................... 28

*Griffin* v. *Breckenridge*,
    403 U.S. 88 (1971).................................................................... passim

*Hall* v. *DIRECTV, LLC*,
    846 F.3d 757 (4th Cir. 2017) ........................................................... 27

*Hamilton* v. *Pallozzi*,
    848 F.3d 614 (4th Cir. 2017) ........................................................... 45

*Hill* v. *City of New York*,
    No. 03-cv-01283, 2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005)...................... 24, 25

*Hinkle* v. *City of Clarksburg, W.Va.*,
    81 F.3d 416 (4th Cir. 1996) ......................................................... 24, 25

*Hui Kun Li* v. *Shuman*,
    No. 5:14-cv-00030, 2015 WL 3766182 (W.D. Va. June 16, 2015) ........................ 37

*Jiang* v. *Porter*,
    156 F. Supp. 3d 996 (E.D. Mo. 2015) ............................................... 24, 27

*Johnson* v. *City of Fayetteville*,
    No. 5:12-CV-456, 2013 WL 12165680 (E.D.N.C. Mar. 28, 2013)........................ 25

*Jones* v. *Alfred H. Mayer Co.*,
    392 U.S. 409 (1968)................................................................ 31, 34

*Koffman* v. *Garnett*,
    265 Va. 12 (2003) ................................................................. 38, 39

*Kunik* v. *Racine Cty.*,
    946 F.2d 1574 (7th Cir. 1991) ......................................................... 25

*McDonough* v. *Aetna Life Ins. Co.*,
    No. 3:09-Civ-71, 2010 WL 1418878 (W.D. Va. Apr. 8, 2010).............................. 2

*Mendocino Envtl. Ctr.* v. *Mendocino Cty.*,
    192 F.3d 1283 (9th Cir. 1999) ............................................... 24, 25, 28, 29

*Morris* v. *Fletcher*,
    No. 7:15-cv-00675, 2017 WL 1161888 (W.D. Va. Mar. 27, 2017) ........................ 22

*Mylan Labs., Inc.* v. *Akzo, N.V.*,
770 F. Supp. 1053 (D. Md. 1991) ................................................................................. 29

*New York State Nat'l Org. for Women* v. *Terry*,
886 F.2d 1339 (2d Cir. 1989) ...................................................................................... 25

*Occupy Columbia* v. *Haley*,
738 F.3d 107 (4th Cir. 2013) ...................................................................................... 45

*Patrick* v. *City of Chicago*,
213 F. Supp. 3d 1033 (N.D. Ill. 2016) ........................................................................ 26

*Rice* v. *Paladin Enters., Inc.*,
128 F.3d 233 (4th Cir. 1997) ................................................................................. 2, 43

*Roberts* v. *United States Jaycees*,
468 U.S. 609 (1984) .................................................................................................. 43

*Salim* v. *Dahlberg*,
170 F. Supp. 3d 897 (E.D. Va. 2016) ......................................................................... 40

*Shaare Tefila Congregation* v. *Cobb*,
481 U.S. 615 (1987) .................................................................................................. 31

*Simmons* v. *Poe*,
47 F.3d 1370 (4th Cir. 1995) ........................................................................ 27, 29, 33

*Snyder* v. *Phelps*,
562 U.S. 443 (2011) ............................................................................................ 41, 42

*Soo Park* v. *Thompson*,
851 F.3d 910 (9th Cir. 2017) ..................................................................................... 24

*St. Francis College* v. *Al–Khazraji*,
481 U.S. 604 (1987) .................................................................................................. 31

*Thomasson* v. *Perry*,
80 F.3d 915 (4th Cir. 1996). ...................................................................................... 43

*United Brotherhood of Carpenters* v. *Scott*,
463 U.S. 825 (1983) ................................................................................ 23, 31, 33, 35

*United States* v. *Amawi*,
695 F.3d 457 (6th Cir. 2012) ........................................................................... 2, 41, 42

*United States* v. *Bledsoe*,
728 F.2d 1094 (8th Cir. 1984) ................................................................................... 32

v

*United States* v. *Cannon*,
750 F.3d 492 (5th Cir. 2014), ........................................................... 32

*United States* v. *Chester*,
628 F.3d 673 (4th Cir. 2010) ........................................................... 44

*United States* v. *Greer*,
939 F.2d 1076 (5th Cir. 1991) ...................................................... 34, 35

*United States* v. *Hatch*,
722 F.3d 1193 (10th Cir. 2013) ........................................................ 32

*United States* v. *Roof*,
225 F. Supp. 3d 438 (D.S.C. 2016) ............................................. 31, 32

*United States* v. *Williams*,
53 U.S. 285 (2008) ........................................................................ 42

*Vansant & Gusler, Inc.* v. *Washington*,
245 Va. 356 (1993) .................................................................... 37, 38

*Vietnamese Fishermen's Ass'n* v. *Knights of the KKK*,
518 F. Supp. 993 (S.D. Tex. 1981) .................................................. 33

*Waller* v. *Butkovich*,
584 F. Supp. 909 (M.D.N.C. 1984) .................................................. 33

*Ward* v. *Connor*,
657 F.2d 45 (4th Cir. 1981) ............................................................ 23

*Wisconsin* v. *Mitchell*,
508 U.S. 476 (1993) ................................................................... 2, 43

*Zayre of Va., Inc.* v. *Gowdy*,
207 Va. 47 (1966) .......................................................................... 39

*Ziglar* v. *Abbasi*,
137 S. Ct. 1843 (2017) .................................................................... 23

## **Statutes**

42 U.S.C. § 1982 .................................................................. passim

42 U.S.C. § 1985(3) .............................................................. passim

42 U.S.C. § 1986 ............................................................................ 36

Virginia Code § 18.2-408 ................................................................ 38

Virginia Code § 18.2-46.5 ................................................................................................. 38

Virginia Code § 8.01-42.1 ........................................................................................ 38, 40, 43

**<u>Rules</u>**

Federal Rule of Civil Procedure 12(b)(6) ...................................................... 22, 24, 42

Case 3:17-cv-00072-NKM-JCH   Document 231   Filed 02/20/18   Page 8 of 56   Pageid#: 1407

## PRELIMINARY STATEMENT

On August 11 and 12, 2017, Defendants and their followers subjected people of color, Jewish people, and supporters of racial and religious equality to a premeditated, two-day campaign of violence and intimidation. Motivated by racial animus and armed with deadly weapons, Defendants filled the City of Charlottesville, Virginia, with echoes of slavery and the Holocaust. Their acts of domestic terrorism inflicted traumatic injuries on many innocent people, including the men and women who filed this case. Although Defendants now seek to portray themselves as peaceful protesters—who just happened to somehow get caught up in violence and destruction that none of them anticipated—nothing could be further from the truth. The particularized factual allegations set forth in the First Amended Complaint ("FAC"), including dozens of private exchanges between Defendants and their followers on secret online platforms, reveal that their brutal and destructive course of conduct was no accident. It reflected months of extensive, coordinated, and militaristic planning by Defendants and their co-conspirators. This common plan to commit acts of racial violence and intimidation violated numerous state and federal laws, including the Ku Klux Klan Act, 42 U.S.C. § 1985(3).[1]

---

[1] This Memorandum addresses the five pending motions to dismiss under Rule 12(b)(6):

- <u>ECF 201</u>: Motion filed by Michael Hill, League of the South, and Michael Tubbs ("Hill Br.");
- <u>ECF 205 & 206</u>: Motion filed by Christopher Cantwell, Nathan Damigo, Matthew Heimbach, Identity Evropa, Jason Kessler, Elliot Kline, National Socialist Movement, Nationalist Front, Matthew Parrott, Robert Azzmador Ray, Jeff Schoep, Traditionalist Worker Party, Vanguard America ("Kessler Br.");
- <u>ECF 207</u>: Motion filed by Nationalist Front ("Nationalist Front Br.");
- <u>ECF 209</u>: Motion filed by Richard Spencer ("Spencer Br."); and
- <u>ECF 212 & 213</u>: Motion filed by Michael Enoch Peinovich ("Peinovich Br.").

Defendants Anglin, Moonbase Holdings LLC, East Coast Knights of the Ku Klux Klan, and Invictus have not filed motions to dismiss. The purported responses of Defendants Loyal White

1

In asking the Court to dismiss Plaintiffs' claims, Defendants repeatedly disregard a cardinal rule of federal practice: "[A] motion to dismiss is not the appropriate stage for the Court to make factual conclusions or resolve factual disputes." *McDonough* v. *Aetna Life Ins. Co.*, No. 3:09-cv-71, 2010 WL 1418878, at *5 (W.D. Va. Apr. 8, 2010). This is particularly true of Defendants' First Amendment arguments, which depend entirely on an alternative factual narrative that bears no resemblance to the allegations set forth in the FAC (or to reality). Plaintiffs do not seek to impose liability on Defendants for expressing hateful ideas or for using militaristic rhetoric, or even for some pushing and shoving incidental to a peaceful protest. Plaintiffs instead charge Defendants with forming, overseeing, and executing a common plan to engage in acts of targeted violence and intimidation at pre-selected locations in Charlottesville over the weekend of August 11 and 12. Such conduct finds no shelter in the First Amendment. *See Rice* v. *Paladin Enters., Inc.*, 128 F.3d 233, 243-47 (4th Cir. 1997); *see also Wisconsin* v. *Mitchell*, 508 U.S. 476, 484 (1993); *Brown* v. *Hartlage*, 456 U.S. 45, 54-55 (1982); *Giboney* v. *Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949); *United States* v. *Amawi*, 695 F.3d 457, 482 (6th Cir. 2012).

Defendants' alternative account of reality requires them to ignore over 165 detailed paragraphs in the FAC alleging that they intentionally organized, strategized, supervised, and then carried out acts of targeted violence and intimidation. Indeed, even before any formal discovery, Plaintiffs' particularized factual allegations of a common plan to commit violence are overwhelming. The FAC describes how Defendants meticulously planned their descent on Charlottesville through scores of private exchanges in the first half of 2017. In these

Knights of the Ku Klux Klan and Fraternal Order of the Alt-Knights were stricken. (*See* ECF 166, 210.) Defendant Fields has answered. (*See* ECF 196.)

2

conversations—which occurred on private chat rooms and social media platforms—Defendants and their co-conspirators discussed in detail topics including how to evade police, how to employ militaristic tactics, which firearms and improvised weapons to bring, how best to injure blacks and Jews using those weapons, how to manufacture additional weapons after arriving in Charlottesville, how to overcome "hostiles," how to coordinate their movements in real time, and who would command their forces. They also discussed when to arrive, where to meet, how to travel, where to obtain funding, and which symbols of Nazism and white supremacy to wear and carry. Through this constant web of communications, Defendants and their co-conspirators formed an agreement to travel to Charlottesville—and to act in concert once there—with the common purpose of using violence to subjugate racial and religious minorities and their supporters. In these exchanges, violence was not discussed as a mere remote possibility; it was anticipated, studied, and strategized. Defendants promised that there would be violence in Charlottesville—and violence there was. As Defendant Mosley declared: "Our birthright will be ashes & they'll have to pry it from our cold hands if they want it. They will not replace us without a fight."

Defendants' agreement to engage in acts of targeted violence and intimidation is further confirmed by their conduct on August 11 and 12. Over a single weekend, hundreds of white supremacists—including Defendants and their co-conspirators—arrived in Charlottesville.[2] As they wreaked havoc, they displayed extraordinary coordination and cohesion. They charged and retreated on command; they marched in a designated order and used their weapons exactly as planned; they defied police orders in tandem; they executed militaristic tactics in waves to

---

[2] All the individual Defendants except Defendant Anglin, who was directing events remotely via *Daily Stormer*, were present in Charlottesville that weekend.

encircle "hostiles" and seize control of public spaces; they dressed in matching uniforms with matching symbols; they attacked and intimidated the precise racial and religious groups that they had discussed in advance; they used shared social media platforms to disseminate up-to-date orders from widely acknowledged leaders; they deployed shield walls and complex defensive formations; and they jointly went on the offensive when faced with unarmed citizens (including Plaintiffs) protesting their violent conduct. In other words, this was no peaceful rally unexpectedly gone awry. This violence was the result of meticulous planning.

Defendants' unlawful conspiracy is also confirmed by how they reacted in the aftermath of the devastation: not by expressing the surprise or dismay that one would expect from peaceful protesters whose rally unexpectedly turned violent, but rather by celebrating the loss of life and injuries that occurred as the consequence of the execution of their plan. For example, Defendant Cantwell told a *Vice* reporter: "I'd say it was worth it. Nobody on our side died . . . none of our people killed anybody unjustly . . . our rivals are just a bunch of stupid animals." Defendant Schoep similarly tweeted at National Socialist Movement ("NSM") and Traditionalist Worker Party ("TWP"), among other Defendants: "It was an Honor to stand with U all in C'Ville this weeknd. . . . true warriors!" And Defendant Spencer told *The New York Times* that August 12 was "a huge moral victory." This is obviously not how people react to unanticipated bloodshed. It is how they react when their violent conspiracy achieves its intended results.

At bottom, Defendants' legal arguments are all directed against a strawman, an alternative version of reality, rather than against the case that Plaintiffs actually filed. On the basis of this factual narrative, which simply ignores the FAC, Defendants argue that Plaintiffs "attempt to frame idle chit chat, edgy jokes, memes, and conversations about the possibility of violence from Antifa thugs as a coordinated plan to attack the residents of Charlottesville."

4

(Peinovich Br. at 8; *see also* Spencer Br. at 15.) But what happened in Charlottesville was surely no joke. The FAC alleges with great particularity how Defendants formed, oversaw, and executed a common plan to arm themselves, travel to Charlottesville, and attack minorities—all in violation of our nation's civil rights statutes. No court has ever held that illegal conspiracies to plan and perpetrate violence are shielded by the First Amendment. That is why Defendants had to invent a completely different version of the alleged facts. Under well-established precedent, however, the appropriate way to resolve factual disputes between parties is through discovery, the presentation of admissible evidence, and trial—not a motion to dismiss.

## RELEVANT FACTUAL BACKGROUND[3]

## I.     THE HIGHLY COORDINATED VIOLENCE OF CHARLOTTESVILLE 2.0

Over a single weekend in August 2017, Defendants and their co-conspirators descended on Charlottesville with the intent to injure and intimidate racial minorities and their supporters. They called it "Charlottesville 2.0"; it was not the first time they had come to Charlottesville and it would not be the last.  As the FAC alleges in detail, Defendants displayed an extraordinary level of coordination and organization as they terrorized this small college town.

### A.     Friday Night: The "Secret" Torch Parade

At 7:30pm on August 11, 2017, approximately 300 white supremacists—including many Defendants and their co-conspirators—began arriving at an athletic field next to the University of Virginia ("UVA") library, known as Nameless Field. (¶153.) They had been directed to assemble there by Defendant Mosley. (¶152.) This plan had not been approved by UVA; rather, it had been kept secret as part of the conspiracy, plotted over a period of months on secret social

---

[3] Facts relevant to this motion are set forth in the FAC and incorporated fully herein.  References to "¶" are to paragraphs of the FAC.  Capitalized terms used herein have the same meaning as in the FAC.

media channels. (¶145.) As the crowd swelled, Defendants Cantwell, Kessler, and Ray issued orders to create military-style formations accompanied by "security" personnel. (¶157.) Executing this plan, the assembled marchers—dressed in a uniform of white polo shirts and khaki pants—filled tiki torches with fuel, formed a long column, and lit the flames. (¶158.) As they marched, they displayed cohesion and uniformity. (¶159.) Organizers—including Defendant Cantwell—wore earpieces, carried radios, and ordered their co-conspirators to keep pace, avoid gaps, and stay in line "two-by-two." (*Id.*) On his live video feed, Defendant Invictus praised a "tight operation." (*Id.*) The marchers barked like dogs and performed Nazi salutes. (¶162.) They also chanted "Jews will not replace us!" and "This is our town now!" (¶161.) Defendant Cantwell marched on the outside of the column, along with other "guards" who were hand-chosen for their willingness to "get physical" with anyone opposed to them. (¶160.)

When they reached the Rotunda, hundreds of white supremacists—including Defendants Kessler and Spencer—deliberately encircled and trapped a much smaller group of students and their supporters near the Thomas Jefferson statue, shouting "Blood and soil" and "Jews will not replace us." (¶¶164-165.) When a gap appeared, one co-conspirator yelled, "we need some more people to fill in this way to block these people off." (¶166.)

Then the marchers began to kick and punch the unarmed, peaceful protesters around the statue, using their torches as weapons. (¶168.) Plaintiff Doe, one of the few African-American men present, was trapped and believed that he faced mortal peril. (¶165.) Plaintiff Romero, one of the few Hispanic-Americans present, had never been more afraid in her life. (*Id.*)

Later, Defendant Ray proudly claimed that the group of white supremacists "went through [the protestors] like shit through a goose!" (¶168.) As their assault unfolded, some marchers threw an unidentified fluid (which Plaintiffs Doe and Romero feared was tiki torch

6

fuel) at the trapped protesters, causing them to fear that they would die. (¶169.) The marchers also threw their lit torches through the air at the protesters. (*Id.*) Defendant Ray shouted, "The heat here is nothing compared to what you're going to get in the ovens!" (*Id.*) Some of the marchers—including Defendant Cantwell—attacked the protesters with mace. (¶172.) When the students and community members finally escaped, Defendants and their co-conspirators climbed to the top of the statue. (¶175.) Waving their torches, they yelled, "Hail Spencer! Hail victory!" (*Id.*) Defendant Spencer declared, "We own these streets! We occupy this ground!" (*Id.*)

As this attack unfolded, hundreds of people were across the street inside St. Paul's Church, listening to religious leaders preach about human dignity and peace. (¶177.) Defendants knew this. They had planted a co-conspirator within the church to live-stream the service. (*Id.*) Determined to protect children and the elderly from the organized violence taking place only a short distance away, the churchgoers prolonged the service and remained inside. (¶180.)

That night, Plaintiff Wispelwey was menaced by Defendant Invictus while trying to deliver fellow clergy safely to their hotels from St. Paul's Church. (¶¶181-182.) Directly outside of one hotel, Wispelwey saw Invictus harass one of Wispelwey's friends. Invictus then walked towards Wispelwey, who was wearing a collar, until they were mere inches apart. Invictus kept moving forward even as Wispelwey pulled back. Once he was directly face-to-face with Wispelwey, Invictus began demanding, in a challenging and highly aggressive tone, that Wispelwey reveal to what church he belonged. Invictus then asked, "What the hell are you doing?" and continued hounding Wispelwey. (*Id.*)

B.    **Saturday Morning: The Siege of Emancipation Park**

On the morning of August 12, 2017, Defendants and their co-conspirators violently seized control of Emancipation Park, which is located in the center of town. In so doing, they deliberately ignored plans meant to separate them from counter-protesters and prevent mayhem.

7

(¶194.) Pursuant to an agreed-upon strategy, white supremacist groups—including many Defendants—entered the Park sequentially. (¶¶192, 197-201.) As planned, they marched in formation, armed with guns, shields, protective gear, flags, and rods. (¶195.) They moved in unison and obeyed commands from their leaders to "move forward" or "retreat." (*Id.*) Members of certain groups decorated their weapons with matching colors and logos. (¶¶197-198.) In Emancipation Park, the marchers repeatedly threatened Charlottesville residents and protesters on the basis of their race, religion, and ethnicity—or their support for people of different races, religions, and ethnicities. (¶201.) For example, they chanted, "Get the fuck out of our country, bitches!" (*Id.*)

Around 8:00am, Plaintiff Wispelwey, joined by community members and clergy, silently marched to Emancipation Park. (¶¶205-206.) There, the clergy were confronted by heavily armed militiamen, many in full military attire with semiautomatic rifles and pistols. (¶206.) Wispelwey and other clergy locked arms and knelt before them. (*Id.*) Consistent with their planning, co-conspirators charged into the unarmed clergy, knocking many to the ground. (¶¶208-209.) One co-conspirator stared Wispelwey directly in the eyes and repeatedly shouted at him, "fuck you, faggot." (*Id.*) Faced with escalating violence, the religious leaders were forced to abandon their peaceful protest. (¶210.)

By 10:00am, Defendants' armed footmen—including members of Defendants TWP, NSM, and League of the South—had seized control of the Park, a public space. (¶214.) That effort had been led by, among others, Defendants Schoep, Hill, Heimbach, and Parrott. (*Id.*) Defendant Tubbs ordered League of the South members to attack counter-protestors, yelling "charge!" (¶35.) Parrott stated that the morning's violence was consistent with "the original plan to define and secure the event perimeter." (¶214.) This plan involved elaborate coordination:

Defendants and their co-conspirators approached Emancipation Park in distinct waves of passenger vans. (¶207.) Defendant Peinovich, flanked by his "security team," approached Emancipation Park in the "third or the fourth wave." (*Id.*) The violence by the Defendants at the entrance to Emancipation Park followed a consistent pattern and plan. (¶209.) Defendants would use shields, flags, and fists to break past the blockade of protestors; they would succeed in entering the park; and then another wave would arrive. (*Id.*) This played out at least half a dozen times and reflected the military-style strategy developed by Defendants.

Once inside the Park, Defendants' violent tactics only escalated. (¶215.) Defendants and their co-conspirators used shields, flags, rods, clubs, smoke bombs, and pepper spray to assault anyone who did not share their racist beliefs. (¶¶216, 222.) As the assault progressed, some Defendants collaborated to undertake and command further violence. For example, *Daily Stormer*—through a livefeed maintained by Defendants Anglin and Ray—encouraged followers to organize in groups and engage in violent acts. (¶217.) These defendants wrote, "WE HAVE AN ARMY! THIS IS THE BEGINNING OF A WAR!" (*Id.*).

By 11:22am, before the permit for the "rally" even began, Charlottesville officials declared the gathering an unlawful assembly. (¶223.) Shortly thereafter, *Daily Stormer* wrote, "Someone is getting gassed! . . . LET'S HOPE IT'S JEWS!" (¶225.)

C.     **Saturday Afternoon: McIntire Park**

After their co-conspirators were expelled from Emancipation Park, Defendant Kessler and other Defendants redirected them to McIntire Park, approximately 1.5 miles away. (¶226.) *Daily Stormer* urged followers to assemble "behind" Defendants Ray and Cantwell. (¶227.)

9

**12:42 PM:**

STREETS BELONG TO US!

COPS WON'T INTERVENE!

> Clash between protesters and counter protesters. Police says "We'll not intervene until given command to do so." #Charlottesville
>
> pic.twitter.com/UkRDlNn2mv
>
> — ACLU of Virginia (@ACLUVA) August 12, 2017

**GET TO MCINTIRE PARK NOW AND FIND AZZMADOR, CANTWELL OR SACCO VANDAL! STAY IN THE GROUP! DO NOT SEPARATE ONCE YOU ARE BEHIND ONE OF THESE THREE MEN!**
**12:33 PM:**

# EVERYONE GO TO MCINTIRE PARK!

GOOGLE MAP COORDINATES HERE!

**12:31 PM:**

FUCK YOU FAGGOTS!

Consistent with the agreed-upon plan, Defendant Schoep also headed toward McIntire Park, attacking protesters along the way. (¶228.) By 1:00pm, Defendants Spencer and Peinovich, and their followers, had mostly reassembled in McIntire Park and unleashed violence. (¶229.) One woman protesting their message was choked by a co-conspirator, Steven Balcaitis; as he grabbed her neck, Balcaitis looked at a bystander and said, "Don't save her." (*Id.*)

Defendants at McIntire Park discussed returning to Emancipation Park in defiance of police orders. (¶231.) To that end, Defendant Mosley sought people with guns. He said, "I need shooters . . . [w]e're gonna send 200 people with long rifles back to that statue." (*Id.*) According to an NSM twitter account, Defendant Schoep "led a group of 40 back the 1.3 miles from the 2nd park back to Lee Park, through Antifa and police interference!" They jeered: "So much respect for my Commander Jeff Schoep. I will go into battle with you anytime Sir . . . !" (*Id.*) At this time, *Daily Stormer* (directed by Defendant Anglin from an undisclosed location) posted: "HOLD YOUR FUCKING GROUND WHEREVER YOU ARE." (¶232.)

10

1:08 PM:

Apparently everyone is getting kicked out of McIntire park.

Everyone is getting kicked out of everywhere.

My advice is this:

# HOLD YOUR FUCKING GROUND WHEREVER YOU ARE.

12:56 PM:

> Daily Stormer reccomendation: HOLD YOUR FUCKING GROUND.
> DON'T RETREAT. DON'T GIVE AN INCH. https://t.co/rYIXmSBidS
>
> — Daily Stormer Status (@rudhum) August 12, 2017

Following orders, some Defendants and co-conspirators stayed in the parks. (¶234.) Others dispersed throughout the downtown area of Charlottesville, near the pedestrian mall, where they terrorized Charlottesville residents. (*Id*.)

### D. The Car Attack

At approximately 1:40pm, in furtherance of the Defendants' conspiracy, Defendant Fields deliberately drove his Dodge Challenger into a crowd of peaceful protesters. (¶¶23, 242.) Plaintiffs Martin, Blair, Sines, Muñiz, Alvarado, and Romero were marching up Fourth Street when Fields attacked. (¶243.) Martin and Blair were approaching the intersection with their friend, Heather Heyer. (¶244.) Martin pushed Blair out of the way and was hit directly by the car, sustaining serious injuries. (*Id.*) Blair fell to the ground and suffered a hematoma and a gash. (*Id.*) Alvarado and Romero were also hit by the car. (¶¶249-252.) Heyer was killed. (¶248.) Many Plaintiffs suffered related injuries. (¶¶244-258.)

Car attacks had been part of the planning that led up to Charlottesville 2.0. Specifically, planning discussions on Discord referenced driving cars into crowds of people, when it is legal to attack people with cars, and the prophetic statement, "This will be us." (¶¶237-241.) Before August 11, for example, Defendant Kessler had asked white supremacist Discord participants for

11

advice on planning a march in Charlottesville. In response, a co-conspirator lamented that "civilians" had not made anti-racist demonstrators and their "babies and children" into "new speed bumps" at a recent anti-racist march in Charlottesville. (¶241.) These discussions were part of Defendants' shared plan of committing violent acts against Jews, blacks, and their supporters. Indeed, Defendants enthusiastically celebrated Heyer's death. (¶¶259-273.)[4]

## II.    THE CONSPIRACY TO VIOLENTLY ADVANCE WHITE SUPREMACY

The violence and intimidation that occurred in Charlottesville on August 11 and 12 were no accident. To the contrary, they were the result of careful planning. Hundreds of people knew about the "secret" Friday night rally—and also knew what to wear, what to bring, who to obey, what security formations to deploy, who to attack, and how to attack them. On Saturday, an even larger group of white supremacists displayed exceptional coordination in timing, location, weaponry, clothing, movement, communication, organizational hierarchy, and preferred targets. This coordination was not limited to the planning involved in a political rally. Rather, it was specifically reflected in their battle strategy, use of violence, and racialized intimidation. That level of military-style organization would be inconceivable without extensive discussion, planning, and agreement—all of which was well known to Defendants, many of whom played a leading role in organizing and directing the conspiracy.

### A.    Defendants Conspired in Advance of Charlottesville 2.0

Each of the pending motions to dismiss asserts that Defendants acted autonomously, with no involvement in a broader plan to commit acts of violence and intimidation. (*See* Hill Br. at

---

[4] Defendant Kessler contends that Plaintiffs have not adequately pleaded a conspiracy involving Defendant Fields. (*See* Kessler Br. at 10.) At this early stage of the case, the Court need not reach questions about the scope of the conspiracy. In all events, the allegations set forth in the FAC at paragraphs 236-277 and 312-335 support a reasonable inference that Fields was a member of the conspiracy and that the car attack was in furtherance of the conspiracy.

12

12-13; Peinovich Br. at 7; Spencer Br. at 20-21; Kessler Br. at 6-8; Nationalist Front Br. at 3.) But the FAC includes detailed factual allegations to the contrary. As early as May 2017, Defendants were in regular communication with each other about their plans for "Charlottesville 2.0."

Some of these discussions occurred in person—demonstrating that Defendants knew each other and formed plans together. For example, Defendants Spencer, Damigo, Peinovich, and Kessler shared a podium at a luncheon in Charlottesville on May 13, 2017, where Spencer announced "we are white . . . We will not be replaced." (¶52.) That night, Defendants Kessler, Spencer, Damigo, Peinovich, Heimbach, Identity Evropa, Vanguard America, TWP, and League of the South participated in a march meant to intimidate Charlottesville residents on the basis of race, religion, and ethnicity. (¶¶50-51.) In June 2017, Kessler invited Defendants and others to promote violence against minority residents in Charlottesville. (¶56.) In July 2017, Kessler also live-streamed Defendant Loyal White Knights' white power march in Charlottesville. (¶59.)

As Charlottesville 2.0 drew near, the pace of these meetings intensified. Defendant Spencer and co-conspirator Evan McLaren, a member of Defendant Identity Evropa, met in person to plan and direct their activities in Charlottesville. (¶64.) Defendants Cantwell and Kessler met in Charlottesville on August 9 to plan and direct acts of violence and intimidation. (¶65.) And Defendants Ray, Cantwell, and Mosley, as well as co-conspirator David Duke, attended yet another meeting on August 11 to plan and direct acts of violence and intimidation. (¶66.) These meetings among the conspiracy's leaders indicate coordination and cohesion.

As one might expect, most of Defendants' communications occurred online. From May through August 2017, Defendants made use of websites (including *Daily Stormer*, run by Defendants Anglin, Ray, and Moonbase Holdings), social media (including Twitter, Facebook,

13

4chan, and 8chan), chat rooms (including Discord), and podcasts to communicate with each other—and they did so to develop a plan for racialized violence and intimidation in Charlottesville. (¶68.) They developed this plan and conveyed its essential details by posting articles on their own websites and sharing messages on social media. (¶70.) In addition, Defendants, including Cantwell, Kessler, Mosley, Anglin, Ray, and Peinovich, used these platforms to raise funds, organize legal support, and arrange travel for co-conspirators—all with the intention that attendees would engage in acts of violence and intimidation. (¶326.) Defendants, including Anglin, Ray, Hill, Nationalist Front, NSM, TWP, League of the South, Vanguard America, and East Coast Knights, also used these platforms to coordinate the logistics of their "joint operation." (¶¶318-319.) Working with these groups, Defendant Damigo and Identity Evropa organized white supremacist participation among people from outside Charlottesville. (¶320.)

The principal online forum that Defendants used to plan and direct their illegal acts was the chat platform Discord. (¶71.) Discord is set up as a series of private, invite-only servers, each providing a space for real-time group discussion. (*Id.*) Each server is organized into "channels," indicated by a "#" before the name. (*Id.*) A "Charlottesville 2.0" server was established in June 2017, and was thereafter used to direct and plan the conspiracy. (¶72.) As one user explained, Discord was "for closed, top super secret communications intended for the elite inner circle of the alt-right." (*Id.*) The Charlottesville 2.0 server was moderated, reviewed, and managed by Defendants Kessler and Mosley, along with their co-conspirators. (¶73.) As moderators of the "invite only" group, they were able to view and manage all of the posts, and invite or reject participants. (*Id.*) On this server, Defendants, including Heimbach, Parrott, Cantwell, and Ray, helped direct and plan Charlottesville 2.0. (¶74.) Defendants Vanguard America, Identity

14

Evropa, TWP, League of the South, and *Daily Stormer* also created unique channels for their members. (¶77.) From June through August, Defendants and their co-conspirators used Discord for "leadership" meetings through which they shared information and plans. (¶¶72, 75.) Ultimately, Defendants established at least 43 channels on Discord. (¶76.) These channels covered everything from "#gear_and_attire" and "#demonstration_tactics" to "#friday-night" and "#safety_planning." (*Id.*) They also included a "#leadership" channel designed for "planning" and "infrastructure." (¶77.) On one of these channels, a co-conspirator with the handle "Caerulus Rex"—who serves as a bodyguard to Defendant Spencer—coordinated the various "security details" created by Defendants. (¶78.)[5]

Defendants used Discord to announce how they would convey orders on other social media during Charlottesville 2.0. (¶80.) In addition, Defendants used Discord to issue "Orders" to each other and to co-conspirators. (¶75.) Notably, Defendant Mosley posted a document entitled "General Orders" for "Operation Unite the Right Charlottesville 2.0." (*Id.*) These "General Orders" split the city into "Friendlies" and "Enemies/Counter Protesters," and described counter-protesters as "hostile." (¶100.) They further instructed co-conspirators that if they ended up losing their permit, they may "have to initiate plan red or have to take the ground by force with plan yellow." (¶101.) Plan Red was described as "incredibly dangerous" and called for meeting early at a rally point and unlawfully marching to the park. (*Id.*) The General Orders promised "security forces ... to reduce the threat" presented by "hostiles." (*Id.*)

These "General Orders" were consistent with many other communications by Defendants in Discord chatrooms and through other media channels in which they plotted violence and

---

[5] As explained in the FAC, only some communications on Discord are available. Others will be the subject of discovery.

commanded co-conspirators to obey their orders. (*See* ¶¶78-123.) Defendant Anglin, for example, explained that "the age of ultraviolence is coming … [and] there will be leaders. You need to be prepared to recognize them for who they are, and you need to be prepared to do whatever they tell you to do, exactly as they tell you to do it." (¶60.)

This was more than heated rhetoric. Defendants' intention to engage in violence, to organize others to engage in violence, and to orchestrate and direct that violence against racial and religious minorities was open and explicit. (¶96.) On the "Daily Shoah," a podcast run by Defendant Peinovich, a co-conspirator discussed the plan for Charlottesville and asked, "Now come on, beating up the wrong negro . . . is that even a possibility?" (*Id.*) Defendant Damigo was arrested on April 15, 2017, for battering a woman at a rally in Berkeley, California, and later described his conduct there as a test run for Charlottesville. (¶28.) Similarly, Discord included many descriptions of anticipated violence, including:

- "I'm ready to crack skulls."
- "You have a week, bros. Best spend it having four or five of your friends simulate jumping you. Go light, don't get injured before the event, and focus on blocking and pushing back in ways that don't look like assault."
- "Studies show 999/1000 niggers and feminists fuck right off when faced with pepper spray."

(¶97.) One co-conspirator, who was active on the Charlottesville 2.0 Discord server told his followers on August 7: "Bring as much gear and weaponry as you can within the confines of the law. I'm serious. . . . You still have a few days to get some protection from Home Depot and bring any guns you have . . . [Defendant] Spencer, organizers, everyone are behind this." (¶108.) He added: "This is the time to get off Discord and take action." (*Id.*)

Because they intended violence, Defendants and their co-conspirators discussed how to remain coordinated and inflict maximum damage. On Discord, they issued instructions for

uniforms and protective armor. (¶¶102, 106.) They also repeatedly commanded their followers to bring firearms or other weapons. (¶¶106, 323.) For instance, Defendant Cantwell expressly "encourage[d]" followers "to carry a concealed firearm." (¶107.) Many other Defendants boasted about the weapons that they intended to carry. (¶109.) Defendant Ray wrote on Discord: "I also come barehanded and barefisted, bc officers don't duck lol. But my guys will be ready with lots of nifty equipment." (¶110.) Statements by other co-conspirators include:

- "[A]void batons . . . just get hardwood dowel (that fits in your hand) from a store and cut it to size."
- "Don't carry anything that's explicitly a weapon. Flag poles and signs work, but openly carrying obvious weaponry is probably not a good idea."
- "A wrench with a wrist lanyard gets the same job [as a blackjack/billyclub] accomplished."

(¶111.) On the *Daily Stormer*, Defendants Ray and Anglin commanded their followers to bring torches, pepper spray, flag poles, and shields. (¶118.) While plotting their arsenal, Defendants paid careful attention to decoration. They told each other to bring shields, uniforms, flags, and signs decorated with iconography in order to instill fear along racial and religious lines. (¶121.)

Defendants and their co-conspirators also planned for the consequences of their intended violence. For example, one Discord participant told people to "purchase self defense insurance." (¶105.) Elsewhere, Defendants provided guidance to co-conspirators about how to try to avoid the legal ramifications of violence. (¶120.) To allay anxiety, Defendants assured co-conspirators that they would be protected when they committed the violent acts intended and strategized by Defendants. (*Id.*) The "General Orders" thus told attendees that if they found themselves arrested, there would be "money and a legal team set aside for you after." (*Id.*)

In sum, Defendants engaged in numerous, wide-ranging, and continuing conversations— in person and online—while planning Charlottesville 2.0. Most of these exchanges occurred on

secret, invite-only servers moderated by Defendants Kessler and Mosley. While only a small number of those records have been made public, they confirm that Defendants and their co-conspirators carefully planned their campaign of racial violence and terror. (¶83.) Anyone who participated in Defendants' private communications would have known that the "rally" was, in fact, an event where illegal tactics would be used to advance their white supremacist objectives. They would also have known that this plot involved violence and intimidation—as evidenced by Defendants' repeated promise that violence would occur, their detailed analysis of which weapons and military formations to use, their battle tactics and General Orders, and their vow to cover legal defense costs. This understanding of Defendants' plan is consistent not only with the allegations in the FAC, but also with the organized violence that subsequently took place.

B.  **Consistent with Their Plan, Defendants Actively Coordinated the Violence and Intimidation that Occurred in Charlottesville on August 11 and 12**

As described above, the violence that occurred on August 11 and 12 was remarkably well organized. Much of that organization occurred in advance and was overseen by Defendants on their preferred online platforms. Some of it, however, took place as events unfolded. That real-time coordination echoed the pre-event planning in its manner, personnel, and use of online platforms. This confirms that Defendants acted in concert to plan and direct an illegal course of conduct.

Orchestrating the Friday night event on the UVA campus, for example, was no small undertaking. It reflected weeks of planning by Defendants and co-conspirators. (¶145.) They had established a "#friday_night" channel on Discord to coordinate the night's events, and they had advised co-conspirators that the event was intended to be a secret. (*Id.*) Moreover, they had issued orders that attendees should bring tiki torches—even though someone had posted on Discord that UVA forbade open fires without authorization. (¶¶145-147, 149.) *Daily Stormer*

18

suggested purchasing tiki torches at Walmart before arriving in Charlottesville. Defendant Kessler similarly ordered attendees to do so out-of-town to avoid "tip[ping] our enemy off." (¶147.) The selection of lit torches was meant to intimidate people of color and Jewish people; as one co-conspirator on Discord explained, "tiki torches are the last stand of implicit whiteness." (¶150.)

Defendants' advance planning was fully activated on August 11. That morning, Defendant Cantwell and others gathered at a Walmart to prepare for the evening. (¶151.) Then, that night, Defendant Mosley used Discord to summon his co-conspirators to Nameless Field. (¶152.) As the march proceeded—accompanied by "security forces"—Defendants exercised careful control over the marchers' conduct. That remained true after Defendants and their co-conspirators engaged in open violence: Defendants participated in and directed assaults on peaceful protesters, including attacks involving the use of caustic substances. Later, when first-hand accounts of the violence were posted on social media, Defendants Mosley and Spencer retweeted them with pride and approval. (¶¶166, 172.)

Consistent with their advance planning, Defendants' coordination continued on August 12. Defendants Kessler, Cantwell, Mosley, Heimbach, Hill, Invictus, Ray, Spencer, Damigo, Peinovich, Fields, Parrott, Tubbs, Schoep, the Nationalist Front, League of the South, NSM, TWP, Vanguard America, the East Coast Knights, the Loyal White Knights, and FOAK all participated in the violent events of the day (¶187), while Defendant Anglin directed his followers from afar through the *Daily Stormer* (¶227). They planned to arrive early and anticipated engaging in violence. (¶188.) As one co-conspirator explained, "Me, the rest of TWP and LS [League of the South] have been to more than one rodeo. / And shit NSM will be there early too / Those guys are nuts / In a good way." (*Id.*) When their followers adhered to the plan

19

and assembled by 8:00am, Defendants Mosley and Kessler instructed them to create a defensive formation in "the most extremely prepared position"—namely, "a white bloc barrier or square around the entire statue + podium." (¶¶189-190.) Meanwhile, on Discord, co-conspirators promised extra supplies: "Vanguard is fabricating 20 additional shields." (¶191.) Another co-conspirator and moderator on Discord had told participants that "we'll be putting out a video for basic formation, roles, and commands to all of the group leaders shortly." (¶192.) He then posted a "Shields & Shield Tactics Primer," as well as a video on shield-fighting techniques. (*Id.*)

This coordination of battle strategy was consistent with the conspiracy's deliberate approach to violence. As Defendant Mosley remarked, "I run this ["rally"] as a military operation . . . I was in the army." (*Id.*) To coordinate their actions, Defendants Anglin and Ray established "meet ups" on *Daily Stormer*'s website; this allowed members of the conspiracy to coordinate while events unfolded. (¶84.) And that is exactly what happened: as the day's events unfolded, Defendants told their followers where to go, when to meet, who to attack, which weapons to use, whether to resist police, and what battlefield strategies to execute.

C.    **The Conspirators Celebrated Charlottesville 2.0 as a Success**

As noted above, while Plaintiffs found the events of August 11 and 12 to be profoundly disturbing, Defendants boasted that the weekend had gone *exactly* as planned. Defendant Kessler tweeted a picture of the Friday night rally and wrote, "Incredible moment for white people who've had it up to here & aren't going to take it anymore." (¶184.) Defendants East Coast Knights, Anglin, and Heimbach tweeted celebrations of Heather Heyer's death at the hands of Defendant Fields. (¶¶262-273.) Defendant Heimbach added: "We achieved all of our objectives." (¶268.) "Kneuss" of the Defendant East Coast Knights celebrated: "3 fatalities in #Charlottesville. How many WN's [white nationalists]? NOT 1." (¶269.) In addition, one member of Defendant Vanguard America later explained that his group had coordinated with

20

Defendant NSM because the Charlottesville event was *meant* to be violent: "In cville we needed numbers, NSM fought so hard regardless of their optics. Do we need them at normie events? No. We need them in a fight?  Yes." (¶117.)

Defendant Parrott wrote an account of the "rally" in "Catcher in the Reich: My Account of my Experience in Charlottesville." (¶212.) He explained that Defendants TWP, League of the South, NSM, and other Nationalist Front groups had joined together "to help create two shield walls" for "the fight." (*Id.*) He elaborated, "While most of the Identity Evropa men were occupied on other fronts, they sent a detachment of fighters to assist us and to relay intelligence to Jason Kessler and other organizers. They offered more fighters, but we had our positions amply covered." (*Id.*) In an interview with the *Los Angeles Times*, he added, "Michael Tubbs, an especially imposing League organizer towered over and pushed through the antifa like a Tyrannosaurus among raptors as league fighters with shields put their training to work." (*Id.*)

Defendant Parrott's account accurately captures the militaristic methods, intent to be violent, and coordination at the heart of Defendants' conspiracy. They viewed Charlottesville as "the fight." (¶212.) They brought heavily armed "detachment[s] of fighters," which they deployed as necessary to "other fronts" and "positions." (*Id.*) They "put their training to work." (*Id.*) They made their decisions based on a "relay [of] intelligence to Jason Kessler and other organizers." (*Id.*) And they used these tactics to achieve a shared goal: violence and intimidation against blacks, Jews, and their supporters.

D.    **Defendants and Their Co-Conspirators Inflicted Injuries on Plaintiffs**

Defendants repeatedly describe this case as merely a clash of political ideologies. (Spencer Br. at 6-11; Peinovich Br. at 5-6.) That framing is profoundly mistaken and directly at odds with the particularized allegations in the FAC. Defendants' conduct inflicted terrible injury on the Plaintiffs in this case. Tyler Magill, for example, an employee of the UVA library,

21

suffered a trauma-induced stroke after the events on August 11 and 12. (¶10.) Marcus Martin was hit by the car driven by Defendant Fields, and suffered a broken leg and ankle. (¶17.) Natalie Romero, an undergraduate at UVA, was severely injured by Fields's car attack and has already missed a semester of school. (¶18.) Chelsea Alvorado, a crisis counselor for the homeless and mentally ill, was also struck by Fields's car. (¶19.) And the other Plaintiffs have been diagnosed with trauma, shock, extreme emotional distress, or other injuries that have prevented them from returning to work, school, or life as they once knew it. (¶¶10-19, 283-295.)

## STANDARD OF REVIEW

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim." *Morris* v. *Fletcher*, No. 7:15-cv-00675, 2017 WL 1161888, at *1 (W.D. Va. Mar. 27, 2017). "In considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff." *Id.* To survive, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and if there is "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

## ARGUMENT

## I.     PLAINTIFFS HAVE STATED A CLAIM UNDER 42 U.S.C. § 1985(3)

"Section 1985(3) was originally enacted by Congress as part of the Ku Klux Klan Act, in order to enforce the Civil War amendments to the Constitution, and to provide a means of redress for persons victimized by the Klan's acts of terror and intimidation." *Bergman* v. *United*

*States*, 551 F. Supp. 407, 413 (W.D. Mich. 1982). This case thus evokes the Act's core original purpose. Defendants, including Ku Klux Klan organizations, plotted a conspiracy to deprive racial minorities of the equal protection of the laws. While the formation of their plan involved distinctly modern methods, their campaign of racial subjugation violated historic laws meant to safeguard fundamental constitutional rights. *See Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1865 (2017).

In *United Brotherhood of Carpenters* v. *Scott*, 463 U.S. 825 (1983), the Supreme Court held that a § 1985(3) claim has four elements:

> (1) a conspiracy;
>
> (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and
>
> (3) an act in furtherance of the conspiracy;
>
> (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Id.* at 828-29 (citations omitted). The Supreme Court has further held that § 1985(3) applies to private actors as well as public officials. *See Griffin* v. *Breckenridge*, 403 U.S. 88, 101 (1971).

Defendants cannot and do not dispute that the FAC alleges that they held class-based, discriminatory animus. *See Carpenters*, 463 U.S. at 836 ("The predominate purpose of 1985(3) was to combat the prevalent animus against Negroes and their supporters."); *Ward* v. *Connor*, 657 F.2d 45, 48 (4th Cir. 1981) ("[R]eligious discrimination . . . falls within the ambit of § 1985([3]).") . Further, Defendants cannot and do not deny that the FAC alleges that each Plaintiff suffered injury as a result of overt acts committed by members of the conspiracy. (*See* ¶¶10-19, 283-295.)

This leaves only two elements: (1) the existence of a conspiracy; and (2) the objective of the conspiracy. Defendants' arguments on these elements rest on their own version of disputed

23

facts. Time and again, Defendants simply ignore the particularized factual allegations that *are* contained in the FAC, while relying heavily on "facts" that *are not*. And when Defendants do address Plaintiffs' factual allegations, they repeatedly violate Rule 12(b)(6) by making improper inferences in their own favor. These deficiencies are compounded by numerous misstatements of law. Separately and together, Defendants' factual and legal errors make it clear that their motions to dismiss should be denied and this case should proceed to discovery and trial.

A.      **Existence of a Conspiracy**

To plead a conspiracy, a plaintiff must allege facts supporting a plausible inference that defendants "positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Hinkle* v. *City of Clarksburg, W.Va.*, 81 F.3d 416, 421 (4th Cir. 1996). Although this requires more than allegations of "parallel conduct," *see Twombly*, 55 U.S. at 556, it does not require "direct evidence of a meeting of the minds," *Hinkle*, 81 F.3d at 421. Indeed, because "conspiracies are by their very nature secretive operations," they often "have to be proven by circumstantial, rather than direct, evidence." *Hill* v. *City of New York*, No. 03-cv-01283, 2005 WL 3591719, at *5 (E.D.N.Y. Dec. 30, 2005). The ultimate question is whether a plaintiff has alleged "at least some facts which would suggest that [the defendants] reached an understanding to violate [his] rights." *Jiang* v. *Porter*, 156 F. Supp. 3d 996, 1010 (E.D. Mo. 2015). "[E]ach participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Mendocino Envtl. Ctr.* v. *Mendocino Cty.*, 192 F.3d 1283, 1302 (9th Cir. 1999); *accord Frazier* v. *Cooke*, No. 4:17-cv-54, 2017 WL 5560864, at *3 (E.D. Va. Nov. 17, 2017).

In assessing conspiracy allegations, "the entire sequence of events in the complaint [must be] considered in context." *Soo Park* v. *Thompson*, 851 F.3d 910, 928 n.22 (9th Cir. 2017). On this basis, courts uphold conspiracy claims where "the alleged conspirators have committed acts

that 'are unlikely to have been undertaken without an agreement.'" *Mendocino*, 192 F.3d at 1301

(quoting *Kunik* v. *Racine Cty.*, 946 F.2d 1574, 1580 (7th Cir. 1991)). That includes highly

coordinated action and repeated patterns of conduct. *See, e.g.*, *Geinosky* v. *City of Chicago*, 675

F.3d 743, 749 (7th Cir. 2012); *New York State Nat'l Org. for Women* v. *Terry*, 886 F.2d 1339,

1359 (2d Cir. 1989) (upholding conspiracy claim under § 1985(3)); *Johnson* v. *City of

Fayetteville*, No. 5:12-cv-456, 2013 WL 12165680, at *6 (E.D.N.C. Mar. 28, 2013) (same).

Here, Plaintiffs have plausibly alleged that Defendants "positively or tacitly came to a

mutual understanding to try to accomplish a common and unlawful plan," *Hinkle*, 81 F.3d at

421—namely, to jointly orchestrate, engage in, and direct specific forms of racialized violence

and intimidation at particular times and places in Charlottesville on August 11 and 12. Only

rarely can a plaintiff point to discussions among defendants in which an illegal plan is

formulated. *See Hill*, 2005 WL 3591719, at *5. But here, Plaintiffs have identified dozens of

such communications—before, during, and after Charlottesville 2.0—in which individual

Defendants (or groups of Defendants) *explicitly* discussed their joint operation, its white

supremacist objectives, and how to use racialized violence and intimidation to achieve those

goals. Unusually for the motion to dismiss stage of a case, Plaintiffs have identified the

establishment of a planning resource—the Charlottesville 2.0 Discord Server—that included

specific sub-groups for leadership, logistics, and general discussions, and which multiple

Defendants either contributed to or led. At the pleading stage, these particularized allegations of

a common plan are clearly more than sufficient. *See Mendocino*, 192 F.3d at 1302; *Nat'l Org. for

Women*, 886 F.2d at 1359; *Frazier*, 2017 WL 5560864, at *3; *Johnson*, 2013 WL 12165680, at

*6.

This direct evidence of a conspiracy is further supported by circumstantial allegations giving rise to the commonsense inference that Defendants acted pursuant to a shared plan. *See Patrick* v. *City of Chicago*, 213 F. Supp. 3d 1033, 1057 (N.D. Ill. 2016) ("[T]he existence of a conspiracy may be inferred through the combination of common sense and circumstantial evidence.").  These allegations include:

- Numerous in-person meetings among Defendants and co-conspirators about their plans for Charlottesville 2.0, showing that Defendants had many opportunities to form and discuss their scheme. (*See* ¶¶49-66.)

- Many online conversations among Defendants—frequently on invite-only servers—that candidly strategized a campaign of racial terror and violence. (*See* ¶¶68-130.)

- A pattern of Defendants interviewing each other, coordinating promotional materials, and sharing each other's statements about violent plans for Charlottesville.  (*See id.*)

- Detailed coordination among Defendants on weaponry, battle tactics, targets, racist symbols, funding, transportation, and defense insurance—as evidenced not only by statements before August 11, but also by their cohesion, communication, and shared strategy amid the violence that they undertook during Charlottesville 2.0.  (*See id.*)

- Highly coordinated, military-style violence—much of it targeting blacks, Jews, and their supporters—that could not have occurred without advance planning and that depended on use of shared platforms for disseminating up-to-date battlefield commands from Defendants.  (*See* ¶¶145-192, 203-235.)

- A repeated pattern of intimidation of blacks, Jews, and their supporters—both before and during Charlottesville 2.0—consistent with specific instructions from several Defendants (including Kessler, Spencer, Mosley, and Peinovich). (*See* ¶¶50-51, 134-142.)

26

- Statements by many Defendants (including Spencer, Heimbach, Cantwell, and Schoep) during and after Charlottesville 2.0 confirming that the weekend—rife with coordinated racial violence—had gone *exactly* as planned. (*See* ¶¶184, 212, 268-271.)

Given the above, this is not a case in which the Court must strain to find "at least some facts which would suggest that [Defendants] reached an understanding." *See Jiang*, 156 F. Supp. 3d at 1010. That inference follows naturally from the particularized allegations in the FAC. At minimum, it is reasonable to infer that Defendants shared "the general conspiratorial objective" of deploying specific forms of racialized violence and intimidation at agreed-upon times and places in Charlottesville on August 11 and 12. *Simmons* v. *Poe*, 47 F.3d 1370, 1378 (4th Cir. 1995).

Faced with several hundred paragraphs of detailed conspiracy allegations, Defendants attempt to sweepingly dismiss them as "conclusory." (Kessler Br. at 7.) In their view, the FAC supports only a single inference: that they engaged in ordinary "event planning." (Peinovich Br. at 7; *accord* Kessler Br. at 8; Spencer Br. at 8.) According to Defendants, "edgy humor and memes are part of internet subculture, and while some . . . may find them offensive, the sharing of such jokes and memes cannot credibly be seen as evidence of a conspiracy to commit violence." (Peinovich Br. at 8.)

This argument fails for several reasons. First, it ignores the FAC's allegations detailing a highly coordinated planning effort that expressly contemplated, organized, and strategized acts of racial violence and intimidation. At this early stage of the case, Defendants are obviously not entitled to the inference that all of these statements were an elaborate series of "edgy" jokes and memes. *See Hall* v. *DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017).

27

Second, it ignores the fact that Plaintiffs' allegations are not limited to Defendants' online conversations: paragraphs 143 through 311 of the FAC describe the violent conduct committed by Defendants and their co-conspirators. Given the extraordinarily close fit between Defendants' discussions of violence and their subsequent conduct, it is reasonable to infer that they acted pursuant to a common plan as they attacked minority residents of Charlottesville. *See Mendocino*, 192 F.3d at 1301. Any uncertainty about whether their discussions before August 11 were merely jokes or something more sinister is resolved by Defendants' own coordinated acts of violence. On this point, Defendants are speechless: they offer no response to the particularized allegations that they participated in and oversaw violence and intimidation. Only by pretending that most of the FAC does not exist can Defendants declare it "conclusory."

Third, even as they ignore nearly 150 paragraphs of factual allegations, Defendants rely heavily on materials *outside* the FAC to generate alternative factual narratives. For example, Defendant Peinovich argues that Plaintiffs have not plausibly alleged the existence of a conspiracy because "the Antifa" and the City of Charlottesville are truly responsible for the violence that occurred. (*See* Peinovich Br. at 5, 6, 10.) These arguments, however, depend on an improper request for judicial notice of disputed facts. *See Goldfarb* v. *Mayor & City Council of Balt.*, 791 F.3d 500, 511 (4th Cir. 2015) ("[J]udicial notice must not 'be used as an expedient for courts to consider "matters beyond the pleadings" and thereby upset the procedural rights of litigants to present evidence on disputed matters.'" (citation omitted)). Much the same is true of Defendant Spencer's claim about his own lack of responsibility for Charlottesville 2.0. (*See* Spencer Br. at 10-15, 18.) At the pleading stage, Defendants cannot defeat Plaintiffs' particularized allegations of an illegal agreement by ignoring most of the FAC and replacing it with their own version of what "really" happened. If Defendants want to present a counter-

narrative and base their legal arguments on that account of the facts, they will be free to do so at trial.

Rather than draw all reasonable factual inferences in Plaintiffs' favor, Defendants do the exact opposite. The FAC alleges substantial organization, coordination, and cohesion in Defendants' violent conduct during Charlottesville 2.0. This suggests advance planning—a reasonable inference that powerfully supports Plaintiffs' case. *See Geinosky*, 675 F.3d at 749; *Mendocino*, 192 F.3d at 1301-02. In arguing otherwise, Defendants not only deny Plaintiffs a reasonable inference to which they are entitled, but also ask the Court to embrace an unreasonable inference in their own favor. Their account of planning a peaceful rally utterly fails to explain the conduct alleged in the FAC, which includes well-organized and heavily armed violence. If any inference is "conclusory," it is Defendants' assertion that the violence of Charlottesville 2.0 was unanticipated and uncoordinated.

As a fallback position, Defendants argue that the FAC does not adequately link each of them to a common plan to commit racialized violence and intimidation. (*See* Hill Br. at 12-13; Peinovich Br. at 7-10, 12-19; Spencer Br. at 20-21; Kessler Br. at 6-8; Nationalist Front Br. at 3.) This argument is also without merit. It is well established that a member of a conspiracy can be held liable even if he does not know every single detail of the illegal plan. *See Mylan Labs., Inc.* v. *Akzo, N.V.*, 770 F. Supp. 1053, 1066 (D. Md. 1991). Each participant need only "share the general conspiratorial objective," and know the "essential nature and general scope" of their common plan when they participate in it. *Poe*, 47 F.3d at 1378. In the following paragraphs, the FAC demonstrates that this requirement is met (and exceeded) as to each individual moving Defendant:

29

**Richard Spencer**
¶¶ 21, 28, 29, 40, 42, 49, 52, 63, 64, 70, 85, 87, 92, 108, 120, 141, 143, 153, 164, 166, 175, 184, 187, 229, 230, 260, 273, 297, 300, 305-306, 311, 315, 327-329.

**Michael Peinovich**
¶¶ 42, 50, 52, 63, 96, 129, 141, 187, 207, 229-230, 310, 326-327.

**Jason Kessler**
¶¶ 20, 49-52, 55-56, 59, 61, 63, 65, 73, 78, 97, 112, 122, 130, 135, 137, 141, 143, 147, 157, 164, 179, 184, 187-190, 212, 226, 241, 260, 267, 302, 307, 316, 321-322, 324, 326-329.

**Christopher Cantwell**
¶¶ 22, 63, 65-66, 74, 107, 127, 143, 151, 157, 159-160, 172, 187, 226-227, 273, 277, 303-304, 309-310, 316-317, 322-323, 326-330.

**Nathan Damigo & Identity Evropa**
¶¶ 28-30, 50, 52, 63-64, 70, 77, 92, 187, 212, 276, 300-311, 320, 322.

**Elliot Kline (a.k.a. Eli Mosley)**
¶¶ 4, 20, 29-30, 63, 66, 73, 75, 78, 89, 97, 100, 129, 137, 141, 143, 147-148, 152, 172, 187, 189, 192, 231, 300, 311, 317, 321-322, 324, 326, 328-329.

**Michael Hill, Michael Tubbs & League of the South**
¶¶ 34-36, 39, 50, 63, 67, 77, 94, 99, 187-188, 196, 198-200, 212-214, 260, 318-319, 322, 327.

**Matthew Heimbach, Matthew Parrott & TWP**
¶¶ 31-33, 37, 50, 63, 67, 74, 77, 90, 116, 187-188, 196, 200, 212, 214, 228, 268, 271, 319, 322, 327.

**Robert Azzmador Ray**
¶¶ 27, 62-63, 66, 74, 84, 88, 92-93, 110, 116, 118, 143, 150, 157, 168-169, 186-187, 202, 217, 226-227, 317-318, 323, 325-326, 328-329.

**Jeff Schoep, Nationalist Front & NSM**
¶¶ 37-39, 44, 63, 67, 117, 187-188, 196, 201, 212, 214, 228, 231, 271, 319.

**Vanguard America**
¶¶ 24, 34, 50, 53, 63, 67, 77, 81, 91, 93, 96, 114-117, 121, 153, 167, 185, 187, 191, 196-198, 218, 228, 266, 270, 276, 319, 322, 332.

At the pleading stage, these allegations plausibly establish that each moving Defendant joined a

common plan to commit premeditated acts of racially motivated violence and intimidation in

Charlottesville at designated times and locations on August 11 and 12. Accordingly, Plaintiffs do not seek to invent an unbounded "liable-by-association" doctrine. (Hill Br. at 12.) Rather, they seek to enforce the rule that defendants who conspire together can be held liable together.

### B. The Object of the Conspiracy: Deprivation of the Equal Enjoyment of Rights Secured by the Law to All

The Supreme Court has "upheld the application of § 1985(3) to private conspiracies aimed at interfering with rights constitutionally protected against private, as well as official, encroachment." *Carpenters*, 463 U.S. at 833. Private conspiracies thus violate § 1985(3) when they seek to achieve deprivations of Thirteenth Amendment rights. *See Bray* v. *Alexandria Women's Health Clinic*, 506 U.S. 263, 278 (1993). Further, as Defendants admit (Kessler Br. at 3-4), § 1985(3) claims can rest upon violations of 42 U.S.C. § 1982. *See Antonio* v. *Sec. Servs. of Am., LLC*, 701 F. Supp. 2d 749, 777-79 (D. Md. 2010). Here, Defendants' conspiracy aimed to violate both of these § 1985(3) predicates.[6] (¶¶338-339.)

#### 1. Thirteenth Amendment

"By the Thirteenth Amendment, we committed ourselves as a Nation to the proposition that the former slaves and their descendants should be forever free." *Griffin*, 403 U.S. at 105. Congress may thus outlaw "badges and incidents of slavery." *Jones* v. *Alfred H. Mayer Co.*, 392 U.S. 409, 440 (1968). That principle encompasses "racially motivated violence." *United States* v. *Roof*, 225 F. Supp. 3d 438, 448 (D.S.C. 2016). Contrary to Defendants' position (Kessler Br. at 5), however, it also covers violence against those who support the rights of racial minorities. *See Carpenters*, 463 U.S. at 836. The Thirteenth Amendment further protects against "less formal

---

[6] These provisions protect Jews as well as African-Americans. *See Shaare Tefila Congregation* v. *Cobb*, 481 U.S. 615, 616-17 (1987); *St. Francis College* v. *Al–Khazraji*, 481 U.S. 604, 612-13 (1987).

but equally virulent means . . . to keep the freed slaves in an inferior status," *United States* v. *Cannon*, 750 F.3d 492, 501 (5th Cir. 2014), such as attacks on their churches and denial of access to public places, *see United States* v. *Bledsoe*, 728 F.2d 1094, 1097 (8th Cir. 1984).

Here, the object of Defendants' conspiracy was to deprive racial minorities—and their supporters—of the right to be free from the badges and incidents of slavery.[7] As alleged in the FAC, the conspiracy sought to do so in three distinct ways, each of which constitutes a classic Thirteenth Amendment deprivation.

*First*, the conspiracy had as its object a campaign of violence and intimidation targeted at racial minorities and their supporters. *See Cannon*, 750 F.3d at 502; *United States* v. *Hatch*, 722 F.3d 1193, 1206 (10th Cir. 2013); *Roof*, 225 F. Supp. 3d at 449.

*Second*, the conspiracy aimed to prevent racial minorities and their supporters from exercising rights of free speech, assembly, association, and movement in public spaces. In *Griffin* v. *Breckenridge*, the Supreme Court upheld a § 1985(3) claim premised on the Thirteenth Amendment where the plaintiffs alleged precisely these deprivations of their rights. As *Griffin* explained, "[such] allegations clearly support the requisite animus to deprive the petitioners of the equal enjoyment of legal rights because of their race." 403 U.S. at 103.

*Third*, the conspiracy aimed to target Jewish synagogues and church services led by black ministers for violence and intimidation. Such conduct violates core original purposes of the Thirteenth Amendment. *See Roof*, 225 F. Supp. 3d. at 448.

Defendants' responses to these allegations are non-responsive and meritless. They first argue that dismissal is required because the moving Defendants did not personally attack each

---

[7] Defendant Peinovich's argument (Br. at 11) that the "badges and incidents of slavery" refer only to the physical "badges that identified slaves" is frivolous. *See Cannon*, 750 F.3d at 501-02.

individual Plaintiff. (Kessler Br. at 5.) But that is not what the law of conspiracy requires: "[A] single overt act by just one of the conspirators is enough to sustain a conspiracy claim even on the merits." *Waller* v. *Butkovich*, 584 F. Supp. 909, 931 (M.D.N.C. 1984) (citing *Vietnamese Fishermen's Ass'n* v. *Knights of the KKK*, 518 F. Supp. 993 (S.D. Tex. 1981)). Indeed, the entire premise of conspiracy liability is that the named defendant need not have committed the act that harmed the plaintiff, but rather can be held liable for the injurious acts of co-conspirators. *See Poe*, 47 F.3d at 1378. In any event, for purposes of this § 1985(3) element, the ultimate question is whether the conspiracy as a whole aimed to achieve Thirteenth Amendment violations. *See Carpenters*, 463 U.S. at 832-33. For the reasons given above, there can be no doubt that it did.

Next, Defendants assert that Plaintiffs fail to allege "that anyone made any racial comments before the assaults, nor that they were the only ones assaulted, or even that they were targeted because of their race." (Kessler Br. at 6.) This is both wrong and misguided: the FAC contains extensive allegations of racial comments by Defendants and their co-conspirators throughout Charlottesville 2.0[8]; and it is no defense under § 1985(3) to observe that *other* minorities and advocates of racial equality were also brutalized by members of the conspiracy. Similarly, Defendants' assertion that Plaintiffs do not allege that they were targeted because of their race is both wrong and legally irrelevant. The FAC alleges that all Plaintiffs were injured either because of their race or because they were peacefully protesting in support of racial equality. (*See* ¶¶10-19); *see also Waller*, 584 F. Supp. at 937. Further, § 1985(3) allows any person injured by a covered conspiracy to recover against any member of that conspiracy; there is no requirement that they have been personally racially targeted. *Cf. Griffin*, 403 U.S. at 103.

---

[8] For example, at the Friday night rally, Defendants and their co-conspirators barked like dogs, performed Nazi salutes, and made monkey noises at black protesters. (¶¶162, 165.)

33

Finally, Defendants seek to minimize the racialized violence that actually occurred. For instance, they note that several Plaintiffs were doused in a foul liquid and targeted with lit torches, but emphasize that nobody actually caught fire. (Kessler Br. 6.) Similarly, Defendant Spencer suggests that the Friday night rally—which he led—resulted only in "small scuffles, without serious injuries." (Spencer Br. at 15.) These arguments can hardly be taken seriously. The FAC contains dozens of particularized allegations of racialized violence and intimidation, and describes a campaign of racial terror that inflicted significant injury on Plaintiffs—as well as many other racial minorities and advocates of equality. Plaintiffs have thus stated a claim under § 1985(3) predicated on violations of the Thirteenth Amendment.

### 2. 42 U.S.C. § 1982

In relevant part, § 1982 guarantees that all U.S. citizens "shall have the same right . . . as is enjoyed by white citizens . . . [to] hold . . . real and personal property." This provision "bars all racial discrimination, private as well as public," in relation to property rights. *Jones*, 392 U.S. at 413. Under § 1982, interference with property need not be "destructive, disruptive or violent." *Frazier*, 2017 WL 5560864, at *6. A defendant violates § 1982 when he engages in racially-motivated intimidation that causes a plaintiff to "fear for [his] safety" in and around his property. *Id.*; *see also United States* v. *Greer*, 939 F.2d 1076, 1091 (5th Cir. 1991). Courts have recognized that § 1982 protects not only property owners, but also members of organizations. *See id.* (holding that § 1982 covers use of a synagogue by members and their guests).

Before and during the weekend of August 11, Defendants and their co-conspirators repeatedly targeted Congregation Beth Israel—to which Plaintiff Pearce belongs—for intimidation and death threats. (¶¶138, 202.) These acts were in furtherance of the conspiracy's common purpose of subordinating Jews. Synagogue members were so terrified by these threats that they hid their sacred Torah scrolls. (¶138.) Synagogue members also changed the time that

34

they held prayer services out of fear for their safety. (¶139.) Since August 12, and in direct response to threats made against it by Defendants and their co-conspirators, Beth Israel has adopted a new, elaborate security protocol for pick-up of children from Hebrew school. (¶295.) Moreover, Pearce now fears for her safety while at the synagogue. (*Id.*)

In targeting Beth Israel, Defendants and their co-conspirators "aimed at interfering" with rights protected by § 1982. *Carpenters*, 463 U.S. at 833. That conclusion is confirmed by *United States* v. *Brown*, 49 F.3d 1162 (6th Cir. 1995). There, a group of white supremacists conspired to engage in a drive-by shooting of a synagogue in Nashville, Tennessee. *See id.* at 1164. Because they shot at the synagogue at 1:00am, nobody was present. *See id.* However, "a member of the synagogue described the effect of the shooting as shocking, intimidating, and perceived as life-threatening." *Id.* On these facts, the Sixth Circuit held that the conspirators had violated § 1982, which protected the right of synagogue members to hold property free of anti-Semitic threats. *See id.* at 1165-67. This analysis was supported by *United States* v. *Greer*, where the Fifth Circuit held that defendants had violated § 1982 by vandalizing a temple and Jewish Community Center in Dallas, Texas. *See* 939 F.2d at 1091.

Here, the FAC states an even stronger claim under § 1982. Defendants and their co-conspirators targeted Beth Israel over a sustained period and did so while the synagogue was occupied by Jews seeking to practice their religion. During Charlottesville 2.0, three co-conspirators with semi-automatic rifles stood across from the temple during Shabbat services. (¶202.) Others, carrying Nazi flags, shouted "There's the synagogue!" followed by chants of "Sieg Heil." (*Id.*) Defendant Ray carried a sign that read "Gas the kikes, race war now!" (*Id.* And co-conspirators publicly suggested meeting at 3:00pm to "torch those Jewish monsters." (¶203.)

These and other acts caused members of Beth Israel—including Plaintiff Pearce—to "fear for [their] safety" in the temple. *Frazier*, 2017 WL 5560864, at *6. Defendants and their co-conspirators thus aimed at interfering with the right of synagogue members to hold property on equal terms with other citizens under § 1982. Accordingly, Plaintiffs have stated a claim for relief under § 1985(3) predicated both on the Thirteenth Amendment and § 1982.

## II.   PLAINTIFFS HAVE STATED A CLAIM UNDER 42 U.S.C. § 1986

Section 1986 "imparts liability on individuals with knowledge of a conspiracy under § 1985, who have the power to stop the wrong, but neglect or refuse to stop the wrong." *Coleman* v. *Boeing Co.*, No. 2:16-cv-1451, 2017 WL 2992526, at *7 (D.S.C. June 22, 2017). Here, the Defendants who seek to dismiss Plaintiffs' § 1986 claim argue only that Plaintiffs failed to state a § 1985(3) claim. (Kessler Br. at 8.) For the reasons discussed in Part I, this contention fails. Further, the FAC alleges with particularity that each Defendant knew about the common plan to commit racialized violence and intimidation, and chose to participate in it rather than seek to stop it. Plaintiffs have thus stated a claim for relief under § 1986.

## III.   PLAINTIFFS HAVE STATED A CLAIM OF COMMON LAW CIVIL CONSPIRACY

In Virginia, "a common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *Commercial Bus. Sys., Inc.* v. *BellSouth Servs., Inc.*, 249 Va. 39, 48 (1995). "The gist of the civil action of conspiracy is the damage caused by the acts committed in pursuance of the formed conspiracy." *CaterCorp, Inc.* v. *Catering Concepts, Inc.*, 246 Va. 22, 28 (1993) (citation omitted). It must therefore be shown that plaintiffs suffered injury "caused by the acts committed in furtherance of the conspiracy." *Dogs Deserve Better, Inc.* v. *Terry*, No. 3:14-cv-591, 2015 WL 1288324, at *3 (E.D. Va. Mar. 20, 2015).

36

Although Defendants raise three objections to Plaintiffs' civil conspiracy claims, not one of them succeeds. First, some Defendants contend that this claim fails because they did not conspire to commit acts of racial violence and intimidation. (*See* Hill Br. at 12-13; Peinovich Br. at 7-10, 12-19; Spencer Br. 20-21; Kessler Br. 6-8.) This argument fails for the reasons discussed above. The FAC sets forth over two hundred paragraphs of factual allegations describing "the requisite concert of action and unity of purpose." *Hui Kun Li v. Shuman*, No. 5:14-cv-00030, 2015 WL 3766182, at *12 (W.D. Va. June 16, 2015) (citations omitted).

Second, certain Defendants argue that the FAC fails to allege that each Defendant personally injured a Plaintiff. (*See* Kessler Br. at 7; Spencer Br. at 11; Peinvich Br. at 7, 10.) This argument rests on a legal error. To establish a civil conspiracy claim, a plaintiff need only prove "that someone in the conspiracy committed a tortious act that proximately caused his injury; the plaintiff can then hold other members of the conspiracy liable for that injury." *Gelber* v. *Glock*, 293 Va. 497, 534 (2017) (citation omitted).

Finally, some Defendants deny that the conspiracy caused injury to Plaintiffs through the commission of illegal acts. (*See* Kessler Br. at 7-9; Hill Br. at 12-14.) This argument misapprehends the law and ignores Plaintiffs' factual allegations. In Virginia, a defendant is liable for civil conspiracy where he has combined with other persons "to accomplish, by some concerted action, some *criminal or unlawful purpose* or some lawful purpose by a criminal or unlawful means." *Commercial Bus. Sys.*, 249 Va. at 48 (emphasis added). Here, the FAC alleges that Defendants conspired to accomplish many criminal acts. (*See* ¶351.) These predicates alone suffice to state a claim for civil conspiracy.[9]

---

[9] Relying on *Vansant & Gusler, Inc.* v. *Washington*, 245 Va. 356 (1993), Defendant Kessler argues that a civil conspiracy cannot be established through proof of a plan to commit criminal

Moreover, the FAC alleges that Defendants conspired to commit many intentional torts, including battery, assault, false imprisonment, and violations of § 8.01-42.1.[10] (¶351.) Each of these allegations is individually sufficient to support Plaintiffs' civil conspiracy claim.

Battery: Virginia defines battery as "an unwanted touching which is neither consented to, excused, nor justified." *Koffman* v. *Garnett,* 265 Va. 12, 16 (2003). The FAC alleges that in advance of August 11, Defendants and their co-conspirators discussed, planned, strategized, and coordinated their use of violence against Jews, blacks, and their supporters in Charlottesville. It further alleges that over the weekend of August 11 and 12, members of the conspiracy (including some Defendants) executed that agreement by conducting many acts of battery against Plaintiffs and others. On Friday night, for example, they charged, encircled, and then attacked Plaintiffs Magill, Romero, and John Doe, as well as other peaceful protesters. (¶¶165-174.) On Saturday, they charged at a group of kneeling clergy, knocking Plaintiff Wispelwey into a bush. (¶208.) That same day, members of the conspiracy committed countless acts of battery in Charlottesville. (¶¶211, 221-222.) Finally, on Saturday afternoon, Defendant Fields intentionally drove a motor vehicle into a crowd and struck Plaintiffs Martin, Romero, and Alvarado, among others. (¶¶242, 244, 249, 252.)

Assault: Assault is "an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in that other person's mind a

---

acts. (*See* Kessler Br. at 8.) *Vansant*, however, held only that a specific Virginia criminal statute did not include a private right of action for damages. *See Vansant*, 245 Va. at 360. It did not state a rule inconsistent with *Commercial Business Systems, Inc.* v. *BellSouth Services, Inc.,* whose holding controls here. 249 Va. at 48.

[10] The FAC further alleges that Defendants and co-conspirators committed numerous other tortious acts in furtherance of the conspiracy that resulted in harm to Plaintiffs—including, *inter alia*, inviting or otherwise causing another to participate in an act of terrorism in violation of Virginia Code § 18.2-46.5 and causing a riot in violation of Virginia Code § 18.2-408.

38

reasonable apprehension of an imminent battery." *Koffman*, 265 Va. at 16. The FAC alleges that Defendants conspired to engage in many acts of violence and intimidation—including assault. Members of the conspiracy, including some Defendants, then carried out this plan. For example, at the Friday night rally, members of the conspiracy waved tiki torches and other weapons at Plaintiffs John Doe, Romero, and Magill, causing them to reasonably fear imminent battery. (¶¶169, 171.) On Saturday, after they charged Plaintiff Wispelwey, members of the conspiracy continued to menace the clergy, leading them to reasonably fear serious injury if they remained. (¶210.) Finally, when Defendant Fields drove his car into the crowd, he caused Plaintiffs Sines, Muñiz, Blair, Romero, and Alvarado to reasonably fear imminent injury. (¶¶242-261.)

False Imprisonment: "If a person is under a reasonable apprehension that force will be used unless he willingly submits, and he does submit to the extent that he is denied freedom of action, this . . . constitutes false imprisonment." *Zayre of Va., Inc.* v. *Gowdy*, 207 Va. 47, 50-51 (1966). The FAC alleges that, pursuant to their common plan, members of the conspiracy falsely imprisoned Plaintiffs Romero and John Doe at the Friday night rally. Both Romero and John Doe attended a protest at the Jefferson statue that night. Members of the conspiracy deliberately encircled the small group of protesters and used violence to trap them. As alleged in the FAC:

> Plaintiff John Doe feared that he was in imminent danger. Encircled by Defendants and co-conspirators, John Doe felt trapped and did not believe that he could escape safely. He knew that as an African-American man, if he had tried to escape before the group dispersed, he would have been attacked. For approximately ten minutes, he remained in place, and while confined within the circle of Defendants and co-conspirators, was sprayed with mace

(¶173.) Plaintiff Romero, too, was trapped and "struggled to escape the mob." (¶174.) She was also sprayed with mace. (*Id.*) This period of entrapment by Defendants and their co-conspirators constituted false imprisonment. *See Zayre*, 207 Va. at 50-51.

Virginia Code § 8.01-42.1: As set forth in detail above, the FAC alleges that each of the Defendants was part of a common conspiracy to engage in acts of intimidation, harassment, and violence "motivated by racial, religious, or ethnic animosity" in violation of § 8.01-42.1. As described below at 40-41, the FAC alleges that members of the conspiracy—including some of the Defendants—committed many violations of § 8.01-42.1, thereby injuring Plaintiffs.

In sum, Defendants formed and participated in an illegal conspiracy to commit acts of racial intimidation and violence in Charlottesville on August 11 and 12. In the course of executing that conspiracy, they and their co-conspirators committed numerous violations of Virginia criminal and tort law, and thereby injured Plaintiffs. The FAC alleges these facts with great particularity. Accordingly, Plaintiffs have stated a claim for relief under Virginia law.

## IV. INDIVIDUAL PLAINTIFFS HAVE STATED CLAIMS AGAINST CERTAIN INDIVIDUAL DEFENDANTS UNDER VIRGINIA CODE § 8.01-42.1

Virginia Code § 8.01-42.1 provides as follows:

> An action for injunctive relief or civil damages, or both, shall lie for any person who is subjected to acts of (i) intimidation or harassment or (ii) violence directed against his person; or (iii) vandalism directed against his real or personal property, where such acts are motivated by racial, religious, or ethnic animosity.

A § 8.01-42.1 claim has two elements: first, an act of intimidation or harassment, violence, or vandalism; and second, evidence that the act was motivated by racial, religious, or ethnic animus. *See Frazier*, 2017 WL 5560864, at *7 (denying motion to dismiss § 8.01-42.1 claim); *Berry* v. *Target Corp.*, 214 F. Supp. 3d 530, 535 (E.D. Va. 2016) (same); *Salim* v. *Dahlberg*, 170 F. Supp. 3d 897, 912 (E.D. Va. 2016) (upholding jury verdict finding violation of § 8.01-42.1).

The FAC alleges several incontrovertible violations of § 8.01-42.1. First, Defendant Invictus harassed and intimidated Plaintiff Wispelwey after the Friday night rally. Invictus had participated in the rally and operated a live video feed. (¶159.) Later that night, he stopped

Wispelwey, demanded information about his religious denomination, and then menaced him. (¶182.) These acts were motivated by racial and religious animus. (*Id.*) And second, that same night, Defendants Mosley, Spencer, Kessler, Ray, Cantwell, and Invictus were all involved in mob violence on the UVA campus. (¶143.) Those Defendants participated in terrifying acts of racially-motivated violence, harassment, and intimidation against peaceful protesters, including Plaintiffs Magill, Romero, Sines, and Wispelwey. (¶¶166-169 (Magill); ¶¶164-166, 169 (Romero); ¶¶161, 170 (Sines); ¶178-182 (Wispelwey).)

## V.    DEFENDANTS' CONSTITUTIONAL OBJECTIONS ARE MERITLESS

### A.    The First Amendment Does Not Protect Defendants' Violent Conspiracy

Defendants broadly assert that the FAC must be dismissed on First Amendment grounds. (*See* Spencer Br. at 6-15; Peinovich Br. at 12-19.) Citing *Snyder* v. *Phelps*, 562 U.S. 443 (2011), and *Brandenburg* v. *Ohio*, 395 U.S. 444 (1969), they seek to pass off their violent conspiracy as advocacy shielded by the Free Speech Clause. This argument reflects a basic misunderstanding of the nature of Plaintiffs' case. Plaintiffs do not allege that they were injured as a consequence of hearing Defendants' speech, as in *Snyder*. Nor do they allege that Defendants are liable for inciting third parties to commit violence, in violation of *Brandenburg*. Rather, Plaintiffs allege that Defendants *themselves* organized, oversaw, and carried out a conspiracy to commit illegal acts of violence and intimidation. And it is black letter law that "forming an agreement to engage in [illegal] activities" is unprotected conduct, "not protected speech." *Amawi*, 695 F.3d at 482.

Defendants' asserted reliance on *Snyder* and *Brandenburg* is thus categorically misplaced. And those cases are also inapposite for many other reasons. The Supreme Court's holding in *Snyder* was premised on its observation that the Westboro Baptist Church could not be held liable for peaceful, innocent, and law-abiding speech that caused others to experience emotional distress. *See* 562 U.S. at 460. But here, the FAC alleges with particularity that

41

Defendants were neither peaceful, innocent, nor law-abiding. More important, Plaintiffs do not complain of harm resulting merely from exposure to Defendants' speech (as in *Snyder*); rather, they argue that an illegal conspiracy formed, overseen, and executed by Defendants injured them.

Inciting imminent lawless action is just one category of speech that is not protected by the First Amendment, as established by *Brandenburg*. But it does not matter whether the conduct alleged here meets the *Brandenburg* test, since Plaintiffs allege that Defendants jointly formed an illegal agreement to commit acts of violence and intimidation, and that Defendants then actively carried out that plan together. This conduct is *also* not protected by the First Amendment. While incitement and illegal conspiracy are both unprotected under Supreme Court precedent, they are distinct categories of wrongdoing. *See, e.g.*, *United States v. Williams*, 553 U.S. 285, 298 (2008) (referring to "conspiracy" and "incitement" as distinct offenses); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002) (same) The *Brandenburg* test, which describes when liability can attach for general advocacy of violence, is thus irrelevant here—just as it had no application in *Griffin* or any of the other § 1985(3) conspiracy cases cited above.

Accepting the allegations in the FAC as true for purposes of Rule 12(b)(6), Plaintiffs' claims are perfectly consistent with the Constitution. Simply put, illegal conspiratorial statements and agreements are not protected by the First Amendment. *See, e.g.*, *Amawi*, 695 F.3d at 482. As the Supreme Court held in *Giboney*:

> [I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed. Such an expansive interpretation of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society.

42

336 U.S. at 502 (citations omitted); *accord Brown*, 456 U.S. at 54-55.

At times, Defendants seem to suggest that the First Amendment forbids any consideration of their statements *at all*. That is plainly wrong: it is commonplace to consider a person's statements in assessing his motives. As the Supreme Court explained in *Wisconsin* v. *Mitchell*, the First Amendment "does not prohibit the evidentiary use of speech to . . . prove motive or intent." 508 U.S. at 489. Here, Plaintiffs' claims under § 1985(3) and § 8.01-42.1 require proof that Defendants were motivated by class-based animus. It is therefore necessary to consider their statements for that purpose. *See Thomasson* v. *Perry*, 80 F.3d 915, 931 (4th Cir. 1996).

Further, it was partly through their exchanges that Defendants planned, implemented, and oversaw an illegal scheme to commit acts of violence and intimidation. Defendants' statements thus evidence their conspiratorial agreement for purposes of § 1985(3) and Virginia law. The First Amendment poses no bar to consideration of their words and writings as proof of such agreement. *See, e.g.*, *Wisconsin*, 508 U.S. at 489. Nor can Defendants evade liability on the ground that they intended to express a political message by attacking and intimidating racial minorities and their supporters. *See Roberts* v. *United States Jaycees*, 468 U.S. 609, 628 (1984) ("[V]iolence or other types of potentially expressive activities that produce special harms distinct from their communicative impact . . . are entitled to no constitutional protection.").

The Fourth Circuit elaborated on these principles in *Rice* v. *Paladin Enterprises, Inc.*, 128 F.3d 233. There, the defendant had published a book with step-by-step instructions on how to commit a contract killing. *Id.* at 239. The estate of a murder victim, whose killer followed the book's instructions to the letter, sued the publisher for aiding and abetting the victim's wrongful death. *Id.* at 241. Following *Giboney* and *Brown*, the Fourth Circuit held that the First Amendment did not protect the publisher from civil liability. *Id.* at 242-43. It reasoned that

43

"speech which, in its effect, is tantamount to legitimately proscribable nonexpressive conduct may itself be legitimately proscribed, punished, or regulated incidentally to the constitutional enforcement of generally applicable statutes." *Id.* at 243. Otherwise, the Court observed, "government would be powerless to protect the public from countless of even the most pernicious criminal acts and civil wrongs." *Id.* at 244 (citing, *inter alia*, the Model Penal Code provision governing conspiracy).

That teaching applies here: just as a publisher can be held liable for knowingly aiding murder, so can Defendants be held liable for knowingly organizing, overseeing, and participating in a plot to commit illegal acts of targeted violence, terror, and intimidation.

B.    **The Second Amendment Does Not Protect Defendants' Use of Weapons**

Several Defendants erroneously invoke the Second Amendment as a blanket defense to the FAC. (Spencer Br. at 15-18; Hill Br. at 14-15.) But Plaintiffs do not seek to impose liability solely on the basis that Defendants *carried* weapons; rather, they allege that Defendants and their co-conspirators *carried and used* weapons as part of an illegal conspiracy to violate Plaintiffs' rights through acts of violence and intimidation. Yet again, Defendants base their constitutional argument on a significant mischaracterization of Plaintiffs' claims.

To the extent Defendants assert that the laws invoked by Plaintiffs are unconstitutional as applied to them, this fails. The application of state and federal civil rights law here does not "impose[] a burden on conduct falling within the scope of the Second Amendment's guarantee," *United States* v. *Chester*, 628 F.3d 673, 680 (4th Cir. 2010), any more than finding a person liable for armed robbery would. Moreover, application of federal and state civil rights law to

Defendants would survive any level of Second Amendment scrutiny. *See, e.g.*, *Hamilton* v. *Pallozzi*, 848 F.3d 614, 623-26 (4th Cir. 2017).[11]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss.

---

[11] Defendant Nationalist Front argues that it should be dismissed from this case pursuant to Rule 17(b)(3) because it "is not an entity that can be sued." (ECF 105 at 1-2, 207.) The Schoep Declaration (ECF 105-1), submitted in support of that request, cannot be considered on a motion to dismiss, *see Occupy Columbia* v. *Haley*, 738 F.3d 107, 116 (4th Cir. 2013), and is insufficient to demonstrate that Nationalist Front is not an unincorporated association in any event. However, if the Court intends to consider this issue, then it should be treated as a motion for summary judgment and Plaintiffs should be given an opportunity to take discovery. *See* Rule 12(d).

45

Dated: February 20, 2018

Respectfully submitted,

s/ Robert T. Cahill
Robert T. Cahill (VSB 38562)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
rcahill@cooley.com

Roberta A. Kaplan (*pro hac vice*)
Julie E. Fink (*pro hac vice*)
Joshua Matz (*pro hac pending*)
Christopher B. Greene (*pro hac vice*)
Seguin L. Strohmeier (*pro hac vice*)
KAPLAN & COMPANY, LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: (212) 763-0883
rkaplan@kaplanandcompany.com
jfink@kaplanandcompany.com
jmatz@kaplanandcompany.com
cgreene@kaplanandcompany.com
sstrohmeier@kaplanandcompany.com

Karen L. Dunn (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Telephone: (202) 237-2727
Fax: (202) 237-6131
kdunn@bsfllp.com
wisaacson@bsfllp.com

Alan Levine (*pro hac vice*)
COOLEY LLP
1114 Avenue of the Americas, 46th Floor
New York, NY 10036
Telephone: (212) 479-6260
Fax: (212) 479-6275
alevine@cooley.com

David E. Mills (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Fax: (202) 842-7899
dmills@cooley.com

Philip M. Bowman (*pro hac vice*)
Yotam Barkai (*pro hac vice*)
Joshua J. Libling (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
575 Lexington Ave.
New York, NY 10022
Telephone: (212) 446-2300
Fax: (212) 446-2350
pbowman@bsfllp.com
ybarkai@bsfllp.com
jlibling@bsfllp.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2018, I filed the foregoing with the Clerk of Court through the CM/ECF system, which will send a notice of electronic filing to:

Justin Saunders Gravatt
David L. Hauck
David L. Campbell
Duane, Hauck, Davis & Gravatt, P.C.
100 West Franklin Street, Suite 100
Richmond, VA 23220
jgravatt@dhdglaw.com
dhauck@dhdglaw.com
dcampbell@dhdglaw.com

*Counsel for Defendant James A. Fields, Jr.*

Bryan Jones
106 W. South St., Suite 211
Charlottesville, VA 22902
bryan@bjoneslegal.com

*Counsel for Defendants Michael Hill, Michael Tubbs, and League of the South*

Elmer Woodard
5661 US Hwy 29
Blairs, VA 24527
isuecrooks@comcast.net

James E. Kolenich
Kolenich Law Office
9435 Waterstone Blvd. #140
Cincinnati, OH 45249
jek318@gmail.com

*Counsel for Defendants Jeff Schoep, Nationalist Front, National Socialist Movement, Matthew Parrott, Matthew Heimbach, Robert Ray, Traditionalist Worker Party, Elliot Kline, Jason Kessler, Vanguard America, Nathan Damigo, Identity Europa, Inc. (Identity Evropa), and Christopher Cantwell*

I further hereby certify that on February 20, 2018, I also served the following non-ECF participants, via U.S. mail, First Class and postage prepaid, addressed as follows:

Loyal White Knights of the Ku Klux Klan
a/k/a Loyal White Knights Church of
the Invisible Empire, Inc.
c/o Chris and Amanda Barker
P.O. Box 54
Pelham, NC 27311

Richard Spencer
1001-A King Street
Alexandria, VA 22314
-and-
P.O. Box 1676
Whitefish, MT 59937

Michael Peinovich
a/k/a Michael "Enoch" Peinovich
PO Box 1069
Hopewell Junction, NY 12533

Moonbase Holdings, LLC
c/o Andrew Anglin
P.O. Box 208
Worthington, OH 43085

Andrew Anglin
P.O. Box 208
Worthington, OH 43085

East Coast Knights of the Ku Klux Klan
a/k/a East Coast Knights of the
True Invisible Empire
26 South Pine St.
Red Lion, PA 17356

Fraternal Order of the Alt-Knights
c/o Kyle Chapman
52 Lycett Circle
Daly City, CA 94015

Augustus Sol Invictus
9823 4th Avenue
Orlando, FL 32824

*s/ Robert T. Cahill*
Robert T. Cahill (VSB 38562)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
Email: rcahill@cooley.com

*Counsel for Plaintiffs*

2