# UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

ELIZABETH SINES, ET AL.,

Plaintiffs,

| v. |

JASON KESSLER, ET AL.,

Defendants. |

Case No. 3:17-cv-00072-NKM |

| Hon. Norman K. Moon

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED

MAR 0 6 2018

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

## DEFENDANT RICHARD SPENCER'S REPLY MEMORANDUM IN FURTHER SUPPORT OF HIS MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Defendant Richard Spencer, Pro Se, submits this reply memorandum in further support of

his motion to dismiss Plaintiff's amended complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## INTRODUCTION

Plaintiffs' amended complaint relies upon a long series of repetitive, unsupported,

conclusory statements accompanied by a broad demand for relief based on an assertedly

irrebuttable portrayal of defendants as violent terrorists of the most dangerous order. In their

motions to dismiss defendants observe plaintiffs' patternistic assertions for what they are: mere

labels and groundless legal conclusions that fail even remotely to satisfy the well-codified

pleading standards set forth by the United States Supreme Court in *Bell Atlantic v. Twombly, 550*

*U. S. 544* (2007) and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009). Plaintiffs' generic response is a

*non sequitur* in relation to defendants' motions to dismiss, and restates plaintiffs' original

unsupported claims while suggesting that defendants must somehow vaporize plaintiffs'

conclusory language itself to validate their motions. Plaintiffs all but explicitly state that the

*Iqbal / Twombly* standard works in reverse, obliging defendants to show above a threshold of plausibility that they are not white supremacist terrorists.

That plaintiffs feel unburdened by the need to satisfy established pleading standards in even the most minimal sense reveals their suit as a bad-faith strategic ploy to impede free speech, intimidate perceived political opponents, and silence defendants by forcing them to mount a costly and debilitating legal defense. In other words, plaintiffs decline to present meritorious arguments supported by fact because they are unconcerned with ultimately prevailing in their claim. Their strategic lawsuit against public participation will have succeeded completely if it survives the motions to dismiss and proceeds to the expensive and time-consuming discovery phase. The only effective deterrent to plaintiffs' bad-faith lawfare tactic is to dismiss their complaint outright.

Permitting plaintiffs to proceed on the basis of their arbitrary characterizations and unsubstantiated parade of awfuls would destroy defendants' ability to engage in a wide scope constitutionally-protected speech and activity. Entertaining plaintiffs' claim would also seriously undermine the operation of several fundamental legal principles that protect all Americans. It would give rise to the presumption that courts may be cynically exploited by the wealthy and powerful to suppress civic expression and participation by less privileged citizens who are unable to finance their legal defenses. It would encourage the notion that plaintiffs may bypass the pleading standards by employing vague, ungrounded allegations of conspiracy and terrorism. It would erode the First Amendment right of Americans to freely assemble and air their grievances, subject to reasonable limitations relating to the time and place of their activity. It would corrupt, perhaps irrevocably, the vital and well-established constitutional principle that the First Amendment extends equally and especially to speech that many find unpleasant,

offensive, and outrageous. Finally, it would confuse and subvert the authority of this court, since the organizer of the event in question sought and obtained an injunction from the United States District Court for the Western District of Virginia vindicating his right to hold the very demonstration plaintiffs now mischaracterize as seditious and riotous.

Plaintiffs seek to distract from the dangerous effects and consequences of their suit by relentlessly repeating their empty labels and legal conclusions in an obfuscating matter-of-fact language and tone designed to mislead. Central to this obfuscation is an unclever elision in which, on the one hand, plaintiffs pretend not to be attacking defendants' exercise of their constitutional rights while, on the other, they seek to mesmerize the court with assertions that defendants' exercise of their constitutional rights itself amounts to violence and terrorism *de facto*. Further, plaintiffs never present a legal argument or set of facts to support their grouping together of the defendants, such that they are all obliged to answer for any alleged act by any one of them.

Absent from plaintiffs' memorandum are citations to even a single case supporting their argument in its reasoning or resembling their complaint in its facts. The simple reason for this is that no court has ever sanctioned the wholesale disregard of minimum pleading standards and of the First Amendment that plaintiffs' complaint demands.

## I.

## PLAINTIFFS' AMENDED COMPLAINT FAILS TO MEET *IQBAL / TWOMBLY* PLAUSIBILITY PLEADING STANDARDS AS TO SPENCER

Spencer is named as a defendant in four of the seven claims alleged in the amended complaint, namely, Count I (42 U.S.C. § 1985(3) Conspiracy), Count II (42 U.S.C. § 1986), Count III (Civil Conspiracy) and Count V (Violation of Virginia Code § 8.01-42.1 Civil Action

for Racial, Religious, or Ethnic Harassment). None of plaintiffs' allegations against Spencer remotely satisfy the plausibility standard of *Iqbal* and *Twombly*.

Spencer is mentioned in 32 of the 335 paragraphs in the amended complaint (prior to the causes of action), namely paragraphs 21, 28, 40, 42, 49, 50, 53, 63, 70, 78, 85, 87, 92, 108, 120, 141, 143, 153, 164, 166, 175, 184, 187, 229, 260, 273, 297, 305, 311, 315, 327, and 328. Several of these allege actions by Spencer that are entirely legal and wholly protected by the First Amendment. These include paragraphs 40 (drafting of a statement), 85 (referring to the same statement), 87 (maintaining a website on which another writer issued an indefinite statement about dominating "the streets"), 92 (maintaining a website on which another writer indicated that event attendance among sympathetic groups would be high), 120 (issuing a public request for legal assistance—the date of this request is not specified), 141 (tweeting a picture of a restaurant), 143 (participating in a torchlit procession through the campus of the University of Virginia), 153 (texting a reporter, "I'd be near campus tonight, if I were you. After 9:00 p.m., Nameless field."), 184 (retweeting a tweet by the event organizer), 260 (sending a tweet urging demonstrators to leave Charlottesville after a declaration of a state of emergency), 273 (commenting to the *New York Times* that the event represented a moral victory), 297 (sending a tweet indicating that he and his supporters were not discouraged and would not be intimidated into refraining from visiting Charlottesville), 305 (maintaining a website on which another writer published, after the Unite the Right event, a statement expressing a non-specific readiness to "fight" for a cause), 311 (soliciting financial contributions online to assist in defending against legal action), and 327 (being featured on a poster promoting the event). Many of the remaining paragraphs are so conclusory in nature that they fail to satisfy the requirements of *Twombly* and *Iqbal* and are thus entitled to no presumption of truth.

Other paragraphs merit special discussion.  In paragraph 70 plaintiffs attribute a quotation to Spencer.  ("Damigo and his group [Identity Evropa] took the lead to organize white supremacist participation among people from outside Charlottesville.")  The article in which this sentence appears can be viewed at https://ww2.kqed.org/news/2017/08/14/californian-who-helped-organize-charlottesville-protests-used-berkeley-as-a-test-run/.  Plaintiffs attribute the quotation to Spencer to highlight his apparent endorsement of the designation "white supremacist."  However, the attributed sentence does not appear in the article as a quotation at all, but rather as a characterization by the author of the article.  Plaintiffs mislead by attributing the statement to Spencer and placing it inside quotation marks, giving the impression that he spoke the words therein as they were printed, thus concurring in plaintiffs' use of the phrase "white supremacist" and by extension the terroristic and violent aims plaintiffs assign to any activity conducted under that label.  This impression is false.

In paragraph 229 plaintiffs indicate that, after the Unite the Right event was shut down by the authorities, Spencer and others reassembled McIntire Park, where, they say, "[v]iolence broke out."  Here plaintiffs do not even bother with the formality of explaining what Spencer or other defendants did to give rise to this alleged violence, or how it was connected to defendants' allegedly conspiratorial, terroristic aims.  Since plaintiffs' complaint relies on the bad-faith assumption that defendants caused and indeed intended all of the violence that took place that day and actually designed and coordinated its occurrence, such explanations are in their mind *pro forma* exercises they entertain as afterthoughts and frequently fail to employ at all.

In paragraphs 143 through 186 plaintiffs present their loaded version of a particular phase of the torchlit procession that occurred on the campus of the University of Virginia on the evening of August 11th, in which Spencer participated.  They describe participants reaching the

statue of Thomas Jefferson and "charging" and surrounding the relatively few counter-participants who had assembled around it. Plaintiffs emphasize that this was a planned, pre-coordinated maneuver by the defendants. This contention is nonsensical on its face. The torchlit procession was not generally publicized, advertised or promoted, and was instead organized through word-of-mouth chains of communication, a fact that plaintiffs readily acknowledge in paragraphs 144 and 145 and do not contradict elsewhere. Plaintiffs fail to explain how participants could have planned to charge, surround, and intimidate a group of counter-participants whom they could not have anticipated would be present, since the procession was organized secretly and not disclosed to the public, apart from isolated, last-minute tips to reporters. Instead of an intentionally-organized and strategized operation of intimidation and violence, the facts presented by the plaintiffs themselves reveal at most an episode of pushing, shoving, and overall tension incident to otherwise peaceful activity.

This breathless account of how they allegedly became the target of defendants' secret nighttime procession through the campus of the University of Virginia is perhaps the most revealing aspect of plaintiffs' story. How did this come to pass? Plaintiffs depict an "attack" at the campus rotunda, but do not explain why the rotunda required defense or why defendants expected to find plaintiffs there in significant numbers between nine and ten o'clock in the evening. Plaintiffs themselves heavily emphasize the fact that the nighttime procession was organized secretly and was neither disclosed in defendant Jason Kessler's event permit application nor revealed publicly. Absent from plaintiffs' presentation, then, is an explanation for their organized presence at the rotunda late in the evening on August 11th.

Plaintiffs neglect this gap in their logical chain for good reason: it exposes the misrepresentation animating their entire claim. Plaintiffs were neither victims of an invidious

conspiracy nor targets of defendants' activity at all—in fact the reverse is nearer to the truth. Defendants participated in a demonstration intended as a public assembly for the expression of opinion and the airing of political and cultural grievances. Defendants would have proceeded with their activity even if none of the plaintiffs nor any counter-demonstrator were present, and most likely would have preferred this to be the case. The reality is that the plaintiffs were counter-protestors who not only came voluntarily to the demonstration to express their opposition, but who sought energetically to place themselves at the center of it, even to the extent of reacting instantaneously to last-minute reports that defendants were present on the University of Virginia campus late Friday night.

Plaintiffs had the right to be present on the University campus and at the rotunda equally as much as did the defendants. They lack the right or legal standing, however, to intentionally seek out the defendants wherever they happen to gather, conduct a loud and physical counter-demonstration against them, and then later raise claims of conspiracy and racial harrassment premised on the false conceit that they were the singular focus of defendants' activity. Permitting plaintiffs' suit to proceed would not only oblige the square peg of the facts to fit into the round hole of a conspiracy claim's elements, but would also embroil federal courts in a futile effort to resolve every highly contentious political and cultural disagreement as such a claim.

Plaintiffs' presentation consists entirely of conclusory statements, descriptions of defendants' lawful conduct, suggestions that do not survive application of the rule of completeness, and combinations thereof. Their complaint does not satisfy *Iqbal / Twombly* plausibility standards for pleading an actionable conspiracy, a conclusion supported by this circuit's well-developed case law. In *A Society Without a Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011), the Fourth Circuit affirmed a dismissal of § 1985(3) conspiracy claims, noting

that, under *Iqbal* and *Twombly*, "[f]acts pled that are 'merely consistent with' liability are not sufficient . ... In addition, where a conspiracy is alleged, the plaintiff must plead facts amounting to more than 'parallel conduct and a bare assertion of conspiracy . ... Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality' . ... The factual allegations must plausibly suggest agreement, rather than being merely consistent with agreement." (quoting *Twombly*). The Fourth Circuit again affirmed dismissal of a § 1985(3) conspiracy claim in *Thomas v. The Salvation Army Southern Territory*, 841 F.3d 632 (4th Cir. 2016), reiterating that allegations of parallel conduct and a bare assertion of conspiracy are insufficient basis for a claim under *Twombly*. *Id.* at 637. *See also Polidi v. Bannon*, 226 F.Supp.3d 615, 623 (E.D. Va. 2016) (dismissing a § 1985(3) claim on *Twombly* pleading grounds); *Melvin v. Social Security Administration*, 126 F.Supp.3d 584, 609-10 (E.D.N.C. 2015) (dismissing a § 1985(3) conspiracy claim and emphasizing that plaintiff must plausibly plead "that there was a single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its consequences"); *cf. Simmons v. Poe,* 47 F.3d 1370, 1377 (4th Cir. 1995) (granting summary judgment against § 1985(3) conspiracy claim and noting the "relatively heightened" pleading standard for such claims); *Scott v. Greenville County*, 716 F.2d 1409, 1424 (4th Cir. 1983) (rejecting allegations that private citizens were liable for § 1985(3) conspiracy simply because they wrote letters and spoke at public meetings).

Central to the *Iqbal / Twombly* pleading standard is the principle that where a court, taking due note of context, observes an "obvious alternative explanation" for the defendant's alleged conduct that does not entail liability under plaintiff's conspiracy theory, the plaintiff has failed to elevate his claim from merely conceivable to actually plausible. *See McCleary-Evans v.*

8

*Maryland Department of Transportation*, 780 F.3d 582, 587-88 (4th Cir. 2015). Here, the alternative explanation for Spencer's alleged conduct *is* obvious: Spencer exercised his First Amendment rights by recording podcasts, speaking on public issues, expressing controversial viewpoints, and participating in a demonstration. If one looks past the layer of conclusory commentary plaintiffs apply throughout their complaint, the facts they present make it difficult to believe their liability theory over the benign alternative. Plaintiffs have not met the pleading requirements of *Iqbal* and *Twombly* and their complaint should not be allowed to proceed.

## II.

### PLAINTIFFS HAVE NOT PLEADED AND CANNOT PLEAD THE NECESSARY ELEMENTS OF A 42 U.S.C. § 1985(3) CLAIM

The scope of § 1985(3) conspiracy claims has been specifically delineated and narrowly circumscribed by both the Fouth Circuit and the Supreme Court. This is not at all apparent from plaintiffs' complaint, however, which seems premised on a different law of the plaintiffs' own imagining for which unambiguous case precedent does not exist. Accepting plaintiffs' mistaken, impressionistic interpretation of the law would lead to a broad and novel expansion of § 1985(3) that was not intended by its drafters and has never been endorsed by this or any sister court.

The elements of a § 1985(3) claim are: (1) a conspiracy by two or more persons; (2) motivated by a specific, class-based, invidiously discriminatory purpose; (3) to deprive the plaintiff of equal enjoyment of rights secured by law to all; (4) resulting in injury to the plaintiff; (5) as a consequence of an overt act committed by defendants in connection with the conspiracy. *Thomas v. Salvation Army*, 841 F.3d 632 at 637 (4th Cir. 2016). Plaintiffs' allegations on their face do not meet these elements, and the relevant case precedent strongly supports defendants' motions to dismiss based on Fed. R. Civ. Pr. 12(b)(6).

Modern case law relating to § 1985(3) descends from the Supreme Court's decision in *Griffin v. Breckenridge*, 403 U.S. 88, 98–99 (1971). In *Griffin*, a group of whites assaulted a group of African-Americans who were traveling on an interstate highway in Mississippi. The African-Americans filed an action for damages pursuant to § 1985(3). The issue before the Supreme Court was whether § 1985(3) reached individuals acting in a purely private capacity. The Court declined to endorse a broad reading § 1985(3) that would permit its application to all instrusions upon the rights of others by private individuals. Although the Court held that the statute could apply to particular kinds of private action—specifically to interferences with federally protected rights to travel and Thirteenth Amendment rights—the Court expressed concern over the broad language of § 1985(3). The Court cautioned that although § 1985(3) was designed to reach some private conspiracies, Congress did not intend it to "apply to all tortious, conspiratorial interferences with the rights of others." 403 U.S. at 101.

In *United Brotherhood of Carpenters v. Scott*, 463 U.S. 825 (1983), the Supreme Court considered the application of § 1985(3) to a labor union dispute. A pro-union group had engaged in a conspiracy against non-union employees working for a particular non-union contractor, culminating in a physical attack upon the non-union workers. The non-union workers brought an action for damages under § 1985(3). The district court found that the attack constituted an interference with the right of association, in violation of § 1985(3), because it amounted to a discriminatory conspiracy against non-union workers as a class. After the Fifth Circuit affirmed, the Supreme Court reversed. The Court was unpersuaded by the argument that § 1985(3) applies to "every concerted effort by one political group to nullify the influence or do injury to a competing group by use of otherwise unlawful means." *Id.* at 836. The Court explained:

> To accede to that view would go far toward making the federal courts, by virtue of § 1985(3), the monitors of campaign tactics in both state and federal elections, a role which

the courts should not be quick to assume. If respondents' submission were accepted, the proscription of § 1985(3) would arguably reach the claim that a political party has interfered with the freedom of speech of another political party by encouraging the heckling of its rival's speakers and the disruption of the rival's meetings.

*Id.*

The Supreme Court also declined to expand the scope of § 1985(3) in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), in which a claim was brought against persons who organized and coordinated demonstrations against a women's health clinic that performed abortions. The Court explained the importance of adhering to a circumscribed application of § 1985(3):

> Our discussion in *Carpenters* makes clear that it does not suffice for application of § 1985(3) that a protected right be incidentally affected. A conspiracy is not "for the purpose" of denying equal protection simply because it has an effect upon a protected right. The right must be *"aimed at," 463* U. S., at 833 (emphasis added); its impairment must be a conscious objective of the enterprise. Just as the "invidiously discriminatory animus" requirement, discussed above, requires that the defendant have taken his action "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group," *Feeney,* 442 U. S., at 279, so also the "intent to deprive of a right" requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it. That was not shown to be the case here, and is on its face implausible.

506 U.S. at 275-76

In *Harrison v. KVAT Food Management, Inc.,* 766 F.2d 155 (4th Cir. 1985), the Fourth Circuit, rejecting a contrary decision by the Second Circuit, held that members of a political party are not protected as a class by § 1985(3), even if it is alleged that defendants' conduct aimed to discourage their participation in the affairs of their party. The Fourth Circuit stated:

> [A]nalyzing the *Scott* decision, we find little support for the contention that § 1985(3) includes in its scope of protection the victims of purely political conspiracies. Indeed, the opinion in *Scott* exhibits a noticeable lack of enthusiasm for expanding the coverage of §

1985(3) to any classes other than those expressly provided by the Court. ... [T]he Court provided no authority on which to base the extension of § 1985(3) protection urged upon us here. ... We are concerned here with a statute enacted to fulfill a particular purpose and designed to meet particular conditions. ... In fact, the Court in *Scott* expressed uncertainty over whether even the use of unlawful conduct in the deprivation of rights necessarily calls for a remedy. The Court remarked: "[W]e find difficult the question of whether § 1985(3) provided a remedy for every concerted effort by one political group to nullify the influence of or do other injury to a competing group by use of otherwise unlawful means." *Carpenters v. Scott*, 463 U.S. at 836.

*Id.* at 161-63.

Viewed against the backdrop of the Fourth Circuit and Supreme Court's repeatedly-expressed reluctance to broadly extend such claims to all manner of private activity, the plaintiffs' theory of liability becomes even more unsupportable. The fact that Spencer's activity consisted simply of expression protected by the First Amendment entirely and finally disposes of plaintiffs' macabre theory of violent, invidious conspiracy. Allowing plaintiffs' claim to proceed would represent a dramatic departure from case precedent and towards the application of § 1985(3) "to all tortious, conspiratorial interferences with the rights of others," an outcome the Supreme Court specifically disavowed in *Griffin*.

Under the plaintiffs' theory, anyone who participated in planning or organizing the demonstration in any way is liable for all alleged harms caused by any of the other hundreds of demonstrators who participated. This is wholly inconsistent with the narrow focus on specific intent required by the Supreme Court in *Bray*, and with the reluctance of the Fourth Circuit and the Supreme Court to apply § 1985(3) categorically to all claims of conspiracy or tortious conduct. In *Bray*, the Supreme Court pointed out that § 1985(3)'s "'intent to deprive of a right' requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it." Plaintiffs' allegations as to Spencer and the other defendants actually illustrate the

opposite: that plaintiffs purposely directed their activity towards the defendants rather than the other way around.

Plaintiffs' reliance on § 1982 as the basis for their conspiracy claim is particularly problematic. Plaintiffs' theory rests largely on their allegation in paragraph 202 that as the nighttime procession of August 11 passed a synagogue to which one of the plaintiffs belongs, three demonstrators wearing uniforms and holding semi-automatic weapons stood across from the temple, shouting offensive and threatening statements. Although this alleged conduct is shocking and offensive, it cannot provide the basis for a claim under § 1982, which provides that "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." Even if plaintiffs offered a nonspeculative allegation that Spencer approved this conduct or was even aware of it—they do not—there still would be no support in Fourth Circuit precedent for such a claim arising under § 1982.

## III.

## PLAINTIFFS HAVE NOT PLEADED AND CANNOT PLEAD A VIABLE CLAIM UNDER 42 U.S.C. § 1986

The broad construction of § 1986 underlying plaintiffs' claim has no support in any case law. No case known to Spencer has ever affirmatively upheld a § 1986 claim, including the case cited in this connection by plaintiffs, *Coleman v. Boeing Co.*, 2017 WL 2992526 (D.S.C. June 22, 2017). The *Coleman* court, in fact, rejected a § 1986 claim on the ground that it was dependent on a viable § 1985(3) claim, which plaintiffs had not pleaded. Dozens of other cases have followed this rationale, *e.g., Trerice v. Summons*, 755 F.2d 1081, 1085 (4th Cir. 1985); *Davis v. Hudgins*, 896 F. Supp.2d 561, 571 (E.D. Va. 1995). These precedents support dismissal of plaintiffs' § 1986 claim in this case as well. Plaintiffs have not pleaded a viable § 1985(3)

claim against Spencer or against all defendants generally, in light of the First Amendment context and the amended complaint's pleading deficiencies.

Even assuming, contrary to fact, that plaintiffs had stated a viable § 1985(3) claim against one of the defendants, § 1986 should not be afforded the broad interpretation plaintiffs urge. Such an interpretation would impose vague and virtually unlimited obligations on private citizens to prevent alleged violations by others of § 1985. This is inconsistent with basic principles of statutory construction. *See, e.g., Nat'l Labor Relations Board v. Wheeling Elec. Co.*, 444 F.2d 783, 787 (4th Cir. 1971) (where a literal interpretation of a statute would not accord with the intended purpose of legislation or produce an absurd result, courts must look beyond words of the statute); *United States v. American Trucking Ass'n*, 310 U.S. 534, 543 (1940) ("Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole,' this Court has followed [the purpose of the act] rather than the literal words."). Moreover, such a broad interpretation would be unconstitutional under the void-for-vagueness and overbreadth doctrines, for no private citizen would have fair notice of the criteria by which he or she could be held liable under § 1986 for the conduct of others, e.g., in a mass demonstration. Under the void for vagueness doctrine, a law cannot be enforced if it is so vague or confusing that the average person could not figure out what is being prohibited or what the penalties are for breaking that law. *See, e.g., Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1048-51 (1991) (holding that an attorney disciplinary rule was unconstitutionally vague as applied); *Keyishian v. Board of Regents*, 385 U.S. 589-603-04 (holding that restrictions on government employee speech were unconstitutionally vague). Under the overbreadth doctrine, a statute that proscribes not merely unprotected speech but also protected speech is unconstitutional. *See, e.g., R.A.V. v. City of St.*

*Paul*, 505 U.S. 377 (1992) (striking down bias-motivated criminal ordinance where it proscribed not only fighting words but also protected speech). Accordingly, to the extent that § 1986 must be interpreted in this case at all, that interpretation must be limited to persons who had an independent, recognized duty to prevent unlawful conduct, such as sheriffs and the police.

## IV.

## PLAINTIFFS HAVE NOT PLEADED A PLAUSIBLE CIVIL CONSPIRACY CLAIM AGAINST SPENCER

Under the common law of Virginia, a plaintiff must prove four elements to state a *prima facie* cause of action for common law conspiracy: (1) a combination of two or more persons; (2) accomplishing, by some concerted action; (3) a criminal or unlawful purpose, or some lawful purpose by a criminal or unlawful means; (4) resulting in damage caused by the defendant's acts committed in furtherance of the conspiracy. *See Commercial Bus. Sys., Inc. v. BellSouth Servs., Inc.,* 453 S.E.2d 261, 267 (1995); *Glass v. Glass,* 321 S.E.2d 69, 74 (1984). In *Iqbal* the Supreme Court clarified that the heightened plausibility standard applies to all civil claims. *See Ashcroft v. Iqbal,* 556 U.S. 662, 684 (2009). Plaintiffs' claim of civil conspiracy falls short of this standard for the same reason their § 1985(3) fails: it rests entirely upon conclusory statements, descriptions of lawful conduct by the defendants, incomplete statements of fact, and combinations thereof that ultimately contradict themselves and together fail to support their intended claim.

Several of plaintiffs' theories are disposed of in other sections of this memorandum, e.g., their allegation that defendants conspired to commit acts of intimidation, harassment, and violence directed at plaintiffs on the basis of racial, religious, or ethnic animosity, in violation of Virginia Code § 8.01-42.1. Others find support only in plaintiffs' recitations of various sections of the Virginia Code followed by their predictable, conclusory say-so that defendants did

commit the underlying act. Thus plaintiffs present allegations that defendants conspired to, for example, cause or produce a riot, in violation of Virginia Code § 18.2-408, and direct others to do so; assemble a collection of people for the purpose off committing acts of assault, battery, and violence, in violation of Virginia Code §§ 18.2-38, 18.2-42, and 18.2-42.1; maliciously cause another person bodily injury by use of any explosive or fire, in violation of Virginia Code § 18.2-52; burn an object with the intent to intimidate in a manner having a direct tendency to place another person in reasonable fear of apprehension of death or bodily injury, in violation of Virginia Code § 18.2- 423.01; possess, use, sell, give, distribute, or manufacture a weapon or imitation weapon that could cause serious bodily harm in connection with an act of terrorism, in violation of Virginia Code § 18.2-46.5; and invite, solicit, recruit, encourage, or otherwise cause another to participate in an act of terrorism, in violation of Virginia Code § 18.2-46.5, and knowingly provide material support to individuals or organizations for whom such terrorism is a primary objective.

Plaintiffs decline to meet their burden under *Iqbal* and *Twombly* or to respond substantially to the motions to dismiss with which they are presented, in which defendants point out that plaintiffs offer only conclusory statements on the one hand and descriptions of defendants' lawful conduct on the other. Plaintiffs respond, in effect, "No we don't," without repairing the factual, logical, and legal gaps that mar their amended complaint. Plaintiffs claim that defendants rely upon facts outside of the complaint to advance the arguments in their motion (Pls. Mem. Opp'n. To Defs. Mots. To Dismiss at 28), and that defendants fail to draw all reasonable factual inferences in the plaintiffs' favor (*Id.* at 29). The opposite is the case. The inference arises from plaintiffs' own factual averments that defendants could not have conspired to terrorize and attack plaintiffs where defendants did not expect to find them and in fact

intended not to find them (speaking of the events of August 11th).  From the same allegations of fact arises the inference that defendants would not have sought and received an injunction from this court to conduct what plaintiffs portray as wholesale terrorism and violence (speaking of the events of August 12th).  Drawing all reasonable factual inferences in plaintiffs' favor, their theories of liability collapse in on themselves.

## V.

## PLAINTIFFS HAVE NOT PLEADED AND CANNOT PLEAD A VIABLE CLAIM UNDER VIRGINIA CODE § 8.01-42.1

In their amended complaint plaintiffs recite the elements of a claim under Virginia Code § 8.01-42.1, state that the elements are met with regard to the plaintiffs, and declare that Spencer and other defendants possessed the requisite *mens rea* for the claim to be valid.  This presentation could function as an illustration to first-year law students of a pleading designed to fail under the *Iqbal / Twombly* standard.  Plaintiffs' bare recitation may place their assertions somewhere within the boundaries of conceivability, but not nearly within the realm of plausibility in which valid claims under *Iqbal* and *Twombly* must be found.  Plaintiffs' own foregoing factual averments do not support the notion that Spencer, particularly or broadly, sought to harass or intimidate anyone, plaintiffs included.  Neither do those averments give rise to the impression that Spencer harbors the racial, religious, or ethnic animosity on which his actions must necessarily be based for such a claim to lie.

The nearest plaintiffs approach the notion that Spencer had any connection to intimidating or harrassing behavior is paragraph 166 of their complaint, in which they note that he retweeted a counter-demonstrator's description of his experience on the night of August 11th.  Spencer appeared to verify the counter-demonstrator's claim that the demonstrators surrounded him and others at the Jefferson statue and, at least initially, would not let them out.  On its face,

however, Spencer's social media comment was but an observation of a moment of confrontation between demonstrators and counter-demonstrators that was specifically designed and intended, not by the demonstrators or any of the defendants, but by the group of counter-demonstrators to which plaintiffs belong. This is the impression given by the plaintiffs' own allegations, in which they relate that they and others intentionally discovered the secretly-conceived plan of the demonstrators to proceed through the campus of the University of Virginia. Plaintiffs and others then made their way to the location they surmised to be the demonstrators' destination and locked arms around a statue in a public square they knew would soon be filled with people against whom they held a specific animus of their own. Spencer's acknowledgement that this in fact took place does not give rise to a plausible claim that he subjected any of the plaintiffs to intidimidation, harassment, or violence. Plaintiffs fail to highlight where or when he might have done so anywhere in their amended complaint.

Plaintiffs' claim would still fail even if they had succeeded in identifying such an instance, since they fail to support the contention that Spencer is motivated even generally by racial, religious, or ethnic animosity. Again, the factual averments in plaintiffs' complaint suggest the opposite. Spencer's endorsement of the belief that "[n]ations must secure their existence and uniqueness and promote their own development and flourishing," and that "[r]acially or ethnically defined states are legitimate and necessary" on its face applies to all groups, not exclusively to white or European ones. Plaintiffs appear to believe very strongly that Spencer harbors the kind of animosity proscribed by Virginia Code § 8.01-42.1, but have failed to cite facts that would encourage others in that belief, much less satisfy the plausibility standard of *Iqbal* and *Twombly*. Plaintiffs' § 8.01-42.1 claim must fail.

Case 3:17-cv-00072-NKM-JCH   Document 253   Filed 03/06/18   Page 18 of 22   Pageid#: 1622

## CONCLUSION

Spencer participated in a demonstration variously planned, coordinated, and attended by other defendants. The demonstration represented an exercise of rights of speech and assembly protected under the First Amendment of the Constitution and was substantially shielded by a judge of this court as such. The demonstration was directed neither at the plaintiffs nor at any group or individual, but instead was focused on the participants themselves and on particular monuments dedicated to important figures of the nation's past. Plaintiffs went far out of their way and ordinary course of affairs to discover defendants' plans and make personal, real-life contact with them and the demonstration in which they were taking part. Now plaintiffs interpret all of the resulting conflict, tension, and offense as the result of a comprehensive scheme of violence and terrorism by defendants, very much in spite of plaintiffs' own factual contentions. This self-serving projection of malign intent onto Spencer and the other defendants is disappointing and does not arise from the facts presented. It should not be permitted to form the basis of costly, prolonged civil litigation, particularly when that cost and entanglement is the plaintiffs' ultimate purpose. This court should grant the defendants' motion to dismiss.

Respectfully submitted,

Richard Spencer, Pro Se

# CERTIFICATE OF SERVICE

I Richard Spencer hereby certify that on March 3rd, 2018, I mailed copies of this reply

memorandum via Express Overnight Delivery to:

Robert T. Cahill (VSB 38562)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
Email: rcahill@cooley.com

Roberta A. Kaplan (*pro hac vice*)
Julie E. Fink (*pro hac vice*)
Christopher B. Greene (*pro hac vice*)
Seguin L. Strohmeier (*pro hac vice*)
KAPLAN & COMPANY, LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: (212) 763-0883
Email: rkaplan@kaplanandcompany.com
Email: jfink@kaplanandcompany.com
Email: cgreene@kaplanandcompany.com
Email:
sstrohmeier@kaplanandcompany.com

Karen L. Dunn (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW Washington, DC
20005
Telephone: (202) 237-2727
Fax: (202) 237-6131
Email: kdunn@bsfllp.com
Email: wisaacson@bsfllp.com

Philip M. Bowman (*pro hac vice*)
Joshua J. Libling (*pro hac vice*)
Yotam Barkai (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
575 Lexington Ave.
New York, NY 10022
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: pbowman@bsfllp.com Email:
jlibling@bsfllp.com
Email: ybarkai@bsfllp.com
*Counsel for Plaintiffs*

Richard Spencer

I further hereby certify that on March 3rd, 2018, I also served the following participants via U.S. mail, First Class and postage prepaid, addressed as follows:

Justin Saunders Gravatt
David L. Hauck
David L. Campbell
Duane, Hauck, Davis & Gravatt, P.C.
100 West Franklin Street, Suite 100
Richmond, VA 23220
jgravatt@dhdglaw.com
dhauck@dhdglaw.com
dcampbell@dhdglaw.com

*Counsel for Defendant James A. Fields, Jr.*

Bryan Jones
106 W. South St., Suite 211
Charlottesville, VA 22902
Bryan@bjoneslegal.com

*Counsel for Defendants Michael Hill, Michael Tubbs, and League of the South*

Elmer Woodard
5661 US Hwy 29
Blaris, VA 24527
isuecrooks@comcast.net

James E. Kolenich
Kolenich Law Office
9435 Waterstone Blvd. #140
Cincinnati, OH 45249
jek318@gmail.com

*Counsel for Defendants Jeff Schoep, Nationalist Front, National Socialist Movement, Matthew Parrott, Matthew Heimbach, Robert Ray, Traditionalist Worker Party, Elliot Kline, Jason Kessler, Vanguard America, Nathan Damigo, Identity Evropa, Inc. (Identity Evropa), and Christopher Cantwell*

Loyal White Knights of the Ku Klux Klan
a/k/a Loyal White Knights Church of the
Invisible Empire, Inc.
c/o Chris and Amanda Barker
P.O. Box 54
Pelham, NC 27311

Michael Peinovich
a/k/a/ Michael "Enoch" Peinovich
P.O. Box 1069
Hopewell Junction, NY 12533

Moonbase Holdings, LLC
c/o Andrew Anglin
P.O. Box 208
Worthington, OH 43085

Andrew Anglin
P.O. Box 208
Worthington, OH 43085

East Coast Knights of the Ku Klux Klan
a/k/a East Coast Knights of the True
Invisible Empire
26 South Pine St.
Red Lion, PA 17356

Fraternal Order of the Alt-Knights
c/o Kyle Chapman
52 Lycett Circle
Daly City, CA 94015

Augustus Sol Invictus
9823 4th Avenue
Orlando, FL 32824

Richard Spencer