# UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

**ELIZABETH SINES, ET AL.,**                    **Case No. 3:17-cv-00072-NKM** │

**Plaintiffs,**                                                  │ **Hon. Norman K. Moon**
│ **v.** │

**JASON KESSLER, ET AL.,**

 **Defendants.** │

### DEFENDANT MICHAEL PEINOVICH'S MOTION TO RESTRAIN ROBERTA KAPLAN, ESQ. AND KAPLAN AND COMPANY LLP FROM FURTHER IMPROPER AND UNETHICAL EXTRAJUDICIAL STATEMENTS AND FOR SANCTIONS;  AND MEMORANDUM IN SUPPORT

Defendant Michael Peinovich, Pro Se, invoking this Court's inherent authority to assure a fair trial and to discipline attorneys who appear before it, as well as its authority under Fed. R. Civ. P. 16(c)(P) to issue pretrial orders "facilitating… the just, speedy, and inexpensive disposition of the action," moves for a pretrial order restraining Roberta Kaplan, Esq., and Kaplan and Company LLP, attorneys for the plaintiffs, from further extrajudicial statements that prejudice Peinovich's and the other defendants' right to a fair trial and that violate ethical rules. Peinovich also respectfully requests sanctions, including dismissal of the complaint.  Peinovich submits the following memorandum in support.

### INTRODUCTION

As shown below, Roberta Kaplan, Esq., attorney for the plaintiffs, has been conducting an aggressive campaign, based on Twitter and in major web and print media outlets, against Peinovich and the other defendants, making extrajudicial statements that have reached

potentially millions of Internet and social media users. Through her tweets, speeches, interviews and statements, Kaplan has outrageously linked defendants to suspected school shooter Nikolas Cruz, abortion clinic bombers, the Holocaust and offensive statements by persons who are not defendants in this case. Additionally, Ms Kaplan has been variously implying, or tacitly agreeing with the implications raised by others in her public presence, that she has special access to and influence with this Court. Further, Ms. Kaplan has repeatedly issued extrajudicial, public, widely-read and heard statements disparaging the defendants and characterizing plaintiffs' claims in a tendentious, non-neutral, pro-plaintiff light. In doing so, she has waived plaintiffs' attorney client privilege and made herself a fact witness in this case.

## BACKGROUND

Ms. Kaplan is very active on many widely used and viewed social media platforms including Twitter where she has a substantial following of approximately 500 users. Although this may seem like a relatively small following, the nature of Twitter, and the basis of its popularity and influence is the ability of its users to freely engage others on the platform, include users they do not "follow," and to rebroadcast ("retweet") others' content to their respective audiences of followers. Thus the audience for Ms. Kaplan's tweets is not 500 but actually a large multiple of this. Such tweets and retweets are not geographically limited. Ms. Kaplan's tweets reach all across the country and the world, including into the potential jury pool for the Western District of Virginia.

In violation of ethical rules and to the prejudice of Peinovich and the other defendants, Ms. Kaplan and her law firm have chosen to tweet repeatedly about this case. Ms Kaplan has also appeared on a video talking about – and tendentiously characterizing – the plaintiffs' claims

in this case. She has also given numerous interviews to large media outlets in which she interpreted the facts and legal underpinning of the case in such a way as to prejudice the defendants and, more outrageously, implied or permitted the implication that she possesses special influence with this Court.

A. **Ms. Kaplan's Tweets**. The following is a non-exhaustive sampling of Ms. Kaplan's tweets regarding this case. It is revealing that Ms. Kaplan, after she became aware that Peinovich knew of the tweets, blocked Peinovich on twitter in an attempt to conceal them and deleted or otherwise made unavailable many of these tweets.

1) Tweet linking defendants in this case to accused school shooter Nikolas Cruz:

 **Robbie Kaplan** @kaplanrobbie · Feb 28

It's Purim. The holiday where the Jewish community fought back against hatred and won. Help us fight back against those who carry guns & shields with swastikas by suing the American Nazis who planned the violence in #Charlottesville. @IntegrityforUSA



**Shooting suspect Nikolas Cruz had swastikas on ammunition magazi...**
Cruz also had 180 rounds of ammunition left, a source confirmed to CBS News

cbsnews.com

3

This tweet emotively links Nikolas Cruz, the man suspected of murdering 17 children and whose name is indelibly at the forefront of current public consciousness and opinion, to "the American Nazis who planned the violence in Charlottesville." Indeed, the link suggests Cruz was a member or supporter of the defendants in this case. But Cruz is not a defendant in this case and even plaintiffs' 112 page amended complaint neither suggests nor provides a factual basis to support, any links between Cruz and any defendant, and certainly not Peinovich, who condemns Cruz's actions. Even if Cruz actually did have "swastikas on his ammunition magazine," as stated in her tweet, this would not justify her in publicly linking Cruz to the defendants. As a matter of fact, however, asserted links between Cruz and white nationalists have been shown to be false. (See, e.g.: http://www.foxnews.com/entertainment/2018/02/19/media-run-with-unconfirmed-report-tying-florida-school-shooter-nikolas-cruz-to-white-nationalist-group.html) Ms. Kaplan, however, has never sought to correct the harm her vicious tweet has inflicted on Peinovich and the other defendants. In any event, it would not be possible at this point to unring that bell.

2) Tweets linking defendants to the "American Identitarian Party."

 **Robbie Kaplan**
@kaplanrobbie

○ Follow ⌄

This is what the Hamans of today are saying about people like me who are fighting them in court re #Charlottesville. On this #Purim, help us fight back against the rise in anti-Semitism. Donate to @IntegrityforUSA today. @TheRaDR @rabbijilljacobs @JTSVoice @IKAR_LA @RavMABAY



**American Identitarian Party** @nationalistprepper
a day · edited

https://www.integrityfirstforamerica.org/  Overtly marxist 501(c)(3) organization. Ironic the lesbian jew Roberta Kaplan that brought down the old legal meaning of marriage, is using archaic laws to punish the Alt-Right. The complaint alleged violations of the 1871 Ku Klux Klan Act and various state laws. **@TheMadDimension** **@Cantwell @pnehlen**



**Robbie Kaplan** @kaplanrobbie · Feb 28

As if we needed any reminder on this Purim of the very real danger from the dramatic rise in anti-Semitism here.  Help us fight back by suing the Nazis and white supremacists responsible for the tragic violence in #Charlottesville. Please donate to @IntegrityforUSA today.

3 hours · edited

In the oven kike dyke, no antisemitism without semitism.

Dyke Kaplan see's us as Haman, the genocidal villain of the Purim story. LOL!

https://twitter.com/TheMadDimension/status/9688876...

↑ 1                    ↩ Reply    ▌▌ Quote    ⟳ Repost

💬 1          ⇄ 7          ♡ 12

Here, Ms. Kaplan tweets links to offensive posts by some unknown person or entity that calls himself, herself, or itself the "American Identitarian Party." (This designation is obscured in the second image, which is from the same Twitter user.) Ms. Kaplan comments: "This is what the Hamans of today are saying about people like me who are fighting them in court re #Charlottesville. On this #Purim, help us fight back against the rise in anti-Semitism. Donate to @Integrityfor USA today." The second tweet contains a similar message, mentioning the Jewish holiday Purim, linking defendants to "a rise in antisemitism", calling defendants "nazis" and "white supremacists" and appealing for funds to "fight back" against them. Ms. Kaplan thus indicates that the defendants in this case — "them" who she is "fighting … in court in #Charlottesvile" — made or approved this post. But the "American Identitarian Party" is not a party in this case; Peinovich has never heard of it, and to his knowledge neither have any of the other defendants. For all that appears, the poster could be an online troll, acting like an immature juvenile on social media, an unfortunately common occurrence. Or it could be a provocateur—someone sympathetic to or even actually allied with Kaplan or the plaintiffs—who is seeking to injure the defendants. In any event, it was highly inappropriate, unethical, and damaging for Ms. Kaplan to broadcast such tweets.

3) Here, Ms. Kaplan broadcasts a tweet again accusing the defendants of being "modern day Hamans" and linking them to a 93% rise in anti-semitic incidents in K-12 schools and colleges:



4) The following tweet by Ms Kaplan is similar to the prior tweet discussed above. Here again she characterizes the defendants as "modern day Hamans" who are responsible for a rise in anti-semitic incidents:



5) In this tweet Ms. Kaplan retweets alleged evidence against the defendants in this case offered to the public by someone with the name or alias of Luke O'Brien, and comments that "[t]he violence, injuries and deaths that occurred were no accident."



6) In the following tweet Ms. Kaplan comments on an alleged statement by Matthew
Heimbach, one of the defendants in this case, that "Of course we look up to men like
Adolph Hitler." Offensive though such an alleged statement may be, Mr. Heimbach had
a First Amendment right to say it, if he did say it. Ms.Kaplan's comment suggests her
true motives in organizing and filing plaintiffs' complaint: to use the Court as a vehicle
to harass, intimidate and bankrupt the defendants and prevent them from expressing
opinions Ms. Kaplan deems "unacceptable."



**Robbie Kaplan** @kaplanrobbie · Feb 10
Help us win this historic lawsuit against Nazis, KKK members and other White
Supremacists and establish that this is not acceptable. @IntegrityforUSA
@KaplanAndCo

> **Adam Sherman** @adamshermanesq
> "Matthew Heimbach, another defendant, says, 'Of course we look up to men
> like Adolf Hitler.'"
>
> thehill.com/opinion/civil-…

7) In the archived tweets collected on the following chain (which Ms. Kaplan has now
deleted or otherwise made unavailable other than through a web archive) Ms. Kaplan
explicitly characterizes the complaint as what amounts to a strategic lawsuit against
public participation (SLAPP). Herein she acknowledges that plaintiffs' motives are to
restrain defendants' exercise of their right to demonstrate, e.g., "We have sued 24 of the
people and entities who together planned and incited the violence. Our goal? To make
it clear that this can never happen again"; criticizes President Trump and the Department
of Justice for not fighting for justice; and exposes her thought processes in drafting the

complaint, i.e., she "conceived lawsuit against organizers of #Charlottesville rally from 20 year old case against website that supported conspiracy against doctors who performed abortions," thus waiving her attorney client privilege and becoming a fact witness as to the plaintiffs' motivations for bringing this lawsuit.

https://web.archive.org/web/20180213104639/https:/twitter.com/kaplanrobbie

B.  **Ms. Kaplan's Speeches.**  In addition to regular tweeting and retweeting, Ms. Kaplan has been giving speeches to large audiences discussing this case.   In her speeches she repeatedly characterizes plaintiffs' lawsuit as a heroic attempt at justice by innocent plaintiffs who have been badly injured by the intentional violence of hateful Nazis and white supremacists.  See, e.g.,

1)  **"Lesbians Who Tech" Speech:**



In this speech Kaplan reveals her underlying contempt for the basic notion of and right to free speech by implying that defendant Spencer, occasionally accompanied by defendant Peinovich, is somehow engaging in violence and rights violations simply by exercising his First Amendment right to speak on college campuses. Spencer's right and ability to do so has been vindicated several times by federal district Courts through injunctions against various public universities seeking to prevent Spencer's speech and activity. These proceedings have been widely publicized in the national and international media. Nonetheless, Kaplan persists in portraying Spencer's actions, and by extension Peinovich's, as an unrestrained, lawless campaign of intimidation, terrorism, and violence. Kaplan appears uninterested in the judicially-recognized distinction between, on the one hand, speech she happens to dislike and, on the other, unlawful violence and aggression.

2) **MAKERS Conference talk with Marissa Blair:**

In the following speech from the feminist MAKERS conference, which Ms. Kaplan promoted on Twitter and which was streamed and broadcast on several Internet outlets including the website of *The Huffington Post.* Ms. Kaplan talked about the present case and showcased one of the plaintiffs, Marissa Blair. This was highly inappropriate on several levels. For one, it shows the dissimulation in plaintiffs' contentions that they are so vulnerable to attacks from defendants and their supporters that some must use John and Jane Doe aliases. On the one hand, when it suits plaintiffs' purposes to poison the Court's mind against the

defendants, they claim defendants are so dangerous that some plaintiffs' identities must be kept secret;   on the other hand, when it serves plaintiffs' purposes to fundraise and invoke widespread sympathy for plaintiffs' claims, other plaintiffs openly appear together with Ms. Kaplan before large audiences. It is not at all clear why, and plaintiffs do not seek to explain, why certain of them require this protection while others do not. The reasoning cannot be that African-American plaintiffs are more vulnerable to retaliation since Ms. Blair is African American.

Moreover, Ms. Blair talks at length, with Ms. Kaplan's approval, about the Charlottesville events, acknowledging that she and other counter-protestors travelled to Charlottesville to confront the pro-monument protestors, a fact that is critical for purposes of First Amendment analysis and at odds with the tenor of the plaintiffs' complaint.   Ms. Blair presents the facts as she sees them favorably to  the plaintiffs, including characterizing the events as a "KKK rally" and stating "they didn't come out there to just, you know, First Amendment, freedom of speech, right to assemble, right to bear arms.   They were out there to incite violence, to scare people." It is inconsistent with the notion of a fair jury trial for plaintiffs' attorneys to be encouraging plaintiffs to broadcast their alleged evidence around the nation, including in the Western District of Virginia, while this litigation is pending.

It is notable also that, to achieve maximum publicity, the Editor in Chief of *The Huffington Post* also participated in Ms. Kaplan's event.   Video of the event was taken in front of a live audience at MAKERS, a well-attended feminist

conference which also featured such luminaries as former Presidential candidate Hillary Clinton, and that was streamed live on the website of *The Huffington Post* and posted to the MAKERS webpage. It is unclear how many times this video was viewed by visitors to the respective websites, but it potentially reached an audience of millions.

The video, including a written transcript, can be found at: https://www.makers.com/videos/5a7b62b31e64220ff8bee6a5 (See transcript of talk attached as Exhibit 1).



**Robbie Kaplan** @kaplanrobbie · Feb 9

So proud to be representing our brave clients in our historic Charlottesville case.
#SueANazi @IntegrityforUSA
Robbie Kaplan, Marissa Blair & Lydia Polgreen | 2018 MAKERS Conference
makers.com/videos/5a7b62b… @makerswomen @KaplanAndCo

💬 8       ⇄ 1       ♡ 14

C. **Ms. Kaplan's Interviews.**

1) In an interview published in the web outlet newsy.com (which can be viewed at

https://www.newsy.com/stories/unite-the-right-rally-organizers-going-to-court/),  Ms.

Kaplan expressed herself at length about the present case, carefully distinguishing her

central purpose in the filing the lawsuit.

> "We want this case to act as a deterrent to others ... Anyone thinking about
> doing that [engaging in defendants' behavior] pauses and changes their
> mind because they understand if they do, there's going to be a very large
> lawsuit filed against them with potentially huge monetary damages
> awarded…"

Kaplan thus expressly, specifically confirmed that the litigation she first conceived,

before then seeking and soliciting plaintiffs, is in fact a strategic lawsuit against

public participation, directed not towards the factual reality and legal merits but

instead as a deterrent against perceived political opponents regardless of the ultimate

legality of their activity.

In the article's final sentence the author indicates that "[t]he judge plans to meet

with Kaplan and make a decision on the motion to dismiss the lawsuit sometime in

13

mid-March." This language implies that Ms. Kaplan enjoys special authority and access to this Court, such that the Court intends to meet individually with Kaplan herself regarding the defendants' motions to dismiss. While it is possible that this language is a product of inartful phrasing by the author, its appearance (and Kaplan's apparent failure to correct it, while still aggressively promoting the article on social media) gives rise to the possible inference that Kaplan believes and perhaps directly boasts of her special influence with the Court. Regardless, Kaplan, through her sustained solicitation of media attention, has subjected herself to the peril that her statements may not always be reported with perfect accuracy, with consequential results. The simpler and more likely explanation is that Kaplan made the statements to the author as he reported them.

2) In a February 12, 2018 article in the New York Times (which can be viewed at https://www.nytimes.com/2018/02/12/us/charlottesville-lawsuit-far-right-heather-heyer.html), Ms. Kaplan's statements given during an interview are summarized as follows:

> "Though all of the plaintiffs live in Virginia, the suit was conceived and filed by a New York lawyer, Roberta A. Kaplan …
>
> After the Charlottesville rally exploded into chaos, Ms. Kaplan started thinking of a lawsuit modeled on the **one brought 20 years ago against the Nuremberg Files**, a website where anti-abortion activists posted the names and addresses of doctors who performed abortions. That suit used civil conspiracy law to prove that the website had led to the murder of doctors, and resulted in a judgment of more than $100 million. Though the damages were eventually reduced, the site was taken down.
>
> 'I thought you could bring a suit under that same strategy,' Ms. Kaplan said, 'against the groups in Charlottesville.'"

14

.

Ms. Kaplan thus not only disclosed the legal theory of her complaint, thus to that extent waiving attorney-client privilege, but likened the defendants in this case to anti-abortion extremists who murdered doctors, in a newspaper that reaches millions of readers across the country.

3) In a March 8, 2018 article appearing on the website vox.com (and that can be viewed at https://www.vox.com/2018/3/8/17071832/alt-right-racists-charlottesville), Ms. Kaplan is quoted as follows:

> "As someone growing up as a Jewish kid in Cleveland, Ohio in the '70s and '80s, my entire religious education was imbued with imagery of facts about the Holocaust. That was something I very much grew up with and had a huge impact on me as a kid," she told me. "I think if you had told me back then that something like [Charlottesville] would ever happen on the streets of an American city, I would have told you you were nuts. And when it happened, I think I, like many, many people, was kind of in a state of shock."

> Kaplan said that the idea behind the suit against the Unite Right organizers came from a 1990s lawsuit against the creator of the "Nuremberg Files" website, which listed the names and personal information (including home addresses) of abortion providers, complete with a legend: "Black font (working); Greyed-out Name (wounded); Strikethrough (fatality)." In *Planned Parenthood v. American Coalition of Life Activists*, a US district court eventually ruled that such websites that clearly encouraged readers to take a violent action constituted a "true threat."

Ms. Kaplan **thus** likened the defendants not only to murderers of doctors but perpetrators of the Holocaust. And again, as she has repeatedly, Kaplan talked openly of the legal theory behind plaintiffs' complaint.

**RELEVANT LEGAL AUTHORITY**

This is a jury trial case. Ms. Kaplan has made repeated prejudicial remarks that she knew or reasonably should have known would be disseminated widely to the public through a variety

of well-read print and web outlets with global readerships. In the course of these remarks Kaplan, explained the plaintiffs' legal theory of the case and described the alleged evidence they claim they will offer in support of their claims. More disconcertingly, in a series of emotionally-charged statements Kaplan again and again linked the defendants to accused school shooter Nikolas Cruz, to perpetrators of the Holocaust, to murderers of doctors, to a supposed rise in acts and expressions of anti-semitism across the country, and to offensive posts by unknown persons. Kaplan facilitated the provision and publication of lengthy accounts of the purported facts and critical aspects of the Charlottesville events by a plaintiff. Kaplan knew or reasonably should have known that the audience for all of this media output included potential jurors in the Western District of Virginia. Her activity , has thus fatally undermined the right of Peinovich and the other defendants to a fair trial in this case.  This Court has the inherent authority to rectify Ms. Kaplan's abusive and prejudicial conduct by dismissing plaintiffs' amended complaint.  *See, e.g., United States v. Shaffer Equipment Company*, 11 F.3d 450, 461-62 (4th Cir. 1993).    Peinovich respectfully requests this sanction.

It is instructive in this regard that Ms. Kaplan's media campaign of extrajudicial statements patently contravenes Section 3.6 of the New York Rules of Professional Conduct. Section 3.6 provides:

> (a) A lawyer who is participating in or has participated in a criminal or civil matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter. (b) A statement ordinarily is likely to prejudice materially an adjudicative proceeding when it refers to a civil matter triable to a jury, a criminal matter or any other proceeding that could result in incarceration, and the statement relates to: (1) the character, credibility, reputation or criminal

> record of a party, suspect in a criminal investigation or witness, or the identity of a
> witness or the expected testimony of a party or witness …

Virginia's Rule of Professional Conduct 3.6, it is true, appears to apply only to criminal matters. Virginia's decision to limit Rule 3.6 to criminal matters, however, does not, Peinovich submits, give parties in civil cases a blank check to mount publicity campaigns that taint the jury pool and compromise an opposing party's fundamental right to a fair trial. *See, e.g., Stradtman v. Republic Services, Inc.*, 121 F.Supp.2d 578, 581 (E.D. Va. 2015) (court has inherent authority to sanction an attorneys conduct even if procedural rules exist which sanction the same conduct). This Court's authority over the attorneys who practice before it, including those admitted pro haec vice, is a matter of federal law;  the Court may adopt the local state's Rules of Professional Conduct.  *See, e.g., Laugier v. City of New York,* 2014 WL 6655283 at * 2 (S.D.N.Y. Nov. 24, 2014).  The overarching and controlling principle is the Court's inherent authority to assure a fair trial.  In any event, under Rule 8.4 of the Virginia Rules, "It is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another."  "Rules of Professional Conduct" in this context can reasonably be interpreted as encompassing the Rules of Professional Conduct of the state in which a pro haec vice attorney is licensed and practices law.

Ms. Kaplan has also violated other ethical rules, under the Virginia and New York Rules. Her apparent insinuation that she has preferred access to the Court contravenes 8.4(d) of the Virginia rules, which declares that an attorney shall not "state or imply an ability to influence improperly or upon irrelevant grounds any tribunal, legislative body, or public official," and Rule 8.4(e) of the New York rules, which is similar.   Ms. Kaplan's repeated public discussions

regarding the purpose of the plaintiffs' lawsuit, including the cases it is modeled after, not only waive plaintiffs' attorney client privilege as to this topic but makes Ms. Kaplan a fact witness, in contravention of Rule 3.7 of the Virginia and New York rules. Defendants have repeatedly contended, in their motions to dismiss and elsewhere, that the plaintiffs' complaint is an improperly motivated SLAPP suit, making the motivations of the plaintiffs and attorneys in filing it a live issue.

Finally, if the Court does not order dismissal of the suit as an appropriate sanction, it has authority under FRCP 16(c)(P) to "take appropriate action on … facilitating in other ways the just, speedy, and inexpensive disposition of the action." The just, speedy, and inexpensive disposition of this action requires, at a minimum, that Ms. Kaplan be instructed to cease her social media and print and television media campaign against Peinovich and the other defendants.

## CONCLUSION

For the reasons stated, Peinovich respectfully requests that plaintiffs' amended complaint be dismissed as an appropriate sanction for Ms. Kaplan's numerous, unethical, and prejudicial extrajudicial statements in this jury trial case. In the alternative, Ms. Kaplan should be instructed to cease her publicity campaign against the defendants.


Dated: March  10, 2018.

Respectfully submitted,

Michael Peinovich, Pro Se

18

**CERTIFICATE OF SERVICE**

On this 10th day of March, 2018, I Michael Peinovich certify that I served electronically

or mailed copies of this reply memorandum to:

Christopher Greene <cgreene@kaplanandcompany.com>,
David Campbell <DCampbell@dhgclaw.com>,
Elmer Woodard <isuecrooks@comcast.net>,
James Kolenich <jek318@gmail.com>,
Bryan Jones <bryan@bjoneslegal.com>,
Roberta Kaplan <rkaplan@kaplanandcompany.com>,
Julie Fink <jfink@kaplanandcompany.com>,
Gabrielle Tenzer <gtenzer@kaplanandcompany.com>,
Alan Levince <alevine@cooley.com>,
Karen Dunn <KDunn@bsfllp.com>,
Philip Bowman <pbowman@bsfllp.com>

_____

Michael Peinovich