# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

ELIZABETH SINES, SETH WISPELWEY,
MARISSA BLAIR, TYLER MAGILL, APRIL
MUNIZ, HANNAH PEARCE, MARCUS
MARTIN, NATALIE ROMERO, CHELSEA
ALVARADO, and JOHN DOE,

               Plaintiffs,

v.

JASON KESSLER, RICHARD SPENCER,
CHRISTOPHER CANTWELL, JAMES
ALEX FIELDS, JR., VANGUARD
AMERICA, ANDREW ANGLIN,
MOONBASE HOLDINGS, LLC, ROBERT
"AZZMADOR" RAY, NATHAN DAMIGO,
ELLIOT KLINE a/k/a/ ELI MOSLEY,
IDENTITY EVROPA, MATTHEW
HEIMBACH, MATTHEW PARROTT a/k/a
DAVID MATTHEW PARROTT,
TRADITIONALIST WORKER PARTY,
MICHAEL HILL, MICHAEL TUBBS,
LEAGUE OF THE SOUTH, JEFF SCHOEP,
NATIONAL SOCIALIST MOVEMENT,
NATIONALIST FRONT, AUGUSTUS SOL
INVICTUS, FRATERNAL ORDER OF THE
ALT-KNIGHTS, MICHAEL "ENOCH"
PEINOVICH, LOYAL WHITE KNIGHTS OF
THE KU KLUX KLAN, and EAST COAST
KNIGHTS OF THE KU KLUX KLAN a/k/a
EAST COAST KNIGHTS OF THE TRUE
INVISIBLE EMPIRE,

               Defendants.

Civil Action No. 3:17-cv-00072-NKM

**JURY TRIAL DEMANDED**

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT
MICHAEL PEINOVICH'S MOTION TO RESTRAIN ROBERTA KAPLAN, ESQ. AND
KAPLAN & COMPANY LLP FROM FURTHER IMPROPER AND UNETHICAL
EXTRAJUDICIAL STATEMENTS AND FOR SANCTIONS**

## PRELIMINARY STATEMENT

Defendants planned, supervised, and executed a brutal campaign of racial terror in Charlottesville, Virginia. Their conduct received extensive coverage from the local and national press. There is strong public and journalistic interest in this case, which seeks to hold Defendants responsible for their illegal, injurious acts. Accordingly, as lawyers often do in civil matters, Roberta Kaplan has discussed the case in various public settings. Through speeches, interviews, and social media posts, she has explained the factual background, legal theory, relief sought, and broader context of the litigation. She has also revealed a small fraction of the death threats and bigoted attacks that she has endured since this case was filed in October 2017. Her statements have all been consistent with norms of attorney speech—and with Ms. Kaplan's duty of zealous advocacy on behalf of the men and women she represents. *See* Model Rules of Prof'l Conduct r. 1.3 cmt. 1 (Am. Bar Ass'n 2016) ("A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf.").

Citing a grab-bag of irrelevant and inapplicable rules, Mr. Peinovich demands that the Court sanction Ms. Kaplan for some of her public remarks. Specifically, he urges that the case be dismissed or that Ms. Kaplan be subjected to a sweeping gag order. But every single premise of his request is erroneous. Counsel to Plaintiffs care deeply about their ethical obligations and have complied fully with the rules of professional conduct. None of Ms. Kaplan's public statements violated any potentially applicable restriction on attorney speech in civil cases. *See* Va. Rules of Prof'l Conduct r. 3.6 (Va. State Bar Ass'n 2010) (declining to impose limits on public statements by counsel in civil matters); N.Y. Rules of Prof'l Conduct r. 3.6 (N.Y. State Bar Ass'n 2010) (prohibiting only statements that "have a substantial likelihood of materially prejudicing an adjudicative proceeding"). That conclusion is only confirmed by relevant First Amendment

1

precedent. *See, e.g., Hirschkop* v. *Snead*, 594 F.2d 356 (4th Cir. 1979) (en banc). Further, Ms. Kaplan has never claimed improper influence over the Court or somehow transformed herself into a fact witness. *See* Va. Rules of Prof'l Conduct rs. 3.7, 8.4(d); N.Y. Rules of Prof'l Conduct rs. 3.7, 8.4(e).

In arguing otherwise, Mr. Peinovich misstates the law and advances bizarre interpretations of Ms. Kaplan's statements. He also engages in jaw-dropping hypocrisy. He and the other Defendants used social media to plan, direct, and perpetrate a series of horrific attacks on racial and religious minorities. To this day, numerous Defendants (and their followers) continue using social media to threaten and denigrate Ms. Kaplan, her colleagues, and a group that supports this lawsuit. As set forth below, these public statements about Ms. Kaplan are rife with religious, sexist, and homophobic slurs—and with occasional threats of mortal peril. Indeed, some of these offensive and derogatory statements have been made by Mr. Peinovich himself. Only in a world gone topsy-turvy would the First Amendment protect people who plot and perpetrate acts of racial violence, while offering no shelter to peaceful attorney speech about claims in civil litigation.

This motion thus constitutes yet another effort by Mr. Peinovich to distract from what really matters here: his illegal conduct. But try as he might, there is no basis for Mr. Peinovich to impugn counsel's motives, to restrict speech (as opposed to conduct), or to paint himself as some kind of victim. He broke the law and should be held accountable. In the interim, his frivolous motion for sanctions should be rejected.

# BACKGROUND[1]

On August 11 and 12, 2017, Mr. Peinovich participated in a campaign of racial violence and intimidation in Charlottesville that he and the other Defendants had carefully planned over the preceding five months. *See, e.g.*, FAC ¶¶ 63, 187, 207. Participants in this campaign primarily targeted blacks and Jews (and their supporters). *See, e.g.*, *id.* at ¶¶ 50-51, 134-142, 201-203, 328. In addition to inflicting terrible harm on Plaintiffs, they caused widespread damage and destruction. *See id.* at ¶¶ 214-261.

Defendants' violent conduct in Charlottesville—and the avowedly anti-Semitic and racist objectives of that violent conduct—received extensive coverage from the local and national press.[2] Many articles explicitly linked the events of Charlottesville 2.0 to a disturbing increase in violence

---

[1]    The background section of Mr. Peinovich's motion is highly adventurous. He assails Ms. Kaplan's credibility; addresses a variety of issues related to his pending motion to dismiss; contends that certain Plaintiffs should not be allowed to proceed anonymously; litigates a non-existent anti-SLAPP motion; and insists (without elaboration) that Ms. Kaplan is prohibited from criticizing white supremacists at any event where she also discusses this litigation. Because these assertions are plainly incorrect, improper, and irrelevant, we do not address them in this response.

[2]    *See, e.g.*, *Violence Erupts at Unite the Right Rally in Charlottesville, Police Respond*, NBC29 (Aug. 12, 2017), http://www.nbc29.com/story/36122119/violence-erupts-at-unite-the-right-rally-in-charlottesville; *Unite the Right rally turns violent, three die*, C-VILLE (Aug. 12, 2017), http://www.c-ville.com/unite-the-right/#.WqmE5pch2cx; *Charlottesville protest takes a deadly turn*, ROANOKE TIMES, (Aug. 12, 2017), http://www.roanoke.com/townnews/politics/charlottesville-protest-takes-a-deadly-turn/article_ca6f2654-60de-500e-a120-e18476433333.html; Dara Lind, *Nazi slogans and violence at a right-wing march in Charlottesville on Friday night*, VOX (Aug. 12. 2017), https://www.vox.com/2017/8/12/16138132/charlottesville-rally-brawl-nazi; Sheryl Gay Stolberg and Brian M. Rosenthal, *Man Charged After White Nationalist Rally in Charlottesville Ends in Deadly Violence*, N.Y. TIMES (Aug. 12, 2017), https://www.nytimes.com/2017/08/12/us/charlottesville-protest-white-nationalist.html; Douglas Belkin, Ben Kesling and Cameron McWhirter, *One Dead as White Nationalists, Protesters Clash in Charlottesville*, WALL STREET JOURNAL (Aug. 13, 2017), https://www.wsj.com/articles/hundreds-face-off-ahead-of-white-nationalist-rally-in-virginia-1502553066; Richard Fausset and Alan Feuer, *Far-Right Groups Surge Into National View in Charlottesville*, N.Y. TIMES (Aug. 13, 2017), https://www.nytimes.com/2017/08/13/us/far-right-groups-blaze-into-national-view-in-charlottesville.html?action=click&contentCollection=U.S.&module=RelatedCoverage&region=EndOfArticle&pgtype=article.

3

and threats against Jews, blacks, and other minorities in the United States.[3] National interest in the events of August 11 and 12 remained high throughout September and October 2017.[4] As a result, the filing of this lawsuit on October 12, 2017, generated significant coverage and commentary.[5]

[3]     *See, e.g.*, *White supremacy: Are US right-wing groups on the rise?*, BBC (Aug. 13, 2017), http://www.bbc.com/news/world-us-canada-40915356; Jelani Cobb, *The Battle of Charlottesville*, NEW YORKER (Aug. 13, 2017), https://www.newyorker.com/news/daily-comment/the-battle-of-charlottesville; Kevin C. Peterson, *Charlottesville And The Revival Of Racism*, WBUR (Aug. 14, 2017), http://www.wbur.org/cognoscenti/2017/08/14/charlottesville-and-the-revival-of-racism; Niall McCarthy, *America's active hate groups are on the rise*, WCPO (Aug. 14, 2017), https://www.wcpo.com/news/national/these-are-americas-active-hate-groups-on-the-rise; Perry Bavon, Jr., *Charlottesville And The Rise Of White Identity Politics*, FIVETHIRTYEIGHT (Aug. 14, 2017), https://fivethirtyeight.com/features/charlottesville-and-the-rise-of-white-identity-politics/; Ryan Struyk, *By the numbers: 7 charts that explain hate groups in the United States*, CNN (Aug. 15, 2017), https://www.cnn.com/2017/08/14/politics/charts-explain-us-hate-groups/index.html; Andrew O'Reilly, *Hate crimes in US on the rise*, FOX NEWS (Aug. 15, 2017), http://www.foxnews.com/us/2017/08/15/hate-crimes-in-us-on-rise.html.

[4]     *See, e.g.*, Eliott C. McLaughlin, *What August showed us about America*, CNN (Sept. 1, 2017), https://www.cnn.com/2017/09/01/us/august-charlottesville-eclipse-harvey/index.html; Evelyn Hockstein and Mark Miller, *One photographer's extraordinary images from the Charlottesville clashes*, WASHINGTON POST (Sept. 12, 2017), https://www.washingtonpost.com/news/in-sight/wp/2017/09/12/one-photographers-extraordinary-images-from-the-charlottesville-clashes/?utm_term=.9db1322bd540; Collier Meyerson, *Have the White Supremacists Left Charlottesville?*, THE NATION (Sept. 25, 2017), https://www.thenation.com/article/have-white-supremacists-left-charlottesville/; Trevor Hughes, *Far right's Richard Spencer returns to Charlottesville, tiki torch in hand*, USA TODAY (Oct. 7, 2017), https://www.usatoday.com/story/news/nation/2017/10/07/white-nationalists-charlottesville-again/743624001/; Spencer S. Hsu, *Charlottesville white supremacist rally in August drew attendees from 35 states, study finds*, WASHINGTON POST (Oct. 8, 2017), https://www.washingtonpost.com/local/public-safety/study-charlottesville-white-supremacist-rally-in-august-drew-attendees-from-35-states/2017/10/08/fe57868e-ac45-11e7-a908-a3470754bbb9_story.html?utm_term=.f24683d85050; A.C. Thompson, Ali Winston, and Darwin BondGraham, *Racist, Violent, Unpunished: A White Hate Group's Campaign of Menace*, PROPUBLICA (Oct. 19, 2017), https://www.propublica.org/article/white-hate-group-campaign-of-menace-rise-above-movement.

[5]     *See, e.g.*, Pete DeLuca, *Victims of August 11 and 12 Violence File Federal Lawsuit*, NBC29 (Oct. 12, 2017), http://www.nbc29.com/story/36584688/victims-of-aug-11-and-12-violence-file-federal-lawsuit; Jennifer Schneider, *Lawsuit filed against Charlottesville protesters*, CNN (Oct. 12, 2017), https://www.cnn.com/2017/10/12/politics/charlottesville-lawsuit/index.html; *Charlottesville rally leaders under legal fire as residents aim to stop future violence*, CHICAGO TRIBUNE (Oct. 12, 2017), http://www.chicagotribune.com/news/nationworld/ct-charlottesville-rally-leaders-legal-20171012-story.html; Joe Heim and Ann E. Marimow, *Charlottesville lawsuit seeks restrictions on white nationalist groups*, WASHINGTON POST (Oct. 12, 2017), https://www.washingtonpost.com/local/charlottesville-lawsuit-seeks-restrictions-on-white-nationalist-groups/2017/10/12/4854bbf8-ae03-11e7-be94-fabb0f1e9ffb_story.html?utm_term=.b43aae4f3a2d.

Responding to inquiries, Ms. Kaplan has made public statements explaining the factual background, legal theories, and relief sought in this litigation, and has also addressed the broader context of this case. Mr. Peinovich references many of these statements in his motion, though the accompanying editorial gloss is more fanciful than factual. In truth, Ms. Kaplan's statements are standard fare for litigators in high-profile civil litigation. Here is a summary of the remarks identified by Mr. Peinovich:

### Speeches

- "Lesbians Who Tech": On March 2, 2018, Ms. Kaplan attended a conference in San Francisco that brought together over 5,000 queer women and allies who specialize in technology. There, she delivered a talk addressing the events in Charlottesville and the legal theory underlying the case. In addition, Ms. Kaplan separately criticized other efforts by Mr. Peinovich and Mr. Spencer to advocate white supremacy.

- MAKERS Conference: On February 7, 2018, prominent women from many different fields gathered in Los Angeles to address the state of the women's movement. At that event, Ms. Kaplan described what happened in Charlottesville on August 11 and 12, 2017, and explained the legal theory underlying this case. She was joined by Plaintiff Marissa Blair, who offered a first-person account of the violence she witnessed and the injury she and her fiancé suffered.

### Interviews

- As Mr. Peinovich notes, Ms. Kaplan has been interviewed by many national news publications—including *Newsy*, *The New York Times*, and *Vox*. In those interviews, she has discussed the factual background, legal theories, and relief requested in this litigation. She has also described personal experiences with anti-Semitism, noting that she was deeply troubled by the anti-Jewish attacks in Charlottesville.

### Tweets

- From February 8 to February 11, 2018, Ms. Kaplan issued a series of tweets in which she shared national newspaper articles reporting on this litigation, praised her co-counsel (Karen Dunn), stated that she is proud to represent Plaintiffs in this case, and urged readers to review a *New York Times* article about the pending motion to dismiss.

  - In four of these tweets, she also described the goals of this litigation: to "establish that this is not acceptable" (February 10 and 12); to "make it clear that hate-incited and planned violence is not acceptable" (February 11); and to "make it clear that this can never happen again" (February 12).

5

- On February 21, 2018, Ms. Kaplan issued a tweet urging her Twitter followers to "read our brief opposing motions to dismiss re #Charlottesville," adding that Plaintiffs' claims are strong and that "the violence, injuries and deaths that occurred were no accident."

- On February 27 and February 28, 2018—the Jewish holiday of Purim—Ms. Kaplan issued five relevant tweets.[6] In three of them, she retweeted articles describing increased anti-Semitic violence in America. Noting that it was Purim, she urged her Twitter followers to support this case against "modern day Hamans." In the other two tweets, Ms. Kaplan retweeted ghastly and bigoted threats directed at her from the "American Identitarian Party." These threats explicitly concerned her representation of Plaintiffs. Ms. Kaplan commented on the threats, noting that they reflect the danger posed by an increase in anti-Semitism and urging her Twitter followers to support a group funding this case.

In sum, Ms. Kaplan has spoken about this case in a diverse array of settings across the nation. She has sought to promote public awareness of the litigation, explain Plaintiffs' legal theories, and warn against the threat posed by an increase in violent white supremacism.

One reason why Ms. Kaplan has been motivated to speak out is that she has received a steady barrage of threats and hateful messages since filing this lawsuit. For example, Defendant Kessler has posted tweets in which he describes Ms. Kaplan as "pitiful" and "hate-filled," warns that she "fucked with the wrong one," and opines that her "Jewish" identity suggests "that she's effectively manipulating the judiciary into a legal hate crime against white people."

---

[6] Purim celebrates the salvation of Persian Jews from a plot by Haman—a royal advisor—to exterminate them all.





Defendant Cantwell, in turn, has retweeted a post that offers a despicable, anti-Semitic caricature of Ms. Kaplan and denounces efforts by a "lesbian Jew" to enforce the Ku Klux Klan Act:



Defendant Azzmador has also reposted tweets attacking Ms. Kaplan because she is Jewish:



Defendants' followers have echoed these hateful messages—in some cases adding death threats and targeting Integrity First for America (an organization that helps to support this case):



American Identitarian Party  @nationalistprepper
3 hours · edited

In the oven kike dyke, no antisemitism without semitism.

Dyke Kaplan see's us as Haman, the genocidal villain of the Purim story. LOL!

https://twitter.com/TheMadDimension/status/9688876...

⌃ 1                    ↩ Reply    ⌄⌄ Quote    ↻ Repost



Jason Kessler                          ( Follow )   ⌄
@TheMadDimension

I'm never one to engage in conspiracy talk or blame everything on other ethnic groups but this Integrity First for America is a blatant front for powerful Jews to vent their ethnic hostility towards whites organizing as a political class.

7:37 PM - 17 Feb 2018

12 Retweets  41 Likes

○ 2      ↻ 12      ♡ 41      ✉



These posts are only the tip of the iceberg. Ms. Kaplan and her colleagues have received dozens of vitriolic and threatening messages on social media from Defendants and their followers.[7]

In addition, several Defendants have spoken publicly about this case in other fora. *See, e.g.*, Jason Kessler, *Exposing the Wealth & Power Behind Unite the Right Lawsuits*, JASONKESSLER.US (Feb. 12, 2018), https://jasonkessler.us/2018/02/12/power-money-unite-the-right-lawsuits/ ("[Plaintiff] Sines wears her cringingly self-righteous liberal platitudes like a badge of honor.");

---

[7]     **@NationalistPrepper** follows Defendants Kessler and Cantwell. **@_LongDivision_** follows Defendant Spencer. **@tiny_shield_NC** follows Defendants Kessler, Damigo, Invictus, Identity Evropa, Peinovich, and Spencer.

10

*see also id.* (stating that this case is being funded by "a usual assortment of elite America-hating Bolsheviks"). That includes Mr. Peinovich, who has been anything but bashful in publicly sharing his assessments of Ms. Kaplan, Plaintiffs, and this lawsuit. *See, e.g.*, Andywarski, *Halsey Vs. Mike Enoch*, YOUTUBE (Feb. 14, 2018), https://www.youtube.com/watch?v=rzE9vfiLU9Q (describing Ms. Kaplan as a "very wealthy and powerful Jewish lesbian" (2:15)); Michael Peinovich, *TDS257: Give Us Us EBT*, DAILY SHOAH (Feb. 14, 2018), https://therightstuff.biz/2018/02/14/tds257-give-us-us-ebt/ (describing this lawsuit as "another thing that these Jews do" (1:11:55) while "pursuing a Jewish ethnic agenda against white people" (1:11:50)). Thus, in speaking about the case, Ms. Kaplan has not only offered proper responses to public inquiries, but has also shared the threats and hate mail that she has received since filing it.

Notably, Ms. Kaplan has not targeted the Western District of Virginia or its environs in her public remarks. As Mr. Peinovich notes, she gave several statements to national news media outlets, issued a series of statements to her geographically-dispersed Twitter followers, and delivered talks in Los Angeles and San Francisco. While it is theoretically possible that some residents of the Western District of Virginia have encountered statements, there is no basis for Mr. Peinovich's speculation that Ms. Kaplan has prejudiced the jury pool. Indeed, Mr. Peinovich repeatedly describes Ms. Kaplan's statements as reaching "all across the country and the world," but does not (and cannot) show that her statements have targeted, saturated, or influenced the Western District of Virginia in a manner that compromises his right to a fair trial. (Br. 2.)

## ARGUMENT

Mr. Peinovich asks this Court for two extreme sanctions: dismissal and a sweeping gag order. These remedies would be justified only in response to the most extraordinary misconduct.

But here, there is no misconduct at all. Ms. Kaplan has complied with her obligations under the rules of professional conduct.

## I.     MS. KAPLAN IS IN FULL COMPLIANCE WITH APPLICABLE RULES

### A.  Extrajudicial Statements: NY Rule 3.6 & VA Rule 3.6

Mr. Peinovich bases most of his request for sanctions on an accusation that Ms. Kaplan violated rules governing extrajudicial statements by counsel. (Br. 16-17.) He also suggests that the Court may impose sanctions for Ms. Kaplan's statements even apart from the requirements of the applicable rules of professional conduct. (*Id.* at 16.) These contentions lack merit. Not only did Ms. Kaplan comply with the rules, but her comments are protected by the First Amendment.

#### 1.  Virginia Rule 3.6

Virginia has categorically declined to extend its "trial publicity" rule to extrajudicial statements by attorneys in civil matters. *See* Va. Rules of Prof'l Conduct r. 3.6(a). Although Mr. Peinovich suggests otherwise, this was not an inadvertent or ill-considered omission. (Br. 17.) The accompanying Committee Commentary acknowledges that Virginia Rule 3.6 was designed in the shadow of *Hirschkop* v. *Snead*, 594 F.2d 356 (4th Cir. 1979) (en banc).  *See* Va. Rules of Prof'l Conduct r. 3.6 comm. cmt. There, the Fourth Circuit held that a predecessor of Virginia Rule 3.6 facially violated the First Amendment by imposing overbroad restrictions on remarks by counsel in civil matters. *See id.* at 373. It is thus clear that the Committee decided that First Amendment principles preclude restricting attorney speech in civil litigation.

This does not mean that defendants have no right to a fair trial. It simply means that any potential bias in the jury pool is properly addressed through other means. *See United States* v. *Lindh*, 212 F. Supp. 2d 541, 549 (E.D. Va. 2002) (rejecting a request for dismissal based on extrajudicial statements and emphasizing that "only those prospective jurors found to be capable

of fair and impartial jury service after careful voir dire will be declared eligible to serve as jurors").

Because Virginia Rule 3.6 does not apply here, Ms. Kaplan plainly did not violate it.

### 2. New York Rule 3.6

Unlike Virginia, New York has undertaken to regulate some extrajudicial statements by counsel in civil matters. *See* N.Y. Rules of Prof'l Conduct r 3.6(a). But even assuming that New York Rule 3.6 applies, Ms. Kaplan did not violate it. Three separate grounds compel that conclusion.

First, none of Ms. Kaplan's statements fall within the compass of New York Rule 3.6(b), which demarcates the kinds of speech that New York Rule 3.6 exists to address. As a result, they are not properly covered by the rule. And to the extent there is any doubt, the Comment to Rule 3.6 emphasizes that attorneys enjoy a broader berth when speaking about civil matters. *See* N.Y. Rules of Prof'l Conduct r. 3.6 cmt. 6 ("[C]ivil trials may be less sensitive [to extrajudicial speech].").[8]

Second, Ms. Kaplan's statements are independently shielded by the safe harbor in New York Rule 3.6(c) for statements describing "the claim" and "information contained in a public record." At the time of Ms. Kaplan's remarks, the public record included the First Amended Complaint (and in some cases Plaintiffs' Opposition to the Motions to Dismiss). In making statements that described and explained those filings, Ms. Kaplan was consistent with New York Rule 3.6(c).

---

[8]      The only sub-section that may apply here is Rule 3.6(b)(1), which identifies statements relating to "the character, credibility, reputation or criminal record of a party . . . ."  There is no plausible basis for concluding that any of Ms. Kaplan's statements addressed the credibility, reputation, or criminal record of any party. Mr. Peinovich might seek to contend that a couple of her statements addressed the "character" of Defendants. But given that Defendants are open and notorious in their views about Jews and blacks, statements comparing them to a Biblical anti-Semite or describing them as white supremacists cannot inflict prejudice.

Finally, Ms. Kaplan's public statements accorded with New York Rule 3.6 because they do not "have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter." This litigation and the events from which it arises have attracted extraordinary attention from the local and national press. Ms. Kaplan's public statements are thus "a mere drop in the ocean of publicity surrounding this [case]," and are "not of a kind to so qualitatively alter public knowledge or mood that [she] should have known [they] would carry a substantial likelihood of materially prejudicing the proceeding." *Matter of Sullivan*, 185 A.D.2d 440, 445 (N.Y. App. 3d Dep't 1992); *see also Graham* v. *Weber*, No. Civ 13-4100, 2015 WL 5797857, at *9 (D.S.D. Oct. 5, 2015) ("Even in the absence of [counsel's] speeches, the public consciousness would hardly be bereft of other media centered on the events surrounding [this case].").

That is especially true given the audience for Ms. Kaplan's statements. Ms. Kaplan spoke to a gathering of queer women in San Francisco and to leaders of the women's movement in Los Angeles. She also tweeted to fewer than 4,600 Twitter followers and gave interviews to national newspapers. There is no indication that these statements have so thoroughly penetrated the jury pool in the Western District of Virginia that ordinary methods of ensuring a fair trial are inadequate. *See Jane Doe No. 1* v. *Zeder*, 782 N.Y.S.2d 349, 354 (N.Y. Sup. Ct. 2004) (rejecting a sanctions motion due to the absence of any "factual argument, beyond a mere conclusion" to establish prejudice). And Mr. Peinovich's inability to demonstrate a substantial likelihood of material prejudice thus dooms his motion under New York law—and under Supreme Court precedent. *See Gentile* v. *State Bar of Nevada*, 501 U.S. 1030, 1037 (1991).

### 3. First Amendment

Mr. Peinovich's motion is foreclosed by constitutional precedent. In *Hirschkop* v. *Snead*, the Fourth Circuit considered a challenge to Rule 7-107 of the Virginia Rules of Professional

Conduct, which restricted lawyers' public comments about pending litigation. *See* 594 F.3d at 362. Although *Hirschkop* upheld some applications of the rule, including in criminal cases, it declared the rule facially vague and overbroad as applied to civil litigation. *See id.* at 373. In so doing, *Hirschkop* emphasized that the government's legitimate interest in restricting attorneys' First Amendment rights is relatively weak in civil cases. *See id.* ("[M]any significant differences between criminal jury trials and civil cases must be considered in evaluating the constitutionality of a general rule limiting lawyers' speech concerning civil cases."). Noting that civil cases are often "more protracted" and "involve questions of public concern," *Hirschkop* emphasized that "the lawyers involved in such cases can often enlighten public debate" and must not be forced to wait until "after the case has concluded." *Id.* Further, *Hirschkop* observed that "narrower means" than a gag order are available to protect trials from any risk of prejudice. *Id.*

As the Fourth Circuit has confirmed, *Hirschkop* remains good law following *Gentile* v. *State Bar of Nevada*, 501 U.S. 1030 (1991), which upheld some restrictions on attorney speech in criminal proceedings. *See In re Morrissey*, 168 F.3d 134, 140 (4th Cir. 1999). And under *Hirschkop*, there is no basis for concluding that Ms. Kaplan's public statements were improper or sanctionable. Nor is there any basis for accepting Mr. Peinovich's unbounded prior restraint argument that Ms. Kaplan may not speak to the *New York Times*, to her Twitter followers, or to queer women in San Francisco.

### B. Implying Influence Over the Court: NY Rule 8.4(e) & VA Rule 8.4(d)

On February 22, 2018, *Newsy* published a video clip about this litigation.[9] *See* Jamal Andress, *Unite the Right Rally Organizers Going to Court*, NEWSY (Feb. 22, 2018),

---

[9] According to the "About Us" section of its website, "*Newsy* is your source for honest, in-depth context on stories that matter. We're a national news network created for people who aren't satisfied with

https://www.youtube.com/watch?v=yNh9PHVEo31. The clip contains several short statements from Ms. Kaplan about Plaintiffs' legal theory. The narrator concludes by stating, "The Judge plans to meet with Kaplan and make a decision on the motion to dismiss the lawsuit sometime in mid-March." *Id.* That is consistent with *Newsy*'s standard practice of explaining what is expected to happen next in the cases that it covers. *See, e.g.*, Katherine Biek, *Nassar Accuses Judge of Turning Sentencing Into A Media Circus*, NEWSY (Jan. 18, 2018), https://www.newsy.com/stories/nassar-complains-about-judge-in-letter-read-aloud-in-court/ ("The hearing might go into next week."); Briana Koeneman, *Supreme Court to Hear Arguments in Ohio Voter Purge Case*, NEWSY (Jan. 10, 2018), https://www.newsy.com/stories/supreme-court-to-hear-arguments-in-ohio-voter-purge-case/ ("The court's ruling is expected in late June."); Grant Suneson, *Lawsuit Over Detainee Mistreatment After 9/11 Reaches Supreme Court*, NEWSY (Jan. 18, 2017), https://www.newsy.com/stories/post-9-11-detainee-treatment-lawsuit-reaches-supreme-court/ ("A ruling on the case is expected within the next six months.").

According to Mr. Peinovich, this statement suggests a violation of New York Rule 8.4(e) and Virginia Rule 8.4(d) by implying that Ms. Kaplan is capable of improperly influencing the Court. (*See* Br. 14, 17.) That is incorrect. The relevant statement was made by Mr. Andress, not Ms. Kaplan, and for that reason alone it cannot be deemed a violation of the rules. Further, no reasonable person would interpret the clip itself, or the fact that Ms. Kaplan retweeted it, as suggesting that Ms. Kaplan enjoys special access to the Court. Rather, any reasonable listener would infer that Mr. Andress—a journalist—was reporting publicly-available information about the Court's schedule. This sort of information is customarily posted on publicly-available dockets

getting only the loudest part of the story." *See About Newsy*, NEWSY, https://www.newsy.com/about/ (last visited Mar. 14, 2018).

and is frequently included in press reports. There is simply no basis for Mr. Peinovich's assertion

that this run-of-the-mill scheduling update by Mr. Andress was part of an elaborate scheme by Ms.

Kaplan to convince the world that she has secret influence over the Court (or would meet with it

alone).

### C.  Lawyer as Fact Witness: NY Rule 3.7 & VA Rule 3.7

In several of her public statements, Ms. Kaplan has discussed the background facts, legal

theory, and relief sought in this litigation. Mr. Peinovich contends that she has thereby become a

fact witness, since "the plaintiffs' complaint is an improperly motivated SLAPP suit, making the

motivations of the plaintiffs and attorneys in filing it a live issue." (Br. 18.) On that basis, he asks

the Court to sanction Ms. Kaplan for violating New York and Virginia Rules 3.7.

This argument is meritless. As an initial matter, Defendants have not asserted an anti-

SLAPP defense to the First Amended Complaint. Nor could they. By its plain terms, Virginia's

narrow anti-SLAPP statute does not apply to any of their statements. *See* Va. Code Ann. §8.01-

223.2(A) (2017). And even if it did, the statute affords a defense only where a plaintiff has alleged

tortious interference, defamation, or violations of Virginia Code § 18.2-499. *Id.* Because Plaintiffs

have not alleged any such claims, there is no colorable basis for treating Virginia's anti-SLAPP

statute as relevant to this litigation. Mr. Peinovich's contentions relating to Rule 3.7 must therefore

be rejected.[10] In all events, these statements by Ms. Kaplan in no way render her a witness in the

case.  Otherwise, any attorney who speaks publicly about her lawsuit would be immediately

disqualified.

---

[10]     Mr. Peinovich further errs in presuming that anti-SLAPP statutes turn plaintiffs' lawyers into fact
witnesses. In general, anti-SLAPP statutes create an expedited adjudication procedure at the very outset of
litigation to ensure that valuable speech is not chilled by unmeritorious lawsuits. To that end, anti-SLAPP
statutes typically require only that the plaintiff make a preliminary factual showing that her case has some
merit. Anti-SLAPP statutes do not require that the plaintiffs and their lawyers give testimony about their
reasons for filing suit.

Mr. Peinovich has repeatedly asserted that he views this lawsuit as nothing more than a strategic effort by Jews and lesbians to harass Defendants for their "edgy jokes." *See* Peinovich Motion to Dismiss, ECF No. 213, at 8. He also appears to believe that he is entitled to fish for proof of that theory by deposing Ms. Kaplan. These assumptions are shot through his sanctions motion. And like the rest of his arguments, they are both profoundly mistaken.[11]

## II.    MR. PEINOVICH COMES NOWHERE CLOSE TO PROVING THAT DISMISSAL OR A GAG ORDER ARE WARRANTED

As a remedy for Ms. Kaplan's alleged improper conduct, Mr. Peinovich seeks dismissal of this lawsuit or a sweeping gag order against Ms. Kaplan and her law firm. These requests should be rejected for the simple reason that Ms. Kaplan did nothing wrong. But even if the Court had questions or concerns about Ms. Kaplan's conduct, the remedies that Mr. Peinovich seeks are inappropriate and disproportionate. *See, e.g.*, *In re Jemsek Clinic, P.A.*, 850 F.3d 150, 158 (4th Cir. 2017) ("Even when a court properly concludes that sanctions are warranted, it abuses its discretion when it imposes sanctions disproportionate to the severity of a party's misconduct.").

### A.  Dismissal of the First Amended Complaint

"Because [the Court's] inherent power is not regulated by Congress or the people and is particularly subject to abuse, it must be exercised with the greatest restraint and caution, and then only to the extent necessary." *United States* v. *Shaffer Equip. Co.*, 11 F.3d 450, 461 (4th Cir. 1993). "Mindful of the strong policy that cases be decided on the merits, and that dismissal without deciding the merits is the most extreme sanction," the Fourth Circuit has identified six factors that a court must consider before dismissing on the basis of misconduct:

---

[11]    Mr. Peinovich does not contend that Ms. Kaplan waived attorney-client privilege in any of her public statements. Nor could he. None of her statements disclosed any information or communications shielded by the privilege.

> (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.

*Id.* at 462-63. Here, Mr. Peinovich has not attempted to show—and could not show—that *any* of these factors supports dismissal, let alone that most of them do so. Thus, even if his allegations of impropriety had any merit (which they do not), dismissal would not be an appropriate remedy.

### B. A Gag Order

Citing only Federal Rule of Civil Procedure "16(c)(P)," Mr. Peinovich asks this Court to impose a gag order that would prohibit Ms. Kaplan from speaking to "social media and print and television media." (Br. 18.) But Rule 16(c)(2)(P) does not authorize such relief. Instead, it provides that at pretrial conferences, "the court may consider and take appropriate action . . . [to facilitate] in other ways the just, speedy, and inexpensive disposition of the action." We are aware of no case holding that this provision empowers courts to prohibit public statements by counsel.

In any event, the Fourth Circuit has demonstrated that it looks with grave doubt on efforts to censor speech by counsel in civil matters. *See Hirschkop*, 594 F.2d at 373. As other courts have acknowledged in this context, "prior restraints are the most drastic, but not necessarily the most effective, judicial tool for enforcing the right to a fair trial." *Bailey* v. *Sys. Innovation, Inc.*, 852 F.2d 93, 98-99 (3d Cir. 1988). Thus, "[i]f any method other than a prior restraint can effectively be employed to further the [threatened] governmental or private interest . . . then the order is invalid." *Id.* at 99; *see also id.* at 100 (identifying "careful *voir dire* of prospective jurors" and "emphatic jury instructions" as alternatives that must receive careful consideration).

Mr. Peinovich has not demonstrated that any of Ms. Kaplan's public statements pose a substantial risk of materially prejudicing the jury pool in the Western District of Virginia. And even if such a statement had been made (which it has not been), that would not justify a sweeping gag order on Ms. Kaplan and her law firm. Instead, it would trigger an inquiry into whether any alternative method of solving the problem is sufficient. Here, any conceivable prejudice resulting from Ms. Kaplan's statements can be cured through the *voir dire* process. Accordingly, Mr. Peinovich's proposed gag order is both unjustified and unconstitutional.

## CONCLUSION

For the foregoing reasons, Defendant Peinovich's motion for sanctions should be denied.

Dated: March 14, 2018

Respectfully submitted,

*s/ Robert T. Cahill*

Roberta A. Kaplan (*pro hac vice*)
Julie E. Fink (*pro hac vice*)
Christopher B. Greene (*pro hac vice*)
Seguin L. Strohmeier (*pro hac vice*)
KAPLAN & COMPANY, LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: (212) 763-0883
rkaplan@kaplanandcompany.com
jfink@kaplanandcompany.com
cgreene@kaplanandcompany.com
sstrohmeier@kaplanandcompany.com

Robert T. Cahill (VSB 38562)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
rcahill@cooley.com

20

Philip M. Bowman (*pro hac vice*)
Yotam Barkai (pro hac vice)
Joshua J. Libling (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
575 Lexington Ave.
New York, NY 10022
Telephone: (212) 446-2300
Fax: (212) 446-2350
pbowman@bsfllp.com
ybarkai@bsfllp.com
jlibling@bsfllp.com

Alan Levine (*pro hac vice*)
COOLEY LLP
1114 Avenue of the Americas, 46th Floor
New York, NY 10036
Telephone: (212) 479-6260
Fax: (212) 479-6275
alevine@cooley.com

Karen L. Dunn (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Telephone: (202) 237-2727
Fax: (202) 237-6131
kdunn@bsfllp.com
wisaacson@bsfllp.com

David E. Mills (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Fax: (202) 842-7899
dmills@cooley.com

# CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2018, I filed the foregoing with the Clerk of Court through the CM/ECF system, which will send a notice of electronic filing to:

Justin Saunders Gravatt
David L. Hauck
David L. Campbell
Duane, Hauck, Davis & Gravatt, P.C.
100 West Franklin Street, Suite 100
Richmond, VA 23220
jgravatt@dhdglaw.com
dhauck@dhdglaw.com
dcampbell@dhdglaw.com

*Counsel for Defendant James A. Fields, Jr.*

Bryan Jones
106 W. South St., Suite 211
Charlottesville, VA 22902
bryan@bjoneslegal.com

*Counsel for Defendants Michael Hill, Michael Tubbs, and League of the South*

Elmer Woodard
5661 US Hwy 29
Blairs, VA 24527
isuecrooks@comcast.net

James E. Kolenich
Kolenich Law Office
9435 Waterstone Blvd. #140
Cincinnati, OH 45249
jek318@gmail.com

*Counsel for Defendants Jeff Schoep, Nationalist Front, National Socialist Movement, Matthew Parrott, Matthew Heimbach, Robert Ray, Traditionalist Worker Party, Elliot Kline, Jason Kessler, Vanguard America, Nathan Damigo, Identity Europa, Inc. (Identity Evropa), and Christopher Cantwell*

Michael Peinovich
a/k/a Michael "Enoch" Peinovich
PO Box 1069
Hopewell Junction, NY 12533

*Pro Se Defendant*

I further hereby certify that on March 15, 2018, I will serve the following non-ECF participants, via U.S. mail, First Class and postage prepaid, addressed as follows:

Loyal White Knights of the Ku Klux Klan
a/k/a Loyal White Knights Church of
the Invisible Empire, Inc.
c/o Chris and Amanda Barker
P.O. Box 54
Pelham, NC 27311

Richard Spencer
1001-A King Street
Alexandria, VA 22314
-and-
P.O. Box 1676
Whitefish, MT 59937

Moonbase Holdings, LLC
c/o Andrew Anglin
P.O. Box 208
Worthington, OH 43085

Andrew Anglin
P.O. Box 208
Worthington, OH 43085

East Coast Knights of the Ku Klux Klan
a/k/a East Coast Knights of the
True Invisible Empire
26 South Pine St.
Red Lion, PA 17356

Fraternal Order of the Alt-Knights
c/o Kyle Chapman
52 Lycett Circle
Daly City, CA 94015

Augustus Sol Invictus
9823 4th Avenue
Orlando, FL 32824

*s/ Robert T. Cahill*
Robert T. Cahill (VSB 38562)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
Email: rcahill@cooley.com

*Counsel for Plaintiffs*