**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA**

**CHARLOTTESVILLE DIVISION**

**ELIZABETH SINES, ET AL.,**                              **Case No. 3:17-cv-00072-NKM**

**Plaintiffs,**                                                        **Hon. Norman K. Moon**
 **v.**

**JASON KESSLER, ET AL.,**

 **Defendants.**

### DEFENDANT MICHAEL PEINOVICH'S OBJECTIONS TO MAGISTRATE JUDGE'S APRIL 20, 2018 ORDER AND REQUEST FOR HEARING

In accordance with 28 U.S.C. § 636(b)(1) and Rule 72(a) of the Federal Rules of Civil Procedure, defendant Michael Peinovich respectfully submits the following objections to Magistrate Judge Hoppe's order issued on April 20, 2018 denying Peinovich's motions 1) to quash plaintiffs' subpoenas to Twitter, Godaddy, Cloudflare, and Hatreon, and 2) to require plaintiffs' full compliance with F.R.C.P. 45(a)(1)(D)(4) and (b)(4).

## Introduction

It is no overstatement to say that the present litigation tests this nation's honest commitment to established First Amendment principles and the rule of law. If plaintiffs succeed in their cynical use of lawfare tactics to silence and intimidate not only Peinovich and the other defendants but any persons who have similar disfavored opinions, they will in the process have profoundly damaged the genuine, albeit robust and vehement, discussion of race relations, the American Civil War, and related issues that First Amendment principles are designed to foster. Scholars and jurists, as the Court is aware, have identified several different rationales for our

1

distinctly American commitment to the values embodied in the First Amendment. For some, this rationale rests on natural law and God-given rights; others see the First Amendment as essential to a true democracy; others see it as a safety valve, allowing dissatisfied citizens to express, and not bottle up, their strongly-held opinions. In this case, all these rationales apply, and profoundly so. But they are all gravely threatened.

The nature of this threat is perhaps more self-evident to those familiar with the practice of doxxing than to those not yet fully aware of this unfortunate phenomenon. As Peinovich explained in his reply memorandum in support of his motion to quash, doxxing and related types of cyber warfare, such as cyber-vigilantism, hactivism, and cyber-bullying, involve use of targeted persons' private and confidential information, such as names (where anonymity is desired), addresses, places of employment, telephone numbers, and personal relationships, to disrupt or cause loss of employment, disrupt or destroy personal relationships, harass through sign and internet postings and unwanted telephone calls, and generally incite trepidation in the lives of the targets and those around them. The accelerating use of doxing and cyber-vigilante tactics, and specifically its use by the Charlottesville counterprotestors, was noted in a recent article in the New York Times entitled "How 'Doxxing' Became a Mainstream Tool in the Culture Wars": https://www.nytimes.com/2017/08/30/technology/doxxing-protests.html. As this article stated:

> Now the online hunt to reveal extremists has raised concerns about unintended consequences, or even collateral damage. A few individuals have been misidentified in recent weeks, including a professor from Arkansas who was wrongly accused of participating in the neo-Nazi march. And some worry that the stigma of being outed as a political extremist can only reinforce that behavior in people who could still be talked out of it.

*   *   *

Charlottesville has made doxxing even more commonplace.

"For a long time it was only a certain quarter of people on the internet who would be willing to do this," Ms. Coleman said. "It was very much hinged on certain geek cultures, but there was an extraordinary quality to the Charlottesville protest. It was such a strong public display I think it just opened the gates."

The right-wing rally ultimately fizzled on Saturday, but counter-protesters were still on the lookout.

"It's important to dox Nazis," said Andrea Grimes, 33, of Alameda, Calif. She held a sign that read: "White people pick one: Be the problem. Be the solution." She said she had "outed" white supremacists to their parents, which she said often worked well to stop bad behavior online.

Peinovich's motion to quash, denied by the Magistrate, fully substantiated the grave risk to him and the anonymous followers of his podcasts from malicious doxxing and cyber vigilantism resulting from the broad and invasive subpoenas plaintiffs have served on Twitter, GoDaddy, Cloudflare, and Hatreon. At the same time, Peinovich showed that plaintiffs had no legitimate interest in the massive and irrelevant information they sought. The Constitutional balance, accordingly, weighs decisively in favor of quashing or at a minimum greatly modifying the subpoenas. On these grounds Peinovich files his present objections to the Magistrate's ruling.

Although doxxing and cyber vigilantism, per se, are recent phenomena, the fundamental Constitutional values they offend – freedom of expression, freedom of association, and the right to privacy – have long been vigorously protected by the Supreme Court against closely analogous threats. The Supreme Court's decision in *NAACP v. Patterson*, 357 U.S. 449 (1957), in which the Court refused to permit the compelled disclosure of the membership lists of the NAACP, is a seminal case. There the Court stated (at page 462):

3

It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as the forms of governmental action in the cases above were thought likely to produce upon the particular constitutional rights there involved. This Court has recognized the vital relationship between freedom to associate and privacy in one's associations. When referring to the varied forms of governmental action which might interfere with freedom of assembly, it said in <u>American Communications Ass'n v. Douds, supra, 339 U.S. at page 402, 70 S.Ct. at page 686:</u> 'A requirement that adherents of particular religious faiths or political parties wear identifying arm-bands, for example, is obviously of this nature.' Compelled disclosure of membership in an organization engaged in advocacy of particular beliefs is of the same order. Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs.

As explained in this pleading, the Supreme Court's stalwart defense of the rights to privacy and freedom of association of supporters of dissident beliefs in *NAACP v. Patterson* and subsequent cases, *e.g., Brown v. Socialist Workers' '74 Campaign Committee (Brown)*, 459 U.S. 87, 95-101 (1982), has direct application to Peinovich's motion to quash. *See, e.g., Pulte Home Corp. et al. v. Montgomery County, Maryland,* 2017 WL 1104670 at * 3-8 (D. Md. March 24, 2017) (applying principles from *NAACP v. Patterson* to discovery dispute); *Sexual Minorities of Uganda v. Lively,* 2015 WL 4750931 at * 3 (D. Mass. Aug. 10, 2015) (same); *International Action Center v. U.S.,* 207 F.R.D. 1, 3 (D.D.C. 2002) (First Amendment freedom of speech and association rights of political action groups and individuals precluded government, sued for alleged First Amendment violations in connection with protest activities at presidential inauguration, from obtaining through discovery names, address and telephone numbers of all individuals who attended, planned to attend or otherwise manifested any intention to attend protests occurring during presidential inauguration parade).

Peinovich also objects to the Magistrate's denial of his motion to require plaintiffs to fully comply with Rules 45(a)(1)(D)(4) and (b)(4). Plaintiffs claim they complied with these rules, but the subpoena information they provided, except as to Cloudflare, lacked information as to the specific address of the party subpoenaed, the date the subpoena issued, and even the court

4

that issued the subpoena.  Such hiding of relevant information contravenes the letter and spirit of the applicable rules.

## Summary of Peinovich's Motions, Plaintiffs' Opposition, Peinovich's Reply, and the Magistrate's Ruling

**Peinovich's Initial Motions**.  Peinovich filed his motion to quash and for a protective order and supporting memorandum on February 14, 2018.  ECF 226.  He attached to his motion plaintiffs' four subpoenas, i.e., to Twitter, GoDaddy, Cloudflare, and Hatreon, as to which he had received notice, albeit defective notice, from the plaintiffs.   He summarized the broad and invasive nature of the subpoenas:

> Plaintiffs have issued subpoenas to the above-listed third parties seeking information that includes but is not limited to personally identifiable information on hundreds of thousands of private citizens who have done nothing more than visit a website.  Plaintiffs are seeking personally identifiable information on visitors to dailystormer.com, alright.com and therightstuff.biz for the dates August 1 to August 19, 2017, as well as a multitude of other documents concerning the free speech rally on August 12, any tweets with particular hashtags, and personally identifiable information about any twitter users that tweeted using those hashtags.

> Mot. to Quash Memo. at 2.

> He also explained how the subpoenas exposed him to great harm:

> Peinovich is the host of a podcast on therightstuff.biz that has tens of thousands of weekly listeners and is Peinovich's means of support. . . . [T]he privacy and security of visitors [to the website] are important.  Allowing plaintiffs' subpoenas would cause irreparable harm to Peinovich, as visitors to his website would no longer feel they can browse this entirely legal, politically controversial, free speech oriented content without fear of a political witch hunt the likes of which plaintiffs are attempting to carry out through the Court. The loss of visitors and users due to the release of personal information of this type would irreparably damage Peinovich's reputation and ability to earn a living.

Case 3:17-cv-00072-NKM-JCH   Document 309   Filed 05/04/18   Page 5 of 15   Pageid#: 2108

*Id.* at 2, 3. He further explained how the subpoena requests have no relevance to the present case and can only be seen as an intelligence gathering tactic. *Id*. at 3.

Peinovich filed his motion to require plaintiffs' full compliance with Rules 45(a)(1)(D)(4) and (b)(4) on February 20, 2018. ECF 229. He explained that despite the underlying fairness rationale of Rule 45(a)(4), that rule's requirement that a "copy of the subpoena must be served on each party," and Rule 45(b)(4)'s indication that "a statement showing the date and manner of service and the names of the persons served" should be filed with the Court, plaintiffs' notices of intention to serve subpoenas, to which plaintiffs attached the subpoenas themselves, lacked critical information, namely: 1) when the subpoenas were served (if they were), and 2) the specific address to which or whom they were sent. Peinovich further explained why this missing information was important in the context of this case.

**Plaintiffs' Opposition Memorandum**. Plaintiffs filed their memorandum in opposition to both of Peinovich's motions on February 20, 2018. ECF 249. Plaintiffs contended that Peinovich had filed in the wrong court; lacked standing; failed to establish grounds to quash the subpoenas; and had articulated only hypothetical concerns that could be addressed by the parties' confidentiality order. Plaintiffs also argued that they had fully complied with their Rule 45 obligations.

**Peinovich's Reply Memorandum**. Peinovich filed his reply memorandum on March 7, 2018. ECF 255. In it, he explained the nature of doxxing and cyber vigilantism and the avowed and repeatedly demonstrated willingness of the counterprotestors at the events described in plaintiffs' complaint, who were closely allied with the plaintiffs, to ruthlessly employ these

6

tactics. *Id.* at 1-3. He also explained why he had standing to protect by means of his motion not only his own First Amendment rights but those of the anonymous followers of his podcasts. *Id.* at 2-3 (citing, *e.g., Enterline v. Pocono Medical Center, Inc.*, 751 F.Supp.2d 782, 784-86 (M.D. Pa. 2008). He further explained why the dangers created by the subpoenas could not be obviated by the parties' confidentiality agreement, given the enormous quantity of personally identifiable information plaintiffs seek by means of the subpoenas and the plaintiffs' doubtful motivation to protect it. *Id.* at 4-5. Here, Peinovich affirmatively averred under oath that numerous of his listeners and supporters have expressed to him great trepidation about becoming targets of doxxing and other cyber attacks as a result of the subpoenas. *Id.* at 4-5. He explained why plaintiffs' subpoenas were manifestly an "undue burden" and showed the error in plaintiffs' contention that he had filed in the wrong court, an error tied to plaintiffs' improper disregard of Rules 459a)(1)(D)(4) and (b)(4). *Id.* at 5-6.

**The Magistrate Judge's April 20, 2018 Order**. The Magistrate Judge interpreted Peinovich's motion as a request for a protective order under Rule 26, and on this ground concluded the Court could consider the motion. *Id.* at 2-3. The Magistrate Judge rejected Peinovich's argument that he has any protected interest in whatever information the subpoenas sought from persons other than himself, describing this argument as "too tenuous." *Id.* at 4. The Magistrate Judge concluded, however, that the subpoenas also sought information about Peinovich's own online presence and activity, and on this basis he concluded that Peinovich had standing to quash the subpoenas. *Id.* at 4. He further concluded, however, that "[t]he alleged risk of harm to Peinovich's reputation or online business . . . is too speculative to show good cause why the Court should quash any of the subpoenas." *Id.* at 6. At no point did the

7

Magistrate Judge address the evidence of doxxing that Peinovich presented or acknowledge Peinovich's averment, under oath, that numerous of his listeners and supporters have expressed great trepidation about becoming targets of doxxing as a result of the subpoenas.

## Standard of Review

Under Federal Rule of Civil Procedure 72(a), a party may serve and file objections to a magistrate's order within 14 days after being served with a copy. Rule 72(a) further states that "[t]he district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Peinovich respectfully submits, however, that given the critical First Amendment issues raised by Peinovich's motion, the Court should conduct an independent, de novo review. *See, e.g., Kriss v. Bayrock Group, LLC*, 2016 WL 406375 at * 1 (S.D.N.Y. Feb. 1, 2016) (conducting de novo review of Magistrate's nondispositive order where First Amendment issues involved); *Clyburn News World Communications, Inc.,* 1988 WL 489658 at * 3 (D.D.C. Apr. 14, 1988) (same); *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 499 (1984) ("[I]in cases raising First Amendment issues we have repeatedly held that an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'").

## Grounds for Peinovich's Objections

As many courts have noted, the Supreme Court in *NAACP v. Patterson* and other cases has effectively created a First Amendment associational privilege. The court in *Sexual Minorities of Uganda v. Lively*, 2015 WL 4750931 at *3 (D. Mass. Aug. 10, 2015) recently summarized:

8

"[F]reedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment." *NAACP v. Alabama*, 357 U.S. 449, 459 (1958). Courts in this country have recognized that "[w]hen ... discovery would have the practical effect of discouraging the exercise of[constitutionally protected] associational rights, the party seeking such discovery must demonstrate a need for the information sufficient to outweigh the impact on those rights." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1152 (9th Cir. 2009); *see also Grandbouche v. Clancy*, 825 F.2d 1463 (10th Cir. 1987); *In re Motor Fuel Temperature Sales Practices Litig.*, 707 F. Supp. 2d 1145, 1151-1152 (D. Kan. 2010). Information that may be privileged on the basis of associational rights includes identities of rank and file members and similarly situated individuals, see *NAACP*, 357 U.S. at 462 ("[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association"); mailing lists and lists of conferences attendees, *see Perry*, 591 F.3d at 1153, 1155; *Grandbouche*, 825 F.2d at 1466-1467, contributor lists, and "past political activities of plaintiffs and of those persons with whom they have been affiliated." *Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 2 (D.D.C. 2002). If the prerequisites for its application are established, the associational privilege also protects internal policy or campaign communications concerning contested political issues. See *Perry*, 591 F.3d at 1162.

See also *Pulte Home Corp. et al. v. Montgomery County, Maryland,* 2017 WL 1104670 at * 3-8 (D. Md. March 24, 2017) (providing summary similar to the one above in *Sexual Minorities of Uganda*); *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 69 (2006) ("[F]reedom of expressive association protects more than just a group's membership decisions. For example, we have held laws unconstitutional that require disclosure of membership lists for groups seeking anonymity, *Brown v. Socialist Workers '74 Campaign Comm. (Ohio),* 459 U.S. 87 (1982), or impose penalties or withhold benefits based on membership in a disfavored group, *Healy v. James*, 408 U.S. 169, 180–184 (1972)") (alternative Supreme Court cites omitted).

9

As the court in *Sexual Minorities in Uganda* further summarized, a party asserting a claim of associational privilege must present a prima facie showing that providing the requested discovery would infringe on the protected associational right. This prima facie showing requires the party to demonstrate that enforcement of the discovery requests will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights. 2015 WL 4750931 at *3 (quoting *Perry v. Schwarznegger*, 591 F.3d 1147, 1160 (9th Cir. 2009)). If such a prima facie showing is made, then the question is whether the party seeking discovery "has demonstrated an interest in obtaining the disclosures it seeks ... which is sufficient to justify the deterrent effect . . . on the exercise . . . of [the] constitutionally protected right of association." *NAACP*, 357 U.S. at 463. The party asserting the privilege need only show there is a reasonable probability that compelling disclosure will lead to these types of threats, harassment, or reprisal. *Buckley v. Valeo*, 424 U.S. 1, 74 (1976) (per curiam); *Black Panther Party v. Smith*, 661 F.2d 1243, 1268 (D.C. Cir. 1981), *vacated*, 458 U.S. 1118 (1982); *Pulte Home Corp.*, 2017 WL 1104670 at * 4 (the party need only show that there is some probability that disclosure will lead to a chilling effect). "Privacy is particularly important where the group's cause is unpopular; once the participants lose their anonymity, intimidation and suppression may follow." *Black Panther Party*, 661 F.2d at 1265 (D.C. Cir. 1981); *see also Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 3 (D.D.C. 2002). Notably, if a discovery request seeks disclosure of internal associational activity, federal courts assume, sometimes implicitly, that the party seeking protection has made his prima facie showing. *See Grandbouche v. Clancy*, 825 F.2d 1463,

1465-67 (10th Cir. 1987) (discovery request sought, among other things, membership lists, therefore, the court applied the balancing test).

Peinovich made a strong prima facie case for infringement of his and his supporters' associational rights, and the Magistrate Judge clearly erred in ruling that Peinovich's showing was "too speculative." Peinovich carefully described doxxing and presented evidence demonstrating the avowed eagerness of the Charlottesville counterprotestors, indisputably allied with the plaintiffs, to use this pernicious practice. He described the nature of his employment as a host of controversial podcasts and averred under oath that numerous of his listeners and supporters have expressed to him great trepidation about becoming targets of doxxing and other cyber attacks as a result of the subpoenas. He explained that "perception in this context is reality: Peinovich's listeners and supporters are highly unlikely to have confidence that their personal identifying information, entrusted to plaintiffs' counsel, will not be inadvertently or intentionally leaked. Merely allowing the subpoenas to proceed will have a chilling effect on the exercise of their First Amendment rights by Peinovich and his listeners and supporters." Peinovich Reply Memo. at 4.

Moreover, Peinovich avers, again under oath, that he has continued since the date of his reply memorandum to receive anxious communications from listeners concerned about being doxed as a result of the subpoenas and has lost regular listeners as a result of these concerns. Many listeners of Peinovich's podcast and members of a related online forum on the The Right Stuff website have reached out to Peinovich to tell him that they canceled their accounts and stopped visiting the site upon hearing news of the April 20th order and seeing public online statements about it by Integrity First for America, Roberta Kaplan, Emily Gorcenski and others, thus

11

making the potential damages to Peinovich and his listeners that Peinovich warned about in his previous motion a fait accompli and no longer speculative.

Accordingly, the burden shifts to the plaintiffs to show an "interest in obtaining the disclosures it seeks ... sufficient to justify the deterrent effect ... on the exercise ... of [the] constitutionally protected right of association." *NAACP*, 357 U.S. at 463. The Maryland District Court in *Pulte Home Corp.* articulated this balancing test as follows:

> Here, the burden is largely on the party seeking disclosure to prove that the information sought is of crucial relevance to its case; that the information is actually needed to prove its claims; that the information is not available from an alternative source; and that the request is the least restrictive way to obtain the information. *See Grandbouche*, 825 F.2d at 1466-67. The Court must then consider the substantiality of the First Amendment interests of the party asserting the privilege, *see Perry*, 591 F.3d at 1161, and determine "whether the privilege must be overborne by the need for the requested information." *Grandbouche* at 1466.

2017 WL 1104670 at * 4*; see also Anderson v. Hale*, 2001 WL 503045 at * 3-4 (N.D. Ill. May 10, 2001) (stating three factors). Plaintiffs decisively fail this balancing test.

When a claim of Associational Privilege is asserted, the relevance standard is more exacting than the minimal showing of relevance under Rule 26(b)(1). The information must be "crucial," *Pulte Home Corp.*, 2017 WL 1104670 at * 4, and go to the "heart of the matter." *Grandbouche,* 825 F.2d at 1467; ; *Black Panther Party,* 661 F.2d at 1268; *Int'l Society for Krisna Consciousness, Inc. v. Lee*, 1985 WL 315 (S.D.N.Y. Feb. 28, 1985) (to obtain discovery of this nature the party must show the information sought is "crucial to the party's case" or goes to the "heart of the claims"). Plaintiffs' subpoenas do not come close to satisfying even a minimal showing of relevance or need, much less a more exacting one. The personally identifiable information regarding potentially thousands of visitors to The Right Stuff website

has no bearing on any issues in plaintiffs' lawsuit. There is nothing illegal or conspiratorial about simply visiting a website, even assuming, *arguendo*, that the website encourages dissident views. *See International Action Center v. U.S.* 207 F.R.D. 1, 2-3 (D.D.C. 2002). The concept of using ideological views – and even ideological curiosity – that lead to visiting a website as a basis for tort liability is antithetical to the First Amendment.

On the other side of the scales, the extent of the injury that disclosure may cause to associational rights, and thus the substantiality of the First Amendment interests, is severe. Nothing, perhaps, inhibits free speech and association more than widespread, amorphous fear. Yet fear of this nature is the effect, and the intended effect, of plaintiffs' subpoenas. Plaintiffs want to broadcast a message by means of the subpoenas to their ideological enemies that those enemies have no rights to privacy and anonymity and are at risk of being doxxed and entangled in litigation just for visiting controversial websites, listening to controversial podcasts or tweeting, retweeting or communicating with controversial public figures on Twitter. The subpoenas should be quashed or modified to prevent a result so poisonous to First Amendment traditions and case law.

As a potential alternative to completely quashing the subpoenas, Peinovich recommends the following: In Document Request 4c of plaintiffs' subpoena to Cloudflare plaintiffs request "All cached versions and copies of the Right Stuff website and ESI relating to the Right Stuff website." Peinovich proposes that cached versions of The Right Stuff website may be provided to plaintiffs, as such documents represent information that has already been made public, and any personal information of visitors to The Right Stuff website would not be compromised. Peinovich affirms that he has made no significant modifications to the site since

the dates in question other than to add new content. Peinovich has never advocated or plotted violence on The Right Stuff website.

As Peinovich contended in his motions, Peinovich cannot know with certainty where, when, and from which court plaintiffs filed their subpoenas, except as to Cloudflare, because plaintiffs have concealed this information except as to Cloudflare. Such concealment of relevant information contravenes the letter and spirit of Rules 45(a)(1)(D)(4) and (b)(4), whose purpose is to give parties such as Peinovich fair notice so they can oppose the subpoenas before they become a fait accompli.

## Conclusion

For the reasons stated, Peinovich respectfully requests that the Magistrate's April 20, 2018 order be reversed;  that the subpoenas in question be quashed or, at a minimum, modified so as not to require disclosure of personally identifiable information of visitors and supporters of Peinovich's website and podcasts or of Peinovich's Twitter followers; and that plaintiffs be required to fully comply with the notice requirements of Rule 45.

## Request for Hearing

Peinovich respectfully requests a hearing on his objections to the Magistrate Judge's April 20th, 2018 order.


Dated:  May 4, 2018.

                                                              Respectfully submitted,


                                                              Michael Peinovich, Pro Se

14

## CERTIFICATE OF SERVICE

On this 4th day of May, 2018, I Michael Peinovich certify that I served electronically or mailed

copies of this objection and memorandum to:

Christopher Greene <cgreene@kaplanandcompany.com>,
David Campbell <DCampbell@dhgclaw.com>,
Elmer Woodard <isuecrooks@comcast.net>,
James Kolenich <jek318@gmail.com>,
Bryan Jones <bryan@bjoneslegal.com>,
Roberta Kaplan <rkaplan@kaplanandcompany.com>,
Julie Fink <jfink@kaplanandcompany.com>,
Gabrielle Tenzer <gtenzer@kaplanandcompany.com>,
Seguin Strohmeier <sstrohmeier@kaplanandcompany.com>,
Alan Levince <alevine@cooley.com>,
Karen Dunn <KDunn@bsfllp.com>,
Philip Bowman <pbowman@bsfllp.com>,
Richard Spencer <richardbspencer@gmail.com>

_____

Michael Peinovich