1          UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF VIRGINIA
2            CHARLOTTESVILLE DIVISION

3  * * * * * * * * * * * * * *
ELIZABETH SINES, ET AL.,    * CIVIL ACTION NO. 3:17-cv-72
4                            * MAY 24, 2018  10:28 A.M.
              Plaintiff,    *
5                            * CHARLOTTESVILLE, VIRGINIA
vs.                          * VOLUME 1 OF 1
6                            *
JASON KESSLER, ET AL.,      *
7                            *
              Defendant.    *
8  * * * * * * * * * * * * * *
                TRANSCRIPT OF MOTIONS TO DISMISS
9            BEFORE THE HONORABLE NORMAN K. MOON
                UNITED STATES DISTRICT JUDGE
10
   APPEARANCES:
11
   For the Plaintiffs:
12
   ROBERTA ANN KAPLAN
13 JOSHUA MATZ
   Kaplan & Company, LLP
14 350 Fifth Avenue, Suite 7110
   New York, NY  10118
15 (212) 763-0884

16 KAREN L. DUNN
   Boies Schiller Flexner, LLP
17 1401 New York Avenue NW
   Washington, DC  20005
18 (202) 237-2727

19 BEN ROTTENBORN
   Woods Rogers
20 10 South Jefferson Street
   Suite 1400
21 Roanoke, VA  24011
   (540) 983-7540
22
   Court Reporter:        Tracey Aurelio, CRR, RDR
23                        1101 Court Street
                          Lynchburg, VA  24504
24                        traceya@vawd.uscourts.gov
       Proceedings recorded by mechanical stenography,
25 transcript produced by computer.

```
 1  Appearances (Continued):

 2  For the Plaintiffs:

 3  DAVID E. MILLS
    Cooley, LLP
 4  1299 Pennsylvania Avenue, NW
    Suite 700
 5  Washington, DC  20004
    (202) 776-2865

 6

 7  For the Defendants:

 8  JAMES EDWARD KOLENICH
    Kolenich Law Office
 9  9435 Waterstone Boulevard
    Suite 140
10  Cincinnati, OH  45249
    (513) 444-2150

11
    BRYAN JEFFREY JONES
12  Bryan J. Jones, Attorney at Law
    106 West South Street, Suite 211
13  Charlottesville, VA  22902
    (434) 260-7899

14
    JOHN A. DiNUCCI
15  8180 Greensboro Drive
    Suite 1150
16  McLean, VA  22102
    (703) 821-4232

17
    MICHAEL ENOCH PEINOVICH (PRO SE)
18  P.O. Box 1069
    Hopewell Junction, NY  12533
19  (917) 747-9238

20  ****************************************************************

21        (Call to Order of the Court at 10:28 a.m.)

22            THE COURT:  Good morning.

23            I'd ask the clerk to call the case, please.

24            THE CLERK:  Yes, Your Honor.  Civil Action

25  No. 3:17-CV-72, *Elizabeth Sines, and others, versus Jason*
```

1  *Kessler, and others.*

2          THE COURT:  Plaintiffs ready?

3          MS. KAPLAN:  We are, Your Honor.

4          THE COURT:  Defendants ready?

5          MR. KOLENICH:  Yes, Your Honor.

6          THE COURT:  All right.  Thank you.  We're here on the

7  defendants' motions.  And we are only to determine here --

8  this argument is over whether the pleadings are sufficient to

9  state a cause of action against the defendants.  There will be

10 no evidence, of course.  And I've given you a rough schedule

11 of, you know, how much time allotted.

12          But, remember, this is -- the argument is for my

13 benefit to try to help me understand what the case is about,

14 not necessarily for your benefit.  So if we need to, we'll

15 bury that.  It's not written in stone.

16          But do remember, we have looked at the briefs very

17 carefully.  So it's not necessary to just repeat what's in

18 your brief.

19          All right.  Who is going to argue first for the

20 defendant?

21          MR. KOLENICH:  Good morning, Your Honor.

22          THE COURT:  Good morning.

23          MR. KOLENICH:  Sir, my name is Jim Kolenich.  I'm

24 admitted pro hac vice from Ohio.  I represent Jason Kessler,

25 Christopher Cantwell, Vanguard America, Robert Ray, Nathan

Damigo, Elliot Kline, Identity Evropa, Matthew Heimbach,

Matthew Parrott, the Traditionalist Worker Party, Jeff Schoep,

National Socialist Movement, Nationalist Front.  All those

defendants have filed a motion to dismiss this complaint for

failure to state a claim.

      The central argument of our motion, Your Honor, is

that the plaintiffs have failed to establish the elements of a

conspiracy either under federal or state law.

      The plaintiffs rely heavily on a good amount of

conclusory allegations, such as that are highlighted in our

brief, with a very few specific factual allegations thrown in.

But what they mostly rely on -- and it is good lawyering.

There's no denying that -- is that they've taken a conspiracy

to show up in Charlottesville for a political rally and,

because violence happened at that rally, tried to turn it into

a conspiracy to commit violence, specifically racial violence

in violation of Section 1985, the Thirteenth Amendment in

Section 1982.

      Now, in support of this allegation, they bring forth

numerous Internet communications, blog postings stating crude

things, uncivilized things, impolite things, offensive things,

and also stating outlandish and implausible things, such as

alleging that there's a chemical that can be deployed that

will dissolve a man on the spot leaving nothing but bones

laying there.  This, of course, is hypobole.  No such chemical

exists.  Such as bringing forth a blog post that lists
fictional farm equipment that can be used to run over
pedestrians who are blocking traffic.  No such equipment
exists.

They wish to use this, apparently -- I guess they'll
speak for themselves, but it seems to me they wish to use this
to establish the element of a plan, a preexisting plan, a
conspiracy to commit that type of violence with equipment that
does exist.  Obviously, vehicles exist.  Mace exists.  Bats,
sticks, fists, those all exist.  But what's lacking in their
complaint, 112 pages of it and 56 pages of supporting brief is
any preexisting conspiracy to actually perpetrate this
violence.

Undoubtedly, some violence occurred.  Undoubtedly,
some violence that exceeded the limits of the law occurred at
the rally.  And the state courts have determined that certain
rally participants are guilty of crimes related to that
violence.  But what is not apparent from the face of the
complaint is that there was a preexisting agreement to engage
in that violence.

If I could, Your Honor, since you've allotted me a
good amount of time, I would like to go over some of the
specific paragraphs that the plaintiffs have cited in their
supporting brief claiming that they have established the
elements of a conspiracy.

1          Excuse me, Your Honor.

2          The plaintiff directs us to Paragraph 37 and 39 of

3     their amended complaint as to Defendant Jeff Schoep.  I'm

4     having some technical difficulties here, Your Honor.  If you'd

5     give me one minute.

6          THE COURT:  Okay.

7          MR. KOLENICH:  The plaintiff was kind enough to give

8     me a hard copy, Your Honor.  We can proceed.

9          Paragraph 37 and 39 of the amended complaint.  They

10    say that this is part of their case against Jeff Schoep.

11    "Defendant Schoep, a resident of Michigan, is the leader of

12    Defendant National Socialist Movement, the largest neo-Nazi

13    coalition in the United States.  On April 22, 2016, Schoep

14    formed the Aryan Nationalist Alliance, later renamed the

15    Nationalist Front, which is an umbrella organization of hate

16    groups such as TWP, the Aryan Terror Brigade, regional

17    factions of the Ku Klux Klan.  Schoep has said if he could

18    meet Adolf Hitler today, he would say, 'Thank you'" and

19    various other kind things about Hitler.

20         And he tweeted after the events in Charlottesville,

21    "It was an honor to stand with you all in C'ville this

22    weekend."  Various groups and the rest are true warriors.

23         Moving to Paragraph 38.  "Defendant National

24    Socialist Movement is an unincorporated association."  It goes

25    on to say it maintains business in Michigan.

1       And Paragraph 39, Nationalist Front is an

2  unincorporated association maintaining a website.  Their

3  complaint goes on and on like that.  And I realize those are

4  introductory paragraphs identifying a defendant, but it is

5  heavy on paragraphs just like that.

6       There is no specific allegation in those paragraphs

7  that says Schoep or the NSM or anybody else engaged in any

8  conspiracy to do anything except go to Charlottesville for a

9  political rally.

10      Now, where -- later on, let's go -- they cite us to

11 paragraph -- we'll go further -- 187 and 188.  187, "On

12 August 12" -- this is under a heading "Defendants

13 Intentionally Planned a Violent Confrontation with

14 Counter-Protesters."

15      "On August 12, defendants, their co-conspirators and

16 others" -- although it's either defendants and their

17 co-conspirators.  I don't know what others might be there,

18 "acting at their direction executed their plan to carry out

19 racial, religious, and ethnic violence, intimidation, and

20 harassment."

21     (Court reporter asked for clarification.)

22      MR. KOLENICH:  "Defendants Kessler, Cantwell, Mosley,

23 Heimbach, Hill, Invictus, Ray, Spencer, Damigo, Peinovich,

24 Fields, Parrott, Tubbs, Nationalist Front, all the defendants

25 who were there all participated in violent events of the day."

1    Now, that paragraph adds nothing.  It's a conclusory

2    paragraph.  It doesn't say what they did or didn't do, where

3    their agreement is.  It doesn't add anything.

4    Okay.  They are going to say that's an introductory

5    paragraph to a section.

6    Moving on.  188.  "Defendants and co-conspirators

7    planned to arrive early and anticipated and encouraged the use

8    of violence to assist the rally."  Now, they put a quote in

9    here.  "As one co-conspirator explained:  'Me, the rest of

10   TWP, League of the South have been to more than one rodeo.

11   And shit NSM will be there early too.  Those guys are nuts in

12   a good way.'  Defendant Kessler promised there would be

13   hundreds of members of TWP and League of the South at the

14   park."

15   Again, colorful language, but where is there evidence

16   of a conspiracy or an agreement to do anything except show up

17   at the park?

18   It doesn't even -- if you take -- as you must -- if

19   you take the plaintiff's allegations in each of these

20   paragraphs in the best possible light, it doesn't allege that

21   they've ever been responsible for violence at any of their

22   prior political rallies.  It merely alleges that they got into

23   fights.  That's not sufficient to sustain a conspiracy

24   allegation here.

25   They specifically sued the defendants for planning to

1  come to Charlottesville and physically assault with racial

2  animosity, not merely physically assault but for racial and

3  religious reasons the local citizens or at least the local

4  counterprotesters.  They have to have proof of an a priori

5  agreement to do that.

6          Now, they've a lot of proof -- and we'll just concede

7  for purposes of this motion, Your Honor, that these guys knew

8  each other and had an opportunity to communicate with each

9  other prior to coming to Charlottesville.  They certainly had

10 an opportunity to conspire.  We're not denying that.  The

11 question is did they conspire?  Is there sufficient allegation

12 that they conspired?

13         They came to Charlottesville.  They knew each other.

14 They planned to come to Charlottesville, but where is the

15 allegation they planned to engage in racial violence?

16         They say a lot of racial things on the Internet.

17 They came to Charlottesville to chant and say a lot of racial

18 things.  Yes, they did.  But the Skokie, Illinois, case may

19 explain that that doesn't matter.  You can't sue over that.

20         If in the 1970s in Skokie, Illinois, you can't

21 actually wear a replica Nazi uniform, fly Nazi flags through a

22 predominantly Jewish community, and if that's First Amendment

23 protected speech, then saying the same kind and doing the same

24 kind of things today, you know, that case hasn't been

25 overruled.  Perhaps the Court will have a different look at

1    it, but you are running up against existing precedence if you

2    say that's not First Amendment protected speech.

3          So they need more.  And they try to give them more

4    because violence occurred, but they need a preexisting

5    conspiracy.  Not to show up and offend people, not to show up

6    and yell at people, not to show up and look offensive,

7    ridiculous, however they want to characterize it, scary.  They

8    need a preexisting condition to actually physically attack

9    people or otherwise impede their rights in a colorable,

10   actionable way.  They don't have it.  They want to say that

11   because it happened they must have conspired ahead of time.

12         Now, the leading case or at least a case from the

13   Western District, *Frazier v. Cooke,* which is cited in our

14   brief, was a case where there were two men, white men sitting

15   on a porch, a black man across the street playing basketball.

16   The white man said same racially insensitive comments.  One of

17   the black men comes across the street onto the white man's

18   property and says, you shouldn't talk like that, you shouldn't

19   say that.

20         The allegation there was that the two white men

21   looked at each other and then in concert stood up, got off the

22   porch and beat the black man up there on the white people's

23   front yard.  That stated a claim for 1985 conspiracy.

24         So we must admit and we do that the conspiracy can

25   happen in an instant, right there in the moment.  But they

have to have agreement, as is plain from the cases cited in our brief, from each member of the conspiracy in order to hold them liable.

So if there's ten men on that porch and only two of them look at each other and get up and go beat up the black man, the other eight haven't conspired to exist in a 1985 conspiracy.

Even if they all think that it's funny, the racially insensitive language or insulting language is funny, there's no 1985 conspiracy. They have to take action to do that.

Now, the vast majority and in some cases all of the allegations against some of my clients are that they conspired to go to Charlottesville. That's it. They went to Charlottesville to have a rally.

Yes, they are provocative people. Yes, they have a far-right political ideology. Yes, they carried torches. While carrying those torches, the plaintiffs have alleged that certain plaintiffs were physically assaulted.

I have two things to say about that. One is plausibility. We live in an era -- you know, since Ashcroft and Iqbal, plausibility is mandatory. They have alleged that lighter fluid was thrown on the people, followed by lit torches, and yet nothing catches on fire. I don't know how we are going to test that here in court. Bring in a grill or something and see how that works? But if lighter fluid and a

torch is thrown on somebody, something should catch on fire.
That allegation in and of itself is implausible, we will
submit to the court.

Secondarily, there were hundreds of people at this
torch rally, according to their complaint. Limiting ourselves
to the universe of our complaint as we must, there were
hundreds of people carrying torches at this rally. Only a
couple, and none of my clients, are alleged to have assaulted
people with the torches and the lighter fluid.

So going back to Frazier and Cooke, if there's ten
people on that porch and only two of them look at each other,
step off the porch and assault a racial minority, if the other
eight haven't conspired, then they don't have a sufficient
allegation of a conspiracy against all the people carrying
torches. Only the people who actually physically assaulted
plaintiffs have engaged in a conspiracy that was agreed upon
there in the moment.

Moving to the next day, the actual August 12 rally,
they want to say that there's a conspiracy to do violence
because certain of the Internet postings by organizers, some
of my clients, Mr. Kessler, Mr. Cantwell, stated bring signs,
bring sign posts because you can use that if things get
violent. They want you to reach the conclusion that that
means they planned to use the sign posts and other implements
for purposes of committing racial violence, but it doesn't say

1  that.  That's not a reasonable implication from that.

2        They were going to a political rally.  Of course
3  they're going to have signs.  They're going to have posts.
4  They're going to be chanting.  They need to show that there
5  was a conspiracy beforehand to use that stuff for violent
6  acts.

7        Now, maybe somewhere in that complaint that I haven't
8  found they've got that agreement there in the moment where two
9  guys are, like, all right, let's charge over there.  You know,
10 the melee starts and two guys decide to jump in, as happened
11 with some of the criminal convictions.  A melee started.  Some
12 other guys jumped in, and they ended up convicted of crimes.

13        We're not arguing that that's not possible.  We're
14 not arguing that you should dismiss a claim if they've shown
15 that.  I just can't find it.  Maybe I didn't carefully enough
16 read 160-whatever pages, but they're arguing that all this
17 stuff was planned out ahead of time.  In fact, they used this
18 language for months and months and months ahead of time, the
19 alt-right marchers came here planning to assault people, to
20 racially assault people.

21        They do have a specific allegation against one of my
22 clients, Robert Ray, that he verbally berated somebody while
23 standing next to men carrying AR-15 rifles -- or I'm sorry.
24 They used the phrase "rifles."  I don't think they specified
25 the kind -- outside of a synagogue, but that allegation is

1   deficient.  It doesn't say that they knew it was a synagogue

2   or Mr. Ray knew it was a synagogue.  It has somebody

3   screaming, there's the synagogue.  It doesn't say that Ray

4   knew or that he heard that person screaming.  It doesn't say

5   that he harassed anybody in an anti-Semitic way.  It says he

6   specifically referenced the phrase "white sharia," which is,

7   if anything, an anti-Muslim phrase or an anti-feminist phrase.

8   It's certainly not an anti-Semitic phrase, at least not until

9   this case.

10          It doesn't say that he attacked anybody.  It doesn't

11  say that he swung at anybody.  It doesn't say that he pointed

12  a gun at anybody, threw a rock, nothing.  Just ran his mouth

13  while wearing anti-Semitic language on his shirt.  I can't

14  remember what the language is, but we'll concede that it's

15  anti-Semitic.

16          Again, if all you're doing is marching and using

17  language, provocative and insulting though it may be, the

18  Skokie case precludes saying that's actionable.  It's First

19  Amendment protected speech, however much it may be a problem

20  for people witnessing the speech, however scared certain

21  people might get having to witness that speech.

22          Now, in the Skokie case itself, the judges there, you

23  know, said that, you know, if they're coming back every day

24  with this stuff, maybe that presents a different case.  If

25  they're coming back frequently maybe it presents a different

case.  But once or once a year, we don't have any choice but
to allow it.  It's speech.  It's political speech, and it's
protected by the First Amendment, however afraid certain
residents might be of it and of the people using it.

So it is our contention in this motion that that is
all the plaintiffs have brought to this court.  They have
brought no a priori or preexisting conspiracy to do violence,
but rather there's a conspiracy to come to Charlottesville and
be provocative in their political speech which is protected.

We are not arguing that the First Amendment protects
violence or that the Second Amendment protects criminal
violence.  Certainly not.  We're not arguing that you're
allowed to bring a gun to a political rally and then point it
at people, no, or use it to intimidate people, no.

What we are arguing is that torches, chants, raising
your voice, all of that goes along with a political rally, and
it is not actionable.  It is First Amendment protected speech.

And to the extent that they had any 1985 conspiracy
in this complaint drawn from the Thirteenth Amendment from
1982, wherever, it is a spur-of-the-moment conspiracy between
limited numbers of people, none of which are my clients.
Everything they've got against my clients is before they got
to Charlottesville.  And it's all protected by the First
Amendment.

They do have state law claims, state law conspiracy

and then a state law racial harassment statute.  And they have
problems there as well.

As to my clients, you know, the only person that they
said racially harassed somebody or religiously harassed
somebody was a plaintiff, Wispelwey.  And Wispelwey claims
that he was assaulted by a defendant named Augustus Invictus.
It's not one of my clients.  It doesn't say that one of my
clients was standing there agreeing with Invictus to do this.
And it specifically doesn't have any allegations that there
was an a priori agreement to hunt down Plaintiff Wispelway or
anybody else and harass them face to face.  That's not what
was agreed to.  That's not what was discussed.  There's no
discussion beforehand, an allegation of a discussion
beforehand in the complaint to go hunt down the synagogue or
hunt down a reverend and harass them on the street or anywhere
else.

That's not to say that the plaintiffs weren't worried
about being assaulted.  They may well have been, but they
weren't.  And the fact that the defendants are scary-looking
individuals saying and doing scary-looking things isn't the
same thing as assaultive behavior.  And however worried they
may have been doesn't transform it into a 1985 conspiracy.

Again, back to Frazier and Cooke.  Had the two looked
at each other, stepped off the porch and walked past the black
man, is there a conspiracy?  Even though he was nervous he was

1   going to get hit, we would submit to the court no.

2          Now, as to the Virginia law, their complaint as to

3   the Virginia conspiracy is heavy on Section 18 of the Virginia

4   code, the criminal code.  Now, Virginia law based on the

5   Vansant case we've cited doesn't automatically allow a civil

6   cause of action for violations of a criminal statute.

7          The plaintiffs in arguing against that point cite to

8   a case called BellSouth.  It's in their pleading.  That says

9   that a civil cause of action will lie but only if you -- and

10  it states -- the case is explicit -- if you injure the

11  plaintiff in their trade or business.  And none of these

12  plaintiffs, to my knowledge as I stand here, have argued that

13  they were injured in their trade or business.  They would

14  argue that they were personally injured.

15         So their argument is off base.  Virginia law does not

16  allow civil liability in these circumstances for violations of

17  a criminal statute.  And that's what their Virginia conspiracy

18  is about, violations of criminal statutes, causing a riot and

19  so forth.

20         As to their racial and religious harassment state law

21  claim, again they just had Augustus Invictus.  They don't

22  bring my clients into it.

23         They do mention the presence of some of my clients at

24  the torchlight rally.  But, again, they don't say -- and they

25  know who my clients are.  They've obviously sued my clients.

1  They've identified my clients.  Their clients have identified

2  my clients, but they specifically do not say that any of my

3  clients who were at the torchlight rally threw any lighter

4  fluid, threw any torches or any such thing and, importantly,

5  conspired to do any such thing.

6          Now, there is the business about mace, people being

7  maced.  But again, which of my clients agree with somebody

8  else to mace the participants?  That is deficient in this

9  complaint, the First Amendment complaint.

10         So I hope that it's clear what our argument is.  It

11 is a defect in their conspiratorial arguments as well as state

12 law defects, and that is what we wish to present to the Court.

13         THE COURT:  Thank you.

14         MR. KOLENICH:  Thank you, Your Honor.

15         THE COURT:  All right.

16         MR. JONES:  Good morning, Your Honor.  My name is

17 Bryan Jones.  I'm representing League of the South, Michael

18 Hill, and Michael Tubbs.

19         To survive a 12(b)(6) motion, plaintiffs must allege

20 sufficient facts to nudge a claim beyond being merely

21 conceivable, to be plausible.  And conclusory legal statements

22 are not enough.

23         In their memorandum of law in support of their motion

24 in opposition to our motion to dismiss, plaintiffs list on

25 page 30 all of the instances where my three clients are named

1  in their -- in the complaint.  There are 24 paragraphs where
2  my clients are listed in the complaint.
3        What is just as important as what is listed is what
4  is missing from their complaint.  Plaintiffs allege that much
5  of this conspiracy was planned online using platforms such as
6  Discord.  Plaintiffs have obtained numerous communications on
7  Discord between participants at the rally and some of the
8  defendants.
9        None of my clients are alleged in the complaint to
10 have made any actual statements on Discord.  There are no
11 agreements from my clients to commit any acts, no agreements
12 even to do anything, no statements whatsoever on Discord.
13       The facts in the plaintiffs' complaint merely allege
14 that --
15       THE COURT:  Who has access to Discord?  Who has it?
16 I mean, can anyone access Discord?
17       MR. JONES:  I don't know if that's alleged in the
18 complaint, but it is alleged in the complaint and we must
19 accept as true the League of the South had a Discord channel,
20 but there's no allegation that any of communications --
21       THE COURT:  I'm just curious.  Could someone not,
22 say, associated with one of the defendants post anything on
23 Discord?
24       MR. JONES:  I'm not sure, Your Honor.  It's my
25 understanding that you have to be invited onto Discord, onto

the specific channels.

So the facts in the complaint simply allege that my clients participated in the rally on August 12. There is no specific allegations that they were present on August 11, before that.

The allegations are that they marched in formation from the parking garage to the park, that Michael Hill's name was on the poster, that after the rally he tweeted, "League of the South had a good day in Charlottesville. Our warriors acquitted themselves as men. God be praised."

There's allegations that there was some scuffling between Michael Tubbs and some of the counterprotesters. No allegation that that was a violation of those counterprotest -- no names or none of the plaintiffs are alleged to have been any of those counterprotesters.

So we have a similar argument, Your Honor, that this is alleged to be a conspiracy. They don't have facts to support sufficiently carrying the claims beyond merely conceivable to plausible.

They've been able to infiltrate the secret communications between the parties, but they have not been able to plead specific facts against my three clients, Your Honor.

That would be my initial argument. Thank you.

THE COURT: Thank you, sir.

1          All right.

2          MR. DiNUCCI:  Good morning, Your Honor.  My name is

3    John DiNucci.  I represent Mr. Spencer.  Just entered an

4    appearance yesterday.  Pleasure to be here, Your Honor.

5          If I can raise two points, which candidly I have not

6    seen in any of the defendants' motion, memorandum of points in

7    authorities.

8          There is a request in the case for injunctive relief.

9    But from my quick and dirty reading of the complaint, after

10   several quick and dirty readings, I don't see any facts

11   pleaded that would entitle the plaintiffs to injunction of any

12   sort.  None whatsoever.

13         Secondly, and very briefly again -- this too was not

14   in any of the briefs that I've seen -- I would argue that the

15   plaintiffs who seek punitive damages haven't pleaded the

16   requisite facts to get punitive damages.  Although there's

17   language about racial animus and the like, I don't see any of

18   the boilerplate standard allegations that one would make to

19   get punitive damages.  There's nothing about hatred, spite,

20   malice.  There's certainly no such allegation made about my

21   client, Mr. Spencer.  So I would suggest that both the prayers

22   for relief should be stricken with respect to the conspiracy

23   allegations, which seem to be the heart of the matter.

24         I'm referring to several cases from the Western

25   District as well from the Fourth Circuit.  The *Muhammad v.*

*Taylor* case, which was decided by Judge Kiser in 2017, I quote, "Allegations of 'parallel conduct and a bare assertion of a conspiracy' are not enough for a conspiracy claim to proceed," citing *Society Without a Name v. Virginia,* 655 F.3d 342.

The *Weathers v. Ebert* case involving Mr. Ebert, a commonwealth's attorney from Prince William County dismissing a conspiracy claim, and I quote, "The other allegations are only general statements that he," Mr. Ebert, "acted in concert with others. These" -- and this is the key -- "unsupported by averments of communication, consultation, cooperation, or command, do not make him responsible under 1983 for the acts of others."

Averments of communication, consultation, cooperation or command, which allegations are not made in this case. And I'll get to some of the illustrative paragraphs in a moment.

And then going back to the *Society Without a Name v. Virginia* case, 1985(3) claims dismissed. The court saying, I quote, "The complaint fails to allege with any specificity the persons who agreed to the alleged conspiracy, the specific communications amongst the conspirators, or the manner in which any such communications were made." That's the framework.

The complaint does not sufficiently allege communications, consultations, commands by Mr. Spencer or for

that matter, I suppose, any of the other defendants.

As an example, Paragraph 64, and I quote, "Defendant Spencer and co-conspirator Evan McLaren, a member of Defendant Identity Evropa, met in person at the Trump Hotel in Washington, D.C., to organize and direct the 'rally' in Charlottesville, with the purpose and result of committing acts of violence, intimidation, and harassment against citizens of Charlottesville."

With the purpose and result, but there's nothing said in that paragraph about what the communications were. What did these gentlemen say? These are purely conclusory allegations not based on any pleaded fact.

Paragraph 230, "Defendants Spencer and Peinovich" -- if I pronounce that correctly -- "spoke to their followers at McIntire Park. Peinovich" -- if I pronounce that correctly -- "called the counterprotesters savages."

There's nothing about what Mr. Spencer allegedly said there, assuming he was there. It has to be taken as truth of the matter he was there. Nothing about what he said. Nothing about communication he had with Mr. Peinovich or anybody else.

Paragraph 315. "Defendant Spencer and co-conspirators McLaren met in person to plan unlawful acts of violence, intimidation, and denial of equal protection for the Unite the Right events."

Again, no allegation of what was said. It's talking

about to plan to do something.  And, in fact, in those
paragraphs I'm quoting from, they don't say they actually came
to a conclusion on a plan.

Then they cite various what I'll call anodyne
statements by Mr. Spencer that don't amount to incitement of
violence and don't evidence -- they actually don't constitute
a direct communication with any other alleged co-conspirator
and don't amount in and of themselves to conspiracy.

Paragraph 52.  This is Mr. Spencer.  "What brings us
together is that we are white, we are a people.  We will not
be replaced."  That's not evidence of a conspiracy.  That's
not communication with another individual to plan something.
It's not urging anyone to act or agree to act.  It's not an
incitement to violence.

Paragraph 85.  And I may garble this one.  I can't
read my own writing, Your Honor.  "A 'Charlottesville
Statement' was distributed by Defendant Spencer, setting out
the philosophy and ideology underlying the rally."  And it
quotes it.

It indicates that Mr. Spencer went on to say,
"Racially or ethically defined states are legitimate and
necessary."  That's not a communication with another alleged
co-conspirator designed to create an agreement.  He's just
making a public statement.

Paragraph 120, and this was after the events started

1  to occur on Saturday.  "Defendants" -- I believe it was

2  Saturday.  "Defendant Spencer put out a call for attorneys on

3  his website, altright.com."  And that's not, again, a direct

4  communication with any of the other alleged co-conspirators.

5  It's certainly not an incitement to violence.  He's saying

6  people may need legal counsel given what's going on.

7         Paragraph 141.  "Defendant Spencer tweeted a picture

8  of Commonwealth Restaurant, which had a sign in the window

9  reading, 'If quality and diversity aren't for you, then

10 neither are we.'"

11        Now, the plaintiffs in the following paragraph, 142,

12 try to suggest that somehow that was an invitation for people

13 to wreak havoc on, vandalize, I suppose, that restaurant or

14 perhaps others.  But that's not -- actually, that's after the

15 conspiracy had been performed.  As other counsel said, you've

16 got to have a prior agreement that results in these acts.

17 That's not an indication of any prior agreement.

18        If I read the complaint correctly, what it consists

19 of primarily where it talks about alleged acts or

20 communications to conspire, they're collective allegations

21 about the defendants.  They don't specifically say Mr. Spencer

22 said this, communicated with this guy, or the same is true as

23 to other defendants.

24        Paragraph 68.  "Defendants also frequently

25 coordinated the illegal acts planned for the Unite the Right

event online." It doesn't say Mr. Spencer. "They made use of
websites, social media, including Twitter, Facebook, 4chan,
8chan" -- I don't know what those are -- "chat rooms, radio,
videos, and podcasts to communicate with each other and their
co-conspirators, followers and other attendees and did so to
plan the intended acts of violence and intimidation, and the
denial to citizens of equal protection of law."

It doesn't mention Mr. Spencer. It doesn't say
Mr. Spencer engaged in any particular communication. That's
not specificity to support a conspiracy claim. And they don't
identify in that paragraph the actual communications they're
taking about.

Paragraph 71, "One Internet tool defendants used
extensively" -- and defendants collectively, not identifying
Mr. Spencer or anybody else.

"One Internet tool defendants used extensively to
plan and direct illegal acts was the chat platform Discord."
No reference to Mr. Spencer. Nowhere in the complaint is
there indication that Mr. Spencer had access to that platform,
if that's the right word, or actually utilized it. No
allegation whatsoever.

And if I recall the brief that the plaintiffs have
submitted for purposes of this hearing, they indicate that
that was the principal means by which the defendants allegedly
communicated to form this alleged conspiracy. The principal

means, but no reference to Mr. Spencer as to accessing the
Discord platform.

Paragraph 72. "Defendants" -- again defendants
collectively -- "used Discord as a tool to promote,
coordinate, and organize the Unite the Right rally, and as a
means to communicate and coordinate violent and illegal
activities in secret during the actual events of that
weekend."

No reference to Mr. Spencer. Just a collective
allegation. If there is evidence to support the claim here,
it would be in there. Why don't they say Mr. Spencer did
these things?

And that's important because if you go to
Paragraph 74, there's a technique used in this complaint I
want to point out. It says, "Individuals including Heimbach,
Parrott, Cantwell, and Ray, were all participants in Discord,
and participated in the direction, planning, and inciting of
unlawful and violent acts through Discord."

Individual defendants including the three or four
people. I can't count. No mention of Mr. Spencer. Doesn't
say including Mr. Spencer. By definition that means he wasn't
part of it, because if he was they would have said so. If
they had evidence, they would have said so. They haven't
pleaded he was part of any communication through Discord.

Same thing in Paragraph 97: "On Discord, moderated

and controlled by Defendants Kessler and Mosley, there were
countless exhortations to violence, including," and then it
goes on.

"Moderated and controlled by Defendants Kessler and
Mosley." Doesn't say moderated and controlled by Defendant
Spencer. Doesn't say Defendant Spencer accessed, used,
participated in the use of Discord.

There's other such references with the word
"including." Paragraph 102, actually it is a little bit
different, Your Honor. Paragraph 102, "Co-conspirators on
Discord incited attendees to bring weapons and engage in
violence. The incitement was known to and promoted by
defendants." But again, no reference to Mr. Spencer. No
reference to Mr. Spencer.

How then can they say he is part of this conspiracy?
They don't plead any -- really don't plead any communications
by Mr. Spencer. And then to the extent they in a general
fashion talk about communications, they don't mention
Mr. Spencer. They're just collective allegations about
defendants.

In short, there is not any -- there is no sufficient
allegation of communication, consultation, cooperation, or
command by Mr. Spencer. They don't allege -- they don't
sufficiently alleged he is part of a conspiracy.

With respect to -- and the same problem, of course, I

```
 1  would respectfully submit, infects, if you will, their civil

 2  conspiracy claim under Virginia law.  They simply haven't

 3  pleaded the necessary communications or the like to indicate

 4  he was part of a conspiracy.

 5          THE COURT:  Is there any difference in whether it be

 6  a civil conspiracy or a criminal conspiracy?  Not him, but in

 7  the law is there any difference in a civil and a criminal

 8  conspiracy?

 9          MR. DiNUCCI:  Other than with respect to burden of

10  proof, I would think not.  But I'll be blunt, Your Honor.  I

11  wasn't prepared for that question.  I've just gotten in this

12  case.  But the simple fact is -- well, they -- for whatever

13  purpose, they have simply not pleaded facts.  This, as counsel

14  has pointed out, are purely conclusory.

15          THE COURT:  I understand that.  But, I mean, we try

16  these drug cases.  There's people acting all over everywhere,

17  and no one has said a word that they can convict 20 or 30

18  people in a drug conspiracy with nothing but actions.

19          MR. DiNUCCI:  Understood.  I mean, I understand the

20  concept.

21          THE COURT:  Well, I understand the law in these cases

22  is you have to be pretty specific about what was said and

23  done, but I was just asking.

24          MR. DiNUCCI:  Well, if the theory is that there was

25  of a tacit conspiracy or implied conspiracy, I would
```

respectfully submit that at least logically you still have to

have some communication with the other alleged

co-conspirators.  It may just be a wink and a nod.  I think

the example -- I get your name butchered, but other counsel

mentioned was an instant conspiracy between a couple of guys

on a porch to go beat up a black man.  It could be a wink and

a nod, but they don't even allege a wink and a nod here.  We

don't have anything specific.

On 8.01-42, the Virginia civil harassment statute,

there's no -- at least I don't remember seeing any allegation

of any particular act by Mr. Spencer.  There's again just a

collective allegation that four or five defendants

collectively, you know, violated the statute.  They don't say

what act of harassment, particular act of harassment against

what particular individual Mr. Spencer engaged in.

The same.  They don't allege any particular act of

violence by Mr. Spencer against any particular individual.

We're left to guess what they're talking about.  And they

certainly don't allege any vandalism of property by

Mr. Spencer, which is the third component of the Virginia

civil harassment statute.

I also would -- I guess I have to confess my

ignorance here.  I'm having a hard time defining exactly what

legal theory beyond conspiracy as a general proposition the

plaintiffs advance.

1    They -- in the complaint at, for example,

2 Paragraph 60, 65 through 68, 315 through 322, 324 through 326,

3 and 341, the plaintiffs allude to a deprivation of a right to

4 equal protection.  Yet, nowhere in the complaint do the

5 plaintiffs suggest, indicate, allege that there was any state

6 action.

7    So I would respectfully submit under -- not only

8 Breckenridge but then the Carpenter case, and then the Bray

9 case -- since the plaintiffs haven't pleaded any state action,

10 they don't have any claim for violation of equal protection of

11 the law.

12    They also talk about in Paragraphs 312 and 341

13 deprivation of the equal privileges and immunities of

14 citizenship.  But with one exception highlighted in the

15 plaintiffs' brief, which is a discussion of the applicability

16 of 1982 to incidents around the synagogue, they don't cite

17 what privilege or immunity they're talking about.  We are left

18 to guess what the claim is about.

19    They don't identify any statute or principle of law

20 that creates or constitutes a privilege or immunity of which

21 they were deprived.

22    In one paragraph, 339, they say they were deprived of

23 equal rights, but they don't tell us, in the complaint at

24 least, what those equal rights were, again with the exception

25 of 1982.

1      They also in Paragraph 342 and only in Paragraph 342

2   of the complaint reference the right to be free of the badges

3   and incidents of slavery.  And I'm going to address that with

4   the Court's indulgence in a moment.

5      They also talk about in Paragraph 312 being deprived

6   of the use, benefits and privilege of property and/or

7   contractual relationships.  Put aside the word "property."

8   There is no allegations that anybody was deprived of use,

9   benefits and privilege of contractual relationships.

10      Judge, if I read the brief correctly, they're saying

11   that the principal claims seem to be -- or set of claims seems

12   to be based on the Thirteenth Amendment.

13      As I understand the law, and these -- again, I will

14   be candid only having gotten in this case -- I've seen issues

15   that weren't necessarily addressed in other briefs.  I've got

16   copies of cases over here for both plaintiffs' counsel and the

17   Court.

18      Is I understand it, the Thirteenth Amendment --

19   excuse me.  1985(3) creates a remedy -- a remedy -- if persons

20   conspire to deprive a protected person of some right that is

21   declared elsewhere such as in the constitution or a statute.

22   One of the plaintiff's cases, *U.S. v. Bledsoe,* 728 F.2d 1094

23   stands for that proposition.

24      Great American Federal Savings & Loan Association v.

25   Novotny, 442 U.S. 366 at page 372 referring to 1985(3), it

merely provides a remedy for violation of rights it
designates.  1985(3), quote, "Provides a civil cause of action
when some otherwise defined federal right" -- not state right
-- "to equal protection of the laws or equal privileges and
immunities under the laws is breached by a conspiracy."
That's Novotny at 366.

Also, as I read again Breckenridge, Carpenter, Scott
and to Bray, with limited exceptions 1985(3) does not apply to
private conspiracies to deprive persons of rights.  That's
*United Brotherhood of Carpenters and Joiners of America, Local
610, v. Scott,* 463 U.S. 825.

That was a case in which people were alleging a
deprivation of First Amendment rights, but there was no
allegation of a state action.

The same principle, though, applies with conspiracy
to deprive persons of the right to equal protection under the
Fourteenth Amendment.  If there's no state action, there's no
claim.  There's *Wong v. Stripling,* 881 F.2d 200, Fifth
Circuit, 1983, in which case there was a dismissal of claims
for deprivation of rights under the First and Fourteenth
Amendments for equal protection because there was no state
action.  And the Fifth Circuit was relying on Scott in that
case.

And then we have *Tilton v. Richardson,* 6 F.3d 683, a
Tenth Circuit case from 1993 affirming a dismissal of a

1985(3) claim by conspiracy to deprive the plaintiff of rights
under the First and Fifth Amendments applicable to the
Fourteenth Amendment, the Court holding that absent state
involvement, plaintiff did not have an actionable claim for
deprivation of the First Amendment right, right to freedom of
religion -- excuse me, Your Honor -- due process, right to
fair and impartial trial.

Federer v. Gephardt, 363 F.3d 754, an Eighth Circuit
case affirming the dismissal of a 1985(3) claim for a
conspiracy to deprive of rights to freedom, association, and
speech holding that state action is necessary because the
First and Fourteenth Amendments only apply to action by a
governmental actor.

And then we move to be to Bray, again concedes that
there are instances in which a 1985(3) claim can exist against
a private actor.  The court there said there were a few rights
that are enforceable, if you will, as against the private
entity.  The court said those rights are the only Thirteenth
Amendment right to be free from involuntary servitude.
There's no allegation of involuntary servitude being forced on
anybody here.

And in the same Thirteenth Amendment context,
interstate travel, there was no allegation in this case that
anybody was deprived of the right to interstate travel.  In
other words, 1985(3) doesn't apply because there is just no

state action, and there is none of the prohibitive private

action.  I will get to badges of incidents in a moment, Your

Honor.

        Also in support of the proposition that in these

circumstances there is no -- without state action there's no

1985(3) claim.  *Park v. City of Atlanta,* 120 F.3rd 1157,

Eleventh Circuit case from 1997, in which the Court said,

among other things -- I think the point is applicable here --

1985(3) doesn't create any general federal tort remedy.

        Now, with respect to the Thirteenth Amendment, I

acknowledge -- I have read Breckenridge and still have a

little bit of difficulty digesting it.  But as I understand it

given other cases, some prior to Breckenridge and some after,

the Thirteenth Amendment does give congress the authority to

determine what are badges and incidents of slavery.  That's

the *Jones v. Alfred H. Mayer* case, 392 U.S. 400 which

plaintiffs cite.  And I think it's Section 2 of the Thirteenth

Amendment gives the congress the power in Section 2 to enact

legislation to implement the Thirteenth Amendment.  And it's

been construed to, again, allow the congress to enact statues,

such as 1982, to ban imposition of badges of incidents of

slavery, but the Thirteenth Amendment itself doesn't create a

private cause of action, I guess with the limited exceptions

of circumstances in Breckenridge, although I would try to

distinguish that.

1      In support of the proposition that the Thirteenth

2  Amendment does not create a right of action, Goss v. Stream

3  Global Services, Inc., a case from the Northern District of

4  Iowa from March 19, 2015.  Again, I have copies.  There is no

5  official cite I have been able to find for that.

6      The only right the Thirteenth Amendment creates on

7  its face is the right to be free of involuntary servitude.  We

8  mentioned *Wong v. Stripling* before, a Fifth Circuit case.

9  That stands for the proposition that the Thirteenth Amendment

10  does not create a right to be free from private racial

11  discrimination in all areas of life.

12      In the *NAACP v. Hunt,* 891 F.2nd 1555, an Eleventh

13  Circuit case from 1990, the court said the Thirteenth

14  Amendment in and of itself doesn't forbid badges and incidents

15  of slavery.  There has to be some implementing legislation

16  such as 1982 that would prohibit imposition of badges and

17  incidents of slavery.

18      In the City of *Memphis v. Greene,* 451 U.S. 100, the

19  Supreme Court noted that it had not ruled on the issue of

20  whether the Thirteenth Amendment itself executed, but it went

21  on in that case to form, I believe, a dismissal of the case

22  concerning a certain allegation of the badge and incident of

23  slavery because there was no statute to say what the defendant

24  was accused of was wrong, was prohibited.

25      In Palmer v. Thompson, 403 U.S. 217, the Supreme

Court said -- that's a 1971 case.  The Court doesn't have a

authority to declare, legislate, and in quotes,

"implementation," that is to identify badges of slavery.

THE COURT:  You've used about 20 minutes.  You've got

10 for rebuttal, if you want to go on and use some of that

time.

MR. DiNUCCI:  I would like to, Your Honor.  I

appreciate the Court's indulgence.

What we have here, Judge, is no citation in the

complaint to any implementing statute other than 1982.  So to

the extent that 1982 is invoked in this case, if you will,

it's on behalf of Ms. Pearce, I believe, one of the Jewish

plaintiffs because of her allegation that her ability to

exercise access to use of the synagogue was restricted.  Put

that aside for a minute.  There's no other implementing

statute that the plaintiffs cite or rely on.

I would argue then there is no Thirteenth Amendment

claim that any plaintiff has except perhaps Ms. Pearce.  So I

don't know what's in the complaint.  What is the cause of

action?  I would suggest there is no cause of action because

we don't have an implementing statute cited with respect to a

Thirteenth Amendment claim, and we don't have state action.

At least with respect to the federal claims, there's no meat

there.  There's no substance there.

And briefly, with respect to Ms. Pearce's claim, I

would respectfully submit that the cases she cites, the Greer
case and the Brown case, are inapposite.

        I think one of the counsel used the phrase in
describing what happened with respect to the synagogue as a
one-off matter. This isn't a continuing thing. It wasn't a
question of vandalism, which I believe was the case in Greer.
In Greer, for example, a 1982 claim was upheld with respect to
the synagogue, deprivation of rights to use the synagogue,
people were shooting live ammunition into the synagogue. We
don't have anything like that here. In fact, there is nothing
pleaded that I recall seeing where Ms. Pearce actually had
been unable to use the synagogue. She's been inconvenienced,
but I would respectfully submit not in the Greer or Brown
cases the plaintiffs cite indicates that you have a cause of
action of somehow your schedule has been changed. And that's
about all we have alleged in the complaint.

        With respect to 1986, Your Honor, as I understand the
law, what you have to allege is not only that there has
been -- well, you have to allege that the defendant knew of an
act about to be committed in furtherance of a conspiracy, an
act about to be committed and that you had the means
reasonably to prevent the commission of the act.

        It's not a question of knowing there's a conspiracy
and bringing it into the conspiracy. The law is you know the
act about to be committed in furtherance of a conspiracy and

you fail when you could to interfere and to stop that act.

Buck v. Board of Elections of City of New York,
536 F.2d 522, a Second Circuit case from 1976.  Knowledge of
the acts is a statutory prerequisite to sue.  Not knowledge of
the conspiracy.  Knowledge of the act and implementation of
the conspiracy.

In the Second Circuit case, the Court cited Hampton
v. City of Chicago, 484 F.2d 602, a Seventh Circuit case from
1973.  Quote, "Liability under 1986, however, is dependent
upon proof of actual knowledge by a defendant of the wrongful
conduct of its subordinates."

Conduct, act, not existence of a conspiracy.  It's
the act that you have an -- that you know of and have an
opportunity to prevent.  There's no allegation here in this
complaint that Mr. Spencer knew of any particular act of
violence or other criminal conduct in which any other
defendant or unnamed co-conspirator engaged.  And there's no
allegation that he could have prevented it.

For example, where is the allegation that Mr. Spencer
knew about what Mr. Fields was going to do?  And where's the
allegation that Mr. Spencer, or for that matter any other
defendant could have prevented somebody from getting in his
car and running somebody down?  We have no such allegations.

Mr. Spencer has not been -- there's no specific
incident of misconduct that's been identified that Mr. Spencer

1   was aware of or could have prevented.

2          One last case, *Bell v. City of Milwaukee,* 746 F.2d

3   1205, a Seventh Circuit case from 1984.  Section 1986

4   predicates liability on:  One, knowledge that any of the

5   conspiratorial wrongs are about to be committed.  Wrong is as

6   an act.  It's not the conspiracy itself.

7          Two, power to prevent or to aid in preventing the

8   commission of those wrongs.  Neglect to do so.  And where the

9   wrongs were committed -- five, the wrongful acts.  Acts could

10  have been prevented by reasonable diligence.  Acts.  Not that

11  you could have stopped the conspiracy, not that you should

12  have never gotten into conspiracy, the alleged conspiracy, but

13  that once the conspiracy was formed and acts were being

14  committed in implementation of it, you knew what those acts

15  were, you were there and you could have prevented them.  No

16  such allegations in the complaint.

17         Thank you.  Your Honor.

18         THE COURT:  Thank you.  All right.

19         MR. PEINOVICH:  May it please the Court, Your Honor.

20  I'm Michael Peinovich.  I am a defendant myself, pro se, sir.

21         THE COURT:  Yes, sir.

22         MR. PEINOVICH:  I'm a political podcast server,

23  commentator, activist from New York, and it's well known that

24  I'm a controversial speaker, often called dogmatic speaker, I

25  have many opinions that many people may find offensive,

shocking and such like that. Nonetheless, I am –– my belief

is that I'm the kind of person for which the First Amendment

was designed.

And in this allegation, in this complaint by the

plaintiffs here, I would like to point out I have a broadly

similar argument that has already been stated, that the facts

alleged do not amount to –– do not amount to survive a motion

to dismiss.

And I would like to point out specifically where I am

mentioned in this –– this is a full complaint, 335 paragraphs

of allegations in here, and I am mentioned in only 14 of them.

And much like Defendant Spencer when it comes to the Discord

server on which the plaintiffs claim the primary planning for

this rally was conducted, there are no allegations of any

comments or any participation on my part in that server

because no such allegation could be made.

I am mentioned in a number of paragraphs but only 14.

And I'd like to call attention to some of those.

So in Paragraph 42, the plaintiffs introduce me.

They describe who I am and what I do. They say that I have

appeared at several other political events alongside Defendant

Spencer, and that is true. Defendant Spencer and I have done

many political events together.

There is no allegation that there was any violence or

allegations of violence that have arisen from any of these

1  other events that we have appeared at together.

2          They also say in this paragraph that Defendant

3  Spencer and myself spoke at McIntire Park August 12, 2017.

4  And they say, quote, "In the immediate aftermath of the car

5  attack."  And there's no allegation that I had any knowledge

6  of the car attack or any involvement in it whatsoever.  They

7  merely include this, in my opinion, in an attempt to draw the

8  implication in the mind of the reader that there was some

9  connection between my appearance in McIntire Park and the

10 incident, which they have no allegation that I knew anything

11 about, which is the car accident involving Mr. Fields.

12         Paragraphs 50, 52, plaintiffs talk about how I took

13 part in a May 13, 2017, demonstration in Charlottesville with

14 Defendant Spencer, with Defendant Damigo, among others.  They

15 talk about how we had lunch and we spoke at a pavilion.

16 Again, this is just -- I mean, I wonder why would they even

17 include that?  There's no actionable behavior there.

18         Paragraph 96, which is also going to be used in this

19 exhibit that they have, is an excerpted quotation of an

20 off-colored joke which they allege appeared on my podcast.  Of

21 course, they're not giving -- they say it was said by a

22 co-conspirator.  They don't name the co-conspirator.  They

23 simply allege that this person was a co-conspirator without

24 naming them.  There's no indication of who this person is

25 anywhere else in the complaint.

1       Now, while there is certainly an off-colored joke

2   that some might find offensive, there's no date, there's no

3   time stamp, there's no episode name, there's no link, there's

4   no indication that this joke has anything whatsoever to do

5   with the rally at all.  And it's my belief that they

6   deliberately omitted those because to give the full context of

7   such quotation would show how absurd it is to include it in an

8   allegation that would indicate any kind of a conspiracy.

9       Certainly there's off-colored jokes that appear on my

10  podcast, but again nothing here would indicate knowledge or

11  communication or intent of anything relating to the events of

12  August 12, whatsoever.

13      Now, in Paragraph 141 they include a tweet.  If you

14  will allow me, this tweet is deliberately misconstrued in

15  their complaint to indicate this is a threat against residents

16  of Charlottesville.  It is exactly the opposite.  It is a

17  warning to them of the possibility of violence from

18  counterprotesters who, you know, attended with the expressed

19  intent of disrupting the events.  So this is a deliberate

20  misconstruction of my intent with that tweet.

21      So in Paragraph 207, they described that I approached

22  Lee Park or Emancipation Park with my security team.  This is

23  true.  I approached the park with a couple of friends of mine

24  who were there to watch my back in case of trouble.

25      Now, there's no allegation of violence by myself or

my conspiracy -- excuse me.  The word "conspiracy" has been
thrown around so much that I accidentally said it -- my
security team.  There's no allegations that we engaged in
violence.  There's no allegations that we witnessed violence.
There's no allegations that we were armed.  There's nothing.

They said we approached the park.  And now we
approached the park for a legally permitted rally, which, you
know, reminds me that this court had actually enjoined the
City of Charlottesville to hold the rally.  The City of
Charlottesville attempted to revoke it.  This court said,
sorry, these guys have First Amendment rights.  You have to
allow them to speak.

So I was approaching the park with the intent to
speak.  There's no allegation of anything else.  Simply I
approached the park.

Paragraph 229.  They allege that Defendant Spencer
and I regrouped in McIntire Park after evacuating Lee Park.
They then say that, quote, "Violence broke out again."  Once
again, I would say this is a carefully worded sort of
equivocal statement meant to draw a connection between this
alleged violence and my appearance there at McIntire Park;
however, there's no direct allegation that I had any knowledge
of this violence or that I was involved in this alleged
violence any way.

They simply included it there hoping to draw the

inference in your mind that there is some connection, but they don't directly allege it because they can't. They can't directly allege that.

Now, in Paragraph 230 they say that in my remarks at McIntire Park I described the counterprotesters at the rally as savages. This is true. However, I believe since they have raised the issue of my remarks at McIntire Park, I can supplement them with other remarks I made there in the same speech. And I have included the full remarks and a video in my motion to dismiss, but if you will allow me a few words.

So I introduced my remarks at McIntire Park by saying this is not a rally about hate. This is not a rally against any other group of people. This is a rally for ourselves. And in my closing statement I said this is about love; this is not about hate. We love ourselves. We love our people. We love our nation. We love Europe, and we love America. We love white people, and there's nothing wrong with that.

Now, certainly some people might find such statements offensive. You know, I can't imagine why but they might. These are First Amendment protected speech, and I certainly don't see how this can be construed as a communication or incitement to violence or some other such thing. They are words indicating love and support for a certain group of people, not attacks on any other group of people.

Other factual allegations that they make about me in

the complaint are similarly innocuous.  I had a guest on my

podcast who announced the event, again legally permitted

event.  I assisted Defendant Cantwell in fundraising while he

was in jail.  I appeared on a poster for the event.  Again,

this is just First Amendment stuff.

So my argument is broadly similar, that all the facts

alleged in this complaint do not suffice to indicate a

conspiracy that would survive a motion to dismiss on these

matters.

And that's all I have, your Honor.  Thank you very

much.

THE COURT:  Thank you.  That's all then for the

defendants, I believe.

Do you need a break before you start?

MS. KAPLAN:  Just five minutes, Your Honor, if that

would be okay.

THE COURT:  Okay.

MS. KAPLAN:  Thank you.  We appreciate that.

THE MARSHAL:  All rise.

(Recess taken from 11:30 a.m. until 11:39 a.m.)

THE COURT:  You may proceed.

MS. KAPLAN:  Yes.  Good morning, Your Honor.  I'm

Roberta Kaplan, counsel with my colleagues for the plaintiffs.

And I'm going to argue why we believe all the motions to

dismiss should be denied in their entirety.

1          As an initial matter, Your Honor, plaintiffs are

2    obviously sensitive to the fact that Your Honor, the people

3    who work in this courthouse, the people who live in this

4    community have their own connections to, recollections of, and

5    personal experiences of what happened in Charlottesville last

6    summer.

7          Defendants too, as we know, have their own views

8    about what took place.  But we're here today on motions to

9    dismiss plaintiffs' first amended complaint.  And like with

10   any motion to dismiss, the allegations of the complaint must

11   be taken as true, and all inferences should be drawn in

12   plaintiffs' favor.

13         Let me start, Your Honor, if a may, with a

14   housekeeping notes, a couple of housekeeping matters.  First

15   of all, Defendant Fields did not move to dismiss at all.  So

16   he is in the case no matter what.  He had answered the

17   complaint.

18         In addition, six defendants, including Andrew Anglin,

19   Moonbase Holdings and others have defaulted.  So they too have

20   not filed motions to dismiss.  That leaves seven defendants in

21   the case who have filed motions to dismiss, and I will try to

22   focus on them and their arguments today.

23         Essentially, Your Honor, we believe -- and if you

24   could turn to page 2 in the kind of slide thing that we did,

25   PowerPoint without a PowerPoint, we believe that the

defendants essentially made four arguments or their arguments can be divided into four broad categories:

First, that the plaintiffs have not adequately pleaded a Section 1985(3) conspiracy claim.

Two -- and you heard a lot of this already this morning -- that particular defendants should not have been named as defendants.

Three, that the court should accept, rather than plaintiffs' interpretation of the facts, defendants' interpretation of the facts alleged by plaintiffs.

And, four, that all of this is protected speech so that no civil liability can lie in any event.

If it's okay with you, Your Honor, what I would like to do is I'm going to address the first three of those arguments. And then my colleague, Karen Dunn, from the Boies Schiller firm will address the fourth, which is the constitutional arguments.

THE COURT: All right.

MS. KAPLAN: I'm going to start with 1985(3). Well, slide three has the claims in the case, which are 1985(3), 1986, common law conspiracy, and violation of Virginia Code 8.01-42.1, but I'm going to go directly into 1985(3).

And if you could turn, Your Honor, if you would to slide five which has the history and language of Section 1985. As we all know, Section 1985(3) was passed by the reconstruct

in congress as a significant part -- and this is what Justice
Kennedy said just last year -- as a significant part of the
civil rights legislation passed in the aftermath of the Civil
War.  The statute is known as the Ku Klux Klan Act.  It was
passed in response to widespread violence and acts of terror
directed at blacks and their supporters -- crucial fact -- and
their supporters in the postwar South.

           Against this backdrop of political terrorism,
Congress enacted Section 1985(3), affording a remedy for the
vindication of the civil rights of those being threatened and
injured, notably blacks and advocates for their cause.

           I'll get to this later, Your Honor, but it's very
crucial.  Section 1985(3) is not limited to acts just about
African-Americans, or subsequent cases have held Jews.  It
also imposes liability for acts of violence and threats and
intimidation against supporters of their cause.

           So I'm going to start with the elements of the claim,
which are on slide six, Your Honor.  There are five elements.
This comes from one of your own court's decisions.  The five
elements are a conspiracy of two or more persons:

           Two, who are motivated by a specific class-based,
invidiously discriminatory animus.

           Three, to deprive the plaintiff of the equal
enjoyment of rights secured by the law.

           Four, which results in injury.

1          And, five, as a consequence of an overt act committed

2    by the defendants in connection with the conspiracy.

3          So I'm just going to do it element by element kind of

4    the old-fashioned way, if that's okay.  And I'm going to start

5    with the conspiracy element.

6          First thing I want to say at the outset, Your

7    Honor -- and it addresses the question you have already

8    asked -- is the elements of a conspiracy for purposes of

9    Section 1985(3) are essentially the same whether it's state

10   law, federal law, common law or even criminal law.

11         There's a slight difference with criminal law in the

12   sense that in the criminal context, the agreement, the

13   conspiracy itself is what's criminal.  And you don't have to

14   show injury the way you do in a civil case.  But for all

15   intents and purposes of what we're talking about, the

16   essential elements and ideas of what constitutes a conspiracy

17   are the same.

18         So to plead a conspiracy, Your Honor, you have to

19   show facts supporting a plausible inference -- and we

20   certainly agree with Iqbal and Twombly that it has to be a

21   plausible inference -- that defendants positively or tacitly

22   came to a mutual understanding to try to accomplish a common

23   and unlawful plan.

24         And although this requires allegations that are more

25   than parallel conduct -- again citing directly from Twombly --

```
 1   it does not require there to be direct evidence of a meeting
 2   of the minds.
 3          And frequently in Section 1985 claims -- and I think,
 4   Your Honor, I read -- I think I read practically every 1985(3)
 5   case you yourself decided -- it is true that routinely these
 6   claims get dismissed.  And they get dismissed because
 7   frequently when plaintiffs bring these allegations, either
 8   they don't show -- they allege a conspiracy in a conclusory
 9   manner, as you have held many times, or they don't show
10   sufficient evidence of discriminatory animus.  And here we
11   think both of those are amply met.
12          So if you can look at Paragraph 7, staying with the
13   conspiracy, it gives Your Honor I think a sense of the kinds
14   of claims that routinely get dismissed.  There's a citing
15   without a name that we've already heard reference to which was
16   whether the relocation of a homeless center outside of the
17   city violated Section 1985(3).
18          There's attempts to convert what would be an ordinary
19   unlawful search and seizure into 1985(3).  That's the second
20   case, *Smith v. McCarthy.*  And then also in a criminal-related
21   context there have been attempts to argue that
22   misidentification of a plaintiff as a drug dealer violated
23   Section 1985(3).  And courts routinely dismiss those claims,
24   as you yourself have, because allegations are conclusory and
25   because there's not enough showing or allegation of a
```

1 conspiracy.

2          But this case, Your Honor, I would respectfully

3 submit is very different from those cases.  And it is very

4 much more like became the cases I have on the right side of

5 that column which really go to the heart or the core of what

6 1985(3) was about.

7          There's the *Griffin v. Breckenridge* case, Your Honor,

8 in which some people were stopped in Mississippi believing

9 that they were civil rights workers and were beaten up.  And

10 that's the case, as you know, where the court made very clear

11 that state action is not required to make a 1985(3) claim.

12          There's the Waller case which involved an anti-Klan

13 rally in which there was violence.

14          And then there's the Bergman case, also another

15 Freedom Riders case which involved injury to Freedom Riders

16 traveling in the South.

17          Here we believe that the core of our allegations in

18 the case bring this case not even closer to the cases on the

19 right side of the column but squarely within the right side of

20 the column.

21          And, in fact, there's a slide later here in which the

22 Supreme Court in Griffin said this case -- if this case

23 doesn't represent the core of what congress intended in

24 Section 1985(3), it's hard to imagine what does.

25          And I would say that the exact same principle is true

1    here, Your Honor.  We are talking about racially motivated

2    violence as the result of a carefully Klan planned conspiracy

3    with people who showed their animus with massive --

4    particularized allegations which I'll get into on the

5    conspiracy -- obviously harm to plaintiff, obviously overt

6    acts.

7            So on the conspiracy, let me tell you that -- before

8    I get there, the defendants seem to be suggesting that the

9    only kind of conspiracy that would be sufficient here or that

10   is sufficient under the law is if all the defendants somehow

11   got into a room on one particular occasion and agreed on

12   exactly what the conspiracy was.  But that's not true.  We all

13   know that not to be true, your Honor.

14           Yourself talked about a drug conspiracy which in

15   certain ways is analogous here where it's agreed that certain

16   people in the conspiracy are the hub and do the planning and

17   coordinate and maybe get the profits, and other persons in the

18   conspiracy who may not even know each other are the spoke,

19   although here we don't have that issue because all the

20   defendants, we will show, did have contact with each other

21   prior to August 11.

22           But among the kinds of things that we allege, we

23   allege that defendants met in person to organize the events of

24   August 11 and 12th.

25           THE COURT:  Let me go back to 1983, 1985(3), and just

ask you to comment on this case, the Second Circuit case, *ALMA Society, Inc., v. Mellon.* And in that case it said the Court, referring to the Supreme Court, has never held that the amendment itself unaided by legislation as it is here reaches the badges and incidents of slavery, as well as the actual conditions of slavery and involuntary servitude. Indeed, all indications are to the contrary. And so is there a freestanding right to be free of the badges and incidents of slavery involved in this case?

         MS. KAPLAN: There is, Your Honor. The courts have held interpreting the Thirteenth Amendment most frequently in the context of upholding the constitutionality of hate crimes statutes, like the Matthew Shepard Act and acts like that have specifically held -- and we cite the cases in our brief -- that racially motivated violence in and of itself is a badge and incident of slavery. And there's no question that's what happened here, Your Honor.

         So, yes. It doesn't happen all that much, but this is exactly the kind of badge and incident case that the Supreme Court was talking about in Griffin.

         THE COURT: Well, in Griffin, though, they did find that there was a violation of their right to traveling.

         MS. KAPLAN: Correct. They said both travel -- they were clear. It was the travel, and there was the badges of incidents under the Thirteenth Amendment.

Here I'm not alleging travel, although I would say that some of the incidents have an aspect of detention to them. In particular, Friday night when our clients were surrounded by hundreds of protesters with lit torches and could not leave from around that the Jefferson statute, that has elements of detention. Same with the synagogue. Same with the church on Friday night.

I'm not saying it's interstate travel. It's not, but it gets to kind of the core of what badges and incidents of slavery were all about. And again, we have those cases cited that say racially motivated violence is enough.

So getting back, Your Honor, to the things that we allege the defendants did. They met in person.

To respond to something that was said by one of my friends on the other side, of course we don't know exactly what they said at their meetings. They were secret meetings. That's why we are going to get discovery to find out what they said.

We cite the Hill case in our brief that says conspiracies often by their very nature are secret. So we can allege that they met. I can't give you a transcript yet of what they said.

Two, they moderated, reviewed, directed and managed private online chat rooms that were used to organize and plan the violence.

1    They encouraged the use of weapons in their

2  communications about August 11 and 12th.  They organized the

3  secret torch-lit march on August 11, which was unlike

4  August 12.  There was no permit for that.  It was secret, but

5  as we allege in the complaint and as we're seeing in

6  discovery, plans were underway to do that all the way going

7  back to the initiation of the Discord server in June.  That

8  wasn't some kind of on the spur-of-the-moment plan.  It was

9  something that had been planned as far back as June.

10    They coordinated which uniforms each group should

11  wear so that they would be identifiable.  It's very crucial

12  for the James Fields allegations.  They lined up and marched

13  in Emancipation Park and preplanned regimented order on

14  August 12.  They charged at bystanders on August 12 in

15  militaristic fashion.

16    THE COURT:  Well, did all of them do this, though?

17  We you say "they" --

18    MS. KAPLAN:  Right.

19    THE COURT:  They seem to be saying we don't -- we

20  won't accept the broad brush of all the defendants, when you

21  have this many defendants, to say all the defendants did so

22  and so without being specific about what they did.

23    MS. KAPLAN:  So I would say -- I was talking about

24  the conspiracy as a whole.  I would say -- I have three more

25  responses to that, Your Honor.

1          First, any conspiracies, particularly large

2    conspiracies, which this was, different people did different

3    things.  We don't deny that.  There were people who we

4    allege -- and most of the people actually who moved to dismiss

5    were the leaders of the conspiracy.  They were the organizers,

6    the planners, the thinkers, for lack of a better term.  We

7    don't allege that all of them -- we may find out in discovery.

8    We don't allege that they were the guys who were actually

9    marching in regimented order.  They were directing the

10   marching in regimented order.

11          THE COURT:  Were there any people -- I mean, do you

12   allege were there any people that, say, on Saturday that were

13   not part of this conspiracy but were there because they were

14   just protesting the idea or they did not wish the statute to

15   come down?

16          MS. KAPLAN:  Yes, Your Honor.

17          THE COURT:  People who were not members of the

18   conspiracy.  There were people.  You would agree there were

19   people there who were not members of your alleged conspiracy?

20          MS. KAPLAN:  Absolutely.

21          THE COURT:  Who shared or maybe shared the views of

22   the conspirators, as you allege, but were not actually members

23   of the conspiracy.

24          MS. KAPLAN:  Correct, your Honor.  I would not

25   contend that every person who showed up on their side in

1  Charlottesville on August 11 and 12 --

2          THE COURT:  What if some of those persons

3  committed -- got caught up in the violence and committed

4  violent acts?

5          MS. KAPLAN:  They're not liable as co-conspirators.

6  We are not seeking to hold anyone liable that way as

7  co-conspirators.  We may identify additional co-conspirators

8  during the course of discovery.  But what we're saying, we

9  carefully chose the 25 defendants we did.  We obviously, as

10 you just noted, could have named many more.  And I'm not

11 saying we couldn't have named more.  I'm just saying we

12 couldn't have named everyone.

13          We chose them because with the exception of

14 Mr. Fields, who has not moved to dismiss, these were all

15 people who were directing, managing, kind of masterminding

16 what happened.  And so we went to the hub, to use the analogy

17 from a drug conspiracy, to the hub of the conspiracy rather

18 than suing all the spokes.  That's not to say that there

19 aren't spokes who could have be sued.  It doesn't even mean

20 that there are not other spokes we may ask Your Honor to name

21 as we discover them in discovery.

22          But to understand our philosophy here, we went after

23 the leaders.  And I hear Your Honor's concern about the size

24 of the conspiracy.  Let me try to address that in a couple

25 ways.

1    First of all, I think living here today in this
2  country at this particular time, I think we can all agree that
3  the Internet and modern technology is both a blessing and a
4  curse, to quote the Bible, Your Honor.  And it's certainly
5  true here.
6    There's no question that this particular conspiracy
7  could not have happened the way it did without the use of
8  Discord, podcasts and other modern technology that the
9  defendants explicitly used.
10    And to answer the question you asked earlier about
11 Discord, it is a private chat room.  It's not something open
12 to the public.  You have to ask to be admitted to one of these
13 chat rooms, and then -- I will show you later the
14 presentation -- be approved by one of the moderators.  The two
15 moderators here were Mr. Kessler and Mr. Mosley.
16    The final response I want to have to your concern
17 about the scope is that looking back actually at the prior
18 cases in which 1985(3) similar conspiracies were upheld, they
19 also have been quite large.
20    We went back and we looked -- and I can hand up the
21 complaint if you want it, Your Honor -- at the Waller case
22 which was the Klan violence in Greensboro, North Carolina.  In
23 that complaint that was upheld against a motion to dismiss,
24 there were 87 separate defendants who were named, so.
25    THE COURT:  I don't think there is any problem how

many you name as long as you meet the Iqbal/Twombly standard
and have enough facts about each one to hold them in the case,
not just a generalization or conclusory language.

MS. KAPLAN:  I agree, Your Honor.  And we believe we
have.  We gave you specific paragraphs in our oppositions to
the motions to dismiss.  If you have specific questions, I
will address them.

To give you one example with respect to Mr. Spencer,
because it came up during argument, there was some discussion
about whether Mr. Spencer participated in Discord.  We don't
know that.  People use nicknames or handles, something like
that on Discord.  So they don't use their own names.  So we
only allege for the people who we knew we could identify by
the handler.

However, there is an individual on Discord that we
allege in Paragraph 78 of the complaint -- his handle was
Caerulus Rex who was a coordinator between various security
details and that he has been identified publicly as a frequent
bodyguard of Spencer.

Again, we think we are going to be able to hook many
more people in once we have the discovery.  But we only have
people -- I'm very aware of my good-faith obligations.  We
only allege the people on Discord who we could match their
handle to the specific people.

Another issue which I think Your Honor is obviously

familiar with which is obviously in a conspiracy case

circumstantial evidence alone is sufficient. That's because

in the typical case, as we have already discussed, your

plaintiff can only really guess at the contents of the secret

communications, at least until discovery is permitted.

And indeed in the Mendocino case that we cited in our

brief, the Ninth Circuit case, highly coordinated action and

repeated patterns of conduct has been held to be sufficient to

create a justifiable inference that preplanning occurred

sufficient to allege a conspiracy.

But here, Your Honor, we actually have a lot more

than that, as I think is clear from the size, detail, and

specificity of the complaint.

Here we have put forward dozens of the defendants'

communications before, during and after what happened in

Charlottesville in which defendants or groups of defendants

explicitly discuss their joint operation, discussed its white

supremacist objectives, discussed how to use racialized

violence and intimidation to achieve those goals.

Today, as I said, with the Internet and social media

platforms, the modern-day conspiracy can be formed and take

place largely online. And that is in substantial part what

happened here. Many of the communications, as we've said,

happened on Discord.

Discord is an online group messaging platform that

allows for simultaneous suite chats.  As I said before and as
Your Honor cogently asked, it is a privately platform.  It's
not open to the public.

           If you turn to page 9, Your Honor, of the printed up
outline, it shows you what a page on Discord looks like.  And
I think it is incredibly illustrative.

           If you look in the right-hand column under "Event
Coordinator" at the top, Your Honor, you'll see -- and just to
be clear, the bottom quote that we highlight there is one
alleged in our complaint.  I took this from the complaint, and
this is how the page actually appears on Discord.

           You have event coordinator on the right.  You have
Mr. Mosley and MadDimension.  I'm sorry, Your Honor.  I'm
losing my vision.  We believe those two people are Mr. Mosley
and Mr. Kessler.  You have a number of moderators.  Again, we
don't necessarily know who those are.  One is called Chef
Goyardee.  One is called Heinz.  One is called Kurt.  And of
course with Discord we hope to identify those people.

           You have a discussion at the bottom from Erika
talking about how this is not a public server in response to
some of those questions, that it is invite only through our
trusted, pre-vetted alt-right servers.  We haven't even opened
it up to the proud boys or the alt-lite because the other
mods, event coordinators, and myself are all aware that they
act like kikes.

1          And then on top of that screen, Your Honor, you see

2    the kinds of communications that happened.  This is all the

3    way back in June.  I believe this is dated June 5.  The kind

4    of communications that were happening all the time from the

5    early part of June until what happened on August 11 and 12,

6    communications all of which we don't have, but of the ones

7    that we have already clearly show a preconceived plan to

8    commit racialized violence in Charlottesville on August 11 and

9    12th.

10          As for the defendants who we know to be on Discord,

11    we know 11 of them were.  Kessler, Mosley, Heimbach, Parrott

12    Cantwell, Ray, Vanguard America, Identity Evropa,

13    Traditionalist Workers Party, League of the South, and Daily

14    Stormer.  And as I said, we have very strong reason to believe

15    that others, including Spencer, either were directly or

16    through people working for them, and we intend fully to

17    identify that during discovery.

18          In addition, certain of the groups actually had their

19    own servers.  So if you look at the left, Your Honor, this is

20    the Charlottesville server, Charlottesville 2.0.  If you look

21    at the left, these are all the different discussion groups

22    that they had.  Shuttle Service, code of conduct, questions

23    for coordinators, flags, promotion, gear and attire.  You can

24    see that on the left.

25          Then in addition to this, certain groups like

Identity of Evropa had their own Charlottesville server.  So
when it said Charlottesville 2.0, it was its own Vanguard
America server for Charlottesville.

        And as I said, we believe that what we have here is
just the tip of the iceberg.  We are pursuing discovery, as
Your Honor can imagine, against Discord.  These all came from
stuff that was openly available on the Internet.  And we
believe there is much, much more.

        Indeed, there was a leadership chat on Discord, one
of these topics, and we don't have the communications in that
chat.  That has not been made publicly available.  We intend
to pursue it in discovery.

        In addition, Your Honor, some chats have been made
public since we amended our complaint.  To the extent Your
Honor is at all interested, we actually could amend to add
them, but we are constantly getting new information in all the
time through discovery and otherwise.

        If that's -- I'm going to go now to the second
element, Your Honor, if it's okay with you, which is the fact
that defendants were motivated by a specific class-based
invidiously discriminatory animus.  Here I don't think there
is much really to argue about.  Defendants don't really argue
that that didn't exist here.

        As I said before, the Supreme Court precedent is very
clear that it's not only discrimination against black people

or Jewish people but also people who advocate for their

rights.  And that shows up in the Carpenter case and the

Waller case that we cite in our briefs.

The Fourth Circuit itself has explicitly held that

animus against Jewish people is sufficient to satisfy the

discriminatory animus element of Section 1985.  We cite the

*Ward v. Connor* case for that.

And it should even be noted as occurred in the

Griffin case that the plaintiff doesn't even have to be right

about it.  Remember, in Griffin the defendants mistakenly

thought a white guy in the car was a civil rights worker.  It

turned out he wasn't, but that still was sufficient to state a

1985(3) claim.

As for the third element, which is what Your Honor

asked about, which is the basis of the objective that would

be -- that is for which defendants could be liable under

1985(3), as we've explained we believe that this is a core

racially motivated violence case which is a badge and incident

of slavery under the Thirteenth Amendment.

I told you about those cases in which courts in the

conduct of hate crimes have held that racially motivated

violence is itself a badge and incident of slavery.

I can refer you to the *United States v. Roof* case out

of 2016, and there are other cites that all stand for that

proposition.

1          Although some of the defendants have seemed to argue

2    that badges and incidents of slavery somehow was only actual

3    in enslavement or actually having, you know, bonds around your

4    wrists or things like that, we obviously know that's not true.

5    That's not what the cases say.  It's certainly not what the

6    Supreme Court said in Griffin.

7          And indeed, in Griffin, as I suggested, the Supreme

8    Court talked about claims of detention, threats and battery as

9    also coming within the ambit.

10          So let me just again kind of repeat what I said.  If

11   you kind of think about what happened here, Your Honor, both

12   the torch-lit rally on March -- I mean, August 11 -- excuse

13   me -- the kind of temporary detention of worshipers at

14   St. Paul's Church on August 11 because of the horrible

15   violence going on outside and, of course, what happened at the

16   synagogue we think are all classic racially motivated

17   violence, badges and incidents of slavery acts.  I can go

18   into --

19          THE COURT:  Was there any property damage or injury

20   to anyone at the synagogue?

21          MS. KAPLAN:  I don't -- Your Honor, we didn't

22   allege -- we said that they had to do some stuff to, like, add

23   security measures, etc.  I don't there's -- there's not

24   secure -- there's not property damage for which we are making

25   a claim.

1        Our claim is under 1982, that the kind of marching

2   and intimidation that happened outside the synagogue Saturday

3   was a classic 1982 violation.  The courts have held that you

4   don't have to be an owner of the property.  You can be a

5   member of a synagogue.

6        In fact, Your Honor, sadly there seems to be a whole

7   line of Section 1982 synagogue cases.  It seems to be the most

8   common feature in 1982 of cases which we cited in our brief

9   where people do drive-by shootings or shouting or intimidation

10  of a synagogue.  It keeps Jewish people understandably fearful

11  given the blood and soil references, the torch-lit rally here.

12  I think any Jewish person would reasonably be fearful.

13       THE COURT:  If you walk past the synagogue and make

14  an anti-Semitic shout or something, that doesn't violate --

15  that is a First Amendment right.

16       MS. KAPLAN:  No.  And if an individual person in a

17  peaceful circumstance walks by the synagogue and calls

18  everyone in there kikes, that doesn't state a 1982 violation,

19  but that's not what we allege.

20       What we allege is that essentially armed groups of

21  men, mostly men wearing Nazi insignia, carrying weapons

22  marched around the synagogue, not only shouting Nazi slogans

23  but talking about burning it and bombing it and burning it

24  down.  And that kind of --

25       THE COURT:  All of that happened right there?

1          MS. KAPLAN:  Yes.  Part of it was because it was so

2    close to Emancipation Park.  So all the people who were at

3    Emancipation Park, it was a hop, skip and jump for them to go

4    over to the synagogue.  It's less than, as you know, a couple

5    blocks away to do that.

6          And we allege how the members of the synagogue,

7    including our plaintiff, were so incredibly fearful for

8    themselves, for their sacred objects in the synagogue, the

9    fact that they had to leave out the back door and since then

10   have had to implement all kinds of security measures to

11   continue to use the synagogue the way any American should be

12   able to use their house of worship.  So I think that covers

13   the 1983 -- the 1982, your Honor, as well.

14         The next element is injury.  Again, there doesn't

15   seem to be much of a dispute here that our plaintiffs were

16   injured.  To give you probably the most dramatic examples,

17   Plaintiff Magill had a stroke that the doctors attributed to

18   the events and stress of what happened.

19         Plaintiff Marcus Martin was hit by the car.

20   Plaintiff Wispelwey was, as you heard talked about earlier,

21   was intimidated, threatened, and maced during the events that

22   occurred.

23         Overt acts again, I think again we've talked about

24   that.  If there's a conspiracy, we obviously know there have

25   to be overt acts, and we have alleged numerous overt acts

1   throughout the complaint.

2          Let me -- if Your Honor has -- I'm happy to answer

3   any other 1985(3) questions, but I was going to go to the next

4   argument, if that's okay with Your Honor.

5          THE COURT:  Okay.  I just wanted to understand.  If

6   you're a member of one of these associations, how far does the

7   liability go?  How does the association become liable for the

8   members of its organization and have the members liable for

9   anything the organization may be --

10         MS. KAPLAN:  So you're talking about something like

11  the Traditionalist Worker Party or Vanguard America, etc.,

12  etc.  So those associations in and of themselves, themselves

13  responded, encouraged, promoted, asked people to come to the

14  event.  As I said before, some of them even had their own

15  Discord channels to do that kind of planning and

16  communication.

17         And then as I said before, for the most part, with

18  the exception of Defendant Fields who has not moved, we have

19  sued the people who were the leaders of the organization.  So

20  we're not suing, you know, kind of the people at the bottom.

21  We are not suing the spokes, again, for the most part.  We are

22  suing the leaders.

23         And it was very clear as you'll see in the

24  communications that it wasn't just individuals.  It wasn't

25  just Matt Heimbach as an individual in the Traditionalist

Worker Party supporting, planning, and conspiring for the events on August 11 and 12th.  It was the Traditionalist Worker Party itself.

And they talk about -- you heard, I think, a quote before about we acquitted ourselves as warriors.  That was discussion of a group of an association.  I don't recall which one, but they all use that similar kind of language.

Let me talk about defendants' argument about liability by association, Your Honor, because I understand your questions about that.  And as I've said, we've tried to be very careful about who we chose and why we chose them.  And we believe that each of the defendants we have chosen played a very prominent role and was an influential member or leader of the conspiracy.

If you turn to slide 12, Your Honor, that shows based on allegations in the complaints connections that the defendants had to each other prior to August 11 and 12th.  So these were not a bunch of random people who all happened to show up in Charlottesville on August 11 and 12th and then kind of get involved in a riot.  These were all people who knew each other, had multiple interconnections with each other well before August 11 and 12.

And to give you an example, Defendant Damigo is the founder of Identity Evropa.  Mosely, another defendant, became the leader of Identity Evropa in 2016.

1     The Traditionalist Worker Party was created by

2  Defendants Heimbach and Parrott.  Heimbach, along with Schoep

3  and Hill lead the Nationalist Front.  Schoep is also the

4  leader of the National Socialist Movement.  And Hill is also

5  the cofounder and president of League of the South.  So these

6  entities all have multiple interconnections not only by

7  association but with membership affiliates that preexisted

8  anything that happened August 11 and 12th.

9     I know there was an argument about the Nationalist

10 Front and whether it's just a website or it's truly an

11 organization.  On that, Your Honor, I believe an affidavit was

12 put in.  We believe we have a right in discovery to contest

13 that affidavit and there'll be an improper action for Your

14 Honor to take on a motion to dismiss.

15     In addition, Your Honor, following these slides we

16 have slides for each of the defendants who move to dismiss

17 with particularized allegations in the complaints about each

18 them.

19     And I'm not going to go through all of them, Your

20 Honor.  Your Honor can read them for yourself obviously.  But

21 just to start with Richard Spencer on the slide 13, there's

22 numerous allegations in the complaint about Mr. Spencer's

23 role, what he did and what he said.  Same thing, Your Honor,

24 for Mr. Kessler.  Same thing for Mr. Mosley.

25     And let me go forward, Your Honor, because I want to

give some time for my colleague, Ms. Dunn, to speak to

Vanguard America and James Fields, which is on Paragraph 22.

So there is a factual dispute here.  Again, I don't

think it's amenable for resolution on the motion to dismiss.

We argue that James Alex Fields showed up wearing the uniform

of Vanguard America on August 12.  We allege that he was

holding a shield with the insignia of Vanguard America on

August 12.

We believe, as Your Honor I'm sure has surmised, that

all of the discussions leading up to August 11 and 12th, the

discussions them called edgy jokes about running over

protesters were not truly edgy jokes, Your Honor.  They were

truly discussions and planning and encouragement of what they

wanted people like Mr. Fields to do.  And we believe that's

exactly what he did.

We understand that they're saying he's not a member,

but that is something that we will be able to explore in

discovery.  It is not an issue that we believe Your Honor

should resolve on a motion to dismiss.

One more thing, Your Honor, and then I'm going to let

my colleague take over.  And I think we have resolved the

other questions.  The state law, I think we can rest on our

brief unless you have any questions.

THE COURT:  No.

MS. KAPLAN:  But of course, Your Honor, a party is

liable for the reasonably foreseeable consequence of the
conspiracy. And that doesn't mean that the conspiracy has to
go exactly as planned. The drug conspiracies that you're
talking about, often all kinds of horrible things happen
during the course of a drug conspiracy. Sometimes people are
killed, perhaps not --

THE COURT: Everyone in a conspiracy is liable for
the reasonable -- what might reasonably be expected to happen
whether it's what was planned or not.

MS. KAPLAN: Right. So our allegations here are not
only that much of this stuff was planned, discussed, and
encouraged, but as Your Honor just said, they are also liable
for all the reasonably foreseeable consequences. And having
weeks and weeks and weeks of discussions telling people, you
know, if you beat up a nigger, it's not really beating
someone, telling people which weapons to bring, telling people
how to take a sock and put pennies in it to hit someone over
the head, talking about running over protesters, and even
worse, Your Honor, talking about the legality of running over
protesters. That was all planned for what they actually did.
And even if it wasn't planned, Your Honor, it was perfectly
reasonably foreseeable given the planning of this conspiracy.

Your Honor, I'm going to turn the table to my
esteemed colleague. And I'm obviously happy to answer any of
your questions.

1          THE COURT:  All right.  Thank you.

2          MS. DUNN:  Good afternoon, Your Honor.  Karen Dunn

3     from Boies Schiller Flexner for the plaintiffs.

4          Hopefully -- we took seriously Your Honor's

5     invitation to assist the court.  So hopefully you have the

6     second slide deck which should be titled "Constitutional

7     Defenses."  And I'll use that to assist in the argument.

8          THE COURT:  All right.

9          MS. DUNN:  When we're talking about constitutional

10    defenses, we're talking about the First Amendment and the

11    Second Amendment in this case.  Only 20 out of 25 defendants

12    raised a First Amendment defense, although I've heard

13    Mr. Kolenich raise it here on behalf of his 13 defendants, but

14    as to them we would argue these arguments are waived in any

15    event.

16         Out of the five who did, the briefing is very

17    general, talking about the importance of the First Amendment,

18    something that absolutely no one here would deny.  And out of

19    those five, only four of them raised the Second Amendment

20    defense.

21         So at the outset, Your Honor, because there's been a

22    lot of discussion already about speech in this case, I want to

23    make something very clear, which is that the plaintiffs in

24    this case believe in the importance of the First Amendment and

25    its protections.

1      And, in fact, it's because they believe in all of our

2 freedoms and protections in part why they decided to bring

3 this case rather than privately nurse the injuries that they

4 suffered.

5      If you look, Your Honor, on page 2 in the deck, it

6 cites Justice Black and his decision in *Giboney v. Empire*

7 *Storage & Ice Company,* a decision from 1949.  And as Your

8 Honor probably well knows, Justice Black was a big champion of

9 the First Amendment.  And he set us on the right track for

10 decades after, followed in the Supreme Court and other courts,

11 by telling us that the First Amendment does not protect

12 violations of valid statutes even if speech is part of the

13 course of conduct, because if it did, it would be practically

14 impossible to enforce the law.  So slide three is a road map

15 of our explanation of why the First Amendment would not be a

16 valid defense in this case.

17      The plaintiffs in this case allege that defendants

18 participated, as Ms. Kaplan explained, in a common plan, a

19 conspiracy to do violence and to intimidate and that the

20 plaintiffs were injured as a result.

21      The First Amendment, as is axiomatic under the law,

22 does not protect against violence.  It does not protect

23 against intimidation or legal conspiracies.

24      And so plaintiffs have alleged in the complaint words

25 of the defendants.  Of course, the defendants' words appear

and they appear for three reasons, none of which encroach on the First Amendment.

First, they appear to show that defendants were part of the conspiracy.

Second, the words are there to show that defendants had intent to do violence or to intimidate.

And, third, the defendants' words appear to show invidiously discriminatory animus, which is required under 1985(3). And we'll talk a little bit about each of those things.

Slide four talks about and lays out the case law here about violence and intimidation not being protected by the First Amendment. And the key cases there, I'm sure Your Honor is well familiar with, *Wisconsin v. Mitchell, American Life League v. Reno* in the Fourth Circuit -- that was Judge Michael's opinion -- and of course for true threats*, Virginia v. Black.*

So if I beat someone up because my view is I don't like their race, the First Amendment doesn't protect me. And that's true if I scream at them very loudly that I don't like their race and then beat them up. It's true if I get together with my friends and decide that together we're going to do that and scream at them together. And it's the same thing, Your Honor, if that happens on the Internet.

Intimidation, *Virginia v. Black*, as Your Honor has

previously applied in your decisions protects against a true
threat.  And importantly, as you've noted, the speaker does
not have to intend to carry out the threat.  They just have to
intend to place a person in fear of bodily harm or death.

And so slides five and six are meant to assist the
court by outlining the paragraphs of the complaint that allege
violent conduct on August 11 and 12th and allege intimidation
on August 11 and 12th.  And I think Ms. Kaplan amply described
some of the acts of violence, the assaults, the kicking, the
beating, the tear gas, the mace.  And so I think it's best if
I focus on a few of the allegations of intimidation because
those are arguable -- argued by the defendants.

THE COURT:  I don't think anyone seriously would
argue that the First Amendment protects violence or physical
harm to somebody to express your opinion.  Protects the words
but not violence.

MS. DUNN:  I think what they're -- the defendants'
arguments appear closer to saying, well, we're just saying
these horribly offensive words and that's protected speech.

And so just to point Your Honor to one example on
page 7 which is --

THE COURT:  The speech could be evidence -- if you
did all the beating someone up, your words might be evidence
of what your intention and the motivation is.

MS. DUNN:  Exactly.  So the words are, in our

complaint, evidence of intent, which is well accepted under
the law.  They are evidence of the formation of agreements and
participation in the conspiracy.  And they're evidence of
invidiously discriminatory animus, which is required under
1985.

And so, Your Honor, I just want to point out because
I heard defendants argue about how conclusory our complaint
is, and they seem to be upset that there is not enough detail.
And on the other hand in their briefs they argue that we are
quoting their words too much and we are talking too much about
the things that they said, but this specifically goes to the
allegations of the complaint.

For example, when Defendant Ray says, "The heat here
is nothing compared to what you're going to get in the ovens,"
maybe in some context that would be looked at as some sort of
protected speech.  In this context it was said during a
torchlight rally where people were throwing lit torches and
also throwing unidentified fluid on people.

So taken together, our complaint clearly does not do
what the defendants in their briefs and to some extent here
say, which is be unhappy about somehow offensive speech or
things that were said that people might not like.  I think the
detail of the complaint specifically goes beyond that.

Another example, Plaintiff Romero in the days
following August 12 when Defendant Fields drove a Dodge

Challenger into a crowd killing somebody received phone calls
to her house offering to sell her a Dodge Challenger.  So to
some extent, in some context that could be speech.  And here
it is a threat and it's intimidating.  And as Your Honor well
understands, it goes to the evidence that we will present
about the conspiracy to do violence and to intimidate.

So, Your Honor, most of our slide deck is really just
to help you break down what parts of our complaint are used as
evidence of a conspiracy and used as evidence of intent.

And it is a fairly unusual thing to have so much of
defendants' language at this point at the motion to dismiss
stage.  Normally you wouldn't even get this until later on.
And so we have alleged a lot of detail in this complaint.  And
that is a virtue of the fact that we have it, but we expect,
as Ms. Kaplan said, to receive more if Your Honor allows
discovery to proceed.

Your Honor, one thing that I do want to call Your
Honor's attention to -- I won't go through all of these -- but
is on slide 11.  There was a lot of discussion about
allegations with regard to Mr. Spencer.  And just generally
speaking, there is a conspiracy in this case where acts were
talked about on the Internet.  Acts exactly the same or
similar to those acts happened.  And then after members of the
conspiracy took credit for those acts.

And so on page 11, there is a particular allegation

to Mr. Spencer where following the Friday night torch march

where people are assaulted and there is violence and

intimidation, Spencer says to the crowd, "We own these

streets.  We occupy this ground."

        And so that -- in any conspiracy case, frankly if

there were no other allegations specific to him other than

that he was a leader of the conspiracy, that he knew these

people, the fact that he was a participant and a leader at an

event and then overtly claimed credit for it would be

sufficient to keep him in the case at the motion to dismiss

stage.

        Having some familiarity with these drug cases, if you

are the organizer of the drug conspiracy, you're not the

person who swallows the drugs and takes it on the airplane.

But if you are the person who helps set up the means to do

that or helps organize the plan to do that, and then

afterwards all that is alleged is you say to the person, you

know, great job doing that and that is evidence of your

agreement, of your conspiracy with others to do that and then

your speech of saying to the person who actually performs the

act, well done, good job for our team, you have basically

adopted what they have done as part of the conspiracy.  And

that is not dissimilar to what happened here.

        I think the leaders in this conspiracy didn't always

have their specific fingertips on the acts of the conspiracy,

and but they did help organize, and in many circumstances we are seeing evidence that they took credit for it after the fact.  I think it bears some discussion to talk about --

THE COURT:  Well, to take credit for that, for the violence, in effect you are saying that they admitted that they participated in the violence.

MS. DUNN:  Well, it's alleged that they did participate.  They were there.  They organized.  But I think it's additional evidence of their participation and their leadership if you're the person who subsequent to that addresses the crowd and claims victory after the assaults and after the violence and intimidation have taken place.

THE COURT:  Well, of course, if you prove that they planned it and at the end they took credit for it or said, you know, we did a good job, that's right.  But just taking and saying I'm happy this happened at the end of something doesn't make you part of the conspiracy.

MS. DUNN:  Well, that's true, Your Honor, but that's not all that we allege.

THE COURT:  Okay.

MS. DUNN:  I agree with you.  You just can't be a separate person and say it's great that that happened, but we include Mr. Spencer's comments in the complaint to show as evidence of his participation in the conspiracy.  And so when counsel to Mr. Spencer gets up and says there's no statements

1  from Mr. Spencer in the complaint, that's just not true.

2           In fact, there is a statement from Mr. Spencer after

3  he participates in the Friday night torch march and witnesses

4  all of the assaults to climb up and say to the crowd and

5  address the crowd to say, "We own these streets." And so that

6  at a motion to dismiss stage is certainly sufficient even

7  alone without the rest of what's alleged in the complaint to

8  keep him in the case.

9           THE COURT: "We own the streets"? I mean what --

10          MS. DUNN: "We own these streets. We occupy this

11  ground."

12          THE COURT: All right. Why -- how does that make him

13  conspiring to commit violence?

14          MS. DUNN: Well, it makes him part of the conspiracy

15  to do violence. Actually, I shouldn't say that. It is

16  evidence of his participation in the conspiracy to do

17  violence. And this taken together with the other allegations

18  in the complaint that just go to his relationships with the

19  other members of the conspiracy taken together are allegations

20  sufficient to keep him in this case.

21          But my point is that Mr. Spencer was not just some

22  sort of passive participant in this as his counsel would like

23  Your Honor to believe. He was an organizer. He was a leader.

24  He was the person who when in the immediate aftermath of this

25  happening addressed the crowd to say that the objective had

1  been achieved.  And so that's the point.

2          I agree with Your Honor it is not the only thing, but

3  all of these statements put together in the complaint are

4  evidence of the defendants' intent and of their participation.

5  So to look at these things in very discrete isolation is --

6  would be, I think, improper.

7          The reason conspiracies are pled in this way is as

8  Your Honor says.  At this point you wouldn't be able to

9  connect every dot.  Actually, here we are able to connect more

10 dots than is usually the case at the complaint stage, but it's

11 just not required.  It's not just required.

12         So let me quickly address the requirement of alleging

13 invidiously discriminatory animus under 1985(3).  So most of

14 the briefing on the First Amendment is a complaint about

15 plaintiffs' reliance on defendants' speech and saying that

16 we're just upset about offensive words.

17         And I think it is an important point to understand

18 legally that 1985(3) requires these statements to be in the

19 complaint.  It requires us to rely on statements or other

20 indicia that defendants had invidiously discriminatory animus.

21         And in Bray, which is a case that defendants rely on,

22 Justice Scalia of the Court, he recognizes that this is a

23 requirement.  And he says that not only do you need to say and

24 prove that there is invidiously discriminatory animus, you

25 have to show that these acts were done for this reason.

1        So the defendants cannot be heard to complain that we

2  have included allegations in this complaint that specifically

3  go to this requirement.  And so on page 13 we've listed some

4  of those, but that is why they're there.  They are not --

5  there is not a single allegation in this entire complaint that

6  alleges that plaintiffs are disturbed simply by offensive

7  speech.

8        I heard Mr. Kolenich raise the Skokie case.  The

9  Skokie case is not applicable here.  It is a case where the

10  Supreme Court only passed on an issue of prior restraint and

11  decided a prior restraint was not appropriate in a

12  circumstance where there was going to be a march.  The march

13  turned out to be a peaceful march.  And then the Illinois

14  Supreme Court issued what turned out to be a more or less

15  merits opinion.

16        *Virginia v. Black* relies on that case basically to

17  say you have to look at acts in context and that burning a

18  cross is not always something that is without First Amendment

19  protection, but in certain circumstances if it is accompanied

20  by other indications that it is motivated by animus, that it

21  is prohibited under a valid law, then it is punishable.

22        So in order to rely on this Illinois Supreme Court

23  case, you would have to ignore all of the law in this area

24  which talks about what conduct is actually prescribable under

25  the First Amendment and in particular all the case law under

1  1985(3).

2      And so here I will just say that most generally

3  construed, defendants' arguments about speech are essentially

4  an argument that 1985(3) is not constitutional because you

5  have to prove the purpose of the act, which is this

6  invidiously discriminatory animus, but there is a series of

7  cases, and I will just name them in case this is helpful to

8  Your Honor: *Wisconsin v. Mitchell*; *Thomasson v. Perry,* which

9  is a Judge Wilkinson opinion; *American Life League*, which is a

10 Judge Michael opinion, that all discuss that if a law is

11 content neutral, which 1985(3) is, then that is perfectly

12 permissible and there is no First Amendment forcing that they

13 draw analogy to the Title 7 context.

14      A number of the arguments that defendants make are

15 not -- are really not proper at the motion to dismiss stage.

16 Mr. Peinovich pointed to Paragraph 141 of the complaint.  And

17 he says, well, when I made the point I was making in

18 Paragraph 141, I was really just issuing a warning that

19 violence could happen.  And so this is not a reason for a

20 complaint to be dismissed or to find that Mr. Peinovich is

21 protected under the First Amendment against enforcement or

22 proceeding of the case under 1985(3).

23      What he has effectively done is he has teed up what

24 is a fact dispute.  And hopefully he has also now conceded, to

25 some extent, knowledge of what happened.  And so if Your Honor

allows this case to proceed, what is going to happen is there
will be an argument between the parties about whether
Mr. Peinovich was evidencing his intent, was evidencing
knowledge that violence was going to happen because he was
helping to plan violence, or was he just simply issuing a
warning to people that violence can happen and he was looking
out for their welfare.

          And so the other citations in the briefs -- and this
is mainly Mr. Peinovich's brief, Mr. Spencer's brief and
Mr. Hill, Mr. Tubbs and League of the South brief.  They
characterize the things that they were saying as just edgy
jokes.  They say we have no sense of humor, which I assure
them is not the case, and they say that their statements were
just bravado.  So these are fact disputes.  They are allowed
to say that.  And I assume if this case goes forward, we'll
have that conversation some more.

          They rely heavily on Brandenburg.  I assume Your
Honor knows at this point we are not alleging incitement.
That is not our basis for liability.  There are a few
allegations in the complaint that are alleged incitement.

          Like, for example, when one of the defendants yells
"charge" and then people charge into a group.  So there are
incidents of incitement, but we do not rely on meeting the
Brandenburg standard for satisfying our burdens on the motion
to dismiss.

1      Unless Your Honor has questions about the Second

2   Amendment, I will skip discussion of that.

3          THE COURT:  I don't think that's necessary.

4          MS. DUNN:  And I think just on behalf of all us, Your

5   Honor, we really appreciate the generosity of your time.

6          THE COURT:  It's your time.  It's not my time.

7          All right.  Would you like to respond?

8          MR. KOLENICH:  Thank you, Your Honor.  It's

9   remarkable after the way they drafted their complaint that

10  they are standing up here saying we really just needed to

11  prove racial animus for 100-and-whatever pages and however

12  many hundreds of paragraphs.  Your Honor doesn't need to spend

13  one single second worrying about that.  For purposes of the

14  motion to dismiss, my clients had racial animus.  Admitted.

15  No problem.

16          The Skokie case is directly relevant.  Nobody is

17  saying you can immunize yourself from being sued over violence

18  because it also has a political component to it.

19          What we're saying is if all you do is use speech,

20  unless it's prescribed by Section 1982 with those particular

21  requirements, it's protected under the First Amendment.  It is

22  not actionable.  It is not actionable that they had swastikas.

23  It is not actionable that they had anti-Semitic T-shirts.  It

24  is not actionable that they said anti-Semitic things.  It is

25  not actionable that they said racial things.  It is only

actionable if it morphs into conduct. And they have a problem
with their conspiracy allegation. They need to prove before
the conduct occurred.

There's a lot of talk about what they said
afterwards, great, awesome, we got our guys out, and worse. A
woman died in a car accident and people are on the Internet
laughing about it. And I promise you, Your Honor, right now
while I'm standing here, somebody on the alt-right is
publishing something on the Internet that is not helpful to
their case. It's not civilized, not a good idea. And no
matter how many times the lawyers tell them that, it doesn't
help. Many of them, that's how they are, but post hoc
statements don't help them prove a conspiracy. They cannot by
their nature help them prove a conspiracy without the
preparatory planning.

And again, as I said before, there's a lot of
planning. Again, admitted. The court doesn't need to worry
about that, but what is it planning for? In the universe of
their complaint, what are they planning? They're planning to
go to Charlottesville. They're planning to go Charlottesville
and march around and insult racial minorities and religious
minorities for a political purpose. At the end of the day,
the political purpose is about a local statue.

Forgive me. I'm from Ohio. I don't even know what
statue it is or what general it is, and it's about opposition

to multiculturalism in general, which are perfectly
permissible First Amendment protected speech.

To the extent that any violence happened, if they
have alleged any violence in their complaint -- limiting
ourselves to their complaint as we must -- all they've got is
in the spur of the moment somebody threw some torches.  That's
it, or Robert Ray shouted at the people in front of a
synagogue, or somebody maced somebody back by the statue.
There is no evidence of planning for that.

There's evidence of planning to bring torches.
There's evidence of planning to bring mace and use sticks and
whatever else as weapons if necessary.  And that's in the
Discord.  And that's in their complaint, the little snippets
that they put in the complaint, but there is no evidence of an
overarching conspiracy that anybody could have joined to
affirmatively commit these acts of violence.

And again, they want the Court to use the presence of
a swastika and the presence of the phrase "blood and soil" and
other such Nazi imagery because of the effect it has on Jewish
people and people in a synagogue.  The First Amendment doesn't
allow for that.  The Skokie case stands for that.

And I'm not sure counsel got that case exactly right.
If I'm not mistaken, that march didn't actually happen.  They
decided not to hold it after they got the permission to hold
it, or at least one of the scheduled marches didn't happen.

1        So the violence that was committed, James Fields, the

2   car attack, where is there anything in the Discord planning

3   that?  Negligence is not enough.  Recklessness also is not

4   enough.  It has to be intentional misconduct.  They have to

5   intentionally have planned to run people over in

6   Charlottesville for this conspiracy to stick, for this to

7   survive a motion to dismiss.

8        THE COURT:  Aren't there sufficient allegations that

9   Fields intentionally ran people over?

10       MR. KOLENICH:  There is certainly sufficient

11  allegations that Fields intentionally ran people over.  What

12  we're saying is that there were no sufficient allegations that

13  that was part of the a priori conspiracy even in the moment.

14       When did he decide to intentionally run people over?

15  When -- you know, they basically stood up here and said

16  Vanguard America, which is one of my clients, told Fields to

17  run people over.  That's not in their complaint.  They want

18  you to deduce that again from the First Amendment protected

19  speech.  That's our whole point.

20       The Court may disagree with us when you review the

21  pleadings, but that is the only point we're trying to make

22  with the motion to dismiss.  We are not saying -- I think

23  there's some confusion on this -- that 1985 isn't applicable.

24  We are not saying that the Thirteenth Amendment and

25  Section 1982 don't support a 1985(3) conspiracy claim.  There

are hundreds of reported cases on the subject.  It absolutely

does.  Racial animus is an element of that, but again we are

conceding that for purposes of this motion.  So that's not our

argument.  If other people are going to make that argument,

great.

        We're not saying that each and every member of the

conspiracy had to agree to each and every part of the violent

acts.  That's not my clients' argument.  If other people want

to make that, okay, but you don't have to worry about that for

our motion.

        What we're saying is there are no sufficient

allegations that our people agreed to do anything except go to

this rally carrying torches, carrying mace, on and on and on.

        They did not plan to or agree to attack anybody.

Now, and that's not -- that's not an obtuse legal concept.

You know, if a Sears repairman goes to somebody's house to

repair their dishwasher and then he goes over and commits a

rape of someone living in the house, Sears gets off the hook.

That's not what they sent him there to do.

        Now, if Sears sends them in the house and they said,

hey, grab the lady's wallet while you're there, they're still

not liable for the rape even though they sent him in there to

commit a crime because he went beyond what they told him to

do.

        So all of these criminal acts either happen -- or

these violent acts, I should say, either happen on a
spur-of-the-moment conspiracy between a limited number of
people who don't involve all of my clients, or in most cases
any of them, or they exceeded what my clients did agree to go
there to do and, therefore, my clients can't be held liable.

My clients at worst were reckless with the language
in what they sent people in there to do. This was no
actionable intent -- they haven't pled any -- to commit the
violent acts they're complained of, most especially not the
James Fields car attack.

Thank you, Your Honor.

THE COURT: Thank you. Sir?

MR. JONES: Your Honor, the difficulty for plaintiffs
is that there are 25 separate defendants. And it's not enough
to simply say all the defendants conspired to engage in
violent acts. They have to show particular facts for each
particular defendant, as Your Honor pointed out. Hopefully in
their memorandum --

THE COURT: Well, you don't have to show that each
committed a violent act but they conspired, each was a member
of a conspiracy to commit a violent act.

MR. MALE SPEAKER: That's right. And what we have
here, Your Honor, as was the case in Twombly, I think, is
parallel conduct. We have my clients, Mr. Hill, Mr. Tubbs,
League of the South attending the same planned rally as the

other defendants.  There were hundreds if not thousands of
people at that rally.  The plaintiffs are trying to hold my
clients responsible for everything, all the violence that
happened on those two days.  I don't think they have
sufficiently pled facts to show there was a conspiracy to
satisfy the Twombly standard.

            Thank you, Your Honor.

            THE COURT:  Thank you, sir.

            MR. DiNUCCI:  Thank you, Your Honor.  I'm not sure
how much time I have.  I'm sure you will tell me when to stop.
Thank you, Your Honor.

            Judge, one of the points that opposing counsel made
is that the arguments of defendants are tantamount that
1985(3) is unconstitutional.  I'm not arguing that.

            My position, Judge, given the facts pleaded in this
complaint and the cases I cited earlier, 1985(3) doesn't
apply.  They don't have any claim for violation of equal
protection or freedom association, freedom of speech because
there's no state action here.

            To the extent they try to bootstrap themselves into
1985(3) through the Thirteenth Amendment with one exception,
that of Ms. Pearce, they don't cite any implementing statute
under Section 2 of the Thirteenth Amendment.  So the
Thirteenth Amendment doesn't apply.

            With respect to Ms. Pearce's claim, as I recall the

allegations, her situation, if you will, is different from

that of the plaintiffs in -- I think it was Brown and Greer.

There was no act of violence at or within the synagogue.

There was no physical damage to the synagogue. There was no

personal injury to Ms. Pearce. Nobody laid a hand on her if I

recall correctly the allegations of the complaint. So the

simple fact is 1982 doesn't apply here. They haven't pleaded

facts to make it applicable.

        Now, there is talk about -- I believe this is the

*Waller v. Butkovich* case that's been cited by the plaintiffs

and talking about how supporters of black people and their

equal rights, their civil rights have standing to sue.

Assuming the argument under that is true -- and I don't agree

with that. I haven't seen a Supreme Court case that says

that.

        In fact, to the extent there's a reference in

Breckenridge to supporters, it's in discussing the legislative

history of the civil rights acts or the Ku Klux Klan Act -- I

always forget which title it is -- from the post Civil War

era.

        I haven't been able to find a U.S. Supreme Court case

that says supporters have the standing that the plaintiffs

claim they do. But assuming that they do, the plaintiffs'

case, *Waller v. Butkovich,* which is 584 F. Supp. 909 -- it's

from the Middle District of North Carolina -- says at

page 937, "The Court notes, however, that to succeed on this ground," meaning supporters have rights, "the plaintiffs must prove that they were identifiable in defendant's eyes as member of a class of advocates of equal rights for black people; otherwise, the defendants could not have singled them out as objects of conspiracy on this ground."

There's no pleading of facts along those lines. There's no pleading, for example, that any defendant knew any of these plaintiffs, saw any of these plaintiffs, could figure out who they were and what they were there for. We don't have any facts like that pleaded.

There was some discussion by counsel of the post Rotunda march statements by Mr. Spencer. It begs that he may have said what -- and I think it's Paragraph 175. "We own these streets. We occupy this ground." That begs to question was there a conspiracy? That doesn't prove there was a conspiracy.

Where are the allegations that show the communications that command the direction? Now, to the extent there is a statement that Mr. Spencer -- allegation that Mr. Spencer was a leader, it's conclusory. Prove -- excuse me. Plead facts, as I would submit they have to, that shows he was actually leading a conspiracy.

With respect to, again, the Thirteenth Amendment, it's adamantly our position there has got to be some

1  implementing legislation on which the claims are based.

2        The Thirteenth Amendment does not create a private

3  cause of action.  And to the extent it might be tantamount of

4  saying there is a private cause of action, the case

5  Breckenridge is distinguishable.  The right to interstate

6  travel was implicated.  That's not implicated here.

7        With respect to Mr. Fields and acts of other people,

8  there is a serious question of foreseeability here.  And

9  there's certainly no allegations that I can find that

10 Mr. Spencer or any other individual defendant intended that a

11 vehicle be used to cause great bodily harm or death of

12 anybody.  There is nothing in the complaint about that.

13 There's certainly no communications amongst the defendants.

14        THE COURT:  It wouldn't make it -- if hypothetically

15 you plan to have, you know, to do violence, you have a

16 conspiracy to commit violence at a particular gathering, it

17 doesn't make any difference how the violence was committed.

18 If somebody did something which was totally unusual, if you

19 planned to commit violence and violence is committed, it

20 doesn't make a lot of difference how it was committed.

21        MR. DiNUCCI:  Assuming arguendo that's correct -- and

22 I'm not challenging Your Honor --

23        THE COURT:  Right.

24        MR. DiNUCCI:  -- the fact remains they haven't

25 pleaded that it was intended that such an act occurred.  And

they haven't sufficiently pleaded any more broadly that is was
intended that violence occurred.  There's not any allegation
by Mr. Spencer to that effect.

So if there is not an allegation that he intended
that violence occur, how is he part of a conspiracy that leads
to liability for what Mr. Fields did?  It's not --

THE COURT:  I'm saying hypothetically the fact that
if there was a conspiracy to hurt, injure the protesters or
counterprotesters, it wouldn't make any difference that you
maybe thought they were going to use billies and clubs and
guns and somebody used a car to run somebody down.

MR. DiNUCCI:  Well, and I do think -- maybe it's not
for today -- there's going to be arguments about
foreseeability.  What if somebody showed up with an M1 Abrams
tank?

THE COURT:  Well, but if you plan to kill them with a
little handgun, a Saturday night special and they got killed,
I don't think it would make any difference probably to the
victim.

MR. DiNUCCI:  I'm not going to disagree with that,
Your Honor.  Let me move on.

THE COURT:  I don't mean to go on, but I think that
generally if you are going to -- you are going to the bank to
rob a bank and you don't anticipate, you don't know that
somebody has got a gun but they pull a gun and use it, you

```
 1   know, that's part of the conspiracy.
 2              MR. DiNUCCI:  I understand your point, Your Honor.
 3              THE COURT:  You could be liable except maybe in
 4   Virginia.  I think there is an exception.
 5              MR. DiNUCCI:  Judge, there was some discussion by
 6   Ms. Kaplan about -- I think it's Paragraph 78 of the complaint
 7   to a reference to a man -- I think it's a man -- who is
 8   supposedly a bodyguard for Mr. Spencer.  And that was in the
 9   context of the discussion about Discord.  Again, there is no
10   allegation in the complaint that Mr. Spencer had access to
11   utilize Discord.
12              And the fact that the plaintiffs are referring to
13   this alleged bodyguard of Mr. Spencer is tantamount to a
14   concession they have no evidence whatsoever -- and they
15   haven't pleaded any -- that Mr. Spencer actually used Discord.
16              THE COURT:  You need to sum up.
17              MR. DiNUCCI:  Lastly, Judge, just a procedural point.
18   There was reference to some demonstrative exhibits, I will
19   call them.  I would object to the consideration of anything in
20   those packets because they're outside the complaint.
21              Thank you, Your Honor.  I appreciate it.
22              THE COURT:  Well, we are looking at the pleadings.
23              MR. DiNUCCI:  Understood, Your Honor.
24              THE COURT:  Not anything --
25              MR. DiNUCCI:  Just being careful.  Thank you, Your
```

1  Honor.

2          THE COURT:  Thank you, all.  I appreciate your

3  argument.

4          Oh, I'm sorry.  I forgot all about you.

5          MR. PEINOVICH:  That's okay.  It happens.  I had a

6  quick --

7          THE COURT:  A lot of defendants like that.

8          MR. PEINOVICH:  I have one important point I'd like

9  to make.  Your Honor correctly asked Ms. Kaplan if it was

10  possible for someone to attend the rally with no intention of

11  being involved in this alleged conspiracy of which the

12  plaintiffs have been begging the question that it even existed

13  at all throughout their pleadings without having sufficient

14  facts to support that, and she said it was.

15          So given that, one of the most important standards

16  that they have to meet in order to survive our motions to

17  dismiss is plausibility.  They have to go -- their story has

18  to be more plausible than an alternative explanation for the

19  same facts.  And the most obvious alternative explanation for

20  the same facts is that this was a political rally, and

21  political activists were attending the rally.

22          There was nothing that would -- nothing in the facts

23  pled specifically as to me particularly that would indicate I

24  had any intent or was involved any conspiracy.  You know, when

25  people plan together or even just talk about plans that other

1  people have made, you know, they're attempting to take that

2  and nudge it up to this line of, you know, credibility.  But

3  the fact is that if it's an already planned legal event, which

4  unfortunate events happen and they are sort of post hoc trying

5  to fit this all together in some kind of conspiracy, it

6  doesn't work.  And she admitted that there's a possibility

7  that people could attend this rally that had no intent of

8  violence.

9        And given that there's no facts pled that would

10  indicate that specifically me -- and I would argue really

11  anybody -- had this intent, it doesn't survive the motion to

12  dismiss.

13        That's all.  Thank you very much, sir.

14        THE COURT:  Thank you.  All right.

15        Did you have something?  Okay.  Thank you.

16        Thank you, all.  I appreciate your argument and your

17  patience.  And I will let you hear something reasonably soon.

18  Thank you.

19        THE MARSHAL:  All rise.

20     (Court recessed at 12:56 p.m.)

21

22                    CERTIFICATE

23  I, Tracey Aurelio, certify that the foregoing is a

24  correct transcript from the record of proceedings in

25  the above-entitled matter.

```
 1

 2    /s/  Tracey Aurelio              Date:  May 31, 2018

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```