UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

**ELIZABETH SINES, ET AL.,**     Case No. 3:17-cv-00072-NKM

**Plaintiffs,**     Hon. Norman K. Moon
v.

**JASON KESSLER, ET AL.,**

**Defendants.**

### DEFENDANT MICHAEL PEINOVICH'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PEINOVICH TO RESPOND TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

Defendant Michael Peinovich, pro se, submits this memorandum in opposition to plaintiffs' motion to compel Peinovich to respond to plaintiffs' Second Set of Interrogatories. As explained below, Plaintiffs' motion fails because:

- the information plaintiffs seek is irrelevant and in fact sought for improper purposes;

- Peinovich's declination to disclose the identity of an attorney who has assisted him is consistent with ethical norms as set forth, e.g., in American Bar Association Formal Opinion 07-446;

- Peinovich has a right to request that the attorney assisting him keep the representation confidential and Peinovich has made this request;

- although Peinovich is not required to show potential harm to this attorney from disclosure of his identity, Peinovich has done so;

1

- and Peinovich's non-disclosure has not caused unnecessary delay or otherwise interfered with efficient case management.

At the outset, Peinovich would emphasize that although he has been assisted by an attorney, he has not simply attached his name to pleadings prepared by the attorney or anyone else. Although not an attorney, Peinovich is an intelligent and knowledgeable person strongly interested in First Amendment and other legal issues and has been and remains an active, fully participating pro se litigant who takes ownership and final control of his pleadings, including arguing his motion to dismiss before Judge Moon. Peinovich's consulting attorney has helped Peinovich with such things as providing templates for Court filings and doing some case law research, but much of the writing and research behind Peinovich's pleadings are his own work. Peinovich is fully aware and understands the arguments and case law behind all of his filings.

## I. THE INFORMATION PLAINTIFFS SEEK IS NOT RELEVANT

Plaintiffs incorrectly state that "Peinovich does not object to the Interrogatory on relevance grounds." Pls' Motion at 7. In reality, in his revised objections and responses (attached as Exhibit 1) Peinovich stated as follows:

> This interrogatory seeks information not relevant to any party's claim or defense, and Peinovich objects to it on this ground. Moreover, even assuming, contrary to fact, the information sought by the interrogatory had some remote relevance, it is not proportional to the needs of the case, the parties' relative access to relevant information, the importance of the issues at stake, the importance of discovery in resolving the issues, and the burden and expense of the discovery when compared to its likely benefit, which is zero.

Plaintiffs are well aware of Peinovich's revised objections and responses. Peinovich sent them in an email to plaintiffs dated June 11, 2018. As shown in this email chain (attached as

Exhibit 2) plaintiffs' attorney Christopher Greene says on June 20, 2018 that while he has not had time to review the revised responses, he would be happy to meet and confer with Peinovich about further production of documents. That telephone conference between Peinovich and Greene happened on June 21, 2018. It is understandable if plaintiffs are busy and have not had time to review the revised documents, but then they should not be complaining to the Court about case efficiency or filing pleadings based on outdated documents.

Peinovich's relevance objection is valid and dispositive of plaintiffs' motion. Plaintiffs have no true need to learn the identity of the attorney assisting Peinovich. The merits of Peinovich's pleadings are not dependent on whether he prepared them entirely himself or with the assistance of an attorney. Peinovich has never requested or received special treatment because he is proceeding pro se. Plaintiffs' interrogatory and motion to compel are in reality attempts to cut Peinovich off from receiving any attorney assistance and, accordingly, even assuming they seek information having remote relevance, are "not proportional to the needs of the case, the parties' relative access to relevant information, the importance of the issues at stake, the importance of discovery in resolving the issues, and the burden and expense of the discovery when compared to its likely benefit."

## II.    PEINOVICH'S NONDISCLOSURE OF THE IDENTITY OF THE ATTORNEY ASSISTING HIM IS CONSISTENT WITH ETHICAL NORMS

Plaintiffs contend that Peinovich's nondisclosure of the identity of an attorney assisting him as he proceeds pro se violates attorney Rules of Professional Conduct. In the last decade or so, however, highly respected courts, ethics committees, and legal scholars have convincingly moved away from the position plaintiffs advocate.

The American Bar Association Standing Committee on Ethics and Professional Responsibility's 2007 Formal Opinion 07-447, titled "Undisclosed Legal Assistance to Pro Se Litigants," was a watershed in the evolution of views on this question. There, the ABA's Ethics Committee, after reviewing the divergent opinions on this topic and its own prior Informal Opinion 1414, ruled as follows: "A lawyer may provide legal assistance to litigants appearing before tribunals 'pro se' and help them prepare written submissions without disclosing or ensuring the disclosure of the nature and extent of such assistance." The Committee further stated (at pages 2-3, footnotes omitted):

> Whether the lawyer must see to it that the client makes some disclosure to the tribunal (or makes some disclosure independently) depends on whether the fact of assistance is material to the matter, that is, whether the failure to disclose that fact would constitute fraudulent or otherwise dishonest conduct on the part of the client, thereby involving the lawyer in conduct violative of Rules 1.2(d), 3.3(b), 4.1(b), or 8.4(c). In our opinion, the fact that a litigant submitting papers to a tribunal on a pro se basis has received legal assistance behind the scenes is not material to the merits of the litigation. Litigants ordinarily have the right to proceed without representation and may do so without revealing that they have received legal assistance in the absence of a law or rule requiring disclosure. Some ethics committees have raised the concern that pro se litigants "are the beneficiaries of special treatment," and that their pleadings are held to "less stringent standards than formal pleadings drafted by lawyers." We do not share that concern, and believe that permitting a litigant to file papers that have been prepared with the assistance of counsel without disclosing the nature and extent of such assistance will not secure unwarranted "special treatment" for that litigant or otherwise unfairly prejudice other parties to the proceeding. Indeed, many authorities studying ghostwriting in this context have concluded that if the undisclosed lawyer has provided effective assistance, the fact that a lawyer was involved will be evident to the tribunal. If the assistance has been ineffective, the pro se litigant will not have secured an unfair advantage. . . .
> Because there is no reasonable concern that a litigant appearing pro se will receive an unfair advantage from a tribunal as a result of behind-the-scenes legal assistance, the nature or extent of such assistance is immaterial and need not be disclosed.

The Committee, at pages 3-4, also rejected the argument that nondisclosure of the fact of legal assistance is dishonest so as to be prohibited by Rule 8.4(c). It further noted, at pages 3-4, that a lawyer may be obliged under Rules 1.2 and 1.6 not to reveal the fact of the representation.

Four years after – and influenced by -- the ABA opinion, the Second Circuit in *In re Fengling Liu*, 664 F.3d 367 (2d Cir. 2011) reached a similar view. After reviewing the various authorities on this question, the Court summarized (at pages 371-72):

> In light of the ABA's 2007 ethics opinion, and the other recent ethics opinions permitting various forms of ghostwriting, it is possible that the courts and bars that previously disapproved of attorney ghostwriting of pro se filings will modify their opinion of that practice. *See Robbins*, supra, at 290 ("Almost all of the federal cases and state ethics opinions opposing ghostwriting were issued before the May 2007 ABA opinion. Because most states look to the ABA Model Rules when adopting and amending their own rules of professional conduct, the coming years may see a number of courts and states take a more relaxed stance on ghostwriting.") (internal footnote omitted); NYCLA Comm. on Prof'l Ethics, Op. 742 at 3 (noting "trend in favor of ghostwriting").

The court then concluded that the "ghostwriting" in that case did not constitute misconduct (page 372): "In light of this Court's lack of any rule or precedent governing attorney ghostwriting, and the various authorities that permit that practice, we conclude that Liu could not have been aware of any general obligation to disclose her participation to this Court."

In 2014, the Virginia State Bar Committee on Legal Ethics, citing, among other authorities, both the ABA's 2007 ethics opinion and the Second Circuit's *In re Fengling Liu* opinion, joined the trend permitting nondisclosure of attorney assistance to pro se litigants. The Committee concluded (pages 10-11):

> To sum up, the Committee does not believe that nondisclosure of the fact of legal assistance is dishonest so as to violate Rules 3.3 or 8.4(c). Whether it is dishonest for the lawyer to provide undisclosed assistance to a pro se litigant turns on whether the court would be misled by failure to disclose such assistance. The lawyer is making no

representation to the tribunal regarding the nature or scope of the representation, and indeed, may be obliged under Rule 1.6 not to reveal the fact of the representation. Absent an affirmative statement by the client that can be attributed to the lawyer that the documents were prepared without legal assistance, the lawyer has not made any false statements of fact to the court prohibited by Rule 3.3, nor has been dishonest within the meaning of Rule 8.4(c). The non-disclosure of the lawyer's behind-the scenes assistance is not material to the court's determination of the merits of the pro se litigant's position or case and therefore the court is not misled by the non-disclosure.

While this Committee opines that undisclosed assistance to a pro se litigant is permissible under the Rules of Professional Conduct, if a lawyer agrees to prepare a lawsuit for a pro se litigant, he or she must do so competently and may not prepare one that is frivolous. See Rules 1.1 and 3.1. Preparing a lawsuit for a person to file pro se requires that the lawyer make a sufficient inquiry of the facts and research of applicable law to ensure that the pleading contains claims that are not frivolous. Further, depending on the complexity of the case and the sophistication of the limited scope client, the preparation of a lawsuit for the limited scope client may not be an appropriate means by which to accomplish the client's objectives. See Rule 1.2. When limited scope representation is considered for a pro se litigant, the lawyer must meet the "consultation" requirement of Rule 1.2 by explaining to the client the advantages and disadvantages of limited scope versus full representation.

This Committee concludes that the Rules of Professional Conduct do not prohibit undisclosed assistance to a pro se litigant. However, lawyers who undertake to prepare or assist in the preparation of a pleading for a pro se litigant may advise the pro se litigant to insert a statement to the effect that "this document was prepared with the assistance of a licensed and active member of the Virginia State Bar." Because the fact of the lawyer's assistance may be confidential under Rule 1.6(a), the lawyer should not include such a statement if the client objects to revealing that fact.

In addition to these authorities, several legal commentators have advocated that nondisclosure of the fact of attorney assistance to pro se litigants not be regarded as unethical. *See, e.g.,* Blake George Tanese, *Give Ghosts a Chance:  Why Federal Courts Should Cease Sanctioning Every Legal Ghostwriter*, 48 Ga. L. Rev. 661 (2014).

About half the cases plaintiffs cite in their memorandum were issued before the ABA's 2007 ethics opinion.  Moreover, the plaintiffs cite no opinion by this Court or the Fourth Circuit requiring disclosure of the identity of an attorney who provides assistance to a pro se litigant, and certainly none decided after the trend allowing nondisclosure had begun to gain momentum. This

6

Court, accordingly, is free to decide this issue with a fresh perspective, informed by the cogent reasoning of the ABA's opinion and the other authorities permitting nondisclosure.

### III. ETHICAL RULES 1.2 AND 1.6 CORROBORATE THAT NONDISCLOSURE OF THE FACT OF ATTORNEY ASSISTANCE TO A PRO SE LITIGANT IS ETHICALLY PERMISSIBLE, INDEED REQUIRED IN SOME INSTANCES, INCLUDING THIS CASE

As noted in the ABA's and Virginia Ethics Committee's ethics opinions, a pro se litigant's prerogatives under ethical rules 1.2[1] and 1.6[2] are important factors supporting the conclusion that nondisclosure of the fact of attorney assistance to a pro se litigant is ethically permissible. Under Rule 1.2, a pro se litigant and the assisting attorney may limit the nature of the representation, i.e, "unbundle" the services the attorney offers such that the pro se litigant avails himself of some but not all of the range of legal services the attorney could provide. Retaining an attorney, in short, is not an all or nothing proposition but may be limited if the limitation is reasonable and the attorney explains to the pro se litigant the advantages and disadvantages of limited scope versus full representation. Under Rule 1.6, the pro se litigant

---

[1] Rules 1.2(a) and (c) of the Model Rules provide: "(a) Subject to paragraphs (c) and (d), a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter… (c) A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent."

[2] Rule 1.6(a) of the Model Rules provide: "(a) A lawyer shall not reveal information relating to the representation of a client unless the client give informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted by paragraph (b)."

may instruct the attorney to keep the relationship confidential and the attorney is then ethically obligated to do so.

Plaintiffs' position as expressed in their motion contravenes Rule 1.2. Plaintiffs' grievance – which is not correct – that Peinovich's pro se status has caused "unnecessary delay" rests on the premise that Peinovich is obligated to choose a relationship with his attorney – an allocation of legal tasks -- that is most convenient for the plaintiffs, so they can more easily destroy Peinovich's vocation, reputation, and First Amendment rights. Plaintiffs, in short, presume to dictate the nature of Peinovich's relationship with his assisting attorney to suit their own purposes. What remarkable arrogance.

Plaintiffs' position also contravenes Peinovich's prerogative under Rule 1.6 to instruct his attorney to keep their relationship confidential. Peinovich states affirmatively that he has so instructed his attorney. His attorney is ethically obligated to comply. Plaintiffs have no right to interfere with that relationship for their own self-serving ends.

## IV. ALTHOUGH NOT NECESSARY, PEINOVICH CAN SHOW THAT DISCLOSURE OF THE IDENTITY OF HIS ASSISTING ATTORNEY PRESENTS A LIKELIHOOD OF SIGNIFICANT HARM TO THE ATTORNEY

Peinovich's nondisclosure of the identity of an attorney assisting him is ethically permissible whether or not Peinovich presents evidence that the attorney would be harmed by disclosure. As a matter of fact, however, Peinovich can present such evidence.

At least one of the plaintiffs in this case, Seth Wispelwey, and undoubtedly many of the others, are closely linked to AntiFa and other groups who openly proclaim their intentions to threaten and harm others and to disregard the law. The following is a quotation from page 72-73

of the November 24, 2017 Independent Review of the 2017 Protest Events in Charlottesville, Virginia prepared by Timothy Heaphy of Hunton and Williams (the "Heaphy Report") (attached as Exhibit 3, also linked here: http://apps.washingtonpost.com/g/documents/local/report-reviewing-protest-related-events-in-charlottesville/2654/):

> Led by Seth Wispelwey and Brittany Caine Conley, these individuals formed a new group called Congregate Charlottesville. Wispelwey told us that the Clergy Collective was too close to the City "establishment" and lacked transparency. He explained that Congregate Charlottesville's goal was to "equip faith leaders to show up on matters of justice." They put out a call for 1,000 clergy to attend the August 12 event. In the weeks leading up to August 12, Congregate organized a series of trainings for nonviolent direct action to anyone who was interested in participating. They brought in trainers from out of town, including Reverend Osagyefo Sekou. We learned that some trainings were attended by as many as 100 people, and participants were repeatedly warned about the potential for significant violence on August 12. Members of Black Lives Matter and Standing Up for Racial Justice also attended the trainings.
>
> Individuals who attended these trainings told us that their goal was to create "cognitive dissonance" and to delay and obstruct the hate speech that they expected. They wanted to be visible in the opposition to the right wing groups and make it harder for them to have a platform to express racism. In service of that mission, they were willing to break the law and expected to be arrested.

Mr. Wispelwey has been particularly emphatic in his support for AntiFa's tactics. The following is an excerpt from an article dated August 17, 2017 by "Crimethinc.Ex-Workers Collective" [an AntiFa publication] entitled "Why We Fought in Charlottesville: A Letter on the Dangers Ahead" (attached as Exhibit 4 and linked here in its entirety: https://itsgoingdown.org/fought-charlottesville-letter-dangers-ahead/):

> I am one of the thousands of people who confronted Nazis and white supremacists in Charlottesville, Virginia last weekend. I am a blue-collar person, with a job, family, and responsibilities. I would have preferred to do other things with my weekend. However, I had to ask myself: *If these people are allowed to run roughshod over this town, what will they do next?*
>
> \* \* \* \* \*
>
> No, I did not behave peacefully when I saw a thousand Nazis occupy a sizable American city. I fought them with the most persuasive instruments at hand, the way both my grandfathers did. I was maced, punched, kicked, and beaten with sticks, but I gave as good as I got, and usually better. Donald Trump says that "there was violence on both sides." Of course there was.
>
> \* \* \* \* \*

Permit me to quote a post from a clergyperson in Charlottesville at length, because it correctly explains what happened on Saturday morning, and why. There are countless other narratives like it online.

> "A note on the Antifa:
> They are the reason Richard Spencer did not speak today. They are the reason the "Unite the Right" march didn't happen. They strategically used violent tactics to incite the Nazis to violence, such that the governor declared a state of emergency before noon. Before the "Unite the Right" rally was scheduled to begin.
> One could argue this meant Nazis dissipated into the streets faster making it less safe, but let's be real: Nazis have been making these streets less safe for a long time. They would have been out and about soon enough with or without the antifa.
> I was with a group of clergy committed to non-violence today. We did our part. We bore witness to the pain and hatred in this city. We provided pastoral care/support as needed, especially during traumatic violent acts. This was our determined role going into today. Yes, some clergy risked injury and arrest to stop the Nazis. They formed a blockade at the entrance, but they were overpowered by the Nazis. The police did not view us as threatening enough to shut things down, because again, we were no there to threaten.
> The antifa strategically incited enough violence before noon to make the police declare it illegal to gather in Emancipation Park. Through this strategic violence they effectively made a previously legally permitted Nazi rally, illegal.
> We may not agree with each others tactics. We may have had different goals, but if you're looking to praise people specifically for shutting down the "Unite the Right" rally, praise/thank the antifa. Not the clergy and not the police."

The "clergyperson in Charlottesville" – almost certainly Mr. Wispelwey – thus "praise[s]/thank[s]" AntiFa for their "strategic violence" in making "a previously legally permitted Nazi rally, illegal" and admits to forming a blockade to prevent the pro-monument protestors from exercising their rights, affirmed by an injunction issued by this Court, to demonstrate.

The AntiFa that plaintiff Wispelwey effusively praises and thanks have openly declared their willingness to threaten and physically harm attorneys who represent persons, such as Peinovich, whom AntiFa label as "neo-Nazis."  (*See, e.g*, Exhibit 5, also linked here: https://torchantifa.org/sacramento-attorney-danny-brace-defends-neo-nazi-william-planer/)  This

attached article describes how AntiFa put out a "Neighborhood Safety Alert" about an attorney named Danny Brace, whom the AntiFa describe as a "scumbag attorney for Neo-Nazis" and as "Dump Truck Dan." The "Neighborhood Safety Alert" has Mr. Brace's photograph, address, and telephone number, and states: "Dump Truck Dan has taken the money of neo-Nazis and is providing legal services to them, enabling their hateful actions. He is not welcome in this neighborhood." The article further states:

> It is unacceptable that Brace is accepting the money of Neo-Nazis and White Nationalists in exchange for defending a known white supremacist, especially one who has attacked anti-racist protesters and sent them to the hospital. These actions cannot go unopposed. Help us spread the word about Brace, who he is funded by, and the kinds of people he likes to defend- you can leave reviews of Danny Brace and Brace Law on Yelp, Google, and Yellow Pages. His law firm is located at 901 H St, suite 500, Sacramento CA, 95814, the office phone number is (916) 447-0592, and Danny Brace's email is dbrace@bracelaw.com. Feel free to get in touch with him and let him know how you feel about him accepting the money of white supremacists and defending a violent Neo-Nazi.

In other words, according to AntiFa, "it is unacceptable" that anyone they label a "neo-Nazi" should have legal representation, and they will threaten, harass, and even physically harm any attorney who tries to provide it. These are the people whose tactics plaintiff Wispelwey not only condones but praises. It bears emphasis that "it is unacceptable" ultimatums from AntiFa are serious and credible threats. AntiFa has a long history of violence and intimidation and their actions have been described as domestic terrorist violence by Homeland Security. (*See, e.g*, Exhibit 6, also linked here: https://www.politico.com/story/2017/09/01/antifa-charlottesville-violence-fbi-242235)

Plaintiffs dismiss the concerns of Peinovich and his assisting attorney as frivolous, noting that other attorneys have appeared on the record and plaintiffs' attorneys have received offensive tweets. But this is not simply a matter of offensive tweets. Peinovich's assisting attorney is particularly vulnerable to AntiFa's harassing tactics, as one of the attorney's children has an

11

upcoming wedding in a public place that AntiFa could easily disrupt, bringing fear and political discord into what should be a joyous occasion. This is no abstract concern; AntiFa have repeatedly demonstrated their willingness to harm families and do other hateful acts in the name of "fighting hate."

AntiFa have made threats to disrupt weddings and other such family events for those that they deem "fascists" before. As an example, on June 30, 2018 a man named Ethan Nordean took part in a rally in Portland with a group named "Patriot Prayer." The intent of Patriot Prayer was to celebrate the 4th of July, President Trump and the upcoming congressional bid by the group's founder Joey Gibson. They planned to recite the pledge of allegiance and a say Christian prayer in a public park in Portland, and were granted a legal permit by the city of Portland to do so. Labeling this group "white supremacists" and "fascists" AntiFa showed up and attacked their rally in an effort to shut down their First Amendment rights, just as they did to the defendants and others in Charlottesville. In the midst of this attack, Nordean was repeatedly assaulted by an unknown member of AntiFa with a club or baton of some sort. Despite this ferocious attack, Nordean was able to defend himself from his assailant by punching him to the ground. Nordean was arrested and then released by Portland Police, who determined that his actions in fighting off his attacker constituted legal self defense. Vowing revenge on Nordean for having the temerity to defend himself against their attacks, AntiFa doxed Nordean on social media, inviting a campaign of harassment against him and his family, and revealed the date and location of his upcoming wedding. See the below tweet by Eugene AntiFa (also linked here: http://archive.is/SkyEx).



AntiFa's recent actions in Chicago against another attorney named William Malan also show their intent to harm not only their political adversaries, but their adversaries' families. In this instance, AntiFa, having intercepted a private email sent by Malan that AntiFa deemed racist, placed posters all around Malan's house, where Malan lived with his wife and children, with Malan's photograph and the large caption "WHITE SUPREMACIST LIVING IN THE AREA." Malan's wife was so terrified that her children would be harmed and their house firebombed by AntiFa that she had a nervous breakdown and died in December 2017. (See Exhibit 7). One of the AntiFa leaders in the attack on Malan's house and family was Daniel Smigel, who was subsequently arrested and charged with felony counts relating to AntiFa's shutdown of Richard

Spencer's attempt to give a speech at Michigan State University in March 2018. (See Exhibit 8). When arrested, Smigel was found in possession of Dragon Fire Pepper Spray. Smigel in all likelihood was among the AntiFa fomenting violence at Charlottesville whom plaintiff Seth Wispelwey has praised and apparently knows personally.

Known associates of AntiFa have already taken cues from public statements by "Integrity First For America," an umbrella organization that plaintiffs are using to fund their bad faith SLAPP lawsuit, to begin looking for the identity of Peinovich's consulting attorney so as to subject him to harassment. Michael Edison Hayden, former Newsweek reporter and current "intelligence analyst" for a company called "Storyful" tweeted on June 22, 2018 asking for tips as to the identity of this attorney (also linked here: http://archive.is/eu3QM).



Hayden is a known associate of AntiFa, has written positively about them in the past, has assisted them in doxing and harassing various individuals and has appeared on a podcast on itsgoingdown.org, a website used by AntiFa to incite violence and coordinate violent actions such as their planned attacks on the Charlottesville and Portland rallies (See Exhibit 9, also linked here: https://itsgoingdown.org/round-table-discussion-on-state-of-the-alt-right/). In a phone conversation with Peinovich, a recording of which Peinovich can make available to the Court, Hayden told Peinovich that he would initiate a harassment campaign against this attorney if the attorney in question was someone powerful, or has black or Jewish clients. Hayden's intentions are not only to initiate a campaign of harassment by revealing the identity of the attorney, but to interfere in the relationship between this attorney and other clients he or she may have.

To sum up, at least one of the plaintiffs has expressed admiration for AntiFa and its tactics; AntiFa have shown an unfettered willingness to harass not only white nationalists but attorneys who represent them, and not only the attorneys but their families; and Peinovich's assisting attorney is particularly vulnerable to such harassment. Thanks to public statements by the plaintiffs and affiliated groups, AntiFa is already seeking the identity of this attorney.

### V. PEINOVICH HAS NOT CAUSED UNNECESSARY DELAY OR INTERFERED WITH EFFICIENT CASE MANAGEMENT

Plaintiffs claim that Peinovich not disclosing the identity of his consulting attorney has already lead to delays in the case. They claim that Peinovich has been late in his discovery responses by over two months. This claim is false. On February 14, 2018 Peinovich filed a

15

motion to stay discovery pending the outcome of his motion to dismiss. Magistrate Judge Hoppe denied this motion on March 26, 2018 and ordered that Peinovich respond to plaintiffs' discovery requests within 21 days. Peinovich fully complied with this deadline. Peinovich would have filed such a motion even if his consulting attorney had entered an appearance before the Court, with the outcome being the same and following the same timeline. There is no reason to think that the case would be expedited in any way by the appearance of this attorney.

Plaintiffs' assertion that nondisclosure of the identity of Peinovich's assisting attorney interferes with efficient case management rests on the errant premise that plaintiffs are free to use the parties' confidentiality agreement as a means to block Peinovich from access to key documents in this case. Plaintiffs' tactic here is to designate such documents "highly confidential," a designation that limits access only to attorneys. Plaintiffs' maneuver amounts to an attempt to gain veto power over whether Peinovich can proceed pro se at all, something he has a right to do. A fairer and more reasonable approach would be to recognize that Peinovich is fully committed to his pro se litigant status and is fully participating and making all final decisions regarding his defense, including the preparation of his pleadings. He and his assisting attorney, accordingly, should have access to documents marked highly confidential, subject, of course, to the restrictions of the confidentiality agreement.

Peinovich has every right to proceed pro se in this matter. Arguments by plaintiffs that doing so is causing them inconvenience should elicit nothing but belly laughs considering that plaintiffs are attempting to destroy Peinovich with this malicious lawsuit. Peinovich is under no obligation to make it easy for plaintiffs to proceed against him. Considering that plaintiffs have failed to state a valid cause of action against Peinovich, and have no facts or evidence to support

16

their spurious conspiracy allegations against him, Peinovich respectfully suggests that plaintiffs simply drop their case against him if they wish to expedite matters for themselves.

## CONCLUSION

Plaintiffs are represented by over a dozen big firm lawyers. But even plaintiffs' enormous advantage in legal resources is not enough for them. They want to prevent Peinovich from having any legal assistance at all by exposing Peinovich's assisting lawyer to threats and intimidation from AntiFa and thus preventing Peinovich from obtaining even this limited degree of legal help. There is no reasonable prospect that plaintiffs' interrogatory will lead to relevant or proportionate information. Plaintiffs have no right to know the identity of Peinovich's assisting attorney or to see the drafts or legal advice Peinovich shared with this attorney. The tactical and harassment motives prompting plaintiffs' interrogatory are plain.

Dated: July 5, 2018.

                                                  Respectfully submitted,

                                                  Michael Peinovich, Pro Se

## CERTIFICATE OF SERVICE

On this 5th day of July, 2018, I Michael Peinovich certify that I served electronically or mailed copies of this objection and memorandum to:

Christopher Greene <cgreene@kaplanandcompany.com>,
David Campbell <DCampbell@dhgclaw.com>,
Elmer Woodard <isuecrooks@comcast.net>,
James Kolenich <jek318@gmail.com>,
Bryan Jones <bryan@bjoneslegal.com>,
Roberta Kaplan <rkaplan@kaplanandcompany.com>,
Julie Fink <jfink@kaplanandcompany.com>,
Gabrielle Tenzer <gtenzer@kaplanandcompany.com>,
Seguin Strohmeier <sstrohmeier@kaplanandcompany.com>,
Alan Levince <alevine@cooley.com>,
Karen Dunn <KDunn@bsfllp.com>,
Philip Bowman <pbowman@bsfllp.com>,
John DiNucci <dinuccilaw@outlook.com>,
David Mills <dmills@cooley.com>,
Joshua Libling <jlibling@bsfllp.com>

Michael Peinovich