CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

07/09/2018

JULIA C. DUDLEY, CLERK
BY: H. Wheeler
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| ELIZABETH SINES, *ET AL.*, | CASE No. 3:17-CV-00072 |
| *Plaintiffs,* | |
| v. | MEMORANDUM OPINION |
| JASON KESSLER, *ET AL.*, | |
| *Defendants.* | JUDGE NORMAN K. MOON |

In 1871, Congress passed a law "directed at the organized terrorism in the Reconstruction South[.]" *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 610 n.25 (1979); *see* 42 U.S.C. § 1985. Over a hundred and forty years later, on August 11th and 12th, 2017, the Defendants in this lawsuit, including the Ku Klux Klan, various neo-Nazi organizations, and associated white supremacists, held rallies in Charlottesville, Virginia. Violence erupted. Charlottesville residents who suffered injuries at the rallies, the Plaintiffs, allege that this violence was no accident. Instead, they allege the Defendants violated the 1871 Act and related state laws by conspiring to engage in violence against racial minorities and their supporters. The Defendants retort that they were simply engaged in lawful, if unpopular, political protest and so their conduct is protected by the First Amendment. While ultimate resolution of what happened at the rallies awaits another day, the Court holds the Plaintiffs have plausibly alleged the Defendants formed a conspiracy to commit the racial violence that led to the Plaintiffs' varied injuries. Accordingly, the Plaintiffs' claims largely survive, although one Defendant is dismissed and other claims are pared down.

## I. LEGAL STANDARD

This opinion addresses one precise question: the legal sufficiency of the Plaintiffs' allegations that the Defendants conspired to engage in racial violence. This question comes

before the Court because some of the Defendants have moved the Court to dismiss the complaint.[1]  A motion to dismiss a complaint tests the legal sufficiency of the allegations to determine whether the Plaintiffs have properly stated a claim; "it does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016).  And so the Court does not today choose between the parties' competing narratives of what "actually happened" at the August rallies.

Plaintiffs' complaint is required to "to provide the 'grounds' of [their] entitle[ment] to relief," but this "requires more than labels and conclusions[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  A court need not "accept the legal conclusions drawn from the facts" by Plaintiffs or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (quotation marks omitted).  But the Court takes all factual allegations in the complaint as true and draws all reasonable inferences in the Plaintiffs' favor.  *Rubenstein*, 825 F.3d at 212.  In sum, a complaint will survive a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

## II.  SUMMARY OF ALLEGATIONS

Before addressing the complaint, three brief points are necessary.  First, Plaintiffs' complaint is 112-pages long, pushing the limits of Rule 8(a)'s requirement of a "short, plain

---

[1]    More specifically, Defendants Michael Hill, League of the South, and Michael Tubbs jointly filed a motion to dismiss (dkt. 201); Defendants Jason Kessler, Christopher Cantwell, Vanguard America, Robert "Azzmador" Ray, Nathan Damigo, Elliot Kline, Identity Evropa, Matthew Heimbach, Matthew Parrott, Traditionalist Worker Party, Jeff Schoep, and National Socialist Movement filed another motion to dismiss (dkt. 205); Defendant Nationalist Front filed a motion to dismiss (dkt. 207); Defendant Richard Spencer filed a *pro se* motion to dismiss (dkt. 209); and Defendant Michael Peinovich filed a *pro se* motion to dismiss (dkt. 212).   Other Defendants either answered, (dkt. 196), filed a motion to dismiss that was stricken, (dkt. 202), or failed to appear.  Judge Hoppe struck Defendant Fraternal Organization of the Alt-Knights' motion to dismiss because organizational defendants cannot proceed *pro se*.  (Dkt. 210).

statement." Fed. R. Civ. P. 8(a). While the Court will not ask the Plaintiffs to trim their complaint, the following summary will necessarily leave out some details. To the extent those details are material to the Court's analysis, they are discussed later in the opinion. Second, the complaint frequently uses vague nouns, lumping all Defendants and all co-conspirators together. Because this style of pleading raises problems addressed below, the following summary focuses on allegations that are tied to specific Defendants. Third, it is important to remember that the following summary is a recounting of *allegations*. While the Court does not repeatedly state "Plaintiffs *allege* that Defendant *X* did *Y*," this summary should not be taken as the Court's endorsement of one version of the facts.

## A.   The Plaintiffs

The Plaintiffs are ten Charlottesville residents who each allegedly suffered some injury related to the rallies. Their relationships to the Defendants fall into three general groups. First, there are those that attended a counter-protest on the night of Friday, August 11th, 2017. As discussed more fully below, various Defendants led a torchlight march at the University of Virginia. At the end of that march, some Plaintiffs were assaulted. One of these Plaintiffs was Tyler Magill, who was surrounded and assaulted by various marchers around a Thomas Jefferson statue. (Dkt. 175 at ¶166). The marchers hurled torches at Magill and others, sprayed them with pepper spray, and threw other liquids on them. (*Id.* at ¶¶169, 173, 174). He later suffered a "trauma-induced stroke" and related injuries. (*Id.* at ¶11). Plaintiff John Doe, an African-American UVA student, attended the march where he also was harassed and assaulted. (*Id.* at ¶13). He suffered various emotional injuries. (*Id.* at ¶293). A third Plaintiff, a UVA student named Natalie Romero, was also surrounded and assaulted at the statue. (*Id.* at ¶18).

Second, another group of Plaintiffs was injured when one of the Defendants, James Fields, drove his car into a crowd of counter-protestors after the "Unite the Right" rally on Saturday, August 12th.  Plaintiff Romero also falls into this second group, as she was hit by Fields's car and sustained subsequent injuries.  (*Id.*).  Plaintiff Marcus Martin, an African-American counter-protestor, was hit by Fields's car and sustained a broken leg and ankle.  (*Id.* at ¶17).  He pushed his fiancé, Plaintiff Marissa Blair, out of the way of the oncoming car, but she too suffered various physical injuries.  (*Id.* at ¶16).  Plaintiff Chelsea Alvarado was also hit by Defendant Fields's car, and she suffered physical and emotional injuries.  (*Id.* at ¶19).  Plaintiff Elizabeth Sines, a second year law student, witnessed the events and suffered severe emotional distress and shock.  (*Id.* at ¶15).  Plaintiff April Muñiz was close to being hit by the car, and she has been diagnosed with acute stress disorder and trauma since the event.  (*Id.* at ¶12).

Third, there are two other Plaintiffs who are more difficult to classify.  Plaintiff Seth Wispelwey is a minister who led an ecumenical organization called "Congregate" in non-violent protest.  (*Id.* at ¶¶11, 134).  He was part of a church service across from the torchlight march on the 11th, was confronted by one of the Defendants after the torchlight rally, and was assaulted while counter-protesting on Saturday.  (*Id.* at ¶¶178, 182, 208).  The last Plaintiff is Hannah Pearce.  She is a member of Congregation Beth Israel, a synagogue close to the park where the Saturday rally took place.  (*Id.* at ¶14).  She peacefully protested throughout the weekend and was subjected to anti-Semitic harassment.  (*Id.* at ¶¶219–21).

## B.    The Defendants

Two of the primary organizers of the Friday and Saturday events were Defendants Richard Spencer and Jason Kessler.  Defendant Richard Spencer planned the Friday night march and encouraged his many followers to attend the Saturday rally.  (Dkt. 175 at ¶21).  Defendant

Jason Kessler is a Charlottesville resident who applied for, and eventually received, a permit to hold the Saturday rally. (*Id.* at ¶¶20, 55).

Two other promoters were Defendants Christopher Cantwell and Michael Peinovich. Defendant Cantwell attended the events and faced criminal charges for using pepper spray at the Friday night march. (*Id.* at ¶22). Defendant Michael Peinovich hosts a podcast called The Daily Shoah and was featured on a promotional poster for the event. (*Id.* at ¶42).

Many of the individual Defendants who helped plan the events are part of organizations that are themselves Defendants. Defendants Andrew Anglin and Robert "Azzmador" Ray run a website called The Daily Stormer. (*Id.* at ¶¶25, 27). They used this platform and associated "book clubs" to promote the events, which Ray attended. (*Id.*). The website is owned by an Ohio limited liability corporation, Defendant Moonbase Holdings, LLC. (*Id.* at ¶26).

Defendant Vanguard America is a white nationalist group with twelve chapters across the country. (*Id.* at ¶24). Many of its members attended the events. (*Id.* at ¶¶153, 197). Plaintiffs alleged one of its members, Defendant James Fields, intentionally drove his car into a crowd of counter-protesters, killing one individual and injuring many others. (*Id.* at ¶23).

Another organizer was Defendant Eli Mosley. (Dkt. 175 at ¶29). He is associated with the white supremacist organization Defendant Identity Evropa. (*Id.* at ¶¶29, 30). The founder of that organization is Defendant Damigo, who helped facilitate transportation for the events. (*Id.* at ¶28). Defendant Identity Evropa popularized the "You will not replace us!" chant that became the protesters' rally cry. (*Id.* at ¶30). Both Damigo and Mosley attended the events.

Defendant Traditionalist Worker Party is a white nationalist organization, with many members who attended the rallies. (*Id.* at ¶33). It is led by Defendant Matthew Heimbach and Defendant Matthew Parrott. (*Id.* at ¶¶31, 32). Parrott wrote an account of his experiences at the

Saturday rally, and he described how multiple Defendants used organized formations of "shield walls" in "the fight." (*Id.*).

Defendant League of the South and two of its leaders, Defendants Michael Hill and Michael Tubbs, were also involved in the fighting at the Saturday rally. (*Id.* at ¶¶34–36). Defendant Tubbs, in particular, led an organized charge of League of the South members against counter-protestors. (*Id.*).

Defendant Augustus Sol Invictus is a member of Defendant Fraternal Order of Alt-Knights, which is the "military wing" of the white nationalist group "Proud Boys." (*Id.* at ¶¶40–41). He attended both events. (*Id.*).

Two different Ku Klux Klan organizations also participated in some capacity. Defendant Loyal White Knights of the Ku Klux Klan organized a previous Charlottesville rally, and then made various statements celebrating Defendant Fields's decision to drive his car into counter-protesters. (*Id.* at ¶36). Defendant East Coast Knights of the Ku Klux Klan also attended the previous rally and then participated in the August 12 rally. (*Id.* at ¶44).

Defendant National Socialist Movement is a white supremacist organization that has a "paramilitary" structure. (*Id.* at ¶38). Defendant Jeff Schoep, its leader, attended the rallies and afterwards tweeted that is was an "honor" to stand with the other "warriors." (*Id.* at ¶37).

Finally, Defendants Schoep, Heimbach, and Hill lead Defendant Nationalist Front, an umbrella organization that includes many of the aforementioned organizations. (*Id.* at ¶39).

## C. Months preceding August 11 and 12th

Charlottesville drew Defendants' attention because of its decision to change the name of Lee Park, a small park in Downtown Charlottesville that contains a statue of General Robert E. Lee, to Emancipation Park in February 2017. (Dkt. 175 at ¶¶47–48). In May 2017, various

white supremacist groups, including some Defendants, led a torchlight march around the Lee statue. (*Id.* at ¶50). "Capitalizing on the perceived success of the May event," Defendant Kessler submitted an application for a follow-up rally on August 12th. (*Id.* at ¶55). In the intervening months, various Defendants came to Charlottesville for marches and demonstrations. (*Id.* at ¶¶56–57). Plaintiff Romero protested one of these events, a Ku Klux Klan march, and received harassing phone calls afterwards from a member of the Klan. (*Id.* at ¶58).

**D.      Planning for the August 11th and 12th rallies**

Key Defendants met together in person for planning purposes at least a few times. Defendant Spencer and Evan McLaren, a member of Defendant Identity Evropa, met at the Trump Hotel in D.C. to organize the rally on an unspecified date. (Dkt. 175 at ¶64). Closer to the rallies, Defendants Cantwell and Kessler then met on August 9th in Charlottesville to plan. (*Id.* at ¶65). Defendants Ray, Cantwell, Mosley, and purported co-conspirator David Duke had a similar meeting on August 11. (*Id.* at ¶66).

Much more significantly, the majority of the planning appears to have occurred online. Defendants Kessler and Mosley used an online program called "Discord" for planning. (*Id.* at ¶¶71–73). This "invite only" platform allowed Defendants and their chosen invitees to engage in private conversations during the lead up to the events. (*Id.* at ¶72). While Defendants Kessler and Mosley moderated and managed Discord, many other Defendants participated on the platform, including Defendants Heimbach, Parrott, Cantwell, Ray, Vanguard America, Identity Evropa, Traditionalist Worker Party, League of the South, and Moonbase Holdings. (*Id.* at ¶¶74, 77). Organizational Defendants were able to maintain private sub-forums for their own members. (*Id.* at ¶77).

Conversation on Discord included mundane planning details, racist "jokes," and concrete threats of violence. Defendant Mosley posted "General Orders" for "Operation Unite the Right Charlottesville 2.0." (*Id.* at ¶75). Organizers also posted information about shuttle service information, lodging, and carpools. (*Id.* at ¶76). Other corners of Discord were significantly darker. One user posted a fake advertisement for a pepper-spray-look-alike called "Nig-Away," described as a "a no-fuss, no muss 'nigger killer,'" promised to "kill[] on contact" in order to "rid the area of niggers." (*Id.* at ¶111). Another frequent Discord user asked whether it was "legal to run over protestors blocking roadways?" (*Id.* at ¶239). He clarified he was not joking, "I'm NOT just shitposting. I would like clarification. I know it's legal in [North Carolina] and a few other states. I'm legitimately curious for the answer." (*Id.*). Other Discord users made similar comments about running over counter-protestors. (*Id.* at ¶236–41). Elsewhere on Discord, users made it clear they planned to fight at the events, saying things like "I'm ready to crack skulls." (*Id.* at ¶97). Defendant Kessler told users: "I recommend you bring picket sign post, shields and other self-defense implements which can be turned from a free speech tool to a self-defense weapon should things turn ugly." (*Id.* at ¶ 112). Defendant Vanguard America instructed its members "to arrive at the rally in matching khaki pants and white polos," with one member noting that this was "a good fighting uniform." (*Id.* at ¶ 115). Defendant Hill wrote, in a Defendant League of the South Facebook group, that he wanted "no fewer than 150 League warriors, dressed and ready for action, in Charlottesville, Virginia, on 12 August." (*Id.* at ¶36). Similar comments from other Defendants abound.

E.    **Counter-protestors prepare**

While this planning was ongoing, separate counter-protesters received permits to hold events in other parks during the Defendants' rally. (Dkt. 175 at ¶132). Plaintiff Wispelwey

started an organization, "Congregate," to join with interfaith clergy in protesting against racial inequality and the rally. (*Id.* at ¶134). Defendant Kessler advised other attendees about Congregate's work, allegedly in an attempt to threaten the organization. (*Id.* at ¶135). The names of other counter-protestors were shared over Discord. (*Id.* at ¶137).

Other individuals opposed to the "Unite the Right" rally also prepared. Plaintiff Pearce's temple, Congregation Beth Israel, moved its Torah scrolls off site in advance of the rally and changed the time of its normal Shabbat services. (*Id.* at ¶¶138–39). Stores around town put signs up supporting diversity and equality. (*Id.* at ¶140). Defendants Kessler, Mosley, Spencer, and Peinovich shared the names and addresses of these businesses, allegedly in an attempt to have attendees intimidate them. (*Id.* at ¶141). Some of these businesses received various threats. (*Id.* at ¶142).

## F.    The march on August 11th

Defendants Mosley, Spencer, Kessler, Ray, Anglin, Cantwell, and Invictus organized a secret torchlight march at UVA. (Dkt. 175 at ¶143–49). These torches were supposed to invoke the Ku Klux Klan's and Nazi's similar use of torches. (*Id.* at ¶150). The marchers marched two-by-two up the Lawn, around the Rotunda, and towards a Thomas Jefferson statue on the far side of the Rotunda. (*Id.* at ¶¶159, 164). As they marched, they chanted various racist slogans and performed Nazi salutes. (*Id.* at ¶¶161–62).

Although the march was supposed to be secret, approximately thirty counter-protesters, including Plaintiffs Doe, Magill, and Romero, reached the Jefferson statute before the marchers. (*Id.* at ¶¶164, 169). The counter-protesters linked arms and surrounded the statue, facing away from it. (*Id.* at ¶164). As the marchers rounded the Rotunda, they charged towards the statue and surrounded the counter-protestors. (*Id.* at ¶¶164, 166). Fighting broke out, and the marchers

kicked and punched the counter-protesters. (*Id.* at ¶168). People in the crowd threw an unidentified fluid at the counter-protesters, including on Plaintiffs Doe, Magill, and Romero. (*Id.* at ¶169). These Plaintiffs were afraid it was fuel and that they would be burned. (*Id.*). Defendant Ray shouted, "The heat here is nothing compared to what you're going to get in the ovens!" (*Id.*). A photo shows Defendant Cantwell spraying a counter-protestor with pepper spray. *Id.* at 56. (*Id.* at ¶172). Plaintiffs Doe and Romero felt trapped and did not believe they could escape safely. (*Id.* at ¶¶173–74).

During this time, Plaintiff Wispelwey and around 1,000 others were inside St. Paul's Church, which is located across the street from the Rotunda. (*Id.* at ¶154). The faith community at St. Paul's, including Plaintiff Wispelwey, witnessed the marchers. (*Id.* at ¶178). The church leaders asked everyone to remain at the church out of a fear of violence. (*Id.* at ¶180). Plaintiff Wispelwey eventually drove some attendees to their homes and hotels. (*Id.* at ¶181). At one hotel, Defendant Invictus confronted Wispelwey and aggressively asked him what he was doing at the hotel and what church he belonged to. (*Id.* at ¶182).

The night ended with Defendants Kessler and Spencer, and others, celebrating the evening's events and encouraging their followers to come to the following day's rally. (*Id.* at ¶184).

## G. The rally on August 12th

Almost all of the Defendants attended Saturday's "Unite the Right" rally, including Defendants Kessler, Cantwell, Mosley, Heimbach, Hill, Invictus, Ray, Spencer, Damigo, Peinovich, Fields, Parrott, Tubbs, Nationalist Front, League of the South, National Socialist Movement, Traditionalist Worker Party, Vanguard America, East Coast Knights, Loyal White

Knights, Fraternal Order of Alt-Knights, and members of The Daily Stormer's "book clubs." (Dkt. 175 at ¶187).

Defendants arrived in passenger vans, gathered at pre-arranged meet up spots, and then marched towards the park. (*Id.* at ¶¶196, 207). They entered Emancipation Park "in military formations, armed like paramilitary forces." (*Id.* at ¶195). Organizations marched with matching uniforms, coordinated shields, and regimental flags. (*Id.* at ¶¶197–98). Defendant Fields, who would later drive his car into the crowd, wore Defendant Vanguard America's uniform and marched with other Vanguard America members. (*Id.* at ¶197).

As the military formations marched into the park, they assaulted and knocked over various counter-protestors, including Plaintiffs Wispelwey and Romero. (*Id.* at ¶208). Other counter-protesters were blockaded around the park, and rally attendees used "shields, flags, or fists" to break through these counter-protesters and enter the park. (*Id.* at ¶209). Once in the park, the violence escalated. According to an account of the day written by Defendant Parrott, members of Defendants Traditionalist Worker Party, League of the South, National Socialist Movement, and other Nationalist Front groups, jointly created "two shield walls" for "the fight." (*Id.* at ¶212). Defendant Identity Evropa "were occupied on other fronts," but "sent a detachment of fighters to assist us and to relay intelligence to Jason Kessler and other organizers." (*Id.*). Defendant Tubbs ordered Defendant League of the South members to "charge," and "[a]fter receiving this command, the group streamed past him to attack counter-protesters." (*Id.* at ¶35).

Some marchers also yelled anti-Semitic and Nazi slogans while passing Plaintiff Pearce's synagogue. (*Id.* at ¶202). Defendant Ray carried a banner that stated "Gas the kikes, race war now!" (*Id.*). An anonymous individual later threatened to "torch those Jewish monsters" in a

comment on a YouTube video, leading Charlottesville's mayor to ask for police protection for the synagogue. (*Id.* at ¶203). Plaintiff Pearce and her son counter-protested the rally outside the park. (*Id.* at ¶220). She wore a Star of David and carried a rainbow flag. (*Id.* at ¶219). She was harassed by a rally attendee, who shouted, "Oh good, they are marking themselves for us." (*Id.* at ¶220). Another rally attendee threw an open bottle with a "foul liquid" that hit Plaintiff Pearce. (*Id.* at ¶221).

Then, at 11:22 a.m., Charlottesville declared the gathering an unlawful assembly. (*Id.* at ¶223). Defendants Kessler, Cantwell, Ray, Schoep, and Vanguard America among others, moved to McIntire Park. (*Id.* at ¶226–28). Defendant Parrott did not leave, and was arrested for failure to disperse. (*Id.* at ¶228). Violence continued in McIntire Park and on Charlottesville's downtown mall. (*Id.* at ¶¶229, 234).

**H.** **The car attack on August 12th**

At 1:40 p.m., Plaintiffs allege Defendant Fields deliberately drove his car into a crowd of peaceful protesters that were congregated at the intersection of Fourth Street and the Downtown mall. (*Id.* at ¶242). Plaintiffs Martin, Blair, Sines, Muñiz, Alvarado, and Romero were all on Fourth Street when Fields drove his car into the crowd. (*Id.* at ¶243). Multiple of these Plaintiffs were struck by Defendant Fields' car and incurred serious injuries. (*Id.* at ¶¶244–56). A friend of some of the Plaintiffs, Heather Heyer, was killed. (*Id.* at ¶248).

**I.** **Happenings after the event**

After the event, Defendants Anglin, Vanguard America, Kessler, Heimbach, East Coast Knights, and Loyal White Knights posted messages approving of the Defendant Fields's car attack. (Dkt. 175 at ¶¶264, 266–69, 272). Defendant Schoep said it was an honor "to stand" with the other co-Defendants at the rally, and referred to them as "true warriors." (*Id.* at ¶271).

Defendant Spencer referred to the rally a "huge moral victory." (*Id.* at ¶273). Defendant Cantwell was glad nobody on the Defendants' "side" died. (*Id.*).

Many Defendants have stated they would like to return to Charlottesville for a similar event. (*Id.* at ¶296). Defendant Spencer and others engaged in another torchlight march in Charlottesville on October 7, 2017. (*Id.* at ¶306). Defendant Kessler filed an application for another rally on August 11 and 12, 2018. (*Id.* at ¶307).

### III.   COUNT ONE: 42 U.S.C. § 1985(3)

In Count One, Plaintiffs allege all Defendants violated 42 U.S.C. § 1985(3), which states:

> If two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . [and] if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

The specific Defendants identified in footnote one moved to dismiss. The majority of the Section 1985(3) claims survive, although Plaintiff Pearce's claims against these Defendants will be dismissed, and all claims against Defendant Peinovich will be dismissed.

Plaintiffs must plausibly allege the following elements to state a Section 1985(3) claim:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (citing *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995)).[2]  Importantly, and unlike Section 1983, Section 1985(3) reaches private conspiracies (*i.e.*, there is no state action requirement).  *See Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

In order to frame a Defendant-by-Defendant analysis of the pleadings, the Court works through these elements slightly out of order.  The Court first addresses the requisite racial animus and purpose of the conspiracy (the second and third elements).  After laying this framework, the Court evaluates the complaint to see if it plausibly alleges that each Defendant joined such a conspiracy (the first element).  The Court then asks whether that conspiracy caused Plaintiffs' alleged injuries (the fourth and fifth elements).  Finally, while Plaintiffs' overarching First Amendment and other defenses are addressed separately at the end of this opinion, the Court does flag specific allegations that are not protected by that Amendment throughout the following discussion.

## A.    Racial animus

Plaintiffs must plead that the Defendants were "motivated by a specific class-based, invidiously discriminatory animus."  *A Soc'y Without A Name*, 655 F.3d at 346; *Francis v. Giacomelli*, 588 F.3d 186, 196–97 (4th Cir. 2009) (same).  No Defendant seriously disputes that Plaintiffs have adequately alleged Defendants possessed racial animus against black and Jewish individuals; the complaint is replete with racist statements made and affirmed by Defendants. However, some Defendants do argue that they only possessed racial animus against non-white

---

[2]    This statute is "the surviving version of § 2 of the Civil Rights Act of 1871" which was passed to address the Ku Klux Klan's violence against minorities and is known as the Ku Klux Klan Act.  *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 368, 394 (1979); Ken Gormley, *Private Conspiracies and the Constitution: A Modern Vision of 42 U.S.C. Section 1985(3)*, 64 Tex. L. Rev. 527, 530 (1985) (providing history of the Act's background).

individuals, and so they cannot be held liable by white Plaintiffs.  But Section 1985(3) was enacted "to combat the prevalent animus against Negroes *and their supporters*."  *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 836 (1983) (emphasis added).  And the Supreme Court has said the statute reaches "class-based animus" directed "against Negroes *and those who championed their cause*[.]"  *Id.* (emphasis added).  Here, Plaintiffs have plausibly alleged that they were attacked because of their support of non-white racial minorities, and so this element is satisfied as to all Defendants.

**B.**     **Intent to deprive Plaintiffs of equal protection of rights secured by law**

In addition to racial animus, the purpose of the alleged conspiracy must be to "deprive the plaintiff of the equal enjoyment of rights secured by the law to all."  But importantly, "Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates."  *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979).  And so, "[t]he rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere."  *Scott*, 463 U.S. at 833.  The Fourth Circuit has further clarified that these underlying rights must be "rights guaranteed by federal law or the Constitution."  *Doski v. M. Goldseker Co.*, 539 F.2d 1326, 1333 (4th Cir. 1976).

Additionally, the federal substantive right "found elsewhere" must be "guaranteed against private impairment."  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 274 (1993).  For example, a plot by solely private parties to deprive individuals of their First Amendment rights is not actionable because those rights are only protected against public impairment  (*i.e.*, "Congress shall make no law . . .").  *See Scott*, 463 U.S. at 833 ("[H]ere the right claimed to have been infringed has its source in the First Amendment.  Because that Amendment restrains only official

conduct, to make out their § 1985(3) case, it was necessary for respondents to prove that the state was somehow involved in or affected by the conspiracy.").

In light of these limitations, the Supreme Court has noted there are "few" rights that can support a Section 1985(3) claim. *Bray*, 506 U.S. at 278. The only rights to be so recognized by the Supreme Court are "the Thirteenth Amendment right to be free from involuntary servitude, *United States v. Kozminski*, 487 U.S. 931, 942 (1988), and, in the same Thirteenth Amendment context, the right of interstate travel, *see United States v. Guest*, 383 U.S. [745,] 759, n. 17 [(1966)]." *Id.*; *see also Tilton v. Richardson*, 6 F.3d 683, 686–87 (10th Cir. 1993) (same). So the big question under this element is which of Plaintiffs' underlying rights satisfy these requirements. Plaintiffs suggest two potentially viable sources.

First, Plaintiffs claim the Thirteenth Amendment provides them with a right to be free from racial violence. In *Griffin v. Breckenridge*, 403 U.S. 88 (1971), the Court held that Section 1985(3) reached a private conspiracy where white Mississippians allegedly stopped African-Americans on a public highway (mistaking them for civil rights workers), pulled them out of their car, and beat them. *Id.* at 89–92. The Supreme Court later summarized *Griffin* as holding that "the conspiracy at issue was actionable because it was aimed at depriving the plaintiffs of the rights protected by the Thirteenth Amendment and the right to travel guaranteed by the Federal Constitution. Section 1985(3) constitutionally can and does protect those rights from interference by purely private conspiracies." *Scott*, 463 U.S. at 832–33. But if Section 1985(3) protects Thirteenth Amendment rights that were implicated by the facts of *Griffin*, those rights must extend beyond the core "right to be free from involuntary servitude." In *Griffin*, after all, the alleged assaults were certainly motivated by racial animus, but they could not be fairly described as seeking to literally enslave the plaintiffs.

Plaintiffs respond by citing cases (including *Griffin*) that discuss Congress's authority to legislate under Section Two of the Thirteenth Amendment, which "extend[s] far beyond [legislation addressing] the actual imposition of slavery or involuntary servitude." *Griffin*, 403 U.S. at 105. Because, "[b]y the Thirteenth Amendment, we committed ourselves as a Nation to the proposition that the former slaves and their descendants should be forever free," these cases teach that "'Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation.'" *Griffin*, 403 U.S. at 105 (quoting *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440 (1968)); *United States v. Cannon*, 750 F.3d 492, 501 (5th Cir. 2014) ("[T]he term 'badge of slavery' . . . refers to indicators, physical or otherwise, of African–Americans' slave or subordinate status." (internal citations omitted)). But this language is not entirely helpful here. No one disputes that Congress's power under the Thirteenth Amendment allows it to address "badges and incidents" of slavery; the question here is whether the Thirteenth Amendment provides rights independent of Congressional action that go beyond a more narrow reading of the "right to be free from involuntary servitude."

The Court concludes the Thirteenth Amendment provides Plaintiffs an underlying right to be free from racial violence analogous to that present in *Griffin*. In doing so, the Court relies most heavily on *Scott*'s statement that the *Griffin* conspiracy was "aimed at depriving the plaintiffs of *the rights protected by the Thirteenth Amendment*," rights which "Section 1985(3) constitutionally can and does protect . . . ." *Scott*, 463 U.S. at 832–33 (emphasis added). Likewise, the Fourth Circuit has characterized *Griffin* as holding that Section 1985(3) protects underlying rights granted by the Thirteenth Amendment. *See Harrison v. KVAT Food Mgmt., Inc.*, 766 F.2d 155, 158 (4th Cir. 1985) ("The Court held that the statute does create a cause of

action for certain kinds of private action interfering with the federally protected rights to travel and *Thirteenth Amendment rights* . . . ." (emphasis added)); *Bellamy v. Mason's Stores, Inc. (Richmond)*, 508 F.2d 504, 506 (4th Cir. 1974) ("The language of [Section 1985(3)] tracks the language of the fourteenth amendment, and we now know that included within it is a wholly private conspiracy to deny Negro citizens the right of travel and *rights based upon the thirteenth amendment*." (emphasis added)). District courts have also assumed Section 1985(3) reaches racial violence analogous to that alleged here, although most have not engaged in careful analysis of the Thirteenth Amendment's scope. *See, e.g., Frazier v. Cooke*, No. 4:17-CV-54, 2017 WL 5560864, at *2–*3 (E.D. Va. Nov. 17, 2017). The repeated Supreme Court and Fourth Circuit interpretations of *Griffin* provide very persuasive guidance, even if found in *dicta*, that the Thirteenth Amendment does provide an underlying right to be free from racial violence that can sustain a Section 1985(3) claim. *See Doe v. Chao*, 435 F.3d 492, 508 (4th Cir. 2006) ("We said long ago that 'certainly dicta of the United States Supreme Court should be very persuasive.'" (citation omitted)). Accordingly, Plaintiffs' claims can proceed on this theory.

Second, Plaintiffs alternatively suggest Section 1982 as a fountainhead of enforceable rights. That statute provides: "All citizens of the United States shall have the same right . . . as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." Plaintiffs claim that rally attendees interfered with the property rights of Congregation Beth Israel by marching past it and making anti-Semitic remarks outside of it. Plaintiff Pearce, a member of that synagogue, seeks to assert its alleged rights. Assuming Pearce can assert the synagogue's rights, Plaintiffs have still failed to adequately allege Defendants conspired to violate rights guaranteed to them by Section 1982.

The Supreme Court's seminal case on Section 1982 is *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968). There the Court held that Congress had authority to prevent private defendants from refusing to sell a home to black plaintiffs because of their race. *Id.* at 438–44. Those facts represent a paradigmatic Section 1982 violation. Some courts have extended the reach of that statute to something closer to Plaintiff's theory. For example, in *United States v. Greer*, 939 F.2d 1076 (5th Cir. 1991), *opinion reinstated in relevant part on reh'g*, 968 F.2d 433 (5th Cir. 1992), the Court affirmed a conviction for conspiracy to violate Section 1982 when a neo-Nazi group damaged the temple's gas lines, painted swastikas and anti-Semitic slogans on the temple, and shot out the windows with a pistol. 939 F.2d at 1083. The court agreed with the Government "that members and non-members of the temple and community center, such as guests, could claim that the acts of defendants violated their right to use this property." *Id.* at 1091. Similarly in *United States v. Brown*, 49 F.3d 1162 (6th Cir. 1995), the court upheld another conviction for conspiracy to violate Section 1982. In that case, a skinhead and member of the Klu Klux Klan shot into a synagogue late at night. Even though no one was present, the court found this conduct violated Section 1982. *Id.* at 1164.

Here, alternatively, there are no allegations that anyone touched or harmed the synagogue. The worst of the allegations concern unidentified individuals who marched past the synagogue and shouted anti-Semitic slogans. This alleged conduct is very different from the shots fired into synagogues in the above cases or the repeated harassment found in other cases. Furthermore, the only allegation concerning an actual Defendant states Defendant Ray carried a banner with anti-Semitic language. (Dkt. 175 at ¶202). It does not allege he carried this banner past the synagogue or otherwise interacted with it. (*Id.*). Likewise, the allegation that Defendants can be held liable for a statement made by an unknown individual on a YouTube

video is frivolous. (*Id.* at ¶203). These allegations do not adequately plead that one of the Defendants interfered with the property rights of the synagogue.

While Plaintiffs have identified an underlying federal right guaranteed against private impairment in the Thirteenth Amendment, they must plausibly allege that Defendants entered a conspiracy to deprive them of that right. Determining whether they have done so requires the Court to return to the first element, conspiracy.

## C. Conspiracy

In order to adequately plead a Section 1985(3) conspiracy, "the plaintiff must show an agreement or a meeting of the minds by [the] defendants to violate the [plaintiff's] constitutional rights." *A Soc'y Without A Name*, 655 F.3d at 346. "[A]lthough an express agreement is not necessary, the participants in the conspiracy must share the general conspiratorial objective . . . . [I]t simply must be shown that there was a single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its consequences." *Simmons*, 47 F.3d at 1378.

One effect of these pleadings requirements, and the overlapping First Amendment interests discussed below, is that Plaintiffs cannot plausibly plead that all rally attendees who disagreed with them were part of one overarching conspiracy. *See A Soc'y Without A Name*, 655 F.3d at 347 (holding Section 1985(3) allegations were insufficient when the plaintiff "fail[ed] to allege with any specificity the persons who agreed to the alleged conspiracy, the specific communications amongst the conspirators, or the manner in which any such communications were made"). Plaintiffs at various times call anonymous individuals who shouted anti-Semitic slogans "co-conspirators." (Dkt. 175 at ¶202). Stretching credulity even further, Plaintiffs allege various statements posted on Facebook and YouTube were made by "co-conspirators." (*See id.*

at ¶203 (attributing screen shot of youtube.com with comment "it's time to torch those jewish monsters" to a co-conspirator); *id.* at ¶271 ("A co-conspirator posted on Facebook . . . .")). Plaintiffs seemingly label everyone at the rally (and for that matter on the internet) who disagreed with them as co-conspirators. The Court does not credit such conclusory labeling. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A pleading that offers 'labels and conclusions' . . . will not do.").[3]

Instead, Plaintiffs must allege each Defendant entered into an agreement with a specific co-conspirator to engage in racially motivated violence at the August 11th and 12th events. The plausibility of these factual allegations increase as Plaintiffs add specificity about the method of agreement, the time or place of the agreement, and the scope of the agreement. The Court works through Plaintiffs' allegations on a Defendant-by-Defendant basis below. While the Court does not credit the conclusory labels discussed above, the Court concludes Plaintiffs have adequately pled specific factual allegations that each moving Defendant, except for Defendant Peinovich, was part of a conspiracy to engage in racially motivated violence at the "Unite the Right" events.

### i. Jason Kessler

Jason Kessler appears prominently throughout the complaint. (*See* dkt. 175 at ¶¶ 20, 49–52, 55, 56, 59, 61, 63, 65, 73, 78, 97, 112, 122, 130, 135, 137, 141, 143, 147, 157, 164, 179, 184, 187–89, 190, 212, 226, 241, 260, 267, 302, 307, 316, 321, 322, 324, 326–29). Kessler was perhaps *the* overarching organizer for the event. He applied for the permit for the August 12th

---

[3]     The complaint also contains some other conclusory allegations that the Court does not credit. (*See, e.g.,* dkt. 175 at ¶63 ("[A list of all Defendants] all agreed and coordinated with and among each other to plan, organize, promote, and commit the unlawful acts that injured Plaintiffs and countless others in Charlottesville."); *id.* at ¶187 ("On August 12, Defendants, their co-conspirators, and others acting at their direction executed their plan to carry out racial, religious, and ethnic violence, intimidation, and harassment."). These more general allegations lack the requisite factual specificity and would not be able to sustain Plaintiffs' claims without the more specific allegations detailed below.

rally and then worked with Defendant Spencer to invite a plethora of white supremacist groups. (*Id.* at ¶¶49, 55, 61, 326). He hoped this rally would help to move white Americans across the South "beyond 'heritage not hate.'" (*Id.* at ¶122). He allegedly "moderated, reviewed, directed, and managed" Discord. (*Id.* at ¶¶ 73, 322, 324). Despite this moderation, he allowed statements like "I'm ready to crack skulls" and "Studies show 999/1000 niggers and feminists fuck right off when faced with pepper spray" to proliferate across the platform. (*Id.* at ¶97). Kessler himself told others on Discord to "bring picket sign post, shields and other self-defense implements which can be turned from a free speech tool to a self-defense weapon should things turn ugly." (*Id.* at ¶112). And, in the days leading up to the event, he met in person with Defendant Cantwell to plan "unlawful acts of violence [and] intimidation." (*Id.* at ¶¶65, 316).

At the Friday night torchlight march, Defendant Kessler once again functioned as an organizer, telling the marchers to get in formation. (*Id.* at ¶¶143, 147, 157, 328). Along with Defendants Cantwell, Mosley, Spencer, Ray, and Invictus, Defendant Kessler "directed and incited physical assaults and violence, the use of open flames, and the intimidation of minority residents and those who advocate for equal rights for minority citizens" at the rally. (*Id.* at ¶329). The complaint identifies Defendant Kessler as leading the charge towards Plaintiffs Magill, Doe, and Romero at the Thomas Jefferson statue. (*Id.* at ¶164). This charge culminated with the circling of the counter-protesters (*id.* at ¶166), Defendant Cantwell and others spraying pepper spray at the counter-protesters (*id.* at ¶172), and the marchers throwing their burning torches at the counter-protesters. (*Id.* at ¶169). Throughout this time, the marchers were performing Nazi salutes, chanting "Blood and Soil," "Jews will not replace us," and making monkey noises at black counter-protesters. (*Id.* at ¶162, 165). Plaintiffs have plausibly alleged

Kessler came to an agreement with these co-Defendants to engage in racially motivated violence against the counter-protesters at the torchlight march.

Then, the next day at the rally, various co-Defendant organizations fought against counter-protesters. (*Id.* at ¶212). While they did this, Defendant Identity Evropa "sent a detachment of fighters to assist [Defendant League of the South] and to relay intelligence to Jason Kessler and other organizers." (*Id.*). This paragraph plausibly alleges Defendant Kessler was overseeing the racial violence at the rally. Finally, after hearing about Defendant Fields's later attack, Kessler called Heather Heyer, the victim who died, a "communist" and said "Communists have killed 94 million. Looks like it was payback time." (*Id.* at ¶267). In light of his other conduct, this plausibly alleges ratification of Defendant Fields's conduct.

The complaint plausibly alleges that Defendant Kessler entered into agreements with these other Defendants for the purpose of assaulting and intimidating individuals who were counter-protesting Defendants' message of white supremacy. As discussed below, many of these actions are completely divorced from any First Amendment protection. (*See, e.g., id.* at ¶164 (the charge resulting in violence around the Jefferson statue); *id.* at ¶212 (overseeing the violence at the Saturday rally)).

### ii.    Richard Spencer

Defendant Spencer was also prominently involved in the organization of the events. (*See* dkt. 175 at ¶¶ 21, 28, 29, 40, 42, 49, 52, 63, 64, 70, 85, 87, 92, 108, 120, 141, 143, 153, 164, 166, 175, 184, 187, 229, 230, 260, 273, 297, 300, 305, 306, 311, 315, 327–29). Alongside Defendant Kessler, "Spencer invited white supremacist groups to visit and hold events around the statue with the intent of intimidating nonwhite and Jewish individuals and their allies." (*Id.* at ¶49). Spencer coordinated with Defendants Damigo and Identity Evropa, who "took the lead in

23

organizing white supremacist participation among people from outside Charlottesville . . . ." (*Id.* at ¶¶28, 70). In the lead up to the rally, Spencer met Evan McLaren, a purported Defendant Identity Evropa member, in person in Washington, D.C. for further organization and direction of the rally. (*Id.* at ¶64). During this time of planning, Spencer made statements that plausibly demonstrate an agreement to engage in violence. An article posted on his website told his followers that "it's time to dominate the streets." (*Id.* at ¶87). A Discord user relayed Spencer's desire that rally attendees "[b]ring as much gear and weaponry as you can within the confines of the law." (*Id.* at ¶108).

Spencer was also a planner of Friday's torchlight march. (*Id.* at ¶¶21, 143, 153, 328). Along with Defendants Cantwell, Mosley, Kessler, Ray, and Invictus, Defendant Spencer "directed and incited physical assaults and violence, the use of open flames, and the intimidation of minority residents and those who advocate for equal rights for minority citizens" at the rally. (*Id.* at ¶329). As with Defendant Kessler, Spencer is specifically alleged to have led the charge towards Plaintiffs Magill, Doe, and Romero at the Thomas Jefferson statue. (*Id.* at ¶164). Marchers climbed to the top of the statue, waved their torches, and yelled "Hail Spencer! Hail victory!" (*Id.* at ¶175). Afterwards, Defendant Spencer confirmed that Defendants had surrounded the counter-protestors at the statue. (*Id.* at ¶166). After the event, he addressed the crowd and thanked them for "risking their lives" for their future. (*Id.* at ¶175).

Defendant Spencer was also involved with and attended the Saturday rally. (*Id.* at ¶187). He continued to actively promote the rally through social media. (*Id.* at ¶¶21, 184). And then, in the aftermath of the rally, his website posted a statement that announced "The Alt-Right is finished debating, negotiating, surrendering. We're ready to close ranks and fight for what is ours. . . . [W]e stand poised to conquer the continent." (*Id.* at ¶305).

Allegations of this degree of planning, followed by these coordinated actions (specifically at the Friday night march), plausibly allege that Defendant Spencer joined a conspiracy to engage in the racially motivated violence that occurred on August 11th and 12th. As with Spencer, much of this conduct was not protected by the First Amendment. (*See, e.g., id.* at ¶164 (the charge resulting in violence around the Jefferson statute)). Other statements might be protected speech taken by themselves, but in light of Spencer's other conduct they can plausibly "be taken as evidence that [he] gave other specific instructions to carry out violent acts or threats." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982); *see, e.g.,* dkt. 175 at ¶175 (thanking marchers who charged the statue "for risking their lives"); *id.* at ¶305 ("The Alt-Right is finished debating, negotiating, surrendering. We're ready to close ranks and fight for what is ours.").

### iii.     Christopher Cantwell

While Defendant Cantwell may have been lower in the pecking order than either Kessler or Spencer, he is more closely tied to acts of overt violence in furtherance of the conspiracy than either of them. (*See* dkt. 175 at ¶¶ 22, 63, 65, 66, 74, 107, 127, 143, 151, 157, 159, 160, 172, 187, 226, 227, 273, 277, 303, 304, 309, 310, 316, 317, 322, 323, 326–330). He was an active participant on Discord in the months leading up to the event. (*Id.* at ¶¶74, 322). He used his various platforms to "advise[] rallygoers on bringing weapons." (*Id.* at ¶323). In the days before the rally, he met with Defendants Kessler, Ray, Mosley, and purported co-conspirator David Duke "to plan and direct the unlawful acts of violence . . . ." (*Id.* at ¶¶65, 66, 316, 317). On the morning of the 11th, he told a reporter that he was "trying to make [himself] more capable of violence." (*Id.* at ¶151).

Then, at the Friday night torchlight march, Cantwell joined Defendants Spencer, Mosley, Kessler, Ray, and Invictus, Defendant Spencer in "direct[ing] and incit[ing] physical assaults and violence, the use of open flames, and the intimidation of minority residents and those who advocate for equal rights for minority citizens." (*Id.* at ¶329). "Defendants Cantwell, Kessler, Ray, and other co-conspirators were issuing orders to the other white supremacists and neo-Nazis, telling them to get in specific formations and assigning people either to march with a torch or on the side as 'security.'" (*Id.* at ¶157). "Organizers, including Defendant Cantwell, wore earpieces, carried radios, and shouted specific orders at the marchers. They shouted to keep pace, avoid gaps, stay in line 'two-by-two,' and march alongside a 'security guard.'" (*Id.* at ¶159). Defendant Cantwell himself marched with guards "who were selected for their willingness to 'get physical' with counter-protestors." (*Id.* at ¶160).

As they approached counter-protesters, Defendant Cantwell personally "attacked the [counter-]protestors with mace." (*Id.* at ¶172). A photograph included in the complaint shows Cantwell in the act of spraying counter-protestors. (*Id.*). He was later charged "with two felony counts of illegal use of tear gas and one felony count of malicious body injury by means of a caustic substance. He was indicted on December 4 on a felony charge of illegal use of tear gas." (*Id.* at ¶22). This conduct, of course, is not protected by the First Amendment. Other co-Defendants shared this picture, congratulating Cantwell on his violence. (*Id.* at ¶172).

Defendant Cantwell came to the Saturday rally heavily armed, bringing three pistols, two semi-automatic machine guns, and a knife. (*Id.* at ¶303). Then as events spiraled out of control, the Daily Stormer informed its followers to assemble "behind" Defendants Cantwell and Ray. (*Id.* at ¶227). In the aftermath, he told a reporter that he thought "a lot more people are going to die before we're done here, frankly." (*Id.* at ¶303). Reflecting on co-Defendant Fields's attack,

he said "[N]one of our people killed anybody unjustly . . . . [O]ur rivals are just a bunch of stupid animals who don't pay attention that couldn't just get out of the way of the car." (*Id.* at ¶273). He continued, saying "[t]hese people want violence and the right is just meeting market demand." (*Id.*).

In light of the specific statements made by Cantwell, the picture of him assaulting counter-protesters with pepper spray, and his joint leadership of various portions of the events with other Defendants (*e.g.*, the Friday night march, the Daily Stormer's encouragement for its followers to get "behind" him), Plaintiffs have plausibly alleged that Defendant Cantwell joined the conspiracy to engage in the racially motivated violence at the "Unite the Right" events.

### iv.     Vanguard America

Plaintiffs have alleged that Defendant Vanguard America's fingerprints were all over last August's events. (Dkt. 175 at ¶¶ 24, 34, 50, 53, 63, 67, 77, 81, 91, 93, 96, 114–17, 121, 153, 167, 185, 187, 191, 196–98, 218, 228, 266, 270, 276, 319, 322, 332). Like other organizational Defendants, Vanguard America had a private channel on Discord called "Southern Front." (*Id.* at ¶77). They used this channel to coordinate attendance, with an organizer telling other members "This event is a **BIG DEAL** and offers a chance to link up Vanguard Guys from across the nation." (*Id.* at ¶¶81, 114). Specifically, members were instructed to wear "matching khaki pants and white polos," which members liked because "it's a good fighting uniform." (*Id.* at ¶115). Some chapters planned to bring shields with matching logos. (*Id.* at ¶121). Vanguard America made twenty extra shields for attendees who were unprepared. (*Id.* at ¶191).

Members made their violent plans explicit. "One member of Defendant Vanguard America explained on the Southern Front server after the event that Vanguard America had coordinated with Defendant National Socialist Movement because the Charlottesville event was

about violence." (*Id.* at ¶117). While Vanguard America did not normally associate with National Socialist Movement, they needed to in Charlottesville because "NSM fought so hard" and Vanguard America "need[ed] them in a fight." (*Id.*). Members also discussed whether to bring firearms, collapsible batons, and various types of knives. (*Id.* at ¶115). A Vanguard America member also posted "a violent drawing of Defendant Heimbach wearing a shirt bearing Nazi and Defendant TWP symbols and the words 'nigger killer' above a tally of 'communists killed,' smiling in front of decapitated black men wearing logos associated with anti-fascist movements." (*Id.* at ¶116). While this could potentially being taken as very dark hyperbole in some instances, in the light of the later events it plausibly alleges a plan for violence.

Defendant Vanguard America members were present at the Friday night event, marching in uniform. (*Id.* at ¶153). Once they had surrounded counter-protesters at the Thomas Jefferson statue, online members encouraged those members present "to physically remove [the counter-protestors]." (*Id.* at ¶167). The violence described above ensued.

Defendant Vanguard America also led the violent events at the Saturday rally. Its members met with Defendants Nationalist Front, League of the South, National Socialist Movement, and Traditionalist Worker's Party to coordinate the march into the park in formation. (*Id.* at ¶196). "Defendant Vanguard America marched to the Park first." (*Id.* at ¶197). They chanted "Blood and Soil!" and carried matching shields and flags. (*Id.*). Defendant Fields, wearing the pre-approved uniform, marched with Defendant Vanguard America. (*Id.*). Members also carried rods and other weapons. (*Id.* at ¶34). Other groups followed. (*Id.* at ¶198). Members on Discord had said they would "remove whoever is in [their] way" when they got to the park. (*Id.* at ¶191). Consistent with this plan, members used their shields to break through counter-protestors and move into the park. (*Id.* at ¶209). Once inside the park, online

members continued telling members physically there to "[j]ust incite a riot already." (*Id.* at ¶218).

At some point, Defendant Fields broke off from the rest of the group and allegedly committed his attack. He was "wearing the uniform white polo and khakis." (*Id.* at ¶332). After his attack, Defendant Vanguard America members congratulated him and celebrated the attack on Discord, stating, "We fucked up many commies . . . . We hospitalized dozens . . . . Now you make the next rally and fight for your people." (*Id.* at ¶¶266, 270).

In light of the coordinated marching and shield tactics, the various communications on Discord, and their members' continued admissions of violence, Plaintiffs have plausibly alleged that Defendant Vanguard America was part of the conspiracy to engage in racially motivated violence. Many of these allegations describe conduct that either does not implicate the First Amendment, (*id.* at ¶191 (alleging "Vanguard is fabricating 20 additional shields" for the fighting at the rally)), or plausibly serves as evidence of other specific violent acts. *Claiborne Hardware Co.*, 458 U.S. at 927; dkt. 175 at ¶270 ("We fucked up many commies . . . . We hospitalized dozens . . . .").

### v.    Robert "Azzmador" Ray

Defendant Ray is a writer at the Daily Stormer, where he published various anti-Semitic and white supremacist content in support of the rally. (Dkt. 175 at ¶¶ 25, 27). He has held himself out as a representative of the Daily Stormer. (*Id.* at ¶27). The complaint alleges he went beyond this role as a publisher of content to become an active conspirator and participant in the violence at the events. (*Id.* at ¶¶ 25, 27, 62, 63, 66, 74, 84, 88, 92, 93, 110, 116, 118, 143, 150, 157, 168, 169, 186, 187, 202, 217, 226, 227, 317, 318, 323, 325, 326, 328, 329).

Defendant Ray contributed to the planning through the use of Discord. (*Id.* at ¶74). Ray also used the Daily Stormer's website to coordinate other meetings for attendees. (*Id.* at ¶84). Some of these meetings were under the auspices of the Daily Stormer's "book clubs," which Defendant Ray clarified do not actually have anything to do with books and instead were used to organize the events. (*See id.* at ¶93 ("You don't think the [Daily Stormer book clubs] have anything to do with books do you? . . . Think boots, not books."). In the days leading up to the rally, Defendant Ray attended in-person meeting with Defendants Cantwell, Mosley, and purported co-conspirator David Duke. (*Id.* at ¶66).

Throughout this time, Defendant Ray used violent language and demonstrated signs of planning for violence. He told a reporter, "We are stepping off the Internet in a big way . . . . We have been organizing on the Internet. And so now they are coming out. We have greatly outnumbered the anti-white, anti-American filth. At some point we will have enough power that we will clear them from the streets forever . . . you ain't seen nothing yet." (*Id.* at ¶88). He wrote that "this rally will put the fear of god into the hearts and minds of our enemies." (*Id.* at ¶92). On Discord, he advised that his followers would "be ready with lots of nifty equipment." (*Id.* at ¶110). He directed his followers to bring tiki torches (for the Friday night march), pepper spray, flag poles, flags, and shields. (*Id.* at ¶118).

This planning came to life on Friday the 11th. Along with Defendants Cantwell and Kessler, Defendant Ray was "issuing orders to the other white supremacists and neo-Nazis, telling them to get in specific formations and assigning people either to march with a torch or on the side as 'security.'" (*Id.* at ¶157). Once they had surrounded the counter-protesters at the statue and torches were being thrown at counter-protesters, he shouted "The heat here is nothing compared to what you're going to get in the ovens!" (*Id.* at ¶169). Within this context, this was

a "true threat" not entitled to First Amendment protection. *See Virginia v. Black*, 538 U.S. 343, 359 (2003). The marchers "began to kick and punch the protesters around the statue, using their torches as weapons, and to beat individuals onto the ground." (Dkt. 175 at ¶168). Defendant Ray claimed the marchers "went through [the counter-protestors] like shit through a goose!" (*Id.*).

Defendant Ray also attended the rally on the 12th. He carried a banner that said "Gas the kikes, race war now!" (*Id.* at ¶202). He made various anti-Muslim statements as well, calling a woman a "sharia whore." (*Id.*). The Daily Stormer also maintained a livefeed of events on its website, where users exhorted further violence. (*Id.* at ¶217 ("We have an army! This is the beginning of a war!")).

Defendant Ray's alleged actions, and most specifically his leadership and statements at the Friday night rally, demonstrate that Plaintiffs have plausibly alleged that he was an active member of the conspiracy to commit racial violence.

### vi. Nathan Damigo and Identity Evropa

Defendant Nathan Damigo attended the events with members of the white supremacist organization he founded, Defendant Identity Evropa. (Dkt. 175 at ¶¶ 28–30, 50, 52, 63, 64, 70, 77, 92, 187, 212, 276, 300–02, 308, 311, 320, 322). Defendant Spencer claims that Defendants Damigo and Identity Evropa coordinated attendance from outside Charlottesville. (*Id.* at ¶¶70, 320). A purported Identity Evropa member, Evan McClaren, met with Defendant Spencer to coordinate and organize the rally in Washington, D.C. (*Id.* at ¶64). Defendant Identity Evropa also had its own Discord channel, which it used to communicate with its members about the events. (*Id.* at ¶¶77, 322). Defendant Damigo also attended a previous rally held in Berkeley, California. (*Id.* at ¶28). Damigo referred to Berkeley as a "test run" for Charlottesville. (*Id.*).

At that rally, Damigo was arrested for assaulting a counter-protestor, demonstrating his violent intentions for the main event. (*Id.*).

Defendants Damigo and Identity Evropa were key participants in the violence on the 12th. In an account of the day called "Catcher in the Reich: My Account of My Experience in Charlottesville," co-Defendant Parrott claimed that "most of the Identity Evropa men were occupied on other fronts" during the fighting, but that Defendant Identity Evropa "sent a detachment of fighters to assist us and to relay intelligence to Jason Kessler and other organizers. They offered more fighters, but we had our positions amply covered." (*Id.* at ¶212). These allegations of organized paramilitary fighting plausibly allege that Defendants Damigo and Identity Evropa were part of the conspiracy to commit racial violence at these events. Defendant Damigo's prior violence at the "test run" for the Charlottesville events further bolsters the allegations of his personal involvement in a plan to commit racial violence at these events. The First Amendment does not shield Defendants from these allegations of violence. *See Claiborne Hardware Co.*, 458 U.S. at 916 ("The First Amendment does not protect violence.").

### vii.    Eli Mosley

Defendant Mosley is closely related to Defendants Damigo and Identity Evropa, taking over leadership of Identity Evropa in late August 2017. (Dkt. 175 at ¶¶29, 30). However, Defendant Mosley had a more central role in the organization of the events, and particularly in the organization of violence at them. (Dkt. 175 at ¶¶ 4, 20, 29, 30, 63, 66, 73, 75, 78, 89, 97, 100, 129, 137, 141, 143, 147, 148, 152, 172, 187, 189, 192, 231, 300, 311, 317, 321, 322, 324, 326, 328, 329). Defendant Mosley referred to himself as the "command soldier major of the 'alt-right'" and told attendees that he was running the rally "as a military operation." (*Id.* at ¶¶29, 192). He also declared that Defendants would not be replaced "without a fight." (*Id.* at ¶¶4, 89).

Defendant Mosley, along with Kessler, "moderated, reviewed, directed, and managed" Discord. (*Id.* at ¶¶ 73, 322). Mosley and other leaders "used Discord for regular 'leadership' meetings through which they shared information and plans." (*Id.* at ¶75). Defendant Mosley used this platform to issue "General Orders" for "Operation Unite the Right Charlottesville 2.0." (*Id.*). These orders described individuals opposed to Defendants' racist ideologies as "hostiles." (*Id.*). A "video for basic formation, roles, and commands" was also promised on Discord, and a "Shield Tactics Primer" and accompanying video was then posted. (*Id.* at ¶192). The video illustrated shield fighting techniques. (*Id.*). Distribution of these sorts of instruction manuals to commit crimes is not protected by the First Amendment. *See Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 265 (4th Cir. 1997) (holding publisher of a "hit man" book was not immune from liability under the First Amendment).

In the build up to the events, Defendant Mosley attended the in-person meeting with Defendants Ray, Cantwell, and purported co-conspirator David Duke. (Dkt. 175 at ¶¶66, 317). Mosley then helped lead the Friday night march, previously having instructed attendees to buy torches. (*Id.* at ¶¶143, 147, 328). He ordered the marchers "to arrive at Nameless Field, a large area behind UVA's Memorial Gymnasium, at 9:30p.m., so that they could march once darkness fell at 9:47 p.m." (*Id.* at ¶148). He used Discord to tell marchers when "to start staging." (*Id.* at ¶152). He would later approvingly tweet the picture of Cantwell spraying pepper spray in a counter-protester's eyes, saying "He protect / He at[t]ack / But most importantly he got your back." (*Id.* at ¶172). This plausibly alleges Defendant Mosley ratified Cantwell's assault.

Defendant Mosley was also active in organizing events on the 12th. He exhorted attendees to arrive before the park opened and create a "a white bloc barrier or square around the entire statue." (*Id.* at ¶189). Once an unlawful assembly was declared and the attendees began

leaving the park, "Defendant Mosley sought people with guns." (*Id.* at ¶231). He said, "I need shooters" because "[w]e're gonna send 200 people with long rifles back to that statue." (*Id.*).

In light of the Defendant Mosley's self-proclaimed role as "command soldier major of the alt-right," his use of Discord to share fighting tactics, and his alleged organization of attendees at the Friday night march, Plaintiffs have adequately alleged that he was part of a conspiracy to commit racial violence.

### viii.    Matthew Heimbach, Matthew Parrott, and Traditionalist Worker Party

Defendants Matthew Heimbach and Matthew Parrott are leaders of Defendant Traditionalist Worker Party, an anti-Semitic organization with around 500 members. (Dkt. 175 at ¶¶31–33). These Defendants, alongside the Defendants associated with Defendant League of the South, allegedly engaged in many of the most specific acts of violence in furtherance of the conspiracy. (Dkt. 175 at ¶¶ 31–33, 37, 50, 63, 67, 74, 77, 90, 116, 187, 188, 196, 200, 212, 214, 228, 268, 271, 319, 322, 327). Like other organizational Defendants, Defendant Traditionalist Worker Party used a private Discord channel for planning with its members. (*Id.* at ¶77). Defendants Heimbach and Parrott participated on Discord. (*Id.* at ¶74). In addition to planning, and as mentioned above, a member of co-Defendant Vanguard America used Discord to distribute a drawing of Defendant Heimbach with "kill tallies" of communists, the words "nigger killer," and drawing of decapitated black men. (*Id.* at ¶116).

On the morning of the 12th, members of Defendant Traditionalist Worker Party met with members from Defendants Nationalist Front, League of the South, and National Socialist Movement "at a pre-set location in order to march to Emancipation Park in formation." (*Id.* at ¶196). Defendants Parrott, Heimbach, and other  Traditionalist Worker Party members then marched behind Defendant League of the South. (*Id.* at ¶200). Defendants in these formations

"charged through the peaceful clergy when they arrived at the park . . . and Plaintiff Wispelwey was knocked into a bush." (*Id.* at ¶208). Then, in Parrott's words, members worked with other Defendants "to help create two shield walls" for "the fight." (*Id.* at ¶212). This apparently was part of an "original plan to define and secure the event perimeter." (*Id.* at ¶214). Defendants Parrott and Traditionalist Worker Party then coordinated the placement of "detachment[s] of fighters" with other Defendants to "amply cover" their positions. (*Id.* at ¶212). Defendant Parrott described how, "[w]ith a full-throated rebel yell," co-Defendant League of the South member Michael Tubbs "towered over and pushed through the antifa like a Tyrannosaurus among raptors as League fighters with shields put their training to work." (*Id.*). Once the gathering was declared an unlawful assembly, Defendant Parrott was arrested for failure to disperse. (*Id.* at ¶228). A co-Defendant later thanked Defendant Traditionalist Worker Party for their work, referring to them as "true warriors." (*Id.* at ¶271).

Plaintiff's recounting of Defendant Parrott's own account of the events, as well as the other allegations of violence, plausibly allege that these three Defendants joined the conspiracy to commit racial violence. As with other Defendants, the First Amendment does not prevent the imposition of liability for the acts of violence alleged here. (*See id.* at ¶212 (summarizing Defendant Parrott's account of the fighting)).

### ix.    Michael Hill, Michael Tubbs, and League of the South

As with the three just-discussed Defendants, Defendants Michael Hill, Michael Tubbs, and League of the South were allegedly in the heart of the violence that occurred on Saturday the 12th. (Dkt. 175 at ¶¶ 34–36, 39, 50, 63, 67, 77, 94, 99, 187, 188, 196, 198–200, 212–14, 260, 318, 319, 322, 327). Defendant Michael Hill is the co-founder and President of Defendant League of the South. (*Id.* at ¶34). The white supremacist organization includes "an armed,

paramilitary unit" called "the Indomitables" that has been "tasked with advancing southern secession by any means necessary." (*Id.*). Defendant Michael Tubbs is the "Chief of Staff" of Defendant League of the South. (*Id.* at ¶35).

Defendant League of the South used Discord and Facebook to communicate with its members. (*Id.* at ¶¶77, 322). In the lead up to the events, Defendant Hill posted in the Facebook group, saying he wanted "no fewer than 150 League warriors, dressed and ready for action, in Charlottesville, Virginia, on 12 August." (*Id.* at ¶36). One member explained that he planned to attend the rally because "I intend to stand for the South and die for it if need be." (*Id.*).

They coordinated with the other Defendants. Defendant Kessler "promised that there would be hundreds of members of [Traditionalist Worker Party] and League of the South at the park as early as 8:00 a.m." on the 12th. (*Id.* at ¶188). Before going to the park, members met with co-Defendants "at a pre-set location in order to march to Emancipation Park in formation." (*Id.* at ¶196). Members then followed Defendant Hill, marching "with coordinated shields and flags," and carrying "rods and other weapons." (*Id.* at ¶198). Either as they approached the park, or once they were already within it, Defendant Tubbs ordered League of the South members "to attack by yelling 'charge!'" (*Id.* at ¶35). "After receiving this command, the group streamed past him to attack counter-protestors." *Id.*; *compare with Noto v. United States*, 367 U.S. 290, 297–98 (1961) ("[M]ere abstract teaching . . . is not the same as preparing a group for violent action and steeling it to such action. There must be some substantial direct or circumstantial evidence of a call to violence now or in the future which is both sufficiently strong and sufficiently pervasive to lend color to the otherwise ambiguous theoretical material . . . .").

And as recounted above, Defendant Parrott's account of the fighting explained how Defendant League of the South used their shields in the fighting. (*Id.* at ¶212). Defendant Tubbs

was the individual pushing "through the antifa like a Tyrannosaurus among raptors." (*Id.*). Defendant Parrott's account also explained that "League fighters with shields put their training to work." (*Id.*). Elsewhere, Defendant Hill claimed that "Mr. Tubbs was everywhere the chaos was." (*Id.* at ¶213). As the day wound down, "Defendant Hill tweeted 'The League of the South had a good day in Charlottesville, Virginia. Our warriors acquitted themselves as men. God be praised!'" (*Id.* at ¶260).

These allegations, specifically the acknowledgment by co-Defendant Parrott that Defendant League members were "putting their training to work," state a claim that these three Defendants entered into a conspiracy to commit racial violence.

        **x.**      **Jeff Schoep, National Socialist Movement, and Nationalist Front**

Defendant Schoep is a leader of Defendant National Socialist Movement, "the largest neo-Nazi coalition in the United States." (Dkt. 175 at ¶37). Defendant National Socialist Movement "is paramilitary in structure; its members claim to be lieutenants, sergeants, or other military ranks." (*Id*. at ¶38). Schoep is the organization's "Commander." (*Id.*). Schoep also formed Defendant Nationalist Front, which is an umbrella organization for groups such as Defendant Traditionalist Worker Party, the Aryan Terror Brigade, and regional factions of the Ku Klux Klan. (*Id.* at ¶37). Co-Defendants Heimbach and Hill also serve as leaders of Defendant Nationalist Front. (*Id.* at ¶39). Defendants Schoep, National Socialist Movement, Nationalist Front, and the members of their umbrella structure are featured throughout the complaint. (Dkt. 175 at ¶¶ 37, 39, 44, 63, 67, 117, 187, 188, 196, 201, 212, 214, 228, 231, 271, 319).

Other Defendants viewed Defendant National Socialist Movement as being more "hard core" than some of the other groups. A Defendant Vanguard America member explained

National Socialist Movement was needed in Charlottesville because "NSM fought so hard regardless of their optics. Do we need them at normie events? No. We need them in a fight? Yes." (*Id.* at ¶117). Likewise, another Discord described National Socialist Movement as "nuts . . . in a good way." (*Id.* at ¶188). Members from Defendant National Socialist Movement met with other Defendants "at a pre-set location in order to march to Emancipation Park in formation." (*Id.* at ¶196). Defendant Schoep, alongside Defendants Hill, Heimbach, and Parrott, led these Defendants in a "charge[] through [counter-]protesters, pushing and shoving them with their shields and rods." (*Id.* at ¶214). This was part of "the original plan to define and secure the event perimeter." (*Id.*). Defendants National Socialist Movement and Nationalist Front were also engaged in the fighting summarized by Defendant Parrott's account. (*Id.* at ¶212).

After the rally was declared an unlawful assembly, "Defendant Schoep also marched to McIntire Park, attacking counter-protestors along the way." (*Id.* at ¶228). He explained how he and others following him "went right through [counter-protestors] like warriors." (*Id.*). Then, according to Defendant National Socialist Movement's twitter account, Defendant Schoep "led a group of 40 back the 1.3 miles from [McIntire] park back to Lee Park, through Antifa and police interference!" (*Id.* at ¶231). Members crooned their admiration: "So much respect for my Commander Jeff Schoep. I will go into battle with you anytime Sir . . . ." (*Id.*). After everything had settled down, Defendant Schoep tweeted that "It was an Honor to stand with U all in C'Ville this weekend. [National Socialist Movement], [Nationalist Front], [Traditionalist Worker Party], [League of the South], [Vanguard America], [East Coast Knights], and the rest, true warriors!" (*Id.* at ¶¶37, 271)

As with the other Defendants discussed above, the Plaintiffs have plausibly alleged that these three Defendants were engaged in the conspiracy to commit racial violence against

counter-protestors. In particular, the Court returns to Defendant Parrott's account of these Defendants' role in the violence, the meeting and then organized fighting to enter the park, and Defendant Schoep's embrace of the other Defendants in his tweet.

### xi. Michael Peinovich

The only moving Defendant who Plaintiffs have failed to plausibly allege was part of the conspiracy is Defendant Michael Peinovich. Through their briefing and argument, Plaintiffs point to fourteen paragraphs that mention Peinovich. (Dkt. 175 at ¶¶ 42, 50, 52, 63, 96, 129, 141, 187, 207, 229, 230, 310, 326, 327). Two of those paragraphs contain merely conclusory language. (*See id.* at ¶63 ("[A list of all Defendants including Peinovich] all agreed and coordinated with and among each other to plan, organize, promote, and commit the unlawful acts that injured Plaintiffs and countless others in Charlottesville."); *id.* at ¶187(similar)). Other than these two conclusory paragraphs, there are no allegations that he participated in any violent acts.

The others do not plausibly allege that Defendant Peinovich joined the alleged conspiracy. Two paragraphs note he hosts a racist podcast, was featured on a poster for the rally, and spoke to followers after the events. (*Id.* at ¶¶42, 327). The podcast, without more, is protected speech. Another paragraph alleges that on his podcast, an unnamed individual asked "Now come on, beating up the wrong negro . . . is that even a possibility? Beat up the wrong nigger . . . ." (*Id.* at ¶96). Without more context about, for example, when and who said this and how Defendant Peinovich responded, this is insufficient to demonstrate Peinovich had entered an agreement to engage in racial violence at the events. The promotional poster at most demonstrates an agreement to promote the rally, an event which many people attended for divergent reasons. His promotion of the event is insufficient to plausibly allege an agreement to commit violence. Finally, the mere fact he addressed followers is innocuous. Although it is

ambiguous whether this was part of the same address, the complaint elsewhere alleges "Peinovich called the counter-protestors 'savages.'" (*Id.* at ¶230). This sort of name calling is far short of plausibly pleading an agreement to commit racial violence and, even within this context, is protected speech. *See, e.g., Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 246 (6th Cir. 2015) ("Offensive statements made generally to a crowd are not excluded from First Amendment protection; the insult or offense must be directed specifically at an individual.").

Turning to his actions at Emancipation Park, while Plaintiffs allege Defendant Peinovich arrived at the park in a passenger van, and was surrounded by a "security team," there are no allegations he was involved in violence. (*Id.* at ¶207). Likewise, the fact he reassembled with followers in McIntire Park, without an allegation of an agreement to commit violence, is insufficient. (*Id.* at ¶229).

Two other paragraphs concern only his appearances at a previous rally with some co-Defendants. (*Id.* at ¶¶50, 52). But there are no allegations these rallies were unlawful; Defendant Peinovich cannot be held liable simply for his associations. Three other paragraphs allege that Defendant Peinovich set up a legal fund before the rally and helped Defendant Cantwell fundraise from prison after the events. (*Id.* at ¶¶129, 310, 326). This sort of fundraising is too far removed from the other Defendants' violence to plausibly connect Defendant Peinovich to a conspiracy to commit violence.

Finally, Plaintiffs allege Defendant Peinovich tweeted, "Do these white business owners and shitlibs in CVille think that their virtue signaling mean they will be spared somehow? Lol." (*Id.* at ¶141). Peinovich was responding to signs put up by various organizations in Charlottesville that "voiced support for equality and diversity." (*Id.* at ¶140). Some of these businesses later received threatening mail. (*Id.* at ¶142). His tweet is still insufficient to

demonstrate a conspiracy to commit violence that injured these Plaintiffs. Even if these businesses were injured, a fact not alleged here, they are not parties to this lawsuit. This tweet does not plausibly allege an agreement to engage in racial violence *at these events*.

There are no allegations Defendant Peinovich engaged in violence. There are no allegations that he even used Discord. And in light of this discussion, there are no other plausible allegations that he joined the conspiracy to commit racial violence. Accordingly, the Court holds Plaintiffs' complaint fails to plausibly allege that Defendant Peinovich violated Section 1985(3), and so he will be dismissed without prejudice.

**D.      Whether Plaintiffs' injuries resulted from overt acts committed in furtherance of the conspiracy**

Plaintiffs have plausibly alleged that Defendants, other than Peinovich, joined a conspiracy to engage in racially motivated violence at the "Unite the Right" events. However, in order to hold Defendants liable, Plaintiffs must also plausibly allege they suffered injuries caused by Defendants' overt acts taken in furtherance of the conspiracy (the fourth and fifth elements). *A Soc'y Without A Name*, 655 F.3d at 346. For almost all Plaintiffs, this is not a problem.

Each Plaintiff need not be able to point to an injury incurred from each Defendant. Instead, because Plaintiffs have adequately pled that all Defendants (other than Peinovich) were part of the conspiracy, Plaintiffs may hold each Defendant liable for the reasonably foreseeable acts of their co-conspirators. *See, e.g., Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946) ("A different case would arise if the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement."); *United States v. Newsome*, 322 F.3d 328, 338 (4th Cir. 2003) ("[U]nder conspiracy law, he is liable for

the conduct of all co-conspirators that was in furtherance of the conspiracy and reasonably foreseeable to him."); *Willis v. Blevins*, 957 F. Supp. 2d 690, 700 (E.D. Va. 2013) (applying the reasonably foreseeable standard in a Section 1985(3) case).

### i.  Injuries incurred at the torchlight march

Plaintiffs Magill, Doe, and Romero allege they were pepper sprayed and otherwise assaulted at the base of the Thomas Jefferson statute on the night of August 11th. (Dkt. 175 at ¶¶11, 13, 18, 166, 169, 173, 174, 293). Injuries associated with these assaults were reasonably foreseeable consequences of the Defendants' conspiracy: Defendant Cantwell sprayed pepper spray at counter-protestors at the foot of the statue (*id.* at ¶22), Defendants Spencer and Cantwell led the charge of marchers towards the statue (*id.* at ¶¶164, 166), and Defendant Ray yelled "The heat here is nothing compared to what you're going to get in the ovens!" while torches were being thrown at them. (*Id.* at ¶169). These Plaintiffs have adequately pled their Section 1985(3) claims.

### ii.  Injuries incurred from Defendant Fields's attack

Plaintiffs Romero, Martin, Blair, Alvarado, Sines, and Muñiz were all injured by Defendant Fields's car attack. (*Id.* at ¶¶12, 15–19). Other Defendants may be held liable for these injuries if it was "reasonably foreseeable" to them that a co-conspirator would intentionally drive his car into a crowd of counter-protestors. The Court holds that Plaintiffs have adequately pled that Defendant Fields's attack was reasonably foreseeable for three reasons.

First, the exact possibility of running over counter-protestors was explicitly mentioned on the invite-only Discord platform before the events. The complaint alleges that a "run them over" catchphrase was popularized on the Fox Nation website, the Daily Caller website, and by Defendants. (Dkt. 175 at ¶236). For example, Defendant Heimbach had previously encouraged

a police car to run over protesters, saying "Don't stop, officer" and "Fucking step on the gas!" (*Id.*). A Discord user posted an image of a bus retrofitted with chainsaws and running over pedestrians. (*Id.* at ¶237). Another frequent Discord user responded, saying "I know NC law is on the books that driving over protesters blocking roadway isn't an offense . . . Sure would be nice." (*Id.* at ¶238). The user later asked whether it was "legal to run over protestors blocking roadways?" (*Id.* at ¶239). He clarified that this was not some sort of sick joke: "I'm NOT just shitposting. I would like clarification. I know it's legal in [North Carolina] and a few other states. I'm legitimately curious for the answer." (*Id.*). Kessler was part of a conversation where a different Discord user talked about how counter-protestors had previously flooded streets, and regretted that it was "[t]oo bad the civilians didn't just make new speed bumps for some of these scum." (*Id.* at ¶241). These posts were all on the private, invite-only, moderated platform that Defendants used.

Second, the Defendants planned to bring deadly weaponry to the event. (*See, e.g.,* dkt. 175 at ¶303 ("After the Unite the Right 'rally,' Defendant Cantwell explained, 'I came pretty well prepared for this thing today,' while pulling out three pistols, two semi-automatic machine guns, and a knife.")). Allegations concerning this level of weaponry demonstrate that it was eminently foreseeable to the Defendants that the rally could turn deadly. The fact that a counter-protestor was killed by a vehicle, instead of by the "semi-automatic machine guns" Defendants brought, provides a distinction that makes no difference to this analysis.

Third, multiple Defendants ratified Defendant Fields's attack after the fact. (Dkt. 175 at ¶¶263–67, 272–73). For example, Defendant Loyal White Knights said: "Nothing makes us more proud at the KKK than we see white patriots such as James Fields, Jr, age 20, taking his car and running over nine communist anti-fascist, killing one nigger-lover named Heather Heyer.

James Fields hail victory." (Dkt. 175 at ¶272). Defendant Kessler tweeted "Communists have killed 94 million. Looks like it was payback time." (Dkt. 175 at ¶267). Others made similar comments. These ratifications plausibly demonstrate that Defendant Fields's actions were consistent with the conspiracy's avowed goals.

In light of the discussion of these sorts of attacks, the potentially deadly nature of the planned violence, and the various ratifications of Defendant Fields's attack, the Court finds Plaintiffs Romero, Martin, Blair, Alvarado, Sines, and Muñiz have adequately pled Defendant Fields's attack was reasonably foreseeable to his co-conspirator Defendants. Accordingly, Plaintiffs have plausibly alleged that these co-conspirator Defendants may be held liable for the overt act Fields's took in furtherance of the conspiracy. *See United States v. Newsome*, 322 F.3d 328, 338 (4th Cir. 2003). Of course, factual development may undermine this conclusion.

### iii. Plaintiffs Wispelwey and Pearce

That leaves only two remaining Plaintiffs. Plaintiff Wispelwey was "knocked into a bush" when rally attendees charged through peaceful clergy, "[c]onsistent with their elaborate planning and lessons in battlefield tactics." (*Id.* at ¶208). While Plaintiff Wispelwey does not allege which specific Defendant knocked him into a bush, the preceding paragraphs of the complaint extensively allege that specific Defendants, including Vanguard America and League of the South, organized in military formations outside Emancipation Park. (*Id.* at ¶¶195–98). Defendant Parrott specifically alleges that Defendant League of the South entered the park by breaking "through the wall of degenerates and [an otherwise unidentified individual named "TradWorker"] managed to enter the [Emancipation] Park venue itself while they were largely still reeling." (*Id.* at ¶212). Plaintiffs also allege Defendants "use[d] shields, flags, or fists to break through the blockade of counter-protestors" in order to enter the park. (*Id.* at ¶209). In

light of the specificity of these allegations of how Defendants entered the park, and Plaintiff Wispelwey's allegation that he was knocked over by someone who was acting consistently with these "battlefield tactics," he has plausibly alleged his injuries were caused by overt actions of the Defendants.

On the other hand, while the Court in no way minimizes the injuries Plaintiff Pearce suffered, she has not sufficiently alleged her injuries were caused by overt acts committed in connection with Defendants' conspiracy. Pearce is mentioned in nine paragraphs. (*Id.* at ¶¶14, 138, 202, 219–22, 258, 295). Some of these paragraphs only allege injury in a conclusory fashion. (*See, e.g., id.* at ¶14 ("On the basis of her religion, Pearce was threatened, harassed, intimidated, and physically assaulted."). Others mention fear of injury that was not associated with a specific overt act of any Defendant. (*See, e.g., id.* at ¶¶138, 219, 295). There is no allegation she was exposed to certain anti-Semitic banners allegedly carried by a Defendant. (*See id.* at ¶202). And the most targeted injuries and insults were made by anonymous "co-conspirators," who Plaintiffs have failed to plausibly allege were part of Defendants' conspiracy. (*See id.* at ¶¶220, 221). While the Court finds Plaintiff Pearce has insufficiently alleged her injuries were caused by overt acts made in connection with the conspiracy, she may seek leave to amend with more specific factual allegations if she is able to provide them.

Accordingly, each of the Plaintiffs except Pearce has alleged they suffered injuries that were caused by an overt act in furtherance of the moving Defendants' conspiracy.

## E. Count I conclusion

The Court concludes Plaintiffs have, for the most part, adequately alleged that Defendants formed a conspiracy to hurt black and Jewish individuals, and their supporters, because of their race at the August 11th and 12th events. The alleged violence is greater than

that alleged in *Griffin*, and likewise "lies so close to the core of the coverage intended by Congress [in enacting Section 1985(3)] that it is hard to conceive of wholly private conduct that would come within the statute if this does not." 403 U.S. at 103. There are two caveats to that general conclusion. First, Plaintiff Pearce's Section 1985(3) claims against the moving Defendants will be dismissed because she has not adequately connected her injuries to these Defendants. Second, the Section 1985(3) claims against Defendant Peinovich will be dismissed because Plaintiffs have not adequately alleged he joined the conspiracy. Finally, while the Court has pointed out conduct and statements that were not protected by Defendants' First Amendment defense along the way, that defense is addressed more fulsomely at the end of this opinion.

## IV. COUNT II: 42 U.S.C. § 1986

In Count Two, Plaintiffs allege all Defendants violated 42 U.S.C. § 1986, which provides:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured . . . for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented . . . .

"A cause of action based upon § 1986 is dependent upon the existence of a claim under § 1985." *Trerice v. Summons*, 755 F.2d 1081, 1085 (4th Cir. 1985); *id.* ("Having affirmed the dismissal of plaintiff's § 1985 claim, we also affirm the dismissal of his § 1986 claim."). The Defendants merely argue that the Section 1986 claim must fail because the Section 1985(3) claim must fail. But as just discussed, those claims survive, and so this argument must be discarded for the majority of the Defendants. With respect to Defendant Peinovich, just as Plaintiffs have failed to plausibly allege that he was part of the underlying conspiracy, they have also failed to allege that he (1) was aware of a conspiracy to commit violence or (2) had "power to prevent or aid in preventing the commission of the same." 42 U.S.C. § 1986. Accordingly, as with the Section

1985(3) claim, the Section 1986 claim against him will be dismissed.  Finally, because Plaintiff

Pearce has insufficiently pled that she was injured by these Defendants, her Section 1986 claim

fails for the same reasons discussed in the Section 1985(3) context.

## V.   COUNT III: CIVIL CONSPIRACY

In Count III, Plaintiffs allege a common law conspiracy under Virginia law.  The

complaint alleges all Defendants conspired together to commit various state law torts and crimes

against all the Plaintiffs.[4]  Although a different claim, the above Defendant-by-Defendant

Section 1985(3) analysis also governs the analysis here.  This is because Plaintiffs have alleged

Defendants committed various assaults, batteries, and violations of Virginia's hate crime statute

in furtherance of the above conspiracy to commit racial violence.

"A common law conspiracy consists of two or more persons combined to accomplish, by

some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal

or unlawful means."  *Commercial Bus. Sys., Inc. v. Bellsouth Servs.*, Inc., 249 Va. 39, 48 (1995);

*see also Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 320 (4th Cir. 2012) (quoting *Commercial

Bus. Sys.*).[5]  "[T]he plaintiff must first allege that the defendants combined together to effect a

preconceived plan and unity of design and purpose, for the common design is the essence of the

conspiracy."  *Bay Tobacco, LLC v. Bell Quality Tobacco Products, LLC*, 261 F.Supp.2d 483,

499 (E.D.Va. 2003) (internal citations and quotation marks omitted).  Here, the just-described

---

[4]     While Plaintiffs maintain there were some eighteen different laws violated in furtherance
of the conspiracy, only four are discussed in Plaintiffs' opposition to the motion to dismiss.
(Dkt. 231 at ECF44–48).  The Court expects this list to be winnowed as the parties develop the
facts.

[5]     Defendants argue that under *Vansant & Gusler, Inc. v. Washington*, 245 Va. 356 (1993),
there is no general civil cause of action for criminal violations.  While that is true as general
matter, it neither undermines nor addresses the above case law describing counts of common law
conspiracy based on criminal violations.  The Court also notes tort liability would exist for the
same alleged assaults and battery.

conspiracy to commit racial violence at the "Unite the Right" events provides such a conspiracy. As demonstrated in the Defendant-by-Defendant analysis, Plaintiffs have plausibly alleged that Defendants (other than Defendant Peinovich) conspired to assault counter-protesters out of racial animus.

A claim of civil conspiracy also "requires proof that the underlying tort was committed" by a co-conspirator in furtherance of that conspiracy. *Almy v. Grisham*, 273 Va. 68, 80 (2007); *Terry v. SunTrust Banks, Inc.*, 493 F. App'x 345, 357 (4th Cir. 2012) ("The 'unlawful act' element requires that a member of the alleged conspiracy have 'committed' an 'underlying tort.'"). Additionally, the plaintiff must suffer an injury from the tort: "The gist of the civil action of conspiracy is the damage caused by the acts committed in pursuance of the formed conspiracy and not the mere combination of two or more persons to accomplish an unlawful purpose or use unlawful means." *CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 28 (1993).

As discussed above when addressing the fourth and fifth elements of the Section 1985(3) claim, Plaintiffs (other than Pearce) have adequately pled specific alleged violations of state tort and statutory law. More specifically, the alleged injuries to Plaintiffs' persons at the Friday night march, Saturday rally, and car attack would all violate Virginia's hate crime statute (discussed more robustly under the following count) and constitute assaults and batteries. *See* Va. Code Ann. § 8.01-42.1(A) ("An action for . . . civil damages, or both, shall lie for any person who is subjected to acts of (i) intimidation or harassment or (ii) violence directed against his person . . . where such acts are motivated by racial, religious, or ethnic animosity."); *Koffman v. Garnett*, 265 Va. 12, 16 (2003) ("The tort of battery is an unwanted touching which is neither consented to, excused, nor justified."); *id.* ("The tort of assault consists of an act intended to cause either

harmful or offensive contact with another person or apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery."). Plaintiffs (other than Pearce) have also pled that their injuries were caused by these unlawful acts of Defendants.

As with Count I, the Court concludes Plaintiffs have, for the most part, adequately alleged that Defendants formed a conspiracy to attack black and Jewish counter-protesters, and their supporters, because of racial animus. Those allegations, reviewed in detail above, can support the civil conspiracy claims. The two caveats to that general conclusion remain. First, Plaintiff Pearce's common law conspiracy claims against the moving Defendants will be dismissed. Second, the common law claims against Defendant Peinovich will also be dismissed.

## VI. COUNT V: VIOLATION OF VIRGINIA CODE § 8.01-42.1

In Count Five, Plaintiffs Wispelwey, Magill, Muñiz, Doe, Sines, Blair, Martin, Alvarado, and Romero allege Defendants Fields, Mosley, Spencer, Kessler, Ray, Cantwell, and Invictus violated Virginia's hate crime statute.

Plaintiffs state a claim against any Defendant who engaged in "intimidation or harassment or . . . violence directed against his person . . . where such acts are motivated by racial, religious, or ethnic animosity." Va. Code Ann. § 8.01-42.1(A). Very few courts have provided elaboration of the statute. Cases have found the statute satisfied when defendants "used racial slurs and physically attacked [the plaintiffs] because of their race," *Frazier v. Cooke*, No. 4:17-CV-54, 2017 WL 5560864, at *7 (E.D. Va. Nov. 17, 2017); when a defendant's employee "harassed plaintiff based on racial animus because he apprehended her, used a racial slur, and later implied that African–Americans came into [the store] to steal," *Berry v. Target Corp.*, 214 F. Supp. 3d 530, 535 (E.D. Va. 2016); and when a skating rink, which was under a consent

decree for denying equal access to public accommodations, singled the plaintiff out for discriminatory treatment and called the police on him, *Johnson v. Hugo's Skateway*, 949 F.2d 1338 (4th Cir. 1991), *on reh'g*, 974 F.2d 1408 (4th Cir. 1992).

Each of the Plaintiffs bringing this claim (Wispelwey, Magill, Muñiz, Doe, Sines, Blair, Martin, Alvarado, and Romero) must demonstrate each of the moving Defendants (Mosley, Spencer, Kessler, Ray, and Cantwell) violated the statute. To start, Plaintiffs Muñiz, Blair, Martin, and Alvarado do not allege they ever interacted with these Defendants; they allegedly incurred injuries from Defendant Fields's attack. In response to the motions to dismiss, these Plaintiffs do not attempt to identify any allegations that the moving Defendants violated this statute. These Plaintiffs' claims against the moving Defendants will be dismissed.

That leaves Plaintiffs Wispelwey, Magill, Doe, Sines, and Romero. Plaintiff Sines claims against the moving Defendants will also be dismissed. In response to the motion to dismiss, she points to two paragraphs. In the first of these, she alleges that she "heard the marchers chanting slogans chosen for their intimidating and racially harassing effect." (Dkt. 175 at ¶161). But this allegation neither alleges the chants were "directed against [her] person," Va. Code Ann. § 8.01-42.1(A), nor alleges that one of these specific Defendants was chanting. In the second, she alleges she "witnessed co-conspirators throwing fuel and tiki torches at the peaceful protestors around the statue." (Dkt. 175 at ¶170). The same problems apply. Plaintiff neither alleges that these specific Defendants were the ones throwing fuel and torches, nor does she allege that this conduct was directed at her. Her claims under this statute against the moving Defendants will be dismissed.

Likewise, Plaintiff Wispelwey's claims against the moving Defendants cannot survive. In response to the motion to dismiss, he identifies five relevant paragraphs. (*Id.* at ¶¶178–82).

These paragraphs describe the church service that occurred across from the Rotunda, where Wispelwey and others could see the mob and their torches. (*Id.*). But the only Defendant mentioned by name in these paragraphs is Defendant Invictus, who is not moving to dismiss. As to the other Defendants, these paragraphs fail to plausibly allege that this conduct was directed against Plaintiff Wispelwey or that these Defendants were specifically involved.

Plaintiffs Magill, Doe, and Romero were each surrounded by the marchers at the base of the Thomas Jefferson statue. (*Id.* at ¶¶164–69). They have plausibly alleged violations of the hate crime statute by Mosley, Spencer, Kessler, Ray, and Cantwell, and so the motion to dismiss these claims against these Defendants will be denied. Plaintiffs allege the torchlight march was designed to intimidate racial minorities by replicating the Ku Klux Klan's and Nazi's use of torches. (*Id.* at ¶150). Plaintiffs allege that the torch-wielding mob, including each of these Defendants, "charged toward a small group . . . including Plaintiffs John Doe and Romero, who had locked arms around the statue of Thomas Jefferson." (*Id.* at ¶¶143, 164, 169, 172). Magill later joined Doe and Romero at the statue. (*Id.* at ¶169). These Plaintiffs were surrounded by Defendants and other marchers. (*Id.* at ¶166). Marchers then "began to kick and punch the protesters around the statue, using their torches as weapons, and to beat the individuals onto the ground." (*Id.* at ¶168). Marchers also threw fluid, which Plaintiffs feared was fuel, onto them. (*Id.* at ¶169). Marchers then threw their torches in the air at Plaintiffs and other counter-protesters. (*Id.*). Defendant Ray said, "The heat here is nothing compared to what you're going to get in the ovens!" (*Id.*).

Even if some of the torchlight march could be characterized as expressive conduct, the combination of the torches and this violence was not protected by the First Amendment, and these moving Defendants can be held liable under Virginia's hate crime statute. "[T]he First

Amendment . . . permits a State to ban a 'true threat.'" *Virginia v. Black*, 538 U.S. 343, 359 (2003). "Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Id.* at 360. Just as the Supreme Court has recognized that cross burnings are often intimidating, the torchlight march and the violence directed at Plaintiffs and other counter-protesters at the foot of the Thomas Jefferson statute, was likewise intimidating "in the constitutionally proscribable sense of the word." *Id.* Plaintiffs Magill, Doe, and Romero have plausibly alleged that Defendants Mosley, Spencer, Kessler, Ray, and Cantwell engaged in "intimidation or harassment or . . . violence directed against [their] person[s] . . . where such acts are motivated by racial, religious, or ethnic animosity." Va. Code Ann. § 8.01-42.1(A). Accordingly, their claims will survive.

## VII. REMAINING DEFENSES AND ISSUES

While Defendants' specific arguments have been addressed throughout, the Court now turns to two remaining defenses that were framed at a higher level of abstraction concerning the First and Second Amendments. The Court finds that neither requires dismissal at this stage, although concerns about the possibility of chilling First Amendment speech do inform the entirety of this opinion. Finally, the Court also addresses two other general issues: judicial notice and Virginia law governing unincorporated associations.

### A. The First Amendment

Defendants argue their conduct was generally protected by the First Amendment. Of course, *peaceful* picketing, *see Thornhill v. State of Alabama*, 310 U.S. 88 (1940), and *peaceful* marching, *see Edwards v. South Carolina*, 372 U.S. 229 (1963), are the sorts of expressive activities that are protected by the First Amendment. And some of the Defendants' behavior

certainly was protected by the First Amendment. After all, the genesis of the Defendants'
interest in Charlottesville was the renaming of the park. Picketing and marching protesting that
decision, even if motivated by racist ideology, *see Brandenburg v. Ohio*, 395 U.S. 444, 447
(1969), would be protected speech. *See generally Citizens Against Rent Control/Coal. for Fair
Hous. v. City of Berkeley, Cal.*, 454 U.S. 290, 295 (1981) ("The Court has long viewed the First
Amendment as protecting a marketplace for the clash of different views and conflicting ideas.").
These are the First Amendment values that led Judge Conrad to grant a preliminary injunction
enjoining Charlottesville from revoking Defendant Kessler's permit last August. *See Kessler v.
City of Charlottesville, Virginia*, No. 3:17CV00056, 2017 WL 3474071, at *3 (W.D. Va. Aug.
11, 2017).[6]

But "[t]he First Amendment does not protect violence." *N.A.A.C.P. v. Claiborne
Hardware Co.*, 458 U.S. 886, 916 (1982). And so "if [the Defendants] have formed or are
engaged in a conspiracy against the public peace and order" and thereby "transcend the bounds
of the freedom of speech which the Constitution protects," any law holding them liable for such
conspiracy does not violate the First Amendment. *De Jonge v. State of Oregon*, 299 U.S. 353,
365 (1937); *Brown v. Hartlage*, 456 U.S. 45, 55 (1982) ("Although agreements to engage in
illegal conduct undoubtedly possess some element of association, the State may ban such illegal
agreements without trenching on any right of association protected by the First Amendment.");

---

[6]     Defendant Kessler applied for and was originally granted a permit for the Saturday rally.
*See Kessler v. City of Charlottesville, Virginia*, 2017 WL 3474071, at *1 (providing further
background). However, "[o]n August 7, 2017, less than a week before the long-planned
demonstration at the Park, the defendants notified Kessler by letter that they were 'revok[ing]'
the permit." *Id.* Defendant Kessler filed a motion for a preliminary injunction, which Judge
Conrad granted. Judge Conrad granted the motion, finding Kessler was likely to succeed on the
merits, because "the evidence cited by Kessler supports the conclusion that the City's decision
constitutes a content-based restriction of speech" and the City did not come forward with
evidence that supported its proffered reason for the revocation. *Id.* at *2.

*United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012) ("Forming an agreement to engage in criminal activities—in contrast with simply talking about religious or political beliefs—is not protected speech."). Just as those conspiracies can violate the criminal law, the First Amendment does not prohibit "tort liability for . . . losses that are caused by violence and by threats of violence." *Claiborne Hardware Co.*, 458 U.S. at 916. As described above, Plaintiffs plausibly allege that the Defendants formed just such a conspiracy to commit violence, and so the First Amendment does not protect Defendants.

To be clear, if Plaintiffs alleged Defendants only engaged in "abstract" advocacy of violence, those statements would be protected. *See Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 243 (4th Cir. 1997) ("[A]bstract advocacy of lawlessness is protected speech under the First Amendment."); *Claiborne Hardware Co.*, 458 U.S. at 927 ("[M]ere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment."); *Brandenburg*, 395 U.S. at 447 ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."). The complaint, though, is replete with specific allegations that extend beyond mere "abstract" advocacy. The allegations of physical assault are "not by any stretch of the imagination expressive conduct protected by the First Amendment." *Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993). And even many of those allegations that do concern expressive conduct, which the Court included in its above analysis, fall into three main categories of speech that extend beyond the First Amendment's protections for advocacy.

First, as the Supreme Court recognized in *Claiborne Hardware*, "a finding that [a Defendant] authorized, directed, or ratified specific tortious activity would justify holding him

responsible for the consequences of that activity." 458 U.S. at 927. The allegations that Defendants directed a charge towards Plaintiffs while they were around the Jefferson statute (dkt. 175 at ¶164), sprayed them with pepper spray (*id.* at ¶172), ratified the other assaults (*id.* at ¶¶166, 169, 172), organized and oversaw violence in the park (*id.* at ¶212), and ratified Defendant Fields's attack all fall within this category. (*Id.* at ¶267).

"Second, a finding that [a Defendant's public statements] were likely to incite lawless action could justify holding him liable for unlawful conduct that in fact followed within a reasonable period." *Claiborne Hardware*, 458 U.S. at 927. Falling within this category are the allegations that Defendants encouraged the throwing of torches at counter-protesters (dkt. 175 at ¶169), and ordered others to "charge!" (*id.* at ¶35). *See also Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 246 (6th Cir. 2015) ("The *Brandenburg* test precludes speech from being sanctioned as incitement to riot unless (1) the speech explicitly or implicitly encouraged the use of violence or lawless action, (2) the speaker intends that his speech will result in the use of violence or lawless action, and (3) the imminent use of violence or lawless action is the likely result of his speech.").

"Third, [otherwise protected speech] might be taken as evidence that [a Defendant] gave other specific instructions to carry out violent acts or threats." *Claiborne Hardware*, 458 U.S. at 927. Multiple allegations fall into this category, including allegations Defendants distributed shield fighting tactics (dkt. 175 at ¶192), instructed members to wear "good fighting uniforms" (*id.* at ¶ 115), and recommended attendees "bring picket sign posts, shields, and other self-defense implements which can be turned from a free speech tool to a self-defense weapon should things turn ugly." (*Id.* at ¶112). Taken by themselves, these statements may be protected. But

taken in light of the other allegations, they can serve as evidence of an agreement to commit violence.

While Defendants are incorrect in suggesting that the First Amendment immunizes them entirely, it does require a careful parsing of the allegations. When conspiracy or other unprotected speech "occurs in the context of constitutionally protected activity, . . . 'precision of regulation' is demanded." *Claiborne Hardware Co.*, 458 U.S. at 916 (quoting *N. A. A. C. P. v. Button*, 371 U.S. 415, 438 (1963)); *id.* at 908 ("The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected."). "Specifically, the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages." *Id.* at 916–17.

One of the primary effects of these restraints is that Plaintiffs may recover "[o]nly those losses proximately caused by unlawful conduct[.]" *Claiborne Hardware Co.*, 458 U.S. at 918. This requires tracing the "specific parties [who] agreed to use unlawful means" and "identify[ing] the impact of such unlawful conduct." *Id.* at 933–34. These requirements substantially overlap with the pleading requirements framed above. *See A Soc'y Without A Name*, 655 F.3d at 347 (holding Section 1985(3) allegations were insufficient when the plaintiff "fail[ed] to allege with any specificity the persons who agreed to the alleged conspiracy, the specific communications amongst the conspirators, or the manner in which any such communications were made"). And so, as described there, the Court has required Plaintiffs to plausibly allege that their various injuries resulted from agreements made by specific Defendants; they cannot allege that all the rally attendees who disagree with them were part of

one overarching conspiracy. The Court has imposed this heightened standard to the pleadings in order to satisfy the "precision of regulation" demanded by the First Amendment. *Claiborne Hardware Co.*, 458 U.S. at 916. However, Defendants' more general argument that it is immunized from liability by the First Amendment fails.[7]

## B. The Second Amendment

Many of the above allegations note that Defendants brought weapons (*e.g.*, assault rifles, shields, poles, and pepper spray) to the Friday and Saturday events. Defendants briefly argue that the Second Amendment protected their rights to bring these weapons to the rally. But Plaintiffs' theory here is not that Defendants incurred liability by *bringing* these weapons, but by *using* them. (Dkt. 231 at ECF 52). As Plaintiffs correctly point out, the Second Amendment "right of the people to keep and bear Arms" no more insulates Defendants from civil liability for the use of their weapons in an assault than it insulates a criminal defendant from liability because he committed his crime with a weapon. "Like most rights, the right secured by the Second Amendment is not unlimited." *D.C. v. Heller*, 554 U.S. 570, 626 (2008).

---

[7] Two remaining First Amendment arguments can be dismissed quickly. First, a few Defendants argue that this Court's August 2017 order enjoining Charlottesville from revoking the attendee's permit establishes the legality of the rally as a matter of *res judicata*. But that *ex ante* determination, that included none of these Plaintiffs, about whether Charlottesville violated the First Amendment is completely different than this *ex post* consideration of whether Defendants violated specific laws. As just discussed, Defendants and other rally attendees did have legitimate First Amendment rights at the rally, but the problem is that Plaintiffs allege Defendants exceeded the bounds of those rights by conspiring to commit violence.

Second, the same Defendants argue that the torchlight march was an expressive activity that is no different than flag burning. *See, e.g., Texas v. Johnson*, 491 U.S. 397 (1989). While this may or may not be correct, *see, e.g., Virginia v. Black*, 538 U.S. 343 (2003) (cross burning is not necessarily protected by the First Amendment because true threats are not protected speech), Plaintiffs' allegations are based not just on the torches themselves, but on the associated violence that occurred during the march. As just discussed, that violence is not protected by the First Amendment.

Likewise, Defendants point to no authority preventing the Court from considering Defendants' decisions to bring substantial amounts of weapons to the rally as evidence of a plan to engage in violence. (*See, e.g.,* dkt. 175 at ¶303 ("After the Unite the Right 'rally,' Defendant Cantwell explained, 'I came pretty well prepared for this thing today,' while pulling out three pistols, two semi-automatic machine guns, and a knife. Of the next 'alt-right protest,' he said, 'it's going to be tough to top but we're up to the challenge . . . I think a lot more people are going to die before we're done here, frankly.'")). While the reasonableness of this inference may vary based on specific allegations (*e.g.*, an individual lawfully carrying a licensed gun does not reasonably give rise to this inference), some of Plaintiffs' allegations concerning weapons do support an inference that Defendants planned to engage in racially motivated violence at the rally. (*See, e.g., id.* at ¶191 ("Vanguard is fabricating 20 additional shields. We should have a good amount between organizations."); *id.* at ¶192 (describing a "Shield Tactics Primer" and "a video illustrating shield fighting techniques" posted on Discord); *id.* at ¶212 (describing how Defendants used shields in "the fight")). Defendants cite no cases to the contrary, choosing instead to invoke *Heller* and *McDonald* as talismans. Defendants' Second Amendment arguments fall flat.

## C.     Judicial notice

Defendants also ask the Court to take judicial notice of various documents and videos, ranging from the Heaphy Report (a report Charlottesville commissioned in the wake of the rally) to YouTube videos of speeches Defendants' made at the rally. *See generally* Fed. R. Evid. 201. First, Defendants wish to demonstrate that the City of Charlottesville and various counter-protesters were also responsible for the violence. While the Court has reviewed the Heaphy Report, other potential causes of violence mentioned by it do not undermine Plaintiffs'

allegations about these Defendants' conspiracy to commit violence. Even assuming it is proper to take judicial notice of the whole report, *see* Fed. R. Evid. 201(b) ("The court may judicially notice a *fact* . . . ."), its only relevance here is to provide general background to the allegations.

Second, Defendants also wish to provide context for various quotes and statements that they made through videos and transcripts of their speeches and statements. Here, the Court declines to take judicial notice of these documents because doing so would lead the Court into some of the fundamental factual disputes of the case, disputes that are appropriate for discussion later in the litigation. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 511 (4th Cir. 2015) ("We are mindful that judicial notice must not 'be used as an expedient for courts to consider 'matters beyond the pleadings' and thereby upset the procedural rights of litigants to present evidence on disputed matters.'"). More specifically, because "[t]he parties clearly and reasonably disagree about the meaning to be ascribed to these [statements]," it is appropriate for the Court to "decline to judicially notice them." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 216 (4th Cir. 2009).

## D. Unincorporated associations under Va. Code § 8.01-15

Multiple Defendants are sued as "unincorporated associations" under Virginia law. Virginia Code § 8.01-15 "provides that unincorporated associations may sue or be sued in their own name, but does not otherwise alter the legal definitions of such groups." *Bedford Genealogical Soc., Inc. v. Bedford Museum & Genealogical Library*, No. CIV.A. 6:09-CV-00060, 2010 WL 2038843, at *3 n.4 (W.D. Va. May 21, 2010). And so, looking to the common law governing unincorporated associations, "[a]n unincorporated association is a collection of individuals gathered for a common purpose and 'is not a legal entity separate from the persons who compose it.'" *Id.* (quoting Black's Law Dictionary, association (8th ed. 2004)). "Such an

association suggests an organized group made up of persons who become members of the association voluntarily, but subject to certain rules or by-laws; the members are customarily subject to discipline for violations or non-compliance with the rules of the association." *Yonce v. Miners Mem'l Hosp. Ass'n*, 161 F. Supp. 178, 186 (W.D. Va. 1958). The word has been used to refer to "associations such as trade unions, fraternal organizations, business organizations, and the like." *Id.* Another court has listed the following unincorporated associations: "a hospital association, real estate investment trust, racing commission, landowner association, and a labor organization." *Muniz v. Fairfax Cty. Police Dep't*, No. 1:05CV466 (JCC), 2005 WL 1838326, at *2 n.2 (E.D. Va. Aug. 2, 2005). Generally, associations have the abilities "to prescribe the conditions or qualifications of their membership or their duties, to enlarge or reduce their membership, to enlarge or decrease the scope of their activities, [and] to dissolve the association . . . ." *Yonce*, 161 F. Supp. at 186.

Only one organizational Defendant addresses whether it qualifies as an "unincorporated associations," and it does so by introducing an affidavit that is not properly before the Court at this stage.[8] However, the Court will eventually need to consider the question in order to

---

[8]    Defendant Nationalist Front briefly raised this issue in a motion to dismiss filed in response to the original complaint. (Dkt. 105 at 1–2; dkt. 207). Defendant Schoep, the founder of Defendant Nationalist Front, filed an affidavit in support of the motion to dismiss. (Dkt. 105-1). The affidavit states that Nationalist Front "has no existence other than [its] website." (*Id.* at ¶9). This is directly contradicted by Plaintiffs' allegations that Defendants Schoep and Heimbach "co-chair" the organization (dkt. 175 at ¶31), that Defendant Hill also assists in its leadership (*id.* at ¶39), that it was designed to be "the thread that would unite white supremacist and white nationalist circles" (*id.* at ¶39), and that its members were present and acted as "warriors" at the Saturday rally (*id.* at ¶¶37, 196, 212). Considering this affidavit and resolving whether Defendant Nationalist was merely a website or instead a platform for Defendants to coordinate their conduct at the rally would require the Court to treat this as a motion for summary judgment. Fed. R. Civ. P. 12(d). Furthermore, Defendant Nationalist Front does not respond to Plaintiffs' argument that consideration of the affidavit would be inappropriate without allowing Plaintiffs time for discovery. The Court holds consideration of the affidavit would be inappropriate at this stage, and so the affidavit will be excluded. *See Occupy Columbia v. Haley*,

determine what alleged actions and statements of individuals are attributable to the purported unincorporated associations. *See* 7 *Corpus Juris Secundum* Associations § 75 (2018 Westlaw) ("An unincorporated association, formed to accomplish a common purpose, is bound to use the same care to avoid injury to others as natural persons, and it may be liable in tort for the wrongful acts of its members *when acting collectively in the prosecution of the business for which it is organized. . . .* An association may not be held liable for torts of a member when it has no control over his or her acts." (emphasis added)).[9] But because this issue is not properly before the Court at this stage and requires further factual development, the Court does not consider these issues at this stage of the litigation.

---

738 F.3d 107, 117 (4th Cir. 2013) (affirming district court's refusal to consider affidavits at the motion to dismiss stage). The parties may seek leave to brief this issue on an expedited basis.

[9]   Difficult questions are also raised by the alleged ratification of certain actions (*e.g.*, Defendant Fields's car attack) by various organizational Defendants. *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 931 (1982) ("To impose liability without a finding that the NAACP authorized—either actually or apparently—or ratified unlawful conduct would impermissibly burden the rights of political association that are protected by the First Amendment."); *see also* 7 *Corpus Juris Secundum* Associations § 75 (2018 Westlaw) ("In the absence of authorization or ratification by all of its members, an association can only be held liable for the unintentional act of an agent or employee, and cannot be held to account for the intentional act of an agent which results in a trespass."); *id.* at § 71 ("An unincorporated association can ratify the conduct of one of its members and an unincorporated association's ratification of an unauthorized act of one of its members has retroactive effect.").

Another thorny issue is whether actions of these organizations can create liability for their individual members. *See Feldman v. N. British & Mercantile Ins. Co.*, 137 F.2d 266, 268 (4th Cir. 1943) ("It is generally held that an unincorporated voluntary association, formed to accomplish a common purpose, is bound to use the same care to avoid injury to others as natural persons, but mere membership in the body or contribution of dues or money to effectuate the common purpose does not make all the members liable for unlawful acts of the association done without their participation and without their knowledge or approval.") (applying South Carolina law); *see also Bedford Genealogical Soc., Inc. v. Bedford Museum & Genealogical Library*, No. CIV.A. 6:09-CV-00060, 2010 WL 2038843, at *3 (W.D. Va. May 21, 2010) ("The unilateral acts of certain Society members—without notice to or the knowledge or consent of the entire membership—in forming a corporation of the same name did not transfer the assets or members of the unincorporated association to the corporation.").

## VIII. Conclusion

> In litigation of this kind the stakes are high. Concerted action is a powerful weapon. History teaches that special dangers are associated with conspiratorial activity. And yet one of the foundations of our society is the right of individuals to combine with other persons in pursuit of a common goal by lawful means.

*Claiborne Hardware Co.*, 458 U.S. at 932–33. While the Court acknowledges the weighty First Amendment interests implicated by the "Unite the Right" events, Plaintiffs here have plausibly alleged conduct that lies "close to the core of the coverage intended by Congress" when it passed the Ku Klux Klan Act to address violence against racial minorities. *Griffin*, 403 U.S. at 103; *Great Am. Fed. Sav. & Loan Ass'n*, 442 U.S. at 368, 394. Accordingly, the Court will largely deny the motion to dismiss. Defendant Peinovich will be dismissed from the case. Plaintiff Pearce's claims against the moving Defendants will be dismissed, although the Court does not address her claims against the non-moving Defendants. And the claims under the Virginia hate crime statute survive only for those Plaintiffs who were injured at the torchlight march.[10]

An appropriate order will issue. The Clerk of Court is requested to send a copy of this Opinion and the accompanying Order to the parties.

Entered this ___9th___ day of July, 2018.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

[10] Counts Four, Five, and Six are only alleged against Defendant Fields, and are tied to his car attack. He has not moved to dismiss, and so these claims are not addressed here.