```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF VIRGINIA
 2                     CHARLOTTESVILLE DIVISION

 3   ELIZABETH SINES, et al.,
                                       No. 3:17-cv-72
 4                     Plaintiffs,
                                       Charlottesville, Virginia
 5       vs.                           November 9, 2018
                                       2:32 p.m.
 6   JASON KESSLER, et al.,

 7                     Defendants.

 8               TRANSCRIPT OF TELEPHONIC MOTION HEARING
                  BEFORE THE HONORABLE JOEL C. HOPPE
 9                  UNITED STATES MAGISTRATE JUDGE.
     APPEARANCES:
10
     For the Plaintiffs:
11
     ROBERTA ANN KAPLAN            PHILIP MATTHEW BOWMAN
12   GABRIELLE E. TENZER           Boies Schiller Flexner, LLP
     Kaplan & Company, LLP         575 Lexington Avenue, 7th Floor
13   350 Fifth Avenue, Suite 7110  New York, NY  10022
     New York, NY 10118            212-446-2300
14   212-763-0883

15   For the Defendants:

16   JAMES EDWARD KOLENICH         JOHN A. DiNUCCI
     Kolenich Law Office           Law Office of John A. DiNucci
17   9435 Waterstone Blvd., Suite 140 8180 Greensboro Drive, Suite 1150
     Cincinnati, OH 45249          McLean, VA 22102
18   513-444-2150                  703-821-4232

19   DAVID LEON CAMPBELL           BRYAN JEFFREY JONES
     Duane, Hauck, Davis & Gravatt 106 W. South Street, Suite 211
20   100 West Franklin St., Ste. 100 Charlottesville, VA 22902
     Richmond, VA 23220            540-623-6952
21   804-644-7400 x 221

22   Transcribed by:   Carol Jacobs White
                        Registered Diplomate Reporter
23                      PO Box 182
                        Goode, VA 24556
24                      Carol.jacobs.white@gmail.com

25       Proceedings recorded by FTR; computer-assisted transcription.
```

1          (Call to Order of the Court at 2:32 p.m.)

2              THE COURT:  All right.  Good afternoon.  This is Joel

3      Hoppe.  Who is on the line for the plaintiffs?

4              MS. KAPLAN:  Hi, Judge.  It is Robbie Kaplan.  I'm here

5      with a bunch of colleagues.  Would you like me to introduce them?

6              THE COURT:  Ms. Kaplan, are you going to be speaking for

7      your clients?

8              MS. KAPLAN:  I'm not, Your Honor.  My partner, Gabrielle

9      Tenzer, will be speaking on the imaging issue.  And to the extent

10     the consent issue comes up, my colleague at Cooley will be speaking

11     to that.

12             THE COURT:  Okay.  All right.  Well, why don't --

13             MS. KAPLAN:  I'm just the MC in a way, Your Honor.

14             THE COURT:  Sure.  Sure.  How about if we will just

15     identify the folks who are going to be participating and speaking

16     at this hearing today.  And I'll remind everyone to -- before you

17     speak, to please identify yourself as well so that we can keep

18     track of who is talking.

19             MS. TENZER:  Hi, Your Honor.  It is Gabrielle Tenzer, at

20     Kaplan Hecker and Fink, on behalf of the plaintiff on the imaging

21     motion, ECF 354.

22             MR. BOWMAN:  Good afternoon, Your Honor.  Philip Bowman

23     from the Cooley firm.  And I'll address the Discord consent issue,

24     to the extent the Court wants to hear about that.

25             THE COURT:  Okay.  All right.  And then how about for the

defendants?  And let me do this by counsel.  I think that may be

the best way to do it.

Mr. Woodard or Mr. Kolenich, are you on the phone?

MR. KOLENICH:  Yes, sir.  This is Jim Kolenich.

THE COURT:  Okay.

All right.  And, Mr. Kolenich, who -- remind me who you

are here on behalf of.

MR. KOLENICH:  Mr. Kessler and a host of other

defendants.  We do have a motion to withdraw pending on two of

them, but that's yet to be granted.

THE COURT:  Okay.  All right.  I think I have that list

here.

All right.  How about mister -- for Mr. Spencer?

Mr. DiNucci, are you on the phone?

MR. DiNUCCI:  I am, Your Honor.

THE COURT:  All right.  And then, Mr. Jones, are you on

the phone?

MR. JONES:  Yes.  I'm here.

THE COURT:  All right.  Let's see.  And then -- who else

do we have for the defendants?

MR. CAMPBELL:  Your Honor, this is David Campbell for

-- on behalf of James Fields.  Good afternoon, Your Honor.

THE COURT:  All right.

MR. CAMPBELL:  Hopefully I'm playing a very small role

here.  But I just wanted to make sure I was available in case it

1    came up.

2            THE COURT:  Okay.  Thank you.  I -- from the plaintiffs'

3    motion, I imagine that you are.  It doesn't seem like they are

4    pursuing anything from mister -- related to Mr. Fields in this

5    motion.

6            All right.  Anyone else --

7            MS. TENZER:  That's correct, Your Honor.

8            THE COURT:  -- for any other defendants?  Okay.

9            All right.  Well, counsel, thank you for calling in.

10   This is a motion related -- or a motion to compel the defendants to

11   submit to the ESI protocol.  And this hearing is being recorded by

12   the Court's FTR system.  So just one more reminder to identify

13   yourself before you -- before you speak.

14           Counsel, I have reviewed everything that has been

15   submitted on this motion, and -- but I'm happy to hear from

16   Ms. Tenzer, if you want to start us off and tell me anything else

17   that you have to say about the motion.

18           MS. TENZER:  Thank you, Your Honor.

19           We've discussed this issue several times already, so I

20   will try to keep it as brief as possible.  And hopefully -- now

21   that plaintiffs have agreed to front the costs of this exercise,

22   which we set forth in our reply papers, which for many of the

23   defendants was really their sort of sole opposition to the ESI and

24   preservation protocols, we're hopeful that with your help today we

25   can get this process finally agreed to and started.

1          You know, we think the proposal we have made is very

2   straightforward.  It is in the stipulation that we submitted to the

3   court.  Defendants would provide us with a list of the devices and

4   social media accounts that they used to communicate and create

5   documents concerning the events that are at issue in this

6   litigation.  We would identify those that we thought needed to be

7   imaged.  There would be a third-party vendor who would conduct that

8   imaging.  That data would go to the defendants.  They would get to

9   review it for privilege and responsiveness.  They could use search

10  terms and date ranges to limit that review.  And then that -- the

11  results of that exercise would be turned over to us.

12          And, again, as we said, we would be willing to pay for

13  that up front.  We're not conceding that the defendants have met

14  their obligation in terms of making their showing for the cost

15  shifting, but we are prepared to move forward at this time and

16  allow them to try to make that showing while the imaging is

17  proceeding.

18          THE COURT:  Do you have a proposed vendor --

19          MS. TENZER:  We have been speaking with a number -- we

20  have -- thank you, Your Honor.  We have been speaking with several

21  vendors.  We have a couple that we have been speaking with in a

22  fair amount of detail who are both willing and able to take up this

23  project and are willing to do it at reduced rates, if not partially

24  on a pro bono basis.  And, therefore, the costs of the imaging

25  would be significantly lower than the estimate of $5,000, a device

1   that was put forward by the defendants.

2          So there are vendors available.  And we are talking to

3   them.  So that -- so, yes.

4          You know, we -- we're hopeful that we can move forward.

5   We still have nine defendants of the 18 who haven't produced any

6   documents.  And the productions we have gotten are deficient both

7   substantively and in terms of their form.  And we're concerned

8   about preservation efforts.

9          Obviously, we're trying to get the best deal possible

10  from the vendor.  And we're available to answer any other questions

11  that you might have about that.

12          THE COURT:  One objection that I saw that the defendants

13  have raised is, you know, why isn't this a reciprocal obligation?

14  Why aren't the plaintiffs submitting to this protocol as well?  Do

15  you want to address that?

16          MS. TENZER:  Sure, Your Honor.

17          We -- we have already actually done the protocol.  We are

18  not asking defendants to do anything that we haven't already done

19  on behalf of the plaintiff.  All of the plaintiffs' devices were

20  imaged many, many, many months ago.  And we have been reviewing,

21  producing that ESI in the format that we are asking defendants to

22  produce their ESI when we produce it to them.

23          So it is reciprocal.  We're perfectly happy to make the

24  stipulation or whatever the Court enters reciprocal.  But we have

25  already satisfied what we have proposed and asked -- and are asking

```
 1   the Court to order the defendants to do.

 2              THE COURT:  Okay.

 3              All right.  Well, is there anything else before I hear

 4   from the defendants?  I will give you an opportunity to respond to

 5   what they have to say as well.

 6              MS. TENZER:  I don't think so, Your Honor.  Thank you.

 7              THE COURT:  Okay.

 8              All right.  Then, Mr. Kolenich.

 9              MR. KOLENICH:  Thank you, Your Honor.

10              Their presentation that they are going to front the costs

11   and then potentially stick us with a bill later doesn't really

12   fairly meet our objections in the pleadings.  But, that said, if it

13   is acceptable to the Court that they use their own equipment and

14   conduct their own ESI and then they produce it to us, we can do

15   that.  We can access -- you know, we can acquire our own equipment

16   far, far cheaper than what these companies charge, professional

17   grade equipment, the same stuff that the companies use, and produce

18   our ESI back to them.  If that's acceptable procedure, then we're

19   willing to do that.  And, you know, we can order that stuff next

20   week.  I imagine I'll have it by the end of the week and we can

21   commence examining my clients' devices, just as they claim they

22   have examined their clients' devices.

23              THE COURT:  Well, why haven't you done that at this

24   point?

25              MR. KOLENICH:  Well, when I went through this in separate
```

1    litigation, the other side objected.  They wanted a third party.

2    They insisted that we use a third-party company.

3          Secondarily, up until recently, working with other

4    attorneys around -- you know, colleagues, I wasn't aware that I

5    could get it any cheaper than many tens of thousands of dollars.

6    But it turns out that we can.  So that's relatively new information

7    to me.  That's why I say if it is acceptable to the Court, we will

8    acquire the equipment and engage in the data acquisition and

9    process.

10          THE COURT:  Well, you know, I guess one concern I would

11   have with that is, you know, these discovery requests were issued

12   in January; now it is November.  And it is a significant delay.  It

13   seems like we need to figure out a way to make sure that all of the

14   relevant information is being produced in a timely manner.  And,

15   you know, setting up -- I want to do this once.  I don't want to go

16   through, you know, a couple different, you know, steps to gather

17   and produce electronic discovery.  So I'm concerned that if you-all

18   just do this in-house that that may perpetuate the delay and the

19   concerns that have led to this motion being filed to begin with.

20   You know, it is typical that this is done using a third-party

21   vendor.

22          MR. KOLENICH:  Well, without getting too far into why

23   that is typical and arguing about it, we're happy to, you know, go

24   with a third-party vendor.  We are not -- you know, we want to make

25   plain to the Court, we cannot pay these vendors' fees.  You know,

```
1    they are saying, "Well, we'll front the fees.  We're going to
2    negotiate some third-party reductions, you know, with the third-
3    party vendors."  That's great.  But when they decide -- or, you
4    know, they want to come back and say we should have to pay them
5    now, we can't make a showing, if they are saying -- they don't have
6    the money.  I want to be very up front with that.
7            We can afford to buy some equipment.  That is a sunk
8    cost.  Counsel might even participate in that cost.  But under no
9    circumstances can they pay the bills that I have seen even on a
10   reduced basis with other ESI vendors.  These bills are
11   astronomical.  And these -- my clients cannot afford them.  Even
12   cut in half, they can't afford them.
13           THE COURT:  And, you know, at this point --
14           MS. TENZER:  Your Honor --
15           THE COURT:  Hold on just a second.
16           It is hard for me to really assess that, not knowing more
17   information about why this is so burdensome or your clients
18   individual -- I understand there's going to be a cost.  But then,
19   also, we don't know the amount at this point.  But perhaps --
20           MR. KOLENICH:  I can only go what amounts have been
21   -- you know, Mr. Kessler went through this in separate litigation.
22   And the bill was 17 or $18,000 for a phone.  So, you know, these
23   guys can't pay that.  They cannot do it.  Now, the equipment can be
24   purchased cheaper than that, the necessary equipment.
25           Now, I understand the Court's concern that you don't want
```

1   to have us do it in-house and it has to come back for another

2   round.  So I see the benefit of going with a third-party vendor

3   here and getting this moving as quickly as possible.  Certainly the

4   third-party vendors will work faster than what staff I have in our

5   first attempt at this.  So I'm all right with that.  I just want to

6   be up front that my guys cannot pay, that we are not making any

7   representation or agreement to their proposal that "We're going to

8   front the costs and come back and bill you later" if, you know, if

9   they feel like -- or whatever the standard use is.  They are saying

10  we haven't made a showing, I think --

11          THE COURT:  Well, I think it will be -- at that time it

12  will be -- you know, if they do -- I mean, typically, the producing

13  party pays for the production of the discovery.  You know, that can

14  be shifted if a certain showing is made.  And, you know, I think it

15  makes a lot of sense.  If this protocol is followed and the

16  plaintiffs pay for it up front, we're going to have a bill.  We're

17  going to know what the amount is.  And we're not going to be

18  talking about, you know, hypotheticals or maybe, you know, someone

19  can pay a certain indeterminate amount.  They are going to be -- it

20  is going to be more concrete at that point.

21          And, you know, if the plaintiffs ask for you-all to pay

22  for this production, then -- you know, I think it will be -- well,

23  it will be a more concrete process to evaluate that issue at that

24  time, after this has been done.  And it is not going to delay the

25  production of any relevant evidence any further.

1          Ms. Tenzer, were you --

2          MR. KOLENICH:  All right.  As long as we're on the same

3  page that we're not -- you know, we're not acquiescing on that cost

4  issue or making any representation that these guys have an ability

5  to pay anywhere near what the usual bill is from these third-party

6  vendors.

7          THE COURT:  I understand that.

8          Ms. Tenzer, were you trying to make a point about that?

9          MS. TENZER:  Your Honor, yes.  Thank you.

10         We agree -- we feel very strongly that this should be

11 done by a third-party vendor.  We're perfectly happy to submit the

12 two best proposals that we have received, you know, for the Court's

13 consideration.  And, you know, we'll just reiterate that, you know,

14 we're taking the financial risk here.  They are bringing up the

15 issues of cost and what they can afford.  And I think, you know, we

16 agree with Your Honor, once we get this going and we have some

17 concrete numbers, you know, we can deal with that.  But we really

18 do need to get it going.

19         THE COURT:  Okay.

20         Mr. Kolenich, anything else that you wanted to say on

21 behalf of any of your clients at this point?

22         MR. KOLENICH:  No, Your Honor, as long as their proposal

23 is followed by the vendor, that we get it for vetting.  You know,

24 the vendors can assist us in getting rid of nonresponsive or

25 frivolous information.  And that's really the most important thing.

```
 1    Other than that, we're fully ready to cooperate.

 2            I do want to mention -- and I think the plaintiffs are

 3    aware -- that there's sort of a separate issue with the separate

 4    -- one of my defendants, Traditionalist Workers Party, had a

 5    completely in-house computer system, hence controlled by one

 6    individual defendant, Mr. Parrott.  And that has been sort of a

 7    side issue as to where that machine is and what has been done to

 8    preserve information on that machine.  But he's going to be fully

 9    cooperative.  But that's just sort of a -- we don't know the status

10    of that, once these third-party vendors get it, because he built

11    the machine himself, I guess.  I just want to put that on the

12    record.  He's sort of a separate issue.

13            We're going to cooperate as long as -- you know, as long

14    as the billing issue is dealt with, then we're prepared to

15    cooperate.

16            THE COURT:  Okay.  Well, you know, the protocol, as I

17    understand, would require you-all, on behalf of Mr. Parrott, to

18    identify any devices that are -- might contain or are likely to

19    contain responsive information and to submit those.  Is that

20    something that he's going to be able to do?

21            MR. KOLENICH:  (Inaudible) to the best of my knowledge,

22    he's prepared to do that; yes, sir.

23            THE COURT:  Okay.  All right.

24            Mr. DiNucci?

25            MR. DiNUCCI:  Yes, Your Honor.
```

1        I share in Mr. Kolenich's concerns about costs.  I also

2   -- my biggest concern -- and, actually, Your Honor, I have

3   attempted to find a third-party vendor down here.  So far, with the

4   exception of some recent developments, have been striking out.  I

5   have been told by various third-party vendors down here that they

6   are conflicted out.  I suspect they do a lot of work down here for

7   Cooley.

8        I also have kind of gotten a sense, in talking to people

9   on the phone or making attempts to get people to call me back, they

10  know a little bit about this case and don't want to deal with

11  people like me.  I don't know why.  I'm a nice guy.

12       I have, however -- today I was actually on the phone with

13  a vendor down here, a small potatoes guy, but a guy that is very

14  professional.  I'm -- he is actually going to be sending me a

15  proposed contract to conduct the kind of examination that we're

16  talking about here, to be done -- he's not an employee of mine.

17  He's an independent contractor.  He is local, which is important to

18  me.  I don't want to be dealing with somebody in LA, Chicago, or

19  New York, because there's going to be a fair amount of time, I

20  suspect, that has to go into this on the part of defense counsel to

21  coordinate with these vendors.  But I'm lining somebody up.  I

22  don't have a problem -- I need to have the thing reviewed myself.

23       And I'm sitting on Mr. Spencer's devices, so to speak.  I

24  have got them in my office.  They are not out getting thrown in the

25  drink, so to speak.

1          THE COURT:  Yeah.  You know, I think the location of the

2     vendor is probably not all that significant.  I know there are

3     shops that do this from Washington state for cases here in

4     Virginia, for, you know, multiple parties in cases.  And they are

5     able to, you know, set up electronic databases to review documents

6     and things like that.  You know, you are going to do it at your

7     office.  You are not traveling across the country to do that.

8          MR. DiNUCCI:  I'm just talking about time difference, as

9     far as I would be on the phone with people.  It is just

10    logistically it is simpler if it is somebody, for example, in the

11    DC metropolitan area for me.  And that's where I have been looking.

12          I also have some concerns about details in the order.

13    But I'll stick to the big picture, unless Your Honor wants me to

14    address, you know, some of the nuances of the order.

15          THE COURT:  Well, I'm happy for you to do that, because,

16    you know, I've looked at the order and I've looked at your letter

17    raising some concerns about parts of the order.  If you still have

18    some remaining concerns, you know, I think we need to flesh that

19    out here.  I mean, that's part of the purpose of the hearing.

20          MR. DiNUCCI:  Well, if I could, then, let me address some

21    of them.  I'll try to do it in summary fashion.  And I guess

22    preliminarily I need to say I don't know the first thing about IT

23    stuff.  But in looking at some of the definitions, looking at page

24    2-4 of the proposed order, roman numeral number one, "General

25    Provisions and Definitions," I see at least on the face of that

some variation between those general provisions and definitions
and, for example, in the definition of instructions set forth in
the requests for production of documents.  It seems to me what we
ought to do is rely on what definitions and instructions were in
the requests for production of documents.  They set forth in great
detail the manner in which they wanted information produced and the
electronic format.  Now there seems to be some variation in this
order compared to what was in the instructions and definitions.

        And also to the extent that they define such terms as
"document" on page three of the draft order, they go on about
-- they use various terms.  It seems to me we ought to just go
-- we ought to default to the federal rules and use whatever
definitions there may be in Rule 34 or elsewhere that is
appropriate so we don't have conflicting sources of authority here
as to what it is we're supposed to be doing.

        Also --

        THE COURT:  Let me address that real -- you know, real
quickly, because, you know, ultimately it is -- as I understand it,
you know, the definitions would apply to this order, but I don't
think that it is -- at the end of the day, when you are tasked with
turning over documents responsive to the discovery requests that
have been propounded to you, this order doesn't change the scope of
those requests, as I -- as I understand.  And this --

        MR. DiNUCCI:  I don't think the request is being changed,
Your Honor, but, again, to the extent that in the instructions

-- in the requests for production they said they wanted electronic

information formatted a certain way, if what they are saying -- and

it seems my quick and dirty sense is they are saying in these

definitions in the proposed order the format they want the stuff

produced at is somewhat different from what they were saying in the

instructions.  Which should prevail in the event of conflict, I

guess is the question?

THE COURT:  Well, let me ask.  Ms. Tenzer, do you think

that there is some conflict in the format of the production from

what you-all have requested and what this order represents?

MS. TENZER:  (Inaudible), Your Honor.  And, obviously,

whatever is in the order would dictate.  So I don't know that

there's any fundamental difference.  And whatever is agreed upon

and ordered by the Court would be what was -- what would -- we

would expect to be followed.  And since nobody has followed the

instructions in the format that we provided in the first instance,

I'm not sure that it makes that much of a difference.

THE COURT:  All right.  Mr. DiNucci, I know that your

client has provided some documents at this point.  But, you know,

those are in a format that doesn't allow metadata and some other

things that I think pretty customarily are sought and required in

discovery.  So I -- you know, I think that, you know, those

documents would certainly need to be produced in a different format

that complies with what the request is -- with the request, but

also, you know, with this proposed order.

1    MR. DiNUCCI:  Well, I understand that, Your Honor.  I'm

2 not even addressing what -- the issue of whether they should get

3 metadata or not.  I'm just talking about the technical demands that

4 are set forth in the requests for production and the technical

5 demands set fourth in this proposed order.  And there may well be

6 -- and my gut as an old man tells me there is variance between the

7 two sets of instructions.  And I just -- you know, what are we

8 telling a vendor predominates -- or prevails?  I presume, as

9 Ms. Tenzer said, it would be the language in the order.  But it is

10 a legitimate issue to raise.  I see differences between the

11 language.

12    But a broader issue too, Judge, on page seven of the

13 proposed order, at six, which is captioned "Identification of

14 Responsive Documents," it says in the last two lines, "Defendant

15 shall review the results of the collection and produce to plaintiff

16 those nonprivileged documents that are responsive to the discovery

17 request," etc., etc., etc.  It makes no reference to what happens

18 -- to whether documents can be withheld on the basis of objections

19 that the defendant has previously asserted in their responses to

20 requests for production.

21    It seems to me we need to include some language saying

22 you have -- you know, you can still stand on the objections you

23 raised before.  And there's a similar requirement, from my

24 perspective, elsewhere in the order.

25    It ought to be clear that if the parties had previously

said that -- made some other objection, they should be able to stand on that and not withhold, if you will, just privileged documents. They haven't waived them. If they stated objections, they stated objections, and they ought to be able to stand on them.

THE COURT: All right. Are those --

MS. TENZER: Your Honor?

THE COURT: Yes. Go ahead. Ms. Tenzer.

MS. TENZER: This is Gabrielle Tenzer.

I was just going to say in many instances the defendants haven't specified in their responses and objections on which objections they are withholding documents. You know, if they knew that, then, obviously, they can stand on those objections. And at some point eventually we may get to actual motions to compel on individual requests. But we're not at that point yet because of where we are with the ESI protocol.

THE COURT: And I -- Mr. DiNucci, are we talking about objections that you have already asserted or are you anticipating that you are going to have new objections after you have seen these documents?

MR. DiNUCCI: Well, I'm certainly referring to any objections that Mr. Spencer previously stated, because he was the one who responded to the requests for production. With respect to whether there may be additional objections, I have to be candid, there may be. I don't know what the universe of documents that there is, assuming there's any additional documents beyond what he

produced.  But, I mean, I have got a duty to Mr. Spencer,

obviously, consistent with the federal rules.  If I see other

documents, well, wait a second, those shouldn't be produced, I -- I

-- I think I'm duty-bound to assert objections to that.  Now, Your

Honor may say they are too late, but I certainly have to, unless I

want to commit malpractice, reserve the right to state objections

if there's other materials out there.

       And I would ask Ms. Tenzer -- if I have to say on what

-- on the basis of what objection something is withheld, I suppose

it boils down to, too, you know, giving some indication what is

being withheld in some fashion that wouldn't disclose the

information subject to the objections.  That way the issue could be

pressed by opposing counsel and Your Honor could decide it.

       THE COURT:  All right.

       All right.

       MR. DiNUCCI:  (Inaudible) with litigation --

       MS. TENZER:  Your Honor --

       MR. DiNUCCI:  -- I don't know what is out there until I

see it.

       THE COURT:  Right.

       All right, Ms. Tenzer.

       MS. TENZER:  Your Honor, all -- the defendants served

their responses and objections months ago.  We have had

back-and-forth letter writing.  And we have gone through deficiency

letters and all of that.  And our position would be, under the

rules, any objections that they have not already raised -- and
there are no -- have been waived.  We're nine months in.  We're
more than nine months in since we served these document requests.
We're not going to -- I don't think there's any grounds on which
they can start asserting new objections.

THE COURT:  Yeah.

Mr. DiNucci, my thought on that would be that, you know,
if you receive some documents that are privileged or something like
that, then certainly, you know, you can create a log and withhold
those.  But to assert, you know, new objections, it does seem like
the time has long since passed to do that.

And really, you know, the objections have been lodged.
You-all have been discussing those over the past couple of months.
And I think that those objections really should be largely, you
know, resolved probably by the time this -- you know this
electronic information is provided to you.  And if there are some
lingering disputes, then, you know, we need to go ahead and get
those addressed.

MR. DiNUCCI:  I understand that.  As I said, I don't know
what I'm going to be -- assuming arguendo there's additional
information that is responsive, I don't know what it is until I see
it.  So I don't know how to handle it.  And I can't say that I
wouldn't object.  I may get shot down really quickly by Your Honor,
but, I mean, I have got to do what I have got to do.  Hopefully
there's not a whole lot we're even talking about.  There's kind of

```
 1   a presumption, this whole exercise, if there's thousands of pages
 2   out there, I suspect (inaudible) and this whole discussion may
 3   become moot.
 4            THE COURT:  All right.
 5            MR. DiNUCCI:  Also, another broader point -- and maybe it
 6   is just me missing the big picture, which is not an unusual
 7   phenomenon, I suppose -- to what extent is any third-party vendor
 8   going to be subject to the protective order in this case?  I don't
 9   recall seeing in this proposed order any such language.  And I
10   certainly haven't seen a contract yet from a third-party vendor.
11            And I'm concerned -- because in going through these
12   devices, any third-party vendor, at least theoretically, could be
13   happening upon information that has absolutely nothing to do with
14   this case.  And I'm concerned about confidentiality.
15            THE COURT:  I think that's a --
16            MS. TENZER:  Your Honor, I --
17            THE COURT:  Go ahead, Ms. Tenzer.
18            MS. TENZER:  I was going to say I believe under the
19   protective order in the case the vendor would be required to sign
20   and be subject to the protective order, which is what we have done
21   with our vendors.
22            MR. DiNUCCI:  But, see, that would be solved, then, to
23   put some similar language in any order that Judge Hoppe may be
24   signing, just so that it is real clear.
25            MS. TENZER:  The order is already --
```

1      MR. DiNUCCI:  I don't recall the terms of it at this

2   point.  I don't have it in front of me.  But that is a concern.

3   But if there's already language that is going to address that

4   issue, so be it.

5      THE COURT:  Yeah, I'd have to review the protective

6   order.  But I think that's -- you know, that's typically how -- you

7   know, how it is done.

8      MR. DiNUCCI:  Another concern, Your Honor, this would be

9   at page 12 of the proposed order, paragraph 17, under roman numeral

10  five, which is "Miscellaneous," it says, "All obligations in the

11  stipulation and order are continuing obligations.  As such, for

12  every new email address, mobile phone device, computer, external

13  storage, social media account, or other communications platform,"

14  etc., etc., etc., "defendants are going to have to provide an

15  updated certification confirming they have completed their

16  obligations under the stipulation and order."  I read that to mean

17  -- maybe I haven't -- maybe I read it incorrectly -- that if my

18  client goes out and buys a new computer, we have got to submit that

19  to the third-party vendor.  That seems kind of absurd, from my

20  standpoint, if what we're talking about is proof of a conspiracy

21  that supposedly was formed in 2017.  It certainly would be onerous.

22  I presume any number of these defendants may periodically get new

23  computers, new phones.  Are we going to have to have all of those

24  imaged?

25      THE COURT:  Yeah, Ms. Tenzer --

1           MS. TENZER:  Your Honor --

2           THE COURT:  -- that is not what you are seeking?

3           MS. TENZER:  It requires that we be informed.  And it

4    would depend.  I mean, based on what we raised in our email

5    yesterday, we're finding out every day that some of these

6    defendants are using email addresses and other, you know, accounts

7    that we're completely unaware of.  And if they are using them to

8    communicate about the events that took place, then that needs to be

9    preserved accordingly.  That's their obligation under the rules.

10          I'm not saying it has to be subjected to a third-party

11   vendor, but it has to be preserved appropriately.  And we need to

12   be made aware of accounts and devices that are being used to

13   communicate about the case.

14          THE COURT:  And so you would -- you would want a

15   supplement of Exhibit A to identify additional devices and what

16   responsive documents may be on the device?

17          MS. TENZER:  Exactly.

18          THE COURT:  All right.

19          So, Mr. DiNucci, you know, if there's additional

20   responsive information on a new device or a new account, plaintiffs

21   are asserting, you know, that that's something that would fall

22   within your duty to supplement.

23          MR. DiNUCCI:  I understand what they are saying, but I --

24          THE COURT:  Why wouldn't it?

25          MR. DiNUCCI:  Well, I understand, Your Honor.  I mean,

```
 1    the simplest thing is for each defendant to keep using the same
 2    computer.  But, again, that's a concern of mine.  If somebody buys
 3    a new computer, do we keep adding to this list?  And even if the
 4    person -- it's used for business purposes and not in any way,
 5    shape, or form relates to anything but a business purpose they may
 6    be engaging in, my concern is we're going to be told, "Hey, we want
 7    to have that device searched," and it just goes on forever.
 8              THE COURT:  But, you know, part of the certification in
 9    Exhibit A is identify the device, the type, and then what the
10    nature of responsive documents is.  You know, if your client
11    obtains, you know, a desktop or something that doesn't have
12    anything to do with this case and there's no discussion of it,
13    there are no responsive documents on it, then I would think that
14    your certification would indicate as much.  And if there are any
15    questions that come up, you-all can talk about that.  But I -- you
16    know, I don't know that that would be subject to review by the
17    third-party vendor.
18              MR. DiNUCCI:  And one other point on this.  Any such
19    obligation I presume is going to be reciprocal here.  I mean, some
20    of the plaintiffs here are like my kids.  They don't talk to one
21    another face-to-face.  Everything they use are thumbs-on devices.
22    I don't know if they are still talking about this case.  But they
23    have -- the plaintiffs themselves ought to be subject to that
24    requirement as well.
25              THE COURT:  Yeah.  Well, every litigant in this case is
```

1    subject to the ongoing duty to supplement.

2              MR. DiNUCCI:  But I'm talking concerns as well, Your

3    Honor, Exhibit A.

4              THE COURT:  Well, do you, Mr. DiNucci -- Ms. Tenzer

5    indicated that her clients have already essentially followed what

6    is laid out in this protocol and that that is why they haven't made

7    it reciprocal; that, you know, they are not opposed to making it

8    reciprocal.  Do you --

9              MR. DiNUCCI:  Well, I take counselor's word always.  I

10   don't necessarily take the plaintiffs themselves at their words

11   that they have turned in all of their devices to their counsel.  I

12   think the defendants should get a certification from the plaintiffs

13   that they have done that.  I mean, our clients are going to be

14   required to certify --

15             MS. TENZER:  That's fine, Your Honor.

16             MR. DiNUCCI:  -- all devices, then that obligation should

17   be incumbent upon the plaintiffs themselves as well.

18             THE COURT:  All right.  So, Ms. Tenzer, one thing that

19   you are to address, the reciprocal -- or the concerns about this

20   being reciprocal, you can add to the stipulation that the

21   plaintiffs would be bound by it as well and that they would -- they

22   would supplement under Exhibit -- under Exhibit A also.

23             MS. TENZER:  Of course, Your Honor.

24             THE COURT:  All right.

25             All right.  Mr. DiNucci, do you have any other concerns?

```
1           MR. DiNUCCI:  Those are the major points, Judge.

2           THE COURT:  Okay.

3           All right.  Mr. Jones.

4           MR. JONES:  Yes, Your Honor.

5           THE COURT:  Anything that you would like to say?

6           MR. JONES:  I don't -- I don't believe I have anything to

7   add, other -- in addition to what Mr. Kolenich and DiNucci have

8   already said.

9           THE COURT:  Okay.

10          All right.  And, Mr. Campbell, you are kind of taking a

11  sideline view today?

12          MR. CAMPBELL:  Yes, sir.  Nothing to add.

13          THE COURT:  All right.  All right.

14          UNIDENTIFIED VOICE:  (Inaudible) anything else?

15          MS. TENZER:  Your Honor.

16          THE COURT:  Yeah?

17          MS. TENZER:  Yeah, Your Honor.  To Mr. DiNucci's point

18  about location, we would -- I think we would just like to add that,

19  one, we think it would be best to just have a single third-party

20  vendor who is handling this for a variety of reasons.  There's also

21  an issue of economies of scale that will be helpful to all of us.

22  And, secondly, the vendors that we're speaking with have the

23  capability and have a presence nationwide.  And so they would be

24  able to handle dealing with the various locations that are at

25  issue.
```

1          THE COURT:  Okay.

2          All right.  Well, counsel, it sounds like a lot of the

3    concerns that the defendants -- Mr. DiNucci in particular, the

4    concerns that you have raised -- can be addressed, you know, by

5    some tweaks to the stipulation.

6          And, Mr. Kolenich, I know that your clients and the other

7    defendants are certainly not agreeing to pay for this third-party

8    vendor now or in the future.  The plaintiffs have agreed, you know,

9    to pay for it at this time.  And, you know, if at some point the

10   payment of the cost for the third-party vendor comes up, then, you

11   know, that's just something I think we'll have to litigate.  But I

12   think we'll be, you know, in a better position to evaluate each

13   party's position once -- you know, once this is done.  And we'll

14   know the actual cost.  And we will move forward on this discovery.

15         I think the stipulation makes a lot of sense, in looking

16   at the cases on this issue, in particular the one cited by the

17   plaintiff, but the *Pro-Cast* case I think is instructive.  And, you

18   know, it doesn't -- I think why it is important to do this is that

19   this discovery has been outstanding for some time.

20         For some of the defendants there's a concern that some of

21   the -- some relevant information may have been lost one way or the

22   other.  With some others -- other defendants there are concerns

23   about the inadequacy of the production.  And both of those reasons

24   can certainly warrant having an order that would impose a third-

25   party vendor.  So I think it -- I think it is necessary do this.

 1    And I -- and it also sounds like, as long as we can do some of

 2    these -- do some of these tweaks, that there isn't a great deal of

 3    opposition either -- or at least that your concerns can be

 4    addressed.

 5            So what I would like you-all to do, Ms. Tenzer, is to

 6    make some of the tweaks that we talked about here.  Make the

 7    stipulation reciprocal.  If there's any way to clarify in the

 8    stipulation that -- you know, objections that have already been

 9    stated to the responsiveness or whatever else of the discovery

10    requests, that those are -- those are preserved.  And I would

11    encourage you-all to try and work through those now, to the extent

12    that you can, so there is no further delay in the production of the

13    discovery.

14            MS. TENZER:  Of course, Your Honor.

15            THE COURT:  Let's see.  And then, you know, we'll have to

16    -- we'll have to change in the -- or at least note in the protocol

17    that for the time being plaintiffs are agreeing to pay for this,

18    but that's -- you know, it is not -- it is without prejudice to any

19    request that the defendants bear the burden.  And the defendants

20    certainly preserve, you know, any objections to paying for them in

21    the future.  But, otherwise, I don't think that there are any other

22    issues to address in this stipulation.

23            Ms. Tenzer, is there anything else that you can identify?

24            MS. TENZER:  I don't think so, Your Honor.

25            THE COURT:  All right.

1          Mr. Kolenich?

2          MR. KOLENICH:  Nothing further, Your Honor.

3          THE COURT:  All right.

4          Mr. DiNucci?

5          MR. DiNUCCI:  Nothing further, although, just for

6    clarification's sake, Your Honor didn't mention the reciprocity

7    aspect.  Is that a tweak we're supposed to provide in this order as

8    well?

9          THE COURT:  I'm sorry if I didn't.  I thought that was

10   the first thing I said.

11         MR. DiNUCCI:  Then we're fine, Your Honor.  I'm sorry,

12   Your Honor.  All right.  We're fine.

13         THE COURT:  Okay.

14         All right.  Mr. Jones, anything?

15         MR. JONES:  No, Your Honor.

16         THE COURT:  All right.

17         All right.  Why don't -- I do want to address the Discord

18   issue today too, if you-all are prepared to do that.  Mr. Kolenich

19   and Mr. DiNucci, Mr. Jones, are you-all prepared to address that?

20         MR. KOLENICH:  Jim Kolenich.  Yes, I can address it, Your

21   Honor.

22         MR. DiNUCCI:  John DiNucci.  No, I'm not prepared, Your

23   Honor.  I'm still reading a decision out in San Francisco and

24   looking at the law and looking -- including the act.  And I have

25   got questions I have to put to my clients.  I mean, I'm familiar

with the issue, but not sufficiently to actually make a reasoned

argument today, if that's what Your Honor is asking.

THE COURT:  Okay.

All right.  Mr. Jones?

MR. JONES:  I'm ready.  I think my -- my clients have

complied.  And I did see Mr. Bowman's email about needing another

email, but I think my clients have complied.

THE COURT:  Okay.  Why don't we go ahead -- Mr. Bowman,

Mr. Kolenich, and Mr. Jones, why don't we go ahead and take up this

issue today.

And, Mr. DiNucci, you know, I'll certainly allow you an

opportunity to address this at a later time if you need some more

time to consider it.

MR. DiNUCCI:  Thank you, Your Honor.

THE COURT:  Mr. Bowman, go ahead and tell me a little bit

more.  I have read the email about it.

MR. BOWMAN:  Thank you, Your Honor.

The issue is that, as the Court may be aware, the

complaint alleges that the defendants conducted much of the

planning for the events in Charlottesville on an online platform

provided by a company called Discord.  And some of those

communications have been made public and are quoted in the

complaint.  But a complete set of those communications we believe

is maintained by Discord.

We had served requests for these materials to the

defendants.  And we have also sent a subpoena to Discord.  Discord

is at this point prepared to produce the responsive documents, but

only on the condition that the defendants provide consent.  And

that is because the Stored Communications Act doesn't allow Discord

-- or they believe it doesn't allow them, and we don't dispute this

-- to provide individual user's communications without their

consent -- or to disclose them without their consent.

So we have asked -- Discord has provided a form of

consent that the defendants can use that would be acceptable to

enable Discord to produce these documents to the plaintiffs.  We

have provided that to the defendants.  As Mr. Jones said, his

clients -- or one of his clients has complied.  One of his clients

has complied in an ineffective way.  And I take it that that will

be addressed.  And the rest of defendants have not complied; in

fact, have said that they would not.

THE COURT:  Okay.

MR. BOWMAN:  Your Honor, our position is that --

THE COURT:  Go ahead.

MR. BOWMAN:  I was just going to say, Your Honor, that

our position is that the Court has the authority and under the

circumstances should order the defendants to provide these

consents.  The documents are, under the standards of the federal

rules, within the defendants' control, because they have the right

to provide consent, and therefore should be produced in this case.

THE COURT:  Okay.  Mr. Jones, what is your view on the

1  Discord?

2          MR. JONES:  Do you mean me, Your Honor?

3          THE COURT:  Yes, sir.

4          MR. JONES:  Or did you mean Mr. Kolenich?

5          THE COURT:  No.  I want to start in reverse order.

6          MR. JONES:  Oh.  My clients are happy to provide the

7  consent.  They have already.  And I'll fix the issue that

8  Mr. Bowman emailed me about earlier today.

9          THE COURT:  Okay.

10         All right.  Mr. Kolenich.

11         MR. KOLENICH:  Thank you, Your Honor.

12         We did discuss this with the attorneys from Cooley last

13  week and explained the reasons why my clients wouldn't comply and

14  were in need of -- you know, we're aware that the Court can order

15  this.  We're aware that this is discoverable.  And I don't have any

16  argument that I'm aware of that can be posited to prevent the Court

17  from issuing that order.  But for reasons that, you know, we

18  discussed among counsel, we need that court order, and specifically

19  because of that Stored Communications Act.  The participants in the

20  Discord chats believed these were private, that they had privacy.

21  Their ignorance of the Court's ability to order us to sign is

22  notwithstanding, but we can't just voluntarily sign these releases

23  in the absence of a court order.

24         If the Court is going to issue that order at the request

25  of the plaintiffs -- and we don't have a problem with the Court

1    accepting an oral motion from them today -- we're not going to

2    object.  We will comply.  But we need that court order.

3              THE COURT:  Okay.  All right.

4              Well, I certainly think it is appropriate to do the

5    order.  I mean, these -- from the allegations and what you-all

6    said, these -- there are potentially relevant discussions on

7    Discord.  And, really, it is -- I think it would be incumbent upon

8    the defendants to provide those discussions.  So, you know, this is

9    the way to do it, to require the consent of Discord --

10             MR. KOLENICH:  Yeah, we can't -- we can't provide them

11   because Discord disabled all of the account credentials from my

12   client.  That's why we haven't been able to provide them.  So

13   Discord has to do it.  And, you know, the Court order allows us to

14   sign the documents that the plaintiffs' attorneys got from Discord.

15             I haven't been able to get anything from Discord.  You

16   know, I wrote them on behalf of my clients.  Nothing.  No response

17   whatsoever.

18             THE COURT:  Okay.  All right.

19             Well, I will enter the order, then, for -- Mr. Jones and

20   Mr. Kolenich, for your clients, requiring that they sign the

21   consent form that Discord has provided.

22             And, Mr. DiNucci, why don't -- why don't we do this?  How

23   about you take a bit of time and then let -- why don't you let the

24   Court know.  And you can just file a notice, and just file it on

25   ECF.  It can be real short, just saying that you are either

1    opposing the Court entering an order requiring that your client

2    sign the consent form or that you are not opposing it.  And if you

3    are opposing it, then we can do a conference call and address the

4    reasons for that.  And I'll be happy to hear what you have to say

5    at that point.  But why don't you do that within -- file that

6    notice within seven days?

7              MR. DiNUCCI:  Fine, Your Honor.

8              THE COURT:  All right.

9              MR. KOLENICH:  Your Honor, this is Jim Kolenich.

10             I just -- one other observation.  If the Court order

11   could order the plaintiffs to turn over whatever they get from

12   Discord to us when they have it, because the release doesn't

13   address that issue, I would appreciate it.

14             THE COURT:  Okay.  Yeah, I think they would be obligated

15   to do that.

16             Okay.  From the plaintiffs' perspective, is there

17   anything else that we need to address today?

18             MS. KAPLAN:  Your Honor, I don't think that there's

19   anything that needs to be addressed substantively.  There's a

20   couple of things coming down the pike, for lack of a better term,

21   here.

22             There's an issue about an email that I received from

23   Mr. Kessler under a different name that may be the subject of a

24   sanctions motion.  And then there's a withdrawal motion which we're

25   currently considering whether or not to oppose, researching the

```
 1   case law.  And we'll get back to the Court promptly on that.
 2              THE COURT:  Okay.
 3              Mr. Kolenich, on the --
 4              MS. TENZER:  Your Honor.
 5              THE COURT:  Hold on just a second, Ms. Tenzer.
 6              Mr. Kolenich, on the motion to withdraw, you know, one
 7   thing that if I were to grant that that we would need so that the
 8   Court can communicate with those clients and also so the plaintiffs
 9   could communicate with a pro se party is that, you know, I wouldn't
10   be able to let you-all out of the case until you provide the
11   contact information for those defendants.
12              MR. KOLENICH:  I can provide that today, Your Honor.
13              THE COURT:  Okay.  Well, we don't need it today, but --
14              MS. TENZER:  Your Honor --
15              THE COURT:  Yes, and -- Ms. Tenzer, go ahead.
16              MS. TENZER:  On that -- on that point, we don't have that
17   information for Mr. Mosely, who counsel has withdrawn their
18   representation for Mr. Mosely and that information hasn't been
19   provided.  And, you know, we have been continuing to try to
20   essentially serve Mr. Mosely through his former counsel.  But at
21   some point it would probably be a good idea to have that contact
22   information.
23              THE COURT:  Yeah.  I did notice that in one of the -- I
24   think a footnote in one of your filings.  And the Court doesn't
25   have anything on ECF for him.
```

1        So, Mr. Kolenich -- and I think that that was something

2 that I had put in the order, you know, that you were to provide the

3 Court with his contact information.

4        MR. KOLENICH:  I missed that in the order if you did,

5 Your Honor, but that's no problem.  I'll provide that with the

6 other two when I send it.

7        THE COURT:  Okay.

8        MR. KOLENICH:  I should observe, as to Mr. Mosely, we

9 don't have anything but an email.  We don't have a good phone

10 number nor an address.

11        THE COURT:  Okay.  All right.  Well, if that's all you

12 have, that -- that's what you have.  So we'll look for that.  And

13 you can just send that in to the clerk's office and also provide to

14 plaintiffs' counsel.

15        MR. KOLENICH:  Yes, sir.

16        THE COURT:  All right.

17        All right.  Mr. Kolenich, is there anything else to raise

18 today?

19        MR. KOLENICH:  No.  I know they have mentioned this

20 Kessler email.  You know, non attorneys aren't aware of the ethical

21 rules governing lawsuits or, you know, attorney contact, so -- he

22 has been instructed and admonished and he agrees not to do that

23 anymore.

24        I also have account credentials for that email.  And

25 there's literally -- you know, it was -- it was opened well after

1  the incident.  There's literally nothing in there about

2  Charlottesville except that one email that he sent to plaintiffs'

3  counsel.  So I wanted to put that of record.  There's really

4  nothing there other than the improper communication.  There's no

5  substance behind that or damages behind that.

6          THE COURT:  Okay.

7          All right.  Mr. DiNucci, anything else?

8          MR. DiNUCCI:  None, Your Honor.

9          THE COURT:  All right.  And, Mr. Jones, anything else?

10         MR. JONES:  No, Your Honor.

11         THE COURT:  All right.  And, Mr. Campbell?

12         MR. CAMPBELL:  No, sir.

13         THE COURT:  Okay.  All right.  Well, counsel, thanks for

14  calling in today.  I will try and get this order out either -- if

15  not today, then certainly early next week.  And in the meantime, if

16  you-all want to work on that stipulation, making the revisions that

17  we have talked about, I'll get that entered shortly after I receive

18  the draft of it.

19         UNIDENTIFIED VOICE:  Thank you, Your Honor.

20         THE COURT:  All right.  Well, thank you-all.  Have a good

21  weekend.

22      (Thereupon, these proceedings were adjourned at 3:29 p.m.)

23

24

25

1          I, court-approved transcriber, certify that the foregoing is a

2    correct transcript from the official electronic sound recording of

3    the proceedings in the above-entitled matter.

4

5          _____/s/ Carol Jacobs White_____  ____November 20, 2018

6          Signature of Approved Transcriber          Date

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25