## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

| | |
|---|---|
| ELIZABETH SINES, SETH WISPELWEY, MARISSA BLAIR, TYLER MAGILL, APRIL MUNIZ, HANNAH PEARCE, MARCUS MARTIN, NATALIE ROMERO, CHELSEA ALVARADO, and JOHN DOE, <br><br><br> Plaintiffs, <br><br> v. <br><br><br> JASON KESSLER, RICHARD SPENCER, CHRISTOPHER CANTWELL, JAMES ALEX FIELDS, JR., VANGUARD AMERICA, ANDREW ANGLIN, MOONBASE HOLDINGS, LLC, ROBERT "AZZMADOR" RAY, NATHAN DAMIGO, ELLIOT KLINE a/k/a/ ELI MOSLEY, IDENTITY EVROPA, MATTHEW HEIMBACH, MATTHEW PARROTT a/k/a DAVID MATTHEW PARROTT, TRADITIONALIST WORKER PARTY, MICHAEL HILL, MICHAEL TUBBS, LEAGUE OF THE SOUTH, JEFF SCHOEP, NATIONAL SOCIALIST MOVEMENT, NATIONALIST FRONT, AUGUSTUS SOL INVICTUS, FRATERNAL ORDER OF THE ALT-KNIGHTS, MICHAEL "ENOCH" PEINOVICH, LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN, and EAST COAST KNIGHTS OF THE KU KLUX KLAN a/k/a EAST COAST KNIGHTS OF THE TRUE INVISIBLE EMPIRE, <br><br><br> Defendants. | Civil Action No. 3:17-cv-00072-NKM |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS AGAINST DEFENDANTS ELLIOT KLINE A/K/A ELI MOSLEY AND MATTHEW HEIMBACH

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND .................................................................................. 3

I.    Defendant Kline ........................................................................................ 3

    A.    Defendant Kline's Pivotal Role in the Conspiracy ................................... 3

    B.    Defendant Kline's Failure to Participate in Discovery While
          Continuing to Comment on Social Media ............................................. 5

    C.    Defendant Kline's Flagrant Disregard of this Court ............................... 6

II.    Defendant Heimbach ................................................................................. 8

    A.    Defendant Heimbach's Pivotal Role in the Conspiracy ......................... 8

    B.    Defendant Heimbach's Failure to Respond to Discovery ....................... 9

ARGUMENT ......................................................................................................... 13

I.    Defendants Kline and Heimbach Have Acted in Bad Faith ............................. 16

II.    Plaintiffs Have Been Severely Prejudiced by Defendants Kline's and
       Heimbach's Failure to Respond to Discovery ................................................. 18

III.    Deterrence Is Required Where, as Here, Multiple Defendants Have
       Resisted Compliance with Discovery ............................................................. 20

IV.    Lesser Sanctions Would Not Be Effective ....................................................... 22

CONCLUSION ...................................................................................................... 24

Plaintiffs respectfully submit this memorandum of law in support of their motion pursuant to Rule 37 of the Federal Rules of Civil Procedure and the Court's inherent authority for sanctions against Defendants Elliot Kline and Matthew Heimbach.

## PRELIMINARY STATEMENT

Defendants Elliott Kline and Matthew Heimbach are leaders in the white supremacy movement and were two of the architects of the violent, racially-motivated conspiracy that led to the injuries and fatalities in Charlottesville. They were engaged in all aspects of planning the events in Charlottesville, down to the nitty-gritty details such as ordering the helmets and riot shields. During the event on August 12, Defendants Kline and Heimbach were out front, leading others into battle on the streets of Charlottesville. Kline emerged with the blood of counter-protesters on his clothes. Then Defendants Kline and Heimbach were sued. While both Defendants initially dabbled in the litigation, they each opted out when faced with discovery requests that would reveal the evidence of their misconduct. Content to play by their own rules, Defendants Kline and Heimbach simply refused to participate any longer.

Defendant Kline vanished the instant Plaintiffs requested his deposition. The phone number he made available to his followers on the social networking website Discord while enthusiastically planning the Charlottesville events suddenly went unanswered. Defendant Heimbach chose to make a more conspicuous exit, firing his attorney after this Court ordered him to produce documents and thereafter ignoring all communication. Further demonstrating his utter contempt for the Court and his legal obligations, Defendant Heimbach continues to comment publicly on social media regarding issues in the case, while simultaneously disregarding all Court orders and efforts to reengage him in this case. Meanwhile, neither Defendant has produced a single document in this case. This willful failure to produce any documents has prejudiced

1

Plaintiffs significantly. Worse, the Defendants' unpunished defiance has become contagious, as one-by-one, other Defendants have begun to employ similar tactics to delay or withhold the production of documents. In fact, as discussed *infra*, Defendant Vanguard America's own counsel concedes that his client's similar refusal to participate in discovery "is a problem." In that sense, Defendants Kline and Heimbach continue to lead.

Defendants Kline and Heimbach must be sanctioned to remedy the prejudice they have inflicted on Plaintiffs, to restore order to this judicial process, and to deter other Defendants from disobeying this Court's rules and orders. Plaintiffs seek the following sanctions under Rule 37 and this Court's inherent authority:

1. That the Court deem the facts listed in the attached Exhibit 1 established for purposes of this action;

2. That the Court deem "authentic" for purposes of satisfying Rule 901 of the Federal Rules of Evidence any document Plaintiffs have a good faith basis to believe were in fact created by Defendants Kline or Heimbach, including, but not limited to, all documents from the social media accounts listed in Exhibit 1;[1]

3. That the Court instruct the jury that Defendants Kline and Heimbach chose to intentionally withhold their documents and that the jury may draw adverse inferences from that fact, including that Kline and Heimbach chose to withhold such documents because they were aware that such documents contained evidence that Defendants Kline and Heimbach conspired to plan racially-motivated violence at the Unite the Right event; and

4. Reasonable expenses, including attorney's fees.

---

[1] Plaintiffs reserve the right to request that additional facts or documents be deemed established or authentic as additional facts or documents are revealed in discovery.

2

## FACTUAL BACKGROUND

### I.     Defendant Kline

#### A.     Defendant Kline's Pivotal Role in the Conspiracy

Kline was central to the planning and execution of the conspiracy to commit racially motivated violence in Charlottesville.  (Ex. 2 at 158 (Deposition of Erica Alduino) ("Eli was one of the main people. . . .")); *id.* at 189 ("But Jason Kessler and Eli Kline were the only ones that I can confirm were planners of [Unite the Right].").)  He, along with Jason Kessler, was one of two key decisionmakers in almost every aspect of planning the weekend of events in Charlottesville, including logistics, public relations, messaging, transportation, weaponry, lodging, speakers, and recruiting.  (*See* Ex. 3 at 237 (Deposition of Jason Kessler) ("Q. Mr. Kessler… you and Eli Mosley were the principal coordinators for the Unite the Right rally on August 11 and 12, 2017, correct? A. Yes."); Ex. 4 (Operation Unite the Right Charlottesville 2.0).)  Kline was responsible for approving details as specific as the words co-conspirators chanted that weekend, chants like "Jews will not replace us" and "Into the ovens."  (Ex. 2 at 239-40.)  He was engaged in the planning at a granular level on a daily basis throughout the summer of 2017, working on every aspect of the Unite the Right weekend, including the torchlight march on Friday, August 11, instructing Defendants and others where to go, when to be there and what to bring.  (First Amended Complaint ("FAC"), ECF No. 175, ¶¶ 147-148, 152.)  He was also a member of Defendant Identity Evropa, which took the lead in organizing white supremacist participation among people from outside Charlottesville in connection with the events on August 11 and 12.  (*Id.* at ¶¶ 28-29.)  It is no exaggeration to say that without Kline, Unite the Right may not have occurred.  At the August 12 event, Kline rushed in with both fists, personally ensuring that his violent plans would play out at that weekend.  Photographs taken that day show Kline smiling gleefully with the blood of counter-protestors on his clothes.  (*See* Ex. 5.)

3

Kline set the goals and tone for the weekend. Early in the planning stages, Kline apparently drafted and circulated to "group leaders" a working document titled, "Operation Unite the Right Charlottesville 2.0." (*See* Ex. 4.) Part battle cry, part playbook, that seven-page document laid out rules, guidelines, and roles for co-conspirators. The seeds for the racially-motivated violence Charlottesville ultimately endured were planted in that foundational document, which explicitly attempted to unify white supremacist groups around the concept of aggression toward so-called "anti-white" protestors: "[w]e will send the message that we will not be divided, we will not allow them to erase history without a fight. . . ." (*Id.* at 1.)

Kline also influenced and monitored the daily communication about the Charlottesville events on the primary communication platform used to plan the weekend events, an invite-only Discord server entitled "Charlottesville 2.0." (Ex. 2 at 122.) In addition to posting thousands of messages himself, Kline was the moderator of the "Charlottesville 2.0" Discord server, and had the ability to invite others to participate, to delete messages from the platform, and to kick people off the server at his discretion. (*Id.* at 126.) He was able to control the content of communication surrounding the planning of the weekend events, and who had access to those communications. He made a concerted effort to keep any evidence of his plans intensely secret, telling Discord users involved in planning that "Sharing information publically [*sic*] from this discord or about this event or who is attending outside of closed circles or this Discord, will get you immediately banned from all future alt right events." (*Id.* at 205.) He communicated with co-conspirators through various social media platforms, including multiple accounts on Twitter and Discord, as well as a phone number and email account, which he disseminated on the Charlottesville 2.0 server. (*See* Ex. 4; Ex. 6 (excerpted post from Elliot Kline's public Twitter profile (Aug. 7, 2017)).) He urged his followers to "Feel free to msg/call whenever," posting the same phone number he later used to

communicate with his attorney in this litigation. (Ex. 4; Ex. 7 (email from J. Kolenich to G. Tenzer (Nov. 9, 2018)).) In stark contrast to his present radio silence in proceedings before this Court, Kline was prolific and easily reachable while planning the Unite the Right.

In addition to spearheading the planning, Kline was a key participant in each of the events leading up to the weekend in Charlottesville, as well each of the violent events that took place the weekend of August 11 and 12. He was present in Charlottesville on May 13, 2017, a precursor event for the ones in August, marching and chanting along with other co-Defendants. (Ex. 2 at 109-10.) He attended both the Friday night torch march and the event on Saturday and found himself in the midst of the violence at both. Although Kline has failed to produce a single document in this litigation, there is little doubt the documents he authored in relation to planning the weekend events in Charlottesville, such as the operational document, are critical to Plaintiffs' ability to establish a conspiracy to commit racially-motivated violence.

## B. Defendant Kline's Failure to Participate in Discovery While Continuing to Comment on Social Media

Kline was served with this lawsuit at his home on October 27, 2017. (ECF No. 62.) Like many other Defendants, he retained James Kolenich, who entered an appearance on his behalf on December 1, 2017. (ECF No. 131.) He was initially vocal and passionate about the case on social media, inviting his Twitter followers to listen to the podcasts where he would be "chatting about this stuff since it is crucial that we continue to win in court for the future of our people." (*See* Ex. 6 (Nov. 9, 2017).) On the same day Mr. Kolenich entered his appearance, Kline tweeted publicly and critically about the investigative findings in the report about Charlottesville issued by Hunton and Williams LLP, a report referenced in certain Defendants' discovery filings. (*Id.* (Dec. 1, 2017).) On January 25, 2018, Plaintiffs served a request for documents on all Defendants, including Kline, seeking documents related to the events described in the Amended Complaint

5

including, for example, e-mails, text messages, and content posted on social media, and also instructed Kline to preserve all documents and communications relevant to this lawsuit. (*See* Ex. 8 (Pls.' [Corrected] First Set of Reqs. for Produc. of Docs. to All Defs. (Jan. 25, 2018)).) On the same date, Plaintiffs served all Defendants, including Kline, with a set of interrogatories, asking him to identify, among other things, all means of communication used to discuss the events at issue here, as well as the electronic devices used for such communications. (*See* Ex. 9 at 8 (Pls.' First Set of Interrogs. to All Defs. (Jan. 25, 2018)).) Kline simply ignored those discovery requests. However, another Defendant, Identity Evropa, responded and identified "Mr. Mosley's[2] communication devices[]" as the electronic devices it used to communicate concerning the events. (Ex. 10 (Def. Identity Evropa's Resp. to Pls.' First Interrogs. and Req. for Prod. of Docs. (Apr. 6 2018)). On April 19, 2018, Plaintiffs raised Kline's total non-compliance with the Court. (ECF No. 308, at 3.) Mr. Kolenich responded that, while he would at times communicate with Kline through Defendant Identity Evropa, Mr. Kolenich had become unable to communicate with Kline. (*Id.* at 4-5.) While ignoring Plaintiffs, his discovery obligations and his own attorneys, Kline nonetheless continued to comment on social media about the Charlottesville events, even betraying an awareness that his communications were relevant to ongoing litigation, noting that he "can't say much more for obvious reasons" while specifically refuting certain facts about the what took place that weekend. (Ex. 6 (May 27, 2018).) His problem was not his ability to use his phone or communicate about the case. His problem was an unwillingness to do so on anyone's terms but his own.

### C. Defendant Kline's Flagrant Disregard of this Court

---

[2] Kline has held himself out as "Eli Mosley"—a tribute to the pro-Nazi British fascist leader Oswald Mosley—and he is referred to by that name by certain co-conspirators.

6

Shortly after Defendants' motions to dismiss the Amended Complaint were denied (ECF Nos. 335, 336), on July 23, 2018, James Kolenich and Elmer Woodard moved to withdraw as Kline's attorneys. (ECF No. 344.) Mr. Kolenich reported that he had been in contact with Kline and told Kline that he would need to stay in touch with his attorneys. (ECF No. 345, at ¶¶ 3-4.) Kline apparently agreed to do so. (*Id.*) Thereafter, Defendant Kline's attorneys advised him that Plaintiffs had requested to take his deposition. (*Id.* at ¶ 5.) At that point, Kline stopped participating in the litigation altogether. (*Id.* at ¶ 6.) On July 25, 2018, the Court granted his attorneys' motion to withdraw, (ECF No. 347), and Kline has since subsequently ignored all communications by Plaintiffs and the Court.[3]

On November 13, 2018, the Court granted Plaintiffs' motion to compel Defendants to produce to Plaintiffs their electronic devices and social media accounts used to communicate about the events in Charlottesville. (ECF No. 379 ("Imaging Order").) Pursuant to the Court's Order, Kolenich provided Plaintiffs with a purportedly working e-mail address for Kline (*see* Ex. 7), which Plaintiffs used to attempt to communicate with Kline on multiple occasions, including to provide him with a copy of the Stipulation and Order for the Imaging, Preservation, and Production of Documents on November 16, 2019. (*See* Ex. 11 (email from C. Greene to E. Kline (Nov. 16, 2018)).) Pursuant to this Court's Order, Kline—like all Defendants—was required to sign that stipulation in order to provide Plaintiffs' access to Defendants' social media accounts and electronic devices. Kline ignored that communication and never signed the stipulation. On November 27, 2018, Plaintiffs emailed Kline a copy of the Stored Communications Act ("SCA")

---

[3] Kline's and Heimbach's status as *pro se* litigants should not afford them any leniency from this Court. To the contrary, Kline and Heimbach are "proceeding *pro se* so [they] [are] entirely responsible for [their] actions," *Silvious v. RR Donnelley & Sons*, No. 5:10-CV-116, 2011 WL 3846775, at *3 (W.D. Va. Aug. 29, 2011), "are still subject to sanctions[,] and cannot be allowed to make a mockery of the Court's authority," *McDonald v. Robinson*, No. 1:18-CV-697, 2018 WL 7001680, at *5 (E.D. Va. Dec. 26, 2018), *report and recommendation adopted*, No. 1:18-CV-697, 2019 WL 166548 (E.D. Va. Jan. 10, 2019).

7

consent form each Defendant was ordered to sign to provide Plaintiffs access to Defendants' Discord accounts. (Ex. 12 (email from C. Greene to E. Kline (Nov. 27, 2018)).) Kline ignored that communication as well and never signed an SCA consent form.

In addition to ignoring communications from Plaintiffs, Kline has failed to appear at seven court conferences on discovery, including a conference scheduled specifically to address Kline's own lack of participation in discovery. (*See* ECF No. 377 (Minute Entry, Nov. 9, 2018); ECF No. 396 (Minute Entry, Jan. 4, 2019); ECF No. 409 (Minute Entry, Feb. 8, 2019); ECF No. 411 (Minute Entry, Feb. 12, 2019); ECF No. 425 (Minute Entry, Feb. 21, 2019); ECF No. 437 (Minute Entry, Mar. 1, 2019); ECF No. 450 (Minute Entry, Mar. 18, 2019).) The Court has attempted to contact Kline more than *ten* times, including via email, physical mail, and voicemail, to no avail. (*See* ECF No. 401 (Feb. 4, 2019); ECF No. 402 ("call[ing] and email[ing] Elliot Kline . . . three times regarding setting a telephonic hearing" and "[a]fter no response[,] . . . [c]lerk called and left voicemails, mailed and emailed notice of [February 8] hearing" (Feb. 5, 2019)); ECF No. 407 ("email[ing] and mail[ing] dial in information" for February 12 hearing (Feb. 8, 2019)); ECF No. 414 (emailing notice of February 21 hearing to Kline (Feb. 15, 2019)); ECF No. 445 (emailing notice of March 18 hearing to Kline (Mar. 13, 2019)).) As far as Plaintiffs are aware, Kline has not once responded to these efforts by the Court.

## II. Defendant Heimbach

### A. Defendant Heimbach's Pivotal Role in the Conspiracy

Heimbach was an actively engaged leader of major white supremacist organizations that had a robust presence in Charlottesville. At the time of the "Unite the Right" events, Heimbach was one of the leaders of two different white supremacist groups that participated that weekend in August: Defendant Traditionalist Worker Party ("TWP"), a group founded to promote anti-Semitism; and Defendant Nationalist Front, an umbrella organization of approximately twenty

8

white supremacist organizations, including racist skinhead crews, Klan groups, and neo-Nazi groups. (FAC ¶¶ 31, 33.)

In the weeks leading up to Unite the Right, Heimbach posted over 4,000 messages on Discord, including some in the "Charlottesville 2.0" server, and led in-person meetings to help other Defendant groups plan for the weekend events. (*See* Ex. 13 (excerpted posts from Matthew Heimbach's Discord profile (July 8, 2017; July 23, 2017; July 30, 2017)) ("We will be holding a Nationalist Front meeting, TWP and allies, in Ocoee TN this weekend on Saturday at 1pm . . . . The purpose of the meeting is to plan for the upcoming Charlottesville event carpool, plan for future events, network, and do a flash demo.").) He instructed TWP members on details such as what to wear on August 12, and provided his followers with "official TWP riot shields" and "a dozen helmets thatll be painted black with Party insignia's on them" so that "alongside our [Defendant] league of the south and [Defendant] vanguard america allies, we'll have an unbreakable line." (*Id.*)

During the August 12 event itself, Heimbach, dressed in combat gear, led Defendant TWP to commit racially-motivated violence. (FAC ¶¶ 200, 214-15; *see* Ex. 14.) Heimbach reported using five different social media platforms—along with his cell phone—to communicate in aid and furtherance of the conspiracy. (ECF No. 354-13, at 1-2 (Def. Matthew Heimbach's Resp. to Pls.' First Interrogs. and Req. for Prod. Of Docs. (Apr. 6, 2018)).) The cell phone number he used was the same as the one he used to communicate with his attorney in this litigation, during the period in which he chose to participate. (Ex. 7.)

## B. Defendant Heimbach's Failure to Respond to Discovery

Since the tragic weekend in Charlottesville, the one thing Heimbach has done fairly consistently is communicate about the events on social media. By contrast, he only participated

in this litigation when it suited his interests, abandoning it entirely as soon as he was under an express Court order to produce documents.

In the early stages of the litigation, while he was still represented by counsel, Heimbach expressed his solidarity with his Charlottesville co-conspirators on social media, posting, for example, a photograph with co-conspirator and fellow TWP leader Tony Hovater outside of Charlottesville Regional Jail, stating that he "went to the jail in Cville to visit our POW's today. Never forget the men behind the wire!" (*See* Ex. 15 (excerpted posts from Matthew Heimbach's Gab profile (Dec. 4, 2017)).) At the same time, he was active in the case, hiring Mr. Kolenich, who entered his appearance on December 1, 2017. Heimbach was served with interrogatories and document requests on January 25, 2018, which sought all documents containing communication about the events at issue in this case.

After those requests were served, but before any of the Defendants responded, tumult ran through the TWP that raised red flags about the potential destruction of documents. On February 27, 2018, another fellow TWP leader and co-Defendant Matthew Parrott encouraged anyone "involved in any altercation in Cville" to disable their social media, because "[e]verybody's getting a ride." (Ex. 16 (excerpted post from Matthew Parrott's Facebook profile (Feb. 27, 2018)).) Fourteen days later, on March 13, 2018, Heimbach was arrested for assaulting Defendant Parrott, who had confronted Heimbach about an alleged affair with Defendant Parrott's wife. (*See* Ex. 17.) Later that day, Defendant Parrot indicated on social media his intention to delete and destroy all TWP membership information. In the early morning hours of March 14, 2018, Defendant Parrott posted on another social media account that "the information was scrubbed on account of widespread concern about the data's security. It was a practical security step, and not a political act." (Ex. 18 (excerpted post from Matthew Parrott's Gab profile (Mar. 14, 2018)).) That alarming

series of posts caused Plaintiffs to seek emergency relief from the Court. (ECF No. 272.) Thereafter, in his April 6, 2018 response to the interrogatories, Heimbach stated, contrary to the evidence of his rampant use of social media to discuss the Charlottesville events, that he had no responsive documents in his possession. (*Compare* ECF No. 354-13 *with* FAC ¶¶ 74, 327.) In the same document, Mr. Heimbach disclosed that he used a cell phone and five different social media accounts to communicate concerning the events of August 11 and 12. (ECF No. 354-13, at 2-4.) Even more concerning, when asked for documents regarding the steps he had taken to preserve documents relevant to the lawsuit, Heimbach simply responded, "N/A." (*Id.*)

On April 24, 2018, Plaintiffs wrote to Heimbach (among others) through his attorney, Mr. Kolenich, regarding his troubling and deficient responses. (*See* Ex. 19 (letter from G. Tenzer to J. Kolenich and E. Woodward (Apr. 24, 2018)).) Having received nothing from Heimbach, Plaintiffs were ultimately forced to move to compel. On October 2, 2018, Plaintiffs moved to compel Defendants to permit inspection and imaging of their electronic devices. (ECF No. 354.) Two weeks later, Mr. Kolenich indicated to the Court, through a motion to withdraw as counsel, that Mr. Heimbach was in breach of his obligation to pay attorneys' fees. (ECF Nos. 357, 358, 372.)[4] On November 13, 2018, this Court granted Plaintiffs' motion to compel, ordering that all parties must submit their electronic devices and social media accounts that contained potentially relevant information to a neutral, third-party vendor for imaging and preservation. (ECF No. 379; *see also* ECF No. 354.) The Court found that the Imaging Order was "necessary and appropriate to manage discovery in this action" and ordered the parties to "promptly" sign a third-party vendor contract to effectuate production. (ECF No. 379, at 1.) Additionally, the Court ordered Defendants to sign

---

[4]    Plaintiffs opposed this motion, having already experienced the difficulties of obtaining compliance from Kline once he was permitted to proceed *pro se*, and fearing similar results in Heimbach's case: "[e]nforcing compliance with the Court's orders and conducting orderly discovery in this case would be rendered impossible without Defense counsel." (ECF No. 384.) Those concerns have been emphatically confirmed.

11

a consent form under the Stored Communications Act ("SCA") allowing Discord to produce any discoverable documents to Plaintiffs. (*Id.* at 2.) Heimbach never signed the third-party vendor contract to provide Plaintiffs access to his electronic devices and social media accounts, and he submitted a facially defective SCA consent form that was inoperable to provide access to his Discord content. (Ex. 20 (SCA Consent from M. Heimbach (Nov. 20, 2018)).)

On December 4, 2018, Plaintiffs wrote to Mr. Kolenich seeking a functional SCA consent. (Ex. 21 (email from C. Greene to J. Kolenich (Dec. 4, 2018)).) Heimbach never provided any such consent.[5] He did, however, shortly thereafter, comment on social media about a separate lawsuit involving a different white nationalist that had recently settled, belittling the settlement, stating that "[l]awsuits are just money[]" and exhorting other nationalists not to "betray their principles" due to "fear of losing money." (Ex. 22 (excerpted posts from Matthew Heimbach's public VK Profile (Dec. 25, 2018; Jan. 30, 2019; Feb. 2, 2019; Feb. 3, 2019; Feb. 4, 2019; Feb. 6, 2019; Feb. 14, 2019; Feb. 16, 2019), *available at* https://vk.com/matthewheimbach)).) He then did something that has since become a familiar tactic in this litigation: he fired his attorney, explicitly forbidding them from "tak[ing] any actions on his behalf." (Ex. 23, at 14 (Jan. 4, 2019 Tr.).)

Since he has been *pro se*, Mr. Heimbach has failed to appear at six court conferences, (ECF Nos. 396, 409, 411, 425, 437, 450), and like Kline, more than ten email, physical mail, and voicemail communications from the Court and Plaintiffs have gone unanswered. (*See, e.g.*, ECF Nos. 401, 402, 407, 414, 445; Ex. 24 (email from G. Tenzer to K. Dotson and Counsel (Feb. 8, 2019)).) He has been contacted to no avail at the same phone number he used to

---

[5] Plaintiffs subsequently managed to obtain documents from Discord that appear to be authored by Kline and Heimbach, although without these Defendants' participation in discovery, it will be difficult for Plaintiffs to authenticate those documents.

communicate both with his attorneys when he was represented and with his co-conspirators while planning the events in Charlottesville. (*See* Ex. 7.)

At the same time, Heimbach has continued to advocate on social media for white supremacy, noting recently that he "look[s] up to men like Adolf Hitler." (Ex. 22; Ex. 25 (excerpted posts from Matthew Heimbach's public Twitter profile (Feb. 28, 2019; Mar. 7, 2019; Mar. 8, 2019; Mar. 10, 2019; Mar. 12, 2019; Mar. 13, 2019; Mar. 14, 2019; Mar. 15, 2019)).) Indeed, Heimbach continues to discuss the case on social media with impunity, even though he cannot be bothered to participate himself, in what can only be described as flagrant disrespect and disdain for the judicial process. (*See* Ex. 25 ("Reports are coming in that the NSM has filed to ask for a summary judgment against itself, without notifying members."); Ex. 22 ("What's the proper etiquette when the people suing you make sweet quote graphics of things you said?").) In willful defiance of multiple Court orders, Heimbach has yet to produce a single document in this case.

## ARGUMENT

A court has wide discretion to impose sanctions when a party fails to serve its answers, objections, or written response to discovery requests or to comply with discovery ordered by the court. *See* Fed. R. Civ. P. 37(b)(2) & (d)(3); *Mut. Fed. Sav. & Loan v. Richards & Ass'n*, 872 F.2d 88, 94 (4th Cir. 1989). It is generally recognized that sanctions are intended to: (1) penalize culpable parties; (2) deter others from engaging in similar conduct; (3) compensate the court and other parties for expense caused; and (4) compel discovery. Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse,* § 49 (2013) (citing *Carlucci v. Piper Aircraft Corp*., 775 F.2d 1440, 1453 (11th Cir. 1985)). Thus, the range of available sanctions "serve both normative—designed to punish culpable conduct and deter it in others—and compensatory—designed to put the party adversely affected by the spoliation in a position that is as close to what it would have

been in had the spoliation not occurred—functions." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 534 (D. Md. 2010). "Rule 37 is flexible," and courts are permitted to "use as many and as varied sanctions as are necessary to hold the scales of justice even." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, No. 06-CV-2662, 2016 WL 1597119, at *4 (D. Md. Apr. 20, 2016) (citation omitted).

Rule 37 specifies a nonexclusive list of substantive, case-related sanctions for failure to obey a discovery order, ranging from an order establishing certain facts to the entry of a default judgment. *See* Fed. R. Civ. P. 37(b)(2)(A); *Camper v. Home Quality Mgmt. Inc.*, 200 F.R.D. 516, 517–18 (D. Md. 2000). Rule 37 also provides that the Court *must* order the payment of expenses by the disobedient party, including "the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C); *see also* Fed. R. Civ. P. 37(d)(3). A court may also award sanctions for discovery violations pursuant to its inherent authority. *See, e.g., Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 375 (4th Cir. 2013) ("[A] court acting under its inherent authority may impose sanctions for any conduct utterly inconsistent with the orderly administration of justice." (citation and internal quotation marks omitted)); *Sampson v. City of Cambridge*, 251 F.R.D. 172, 178–79 (D. Md. 2008).

The Fourth Circuit has developed a four-part test for determining what sanctions to impose under Rule 37: "(1) whether the noncomplying party acted in bad faith;[6] (2) the amount of

---

[6] While bad faith is relevant to the analysis and evident in the case of Kline and Heimbach, the Fourth Circuit does not require that a court find bad faith in order to impose the type of sanctions being sought here. *See Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 593 (4th Cir. 2001) (holding that dismissal for spoliation is "usually justified only in circumstances of bad faith or other like action. But even when conduct is less culpable, dismissal may be necessary if the prejudice to the defendant is extraordinary, denying it the ability to adequately defend its case."); *Sampson*, 251 F.R.D. at 179 ("Although, some courts require a showing of bad faith before imposing sanctions, the Fourth Circuit requires only a showing of fault, with the degree of fault impacting the severity of sanctions.").

14

prejudice that noncompliance caused the adversary; (3) the need for deterrence of the particular sort of noncompliance; and (4) whether less drastic sanctions would be effective." *Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians*, 155 F.3d 500, 504 (4th Cir. 1998). The presence or absence of any one of these factors is not dispositive. *See, e.g.*, *Victor Stanley,* 269 F.R.D. at 533.

Additionally, the Court has the power to sanction parties under its inherent authority. The factors courts consider largely mirror those courts apply under Rule 37:

> (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that [the court] seldom dismiss[es] claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.

*Projects Mgmt.*, 734 F.3d at 374 (quoting *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462–63 (4th Cir. 1993)).

Each of the four prongs of the Rule 37 test—as well as the factors courts consider under their inherent authority—are easily satisfied here. Kline's and Heimbach's bad faith disappearances have significantly hindered Plaintiffs' ability to establish vital facts and authenticate critical documents they otherwise would have been able to, had Kline and Heimbach simply complied with their discovery obligations to turn over responsive documents and answer questions in depositions. Moreover, their willful disobedience has led to somewhat predictable copycat behavior from other Defendants—like Defendants Jeff Schoep, Vanguard America, and potentially others—who so far apparently see little downside in similarly disobeying the Court's discovery orders. Sanctions are tailor-made for precisely this scenario. Specifically, Plaintiffs seek the following sanctions:

15

1. That the Court deem the facts listed in the attached Exhibit 1 established for purposes of this action;

2. That the Court deem "authentic" for purposes of satisfying Rule 901 of the Federal Rules of Evidence any document Plaintiffs have a good faith basis to believe were in fact created by Defendants Kline or Heimbach, including, but not limited to, all documents from the social media accounts listed in Exhibit 1;[7]

3. That the Court instruct the jury that Defendants Kline and Heimbach chose to intentionally withhold their documents and that the jury may draw adverse inferences from that fact, including that Kline and Heimbach chose to withhold such documents because they were aware that such documents contained evidence that Defendants Kline and Heimbach conspired to plan racially-motivated violence at the Unite the Right event;

4. Reasonable expenses, including attorney's fees.

The requested sanctions are necessary to put Plaintiffs in the position they would have been in had Kline and Heimbach complied with their discovery obligations in this case and are designed to deter other Defendants from continuing to defy this Court's orders.

## I. Defendants Kline and Heimbach Have Acted in Bad Faith

As an initial matter, it is abundantly clear that Kline and Heimbach have been acting in bad faith. Courts have considered a number of non-exclusive factors in determining whether to presume bad faith, including, as discussed *infra*, whether a decision not to participate appears to be a conscious one, whether there is a legitimate explanation for the failure to participate, and the length of time a party has failed to participate, among others.

There is little question that the failure to participate and produce a single document by both Kline and Heimbach constitute willful decisions by each Defendant. At the beginning of this case, Kline was in sporadic communication with his attorney, communicating via the same phone

---

[7]  Plaintiffs reserve the right to request that additional facts or documents be deemed established or authentic as additional facts or documents are revealed in discovery.

number he used to plan the Unite the Right events. It was after Plaintiffs requested to set a date for Kline's deposition that he finally disappeared entirely. His phone worked; he simply stopped responding because he felt like it. Indeed, at the same time Kline used his electronic devices to comment about the events in this case on social media, he failed to respond to the most basic discovery requests, such as Plaintiffs' interrogatories.

Similarly, Heimbach was reachable for a time on the same device he used to plan the weekend events in Charlottesville, but his participation ended in this case when it came time for him to comply with the Court's Order to provide a working SCA consent and access to his electronic devices and social media accounts. Even after dropping out of the case, Heimbach continues to stick his thumb in the Court's eye by commenting on the litigation from the sidelines. More than twenty communications from the Court have gone unheeded, not to mention Plaintiffs' attempts to get Defendants to respond to Plaintiffs' discovery requests.

Kline and Heimbach have "proceeded in a manner so dilatory and mulish, the court cannot find it to be other than deliberate." *Gardendance, Inc. v. Woodstock Copperworks, Ltd.*, 230 F.R.D. 438, 452 (M.D.N.C. 2005). Moreover, Defendants have "made no effort to explain or justify [their] failure to engage in meaningful discovery, and given [their] persistent failure to cooperate, [their] silence leaves the court with no choice but to presume bad faith." *Sawyers v. Big Lots Stores, Inc.*, No. 7:08-CV-258, 2009 WL 55004, at *3 (W.D. Va. Jan. 8, 2009); *see also Dusé v. Barnes & Noble, Inc.*, No. 1:11-CV-875, 2011 WL 13192908, at *2 (E.D. Va. Dec. 22, 2011) (finding that where a party "made a conscious decision not to participate" in the case, "[s]uch a refusal amounts to bad faith"), *report and recommendation adopted*, No. 1:11-CV-875, 2012 WL 12973545 (E.D. Va. Jan. 6, 2012), *aff'd*, 473 F. App'x 189 (4th Cir. 2012).

17

It has been *fourteen months*—and counting— since Plaintiffs requested documents from Kline and Heimbach and four months since the Court ordered Defendants to turn over their devices and social media accounts. That amount of time alone suggests bad faith. *See, e.g.*, *Green* v. *John Chatillon & Sons*, 188 F.R.D. 422, 424 (M.D.N.C. 1998) (noting that "[n]oncompliance with discovery orders can serve as a basis for a finding of bad faith," and dismissing plaintiff's claims with prejudice where plaintiff's "complete failure to provide discovery over *eight months* after the original requests and over two months after being ordered by Magistrate Judge Eliason to do so satisfies the four-part test required by *Mutual Federal*" (emphasis added)); *Daye* v. *Gen. Motors Corp.*, 172 F.R.D. 173, 177 (M.D.N.C 1997) ("The failure of Plaintiffs and [their counsel] to honor the Orders of this Court and [Plaintiff's counsel's] failure to initiate any contact with Defendant's counsel for *over six months* constitutes both unjustifiable negligence as well as bad faith." (emphasis added)). The evidence unequivocally establishes that Kline and Heimbach have been acting in bad faith.

## II. Plaintiffs Have Been Severely Prejudiced by Defendants Kline's and Heimbach's Failure to Respond to Discovery

The prejudice caused by Heimbach's and Kline's wholesale failure to produce documents cannot be understated, particularly in a case where Plaintiffs need to prove a conspiracy. Courts have consistently found prejudice where parties are hampered in their ability to prove material components of their case due to the opposing party's failure to produce documents. "The purpose of pre-trial discovery is for a litigating attorney to obtain information from the opposing party, information which in many cases is not otherwise available" and "an absolute lack of discovery results in clear prejudice." *Pruitt* v. *Bank of Am., N.A.*, No. 8:15-CV-1310, 2016 WL 7033972, at *3 (D. Md. Dec. 2, 2016) (citation omitted); *see also id.* at *2 ("Interrogatories[, document requests,] and depositions are important elements of discovery; [a party] would be hard-pressed to

18

conduct its case without them. When a [party] refuses to respond to such requests, it can have a debilitating effect on the rest of the litigation."). Due to Defendants' repeated and ongoing discovery misconduct, "this case has taken up an inordinate amount of judicial resources, and resulted in significant procedural and substantive prejudice to Plaintiff[s]" who have "been stymied at every turn . . . to get the evidence [they] need[] to prosecute [their] claims." *First Mariner Bank v. Resolution Law Grp., P.C.*, No. 12-CV-1133, 2014 WL 1652550, at *19 (D. Md. Apr. 22, 2014); *see also Diamond v. Mohawk Indus., Inc.*, No. 6:12-CV-00057, 2014 WL 1404563, at *5 (W.D. Va. Apr. 10, 2014) (finding defendant was "greatly prejudiced by the inability to . . . communicate with [plaintiff] in any regular fashion about the case, or receive responsive documents from him"). "Significant prejudice" is also present where, as here, "the evidence sought by [Plaintiffs'] discovery requests 'goes to the heart' of [their] claim." *Hendricks*, 2017 WL 2711131, at *4; *see also Knight v. Boehringer Ingelheim Pharm., Inc.*, 323 F. Supp. 3d 837, 845 (S.D.W. Va. 2018) ("[P]rejudice arises when a party cannot present evidence essential to its underlying claim." (citation and internal quotation marks omitted)).

Discovery is especially critical in a conspiracy case. There is already an "inherent difficulty in proving conspiracy," *Precision Piping & Instruments, Inc. v. E.I. duPont De Nemours & Co.*, 707 F. Supp. 225, 228 (S.D.W. Va. 1989), and the Fourth Circuit has held that "[a]cknowledging the difficulty of proving the existence of a conspiracy by direct evidence, . . . 'a conspiracy may be proved wholly by circumstantial evidence . . . of a defendant's relationship with other members of the conspiracy, the length of this association, the defendant's attitude and conduct, and the nature of the conspiracy,'" *United States v. Masi*, 135 F.3d 771, at *6 (4th Cir. 1998) (table decision) (quoting *United States v. Burgos*, 94 F.3d 849, 858 (4th Cir. 1996)). The absence of documents that Plaintiffs can authenticate as having been generated by Kline and

19

Heimbach impedes Plaintiffs' ability to prove the manner in which they communicated and conspired with other Defendants, thus jeopardizing Plaintiffs' ability to prove their case against other Defendants as well.

Defendants' failure to participate in discovery has resulted in textbook prejudice here. Although Plaintiffs are aware of damning evidence Kline and Heimbach have in their possession, Plaintiffs are denied access to a huge volume of that evidence, and even those documents Plaintiffs have obtained through other means become difficult to authenticate without the Defendants' participation in the discovery process. For example, Kline and Heimbach were lead organizers of the Unite the Right event and are central members of the conspiracy. Kline published "General Orders" for the event, instructing co-conspirators and attendees that they may have to "take the ground by force," and he moderated, reviewed, and managed the Discord server used to direct and plan the event. (FAC ¶¶ 100-01, 322.) Plaintiffs have worked diligently to mitigate the prejudice from Kline's and Heimbach's wholesale failure to produce by attempting to obtain their documents from third parties, like Discord. While that process has yielded a substantial number of Discord posts that purport to be authored by Kline and Heimbach, Plaintiffs are unable to authenticate these documents or gain any understanding of the volume of documents Kline and Heimbach continue to withhold without being able to get discovery from their electronic devices or take their depositions. Yet, without Court intervention, that is exactly where Plaintiffs find themselves.

## III. Deterrence Is Required Where, as Here, Multiple Defendants Have Resisted Compliance with Discovery

Kline's and Heimbach's overt defiance has already had a cascading effect on other Defendants. Since these two stopped participating, other Defendants have similarly fired their attorneys, failed to surrender electronic devices and social media accounts, disbanded their organizations, and shut down servers leading to another pending sanctions motions, one pending

20

order to show cause, and potentially more such filings on the way. And the discovery process is far from over. Deterrence is badly needed in this case.

As the Fourth Circuit has held, "not only does the noncomplying party jeopardize his or her adversary's case by such indifference, but to ignore such bold challenges to the district court's power would encourage other litigants to flirt with similar misconduct." *Mut. Fed. Sav. & Loan*, 872 F.2d at 92; *see also Nat'l Hockey League* v. *Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (holding that sanctions "must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent"). And in fact, they already have. By way of example, and as their own counsel concedes, Defendant Vanguard America "is a problem." (Ex. 26 (Mar. 18, 2019 Tr. at 14).) In the words of its own attorney, Vanguard America "has not turned over the devices they were supposed to turn over and is not listening to counsel on the necessity of hurrying up and providing this stuff, so I really don't have anything to say in regard to them other than in might be useful for the Court to give them sort of a warning shot. . . ." (*Id.*)

Multiple Defendants still have not complied with the Court's latest deadline— March 8— to produce their electronic devices and social media credentials to the third-party vendor. The extent of non-compliance or late compliance among Defendants underscores the need for stiff sanctions against noncomplying parties. *Silvestri*, 271 F.3d at 590 ("The courts must protect the integrity of the judicial process because, as soon as the process falters . . . the people are then justified in abandoning support for the system." (alteration, citation, and internal quotation marks omitted)). The need to deter this type of conduct "is manifest. Civil cases simply cannot proceed without participation by all parties in discovery." *Pruitt*, 2016 WL 7033972, at *2. "Continued

21

contumacious behavior and abuse through non-compliance with [a Court's] orders cannot be tolerated. And with discovery's important role in modern litigation, deterrence is greatly needed." *Flame S.A. v. Industrial Carriers, Inc.*, 39 F. Supp. 3d 752, 765 (E.D. Va. 2014).

## IV.    Lesser Sanctions Would Not Be Effective

Pursuant to Rule 37 and the Court's inherent authority, severe sanctions are warranted for Kline's and Heimbach's misconduct.[8] *Butler v. DirectSat USA, LLC*, No. 10-CV-2747, 2013 WL 6629240, at *1 (D. Md. Dec. 16, 2013) ("A party's total failure to comply with the mandates of discovery, with no explanation for that failure, can certainly justify this harshest of sanctions."); *Nucor Corp. v. Bell*, 251 F.R.D. 191, 194 (D.S.C. 2008) (finding "harsher sanctions" permitted where "the spoliation was so prejudicial that it prevents the non-spoliating party from maintaining [their] case"). Rule 37(b)(2)(ii) expressly provides for sanctions that both remedy the substantial prejudice Plaintiffs have suffered and constitute the most appropriate disincentive to other Defendants contemplating similar transgressions.

Regarding the first and second requested sanctions, Plaintiffs are simply asking that the Court deem certain facts established that Plaintiffs have a good faith basis to believe they would in fact establish if Kline and Heimbach had produced their documents and continued to participate in this case. Rule 37(b)(2)(A)(i) expressly contemplates this particular sanction for exactly this purpose, allowing a court to "direct[] that . . . designated facts be taken as established for purposes of the action, as the prevailing party claims." *See*, *e.g.*, *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 104 (D.N.J. 2006) (holding that certain facts would "be deemed admitted for all purposes" in

---

[8]    Plaintiffs believe that Kline's and Heimbach's complete failure to comply with discovery could warrant the granting of a default judgment, arguably a more severe sanction than what is sought here. Such a sanction would frankly leave Plaintiffs worse off, however, given the amount of damning evidence Kline and Heimbach possess that may never see the light of day. In a conspiracy case, such a result would hinder Plaintiffs' ability to prove their case against other Defendants and perversely would therefore constitute somewhat of a windfall for these two Defendants.

22

light of "the significance of the documents withheld from Plaintiffs, the deliberate and willful nature of the non-disclosure, and the prejudice suffered by Plaintiffs"). If these Defendants turned over their documents and participated in the rest of discovery, Plaintiffs would be able to confront them with their documents and establish the authenticity of documents they authored in furtherance of this conspiracy. Any lesser sanction would fail to alleviate the substantial prejudice Plaintiffs have suffered from the inability to obtain and authenticate many of these Defendants' documents and place them before a jury. Moreover, any sanction that does not impose a case-related consequence would allow Defendants to avoid accountability entirely simply by opting out of the process. Defendants should not be rewarded for their disobedience.

As to the third requested sanction—adverse inferences—a wholesale failure to preserve and produce documents is, in effect, no different from intentional spoliation. "Under the spoliation of evidence rule, an adverse inference may be drawn against a party who destroys relevant evidence." *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir. 1995); *see also Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 554–55 (6th Cir. 2010) (affirming district court "imposing a non-rebuttable adverse inference after finding that the Defendants' destruction of [evidence] severely compromised the Plaintiffs' case by depriving the Plaintiffs of the most relevant piece of evidence to prove their claims" (internal quotation marks omitted)). "Such an instruction can be critical to assisting the innocent party in establishing the nature of the evidence that has gone missing" and "ameliorate any prejudice to the innocent party by filling the evidentiary gap created by the party that destroyed evidence." *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 584 (S.D.N.Y. 2017) (citation and internal quotation marks omitted).

These remedies are the only way to properly "level[] the evidentiary playing field and . . . sanction[] the improper conduct." *Vodusek*, 71 F.3d at 156. Moreover, given that this Court's

"direct, unequivocal order[s] ha[ve] been met with . . . silence" Messrs. Kline and Heimbach, "there is nothing to indicate that a less drastic sanction would lead to different results." *Pruitt*, 2016 WL 7033972, at *3.

Because Defendants Kline and Heimbach have willfully withheld documents and ceased participating in discovery in this case, the above-requested sanctions are the minimum necessary and appropriate to remedy the prejudice Plaintiffs have suffered from Defendants' defiance, and to deter other Defendants from following suit.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court grant their motion for sanctions against Defendants Kline and Heimbach in its entirety, order the requested relief, and order such other relief as the Court deems just and proper.

Dated:  April 3, 2019

Roberta A. Kaplan (*pro hac vice*)
Julie E. Fink (*pro hac vice*)
Gabrielle E. Tenzer (*pro hac vice*)
Michael L. Bloch (*pro hac vice*)
Christopher B. Greene (*pro hac vice*)
KAPLAN HECKER & FINK, LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: (212) 763-0883
rkaplan@kaplanhecker.com
jfink@kaplanhecker.com
gtenzer@kaplanhecker.com
mbloch@kaplanhecker.com
cgreene@kaplanhecker.com

Respectfully submitted,

/s/
Robert T. Cahill (VSB 38562)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
rcahill@cooley.com

24

Yotam Barkai (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
Fax: (212) 446-2350
ybarkai@bsfllp.com

Karen L. Dunn (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Jessica Phillips (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Telephone: (202) 237-2727
Fax: (202) 237-6131
kdunn@bsfllp.com
wisaacson@bsfllp.com
jphillips@bsfllp.com

Alan Levine (*pro hac vice*)
COOLEY LLP
1114 Avenue of the Americas, 46th Floor
New York, NY 10036
Telephone: (212) 479-6260
Fax: (212) 479-6275
alevine@cooley.com

David E. Mills (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Fax: (202) 842-7899
dmills@cooley.com

*Counsel for Plaintiffs*

25

## RULE 37 CERTIFICATION

Plaintiffs hereby certify pursuant to Rule 37(a)(1) that they have attempted to meet and confer with Kline and Heimbach. Additionally, Plaintiffs hereby certify pursuant to Rule 37(d)(1)(B) that they have attempted to meet and confer with Kline. As detailed on pages four through fourteen, all communications with Kline and Heimbach have gone unheeded. Therefore, Plaintiffs certify that they are unable to obtain an answer or response to Plaintiffs' discovery without court action.

Dated: April 3, 2019

Respectfully submitted,

/s/ _____
Robert T. Cahill (VSB 38562)
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2019, I filed the foregoing with the Clerk of Court through the CM/ECF system, which will send a notice of electronic filing to:

Justin Saunders Gravatt
David L. Hauck
David L. Campbell
Duane, Hauck, Davis & Gravatt, P.C.
100 West Franklin Street, Suite 100
Richmond, VA 23220
jgravatt@dhdglaw.com
dhauck@dhdglaw.com
dcampbell@dhdglaw.com

*Counsel for Defendant James A. Fields, Jr.*

Lisa M. Lorish
Federal Public Defenders Office
Western District of Virginia - Charlottesville
401 E Market Street, Suite 106
Charlottesville, VA 22902
lisa_lorish@fd.org

*Fifth Amendment Counsel for Defendant
James A. Fields, Jr.*

Bryan Jones
106 W. South St., Suite 211
Charlottesville, VA 22902
bryan@bjoneslegal.com

*Counsel for Defendants Michael Hill,
Michael Tubbs, and League of the South*

Elmer Woodard
5661 US Hwy 29
Blairs, VA 24527
isuecrooks@comcast.net

James E. Kolenich
Kolenich Law Office
9435 Waterstone Blvd. #140
Cincinnati, OH 45249
jek318@gmail.com

*Counsel for Defendants Matthew Parrott,
Robert Ray, Traditionalist Worker Party,
Jason Kessler, Vanguard America, Nathan
Damigo, Identity Europa, Inc. (Identity
Evropa), and Christopher Cantwell*

John A. DiNucci
Law Office of John A. DiNucci
8180 Greensboro Drive, Suite 1150
McLean, VA 22102
dinuccilaw@outlook.com

*Counsel for Defendant Richard Spencer*

William E. Rebrook, IV
The ReBrook Law Office
6013 Clerkenwell Court
Burke, Virginia 22015
edward@ReBrookLaw.com

*Counsel for Jeff Schoep, Nationalist Front,
and National Socialist Movement*

I further hereby certify that on April 3, 2019, I also served the following non-ECF participants, via U.S. mail, First Class and postage prepaid, addressed as follows:

Loyal White Knights of the Ku Klux Klan
a/k/a : Loyal White Knights Church of
the Invisible Empire, Inc.
c/o Chris and Amanda Barker
2634 U.S. HWY 158 E
Yanceyville, NC 27379

Moonbase Holdings, LLC
c/o Andrew Anglin
P.O. Box 208
Worthington, OH 43085

Andrew Anglin
P.O. Box 208
Worthington, OH 43085

East Coast Knights of the Ku Klux Klan
a/k/a East Coast Knights of the
True Invisible Empire
26 South Pine St.
Red Lion, PA 17356

Fraternal Order of the Alt-Knights
c/o Kyle Chapman
52 Lycett Circle
Daly City, CA 94015

Augustus Sol Invictus
9823 4th Avenue
Orlando, FL 32824

I further hereby certify that on April 3, 2019, I also served the following non-ECF participants, via electronic mail, as follows:

Elliot Kline
eli.f.mosley@gmail.com

Matthew Heimbach
matthew.w.heimbach@gmail.com

/s/
Robert T. Cahill (VSB 38562)
COOLEY LLP

*Counsel for Plaintiffs*

2