# EXHIBIT 3

REDACTED PURSUANT TO

APRIL 25, 2019 ORDER (ECF NO. 477)

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **ELIZABETH SINES et al.,** | : | **CASE NO: 3:17cv00072** |
| **Plaintiff** | : | **(J. Moon, Magistrate J. Hoppe)** |
| | : | |
| **vs.** | : | |
| | : | |
| **JASON KESSLER et al.,** | : | |
| **Defendant** | : | |

## DEFENDANT JASON KESSLER'S RESPONSES TO DEFENDANT'S FIRST INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS

Now comes defendant Jason Kessler and responds to defendants first set of Interrogatories and Request for Documents as follows:

## I. DISCOVERY REQUESTS

1.      Identify all means of communication used by you to communicate concerning the Events, whether before, during, or after the Events, and for each means of communication, identify all names, aliases, e-mail addresses, phone numbers, and Social Media Handles you used in connection with such communications, including the 18-digit account identifier associated with any Discord account used by You. Means of communications include, but are not limited to, telephone calls, in-person meetings, and all means of electronic communication including, for example, Social Media, email, SMS messages, podcasts, and online video.

**ANSWER:** *twitter* ▓▓▓▓▓▓▓, *Facebook* ▓▓▓▓▓▓▓, *Discord* ▓▓▓▓▓▓▓ *redditt* ▓▓▓▓▓▓▓, *Gab.ai* ▓▓▓▓▓▓▓, *youtube* ▓▓▓▓▓, *Instagram* ▓▓▓▓▓▓▓.

2.      Identify any "channel" or "server" on Discord to which you had access.

**ANSWER: See above answer to #1.**

3.    Identify all persons (natural or non-natural) with whom you communicated concerning the Events, whether before, during, or after the Events.

> **ANSWER: Mr. Kessler regularly posts to the internet regarding the events and has no way of knowing who views these posts. Particular persons spoken to regarding the events are: Elliott Kline, Matt Heimbach, Christopher Cantwell, Richard Spencer, Michael Peinovich, Augustus Invictus, ███████████ ███████████, Jeff Schoep, Michael Hill, numerous anonymous posters on Discord.**

4.    Identify all Electronic Devices used by you to communicate concerning the Events, whether before, during, or after the Events.

> **ANSWER: cellular phone (calls and text messages, ███████████ ), e-mail ███████████**

## II. DOCUMENT REQUESTS

**General Response**: Mr. Kessler is in possession of certain text messages that are responsive however, due to technical difficulties, Kessler will not be able turn these items over until the week of April 9, 2018.

Mr. Kessler is in possession of the so-called Heaphy Report commissioned by the City of Charlottesville. Said report was widely reported on when released and is freely available on the internet through the City of Charlottesville. Mr. Kessler will request instructions from the Plaintiffs, through Counsel, as to whether or not it is necessary to transmit this report to the Plaintiffs.

Mr. Kessler is in possession of drone footage taken by a local resident ███████████ of the August 12, 2017 incidents. This video is responsive however, due to technical difficulties, Kessler will not be able turn these items over until the week of April 9, 2018.

1.    All Documents and Communications concerning the Events, including without limitation all
documents and communications:
i. concerning any preparation, planning, transportation to, or coordination for, the Events, including receipts, bills and credit card statements reflecting costs for transportation, lodging, apparel, gear, or any other material purchased for the Events;
ii. concerning any instructions or coordination relating to the Events, including security details, what to wear, what to bring, when to meet, where to meet, what to say, and any other logistical information or arrangements;
iii. that are Social Media documents concerning the Events;
iv. you created during the Events, including Social Media, text messages, video, and

2

photographs;
v. concerning African Americans, Jewish individuals, or other religious, racial, or ethnic minorities that relate in any way to the Events;
vi. concerning any statement or action attributed to You in the Amended Complaint; or
vii. concerning any allegation of an altercation, violent act, injury, or instance of intimidation or harassment that occurred during the Rally, including but not limited to James Fields' vehicular incident; or
viii. concerning any funding of the Events, including for transportation, housing, food, weapons, uniforms, signage, tiki torches, or other materials or services used in connection with the Events (or the planning thereof)..

**ANSWER: See attached.**


2. All Documents and Communications concerning events, meetings, rallies, conferences, or conversations held prior to the Events that relate to the Events in any way.

**ANSWER: See attached.**


3. All Documents concerning and all Communications concerning or with East Coast Knights of the Ku Klux Klan (or East Coast Knights of the True Invisible Empire), Fraternal Order of the AltKnights, Identity Europa (or Identity Evropa), League of the South, Loyal White Knights of the Ku Klux Klan (or Loyal White Knights Church of the Invisible Empire Inc.), Moonbase Holdings, LLC, Nationalist Socialist Movement, Nationalist Front (or Aryan National Alliance), Traditionalist Worker Party, Vanguard America, or any such other social group or organization that has as part of its agenda a racial, religious, or ethnic objective.

**ANSWER: See attached.**


4. All Documents and Communications concerning violence, intimidation, or harassment of Persons on the basis of race, religion, or ethnicity, including but not limited to, ethnic cleansing, white genocide, a white ethno-state, or any other form of large or small scale violence.

**ANSWER: See attached.**


5. For any Social Media account You had from January 1, 2015, to the present: i. Documents and Communication sufficient to show the account home page, and all uses of Social Media for that account that reference or concern the Events or Defendants in any way. ii. Documents and Communication sufficient to show all Your "friends" and/or "social connections" maintained on Your account, including their names, addresses, and social network usernames or handles.

3

**ANSWER: See attached.**

6.      All Documents concerning and all Communications concerning or with any Plaintiff or Defendant (other than You) named in the Amended Complaint, and any other Person who attended, planned or was involved in the Events.

**ANSWER: See attached.**

7.      All Documents and Communications concerning any lawsuits, claims of violence, or arrests relating to or arising out of racially, ethnically, or religiously motivated conduct by You or any Defendant named in the Amended Complaint.

**ANSWER: None other than items responsive to above requests.**

8.      All Documents and Communications concerning the steps you have taken to preserve Documents and Communications relevant to the lawsuit, including the Documents and Communications responsive to these Requests.

**ANSWER: None other than items responsive to above requests.**

Respectfully Submitted and as to Objections:

s/ James E. Kolenich PHV
 James E. Kolenich
 Ohio Bar Number: 0077084
***Attorney for Jason Kessler***
**Kolenich Law Office**
9435 Waterstone Blvd. #140
Cincinnati, OH 45249
(513) 444-2150
(513) 297-6065 (fax)
Email: Jek318@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on **April 6, 2018** *via email* upon:  Mr. Yotam Barkai, Esq., Ms. Sequin Strohmeier Esq. ***Attorneys for Plaintiffs*** as follows: email:  YBarkai@bsfllp.com; sstrohmeier@kaplanandcompany.com

4

**s/ James E. Kolenich PHV**
James E. Kolenich

5

Jason Kessler *(signature)*
Jason Kessler


CHRISTOPH H. SCHARNBECK
Notary Public
Commonwealth of Virginia
Registration #: 7041945
My Commission Expires October 31, 2021

## Acknowledgment

STATE OF Virginia

Personally appeared before me Jason Kessler on ____4/6/2018____ (date) and did swear that the above responses to interrogatories and requests for production of documents are true and correct to the best of his knowledge on the date listed in this acknowledgement.

Notary Public CHRISTOPH H. SCHARNBECK

Printed Name: Jason Kessler(s)

My Commission Expires: 10-31-2021


CHRISTOPH H. SCHARNBECK
Notary Public
Commonwealth of Virginia
Registration #: 7041945
My Commission Expires October 31, 2021





FINAL REPORT

# INDEPENDENT REVIEW OF THE 2017 PROTEST EVENTS IN CHARLOTTESVILLE, VIRGINIA

*Photo credit: Jill Mumie*

# TABLE OF CONTENTS

PREFACE .................................................................................................. ix

ACKNOWLEDGMENTS ......................................................................... xi

EXECUTIVE SUMMARY ......................................................................... 1

I.    May 13-14 ........................................................................................ 1

II.   July 8 ............................................................................................... 2

III.  August 11-12 ................................................................................... 4

IV.   Recommendations ........................................................................... 7

      A. Preparing for Civil Disturbance ............................................... 7

      B. Effective Management of Protest Events ................................. 7

      C. Changes in Law ........................................................................ 8

      D. Restoring Faith in Government ................................................ 8

METHODOLOGY ...................................................................................... 9

I.    Introduction .................................................................................... 9

II.   Scope of Engagement ..................................................................... 9

III.  Sources of Information ..................................................................10

      A. Documents ...............................................................................10

      B. Images and Recordings ...........................................................11

      C. Witness Interviews ..................................................................11

      D. Independent Review Web Site and Tipline .............................12

IV.   Resistance to Cooperation .............................................................12

      A. Charlottesville Police Department ...........................................12

      B. State Government .....................................................................14

      C. Organizational Responses .......................................................17

      D. Community Members ...............................................................18

V.    Consultants ....................................................................................19

FACTUAL FINDINGS ...............................................................................21

I.    Why Charlottesville? ......................................................................21

      A. Charlottesville's City Government and Event Permitting Process .......................21

Case 3:17-cv-00072-NKM-JCH   Document 488-3   Filed 05/02/19   Page 9 of 227   Pageid#:
4993

  B. History of the Lee and Jackson Statues .................................................22

  C. The First Hint of Controversy .........................................................23

  D. Jason Kessler and the Attempted Removal of Wes Bellamy ...............23

  E. The Capital of the Resistance .........................................................24

  F. Charlottesville Moves Forward........................................................24

  G. Jason Kessler Meets Richard Spencer ............................................25

II. Initial Events of May 13-14 .....................................................................25

  A. May 13 Demonstrations.................................................................25

    1. The Jackson Park Event ..........................................................26

    2. The Lee Park Event ................................................................27

  B. May 14 Counter-Protest ...............................................................28

  C. Aftermath ....................................................................................30

  D. What Went Right and What Went Wrong........................................31

III. July 8 Ku Klux Klan Rally .....................................................................31

  A. Preparation .................................................................................31

    1. Permit Application, Review, and Approval..................................31

    2. Intelligence Gathering.............................................................33

    3. Training.................................................................................35

    4. Agency Coordination ..............................................................36

      a. Charlottesville Fire Department .........................................36

      b. Department of Parks and Recreation ...................................37

      c. Department of Public Works ..............................................37

      d. Charlottesville Sheriff ......................................................38

      e. Legal Advice ...................................................................38

      f. Virginia State Police .........................................................38

      g. Albemarle County ............................................................39

      h. University of Virginia ........................................................40

      i. Emergency Communications Center .....................................40

  B. CPD Operational Plan ..................................................................41

  C. Public Communications .................................................................46

    1. Efforts to Discourage Attendance .............................................46

    2. Informing the Public ...............................................................47

D. Events of July 8 ..................................................................48

   1. Preparing Justice Park .........................................................48

   2. All-Hands Briefing ...............................................................48

   3. Opening the Command Center ...........................................49

   4. The Crowd Gathers .............................................................50

   5. March of the Clergy Collective ..........................................51

   6. Media .....................................................................................52

   7. The First Arrests .................................................................52

   8. The Arrival of the Klan .......................................................53

   9. The Klan Speaks .................................................................55

   10. The Klan Exits ...................................................................57

   11. The Crowd Turns on Law Enforcement ............................58

   12. Deployment of Tear Gas ....................................................59

   13. The Crowd Disperses ........................................................61

   14. After-Action ......................................................................62

      a. Statistics ......................................................................62

      b. Community Criticism .................................................62

      c. Evolving Explanations for Deployment of Tear Gas .........63

      d. After-Action Meetings, Reports, and Takeaways ..............64

E. What Went Right and Want Went Wrong ..................................64

   1. What Went Right ..................................................................64

      a. City Officials Provided Thorough Information to the Community .......64

      b. Law Enforcement Protected the Free Speech of All Participants ..........65

      c. No Significant Injuries or Property Damage .......................65

   2. What Went Wrong ...............................................................66

      a. Law Enforcement Failed to Operate Within a Unified Command .......66

      b. Law Enforcement Allowed Media Inside a Law Enforcement Zone ....66

      c. The Operational Plan Created Insufficient Space for Opposing Groups ..................................................67

      d. The Deployment of Tear Gas Was Unauthorized by Command ..........67

      e. City Leadership Failed to Respond to Community Criticism ...............68

IV. August 12 Unite The Right Rally ....................................................69

A. Preparation .............................................................................69

   1. The Permit Application ........................................................69

2. Law Enforcement Efforts to Gather Information........................................69

    a. Open-Source Review.................................................................69

    b. Law Enforcement Agencies and Advocacy Groups..........................70

    c. Human Intelligence................................................................70

3. Community Preparation.............................................................72

    a. The Clergy Collective and Congregate Charlottesville .....................72

    b. Local Activist Groups .............................................................73

    c. Houses of Worship ...............................................................74

    d. Downtown Businesses ..........................................................75

    e. Neighborhood Associations ....................................................76

    f. Counter-Protesters in McGuffey and Justice Parks .........................77

    g. Unite The Right Preparation ...................................................78

    h. City Council Preparation.........................................................79

        1) Community Response ......................................................79

        2) Efforts to Move Unite The Right ........................................80

        3) The ACLU Litigation .......................................................83

        4) Discussions with State Officials .........................................84

4. Law Enforcement Preparation.....................................................85

    a. Community Outreach .............................................................85

    b. Training............................................................................85

    c. Consultation with Outside Agencies ..........................................86

        1) Virginia State Police........................................................86

        2) Agencies Outside Virginia ................................................87

5. CPD Operational Plan ..............................................................89

    a. Traffic and Street Closures .....................................................89

    b. Placement of Officers Around Emancipation Park ...........................92

    c. Ingress and Egress of Crowds and Arrival of Speakers.....................96

    d. Arrest Guidance...................................................................97

    e. Riot Gear...........................................................................98

    f. Staging of Tactical Field Forces and Other Assets ...........................99

    g. Coordination with Albemarle County Police Department .................101

    h. Coordination with University Police Department...........................102

    i. Contingency Plan for McIntire Park .........................................103

6. Virginia State Police Operational Plan ........................................103

      7.     Emergency Services Plans ........................................................ 104

          a.    Charlottesville Fire Department ................................ 104

          b.    University of Virginia Medical Center ........................ 105

          c.    Emergency Communications and Operations Center ....... 105

      8.     The Virginia National Guard .................................................. 106

      9.     VDEM and the Incident Management Team ............................. 106

      10.    Command Centers ................................................................. 109

B.  Events of August 11 ....................................................................... 110

      1.     Intelligence ........................................................................ 110

      2.     Wal-Mart Parking Lot .......................................................... 112

      3.     Law Enforcement Awareness and Planning ............................ 112

      4.     Interfaith Service at St. Paul's Memorial Episcopal Church ...... 113

      5.     Jason Kessler Moves Forward ............................................... 115

      6.     Difficulties at St. Paul's ....................................................... 115

      7.     The March Begins ............................................................... 117

      8.     UPD Requests Mutual Assistance .......................................... 118

      9.     Aftermath ........................................................................... 119

C.  Events of August 12 ....................................................................... 120

      1.     Early Movements ................................................................ 120

          a.    Law Enforcement Postings ...................................... 120

          b.    Interoperability ..................................................... 121

          c.    Going "Off Plan" .................................................. 121

          d.    The Clergy Arrives ................................................ 122

          e.    The Militia Arrives ................................................ 123

          f.    The Alt-Right Arrives ............................................ 124

      2.     Escalation .......................................................................... 126

          a.    2nd Street NE Near First United Methodist Church ..... 126

          b.    2nd Street NE and East Market Street ....................... 127

          c.    Police Fail to Intervene as Violence Increases ............ 130

          d.    Withdrawal of CPD To Rear of Park ........................ 132

      3.     Unlawful Assembly ............................................................ 133

      4.     Dispersal of the Crowd ........................................................ 135

      5.     After the Unlawful Assembly ............................................... 136

          a.    A Gunshot and Punches at 1st and Market .................. 136

b.     Assault At The Market Street Parking Garage .................................. 137

c.     Officer in Distress at 4th and Market ................................. 139

d.     False Alarm at Justice Park ............................................. 140

e.     Protecting the Downtown Mall ...................................... 140

f.     Militia Group at Friendship Court .................................. 140

6.     The Vehicle Incident at 4th and Water Streets ........................... 144

7.     Afternoon and Evening Developments ..................................... 146

a.     Skirmishes and Threats .................................................. 146

b.     VSP Helicopter Crash ................................................... 146

c.     Press Conference and Cyber Attack .............................. 147

d.     Kessler's Sunday Press Conference .............................. 147

8.     After Action Review ........................................................... 148

a.     Charlottesville Police Department ................................ 148

b.     Virginia State Police .................................................... 149

D.   What Went Right and What Went Wrong .................................... 151

1.     What Went Right ................................................................ 151

a.     Despite the Presence of Firearms and Angry Confrontations Between Protesters and Counter-Protesters, No Person was Shot and No Significant Property Damage Occurred. .............................. 151

b.     The Charlottesville Fire Department and UVA Health System Had Effective Operations Plans That Allowed Rescue Personnel to Extract and Treat a Large Number of Injured Persons Within Minutes of a Violent Attack. ............................. 151

c.     Law Enforcement Planning and Response Was Informed by Thorough, Accurate Intelligence Before and During the Event. ......... 152

2.     What Went Wrong ............................................................. 153

a.     The Charlottesville Police Department Did Not Seek Input From Law Enforcement Personnel Experienced In Handling Similar Events. ................................................. 153

b.     The Charlottesville Police Department Did Not Provide Adequate Training or Information to Officers In Advance of the Event. ............ 153

c.     The City of Charlottesville Waited Too Long to Request the Specialized Assistance of the Virginia Department of Emergency Management. ................................................. 154

d.     The Charlottesville City Council Unduly Interfered With Operational Planning By Directing That the Event Be Moved to McIntire Park Just Days In Advance. ............................... 155

1) Lack of Deference to Law Enforcement. .................................. 155

2) Timing of Decision to Move the Event. .................................. 156

e. The City of Charlottesville Did Not Provide Adequate Information to The Public About Plans For the Event. ......................................... 156

f. City Planners Mistakenly Believed That They Could Not Limit the Possession of Certain Items Used as Weapons At the Unite The Right Event. .......................................................................... 156

g. The Owners of Private Property Adjacent to Emancipation Park Refused Access to Their Facilities, Which Hampered Law Enforcement Response During the Event. ......................................... 157

h. The University of Virginia Police Department Refused Multiple Offers of Mutual Aid Assistance from the Charlottesville Police Department, Resulting in Violent Encounters That Emboldened Protesters at the Unite The Right Rally. ............................................. 158

i. The Charlottesville Police Department Implemented a Flawed Operational Plan That Failed to Protect Public Safety On August 12. 159

1) Law Enforcement Did Not Adequately Ensure Separation Between Alt-Right Protesters and Organized Counter-Protesters. .................................................................. 159

2) Law Enforcement Failed to Intervene in Violent Disorders and Did Not Respond to Requests for Assistance. .......................... 160

a) Areas Where Conflict Predictably Occurred Were Not Occupied by Officers. ...................................................... 160

b) CPD and VSP Personnel Were Insufficiently Equipped To Respond to Mass Unrest. ................................................. 161

c) CPD Commanders Failed to Deploy Available Law Enforcement Resources to Quell Violence ........................ 161

d) VSP Directed Its Personnel to Remain Behind Barriers Within Emancipation Park. ............................................... 162

e) Upon the Declaration of an Unlawful Assembly, Protesters Were Pushed Directly Toward Counter-Protesters Without Separation. ......................................... 162

3) The Traffic Plan Placed Insufficient Resources at Particular Intersections and Left the Downtown Mall Vulnerable to a Vehicle Used as a Weapon. ...................................................... 163

4) The Charlottesville Police Department and Virginia State Police Failed to Operate Under a Unified Command, Resulting In Delayed And Ineffective Responses To Critical Events. ........ 164

a) Failure to Share VSP Operational Plan ............................ 164

b) Lack of Unified Decision Making. .................................... 164

                c)      No All-Hands Briefing ...................................................... 165

                d)      Lack of Interoperable Communications ............................ 165

           j.     Failure to Protect Public Safety Erodes Trust in Law Enforcement .... 166

RECOMMENDATIONS ................................................................ 167

I.   Preparation for Civil Disturbances .......................................... 167

    A. Emergency Management and Coordination ...................................... 167

    B. Intelligence Gathering ............................................................ 167

    C. Law Enforcement Training ....................................................... 168

    D. Communications ................................................................... 169

    E. Protecting Both Public Safety and Freedom of Speech ..................... 170

II.  Effective Management of Protest Events ................................... 171

    A. The Stadium Approach ........................................................... 171

    B. Unified Command ................................................................. 172

    C. Responses to Disorders .......................................................... 173

    D. Contingencies ..................................................................... 174

III. State Support for Local Jurisdictions ..................................... 175

IV. Changes in Law ................................................................ 175

    A. Permitting.......................................................................... 175

    B. Firearms ........................................................................... 176

V.  Restoring Faith in Government .............................................. 176

TIMELINE ............................................................................. 179

REVIEW TEAM ....................................................................... 195

ENDNOTES ........................................................................... 197

# PREFACE

The founders of our democratic government believed in an ordered liberty that guarantees all Americans the right to express themselves in the public square. Thomas Jefferson helped enshrine that value in the early days of the republic. It is therefore only fitting that his hometown of Charlottesville, Virginia, continues to serve as a forum for emerging intersections of speech and security.

In 2017, a series of events in Charlottesville made this community a flashpoint in a larger American discussion about race, history, and the challenges of free speech. When our City Council voted to remove two statues of generals who fought for the confederacy during the Civil War, the action triggered a series of events that brought hatred, violence, and despair to our community. Three people lost their lives, and numerous other lives were dramatically and unalterably changed by what happened in our community.

In the following pages, we try to make sense of the tragic events of 2017. We start with the facts, as truth must be the foundation for any constructive effort to learn and improve. We have tried to assemble a coherent narrative of the protest events that occurred in Charlottesville on May 13 and 14, July 8, and August 11 and 12, 2017. To construct the narrative contained in this report, we spoke to hundreds of people and gathered a wide array of perspectives about these events. We reviewed hundreds of thousands of documents that provide important information. We viewed many hours of video and thousands of photographs, which have allowed us to re-experience those difficult days. We sifted through and consolidated all of this information to produce a cogent summary of what happened in Charlottesville during the turbulent summer of 2017.

We intend for those facts to be the foundation for learning how this community and other small cities can better handle large protest events. We document what went right and what went wrong on each occasion. We consider issues of public safety, communications, permitting, and interagency coordination. We look ahead and make specific recommendations to guide preparation for and response to future events in Charlottesville and elsewhere.

Throughout the process of our review, we have endeavored to be objective and approach our serious task without preconceived opinions. Our client has facilitated that objective approach and made available to us whatever we requested. We have not been limited or directed in any way by any person or agency within City government. Consequently, what follows is our independent assessment of these events.

Our goal in preparing this report is to enhance our community's ability to understand and learn from the difficult events of 2017. We also hope the facts and recommendations herein lead to constructive discussion in Charlottesville and elsewhere about the important issues raised by the protest events.

Today, we are a fractured city. The divisions within our community surfaced at multiple points during our review, and they continue to hamper our ability to heal and move forward. We hope that an honest pursuit of the issues identified in this report leads to more informed discussion, increased understanding, and a more unified Charlottesville.

Timothy J. Heaphy
Hunton & Williams LLP
November 24, 2017

# ACKNOWLEDGMENTS

Many people contributed to the work of our independent review and helped put this report together. Each of the individuals cited herein deserves a share of the credit for the final product and the gratitude of everyone who will read it.

## A. Hunton & Williams

A very strong team of associates at Hunton & Williams provided invaluable assistance from the onset of our engagement. Trevor Garmey, Kevin Elliker, and Jon Caulder each traveled to Charlottesville for multiple interviews, pored over documents and video images, and composed drafts of substantial sections of the report. Their diligence and cooperative spirit was indispensable and helped make the enormous challenge of our work more manageable. Associates Brittany Davidson, Suzanne Hosseini, Martha Condyles, and Britt Anderson, and Temporary Attorney Max Holland contributed time reviewing documents and summarizing interview information, providing raw material that is embedded in these pages.

In addition to attorneys, a large number of professional staff at Hunton & Williams contributed their unique talents to our team. Research librarians Jonathan Hartnett and Alexis Sharp scoured open sources of information and helped us identify important witnesses. Senior Marketing and Communications Manager Katie Abbott and the outstanding Document Processing team of Rhonda Wash, Danelle Gager, Nannette White and Katie Bullock lent their creative skills and ensured that our final report was visually appealing. Paralegal Michelle Hayden-Winston pitched in on a variety of tasks. Finally, my Professional Assistants Ye-Eun Sung and Barbara Butler kept me on task and ensured that nothing fell through the cracks during our immersion in this project.

## B. Cognicion

As detailed above, we gathered more than a half million documents over the course of our independent review. That large volume of material was received and made usable by the team of litigation support professionals at Cognicion LLC. They traveled to Charlottesville and worked with IT and other City staff to create an efficient system of document production and review. Their work was timely and ensured our access to important information. Chris McDaniel managed the project with help from Mike Perkins and Geoffrey Swanson. In light of the public-service focus of this matter, Cognicion agreed to provide their services to the City of Charlottesville at no charge, saving the City tens of thousands of dollars.

## C. The Police Foundation and Law Enforcement Consultants

As our review focused on the actions of multiple law enforcement agencies, we enlisted the expertise of law enforcement consultants . The Police Foundation provided us with Eddie Reyes and Kim Dine, both of whom lent their considerable experience and insight to our

review.  We supplemented The Police Foundation's Team with two local experts, former Roanoke, Virginia Police Chief Chris Perkins and Rachel Harmon from the University of Virginia School of Law.  The former Chiefs brought direct personal experience in handling large protest events to our work.  Professor Harmon provided insights into best practices and research on law enforcement practices.  All four experts provided important work, and they did so pro bono given the important public benefit of this work.  Without the time and effort expended by our experts, our report would have been incomplete.

### D.   Others

We received many photographs and a great deal of video footage documenting the events at issue in our review.  Photographers Patrick Morrissey and Jill Mumie shared their stories of the protest rallies with us.  They also provided the photographs that are included in this report. The images they captured help tell the story of July 8 and August 12, and we are grateful for their inclusion in the pages that follow.  Victoria Pearson at the Office of Attorney General was extremely helpful in navigating the issues involved in our exchange of information with the Commonwealth of Virginia.  We appreciate her professionalism and sense of humor,  and we are grateful for her assistance over the course of our review.

# EXECUTIVE SUMMARY

The three protest events we were asked to evaluate in this report all took place in the immediate vicinity of two statues of confederate generals Robert E. Lee and Thomas "Stonewall" Jackson. While these statues have stood in our town squares for years, they are not universally celebrated or embraced. To some members of our community, the statues are symbols of discrimination and violence. To others, they are proud symbols of a history from which we must learn, not ignore.

This conflict played out in a public discussion facilitated by a Blue Ribbon Commission on Race, Memorials, and Public Spaces, a group convened by City leaders to evaluate the future of the iconic statues. After receiving recommendations from the Commission, the City Council voted to remove one of them from the park where it stood for years. The Council decision was challenged in court and remains stalled by litigation involving the interpretation of a state law governing "war memorials."

The statue controversy has drawn interest from people around the world, on both sides of the issue. Many members of our community embraced the effort to remove the statues, believing them symbols of white supremacy. They began talking not just about the statues, but more systemic issues like race, immigration, and economic opportunity. The election of President Trump further motivated progressives in Charlottesville. City leaders encouraged this liberal activism and declared Charlottesville the "capital of the resistance" to oppressive policies and systemic inequality.

Local resident Jason Kessler strongly opposed the City's efforts to remove the statues and the broader effort to brand Charlottesville as a haven for liberal opposition to President Trump. Others shared his views, particularly members of the self-proclaimed "Alt-Right" community that had largely communicated in electronic forums. Kessler found an ally in Richard Spencer, a white nationalist who had developed a following of like-minded individuals through the National Policy Institute.

## I.  May 13-14

Spencer and Kessler joined forces to organize the first protest events that are discussed in our report. They convened two events on Saturday, May 13 a daytime march from McGuffey Park to Jackson Park and a nighttime event at Lee Park at which white nationalists carried torches. Over 100 people attended both events, carrying flags and chanting Nazi slogans such as "blood and soil" and "you will not replace us." Several speakers addressed the crowd at these events, suggesting that Charlottesville's attempt to remove the civil war statues was part of a broader war against white people and their heritage.

These events were not promoted in advance. Organizers did not obtain permits for either one. Accordingly, they did not attract counter-protesters until near the end of each event, when small groups came to confront the racist ideology. Similarly, they did not draw law

enforcement attention. Officers responded to calls for service for both events and arrived well after each event began. They monitored crowds but made no arrests.

The May 13 events prompted a strong, immediate reaction among Charlottesville's progressive community and broadened its focus beyond the statues themselves. Political leaders criticized the symbolism of the use of torches and the racist ideology espoused at the events. A group quickly organized a counter-protest on Sunday, May 14 a candlelight vigil at the Lee statue. A large crowd gathered at the Lee statue that Sunday night. Speakers at the event focused on embracing diversity and inclusion and rejecting imagery and tactics used by Kessler and Spencer. Several fights occurred when Kessler arrived and disrupted the event. Several people including Kessler were arrested.

The events of May 13 and 14 hardened the resolve of both sides to continue their ongoing battle over the statues and broader issues of race and history. While the views expressed at the May 13 protests were not shared by all who supported keeping the statues in place, they attracted attention to our City's ongoing debate. Kessler and Spencer promoted their role in the events and used them to attract more followers. Community organizations in Charlottesville similarly used these events to attract new followers concerned with the tenor and substance of the words used at the events. Police officials realized they had a gap in intelligence gathering, as they were caught unaware of the events until they took place. Many in Charlottesville began to expect future events on the horizon.

All three of the events of May 13 14 were arguably covered by the City's special events regulation. Nonetheless, no permits were obtained for any of the individual gatherings and no effort to restrict the events took place. The nighttime events both violated the City's open flame ordinance, though no enforcement action was taken.

## II.    July 8

Shortly after the May 13-14 events, a Ku Klux Klan group in North Carolina applied for a permit to conduct a demonstration in Charlottesville on July 8. The Klan group wanted to protest the potential removal of the civil war statues and "stop cultural genocide." The City immediately began preparing for this event, as leaders knew it would generate a great deal of interest and controversy.

City officials prepared to protect both free expression and public safety at this event. They gathered information, secured the assistance of other agencies, and formulated an Operational Plan for July 8. Police reached out to both the permit holders and representatives of groups opposed to their speech, though their efforts were criticized as an attempt to "intimidate" and "curtail leftist speech and expressive conduct." Charlottesville Police Department (CPD) commanders worked with their counterparts at the Virginia State Police and other agencies to bring police, fire and rescue resources to the event. They created a plan that attempted to ensure separation between the Klan and counter-protesters, who were expected to vastly outnumber the permitted protest group.

City officials worked together to discourage attendance at the Klan event. In meetings with various groups and in multiple public statements, City Councilors, the City Manager and the Chief of Police recommended that Charlottesville residents not give the Klan an

audience. City officials helped organize and promote a series of alternative events that would take place on July 8, with an eye toward minimizing crowds and potential danger of the Klan event. They provided ample information about logistics of all events and were responsive to community concerns. The communications strategy was effective, as thorough information allowed citizens to make informed decisions about potential responses to the Klan event.

The Klan rally took place on July 8. Law enforcement was able to facilitate the Klan's arrival, speech, and departure while protecting public safety. While there were arrests and minor disturbances, no person in attendance was seriously injured and no property damaged. The City also protected the free expression of the Klan, despite its odious character. The City's response to the Klan event adequately accommodated both compelling interests at stake on July 8   free speech and public safety.

---

### The City's response to the Klan event adequately accommodated both compelling interests at stake on July 8   free speech and public safety.

---

Despite the overall success of the event, law enforcement made several critical mistakes on July 8. CPD and VSP did not operate with sufficient coordination before, during or after the event. There was no joint training, unified operational plan, or joint radio communication between the agencies. VSP operated largely independently throughout the Klan rally, rather than in an integrated multi-agency force. CPD planners failed to anticipate the counter-protesters' desire to disrupt the event by impeding the Klan's arrival and departure. To protect the safety of all participants, officers had to adjust plans and use an enclosed parking garage for Klan vehicles and a mobile field force to clear a path of ingress and egress into the park. While officers created separation between the Klan and counter-protesters, they left too little space between barricades and allowed media representatives into the buffer zone between the conflicting groups.


Photo Source: Patrick Morrissey

After the Klan's departure, a group of counter-protesters focused their anger at law enforcement. Crowds failed to disperse when directed to do so and obstructed the actions of officers. This led to scuffles between officers and counter-protesters, multiple arrests, and the declaration of the event as an unlawful assembly. VSP ultimately deployed three canisters of CS dispersion powder to disperse the crowd, which impacted both counter-protesters and officers. The decision to deploy a chemical agent was based on incomplete information and did not follow the protocol that had been established for its use.

The use of military-type equipment, number of arrests, and deployment of chemical dispersants generated strong opposition in the community. City leaders failed to adequately respond to that criticism. They did not provide a complete explanation of the reasons for the use of chemical irritants and other tactical decisions made on July 8, in part because they turned immediately to preparations for the larger August 12 Unite The Right rally. The City's inability or unwillingness to engage with community members concerned about the July 8 event created distrust in law enforcement and City government.

## III. August 11-12

Jason Kessler obtained a permit to convene a rally at the Lee statue at which he planned to bring together a wide array of right-wing and white nationalist groups. This event was called "Unite The Right" and was expected to be a much larger event and more significant public safety challenge than the July 8 Klan rally. Counter-protesters began mobilizing for this event and similarly recruited a range of left-wing groups to come to Charlottesville to confront the racist ideology of the Unite The Right groups. Charlottesville was destined to become the latest arena for a conflict between various groups who had clashed in Portland, Oregon; Berkeley, California; Pikeville, Kentucky, and various other locations where these so-called "Alt-Right" gatherings had taken place.



Photo Source: Patrick Morrissey

City planners understood the scope and challenge presented by the August 12 event. CPD commanders obtained accurate information about expected attendance at the Unite The Right rally, from online and human sources. They knew the event would attract hundreds if not thousands of people on both sides. They also were aware that many attendees would be armed, which created the potential for significant violence. They effectively gathered accurate, timely intelligence about the event, which informed planning efforts.

Citizens of Charlottesville began preparing for the Unite The Right event as well. A new faith-based organization called Congregate Charlottesville was formed and organized a series of trainings in nonviolent civil disobedience for those interested in engaging in those tactics on August 12. Local anti-racist groups prepared to disrupt the event and hinder law enforcement response to specific threats. Business owners and neighborhood groups sought information from City leaders and were frustrated by the lack of communication they received.

In the face of strong community opposition to the Unite The Right rally, City leaders wanted to deny Kessler's permit application. City Councilors responded to this pressure by injecting themselves into the operational details of the City's response to this event a function typically reserved for City staff. In a closed meeting ten days before the event, they considered the prospect of moving the Unite The Right event to McIntire Park. City

Manager Maurice Jones and CPD Chief Al Thomas voiced concerns with moving the event to McIntire Park, particularly just days from the event. City attorneys and outside lawyers cautioned that an attempt to move the event was likely to be struck down by courts. Nonetheless, four of the five Councilors emerged from the closed meeting in favor of moving the event to McIntire Park. This put strong pressure on City Manager Jones and Chief Thomas to comply with their desire to move the event.

The late decision to shift the event's location had a negative impact on preparations for this challenging event. Uncertainty about the location prevented City leaders from providing thorough information to the public about the event beyond its potential danger. The limited communication by the City frustrated many residents already on edge after the July 8 events. Law enforcement leaders had to plan for two possible scenarios, complicating their efforts. The move to McIntire was ultimately unsuccessful; a federal judge granted Kessler an injunction that prevented the move and guaranteed his group access to Emancipation Park.

Even apart from the complexity introduced by the possible move, police planning for August 12 was inadequate and disconnected. CPD commanders did not reach out to officials in other jurisdictions where these groups had clashed previously to seek information and advice. CPD supervisors did not provide adequate training or information to line officers, leaving them uncertain and unprepared for a challenging enforcement environment. CPD planners waited too long to request the assistance of the state agency skilled in emergency response. CPD command staff also received inadequate legal advice and did not implement a prohibition of certain items that could be used as weapons.

CPD devised a flawed Operational Plan for the Unite The Right rally. Constraints on access to private property adjacent to Emancipation Park forced planners to stage particular law enforcement units far from the areas of potential need. The plan did not ensure adequate separation between conflicting groups. Officers were not stationed along routes of ingress and egress to and from Emancipation Park but rather remained behind barricades in relatively empty zones within the park and around the Command Center. Officers were inadequately equipped to respond to disorders, and tactical gear was not accessible to officers when they needed it.

CPD commanders did not sufficiently coordinate with the Virginia State Police in a unified command on or before August 12. VSP never shared its formal planning document with CPD, a crucial failure that prevented CPD from recognizing the limits of VSP's intended engagement. CPD and VSP personnel were unable to communicate via radio, as their respective systems were not connected despite plans to ensure they were. There was no joint training or all-hands briefing on or before August 12. Chief Thomas did not exercise functional control of VSP forces despite his role as overall incident commander. These failures undercut cohesion and operational effectiveness. CPD and VSP operated largely independently on August 12, a clear failure of unified command.

On Friday, August 11, the Unite The Right organizers held another unpermitted torch lit march, this time at the University of Virginia. University officials were aware of this event for hours before it began but took no action to enforce separation between groups or otherwise prevent violence. They were unprepared when hundreds of white nationalists

walked through the University grounds and surrounded a small group of counter-protesters at the base of a statue of Thomas Jefferson next to the Rotunda. As more and more marchers arrived, shouting and chanting became punching and kicking. When the University Police Department invoked mutual aid   only after repeated offers from CPD officers from both agencies dispersed the unruly crowd. The tenor of this event set an ominous tone for the following day. So did the relative passivity of law enforcement whose failure to anticipate violence and prevent disorders would be repeated on Saturday at Emancipation Park.

The planning and coordination breakdowns prior to August 12 produced disastrous results. Because of their misalignment and lack of accessible protective gear, officers failed to intervene in physical altercations that took place in areas adjacent to Emancipation Park. VSP directed its officers to remain behind barricades rather than risk injury responding to conflicts between protesters and counter-protesters. CPD commanders similarly instructed their officers not to intervene  in all but the most serious physical confrontations. Neither agency deployed available field forces or other units to protect public safety at the locations where   violence took place. Instead, command staff  prepared to declare an unlawful assembly and disperse the crowd. When violence was most prevalent, CPD commanders pulled officers back to a protected area of the park, where they remained for over an hour as people in the large crowd fought on Market Street.

Once the unlawful assembly was declared, law enforcement efforts to disperse the crowd generated more violence as Alt-Right protesters were pushed back toward the counter-protesters with whom they had been in conflict. Once Emancipation Park was clear, the violent conflicts spread beyond the park. Small groups of people wandered through the

---

**Because of their misalignment and lack of accessible protective gear, officers failed to intervene in physical altercations that took place in areas adjacent to Emancipation Park.**

---

streets and engaged in frequent skirmishes unimpeded by police. Violence erupted at the Market Street parking garage, Justice Park, High Street, the Water Street parking area, and on the Downtown Mall. Police attempted to respond to these violent conflicts, but were too far away and too late to intervene. The result was a period of lawlessness and tension that threatened the safety of the entire community.

The most tragic manifestation of the failure to protect public safety after the event was declared unlawful was the death of Heather Heyer. Early on August 12, CPD had placed a school resource officer alone at the intersection of 4th Street NE and Market Street. This officer feared for her safety as groups of angry Alt-Right protesters and counter-protesters streamed by her as they left Emancipation Park. The officer called for assistance and was relieved of her post. Unfortunately, CPD commanders did not replace her or make other arrangements to prevent traffic from traveling across the Downtown Mall on 4th Street. A single wooden saw horse was all that impeded traffic down 4th Street as large groups of people continued to roam the streets. This vulnerability was exposed when James Fields drove his vehicle down the unprotected street into a large crowd of counter-protesters at the intersection of 4th Street SE and Water Street,  killing Ms. Heyer.

HUNTON&
WILLIAMS

Hunton & Williams LLP | 6

Case 3:17-cv-00072-NKM-JCH   Document 488-3   Filed 05/02/19   Page 26 of 227   Pageid#: 5010

CFD and the UVA Health System had effective plans and promptly responded to the vehicle incident at the intersection of 4th and Water. Every person who was injured and needed hospitalization was removed from the scene and received treatment within thirty minutes, a remarkable feat given the circumstances. This prompt, effective response represents a bright success on a day largely filled with failure.

Several hours after the incident at 4th and Water Streets, a VSP helicopter crashed, killing two troopers inside. While the crash appears to have been an accident, the loss of the troopers is another disheartening tragedy. Their loss compounded the earlier loss of Heather Heyer and emphatically reinforced the terrible toll this event took on our community.

In contrast to the July 8 event, the City of Charlottesville protected neither free expression nor public safety on August 12. The City was unable to protect the right of free expression and facilitate the permit holder's offensive speech. This represents a failure of one of government's core functions the protection of fundamental rights. Law enforcement also failed to maintain order and protect citizens from harm, injury, and death. Charlottesville preserved neither of those principles on August 12, which has led to deep distrust of government within this community.

## IV. Recommendations

Looking ahead, we recommend the following steps to improve response to future events. We hope these suggestions also provide guidance to other small cities faced with managing volatile protest events.

### A. Preparing for Civil Disturbance

Better preparation is critical. We recommend that CPD and CFD planners follow Incident Command System (ICS) procedures implemented by the National Incident Management System (NIMS) in anticipation of future large protest events. Police agencies should ensure that they have adequate means to gather and vet intelligence and incorporate that information into operational plans. They should reach out to peers in other jurisdictions and learn from their experience. Officers charged with protecting public safety during protest events need specialized training with partner agencies that includes standards of law, field training, tactics and equipment to be used during civil unrest situations. City leaders should provide comprehensive information to the public about plans for future large demonstration events. Operational plans that ensue from this process should seek to protect both free expression and public safety.

### B. Effective Management of Protest Events

When a protest threatens to be volatile, the City should consider creating a secure perimeter with designated points of entry and enforced separation of conflicting groups. While this "stadium approach" will not be possible in every situation, it is a sensible default approach to planning for large, potentially violent events. Regardless of the specific plan adopted, state and local law enforcement planners should ensure all personnel share a common understanding of each involved agency's role in protecting public safety in a large protest

event.  All agency personnel should be prepared to respond safely, but immediately to violence of any kind.  Operational plans need to allow flexibility and contemplate the movement of specialized units in response to emerging conditions.  Finally, the Commonwealth of Virginia should assemble best practices and become a consistent source of training, legal advice, resources, and information to assist localities in handling large protest events.

### C.    Changes in Law

Charlottesville should modify its permitting regulations to explicitly codify the prohibition of certain objects at large protest events and require permits for all events involving open flames.  The Virginia General Assembly should criminalize the use of a flame to intimidate. The General Assembly should empower municipalities to enact reasonable restrictions on the right to carry firearms at large protest events.

### D.    Restoring Faith in Government

Our evaluation revealed a city divided.  We recommend that the City address the issues raised in the wake of these events as a means to restore confidence in government.  For CPD, this means not only better planning and event management, but also more community engagement, a necessary condition for proactive, effective policing.  CPD must work with other parts of City government, business and community groups, and citizens as a partner in promoting community well-being.  City Council needs to find ways to solicit community input more effectively and identify specific areas of potential change.  Citizens can contribute to better communication by approaching the City and efforts to change our community with both flexibility and patience.  Our dialogue must be constructive, not accusatory.  We should encourage all voices to participate in a robust discussion of the issues that have come to light since the summer protest events.

# METHODOLOGY

## I.    Introduction

In this section, we describe the process by which we prepared this report. We set forth the terms of our engagement and subsequent interaction with our client, the City of Charlottesville. We discuss the processes we used to solicit and obtain relevant information and document specific sources of information obtained. We also describe the resistance we encountered over the course of our review and our inability to obtain information from various individuals and organizations.

## II.    Scope of Engagement

On August 24, 2017, the City of Charlottesville retained Hunton & Williams LLP to perform an independent evaluation of the City's handling of the summer protest events. The engagement letter executed by City Manager Maurice Jones specifically indicates that our firm will perform "an independent assessment on the City's handling of several protest events in the summer of 2017."[1] The letter goes on to specify that the firm's work "will include an evaluation of the City's compliance with applicable laws and regulations, as well as recommendations for potential changes in law and other actions for improved response to future events."[2]

Upon our engagement, City Manager Maurice Jones made clear that he wanted us to perform an objective review of the City's handling of these challenging events. He asked that we consider all of the summer protest events, including the unpermitted May 13 appearances at the Jackson and Lee statues by Richard Spencer and others, the July 8 Klan event, and the August 12 Unite The Right rally. He asked that we evaluate the City's comprehensive response to each event and consider issues such as permitting, communications, legal restrictions, public safety, and interagency coordination. He directed us to pursue all relevant facts and document findings regardless of whether those facts reflected favorably upon the City government or various individuals. He asked us to offer advice to the City for improving its future handling of large demonstrations, particularly those that threaten public safety.

At no time has Mr. Jones or anyone else within City government modified those instructions. To the contrary, Mr. Jones and others have reinforced their desire for an objective, independent review in both word and deed. Mr. Jones has facilitated our access to relevant information and directed City employees to comply with our requests. City Attorney Craig Brown and his staff supervised the collection of documents and ensured that all employees were aware of their obligation to cooperate with our review. Neither Mr. Jones nor Mr. Brown ever directed us toward or away from any particular source of information. They did not supervise our investigation but rather stood back and allowed us access to the sources of information within their control. At no time did Mr. Jones or Mr. Brown interfere with our review. Their approach to our work has been consistent, and it has allowed us to perform a truly independent assessment of these events.

## III. Sources of Information

Over the course of our evaluation of these events, we reviewed hundreds of thousands of documents, watched or listened to countless hours of video and audio recordings, reviewed numerous still images, and interviewed hundreds of witnesses. Although we did not obtain all information we sought, we were able to access a tremendous volume of information from a wide array of sources. We believe this information provides a thorough factual basis for the findings and recommendations outlined below.

### A. Documents

We began our review by obtaining all relevant information from our client, the City of Charlottesville. We made a specific request for access to all documents that touched upon the summer protest events. We asked for all communications regarding those events, including e-mails and text messages. We requested any documents prepared before or after the events, including briefings, presentations, drafts, and final versions. We coordinated with the City's Department of Information Technology to directly obtain e-mails and electronically stored information for sixty-two City custodians. In obtaining these documents, we followed best practices in electronic document collection and maintained an appropriate chain of custody.

The City Attorney's office also established a process through which City employees, including the Charlottesville Police Department, could provide us with information. First, the City Attorney directed that all City employees preserve all relevant information. The City Attorney's office then created a process through which employees could upload documents for our review. This process resulted in the production of voluminous documents from City employees. Hunton & Williams lawyers reviewed all documents and isolated particularly significant documents for internal and external discussion.

We submitted FOIA requests to several agencies of the Commonwealth of Virginia, including the Virginia State Police (VSP), the Department of Emergency Management (VDEM), the National Guard, the Office of the Governor, and the Attorney General's Office. The Virginia State Police provided some documents in response to our FOIA request. However, they failed to provide information regarding VSP briefings, trainings, presentations, intelligence reports, video footage, plans, after-action reviews, meeting notes, or minutes, indicating that "release of those materials would jeopardize law-enforcement and the general public."[3] VDEM turned over three boxes of documents generated during the August 12 event, which helped us understand the work of the Incident Management Team described below. The Office of the Governor also provided documents in response to our FOIA request. The Virginia National Guard responded to our request with a letter indicating a "preliminary estimated completion date of April 30, 2019."[4] The Office of the Attorney General has indicated that all materials that office possesses are protected by the attorney-client privilege or otherwise excepted from disclosure under FOIA.

We obtained a limited range of documents from the University of Virginia through an informal request for information. We also received documents from various churches, businesses, and community organizations. Overall, we received and reviewed over 545,000 documents that in some way pertained to the summer protest events.

## B. Images and Recordings

During each of the protest events that are encompassed in our review, a large number of people present created images documenting their respective experiences. Much of this information was posted to publicly available open sources, either during or after the events. A team of Hunton & Williams professionals scoured open source media to identify relevant video clips and images. Other such material was obtained directly from the people who produced the images. Numerous witnesses provided us with video footage and still photographs taken during the various events. We were able to access a great deal of information from individuals documenting their own experience during the events.

In sum, we received nearly 2,000 still images and over 300 hours of video footage over the course of our review. The large amount of video and still images available electronically created both a burden and an opportunity. The value of these images is tremendous. We were able to actually view these events from numerous perspectives via the social media feeds and images available on the internet. Rather than relying on witnesses' memories and second-hand reports, we were able to see for ourselves what actually happened as these large demonstrations unfolded. Our review of video informed our interviews and facilitated additional fact-gathering. These were well-documented events, which gave us a unique birds-eye view of conditions on the ground from a wide array of sources.

The volume of images, however, did require a substantial amount of time to review and incorporate into our ongoing evaluation. A team of professionals at Hunton & Williams sought out these images from various sources and reviewed all information submitted to us directly. Much like the document review described above, the video reviewers flagged particular moments for follow up and subsequent factual development.

We also obtained images and audio recordings from law enforcement sources. We were able to view footage from several cameras mounted in Justice and Emancipation Parks during the protest events as well as the footage recorded by CPD officers' body cameras. We also obtained footage taken by cameras mounted to Virginia State Police helicopters during both events. These videos were the same images available to law enforcement leaders in the command centers during the events. The cameras were specifically focused by officers in the command centers or in the helicopter in response to particular events on the ground. We also obtained more than seventy hours of radio communications of Charlottesville Police Department from July 8 and August 12. We were able to synch the radio communications to the video images, creating a real time account of the tactical decisions made by police agencies during the events.

## C. Witness Interviews

Witness interviews served as our primary vehicle for obtaining information during the review. We conducted formal interviews and had informal conversations with a wide array of people. We interviewed City employees, law enforcement personnel, and representatives of various organizations that participated in the rallies. We also spoke to a large number of people in our community who were not affiliated with any particular organization but simply attended these events on their own. We respected individuals' requests to remain

anonymous or provide information without attribution. We ultimately interviewed more than 150 people over the course of our review.

We cast a wide net in the process of seeking information from individuals. Our goal was to speak to people with diverse perspectives on these events. We spoke to the people who obtained the original permits on July 8 and August 12 as well as those who organized alternative events on those dates. We spoke with individuals who claimed affiliation with various organizations that mobilized for these events. We interviewed representatives of both far-right white nationalist organizations and groups who organized in opposition to the permitted events. We approached local representatives of these groups as well as national figures that came to Charlottesville for the demonstrations.

In addition to organizational representatives, we talked to dozens of people who were simply present at these rallies. Some of these people we identified from documents or images and directly contacted. Others reached out to our review team and asked to speak with us. These individuals provided vitally important information that informed the conclusions and recommendations outlined below.

### D. Independent Review Web Site and Tipline

Soon after we were retained to conduct this review, we created two resources for public input. We created a web site (www.charlottesvilleindependentreview.com) at which members of the public could provide information directly to our review team. The web site included a field for a narrative description of events, as well as a link to submit photographs and video images. We also created a tipline (1-877-4HUNTON) for the public to use to provide us with specific information regarding the protest events. Over the course of our review, we received sixty-two web site submissions and tipline calls with information.

Both the web site and tipline asked those who submitted information if they wanted to be contacted for further discussion. A member of the review team contacted every person who asked for follow-up. These contacts often resulted in long interviews and useful information. The community members who reached out to us via these outlets provided valuable perspectives on the relevant events.

### IV. Resistance to Cooperation

Over the course of our review, we were unable to access certain information that we requested from various sources. Some of our requests for information were denied due to pending litigation. Others were rejected due to skepticism about the independence of our review and potential uses of the information we collected. Despite this resistance, we believe we obtained sufficient information to understand these events from diverse perspectives and ultimately justify our conclusions.

### A. Charlottesville Police Department

The approach to our review within the Charlottesville Police Department evolved over time. Chief Al Thomas initially attempted to sequence our review by limiting our access to information about various topics. He directed subordinates to provide us only with

information regarding the planning for the protest events, not the events themselves. He later admitted to us in an interview that his goal in this process was to educate our review team in a methodical process which he controlled. He told officers that he wanted to first convince us that the planning for the protest events was thorough and considered all contingencies before going into the unexpected turns during the events themselves. Pursuant to the Chief's strategy of controlling the flow of information to our review team, we had several interviews with officers in which they refused to discuss certain topics. We objected to those limitations, after which they were removed by the Chief. Nonetheless, we had to schedule multiple interviews with several lieutenants and other key personnel. The initial limitation made those interviews less productive and unduly lengthened and complicated our review process.

In our interviews with CPD personnel, we learned that Chief Thomas and other CPD command staff deleted text messages that were relevant to our review. Chief Thomas also used a personal e-mail account to conduct some CPD business, then falsely denied using personal e-mail in response to a specific FOIA request. Chief Thomas and the commanders with whom we spoke denied any effort to hide information from our review team. Conversely, they indicated that we received everything in the Department's possession that bears upon the issues at stake in our evaluation.

In addition to limiting our initial access to all relevant information, Chief Thomas directed the creation of various documents that outlined CPD's preparation for these events. For example, Chief Thomas asked his captains to create a "checklist" to document CPD's preparation for each event. In response to the Chief's direction, Captain David Shifflett located a Department of Justice Document entitled "Checklist for the Preparation of Mass Unrest Events." This document is essentially a planning guide, designed to be used in advance of large demonstrations. Captain Shifflett asked the Chief's executive assistant to convert this checklist to a format in which it could be edited. She did so, and sent the template to Captain Shifflett for his use in creating a checklist for the July 8 event. Captain Shifflett then went through the various items in the checklist and "checked" each task that had been performed. He then sent the completed document to the Chief's assistant, who affixed a CPD logo to the front of the document and created a finished checklist for delivery to our independent review team.

When the July 8 checklist was uploaded to the system created for production of documents to our review team, Deputy City Attorney Lisa Robertson noticed that it was undated. Ms. Robertson then directed that the checklist and other documents created for our review be dated to reflect the time of their creation and contain a footer that makes clear the document was created for Hunton & Williams for the purpose of the firm's provision of legal services to the City of Charlottesville. Captain Shifflett then complied with that request and produced a finished checklist with the footer included.

Chief Thomas and Captain Shifflett both denied any intent to "back-date" the checklist or any other document. They indicated that the checklist was created as a mechanism to catalogue the preparation that informed the Department's approach to the July 8 event. Chief Thomas acknowledged that the document was designed to be used in advance of

these events, though he denied any intention to suggest it had been used in advance of these events.

In addition, Chief Thomas attempted to gather information from CPD personnel about the substance and tenor of our interviews. He questioned his assistant and members of the command staff after interviews occurred, asking about what areas were covered. His attempts to follow our interviews resulted in the City Manager directing all CPD employees to refrain from discussing the substance of our interviews with others.

Chief Thomas's attempts to influence our review illustrate a deeper issue within CPD a fear of retribution for criticism. Many officers with whom we spoke expressed concern that their truthful provision of critical information about the protest events would result in retaliation from Chief Thomas. They described a culture of conformity within the Department that discourages officers from raising issues and providing feedback. These officers suggested that this hierarchical approach hampered the planning for the July 8 and August 12 events, as lieutenants, sergeants, and line officers were not sufficiently consulted or asked to provide input.

Regardless of these issues, we were able to develop fulsome information from CPD regarding the handling of the protest events. We eventually obtained all requested documents and got access to all CPD personnel with whom we requested to speak. In the face of the culture of conformity described above, many officers were willing to criticize the Department's planning for the rallies and conduct during the events. Some officers provided information without attribution, but others openly provided important details that appear in this report. Without the cooperation of a large number of dedicated professionals within CPD who elevated duty over fear of retaliation, we would not have gotten the truthful information that informs the findings and recommendations below.

## B. State Government

Upon our retention in this matter, we immediately contacted state officials to discuss access to information maintained by various agencies within state government involved in preparations for and responses to the Charlottesville protest events. We first contacted Secretary of Public Safety Brian Moran, who initially expressed a willingness to coordinate the various after-action reviews that were underway or contemplated. He referred us to a lawyer in the Office of the Governor to discuss the specifics of such coordination, which led to a series of discussions with counsel Noah Sullivan.

Mr. Sullivan initially expressed the same willingness to cooperate with our review. However, Mr. Sullivan informed us on September 8, 2017, that Secretary Moran would not meet with us or provide information regarding the protest events. He explained that the Commonwealth wanted to maintain executive privilege over the information we requested and was concerned about the prospect of anticipated litigation against the state. Mr. Sullivan indicated that the Governor was planning to appoint a Task Force on Public Safety Preparedness and Response to Civil Unrest which would separately conduct its own review of the Charlottesville protest events.

On Monday, September 11, 2017, we reached out to Colonel W. Steven Flaherty, the Superintendent of the Virginia State Police, in an attempt to schedule a meeting to discuss the State Police response to the summer protest events. We received a call from Victoria Pearson in the Office of the Attorney General, who indicated that her office represents VSP for purposes of this matter. Ms. Pearson expressed concerns similar to Mr. Sullivan's regarding the confidentiality of the requested materials, given the prospect of litigation against the Commonwealth. She indicated that she would facilitate our request for information from the State Police and attempt to find a way to minimize her client's concern. On September 15, 2017, we delivered a letter to Ms. Pearson requesting information from the Virginia State Police.[5] We specifically requested the opportunity to interview Colonel Flaherty and other Virginia State Police personnel who were involved in the Charlottesville protest events, and we identified categories of documents and recordings we wished to obtain. We also suggested cooperation between the law enforcement experts from The Police Foundation we had retained to assist our review and those working with the Governor's Task Force from the International Association of Chiefs of Police (IACP). We sent a similar letter to Mr. Sullivan, reiterating our request to speak to Secretary Moran.[6]

On September 15, 2017, we submitted Freedom of Information Act (FOIA) requests to the Virginia State Police, the Virginia National Guard, the Virginia Department of Emergency Management, the Office of the Governor, and the Office of the Attorney General. These identical FOIA requests sought information regarding assistance provided by each agency to the City of Charlottesville before, during, and after the summer protest events.

On September 22, 2017, Mr. Sullivan sent us a proposal to govern the sharing of information between all state agencies and our independent review. He specifically requested certain documents regarding the August 12 event, and he asked that IACP be given the opportunity to interview four specific individuals in Charlottesville: Chief Thomas, Captain Victor Mitchell, Lieutenant Steve Knick, and Deputy Fire Chief Mike Rogers. In response to this request, we submitted a request for five narrow categories of documents we wished to obtain from VSP and identified five specific VSP personnel we wished to interview. We also requested an opportunity to meet with the VDEM personnel who were involved in the Incident Management Team sent to Charlottesville on August 12, 2017. Our hope was to facilitate an information-sharing agreement by which the Governor's Task Force and our independent review could coordinate efforts to access facts regarding the effectiveness of state/local agency coordination  an important issue for each after-action review.

The City of Charlottesville agreed to accommodate the Governor's request for information. Subsequently, we provided the specific documents identified in Mr. Sullivan's September 22 proposal. We also facilitated interviews of the four individuals identified in that request by the team of consultants from IACP. That information was provided, and those interviews took place before IACP completed its report to the Governor's Task Force on November 15, 2017.

Despite the City's cooperation with the IACP review, VSP provided only limited information in response to our requests. The agency provided us with only one document

the VSP operational plan for the July 8 event. VSP did not provide documents regarding training of officers prior to the protest events, radio communications, briefings, timelines of the agency's role in that event, or after-action reviews. VSP did allow us to interview Colonel Flaherty, along with two troopers who were not present in Charlottesville on August 12. They refused our requests to interview the other four individuals we had identified as important to our evaluation, including the major who was primarily responsible for pre-event coordination with CPD, the lieutenant who served as the VSP ground commander in Emancipation Park, the sergeant in charge of communications, and a lieutenant who supervised one of the VSP mobile field forces.[7] The level of VSP cooperation was disappointing, given the agency's substantial role in the summer protest events.

VSP's refusal to cooperate with our independent review is consistent with the agency's relative independence before and during the August 12 event. As we develop in detail below, VSP did not share its formal planning document for the Unite The Right event with the Charlottesville Police Department. VSP conducted separate trainings and convened an exclusive briefing for its on-scene personnel on the morning of August 12. VSP utilized separate radio communications channels during that event, in clear contravention of the IMT plan and CPD's expectations. When viewed in the context of these failures in coordination, VSP's refusal to cooperate with an evaluation commissioned by the City of Charlottesville is not surprising.

While disappointing, the lack of cooperation from VSP and other state agencies did not ultimately undermine our ability to draw certain conclusions about the nature and effectiveness of state/local agency coordination during the protest events. We obtained a large amount of VSP information about the protest events from other sources, including material that was in the possession of CPD and other departments of City government. We received a copy of the VSP operations plan for August 12, which troopers had mistakenly left behind in a field force staging area. We obtained video images recorded by the State Police and were able to hear some but not all of the VSP radio communications. We developed substantial information about the VSP preparations for and specific actions during these events from people with whom troopers interacted, both law enforcement personnel and citizens. In our interview, Colonel Flaherty provided helpful perspective about VSP's role in these events. This information allowed us to develop a sufficient understanding of the aspects of VSP's role that are detailed in this report.

VDEM was more forthcoming with information. We interviewed Gene Stewart, the agency's Regional Coordinator for territory that includes Charlottesville. Mr. Stewart provided important information about the use of the Incident Management Team (IMT) that was implemented in Charlottesville. We also conducted telephone interviews of two local officials who participated in the IMT, who provided useful information about the team's preparation of an Incident Action Plan. VDEM provided us with that Incident Action Plan as well as other documents generated during the IMT mobilization. VDEM's cooperation with our review is another manifestation of the agency's cooperative approach to emergency events and fulsome coordination with local agencies.

## C. Organizational Responses

Over the course of our review, we attempted to obtain information from a wide array of organizations that were represented at the summer protest events. We had varying levels of success with these efforts.

Early in our review process, we contacted the individuals who obtained the permits on July 8 (Amanda Barker) and August 12 (Jason Kessler). We were able to interview each of them and incorporate their perspectives into this report. We were also able to interview a number of white nationalist leaders who attended the August 12 rally, including Chris Cantwell, Mike Enoch, and Trace Chiles. We also attempted to interview individuals associated with various groups who participated in the Unite The Right Rally, including Identity Evropa, the National Workers Front, the League of the South, the National Policy Institute, and the Nationalist Front. We had discussions with Sam Dickson, an attorney who indicated that he represents many of these organizations. Mr. Dickson initially indicated that Richard Spencer, Nathan Damigo, Evan McLaren, Eli Mosley, and Michael Hill, were unwilling to speak with us. He cited the City's pending lawsuit filed against his clients and their affiliate organizations as reasons for their lack of cooperation with our review. Nevertheless, on November 20, 2017, we received a short letter from Mr. Spencer restating his position that police had failed to protect his group's First Amendment rights.[8] We also received a longer narrative from Mr. Dickson describing his experience on August 12.[9]

We also attempted to speak with individuals who organized counter-protests or actively resisted the Klan and Unite The Right protest events. We interviewed a number of anti-racist activists, including Emily Gorcenski, Seth Wispelwey, Willis Jenkins, Ann Marie Smith, Rebekah Menning, Tanesha Hudson, and Lawton Tufts. We also reached out to representatives of Black Lives Matter, Solidarity Charlottesville, Standing Up for Racial Justice, and Congregate Charlottesville. As with the organizations above, we were unable to obtain fulsome cooperation from these groups. We also attempted to interview Walter Heinecke, who obtained permits for counter-demonstration events on August 12 at McGuffey and Justice Parks. Mr. Heinecke refused to speak with us, citing the "implications" of our review and his participation in litigation surrounding the protest events.[10]

In response to efforts to contact voices in the progressive community and gather their perspective on the protest events, we received an inquiry from the National Lawyers' Guild (NLG), a legal organization that claimed to have advised many members of anti-racist groups with respect to the protest events. NLG made a number of requests of our firm before agreeing to speak with us and advise others to do so. Specifically, NLG wanted us to keep information received during interviews with various individuals confidential from our client, the City of Charlottesville. NLG also asked us to modify our engagement with the City of Charlottesville to compel public release of all information gathered.[11] As explained in our response, we were unable to accommodate those requests due to our ethical obligations.[12] Accordingly, we have not been able to access information from NLG or others who they advised.

Much like the VSP resistance outlined above, the lack of cooperation from various organizations and individuals engaged in counter-protest activities mirrored their approach to the protest events themselves. For example, when CPD detectives attempted to obtain information from various groups who had openly promoted resistance to the July 8 event, their efforts were criticized as "an intimidation tactic intended to curtail leftist speech and expressive conduct."[13] NLG made a similar allegation in response to our attempts to interview people who were present in opposition to the permitted events. Many of the individuals in this category do not trust local government or law enforcement, and that distrust informed their reluctance to talk with police in advance of the protest events. They viewed our review as an extension of City government, as we were retained by the City to conduct this review.

In addition to the protesters and counter-protesters present for these events, we attempted to interview the militia personnel who appeared on August 12. In public statements and in conversations with us, the militia members claimed objectivity. They indicated that they appeared in Charlottesville to protect free speech and discourage violence on all sides. We had constructive discussions with several militia members, though we were unable to arrange formal interviews with any of them. As described above, the City's lawsuit against the militia groups halted our constructive efforts to obtain their cooperation. Once the lawsuit was filed, the militia groups told us they were no longer willing to provide information to our review.[14]

### D. Community Members

In addition to the organizational efforts described above, we attempted to interview other unaffiliated members of our community who were present during the protest events. In addition to the open call for submissions to our web site and tipline, we reached out to people who were identified from open source video or by other witnesses. With all witnesses, we expressed the desire to obtain relevant information about the protest events and incorporate diverse perspectives into our findings and recommendations. We promised all witnesses confidentiality and non-attribution of information provided. We stressed our independence throughout the process and reiterated our desire to make credible findings at the end of our review.

We met with a group of community leaders at the Legal Aid Justice Center on September 13, 2017. At this meeting, some attendees expressed the view that our evaluation is not truly independent, as the City of Charlottesville is our client and is paying our firm to conduct the review. Others expressed a deep distrust of City government and its leaders and the belief that any negative findings would be suppressed from public disclosure. Some individuals were concerned that Mr. Heaphy's law enforcement experience would result in a report that was biased toward the police. Others believed he was too close to the Mayor and others in City and state government to be openly critical of those officials. The views expressed at the Legal Aid meeting were repeated elsewhere, including at City Council meetings, over the course of our review.

We persistently pushed back against these objections by declaring our objectivity and attempting to assure people that our process would be fair and balanced. We stressed that non-cooperation would be a missed opportunity to inform the process of learning from these

events and improving future response. We attempted to meet objections head on and disabuse people of their concerns by addressing them directly. We cajoled, encouraged, and coaxed cooperation, with varying degrees of success.

While the reluctance of certain individuals to speak with us was disappointing, it did not ultimately undermine our ability to gather diverse perspectives or our confidence in the facts we obtained. In the face of objections to our review, many people in our community provided a large amount of important information. Indeed, several individuals who were most vocal in their objections to our review, in private and in public, ultimately spoke with us and provided useful information. We believe we obtained a comprehensive perspective of these events that is informed by people with diverse perspectives. Of course, we cannot know how the voices left unheard during our review may have impacted our conclusions. Nonetheless, we believe the voices that did emerge were comprehensive, informed, and diverse. We spoke to enough white nationalists, anti-racists, and curious onlookers to develop a thorough understanding of how the protest events unfolded. Accordingly, we believe the information that follows is firmly grounded and well-informed.

## V.   Consultants

Several law enforcement professionals served as consultants to our independent review. We enlisted the assistance of The Police Foundation, an independent, non-partisan organization devoted to improving policing through innovation and science. The Foundation has provided expertise to several critical incident reviews in the past, including after-action reviews of recent civil unrest in Charlotte, North Carolina, the occupation of a police station in North Minneapolis, Minnesota, and the San Bernardino, California terrorist attacks. The Foundation agreed to provide consulting services to our review as a pro bono service to the City of Charlottesville.[15] The Police Foundation provided us with two consultants who contributed their time and expertise to our review   Kim C. Dine and Eddie Reyes. Mr. Dine is the retired Chief of Police in Frederick, Maryland. He also served with the Metropolitan Police Department in Washington, D.C. and U.S. Capitol Police. Mr. Reyes is the retired Deputy Chief of Police in Alexandria, Virginia. He also served with the Amtrak Police Department.

In addition to The Police Foundation, we identified two additional experts and enlisted their assistance to our review. Chris Perkins is the retired Chief of Police in Roanoke, Virginia. When we were first retained, CPD Chief Thomas suggested that we solicit the expertise of Mr. Perkins. While he is not regularly engaged as a consultant, Mr. Perkins agreed to work with our team and provide his insight and expertise to our review on a pro bono basis.[16] We also reached out to Rachel Harmon, a tenured professor at the University of Virginia School of Law. Professor Harmon is a recognized expert on police practices and has published widely on issues related to effective policing. She is also a former prosecutor in the Civil Rights Division at the United States Department of Justice. Professor Harmon also agreed to provide consulting services to our review free of charge.[17]

The four consultants provided invaluable assistance to this review. They traveled to Charlottesville and reviewed a substantial amount of information about the protest events we had assembled. They participated in interviews with CPD and VSP personnel and helped derive important information from those witnesses. They reviewed documents and

video images and helped us shape the issues involved in our inquiry.  They made cogent observations and insightful recommendations, many of which are included in this report. Their assistance has been indispensable to the information that follows.

# Factual Findings

## I.  Why Charlottesville?

The racially charged events that roiled Charlottesville in the summer of 2017 did not occur in a vacuum.  These demonstrations have deep roots in our community and stem from events that occurred much earlier.  The Ku Klux Klan and Unite The Right rallies were not anomalous events but rather particularly sad chapters in a lengthy record of social and racial discord in Charlottesville.

This section will provide a brief introduction to the form of government used by the City of Charlottesville, summarize the history of the statues, then shift to a broader examination of how City officials and activists led a coordinated campaign to remove them, in hopes of reshaping the City's architectural and cultural character.  These efforts sparked a fiery backlash from a small but highly motivated group of people who  capitalized on attention generated by the statue debate to place Charlottesville squarely in the crosshairs of a heated national debate about race and cultural heritage.

### A.  Charlottesville's City Government and Event Permitting Process

A brief discussion of the Charlottesville City Government is helpful to understanding both the controversy involving the Lee and Jackson statues and the events of the summer of 2017.  The City of Charlottesville follows a professional model of municipal governance.  The City is overseen by a City Manager selected by and responsible to a five-member City Council.  Councilors serve staggered four-year terms, with elections held every two years.  After each election, Councilors elect a Mayor and Vice-Mayor.  The Mayor's primary role is to preside over City Council meetings, with the Vice-Mayor presiding if the Mayor is absent or recused.   The Mayor holds no veto power or special authority over City Council decisions.[18]

The executive power for the City Government is vested in a City Manager.  Selected by City Council, the City Manager is the "chief executive and administrative officer" for the City Government and thus responsible for enforcing the laws of the City and ensuring that City employees faithfully perform their administrative responsibilities.  The City Manager is the director of public safety and given general powers of supervision over the Charlottesville Fire Department (CFD) and the Charlottesville Police Department (CPD).[19]  The City Manager serves at the will of City Council.

City of Charlottesville Standard Operating Procedure § 3.2 governs "special events" within the City.  That regulation defines a "demonstration" as non-commercial expression protected by the First Amendment of the United States Constitution (such as picketing, political marches, speechmaking, vigils, walks, etc.) conducted on public property, the conduct of which has the intent or propensity to draw a crowd of onlookers.[20]

Case 3:17-cv-00072-NKM-JCH   Document 488-3   Filed 05/02/19   Page 41 of 227   Pageid#: 5025

The regulation provides that a "demonstration" within the City "may only be held pursuant to a permit issued by the Events Coordinator." It contains an exception for "demonstrations involving fifty or fewer persons, or which will not occur in any City rights-of-way." Such events may take place without a permit if they are "otherwise conducted in accordance" with certain conditions regarding time, date, amplified sound, and waste disposal, and do not "unreasonably interfere with other demonstrations or special events scheduled or taking place concurrently."[21]

Michelle Christian, the Special Events Coordinator for the City's Department of Parks and Recreation, manages permit applications and facilitates the City's review of them. To that end, the City has a Special Events Committee with members from various departments, including the Police Department, the Fire Department, Neighborhood Development Services, Parks and Recreation, Public Works, and Charlottesville Area Transit. After Christian receives a permit application, she sends it to the Special Events Committee for review. Members of the Special Events Committee may raise concerns they have about the permit application. Under such circumstances, the Committee can make changes to the permit or request that the applicant take steps to resolve those concerns. Christian then sends the applicant a "certificate of approval" and coordinates any post-event bills, if assessed by the City. If the application is not approved, or if the applicant disagrees with the Committee's changes or conditions, then the applicant may appeal to the City Manager.

### B. History of the Lee and Jackson Statues

Charlottesville received the property now known as Emancipation Park as a gift from resident Paul Goodloe McIntire in 1918. McIntire transferred the land to the City to serve as a public park bearing a statue of Robert E. Lee. The deed also granted the City the right to "control, regulate, and restrict the use" of the property, which was then known as Lee Park. The statue of Lee on his horse Traveler was installed in 1924. The Blue Ribbon Commission later appointed by the City to study the potential removal of the statue noted that "[r]eflecting many of the racist attitudes of the Jim Crow-era South, an unveiling ceremony for the sculpture was organized by local chapters of the Confederate Veterans, Sons of Confederate veterans, and United Daughters of the Confederacy." Virginia Military Institute cadets also marched in the dedication ceremony. The Blue Ribbon Commission report further noted that "[a]lthough a public park, the landscape surrounding the Lee sculpture retained a reputation as a segregated 'whites only' space for decades."[22]

McIntire gifted the land for what is now called Justice Park in late 1918. Three years later, he donated a statue of Thomas "Stonewall" Jackson on his horse Little Sorrel to stand in the park. The City dedicated Jackson Park and the statue on October 19, 1921. At the time, "the sculpture … was considered to be one of the best equestrian statues in the country" and was listed on the Virginia Landmarks Register and the National Register of Historic Places.[23] As the Blue Ribbon Commission report noted, "[l]ike the dedication of the Lee sculpture … the dedication of the Jackson sculpture was organized by local chapters of the Confederate Veterans, Sons of Confederate Veterans, and United Daughters of the Confederacy and included a parade, dances, and decoration of [Charlottesville] with Confederate colors and flags."[24]

For much of their existence, the Lee and Jackson statues were relatively uncontroversial. In 1997, the City accepted funds from a private donor for the care of the statues. Restoration work was complete in 1999, and the City accepted the gift in a re-dedication ceremony.

## C.    The First Hint of Controversy

The dynamic shifted in March 2016. Vice-Mayor Wes Bellamy held a press conference alongside University of Virginia professor and Charlottesville NAACP chairman M. Rick Turner to express his distaste for the Lee statue.[25] The trigger for Bellamy's press conference was an online petition started by a student at Charlottesville High School. The student had argued that "keeping a statue here in representing hate and a subliminal message of racism that has existed in Charlottesville for a very long time.[26] Turner agreed, commenting that the statue "means all the horror and legacy of black people. It romanticizes citizens who don't know. They look at that statue, they think it was a gallant person that saved us, but he was a terrorist."[27] Citing decisions by jurisdictions in South Carolina to remove Confederate monuments after the racially-charged shooting in Charleston, South Carolina, Bellamy urged the City to join the movement and remove the statues of Lee and Jackson.

Vice Mayor Bellamy's attempt to move the statues was met with both praise and criticism in our community. While some praised the potential removal of the statues as a step toward a more tolerant, progressive city, others were virulently opposed. Those against the statue removal cited a reverence for history and desire to recognize and preserve Southern heritage in support of their view that the statues should remain.

In the face of the division of opinion regarding the potential removal of the Civil War statues, Mayor Mike Signer released a plan to create a commission to seek public input on the future of the Lee and Jackson statues and consider options, including the removal of the statues and the addition of additional monuments to add historical context.[28] On May 28, 2016, City Council passed a resolution to assemble a Blue Ribbon Commission on Race, Memorials, and Public Spaces, with the objective of providing City Council with options for "telling the full story of Charlottesville's history of race" and "changing the City's narrative through [its] public spaces."[29]

The Blue Ribbon Commission reported its recommendations to the City in December 2016. The Commission did not affirmatively recommend relocating the statues or keeping them and adding "contex," but rather sent both options to Council for deliberation.[30] The commission also recommended renaming the parks.[31]

## D.    Jason Kessler and the Attempted Removal of Wes Bellamy

The debate over the future of the Lee and Jackson statues was a significant factor in the radicalization of the key figure behind the Unite The Right rally, Jason Kessler. In a lengthy interview with us, Kessler described himself as an advocate for "white civil rights." He told us that he was angered by the potential removal of the statues, believing that whites were unfairly asked to "apologize for history" and deny their cultural heritage.

The movement to remove the statues coincided with another event that captured Kessler's attention. In October 2016, a Charlottesville entrepreneur and University of Virginia

lecturer named Douglas Muir posted a public comment on Facebook that was highly critical of Black Lives Matter (BLM). Muir's post stated "Black lives matter is the biggest rasist[sic] organisation [sic] the [Ku Klux Klan]. Are you kidding me. Disgusting!"[32] The public backlash against Muir was bolstered when Vice-Mayor Bellamy took to social media to condemn Muir and urge Charlottesville citizens to boycott Muir's restaurant. Muir ultimately took a leave of absence from his position at the University.

Kessler believed that Bellamy had exploited his official position to unfairly malign Muir. Kessler began conducting research on Bellamy. He found that, prior to moving to Charlottesville in 2011, Bellamy posted racially offensive and inflammatory statements on Twitter. Kessler incorporated screen shots of these postings into an article on Bellamy that he published on his personal webpage. Kessler also began seeking signatures for a legal petition to recall Bellamy from office. The petition was dismissed by the Charlottesville Circuit Court in March 2017. Nonetheless, Bellamy resigned his position at Albemarle High School. Sometime thereafter, Kessler interrupted an event attended by Bellamy at the Jefferson School by reading Bellamy's tweets to the crowd. Some attendees attempted to remove Kessler, resulting in an altercation. Kessler filed assault charges after the incident, but no criminal case was pursued.[33]

### E.    The Capital of the Resistance

On January 31, 2017, Mayor Signer drew additional attention to Charlottesville with an unscheduled rally to protest the recent inauguration of President Donald Trump. Hundreds of people gathered on Charlottesville's Downtown Mall to proclaim the City the "Capital of the Resistance" to Trump's agenda. During his brief address, Signer focused his comments on issues related to immigration.[34] The defiant tone of the event attracted attention, which, like the potential removal of the statues, was mixed. CPD Lieutenant Brian O'Donnell recalled his dismay at the aggressive posture taken by the Mayor, noting that the Mayor's event was "tantamount to war rhetoric" and a recipe for undermining the legitimacy of institutions of government. When conservatives raised questions about whether Signer should have obtained a permit for this event, Signer stated that the City had "never required permits for press conferences, no matter how big, right in that area."[35]

### F.    Charlottesville Moves Forward

City Council considered the issue of statue removal on February 6, 2017. During the public comment period, numerous speakers urged Council to remove the statues. Jalane Shmitt argued that the statues promoted an inaccurate narrative about the reasons for the defeat of the Confederacy and noted the lack of empathy for "generations of African-American refugees who fled Charlottesville."[36] Supporters of the statues showed up in large numbers wearing Confederate-themed apparel and decried the removal of symbols of the City's Confederate heritage. Councilor Bob Fenwick noted that the conduct of these supporters contributed to his vote in favor of removal, commenting that the supporters did not act like Southern gentlemen and noting prophetically that "[t]here's something deeper and darker going on …."[37] At the conclusion of the meeting, City Council voted 3-2 to remove the Lee statue from Lee Park.[38] City Council asked City staff to provide recommendations on removal within sixty days.[39]

The City's decision resulted in severe criticism from some corners. Republican gubernatorial candidate Corey Stewart held two rallies in Charlottesville after the vote. The first, in Lee Park, was interrupted by a large crowd of demonstrators when Stewart appeared beside supporters waving a Confederate battle flag.[40] The second Stewart rally occurred on February 21 on Charlottesville's Downtown Mall. Jason Kessler spoke at that rally, and he framed the battle over the statues as a generational struggle, noting that "every generation has a fight, and our fight is this."[41]

Litigation over the statues was initiated soon after the Council voted to remove them. On March 22, a non-profit organization called the Monument Fund joined with the Virginia Division of the Sons of Confederate Veterans, a relative of the Lee statue sculptor, and the donor of funds for the 1997 statue restoration in a suit against the City in the Charlottesville Circuit Court.[42] The suit alleged that the City's plans violated several Virginia state laws protecting Civil War monuments and requested that the Court enjoin the City from moving forward with its plans.[43] The suit argued that the City was "required by law to protect and preserve" the statues and asked the Court to "freeze the status quo" while the litigation proceeded.[44]

On May 2, 2017, less than two weeks before the first of the protest events that form the basis for this report, Charlottesville Circuit Judge Richard Moore ruled on the Monument Fund's motion for a preliminary injunction. Judge Moore granted the motion and ordered that the public interest required preservation of the Lee statue for a minimum of six months. Judge Moore authorized the City to rename Lee Park, however and allowed the City to continue planning for the ultimate relocation of the statue.[45] The lawsuit remains pending today.

### G.  Jason Kessler Meets Richard Spencer

Kessler's involvement in the statue controversy elevated his profile within the burgeoning "alt-right." He contributed to various conservative publications, including *The Daily Caller*, *VDARE*, and *GotNews*. In April 2017, Kessler traveled to Washington, D.C., to attend a protest against the President's authorization of a missile strike against the Syrian government. While in Washington, Kessler met Richard Spencer, an Alexandria resident and the President of the National Policy Institute. Kessler also met Eli Mosley (also known as Elliot Kline), the leader of Identity Evropa, a "fraternal organization for people of European heritage."[46] At this protest, Spencer, an avowed white nationalist, learned that Kessler was from Charlottesville. Spencer informed Kessler that he hoped to conduct a rally in Charlottesville for like-minded activists on May 13. Spencer specifically noted that he was attracted to Charlottesville by the controversy over the statues and the appeal of the issue to his supporters. Kessler agreed to participate.

## II.  Initial Events of May 13-14

### A.  May 13 Demonstrations

The first protest events we have been asked to evaluate took place on May 13, 2017. On that date, Richard Spencer organized two rallies focused on "white nationalism." Spencer organized the events in collaboration with Identity Evropa. Other groups involved included

the Traditionalist Worker's Party and American Vanguard.[47]  Spencer did not contact the City of Charlottesville in advance, and he did not apply for a permit.

### 1.  The Jackson Park Event

Around 12:00 p.m. on May 13, Spencer and his colleagues gathered in Charlottesville's McGuffey Park.[48]  Around 100 people attended, some of whom carried flags and signs and dressed in white polo shirts and khaki trousers.  They marched in two lines from McGuffey Park eastbound on Jefferson Street.  They passed by Lee Park, where the annual Festival of Cultures was taking place, and entered Jackson Park at approximately 12:30 p.m.

In his remarks in Jackson Park, Spencer castigated Charlottesville for the pending removal of the Lee statue.  He linked the pending removal of the statue to the removal of Confederate monuments in New Orleans and the removal of a portrait of William Shakespeare at "some Ivy League college."[49]  Spencer characterized the attendees as the "tip of the spear" on a mission to give voice to these concerns and grievances.  Spencer prophesied a moral and psychological war of genocide against whites and pledged to fight that war "on the battlefield of symbolism."  Spencer concluded by praising Lee and Jackson as "gods" and alleging that Charlottesville's leadership sought to replace them with some "monument to slavery or the holocaust … or some statue to Lady Gaga."[50]

Podcast host Mike Enoch also spoke at the event.  Although he was surrounded by Confederate flags, he said the event was about "more than just Confederate monuments."  Enoch decried the destruction of "images of white people" and "white heroes" to "attack and demoralize our people" and "make us think that we do not have a future."  Enoch speculated that Charlottesville leaders wanted to "replace us with some mixed, muddy people that will just be easy consumers and won't stand up for themselves."[51]

The protesters chanted various slogans, including "you will not replace us."  Protester Orry Van Dize commented to a reporter from Charlottesville's NBC29 station that there was "no reason why we can't celebrate the history that has brought us to the glorious future that we are emboldened in now."  He described the gathering as "just white people that love our heritage, our culture, our European identity."[52]  Spencer also spoke to NBC29, noting that he had traveled from Alexandria to "take part in this great celebration of our heritage and to say 'no' to the City of Charlottesville."  Spencer warned that Charlottesville would not be permitted to "tear down our statue" and would not "replace us."[53]

Spencer and Van Dize denied that the rally was designed to intimidate or inspire fear in the Charlottesville African-American community.  Van Dize noted that those gathered were "not white supremacists," while Spencer described the event as a "peaceful demonstration" designed to allow him and his colleagues to discuss "who we are and what we are about."[54]  Spencer noted that "[n]obody here is committing violence."[55]

Congregation Beth Israel (CBI), the oldest standing synagogue in Virginia, hosted a bar mitzvah that afternoon.  The synagogue is located less than one block from Jackson Park.  CBI President Alan Zimmerman recalled that during the ceremony, the congregation heard loud noises coming from Jackson Park.  Zimmerman's son, who is in his early twenties and wears a yarmulke, left the ceremony to "see what was up."  Zimmerman recalled his son

telling him that when he reached Justice Park, he encountered a large group of aggressive white males who accosted him for wearing a yarmulke and made abrasive comments about his Jewish heritage.

As this was a non-permitted event, there was no law enforcement presence. Charlottesville Sherriff James Brown, whose office in the Charlottesville Circuit Courthouse is directly across East High Street from Jackson Park, recalled hearing the chanting as he prepared to depart that afternoon. Brown left his office and walked to the street, where he observed a "bunch of flags" and groups chanting. Brown noted the absence of any visible law enforcement presence in the vicinity of the park.

The May 13 event ended on a tense note. As the rally was breaking up, an African-American counter-protester arrived in Jackson Park to confront Spencer and his followers. She was soon joined by several supporters. When the counter-protesters began chanting "Black Lives Matter," a large number of Spencer's followers encircled them and chanted "anti-white." Charlottesville residents Allison Firster and Matt Sellman were driving past Jackson Park on their way to the Festival of Cultures when they saw this disturbance. Firster and Sellman left their vehicle and joined the counter-protesters. Firster described the atmosphere as "highly tense" and very dangerous. A physical altercation ensued, during which a counter-protester fell to the ground. Spencer's followers then rapidly withdrew from the area. No arrests were made.

## 2. The Lee Park Event

The afternoon event at Jackson Park on May 13 was simply a precursor to a second event that took place later that night. At approximately 9:00 p.m., Spencer, Enoch, Kessler, and large number of supporters marched in two single-file lines into Lee Park from East Jefferson Street, carrying lit tiki torches. The group formed into ranks five lines deep in front of the statue of Robert E. Lee, and chanted "blood and soil," "you will not replace us," and "Russia is our friend."[56] Organizers filmed the event with a drone and posted the footage online.[57]

According to Spencer, unannounced events like the May 13 gatherings "illustrated how matters proceed and people with whom [he] associate[s] conduct themselves when elements of the political Left do not appear to disrupt and attack peaceful demonstrators."[58] Similarly, Kessler told us that the evening gathering was meant to be a "flash demonstration" a gathering with no prior publicity to minimize the risk of violence and prevent counter-protesters from undermining Spencer's message. Kessler also explained that the torches were not meant to intimidate, but rather to mimic the ancient funeral rites and commemorate the "fallen dead" from so-called "brother wars" in Europe, referring to the conflicts between European peoples. Kessler attributed the "blood and soil" chant to individuals who believe that the Second World War "is not accurately depicted by the history books." The white polo shirts and khaki trousers worn by Spencer's followers were chosen as a deliberate contrast to the black worn by Antifa.[59]

CPD was on alert after the Jackson Park event earlier that afternoon. At the roll call for the May 13 evening shift, Sergeant Lee Gibson noted the event at Jackson Park and informed his officers that "men in white polo shirts and khaki pants" had attempted to disrupt the

Festival of Cultures earlier in the day.[60]  Sergeant Bradley Pleasants passed Lee Park while driving to CPD headquarters for the midnight shift.  Pleasants was on the phone with his father, CPD Major and Deputy Chief Gary Pleasants, when he saw a "mass of torches." Sergeant Pleasants was struck by the spectacle and communicated the disturbance to his father, who instructed him to investigate.  Sergeant Pleasants drove to CPD headquarters, parked his car and ran inside to alert the evening shift desk sergeant, who had already summoned all available officers to the incident.  Pleasants then returned to his car and drove immediately to the park.

Around the same time, the Charlottesville-UVA-Albemarle County Regional Emergency Communications Center (ECC) received a 911 call from an anonymous source, who reported a gathering of more than 100 individuals in Lee Park with torches.  The ECC immediately put out a request for CPD officers to investigate.[61]  Nine CPD officers responded to the ECC request.  When Officer E.A. Maney arrived at 9:20 p.m., he encountered more than one hundred torch-bearing demonstrators shouting "we will not be overcome."  Maney also observed Charlottesville resident Jordan McNeish urging Spencer and his followers to "get out of my town."  Maney noted that McNeish was rapidly surrounded by men with torches and a confrontation ensued.[62]

Maney began issuing orders to Spencer and his colleagues to leave Lee Park.  Maney then moved to break up the altercation with McNeish.[63]  Other CPD officers arrived shortly thereafter, and Sergeant Pleasants assumed command.  No arrests were made, and Pleasants stationed two officers to monitor Lee Park for the rest of the evening.[64]

Charlottesville political figures and social activists quickly denounced the event.  Mayor Signer indicated that the event was "either profoundly ignorant or designed to instill fear in our minority populations in a way that hearkens back to the days of the KKK."[65] Charlottesville's delegate in the Virginia General Assembly, David Toscano, took to Twitter to condemn the "outrageous protests … by apparent white supremacists."[66]  The Charlottesville Clergy Collective issued a statement condemning "acts of hate and bigotry that threaten to intimidate and undermine the peace and well-being of our neighbors."[67]

The event also captured the attention of the national media.  *TIME* ran a story on the torch-lit march quoting Mayor Signer and noting that the Mayor received "anti-Semitic tweets" after criticizing Spencer.[68]

### B.    May 14 Counter-Protest

Outraged by the content of Spencer's message, activists and anti-racist demonstrators in Charlottesville quickly organized a response to Spencer's event.  On Sunday Morning, May 14, University of Virginia law professor Anne Coughlin circulated an e-mail to a group of like-minded activists, including Mayor Signer and Charlottesville Office of Human Rights Manager Charlene Green, asking if plans were underway for a response to the "protest in Lee Park."  Coughlin noted "if not, God help us all."[69]

Coughlin's e-mail resulted in an outpouring of responses; nearly all recognized the need to respond to Spencer and demonstrate the unity of the Charlottesville community.  Erik Wikstrom, a Unitarian-Universalist minister at the Thomas Jefferson Memorial Church,

proposed a silent gathering that evening to show "solidarity with all those who have been silenced by the evil of white supremacy."[70]  Shortly thereafter, Wikstrom forwarded a message from a parishioner.  The parishioner noted that Showing Up for Racial Justice Charlottesville (SURJ) and other groups were planning a vigil that evening in Lee Park. The parishioner shared an e-mail stating that on the evening of May 14, activists would "take back Lee Park" at 9:00 p.m.  The message referenced the powerful visual images from the previous evening and stated, in pertinent part:

> **TAKE BACK LEE PARK:** we are taking back the park tonight at 9P (or whenever folx think the sun will be fully set) bring all the candles you can find.  [W]e will outshine their torches with our love, but we will also be sending a message that they will not come here to intimidate us unchallenged. **[T]hat their statues WILL COME DOWN.  [A]nd we will be standing here together to love and protect one another.**  [w]e will recreate this monstrous photo of them but our light will radiate with our families and communities standing in solidarity for justice ….  Tell everyone you know to meet us in lee with candles and flowers and balloons… but don't put this out in public… face to face and private messages/telephone.  **[S]urj antifa phar apoc uva students united and living wage… all of us.**  [T]ogether.[71]

City leaders were made aware of the plans for a candle-lit march on May 14.  Charlene Green forwarded the above message to Charlottesville City Manager Maurice Jones and assistant City Manager Mike Murphy at 2:44 p.m.  Murphy responded at 3:02 p.m., noting that he "heard about [the event] a while ago," and that it "[s]ounds like a peaceful effort to respond to last night's event."[72]  There was no effort to obtain or grant a permit for the event.

The candle-lit event began at 9:00 p.m., and was led by members of SURJ, Black Lives Matter, and other activist groups.  Five CPD officers and a sergeant were dispatched and were present for the event.[73]  Anti-racist demonstrators covered the Lee statue with a drape that read "Black Lives Matter    Fuck White Supremacy."  Speakers at the event focused on two messages:  embracing diversity and inclusion, and rejecting the imagery and tactics used by Spencer.  Charlottesville resident Don Gathers, the chair of Charlottesville's Blue Ribbon Commission on Race, Memorials, and Public Spaces, told a local reporter that the protest was designed to tell white nationalists, "We will not let you come in and take over, and have your way."  Gathers further explained, "We are going to take control of this City and we are going to do it in the proper way.  It might take six months to take care of this situation, but we're not going to give up the fight."[74]

The tenor of the event changed around 10:00 p.m., when CPD announced that the park was scheduled to close.  Around the same time, Kessler arrived.  Kessler claimed that he had been watching the event on a livestream by Emerson Stern, an African-American man who Kessler considered an ally.  Kessler believed that Stern was being "bullied and called a Nazi," which prompted him to go to Lee Park.  Kessler brought a bullhorn so that he could be "heard over the crowd."  When Kessler saw the sign covering the Lee statue, he decided that the sign was vandalism and tore it down.  A scuffle between Kessler and others at the event ensued.  At one point during this spectacle, Jordan McNeish spat on Kessler, resulting

in McNeish's arrest for disorderly conduct. McNeish recalled seeing Kessler "with a loud speaker being obnoxious," but did not realize that a CPD officer was behind him.[75] Kessler was also charged with disorderly conduct, after being arrested for refusing to comply with CPD instructions to desist from the use of the megaphone.[76] CPD also arrested Charles W. Best, a 21-year old male from Richmond, Virginia, for disorderly conduct and carrying a concealed weapon.[77]

### C.  Aftermath

The May 13 event at Lee Park hardened the resolve of Charlottesville elected officials to remove the Lee statue. Three weeks later, on June 5, the Charlottesville City Council voted unanimously to change the name of Jackson Park to "Justice Park," and to change the name of Lee Park to "Emancipation Park."[78]

Spencer and Kessler viewed the publicity surrounding the May 13 event at Lee Park as a significant victory. Spencer celebrated the event on Twitter, engaging in a debate with former congressman Tom Perriello, then a candidate for Governor.[79] Kessler's antagonism of counter-protesters at the candlelight event similarly elevated his profile, both among Alt-Right followers and local progressive activists.

The May 14 event demonstrated a degree of coordination between various activist groups in Charlottesville and their ability to rapidly mobilize a large-scale response to a perceived threat using social media and interpersonal networks. SURJ, Black Lives Matter, Antifa, Solidarity Charlottesville, and other interested individuals united in opposition to Spencer, Kessler, and the images of torches in downtown Charlottesville. While we were unable to develop extensive information on the role of anti-racist demonstrators in these events, we believe that the May rallies motivated increased activism in Charlottesville. The events also heightened preexisting skepticism about City officials and the CPD among certain groups and individuals.

For CPD, the events led to a reassessment of the Department's approach to intelligence-gathering. CPD Chief Al Thomas told us that the events of May 13 revealed an "operational blind spot." Thomas noted that CPD lacked advanced capabilities for social media monitoring that may have helped the Department anticipate these events. Chief Thomas moved forward with a request to purchase software capable of pinpointing potential threats based on social media activity. Thomas also ordered his investigations division, led by Captain Wendy Lewis, to begin gathering intelligence about Spencer, Kessler, and other white nationalists. Lewis assigned this task to Detective Braden Kirby. Kirby gathered open-source information about May 13 and 14. He also worked with Carla Hill from the Anti-Defamation League to assemble a dossier about white nationalists, including Spencer, Kessler, Enoch, Nathan Damigo, and Sam Dickson. Kirby told us that he began contacting representatives of the various organizations that participated in the events, "to see what they were about."

For senior employees of the City of Charlottesville, the May events led to significant discussions about the permitting process. Assistant City Manager Mike Murphy was away from Charlottesville when the events occurred, but returned to work on May 15 and quickly realized that the public was very concerned about the events of May 13. Murphy recalled

receiving a number of questions from other City officials about whether Spencer had a permit, or should have been cited for failing to obtain a permit. Murphy noted that while the Charlottesville Permitting Standard Operating Procedures for special events and demonstrations may have technically applied to Spencer's event, there has been an "understanding" among City officials that permits would not be required for political speech. Murphy cited Mayor Signer's "Capital of the Resistance" speech as an example, noting that the Mayor held an unpermitted event on a City right-of-way for more than fifty people without securing a permit. Murphy noted that it would have been difficult to cite Spencer for violating Charlottesville's rules in light of the Mayor's conduct. Special Events Coordinator Michelle Christian echoed Murphy's comments, noting that the City has traditionally not required permits for political events unless the event could "potentially impede traffic."

The most important outcome of the events of May 13 and May 14, however, was an escalation of the attention to and participation in the debate surrounding the removal of the Lee statue. What had been a local dispute moved to the forefront of a national debate on race and cultural heritage. The event in Lee Park on May 13 also demonstrated that Spencer and Kessler planned to use the Lee statue as a vehicle to transmit their white nationalist message to a broader audience. It also revealed their willingness to employ tactics and evoke images drawn directly from Nazi Germany and the Ku Klux Klan.

### D. What Went Right and What Went Wrong

It is difficult to fault CPD or others within City government for their failure to anticipate the May protest events. The organizers of the Saturday rallies provided no notice to City officials, which prevented any preparation. CPD promptly responded to calls for service that arose during these events. City officials had several hours' notice of the Sunday evening candle light event, and they responded appropriately by dispatching officers to the park to protect the safety of all participants.

All three events that took place in May were arguably covered by the City's Special Events regulation. They fell within the definition of "demonstration" quoted above, and they crossed the threshold limit of fifty people. The lack of a permit for any of the three May events gave the City the authority to prevent or interrupt any of the events. That did not occur, as the City has traditionally ignored its own permit regulation for demonstrations. We explore the wisdom of that permissive approach to protest events in the Recommendations section, below.

### III. July 8 Ku Klux Klan Rally

#### A. Preparation

##### 1. Permit Application, Review, and Approval

The Loyal White Knights of the Ku Klux Klan is a group based in Pelham, North Carolina, with an estimated membership of 150 to 200.[80] Amanda Barker serves as the "Imperial Kommander" of the women's division, and her husband Christopher serves as the "Imperial Wizard."[81] In an interview, Ms. Barker indicated that she routinely participates in Klan

events across the country, having attended rallies in Berkeley, California; Danville, Virginia; Columbia, South Carolina; Raleigh, North Carolina; and Stuart, Virginia.

The Klan chose to organize a rally in Charlottesville because of the City's decision to remove the Robert E. Lee statue from Emancipation Park. Ms. Barker identified the Charlottesville City Circuit Courthouse steps as the location for the Klan's rally based on the mistaken belief that "that is where the votes were put in to remove the statue."[82] On May 24, Barker drove to Charlottesville to "scope out" the courthouse and observed that it has a sizeable rear parking lot. Deciding that this location would suffice, Barker drove to the City's Department of Parks and Recreation and filed the Klan's permit application. The application requested a "public demonstration" to "stop cultural genocide rally at the courthouse" on July 8 from 3:00 p.m. to 4:00 p.m. and estimated that 100 participants would attend.[83]

On May 24 the same day Barker filed the permit application Michelle Christian sent it to the Special Events Committee for review.[84] Given the involvement of the Klan, Parks and Recreation Director Brian Daly immediately forwarded the application to City Manager Maurice Jones, CPD Chief Al Thomas, and the City's Director of Communications Miriam Dickler.[85] Thus, the City's key personnel learned of the Klan event on the same day of the permit application's filing. City Manager Jones informed City Council of the permit application about one week later on June 2.[86]

CPD raised the first concern about the Klan event: the location. Specifically, CPD worried that the Charlottesville City Circuit Courthouse steps were inadequate for the estimated number of attendees. CPD Captain David Shifflett contacted Barker and proposed moving the Klan event from the courthouse steps to nearby Justice Park, offering a larger space away from surrounding businesses and private property.[87] On June 8, Barker accepted Captain Shifflett's offer and agreed to "shift everyone to that location."[88] According to Captain Shifflett, the Klan agreed to the move because Justice Park provided visibility of the courthouse and the Stonewall Jackson statue. Amanda Barker told us she "felt like we were running out of options so we better take what [Captain Shifflett] is recommending." According to CPD Major Gary Pleasants, Barker "had no issue with the change."[89] Regardless of the reasons, both CPD and the Klan agreed to move the event to Justice Park.

On behalf of CPD, Captain Shifflett continued to communicate with Barker before the Klan event. In the weeks leading up to the event, Barker and Shifflett spoke over the phone and exchanged e-mails. They discussed planning issues such as transportation, parking, and legal behavior. Barker asked Captain Shifflett to acquire buses, meet the Klan at a secret location, and transport them to Justice Park on July 8. In Barker's experience, jurisdictions that use this strategy effectively keep the Klan separated from counter-protesters. According to Barker, Captain Shifflett rejected the bussing request because the City "felt it was not needed." Next, Captain Shifflett informed Barker that the parking lot she saw behind the Charlottesville City Courthouse was unavailable for Klan parking, but he could arrange for the group to park across from Justice Park at the Albemarle County Juvenile and Domestic Relations Courthouse (JDR Court) surface parking lot. He told Barker that the Klan would have to consolidate into no more than twenty-five cars to park at that location.[90]

Captain Shifflett developed and shared a transportation plan with Barker in light of the parking arrangement. The Klan would drive to a secret location on City property just outside of the downtown area. There, the Klan would consolidate vehicles, leaving excess cars parked at the City property. Then, a CPD lead car and tail car would escort them to the JDR Court surface parking lot near Justice Park. Captain Shifflett instructed Barker to call him when the Klan was about ten miles outside of the City so he could coordinate appropriate police resources.[91]

Barker also raised several legal issues with Captain Shifflett. She revealed that some Klan members would bring guns pursuant to Virginia's open carry laws. She also explained that some Klan members intended to wear full robes complete with head gear. Captain Shifflett cautioned her that CPD would arrest Klan members who cover their faces in violation of Virginia's anti-masking law. Barker knew about this legal issue and the Klan members agreed to roll up the face flap on their head gear, exposing their faces in compliance with the law.

Overall, Captain Shifflett described Barker as "very cooperative." Chief Thomas likewise told us that the Klan "adhered to the plan" created by police. During the planning phase, Barker expressed displeasure about only one issue: publicity. When filing her permit application, Barker asked that the City delay announcing the Klan event to the public "until the last minute." In Barker's experience, a delay in publicity about a Klan event results in a smaller and less hostile crowd of counter-protesters. The City did not comply with Barker's delayed publicity request, announcing it to the public shortly after Barker filed her permit application. Barker disagreed with this step. She reached out to Captain Shifflett to inform him that counter-protesters had begun organizing on social media to attend the Klan event while armed, and she urged a weapons check at Justice Park to avoid a "blood bath."[92] Captain Shifflett assured Barker that CPD planned to protect free speech and keep everyone safe.

Several days prior to the Klan event, Barker contacted Captain Shifflett and offered to drive to Charlottesville to visit Justice Park and learn about the operational plan. Captain Shifflett replied that he was vacation and could not meet with Barker, and he did not offer to arrange for other CPD personnel to meet with Barker. According to Captain Shifflett, he offered to have her visit on another day. Barker never came back to Charlottesville to review the operational plan before the Klan event.

## 2. Intelligence Gathering

CPD engaged in substantial intelligence gathering for the Klan event through its investigations unit, which is supervised by Captain Wendy Lewis. On June 2, Lewis held a meeting to commence intelligence research on the Klan gathering and to request updated weekly intelligence reports for CPD command staff.[93] CPD detectives reviewed open-source and social-media information about the Klan and groups expected to come in opposition to the Klan. On June 14, Captain Lewis's team completed its first intelligence report. It identified Klan members, potential protest groups such as Identity Evropa and the Traditionalist Worker Party, and potential counter-protest groups such as BLM and SURJ as possible attendees.[94]

When the first intelligence report regarding the Klan rally was presented to Chief Thomas, he expressed frustration at the relative paucity of information. He indicated that he wanted to know expected attendance numbers, criminal histories, and tactics of potential protest and counter-protest groups. He further instructed Captain Lewis and her team to knock on doors in the community and ask for information from known BLM and SURJ members. Chief Thomas told us that the early efforts to gather information in anticipation of the Klan rally was an example of the "blind spot" of insufficient intelligence that he had identified after the May events.

On June 20 and 21, Captain Lewis's team complied with Chief Thomas's direction by knocking on doors, making phone calls, and sending e-mails to local activists affiliated with BLM and SURJ. A member of Captain Lewis's team also attended a SURJ meeting. A few days later, Pamela Starsia an attorney "representing a number of anti-racist activists and organizations in Charlottesville" delivered a strongly worded letter to Chief Thomas accusing CPD of using "aggressive inquiries" as "an intimidation tactic intended to curtail leftist speech and expressive conduct."[95] Starsia also held a press conference to allege that CPD had tried to interrogate City residents. In response, CPD issued a press release emphasizing its investigation of all groups attending the Klan event.[96] Indeed, CPD visited the home of Jason Kessler to gather information about his plans for July 8. Starsia's accusations halted CPD's efforts to gather information directly from local activists, hurting CPD's intelligence-gathering efforts.

Taking a new approach, CPD personnel received research assignments for specific protest and counter-protest groups using online resources.[97] Police also received information about the July 8 event from law enforcement in other jurisdictions. For example, the Greensboro, North Carolina police shared a flyer from social media advertising for counter-protesters to attend the Klan rally in Charlottesville to "shut them down." They also informed CPD that the Klan planned to meet in a park and stay at hotels in Waynesboro, Virginia, before the rally.[98]

CPD's intelligence-gathering efforts did not include reaching out to other jurisdictions that have dealt with Klan events for tactical advice. Captain Lewis's team discussed taking this step but ultimately did not take it. Captain Shifflett confirmed in an interview that he did not speak with other jurisdictions about tactical advice. CPD Lieutenant Brian O'Donnell knew of no CPD efforts to contact other jurisdictions that had previously managed Klan events. Thus, CPD missed did not try to learn about successful strategies for managing the Klan and counter-protesters from law enforcement personnel with experience at similar events.

Captain Lewis's team ultimately produced three intelligence reports. A June 19 report provided a summary of events, persons, and groups related to the Robert E. Lee statue in Emancipation Park.[99] A report dated the next day updated the first intelligence report.[100] A third report dated June 22 provided more in-depth information about the Klan based on the group's web site, past rallies, and criminal records.[101] Together, these reports provided substantial information about the Klan and its membership, potential protest groups, potential counter-protest groups, and recent activities of all groups at a local and national

level. On June 23, CPD held an intelligence update meeting to review and discuss the intelligence gathered thus far.[102]

CPD's intelligence-gathering efforts continued into the next week. On June 27, an updated report revealed additional groups that might join the Klan for the event.[103] On June 30, CPD received a Special Event Assessment from the Virginia Fusion Center confirming that counter-protesters planned to appear in Justice Park and suggesting that civil disturbances could result.[104] On the same day, CPD drafted an intelligence report about Antifa.[105] Based on the intelligence gathered, CPD believed that internal conflicts within the Klan would keep their numbers under 100 on July 8. Police expected between 600 and 800 counter-protesters would attend. Officers knew that at least some Klan members would be armed and that counter-protesters would also be armed and planned to disrupt the Klan event.[106]

Intelligence regarding the event was conveyed to CPD officers in advance of July 8.[107] CPD Lieutenant Mike Gore recalled that his officers received daily and weekly intelligence briefings at roll calls leading up to the Klan rally. CPD Lieutenant Steve Upman shared all intelligence with his SWAT members and actively encouraged lieutenants to push intelligence down to officers. The sharing of intelligence made clear to all CPD personnel that the July 8 event would likely be a large, confrontational, and potentially violent event.

### 3.    Training

CPD's training efforts to prepare for the Klan event were fragmented, unfocused, and inadequate. Although policies were reviewed during roll calls, CPD did not engage in any specific training for the Klan event.

The CPD command staff provided general directions for lieutenants to discuss policies with officers during rolls calls. For example, Captain Victor Mitchell   the interior commander for the Klan event   directed shift commanders to have "refresh" discussions with officers about constitutionally protected activity and responses to illegal behavior. Captain Lewis sent a "First Amendment Refresher" to two lieutenants and explained "it might be useful to send out to your personnel as a refresher."[108] Lieutenant Mike Gore did as instructed and reviewed that document during roll calls. Lieutenant Brian O'Donnell encouraged officers to re-familiarize themselves with statutes relevant to the event. Lieutenant Jim Mooney discussed several policies at roll call with his officers.

CPD did not provide officers with any specific training for the Klan event, such as civil disturbance or field force training. Captain Mitchell told us that he did not recall completing any specific training for the Klan event with CPD officers. And although Major Pleasants conducted crowd control training for the daylight and evening shifts at the end of June, that training did not include field exercises. Lieutenant Dwayne Jones admitted that officers needed a refresher in field force training, noting that he has not had such training for at least five years. He stated that CPD completed a lot of "academic" training before events but not enough "hands on" training, either in terms of working on arrests and de-escalation, or in terms of practicing with riot gear. The CPD SWAT unit held its normal training about two weeks prior to the event, where Lieutenant Upman provided overall plans for the Klan event and shared intelligence with officers. CPD provided us with a Charlottesville Police

Officer Training List that confirms CPD officers received no specific training for the Klan event.[109]

CPD likewise failed to provide its officers with basic information about the use of riot gear. Officer Lisa Best indicated that she received no riot gear training. Even more alarming, on June 28, Chief Thomas' assistant Emily Lantz asked the Albemarle County Police Department if CPD could borrow helmets after a meeting revealed that 80% of CPD officers lacked helmets.[110] Thus, some CPD personnel entered the Klan event without proper riot gear at all, while others who did possess riot gear lacked practice or familiarity using it.

These fractured efforts left CPD officers feeling ill prepared. Officer Best told us she received "absolutely no" intelligence or training ahead of the Klan event. Thus, she had no individual instructions about what to expect at the Klan event. The lack of training created a great deal of uncertainty which undercut operational effectiveness on July 8.

### 4. Agency Coordination

#### a. Charlottesville Fire Department

Many agencies were involved in preparations for the Klan event. The Charlottesville Fire Department was responsible for fire protection and emergency management systems at the Klan event. In mid-June, CPD and CFD personnel held several planning meetings.[111] Deputy Fire Chief Mike Rogers oversees special operations and training for CFD. He recalled meeting attendees discussing basic information about staffing requirements, overhead needs, traffic plans, and staging resources. CPD shared intelligence and revealed its intention to involve the Virginia State Police with the Klan event. On June 28, Deputy Chief Rogers attended a large meeting organized by CPD. There, multiple agencies received a draft of CPD's Operational Plan, which included detailed aerial maps and a traffic plan.

Deputy Chief Rogers told us that he received enough information at these June meetings to develop plans for the fire/EMS personnel on July 8. He aimed to stage fire/EMS assets close enough to the Klan event to treat patients effectively but far enough away to ensure the safety of personnel. To achieve this goal, Rogers used a "hot/warm/cold" area system. Justice Park served as the "hot" area, the City blocks surrounding Justice Park served as the "warm" area, and City blocks farther away served as the "cold" area. Deputy Chief Rogers concluded that the "hot" area was unsafe for staging fire/EMS assets. As a result, he planned to stage lighter fire/EMS assets in the "warm" area of the Levy Opera House parking lot and heavier fire/EMS assets in the "cold" area of the Albemarle County Office Building and parking lot on McIntire Road (COB McIntire). Rogers also established decontamination zones in the "warm" area to triage, treat, and transport patients near Justice Park, as well as landing zones in the "cold" area for medical helicopters to transport patients to regional hospitals.

Deputy Chief Rogers memorialized his plans in a CFD Incident Action Plan.[112] In the week before the event, he ensured that CFD personnel received accurate, timely, and repeated updates. On July 3 and 6, Deputy Chief Rogers held shift briefings and invited CPD.[113] At these shift briefings, Rogers gave presentations that covered updated intelligence, task

assignments, zone and traffic maps, staging areas, and the CFD Incident Action Plan.[114] CFD Deputy Chief Emily Pelliccia told us that there was "good sharing [of plans] among the City entities." She was aware, for example, of intelligence suggesting that Antifa would travel with street medics, which prepared fire/EMS personnel to encounter them at the Klan event.

### b.  Department of Parks and Recreation

Captain Shifflett considered several barricade options for the Klan event. He consulted with employees at the Sprint Pavilion on the Downtown Mall and learned that the plastic barriers used at that facility were likely not strong enough for the Klan rally. Captain Shifflett researched construction fences for possible use but did not pursue acquiring them. Captain Shifflett learned that the University of Virginia's John Paul Jones Arena had bike-rack barricades, but the venue suggested they were not very heavy and might not be effective "as a frontal barricade." Arena staff also worried about barricades  which are painted with the JPJ Arena logo  appearing in media coverage of the event.[115]

Out of options, Captain Shifflett consulted Doug Ehman, the Parks Division Manager of the City's Department of Parks and Recreation, about barricade options. Ehman told Captain Shifflett that the City had access to two types of barriers. The City owns a small number of large plastic containers that can be filled with water and used as barricades. Ehman also told Shifflett that the University of Virginia owns an abundance of bike-rack barricades, or heavy metal barriers that lock together at the joints. He indicated that the City could rent them from the University. Captain Shifflett decided that the University's bike-rack barricades provided the best option for enforcing separation between conflicting groups at the Klan event. He provided Ehman with an estimate of the total linear feet of barricades he needed. Parks and Recreation then coordinated the City's rental and acquisition of the bike-rack barricades from Scott Stadium.[116]

At the end of June, Captain Shifflett met with Parks and Recreation to discuss logistics.[117] On July 5, representatives from CPD, Parks and Recreation, and Public Works met in Justice Park. The group examined the barricade plan and made recommendations.[118] Brian Daly described CPD's ingress/egress plan at that meeting as "well thought out" and that the goal to separate protesters from counter-protesters "made a ton of sense." On July 7, CPD gave Ehman a Justice Park diagram with a final layout for barricade placement so the Parks and Recreation crew could setup the bike-rack barricades for the Klan event.

### c.  Department of Public Works

The City's Department of Public Works provided important support to CPD in preparing for the Klan event. At the July 5 meeting described above, Oberdorfer received the CPD traffic plan. The City's traffic engineer approved the plan, which Oberdorfer and his staff subsequently implemented it. Oberdorfer also gave Captain Shifflett permission to use a Public Works facility as the secret, off-site location for the Klan and CPD to meet for escorting to the Klan event.

### d.  Charlottesville Sheriff

CPD called upon Charlottesville Sheriff James Brown to prepare the Charlottesville Circuit Courthouse for processing arrests at the Klan event.  Sheriff Brown recalled attending at least one CPD planning meeting and sharing information about the courthouse.[119]  At the end of June, Captain Shifflett learned about the courthouse's IT capabilities, including its video system for magistrate hearings.[120]  Captain Shifflett planned for a magistrate to conduct hearings via the video system for arrestees at the Klan event.  Consistent with this plan, Sheriff Brown stationed two deputies on the interior and two deputies on the exterior of the courthouse to process arrests on July 8.

### e.  Legal Advice

CPD sought legal advice from City Attorney Craig Brown's office for multiple legal issues.  Mr. Brown and Deputy City Attorney Lisa Robertson provided CPD with information about Virginia's anti-masking law and the possibility of banning weapons from Justice Park on July 8.  They also considered the First Amendment restrictions on the event, including possible separation between the Klan from counter-protesters.[121]

Charlottesville Commonwealth Attorney Dave Chapman provided a summary of offenses against peace and order,[122] gathered information about Christopher Barker's bond restrictions from another jurisdiction,[123] and prepared unlawful-assembly declaration instructions.[124]  On June 27, Chapman met with CPD command staff and lieutenants to share this legal advice.[125]  Notably, Chapman also offered his legal help for training assistance and preparation for the Klan event.[126]

### f.  Virginia State Police

Perhaps the most important partner in the preparation for and handling of the July 8 event was the Virginia State Police.  That agency provided a substantial commitment of personnel and other resources to the City for this event.  Given VSP's significant presence at the event, successful coordination between CPD and VSP was critical.  Unfortunately, that coordination was erratic and produced inconsistent approaches to the event.

Colonel W. Steven Flaherty, the Superintendent of the Virginia State Police, told us that one of VSP's core functions is to provide support to local police agencies during large-scale events.  He stressed that while VSP has significant experience dealing with protest rallies and other significant public safety threats across the Commonwealth, the agency does not assume control over any particular event.  Rather, VSP provides support to local police agencies in preparation for and handling of large events.  Colonel Flaherty stressed to us that "the locality is always in charge" even if VSP has a greater number of personnel and resources at a particular event.

Consistent with Colonel Flaherty's statements regarding local control, VSP was largely deferential to CPD during the planning process for the July 8 rally.  On June 20, CPD and VSP command staff met for the first time to discuss the Klan event.[127]  CPD Lieutenant Mike Gore recalled that Chief Thomas and Captain Shifflett led the meeting, at which Captain Shifflett discussed the operational plan, the unlawful-assembly declaration process,

mobile field force procedures, and intelligence. At the end of June, VSP attended another CPD-led meeting, received a draft of the CPD operational plan, and obtained Justice Park aerial maps and the traffic plan.[128] In the week before the Klan event, CPD continued to provide VSP with updated drafts of park maps, traffic patterns, and the CPD operational plan.[129]

Although CPD frequently shared and updated VSP with information, the relationship operated as a one-way street. VSP devised its own planning document for July 8, but that plan was never shared with CPD. Captain Shifflett told us that no one from VSP ever offered specific suggestions or objected to any part of the CPD operational plan. VSP's passive role in the planning and failure to share information with CPD represented another missed opportunity for an experienced agency to offer critical insight into how to adequately prepare for a mass protest event.

CPD and VSP failed to jointly prepare for the Klan rally or otherwise ensure a uniform approach to the event. Captain Shifflett told us that CPD and VSP held no joint trainings or exercises, nor was there any "down-chain coordination" among troopers and officers. According to Lieutenant Upman, CPD SWAT and VSP SWAT never trained together. Major Pleasants told us that the two agencies held no joint field force or tabletop exercises prior to the Klan event. Lieutenant Gore a zone commander for the Klan event told us that he had no direct communication with VSP although multiple VSP troopers were assigned to his zone and under his command. Lieutenant O'Donnell similarly told us that he met the VSP sergeant and troopers assigned to his zone for the first time on July 8. This lack of down-chain coordination meant that VSP troopers and CPD officers would work side-by-side during the Klan event without meeting each other beforehand.



Photo Source: Patrick Morrissey

Despite these shortcomings in preparation and coordination, VSP supplied the City with much-needed resources for July 8. Troopers served within each zone and also patrolled the Downtown Mall.[130] A VSP helicopter monitored the Klan event and provided images to the command center.[131] According to the VSP Operational Plan for July 8, the agency provided a total of ninety-one people to support the event.[132] CPD would not have been able to protect public safety on July 8 without the substantial commitment of VSP.

### g. Albemarle County

In contrast to VSP, CPD and the Albemarle County Police Department (ACPD) engaged in strong coordination and planning for the Klan rally. On June 29, Major Pleasants sent an unofficial request to ACPD asking for the assistance of law enforcement personnel during the Klan event.[133] ACPD agreed to provide assistance and ultimately provided forty-one

law enforcement personnel, including an 11-member mobile field force team, a 7-member SWAT team, and a 20-member patrol team to handle service calls.[134]  ACPD prepared an Operational Plan for its personnel on July 8, and shared two drafts of that plan with CPD.[135]  On July 7, City Manager Jones formalized the City's request for assistance pursuant to a Police Mutual Aid Agreement between the City and Albemarle County.[136]  Overall, ACPD Chief Rick Lantz told us that the City and Albemarle County engaged in a good degree of coordination.  Likewise, Assistant City Manager Mike Murphy characterized ACPD as providing "universal support" to the City for the Klan event.

CPD also coordinated with Albemarle County Sheriff J.E. Harding in anticipation of the July 8 event.  On June 15, Captain Shifflett asked Sheriff Harding to meet to discuss resources, including access to Albemarle County's JDR Court, which is located directly across from Justice Park.[137]  Several days later, Captain Shifflett and Sheriff Harding conducted a walkthrough of the JDR Court and discussed CPD's resource request.[138]  Sheriff Harding communicated with the JDR Court's judges and obtained permission for CPD to access the JDR Court facilities on July 8.  As a result, a VSP mobile field force unit was staged in a courtroom on July 8, and public safety personnel used the building to cool off and access restroom facilities.  Sheriff Harding also arranged for the Klan to park multiple vehicles in the JDR Court's surface parking lot across the street.

## h.  University of Virginia

CPD and the University of Virginia Police Department (UPD) coordinated and planned for the Klan event to limited degree.  The City sent UPD a mutual aid request in advance of July 8.  UPD Captain Melissa Fielding told us that the University "could not fully commit" to providing resources, however, as there was a desire to protect the University's campus on July 8.  As a result, UPD did not provide officers to assist with crowd control at the Klan event.  Instead, UPD played a "support" role during preparations and agreed to answer priority calls for service within the City during the event.  Captain Fielding recalled attending several planning meetings and received the CPD Operational Plan, though she criticized CPD's shared intelligence as both limited and late.

The University of Virginia Health System planned for the potential of significant injuries during the Klan event.  Tom Berry, the Director of Emergency Management at the UVA Health System, told us that he began preparations about ten days before the Klan event.  He instructed his IT department to gather intelligence via social media, blogs, and web sites, while he sought information from CPD via informal discussions with Lieutenant Upman.  Mr. Berry also organized small staff groups to perform detailed planning, share information, and coordinate with local, regional, and state-wide resources to know and understand the UVA Health System's needs.  During the event, Mr. Berry increased medical and security staff and established a UVA Health System Command Center.

## i.  Emergency Communications Center

In advance of July 8, CPD coordinated with the Charlottesville UVA Albemarle County Emergency Communications Center (ECC).  Allison Farole, the ECC's Emergency Management Coordinator,  explained that the three jurisdictions share a common 911 system and regional emergency management protocol.  ECC's primary role is to provide

Case 3:17-cv-00072-NKM-JCH   Document 488-3   Filed 05/02/19   Page 60 of 227   Pageid#: 5044

radio communications and coordinate emergency responders for the Charlottesville and Albemarle County regions.

For the Klan event, Captain Shifflett requested ECC's help with establishing shared radio communications for VSP and CPD.[139] He also met with ECC personnel to bring them "up to speed" on the Klan event planning and provided a draft of the CPD Operational Plan. Based on these communications, Captain Shifflett understood that CPD and VSP radios would patch together so the agencies could communicate on shared channels during the Klan event.

For certain events, the ECC will also establish an Emergency Operations Center, or EOC. City leadership decided not to do so for the Klan event. As an alternative, Farole established a Virtual Emergency Operations Center Interface, also known as a "VEOCI," on July 8. VEOCI allows users to view maps, share files, assign tasks, and access information about emergency broadcasts from an electronic device. Upon Captain Shifflett's request, Farole visited CPD on July 7 and provided an overview and training for VEOCI's use.[140] Farole recalled uploading the CPD and ACPD operational plans to the VEOCI system before the Klan event. Importantly, Tom Berry of the UVA Health Systems emphasized his use of the VEOCI to receive updated information during the Klan event.

## B. CPD Operational Plan

As the overall incident commander for the Klan rally, Captain Shifflett had responsibility for drafting the CPD Operational Plan. He began planning for July 8 during the first week of June. Internal CPD planning meetings for the Plan began as early as June 12th.[141] Captain Shifflett delegated drafting responsibilities for portions of the Plan: CPD Lieutenant Tito Durrette drafted the "traffic" section,[142] Major Pleasants drafted the "CPD Mobile Field Force" section, Captain Lewis drafted a section,[143] CPD Lieutenant Steve Knick drafted aerial maps of Justice Park as well as traffic plans,[144] and Captain Mitchell drafted the interior plan section.

By June 26, Captain Shifflett secured use of the Charlottesville office of the McGuireWoods law firm at 310 4th Street, N.E. and designated it as the Command Center for the Klan event.[145] He told us that this Command Center location offered the following advantages: (1) a large conference room with big windows overlooking Justice Park; (2) a proximity to Justice Park close enough to view the Klan event in real time but far enough away so it did not feel unsafe; (3) sophisticated technology capabilities with multiple large screen televisions for live streaming of helicopter and pole camera footage; and (4) an opportunity for Command Center personnel to exit the building and stand outside to "get a feel from the crowd" without relying solely on radio traffic and video systems.

Captain Shifflett investigated CPD's resources for the Klan event. He gathered information from Captains Lewis and Mitchell regarding how many officers would be available on July 8.[146] He also inquired about using unsworn CPD personnel for traffic control, including a forensic technician and an animal control officer.[147] By June 22, Major Pleasants assigned CPD resources to staging areas in and around Justice Park and identified resources needed from partner agencies.[148] Captain Shifflett also held a CPD command staff meeting to solicit

recommendations and foster discussions about choosing zone commanders for the Klan event.

In formulating the Operational Plan, Captain Shifflett considered assigning CPD officers to locations of potential threats beyond Justice Park. Alan Zimmerman, the President of Congregation Beth Israel, asked the City to provide an off-duty police officer at the synagogue on July 8. Zimmerman noted that CPD frequently provides off-duty officers on major Jewish holidays, and the synagogue compensates the officers for their time. CPD declined to provide an officer on July 8. Captain Shifflett explained that he believed CBI would be adequately protected by the amount of officers patrolling the park and surrounding areas. Without an off-duty CPD officer to provide security, Zimmerman retained a private security firm to provide protection for the synagogue on July 8.

Captain Shifflett convened a series of meetings to refine the Operational Plan during the last week of June, including a June 26 logistics meeting with CPD lieutenants[149] and an interior and exterior command meeting with Captains Lewis and Mitchell on June 27.[150] On June 28, Captain Shifflett organized a meeting for lieutenants designated as zone commanders, during which he reviewed the Operational Plan and solicited input.[151] Lieutenant Upman visited Justice Park and selected observation points for SWAT sniper units, which were also added to the Operational Plan. Captain Shifflett's coordination and planning with City and non-City agencies informed the Plan as it endured multiple revisions. Chief Thomas, Major Pleasants, Captain Lewis, and Captain Mitchell also reviewed and revised the Plan.[152]

On July 5, Captain Shifflett announced the schedule for July 8 to all CPD personnel. He specifically directed them to report to a command briefing in the COB McIntire auditorium on July 8 at 10:00 a.m., which would be followed by individual unit meetings with assigned zone commanders. He further directed that all CPD personnel should be at their assigned post by noon on July 8.[153] The day before the event, Captain Shifflett again met with zone commanders and provided them with an updated Operational Plan which included their list of assigned officers and staging areas.[154] Lieutenant Mooney told us that zone commanders viewed maps from the Plan and gave input on safety and equipment needs at this meeting. Officer Lisa Best recalled that Lieutenant O'Donnell forwarded the Plan to his assigned zone officers. Overall, Lieutenant Mooney told us that "multiple briefings allowed for input at all levels" which facilitated "significant adjustments to plans . . . based on all factors known prior to the event." He believed the Plan was "solid."[155]

The final Operational Plan segregated Justice Park into five zones with the goal of separating the Klan and counter-protesters at all times:



Aerial view of area of the July 8 rally, showing KKK protest area
and designated enforcement zones

The Plan provided a protected area between the Jackson statue and the Albemarle County Circuit Courthouse for the Klan's rally to occur.  Double barriers   or two rows of bike-rack barricades spread ten feet apart   surrounded the KKK Zone on three sides with the Courthouse serving as a natural barrier on the fourth side.  The remaining four numbered zones were established for counter-protesters around the KKK Zone.

Case 3:17-cv-00072-NKM-JCH   Document 488-3   Filed 05/02/19   Page 63 of 227   Pageid#: 5047

The Plan also called for street closures around Justice Park:



These street closures began at 12:00 p.m. and established a traffic perimeter securing Justice Park for the Klan event.

The Plan utilized the following locations around Justice Park as staging areas on July 8:

- McGuireWoods Conference Room.  Directly across from Justice Park, this area served as the Command Center.  The building's lobby also housed riot gear for one zone of police personnel.

- Charlottesville Circuit Courthouse.  The courthouse served as the processing center for arrestees.  Officers were to transport arrestees there to either issue a summons or conduct a hearing with a magistrate through a remote video system.  The building's lobby also housed riot gear for one zone of police personnel.  Restrooms were available for public safety personnel.

- Albemarle Juvenile & Domestic Relations Courthouse (JDR Court).  The VSP mobile field force as well as the CPD SWAT team and Bearcat were staged at the courthouse.  Also, restrooms were available for public safety personnel.

- Albemarle General District Courthouse. The courthouse served as a natural barrier for the east side of the Klan's designated area. It also housed riot gear for two zones of police personnel. Restrooms were available for public safety personnel.

- Levy Opera House. The VSP SWAT team and Bearcat as well as fire/EMS resources were staged in the Levy Opera House parking lot.

- Albemarle County Office Building   McIntire (COB McIntire). The ACPD mobile field force and Fire/EMS resources were staged at COB McIntire.

- 400 and 500 Blocks of E. Jefferson Street. Members of the media were designated to park in the 500 block and to stage in 400 block of E. Jefferson Street close to Zone 4.

The Plan called for the Klan to consolidate into vehicles at an off-site location and follow police escorts to the JDR Court's surface parking lot. From there, police would escort the Klan members as they walked behind the JDR Court, across High Street, and into the KKK Zone inside Justice Park. This ingress/egress strategy aimed to provide the Klan with safe passage to their designated area while maintaining separation from counter-protesters at all times.

Throughout the Klan event, both CPD and VSP police personnel planned to be stationed inside the four numbered zones. Each zone consisted of one CPD commander, two CPD supervisors, one VSP supervisor, and a team of uniformed CPD officers and VSP troopers. Police personnel staged in these zones would wear regular uniforms with riot gear staged nearby in buildings if needed. Captain Shifflett did not want officers in zones wearing riot gear. He planned a "softer approach," citing research suggesting that the appearance of riot gear at events suggests to crowds that police are "there looking for a fight." Each zone also included detectives wearing plain clothes to monitor crowd behavior and serve as "eyes and ears" for law enforcement.

The Plan directed officers to "maintain close observation of the crowd," and watch for people "who are exhibiting behaviors which could become violent." The Plan directed officers to "make arrests when appropriate for unlawful behavior." Each zone's CPD officers and VSP troopers would be paired to form arrest and cover teams. To make an arrest, a two-member team would perform the arrest while a two-member cover team would protect the arrest team and the arrestee from the crowd. The arrest team would then escort the arrestee to the designated processing area at the Charlottesville Circuit Courthouse. The arrestee would either be released on summons with a debarment notice not to return to Justice Park or taken before a magistrate for a hearing over a video system. Arrestees committed to jail would be placed in the Charlottesville Circuit Courthouse holding cells until transported to a regional jail via police transport vans.

Other than to escort an arrestee to the processing area, officers would not be permitted to leave their assigned zone without permission from their zone commander. Zone commanders would, however, have authority to adjust staffing within the double barricades and zones based on operational needs.

The Plan established procedures for the possible declaration of an unlawful assembly. Chief Thomas or his designee held authority to issue the order for an unlawful-assembly declaration "should circumstances warrant such declaration." If he did so, Captain Shifflett would direct the Zone 1 commander and the logistics commander to communicate the unlawful-assembly declaration over bull horns and notify the VSP and ACPD mobile field force commanders to prepare for deployment. CPD officers staged within the numbered zones would relocate to buildings around Justice Park to retrieve and put on riot gear, meet at a location nearby, and await deployment.[156]

If the crowd failed to disperse "after an appropriate amount of time," Captain Shifflett would deploy the VSP mobile field force team to clear the unlawful assembly area. The VSP mobile field force would march south pushing people out of Justice Park, with the potential assistance of the ACPD mobile field force. CPD officers would retrieve their riot gear and form their own mobile field force to provide perimeter and rear support. The Plan directed that if the crowd remains passive and non-violent, then "no pain compliance instruments or chemical agents will be used" to disperse the crowd. CPD had stretchers and cots staged close to Justice Park for transporting those who failed to disperse.

Finally, the Plan addressed demobilization. After the Klan event ended, Captain Shifflett would disengage officers as appropriate, assign officers to the area "to prevent recurrence of trouble," discontinue the Command Center, relieve personnel, account for all department members, and collect department equipment.

CPD shared the Operational Plan with all agencies involved in the July 8 event. On June 28, CPD hosted a large meeting for the heads of City departments.[157] At this meeting, CPD shared a draft of its Operational Plan, discussed traffic restrictions, and revealed road closures. In the final days before the Klan event, Captain Shifflett shared the Plan with other agencies, including UPD, ACPD, the UVA Health System, and VSP.[158] Assistant City Manager Mike Murphy criticized CPD for looping in other agencies "at the eleventh hour." On July 7, Chief Thomas gave his approval to upload the Plan to VEOCI for sharing with regional authorities.[159]

## C. Public Communications

### 1. Efforts to Discourage Attendance

The City made a concerted and unified effort to discourage attendance at the Klan event and to schedule alternative events.[160] Chief Thomas's approach to public communications was "don't take the bait," which he repeated to multiple audiences as a means of encouraging people to stay away from the Klan event. Assistant City Manager Mike Murphy told us that City Council and staff made a conscious decision to discourage residents from attending the Klan event and to encourage businesses and non-profits to host alternative programs. Assistant City Manager Leslie Beauregard recalled attending two meetings about alternative programming that the City planned to coordinate with third-parties. Mayor Mike Signer wanted to send out a "stay away" message and, with City Manager Jones, created an organizing committee for the purpose of creating alternative events for Charlottesville residents.

Instigated by the City, community organizers planned "counter-programming" events for July 8. City Manager Jones and Mayor Signer attended a Clergy Collective meeting and asked the faith community to take a lead in organizing a community-wide response. Reverend Will Peyton, the Rector of St. Paul's Memorial Church, understood from this meeting that the City wanted residents to stay away from Justice Park and leave the Klan alone. The Charlottesville-Albemarle NAACP organized a counterprogramming event at Jack Jouett Middle School. The Black Student Alliance at the University of Virginia sent an organization-wide e-mail warning that the Klan would be armed and encouraging students to attend the NAACP's counterprogramming event from 2:00 p.m. to 5:00 p.m.[161] Downtown business owners also told us that the City made an explicit effort to keep people away from the Klan event.

On June 20, Charlottesville City Councilors, Chief Thomas, City Manager Jones, and community members held a press conference to discuss "Unity Day."[162] Specifically, City representatives discussed public safety and addressed community concerns about the upcoming Klan rally. After this announcement, representatives of the Clergy Collective and the Jefferson School African-American Heritage Center promoted "Unity Day" with the following schedule of counterprogramming events for July 8:[163]

9:00 a.m. 11:00 a.m.: Programming at the Jefferson School African-American Heritage Center, including meditation, gospel choir performances, and presentations on the history of the Klan and Charlottesville.[164]

11:30 a.m. 1:30 p.m.: Community lunch and potluck picnic at IX Art Park.

2:00 p.m. 5:00 p.m.: Unity Day concert at the Sprint Pavilion on the Downtown Mall.

The City agreed to fund at least some of these counterprogramming events.[165]

The City's attempts to discourage counter-protests at the Klan rally alienated some members of this community. Reverend Seth Wispelwey recalled that City Manager Jones' and Chief Thomas' request that members of the clergy help "tell the story" of the day by discouraging attendance and promoting alternative programs was not universally accepted. Wispelwey told us that the request "rubbed people wrong" as alienating and patronizing because some people felt strongly that they should confront the Klan and their hateful speech. The differing reactions to the City's counter-programming strategy created a division within the faith community, which only deepened after July 8.

## 2. Informing the Public

CPD waited until the eve of the Klan rally to inform the public of logistics for July 8. On July 6, Captain Shifflett drafted a press release addressing road closures, parking restrictions, the ACPD/UVA response to emergency calls for service, and alternative reporting options for non-emergency calls during the Klan event.[166] That same day, Lieutenant Upman distributed to media members a map of traffic patterns and street closures for the Klan event.[167] On July 7, Lieutenant Upman provided media members with additional information related to road closures, parking, and alternative reporting options.[168]

## D. Events of July 8

### 1. Preparing Justice Park

The City's preparations inside Justice Park began two days before the Klan event. On July 6, Parks and Recreation secured bike-rack barricades from UVA's Scott Stadium and, with the help of Public Works, transported them to Justice Park and chained them up securely. On the morning of July 7, CPD provided Parks and Recreation with a diagram depicting the final barricade layout and crews set up the bike-rack barricades accordingly.[169] That same day, Sheriff Brown had his deputies remove trash cans and other potentially dangerous items from the Charlottesville Circuit Courthouse's vicinity.

CPD Sergeant Bradley Pleasants worked the midnight shift between July 7 and July 8. Around midnight, Sergeant Pleasants received a call about unusual activity at Justice Park. Upon arrival, he discovered hundreds of photographs of CareBears covering the barricades. He and other officers removed them during the shift. He also ensured the barricades were interwoven with police tape to create a police line, because in Virginia it is unlawful to cross a police line.[170]

In the early morning of July 8, CPD stationed officers in Justice Park to secure the Klan-designated area. Together, CPD, Parks and Recreation, and Public Works swept the area and removed potentially dangerous objects, such as newspaper boxes, loose bricks, rocks, benches, sticks, and guts of trash cans.

### 2. All-Hands Briefing

At 10:00 a.m., CPD hosted an all-hands briefing in the COB McIntire auditorium.[171] All major agencies attended, including representatives from UPD, ACPD, and CFD, as well as officers on duty for the day from CPD and VSP. According to CPD Lieutenant Tom McKean, this briefing was clearly a "CPD operation." Chief Thomas spoke first, urging officers to be professional, exercise discretion, and use de-escalation techniques. Captain Shifflett then presented a plan overview, where he explained the street closures, the ingress/egress plan for the Klan, the barricade arrangement, the staging of officers in and around Justice Park, and how to process arrestees. CPD Sergeant Tony Newberry remembered receiving a handout with guidance and citations for criminal offenses. Major Pleasants recalled that CPD officers were told to "set the tone early" by making arrests. Captain Lewis remembered that the CPD instructions were to arrest "early and often" and that VSP was also very clear about its intent to arrest disruptive counter-protesters.

At the end of the all-hands briefing, Captain Shifflett introduced the CPD lieutenants who would serve as zone commanders for the Klan event. Attendees then broke into groups and met with their assigned zone commanders in different areas of the auditorium. The zone commanders provided additional arrest instructions. Lieutenant O'Donnell asked his officers to focus on behavior beyond mere yelling and screaming and to arrest for significant violations of the law, such as felonies. CPD Lieutenant Joe Hatter understood his duties to include "watching the crowd," so he instructed his officers to look for violent behaviors and make arrests if they saw unlawful conduct. Lieutenant Hatter also encouraged his officers to step out beyond the barricades and to remain out on High Street. Lieutenant Gore

instructed his officers not to arrest for speech, but to focus on assaults and impediments to the free movement of individuals. He also urged his officers to give warnings first and, if counter-protesters refused to comply, then arrest them. Lieutenant O'Donnell told us that because his officers lacked riot gear in the zone, he had no intention of sending them into brawls among large numbers of people without a clear threat to life.

CPD Lieutenant James Mooney observed later that the "multi-agency debrief prior to the event put all agencies on the same page with the mission of the operation stated clearly."[172] However, all attendees did not hold that same view. CPD Officer Lisa Best told us she did not receive complete instructions at the all-hands briefings on what to do. She was told the location of her assigned zone and informed where to take arrestees, but she did not know the exact identity of her VSP cover team. Her understanding was that she was to protect her zone and arrest anyone who came over the barricades. CPD forensic technician Diane Hueschen guarded the 3rd Street and Jefferson Street intersection. At the all-hands briefing, she was not told anything specific about her role other than to block the street and not let anyone through except law enforcement. Lieutenant Mooney recalled that there was no particular guidance on how to conduct arrests, other than the fact that zone commanders needed to establish arrest teams.

The lack of "down the chain of command" coordination between CPD and VSP was also revealed early on July 8. Unbeknownst to CPD, VSP personnel held an all-hands briefing at a state facility in Charlottesville at 9:00 a.m., prior to the "all-hands briefing" with CPD. Many VSP troopers who came to Charlottesville for the Klan met each other for the first time that morning. VSP troopers were also meeting CPD personnel for the first time. Lieutenant Mooney was uncomfortable with this arrangement. He described these unacquainted circumstances as "tricky" because he was responsible for people he had never met. He was concerned that if the VSP troopers did not keep track of each other, then he would have no way of knowing their location. Lieutenant O'Donnell explained he had "no familiarity" with the VSP troopers he was to supervise that morning.

### 3. Opening the Command Center

On July 8, the Command Center opened at 11:49 a.m.[173] The large conference room contained multiple large screen televisions for monitoring live video feeds from the VSP helicopter and pole cameras. The Plan identified fifteen individuals as Command Center personnel:

| Command Center: | |
|---|---|
| **McGuire Woods Conference Room: 310 4th St NE** | |
| **Position** | **Commander** |
| CPD Chief of Police | Chief A. Thomas |
| CPD Incident Commander | Capt. D. Shifflett |
| CPD Interior Commander | Capt. V. Mitchell |
| CPD Exterior Commander | Capt. W. Lewis |
| CPD Mobile Field Force Commander | Maj. G. Pleasants |
| CPD Logistical Support Commander | Lt. S. Knick |
| VSP Commander | 1st/Sgt. C. Clark |
| ACPD Commander | Maj. K. Carr |
| Fire/EMS Commander | Bat. Chief M. Rogers |
| UPD Commander | Capt. M. Fielding |
| ECC Emergency Management Coordinator | Allison Farole |
| VDEM | Gene Stewart |
| VSP Analyst – Fusion Center | Analyst C. Phauk |
| Media Liaison | M. Dickler |
| Recorder | E. Lantz |

In addition to these individuals, City Manager Maurice Jones, Assistant City Manager Mike Murphy, Mayor Mike Signer, VSP Major Lenmuel Terry, CFD Fire Chief Andrew Baxter, VSP Lieutenant Cooper, and UPD Lieutenant Angela Tabler were also present in the Command Center for at least part of the day on July 8.

Farole explained her role in the Command Center mainly as providing important updates through VEOCI. Before the event, she trained a group of volunteers  the Virtual Operations Support Team (VOST)  to monitor open source media during emergencies. During the Klan event, the VOST team monitored social media because people in the crowds were tweeting and sharing videos. Farole acted as a "funnel" for that information and shared it on VEOCI.

### 4. The Crowd Gathers

By noon on July 8, VSP had swept the Justice Park area for explosives, road closures had commenced, and all public safety personnel had reported to their posts.[174]

The crowd at Justice Park built slowly over the early afternoon hours, with reports trickling in about small disturbances or the arrival of known counter-protest groups. From 12:00 p.m. to 1:30 p.m., Justice Park remained sparsely populated and peaceful with officers communicating with the crowd. At 1:10 p.m., City Manager Jones sent an e-mail to City Council indicating that that several dozen people were in the park and noting that it was "very peaceful at the moment."[175] At 1:20 p.m., police spotted people putting on Black Lives Matter shirts.[176] From 12:00 p.m. to 1:30 p.m., Lieutenant Mooney described foot traffic in Zone 4 as "light with small groups or individuals arriving" with fifteen individuals "carrying firearms and/or knives openly."[177] Similarly, Lieutenant Hatter observed that "traffic was very light in Zone 1 with small groups or individuals arriving in the park.

Officers were able to engage citizens in conversation including members supporting Black Lives Matter and the ACLU monitors."[178]

At approximately 1:30 p.m., "opposition groups and various factions arrived," including a religious leader with a bullhorn who "incite[d] various individuals about their lifestyle choices." These opposition groups continued to float between Zones 2, 3, and 4. At 1:33 p.m., police spotted Antifa members with banners beside a corner of Justice Park. CPD Officer Lisa Best observed that people began trickling into the park around 1:30 p.m. and that it was peaceful at first. At 1:42 p.m., multiple people were seen carrying firearms, knives, and swords. By 1:50 p.m., the Command Center estimated that 200 people were in Justice Park. [179]

Starting at 2:00 p.m., the crowd size at Justice Park increased significantly. Lieutenant Hatter recalled that various opposition groups, including a religious group, BLM, and Antifa, all arrived at the event. People began marching through Justice Park carrying signs, chanting slogans, singing, and using drums and noise makers.[180] By 2:10 p.m., the Command Center estimated that 400 people were Justice Park. At 2:12 p.m., a SURJ group was spotted in Justice Park.[181] Around 2:00 p.m., an anonymous eyewitness who toted a BLM sign told us she arrived at Justice Park and had "never been somewhere with so many police officers."

Law enforcement personnel immediately noticed Antifa's sophisticated level of organization. Lieutenant Hatter observed that Antifa coordinated with local activists, had logistics and medical support, and figured out the Klan's entrance location to the park. Lieutenant O'Donnell characterized Antifa as "very organized" and "totally coordinated." He spoke with a "street medic" who revealed that she had protested at Standing Rock, South Dakota for eight months before arriving in Charlottesville. At 2:15 p.m., Antifa was spotted wearing gas masks, padded clothing, and body armor.[182] Captain Shifflett recalled being surprised at the planning by some counter-protesters who brought organized medics, used walkie-talkies to share information, and wore helmets, full body pads, gas masks, and shields. CPD Lieutenant Dwayne Jones observed counter-protesters actively monitoring scanners and other devices to track the movements and communications of the police.

Charlottesville resident Dan Haig served as a street medic during the Klan event. He has first aid training though is not certified. Mr. Haig explained to us that the street medics are a private group of people who volunteer for major community events. The street medics gathered at Jefferson Theater and walked over to Justice Park prior to the Klan's arrival. They wore vests with red tape on the back symbolizing that they provide medical help. During the day, Haig mainly directed people to a first aid station for water to avoid dehydration. At 2:41 p.m., "Antifa medics" were spotted carrying gas masks and stated they were "here to help."[183] CFD Deputy Chief Emily Pelliccia told us that the street medic's red tape crosses made them appear affiliated with the Red Cross, creating confusion and misleading people in Justice Park about the identity of the fire/EMS personnel.

## 5.     March of the Clergy Collective

The Clergy Collective organized a large interfaith service prior to the Klan rally at the First United Methodist Church, which is located just three blocks from Justice Park. At the

Case 3:17-cv-00072-NKM-JCH   Document 488-3   Filed 05/02/19   Page 71 of 227   Pageid#: 5055

service, members of different faith groups spoke and sang. After the service, the Clergy Collective split into two groups and left the church. The first group preferred to attend alternative events to express their thoughts without engaging the Klan. Rabbi Gutherz of Congregation Beth Israel joined this group. They marched down 1st Street, entered the Downtown Mall, and marched to the Sprint Pavilion for counterprogramming complete with bands, prayers, and speeches. Rabbi Gutherz spoke at the event. The Command Center took notice, indicating that at 2:14 p.m., a "large, peaceful group" of people was spotted entering the Sprint Pavilion on the Downtown Mall.[184]

A second group of attendees at the interfaith service chose to march to Justice Park, witness the Klan event, and serve as a pastoral presence for people looking for guidance. According to several faith leaders present, some members of this group had hostile intentions toward the Klan. Reverend Seth Wispelwey joined the group marching to Justice Park, though he was concerned about the lack of non-violent and de-escalation training. Wispelwey provided a short briefing at the First United Methodist Church in which he asked marchers not to engage those with contrary views. Around 2:30 p.m., a large group of clergy was spotted marching in a circle near the northwest corner of Justice Park.[185]

### 6. Media

When the clergy group arrived at Justice Park, the Command Center estimated that the crowd in Justice Park had tripled to about 600 people.[186] Before 3:00 p.m., Lieutenant O'Donnell observed that Justice Park and Zone 2 were calm. At that point, CPD permitted reporters to enter the barricaded area.

The CPD Operational Plan for July 8 designated the 400 and 500 blocks of E. Jefferson Street as the media staging area. This zone was immediately adjacent to Justice Park and in close proximity to both the protected space in which the Klan held its permitted rally and zones designated for counter-protesters. The media staging area was near but not within the large "buffer zone" between the Klan's reserved area and the larger counter-protest areas. This "buffer zone" was intended to be reserved for law enforcement personnel who would monitor the crowd and respond to disturbances.

Law enforcement did not enforce the plan as contemplated. Instead, they allowed reporters within the "buffer zone" between the Klan protest area and the zones designated for counter-protesters. Lieutenant O'Donnell told us that because reporters are permitted to cross police lines under Virginia law, CPD "let them in there." Lieutenant Mooney recalled that because it "took considerable time" for police to "check the credentials of each person, the media entered at various locations." Mooney estimated that "at least fifty entered through the Zone 4 barricades and continued to do so throughout the event." He told us that "only a few were turned away who failed to produce adequate credentials."

### 7. The First Arrests

Just before 3:00 p.m., the size of the crowd increased and the atmosphere in the park intensified. At 2:56 p.m., "most of Zone 1 was full of marchers, counter-protesters, and bystanders."[187] Sergeant Newberry said the streets surrounding Justice Park and adjacent sidewalks were "filled up." Lieutenant Mooney remembered pulling his officers out of the

public area and ordering them between the barricades because they were in "a terrible safety situation with their backs to people." He told us that the zones became packed with people who began pressing against the barricades. The Command Center also knew by 3:10 p.m. that counter-protesters were pushing against the barricades in Justice Park.[188] Around this time, Major Pleasants left the Command Center to "get a feel for the crowd."

Counter-protesters identified the area through which the Klan would enter Justice Park. At 3:16 p.m., about a dozen people locked arms on High Street to form a human wall blocking entrance into the Klan's zone.[189] Because this occurred in Zone 1, Lieutenant Hatter and officers assigned to that Zone responded. Lieutenant Hatter repeatedly warned the counter-protesters via a bullhorn that they must move or risk arrest.[190] The counter-protesters told Lieutenant Hatter that they would not voluntarily clear the entry point and disperse.



Photo Source: Patrick Morrissey

At 3:18 p.m., the VSP mobile field force came out of their staging area inside the JDR Court and prepared to clear the counter-protesters blocking High Street.[191] Around 3:30 p.m., CPD personnel arrested the counter-protesters while the VSP mobile field force created a human corridor on High Street for the Klan to use.[192] Emily Gorcenski positioned herself at the end of the counter-protesters locking arms to livestream it on social media. Ms. Gorcenski told us that police were overly aggressive in the way they arrested people who were simply standing in the way. Lieutenant Hatter acknowledged that the arrests and the VSP Field Force "fired up" the crowd. Nevertheless, law enforcement personnel cleared a path for the Klan's entrance into Justice Park.[193]

The crowd moved within Justice Park in anticipation of the Klan's arrival. Officer Best explained that counter-protesters flooded from Zones 2, 3, and 4 into Zone 1 on High Street, nearly overwhelming the law enforcement in that zone. Lieutenant Durrette stated that "the number of people in Zone 1 was growing and we had to make some arrests for blocking the entrance to the park, sidewalks."[194] Lieutenant Hatter stated that the Zone 1 crowd "became more agitated with the large majority obviously in opposition" to the Klan. The barricades were closed off and "officers were removed from the crowd and placed inside the barricaded area. This was an officer safety decision where the officers were severely out-numbered by the large crowd."[195] Lieutenant O'Donnell observed that large numbers of counter-protesters began flooding Zones 1 and 2, prompting him to send some officers to assist Lieutenant Hatter in Zone 1.

### 8.     The Arrival of the Klan

As the crowd at Justice Park swelled, members of the Klan were gathering for the rally. At 1:02 p.m., about a dozen Klan members showed up at Coyner Springs Park in Waynesboro, Virginia.[196] Around 2:30 p.m., Captain Shifflett instructed Lieutenant McKean and his

team to travel to the prearranged off-site location to meet the Klan. Lieutenant McKean traveled with two unmarked police vehicles and eight CPD officers to the off-site location. Twenty minutes later, Captain Shifflett spoke on the phone with Barker, who reported the Klan was fifteen minutes away with approximately sixty members.

The Klan arrived at the off-site location and met Lieutenant McKean's team at 3:13 p.m. Lieutenant McKean observed that because the Klan group only had eighteen vehicles, there was no need for them to consolidate into fewer cars or leave any cars parked at the off-site location. The Command Center instructed Lieutenant McKean to hold the Klan at the off-site location as officers cleared the Klan's entrance point on High Street.[197] While waiting for notice from the Command Center, Lieutenant McKean told the Klan members that due to the sizable crowd in and around Justice Park, they would have "no time to fiddle around in the parking lot." The Klan then dressed in robes and completed a few rituals. Klan members revealed that they were armed, and an officer inspected their vehicles.[198] Shortly thereafter, Captain Shifflett gave the order to bring the Klan to Justice Park. Lieutenant McKean instructed the Klan not to stop at traffic lights along the way as two police vehicles guided them from the off-site location.

By 3:30 p.m., the Klan cars were on the way to Justice Park with police escorts crossing the Belmont Bridge.[199] Barker recalled that the commute from the off-site location to Justice Park was a "dangerous and unsafe" route that took about ten minutes. In the lead car, Lieutenant McKean arrived on 4th Street just north of Justice Park. While Lieutenant McKean parked in the surface lot as planned, about half of the Klan cars were directed into the JDR Court parking garage by a Sheriff's Deputy standing nearby. The Deputy had secured permission from Sheriff Harding to allow the Klan vehicles into the garage due to his belief that the surface parking was an unsafe area. Upon seeing this change in plans, Lieutenant McKean directed the remainder of the Klan vehicles into the garage.

Lieutenant McKean told us that the impromptu use of the JDR Court parking garage "saved a lot of issues." Lieutenant Hatter similarly observed that "we were just lucky" with the decision to allow Klan to park in the garage because parking them on the surface lot would have been a disaster. Lieutenant Durrette told us "thank god we parked them in the garage, otherwise we probably would have had to shoot someone" to get the Klan out later. Once the Klan entered the JDR Court garage at 3:39 p.m., the garage door closed.[200]

Lieutenant McKean instructed the Klan to line up inside the garage and, once outside, squeeze through the narrow path in the crowd created by the VSP mobile field force. Amanda Barker said that the Klan was told to "line up, stay together, and move quickly." Many Klan members toted confederate flags and wore Klan robes with hoods and exposed faces. Around 3:45 p.m., police escorted the Klan through the crowd of counter-protesters on High Street and into Justice Park.[201] Barker recalled that, even with police presence and protection, the counter-protesters gathered on both sides of the human police wall threw punches, launched bottles and fruit, and shouted ugly chants at the Klan. A photographer recalled that counter-protesters were "trying to jump over" the police wearing riot gear yet the VSP troopers remained very professional and non-confrontational.



*This aerial photograph shows the path taken by the Klan between the JDR garage and Justice Park, along with the locations of the first unlawful assembly declaration and subsequent tear gas deployment on July 8*

### 9. The Klan Speaks

By 3:50 p.m., the Klan reached their designated zone in Justice Park.[202] From High Street, many counter-protesters shifted into Justice Park's numbered zones. Officer Best said that the crowd began pressing against the barricades as the Klan event took place. Amanda Barker described Justice Park as a "zoo," with counter-protesters staged too close to the Klan and reaching through the barricades. According to Barker, the "gap was not big enough" so "counter-protesters were right up on us." Charlottesville resident Ann Marie Smith told us that Antifa members she had never met before asked her to stand between them and police during the Klan rally, which she did for a period of time.

The emotional intensity at Justice Park during the Klan rally was most acute near the barricades encircling the Klan. Farther away, the event remained largely peaceful. Charlottesville residents Bo and Maureen Perriello stood in Zone 1 and never felt a sense of danger. They noted a clear separation between counter-protesters and the Klan, though they did see a couple of "scuffles" in the crowd.

The Klan stayed in Justice Park from approximately 3:50 p.m. to 4:25 p.m., where several Klan members made speeches. Lieutenant Mooney reported that while "exchanges between the Klan members and individuals in the crowd were constant, . . . [n]o one

crossed the barricades [or] . . . threw anything at the Klan."[203]  Officer Best recalled that the crowd noise muffled the Klan's speeches.  Sergeant Newberry confirmed that "it was so loud in our section, you could not hear what the Klan were saying."  An anonymous eyewitness toting a BLM sign told us that the counter-protesters aimed to be louder than the Klan so they could not hold their rally.

In addition to noise, counter-protesters launched projectiles at the Klan, including apples, tomatoes, oranges, and water bottles.[204]  An anonymous eye witness saw a counter-protester throw an orange at the Klan.  A Klan member caught it and threw it back into the crowd.  At 4:00 p.m., City Manager Jones reported to City Council that the Command Center "received reports of some objects being thrown at the police" but there are no injuries.[205]  Charlottesville resident Casey Landrum observed people throwing bottles at the Klan.  She also noted that the Klan members were attempting to provoke counter-protesters.



Photo Source: Patrick Morrissey

Ms. Landrum and others characterized law enforcement as "too aggressive" and suggested that police did not make an effort to protect or preserve the speech rights of counter-protesters.  An anonymous eyewitness felt that the police went out of their way to protect the Klan.  She told us that the police presence was so strong that "even if I wanted to jump the barricades and attack the KKK I could not."  She felt that the police protected the Klan more than counter-protesters.  Ann Marie Smith suggested that the positioning of the police between the barricades was "unsettling" because the police faced the counter-protesters with their backs to the Klan, giving the crowd the impression that the police were protecting the Klan while suspicious of the crowd.

Eyewitnesses estimated that the Klan had forty to sixty members while the crowd contained 1,500 to 2,000 counter-protesters.  City Manager Jones reported to City Council that the Klan has about sixty members.[206]  CPD Executive Assistance Emily Lantz reported about forty Klan members in Justice Park.[207] According to Emily Gorcenski, the Klan had close to fifty members and the crowd contained perhaps 1,500 to 2,000 people.  Lieutenant Hatter estimated that nearly 2,000 counter-protesters showed up.  Captain Shifflett also believed that 1,500 to 2,000 counter-protesters attended.

Around 4:00 p.m.  the scheduled end time for the Klan event  the crowd began chanting for the police to shut it down.  According to eyewitness Elizabeth Pettit, the crowd was frustrated that the police allowed the Klan to exceed their time.  Captain Shifflett told us that because the event was delayed by the arrest of counter-protesters blocking the Klan's point of ingress, Chief Thomas agreed to give them twenty more minutes.  Shortly after 4:00 p.m., Lieutenants McKean and Hatter spoke with Barker and informed her that the Klan had twenty more minutes to conclude their program.[208]

At 4:22 p.m., Lieutenant Hatter told Barker that the Klan's "time is up" and police would escort them back to their vehicles.[209] The Klan did not object. According to Major Pleasants, they were "ready to go." Amanda Barker confirmed that fact later, telling us that she applied for a one-hour permit and felt satisfied with the amount of time the Klan actually spent in the park. As the Klan prepared to exit, many counter-protesters relocated to the Klan's egress area on High Street.

### 10. The Klan Exits

At approximately 4:25 p.m., the Klan left Justice Park.[210] Police told the Klan to return through the path in the crowd on High Street created and maintained by the VSP mobile field force. Again, police lined up the Klan and told them to move quickly. Police formed a wall to separate the Klan from counter-protesters. Barker believed the path was unduly narrow, which allowed counter-protesters to reach through the "human cop wall." Police shouted at the Klan to keep moving, even after one member was punched in the face. According to Barker, the Klan struggled to exit the park. Lieutenant Durrette noted that "as we escorted the KKK from the rally to the garage, we encountered people that threw tomatoes, water bottles, and some officers were spit on."



Photo Source: Patrick Morrissey

As the Klan exited Justice Park, hundreds of counter-protesters surged down 4th Street to the JDR Court parking garage where the Klan parked.[211] Watching this unfold, Lieutenant Hatter and his team quickly moved to the front of the parking garage and spoke with the ACPD mobile field force stationed nearby. Lieutenant Hatter "knew we would need [the ACPD mobile field force]" and alerted them that the Klan was on the way.[212]

Around this time, the Command Center ordered Lieutenant O'Donnell to bring officers assigned to Zone 2 to the JDR Court garage entrance to assist Lieutenant Hatter. Law enforcement personnel in front of the parking garage quickly linked up to maintain a separation between the Klan and counter-protesters, whose numbers continued to increase.

By 4:30 p.m., the Klan entered the parking garage. The Command Center issued an order to hold the Klan inside because counter-protesters were blocking the door.[213] Coincidentally, one of the Klan's vehicles broke down inside the garage, which required that it be pushed aside and left behind. Amanda Barker explained that police instructed the Klan to stay in their vehicles. She described it as "terrifying" because the Klan were "trapped inside the garage" and could hear the counter-protesters outside. Police instructed the Klan to line up their cars and prepare to quickly exit the garage.

With the increasing amount of counter-protesters gathering outside of the garage door and blocking the Klan's exit, Lieutenant Hatter told the Command Center "this is serious" and

requested permission to declare an unlawful assembly. He also asked for more officers from zones to assist at the parking garage and informed the VSP mobile field force that he planned to declare an unlawful assembly. Chief Thomas gave permission to make the unlawful-assembly declaration. An all-hands call subsequently went out to CPD officers to report to 4th Street. Captain Shifflett recalled that CPD officers were not instructed to put on riot gear prior to responding to the all-hands call.

At 4:35 p.m., Lieutenant Hatter organized CPD, ACPD, and VSP officers as well as several sheriff's deputies into a line in front of the parking garage. He then used a bullhorn to announce that the gathering had been declared an unlawful assembly. At 4:38 p.m., Major Pleasants left the Command Center and walked towards the JDR Court area.[214] He observed counter-protesters surrounding Lieutenant Hatter at the parking garage. Major Pleasants assumed command of the remaining CPD officers in Justice Park and moved them to assist Lieutenant Hatter.

The line of law enforcement personnel in front of the parking garage pivoted and pushed the crowd away from the garage door and across 4th Street.[215] With the driving path cleared, the Klan exited the parking garage around 4:45 p.m.[216] Lieutenant McKean again drove the lead car to escort the Klan. Barker told us that as she and the other Klan members drove away, counter-protesters confronted the cars, hit them with weapons, and "stood in our way." Lieutenant McKean told us that the exit plan did not go smoothly because, on Hedge Street, he and some Klan vehicles turned right yet other Klan vehicles turned left. All of the Klan vehicles made it to the 250 Bypass and immediately left the City.

## 11. The Crowd Turns on Law Enforcement

By all accounts, the crowd of counter-protesters became hostile to law enforcement personnel after the Klan vehicles exited the JDR Court parking garage. Frank Buck, a former City Mayor, was present for the July 8 event. He told us that after the Klan left, counter-protesters turned on law enforcement and "things got crazy." Elizabeth Pettit, an eyewitness, observed that counter-protesters and police had hostile interactions, facilitated by counter-protesters who taunted the police for helping the Klan. Reverend Seth Wispelwey said the "police became the enemy" to many in the crowd, as people were angry that the police "protected the Klan." Ann Marie Smith told us that the crowd "turned against the police" after the Klan left, partly because of the riot gear and aggressive actions of officers. Some crowd members chanted "Cops and Klan go hand in hand!"

Lieutenant O'Donnell expected counter-protesters to disperse after the Klan departed. He told us that while much of the crowd left the area, some counter-protesters remained and had an "ax to grind." Lieutenant Hatter explained that CPD and VSP "did a piss-poor job of retreating" to Justice Park. He feared that officers became isolated and had to "fend for themselves in dangerous spots with hundreds of people around them." Lieutenant Mooney lost track of his assigned VSP troopers at this point and did not have a way to communicate with them. Lieutenant O'Donnell similarly told us that when he brought his assigned officers to the JDR Court garage, the VSP troopers assigned to his zone "disappeared."

A large group of counter-protesters moved toward an alley next to the JDR Court where the CPD SWAT team and its armored Bearcat vehicle were staged. Counter-protesters

approached the Bearcat, prompting Lieutenant Upman to call for assistance from VSP. CPD SWAT officers established a perimeter around the Bearcat and Lieutenant Upman commanded the crowd to disperse from the area. VSP SWAT responded to Lieutenant Upman's call for help, moving into the alley and keeping the crowd away from the Bearcat. Major Pleasants then ordered CPD SWAT to move to the Levy Opera House parking lot.

CPD officers and counter-protesters were also gathered on an outdoor ramp near the JDR Court. A female counter-protester kicked CPD Officer Eric Thomas in the groin, provoking Officer Thomas to arrest her for assaulting an officer. In an attempt to disrupt the arrest, two counter-protesters linked arms with the arrestee and fell to the ground. Officer Thomas ordered the group to separate and warned them several times that he planned to deploy OC spray. After the three individuals repeatedly refused to cooperate, Officer Thomas sprayed the arrestee and the two linked counter-protesters with OC spray. Officer Thomas then arrested the female counter-protester and one of the people who had interfered with his arrest. He escorted the arrestees to a van near the JDR Court operated by the Charlottesville Sheriff and described the scene as a "mad house." Lieutenant Mooney reported to the area and recalled detecting OC spray in the air.

### 12. Deployment of Tear Gas

The intermingling and clashes of CPD, VSP, and counter-protesters along High Street and near the JDR Court prompted Major Pleasants to declare a second unlawful assembly. He used a bullhorn to announce the unlawful assembly and order the crowd to disperse. The crowd failed to disperse, despite repeated commands. Major Pleasants told us that counter-protesters continued to engage law enforcement personnel, who struggled to maintain control. CPD Detective Braden Kirby was told to get his riot gear, which was stored at the Charlottesville Circuit Courthouse. He was unable to do so, given the substantial crowd and simultaneous need to respond to the disturbances on High Street.

As the commotion on High Street continued, a VSP 1st Sergeant asked Chief Thomas for permission to deploy tear gas to disperse the crowd. Chief Thomas denied that request. He told us that before using a chemical agent, he wanted to give officers time to retreat to Justice Park and put on their gas masks and riot gear. His denial was not, however, communicated to VSP or CPD supervisors on the ground. Unaware of Chief Thomas's denial of permission, a VSP mobile field force sergeant approached Major Pleasants and asked for consent to deploy a chemical agent. Without consulting with the Command Center, Major Pleasants said "absolutely." Major Pleasants believed that the Operational Plan called for the VSP mobile field force Commander Lieutenant Cooper to consent to VSP's deployment of tear gas, not Chief Thomas. Major Pleasants noted that



Photo Source: Patrick Morrissey

Case 3:17-cv-00072-NKM-JCH   Document 488-3   Filed 05/02/19   Page 79 of 227   Pageid#: 5063

Lieutenant Cooper was near the JDR Court's patio, which led him to assume that the VSP sergeant with whom he spoke was acting on Lieutenant Cooper's authority.

Using a bullhorn, Major Pleasants issued a dispersal order to the crowd and announced three times that chemical agents would be used. No warning, however, went out over CPD or VSP communications warning law enforcement personnel on the ground. Charlottesville resident Mason Pickett heard a dispersal order and noticed that counter-protesters did not disperse. He observed law enforcement "acting responsibly" by issuing warnings and putting on gas masks. Photographer Patrick Morrissey said that police made repeated demands over bullhorns to disperse and threatened to use tear gas if counter-protesters did not leave the area. Reverend Seth Wispelwey recalled seeing troopers put on gas masks but did not hear any warning regarding the impending tear gas deployment. Alan Zimmerman, president of Congregation Beth Israel, similarly observed law enforcement donning gas masks but did not recall any warnings from police before the release of tear gas.

VSP deployed three canisters of CS dispersion powder, a localized chemical irritant commonly referred to as tear gas.[217] Colonel Flaherty told us that VSP chose to use this less abrasive "skin irritant" instead of more powerful tear gas options. Photographer Patrick Morrissey told us that he heard a "pop pop pop" sound and saw that police shot off tear gas around 5:07 p.m. Emily Gorcenski told us that at the time the gas was deployed, a line of counter-protesters stood about fifteen feet in front of the VSP Field Force, though they were not obstructing or blocking the street. Gorcenski heard screams of pain in the crowd when VSP deployed the first tear gas canister. She was also affected by the tear gas and was forced to flush her eyes. Less than a minute later, Gorcenski heard a second tear gas canister fired by police. Reverend Seth Wispelwey remembered seeing people in the crowd washing their eyes out due to tear gas exposure while police escorted arrestees away for processing. Ann Marie Smith saw people struggling after exposure  crowd members laid down on the ground and received treatment from street medics using milk and water.

The crowd reacted negatively to the tear gas, with counter-protesters calling for medics and screaming at the police officers. Gorcenski criticized the use of tear gas, explaining that there was no major crowd to warrant tear gas use and that the counter-protesters in the street had their backs to the police. Ann Marie Smith believes that the tear gas was deployed unnecessarily and without adequate warning.

Law enforcement personnel were exposed to the tear gas without adequate protection. Lieutenant Hatter explained that his team did not have on their riot gear with gas masks when the tear gas was deployed by VSP. An officer at the traffic post on High Street also did not have a gas mask and was affected. Lieutenant O'Donnell described the deployment of tear gas as a surprise and explained that his zone's riot gear and gas masks were inaccessible because they locked in the McGuireWoods building.

CFD Deputy Chief Emily Pelliccia's crew was staged nearby in the Levy Opera House parking lot. She observed street medics extract members from the High Street area for tear gas exposure. She offered to assist but the street medics and victims refused CFD's help. Rather, they screamed at CFD to "go away." As a result, CFD did not tend to many victims of tear gas exposure. When Deputy Chief Pelliccia questioned one of the street medics, she was spat upon and informed that they travel with Antifa for Antifa's protection.

Officers in the Command Center learned that tear gas had been deployed when they saw it on video feeds. Deputy Chief Rogers observed tear gas on a Twitter feed. He recalled confusion in the Command Center from CPD leaders, who exclaimed "we did not deploy anything." Assistant City Manager Mike Murphy recalled the Chief's reaction as being "what the hell just happened?" At 5:12 p.m., the Command Center confirmed that VSP deployed the tear gas. Major Pleasants gave a statement to media about the tear gas deployment and then returned to the Command Center.[218]

Chief Thomas was upset over the tear gas deployment, as he had insisted that gas not be used without his direct instruction. When Major Pleasants returned to the Command Center, Chief Thomas confronted him about the decision to use gas. Major Pleasants specifically told the Chief "you are damn right I gassed them, it needed to be done." He further explained that CPD was "under attack." VSP Major Terry likewise expressed displeasure over the tear gas deployment because VSP informed CPD before the Klan event that VSP would only deploy tear gas on orders from a VSP senior official. Miriam Dickler was upset that Major Pleasants spoke with the media before returning to the Command Center and consulting her first. Major Pleasants responded that he "told the media what they needed to be told."

Despite the manner in which the decision was made, Chief Thomas now believes that the use of tear gas was appropriate. Chief Thomas noted that the gas had the desired effect and caused the crowd to disperse quickly. He also pointed to the fact that because of the use of tear gas, neither CPD nor VSP had to become physical with the crowd. Colonel Flaherty similarly told us that he agreed with the decision to deploy gas. He told us despite confusion about the who gave the order, he believes that based on the circumstances that arose on July 8, tear gas was going to be deployed "regardless."

### 13. The Crowd Disperses

After the tear gas was deployed, the crowd along High Street dissipated. Some counter-protesters returned to Justice Park and congregated in Zone 4, where officers equipped themselves with riot gear in anticipation of confrontations. A bullhorn was again used to declare a third unlawful assembly at 5:22 p.m., prompting the crowd to disperse.[219] All police units began withdrawing from Justice Park.[220] The remaining counter-protesters left the park peacefully and without incident."[221] At 5:29 p.m., Maurice Jones reported to City Council that the crowds were "slowly but surely" dispersing.[222] By 5:38 p.m., most police units had been relieved and the Command Center closed.[223]

After the Klan event, Public Works disassembled the bike-rack barricades and secured them in Justice Park. Public Works also picked up trash in the park, finding discarded body armor and a stretcher. On Monday, July 9, Parks and Recreation completed an additional cleanup of Justice Park and returned the bike-rack barricades to Scott Stadium.

### 14. After-Action

#### a. Statistics

Law enforcement personnel made twenty-two total arrests at the Klan event:[224]

| Agency | Offense | Arrests |
|---|---|---|
| VSP[225] | Obstruction of Justice | 6 |
| | Obstruction of Free Passage | 1 |
| CPD[226] | Obstruction of Justice | 3 |
| | Obstruction of Free Passage | 5 |
| | Assault[227] | 1.5 |
| | Failure to Disperse | 1 |
| | Disorderly Conduct | 1.5 |
| | Wearing Mask in Public | 3 |
| **Total** | | **22** |

Most arrestees were released on summons according to Sheriff Brown, and he recalled that one was taken to jail for assaulting an officer. One of his deputies conducted background checks on arrested individuals.

Three patients were transported to the hospital: two for heat-related issues and one for an alcohol-related issue.[228] UVA Health Systems reported that it did not experience many disruptions to its normal operations on July 8 and treated a total of thirty-five patients from the Klan event.

#### b. Community Criticism

Law enforcement faced criticism in the wake of the Klan rally. Some community members were concerned about the "militarization" of the police response. On July 17, the Legal Aid Justice Center, National Lawyer Guild, ACLU, and the Rutherford Institute sent a letter to Governor McAuliffe, Charlottesville City Councilors, City Manager Jones, and Chief Thomas which criticized the "outsized and militaristic governmental response" to counter-protesters on July 8. The letter asserted that counter-protesters "were met with a highly militarized law enforcement presence who, prior to any clear and present danger of violence, descended on the scene dressed in riot gear, driving armored vehicles, and carrying weapons typically used only in war zones." The July 17 letter also criticized the use of tear gas: "[w]e are highly concerned about the use of chemical agents to facilitate the dispersal of demonstrators." The letter alleged that counter-protesters were "standing a good distance

away from the line of riot police" yet "three gas grenades were deployed" in front of the JDR Court.[229]

Reverend Seth Wispelwey explained that community progressives and faith leaders had an extremely strong reaction to the tear gas after July 8. To many, "it seemed like [the police] had no plan, other than protecting white supremacy." Wispelwey worried that City leaders and law enforcement "didn't know what they were doing." The image of police focusing exclusively on protecting the Klan then acting aggressively toward the counter-protesters angered others in the community. Ann Marie Smith was disappointed by the lack of explanation of tear gas use by CPD. Like many others, she came away from the event with less trust in police. Assistant City Manager Mike Murphy observed that the crowd's angry mood was exacerbated by the VSP riot gear and presence of Bearcat armored vehicles.

### c. Evolving Explanations for Deployment of Tear Gas

The City's explanation for the tear gas deployment evolved after the Klan event. Shortly after July 8, Chief Thomas informed the public that he personally ordered and agreed with the tear gas deployment. This statement was not factually accurate. Assistant City Manager Mike Murphy confronted Thomas about publicly taking responsibility for the tear gas deployment. Mr. Murphy told us that Chief Thomas replied that he "partnered" with VSP and could not "hang them out to dry" because he "needed VSP for August 12."

Chief Thomas also indicated that the tear gas deployment was based in part on the use of chemical agents against law enforcement.[230] Indeed, police discovered a canister of pepper gel shortly after the Klan event.[231] However, it is unclear whether this pepper gel was used by a counter-protester or even used at the Klan event at all. Chief Thomas confirmed to us that he was unaware of the use of chemical agents against police at any time on July 8. Major Pleasants did perceive pepper spray before the tear gas deployment, though given his location we believe that resulted from Officer Thomas's use of OC spray to effectuate an arrest.

In response to the criticism of the use of tear gas, Mayor Mike Signer requested that Chief Thomas appear before City Council to explain the tear gas response. According to Mr. Signer, Chief Thomas "refused to come" speak at City Council and explain the use of tear gas. City Manager Jones told us that the City did provide information to the public about the use of tear gas through press statements and reports at City Council meetings.

Commonwealth Attorney Dave Chapman encouraged a more complete public explanation of law enforcement's tactics and use of tear gas on July 8. In a memo sent to City Manager Jones and Assistant City Manager Murphy on July 19, Mr. Chapman recommended "a systematic public effort to document and explain elements of law enforcement planning for and performance at the KKK demonstration on July 8."[232] Mr. Chapman told us that despite his encouragement, there was no such "systematic public effort" to explain the decisions made by law enforcement. The City did not explain to the public the role of the VSP and ACPD mobile field forces on July 8, the predicates for the declarations of unlawful assembly, or the reasons for Major Pleasants' decision to deploy tear gas. The lack of such information diminished community trust in law enforcement.

### d. After-Action Meetings, Reports, and Takeaways

CPD did endeavor to learn from the July 8 rally by conducting a debriefing meeting with the lieutenants who had commanded zones or specialized units. Captain Shifflett told us that during that meeting, lieutenants criticized the lack of a field commander to coordinate actions, the difficulty in hearing radio communications due to crowd noise and the resulting need to communicate via cell phone, the remote staging of riot gear, and the lack of coordination with VSP. In anticipation of the August 12 rally, commanders suggested additional Mobile Field Forces and the removal of media from the barricaded area. Lieutenant Mooney recalled Chief Thomas stating, in reference to the August 12 event, that "I'm not going to get them in and out" of the event.

## E. What Went Right and Want Went Wrong

In this section, we evaluate the successes and failures of the City's handling of the Klan rally on July 8. City officials adequately prepared for this event and were able to prevent significant injury despite the large, unruly crowd. The law enforcement response lacked clear lines of authority, which led to a series of spontaneous decisions. The deployment of tear gas and subsequent public criticism informed preparations for the larger August 12 event, as described below.

### 1. What Went Right

#### a. City Officials Provided Thorough Information to the Community

In the weeks prior to July 8, City officials came together to devise and implement a plan to minimize the number of people attending the Klan rally as a means of reducing the prospect of violence and protecting public safety. They achieved this goal through a combination of discouraging attendance and promoting counterprogramming in partnership with community representatives.

The City's communication strategy and affirmative outreach effort allowed citizens to make informed decisions about their individual responses to the Klan event. Some people agreed with the City's strategy to avoid the event. Others felt compelled to attend the event and express strong opposition to the racist views of the Klan speakers. Regardless of which path people chose, they had clear information about the event and options as to how to respond. The City's clear communication facilitated the flow of information and informed individual choice on July 8.

While the fact of communication by City leaders was clearly a success, the content of that communication was not universally appreciated. Several people with whom we spoke expressed the view that the City should not have discouraged attendance, but rather just set forth counterprogramming options for the Klan event. These witnesses believe that a decision to confront or avoid hate-based speech is a personal choice which the City should not have attempted to influence. The City's attempt to discourage attendance was seen by some as disrespectful of this personal choice, resulting in a lack of faith in City leadership and law enforcement at and after July 8.

### b.    Law Enforcement Protected the Free Speech of All Participants

The First Amendment to the United States Constitution guarantees all citizens the right to express their views in public places, however objectionable those views may be.  Law enforcement is tasked with protecting that right, as well as ensuring public safety.  Those values often conflict, particularly when the content of speech provokes strong, sometimes violent reactions.

In the context of public demonstrations in parks and plazas, the United States Supreme Court has made clear that both protesters and counter-protesters have a constitutionally protected interest in being seen and heard.  The First Amendment will similarly protect the interest of protesters and counter-protesters who seek to show one another that their message is wrong or otherwise unacceptable.[233]   Again, law enforcement must protect the safety of all participants in these events   both protesters and counter-protesters.

The CPD Operational Plan for July 8 appropriately balanced these conflicting rights and ultimately protected the free speech rights of all persons present.  The City fulfilled its constitutional obligation to protect the Klan's exercise of free speech.  Those individuals secured a permit and worked with law enforcement in advance of the event.  They were able to convene in Justice Park and express their views, however unpopular.  Police similarly protected the rights of counter-protesters to confront the Klan and express their disapproval of the permit-holder's speech.  The counter-protesters were within sufficient proximity to the vastly outnumbered Klan and were able to directly confront the permitted speech.  Barricades separated the groups and protected everyone's safety while the confrontational speech occurred.  The City was able to successfully balance free speech and public safety without violating anyone's First Amendment rights.

### c.    No Significant Injuries or Property Damage

There is broad disagreement about the nature and extent of police activity on July 8.  Many people told us that they were extremely troubled by the anti-police rhetoric and aggression directed at police after the Klan event concluded.  These witnesses indicated that officers exhibited extreme patience and professionalism in the midst of an angry, confrontational crowd.  Law enforcement witnesses described their fear of assault during these events.  One longtime officer told us that his disappointment over the extreme negative reaction to his actions in protecting free speech led him to question why he had become a police officer.

Officers did use force to make arrests and disperse the crowd.  We heard strong criticism of these actions, as detailed above.  Some witnesses indicated that the police provoked the aggressive reaction and expressed the view that the event would have ended peacefully if officers had simply stood down after the Klan departed.  Most people complied with police efforts to disperse, even if they disagreed with that direction.

The one point of agreement that we can identify from these interviews is the conclusion that the July 8 event could have been much worse than it turned out to be.  The elements of a mass unrest and civil disturbance were undoubtedly present on July 8.  The fact that the event did not produce serious injury, property damage, or wide scale disorder is a positive outcome.

## 2. What Went Wrong

### a. Law Enforcement Failed to Operate Within a Unified Command

When large-scale protest events occur in small communities like Charlottesville, local officials must depend upon the assistance of other agencies to protect public safety. Many police agencies stepped forward and offered assistance to CPD on July 8. Albemarle County Police Department, the University Police Department and the Virginia State Police all sent personnel to Justice Park to manage this large and difficult event. The assistance of these agencies was instrumental in the overall protection of public safety on July 8.

Unfortunately, the agencies that did send personnel to assist CPD on July 8 were not well integrated. The disconnect between the agencies' respective approaches to the Klan event began well in advance of July 8. There were no joint trainings for all personnel detailing the rules of engagement for this event. VSP and CPD operated under separate operational plans on July 8. While CPD shared their plan with VSP leadership, VSP did not disclose its plan to CPD. The CPD officers and VSP officers who were assigned to work together in particular zones did not meet each other or have any communication prior to July 8. This represents a failure in preparation that undercut operational cohesion and effectiveness during the event.

As the Klan event unfolded, CPD and VSP personnel operated on separate communications channels. CPD zone commanders could not communicate with assigned VSP personnel via radio on July 8. Instead, CPD supervisors had to find their VSP counterparts to request assistance or respond to specific issues. Several CPD lieutenants told us that they were uncomfortable directing officers from another agency, particularly given the lack of introduction, joint training, or other preparation beforehand. CPD officers assigned to several zones told us that VSP personnel did not accompany them to 4th Street, where a crowd had blocked the parking garage in which the Klan vehicles were parked and an unlawful assembly was declared. CPD lieutenants described a situation in which CPD and VSP operated largely independently throughout the course of the day.

### b. Law Enforcement Allowed Media Inside a Law Enforcement Zone

The Code of Virginia guarantees members of the news media unique access to certain restricted areas. Section 15.2-1714 provides that "personnel from information services such as press, radio, television, when gathering news, shall be exempt" from the prohibition of crossing a police line or barricade. This Virginia law requires planners to provide reporters with access to areas close enough to the event to allow them to hear and broadcast the speeches made.

This law was misinterpreted by CPD during the July 8 event, resulting in reporters being present in a zone that should have been reserved for law enforcement. The press was literally caught between conflicting groups as they exchanged angry words and hurled projectiles over the barricades. Had people on either side of the barricades pushed through or surmounted these barricades, the press would have been trapped in the middle of a violent conflict. Moreover, their presence interfered with law enforcement's ability to preserve the separation between the groups. Officers' ability to move freely within the

"buffer zone" was hampered by the presence of reporters and their equipment. While law enforcement was able to enforce the designated separation between groups, the reporters made that task more difficult.

### c. The Operational Plan Created Insufficient Space for Opposing Groups

The CPD Operational Plan failed to adequately ensure the separation of the Klan and counter-protesters during the Klan's entry to and exit from the event. Thankfully, law enforcement disregarded the plan and modified their actions in several specific ways. These spontaneous decisions protected all attendees from potential violence. However, the fact that they were necessary illustrates a significant mistake in the planning and preparation for this event.

There were multiple flaws in the Operational Plan that required real-time modification decisions by law enforcement. Parking the Klan members inside the JDR Court garage, bringing the VSP Field Force onto High Street to clear a path of entry and exit, and dispersing the crowd that gathered at the entrance to the garage after the Klan event were steps made necessary by failures in the Operational Plan to anticipate and prepare for predictable conditions. Poor planning led to several unlawful-assembly declarations, which required aggressive actions by law enforcement to enforce.

It is hard to understate the significance of this mistake, give how markedly the unlawful-assembly declarations and forced dispersal of the crowd changed the tenor of this event. Animosity toward law enforcement informed multiple confrontations and ultimately led to tear gas deployment. Had planners done a better job of ensuring separation through the Klan's exit, the event could have ended when the Klan vehicles departed. While we will never know what would have happened if officers had been able to ensure the Klan's exit without the necessity of dispersal, it seems likely that much of the acrimony and disorder that followed this event would have been avoided.

### d. The Deployment of Tear Gas Was Unauthorized by Command

The most significant manifestation of the lack of a unified command in Justice Park on July 8 was the decision to deploy tear gas. CPD and VSP officers approached this crucial decision with different understandings of the conditions necessary to use chemical dispersants, and who was authorized to make such a decision. The circumstances that led to the use of tear gas demonstrate the risks involved when agencies fail to adequately prepare, communicate, and operate under a clear unified command.

Chief Thomas told us that he gave clear orders that chemical dispersants should not be used without his explicit approval. But the CPD Operational Plan stated that chemical dispersants would be deployed by order of Major Pleasants. VSP's plan indicated that that agency's field force would only disperse tear gas upon order of the VSP commander. This inconsistency shows that there was no unified plan or understanding as to who would authorize the use of tear gas on July 8.

It is difficult for us to assess whether the decision to use tear gas on July 8 was or was not a sound one. We have heard widely divergent views on that decision from people impacted by the tear gas. Both officers and some community members asserted to us a belief that the tear gas was an appropriate response to a dangerous crowd and averted violence. Others strongly disagree with that assessment and believe that the use of tear gas was an overreaction.[234] We cannot reconcile this conflict to the degree of certainty we need to make a firm conclusion. Consequently, we can neither criticize nor justify the tactical decision to deploy tear gas on July 8.

We can, however, conclude that the decision to take a significant action like the use of a chemical dispersant was made outside of a well-defined chain of unified command. Major Pleasants and the VSP Field Force improvised at the time of this decision. They were not coordinated in a clear chain of authority or even aware of who was authorized to deploy the tear gas canisters. This ad hoc decision represents a planning failure. The fundamental concept of unified command was not followed on July 8, which substantially undermined the effectiveness of the law enforcement response to the Klan event.

### e. City Leadership Failed to Respond to Community Criticism

City leaders did not effectively respond to vocal community criticism of the law enforcement actions on July 8. There was little explanation of the specific predicates for police action over the course of the event, but for a self-serving and incorrect press statement by Chief Thomas about the tear gas deployment and the City Manager's brief explanation to City Council. Little information about the broader issues faced by law enforcement during this volatile event was put forth to the community. Similarly, there was no effort to convene a "town hall" or other opportunity for citizens to voice concerns and get answers to important questions.

Chief Thomas told us that CPD did not have sufficient time to do a careful review of the July 8 events because the agency immediately became immersed in planning for August 12. His explanation is unsatisfying. While preparations for August 12 were certainly urgent and time-consuming, it would not have been difficult to task someone with gathering the important facts regarding the Klan rally and providing them to City Council and the public. City leaders should have done as Commonwealth's Attorney Chapman suggested and provided more fulsome information about July 8 soon after that event occurred.

The City's failure to communicate with the public after July 8 stands in stark contrast to its effective, unified communications before the event. The City's consistent messaging before the event helped the community understand and prepare for the KKK rally and make informed decisions about individual responses. Conversely, the relative silence after that event left questions unanswered and created confusion.

The failure to provide information to the public or give people an opportunity to express concerns had direct consequences in the preparations for August 12. More information about the tactics used on July 8 could have helped our community understand how the First Amendment intersects with public safety. Placing the police actions into a broader context would have mitigated some of the concern with their actions. If the City had undertaken a conscientious effort to facilitate understanding of those complex issues, our community

would have been more prepared for August 12. The City should have responded to July 8 with more speech, not less particularly in anticipation of the larger Unite The Right event on the horizon.

## IV. Augurst 12 Unite The Right Rally

### A. Preparation

#### 1. The Permit Application

On May 30, Jason Kessler filed a Special Event Application Request with the City, seeking a permit to hold a demonstration at Emancipation Park on August 12, 2017 an event he dubbed "Unite The Right" on social media. His permit described the event as a "free speech rally in support of the Lee Monument" and estimated that 400 participants would attend. He wrote that the rally would last from 12:00 p.m. until 5:00 p.m. He handed the request to the receptionist and told her he expected City Council would "try to shut this down." He mentioned that he would look into getting event insurance. Kessler did later get event insurance, but it was subsequently cancelled by the insurer. The cancellation apparently did not affect the permit, however, because insurance is required only for "special events," not "demonstrations."

When Charlottesville Special Events Coordinator Michelle Christian received Kessler's application, she immediately forwarded the request to City Manager Jones, Director of Communications Miriam Dickler, and Director of Parks and Recreation Brian Daly. She also escalated the request to the Special Events Committee. All involved understood that Kessler's event would be bigger than the July 8 Ku Klux Klan rally at Justice Park and would attract various disjointed groups from the right and left. As City Manager Jones explained to us, there was unanimity among City officials that Kessler's permit could not be denied based on the anticipated message of his rally. The chief focus of the City became the prevention of violence.

#### 2. Law Enforcement Efforts to Gather Information

Kessler filed his request six days after the City received Amanda Barker's permit application for the July 8 demonstration. Accordingly, the City's efforts to prepare for both events ran parallel. In particular, CPD gathered information on a variety of political activists and affiliated groups to determine whether those persons and how many of them would attend either event. CPD's information-gathering efforts ran through its investigations unit, a group of detectives overseen by Lieutenant Joe Hatter. In turn, Hatter reported to Captain Wendy Lewis.

##### a. Open-Source Review

Each detective in the investigations unit was assigned people and groups to research. Those people and groups included anyone that CPD believed might attend either event, whether in support of or opposition to the events' speakers.[235] Detectives attempted to reach out to individuals if possible, but many groups had no discernable leadership structure. Others showed no contact information on their web sites or had information that was outdated.

Thus, most information came from open sources  news reports, internet postings, social media, etc.  That information was compiled and presented in intelligence reports, which were then submitted to CPD's command staff.  The intelligence reports were completed prior to the July 8 event and were subsequently updated before August 12.  Additionally, the CPD Chief's personal assistant was assigned to monitor web sites and social media accounts throughout the weeks leading up to August 12.

Based on their intelligence gathering efforts, CPD planners expected that the Unite The Right event would attract as many as 1,000 supporters.  And while estimates for the counter-protester side were difficult to obtain, experience on July 8 suggested that the opposition might be as many as 2,000 people.  CPD planners also recognized that the groups associated with the Unite The Right demonstration had violently clashed at various events within the last year, including rallies in Portland, Berkeley, Sacramento, and Anaheim.  Based on that size and recent history, Captain Lewis believed that CPD should expect "similar or greater violent clashes" on August 12.[236]

### b.    Law Enforcement Agencies and Advocacy Groups

CPD officers received some information from outside agencies and groups.  For example, one detective spoke with the police chief in Pikeville, Kentucky and an FBI agent in Louisville to discuss how the Traditionalist Worker Party had behaved during a recent event in Pikeville.  The Kentucky officials advised the detective that the TWP had arrived in town early to perform their own intelligence ahead of the rally.  The FBI agent told the detective that the TWP was not likely to cause problems, though groups that might show up to oppose them could.

CPD also received an "event assessment" from an investigator at the Anti-Defamation League.  The event assessment discussed the Loyal White Knights and several of the groups and speakers associated with the Unite The Right event.  The ADL event assessment also provided insight into the schism between some white supremacist groups and the Oath Keepers, a self-styled neutral peacekeeping militia.  The ADL noted that the publicity surrounding the Unite The Right event "will likely result in an extremely boisterous counter-protest from militant anti-fascist groups."

CPD also received information and threat assessments from the FBI's Richmond field office and the Virginia Fusion Center.  These updates suggested that Unite The Right supporters would bring bats, batons, flag sticks, knives, and firearms to confront their political opponents.  Similarly, it was suggested that left-wing counter-protesters, such as Antifa, would attempt to disrupt the event using soda cans filled with cement and balloons or water bottles filled with paint, urine, or fuel.  The reports also warned that groups on either side might bring pepper spray.

### c.    Human Intelligence

Throughout the planning stages for August 12, detectives and officers attempted to contact individuals associated with the various groups that might attend or protest against the Unite The Right event.  Some efforts were unsuccessful because groups  like Antifa  have no discernable leadership structure or prefer to remain anonymous.

Efforts to contact local Charlottesville residents associated with counter-protester groups were met with extreme resistance. As described above, officers attempted to speak with members of Standing Up for Racial Justice and Black Lives Matter, resulting in demands by a local attorney that such contacts cease. As a result, detectives were instructed not to reach out to anyone affiliated with those groups. Officers told us that they were frustrated that their safety-focused information-gathering actions were construed as harassment against vocal members of the community and by the resulting limitation in their ability to gather important intelligence.

Members of several militia groups contacted CPD, including George Curbelo and Christian Yingling, the commanders of the New York Lightfoot Militia and Pennsylvania Lightfoot Militia, respectively. Captain Mitchell told us that CPD explicitly rejected coordinating with these groups and asked them to "stay away." Likewise, Lieutenant Hatter told us that he instructed one of his detectives to contact Yingling and tell him, "do not come to Charlottesville, we do not need your assistance." From Mitchell's perspective, inviting the militia would simply increase tension with additional firearms at the event.

Detective Braden Kirby and Officer Logan Woodzell recalled communications with Curbelo. Kirby received e-mails and phone calls from Curbelo asking whether CPD would request the militia's assistance, which he described as "peace-making." Kirby told him that CPD did not want assistance, but conceded that the militia had a right to attend. Curbelo said he would send Kirby the militia's plans, but Kirby never received them. Woodzell spoke with Curbelo on August 11, and Curbelo advised him that they planned to arrive in Charlottesville at 7:00 a.m. on Saturday morning. Woodzell told us that he explained to Curbelo that CPD did not want the assistance, but offered to meet up with the group and escort them to Emancipation Park to make sure they avoided any issues.

Jason Kessler was the most informative human source CPD had in advance of August 12. Captain Lewis was Kessler's primary point of contact within CPD, and they exchanged e-mails and met on several occasions between early June and the first week of August. Lewis told us that her goal with these exchanges was to determine how far Kessler was willing to work with law enforcement. And, initially, it seemed he would cooperate. For example, they discussed whether Kessler would be able to set up tents in the event of inclement weather and how he could drop off and load audio equipment. On one occasion in July, Kessler came to the police station with his associate Brian Brathovd to review the CPD security plan.

Kessler delegated many police discussions to associates who he designated as "security" for the event. One such individual was Jack Pierce, who Kessler indicated was affiliated with Richard Spencer. Lewis passed Pierce's contact information to Sergeant Tony Newberry on August 8  four days before the event  to coordinate the arrival of the event speakers at Emancipation Park. Newberry also used their conversations to gather more intelligence.

In addition to Kessler, Brathovd, and Pierce, several other Unite The Right speakers or attendees spoke with CPD officers ahead of the August 12 event. Mike Enoch, an Alt-Right podcast host and event speaker, and Trace Chiles, a former member of the Fraternal Order of Alt-Knights, told us they had brief conversations with officers. Each told CPD that he expected a peaceful rally and hoped the police would protect Alt-Right groups from violent

counter-protesters.  We also learned that officers spoke with Eli Mosley and speaker Johnny Monoxide in advance of the event.

### 3.    Community Preparation

While CPD endeavored to gather information about what to expect on August 12, various groups within the Charlottesville community banded together to prepare for Unite The Right.  We interviewed various stakeholders involved in these groups, including members of the clergy, social activists, business owners, and community members.

#### a.    The Clergy Collective and Congregate Charlottesville

The Clergy Collective formed in the aftermath of the June 2015 Charleston church shooting with the goal to create interfaith and interracial conversations and opportunities for fellowship.  Nominally led by Pastor Alvin Edwards of Mount Zion First African Baptist Church, the Clergy Collective began with fifteen pastors but eventually grew to over ninety people, both clergy and laity.

In advance of the July 8 Klan event, Mayor Signer and City Manager Jones came to a Clergy Collective meeting and asked for the group's help in "telling the story" of the day.  In particular, Signer and Jones hoped to discourage attendance at the Klan event, and thought that the Clergy Collective could help organize and promote alternative programming that would take place simultaneously.  Some within the Clergy Collective were put off by Signer and Jones's message, because many in the group felt called to confront the Klan and the speech they would present.  Any attempt to push that confrontation away felt patronizing.

After the July 8 rally, the division within the Clergy Collective split.  Many of the members who had gone to Justice Park on that day thought CPD had planned to do nothing but "protect white supremacy" and lacked a basis to use tear gas.  The image of police focusing exclusively on protecting the Klan and then acting aggressively toward counter-protesters angered many, and that memory informed preparations for August 12.

Led by Seth Wispelwey and Brittany Caine-Conley, these individuals formed a new group called Congregate Charlottesville.  Wispelwey told us that the Clergy Collective was too close to the City "establishment" and lacked transparency.  He explained that Congregate Charlottesville's goal was to "equip faith leaders to show up on matters of justice."  They put out a call for 1,000 clergy to attend the August 12 event.  In the weeks leading up to August 12, Congregate organized a series of trainings for nonviolent direct action to anyone who was interested in participating.  They brought in trainers from out of town, including Reverend Osagyefo Sekou.  We learned that some trainings were attended by as many as 100 people, and participants were repeatedly warned about the potential for significant violence on August 12.  Members of Black Lives Matter and Standing Up for Racial Justice also attended the trainings.

Individuals who attended these trainings told us that their goal was to create "cognitive dissonance" and to delay and obstruct the hate speech that they expected.  They wanted to be visible in the opposition to the right-wing groups and make it harder for them to have a platform to express racism.  In service of that mission, they were willing to break the law

and expected to be arrested. Although they had been warned about the potential for violence, few expected it.

Reverend Edwards and the Clergy Collective were not part of this nonviolent training effort or otherwise affiliated with Congregate Charlottesville. Wispelwey told us that his group came to view Edwards as "working for the City" given his close coordination with City leaders and law enforcement. Such coordination is unsurprising in light of Reverend Edwards's past roles as School Board member, Mayor, and City Councilor in Charlottesville. In any event, many were frustrated by the lack of success produced by engaging with City leaders. Congregate's formation thus marked a sharp conflict between the "old guard" clergy and a younger, more confrontational generation of faith leaders.

On July 31, Congregate held a press conference to announce that several national leaders would be coming to Charlottesville for the weekend of August 12, including Cornel West and Traci Blackmon. Reverend Edwards was not told about the press conference or invited. According to Wispelwey, "sides were chosen."

The Congregate organizers planned to host an interfaith prayer service on the evening of August 11 at St. Paul's Memorial Episcopal Church. Located on University Avenue, St. Paul's sits just across the street from the University of Virginia, a stone's throw away from the iconic Rotunda and the statue of Thomas Jefferson.

### b.    Local Activist Groups

Local chapters of Black Lives Matter and Standing Up for Racial Justice were tangentially, though not entirely, affiliated with the faith community in the weeks leading up to August 12. Some members of those groups participated in the nonviolent resistance training sponsored by Congregate Charlottesville. The distrust these groups felt towards City leadership created distance ahead of the event.

Lawton Tufts and Anne Coughlin played a role in facilitating communication between members of BLM and SURJ and City officials. Tufts is an employee of the UVA School of Law and a former public defender who serves as a member of the Police Citizen's Advisory Panel. Coughlin is a professor of criminal law at UVA. Tufts attempted to arrange a meeting between Reverend Edwards, BLM, Congregate Charlottesville, and CPD. BLM refused to attend the meeting if Chief Thomas attended, so the City sent Assistant City Manager Mike Murphy.

During the meeting, Murphy shared the City's prediction that the right-wing groups present at Unite The Right would be armed. This alarmed Coughlin, who told us that she thought the City's laissez-faire approach was "crazy and terrifying." Tufts discussed the need for comprehensive community messaging, including sharing CPD's operational plan and using Tufts as an intermediary between CPD and BLM and SURJ. Murphy offered to give Tufts the contact information for Lieutenant Cheryl Sandridge. Tufts told us that his communications with Sandridge on August 12 amounted to a few unanswered text messages about a militia group. Unbeknownst to Tufts, Sandridge was not even stationed downtown on August 12 but was rather at the Emergency Operations Center at Zehmer Hall at UVA.

Tufts shared with us that the messaging he received in advance of August 12 suggested that law enforcement's focus was on restoring order after it broke down, not preserving order before conflict began. He noted that Lieutenant Brian O'Donnell told him before August 12 that CPD would be unable to prevent every act of violence, and that CPD officers would not enter a crowd unless and until the VSP mobile field force dispersed the crowd. Tufts took that to mean that CPD expected serious violence, and members of the community needed to be aware of the serious risk of injury. Tufts conveyed as much to BLM and SURJ, who continued to meet on a weekly basis until August 12. They were unsurprised. The groups resolved to avoid violence at all costs but record law enforcement conduct.

An organization called Solidarity Cville, "a community defense network of Charlottesville activists acting in solidarity with communities of color locally and globally to fight all forms of white supremacy," was also involved in organizing opposition to the Unite The Right rally.[237] With membership that overlaps with BLM, SURJ, and Congregate, Solidarity Cville was described to us as an umbrella group that focuses on social media strategies. Initially, the Solidarity Cville web site contained a list of demands to City Council, including the revocation of Kessler's permit. Then, in the days leading up to the Unite The Right rally, the site hosted links to events and efforts put on by BLM, SURJ, and Congregate.

On August 5, a Solidarity Cville post titled "How to Prepare for August 12 (and action in general)" offered advice and tips for anyone intending to attend Unite The Right as a counter-protester. The post warned attendees to expect to see firearms and lots of law enforcement. The post also advised bringing water and first aid kits. Notably, the post explained that if an attendee ever needed aid, like in the event of tear gas or pepper spray, "simply shout 'medic!' if you are in need."[238]

### c.    Houses of Worship

Separate from the interfaith groups, individual houses of worship located near Emancipation Park made preparations for August 12.

Paul Walker and Marilu Thomas, the Rector and Associate Rector at Christ Episcopal Church located one block west of Emancipation Park were concerned about the safety of their church on August 12. Walker contacted nearby Hill & Wood Funeral Home to inquire how they planned to secure their building on the day of the event. He learned that the funeral home had already reached out to Captain Mitchell and offered law enforcement the use of the Hill & Wood building during the demonstration. Walker called Captain Mitchell and described his concerns about security and property damage. Mitchell replied by asking if CPD could stage sixty state troopers in one of the church's buildings. Walker thought this would provide Christ Episcopal Church extra protection, so he offered up the church parish hall.

Sometime after that conversation, a group of state troopers came to Christ Episcopal Church unannounced. The troopers did not ask for permission to explore the premises but nonetheless roamed throughout the church buildings to evaluate possible uses of the facilities. VSP troopers specifically discussed a plan to stage snipers on top of a church building. This episode concerned staff at Christ Episcopal, as it suggested that police

planned more extensive use of church property than simply "staging" in the parish hall. Christ Episcopal's leaders held an emergency meeting, and they voted to deny law enforcement access to the church. The church later decided to permit EMT vehicles in their parking lot, but the buildings were otherwise shut down on August 12.

Leaders of Congregation Beth Israel located one block east of Emancipation Park likewise expressed concern about their safety on August 12. The synagogue's executive director contacted CPD to ask for an officer to be present that day. The request was passed down the chain of command to Lieutenant Gore, who met with CBI's leadership on July 26. Lieutenant Gore explained that CPD would have a community service officer stationed at a nearby street corner. The officer would not be armed but would have direct radio contact to CPD.[239] Even with the knowledge that an officer would be stationed nearby, CBI hired a private security guard for the synagogue on August 10, 11, and 12, and they consented to allow the guard to carry a firearm. Rabbis also removed the synagogue's sacred scrolls for safekeeping outside of the downtown area.

The leadership of CBI offered the synagogue as a staging area for the police. CPD did not accept the offer. We asked the president of CBI whether they would have considered moving Saturday services to further accommodate police staging. He explained that, although he had no intention of sacrificing his right to practice his religion because of the actions of groups whose messages he abhorred, he would have recommended such an accommodation if there was a compelling public safety interest.

Several United Methodist churches in Charlottesville offered their space and services to support those protesting against the Unite The Right rally. The First United Methodist Church, which overlooks Emancipation Park from the north, supported efforts of both the Clergy Collective and Congregate Charlottesville. The interior of the church was to be open for prayer and pastoral care throughout the day. The church's back parking lot would serve as a staging area for snacks, water, and medical care. In support of the efforts to bring clergy from out of town, other Methodist churches in Charlottesville offered space for sleeping, showering, and parking.

### d.   Downtown Businesses

Throughout the summer, business owners expressed concern to the City and CPD regarding safety and protection of their stores and restaurants. Several downtown merchants told us that the various protest events had cast "a pall on the downtown area," and that, despite excellent weather, business had been very soft throughout the summer. We also learned that the only interaction business owners had with City officials or CPD were the result of their own repeated efforts; there was no reciprocal outreach initiated by the local government.

Without effective communication, rumors easily spread. For example, we learned that one business owner told others that CPD had recommended all businesses close from August 11 through August 13 and board up their windows. When Joan Fenton, chair of the Downtown Business Association of Charlottesville (DBAC), raised the issue with City officials, it became clear that the City and police made no such recommendation. Fenton asked the City to make that clear to business owners, but no statement ever came.

Downtown business owners told us that the lack of information about the City's response to the July 8 Klan rally prompted a request for a meeting with City officials. A meeting took place on July 25 at the Violet Crown theatre, and more than forty business owners attended. Fenton told us that business owners made several simple requests of the City at this meeting: communicate to business owners through the DBAC; implement a reverse 911 system to provide rapid communications to businesses about emergency situations; provide business owners insight into the City's plan for August 12; use barricades to channel access away from the Downtown Mall; and use a web site to communicate updates with City residents. In exchange, business owners offered to provide food, water, and shelter for officers during the event on August 12.

Restaurant owner Mike Rodi arranged a second meeting on July 25 among business owners to discuss what rights they had to deny service, enforce dress codes, and prohibit the possession of weapons on August 12. At this meeting, attendees collected phone numbers to create a group text thread. This ultimately became a Slack chat a group messaging system that allowed for easy and real-time communication among members. The meeting also allowed for the collection of signatures for a letter to the City, which requested the enforcement of certain permitting codes and regulations that might require the cancellation or transfer of the Unite The Right event. As Rodi explained, the letter said "go ahead and enforce your own codes."

Business owners did not get a specific response to the requests made on July 25. Accordingly, they requested a second meeting with City leaders. On August 9, at least a hundred business owners met with City Manager Jones and Chief Thomas. Business owners again voiced their concern about the lack of guidance from City and police officials, including whether businesses should remain open or closed on August 12. Jones attempted to reassure those gathered that the City had an effective safety plan for the Unite The Right rally. Chief Thomas ultimately shared contact information for the officer in charge of the Downtown Mall on August 12, but advised them to call 911 if there was an emergency.

Even as the City attempted to move the event away from Emancipation Park, there was no direct communication to business owners. Without guidance or advice from the City or police, business owners took it upon themselves to organize whether to be open for police relief, limit their hours, or close their doors on August 12. Todd Howard, the owner of Escafe, told us that he decided to board up his restaurant out of fear that it would be a target as a gay establishment. Mike Rodi, owner of the restaurant Rapture, sent word to CPD that he would stock up on bottles of water and have snacks available. Various business owners decided to close or reduce staff needs out of safety concerns for customers and employees.

### e. Neighborhood Associations

The North Downtown Residents Association (NDRA), which includes McGuffey, Emancipation, and Justice Parks, sought information from and attempted to provide information to the City and police. NDRA President Heather Hill told us that the NDRA requested a point of contact within CPD and access to traffic plans so that residents could plan ahead. NDRA also offered to provide assistance in the form of shelter, food and water, and bathrooms. Ms. Hill told us that CPD was too disorganized to accept the offer and they

were uncertain of their specific plans given the late-breaking attempt to move the event to McIntire Park.

Conversations with neighborhood associations could have improved intelligence and reassured the community. We heard from witnesses who hosted Unite The Right demonstrators through Airbnb listings or discovered demonstrators were staying in a rented home nearby. A resident of the Fry's Spring neighborhood told us that he found racist and anti-Semitic literature from the Loyal White Knights of the Ku Klux Klan who planned the July 8 rally, but also attended Unite The Right scattered in plastic bags on his neighbors' yards on the morning of August 12. Later in the day, he convened an informal neighborhood watch group after another resident saw a large white van drop off a group of men carrying Confederate flags and sticks.

### f.    Counter-Protesters in McGuffey and Justice Parks

On July 13, UVA professor Walt Heinecke filed a special events permit request to the City to use Justice and McGuffey Parks on August 12. The request described the event as an effort "to allow citizens of Charlottesville the ability to lawfully assemble and engage in free speech about unity and love and justice." He requested use of the two parks from 8:00 a.m. until 8:00 p.m. and estimated that seventy-five to 100 participants would attend. The hand-drawn diagrams in Heneicke's application showed that both parks would house "medic tents."[240]

Professor Heinecke refused to speak with us, but we were able to glean information about his plans for August 12 from e-mails he sent to media outlets that then were forwarded to various City officials. In his view, police had needlessly declared an unlawful assembly on July 8, and the speed with which officers did so left protesters "no place to go that allowed for lawful assembly." So he sought to reserve space at Justice and McGuffey Parks "to allow assembly for citizens protesting the white supremacist groups that will occupy Emancipation Park." He did so for the sake of "the safety and security of citizens of Charlottesville."[241]

After receiving Heinecke's request, Special Events Coordinator Michelle Christian immediately forwarded the application to the special events committee as well as the command staff at CPD. Captain Wendy Lewis suggested to the other police leadership that CPD recommend the denial of the application. She was concerned that police would need the parks for staging equipment and support response on August 12. Captain Victor Mitchell, the incident commander for CPD's August 12 operations, disagreed. He did not object to the granting of the permit so long as there was no promise of security from CPD.

Christian e-mailed Heinecke on July 31 to inform him his request had been approved as a demonstration. Heinecke responded by asking whether he could meet with her and a representative of the police department to speak about logistical and security concerns. The CPD command staff conferred and responded that there were no available police assets to provide security at either park on August 12. Nevertheless, Heinecke met with Christian and Captain Lewis in advance of August 12, and it became clear that the true focus of the Justice and McGuffey events was to use the parks as staging areas for counter-protesters.

Heinecke discussed the possibility of hiring private security, and Captain Lewis provided him with her contact information in case he needed direct contact with CPD on August 12.

Our review of e-mails suggests that Chief Thomas advised Heinecke to update CPD if he learned of a "credible threat" that might require a shift in law enforcement resources. Late in the evening on August 11, Heinecke sent an e-mail to Chief Thomas with a narrative of the events at the Rotunda. His email concluded, "If this is a sign of things to come, the white supremacists will be violent tomorrow. I want police protection at McGuffey and Justice Parks." Late that evening, Thomas responded to Heinecke that CPD would bring additional officers "to monitor McGuffey and Justice."[242]

Finally, on July 29, Charlottesville resident Don Gathers submitted a special event application request for August 12 for a parade and march. Gathers explained that a group of approximately 200 individuals would march from the Jefferson School located on Commerce Street, about a quarter-mile west of the Downtown Mall to McGuffey Park. The permit sought the closure of the in-between sections of 4th Street NW, Preston Avenue, and High Street from 10:30 a.m. until 11:00 a.m. Although Gathers' permit request was not formally granted by the City, the march from the Jefferson School to McGuffey Park went forward on the morning of August 12.

### g. Unite The Right Preparation

Jason Kessler told us that his organizing principle for Unite The Right "was that anybody could come to the event so long as they were peaceful and willing to respect our speakers." He indicated that the July 8 rally bothered him, because he did not want to be associated with the Klan. Kessler told us that in advance of July 8, he contacted the Barkers and asked them to reconsider their rally, telling them that "if you really care about white people, you can't bring this KKK stuff in." Ultimately, the Klan rejected Kessler's request and came on July 8. Kessler did not attend.

In July, Kessler reached out to speakers and started working on flyers for the August 12 demonstration. The Alt-Right groups who were interested frequently interact and organize through private message boards and anonymous chat applications like Discord. Although Kessler obtained the help of anonymous supporters, he also reached out to Eli Mosley and Brian Brathovd for security help.

Unite The Right speaker Mike Enoch was not involved in the planning for the event, but he noted that, because it was "one of the largest" Alt-Right events ever held, rally planners recognized the need to be organized. They provided guidance on whether and how attendees could be armed and formulated plans for entering and exiting McIntire Park in a convoy. Maps were drawn up and plans were distributed.

One of those planning documents was posted online after August 12, along with an audio recording of a meeting hosted by Eli Mosley to go over planning details in the days prior to the event. During the meeting, Mosley went over the guidance for attendees, which included warnings about "enemies/counter protesters," which they expected would exceed 3,000 people. The planning document circulated among various group leaders also indicated that the organizers had arranged for legal assistance for anyone whose lodging

reservations had been cancelled or got into trouble on August 12. The planning document also advised attendees about the items they could permissibly bring to the park. Firearms were legal, but organizers implored gun owners to be sure they were complying with Virginia law. They advised against bringing knives, tasers, or masks. Shields, flags, and flagpoles could be brought, but attendees should avoid using anything that could be construed as a weapon and shields should only be used "defensively." Helmets were recommended, and pepper spray was allowed but they discouraged its deployment.[243]

With respect to conduct, the planning document advised all attendees to avoid violence "at all costs outside of what is needed to defend our people." The Unite The Right rally was to be "as open as friendly as possible," so attendees were warned to "refrain from being overly edgy for the sake of edginess." In other words, they should remember "that we are trying to gain sympathy from whites and the general right wing." Attendees were asked to "refrain from roman salutes" akin to the Nazi salute and remember cameras would be everywhere on August 12.[244]

Mosley went over the three plans organizers had developed. He described a color-coded system green, yellow, and red for each contingency. If the permit for Emancipation Park stayed in place, then Plan Green called for attendees to arrive as planned for an event to start at noon. If police refused to secure Emancipation Park, then Plan Yellow called for attendees to get to the park early to secure the area and start speeches at 10:00 a.m. Finally, if police refused to secure the area and intended to arrest attendees, then Plan Red called for them to go to the park "to engage in civil disobedience."[245]

As for transportation to the park, the planning document explained that there would be a rally point from which transport vans would take attendees to Emancipation Park. The document suggested that they would attempt to get the vans beyond the traffic barricades, if police would allow it. Barring that, however, the document stated, "we will form all forces at the Line of Departure and march into the park together, using the shield wall to keep hostile forces away from our civilians and HVT's [high-value targets]."[246]

The document also advised attendees of two other events that would be held in Charlottesville. On Friday night, attendees were invited to participate in a torch-lit rally at the "Jefferson Monument" on UVA's campus. Then, on Saturday night, the organizers would host an after party. Party-goers were required to send money through PayPal to buy a ticket.[247]

## h. City Council Preparation

### 1) Community Response

The City did not officially sponsor any alternative events to divert attention away from the August 12 Unite The Right event. Instead, City leadership encouraged local groups and organizations to hold their own programs. We heard from members of the Charlottesville Clergy Collective that City leaders encouraged the faith community to "take the lead in a community-wide response." Mayor Signer reached out to UVA professor and Vice-Provost for Academic Outreach Louis Nelson in mid-July to encourage UVA to develop alternative programming for City residents. Nelson jumped into action and ultimately developed a

schedule of forty-five programs put on by various faculty members, which would begin at 11:00 a.m. on August 12. Mayor Signer encouraged local leaders and community stakeholders to participate in these events.[248]

Mayor Signer told us that, in the weeks leading up to the event, he consulted with mayors of other major cities about how to manage racially charged events. He was advised of the need to separate groups and try to conduct the events in large, open areas. Mayor Signer also tried to coordinate efforts to bring a national figure to Charlottesville before the rally to "calm nerves." Names like John Lewis, Jesse Jackson and Michelle Obama were suggested, but the event never occurred.

Despite the behind-the-scenes coordination with UVA and some other cities, there was no comprehensive effort on the part of the City to communicate with residents about what to expect on August 12. Signer told us that City staff promised Council that a town hall meeting would be held, at which Jones, Chief Thomas, Miriam Dickler, and Craig Brown would discuss the City's plan, give background on the use of riot gear, and explain why the City could not cancel the rally. Fire Chief Andrew Baxter and Office of Human Rights manager Charlene Green were also expected to speak. The event never happened because, in Signer's words, employees "ran out of bandwidth" and "were all crazed."

Similarly, daily press briefings that had been promised by Jones and Dickler never occurred. Instead, the City held a press conference on August 7 to explain the decision to grant the permit for McIntire Park. Two days later, Miriam Dickler released a series of bullet points advising the public that CPD was planning for both McIntire and Emancipation Parks and asking residents to assemble peaceably. The traffic plan for the downtown area was finally released to the public on August 11.

The City hired the Powell Tate public relations firm to provide expert guidance on how to communicate in a crisis. Mayor Signer indicated that the Powell Tate team was prepared to provide "messaging" advice to the City and work with Communications Director Miriam Dickler to provide information about the Unite The Right rally to the public. They did not ultimately perform this service. The Powell Tate team was not present in the command center on August 12 and instead remained with Mayor Signer throughout the day.

## 2)  Efforts to Move Unite The Right

In early July, City Attorney Craig Brown and his deputy Lisa Robertson advised the City Manager and City Council of the legal difficulty if not impossibility of cancelling Kessler's permit. Although there were murmurings of the potential for violence on August 12, state and local law enforcement explained that most of that "noise" arose from groups which planned to come in opposition to the Unite The Right protesters. Those threats were viewed by the City's lawyers as a potential "heckler's veto," which meant that they did not provide a valid basis for any decision to cancel the permit without violating the First Amendment.[249]



**Map of Charlottesville showing McIntire, McGuffey, Emancipation, and Justice Parks**

In the face of this clear authority, the City   with Mayor Signer acting as the driving force   shifted focus to whether it could force the rally to move out of downtown to McIntire Park.[250]   Located a little more than a mile north of the Downtown Mall, McIntire Park offered dozens of acres of open, green space that could easily contain the thousands of people anticipated on August 12.  Signer told us that members of City Council were uniform in their interest in exploring the idea, a consensus reached through behind-the-scenes discussions in numbers small enough to avoid public-meeting requirements.

On July 31, Mayor Signer called for a closed session of City Council to take place on August 2, at which time Council could receive legal advice on the issue.[251]  In anticipation that a decision to move the event would instigate litigation by Kessler   and, in part, due to Signer's concern that the City Attorney's approach to this issue was "conservative"   Signer suggested the City hire outside counsel.[252]  City staff agreed and hired the firm of Boies

Schiller Flexner LLP (BSF) to help evaluate the potential legality of moving the event.[253] During the closed session on August 2, Council received legal advice from the City Attorney, lawyers from BSF, and an attorney from the Thomas Jefferson Center for the Protection of Free Expression. The consensus of this advice was that a decision to move the permit away from Emancipation Park would require evidence of a "specific, credible threat" to public safety posed by rally organizers. Council was told that generalized threats of violence, promises to use violence in self-defense, and information that counter-protesters planned to use violence to quell a permit holder's speech were insufficient bases to move the event from Emancipation Park.

In addition to legal advice, City Council received intelligence information about the event and solicited the views of law enforcement about a proposed move to McIntire Park. Two troopers from the Virginia State Police provided Council with a briefing about expected attendance and the potential for violence at the Unite The Right event. Council also heard from Chief Thomas, who expressed reluctance to move the location so close to the scheduled event. Chief Thomas acknowledged that the proposed relocation of the event might be "marginally better" to solve some safety concerns. He indicated, however, that CPD had been working on the Unite The Right Operational Plan for six weeks and worried that a sudden change would pose logistical problems. He told Council it would be extremely difficult to manage the event on two fronts, which would become necessary regardless of the outcome of any legal battle. Council asked the law enforcement officers about imminent danger, but received no information suggesting a "specific, credible threat" of violence. Chief Thomas told us that the information presented to Council did not, in his view, meet the threshold that would justify moving the event to McIntire Park.

Despite the legal and operational concerns of City staff, Council indicated a strong preference for moving the Unite The Right event to McIntire Park. During the closed meeting, Councilors made clear by a 4-1 margin that they wanted the event moved to McIntire.[254] While the decision about the granting, revocation, or amendment to the permit was technically in the hands of City Manager Jones, members of City Council made clear their expectation that Jones would move the event to McIntire Park.

City Manager Jones recalled that after the closed session of City Council, he asked for twenty-four hours to make a decision about moving the August 12 event. He wanted to ensure that Charlottesville High School would allow parking; otherwise there would be no way to separate the groups at McIntire Park. Chief Thomas told us that he was concerned that continued opposition to the move would result in City Council firing the City Manager. Accordingly, Chief Thomas told us that he suggested to Jones that he should go ahead and support the move despite their joint opposition. After considering the various pros and cons, Jones called Councilors on August 3 and individually and told them he would support the move to McIntire Park.

Preparations to move the event to McIntire Park proceeded immediately. On August 4, the City hired BSF to provide legal advice and agreed to pay the firm a flat rate of $30,000.[255] Over the weekend of August 4-6, Signer corresponded with BSF regarding the appropriate basis and analysis for requiring the move to McIntire, which focused on logistical concerns based on the high numbers of attendees rather than concerns over threats of violence. BSF

produced a memorandum of legal analysis and a draft letter to send to Kessler when the decision was finalized. That information was shared with the rest of City Council in the evening on Sunday, August 6. Signer also shared his intent to hold a press conference the following day to discuss the City's decision to move the event to McIntire Park.[256]

On Monday, August 7, Michelle Christian who had been receiving e-mails from Kessler asking whether his permit had been approved invited Kessler to an 11:00 a.m. meeting at the Parks and Recreation office. When Kessler arrived, he was greeted not only by Christian, but also City Manager Jones and Captain Wendy Lewis. During the hour-long meeting, Jones inquired as to the anticipated size of the event, noting media estimates that the event could attract thousands of people far more than the 400 listed on Kessler's permit. Kessler resisted that estimate, stating that his numbers were closer to the estimated size and, in any event, he could not be responsible for how many participants decided to come. Kessler also voiced his concern that the City had granted permits for simultaneous events at Justice and McGuffey Parks. Ultimately, Jones explained that the City would be granting Kessler's permit for August 12, but only for an event to be held at McIntire Park. Kessler responded by stating he and the other Unite The Right organizers would be going to Emancipation Park regardless of the permit decision. He also promised that he would challenge the City's decision in federal court.[257]

Later that afternoon, Jones sent Kessler a letter that explained the City's decision to allow the event only at McIntire Park. The letter explained that, despite Kessler's statement that the event would have 400 participants, "it has come to the City's attention that many thousands of individuals are likely to attend the demonstration." Given the small space provided by Emancipation Park, the City reasoned that "law enforcement, fire and emergency medical services personnel cannot adequately protect people and property in and around Emancipation Park."[258] Shortly after sending the letter, the City held a press conference to explain the decision to the public.[259]

On Tuesday, August 8, Kessler went to the police station, where he met with Chief Thomas, Captain Mitchell, and Captain Lewis. At that ten-minute meeting, which Lewis recorded, Chief Thomas reiterated the department's goal to hold a peaceful and safe rally that respects everyone's rights, and explained that CPD believed that an event at McIntire would be much safer. Kessler was adamant that the event would go on in Emancipation Park, permit or not. He wanted to know whether the police would still stick to the earlier security plan that he had seen. Thomas conveyed that the police would plan for either contingency.

### 3) The ACLU Litigation

Represented by a team of lawyers including the American Civil Liberties Foundation of Virginia and the Rutherford Institute, Kessler sued the City on August 10. The lawsuit asked the federal court to enjoin the cancellation of Kessler's permit and order the City to allow the demonstration to go on in Emancipation Park.[260]

To prepare the City's response to the lawsuit, City Attorney Craig Brown asked Chief Thomas to prepare an affidavit. Thomas's affidavit included information gathered by CPD indicating that thousands of participants were likely to attend in support of Unite The Right.

The affidavit related the logistical and safety concerns related to managing such large numbers in a confined downtown area and suggested that moving the event to McIntire Park would address those concerns.[261]

Captain Mitchell told us that the command staff "knew it [the rally] was going to happen in Emancipation Park no matter what." Other officers conveyed to us that members of the command staff including Chief Thomas and Captain Mitchell expressed hope that the City would lose the lawsuit. Chief Thomas admitted saying to other officers that he "hoped Kessler would win" the lawsuit. He believed that allowing the event to go forward at Emancipation Park would give CPD greater ability to "maintain control" of the event. That position was made clear to Captain Lewis when she suggested that Chief Thomas include actionable intelligence CPD possessed about the violent intentions of Unite The Right attendees. According to Captain Lewis, Thomas responded he did not want his affidavit to "look too good." Chief Thomas denied to us that he left information out of the affidavit. He attributed any omissions from his affidavit to lawyers working with the City.

On Friday, August 11, the court held a hearing on Kessler's motion for a preliminary injunction. That evening, in a six-page opinion, the court granted the motion and enjoined the revocation of the permit for Unite The Right rally at Emancipation Park.

### 4)     Discussions with State Officials

State officials were concerned about the City's preparations for the Unite The Right rally. Documents we received pursuant to a FOIA request show that on August 1, Secretary of Public Safety Brian Moran recommended that the Governor call Mayor Signer to discuss preparations for the August 12 event. Secretary Moran sent the Governor a memorandum outlining talking points for the call. First, Moran suggested that the Governor ask the City to modify the event permit to prohibit any firearms or weapons within a "10 block vehicular restriction area." He noted that the change "could draw attention from pro-second amendment groups, so discussion is needed." Curiously, the memorandum reflects a misunderstanding of Virginia law, which unambiguously prohibits Charlottesville from restricting the open carrying of firearms at this or any other event. Secretary Moran also recommended that the Governor encourage the City to designate parking areas, bus protesters in and out of the area, reduce the length of the rally, prohibit items that could be used as weapons, and require the event's organizers to meet with law enforcement before the event. The memorandum did not offer insight into the logistics that would be required to take those steps.

Second, Moran also proposed coordinated messaging between the Governor and City to convey support of both law enforcement and First Amendment rights. The talking points emphasized that violence should not be tolerated and the failure to obey the law would result in immediate arrest. Further, Moran suggested that the City deny any additional permits for demonstrations on August 12 apparently unaware that "demonstrations" do not necessarily require a permit under Charlottesville's operating procedures. Finally, Moran asked the Governor to stress to elected officials and City staff "the necessity of meeting with Law Enforcement leadership for situational briefing to understand the potential dynamics of multiple protests in one area."[262]

Signer told us that the Governor called him personally on August 2 to convey that his office had significant fears about the violent tenor of the event. The Governor further explained that VSP had a "list of demands" for CPD to adopt before coming to assist on August 12. Signer told us he never received that list, but recalled the Governor listing a few examples, such as searching backpacks and prohibiting weapons. Signer was adamant that the Governor did not mention the potential use of a vehicle as a weapon. Signer shared with us that Vice Mayor Wes Bellamy also had separate conversations with the Governor and Secretary of Public Safety Brian Moran, but those conversations "never went anywhere."

### 4. Law Enforcement Preparation

#### a. Community Outreach

Within CPD, community outreach took a backseat to tactical planning. But that did not stop some officers from offering up suggestions that might have assured citizens in advance of August 12. For example, Captain Lewis suggested that CPD issue regular updates to the community about their planning efforts. She also thought that the community should be informed of the predicate for police to be dressed in riot gear, which might allay concerns raised about the "militarization" of the police force after July 8.

Lewis also devised a novel approach to "change the narrative" surrounding the event. She proposed sending a letter to every group likely to attend the Unite The Right demonstration, asking the groups to commit to nonviolence. The letter would simultaneously be released to the media. The draft letter circulated by Lewis suggested all parties could agree that free speech rights deserved protection and asked everyone to reflect on their shared civil and constitutional values. The letter requested that each group sign a written commitment to nonviolence and return it to Chief Thomas. In recognition that some groups may intend to practice civil disobedience, the letter did not ask attendees to foreswear violating the law, but instead simply asked that any disobedience be taken on with nonviolent means.[263]

All of Lewis's suggestions were rejected. Chief Thomas never took her letter idea seriously, and he privately derided her public communications proposal as "Wendy's propaganda campaign." Similarly, we learned that Chief Thomas skipped a meeting with a representative of the Rutherford Institute that was focused on nonviolent de-escalation by law enforcement and sent Captain Mitchell in his place. It is unclear whether the details of that meeting were communicated to the rest of the CPD leadership or whether they affected Mitchell's planning for August 12.

#### b. Training

Efforts to train police officers ahead of August 12 were meager if not nonexistent. We learned that the primary method of conveying information to officers was through roll call training, which involved brief discussions of written policies. Lieutenant Mooney told us that these verbal briefings on case law and code sections would have meant little to officers relatively new to the department.

There was no field training of any kind in advance of August 12. Officers did not try on riot gear, including new ballistic helmets that had been purchased specifically for the August 12

event. As a result, many officers likely did not put on their gear or helmets until ordered to do so on the day of the event. CPD officers did not engage in any joint training exercises with their counterparts in the state police or their local partners in Albemarle County.

In the week leading up to the Unite The Right rally, CPD leadership ordered every officer to attend three hour-long training sessions focused on "stress, trauma, and resiliency." The goal of the training was "to help understand the human responses to the situations that the Department has recently been facing." The sessions were led by Dr. Jeff Fracher, a local psychologist. Lieutenant Mooney, who supervises the evening shift and served as a zone commander on August 12, believed that these "three breathing trainings" got in the way of time he could have used to prepare his officers, and he made that concern clear to his supervisors.

On the afternoon of August 8  four days before the event  Lieutenant Cheryl Sandridge sent an e-mail to all CPD officers titled "information to review." The e-mail asked officers to "take a few minutes to read this information before the weekend," noting that it was compiled in one e-mail "for easy access." Attached to the e-mail were four files: (1) CPD's General Order regarding constitutional procedures  policies for compliance with the First, Second, Fourth, Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution; (2) CPD's General Order regarding the use of force; (3) CPD's General Order regarding civil disturbance and unrest mobilization plans; and (4) a PowerPoint slide deck reviewing the role of peace officers under the First Amendment. In sum, the four files numbered more than seventy-five pages of written materials. The e-mail did not make review of these documents mandatory.[264]

Captain Mitchell candidly admitted to us that, prior to August 12, he did not check to make sure CPD officers received sufficient training. Instead, he intended for zone commanders to convey to the CPD and VSP officers in each zone the expectations and procedures for arrests prior to the start of the event. Of course, that presumed that CPD zone commanders would be able to meet with all the state troopers in their zones on Saturday morning, given that there was no all-hands meeting with every law enforcement officer participating. When VSP arrived at the park late, that opportunity disappeared.

### c.   Consultation with Outside Agencies

Starting in July, CPD held weekly planning meetings to prepare for the August 12 event. Those meetings were attended by officials from a broad spectrum of agencies, including VSP, CFD, the Charlottesville-Albemarle Rescue Squad, the Emergency Communications Center, the Albemarle County Police Department, and the National Guard. Throughout this process, however, VSP remained CPD's primary partner in planning for the event.

### 1)   Virginia State Police

The Virginia State Police offered their expertise to CPD for August 12 preparation. Chief Thomas ordered Captain Mitchell to coordinate with VSP Captain Craig Worsham in formulating the Operational Plan for the event. Worsham and other VSP supervisors attended planning meetings in Charlottesville in the weeks leading up to August 12, and Chief Thomas traveled to Richmond a few times to meet with VSP leadership. Mitchell

said that he and Captain Worsham worked well together. He indicated that VSP provided an increasing amount of resources as the event drew near, including additional staffing for the Downtown Mall and the installation of surveillance cameras in and around Emancipation Park.

As the CPD Operational Plan evolved in advance of August 12, Captain Mitchell regularly provided copies to his VSP counterparts. He told us that Captain Worsham and others offered some suggestions, such as checking backpacks and barring flagpoles, but overall deemed the plan "fine as written." Captain Lewis, who also attended these meetings, conveyed that VSP's role was conceptual rather than "down in the weeds." She recalled that on at least one occasion, VSP officers shared their experiences with protest events and noted the importance of making arrests early to "set the tone." She also told us that, during a meeting, VSP had to be corrected about the procedures for arrests during the event. VSP had been under the impression that troopers could make arrests and then simply take the arrestees to a Bureau of Criminal Investigation area. Charlottesville officials corrected them by explaining that any arresting officer would be required to accompany the arrestee to the City's processing area and appear in front of a magistrate.

We discovered that, in addition to participating in CPD's planning efforts, VSP had written its own detailed plan for VSP resources on August 12. No one in CPD was aware of that plan, and the plan was never shared with anyone at CPD. In fact, CPD learned of the VSP plan only after copies were accidentally left behind in a staging area after August 12. Captain Mitchell told us he was bothered by VSP's decision not to share their plan with CPD, as he would have reviewed it to ensure there were no conflicts between the City's and State's efforts.

Beyond these interactions among high-ranking officers in the two agencies, there was little meaningful coordination regarding training for officers in advance of August 12. VSP held three training sessions for commanders and officers, to which CPD officials were invited. None attended, citing schedule constraints. VSP also invited CPD officers to participate in the state's mobile field force training, but CPD likewise declined that offer given the need to have officers work their regular shifts. Captain Mitchell also told us that CPD had its own mobile field force training over the summer, though such training was in a classroom rather than in an open field. Lieutenant Gore received training in how to lead a mobile field force in advance of August 12, as Major Pleasants was scheduled to be on vacation. As a result, August 12 was to be Lieutenant Gore's first experience leading officers in a mobile field force   most of whom had never themselves participated in one.

## 2)   Agencies Outside Virginia

Given the recent rise in events like Unite The Right, several officers recognized the value of conferring with departments in cities or towns where such rallies had occurred previously   including Berkeley, California; Portland, Oregon; and Pikeville, Kentucky. The investigations unit made contacts with Pikeville, Kentucky officials to discuss how law enforcement managed an Alt-Right event on May 1, 2017. Those contacts suggested that the Alt-Right groups were generally cooperative with law enforcement, but also that the opposing groups needed to be physically separated.

Based on this intelligence, Lieutenant Joe Hatter, the supervisor of the investigations unit, suggested the department purchase a wrought-iron fence to control entry to Emancipation Park and that officers on horseback be used for crowd control. Multiple officers involved in the investigations unit told us that they implored the command staff that large-scale violence should be expected and that people would be traveling to Charlottesville "to fight, to disrupt, and even to throw urine and feces." Detective Newberry told us that, with the number of unprotected alleys in the downtown area, he wondered "how many murders are we going to be investigating?"

In addition to the Kentucky intelligence, CPD received valuable information from law enforcement in Portland, Oregon although it is notable that the conversation took place because VSP, not CPD, reached out and asked for it. Nevertheless, Captain Lewis spoke with a detective from Portland who had recently worked an event involving Antifa and the Alt-Right. He emphasized the importance of keeping protesters and counter-protesters separated and recommended the use of barricades as "force multipliers." He also warned Lewis that members of the Alt-Right often attempt to ingratiate themselves with law enforcement. Unfortunately, the information received from other jurisdictions did not impact CPD's Operational Plan for the Unite The Right rally. Captain Mitchell candidly admitted that the input from outside jurisdictions was not a factor in planning for August 12.

Planners similarly disregarded internal concerns about the potential for violence. Captain Lewis told us that when she shared the concerns of investigators she supervised, the command staff was dismissive of a "worst case scenario" that they deemed unlikely to happen. Lieutenant Hatter suggested to us that CPD leadership was approaching August 12 like a "concert" event, not like the potentially violent confrontation about which they had been warned. He told us that when he offered suggestions regarding plans for August 12 to Captain Mitchell, "it was like talking to a brick wall." When we asked Captain Mitchell about whether he had ever planned for an event like Unite The Right, he pointed to his role organizing police for the annual Wertland Street Block Party, a social event informally organized by UVA students. Captain Shifflett likened preparations for summer protest events to CPD's planning for visits from President Obama, Bill and Hillary Clinton, and the Dalai Lama.

Other agencies were available to CPD, but officers declined to make the connections. CFD Chief Andrew Baxter met officials in Charlotte, North Carolina, who had experience handling civil disturbances in the wake of an officer-involved shooting of an unarmed African-American man. Those officials were interested in sharing their experiences from those protest events with Charlottesville officials. Chief Baxter offered to connect Chief Thomas to his counterpart in Charlotte, but Chief Thomas responded that he did not have time. As a result, no one from CPD spoke with officers from Charlotte. We also learned that a New York City Police Department detective contacted CPD in the weeks before the rally to convey intelligence that members of Black Lives Matter New York planned to travel to Charlottesville on August 12.

## 5.    CPD Operational Plan

CPD's primary (if not exclusive) focus in advance of August 12 was the design of its operational plan for the Unite The Right rally. Those efforts were headed by Captain Victor Mitchell, who Chief Thomas tapped to be incident commander soon after the permit was filed. Mitchell had been present in the command center on July 8, and he had the willing input from all officers within the department. Nevertheless, our review suggests that the key planning for August 12 remained confined to the command staff: Chief Thomas, Captain Mitchell, Captain Shifflett, and Captain Lewis.

When we asked who was responsible for final decisions in CPD's operational plan, the command staff equivocated; some stated that decisions were reached as a matter of consensus, while others indicated that there were sharp disagreements about overall strategy and tactics. The resolution of such disagreements presumably would have been left to Chief Thomas, but our interview with Chief Thomas suggested that he deferred entirely to his captains when it came to tactical decisions for August 12.

After July 8, zone commanders had been asked to provide feedback to the command staff, purportedly to influence the planning for August 12. Commanders offered many constructive criticisms, including the sufficiency of staffing within the zones and the need for officers to be wearing their riot gear, or alternatively have it at the ready in their zones if and when events required its use. The latter suggestion was dismissed by command staff, who were of the opinion that starting the day in riot gear would send a message to the public that police expected and intended to engage in fighting. CPD leadership also rejected the suggestion to have the gear with each officer, opting instead to have all riot gear stored in a trailer on Jefferson Street, behind Emancipation Park. When Lieutenant Jim Mooney asked Captain Mitchell why particular feedback was not being incorporated into the August 12 plans, Mitchell responded, "Every time we ask, the plan changes."

### a.    Traffic and Street Closures

Given the anticipated crowds for August 12, CPD recognized the need to close streets and redirect vehicle traffic in the downtown area. Captain Mitchell worked with Captain Lewis, Lieutenant Steve Knick, and Traffic Lieutenant Tito Durrette to implement an appropriate traffic plan. Lieutenant Knick told us that he had initially recommended CPD shut down all traffic in the downtown area between Water Street and High Street, but that idea was rejected by Captain Mitchell based on the perceived lack of manpower to maintain such a large perimeter.

Lieutenant Durrette was initially assigned responsibility for the design and supervision of the traffic plan for August 12. He outlined the preliminary plan for traffic, which was reviewed and revised by Captain Lewis and Lieutenant Knick. The preliminary traffic plan did not close off the 4th Street southbound crossover of the downtown pedestrian mall. This alarmed both Captain Lewis and Lieutenant Knick, who insisted that the Downtown Mall be shut off to any vehicle traffic. After discussing the issue with Lieutenant Durrette, the decision was made to block all southbound traffic at the intersection of Market Street and 4th Street NE.

In early August, Mitchell, Lewis, Knick, and Durrette (and possibly Captain Shifflett) met with Paul Oberdorfer, the City's Director of Public Works. During the meeting, Oberdorfer agreed to provide logistical support for the set-up of traffic barriers. He also suggested that CPD use water-filled jersey barriers along 4th Street. Captain Mitchell resisted that suggestion, noting the need for emergency services to enter the downtown area. Oberdorfer responded that a fire truck or ambulance could easily push through the plastic, water-filled barriers. Oberdorfer also pitched the idea of using dump trucks or school buses to block roads at the event. He noted that the Public Works Department had fifteen dump trucks. Oberdorfer told us that no one rejected the idea, but it "did not get any real response." At the conclusion of the meeting, both Knick and Lewis were under the impression that jersey barriers would be used in the final plan. But Mitchell told us he understood the discussion of jersey barriers to relate only to blocking vehicles from turning onto the pedestrian mall itself, and that issue was mooted by the decision to block 4th Street NE at Market Street.

The final traffic plan ultimately called for a combination of manned and unmanned barriers that would block off vehicle traffic around Emancipation Park. To the west of the park, Market Street would be blocked at its intersection with High Street by three officers and a squad car, who would divert any downtown traffic up High Street. Then, on High Street, individual officers with squad cars would block southbound traffic toward Emancipation Park at 2nd Street NW, 2nd Street NE, and 3rd Street NE; southbound traffic at 1st Street would be blocked by a traffic barrier. Southbound traffic would be open on 4th Street NE until Market Street, and officers with squad cars would prevent any westbound traffic back towards Emancipation Park on Jefferson and Market Streets. The plan called for a traffic barrier to block entry to the Downtown Mall crossover at 4th Street NE and Market Street, and an officer in a squad car to block northbound Mall crossover at 2nd Street NW and Water Street. Finally, traffic barriers would be set up to secure a law enforcement zone along Jefferson Street behind Emancipation Park.

Captain Mitchell told us that police personnel were not staged at every altered intersection due to a perceived lack of resources. Moreover, many of the manned traffic posts were occupied by unsworn personnel like forensic technicians, animal control officers, and school resource officers. Captain Lewis told us that she suggested Mitchell use state troopers for traffic positions, but Mitchell responded that he would not take "VSP away from the action" given the volume of resources they were committing to the City.

Oberdorfer did not receive the final traffic plan until the morning of August 11. That late notice required Public Works to immediately get to work posting No Parking signs and coordinating logistical support. It also meant the City's traffic engineer could not review and approve the plan. The plan did not reference any jersey barriers, so Oberdorfer arranged for traditional wooden traffic barriers to be used.



**Traffic Plan Map for August 12. Blue lines denote staffed barriers; red lines denote unmanned barriers.**

Public Works employees put up the barriers at 6:30 a.m. on August 12. Oberdorfer and his team of ten Public Works employees then staged in the parking lot of the Levy Opera House alongside Lieutenant Knick's logistical team. The Public Works team ultimately left that position around 9:45 a.m. when the area was deemed "too volatile." They fell back to the Public Works building, where they barricaded the building's gates with dump trucks filled with sand.

As mentioned earlier, the intersection of 4th Street NE and Market Street had two impediments to traffic: a traffic barrier blocking any southward movement on 4th Street NE and an officer and squad car blocking any westward movement on Market Street. The traffic plan called for Officer Jeff Sandridge to man that post.

Late in the week, two developments changed that plan. First, the Incident Management Team advised Captain Lewis that Lieutenant Tito Durrette had too many roles for August 12. Second, Captain Shifflett found out that Officer Tammy Shiflett, a school resource officer, was available to work after having spent most of June and July recovering from elbow surgery. So on August 11, Lewis replaced Sandridge with Tammy Shiflett, which freed up Sandridge to take over Durrette's role as a roving traffic supervisor. Officer Shiflett was told about her assignment at Market Street and 4th Street NE, but she did not receive any instruction other than that she would be "doing traffic." She understood that her role was to prevent "anything coming down East Market Street" to Emancipation Park.

Video footage shot around 10:30 a.m. on August 12 shows Officer Shiflett standing at her post next to her squad car in Market Street as scores of Unite The Right attendees streamed past her towards Emancipation Park. The video also shows that the southbound route on 4th Street SE was obstructed by a single wooden sawhorse that spanned only the middle third of the road.



*Witness video shows Officer Shiflett at Market Street and 4th Street NE around 10:30 a.m. Her police vehicle is pictured blocking westbound traffic on Market Street, and a single sawhorse blocks southbound traffic from accessing the Downtown Mall via 4th Street. (Video provided by Tom Hubbard).*

### b. Placement of Officers Around Emancipation Park

CPD's plans for stationing law enforcement officers on August 12 focused almost exclusively on Emancipation Park and the Downtown Mall. There was little to no consideration given to whether officers should be stationed between traffic barricades and Emancipation Park. Mitchell also assigned thirty-plus officers to patrol the Downtown Mall and a handful more to go back and forth between McGuffey and Justice Parks, as well as a small contingent to McIntire Park. But, as one officer told us, "everything was focused on the [Emancipation] Park."

At one point during the planning process, command staff considered blocking off all of the park for Unite The Right group. As Captain Mitchell explained to us, however, that plan would give no designated space to counter-protesters, who would then likely fill the streets surrounding the park. Captain Mitchell feared that would require police to unnecessarily expand their footprint in the downtown area. Accordingly, the only designs seriously considered by CPD included designated areas within Emancipation Park for both Unite The Right demonstrators and the expected counter-protesters.

CPD Planners considered many configurations and Operational Plans in the weeks prior to August 12. Early versions of the plan assigned officers to areas inside and outside of Emancipation Park and along likely routes of ingress and egress. In one version, planners considered assigning as many as thirty officers to Market Street south of Emancipation Park

and twenty officers along 1st and 2nd Streets north of the park. When asked why this plan was abandoned, no one on the CPD command staff could provide a specific answer. Chief Thomas told us that he did not know why this plan had changed, and he suggested we ask Captain Mitchell.



**In one early plan, designed July 20 by Captain Lewis, sixty officers would be stationed within one block of the park, with no barricades separating groups. The design also called for staging riot gear in buses in 1st and 2nd Streets.**

Subsequent versions of the plan had fewer and fewer officers assigned to areas outside of Emancipation Park. On July 25, Captain Mitchell circulated a design to VSP that assigned all officers to four zones: one south of the park along Market Street and three inside the park. The park zones consisted of the northern area beyond the Lee statue, the southwest quadrant, and the southeast quadrant. The northern zone would be a public safety area where officers would stage their riot gear. The southern quadrants would be the designated areas for Unite The Right attendees (southeast) and counter-protesters (southwest). Mitchell labeled these areas Zone 1 (southeast quadrant), Zone 2 (southwest quadrant), Zone 3 (Market Street), and Zone 4 (northern area). The design also designated an area for the Unite The Right speakers in front of the Lee statue. Mitchell sent this plan to his VSP counterparts more than two weeks before the event, on July 25.[265]



**CPD's four-zone plan as circulated on August 4. The zone labels indicate officers would be stationed inside the protest areas and along Market Street.**

Five days later, on July 30, Mitchell sent VSP an updated plan that shifted the law enforcement footprint into five zones. The five-zone plan no longer called for officers to be inside the Unite The Right or public quadrants in Emancipation Park. Instead, officers would be assigned to areas outside of the quadrants  1st and 2nd Streets  as well as a narrow gauntlet between them created by two rows of metal barriers. Thus, rather than having officers stationed inside areas where Unite The Right demonstrators and counter-protesters would be present, police were assigned to separate law-enforcement-only areas: Zone 1 (2nd Street NE); Zone 2 (area between demonstrators and counter-protesters); and Zone 3 (1st Street). The law enforcement area in the north remained Zone 4 and the Market Street area became Zone 5.[266]



CPD's five-zone plan as circulated on August 7. The zone labels indicate that officers would be stationed between protest areas rather than inside of them. The Unite The Right and Public Area were later swapped on August 11 when CPD learned Unite The Right demonstrators would be arriving from the west.

When Mitchell sent another updated version of the plan to his VSP counterparts on August 4 — the primary revision appearing to be the addition of the McIntire Park contingency plan — the Emancipation Park layout had shifted back to the original four-zone design.[267] This may have been a mistake, because three days later, on August 7, Mitchell sent yet another revision — this time achieving the plan that would remain substantively in place on August 12 — that reverted to the five-zone layout.[268] The five-zone design was circulated to other agencies in the days leading up to the event and was shared internally among the supervisors and zone commanders on August 9. Each zone would be manned by one squad of CPD officers and three squads of VSP troopers; with eight officers per squad, every zone would be staffed by at least thirty-two officers.[269]

Despite Mitchell's circulation of the substantively finalized five-zone plan to VSP on August 7, various VSP commanders expressed surprise when they arrived in Charlottesville and saw that there would be five zones instead of four. The VSP operational plan that was accidentally left behind in Charlottesville may explain the confusion: that document included the August 4 design with four zones.

Separate from the zone-switching in the weeks before Unite The Right, the Emancipation Park operational plans changed in two other significant ways in the last twenty-four hours before the event.

First, as discussed below, Sergeant Newberry relayed information on August 11 that the Unite The Right demonstrators were planning to arrive via shuttles that would stop at the intersection of Ridge McIntire Road and Market Street — west of Emancipation Park. Based

on this information, Captain Mitchell switched the designated areas for demonstrators and counter-protesters, placing the former in the southwest quadrant and the latter in the southeast quadrant. That information was then conveyed to Jason Kessler by Captain Lewis late on August 11. It appears that no efforts were made to communicate the zone designation to counter-protest groups.

Second, Zone 5 the Market Street area was not originally intended to be blocked off by any barricades. Indeed, every iteration of the plan called for CPD and VSP officers to be stationed in the parking lot on the opposite side of the street from Emancipation Park. Captain Lewis told us that it was her understanding Zone 5 officers would be tasked with "breaking up fights" on Market Street. But the parking lot backed up to the Wells Fargo building, where the Unified Command Center would be hosted. VSP insisted that the entire area be protected by barricades. CPD complied with that request and installed barricades around the surface parking lot south of Emancipation Park. This crucial change effectively stationed the officers in Zone 5 behind barricades, much like the officers assigned to the other four zones. As a result, no officers were assigned to open areas in which protesters and counter-protesters would interact.

### c. Ingress and Egress of Crowds and Arrival of Speakers

Beyond the designated entry points and separated quadrants within Emancipation Park, CPD did not contemplate how general attendees would arrive to and exit from the downtown area. Nevertheless, conversations between the investigations unit and security personnel for Unite The Right provided some insight into how and when various demonstrators would be arriving at Emancipation Park.

Mitchell told us he intentionally channeled entry to and exit from the interior of the park through the staircases at its southeast and southwest corners. He explained to us that such a design would force attendees to walk around and enter at those controlled locations. Through communications with Jason Kessler and his security personnel, CPD agreed to allow Unite The Right security members to act as "doormen" at their entry point to ensure only demonstrators would enter the appropriate quadrant of the park.

Sergeant Tony Newberry had several telephone conversations with Jack Pierce, who had been designated as a security manager for the Unite The Right groups. On the afternoon of Friday, August 11, Lieutenant Hatter and Sergeant Newberry met with Pierce to show him around Emancipation Park and discuss the strategic layout for the event. Pierce told Newberry that the event's organizers were considering meeting up in a nearby area and shuttling in to the downtown area in passenger vans. The shuttles would drop off demonstrators at the intersection of Ridge McIntire Road and Market Street, about a quarter-mile west of Emancipation Park, and the demonstrators would walk to the park from there.

Newberry passed the shuttle information up the chain of command. Mitchell's original plan called for the Unite The Right demonstrators to occupy the eastern protest zone, but CPD now understood that those individuals would be arriving from the west. On learning that information, Mitchell swapped the zones so that the demonstrators would enter at the southwest corner of Emancipation Park.

Sergeant Newberry told us that when he passed the shuttle information up to his supervisors, he also suggested that they consider posting law enforcement officers along Market Street between the putative drop-off spot and Emancipation Park. Newberry does not recall receiving a substantive response to his idea other than that the command staff "needed to think about it." The planning documents do not show any revisions implementing Newberry's suggestion. Relatedly, Lieutenant Jim Mooney, told us that during the July 8 zone commanders debriefing, Chief Thomas said, in reference to August 12, "I'm not going to get them in and out."

In truth, Sergeant Newberry's main purpose in communicating with Jack Pierce was to coordinate the arrival of the event's speakers. As Newberry explained, CPD worried that as soon as counter-protesters learned the whereabouts of some of those people, their location would become "a hot area." Thus, CPD hoped to work with the speakers to safely escort them to and from Emancipation Park similar to the escort provided to the Klan on July 8. Jack Pierce was open to assistance for the seventeen individuals identified as either speakers or "VIPs" at the Unite The Right rally. Newberry suggested the speakers load into one or two passenger vans and then join a convoy of unmarked police vehicles. The vans would be waived through barricaded streets and park on Jefferson Street, directly behind the Park. Then, Newberry would coordinate with the appropriate zone commander to allow the speakers direct entry into the event.

Pierce was in agreement with that plan, but he and Newberry could not settle on precisely when the speakers would arrive. Newberry hoped to bring the speakers in very early perhaps as early as 7:30 or 8:00 a.m. Pierce resisted arriving so many hours before the official noon start time. Ultimately, they agreed that the speakers would arrive sometime around 10:00 or 11:00 a.m. Pierce was circumspect about where CPD could meet the VIP vans to escort them, but agreed to call Newberry in the morning with their location when they were ready to depart for Emancipation Park.

### d. Arrest Guidance

Based on the experiences of July 8 and intelligence gathered in advance of August 12, the CPD operational plan included guidance on potential criminal offenses and arrest procedures. In particular, Captain Mitchell included a short primer on particular offenses with which officers might be confronted, identified by the Commonwealth Attorney's Office: obstruction of free passage; rioting; failure to disperse; injury to property or person; crossing established police lines; disorderly conduct; curse and abuse; wearing masks; offense related to burning crosses and other objects; display of nooses; conspiracy to commit crime; and unlawful assembly. The plan also advised officers to "maintain close observation of the crowd and be mindful of potential open carry and concealed weapons" and to "keep close watch of crowd members who are exhibiting behaviors which could become violent." Lieutenant Joe Hatter was in charge of Zone 5 (the Market Street zone) and took those instructions literally, telling us that he understood that officers should make arrests and actively engage if necessary.

According to the plan, officers were not limited to making arrests solely for those listed offenses. Indeed, the plan stated, "Officers should make arrests when appropriate for unlawful behavior and should use issued flex cuffs as restraints." Moreover, the plan

envisioned that each zone would have designated arrest and cover teams. Mitchell designated Lieutenant Dwayne Jones and three other CPD officers to supervise arrest processing at the Charlottesville General District Court on East Market Street, and even broke down the step-by-step procedure officers should follow to efficiently process arrestees.

Despite these written instructions, officers had a very different understanding of the expectations for arrests on August 12. We spoke to multiple officers at all levels who expressed concern that normal arrest procedures would put officers in harm's way. In the week before August 12, the Virginia Fusion Center shared credible threats that members of Antifa would bring soda cans filled with cement and might attack police. Then, on the morning of August 12, rumors circulated among CPD that Antifa might attack officers with fentanyl.

Out of concern for officer safety, Lieutenant Brian O'Donnell, commander of Zone 3 (1st Street) instructed his officers to avoid engaging attendees over "every little thing." Officer Lisa Best was assigned to Lieutenant O'Donnell's zone. She told us that officers "were not going to go in and break up fights" or enter the crowd to make arrests "unless it was something so serious that someone will get killed." Sergeant Robert Haney described the instructions he received as "do not interrupt mutual combat" unless someone is seriously injured. Lieutenant McKean commanded Zone 1. He told us that he was "not sending guys out there and getting them hurt." This concern is reflected in our review of body camera footage, which reflects multiple instances of officer uncertainty about potential engagement with the crowd.

Rather than engage the crowd and prevent fights, the CPD plan was to declare the event unlawful and disperse the crowd. The Operational Plan outlined the steps by which an unlawful assembly could be declared. According to the plan, the Chief of Police or his designee retained "the authority to issue the order for declaration of an unlawful assembly should circumstances warrant such action." At such time, zone commanders would use bullhorns to alert the crowd that they must disperse. If that did not work to disperse the crowd, then the VSP's Mobile Field Force units would be called out in riot gear to clear the area. At that time, all CPD officers located within the zones would revert to Zone 4 – the law enforcement area north of the Lee statue – to don protective gear and become the CPD mobile field force under the command of Lieutenant Michael Gore. The CPD mobile field force would then "take a position behind the VSP mobile field force and act as rear guards."

### e. Riot Gear

One of the lessons learned from July 8 was the need for officers to have easy access to their riot gear- helmets, shields, and gas masks- in the event of an unlawful assembly. As mentioned above, many officers believed that they should arrive at their posts wearing their riot gear on August 12. In fact, numerous officers strongly endorsed starting the day in their gear, or in the alternative, having the riot gear immediately at their side. Lieutenant O'Donnell shared with us an email from one of his officers expressing the concern "that not having our protective equipment accessible will place myself and others at risk of bodily harm."[270] Another officer assigned to Zone 3 told us that she was so concerned about the potential for violence and her lack of protection that she updated her will and left letters to both of her children when she reported for duty on August 12.

Ultimately, the command staff rejected the suggestion to have officers arrive already wearing riot gear. Captain Lewis told us that Chief Thomas refused to consider such steps in the aftermath of July 8, when CPD faced criticism for its deployment of tear gas. Captain Mitchell explained he intentionally staged the VSP mobile field force units behind closed doors because the "optics are bad" when citizens see officers wearing protective gear suggesting police are "ready to fight."

Accordingly, the plan called for all officers stationed in the zones in and around Emancipation Park to pack their riot gear into bags, which were then stowed in a trailer in Zone 4 north of the park on Jefferson Street. If and when the time came for CPD officers to access their riot gear, they would retreat to that area and suit up. Notably, that instruction applied equally to Zone 5 the officers assigned to Market Street. Lieutenant Hatter recognized that this plan would require his officers to traverse Market Street and Emancipation Park and face whatever conditions merited the call to wear protective gear. So he exercised his command discretion and ordered his officers to stage their riot gear in the lobby of the Wells Fargo building, which abutted Zone 5.

### f. Staging of Tactical Field Forces and Other Assets

In addition to the 160 officers stationed in and around Emancipation Park 32 per zone the CPD plan called for the staging of four VSP mobile field force units nearby. Each of these units consisted of fifty-two state troopers who had been trained to face riot conditions and disperse unruly crowds. They would wear protective gear and carry large shields for crowd control.

Unlike Justice Park, which is surrounded by various municipal office buildings, Emancipation Park did not have many nearby public facilities where CPD could easily arrange to stage the VSP mobile field force units. At one point in the planning process, the command staff hoped to use air-conditioned buses on 1st, 2nd NE, and Jefferson Streets the western, eastern, and northern boundaries of the park, respectively to stage the mobile field force units. Unfortunately, the City would not make available its transit buses, offering instead only school buses with no air conditioning. That was not viewed as a viable option.



**There were many potential locations for staging mobile field forces. Ultimately CPD was only able to secure Hill & Wood, the Omni Hotel, City Space, and the Jessup House, marked in yellow above.**

Mitchell contacted various private buildings adjacent to the park to seek help. Mitchell received the agreement of Hill & Wood Funeral Service for CPD to use their entire facility and parking areas. That allowed Mitchell to stage a VSP mobile field force at the corner of Market and 1st Streets. As described above, Mitchell initially received an agreement from Christ Episcopal Church to house a field force, but that permission was withdrawn on August 2. Mitchell faced similar difficulty securing the Jefferson-Madison Regional Library, which is located at the corner of Market Street and 2nd Street NE, adjacent to the southeast corner of Emancipation Park. The Library's board denied permission to use the building as a staging area, although it agreed to allow use of the building's loading dock. And Mitchell knew that the First United Methodist Church was unavailable as that facility was being used by both Congregate and the Clergy Collective for counter-protester support.

Mitchell housed the remaining three VSP mobile field force units in three distant locations: the Omni Hotel (three blocks to the southeast on the downtown pedestrian mall); the Jessup House (five blocks west-northwest at the corner of High Street and 7th Street NE; and City Space (four blocks west-southwest at the 5th Street pedestrian crossover of the Downtown Mall).

According to Mitchell, the 200-plus VSP troopers stationed in these locations would be called out only in the event of an unlawful-assembly declaration. The plan called for the field force units staged at the Hill & Wood and Jessup House units to deploy to the rear of Emancipation Park to form the park-clearing line. The units at the Omni and City Space would form lines across the Downtown Mall to control foot traffic from the crowds that

would be pushed south. Colonel Flaherty told us that VSP did not contemplate deploying the field forces to respond to disturbances on Market Street. Except in the event of an unlawful assembly, the VSP mobile field forces would not exit their buildings or reveal their locations to the public.

Early on the morning of August 11, Lieutenant Knick e-mailed Captain Lewis to confirm updates to staffing changes and to let her know that the Paramount Theater a concert venue with a backdoor loading area less than a block east of Emancipation Park on Market Street had cancelled a show scheduled for August 12 and would perhaps be available to stage a mobile field force.[271] Lewis forwarded the message to Captain Mitchell with the message: "Just FYI, we talked about all of these last night except the paramount. I think it is too late for that."[272]

### g. Coordination with Albemarle County Police Department

The City has agreements with both the Albemarle County Police Department and University Police Department that allow each law enforcement agency to ask for and receive help from the others. Captain Mitchell told us he requested additional resources from both UPD and ACPD, but was rebuffed. According to our interviews with multiple CPD officers, Chief Thomas told his command that CPD did not have the support of its "allies" on August 12. In particular, Chief Thomas criticized ACPD for refusing to provide any assistance other than answering priority calls for service within the City. Additionally, Assistant City Manager Mike Murphy told us that he was told ACPD units were not available because the County did not want to have "its logo associated" with Unite The Right.

Albemarle County Police Chief Rick Lantz and others within ACPD tell a far different story regarding actual and potential cooperation between ACPD and CPD on August 12. Chief Rick Lantz told us he repeatedly offered assistance to Chief Thomas and CPD, in the form of police resources and information. He expressed the view that ACPD did all it could to assist CPD on August 12, though he stressed that his officers were forced to respond to multiple incidents within the County related to the Unite The Right event. Chief Lantz indicated that in advance of August 12, he told Chief Thomas about his experience working in Fairfax County, where he would assist law enforcement efforts for large demonstrations in Washington, D.C. Lantz told us that Thomas never accepted help or reached out for Lantz's input.

ACPD Captain Sean Reeves similarly criticized CPD's lack of flexibility and willingness to accept help during preparations for the August 12 event. Captain Reeves attended the weekly interagency planning meetings for August 12. He recalled that VSP began the planning process and seemed to be in charge. They discussed "setting the tone" early in the event by making arrests and deescalating fights. But as the event grew closer, CPD took the lead and the tone changed. During meetings soon before August 12, VSP and others would raise issues to Chief Thomas that he dismissed without consideration. For example, there were suggestions that the Command Center was too close to Emancipation Park and that the area in and around the Park should be "sanitized" for the event by removing newspaper boxes and other items. Reeves also recalled a discussion about the risks of dispersing the crowds toward the Downtown Mall in the event of an unlawful assembly. According to

Reeves, Chief Thomas continued to minimize or ignore these concerns, exhibiting a "hunkered down" mentality that was unwilling to consider alternative plans, particularly as the event got closer.

With respect to ACPD assistance, Reeves explained that he understood that ACPD would answer priority calls for service in the City on August 12. At one planning meeting, Captain Mitchell suggested that ACPD's coverage should include McGuffey and Justice Parks  the locations where counter-protesters would be staging for the event. Reeves objected out of the concern that those locations were within the area of potential disturbance, and not all of his officers had been sufficiently trained in civil disturbance events.

As the event drew closer, Captain Reeves sent Captain Mitchell an e-mail that explained ACPD's officers would answer priority calls for service "not related to the protest rally" from 11:00 a.m. until 7:00 p.m., and they could "hold over to continue to assist" if requested. The e-mail also explained that ACPD would have its SWAT Team and mobile field force "staged at the County Office Building on McIntire Road in the event they are needed to assist CPD or respond to incidents in the county."[273] Mitchell forwarded that e-mail to Chief Thomas. Chief Thomas replied directly to Captain Reeves, expressing his view that ACPD had "made it very clear that ACPD officers will not assist CPD with any activities related to the Alt Right Rally."[274] Reeves responded by reiterating that ACPD's SWAT Team and mobile field force would be available "in the event they are needed to assist CPD with the planned rallies, protests and counter-protests. These assets will deploy at the request of CPD."[275] Thomas did not respond.

Chief Lantz told us he did not understand why Chief Thomas did not acknowledge the availability of ACPD's SWAT and mobile field force personnel, much less call them into service on August 12. He denied that ACPD ever refused to provide assistance beyond normal calls for service, and stressed that the officers in those units  who were stationed in COB McIntire, about a quarter-mile from Emancipation Park  were anxious to deploy when they saw the violence unfolding that morning. In fact, Lantz sent a text message to Thomas on August 12 to remind him that his officers were standing by if "hell breaks loose," and they would deploy immediately if Thomas "hit the red button." Lantz never got a response.

Captain Reeves was stationed in the "overflow room" at the Command Center on August 12. Throughout the day, he received no information from CPD about the events but instead had to monitor conditions himself. The ACPD SWAT Team and mobile field force were never discussed. He does not know why they were not called upon or used in the midst of disturbances around Emancipation Park.

### h.    Coordination with University Police Department

We heard from City officials that UPD officers were unavailable to provide direct assistance during the Unite The Right rally. Captain Mitchell told us that the University refused to allow any officers to "go near" Emancipation Park because they saw the Unite The Right rally as "radioactive." That perception aligns with similar opinions we heard from others who suggested that the University is particularly hesitant to intervene in any events that implicate First Amendment speech rights. UPD Chief Michael Gibson admitted to us that

UPD agreed to allow their officers to answer emergency calls in the City on August 12 but could not agree to provide officers for crowd control. He suggested, however, that this decision was based on the need for his officers to protect the University in the event of a threat on August 12.

### i. Contingency Plan for McIntire Park

When it became clear that City Council was seriously considering attempting to move the event to McIntire Park, Captain Mitchell assigned Lieutenant Durrette responsibility for designing a plan. The large layout reduced most of the complications posed by having a rally in the congested downtown area. Durrette was able to quickly determine that two baseball fields that sat next to each other created convenient areas to corral the Unite The Right demonstrators and opposing counter-protesters. He staged a law enforcement safety zone nearby, and drew up a map showing where additional barriers would need to be placed. He submitted the plan to Captain Mitchell on July 31.

### 6. Virginia State Police Operational Plan

VSP had written its own operational plan for August 12. All of the CPD command staff told us that they did not see that plan before the event, nor were they aware that VSP had created their own document. Captain Mitchell told us that he would have liked to see it ahead of time to ensure there were no conflicts with CPD's planning. CPD officers became aware of the VSP plan only when a copy was accidentally left behind at City Space, where one of the mobile field forces had been staged.

The VSP plan appears to have been finalized on August 7 and ran more than 100 pages. Much of the information contained in the VSP plan focused on general administrative guidance for troopers, such as uniform requirements, meals, lodging, overtime compensation, and so on. The plan also included intelligence and threat assessments and outlined VSP's general procedures for the use of force. Several pages of the plan explained post-arrest procedures that conflicted with the post-arrest procedures outlined in the CPD plan.[276] Finally, the VSP plan also includes the radio "talkgroups" that were to be used by VSP and there is no mention of whether and how CPD communications would be patched in. Nor is there any guidance in the VSP plan suggesting that state troopers would answer to anyone outside their internal chain of command  nothing to indicate how CPD fit into the command structure for the event.

VSP's plan called for a large contingent of officers  nearly 600 in total  for various assignments on August 12. More than 100 troopers would be stationed in the various zones in Emancipation Park. Plain clothes undercover officers would be circulating within the crowd. A squad of thirty-five troopers would be dispatched to McIntire Park, with another thirty-five troopers assigned to the Downtown Mall. VSP would stage four mobile field forces, each numbering over fifty troopers equipped with riot gear and trained to move crowds. A VSP tactical team (akin to SWAT) of approximately thirty troopers would stand ready, too. Yet more VSP personnel would perform other duties  K-9 units, arrest processing, medical units, and communications oversight. Finally, VSP would deploy two aviation teams to fly helicopters over the event and provide surveillance.

The VSP plan included as its final appendix Captain Mitchell's August 4 Operational Plan. As explained above, the August 4 plan contemplated the use of four zones within Emancipation Park. The CPD plan, as circulated to VSP on August 7, implemented five zones. The distinction between the VSP and CPD plans may have been the cause for VSP commanders' confusion on August 12 as to the number of zones.

### 7. Emergency Services Plans

#### a. Charlottesville Fire Department

We received various documents from CFD and interviewed Deputy Fire Chiefs Mike Rogers and Emily Pelliccia. Rogers drafted CFD's incident action plan for August 12, and his planning was informed by frequent interaction with CPD and larger conglomeration of agencies involved in the overall planning process. The documents provided by CFD and our conversations with CFD leadership reflect that the department had a comprehensive plan for organizing both fire and EMS resources for August 12.

CFD's plan called for fire and EMS assets to be staged at the County Office Building on McIntire Road (COB McIntire) on August 12. Rogers included detailed schedules and schematics for how COB McIntire should be organized. He divided assets into distinct groups responsible for assisting law enforcement with extracting protesters, treating individuals in need of medical attention, transporting such individuals, and responding in the event of a hazardous material situation. He explained in detail various "Event Levels" that could be used on August 12: Event Level 1 (normal tactics, responders on offensive); Event Level 2 (normal tactics, but withdrawing assets from Zone 4 and rerouting them to the COB Base); and Event Level 3 (defensive tactics, withdrawing all assets to COB Base, and reserving radio traffic for emergency operations only). Rogers even designated medevac landing zone areas for both the Downtown Mall and McIntire Park in the event that emergency air transport would be required.

Rogers went so far as to even consider the appearance of his staff at the event. During the planning for August 12, Rogers learned that crowds at similar events had been hostile to police. So Rogers ordered all CFD and EMS staff to wear red shirts that would distinguish them from other emergency services personnel in a crowd.

The CFD plan also included a rendering of the CPD's five-zone plan for Emancipation Park. It highlighted Zone 5 (Market Street) in red and white stripes and emphasized the area with arrows. When we asked Deputy Chief Rogers why he had labeled Zone 5 in that manner, he replied that he had major concerns with the area, both because he felt it was too close to the Command Center and because he predicted demonstrators and counter-protesters would clash there. The red labeling on CFD's plan was to indicate that he would not stage any CFD or EMS personnel or respond to complaints in that area given the safety concerns. Instead, CPD would be required to extract injured individuals from that zone and deliver them to an extraction team nearby for treatment. Rogers expressed this opinion to CPD.

Rogers shared with us that his planning process was not without its own difficulties. He expressed frustration with finding enough resources for the large-scale event. For example,

he knew that he needed additional ambulances for August 12, but when he reached out to state agencies requesting them, he encountered "bureaucratic red tape" for how to formally make the request. The procurement process presented so many hurdles that Rogers eventually maneuvered around them by contacting surrounding jurisdictions directly and asking for their assistance. The neighboring jurisdictions agreed and provided the ambulances Rogers needed.

### b. University of Virginia Medical Center

We spoke with Tom Berry, the Director of Emergency Management at UVA Health Systems, regarding the University of Virginia Medical Center's planning for August 12. Berry recognized that the Unite The Right rally had the potential to be a mass casualty incident. His planning began immediately after the July 8 demonstration.

In subsequent weeks, he held two large incident management meetings that included personnel from inside and outside the hospital, including the emergency room and operating room staffs, radiology, blood bank, registration, supplies, peer logistics, transporters, patient and guest services, trauma surgeons and emergency medical physicians, CFD, and officials from Martha Jefferson Hospital. The nearly 100 people who attended these meetings came together to share information, ensure clear and efficient communication, and create accountability for August 12.

Berry also made tactical decisions that would make the hospital more available in the event of a mass casualty incident. The hospital cancelled all elective surgeries. Berry also established three rings of security around the hospital, which would allow him to lock down facilities, ranging from specific units within the building all the way to the entire hospital itself. He arranged for stretchers and trauma carts to be lined up inside and outside of the hospital so that at any moment he could "flip the switch" to convert the hospital's emergency intake from the Emergency Room to the main lobby. And the hospital's plan called for a hazmat tent to be established at the Lee Street parking garage to decontaminate patients from any chemicals, such as tear gas.

Notably, Berry told us how frustrated he was about the flow of information from CPD in advance of the event. He repeatedly requested to be present at briefing meetings but was never invited to any planning meetings for August 12. He told us that he could have learned more from just sitting and listening for thirty minutes than he could by asking his IT department to gather intelligence on social media (which he did). Accordingly, he was denied the opportunity to get any information from CPD to prepare the hospital. He did tell us he attended meetings organized by CFD, and he was able to tell Deputy Chief Rogers that the University's hospital could absorb fifty "red" patients a number that affected Rogers's planning for triage in the event of a mass casualty incident.

### c. Emergency Communications and Operations Center

We spoke with Allison Farole, the emergency management coordinator for the Charlottesville-UVA-Albemarle County Office of Emergency Management, which is part of the regional Emergency Communications Center (ECC). For August 12, Farole oversaw the regional Emergency Operations Center (EOC), which was based at Zehmer Hall on the

grounds of UVA. In general, the ECC operates on a regular basis to provide regional communications and a common 911 system. For special events, Farole can recommend the creation of a temporary EOC, but the decision is ultimately made by the responsible executives in each jurisdiction: Charlottesville City Manager Maurice Jones; Albemarle County Executive Doug Walker; and UVA Vice President and Chief Operating Officer Pat Hogan.

Usually, the EOC operates in a conference room at the regional ECC building (2306 Ivy Road about a ten-minute drive from the downtown area). As discussed above, there was no formal EOC for the July 8 event; instead Farole operated a Virtual Emergency Operations Center Interface, which provides a workstation for any user granted access. For August 12, however, Farole recommended, and the relevant executives agreed, to stand up a full EOC at Zehmer Hall on the University Grounds.

EOC preparations for the Unite The Right rally began immediately after July 8. Farole recalls attending weekly regional meetings with CPD, VSP, CFD, and various other agencies. Farole shared that CPD and VSP controlled these meetings, and she believed that the two agencies seemed to have "informal" plans for how to manage the incident. She recalled intelligence about the event being discussed. Despite this close contact with law enforcement, she only learned of the decision to move the rally to McIntire Park "at the same time everyone else did." She explained that her primary role was to work with fire and emergency medical units. For example, they decided to seek additional 911 operators from neighboring jurisdictions for August 12.

### 8.    The Virginia National Guard

Colonel Flaherty told us that efforts to mobilize the Virginia National Guard began during the week leading up to August 12. Flaherty spoke with Brigadier General Timothy Williams, the National Guard's Adjutant General, and on August 8 they agreed that VSP would take command of the Guard's company of 115 military police officers. The National Guard unit would stage at their armory on Avon Street, about 2.5 miles from Emancipation Park.

Although we received some communications regarding the National Guard pursuant to a FOIA request to the Governor, we have not received any planning documents or been told about the Guard's tactical objectives or mission on August 12. Captain Wendy Lewis, who served as the Unite The Right exterior commander, told us she was never informed about the Guard's mission or role. E-mail communications show that the National Guard held a series of briefings on the afternoon of August 11. They first heard from the Adjutant General, then they received a legal briefing from a Judge Advocate General. At 4:00 p.m., the National Guard received a briefing from the VSP.

### 9.    VDEM and the Incident Management Team

The Virginia Department of Emergency Management (VDEM) provides assistance to local governments in the event of emergencies beyond their capacity to handle alone. These events typically involve storms and other weather events, though they also include large gatherings of people presenting safety concerns. In preparation for particular emergencies,

VDEM often convenes an "Incident Management Team" (IMT) to coordinate multi-agency response. An IMT is made up of officials from local and state agencies trained in emergency management. They travel to the location of a potential emergency to assist in a local response. IMT personnel often collate multiple agencies' operational plans into a single plan using nomenclature identified by the National Incident Management System (NICS). Having a final, consolidated operational plan helps ensure that everyone involved in responding to a crisis event understands the command objectives.

On August 1, 2017, VDEM employee Lee Williams attended a meeting with CPD and VSP at which planning for the Unite The Right rally was discussed. After learning details of the CPD Operational Plan, Williams shared concerns with CPD and VSP, including the absence of "overall incident objectives," potential challenges with bandwidth and cellular phone coverage, inadequate attention to the logistical requirements for the large VSP population, and the absence of contingency plans in case the event lasted longer than anticipated. Williams also commented that the Command Center was too close to the rally site.

On August 8, 2017, Williams attended a second briefing with VSP, CPD, and CFD. At that meeting, CFD Chief Andrew Baxter informed Chief Thomas that he planned to request an IMT for August 12, regardless of whether Thomas wanted the assistance of VDEM. However, Baxter invited Thomas to join him in making the request. Williams explained to Thomas the benefits that an IMT could offer.

Chief Thomas and Captain Mitchell had resisted the suggestion to implement an IMT in the weeks before August 12. From the Chief's perspective, implementing an IMT would simply put the existing CPD plan into Incident Command System (ICS) format, which used a different nomenclature. Captain Mitchell told us that Captain Worsham  VSP's incident commander for August 12  had warned him that the IMT would attempt to formalize his planning efforts and only "get in the way."

Regardless of these concerns, Chief Thomas agreed to join Chief Baxter's request for an IMT on August 8 as it had become clear that CPD had to plan for the possibility of hosting the event at McIntire Park. Chief Thomas told us that he thought there was insufficient time to plan for two separate locations, so he agreed to request an IMT.[277] Thomas said that VDEM seemed unconcerned about the late window of their involvement, because "they are used to being brought into a crisis."

CFD Deputy Fire Chief Emily Pelliccia assumed the role of IMT liaison for August 12. Within twenty-four hours, she had fourteen IMT members stationed at the Fontaine Avenue fire station, where they quickly got to work coordinating the planning efforts between the agencies and arranging for various resources for the weekend. Among the resources brought to bear by the IMT were GPS monitors to track the locations of law enforcement officers, a cache of at least 100 additional radios, and hourly status reports that were transmitted during and after the event. The IMT consolidated various agency plans into a single Incident Action Plan (IAP).

In the few days left before August 12, the IMT held several meetings. The first meeting, held August 9, was for "agency administrators" which included Chief Baxter and Allison

Farole. CPD sent Lieutenant Steve Knick but no one from the command staff. Knick told us that he was impressed by the IMT's "tremendous" resources, and he expressed shock that no one at CPD had been aware of their skills. Because none of CPD's command staff attended the agency administrators meeting, the IMT held a second meeting later in the day for CPD. Captains Shifflett and Lewis attended; Chief Thomas and Captain Mitchell did not. Shifflett and Lewis gave the IMT their operational plan and discussed the IMT's capabilities. One IMT official recalled that Captain Lewis was very excited about the availability of GPS trackers.

August 10 saw a flurry of IMT meetings. In the morning, Chief Thomas finally attended a meeting with the IMT, where he consented to the merger of the CPD and CFD operational plans, and he agreed to be designated as the overall incident commander with Captain Mitchell as operations section chief. These labels derive from the ICS protocols, which VDEM and the Federal Emergency Management Agency impose as a condition of state and federal reimbursement. In the afternoon the IMT held a meeting to "poke holes" in CPD's plan through tabletop exercises. Again only Captain Shifflett and Captain Lewis attended; Chief Thomas and Captain Mitchell did not. Shifflett told us that these scenarios required them to game out responses to various situations, including suspicious packages, explosive devices, explosions, active shooters, and other disorders. Later that day, the IMT went over the tactical plans outlined by CPD to ensure "clarity on expectations." It was at this meeting that Lieutenant Durrette was deemed to have too much responsibility   command of the McIntire Park units, supervision of the traffic plan, and participation in CPD's SWAT plans. Accordingly, Captain Lewis agreed to shift traffic responsibility to Lieutenant Knick.

The IAP denoted various branches   Exterior, Emancipation Park, Fire/EMS, and Response (i.e., SWAT and mobile field forces)   and listed the relevant supervisors in each division within the branches. For example, the IAP noted that Zone 1 in Emancipation Park fell under the leadership of both CPD Captain David Shifflett and VSP Lieutenant Becky Crannis-Curl, showed that Lieutenant Thomas McKean would serve as zone commander, and listed the four squad sergeants in charge of each squad assigned within that Zone 1. The IAP also designated the radio channels to be used by various units, and it contemplated all the officers in a given division, whether VSP or CPD, would be using the same frequency.

For each Emancipation Park grouping, the IAP contained the following "Special Instructions" regarding arrests: "Make arrests as necessary after notification to supervisor, unless personal safety is compromised, in which supervisor notification should be done immediately after arrest." Kent Emerson, the Resources Unit head on the IMT, told us that he composed that language after the August 10 strategy session at which Captains Lewis and Shifflett discussed possible responses to contingencies. Captain Lewis told us that she did not tell Mr. Emerson or otherwise mean to imply that officers needed to obtain supervisory approval before making arrests on August 12. Rather, she wanted to ensure that zone supervisors were aware of arrests and could shift resources accordingly. The "special instructions" language in the final IAP did not contribute to officer uncertainty on August 12. The IAP plan was distributed to supervisory personnel and did not reach line CPD or VSP officers who were assigned to particular zones in and around Emancipation Park.

At noon on Friday, August 11, the IMT presented its consolidated IAP at a meeting of supervisors from various agencies held in City Council chambers. An IMT member described the meeting as a "sea of VSP" with a few CPD senior officers intermingled. At that time, the IMT requested and received approval of its plan from Captain Mitchell.

A final briefing meeting was held that afternoon at the Fontaine fire station, which was attended by VSP, CPD, CFD, and the National Guard. After that meeting, VSP Lieutenant David Cooper informed the IMT that some of the personnel information listed in the IAP was incorrect. The IMT worked quickly to amend the IAP, but did not complete the work in time to redistribute the plan that evening. New copies were printed and delivered to various locations early on August 12, including the Command Center.

Despite this quick and impressive work, Chief Thomas told us no one in the Command Center looked at or operated from the IAP on August 12.

### 10. Command Centers

Rather than culling down the number of vital decision makers who should be in the same room on August 12, the various officials in charge of the multiple agencies involved were spread out across three primary locations. Charlottesville and VSP command staff set up their Command Center   referred to as a "Unified" Command Center,   in the Wells Fargo building across Market Street from Emancipation Park. One room in the Wells Fargo building was reserved for key decision makers from CPD and VSP. CPD was represented by Chief Thomas, Captain Mitchell, Captain Lewis, Lieutenant Steve Upman, and Thomas's personal assistant Emily Lantz, who recorded the scribe notes for the event. The plan also accounted for ten VSP officers, including the incident and deputy incident commanders. Maurice Jones and Mike Murphy were present in that room, as were Colonel Flaherty and intelligence analysts from the Virginia Fusion Center and the FBI. Murphy told us he recalled officials from VDEM also being present. The law enforcement conference room of the Command Center had multiple computer and television screens, which showed live video feeds from pole cameras in and around Emancipation Park, a live feed from the VSP helicopter units, and open source livestreams of the event.

A second room adjacent to the law enforcement base of operations in the Well Fargo building was occupied by CFD Deputy Chief Mike Rogers, EOC Coordinator Allison Farole, ACPD Captain Sean Reeves, UPD representative Don McGhee, City Director of Communications Miriam Dickler, VSP public information officer Corrine Geller, and various representatives from the National Guard, VDEM, and IMT. In contrast to the multimedia displays in the law enforcement room, the second conference room had no technological capabilities.

The EOC stood up its operations at Zehmer Hall on the Grounds of UVA. Convened at that location was the Regional Policy Group, which included Assistant City Manager Leslie Beauregard, UVA President Teresa Sullivan, UVA Vice President and COO Pat Hogan, Albemarle County Executive Doug Walker, CFD Chief Andrew Baxter, UVA Director of Safety and Emergency Preparedness Marge Sidebottom, CPD Lieutenant Cheryl Sandridge, Albemarle County Fire Department Chief Dan Eggleston, and ECC Executive Director Tom Hanson. There were also "dozens" of UVA administrators gathered in a separate

conference room. The Policy Group watched live feeds from social media and television media. Captain Mitchell shared with us his view that the Zehmer Hall gathering existed simply so that UVA decision makers would "have a place to go."

The IMT was headquartered at the CFD Station 10 on Fontaine Avenue. We believe that members of the IMT had some interaction with individuals who were also stationed in the second conference room at the Command Center, but it is unclear how and whether personnel at the Fontaine Avenue fire station were used. Captain Mitchell told us that the work performed by the IMT at the Fontaine fire station had "no effect on what [CPD] was doing" at the Command Center

We note that none of the command centers explicitly called for the presence of City Councilors. We have learned that Mayor Signer spent some time at the EOC at Zehmer Hall, but that he repeatedly requested access to the Command Center near Emancipation Park. Both Chief Thomas and City Manager Jones deflected the Mayor's requests and expressed to Signer their view that his presence was not needed. Despite these assurances, Signer made his way to the Wells Fargo building. He was refused entry to the Command Center and was sent instead to a separate floor of the building. When City Manager Jones left Command to meet with Signer, he had already departed. Mayor Signer told us that he was frustrated by his lack of access to the Command Center, as he believed it was important for elected officials to understand what was occurring to facilitate the provision of information to the public. Mayor Signer also admitted that after he was denied entry to the Command Center, he told City Manager Jones "you work for me" and suggested there would be ramifications for his failure to admit Signer to the Command Center.

## B. Events of August 11

The Unite The Right event began earlier than advertised. On the evening of Friday, August 11, Jason Kessler, Richard Spencer, and more than three hundred torch-bearing supporters marched to the Rotunda of the University of Virginia. The march set an ominous tone for the rally that would follow on August 12.

### 1. Intelligence

There were early warnings about a Friday night event well in advance of August 11. On July 14, VSP analyst Chanthu Phauk provided CPD Captain Wendy Lewis with a report suggesting that Kessler has "mentioned people meeting up somewhere to hang out on Friday before the event in Charlottesville." Lewis forwarded the message to Captain Mitchell and predicted that the "Friday leading up to the [Unite The Right] event will be very very busy!"[278] In light of the report, Mitchell decided to deploy additional resources on Friday evening and focus on protecting the Downtown Mall.[279]

In early August, Lieutenant Hatter received information from a confidential source that Kessler and others planned to march with torches at Darden Towe Park in Albemarle County. Hatter shared this information with Captain Lewis. The VSP Fusion Center corroborated these reports on August 8, noting that Kessler and others planned to meet at Darden Towe at 8:00 p.m. on August 11, and march to an "unknown location" to "replicate

a torch lighting." The Fusion Center also noted that "anarchist groups" were aware of the event.[280]

CPD shared this information with UPD and discussed possible venues for the march. Because Richard Spencer graduated from UVA, planners discussed the University as a possible rally site. UPD Captain Don McGee advised UPD Chief Michael Gibson of these concerns on August 9, noting "[t]here is a concern that the location [for the torch rally] could be the Rotunda or Lawn area." McGee went on to advise Gibson that the march presented a "fire safety issue" and that UPD should "think ahead and plan."[281]

Lieutenant Hatter was also in communication with Jack Pierce, "head of security" for Richard Spencer. Pierce confirmed to Hatter that an event would occur on August 11, but refused to provide details. Hatter recalled that Pierce and his colleagues seemed "determined to make a statement." CPD was also in contact with Kessler throughout much of June and July, but Kessler never revealed any details about his plans for August 11.

To conceal their planning efforts, Kessler, Richard Spencer, and other Unite The Right organizers used Discord, an application that allows confidential communications in private chat rooms. As indicated above, a Unite The Right planning document shared on Discord was made public on August 16, 2017.[282] The document reveals that a core group began planning for August 11 as early as June 6, and finished planning on August 10. The final planning document, entitled "Operation Unite The Right Charlottesville 2.0", stated, in relevant part:

> The Torchlit rally will be at the Jefferson Monument near the UVA campus on Friday the 11th under cover of darkness. We will meet at 2130 in "Nameless Field" and march with our torches lit to the monument. Each person should bring their own torches which can be brought from a local Wal-Mart, Lowes, Home Depot, etc. Tiki Torches are fine. Once on the grounds of the monument a speech will be given, we do some chants, then sing dixie, then put out the torches. We will return to "Nameless Field" and back to our cars.[283]

The section also emphasized that attendees should not "mention this torchlight beforehand outside of extremely vetted circles," and should not "post about [the torchlight event] on social media until after."[284]

While law enforcement lacked concrete knowledge of Kessler's plans, anti-racist activists successfully penetrated Discord and developed significant intelligence about the August 11 event. According to Seth Wispelwey, it was common knowledge among activists that Kessler planned to hold an event with torches on August 11. Similarly, Charlottesville activist Emily Gorcenski recalled hearing about the plans for a Friday evening event as early as Wednesday, August 9. Ms. Gorcenski knew that the event would involve torches, and assumed that the event would be in the vicinity of the Rotunda. She did not inform CPD.

## 2. Wal-Mart Parking Lot

The first hint of trouble on August 11 occurred in the Wal-Mart parking lot on U.S. Route 29 in Albemarle County at approximately 12:00 p.m. Chris Cantwell, the host of a right wing podcast called the "Radical Agenda," told us that he arranged to meet with a number of paying customers at that location. Cantwell noted that he maintains a "pay wall" on his web site in order to protect information regarding his whereabouts from Antifa and other activist groups. Cantwell planned to meet his supporters, find a place to have lunch, and discuss plans for Saturday morning.

When Cantwell and his supporters arrived, they were confronted by demonstrators. Emily Gorcenski was part of the group; she recalled learning about the meeting through an "intel ring" that had infiltrated Cantwell's web site. Gorcenski drove to the Wal-Mart to take pictures, and she posted the pictures on Twitter. Within minutes, the Albemarle County Police Department received a report of a man with a firearm. When confronted by ACPD, Cantwell indicated that he had a permit to carry a concealed weapon but denied brandishing the firearm. ACPD declined to pursue charges, and Cantwell and his supporters departed.

## 3. Law Enforcement Awareness and Planning

Soon after the Wal-Mart incident, UVA Vice-Provost for Community Engagement Louis Nelson received a phone call from an anonymous source in the Charlottesville community with more specific details about an event at the University on Friday night. At 3:13 p.m., the source informed Nelson that Jason Kessler and other members of the "alt-right" planned to march that evening on the University Grounds with torches. Nelson immediately escalated the information to University Chief Operating Officer Pat Hogan and other senior members of the Provost's office.

Nelson's e-mail triggered a flurry of correspondence between senior administrators at the University and local law enforcement. At 3:23 p.m., Vice Provost for Administration Anda Webb distributed an e-mail to UPD Chief Michael Gibson and University Director of Safety and Emergency Management Marge Sidebottom, summarizing Nelson's information. Webb specifically mentioned the "possibility of an alt-right march on-Grounds this evening, beginning at the Jefferson statue."[285] Webb also noted that the march would end near St. Paul's Memorial Episcopal Church.[286]

Ten minutes later, Chief Gibson forwarded the e-mail to ACPD Chief Ron Lantz and to Chief Thomas. Lantz responded at 4:10 p.m., noting that ACPD had already responded to several troubling calls that afternoon involving large groups at Darden Towe Park.[287] Because the intelligence reports earlier that week suggested the park as the starting point for the march, Lantz continued to stage units there, and worked with Albemarle County officials to close the park early. However, Lantz also prepared to assist UPD.[288]

Gibson developed what he believed was an adequate plan for the potential march. Before leaving for the evening, Gibson doubled the number of officers on duty, and instructed his staff to stage a group of UPD officers in the vicinity of the Rotunda to monitor the march, with additional officers on call near UPD headquarters. However, Gibson failed to develop

a comprehensive plan to maintain separation between alt-right marchers and counter-protesters who would likely confront them. Nor did Gibson work directly with either Chief Thomas or Chief Lantz to coordinate a unified response. Gibson did not recognize that Kessler's controversial ideology might result in violent encounters with students or other demonstrators in Charlottesville for the events of August 12. In his interview with us, Chief Gibson recalled that he considered Kessler's march like any other political event on grounds. He noted that the University's public areas were fair game for any ideology, and UPD would only intervene if laws were broken.

Gibson did not communicate the potential threat to other first responders that might be required to manage a potential large-scale disruption, including the Charlottesville Fire Department and the Charlottesville-Albemarle Rescue Squad. Thomas and Lantz each took steps to prepare their respective departments to assist, but Gibson's failure to fully engage and leverage the law enforcement resources at his disposal, including VSP units already staging in Charlottesville for the Unite The Right event on August 12, resulted in a fragmented and disorganized response later that evening.

Chief Gibson also declined an offer of assistance from VSP. During his interview with us, Colonel Flaherty recalled that VSP tracked intelligence reports about the August 11 march, and troopers contacted UPD to offer assistance. According to Flaherty, Chief Gibson responded that he was aware of the reports and was preparing to monitor Kessler's activities.

Kessler, Cantwell, and others arrived at McIntire Park at 5:00 p.m. to discuss the plans for the evening. Cantwell asked if Kessler planned to coordinate with law enforcement. Kessler responded that he did not want to inform law enforcement, because he wanted the event to be a "secret." Cantwell strongly disagreed, noting that Antifa and other anti-racist groups often interfere with free speech events held in public areas. Cantwell refused to be a part of the march unless Kessler contacted law enforcement. Kessler then placed a call to Captain Lewis, who instructed Kessler to call UPD Patrol Lieutenant Angela Tabler. Kessler called Lieutenant Tabler, then passed the phone to an associate, who informed Tabler that the group planned to assemble at Nameless Field on the University grounds, march to the statue of Thomas Jefferson in front of the Rotunda, and make a short speech. There was no mention of torches.

### 4. Interfaith Service at St. Paul's Memorial Episcopal Church

St. Paul's Memorial Episcopal Church is located at the intersection of University Avenue and Chancellor Street in Charlottesville, directly across the street from the University. In the weeks leading up to August 12, St. Paul's associate rector Elaine Ellis Thomas, an ally of Congregate Charlottesville, asked the church rector, Will Peyton, for permission to host an interfaith service on the evening of August 11. Thomas informed Peyton that Princeton University Professor and longtime Civil Rights activist Cornel West planned to attend. Peyton gave his consent, as he recognized that St. Paul's was large enough to accommodate the sizeable crowd that Thomas anticipated. Peyton told us that he felt that "an interfaith service is never the wrong thing to do."

Around noon on August 11, Peyton decided to close the St. Paul's sanctuary for the afternoon and lock the building. Peyton anticipated that the attendance of Cornel West would draw attention, and he wanted to prevent vandalism. Peyton and parish administrator John Reed also contacted CPD and asked to hire off-duty officers to provide security. CPD agreed and promised to send two off-duty officers.

Just before 4:00 p.m. that afternoon, Peyton returned to the church, expecting to find the building empty. Instead, Peyton found Osagyefu Sekou, a minister from New York City who achieved notoriety for his protest work in Ferguson, Missouri, leading a training session of more than 100 activists in the parish hall.[289] Unbeknownst to Peyton, members of Congregate Charlottesville had organized and presented a number of training sessions in nonviolent direct action conducted by Reverend Sekou in the weeks before August 12. Eugene Locke, a Charlottesville resident and retired minister, attended the training, and said that Sekou instructed attendees on nonviolent techniques for disrupting hate speech and obstructing law enforcement. A second session was scheduled for later that evening, at 9:30 p.m.[290]

Sekou's entourage informed Peyton that they were concerned about security at the interfaith service later that night. When Peyton explained that he had arranged to have CPD officers protect the service, Sekou responded that law enforcement "made [him] uneasy." Instead, Sekou proposed that Peyton allow his "security" to protect the parish. Shortly after this conversation, Peyton received a call from CPD, informing him that the department would be unable to provide off-duty officers.

University professor Willis Jenkins arrived at St. Paul's at 5:00 p.m. He became part of the security detail that was organized to protect the interfaith service. Mr. Jenkins met two members of the security detail who indicated that they were affiliated with Redneck Revolt, an anti-capitalist organization that also strongly endorses the Second Amendment.[291] Jenkins recalled that Redneck Revolt requested permission to carry firearms into the sanctuary, but the request was denied. The security team scouted the external perimeter, posted guards at ingress and egress points, and monitored the social media communications of Spencer, Kessler, and other supporters of the Unite The Right event.

The service began as scheduled at 7:00 p.m. The security team screened entrants at the door. Jenkins and others, including Casey Landrum, participated in searching backpacks. Jenkins admitted that white males entering the service were subject to enhanced vetting and asked multiple questions about their purpose in attending. Sekou asked to allow television cameras into the service. Peyton firmly denied the request, stating "this is not a media event, it is a prayer service."

Multiple witnesses testified that despite the security concerns, the first ninety minutes of the service were peaceful. Rabbi Tom Gutherz of Charlottesville's Congregation Beth Israel commented that the church was "full and overflowing," and that the service was "uplifting" due to the broad representation of different denominations and faiths.

### 5. Jason Kessler Moves Forward

After the service at St. Paul's began, the University and the UPD obtained additional information about Kessler's plans. At 7:41 p.m., the University discovered a social media post confirming that the event would take place on the University grounds.[292] Chief Gibson passed the information along to Chief Thomas and Chief Lantz.[293] However, Gibson made no effort to prepare a unified law enforcement response. Chief Thomas shared the developments with Charlottesville City Manager Maurice Jones. Jones immediately recognized the gravity of the situation, and understood that CPD would be called upon to assist.[294]

The Mutual Aid Agreement between the City of Charlottesville, Albemarle County, and the University permits UPD to request assistance from CPD in managing events on the University grounds. However, for CPD officers to assist UPD, UPD must make a formal request for assistance.[295] CPD expected mutual aid to be requested and prepared to respond.

Lieutenant Dwayne Jones, the commander of the CPD midnight shift, informed his officers about the interfaith service and shared intelligence about the Unite The Right event. Lieutenant Jones departed from normal procedures and ordered his officers to travel two to a car.[296] Lieutenant Jones further ordered that in the event of a disturbance, two units, totaling four officers, were to respond.

At 8:10 p.m., one of Kessler's representatives contacted CPD and stated that the march would start at Nameless Field on the University grounds.[297] Chief Thomas passed the information on to Lieutenant Jones and to Lieutenant James Mooney, whose evening shift was guarding the Downtown Mall.[298] Lieutenant Mooney informed Chief Thomas that CPD would provide assistance to UPD upon request.[299]

Chief Gibson remained relatively unconcerned about the potential march, noting in an e-mail to Thomas and Chief Lantz that his officers were "good for right now" and were "watching this closely."[300] Chief Gibson's lack of concern was shared by senior members of the UVA administration. Shortly after Gibson contacted Thomas and Lantz, City Manager Maurice Jones e-mailed UVA Executive Vice President and Chief Operating Officer Pat Hogan, asking if UVA required assistance that evening. Hogan replied that Chief Gibson had "adequate coverage" for UVA, but asked if CPD would be "available to assist in other areas." Jones responded that he would "find out more."[301]

### 6. Difficulties at St. Paul's

Mayor Signer was present at the interfaith service at St. Paul's. At 8:21 p.m., he sent a text message to City Manager Jones and Chief Thomas, informing them that "four alt right" were inside the church and appeared to be dangerous. Signer noted that no officers were present in the church.[302] Juvenile and Domestic Relations Judge Claude Worrell was also present and reached out to Lieutenant Mooney, noting that more than seven hundred parishioners were inside St. Paul's and asking Mooney what CPD intended to do to protect the crowd.

Willis Jenkins recalled that Congregate Charlottesville had allies monitoring social media and providing information to the security detail. At some point during the service, the security detail learned that an Alt-Right follower had sent a Twitter message from inside the church. The security detail identified a suspect but declined to remove the individual from the service, reasoning that he was unlikely to be armed.

The ECC received the first of several calls related to the service at 8:43 p.m. An anonymous male caller claimed to have an AR-15 rifle and threatened to open fire inside the church in five minutes.[303] At the time, Lieutenant Jones was patrolling Chancellor Street, adjacent to the church.[304] Eight additional CPD officers responded, including Sergeant Pleasants, the second-in-command for the midnight shift. When Pleasants arrived, Lieutenant Jones and two other CPD officers were already searching for a potential active shooter; no shooter was found.

A second threat against the church was made at 8:56 p.m. An unidentified male called the ECC and threatened to walk inside St. Paul's and kill a large number of parishioners.[305] CPD again failed to identify a suspect, but officers remained in the area. Based on these threats, the security detail at the church decided to place the facility on "lock down," and prevented parishioners from leaving.

Lieutenant Jones received notification from the ECC that Kessler's march was to begin at Nameless Field. Jones placed Sergeant Pleasants in charge of the CPD officers in the area, and Pleasants ordered the unit to move to the intersection of University Avenue and Madison Lane, within visual range of the Rotunda. When Pleasants arrived at that intersection, he encountered a UPD officer. Pleasants mentioned the march and asked if UPD required assistance. The officer stated that UPD had the situation under control. Lieutenant Jones then spoke by telephone with the UPD supervising officer, who stated that UPD was monitoring the situation and did not require assistance.[306] UPD's relaxed posture concerned the CPD commanders. To provide additional manpower, Lieutenant Mooney began moving evening shift units from the Downtown Mall to University Avenue.

At 9:02 p.m., Chief Gibson received an e-mail from Student Council Vice-President Alex Cintron, indicating that a torch rally would occur at 9:30 p.m. Cintron asked if there was "any safety information" available to students.[307] Gibson responded at 9:17 p.m., stating that UPD was aware of the situation and "monitoring .... very closely to make sure Grounds stay safe."[308]

Neither Chief Gibson nor anyone else sent any notification about the pending event to the University community. Body camera footage from later that evening shows pedestrians, including one female in an evening gown, walking across the Lawn shortly after the march. The failure to distribute timely information to the University community exposed bystanders and raised the prospect of their unforeseen exposure to a contentious demonstration.

Despite the lack of any warning from the University, students did learn about the torch lit march and respond. At 9:15 p.m., a group of demonstrators began to assemble near the Thomas Jefferson statue in front of the Rotunda.[309] Joined by supporters from the community, the students formed a circle around the statue.

### 7. The March Begins

By 9:20 p.m., Kessler, Spencer and their supporters were preparing for the march. Emily Gorcenski observed the preparations; the marchers passed out torches and gave instructions on what to do if Antifa attacked. At 9:30 p.m., UPD attempted to contact Kessler; his associate informed UPD that the marchers would begin at 10:00 p.m. at Nameless Field, walk up University Avenue, and stop at the Rotunda.[310]

The march began early. UPD stationed several officers in the vicinity of Nameless Field, and they followed the procession.[311] Chris Cantwell recalled that he was instructed to join other "guards" on the outsides of the line. The guards were selected for their willingness to "get physical" with Antifa. Cantwell was shocked by the absence of a law enforcement presence, and noted in his interview that "if you notify law enforcement that white nationalists were going to march on a public university with torches, you would think they would take an interest."



**The path followed by the torch-bearing marchers.**

Open-source video footage shows that contrary to representations made to UPD, the marchers moved from Nameless Field, around Alderman Library, down McCormick Road, and onto the Lawn.[312]  By 10:07 p.m., the march reached the rear of the Rotunda.  The marchers then split, encircling the Rotunda and marching down the stairs to face University Avenue.[313]  When Sergeant Pleasants saw the torches appear at the top of the Rotunda, he again asked if UPD required assistance.  Once again, he was told "no."

Colonel Flaherty also observed the marchers encircle the Jefferson statue.  His subordinates had informed him about the march, and he and VSP Lieutenant Colonel George Daniels decided to drive around UVA.  The two senior VSP officials saw the torches for the first time while driving up University Avenue, and Colonel Flaherty pulled his VSP vehicle into the parking lot of the University President's home at Carrs Hill.  When Flaherty saw hundreds of torches emerge from behind the Rotunda, he recalled instructing Daniels to give him a sidearm, as he anticipated trouble and he had no intention of "wading into white supremacists unarmed."  Flaherty immediately contacted his dispatcher, who indicated that VSP units staged at Hill & Wood were prepared to assist UPD.  Colonel Flaherty also ordered a local VSP patrol detachment assigned to cover the Charlottesville area that evening to converge on UVA.

Marchers formed a semi-circle around the Jefferson statue.  The small group of counter-protesters who were waiting for them locked arms.  Emily Gorcenski recalled that after observing the march begin, she ran to the Jefferson statue, and warned the group that a large crowd was coming, with torches.  When she noticed that no police were in sight, Gorcenski decided to remain with the group.  When the torch bearing marchers arrived, confrontations ensued, as the counter-protesters exchanged taunts with march participants.  On at least one occasion, a counter-protester attempted to knock down a torch, resulting in a physical altercation.[314]  At some point, Gorcenski recalled seeing Chris Cantwell deploy mace; both Cantwell and Gorcenski claimed to have suffered injuries as the result of a chemical agent.

University Professor Walt Heinecke arrived at St. Paul's to participate in the training scheduled for 9:30, only to learn that his students were "surrounded by Nazis in front of the Rotunda."[315]  Heinecke noted that the students involved had "taken nonviolent training," but were very frightened.[316]  Heinecke recalled seeing a torch thrown in the direction of University Dean of Students Allen Groves, who was also in the vicinity of the Jefferson statue.

### 8.   UPD Requests Mutual Assistance

At 10:16 p.m., as disorders broke out in front of the Rotunda and torches flew in the air, UPD Officer Scott Smallwood crossed University Avenue and finally requested assistance from Sergeant Pleasants.  When Pleasants saw Smallwood approach, he radioed the ECC for all available units, including the remaining evening shift officers on the Downtown Mall, and VSP units stationed at the Hill & Wood funeral home.  Unfortunately, by the time UPD requested assistance, many of the disorders around the Jefferson statue were over and the participants were either dazed or fleeing.

Recognizing that he was outnumbered, Sergeant Pleasants ordered his officers to stay together and turn on their body cameras.  Pleasants then moved across University Avenue,

and UPD asked him to take a position along the steps in front of the Jefferson statue, facing University Avenue. CPD officers reached the steps at approximately 10:17 p.m. one minute after UPD first requested mutual aid. By then, the marchers had begun to retreat, though a large crowds still surrounded the statue. More students began arriving in large numbers. A CPD officer drove into the plaza near the statue and parked a marked CPD vehicle just below the stairs. Pleasants then attempted to organize the UPD officers, who did not have a commander on scene.

At 10:18, Emily Gorcenski approached the line of CPD and UPD officers, asking "who is in command." Seegant Pleasants spoke to Gorcenski and provided his badge number. When asked why his officers did not intervene during the confrontations at the Jefferson statue, Sergeant Pleasants stated "there was no brawl when we got here." Gorcenski called Pleasants a "fucking liar," and continued to walk up and down the line. Two minutes later, having received no direction from UPD, Pleasants turned to a UPD officer and asked to speak to a sergeant or lieutenant. He was told "they are scattered." Pleasants responded that it would be helpful to "figure out what [UPD] want[s] from us." Meanwhile, marchers continued to disperse toward Nameless Field, while counter-protesters criticized police for failing to protect their rights.

At 10:22 p.m., UPD Sergeant Stuart approached Pleasants and asked him for CPD assistance clearing the area surrounding the Jefferson statue. Pleasants moved his officers to a clearing left of the statue and instructed UPD to prepare to assist his unit in pushing the crowd. Sergeant Pleasants informed Stuart that before he could disperse the crowd, Stuart needed to declare an unlawful assembly. Sergeant Pleasants noted that the declaration required amplified sound; Stuart responded that UPD did not have a bullhorn. Pleasants then instructed Stuart to use the public address microphone on a nearby CPD squad car to declare the unlawful assembly and explained that the declaration must be given multiple times. Pleasants also informed Stuart that he was required to give the crowd several minutes from the time of the declaration before beginning forced dispersal.

Stuart moved to the squad car. Pleasants then moved the remaining CPD and UPD officers into a two-deep line. Gorcenski saw law enforcement preparing to clear the area, and requested permission to assist a student in a wheelchair. Pleasants agreed and allowed Gorcenski to move the student. Stuart declared the unlawful assembly at 10:24 p.m. The officers then drew collapsible batons and began marching across the front of the Rotunda, funneling protesters away from the Jefferson statue. The area was clear by 10:29 p.m. Sergeant Pleasants took a holding position at the top of the hill overlooking McCormick Road and monitored foot traffic as EMS units provided assistance to victims of pepper spray. At 10:43 p.m., with the mob dispersed, Pleasants and his officers departed the area. [317]

### 9.    Aftermath

As the march ended and the crowd dispersed, the service at St. Paul's was finally released and parishioners returned to their vehicles. A few reported encounters with Kessler supporters leaving the University grounds, but no serious altercations took place. UPD made one arrest after the incident. EMS units treated several individuals for exposure to

pepper spray; others refused treatment. Small disorders continued in the vicinity of the University for approximately twenty minutes, but no arrests were made.

In an interview with us, Chief Gibson downplayed the incident, noting that it lasted for less than an hour and did not result in any serious injuries. Gibson also noted that following the incident, he learned that the University's open-flame policy may have permitted him to declare an unlawful assembly before disorders began. That policy prohibited open flame devices on University property and facilities, absent approval by the University Office of Environmental Health and Safety or the University of Virginia Medical Center Fire Protection Inspector's Office.[318] Gibson admitted that he was not aware of the policy on August 11.

Chief Gibson's comments notwithstanding, numerous witnesses commented that the August 11 event had a significant emotional impact. Bo and Maureen Perriello, local Charlottesville residents who are not affiliated with any of the anti-racist activist groups in the area, commented that witnessing the sight of torches on the University lawn convinced them to attend the event on August 12 to protest against white supremacy and bigotry. Seth Wispelwey commented that the failure of law enforcement to actively intervene in disorders and to permit a rally of this magnitude without close supervision fostered a permissive attitude toward violence that continued into the morning of August 12. For Professor Heinecke, who had received permits to hold two events the next day at McGuffey and Justice Park, the torch rally suggested that the "white supremacists will be violent tomorrow." He consequently requested that CPD provide law enforcement protection for his events.[319]

## C. Events of August 12

### 1. Early Movements

#### a. Law Enforcement Postings

There was no all-hands briefing for CPD officers on the morning of August 12. Instead, the various zone commanders and operational heads met at the City Council chambers at 4:00 p.m. on Friday, August 11. At this meeting, the zone commanders met their VSP command counterparts and discussed the formation of arrest teams and cover teams. They were expected to convey information to officers within their assigned zones early on August 12.

CPD officers were ordered to report to their posts by 7:00 a.m. on Saturday morning. When they arrived, they were surprised by the absence of their state counterparts. As it turns out, VSP held its own all-hands meeting for its several hundred troopers that morning at the John Paul Jones Arena. No CPD officers were invited to that meeting. VSP personnel did not fully arrive at Emancipation Park until 8:39 a.m., much later than CPD expected.[320] The late arrival of VSP left little time to meet and review plans.

### b.    Interoperability

Had VSP arrived earlier, the two agencies might have quickly realized that they were not communicating on the same radio channels.  Captain Lewis noticed the lack of radio connectivity immediately upon VSP's arrival.  She notified Captain Mitchell, who did not attempt to remedy the problem.  Captain David Shifflett told us that throughout the day, the respective commanders from CPD and VSP had radio contact with their respective subordinates, but not each other.  VSP and CPD officers on the ground had no radio communications with each other.  If a CPD officer needed to share information with a VSP officer, the conversation had to happen face-to-face or the message had to be relayed through the Command Center, where the VSP supervisors could then send the message through VSP channels to troopers on the ground.

Colonel Flaherty told us that the lack of interoperability of communications could have been easily and immediately remedied, but it did not occur because "CPD did not request that it be done."  Chief Thomas indicated that he expected CPD and VSP to use linked communications channels.  He could not explain why that linkage did not occur.  Chief Thomas told us that by the time he learned of the problem, he was too immersed in responding to changing conditions to address the interoperability issue.  The bottom line here is that despite identifying this exact issue  CPD and VSP interoperability  as a problem from July 8, it had not been fixed for August 12.  No one tried to fix it when they realized it was an issue on August 12.

### c.    Going "Off Plan"

A few small events occurred that morning before participants began to arrive.  Lieutenant Jim Mooney told us he enlarged the southwest barricaded area designated for the Unite The Right demonstrators.  VSP K-9 units responded to a suspicious car in the Wells Fargo parking lot.  Other than the use of K-9 units, there does not appear to have been a concerted effort on the morning of August 12 to sweep Emancipation Park to remove any items in or around the area.  As a result, newspaper boxes located near the entry areas remained in place.

Shortly after VSP arrived at Emancipation Park, VSP Ground Commander Lieutenant Becky Crannis-Curl made comments that suggested miscommunication and a change in tactics by VSP.  First, she commented to Captain David Shifflett that she was surprised to see the area divided into five zones instead of four.  Shifflett was surprised by this comment, because he had gone over the five-zone plan the day before with another VSP supervisor.  Lieutenant Crannis-Curl reassigned some VSP troopers to Zone 5 and requested that metal barricades be placed around the surface parking lot behind the Wells Fargo building within that zone.  Captain Shifflett and Lieutenant Crannis-Curl walked around the park, made additional adjustments to the barricades, and set up their personnel in the zones.

When attendees began arriving sooner than expected and tensions rose, Lieutenant Crannis-Curl told Captain Shifflett that she was going "off-plan" and was "not going to send arrest teams into the street."  Shifflett told us that he thought nothing of her comment and did not communicate it to anyone else in the CPD chain of command.  He explained to us that he believed Lieutenant Crannis-Curl simply meant that "they needed to be safe about how they

approached these issues within the mob of people." He also pointed out to us that VSP troopers did later respond to a disturbance on 2nd NE and High Streets, which suggested to him that they were not entirely hands-off.[321]

We developed substantial additional evidence that suggests that Lieutenant Crannis-Curl's "off-plan" directive had been passed along and adopted by all of the VSP troopers stationed in and around Emancipation Park. Lieutenant McKean told us that the VSP sergeant assigned as his counterpart in Zone 1 told him he would not send troopers over the barricades to engage the crowd if their safety was compromised. A trooper in Zone 3 told Officer Lisa Best that VSP was "under orders not to go in." Another VSP officer in Zone 3 indicated that troopers had been instructed "not to break up fights." Lieutenant Jim Mooney, the commander of Zone 2, told us that his VSP counterpart saw the isolated area between demonstrators and counter-protesters and suggested that "if all hell breaks loose, we're not standing officers here without equipment." CPD Officer Otis Collier told us that a VSP Sergeant in his zone that morning simply said "we're not ready."

Multiple citizens provided further evidence of the VSP "off-plan" decision to refrain from leaving barricaded areas adjacent to Emancipation Park. Several witnesses told us that they directly solicited help from VSP troopers and were told that they were not available to assist. For example, former Charlottesville Mayor Frank Buck observed an Alt-Right protester fire a gun in the direction of a counter-protester on Market Street. He then followed the person who had fired the gun and attempted to alert law enforcement. Mr. Buck told us that on two separate occasions, he identified the man who had fired the gun to VSP troopers. Each time, the trooper refrained from pursuing the man or taking other action.

### d. The Clergy Arrives

The First Baptist Church held a 6:00 a.m. sunrise service on August 12. Members of both the Clergy Collective and Congregate Charlottesville attended, as did other activists and counter-protesters. Seth Wispelwey explained to us that after the service, attendees split up; those trained in nonviolent resistance would stay behind to march to Emancipation Park



and engage in direct action, while all others would go to the Jefferson School to participate in the march to McGuffey Park. One witness who joined the latter group estimated that about 150 people marched to McGuffey. The direct-action group whose goal was to encircle Emancipation Park in a locked-arm barricade numbered only about sixty. The witness suggested that those numbers dwindled after leaders gave stern warnings about the potential for violence.

Photo Source: Patrick Morrissey

The group that gathered at the Jefferson School set out around 8:00 a.m. They arrived at McGuffey Park around 8:20 a.m., where their numbers grew to an estimated 300 people. Organizers on the counter-protester side had set up first-aid stations and water areas under

tents. At McGuffey they heard speeches, sang songs, and milled about talking with each other. One attendee told us he did not see any Unite The Right demonstrators moving toward Emancipation Park. From his vantage point, "Charlottesville seemed so peaceful that morning."

Some who marched to McGuffey walked over to the First United Methodist Church, where prayer services happened inside while medical tents and counter-protester support organized in the back parking lot. Deborah Porras, a minister who traveled to Charlottesville to support counter-protest efforts, told us that FUMC had installed metal detectors and required white males to have a "sponsor" to enter the building. We also learned that FUMC went on "lockdown" at several points during the day, during which people were barred from entering or exiting the building. Members of Antifa were asked to leave when they refused to agree to avoid violence.

Others journeyed beyond Emancipation Park to Justice Park, where more counter-protesters were gathering. Both McGuffey and Justice Parks had tents for water and medical treatment. Both locations were staffed by an organized group of "marshals" who had walkie-talkies and could communicate with each other and people who were at Emancipation Park.

At 8:55 a.m., police reported that the clergy group gathered at First Baptist Church was heading to the park. When they arrived at Emancipation Park a short time later, they formed a line at the north edge of Market Street facing the park, locked arms, knelt, and began to sing hymns. There was no barrier between them and the armed militia, who stood just a few feet away. The clergy then stood and took turns saying prayers out loud.[322]

### e. The Militia Arrives

CPD received several phone calls from concerned citizens that morning about the presence of armed militia at various locations. Security for counter-protesters at Justice Park was provided by the Redneck Revolt group that had been present at St. Paul's the night before. One witness told us he spoke with a Redneck Revolt member and learned that they intended to prevent Unite The Right demonstrators from coming to Justice Park. Professor Walt Heinecke, the holder of the permit for Justice and McGuffey Parks, also hired private security for the day.



Photo Source: Patrick Morrissey

Around the same time the marchers arrived at McGuffey, other militia groups were organizing their approach to Emancipation Park. Officer Logan Woodzell observed one group meeting up in the Market Street garage around 8:26 a.m. and noted that they carried long guns and wore body armor. Police body camera footage shows the arrival of the Pennsylvania and New York Lightfoot Militias at 8:31 a.m. Around thirty members walked up 2nd Street

NE and entered the public area of Emancipation Park. After standing around for a few minutes, the militia left the park and formed a line along the southern edge of Emancipation Park between 1st and 2nd Streets. A VSP trooper who arrived a few minutes later asked a colleague, "What are they, like military? They're more armed than we are."

### f. The Alt-Right Arrives

Before 9:00 a.m., there were no organized groups inside Emancipation Park. Body camera footage does indicate that a handful of people were present in and around the park, milling about. For example, police body camera footage shows Richard Wilson Preston, the leader of the Confederate White Knights of Ku Klux Klan, standing by himself inside Emancipation shortly before 9:00 a.m.

At 8:45 a.m., police observed a large group of Unite The Right demonstrators gathering at McIntire Park, many of them wearing white polo shirts and carrying white flags. Open source video footage shows hundreds of people gathered in the McIntire parking lot, many carrying shields or wearing helmets. Some apparently met for the first time that day after having only interacted through online message boards. Several people livestreamed the gathering. Prominent white nationalist and Alt-Right leaders were present, including Richard Spencer, Mike Enoch, David Duke, and Jason Kessler. The demonstrators soon began loading into white passenger vans, which would shuttle them from McIntire Park to various locations around downtown Charlottesville.[323]

Around 9:00 a.m., a white U-Haul truck arrived at a police barrier and requested entry to the park to unload sound equipment for the rally. Lieutenant Michael Gore, the Zone 4 commander, conferred with Captain Shifflett, and they agreed that the truck could enter the secured public safety area to unload the equipment. The truck parked at 2nd Street NE and Jefferson Street. After they unloaded the equipment, they exited along East Jefferson Street.

Just after 9:00 a.m., Sergeant Tony Newberry the detective who had been in touch with Unite The Right security organizer Jack Pierce about getting speakers and VIPs into the park was driving around the downtown area with his partner in an unmarked van. Pierce had refused to share where the speakers would be gathering that day to assemble for the convoy, but Newberry knew by now that they were at McIntire Park. As the morning went on and groups began to gather, Newberry was anxious to get the speakers and VIPs into the park.

Newberry called Pierce's cell phone and told him, "There's never going to be a better time than right now." Pierce said he understood and responded that he would get everyone together and call Newberry back. A few minutes later, Pierce called back and told Newberry that the speakers had changed their minds about coming in separately because they wanted to "walk in with their audiences." There would be no police escort from McIntire Park. Newberry told us that he had a hunch that Pierce had been tricked into working with him and that the rally organizers had never planned to be brought in through the back of the park. After the call ended, Newberry turned to his partner in the van and told him, "They do not plan on this going well."

The decision to forego a police escort may not have been clearly communicated to the Unite The Right speakers who were supposed to be in the speakers' convoy. Mike Enoch told us that he believed that the plan had always been for all attendees to be dropped off a block or so from the park and then parade in together. In contrast, Christopher Cantwell told us that he understood the speakers would walk into Emancipation Park from behind the Lee statue with other speakers. He did not expect that he would have to walk through a gauntlet of counter-protesters.

At 9:42 a.m., the first organized group of demonstrators carrying the flag of Identity Evropa and led by Eli Mosley entered the public area of Emancipation Park through the southeast entrance. Body camera footage shows Mosley walking over to the police officers stationed in Zone 2 and asking whether they were in the right section of the Park. Officers told Mosley that the designated Unite The Right area was in the opposite section. Mosley called out to his group to form up and go around to the other side. The Identity Evropa group marched to the southern edge of the Emancipation Park chanting "You will not replace us." They then turned right and made their way to the southwest entrance of the park.

Another wave of passenger vans left McIntire Park at 9:46 a.m. Some groups were dropped off near the Commonwealth Center, at the western terminus of Market Street down the hill from Emancipation Park. But other vans dropped demonstrators off along High Street, northeast of the park. Those groups would walk south on 3rd or 4th Streets NE, take a right onto Market Street, and then walk into Emancipation Park from the southeast. Antifa "marshals" stationed at Justice Park radioed down to their counterparts in Emancipation Park to warn of the coming demonstrators. Like Mosley's group, many of the Unite The Right attendees entered the public area of the park only to learn that they needed to be on the opposite side. They walked back out the southeast staircase and marched between the clergy and militia to reach the southwest entrance.

As the groups marched to the southwest entrance of Emancipation Park, the counter-protesters swelled around that area. Market Street was quickly filling up. Lieutenant Hatter, who was supervising Zone 5 in the Wells Fargo parking lot, ordered his men to back up from the barricades as tensions rose. In a conversation recorded by his body camera, Sergeant Larry Jones explained to the officers that the extra space would create a "reaction gap" in case someone came over the barricade. On Market Street, the crowds roared with chants "Love Has Already Won!" from the counter-protesters, followed by "Commie Scum off our streets!" and "Build the wall!" from the Alt-Right demonstrators.

As Sergeant Jones stood behind the barricades in the parking lot south of Market Street, he remarked to other officers that the groups should "save their energy," as it was not yet 10:00 a.m. An officer responded that the same thing had happened on July 8: "They chanted, they came, they booed." His colleague responded, "It was a little more controlled back then." A few minutes later, during a calm moment between waves of Unite The Right arrivals, Sergeant Jones greeted a friend who had been at the farmer's market on Water Street. He cautioned him with a joking tone, "Be careful over there. If this turns south, they'll just rush across the mall. … That's the plan, just get everyone out of here and vent them to Water Street."

At 10:00 a.m., Charlottesville resident Tanesha Hudson approached police officers standing at the barricade in Zone 2, just above where the clergy and militia were facing each other. She asked Sergeant Lee Gibson to identify the officer in charge that day. Sergeant Gibson responded, "There's a lot." Hudson complained to him that the Unite The Right demonstrators were lowering their flags into the faces of their opponents, and she wanted to know why there were no law enforcement officers on the outside of the barricades. Gibson replied, "We got everyone we can out here to keep people safe. … They've gone through weeks and weeks of planning to do the best they can. There's no one in the middle this second. When things happen, we'll respond." Hudson was taken aback. "When they happen?" she asked in disbelief. "You're supposed to prevent it from happening."

Twenty minutes later, Hudson returned to the barricade to again request police presence on Market Street. She asked Lieutenant Jim Mooney why police were not on the other side of the barricades. Mooney responded, "We thought the counter-protesters would go into the group that we designated for them, but they're not doing that. … But if it overruns here, we'll have to adjust and be down there." Hudson told him, "Y'all should already be down there with us." Mooney said he understood and assured her that they would adapt if they needed to.

Sergeant Ronald Stayments then stepped in and said, "If we go here, Tanesha, they're going to go there. It doesn't matter where we go." She shot back, "There's enough of y'all to be everywhere!" Stayments responded, "There's not that much of us." When Hudson suggested they could spare three to five officers to go to the southwest entrance of the park, Stayments asked, "What are three or five cops going to do down there with that crowd?" Hudson retorted, "What the hell are forty of y'all gonna do right here?"

## 2. Escalation

### a. 2nd Street NE Near First United Methodist Church

Shortly after the waves of Unite The Right demonstrators began arriving, so too did groups of counter-protesters that had staged at McGuffey and Justice Parks. Just after 10:00 a.m., two of these opposing groups ran into each other behind the First United Methodist Church on 2nd Street NE. Will Peyton, the Rector of St. Paul's, was standing in the parking lot of FUMC when a fight broke out between a group of counter-protesters in black shirts and white-shirted Unite The Right demonstrators "with short haircuts and swastikas."

Peyton saw law enforcement officers standing on either end of 2nd Street NE, bookending the crowds. On the south end, at Jefferson Street, a large group of VSP troopers had gathered behind the barricade creating Zone 4. On the north end near High Street, a lone female CPD officer stood near her squad car. When the fight broke out, none of the officers made a move. Peyton told us that the CPD officer "was clearly ordered to stand by the car no matter what happens, and she wasn't going to do a thing." He was right.

Diane Hueschen, an unsworn civilian employee of CPD who works as a forensic technician, was that lone officer standing at the corner of 2nd Street NE and High Street. Her normal job requires her to maintain evidence collected from crime scenes, but she often works traffic duty for football games. On August 12, she had been ordered to stand post at

2nd Street NE and High Street with a marked unit blocking southbound vehicle traffic on 2nd Street NE. She was not authorized to carry a weapon in her job, but she did have pepper spray. Nevertheless, her traffic supervisor had instructed all the civilians manning traffic posts that if things "went south" they "need to get out." Hueschen was not given any intelligence about the event, but she told us that her superiors "expected things to go south." That morning, Hueschen had seen, in her words, "tons" of foot traffic. White passenger vans had been running on a loop since mid-morning, continuously dropping Unite The Right demonstrators off on High Street between 2nd and 3rd Streets NE, just to the east of her location. She believed the van shuttles were clearly an organized effort.

Hueschen saw the fight break out at 10:00 a.m. just south of her position. She said people had been arguing as they walked south towards the park. By the time they approached the barricades at Jefferson Street which were blocking off the law enforcement area of Zone 4 there was a mob of thirty or forty people in a commotion. The fight broke out, but she could not tell who was doing what. She told us that she expected the VSP troopers standing nearby to react, but they did nothing. The scuffle lasted five minutes, until finally some troopers started to walk towards the groups.

From Peyton's perspective, it appeared that the Unite The Right demonstrators had focused their aggression on a middle-aged black man. As the troopers approached, the Unite The Right demonstrators took off running and darted through the FUMC parking lot. They laughed among themselves and shouted, "You want some more?"

Lieutenant Gore reported the confrontation between the groups to the Command Center at 10:08 a.m. Five minutes later, he requested additional assistance, so the CPD squad from Zone 2 was deployed. Body camera footage shows that, by the time they arrived, there were nearly two dozen officers standing around the area and the fight had long since ended. EMTs treated one person for a head injury, while street medics treated another injured counter-protester. Some individuals refused treatment. After a few minutes, CPD officers withdrew and returned to their zones. No arrests were made.

Eugene Locke witnessed the fight behind FUMC. Mr. Locke told us he walked over to police at the corner of Jefferson Street and 2nd Street NE and told them he thought the lone officer at the corner of 2nd and High was insufficient. He suggested one or two officers join her. The police officer replied to the man, "I can't spare anymore."

Hueschen told us that people came to ask her why she had not intervened in skirmishes during the day. She was reluctant to respond that she was not a police officer, because she did not want to become a target. But she also knew she could not run a mob of people off on her own. She remained at her post all day.

### b.    2nd Street NE and East Market Street

At 10:21 a.m., a large group of counter-protesters wearing helmets and carrying a banner reading "Fascist Scum" confronted Alt-Right demonstrators on Market Street between 1st Street and 2nd Street NE. At 10:26 a.m., a scuffle broke out when a counter-protester tried to grab a demonstrator's flag in the center of Market Street directly south of the Lee statue. CPD officers in Zone 5 walked up to the barricade, and Sergeant Larry Jones reported to

Captain Shifflett, "We've got a disorder in middle of Market." Shifflett responded, "Let's give them a second," then asked whether Zone 3 which was situated behind two rows of barricades more than twenty feet from the fighting needed more units. Officers in Zone 5 watched as militia stepped in to separate people. Officer Maney turned to a fellow officer and said, "We need clarification of when we're jumping in or not."

A minute or so later, Lieutenant Hatter jumped over the barricade to deescalate the tension between the flag-toting demonstrator and the crowd around him. Followed by a VSP trooper, Hatter drew his retractable baton and walked over to step between the parties. Officer E.A. Maney, who had moved to the back of the parking lot for a moment, noticed Lieutenant Hatter go over the barrier and confront the demonstrator. Maney's body camera footage shows Hatter and the state trooper walking the demonstrator away from the crowd with members of the militia appearing to guard Hatter's rear. Maney then jumped the barrier to assist Hatter. Hatter spoke a few words to calm the demonstrator down then walked back around to 2nd Street to re-enter Zone 5. This is the only instance we identified of a CPD officer leaving a barricaded safe zone to enter the crowd and de-escalate a potentially violent situation on August 12.



**Lieutenant Joe Hatter entered the crowd on Market Street around 10:30 a.m. to separate a Unite The Right demonstrator from counter-protesters who were grabbing at his flag.**

Seeing officers enter the crowd on Market Street, an officer in Zone 1 asked Sergeant Paul Best, "What happened to not going outside the gate if they're beating the crap out of each other?" Sergeant Best responded, "Yeah, well, that was somebody else's zone." Back in Zone 5, Officer Maney told a fellow officer, "I like those militia guys." His colleague replied, "Yeah, they're doing a good job."

When skirmishes began at the southwest entrance to the park, a group of the clergy broke away from their line on Market Street and moved to the southeast staircase. Wispelwey told us that they intended to block entry for the Unite The Right demonstrators. He said there were no police present at the intersection, but the clergy hoped they might "create a scene" that would lead to a police response.

Officers in Zone 1 saw the clergy stop on the stairs. Sergeant Best remarked that they were blocking free passage, but said, "That's OK they keep people out of that area, I'm fine with that." The officers apparently believed the ministers were attempting to keep counter-protesters from entering the public area to engage with demonstrators on the other side. Officer Johnston responded, "Until the others side tries to get in there, then that becomes a problem. We'll address it at that point."

The clergy stood at the top of those stairs for about ten minutes before any Unite The Right demonstrators arrived. During that time, the counter-protesters that had been crowding around the southwest entrance began to move east. Pole camera footage shows that at 10:36 a.m., Reverend Sekou walked down to the crowd that was gathering around the bottom of the staircase and got them to move away to clear the area.

Ann Marie Smith and Rebekah Menning were part of the group that formed a line at the top of the stairs. They indicated that Antifa counter-protesters had agreed to "stand down" as the Alt-Right demonstrators approached. Antifa indicated, however, that they would "jump in if things got violent." Smith and Menning told us that they expected to be arrested for blocking entry to Emancipation Park. But officers did nothing. As indicated above, the closest police officers were behind two rows of barricades on 2nd Street NE, discussing their hope that the clergy would keep others out of the park.

Just as the Antifa group cleared from the street in front of the clergy blockade, a large column of Unite The Right demonstrators wielding shields arrived from the east. The demonstrators stood at the corner of Market and 2nd Street NE for about a minute before pushing forward. They marched up the stairs, shields first, and pushed through the line of clergy. Wispelwey told us that Cornel West, who was standing in the blockade, said they should break the line to let the Unite The Right demonstrators through rather than risk injury. This group was followed by more than 100 Unite The Right demonstrators who marched into the public area of Emancipation Park. But just like the previous groups to enter from the southeast, they quickly realized they had entered the wrong area of the park. They walked back out of the park, along Market Street and around to the southwest entrance. The clergy reformed their line.

By 10:40 a.m., the Command Center was taking steps to secure the area. The National Guard began to gear up and prepared to be deployed. Logistical assets were evacuated from the Levy Opera House to City Yard on the other side of Ridge-McIntire Road. The VSP's Tactical Field Force began to suit up. Nevertheless, it would still be almost an hour until the unlawful assembly was declared.

At 10:45 a.m., a man with an American flag approached officers in Zone 1 and asked, "What's a good way to get into the park?" An officer responded, "Right now, there is no good way." Another officer suggested that "up the front" would be easiest. The man

pointed at the clergy blocking the southeast staircase and asked, "Through that?" The officer responded, "That's the only way." The man walked away. One officer turned to his colleague and said, "Welcome to Charlottesville."

### c. Police Fail to Intervene as Violence Increases

At that moment, a massive column of hundreds of Unite The Right demonstrators marched west down Market Street towards the southeast entrance of Emancipation Park. Led by members of the League of the South and the Traditionalist Worker Party, they wore helmets and carried shields, flagpoles, and pepper spray. The crowd of counter-protesters saw this, and they rushed east to form their own blockade in front of the clergy. They locked arms and blocked Market Street.[324]

Captain Shifflett called out the sudden movement of counter-protesters at 10:52 a.m. Around that same time, an officer in Zone 2 observed, "They're trying to take over the street." Officer Hulme saw this and remarked, "This is going to get ugly they're blocking their passage. This is going to get really ugly if they don't get out of the way." He paused for a moment then commented, "I thought we had a Zone 5 right here," as he pointed out to the area where the groups were coming together in the middle of the street. Of course, Zone 5 was another twenty feet beyond that intersection behind a row of metal barricades, and the officers in that zone were standing another twenty feet from the road.

Seconds later, a brawl broke out on Market Street. Unite The Right demonstrators pushed forward with their shields and hit the counter-protesters with flagpoles. Open source video footage shows demonstrators violently jabbing the poles at counter-protesters' faces. The counter-protesters fought back and tried to grab the flagpoles away. Eventually, the demonstrators pushed the counter-protesters away with brute force and a cloud of pepper spray.

Body camera footage shows that police officers in Zone 1 witnessed all of this. They called out the fight and observed that pepper spray had been deployed. Body camera footage shows people attacking each other in plain view of the officers. The officers stood behind the barricades and watched.



**Body camera footage recorded at 10:55 a.m. shows officers and troopers standing behind two rows of barricades in Zone 1, watching the crowds converge and engage in violence at the intersection of Market Street and 2nd Street NE.**

After the first salvo of the fight, a legal observer wearing a neon green hat turned to the police as if to motion in the direction of something near the stairway. A woman walked up to the barricade and shouted to the officers, "You tear-gassed us last time, what are you doing?" Another woman who stood near the barricade had been turning back and forth for a few minutes, watching the police, like she was waiting to see if and when they might react. Seeing no reaction, she finally shouted with emotion:

> This is shameful! I am a teacher, I am a community member, take care of your people! What the fuck are you doing? I am the wife of a priest, I am a teacher, I love this City! Take care of your people!

The officers continued to stand in silence. None responded. The cry for medics can be heard in the officers' body camera recordings.

For a moment, it appeared that a squad of VSP troopers would go into the area, as they maneuvered around the first barricade into the buffer zone. CPD officers standing next to them turned and said, "What are we doing? Are we going in?" Another officer responded, "No, we're not. We're not going in. We need the riot squad, fast." The VSP troopers did not go into the melee. A cloud of pepper spray wafted over to Zone 1, and the troopers returned behind the second barricade. A minute or so later, the CPD officers wondered whether the unlawful assembly would be declared before the event started. Soon objects were being thrown out of the park into the crowd.

At 10:57 a.m., a woman approached the outer barricade outside of Zone 1 and got Officer Ernest Johnston's attention. She asked, "Are you going to engage the crowd at all?"

"Not unless I get a command to," Officer Johnson responded.

"Even if there are people physically hurting one another?" she asked.

"If I'm given the command to act, yes ma'am, I will." She repeated her question, and he gave the same answer: he would engage if and when he was commanded to do so.

Tim Messer, a witness with whom we spoke, explained that the skirmishes he observed followed a consistent pattern. As the Unite The Right groups approached Emancipation Park, counter-protesters shouted "here they come" and formed blockades. The demonstrators then used shields, flags, or fists to start skirmishes, all of which were eventually broken up by pepper spray. The crowd would then part and allow them entry into the park. That scenario played out at least half a dozen times. Mr. Messer encountered a VSP trooper near 2nd and Market Streets and asked him why police had been standing back. The trooper replied, "Our policy today is that we cannot get involved in every skirmish, and we are here to protect the public's safety." The witness was incredulous that police would allow the fights to go on, but the trooper reiterated, "That is our policy."

At 10:59 a.m., Captain Shifflett relayed to the Command Center that 2nd and Market Street were once again "getting ready to erupt any second now." A moment later, he reported another fight of "about forty people going at it, they're using sticks." He again radioed, "Weapons are being used on Market and Second Street." He added, "Recommend unlawful assembly."

### d. Withdrawal of CPD To Rear of Park

At 11:01 a.m., the Command Center ordered all CPD units to go to Zone 4 to suit up. All Charlottesville officers stationed inside the park and along the sides near the park entrances withdrew to the back of Emancipation Park to put on their riot gear. CPD Officers in Zone 5 withdrew to the lobby of the Wells Fargo building for the same purpose. When CPD withdrew, only VSP troopers remained within the five zones in and around Emancipation Park. The troopers did not have riot gear and remained standing behind the barricades.

When the CPD officers arrived at the supply trailer, they had to fish through plastic bins to find their gear, which included gas masks, riot shields, and ballistic helmets. For many of them, it was the first time they had ever worn this equipment. At one point, officers called for more gas masks, only to learn that all the department's gas masks were already there. It took about fifteen minutes before all officers were suited up. And, much to their chagrin, the zone commanders could not locate all of the bullhorns that would be needed to disperse the crowd.

In the meantime, the intersection at Market and Second Street descended into chaos. The brawling continued and became violent as Unite The Right demonstrators who had just entered the park began to rove out from the southeast staircase, forming shield walls to push the counter-protesters back. Bottles, balloons filled with unknown substances, and debris

flew through the air. The clouds of pepper spray rose every few minutes. By 11:08 a.m., Maurice Jones and the Regional Policy Group declared a local and regional state of emergency. At 11:13 a.m., COB McIntire was put on lockdown.

Chief Thomas's response to the increasing violence on Market Street was disappointingly passive. Captain Lewis and Chief Thomas' personal assistant Emily Lantz both told us that upon the first signs of open violence on Market Street, Chief Thomas said "let them fight, it will make it easier to declare an unlawful assembly." Thomas did not recall making that statement, though he did confirm that he waited to "see how things played out" before declaring the unlawful assembly. Regardless of what he said, Chief Thomas' slow-footed response to violence put the safety of all at risk and created indelible images of this chaotic event.

### 3. Unlawful Assembly

At 11:31 a.m., thirty minutes after Captain Shifflett requested authority to declare the event unlawful and CPD officers were ordered to withdraw to Zone 4, Chief Thomas called for the declaration of unlawful assembly. Zone commanders were instructed to announce the unlawful assembly and that all present must disperse or else be arrested. A few moments later, the Command Center clarified that zone commanders should "declare but do not move" from their position near the back of the park, as they needed to wait for the VSP mobile field force to deploy and get into position. The commanders made the announcements from Zone 4, but remained at least half a block away from the melee at 2nd and Market.

At almost the exact moment the unlawful assembly order went out, a smoke grenade was deployed by someone at the southeast corner of the Park. The crowd scattered. Overhead, the VSP helicopter footage showed the smoke tail of the grenade trailing back and forth as demonstrators and counter-protesters picked it up and threw it back at each other. Out of the pure happenstance of that smoke grenade, much of the crowd dissipated for a moment.


Photo Source: Patrick Morrissey

As CPD made the announcement of an unlawful assembly over their bullhorns, the barricades running down the center of Emancipation Park to form Zone 2 were toppled by Unite The Right demonstrators. Many demonstrators crossed the open area to the western half of the park and waited in the crush of people filing out through the bottlenecked southwest entrance. Other belligerent Alt-Right demonstrators remained at the southeast entrance, continuing to throw objects and hurl insults at their opponents in Market Street. Sam Dickson, a lawyer who attended the Unite The Right event, told us that he asked to help police officers clear the park by making an announcement to those gathered

and explaining why they needed to leave, but he was "rudely rebuffed" by law enforcement.[325]

We asked every member of the CPD command staff why the unlawful assembly took so long to call. Uniformly, everyone ascribed the delay to the time it took to bring the VSP mobile field force to Emancipation Park from the Jessup House. They also told us that VSP insisted on extracting its undercover officers from the crowd before the unlawful assembly was declared, and that process took much longer than expected. Colonel Flaherty acknowledged that some portion of the delay in declaring the unlawful assembly was due to the failure to locate one VSP undercover officer who had been deployed within the crowd. He indicated, however, that the undercover agent had been out of the park for some time.



**Map of the deployment paths of VSP's mobile field force units.**

The VSP mobile field force began entering Emancipation Park at 11:44 a.m. By that time, the majority of Unite The Right demonstrators had cleared out of the park through the southwest entrance. The mobile field force formed an east-west line just south of the Lee Statue and stood shoulder-to-shoulder with their shields in front of them. At 11:49 a.m., they started to inch south, showing those still present that they needed to leave. By this time, demonstrators and counter-protesters were fighting inside the park, and they engaged in more violent confrontations  throwing debris, attacking each other with sticks, and recklessly spraying pepper spray   within a few yards of the approaching mobile field force line.

### 4.     Dispersal of the Crowd

Much like the plan for entry to Emancipation Park, the dispersal of crowds following the unlawful-assembly declaration did not ensure separation between conflicting groups. Rather, the mobile field force units pushed the Unite The Right protesters right back onto Market Street, where a larger group of counter-protesters were waiting for them. Captain Mitchell indicated that he believed the field forces would disperse the crowds from their separate zones within the park. Unfortunately, the barriers had been trampled by the time the unlawful assembly was declared and there were very few counter-protesters within the park itself.

Lieutenant Hatter described the dispersal of Emancipation Park on August 12 as the "most messed up thing I ever saw." Hatter noted that the Alt-Right demonstrators were screaming at the VSP and CPD officers as the mobile field force pushed from the rear of Emancipation Park, commenting that "you are pushing us right into the crowd." Hatter agreed with this assessment, noting that the effort was "causing confrontations and pushing [the Alt-Right] right into their enemies." Lieutenant Mooney similarly told us that several of the Alt-Right demonstrators complained to him that the dispersal order "is pushing us right into our enemies."

Seeing the VSP field force begin to disperse the park, a small group of Unite The Right demonstrators, including Richard Spencer, attempted to resist by locking arms and refusing to leave the park. A handful were taken into custody, and the rest eventually gave way and left the park. As the wall of shields moved closer to the fights in the southern half of the park, VSP troopers deployed OC spray to disperse the crowd.

Throughout the lead up to the unlawful-assembly declaration and the clearing of the park by the VSP field force, CPD officers remained in Zone 4 waiting for further command. Lieutenant Jim Mooney related to us how frustrated he and other CPD officers were, having been removed from their zones almost an hour earlier. "We were sitting there with our thumbs up our asses," he told us. Lieutenant Hatter had a similarly strong reaction. Because of the withdrawal of all CPD officers to Zone 4, "we were prevented from doing police work." Lieutenant Hatter lamented the fact that there were "people getting hurt, and I'm standing around behind a steel fence." Rather than breaking up fights, he was "guarding an empty parking lot." Hatter commented that CPD should have been in the street, rather than standing around twiddling their thumbs in a secure area of Emancipation Park. Hatter noted that one of his concerns about July 8 was that CPD acted as "human shields" rather than police officers, and "it happened again." Detective Mark Frazier was more critical. He told us that CPD "failed this community" on August 12.

We asked the command staff why no order was given to send a CPD squad in riot gear or another field force out into the streets   particularly given that the plan as written and enacted simply called for the clearing of the *park*. They explained their view that, had officers been sent into the crowd, officers would have been put into a deadly force situation. Colonel Flaherty concurred with that assessment. He explained that he feels that only "fools rush in" to a situation in which they are not adequately protected. Colonel Flaherty

indicated that for the safety of both his people and the people VSP will encounter in a mass unrest situation, he would prefer to have his officers exercise caution.

Finally, at 11:56 a.m., the CPD officers were ordered to form up VSP's rear guard inside the park. At 12:06 p.m., the Governor declared a state of emergency. By 12:13 p.m., Emancipation Park had been cleared.

### 5. After the Unlawful Assembly

The crowds in and around Emancipation Park dissipated in various directions. The field forces that had cleared the park formed two groups, facing east and west on Market Street. Their goal was to prevent any pedestrians from returning to the park. The demonstrators and counter-protesters dispersed in various directions. Other than the route south across the Downtown Mall on 1st and 2nd Streets, there were no officers stationed along the routes of egress. Violence broke out in all directions.

### a. A Gunshot and Punches at 1st and Market

Most of the Unite The Right groups left Emancipation Park through the southwest stairs. As the VSP field force pushed the crowd south onto Market Street, it forced the demonstrators into the angry crowd of counter-protesters. Predictably, several violent acts ensued.

The most notorious incident from those tense moments involved a homemade flamethrower and a gunshot. As Alt-Right demonstrators left the park and turned right to move west down Market Street, they passed by counter-protester Corey Long. Video taken by a bystander shows Long igniting the spray from an aerosol canister and pointing the flames at passing demonstrators. Richard Wilson Preston, a Ku Klux Klan leader from Maryland, saw this as he exited the park. He drew his handgun and pointed it at Long while screaming at him to stop. Preston loaded a round into the chamber of his gun then fired a single shot at the ground next to Long. He holstered his gun and walked away. VSP troopers, identified by their neon yellow vests, stood in a line behind two barricades about twenty feet away. None appeared to react.[326]

An unprovoked assault happened at that same corner, shortly before or after the Long-Preston interaction. The victim, a counter-protester who asked to remain anonymous, told us she was standing about where Preston had fired his gun, and she was yelling at the demonstrators as they walked by. One Unite The Right demonstrator walked up to her and punched her in the face. She provided us with a video of the incident, which shows the incident as she described. The victim of this assault told us that after she was punched, she stumbled up to the state troopers standing at the barricades to ask for help. None of them responded. She later learned she suffered a concussion.[327]

Samuel LeBeau told us that he was at the southwest corner of the park around the time of the gunshot. Mr. LeBeau told us he witnessed an assault against a Unite The Right attendee. He told us that as the Alt-Right demonstrators filed out of the park, a counter-protester emerged from the crowd with a clear liquid. He threw it in the demonstrator's face, inflicting visible pain. Again, no law enforcement officers responded to the scene.

That witness told us he saw a state trooper as he left the downtown area and told the trooper, "I thought the police did a pretty bad job today." The state trooper nodded and replied, "It wasn't our call."


Photo Source: Patrick Morrissey

As groups moved away from Emancipation Park to the west, they engaged in more pushing and shoving. A group of militia had moved away from the park at the declaration of the unlawful assembly and taken refuge in the alley off of Market Street behind Hill & Wood. Police had actually taped off the alley earlier in the day, but with all the police in the back of Emancipation Park, there was no one there to stop entry. Several people who were injured made their way into the alley, and it became a makeshift safe zone with the militia members pushing agitators from all sides away. One video shows Eli Mosley sitting on the ground, holding his face as though he had been pepper sprayed.[328]

Many of the Unite The Right groups that left Emancipation Park walked back to McIntire Park. CPD radio traffic suggests that a large group arrived back at McIntire around 12:20 p.m. The demonstrators held an impromptu rally where Richard Spencer, Mike Enoch, and David Duke spoke. As Duke finished, Eli Mosley stood up and advised everyone to get to their vehicles immediately and leave before Antifa and the police arrived.

As for counter-protesters who left westbound, many of them regrouped at McGuffey Park, where they waited to determine where they should go next.

### b.  Assault At The Market Street Parking Garage

Not all Alt-Right demonstrators moved west down Market Street back towards McIntire Park. Many of them marched east, and they were followed by vocal counter-protesters.

One such group was the conglomeration of League of the South and Traditionalist Worker Party members that had been in the massive column whose entrance sparked the fighting that caused CPD to withdraw to put on their riot gear. As the group passed the rear of the Paramount Theater near 3rd Street, they walked by counter-protesters who shouted at them. Several counter-protesters picked up and followed the group, wielding sticks and engaging in profane arguments. Physical threats were made, and the groups threw objects at each other.

At about 12:07 p.m., the group stopped in front of the Market Street garage and a fight broke out. From our review of the ample open source video footage of this confrontation, it appears that a counter-protester attempted to yank a flag away from a Unite The Right demonstrator who resisted and fought back. During that struggle, a second counter-protester named Deandre Harris rushed in and used a club   possibly a Maglite flashlight

to strike the Alt-Right demonstrator's head or shoulder.[329]  Nearby demonstrators rushed over to fight back and deployed pepper spray.  The struggle moved into the parking garage. Harris appears to have tripped or been pushed to the ground, which left him defenseless against a mob of angry Alt-Right demonstrators that descended upon him with flagsticks, shields, and pieces of wood.[330]

Charlottesville Sheriff James Brown was standing outside the CPD headquarters, which is located next to the Market Street garage.  Brown told us that he had no communication with CPD on the morning of August 12, and he did not realize that crowds would be pushed east down Market Street in the aftermath of an unlawful-assembly declaration. When the commotion broke out near the garage, Brown responded and moved closer. Someone stopped him and said that a Unite The Right member had drawn a firearm, but then Brown heard the sound of heavy sticks hitting the pavement.  Sheriff Brown turned and saw Harris being beaten, attempt to get up, and then stumble to the stairwell.  Brown went to assist Harris.  As he walked towards him, he picked up a 36-inch baton that had been carried by a Unite The Right demonstrator.

Sheriff Brown reached Harris and attempted to render aid in the stairwell.  Harris's head had been split open and he was bleeding.  He described the scene as "surreal."  When Brown looked around, he realized he was the only law enforcement officer in the garage. Brown was then approached by another individual who was bleeding from a head wound.

The demonstrators moved out of the garage and continued to moved down Market Street. Another brief fight broke out, in which an older Alt-Right demonstrator suffered a head injury.  In response to this fight, Sheriff's Deputies who had been standing outside the CPD headquarters came out and ordered everyone to keep moving.  They pulled Taser devices to disperse the small crowd.  They did not, however, attempt to detain anyone or make any arrests.[331]

Lieutenant Dwayne Jones was assigned to the CPD headquarters on August 12 to oversee arrest processing, and he was standing outside along with the Sheriff and his deputies when the Harris incident happened.  Lieutenant Jones told us that he did not order anyone into the garage because the CPD officers under his command were in civilian clothes and assigned to light duty.  But when he realized Sheriff Brown was in the garage, Lieutenant Jones went in to make sure he was safe.

At 12:08 p.m., a radio call went out that there were multiple injuries at the Market Street garage.  Sergeant Russell Handy and his squad of officers stationed on the Downtown Mall responded.  They arrived at 12:13 p.m. and formed a line across Market Street in front of the garage's entrance.  A few minutes later, the CPD SWAT unit arrived in their Bearcat armored vehicle.  Street medics and police officers moved Harris across the street to the alcove in front of NBC 29's studio.  By 12:28 p.m., paramedics arrived and transported Harris to the triage center at COB McIntire.



*Deandre Harris is moved from the Market Street parking garage at 12:11 p.m. Sheriff James Brown is to the left of Harris carrying a black club. (Photo Source: Patrick Morrissey).*

### c. Officer in Distress at 4th and Market

One block to the east, Tammy Shiflett the school resource officer stationed at 4th Street NE and Market Street was standing alone with no protective gear. She felt she was in danger. As people started to pass, they made profane and aggressive statements toward her. She smelled pepper spray in the air. Just as Sergeant Handy and his unit arrived at the Market Street garage, Shiflett radioed Captain Lewis and said, "They are pushing the crowd my way, and I have nobody here to help me." Lewis radioed to Sergeant Handy and instructed him to help Shiflett.

Sergeant Handy and Officer Logan Woodzell started to move towards Shiflett's location, and Handy radioed Shiflett to walk towards them. Woodzell's body camera footage shows Shiflett leaving 4th Street and jogging to the two officers. But she forgot to lock her car, so Handy instructed her to go back and move her car. Shiflett hustled back to the car, got in, and moved it out of the intersection to Market Street near the parking garage.

Officer Shiflett ultimately ended up with Lieutenant Jones as he handled the Deandre Harris incident. Lieutenant Jones told us that he was asked by either Handy or Woodzell to let Officer Shiflett stay with him because she did not have any protective gear. Neither Shiflett nor Jones notified the traffic commander or the Command Center that she was no longer at

her assigned post at 4th Street NE and Market Street. As a result, all that remained there was a wooden sawhorse barricade.

### d. False Alarm at Justice Park

Just as westbound counter-protesters moved toward McGuffey Park, numerous counter-protesters had left in the opposite direction and regrouped at Justice Park. Around 12:20 p.m., CPD received a radio call about a large disorder near Justice Park. The Command Center sent the east-facing CPD field force from Emancipation Park to Justice Park in response. The CPD unit, led by Lieutenant Gore, was accompanied by one of the VSP mobile field force squads. When these units arrived, there was no disorder. Lieutenant Gore could see the presence of the officers in riot gear agitated the counter-protesters. As a result, the police units left Justice Park and took up a position in the alley next to the police station.

### e. Protecting the Downtown Mall

Upon the declaration of the unlawful assembly, two VSP mobile field forces were deployed to protect the Downtown Mall. One field force came from its staging area at the Omni Hotel at the west and of the mall, while the other came from City Space at the eastern side. Dressed in full riot gear, the VSP mobile field force formed lines across the mall along 1st Street and 2nd Street NE, respectively. Their positions prevented anyone moving south from Emancipation Park from entering the Downtown Mall, funneling them instead south toward Water Street.

Throughout the morning, the Downtown Mall had been relatively quiet. Sergeant Handy and Officer Woodzell patrolled the area and visited businesses to hand out their business cards in case anyone needed to contact them. When the unlawful assembly was declared, they were standing near the intersection of East Main Street and 2nd Street NE on the Downtown Mall. A large crowd moved behind them  from the west to east  which they soon saw was being pushed by one of the VSP mobile field forces.

Neither Handy nor Woodzell had been instructed to gear up. When they observed their VSP counterparts on the Downtown Mall putting on their riot gear, Sergeant Handy called his supervisor and confirmed that they should be wearing their gear. Sergeant Handy and Officer Woodzell then walked four blocks to the 6th Street secured entrance at City Space and retrieved their gear. They put on their body protection equipment and ballistic helmets and carried their shields and gas masks back to 2nd Street NE and Main Street.

### f. Militia Group at Friendship Court

Incidents south of the mall occurred as counter-protesters pursued members of the militia that were pushed along Water Street. Video posted to social media shows one militia group called American Revolutionary Warrior gathering at 1st and Water Streets after passing by the VSP mobile field force lines across the mall. The militia group then patrolled west along Water Street to "locate individuals being infringed upon" to protect their rights. They circled back east by the Omni Hotel, crossed the Downtown Mall at Old Preston Avenue, and walked through a parking lot to arrive back on Market Street. They walked east, where

they passed by a large group of counter-protesters who had gathered at the southeast corner of McGuffey Park, near 2nd Street NE and Market Street. [332]

The militia group approached the CPD mobile field force line that was stationed at 2nd Street NW and Market Street, preventing pedestrian access to Emancipation Park. They spoke with Lieutenant Hatter, who advised them that everyone was remaining calm at that time and they did not want any more altercations. [333] Lieutenant O'Donnell told us that Christian Yingling, the commander of the Pennsylvania Lightfoot Militia, was with the militia group that approached the CPD field force line. He told Yingling that the militia's presence was a "lightning rod" and encouraged them to leave. The militia group complied and walked back toward the Downtown Mall.

After their encounter with CPD, the militia group decided to leave the area. They walked across Water Street and entered the surface lot near 1st Street SE. As the militia members attempted to enter their vehicles, a group of counter-protesters followed and yelled at them. CPD received word of a disorder in the area, so United Command deployed the combined CPD/VSP field force units that had taken up a position in the alley near the police station.

After one militia member experienced difficulty getting into his car and exiting the lot, the other members opted not to get in their vehicles. Instead, they continued to walk east, away from the crowd of counter-protesters. When they reached the intersection of South Street and 2nd Street SE, they turned right, moving across the train tracks. The counter-protesters followed. By that time, the police field forces had started to arrive along Water Street, but they chose not to follow. Lieutenant Gore later explained in his after-action report that he did not want to chase the angry groups farther away from law enforcement units on the mall that could provide backup. [334]

Witness Richard Goodin followed the group of counter-protesters that pursued the militia to Garrett Street. He told us that he saw young men picking up and throwing rocks at the militia as they crossed the railroad tracks near Garrett Street. Video provided to us confirms the rock-throwing, as does the open source video showing the militia's perspective. When one of the militia members was hit in the head with a rock, they took up a position along the wall near the Sultan Kebab restaurant at the corner of Garrett and 2nd Street SE. The militia members apparently did not realize that they had stopped directly across the street from Friendship Court, a predominantly African-American public housing complex. [335]

Mr. Goodin told us that the counter-protesters continued to yell at the militia to leave, to which the militia members responded that they were not being allowed to leave. Someone approached the police and advised them that someone was injured. As the CPD forces started to move towards the crowd, it dissipated, and the militia members made their way back towards the parking lot on Water Street.

At 1:05 p.m., CPD requested medics to respond to the Water Street parking lot. In addition to the militia member who had been hit by a rock, a woman apparently tripped and hit her head on the ground. The combined field forces formed a semicircular wall to separate the militia on one side from the counter-protesters on the other. Street medics cared for the woman who hit her head until the ambulance arrived. At that point, the field force escorted the militia to the western lot on Water Street. The ambulance left, and the police departed

and headed towards City Space to hydrate. The militia got in their cars and prepared to leave the area. Aerial footage shows that one of their cars accelerated to flee the counter-protesters, nearly running one of them over. The crowd of counter-protesters reacted angrily, kicking and swinging objects at the car. The car sped around South Street, then 2nd Street, then west on Water Street, with counter-protesters chasing on foot.

Unbeknownst to the police, the counter-protesters who had followed the militia across the parking lot believed that they were intentionally headed towards Friendship Court to harass residents. The call went out through their communications channels that Friendship Court was under attack. Large groups at Justice and McGuffey Parks began to mobilize.

VSP helicopter footage shows a group of more than 100 counter-protesters leaving Justice Park around 1:20 p.m., walking south on 4th Street. As they passed through the intersection at Market Street, there was no officer present and they passed the small plastic sawhorse that stood to prevent southbound traffic. They crossed the Downtown Mall and Water Street, went under the railroad tracks, then arrived at Garrett Street. Dan Haig, who was with the group from Justice Park, told us that when they arrived someone from the community ran out to tell them that the everything was safe and they should stop shouting. The group stopped for a moment to regroup. At 1:30 p.m., the group continued west down Garrett Street, then turned right on 2nd Street SE and moved back towards Water Street.



**VSP helicopter footage showed the single sawhorse and no police presence at the intersection of Market Street and 4th Street NE at 1:23 p.m., as a group of counter-protesters walked by to go to Friendship Court.**

As the Justice Park group walked by the Water Street parking garage, the group that had set out from McGuffey Park — which was larger than the Justice Park group — emerged at 1st Street SE and Water Street. The two groups converged on Water Street and marched east. Emily Gorcenski was in the McGuffey group, and she told us that when they reached the intersection of Water Street and Fourth Street SE, those who had come from McGuffey started to turn towards Friendship Court. They quickly learned that Friendship Court was safe.

The group of several hundred counter-protesters paused for a moment as they decided where to go. Some within the crowd started to move north up 4th Street SE, back towards Justice Park. They maneuvered around two cars that appeared to be stuck at the intersection after having driven south on 4th Street.



*Locations related to the vehicle incident on August 12, 2017.*

### 6. The Vehicle Incident at 4th and Water Streets

At 1:41 p.m., a gray Dodge Charger driven by Unite The Right demonstrator James Fields sped down 4th Street SE, crossed the Downtown Mall, slammed into the crowd, and plowed into the back of the two cars waiting at the intersection. Open source video footage and photographs showed people were knocked out of their shoes and bodies went flying.

Emily Gorcenski told us she was fifteen feet from the car when it came down on the group, and her first thought was that the driver was about to exit his car and open fire. But the car went into reverse and quickly retreated back up 4th Street to Market. Once Fields reached Market Street, he fled east. Officers saw the car speed by, noted the damaged bumper, and called in its license plate number over the radio. The VSP helicopter followed the Charger as it turned right on Avon Street, then left on Monticello Avenue. Officers gave chase, and Fields pulled over and dropped his keys out the window of the Charger at 1:45 p.m.

Lieutenant Dwayne Jones, who had been at the police station all day, was one of the first CPD officers to respond to the crash site. He told us that when the call went out about the attack, he ran out of headquarters and saw the Charger moving back up Market Street. He then grabbed another officer and made his way to the mall. As he passed the intersection at 4th Street NE and Market Street, he saw the plastic sawhorse catty-corner to the intersection.

Witnesses to the incident were running up 4th Street toward the Downtown Mall, screaming for help. Jones ran down to the site and started to look at victims to see who he could help. He noted some were severely wounded while others suffered less critical injuries. Jones then helped the fire and EMS squads maneuver into the area. He estimated between 400 and 500 counter-protesters were crowding the intersection.

Street medics provided first aid until the fire fighters and EMTs arrived. Deputy Fire Chief Rogers, who was in the Command Center, ordered a fire engine to deploy from the CFD Station on Rich Street. When the engine arrived a few minutes later, the fire fighters asked the VSP troopers who had arrived to create a perimeter. Sergeant Handy responded from the Downtown Mall and helped push people away to create a secure perimeter. Soon more officers arrived and began taping off the area. The CPD SWAT team drove the armored Bearcat vehicle down 4th Street to secure the roadway north of the injured counter-protesters. Eventually, scores of National Guardsmen and field force officers arrived on the Downtown Mall to block off the pedestrian intersection with 4th Street SE. A CPD squad later brought metal barricades and remained on guard there throughout the afternoon and evening.

CFD Chief Andrew Baxter told us that in less than thirty minutes, Charlottesville rescue units triaged, treated, and transported twenty patients at the 4th and Water Street scene. He related to us that any department could not expect to "do that in a drill on your best day." CFD used a triage system to categorize victims as red, yellow, or green, to indicate the severity of their injuries. That system, along with the cooperation of street medics, allowed emergency responders to quickly assist the injured. Baxter also credits the coordination among regional fire departments that gave him access to additional engines and personnel. In particular, Baxter noted the decision to go to neighboring jurisdictions to get an "ambulance strike team" of five ambulances, which were deployed to the Water Street scene.

The prompt response of CFD was not enough to save Charlottesville resident Heather Heyer, who had been fatally struck by Fields's vehicle. Ms. Heyer had attended the event that day as a counter-protester. She was present at 4th and Water Streets when Fields plowed into the crowd. Ms. Heyer succumbed to her injuries at the scene. Chief Baxter told us that she had already died when CFD arrived, but given the raw emotions of the crowd fire fighters continued to perform CPR on her.

The Command Center began to pull various officers from rally duties to assist in the investigation of the car crash. Forensic technicians and detectives were reassigned to work the crime scene. Officers set up in the General District Courthouse to collect witness statements. According to Sergeant Newberry, a team of VSP investigators provided invaluable help with the technological ability to dump photographs and videos from witnesses' cell phones.

### 7. Afternoon and Evening Developments

#### a. Skirmishes and Threats

After the car attack, many counter-protesters were on edge. Videos from the day show residents screaming and crying hysterically and in shock from the crime they had witnessed. Anger burned.

Witnesses related various stories to us about skirmishes in and around the Downtown Mall after the car attack. One described a band of counter-protesters chasing an older female wearing a Confederate flag. He also observed small bands of people wearing all black with handkerchiefs covering their mouths — he presumed them to be Antifa — patrolling the mall. Video footage shows a Unite The Right demonstrator giving a Nazi salute before being chased west by angry residents and violent counter-protesters who were wearing masks, cursing, and threatening to assault him with weapons.[336] Police later received a report of a disturbance on the second level of the Market Street garage. Captain Shifflett responded, but was told by a VSP unit that the incident was over when he arrived.

The First United Methodist Church flooded with counter-protesters after the car attack, many of whom were at or near the site when the Charger plowed through the crowd. People sought medical help. Someone saw a report on social media that someone had threatened to burn down the synagogue. The Congregation Beth Israel leadership rushed to the temple and were relieved to discover the rumor had been just that.[337]

Around 2:00 p.m., witness Carrie Shaffer recalled a fight breaking out on High Street between 1st Street and 2nd Street NE, near the First United Methodist Church. She heard someone scream that one of the fighters had pulled a gun. Ms. Shaffer escaped and ran into the church, which then went on lockdown. Diane Hueschen described a similar incident to us, and noted everyone dropped to the ground. Hueschen did not see a gun, but there were so many people in the area that she could not see what was going on. Ms. Hueschen reported the incident to her commander. She noted that the state troopers gathered just south of her position did not react to her radio call — which was the first time she realized she could not communicate with VSP personnel on her assigned radio.

For the rest of the afternoon, angry crowds gathered at the barricade that had been placed at 4th Street on the Downtown Mall and accosted Charlottesville police for failing to protect counter-protesters from the car attack. Body camera footage shows officers taking shifts standing behind the metal barricades while the counter-protesters yelled. Over time, officers rotated through the area in shifts and were able to hydrate and recuperate. Around 7:30 p.m., twelve hours after their post time in Emancipation Park, officers started to be released from duty. Most units that had been present in Zones 1 through 5 were released by 8:30 p.m.

#### b. VSP Helicopter Crash

Earlier in the afternoon, City leaders decided to schedule a press conference. City Communications Director Miriam Dickler told us the press conference was to take place at

4:00 p.m., but it was pushed back to later in the evening when Governor McAuliffe announced his intention to travel to Charlottesville.

As the Governor approached the Charlottesville area, the VSP helicopter that had been providing aerial video responded to watch over his motorcade. At 4:49 p.m., a report went out that the helicopter had crashed. The National Transportation Safety Board's preliminary report, released on September 5, did not posit the cause of the crash but noted that there was no indication the helicopter collided with any other object. Lieutenant H. Jay Cullen and Trooper-Pilot Berke M. M. Bates were both killed in the crash.[338] Our review does not encompass the circumstances of the tragic helicopter crash, but we were told that almost all of the VSP personnel in the Command Center left the Wells Fargo building to go to the crash scene.[339] Deputy Fire Chief Mike Rogers described this as leaving a "VSP hole" at the Command Center. Had the helicopter crash and car attack happened in the opposite order, the response to Water Street would have been severely delayed.

### c. Press Conference and Cyber Attack

Shortly after 6:00 p.m., Governor McAuliffe and Mayor Signer gave statements at a joint press conference. The Governor delivered a harsh rebuke of white supremacists and implored them: "Go home. You are not wanted in this great commonwealth. Shame on you."[340] Mayor Signer, City Manager Jones, and Chief Thomas also spoke, each condemning the violence and promising to help the community come together in the face of the day's events."[341]

With all the unfolding events, City Manager Jones suggested to City Attorney Craig Brown that it may be necessary to impose a curfew. Brown quickly researched the requirements to take such steps and concluded that City Council could meet without prior notice to adopt an emergency ordinance that would grant Chief Thomas emergency powers to restrict the movement of people and vehicles. Brown drafted the ordinance and sent it to Jones and Mayor Signer for review. City Council held an impromptu meeting at 7:00 p.m., where they adopted the ordinance. Chief Thomas never exercised his emergency powers.

Late that evening, the City of Charlottesville was subjected to a cyberattack, which appears to have been the result of phishing e-mails sent to Captains Mitchell and Lewis. Additionally, the City's web site domain was disabled. Within a few days, the Virginia Fusion Center identified a tweet from the hacker group Anonymous appearing to take credit for the cyberattack on Charlottesville.

### d. Kessler's Sunday Press Conference

The next day, Sunday, August 13, Jason Kessler called a press conference in front of City Hall on the Downtown Mall at 2:00 p.m. That morning, Lieutenant Steve Upman quickly organized a security plan. He placed security personnel around City Hall near where Kessler would stand. He also staged a VSP mobile field force at the Levy Opera House and deployed CPD SWAT members in the alleyway right next to City Hall. Snipers and observers stood on rooftops along the mall.

A sea of angry people greeted Kessler as he approached the microphones that had been set up for the press conference. He could not be heard over the crowd. Law enforcement stood a good distance back from him, so no one was there to stop members of the audience from approaching Kessler and screaming in his face. Kessler was quickly overwhelmed by the crowd and turned to walk away. Someone in the crowd tried to punch him. Kessler turned to the law enforcement officers for help, and they then formed up around him as he walked through grass to the side of the building. Kessler told us that he thought the police intended to allow him to get "roughed up" a little before stepping in to help him.[342]

## 8. After Action Review

### a. Charlottesville Police Department

An after-action meeting was held for the CPD zone commanders on August 17. In an e-mail sent to the other command staff the day before, Captain Lewis suggested that they schedule two or three after-action meetings. For the first one, they should not focus on what would have been done differently but instead on what actually happened. She recommended that zone commanders be asked to confer with their officers and discuss how they intervened to stop disorders and whether they saw interventions by the VSP or National Guard. She also suggested that zone commanders review body camera footage from their squad members to create a list of instances when officers should have intervened. She also suggested the creation of a timeline of events, photographs, information about briefings and intelligence gathering should be compiled.[343]

Whatever the command staff's intentions for the August 17 after-action meeting, the impression given to the zone commanders was that they were not invited to provide constructive feedback to commanders. Lieutenants were ordered to review body camera footage and specifically look for any evidence of a "stand down order." Each commander was also told to draft an after-action memorandum that documented what actually occurred and whether there were particular instances observed where officers intervened. Lieutenant Jim Mooney recalled that at the August 17 meeting, Captain Mitchell remarked that they could not have sent in their younger officers into crowds on August 12 for fear that they might have killed someone. Captain Shifflett reiterated that sentiment when we interviewed him.

A few days later, Lieutenant Mooney asked Captain Shifflett via e-mail to clarify that the after-action report he was told to prepare was to be "a summary of our zones and not a true after-action report." Shifflett confirmed. Mooney forwarded the message to fellow lieutenants and added, "I'm thinking they don't ever want to hear our opinions of what we disagreed with."[344] When Mooney e-mailed the officers assigned to Zone 2 and asked for their recollections of the day, one responded, "I asked [Sergeant] Gibson if we were enforcing assaults that we see, and he said 'only if need be' or something like that."[345]

Lieutenants completed their after-action reports and submitted them to Captain Mitchell by August 23. They varied in length and detail. Some went on for six pages and included photographs and body camera images. Another included a detailed scribe log for the events for the logistics command. One report consisted of four paragraphs that took up half a page.

Captain Shifflett told us that there was a second August 12-related meeting held with zone commanders on August 28, but did not elaborate on the substance of the meeting.

On August 25, Chief Thomas called an all-hands meeting in City Council Chambers to discuss the events of August 12. At the meeting, Chief Thomas said he was proud of how the department had handled the event, particularly in light of the constraints ACPD and UPD placed on their resources to the City. At this meeting, Lieutenant Mooney asked Chief Thomas whether there was any explanation for the hour-plus delay between when CPD officers were withdrawn from their zones and Emancipation Park was fully cleared. Chief Thomas said he would get back to him with more information. Later, when Mooney asked him the same question, Chief Thomas said the delay was attributable to the radio interoperability issue between VSP and CPD. Thomas also shared that VSP encountered difficulties walking to Emancipation Park, but did not elaborate about what that meant.

### b. Virginia State Police

On August 17, Captain Mitchell e-mailed VSP Captain Craig Worsham to request information from each of the VSP sergeants supervising squads assigned to zones on August 12. He noted, "This is more about fact finding and observations than it is about debriefing and making improvements. That is another discussion." He requested information on any disorders broken up, injuries responded to, or behaviors observed.[346] A few days later, Worsham forwarded Mitchell's request to twenty-four VSP officers, asking them to provide summaries as described in Mitchell's e-mail. Worsham copied Mitchell on the message as well as VSP's August 12 incident command staff and Public Information Officer.[347] Out of the two-dozen VSP officers, Mitchell received after-action responses from seven.[348]

Chief Thomas reached out to VSP and requested a debriefing meeting between agencies' command staffs. The meeting was set for September 6, at the VSP Training Academy in Chesterfield, Virginia. We learned from Captain Mitchell that, as a condition of the meeting, VSP asked for assurances that the Charlottesville commanders would not relay any information they learned to our independent review team. Mitchell claimed that Thomas took that stipulation to Maurice Jones, and the City Manager agreed to it. But when we asked Jones, we learned he never made that statement to Chief Thomas and did not agree to allow Charlottesville officers to withhold information during the review. As a result, Jones ordered all Charlottesville officers to answer all questions we had  including those posed to the command staff about the VSP debriefing.

The debriefing at VSP was attended by Chief Thomas and his three captains  Mitchell, Shifflett, and Lewis. There were between twenty-five and thirty representatives from VSP. Chief Thomas began by thanking the state police for their help and participation, but acknowledged there were some issues that required discussion. In particular, Chief Thomas pointed out the issues with communication between the agencies. Thomas shared that he did not know about the radio interoperability problem until halfway through the event, and he did not know VSP had written its own operational plan until after they had left town. In response, VSP First Sergeant Christopher Clark explained that a radio patch had been created to allow the VSP and CPD communications channels to work together, but it was

never installed on the morning of August 12. Per Captain Lewis's recollection, Clark said he could have "flipped the switch at any point" had he been told to do so.

VSP Lieutenant Jean-Paul Kouschel  an officer from one of the mobile field forces criticized VSP's communication issues, claiming that "the right hand didn't know what the left was doing." According to Mitchell, Kouschel said he understood why the public thought there was a stand-down order. He wanted to know why the mobile field forces had not been called out much earlier to quell disturbances on Market Street to allow the Unite The Right event to proceed. VSP officials pointed out that they needed to extract their undercover officers first, but no one explained why that process took as long as it did.

Lieutenant Becky Crannis-Curl  VSP's ground commander inside of Emancipation Park (referred to as "Venue Security" in VSP's operational plan)  commented that that she and Captain Shifflett created a "new zone" that morning. None of the CPD commanders knew what this comment meant, but it may reflect the fact that VSP was using an outdated four-zone version of the plan when they finalized their own document.

All four Charlottesville commanding officers corroborated what Crannis-Curl said next. She recalled telling Shifflett that VSP was going "off-plan" and that she was not going to send any troopers out into the crowds to make arrests. Mitchell looked over to Shifflett, who seemed to shrug and acknowledge the conversation. Lewis recalls Crannis-Curl adding that VSP intended to leave Charlottesville with the same number of troopers they brought in. Colonel Steven Flaherty, the VSP Superintendent, interrupted her to say that VSP's primary role on August 12 was "park security," and troopers were not going to "wade into the mess on Market Street."

Later in the meeting, Colonel Flaherty added that VSP had constructed a comprehensive timeline that it combined with its dispatch log and information from the Virginia Fusion Center. Chief Thomas asked for a copy to be sent to him. CPD still has not received VSP's timeline. Chief Thomas later told his assistant that VSP was refusing to cooperate with CPD in an effort to remain blameless for the events of August 12.

On the drive back to Charlottesville, Lieutenant Crannis-Curl's comment worried Captain Lewis. She asked Shifflett if it was true. "Was that the 'stand-down order?'" she asked. Shifflett confirmed that the conversation took place, but downplayed its significance. In his mind, the comment simply meant they needed to be smart about how they deployed officers. He also reiterated his view that sending any law enforcement into the crowd to deescalate violence on Market Street would have resulted in a deadly force situation. Lewis said she understood, but wondered if he realized how significant it was for the VSP ground commander to "change the plan"  and have the CPD ground commander agree to it without escalating it to the Command Center.

Governor McAuliffe has similarly characterized the VSP response on August 12 as "park security." Charlottesville City Councilor Kristin Szakos told us that she attended a meeting of the Local Government Policy Council in Richmond on October 31, 2017. The Governor convened this meeting and invited a number of local government officials to discuss policy priorities. In the midst of the discussion, Councilor Szakos asked the Governor a question about what support localities could expect from state government to help manage large-scale

events. She cited the substantial presence of VSP in Charlottesville on August 12, which prompted the Governor to say that the State Police were "just there for park security." The Governor's comments are consistent with Colonel Flaherty's description of the VSP role in the Unite The Right event.

### D. What Went Right and What Went Wrong

In this section, we evaluate the successes and failures of the City's handling of the Unite The Right event. While there were evident victories that protected public safety, we found a greater number of failures in both planning and execution. These shortcomings contributed to a chaotic series of events that led to violence and death. The mistakes made on August 12 have significantly undermined our community's confidence in government's ability to protect public safety.

#### 1. What Went Right

##### a. Despite the Presence of Firearms and Angry Confrontations Between Protesters and Counter-Protesters, No Person was Shot and No Significant Property Damage Occurred.

While August 12 was a horrific day for our community, it could have been much worse. The presence of firearms during this intensely acrimonious event was particularly dangerous, as people could have easily used lethal force against their enemies. Despite the confrontational tone of the event, we found evidence of only a single gunshot being fired. The shot easily could have hit any number of individuals who were in the immediate vicinity of the man who fired. The shot also could have triggered additional gunshots in the midst of this volatile event. It is not hard to imagine how someone with ready access to a gun could use it offensively against another person with whom he disagreed. Indeed, many people brandished weapons and specifically threatened to use firearms against others. The angry rhetoric that characterized this event could easily have led someone to use a firearm defensively against someone he or she perceived as a threat.

While there was some damage to property at the Unite The Right rally, such damage was limited and confined to the immediate vicinity of Emancipation Park. There was no damage to businesses or property on the Downtown Mall, just south of the protest event. The operational plans devised by CPD and VSP specifically called for the protection of downtown businesses during the event. This affirmative strategy was motivated by a desire to prevent looting or other damage to the businesses in the commercial heart of our community.

##### b. The Charlottesville Fire Department and UVA Health System Had Effective Operations Plans That Allowed Rescue Personnel to Extract and Treat a Large Number of Injured Persons Within Minutes of a Violent Attack.

The Charlottesville Fire Department (CFD) had a thorough plan in place for the August 12 event. Their operational plan called for the rapid deployment of fire and rescue resources should a need arise. They staged vehicles and personnel in locations that kept them safe

from violence or disruption yet allowed their dispatch to areas of need. The UVA Health System also devised and executed an excellent plan in place to ensure available treatment for persons injured on August 12. These agencies worked well together and with the IMT planners, resulting in a coordinated emergency response strategy.

The CFD and UVA plans were tested by the vehicular collision at 4th and Water Streets. When that event occurred, CFD was able to immediately respond with multiple ambulances and rescue vehicles. Those injured on the scene were provided treatment by skilled EMS personnel who arrived minutes after the vehicle incident. EMS personnel classified the injuries according to severity and prioritized transport to hospitals accordingly. Seventeen required hospitalization, and all seventeen were transported to hospitals within thirty minutes of the first dispatch to EMS. Those taken to UVA were admitted through the main lobby, where the treatment teams were standing by according to plan. The speed of the response is particularly impressive given the large number of people crowded at the scene of the homicide.[349]

The rapid EMS response is a product of the thorough planning conducted by CFD and UVA before the event. These agencies were prepared for the contingency that arose  a violent event with multiple injuries. They executed their plans effectively, amidst dangerous and fluid circumstances. The CFD/UVA success is evidence that thorough interagency preparation leads to effective crisis management. This community benefited directly from the careful planning done by the professionals within these organizations.

### c. Law Enforcement Planning and Response Was Informed by Thorough, Accurate Intelligence Before and During the Event.

The success or failure of any law enforcement operation often depends upon the quality of information available to decision-makers. In the weeks before August 12, those tasked with planning for the Unite The Right rally had ample information about the numbers, plans and anticipated activities of potential attendees. During the rally itself, law enforcement leaders in the Command Center could observe events on multiple video feeds which provided accurate, real time information about conditions in and around Emancipation Park. As a result, there was a wealth of accurate information to inform both planning for and response to these events.

In the weeks before August 12, law enforcement received accurate information about possible attendance and the potential for violence at the Unite The Right rally from multiple sources. CPD investigators monitored social media and obtained useful information about the Unite The Right event from both its promoters and opponents. The Virginia Fusion Center and Federal Bureau of Investigation also provided important information that guided event preparations through regular oral and written briefings. The information gathered in advance made clear to CPD and VSP planners that this event was going to be well-attended and potentially violent. They knew that various groups and individuals who had participated in previous rallies were coming to Charlottesville for the Unite The Right demonstration. They could not have been reasonably surprised by what occurred on August 12.[350]

Throughout the day on August 12, law enforcement leaders in the Command Center had access to real time video of events occurring in and around Emancipation Park. Commanding officers watched events unfold on pole cameras with direct views of the entrances to the park, overhead footage from a VSP helicopter, multiple live feeds broadcasting on social media platforms, and national television networks broadcasting live. These images gave law enforcement leaders a comprehensive perspective of the events that unfolded on the ground as they happened.

The fact that we live in an electronically interconnected world creates real benefits for law enforcement decision makers. Both before and during the event, technology provided important information to those tasked with protecting public safety. We found no evidence of a "fog of war" effect   the uncertainty of conditions that leads to uninformed decisions. To the contrary, we believe officers who planned for and reacted to these events were armed with reliable, accurate, and timely information. This information provided a sound factual foundation on which to make critical enforcement decisions.

## 2. What Went Wrong

### a. The Charlottesville Police Department Did Not Seek Input From Law Enforcement Personnel Experienced In Handling Similar Events.

The size and scope of the Unite The Right rally was beyond any similar event that had occurred in Charlottesville for many years, perhaps ever. The resulting challenges to law enforcement and other City planners were tremendous. That said, the men and women tasked with preparing for the Unite The Right event did not sufficiently appreciate the challenge presented. They did not ask for advice or assistance from fairly obvious potential sources. They "didn't know what they didn't know," which in part led to the inadequate preparation for this event.

Despite the obvious similarity between these prior events and the Unite The Right rally, CPD planners did not sufficiently consult with officials in other jurisdictions as they planned for August 12. While they had brief discussions with officers in other jurisdictions, they did not make any attempt to incorporate lessons learned in their own operational plans. They did not travel to other jurisdictions, obtain other departments' operational plans for similar events, or share their thoughts about Unite The Right with counterparts with more experience. This failure represents a tremendous missed opportunity.

### b. The Charlottesville Police Department Did Not Provide Adequate Training or Information to Officers In Advance of the Event.

Despite the complexity and unique nature of this event, CPD did not provide officers with sufficient information to prepare them for the challenges of this event. They failed to provide department-wide training, relying instead on information conveyed to officers at roll calls and via e-mail. They did not provide their line officers with the substantial intelligence that had been gathered about the event. They failed to convene an all-hands briefing on the day before or morning of the event. As a result of these failings, officers approached this

volatile event with a sense of uncertainty about what they would confront in and around Emancipation Park.

August 12 was the first time that many CPD personnel had ever become part of a mobile field force.[351] The leader of the CPD field force, Lieutenant Michael Gore, had never before commanded a mobile field force. Most officers had not trained in crowd dispersal, moving as a group in a line formation, or the appropriate use of non-lethal weapons, with Lieutenant Gore or any other commander. They had never responded to the military-style commands that are used when field forces are put in motion. They had never gathered in a field or large open area to practice as a field force. Many officers had never worn or even tried on their "riot gear," which consisted of ballistic helmets, plastic shields, and gas masks. We heard numerous stories from officers regarding incomplete equipment, struggles to put on gas masks underneath their helmets, and forced adjustment of sizes for equipment as they "geared up" in Emancipation Park. The fact that officers were doing this for the first time on August 12 is a stunning and obvious failure in preparation.

Training failures contributed to the lack of coordination between CPD and VSP on August 12. There was no "all-hands" briefing where all personnel were brought together prior to the Unite The Right rally. CPD personnel also failed to participate in any trainings with their VSP counterparts. There were no table top or joint field exercises. CPD officers below the level of Lieutenant met the troopers who were also assigned to their zones in and around Emancipation Park on the morning of the event. This lack of coordination or even familiarity created uncertainty and diminished the chances of a consistent, unified command.

### c. The City of Charlottesville Waited Too Long to Request the Specialized Assistance of the Virginia Department of Emergency Management.

Once it was deployed, the VDEM Incident Management Team provided valuable assistance to those planning for the Unite The Right rally. The IMT provided useful equipment, including GPS trackers for CPD officers that showed commanders where they were located during the event.[352] It consolidated separate and disconnected operational plans into a single Incident Action Plan (IAP). Planners also held tabletop exercises that helped CPD commanders prepare for the handling of particular scenarios.

The effectiveness of the IMT was limited, however, by a lack of fulsome cooperation by all agencies involved in the Unite The Right rally. VSP did not participate in any of the IMT briefings in advance of the final meeting at which the IAP was distributed. Their command staff did not participate in the tabletop training exercise in which hypothetical scenarios and responses were developed. IMT planners did not have the VSP operational plan as they drafted the IAP. ACPD was similarly uninvolved in these meetings, and their resources were never noted in the final IAP.

If the City of Charlottesville had heeded Chief Baxter's advice and requested that VDEM deploy an IMT several weeks before the Unite The Right rally, the IMT would have had more time to access and incorporate information and create a more comprehensive plan.

The IMT did much with the limited information that was available. It could have done much more with additional time and cooperation.

### d. The Charlottesville City Council Unduly Interfered With Operational Planning By Directing That the Event Be Moved to McIntire Park Just Days In Advance.

In the days prior to the Unite The Right rally, many members of this community encouraged City leaders to cancel the event. Business leaders, faith groups, neighborhood associations, and other interested members of the community expressed concern about the prospect of a large-scale disorder. They correctly predicted that the presence of a large gathering of far-right groups would attract considerable opposition and create the potential for violence, disorder, and a substantial threat to public safety. Accordingly, they brought considerable pressure on members of the City Council and the City Manager to deny the permit for this event.

There were clear legal impediments to denying the Unite The Right event permit. The City Attorney correctly advised Council and the City Manager that the First Amendment did not allow a local government to deny a permit application based on the content of the speech at an event. The Constitution allows time, place and manner restrictions on permitted events, though those restrictions must be limited and guided by specific, credible evidence.

The intersection of free speech and public safety created a real dilemma for City leaders. They wrestled with a solution that would both minimize the prospect of violence and protect everyone's First Amendment rights. They ultimately reconciled these competing interests by granting Mr. Kessler's permit application, but for an event in McIntire Park rather than Emancipation Park. Their effort to move the event to McIntire Park was ultimately overruled by a federal judge who granted an injunction that kept the Unite The Right rally in Emancipation Park.

### 1) Lack of Deference to Law Enforcement.

City Council should not have injected itself into the process of deciding where to hold the Unite The Right rally. That decision was informed by both legal analysis and operational planning, neither of which is the province of the elected City Council. The City Attorney has the expertise to evaluate the requirements of law and identify the rules that govern time, place and manner restrictions on free speech events. The Charlottesville Police Department is the agency best equipped to protect public safety during large-scale events. Conversely, the City Council does not have such expertise. Their decision to take this important and difficult decision away from the arms of City government most equipped to evaluate and manage this event was a dangerous overreach with lasting consequences.

As elected representatives, Council should respond to public concerns like those expressed in the days before August 12. But rather than micromanage professional staff and second-guess their decisions, Council should have helped the community understand the rules that govern these events. Rather than overruling law enforcement and forcing them to prepare for a more complex event, Council should have helped the community understand the public safety challenge and anticipate the law enforcement response to the event. Instead of

working as a team, City staff and City Council worked at cross purposes and stoked public uncertainty about the event. This was a significant failure that has diminished the City's faith in its elected leaders.

### 2) Timing of Decision to Move the Event.

The effort to move the rally to McIntire Park was initiated much too late. Despite the ample notice of Mr. Kessler's desire to hold a large gathering of white nationalists in Charlottesville, the violence that had ensued at similar events around the country, and accurate intelligence about the potential for violence here, City leaders waited until just days before the event to act. Waiting until the week before the event to move it away from the location requested by the organizer negatively impacted both planning and communications. Law enforcement officials were suddenly forced to prepare for the possibility of protest activity in both McIntire and Emancipation Parks. Planners were already attempting to prepare for the unpredictable behavior of protestors and counter-protestors; the decision to move the event exacerbated these concerns and created additional uncertainty in the difficult days before August 12.

### e. The City of Charlottesville Did Not Provide Adequate Information to The Public About Plans For the Event.

The late attempt to move the Unite The Right rally to McIntire Park also hampered communications with the public. Uncertain as to where the event would ultimately take place, City leaders were unable to provide specific details about street closures, safety measures, and other important information. They left important questions from the business community, neighborhood groups, and interested citizens unanswered. As a result, many people were uncertain about whether to attend the protest event, and what to expect if they did. That uncertainty created anxiety in this community. It has also diminished confidence in City government in the weeks since the demonstration.

When City leaders did speak in advance of August 12, they sometimes sent conflicting messages. Mayor Signer consistently discouraged attendance at the August 12 rally, much like he and other City leaders had done prior to July 8. By contrast, Vice Mayor Bellamy encouraged attendance and personally participated in a faith-based endeavor to visibly oppose the Alt-Right event. While Council is a diverse body with differing perspectives on various issues, the mixed messages to the public in the days leading to August 12 created confusion and diminished confidence in the City's ability to comprehensively manage this event.

### f. City Planners Mistakenly Believed That They Could Not Limit the Possession of Certain Items Used as Weapons At the Unite The Right Event.

Virginia Code § 15.2-915, first enacted in 1987,[353] preempts Virginia localities from enacting local laws that regulate the possession of firearms. It provides, in pertinent part:

> No locality shall adopt or enforce any ordinance, resolution or motion . . . and no agent of such locality shall take any administrative action, governing

the purchase, possession, transfer, ownership, carrying, storage or transporting of firearms, ammunition, or components or combination thereof other than those expressly authorized by statute. For purposes of this section, a statute that does not refer to firearms, ammunition, or components or combination thereof, shall not be construed to provide express authorization.[354]

Thus, in the absence of a state law expressly authorizing local gun-control laws, localities may not prohibit citizens from open-carrying firearms. There is currently no such state law, which precludes Charlottesville and other localities from restricting the possession of firearms at protest events. Because of this statute, Charlottesville could not have banned guns or otherwise restricted attendees from openly carrying firearms.[355]

State law does not similarly impede localities from enforcing restrictions on the possession or use of other weapons. Cities may restrict the possession of sticks, bats, shields, clubs, poles, or other items that may be used as weapons at protest events. The City's charter[356] and the uniform-charter-power provision of the Virginia Code[357] empower the City to regulate and restrict the possession of weapons at demonstrations, provided that the City determines that such regulation is appropriate to protect public safety.[358]

CPD did not receive accurate information about the legality of restricting weapons other than firearms before the Unite The Right event. On August 4, 2017, Captain Wendy Lewis sent an e-mail message to Commonwealth's Attorney Dave Chapman asking if law enforcement could ban the possession of certain items that could be used as weapons   such as bats, poles, or shields   from Emancipation Park on August 12. Mr. Chapman responded that such a ban would be permissible only if there was a pre-existing restriction on the possession of those items in the park. Captain Lewis reported this to Chief Thomas and others on the CPD command staff. They proceeded with planning for August 12 under the mistaken assumption that they could not ban the possession of any items at the Unite The Right event.

Restricting weapons other than firearms would have been difficult to accomplish on August 12. A prohibition on bats, poles, and shields would have required posting rules regarding the possession of certain items and the ability to uniformly enforce such restrictions. Despite the challenges to enforcing a ban on weapons other than firearms, we believe that such a ban would have been advantageous. Weapons carried by Alt-Right demonstrators and  those there to oppose them increased both the quantum and seriousness of violence on August 12. If the individuals engaged in those acts of violence had been unarmed, there would have been fewer and less dangerous encounters. Accordingly, the City should have prohibited the possession of these items.

### g. The Owners of Private Property Adjacent to Emancipation Park Refused Access to Their Facilities, Which Hampered Law Enforcement Response During the Event.

Police planners relied upon access to buildings close to the event and used those buildings to stage specialized units of officers and equipment. The farther from Emancipation Park those resources were staged, the less responsive they could be in an emergency situation.

Both the Central Branch of the Jefferson-Madison Regional Library and Christ Episcopal Church withdrew offers of access to their buildings. The loss of those facilities took away law enforcement staging areas in close proximity to Emancipation Park and required the use of buildings much farther away. The VSP field force staged at the Jessup House was one of two such units that was called to Emancipation Park to disperse the crowd after an unlawful assembly had been declared. It took this field force group longer to arrive and engage than it would have had they been adjacent to the park. This delay came at a critical time, as multiple fights occurred on Market Street before the field forces began clearing the park. As a result, the withdrawal of access to the library and church buildings hampered law enforcement response time and threatened public safety.

> ### h. The University of Virginia Police Department Refused Multiple Offers of Mutual Aid Assistance from the Charlottesville Police Department, Resulting in Violent Encounters That Emboldened Protesters at the Unite The Right Rally.

The University of Virginia Police Department did not sufficiently prepare for the violence that occurred at the Jefferson statue on Friday night. Despite ample warning that a large group would march on Grounds with torches and confront counter-protesters, UPD failed to take proactive steps to prevent violence. They did not attempt to separate the marchers from those that came to confront them. They did not station any uniformed officers near the statue, even after a confrontation was obvious. Most importantly, they failed to accept multiple offers of assistance from CPD officers who were staged immediately across the street. Instead, UPD waited for violence to occur before requesting such assistance. Even then, they were disorganized and unfamiliar with the process of declaring an unlawful assembly. Their response to the Friday night torchlight event was woefully inadequate, even for a small campus police department.

The lack of police intervention on Friday night set a dangerous tone for the events of the next day. UPD's lack of intervention was obvious to everyone present, both among the Unite The Right torch-bearers and the organized counter-protesters who were planning to attend the larger Saturday rally. The Friday night event increased attendance at the Unite The Right rally and stoked apprehension about what would occur. The seeming paralysis of police infected the image of all law enforcement and created a general sense of inadequacy and unpreparedness for the weekend's events.

It also seems likely that the insufficient police response on Friday night emboldened people who intended to engage in similar acts of violence on Saturday. Anyone who came to Charlottesville to violently confront others was undoubtedly encouraged by what he saw in person or on video at UVA. We believe that the police passivity on Friday night potentially encouraged violence on Saturday. Had the Friday night event been handled more effectively, it would have set a tone of control and discouraged possible confrontations at Emancipation Park.

i. **The Charlottesville Police Department Implemented a Flawed Operational Plan That Failed to Protect Public Safety On August 12.**

1) **Law Enforcement Did Not Adequately Ensure Separation Between Alt-Right Protesters and Organized Counter-Protesters.**

Every law enforcement expert we have consulted (and many who have opined from a distance) shares the view that law enforcement must endeavor to keep groups of protesters and counter-protesters separated from each other at large protest gatherings. To protect the safety of all attendees at these events, even willing combatants in violence, law enforcement must at all times endeavor to create and enforce separation between various groups with divergent perspectives.

CPD and VSP planners failed to follow this important rule of separation on August 12. While they spent many hours considering how to divide Emancipation Park into different areas and keep the Alt-Right protesters separate from confrontational groups, they did not sufficiently plan to protect public safety as attendees moved toward and away from Emancipation Park. The Operational Plan was fundamentally flawed in its lack of focus on areas adjacent to the park   the areas where violence predictably occurred on August 12.

Despite the knowledge that people would be approaching Emancipation Park from both the east and the west along Market Street, law enforcement made no attempt to ensure separation between groups along those crucial pathways. There was one officer positioned between the Market Street garage and the southeast entrance to Emancipation Park  a school resource officer stationed at 4th Street NE and Market Street   and she was relieved from that post without any replacement shortly after the unlawful-assembly declaration. There were several officers at the intersection of Ridge-McIntire and Market Street, though no officers between that location and the southwest entrance to the park. Rather than protecting people along the likely routes of travel, officers were stationed in Emancipation Park, behind metal barricades. This represents a horrible misalignment of resources that left our community unprotected.

These assignments did not change after the declaration of unlawful assembly. The protest groups left Emancipation Park and walked back in the direction from which they had come. Again, there was no separation between the Alt-right groups and counter-protesters outside of the park as people streamed out of the park and returned to their vehicles or the vans that had dropped them off.

The violence on Market Street could have been prevented by a more effective separation strategy. Instead of positioning hundreds of officers behind barricades inside of Emancipation Park, planners should have spread officers along Market Street in the blocks leading to the park. A more visible police presence along Market Street would have deterred violence and allowed earlier, affirmative response when confrontations occurred. There were ample law enforcement resources available to protect Market Street. Commanders could have used field force personnel, SWAT resources, or other specialized units to monitor ingress and egress. Officers could have been posted at specific locations or

WILLIAMS

Hunton & Williams LLP | 159

Case 3:17-cv-00072-NKM-JCH   Document 488-3   Filed 05/02/19   Page 179 of 227   Pageid#: 5163

moved along with crowds to and from the event, responding to conditions as they evolved. These posts could have been established, moved or reestablished before and after the declaration of the unlawful assembly.[359]

No plan could have completely ensured separation between people who came to this event with the specific intent to commit acts of violence. That said, there were many ways to reduce the chance that such violence would occur and respond to it more forcefully when it did. The law enforcement plan that was implemented was woefully inadequate in this area, resulting in dangerous proximity between opposing groups and numerous acts of violence.

### 2) Law Enforcement Failed to Intervene in Violent Disorders and Did Not Respond to Requests for Assistance.

Over the course of our evaluation, we spoke to numerous citizens who reported instances of police inactivity in response to specific acts of violence. Many people reported disorders and asked for police intervention. Others identified specific perpetrators of violence and requested arrests or other police response. Despite clear evidence of violence, police consistently failed to intervene, de-escalate, or otherwise respond. Upon review of police body camera and open source video, we saw numerous examples of police failing to act when requested to do so by citizens. The fact that officers made very few arrests also supports the conclusion that law enforcement failed to intervene in violent encounters between attendees of the Unite The Right event.

We did not find evidence of a direct order to officers to "stand down" and not respond to fights and other disorders. Even if there was no explicit "stand down" order in place, CPD and VSP both failed to "stand up" to protect human life. Supervisors devised a poorly-conceived plan that under-equipped and misaligned hundreds of officers. Execution of that plan elevated officer safety over public safety. The consequence was that many in the crowd felt physically vulnerable despite intense law enforcement presence, a perfect recipe for undermining the community's faith in law enforcement.

### a) Areas Where Conflict Predictably Occurred Were Not Occupied by Officers.

A number of factors led to law enforcement's inability to prevent and respond to violence. First, the CPD operational plan failed to deploy officers to areas where violent confrontations were likely to occur. As described above, the plan placed an inordinately large number of officers within designated zones inside of Emancipation Park, leaving areas of ingress and egress relatively unprotected. Officers would have had to leave their designated zones to respond to fights on Market Street, which could only be accomplished with supervisory approval. The plan's focus on the park rather than surrounding areas resulted in the large majority of law enforcement personnel being some distance from the violent confrontations that occurred.

### b) CPD and VSP Personnel Were Insufficiently Equipped To Respond to Mass Unrest.

CPD and VSP personnel with whom we spoke cited the lack of protective gear as the main reason they did not intervene in violent encounters during the Unite The Right rally. The officers who were in a position to observe and respond to fights and aggressive acts were insufficiently protected to safely intervene. CPD zone commanders consistently cited the lack of protective gear as the main reason for not directing their assigned officers to deescalate or interrupt disorders.

Chief Thomas explained to us that the decision to have officers in "soft" uniforms rather than riot gear was motivated by "optics" and the desire to avoid alienating and intimidating the crowd through a militarized officer appearance. There is support for a "soft" approach to equipping officers during large events, as it permits officers to interact informally with members of the crowd, building communication, articulating expectations, and encouraging participants to self-police. Often, this means walking through and with the crowds, "meeting and greeting" participants, expressing both a commitment to support free expression and a recognition that most participants are peaceful.

Despite CPD's soft uniforms, its officers did not prepare to engage protesters or engage participants in those ways. The department did not train officers in crowd management or de-escalation in the lead up to the rallies. Officers did not roam through the crowds and talk with protesters. To the contrary, they lined up behind barricades in military-looking formation and stood scanning the crowds.

CPD also failed to prepare adequately for the transition from soft strategies to "harder" alternatives. Riot gear was stored too far from officers who might need it to respond to unfolding events, requiring officers to leave the area just as disorder and violence most required their presence. Since CPD officers were unfamiliar with riot gear and had not been trained with it, they were inevitably slow to "gear up." As a consequence, CPD left the crowd under-policed when intervention would have been valuable. In these ways, CPD's strategy ensured that it would face the worst of both worlds: officers felt inadequately protected when things went awry, and yet the department did not reap the benefits of promoting peace and building civilian trust that a soft approach is thought to promote.

### c) CPD Commanders Failed to Deploy Available Law Enforcement Resources to Quell Violence

CPD commanders could have deployed multiple specialized units to respond to the violent skirmishes that occurred on Market Street. The CPD SWAT team was staged just blocks away in the alley next to the CPD station. This specialized unit was more prepared to respond to violent disturbances, as they had protective equipment and were trained as a unit. The Albemarle County Police Department's SWAT Team and mobile field force were also staged just blocks from Emancipation Park. Like the CPD counterparts, these units were standing by in full protective equipment, ready to deploy if requested by the CPD incident commander. Despite their availability and clear utility, none of these specialized units was mobilized to respond to the violence that occurred on Market Street. The failure

to utilize these specialized units was a clear failure that exacerbated the violence around Emancipation Park.

### d) VSP Directed Its Personnel to Remain Behind Barriers Within Emancipation Park.

VSP intended and instructed their officers to engage in a far more limited range of law enforcement activities than CPD envisioned. As VSP ground commander Lieutenant Becky Crannis-Curl told Captain Shifflett early on August 12, troopers were directed not to enter large unruly crowds to make arrests. This was an "off-plan" decision that was unanticipated and not adequately conveyed to CPD officers in the five zones. As a result, the agencies approached the Unite The Right event with a dangerous inconsistency in approach to the crucial issue of arrests. The "left hand" did not know what the "right hand" was doing, which created danger to both officers and event attendees.

It is remarkable that VSP officials attended weeks of planning sessions with CPD and weighed in on CPD's operational plans without ever specifying in writing or verbally that VSP did not expect its officers to police serious incidents of lawbreaking by participants. Their inaction in the face of violence left the City unprepared and unaware that it was unprepared to address one of the predictable risks of the event: brief but serious incidents of interpersonal violence and mutual combat. In the future, VSP should make clear the limits of the aid it provides in writing and set consistent expectations so that communities understand what aid is and is not available under particular conditions.

### e) Upon the Declaration of an Unlawful Assembly, Protesters Were Pushed Directly Toward Counter-Protesters Without Separation.

As the crowd dispersed, law enforcement failed to prevent and respond to violent confrontations in and around the park. Those in the park at the time of the unlawful assembly were pushed straight south, into the area on Market Street where counter-protesters had assembled. Predictably, violent confrontations occurred as the Unite The Right protesters streamed past the counter-protesters. Rather than separate the crowds and break up individual fights, troopers stood behind barricades as people left the park. The CPD officers who could have deescalated confrontations stood in the back of Emancipation Park, acting as a rear guard for the VSP field force.

The inability to enforce separation during dispersal represents another planning failure. Commanders knew when they declared an unlawful assembly that the Unite The Right protesters had arrived at Emancipation Park from both directions on Market Street. They should have expected that those same people would leave the park and return along the paths by which they arrived. Nonetheless, CPD and VSP commanders failed to protect the points of egress, instead pushing the conflicting groups directly into each other. The violent conflicts that resulted were a predictable recurrence of what had led to the unlawful assembly.

3) **The Traffic Plan Placed Insufficient Resources at Particular Intersections and Left the Downtown Mall Vulnerable to a Vehicle Used as a Weapon.**

CPD's traffic plan represented another misallocation of resources that had tragic consequences on August 12. Planners put unarmed civilian employees at particular intersections where violent confrontations arose. They also failed to sufficiently protect a crucial intersection, allowing a vehicle to strike a large crowd of people and cause on death and numerous injuries.

Officer Tammy Shiflett was in a vulnerable position at her assigned post at the intersection of 4th Street NE and Market Street. Although she is a sworn police officer and carries a firearm, Officer Shiflett is a school resource officer who works in an elementary school, and she had just returned to active duty following more than two months of leave while recovering from elbow surgery. In the face of the Market Street skirmishes that broke out after the unlawful-assembly declaration, Officer Shiflett felt unsafe and radioed for assistance. She was soon reassigned, and she moved her vehicle away from that intersection.

After Officer Shiflett departed, all that remained at that crucial intersection was a wooden sawhorse barricade. Lieutenant Steve Knick, the traffic supervisor, was not aware that Officer Shiflett had been reassigned. No one in the Command Center thought to replace Officer Shiflett with other officers, or install any additional barricades. The lack of protection of that intersection left it vulnerable to vehicle traffic southbound on 4th Street, across the Downtown Mall. The sawhorse barricade blocking 4th Street was moved by unknown persons, and several vehicles were able to travel southbound across the Downtown Mall. James Fields exploited this vulnerability when he drove his Dodge Challenger southbound along 4th Street into a crowd of counter-protesters, causing the death of Heather Heyer.

The 4th Street incident is the most dramatic manifestation of the failed traffic plan implemented by CPD on August 12. Rather than placing civilian employees and single officers at perimeter traffic posts, planners should have placed officers or units prepared to more affirmatively respond to disturbances. Had there been a team of sworn officers at each traffic post, fights like the one witnessed by Diane Hueschen on 2nd Street could have been prevented or interrupted. When Officer Shiflett radioed "there is no one here to help me" at 4th Street NE and Market Street, the Command Center should have reinforced rather than abandoned that crucial intersection. Leaving that intersection unguarded was a tactical error that should not have been allowed to happen.

As above, there were ample law enforcement resources available to assign to traffic posts and physical assets offered by Public Works. Captain Mitchell rejected a suggestion to use VSP troopers at traffic posts based on the view that the traffic posts were insufficiently critical to merit VSP assignment. Public Works Director Paul Oberdorfer raised the possibility of using water-filled jersey barriers or large dump trucks to block traffic at particular intersections. All of these suggestions would have made the intersections more

secure and done a more effective job of preventing unauthorized access to the streets designated as protected in the plan.

4) **The Charlottesville Police Department and Virginia State Police Failed to Operate Under a Unified Command, Resulting In Delayed And Ineffective Responses To Critical Events.**

Another central principle that guides event planning for any large law enforcement response is the concept of unified command. All experts agree that it is imperative for all agencies contributing to an operational response to a large-scale event to coordinate activities and operate under a single and well-established chain of command. The August 12 CPD and VSP commanders ignored this fundamental lesson and failed to implement a unified command. This failure slowed response time, confused officers on the ground, and greatly diminished the effectiveness of the law enforcement response to this difficult event.

### a) Failure to Share VSP Operational Plan

Multiple law enforcement agencies coordinated in the planning process for the Unite The Right rally. Commanders from VSP and CPD convened weekly meetings at which they discussed intelligence, resource deployment, logistics and other operational details. Other agencies participated in these meetings, including fire and rescue agency personnel and other local law enforcement agencies.

Despite the multi-agency commitment and numerous meetings in advance of August 12, there were numerous failures of coordination. VSP and CPD had separate operational plans for the Unite The Right rally. VSP never provided its plan to CPD during the planning process. When we interviewed CPD incident commander Captain Mitchell, he told us he has not seen the VSP operational plan to this day. The fact that the agency with the largest commitment of personnel did not share its operational plan with the agency that maintained overall command at the event is a stunning failure to align mission and ensure mutual understanding.

### b) Lack of Unified Decision Making

Despite CPD's role as the lead agency and Chief Thomas's responsibility as incident commander, there was no unified command on August 12. Chief Thomas admitted to us that although Charlottesville had formal command authority he did not exercise functional command over the law enforcement response, nor did he seem to understand fully the need to do so. In the face of the resources VSP brought to the cooperative effort, Thomas deferred to the point of dysfunction. He noted the presence of senior VSP and state government leadership in the command center and indicated that the state officials periodically left the Command Center for separate conversations. Unified command requires soliciting and attending to the input and skills brought by other agencies, but it also demands exercising authority and clear leadership. CPD failed miserably to effectively establish a unified command and exercise the authority it nominally had been given.

### c) No All-Hands Briefing

There was no all-hands briefing between CPD and VSP personnel on August 12 or any time prior to the Unite The Right event. CPD personnel reported to their zones at 7:00 a.m. on August 12 to allow time for joint briefings with the VSP personnel assigned to their zones before attendees began to arrive. When VSP showed up nearly two hours late on August 12 because it engaged in its own briefing, it left no opportunity for joint discussions before the event. The fact that such a briefing took place without CPD's knowledge or participation is yet another manifestation of the lack of coordination between these two agencies.

### d) Lack of Interoperable Communications

The use of separate radio channels on August 12 undermined the concept of unified command and delayed important tactical decisions. All communications between CPD and VSP ultimately had to be conducted face-to-face, whether between officers and troopers on the ground or CPD and VSP leadership in the command center. All CPD personnel, in the command center and on the ground, told us that there were times when they could not immediately locate their VSP counterparts, which delayed communications.

The use of separate communications delayed decision-making and the implementation of specific resources during the event. As early as 10:21 a.m., zone commanders requested the authority to declare an unlawful assembly. Nonetheless, the declaration was not made until 11:31 a.m. Captain Mitchell and Chief Thomas told us that the delay in declaring the unlawful assembly resulted in part from VSP's attempt to extract plain clothes personnel from the various zones in Emancipation Park. Even after the unlawful assembly was declared, it took the VSP field forces almost forty minutes to assemble and disperse the crowd in Emancipation Park. During this delay, CPD officers were simply waiting in the public safety area, rather than responding to disturbances. These significant delays were caused in part by the necessity of relaying information along separate communications channels. If all agencies had been given access to the same information on a unified communications channel, decisions could have been made more quickly and plans executed more immediately.

Our overall conclusion about the interagency coordination on August 12 is consistent with that of Officer Otis Collier, who was assigned to Zone 3 during the Unite The Right event. While he and every CPD officer with whom we spoke praised VSP for their substantial commitment to the City on August 12, Officer Collier told us that it seemed to him that VSP was "operating independently" on August 12.

VSP's commitment of resources and support was indispensable on August 12. Nonetheless, those resources were not sufficiently coordinated with those of CPD, the nominal "lead agency" for the event. The disconnect in planning, communications, and operations had a materially negative impact on the overall law enforcement response to this challenging event. There was no truly unified command on August 12, which is a central failure of both planning and execution.

### j. Failure to Protect Public Safety Erodes Trust in Law Enforcement

The passive law enforcement response to violence on August 12 represents a tremendous tactical failure that has real and lasting consequences. People were injured in violent confrontations that could have been but were not prevented by police. Some of the individuals who committed those violent acts escaped detection due to police inability or unwillingness to pursue them. People who watched violence occur without police intervention were alarmed and unsettled. Many individuals described to us a diminished confidence in law enforcement which has potentially lasting consequences for this and other communities.

Assessed by whether CPD's efforts protected human life and free expression, indisputably among the most important measures by which one can judge the success of law enforcement response to a political protest, CPD and VSP failed miserably on August 12. Many things could have gone worse: protesters could have caused each other additional serious injuries; officers could have used excessive force in resolving disorder; property could have been destroyed. But viewing those limited successes as evidence that the police response to the event was successful indicates that both state and local law enforcement continue to overlook the role of these goals in policing, a failure that undermines public faith in government.

# RECOMMENDATIONS

In this section, we look prospectively at what the City of Charlottesville and other municipalities can and should do in response to the summer protest events. Some of our recommendations address issues that have arisen in our review, and others suggest improved practices to manage future protest events. These recommendations follow directly from the lessons learned during the July 8 and August 12 rallies. Some can be implemented unilaterally by City agencies in advance of mass unrest events. Others will require legislative change and political action.

## I. Preparation for Civil Disturbances

In advance of a large protest event, every municipality can take steps to protect both free speech and public safety. We offer the following recommendations as a means to improve the City of Charlottesville's approach to future events. We hope other small cities will find the suggestions useful as they inevitably confront volatile events of their own.

### A. Emergency Management and Coordination

The City of Charlottesville should follow Incident Command System (ICS) procedures implemented by the National Incident Management System (NIMS) in anticipation of all future large protest events. These nationally-recognized standards provide the crucial blueprint for managing emergencies. The ICS standards use standard nomenclature and help ensure a unified command structure to govern a multi-agency response.

- Provide training to all CPD and CFD personnel on NIMS and ICS processes in advance of large events.

- Use standard NIMS/ICS terminology when planning and creating event-specific roles to ensure common understanding among participating agencies.

- Designate the Charlottesville Fire Chief to serve as the City's Emergency Management Coordinator and provide the Coordinator with sufficient resources to implement the NIMS process in anticipation of large protest events.

- Consider the utility of an Incident Management Team (IMT) and involve planners well in advance of large events.

- Adhere to any agreed upon Incident Action Plan during a major event.

### B. Intelligence Gathering

Accurate information about large protest events is essential to effective planning. Intelligence about attendees and anticipated activities at these events is critical. Police

agencies should develop the means to gather and vet intelligence and incorporate that information into operational plans.

As the events of August 12 demonstrate, not all attendees at protest events will coordinate with law enforcement, either because they are too loosely organized to do so or because it is incompatible with their ideology. Rather than ignore groups that do not cooperate with law enforcement, agencies should plan for this resistance and prepare to anticipate gaps in intelligence and in planning that result. Planners must also ensure flexibility to adjust when certain groups and individuals do not keep promises or act in accord with previous agreements.

In addition to gathering event-specific information, agencies preparing for large protest events should endeavor to consult with law enforcement agencies in other parts of the country where similar events have occurred. While each demonstration will present unique facts and circumstances, small police agencies like CPD would be well served by learning from the experience of peers in other jurisdictions. The Department of Justice or a national police organization could facilitate information sharing between agencies, creating a clearinghouse of plans, after-actions, and other guidance to agencies preparing for situations of mass unrest.

- Improve the intelligence gathering capabilities of CPD through enhanced technology, including software to aggregate and sift open sources of information and drones to monitor demonstrations as they occur.

- Access intelligence available through the Virginia Fusion Center and participation in the FBI-led Joint Terrorism Task Force.

- Develop lines of communication with protest organizers and representatives of groups likely to attend when possible to ensure clear expectations and inform operational planning.

- Cultivate relationships with community members through effective outreach, including groups critical of law enforcement.

- Gather information from law enforcement agencies in other communities where large protest events have occurred.

- Develop a national means for gathering and sharing information about law enforcement responses to mass unrest and connecting cities facing volatile events with officials elsewhere with relevant experience.

### C. Law Enforcement Training

Officers charged with protecting public safety during protest events need specialized training. Planners should provide information about standards of law that govern these events. Officers should also receive field training and become familiar with tactics and equipment to be used during civil unrest situations. Training should be coordinated among agencies to ensure seamless coordination during these events.

- Implement periodic training of CPD personnel on incident management, including table-top and classroom exercises, and field work in crowd control/civil disturbance.

- Ensure officer familiarity with the capabilities and intended use of riot gear, gas masks, helmets, and non-lethal means of controlling large crowds.

- Provide First Amendment training and discussion of the role of law enforcement in facilitating free expression.

- Create event-specific training to provide officers with intelligence information, applicable laws and ordinances, operational goals and objectives, interagency coordination, and contingency plans.

- Ensure regular training on de-escalation techniques and use of force policies and engage in training before a planned event on application of those techniques and policies to the circumstances likely to arise.

- Conduct joint training with partner agencies prior to the event, including field training, table top exercises and all-hands briefings regarding specific operational plans.

- Complete thorough after-action reports to document lessons learned, identification of what went right and what went wrong and overall assessment of agency effectiveness.

**D. Communications**

City leaders should provide comprehensive information to the public about plans for future large demonstration events. Elected officials and City staff should ensure coordination in timing and content of public messaging. CPD should endeavor to provide information about potential threats and anticipated responses to protect public safety. City officials should engage effectively with community groups, businesses and a full range of interested organizations and individuals.

- Enhance City's communications capacity with increased professional staff, technology and equipment.

- Increase use of social media and electronic means of disseminating information.

- Communicate overall public safety goals, potential threats, expected crowd control strategies, specific behavior that will result in arrest, and overall expectations to the public well in advance of the event.

- Engage dissenting voices and open channels of communication outside times of crisis to build relationships and trust.

### E. Protecting Both Public Safety and Freedom of Speech

In addressing large political protests, City officials, including law enforcement, must both protect public safety and facilitate free expression. Though many find the belief of the protesters in these events hateful, the City is legally obliged not to allow such views to affect its planning. Strategies used on objectionable speech today could be used to suppress other kinds of critical speech tomorrow. Thus, both command staff and field officers should prepare for events with both of these paramount goals in mind. Operational plans should make both goals plain, and specific tactical decisions should be mindful of the need to ensure security and to protect free speech.

Law enforcement should not plan to declare an event unlawful and disperse crowds before an event begins or permit violence that is likely to disrupt a planned event. Nor should it plan to arrest aggressively as a means to create order. Although arrests are sometimes necessary to protect public safety, they are also costly for individuals, can be frustrating for communities, and increase liability for cities. Rather, command staff should make every effort to ensure that a permitted event takes place in a manner that protects the safety of all attendees. Preventing violence and addressing individual acts of violence quickly when they do arise are the best ways to protect both public safety and free speech. Rather than wait for large assemblies to be declared unlawful, law enforcement should attempt to create conditions that ensure lawful behavior.

In navigating the complicated terrain of political protest and public safety, law enforcement needs effective legal advice. The City Attorney and Commonwealth Attorney should have access to specialized expertise in these nuanced and evolving areas. Rather than proscribing bright lines and dictating strategy, lawyers advising police agencies should present data points reflected in case law, describe the minimum constitutional requirements at issue in free speech events, and help evaluate specific tactics that attempt to reconcile these competing interests. This approach will allow law enforcement to develop proactive plans that both protect the core value of free speech and prevent disorder.

The Charlottesville City Attorney's office and other small city attorneys would benefit from centralized expertise and guidance at the state level. These issues will inevitably affect other cities and towns in Virginia, many of which have far fewer available municipal legal services than Charlottesville. The Secretary of Public Safety and Homeland Security or the Attorney General's office could mitigate this problem at low cost by providing well-researched guidance across the state. Creating a mechanism to guide planning for these volatile protest events would be consistent with the goal of preparing Virginia for emerging issues like the unique public safety threats that arise at events with mass unrest.

- In policing future events, CPD should demonstrate clear commitment to protecting individuals from physical harm and promoting the exercise of constitutional rights.

- CPD should use the event mission to guide planning and preparation.

- Beyond any specific event, CPD should embrace facilitating free expression and ensuring the safety of all attendees at protest events as a critical part of the department's mission.

- The Secretary of Public Safety and/or the Attorney General's Office should monitor relevant state law and federal constitutional law on policing First Amendment activities and issue annual legal updates to towns and cities in Virginia.

## II.  Effective Management of Protest Events

During large protest events, law enforcement agencies must work closely together in a unified command structure.  Such unity should include an agreed-upon, clearly-articulated response to disorders and plans for arrests.  Law enforcement agencies should plan for attendees' entry to and exit from these events and position resources sufficient to facilitate separation beyond the permitted area.  Any operational plan should be flexible enough to accommodate unexpected events and quickly direct officers and other resources to problem areas.

### A.  The Stadium Approach

When crowds are likely to be large, groups have conflicting agendas, and intelligence indicates that violence is probable, security at large protest events may be best served by a stadium-type security plan.  Under such circumstances, CPD should create and enforce a secure perimeter around the location of the permitted event.  The area within the perimeter should be broader than the park or other location at which an event will take place and be large enough to accommodate expected crowds with diverse perspectives.  Fixed checkpoints should be established to allow entry into the secure perimeter, much like the gates to a stadium.  These points of entry should facilitate prohibitions on items that can be used as weapons.  The enforcement of a hard perimeter will require law enforcement personnel and physical barriers that encircle the designated area and ensure that attendees can only enter at designated locations.

Law enforcement planning should extend beyond the secure perimeter and fixed points of entry.  Officers must protect likely paths of entry to and exit from the permitted event. Effective separation between groups must extend from staging areas to the location of the event itself and minimize the potential for opposing groups to come into contact and conflict.  Within the perimeter, conflicting groups should be funneled into designated areas separated by barricades.  These zones should connect to designated points of entry for protesters and counter-protesters.  In addition to the positioning of individual officers, planners should consider the use of hard barricades, vehicles, and landmarks to enforce separation.  Planners should also ensure the availability of enforcement resources well before and after the time designated for a protest event.

Although creating a stadium can consume city resources and impose some additional burden on protesters, the stadium approach has important benefits.  Enforced separation of protesters and counter-protesters could minimize conflicts of the kind experienced on

August 12 in Charlottesville. Lessening violence both protects lives and ultimately permits more speech, as the event will be less likely to be declared unlawful and dispersed. With fewer weapons inside the perimeter, officers can adopt a less militarized approach, engage more positively with crowds with less fear for their physical safety, and potentially reduce the need for arrests. We encourage CPD and other agencies to begin planning for a large and potentially volatile protest event by considering the "stadium" approach described here.

Plans for each protest event will depend upon the resources available to responding agencies, the unique features of the location of each event, and intelligence about expected threats. When these and other conditions make the "stadium effect" impractical or unnecessary, planners should endeavor to maximize law enforcement's ability to protect the core values of public safety and free expression. All operational plans should allow individual officers to engage with attendees at protest events. They should strategically intervene in potential or actual conflicts, and de-escalate or arrest when appropriate. Officers should have be given thorough training, adequate equipment, and clear guidance on goals and strategies for engaging the crowd.

- If large events raise the potential for violence, law enforcement planners should create a secure perimeter surrounding the location of a protest event, using law enforcement personnel, hard barricades, buildings and natural boundaries.

- Assign officers to areas outside the secure perimeter along likely routes of ingress and egress, and equip officers with capacity to respond to disorders.

- Designate secure points of entry for protesters and counter-protesters at which attendees are screened for prohibited items.

- Direct attendees from secure points of entry into zones within the event dedicated to particular groups, using barricades and buffer zones to promote separation between zones within the perimeter.

- Regardless of whether a plan enforces a secure perimeter, officers should engage with crowds and strategically respond to actual and potential threats.

**B. Unified Command**

A relatively small police agency like CPD will always rely upon partnerships with other agencies to manage large-scale events. Given the necessity of a multi-agency response, it is imperative that all participants clearly understand their respective roles and report to a unified structure of command. Supervisors and officers from different agencies must be able to communicate via patched radio systems to ensure common understanding of conditions and timely reaction to events. Coordination should be rehearsed rather than spontaneous. Without a unified command and true integration of resources, the effectiveness of a multi-agency response is severely handicapped.

The breakdown in coordination that occurred during the summer protest events in Charlottesville raises serious concerns about Virginia's law enforcement preparedness in the future. As the state's largest law enforcement agency, VSP will provide substantial

resources and experience to Charlottesville and other localities in future planned and unplanned major events. Given the certainty of their repeat role in these events, VSP must do a better job of coordinating with local agencies. In anticipation of any large protest event, planners should ensure that all personnel clearly understand their respective roles and report to a unified, central decision-maker.

- Design a command structure that clearly identifies decision making authority across agencies.

- Designate an overall incident commander, operational and tactical commanders with well-defined responsibilities, and field commanders with discretion to respond to conditions that evolve on the ground.

- Use standard NIMS/ICS terminology when staffing these roles so that all agencies are speaking the same language.

- Create and distribute a unified operational plan and ensure total transparency between participating agencies/departments.

- Connect communications equipment to allow all personnel within a unified command to directly communicate with each other and share important information.

- Ensure that contingency plans are part of the overall operational plan and that those approaches and considerations are incorporated in pre-event training.

### C. Responses to Disorders

Policing mass demonstrations requires a continuum of resources and strategies. Adopting a "soft" approach, wearing ordinary uniforms and avoiding militarized approaches to the crowd can build community trust and reduce the likelihood that provocative law enforcement tactics will themselves stir confrontation or lawbreaking. Nevertheless, law enforcement must also be prepared to respond when protest turns to riot and the physical safety of officers or others is at risk. When disorders do arise, agencies must have a clearly-defined plan to guide response.

While each situation will be informed by unique facts, central principles must guide the exercise of officer discretion. All agency personnel should be prepared to respond immediately to violence of any kind without unduly jeopardizing officer safety. Planners must define and train officers as to what categories of conduct will justify arrests. All agencies within a unified command structure must apply a uniform approach to the issue of response to disorders and arrest protocol.

- Use of force policies should be clear and communicated to all participating agencies.

- Deployment of less lethal devices should be used when appropriate, consistent with guidance provided to all personnel pursuant to the unified operational plan.

- Educate law enforcement on relevant statutes and regulations, including direction as to what violations shall be immediately enforced and other categories of conduct where discretion shall be used.

- Encourage de-escalation and intervention before violations occur, facilitated by officer interaction with rally participants.

- Provide officers with sufficient personnel and protective equipment to safely prevent and interrupt disorders.

- Prepare for arrests and assign personnel specific to the processing, transportation, and housing of prisoners and coordination with courts, corrections and prosecutors.

### D. Contingencies

Regardless of best efforts of planning and coordination, it is likely that conditions will evolve during large protest events that require flexible response. Groups will not act in accordance with posted direction or individual officers' commands. They may fail to follow plans that were pre-arranged with law enforcement. Some individuals or groups may affirmatively attempt to disrupt these events and take steps to thwart public safety efforts. All of these contingencies arose in Charlottesville on August 12, which presented great challenges to law enforcement.

The likelihood of disruptive conduct and unexpected conditions requires flexibility in planning and resource deployment. Operational plans need to allow for the movement of specialized units in response to emerging conditions. Unified commanders must be able to monitor events in real time and make informed decisions in reaction to unforeseen events. Forces must be nimble enough to respond to changing circumstances. The best operational plans allow for immediate alterations without sacrificing overall security. Robust training helps facilitate the goal of flexibility and help all personnel prepare for the challenges of a volatile environment.

- Ensure operational plans are sufficiently flexible to allow for the rapid deployment and movement of specialized units without sacrificing overall security.

- Develop a mechanism by which unified commanders receive actionable intelligence about conditions that require response and are able to immediately convey direction to all agencies.

- Train for contingencies in advance of large protest events, using table top exercises in which all personnel can anticipate and prepare for complex, volatile events.

## III. State Support for Local Jurisdictions

Charlottesville could soon face significant protests again, and even if it does not, other jurisdictions will. Since any small town or city is likely to confront such events only rarely, promoting public safety around Virginia requires state support for local jurisdictions. While the Virginia State Police routinely make officers and specialized services available to local agencies, additional state efforts to ensure better, more regularized, coordination with local agencies is necessary. The Commonwealth should also increase state support for equipment, training and enhanced emergency management services.

- The Department of Criminal Justice Services should develop model policies and in-service training standards for promoting free speech and managing large-scale events.

- VSP should develop written procedures and practices for working with local agencies, including, but not limited to written advisories for local agencies on working with the state police on planning, command structure, training, communication, sharing information, command structure, and the use of force.

- VSP should be given adequate resources to ensure that all of its officers are trained and prepared to assist local jurisdictions as necessary.

## IV. Changes in Law

### A. Permitting

Planning for these events is constrained by various sources of law  local policies and ordinances, state statutes, and the United States Constitution. Local ordinances should give law enforcement authority to enforce appropriate time, place and manner restrictions on permitted events, including the restriction on the possession of certain dangerous items and the use of open flames. State law should give localities the autonomy to enact specific restrictions on the possession of firearms, consistent with the Second Amendment. Specific measures to protect public safety at large protest events should be codified in statutes that clearly state possible restrictions and ensure content-neutral application.

While we believe the City could have banned the possession of some items that could be used weapons at the summer protest events, we recommend that the amendment of the City's special events regulations to make this prohibition clear. Specifically, the City should explicitly provide law enforcement with the ability to restrict the possession of certain weapons to protect public safety. Codifying this rule in a regulation ensures its uniform, content-neutral application.

With regard to open flames, the City should modify its existing regulation and require the issuance of a permit for all events at which they will be used. The permit should be conditioned upon the applicant's provision of a fire safety plan, approved by the Fire Marshal. We also recommend that the General Assembly consider broadening the intent standard for the criminal prohibition on the use of open flames to threaten or intimidate. The current statute requires a showing that the defendant's use of an open flame "in a

manner having a direct tendency to place another person in reasonable fear or apprehension of death or bodily injury." This statute should be altered to track the language of statutes that proscribe the use of swastikas and burning crosses and include the use of fire with the intent to intimidate.

- Modify the Charlottesville City Policy 100-04, the Special Events Regulations, to provide City officials with the ability to prohibit certain items that may be used as weapons and the ensure events are held at locations with sufficient space and to protect public safety.

- Create a more robust process of review of permit applications that ensures the involvement of all relevant agencies, including CPD, CFD, Public Works, Parks and Recreation, and the City Manager.

- Modify the open flame ordinance, Charlottesville City Code Section 12-32(a)(8) to require a permit application and submission of a fire safety plan to the Fire Marshal for any special event or demonstration at which open flames will be used.

- Amend Va. Code Section 18.2-423.01 to make criminal the use of an open flame "with the intent to intimidate any person or group of persons."

## B. Firearms

As explained above, current Virginia law prevents localities from restricting citizens' right to possess firearms in any circumstance. The General Assembly should change this rule and empower all municipalities to enact reasonable restrictions on the right to carry firearms at large protest events. If the state law provides local governments with the authority to restrict gun possession, the Charlottesville City Council should enact an ordinance that prohibits the possession of firearms at large public gatherings.

- The Virginia General Assembly should pass a law repealing or modifying Va. Code § 15.2-915 to specifically allow local governments to restrict the possession of firearms at large protest events in the interest of public safety.

- The Charlottesville City Council should pass an ordinance outlining the conditions which will allow for the prohibition of items that may be used as weapons at large protest events, including firearms.

## V. Restoring Faith in Government

Over the course of our work on this review, we repeatedly encountered community frustration with Charlottesville City government. Many people expressed frustration with various City agencies and officials and provided specific information about ways in which they felt underserved by the City's response to these protest events. As detailed above, we spoke to a number of witnesses who were critical of the processes used to consider and grant permits, the lack of communication and information provided prior to the event, the late

attempt to move the Unite The Right rally, and the law enforcement response to the protest events.

Community skepticism of City government handicapped our ability to gather facts and develop relevant information. Representatives of various anti-racist groups told us that our attorney-client relationship with the City was the basis for their refusal to provide us with information. These individuals wanted us to keep information received confidential and not share it with the City, and they asked us to guarantee the public release of our full report. The distrust of City officials was palpable in our conversations with those groups. We have also witnessed a lack of faith in City officials at City Council and other public meetings.

Community criticism of the Charlottesville Police Department is particularly acute. Some of this skepticism is a reflection of the actions of CPD and other law enforcement agencies during these protest events. We heard strong criticism of the deployment of tear gas on July 8 and the seeming police inaction in the face of violence on August 12. Some people see those actions as part of a broader pattern of law enforcement inability or unwillingness to protect public safety, particularly in communities of color. Skepticism about CPD is also informed by concerns over racial profiling, drug enforcement, and other systemic issues beyond the protest events.

Not everyone shares the concerns outlined above. We spoke to a large number of people who praised the police response to these protest events. Witnesses described the patience and restraint shown by officers in the face of extreme animosity directed at them on July 8. CPD officers reported strong support in the community and described repeated expressions of gratitude at and after the protest events. Other witnesses expressed similar support for the City Manager, City Council, and professional staff within City government. This information suggests that there is a diversity of opinion within our community about the effectiveness of CPD and City government more generally. Our community is divided with respect to belief in the efficacy of government, which has lasting consequences if left unaddressed.

We recommend an increased effort to restore confidence in City government through a focus on the issues that have arisen in the wake of these events. Community engagement is paramount for proactive, effective policing. CPD must commit on an ongoing basis to being a citizen-centric partner in promoting community well-being rather than a reactive, independent force. As one manifestation of that commitment, CPD needs to understand and respond to community concerns. City Council needs to find constructive ways to solicit community input and identify specific areas of potential change.

Citizens share the responsibility to facilitate communication and strive for improved understanding. Everyone interested in contributing to a better Charlottesville must approach that effort with patience and flexibility. We must involve all voices in this effort and affirmatively encourage the participation of a diverse array of stakeholders. We must listen to each other, not yell at each other. The division that exists in our community will make this spirit of cooperation both difficult and essential.

If we do not recognize and endeavor to address community concerns, we will remain a community divided. If, however, we use these events as an impetus to confront difficult issues and learn from each other, we can emerge a stronger, more united community.

- The City Manager should evaluate and endeavor to implement the resource recommendations of our independent review and report to the community about changes that will improve response to future protest events.

- The Charlottesville Police Department should work with the Police Citizens Advisory Panel to more regularly and effectively solicit and address community concerns.

- CPD should develop and implement training for all personnel emphasizing community engagement through accountability, customer service and diversity, shifting the culture from action oriented to cause oriented.

- The Charlottesville City Council should identify opportunities for citizen feedback beyond open Council meetings.

- City government should encourage broader participation in government, including the formation of diverse working groups to advise Council and City staff on policies and solutions to particular issues.

# TIMELINE

| STATUES | |
|---|---|
| **March 22, 2016** | Initial press conference seeking removal of Jackson, Lee statues |
| **May 28, 2016** | Charlottesville City Council creates Blue Ribbon Commission on Race, Memorials, and Public Spaces |
| **November 10, 2016** | Blue Ribbon Commission delivers draft report, recommending retention of the Lee and Jackson statues and addition of context |
| **January 31, 2017** | Mayor Mike Signer holds "Capital of the Resistance" press conference on Downtown Mall |
| **February 6, 2017** | City Council votes 3-2 to remove the statue of Robert E. Lee and to add context to statue of Stonewall Jackson |
| **February 21, 2017** | Corey Stewart holds rally to protest pending removal of Lee statue |
| **March 22, 2017** | Lawsuit filed to enjoin removal of the Lee statue |
| **May 2, 2017** | Judge Richard Moore issues injunction preventing City from removing Lee statue |
| **June 6, 2017** | City Council votes to rename Lee Park as Emancipation Park, and to rename Jackson Park as Justice Park |

| MAY 13 AND MAY 14 DEMONSTRATIONS | | |
|---|---|---|
| May 13, 2017 | 11:00 a.m. | Supports of Richard Spencer enter Festival of Cultures, attracting attention of Festival supervisors and the Charlottesville Police Department |
| | 12:00 p.m. | Richard Spencer, Jason Kessler, and nearly one hundred white nationalist supporters gather in McGuffey Park |
| | 12:30 p.m. | Spencer and Mike Enoch begin speaking in Jackson Park |
| | 1:30 p.m. | Spencer event disrupted by counter-protesters |
| | 3:30 p.m. | Spencer followers re-enter Festival of Cultures, engage "Germany" table in discussion regarding Hitler |
| | 9:00 p.m. | Spencer-led group reassembles in McGuffey Park |
| | 9:05 p.m. | Spencer-led group lights torches, marches to Lee Park |
| | 9:15 p.m. | CPD Sergeant Bradley Pleasants observes Spencer's group in Lee Park, reports presence to CPD |
| | 9:20 p.m. | Officer E.A. Maney investigates reports of torches made to Charlottesville-Albemarle Regional Emergency Communications Center |
| | 9:30 p.m. | Additional CPD officers arrive, dispersing Spencer and his followers |
| May 14, 2017 | 12:09 p.m. | Rev. Erik Wikstrom circulates e-mail from parishioner noting that Stand Up for Racial Justice Charlottesville, Black Lives Matter, Antifa, and the Public Housing Association of Residents were organizing a counter-protest at Lee Park |
| | 2:44 p.m. | Charlene Green notifies Charlottesville City Manager Maurice Jones and Assistant City Manager Mike Murphy of protest plans |
| | 9:00 p.m. | Candlelight event begins in Lee Park |
| | 9:45 p.m. | Jason Kessler arrives in Lee Park, removes signs covering Lee statue |
| | 10:00 p.m. | CPD officers order crowd in Lee Park to disperse; three arrests made for disorderly conduct and other offenses. |

| JULY 8, 2017 KU KLUX KLAN RALLY | | |
|---|---|---|
| **May 24, 2017** | | Amanda Barker drives to Charlottesville to identify locations for protest and files application for permit on behalf of Loyal White Knights of the Ku Klux Klan |
| | 11:02 a.m. | Special Events Coordinator Michelle Christian forwards Barker application to Special Events Committee |
| | 1:04 a.m. | Director of Parks and Recreation Brian Daly forwards Barker application to City Manager Maurice Jones and CPD Police Chief Al Thomas |
| **June 2, 2017** | | City Manager Jones informs City Council of Barker application |
| | | CPD Captain Wendy Lewis instructs subordinates to begin gathering intelligence for Klan event |
| **June 8, 2017** | | Amanda Barker agrees to CPD request to move KKK event to Justice Park |
| **June 14, 2017** | | CPD Detectives Nick Rudman and Blane Cosgro present initial intelligence report to Chief Thomas. Thomas requests a more comprehensive intelligence gathering operation, including personal visits to potential protesters and anti-racist activists |
| **June 20, 2017** | | CPD holds press conference to advertise alternative programming options for City residents on July 8 |
| **June 20-21, 2017** | | CPD Detectives meet with Jason Kessler and counter-protester groups about July 8 |
| **June 22, 2017** | | Attorney Pamela Starsia writes to Chief Thomas and holds press conference criticizing CPD intelligence efforts |
| | | CPD Lieutenant Joe Hatter completes CPD Intelligence Report for July 8 |
| **June 29, 2017** | | CPD Major Gary Pleasants sends request for assistance to APD and University of Virginia Police Department regarding July 8 |
| **July 5, 2017** | . | APD confirms offer of assistance to CPD |
| **July 6, 2017** | | CPD Lieutenant Steve Upman distributes information regarding road closures to the public |
| **July 7, 2017** | 9:00 a.m. | VSP-only briefing at VSP Division III headquarters |
| | 4:45 p.m. | Captain Shifflett circulates final CPD Operational Plan |
| | 9:22 p.m. | Charlottesville Public Works grants CPD permission to use Avon Street bus lot to park and organize the Klan |

HUNTON & WILLIAMS

Case 3:17-cv-00072-NKM-JCH    Document 488-3    Filed 05/02/19    Page 201 of 227    Pageid#: 5185

| July 8, 2017 | 10:00 a.m. | CPD-VSP-CFD "all hands" briefing at Albemarle County Office Building |
| --- | --- | --- |
| | 11:49 a.m. | Unified Command Center opens |
| | 12:00 p.m. | CPD Officers arrive in zones at Justice Park; traffic closures pursuant to traffic plan; VSP officers sweep Justice Park for explosives |
| | 1:02 p.m. | Klan members arrive in Waynesboro, Virginia |
| | 2:15 p.m. | Antifa spotted in gas masks, padded clothing, and body armor |
| | 2:30 p.m. | CPD Lieutenant Tom McKean and CPD Rapid Reaction team dispatched to Avon Street bus facility to meet Klan vehicles |
| | 2:30 p.m. | Members of Clergy Collective arrive in Justice Park |
| | 2:56 p.m. | Zone 1 fills with bystanders and counter-protesters |
| | 3:00 p.m. | CPD allows media to enter buffer area between barricades at Justice Park |
| | 3:13 p.m. | Klan members arrive at Avon Street bus facility, begin preparing for trip to Justice Park |
| | 3:16 p.m. | Counter-protesters lock arms and obstruct anticipated point of Klan members' entry into Justice Park |
| | 3:18 p.m. | VSP Tactical Field Force departs JDR Court, begins clearing path for Klan to enter Justice Park |
| | 3:30 p.m. | After repeated warnings, CPD arrests activists blocking entry to Justice Park |
| | 3:30 p.m. | Klan departs Avon Street with CPD escort |
| | 3:39 p.m. | Albemarle County Sheriff's deputy directs Klan vehicles into JDR Court garage |
| | 3:45 p.m. | CPD escorts Klan from JDR Court garage to Justice Park |
| | 3:50 p.m. | Klan begins demonstration in Justice Park |
| | 4:00 p.m. | CPD advises Klan they have twenty minutes remaining |
| | 4:22 p.m. | CPD Lieutenant Hatter informs Barker that time has expired |
| | 4:25 p.m. | Klan begins exit from Justice Park; crowd streams down 4th Street, toward JDR Court garage |
| | 4:30 p.m. | Lieutenant Hatter requests assistance on 4th Street from APD Mobile Field Force |
| | 4:30 p.m. | Command Center orders CPD Lieutenant Brian O'Donnell to move zone 2 officers to JDR Court garage entrance |

| | |
|---|---|
| 4:30 p.m. | Klan enters JDR Court garage; lead Klan vehicle breaks down |
| 4:30 p.m. | Six University of Virginia Police Department officers deployed to JDR Court |
| 4:32 p.m. | Counter-protesters block exit of JDR Court garage; Lieutenant Hatter requests permission to declare unlawful assembly |
| 4:32 p.m. | Chief Thomas gives Lieutenant Hatter permission to declare unlawful assembly; Command Center orders all available officers to assist Lt. Hatter |
| 4:35 p.m. | Lieutenant Hatter gathers CPD, APD, and VSP personnel into line in front of JDR Court garage; declares unlawful assembly |
| 4:38 p.m. | Major Pleasants leaves Command Center to assume ground command |
| 4:40 p.m. | Officers push crowd away from garage exit |
| 4:45 p.m. | Klan vehicles begin to exit JDRF Court garage |
| 4:49 p.m. | Chief Thomas orders all CPD units to return to zones in Justice Park |
| 4:56 p.m. | CPD Officer Eric Thomas kicked in groin while attempting to make arrest; counter-protesters lock arms and interfere with Thomas and other officers |
| 4:59 p.m. | Command Center orders all units to vicinity of JDR Court |
| 4:59 p.m. | Officer Thomas deploys OC spray; officers make several arrests |
| 5:00 p.m. | Chief Thomas denies VSP request to deploy chemical agents |
| 5:02 p.m. | Major Pleasants approves VSP request to deploy CS dispersal powder, declares unlawful assembly, warns crowd that chemical agents will be used |
| 5:07 p.m. | VSP Tactical Field Force deploys three CS dispersal canisters |
| 5:12 p.m. | Major Pleasants back in Command Center, confirms deployment of chemical agent |
| 5:22 p.m. | Unlawful assembly declared in Justice Park; crowd continues to disperse |
| 6:02 p.m. | High Street opened to traffic |
| 6:06 p.m. | All remaining roads opened to traffic |
| 6:38 p.m. | Command Center closed |

| AUGUST 12, 2017 "UNITE THE RIGHT" RALLY | | |
|---|---|---|
| **May 30, 2017** | | Jason Kessler files permit application for "Unite The Right" rally on August 12 |
| **July 5, 2017** | | CPD Detective Braden Kirby speaks with Kessler, who indicates that the Unite The Right event will include music and speakers. Kessler declines to provide information on attendance and says that speakers will have separate security |
| **July 13, 2017** | | Walt Heinecke files permit applications for Justice and McGuffey Parks on August 12 |
| | 1:00 p.m. | VSP meets with CPD to begin discussions about August 12; VSP provides recommendations on best practices for managing large events |
| **July 14, 2017** | | Deputy City Attorney Lisa Robertson delivers memorandum setting forth legal standards for denying or modifying permit application |
| | 11:53 a.m. | CPD detectives assigned to research alt-right and anti-racist groups |
| | 1:19 p.m. | Virginia Fusion Center notifies CPD that Kessler will hold an event on Friday night, August 11 |
| **July 17, 2017** | | Lisa Robertson tells Mayor Signer that Council involvement with operational function like location of Unite The Right raises prospect of personal liability |
| **July 18, 2017** | . | Mayor Signer sends e-mail to City Manager and City Attorney regarding Unite The Right rally, noting the size of the crowd is "another reason to have the event elsewhere." |
| **July 19, 2017** | . | City Attorney Brown meets with City Manager Jones to discuss potential plans by City Council to move the Unite The Right event |
| **July 23, 2017** | | Captain Lewis sends Chief Thomas a proposed plan to request that all protest groups attending Unite The Right rally commit to non-violence |
| **July 24, 2017** | | VSP and CPD conduct walk-through at Christ Episcopal Church |
| **July 25, 2017** | | John Halliday of Jefferson-Madison Regional Library notifies Captain Mitchell that the library is revoking consent for CPD to use facility on August 12 |
| | 12:00 p.m. | Downtown Area Business Association meets with City Manager regarding plans for August 12 |

HUNTON &
WILLIAMS

| | | |
|---|---|---|
| **July 26, 2017** | | City Director of Parks and Recreation Brian Daly requests CPD feedback on whether Heinecke permits should be granted |
| **July 27, 2017** | 10:23 a.m. | City Manager Jones notifies City Council that the Special Events Committee has approved the Kessler permit |
| | | Mayor Signer receives letter from Allan Cadgene and forty-three other downtown business and property owners requesting cancellation of Unite The Right event |
| | | Major Pleasants notifies Brian Daly that CPD does not object to granting the permits to Walt Heinecke for McGuffey and Justice Parks on August 12, but notes that CPD will be unable to provide officers |
| | 1:59 p.m. | Mayor Signer e-mails City Attorney asking if City Council can "give ourselves" authority over permitting through a new permitting ordinance |
| **July 28, 2017** | 8:20 p.m. | City Attorney again warns Mayor Signer that Council involvement in administrative functions raises prospect of Councilors' personal liability |
| **July 29, 2017** | 10:04 a.m. | Mayor Signer sends e-mail to City Attorney informing him that City Council would like to "move ahead with a narrowly tailored capability to relocate" the Unite The Right event based on logistical concerns |
| | 4:22 p.m. | City Manager Jones sends e-mail to City Council with communications plan for August 12 |
| **July 30, 2017** | | Captain Victor Mitchell forwards CPD Operational Plan to VSP for review |
| **July 31, 2017** | 8:01 a.m. | Mayor Signer recommends to City Attorney Brown that City retain outside counsel to prepare for potential move of Unite The Right to McIntire Park. |
| | 1:30 p.m. | City Council holds call to discuss potential options for moving Unite The Right event, including retention of outside counsel. |
| | 9:14 p.m. | Joan Fenton e-mails Mayor Signer on behalf of Downtown Business Association, complaining about lack of public information about August 12 |
| **August 1, 2017** | | Virginia Secretary of Public Safety Brian Moran recommends that Governor McAuliffe call Mayor Signer and make recommendations to ensure public safety |
| | 1:43 p.m. | Joan Fenton sends e-mail to Mayor Signer and Chief Thomas requesting distribution of information regarding August 12 |

| | | |
|---|---|---|
| | 2:55 p.m. | Assistant City Manager Murphy sends e-mail to City Council that delay in communications is attributable to pending action by City Council on moving the Unite The Right event |
| | 8:23 p.m. | Tom Berry distributes University of Virginia Hospital System Incident Action Plan for August 12 |
| August 2, 2017 | | Governor McAuliffe calls Mayor Signer and suggests certain safety measures on August 12, including legally impermissible ban on firearms; Governor tells Signer that VSP will provide list of recommendations; list never delivered. |
| | 8:00 a.m. | VSP Tactical Field Force training for August 12; no CPD attendance |
| | 4:00 p.m. | Closed session of City Council regarding moving the Unite The Right rally to McIntire Park |
| | 7:00 p.m. | City Council takes poll that shows four councilors support moving Unite The Right event; City Manager requests twenty-four hours to consider options |
| | 7:38 p.m. | Captain Mitchell notifies VSP First Sergeant Clark that Christ Episcopal Church has withdrawn its offer to allow VSP to use the facility on August 12 |
| August 3, 2017 | | VSP Tactical Field Force Training continues; Commonwealth's Attorney Dave Chapman provides guidance to VSP on legal obligations; no CPD attendance |
| | 8:22 a.m. | Councilor Galvin sends e-mail reminding Mayor Signer of Council's obligation to seek advice of City's professional staff on matters of policy |
| | 8:49 a.m. | City Attorney Brown sends e-mail to Mayor Signer that he is stepping into "operational" details of City government. |
| | 11:33 a.m. | CPD finalizes intelligence report for August 12 |
| | 2:00 p.m. | City Manager Jones advises City Council he has decided to move the rally to McIntire Park |
| August 4, 2017 | 8:00 a.m. | VSP Tactical Field Force training for August 12 continues; no CPD attendance |
| | 2:38 p.m. | Captain Mitchell circulates revised CPD Operational Plan for August 12, incorporating large footprint at McIntire Park |
| | 3:48 p.m. | Mayor Signer distributes announcement of alternative programming for August 12 hosted by University of Virginia |

Case 3:17-cv-00072-NKM-JCH   Document 488-3   Filed 05/02/19   Page 206 of 227   Pageid#: 5190

| | | |
|---|---|---|
| **August 5, 2017** | 7:42 a.m. | VSP provides Captain Lewis with intelligence information about Antifa filling soda cans with concrete for August 12 |
| | 2:41 p.m. | Mayor Signer sends e-mail to Chief Thomas and City Manager Jones, indicating that Governor McAuliffe has recommended restrictions on firearms and pledged to provide recommendations for August 12 from the VSP |
| | 2:45 p.m. | City Attorney Brown responds to Mayor Signer's e-mail, indicating that Virginia law prevents Charlottesville from restricting firearms on August 12 |
| **August 7, 2017** | | VSP finalizes Operational Plan for August 12; not distributed to CPD |
| | 11:00 a.m. | Michelle Christian and City Manager Jones meet with Jason Kessler and propose move to McIntire Park; Kessler refuses, indicates his group will pursue litigation and march to Emancipation Park regardless of outcome. |
| | 3:30 p.m. | City press conference announcing efforts to move Unite The Right to McIntire Park |
| **August 8, 2017** | | Kessler meets with Chief Thomas, Captain Lewis, and Captain Mitchell at CPD headquarters, informing them that he intends to hold rally at Emancipation Park regardless of City action |
| | | Colonel Flaherty meets with Brigadier General Timothy Williams, Adjutant General of the Virginia National Guard, resulting in agreement that VSP would assume command of the Guard's military police company in Charlottesville on August 12 |
| | 9:00 a.m. | CFD Chief Andrew Baxter informs Chief Thomas that he has requested that VDEM deploy an Incident Management Team for August 12 |
| | 9:04 a.m. | Commonwealth's Attorney Dave Chapman sends Captain Mitchell the requirements for a declaration of an unlawful assembly |
| | 11:00 a.m. | VDEM IMT holds Agency Administration Meeting at Fontaine Fire Station |
| | 12:45 p.m. | Virginia Fusion Center sends intelligence report to CPD; document suggests Unite The Right organizers planning torch rally at Darden Towe Park in Albemarle County on August 11 at 9:30 p.m. |
| | 1:16 p.m. | CPD Lieutenant Cheryl Sandridge circulates guidelines on First Amendment and civil unrest for CPD officers to review |

| | | |
|---|---|---|
| | 1:20 p.m. | ACLU sends demand letter to City Manager Jones and City Council, demanding rescission of efforts to move rally to McIntire Park |
| | 3:41 p.m. | Captain Mitchell circulates copy of revised CPD Operational Plan incorporating move to McIntire Park with three CPD squads assigned there |
| **August 9, 2017** | 8:01 a.m. | IMT holds Command and General Staff Briefing |
| | 8:30 a.m. | Meeting between local business owners and City Manager regarding plans for August 12 |
| | | City Attorney responds to ACLU letter, denying request that City cease and desist in efforts to move the Unite The Right event. |
| | 11:40 a.m. | VSP Captain Craig Worsham sends e-mail noting that CPD and VSP will need to "settle" the issue of the Wells Fargo parking lot on August 11 |
| | 11:35 a.m. | Miriam Dickler e-mails City Manager and Chief Thomas requesting consent to distribute information to public about street closures and logistics for August 12 |
| | 4:00 p.m. | Mayor Signer conveys request from Congregation Beth Israel to CPD for security protection on August 12 |
| | 9:09 p.m. | Captain Shifflett provides Chief Thomas with summary of IMT meetings, notes that "IMT will be of great assistance to us." |
| | 11:00 p.m. | Captain Lewis contacts Doug Ehrman of Charlottesville Department of Parks and Recreation, requesting additional 225 feet of barricades for Zone 5 |
| **August 10, 2017** | | Jason Kessler and allies complete operational plan for Unite The Right event |
| | 9:00 a.m. | IMT logistics meeting with CPD and CFD |
| | 10:30 a.m. | IMT planning meeting with CPD and CFD |
| | 1:00 p.m. | IMT meets with Captains Shifflett and Mitchell to conduct tabletop exercises on contingency plans |
| | 3:19 p.m. | City Manager Jones sends e-mail to Albemarle County Executive Doug Walker to formalize Mutual Aid Agreement for August 12 |
| | 3:30 p.m. | Chief Thomas briefs Mayor Signer and City Manager on security plans for August 12 |
| | 3:47 p.m. | Miriam Dickler distributes traffic plan and parking restrictions for August 12 |

| | | |
|---|---|---|
| | 4:00 p.m. | IMT holds "tactics" meeting; based on IMT recommendations, oversight of CPD traffic plan shifted from Lt. Tito Durrette to Lt. Steve Knick |
| | 4:30 p.m. | Chief Thomas provides briefing on August 12 preparations to City Council |
| | 6:08 p.m. | ACLU files lawsuit against City of Charlottesville over attempts to move Unite The Right Event to McIntire Park |
| August 11, 2017 | 7:01 a.m. | CPD Lieutenant Steve Knick sends e-mail to Captain Lewis, confirming that Officer Tammy Shiflett will replace Officer Jeff Sandridge at 4th Street and Market Street on August 12, and Sandridge will be Traffic Supervisor |
| | 8:30 a.m. | Final IMT meeting to prepare Incident Action Plan |
| | 8:30 a.m. | Doug Walker sends e-mail to Maurice Jones, confirming activation of Mutual Aid Agreement with APD |
| | 10:26 a.m. | APD Lieutenant Miller Stoddard distributes briefing and operational plan for APD on August 12 |
| | 11:00 a.m. | CPD meets with Parks and Recreation and Public Works to set up barricades in Emancipation Park |
| | 12:00 p.m. | CPD Lt. Hatter and Sgt. Tony Newberry meet with Jack Piece, security manager for Unite The Right, to arrange speaker entry on August 12 |
| | 12:08 p.m. | Virginia National Guard arrives in Charlottesville |
| | 1:00 p.m. | Activation of Emergency Operations Center at Zehmer Hall |
| | 2:00 p.m. | Multi-agency briefing on August 12 plans for CPD, VSP, ACPD, CFD, VDEM, National Guard and other agencies |
| | 2:30 p.m. | Hearing before United States District Judge Glen Conrad regarding ACLU motion for preliminary injunction |
| | 3:13 p.m. | University of Virginia Vice Provost Louis Nelson receives tip that Kessler will hold rally with torches on the University Grounds that evening |
| | 3:23 p.m. | University of Virginia Vice Provost Anda Webb circulates an e-mail to University administrators and UPD Chief Michael Gibson regarding plans for torch lit march on UVA grounds later that night |
| | 3:33 p.m. | UPD Chief Gibson sends e-mail to Chief Thomas and APD Chief Ron Lantz about the planned torch lit event at UVA |
| | 4:00 p.m. | Final IMT briefing at Fontaine Fire Station |

| | | |
|---|---|---|
| 4:18 p.m. | CPD Lieutenant Michael Gore requests that all shift commanders ask officers to patrol Congregation Beth Israel | |
| 4:57 p.m. | Chief Thomas notifies UPD Chief Gibson that he is aware of reports about Kessler holding a torch march, and asks Gibson to keep him posted | |
| 5:00 p.m. | Kessler and Christopher Cantwell meet in McIntire Park to discuss plans for the march that evening; Cantwell insists that Kessler contact law enforcement; Cantwell calls CPD and is redirected to UPD Lieutenant Angela Tabler | |
| 7:00 p.m. | Interfaith service begins at St. Paul's Memorial Episcopal Church | |
| 7:41 p.m. | UPD discovers social media post announcing Kessler march; UPD Chief Gibson circulates information to Chief Thomas and APD Chief Lantz | |
| 8:00 p.m. | Judge Conrad issues order granting injunction preventing move of Unite The Right rally to McIntire Park. | |
| 8:10 p.m. | Kessler's representatives contact CPD regarding the march at the University, and state that the march will begin at Nameless Field | |
| 8:19 p.m. | Captain Lewis circulates final IMT Incident Action Plan for August 12 | |
| 8:43 p.m. | ECC receives anonymous call from male threatening automatic weapon attack on St. Paul's | |
| 8:56 p.m. | ECC receives second anonymous call from male threatening to murder parishioners at St. Paul's | |
| 9:00 p.m. | CPD Lieutenant Dwayne Jones and Sergeant Bradley Pleasants ask UPD officers if UPD requires assistance; UPD declines request | |
| 9:02 p.m. | UPD Chief Gibson receives notification from University Student Council Vice-President, notifying him that the Kessler march would occur at 9:30 p.m. | |
| 9:14 p.m. | Chief Thomas sends e-mail to Assistant City Manager Mike Murphy, indicating that CPD will be repositioning barricades and demobilizing McIntire Park throughout the evening and shifting officers from McIntire Park to Emancipation Park for August 12 | |
| 9:15 p.m. | Demonstrators begin assembling around the statue of Thomas Jefferson in front of the University Rotunda | |

| | | |
|---|---|---|
| | 9:30 p.m. | Kessler's associate informs UPD that the march would begin at Nameless Field at 10:00 p.m. and march up University Avenue to the Rotunda |
| | 9:45 p.m. | Kessler march begins |
| | 10:00 p.m. | Sergeant Bradley Pleasants observes volume of torches and asks UPD again if they require CPD assistance; UPD again declines request |
| | 10:07 p.m. | Kessler march reaches the Rotunda |
| | 10:14 p.m. | Disorders break out in front of the Rotunda |
| | 10:16 p.m. | UPD requests mutual aid from CPD |
| | 10:17 p.m. | UPD officers reach the steps in front of the Jefferson statue |
| | 10:22 p.m. | UPD Sergeant Stuart requests that CPD disperse crowds |
| | 10:24 p.m. | UPD declares Unlawful Assembly |
| | 10:25 p.m. | UPD and CPD  disperse crowds from the area of the Jefferson statue |
| **August 12, 2017** | 6:00 a.m. | Sunrise service at First Baptist Church |
| | 6:30 a.m. | City Public Works employees set up traffic barricades for Unite The Right event |
| | 6:30 a.m. | VSP briefing at John Paul Jones arena |
| | 7:00 a.m. | CPD officers arrive at Emancipation Park |
| | 8:00 a.m. | Members of Clergy Collective gather at Jefferson School, begin march to McGuffey Park |
| | 8:20 a.m. | Members of Clergy Collective arrive at McGuffey Park |
| | 8:30 a.m. | VSP officers begin arriving in Emancipation Park |
| | 8:31 a.m. | Militia groups enter Emancipation Park |
| | 8:45 a.m. | Unite The Right demonstrators begin gathering in McIntire Park |
| | 8:55 a.m. | Clergy arrive at Emancipation Park from First Baptist Church, form line on Market Street |
| | 9:05 a.m. | Jack Pierce informs Sergeant Tony Newberry that Unite The Right speakers are refusing CPD escort into Emancipation Park |
| | 9:42 a.m. | Eli Mosely leads Identity Evropa into Emancipation Park. Mosley's group is instructed by CPD officers to exit the "public area" and move to the "Unite The Right" area |
| | 10:00 a.m. | Disorder breaks out at intersection of East Jefferson Street and 2nd Street NE |

HUNTON&
WILLIAMS

| | |
|---|---|
| 10:20 a.m. | VSP troopers arrest a Unite The Right supporter for throwing rocks |
| 10:26 a.m. | Fight breaks out in Market Street after Antifa member attempts to grab flag from Unite The Right attendee; militia member separates the group initially. Lt. Hatter, VSP troopers, and CPD Officer E.A. Maney de-escalate incident |
| 10:28 a.m. | Members of clergy block entrance to public area in Emancipation Park |
| 10:38 a.m. | Unite The Right supporters push through clergy and enter Emancipation Park |
| 10:40 a.m. | VSP Tactical Field Forces begin to mobilize |
| 10:41 a.m. | National Guard departs from the Charlottesville armory |
| 10:43 a.m. | CPD officers in Zone 5 ordered to move to lobby of Wells Fargo Building to access riot gear |
| 10:44 a.m. | CPD logistics base relocates from Levy Opera House to City Yard |
| 10:52 a.m. | Large group of counter-protesters lock arms, block entrance to park; large group of Unite The Right attendees, including members of the League of the South, approach from East on Market Street and engage in fights with antifa counter-protesters |
| 10:59 a.m. | Captain Shifflett recommends declaration of unlawful assembly |
| 11:01 a.m. | All CPD officers in Zones 1-4 ordered to withdraw to Zone 4, put on riot gear |
| 11:08 a.m. | City declares Local State of Emergency |
| 11:21 a.m. | All CPD officers dressed in riot gear |
| 11:31 a.m. | CPD declares Unlawful Assembly in Emancipation Park |
| 11:33 a.m. | National Guard deploys to East Market Street and 15th Street |
| 11:35 a.m. | Crowds begin dispersing from Emancipation Park onto Market Street; |
| 11:44 a.m. | VSP Tactical Field Force enters Emancipation Park |
| 11:52 a.m. | Corey Long fires improvised flamethrower at Unite The Right attendees |
| 11:52 a.m. | VSP Tactical Field Force deploys OC spray in Emancipation Park |

| | |
|---|---|
| 11:52 a.m. | Mayor Signer texts Chief Thomas, complaining that he was not admitted to Command Center |
| 11:54 a.m. | Richard Preston fires a single shot at the feet of Corey Long |
| 11:56 a.m. | CPD officers ordered to form rear guard to VSP Tactical Field Force |
| 11:57 a.m. | VSP Tactical Field Forces mobilized, move from City Space and Omni Hotel onto downtown mall |
| 12:06 p.m. | Governor McAuliffe declares State of Emergency |
| 12:07 p.m. | League of South members engage in fights with counter-protesters near Market Street Garage; Deandre Harris strikes Unite The Right attendee with flashlight |
| 12:07 p.m. | Unite The Right attendees chase Deandre Harris into garage, assault him with clubs and sticks |
| 12:08 p.m. | Sheriff James Brown assists Deandre Harris; CPD Lieutenant Dwayne Jones requests assistance at CPD headquarters due to large crowds |
| 12:13 p.m. | CPD Sergeant Russell Handy's unit arrives to assist Lieutenant Jones |
| 12:14 p.m. | Officer Tammy Shiflett requests assistance at 4th Street and East Market Street; Command Center reassigns Officer Shiflett to Sgt. Handy; Officer Shiflett moves to area near parking garage. |
| 12:20 p.m. | Large group of Unite The Right attendees arrives in McIntire Park |
| 12:20 p.m. | CPD field force led by Lt. Gore sent to Justice Park after report of disorder. |
| 12:28 p.m. | CFD EMS unit transports Deandre Harris to EMS staging area |
| 12:51 p.m. | Militia members confronted by counter-protesters in Water Street surface parking lot; CPD mobile field force responds; Antifa members communicate that militia moving toward Friendship Court housing area |
| 1:20 p.m. | Group of more than one hundred counter-protesters leaves Justice Park heading South on 4th Street |
| 1:36 p.m. | Counter-protesters from McGuffey and Justice Parks merge with others leaving Water Street parking lot; groups converge at intersection of 4th Street and Water Street |
| 1:41 p.m. | James Fields drives vehicle into crowd at 4th Street and Water Streets, killing Heather Heyer and injuring dozens. |

| | | |
|---|---|---|
| | 1:44 p.m. | CPD and UPD officers conduct traffic stop, arrest James Fields |
| | 1:50 p.m. | CFD declares collision on Fourth Street as a Mass Casualty Incident |
| | 2:00 p.m. | Report of altercation on High Street |
| | 2:07 p.m. | VSP and National Guard sent to secure 4th and Market Street crime scene |
| | 2:20 p.m. | All injured persons from 4th Street and Water Street transported to University of Virginia Medical Center, Martha Jefferson Hospital, or triage area at COB-McIntire |
| | 2:32 p.m. | Twitter posts urges firebombing of Congregation Beth Israel at 3:00 p.m. |
| | 4:40 p.m. | VSP helicopter crashes near Farmington Country Club; two troopers killed |
| | 6:00 p.m. | Mayor Signer and Governor McAuliffe hold joint press conference |
| | 7:00 p.m. | CPD officers begin demobilization |
| | 7:00 p.m. | City Council holds emergency meeting, adopts ordinance giving Chief Thomas power to declare curfew |
| | 11:54 p.m. | Mayor Signer notices Chief Thomas and Maurice Jones of his intent to speak on national news shows on Sunday morning |
| **August 13, 2017** | 2:00 p.m. | Jason Kessler holds press conference |
| | 2:04 p.m. | Crowds charge Kessler |
| | 2:07 p.m. | Detectives Mark Frazier and Mark Jones escort Kessler into CPD Headquarters |

HUNTON&
WILLIAMS

Hunton & Williams LLP | 194

Case 3:17-cv-00072-NKM-JCH   Document 488-3   Filed 05/02/19   Page 214 of 227   Pageid#: 5198

# REVIEW TEAM

## Hunton & Williams LLP

**Timothy J. Heaphy** is a partner at Hunton & Williams LLP and chairs the firm's white collar defense and internal investigations practice. From 2009 through 2014, Mr. Heaphy served as United States Attorney for the Western District of Virginia, a position for which he was nominated by President Barack Obama and unanimously confirmed by the United States Senate. Before being appointed United States Attorney, Mr. Heaphy was a partner at an international law firm in Richmond, Virginia and served as an Assistant United States Attorney in Charlottesville, Virginia and Washington, DC. Mr. Heaphy brings his vast experience as a prosecutor and a defense lawyer to his diverse practice and helps clients manage crises of varying scope and complexity, conduct confidential internal investigations, and implement effective compliance programs. He attended the University of Virginia and its law school and currently resides in Charlottesville.

**Trevor T. Garmey** is an associate at Hunton & Williams LLP in the firm's white-collar criminal defense and internal investigations practice. Mr. Garmey assists clients in managing complex investigations and adopting effective compliance programs. Before joining the firm, Mr. Garmey served as a law clerk to United States District Judge Irene C. Berger. Mr. Garmey also practiced for two years at Cahill Gordon & Reindel LLP in New York City, where he focused on internal investigations and complex civil litigation. A native of Lynchburg, Mr. Garmey is a graduate of the University of Virginia School of Law, and the College of William and Mary.

**Kevin Elliker** graduated first in his class at William & Mary Law School then clerked for Judge John A. Gibney, Jr., of the U.S. District Court for the Eastern District of Virginia and Judge Robert B. King of the U.S. Court of Appeals for the Fourth Circuit. He handles a broad spectrum of trial and appellate litigation at Hunton & Williams.

**Jonathan Caulder** is an associate in the energy and environmental law practice at Hunton & Williams in Richmond, VA. Jon is a commercial litigator who handles post-M&A disputes, products liability issues, environmental challenges, and appellate litigation. A native of Franklin, Virginia, he is a graduate of the Washington and Lee University School of Law and the University of Virginia. Before law school, Jon worked in the education field as a sixth grade math teacher for Teach for America.

## The Police Foundation

**Kim C. Dine** is a forty-one-year veteran of federal, major city, and local policing. Mr. Dine started his police career with the Metropolitan Police Department (MPD) in Washington, DC, where he spent twenty-seven years and rose to Assistant Chief. After retiring from MPD, Mr. Dine served as Chief of both the Frederick, Maryland Police Department and the United States Capitol Police. Dine holds a BA from Washington College, in Chestertown, MD and an MS from American University in Washington, DC. Dine is a

graduate of the FBI National Academy . He is a member of the Police Executive Research Forum and the International Association of Chiefs of Police.

**Eddie Reyes** is a Senior Law Enforcement Project Manager at The Police Foundation. His work involves overseeing a diverse array of law enforcement research projects involving gunshot detection technology, unmanned aircraft systems, community policing and open data. He retired as Deputy Chief of the Alexandria Police Department after twenty-five years of service, then became Deputy Chief with the Amtrak Police Department. He is also a member of the International Association of Chiefs of Police and serves as the current chairman of the IACP Communications & Technology Committee.

## Additional Consultants

**Chris Perkins** served as Roanoke Police Department from 2010-2016. His professional affiliations include the: Blue Ridge Chiefs of Police, President 2015-2017; the Virginia Association of Chiefs of Police (VACP), Second Vice President; International Association of Chiefs of Police (IACP) member of the Police Investigative Operations Committee; the FBI National Academy Associates; Public Safety Work Group for the Governor's School and Campus Safety Task Force in 2013. He has been an instructor for the Virginia Center for Policing Innovation (VCPI) since 2007. He has provided classroom instruction, influencing hundreds of professionals in law enforcement, local and state government, emergency management, and communities across the nation. He holds a Bachelor of Arts from the University of Tennessee, a Masters of Arts degree from Hollins University, and a Graduate Certificate from the University of Virginia.

**Rachel Harmon** is the F.D.G. Ribble Professor of Law at the University of Virginia, where she teaches and writes on police regulation, criminal procedure, and civil rights. Harmon consults and advises nationally on policing and currently serves as a law enforcement expert on the court-appointed Baltimore Police Department Monitoring Team; as associate reporter for the American Law Institute's project on policing; and on a National Academy of Sciences committee to review research on police policy and practices. Before becoming a law professor, Harmon served for eight years as a prosecutor at the U.S. Department of Justice. After a stint at the U.S. Attorney's Office in the Eastern District of Virginia, she worked in the Civil Rights Division, Criminal Section, prosecuting hate crimes and official misconduct cases, many of which involved excessive force or sexual abuse by police officers. Harmon received her law degree at Yale Law School and clerked for Judge Guido Calabresi of the U.S. Court of Appeals for the Second Circuit and Justice Stephen Breyer of the U.S. Supreme Court.

# ENDNOTES

[1] Letter from Timothy J. Heaphy to Maurice Jones (Aug. 24, 2017).

[2] Id.

[3] Letter from 1st Sergeant David Ostwinkle to Timothy J. Heaphy (Nov. 3, 2017).

[4] Letter from Jennifer Nikolaisen, Chief, Information and Privacy, to Barbara Butler (Oct. 5, 2017).

[5] Letter from Timothy J. Heaphy to Colonel W. Steven Flaherty (Sept. 15, 2017).

[6] Letter from Timothy J. Heaphy to Secretary of Public Safety Brian Moran (Sept. 15, 2017).

[7] CPD and VSP use slightly different terminology—mobile field force and tactical field force, respectively—to refer to the law enforcement units that are trained to respond to civil disorder. We use mobile field force for the sake of consistency and clarity.

[8] Letter from Richard Spencer to Timothy J. Heaphy (Nov. 20, 2017).

[9] Letter from Sam Dickson to Timothy J. Heaphy (Nov. 20, 2017).

[10] E-mail from Walter Heinecke to Timothy J. Heaphy (Nov. 2, 2017).

[11] Letter from National Lawyers Guild to Timothy J. Heaphy (Oct. 27, 2017).

[12] Letter from Timothy J. Heaphy to Andrew Mahler, Central Virginia Chapter of National Lawyers Guild (Nov. 2, 2017).

[13] Letter from Pamela Starsia, Esq. to Charlottesville Police Chief Al Thomas (June 23, 2017).

[14] The City's lawsuit against various white nationalist and militia groups was filed on October 12, 2017. The suit was filed without notice to our review team and without evident consideration of its impact on our fact-gathering process.

[15] Letter from Police Foundation President Jim Bueermann to Timothy J. Heaphy (Sept. 14, 2017).

[16] Letter from Timothy J. Heaphy to Chris Perkins (Sept. 20, 2017).

[17] Letter from Timothy J. Heaphy to Rachel Harmon (Sept. 20, 2017).

[18] City of Charlottesville Charter, Section 5(a).

[19] City of Charlottesville Charter, Section 5(b).

[20] City of Charlottesville Standard Operating Procedure § 3.2.

[21] Id.

[22] Blue Ribbon Commission on Race, Memorials, and Public Spaces, Report to City Council, Winter 2016, at 7.

[23] Id. at 10.

[24] Id.

[25] *People show support for, opposition to Lee Statue in Charlottesville*, NBC29 (Mar. 22, 2016), http://www.nbc29.com/story/31536897/people-show-support-for-opposition-to-lee-statue-in-charlottesville.

[26] Id.

[27] Id.

[28] Id.

[29] Blue Ribbon Commission on Race, Memorials, and Public Spaces, Report to City Council, Winter 2016, at 7.

[30] Charlottesville City Council Agenda, Direction from council on recommendations, January 17, 2017.

[31] Id.

[32] *UVA Lecturer Likening BLM to KKK Issues Apology*, NBC29 (Oct. 12, 2016), http://www.nbc29.com/story/33378993/uva-lecturer-likening-blm-to-kkk-issues-apology.

[33] Reporting Officer's Narrative, Elias, P.A., January 17, 2017.

[34] *Charlottesville Mayor Holds Rally to Declare City Capital of Resistance*, NCB29 (Jan. 31, 2017), http://www.nbc29.com/story/34389763/charlottesville-mayor-holds-rally-to-declare-city-capital-of-resistance.

[35] *Charlottesville Mayor: Permit Rule Not Enforced on Downtown Mall*, NBC29 (Feb. 15, 2017), http://www.nbc29.com/story/34516722/charlottesville-mayor-permit-rule-not-enforced-on-downtown-mall.

[36] Chris Suarez, *Charlottesville City Council Votes to Remove Statue from Lee Park*, The Daily Progress (Feb. 6, 2017), http://dailyprogress.com%2Fnews%2Flocal%2Fcharlottesville-city-council-votes-to-remove-statue-from-lee-park%2Farticle_2c4844ca-ece3-11e6-a7bc-b7d28027df28.html.

[37] Justin Wm. Moyer, *Lawsuit seeks to stop removal of Confederate statue in Virginia*, The Washington Post, (Mar. 24, 2017), https://www.washingtonpost.com/local/lawsuit-seeks-to-stop-removal-of-confederate-statue-in-virginia/2017/03/24/62df23ca-0fe6-11e7-8fed-dbb23e393b15_story.html.

[38] Chris Suarez, *Charlottesville City Council Votes to Remove Statue from Lee Park*, The Daily Progress (Feb. 6, 2017), http://dailyprogress.com%2Fnews%2Flocal%2Fcharlottesville-city-council-votes-to-remove-statue-from-lee-park%2Farticle_2c4844ca-ece3-11e6-a7bc-b7d28027df28.html.

[39] Id.

[40] *Protestors Block Republican Candidate's Rally at Lee Park Statue*, NBC29 (Feb. 11, 2017), http://www.nbc29.com/story/34482363/protesters-block-republican-candidates-rally-at-lee-park-statue.

[41] Chris Suarez, *GOP's Stewart rallies against Lee statue's removal*, The Daily Progress (Feb. 21, 2017), http://www.dailyprogress.com/news/local/gop-s-stewart-rallies-against-lee-statue-s-removal/article_583953f4-f8ae-11e6-b423-43a6c3f04be7.html.

[42] Chris Suarez, *Suit filed to prevent Lee statue removal*, The Daily Progress (Mar. 20, 2017), http://www.dailyprogress.com/news/local/suit-filed-to-prevent-lee-statue-removal/article_3093c5e0-0d6d-11e7-b80c-b35bede4ed1a.html.

[43] Justin Wm. Moyer, *Lawsuit seeks to stop removal of Confederate statue in Virginia*, The Washington Post, (Mar. 24, 2017), https://www.washingtonpost.com/local/lawsuit-seeks-to-stop-removal-of-confederate-statue-in-virginia/2017/03/24/62df23ca-0fe6-11e7-8fed-dbb23e393b15_story.html.

[44] Id.

[45] Judge rules Charlottesville cannot move Lee Statue for six months, CBS19 (May 2, 2017), http://www.newsplex.com/content/news/BREAKING-Judge-rules-Charlottesville-cannot-move-Lee-Statue-for-6-months-421090593.html.

[46] *Frequently Asked Questions*, Identity Evropa, https://www.identityevropa.com/faq.

[47] E-mail from Carla Hill to Braden Kirby (May 22, 2017, 3:59 p.m.).

[48] Our attendance estimate is based on review of video and news reports of the event.

[49] Spencer & Enoch at Charlottesville, VA (13-May-2017), *available at* https://www.youtube.com/watch?v=B-syXRg6TRE.

[50] Id.

[51] Id.

[52] *Lee Statute-Removal Protestors Clash with Supporters at Jackson Park*, NBC29 (May 13, 2017), http://www.nbc29.com/story/35422510/lee-statue-removal-protesters-clash-with-supporters-at-park.

[53] Id.

[54] Id.

[55] Id.

[56] Allison Wrabel, *Candlelit counter-protest follows 'alt-right' torch bearers in Lee Park*, The Daily Progress, May 14, 2017, *available at* http://www.dailyprogress.com/news/local/candlelit-counter-protest-follows-alt-right-torch-bearers-at-lee/article_37fe18f6-3916-11e7-ae38-0710fe91dea3.html.

[57] *CHARLOTTESVILLE*, https://www.youtube.com/watch?v=vVFhC4kuYDU.

[58] Letter from Richard Spencer to Timothy J. Heaphy (Nov. 20, 2017).

[59] Lisa Provence, *Lee Park scene of white nationalist demonstration, counterprotest*, C-Ville Weekly (May 15, 2017), http://www.c-ville.com/lee-park-scene-white-nationalist-demonstration-counter-protest/.

[60] Reporting Officer Narrative by Officer E.A. Maney, May 13, 2017, 10:55 p.m.

[61] Report of Emergency Communications Center, Call for Service 173, May 13, 2017.

[62] Reporting Officer Narrative by Officer E.A. Maney, May 13, 2017, 10:55 p.m.

[63] Id.

[64] Media Release, Charlottesville Police Department, May 14, 2017.

[65] Allison Wrabel, *Candlelit counter-protest follows 'alt-right' torch bearers in Lee Park*, The Daily Progress (May 14, 2017), http://www.dailyprogress.com/news/local/candlelit-counter-protest-follows-alt-right-torch-bearers-at-lee/article_37fe18f6-3916-11e7-ae38-0710fe91dea3.html.

[66] Id.

[67] Id.

[68] Maya Rhodan, *Virginia Mayor: Protest Supporting Confederate Statues 'Harkens Back to Days of KKK'*, TIME (May 15, 2017), http://time.com/4778772/virginia-mayor-confederate-statues-protest-kkk/

[69] E-mail from Anne Coughlin to a large distribution list (May 14, 2017, 10:53 a.m.).

[70] E-mail from Erik Wikstrom to a large distribution list (May 14, 2017, 11:55 a.m.).

[71] E-mail from Erik Wikstrom to a large distribution list (May 14, 2017, 12:09 p.m.) (emphasis added).

[72] E-mail from Mike Murphy to Charlene Green (May 14, 2017, 3:02 p.m.).

[73] E-mail and attachment from Eric Pendleton to Wendy Lewis (June 9, 2017, 5:47 p.m.).

[74] Allison Wrabel, *Candlelit counter-protest follows 'alt-right' torch bearers in Lee Park*, The Daily Progress, (May 14, 2017).

[75] Lisa Provence, *The man who confronted white nationalists in Lee Park*, C-Ville Weekly (May 24, 2017), http://www.c-ville.com/man-confronted-white-nationalists-lee-park/.

[76] Media Release, Charlottesville Police Department, May 15, 2017.

[77] Id.

[78] *Charlottesville City Council Votes to Rename Lee, Jackson Parks*, NBC29 (June 5, 2017, 10:45 p.m.), http://www.nbc29.com/story/35595559/charlottesville-city-council-votes-to-rename-lee-jackson-parks.

[79] Lisa Provence, *Lee Park scene of white nationalist demonstration, counterprotest*, C-Ville Weekly (May 15, 2017), http://www.c-ville.com/lee-park-scene-white-nationalist-demonstration-counter-protest/.

[80] Although there are various independent groups that take on the label of the Ku Klux Klan, we refer to the Loyal White Knights in our report as "the Klan."

[81] CPD Intel Report for KKK Rally (June 14, 2017).

[82] City Council meetings are held at City Hall, not the Charlottesville City Circuit Courthouse.

[83] Amanda Barker Permit Application (May 25, 2017).

[84] E-mail from Michelle Christian to Special Events Committee (May 24, 2017, 11:02 a.m.).

[85] E-mail from Brian Daly to City Manager, Assistant City Managers, Chief of Police, and Director of Communications (May 24, 2017, 11:04 a.m.).

[86] E-mail from Maurice Jones to City Council (June 2, 2017, 3:33 p.m.).

[87] E-mail from Gary Pleasants to City Leaders (June 9, 2017, 1:04 p.m.).

[88] E-mail from Amanda Barker to David Shifflett (June 8, 2017, 7:52 p.m.)

[89] E-mail from Gary Pleasants to City Leaders (June 9, 2017, 1:04 p.m.).

[90] E-mail from David Shifflett to Amanda Barker (July 7, 2017, 8:50 p.m.).

[91] Id.

[92] E-mail from Amanda Barker to David Shifflett (July 1, 2017).

[93] E-mail from Wendy Lewis to CPD Personnel (June 1, 2017, 7:20 p.m.).

[94] CPD Intel Report for KKK Rally (June 14, 2017).

[95] Letter from Pamela Starsia to Al Thomas (June 23, 2017).

[96] Derek Quizon, *Activists' attorney says police inquiries are an attempt to stifle protest*, The Daily Progress (June 23, 2017), http://www.dailyprogress.com/news/local/activists-attorney-says-police-inquiries-are-an-attempt-to-stifle/article_4d4ac5e6-587a-11e7-8400-b352d4520a81.html.

[97] E-mail from Joe Hatter to CPD Personnel (June 20, 2017, 12:32 p.m.).

[98] E-mail from Greensboro, NC Police to Al Thomas and Wendy Lewis (June 22, 2017, 10:28 p.m.); E-mail from Greensboro, NC Police to Victor Mitchell and Gary Pleasants (July 7, 2017, 4:57 p.m.).

[99] E-mail from Wendy Lewis to CPD Command staff (June 19, 2017, 8:04 p.m.).

[100] CPD Intel Report for Klan Rally (June 20, 2017).

[101] CPD Intel Report for Klan Rally (June 22, 2017).

[102] E-mail Invite from David Shifflett re investigation kkk rally Intel update (June 23, 2017).

[103] E-mail from Steve Upman to CPD Command staff June 27, 2017, 12:40 p.m.).

[104] Virginia Fusion Center's Special Event Assessment (June 30, 2017).

[105] E-mail from Steve Upman to CPD Command staff (June 30, 2017, 4:24 p.m.).

[106] E-mail from Greensboro, NC Police to Al Thomas and Wendy Lewis (June 22, 2017, 10:28 p.m.).

[107] E-mail from James Mooney to CPD Officers (June 29, 2017, 2:40 p.m.).

[108] E-mail from Wendy Lewis to Joe Hatter and Steve Upman (June 7, 2017, 2:53 p.m.).

[109] CPD Police Officer Training List (Sept. 10, 2017).

[110] E-mail from Emily Lantz to Ron Lantz (June 28, 2017, 1:34 p.m.).

[111] E-mail from Mike Rogers to David Shifflett, Andrew Baxter, and Emily Pelliccia (June 13, 2017, 6:13 p.m.); E-mail Invite from David Shifflett re Meet with Fire Dept - KKK Event Planning (June 15, 2017).

[112] CFD Incident Action Plan for Klan Event (July 7, 2017).

[113] E-mail from David Shifflett to Mike Rogers (July 5, 2017, 3:50 p.m.).

[114] CFD A-Shift Briefing Presentation (July 3, 2017); CFD Stand-By Group Briefing Presentation (July 6, 2017).

[115] E-mail from Jason Pedone to David Shifflett and Kirby Hutto (June 8, 2017, 4:12 p.m.).

[116] Parks and Recreation Director Brian Daly told us that the bike-rack barricades were chosen because they were "what we had available."

[117] E-mail Invite from David Shifflett re KKK Logistics Meeting - Parks and rec-Public Works - CP5 (June 27, 2017).

[118] E-mail Invite from David Shifflett re KKK Logistics Meeting - Parks and rec-Public Works - CP5 (June 27, 2017).

[119] E-mail from James Brown to David Shifflett (June 27, 2017, 9:30 a.m.).

[120] E-mail from Chris Allen to David Shifflett (June 22, 2017, 12:34 p m.).

[121] E-mail from Craig Brown to City leaders (June 7, 2017, 5:23 p m.).

[122] E-mail from Dave Chapman to David Shifflett and Wendy Lewis (June 26, 2017, 10:16 a.m.); Memorandum from Dave Chapman to July 8th Preparation (June 26, 2017).

[123] E-mail from Dave Chapman to Maurice Jones and Mike Signer (June 30, 2017, 3:16 p m.); E-mail from David Shifflett to Dave Chapman (June 30, 2917, 2:18 p.m.).

[124] E-mail from Dave Chapman to David Shifflett (July 6, 2017, 12:22 p m.).

[125] E-mail Invite from David Shifflett re KKK Planning Meeting – CA's Office (June 27, 2017); Interview with David Shifflett (Sept. 21, 2017).

[126] E-mail from Dave Chapman to CPD Command staff (June 28, 2017, 10:15 a m.).

[127] E-mail Invite from David Shifflett invite re Meeting with VSP (June 20, 2017).

[128] E-mail from David Shifflett to Large Distribution List (June 30, 2017, 4:14 p m.).

[129] E-mail from Chanthu Phauk to Dale Sturdifen (July 5, 2017, 12:28 p.m.); E-mail from David Shifflett to David Cooper (July 6, 2017, 9:58 a.m.); E-mail from David Shifflett to David Cooper (July 7, 2017, 6:25 p.m.).

[130] E-mail from David Shifflett to David Cooper (July 7, 2017, 3:44 p.m.); E-mail from David Shifflett to David Cooper (July 7, 2017, 6:25 p.m.).

[131] E-mail from David Cooper David Shifflett (July 6, 2017, 9:51 a.m.).

[132] VSP Operational Plan for July 8 KKK Rally.

[133] E-mail from Gary Pleasants to Ron Lantz and Michael Gibson (June 29, 2017, 2:26 p.m.).

[134] E-mail from Steve Upman to CPD Command staff (July 7, 2017, 11:21 a m.).

[135] E-mail from Miller Stoddard to David Shifflett (July 5, 2017, 4:36 p.m.); E-mail from Steve Upman to CPD Command staff (July 7, 2017, 11:21 a m.).

[136] E-mail from Doug Walker to Maurice Jones (July 7, 2017, 3:32 p.m.).

[137] E-mail from David Shifflett to Chip Harding (June 15, 2017, 7:43 p.m.).

[138] E-mail from Chip Harding to David Shifflett (June 19, 2017, 6:55 p.m.); E-mail from David Shifflett to Chip Harding (June 26, 2017, 3:09 p m.).

[139] E-mail from David Shifflett Tom Hanson (June 13, 2017, 10:24 a m.).

[140] E-mail from David Shifflett to Allison Farole (July 7, 2017, 4:10 p.m.).

[141] E-mail Invite from David Shifflett re Ops Plan - KKK Protest (June 12, 2017).

[142] E-mail from Tito Durrette to David Shifflett (June 12, 2017, 3:27 p m.); E-mail from Tito Durrette to CPD Command staff (June 22, 2017, 1:34 p m.); E-mail Invite David Shifflett re KKK - Traffic Assignments (June 26, 2017)

[143] E-mail from David Shifflett to Wendy Lewis and Victor Mitchell (June 27, 2017, 7:51 p m.).

[144] E-mail from Steve Knick to David Shifflett (June 28, 2017, 3:53 p m.).

[145] E-mail from McGuireWoods to David Shifflett (June 26, 2017, 11:24 a.m.).

[146] E-mail from David Shifflett to Victor Mitchell and Wendy Lewis (June 12, 2017, 8:18 p m.); E-mail from David Shifflett to Victor Mitchell (June 20, 2017, 2:46 p.m.).

[147] E-mail from David Shifflett to Victor Mitchell (June 27, 2017, 9:56 a m.).

[148] E-mail from Gary Pleasants to CPD Command staff (June 22, 2017, 11:41 a m.).

[149] David Shifflett invite re KKK Event Logistics Meeting (June 26, 2017).

[150] David Shifflett invite re Interior and Exterior Command Meeting - KKK Planning (June 27, 2017).

[151] David Shifflett invite re KKK Operations Meeting – Zone Commanders (June 28, 2017).

[152] E-mail from David Shifflett to Wendy Lewis and Victor Mitchell (June 27, 2017, 1:51 p m.); E-mail from David Shifflett to CPD Command staff (June 30, 2017, 6:27 p.m.).

[153] E-mail from David Shifflett to CPD Police Department (July 5, 2017, 11:22 p.m.).

[154] E-mail Invite from David Shifflett re Zone Commander and Rapid Response Unit Meeting - KKK Event (July 7, 2017); E-mail from David Shifflett to CPD Command staff and Lieutenants (July 7, 2017, 4:45 p.m.).

[155] Jim Mooney Zone 4 After-Action Report (July 13, 2017).

[156] Id.

[157] E-mail Invite from David Shifflett re KKK Planning Meeting and Update - Department Head & Managers (June 28, 2017).

[158] E-mail from David Shifflett to Large Distribution List (July 6, 2017, 1:56 p.m.); E-mail from David Shifflett to Large Distribution List (July 7, 2017, 4:31 p.m.).

[159] E-mail from Al Thomas to David Shifflett (July 7, 2017).

[160] Tito Durrette After Action Report (July 19, 2017); Memo from David Shifflett to Gary Pleasants (Sept. 11, 2017).

[161] E-mail from Black Student Alliance to Large Distribution List (July 7, 2017, 1:47 p.m.).

[162] E-mail from Charlottesville Communications Office re Media Advisory for June 20 Press Conference (June 19, 2017, 2:50 p.m.).

[163] E-mail from Mike Signer to Community leaders (June 19, 2017, 4:57 p.m.); E-mail from Mike Signer to City Council (June 19, 2017, 11:53 a.m.).

[164] E-mail from Heritage Center to Large Distribution List (June 30, 2017, 10:40 a.m.).

[165] E-mail from IX Art Park community picnic organizer to Maurice Jones (June 27, 2017, 5:55 p.m.); E-mail from Maurice Jones to IX Art park community picnic organizer (July 5, 2017, 8:56 a.m.).

[166] E-mail from David Shifflett to CPD Command staff (July 6, 2017, 7:30 p.m.).

[167] E-mail from Steve Upman to Large Distribution List (July 6, 2017, 5:25 p.m.).

[168] E-mail from Steve Upman to Large Distribution List (July 7, 2017, 10:22 a.m.).

[169] CPD Final Operational Plan (July 7, 2017).

[170] In June, the City received a permit application for a "CareBear Stare" event, where hundreds of stuffed bears would be lined up in front of the Klan's protected area. That application was denied because it required leaving the bears unattended, which CPD refused to allow due to safety concerns.

[171] E-mail from David Shifflett to CPD Police Department (July 5, 2017, 11:22 p.m.).

[172] Jim Mooney Zone 4 After-Action Report (July 13, 2017).

[173] Command Center's KKK Rally Scribe Log (July 8, 2017).

[174] Id.

[175] E-mail from Maurice Jones to City Council (July 8, 2017, 1:10 p.m.).

[176] Command Center's KKK Rally Scribe Log (July 8, 2017).

[177] Jim Mooney Zone 4 After-Action Report (July 13, 2017).

[178] Joe Hatter Zone 1 After Action Report (July 17, 2017).

[179] Command Center's KKK Rally Scribe Log (July 8, 2017).

[180] Joe Hatter Zone 1 After Action Report (July 17, 2017).

[181] Command Center's KKK Rally Scribe Log (July 8, 2017).

[182] Id.

[183] Id.

[184] Id.

[185] Id.

[186] Id.

[187] Joe Hatter Zone 1 After Action Report (July 17, 2017).

[188] Command Center's KKK Rally Scribe Log (July 8, 2017).

[189] Id.; Joe Hatter Zone 1 After Action Report (July 17, 2017).

[190] Joe Hatter Zone 1 After Action Report (July 17, 2017).

[191] Command Center's KKK Rally Scribe Log (July 8, 2017); Joe Hatter Zone 1 After Action Report (July 17, 2017).

[192] Joe Hatter Zone 1 After Action Report (July 17, 2017).

[193] Joe Hatter Zone 1 After Action Report (July 17, 2017).

[194] Tito Durrette After Action Report (July 19, 2017).

[195] Joe Hatter Zone 1 After Action Report (July 17, 2017).

[196] E-mail from Waynesboro Chief of Police to Al Thomas (July 10, 2017, 1:40 p.m.).

[197] Command Center's KKK Rally Scribe Log (July 8, 2017).

[198] Id.

[199] Id.

[200] Id.

[201] E-mail from Maurice Jones to City Council (July 8, 2017, 3:45 p.m.).

[202] E-mail from Maurice Jones to City Council (July 8, 2017, 3:51 p m.); Command Center's KKK Rally Scribe Log (July 8, 2017).

[203] Jim Mooney Zone 4 After-Action Report (July 13, 2017).

[204] Command Center's KKK Rally Scribe Log (July 8, 2017).

[205] E-mail from Maurice Jones to City Council (July 8, 2017, 4:00 p.m.).

[206] E-mail from Maurice Jones to City Council (July 8, 2017, 3:59 p.m.).

[207] Command Center's KKK Rally Scribe Log (July 8, 2017).

[208] Id.

[209] Id.

[210] Command Center's KKK Rally Scribe Log (July 8, 2017); E-mail from Maurice Jones to City Council (July 8, 2017, 4:25 p.m.).

[211] Command Center's KKK Rally Scribe Log (July 8, 2017).

[212] Joe Hatter Zone 1 After Action Report (July 17, 2017).

[213] Command Center's KKK Rally Scribe Log (July 8, 2017).

[214] Id.

[215] Joe Hatter Zone 1 After Action Report (July 17, 2017); Tito Durrette After Action Report (July 19, 2017).

[216] Command Center's KKK Rally Scribe Log (July 8, 2017); E-mail from Maurice Jones to City Council (July 8, 2017, 4:45 p.m.).

[217] E-mail from Maurice Jones to Kristin Szakos (July 8, 2017, 6:04 p.m.); E-mail from VSP Public Relations Director to Miriam Dickler (July 11, 2017, 1:21 p m.); E-mail from Al Thomas to Miriam Dickler (July 8, 2017, 8:41 p.m.).

[218] Pete DeLuca, et al., *KKK Group Holds Rally in Charlottesville Park*, NBC 29 (July 8, 2017), http://www.nbc29.com/story/35839823/kkk-group-holds-rally-in-charlottesville-park.

[219] Joe Hatter Zone 1 After Action Report (July 17, 2017); Jim Mooney Zone 4 After-Action Report (July 13, 2017); Command Center's KKK Rally Scribe Log (July 8, 2017).

[220] Joe Hatter Zone 1 After Action Report (July 17, 2017).

[221] Jim Mooney Zone 4 After-Action Report (July 13, 2017).

[222] E-mail from Maurice Jones to City Council (July 8, 2017, 5:29 p.m.).

[223] Command Center's KKK Rally Scribe Log (July 8, 2017).

[224] E-mail from Al Thomas to Maurice Jones and Miriam Dickler (July 9, 2017, 9:12 a.m.).

[225] E-mail from VSP Public Relations Director to Miriam Dickler (July 11, 2017, 1:21 p.m.).

[226] E-mail from David Shifflett to CPD Command staff (July 14, 2017, 11:07 a.m.).

[227] Only one individual faced two charges: assault and disorderly conduct. Thus, the "disorderly conduct" line and the "assault" line each have one-half point.

[228] E-mail from Miriam Dickler to Large Distribution List (July 9, 2017, 9:28 a.m.); E-mail from David Shifflett to CPD Command staff (July 10, 2017, 4:14 p.m.); Interview with Miriam Dicker (Aug. 28, 2017).

[229] Letters from Legal Aid Justice Center, National Lawyers Guild, ACLU, and the Rutherford Institute to City and State Officials (July 17, 2017).

[230] E-mail from Al Thomas Miriam Dickler (July 8, 2017, 8:41 p m.).

[231] E-mail from David Shifflett to Wendy Lewis (July 11, 2017, 10:45 a.m.).

[232] Memorandum from Dave Chapman to Maurice Jones and Mike Murphy (July 19, 2017).

[233] *See Heffron v. Int'l Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981) ("The First Amendment protects the right of every citizen to 'reach the minds of willing listeners and to do so there must be opportunity to win their attention.' ") (quoting *Kovacs v. Cooper*, 336 U.S. 77, 87 (1949)).

[234] We tried to contact some of the individuals who have been most critical of the use of tear gas on social media platforms and in public meetings. Unfortunately, many of those individuals refused to meet with us or otherwise provide us with their perspective on the use of tear gas. As described in the Methodology section above, we consider the lack of cooperation from these individuals to be an unfortunate missed opportunity. It is hard to know if access to these individuals and an understanding of their objections to the use of tear gas would have impacted our evaluation.

[235] Detectives researched the speakers associated with July 8 (the Loyal White Knights of the Ku Klux Klan) and August 12 (Richard Spencer, Mike Enoch, Jason Kessler, Tim "Baked Alaska" Gionet, Augustus Invictus, Christopher Cantwell, Matthew Heinbach, John "Johnny Monoxide" Ramondetta, Pax Dickinson, and Dr. Michael Hill). Detectives also researched groups associated with those speakers as well as groups or associations that might protest against the events: the Traditionalist Worker Party; the Proud Boys; The Daily Stormer; the One Percenters;

Occidental Dissent; Vanguard America; Identity Evropa; the League of the South; 3 Percent Rising; the Oath Keepers; the Sons of Confederate Veterans; the Hells Angels; Warlocks; the One Percenters; the Virginia Flaggers; Solidarity Charlottesville; Charlottesville Stands United Against Hate; Together C'ville; Standing Up for Racial Justice; Black Lives Matter; and Antifa.

[236] E-mail from Wendy Lewis to Joe Hatter (Aug. 9, 2017, 6:35 a.m.).

[237] *About Us*, SOLIDARITYCVILLE, http://solidaritycville.com/About/.

[238] *How to Prepare for August 12 (and action in general)*, SOLIDARITYCVILLE (Aug. 5, 2017), http://solidaritycville.com/2017/08/05/First-Time-Preparation-Tips-for-August-12/.

[239] Alan Zimmerman told us that the promised community service officer never arrived on August 12. The front steps of CBI overlook the intersection of 3rd and Jefferson Streets; CPD's traffic plan did not call for an officer to be stationed at that intersection, but there were officers one block north (3rd Street NE and High Street) and one block east (4th Street NE and Jefferson Street). Although it is possible that CPD told Zimmerman that the community service officer would be stationed at the intersection in front of CBI, it may be that the message was unclear or misunderstood that officers would be at nearby intersections, just not directly in front of the synagogue.

[240] Walter Heinecke Permit Application (July 13, 2017).

[241] E-mail from Walt Heinecke to Local Media (July 14, 2017, 2:17 p.m.), forwarded by Amanda Williams to Miriam Dickler (July 14, 2017, 2:23 p.m.).

[242] E-mail from Walt Heinecke to Al Thomas (Aug. 11, 2017, 11:19 p.m.); E-mail from Al Thomas to Walt Heinecke (Aug. 12, 2017, 12:52 a.m.).

[243] Operation Unite The Right Charlottesville 2.0, *available at* https://www.unicornriot.ninja/2017/leaked-planning-meetings-led-neo-nazi-terrorism-charlottesville/.

[244] Id.

[245] Id.

[246] Id.

[247] Id.

[248] Those events started as scheduled, but were cancelled at noon when Nelson learned of the local state of emergency.

[249] There were also concerns raised by citizens that Kessler's event insurance had been cancelled, but that requirement applied only to "special events," as defined by the City's standard operating policy for special events. Unite The Right had been explicitly designated a "demonstration," a particular type of event that is carved out of the definition of "special events." For that reason, Council was advised that Kessler's voluntary compliance (or not) with the special events policy was not a basis for revoking the permit. E-mail from Craig Brown to City Council (July 30, 2017, 10:39 p.m.).

[250] E-mail from Michael Signer to Craig Brown (July 29, 2017, 10:04 p.m.).

[251] E-mail from Michael Signer to Paige Rice (July 31, 2017, 2:24 p.m.).

[252] E-mail from Michael Signer to Craig Brown (July 31, 2017, 8:01 a.m.).

[253] E-mail from Michael Signer to Craig Brown, Maurice Jones, and Samuel Kaplan (Aug. 1, 2017, 4:56 p.m.).

[254] Councilor Galvin was the sole counselor to defer to Chief Thomas and oppose moving the event.

[255] Engagement letter from Samuel Kaplan to Maurice Jones (Aug. 2, 2017), executed by Michael Murphy (Aug. 4, 2017).

[256] E-mail from Craig Brown to City Council (Aug. 6, 2017, 6:14 p.m.).

[257] E-mail from Maurice Jones to Allyson Davies (Aug. 8, 2017); Interview with Mike Murphy (Aug. 30, 2017).

[258] Letter from Maurice Jones to Jason Kessler (Aug. 7, 2017).

[259] *Charlottesville Leaders Ask Kessler to Move Unite The Right Rally*, NBC29 (Aug. 7, 2017), http://www.nbc29.com/story/36079665/charlottesville-press-conference-8-7-2017.

[260] *Kessler v. City of Charlottesville*, Case 3:17-cv-00056-GEC (filed Aug. 10, 2017).

[261] Affidavit of Chief of Police Al S. Thomas, *Kessler v. City of Charlottesville*, Case 3:17-cv-00056-GEC (Aug. 11, 2017), ECF No. 10-2.

[262] Memorandum from Brian Moran to Governor Terence McAuliffe (Aug. 1, 2017).

[263] E-mail from Wendy Lewis to Victor Mitchell, David Shifflett, Gary Pleasants, and Al Thomas (July 23, 2017, 6:07 p.m.).

[264] E-mail from Cheryl Sandridge to a large distribution list (Aug. 8, 2017, 1:16 p.m.).

[265] E-mail from Victor Mitchell to Christopher Clark (July 25, 2017, 7:55 p.m.).

[266] E-mail from Victor Mitchell to Christopher Clark and Craig Worsham (July 30, 2017, 5:43 p.m.).

[267] E-mail from Victor Mitchell to Christopher Clark and Craig Worsham (Aug. 4, 2017, 2:39 p.m.).

[268] E-mail from Victor Mitchell to Christopher Clark and Craig Worsham (Aug. 7, 2017, 10:13 p.m.).

[269] E-mail from Victor Mitchell to Emergency Operations Center Director Allison Farole (Aug. 8, 2017, 2:37 p.m.); E-mail from Victor Mitchell to Albemarle County Police Department Lieutenant Stoddard (Aug. 8, 2017, 8:23 p.m.); E-mail from Victor Mitchell to CPD Lieutenants (Aug. 9, 2017, 3:52 p.m.).

[270] E-mail from Otis Collier to Brian O'Donnell (Aug. 8, 2017, 11:46 a.m.)

[271] E-mail from Steve Knick to Wendy Lewis (Aug. 11, 2017, 7:01 a.m.).

[272] E-mail from Wendy Lewis to Victor Mitchell (Aug. 11, 2017, 7:36 a.m.).

[273] E-mail from Sean Reeves to Victor Mitchell (Aug. 9, 2017, 4:10 p.m.).

[274] E-mail from Al Thomas to Sean Reeves (Aug. 10, 2017, 10:02 a.m.).

[275] E-mail from Sean Reeves to Al Thomas (Aug. 10, 2017, 11:01 a.m.).

[276] VSP instructed officers to bring arrestees to a Mass Arrest Team organized by the Bureau of Criminal Investigation, while the CPD plan makes no mention of BCI and indicates arrestees should be taken to the unit overseen by Lieutenant Jones at the Charlottesville General District Court.

[277] Lieutenant Tito Durrette submitted his proposed design for McIntire Park on July 31; Thomas did not agree to use the IMT until August 8.

[278] E-mail from Wendy Lewis to Victor Mitchell (July 16, 2017, 7:29 a.m.).

[279] E-mail from Victor Mitchell to Wendy Lewis (July 16, 2017, 10:36 a.m.).

[280] Virginia Fusion Center, Unite The Right Daily Situation Report (Aug. 8, 2017).

[281] Jack Striping, *Inside the U. of Virginia's Response to a Chaotic White-Supremacist Rally*, The Chronicle of Higher Education (Nov. 20, 2017), https://www.chronicle.com/article/Inside-the-U-of-Virginias/241832.

[282] Operation Unite The Right Charlottesville 2.0, *available at* https://www.unicornriot.ninja/2017/leaked-planning-meetings-led-neo-nazi-terrorism-charlottesville/.

[283] Id.

[284] Id.

[285] E-mail from Anda Webb to Michael Gibson, Marge Sidebottom, and Anthony de Bruyn (Aug. 11, 2017, 3:23 p.m.); *see also* University Police Department (UPD) – Timeline: August 11, 2017, *available at* https://content.law.virginia.edu/news/201709/working-group-recommends-improvements-releases-police-timeline-aug-11.

[286] University Police Department (UPD) – Timeline: August 11, 2017, *available at* https://content.law.virginia.edu/news/201709/working-group-recommends-improvements-releases-police-timeline-aug-11.

[287] E-mail from Ron Lantz to Michael Gibson and Al Thomas (Aug. 11, 2017, 4:10 p.m.).

[288] E-mail from Ron Lantz to Michael Gibson and Al Thomas (Aug. 11, 2017, 8:08 p.m.)

[289] Interview of Casey Landrum, September 4, 2017; *see also* http://archives forusa.org/blogs/osagyefo-uhuru-sekou/ferguson-cnn-lying-were-facing-police-again/13011. We attempted to communicate with Rev. Sekou through his publicist on September 5, 2017, but did not receive a response.

[290] Defense Strategy: UVA prof fends off white supremacy invasion, Lisa Provence, C-Ville Weekly, August 23, 2017.

[291] *About*, Redneck Revolt, https://www.redneckrevolt.org/about.

[292] University Police Department (UPD) – Timeline: August 11, 2017, *available at* https://content.law.virginia.edu/news/201709/working-group-recommends-improvements-releases-police-timeline-aug-11.

[293] E-mail from Michael Gibson to Al Thomas and Ron Lantz (Aug. 11, 2017, 7:52 p.m.).

[294] E-mail from Maurice Jones to Leslie Beauregard (Aug. 11, 2017, 8:07 p.m.).

[295] Police Mutual Aid Agreement, August 16, 1995, at 1.

[296] Dwayne Jones After-Action Report, August 11-12, 2017.

[297] University Police Department (UPD) – Timeline: August 11, 2017, *available at* https://content.law.virginia.edu/news/201709/working-group-recommends-improvements-releases-police-timeline-aug-11.

[298] E-mail from Al Thomas to Victor Mitchell, Wendy Lewis, David Shifflett, James Mooney, and Dwayne Jones (Aug 11, 2017, 8:13 p.m.).

[299] E-mail from James Mooney to Al Thomas (Aug. 11, 2017 8:16 p.m.).

[300] E-mail from Michael Gibson to Rick Lantz and Al Thomas (Aug. 11, 2017, 8:11 p.m.).

[301] E-mail from Maurice Jones to Pat Hogan (Aug. 11, 2017, 8:01 p.m.).

[302] Text message from Mike Signer to Maurice Jones and Al Thomas (Aug. 11, 2017, 8:21 p.m.).

[303] Dwayne Jones After-Action Report, August 11-12, 2017.

[304] Id.

[305] Id.

[306] Id.

[307] E-mail from Alex Cintron to Michael Gibson (Aug. 11, 2017, 9:02 p.m.).

[308] E-mail from Michael Gibson to Alex Cintron, (Aug. 11, 2017, 9:17 p.m.).

[309] We have attempted to contact several individuals who believe were part of this group; our efforts have been unsuccessful. Therefore, we cannot provide any details about their intentions, or how they learned about the march.

[310] University Police Department (UPD) – Timeline: August 11, 2017, *available at* https://content.law.virginia.edu/news/201709/working-group-recommends-improvements-releases-police-timeline-aug-11.

[311] University Police Department (UPD) – Timeline: August 11, 2017, *available at* https://content.law.virginia.edu/news/201709/working-group-recommends-improvements-releases-police-timeline-aug-11.

[312] *Unite the Right Torchlit March Towards Lee Park Through Charlottesville, Va*, https://www.youtube.com/watch?v=hVc1hvD6mCw.

[313] Id.

[314] Id.

[315] Defense Strategy: UVA prof fends off white supremacy invasion, Lisa Provence, C-Ville Weekly, August 23, 2017.

[316] Id.

[317] At 11:49 p.m., Mayor Signer texted City Attorney Brown and suggested that the Friday night events at UVA provided justification for reopening the federal court litigation over the Unite The Right rally location.  In response, City Attorney Brown indicated that it was likely too late to return to court with these new facts and attempt to move the rally. Accordingly, the City did not bring those facts to the federal judge who had earlier granted the injunction.

[318] The University's Response to August 11, 2017: Observations and Improvements, *available at* http://response.virginia.edu/documents.

[319] E-mail from Walt Heinecke to Al Thomas (Aug. 11, 2017, 11:19 p.m.).

[320] Command Center's Unite The Right Rally Scribe Log (Aug. 12, 2017).

[321] We requested an opportunity to speak with Lieutenant Crannis-Curl about her comment and overall impressions of August 12. VSP denied our request and would not make her available for an interview.

[322] @cvillenews_desk, Twitter (Aug. 12, 2017, 9:15 a.m.), https://twitter.com/cvillenews_desk/status/896359466807042050; C-VILLE Weekly (@cvillenews_desk), Twitter (Aug. 12, 2017, 9:18 a.m.), https://twitter.com/cvillenews_desk/status/896360160205185024; Allison Wrabel (@craftypanda), Twitter (Aug. 12, 2017, 9:56 a.m.), https://twitter.com/craftypanda/status/896369731506188289l.

[323] *Unite The Right All Day Livestream (Charlottesville, 8/12/2017)*, https://www.youtube.com/watch?v=iZF9TvgsKyc.

[324] *Grounds of conflict: "Unite The Right" rally Charlottesville, Va.*, https://www.youtube.com/watch?v=4nCnMwAyf84.

[325] Letter from Sam Dickson to Timothy J. Heaphy (Nov. 20, 2017).

[326] *Video shows man firing into crowd in Charlottesville*, https://www.youtube.com/watch?v=C2ro7U_Yoc4.

[327] This incident resulted in a criminal charge against Dennis Mothersbaugh, an Ohio man who traveled to Charlottesville to participate in the Unite The Right Rally. Mothersbaugh pleaded guilty to a misdemeanor charge of assault and battery. He was sentenced to the maximum allowable prison term of 360 days in jail.

[328] *Charlottesville Unite The Right Rally Charlottesville VA August 12 2017*, http://www.youtube.com/watch?v=bcNBoGoFnVk.

[329] *Conclusive evidence that DeAndre Harris ATTACKED protesters*, https://www.youtube.com/watch?v=33R_MqZQCVI.

[330] *Full Video Deandre Harris*, https://www.youtube.com/watch?v=3P9jho86s4Y.

[331] *Full Video Deandre Harris*, https://www.youtube.com/watch?v=3P9jho86s4Y.

[332] American Warrior Revolution, *What's happening in Charlottesville, Virginia*, https://www.facebook.com/americanwarriorrevolution/videos/1428969810526013/.

[333] American Warrior Revolution, *What's happening in Charlottesville, Virginia*, https://www.facebook.com/americanwarriorrevolution/videos/1428969810526013/.

[334] American Warrior Revolution, *What's happening in Virginia*, https://www.facebook.com/americanwarriorrevolution/videos/1429012537188407/.

[335] Michael Gore Zone 4 After Action Report (Aug. 21, 2017).

[336] *Guy proclaims himself happy with people getting cut down by car at Unite The Right rally gets roughed up*, https://www.youtube.com/watch?v=LsEA5iBK5dc.

[337] When Mayor Signer got word of the threat on CBI, he sent a text message to the Governor, who responded with a promise to send the National Guard to protect the synagogue.

[338] National Transportation Safety Board Aviation Accident Preliminary Report (Accident No. ERA17FA274), *available at* https://app.ntsb.gov/pdfgenerator/ReportGeneratorFile.ashx?EventID=20170813X82426&AKey=1&RType=Prelim&IType=FA.

[339] While we have not examined the reasons for the helicopter crash, we believe some consideration should be given at future events to the use of drones rather than manned aircraft to provide images of large protest events.

[340] *Virginia Governor McAuliffe Holds Press Conference 8-12-2017*, http://www.youtube.com/watch?v=lse0nQ0jvQ.

[341] Id.

[342] Four individuals have been criminally charged with assaulting Jason Kessler at his press conference. Their cases remain pending at the time of this report.

[343] E-mail from Wendy Lewis to David Shifflett, Victor Mitchell, and Al Thomas (Aug. 16, 2017, 9:10 p.m.).

[344] E-mail from Jim Mooney to Dwayne Jones and Michael Gore (Aug. 21, 2017, 6:20 p.m.).

[345] E-mail from Charles Davis to Jim Mooney (Aug. 22, 2017, 5:57 p m.).

[346] E-mail from Victor Mitchell to Craig Worsham (Aug. 17, 2017, 842 p m.).

[347] E-mail from Craig Worsham to VSP Officers (Aug. 21, 2017, 9:50 a m.).

[348] E-mail from Eric. King to Victor Mitchell (Aug. 21, 2017, 10:11 a.m.); E-mail from Anthony Nicely to Victor Mitchell (Aug. 21, 10:47 a.m.); E-mail from Scott VanLear to Victor Mitchell, Aug. 21, 2017, 3:41 p.m.); E-mail from Donald Jones to Victor Mitchell (Aug. 24, 2017, 11:02 a m.); E-mail from Gregory Mitchell to Victor Mitchell (Aug. 24, 11:13 p.m.); E-mail from James Hopkins to Victor Mitchell (Aug. 24, 1:38 p m.); E-mail from Matthew Patterson to Victor Mitchell (Aug. 25, 4:47 p.m.).

[349] The Charlottesville-Albemarle Rescue Squad ultimately treated forty individuals on August 12. Thirty-eight were injuries related to the Unite The Right event, and two were unrelated. They responded to multiple scenes and provided care that ranged from first aid to emergency services.

[350] Some of this intelligence regarding threats of violence before the rally informed the City of Charlottesville's attempt to move the Unite The Right rally to McIntire Park, rather than Emancipation Park. While information regarding potential violence continued to mount in the days immediately before the event, there was ample information regarding threats well before the move to McIntire Park was initiated. The tardiness of this attempt to move the rally is described more fully below.

[351] While the July 8 plan called for a CPD Field Force to be deployed, conditions occurred too rapidly for that to occur.

[352] VSP personnel did not use the GPS trackers. Colonel Flaherty expressed concern that the use of these devices would put troopers in danger, as information regarding their whereabouts could be intercepted and used to disrupt their activities.

[353] 1987 Va. Acts ch. 629.

[354] Va. Code Ann. § 15.2-915(A) (2012).

[355] As noted above, Governor McAuliffe advised Mayor Signer to ban firearms from the Unite The Right event in a phone call some days before. We find this suggestion puzzling, as state law clearly precludes such a prohibition. We do not fault City planners for disregarding this advice, as following it would have violated Virginia law.

[356] *See* City of Charlottesville Charter, § 14, ¶ 10 (granting City Council the power "to regulate or prohibit . . . the discharge of firearms . . . and the carrying of concealed weapons"), ¶ 16 (granting City Council the "power to make such other and additional ordinances as it may deem necessary for the general welfare of said city"), 1972 Va. Acts ch. 184, at 213-14.

[357] Va. Code Ann. § 15.2-1102 (2012) ("A municipal corporation shall have and may exercise all powers which it now has or which may hereafter be conferred upon or delegated to it under the Constitution and laws of the Commonwealth and all other powers pertinent to the conduct of the affairs and functions of the municipal government, the exercise of which is not expressly prohibited by the Constitution and the general laws of the Commonwealth, and which are necessary or desirable to secure and promote the general welfare of the inhabitants

of the municipality and the safety, health, peace, good order, comfort, convenience, morals, trade, commerce and industry of the municipality and the inhabitants thereof. . . .").

[358] The Virginia Code specifically criminalizes the carrying in public of specified "concealed weapons," including "any dirk, bowie knife, switchblade knife, ballistic knife, machete, razor, slingshot, spring stick, metal knucks, or blackjack," "flailing instruments" like nun chucks, and throwing stars and similar weapons. Va. Code Ann. § 18.2-308 (Supp. 2017).

[359] As described more fully in the Recommendations section, below, we believe that a more effective separation strategy would have involved creating a broad secure perimeter covering multiple City blocks and funneling all rally attendees through designated secure points of entry.