# EXHIBIT C

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## Charlottesville Division

| | |
|---|---|
| ELIZABETH SINES, SETH WISPELWEY, MARISSA BLAIR, TYLER MAGILL, APRIL MUNIZ, HANNAH PEARCE, MARCUS MARTIN, NATALIE ROMERO, CHELSEA ALVARADO, and JOHN DOE, <br><br> Plaintiffs, <br><br> v. <br><br> JASON KESSLER, RICHARD SPENCER, CHRISTOPHER CANTWELL, JAMES ALEX FIELDS, JR., VANGUARD AMERICA, ANDREW ANGLIN, MOONBASE HOLDINGS, LLC, ROBERT "AZZMADOR" RAY, NATHAN DAMIGO, ELLIOT KLINE a/k/a/ ELI MOSLEY, IDENTITY EVROPA, MATTHEW HEIMBACH, MATTHEW PARROTT a/k/a DAVID MATTHEW PARROTT, TRADITIONALIST WORKER PARTY, MICHAEL HILL, MICHAEL TUBBS, LEAGUE OF THE SOUTH, JEFF SCHOEP, NATIONAL SOCIALIST MOVEMENT, NATIONALIST FRONT, AUGUSTUS SOL INVICTUS, FRATERNAL ORDER OF THE ALT-KNIGHTS, MICHAEL "ENOCH" PEINOVICH, LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN, and EAST COAST KNIGHTS OF THE KU KLUX KLAN a/k/a EAST COAST KNIGHTS OF THE TRUE INVISIBLE EMPIRE, <br><br> Defendants. | Civil Action No. 3:17-cv-00072-NKM <br><br> **JURY TRIAL DEMANDED** |

## DECLARATION OF THOMAS BAKER
## IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE
## TO FILE SECOND AMENDED COMPLAINT

I, Thomas Baker, declare as follows:

1.  I am a resident of Charlottesville, Virginia, and have lived there since May 2017. I am over 18 years of age and competent to testify.

2.  I submit this declaration in support of a motion to amend the complaint to permit me to join this lawsuit. This is not a complete account of everything I witnessed throughout the day on August 12, 2017, but it generally describes the events leading to my injuries and subsequent events concerning my ability to join this lawsuit.

## Car Attack

3.  On August 12, 2017, I was present in Charlottesville, Virginia during the time of the Unite the Right event and in the hours after the scheduled rally was shut down. I was present that day to observe the events, but I did not participate in any organized events in or near Emancipation Park.

4.  On the afternoon of August 12, I was present in the area outside Emancipation Park and observed the dispersal of individuals who appeared to have been participating in the United the Right event, as well as individuals who appeared to be counter-protesters.

5.  At approximately 1:30 p.m., I was walking east on Water Street along with a large group of cheerful counter-protesters. At some point, the crowd took a left turn onto Fourth Street, toward the pedestrian mall on East Main Street. Once the crowd turned left, we all walked slowly up Fourth Street, which is a narrow roadway. I was somewhere toward the front of the crowd at that point, but I was not leading the group.

6.  At approximately 1:40 p.m., I was about a third of the way from Water Street toward East Main Street when a car, which I now know was a Dodge Challenger driven by James

2

Fields, drove at high speed directly into me and many other people near the front and center of the group, hitting me and several people standing near me.

7. Due to the high speed of the car, the narrow street, and the large number of people around me, I was unable to get out of the way of the Dodge Challenger.

8. As a result of being hit by the fast-moving vehicle, I was sent flying into the air, tumbling over the vehicle as it continued moving at speed through more people. Attached as Exhibit 1 is a true and accurate copy of a photograph of the scene at the time the car hit the crowd; I am shown high in the air, upside down. I hit the ground after the car had passed under me.

9. I then saw the Dodge Challenger begin to reverse after it had struck a stopped car on Fourth Street, and I was afraid the Challenger would hit me again. Even though I had severe injuries, I was able to scramble out of the way as it passed me in reverse, also at a high rate of speed.

## Physical Injuries

10. The Dodge Challenger colliding into me caused me immediate, severe, and permanent injuries.

11. Immediately after the attack, I was taken to the hospital, where the doctors told me I had a concussion caused by my head and upper body bouncing off the windshield of the car, and my left wrist was put in a temporary cast due to the severity of bruising and swelling. However, the swelling around my injuries was so severe that doctors were unable to conduct proper imaging, take effective x-rays, or conduct a comprehensive diagnostic examination. They discharged me from the hospital after several hours with instructions to return in a week so they could determine whether the swelling had subsided sufficiently to examine my injuries properly.

3

12. I returned to the hospital a week later and the doctors were able to take effective x-rays and MRIs that could be used to help determine the extent of my injuries.

13. After undergoing many tests, I was diagnosed with a torn ligament in my left wrist, multiple lacerations on my face, abdomen, arms, and legs, and a torn labrum of my right hip, all of which occurred as a direct result of being struck by James Fields' car on August 12, 2017.

14. Upon diagnosis of a torn ligament in my left wrist, I wore an arm cast for about six weeks. It took over two months, including two hospital visits, for my left wrist to heal completely.

15. One doctor told me that the severity of the labral tear of my right hip, caused by the August 12 car attack, made me a candidate for surgery, but that similar injuries in other people in some cases have healed with just physical therapy. I decided to try physical therapy first in an attempt to avoid surgery and heal the injury. I went to physical therapy for approximately one month, during which the injury got worse. I got a second doctor's opinion on the best course of treatment, and he recommended surgery, too.

16. Based on the doctors' advice, I scheduled reparative surgery for my right hip and received a cortisone shot to help with pain management until my date of surgery. During the surgery, the surgeons discovered additional damage to my hip socket and femur head. The unexpected damage required them to reshape my femur head and hip socket. This additional hip repair work extended and complicated the surgery, and it required a longer, more challenging recovery. The surgery included placing permanent sutures and surgery-grade plastic screws in my hip.

17. I then spent about four months in physical therapy to try to regain my strength and mobility. I had to use crutches for six weeks and was restricted to sleeping in a recliner for more

4

than two weeks because getting into and out of a horizontal position (e.g., a bed) caused too much pain.

18. The physical pain for the first three weeks post-hip surgery was debilitating, severe, and constant. On top of the physical pain, I missed several weeks' worth of work, and I was entirely dependent on others for almost all tasks (bathing, food, getting up/sitting down, etc.) during this time. It took me eight months to return to a physically active gym and workout routine.

19. Many of my injuries from the car attack have been long-lasting and continue to impair me almost two years after the attack. Before the attack, exercise and team sports were a huge part of my life and my identity. Now I cannot engage in the same activities or maintain that lifestyle, and I have had to reshape my identity.

20. I had been an athlete for my entire life with no physical limitations – I played soccer, lacrosse, and was a dedicated weightlifter. All of these sports require sprinting, quick pivoting, heavy lifting, and other movements that place high impact on the hips. I had no injuries or limitations whatsoever in my right hip before the attack. I am now limited in all these activities. I can no longer run or jump at all, to avoid high impact on my hip. Doctors explain that I will likely need a hip replacement in the next 20 years, and any high impact on my hip will increase wear on the joint and hasten the need for a hip replacement.

21. Currently, in addition to the pain and limited functionality of my right hip, the hip has approximately 85% of its pre-attack mobility. I am dedicated to staying healthy, so I have returned to a consistent, but completely different, gym and workout routine. Because of the consistent pain and discomfort in my hip, I have had to modify substantially my workouts and activities. I can no longer do the strength exercises that were part of my routine, as my hip mobility and pain limits my ability to engage in intense and high weight bearing activities. The most

significant and lasting impact is the consistency of pain and discomfort in my hip when sitting or standing for several hours at a time and the reduced mobility of my hip joint. My hip mobility and physical discomfort is not expected to improve beyond my current condition.

22. At the time I was hit by the vehicle, I worked at a nursery where I managed the Integrated Pest Management program and overall nursery health. After the attack, I had to reduce significantly my work responsibilities due to my physical limitations. For example, I could no longer carry or move heavy equipment, and I could not stand or engage in certain movements for long periods. I missed about two weeks' worth of work due to physical pain, doctors' appointments, physical therapy sessions, and mental/emotional distress. I had to miss four weeks to recover from the surgery itself.

23. I obtained a new job after my hip surgery where I sit at a desk most days. I also have had to call out of my new job, or leave work early, at least 15 more days after my surgery to attend more doctors' appointments and to cope with my emotional trauma from the attack. I cannot sit still for long periods because sitting or standing in the same position for several hours still causes cramping and pain in my right hip. This discomfort creates significant distractions throughout each day.

## **Mental and Emotional Injuries**

24. Since the car attack, I have experienced several panic attacks, one of which caused an emergency room visit because it felt like a heart attack. I routinely have flashbacks and anxiety triggered by what used to be normal situations. Walking on sidewalks past moving cars causes anxiety and mental discomfort. Abrupt or loud noises (e.g., a door slamming, a book falling off a desk, a knock on a door) and quick movements (e.g., if someone runs past me unexpectedly) continue to trigger flashbacks, which causes paralyzing stress. New situations routinely, but

unpredictably, arise that cause flashbacks. Even normal life activities and situations can unpredictably create anxiety, stress, and flashbacks.

### Initial Reluctance to Join Litigation

25. While still undergoing rehabilitation, I met April Muniz, another person present at the car attack. The one time I met Ms. Muniz, she mentioned a lawsuit against James Fields and potentially others involved in the United the Right rally, possibly to gauge my interest in joining the case, and she sent me a couple emails or text messages with news articles. I was in no shape, physically or emotionally, to focus on possible legal proceedings, however, and although I emailed that I would get back to her, I never did respond regarding her lawsuit. I did not know Ms. Muniz before that meeting, and we never did discuss any details of her lawsuit.

26. At that time, I was still undergoing a series of extensive medical and surgical treatments, and I was both physically and emotionally unable to consider joining any litigation. The surgical procedures were painful, and the physical therapy was extremely difficult. I was preoccupied with attempting to follow doctors' instructions so I would eventually recover some of the mobility and functionality I had lost in the attack. I was not able to focus on taking legal actions, which would not make me feel better physically or heal my injuries.

27. In addition to my physical concerns, I was afraid to file or join a lawsuit because the people who I would sue were known to be violent people. These people had caused injuries to me and others only because we were present at the Unite the Right events and must have appeared to belong to or support the racial and ethnic groups they hated. At the time, I was afraid to take a public stance that would put myself and my wife in a dangerous position, where white supremacists and others who supported the United the Right event with violence might cause us further harm.

28. During that time, I intentionally kept a low profile, refused to make any public statements regarding the attack to the media or otherwise, and did everything I could to avoid drawing attention from the Nazis, White Nationalists, or any other hate groups present in Charlottesville on August 12, 2017. I was aware that the media and possibly others wanted to hear my story, partly because the photograph of me suspended in the air after being struck by the Dodge Challenger had become well known. However, I avoided any publicity stemming from these events.

29. Other than the limited early communications described above, I had no contact with Ms. Muniz or any of the other plaintiffs involved in this case, or with any of their attorneys, until the criminal trial of James Fields. I never hired a lawyer of my own to pursue similar claims, and I never joined or inquired about any other lawsuit regarding the events of August 12, 2017.

### Subsequent Discussions to Testify and, Later, to Join Litigation

30. In December 2018, in response to a subpoena from the Commonwealth of Virginia, I testified at the criminal trial of James Fields in connection with the events of August 12, 2017. Although I was fearful of testifying in public against one of the White Supremacists who engaged in violence on August 12, I had no choice because I was subpoenaed.

31. In retrospect, testifying in open court, without repercussions in the succeeding months, alleviated some of the concerns I initially had about making public statements against James Fields and his associates.

32. In April 2019, I was contacted by plaintiffs' counsel about potentially testifying in this matter. Despite my initial hesitation, I eventually agreed to discuss the possibility of acting as a witness in their civil action.

33. Over the course of multiple conversations, I learned about the nature of plaintiffs' claims in this lawsuit, the extent to which other victims and witnesses had already come forward, and some of the security measures that could help provide safety to parties and witnesses. During these discussions I began to feel more comfortable publicly describing the events of August 12, particularly as I had already testified publicly at the criminal trial.

34. I realized that I have similar claims that I could assert, and I began to consider the possibility of joining the suit against James Fields and his coconspirators. I asked the plaintiffs' lawyers whether it was possible to join the lawsuit as a plaintiff, not just a witness, and what that would entail.

35. By April 2019, my recovery had progressed to the point where I felt capable of undergoing the additional stress and effort that is likely to accompany participating in a lawsuit.

36. After much consideration, in late April 2019, I finally felt adequately recovered, physically, mentally, and emotionally, to seek court permission to join the action against the people who caused my injuries, and I wish to do so now.

37. I am prepared to provide documents and information expeditiously so that I would not slow the progress of discovery or trial preparation for the defendants.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 10 day of July 2019 in Charlottesville, Virginia.

_____
Thomas Baker

9

# EXHIBIT 1

