# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

Civil Action - Law
No. 3:17-cv-00072-NKM
-------------------------------------x

 ELIZABETH SINES, SETH WISPELWEY,    :
 MARISSA BLAIR, TYLER MAGILL,        :
 APRIL MUNIZ, HANNAH PEARCE,         :
 MARCUS MARTIN, NATALIE ROMERO,      :
 CHELSEA ALVARADO, and JOHN DOE,     :
                                     :
            Plaintiffs,              :
                                     :
            - vs -                   :
                                     :
 JASON KESSLER, et al.,              :
                                     :
            Defendants.              :
-------------------------------------x

_____

               Deposition of ELLIOTT KLINE
_____

228 Walnut Street          Wednesday, August 7, 2019
Harrisburg, PA             10:05 a.m.
_____

    IT IS HEREBY STIPULATED and agreed that the
sealing of the within transcript is waived.
    IT IS FURTHER STIPULATED and agreed that all
objections except as to the form of the question
are reserved to the time of trial.
_____

1  your capacity as a member of Identity Evropa,
2  were you also personally represented in this
3  case?
4      A.  Yes.  By -- by Mr. Kolenich, and I
5  guess at the time Mr. Woodard.  But I don't
6  think he is still in the case, or not.
7      Q.  Did you personally pay them?
8      A.  No.
9      Q.  Have you ever personally paid for
10 their representation?
11     A.  No.
12     Q.  Were you involved in retaining them as
13 attorneys?
14     A.  No.  I was told it was all taken care
15 of.
16     Q.  Did you personally communicate with
17 Mr. Kolenich and Mr. Woodard?
18     A.  Yes.
19     Q.  Did you communicate them by --
20 communicate with them by phone?
21     A.  Yes.
22     Q.  Did you speak on the phone with them?
23     A.  Yes.
24     Q.  Did you exchange text messages with
25 them?

1      A.  Just hey, can I call, kind of.  Yes --
2  yes, I am free, or whatever.
3      Q.  Did you use -- did you communicate
4  with them by e-mail?
5      A.  No.
6      Q.  You have never communicated with Mr.
7  Kolenich or Mr. Woodard by e-mail?
8      A.  Not that I -- not that I recall or
9  anything like that.  I think maybe them sending
10 me something like this and me just receiving it.
11 But I don't remember ever -- I never really
12 e-mailed them back, like, anything other than
13 maybe thanks for the document, or something like
14 that.  But I don't use e-mail a lot.
15     So, I don't think -- no, I -- I don't
16 think I ever e-mailed them.  The only thing it
17 would be would be, like, a thanks for the
18 document, or whatever.
19     Q.  When you communicated with Mr.
20 Kolenich and Mr. Woodard by phone, what kind of
21 phone did you use?
22     A.  Just, like, a crappy Walmart phone
23 and, like, an iPhone.
24     Q.  Two phones?
25     A.  I had two different phones over the

1  course of this whole thing.
2      Q.  Did those two phones have different
3  phone numbers?
4      A.  Yes, yes.
5      Q.  Was one of the phone numbers (610)
6  406-2229?
7      A.  Yes, that is the iPhone.  And then the
8  Walmart one was, like, a prepaid phone.  I don't
9  even remember what the number was.  I only used
10 it for, like, maybe four or five months.
11     Q.  When were those four or five months?
12     A.  Umm, it was when I was moving from
13 Virginia back to Pennsylvania.  So, right when I
14 left Identity Evropa.  So, somewhere 2017.
15     Q.  Did you use that prepaid phone during
16 August of 2017?
17     A.  No.  I didn't even have it then.
18     Q.  When was the last time you remember
19 using the prepaid Walmart phone?
20     A.  Umm, like, that summer.  Like I said,
21 I used it from the beginning of the summer,
22 maybe end of spring to the end of 2017 summer.
23 It was just while I was moving, because my
24 iPhone had issues and kept dying, so I just had
25 to get a new phone so I had one.

1      Q.  Your iPhone kept dying so you got a
2  prepaid phone from Walmart?
3      A.  Yeah.
4      Q.  Did the prepaid phone offer text
5  messages?
6      A.  Yes.
7      Q.  Voicemails?
8      A.  Umm, I think so.  Probably.
9      Q.  E-mails?
10     A.  I never set it up or anything like
11 that.
12     Q.  Was your iPhone set up to use e-mails?
13     A.  My iPhone was set up to use one e-mail
14 address.  It was Elliott or
15 EliMosley@IdentityEvropa1.  But when I left the
16 organization, they shut my e-mail off.  So, the
17 only e-mail that was on my phone was that one.
18 And I never had access to it because the account
19 shut down.  Like, I always get pop-ups saying
20 this account doesn't work, or whatever, on my
21 phone.
22     Q.  Your iPhone was only set up to use the
23 Identity Evropa address, but not your Gmail
24 address; is that correct?
25     A.  Correct.  It might have been set up to

MAGNA®
LEGAL SERVICES

1  use other e-mail addresses that were, like, not
2  related to any Alt-Right stuff. Like, one of my
3  e-mail addresses, I think, that might have been
4  used on there was, like, an old one I had from
5  high school I never even used, or anything like
6  that. So, there might be, like, other e-mails
7  on -- e-mail addresses on there. But they were
8  old ones that I don't even use anymore, or
9  didn't have anything to do with Alt-Right stuff.
10     Q. You have other e-mail addresses aside
11  from your Identity Evropa and Gmail addresses
12  that you never used for, quote, Alt-Right stuff?
13     A. Yeah. I mean, like, e-mails from when
14  I was in high school. E-mail addresses when I
15  was in high school and things like that. Or
16  college or in the Army and things like that.
17     Q. Did you ever use those e-mail
18  addresses to discuss Unite the Right?
19     A. No.
20     Q. When was the last time that you
21  remember using your own e-mail addresses?
22     A. Far before I did anything Alt-Right.
23     Q. And approximately when would that be?
24     A. I guess 2015, 2014 would be the very
25  latest. But I didn't start doing Alt-Right

1  stuff until 2016. So --
2     I would say probably it is even
3  earlier than that. I haven't used those e-mail
4  addresses since 2012, 2013, or something like
5  that.
6     Q. When Mr. Kolenich and Mr. Woodard were
7  representing you, there were times when they
8  sent you documents, right?
9     A. Correct.
10     Q. Did they send you documents via
11  e-mail?
12     A. Yes.
13     Q. Did they send you documents via
14  physical U.S. Mail?
15     A. Umm, I don't believe so. I think all
16  the physical documents I have gotten have been
17  from the Court itself.
18     Q. You have received physical documents
19  from the Court, is that correct?
20     A. They get sent to my parents' house.
21  So, whenever I am around or near whatever, I
22  just swing by to pick up my mail, stuff like
23  that. I'll get it from -- I'll get it from them
24  then.
25     Q. How often do you swing by to pick up

1  your mail?
2     A. It is really sporadic. Sometimes it
3  is once a month, sometimes it is multiple times
4  a week I'll be there. It just depends what's
5  going on.
6     Q. You have testified that your parents
7  have contacted you to let you know you have mail
8  waiting for you, right?
9     A. They have done that in the past. They
10  don't always do that though.
11     Q. Do Mr. Kolenich and Mr. Woodard still
12  represent you?
13     A. No.
14     Q. Why do they no longer represent you?
15     A. Because they feel like I wasn't being
16  communicative with them as their -- I guess
17  their side of what happened. From what I
18  understand or what was going on at the time,
19  they -- we were going through the discovery
20  stuff and they asked me -- Mr. Kolenich had
21  asked me to produce things like Twitter accounts
22  that I don't have access to, Facebook accounts,
23  things like that. The discovery stuff.
24     And I had explained to him that I
25  didn't have access to it or anything like that

1  anymore. And then weeks later he called me back
2  and he actually said to me -- or him and a
3  couple other people. I think it was -- what's
4  his name?
5     One of the other members of Identity
6  Evropa had called me and let me know that, hey,
7  they are going to stop this lawsuit, they are
8  ending it, so you got to call the lawyer and let
9  him know if you would be okay with, like, a plea
10  deal or like a -- I don't know, some sort of
11  agreement. So, I said yes to that. And then
12  the week later or two weeks later I found out
13  from a news article that they had filed a motion
14  to remove me.
15     So, I was under the information that I
16  was -- I was being told there was going to be a
17  deal or that the case is going to be done with
18  or I was going to be dropped from it. In
19  reality, I was being dropped as a Defendant from
20  their law -- their legal team, I guess.
21     Q. Who is the other member of Identity
22  Evropa who called you?
23     A. Umm, Patrick Casey.
24     Q. Are you in communication with Patrick
25  Casey?

1    A.  Very, very little.  Umm, I spoke to
2  him a couple weeks ago when originally, umm, you
3  guys had -- I guess there was a hearing on the
4  discovery stuff.  And he called me to let me
5  know, hey, you need to do -- you need to call
6  the lawyer and let him know what's going on.
7      Before that, I hadn't spoken to him
8  for maybe seven or eight months.
9      Q.  When you have communicated with
10  Patrick Casey, has it just been over phone call?
11    A.  Mm-hmm.
12    Q.  Have you texted with him?
13    A.  Umm, yes.
14    Q.  E-mailed with him?
15    A.  No.
16    Q.  When Mr. Kolenich has sent you
17  documents via e-mail, what e-mail address has he
18  used?
19    A.  The same one you guys used, the Eli F.
20  Mosley one --
21    Q.  You have --
22    A.  -- Gmail.com.
23    Q.  You have access to that e-mail
24  address, right?
25    A.  Yes, yes.

1    Q.  Your --
2    A.  I didn't for a long time, because I
3  only had -- I only had access to the e-mail
4  through my phone, and my phone -- that e-mail
5  account will not log in on my phone because of
6  the other account that I said earlier, the
7  Elliott.Kline@IdentityEvropa.com.  That one will
8  not let me sign in another Gmail account.  So, I
9  don't have Gmail on my phone.
10    Q.  Earlier you testified that your
11  Identity Evropa e-mail address was, I believe,
12  EliMosley@IdentityEvropa.com?
13    A.  I believe it was Eli Mosley or
14  Eli.Mosley.  One of the two.
15    Q.  Not Elliott.Kline@IdentityEvropa?
16    A.  I don't think it was Elliott.Kline.
17  It might have been Elliott.Kline as well.  Like
18  I said, I mean, my phone is off right now.  I
19  could try to check it right now.  But, like I
20  said, it is -- I believe they had an at name
21  through, like, Google or something like that.
22  When I got removed from the organization, they
23  deleted the e-mail address without letting me
24  pull that e-mail off my phone.  So, now every
25  time I try to log in, it tells me you can only

1  log in with that e-mail address.  And I don't --
2  it is a dead e-mail address.  There is nothing
3  -- there is nothing I can do with it.
4      (Exhibit 4, Motion in Support of
5  Motion to Withdraw as Counsel, marked for
6  identification.)
7  BY MR. BARKAI:
8    Q.  Mr. Kline, you have been handed
9  Exhibit No. 4.
10      Do you recognize this document?
11    A.  Yes.  This is the document that Mr.
12  Woodard and the other attorneys, that they put
13  together to drop me from the case, as with them
14  as my lawyers.
15    Q.  Do you see where this document states
16  Mr. Kline had been unresponsive to counsel's
17  attempts to communicate throughout this
18  litigation?
19    A.  Yes.
20    Q.  Do you see that the brief states that
21  you refused to answer your counsel's calls or
22  e-mails?
23    A.  Yes, I see that.
24    Q.  Turning to the second page of this
25  document, do you see that you were advised by

1  your counsel to let them know about your
2  availability for a deposition?
3    A.  Yes.
4    Q.  Do you see in Paragraph 6, quote, Mr.
5  Kline's, quote, response, end quote, has been
6  complete and nonresponsive silence, end quote?
7    A.  Yes, I see that.
8    Q.  Do you see in Paragraph 10,
9  undersigned currently do not even know with any
10  certainty how to contact Mr. Kline, quote?
11    A.  Yes.
12    Q.  Were you unresponsive to your
13  counsel's attempts to communicate with you?
14    A.  Umm, this is during the time where I
15  was switching those phones and moving my phones
16  around.  I finally got back to my original
17  number, which was the (610) 406-2229 number.
18  But, yeah, we had serious communication issues
19  for a long time.  We finally -- it finally got
20  worked out when I got my new phone.
21    Q.  Did you ever tell your counsel that
22  you were switching phones?
23    A.  Yes.  They knew that I was having
24  issues the whole time.
25    Q.  Did you continue communicating with

1  your counsel via e-mail while you were having
2  issues communicating via phone?
3       A.  Umm, no.  It was -- it was still all
4  on the phone.
5       Q.  Do you disagree with your counsel's
6  statement that you were completely silent in
7  response to their attempts to communicate with
8  you?
9       A.  Umm, it depends on when it was.  So,
10 yes, sometimes I was silent because I didn't
11 have a phone when they were trying to call me.
12 And other times they would call me and I would
13 pick up the phone right away.  It was depending
14 what was going on with my phone at the time.
15      Q.  Did you ever try to communicate with
16 them some other way, such as borrowing someone
17 else's phone?
18      A.  No.  Because, first of all, I didn't
19 want to get anyone else mixed up in this whole
20 thing, as far as phones go.  The other issue was
21 is I would call -- I would call them, I would
22 leave a message, like, hey, can you call me back
23 at this number, that number, and they would
24 never return that call.
25      So, I originally tried to do something

1  like that, but I didn't get a call back then.
2  They would only really communicate with me on my
3  -- my phone number, the 610 one.
4       Q.  I am going to return to questions
5  regarding your phone a little bit later.
6       A.  Mm-hmm.
7       Q.  Besides Mr. Kolenich and Mr. Woodard,
8  has anyone else given you legal advice in this
9  case?
10      A.  Umm, no, not really.
11      Q.  Has -- when you say not really, has
12 anyone given you --
13      A.  Not official legal advice, no.
14      Q.  Unofficial legal advice?
15      A.  I have spoken to people who are
16 familiar with this type of litigation.  But they
17 are not lawyers or anything like that, just
18 dealing with the business world, I guess.
19      Q.  Have you had any legal training?
20      A.  No.
21      Q.  Who were the people who are familiar
22 with the litigation whom you have spoken to?
23      A.  Umm, people I just -- umm, I am trying
24 to think of how I could explain.  The people I
25 played -- I talk with online, play games with

1  online.  I don't even know their real names.
2  Just people I play games with online that I know
3  one of them owns his own business.  He has had a
4  similar -- like, not a similar lawsuit, but a
5  lawsuit.  I asked him today before I left, hey,
6  what is a deposition like, or whatever.  And he
7  just -- he has been -- he did -- he had a big
8  lawsuit with his company.  So, it was just like
9  that.  Nothing -- I haven't spoken with anybody
10 as, like, legal advice or anything like that.
11      Q.  What is that person's name to whom you
12 spoke?
13      A.  I have no idea.
14      Q.  Do you know what his handle is online?
15      A.  Umm, Char Char Binks.
16      Q.  How do you spell that?
17      A.  I -- Char Char.  So, C-H-A-R C-H-A-R.
18 Then Binks is B-I-N-K-S.
19      Q.  How did you speak to him online?  Was
20 that in a forum of some kind?
21      A.  No, it is just in-game chat.
22      Q.  What game?
23      A.  Umm, a game on Steam called Squad.
24      Q.  So, you spoke to, quote, Char Char
25 Binks in Squad in the game chat about this

1  deposition; is that right?
2       A.  Yeah.  Just in voice chat.
3       Q.  In the voice chat?
4       A.  Yeah.
5       Q.  Have you spoken to others through
6  Squad?
7       A.  No.
8       Q.  How else have you spoken to people
9  online about this lawsuit?
10      A.  Umm, on my original Discord account
11 that got banned, that is the only other kind of
12 communication online that I ever do, was on
13 Discord.  But that got banned.
14      Q.  We'll return to that later as well.
15      Anyone else on Steam?
16      A.  No.
17      Q.  Are chats through Steam saved?
18      A.  It is not a chat.  It is -- it is,
19 like, when you are in the game, you can talk to
20 the person across from you.  It is not, like, a
21 typing chat.  It is just voice communication
22 that is, like, live.  And none of it is saved or
23 anything.  It is just -- like I said, it is just
24 -- we were just shit talking or talking about
25 what's going on in our lives while we are

1     Q.  When were you most recently employed?
2     A.  Umm, I mean, technically by Identity
3  Evropa, I guess.  Most of the work I have been
4  doing was just kind of odd stuff, you know.
5  Because it is really hard for me to find a job
6  right now.
7     Q.  What kind of odd stuff?
8     A.  Like, house sitting, pet sitting.  You
9  know, cleaning cars.  Stuff like that.
10    Q.  Were you being paid for your work for
11  Identity Evropa?
12    A.  Yes.
13    Q.  What kind of work was that you were
14  being paid for?
15    A.  Administrative organizational-type
16  work.  Yeah.
17    Q.  Did administrative organizational-type
18  work involve making documents for Identity
19  Evropa?
20    A.  Umm, yes.  But I wasn't the only -- I
21  wasn't the only one who did it.  Most of the
22  documents that were made were made by Nathan
23  Damingo.
24    Q.  What kind of documents did you make?
25    A.  Umm, I am trying to think of what kind

1  of documents I would have made.  I made things
2  that were sort of, like -- so, after
3  Charlottesville -- I mean, what happened at
4  Charlottesville freaked me out, as far as the
5  violent stuff.  So, I kind of made -- one of the
6  documents I know is -- and I made it with Nathan
7  -- was Identity Evropa moving forward's peaceful
8  protesting and how to, you know, communicate our
9  ideas peacefully kind of thing.
10       Other than that, I can't remember any
11  specific documents other than that one.
12    Q.  Did you make documents before Unite
13  the Right for Identity Evropa?
14    A.  Umm, no.  Not that I -- no.
15    Q.  Where -- where is the document that
16  you remember making saved?
17    A.  The old Discord server, I believe, is
18  the best place to find it, is they -- Identity
19  Evropa had a Discord server where documents and
20  things like that were -- it wasn't documents,
21  yeah.  But mostly it was just people posting
22  things like that on Discord.  And one of those
23  things was the document.
24       I believe Discord deleted the whole
25  server.  But that was after I had already left.

1  So, I don't -- I don't know exactly what the
2  status of the server is.  But I believe -- I
3  have heard they deleted everything.  From the
4  news, actually.  Not even --
5     Q.  So, your testimony is the document was
6  posted on Discord, right?
7     A.  Correct.
8     Q.  Identity Evropa's Discord server?
9     A.  Correct.
10    Q.  Was the document itself made on a
11  computer though?
12    A.  Umm, I think that specific one I made
13  on Google docs, and then sent the Google doc to
14  somebody who made it into a Word document and
15  posted it.  So, it was Google docs on my phone
16  kind of thing on my -- just the Google app or
17  whatever.  With the EliMosley@IdentityEvropa.com
18  Gmail address.
19    Q.  Which e-mail address was that?
20    A.  The @IdentityEvropa one.  So, if it
21  was Eli Mosley, which I think is what it was, or
22  Elliott Kline, whatever it was.
23       I am pretty sure it was
24  EliMosley@IdentityEvropa.com, though.  I made it
25  on that Google documents drive or whatever.

1     Q.  On your phone?
2     A.  Yeah.
3     Q.  Correct?
4     A.  Mm-hmm.
5     Q.  So, you logged into Google docs on
6  your phone --
7     A.  Mm-hmm.
8     Q.  -- and made the document on your
9  phone, right?
10    A.  Yeah.  And it was -- it was a
11  collaborative thing.  There was other people
12  that were adding -- like, other people that were
13  in the organization that were putting it
14  together, or whatever.
15    Q.  Who were the other people who were
16  putting it together?
17    A.  Nathan and Patrick, obviously.  I
18  can't really remember anyone else's names that
19  would have been involved.  But --
20    Q.  Did you communicate with Mr. Damingo
21  and Mr. Casey via e-mail?
22    A.  No.
23    Q.  Via phone call?
24    A.  Yeah.
25    Q.  Via text?

**MAGNA**
LEGAL SERVICES

1  as, like, information that I have retained, the
2  only thing I have left from then is my old cell
3  phone.  It is currently not activated, it is
4  just kind of sitting here.
5      A.  Yes, that is the iPhone.
6      Q.  That is the iPhone whose phone number
7  begins with 610, correct?
8      A.  Correct.
9      Q.  What model iPhone is that?
10     A.  Umm, I have it with me right now.  Let
11 me see.  I don't even know.  iPhone S.
12     Q.  iPhone S?
13     A.  Mm-hmm.
14     Q.  That is what it says on the back?
15     A.  Yeah.  I don't know if it is, like, a
16 six or what.  Doesn't say.  Doesn't say.
17     Q.  You told the Court that it is
18 currently not activated, right?
19     A.  Yes.  It has been reactivated since
20 then specifically for you guys to get your stuff
21 off it or whatever, I guess.
22     Q.  You reactivated the phone?
23     A.  Yes.
24     Q.  When did you do that?
25     A.  Probably a day or two after this phone

1  call.  After -- from Exhibit 5.
2      Q.  A day or two after the July 2
3  hearing --
4      A.  Yes.
5      Q.  -- you reactivated the phone?
6      A.  Yeah.
7      Q.  Are you using that as your main phone
8  now?
9      A.  Right now, yes.  But I am getting a
10 new phone, like, with a new number, new
11 everything.  Because my phone number has been
12 leaked to the public, so I just get phone calls
13 all day, nonstop, from people I don't want to be
14 calling me.
15     Q.  Before you reactivated the phone,
16 where were you keeping it?
17     A.  In my room.  Just -- or with me in my
18 car, wherever I was at.  It just traveled with
19 me.
20     Q.  You were keeping your old phone in the
21 car traveling with you, even though it wasn't
22 activated?
23     A.  Yeah.  For the discovery stuff, so you
24 guys had it, or whatever.
25     Q.  Were you -- strike that.

1      When did you first get that phone?
2      A.  This phone?
3      Q.  Correct.
4      A.  Years ago.  I don't even know how old
5  this phone is.  Probably four years old --
6  four-year-old phone, I would say.
7      Q.  Was that the phone that you were using
8  in the months leading up to Unite the Right?
9      A.  Yes.
10     Q.  Did you use that phone in August of
11 2017?
12     A.  Yes.
13     Q.  And that phone is connected to the
14 phone number (610) 406-2229?
15     A.  Mm-hmm, yes.
16     Q.  How long has that been your phone
17 number?
18     A.  Since middle school.
19     Q.  So, it was your phone number at the
20 time of Unite the Right?
21     A.  Yes.
22     Q.  It is still your phone number?
23     A.  Yes.
24     Q.  Do you have other phone numbers?
25     A.  I will very soon, in the next couple

1  days.  I just signed up for a new phone plan.
2      Q.  Who is your phone provider?
3      A.  AT&T.
4      Q.  Have you bought your new phone yet?
5      A.  Yes.
6      Q.  What kind of new phone did you buy?
7      A.  It is an iPhone.  I don't know what
8  model it is.  I think it is a 10.
9      Q.  Have you received it?
10     A.  I have it.  I just haven't activated
11 it yet.
12     Q.  And you don't have a phone number for
13 that phone yet?
14     A.  No.
15     Q.  You have testified that you use your
16 old iPhone to communicate regarding Unite the
17 Right, right?
18     A.  Yes.  This is the phone I used right
19 here to talk to people during Unite the Right.
20     Q.  Has anyone else used that phone?
21     A.  No.
22     Q.  So, communications that were made
23 using that phone are yours; is that correct?
24     A.  Yes.
25     Q.  How did you use that old cell phone

MAGNA®
LEGAL SERVICES

1  against you, correct?
2     A.  Correct.
3     Q.  Did you ever save any of those e-mails
4  anywhere else?
5     A.  No.  I never thought that I would have
6  to.  I thought it would be on whatever they had,
7  or whatever.  I didn't think I was going to get
8  my access taken away.
9     Q.  Did you ever take any screen shots of
10  any e-mails?
11     A.  No.
12     Q.  Did you ever back up those e-mails
13  onto any external device?
14     A.  No.
15     Q.  Did you ever save any of those e-mails
16  onto any type of cloud service?
17     A.  No.
18     Q.  You testified that you had a weekly
19  phone call with others regarding the planning of
20  Unite the Right, correct?
21     A.  Mm-hmm.
22     Q.  You testified those phone calls
23  including Jason Kessler?
24     A.  Umm, yeah.
25     Q.  Did they include Richard Spencer?

1     A.  Sometimes.  Not often.
2     Q.  Did they include Christopher Cantwell?
3     A.  No.
4     Q.  Did they include James Alex Fields,
5  Jr.?
6     A.  No.  I didn't know who that was until
7  after the whole thing happened.
8     Q.  Did they include members of Vanguard
9  America?
10     A.  Umm, yes.
11     Q.  Which members?
12     A.  I wouldn't know their names.  I
13  wouldn't -- I don't even know the names they
14  went by.  I can't remember their names.  They
15  had a weird leadership thing going on at the
16  time where they were changing leaders.  So,
17  whoever their old leader was, is I assume who it
18  would be.  Not the one that they have now.
19  Whoever it would have been at the time.  Whoever
20  who that is.  I don't remember his name.
21     Q.  Did the weekly phone calls include
22  Andrew Anglin?
23     A.  No.
24     Q.  Did the weekly phone calls include
25  Robert Azzmador Ray?

1     A.  No.
2     Q.  Did they include Mr. Damingo?
3     A.  Umm, no.
4     Q.  Did they include other members of
5  Identity Evropa?
6     A.  Umm, not that I really remember.  Not
7  that I remember specifically.  No.
8     Q.  Did they include Michael Hill?
9     A.  Umm, yes.  From Southern -- League of
10  the South, or whatever, right?  That's who
11  Michael Hill is, correct?
12     Q.  To the best of your recollection.
13     A.  Yeah, I think Michael Hill is from --
14  yeah, yes.
15     Q.  Did they include Matthew Parrott?
16     A.  No.
17     Q.  Did they include Michael Tubbs?
18     A.  I don't know who that is.
19     Q.  Did they include Jeff Schoep?
20     A.  No.
21     Q.  Did they include Agustus Sol Invictus?
22     A.  Sometimes.
23     Q.  Did they include Michael Peinovich,
24  known as Mike Enoch?
25     A.  Umm, no.

1     Q.  Did they include Andrew Anglin?
2     A.  No.
3     Q.  You have testified at -- both today
4  and you told the Court that your old cell phone
5  that you have there on the table has text
6  messages, right?
7     A.  Mm-hmm, yes.
8     Q.  And those text messages include text
9  messages about Unite the Right, correct?
10     A.  Yes.
11     Q.  With whom did you send and receive
12  text messages regarding Unite the Right?
13     A.  Umm, there is -- like I said before,
14  there was very few text messages that I
15  remember.  Most of it was done through Discord.
16  Like, 95 percent or more of our communication
17  was done through Discord.  Like, most of it was.
18        The only time I can think of text
19  messages, umm, being sent would have been when
20  -- I know Friday night was the Torch Rally, the
21  Torch March, and Saturday was the rally.  And I
22  know the -- after what happened at the Torch
23  Rally happened, or Torch March happened, Chris
24  Cantwell texted me and asked if he could call
25  me.  So, there would be a text there.  Then he

**MAGNA**
LEGAL SERVICES

1 called me. Because he wanted to ask me advice
2 on what to do.
3     Q. Besides Mr. Cantwell, with whom --
4     A. That is the only person I can think of
5 from text messages and things like that I would
6 have. There might be more. Like I said, I
7 can't remember anything I would have had.
8     Q. You don't remember a single other text
9 message regarding Unite the Right?
10     A. No. Like I said, most of the time we
11 used Discord.
12     Q. Umm --
13     A. And if it was a text, it would be with
14 -- it would be -- I can't think of -- I can't
15 think of a reason I would text anybody. It was
16 all Discord, pretty much.
17     Q. I am going to ask you again just to go
18 through a list of individuals. I am going to
19 ask you if you exchanged text messages with
20 them.
21     A. Text messages, yeah.
22     Q. Did you exchange -- exchange, excuse
23 me, text messages with Mr. Kessler?
24     A. Yes.
25     Q. You did exchange text messages about

1 Unite the Right with Mr. Kessler?
2     A. Yes. I would say out of all the
3 Discord messages, 95 percent of it was Discord.
4 The rest -- like, any text messages I had were
5 probably with Jason, actually.
6     Q. So, earlier when you testified that
7 Mr. Cantwell was the only person you could think
8 of --
9     A. During the rally, yeah. That was --
10 because I didn't -- communication with me and
11 Jason would have been on the phone during the
12 rally. But during the rally as far as text
13 messages go, during the event or whatever, Chris
14 is the only one I can think of.
15     But, yeah, I communicated before the
16 event with Kessler through text message, yes.
17     Q. Before the event or after the event,
18 did you communicate regarding Unite the Right
19 via text message with Mr. Spencer?
20     A. Yes.
21     Q. With Mr. Anglin?
22     A. No.
23     Q. With Mr. Fields?
24     A. No.
25     Q. With Mr. Ray?

1     A. No.
2     Q. With Mr. Damingo?
3     A. Maybe. I don't know. Maybe. I don't
4 know. I have no idea. I would have to go back
5 through and look.
6     Q. With Mr. Heimbach?
7     A. Umm, yes.
8     Q. With Mr. Parrott?
9     A. No.
10     Q. Mr. Hill?
11     A. No.
12     Q. Mr. Tubbs?
13     A. No.
14     Q. Mr. Schoep?
15     A. Who is Mr. Tubbs? Where is that name
16 at?
17     Q. The name is Michael Tubbs.
18     A. He is a League of the South. Okay.
19 That makes sense. Okay.
20     Q. Mr. Schoep?
21     A. No.
22     Q. Mr. Invictus?
23     A. No.
24     Q. Mr. Peinovich?
25     A. Yes.

1     Q. When you were discussing Unite the
2 Right via text message with certain of these
3 individuals, did you discuss the planning of
4 Unite the Right?
5     A. Umm, mostly just, like, call times or
6 call dates for those weekly calls. Or
7 complaining about, hey, this person's being a
8 jerk or whatever about -- like, hey, they want
9 to do this way or that way, that way is stupid.
10 So, just stuff like that.
11     Q. So, you did discuss the planning of
12 Unite the Right via text message, correct?
13     A. Yes, yes, yes.
14     Q. Did you discuss speakers at Unite the
15 Right?
16     A. Yes. On -- that was mostly Discord.
17 But, yes.
18     Q. Did you discuss who should attend
19 Unite the Right?
20     A. Yes.
21     MR. DiNUCCI: (Inaudible.) --
22 deposition by Plaintiffs' counsel exclusively to
23 the conduct in pretrial discoveries and his
24 efforts to preserve any documents, information,
25 material that are potentially relevant to

1 litigation.
2     I object to the extent we are going
3 beyond the scope of what Judge Hoppe has allowed
4 at deposition. Please proceed.
5     MR. BARKAI: Okay. Going forward, we
6 request that objections not be speaking
7 objections.
8 BY MR. BARKAI:
9     Q. Did you discuss how people should
10 behave at Unite the Right via text message?
11     A. Via text message, no. That was
12 Discord.
13     Q. Did you discuss what you -- what your
14 goals were with Unite the Right?
15     A. On Discord.
16     Q. Via text message?
17     A. No.
18     Q. Did you send and receive text messages
19 regarding the Torch March on August 11?
20     A. Yes.
21     Q. What is the most recent time that you
22 sent a text message about the events in this
23 case?
24     A. Umm, I haven't texted anybody or
25 talked to anybody about the event for almost a

1 year now, really. Like, I haven't spoken to
2 anyone in the Alt-Right, or anything like that.
3     Q. When you were using your old cell
4 phone there that's been reactivated, were you
5 saving or backing up the contents of the phone?
6     A. No. Everything that is on the phone
7 is how it has always been. I haven't deleted
8 anything, I haven't saved it to external, or
9 anything like that.
10     Q. When you say you haven't deleted
11 anything, you have never deleted anything?
12     A. Umm, to make room I might delete,
13 like, photos, like -- you know, photos I have
14 taken of nothing. Like, if you accidentally hit
15 the picture button on the side. But I haven't
16 deleted anything on that phone for as long as I
17 can remember.
18     There is -- I get, like, a notice
19 saying you have not plugged this phone into a
20 computer to back it up for 487 days, or
21 something like that. So, I very -- I don't -- I
22 don't use the phone like that.
23     Q. So, you have not backed up your phone
24 for at least 487 days?
25     A. Something crazy like that I think was

1 the last time. Like I said, I am getting a new
2 phone because this hasn't really worked that
3 well.
4     Q. During that time when you were not
5 backing up your phone, were you saving the
6 contents of the phone somewhere else?
7     A. No.
8     Q. Were you taking screen shots of
9 anything on your phone?
10     A. No.
11     Q. When you said that you might delete
12 photos that you have taken of nothing, have you
13 ever deleted a photo regarding Unite the Right?
14     A. No.
15     Q. Regarding the planning of Unite the
16 Right?
17     A. No, no. Never deleted anything on
18 that phone or anywhere that dealt with anything
19 Unite the Right.
20     Q. Have you ever deleted an e-mail from
21 your phone?
22     A. No.
23     Q. Have you ever deleted a text message
24 from your phone?
25     A. I have deleted a text message from my

1 phone, but not in regards to Unite the Right.
2     Q. Before you stopped using that phone,
3 did you have automatic deletion turned on?
4     A. For -- for what? For text messages?
5     Q. For example, did you have an automatic
6 deletion feature for your text messages turned
7 on?
8     A. No, I don't think so. I think there
9 is text messages in there from years ago. So, I
10 don't think that is a thing on my phone.
11     Q. But you don't know for sure, is that
12 right, whether you had automatic deletion turned
13 on?
14     A. I didn't even know that was a feature,
15 so I am going to say it wasn't on.
16     Q. Has anyone ever instructed you to
17 delete anything relating to Unite the Right?
18     A. No.
19     Q. Have you ever instructed anyone to
20 delete anything related to Unite the Right?
21     A. No.
22     Q. I want to understand now what happened
23 with the phone that you had subsequent to that
24 phone. So, you have testified today that you
25 had a separate Walmart phone, correct?

MAGNA

LEGAL SERVICES

1   A. Yes.
2   Q. Why did you get that Walmart phone?
3   A. It was because this phone was not
4   working at the time. So -- and I kept getting
5   phone calls from people I didn't want to get
6   phone calls from.
7   Q. In what way was that phone not
8   working?
9   A. It wasn't receiving any connection to
10  -- it was water damaged. So, I had to get a
11  part in it replaced, then it was fixed, like, a
12  month or two after it happened.
13  Q. When the phone was damaged by water,
14  was any of the content of it lost?
15  A. No, everything on it was still on it.
16  Q. How do you know?
17  A. Because -- I mean, it might -- stuff
18  might have gotten deleted for all I know. But
19  like I said, I went through it. Everything was
20  fine. All the photos were still there, all the
21  text messages were still there that I -- nothing
22  -- contacts were still there. Nothing changed
23  on the phone. All my apps were still there. No
24  memory change happened on the phone.
25  Q. So, at that time you had two phones.

1   You had the iPhone and you had the Walmart
2   phone, correct?
3   A. Mm-hmm, yes.
4   Q. And how long did you have the Walmart
5   phone for?
6   A. Only maybe two, three months, maybe.
7   Something like that. I don't know. It wasn't
8   very long.
9   Q. When was this?
10  A. It was me leaving Virginia. So, like,
11  a year-and-a-half ago. So -- whenever I left
12  Virginia. So, that would have been 2018, spring
13  of 2018.
14  Q. It was in the spring of 2018 that you
15  had the Walmart phone?
16  A. Spring, summer of 2018. Yeah.
17  Q. When did you stop using the Walmart
18  phone?
19  A. The moment I got this fixed. So, it
20  was -- like I said, it was maybe three months, I
21  would say, if I had to guess, I used that phone.
22  But I didn't really use it that much, the
23  Walmart phone.
24  Q. Mr. Kline, you have testified that you
25  got that phone fixed this year, correct?

1   A. Umm, I have gotten that phone fixed
2   multiple times. This phone -- I got the water
3   damage replaced. That was between, I guess,
4   2018 -- spring, summer of 2018. And then just a
5   couple weeks ago this wasn't working and I got
6   it fixed again. And I just got this new phone
7   that I haven't activated yet.
8   Q. So, in spring of 2018, your iPhone was
9   water damaged?
10  A. Mm-hmm.
11  Q. And you got a Walmart phone, right?
12  A. Correct.
13  Q. You used the Walmart phone for --
14  A. About three months.
15  Q. -- three months. And then -- umm --
16  A. I started using this phone again.
17  Q. Then you started using that phone
18  again, the iPhone that you told the Court about,
19  correct?
20  A. Correct.
21  Q. What happened to the Walmart phone
22  then?
23  A. I still have it. I would have to look
24  exactly where it is at. It somewhere in one of
25  my bags. I have a bunch of boxes from when I

1   moved. It is in one of those.
2   Q. When was the last time you saw the
3   Walmart phone?
4   A. Months ago. Like, three or four
5   months ago. Maybe -- maybe longer.
6   Q. Was the Walmart phone -- is the
7   Walmart phone also a smart phone?
8   A. Umm, I guess technically it is, I
9   think. But I didn't have any of that stuff
10  turned on it, like the internet, browser,
11  anything like that.
12  Q. Which phone number was connected to
13  that Walmart phone?
14  A. I don't remember the phone number for
15  it. I mean, I might have -- I don't even have
16  it -- it is not on. But I don't remember what
17  the phone number for it was. It was a Virginia
18  number. That is all I know.
19  Q. It was not your 610 number?
20  A. No.
21  Q. After your iPhone was fixed, was that
22  then the only phone you were using?
23  A. Correct.
24  Q. When did you stop using that phone?
25  A. The iPhone? This iPhone?

Case 3:17-cv-00072-NKM-JCH   Document 256-3   Filed 08/26/19   Page 12 of 76   Pageid#: 6071

MAGNA
LEGAL SERVICES

1     Q.  When did you stop using the old iPhone
2  that you told the Court about?
3     A.  Umm, just very recently I stopped
4  using it because it stopped working completely
5  and I got it fixed again.  So, maybe couple
6  months ago.  Two, three months ago.  Around the
7  time they -- it was -- it started breaking again
8  around the time they issued this -- this order.
9  So, that would be -- when was this?  Umm, so, in
10  July.  This was July.  So, June, July, and
11  August, this phone was, like, off and on
12  working.
13     Q.  When you got a new phone number, did
14  you tell your attorneys that you had a new phone
15  number?
16     A.  On the old Walmart phone you mean?
17  Yes, yes.  On the Walmart phone.
18     Q.  Your testimony is that when you got
19  your new phone number from Walmart, that you
20  told your attorneys about that phone number,
21  correct?
22     A.  Yes.
23     Q.  But you don't remember that phone
24  number?
25     A.  I don't remember the phone number.  I

1  could figure it out.  But, like I said, my phone
2  is off right here.  I don't think it is even
3  saved on that one.  They might actually have it
4  -- the attorneys might actually have the number.
5     Q.  When you --
6     A.  It should also be on the back of the
7  phone.  But --
8     Q.  That phone is somewhere in your bags
9  or boxes, correct?
10     A.  Yeah, yeah.  Like, I have a bunch of
11  moving boxes.  It is just in one of my moving
12  boxes.
13     Q.  Where are those moving boxes?
14     A.  In a storage shed.
15     Q.  Where is that storage shed?
16     A.  In Reading, where my family is from.
17     Q.  Do you have access to that storage
18  shed?
19     A.  Yeah, yeah.
20     Q.  You have not told the Court about that
21  Walmart phone, correct?
22     A.  No, I haven't been asked about it.
23  Like I said, it was -- it was -- I used it --
24  so, from the time -- that was the time I left
25  the Alt-Right.  So, I was mostly using that

1  phone for my move back to Pennsylvania, as well
2  as trying to find a job and stuff like that.
3  So, there is literally nothing on that phone.
4        I don't think I gave anyone in the
5  Alt-Right that phone number, even.  Just to be
6  clear, like, I did have another phone.  I am not
7  hiding a phone, or whatever.  So, there is not
8  going to be anything on that phone relevant to
9  the case.  But I did have another phone.
10     Q.  Are there text messages on that phone?
11     A.  Yeah, I am sure there are.
12     Q.  Are there communications on that phone
13  with Mr. Kolenich or Mr. Woodard?
14     A.  There might be.  Might be a phone
15  call, yeah.  There might be a phone call.  Maybe
16  a text message, like, saying, hey, can I call
17  you, or something like that.  But I would have
18  to go through and look at it to know exactly
19  what was on it.  But they did have that number.
20     Q.  You told the Court that your iPhone,
21  the one that you have with you today, was,
22  quote, currently not activated, correct?
23     A.  Yeah.  When we had that call a couple
24  weeks ago, it was when it was complete -- I was
25  trying to get the new phone that I have now.

1  But the issue was they wanted me to turn that
2  phone in.  So, I told them, no, I am not turning
3  the phone in.  Because you guys need it, or
4  whatever.
5        So, I had to get a new contract with a
6  new company, a new phone company.  Then I am
7  keeping this one.  I have it activated right now
8  so that you guys can do whatever you need to do.
9  And I haven't activated my newest one yet.
10     Q.  What phone were you using to make the
11  call to the Court?
12     A.  Umm, what phone was that?  Might have
13  been my sister's phone.  I have to check.  I
14  don't know exactly what it was.  It might have
15  been -- might have been my sister's phone.  I am
16  not sure what I was using.
17     Q.  What kind of phone was that?
18     A.  I think she also has an iPhone.
19     Q.  And what phone number is that?
20     A.  I have no idea.  I mean, my phone is
21  off right now.  You have to turn the phones off,
22  so I just have to turn it on.
23     Q.  When we go off the record, we'll ask
24  for the phone numbers and the e-mail addresses,
25  yes.

MAGNA
LEGAL SERVICES

1    A. Okay. Like I said, I don't even know
2  -- I don't know if it was my sister's phone. I
3  used some -- I used someone else's phone that
4  was in my house. We had family over at the
5  time.
6    Q. Do you have access to your sister's
7  phone now?
8    A. No, no.
9    Q. Does your sister still have that
10 phone?
11   A. Yeah.
12   Q. Where is your sister located?
13   A. She goes to college in Kutztown.
14   Q. What is your sister's name?
15   A. Hailey Kline. Like I said, I don't
16 know if that is whose phone I used or not. I
17 think I just used --
18     MR. BLOCH: A month ago.
19     THE WITNESS: Yeah, it was a month
20 ago. I just used -- we had family over because
21 it was summer, or whatever. It was, like, hey,
22 can I use someone's phone, or whatever. I just
23 grabbed it. They were all in the pool. I just
24 grabbed the phone.
25     It was just to call you guys, or

1  whatever.
2  BY MR. BARKAI:
3    Q. Have you had any phones yourself
4  besides the iPhone here and the Walmart phone?
5    A. No. Well, I just got a new phone
6  just, like, two or three days ago, I think it
7  came in the mail. I just haven't activated it
8  yet.
9    Q. The new phone, the old iPhone here,
10 and the Walmart phone?
11   A. Those are the phones, yes.
12   Q. But you also used your sister's phone,
13 for example?
14   A. I used hundreds of people's phones.
15 People for work, and stuff like that.
16   Q. Who else?
17   A. For -- I don't know. Other people for
18 work. I don't know. What do you mean.
19   Q. Who are other people whose phones you
20 have used --
21   A. Umm --
22   Q. -- to discuss this lawsuit and Unite
23 the Right?
24   A. Just that one. Just that one. The
25 phone I grabbed to make the phone call.

1    (Exhibit 6, a photograph, marked for
2  identification.)
3  BY MR. BARKAI:
4    Q. Mr. Mosley, you have been handed a
5  document marked as Exhibit 6.
6    Do you recognize this?
7    A. Yes.
8    Q. What is it?
9    A. It is a picture of me at the Unite the
10 Right rally on my phone.
11   Q. You are speaking on a phone in this
12 photo, correct?
13   A. Yes.
14   Q. Was this on August 12, 2017?
15   A. Yes. It was this phone right here.
16   Q. It is that iPhone that you told the
17 court about?
18   A. Yes.
19   Q. And that you brought with you today?
20   A. Yes.
21   Q. Do you recall this conversation?
22   A. Umm, I think that is me talking with
23 the police, maybe. But I am not entirely sure
24 who it would be at the time. But I am pretty
25 sure that is me talking to the police. Just

1  based on that day I was talking to them, like I
2  said, every five, ten minutes.
3    Q. Do you recall who at the police you
4  were talking to?
5    A. No. It was a female. I can't
6  remember what her name was though.
7    Q. You said that you had conversations
8  with the police every five or ten minutes?
9    A. Yeah. I was constantly in contact
10 with them on what was going on, updating them
11 with what was going on.
12   Q. What exactly were you updating them
13 on?
14   A. Umm, people coming in, the issues we
15 were having. I mean, basically, we had come up
16 with a plan on how everything was going to
17 happen, and they changed it all last minute.
18   Q. Which police department were you
19 speaking with?
20   A. I -- I know at the Torch Rally I was
21 speaking to UVA police. So, the campus police.
22 I know that for a fact. Umm, but the day of, I
23 don't remember exactly who that was I was
24 speaking to. Whoever it was, they told me they
25 were able to speak to multiple different -- I

MAGNA
LEGAL SERVICES

1 guess there was multiple different departments
2 and things like that there, police departments
3 and things. They said they were able to
4 communicate to multiples, to whoever it was.
5 Q. You don't remember whether it was
6 Charlottesville Police?
7 A. No. I think it was, but I am not
8 entirely sure.
9 Q. Or State Police?
10 A. Umm, sounds like to me like that would
11 have been something State Police would do, kind
12 of overseeing everybody. But I don't know for
13 sure who that was.
14 Q. You testified earlier that there were
15 -- that there was, quote, a plan on how
16 everything was going to happen?
17 A. Yes.
18 Q. Right? Are there any documents
19 regarding that plan?
20 A. Yes.
21 Q. What are those documents?
22 A. They are the documents that were
23 already leaked all over the internet. Umm, the
24 planning document that was put on the Discord.
25 Umm, and, like I said, it was leaked everywhere.

1 So, I am sure you guys have seen it or have it.
2 Q. Do you have those documents?
3 A. I mean, I have them on the Google
4 drive for Identity Evropa, or whatever. I don't
5 have physical copies or anything like that.
6 Q. You have never produced any documents
7 regarding those plans, right?
8 A. Umm --
9 Q. To Plaintiffs.
10 A. Oh, no, no.
11 Q. Are there other documents besides what
12 you called, quote, the plan document? Any other
13 documents?
14 A. No.
15 Q. I am going to ask you a couple
16 questions about the use of computers to
17 communicate and make documents regarding Unite
18 the Right.
19 You testified that you -- that you
20 primarily used your iPhone, the iPhone that you
21 have with you here to create documents, right?
22 A. Mm-hmm, yes.
23 Q. Have you ever used a computer to make
24 documents regarding Unite the Right?
25 A. No.

1 Q. Not a single time?
2 A. No.
3 Q. Have you ever used a computer to
4 communicate regarding Unite the Right?
5 A. Umm, maybe Mr. Spencer -- Richard
6 Spencer's computer. Maybe I used his once or
7 twice while I was at his place. But it would
8 have been to either type something up or print
9 something out.
10 Q. When would that have been?
11 A. Leading up to the Unite the Right.
12 So, months before.
13 Q. You testified that it would have been
14 to type something up, right?
15 A. Yeah. Like, not necessarily related
16 to Unite the Right. Like, just typed something
17 unrelated up.
18 Q. Have you ever used Richard Spencer's
19 computer to type something up related to Unite
20 the Right?
21 A. No, I don't think so.
22 Q. You are not sure?
23 A. Umm --
24 MR. DiNUCCI: Objection,
25 characterization.

1 You may answer.
2 THE WITNESS: Not -- I am not sure.
3 BY MR. BARKAI:
4 Q. What were the circumstances under
5 which you were going to Mr. Spencer's --
6 A. I was just at Mr. Spencer's house.
7 Q. -- place?
8 A. And his computer would be out and we
9 were putting movies on or whatever on the TV
10 through his computer.
11 Q. When was that?
12 A. I mean, all the time whenever we would
13 be at his place. So, before Unite the Right or
14 after Unite the Right.
15 Q. In the months leading up to Unite the
16 Right; is that correct?
17 A. Yes.
18 Q. And afterwards?
19 A. Yes.
20 Q. It would have been under those
21 circumstances at Mr. Spencer's house when you
22 may have used a computer to type something up?
23 A. Yes.
24 Q. It may have been related to Unite the
25 Right?

MAGNA
LEGAL SERVICES

1      A. No, I don't think any of it was. The
2  only -- the only document typing or anything
3  like that, creation that I did, was on my Google
4  drive to Google docs, copying it and pasting it
5  and making it into that -- putting it on
6  Discord, was that document explaining the rules
7  and what everyone was doing, the planning
8  document that got leaked.
9          That is the only documents that I made
10 or created for the event.
11     Q. Did you make any promotional
12 materials, such as a poster?
13     A. I didn't make any of that. Somebody
14 else did.
15     Q. Did you discuss with others who made
16 promotional materials, what those materials
17 were?
18     A. I believe Jason Kessler handled all
19 that stuff.
20     Q. When you say somebody else made
21 promotional materials, who would that have been?
22     A. I have no idea who made -- who made
23 the stuff. Like I said, Jason Kessler handled
24 that kind of thing. The promotion, the
25 promotional stuff, the speakers, things like

1  that.
2      Q. Did you write any articles about Unite
3  the Right?
4      A. Articles for what? For -- no, I
5  didn't produce any -- publish any articles or
6  anything like that.
7      Q. Did you write any kind of blog post
8  about Unite the Right?
9      A. Umm, not that I can remember.
10     Q. Have you used a computer to send
11 e-mails regarding Unite the Right?
12     A. Other than the court case stuff, no.
13     Q. But you have used a computer to send
14 e-mails regarding the court case?
15     A. Just, like, responding -- when the
16 phone wasn't working, I would just use, like,
17 whatever computer I could get. Like, I went to
18 a -- I think I went to -- I don't even know what
19 the hell they are called. One of those internet
20 cafe places just to get to my e-mail once. I
21 don't remember where it was. It was in
22 Lancaster City. But it was just trying to get
23 to my e-mail, to e-mail them back.
24     Q. When was that?
25     A. I don't know. Sometime before all the

1  -- before they filed this. So, before July.
2      Q. Which e-mail address would that have
3  been?
4      A. The Eli F. Mosley one.
5      Q. Did you own a computer in 2017?
6      A. Umm, in 2017. So, that is the year of
7  the rally and stuff. Yes, I did. But I didn't
8  -- basically what happened with me was I had
9  gotten let go of my job in late 2016 and I moved
10 down to South Carolina with my girlfriend at the
11 time. I wasn't able to bring any of my stuff,
12 which included my computer and lots of other
13 stuff.
14     Q. What job had you gotten let go of in
15 late 2016?
16     A. I was an HR manager for a company
17 called JC Ehrlich.
18     Q. When you moved down to South Carolina,
19 why were you not able to bring your computer?
20     A. I couldn't fit all my stuff in the
21 car. I just brought my clothes and stuff like
22 that.
23     Q. So, what happened to your computer
24 then?
25     A. It was set in my parents' storage

1  shed, I think. It was -- it was a computer I
2  used for work, for when I had the job at JC
3  Ehrlich.
4      Q. Where is that computer now?
5      A. At my parents' place.
6      Q. Do you use that computer now?
7      A. No.
8      Q. Does the computer still work?
9      A. I think so. Probably.
10     Q. When did you first get that computer?
11     A. Probably 2012.
12     Q. What kind of computer is it?
13     A. Just a -- I don't know, desktop
14 computer.
15     Q. Do you know the brand of computer it
16 is?
17     A. No. I think it is custom -- it is
18 just kind of a Frankenstein machine.
19     Q. You used that computer in 2017, right?
20     A. No, no, no. No. Like I said --
21     Q. Excuse me, you used that computer in
22 2016, right?
23     A. Yes. But it was -- like I said, it
24 was before most of the Alt-Right stuff.
25     Q. When was the last time that you used

MAGNA
LEGAL SERVICES

1  that computer?
2      A.  Late 2016.
3      Q.  It has been sitting in the storage
4  shed since then?
5      A.  Yes.
6      Q.  So, when you moved to South Carolina,
7  you testified that you were not able to bring
8  your computer, right?
9      A.  No, which was why I used my phone.
10      Q.  Did you get another computer once you
11  were in South Carolina?
12      A.  No.
13      Q.  Did you use someone else's computer in
14  South Carolina?
15      A.  The only time I used my computer is
16  when I went to print stuff off, which was, like,
17  rarely, because I didn't -- I didn't need paper
18  when I was down there.  I didn't need anything
19  printed out for me, or whatever.  It wasn't like
20  I was handing it out to anybody down there.
21          So, the only time I had to print
22  something off was -- I had some sort of meeting
23  where I had to be on the phone and I had to look
24  at what I was looking at.  So, I couldn't look
25  at it while I was on the phone.

1      Q.  When was that?
2      A.  Late -- or early 2017.  By the spring,
3  summer 2017, I guess.
4      Q.  So, what computer were you using in
5  2017 then?
6      A.  I wasn't using a computer.  What do
7  you mean?
8      Q.  Well, you testified that in 2017 you
9  had some kind of meeting where you had to be on
10  the phone, that you couldn't look at what was on
11  your phone, so you used a computer to print
12  something.
13      A.  That was the neighbor's computer I
14  said I used to print something off.  I literally
15  just -- all I did was plug my phone into her
16  computer and send it to the printer, or
17  whatever.
18      Q.  You don't know that neighbor's name?
19      A.  I don't remember her name at all, no.
20  I don't even remember -- I don't remember the
21  address we even lived at or anything.
22      Q.  You don't remember the address that
23  you lived at --
24      A.  No.
25      Q.  -- in South Carolina?

1      A.  I was only there for, like, two or
2  three months, then we moved.
3      Q.  Do you remember anything about where
4  you were living in South Carolina?
5      A.  It was in Greenville.  It was on,
6  like, a popular road.  I don't know.  It was on
7  a busy road.  I don't know.
8      Q.  Did you ever use anyone else's
9  computer or your own computer to -- umm, to send
10  e-mails regarding Unite the Right?
11      A.  To send e-mails, no.
12      Q.  You did testify that you used an
13  internet cafe, right, in Lancaster City to send
14  e-mails regarding --
15      A.  That was to check my e-mails, to see
16  if I got anything for this.  And I hadn't.
17      Q.  Have you used anyone else's computer,
18  yours or anyone else's, to check your e-mails to
19  see if you had gotten e-mails regarding this
20  case?
21      A.  No.  Just that one.
22      Q.  What about your neighbor's computer?
23      A.  Umm, no.  That was -- we left there
24  before Unite the Right even happened.
25      Q.  What about Mr. Spencer's computer?

1      A.  Like I said, his computer was always,
2  like, out or whatever, I guess, you can say.
3  Like, I didn't use it for e-mails or anything
4  like that, no.  I never signed into my e-mail
5  address on his computer or anything, no.
6      Q.  What about family members' computers?
7      A.  No.
8      Q.  Does your sister have a computer, for
9  example, that you used?
10      A.  No.
11      Q.  What about to send or check social
12  media messages regarding Unite the Right?  Did
13  you ever use anyone's computer to do that?
14      A.  No, just my cell phone.
15      Q.  Not a single time you can remember
16  using anyone's computer --
17      A.  No.
18      Q.  -- to check --
19      A.  No.
20      Q.  -- or send messages regarding Unite
21  the Right?
22      A.  No.  I always used my phone.
23      Q.  When you used computers to print
24  documents, which documents were those?
25      A.  I don't remember what they were for.

1    I think it was -- I don't remember what it was
2    for.  We had -- we had a phone call and it was
3    about -- might have been about one of Mr.
4    Spencer's speaking engagements.  And it might
5    have been about that we were on the phone for.
6    I don't remember exactly what it was.
7       Q.  What did you do with the document to
8    get it onto the computer from which you printed
9    it?
10       A.  I had it on my phone, my Google drive.
11    I think I -- I don't even -- maybe I didn't even
12    plug it in.  I think I had it on my Google
13    drive.  I got on the neighbor's computer just to
14    hit print.  Just, like, signed -- like, signed
15    in -- I signed in on the account I don't have
16    access to anymore and hit print.
17       Q.  I am going to ask you some questions
18    about your e-mail addresses.
19       A.  Okay.
20       Q.  Now, you have testified that you have
21    used e-mail addresses to discuss Unite the
22    Right, correct?
23       A.  Mostly just the court stuff, the court
24    case stuff.
25       Q.  Umm --

1       A.  I don't think there is any e-mails
2    planning or discussing the actual event.  We
3    didn't use e-mail.  We used Discord.
4       Q.  The e-mail address that would have on
5    it e-mails regarding this case or Unite the
6    Right is Eli.F.Mosley@Gmail.com, correct?
7       A.  Yes.  And I --
8    Eli.Mosley@IdentityEvropa.
9       Q.  Have you used the e-mail address
10    DeplorableTruth@Gmail.com?
11       A.  That is another one, yes.
12       Q.  Would that e-mail address contain
13    e-mails regarding Unite the Right or this case?
14       A.  No.  That is something I used to sign
15    up for, like, free trials and stuff.  That is
16    nothing --
17       Q.  So, your testimony is you did not use
18    the e-mail address, quote,
19    DeplorableTruth@Gmail.com to communicate
20    regarding Unite the Right?
21       A.  No.
22       Q.  Not a single time?
23       A.  No.
24       (Exhibit 7, 6/11/2017 Operation Unite
25    the Right Charlottesville 2.0, marked for

1    identification.)
2    BY MR. BARKAI:
3       Q.  Mr. Kline, you are being handed a
4    document that's been marked Exhibit 7.
5       Do you recognize this document?
6       A.  Yes.  This is the planning document
7    that I referenced earlier.
8       Q.  This is a planning document regarding
9    Operation Unite the Right Charlottesville 2.0;
10    is that right?
11       A.  Correct.
12       Q.  Did you write this document?
13       A.  Yes.
14       Q.  Did anyone else write this document?
15       A.  Umm, I believe Jason might have helped
16    me make this.  But it was mostly me and maybe
17    him editing it.
18       Q.  You wrote this document on your
19    iPhone; is that right?
20       A.  I wrote this and I sent it to
21    somebody.  I don't remember who I sent it to.
22    And they put it in this format like this.
23       Q.  How did you send it to someone else?
24       A.  I had it on the Google drive on my
25    phone.

1       Q.  But when you say you sent it to
2    someone else, how did you, quote, send it?
3       A.  Oh, just send them, like, the share
4    link on Gmail, on Google.
5       Q.  So, you e-mailed a share link; is that
6    right?
7       A.  No.  I hit copy on the link for Gmail,
8    and then pasted it in a Discord message to that
9    person.  Then they clicked it and then they
10    opened it and reformatted it in, I guess, Word,
11    or whatever they use.
12       Q.  Who is that person to whom you sent
13    it?
14       A.  I don't remember who it was.  It would
15    be in Discord --  like, in Discord logs, or
16    whatever.  It was two years ago.  I don't really
17    remember who it was.
18       Q.  When Mr. Kessler edited the document,
19    how did he edit it?
20       A.  I don't know how much he edited it.  I
21    just know I sent these to him before I sent it
22    to anybody else, so he was on the same page.
23       Q.  So, when you say that you shared this
24    document with someone else, were you sharing it
25    with Mr. Kessler or with someone aside from Mr.

MAGNA
LEGAL SERVICES

1  Kessler?
2      A.  So, this was sent out to everybody
3  that was in that Discord, I believe, the Unite
4  the Right Discord.  So, first I would kind of go
5  over what's going on, or, like, the plan or
6  whatever.  Then I would send -- send it to
7  Jason, he would look over it, and be, like, that
8  looks fine, or whatever, then I would post it on
9  Discord, or have someone post it on Discord.
10     Q.  When you wrote this document, you
11 wrote this as a Google doc on your phone; is
12 that right?
13     A.  Yes.  On the Identity Evropa e-mail
14 address, I think that is the one this would be
15 on.  I think so, yeah.
16     Q.  Did you use any other app on your
17 phone to write this?
18     A.  No.  Just the Google docs, or
19 whatever.
20     Q.  Could you please turn to Page 5 of
21 this planning document?
22     A.  Okay.
23     Q.  Do you see under contact information,
24 Eli Mosley - Discord?
25     A.  Mm-hmm.

1      Q.  That sentence?
2      A.  Yes.
3      Q.  Do you recognize that as your contact
4  information?
5      A.  Yeah.  I see that my Deplorable Truth
6  e-mail on there.  I don't think I ever got
7  anything on there.  I think by that time I had
8  started using the Identity Evropa e-mail.  But I
9  don't think I got anything on there.  You guys
10 can check that e-mail, too.  That is still
11 active.  There is nothing on there.
12     Q.  You -- you told people on the Discord
13 server, quote, feel free to message slash call
14 whenever, unquote, correct?
15     A.  Mm-hmm.
16     Q.  And you put on this planning document
17 DeplorableTruth@Gmail.com, correct?
18     A.  And out of putting all that contact
19 information, still 95 percent or more of all
20 communication went to Discord.
21     Q.  But some communication to you came not
22 through Discord, correct?
23     A.  Umm, the only other noncommunication
24 through Discord would have been through Kessler,
25 through text messages.  But no one used my e-mail,

1  and I can't think of a single person who just
2  called me out of the blue.
3      Q.  Your testimony is that you never
4  received a single e-mail at
5  DeplorableTruth@Gmail.com, despite putting this
6  e-mail address here?
7      A.  I don't think so, no.  I can't -- I
8  don't remember a single time responding or
9  getting a single e-mail from anybody on that --
10 on that address.
11     Q.  When --
12     A.  Or any address.  I don't think I
13 e-mailed relating to Unite the Right at all.  I
14 think all my e-mails have been related to the
15 court case stuff.
16     Q.  Earlier I asked you, have you used the
17 e-mail address DeplorableTruth@Gmail.com and you
18 agreed that you had.  And you said that you used
19 that address to sign up for free trials and
20 stuff, correct?
21     A.  Yeah.  Like I said, that was a
22 throwaway e-mail.  That is why I put it there,
23 because I wasn't intending to use it after or
24 anything, you know what I mean?  Because I knew
25 -- I figured this kind of stuff would get out,

1  right.  Like, this document would get leaked,
2  and things like that.  So, I used my throwaway
3  e-mail address to put on there so people didn't
4  contact me.
5      Like I said, I don't think I have
6  gotten anything on that e-mail address about
7  Unite the Right.
8      Q.  But you did put forward that e-mail
9  address --
10     A.  Yes, correct.
11     Q.  -- as an e-mail address that people
12 could use to talk to you --
13     A.  Yes.
14     Q.  -- about Unite the Right, correct?
15     A.  So, nobody -- like I said, I don't
16 think I got any communication from it.
17     Like I said, I have -- this is one of
18 the few accounts I still have access to, I
19 haven't been banned from.  So, you guys are more
20 than welcome to go through that.  There is
21 nothing in there that is -- there is nothing in
22 there that is part of this case though.
23     Q.  Have you deleted any e-mails from
24 DeplorableTruth@Gmail.com?
25     A.  No.

**MAGNA**
LEGAL SERVICES

1     A. Yes.
2     Q. But until today, you never actually
3  provided any of your social media accounts to
4  Plaintiffs, did you?
5     A. I have never been -- when we
6  originally talked on the phone here, I assumed
7  that packet you guys sent me to sign was going
8  to have, like, put in what your accounts are. I
9  have never been asked.
10       Outside of the lawyers -- the lawyer
11  -- what's his name? Umm, what the hell's his
12  name? I always forget his name. Umm, outside
13  of the lawyer that I originally had, there is --
14  no one's asked me to -- like, I have never been
15  given, like, the opportunity to tell you guys or
16  give you guys the accounts, or whatever.
17     Q. You are testifying that you have never
18  been given the opportunity to tell us the
19  accounts?
20     A. Not that I have any awareness of, or
21  anything like that. I have never been given
22  them. Like, I have never received, like --
23  like, a paper in the mail or something that says
24  what's your social media accounts, or I never
25  got any e-mails or anything like that.

1     Q. You just testified outside of the
2  lawyers -- excuse me, outside of the lawyer that
3  I originally had, no one has asked you to give
4  Plaintiffs the accounts.
5       Who is the lawyer that you had?
6     A. Umm, what is his name? I can never
7  remember his name. Kaplan, I think, right?
8     Q. Is that Mr. Kolenich?
9     A. Or Mr. Kolenich, rather. Yes. I
10  think. I don't -- I don't know the names of
11  some of the lawyers.
12       He is literally my friend's lawyer.
13  Umm, so, I don't remember his name all the time.
14  But, yeah, the -- I have never -- like I said, I
15  have never had to, like, give over the account,
16  or whatever. The only times I have even
17  mentioned to the lawyers is explaining to them
18  the status of the accounts. Not even what the
19  specific accounts are.
20     Q. Did Mr. Kolenich inform you that you
21  had been asked to provide Plaintiffs with your
22  social media accounts?
23     A. Yes.
24     Q. Mr. Kolenich did inform you of that?
25     A. Yes.

1     Q. How did he inform you of that?
2     A. He told me that I had to provide that
3  information. Not how to do it, just I had to do
4  it.
5     Q. Did you testify earlier your friend is
6  a lawyer? Did I mishear that?
7     A. Yeah, I don't remember saying --
8     Q. Aside from Mr. Kolenich telling you
9  that you had been asked to provide Plaintiffs
10  with your social media accounts, your testimony
11  is that you were never told by Plaintiffs that
12  you had to provide your social media accounts?
13     A. No, no. That is not -- I am not
14  saying that I wasn't told I have to provide it.
15  I am saying I wasn't given a means to do it.
16     Q. Your testimony is that you were
17  expecting to be given a means to provide your
18  social media accounts and you were never --
19     A. Yeah. Like, tell the computer that's
20  doing the discovery, hey, I am available at this
21  time, or whatever. Like, I never got anything
22  like that.
23     Q. When did Mr. Kolenich tell you that
24  you had been asked to provide Plaintiffs with
25  your social media accounts?

1     A. I don't know. Before that call, a
2  couple weeks before that call. I don't know. I
3  have known that we have had to put this part of
4  discovery for awhile. Like I said, I have never
5  been given the means to do it.
6     Q. You were told a couple weeks before
7  the July 3 call that -- excuse me, the July 2
8  call that you had to provide Plaintiffs with
9  your accounts?
10     A. Yes.
11     Q. And you also have known that this was
12  part of discovery for awhile, right?
13     A. Yes. Like I said, I have never been
14  given the means to do it. Like, where do I go?
15  Who do I give this to? I don't have a lawyer.
16  So, how do I give this information to you guys?
17  I have never been -- I have never been told how
18  to do it, or given anything to actually do it.
19  I have been --
20     Q. Did you --
21     A. I have been waiting for the Court or
22  for somebody, the discovery company, to contact
23  me to get that taken care of. I have never
24  gotten anything.
25     Q. You never received an e-mail from the

MAGNA

LEGAL SERVICES

1　discovery vendor regarding providing your social
2　media accounts?
3　　　A.　They sent me -- basically a release
4　form, but it didn't say, like, list your
5　accounts.
6　　　Q.　You have never received an e-mail from
7　Plaintiffs' counsel regarding how to provide
8　your social media accounts?
9　　　A.　No, not that I -- I mean, if I have
10　received an e-mail like that saying, hey, this
11　is how -- this is how we want you to hand it
12　over, I either completely missed it or misread
13　it or something.　Like I said, I have been
14　looking for something like that.　I never got
15　anything like that.
16　　　Q.　You have never received an e-mail from
17　the Court regarding providing your social media
18　accounts?
19　　　A.　No, not that I can remember.　Not that
20　I -- not that I have.
21　　　Q.　You have never been called about
22　providing your social media accounts?
23　　　A.　No, not that I -- not that I know of.
24　　　Q.　No voicemail has ever been left for
25　you?

1　　　A.　I have had voicemails, but not in
2　regards to discovery.　I have had voicemails
3　saying, hey, there is a conference call
4　tomorrow, you know, show up at this time.　Here
5　is the information.
6　　　　But none -- not that I can remember
7　or, you know, anything like that, did I ever get
8　a call saying, hey, to -- hey, send me a list of
9　your social media accounts and cell phone
10　numbers or whatever.
11　　　Q.　Your testimony is that no one has ever
12　left you a voicemail regarding --
13　　　A.　Not that I remember, no.
14　　　Q.　I need you to stop interrupting me,
15　please.
16　　　　Your testimony is that no one has ever
17　left you voicemail regarding how to provide your
18　social media accounts to Plaintiffs; is that
19　correct?
20　　　A.　Not that I remember, no.
21　　　Q.　Has anyone ever left you a voicemail
22　regarding your obligations in discovery, aside
23　from joining conference calls?
24　　　A.　From the Court, umm, I believe they
25　tried to get in touch with me.　I don't know who

1　it was, tried to get me to call in or whatever.
2　And that is how I got back in touch with
3　everybody, when I got that voicemail.　Other
4　than that, no.
5　　　Q.　You have never received a voicemail
6　from Mr. Bloch regarding your obligations in
7　discovery?
8　　　A.　Not that I remember.
9　　　Q.　Have you ever received a voicemail
10　from Jessica Phillips regarding your obligations
11　in discovery?
12　　　A.　I am not sure who that is.
13　　　Q.　Have you ever received an e-mail from
14　Mr. Bloch regarding your obligations in
15　discovery?
16　　　A.　I think on the Eli F. Mosley account.
17　But I am not sure that it had -- I am not sure
18　it was in regards to how to give them my
19　information.
20　　　Q.　Have you received an e-mail from Miss
21　Phillips regarding your obligations in
22　discovery?
23　　　A.　I am not sure who that is.　I don't
24　remember her, who that is.
25　　　Q.　Have you received an e-mail from the

1　Court regarding your obligations in discovery?
2　　　A.　Umm, other than the Order they sent me
3　that says to sign over -- sign the discovery
4　thing, discovery release, or whatever.　No.
5　After we got off that phone call on July 3, or
6　whatever it was.
7　　　Q.　Have you received an e-mail from Karen
8　Dotson regarding your conduct in discovery?
9　　　A.　I don't -- off the top of my head, I
10　don't know who that is.
11　　　Q.　Have you received a phone call or
12　voicemail from Miss Dotson?
13　　　A.　Again, off the top of my head, I don't
14　know who that is.　I might have.　But I don't --
15　I don't remember who that is.
16　　　Q.　I am going to ask you a few questions
17　about a social media service known as Discord.
18　　　　And you are familiar with that,
19　correct?
20　　　A.　Yes.
21　　　Q.　What is it?
22　　　A.　Umm, it is a mostly voice chat system
23　that you can make your own server on and you can
24　invite people to, and you can have your own chat
25　areas and voice areas and post various things in

**MAGNA**
LEGAL SERVICES

1   primary method of communication regarding Unite
2   the Right.
3       Q. Did you make public posts on Discord?
4       A. Yes.
5       Q. Did you make public posts or send
6   private messages to Jason Kessler?
7       A. Yes.
8       Q. Mr. Spencer?
9       A. Umm, on Discord, no.
10      Q. Mr. Cantwell?
11      A. Discord, no. No.
12      Q. Mr. Fields?
13      A. No.
14      Q. Mr. Anglin?
15      A. No.
16      Q. Mr. Ray?
17      A. No. Umm, wait. Who was Mr. Ray?
18      Q. Robert Azzmador Ray.
19      A. Yes, I did talk to him on Discord.
20      Q. Via public posts or private messages?
21      A. Private messages.
22      Q. When you spoke to Mr. Kessler, was
23  that through public posts or private messages or
24  both?
25      A. Both. Mostly -- mostly private. He

1   is also one of the few people I text messaged.
2       Q. You exchanged text messages with Mr.
3   Kessler?
4       A. Yeah. Like I said earlier, he is one
5   of the few people I actually text.
6       Q. From the 610 phone number?
7       A. Yes.
8       Q. From your iPhone?
9       A. Yes.
10      Q. When we were off the record earlier
11  you said that you were going to check which
12  phone number your Walmart phone that you
13  temporarily had --
14      A. It wasn't in my phone -- it wasn't in
15  my phone book. So, I am going to have to get
16  that out of my storage area or whatever and try
17  to get it out and figure out the number and
18  stuff like that is.
19      Q. This was the phone you were using for
20  several months, right?
21      A. Like, two or three months. Like, a
22  year after Unite the Right.
23      Q. You don't remember the phone number?
24      A. No.
25      Q. Umm --

1       A. Like I said, I only used it to call
2   places for work and get calls back. That was --
3   that was all that was for.
4       Q. Did you exchange Discord messages,
5   whether public or private, with Mr. Damingo?
6       A. Yes.
7       Q. What about Mr. Heimbach?
8       A. Umm, I don't think so.
9       Q. Mr. Parrott?
10      A. No.
11      Q. Mr. Hill?
12      A. Umm, no.
13      Q. Mr. Tubbs?
14      A. No.
15      Q. Mr. Schoep?
16      A. No.
17      Q. Mr. Invictus?
18      A. Uh, maybe. I am not sure.
19      Q. You may have?
20      A. I may have. I remember I had
21  conversations with him. I don't know if it was
22  on Discord.
23      Q. And Mr. Peinovich?
24      A. Umm, no, not on Discord.
25      Q. When you said earlier that you

1   exchanged Discord messages with Mr. Damingo,
2   were those public or private or both?
3       A. Mostly private.
4       Q. You do not have access to Discord
5   today, right?
6       A. No.
7       Q. Because you were banned?
8       A. Yes.
9       Q. Before you were banned from Discord,
10  did you ever save any of your Discord messages
11  anywhere?
12      A. Umm, no. I don't know -- I don't
13  think there is a way to save them, other than a
14  screen shot or something like that. But, no.
15      Q. Did you take any screen shots of any
16  Discord messages?
17      A. No.
18      Q. Did you save any documents that have
19  been circulated on Discord?
20      A. Umm, they might be on my phone. But I
21  don't think -- I think most of the documents
22  that were put out on Discord were ones I made on
23  my Google drive. So, I wouldn't have taken them
24  off. Like, downloaded them off of Discord or
25  anything like that.

1    Q. Did you ask Discord at any time to
2 send you the content of your account?
3    A. I am not -- I don't know --
4    Q. Did you ever contact the company that
5 runs Discord to ask them to send you anything
6 from your account?
7    A. Like, send what though? What do you
8 mean, send stuff from my account?
9       The only communication I had with
10 Discord was they had banned me -- banned my
11 account and I asked them if I could have -- I
12 was an admin on nonpolitical -- it was, like, a
13 gaming community, or whatever. I asked them to
14 switch over the admin when I got banned to
15 somebody else. And they didn't answer me back.
16       But that is the only kind of
17 communication I had with Discord.
18    Q. Your Discord account had messages in
19 it, right?
20    A. Yeah.
21    Q. And it had documents that had been
22 circulated?
23    A. Not -- no. No.
24    Q. But it had messages?
25    A. Yes.

1    Q. Did you ever ask Discord to send you
2 copies of those messages after you were banned?
3    A. No.
4    Q. Do you still have the Discord app on
5 your phone?
6    A. Yes.
7    Q. Before you were banned from Discord,
8 did you delete any Discord messages related to
9 Unite the Right?
10    A. No.
11    Q. Not a single one?
12    A. Nope.
13    Q. Ever?
14    A. No.
15    Q. You told the Court at the July 2
16 hearing that Discord had sent you an e-mail
17 regarding this case, correct?
18    A. Yeah, they had sent me e-mails asking
19 -- this was a long -- this was awhile ago. They
20 asked me if they could send the stuff for
21 discovery, and I e-mailed them back and said
22 yes. And they never e-mailed me back anything.
23 They never -- they never sent anything to me.
24       I think it was -- what other --
25 somebody else sent me an e-mail like that, too.

1 I can't remember who it was. Oh, Twitter, I
2 think sent me an e-mail like that, too. Or
3 somebody forwarded me an e-mail from Twitter
4 with the same idea.
5    Q. Which e-mail address did you receive
6 these e-mails on?
7    A. I think the Eli F. Mosley one.
8    Q. When did Discord send you this e-mail?
9    A. Uh, before I was banned. About two
10 months before I was banned, or a month before I
11 was banned. So, probably the beginning of this
12 summer, end of spring.
13    Q. When were you banned from Discord?
14    A. I don't -- I don't remember. I want
15 to say I was banned in the spring. I think that
16 is when -- I think I was banned in the spring --
17 no, I was banned -- they sent me the e-mail --
18 sent me the message asking about do you want --
19 or can we send the information in. And then,
20 like, a month or two later I was banned.
21       So, I think that was probably the
22 beginning or middle of spring when they asked me
23 if they could do that. And then I think they
24 banned me, like, a month or two later.
25    Q. You told the Court that Discord sent

1 you an e-mail saying, quote, hey, do you want to
2 comply with the discovery of this case, yada,
3 yada, yada, quote.
4    A. Yes. That is -- they basically asked
5 me if I was willing to comply, and I said yes to
6 them. Which I thought at the time -- because it
7 was awhile ago. I thought at the time was part
8 of the means of which I shared the discovery
9 with you guys. Oh, I see what's going to
10 happen, I am going to get e-mails from the
11 companies that my accounts are deleted from.
12    Q. What exactly did you tell Discord in
13 response to this e-mail?
14    A. I have to check to see what the exact
15 e-mail was. I said -- I approved the -- I
16 approved the -- what they asked me.
17    Q. You still have this e-mail in your
18 Gmail account, right?
19    A. Yes.
20    Q. You have no other active account on
21 Discord now?
22    A. Umm, no, I don't. Not that is active.
23 I have an account, but it was one from before,
24 and I just -- I never used it.
25    Q. Which account is that?

1    A. I don't even know the name of it. I
2    think it is -- the name is -- I think it is also
3    Sayer, but I don't know the number for it, or
4    anything like that. It is a really old account.
5    I don't know what it is though.
6    Q. You didn't use it to discuss Unite the
7    Right?
8    A. No. It was, like, an account when
9    Discord first came out.
10   Q. You used Twitter also to communicate
11   regarding Unite the Right, correct?
12   A. Correct, yes.
13   Q. Do you currently have a Twitter
14   username?
15   A. No.
16   Q. Have you used in the past the username
17   That Eli Mosley?
18   A. Yes.
19   Q. Have you used Not Eli Mosley?
20   A. Yes.
21   Q. You testified earlier today that --
22   A. Well, just for the record, the Not Eli
23   Mosley one was hacked. Just so -- that was very
24   -- that was an account that got hacked.
25   Q. When was that hacked?

1    A. I -- it was before Unite the Right, I
2    believe. I don't remember exactly what the
3    timeline was. But they were posting stuff on
4    there that wasn't me, the Not Eli Mosley one.
5    Q. Who hacked it?
6    A. I have no idea. But I was able to
7    delete the account after they were posting
8    whatever.
9    Q. Your testimony is you deleted the Not
10   Eli Mosley account because it was hacked?
11   A. It was either I deleted it or I
12   changed the password, then got banned right
13   after for what the person was posting. That
14   actually might be how it happened. I think
15   that's what happened.
16   So, I think what happened was -- is
17   that the person got ahold of the account
18   somehow, and then was posting stuff. It wasn't
19   me. I deleted those messages and changed the
20   password. But then the account got banned
21   because of the messages that person posted.
22   That was the Not -- I just remember that about
23   the Not Eli Mosley account, that somebody took
24   it.
25   Q. You have been banned from other times,

1    right?
2    A. Probably 30 times. Yeah.
3    Q. Have you ever had a Twitter account
4    that has not been banned?
5    A. No.
6    Q. Not Eli Mosley was not the account
7    that was banned, it was all of your accounts?
8    A. All of my accounts I ever had have
9    been banned. I don't remember them all. Like I
10   said, the only one I know was compromised was
11   that Not Eli Mosley one. All the rest of them,
12   I had access to, I was the only one with access
13   to.
14   Like I said, they were all deleted. I
15   don't remember the names of all of them.
16   Q. You don't have access to any of these
17   Twitter accounts now?
18   A. No. I was removed from all of them.
19   Q. Did you report the hacking of Not Eli
20   Mosley when it occurred?
21   A. No, because I knew Twitter wouldn't
22   care. It was -- I knew from what they posted,
23   they posted some really bad stuff. And I knew
24   right then and there as soon as it was posted
25   the account was going to get deleted anyway.

1    I don't even remember exactly what
2    they said. I just remember reading it and
3    being, like, holy shit, this is the stupidest
4    thing, I can't believe that somebody is posting
5    this. People were calling me and asking me,
6    like, did you post that? It was only up, like,
7    a minute.
8    Q. Who contacted you -- who contacted you
9    to ask if you had posted it?
10   A. I don't know. I think it might have
11   been just friends of mine at the time. I don't
12   remember who it was. Someone saw them on their
13   Twitter feed. They knew I wouldn't have posted
14   it.
15   Q. Have you ever told anyone else that
16   this account was hacked?
17   A. Umm, at the time I told people. But I
18   knew it was another account that was going to
19   get banned. So, it wasn't, like, an important
20   thing.
21   Q. Whom did you tell it had gotten
22   hacked?
23   A. Umm, like I said, I don't know who.
24   Friends at the time, people I would be talking
25   to. I don't know exactly who.

MAGNA®
LEGAL SERVICES

1      Q.  Can you name a single person you told
2  that your account had been hacked?
3      A.  I mean, I probably told Richard, I
4  probably told -- I don't know.  Other people.  I
5  don't know.  Whoever I was with at the time.
6      Q.  Richard, does that refer to Mr.
7  Spencer?
8      A.  Yeah, yeah.
9      Q.  You have used the account EliMosleyIE
10  on Twitter, right?
11      A.  Yes.
12      Q.  Have you used Eli_Mosley_?
13      A.  Uh, Yes.
14      Q.  Have you used Sheli_Shmosley?
15      A.  Yes.
16      Q.  Have you used Eli Mosley?
17      A.  Yes.
18      Q.  Have you used Eli Mosley is Back?
19      A.  Yes.
20      Q.  Have you used EliMosleyOH?
21      A.  Umm -- oh, yes.
22      Q.  Have I named -- excuse me.  Are there
23  any other Twitter usernames besides the
24  usernames that I have named that you have used?
25      A.  I am sure there are, but not that I

1  remember the names of.  There are more
2  transformations of Eli and Eli Mosley or
3  whatever.  But none that I remember.
4      Q.  There are other Twitter usernames that
5  feature the name Eli Mosley in some form?
6      A.  I am sure there are.  But, like I
7  said, I don't know what they would be.  As you
8  can see, that list -- you can't differentiate
9  between one or the other usually.  So, it is
10  kind of hard to remember them all.
11      Q.  You had a password for each Twitter
12  account, right?
13      A.  Uh, Yes.
14      Q.  Did anyone else have those passwords?
15      A.  No.
16      Q.  Did anyone else use your Twitter
17  accounts?
18      A.  No.
19      Q.  So, would you agree that the messages
20  posted on Twitter were posted by you?
21      A.  Yes.  Except for the Not Eli Mosley
22  account.
23      Q.  Other than the Not Eli Mosley account,
24  which you have testified was hacked, would you
25  agree that the messages posted on Twitter under

1  each of the other usernames were posted by you?
2      A.  Yes.
3      Q.  Which device did you use to post
4  messages on Twitter?
5      A.  My iPhone.
6      Q.  Did you ever use anything aside from
7  your iPhone?
8      A.  No.
9      Q.  Now, you told the Court that you did
10  not sign up for Twitter with your real e-mail
11  address, but that you used burner e-mails,
12  right?
13      A.  Yes.  I don't even know -- go ahead.
14      Q.  What is a burner e-mail?
15      A.  You can go on, like, a website and
16  say, hey, I need an e-mail address to confirm an
17  account.  And they'll give you like random
18  letters and numbers together, and they'll say
19  here, this is going to be an e-mail for ten
20  minutes.  And then you sign up for the Twitter
21  account or whatever it is, you get your
22  activation code, put it in.  Then that e-mail,
23  you just don't ever use it again.
24          So, it is -- like I said, it is like a
25  burner phone, but for an e-mail.

1      Q.  You told the Court that the burner
2  e-mails were, quote, not real e-mail addresses?
3      A.  Correct.
4      Q.  When you were referring to, quote,
5  real e-mail addresses, are there any others
6  besides the ones we discussed today,
7  Eli.F.Mosley@Gmail.com,
8  DeplorableTruth@Gmail.com, and your Identity
9  Evropa e-mail address?
10      A.  No.
11      Q.  Those are the only three you have?
12      A.  Correct.
13      Q.  Does Identity Evropa have its own
14  Twitter account?
15      A.  I don't believe it does anymore.  I
16  think it did at one point.
17      Q.  Did you administer that Twitter
18  account?
19      A.  No.
20      Q.  You told the Court that you were,
21  quote, more than happy to go through with the
22  process so that Twitter could hand over
23  information to the Court, right?
24      A.  Yes.
25      Q.  You haven't actually executed anything

1  to enable Twitter to hand over information to
2  the Court, right?
3      A. Well, I haven't been asked anything or
4  given anything. If I had a document right now
5  from Twitter saying, hey, can we hand over the
6  information or whatever, I would sign it right
7  now and give it to you guys.
8      Q. Aside from a document right now from
9  Twitter, in your words, your testimony is that
10  you have never been given any means of handing
11  over information to the Court from Twitter?
12      A. No.
13      Q. Before you were banned from all of
14  your Twitter accounts, did you save any of the
15  tweets for your accounts?
16      A. No.
17      Q. Did you ever take any screen shots of
18  the messages?
19      A. Not that I know of. Not that I know
20  of.
21      Q. Not that you know of?
22      A. No.
23      Q. You have never taken any screen shots
24  of your messages?
25      A. Not that I know of, no. Not that I

1  can -- nothing that stands out, whatever.
2  Nothing I can remember, or anything like that.
3      Q. Is it possible that you have taken a
4  screen shot of your Twitter messages?
5      A. If I did, it would be on my phone.
6  So --
7      Q. It would be on your iPhone?
8      A. Yes.
9      Q. Did you delete tweets from your
10  Twitter accounts before you were banned?
11      A. Oh, yeah.
12      Q. Did those relate to Unite the Right?
13      A. No. It was mostly tweets, like, where
14  I -- I tweeted I didn't want to get banned for,
15  or something like that.
16      Q. Why would you get banned for the
17  tweets that you deleted?
18      A. Oh, I -- the Twitter's policy was to
19  ban anyone who was Alt-Right, or not even
20  Alt-Right, you know, at the time. So, they were
21  banning anyone. So, any kind of hint at that
22  kind of thing.
23      Q. So, you deleted tweets that had a hint
24  of Alt-Right; is that accurate?
25      A. No. I would say the only time I would

1  delete tweets is when I would think they would
2  get me banned from Twitter. But I wasn't
3  someone who deleted a lot of tweets, either.
4      You asked if I deleted any tweets.
5  Yes, I did. The reason was because I didn't
6  want to get banned. But I don't know which ones
7  there were or how many. It wasn't very many, I
8  know that. That was from before Unite the
9  Right. Because I got -- I got banned from
10  Twitter, umm, the day after Unite the Right, and
11  I didn't get a new account for maybe a month or
12  two. Like, awhile, if I remember correctly.
13  So --
14      Q. What was the -- what was the account
15  that you had after Unite the Right?
16      A. I believe it went -- I am not entirely
17  sure. But I think it went -- I don't even have
18  my Twitter on the contact me page. So, my
19  Twitter account was banned before it even
20  happened -- like, Unite the Right even happened.
21  But I don't know which account would be right
22  afterwards. Maybe -- I don't know. Maybe
23  Sheli_Shmosley. That is a guess.
24      Q. Your Twitter account was banned before
25  the Unite the Right?

1      A. Yeah. That is why there is no -- that
2  is why there is no Twitter account in the
3  contact me spot.
4      Q. So, you did not have a Twitter account
5  operating at the time of Unite the Right?
6      A. No. I mean, I don't think it's -- I
7  don't think I did, and that is why I don't have
8  my Twitter listed as a contact for me.
9      Or perhaps when this document was
10  made, it was banned. Because this is -- this
11  document is from 6/18. So, this is two months
12  before Unite the Right. So, maybe it was banned
13  two months before Unite the Right, but I had one
14  during Unite the Right. I don't remember.
15      (Exhibit 8, 8/10/2017 Operation Unite
16  the Right Charlottesville 2.0, marked for
17  identification.)
18  BY MR. BARKAI:
19      Q. You are being handed an exhibit marked
20  as Exhibit 8. Is this another version of the
21  planning document that we have seen before?
22      A. Yeah. This is, the, umm -- the one, I
23  think, that is right before. Yes. Yes, this is
24  the one, I think, was right before. So, yes, I
25  did have a Twitter account, it looks like. So,

MAGNA
LEGAL SERVICES

1  it would have been Not Eli Mosley.
2      Q.  So, that was the Twitter account that
3  you had at the time of Unite the Right, correct?
4      A.  Correct, yes.  So, this other one was
5  from two months before.  Clearly my account was
6  banned.  Not Eli Mosley would be the new one.
7      Q.  You have no active account on Twitter
8  right now; is that true?
9      A.  No, I haven't had one for probably two
10 years, or a year-and-a-half.
11     Q.  Do you see the top of this version of
12 the operational documents, which is Exhibit 8,
13 do you see the sentence this version of the
14 document is to only be shared in extremely
15 vetted circles, do not post on social media?
16     A.  Yes.
17     Q.  What were the extremely vetted circles
18 in which this document was shared?
19     A.  Well, looking back, that is kind of a
20 joke.  It was meant to be logistical.
21         MR. DiNUCCI:  Note my objection from
22 earlier based on Judge Hoppe's Order.  Thank
23 you.
24 BY MR. BARKAI:
25     Q.  You may answer.

1      A.  It was just the, umm -- it was just
2  Discord, is what it meant.  Discord was supposed
3  to have people vetted before they could join it.
4  So, that is what I was talking about.
5      Q.  How is the document shared within
6  Discord?
7      A.  Just post it.  Like you would on
8  Facebook or -- just put it in a channel.
9      Q.  Who posted it?
10     A.  Umm, maybe me.  But I don't know.
11 Like I said, the way I made these, is I made
12 them on Google drive and I sent them to somebody
13 usually.  I don't remember who each one.  Some
14 -- each one was different.  They would format it
15 like this.  Then either they would post it, or I
16 would -- they would send it back to me and I
17 would post it.
18     Q.  How many versions of this document did
19 you make?
20     A.  Umm, probably five or six.  And they
21 were all posted in Discord.
22     Q.  You made five or six versions of this
23 document?
24     A.  Yes.
25     Q.  This document is several pages long,

1  correct?
2      A.  Yes.
3      Q.  This document appears to be nine pages
4  long, right?
5      A.  Yeah.  The final one was really long.
6  Yeah.
7      Q.  The final version was very long?
8      A.  Yes.
9      Q.  You typed out these very long
10 documents on your phone?
11     A.  Yes.  It was mostly editing old stuff
12 and changing it out.  It wasn't like I made it
13 all at once.  It was, oh, I dealt with this part
14 of this, let me type this part up.  And then,
15 you know, save another document, or whatever.
16 Oh, I fixed -- this part needs to change.  It
17 was kind of, like, a living document, I guess
18 you could say.
19     Q.  So, you had one version of the
20 document that you edited?
21     A.  Yes, yes.
22     Q.  You did not create multiple documents?
23     A.  Correct.
24     Q.  And, again, you did all this on your
25 phone?

1      A.  Yes.
2      Q.  When you -- strike that.
3         At the top of this page, Page 1 of
4  Exhibit 8, do you see reported version
5  8/10/2017, general orders?
6      A.  Yes.
7      Q.  What are general orders?
8      A.  Just like the general -- the way
9  people were supposed to behave and act at the
10 thing, which basically no one followed, as most
11 people can tell.  This thing clearly outlines
12 that people aren't supposed to be violent and
13 that -- basically this whole document wasn't
14 followed from the beginning to end.
15     Q.  You also used Facebook to communicate
16 about Unite the Right, correct?
17     A.  Yes.
18     Q.  Which is -- what is your Facebook
19 username?
20     A.  I was banned from Facebook as well,
21 and I don't know what the name of the account or
22 -- is it -- I think Facebook is saved by e-mail
23 address, if I am not mistaken.  But I don't know
24 what e-mail address I would have been using.
25     Q.  Would it have been

MAGNA
LEGAL SERVICES

1  discuss Unite the Right before Unite the Right
2  occurred?
3      A. Yes.
4      Q. Did you meet in person with Mr. -- did
5  you meet in person with Mr. Cantwell to discuss
6  Unite the Right before Unite the Right occurred?
7      A. No.
8      (Exhibit 10, Plaintiffs' Corrected
9  First Set of Requests for Production of
10  Documents to all Defendants, marked for
11  identification.)
12  BY MR. BARKAI:
13      Q. Mr. Kline, you have been handed a
14  document marked Exhibit 10.
15      Do you recognize this document?
16      A. No, I don't.
17      Q. You have never seen this before?
18      A. No.
19      Q. This has never been provided to you
20  before?
21      A. Not that I have seen, no. I have
22  never seen this. Especially this appendix at
23  the back.
24      Q. This has never been e-mailed to you?
25      A. It might have, but I don't -- I don't

1  recall seeing this ever.
2      Q. Do you see that this document is
3  called Plaintiffs' Corrected First Set of
4  Requests for Production of Documents to all
5  Defendants?
6      A. Yes.
7      Q. Do you understand all Defendants to
8  include us?
9      A. Yes.
10      Q. This is the first time you have
11  received this document?
12      A. Umm --
13      Q. That is your testimony?
14      A. I might have gotten in e-mail. But I
15  don't -- I never -- I don't remember seeing this
16  ever, no.
17      Q. You might have received it in an
18  e-mail; is that right?
19      A. I might have. But I have never seen
20  this. I have never seen this, no. I would have
21  remembered the -- the table at the back.
22      (Exhibit 11, 7/1/2019 Bloch e-mail,
23  marked for identification.)
24  BY MR. BARKAI:
25      Q. You are being given, Mr. Kline, a

1  document marked as Exhibit 11.
2      Do you recognize this document?
3      A. This is the -- is this the -- maybe I
4  haven't seen this. This was sent before our
5  call, is what this shows. I might have received
6  this, but I don't really remember what the
7  context of it is. I think this was -- I am not
8  exactly sure what this was.
9      Q. Do you see that it is an e-mail
10  addressed to you?
11      A. Yes.
12      Q. Do you see that it is addressed to
13  Eli.F.Mosley@Gmail.com?
14      A. Yes.
15      Q. Is that you?
16      A. Yes.
17      Q. You are not sure whether you received
18  this e-mail?
19      A. I mean, I am assuming I did receive
20  it. I don't remember reading through this.
21  But, umm, I just noticed it was the day before
22  that call. So, I should have seen it when I
23  went through.
24      Q. But you are not sure if you read it?
25      A. Correct.

1      Q. Could you turn to what you have in
2  front of you as Exhibit 5, please, on Page 21?
3      A. Okay.
4      Q. Do you see where the Judge in the
5  middle of Page 21, Line 14, asks you, Mr. Kline,
6  did you receive that e-mail?
7      A. Yeah, I think I was at the time
8  scanning through a different document than this
9  one. Because this one has -- it is formatted
10  totally differently than what I was scanning
11  through at that time.
12      Q. Aside from the fact that it was
13  formatted entirely differently --
14      A. I just remember the one that I had
15  read -- the one that I had gotten -- or that I
16  read through, or whatever, was, like, a -- it
17  was a DocuSign document that I was talking about
18  here. It wasn't like this, if that makes sense.
19      Q. Putting aside the DocuSign contract,
20  this is an e-mail that was sent to you at
21  Eli.F.Mosley@Gmail.com on July 1, 2019, right?
22      A. Yes.
23      Q. Your testimony is that you have never
24  received this e-mail before? Or if you have,
25  you never read it?

MAGNA⊗
LEGAL SERVICES

1      A.  Correct.
2      Q.  So, you did receive this e-mail?
3      A.  I don't know.  But if I did, I haven't
4  read it.
5      Q.  Okay.  So, if you did receive this,
6  you didn't read it?
7      A.  Correct.  I don't know -- I don't know
8  if I did receive it or not.
9      Q.  Do you see in the attachments on this
10  exhibit, at the end of the list of attachments,
11  Plaintiffs' Corrected First Set of Document
12  Requests.pdf?
13      A.  Yeah -- see -- that is another --
14  yeah, no.  I do see that.  But, like I said, I
15  don't -- I don't think I went through this
16  e-mail.  This is exactly what I was talking
17  about earlier when you guys -- I said I didn't
18  have the means to give it.  That's what this
19  looks like.  It looks like a PDF I could have
20  just filled out, which I obviously would have
21  done.
22      But I didn't -- I didn't -- I don't
23  think I read through this, or I would have done
24  that.
25      Q.  Turning back to what you have in front

1  of you as Exhibit 10, you did receive this set
2  of Requests for Production, correct?
3      A.  Umm, is this the one with the table at
4  the end?  I don't recognize this one, either,
5  no.
6      Q.  Putting aside whether you recognize it
7  right now or not, you were e-mailed this
8  document on July 1, 2019, right?
9      A.  Maybe.  I don't know.  I have no way
10  of confirming that.
11      I mean, was this sent with this?
12  Because then, yeah, because it says July 1 on
13  it.  But this doesn't have a date on it.
14      Q.  On Exhibit 11, do you see that the
15  e-mail attached Plaintiffs' Corrected First Set
16  of Documents.pdf?
17      A.  Yes.  Is that what this is?
18      Q.  Do you see on Exhibit 10 the document
19  is titled Plaintiffs' Corrected First Set of
20  Requests for Production of Documents to all
21  Defendants?
22      A.  Yes.  I never seen either of these
23  then, yeah.
24      Q.  But they were e-mailed to your e-mail
25  address?

1      A.  I mean, it says they were.  But I
2  didn't read it.
3      Q.  At the end of these Requests for
4  Production, the date on Page 10 is January 25,
5  2018, right?
6      A.  Okay.
7      Q.  Do you see that?
8      A.  Yes.
9      Q.  So, the first time that these requests
10  were first issued was in January 2018, right?
11      A.  Okay, yes.
12      Q.  On the first page of Exhibit 10, do
13  you see that the deadline to respond to these
14  was 30 days from when they were served?
15      A.  Correct.  But I didn't -- like I said,
16  I haven't seen these documents.  But that makes
17  sense.
18      Q.  You haven't responded to these
19  Requests for Production, right?
20      A.  No.  Because I haven't -- like I said,
21  I haven't read through them.
22      Q.  You haven't produced a document to
23  Plaintiffs before --
24      A.  No.  But I am more than happy -- I am
25  more than happy to.

1      Q.  Putting aside -- putting that aside,
2  you have not produced a document to Plaintiffs,
3  correct?
4      A.  No.  I would like to.
5      Q.  Why was it that you didn't provide
6  Plaintiffs with any documents?
7      A.  I didn't -- I didn't read through -- I
8  didn't see this -- that's what these were.
9  Because I get so many e-mails from these, they
10  must have gotten mixed up with some other ones.
11      Every time somebody makes a -- does
12  anything in the case, I get an e-mail.  So, I
13  thought that -- these might -- this might have
14  been attached to something else when it was
15  first sent.  I don't know.
16      Q.  Did you hear about these Requests for
17  Production at any time?
18      A.  What do you mean, hear?
19      Q.  Did anyone ever tell you about these
20  Requests for Production?
21      A.  Umm, originally the lawyer told me,
22  and I explained to him the situation with my
23  accounts being banned and things like that.  But
24  other than that, no.
25      Q.  When you say the lawyer, who are you

MAGNA
LEGAL SERVICES

1  referring to?
2      A.  The original lawyer I had with Mr.
3  Almer.  That is -- the lawyer that Identity
4  Evropa has.
5      Q.  Are you referring to Mr. Kolenich?
6      A.  Yes.
7      Q.  So, Mr. Kolenich did tell you about
8  these Requests for Production?
9      A.  Umm, yeah.  He told me about them.  He
10  didn't tell me how I would actually go about
11  doing -- turning them in.
12      Q.  When did he tell you about them?
13      A.  Umm, well, he originally told me when
14  he explained to me that they were going to be
15  filing a motion against him, I guess, or a
16  motion against certain parts -- parts.
17      Q.  That was the only time that he ever
18  told you about these Requests for Production?
19      A.  Umm, maybe once more.  Just -- nothing
20  I can think of, like, specific.  Like, hey, you
21  got to send this in or anything like that, no.
22      Q.  Your testimony is that he never told
23  you that you would have to submit documents?
24      A.  He did.  But, like I said, the first
25  time we spoke about it, he was saying that we

1  were going to be filing a motion to get rid of
2  them or do whatever with them.  I don't remember
3  what it was.
4      And then I never got anything else
5  about it, I guess.  He has talked to me about it
6  before.  But it wasn't, like, hey, I need you to
7  fill out this form and, like, hand it in to
8  them, or whatever.
9      Q.  He never told you you had to fill out
10  a form?
11      A.  No, nothing specific like that.
12  Because it would have been done.
13      Q.  If you had ever been told to fill out
14  a form, you would have done it?
15      A.  Yes.  If there was ever a form that I
16  was -- someone would have called me or e-mailed
17  me and said, hey, if you fill this out with
18  whatever your e-mails are, I would have done it.
19      That's what this looks like, the
20  Exhibit 11.  That's what this looks like.  But,
21  like I said, I have never seen this.
22      Q.  But no one ever called or e-mailed you
23  to ask you to fill out a form with e-mails; is
24  that right?
25      A.  No, no.

1      Q.  Do you see on Page 3 of Exhibit No. 10
2  the definition of events?
3      A.  Yeah, I see that.
4      Q.  So, events has a definition that means
5  the activities described in Paragraphs 45 to 335
6  of the Complaint, right?
7      A.  Yes.
8      Q.  Do you understand that events includes
9  Unite the Right?
10      A.  Yes.
11      Q.  Do you know what the protests in
12  Berkeley in 2017 were?
13      A.  Oh, yeah.  Yes.
14      Q.  Including the Battle of Berkeley?
15      A.  Yes.
16      Q.  Were you present for any of those?
17      A.  No.
18      Q.  Do you understand that those events
19  are included within the definition of events?
20      A.  I didn't realize that, no.
21      Q.  You know what Charlottesville 1.0 was,
22  right?
23      A.  Yes.
24      Q.  Were you present there?
25      A.  Yes.

1      Q.  Do you understand that the definition
2  of events in the Request for Production means
3  activities before Unite the Right, not just
4  Unite the Right itself?
5      A.  Yes, yes.  Like I said, I just didn't
6  know that Berkeley was part of that.  But --
7      Q.  Do you understand that the definition
8  of events includes Charlottesville 1.0?
9      A.  Yes, I knew that.
10      Q.  Do you know what the KKK rally in July
11  of 2017 in Charlottesville was?
12      A.  I knew what it was, yes.
13      Q.  Were you there?
14      A.  No.
15      Q.  Do you understand that the KKK rally
16  would also be included in the definition of
17  events?
18      A.  Yes.  I had no contact with them.
19      Q.  Do you know what the Torch March on
20  August 11 was?
21      A.  Yes.
22      Q.  You were present, right?
23      A.  Yes.
24      Q.  Do you understand that the Torch
25  March is also included in the definition of

MAGNA
LEGAL SERVICES

1   events --
2     A. Yes.
3     Q. -- in the Complaint?
4       Turning to Page 5 of Exhibit No. 10,
5   please. Do you see Paragraph G at the bottom of
6   that page?
7     A. Yes.
8     Q. Do you see that Paragraph G states
9   whether or not you object, you must preserve all
10  documents and communications relevant to the
11  lawsuit, including all documents and
12  communications responsive to these requests?
13     A. Yep.
14     Q. Have you read that before?
15     A. Uh, not here on this page. But I
16  think there was another one where I did read,
17  like, that you can't dispose of or get rid of
18  anything, which is why I kept the phone and all
19  that other stuff.
20     Q. Did your attorney speak to you
21  about --
22     A. Yes.
23     Q. -- that requirement?
24     A. Yes.
25     Q. Was that Mr. Kolenich?

1     A. Yes.
2     Q. When did he speak to you about that
3  requirement?
4     A. When I first started working with him.
5  So, probably before this was even sent out. So,
6  before January 2018.
7     Q. Would that have been in October of
8  2017?
9     A. Yeah, probably.
10     Q. You were instructed to preserve all
11  documents, right?
12     A. Yes.
13     Q. Do you understand that that means you
14  are obligated to keep all documents and
15  communications relevant to the case?
16     A. Yes.
17     Q. Do you understand that you are
18  obligated not to delete anything?
19     A. Yes.
20     Q. Not to delete anything relevant to the
21  case, that is?
22     A. Yes.
23     Q. Have you taken any steps to make sure
24  that all documents and communications relative
25  to the lawsuit are preserved?

1     A. Well, I kept my cell phone when it was
2  broken, and I fixed it when it was broken. Umm,
3  but that is really the only thing I have -- any
4  information I can retrieve, other than the
5  social media accounts.
6     Q. You have never backed up any of your
7  documents to a separate device, right?
8     A. No, no.
9     Q. You never turned on any kind of cloud
10  back up?
11     A. No.
12     Q. You never made any screen shots of any
13  of your messages?
14     A. No.
15     Q. You never forwarded any of your
16  messages to anyone else?
17     A. No.
18     Q. Did you ever make any copies of any of
19  the information relevant to Unite the Right?
20     A. No.
21     Q. Did you store your broken iPhone in
22  any kind of secure location?
23     A. No.
24     Q. Did you store your Walmart phone in
25  any kind of secure location?

1     A. No.
2     Q. Your iPhone was water damaged, right?
3     A. Correct.
4     Q. How did that water damage occur?
5     A. I think it was literally raining one
6  night and I was outside, coming home. And it
7  was in my back pocket and it got wet.
8     Q. On Page 8 of this Exhibit No. 10, do
9  you see the Request for Production No. 1
10  requests all documents and communications
11  concerning the events?
12     A. Yes.
13     Q. Do you see there is a list of
14  different types of documents and communications
15  which are included as examples?
16     A. Yes.
17     Q. Do you understand that you are
18  obligated to produce to Plaintiffs all documents
19  and communications you have in your possession
20  concerning the events?
21     A. Yes.
22     Q. And you have at various times had
23  documents and communications concerning the
24  events, right?
25     A. Yes.

MAGNA
LEGAL SERVICES

1    Q. You have never produced any of those
2  to Plaintiffs, right?
3    A. No. But I would like to, using the
4  PDF or whatever you guys have that looks like
5  from this e-mail.
6    Q. You are ready to do that today?
7    A. Yes.
8    Q. You are ready to turn over your
9  devices --
10   A. Umm --
11   Q. -- for imaging?
12   A. I could turn the -- I would like to
13 not do the cell phone today, just because I use
14 it to get home on GPS. I have somewhere to go
15 that I am not familiar with. But I could, like,
16 do it right after I get home and activate the
17 new cell phone I just got.
18   Q. You are ready to provide consents for
19 social media accounts --
20   A. Yes.
21   Q. -- to be disclosed?
22   A. Yes.
23   Q. Did you ever at any time have
24 documents and communications relevant to the
25 events in the Complaint that you no longer have?

1    A. No.
2    Q. Do you see Request for Production No.
3  2 at the bottom of Page 8 of this document?
4    A. Number -- okay, I see that, yes.
5    Q. Do you see that it asks there for you
6  to produce all documents and communications
7  concerning events, meetings, rallies,
8  conferences, or conversations held prior to the
9  events that relate to the events in any way?
10   A. Yeah.
11   Q. Do you understand you are obligated to
12 produce all such documents to Plaintiffs?
13   A. Yep.
14   Q. And you have at various times had
15 documents and communications concerning such
16 events, right?
17   A. Yes. And it is all in my phone, or
18 Discord.
19   Q. You haven't produced any of those yet,
20 have you?
21   A. No. But I would like to today, if
22 that is possible. Or consent for the social
23 media ones today.
24   Q. On Page 9 of this document, do you see
25 Request for Production No. 3 --

1    A. Yes.
2    Q. -- which asks for documents concerning
3  and communications with various groups?
4    A. Yes.
5    Q. Did you understand that you are
6  obligated to produce all documents and
7  communications you have concerning or with these
8  groups?
9    A. Yes.
10   Q. Do you have, or have you had in the
11 past documents concerning or communications
12 concerning or with East Coast Knights of the
13 KKK?
14   A. No.
15   Q. What about Fraternal Order of the Alt
16 Knights?
17   A. No.
18   Q. Identify Evropa you do, correct?
19   A. Yes.
20   Q. What about League of the South?
21   A. Umm, yes, on Discord.
22   Q. What about Loyal White Knights of the
23 KKK?
24   A. No.
25   Q. What about Moonbase Holdings, LLC?

1    A. I don't know what that is. No.
2    Q. What about Nationalist Socialist
3  Movement?
4    A. No.
5    Q. What about Nationalist Front?
6    A. No.
7    Q. What about Traditionalist Worker
8  Party?
9    A. Yes.
10   Q. What about Vanguard America?
11   A. Yes.
12   Q. With respect to Traditionalist Worker
13 Party, what sorts of documents are those?
14   A. Just communication between us on
15 Discord.
16   Q. Between you and who?
17   A. Umm, it wasn't -- it wasn't Matt
18 Heimbach at the time, it was somebody else I was
19 dealing with. I can't remember his name. I
20 can't remember the guy's name. But it was
21 somebody that was on Discord. They were, like,
22 the -- they were marked as the communication
23 liaison for the Traditionalist Worker Party.
24   Q. What about Vanguard America?
25   A. I spoke to one or two guys. One of

Case 3:17-cv-00072-NKM-JCH   Document 556-3   Filed 08/16/19   Page 32 of 76   Pageid#: 6091

MAGNA®
LEGAL SERVICES

1   them became the new leader. I can't remember
2   his name. Umm, it is not -- it is not -- it is
3   not the guy that I was on the phone with the
4   other day. Umm, it is -- what's his name?
5   What's the current -- Hopper. Mr. Hopper. It
6   was not Mr. Hopper, it was somebody else from
7   Vanguard America.
8       Then just somebody I knew, umm, that
9   was from Texas from Vanguard America. I don't
10  remember who it was. I just know they were from
11  Texas.
12     Q. Did you communicate with Thomas Russo?
13     A. Yes. That's who I'm talking about.
14     Q. How did you communicate with Mr.
15  Russo?
16     A. Uh, on Discord mostly. And I also had
17  his phone number. And I think I texted him
18  afterwards or whatever, just saying hey, like.
19  And I think it was just, like, a hi thing.
20     Q. You exchanged text messages with Mr.
21  Russo?
22     A. Yes. But it was very brief. I think
23  it was one sided. I think I messaged him, he
24  never messaged me back.
25     Q. Did you communicate with Mr. Russo

1   before Unite the Right occurred?
2     A. Briefly, yes.
3     Q. You stated earlier in your testimony
4   that you were on the phone with a guy the other
5   day?
6     A. What do you mean?
7     Q. Earlier in your testimony a minute ago
8   you stated --
9     A. Just now?
10     Q. Just now, a minute ago --
11     A. When we were on the phone, the guy I
12  was on the phone with, Mr. Hopper. I couldn't
13  remember his name. We were on the phone on --
14  talking about discovery and stuff.
15     Q. You spoke with Mr. Hopper on the phone
16  about discovery stuff?
17     A. No. What I was saying was when we
18  were on the phone talking with me, Heimbach, and
19  Hopper, that was the -- it wasn't him, is what I
20  was saying. It wasn't Hopper that I talked to
21  before, it was Mr. Russo.
22     Q. You are referring to the Court call?
23     A. Yes.
24     Q. Do you have Mr. Russo's phone number?
25     A. I don't know. Maybe. I don't think

1   so. Maybe. I don't know. I have no idea. I
2   should still have it.
3     Q. You exchanged -- you spoke with him on
4   the phone, right?
5     A. Yeah, yeah. I mean, I have a text
6   message exchange with him. But that doesn't --
7   so, I guess I have his phone. But I don't know
8   if that is his current number or anything like
9   that.
10     Q. Can you provide Plaintiffs with that
11  number?
12     A. Yeah.
13     Q. When we go off the record, we'll ask
14  you to do that.
15     A. Well, I mean, can't you guys just get
16  that when you do the discovery stuff?
17     Q. Umm --
18     A. Won't that come up in discovery?
19     Q. Do you see on Page 9 of this document,
20  Request for Production No. 4?
21     A. Yeah.
22     Q. Do you see that requests all the
23  documents and communications concerning
24  violence, intimidation, or harassment of persons
25  on basis of race, religion, or ethnicity?

1     A. Yes.
2     Q. Then the sentence continues, including
3   but not limited to certain examples?
4     A. Yes.
5     Q. Do you understand you are obligated to
6   produce all such documents and communications
7   that you have?
8     A. Yes.
9     Q. Do you have any such documents?
10     A. No. Other than what's in Discord.
11  But those are on the Discord servers.
12     Q. Do you see Request for Production No.
13  5 on this page?
14     A. Yes.
15     Q. Do you see that the Request for
16  Production seeks uses of social media that
17  reference or concern the events or Defendants?
18     A. Yes.
19     Q. Do you understand that you are
20  obligated to produce such messages to
21  Plaintiffs?
22     A. Yes.
23     Q. You have made such messages in the
24  past, correct?
25     A. Yes.

MAGNA

LEGAL SERVICES

1     Q.  You have made messages regarding the
2  events in the Complaint through Discord?
3     A.  Yes.
4     Q.  And through Twitter?
5     A.  Yep.
6     Q.  And through Facebook?
7     A.  Yep.
8     Q.  You haven't produced those messages
9  before?
10     A.  Well, I am banned from all of them, so
11  I can't.
12     Q.  You have not made any efforts to
13  enable the production of those documents before?
14     A.  No, but I would like to.
15     Q.  On the next page, Page 10 of this list
16  of Requests for Production, do you see that
17  Request for Production 6 seeks all the documents
18  concerning and all communications concerning or
19  with any Plaintiff or Defendant other than you
20  named in the Amended Complaint, and any other
21  person who attended, planned, or was involved in
22  the events?
23     A.  Yes.
24     Q.  Do you understand that you are
25  obligated to produce all such documents and all

1  such communications?
2     A.  Yes.
3     Q.  You have had such documents and
4  communications in the past, right?
5     A.  Yes.
6     Q.  You have had text messages, for
7  example?
8     A.  Yes.
9     Q.  You have had social media messages,
10  for example?
11     A.  Yes.
12     Q.  You have not produced any of those,
13  right?
14     A.  No, but I would like to.
15     Q.  Do you see Request for Production 7 on
16  Page 10?
17     A.  Yes.
18     Q.  That Request for Production asks for
19  documents and communications concerning any
20  lawsuits, claims of violence, or arrests
21  relating to or arising out of racially,
22  ethnically, or religiously-motivated conduct by
23  you or any Defendant named in the Amended
24  Complaint.
25     Do you see that?

1     A.  Yes.
2     Q.  You have such documents, right?
3     A.  Not that I know of.  Never mind.  It
4  says something about lawsuits.  Yes.  But
5  violence, no.  But the lawsuits, yes.
6     Q.  You do have documents concerning
7  lawsuits, right?
8     A.  The lawsuits, yes.
9     Q.  You have not produced any of those
10  documents, right?
11     A.  No, but I would like to.
12     Q.  On the same page, Request for
13  Production 8.  Do you see that the request seeks
14  documents and communications concerning the
15  steps that you have taken to preserve documents
16  and communications relative to the lawsuit?
17     A.  Yes.
18     Q.  Do you have any such documents?
19     A.  No.
20     Q.  You don't have any documents
21  concerning the steps you have taken to preserve
22  documents and communications relative to the
23  lawsuit?
24     A.  No.  That would be like -- no, I don't
25  have anything like that.

1     Q.  Is that because aside from keeping
2  your old --
3     A.  Cell phone.
4     Q.  -- cell phone, you don't have any
5  steps that you have taken to preserve documents
6  and communications?
7     A.  Other than telling -- the only other
8  thing would be social media, right.  So, I don't
9  have any documents related to that, so I can't
10  preserve it.
11     Q.  Have you made comments on social media
12  regarding your preservation obligations?
13     A.  No, I don't think so.
14     Q.  Have you sent any e-mails regarding
15  your preservation obligations?
16     A.  No.
17     Q.  Have you sent any text messages
18  regarding your preservation obligations?
19     A.  No, no.
20     Q.  But Mr. Kolenich did speak to you
21  regarding your preservation obligations, right?
22     A.  Yeah.  When the case first opened up,
23  he explained, like, the broad strokes that was
24  going to happen.  He said don't delete -- you
25  know, don't delete your stuff, or whatever.

MAGNA
LEGAL SERVICES

1   Q. He did that over the phone?
2   A. Yes.
3   Q. Have you ever deleted any document or
4   communication that is responsive to any of these
5   Requests for Production?
6   A. No.
7   Q. Have you ever lost any document or
8   communication responsive to any of these --
9   A. No.
10   Q. -- requests?
11   A. No.
12   Q. How do you know that for sure?
13   A. Because it is all in my phone, and I
14   don't delete things off my phone. Like I said,
15   the only thing I could possibly delete would be,
16   like, non-picture pictures or whatever, just
17   trying to free up some space.
18        But other than that, I have not
19   deleted anything. No photos or things that have
20   to deal with this case, or anything like that.
21        (Exhibit 12, Plaintiffs' First Set of
22   Interrogatories to All Defendants, marked for
23   identification.)
24   BY MR. BARKAI:
25   Q. Mr. Kline, you have just been handed a

1   document marked Exhibit 12.
2        Have you seen this before?
3   A. I am not sure yet. Hold on.
4        I am not sure I have seen this one
5   before. But it looks kind of familiar as far as
6   -- yeah, I think I have seen this one before.
7   Q. How have you seen it?
8   A. Via e-mail. Maybe this one was sent
9   to me. I think this one was sent to me,
10   actually. Some of them I get by e-mail, some I
11   get sent to me.
12        For some reason not all of -- somebody
13   -- I don't remember who. Somebody else involved
14   in this, I get all of -- anything he does sent
15   to my parents' house. When I get home, it is
16   all his stuff. And none of this kind of thing.
17   But I think I was given this one.
18   Q. Who is the person --
19   A. Umm --
20   Q. -- who sends you things that get sent
21   to your parents' house?
22   A. No, it is from the Court. But it is
23   -- Mr. Regnery, I think is -- stuff that deals
24   with him. I get things all the time that deal
25   with what he has said or done in the case, I

1   guess.
2   Q. Mr. Regnery?
3   A. Yeah. I think is his name, Bill
4   Regnery. I have to look at the things again. I
5   constantly get -- more than 75 percent of the
6   stuff I get from the Court is stuff that has
7   his, like, name on it. It is, like, interviews
8   or whatever, I guess. I don't know. Or his
9   motions or something. I don't know.
10   Q. You think that you were sent this
11   document, right?
12   A. I think I was, yes. I think I was
13   sent this one.
14   Q. When you were sent this document, were
15   you sent it by your attorney?
16   A. Umm, I am not sure. I think it showed
17   up in an orange envelope. It was either sent by
18   the Court or by the attorney.
19   Q. When you received this document, did
20   you read it?
21   A. Umm, yes.
22   Q. Did you read it all the way through?
23   A. I believe so.
24   Q. What do you understand this document
25   to be?

1   A. It is going over what constitutes a
2   document, if I remember correctly. And, like,
3   what needs to be produced, and defining the
4   various things that need to be produced.
5   Q. Do you see on the first page of this
6   document it is called Plaintiffs' First Set of
7   Interrogatories to All Defendants?
8   A. Yes.
9   Q. Do you understand all Defendants to
10   include you?
11   A. Yes.
12   Q. Do you see the last page of this
13   document the document is dated January 25, 2018?
14   A. Yes.
15   Q. Do you have a recollection of when you
16   were sent this document?
17   A. No. It was probably somewhere around
18   there, but I am not entirely sure. I don't
19   remember.
20   Q. You didn't respond to these
21   Interrogatories, did you?
22   A. Umm, no. But, I mean, I don't know --
23   I mean, even reading through this now, it
24   doesn't -- it is just defining things. Like, I
25   mean, I didn't really know what I was supposed

MAGNA
LEGAL SERVICES

1  to do with this.
2      Q. Turning to Page 5, do you see --
3  excuse me, turning to Page 3. Do you see
4  Paragraph 5, the definition of events?
5      A. Yes.
6      Q. Do you understand that events for
7  purposes of this document includes Unite the
8  Right, as well as the events before Unite the
9  Right?
10      A. Yes.
11      Q. Including the planning of Unite the
12  Right?
13      A. Yes.
14      Q. Turning to Page 8, do you see a list
15  of Interrogatories?
16      A. Yeah.
17      Q. Do you see where this document states,
18  identify all means of communication used by you
19  to communicate concerning the events, whether
20  before, during, or after the events. And for
21  each means of communication, identify all names,
22  aliases, e-mail addresses, phone numbers, and
23  social media handles you used in connection with
24  such communications, including the 18-digit
25  account identifier associated with any Discord

1  account used by you.
2      Do you see that?
3      A. Mm-hmm, yes.
4      Q. So, this Interrogatory asks you to
5  identify all means of communication that you had
6  used to communicate concerning the events,
7  right?
8      A. Yes.
9      Q. Did you understand that when you read
10  this document?
11      A. Yeah, but it doesn't really say how,
12  like, how -- am I supposed to reply to the
13  e-mail? It doesn't really make sense to me.
14      Like, this one, this other one you
15  sent makes sense. I mean, it literally just
16  says respond to this e-mail with what you need
17  or what you have. This one doesn't really -- it
18  literally just says identify. It doesn't say
19  how to actually do it.
20      Q. You stated that you received this
21  document, you think, around January 2018, right?
22      A. Yes.
23      Q. You were represented by Mr. Kolenich
24  at that time, right?
25      A. Umm, I am not sure. I think that was

1  around the date. Maybe.
2      Q. You think you were represented by Mr.
3  Kolenich at that time?
4      A. I think so. Maybe. I don't know the
5  date that him and I -- he stopped representing
6  me. I believe we have the date on this though.
7  Hold on. He stopped -- he filed to drop me --
8      Q. I think you are looking for Exhibit 4.
9      A. Yes, I found it. That was July 23.
10  So, yes, that was under him.
11      Q. Did you ever ask Mr. Kolenich how to
12  respond to these interrogatories?
13      A. No, I didn't know that I had to
14  respond. I think this might have been one of
15  those things where they filed the motion in
16  response to this asking for something. I don't
17  remember what it was. So, it was delayed. Or
18  whatever had -- didn't have to be done because
19  they were filing a motion, is my understanding.
20      Q. You have never been told that you had
21  to respond to these Interrogatories?
22      A. I don't even know how to respond to
23  them.
24      Q. Has anyone ever told you to respond to
25  these Interrogatories?

1      A. No, not that I remember. Like I said,
2  I don't -- I would like to -- like I said, I
3  want to take care of whatever my obligation is,
4  give you guys the clearance to get the social
5  media accounts and to get on my phone and get
6  imaged, or whatever. That is totally fine. But
7  I don't know -- I don't know how I would do this
8  with the Interrogatories.
9      But I do know around that time, around
10  January, that's when I remember they said they
11  were going to be filing a motion against
12  something here. So, I think it was supposed to
13  be delayed. That is all I remember about that
14  specific -- this specific page.
15      Q. Your testimony that you have never
16  been told to respond to these Interrogatories,
17  including by the Court, right?
18      A. Not that I remember, no. Or that -- I
19  shouldn't -- I mean, I shouldn't say I was never
20  told, because I obviously was. But I don't know
21  how to do it.
22      Q. Do you see --
23      A. Reading it now even, I don't know how
24  to do it.
25      Q. Do you see in Paragraph 1 on this page

1  that means of communication include telephone
2  calls, in-person meetings, and all means of
3  electronic communication, including, for
4  example, social media, e-mail, SMS images,
5  podcasts, and online video?
6      A.  Yes.
7      Q.  Do you understand that this
8  Interrogatory requires you to identify all
9  relevant means of communication?
10     A.  Yes.
11     Q.  Do you see Interrogatory 2, identify
12  any channel or server on Discord to which you
13  had access?
14     A.  Yes.
15     Q.  You have not done that, have you?
16     A.  No, but I can.  I mean, it is really
17  easy, because I was one of the admins on the
18  server.  So, the answer is all.
19     Q.  The answer to this Interrogatory is
20  that you had all -- you had access to all
21  channels or servers?
22     A.  I had vision access, at least.  Not
23  necessarily the ability to post.  But I had
24  vision access to all of them.
25     Q.  Returning to Interrogatory No. 1 for a

1  moment.  You have said that you don't know how
2  to respond to this because you don't know how to
3  identify all means of communication, right?
4      A.  No, i don't know, like, where am I
5  sending this to?  Am I responding to this
6  e-mail?  Am I sending a postcard?  Like, how am
7  I supposed to answer the Interrogatory?
8      Q.  Have you ever asked anyone how to
9  answer this Interrogatory?
10     A.  At the time I got sent this was when
11  we were filing the motion to delay, so it wasn't
12  necessary.  In the time I have gotten this, I
13  don't have a lawyer.
14         But this, this page right here, this
15  one I said I never saw before, if I had seen
16  this, it would have made a lot of sense.  I
17  would have been able to go right ahead and take
18  care of it.
19         Because, like I said, this form right
20  here clearly says fill out this form and e-mail
21  it back to us with all your accounts.  And I
22  would have -- that would have been super easy.
23     Q.  You did not do that, right?  You did
24  not fill out that form?
25     A.  No.  I would like to though.  I would

1  like to do that though.
2      Q.  You didn't do it at the time?
3      A.  I didn't know how to do it at the
4  time, because I didn't -- this page right here,
5  Exhibit 11, I hadn't even seen.  So, umm, I
6  didn't really have a choice to do it at the
7  time.  But I would like to.
8      Q.  Exhibit 11 was sent to
9  Eli.F.Mosley@Gmail.com, right?
10     A.  Correct.
11     Q.  That is your e-mail address, right?
12     A.  Correct.
13     Q.  On which channels or servers on
14  Discord did you post messages?  Did you post
15  messages on Charlottesville 2.0?
16     A.  Yes.
17     Q.  Vibrant Diversity?
18     A.  I am not sure.
19     Q.  Trad Worker?
20     A.  No.
21     Q.  Charlottesville 1.0?
22     A.  Yes.
23     Q.  altright.com?
24     A.  Uh, yes.
25     Q.  AnteCom?

1      A.  No.
2      Q.  Southern Front?
3      A.  No.
4      Q.  Front and Center?
5      A.  No.
6      Q.  MI Goy Scouts?
7      A.  No.
8      Q.  Identity Evropa?
9      A.  Yes.
10     Q.  New Byzantium?
11     A.  No.
12     Q.  IRL Networking Events?
13     A.  Yes.
14     Q.  Operation Wolverine?
15     A.  No.
16     Q.  Far Right Escape Pod Alpha One?
17     A.  No.
18     Q.  Do you see on Page 8 of this list of
19  Interrogatories, Interrogatory No. 3, identify
20  all persons, natural or non-natural, with whom
21  you communicated concerning the events, whether
22  before, during, or after the events?
23     A.  Mm-hmm, yes.
24     Q.  Have you read that before?
25     A.  Yeah.  I actually have, yeah.  I just

MAGNA
LEGAL SERVICES

1    don't know -- like, just give a list of all the
2    people I have talked to about the events?  It
3    doesn't make sense to me.  But --
4         Q.  What does not make sense to you about
5    giving a list of people with whom you
6    communicated?
7         A.  Right.  Like, I understand that is
8    something I need to do, right.  So, is that
9    going to be in this PDF I got sent, a spot to
10   list all the people?
11        Q.  Are you prepared to identify the
12   persons with whom you communicated now?
13        A.  Yes.
14        Q.  But you haven't done it before?
15        A.  No, but I would like to.
16        Q.  Have you communicated concerning the
17   events, whether before, during, or after the
18   events, with Jason Kessler?
19        A.  Yes.
20        Q.  Erika Alduino?
21        A.  Yes.
22        Q.  Richard Spencer?
23        A.  Yes.
24        Q.  Christopher Cantwell?
25        A.  Yes.

1         Q.  James Alex Fields, Jr.?
2         A.  No.
3         Q.  Andrew Anglin?
4         A.  No.
5         Q.  Robert Azzmador Ray?
6         A.  Yes.
7         Q.  Nathan Damingo?
8         A.  Yes.
9         Q.  Matthew Heimbach?
10        A.  Yes.
11        Q.  Matthew Parrott?
12        A.  No.
13        Q.  Michael Hill?
14        A.  Uh, no.
15        Q.  Michael Tubbs?
16        A.  No.
17        Q.  Jeff Schoep?
18        A.  No.
19        Q.  Agustus Sol Invictus?
20        A.  Yes.
21        Q.  Michael Peinovich?
22        A.  Yes.
23        Q.  Identify -- is there anyone else with
24   whom you communicated concerning the events,
25   whether before, during, or after them?

1         A.  No, not -- no.
2         Q.  Not a single person?
3         A.  I mean, I have talked to people about
4    it, obviously.  But, like, I talked about, like,
5    hey, this crazy thing happened, or whatever.  I
6    don't have -- like, everyone I have communicated
7    with.  I mean, that is a list of thousands of
8    people.
9         Q.  You have not made a list of people you
10   communicated with concerning the events, have
11   you?
12        A.  No, but I can.  I can make a list of
13   the people I have communicated with concerning
14   the events.  I mean, more than half of them I
15   won't even know their real names.  Most people
16   operate anonymously.  I can give pseudonyms or
17   fake names or whatever that they use if I
18   remember them.  But --
19        Q.  Do you understand Interrogatory No. 3
20   is asking you to identify all those persons?
21        A.  Yes.  And I would be fine with doing
22   that.  Like I said, it is going to be a
23   difficult task.
24        Q.  Do you see Interrogatory No. 4, that
25   asks you to identify all electronic devices used

1    by you to communicate concerning the events,
2    whether before, during, or after the events?
3         A.  Yes.
4         Q.  You have not done that in the past,
5    have you?
6         A.  No, but I would like to.  I have my
7    cell phone ready to do that.  Not today.  But
8    literally, like, tomorrow or even tonight I
9    would send it out.  It doesn't matter.
10        Q.  You understand that this Interrogatory
11   asks you to identify all electronic devices that
12   you used, even if you no longer use them, right?
13        A.  Yes.
14        Q.  Do you understand that this
15   Interrogatory asks you to identify all
16   electronic devices that you used, even if they
17   did not belong to you?
18        A.  Yes.
19        Q.  For example, if you borrowed someone
20   else's phone, that would be included, right?
21        A.  Yes.
22        Q.  So, Mr. Spencer's computer, for
23   example, would be included if you used it to
24   communicate concerning the events, right?
25        A.  Correct.

MAGNA⊗
LEGAL SERVICES

1      MR. BARKAI:  How much time is left on
2  the tape?
3      THE VIDEOGRAPHER:  About 15 minutes.
4      MR. BARKAI:  15 minutes.  We'll go for
5  another approximately 15 minutes, then we'll
6  break for lunch.
7      THE WITNESS:  Okay.  How much longer
8  do you think this is going to be?
9      MR. BARKAI:  I think you should
10  anticipate being here for basically the whole
11  day.
12      THE WITNESS:  Okay.  So, not tomorrow?
13  Because it did say it could go multiple days.
14  Not tomorrow?
15      MR. BARKAI:  We are not making a
16  commitment one way or the other.  We'll see how
17  it goes.
18      THE WITNESS:  Okay.
19      MR. BARKAI:  You can keep your
20  microphone on.  We are still going for
21  another --
22      THE WITNESS:  I thought you said you
23  were taking a break.
24      MR. BARKAI:  -- 15 minutes.  We'll
25  take a break in about 15 minutes.

1      (Exhibit 13, 3/26/2018 Order, marked
2  for identification.)
3  BY MR. BARKAI:
4      Q.  Mr. Kline, you have been handed a
5  document that's been marked as Exhibit 13.
6      Have you seen this before?
7      A.  I don't think so, but maybe.  I
8  believe so.
9      Q.  At this time when this document was
10  created -- well, first, do you see this document
11  was created in March of 2018?
12      A.  Yes.
13      Q.  You were still being represented by
14  Mr. Kolenich at the time, right?
15      A.  Correct.
16      Q.  Do you see that this document is an
17  Order by Judge Hoppe?
18      A.  Yes.
19      Q.  You don't remember Mr. Kolenich ever
20  speaking to you about this Order?
21      A.  No, I have never seen this Order.  I
22  am not too sure what it is saying yet, either.
23  Is this declining the motion they did to delay
24  or change the discovery, I guess?  I don't know.
25      Q.  Do you see on Page 3 that the Order

1  states that Defendant Peinovich's motion to --
2  excuse me -- Defendant Peinovich's motion to
3  stay discovery is denied?
4      A.  I do, yes.
5      Q.  Do you see further down on Page 3 the
6  Defendants are directed to answer, respond, or
7  object to Plaintiffs' First Set of Discovery
8  Requests within 21 days from the date of this
9  Order?
10      A.  Yes.
11      Q.  So, the Court ordered you as well as
12  other Defendants to respond to Plaintiffs'
13  Discovery Requests within 21 days, right?
14      A.  Yep.  I never seen this -- I never
15  seen this document for sure.  I have never seen
16  this one.
17      Q.  Did Mr. Kolenich ever inform you that
18  you were being ordered to respond to Plaintiffs'
19  Discovery Requests?
20      A.  Yes.  But, again, I was never told how
21  to go through and do that.
22      Q.  When did Mr. Kolenich inform you of
23  that requirement?
24      A.  I am not too sure.  Before they
25  dropped me, obviously.  But I don't know exactly

1  when.
2      Q.  Did Mr. Kolenich inform you that you
3  were being instructed to respond to Plaintiffs'
4  Discovery Requests in March of 2018?
5      A.  Uh, no.  I actually didn't know -- I
6  didn't know what ended up happening with that
7  motion that Mike filed.  I never followed up or
8  saw what happened with it.  So, I mean, I
9  figured it got blocked or whatever, or whatever
10  happened with it.  But I never actually saw the
11  paperwork saying that.
12      Q.  When you were referring to Mike, you
13  mean Mr. Peinovich?
14      A.  Yes.
15      Q.  Does this -- do you now see based on
16  this Order that Mr. Peinovich's order to stay
17  discovery was denied?
18      A.  Yes.
19      Q.  Does this refresh your recollection at
20  all as to whether Mr. Kolenich discussed with
21  you that you are required to submit to
22  Plaintiffs' Discovery Requests?
23      A.  No, it doesn't.
24      Q.  Your testimony is that you were not
25  aware that was a requirement?

MAGNA

LEGAL SERVICES

1     A.  No.  My testimony is that I knew I had
2  to do discovery, I just didn't know how to do it
3  and then where to send it to.
4        Again, this paper just says, again --
5  here it says send it in within 21 days.  Okay,
6  well, what -- who -- like, what, in send what?
7  The -- this is the closest thing, this --
8  Exhibit 11 is the closest thing I have seen to
9  actually telling me how to follow through with
10  my discovery obligations.
11     Q.  You were being --
12     A.  No. 11, and whatever this -- I guess
13  it is 12.
14     Q.  You were being represented by Mr.
15  Kolenich at the time that this motion to stay
16  discovery was denied, correct?
17     A.  Yes.
18     Q.  Did you ask Mr. Kolenich how to comply
19  with your discovery obligations?
20     A.  I didn't -- I didn't receive this one.
21  But, yes, I believe I did.  And I didn't
22  get a straight answer.  I never got a straight
23  answer out of anyone I asked about how to comply
24  with discovery.
25     Q.  You asked Mr. Kolenich and you never

1  got a straight answer?
2     A.  Well, no.  I don't know -- what I am
3  saying is he had sent me -- or he had told me
4  about this motion to the discovery motion, and I
5  have never seen that this was dismissed.  On my
6  next communication with him or my further
7  communication with him was on the basis this was
8  still going.  I didn't know -- I didn't know
9  this had happened.
10     Q.  You testified just a few minutes ago
11  that Mr. Kolenich did tell you that you had to
12  comply with your discovery requirements.
13     A.  Yes.  When the case first started, he
14  explained to me what discovery was and what I
15  would have to do in general.  But as far as the
16  specific send this document or send this to this
17  person or do that, the very specifics of it, I
18  never got anything.
19     Q.  No one's ever told you how to do
20  anything specific?
21     A.  No, no.
22        (Exhibit 14, transcript of 4/19/2018
23  telephonic hearing, marked for identification.)
24  BY MR. BARKAI:
25     Q.  Mr. Kline, does this appear to you to

1  be the transcript of a hearing before Judge
2  Hoppe in this case?
3     A.  Yes.
4     Q.  Does this appear to you to be a
5  transcript from April 19, 2018?
6     A.  Yes.
7     Q.  Would you please turn to Page 4?
8     A.  Yes.
9     Q.  Do you see at the bottom of Page 4 a
10  statement from Mr. Kolenich to the Court, quote,
11  since very early on in this litigation, I have
12  had an inability to communicate with Mr. Kline.
13  And I have communicated with him through members
14  of a group, Identity Evropa, and they recently
15  have had difficulty communicating with him as
16  well.  And neither I nor they have been able to
17  get him to participate in this litigation.
18        Do you see that?
19     A.  Yes.
20     Q.  Then do you see a few lines later at
21  Line 12, do you see that Mr. Kolenich told the
22  Court, and we just have had no communication
23  with him at all.  It is not as if we haven't
24  tried.  He is just not participating, closed
25  quote.

1     A.  Yes, I see that.
2     Q.  Mr. Kolenich told the Court that he
3  had become unable to communicate with you,
4  right?
5     A.  Yes.
6     Q.  He couldn't get you to participate in
7  the litigation, right?
8     A.  That's what he says, yes.
9     Q.  Even though he had tried to
10  communicate with you, correct?
11     A.  Yes.  That's what he says again.
12     Q.  Why was he unable to communicate with
13  you?
14     A.  The phone issues that I talked about
15  earlier.  I had been having phone issues.  That
16  is the reason I got that Walmart phone.  And
17  then I finally fixed the phone and I just -- I
18  wasn't able to communicate with him, apparently.
19        THE VIDEOGRAPHER:  I'm sorry, could
20  you fix the mic?  It is about to fall off.
21        THE WITNESS:  Yeah, yeah.
22  BY MR. BARKAI:
23     Q.  Mr. Kolenich was unable to communicate
24  with you due to phone issues in April 2018 and
25  prior to that, right?

1      A.  From April all through -- yeah,
2  through -- for awhile, through that whole
3  summer, in the middle of that summer when that
4  phone -- until I used that phone, or whatever,
5  the Walmart one.
6      Q.  Did you give Mr. Kolenich the phone
7  (sic) of your temporary Walmart --
8      A.  Yes.
9      Q.  -- phone?
10      A.  And I never got anything from him.
11      Q.  Your testimony is that you gave Mr.
12  Kolenich the number of your Walmart phone?
13      A.  Yes.  The new phone number, yeah, I
14  did.
15      Q.  But he never called you?
16      A.  No.  Not that I know of.  I mean, I
17  have to go through the phone to check to see.  I
18  mean, it was a year ago.  But I don't remember
19  him ever calling that phone.
20      Q.  You don't remember Mr. Kolenich ever
21  trying to get in touch with you?
22      A.  Not on that phone.  I mean, I know
23  when I finally got the phone, the iPhone working
24  again, I went through, I had missed calls from
25  him, voicemail -- a couple voicemails.  But

1  nothing on the new phone I sent them.
2      I would have to go back and check to
3  see if he called me on that phone to be sure or
4  not.
5      Q.  Did you try to check your voicemail
6  from any other phone to see if anyone had tried
7  to call you?
8      A.  No.
9      Q.  Did you try to check your e-mail
10  address from any other device to see if anyone
11  had tried to e-mail you?
12      A.  No.
13      Q.  Do you see at the bottom of Page 4 in
14  Line 24 Mr. Kolenich said since very early on in
15  this litigation, I had had an inability to
16  communicate with Mr. Kline?
17      A.  Yes.
18      Q.  When did your phone issues first occur
19  where you were not able to use your iPhone?
20      A.  Like, January.
21      Q.  Your phone issues occurred in January?
22      A.  Yeah.  My -- my -- yeah, phone has
23  been -- my phone -- the water damage happened in
24  January, I believe.  Maybe December, even.  I
25  just know it was snowing outside.  It was -- or

1  it was snow on the ground.  It was, like, wet
2  raining or whatever.
3      Q.  When did you fix your iPhone?
4      A.  Well, there has been multiple times I
5  have had to fix it.  I fixed it --
6      Q.  From your water damage.
7      A.  The water damage would be the end of
8  the summer, end of that summer, I guess.
9      Q.  You were using your Walmart phone from
10  January 2018 to the end of the summer?
11      A.  No, I still used the phone until the
12  beginning or the end of spring.  It wasn't
13  totally broken.  For some reason it just wasn't
14  receiving all calls or all texts.  So, I kept
15  using it for awhile.  So, it was from the middle
16  of spring, I guess, until the middle of summer.
17      Q.  So, your water damage occurred in
18  January; is that right?
19      A.  I mean, yeah.  Middle of winter.
20      Q.  And then your phone continued to work
21  for awhile afterwards?
22      A.  Yeah, it basically worked.  But for
23  some reason I wasn't getting calls or
24  voicemails.  Or sometimes I would get a text
25  message and it would, like -- or I would send a

1  text message, it would send multiple times,
2  things like that.  It was a wonky issue with the
3  phone.
4      Then it stopped working altogether.
5  That is when I got the new Walmart phone.
6      Q.  When did it stop working altogether?
7      A.  Middle of spring -- or middle of
8  spring that year.
9      THE VIDEOGRAPHER:  Five minutes.
10      MR. BARKAI:  Thank you.
11  BY MR. BARKAI:
12      Q.  Mr. Kline, is -- could you turn to
13  Exhibit 4 again, please?
14      A.  I got it.
15      Q.  Do you see in Paragraph 3 that Mr.
16  Kolenich and Mr. Woodard informed the Court that
17  they asked for other clients who used to know
18  Mr. Kline to reach out and advise we would have
19  to withdraw if we did not hear from him?
20      A.  Yes, I see that.
21      Q.  Do you remember being informed by
22  anyone that --
23      A.  No.
24      Q.  -- your attorneys would have to
25  withdraw if they did not hear from you?

1    A. No.
2    Q. In Paragraph 4, do you see that Mr.
3  Kolenich and Mr. Woodard informed the Court,
4  quote, Mr. Kline was told that we would need to
5  speak with him regularly to defend him in this
6  and other litigation and he has to stay in touch
7  in order for us to properly represent him. Mr.
8  Kline agreed, end quote.
9    A. Yes.
10   Q. Do you remember that?
11   A. Yeah.
12   Q. When did that occur?
13   A. Umm, I think it was the same
14  conversation we had just explaining the
15  discovery process. Not saying hey, you need to
16  turn something in. But just saying hey, don't
17  delete your stuff, and that kind of thing. Just
18  having a general conversation.
19   Q. Your understanding of this document is
20  that was a general conversation in the beginning
21  of the discovery process?
22   A. No, at the beginning of when we first
23  -- when they first took the case and when they
24  spoke -- I spoke to them, they said they would
25  have to keep in regular touch, or whatever. And

1  they also -- in that same conversation they also
2  said don't delete anything, anything like that,
3  for the discovery process.
4    Q. Looking back at Paragraph 3, which is
5  on the prior page, do you see that Mr. Kolenich
6  and Mr. Woodard informed the Court, only at the
7  last minute and after we requested other clients
8  who used to know Mr. Kline to reach out and
9  advise we would have to withdraw if we did not
10  hear from him, did Mr. Kline respond and allow
11  us to respond to discovery?
12   A. Mm-hmm, yes. I don't even know who it
13  was that reached out to me. But -- I don't know
14  who that would have been.
15   Q. Then in Paragraph 4, Mr. Woodard and
16  Mr. Kline told the Court -- sorry, Mr. Woodard
17  and Mr. Kolenich told the Court at that, Mr.
18  Kline was told that we would need to speak with
19  him regularly to defend him in this and other
20  litigation, and he has to stay in touch for us
21  to properly represent him. Mr. Kline agreed.
22    So, Mr. Woodard and Mr. Kolenich
23  informed the Court that you had a conversation
24  with them after --
25   A. I would just be -- I would be curious

1  when this conversation was. Because I don't --
2  I don't know when that was.
3    Q. You don't remember this conversation
4  with Mr. Kolenich and Mr. Woodard?
5    A. I just don't know when -- I was never
6  on the phone with both of them, ever. I was
7  only ever talking to one or the other.
8     Umm, but I don't even know when that
9  conversation was.
10   Q. In Paragraph 5 you see that Mr.
11  Woodard and Mr. Kolenich stated Plaintiffs
12  requested to set the deposition of Mr. Kline.
13  Mr. Kline was advised by the undersigned more
14  than once to let us know what a convenient time
15  and place for his deposition would be.
16   A. And I told them it would be
17  Harrisburg, and I told them any time. That is
18  100 percent what I told them.
19   Q. The date on this document is July 23,
20  2018. Do you see that?
21   A. Mm-hmm, yes.
22   Q. So, this is not referring to the
23  deposition we are here today. This is referring
24  to a prior deposition, correct?
25   A. And I told them for that deposition, I

1  told them that they can have it in Harrisburg.
2  And I said that it is up to them when they
3  wanted it. I was very open.
4    Q. In July of 2018 --
5    A. Yes.
6    Q. -- you told your attorneys that you
7  were open for a deposition in Harrisburg at any
8  time?
9    A. Yes.
10    THE VIDEOGRAPHER: About a minute.
11    MR. BARKAI: Okay.
12  BY MR. BARKAI:
13   Q. So, Mr. Kline, when Mr. Woodard and
14  Mr. Kolenich said you responded with, quote,
15  complete and nonresponsive silence, is that not
16  true?
17   A. I mean, obviously not. They are
18  talking about how I responded to them. So, I
19  was in communication with them for awhile.
20   Q. They said that you did not respond to
21  their request for your availability for a
22  deposition.
23   A. And I am 100 percent telling you I
24  told them I could do Harrisburg whenever is
25  convenient.

66 (Pages 258 to 261)

1    Q. So, they are wrong?
2    A. Yes. I 100 percent told them that. I
3  know I told them verbally over the phone. I
4  wouldn't be surprised if I have text messages
5  saying that.
6    Q. Text messages on your iPhone?
7    A. I probably do have -- I don't know.
8  Like I said, I have to check. But I wouldn't be
9  surprised if my text messages said Harrisburg
10 and whenever. But I know I told them that
11 verbally.
12   MR. BARKAI: I think this is a good
13 time to break for lunch.
14   THE WITNESS: Okay.
15   MR. BARKAI: Let's go off the record.
16   THE VIDEOGRAPHER: Time is now 2:13
17 p.m., we are going off the video record.
18   (Lunch recess was taken.)
19   THE VIDEOGRAPHER: The time is now
20 3:00 p.m., we are back on the video record.
21 BY MR. BARKAI:
22   Q. Welcome back, Mr. Kline.
23   A. Hi.
24   Q. When we were going off the record, you
25 had said that you were going to check to see if

1  you had Mr. Russo's phone number?
2    A. I couldn't find it. The only way I
3  could think it would be in there is if I never
4  saved it as his phone number and it is in there
5  as a number. Do you know what I mean? Like, if
6  you have text messages, they show up as numbers.
7  I didn't want to go through every single one of
8  those numbers, you know what I mean? I
9  shouldn't say I didn't want to. There are just
10 so many of them, that I have numbers -- text
11 messages from numbers that aren't contacts in my
12 phone.
13   So, I went through a couple of them,
14 but I couldn't find it. But I do have text
15 messages from him somewhere. When you image the
16 phone or whatever, it'll show up. It'll be
17 obvious it is him.
18   Q. You had told us before lunch that you
19 had provided Mr. Kolenich with the phone number
20 for your temporary Walmart phone --
21   A. Yes.
22   Q. -- that you used while your iPhone was
23 broken, correct?
24   A. Correct.
25   Q. Do we have your permission to ask Mr.

1  Kolenich for the phone number that you provided
2  him?
3    A. Yeah. If you want, yeah.
4    Q. Before we broke for lunch, we were
5  speaking about the Request for Production in the
6  Interrogatories that Plaintiffs had served on
7  you before.
8    A. Yes.
9    Q. Do you remember that? You have never
10 responded to any of those Requests for
11 Production, correct?
12   A. No, not yet. But I would like to.
13   Q. You have never responded to any of
14 those Interrogatories, have you?
15   A. No. But I want to respond to those
16 and get this taken care of, get the discovery
17 portion taken care of.
18   Q. You testified that Mr. Kolenich never
19 informed you how to respond to the Request for
20 Production, right?
21   A. No, no. I never got any, like, step
22 one do this, or send an e-mail to this person,
23 or here is a form, or anything like that, no.
24   Q. The Court never informed you how to
25 comply with your discovery obligations?

1    A. There is an e-mail in one of these
2  exhibits that looks like it was. But I never --
3  I never read that e-mail. The one from July 1,
4  I believe it is. So, it is -- hold on a second.
5    Q. Is that Exhibit 11?
6    A. Umm, hold on. Let me put these back
7  in order so I can find them.
8    Yes, Exhibit 11 is the one I am
9  talking about.
10   Q. Aside from Exhibit 11, you have never
11 been told how to comply with your discovery
12 obligations?
13   A. No, not the actual means. But I would
14 like to.
15   Q. When Google removed your
16 IdentityEvropa.com e-mail address, did it
17 remove, as far as you know, all
18 IdentityEvropa.com e-mail addresses?
19   A. So, I first got my e-mail address
20 removed by Identity Evropa itself. So, by
21 Nathan Damingo. Then I heard on a news article
22 that they had their Google stuff taken away a
23 couple months later. So, I don't know the terms
24 of them removing -- Google removing their stuff.
25   Q. Was it your understanding when Google

MAGNA
LEGAL SERVICES

1  removed, quote, the Google stuff, that that was
2  all of Identity Evropa's data that Google was
3  hosting?
4      A. I am unsure. Like I said, I never
5  touched the back end or anything. I never did
6  anything with the websites or anything like
7  that, or any data stuff.
8      Q. When did Mr. Damingo remove --
9      A. So, I --
10     Q. -- your Identity Evropa e-mail
11  address?
12     A. I left Identity Evropa in the spring
13  of 2018 and it was done the next day. So,
14  spring of 2018. Umm, if you -- I don't know the
15  exact date. But it was done in spring of 2018,
16  I believe.
17     Q. Mr. Kolenich stopped representing you
18  at a certain point, right?
19     A. Yes.
20     Q. And after he stopped representing you,
21  you did not appear at conferences with the
22  Court, right, until July 2, 2019?
23     A. Correct.
24     Q. Why did you fail to appear at those
25  conferences with the Court?

1      A. I didn't know I was requested for any
2  of the conferences or anything like that.
3      Q. Only --
4      A. The only things I had gotten in the
5  mail, like I said before, were things about a
6  Bill Regnery. That was, like -- they were,
7  like, Court documents like this being sent to my
8  house. Like I said, more than 75 percent of the
9  things I get are things with his name on it.
10     Q. How do you spell Regnery?
11     A. I am unsure. It is -- umm, I don't
12  know how to spell it.
13     Q. So, your testimony is that you were
14  never informed of the Court conferences that you
15  were supposed to attend?
16     A. No, I didn't know which ones I was
17  supposed to attend. Because I was getting -- I
18  am getting ones that say, hey, you have to be on
19  this call, and it is literally just, like, some
20  kind of conference call about Bill Regnery's
21  thing.
22     Q. Is that related to Sines versus
23  Kessler?
24     A. I thought it was, but maybe it is not.
25  Maybe it is something separate. I don't know.

1      Q. Have you appeared on conference calls
2  about Bill Regnery?
3      A. No, no. Because I knew it had nothing
4  to do with me.
5      Q. Did you tell anyone when you got those
6  notices that this had nothing to do with you?
7      A. No.
8      Q. How often did you receive notices
9  about Bill Regnery?
10     A. Umm, probably once or twice a month.
11     Q. When did those notices begin?
12     A. Since the beginning of this whole --
13  the whole court case I have been getting them.
14  Probably summer or spring, after the initial
15  thing was filed.
16     Q. How did you receive those notices?
17     A. When I would come back to my parents'
18  place, they would have my stack of mail and it
19  was in there.
20     Q. You received stacks of mail at your
21  parents' place?
22     A. Right. Yeah. I would go through it
23  would say something, like, you know, Bill
24  Regnery files motion to do blah, blah, blah.
25  Like, this whole -- you know what I mean? The

1  whole thing. I was, like, okay. And I would
2  read through the whole thing and I was, like,
3  why is this something that matters to me?
4      Q. When you --
5      A. I always assumed it was part of the
6  discovery for this case, that he was being asked
7  questions for discovery and he was filing
8  motions to not be part of discovery.
9      Q. Were you sued in another lawsuit?
10     A. I might be. I don't know, actually.
11  It might be another case. Or I might be called
12  as a witness for another case. But this was the
13  only lawsuit that I know that my name was on.
14     Q. Have you been --
15     A. It might also be that Identity Evropa
16  was being sued and my name was on in when that
17  lawsuit went through. So, maybe I am getting
18  mail for it. I am unsure.
19         But all the mail that is related to
20  that has been from -- or has been related to
21  Bill Regnery is whatever is going on with that.
22  As soon as I see one of these court cases and I
23  saw Bill Regnery, blah, blah, blah, blah, blah,
24  I didn't know what to do with it.
25     Q. When you receive mail at your parents'

MAGNA⊘
LEGAL SERVICES

1  house, you reviewed that mail?
2     A. Most of it. Like I said --
3     Q. Most of the mail?
4     A. I would come home after, like, a month
5  of being gone, or two months being gone, and
6  there would be, you know, five or six brown
7  envelope court documents, all with Bill Regnery
8  stuff on it. So, obviously I didn't read all of
9  it. They were -- some of them were, you know,
10  50 pages long, 60 pages long. None of them had
11  my name on it anywhere.
12     Q. Was there also mail at your parents'
13  house involving this case --
14     A. Yes.
15     Q. -- Sines v. Kessler?
16     A. Yes.
17     Q. Did you read that mail?
18     A. Yes. When I -- when I -- when I saw
19  -- like I said, some of the exhibits in here, I
20  called out I never received and I never saw.
21  So, I don't know if that means that they were
22  just e-mailed to me and I didn't see them, or
23  what.
24     Q. Is there any e-mail address that we
25  should be using to contact you, besides

1  Eli.F.Mosley@Gmail.com?
2     A. No, that is the best one.
3     Q. You are able to log into that account?
4     A. Yes.
5     Q. You receive e-mails at that account?
6     A. Yes.
7     Q. Do you read those e-mails?
8     A. Yes.
9     Q. Do you respond to those e-mails?
10     A. Yes. I mean, I am able to now. So,
11  yes. I finally was able to get my -- that
12  e-mail address on this phone. So --
13     Q. You'll respond to those e-mails going
14  forward?
15     A. Yes.
16     Q. Is there a phone number that we should
17  be using to reach you besides the 610 phone
18  number?
19     A. I don't know that phone number. But I
20  can let you know -- like I said, I have a new
21  phone. It is ready to be activated. I was
22  talking with my dad on the way out and I asked
23  him, hey, what's that new phone number. He
24  didn't know what it is, because I was going to
25  give it to you guys so you have it. He doesn't

1  know that. I can give it to you guys as soon as
2  I get it.
3     Q. Will you provide that phone number to
4  us as soon as you get it?
5     A. Yes.
6     Q. How will you do that?
7     A. Umm, how do you guys want? I can --
8  what, e-mail you guys back on one -- one of the
9  e-mails, e-mail addresses you guys sent.
10     Q. Umm, will you e-mail that phone number
11  to us in response to the e-mails -- inbox from
12  Michael Bloch?
13     A. Yeah, exactly. When I get an e-mail
14  from you guys, I'll respond by the way, my new
15  number is whatever. The Court will have it, you
16  guys will have it. And then hopefully everyone
17  has it, or whatever.
18     Q. Are you aware that Plaintiffs filed a
19  motion in October 2018 to get the Judge to have
20  your electronic devices imaged?
21     A. No, I did not know that. I knew that
22  it was part of the discovery process, getting
23  devices imaged. Like I said, there was nothing,
24  like -- there was no means for me to do that. I
25  didn't know how we were supposed to be doing

1  that.
2     Q. But you were aware that you were
3  supposed to have your devices imaged?
4     A. Yes. I knew that was part of the
5  process, which is why I saved the phone.
6     Q. Who told you that you needed to have
7  your devices imaged?
8     A. Mr. Kolenich, when I -- like I said,
9  when he originally picked up the case.
10     Q. When did he tell you that you needed
11  to have your devices imaged?
12     A. It was just part of a general
13  conversation of how discovery works. Like I
14  said before, when he first picked up the case,
15  he said things, like, don't delete your stuff,
16  it is part of discovery. And they are going to
17  take your phone and image it, or whatever.
18     That is how -- then it goes to, I
19  guess, a third-party company he explained. They
20  put it in some database that queries all the
21  information, or something. I don't know. He
22  was explaining it to me then. It was awhile
23  ago.
24     Q. You had that conversation when Mr.
25  Kolenich originally pinged up the case?

MAGNA
LEGAL SERVICES

1     A. Yes.
2     Q. Have you had any conversations with
3 Mr. Kolenich since then about imaging your
4 phone?
5     A. No.
6     Q. Never since he picked up the case?
7     A. No.
8     Q. Approximately when was it that he
9 picked up the case?
10     A. Umm, I want to say winter 2018, but I
11 really don't know that date when he actually
12 picked it up. This lawsuit was filed a couple
13 months after Charlottesville. So, it would have
14 been a month or two after that.
15     Q. So, since 2017 when the lawsuit was
16 filed and Mr. Kolenich picked up the case, since
17 that time you haven't had any further
18 conversations about imaging your phone?
19     A. No. I have no idea how to get that
20 started or what I need to do.
21     Q. Mr. Kolenich didn't tell you?
22     A. No.
23     Q. Did Plaintiffs tell you?
24     A. Not that I -- no -- nothing I know of.
25 Like I said, this Exhibit 11 is the closest

1 thing I have gotten to this is how you do this,
2 A, B, C.
3     (Exhibit 15, Discord consent form,
4 marked for identification.)
5 BY MR. BARKAI:
6     Q. Mr. Kline, you have been handed a
7 document marked Exhibit 15.
8     Do you recognize this?
9     A. Yes, actually I do.
10     Q. What is this?
11     A. This is -- I mean, it didn't look like
12 this when they sent it to me. But Discord, I
13 believe, sent this to me. And I e-mailed them
14 back with it signed, or whatever. They e-mailed
15 this to me in PDF form, and I said yes. And
16 then they banned my account, like, two weeks
17 later, or something like that.
18     Q. When was this?
19     A. I think this is -- I don't know. I
20 have no idea what time -- when that was. My
21 Discord account was banned this -- I guess in
22 late 2018, early 2019.
23     Q. Your Discord account was banned in
24 2018 or 2019?
25     A. I don't know exactly when it was

1 banned. I think it was somewhere in there, late
2 '18, early '19 was that Discord account ban.
3     Is this -- yeah, I believe this is
4 something that they sent me. Because, like I
5 said, I responded to this. I did not get one of
6 these from Twitter, because they did not have my
7 e-mail address, I guess. I did get one of these
8 from Discord.
9     Q. Do you recognize this document as a --
10     A. I think anyway.
11     Q. Do you recognize this document as a
12 consent form for Discord to disclose your data?
13     A. Yes.
14     Q. You stated earlier that you are
15 prepared to execute whatever consents you need
16 to execute --
17     A. Yes.
18     Q. -- in discovery, right?
19     A. This is one of the things I thought I
20 had already done.
21     Q. Are you prepared to execute this
22 today?
23     A. Yes.
24     Q. What e-mail account did Discord send
25 this e-mail to?

1     A. It was probably the Deplorable Truth
2 one. I -- I assume so. Maybe you guys know. I
3 assume probably that.
4     Q. How did --
5     A. But it might have been Eli F. Mosley,
6 because the Court gave it to them. I don't
7 know.
8     Q. You used either
9 DeplorableTruth@Gmail.com or
10 Eli.F.Mosley@Gmail.com to respond?
11     A. Yes, it was one of those two.
12     Q. Mr. Kline, are you -- do you have
13 access to those e-mails now?
14     A. Like, right now? On my phone, maybe.
15 I might. I don't know. I would have to go
16 through and look.
17     Q. You might have access to the e-mails
18 on your phone?
19     A. I mean, I -- the Deplorable Truth and
20 Eli Mosley are both on there. The fact would be
21 can I go through and find the e-mail, or
22 whatever.
23     But, yeah, I have -- like I said, I
24 e-mailed them back saying, yes, I approve. And
25 I remember, I was waiting -- I was waiting for

MAGNA®
LEGAL SERVICES

1  them to send it, or whatever. Then I actually
2  got an e-mail on my phone and it was from
3  Discord. I was like oh, they finally got,
4  responded. It was two weeks later. I looked
5  down, it said your account has been banned from
6  Discord. I was, like, okay, I signed this
7  release form and you banned me two weeks later.
8  It didn't make any sense. So, it was that
9  account.
10  Q. Are you prepared to produce to
11  Plaintiffs your e-mails with Discord that you
12  are describing?
13  A. Yes.
14  Q. We would like you to, within the next
15  24 hours, search through your e-mails and locate
16  the e-mails that you have with Discord and to
17  forward them to us.
18  A. Sure. Yeah, I'll just forward them
19  right over to you guys. Like I said, it was
20  literally just -- it was literally me just
21  saying yes -- yes to this form. I consent for
22  them to go through whatever it was.
23  Q. We would like you to search through
24  your e-mails, locate the e-mails that you have
25  with Discord, whether they are ones that they

1  sent to you or the ones you sent to them, and to
2  send them -- to forward them to us.
3  A. Yeah, that makes sense. They were a
4  mess over there, too. Like I said, I e-mailed
5  them afterwards and said, did you get the
6  consent form or whatever. And, also, can you
7  change the admin privileges on all of the
8  accounts I was on to somebody else. And they
9  e-mailed me back and said we are not reversing
10  your ban. That is all they said. I was, like,
11  that is not the answer to either of my
12  questions.
13  Q. Do you commit to looking for --
14  A. Yes.
15  Q. -- e-mails and sending them to us?
16  A. Yes. That is super easy for me to do.
17  Umm, I'll just -- yeah, I should be able to find
18  those.
19  Q. Are you prepared to fill this form out
20  and sign it today?
21  A. Yes.
22  Q. If I give this to you right now, are
23  you prepared to write here --
24  A. The only issue is going to be is I
25  don't know which e-mail address it was used for.

1  Q. But you --
2  A. I can put both of them right there.
3  Eli Mosley -- Eli F. Mosley or Deplorable Truth.
4  You know what I mean? Do you have a pen?
5  Thanks.
6  One for each?
7  Q. Do one for each e-mail account.
8  A. What was the --
9  Q. The username is --
10  A. The Eli Mosley one.
11  Q. Eli Mosley. And, also, Sayer.
12  A. Okay. I have to get the number that
13  is next to it. You can have the name username,
14  just different numbers.
15  Q. 5269.
16  A. 5269. Thank you.
17  Umm, Sayer. There is one of them.
18  Then can -- that should be good. Here
19  is those two.
20  Q. Thank you.
21  A. Those should be what you guys are
22  saying, right?
23  Q. Thank you. In addition, Mr. Kline,
24  are you prepared to submit those consent forms
25  from your e-mail address to Discord?

1  A. Yes.
2  Q. Are you prepared to do that right now?
3  A. I mean, I have to turn my phone on and
4  send -- like, find the e-mail and send it back,
5  I guess.
6  Q. You can go ahead and turn your phone
7  on. Mr. Bloch sent you via e-mail this same
8  consent filled in with your information to your
9  DeplorableTruth@Gmail.com e-mail address.
10  You have access to that e-mail
11  address, right?
12  A. The Deplorable Truth one?
13  Q. Correct.
14  A. Yes, yes.
15  Okay, so, I received it. And you just
16  want me to respond --
17  Q. We would like you to forward that
18  e-mail --
19  A. Okay.
20  Q. -- to the following e-mail address.
21  It is sca --
22  A. Should I include you guys or anything
23  right?
24  Q. You can just do this e-mail address.
25  A. Okay.

1    Q. sca@bsfllp --
2    A. bsfllp --
3    Q. .com.
4    A. .com, okay. That is it?
5    Q. Yes.
6    A. All right.
7    Q. Could you also just reply to the
8 e-mail as well from Mr. Bloch?
9    A. Mm-hmm.
10    Q. And just say you received it. You can
11 just type in the word received.
12    A. This e-mail address -- okay. So, just
13 for your information, the Gab account that I
14 have is signed up -- is on the Deplorable Truth
15 e-mail. It says my last log in was two years
16 ago. So, I just haven't -- like, I am just
17 going through the e-mails right now. That is
18 what I have.
19    The Deplorable Truth one is literally
20 -- like, it is my spot -- it is, like, Spotify,
21 Hulu, PayPal, stuff. You know what I mean? It
22 is not really a lot of Alt-Right stuff. Like I
23 said, I use that e-mail like that on the
24 document because I -- I didn't think anyone was
25 going to use it anyway.

1    Q. Thank you, Mr. Kline. We received
2 that.
3    A. So, just to be clear then, that is
4 basically telling Discord that they can send
5 over all the stuff that deals with that account.
6 And then I believe I got one from Twitter, I
7 think, at one point. But I can't remember.
8    (Exhibit 16, Twitter consent form,
9 marked for identification.)
10    THE WITNESS: This is going to be the
11 issue with this one. I remember when I saw
12 this, that was an issue. It is asking for,
13 like, username and e-mail addresses. But I
14 don't know either, outside the list of usernames
15 you guys have.
16 BY MR. BARKAI:
17    Q. Mr. Kline, you are referring to
18 Exhibit 16; is that right?
19    A. Correct.
20    Q. You recognize this to be a consent to
21 disclose data from Twitter; is that right?
22    A. Correct.
23    Q. You are willing to fill this out?
24    A. Yes. But, like I said, I don't know
25 the e-mail addresses or the account names, other

1 than the list you guys have of the account
2 names.
3    Q. The issue with the e-mail addresses is
4 that they were, quote, burner e-mails; is that
5 right?
6    A. Yes, yes. It is random letters and
7 numbers at whatever website.
8    Q. Was there any Twitter account that you
9 created using an e-mail address that was not a
10 burner e-mail address?
11    A. Not that I recall, no.
12    Q. Never a Twitter account that was
13 created using Eli.F.Mosley?
14    A. I don't believe so, no.
15    Q. Or --
16    A. I have to go back and check. If I
17 did, it would have been way, way long ago.
18    Q. And never a Twitter account associated
19 with the e-mail address
20 DeplorableTruth@Gmail.com?
21    A. No, I don't think I would have made a
22 Twitter account with that one.
23    Q. Are you willing to complete this form
24 to the best of your ability, even if you don't
25 remember all --

1    A. If I could just e-mail a list -- you
2 guys had that list earlier of all my Twitter
3 accounts that you guys had, that you guys knew
4 of. That is the best list I have seen of ones I
5 would remember, from what I would remember.
6    Q. When we go off the record, we'll ask
7 you to complete the Twitter form to the best of
8 your ability.
9    Are you prepared to do that?
10    A. That's fine. Yeah.
11    Q. You said earlier, Mr. Kline, that you
12 were prepared to turn over all of your
13 electronic devices for imaging, right?
14    A. Yes. Just not tonight, because I have
15 to use the GPS to get somewhere. But after
16 that, yeah.
17    Q. But you are -- are you prepared to
18 today identify all of your electronic devices?
19    A. Yes. It is my phone. I don't --
20 there is nothing else that I would have used.
21    Q. Are you prepared today to identify all
22 of your social media accounts that may contain
23 potentially relevant documents?
24    A. Yes.
25    (Exhibit 17, social media and

**MAGNA⊗**
LEGAL SERVICES

1  electronic devices consent form, marked for
2  identification.)
3  BY MR. BARKAI:
4     Q. You are being handed a document marked
5  Exhibit 17.
6     Do you recognize this document?
7     A. No, I have never seen this. But I can
8  understand what it is asking.
9     Q. Do you see you are being asked to
10  certify your social media accounts and
11  electronic devices?
12     A. Yes.
13     Q. Are you prepared to fill this form out
14  as well?
15     A. Yes. I am just trying to think of
16  what other social media accounts, or how I would
17  denote them. We already have Discord and
18  Twitter. The only other one is Facebook, but
19  that was deleted. I don't know what the account
20  username for a Facebook account would be.
21     Q. When we go off the record, we are
22  going to ask you to fill that form out.
23     A. Okay.
24     Q. You are prepared to do so?
25     A. Yes.

1     (Exhibit 18, 11/27/2018 Greene e-mail,
2  marked for identification.)
3  BY MR. BARKAI:
4     Q. Mr. Kline, you are being handed an
5  exhibit marked Exhibit 18.
6     Do you recognize this e-mail?
7     A. Yeah. I think this is the e-mail that
8  I responded to. Maybe this is. I am not --
9  maybe not.
10     Q. You think that you responded to this
11  e-mail?
12     A. No, this doesn't look the same.
13  Because it is -- the bottom part looks similar.
14  The form, I guess you could say. The form looks
15  similar. But the body of the e-mail above it
16  does not.
17     Q. You recognize the form below as the
18  Discord consent that you have just signed?
19     A. Yeah. I think Discord itself sent
20  this to me, and this is not from Discord. This
21  is from you guys, I guess.
22     Q. This is the Discord consent that you
23  were asked to sign --
24     A. Correct.
25     Q. -- that you signed just now?

1     A. That I just signed now, yes.
2     Q. So, you never signed that form before
3  today, right?
4     A. No. But the original e-mail I got, I
5  believe, was from Discord asking me for my
6  permission, and I said yes to them.
7     Q. Do you see above the form that you
8  have just signed for the first time an e-mail
9  from Christopher Greene to
10  Eli.F.Mosley@Gmail.com?
11     A. Yes.
12     Q. Is that your e-mail address?
13     A. Yes.
14     Q. The subject of this e-mail is Sines
15  versus Kessler, right?
16     A. Yes.
17     Q. And you understand that to be the name
18  of this lawsuit?
19     A. Yeah.
20     Q. Do you remember receiving this e-mail?
21     A. No, I don't. Or if I did, I had -- it
22  was -- maybe -- maybe I got this e-mail, and
23  then Twitter -- or Discord sent me their -- I
24  don't know. I would have to go through and look
25  at it.

1     The only other thing I could think of
2  is that you guys sent this to me, and then
3  Discord sent something to me, and I responded to
4  Discord, thinking it was, like, the same thing,
5  or goes to the same person.
6     Q. You didn't respond to this e-mail,
7  right?
8     A. Not to this e-mail, definitely not.
9  Like I said, I -- I don't recognize the body of
10  it, or whatever. But this, like -- bottom
11  part of Exhibit 18, that looks familiar.
12     Q. Do you see the paragraph that states
13  Plaintiffs request that you send the below
14  consent e-mail to sca@bsfllp.com no later than
15  Friday, November 30?
16     A. Yes.
17     Q. You didn't do that, right?
18     A. No.
19     Q. Why didn't you do that?
20     A. Because, like I said, I didn't even
21  see that this e-mail existed, or I don't
22  remember about this one. Umm, and I -- like
23  I said, Discord is one of the companies that I
24  sent back an e-mail to saying I approve, then
25  they banned me. So, I thought this part was

1   taken care of.
2       Q. Those e-mails with Discord are e-mails
3   that you will produce to us in the next 24
4   hours, right?
5       A. Yes, yes.
6           (Exhibit 19, civil docket sheet,
7   marked for identification.)
8   BY MR. BARKAI:
9       Q. You have been handed a document marked
10  Exhibit 19.
11          Have you seen this document before?
12      A. Definitely not.
13      Q. This document states that it is a
14  civil docket sheet for this case at the top of
15  Page 1.
16          Do you see that?
17      A. Yes.
18      Q. Turning to the third page of this
19  document, you had stated earlier that you never
20  received a phone call from the Court regarding
21  Court conferences in which you were supposed to
22  appear, right?
23      A. Yes.
24      Q. Did you receive an e-mail from the
25  Court regarding Court conferences in which you

1   were supposed to appear?
2       A. I might have. I would have to go back
3   and check. But it wouldn't be something that I
4   would remember, like, right now.
5       Q. Do you see Docket Entry 402, quote,
6   clerk called and e-mailed Elliott Kline, a/k/a
7   Eli Mosley, and Matthew Heimbach three times
8   regarding setting a telephone -- telephonic
9   hearing an outstanding discovery issue. After
10  no response from either, clerk set hearing.
11  Clerk called and left voicemails, mailed and
12  e-mailed notice of hearing to both Defendants.
13      A. I mean, I see that. I just don't know
14  -- I don't know if that was a call I received --
15  I guess not. They said they left voicemails.
16  But I don't have anything.
17      Q. Is that wrong, what it states here?
18      A. I mean, I am not saying they didn't do
19  that. But I didn't receive any of it or read
20  any of that. I didn't know -- you know what I
21  mean? It is, like, it is saying that -- telling
22  the outstanding discovery issues, and this was
23  in February. I don't remember having any issues
24  in February, as far as discovery goes.
25          I think that -- wasn't that near the

1   time where they did the motion as well? I mean,
2   is that in here? I don't even know. No, I
3   don't know. But, no, that -- the Court may have
4   done that. But, like I said, I didn't know what
5   I was supposed to be doing.
6       Q. Did you receive any e-mails from the
7   Court regarding your attendance at a hearing?
8       A. Possibly. I am not sure.
9       Q. Did you receive any phone calls from
10  the Court regarding your attendance at a
11  hearing?
12      A. Possibly.
13      Q. Did you receive any voicemails from
14  the Court regarding your attendance at a
15  hearing?
16      A. Possibly. Like I said, I am not sure.
17      Q. You didn't respond to any e-mail or
18  phone call or voicemail from the Court, right?
19      A. Correct. I assume I didn't answer any
20  of their calls.
21      Q. Why didn't you answer any of their
22  calls?
23      A. Because - first of all, like I said
24  earlier, I -- my phone number was leaked awhile
25  ago, so I get phone calls all the time, every

1   day, from people who I don't want calling me.
2   And second of all, I didn't -- like I said, I
3   didn't know I got any calls from the Court here,
4   or I would have picked up or answered it if I
5   knew they were from the Court.
6       Q. This is the first time that you have
7   ever found out you have gotten a call from the
8   Court?
9       A. I knew I got calls from the Court for
10  things like the July 2. I got that phone call
11  about the teleconference. I had that with all
12  the information. And then I got one today,
13  actually, reminding me about the call tomorrow.
14          But as far as going back, like, you
15  know, February 2019, I don't remember getting
16  any calls then.
17      Q. You don't remember getting any e-mails
18  from the Court regarding this hearing?
19      A. No.
20      Q. Do you check your voicemails that you
21  receive?
22      A. Yes, pretty frequently.
23      Q. You do check your voicemails?
24      A. Yes. That's how I noticed -- I just
25  checked when we went for lunch. That is how I

1  saw the voicemail about tomorrow with the
2  information on the call for tomorrow.
3      Q. You received a voicemail about the
4  conference call tomorrow?
5      A. Yes.
6      Q. You never received a voicemail about
7  the conference call on February 2019?
8      A. No. I mean -- not that -- no, not
9  that I remember. I literally get phone calls
10  that are just people screaming into the
11  microphone, like, kill yourself, and then they
12  hang up, right.
13      So, I get those, like, all day, all
14  the time. I just never changed my number. And,
15  so, when I get calls from numbers I don't know,
16  I generally don't answer them right away. But
17  if it is a call from, like, the Court, and I can
18  -- I go to my voicemail and it puts it in text,
19  I can see right away that is the Court.
20      So, like I said, I have gotten -- I
21  have gotten the last two calls they sent me.
22  But before that, I haven't gotten anything.
23      Q. So, you do respond to calls from the
24  Court; is that right?
25      A. Yeah, yeah. I mean, I shouldn't say I

1  respond. I mean, I acknowledge them. Because
2  -- I don't call them back and say, hey, I got
3  your call for the teleconference tomorrow, or
4  whatever. She sent me the code or whatever.
5      Q. You do receive voicemails from the
6  Court?
7      A. Yes.
8      Q. And you do listen to those voicemails?
9      A. Yes.
10      Q. Do you check when the voicemail comes
11  in what phone number it is from, and if it is
12  from the Court, you listen to it?
13      A. If it is a Charlottesville number, I
14  can tell you. Or Virginia number.
15      (Exhibit 20, 3/4/2019 Order, marked
16  for identification.)
17  BY MR. BARKAI:
18      Q. Mr. Kline, you do check when the
19  voicemail comes in whether it is from the Court,
20  right?
21      A. Yes.
22      Q. You know it is from the Court because
23  of the phone number?
24      A. Yes.
25      Q. But, nonetheless, you have not

1  appeared on any conference calls with the Court
2  from the time that Mr. Kolenich was no longer
3  representing you until July 2, 2019, right?
4      A. Like I said before, I didn't notice or
5  see or get any of those calls that I had -- like
6  I said, I never -- I mean, I can go through my
7  phone and see maybe I missed some or something.
8  But I never saw any of those calls.
9      I didn't start responding to what was
10  going on until -- the first thing was -- was
11  Patrick Casey reached out to me. I was, like --
12  first of all, he called me and I knew right away
13  who it was because I had it in my cell phone.
14  So, I answered it. He was, like, hey, you got
15  to appear on this call for the Court case. And
16  you haven't done any of the discovery stuff. I
17  said -- I told him I thought that it was taken
18  care of, I already responded to the Discord guy,
19  I think I responded to the Twitter guy -- or the
20  form or whatever. And then I told them to let
21  me know what they want to do with the phone.
22      Umm, that is what I told Mr. Kolenich.
23  And he was, like, no, you have to do all this
24  other stuff. Like, you haven't responded to
25  anything. And I didn't even know there was

1  anything I wasn't responding to.
2      Q. When was that conversation with Mr.
3  Casey?
4      A. Umm, I want to say, like, a week or
5  two before July 2.
6      Q. The conversation with Mr. Casey was a
7  week or two before July 2?
8      A. Before -- yeah, before the phone
9  conference that we had that we set the dates for
10  discovery.
11      Q. I asked you a question earlier, Mr.
12  Kline, and you gave a long response about a
13  conversation you had with Mr. Casey, but you
14  didn't answer the question.
15      You have not appeared on any
16  conference calls with the Court from the time
17  that Mr. Kolenich was no longer representing you
18  until July 2, 2019, right?
19      A. Correct. I didn't know I had any. I
20  didn't know I had a responsibility for any.
21      Q. You did testify that you listened to
22  your voicemails, right?
23      A. Yes.
24      Q. And your e-mail address is
25  Eli.F.Mosley@Gmail.com, right?

1    A.  Yes.
2    Q.  You have been handed a document marked
3  Exhibit 20.
4    A.  Mm-hmm.
5    Q.  Have you seen this before?
6    A.  No.
7    Q.  Do you see this is an Order from Judge
8  Hoppe?
9    A.  Yes.
10    Q.  You have never -- you have never been
11  provided this?
12    A.  It looks like it is to, umm, the --
13  what are they -- I don't know what they are
14  called anymore -- National Socialist Movement.
15  Doesn't look like -- it doesn't say me anywhere,
16  does it?
17    Q.  If you could turn to Page 3 of this
18  Order.  Do you see in the second bullet point
19  that the Court ordered all Defendants, quote on
20  quote, to produce their electronic devices and
21  social media account credentials to access
22  electronically stored information to the third
23  party vendor by the end of the day on Friday,
24  March 8, 2019?
25    A.  Yeah, I see that.  But I have never

1  seen this -- this form, or this -- this page.
2    Q.  You understand all Defendants to
3  include you?
4    A.  Yes.
5    Q.  You did not produce your electronic
6  devices and social media account credentials by
7  Friday, March 8, 2019, did you?
8    A.  No.  But like I said, if I would have
9  known how to, I would have been more than happy
10  to.
11    Q.  Are you aware that earlier this year
12  Plaintiffs moved for sanctions against you?
13    A.  Yes.  That's what Patrick Casey told
14  me.
15    Q.  A hearing was scheduled regarding that
16  motion for sanctions, right?
17    A.  I guess.  I don't -- I don't -- I am
18  not too sure how that works.  But I guess you
19  guys had a hearing about it, or whatever.  But I
20  didn't know about it.
21    Q.  You did not know that the hearing was
22  happening?
23    A.  No.
24    Q.  No one ever told you that the hearing
25  was happening?

1    A.  No.
2    Q.  Plaintiffs never told you that the
3  hearing was happening?
4    A.  I mean, they might have e-mailed me,
5  but I didn't see it.
6    (Exhibit 21, 5/14/2019 e-mail
7  exchange, marked for identification.)
8  BY MR. BARKAI:
9    Q.  You are being handed a document marked
10  Exhibit No. 21.
11      Do you recognize this e-mail?
12    A.  No, I don't.  Honestly.
13    Q.  Do you see your e-mail address in the
14  CC?
15    A.  Yeah, I see it on there.  But, like I
16  said, I don't know -- I don't remember -- I
17  don't recognize this as something that was sent
18  to me.
19    Q.  But this was sent to the correct
20  e-mail address?
21    A.  Yes.
22    Q.  Is there any reason that you can think
23  of why you would not have received this at your
24  e-mail address?
25    A.  No.  I mean, I should have received

1  it.  But, I don't -- like I said, I don't --
2    Q.  Do you see that this is an e-mail
3  scheduling an argument on the motion for
4  sanctions against Elliott Kline, a/k/a Eli
5  Mosley?
6    A.  Yeah, I do see that.  But, like I
7  said, I didn't know that was happening.  I
8  didn't know there was a hearing.  Like I said, I
9  didn't recognize -- I didn't receive -- I mean,
10  I probably -- it is my e-mail address, but I
11  didn't -- I didn't read through this one.  I
12  didn't know I had a motion, like I said, until
13  Patrick Casey had called me.
14    Q.  Did you not know that there was a
15  motion regarding you until Patrick Casey called
16  you because you were ignoring e-mails?
17    A.  No, I wasn't ignoring them.  I was --
18  like I said, I was getting e-mails.  But none of
19  the e-mails pertained to me that I read.
20    Q.  Were you choosing which e-mails to
21  read?
22    A.  No.  I mean, almost all of them are
23  read right now.  I went through and read most of
24  them, or opened them.  I just don't know how I
25  would have missed so many of these.

1    Q. You also missed the e-mail in Exhibit
2  11, right --
3    A. Yes.
4    Q. -- that we had looked at earlier?
5    A. That one is after I had been
6  contacted. That was the one that the Judge had
7  said are you -- do you see that paper, and I
8  said yes. I was looking at a different one that
9  was sent to me that day instead of the one the
10  day before. Because that one, Exhibit 11, was
11  from July 1, the day before the phone call.
12    Q. You testified earlier that you had --
13  you had missed messages from the Court regarding
14  your court hearing, right?
15    A. I believe so. Maybe. I don't know.
16  For what?
17    Q. You testified earlier that you check
18  your voicemails, right?
19    A. Yes.
20    Q. And that the 610 phone number is the
21  correct phone number?
22    A. Yes.
23    Q. And Eli.F.Mosley@Gmail.com is the
24  correct e-mail address?
25    A. Yes.

1    Q. You testified earlier that you agreed
2  that it appeared to you that the Court had been
3  attempting to reach you regarding your upcoming
4  court hearings, right?
5    A. Yes.
6    Q. Do you have any explanation as to why
7  you did not receive those messages?
8    A. I just -- I have -- I started
9  receiving messages -- or I started noticing
10  these messages were for me, or whatever, for the
11  hearing for me after I talked with Patrick
12  Casey. And then we had the July 2 phone call.
13    Q. Were you --
14    A. Before that, I didn't realize that --
15  I didn't know these -- I didn't know that there
16  was actions I needed to take. I thought I was
17  good.
18    Q. Did you receive this e-mail, Mr.
19  Kline, or did you not?
20    A. What, this?
21    Q. Exhibit 21.
22    A. Exhibit 21. I mean, obviously it says
23  -- it says it was sent to me. But I don't
24  recognize it.
25    Q. Do you not recognize it because you

1  didn't read it at the time when it came into
2  your inbox?
3    A. I am not sure. I don't have access to
4  my inbox right now to look and see if it was
5  read or not. I assume I looked at this. The
6  subject is Sines versus Kessler, so I assume I
7  saw it.
8    Like I said, I did not know back in
9  May there was a motion against me. I didn't
10  know that.
11    Q. This is an e-mail about that motion,
12  right?
13    A. Right. I didn't know that was a
14  thing.
15    Q. The e-mail was informing you that
16  there was a motion about you in effect, right?
17    A. Correct. Like I said, I didn't know
18  -- I didn't know that until Patrick Casey called
19  me several weeks after this, or a couple weeks
20  after this.
21    Q. But this e-mail was in advance of the
22  hearing and in advance of when Mr. Casey talked
23  to you, and this e-mail is about that motion,
24  right?
25    A. Right. That is what I am saying. I

1  didn't find out from this e-mail, I found out
2  from Casey, from Patrick Casey.
3    Q. If you had read this e-mail, this
4  e-mail would have revealed to you that there was
5  a hearing coming up on your motion, right?
6    A. Right. But what I am saying is, I
7  don't remember reading this or seeing this. So,
8  if I would have read it, I would have known that
9  it was -- I would have known there was a motion
10  against me. Like I said, I didn't know that. I
11  didn't know that was a thing.
12    Patrick Casey called me, what, a week
13  or two after this. So, like I said, I just
14  didn't know there was a motion against me.
15    Q. When exactly did Mr. Casey call you?
16    A. Probably a week or two before the July
17  2 call. Maybe -- maybe even a little longer
18  than that. Maybe three weeks, a month. I am
19  not entirely sure.
20    Q. You -- during this time was anyone
21  informing you of your obligations in discovery?
22    A. No.
23    Q. Were -- well, were you in touch with
24  Mr. Kolenich at all?
25    A. Patrick Casey told -- Patrick Casey

MAGNA⊗
LEGAL SERVICES

1  told me to call Mr. Kolenich and get in touch
2  with him.  And he essentially said that I am
3  going to have to get on a call with you guys and
4  the Court and work out how to fix the discovery
5  issues.  And that was, like, the extent of our
6  conversation.  That was the first time I had
7  spoken to him for awhile.
8       (Exhibit 22, 6/26/2019 e-mail
9  exchange, marked for identification.)
10  BY MR. BARKAI:
11      Q.  You are being handed a document marked
12  Exhibit 22.  I would like you to turn to the
13  second page of this document.  Do you see an
14  e-mail from James Kolenich on June 7, 2019 to
15  Michael Bloch regarding Eli Mosley?
16      A.  Umm, no.  You mean this part right
17  here?  Yeah, okay.  I see it.  You said the
18  second page?
19      Q.  On the second page there is an e-mail
20  from Mr. Kolenich to Mr. Bloch --
21      A.  Yes.
22      Q.  -- regarding you?
23      A.  Yes.
24      Q.  This e-mail states the word arrest has
25  had a near magical effect on my former client.

1  Eli Mosley, Elliott Kline, can be reached at
2  (610) 406-2229.  He reached out to IE upon
3  seeing a news article referencing the arrest
4  discussion in court.  You can text that number
5  or call him.  He has been fully informed of the
6  discovery/ESI --
7       A.  He knows Patrick Casey called me.  So,
8  I mean, that is just wrong.  He knows Patrick
9  Casey called me.
10      Q.  Mr. Kolenich is wrong about this?
11      A.  100 percent.  Patrick Casey called me
12  and informed me of what was going on.  And I
13  read a news article about what was going on, and
14  then I called Mr. Kolenich.  That is how I knew
15  about the news article that he is referencing.
16  Because in the news article the Judge had -- it
17  said right in the news article the Judge was
18  talking about possible arrests.  And I said --
19  so I asked Mr. Kolenich, I said, I didn't know
20  any of this was going on.  Like, how did -- you
21  didn't inform me, or no one informed me, and I
22  read it in the news.  So, that is what he is
23  referencing in the e-mail.
24       But Patrick Casey is the one who
25  called me and reached out to me about what was

1  going on.  Before that, I thought that
2  everything was going -- going on.  And I was
3  still waiting for you guys to try to get my
4  phone, which I was just sitting on, waiting for
5  you guys to take -- or get the image of.
6       And I thought -- like I said, at the
7  time I thought the Discord and the Twitter stuff
8  was taken care of.  Or at least the Discord
9  stuff.  I wasn't sure about the Twitter stuff.
10      Q.  So, you told Mr. Kolenich that you
11  didn't know any of this was going on, even
12  though there had been e-mails and calls to you
13  about your attendance at hearings, right?
14      A.  Right.  Like I said, I didn't know
15  those hearings were hearings for me.  Like, if I
16  saw them.  Most of them I don't think I saw
17  though.  I didn't know they were for me.
18      Q.  You told Mr. Kolenich that you didn't
19  know any of this was going on, even though there
20  had been --
21      A.  I didn't know the motions were filed
22  against me.
23      Q.  Do we have your permission to ask Mr.
24  Kolenich about this?
25      A.  Ask him what?

1       Q.  Do we have permission to ask Mr.
2  Kolenich about your conversations that are
3  referenced in the June 7 e-mail?
4       A.  I mean, I have -- I'll show you right
5  now that Patrick Casey called me.
6       THE VIDEOGRAPHER:  Can we go off the
7  record for a second?
8       MR. BARKAI:  Sure.  We are going off
9  the record.
10      THE VIDEOGRAPHER:  Time is 3:48 p.m.,
11  going off the video record.
12      (Recess was taken.)
13      THE VIDEOGRAPHER:  The time is now
14  3:56 p.m., we are back on the video record.
15  BY MR. BARKAI:
16      Q.  Mr. Kline, before we took a break you
17  had testified that you were going to show us
18  where the -- where in the call log Patrick Casey
19  called you regarding the hearing before the
20  Court, right?
21      A.  Correct.
22      Q.  Were you able to find that?
23      A.  No.  My phone calls only go back to --
24  until July.  Like, the beginning of July.  So,
25  it doesn't go back that far.

1       I don't know if -- when -- if they
2   image the phone if they are able to pull that up
3   or not.  But it doesn't go back far enough.
4       Q.  Your call log --
5       A.  I am 100 percent sure that is exactly
6   how that happened.
7       Q.  Your call logs go back to the
8   beginning of July, you said?
9       A.  It goes back to -- the last one is
10  7/9/2019.
11      Q.  We asked you earlier whether we have
12  your permission to ask Mr. Kolenich for the
13  phone number of your temporary Walmart phone
14  that you were using when your iPhone was
15  temporarily broken.
16      Do you remember that?
17      A.  Yes.
18      Q.  You had said earlier that you have
19  granted us permission to do that, right?
20      A.  Umm, what, just ask him if -- for the
21  phone number?
22      Q.  Correct.
23      A.  I mean, sure.  I don't understand -- I
24  don't understand the question.
25      Q.  Do you mind if we ask Mr. Kolenich

1   what that phone number was for the Walmart
2   phone?
3       A.  Does that have any implications or
4   anything like that?  I mean -- I just heard --
5       Q.  Mr. Kolenich, to the extent that you
6   may have attorney-client privilege that covers
7   that issue --
8       A.  Mm-hmm.
9       Q.  -- do you waive that privilege as to
10  that issue?
11      A.  No, no.  I'll provide you guys that
12  phone number when I get it out of storage.
13      Q.  Looking at Exhibit 22 --
14      A.  Which one was that?
15      Q.  That is an e-mail from Mr. Kolenich --
16      A.  I got it.
17      Q.  -- to Mr. Bloch on June 26.
18      We were looking at Page 2 and we were
19  discussing whether you had reached out to
20  Identity Evropa as Mr. Kolenich said, or whether
21  Mr. Casey had called you.
22      Do you remember that?
23      A.  Yes.
24      Q.  This e-mail states, quote, he has been
25  fully informed of the discovery/ESI

1   expectations, closed quote.
2       A.  That -- that is also not true.  He
3   literally said that we are going to set a call,
4   and we'll talk about it on the call, or
5   whatever.  And then after the July 2 call, he
6   never called me or contacted me again.  So, the
7   only thing that I knew was coming down the
8   pipeline was the -- umm, the DocuSign form.
9       Q.  So, Mr. Kolenich is wrong here?
10      A.  I mean, he says I have been fully
11  informed of discovery expectations.  That is not
12  true.  That would imply that I knew how to give
13  you guys my phone, that would imply I knew how
14  to give you -- you know, fill out these forms,
15  these Twitter forms or Discord forms.  I didn't
16  know anything about those.
17      (Exhibit 23, 6/21/2019 Order, marked
18  for identification.)
19  BY MR. BARKAI:
20      Q.  This document is being marked as
21  Exhibit 23.
22      Do you recognize this?
23      A.  No, but it looks like this is the
24  motion against me, I guess.
25      Q.  Does this appear to be an Order on

1   Plaintiffs' motion for sanctions against you?
2       A.  Correct.
3       Q.  You don't remember ever receiving this
4   e-mail -- I mean, excuse me, you don't remember
5   ever receiving this Order?
6       A.  No, I don't.  Because I would have --
7   like I said, I didn't know there was a motion
8   against me until I got that call.  Which was --
9   I mean, it might have been, like, the day of --
10  this was filed.  This was -- that is pretty
11  close to it.  This was filed 6/21.
12      (Exhibit 24, 6/25/2019 Bloch e-mail,
13  marked for identification.)
14  BY MR. BARKAI:
15      Q.  I am handing you a document that's
16  being marked as Exhibit 24.
17      Do you recognize this document?
18      A.  Yes.  This is something I was sent,
19  umm, to confirm the July 2 call we had.
20      Q.  Do you see that Mr. Bloch sent you
21  this e-mail on June 25, and that Mr. Bloch
22  attached -- do you see that Mr. Bloch sent you
23  this e-mail on June 25 attaching an Order on
24  Plaintiffs' motion for sanctions?
25      A.  Yes.

1       Q.  Does this refresh your recollection as
2  to whether you received the Order on the motion
3  for sanctions?
4       A.  I mean, yes.  Yeah, I received it.
5       But what I was saying earlier is that
6  I -- this was on 6/21.  That may be the day that
7  Patrick Casey called me.  The motion was filed
8  on 6/21.
9       Q.  The Order on the motion for
10 sanctions --
11      A.  Correct.
12      Q.  -- was filed by the Court on June 21?
13      A.  Yes.  And then the call was, what, a
14 week-and-a-half later, or on -- on July 2.  So,
15 I believe it was either the 21st, 22nd, or 23rd
16 that Patrick Casey called me.
17      But, yes, I recognize -- once he sent
18 me that, I saw -- yes, I saw this.  I saw what
19 was going on.  I knew what was going on.  I
20 didn't know beforehand, before that phone call.
21      Q.  Did you read this Order?
22      A.  Yes.
23      Q.  You read this Order all the way
24 through?
25      A.  Yes.  When I got it, I did.

1  Explaining I need to basically provide the stuff
2  for discovery.  And do the phone -- attend the
3  phone call.
4       Q.  Do you see on Page 3 where the Court
5  ordered you to, quote, provide complete and
6  accurate written answers or responses to
7  Plaintiffs' First Set of Interrogatories and
8  Request for Production of Documents?
9       A.  Yes, I see that.
10      Q.  So, did you understand when you
11 received this document that you were being
12 ordered to respond to those Interrogatories and
13 Request for Production of Documents?
14      A.  Yes.  And that was part of why I
15 wanted to go through with the phone call and
16 figure out how to do that.
17      Like I said earlier, the DocuSign
18 document that I got, when I first got it sent to
19 me, I thought it was going to be -- I thought it
20 was going to be these forms, the ones that tell
21 you, you know, list your username and all the
22 devices.  I still -- I still haven't gotten
23 this.
24      Q.  You still have not --
25      A.  I got them.  I have them now.  But --

1       Q.  But until today, you -- and still not
2  at this moment, you have not filled out those
3  forms, right?
4       A.  Correct.  But, like I said, I always
5  wanted to and intended to.  That was -- like I
6  said, that is what I wanted to do.  I just never
7  had the means sent to me.
8       Q.  Do you see in the next bullet that you
9  were being ordered to give Plaintiffs' counsel a
10 complete and accurate SCA consent form, allowing
11 Discord to produce documents?
12      A.  Yes.
13      Q.  You did not do that until today,
14 right?
15      A.  I didn't even have that form until
16 today.  I haven't seen the form until today.
17      Q.  You testified earlier that --
18      A.  Other than -- other than the one I
19 sent back to Discord.  But, like I said, seeing
20 this led me to believe oh, maybe Discord never
21 sent it to them.  Or maybe them banning me, my
22 account afterwards screwed something up in their
23 communication pipeline.  I don't know.
24      Q.  You testified earlier that Discord had
25 sent you the form before?

1       A.  Yes.  Discord sent me a form.  It
2  might not have been that exact form, but it was
3  a form basically asking for permission for --
4  for the case to use my information.  And I
5  responded I approved that.  Like I said, they
6  banned me two weeks later.
7       Q.  Earlier today we looked together at an
8  exhibit in which Plaintiffs' counsel had
9  previously sent you the Discord form, right?
10      A.  Umm, yes.  I think so, yes.
11      Q.  You had been provided that form
12 before, right?
13      A.  Correct.  But I don't know if it was
14 provided -- I think it was attached to -- it was
15 attached to something else I hadn't seen.
16      Q.  Do you see in the next bullet that you
17 were being ordered to complete SCA consent forms
18 giving Plaintiffs' counsel access to any other
19 social media accounts?
20      A.  Yes.
21      Q.  You also have not done that yet,
22 right?
23      A.  I am doing it right now.  But, like I
24 said, I have been waiting for this -- something
25 like this explaining what I needed to do with

1  the form, being able to write out my accounts,
2  or whatever.  Since the very beginning I was
3  told about discovery.  I never have gotten those
4  specific forms or instructions.
5      Q.  You received those forms and
6  instructions in an e-mail from Mike Bloch on
7  July 1, right?
8      A.  Umm, which exhibit is that?
9      Q.  Exhibit 11.
10      A.  Yes.  This is that -- yeah, this goes
11  back to that e-mail -- like I said, this is the
12  one where the Judge had said are you looking at
13  this, and I responded yes on the phone.  But I
14  was looking at a different form as the day
15  before.  I had not seen this one.
16      Q.  But you did -- my question was, you
17  received the forms and instructions in an e-mail
18  from Michael Bloch on July 1, right?
19      A.  Correct.  With the July 2 meeting
20  already -- already scheduled, or whatever.  But
21  I didn't know -- like I said, I received this,
22  but I did not -- I did not know this was what
23  this was in here.
24      Q.  But you did not complete any of the
25  forms that were attached to Mr. Bloch's July 1

1  e-mail --
2      A.  No, I didn't see this --
3      Q.  Correct, right?
4      A.  No, I did not see this e-mail.  Like I
5  said, when the Judge asked me, do you see this
6  e-mail, he was referencing this one.  I thought
7  he was referencing a different one I had
8  received probably, you know, July 1 or the
9  morning of July 2, I think it was.
10      Q.  That is your e-mail address, right,
11  Eli.F.Mosley@Gmail.com?
12      A.  Yes.
13      Q.  So, that e-mail did arrive in your
14  inbox, right?
15      A.  Correct.  But I didn't see this
16  specific -- these specific attachments or
17  anything like that.  This is the kind of thing I
18  have been looking for, as far as just to comply
19  with the Court's Orders.
20      Q.  Exhibit No. 24 was an e-mail from Mr.
21  Bloch to you regarding a hearing date, right?
22      A.  Yes.
23      Q.  Did you respond to that e-mail?
24      A.  Umm, I think I told him any day.
25      Q.  You remember responding to Mr. Bloch

1  saying any day?
2      A.  Umm, yeah, I think that is what -- I
3  think I just said yes.  Like, yes, that works.
4  I am pretty sure I responded like that.
5      Q.  You are pretty sure you said yes, that
6  works?
7      A.  Yeah, I am pretty sure.  I think it
8  was very short of me saying that works.
9      Q.  That e-mail would be in your Gmail
10  account?
11      A.  Yes.  That would be in the Eli F.
12  Mosley account.  I definitely responded to this
13  e-mail saying yes.
14      Q.  You said you definitely responded to
15  that?
16      A.  Yeah.
17      (Exhibit 25, 6/25/2019 & 6/26/2019
18  Bloch e-mails, marked for identification.)
19  BY MR. BARKAI:
20      Q.  You are being handed Exhibit 25.  This
21  is an e-mail from Mr. Bloch to
22  Eli.F.Mosley@Gmail.com on June 26.
23      Do you see that?
24      A.  Yes.
25      Q.  Do you remember receiving this e-mail?

1      A.  Not this one, no.  He is asking me if
2  he -- he is basically asking me if I am going to
3  show up to the thing.  But I know I responded to
4  him at some point saying yes.
5      Q.  Do you see where in this e-mail Mr.
6  Bloch states to you, we have not heard back from
7  you regarding your availability for a court
8  conference on July 2 at 12:00 p.m.?
9      A.  Yes, I see that.  I can check to see
10  which e-mail I responded to.  But I know I
11  responded to him.
12      Q.  Was Mr. Bloch wrong in this statement?
13      A.  What is his -- oh, wow.  It is in my
14  -- it is literally my drafts, yes, this time
15  works for me.  Okay.  Well, I didn't send that
16  e-mail.  So --
17      Q.  Could you share that draft with us
18  now?
19      A.  I mean, it is literally just --
20      Q.  Are you typing something, Mr. Kline?
21      A.  No, I am using one hand.  I am just
22  trying to find it.  Okay.  It is not coming up.
23  Hold on.  I have too many inboxes on this thing.
24      Q.  Which inboxes do you have on that
25  phone?

Case 3:17-cv-00072-NKM-JCH   Document 526-3   Filed 08/26/19   Page 57 of 76   Pageid#: 07 16

1      A.  Uh, just the one for Deplorable Truth
2  and Eli F. Mosley.  But it is bugged because of
3  the Identity Evropa account.
4      Q.  What do you mean, it is bugged because
5  of the Identity Evropa account?
6      A.  Because the Identity Evropa account
7  keeps trying to get me to sign in, because it
8  was signed in before they pulled that account.
9  So, my phone is always trying to get me to sign
10  into it every time I go to e-mail.
11      Q.  Are you not able to find the draft
12  that you just told us about 60 seconds ago?
13      A.  No, I am trying to find it right now.
14      Q.  You were just looking at that draft a
15  minute ago, right?
16      A.  Well, I hit drafts.  And it -- it is,
17  like, messed up.
18      Q.  What does it is, like, messed up mean?
19      A.  I can show it to you.  This is what it
20  was.  I have this.  I have this, right.  So,
21  this is my -- this is me
22  responding to Discord.  I have this right here.
23  And then --
24      Q.  That is a blank e-mail, right?
25      A.  I know.  But there was a draft right

1  above this, right here.
2      Q.  When was there a draft above it?
3      A.  Just now when I was talking to you.
4      Q.  Is the draft gone?
5      A.  I have no -- I am trying to find it.
6  I am trying to see if maybe I go into the
7  specific e-mail it was sent to, I can find it.
8      Q.  You were just looking at a draft a
9  minute ago, right?
10      A.  It was literally just a draft that
11  said I understand and can make that time.  That
12  is all it was.
13      Q.  Is the draft gone now?
14      A.  I mean, I am trying to find it.  Hold
15  on.
16          I mean, you can -- you can find that
17  in the discovery.  Regard -- regardless, I
18  showed up for this -- this call at the given
19  time.  I don't understand what the issue is.
20          No, I couldn't find the draft.
21      Q.  You couldn't find the draft?
22      A.  No.
23      Q.  We have spoken a couple of times about
24  your comment to the Judge at the July 2, 2019
25  hearing stating that you had received an e-mail

1  from Plaintiffs' counsel, correct?
2      A.  Yes.
3      Q.  Which e-mail were you referring to?
4      A.  Umm, well, he -- he was referring to
5  Exhibit 11, but I was referring to a different
6  e-mail that was a different court form.  I don't
7  know what it was.  I would have to go back and
8  look.  But it was a different thing I had been
9  sent the day before.
10          So, I was sent Exhibit 11 and then
11  something the same day.  He was asking if I had
12  received Exhibit 11.  I said yes, thinking that
13  what I was looking at was Exhibit 11, when it
14  wasn't.
15      Q.  It was a different e-mail that was
16  sent?
17      A.  Yes.
18      Q.  What date was that e-mail sent on?
19      A.  Umm, I am not sure.
20      Q.  Who sent that e-mail?
21      A.  Umm, someone -- I don't know.  It was
22  -- it was the subject of the Sines versus
23  Kessler e-mail.  It was for the court case.  I
24  don't know.
25          Like I said, he asks if I have the

1  page in front of me, and I said yes.  And I was
2  looking at a totally different page.  I know it
3  wasn't this page, or I would have known -- I
4  would have been able to follow through with it.
5      Q.  So, you were looking at some other
6  e-mail?
7      A.  Yes.
8      Q.  But you don't know who sent that
9  e-mail?
10      A.  I mean, it was one of the e-mails you
11  guys -- like, from the Court.  It was either
12  from you guys or the Court.
13      Q.  It was either from Plaintiffs or from
14  the Court?
15      A.  Correct.
16      Q.  You don't know what date that e-mail
17  was sent on?
18      A.  It was sent the day before or the day
19  of, the Exhibit 11.
20      Q.  It was sent on July 1; is that right?
21      A.  July 1 or the morning of July 2, yes.
22  Which is why I was looking at that one instead
23  of the one he was looking at.
24      Q.  You were looking at a different e-mail
25  sent from Plaintiffs or from the Court sent on

MAGNA
LEGAL SERVICES

1    July 1 or July 2?
2        A.  Correct.
3        Q.  You were not looking at Exhibit 11,
4    right?
5        A.  Correct.  And, like I said, he said do
6    you see the form we sent you.  And I was just
7    looking at a different one of them.
8        Q.  I would like to look at Exhibit 5,
9    which is the transcript of the July 2 call that
10   we have been looking at before.  If you could
11   please turn to Page 21 of Exhibit 5.
12       A.  Page 1, you said?
13       Q.  Yes.  Sorry, Page 21 of Exhibit 5.
14           Did you see that the Court asked you
15   at Line 14 of Page 21, Mr. Kline, did you
16   receive that e-mail and were you able -- do you
17   know what I am talking about with the -- you
18   know, the certification?  You responded, yeah, I
19   received the e-mail.  I am just scanning through
20   it right now, Your Honor, trying to catch up to
21   speed what it is talking about, what it is
22   asking for.
23       A.  Yes.  So, I was -- like I said, I
24   thought he was talking about one document, and I
25   was reading another one.

1        Q.  You told the Court that you had
2    received an e-mail with a certification, right?
3        A.  Well, I -- I misunderstood what
4    certification meant.  I just thought he was -- I
5    mean, I don't know.  I am guessing at the time I
6    thought he was asking me if I was reading
7    through the document that was a certified
8    document, not necessarily the certification of
9    the discovery items.
10       Q.  On Page 31 of that document do you see
11   that the Court asked you about documents that
12   you had received from Plaintiffs' counsel?  That
13   is at Line 23.
14       A.  Yes.  What was the question?
15       Q.  Do you see that the Court asked you
16   about documents you had received from
17   Plaintiffs' counsel?
18       A.  Yes.
19       Q.  Do you see on Page 32 that you
20   informed the Court that you had received consent
21   forms for Discord and stipulations about
22   electronically stored information and
23   certification documents for the accounts and
24   devices?
25       A.  Yes.

1        Q.  You told the Court that you had
2    received that, right?
3        A.  Right.  But whatever I was looking at
4    -- I have to go back and look.  Whatever I was
5    looking at had stuff about discovery.  That is
6    when he asked me that stuff, I was like, yeah,
7    that has discovery on it.  I didn't realize that
8    it was exact -- when he said certification
9    documents, I didn't know he meant exactly, you
10   know, the forms I have been filling out today.
11       Q.  You didn't fill out any of the forms
12   that you have been filling out today or any
13   other forms after this call, right?
14       A.  No, I wanted to.  But I didn't know --
15   I just didn't have the means to do it.
16       Q.  But you told the Judge you had
17   received the documents, right?
18       A.  Correct.  A misunderstanding which
19   documents he was talking about.
20       Q.  So, your testimony is that you had not
21   received the documents, even though you told the
22   Judge that you did?
23       A.  No.  My testimony is that I thought he
24   was talking about one set of documents, when I
25   had possession of a different set of documents.

1        Q.  Which documents did you have -- did
2    you have possession of?
3        A.  Ones that were sent to me the day
4    before.
5        Q.  Which documents were you sent the day
6    before?
7        A.  I am not sure.  But they were talking
8    about discovery and things like -- that he is
9    talking about in here, electronically stored
10   information.
11       Q.  At this time -- this was on July 2.
12   At this time you have received the e-mail from
13   Mr. Bloch attaching all of the Orders and
14   certifications, right, in Exhibit 11?
15       A.  In Exhibit 11?
16       Q.  Correct.
17       A.  I received it, but I didn't -- I
18   didn't -- I hadn't seen it.  Like I said, I was
19   looking at different -- a different e-mail.
20       Q.  So, you told the Court that you had
21   received a number of documents, referring to
22   documents other than the ones that you had
23   actually received from Mr. Bloch?
24       A.  No.  I had received multiple -- many
25   sets of documents.  I was reading one set that

MAGNA
LEGAL SERVICES

1    was dealing with the electronic and the
2    discovery stuff.  And I was reading through them
3    and skimming through, because that is what we
4    were talking about on the phone.  He asked me if
5    I had that in front of me, I said yes.  Not
6    realizing that he was talking about Exhibit 11
7    and I was looking at a different page.
8        Q.  Notwithstanding -- umm, strike that.
9            You did not fill out any
10   certifications after that call, right?
11       A.  I wasn't -- I wasn't expected to.  At
12   the end of the call, they said that you'll be
13   receiving a document to sign, and then that will
14   push forward the electronic -- umm, the
15   electronic imaging, which was the -- the
16   DocuSign agreement.
17       Q.  You received the DocuSign agreement?
18       A.  Yeah, and I signed it.
19       Q.  You also received from Mr. Bloch a
20   number of documents, right?  A number of
21   certifications and forms.
22           You see that now?
23       A.  I see it now, the Exhibit 11.  But,
24   like I said, I didn't know about it.  I didn't
25   see it until today.  This is the first time I

1    have seen this Exhibit 11.
2        Q.  You knew during that call with the
3    Court that you were expected to fill out some
4    forms, right?
5        A.  Yes.
6        Q.  And you were waiting to receive the
7    forms?  Is that your testimony?
8        A.  I was awaiting and I filled them out,
9    the ones I was sent, after the call.
10       Q.  You were never sent anything other
11   than the DocuSign contract?  Is that your -- is
12   that what you are saying?
13       A.  After the call, correct.  After the
14   call I got a DocuSign contract that I signed.  I
15   thought that was what I was supposed to sign.
16   Then the next part would be, I guess, the
17   company -- what I thought was the company reach
18   out for the discovery stuff.
19       Q.  You told the Court that you would fill
20   -- that you were happy to fill out some consents
21   regarding your devices, right?
22       A.  Yes.
23       Q.  That you were happy to identify your
24   social media accounts, right?
25       A.  Correct.

1        Q.  That you were happy to turn over your
2    devices for imaging?
3        A.  Yes.
4        Q.  Did you understand the DocuSign
5    contracts to cover your devices for imaging and
6    your social media accounts and your consents?
7        A.  I thought that's what that was, yes.
8    I thought that was consenting to all my things.
9            I thought it was weird because it
10   didn't ask me what they were.  Then I went
11   through and I read the whole thing, I was, like,
12   that is not what this is at all, but I still
13   need to sign it.
14       Q.  Did you ever ask anyone for
15   clarification?
16       A.  I mean, who I am going to ask?  The --
17   my lawyer?  Like, there was no -- there was no
18   clarification.  So --
19       Q.  Did you ever ask anyone for
20   clarification?
21       A.  I mean, like I said, I thought the
22   DocuSign document was what they were all talking
23   about.
24       Q.  Did you ask Mr. Kolenich for
25   clarification of your obligations?

1        A.  No.
2        Q.  Did you ask Mr. Bloch for
3    clarification of your obligations?
4        A.  No, because I thought my obligations
5    were fulfilled.
6        Q.  But you just testified that when you
7    reviewed the DocuSign contract you thought it
8    was strange because it didn't ask you about your
9    specific social media accounts.
10       A.  Right.  I thought that was the first
11   step, and the next step would be them asking for
12   specifics.
13       Q.  Did you ever ask anyone whether there
14   would be follow-up steps?
15       A.  No, because I had a hearing today.
16   And I knew -- I thought that DocuSign document I
17   signed was it.
18       Q.  Do you see at Page 33 in Line 25 --
19       A.  On --
20       Q.  We are still on the same exhibit.  I'm
21   sorry, the transcript, which is Exhibit 5.
22       A.  Five?
23       Q.  Correct.
24       A.  You said 22?
25       Q.  It is Page 33, Line 25.

MAGNA®
LEGAL SERVICES

1      A.  Yes.
2      Q.  Do you see there that -- well, first
3  of all, I'll refer you to the bottom of Page 32,
4  which is the prior page.  The Court said -- you
5  were on this call, right?
6      A.  Yes.
7      Q.  The Court said I think that, you know,
8  if it is a -- because it really just concerns a
9  matter of executing some consents then
10  identifying the accounts and devices, I think a
11  week is enough time to be able to do that.
12      At the bottom of Page 33 the Court
13  said, Mr. Kline, is a week -- will a week give
14  you sufficient time?  Page 34.  Mr. Kline, yes,
15  Your Honor.
16      Do you see that?
17      A.  Yes.
18      Q.  You told the Court that a week would
19  be enough time to -- to execute consents and
20  identify accounts and devices, correct?
21      A.  Correct.
22      Q.  When did you sign the DocuSign
23  contract?
24      A.  Umm, I am not sure.  A little bit
25  after that, I think.  Maybe a couple days.

1      Q.  Your testimony is that you signed the
2  DocuSign contract a couple days after this call?
3      A.  I am not entirely sure.  That was when
4  I was -- I was traveling during that.  So, it
5  was really tough for me to be able to do a
6  DocuSign on my phone.
7      Q.  How did you end up doing the DocuSign?
8      A.  On my phone.  It really sucked.  I had
9  to, like, tilt the phone to get it to sign
10  right.
11      Q.  Where were you traveling?
12      A.  I was house-sitting for somebody.  So,
13  I was up in Hazleton, I think.
14      Q.  You think that you signed the contract
15  on August 1 -- I'm sorry, that you signed the
16  contract within a couple of --
17      A.  I don't know.  I don't know when I
18  signed it.  But I know I first opened it up and
19  I went through and hit sign, and then I thought
20  it was weird I didn't get anything back.  I
21  didn't get -- you know how when you sign
22  something with DocuSign, how it sends it back,
23  kind of like a receipt.  I didn't receive
24  anything like that.  So, I went and tried it
25  again, then I finally got a receipt.

1      Q.  My question was, when did you sign the
2  DocuSign contract?
3      A.  I am not -- I am not sure when.
4      Q.  You previously said that you signed
5  the DocuSign contract a couple days after the
6  call?
7      A.  I feel like it was a couple of days.
8  I mean, I think I originally -- I originally
9  signed it maybe five or six days after the call.
10  And then, like I said, I didn't get a receipt,
11  so I went and did it again and it worked the
12  second time.
13      I don't know how many days it was
14  though.
15      Q.  You told the Court that you had signed
16  the contract within a week, right?
17      A.  Yes.
18      Q.  That you would sign the contract
19  within a week?
20      A.  Yes.
21      (Exhibit 26, 7/25/2019 - 8/1/2019
22  e-mail exchange, marked for identification.)
23  BY MR. BARKAI:
24      Q.  You are being handed Exhibit 26.  This
25  document -- do you recognize this document?

1      A.  Yes.  I had responded to this -- this
2  person.  Because I was at -- I had already
3  signed it and I got an e-mail from them saying
4  this hasn't been signed.  So, I messaged them
5  back and I said DocuSign says it is expired, can
6  you resend it?  And then right when I sent that
7  e-mail I went back to try it again, I was, like,
8  what the hell is going on with this thing.  And
9  then I got an e-mail from her saying, hey, it
10  worked.  And I didn't even do anything.  I
11  didn't click any -- I didn't click final sign on
12  my phone or anything.  It just said this
13  document has expired.
14      Q.  When did you go back to try it again?
15      A.  Several times.  I mean, I noticed -- I
16  think -- I think it was a couple days before
17  this.  And they sent me -- no, it was actually a
18  long time before this.
19      It went -- I signed the -- I signed
20  the DocuSign document and it didn't -- and I
21  didn't get a receipt.  I tried again a couple
22  days after that.  So, that might have been a
23  week or so after the call.  And then I didn't
24  know it wasn't done until I got these e-mails.
25  I am following up on our e-mail below, please

1  provide an update on signing the engagement
2  letter.  This is July 25.  I didn't see this
3  e-mail until, I don't know, the -- I guess
4  August 1.  And I said -- that's when I went to
5  go re-sign it.  Like, what is going on?  When I
6  clicked it, it says expired.
7      I said it was expired and she
8  responded you got -- you signed it.  So, the
9  document -- the document website said it was
10 expired, even though she said I signed it.  But
11 on my screen it said it was expired.
12     Like I said, I didn't know that they
13 didn't receive me signing this until this July
14 29, August 1.  I don't know which day I saw that
15 e-mail.  I guess it was August 1.
16     Q.  Do you see on the fourth page of this
17 exhibit a July 22 e-mail?
18     A.  July 22 e-mail.  Umm, yes, I see this.
19     Q.  Do you see that your signature had not
20 been received as of July 22?
21     A.  Yeah, I didn't see this e-mail until
22 the August 1 date.
23     Q.  Was this e-mail sent to your correct
24 e-mail address?
25     A.  Yes, it was.

1      Q.  But you didn't see this e-mail?
2      A.  No, I did not see this e-mail.
3      Q.  You didn't see any e-mails regarding
4  your signing the engagement letter?
5      A.  No.  Like I said, I thought I had
6  signed this.  So, I didn't -- I didn't know I
7  hadn't until I saw her e-mail from the 29th.
8  And then when I went into it, it said it was
9  expired.  So, I re-signed it, or whatever.
10     Q.  So, on July 29 -- I'm sorry, you went
11 to -- on August 1 you received these July 29
12 e-mails?
13     A.  Well --
14     Q.  You then went to DocuSign again?  Is
15 that your testimony?
16     A.  Yes.  On August 1 I -- I went and
17 checked my e-mails on August 1 and I went and
18 saw, oh, she e-mailed me on the 29th, and that
19 is when I saw the 25th e-mail as well.  And when
20 I went into the document to -- on DocuSign to
21 sign it, it said it was expired, because she
22 said it wasn't done.
23     So, I went into DocuSign, clicked
24 sign, it said you can't sign this, it is
25 expired.  I asked her to re-send it.  Like I

1  said, she responded to me, oh, no, you did sign
2  it.
3      Like, you understand what I am saying?
4  So, I clicked sign on the week it happened and I
5  never got a receipt.  So, I went back through
6  and did it again.  I thought it was done, okay.
7  And then I got an e-mail from them on August 1
8  saying, hey, this isn't done.  So, I opened the
9  DocuSign back up and it said it is expired.  I
10 asked her to re-send it.  Her response was, oh,
11 you already signed it.
12     So, on August 1, I didn't even sign
13 it.  It was already done.
14     Q.  Is that response from DocuSign
15 something that is in your Gmail?
16     A.  Yes.  This whole conversation is in
17 Gmail, yes.
18     Q.  It'll be there on your phone?
19     A.  Yes.  And the receipt and everything.
20 I finally got a receipt and everything after
21 that happened.
22     Q.  Turning to Page 1 of Exhibit 26, do
23 you see the e-mail from Ken Kim on August 1,
24 2019?
25     A.  Yes.

1      Q.  Do you see it states we just got
2  confirmation that Elliott Kline signed the
3  updated contract today?
4      A.  Yes.  That is what I am saying, that
5  is the response to me saying it is expired.
6      Q.  This e-mail states that you signed the
7  updated contract today, on August 1, right?
8      A.  At -- at 12:50.  At 12:37 I had
9  e-mailed them and said, hey, this is expired.
10 Like, what's going on.
11     Q.  This e-mail states that you signed the
12 contract on August 1, right?
13     A.  Correct.
14     Q.  Is that wrong?
15     A.  No, that is -- I mean, I know I signed
16 it -- I originally signed it, like, six days
17 after the call.  I didn't get a receipt so I
18 went back to sign it again.  And I thought I was
19 good to go until I got the e-mail -- until I saw
20 the e-mail on August 1.
21     But I didn't even sign the document on
22 August 1, is what I am telling you.  I opened
23 DocuSign and it said it was expired.  I sent her
24 an e-mail asking her to re-send it.  And the
25 response was, no, you are good, you signed it.

**MAGNA**
LEGAL SERVICES

1          So, I didn't even sign the document on
2   August 1, is what I am saying.
3          Does that make sense?
4          (Exhibit 27, 7/3/2019 Order, marked
5   for identification.)
6   BY MR. BARKAI:
7       Q.  You are being handed a document marked
8   Exhibit 27.
9          Do you recognize this Order?
10      A.  This is the Order we got after the
11  phone call.
12      Q.  Did you receive this at the time?
13      A.  Yes.
14      Q.  You did receive this at the time?
15      A.  Yes.
16      Q.  Did you read it all the way through?
17      A.  Yes.
18      Q.  Do you see that the Court ordered you
19  within seven days of the date of this Order to
20  give Plaintiffs' counsel, SCA, consent forms for
21  Discord, Twitter, and any other social media
22  provider?
23      A.  Yes.
24      Q.  Did you do that within seven days of
25  this Order?

1       A.  I thought that is what the DocuSign
2   document was.  So, I mean, yes, to my knowledge
3   I had done it.
4       Q.  The DocuSign contract which the vendor
5   stated you signed on August 1, right?
6       A.  Yes.  But I was under the impression I
7   had signed it before that.
8       Q.  This Order, Exhibit 27, states that
9   you were being ordered to execute the third
10  party discovery vendor contract within seven
11  days, right?
12      A.  Correct.  Which I -- yes.
13      Q.  That is signing the DocuSign --
14      A.  Yes.
15      Q.  -- contract?
16         This Order also states that you were
17  to complete and give to Plaintiffs' counsel the
18  certification form attached as Exhibit A to the
19  imaging order, right?
20      A.  Yes.
21      Q.  Within seven days?
22      A.  Yes.
23      Q.  You didn't do that within seven days,
24  did you?
25      A.  Well, I didn't -- I didn't have that

1   -- this certification form.  Like, when -- none
2   of the e-mails they sent me had that attached.
3   Unless it is this Exhibit 11 from before the
4   phone call.  That wouldn't have made sense to
5   me.
6       Q.  Did you complete this certification
7   form within seven days of the Order?
8       A.  I didn't receive a certification form.
9       Q.  Did you complete the certification
10  form within seven days of the Order?
11      A.  I didn't receive a certification form.
12      Q.  So, is that yes or no.  Did you
13  complete it or no?
14      A.  The answer is I didn't receive a
15  certification form.
16      Q.  So, you did not complete it, right?
17      A.  I didn't -- I didn't receive one.
18      Q.  So, you did not complete it, right?
19      A.  I didn't receive one.
20      Q.  It is a very simple question.
21         Did you --
22      A.  I am giving you the answer.  I can't
23  complete something that I am not given.
24      Q.  So, it is your testimony that you did
25  not complete the certification form?

1       A.  I did not receive a certification
2   form.
3       Q.  Is the answer yes or no?  You did
4   complete it or you did not complete the
5   certification form?
6       A.  I didn't receive it.
7       Q.  On Page 2 of this Order, continuing
8   further down, do you see that the Court ordered
9   you within 14 days to make available to the
10  third party discovery vendor for imaging and
11  collection any electronic devices or social
12  media account credentials identified in the
13  certification form?
14      A.  Yes, I see that.
15      Q.  Did you do that?
16      A.  I never had a certification form.  So,
17  no, I wasn't able to do this because I never
18  received that form.
19      Q.  Did you --
20      A.  The first time I am receiving this
21  form is today.
22      Q.  Did you make your electronic -- excuse
23  me.  Did you make your electronic devices and
24  social media account credentials available to
25  the third party discovery vendor within 14 days

MAGNA®
LEGAL SERVICES

1  of this Order?
2      A.  Oh, I didn't receive a certification
3  form, so I wasn't able to do that.
4      Q.  That is yes or no.
5      A.  I mean, I didn't receive a
6  certification form, so I wasn't able to do that.
7      Q.  It is just a yes or no question.
8       Did you make your devices and accounts
9  available to the vendor?
10     A.  I didn't receive them from the vendor,
11 so I wasn't able to complete it.
12     Q.  Is that a no?
13     A.  I mean, it is me telling you I didn't
14 receive that form at all to be able to complete
15 it.
16     Q.  It is just a yes or no question.  I am
17 looking for a yes or a no.
18     A.  It is not a yes or no question.
19 Because you are asking me if I completed a form
20 that I hadn't received.  And I have to tell you
21 I didn't receive that form, to give a complete
22 answer.
23     Q.  Do you see that this Order within 21
24 days ordered you to provide complete and
25 accurate written answers to Plaintiffs' First

1  Set of Interrogatories?
2      A.  Yes.
3      Q.  Did you do that?
4      A.  No, I did not do that.  But, like I
5  said again, I hadn't received this for sure.  I
6  mean, this is saying that -- see Order of June
7  21, 2019.  Is that one of these, June 21 -- I
8  don't even know which one that would be.
9      But, no, I didn't -- I didn't -- like
10 I said, again, this is another certification or
11 form that I had never received.
12     Q.  If I refer to Exhibit 11, you know
13 which e-mail that is, right?
14     A.  Umm, which what?
15     Q.  Which e-mail Exhibit 11 is?
16     A.  Yes, I know --
17     Q.  That is July 1, 2019, from Mr. Bloch?
18     A.  Correct.
19     Q.  That e-mail attached the certification
20 form, right?
21     A.  Right.  That is the one I hadn't --
22 that the Judge thought I was looking at, that I
23 wasn't looking at this.
24     Q.  That e-mail also attached Plaintiffs'
25 First Set of Interrogatories, right?

1      A.  I -- yes, I guess so.
2      Q.  This Order from Judge Hoppe dated July
3  3, 2019 also ordered you within 21 days to
4  provide complete and accurate written responses
5  to the Plaintiffs' Request for Production of
6  Documents, right?
7      A.  Yes.
8      Q.  Within 21 days?
9      A.  Correct.
10     Q.  Did you do that?
11     A.  I didn't receive the -- whatever this
12 is called, the discovery vendors -- the Order,
13 the production of documents.  I didn't have
14 that.
15     Q.  You had not received the Request for
16 Production of Documents?
17     A.  No.  It was on the Exhibit 11, which
18 we have already talked about.  I hadn't realized
19 was the form everyone was talking about.
20     Q.  So, you would agree that Exhibit 11
21 included all of the forms that are discussed in
22 this Order, right?
23     A.  Yeah, that is what it looks like.
24     Q.  But you had not read the e-mail at
25 Exhibit 11?

1      A.  I didn't realize that it was talking
2  about the same thing, because the Judge and I --
3  the Judge was talking about one form, and I was
4  talking about another.  And I didn't realize
5  that.
6      Q.  That wasn't my question.  Did you read
7  the e-mail Mr. Bloch sent you July 1, 2019?
8      A.  I am unsure if I read that e-mail or
9  not.  There was multiple e-mails that day.  I am
10 assuming I read that one.  But there was a bunch
11 of them that day.  The day before the phone call
12 I got probably six or seven e-mails related to
13 the case.
14     Q.  You are assuming that you read the
15 e-mail that Mr. Bloch sent you on July 1?
16     A.  Correct.  But I don't -- I didn't know
17 what those attachments were.  Whatever is on
18 there, I didn't know what they were.
19     Q.  Did you read the attachments?
20     A.  No, because it was the day before that
21 phone call, and this is when the Judge asked me,
22 are you looking through this -- are you looking
23 through the page.  I said yes, because I was
24 looking through a totally different one.
25     Q.  So, you did not read the attachments?

MAGNA
LEGAL SERVICES

1    A. I -- I recognize -- I don't recognize
2 the name at all. But, yeah, I mean, I see
3 someone named Jessica Phillips sent me
4 something. I just didn't recognize the name.
5    Q. Who were you house-sitting for on July
6 15?
7    A. My cousin.
8    Q. What is your cousin's name?
9    A. Aaron Ward.
10    Q. Aaron Ward?
11    A. Yeah.
12    Q. Where does he live?
13    A. Macungie.
14    Q. What is Macungie?
15    A. It is a town called Macungie.
16    Q. How long were you house-sitting for?
17    A. Like, a week-and-a-half, two weeks.
18    Q. What is his address?
19    A. I don't know off the top of my head.
20    Q. You don't know the address where you
21 were house-sitting for a week-and-a-half or two
22 weeks?
23    A. No, because I didn't leave the house.
24 I was basically watching the dogs.
25    Q. Did you receive any calls or e-mails

1 regarding a conference call tomorrow, August 8?
2    A. Yes.
3    Q. Who called you or e-mailed you?
4    A. Umm, I don't know. I have a voicemail
5 I just checked that was done this morning while
6 we were in here. And I haven't checked the
7 e-mail.
8    Q. You have one voicemail?
9    A. I have a voicemail, and then -- I saw
10 I had an e-mail. I just haven't looked at it
11 yet.
12    Q. Who is the e-mail from?
13    A. I -- I have no idea. Umm, umm, it is
14 from -- there is no way that is right.
15    Q. What are you doing right now?
16    A. Like, the last -- the last e-mail I
17 have, it says, is from 6/11. But that is not --
18    Q. On your phone -- the last e-mail on
19 your phone --
20    A. This is obviously wrong. Like, 6/11
21 is not the earliest e-mail I have.
22    Q. What is --
23    A. Do you see what I am saying?
24    Q. The earliest e-mail on your phone is
25 from June 11?

1    A. It is trying -- that is what I am
2 saying. It is trying to set -- I have already
3 received that e-mail. I have seen it. But I am
4 saying the newest one it is showing is wrong.
5    So, I don't know who sent me the
6 newest e-mail.
7    Q. The newest e-mail on your phone is
8 from June 11?
9    A. No. What I am saying is that right
10 now, when I looked at it, it is showing June 11.
11 Earlier when we took our break, when I was going
12 through, I saw I had two missed -- I had new
13 e-mails from today.
14    Q. You had two e-mails from today?
15    A. The other one might have been from
16 yesterday. But definitely one from today.
17    Q. Who sent you the e-mails from today or
18 yesterday?
19    A. I don't know. I didn't get to look at
20 them yet. I definitely have a phone call from
21 somebody telling me, umm, the code for the
22 conference call tomorrow.
23    Q. You said just now in your testimony
24 that the earliest e-mail on your phone right now
25 is June 11. You also said that the latest

1 e-mail on your phone is June 11.
2    Could you please clarify?
3    A. Right now when I am going onto my
4 phone, it is showing June 11 is the newest
5 e-mail I have. However, earlier when we took a
6 break I had seen what e-mails I received today
7 and it showed I received e-mails today. So,
8 there is something wrong with the phone.
9    Q. You can't see those e-mails now?
10    A. The ones from today are not showing
11 up, no. I mean, we have documents here that are
12 from later date than 6/11. So, I mean, and you
13 can see it. I am not -- you can see 6/11 is the
14 latest. It is not letting me -- you see this?
15 It is not --
16    Q. Did your phone just ask you to enter
17 the password for Eli.F.Mosley@Gmail.com?
18    A. Yes. That is the same thing it does
19 for the, umm -- the same thing it does for the
20 Identity Evropa account as well.
21    Q. Are you not logged into your Gmail
22 account?
23    A. I am definitely logged into the Gmail
24 account. I just sent the e-mail to you guys
25 from it.

MAGNA

LEGAL SERVICES

1    Q.  You sent an e-mail to us from
2  DeplorableTruth@Gmail.com.
3    A.  Did I?  Maybe I have to re-sign into
4  Eli F. Mosley.  I definitely received an e-mail
5  earlier today.
6    Q.  Are you not logged into your
7  Eli.F.Mosley@Gmail.com account on your phone
8  right now?
9    A.  I believe I am.  I mean, I am able to
10  go into my inbox.  Why wouldn't -- how would I
11  be able to go to the inbox if I wasn't logged
12  in?
13    Q.  The last e-mail in your
14  Eli.F.Mosley@Gmail.com inbox appearing on your
15  phone is from June 11, right?
16    A.  Yeah.
17    Q.  Do e-mails just disappear from your
18  phone periodically?
19    A.  I mean, that is strange.  I don't know
20  what's going on with it.  Like I said, earlier I
21  had a pop-up that an e-mail showed up.
22    Q.  My question was, do e-mails just
23  disappear from your phone periodically?
24    A.  No.
25    Q.  Do texts disappear from your phone

1  periodically?
2    A.  No.
3    Q.  What is the oldest
4  Eli.F.Mosley@Gmail.com e-mail on your -- in your
5  inbox?
6    A.  9/21/18.
7    Q.  So, right now your Gmail --
8    A.  That it is showing.  I don't know --
9  maybe it is -- maybe it goes back further.  I
10  don't know.
11    Q.  So, on your phone right now your
12  Eli.F.Mosley@Gmail.com e-mail address displays
13  e-mails from September 21, 2018 to June 11,
14  2019, right?
15    A.  Correct.  But I am pretty sure I had
16  the account before that, and I have obviously
17  gotten e-mails after that.
18    Q.  You are pretty sure you had the
19  account before that?
20    A.  Yeah, I am pretty sure I had the
21  account before that.  Probably 2017.  Like I
22  said, it just might be what the phone is
23  displaying right now.
24    Q.  But you -- your password needs to be
25  entered into your phone right now?

1    A.  I just entered it again.  It kicked me
2  right back out.
3    Q.  You entered your password and it
4  kicked you out?
5    A.  Well, when I entered the password, it
6  asked for the Identity Evropa e-mail password.
7  That is what I told you before, when they wrote
8  me out of Identity Evropa e-mail, service, it
9  messed with the e-mail on my phone.
10    Q.  After you entered your password for
11  your Eli.F.Mosley@Gmail.com account, did the
12  rest of the e-mails for that account show up?
13    A.  No.  A pop-up came up, said sign in
14  Eli.Mosley@IdentityEvropa.com.  And I can't.  If
15  I hit sign in or yes, it says this account
16  doesn't exist and takes me right back to where I
17  was.
18    Q.  You did enter your password for your
19  Gmail account, right?
20    A.  Correct.  And the next question it
21  asked me was the account information for the
22  Identity Evropa e-mail, which I no longer can
23  get into.
24    Q.  Your e-mails for your Gmail account
25  are still stopped at June 11?

1    A.  Yeah.  But I have been receiving all
2  these other things.  So, like I said, I don't
3  know what is going on with it.  Maybe when I get
4  my -- you know, my new phone, when I activate my
5  new phone, it'll fix it, or whatever.
6    Q.  How have you been receiving them?
7    A.  I am receiving them on that phone, is
8  what I am telling you.
9    Q.  Where are they now then?
10    A.  I don't know.  I don't understand what
11  is going on with the phone.
12    Q.  They just disappeared?
13    A.  It is clearly a broken phone.  It is
14  clearly, like, a messed up phone.
15    Q.  It is a messed up phone?
16    A.  I mean, the phone I have already
17  explained to you guys has had issues.
18    Q.  It has had issues, right?
19    A.  Yeah.  But it hasn't lost any, like,
20  data or anything like that.  It is still full.
21    Q.  But the e-mails are not showing up
22  right now, right?
23    A.  No.  But I know I have those e-mails.
24  Because, like I said, I have received them
25  before.  I have looked at them on that phone.

MAGNA
LEGAL SERVICES

1     Q.  You have looked at them on your phone?
2     A.  Yes.
3     Q.  And since then, now they are not able
4  to be viewed?
5     A.  No, but I am sure they are still in
6  the inbox.  It is not like I went through -- I
7  didn't go through and delete the e-mails, or
8  whatever.
9        (Exhibit 29, 8/6/2019 e-mail exchange,
10  marked for identification.)
11  BY MR. BARKAI:
12     Q.  You are being handed a document marked
13  Exhibit 29.  Now, you had testified earlier that
14  you had received some e-mails and voicemails
15  regarding a court hearing tomorrow, right?
16     A.  Yes.
17     Q.  You couldn't remember who sent them to
18  you?
19     A.  Correct.
20     Q.  And you couldn't remember how many you
21  received?
22     A.  No.
23     Q.  And when you looked for them on your
24  phone, you couldn't find them, right?
25     A.  The voicemails?  No, I have it.

1     Q.  Also e-mails?
2     A.  Well, right now my phone is not
3  showing any e-mails.  But, like, this is from
4  August 6, so it is not showing for whatever
5  reason.  I can see the voicemail on my phone.
6     Q.  Do your voicemails get sent to your
7  e-mails?
8     A.  No.
9     Q.  Excuse me, do your voicemails get sent
10  to your e-mail address?
11     A.  No.
12     Q.  They are just accessible through your
13  phone?
14     A.  Correct.
15     Q.  Do you recognize the e-mails in this
16  exhibit?
17     A.  29, yes.
18     Q.  Correct.  You do recognize these?
19     A.  Yes.
20     Q.  What are they?
21     A.  They are e-mails asking me what time
22  and day I can do this -- I can do the next call.
23     Q.  Did you receive this e-mail from
24  KarenD@vawd.uscourts.gov on August 22, 2019, at
25  12:24 p.m.?

1     A.  Yes.  That is not when I read it.  I
2  read it little bit after that.  But, yes.
3     Q.  You did receive it?
4     A.  Yes.
5     Q.  Do you see when Miss Dotson asks, what
6  time works best for you and I'll get the call
7  set up?
8     A.  Uh, yes.
9     Q.  Did you respond to her?
10     A.  Umm, I don't know if I did or not.
11  But I think -- no, I don't think I responded to
12  her.  But I definitely seen this e-mail.
13        I think by the time I saw this -- yes,
14  that's what it is.  The next e-mail is three
15  days later, and I didn't see that e-mail until
16  she had already sent back that'll take place at
17  3:30.  So, by that time I didn't respond to her,
18  because I didn't realize -- or I -- you know,
19  the time was already set and that is a fine time
20  for me.
21     Q.  You did not respond to Mrs. Dotson's
22  e-mail because you didn't see it until August 5,
23  2019 when Mr. Bloch sent the e-mail?
24     A.  Correct.
25     Q.  Do you see where Mr. Bloch told Miss

1  Dotson, we reached out to Mr. Kline on Friday
2  regarding this conference call, we have not
3  received any response?
4     A.  Yes, I see that.
5     Q.  Is that wrong?
6     A.  I mean, I guess.  I -- I don't know
7  who we would be.  The only person that called me
8  or that would have called me would be -- I guess
9  that is from you guys.  But I don't know -- is
10  it 929 is the number up there?  I don't -- I
11  don't recognize anyone calling me from that
12  number.
13     Q.  You have not received a phone call --
14     A.  The only --
15     Q.  -- from a number beginning 929; is
16  that right?
17     A.  No.  The numbers that I am receiving
18  -- the calls I am receiving from are -- are 540
19  numbers, which are Virginia.
20     Q.  What about an e-mail from Mr. Bloch?
21  Did you receive an e-mail from Mr. Bloch?
22     A.  Yeah.  But it was after they had
23  already confirmed the time and date.
24     Q.  It was this e-mail here?
25     A.  Yes.

MAGNA
LEGAL SERVICES

1  this document now and will send it to you guys
2  after it is done?
3      A. Yes.
4      Q. Does that refer to the same
5  operational document of which we have seen
6  copies before?
7      A. I imagine so. I mean, I don't know
8  for sure. But I imagine that is what it is.
9  Because there is no other types of documents I
10  put together.
11     Q. Did you send planning documents to
12  Jason Kessler and Erika Alduino?
13     A. Both on Discord, yes.
14     Q. You send them --
15     A. The copy paste, or the -- I'm sorry,
16  the link for G -- like, Google docs, or
17  whatever.
18     Q. You sent the link via Discord?
19     A. Yes.
20     Q. Did you share the documents with
21  anyone else?
22     A. After it was done -- I mean, I don't
23  know which one they are talking about here. But
24  usually when I was done sending it to those
25  guys, then we would post it on the Discord. So,

1  like, everyone can see it, or whatever.
2      Q. How many versions of that document
3  existed?
4      A. Like I said, it was kind of, like, a
5  living document. So, there is no really way to
6  say, like, if something changed day-to-day. I
7  would edit it. Then once a week I would send it
8  to these guys, make sure they knew what was
9  going on.
10     Q. You sent the documents to Mr. Kessler
11  and Miss Alduino once a week?
12     A. Uh, I mean, not -- sometimes it was
13  every other week, depending on how close it was
14  to the event, or every three weeks, or whatever
15  it was.
16     Q. Did you send the documents to other
17  people?
18     A. It was post -- whenever there was a
19  document, it was posted on Discord.
20     Q. Did you send the documents to other
21  people also approximately once a week or once
22  every other week?
23     A. It is -- like I said, at the beginning
24  when we first started planning it, it was maybe
25  once every three weeks. Then towards -- closer

1  we got to the day of the event, it was, like,
2  every week, you know, or every couple days --
3  every couple days I would send one out.
4      Every time I had one, I would post it
5  on Discord.
6      Q. You have in front of you Exhibit 7,
7  right? Exhibit 7 is a --
8      A. Oh, yeah.
9      Q. -- is what we have discussed before as
10  the planning document?
11     A. Yes. This is one version.
12     Q. This is one version?
13     A. Yeah. Like I said, it was a living
14  document that kept going. This is one of the
15  earlier versions. This might be the version
16  from what they are talking about here. Umm, I
17  don't know what the date is on this though.
18     Q. Do you see on Page 1 of this document
19  that the date is June 11, 2017?
20     A. Yeah, okay. Perfect. This is June
21  11, and this one is June 7. So, yeah, that
22  makes sense.
23     Q. On Page 4 of this document, do you see
24  the sentence --
25     A. Which one?

1      Q. Page 4 of Exhibit 7, about halfway
2  down the page. This report states there will be
3  two different reports like this every week
4  leading up to the event where it will switch to
5  every day.
6      A. That ended up being not accurate.
7  That was the original intention. But we didn't
8  need to send that out as often as that.
9      Q. But you still sent it out frequently;
10  is that right?
11     A. Yes. Like I said, just like this
12  says, the closer we got to the event, the more
13  frequent I sent them out.
14     Q. And this document states the first
15  version will be for leadership and Alt-Right
16  groups. The second version will be for the
17  general attendees and Alt-Right/New Right
18  groups?
19     A. Yes.
20     Q. So, there were two versions?
21     A. Again, that was something that was
22  originally planned. But the -- I mean, this
23  was, what, like, two months before the event.
24  There ended up only ever being one version.
25     Q. There ended up only ever being one?

**MAGNA**
LEGAL SERVICES

1    A. Yes.
2    Q. But on different dates you created
3 other versions, right?
4    A. Umm, yes. So, there is -- there is
5 one of these -- like, there is one in here for
6 6/11. There is another one that got posted
7 probably two or three weeks after this. It was
8 posted in Discord.
9    Q. Were there two versions on June 11?
10    A. No, no.
11    Q. Only one version on June 11?
12    A. Yeah, I don't think I ever did two
13 versions, if I remember correctly. If I did,
14 again, both versions would be posted, right.
15 So, one of the channels in the Discord was
16 leadership, where only leaders had access to, I
17 guess. And it would have been posted there for,
18 like, a leadership one, if I did that. But I
19 don't think I ever did that. I think I --
20 originally that was the plan, but we ended up
21 not doing that.
22    Q. You stated you created a living
23 document that you edited on an ongoing basis,
24 right?
25    A. Mm-hmm.

1    Q. Did you have multiple living
2 documents?
3    A. No. It was just one -- it was
4 literally just one -- one document the whole
5 time.
6    Q. Do you see at the top of this document
7 on all pages it states, this version of the
8 document is to only be shared by and with group
9 leaders. Do not share with other attendees.
10 Another version will be released for them?
11    A. Yes. This is something on this one,
12 like I said, on the earlier version, these
13 versions, that was the intention, umm, was to
14 have multiple versions. We ended up -- I don't
15 think doing that anymore.
16    MR. BARKAI: Let's go off the record
17 just for a moment.
18    THE VIDEOGRAPHER: The time is 5:12
19 p.m., we are going off the video record.
20    (A discussion off of the record took
21 place.)
22    THE VIDEOGRAPHER: The time is now
23 5:13 p.m., we are back on the video record.
24 BY MR. BARKAI:
25    Q. Mr. Kline, you described that the

1 intent was to have multiple versions on a given
2 date, but you ended up with only one version on
3 each given date; is that right?
4    A. Yeah, I believe. Yes, yes. That's
5 how I believe we went through that. But like I
6 said, if it ended up changing, and we -- or if I
7 ended up doing two versions, they would be both
8 on Discord.
9    Q. All versions of this document would be
10 on Discord?
11    A. Yes. Every iteration of this document
12 would be on Discord, on the server.
13    Q. Would the document be anywhere else?
14    A. No.
15    Q. You created this document on your
16 phone?
17    A. Yes.
18    Q. Only ever on your phone?
19    A. Yes.
20    Q. You never used any -- any other device
21 to make this document?
22    A. No.
23    (Exhibit 31, Discord messages from Eli
24 Mosley in Charlottesville, marked for
25 identification.)

1 BY MR. BARKAI:
2    Q. You are being handed a document that's
3 been marked Exhibit 31.
4    Do you recognize what this is?
5    A. One second. I guess these are Discord
6 excerpts.
7    Q. Do you see messages here under the --
8 under the name Eli Mosley?
9    A. Yes.
10    Q. Do you recognize those messages as
11 yours?
12    A. Yes.
13    Q. Could you please turn to Page 6?
14    A. They are not labeled. Is it this one?
15 I think it is the same. Okay.
16    Q. Do you see a message on that page from
17 Eli Mosley?
18    A. Yes.
19    Q. Is this a message that you posted?
20    A. Yeah.
21    Q. Does this appear to be accurate?
22    A. Yes.
23    Q. Do you see that you asked for one
24 representative from each group to jump on a
25 meeting?

MAGNA
LEGAL SERVICES

1    A.  No.  Because at that point what we did
2  is a lot of the groups had taken over their --
3  so, you know, the groups were sent, okay, you
4  are going to be in this order, or whatever.  Now
5  you take care of your own thing, your own
6  transportation, or whatever it was.  A lot of
7  the groups did -- a lot of them were doing it
8  themselves.
9         But the -- the collection of people
10  threatening the whole rally, or whatever, was
11  many, many people and putting -- putting it into
12  some -- one person put it together.  I just
13  don't know who sent it in.
14    Q.  It was a list of many, many people,
15  right?
16    A.  I would say probably 20 people, yeah.
17  25 people that were threatening the rally.
18    Q.  Did you work on that list on a
19  computer?
20    A.  No.
21    Q.  Did you work on that list on a phone?
22    A.  I didn't work on -- all I did was -- I
23  looked through the list.  I didn't actually put
24  together the list.
25    Q.  When you -- when you looked through

1  the list, how did you look through the list?
2    A.  It was on a Google doc, and I just
3  skimmed through it.  I just scrolled through and
4  I saw, oh, I know this person, oh, I know that
5  person.
6    Q.  Who shared the Google doc with you?
7    A.  Umm, I might have put it together and
8  posted it in one of the channels and said, hey,
9  if you see people threatening the rally, post
10  the information here and we'll get it to the
11  police.
12    Q.  You might have put together the Google
13  doc?
14    A.  I think I just posted the Google doc
15  and people put it -- it was, like, a public
16  Google doc.  You know what I mean?  I think that
17  is how I made it.
18    Q.  And how did you --
19    A.  Or how I -- I shared it, or whatever
20  got done.
21    Q.  How did you post the Google doc?  With
22  what device?
23    A.  On my phone.
24    Q.  You don't remember who sent that to
25  the police?

1    A.  No.  Like I said, I am not entirely
2  sure, but I want to say it was somebody from
3  League of the South, maybe, that was talking to
4  the police about that.  But I don't remember who
5  it was that ended up being the person that
6  handed it off to the police.
7         There was a lot of other stuff.  That
8  was just one of the things.
9    Q.  But you are not able to testify
10  definitively that it was not you, right?  You
11  thought you might have been the person who sent
12  it?
13    A.  It might have been me, it might have
14  been somebody else.  But all I know is that -- I
15  did not send it to the police.  I know that.  I
16  know I did not -- I wasn't the one who sent it
17  to the police.  I know that.
18         But as far as putting the list
19  together, it was either me making a Google doc
20  and throwing it in a chat and people just making
21  it -- kind of, like, a lot of people together
22  making it, or some -- one person taking it upon
23  themselves to put it together.  I just don't
24  remember how it was done.
25    Q.  Mr. Kline, you testified earlier that

1  you only had one phone in 2017, right?
2    A.  2017.  Yeah, I think 2018 is when I
3  got the Walmart phone.  I think it was 2018 when
4  I got that.
5    Q.  The -- so, yes, you had one phone in
6  2017?
7    A.  Correct.
8    Q.  That phone you had in 2017 was your
9  personal phone, right?
10    A.  Correct.
11    Q.  It was your iPhone, right?
12    A.  Correct.
13    Q.  It was your iPhone with the 610
14  number, right?
15    A.  Yes.
16    Q.  That is the number that you have here
17  with you now?
18    A.  Correct.
19    Q.  Mr. Kline, isn't it true that you had
20  three phones in 2017?
21    A.  I don't believe so.
22    Q.  You had one phone for work in 2017?
23    A.  I am not sure I am following the
24  question.
25    Q.  Isn't it true that you had one phone

1  for work in 2017, and one for personal in 2017,
2  and one for the Alt-Right?
3      A. I am not sure. I don't think that is
4  accurate. I think I only ever had this phone.
5  I had a work phone before I got fired from my
6  job, but it wasn't a cell phone. It was just my
7  phone at work, my extension.
8      Q. So, is it your testimony, Mr. Kline,
9  that you did not have, in 2017, one phone for
10  work, one phone for personal matters, and one
11  phone for the Alt-Right matters?
12      A. I don't think that is accurate, no.
13      (Exhibit 33, 3/31/2017 Discord chat,
14  marked for identification.)
15  BY MR. BARKAI:
16      Q. You have been handed a document marked
17  Exhibit 33.
18      Do you see that?
19      A. Yes. I just don't know what I am
20  looking at.
21      Q. Those are Discord chats, right?
22      A. Yeah. I mean, I guess.
23      Q. On the top of Page 1, do you see a row
24  with the date March 31, 2017 at 6:37 p.m.?
25      A. Yes. But --

1      Q. Do you see --
2      A. Go ahead.
3      Q. Do you see the username Eli Mosley
4  #5269?
5      A. Yes.
6      Q. That is your Discord username, right?
7      A. Yes.
8      Q. Do you see the message, you should get
9  a separate phone for Alt-Right stuff, then arm
10  it with a kill password to go off between noon
11  and 1:00 p.m. I activate it before I go out and
12  do things.
13      A. Yeah, I don't -- I mean, that was -- I
14  mean, that was a lie. I lied to them on
15  Discord. That is not true.
16      Q. You made that statement on Discord,
17  right?
18      A. Correct. I mean, I am saying this on
19  Discord to somebody. I don't -- I don't even
20  know how to -- I don't even know how to do that
21  on my phone.
22      Q. You agree that you said that on
23  Discord, right?
24      A. I did say that on Discord. But that
25  is not something I actually did.

1      Q. But you are saying -- you agree that
2  you said that on Discord. But when you said it,
3  it was a lie; is that correct?
4      A. Correct.
5      Q. Can you turn to Page 2 of that
6  exhibit, please?
7      Why did you lie on Discord in the
8  message we were looking at on Page 1 --
9      A. I don't know the -- I don't know the
10  -- I could have been joking. There is no -- I
11  have no way of knowing, because there is nothing
12  before this. I have to see it in context.
13      Q. You previously said it was a lie,
14  right?
15      A. I mean, it could have been a joke,
16  could have been a lie. I don't know. I don't
17  have the context of it. It starts with that.
18      Q. You don't know if it was a lie or a
19  joke?
20      A. I mean, yeah. Like, it could have
21  been a joke, like, before this. I just have no
22  idea. This is just an out-of-context thing.
23      Q. Do you mind handing that back just for
24  a moment? Thank you.
25      A. Which one? This?

1      Q. The whole document, please. The
2  exhibit. Thank you.
3      Thank you. On Page 2 of that exhibit
4  in front of you --
5      A. Yes.
6      Q. -- do you see a message from you, from
7  your Discord user account, where you state, I
8  have three phones?
9      A. Wait. Yeah, I see it. I see it.
10      Yeah, I definitely don't have three
11  phones.
12      Q. You made that statement on Discord,
13  right?
14      A. Correct.
15      Q. And you made that statement, I have
16  three phones, on March 31, 2017 at 6:38 p.m.,
17  right?
18      A. Correct. I certainly do not have
19  three phones though. I never have. The only
20  two phones I have had has been the iPhone and
21  the Walmart one.
22      Q. Looking further down on that same
23  page, do you see a message March 31, 2017 at
24  6:38 p.m.?
25      A. When?

1    Q. 6:38 p.m.
2    A. Yes, I see.
3    Q. From Eli Mosley.
4    A. Which one? There is -- yeah, the PC
5 one? That is not a huge deal. That one?
6    Q. Do you see a message on March 31, 2017
7 from Eli Mosley stating one for work, one for
8 personal shit, and one for the Alt-Right?
9    A. Yeah, I see that. But, like I said, I
10 did not have multiple phones.
11    Q. Did you make that statement on
12 Discord? Did you write that?
13    A. Yeah. I mean, I did -- I mean, I said
14 I have three phones, right. And I said that one
15 for each thing. But I don't know -- I
16 definitely didn't have three phones. I never
17 had three phones. I don't know why I would say
18 that. I don't know if it was -- if I was
19 joking.
20       The guys that were in this chat -- I
21 don't know who deleted user, Unlimited Power,
22 is. But Gray and Wyatt, or whatever, I know we
23 -- we would constantly joke about stuff. I
24 don't know if that is what this is or not.
25    Q. Why would you say on Discord that you

1 had three phones if it wasn't true?
2    A. Like I said, I don't know -- I don't
3 know the context of these -- this conversation.
4 So, it could be that we were joking about
5 something. I don't know.
6       I definitely didn't have three phones
7 though. The only two phones I have ever had --
8 I mean, the 610 number I have had since, like,
9 seventh grade. And, like, it has only been on
10 two different phones. The other phone I got is
11 the, umm, the Walmart one. I definitely don't
12 have three phones.
13    Q. You testified, Mr. Kline, that you had
14 a computer in 2016, right?
15    A. In 2016, yes.
16    Q. And, Mr. Kline, you testified that you
17 left that computer at your parents' place in
18 2016; is that right?
19    A. In a storage unit, or whatever. I
20 haven't touched it for awhile.
21    Q. You stated that you moved to South
22 Carolina with your girlfriend in 2016, right?
23    A. Umm, it wasn't -- it was -- it was
24 2017, I think. It was the early part of 2017.
25 I think it was the spring of 2017.

1    Q. Did you testify that you moved to
2 South Carolina with your girlfriend in late
3 2016?
4    A. I might have -- it might have been
5 2017, is what I meant. I think it was 2017 when
6 I moved there. I would have to -- I don't know
7 the exact dates. I think it would be 2017
8 though. Because late -- maybe it was late 2016
9 into early 2017. That would make sense.
10 Because I was let go from my job in late 2016, I
11 believe. Which -- and I moved there with her,
12 like, three weeks afterwards. So, that would
13 actually make sense. Like, late -- either the
14 beginning of 2017 or late 2016.
15    Q. When were you let go from your job?
16    A. Umm, I don't know the exact date. It
17 was late 2016, I think it was. It was right
18 around Christmas, I think it was.
19    Q. Who was your employer at that time?
20    A. JC Ehrlich Rentokil.
21    Q. And it was after that point that you
22 moved to South Carolina with your girlfriend?
23    A. Correct.
24    Q. When you moved to South Carolina, you
25 had testified that you did not bring the

1 computer with you, right?
2    A. Right.
3    Q. And you testified that was because you
4 couldn't store it in the car; is that right?
5    A. Yeah. It is a huge -- it is, like, a
6 huge, old tower.
7    Q. So, you did not have a computer in
8 2017, right?
9    A. No.
10    Q. You testified that the only computers
11 that you used in 2017 were Richard Spencer's and
12 your girlfriend's neighbor's computer?
13    A. Correct. Just to print stuff off.
14    Q. Only those two computers?
15    A. Correct.
16    Q. You did not have a home PC in 2017,
17 correct?
18    A. No, not in 2017, no. 2016, like I
19 said, I had the big tower thing.
20    Q. Isn't it true that, in fact, you did
21 have a home PC in 2017?
22    A. What do you mean? I don't understand.
23    Q. Isn't it true that you did have a home
24 PC in 2017?
25    A. I wasn't even -- I don't understand

MAGNA&reg;
LEGAL SERVICES

1  what you mean. I had, like, a desktop. Like, I
2  don't understand. The desktop I had that I left
3  in Pennsylvania while I went to South Carolina.
4  But I don't understand what you mean.
5      Q. Isn't it true that you did have a home
6  PC in 2017?
7      A. Yeah, the one that -- the big, giant
8  tower that is at my parents' place.
9      Q. Isn't it true that you also had a work
10 computer in 2017?
11     A. Not in 2017. In 2016, before I got
12 fired from my job, yes. I had a work laptop.
13     (Exhibit 34, 3/22/2017 Discord chat,
14 marked for identification.)
15 BY MR. BARKAI:
16     Q. You are being given an exhibit that
17 has been marked Exhibit 34.
18     Do you recognize that, Mr. Kline?
19     MR. CAMPBELL: This is just Dave
20 Campbell coming back. I got disconnected.
21 BY MR. BARKAI:
22     Q. Do you recognize that exhibit, Mr.
23 Kline?
24     A. I don't -- is this a Discord message?
25 Is this a Discord message? Is that what this

1  is?
2      Q. This is your Discord chat, right?
3      A. I mean, I don't know what-- I don't
4  know what I am referencing here.
5      Q. But this is your Discord chat, right?
6      A. Correct. But I don't know what I am
7  referencing here. This is just a single
8  message.
9      Q. Do you see, Mr. Kline, on March 22,
10 2017 at 8:42 p.m. you wrote, quote, an hour
11 after my video came out with the kike and the
12 sign, he commented on it with Echo American,
13 question mark. I have the screen cap on my home
14 PC, closed quote.
15     A. Yeah, I am not sure what that is in
16 reference to.
17     Q. Did you write that on Discord?
18     A. I mean, it looks like it might be
19 mine. But it says #Convo. I don't know what
20 that means. That is not me. That is another
21 person. Like, that is clearly not me.
22     Q. You didn't write this message?
23     A. No, that is not -- that is not even
24 the way I talked online. So, that is not me.
25 That is somebody else named Convo. I know who

1  that is. They got a number next to their name.
2  So, that is not me that said that. That name
3  was Convolution, is what we called him. But
4  that definitely wasn't me.
5      Q. Your testimony is that this was not
6  you, even though you just testified this was
7  your Discord chat?
8      A. No, I can't tell because the way this
9  is formatted. It says my name underneath it,
10 but that is not me. It says it right here. It
11 says it is from Convo.
12     Q. Do you see the beginning of the
13 message the at sign before Convo #5941?
14     A. Yes.
15     Q. Do you recognize that as making this
16 chat on Discord to someone named Convo #5941?
17     A. I mean, I guess. I don't know. Like
18 I said, the formatting of this doesn't look like
19 a Discord message.
20     Q. This is your Discord username, right?
21     A. @Convo, no. The one below that, yes,
22 that is mine. But, like I said, it is taken
23 without any context. So, I don't know what it
24 is talking about, or what this is in reference
25 to.

1      Q. Eli Mosley #5269 is your username,
2  right?
3      A. Correct.
4      Q. Earlier when I asked you if this is
5  your user -- excuse me, earlier when I asked you
6  if this was your Discord chat, you said it was,
7  right?
8      A. Well, that was before I really
9  understood what I was looking at, yeah.
10     (Exhibit 35, 3/22/2017 Discord chat,
11 marked for identification.)
12 BY MR. BARKAI:
13     Q. You are being given an exhibit marked
14 Exhibit 35.
15     Do you recognize this document?
16     A. Yeah. This is another one that is
17 totally out of the context. I don't know what
18 it is referencing.
19     Q. This is a Discord chat that you made,
20 right?
21     A. Umm, I actually I think I know what
22 this one is referencing.
23     Q. The question I asked you was, this is
24 a Discord chat you made, right?
25     A. Correct.

MAGNA

LEGAL SERVICES

1    Q. This was your Discord chat?
2    A. Yes.
3    Q. You made this message on Discord on
4  March 22, 2017 at 5:02 p.m., right?
5    A. Yes.
6    Q. And you wrote on Discord, quote -- you
7  wrote, quote, if he comes in and I have to
8  defend myself, all they have to do is look
9  through my computer and I am fucked. So, not
10 really a good option, closed quote.
11   A. Yeah. So, the only thing I can think
12 of I am referencing there is my computer screen.
13 I had a computer screen that I would -- at my
14 girlfriend's house, we didn't have a TV. We
15 used a computer screen to watch Netflix and
16 stuff like that on.
17     But I don't know -- I don't know --
18 you guys gave me -- are giving these to me with
19 no context. So, I don't know what they are
20 about, what it is talking about. It could be
21 talking about something else entirely than what
22 this conversation -- or what this single comment
23 says.
24   Q. You did make this statement on Discord
25 in March of 2017, right?

1    A. Correct.
2    Q. And your testimony is that this
3  message has to do with a computer screen?
4    A. I don't know, because my -- I can't
5  give a testimony on something when it is
6  literally one sentence. If you want me to look
7  through the entire message, maybe I can get some
8  context what's going on.
9    Q. You just stated at the beginning of
10 one of your prior answers the only thing I am
11 referencing there is my computer screen.
12     That is your testimony?
13   A. I said that is -- I mean, that is
14 probably what I am referencing there. I mean,
15 that is when I am living at the house with my
16 girlfriend. And I know that we had a computer
17 screen as our only screen.
18     But I don't know what I am referencing
19 here with the if he comes in thing. It might
20 totally be a joke. I don't know what it is
21 talking about. I don't know what I am talking
22 about there. I would need the full -- like I
23 said, I would need the full context.
24     (Exhibit 36, 3/31/2017 Discord chat,
25 marked for identification.)

1  BY MR. BARKAI:
2    Q. You are being handed Exhibit 36. This
3  was also a Discord message that you made, right?
4    A. Yes, it looks like it.
5    Q. This Discord chat you posted in -- on
6  March 31, 2017 at 10:38 p.m., right?
7    A. Correct.
8    Q. In this chat you wrote, well, it is
9  not a huge deal, cause the phone is backed up on
10 my PC, closed quote, right?
11   A. I am probably talking about the old PC
12 I left in Pennsylvania when I moved. Because
13 this phone hasn't been backed up for 400-
14 something days, or 600 days, or something like
15 that.
16     Like I said, I left the -- I left -- I
17 left the computer -- you guys can go through if
18 you want. It is, like, a shitty, like, broken
19 computer.
20   Q. Did you back up your phone on the
21 computer?
22   A. Oh, yeah. I mean, way before -- like,
23 in 2016 I backed it up. I haven't backed it up
24 again since, I don't think.
25   Q. Earlier today when I asked you if you

1  had backed up your phone onto a computer or any
2  other device and you said you had not done that,
3  that wasn't true, right?
4    A. Well, what I thought you meant at the
5  time, or what I meant was I haven't backed up
6  the -- I haven't backed up this phone before,
7  like -- 2016 -- 2016, umm, Unite the Right
8  wasn't even a thing yet. We haven't been
9  talking about it. So, it wasn't really in
10 reference to it.
11     But now -- now that I -- obviously I
12 have had this phone for years. It has been
13 backed up at some point on a computer. But it
14 was backed -- so, yeah, it was backed up on an
15 old computer. But it was forever ago.
16   Q. Earlier today I asked you if you had
17 backed up your phone onto a computer and you
18 said that you had not done that. That wasn't
19 true, right?
20   A. Well, not -- right. But when I said
21 that, like I said, I was saying that with the
22 thought of reference to Unite the Right.
23     The phone was backed up before Unite
24 the Right was even -- Unite the Right one even
25 happened, let alone two. So, what I am talking

MAGNA
LEGAL SERVICES

1    about when I said that, it wasn't backed up, I
2    didn't mean ever in the phone's life span.  You
3    can't even -- you can't even activate a phone
4    without doing that.
5        Q.  Is it your testimony that none of
6    these posts refer to a computer that you had in
7    2017?
8        A.  I don't know.  I did not own a
9    computer in 2017.  The -- I mean, I shouldn't
10   say that, either.  I did own a computer.  I just
11   -- I didn't have access to it.  It was in
12   Pennsylvania when I was in South Carolina.  Then
13   when I moved to Virginia, it was still in
14   Pennsylvania.
15       (Exhibit 37, 3/22/2017 Discord chat,
16   marked for identification.)
17   BY MR. BARKAI:
18       Q.  So, to be clear now for the record, in
19   fact, that phone was backed up to your computer?
20       A.  To my -- yes.  To my computer that was
21   in Pennsylvania at the time.
22       Q.  You have been handed a document marked
23   Exhibit 37.  Do you recognize this as your
24   Discord chat?
25       A.  Yes.

1        Q.  You made this chat on March 22, 2017,
2    at 1:05 a.m.?
3        A.  Yes.
4        Q.  This Discord chat states, quote, it
5    played over my work computer once, closed quote,
6    right?
7        A.  Yes.  I had a laptop when I worked at
8    the company I worked at.
9        Q.  In 2017?
10       A.  No, I didn't work there in 2017.  But
11   I am talking about the past tense in this.
12   Again, this is a single comment with no context.
13   So, I don't really know what I am talking about
14   here.  But it is in past tense.  So, I am
15   talking about my work computer I had in 2016.
16       Q.  That -- the computer that you have
17   said is in your parents' house, that you left
18   there when you moved in fall of 2016 or in early
19   2017 --
20       A.  Mm-hmm.
21       Q.  -- did you use that computer to
22   communicate regarding Identity Evropa?
23       A.  No.  I wasn't a member of Identity
24   Evropa when I used it last.
25       Q.  Did you use that computer to

1    communicate regarding the Alt-Right?
2        A.  No.
3        Q.  Did you use that computer to
4    communicate regarding White Nationalism?
5        A.  No.
6        Q.  Or White Identitarianism?
7        A.  Nothing.
8        Q.  Did you use your social media accounts
9    on that computer?
10       A.  None that were associated with the
11   Alt-Right or anything like that.
12       Q.  Did you ever use any social media
13   accounts on that computer?
14       A.  Yeah.  Like, Facebook accounts when I
15   was in high school.  It was my computer when I
16   was in high school.  So --
17       Q.  You used that computer in 2016 though,
18   right?
19       A.  Probably middle to early 2016.  Not
20   towards the end.  It was on its last legs.  It
21   was dying.  I used my work laptop mostly.
22       Q.  Did you use social media on that
23   computer in 2016 before it died?
24       A.  Facebook.  But nothing related to the
25   Alt-Right.

1        Q.  You used Facebook on that computer,
2    right?
3        A.  Yeah.
4        Q.  Did you use Twitter on that computer?
5        A.  No.
6        Q.  When did you join the Alt-Right?
7        A.  Umm, I don't know the exact date or
8    anything like that.  Umm, I don't know.
9        Q.  Approximately when?
10       A.  Umm, a little bit before the election.
11   The 2016 election, I guess.  I don't know.
12       Q.  You joined the Alt-Right in 2016, a
13   little bit before the 2016 election?
14       A.  Yeah.  I don't know how that would
15   work.  I have to think about how I joined it.
16   Umm --
17       Q.  You were a member of the Alt-Right --
18       A.  So, it would have been -- so, November
19   2016 was the inauguration.  No, I'm sorry, the
20   election.  Inauguration was in January.  That
21   would have been 2017.
22       So, that computer stopped working in
23   -- probably, actually, fall of 2015.  Of 2015
24   probably is when it stopped working, a year
25   before the election.

MAGNA
LEGAL SERVICES

1     But I joined the Alt-Right in probably
2 the spring of 2016. So, before the election.
3 Not even a year before the election.
4     Q. Your testimony is that the computer
5 stopped working in the fall of 2015 --
6     A. I don't -- -
7     Q. -- and you joined the Alt-Right in the
8 spring of 2016?
9     A. Yeah, somewhere around there. The
10 reason I say that is because -- I just don't
11 know when the computer -- I just don't know when
12 the computer stopped working. I am trying to
13 remember.
14     I just know that, umm -- I just know I
15 used my work computer for a lot of stuff. Like,
16 all my, like, personal stuff, things like that,
17 leading up to the election. I know that. Once
18 the election happened, I stopped using the
19 computer and I started using my phone, because I
20 got fired shortly after.
21     Q. Did you use your work computer for
22 Alt-Right matters?
23     A. No.
24     Q. But you were using the work computer
25 while you were a member of the Alt-Right,

1 correct?
2     A. Correct. But I was only using it for
3 work -- work stuff.
4     Q. Your testimony is that the computer
5 stopped -- the personal computer stopped working
6 in the fall of 2015, right?
7     A. I want to say 2015 -- like, fall of
8 2015. But I don't know that for sure. I really
9 don't know when it stopped working. I just know
10 it stopped working a long time before the
11 election. Because I was just using my phone
12 after that.
13     Q. The computer that you backed your
14 phone up to was not working in 2016; is that
15 right?
16     A. I don't know. I don't think so. I
17 think it was dead by then, by 2016. 2015 or
18 2016 it died. Like I said, I don't know.
19     Q. Why do you still have that phone --
20 excuse me. Why do you still have that computer
21 if it does not work?
22     A. Because I have it for parts, just in
23 case I need it. It's got fans in it. It is,
24 like, a big tower. It's got fans in it, it's
25 got, like, a power supply that's still good.

1     Q. You testified earlier that you posted
2 a Discord chat on March 31, 2017 where you
3 wrote, quote, the phone is backed up on my PC,
4 quote, right?
5     A. Correct.
6     Q. And that is -- you made that statement
7 in 2017, right?
8     A. Correct. I am not --
9     Q. But your PC had not been working since
10 2015?
11     A. It wasn't even a PC I had on me. It
12 was a PC that was in Pennsylvania while I was --
13 I think at that time probably in South Carolina.
14     I am saying if I don't -- I don't know
15 the context of what I am saying and the
16 conversation. I can't really -- I don't really
17 know.
18     Q. But you did testify that you posted a
19 chat in March of 2017 where you said that the
20 phone, quote, is, quote, backed up on my PC,
21 right?
22     A. Correct. Again, my phone, you can
23 look at it. It hasn't been backed up for, like,
24 500 days, or 600 days, something like that.
25     (Exhibit 38, 3/22/2017 Discord chat,

1 marked for identification.)
2 BY MR. BARKAI:
3     Q. You are being handed a document marked
4 Exhibit 38. Do you recognize that as a Discord
5 chat that you made?
6     A. Yeah, but that, I think, is probably
7 talking about the computer screen I was talking
8 about earlier. I don't know. Again, you have
9 these single messages. I can't see what it is
10 in reference to. I can't see, like, what I am
11 talking about. But if I am talking about they
12 share a wall with my computer, the computer
13 screen was up against a wall that we had. That
14 is what we watched Netflix or TV on, or
15 whatever.
16     Q. Do you --
17     A. It was a computer screen.
18     Q. You made that statement on Discord,
19 right?
20     A. Yes.
21     Q. That is yours?
22     A. Correct.
23     Q. In 2017, right?
24     A. Correct.
25     Q. You made that post on Discord on March

MAGNA
LEGAL SERVICES