# EXHIBIT B

```
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

Civil Action - Law
No. 3:17-cv-00072-NKM
-------------------------------------x

 ELIZABETH SINES, SETH WISPELWEY,     :
 MARISSA BLAIR, TYLER MAGILL,         :
 APRIL MUNIZ, HANNAH PEARCE,          :
 MARCUS MARTIN, NATALIE ROMERO,       :
 CHELSEA ALVARADO, and JOHN DOE,      :
                                      :
              Plaintiffs,             :
                                      :
           - vs -                     :
                                      :
 JASON KESSLER, et al.,               :
                                      :
              Defendants.             :
-------------------------------------x
```

_____

Deposition of ELLIOTT KLINE
_____

| | |
|---|---|
| 228 Walnut Street | Wednesday, August 7, 2019 |
| Harrisburg, PA | 10:05 a.m. |

_____

   IT IS HEREBY STIPULATED and agreed that the sealing of the within transcript is waived.
   IT IS FURTHER STIPULATED and agreed that all objections except as to the form of the question are reserved to the time of trial.
_____

1  playing the game. There is nothing -- just
2  voice or whatever.
3      Q. Just voice only?
4      A. Just voice.
5      Q. Besides talking to Char Char Binks,
6  did you do anything else to prepare for today's
7  deposition?
8      A. No.
9      Q. Did you speak with or meet with Mr.
10 Kolenich in advance of the deposition?
11     A. No.
12     Q. Mr. Woodard?
13     A. No.
14     Q. Have you communicated with Jason
15 Kessler about his deposition?
16     A. No.
17     Q. Have you communicated with Erika
18 Alduino about her deposition?
19     A. No.
20     Q. Mr. Kline, where did you grow up?
21     A. Reading, Pennsylvania.
22     Q. Is that the address that we discussed
23 earlier as being your parents' address?
24     A. Yes.
25     Q. 117 Mesa Drive?

1      A. Yes.
2      Q. Where do you live now?
3      A. Umm, I am kind of moving between a
4  bunch of different places. I just house sit for
5  -- like, the last two weeks I house sitted for a
6  family. But I don't really have a permanent
7  address right now. I am kind of moving around,
8  trying to find a job.
9      Q. What is the address where you have
10 been house sitting?
11     A. I don't even know the address. It is
12 up in Allentown.
13     Q. Where did you live before Allentown?
14     A. I was -- like, after I left Virginia,
15 I lived with my parents for a little bit. And I
16 have been trying -- I have been driving around
17 trying to find a job all throughout
18 Pennsylvania. So, I might stay in, like, a
19 hotel one night, or stay with a friend or
20 college or something like that. But --
21     Q. What is the last physical address that
22 you remember having?
23     A. The 117 Mesa Drive is the -- I guess
24 the best address.
25     Q. When did you leave that address?

1      A. I am there right now. But I might be
2  leaving in another week or two to go look for a
3  job.
4      Q. Where were you living in Virginia?
5      A. Umm, I got to remember the name of the
6  town. I can't believe I can't remember. Umm,
7  what was the name of that place? If I had my
8  phone out, I could just look at Google Maps and
9  know exactly where it is at. I just don't know
10 exactly where it is.
11        It is Loudoun. Loudoun County. So,
12 whatever town -- the town that is in Loudoun
13 County, that is where it was.
14     Q. Have you ever lived in
15 Charlottesville?
16     A. No.
17     Q. Your name is Elliott Kline, but you go
18 by Eli Mosley, right?
19     A. I went by that. I no longer go by
20 that name.
21     Q. Why did you go by Eli Mosley at the
22 time?
23     A. Pretty much everyone in the Alt-Right
24 had, like, a pseudonym or, like, a fake name for
25 anonymity.

1      Q. For anonymity?
2      A. Yeah.
3      Q. Why did you choose Eli Mosley?
4      A. Umm, at the time -- well, Elliott,
5  Eli. That's pretty simple. Mosley was just --
6  he is a political figure from the United Kingdom
7  who I was reading at the time.
8      Q. When did you stop using that name?
9      A. Uh, probably, I mean, a year ago.
10 Maybe a little bit more than a year ago.
11     Q. How old are you?
12     A. 27.
13     Q. What is the highest level of education
14 that you have received?
15     A. Some college.
16     Q. Where were you in college?
17     A. Shippensburg University, and then
18 Millersville University.
19     Q. You did not graduate; is that right?
20     A. No.
21     Q. What were you studying?
22     A. Political science at Shippensburg and
23 computer science in Millersville.
24     Q. Are you employed now?
25     A. No.

Page 50

1  Q. When were you most recently employed?
2  A. Umm, I mean, technically by Identity
3  Evropa, I guess. Most of the work I have been
4  doing was just kind of odd stuff, you know.
5  Because it is really hard for me to find a job
6  right now.
7  Q. What kind of odd stuff?
8  A. Like, house sitting, pet sitting. You
9  know, cleaning cars. Stuff like that.
10 Q. Were you being paid for your work for
11 Identity Evropa?
12 A. Yes.
13 Q. What kind of work was that you were
14 being paid for?
15 A. Administrative organizational-type
16 work. Yeah.
17 Q. Did administrative organizational-type
18 work involve making documents for Identity
19 Evropa?
20 A. Umm, yes. But I wasn't the only -- I
21 wasn't the only one who did it. Most of the
22 documents that were made were made by Nathan
23 Damingo.
24 Q. What kind of documents did you make?
25 A. Umm, I am trying to think of what kind

Page 51

1  of documents I would have made. I made things
2  that were sort of, like -- so, after
3  Charlottesville -- I mean, what happened at
4  Charlottesville freaked me out, as far as the
5  violent stuff. So, I kind of made -- one of the
6  documents I know is -- and I made it with Nathan
7  -- was Identity Evropa moving forward's peaceful
8  protesting and how to, you know, communicate our
9  ideas peacefully kind of thing.
10      Other than that, I can't remember any
11 specific documents other than that one.
12 Q. Did you make documents before Unite
13 the Right for Identity Evropa?
14 A. Umm, no. Not that I -- no.
15 Q. Where -- where is the document that
16 you remember making saved?
17 A. The old Discord server, I believe, is
18 the best place to find it, is they -- Identity
19 Evropa had a Discord server where documents and
20 things like that were -- it wasn't documents,
21 yeah. But mostly it was just people posting
22 things like that on Discord. And one of those
23 things was the document.
24      I believe Discord deleted the whole
25 server. But that was after I had already left.

Page 52

1  So, I don't -- I don't know exactly what the
2  status of the server is. But I believe -- I
3  have heard they deleted everything. From the
4  news, actually. Not even --
5  Q. So, your testimony is the document was
6  posted on Discord, right?
7  A. Correct.
8  Q. Identity Evropa's Discord server?
9  A. Correct.
10 Q. Was the document itself made on a
11 computer though?
12 A. Umm, I think that specific one I made
13 on Google docs, and then sent the Google doc to
14 somebody who made it into a Word document and
15 posted it. So, it was Google docs on my phone
16 kind of thing on my -- just the Google app or
17 whatever. With the EliMosley@IdentityEvropa.com
18 Gmail address.
19 Q. Which e-mail address was that?
20 A. The @IdentityEvropa one. So, if it
21 was Eli Mosley, which I think is what it was, or
22 Elliott Kline, whatever it was.
23      I am pretty sure it was
24 EliMosley@IdentityEvropa.com, though. I made it
25 on that Google documents drive or whatever.

Page 53

1  Q. On your phone?
2  A. Yeah.
3  Q. Correct?
4  A. Mm-hmm.
5  Q. So, you logged into Google docs on
6  your phone --
7  A. Mm-hmm.
8  Q. -- and made the document on your
9  phone, right?
10 A. Yeah. And it was -- it was a
11 collaborative thing. There was other people
12 that were adding -- like, other people that were
13 in the organization that were putting it
14 together, or whatever.
15 Q. Who were the other people who were
16 putting it together?
17 A. Nathan and Patrick, obviously. I
18 can't really remember anyone else's names that
19 would have been involved. But --
20 Q. Did you communicate with Mr. Damingo
21 and Mr. Casey via e-mail?
22 A. No.
23 Q. Via phone call?
24 A. Yeah.
25 Q. Via text?

1  A. Yes.
2  Q. Why did you get that Walmart phone?
3  A. It was because this phone was not
4  working at the time. So -- and I kept getting
5  phone calls from people I didn't want to get
6  phone calls from.
7  Q. In what way was that phone not
8  working?
9  A. It wasn't receiving any connection to
10 -- it was water damaged. So, I had to get a
11 part in it replaced, then it was fixed, like, a
12 month or two after it happened.
13 Q. When the phone was damaged by water,
14 was any of the content of it lost?
15 A. No, everything on it was still on it.
16 Q. How do you know?
17 A. Because -- I mean, it might -- stuff
18 might have gotten deleted for all I know. But
19 like I said, I went through it. Everything was
20 fine. All the photos were still there, all the
21 text messages were still there that I -- nothing
22 -- contacts were still there. Nothing changed
23 on the phone. All my apps were still there. No
24 memory change happened on the phone.
25 Q. So, at that time you had two phones.

1  You had the iPhone and you had the Walmart
2  phone, correct?
3  A. Mm-hmm, yes.
4  Q. And how long did you have the Walmart
5  phone for?
6  A. Only maybe two, three months, maybe.
7  Something like that. I don't know. It wasn't
8  very long.
9  Q. When was this?
10 A. It was me leaving Virginia. So, like,
11 a year-and-a-half ago. So -- whenever I left
12 Virginia. So, that would have been 2018, spring
13 of 2018.
14 Q. It was in the spring of 2018 that you
15 had the Walmart phone?
16 A. Spring, summer of 2018. Yeah.
17 Q. When did you stop using the Walmart
18 phone?
19 A. The moment I got this fixed. So, it
20 was -- like I said, it was maybe three months, I
21 would say, if I had to guess, I used that phone.
22 But I didn't really use it that much, the
23 Walmart phone.
24 Q. Mr. Kline, you have testified that you
25 got that phone fixed this year, correct?

1  A. Umm, I have gotten that phone fixed
2  multiple times. This phone -- I got the water
3  damage replaced. That was between, I guess,
4  2018 -- spring, summer of 2018. And then just a
5  couple weeks ago this wasn't working and I got
6  it fixed again. And I just got this new phone
7  that I haven't activated yet.
8  Q. So, in spring of 2018, your iPhone was
9  water damaged?
10 A. Mm-hmm.
11 Q. And you got a Walmart phone, right?
12 A. Correct.
13 Q. You used the Walmart phone for --
14 A. About three months.
15 Q. -- three months. And then -- umm --
16 A. I started using this phone again.
17 Q. Then you started using that phone
18 again, the iPhone that you told the Court about,
19 correct?
20 A. Correct.
21 Q. What happened to the Walmart phone
22 then?
23 A. I still have it. I would have to look
24 exactly where it is at. It somewhere in one of
25 my bags. I have a bunch of boxes from when I

1  moved. It is in one of those.
2  Q. When was the last time you saw the
3  Walmart phone?
4  A. Months ago. Like, three or four
5  months ago. Maybe -- maybe longer.
6  Q. Was the Walmart phone -- is the
7  Walmart phone also a smart phone?
8  A. Umm, I guess technically it is, I
9  think. But I didn't have any of that stuff
10 turned on it, like the internet, browser,
11 anything like that.
12 Q. Which phone number was connected to
13 that Walmart phone?
14 A. I don't remember the phone number for
15 it. I mean, I might have -- I don't even have
16 it -- it is not on. But I don't remember what
17 the phone number for it was. It was a Virginia
18 number. That is all I know.
19 Q. It was not your 610 number?
20 A. No.
21 Q. After your iPhone was fixed, was that
22 then the only phone you were using?
23 A. Correct.
24 Q. When did you stop using that phone?
25 A. The iPhone? This iPhone?

Page 110

1  A. No, I don't think any of it was. The
2  only -- the only document typing or anything
3  like that, creation that I did, was on my Google
4  drive to Google docs, copying it and pasting it
5  and making it into that -- putting it on
6  Discord, was that document explaining the rules
7  and what everyone was doing, the planning
8  document that got leaked.
9      That is the only documents that I made
10 or created for the event.
11     Q. Did you make any promotional
12 materials, such as a poster?
13     A. I didn't make any of that. Somebody
14 else did.
15     Q. Did you discuss with others who made
16 promotional materials, what those materials
17 were?
18     A. I believe Jason Kessler handled all
19 that stuff.
20     Q. When you say somebody else made
21 promotional materials, who would that have been?
22     A. I have no idea who made -- who made
23 the stuff. Like I said, Jason Kessler handled
24 that kind of thing. The promotion, the
25 promotional stuff, the speakers, things like

Page 111

1  that.
2      Q. Did you write any articles about Unite
3  the Right?
4      A. Articles for what? For -- no, I
5  didn't produce any -- publish any articles or
6  anything like that.
7      Q. Did you write any kind of blog post
8  about Unite the Right?
9      A. Umm, not that I can remember.
10     Q. Have you used a computer to send
11 e-mails regarding Unite the Right?
12     A. Other than the court case stuff, no.
13     Q. But you have used a computer to send
14 e-mails regarding the court case?
15     A. Just, like, responding -- when the
16 phone wasn't working, I would just use, like,
17 whatever computer I could get. Like, I went to
18 a -- I think I went to -- I don't even know what
19 the hell they are called. One of those internet
20 cafe places just to get to my e-mail once. I
21 don't remember where it was. It was in
22 Lancaster City. But it was just trying to get
23 to my e-mail, to e-mail them back.
24     Q. When was that?
25     A. I don't know. Sometime before all the

Page 112

1  -- before they filed this. So, before July.
2      Q. Which e-mail address would that have
3  been?
4      A. The Eli F. Mosley one.
5      Q. Did you own a computer in 2017?
6      A. Umm, in 2017. So, that is the year of
7  the rally and stuff. Yes, I did. But I didn't
8  -- basically what happened with me was I had
9  gotten let go of my job in late 2016 and I moved
10 down to South Carolina with my girlfriend at the
11 time. I wasn't able to bring any of my stuff,
12 which included my computer and lots of other
13 stuff.
14     Q. What job had you gotten let go of in
15 late 2016?
16     A. I was an HR manager for a company
17 called JC Ehrlich.
18     Q. When you moved down to South Carolina,
19 why were you not able to bring your computer?
20     A. I couldn't fit all my stuff in the
21 car. I just brought my clothes and stuff like
22 that.
23     Q. So, what happened to your computer
24 then?
25     A. It was set in my parents' storage

Page 113

1  shed, I think. It was -- it was a computer I
2  used for work, for when I had the job at JC
3  Ehrlich.
4      Q. Where is that computer now?
5      A. At my parents' place.
6      Q. Do you use that computer now?
7      A. No.
8      Q. Does the computer still work?
9      A. I think so. Probably.
10     Q. When did you first get that computer?
11     A. Probably 2012.
12     Q. What kind of computer is it?
13     A. Just a -- I don't know, desktop
14 computer.
15     Q. Do you know the brand of computer it
16 is?
17     A. No. I think it is custom -- it is
18 just kind of a Frankenstein machine.
19     Q. You used that computer in 2017, right?
20     A. No, no, no. No. Like I said --
21     Q. Excuse me, you used that computer in
22 2016, right?
23     A. Yes. But it was -- like I said, it
24 was before most of the Alt-Right stuff.
25     Q. When was the last time that you used

1  Q. Not a single time?
2  A. No.
3     THE VIDEOGRAPHER: Pardon me, Counsel.
4  About three minutes until I have to change over
5  the tape.
6     MR. BARKAI: So, we'll go for another
7  couple minutes, then we'll take a break.
8     THE WITNESS: Yeah.
9  BY MR. BARKAI:
10  Q. You still have access to
11  DeplorableTruth@Gmail.com, right?
12  A. Yes.
13  Q. And you still have access to
14  Eli.F.Mosley@Gmail.com?
15  A. Yes.
16  Q. You also have an IdentityEvropa.com
17  e-mail address, correct?
18  A. I do not have access to.
19  Q. Do you have any other e-mail addresses
20  that you have used in the last four years?
21  A. Yeah. Umm, the only other -- well,
22  there is two things for that. The first thing
23  is I have an e-mail address that is used, like,
24  that I signed up for a lot of stuff, like, bank
25  accounts and things like that. I have that

1  e-mail address. Umm, that is at Comcast
2  address. Again, there is nothing in there.
3  That is what I sign up for accounts for, like I
4  said, banking and things like that.
5     And then the other e-mail address is
6  when I would make a new Twitter account or
7  whatever, when I needed a new Twitter account, I
8  would just have a random e-mail address I don't
9  have any access to at all. It would be random
10  letters, if that makes sense.
11  Q. Are you able to log into those e-mail
12  addresses?
13  A. I don't even -- no. They have all
14  been deleted. All -- Twitter deleted -- Twitter
15  somehow got -- Twitter had, like, a way of just
16  knowing it was me and they started deleting them
17  right away. So --
18  Q. Have you used anyone else's e-mail
19  address to communicate --
20  A. No.
21  Q. -- about Unite the Right?
22  A. No.
23  Q. Does Identity Evropa have its own
24  e-mail addresses --
25  A. Yeah.

1  Q. -- for the organization?
2  A. Yes.
3  Q. Have you operated those e-mail
4  addresses?
5  A. No. I wasn't ever in control of any
6  of the tech stuff.
7  Q. Have you deleted any e-mails at all
8  that you have sent or received concerning the
9  events in this case?
10  A. No.
11  Q. Have you ever been instructed to
12  delete any such e-mails?
13  A. No.
14  Q. Have you ever instructed anyone else
15  to delete any such e-mails?
16  A. No.
17     MR. BARKAI: We can take a break. Go
18  off the record.
19     THE VIDEOGRAPHER: The time is 12:04
20  p.m., we are going off the video record.
21     (Recess was taken.)
22     THE VIDEOGRAPHER: The time is now
23  12:13 p.m., we are back on the video record.
24  BY MR. BARKAI:
25  Q. Mr. Kline, before we continue

1  discussing your communications regarding Unite
2  the Right, a few questions about your
3  preparation for this deposition.
4     In preparation for this deposition,
5  did you speak to Mr. DiNucci, who is on the
6  phone?
7  A. No.
8  Q. Did you speak with Mr. Campbell, who
9  is on the phone, in preparation for this
10  deposition?
11  A. No.
12  Q. What about regarding this case
13  generally? Have you had conversations with Mr.
14  DiNucci?
15  A. No, I don't think so. Outside of --
16  no, actually I don't think I have ever talked to
17  him before. I mostly talked with Kaplan, I
18  think.
19  Q. You started to say outside of, have
20  you ever had any conversations with Mr. DiNucci
21  about this case?
22  A. No, I don't think so.
23  Q. What about Mr. Campbell? Have you had
24  conversations with Mr. Campbell about this case?
25  A. No.

Page 206

1   A. Correct.
2   Q. So, you did receive this e-mail?
3   A. I don't know. But if I did, I haven't
4   read it.
5   Q. Okay. So, if you did receive this,
6   you didn't read it?
7   A. Correct. I don't know -- I don't know
8   if I did receive it or not.
9   Q. Do you see in the attachments on this
10  exhibit, at the end of the list of attachments,
11  Plaintiffs' Corrected First Set of Document
12  Requests.pdf?
13  A. Yeah -- see -- that is another --
14  yeah, no. I do see that. But, like I said, I
15  don't -- I don't think I went through this
16  e-mail. This is exactly what I was talking
17  about earlier when you guys -- I said I didn't
18  have the means to give it. That's what this
19  looks like. It looks like a PDF I could have
20  just filled out, which I obviously would have
21  done.
22      But I didn't -- I didn't -- I don't
23  think I read through this, or I would have done
24  that.
25  Q. Turning back to what you have in front

Page 207

1   of you as Exhibit 10, you did receive this set
2   of Requests for Production, correct?
3   A. Umm, is this the one with the table at
4   the end? I don't recognize this one, either,
5   no.
6   Q. Putting aside whether you recognize it
7   right now or not, you were e-mailed this
8   document on July 1, 2019, right?
9   A. Maybe. I don't know. I have no way
10  of confirming that.
11      I mean, was this sent with this?
12  Because then, yeah, because it says July 1 on
13  it. But this doesn't have a date on it.
14  Q. On Exhibit 11, do you see that the
15  e-mail attached Plaintiffs' Corrected First Set
16  of Documents.pdf?
17  A. Yes. Is that what this is?
18  Q. Do you see on Exhibit 10 the document
19  is titled Plaintiffs' Corrected First Set of
20  Requests for Production of Documents to all
21  Defendants?
22  A. Yes. I never seen either of these
23  then, yeah.
24  Q. But they were e-mailed to your e-mail
25  address?

Page 208

1   A. I mean, it says they were. But I
2   didn't read it.
3   Q. At the end of these Requests for
4   Production, the date on Page 10 is January 25,
5   2018, right?
6   A. Okay.
7   Q. Do you see that?
8   A. Yes.
9   Q. So, the first time that these requests
10  were first issued was in January 2018, right?
11  A. Okay, yes.
12  Q. On the first page of Exhibit 10, do
13  you see that the deadline to respond to these
14  was 30 days from when they were served?
15  A. Correct. But I didn't -- like I said,
16  I haven't seen these documents. But that makes
17  sense.
18  Q. You haven't responded to these
19  Requests for Production, right?
20  A. No. Because I haven't -- like I said,
21  I haven't read through them.
22  Q. You haven't produced a document to
23  Plaintiffs before --
24  A. No. But I am more than happy -- I am
25  more than happy to.

Page 209

1   Q. Putting aside -- putting that aside,
2   you have not produced a document to Plaintiffs,
3   correct?
4   A. No. I would like to.
5   Q. Why was it that you didn't provide
6   Plaintiffs with any documents?
7   A. I didn't -- I didn't read through -- I
8   didn't see this -- that's what these were.
9   Because I get so many e-mails from these, they
10  must have gotten mixed up with some other ones.
11      Every time somebody makes a -- does
12  anything in the case, I get an e-mail. So, I
13  thought that -- these might -- this might have
14  been attached to something else when it was
15  first sent. I don't know.
16  Q. Did you hear about these Requests for
17  Production at any time?
18  A. What do you mean, hear?
19  Q. Did anyone ever tell you about these
20  Requests for Production?
21  A. Umm, originally the lawyer told me,
22  and I explained to him the situation with my
23  accounts being banned and things like that. But
24  other than that, no.
25  Q. When you say the lawyer, who are you

1 Q. You have never produced any of those
2 to Plaintiffs, right?
3 A. No. But I would like to, using the
4 PDF or whatever you guys have that looks like
5 from this e-mail.
6 Q. You are ready to do that today?
7 A. Yes.
8 Q. You are ready to turn over your
9 devices --
10 A. Umm --
11 Q. -- for imaging?
12 A. I could turn the -- I would like to
13 not do the cell phone today, just because I use
14 it to get home on GPS. I have somewhere to go
15 that I am not familiar with. But I could, like,
16 do it right after I get home and activate the
17 new cell phone I just got.
18 Q. You are ready to provide consents for
19 social media accounts --
20 A. Yes.
21 Q. -- to be disclosed?
22 A. Yes.
23 Q. Did you ever at any time have
24 documents and communications relevant to the
25 events in the Complaint that you no longer have?

1 A. No.
2 Q. Do you see Request for Production No.
3 2 at the bottom of Page 8 of this document?
4 A. Number -- okay, I see that, yes.
5 Q. Do you see that it asks there for you
6 to produce all documents and communications
7 concerning events, meetings, rallies,
8 conferences, or conversations held prior to the
9 events that relate to the events in any way?
10 A. Yeah.
11 Q. Do you understand you are obligated to
12 produce all such documents to Plaintiffs?
13 A. Yep.
14 Q. And you have at various times had
15 documents and communications concerning such
16 events, right?
17 A. Yes. And it is all in my phone, or
18 Discord.
19 Q. You haven't produced any of those yet,
20 have you?
21 A. No. But I would like to today, if
22 that is possible. Or consent for the social
23 media ones today.
24 Q. On Page 9 of this document, do you see
25 Request for Production No. 3 --

1 A. Yes.
2 Q. -- which asks for documents concerning
3 and communications with various groups?
4 A. Yes.
5 Q. Did you understand that you are
6 obligated to produce all documents and
7 communications you have concerning or with these
8 groups?
9 A. Yes.
10 Q. Do you have, or have you had in the
11 past documents concerning or communications
12 concerning or with East Coast Knights of the
13 KKK?
14 A. No.
15 Q. What about Fraternal Order of the Alt
16 Knights?
17 A. No.
18 Q. Identify Evropa you do, correct?
19 A. Yes.
20 Q. What about League of the South?
21 A. Umm, yes, on Discord.
22 Q. What about Loyal White Knights of the
23 KKK?
24 A. No.
25 Q. What about Moonbase Holdings, LLC?

1 A. I don't know what that is. No.
2 Q. What about Nationalist Socialist
3 Movement?
4 A. No.
5 Q. What about Nationalist Front?
6 A. No.
7 Q. What about Traditionalist Worker
8 Party?
9 A. Yes.
10 Q. What about Vanguard America?
11 A. Yes.
12 Q. With respect to Traditionalist Worker
13 Party, what sorts of documents are those?
14 A. Just communication between us on
15 Discord.
16 Q. Between you and who?
17 A. Umm, it wasn't -- it wasn't Matt
18 Heimbach at the time, it was somebody else I was
19 dealing with. I can't remember his name. I
20 can't remember the guy's name. But it was
21 somebody that was on Discord. They were, like,
22 the -- they were marked as the communication
23 liaison for the Traditionalist Worker Party.
24 Q. What about Vanguard America?
25 A. I spoke to one or two guys. One of

Page 226

1   Q. You have made messages regarding the
2   events in the Complaint through Discord?
3       A. Yes.
4       Q. And through Twitter?
5       A. Yep.
6       Q. And through Facebook?
7       A. Yep.
8       Q. You haven't produced those messages
9   before?
10      A. Well, I am banned from all of them, so
11  I can't.
12      Q. You have not made any efforts to
13  enable the production of those documents before?
14      A. No, but I would like to.
15      Q. On the next page, Page 10 of this list
16  of Requests for Production, do you see that
17  Request for Production 6 seeks all the documents
18  concerning and all communications concerning or
19  with any Plaintiff or Defendant other than you
20  named in the Amended Complaint, and any other
21  person who attended, planned, or was involved in
22  the events?
23      A. Yes.
24      Q. Do you understand that you are
25  obligated to produce all such documents and all

Page 227

1   such communications?
2       A. Yes.
3       Q. You have had such documents and
4   communications in the past, right?
5       A. Yes.
6       Q. You have had text messages, for
7   example?
8       A. Yes.
9       Q. You have had social media messages,
10  for example?
11      A. Yes.
12      Q. You have not produced any of those,
13  right?
14      A. No, but I would like to.
15      Q. Do you see Request for Production 7 on
16  Page 10?
17      A. Yes.
18      Q. That Request for Production asks for
19  documents and communications concerning any
20  lawsuits, claims of violence, or arrests
21  relating to or arising out of racially,
22  ethnically, or religiously-motivated conduct by
23  you or any Defendant named in the Amended
24  Complaint.
25          Do you see that?

Page 228

1       A. Yes.
2       Q. You have such documents, right?
3       A. Not that I know of. Never mind. It
4   says something about lawsuits. Yes. But
5   violence, no. But the lawsuits, yes.
6       Q. You do have documents concerning
7   lawsuits, right?
8       A. The lawsuits, yes.
9       Q. You have not produced any of those
10  documents, right?
11      A. No, but I would like to.
12      Q. On the same page, Request for
13  Production 8. Do you see that the request seeks
14  documents and communications concerning the
15  steps that you have taken to preserve documents
16  and communications relative to the lawsuit?
17      A. Yes.
18      Q. Do you have any such documents?
19      A. No.
20      Q. You don't have any documents
21  concerning the steps you have taken to preserve
22  documents and communications relative to the
23  lawsuit?
24      A. No. That would be like -- no, I don't
25  have anything like that.

Page 229

1       Q. Is that because aside from keeping
2   your old --
3       A. Cell phone.
4       Q. -- cell phone, you don't have any
5   steps that you have taken to preserve documents
6   and communications?
7       A. Other than telling -- the only other
8   thing would be social media, right. So, I don't
9   have any documents related to that, so I can't
10  preserve it.
11      Q. Have you made comments on social media
12  regarding your preservation obligations?
13      A. No, I don't think so.
14      Q. Have you sent any e-mails regarding
15  your preservation obligations?
16      A. No.
17      Q. Have you sent any text messages
18  regarding your preservation obligations?
19      A. No, no.
20      Q. But Mr. Kolenich did speak to you
21  regarding your preservation obligations, right?
22      A. Yeah. When the case first opened up,
23  he explained, like, the broad strokes that was
24  going to happen. He said don't delete -- you
25  know, don't delete your stuff, or whatever.

Page 238

1  that means of communication include telephone
2  calls, in-person meetings, and all means of
3  electronic communication, including, for
4  example, social media, e-mail, SMS images,
5  podcasts, and online video?
6      A. Yes.
7      Q. Do you understand that this
8  Interrogatory requires you to identify all
9  relevant means of communication?
10     A. Yes.
11     Q. Do you see Interrogatory 2, identify
12 any channel or server on Discord to which you
13 had access?
14     A. Yes.
15     Q. You have not done that, have you?
16     A. No, but I can. I mean, it is really
17 easy, because I was one of the admins on the
18 server. So, the answer is all.
19     Q. The answer to this Interrogatory is
20 that you had all -- you had access to all
21 channels or servers?
22     A. I had vision access, at least. Not
23 necessarily the ability to post. But I had
24 vision access to all of them.
25     Q. Returning to Interrogatory No. 1 for a

Page 239

1  moment. You have said that you don't know how
2  to respond to this because you don't know how to
3  identify all means of communication, right?
4      A. No, i don't know, like, where am I
5  sending this to? Am I responding to this
6  e-mail? Am I sending a postcard? Like, how am
7  I supposed to answer the Interrogatory?
8      Q. Have you ever asked anyone how to
9  answer this Interrogatory?
10     A. At the time I got sent this was when
11 we were filing the motion to delay, so it wasn't
12 necessary. In the time I have gotten this, I
13 don't have a lawyer.
14        But this, this page right here, this
15 one I said I never saw before, if I had seen
16 this, it would have made a lot of sense. I
17 would have been able to go right ahead and take
18 care of it.
19        Because, like I said, this form right
20 here clearly says fill out this form and e-mail
21 it back to us with all your accounts. And I
22 would have -- that would have been super easy.
23     Q. You did not do that, right? You did
24 not fill out that form?
25     A. No. I would like to though. I would

Page 240

1  like to do that though.
2      Q. You didn't do it at the time?
3      A. I didn't know how to do it at the
4  time, because I didn't -- this page right here,
5  Exhibit 11, I hadn't even seen. So, umm, I
6  didn't really have a choice to do it at the
7  time. But I would like to.
8      Q. Exhibit 11 was sent to
9  Eli.F.Mosley@Gmail.com, right?
10     A. Correct.
11     Q. That is your e-mail address, right?
12     A. Correct.
13     Q. On which channels or servers on
14 Discord did you post messages? Did you post
15 messages on Charlottesville 2.0?
16     A. Yes.
17     Q. Vibrant Diversity?
18     A. I am not sure.
19     Q. Trad Worker?
20     A. No.
21     Q. Charlottesville 1.0?
22     A. Yes.
23     Q. altright.com?
24     A. Uh, yes.
25     Q. AnteCom?

Page 241

1      A. No.
2      Q. Southern Front?
3      A. No.
4      Q. Front and Center?
5      A. No.
6      Q. MI Goy Scouts?
7      A. No.
8      Q. Identity Evropa?
9      A. Yes.
10     Q. New Byzantium?
11     A. No.
12     Q. IRL Networking Events?
13     A. Yes.
14     Q. Operation Wolverine?
15     A. No.
16     Q. Far Right Escape Pod Alpha One?
17     A. No.
18     Q. Do you see on Page 8 of this list of
19 Interrogatories, Interrogatory No. 3, identify
20 all persons, natural or non-natural, with whom
21 you communicated concerning the events, whether
22 before, during, or after the events?
23     A. Mm-hmm, yes.
24     Q. Have you read that before?
25     A. Yeah. I actually have, yeah. I just

```
 1   don't know -- like, just give a list of all the
 2   people I have talked to about the events?  It
 3   doesn't make sense to me.  But --
 4       Q.  What does not make sense to you about
 5   giving a list of people with whom you
 6   communicated?
 7       A.  Right.  Like, I understand that is
 8   something I need to do, right.  So, is that
 9   going to be in this PDF I got sent, a spot to
10   list all the people?
11       Q.  Are you prepared to identify the
12   persons with whom you communicated now?
13       A.  Yes.
14       Q.  But you haven't done it before?
15       A.  No, but I would like to.
16       Q.  Have you communicated concerning the
17   events, whether before, during, or after the
18   events, with Jason Kessler?
19       A.  Yes.
20       Q.  Erika Alduino?
21       A.  Yes.
22       Q.  Richard Spencer?
23       A.  Yes.
24       Q.  Christopher Cantwell?
25       A.  Yes.
```

```
 1       Q.  James Alex Fields, Jr.?
 2       A.  No.
 3       Q.  Andrew Anglin?
 4       A.  No.
 5       Q.  Robert Azzmador Ray?
 6       A.  Yes.
 7       Q.  Nathan Damingo?
 8       A.  Yes.
 9       Q.  Matthew Heimbach?
10       A.  Yes.
11       Q.  Matthew Parrott?
12       A.  No.
13       Q.  Michael Hill?
14       A.  Uh, no.
15       Q.  Michael Tubbs?
16       A.  No.
17       Q.  Jeff Schoep?
18       A.  No.
19       Q.  Agustus Sol Invictus?
20       A.  Yes.
21       Q.  Michael Peinovich?
22       A.  Yes.
23       Q.  Identify -- is there anyone else with
24   whom you communicated concerning the events,
25   whether before, during, or after them?
```

```
 1       A.  No, not -- no.
 2       Q.  Not a single person?
 3       A.  I mean, I have talked to people about
 4   it, obviously.  But, like, I talked about, like,
 5   hey, this crazy thing happened, or whatever.  I
 6   don't know -- like, everyone I have communicated
 7   with.  I mean, that is a list of thousands of
 8   people.
 9       Q.  You have not made a list of people you
10   communicated with concerning the events, have
11   you?
12       A.  No, but I can.  I can make a list of
13   the people I have communicated with concerning
14   the events.  I mean, more than half of them I
15   won't even know their real names.  Most people
16   operate anonymously.  I can give pseudonyms or
17   fake names or whatever that they use if I
18   remember them.  But --
19       Q.  Do you understand Interrogatory No. 3
20   is asking you to identify all those persons?
21       A.  Yes.  And I would be fine with doing
22   that.  Like I said, it is going to be a
23   difficult task.
24       Q.  Do you see Interrogatory No. 4, that
25   asks you to identify all electronic devices used
```

```
 1   by you to communicate concerning the events,
 2   whether before, during, or after the events?
 3       A.  Yes.
 4       Q.  You have not done that in the past,
 5   have you?
 6       A.  No, but I would like to.  I have my
 7   cell phone ready to do that.  Not today.  But
 8   literally, like, tomorrow or even tonight I
 9   would send it out.  It doesn't matter.
10       Q.  You understand that this Interrogatory
11   asks you to identify all electronic devices that
12   you used, even if you no longer use them, right?
13       A.  Yes.
14       Q.  Do you understand that this
15   Interrogatory asks you to identify all
16   electronic devices that you used, even if they
17   did not belong to you?
18       A.  Yes.
19       Q.  For example, if you borrowed someone
20   else's phone, that would be included, right?
21       A.  Yes.
22       Q.  So, Mr. Spencer's computer, for
23   example, would be included if you used it to
24   communicate concerning the events, right?
25       A.  Correct.
```

Page 270

1  house, you reviewed that mail?
2       A. Most of it. Like I said --
3       Q. Most of the mail?
4       A. I would come home after, like, a month
5  of being gone, or two months being gone, and
6  there would be, you know, five or six brown
7  envelope court documents, all with Bill Regnery
8  stuff on it. So, obviously I didn't read all of
9  it. They were -- some of them were, you know,
10 50 pages long, 60 pages long. None of them had
11 my name on it anywhere.
12      Q. Was there also mail at your parents'
13 house involving this case --
14      A. Yes.
15      Q. -- Sines v. Kessler?
16      A. Yes.
17      Q. Did you read that mail?
18      A. Yes. When I -- when I -- when I saw
19 -- like I said, some of the exhibits in here, I
20 called out I never received and I never saw.
21 So, I don't know if that means that they were
22 just e-mailed to me and I didn't see them, or
23 what.
24      Q. Is there any e-mail address that we
25 should be using to contact you, besides

Page 271

1  Eli.F.Mosley@Gmail.com?
2       A. No, that is the best one.
3       Q. You are able to log into that account?
4       A. Yes.
5       Q. You receive e-mails at that account?
6       A. Yes.
7       Q. Do you read those e-mails?
8       A. Yes.
9       Q. Do you respond to those e-mails?
10      A. Yes. I mean, I am able to now. So,
11 yes. I finally was able to get my -- that
12 e-mail address on this phone. So --
13      Q. You'll respond to those e-mails going
14 forward?
15      A. Yes.
16      Q. Is there a phone number that we should
17 be using to reach you besides the 610 phone
18 number?
19      A. I don't know that phone number. But I
20 can let you know -- like I said, I have a new
21 phone. It is ready to be activated. I was
22 talking with my dad on the way out and I asked
23 him, hey, what's that new phone number. He
24 didn't know what it is, because I was going to
25 give it to you guys so you have it. He doesn't

Page 272

1  know that. I can give it to you guys as soon as
2  I get it.
3       Q. Will you provide that phone number to
4  us as soon as you get it?
5       A. Yes.
6       Q. How will you do that?
7       A. Umm, how do you guys want? I can --
8  what, e-mail you guys back on one -- one of the
9  e-mails, e-mail addresses you guys sent.
10      Q. Umm, will you e-mail that phone number
11 to us in response to the e-mails -- inbox from
12 Michael Bloch?
13      A. Yeah, exactly. When I get an e-mail
14 from you guys, I'll respond by the way, my new
15 number is whatever. The Court will have it, you
16 guys will have it. And then hopefully everyone
17 has it, or whatever.
18      Q. Are you aware that Plaintiffs filed a
19 motion in October 2018 to get the Judge to have
20 your electronic devices imaged?
21      A. No, I did not know that. I knew that
22 it was part of the discovery process, getting
23 devices imaged. Like I said, there was nothing,
24 like -- there was no means for me to do that. I
25 didn't know how we were supposed to be doing

Page 273

1  that.
2       Q. But you were aware that you were
3  supposed to have your devices imaged?
4       A. Yes. I knew that was part of the
5  process, which is why I saved the phone.
6       Q. Who told you that you needed to have
7  your devices imaged?
8       A. Mr. Kolenich, when I -- like I said,
9  when he originally picked up the case.
10      Q. When did he tell you that you needed
11 to have your devices imaged?
12      A. It was just part of a general
13 conversation of how discovery works. Like I
14 said before, when he first picked up the case,
15 he said things, like, don't delete your stuff,
16 it is part of discovery. And they are going to
17 take your phone and image it, or whatever.
18        That is how -- then it goes to, I
19 guess, a third-party company he explained. They
20 put it in some database that queries all the
21 information, or something. I don't know. He
22 was explaining it to me then. It was awhile
23 ago.
24      Q. You had that conversation when Mr.
25 Kolenich originally pinged up the case?

Page 278

1  them to send it, or whatever. Then I actually
2  got an e-mail on my phone and it was from
3  Discord. I was like oh, they finally got,
4  responded. It was two weeks later. I looked
5  down, it said your account has been banned from
6  Discord. I was, like, okay, I signed this
7  release form and you banned me two weeks later.
8  It didn't make any sense. So, it was that
9  account.
10      Q. Are you prepared to produce to
11 Plaintiffs your e-mails with Discord that you
12 are describing?
13      A. Yes.
14      Q. We would like you to, within the next
15 24 hours, search through your e-mails and locate
16 the e-mails that you have with Discord and to
17 forward them to us.
18      A. Sure. Yeah, I'll just forward them
19 right over to you guys. Like I said, it was
20 literally just -- it was literally me just
21 saying yes -- yes to this form. I consent for
22 them to go through whatever it was.
23      Q. We would like you to search through
24 your e-mails, locate the e-mails that you have
25 with Discord, whether they are ones that they

Page 279

1  sent to you or the ones you sent to them, and to
2  send them -- to forward them to us.
3      A. Yeah, that makes sense. They were a
4  mess over there, too. Like I said, I e-mailed
5  them afterwards and said, did you get the
6  consent form or whatever. And, also, can you
7  change the admin privileges on all of the
8  accounts I was on to somebody else. And they
9  e-mailed me back and said we are not reversing
10 your ban. That is all they said. I was, like,
11 that is not the answer to either of my
12 questions.
13      Q. Do you commit to looking for --
14      A. Yes.
15      Q. -- e-mails and sending them to us?
16      A. Yes. That is super easy for me to do.
17 Umm, I'll just -- yeah, I should be able to find
18 those.
19      Q. Are you prepared to fill this form out
20 and sign it today?
21      A. Yes.
22      Q. If I give this to you right now, are
23 you prepared to write here --
24      A. The only issue is going to be is I
25 don't know which e-mail address it was used for.

Page 280

1      Q. But you --
2      A. I can put both of them right there.
3  Eli Mosley -- Eli F. Mosley or Deplorable Truth.
4  You know what I mean? Do you have a pen?
5  Thanks.
6         One for each?
7      Q. Do one for each e-mail account.
8      A. What was the --
9      Q. The username is --
10     A. The Eli Mosley one.
11     Q. Eli Mosley. And, also, Sayer.
12     A. Okay. I have to get the number that
13 is next to it. You can have the name username,
14 just different numbers.
15     Q. 5269.
16     A. 5269. Thank you.
17        Umm, Sayer. There is one of them.
18        Then can -- that should be good. Here
19 is those two.
20     Q. Thank you.
21     A. Those should be what you guys are
22 saying, right?
23     Q. Thank you. In addition, Mr. Kline,
24 are you prepared to submit those consent forms
25 from your e-mail address to Discord?

Page 281

1      A. Yes.
2      Q. Are you prepared to do that right now?
3      A. I mean, I have to turn my phone on and
4  send -- like, find the e-mail and send it back,
5  I guess.
6      Q. You can go ahead and turn your phone
7  on. Mr. Bloch sent you via e-mail this same
8  consent filled in with your information to your
9  DeplorableTruth@Gmail.com e-mail address.
10        You have access to that e-mail
11 address, right?
12     A. The Deplorable Truth one?
13     Q. Correct.
14     A. Yes, yes.
15        Okay, so, I received it. And you just
16 want me to respond --
17     Q. We would like you to forward that
18 e-mail --
19     A. Okay.
20     Q. -- to the following e-mail address.
21 It is sca --
22     A. Should I include you guys or anything
23 right?
24     Q. You can just do this e-mail address.
25     A. Okay.

1  Q. 6:38 p.m.
2  A. Yes, I see.
3  Q. From Eli Mosley.
4  A. Which one? There is -- yeah, the PC
5  one? That is not a huge deal. That one?
6  Q. Do you see a message on March 31, 2017
7  from Eli Mosley stating one for work, one for
8  personal shit, and one for the Alt-Right?
9  A. Yeah, I see that. But, like I said, I
10 did not have multiple phones.
11 Q. Did you make that statement on
12 Discord? Did you write that?
13 A. Yeah. I mean, I did -- I mean, I said
14 I have three phones, right. And I said that one
15 for each thing. But I don't know -- I
16 definitely didn't have three phones. I never
17 had three phones. I don't know why I would say
18 that. I don't know if it was -- if I was
19 joking.
20     The guys that were in this chat -- I
21 don't know who deleted user, Unlimited Power,
22 is. But Gray and Wyatt, or whatever, I know we
23 -- we would constantly joke about stuff. I
24 don't know if that is what this is or not.
25 Q. Why would you say on Discord that you

1  had three phones if it wasn't true?
2  A. Like I said, I don't know -- I don't
3  know the context of these -- this conversation.
4  So, it could be that we were joking about
5  something. I don't know.
6     I definitely didn't have three phones
7  though. The only two phones I have ever had --
8  I mean, the 610 number I have had since, like,
9  seventh grade. And, like, it has only been on
10 two different phones. The other phone I got is
11 the, umm, the Walmart one. I definitely don't
12 have three phones.
13 Q. You testified, Mr. Kline, that you had
14 a computer in 2016, right?
15 A. In 2016, yes.
16 Q. And, Mr. Kline, you testified that you
17 left that computer at your parents' place in
18 2016; is that right?
19 A. In a storage unit, or whatever. I
20 haven't touched it for awhile.
21 Q. You stated that you moved to South
22 Carolina with your girlfriend in 2016, right?
23 A. Umm, it wasn't -- it was -- it was
24 2017, I think. It was the early part of 2017.
25 I think it was the spring of 2017.

1  Q. Did you testify that you moved to
2  South Carolina with your girlfriend in late
3  2016?
4  A. I might have -- it might have been
5  2017, is what I meant. I think it was 2017 when
6  I moved there. I would have to -- I don't know
7  the exact dates. I think it would be 2017
8  though. Because late -- maybe it was late 2016
9  into early 2017. That would make sense.
10 Because I was let go from my job in late 2016, I
11 believe. Which -- and I moved there with her,
12 like, three weeks afterwards. So, that would
13 actually make sense. Like, late -- either the
14 beginning of 2017 or late 2016.
15 Q. When were you let go from your job?
16 A. Umm, I don't know the exact date. It
17 was late 2016, I think it was. It was right
18 around Christmas, I think it was.
19 Q. Who was your employer at that time?
20 A. JC Ehrlich Rentokil.
21 Q. And it was after that point that you
22 moved to South Carolina with your girlfriend?
23 A. Correct.
24 Q. When you moved to South Carolina, you
25 had testified that you did not bring the

1  computer with you, right?
2  A. Right.
3  Q. And you testified that was because you
4  couldn't store it in the car; is that right?
5  A. Yeah. It is a huge -- it is, like, a
6  huge, old tower.
7  Q. So, you did not have a computer in
8  2017, right?
9  A. No.
10 Q. You testified that the only computers
11 that you used in 2017 were Richard Spencer's and
12 your girlfriend's neighbor's computer?
13 A. Correct. Just to print stuff off.
14 Q. Only those two computers?
15 A. Correct.
16 Q. You did not have a home PC in 2017,
17 correct?
18 A. No, not in 2017, no. 2016, like I
19 said, I had the big tower thing.
20 Q. Isn't it true that, in fact, you did
21 have a home PC in 2017?
22 A. What do you mean? I don't understand.
23 Q. Isn't it true that you did have a home
24 PC in 2017?
25 A. I wasn't even -- I don't understand

```
 1                  C E R T I F I C A T E
 2
 3      I, Angela N. Kilby, the officer before whom
 4   the within deposition(s) was taken, do hereby
 5   certify that the witness whose testimony appears
 6   in the foregoing deposition(s) was duly sworn by
 7   me on said date and that the transcribed
 8   deposition of said witness is a true record of
 9   the testimony given by said witness;
10      That the proceeding is herein recorded fully
11   and accurately;
12      That I am neither attorney nor counsel, nor
13   related to any of the parties to the action in
14   which these depositions were taken, and further
15   that I am not a relative of any attorney or
16   counsel employed by the parties hereto, or
17   financially interested in this action.
18
19                       _____
                         Angela N. Kilby, Reporter
20                       Notary Public in and for the
                         Commonwealth of Pennsylvania
21
     My commission expires
22   June 2, 2023
23
24
25
```