# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

Civil Action - Law
No. 3:17-cv-00072-NKM
-------------------------------------x

 ELIZABETH SINES, SETH WISPELWEY,    :
 MARISSA BLAIR, TYLER MAGILL,       :
 APRIL MUNIZ, HANNAH PEARCE,        :
 MARCUS MARTIN, NATALIE ROMERO,    :
 CHELSEA ALVARADO, and JOHN DOE,   :
                                  :
          Plaintiffs,       :
                                  :
          - vs -          :
                                  :
 JASON KESSLER, et al.,         :
                                  :
          Defendants.      :
-------------------------------------x

_____

Deposition of ELLIOTT KLINE
_____

228 Walnut Street      Wednesday, August 7, 2019
Harrisburg, PA         10:05 a.m.
_____

    IT IS HEREBY STIPULATED and agreed that the
sealing of the within transcript is waived.
    IT IS FURTHER STIPULATED and agreed that all
objections except as to the form of the question
are reserved to the time of trial.
_____

MAGNA  LEGAL SERVICES

1 type of, you know, violent -- like, a
2 premeditated violent plan against the people of
3 Charlottesville. Which isn't -- which isn't
4 true at all. And they are trying to seek
5 damages, I guess. Like, that is really all I
6 know about it.
7     Q. You indicated earlier that you are
8 familiar with an event called Unite the Right?
9     A. Mm-hmm.
10     Q. Correct? Were you one of the
11 organizers of Unite the Right?
12     A. Yes.
13     Q. You understand that you are here to
14 testify as part of the litigation Sines versus
15 Kessler, correct?
16     A. Correct.
17     MR. DiNUCCI: Mr. Barkai, can I
18 interject an objection? As I recall Judge
19 Hoppe's order in the matter, this deposition is
20 limited to the question of whether or not or the
21 issue of Mr. Kline's compliance or alleged
22 noncompliance with discovery-related Orders, not
23 the substance or merits of the case.
24     THE WITNESS: That is tomorrow.
25     MR. BARKAI: The questions are about

1 Mr. Kline's understanding of litigation, his
2 receipt of the Complaint, his compliance with
3 discovery throughout the process since being
4 served with the Complaint, including the
5 preservation of devices and of relevant
6 documents.
7     MR. DiNUCCI: I'll just set up one
8 more comment, then you do what you got to do.
9 But at least the answers are tending towards the
10 substance of the case, the merits of the case.
11 I thought I heard a question about whether or
12 not Mr. Kline was part of any effort to organize
13 the events.
14     That is my objection. But you can go
15 ahead.
16     MR. BARKAI: Well, organizing an event
17 would certainly lead to the inference that you
18 would have documents and discovery related to
19 the event. So, it is a relevant question.
20 BY MR. BARKAI:
21     Q. Mr. Kline, after you were sued you
22 hired attorneys, as you indicated, correct?
23     A. Through Identity Evropa. I was
24 represented through them, basically. As part of
25 my leading with our organization, part of the

1 deal was they would pay for my legal fees -- the
2 legal, the attorneys, things like that.
3     Q. What is Identity Evropa?
4     A. I believe it is no longer an
5 organization. But it was a -- originally it
6 started out as sort of an European-American
7 fraternity-type organization. Then it kind of
8 morphed and changed over time to something else
9 and became kind of what it was when it stopped
10 being an organization. I guess they called it
11 quits kind of months ago, from what I
12 understand. But, like I said, I don't follow a
13 whole lot of it anymore.
14     Q. You were formerly a member of Identity
15 Evropa; is that correct?
16     A. Yes.
17     Q. During what period?
18     A. Probably a year before
19 Charlottesville, maybe a year-and-a-half before
20 Charlottesville. So, I was a member for a year,
21 year-and-a-half, I would say.
22     Q. Beginning in approximately 2016?
23     A. Yeah.
24     Q. And ending when?
25     A. The summer of 2017, I want to say,

1 maybe.
2     Q. The summer of 2017, after Unite the
3 Right?
4     A. Yes.
5     Q. What led to your no longer being a
6 member of identity Evropa?
7     A. Umm, there was issues with me and the
8 owners or the leadership, Nathan Damingo.
9     Q. You stated that Identity Evropa as
10 part of your deal with the organization would
11 pay for your legal fees, correct?
12     A. Yes.
13     Q. Who was the attorney for whom Identity
14 Evropa paid at that time?
15     A. Umm, the -- I think it is the same
16 attorney they have now. I can't remember his
17 name off the top of my head.
18     Q. Is that Mr. Kolenich?
19     A. Yes, Kolenich.
20     Q. Mr. Woodard?
21     A. Originally I think they may have
22 started paying him. But I don't think Identity
23 Evropa kept doing that. Maybe they did. I am
24 not sure.
25     Q. In addition to being represented in

1  use other e-mail addresses that were, like, not
2  related to any Alt-Right stuff. Like, one of my
3  e-mail addresses, I think, that might have been
4  used on there was, like, an old one I had from
5  high school I never even used, or anything like
6  that. So, there might be, like, other e-mails
7  on -- e-mail addresses on there. But they were
8  old ones that I don't even use anymore, or
9  didn't have anything to do with Alt-Right stuff.
10     Q. You have other e-mail addresses aside
11 from your Identity Evropa and Gmail addresses
12 that you never used for, quote, Alt-Right stuff?
13     A. Yeah. I mean, like, e-mails from when
14 I was in high school. E-mail addresses when I
15 was in high school and things like that. Or
16 college or in the Army and things like that.
17     Q. Did you ever use those e-mail
18 addresses to discuss Unite the Right?
19     A. No.
20     Q. When was the last time that you
21 remember using your own e-mail addresses?
22     A. Far before I did anything Alt-Right.
23     Q. And approximately when would that be?
24     A. I guess 2015, 2014 would be the very
25 latest. But I didn't start doing Alt-Right

1  stuff until 2016. So --
2      I would say probably it is even
3  earlier than that. I haven't used those e-mail
4  addresses since 2012, 2013, or something like
5  that.
6      Q. When Mr. Kolenich and Mr. Woodard were
7  representing you, there were times when they
8  sent you documents, right?
9      A. Correct.
10     Q. Did they send you documents via
11 e-mail?
12     A. Yes.
13     Q. Did they send you documents via
14 physical U.S. Mail?
15     A. Umm, I don't believe so. I think all
16 the physical documents I have gotten have been
17 from the Court itself.
18     Q. You have received physical documents
19 from the Court, is that correct?
20     A. They get sent to my parents' house.
21 So, whenever I am around or near whatever, I
22 just swing by to pick up my mail, stuff like
23 that. I'll get it from -- I'll get it from them
24 then.
25     Q. How often do you swing by to pick up

1  your mail?
2      A. It is really sporadic. Sometimes it
3  is once a month, sometimes it is multiple times
4  a week I'll be there. It just depends what's
5  going on.
6      Q. You have testified that your parents
7  have contacted you to let you know you have mail
8  waiting for you, right?
9      A. They have done that in the past. They
10 don't always do that though.
11     Q. Do Mr. Kolenich and Mr. Woodard still
12 represent you?
13     A. No.
14     Q. Why do they no longer represent you?
15     A. Because they feel like I wasn't being
16 communicative with them as their -- I guess
17 their side of what happened. From what I
18 understand or what was going on at the time,
19 they -- we were going through the discovery
20 stuff and they asked me -- Mr. Kolenich had
21 asked me to produce things like Twitter accounts
22 that I don't have access to, Facebook accounts,
23 things like that. The discovery stuff.
24     And I had explained to him that I
25 didn't have access to it or anything like that

1  anymore. And then weeks later he called me back
2  and he actually said to me -- or him and a
3  couple other people. I think it was -- what's
4  his name?
5      One of the other members of Identity
6  Evropa had called me and let me know that, hey,
7  they are going to stop this lawsuit, they are
8  ending it, so you got to call the lawyer and let
9  him know if you would be okay with, like, a plea
10 deal or like a -- I don't know, some sort of
11 agreement. So, I said yes to that. And then
12 the week later or two weeks later I found out
13 from a news article that they had filed a motion
14 to remove me.
15     So, I was under the information that I
16 was -- I was being told there was going to be a
17 deal or that the case is going to be done with
18 or I was going to be dropped from it. In
19 reality, I was being dropped as a Defendant from
20 their law -- their legal team, I guess.
21     Q. Who is the other member of Identity
22 Evropa who called you?
23     A. Umm, Patrick Casey.
24     Q. Are you in communication with Patrick
25 Casey?

1  playing the game.  There is nothing -- just
2  voice or whatever.
3      Q.  Just voice only?
4      A.  Just voice.
5      Q.  Besides talking to Char Char Binks,
6  did you do anything else to prepare for today's
7  deposition?
8      A.  No.
9      Q.  Did you speak with or meet with Mr.
10 Kolenich in advance of the deposition?
11     A.  No.
12     Q.  Mr. Woodard?
13     A.  No.
14     Q.  Have you communicated with Jason
15 Kessler about his deposition?
16     A.  No.
17     Q.  Have you communicated with Erika
18 Alduino about her deposition?
19     A.  No.
20     Q.  Mr. Kline, where did you grow up?
21     A.  Reading, Pennsylvania.
22     Q.  Is that the address that we discussed
23 earlier as being your parents' address?
24     A.  Yes.
25     Q.  117 Mesa Drive?

1      A.  Yes.
2      Q.  Where do you live now?
3      A.  Umm, I am kind of moving between a
4  bunch of different places.  I just house sit for
5  -- like, the last two weeks I house sitted for a
6  family.  But I don't really have a permanent
7  address right now.  I am kind of moving around,
8  trying to find a job.
9      Q.  What is the address where you have
10 been house sitting?
11     A.  I don't even know the address.  It is
12 up in Allentown.
13     Q.  Where did you live before Allentown?
14     A.  I was -- like, after I left Virginia,
15 I lived with my parents for a little bit.  And I
16 have been trying -- I have been driving around
17 trying to find a job all throughout
18 Pennsylvania.  So, I might stay in, like, a
19 hotel one night, or stay with a friend or
20 college or something like that.  But --
21     Q.  What is the last physical address that
22 you remember having?
23     A.  The 117 Mesa Drive is the -- I guess
24 the best address.
25     Q.  When did you leave that address?

1      A.  I am there right now.  But I might be
2  leaving in another week or two to go look for a
3  job.
4      Q.  Where were you living in Virginia?
5      A.  Umm, I got to remember the name of the
6  town.  I can't believe I can't remember.  Umm,
7  what was the name of that place?  If I had my
8  phone out, I could just look at Google Maps and
9  know exactly where it is at.  I just don't know
10 exactly where it is.
11         It is Loudoun.  Loudoun County.  So,
12 whatever town -- the town that is in Loudoun
13 County, that is where it was.
14     Q.  Have you ever lived in
15 Charlottesville?
16     A.  No.
17     Q.  Your name is Elliott Kline, but you go
18 by Eli Mosley, right?
19     A.  I went by that.  I no longer go by
20 that name.
21     Q.  Why did you go by Eli Mosley at the
22 time?
23     A.  Pretty much everyone in the Alt-Right
24 had, like, a pseudonym or, like, a fake name for
25 anonymity.

1      Q.  For anonymity?
2      A.  Yeah.
3      Q.  Why did you choose Eli Mosley?
4      A.  Umm, at the time -- well, Elliott,
5  Eli.  That's pretty simple.  Mosley was just --
6  he is a political figure from the United Kingdom
7  who I was reading at the time.
8      Q.  When did you stop using that name?
9      A.  Uh, probably, I mean, a year ago.
10 Maybe a little bit more than a year ago.
11     Q.  How old are you?
12     A.  27.
13     Q.  What is the highest level of education
14 that you have received?
15     A.  Some college.
16     Q.  Where were you in college?
17     A.  Shippensburg University, and then
18 Millersville University.
19     Q.  You did not graduate; is that right?
20     A.  No.
21     Q.  What were you studying?
22     A.  Political science at Shippensburg and
23 computer science in Millersville.
24     Q.  Are you employed now?
25     A.  No.

MAGNA

LEGAL SERVICES

1   Q. But you are not aware of who was
2 operating Identity Evropa's social media
3 accounts?
4   A. No. Like I said, at the time I am
5 pretty sure in the Discord we had, like, a thing
6 that was, like, social media posts, I think was
7 the name of the channel, maybe. I don't know.
8 And we would -- I would post in there, then it
9 would get posted on the Twitter. I don't even
10 know who would do it. I don't remember who it
11 was, or anything like that.
12   Q. Did you e-mail those posts to people
13 to post?
14   A. No. Like I said, I never -- I almost
15 never use e-mail, outside of talking this legal
16 stuff, really.
17   Q. Did you text posts for people to post?
18   A. Umm, no, not -- no. Because I
19 wouldn't have had their numbers. No one shared
20 phone numbers, right. So, it was mostly all
21 through Discord, is how most of the
22 communication, happened.
23   Q. Your testimony is that you would write
24 a social media post for Identity Evropa in
25 Discord, and then someone else would post it?

1   A. Yes. Either through Discord or -- I
2 am trying -- I don't think there is any other
3 way. It would have been either a direct message
4 on Discord, like a private message, or on the
5 actual Identity Evropa Discord server. But I
6 don't know who that person would be that had the
7 credentials or anything like that.
8   Q. Do you remember anything about that
9 person?
10   A. No. I don't even know if it was a
11 male or female. I don't know. I don't
12 remember. And I think that job changed hands a
13 few times as well. So, you know, like I said, I
14 don't really remember.
15   Q. Did you discuss those social media
16 posts over the phone?
17   A. No, not that I know of.
18   Q. Did Identity Evropa participate in the
19 planning of Unite the Right?
20   A. Umm, yes. A little -- I would say a
21 little bit. I wouldn't say they were -- it is
22 kind of hard to say, like, separate who was in
23 Identity Evropa and helping organize, I guess
24 you could say, then who was organizing as an
25 Identity Evropa member, if that makes sense.

1   It was kind of, like, a loose
2 collection of groups, and each group was, like,
3 given a broad outline. And then within those
4 groups they were expected to kind of do their
5 own organizing, I guess you could say.
6   Q. The members of Identity Evropa,
7 whether individually or as part of the
8 organization, did work on organizing Unite the
9 Right, correct?
10   A. Yes.
11   Q. Including creating documents?
12   A. Yes.
13   Q. Sending e-mails?
14   A. I don't know about sending e-mails.
15 But creating documents, sure.
16   Q. Where would those documents be
17 located?
18   A. Well, they have all been leaked. So,
19 the -- they were originally posted on the
20 Discord server. Not the Identity Evropa Discord
21 server, but the -- I think there might be
22 something on Identity Evropa's Discord server.
23 But the, like, event, the Unite the Right
24 Discord server.
25   So, there was the Identity Evropa

1 Discord server, then there was the Unite the
2 Right Discord server. That was for not -- non
3 Identity Evropa people. There was way many
4 people on that server. And any documents that
5 were produced would be posted on that server.
6 Which, again, was deleted.
7   (Exhibit 5, transcript of 7/2/2019
8 telephonic discovery hearing, marked for
9 identification.)
10 BY MR. BARKAI:
11   Q. Mr. Kline, I am going to now ask some
12 more detailed questions about the devices that
13 you used to communicate regarding Unite the
14 Right, as well as more generally.
15   First, you appeared at the July 2,
16 2019 hearing in this matter, right?
17   A. Yes.
18   Q. Does this exhibit in front of you
19 appear to you to be a transcript of that
20 hearing?
21   A. Umm, yes.
22   Q. Could you turn to Page 19, please?
23   A. Okay.
24   Q. Do you see at the top of that page
25 where you told the Judge, so, currently, as far

MAGNA
LEGAL SERVICES

1  that you have now here on the table to
2  communicate regarding Unite the Right?
3      A.  Mostly on -- using Discord app on the
4  phone and making phone calls.  Very few text
5  messages.  Because, like I said, most people
6  didn't exchange phone numbers.  And little to no
7  e-mail.  And then just making -- like, using
8  Google docs on it, stuff like that.
9      Q.  What about photos?  Do you have photos
10  on that phone?
11      A.  Yeah.
12      Q.  Are they photos related to Unite the
13  Right?
14      A.  No.
15      Q.  You don't have a single photo related
16  to Unite the Right?
17      A.  Not that I -- not that I know of.
18  People didn't really like taking pictures of
19  each other and things like that, because they
20  didn't want their identities revealed and stuff
21  like that.  So, taking pictures is a big no-no.
22  You don't take pictures of the other people.
23      Q.  Did you at any time have any photos
24  related to Unite the Right?
25      A.  Umm, no.  I can't remember a time --

1  there is no pictures taken, or anything like
2  that.  Other than a few people walking around,
3  things like that.
4      Q.  There may have been pictures of people
5  walking around?
6      A.  But not on my phone.  None of the
7  pictures on my phone are related to Unite the
8  Right.  All the pictures on my phone are just,
9  like, personal, like, goofy stuff.  None of it
10  is at all related to the thing.
11      Q.  Do you have social media apps on your
12  phone?
13      A.  I do, but none of them are working
14  because I have been removed from all those.  So,
15  like, Twitter -- like, Twitter wouldn't work on
16  my phone, Facebook wouldn't work on my phone.
17  Umm, and now Discord doesn't work on my phone.
18      Q.  Do you have logs on your phone of
19  people with whom you made phone calls?
20      A.  No.
21      Q.  You don't have any call logs on your
22  phone?
23      A.  I mean, there is, like, the recent
24  call list.  But I don't know how far back it
25  goes or anything.

1      Q.  Are the text messages still on your
2  phone from Unite the Right?
3      A.  Yes.  Like I said, there is very few
4  of them.
5      Q.  Returning to photos, you did not take
6  any photos on August 12?
7      A.  Not that I can remember, no.  Not that
8  I -- I would have to look through the phone to
9  see.  But none of the pictures that I think --
10  none of the pictures I am aware of are from
11  Unite the Right or anything like that.
12      Q.  You didn't take a single photo on
13  August 11?
14      A.  Not that I know of, no.
15      Q.  Not that you know of?
16      A.  No.
17      Q.  You testified that you made phone
18  calls regarding Unite the Right, correct?
19      A.  Yes.
20      Q.  Whom did you discuss Unite the Right
21  with over the phone using phone calls?
22      A.  We had, like, I guess, the weekly
23  phone call with most of, like, the leaders of
24  the organizations that were going or people
25  putting it together.  So, it would have been

1  people like me, Kessler.  I can't even remember
2  any of the other people.  I am sure it is people
3  on this list.
4          Mr. Heimbach was on a few of them, I
5  know that.  Umm, but I don't -- I don't really
6  remember any of the other people that would have
7  been on there.  But there is phone calls on
8  that.  And then other than on the ground that
9  day, I had plenty of phone calls.  The primary
10  mode of communication at the rally was my phone,
11  calling people.  That is how I talked to the
12  police, that is how I talked to the police the
13  night before.  That is how I talked to, like,
14  our sound crew that was stuck there, things like
15  that.
16      Q.  So, you have testified that you had
17  calls with Jason Kessler, correct?
18      A.  Yes.
19      Q.  Matthew Heimbach, correct?
20      A.  Yes.
21      Q.  Do you remember having phone calls
22  with Erika Alduino?
23      A.  Yes.
24      Q.  You have testified that you had plenty
25  of phone calls on the ground, correct?

**MAGNA○**
LEGAL SERVICES

1     A.  Yes.
2     Q.  With whom?
3     A.  Mostly it was with the police,
4  actually.  The -- both at the rally and the
5  night -- the Torch March the night before.  I
6  was on the police.  Like, every five minutes I
7  called them.
8     Q.  Who did you speak to at the police?
9     A.  I do not remember their name.
10    Q.  You do not remember a single name of
11  anyone from the police you spoke?
12    A.  Both of them are female.  Umm, I know
13  one of them accused me of lying to some court,
14  some -- I read in some news article that she
15  said I lied.  But it doesn't make sense because
16  -- I mean, the phone records are there.  There
17  is no way the police don't have it recorded.
18  Where -- I didn't lie at all.  I told them -- I
19  was very honest with them with what we were
20  doing and what was going on.
21    Q.  Did you ever speak with anyone from
22  the police department in any way other than
23  phone calls?
24    A.  Umm, I spoke to -- I actually -- one
25  person I spoke with is a detective, I believe it

1  was, in Charlottesville, leading up to the
2  rally.  He was kind of trying to figure out,
3  like, who was coming and what the different
4  groups were, I guess.  From both the left and
5  the right.
6        And I just -- I had spoken to him.  I
7  don't remember his name.  But I know it was a
8  detective in Charlottesville.  And then -- I
9  don't remember who else I would have spoken to.
10    Q.  Did you ever use e-mails to
11  communicate with --
12    A.  No.
13    Q.  -- the police?
14    A.  No.
15    Q.  Text messages?
16    A.  No.  No text messages with the police.
17    Q.  How did you first communicate with
18  them via phone?
19    A.  I think -- I think either I received
20  an e-mail, maybe, on Identity Evropa e-mail, I
21  think it might have been.  Or somebody else had
22  spoken to this person and sent me -- and said
23  hey, you should talk to this detective.
24        I think that is actually what it was,
25  was somebody told me, hey, this detective is

1  still trying to get -- figure out who is coming.
2  I don't remember who told me that.  I just
3  remember calling the detective and talking to
4  him about, hey, this is who's coming, this is
5  what's going on, or whatever.  But that is it.
6    Q.  Is that e-mail still on your phone?
7    A.  None of the e-mails from the Identity
8  Evropa e-mail are on my phone.  I can't log into
9  the account at all.
10    Q.  If you were to log into the account,
11  would the e-mails still be there?
12    A.  I don't think so.  I think Gmail -- I
13  mean, the only way I could think of that you
14  would be able to retrieve those e-mails is if
15  you contacted Google itself and got it.  Because
16  I think what happened was they removed me from
17  their server -- or from their access, right.
18  So, I got removed from the Identity Evropa at
19  Gmail account access.
20        When I got removed from that, I was no
21  longer able to use my phone's e-mail at all.
22  Because it wouldn't -- it kept saying try to log
23  in, then it would say this account doesn't
24  exist.  And then I think a couple months after
25  that I got removed.  I think a couple months

1  after that Gmail removed their services.  So,
2  they said, hey, we are not letting you use our
3  services anymore at all.
4        So, the only way I could think of is
5  -- would be Gmail or Google having them on their
6  server somewhere backed up.  Because, like I
7  said, even if I log into my -- like, even if I
8  type my password into my Gmail -- to the
9  Identity Evropa account right now, if I were to
10  type it in, it says this account doesn't exist.
11    Q.  When did Google remove Identity
12  Evropa's services?
13    A.  I have -- I don't know.  I have no
14  idea.  It was sometime after I got removed from
15  Identity Evropa.  So --
16    Q.  When was the last time that you
17  remember logging into your Identity Evropa
18  e-mail?
19    A.  Umm, the summer of -- I guess it was
20  spring.  March, May.  I would say May 2018,
21  maybe.  Maybe a little earlier than that.  Maybe
22  April or March, somewhere in there.  2018.  So,
23  not a year after, you know, but almost a year
24  after, half a year after Unite the Right.
25    Q.  That was after the lawsuit was filed

1  against you, correct?
2      A.  Correct.
3      Q.  Did you ever save any of those e-mails
4  anywhere else?
5      A.  No.  I never thought that I would have
6  to.  I thought it would be on whatever they had,
7  or whatever.  I didn't think I was going to get
8  my access taken away.
9      Q.  Did you ever take any screen shots of
10 any e-mails?
11     A.  No.
12     Q.  Did you ever back up those e-mails
13 onto any external device?
14     A.  No.
15     Q.  Did you ever save any of those e-mails
16 onto any type of cloud service?
17     A.  No.
18     Q.  You testified that you had a weekly
19 phone call with others regarding the planning of
20 Unite the Right, correct?
21     A.  Mm-hmm.
22     Q.  You testified those phone calls
23 including Jason Kessler?
24     A.  Umm, yeah.
25     Q.  Did they include Richard Spencer?

1      A.  Sometimes.  Not often.
2      Q.  Did they include Christopher Cantwell?
3      A.  No.
4      Q.  Did they include James Alex Fields,
5  Jr.?
6      A.  No.  I didn't know who that was until
7  after the whole thing happened.
8      Q.  Did they include members of Vanguard
9  America?
10     A.  Umm, yes.
11     Q.  Which members?
12     A.  I wouldn't know their names.  I
13 wouldn't -- I don't even know the names they
14 went by.  I can't remember their names.  They
15 had a weird leadership thing going on at the
16 time where they were changing leaders.  So,
17 whoever their old leader was, is I assume who it
18 would be.  Not the one that they have now.
19 Whoever it would have been at the time.  Whoever
20 who that is.  I don't remember his name.
21     Q.  Did the weekly phone calls include
22 Andrew Anglin?
23     A.  No.
24     Q.  Did the weekly phone calls include
25 Robert Azzmador Ray?

1      A.  No.
2      Q.  Did they include Mr. Damingo?
3      A.  Umm, no.
4      Q.  Did they include other members of
5  Identity Evropa?
6      A.  Umm, not that I really remember.  Not
7  that I remember specifically.  No.
8      Q.  Did they include Michael Hill?
9      A.  Umm, yes.  From Southern -- League of
10 the South, or whatever, right?  That's who
11 Michael Hill is, correct?
12     Q.  To the best of your recollection.
13     A.  Yeah, I think Michael Hill is from --
14 yeah, yes.
15     Q.  Did they include Matthew Parrott?
16     A.  No.
17     Q.  Did they include Michael Tubbs?
18     A.  I don't know who that is.
19     Q.  Did they include Jeff Schoep?
20     A.  No.
21     Q.  Did they include Agustus Sol Invictus?
22     A.  Sometimes.
23     Q.  Did they include Michael Peinovich,
24 known as Mike Enoch?
25     A.  Umm, no.

1      Q.  Did they include Andrew Anglin?
2      A.  No.
3      Q.  You have testified at -- both today
4  and you told the Court that your old cell phone
5  that you have there on the table has text
6  messages, right?
7      A.  Mm-hmm, yes.
8      Q.  And those text messages include text
9  messages about Unite the Right, correct?
10     A.  Yes.
11     Q.  With whom did you send and receive
12 text messages regarding Unite the Right?
13     A.  Umm, there is -- like I said before,
14 there was very few text messages that I
15 remember.  Most of it was done through Discord.
16 Like, 95 percent or more of our communication
17 was done through Discord.  Like, most of it was.
18         The only time I can think of text
19 messages, umm, being sent would have been when
20 -- I know Friday night was the Torch Rally, the
21 Torch March, and Saturday was the rally.  And I
22 know the -- after what happened at the Torch
23 Rally happened, or Torch March happened, Chris
24 Cantwell texted me and asked if he could call
25 me.  So, there would be a text there.  Then he

MAGNA⊙
LEGAL SERVICES

1    A. Yes.
2    Q. Why did you get that Walmart phone?
3    A. It was because this phone was not
4 working at the time. So -- and I kept getting
5 phone calls from people I didn't want to get
6 phone calls from.
7    Q. In what way was that phone not
8 working?
9    A. It wasn't receiving any connection to
10 -- it was water damaged. So, I had to get a
11 part in it replaced, then it was fixed, like, a
12 month or two after it happened.
13    Q. When the phone was damaged by water,
14 was any of the content of it lost?
15    A. No, everything on it was still on it.
16    Q. How do you know?
17    A. Because -- I mean, it might -- stuff
18 might have gotten deleted for all I know. But
19 like I said, I went through it. Everything was
20 fine. All the photos were still there, all the
21 text messages were still there that I -- nothing
22 -- contacts were still there. Nothing changed
23 on the phone. All my apps were still there. No
24 memory change happened on the phone.
25    Q. So, at that time you had two phones.

1 You had the iPhone and you had the Walmart
2 phone, correct?
3    A. Mm-hmm, yes.
4    Q. And how long did you have the Walmart
5 phone for?
6    A. Only maybe two, three months, maybe.
7 Something like that. I don't know. It wasn't
8 very long.
9    Q. When was this?
10    A. It was me leaving Virginia. So, like,
11 a year-and-a-half ago. So -- whenever I left
12 Virginia. So, that would have been 2018, spring
13 of 2018.
14    Q. It was in the spring of 2018 that you
15 had the Walmart phone?
16    A. Spring, summer of 2018. Yeah.
17    Q. When did you stop using the Walmart
18 phone?
19    A. The moment I got this fixed. So, it
20 was -- like I said, it was maybe three months, I
21 would say, if I had to guess, I used that phone.
22 But I didn't really use it that much, the
23 Walmart phone.
24    Q. Mr. Kline, you have testified that you
25 got that phone fixed this year, correct?

1    A. Umm, I have gotten that phone fixed
2 multiple times. This phone -- I got the water
3 damage replaced. That was between, I guess,
4 2018 -- spring, summer of 2018. And then just a
5 couple weeks ago this wasn't working and I got
6 it fixed again. And I just got this new phone
7 that I haven't activated yet.
8    Q. So, in spring of 2018, your iPhone was
9 water damaged?
10    A. Mm-hmm.
11    Q. And you got a Walmart phone, right?
12    A. Correct.
13    Q. You used the Walmart phone for --
14    A. About three months.
15    Q. -- three months. And then -- umm --
16    A. I started using this phone again.
17    Q. Then you started using that phone
18 again, the iPhone that you told the Court about,
19 correct?
20    A. Correct.
21    Q. What happened to the Walmart phone
22 then?
23    A. I still have it. I would have to look
24 exactly where it is at. It somewhere in one of
25 my bags. I have a bunch of boxes from when I

1 moved. It is in one of those.
2    Q. When was the last time you saw the
3 Walmart phone?
4    A. Months ago. Like, three or four
5 months ago. Maybe -- maybe longer.
6    Q. Was the Walmart phone -- is the
7 Walmart phone also a smart phone?
8    A. Umm, I guess technically it is, I
9 think. But I didn't have any of that stuff
10 turned on it, like the internet, browser,
11 anything like that.
12    Q. Which phone number was connected to
13 that Walmart phone?
14    A. I don't remember the phone number for
15 it. I mean, I might have -- I don't even have
16 it -- it is not on. But I don't remember what
17 the phone number for it was. It was a Virginia
18 number. That is all I know.
19    Q. It was not your 610 number?
20    A. No.
21    Q. After your iPhone was fixed, was that
22 then the only phone you were using?
23    A. Correct.
24    Q. When did you stop using that phone?
25    A. The iPhone? This iPhone?

MAGNA
LEGAL SERVICES

1   guess there was multiple different departments
2   and things like that there, police departments
3   and things.  They said they were able to
4   communicate to multiples, to whoever it was.
5        Q.  You don't remember whether it was
6   Charlottesville Police?
7        A.  No.  I think it was, but I am not
8   entirely sure.
9        Q.  Or State Police?
10       A.  Umm, sounds like to me like that would
11  have been something State Police would do, kind
12  of overseeing everybody.  But I don't know for
13  sure who that was.
14       Q.  You testified earlier that there were
15  -- that there was, quote, a plan on how
16  everything was going to happen?
17       A.  Yes.
18       Q.  Right?  Are there any documents
19  regarding that plan?
20       A.  Yes.
21       Q.  What are those documents?
22       A.  They are the documents that were
23  already leaked all over the internet.  Umm, the
24  planning document that was put on the Discord.
25  Umm, and, like I said, it was leaked everywhere.

1   So, I am sure you guys have seen it or have it.
2        Q.  Do you have those documents?
3        A.  I mean, I have them on the Google
4   drive for Identity Evropa, or whatever.  I don't
5   have physical copies or anything like that.
6        Q.  You have never produced any documents
7   regarding those plans, right?
8        A.  Umm --
9        Q.  To Plaintiffs.
10       A.  Oh, no, no.
11       Q.  Are there other documents besides what
12  you called, quote, the plan document?  Any other
13  documents?
14       A.  No.
15       Q.  I am going to ask you a couple
16  questions about the use of computers to
17  communicate and make documents regarding Unite
18  the Right.
19           You testified that you -- that you
20  primarily used your iPhone, the iPhone that you
21  have with you here to create documents, right?
22       A.  Mm-hmm, yes.
23       Q.  Have you ever used a computer to make
24  documents regarding Unite the Right?
25       A.  No.

1        Q.  Not a single time?
2        A.  No.
3        Q.  Have you ever used a computer to
4   communicate regarding Unite the Right?
5        A.  Umm, maybe Mr. Spencer -- Richard
6   Spencer's computer.  Maybe I used his once or
7   twice while I was at his place.  But it would
8   have been to either type something up or print
9   something out.
10       Q.  When would that have been?
11       A.  Leading up to the Unite the Right.
12  So, months before.
13       Q.  You testified that it would have been
14  to type something up, right?
15       A.  Yeah.  Like, not necessarily related
16  to Unite the Right.  Like, just typed something
17  unrelated up.
18       Q.  Have you ever used Richard Spencer's
19  computer to type something up related to Unite
20  the Right?
21       A.  No, I don't think so.
22       Q.  You are not sure?
23       A.  Umm --
24           MR. DiNUCCI:  Objection,
25  characterization.

1            You may answer.
2            THE WITNESS:  Not -- I am not sure.
3   BY MR. BARKAI:
4        Q.  What were the circumstances under
5   which you were going to Mr. Spencer's --
6        A.  I was just at Mr. Spencer's house.
7        Q.  -- place?
8        A.  And his computer would be out and we
9   were putting movies on or whatever on the TV
10  through his computer.
11       Q.  When was that?
12       A.  I mean, all the time whenever we would
13  be at his place.  So, before Unite the Right or
14  after Unite the Right.
15       Q.  In the months leading up to Unite the
16  Right; is that correct?
17       A.  Yes.
18       Q.  And afterwards?
19       A.  Yes.
20       Q.  It would have been under those
21  circumstances at Mr. Spencer's house when you
22  may have used a computer to type something up?
23       A.  Yes.
24       Q.  It may have been related to Unite the
25  Right?

1     A. No, I don't think any of it was. The
2 only -- the only document typing or anything
3 like that, creation that I did, was on my Google
4 drive to Google docs, copying it and pasting it
5 and making it into that -- putting it on
6 Discord, was that document explaining the rules
7 and what everyone was doing, the planning
8 document that got leaked.
9         That is the only documents that I made
10 or created for the event.
11    Q. Did you make any promotional
12 materials, such as a poster?
13    A. I didn't make any of that. Somebody
14 else did.
15    Q. Did you discuss with others who made
16 promotional materials, what those materials
17 were?
18    A. I believe Jason Kessler handled all
19 that stuff.
20    Q. When you say somebody else made
21 promotional materials, who would that have been?
22    A. I have no idea who made -- who made
23 the stuff. Like I said, Jason Kessler handled
24 that kind of thing. The promotion, the
25 promotional stuff, the speakers, things like

1 that.
2     Q. Did you write any articles about Unite
3 the Right?
4     A. Articles for what? For -- no, I
5 didn't produce any -- publish any articles or
6 anything like that.
7     Q. Did you write any kind of blog post
8 about Unite the Right?
9     A. Umm, not that I can remember.
10    Q. Have you used a computer to send
11 e-mails regarding Unite the Right?
12    A. Other than the court case stuff, no.
13    Q. But you have used a computer to send
14 e-mails regarding the court case?
15    A. Just, like, responding -- when the
16 phone wasn't working, I would just use, like,
17 whatever computer I could get. Like, I went to
18 a -- I think I went to -- I don't even know what
19 the hell they are called. One of those internet
20 cafe places just to get to my e-mail once. I
21 don't remember where it was. It was in
22 Lancaster City. But it was just trying to get
23 to my e-mail, to e-mail them back.
24    Q. When was that?
25    A. I don't know. Sometime before all the

1 -- before they filed this. So, before July.
2     Q. Which e-mail address would that have
3 been?
4     A. The Eli F. Mosley one.
5     Q. Did you own a computer in 2017?
6     A. Umm, in 2017. So, that is the year of
7 the rally and stuff. Yes, I did. But I didn't
8 -- basically what happened with me was I had
9 gotten let go of my job in late 2016 and I moved
10 down to South Carolina with my girlfriend at the
11 time. I wasn't able to bring any of my stuff,
12 which included my computer and lots of other
13 stuff.
14    Q. What job had you gotten let go of in
15 late 2016?
16    A. I was an HR manager for a company
17 called JC Ehrlich.
18    Q. When you moved down to South Carolina,
19 why were you not able to bring your computer?
20    A. I couldn't fit all my stuff in the
21 car. I just brought my clothes and stuff like
22 that.
23    Q. So, what happened to your computer
24 then?
25    A. It was set in my parents' storage

1 shed, I think. It was -- it was a computer I
2 used for work, for when I had the job at JC
3 Ehrlich.
4     Q. Where is that computer now?
5     A. At my parents' place.
6     Q. Do you use that computer now?
7     A. No.
8     Q. Does the computer still work?
9     A. I think so. Probably.
10    Q. When did you first get that computer?
11    A. Probably 2012.
12    Q. What kind of computer is it?
13    A. Just a -- I don't know, desktop
14 computer.
15    Q. Do you know the brand of computer it
16 is?
17    A. No. I think it is custom -- it is
18 just kind of a Frankenstein machine.
19    Q. You used that computer in 2017, right?
20    A. No, no, no. No. Like I said --
21    Q. Excuse me, you used that computer in
22 2016, right?
23    A. Yes. But it was -- like I said, it
24 was before most of the Alt-Right stuff.
25    Q. When was the last time that you used

1 that computer?
2    A. Late 2016.
3    Q. It has been sitting in the storage
4 shed since then?
5    A. Yes.
6    Q. So, when you moved to South Carolina,
7 you testified that you were not able to bring
8 your computer, right?
9    A. No, which was why I used my phone.
10    Q. Did you get another computer once you
11 were in South Carolina?
12    A. No.
13    Q. Did you use someone else's computer in
14 South Carolina?
15    A. The only time I used my computer is
16 when I went to print stuff off, which was, like,
17 rarely, because I didn't -- I didn't need paper
18 when I was down there. I didn't need anything
19 printed out for me, or whatever. It wasn't like
20 I was handing it out to anybody down there.
21    So, the only time I had to print
22 something off was -- I had some sort of meeting
23 where I had to be on the phone and I had to look
24 at what I was looking at. So, I couldn't look
25 at it while I was on the phone.

1    Q. When was that?
2    A. Late -- or early 2017. By the spring,
3 summer 2017, I guess.
4    Q. So, what computer were you using in
5 2017 then?
6    A. I wasn't using a computer. What do
7 you mean?
8    Q. Well, you testified that in 2017 you
9 had some kind of meeting where you had to be on
10 the phone, that you couldn't look at what was on
11 your phone, so you used a computer to print
12 something.
13    A. That was the neighbor's computer I
14 said I used to print something off. I literally
15 just -- all I did was plug my phone into her
16 computer and send it to the printer, or
17 whatever.
18    Q. You don't know that neighbor's name?
19    A. I don't remember her name at all, no.
20 I don't even remember -- I don't remember the
21 address she even lived at or anything.
22    Q. You don't remember the address that
23 you lived at --
24    A. No.
25    Q. -- in South Carolina?

1    A. I was only there for, like, two or
2 three months, then we moved.
3    Q. Do you remember anything about where
4 you were living in South Carolina?
5    A. It was in Greenville. It was on,
6 like, a popular road. I don't know. It was on
7 a busy road. I don't know.
8    Q. Did you ever use anyone else's
9 computer or your own computer to -- umm, to send
10 e-mails regarding Unite the Right?
11    A. To send e-mails, no.
12    Q. You did testify that you used an
13 internet cafe, right, in Lancaster City to send
14 e-mails regarding --
15    A. That was to check my e-mails, to see
16 if I got anything for this. And I hadn't.
17    Q. Have you used anyone else's computer,
18 yours or anyone else's, to check your e-mails to
19 see if you had gotten e-mails regarding this
20 case?
21    A. No. Just that one.
22    Q. What about your neighbor's computer?
23    A. Umm, no. That was -- we left there
24 before Unite the Right even happened.
25    Q. What about Mr. Spencer's computer?

1    A. Like I said, his computer was always,
2 like, out or whatever, I guess, you can say.
3 Like, I didn't use it for e-mails or anything
4 like that, no. I never signed into my e-mail
5 address on his computer or anything, no.
6    Q. What about family members' computers?
7    A. No.
8    Q. Does your sister have a computer, for
9 example, that you used?
10    A. No.
11    Q. What about to send or check social
12 media messages regarding Unite the Right? Did
13 you ever use anyone's computer to do that?
14    A. No, just my cell phone.
15    Q. Not a single time you can remember
16 using anyone's computer --
17    A. No.
18    Q. -- to check --
19    A. No.
20    Q. -- or send messages regarding Unite
21 the Right?
22    A. No. I always used my phone.
23    Q. When you used computers to print
24 documents, which documents were those?
25    A. I don't remember what they were for.

MAGNA
LEGAL SERVICES

1    I think it was -- I don't remember what it was
2    for.  We had -- we had a phone call and it was
3    about -- might have been about one of Mr.
4    Spencer's speaking engagements.  And it might
5    have been about that we were on the phone for.
6    I don't remember exactly what it was.
7        Q.  What did you do with the document to
8    get it onto the computer from which you printed
9    it?
10       A.  I had it on my phone, my Google drive.
11   I think I -- I don't even -- maybe I didn't even
12   plug it in.  I think I had it on my Google
13   drive.  I got on the neighbor's computer just to
14   hit print.  Just, like, signed -- like, signed
15   in -- I signed in on the account I don't have
16   access to anymore and hit print.
17       Q.  I am going to ask you some questions
18   about your e-mail addresses.
19       A.  Okay.
20       Q.  Now, you have testified that you have
21   used e-mail addresses to discuss Unite the
22   Right, correct?
23       A.  Mostly just the court stuff, the court
24   case stuff.
25       Q.  Umm --

1        A.  I don't think there is any e-mails
2    planning or discussing the actual event.  We
3    didn't use e-mail.  We used Discord.
4        Q.  The e-mail address that would have on
5    it e-mails regarding this case or Unite the
6    Right is Eli.F.Mosley@Gmail.com, correct?
7        A.  Yes.  And I --
8    Eli.Mosley@IdentityEvropa.
9        Q.  Have you used the e-mail address
10   DeplorableTruth@Gmail.com?
11       A.  That is another one, yes.
12       Q.  Would that e-mail address contain
13   e-mails regarding Unite the Right or this case?
14       A.  No.  That is something I used to sign
15   up for, like, free trials and stuff.  That is
16   nothing --
17       Q.  So, your testimony is you did not use
18   the e-mail address, quote,
19   DeplorableTruth@Gmail.com to communicate
20   regarding Unite the Right?
21       A.  No.
22       Q.  Not a single time?
23       A.  No.
24       (Exhibit 7, 6/11/2017 Operation Unite
25   the Right Charlottesville 2.0, marked for

1    identification.)
2    BY MR. BARKAI:
3        Q.  Mr. Kline, you are being handed a
4    document that's been marked Exhibit 7.
5        Do you recognize this document?
6        A.  Yes.  This is the planning document
7    that I referenced earlier.
8        Q.  This is a planning document regarding
9    Operation Unite the Right Charlottesville 2.0;
10   is that right?
11       A.  Correct.
12       Q.  Did you write this document?
13       A.  Yes.
14       Q.  Did anyone else write this document?
15       A.  Umm, I believe Jason might have helped
16   me make this.  But it was mostly me and maybe
17   him editing it.
18       Q.  You wrote this document on your
19   iPhone; is that right?
20       A.  I wrote this and I sent it to
21   somebody.  I don't remember who I sent it to.
22   And they put it in this format like this.
23       Q.  How did you send it to someone else?
24       A.  I had it on the Google drive on my
25   phone.

1        Q.  But when you say you sent it to
2    someone else, how did you, quote, send it?
3        A.  Oh, just send them, like, the share
4    link on Gmail, on Google.
5        Q.  So, you e-mailed a share link; is that
6    right?
7        A.  No.  I hit copy on the link for Gmail,
8    and then pasted it in a Discord message to that
9    person.  Then they clicked it and then they
10   opened it and reformatted it in, I guess, Word,
11   or whatever they use.
12       Q.  Who is that person to whom you sent
13   it?
14       A.  I don't remember who it was.  It would
15   be in Discord --  like, in Discord logs, or
16   whatever.  It was two years ago.  I don't really
17   remember who it was.
18       Q.  When Mr. Kessler edited the document,
19   how did he edit it?
20       A.  I don't know how much he edited it.  I
21   just know I sent these to him before I sent it
22   to anybody else, so he was on the same page.
23       Q.  So, when you say that you shared this
24   document with someone else, were you sharing it
25   with Mr. Kessler or with someone aside from Mr.

MAGNA
LEGAL SERVICES

1  Kessler?
2      A.  So, this was sent out to everybody
3  that was in that Discord, I believe, the Unite
4  the Right Discord.  So, first I would kind of go
5  over what's going on, or, like, the plan or
6  whatever.  Then I would send -- send it to
7  Jason, he would look over it, and be, like, that
8  looks fine, or whatever, then I would post it on
9  Discord, or have someone post it on Discord.
10      Q.  When you wrote this document, you
11  wrote this as a Google doc on your phone; is
12  that right?
13      A.  Yes.  On the Identity Evropa e-mail
14  address, I think that is the one this would be
15  on.  I think so, yeah.
16      Q.  Did you use any other app on your
17  phone to write this?
18      A.  No.  Just the Google docs, or
19  whatever.
20      Q.  Could you please turn to Page 5 of
21  this planning document?
22      A.  Okay.
23      Q.  Do you see under contact information,
24  Eli Mosley - Discord?
25      A.  Mm-hmm.

1      Q.  That sentence?
2      A.  Yes.
3      Q.  Do you recognize that as your contact
4  information?
5      A.  Yeah.  I see that my Deplorable Truth
6  e-mail on there.  I don't think I ever got
7  anything on there.  I think by that time I had
8  started using the Identity Evropa e-mail.  But I
9  don't think I got anything on there.  You guys
10  can check that e-mail, too.  That is still
11  active.  There is nothing on there.
12      Q.  You -- you told people on the Discord
13  server, quote, feel free to message slash call
14  whenever, unquote, correct?
15      A.  Mm-hmm.
16      Q.  And you put on this planning document
17  DeplorableTruth@Gmail.com, correct?
18      A.  And out of putting all that contact
19  information, still 95 percent or more of all
20  communication went to Discord.
21      Q.  But some communication to you came not
22  through Discord, correct?
23      A.  Umm, the only other noncommunication
24  through Discord would have been through Kessler,
25  through text messages.  But no one used my,

1  and I can't think of a single person who just
2  called me out of the blue.
3      Q.  Your testimony is that you never
4  received a single e-mail at
5  DeplorableTruth@Gmail.com, despite putting this
6  e-mail address here?
7      A.  I don't think so, no.  I can't -- I
8  don't remember a single time responding or
9  getting a single e-mail from anybody on that --
10  on that address.
11      Q.  When --
12      A.  Or any address.  I don't think I
13  e-mailed relating to Unite the Right at all.  I
14  think all my e-mails have been related to the
15  court case stuff.
16      Q.  Earlier I asked you, have you used the
17  e-mail address DeplorableTruth@Gmail.com and you
18  agreed that you had.  And you said that you used
19  that address to sign up for free trials and
20  stuff, correct?
21      A.  Yeah.  Like I said, that was a
22  throwaway e-mail.  That is why I put it there,
23  because I wasn't intending to use it after or
24  anything, you know what I mean?  Because I knew
25  -- I figured this kind of stuff would get out,

1  right.  Like, this document would get leaked,
2  and things like that.  So, I used my throwaway
3  e-mail address to put on there so people didn't
4  contact me.
5      Like I said, I don't think I have
6  gotten anything on that e-mail address about
7  Unite the Right.
8      Q.  But you did put forward that e-mail
9  address --
10      A.  Yes, correct.
11      Q.  -- as an e-mail address that people
12  could use to talk to you --
13      A.  Yes.
14      Q.  -- about Unite the Right, correct?
15      A.  So, nobody -- like I said, I don't
16  think I got any communication from it.
17      Like I said, I have -- this is one of
18  the few accounts I still have access to, I
19  haven't been banned from.  So, you guys are more
20  than welcome to go through that.  There is
21  nothing in there that is -- there is nothing in
22  there that is part of this case though.
23      Q.  Have you deleted any e-mails from
24  DeplorableTruth@Gmail.com?
25      A.  No.

MAGNA
LEGAL SERVICES

1     Q. Not a single time?
2     A. No.
3         THE VIDEOGRAPHER: Pardon me, Counsel.
4  About three minutes until I have to change over
5  the tape.
6         MR. BARKAI: So, we'll go for another
7  couple minutes, then we'll take a break.
8         THE WITNESS: Yeah.
9  BY MR. BARKAI:
10    Q. You still have access to
11 DeplorableTruth@Gmail.com, right?
12    A. Yes.
13    Q. And you still have access to
14 Eli.F.Mosley@Gmail.com?
15    A. Yes.
16    Q. You also have an IdentityEvropa.com
17 e-mail address, correct?
18    A. I do not have access to.
19    Q. Do you have any other e-mail addresses
20 that you have used in the last four years?
21    A. Yeah. Umm, the only other -- well,
22 there is two things for that. The first thing
23 is I have an e-mail address that is used, like,
24 that I signed up for a lot of stuff, like, bank
25 accounts and things like that. I have that

1  e-mail address. Umm, that is at Comcast
2  address. Again, there is nothing in there.
3  That is what I sign up for accounts for, like I
4  said, banking and things like that.
5         And then the other e-mail address is
6  when I would make a new Twitter account or
7  whatever, when I needed a new Twitter account, I
8  would just have a random e-mail address I don't
9  have any access to at all. It would be random
10 letters, if that makes sense.
11    Q. Are you able to log into those e-mail
12 addresses?
13    A. I don't even -- no. They have all
14 been deleted. All -- Twitter deleted -- Twitter
15 somehow got -- Twitter had, like, a way of just
16 knowing it was me and they started deleting them
17 right away. So --
18    Q. Have you used anyone else's e-mail
19 address to communicate --
20    A. No.
21    Q. -- about Unite the Right?
22    A. No.
23    Q. Does Identity Evropa have its own
24 e-mail addresses --
25    A. Yeah.

1     Q. -- for the organization?
2     A. Yes.
3     Q. Have you operated those e-mail
4  addresses?
5     A. No. I wasn't ever in control of any
6  of the tech stuff.
7     Q. Have you deleted any e-mails at all
8  that you have sent or received concerning the
9  events in this case?
10    A. No.
11    Q. Have you ever been instructed to
12 delete any such e-mails?
13    A. No.
14    Q. Have you ever instructed anyone else
15 to delete any such e-mails?
16    A. No.
17        MR. BARKAI: We can take a break. Go
18 off the record.
19        THE VIDEOGRAPHER: The time is 12:04
20 p.m., we are going off the video record.
21        (Recess was taken.)
22        THE VIDEOGRAPHER: The time is now
23 12:13 p.m., we are back on the video record.
24 BY MR. BARKAI:
25    Q. Mr. Kline, before we continue

1  discussing your communications regarding Unite
2  the Right, a few questions about your
3  preparation for this deposition.
4         In preparation for this deposition,
5  did you speak to Mr. DiNucci, who is on the
6  phone?
7     A. No.
8     Q. Did you speak with Mr. Campbell, who
9  is on the phone, in preparation for this
10 deposition?
11    A. No.
12    Q. What about regarding this case
13 generally? Have you had conversations with Mr.
14 DiNucci?
15    A. No, I don't think so. Outside of --
16 no, actually I don't think I have ever talked to
17 him before. I mostly talked with Kaplan, I
18 think.
19    Q. You started to say outside of, have
20 you ever had any conversations with Mr. DiNucci
21 about this case?
22    A. No, I don't think so.
23    Q. What about Mr. Campbell? Have you had
24 conversations with Mr. Campbell about this case?
25    A. No.

MAGNA&copy;
LEGAL SERVICES

1    Q.  Can you name a single person you told
2  that your account had been hacked?
3    A.  I mean, I probably told Richard, I
4  probably told -- I don't know.  Other people.  I
5  don't know.  Whoever I was with at the time.
6    Q.  Richard, does that refer to Mr.
7  Spencer?
8    A.  Yeah, yeah.
9    Q.  You have used the account EliMosleyIE
10 on Twitter, right?
11   A.  Yes.
12   Q.  Have you used Eli_Mosley_?
13   A.  Uh, Yes.
14   Q.  Have you used Sheli_Shmosley?
15   A.  Yes.
16   Q.  Have you used Eli Mosley?
17   A.  Yes.
18   Q.  Have you used Eli Mosley is Back?
19   A.  Yes.
20   Q.  Have you used EliMosleyOH?
21   A.  Umm -- oh, yes.
22   Q.  Have I named -- excuse me.  Are there
23 any other Twitter usernames besides the
24 usernames that I have named that you have used?
25   A.  I am sure there are, but not that I

1  remember the names of.  There are more
2  transformations of Eli and Eli Mosley or
3  whatever.  But none that I remember.
4    Q.  There are other Twitter usernames that
5  feature the name Eli Mosley in some form?
6    A.  I am sure there are.  But, like I
7  said, I don't know what they would be.  As you
8  can see, that list -- you can't differentiate
9  between one or the other usually.  So, it is
10 kind of hard to remember them all.
11   Q.  You had a password for each Twitter
12 account, right?
13   A.  Uh, Yes.
14   Q.  Did anyone else have those passwords?
15   A.  No.
16   Q.  Did anyone else use your Twitter
17 accounts?
18   A.  No.
19   Q.  So, would you agree that the messages
20 posted on Twitter were posted by you?
21   A.  Yes.  Except for the Not Eli Mosley
22 account.
23   Q.  Other than the Not Eli Mosley account,
24 which you have testified was hacked, would you
25 agree that the messages posted on Twitter under

1  each of the other usernames were posted by you?
2    A.  Yes.
3    Q.  Which device did you use to post
4  messages on Twitter?
5    A.  My iPhone.
6    Q.  Did you ever use anything aside from
7  your iPhone?
8    A.  No.
9    Q.  Now, you told the Court that you did
10 not sign up for Twitter with your real e-mail
11 address, but that you used burner e-mails,
12 right?
13   A.  Yes.  I don't even know -- go ahead.
14   Q.  What is a burner e-mail?
15   A.  You can go on, like, a website and
16 say, hey, I need an e-mail address to confirm an
17 account.  And they'll give you like random
18 letters and numbers together, and they'll say
19 here, this is going to be an e-mail for ten
20 minutes.  And then you sign up for the Twitter
21 account or whatever it is, you get your
22 activation code, put it in.  Then that e-mail,
23 you just don't ever use it again.
24       So, it is -- like I said, it is like a
25 burner phone, but for an e-mail.

1    Q.  You told the Court that the burner
2  e-mails were, quote, not real e-mail addresses?
3    A.  Correct.
4    Q.  When you were referring to, quote,
5  real e-mail addresses, are there any others
6  besides the ones we discussed today,
7  Eli.F.Mosley@Gmail.com,
8  DeplorableTruth@Gmail.com, and your Identity
9  Evropa e-mail address?
10   A.  No.
11   Q.  Those are the only three you have?
12   A.  Correct.
13   Q.  Does Identity Evropa have its own
14 Twitter account?
15   A.  I don't believe it does anymore.  I
16 think it did at one point.
17   Q.  Did you administer that Twitter
18 account?
19   A.  No.
20   Q.  You told the Court that you were,
21 quote, more than happy to go through with the
22 process so that Twitter could hand over
23 information to the Court, right?
24   A.  Yes.
25   Q.  You haven't actually executed anything

MAGNA
LEGAL SERVICES

1  it would have been Not Eli Mosley.
2     Q. So, that was the Twitter account that
3  you had at the time of Unite the Right, correct?
4     A. Correct, yes. So, this other one was
5  from two months before. Clearly my account was
6  banned. Not Eli Mosley would be the new one.
7     Q. You have no active account on Twitter
8  right now; is that true?
9     A. No, I haven't had one for probably two
10  years, or a year-and-a-half.
11     Q. Do you see the top of this version of
12  the operational documents, which is Exhibit 8,
13  do you see the sentence this version of the
14  document is to only be shared in extremely
15  vetted circles, do not post on social media?
16     A. Yes.
17     Q. What were the extremely vetted circles
18  in which this document was shared?
19     A. Well, looking back, that is kind of a
20  joke. It was meant to be logistical.
21     MR. DiNUCCI: Note my objection from
22  earlier based on Judge Hoppe's Order. Thank
23  you.
24  BY MR. BARKAI:
25     Q. You may answer.

1     A. It was just the, umm -- it was just
2  Discord, is what it meant. Discord was supposed
3  to have people vetted before they could join it.
4  So, that is what I was talking about.
5     Q. How is the document shared within
6  Discord?
7     A. Just post it. Like you would on
8  Facebook or -- just put it in a channel.
9     Q. Who posted it?
10     A. Umm, maybe me. But I don't know.
11  Like I said, the way I made these, is I made
12  them on Google drive and I sent them to somebody
13  usually. I don't remember who each one. Some
14  -- each one was different. They would format it
15  like this. Then either they would post it, or I
16  would -- they would send it back to me and I
17  would post it.
18     Q. How many versions of this document did
19  you make?
20     A. Umm, probably five or six. And they
21  were all posted in Discord.
22     Q. You made five or six versions of this
23  document?
24     A. Yes.
25     Q. This document is several pages long,

1  correct?
2     A. Yes.
3     Q. This document appears to be nine pages
4  long, right?
5     A. Yeah. The final one was really long.
6  Yeah.
7     Q. The final version was very long?
8     A. Yes.
9     Q. You typed out these very long
10  documents on your phone?
11     A. Yes. It was mostly editing old stuff
12  and changing it out. It wasn't like I made it
13  all at once. It was, oh, I dealt with this part
14  of this, let me type this part up. And then,
15  you know, save another document, or whatever.
16  Oh, I fixed -- this part needs to be done. It
17  was kind of, like, a living document, I guess
18  you could say.
19     Q. So, you had one version of the
20  document that you edited?
21     A. Yes, yes.
22     Q. You did not create multiple documents?
23     A. Correct.
24     Q. And, again, you did all this on your
25  phone?

1     A. Yes.
2     Q. When you -- strike that.
3     At the top of this page, Page 1 of
4  Exhibit 8, do you see reported version
5  8/10/2017, general orders?
6     A. Yes.
7     Q. What are general orders?
8     A. Just like the general -- the way
9  people were supposed to behave and act at the
10  thing, which basically no one followed, as most
11  people can tell. This thing clearly outlines
12  that people aren't supposed to be violent and
13  that -- basically this whole document wasn't
14  followed from the beginning to end.
15     Q. You also used Facebook to communicate
16  about Unite the Right, correct?
17     A. Yes.
18     Q. Which is -- what is your Facebook
19  username?
20     A. I was banned from Facebook as well,
21  and I don't know what the name of the account or
22  -- is it -- I think Facebook is saved by e-mail
23  address, if I am not mistaken. But I don't know
24  what e-mail address I would have been using.
25     Q. Would it have been

1  events --
2      A.  Yes.
3      Q.  -- in the Complaint?
4          Turning to Page 5 of Exhibit No. 10,
5  please.  Do you see Paragraph G at the bottom of
6  that page?
7      A.  Yes.
8      Q.  Do you see that Paragraph G states
9  whether or not you object, you must preserve all
10 documents and communications relevant to the
11 lawsuit, including all documents and
12 communications responsive to these requests?
13     A.  Yep.
14     Q.  Have you read that before?
15     A.  Uh, not here on this page.  But I
16 think there was another one where I did read,
17 like, that you can't dispose of or get rid of
18 anything, which is why I kept the phone and all
19 that other stuff.
20     Q.  Did your attorney speak to you
21 about --
22     A.  Yes.
23     Q.  -- that requirement?
24     A.  Yes.
25     Q.  Was that Mr. Kolenich?

1      A.  Yes.
2      Q.  When did he speak to you about that
3  requirement?
4      A.  When I first started working with him.
5  So, probably before this was even sent out.  So,
6  before January 2018.
7      Q.  Would that have been in October of
8  2017?
9      A.  Yeah, probably.
10     Q.  You were instructed to preserve all
11 documents, right?
12     A.  Yes.
13     Q.  Do you understand that that means you
14 are obligated to keep all documents and
15 communications relevant to the case?
16     A.  Yes.
17     Q.  Do you understand that you are
18 obligated not to delete anything?
19     A.  Yes.
20     Q.  Not to delete anything relevant to the
21 case, that is?
22     A.  Yes.
23     Q.  Have you taken any steps to make sure
24 that all documents and communications relative
25 to the lawsuit are preserved?

1      A.  Well, I kept my cell phone when it was
2  broken, and I fixed it when it was broken.  Umm,
3  but that is really the only thing I have -- any
4  information I can retrieve, other than the
5  social media accounts.
6      Q.  You have never backed up any of your
7  documents to a separate device, right?
8      A.  No, no.
9      Q.  You never turned on any kind of cloud
10 back up?
11     A.  No.
12     Q.  You never made any screen shots of any
13 of your messages?
14     A.  No.
15     Q.  You never forwarded any of your
16 messages to anyone else?
17     A.  No.
18     Q.  Did you ever make any copies of any of
19 the information relevant to Unite the Right?
20     A.  No.
21     Q.  Did you store your broken iPhone in
22 any kind of secure location?
23     A.  No.
24     Q.  Did you store your Walmart phone in
25 any kind of secure location?

1      A.  No.
2      Q.  Your iPhone was water damaged, right?
3      A.  Correct.
4      Q.  How did that water damage occur?
5      A.  I think it was literally raining one
6  night and I was outside, coming home.  And it
7  was in my back pocket and it got wet.
8      Q.  On Page 8 of this Exhibit No. 10, do
9  you see the Request for Production No. 1
10 requests all documents and communications
11 concerning the events?
12     A.  Yes.
13     Q.  Do you see there is a list of
14 different types of documents and communications
15 which are included as examples?
16     A.  Yes.
17     Q.  Do you understand that you are
18 obligated to produce to Plaintiffs all documents
19 and communications you have in your possession
20 concerning the events?
21     A.  Yes.
22     Q.  And you have at various times had
23 documents and communications concerning the
24 events, right?
25     A.  Yes.

1     Q.  You have never produced any of those
2  to Plaintiffs, right?
3     A.  No.  But I would like to, using the
4  PDF or whatever you guys have that looks like
5  from this e-mail.
6     Q.  You are ready to do that today?
7     A.  Yes.
8     Q.  You are ready to turn over your
9  devices --
10     A.  Umm --
11     Q.  -- for imaging?
12     A.  I could turn the -- I would like to
13  not do the cell phone today, just because I use
14  it to get home on GPS.  I have somewhere to go
15  that I am not familiar with.  But I could, like,
16  do it right after I get home and activate the
17  new cell phone I just got.
18     Q.  You are ready to provide consents for
19  social media accounts --
20     A.  Yes.
21     Q.  -- to be disclosed?
22     A.  Yes.
23     Q.  Did you ever at any time have
24  documents and communications relevant to the
25  events in the Complaint that you no longer have?

1     A.  No.
2     Q.  Do you see Request for Production No.
3  2 at the bottom of Page 8 of this document?
4     A.  Number -- okay, I see that, yes.
5     Q.  Do you see that it asks there for you
6  to produce all documents and communications
7  concerning events, meetings, rallies,
8  conferences, or conversations held prior to the
9  events that relate to the events in any way?
10     A.  Yeah.
11     Q.  Do you understand you are obligated to
12  produce all such documents to Plaintiffs?
13     A.  Yep.
14     Q.  And you have at various times had
15  documents and communications concerning such
16  events, right?
17     A.  Yes.  And it is all in my phone, or
18  Discord.
19     Q.  You haven't produced any of those yet,
20  have you?
21     A.  No.  But I would like to today, if
22  that is possible.  Or consent for the social
23  media ones today.
24     Q.  On Page 9 of this document, do you see
25  Request for Production No. 3 --

1     A.  Yes.
2     Q.  -- which asks for documents concerning
3  and communications with various groups?
4     A.  Yes.
5     Q.  Did you understand that you are
6  obligated to produce all documents and
7  communications you have concerning or with these
8  groups?
9     A.  Yes.
10     Q.  Do you have, or have you had in the
11  past documents concerning or communications
12  concerning or with East Coast Knights of the
13  KKK?
14     A.  No.
15     Q.  What about Fraternal Order of the Alt
16  Knights?
17     A.  No.
18     Q.  Identify Evropa you do, correct?
19     A.  Yes.
20     Q.  What about League of the South?
21     A.  Umm, yes, on Discord.
22     Q.  What about Loyal White Knights of the
23  KKK?
24     A.  No.
25     Q.  What about Moonbase Holdings, LLC?

1     A.  I don't know what that is.  No.
2     Q.  What about Nationalist Socialist
3  Movement?
4     A.  No.
5     Q.  What about Nationalist Front?
6     A.  No.
7     Q.  What about Traditionalist Worker
8  Party?
9     A.  Yes.
10     Q.  What about Vanguard America?
11     A.  Yes.
12     Q.  With respect to Traditionalist Worker
13  Party, what sorts of documents are those?
14     A.  Just communication between us on
15  Discord.
16     Q.  Between you and who?
17     A.  Umm, it wasn't -- it wasn't Matt
18  Heimbach at the time, it was somebody else I was
19  dealing with.  I can't remember his name.  I
20  can't remember the guy's name.  But it was
21  somebody that was on Discord.  They were, like,
22  the -- they were marked as the communication
23  liaison for the Traditionalist Worker Party.
24     Q.  What about Vanguard America?
25     A.  I spoke to one or two guys.  One of

1  them became the new leader.  I can't remember
2  his name.  Umm, it is not -- it is not -- it is
3  not the guy that I was on the phone with the
4  other day.  Umm, it is -- what's his name?
5  What's the current -- Hopper.  Mr. Hopper.  It
6  was not Mr. Hopper, it was somebody else from
7  Vanguard America.
8        Then just somebody I knew, umm, that
9  was from Texas from Vanguard America.  I don't
10  remember who it was.  I just know they were from
11  Texas.
12        Q.  Did you communicate with Thomas Russo?
13        A.  Yes.  That's who I'm talking about.
14        Q.  How did you communicate with Mr.
15  Russo?
16        A.  Uh, on Discord mostly.  And I also had
17  his phone number.  And I think I texted him
18  afterwards or whatever, just saying hey, like.
19  And I think it was just, like, a hi thing.
20        Q.  You exchanged text messages with Mr.
21  Russo?
22        A.  Yes.  But it was very brief.  I think
23  it was one sided.  I think I messaged him, he
24  never messaged me back.
25        Q.  Did you communicate with Mr. Russo

1  before Unite the Right occurred?
2        A.  Briefly, yes.
3        Q.  You stated earlier in your testimony
4  that you were on the phone with a guy the other
5  day?
6        A.  What do you mean?
7        Q.  Earlier in your testimony a minute ago
8  you stated --
9        A.  Just now?
10        Q.  Just now, a minute ago --
11        A.  When we were on the phone, the guy I
12  was on the phone with, Mr. Hopper.  I couldn't
13  remember his name.  We were on the phone on --
14  talking about discovery and stuff.
15        Q.  You spoke with Mr. Hopper on the phone
16  about discovery stuff?
17        A.  No.  What I was saying was when we
18  were on the phone talking with me, Heimbach, and
19  Hopper, that was the -- it wasn't him, is what I
20  was saying.  It wasn't Hopper that I talked to
21  before, it was Mr. Russo.
22        Q.  You are referring to the Court call?
23        A.  Yes.
24        Q.  Do you have Mr. Russo's phone number?
25        A.  I don't know.  Maybe.  I don't think

1  so.  Maybe.  I don't know.  I have no idea.  I
2  should still have it.
3        Q.  You exchanged -- you spoke with him on
4  the phone, right?
5        A.  Yeah, yeah.  I mean, I have a text
6  message exchange with him.  But that doesn't --
7  so, I guess I have his phone.  But I don't know
8  if that is his current number or anything like
9  that.
10        Q.  Can you provide Plaintiffs with that
11  number?
12        A.  Yeah.
13        Q.  When we go off the record, we'll ask
14  you to do that.
15        A.  Well, I mean, can't you guys just get
16  that when you do the discovery stuff?
17        Q.  Umm --
18        A.  Won't that come up in discovery?
19        Q.  Do you see on Page 9 of this document,
20  Request for Production No. 4?
21        A.  Yeah.
22        Q.  Do you see that requests all the
23  documents and communications concerning
24  violence, intimidation, or harassment of persons
25  on basis of race, religion, or ethnicity?

1        A.  Yes.
2        Q.  Then the sentence continues, including
3  but not limited to certain examples?
4        A.  Yes.
5        Q.  Do you understand you are obligated to
6  produce all such documents and communications
7  that you have?
8        A.  Yes.
9        Q.  Do you have any such documents?
10        A.  No.  Other than what's in Discord.
11  But those are on the Discord servers.
12        Q.  Do you see Request for Production No.
13  5 on this page?
14        A.  Yes.
15        Q.  Do you see that the Request for
16  Production seeks uses of social media that
17  reference or concern the events or Defendants?
18        A.  Yes.
19        Q.  Do you understand that you are
20  obligated to produce such messages to
21  Plaintiffs?
22        A.  Yes.
23        Q.  You have made such messages in the
24  past, correct?
25        A.  Yes.

MAGNA
LEGAL SERVICES

1  don't know -- like, just give a list of all the
2  people I have talked to about the events? It
3  doesn't make sense to me. But --
4      Q. What does not make sense to you about
5  giving a list of people with whom you
6  communicated?
7      A. Right. Like, I understand that is
8  something I need to do, right. So, is that
9  going to be in this PDF I got sent, a spot to
10 list all the people?
11     Q. Are you prepared to identify the
12 persons with whom you communicated now?
13     A. Yes.
14     Q. But you haven't done it before?
15     A. No, but I would like to.
16     Q. Have you communicated concerning the
17 events, whether before, during, or after the
18 events, with Jason Kessler?
19     A. Yes.
20     Q. Erika Alduino?
21     A. Yes.
22     Q. Richard Spencer?
23     A. Yes.
24     Q. Christopher Cantwell?
25     A. Yes.

1      Q. James Alex Fields, Jr.?
2      A. No.
3      Q. Andrew Anglin?
4      A. No.
5      Q. Robert Azzmador Ray?
6      A. Yes.
7      Q. Nathan Damigo?
8      A. Yes.
9      Q. Matthew Heimbach?
10     A. Yes.
11     Q. Matthew Parrott?
12     A. No.
13     Q. Michael Hill?
14     A. Uh, no.
15     Q. Michael Tubbs?
16     A. No.
17     Q. Jeff Schoep?
18     A. No.
19     Q. Agustus Sol Invictus?
20     A. Yes.
21     Q. Michael Peinovich?
22     A. Yes.
23     Q. Identify -- is there anyone else with
24 whom you communicated concerning the events,
25 whether before, during, or after them?

1      A. No, not -- no.
2      Q. Not a single person?
3      A. I mean, I have talked to people about
4  it, obviously. But, like, I talked about, like,
5  hey, this crazy thing happened, or whatever. I
6  don't know -- like, everyone I have communicated
7  with. I mean, that is a list of thousands of
8  people.
9      Q. You have not made a list of people you
10 communicated with concerning the events, have
11 you?
12     A. No, but I can. I can make a list of
13 the people I have communicated with concerning
14 the events. I mean, more than half of them I
15 won't even know their real names. Most people
16 operate anonymously. I can give pseudonyms or
17 fake names or whatever that they use if I
18 remember them. But --
19     Q. Do you understand Interrogatory No. 3
20 is asking you to identify all those persons?
21     A. Yes. And I would be fine with doing
22 that. Like I said, it is going to be a
23 difficult task.
24     Q. Do you see Interrogatory No. 4, that
25 asks you to identify all electronic devices used

1  by you to communicate concerning the events,
2  whether before, during, or after the events?
3      A. Yes.
4      Q. You have not done that in the past,
5  have you?
6      A. No, but I would like to. I have my
7  cell phone ready to do that. Not today. But
8  literally, like, tomorrow or even tonight I
9  would send it out. It doesn't matter.
10     Q. You understand that this Interrogatory
11 asks you to identify all electronic devices that
12 you used, even if you no longer use them, right?
13     A. Yes.
14     Q. Do you understand that this
15 Interrogatory asks you to identify all
16 electronic devices that you used, even if they
17 did not belong to you?
18     A. Yes.
19     Q. For example, if you borrowed someone
20 else's phone, that would be included, right?
21     A. Yes.
22     Q. So, Mr. Spencer's computer, for
23 example, would be included if you used it to
24 communicate concerning the events, right?
25     A. Correct.

1    Q. sca@bsfllp --
2    A. bsfllp --
3    Q. .com.
4    A. .com, okay. That is it?
5    Q. Yes.
6    A. All right.
7    Q. Could you also just reply to the
8  e-mail as well from Mr. Bloch?
9    A. Mm-hmm.
10    Q. And just say you received it. You can
11  just type in the word received.
12    A. This e-mail address -- okay. So, just
13  for your information, the Gab account that I
14  have is signed up -- is on the Deplorable Truth
15  e-mail. It says my last log in was two years
16  ago. So, I just haven't -- like, I am just
17  going through the e-mails right now. That is
18  what I have.
19        The Deplorable Truth one is literally
20  -- like, it is my spot -- it is, like, Spotify,
21  Hulu, PayPal, stuff. You know what I mean? It
22  is not really a lot of Alt-Right stuff. Like I
23  said, I use that e-mail like that on the
24  document because I -- I didn't think anyone was
25  going to use it anyway.

1    Q. Thank you, Mr. Kline. We received
2  that.
3    A. So, just to be clear then, that is
4  basically telling Discord that they can send
5  over all the stuff that deals with that account.
6  And then I believe I got one from Twitter, I
7  think, at one point. But I can't remember.
8        (Exhibit 16, Twitter consent form,
9  marked for identification.)
10        THE WITNESS: This is going to be the
11  issue with this one. I remember when I saw
12  this, that was an issue. It is asking for,
13  like, username and e-mail addresses. But I
14  don't know either, outside the list of usernames
15  you guys have.
16  BY MR. BARKAI:
17    Q. Mr. Kline, you are referring to
18  Exhibit 16; is that right?
19    A. Correct.
20    Q. You recognize this to be a consent to
21  disclose data from Twitter; is that right?
22    A. Correct.
23    Q. You are willing to fill this out?
24    A. Yes. But, like I said, I don't know
25  the e-mail addresses or the account names, other

1  than the list you guys have of the account
2  names.
3    Q. The issue with the e-mail addresses is
4  that they were, quote, burner e-mails; is that
5  right?
6    A. Yes, yes. It is random letters and
7  numbers at whatever website.
8    Q. Was there any Twitter account that you
9  created using an e-mail address that was not a
10  burner e-mail address?
11    A. Not that I recall, no.
12    Q. Never a Twitter account that was
13  created using Eli.F.Mosley?
14    A. I don't believe so, no.
15    Q. Or --
16    A. I have to go back and check. If I
17  did, it would have been way, way long ago.
18    Q. And never a Twitter account associated
19  with the e-mail address
20  DeplorableTruth@Gmail.com?
21    A. No, I don't think I would have made a
22  Twitter account with that one.
23    Q. Are you willing to complete this form
24  to the best of your ability, even if you don't
25  remember all --

1    A. If I could just e-mail a list -- you
2  guys had that list earlier of all my Twitter
3  accounts that you guys had, that you guys knew
4  of. That is the best list I have seen of ones I
5  would remember, from what I would remember.
6    Q. When we go off the record, we'll ask
7  you to complete the Twitter form to the best of
8  your ability.
9        Are you prepared to do that?
10    A. That's fine. Yeah.
11    Q. You said earlier, Mr. Kline, that you
12  were prepared to turn over all of your
13  electronic devices for imaging, right?
14    A. Yes. Just not tonight, because I have
15  to use the GPS to get somewhere. But after
16  that, yeah.
17    Q. But you are -- are you prepared to
18  today identify all of your electronic devices?
19    A. Yes. It is my phone. I don't --
20  there is nothing else that I would have used.
21    Q. Are you prepared today to identify all
22  of your social media accounts that may contain
23  potentially relevant documents?
24    A. Yes.
25        (Exhibit 17, social media and

1    Q. You also missed the e-mail in Exhibit
2  11, right --
3    A. Yes.
4    Q. -- that we had looked at earlier?
5    A. That one is after I had been
6  contacted. That was the one that the Judge had
7  said are you -- do you see that paper, and I
8  said yes. I was looking at a different one that
9  was sent to me that day instead of the one the
10  day before. Because that one, Exhibit 11, was
11  from July 1, the day before the phone call.
12    Q. You testified earlier that you had --
13  you had missed messages from the Court regarding
14  your court hearing, right?
15    A. I believe so. Maybe. I don't know.
16  For what?
17    Q. You testified earlier that you check
18  your voicemails, right?
19    A. Yes.
20    Q. And that the 610 phone number is the
21  correct phone number?
22    A. Yes.
23    Q. And Eli.F.Mosley@Gmail.com is the
24  correct e-mail address?
25    A. Yes.

1    Q. You testified earlier that you agreed
2  that it appeared to you that the Court had been
3  attempting to reach you regarding your upcoming
4  court hearings, right?
5    A. Yes.
6    Q. Do you have any explanation as to why
7  you did not receive those messages?
8    A. I just -- I have -- I started
9  receiving messages -- or I started noticing
10  these messages were for me, or whatever, for the
11  hearing for me after I talked with Patrick
12  Casey. And then we had the July 2 phone call.
13    Q. Were you --
14    A. Before that, I didn't realize that --
15  I didn't know these -- I didn't know that there
16  was actions I needed to take. I thought I was
17  good.
18    Q. Did you receive this e-mail, Mr.
19  Kline, or did you not?
20    A. What, this?
21    Q. Exhibit 21.
22    A. Exhibit 21. I mean, obviously it says
23  -- it says it was sent to me. But I don't
24  recognize it.
25    Q. Do you not recognize it because you

1  didn't read it at the time when it came into
2  your inbox?
3    A. I am not sure. I don't have access to
4  my inbox right now to look and see if it was
5  read or not. I assume I looked at this. The
6  subject is Sines versus Kessler, so I assume I
7  saw it.
8    Like I said, I did not know back in
9  May there was a motion against me. I didn't
10  know that.
11    Q. This is an e-mail about that motion,
12  right?
13    A. Right. I didn't know that was a
14  thing.
15    Q. The e-mail was informing you that
16  there was a motion about you in effect, right?
17    A. Correct. Like I said, I didn't know
18  -- I didn't know that until Patrick Casey called
19  me several weeks after this, or a couple weeks
20  after this.
21    Q. But this e-mail was in advance of the
22  hearing and in advance of when Mr. Casey talked
23  to you, and this e-mail is about that motion,
24  right?
25    A. Right. That is what I am saying. I

1  didn't find out from this e-mail, I found out
2  from Casey, from Patrick Casey.
3    Q. If you had read this e-mail, this
4  e-mail would have revealed to you that there was
5  a hearing coming up on your motion, right?
6    A. Right. But what I am saying is, I
7  don't remember reading this or seeing this. So,
8  if I would have read it, I would have known that
9  it was -- I would have known there was a motion
10  against me. Like I said, I didn't know that. I
11  didn't know that was a thing.
12    Patrick Casey called me, what, a week
13  or two after this. So, like I said, I just
14  didn't know there was a motion against me.
15    Q. When exactly did Mr. Casey call you?
16    A. Probably a week or two before the July
17  2 call. Maybe -- maybe even a little longer
18  than that. Maybe three weeks, a month. I am
19  not entirely sure.
20    Q. You -- during this time was anyone
21  informing you of your obligations in discovery?
22    A. No.
23    Q. Were -- well, were you in touch with
24  Mr. Kolenich at all?
25    A. Patrick Casey told -- Patrick Casey

MAGNA

LEGAL SERVICES

1  told me to call Mr. Kolenich and get in touch
2  with him. And he essentially said that I am
3  going to have to get on a call with you guys and
4  the Court and work out how to fix the discovery
5  issues. And that was, like, the extent of our
6  conversation. That was the first time I had
7  spoken to him for awhile.
8       (Exhibit 22, 6/26/2019 e-mail
9  exchange, marked for identification.)
10 BY MR. BARKAI:
11      Q. You are being handed a document marked
12 Exhibit 22. I would like you to turn to the
13 second page of this document. Do you see an
14 e-mail from James Kolenich on June 7, 2019 to
15 Michael Bloch regarding Eli Mosley?
16      A. Umm, no. You mean this part right
17 here? Yeah, okay. I see it. You said the
18 second page?
19      Q. On the second page there is an e-mail
20 from Mr. Kolenich to Mr. Bloch --
21      A. Yes.
22      Q. -- regarding you?
23      A. Yes.
24      Q. This e-mail states the word arrest has
25 had a near magical effect on my former client.

1  Eli Mosley, Elliott Kline, can be reached at
2  (610) 406-2229. He reached out to IE upon
3  seeing a news article referencing the arrest
4  discussion in court. You can text that number
5  or call him. He has been fully informed of the
6  discovery/ESI --
7       A. He knows Patrick Casey called me. So,
8  I mean, that is just wrong. He knows Patrick
9  Casey called me.
10      Q. Mr. Kolenich is wrong about this?
11      A. 100 percent. Patrick Casey called me
12 and informed me of what was going on. And I
13 read a news article about what was going on, and
14 then I called Mr. Kolenich. That is how I knew
15 about the news article that he is referencing.
16 Because in the news article the Judge had -- it
17 said right in the news article the Judge was
18 talking about possible arrests. And I said --
19 so I asked Mr. Kolenich, I said, I didn't know
20 any of this was going on. Like, how did -- you
21 didn't inform me, or no one informed me, and I
22 read it in the news. So, that is what he is
23 referencing in the e-mail.
24      But Patrick Casey is the one who
25 called me and reached out to me about what was

1  going on. Before that, I thought that
2  everything was going -- going on. And I was
3  still waiting for you guys to try to get my
4  phone, which I was just sitting on, waiting for
5  you guys to take -- or get the image of.
6       And I thought -- like I said, at the
7  time I thought the Discord and the Twitter stuff
8  was taken care of. Or at least the Discord
9  stuff. I wasn't sure about the Twitter stuff.
10      Q. So, you told Mr. Kolenich that you
11 didn't know any of this was going on, even
12 though there had been e-mails and calls to you
13 about your attendance at hearings, right?
14      A. Right. Like I said, I didn't know
15 those hearings were hearings for me. Like, if I
16 saw them. Most of them I didn't think I saw
17 though. I didn't know they were for me.
18      Q. You told Mr. Kolenich that you didn't
19 know any of this was going on, even though there
20 had been --
21      A. I didn't know the motions were filed
22 against me.
23      Q. Do we have your permission to ask Mr.
24 Kolenich about this?
25      A. Ask him what?

1       Q. Do we have permission to ask Mr.
2  Kolenich about your conversations that are
3  referenced in the June 7 e-mail?
4       A. I mean, I have -- I'll show you right
5  now that Patrick Casey called me.
6       THE VIDEOGRAPHER: Can we go off the
7  record for a second?
8       MR. BARKAI: Sure. We are going off
9  the record.
10      THE VIDEOGRAPHER: Time is 3:48 p.m.,
11 going off the video record.
12      (Recess was taken.)
13      THE VIDEOGRAPHER: The time is now
14 3:56 p.m., we are back on the video record.
15 BY MR. BARKAI:
16      Q. Mr. Kline, before we took a break you
17 had testified that you were going to show us
18 where the -- where in the call log Patrick Casey
19 called you regarding the hearing before the
20 Court, right?
21      A. Correct.
22      Q. Were you able to find that?
23      A. No. My phone calls only go back to --
24 until July. Like, the beginning of July. So,
25 it doesn't go back that far.

1    A.  I -- I recognize -- I don't recognize
2  the name at all.  But, yeah, I mean, I see
3  someone named Jessica Phillips sent me
4  something.  I just didn't recognize the name.
5    Q.  Who were you house-sitting for on July
6  15?
7    A.  My cousin.
8    Q.  What is your cousin's name?
9    A.  Aaron Ward.
10    Q.  Aaron Ward?
11    A.  Yeah.
12    Q.  Where does he live?
13    A.  Macungie.
14    Q.  What is Macungie?
15    A.  It is a town called Macungie.
16    Q.  How long were you house-sitting for?
17    A.  Like, a week-and-a-half, two weeks.
18    Q.  What is his address?
19    A.  I don't know off the top of my head.
20    Q.  You don't know the address where you
21  were house-sitting for a week-and-a-half or two
22  weeks?
23    A.  No, because I didn't leave the house.
24  I was basically watching the dogs.
25    Q.  Did you receive any calls or e-mails

1  regarding a conference call tomorrow, August 8?
2    A.  Yes.
3    Q.  Who called you or e-mailed you?
4    A.  Umm, I don't know.  I have a voicemail
5  I just checked that was done this morning while
6  we were in here.  And I haven't checked the
7  e-mail.
8    Q.  You have one voicemail?
9    A.  I have a voicemail, and then -- I saw
10  I had an e-mail.  I just haven't looked at it
11  yet.
12    Q.  Who is the e-mail from?
13    A.  I -- I have no idea.  Umm, umm, it is
14  from -- there is no way that is right.
15    Q.  What are you doing right now?
16    A.  Like, the last -- the last e-mail I
17  have, it says, is from 6/11.  But that is not --
18    Q.  On your phone -- the last e-mail on
19  your phone --
20    A.  This is obviously wrong.  Like, 6/11
21  is not the earliest e-mail I have.
22    Q.  What is --
23    A.  Do you see what I am saying?
24    Q.  The earliest e-mail on your phone is
25  from June 11?

1    A.  It is trying -- that is what I am
2  saying.  It is trying to set -- I have already
3  received that e-mail.  I have seen it.  But I am
4  saying the newest one it is showing is wrong.
5    So, I don't know who sent me the
6  newest e-mail.
7    Q.  The newest e-mail on your phone is
8  from June 11?
9    A.  No.  What I am saying is that right
10  now, when I looked at it, it is showing June 11.
11  Earlier when we took our break, when I was going
12  through, I saw I had two missed -- I had new
13  e-mails from today.
14    Q.  You had two e-mails from today?
15    A.  The other one might have been from
16  yesterday.  But definitely one from today.
17    Q.  Who sent you the e-mails from today or
18  yesterday?
19    A.  I don't know.  I didn't get to look at
20  them yet.  I definitely have a phone call from
21  somebody telling me, umm, the code for the
22  conference call tomorrow.
23    Q.  You said just now in your testimony
24  that the earliest e-mail on your phone right now
25  is June 11.  You also said that the latest

1  e-mail on your phone is June 11.
2    Could you please clarify?
3    A.  Right now when I am going onto my
4  phone, it is showing June 11 is the newest
5  e-mail I have.  However, earlier when we took a
6  break I had seen what e-mails I received today
7  and it showed I received e-mails today.  So,
8  there is something wrong with the phone.
9    Q.  You can't see those e-mails now?
10    A.  The ones from today are not showing
11  up, no.  I mean, we have documents here that are
12  from later date than 6/11.  So, I mean, and you
13  can see it.  I am not -- you can see 6/11 is the
14  latest.  It is not letting me -- you see this?
15  It is not --
16    Q.  Did your phone just ask you to enter
17  the password for Eli.F.Mosley@Gmail.com?
18    A.  Yes.  That is the same thing it does
19  for the, umm -- the same thing it does for the
20  Identity Evropa account as well.
21    Q.  Are you not logged into your Gmail
22  account?
23    A.  I am definitely logged into the Gmail
24  account.  I just sent the e-mail to you guys
25  from it.

1    Q. You sent an e-mail to us from
2  DeplorableTruth@Gmail.com.
3    A. Did I? Maybe I have to re-sign into
4  Eli F. Mosley. I definitely received an e-mail
5  earlier today.
6    Q. Are you not logged into your
7  Eli.F.Mosley@Gmail.com account on your phone
8  right now?
9    A. I believe I am. I mean, I am able to
10  go into my inbox. Why wouldn't -- how would I
11  be able to go to the inbox if I wasn't logged
12  in?
13    Q. The last e-mail in your
14  Eli.F.Mosley@Gmail.com inbox appearing on your
15  phone is from June 11, right?
16    A. Yeah.
17    Q. Do e-mails just disappear from your
18  phone periodically?
19    A. I mean, that is strange. I don't know
20  what's going on with it. Like I said, earlier I
21  had a pop-up that an e-mail showed up.
22    Q. My question was, do e-mails just
23  disappear from your phone periodically?
24    A. No.
25    Q. Do texts disappear from your phone

1  periodically?
2    A. No.
3    Q. What is the oldest
4  Eli.F.Mosley@Gmail.com e-mail on your -- in your
5  inbox?
6    A. 9/21/18.
7    Q. So, right now your Gmail --
8    A. That it is showing. I don't know --
9  maybe it is -- maybe it goes back further. I
10  don't know.
11    Q. So, on your phone right now your
12  Eli.F.Mosley@Gmail.com e-mail address displays
13  e-mails from September 21, 2018 to June 11,
14  2019, right?
15    A. Correct. But I am pretty sure I had
16  the account before that, and I have obviously
17  gotten e-mails after that.
18    Q. You are pretty sure you had the
19  account before that?
20    A. Yeah, I am pretty sure I had the
21  account before that. Probably 2017. Like I
22  said, it just might be what the phone is
23  displaying right now.
24    Q. But you -- your password needs to be
25  entered into your phone right now?

1    A. I just entered it again. It kicked me
2  right back out.
3    Q. You entered your password and it
4  kicked you out?
5    A. Well, when I entered the password, it
6  asked for the Identity Evropa e-mail password.
7  That is what I told you before, when they wrote
8  me out of Identity Evropa e-mail, service, it
9  messed with the e-mail on my phone.
10    Q. After you entered your password for
11  your Eli.F.Mosley@Gmail.com account, did the
12  rest of the e-mails for that account show up?
13    A. No. A pop-up came up, said sign in
14  Eli.Mosley@IdentityEvropa.com. And I can't. If
15  I hit sign in or yes, it says this account
16  doesn't exist and takes me right back to where I
17  was.
18    Q. You did enter your password for your
19  Gmail account, right?
20    A. Correct. And the next question it
21  asked me was the account information for the
22  Identity Evropa e-mail, which I no longer can
23  get into.
24    Q. Your e-mails for your Gmail account
25  are still stopped at June 11?

1    A. Yeah. But I have been receiving all
2  these other things. So, like I said, I don't
3  know what is going on with it. Maybe when I get
4  my -- you know, my new phone, when I activate my
5  new phone, it'll fix it, or whatever.
6    Q. How have you been receiving them?
7    A. I am receiving them on that phone, is
8  what I am telling you.
9    Q. Where are they now then?
10    A. I don't know. I don't understand what
11  is going on with the phone.
12    Q. They just disappeared?
13    A. It is clearly a broken phone. It is
14  clearly, like, a messed up phone.
15    Q. It is a messed up phone?
16    A. I mean, the phone I have already
17  explained to you guys has had issues.
18    Q. It has had issues, right?
19    A. Yeah. But it hasn't lost any, like,
20  data or anything like that. It is still full.
21    Q. But the e-mails are not showing up
22  right now, right?
23    A. No. But I know I have those e-mails.
24  Because, like I said, I have received them
25  before. I have looked at them on that phone.

1       Q.  You have looked at them on your phone?
2       A.  Yes.
3       Q.  And since then, now they are not able
4   to be viewed?
5       A.  No, but I am sure they are still in
6   the inbox.  It is not like I went through -- I
7   didn't go through and delete the e-mails, or
8   whatever.
9           (Exhibit 29, 8/6/2019 e-mail exchange,
10  marked for identification.)
11  BY MR. BARKAI:
12      Q.  You are being handed a document marked
13  Exhibit 29.  Now, you had testified earlier that
14  you had received some e-mails and voicemails
15  regarding a court hearing tomorrow, right?
16      A.  Yes.
17      Q.  You couldn't remember who sent them to
18  you?
19      A.  Correct.
20      Q.  And you couldn't remember how many you
21  received?
22      A.  No.
23      Q.  And when you looked for them on your
24  phone, you couldn't find them, right?
25      A.  The voicemails?  No, I have it.

1       Q.  Also e-mails?
2       A.  Well, right now my phone is not
3   showing any e-mails.  But, like, this is from
4   August 6, so it is not showing for whatever
5   reason.  I can see the voicemail on my phone.
6       Q.  Do your voicemails get sent to your
7   e-mails?
8       A.  No.
9       Q.  Excuse me, do your voicemails get sent
10  to your e-mail address?
11      A.  No.
12      Q.  They are just accessible through your
13  phone?
14      A.  Correct.
15      Q.  Do you recognize the e-mails in this
16  exhibit?
17      A.  29, yes.
18      Q.  Correct.  You do recognize these?
19      A.  Yes.
20      Q.  What are they?
21      A.  They are e-mails asking me what time
22  and day I can do this -- I can do the next call.
23      Q.  Did you receive this e-mail from
24  KarenD@vawd.uscourts.gov on August 22, 2019, at
25  12:24 p.m.?

1       A.  Yes.  That is not when I read it.  I
2   read it little bit after that.  But, yes.
3       Q.  You did receive it?
4       A.  Yes.
5       Q.  Do you see when Miss Dotson asks, what
6   time works best for you and I'll get the call
7   set up?
8       A.  Uh, yes.
9       Q.  Did you respond to her?
10      A.  Umm, I don't know if I did or not.
11  But I think -- no, I don't think I responded to
12  her.  But I definitely seen this e-mail.
13          I think by the time I saw this -- yes,
14  that's what it is.  The next e-mail is three
15  days later, and I didn't see that e-mail until
16  she had already sent back that'll take place at
17  3:30.  So, by that time I didn't respond to her,
18  because I didn't realize -- or I -- you know,
19  the time was already set and that is a fine time
20  for me.
21      Q.  You did not respond to Mrs. Dotson's
22  e-mail because you didn't see it until August 5,
23  2019 when Mr. Bloch sent the e-mail?
24      A.  Correct.
25      Q.  Do you see where Mr. Bloch told Miss

1   Dotson, we reached out to Mr. Kline on Friday
2   regarding this conference call, we have not
3   received any response?
4       A.  Yes, I see that.
5       Q.  Is that wrong?
6       A.  I mean, I guess.  I -- I don't know
7   who we would be.  The only person that called me
8   or that would have called me would be -- I guess
9   that is from you guys.  But I don't know -- is
10  it 929 is the number up there?  I don't -- I
11  don't recognize anyone calling me from that
12  number.
13      Q.  You have not received a phone call --
14      A.  The only --
15      Q.  -- from a number beginning 929; is
16  that right?
17      A.  No.  The numbers that I am receiving
18  -- the calls I am receiving from are -- are 540
19  numbers, which are Virginia.
20      Q.  What about an e-mail from Mr. Bloch?
21  Did you receive an e-mail from Mr. Bloch?
22      A.  Yeah.  But it was after they had
23  already confirmed the time and date.
24      Q.  It was this e-mail here?
25      A.  Yes.

MAGNA®
LEGAL SERVICES

1    Q.  You did not receive an e-mail before
2  this e-mail about the time and date of this
3  conference?
4    A.  I didn't see it, no.
5    Q.  You didn't see it?
6    A.  No.  I mean, like I said, they sent
7  this to me August 2.  I must have checked my
8  e-mail on the fifth.  And when I -- they had
9  already approved the time.  So, I was okay.
10   Q.  Did you not see an e-mail from Mr.
11 Bloch because your phone does not have any
12 messages on it after June 11?
13   A.  No, I don't think so.  Because, like I
14 said, I had opened that up today earlier and it
15 was -- it was working.  It was showing the
16 e-mails I was getting today and yesterday.
17        MR. BARKAI:  Let's take a break.
18        THE WITNESS:  Okay.
19        MR. BARKAI:  We'll go off the record
20 for a few minutes.
21        THE VIDEOGRAPHER:  Time is 4:54 p.m.,
22 we are going off the video record.
23        (Recess was taken.)
24        THE VIDEOGRAPHER:  The time is now
25 5:04 p.m., we are back on the video record.

1        (Exhibit 30, text messages, marked for
2  identification.)
3  BY MR. BARKAI:
4    Q.  Mr. Kline, you are being handed a
5  document that is being marked Exhibit 30.
6        Do you recognize this document?
7    A.  No -- there are messages.  I don't
8  know who they are between.
9    Q.  Do you see at the very top of Page 1,
10 Eli Mosley +1 (610) 406-2229 at the very top of
11 Page 1?
12   A.  Yes.
13   Q.  Is that your phone number?
14   A.  Yes.
15   Q.  Is that your alias that you have used
16 in the past?
17   A.  Yes.
18   Q.  Are these your text messages?
19   A.  Yes.  I assume so, yes.
20   Q.  These are your text messages?
21   A.  Yes.
22   Q.  Were these text messages with Erika
23 Alduino, to your recollection?
24   A.  Yeah.  I mean, I don't know who these
25 -- I have to read through all these to see who

1  they are with.  But it is kind of formatted
2  strangely.
3        I mean, this is me, right?  And this
4  is somebody else.  I don't know who this is.
5  And this is Erika, and this is me, this is
6  Erika.  And who is this?  Do we know who this
7  is?
8    Q.  Do you see at the bottom of Page 1 the
9  question, Jason, is that your 434 number?
10   A.  Oh, okay.  This is a group text.
11 Okay.  That makes more sense.  Okay, yes.
12   Q.  Does that refresh your recollection
13 that this was a conversation that you had over
14 text with Erika Alduino --
15   A.  Yes.
16   Q.  -- and Jason Kessler?
17   A.  Yes.
18   Q.  Do you see on Page 1 where you said
19 please just trust me -- this is the top of Page
20 1 -- please just trust me that I am taking care
21 of everything that needs to be done.  We have
22 two months and don't need to rush this.  I am
23 doing this full time and can handle it.
24   A.  Yeah, I see that.
25   Q.  What did you mean, I am doing this

1  full-time?
2    A.  Umm, well, two things.  First of all,
3  did you un-mute the phone for those guys?  And
4  isn't this supposed to be about the discovery
5  stuff?  And this seems more about the case.
6    Q.  The phone is not muted.  As I said at
7  the outset, even if there are objections, you
8  are still required to answer my questions.
9    A.  Okay.  So, what was your question
10 again?
11   Q.  The question was, what did you mean
12 when you told Jason Kessler and Erika Alduino, I
13 am doing this full-time and can handle it?
14   A.  I didn't have a job at the time, so I
15 was trying to get as much stuff organized as I
16 possibly could.
17   Q.  Was organizing Unite the Right a
18 full-time job for you?
19   A.  I mean, not hours or pay, no.  But
20 that is what I was doing.
21   Q.  It was the only thing you were doing?
22   A.  Yes.
23   Q.  On Page 2 of this text message
24 conversation, do you see where you told Erika
25 Alduino and Jason Kessler, I am putting together

MAGNA
LEGAL SERVICES

1  this document now and will send it to you guys
2  after it is done?
3      A. Yes.
4      Q. Does that refer to the same
5  operational document of which we have seen
6  copies before?
7      A. I imagine so. I mean, I don't know
8  for sure. But I imagine that is what it is.
9  Because there is no other types of documents I
10 put together.
11     Q. Did you send planning documents to
12 Jason Kessler and Erika Alduino?
13     A. Both on Discord, yes.
14     Q. You send them --
15     A. The copy paste, or the -- I'm sorry,
16 the link for G -- like, Google docs, or
17 whatever.
18     Q. You sent the link via Discord?
19     A. Yes.
20     Q. Did you share the documents with
21 anyone else?
22     A. After it was done -- I mean, I don't
23 know which one they are talking about here. But
24 usually when I was done sending it to those
25 guys, then we would post it on the Discord. So,

1  like, everyone can see it, or whatever.
2      Q. How many versions of that document
3  existed?
4      A. Like I said, it was kind of, like, a
5  living document. So, there is no really way to
6  say, like, if something changed day-to-day. I
7  would edit it. Then once a week I would send it
8  to these guys, make sure they knew what was
9  going on.
10     Q. You sent the documents to Mr. Kessler
11 and Miss Alduino once a week?
12     A. Uh, I mean, not -- sometimes it was
13 every other week, depending on how close it was
14 to the event, or every three weeks, or whatever
15 it was.
16     Q. Did you send the documents to other
17 people?
18     A. It was post -- whenever there was a
19 document, it was posted on Discord.
20     Q. Did you send the documents to other
21 people approximately once a week or once
22 every other week?
23     A. It is -- like I said, at the beginning
24 when we first started planning it, it was maybe
25 once every three weeks. Then towards -- closer

1  we got to the day of the event, it was, like,
2  every week, you know, or every couple days --
3  every couple days I would send one out.
4      Every time I had one, I would post it
5  on Discord.
6      Q. You have in front of you Exhibit 7,
7  right? Exhibit 7 is a --
8      A. Oh, yeah.
9      Q. -- is what we have discussed before as
10 the planning document?
11     A. Yes. This is one version.
12     Q. This is one version?
13     A. Yeah. Like I said, it was a living
14 document that kept going. This is one of the
15 earlier versions. This might be the version
16 from what they are talking about here. Umm, I
17 don't know what the date is on this though.
18     Q. Do you see on Page 1 of this document
19 that the date is June 11, 2017?
20     A. Yeah, okay. Perfect. This is June
21 11, and this one is June 7. So, yeah, that
22 makes sense.
23     Q. On Page 4 of this document, do you see
24 the sentence --
25     A. Which one?

1      Q. Page 4 of Exhibit 7, about halfway
2  down the page. This report states there will be
3  two different reports like this every week
4  leading up to the event where it will switch to
5  every day.
6      A. That ended up being not accurate.
7  That was the original intention. But we didn't
8  need to send that out as often as that.
9      Q. But you still sent it out frequently;
10 is that right?
11     A. Yes. Like I said, just like this
12 says, the closer we got to the event, the more
13 frequent I sent them out.
14     Q. And this document states the first
15 version will be for leadership and Alt-Right
16 groups. The second version will be for the
17 general attendees and Alt-Right/New Right
18 groups?
19     A. Yes.
20     Q. So, there were two versions?
21     A. Again, that was something that was
22 originally planned. But the -- I mean, this
23 was, what, like, two months before the event.
24 There ended up only ever being one version.
25     Q. There ended up only ever being one?

MAGNA
LEGAL SERVICES

1    A. Yes.
2    Q. But on different dates you created
3  other versions, right?
4    A. Umm, yes. So, there is -- there is
5  one of these -- like, there is one in here for
6  6/11. There is another one that got posted
7  probably two or three weeks after this. It was
8  posted in Discord.
9    Q. Were there two versions on June 11?
10   A. No, no.
11   Q. Only one version on June 11?
12   A. Yeah, I don't think I ever did two
13  versions, if I remember correctly. If I did,
14  again, both versions would be posted, right.
15  So, one of the channels in the Discord was
16  leadership, where only leaders had access to, I
17  guess. And it would have been posted there for,
18  like, a leadership one, if I did that. But I
19  don't think I ever did that. I think I --
20  originally that was the plan, but we ended up
21  not doing that.
22   Q. You stated you created a living
23  document that you edited on an ongoing basis,
24  right?
25   A. Mm-hmm.

1    Q. Did you have multiple living
2  documents?
3    A. No. It was just one -- it was
4  literally just one -- one document the whole
5  time.
6    Q. Do you see at the top of this document
7  on all pages it states, this version of the
8  document is to only be shared by and with group
9  leaders. Do not share with other attendees.
10  Another version will be released for them?
11   A. Yes. This is something on this one,
12  like I said, on the earlier version, these
13  versions, that was the intention, umm, was to
14  have multiple versions. We ended up -- I don't
15  think doing that anymore.
16    MR. BARKAI: Let's go off the record
17  just for a moment.
18    THE VIDEOGRAPHER: The time is 5:12
19  p.m., we are going off the video record.
20    (A discussion off of the record took
21  place.)
22    THE VIDEOGRAPHER: The time is now
23  5:13 p.m., we are back on the video record.
24  BY MR. BARKAI:
25   Q. Mr. Kline, you described that the

1  intent was to have multiple versions on a given
2  date, but you ended up with only one version on
3  each given date; is that right?
4    A. Yeah, I believe. Yes, yes. That's
5  how I believe we went through that. But like I
6  said, if it ended up changing, and we -- or if I
7  ended up doing two versions, they would be both
8  on Discord.
9    Q. All versions of this document would be
10  on Discord?
11   A. Yes. Every iteration of this document
12  would be on Discord, on the server.
13   Q. Would the document be anywhere else?
14   A. No.
15   Q. You created this document on your
16  phone?
17   A. Yes.
18   Q. Only ever on your phone?
19   A. Yes.
20   Q. You never used any -- any other device
21  to make this document?
22   A. No.
23    (Exhibit 31, Discord messages from Eli
24  Mosley in Charlottesville, marked for
25  identification.)

1  BY MR. BARKAI:
2    Q. You are being handed a document that's
3  been marked Exhibit 31.
4     Do you recognize what this is?
5    A. One second. I guess these are Discord
6  excerpts.
7    Q. Do you see messages here under the --
8  under the name Eli Mosley?
9    A. Yes.
10   Q. Do you recognize those messages as
11  yours?
12   A. Yes.
13   Q. Could you please turn to Page 6?
14   A. They are not labeled. Is it this one?
15  I think it is the same. Okay.
16   Q. Do you see a message on that page from
17  Eli Mosley?
18   A. Yes.
19   Q. Is this a message that you posted?
20   A. Yeah.
21   Q. Does this appear to be accurate?
22   A. Yes.
23   Q. Do you see that you asked for one
24  representative from each group to jump on a
25  meeting?

1    A.  No.  Because at that point what we did
2  is a lot of the groups had taken over their --
3  so, you know, the groups were sent, okay, you
4  are going to be in this order, or whatever.  Now
5  you take care of your own thing, your own
6  transportation, or whatever it was.  A lot of
7  the groups did -- a lot of them were doing it
8  themselves.
9        But the -- the collection of people
10  threatening the whole rally, or whatever, was
11  many, many people and putting -- putting it into
12  some -- one person put it together.  I just
13  don't know who sent it in.
14    Q.  It was a list of many, many people,
15  right?
16    A.  I would say probably 20 people, yeah.
17  25 people that were threatening the rally.
18    Q.  Did you work on that list on a
19  computer?
20    A.  No.
21    Q.  Did you work on that list on a phone?
22    A.  I didn't work on -- all I did was -- I
23  looked through the list.  I didn't actually put
24  together the list.
25    Q.  When you -- when you looked through

1  the list, how did you look through the list?
2    A.  It was on a Google doc, and I just
3  skimmed through it.  I just scrolled through and
4  I saw, oh, I know this person, oh, I know that
5  person.
6    Q.  Who shared the Google doc with you?
7    A.  Umm, I might have put it together and
8  posted it in one of the channels and said, hey,
9  if you see people threatening the rally, post
10  the information here and we'll get it to the
11  police.
12    Q.  You might have put together the Google
13  doc?
14    A.  I think I just posted the Google doc
15  and people put it -- it was, like, a public
16  Google doc.  You know what I mean?  I think that
17  is how I made it.
18    Q.  And how did you --
19    A.  Or how I -- I shared it, or whatever
20  got done.
21    Q.  How did you post the Google doc?  With
22  what device?
23    A.  On my phone.
24    Q.  You don't remember who sent that to
25  the police?

1    A.  No.  Like I said, I am not entirely
2  sure, but I want to say it was somebody from
3  League of the South, maybe, that was talking to
4  the police about that.  But I don't remember who
5  it was that ended up being the person that
6  handed it off to the police.
7        There was a lot of other stuff.  That
8  was just one of the things.
9    Q.  But you are not able to testify
10  definitively that it was not you, right?  You
11  thought you might have been the person who sent
12  it?
13    A.  It might have been me, it might have
14  been somebody else.  But all I know is that -- I
15  did not send it to the police.  I know that.  I
16  know I did not -- I wasn't the one who sent it
17  to the police.  I know that.
18        But as far as putting the list
19  together, it was either me making a Google doc
20  and throwing it in a chat and people just making
21  it -- kind of, like, a lot of people together
22  making it, or some -- one person taking it upon
23  themselves to put it together.  I just don't
24  remember how it was done.
25    Q.  Mr. Kline, you testified earlier that

1  you only had one phone in 2017, right?
2    A.  2017.  Yeah, I think 2018 is when I
3  got the Walmart phone.  I think it was 2018 when
4  I got that.
5    Q.  The -- so, yes, you had one phone in
6  2017?
7    A.  Correct.
8    Q.  That phone you had in 2017 was your
9  personal phone, right?
10    A.  Correct.
11    Q.  It was your iPhone, right?
12    A.  Correct.
13    Q.  It was your iPhone with the 610
14  number, right?
15    A.  Yes.
16    Q.  That is the number that you have here
17  with you now?
18    A.  Correct.
19    Q.  Mr. Kline, isn't it true that you had
20  three phones in 2017?
21    A.  I don't believe so.
22    Q.  You had one phone for work in 2017?
23    A.  I am not sure I am following the
24  question.
25    Q.  Isn't it true that you had one phone

1  for work in 2017, and one for personal in 2017,
2  and one for the Alt-Right?
3      A.  I am not sure.  I don't think that is
4  accurate.  I think I only ever had this phone.
5  I had a work phone before I got fired from my
6  job, but it wasn't a cell phone.  It was just my
7  phone at work, my extension.
8      Q.  So, is it your testimony, Mr. Kline,
9  that you did not have, in 2017, one phone for
10  work, one phone for personal matters, and one
11  phone for the Alt-Right matters?
12      A.  I don't think that is accurate, no.
13          (Exhibit 33, 3/31/2017 Discord chat,
14  marked for identification.)
15  BY MR. BARKAI:
16      Q.  You have been handed a document marked
17  Exhibit 33.
18          Do you see that?
19      A.  Yes.  I just don't know what I am
20  looking at.
21      Q.  Those are Discord chats, right?
22      A.  Yeah.  I mean, I guess.
23      Q.  On the top of Page 1, do you see a row
24  with the date March 31, 2017 at 6:37 p.m.?
25      A.  Yes.  But --

1      Q.  Do you see --
2      A.  Go ahead.
3      Q.  Do you see the username Eli Mosley
4  #5269?
5      A.  Yes.
6      Q.  That is your Discord username, right?
7      A.  Yes.
8      Q.  Do you see the message, you should get
9  a separate phone for Alt-Right stuff, then arm
10  it with a kill password to go off between noon
11  and 1:00 p.m.  I activate it before I go out and
12  do things.
13      A.  Yeah, I don't -- I mean, that was -- I
14  mean, that was a lie.  I lied to them on
15  Discord.  That is not true.
16      Q.  You made that statement on Discord,
17  right?
18      A.  Correct.  I mean, I am saying this on
19  Discord to somebody.  I don't -- I don't even
20  know how to -- I don't even know how to do that
21  on my phone.
22      Q.  You agree that you said that on
23  Discord, right?
24      A.  I did say that on Discord.  But that
25  is not something I actually did.

1      Q.  But you are saying -- you agree that
2  you said that on Discord.  But when you said it,
3  it was a lie; is that correct?
4      A.  Correct.
5      Q.  Can you turn to Page 2 of that
6  exhibit, please?
7          Why did you lie on Discord in the
8  message we were looking at on Page 1 --
9      A.  I don't know the -- I don't know the
10  -- I could have been joking.  There is no -- I
11  have no way of knowing, because there is nothing
12  before this.  I have to see it in context.
13      Q.  You previously said it was a lie,
14  right?
15      A.  I mean, it could have been a joke,
16  could have been a lie.  I don't know.  I don't
17  have the context of it.  It starts with that.
18      Q.  You don't know if it was a lie or a
19  joke?
20      A.  I mean, yeah.  Like, it could have
21  been a joke, like, before this.  I just have no
22  idea.  This is just an out-of-context thing.
23      Q.  Do you mind handing that back just for
24  a moment?  Thank you.
25      A.  Which one?  This?

1      Q.  The whole document, please.  The
2  exhibit.  Thank you.
3          Thank you.  On Page 2 of that exhibit
4  in front of you --
5      A.  Yes.
6      Q.  -- do you see a message from you, from
7  your Discord user account, where you state, I
8  have three phones?
9      A.  Wait.  Yeah, I see it.  I see it.
10          Yeah, I definitely don't have three
11  phones.
12      Q.  You made that statement on Discord,
13  right?
14      A.  Correct.
15      Q.  And you made that statement, I have
16  three phones, on March 31, 2017 at 6:38 p.m.,
17  right?
18      A.  Correct.  I certainly do not have
19  three phones though.  I never have.  The only
20  two phones I have had has been the iPhone and
21  the Walmart one.
22      Q.  Looking further down on that same
23  page, do you see a message March 31, 2017 at
24  6:38 p.m.?
25      A.  When?

1    Q. 6:38 p.m.
2    A. Yes, I see.
3    Q. From Eli Mosley.
4    A. Which one? There is -- yeah, the PC
5  one? That is not a huge deal. That one?
6    Q. Do you see a message on March 31, 2017
7  from Eli Mosley stating one for work, one for
8  personal shit, and one for the Alt-Right?
9    A. Yeah, I see that. But, like I said, I
10 did not have multiple phones.
11   Q. Did you make that statement on
12 Discord? Did you write that?
13   A. Yeah. I mean, I did -- I mean, I said
14 I have three phones, right. And I said that one
15 for each thing. But I don't know -- I
16 definitely didn't have three phones. I never
17 had three phones. I don't know why I would say
18 that. I don't know if it was -- if I was
19 joking.
20      The guys that were in this chat -- I
21 don't know who deleted user, Unlimited Power,
22 is. But Gray and Wyatt, or whatever, I know we
23 -- we would constantly joke about stuff. I
24 don't know if that is what this is or not.
25   Q. Why would you say on Discord that you

1  had three phones if it wasn't true?
2    A. Like I said, I don't know -- I don't
3  know the context of these -- this conversation.
4  So, it could be that we were joking about
5  something. I don't know.
6      I definitely didn't have three phones
7  though. The only two phones I have ever had --
8  I mean, the 610 number I have had since, like,
9  seventh grade. And, like, it has only been on
10 two different phones. The other phone I got is
11 the, umm, the Walmart one. I definitely don't
12 have three phones.
13   Q. You testified, Mr. Kline, that you had
14 a computer in 2016, right?
15   A. In 2016, yes.
16   Q. And, Mr. Kline, you testified that you
17 left that computer at your parents' place in
18 2016; is that right?
19   A. In a storage unit, or whatever. I
20 haven't touched it for awhile.
21   Q. You stated that you moved to South
22 Carolina with your girlfriend in 2016, right?
23   A. Umm, it wasn't -- it was -- it was
24 2017, I think. It was the early part of 2017.
25 I think it was the spring of 2017.

1    Q. Did you testify that you moved to
2  South Carolina with your girlfriend in late
3  2016?
4    A. I might have -- it might have been
5  2017, is what I meant. I think it was 2017 when
6  I moved there. I would have to -- I don't know
7  the exact dates. I think it would be 2017
8  though. Because late -- maybe it was late 2016
9  into early 2017. That would make sense.
10 Because I was let go from my job in late 2016, I
11 believe. Which -- and I moved there with her,
12 like, three weeks afterwards. So, that would
13 actually make sense. Like, late -- either the
14 beginning of 2017 or late 2016.
15   Q. When were you let go from your job?
16   A. Umm, I don't know the exact date. It
17 was late 2016, I think it was. It was right
18 around Christmas, I think it was.
19   Q. Who was your employer at that time?
20   A. JC Ehrlich Rentokil.
21   Q. And it was after that point that you
22 moved to South Carolina with your girlfriend?
23   A. Correct.
24   Q. When you moved to South Carolina, you
25 had testified that you did not bring the

1  computer with you, right?
2    A. Right.
3    Q. And you testified that was because you
4  couldn't store it in the car; is that right?
5    A. Yeah. It is a huge -- it is, like, a
6  huge, old tower.
7    Q. So, you did not have a computer in
8  2017, right?
9    A. No.
10   Q. You testified that the only computers
11 that you used in 2017 were Richard Spencer's and
12 your girlfriend's neighbor's computer?
13   A. Correct. Just to print stuff off.
14   Q. Only those two computers?
15   A. Correct.
16   Q. You did not have a home PC in 2017,
17 correct?
18   A. No, not in 2017, no. 2016, like I
19 said, I had the big tower thing.
20   Q. Isn't it true that, in fact, you did
21 have a home PC in 2017?
22   A. What do you mean? I don't understand.
23   Q. Isn't it true that you did have a home
24 PC in 2017?
25   A. I wasn't even -- I don't understand

Case 3:17-cv-00072-NKM-JCH   Document 681   Filed 12/06/19   Page 34 of 37   Pageid#: 1741

MAGNA
LEGAL SERVICES

1  what you mean. I had, like, a desktop. Like, I
2  don't understand. The desktop I had that I left
3  in Pennsylvania while I went to South Carolina.
4  But I don't understand what you mean.
5      Q. Isn't it true that you did have a home
6  PC in 2017?
7      A. Yeah, the one that -- the big, giant
8  tower that is at my parents' place.
9      Q. Isn't it true that you also had a work
10  computer in 2017?
11      A. Not in 2017. In 2016, before I got
12  fired from my job, yes. I had a work laptop.
13      (Exhibit 34, 3/22/2017 Discord chat,
14  marked for identification.)
15  BY MR. BARKAI:
16      Q. You are being given an exhibit that
17  has been marked Exhibit 34.
18      Do you recognize that, Mr. Kline?
19      MR. CAMPBELL: This is just Dave
20  Campbell coming back. I got disconnected.
21  BY MR. BARKAI:
22      Q. Do you recognize that exhibit, Mr.
23  Kline?
24      A. I don't -- is this a Discord message?
25  Is this a Discord message? Is that what this

1  is?
2      Q. This is your Discord chat, right?
3      A. I mean, I don't know what-- I don't
4  know what I am referencing here.
5      Q. But this is your Discord chat, right?
6      A. Correct. But I don't know what I am
7  referencing here. This is just a single
8  message.
9      Q. Do you see, Mr. Kline, on March 22,
10  2017 at 8:42 p.m. you wrote, quote, an hour
11  after my video came out with the kike and the
12  sign, he commented on it with Echo American,
13  question mark. I have the screen cap on my home
14  PC, closed quote.
15      A. Yeah, I am not sure what that is in
16  reference to.
17      Q. Did you write that on Discord?
18      A. I mean, it looks like it might be
19  mine. But it says #Convo. I don't know what
20  that means. That is not me. That is another
21  person, like that is clearly not me.
22      Q. You didn't write this message?
23      A. No, that is not -- that is not even
24  the way I talked online. So, that is not me.
25  That is somebody else named Convo. I know who

1  that is. They got a number next to their name.
2  So, that is not me that said that. That name
3  was Convolution, is what we called him. But
4  that definitely wasn't me.
5      Q. Your testimony is that this was not
6  you, even though you just testified this was
7  your Discord chat?
8      A. No, I can't tell because the way this
9  is formatted. It says my name underneath it,
10  but that is not me. It says it right here. It
11  says it is from Convo.
12      Q. Do you see the beginning of the
13  message the at sign before Convo #5941?
14      A. Yes.
15      Q. Do you recognize that as making this
16  chat on Discord to someone named Convo #5941?
17      A. I mean, I guess. I don't know. Like
18  I said, the formatting of this doesn't look like
19  a Discord message.
20      Q. This is your Discord username, right?
21      A. @Convo, no. The one below that, yes,
22  that is mine. But, like I said, it is taken
23  without any context. So, I don't know what it
24  is talking about, or what this is in reference
25  to.

1      Q. Eli Mosley #5269 is your username,
2  right?
3      A. Correct.
4      Q. Earlier when I asked you if this is
5  your user -- excuse me, earlier when I asked you
6  if this was your Discord chat, you said it was,
7  right?
8      A. Well, that was before I really
9  understood what I was looking at, yeah.
10      (Exhibit 35, 3/22/2017 Discord chat,
11  marked for identification.)
12  BY MR. BARKAI:
13      Q. You are being given an exhibit marked
14  Exhibit 35.
15      Do you recognize this document?
16      A. Yeah. This is another one that is
17  totally out of the context. I don't know what
18  it is referencing.
19      Q. This is a Discord chat that you made,
20  right?
21      A. Umm, I actually I think I know what
22  this one is referencing.
23      Q. The question I asked you was, this is
24  a Discord chat you made, right?
25      A. Correct.

MAGNA
LEGAL SERVICES

1    Q. This was your Discord chat?
2    A. Yes.
3    Q. You made this message on Discord on
4  March 22, 2017 at 5:02 p.m., right?
5    A. Yes.
6    Q. And you wrote on Discord, quote -- you
7  wrote, quote, if he comes in and I have to
8  defend myself, all they have to do is look
9  through my computer and I am fucked. So, not
10  really a good option, closed quote.
11    A. Yeah. So, the only thing I can think
12  of I am referencing there is my computer screen.
13  I had a computer screen that I would -- at my
14  girlfriend's house, we didn't have a TV. We
15  used a computer screen to watch Netflix and
16  stuff like that on.
17       But I don't know -- I don't know --
18  you guys gave me -- are giving these to me with
19  no context. So, I don't know what they are
20  about, what it is talking about. It could be
21  talking about something else entirely than what
22  this conversation -- or what this single comment
23  says.
24    Q. You did make this statement on Discord
25  in March of 2017, right?

1    A. Correct.
2    Q. And your testimony is that this
3  message has to do with a computer screen?
4    A. I don't know, because my -- I can't
5  give a testimony on something when it is
6  literally one sentence. If you want me to look
7  through the entire message, maybe I can get some
8  context what's going on.
9    Q. You just stated at the beginning of
10  one of your prior answers the only thing I am
11  referencing there is my computer screen.
12       That is your testimony?
13    A. I said that is -- I mean, that is
14  probably what I am referencing there. I mean,
15  that is when I am living at the house with my
16  girlfriend. And I know that we had a computer
17  screen as our only screen.
18       But I don't know what I am referencing
19  here with the if he comes in thing. It might
20  totally be a joke. I don't know what it is
21  talking about. I don't know what I am talking
22  about there. I would need the full -- like I
23  said, I would need the full context.
24    (Exhibit 36, 3/31/2017 Discord chat,
25  marked for identification.)

1  BY MR. BARKAI:
2    Q. You are being handed Exhibit 36. This
3  was also a Discord message that you made, right?
4    A. Yes, it looks like it.
5    Q. This Discord chat you posted in -- on
6  March 31, 2017 at 10:38 p.m., right?
7    A. Correct.
8    Q. In this chat you wrote, well, it is
9  not a huge deal, cause the phone is backed up on
10  my PC, closed quote, right?
11    A. I am probably talking about the old PC
12  I left in Pennsylvania when I moved. Because
13  this phone hasn't been backed up for 400-
14  something days, or 600 days, or something like
15  that.
16       Like I said, I left the -- I left -- I
17  left the computer -- you guys can go through if
18  you want. It is, like, a shitty, like, broken
19  computer.
20    Q. Did you back up your phone on the
21  computer?
22    A. Oh, yeah. I mean, way before -- like,
23  in 2016 I backed it up. I haven't backed it up
24  again since, I don't think.
25    Q. Earlier today when I asked you if you

1  had backed up your phone onto a computer or any
2  other device and you said you had not done that,
3  that wasn't true, right?
4    A. Well, what I thought you meant at the
5  time, or what I meant was I haven't backed up
6  the -- I haven't backed up this phone before,
7  like -- 2016 -- 2016, umm, Unite the Right
8  wasn't even a thing yet. We haven't been
9  talking about it. So, it wasn't really in
10  reference to it.
11       But now -- now that I -- obviously I
12  have had this phone for years. It has been
13  backed up at some point on a computer. But it
14  was backed -- so, yeah, it was backed up on an
15  old computer. But it was forever ago.
16    Q. Earlier today I asked you if you had
17  backed up your phone onto a computer and you
18  said that you had not done that. That wasn't
19  true, right?
20    A. Well, not -- right. But when I said
21  that, like I said, I was saying that with the
22  thought of reference to Unite the Right.
23       The phone was backed up before Unite
24  the Right was even -- Unite the Right one even
25  happened, let alone two. So, what I am talking

MAGNA⊗ LEGAL SERVICES

```
 1                    C E R T I F I C A T E
 2
 3       I, Angela N. Kilby, the officer before whom
 4    the within deposition(s) was taken, do hereby
 5    certify that the witness whose testimony appears
 6    in the foregoing deposition(s) was duly sworn by
 7    me on said date and that the transcribed
 8    deposition of said witness is a true record of
 9    the testimony given by said witness;
10       That the proceeding is herein recorded fully
11    and accurately;
12       That I am neither attorney nor counsel, nor
13    related to any of the parties to the action in
14    which these depositions were taken, and further
15    that I am not a relative of any attorney or
16    counsel employed by the parties hereto, or
17    financially interested in this action.
18
19                    _____
                      Angela N. Kilby, Reporter
20                    Notary Public in and for the
                      Commonwealth of Pennsylvania
21
      My commission expires
22    June 2, 2023
23
24
25
```

MAGNA⊗
LEGAL SERVICES