# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                          \*
UNITED STATES OF AMERICA        \*
                                          \*  1:20-cr-6-01-PB
              v.                 \*  February 25, 2020
                                          \*  10:09 a.m.
CHRISTOPHER CANTWELL            \*
                                          \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


<u>CONTINUED TRANSCRIPT OF RECORDED DETENTION HEARING</u>
<u>BEFORE MAGISTRATE JUDGE ANDREA K. JOHNSTONE</u>


<u>Appearances</u>:


<u>For the Government</u>:        Anna Z. Krasinski, AUSA
                                United States Attorney's Office



<u>For the Defendant</u>:        Eric Wolpin, Esq.
                                Federal Defender's Office



<u>Probation Officer</u>:        Janice Bernard

```
 1                    P R O C E E D I N G S
 2          THE CLERK:  This court is now in session and
 3  has before it for consideration a detention hearing in
 4  20-cr-6-01-PB, United States of America vs. Christopher
 5  Cantwell.
 6          THE COURT:  Okay.  Good morning.
 7          Attorney Wolpin, I did receive the addendum
 8  that you filed in this matter and I have reviewed it, so
 9  thank you for getting that to me.
10          Did the government have an opportunity to
11  review that before today's proceeding?
12          MS. KRASINSKI:  Yes, your Honor.  Thank you.
13          THE COURT:  Okay.  Thank you.  Very good.
14          So we had left things last week with a witness
15  having concluded his testimony and it was left also that
16  the government's case would still be open to make any
17  further presentations that it wished to make.
18          Are you calling any additional witnesses?
19          MS. KRASINSKI:  No, your Honor.
20          THE COURT:  All right.  So I'm going to take
21  it then that what you'd like to still do is simply argue
22  through proffers as to your bases for detention.
23          MS. KRASINSKI:  Before argument, your Honor, I
24  would like to proffer regarding the nature and
25  circumstances of the underlying offenses.
```

1          THE COURT:  Okay.  So before I ask you to do

2    that, I'm just going to turn it over to Attorney Wolpin

3    to ask if he has any witnesses.

4          MR. WOLPIN:  No, your Honor.

5          THE COURT:  All right.

6          So I will turn it over to the government and

7    then I will give defense counsel an opportunity to make

8    its presentation to the Court.

9          Please proceed.

10          MS. KRASINSKI:  As to the nature and

11    circumstances of the offenses, the government proffers

12    that the background of this case involves an online

13    dispute between the defendant and members of a group

14    named Bowl Patrol.

15          Beginning about 2018 and ending, to the best

16    of my knowledge, in about January of 2019, members of

17    Bowl Patrol would prank the defendant's radio show.

18          In February of 2019, the defendant alleged

19    that members of Bowl Patrol were responsible for hacking

20    his website.  He believed that the leader of Bowl

21    Patrol, who he knew used an online pseudonym of Vic, and

22    one other Bowl Patrol member were responsible for that

23    hack.

24          And it's important to note that Vic, Victim 1,

25    other members of Bowl Patrol, used pseudonyms when

4

```
1   communicating online in this context.  And pertinent
2   here, sometimes individuals attempt to "dox" these
3   people using pseudonyms, basically to reveal their
4   personal information to the public over the Internet,
5   you know, in an attempt to expose that person, attempt
6   to ruin their life.
7           So fast forward to June 15th, 2019.  On that
8   time -- at that time, Victim 1 briefly entered a chat
9   room on Telegram that included the defendant.  The two
10  then began chatting.  That conversation continued on
11  June 16th, 2019.
12          During the conversation, the defendant sent
13  the following threat to Victim 1:  So if you don't want
14  me to come and F your wife in front of your kids, then
15  you should make yourself scarce; give me Vic; it's your
16  only out; I guess I'm going to have to prove my
17  seriousness.
18          The defendant, in the context of that two-day
19  communication, also made the following additional
20  statements:  I bet one of my incel listeners would love
21  to give her another baby.
22          On Tuesday:  I'm going to send every episode
23  of Bowlcast, along with your identifying information, to
24  whatever the local equivalent of CPS is in your
25  jurisdiction.  This way the information won't be public
```

1    yet.  On Tuesday you should be able to talk your wife

2    and kids -- talk to your wife and kids and get them to

3    all have their stories straight.  Get anything

4    incriminating out of the house, but I'm pretty sure that

5    once that visit comes, you'll understand that this is

6    serious.  If that doesn't work, I'll escalate until I

7    get what I want.  Tell Vic that if he gives himself up,

8    he can save your family.

9         The investigation reveals that the defendant

10   did, in fact, contact Victim 1's local child protective

11   services, although nothing came of that.

12        During that conversation, the defendant also

13   provided Victim 1 with proof that the defendant knew

14   Victim 1's true identity, including providing Victim 1's

15   address and a photograph of Victim 1 and a photograph of

16   Victim 1's family.

17        The defendant was interviewed by law

18   enforcement on multiple occasions.  In addition, he

19   emailed law enforcement many times.  Not once during any

20   of those conversations or emails did the defendant

21   disclose the full nature of his communications with

22   Victim 1 on June 15th and June 16th of 2019.

23        On October 24th, 2019, the FBI showed the

24   defendant a copy of his exchange with Victim 1 and the

25   defendant confirmed that he sent the messages to

6

1    Victim 1.  He added:  I'm a little nervous that I'm

2    being asked about this because, quote, they told him

3    that it was extortion.

4            In an email that the defendant sent to the

5    FBI, he wrote:  I threatened to expose his identity if

6    he continued harassing and defaming me and I did expose

7    him after offering him the out of identifying -- of

8    identifying Vic.  I also called the CPS office in his

9    area.

10           The defendant also emailed the FBI a copy of a

11   recorded call between himself and a female.  In that

12   call, the defendant stated that he had some legal

13   liability for his threat.

14           In his conversations with law enforcement, the

15   defendant stated that he did not have any records of his

16   communications with Victim 1 and that he had deleted

17   those communications.

18           As the Court's aware, a number of the

19   defendant's electronic devices were seized when his home

20   was searched and the examination of his electronic

21   devices shows that he did, in fact, save copies of those

22   communications.

23           Your Honor, would you like argument now or

24   would you like me to wait until the defense has an

25   opportunity to proffer?

1          THE COURT:  All right.  Why don't we do this.

2     I'm going to allow the defense to proffer and then I'll

3     let you make your arguments and then I'll let the

4     defense respond.

5          Thank you.

6          MS. KRASINSKI:  Thank you, your Honor.

7          MR. WOLPIN:  May I just have a moment your

8     Honor?

9          THE COURT:  Certainly.

10         MR. WOLPIN:  Your Honor, I would ask that I be

11    allowed to address the nature and circumstances of the

12    offense within my argument.

13         THE COURT:  That's fine.

14         MR. WOLPIN:  I think from a context

15    perspective, it will make more sense.

16         THE COURT:  That's fine.  Very good.

17         You can proceed.

18         MS. KRASINSKI:  Your Honor, to justify

19    detention, the government has to demonstrate by clear

20    and convincing evidence that the -- that the defendant

21    was a danger to the community or by a preponderance of

22    evidence that he poses a risk of flight or obstruction

23    of justice.

24         Here, the proffer and the testimony

25    demonstrates both.

1              As it relates to danger to the community, the

2     nature and circumstances of the offense charged you've

3     heard a bit about today.  A grand jury found probable

4     cause to believe that the defendant's statements

5     constituted an interstate threatening communication and

6     an extortionate interstate communication, both of which

7     are crimes of violence by statute.

8              The conduct, essentially, is a threat to

9     commit a rape.  And it also commits -- or includes a

10    second thinly valid threat to have one of the

11    defendant's incel listeners also commit a rape.

12             And I think that bears emphasis.  The

13    defendant appears aware of his ability to influence

14    other people.  I think that makes his statements all the

15    more serious, because any victim doesn't know if -- if

16    it's the defendant that's going to carry out a threat or

17    if it's one of his listeners that he has the ability to

18    influence is going to carry out a threat.

19             As it relates to the weight of the evidence,

20    it includes those threatening communications, the

21    defendant's statements about those communications,

22    admitting to sending them, and his lie to law

23    enforcement about whether or not he retained evidence of

24    those communications.

25             As it relates to his history and

1  characteristics, he has a long history of substance

2  abuse, alcohol, heroin, cocaine, crack, methamphetamine,

3  PCP, steroids.

4           The Court has heard a lot that demonstrates

5  that the defendant is essentially volatile.  He makes

6  decisions that are unsafe or dangerous and it includes,

7  for example, storing a pistol in an unlocked container

8  underneath his car that's parked across the street from

9  a school.  Anyone could reach their hand under that car

10  and access that firearm.  It wasn't locked.  All the

11  components were there.  There was ammunition there.

12           Evidence of that includes his Joker post.  He

13  was essentially attempting to exploit fear around mass

14  shootings at the Joker movie.  Why else would he post

15  about having a gun, taking a gun, into the movie?  He's

16  aware that there's fear of mass shootings during the

17  movie.  He may have said that he intended it as an edgy

18  joke, as a publicity stunt, but it could have ended very

19  badly.

20           He has a strong association with firearms, 17

21  total firearms found during the search of his home and

22  his vehicle.  And when the defendant traveled to

23  Charlottesville in 2017, he took a number of firearms

24  with him, including an AR-style firearm, a knife, pepper

25  spray.

1          I know there was discussion on Thursday about

2    that he's not legally prohibited from possessing those

3    by virtue of a felony conviction.  And that's true.  But

4    I would say it's certainly at least questionable as to

5    whether or not he's prohibited from possessing them

6    under 18 U.S.C. 922(g)(3) as an unlawful user of illegal

7    substances.

8          In the bond report, he talks about using

9    Ecstasy three times a month from when he was 2000 -- or

10   from when he was 17 to 2018.  So in August of 2017, when

11   he took those firearms to Charlottesville, he was

12   certainly an unlawful user of Ecstasy.

13         And now, during the search of his home,

14   investigators found vials of clear liquids, bags of

15   unlabeled pills.  It's questionable what those are.

16   They're being tested.  While he may not have a prior

17   felony conviction, I'm not certain his possession of

18   those firearms is legal.

19         His criminal history includes a conviction for

20   violating his bond condition -- conditions and while

21   it's one conviction for that, the evidence -- and,

22   particularly, the attachments to the government's motion

23   to detain -- demonstrate repeated bond violations.  He

24   violated his bond conditions by committing a new law

25   violation, and that was the public swearing and

1   intoxication, and it's worth noting that the initial

2   bond conditions prohibited him from consuming illegal

3   drugs or alcohol.

4              He was also on home electronic monitoring at

5   the time, so that condition didn't serve to deter him.

6              Next he violated those conditions by

7   repeatedly engaging in online conduct intending to

8   intimidate victims in that case.  Again, conditions like

9   electronic monitoring, home confinement, wouldn't

10  address that in this case.

11             Essentially, he committed three types of bond

12  violations; excessive drinking, he wasn't home despite

13  home confinement, and that online harassment.

14             His history and characteristics also include

15  engaging in violence.  This is demonstrated by his

16  activities in Charlottesville, dispensing pepper spray

17  into a counterprotester's face.  And he pled guilty to

18  that.  There's no question about that.

19             He has engaged in continued online harassment

20  of other individuals -- the Court saw online posts about

21  that -- attempting to harass journalists, an attorney

22  representing individuals suing the defendant in a civil

23  matter.  He has no qualms to using that platform to

24  engage in further threats.

25             And he uses -- despite doing many things

1   publicly, he also uses a lot of platforms designed to
2   conceal what he's doing.

3           Telegram, the application that he used to send
4   the messages in this case, is essentially concealed
5   communications.  He uses Bitcoin for his finances.

6           And I agree none of those things are illegal,
7   but they're certainly something the Court can consider
8   in determining whether he's likely to comply with
9   conditions of release and whether or not there are
10  conditions that would allow probation to adequately
11  monitor him.  If -- if he's not disclosing his reliance
12  on cyber currency, if he's using applications that are
13  designed to conceal what he's doing, probation can't
14  effectively -- cannot effectively monitor that.

15          Now, as it relates to his risk of flight, he
16  has limited ties to the area.  He grew up in New York.
17  His mom still resides there.  His on-and-off-again
18  relationship is with someone who lives in Maryland.  So
19  he does not have significant ties to New Hampshire.

20          He lacks steady and gainful employment.  He
21  appears to have last held a regular job in 2013.  He
22  does say he earns approximately $2,000 a month from his
23  four companies, but it's not clear whether this is from
24  actually selling merchandise or just -- or advertising
25  rights or if it's just him asking for donations.

1          And it's concerning to the government that

2     while he did disclose to probation the checking accounts

3     associated with those companies that he doesn't appear

4     to have disclosed anything to probation about his

5     financial holdings and use of cryptocurrency.  He didn't

6     disclose that.

7          I also -- you know, the government doesn't

8     have access to it, but I certainly think the Court can

9     consider in determining whether or not the defendant is

10    likely going to comply with it -- any of the Court's

11    orders whether or not he disclosed that on his financial

12    affidavit.  And, you know, since the government doesn't

13    have access to it, I don't know.

14         But I think the most significant factor as it

15    relates to the risk of flight is the fact that after

16    Charlottesville, he was aware at least as early as

17    August 16th of 2017 when he spoke to Special Agent

18    Christiana that there was a warrant for his arrest.  He

19    was told to turn himself in to the closest police

20    department.  He didn't do so.  He refused to tell Agent

21    Christiana where he was other than generally what state

22    he was in and he waited until August 23rd, 2017, to turn

23    himself in.  That delay is a strong indicator that the

24    defendant is a risk of flight.

25         Based on everything the Court has seen and

1   heard, his -- his history of threatening communications,

2   his ability to incite others to act, his criminal

3   history, his repeated violation of bond conditions,

4   those demonstrate that the defendant poses a danger to

5   the community if released.

6           And his lack of family ties to the area, his

7   lack of steady and gainful employment, his delay in

8   turning himself in despite knowledge of a warrant -- of

9   a warrant demonstrate by preponderance of the evidence

10  that the defendant is a risk of flight.

11          May I have one moment, your Honor?

12          THE COURT:  Yes you may.

13          MS. KRASINSKI:  Thank you, your Honor.

14          THE COURT:  Okay.  Attorney Wolpin.

15          MR. WOLPIN:  Yes, thank you.

16          Chris is not a danger or a flight risk and we

17  believe there are conditions this Court can set to

18  assure his appearance and safety of the community.  This

19  Court has at its discretion through probation quite a

20  few possibilities for that, most of which or all of

21  which we're going to be agreeable.

22          So we're going to suggest that the Court place

23  a drug and alcohol testing obligation on Chris; that the

24  Court allow for the probation officer to order him to

25  participate in counseling; that he be required to reside

1    at the same address he's been living at now for a couple

2    years and which has been confirmed through myself and

3    probation as a continuing option for him; a condition

4    that he not have any firearms, which, considering

5    they're now in the possession of the FBI, becomes

6    something that is unavailable to him without going out

7    and actively seeking firearms; a requirement that he be

8    supervised; a requirement that he not be on any social

9    media platform, whether that be Telegram, Gab, Facebook,

10   Twitter, whatever social media platform is available;

11   and the requirement that he be electronically monitored.

12          The Court, again, has at its discretion a

13   number of these options.  There may even be more.  But

14   those allow the Court to guarantee the safety of the

15   community and his appearance.

16          Setting forth the legal framework of this

17   hearing, there is a rebuttal of presumption as it

18   relates to detention and the defendant has an obligation

19   to present some evidence.

20          As the First Circuit has recognized in the

21   *Jessup* case, basically, a defendant can basically always

22   meet that burden and certainly we would assert we have

23   met that burden throughout, as we presented from his

24   prior monitor as well as background information

25   regarding his stability and connection to the Keene

1    community.

2            That means that presumption becomes just one

3    of many considerations when the Court is considering

4    release and it still does not alleviate the government

5    of its burden to prove by preponderance and by clear and

6    convincing evidence.

7            I'd like to start by addressing Chris's

8    personal history and characteristics.

9            Chris has now been living in the Keene area

10   for most of the last seven years.  He's had the same

11   apartment for the last two -- excuse me, six years, not

12   seven, six -- and has had the same apartment for the

13   last two years.  Both myself --

14           THE DEFENDANT:  Six years I've been in this

15   apartment.

16           MR. WOLPIN:  In this apartment?

17           THE DEFENDANT:  Yeah.

18           MR. WOLPIN:  All right.  I guess I had the

19   shorter end of that.  Even longer in that apartment.

20           But he has been a good tenant.  I have spoken

21   with his landlord.  Probation has spoken with his

22   landlord.  He's agreed that he's been unobtrusive, been

23   a good tenant, someone that's been reliable and has that

24   opportunity to return to that same address, which is

25   something that probation is aware of.

1          Although there is a certain public narrative

2     about Chris and his opinions, while he's been in Keene

3     he's worked incredibly hard to keep a strong and

4     respectful relationship with the Keene Police

5     Department.  I submitted to the Court one example of

6     that through his email to the sergeant and I made

7     reference at least with the officer who testified about

8     another contact he had with the Keene Police Department.

9          In June he had contact with the police

10    department by email and he explained that he'd be happy

11    to permit you or anyone under your command to enter my

12    apartment; I would even gladly provide you a key to my

13    entrance, provided we all agree that use of that key

14    without my permission is no different than kicking down

15    my door.

16          So he's someone who has reached out to Keene

17    PD, has offered up his key, has offered up his

18    cooperation with them while living in Keene.

19          We see that same attitude and intent in his

20    email that was submitted as an exhibit to this Court in

21    relation to the Joker situation, where, A, he apologized

22    for that, said, I realize I went too far, I am sorry, I

23    promise to learn from my mistake.

24          He expressed to them that there was a time in

25    his life where he was antagonistic towards police, but

1   that time was no longer, that he appreciated their

2   professionalism, that he appreciated how they treated

3   him.  And through that officer's testimony, although not

4   there, we know that in relation to that event, he did

5   not resist, he was not noncompliant, and he was

6   absolutely to issue in relation to the Keene Police

7   Department.

8          We see the same thing in relation to the

9   search of his home that happened just in the last couple

10  months where the officer, among quite a few others, went

11  to his home, conducted a search of his home.  Chris

12  didn't resist.  Chris didn't cause any issues at all.

13  He was arrested without problem.

14         As I will discuss, this is consistent with his

15  behavior in this case.  So when we get to the

16  circumstances and nature of this case, he was, despite

17  what the government has said, highly cooperative with

18  the FBI and with the Keene Police Department.

19         As to the Charlottesville situation, which the

20  government has referenced and presented evidence about,

21  ultimately, that was the third rally, to my

22  understanding, my client was attending.  The first two,

23  there were no issues at all; no violence, no arguments,

24  nothing of that type.

25         As submitted in the addendum, Charlottesville

19

1  went horribly, in large part, according to the

2  independent evaluator, because of the failure of the

3  city and the police to adequately address two different

4  sides of a charged issue.

5          Now, as the Court can see through what we

6  submitted, Chris demanded that he would only participate

7  if the police were involved; that he wasn't interested

8  in being in a situation where violence might erupt and

9  the police were not there; that he, in fact, demanded

10 that those who were organizing call the police and

11 inform them of their plans.

12         As noted throughout that much more objective

13 recitation of how Charlottesville occurred that there

14 were efforts on people like Chris's part not to

15 participate in violence, that when Chris appeared at the

16 UVA green, that it was, to my understanding, a gun-free

17 zone and he did not have a gun.  So he abided by

18 obligation not to have one there.

19         The issue ultimately with the mace, which is

20 something that as well, from my understanding, happened

21 to Chris, that he received also pepper spray in relation

22 to his involvement in the protest, that that led to two

23 misdemeanor convictions which, as the Court has seen in

24 the attachment, are quite unspecific as to what actually

25 was the nature of the conduct.

1          Since then, to my knowledge, Chris has not

2    attended any other such rallies, has not been involved

3    in any physical protests or demonstrations and, thus,

4    this sort of isolated incident, which is not consistent

5    with either the history of prior protests or the history

6    since, I don't think lends itself to a conclusion that

7    he is violent of character because of what happened in

8    Charlottesville.

9          Addressing next that my client does have some

10   experience with computers, has held jobs in computer

11   fields.  The police now have his computers; it's my

12   understanding, all of them.  To the extent that the

13   Court is concerned about his access to computers or

14   websites, he can be limited to a single computer.  That

15   computer can be monitored by probation.  He can be

16   excluded from websites like Telegram, if that is a

17   concern from the Court.  And so there are manners in

18   which that can be addressed without detaining him and

19   removing him from his liberty.

20         As to the situation with turning himself in,

21   he turned himself in in relation to Charlottesville.  My

22   understanding of what occurred is he was taking phone

23   calls from the FBI as they contacted him, as is

24   evidenced through the testimony of the officer, but

25   ultimately my client wanted to have a lawyer when he

 1   addressed this issue, worked towards getting a lawyer,

 2   and once he was comfortable with that, he turned himself

 3   in without violence or without issue.  I don't think

 4   that the turning yourself in should become essentially a

 5   weapon against the person indicating in the future we

 6   should assume your noncompliance of bail conditions.  In

 7   fact, I think it's evidence of the opposite.

 8          As to some of the issues that occurred while

 9   on bail, that is -- some are repudiated by the

10   submission from his supervising bracelet monitor who

11   indicated that he was -- made strong efforts to be

12   compliant; that, in fact, when this issue arose with

13   alcohol, which we've acknowledged -- will acknowledge is

14   an issue, which he will have drug testing and alcohol

15   testing for, which if the Court requires counseling, he

16   will attend -- was something that occurred one night,

17   didn't occur again, that he was then placed on another

18   type of monitor which addressed that issue and that

19   issue did not return.

20          The balance of the violation relates to issues

21   between him and other people involved in the case.  For

22   reasons I'm going to discuss when discussing the nature

23   and circumstances of this case, I don't think the Court

24   needs to have such similar concerns between Chris and

25   the individual involved in our present case.

1          Although there is some history of substance

2    use which Chris has admitted and acknowledged, it's not

3    an active addiction at this time.  I think he's

4    acknowledged that alcohol may be a problem that he

5    should address and is willing to address, but this is

6    not someone where heroin, methamphetamine, were found in

7    his apartment.  And I think the Court can address any

8    prior substance abuse issue through counseling and

9    testing requirements.

10         I do think it's important for the Court to

11   understand some things about the nature and

12   circumstances of this offense, as the statute demands.

13   That context is important and for arguments I'm going to

14   make, this offense doesn't indicate the public or even

15   the alleged victim in this case is ever asked.

16         These allegations surround a chat over an app

17   from June of 2019, meaning the allegations are at this

18   point eight months old.  Although the government has

19   contended that Chris was not all that cooperative with

20   police, we know that Chris provided information to the

21   Keene Police Department, including emails to them of the

22   photographs that the government has referenced,

23   indicating that here, here are the photographs that have

24   become part of the government's case about which we're

25   here for; that he met with the FBI to explain to them

 1   what was going on, twice, voluntarily, without

 2   resistance, without a lawyer, without refusal.

 3           What I've heard is no information that the

 4   government has presented that Chris has contacted this

 5   other person in the last eight months.  So we have an

 6   allegation from June.  We have no, to my understanding,

 7   further contact.  There's effort by the other individual

 8   to contact Chris, I believe, but not the other way

 9   around.

10           Now, the types of things said both by Chris

11   and by the other individual involved in this case are

12   not particularly pleasant.  We concede that.

13           If I can just approach and see the exhibit

14   that we presented?  It's marked as Exhibit A.

15           So as the government has discussed, the other

16   side of this conversation was someone who was affiliated

17   with a group called the Bowlcast.  What is before the

18   Court is the Bowlcast Telegram still from their Telegram

19   site which is public and, in particular, a reference to

20   one of their podcasts, which discusses the following.

21   Their synopsis of their own production is:  The Bowlcast

22   returns to answer the big question, discuss the American

23   addiction to nigger ball, disseminate hard truths about

24   kikes' aversion of the CSA and support our valiant

25   school shooters.

1          This group began harassing Chris over and over

2     and over again.  Chris, when he receives harassment or

3     death threats, has presented them in the past to the

4     police department.  We have, for example, from May, an

5     email he sent to Keene PD explaining the threat that

6     he'd gotten, providing that threat to the police

7     department, and explaining what it was all about.

8          In relation to the harassment he was receiving

9     over the Internet, he himself submitted to the federal

10    authorities months before a complaint explaining to them

11    the issue that was going on.

12         So we have a complaint from February of 2019

13    entitled Complaint Referral Form for Internet Crime

14    Complaint Center.  Chris explains that his website was

15    being defaced.  He complained about the Bowl Patrol,

16    talked about this person named Vic, explained that they

17    had had constant spam and harassment of me for months,

18    even as I distanced myself from the group in the wake of

19    the Pittsburgh synagogue shooting.

20         So Chris went to federal authorities, asked

21    them to help.  Chris then, after making the complaint to

22    the federal government, posted online:  Today I

23    submitted a criminal complaint to the FBI naming this

24    Vic individual and another person for defacing my

25    website last night.

1          So he wasn't hiding it.  He wasn't even

2    thinking about it.  He was attempting to engage the

3    other side of the aisle in helping him deal with the

4    fact that he receives a certain degree of harassment.

5    This chat occurred in that framework.

6          The other party, from everything I've been

7    provided, did not go to the police with this information

8    or express concern for his safety to any law enforcement

9    authority.  Instead what this person did was have that

10   interaction posted online, on the Bowlcast Telegram

11   site, or had someone else do it for him.  He then,

12   within days, made another public post in which he

13   exclaimed that Chris was quote, a fed snitch nigger

14   kike, among other things.  This was, unfortunately,

15   relatively par for the course of the Internet discourse

16   on the Bowlcast Telegram site.

17         So there is a legitimate question of whether

18   this was someone who was truly afraid of Chris, who was,

19   I don't know, thousands or however many miles away.

20   Everyone knows where Chris lives.  Chris's home address

21   is quite popularly known.  This individual certainly

22   knew that Chris lived in New Hampshire and this person

23   does not live in this area.

24         Now, the government was aware of these

25   communications.  I can't quite glean from discovery

1   exactly when, but I know in their conversations with

2   Chris this was coming up, so we're in the fall of last

3   year.  They didn't at that point feel compelled by

4   public safety to file a complaint in September or

5   October, November, or December.  They waited to get

6   their indictment.  They were able to do so because this

7   individual was not in any risk.  Again, there's been no

8   evidence presented that Chris has been in touch with

9   this other party at all in the meantime, even though

10  it's clear from the evidence the Court has heard that he

11  was aware of this person's address.

12          And, thus, as far as the nature and

13  circumstances of this offense that brings us to today,

14  because as far as I can tell from discovery, there are

15  no follow-throughs, there's no effort on Chris to

16  continue a dispute with this individual, and this person

17  had their say in a long spree following which in which

18  they called Chris many slurs and names.

19          So the Court is then left with the question

20  based on the nature and circumstances of this offense

21  and his background whether it can set conditions of

22  release to assure safety and appearance.

23          As the Court is certainly well aware of the

24  supreme court quote in *Salerno*, in our society, "Liberty

25  is the norm and detention prior to trial or without

1   trial, is the carefully limited exception.  Liberty is

2   the norm."

3          The Court can set conditions.  Chris will be

4   challenged to abide by them, will be required to abide

5   by them.  If he fails to do so, he can be arrested, he

6   can be detained, he can be charged.

7          With the availability of supervision, the

8   availability of the Court to limit Internet access --

9   and, again, the -- the physical, true, in-person aspect

10  of his history are really limited to Charlottesville.

11  And when you look at what we submitted in relation to

12  Charlottesville, that doesn't express an overriding or

13  constant danger to the community.

14         And so for those reasons, we would argue the

15  Court can set conditions and the government has not met

16  its burden of proving that he's not a danger or flight

17  risk.

18         May I just have a moment?

19         THE COURT:  Yes, of course.

20         Anything further, Attorney Wolpin?

21         MR. WOLPIN:  Just to address his -- the

22  government made some indication or assertion that maybe

23  Chris wasn't honest about his finances.

24         Chris doesn't have a lot of money, whether it

25  be crypto or regular.  I know at least from the

28

1    discovery I've been provided they've gotten access to

2    his bank accounts, they've gotten access to quite a lot

3    of his financial history.  And I don't think that there

4    is some cache of significant money that he's not

5    disclosing to this Court.  I mean, he is in fear that

6    he's not going to be able to make the next rent payment

7    if he's not released today to keep his stuff.  So this

8    isn't, again, someone who has a -- a crypto sort of

9    stash that is being hidden from the Court.

10            And to the extent, again, the Court is going

11   to put a condition that allows for monitoring of his

12   access to websites, that would allow for some

13   observation of that.

14            And, again, I can't speak in great detail,

15   because I haven't had the chance to look at it in great

16   detail, but I have received discovery indicating

17   Bitcoin-type transactions from Bit things and Bit -- I

18   mean, again, there are dozens of holders in relation to

19   his -- his records and history, but it does appear that

20   the government has at least been able to obtain through

21   some of these services some actual information as to

22   context.  But as far as him being untruthful with the

23   Court because he has money stored elsewhere, that is not

24   true.

25            THE COURT:  Okay.  Thank you.  Anything

1   further from the government?

2            MS. KRASINSKI:  I'd just like to briefly

3   respond, your Honor.

4            Let's start with the last point.  It's not

5   about how much money he has.  That's not what the

6   government's arguing.  The government's bringing up his

7   use and reliance on cryptocurrency as it relates to

8   whether or not he's being candid with the Court and

9   probation, which I think is something the Court can

10  consider in determining whether or not he is likely to

11  comply with conditions that the Court will set.

12            As it relates to the defendant's perceived

13  cooperation with law enforcement, at -- he's cooperative

14  to a point, to the point where he wants to be.  He seems

15  to try to create this public persona that he can rely

16  on, saying that, yes, I -- I provide information to law

17  enforcement.  Ands he does provide some information to

18  law enforcement.  But he only does that to a point.  He

19  conceals everything else that he wants to.

20            So, yes, he certainly provided some

21  information to the FBI.  He certainly provided a glowing

22  email to the Keene Police Department after this Joker

23  incident.  But he doesn't reveal everything.  He's not

24  candid about everything.  And this lack of candor is

25  something, again, the Court can consider in whether or

1   not he's going to comply with conditions the Court will

2   set or be candid with probation.

3           As it relates to Charlottesville, regardless

4   of whether or not he requested law enforcement

5   present -- presence, there is no dispute that there he

6   engaged in conduct that was criminal.  He pled guilty to

7   the illegal use of gas and to assault and battery.

8           Also, I -- I think it's worth noting that even

9   in the report that the defendant submitted in his

10  addendum, it -- it points out -- and then I'll just

11  read:  Chris Cantwell recalled that he was instructed to

12  join other guards on the outside of the line.  The

13  guards were selected for their willingness to get

14  physical with Antifa.

15          His willingness to get physical -- his history

16  and characteristics include a willingness to get

17  physical even by the groups and individuals that he

18  wants to associate with him -- with.  They knew him as

19  someone who was willing to get physical.  I think that

20  suggests a danger to the community.

21          As it relates to the nature and circumstances

22  of this offense, when the defendant reported that people

23  had defamed his website, Vic and another person,

24  Victim 1 is not a person that the defendant believed to

25  have hacked and defamed his website.  Victim 1 is a

1    person the defendant believed knew the personal

2    identifying information of one of those people.

3            So he didn't -- the defendant didn't directly

4    go after Vic.  He did it in a circular way.  He went

5    after Victim 1 because of Victim 1's association with

6    Vic, who he believed hacked the defendant's website.

7            And, yes, the N word became -- are slurs that

8    are commonplace on these online chat groups that both

9    Victim 1 and the defendant frequent, but I proffer that

10   rape threats are not.

11           Also, I just want to note that I am not aware

12   of any evidence presented here that Victim 1 has

13   continued to attempt to contact the defendant.

14           Finally, sort of turning a bit again to risk

15   of flight, it's not the fact that the defendant

16   ultimately turned himself in; it's the week-long delay,

17   it's the fact that he hesitated, it's that delay that's

18   the weapon regarding risk of flight.

19           And while the defendant has suggested that the

20   Court has a number of tools that could ensure that he'll

21   appear at court and ensure the safety of the community,

22   including electronic monitoring, including orders

23   regarding what websites he can use and regarding

24   monitoring of his electronic devices, the Commonwealth

25   of Virginia had many similar tools in its toolbox, used

1   those tools, and the defendant violated them anyway.

2   His history of violating bond conditions demonstrates

3   that he's not likely to abide by any here.

4           May I have one moment, your Honor?

5           THE COURT:  Certainly.

6           MS. KRASINSKI:  Thank you, your Honor.

7   Nothing further.

8           THE COURT:  Okay.  Attorney Wolpin, anything

9   further?

10          MR. WOLPIN:  Just very briefly.

11          I understand the minimizing of Chris's

12  cooperation, but I don't think that's quite fair.  This

13  is, again, someone who has brought this repeatedly to

14  their attention.  He has shown up without lawyers to

15  speak with them.  He has provided them, again,

16  photographs that are evidence in relation to this

17  offense.

18          So this is someone who has made an effort to

19  be up front with law enforcement about this situation.

20  This chat was ultimately posted online.  It wasn't

21  something we needed to obtain from Chris to have access

22  to because the whole conversation is available to anyone

23  who wants to go get it online with certain profane

24  pictures of Chris sort of blocking out certain pictures

25  that they put over him, but ultimately the content is

1    available.

2           I think that it is -- as to the individual

3    involved, we've sort of made effort not to identify that

4    person.  I think what the government is saying is this

5    is someone who's quite tangential to this activity of --

6    of contact.  There's some indication in our discovery

7    that there were dozens upon dozens of calls by this

8    person in to Chris.  This person is not someone who's

9    tangentially related to the Bowlcast group.  This is

10   someone who is actively involved over and over again and

11   this is a group that dedicates itself to mass murder.

12          Chris attempted to distance himself from that.

13   As some of what the government has submitted as to his

14   past or his past posts, he has made calls not for people

15   to engage in mass violence and said that was not to the

16   benefit of his sort of political interests as opposed to

17   a group that made that the centerpiece of who they were.

18          As to his delay in appearing, I don't hear

19   anything from the Court that -- or from the government

20   that he failed to appear for court hearings that he had

21   in Charlottesville.  I presume he had a number,

22   including bail revocation hearings, and he appeared

23   to -- as far as I understand, at those hearings.

24          I think it's a dangerous approach to say that

25   someone who seeks out an attorney to turn themself in

1    and then does so is sort of doing something nefarious in

2    making that effort, when they ultimately did turn

3    themself in without issue and without requiring any kind

4    of involvement of police other than him showing up at

5    the door of a police station.

6            As to Charlottesville, I'm not going to rehash

7    that.  His convictions were for the sort of unspecified

8    assault and battery, not for the pepper spray.  It's a

9    little unclear what they are about.  I think the Court

10   can take the totality of the addendum to see what

11   Chris's perspective was and I think the Court can see

12   that in the meantime, there has been no attendance at

13   similar rallies and no repeat of that issue.

14           Other than that, his criminal history is not

15   replete with other instances of physical violence and

16   other than, if my memory serves, a DWI from a number of

17   years ago, really since 19 years old, there hasn't been

18   significant criminal record or significant instances of

19   physical violence.

20           I think if the Court restricts access to

21   social media, that takes care of the kind of conduct

22   alleged here.  The back-and-forth, the sparring,

23   unfortunately, has been common on the Internet and has

24   become common with Chris, sometimes going in both

25   directions, including, again, a number of threats on his

1   life that come his way on, unfortunately, a routine

2   basis.

3          So if the Court restricts that access, I think

4   the Court can be assured of safety.  Again, this other

5   individual is distant, there's been no effort at

6   retaliation or harm in the matter of months that have

7   gone on since then, and we would argue that that allows

8   for the safety of the community to be protected.

9          THE COURT:  Anything further from the

10  government?

11         MS. KRASINSKI:  No, your Honor.  Thank you.

12         THE COURT:  Okay.  Attorney Wolpin, would you

13  like a few minutes to consult with your client to see if

14  there's anything further you'd like to present?

15         MR. WOLPIN:  We're all set.

16         Thank you, your Honor.

17         THE COURT:  Okay.  Very good.  The Court is

18  going to take this matter under advisement and will

19  issue a written ruling.

20         In the interim, Mr. Cantwell, you will

21  continue to be detained.  Okay?  Thank you.

22         MS. KRASINSKI:  Your Honor --

23         THE COURT:  Yes.

24         MS. KRASINSKI:  -- may I make one brief

25  request?

36

```
 1              Government's Exhibits 11, 12, and 14, may I
 2   ask -- move that the unredacted versions of those be
 3   sealed and we will provide the clerk's office with
 4   versions that redact personal information?
 5              MR. WOLPIN:  We have no objection.  And I also
 6   submitted a redacted version of C.  So in our version,
 7   C-1 would remain sealed and C-2 would have the
 8   redacted --
 9              THE COURT:  Okay.
10              MR. WOLPIN:  -- information.
11              THE COURT:  So here's what I'm going to ask
12   counsel to do.
13              After the courtroom clears out, before you
14   leave, will you please just coordinate with my deputy
15   clerk, just to make sure that it's clear which documents
16   you'll be sealing and which ones you'll be providing
17   additional redacted versions of?
18              MS. KRASINSKI:  Yes, your Honor.
19              THE COURT:  Thank you.
20              MR. WOLPIN:  Yes.
21              THE COURT:  I appreciate it.  Thank you.
22              (Proceedings concluded at 11:00 a.m.)
23
24
25
```

C E R T I F I C A T E


      I, Liza W. Dubois, do hereby certify that the foregoing transcript is true and accurate to the best of my ability and belief.


Submitted: 3/25/2020     /s/  Liza W. Dubois
                            LIZA W. DUBOIS, RMR, CRR