# EXHIBIT 1

1   VIRGINIA:   IN THE CIRCUIT COURT FOR THE CITY OF
            CHARLOTTESVILLE

2

3

4   COMMONWEALTH OF VIRGINIA,

5              Plaintiff,

6   v.

7

8   JAMES ALEX FIELDS,

9              Defendant.

10

11

12

13

14

15

16                    COURT PROCEEDINGS

17                     Taken on

18               December 18, 2017
               August 30, 2018
19               October 4, 2018
              October 9, 2018
20               October 29, 2018
             November 15, 2018
21              November 20, 2018
            November 26-30, 2018
22              December 3-5, 2018
            December 10&11,2018
23

24

25

1   **December 4, 2018**

2                                WITNESSES

3   WITNESS – Commonwealth      DIRECT   CROSS   REDIRECT   RECROSS

4   Detective Steve Young       2299     2333

5   Brant Meyer                 2340     2355

6

7   WITNESS – Defense           DIRECT   CROSS   REDIRECT   RECROSS

8   Jeremy Carper               2380     2393

9   Tammy Shifflett             2395     2406

10  Paul Critzer                2407     2419    2422

11  Fred Kirschnick             2423     2429

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2340

```
1              THE COURT:  Thank you very much.  You still can-
2   not talk to any of the other witnesses.
3              A  Correct.
4              THE COURT:  All right, thank you.  Do you have
5   one other witness you want to try to get on?
6              MR. PLATANIA:  If the jury is okay with that,
7   yes.  It should not be lengthy.
8              THE COURT:  Okay.  I suspect they are okay with
9   that.  They're already had two or three breaks.
10              MR. PLATANIA:  Brant Meyer.
11              THE COURT:  Is that Brant with a B as in boy?
12              MR. PLATANIA:  Yes, sir, B-r-a-n-t.
13              THE COURT:  All right.  Mr. Meyer, would you
14   pause and raise your right hand and face the clerk to be
15   sworn in.
16              (The witness was sworn at this time.)
17              THE CLERK:  You may be seated.
18
19
20              **BRANT MEYER**, having been duly sworn testified as
21   follows:
22
23                          DIRECT EXAMINATION
24   By:  Mr. Platania
25
```

2341

1          Q  Brant that's a microphone and it amplifies

2   pretty well but if you could just direct your answers to

3   the jury.  Would you state and spell for the record your

4   first and last name.

5          A  Brant Meyer, B-r-a-n-t M-e-y-e-r.

6          Q  How are you currently employed?

7          A  I'm a staff operation specialist with the FBI.

8          Q  What is a staff operation specialist?

9          A  So basically I'm a tactical analyst imbedded

10  on an investigative squad and that would be a tactical ana-

11  lyst versus a strategic analyst and what that means is a

12  strategic analyst would look at a big picture threat and do

13  research on that.  A tactical analyst is just looking at a

14  specific case, a specific individual.  And my job more or

15  less is to do research and analysis, document that in writ-

16  ing and summarize large piles of information and data and

17  synopsize that for case agents so that they can make deci-

18  sions to help move an investigation forward.

19         Q  You said you're employed by the FBI, correct?

20         A  Correct.

21         Q  Is there a federal local partnership that ex-

22  ists in this area and if there is, can you tell us a little

23  bit about it?

24         A  Yes.

25         Q  And your role in it.

2342

1          A   Sure.  We work with state and local law en-

2    forcement as well as other federal law enforcement quite

3    frequently.  The FBI also has task forces specifically set

4    up where we have full time state and local partners that

5    sit with us. Examples would be joint terrorism task force

6    as well as safe streets gang task force and there's numer-

7    ous others, but those are two that we have in Char-

8    lottesville.

9          Q   Drawing your attention to August 12th, 2017,

10   what was your role as an FBI SOS on that day?  Who were you

11   working with, what were you doing?

12         A   Sure.  So we had agents and analysts imbedded

13   in the command post with the Charlottesville Police Depart-

14   ment and I was in a support role at the office should any-

15   thing take place, but a lot of that was also preparation

16   leading up to the event and sharing any intelligence that

17   we had.

18         Q   Can you talk a little bit about open source,

19   just very generally, open source information and any expe-

20   rience or training you have related to that and sort of

21   what it means just as an overview?

22         A   Sure.  So I'm certified as a trainer for open

23   source intelligence and online operational security.  And

24   basically that's just a long way of saying I help train

25   other FBI employees to find things, not just online but

2343

1      just through open publicly available sources, and so I

2      train colleagues in that.  I've also conducted trainings

3      outside of the FBI in that.

4            Q  Related, you talked about sometimes you'll

5      help case agents and that's sometimes for federal cases

6      there's a federal case agent but the jury has heard from

7      Corporal Steve Young who is the case agent for the prosecu-

8      tion of this matter.  Did you become involved in assisting

9      Corporal Young as a case agent for the case that we're here

10     about?

11           A  I became involved in helping the local and

12     state investigation more broadly, though I didn't work di-

13     rectly with Detective Young.

14           Q  As part of that, working with those different

15     folks, did you conduct an analysis of a Facebook search

16     warrant return?

17           A  I did.

18           Q  I'm going to ask you to just briefly walk

19     through kind of at macro level what an identifier is and

20     how you get them and once you get them what you do with

21     them to sort of search different things and then apply for

22     search warrants just to capture it and analyze it.  That

23     was a very long question, but I know you can simply what

24     I'm trying to ask.

25

2344

1          A   Sure.  So broadly speaking we're trying to

2    link a social media account with a subject of interest.

3    Usually what we'll start with is an identifier and that's

4    just a name for an email address, a phone number, user

5    name, nickname, other social media monikers, anything that

6    we already know is identified with our subject of interest.

7    We start with that and then use open source intelligence

8    techniques which is a short way of saying looking online in

9    an attempt to find other social media accounts that may be

10   linked with those known identifiers.  And then usually what

11   happens is once we have a known identifier and we find a

12   social media account associated with it.  We will then

13   serve a subpoena or a search warrant if we have probable

14   cause.  And then once we receive those returns from the so-

15   cial media company be it Facebook, Instagram, whatever it

16   is, I would then perform analysis on that to further cor-

17   roborate that it does indeed belong to the subject and it

18   can go beyond just searching online for stuff.  There are

19   other investigative methods when agents do interviews with

20   witnesses or family members or other people can say yes,

21   that's his phone number, that's his email address and

22   that's his social media handle and all of that broadly took

23   place conducting the analysis of both the Facebook and In-

24   stagram page.

25

2345

1          Q   During the course of the investigation was a

2    search warrant issued related to the Facebook account of

3    the defendant, James Alex Fields, Jr.?

4          A   Yes.

5          Q   And that search warrant was served and you re-

6    ceived what's called a return.

7          A   Yes.

8          Q   What's a return?

9          A   So basically that's the totality of the data

10   that a user has generated while using their social media

11   account and in terms of the specifics of how we actually

12   receive that, every social media company is different in

13   how they provide that.  For Facebook and Instagram specifi-

14   cally it comes in two formats.  One is a giant PDF and that

15   could be anywhere from five thousand (5,000) to fifty thou-

16   sand (50,000) pages depending on how long the account has

17   been open, how much activity they've had on it.  And then

18   the other format we receive it in usually a series of zip

19   files which is just compressed file folders.  And usually

20   what you can find in there that you wouldn't be able to

21   find in the PDF would be media, so videos and audio that

22   you couldn't just imbed in a PDF file.  So for Facebook and

23   Instagram specifically, they're owned by the same company,

24   that is generally how we receive the returns from the

25   search warrant.

2346

1      Q  If an individual has a Facebook account, is

2  there a feature that I'll call geo location or location

3  history?

4      A  Yes.  You can enable that and it can track

5  your location essentially.

6      Q  The Facebook return associated with Mr. Fields

7  did have geo location and the location history was enabled

8  from July 19th of 2017 to August 12, 2017?

9      A  That's correct.

10      Q  You conducted an analysis of that?

11      A  I did.

12      Q  Judge, move to admit and public Commonwealth's

13  167.

14      THE COURT:  Any objection to 167?

15      MR. HILL:  No objection.

16      THE COURT:  So 167 will be admitted.

17      Q  And, Judge, I'll describe it as a geo location

18  data file.

19      THE COURT:  All right.

20

21      (Commonwealth's Exhibit #167 was received into

22  evidence at this time.)

23

24      Q  So we'll get into some of the specifics, but

25  for the record it looked like there was just an overview of

2347

1   the United States and it sort of zoomed in onto a certain

2   location with a bunch of dates and times and what looks

3   like sort of a dark line.  Just walk through what we're

4   looking at before we get into any of the specifics.

5           A   Sure.  So basically the location history that

6   Facebook gave back came in a PDF.

7           Q   And I'm sorry to interrupt but if you need---

8           A   Sure.

9           Q   There should be an extendible pointer.

10          A   Sure.

11          Q   If you need to point to anything on the

12   screen.

13          A   Okay.

14          THE COURT:  Could I even go a little further than

15   that?  I mean, this day and time people are learning more

16   and more, but I know what a PDF file is.

17          A   Sure.

18          THE COURT:  But somebody night not.

19          A   Sure.

20          THE COURT:  And if you could just tell us what

21   you mean when you say it's a PDF.

22          A   Sure.  It's just a, kind of like a word docu-

23   ment almost.

24          THE COURT:  Except?

25

2348

1          A   Except it doesn't, it doesn't have media or

2    audio in it and usually with a PDF file you can't alter it

3    or edit it usually.  That would be the difference between

4    just a general word processing file.

5          THE COURT:  So it's almost like a picture of a

6    document.

7          A   Correct, correct.

8          THE COURT:  Okay.

9          A   And when those Facebook returns come, they ba-

10   sically, if you're familiar with Facebook, there's lots of

11   different activity you can take place, whether that be com-

12   menting on things, direct messaging with someone else and

13   then a PDF file, it will basically have categories and it

14   will say location history and in that section it literally

15   listed out the date and time and the latitude and the lon-

16   gitude coordinates for the time that that was enabled.  So

17   that's what came to us from the search warrant from Face-

18   book, and then I took that, made sure that the time came in

19   universal time code.  I switched it to eastern standard

20   time and them basically imported it to a Google earth file

21   so that you could geographically display what those points

22   were as opposed to just knowing what latitudes and longi-

23   tudes met along the map. So this is a visual representation

24   of the location history that Facebook gave us back with

25

2349

1    dates and time and the latitudes and longitudes, and that's

2    what the labels are on the map.

3             THE COURT:  Okay, thank you.

4             Q  Feel free to continue to help clarify.  So if

5    someone has a phone and they're traveling between August

6    11, 2017 and the 12th and they've got a phone and their geo

7    location history is enabled, it tracks them, is that---

8             A  Correct.

9             Q  Basically?

10            A  Yes.

11            Q  And it's hitting off of, it's doing something

12   to sort of, we know where the phone is moving.

13            A  Yeah.  It's using GPS technology on the phone

14   to capture those latitudes and longitudes.

15            Q  And again, I want to talk about the timeframe

16   of August 11, 2017 to August 12, 2017.  Ms. Antony, are you

17   able to isolate anything between 16:40 and 16:50:09 as far

18   a pin that we can zoom in on?

19            MS. ANTONY:  On August 11?

20            Q  Yes.  So before you, before you do anything, I

21   want to just make a record of what you're doing.  So Ms.

22   Antony is typing in the word in the upper left, Dunbridge

23   and it's in a box next to something that says search.

24   What's that function on Google earth which is what we're

25   looking at?

2350

1          A   Yeah, it's basically just to be able to search

2    and zoom in on the specific geographic location.

3          Q   I think some of the data is still filling it-

4    self in, but is Dunbridge a location that's still in Ohio?

5          A   Yes.

6          Q   And this is August 11, 2017 at 16:40.  You

7    said you converted it.  So what time is Mr. Fields still

8    looking like he's in Ohio on August 11th of 2017?

9          A   Right.  So you can see there I have the origi-

10   nal UTC time and the eastern standard time of 16:40 which

11   is, you know, just before five o'clock on August 11th, 2017.

12         Q   And then at some point shortly thereafter the

13   phone start tracking from Ohio all the way into Char-

14   lottesville, Virginia.

15         A   Correct.

16         Q   And that's from the afternoon or early evening

17   on the 11th all the way into the very early morning hours of

18   August 12th, 2017.

19         A   Correct.

20         Q   I have what's in front of you marked for iden-

21   tification as 168 and 169.  Are those just two exhibits

22   that show the path of travel with date and time?

23         A   Correct.

24         Q   Judge, move in 168 and 169.  There's not a mo-

25   tion to publish them at this point.

2351

1              THE COURT:  Any objection?

2              MR. HILL:  No objection to either of those.

3              THE COURT:  So they'll both be admitted.

4

5              (Commonwealth's Exhibits #168 and #169 were re-

6    ceived into evidence at this time.)

7

8              Q   Sometimes technology is a good thing and some-

9    times it's not.  We didn't have this problem with our pic-

10   tures.  So does it basically show, though, if we get back

11   into it, he does get into Charlottesville on the early

12   morning hours of August 12th, 2017?

13             A   That's correct.

14             Q   So you talked about a Facebook return.  What

15   is Instagram?

16             A   Instagram is another social media platform.

17   The distinction would be it's primarily for sharing photos,

18   although it has a lot of the same functionality of Facebook

19   in the sense that individual Instagram users can communi-

20   cate publicly with each other, but also directly and in

21   private with each other and the search warrant return we

22   got from Instagram would include the totality of that ac-

23   tivity.

24             Q   Again, using the same techniques with identi-

25   fiers you have previously described, were you able to

2352

1    locate an Instagram account that you associated with James,

2    Alex Fields, the defendant in this case?

3            A   Yes.

4            Q   And did a judge issue a search warrant that

5    gave you the return that you were able to analyze?

6            A   Yes.

7            Q   And you were looking for specific items of in-

8    terest.

9            A   Yes.

10           Q   Are you able to locate what's been marked for

11   identification in front of you as Commonwealth's 170?

12           A   Yes.

13           Q   Move to admit and publish Commonwealth's 170.

14           THE COURT:  Any objection to 170?

15           MS. LUNSFORD:  Is this the post that was the sub-

16   ject of the earlier motion?

17           Q   I'm sorry.

18           MS. LUNSFORD:  Subject to the previous objection,

19   Your Honor.

20           THE COURT:  All right.  I've already made a rul-

21   ing on it but it will be admitted over defense objection.

22

23           (Commonwealth's Exhibit #170 was received into

24   evidence at this time.)

25

2353

1          Q  One seventy (170).  If you could zoom in.  So

2     at the top it says May 12, 2017, private message to

3     Jamicus.  We're going to talk about that in a second, but

4     was that added by Ms. Antony and I just to put the date?

5          A  Yes.

6          Q  And let's show what the image is.  So this is

7     something that Mr. Fields sent to someone else.

8          A  Correct.

9          Q  On his Instagram account.

10          A  Correct.

11          Q  If you can walk through who Jamicus was and

12     how you know it was a sent image to that person.

13          A  Sure.  That's the Instagram handle for another

14     Instagram user and in the Instagram search warrant return

15     it indicated that Mr. Fields' account sent this image to

16     the other Instagram user and it marks basically if you're

17     sending a message in private versus if you're posting some-

18     thing publicly and it also gives a date and a time when

19     that activity took place.

20          Q  And from May 2nd to May 12th the time period

21     preceding this, they had had over a hundred communications

22     back and forth with each other.

23          A  That's correct.

24

25

2354

1          Q   So this is an image that Mr. Fields, kind of

2    likes a text message, it's just Instagram sends to someone

3    else.

4          A   Correct.  He posted, he sent to photo to

5    Jamicus.

6          Q   If you could look in front of you, it's what's

7    been marked for identification as Commonwealth's 171.

8          A   Yes.

9          Q   Did you also obtain that, locate that during

10   your analysis?

11         A   I did.

12         Q   Judge, move to admit and publish Common-

13   wealth's 171.

14         THE COURT:  All right, so 171 is also one that I

15   previously ruled on and will admit it over defense objec-

16   tion.

17         MS. LUNSFORD:  Thank you, Judge.  We would note

18   that objection.

19

20         (Commonwealth's Exhibit #171 was received into

21   evidence at this time.)

22

23         Q   And again, the upper left is the date that Ms.

24   Antony and I put just to assist the jury, but you saw date

25

2355

1    imbedded in what you were looking at that confirmed the

2    date of May 16th, 2017.

3              A  Correct.

4              Q  So you just talked about in Commonwealth's 170

5    a private message to Jamicus and this one is marked differ-

6    ently.  This is marked a public post to Instagram.  What's

7    the difference between the May 16th and the earlier.

8              A  Sure.  So the first one was sent directly to

9    Jamicus, almost like you would use Instagram to text mes-

10   sage someone directly, whereas this one was published to

11   his account so anyone that was following his account could

12   have seen this second image.

13             Q  Thank you, Ms. Meyer.  Those are all my ques-

14   tions.

15             THE COURT:  All right.  Mr. Hill, do you want to

16   go into cross now?

17             MR. HILL:  Yes, sir.

18             THE COURT:  Okay.

19

20                      CROSS-EXAMINATION

21   By:  Mr. Hill

22             Q  Mr. Meyer, the image that we just that was

23   posted publicly on Instagram was later deleted, correct?

24             A  Correct.

25             Q  Do you know when it was deleted?

2356

1             A  No, sir,

2             Q  The image, Commonwealth's Exhibits 170 and 171

3    I'll refer to as memes.  Is that correct?

4             A  Yes.

5             Q  And were you able to determine in your inves-

6    tigation whether that was, that image with the particular

7    writing on it was created by Mr. Fields or whether it was

8    created by in some other location and then copied?

9             A  I was not able to determine that.  I was able

10   to determine that that image and caption existed online

11   previously, but I can't tell who created it.

12            Q  Online in other locations or websites where

13   someone from the public could make a copy of it.

14            A  Sure.

15            Q  The---in your analysis of Mr. Fields Facebook

16   account with the geo location data you were able to pin-

17   point his location within the City of Charlottesville as

18   well, correct?

19            A  Correct.

20            Q  Were you able to determine where he was on the

21   afternoon of August the 12th, 2017 within the City of Char-

22   lottesville?

23            A  There were a number of geo location points

24   during that time.

25

2357

1          Q  Do you have that information readily available

2    on your memory or is---

3          A  I think, I mean, there were hundreds of

4    points.  You could ask me and I can tell you if I remember

5    specifically him being at that point, but I can't guarantee

6    that I'm going to know those off the top of my head.

7          Q  Do you recall---

8          MR. PLATANIA:  In fairness to Mr. Hill.  I think

9    we probably are going to be able to get---

10         MS. ANTONY:  I can see if I can try to pull that

11   up again.  It just was being quirky and I'm---

12         THE COURT:  Okay.

13         Q  Let me ask the witness and then if you can't

14   we'll---

15         MS. ANTONY:  I'm sorry, Mr. Hill.  Would you like

16   me to try to bring it up while you ask or just not distract

17   while you're asking.

18         Q  Yeah, yeah, right.  Let's not waste any time.

19   If you could do it while I'm asking.  If it comes up,

20   great, if it doesn't we'll---

21         MS. ANTONY:  Yes, sir.

22         Q  Do it the hold fashioned way.  Do you recall

23   when he was---there's been testimony that Mr. Fields was at

24   Emancipation Park on the late morning, early afternoon of

25

2358

1    2012.  Were you able to confirm that through the geo loca-

2    tion data?

3              A  That sounds accurate.

4              Q  And if I told you that he was at the park at

5    least until quarter of twelve that day, would that sound

6    accurate to you?

7              A  That would sound accurate without looking, but

8    that sounds accurate.

9              Q  And were you also able to locate him through

10   the City of Charlottesville later on that afternoon with

11   local coordinates at approximately 1:30 at 3rd and Water

12   Street?

13             A  That sounds accurate.

14             Q  And then at 1:36 between Water and the Belmont

15   Bridge?

16             A  Sounds right.

17             Q  And then at 1:38 at 5th and Jefferson?

18             A  Uh-huh, yes.

19             Q  And then at 1:40 on 4th at the Main Street

20   Mall, is that correct?

21             A  That's correct.

22             Q  Facebook allows you to turn that geo location,

23   I guess, locator off, correct?

24             A  Correct.

25

2359

```
1            Q  So if you didn't want anybody to know where

2   you were, you could turn that particular---

3            A  Yes.

4            Q  Okay.  Good to know.  All right.  Judge, I

5   think that's all the information that we need to ask Mr.

6   Meyer.  Thank you.  Thank you, Ms. Antony, for trying.

7            THE COURT:  All right, thank you.  Any redirect?

8            MR. PLATANIA:  No, sir, and we apologize.  We had

9   it working better, so no further questions.  If they want

10  to get into it later but---

11           THE COURT:  Okay.  Do you want to ask that he be

12  excused?

13           MR. PLATANIA:  Why don't we---this is a very good

14  spot to take a lunch break.  Maybe the attorneys can confer

15  with him.

16           THE COURT:  That's fine.  Do you want to have him

17  remain available for right now?

18           MR. HILL:  For right now.

19           THE COURT:  Okay, sure. So you're not released

20  from your subpoena yet.  We are going to take a break, a

21  recess and we'll go ahead and take our lunch break now and

22  members of the jury, every day is different.  Given the

23  fact that we may have some legal things to take up, I think

24  I'm going to give you an hour and fifteen (15) minutes.

25  Any objection to that? So if you can be back here by 2:20
```