**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| **ELIZABETH SINES, ET AL.,** | |
| Plaintiffs, | |
| v. | Civil Action No. 3:17-cv-00072 |
| **JASON KESSLER, ET AL.,** | |
| Defendants. | |

## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

COME NOW Defendants Michael Hill, Michael Tubbs, and League of the South ("the

League"), by counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and move this

Honorable Court for summary judgment on and dismissal with prejudice of all claims asserted

against them in Plaintiffs' Second Amended Complaint. The accompanying Memorandum

provides the grounds for granting this Motion for Summary Judgment.

Respectfully submitted,

/s/  Bryan J. Jones____
Bryan J. Jones (VSB #87675)
106 W. South St., Ste. 211
Charlottesville, VA 22902
(P): (434) 260-7899
(F): (434) 381-4397
(E): bryan@bjoneslegal.com

*Counsel for Defendants for Michael Hill,*
*Michael Tubbs, and League of the South*

1

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 7th day of August, 2020, a true and correct copy of the foregoing

Motion for Summary Judgment was electronically filed with the Clerk of the Court using the

CM/ECF system, which will provide electronic notice to all counsel of record.

/s/  Bryan J. Jones____
Bryan J. Jones (VSB #87675)
106 W. South St., Ste. 211
Charlottesville, VA 22902
(P): (434) 260-7899
(F): (434) 381-4397
(E): bryan@bjoneslegal.com

I further hereby certify that on August 7, 2020, I also served the following non-ECF

participants, via electronic mail, as follows:

Christopher Cantwell
christopher.cantwell@gmail.com

Robert Azzmador Ray
azzmador@gmail.com

Elliott Kline a/k/a Eli Mosley
eli.f.mosley@gmail.com
deplorabletruth@gmail.com

Vanguard America
c/o Dillon Hopper
dillon_hopper@protonmail.com

Matthew Heimbach
matthew.w.heimbach@gmail.com

Richard Spencer

richardbspencer@gmail.com

/s/  Bryan J. Jones\_\_\_\_\_
Bryan J. Jones (VSB #87675)
106 W. South St., Ste. 211
Charlottesville, VA 22902
(P): (434) 260-7899
(F): (434) 381-4397
(E): bryan@bjoneslegal.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

| | |
|---|---|
| **ELIZABETH SINES, ET AL.,** | |
| Plaintiffs, | |
| v. | Civil Action No. 3:17-cv-00072 |
| **JASON KESSLER, ET AL.,** | |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS HILL, TUBBS, & LEAGUE OF THE SOUTH'S MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants, Michael Hill, Michael Tubbs, and League of the South ("movant-defendants"), by counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and for their Memorandum in support of their Motion for Summary Judgment state as follows:

### PRELIMINARY STATEMENT

James Fields acted alone. There is insufficient evidence that he conspired with any of the Defendants to commit racial violence. The Torch March was planned and executed without the involvement of Hill, Tubbs, or League of the South. Indeed, when asked via email several hours before the March whether the League was participating in the Torch March, Hill responded, "this is not our game. We are sending two observers." All the Plaintiffs' injuries resulted from either the Torch March or the Fields car attack. Because Fields was not a co-conspirator with any of the Defendants in this lawsuit and because the movant-defendants did not participate in any manner with the planning or execution of the Torch March, Counts I, II, and III of the Second Amended Complaint should be dismissed as to movant-defendants.

Furthermore, movant-defendants did not conspire to commit racial violence at the Unite the Right Rally. Hill, Tubbs, and the League prepared to defend themselves from the attacks of violent oppositionists. At the Rally, when they were attacked and an attempt was made to prevent them from lawfully attending the Rally, the members of the League of the South forced their way through an Antifa blockade to enter the park and engaged in spontaneous clashes with violent oppositionists. The fact that members of the League clashed with violent political opponents does not support Plaintiffs' claims that movant-defendant's conspired to commit racial violence.

**<u>Table of Contents</u>**

Table of Authorities ........................................................................................................7

Statement of Undisputed Material Facts ........................................................................9

    Background ..............................................................................................................9

    Movant-defendants' Preparation for the Unite the Right Rally ........................13

    Law Enforcement's analysis of the Unite the Right ........................................18

    The Torch March ..................................................................................................19

    Unite the Right Rally ..........................................................................................20

Argument ......................................................................................................................27

I. Introduction ..............................................................................................................27

II. Standard of Review ................................................................................................27

III. The conspiracy claims of Plaintiffs who were injured in the Fields car attack should be dismissed because Hill, Tubbs, and the League of the South were not co-conspirators with Fields...................................................................................................................................28

IV. The conspiracy claims of the Plaintiffs who were injured in the Torchlight March should be dismissed because Hill, Tubbs, and the League of the South did not participate in the Torchlight March and were not co-conspirators with those who committed violence at the March. ....................................................................................................................................29

V. Hill, Tubbs, and the League did not violate 42 U.S.C. § 1985(3) because they did not conspire with the other Defendants to commit racial violence. ..................................................................31

    A. The Court should hold that plaintiffs' claim fails because movant-defendants did not conspire to commit racial violence. ..................................................................................31

        i. Movant-defendants cannot be part of a conspiracy because they were unaware of any plan by their co-defendants to commit racial violence. ..............................32

        ii. A conspiracy should not be inferred from movant-defendants' plans to defend themselves from violent oppositionists.......................................................34

        iii. Movant-defendants' clash with Antifa on Market Street is not evidence of a conspiracy because it was a spontaneous encounter.............................................36

        iv. Movant-defendants' derogatory comments and political rhetoric are protected by the First Amendment and should not be construed as evidence of a conspiracy. ...............................................................................................38

    B. Plaintiffs' claim should fail because movant-defendants' participation in Unite the Right was political and was not motivated by animus toward a protected class. ..............39

        i. The Court should hold that plaintiffs' claim fails because section 1985(3) is inapplicable to political conflict, even violent political conduct. .........................40

        ii. The Court should hold that plaintiffs' claim fails because movant-defendants' opposition to conduct cannot be the basis for designating a protected class. ........43

        iii. The Court should hold that Plaintiffs' claim fails because being affected by movant-defendants' activities does not make oppositionists a protected class. .....................................................................................................44

        iv. The Court should rule that Plaintiffs' claim fails because movant-defendants' activities do not otherwise indicate that they were motivated by a class-based animus. ..................................................................................................45

    C. Plaintiffs' psychological injuries cannot be tied to any incident(s) other than the Torchlight March or Fields car attack................................................................................47

VI. Because movant-defendants did not engage in a Section 1985 conspiracy, neither Hill, Tubbs, nor the League violated 42 U.S.C. § 1986........................................................................48

VII. Because movant-defendants did not conspire to intimidate or harm minorities, they were not part of a common law conspiracy. ................................................................................................48

VIII. Even if a conspiracy to commit racial violence can be established, events other than the Unite the Right rally were beyond the scope of movant-defendants' involvement......................49

Conclusion ..........................................................................................................................50

## <u>Table of Authorities</u>

*Cases:*

*Anderson v. Liberty Lobby, Inc*,
    477 U.S. (1986)..................................................................................................28

*Barwick v. Celotex Corp.*,
    736 F.2d (4th Cir. 1984) ....................................................................................28

*Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*,
    261 F.Supp.2d (E.D. Va. 2003) .........................................................................49

*Beale v. Hardy*,
    769 F.2d (4th Cir. 1985) ....................................................................................28

*Brandenburg v. Ohio*,
    395 U.S. (1969).................................................................................................38

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. (1993)...............................................................................31, 40, 43, 44, 45, 49

*Buschi v. Kirven*,
    775 F.2d (4th Cir. 1985)  ...................................................................31, 32, 40

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 322 (1986)...................................................................................28

*Commercial Bus. Sys. v. Bellsouth Servs.*,
    453 S.E.2d (Va. 1995)..................................................................................48, 49

*Edwards v. South Carolina*,
    372 U.S. (1963)..................................................................................................38

*Fortress Holdings II, LLC v. Patty*,
    95 Va. Cir. (Cir. Ct. 2017) ................................................................................49

*Fox v. Deese*,
    362 S.E.2d (Va. 1987)........................................................................................49

*Frazier v. Cooke*,
No. 4:17-cv-54, 2017 U.S. Dist. LEXIS 190896 (E.D. Va. Nov. 16, 2017) ...................46

*Griffin v. Breckenridge*,
403 U.S. (1971) .................................................................................31, 40, 46

*Harrison v. KVAT Food Mgmt.*,
766 F.2d (4th Cir. 1985) ......................................................................31, 40

*Hinkle v. City of Clarksburg*,
81 F.3d (4th Cir. 1996) ........................................................................31

*Hughes v. Ranger Fuel Corp., Div. of Pittston Co.*,
467 F.2d (4th Cir. 1972) ......................................................................36

*Lenard v. Argento*,
699 F.2d (7th Cir. 1983) ......................................................................32

*Owens v. Commonwealth*,
675 S.E.2d (Va. Ct. App. 2009)............................................................50

*Pinkerton v. United States*,
328 U.S. (1946)..............................................................................31, 49

*Rice v. Paladin Enters.*,
128 F.3d (4th Cir. 1997) ..................................................................38, 39

*Rodgers v. Tolson*,
582 F.2d (4th Cir. 1978) ....................................................................40

*Shirvinski v. U.S. Coast Guard*,
673 F.3d (4th Cir. 2012) ....................................................................48

*Simmons v. Poe*,
47 F.3d (4th Cir. 1995) 27, 31 .......................................................28, 32

*Thornhill v. State of Alabama*,
310 U.S. 88 (1940)............................................................................38

*Trerice v. Summons*,
755 F.2d (4th Cir. 1985) ....................................................................48

*United Bhd. of Carpenters & Joiners, Local 610 v. Scott*,
463 U.S. (1983) ...............................................................................31

*United States v. Newsome*,

322 F.3d (4th Cir. 2003) ...................................................................................................49

*Willis v. Blevins*,
   957 F. Supp. 2d (E.D. Va. 2013) ..................................................................................50

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**Background**

The League of the South ("the League") is a corporate entity that exists to "advance the cultural, social, economic, and political well-being and independence of the Southern people, by all honorable means." Second Interrogs. for Hill at 61.[1] There are currently approximately 250 members of the League. Hill Aff. ¶2. To accomplish its mission, the League pursues two objectives. First, the League seeks to promote the peaceful and lawful secession of the southern states. Ex. 6 ⁋ 1, 10; Second Interrogs. for Hill at 62). The League's second goal is to promote "a return to a more traditional, conservative Christian-oriented Southern culture." Ex. 7 ⁋ 1. League members believe that trends such as globalism, immigration, and the civil rights movement are destructive to Southern history and culture. Hill Aff. ¶3.  They, therefore, view the League's activities as being opposed to those movements. Hill Aff. ¶3.

Michael Hill ("Hill") is a co-founder and the president of the League. Hill Aff. ¶4. He and other co-founders intended the League to be a politically active organization and did not seek 501(c)(3) tax exempt status from the IRS for that reason. Hill Aff. ¶3. Hill periodically posts articles on the League's website, where he uses rhetoric that alludes to political conflict. Hill Dep. 166:5-15; 238:8-13, Ex. 4, Ex. 6; Ex. 8; Ex. 9. These articles are separate from the League's official position papers and represent only Hill's views. Hill Dep. 31:19-24, 32:15-25;

---

[1] When an exhibit is cited, the notation Ex. (exhibit number) will be used. When an exhibit from a deposition is cited, the notation Hill (or Tubbs) Dep. Ex. (deposition exhibit number) will be used.

Tubbs Dep. 55:10-15. Members and officers of the League are free to disagree with Hill, and many have divergent beliefs. Tubbs Dep. 61:18-23.

Hill views organizations that advance the interests of Jews and African Americans as being politically hostile to the League, including Black Lives Matter, the NAACP and the Anti-Defamation League. Hill Dep. Ex.5. He often refers to those organizations as "enemies" or "opponents." Hill Aff. ¶6. In expressing his political views, Hill sometimes speaks derogatorily of African Americans and Jews.  Hill Dep. Ex. 4, 6, 8, 22, 25. Hill also believes an independent South should have a white majority and should not welcome individuals or organizations that would be hostile to that majority. Hill Dep. 34:20-35:7; Ex. 6. However, Hill does not advocate for the use of violence, except in self-defense. Hill Aff. ¶11; Tubbs Aff. ¶7. He advocates for change within the political process by legal means. Hill Dep. 33:24-34:10. For example, Hill has written, "[w]e Southern nationalists do not want a race war (or any sort of war). But if one is forced on us, we'll participate." Ex. 10 �P 2.

Michael Tubbs ("Tubbs") is the League's chief-of-staff and the state chairman of the Florida chapter of the League of the South. Tubbs Dep. 48:21-22; Hill Dep. 228:3-8.

Members of the League formally gather to listen to speakers and to participate in political discourse. Hill Aff. ¶7; Tubbs Aff. ¶4; Baker Aff. ¶2. Members of the League have gathered on several occasions to protest the removal or destruction of monuments dedicated to Civil War-era historical figures. Hill Dep. 143: 15-18. Beginning in 2013, members of the League have protested in locations including Vidalia, GA; Calhoun, GA; Shelbyville, TN; Murfreesboro, TN; Wetumpka, AL; Harrison, AR; Pikeville, KY; and New Orleans, LA. Ex. 11; Ex. 12; Hill Aff. ℙ7.

The League's political adversaries often appear at League events. Hill Aff. ¶8; Tubbs Aff. ¶5; Baker Aff. ¶3. Prior to 2017, only small groups of people would gather to oppose League events. Hill Aff. ¶8. Both League members and the League's political adversaries acted peacefully, and law enforcement did not have a large presence. Hill Aff. ¶7; Tubbs Aff. ¶5. In 2017, larger groups began opposing League events, and law enforcement had a much larger presence. Baker Dep. 85:2-19. At events in Pikeville, KY and New Orleans, LA, law enforcement escorted League members to and from the venues and physically separated oppositionists from League members. Baker Dep. 85:2-19; Ex. 11. Consequently, only isolated scuffles took place at those events. Hill Aff. ¶8; Tubbs Aff. ¶5.

At events prior to August 2017, Hill, Tubbs, and other League members noted the dress and symbols utilized by violent oppositionists. Hill Aff. ¶9; Tubbs Aff. ¶6; Baker Aff. ¶3. Many violent oppositionists dressed in all-black clothing and often wore masks Hill Aff. ¶9; Tubbs Aff. ¶6; Baker Aff. ¶3. They also frequently wore or carried symbols such as red and black flags, an image of two overlapping flags, a symbol of three arrows pointing downward, and a symbol of an "A" inside a circle. Ex. 11 at 0:16, 0:29, 0:32 (videos embedded in the article). These marks are commonly associated with Anti-Fascist Action ("Antifa"). Ex. 13 at 1, 3.

Antifa is commonly understood to be a political movement comprised of loosely affiliated groups. Ex. 14 at 1. Antifa is commonly known for physically obstructing access to events that its adherents believe are associated with fascism. Ex. 14 at 1-2. Antifa is also commonly known for the idea that preemptive violence against "fascists" is acceptable. Ex. 14. Antifa is commonly associated with anarchism. Ex. 14 at 1.

In the interest of safety, League officers take extensive precautions when planning an event. Hill Aff. ¶10; Tubbs Aff. ¶7; Baker Aff. ¶4. From 2013-2017, League officers worked

11

with local officials to obtain permission to gather, if necessary, and to request the presence and protection of law enforcement officers. Baker Dep. 71:18-72:20. League officers also coordinate logistics by 1) encouraging League members to stay in groups, 2) organizing lodging and travel to keep members together and to lessen the financial burden of participating, 3) planning safe routes to and from event locations, 4) identifying a safe place for League members to park their vehicles, and 5) organizing groups to administer first aid to individuals with heat-exhaustion, injuries, or other conditions. Baker Dep. 49:17-21, 96:9-14; Hill Dep. 140:9-11. Before any event, Hill and other League officers instruct members that they are to be courteous, follow the law, obey directions from law enforcement, and use force only for self-defense within the parameters of the law. Ex. 15; Ex. 16 ¶ 4.

In 2017, the League agreed to attend events with the Traditionalist Workers' Party, the National Socialist Movement, and Vanguard America. Hill Dep. Ex. 18. This alliance was termed The Nationalist Front. Id. Hill, on behalf of the League, committed to the alliance. Hill Aff. ¶13. He hoped that holding combined events with a larger attendance would deter violence on the part of Antifa and other violent parties. Hill Dep. 103:8-9. Prior to August 2017, Nationalist Front groups attended events together in Pikeville, KY and New Orleans, LA. Hill Aff. ¶13; Baker Aff. ¶5. Each of these events was planned by a single organization. Hill Aff. ¶13; Baker Aff. ¶5. Other Nationalist Front organizations were merely invited to attend. Hill Aff. ¶13; Baker Aff. ¶5. As with League-only events, a large contingent of law enforcement officers separated attendees from oppositionists, and only isolated scuffles took place. Hill Aff. ¶13; Tubbs Aff. ¶5; Baker Aff. ¶6.

**Movant-defendants' Preparation for the Unite the Right Rally**

Several rallies took place in Charlottesville prior to August 2017. The League had no official involvement in planning or attending those events. Hill Dep. 95:23-96:9. Hill nor Tubbs played any role in those events. Hill Aff. ¶14; Tubbs Aff. ¶8.

In April 2017, Jason Kessler ("Kessler") contacted Hill about speaking at the Unite the Right rally on August 12, 2017. Second Interrogs. for Hill at 42. Kessler also asked Hill to invite League members to attend. Hill Dep. 95:15-16. As with past events, Hill believed that protesting the statue's removal would preserve traditional Southern history and provide an opportunity to broadcast the League's beliefs. Second Interrogs. for Hill at 42; Hill Dep Ex. 14. As such, Hill agreed that the League would attend the rally. Hill Aff. ¶15.

Movant-defendants had a handful of other communications with rally organizers. Hill spoke with Kessler on a few occasions about who would be speaking at the Unite the Right rally and how speakers would safely enter and exit Emancipation Park. Second Interrogs. for Hill at 42; Hill Dep. 150:5-8. These conversations were strictly informational Hill Aff. ¶16. Hill recommended potential speakers, but he had no decision-making power as to who would speak or how event security would be handled. Hill Dep. 115:4-6. Hill spoke with Matthew Heimbach ("Heimbach") and Jeff Schoep ("Schoep") on several occasions about how to safely travel to and from Emancipation Park. Second Interrogs. for Hill at 43-44; Hill Dep. 152:13-24, 153:11-17, 158:5-11. Ike Baker ("Baker"), who handled some planning for the League, spoke to Schoep and two other members of the National Socialist Movement about traveling to Emancipation Park. Baker Dep. Ex. 16; Baker Dep. 117:8-13, 120:11-19. Hill, Tubbs, and other League officers did not know James Fields and did not know of him until after the events of August 11-12, 2017. Second Interrogs. for Hill at 42. Movant-defendants did not have any interactions with Richard Spencer, Andrew Anglin, Christopher Cantwell, Matthew Parrott, Robert "Azzmador" Ray,

Nathan Damigo, Elliot Kline, Moonbase Holdings, LLC, Identity Europa, Augustus Sol Invictus, the Fraternal Order of the Alt-Knights, Michael Peinovich, the Loyal White Knights of the KKK, or the East Coast Knights of the KKK about planning the events of August 11-12, 2017. Second Interrogs. for Hill at 42-46.

Some coordination between organizations involved in the Unite the Right rally took place on the chat application, Discord. Hill Dep. 77:11-15. Kessler established a general Discord chatroom where rally participants could interact. Tubbs Aff. ¶10; Baker Aff. ¶7. Kessler also created separate channels for each participating organization, including the League, where members could interact. Baker Aff. ¶7. Hill and Tubbs attempted to use Discord but were unable to do so due to technical difficulties. Hill Dep. 77:18-21; Tubbs Dep. 195:21-24; Ex. 17. Baker served as the League point of contact for rally organizers on Discord. Baker Dep. Ex. 22. He listened in on planning meetings. Baker Aff. ¶7. These meetings were informational. Baker Aff. ¶7. Kessler did not ask for input, and Baker participated in no group decision-making. Baker Aff. ¶7. League officers did not know of or engage in violent discourse on Discord. Tubbs Aff. ¶10; Baker Aff. ¶7. Some unidentified League members participated in a general Discord chatroom Baker Aff. ¶7.

In June 2017, Hill announced via a press release that the League would attend the Unite the Right rally on August 12, 2017. Hill Dep. Ex. 15. In that statement, Hill wrote that the League planned to oppose "the communist-globalist menace that has manifested itself in our streets in the form of Anti-fascist Action (Antifa), Black Lives Matter (BLM), and the New Black Panther Party," Id. Hill clarified that the League's attendance would consist of "taking a stand in the public square and exercising [their] rights to free assembly and political speech." Id. He further reflected that the League "stood against the enemies of [their] God, [their] folk, and

[their] civilization in the streets of Pikeville (KY), New Orleans, Gainesville (FL), Orlando, Marietta (GA), and other towns and cities." Id. He stated that the League would likewise "[stand] with [their] allies on the right in Charlottesville." Id.

In June or July of 2017, Hill and other League officers became dissatisfied with Kessler's planning. Hill Dep. 154:20-24. Kessler and most other participating groups planned to gather at McIntire Park, 1.2 miles North of Emancipation Park, and shuttle to the rally venue in small groups. Hill Aff. ¶17; Baker Aff. ¶9. Baker, Hill, and other League officers believed that arriving in small groups would put rallygoers at risk of being attacked by violent anarchists. Hill Aff. ¶17; Baker Aff. ¶9; they had seen stragglers attacked at events earlier that year. Hill Aff. ¶17. Hill instructed Baker to make a different arrival plan for League members. Second Interrogs. for Hill at 53. Hill and other League officers believed it would be safer to park near Emancipation Park and arrive as a group. Hill Aff. ¶17. After this decision, Baker stopped participating in meetings on Discord. Baker Aff. ¶9.

As was standard practice before League events, Hill instructed members who would attend the Unite the Right Rally to obey directions from law enforcement, follow the law, and to use only lawful force in defense of self, others, and property. Ex. 15; Ex. 16 ¶ 4.

Baker identified the Market Street garage as a potential parking spot for League members. Baker Dep. 140:6-10. Baker believed that the Market Street garage would be a favorable gathering place because 1) its proximity to a police station would deter Antifa from confronting League members there, 2) the garage's location would enable League members to travel a short distance, as a group, to Emancipation Park, minimizing the risk of violence on the way to the park, and 3) Antifa and other unfriendly parties would be less likely to vandalize the League members' vehicles, because the garage stands next to the Charlottesville Police Station.

Baker Dep. 140:10-18. Baker contacted the Charlottesville Police Department, Albemarle County Sherriff's Department, and Virginia State Police to inform them of the League's plan to get to and from Emancipation Park. Hill Dep. 186:10-11; Baker Dep. 71:18-72:2.

Hill and other League officers invited a few other organizations to walk with League members to Emancipation Park. Hill Dep. 155:5-9; Baker Dep. Ex 26. The Traditionalist Worker's Party and Nationalist Socialist Movement agreed to join in the League's plan. Baker Dep. Ex. 26; Hill Dep. 155:9-16. Together, these organizations agreed to meet at JoAnn's Fabric in Albemarle County, 5 miles north of Emancipation Park, and then drive to the Market Street garage. Hill Dep. 155:11-16, 157:19-158:1, 158:5-14; Baker Dep. 135:10-16.

While planning for the Unite the Right rally, League officers learned of plans by anarchists to commit acts of violence against rallygoers. Hill Dep. Ex. 24; Tubbs Dep. 72:18-73:4. They knew from previous experience that Antifa would likely follow through with plans to violently attack rallygoers. Hill Aff. ¶18; Tubbs Aff. ¶11. They had heard that Antifa had committed similar acts of violence in Berkeley and Sacramento, California and at various Trump rallies. Hill Dep. 170-71; Second Interrogs. for Hill at 43. But they believed that law enforcement would keep violent oppositionists at bay—as they had at previous events—and that League members would be safe in a large group. Baker Dep. 133:11-21, 140:19-41:2, 142:8-14. They felt that they had a duty to voice their political views and to follow through with their promise to attend. Hill Dep. 247:13-15. They also felt that backing out would amount to a forfeiture of their rights to free speech and would encourage future Antifa threats. Hill Dep. 247:13-15. To protect against thrown objects and stray attacks, Hill and other League officers encouraged members to wear helmets and to consider bringing shields. Second Interrogs. for Hill at 53; Hill Dep. 145:24-146:5, 170:24-171:7. A League member volunteered to make some

shields for the rally. Hill Dep. 146:3-5, 147:19-21. Hill and other League officers told members to remain within the parameters of the law when deciding what else to bring. Ex. 15; Ex. 16 ⁋ 4; Hill Dep. 147:10-15. Per Virginia law, Hill forbade members from bringing long guns or knives. Tubbs Dep. 85:17-20.

Many League members, including Hill and Tubbs, view Antifa as a political enemy. Hill Aff. ¶10; Tubbs Aff. ¶12. Throughout 2017, Antifa adherents tried to prevent and disrupt League events. Baker Dep. 85:11-19. A few isolated incidents of violence broke out between League members and Antifa at previous events. Ex. 19, p. 3. Hill and Tubbs viewed the Unite the Right rally as an opportunity to stand up to Antifa by publicly gathering and disseminating their message. Before the Rally, Hill stated:

> "In response to the Alt-Right's peaceful demonstration in support of the Lee Monument on May 13th, the City of Charlottesville and roving mobs of Antifa have cracked down on the First Amendment rights of conservatives and right wing activists. They have threatened our families, harassed our employers and tried to drive us from public spaces with threats of intimidation. We are not afraid. You will not divide us."

Ex. 20.

Hill and other League officers strictly condoned only lawful, defensive use of force. Ex. 15; Hill Aff. ¶21; Tubbs Aff. ¶12. Some League members, including Hill and Tubbs, did not shy away from the opportunity for League members to confront violent oppositionists with defensive force. Hill had previously congratulated a League member who contended with anarchists who had attacked him at another event. Hill Dep. Ex. 26. After learning of Antifa's plans to use violence at Unite the Right, Tubbs commented that some League members had anticipated the possibility of clashing with Antifa and even looked forward to it. Hill Dep. Ex. 24. Another League member commented that the League should have a codeword to communicate that League members should "unleash hell" on Antifa adherents in the event that they become

violent. Hill Dep. Ex. 27. No one responded to that comment, and no such codeword was ever established or used. Hill Dep. 182:18-20; Baker Dep. 83:24-25.

**Law Enforcement's Analysis of Unite the Right**

Prior to the events on August 11th and 12th, 2017, the City of Charlottesville had reliable intel that anarchists intended to disrupt the Unite the Right rally. Jason Kessler and the Foundation for the Marketplace of Ideas ("the Foundation") warned Charlottesville officials, including the mayor, city council, and police chief, that groups of anarchists intended to disrupt the Unite the Right Rally. Ex. 21, Ex. 22, Ex. 23. They warned the City that violent anarchists intended to physically prevent rallygoers from accessing Emancipation Park and planned to commit acts of violence. Ex. 21, Ex. 22, Ex. 23. The Foundation pointed out that failing to intervene would amount to a heckler's veto of First Amendment rights and could lead to violence and injuries. Ex. 21, Ex. 22, Ex. 23. The City of Charlottesville was also aware that a call had gone out for "anarchist, anti-fascist, and anti-authoritarian groups" to "converge" on the rally. Ex. 24. The City had intel from a credible source that violent anarchists intended to attack law enforcement and rallygoers with soda cans filled with cement. Ex. 25, p. 2. As noted in the City's internal memo, this was a tactic Antifa had used at a Rally in Berkeley. Id.

Prior to August 2017, the Charlottesville Police Department prepared internal reports on known Unite the Right attendees. Ex. 26. In the report on Hill, Sergeant Newberry concluded that Hill often spoke of being ready for a fight but never called for violence. Ex. 27, p. 2. Sergeant Newberry also found no previous acts of violence committed by Hill. Ex. 28, p. 3. In the report on the League, Sergeant Newberry found "nothing . . . indicating a call for violence" associated with League protests. Ex. 29, p. 1.

The Charlottesville Police Department also noted other groups that were hostile to rallygoers. In the months leading up to August 2017, groups such as Cville Solidarity instructed adherents to "refuse to let [Nazis] sit peacefully in a public place." Ex. 30, p. 1. These groups further instructed, "Do not shame others for taking on tactics they deem necessary. Do not allow for false equivalencies of violence on both sides." Ex. 31, p. 2.

**The Torch March**

Hill and most League members arrived in Virginia on the afternoon of August 11, 2017. Hill Aff. ¶22; Tubbs Aff. ¶13. Tubbs arrived late that night. Tubbs Dep. 87:8-10. Most—if not all—attendees were not from the area and were unfamiliar with the area. Hill Dep. 184:21-185:2, 187:15-17, 24. Many traveled long distances. Hill Dep. 234:2-13. Most League members, including Hill and Tubbs, stayed at a campground near Madison, Virginia that League officers had arranged for members. Hill Aff. ¶22; Tubbs ¶13. That evening, Hill, Tubbs, and League members who had arrived, as well as Heimbach and Schoep, held a meeting to prepare for the following day. Hill Dep. 148:6-15; Tubbs Dep. 93:4-25. In that meeting, Tubbs reiterated Hill's directions related to obeying the law and using violence only in self-defense. Hill Dep. 180:19-181:3; Baker Dep. 131:8-18; Tubbs Dep. 95:22-97:9. Baker related the plan to park on Market Street and walk to the park. Baker Dep. 131:13-17; Tubbs Dep. 68:2-7, 68:21-69:3.

Hill, Tubbs, and the League did not participate in the Torch March. Hill Dep. 129: 4-19; Hill Dep. Ex. 19; Baker Dep. 126:3-7. Hill and other League officers came to Charlottesville only to attend the Unite the Right rally. Hill Aff. ¶23; Tubbs Aff. ¶14. As such, Hill, Tubbs, and the League did not participate in the Torch March. Hill Dep. Ex. 19. Hill asked two League members to act as observers of the March. Hill Dep. Ex. 19. Before the Torch March, when asked if the League was participating in the Torch March, Hill said no. Hill Dep. Ex. 19.

**Unite the Right Rally**

On the morning of August 12th, League members loaded into vehicles and departed from the campground where they were staying. Hill Dep. 199:16-18. Before leaving, League officers distributed the 12 shields and instructed the recipients to use them only defensively. Hill Dep. 148:2-5; Tubbs Dep. 80:14-24. The League gathered in the parking lot of JoAnn's Fabric in Albemarle County with the other Rally attendees who broke off from the main group of Rally attendees. Hill Dep. 199:20-200:6; Baker Dep. 135:10-16. From there, they drove to the Market Street garage. Hill Dep. 200:6-9. After arriving, officers from the various organizations directed rally attendees to form a line. Hill Dep. 200:21-23. Hill instructed the League members with shields to join him at the front of the line. Hill Dep. 171:14-18. The groups then left the parking garage and walked West on Market Street toward Emancipation Park. Hill Dep. 201:19-21. As the group progressed, observers and counter protestors stood on the sidewalk and road. Ex. 39 at 5:40. The rallygoers gathered closer together and continued toward the park. Id. Oppositionists threw objects at the group as they progressed toward the park. Tubbs Aff. ¶15. Unidentified rallygoers and oppositionists shouted insults at one another. Hill Aff. ¶24.

Rallygoers from the main body had already arrived at Emancipation Park from McIntire Park. Hill Aff. ¶25; Tubbs Aff. ¶15. A large crowd of people who opposed the rally ("oppositionists") had also congregated around the park Ex. 39; Hill Aff. ¶25; Tubbs Aff. ¶15. That morning a crowd of 100 Antifa members had marched down Market Street in front of the park. Ex. 33. Additional Antifa members were at McIntire Park, where the main body had gathered. Id.

As the group neared Emancipation Park, a crowd of oppositionists gathered on the east side of the intersection of Market Street and 2nd Street. Ex. 35 at 6:25-6:30. The crowd linked

arms to form a blockade between the group and Emancipation Park. Ex. 36. Most of the oppositionists in the blockade were white-skinned and appear to be mostly male. Ex. 36; Id. at 6:36. Several were dressed in Antifa-like, all-black clothing. Id. One wore a mask over his face. Ex. 35 at 6:36; Tubbs Dep. Ex. 16. At least five others had handkerchiefs tied around their necks. Ex. 35 at 6:36. At least three carried red and black flags, a common anarchist symbol. Id. None of the oppositionists wore symbols to indicate other ideological or group sympathies. Id.



Ex. 36.

Of the four entrances to Emancipation Park, police had barricaded off the northeastern and northwestern entrances. Ex. 36; Hill Dep. 185:10-13, 185:23-186:2. The blockade stood between the rallygoers and the southeastern and southwestern entrances. Hill Dep. 185:15-20,186:5-11. Law enforcement were congregated and remained behind a barricade on the north side of the intersection—behind the blockade of oppositionists. Ex. 56, p. 135, 139; Hill Aff. ¶25; Tubbs Aff. ¶15. Law enforcement took no action to separate the groups or to keep the peace or clear the public street. Hill Aff. ¶25; Tubbs Aff. ¶18. Charlottesville City Police Chief Thomas was quoted as saying that upon the first signs of open violence on Market Street, "let them fight, it will make it easier to declare an unlawful assembly." Ex. 56, p. 133.

The oppositionists remained in the road as the group approached. Ex. 35 at 6:25-6:43. Tubbs and another League member tried to push their way through the blockade. Tubbs Dep. Ex. 13 at 0:29-0:30. As they did, oppositionists punched at their heads. Ex. 37 at 0:22-0:23. One oppositionist swung a club at Tubbs's head. Tubbs Dep. Ex. 13 at 0:30-0:31.



Others from the group then pushed through the blockade with their shields. Ex. 37 at 0:23. Fights erupted between the political opponents. Id. Most fights occurred between rallygoers and oppositionists. Id. But, in the chaos of the scene, several oppositionists also attacked one another. Ex. 38 at 0:02-0:08. As Tubbs struggled with one oppositionist, another man struck him in the head with a rod and then ran away through the crowd. Id. at 0-0:03.

Tubbs initially walked to the east side of the intersection but later joined the smaller group. Tubbs Dep. Ex. 13 at 0:56-1:25. A crowd of violent oppositionists gathered in front of Tubbs. Tubbs Dep. Ex. 13 at 1:46-1:48. Several people in the crowd wore all-black clothing and protective gear. Id. at 1:55. They carried a banner that read "DC Antifascist Coalition" and carried an Antifa flag depicting two overlapping flags Id. at 1:55. Another group carried pink and black shields that used an anarchist pattern, diagonally dividing the colors. Tubbs Dep. Ex. 13 at 2:02. The violent oppositionists again attempted to block the rally goers from entering the park. (Heaphy Report p. 130). The police stood behind the barricades and watched. Id.



Exhibit 13

Groups of counter protestors gathered on both sides of the park entrance as rallygoers entered. Ex. 39 at 8:47-10:30. Counter protestors on the west side of the park entrance chanted "F*** you Kessler," "Follow your leader and kill yourself," and "Nazi scum off our streets." Ex. 39 at 2:18, 12:14, and 13:03.

After the group entered the park, a crowd of press and oppositionists gathered in front of the southeast entrance. Hill Aff. ¶27; Tubbs Aff. ¶16. Peaceful and violent protestors intermingled. Hill Aff. ¶27. Some carried signs that read "killing Nazis is my heritage," "this machine kills fascists," and "smash white supremacy" Ex. 40; Ex. 41; Tubbs Dep. Ex. 17 at 1:51. Many in the crowd wore and carried Antifa imagery. Hill Aff. ¶27; Tubbs Aff. ¶16. Oppositionists threw objects at rallygoers, including bricks, feces, paint, water bottles filled with urine, frozen water bottles, and chemical agents. Ex. 33; Ex. 48; Baker Dep. 148:16-19. Rallygoers threw some of these objects back at the crowd. Hill Aff. ¶27; Tubbs Aff. ¶16. Some oppositionists brandished rods and other weapons. Ex. 35 at 10:45-10:59. Contrary to expectations, police did virtually nothing. Ex. 56, p. 130-133.

At approximately 11:02 am, police received orders to dawn riot gear. Ex. 44. Police withdrew to the back of Emancipation Park. Ex. 56, p. 132.

Until he left the park, Tubbs spent most of his time pacing in front of the shield line. Ex. 45 at 31:22; Ex. 43 at 0:59. On at least one occasion, an oppositionist shoved him. Ex. 43 at 0-0:08. Tubbs spoke briefly to the oppositionist and walked away. Ex. 43 at 0:08-0:16. Tubbs was pepper sprayed twice and went into the park to be treated by the League's medical staff. Hill Aff. ¶30; Tubbs Aff. ¶17. Periodically, Tubbs tried to break up fights and maintain distance between rallygoers and counter protestors. Ex. 35 at 7:16-7:21, 9:20-9:31; Ex. 46 at 2:16-2:33, 5:46-5:51; Ex. 42 at 0:49-1:09, 4:28-4:41; Hill Dep. Ex. 29 at 0:48-0:53).

At one point, Tubbs witnessed a group of rallygoers being assaulted by oppositionists outside the park. Hill Aff. ¶33; Tubbs Aff. ¶20. In an effort to help the rallygoers outside the park, Tubbs shouted "follow me" and lead a group of rallygoers into the crowd of violent oppositionists. Ex. 42 at 3:10-3:30; Ex. 46 at 4:36-4:39. Fights erupted between rallygoers and counter protestors. Ex. 42 at 3:32-3:52; Ex. 46 at 4:36-5:03. Both sides hit at each other with fists, shields, rods, and other weapons. Ex. 42 at 3:32-3:52; Ex. 46 at 4:36-5:03. The two sides then separated. Ex. 46 at 5:04.

At 11:31 am, Governor McAuliffe declared the rally and surrounding crowds to be an unlawful assembly. Ex. 47; Ex. 48. Police outside of the park ordered the crowds to disperse. Hill Aff. ¶33; Tubbs Aff. ¶18. Hill and Tubbs ordered League members to comply with the police's orders and leave the park. Hill Dep. 202:3-9; Tubbs Dep. 128:24-29:2. Officers in riot gear physically pushed rallygoers toward the southern entrances, where they had to pass through the crowds of violent oppositionists. Hill Dep. 205:2-7; Baker Dep. 157:3-7. Police would not allow rallygoers to cross the barricades to use the exits on the north side of the park. Baker Dep.

156:7-10; Tubbs Dep. 128:4-9. Police did not intervene to separate rallygoers and violent oppositionists as rallygoers exited the park. Hill Aff. ¶33; Tubbs Aff. ¶19. A large number of fights broke out as rallygoers and oppositionists mixed. Hill Aff. ¶33; Tubbs Aff. ¶19.

Rallygoers dispersed in several directions. Hill Dep. 202:12-13. Most initially walked West on Market Street. Hill Aff. ¶33; Tubbs Aff. ¶20. From there, some, including Tubbs, doubled back and started toward the Market Street garage. Ex. 47. Others, including Hill, followed other rallygoers North to McIntire Park. Hill Dep. 202:12-22. Hill and others had to ask for a ride back to the Market Street garage. Hill Dep. 203:3-5, 203:10-14.

Crowds of oppositionists lined the streets as rallygoers left the park. Ex. 57 at 0:53-2:20. A group of oppositionists carrying rods and other weapons followed rallygoers as they walked toward the Market Street garage. Id. Deandre Harris was one of the members of this group. One member of the group walked close behind members of the League swinging his bat in a menacing manner. Ex. 57 at 1:44-2:08. Harris's group shouted threats, including "I'll beat you over that baseball helmet, bitch!" Id. at 4:25-4:27. Some oppositionists chanted "go home, Nazi scum" Ex. 49 at 6:30-6:40.

When a group of rallygoers arrived back at the Market Street garage, a confrontation took place between a League member, Harold Crews, and the group of men with Deandre Harris who had been taunting and threatening rally goers as they followed them up the street. Ex. 57 at 1:44 – 4:30. The group of men yelled repeatedly at rally goers, "Do something! Do something!" Ex. 42 at 28:51-28:57; Ex. 57 at 4:10 – 4:30. The fight started when the men grabbed Crews's flag. Ex. 56, p. 137. Crews and the men struggled until one of the men struck Crews in the head with a club. Ex. 42 at 28:51-28:57. Nearby rallygoers chased the men into the garage. Id. There, a handful of rallygoers, including Tyler Davis, a League member, beat Harris. Tubbs Dep. Ex. 20.

Tubbs, who was nearby, moved to the garage entrance and told others moving in that direction not to get involved. Tubbs Dep. 137:10-20. He then walked into the garage and assisted a man with a headwound. Tubbs Dep. 13616-25; Ex. 50.

When the fight in the garage subsided, rallygoers and oppositionists moved East, in front of a police station and courthouse. Ex. 42 at 30:13-30:26. There, oppositionists dressed in black struck Harold Crews in the back of the head with a rod or pipe. Id. They also threw another League member to the ground and repeatedly punched him in the head. Id. When League members and bailiffs from the police station moved toward them, the attackers ran away. Id. After the second attack, Harold Crews could not stand on his own and needed the support of others and his flag pole. Id. at 30:45-31:45.

League members eventually made their way back to the campground outside of Charlottesville. Hill Dep. 217:20-23. At or near the time that he returned to the campground, Hill tweeted, "The League of the South had a good day in Charlottesville, Virginia. Our warriors acquitted themselves as men." Hill Dep. Ex. 31. Though the rally, itself, never took place, Hill was proud that League members had fulfilled their duty by showing up to voice their political views about removing the monument of Robert E. Lee. Hill Dep. 216:19-25, 217:20-218:5, 244:12-23, 246:20-25, 248:6-9; Ex. 16. Hill also felt that League members had acted honorably by assisting rallygoers who were being assaulted in the crowd outside of Emancipation Park. Hill Dep. 220:5-10. Other members of the League, including Tubbs and Baker, feel that the Unite the Right rally was not successful. Tubbs Dep. 177:9-12; Baker Dep. 47:21-24.

To the best of their knowledge, Hill and Tubbs did not see or come into contact with any of the plaintiffs in this action. Hill Aff. ¶36; Tubbs Aff. ¶25. They are not aware of any League member who saw or came into contact with any of the plaintiffs. Hill Aff. ¶36; Tubbs Aff. ¶25.

None of the plaintiffs' injuries resulted from the actions of Hill, Tubbs, or the League. Tubbs Aff. ¶25.

## ARGUMENT

### I. Introduction

Movant-defendants are named in Counts I, II, and III of the Second Amended Complaint. All three counts are conspiracy claims. As shorthand, throughout this Motion, the three counts that movant-defendants are named in are referred to as "the conspiracy claims."

Plaintiffs can trace their injuries to the Torch March on August 11, 2017 or the Fields car attack on August 12, 2017. Because Plaintiffs cannot produce evidence that Hill, Tubbs, or the League of the South were co-conspirators with Fields, the claims of the Plaintiffs injured in the car attack should be dismissed as to movant-defendants. Because Hill, Tubbs, and the League of the South expressly disassociated themselves with the Torch March, and did not conspire to participate in any violence on at the March, the claims of the Plaintiffs injured at the Torch March should also be dismissed as to movant-defendants.

To the extent Plaintiffs claim injuries from incidents other than the Torch March or the Fields car attack, those claims should also be dismissed because Hill, Tubbs, and the League of the South did not conspire to commit racial violence on August 11 or 12, 2017. In addition, Plaintiffs cannot prove injuries from incidents other than the Torch March or the Fields car attack.

### II. Standard of Review

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of establishing the basis for its motion and identifying the

evidence that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Yet, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The non-moving party may not "create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (citing *Barwick v. Celotex Corp.*, 736 F.2d 946, 963 (4th Cir. 1984)). Plaintiffs must produce substantial evidence to defeat a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 249-52. A scintilla of evidence or evidence that is merely colorable is insufficient. Id.

### III. The conspiracy claims of Plaintiffs who were injured in the Fields car attack should be dismissed because Hill, Tubbs, and the League of the South were not co-conspirators with Fields.

For the conspiracy claims to prevail for the Plaintiffs who were injured in the Fields car attack, Plaintiffs must present evidence, inter alia, that (1) Fields conspired with one of the Defendants in this lawsuit to commit racial violence, (2) Hill, Tubbs, and the League of the South were co-conspirators in the same conspiracy as Fields, and (3) the car attack was an overt act in furtherance of the conspiracy.

There is no evidence that Fields conspired with any of the Defendants or Defendant organizations involved in this lawsuit. Plaintiffs must show a meeting of the minds between Fields and at least one of the Defendants. *Simmons v. Poe*, 47 F.3d 1370, 1377-78 (4th Cir. 1995). Plaintiffs must show that there was a "single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences." Id. Fields' mere attendance at the rally is insufficient to prove he was a member of any conspiracy.

His holding a shield and standing with members of Vanguard America is also insufficient to prove he was a member of any conspiracy. If that were sufficient, all rally goers would be co-conspirators with Fields. Michael Hill has never had contact with James Fields. Hill Aff. ¶16. Michael Tubbs has never had contact with James Fields. Tubbs Aff. ¶9. There is no evidence anyone in the League of the South has had contact with James Fields.

Fields acted alone when he carried out the car attack. Because he acted alone and was not a co-conspirator with movant-defendants, the conspiracy claims of the Plaintiffs who were injured in the car attack should be dismissed as to Hill, Tubbs, and the League of the South.

**IV. The conspiracy claims of the Plaintiffs who were injured in the Torch March should be dismissed because Hill, Tubbs, and the League of the South expressly did not participate in the Torch March and were not co-conspirators with those who committed violence at the March.**

For the conspiracy claims to prevail for the Plaintiffs who were injured at the Torch March on August 11, 2017, Plaintiffs must present evidence that Hill, Tubbs, and the League of the South were part of a conspiracy to commit racial violence on August 11, 2017 at the Torch March. Because the undisputed evidence is that Hill, Tubbs, and the League of the South expressly disassociated themselves from the Torch March and did not participate, Plaintiffs' conspiracy claims relating to injuries suffered at the Torch March should be dismissed as to movant-defendants.

The League of the South, Michael Hill, and Michael Tubbs took no part in the Torch March. Before the Torch March on August 11, 2017, Hill was asked whether he and the League planned to participate in the March. He responded, "That's not our game." Hill. Dep. Ex. 19. Tubbs did not even arrive in the area until the March had ended. Tubbs Dep. 87:8-10. Hill and the rest of the League were at a location in Madison, Virginia, approximately 30 miles north of Charlottesville during the March. Hill Dep. 129:4-19.

The Torch March was a separate and distinct event from the Unite the Right Rally. The Unite the Right Rally had a lawful permit. The Torch March did not. The Unite the Right Rally took place during daytime hours. The Torch March took place a day earlier during the dusk and nighttime hours. The Unite the Right Rally took place in Emancipation Park. The Torch March took place on the grounds of the University of Virginia.  The purpose of the Unite the Right Rally was to protest the removal of the Robert E. Lee statute located at Emancipation Park. The purpose of the Torch March is unknown to movant-defendants. Hill Dep. 129:4-19. The Unite the Right Rally was coordinated with the assistance of law enforcement and the City of Charlottesville. The Torch March was done in secret. The Unite the Right Rally had a planned program with a list of speakers. The Torch March did not. The events were separate and distinct. Attending one event does not implicate one in a conspiracy to commit violence at the other.

The fact that Hill asked two members of the League to observe the Torch March does not make Hill, Tubbs, or the League of the South co-conspirators with those who committed violence at the March. Hill. Dep. Ex. 19. Hundreds and probably thousands of people observed the Torch March on August 11, 2017. Journalists, police officers, local students, and an international internet audience all observed the March. The mere observing of an event does not make one a co-conspirator.

In approximately January 2018, Hill was interviewed about the Torch March. Hill Dep. 131-134. During that interview, he made complementary statements about the March. Id. However, those statements do not suggest that the League, Hill, or Tubbs took part in the March or conspired with other defendants to commit racial violence at the March. Making complimentary statements about an event, after the fact, does not make one a co-conspirator with those who planned and participated in the actual event.

### V. Hill, Tubbs, or the League did not violate 42 U.S.C. § 1985(3) because they did not conspire with the other Defendants to commit racial violence.

[W]e find difficult the question whether § 1985(3) provided a remedy for every concerted effort by one political group to nullify the influence of or do other injury to a competing group by use of otherwise unlawful means. To accede to that view would go far toward making the federal courts, by virtue of § 1985(3), the monitors of campaign tactics in both state and federal elections, a role that the courts should not be quick to assume. If respondents' submission were accepted, the proscription of § 1985(3) would arguably reach the claim that a political party has interfered with the freedom of speech of another political party by encouraging the heckling of its rival's speakers and the disruption of the rival's meetings. *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 836 (1983)

To establish a claim under section 1985(3), Plaintiffs must demonstrate 1) a conspiracy of two or more persons, 2) who are motivated by a specific class-based, invidiously discriminatory animus, to 3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, 4) and which results in injury to the plaintiff as 5) a consequence of an overt act committed by the defendants in connection with the conspiracy. *Buschi v. Kirven*, 775 F.2d 1240 (4th Cir. 1985) (citing *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983)). Section 1985(3) is not a general tort statute, and it is not intended to punish every "assault and battery when committed by two or more persons within a State". *Griffin v. Breckenridge*, 403 U.S. 88, 101-02 (1971); *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268-69 (1993). Rather, it is applicable only in a narrow set of circumstances. *Harrison v. KVAT Food Mgmt.*, 766 F.2d 155, 161 (4th Cir. 1985) (noting that 1985(3) is "a statute enacted to fulfill a particular purpose and designed to meet particular conditions"). When these elements are met, co-conspirators are liable for one another's actions to the extent that the resulting harm was foreseeable to each accomplice. *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946).

### A. The Court should hold that Plaintiffs' claim fails because movant-defendants did not conspire to commit racial violence.

Plaintiffs who seek to establish a civil rights conspiracy carry a heavy burden. *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). Indeed, claims under section 1985(3) have

"rarely, if ever" withstood a motion for summary judgment in the 4th Circuit. *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995) To establish a conspiracy, claimants must demonstrate a "meeting of the minds" among the alleged conspirators to violate the claimants' constitutional rights. Id. "It simply must be shown that there was a 'single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences.'" Id. at 1378 (citing *Lenard v. Argento*, 699 F.2d 874, 882-83 (7th Cir. 1983)). Generally, a corporate entity and its agents cannot conspire with one another. *Buschi*, 775 F.2d at 1251.

### i. Movant-defendants cannot be part of a conspiracy because they were unaware of any plan by their co-defendants to commit racial violence.

For a conspiracy to exist, co-conspirators must have an understanding of the type of actions that they and fellow co-conspirators will undertake. In *Simmons*, the plaintiff, an African American man, alleged that a deputy sheriff and state police officer conspired to seize a blood sample from him. 47 F.3d at 1372. The state police officer had created a behavioral profile for the deputy's rape investigation, wherein he stated that the perpetrator was either "a black male" or a "'really screwed up' white male." Id. at 1373. After consulting with the FBI, the police officer later advised the deputy to remove racial characteristics from the profile. Id. at 1374. Nevertheless, the deputy used the behavioral profile to apply for a search warrant and included that the perpetrator was likely "a black male." Id. at 1375. Affirming dismissal of the section 1985(3) claim on a motion for summary judgment, the court found that there was no conspiracy, because the police officer had acted as an advisor and had played no role in applying for the warrant. Id.

Movant-defendants were not aware of a conspiracy by their co-defendants to commit racial violence. Hill's only communications with Kessler related to who would be speaking at the rally and what steps were being taken to ensure their safety. Second Interrogs. for Hill at 42; Hill

Dep. 150:5-8. The communications that Hill and Baker had with Heimbach and Schoep strictly concerned their plan to travel to and from the rally on August 12, 2017. Second Interrogs. for Hill at 43-44; Baker Dep. 117:8-13, 120:11-19). Baker listened to planning meetings on Discord but did not hear or see any content that suggested there was an actual conspiracy to commit racial violence. Tubbs Aff. ¶10; Baker Aff. ¶7. Neither Hill nor Tubbs had any other contact with rally organizers in connection with the events of August 11-12, 2017. Tubbs Aff. ¶9; Second Interrogs. for Hill at 43-46. Neither Hill nor Tubbs heard rally organizers speak of plans to commit racial violence. Tubbs Aff. ¶10; Hill Aff. ¶15. Movant-defendants planned to travel to Charlottesville, take part in a political rally, and return home. Hill Aff. ¶23.

Furthermore, movant-defendants consistently communicated that their intention was to simply exercise their rights to engage in political discourse. Movant-defendants hosted and attended a number of political rallies before August 2017. Ex. 11, Ex. 12. In years prior to 2017, these events were generally peaceful. Hill Aff. ¶7; Tubbs Aff. ¶5. Only after violent oppositionists turned out in large numbers did isolated scuffles take place. Hill Aff. ¶8; Tubbs Aff. ¶5. Even then, with the proactive help of law enforcement, the League voiced their opinions in a nonviolent manner. Baker Dep. 85:2-19; Ex. 11. When preparing for the Unite the Right rally, Hill was clear in the League's press release that he and other League members planned to engage in "free assembly and political speech" Hill Dep. Ex. 15. He announced to League members and to the world that the League would "[stand] with [their] allies on the right in Charlottesville" in the same sense that they "stood against the enemies of [their] God, [their] folk, and [their] civilization in the streets of Pikeville (KY), New Orleans, Gainesville (FL), Orlando, Marietta (GA), and other towns and cities." Hill Dep. Ex. 15.

As was the case with the Defendants in *Simmons*, Hill, Tubbs, and the League played no significant role in planning or carrying out the Rally. Hill was a listed speaker and Tubbs and the League were attendees. None of the movant-defendants agreed to or contributed to any plans to commit racial violence with the other Defendants. Hill recommended potential speakers to Kessler, but he did not decide who would be invited. Hill Dep. 115:4-6. Baker listened to informational meetings on Discord, but he did not have a voice in how the Rally would be organized. Baker Aff. ¶7. When movant-defendants became dissatisfied with Kessler's planning, they made their own plans to travel to and from the Rally. Hill Dep. 154. Movant-defendants did not participate with their co-defendants in any plan to commit racial violence.

To the contrary, where movant-defendants perceived a heightened risk of conflict in organizers' plans, they made plans of their own. Hill Dep. 154. For this reason, movant-defendants planned to walk to Emancipation Park as a group rather than arriving a few carloads at a time from McIntire Park as the major participants in the Rally planned to do. Id. As an added precaution, movant-defendants informed police of their plans to park in the Market Street garage and walk to the park. Hill Dep. 186:10-11; Baker Dep. 71:18-72:2. Movant-defendants also instructed League members on several occasions to obey the law, follow the directions of police officers, and to avoid inciting violence. Ex. 15; Ex. 16 ¶ 4; Hill Dep. 180:19-181:3; Baker Dep. 131:8-18; Tubbs Dep. 95:22-97:9. Tubbs repeatedly tried to break up fights. Ex. 35 at 7:16-7:21, 9:20-9:31; Ex. 46 at 2:16-2:33, 5:46-5:51; Ex. 42 at 0:49-1:09, 4:28-4:41;Hill Dep. Ex. 29 at 0:48-0:53. Such actions are inconsistent with a conspiracy to commit racial violence. Movant-defendants should not be liable merely for attending and agreeing to speak at the Rally.

**ii. A conspiracy should not be inferred from movant-defendants' plans to defend themselves from violent oppositionists.**

Movant-defendants believed that oppositionists, including Antifa, planned to violently oppose them. They had heard as much from a source that they trusted. Hill Dep. Ex. 24; Tubbs Dep. 72:18-73:4. They knew from the news that Antifa had acted similarly at events on the West Coast. Second Interrogs. for Hill at 43. Most importantly, they had witnessed Antifa attack a rallygoer at a previous event. Hill Aff. ¶17. Movant-defendants believed and hoped that law enforcement would proactively restrain violent oppositionists. Baker Dep. 133:11-21, 140:19-41:2, 142:8-14. Police had done so at previous League rallies. Baker Dep. 85:2-19; Ex. 11.

But in the interest of safety, movant-defendants prepared to defend themselves against violent oppositionists by bringing shields and other legally permissible accoutrements. Second Interrogs. for Hill at 53; Hill Dep. 145:24-146:5, 170:24-71:7. And they were right to do so. On August 12, 2017, Antifa was present. Tubbs Dep. Ex. 13 at 1:55. Violent oppositionists crowded in front of the park and threw dangerous and disgusting objects at rallygoers. Ex. 48; Baker Dep. 148:16-19. They carried signs calling for violence and came prepared with fists and weapons. Ex. 40; Ex. 41; Ex. 35 at 10:45-10:59. Oppositionists harassed rallygoers from the moment they arrived near Emancipation Park and then pursued them as they dispersed. Ex. 35 at 6:25-6:30; Ex. 39 at 8:03-8:13; Ex. 57 at 0:53-5:33. Among others, oppositionists struck Tubbs in the head multiple times and pepper sprayed him twice. Tubbs Dep. Ex. 13 at 0:30-0:31; Ex. 38 at 0-0:03. The police—though present—did nothing to intervene. Ex. 56, p. 135-139. Movant-defendants did what they could to keep themselves safe and exercise their rights to speech and assembly. Some League members looked forward to defending themselves and clashing with the political opponents who threatened them, but movant-defendants never planned for anything but defensive use of force. Ex. 15. There is no evidence that they targeted any racial or religious group in these encounters.

### iii. Movant-defendants' clash with Antifa on Market Street is not evidence of a conspiracy because it was a spontaneous encounter.

Spontaneous acts cannot form the basis of a conspiracy. *See Hughes v. Ranger Fuel Corp., Div. of Pittston Co.*, 467 F.2d 6, 10 (4th Cir. 1972). In *Hughes*, defendants threw rocks at the plaintiffs as they photographed the defendants illegally polluting a river. 467 F.2d at 8. The court found no conspiracy because the assault was committed on a single occasion in response to plaintiffs' conduct. Id. at 10.

With the benefit of hindsight, movant-defendants could have done more to de-escalate the violence between themselves and the violent oppositionists. In the heat of the moment, having travelled hundreds, sometimes thousands of miles, and faced with a lawless, barrage of violence and opposition, movant-defendants reacted in a spontaneous manner. Movant-defendants had no idea that violent oppositionists would blockade a public street and that law enforcement would do nothing. Like the defendants in *Hughes*, movant-defendants were presented with an aggravating situation. Movant-defendants knew prior to August 12th that Antifa would oppose the rally. Hill Dep. Ex. 24; Tubbs Dep. 72:18-73:4. They anticipated that they would need to defend themselves from stray attackers who managed to evade law enforcement officers. Baker Dep. 133:11-21, 140:19-41:2, 142:8-14. They did not foresee being abandoned by law enforcement and left to face crowds of violent oppositionists. Baker Dep. 133:11-21, 140:19-141:2, 142:8-14.

When movant-defendants encountered the blockade of oppositionists on Market Street, they were left at an impasse. Movant-defendants were not familiar with the area. (Hill Dep. 184:21-185:2, 187:15-17). They knew that anarchists wanted to harm them so they walked as a group for protection. Hill Dep. Ex. 24; Tubbs Dep. 72:18-73:4; . When they neared Emancipation Park, they encountered an Antifa blockade. Members of the blockade wore the

same anarchist symbols that movant-defendants had witnessed at other rallies that year. Ex. 36; Hill Aff. ¶27. The only available entrances to the park were behind the blockade. Ex. 36; Hill Dep. 185:10-13, 185:15-20 185:23-186:2, 186:5-11. Redirecting the group would have been chaotic—if not impossible—task. Even if they managed to do so, circumventing the blockade would mean walking several blocks around the intersection. The violent oppositionists would have simply followed them and obstructed their way again.

Law enforcement took no action to prevent a heckler's veto. Ex. 56, p. 136, 139. In a tense and difficult situation, movant-defendants—among many others—chose to push through the blockade. Tubbs Dep. Ex. 13 at 0:29-0:30; Ex. 37 at 0:23. Movant-defendants had no way to know that the oppositionists in the blockade would resort to punching and swinging clubs at Tubbs and others. As in *Hughes*, this conflict was unlike anything that movant-defendants had experienced previously or that they have experienced since.

The incident involving Deandre Harris was also a spontaneous encounter brought on by Harris and his group's taunting and their attempt to steal the flag of a member of the League. As rally-goers were forced out of the Park by law enforcement, they were forced to encounter violent oppositionists again. Ex. 56, p. 135. Harris and a group of oppositionists followed League members from the Park to the Market Street Parking Garage wielding bats and other weapons. Ex. 57 at 1:44 – 4:30. Harris and the members of his group taunted, threatened, and assaulted League members as they walked. Id. One member of Harris's group followed close behind League members swinging a bat as if he was warming up on deck or standing in the batter's box awaiting a pitch. Id. At 1:44-2:08. Harris's group repeatedly shouted, "Do something! Do something!" Ex. 57, 4:10-4:30. Finally, Harris was attacked after he attempted to assist in stealing a League member's flag. Ex. 56, p. 137. The entire interaction is captured on video and

available as an exhibit to this motion. Ex. 57. The Heaphy Report also describes the incident in the same way. Ex. 56, p. 137.

### iv. Movant-defendants' derogatory comments and political rhetoric are protected by the First Amendment and should not be construed as evidence of a conspiracy.

The First Amendment protects a wide range of expressive activities, including picketing and marching. *See Thornhill v. State of Alabama*, 310 U.S. 88 (1940); *Edwards v. South Carolina*, 372 U.S. 229 (1963). The First Amendment safeguards peaceful expressions, even when motivated by racist ideology. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). Speech that alludes to violence also falls under the First Amendment's protection when it consists of "abstract advocacy." *Rice v. Paladin Enters.*, 128 F.3d 233, 248-49 (4th Cir. 1997).

Movant-defendants' speech is abstract political rhetoric. Abstract language is marked by a lack of specificity as to the conduct that the author wishes viewers to engage in. In *Paladin*, the court found that the defendant's book aided and abetted murders because the book gave specific, step-by-step instructions on how to carry out a murder for hire. 128 F.3d at 249, 254. The court further suggested that the book's "only instructional communicative "value" [was] the indisputably illegitimate one of training persons how to murder." Id.

Movant-defendants' communications were intended and understood as abstract political rhetoric. The book in *Paladin* detailed specific preparations, weapons, and techniques that readers should use to kill. Id. at 257-62. Movant-defendants' political communications use only vague terms. For example, Hill's June 2017 article announced that the League would attend the Unite the Right rally, acknowledged that Antifa would likely have a presence, and admonished readers, "[d]on't miss out on the fun!" Baker Dep. Ex. 10. The following month, Hill posted on social media, "If you want to defend the South and Western civilization from the Jew and his dark-skinned allies, be at Charlottesville on 12 August." Hill Dep. Ex. 16. Unlike the book in

*Paladin*, movant-defendants' communications do not clearly implicate physical violence. The League has a history of participating in peaceful political rallies and agreed to take part in Unite the Right to protest the removal of the Robert E. Lee statute. Second Interrogs. for Hill at 42; Hill Dep Ex. 14. Along with the League's preparations to prevent conflict, this context suggests that "fun" and "defend" denote engaging in speech as part of a political contest. This is how Hill intends such language to be interpreted. Hill Dep. 166:6-10. Sergeant Newberry of the Charlottesville Police Department also did not interpret Hill's past statements to be a call for violence. Ex. 27.

Furthermore, unlike the book in *Paladin*, rhetoric has value other than inciting conflict. It gives salience to political and athletic struggles and is commonly used in those fields. *See e.g.,* Alexa Lardieri, *Cuomo Says He Won't Give Donald Trump a Political Fight Over the Coronavirus*, U.S. NEWS (Apr. 14, 2020, 2:12 PM), https://www.usnews.com/news/politics/articles/2020-04-14/gov-andrew-cuomo-says-he-will-not-give-trump-the-political-fight-he-wants-over-the-virus; *Top Moments: Cavaliers, Warriors Battle Four Years Straight in Finals*, NBA HISTORY, https://www.nba.com/history/top-moments/warriors-cavaliers-four-straight-finals (last visited July 30, 2020). Such rhetoric also has historical and artistic value. Religious texts use such language to describe spiritual struggles. *See e.g.*, Ephesians 6:11-17 (King James). Because movant-defendants' speech is abstract, it falls within the First Amendment's protection and is insufficient to support a claim of conspiracy.

**B. Plaintiffs' claim should fail because movant-defendants' participation in Unite the Right was political and was not motivated by animus toward a protected class.**

To establish a claim under section 1985(3), plaintiffs must show that the defendants were motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory

animus." *Griffin*, 403 U.S. at 102 (1971). Very few groups qualify as protected classes under this statute. *Scott*, 463 U.S. at 836. ("it is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause, most notably Republicans"); *Buschi*, 775 F.2d at 1258 (acknowledging that the 4th Circuit had incorrectly found a number of classes to be protected). A group is more likely to qualify as a protected class if its members share "discrete, insular, and immutable characteristics comparable to those characterizing classes such as race, national origin and sex." *See Buschi*, 775 F.2d at 1257. For the purposes of section 1985(3), "animus" denotes an intent to target and not merely an adverse effect. *See Bray*, 506 U.S. at 271-73.

This is a difficult issue because race is at the forefront of modern politics. Major mainstream political organizations have race as their defining characteristic. The Black Lives Matter (BLM) movement, for example, is a political movement that seeks to promote the interests of African Americans. Despite the racial motivation behind BLM, political opposition to BLM or members of BLM is protected by the First Amendment.

### i. The Court should hold that plaintiffs' claim fails, because section 1985(3) is inapplicable to political conflict, even violent political conduct.

Political groups have never qualified for class protection under section 1985(3). *Scott*, 463 U.S. at 836; *Bray*, 506 U.S. at 287 (Kennedy, J., concurring) (pointing out that other statutes provide federal assistance to address unruly political protest); *Harrison*, 766 F.2d at 161-63 (finding "little support for the contention that § 1985(3) includes in its scope of protection the victims of purely political conspiracies"); *Rodgers v. Tolson*, 582 F.2d 315, 317 (4th Cir. 1978). The Supreme Court declined to hold that section 1985(3) applies to situations where a group "has interfered with the freedom of speech of another political party by encouraging the heckling of its rival's speakers and the disruption of the rival's meetings." *Scott*, 463 U.S. at 836. The

Court's fears concerning such use of section 1985(3) are exemplified by this case. The present analysis does not discuss the Plaintiffs injured by the Torch March on August 11, 2017 or the Fields car attack on August 12, 2017, because movant-defendants played no role in planning, participating, or carrying out those events.

Political groups are characterized by a common attitude toward ideas or people. *See Rodgers*, 82 F.2d at 318. For example, a group that engaged in outspoken criticism of a public official did not qualify as a protected class, because the group did not "define a larger group that could be objectively identified by an observer." Id. Here, the blockade that movant-defendants encountered on the way to Emancipation Park on August 12, 2017 was a political group. Like the group in *Rodgers*, oppositionists in the blockade were united in opposition to a group—the rallygoers. The group's only identifying features were Antifa-like dress and anarchist flags. Ex. 35 at 6:36. Their appearance and conduct gave no indication that they supported any racial, ethnic, or religious group. Id. The oppositionists in the blockade were predominately male and consisted mostly of white-skinned individuals. Id. Furthermore, the oppositionists' conduct communicated opposition to the rally and its attendees. When Tubbs tried to push through the group, they escalated the conflict by attacking him with fists and rods. Ex. 37 at 0:22-0:23, Ex. 38 at 0-0:03. The oppositionists continued attempting to obstruct rally-goers' use of the road after the fighting subsided. Ex. 39 at 8:03-8:13. As movant-defendants and others entered Emancipation Park, the surrounding crowds chanted "F*** you Kessler," "Follow your leader and kill yourself," and "Nazi scum off our streets." Ex. 39 at 2:18, 12:14 and 13:03. These actions communicate opposition to the rallygoers but do not denote membership in or support for a racial, ethnic, or religious group.

Likewise, the group that gathered after movant-defendants entered Emancipation Park was amorphous and generally characterized only by political opposition to the rally. Locals from Charlottesville had obtained permits to hold peaceful counter-protests at McGuffey Park and Justice Park. Compl. ⁋ 131. But this group instead gathered at the Unite the Right rally, itself. Ex. 56, p. 185. Some oppositionists at Emancipation Park may have intended to peacefully support minority groups. However, many communicated only political opposition and violent intentions. Numerous people in the crowd displayed symbols associated with Antifa, including all-black dress, an encircled "A," images of overlaying flags, red and black flags, and banners identifying them as anti-fascist adherents. Ex. 40; Tubbs Dep. Ex. 13 at 1:46-1:48. One oppositionist carried a sign that read, "killing Nazis is my heritage." Ex. 40. Another carried a sign stating, "this machine kills fascists" Ex. 41. They carried weapons, including rods, shields, and caustic substances. Ex. 35 at 10:45-10:59; Ex. 42 at 3:32-3:52; Ex. 46 at 4:36-5:03. Because police made no effort to separate oppositionists from rallygoers, movant-defendants and others faced a chaotic crowd.

Movant-defendants knew only that the crowd—as a whole—was gathered in opposition to the Unite the Right rally. Hill Aff. ¶ 27. The crowd was chaotic, with people coming and going, irrespective of whatever political ideology they may have supported. Id. When Tubbs witnessed rallygoers being assaulted by the crowd outside the Park, he had no way of knowing whether the oppositionists between him and the victims would attack him. He chose to clear a path for the rally-goer to escape into the park. Ex. 42 at 3:10-3:30; Ex. 46 at 4:36-4:39.

The Supreme Court anticipated that section 1985(3) could be inappropriately used where one political group seeks to disrupt the political event of another. The present case exemplifies

section 1985(3) being used for just such a purpose. As a matter of law, the plaintiff's claim should fail.

### ii. The Court should hold that plaintiffs' claim fails because movant-defendants' opposition to conduct cannot be the basis for designating a protected class.

A protected class cannot be defined by a "desire to engage in conduct that the § 1985(3) defendant disfavors." *Bray*, 506 U.S. at 269; *see also Scott*, 463 U.S. at 829 (rejecting the notion that Section 1985(3) protects a general right "'to be free of violent acts against [one's body] and property because of . . . association or non-association'" with a group). The lawfulness of defendants' conduct is irrelevant. *Bray*, 506 U.S. at 274. In *Bray*, the Supreme Court determined that "women seeking abortions" are not a protected class under section 1985(3). Id. at 269. In doing so, the Court rejected the plaintiffs' assertion that opposing the practice of abortion by obstructing access to abortion clinics reflects an intent to target women. Id. at 269-70. Indeed, the Court noted that the defendants believed their plans were a physical intervention "'between abortionists and . . . innocent victims." Id. The Court further opined that a desire to engage in particular conduct can define a class only when the targeted activity is "an irrational object of disfavor" and is "engaged in exclusively or predominantly by a particular class of people." Id. at 270-71. For example, the Court hypothesized that taxing yarmulkes would demonstrate animus toward Jews. Id.

Here, movant-defendants' resistance to oppositionist conduct does not reflect animus toward a protected class. In *Bray*, the individuals affected by the defendants' conduct were those who wished to access an abortion clinic. Similarly, those affected by the plans and actions of movant-defendants are those who opposed the Unite the Right rally. For example, movant-defendants planned to use defensive force only against groups that intended to violently disrupt the rally. Hill Dep. Ex. 24; Hill Dep. Ex. 27. They made no plans to use force against non-violent

parties. Other than political affiliation, the violent oppositionists that movant-defendants encountered on Market Street are characterizable only by their efforts to obstruct access to Emancipation Park. As previously discussed, the race, gender, and dress of the oppositionists did not communicate support for any group or ideology other than antifascism and anarchism. Ex. 35 at 6:36. Finally, the crowd that gathered outside of Emancipation Park is characterizable only by its opposition to the Unite the Right rally. That crowd consisted of persons with different ideologies and motivations. They voiced differing opinions by their speech and conduct. Some peacefully observed while others threw objects and assaulted rallygoers. Opposing these actions does not demonstrate animus toward a protected class.

Furthermore, movant-defendants had legitimate motives for their actions. In *Bray*, the defendants' motives to protect "victims" contributed to the Court finding that there was no conspiracy. 506 U.S. at 269. Here, movant-defendants were motivated by a desire to be safe and to exercise their right to attend the rally. After learning that Antifa adherents planned to use violence to disrupt the Unite the Right rally, movant-defendants prepared to defend themselves and others out of a concern for safety. Second Interrogs. for Hill at 53; Hill Dep. 145:24-46:5,170:24-71:7. Likewise, movant-defendants pushed through the blockade to access Emancipation Park. Hill Dep. 185:15-20,186:5-11.

### iii.    The Court should hold that Plaintiffs' claim fails because being affected by movant-defendants' activities does not make oppositionists a protected class.

A protected class cannot be defined by virtue of being a "group of victims [affected by a] tortious action" *Bray*, 506 U.S. at 269 In *Bray*, denying access to an abortion clinic primarily affected women. U.S. at 271. But that disproportional effect was not enough to establish a class-based animus. Id. at 269. In the present dispute, the affected groups are not easily characterized by any trait. As previously discussed, the blockaders were predominately white-skinned and

44

communicated no ideology other than anti-fascism and anarchism. Ex. 35 at 6:36. The crowd outside of Emancipation Park was a mixture of people with differing ideologies and motivations. Ex. 36. If these groups are not defined by political affiliation or opposition to the rally, they are generally characterizable only by the effect that movant-defendants' activities had on them; had these crowds not clashed with rallygoers, they would be irrelevant to this case.

The conduct of oppositionists on August 12, 2017 was not an irrational object of opposition. As the Supreme Court pointed out in *Bray*, targeting the practice of wearing yarmulkes would be irrational. 506 U.S. at 270. Wearing a yarmulke poses no threat of harm. In contrast, many believe that abortion is harmful to both women and developing children. Id. at 269. Here, the activities of oppositionists on August 12, 2017 were harmful. For instance, violence is harmful and is widely recognized as a rational object of opposition, including opposition through self-defense. Obstructing access to a constitutionally protected event interfered with movant-defendants' ability to express their views. Even if pushing through the blockade is not a constitutionally sanctioned activity, it is natural to resist being silenced.

Furthermore, the conduct of oppositionists on August 12, 2017 was not exclusively or predominately engaged in by members of a protected class. In *Bray*, the Supreme Court recognized that the practice of wearing yarmulkes unique to Jews. 506 U.S. at 270-71. In contrast, violence—such as that plotted by Antifa adherents and used by oppositionists on August 12th—is not unique to any class. Similarly, obstructing access to a rally venue has no necessary connection to any group.

> **iv. The Court should rule that Plaintiffs' claim fails because movant-defendants' activities do not otherwise indicate that they were motivated by a class-based animus.**

The class-based animus requirement is met only when it is clear that the alleged conspirators intended to target members or supporters of a protected class. *Griffin* 403 U.S. at 103 (stating that section 1985(3) would apply to no set of facts if it did not apply to those in *Griffin*); *see also Frazier v. Cooke*, No. 4:17-cv-54, 2017 U.S. Dist. LEXIS 190896 (E.D. Va. Nov. 16, 2017). In *Griffin*, the plaintiffs, a group of African Americans, alleged that the defendants had agreed to block their travel on a public roadway, pull them from a vehicle, beat them, and threaten them with firearms. 403 U.S. at 90-92. Plaintiffs alleged that defendants undertook these actions while mistakenly believing that one of the plaintiffs was a civil rights worker. Id. at 90. The court found that these allegations sufficiently alleged a class-based animus to survive a motion to dismiss. Id. at 103.

Movant-defendants did not target members of a protected class. In *Griffin*, the defendants' plans and actions were clearly directed at African Americans. In the present case, movant-defendants plans and actions were not directed toward any racial or religious group. Their primary goal was to politically triumph over their opponents by successfully gathering at the Unite the Right rally. Baker Dep. Ex. 10 ¶ 3. As a precaution, movant-defendants planned and utilized defensive force against anyone who attempted to assault rallygoers. Ex. 15; Second Interrogs. for Hill at 53; Hill Dep. 145:24-46:5,170:24-71:7; . Unlike the *Griffin* defendants, who specifically targeted African Americans and civil rights workers, movant-defendants prepared to contend with political opponents who planned to use violence to silence them. Hill Dep. Ex. 24; Tubbs Dep. 72:18-73:4.

The incident on Market Street where the League forced its way through an Antifa barricade is an example of one instance where movant-defendants used force for a purpose other than defending themselves or others. But that incident was not an attempt to target a protected

class. In that circumstance, Hill, Tubbs, and nearly all other rallygoers were in an unfamiliar area. Hill Dep. 184:21-185:2, 187:15-17. They had traveled long distances to engage in a political rally. Hill Dep. 187:16. They were in front of a large group that would be difficult to redirect. With only two available entrances to the park—both on the south side—there was no guarantee that the same group would not obstruct further attempts to attend the rally. As previously discussed, the blockaders, by their appearance and conduct, did not communicate membership in or support for any non-political group. From these facts, it is not reasonable to infer that movant-defendants targeted the members or supporters of a class with immutable characteristics.

### C. Plaintiffs' psychological injuries cannot be tied to any incident(s) other than the Torch March or Fields car attack.

To the extent that Plaintiffs base their claims on psychological or emotional injuries that resulted from incidents other than the Torch March or the Fields car attack, those claims are speculative and lack sufficient evidence to support them.

For example, Plaintiff Wispelwey received no physical injury on either August 11 or August 12, 2017. At his deposition, he was asked, "If I understood correctly, you, yourself, were not physically injured ay any point on August 12, 2017?" Wispelwey Dep. 179. Wispelwey responded, "Correct." As to the Torch March on August 11, Wispelwey merely observed some of the protesters but was not physically harmed. Id at 138 - 140.

Wispelwey was asked whether he could tie certain psychological injuries to certain events, "But can you differentiate a percentage or how much of your symptoms you feel are from the scene of the car attack as opposed to the scene of the torchlit march or the scene of the white supremacists pushing through your group with shields?" Id. At 97-98. Wispelwey responded,

"I'm not sure I can quantify it. That scene and being immersed in it and unsure what was going on, with all the pain and terror and blood and death, was uniquely awful." Id.

To the extent that Plaintiffs base their claims on psychological injuries that resulted from incidents other than the Torch March or the Fields car attack, those claims are speculative and lack sufficient evidence to support them. Witnessing the League push through a blockade of violent oppositionists or skirmishing in the streets with other violent oppositionists, cannot be tied to any Plaintiffs' injury. For those reasons, Plaintiffs' claims should be dismissed.

### VI. Because movant-defendants did not engage in a section 1985 conspiracy, neither Hill, Tubbs, nor the League violated 42 U.S.C. § 1986.

Section 1986 punishes those who have knowledge of a conspiracy and fail to take steps to prevent the harms that are the conspiracy's object. 42 U.S.C. § 1986. A claim under section 1986 is dependent on successfully establishing a claim under Section 1985. *See, e.g.*, *Trerice v. Summons*, 755 F.2d 1081, 1085 (4th Cir. 1985). As described above, movant-defendants did not enter into a conspiracy to commit racial violence and had no knowledge of any plan conspiracy by their co-defendants to commit racial violence. Movant-defendants could not have prevented the Torch March because they were not involved in the March in any way. They could not have prevented the Fields car attack because they had already left Charlottesville and did not actually know Fields. Plaintiffs' claim under section 1986, therefore, must fail.

### VII. Because movant-defendants did not conspire to intimidate or harm minorities, they were not part of a common law conspiracy.

In Virginia, a "common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *Commercial Bus. Sys. v. Bellsouth Servs.*, 453 S.E.2d 261, 267 (Va. 1995); *see also Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 320 (4th Cir.

2012) (quoting *Commercial Bus. Sys.*). As with Section 1985(3), a successful common law conspiracy claim is predicated upon showing that the alleged co-conspirators had a common plan. *Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F.Supp.2d 483, 499 (E.D. Va. 2003)  ("[T]he plaintiff must first allege that the defendants combined together to effect a preconceived plan and unity of design and purpose, for the common design is the essence of the conspiracy.") (internal citations and quotation marks omitted). Corporate entities generally cannot conspire with their agents. *See e.g., Fox v. Deese*, 362 S.E.2d 699 (Va. 1987); *Fortress Holdings II, LLC v. Patty*, 95 Va. Cir. 402, 408 (Cir. Ct. 2017). Plaintiffs allege that movant-defendants joined in a plan to intimidate and harm racial minorities. Compl. ¶¶ 337-38, 353. As discussed above, movant-defendants engaged in no such plan and no Plaintiffs were harmed by movant-defendants' conduct.

### VIII. Even if a conspiracy to commit racial violence can be established, events other than the Unite the Right rally were beyond the scope of movant-defendants' involvement.

Fields acted alone. Co-conspirators are liable for the injuries caused by their accomplices only when those injuries were reasonably foreseeable and pursuant to the conspiracy or plan. *See, e.g., Pinkerton*, 328 U.S. at 647-48 ("A different case would arise if the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement."); *United States v. Newsome*, 322 F.3d 328, 338 (4th Cir. 2003) ("[U]nder conspiracy law, he is liable for the conduct of all co-conspirators that was in furtherance of the conspiracy and reasonably foreseeable to him"). This standard applies to conspiracies under section 1985(3). *Bray*, 506 U.S. at 333 (Stevens, J., dissenting) (arguing that the burden placed

on affected parties was a foreseeable consequence of the conspiracy); *Willis v. Blevins*, 957 F. Supp. 2d 690, 700 (E.D. Va. 2013). Virginia also utilizes a foreseeability standard. *E.g., Owens v. Commonwealth*, 675 S.E.2d 879, 881 (Va. Ct. App. 2009). There appears to be no on-point case law that precisely defines the parameters of foreseeability under section 1985(3) or a Virginia common law conspiracy.

Here, it was not foreseeable to movant-defendants that rallygoers would commit acts of violence at times and places other than the Unite the Right rally. Movant-defendants had limited interactions with other rally attendees. Hill and Tubbs never successfully used Discord. Hill Dep. 77:18-21; Tubbs Dep. 195:21-24; Ex. 17. Baker participated in some meetings and chats. Baker Aff. ¶ 7. But he did not see any messages suggesting the other defendants in this lawsuit were conspiring to commit acts of racial violence in Charlottesville. Id. When movant-defendants did interact with other rallygoers, their conversations related only to the Unite the Right rally. Hill Dep. 115:4-6, 152:13-24, 153:11-17, 158:5-11; Second Interrogs. for Hill at 43-44; Baker Dep. 117:8-13, 120:11-19. Movant-defendants did not plan or participate in the torch march on August 11th or gatherings after the rally on August 12th. Hill Dep. Ex. 19; Baker Dep. 126:3-7. Movant-defendants' plans and actions concerned the Unite the Right rally and only that event. They planned to stay at a campground outside of Charlottesville, take part in the rally, and return to the campground. And that is what they did. Events that took place at different times and places than the rally—including the torch march and incident involving James Fields—are beyond the scope of movant-defendants' involvement. These incidents were not foreseeable to movant-defendants.

**CONCLUSION**

Fields acted alone when he drove his car into the crowd at the intersection of 4th and Water Street. He was not the member of a conspiracy. Hill, Tubbs, and the League did not take part in planning for or even participate in the Torch March, and therefore, were not part of a conspiracy to commit racial violent at the March. The Unite the Right Rally was a political event where various political opponents clashed. Police failed to intervene to preserve order. Movant-defendants did not cause any of Plaintiffs injuries and did not conspire with any of their co-defendants to commit racial violence.

Respectfully submitted,

/s/  Bryan J. Jones____
Bryan J. Jones (VSB #87675)
106 W. South St., Ste. 211
Charlottesville, VA 22902
(P): (434) 260-7899
(F): (434) 381-4397
(E): bryan@bjoneslegal.com

*Counsel for Defendants for Michael Hill, Michael Tubbs, and League of the South*