## UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF VIRGINIA
#### Charlottesville Division

| | |
|---|---|
| ELIZABETH SINES, SETH WISPELWEY, MARISSA BLAIR, TYLER MAGILL, APRIL MUNIZ, HANNAH PEARCE, MARCUS MARTIN, NATALIE ROMERO, CHELSEA ALVARADO, and JOHN DOE,<br><br><br>                        Plaintiffs,<br><br>v.<br><br><br>JASON KESSLER, RICHARD SPENCER, CHRISTOPHER CANTWELL, JAMES ALEX FIELDS, JR., VANGUARD AMERICA, ANDREW ANGLIN, MOONBASE HOLDINGS, LLC, ROBERT "AZZMADOR" RAY, NATHAN DAMIGO, ELLIOT KLINE a/k/a/ ELI MOSLEY, IDENTITY EVROPA, MATTHEW HEIMBACH, MATTHEW PARROTT a/k/a DAVID MATTHEW PARROTT, TRADITIONALIST WORKER PARTY, MICHAEL HILL, MICHAEL TUBBS, LEAGUE OF THE SOUTH, JEFF SCHOEP, NATIONAL SOCIALIST MOVEMENT, NATIONALIST FRONT, AUGUSTUS SOL INVICTUS, FRATERNAL ORDER OF THE ALT-KNIGHTS, MICHAEL "ENOCH" PEINOVICH, LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN, and EAST COAST KNIGHTS OF THE KU KLUX KLAN a/k/a EAST COAST KNIGHTS OF THE TRUE INVISIBLE EMPIRE,<br><br><br>                        Defendants. | Civil Action No. 3:17-cv-00072-NKM |

### PLAINTIFFS' SECOND SET OF INTERROGATORIES TO ALL NON-DEFAULTED ENTITY DEFENDANTS

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs, by their undersigned counsel, hereby request that each of the Non-Defaulted Entity Defendants, as that term is defined below, answer under oath the Interrogatories set forth below within the time specified in Rule 33, unless otherwise agreed by the parties or required by any scheduling order entered by the Court in this action.

The Definitions and Instructions that appear below form an integral part of the Interrogatories that follow and must be read in conjunction with them and followed when responding to the Interrogatories.

## DEFINITIONS

In each Definition, the singular shall include the plural and the plural shall include the singular. Terms used herein shall have the following meanings:

1.      "Advertise" means, in addition to its customary and usual meaning, to Communicate in any manner designed to encourage any behavior such as attendance, including but not limited to posting a message, poster, billboard, banner, flyer, article or other Document in any public place, whether online or in any physical space (an "Advertisement").

2.      "Affiliate," in addition to its customary and usual meaning, means to associate with, connect to, relate to, partner with, ally with, identify with, share with, derive from, be a member of, or be a participant of.

3.      "Amended Complaint" means the amended complaint filed in the above-captioned litigation as ECF docket entry number 175.

4.      "Communication" or "to Communicate" means, in addition to its customary and usual meaning, every contact of any nature, whether documentary, electronic, written or oral, formal or informal, at any time or place and under any circumstances whatsoever whereby

1

information of any nature is transmitted or transferred by any means, including, but not limited to letters, memoranda, reports, emails, text messages, instant messages, social media postings, gaming consoles or platforms, invoices, telephone conversations, voicemail messages, audio recordings, face-to-face meetings and conversations, or any other form of correspondence, and any Document relating to such contact, including but not limited to correspondence, memoranda, notes or logs of telephone conversations, e-mail, electronic chats, text messages, instant messages, direct or private messages, correspondence in "meet ups" or chat rooms, and all other correspondence on Social Media. Without limiting the foregoing in any manner, commenting as well as any act of expression that is not directed at a specific person, or otherwise may not be intended to provoke a response (such as a social media posting, "likes," "shares," or any other form of reacting to another's use of Social Media), are forms of Communication.

5.      "Concerning" means, in addition to its customary and usual meaning, alluding to, confirming, constituting, comprising, containing, commenting upon, discussing, describing, embodying, evaluating, evidencing, identifying, in connection with, involving, mentioning, noting, pertaining to, probative of, related to, relating to, reflecting, referring to, regarding, setting forth, supporting, stating, showing, touching upon, dealing with, assessing, recording, bearing upon, connected with, in respect of, about, indicating, memorializing, proving, suggesting, having anything to do with, contradicting, and/or summarizing in any way, directly or indirectly, in whole or in part, the subject matter referred to in the Interrogatory.

6.      "Contact" means, in addition to its customary and usual meaning, to meet, touch, or Communicate with another person in any manner (written, verbal, or non-verbal), including in person, on the telephone or mobile device, or online, whether or not You personally exchanged words with the other person or whether you used an intermediary.

2

7.    "Criminal Proceeding" means, without limitation, any federal or state action involving an infraction, violation, misdemeanor, felony, or other offense.

8.    "Describe in Detail" means, in addition to its customary and usual meaning, to provide a complete description and explanation of the facts, circumstances, analysis, opinion and other information relating to the subject matter of a specific Interrogatory.

9.    "Document" or "Documents" means documents broadly defined in FRCP Rule 34, and includes (i) papers of all kinds, including but not limited to, originals and copies, however made, of letters, memoranda, handwritten notes, notebooks, messages, agreements, rough drafts, drawings, sketches, pictures, posters, pamphlets, publications, news articles, Advertisements, sales literature, brochures, announcements, bills, receipts, credit card statements, and (ii) non-paper information of all kinds, including but not limited to, any computer generated or electronic data such as digital videos, digital photographs, audio recordings, podcasts, Internet files (including "bookmarks" and browser history), online articles and publications, website content, electronic mail (e-mail), electronic chats, instant messages, text messages, uploads, posts, status updates, comments, "likes", "shares", direct messages, or any other use of Social Media, and (iii) any other writings, records, or tangible objects produced or reproduced mechanically, electronically, or photographically.  Without limiting the foregoing in any way, every Communication is also a Document.

10.    "Events" means the occurrences and activities described in Paragraphs 45 to 335 of the Amended Complaint.

11.    "Government Official" means, in addition to its customary and usual meaning, any employee, agent, representative, or member, of any governmental agency, body, or office,

3

whether local, municipal, state or federal, including but not limited to any elected official and his or her representatives or designees.

12.     "Include" or "Including" means include or including but not limited to.

13.     "Law Enforcement" means, in addition to its customary and usual meaning, any police officer, detective, employee, security officer, prosecutor or any other representative or agent of any private, municipal, local, state, federal or university police or security department.

14.     "Member" means, in addition to its customary and usual meaning, any official or unofficial individual, person, entity, group, participant, partner, part, organ, contributor, affiliate, associate, constituent, comrade, compatriot, auxiliary, adjunct, accessory, companion, assistant, co-worker, collaborator, cooperator, and colleague.

15.     "Non-Defaulted Entity Defendants" means any of Defendants in the above-captioned matter who are not natural persons, and have not been defaulted in this case, including Vanguard America; Identity Evropa; Traditionalist Worker Party; League of the South; National Socialist Movement; Nationalist Front.

16.     "Promotional Material" means, in addition to its customary and usual meaning, any Document that Advertises, promotes, or encourages any sort of behavior, such as attendance at an event.

17.     "School Official" means, in addition to its customary and usual meaning, any employee, agent, or representative of any school or university, at any level of education, whether public or private, including but not limited to any employee, agent, or representative of the University of Virginia.

18.     "Social Media" means any forum, website, application, or other platform on which persons can create, transmit, share, Communicate concerning, or comment upon any

4

information, ideas, or opinions, or otherwise engage in social networking. Without limiting the foregoing in any manner, and by way of example only, the following are Social Media platforms: comment sections of websites, Facebook, Discord, Gab, Reddit, Imgur, Snapchat, Instagram, Google+, 4chan, 8chan, Twitter, Tumblr, YouTube, VK (also known as VKontakte or ВКонтáкте), Stormfront, Minds, WrongThink, Voat, BitChute, PewTube, and instant messaging services such as Signal, WhatsApp, Messenger, Hangouts, Telegram, or Skype. Without limiting the foregoing in any manner, and by way of example only, the following are methods of using Social Media platforms: uploading, posting, commenting, reacting (e.g., "liking" a post), and sharing.

19.     "Unite the Right" means the events described in Paragraphs 133 to 254 of the Amended Complaint, namely the marches, protests, demonstrations, rallies, gatherings, associations, meetings, congregations, celebrations, conventions, and assemblies that occurred the weekend of August 11, 2017 through August 12, 2017 in Charlottesville, Virginia.

20.     "You," "Your," "Yours," "Defendant," and "Defendants" refer to the Defendants in the above-captioned matter and include any persons or entities acting for them or on their behalf, including but not limited to all representatives, agents, employees, officers, affiliates, subsidiaries, parent companies, third parties, and attorneys, as well as any entities over which any of the Defendants have control.

21.     Any other term used in these Interrogatories shall be given its broadest meaning(s), as defined in accordance with standard American use or as shown in a dictionary of the English language.

## INSTRUCTIONS

A.     Where an Interrogatory requests knowledge or information, such Interrogatory encompasses knowledge and information in your possession, custody, or control, or in the

possession, custody, or control of your staff, agents, employees, representatives, and, unless privileged, attorneys, or any other person who has possession, custody, or control of your proprietary knowledge or information.

      B.    When the term "identify" is used in these Interrogatories, please supply the following information:

          i.    when used in reference to a natural person, state the person's full name, present or last known business and residential addresses, present or last known telephone numbers or other contact information, and present or last known employment position or business affiliation;

          ii.    when used in reference to any person who is not a natural person, state the full name, present or last known address, and present or last known telephone number or other contact information;

          iii.    when used in reference to an object, state the nature, type, and location of the object and identify the person (natural or non-natural) who has custody or control over the object.

      C.    If, in responding to any of the following Interrogatories, you encounter any ambiguity or confusion in construing either an Interrogatory or a Definition or Instruction relevant to an Interrogatory, set forth the matter deemed ambiguous, select a reasonable interpretation that you believe resolves the ambiguity, respond to the Interrogatory using that interpretation, and explain with particularity the construction or interpretation selected by you in responding to the Interrogatory.

      D.    References to any natural person shall be deemed to include that natural person's agents, representatives, current and former employees, and successors.

E.     References to any non-natural person (e.g., corporation, partnership, entity, membership organizations) shall be deemed to include that non-natural person's predecessors, successors, divisions, subsidiaries, parents, assigns, partners, members, and affiliates, foreign or domestic, each other person directly or indirectly, wholly or in part, owned by, controlled by, or associated with them, and any others acting or purporting to act on their behalf for any reason, and the present and former officers, directors, partners, consultants, representatives, employees, assigns, attorneys, and agents of any of them.

F.     The use of the singular form of any word includes the plural and vice versa.

G.     The use of the past tense includes the present tense and vice versa, as necessary to bring within the scope of each request all responses that might otherwise be considered outside its scope.  Whenever a term is used herein in the present, past, future, subjunctive, or other tense, voice, or mood, it shall also be construed to include all other tenses, voices, or moods.

H.     The terms "and" and "or" should be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

I.     The term "each" means "each, any, or all" as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

J.     The obligation to respond to these Interrogatories is continuing in nature and requires further response if additional information is obtained or located by you after the time of your initial answer.

K.     If you believe that an Interrogatory calls for production of a Document or Communication, or requires disclosure of information, claimed by You to be protected by

7

privilege or as attorney work product, or subject to non-disclosure on any other basis, furnish a list identifying the Documents, Communications, or information for which the protection is claimed together with the following (if applicable): the type of Document or Communication; the date or dates of the Document or Communication; the name, position, and address of each person who participated in the Document or Communication, to whom the Document or Communication was addressed, or to whom the Document or Communication or the contents thereof have been Communicated by any means; the general subject matter of the Document, Communication, or information; the specific basis for nonproduction or non-disclosure; and a description that you contend is adequate to support your contention that the Document, Communication, or information may be withheld from production and/or disclosure.   If a Document or Communication is withheld on the ground of attorney work product, also specify whether the Document or Communication was prepared in anticipation of litigation and, if so, identify the anticipated litigation(s) upon which the assertion is based.

L.      If the answer to all or part of an Interrogatory is that you lack knowledge of the requested information, set forth such remaining information as is known to you and describe all efforts made by you or by your attorneys, accountants, agents, representatives, or experts, or by any professional employed or retained by you, to obtain the information necessary to answer the interrogatory.   If any approximation can reasonably be made in place of unknown information, also set forth your best estimate or approximation, clearly designated as such, in place of unknown information, and describe the basis upon which the estimate or approximation is made.

M.      In answering each Interrogatory, you shall identify each Document relied upon that forms the basis for your answer or in any way corroborates your answer or the substance of your answer.

8

N.      A response identifying Documents falling within the scope of these Interrogatories shall state that the Documents have or will be produced, unless the Interrogatory is objected to, in which event the reasons for objection shall be specifically stated.

O.      To the extent you object to any of the following Interrogatories, state each ground for your objection in detail. If you consider only a portion of the Interrogatory objectionable, respond to the remainder of the Interrogatory, and separately state the part of each Interrogatory to which you object and specify in detail the grounds for each objection.

## INTERROGATORIES

1.      Describe in Detail the structure of Your organization as it existed between January 2017 and January 2018, including but not limited to: (a) each level, group, division, sub-division, unit, branch, or segment   (whether formal or informal); (b) the titles, roles and responsibilities of each position (whether formal or informal) associated with each level, group, division, sub-division, unit, branch or segment; (c) the hierarchy, relationships, and ranks of each level, group, division, sub-division, unit, branch or segment relative to each other; (d)  the hierarchy, relationship and ranks of each position within and across such groups, divisions, sub-divisions, units, branches or segments and (e) the name(s) of every person who occupied each position from January 2017 to January 2018.

2.      Describe in Detail the core values, beliefs, and mission of Your organization, and any manner in which Your organization expresses, Communicates, or promotes those core values, beliefs and mission.

3.      Describe in Detail the process by which an individual becomes a Member of Your organization, including but not limited to any pre-requisites or requirements, conditions of

membership, application process, investigation or vetting process, decision or approval process, initiation procedures, or rituals.

4.      Identify each Member of Your organization who participated in any aspect of planning or organizing in advance of the Unite the Right rally, and Describe in Detail the nature of the planning or organizing in which each such Member participated.

5.      Identify each Member of Your organization who attended the Unite the Right rally.

6.      Identify each method of communication used by Members of Your organization from January 2017 to January 2018 to Communicate with each other, including but not limited to text-message communications, email communications, telephone conversations, in-person communications, communications on Discord, communications on Gab, communications on Facebook, communications on What's App, etc.

7.      Identify and Describe in Detail each Contact or Communication of any kind you had with each one of the other Defendants between January 2017 and August 12, 2017, including for each Contact or Communication, the nature or content of the Contact or Communication, the method of Contact or Communication used, where and when the Contact or Communication took place, and anyone else who participated in the Contact or Communication.

8.      Identify all expenses You incurred in planning, organizing, or attending the Unite the Right rally and the sources of funding and method of payment used to satisfy those expenses.

9.      Identify and Describe in Detail each case in which You were charged in a Criminal Proceeding that resulted in a conviction, whether state or federal, including for each such case: the full title of the action, court, docket number, a description of the allegations, the disposition, and sentence.

10

10.     Identify each legal matter, whether federal, state, criminal, civil, administrative, or otherwise, concerning the Events in which You have participated as a party or a witness, including but not limited to giving any testimony (written or verbal) in depositions, hearings, trials, or any other legal proceeding.

11.     Describe in Detail any Advertisement or Promotional Material You displayed or posted whether online or otherwise, in which You Advertised or promoted the Unite the Right rally, including where, when, how, and for what period of time you displayed or posted such Advertising or Promotional Material and the content of such Advertisement or Promotional Material.

12.     Identify each Communication concerning the Events that You had with each member of Law Enforcement, whether before, after, or during the Events, including the name of the member of Law Enforcement, when, where, and how each Communication took place, and the nature or content of each Communication.

13.     Identify each Communication concerning the Events that You had with any Government Official, whether before, after, or during the Events, including the name of the Government Official, when, where, and how each Communication took place, and the nature or content of each Communication.

14.     Identify each Communication concerning the Events that You had with any School Official, whether before, after, or during the Events, including the name of the School Official, when, where, and how each Communication took place, and the nature or content of each Communication.

11

Dated:  October 29, 2019

Roberta A. Kaplan (*pro hac vice*)
Julie E. Fink (*pro hac vice*)
Gabrielle E. Tenzer (*pro hac vice*)
Michael L. Bloch (*pro hac vice*)
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: (212) 763-0883
rkaplan@kaplanhecker.com
jfink@kaplanhecker.com
gtenzer@kaplanhecker.com
mbloch@kaplanhecker.com

Of Counsel:

Karen L. Dunn (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Jessica Phillips (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Telephone: (202) 237-2727
Fax: (202) 237-6131
kdunn@bsfllp.com
wisaacson@bsfllp.com
jphillips@bsfllp.com

Robert T. Cahill (VSB 38562)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
rcahill@cooley.com

Alan Levine (*pro hac vice*)
Philip Bowman (*pro hac vice*)
COOLEY LLP
1114 Avenue of the Americas, 46th Floor New
York, NY 10036
Telephone: (212) 479-6260
Fax: (212) 479-6275
alevine@cooley.com
pbowman@cooley.com

Yotam Barkai (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
Fax: (212) 446-2350
ybarkai@bsfllp.com

David E. Mills (*pro hac vice*)
Joshua M. Siegel (VSB 73416)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Fax: (202) 842-7899
dmills@cooley.com
jsiegel@cooley.com

J. Benjamin Rottenborn (VSB 84796)
Erin Ashwell (VSB 79538)
WOODS ROGERS PLC
10 South Jefferson St., Suite 1400
Roanoke, VA 24011
Telephone: (540) 983-7600
Fax: (540) 983-7711
brottenborn@woodsrogers.com
eashwell@woodsrogers.com

*Counsel for Plaintiffs*

13

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

ELIZABETH SINES, SETH WISPELWEY,
MARISSA BLAIR, TYLER MAGILL, APRIL
MUNIZ, HANNAH PEARCE, MARCUS
MARTIN, NATALIE ROMERO, CHELSEA
ALVARADO, and JOHN DOE,

                           Plaintiffs,

v.

JASON KESSLER, RICHARD SPENCER,
CHRISTOPHER CANTWELL, JAMES
ALEX FIELDS, JR., VANGUARD
AMERICA, ANDREW ANGLIN,
MOONBASE HOLDINGS, LLC, ROBERT
"AZZMADOR" RAY, NATHAN DAMIGO,
ELLIOT KLINE a/k/a/ ELI MOSLEY,
IDENTITY EVROPA, MATTHEW
HEIMBACH, MATTHEW PARROTT a/k/a
DAVID MATTHEW PARROTT,
TRADITIONALIST WORKER PARTY,
MICHAEL HILL, MICHAEL TUBBS,
LEAGUE OF THE SOUTH, JEFF SCHOEP,
NATIONAL SOCIALIST MOVEMENT,
NATIONALIST FRONT, AUGUSTUS SOL
INVICTUS, FRATERNAL ORDER OF THE
ALT-KNIGHTS, MICHAEL "ENOCH"
PEINOVICH, LOYAL WHITE KNIGHTS OF
THE KU KLUX KLAN, and EAST COAST
KNIGHTS OF THE KU KLUX KLAN a/k/a
EAST COAST KNIGHTS OF THE TRUE
INVISIBLE EMPIRE,

                           Defendants.

Civil Action No. 3:17-cv-00072-NKM

## PLAINTIFFS' SECOND SET OF INTERROGATORIES
## TO ALL INDIVIDUAL DEFENDANTS

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs, by their undersigned counsel, hereby request that Defendants answer under oath the Interrogatories set forth below within the time specified in Rule 33, unless otherwise agreed by the parties or required by any scheduling order entered by the Court in this action.

The Definitions and Instructions that appear below form an integral part of the Interrogatories that follow and must be read in conjunction with them and followed when responding to the Interrogatories.

## DEFINITIONS

In each Definition, the singular shall include the plural and the plural shall include the singular.  Terms used herein shall have the following meanings:

1.    "Act of Violence" means, in addition to its customary and usual meaning, any act of threatening, intimidating, provoking, striking, shooting, or assaulting another person or persons in any manner, or attempts to do the same, including but not limited to punching, kicking, pushing, shooting, stabbing, burning, throwing objects or fluid or fire at or toward, or driving a car toward or into another person or persons.

2.    "Advertise" means, in addition to its customary and usual meaning, to Communicate in any manner designed to encourage any behavior such as attendance, including but not limited to posting a message, poster, billboard, banner, flyer, article or other Document in any public place, whether online or in any physical space (an "Advertisement").

3.    "Affiliate," in addition to its customary and usual meaning, means to associate with, connect to, relate to, partner with, ally with, identify with, share with, derive from, be a member of, or be a participant of.

1

4.      "Amended Complaint" means the amended complaint filed in the above-captioned litigation as ECF docket entry number 175.

5.      "Communication" or "to Communicate" means, in addition to its customary and usual meaning, every contact of any nature, whether documentary, electronic, written or oral, formal or informal, at any time or place and under any circumstances whatsoever whereby information of any nature is transmitted or transferred by any means, including, but not limited to letters, memoranda, reports, emails, text messages, instant messages, social media postings, gaming consoles or platforms, invoices, telephone conversations, voicemail messages, audio recordings, face-to-face meetings and conversations, or any other form of correspondence, and any Document relating to such contact, including but not limited to correspondence, memoranda, notes or logs of telephone conversations, e-mail, electronic chats, text messages, instant messages, direct or private messages, correspondence in "meet ups" or chat rooms, and all other correspondence on Social Media. Without limiting the foregoing in any manner, commenting as well as any act of expression that is not directed at a specific person, or otherwise may not be intended to provoke a response (such as a social media posting, "likes," "shares," or any other form of reacting to another's use of Social Media), are forms of Communication.

6.      "Concerning" means, in addition to its customary and usual meaning, alluding to, confirming, constituting, comprising, containing, commenting upon, discussing, describing, embodying, evaluating, evidencing, identifying, in connection with, involving, mentioning, noting, pertaining to, probative of, related to, relating to, reflecting, referring to, regarding, setting forth, supporting, stating, showing, touching upon, dealing with, assessing, recording, bearing upon, connected with, in respect of, about, indicating, memorializing, proving,

2

suggesting, having anything to do with, contradicting, and/or summarizing in any way, directly or indirectly, in whole or in part, the subject matter referred to in the Interrogatory.

7.      "Contact" means, in addition to its customary and usual meaning, to meet, touch, or Communicate with another person in any manner, (written, verbal, or non-verbal) including in person, on the telephone or mobile device, or online, whether or not You personally exchanged words with the other person or whether you used an intermediary.

8.      "Criminal Proceeding" means without limitation any federal or state action involving an infraction, violation, misdemeanor, felony or other offense.

9.      "Describe in Detail" means, in addition to its customary and usual meaning, to provide a complete description and explanation of the facts, circumstances, analysis, opinion and other information relating to the subject matter of a specific Interrogatory.

10.      "Document" or "Documents" means documents broadly defined in FRCP Rule 34, and includes (i) papers of all kinds, including but not limited to, originals and copies, however made, of letters, memoranda, handwritten notes, notebooks, messages, agreements, rough drafts, drawings, sketches, pictures, posters, pamphlets, publications, news articles, Advertisements, sales literature, brochures, announcements, bills, receipts, credit card statements, and (ii) non-paper information of all kinds, including but not limited to, any computer generated or electronic data such as digital videos, digital photographs, audio recordings, podcasts, Internet files (including "bookmarks" and browser history), online articles and publications, website content, electronic mail (e-mail), electronic chats, instant messages, text messages, uploads, posts, status updates, comments, "likes", "shares", direct messages, or any other use of Social Media, and (iii) any other writings, records, or tangible objects produced or reproduced

3

mechanically, electronically, or photographically.  Without limiting the foregoing in any way, every Communication is also a Document.

11.    "Entity Defendants" means any of Defendants in the above-captioned matter who are not natural persons, including Vanguard America; Moonbase Holdings, LLC; Identity Evropa; Traditionalist Worker Party; League of the South; National Socialist Movement; Nationalist Front; Fraternal Order of the Alt-Knights; Loyal White Knights of the Ku Klux Klan; and East Coast Knights of the Ku Klux Klan, a/k/a East Coast Knights of the True Invisible Empire.

12.    "Events" means the occurrences and activities described in Paragraphs 45 to 335 of the Amended Complaint.

13.    "Government Official" means, in addition to its customary and usual meaning, any employee, agent, representative, or member, of any governmental agency, body, or office, whether local, municipal, state or federal, including but not limited to any elected official and his or her representatives or designees.

14.    "School Official" means, in addition to its customary and usual meaning, any employee, agent, or representative of any school or university, at any level of education, whether or public of private, including but not limited to any employee, agent, or representative of the University of Virginia.

15.    "Law Enforcement" means, in addition to its customary and usual meaning, any police officer, detective, agent, security officer, prosecutor or any other representative of any private, municipal, local, state, federal or university police or security department.

16.    "Promotional Material" means, in addition to its customary and usual meaning, any Document that Advertises, promotes, or encourages any sort of behavior, such as attendance at an event.

17.    "Social Media" means any forum, website, application, or other platform on which persons can create, transmit, share, Communicate concerning, or comment upon any information, ideas, or opinions, or otherwise engage in social networking. Without limiting the foregoing in any manner, and by way of example only, the following are Social Media platforms: comment sections of websites, Facebook, Discord, Gab, Reddit, Imgur, Snapchat, Instagram, Google+, 4chan, 8chan, Twitter, Tumblr, YouTube, VK (also known as VKontakte or ВКонтáкте), Stormfront, Minds, WrongThink, Voat, BitChute, PewTube, and instant messaging services such as Signal, WhatsApp, Messenger, Hangouts, Telegram, or Skype. Without limiting the foregoing in any manner, and by way of example only, the following are methods of using Social Media platforms: uploading, posting, commenting, reacting (e.g., "liking" a post), and sharing.

18.    "Unite the Right" means the events described in Paragraphs 133 to 254 of the Amended Complaint, namely the marches, protests, demonstrations, rallies, gatherings, associations, meetings, congregations, celebrations, conventions, or assemblies that occurred the weekend of August 11, 2017 through August 12, 2017 in Charlottesville, Virginia.

19.    "You," "Your," "Yours," "Defendant," and "Defendants" refer to the Defendants in the above-captioned matter and includes any persons or entities acting for them or on their behalf, including but not limited to all representatives, agents, employees, officers, affiliates, subsidiaries, parent companies, third parties, and attorneys, as well as any entities over which any of the Defendants have control.

20.     "Weapon" means any object designed for or with the potential to be intentionally used for inflicting bodily harm or physical damage or to attempt or threaten to do the same, including but not limited to a firearm, Tiki Torch, lighter fluid or other flammable liquid, pepper spray, knife, baton, bat, rod, explosive, grenade, tear gas, armor, helmet, flagpole, pipe, earpiece, or radio.

21.     Any other term used in these Interrogatories shall be given its broadest meaning(s), as defined in accordance with standard American use or as shown in a dictionary of the English language.

## **INSTRUCTIONS**

A.     Where an Interrogatory requests knowledge or information are requested, such Interrogatory encompasses knowledge and information in your possession, custody, or control, or in the possession, custody, or control of your staff, agents, employees, representatives, and, unless privileged, attorneys, or any other person who has possession, custody, or control of your proprietary knowledge or information.

B.     When the term "identify" is used in these Interrogatories, please supply the following information:

    i.     when used in reference to a natural person, state the person's full name, present or last known business and residential addresses, present or last known telephone numbers or other contact information, and present or last known employment position or business affiliation;

    ii.     when used in reference to any person who is not a natural person, state the full name, present or last known address, and present or last known telephone number or other contact information;

6

     iii.    when used in reference to an object, state the nature, type, and location of the object and identify the person (natural or non-natural) who has custody or control over the object.

C.    If, in responding to any of the following Interrogatories, you encounter any ambiguity or confusion in construing either an Interrogatory or a Definition or Instruction relevant to an Interrogatory, set forth the matter deemed ambiguous, select a reasonable interpretation that you believe resolves the ambiguity, respond to the Interrogatory using that interpretation, and explain with particularity the construction or interpretation selected by you in responding to the Interrogatory.

D.    References to any natural person shall be deemed to include that natural person's agents, representatives, current and former employees, and successors.

E.    References to any non-natural person (e.g., corporation, partnership, entity, membership organizations) shall be deemed to include that non-natural person's predecessors, successors, divisions, subsidiaries, parents, assigns, partners, members, and affiliates, foreign or domestic, each other person directly or indirectly, wholly or in part, owned by, controlled by, or associated with them, and any others acting or purporting to act on their behalf for any reason, and the present and former officers, directors, partners, consultants, representatives, employees, assigns, attorneys, and agents of any of them.

F.    The use of the singular form of any word includes the plural and vice versa.

G.    The use of the past tense includes the present tense and vice versa, as necessary to bring within the scope of each request all responses that might otherwise be considered outside its scope. Whenever a term is used herein in the present, past, future, subjunctive, or other tense, voice, or mood, it shall also be construed to include all other tenses, voices, or moods.

7

H.      The terms "and" and "or" should be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

I.      The term "each" means "each, any, or all" as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

J.      The obligation to respond to these Interrogatories is continuing in nature and requires further response if additional information is obtained or located by you after the time of your initial answer.

K.      If you believe that an Interrogatory calls for production of a Document or Communication, or requires disclosure of information, claimed by you to be protected by privilege or as attorney work product, or subject to non-disclosure on any other basis, furnish a list identifying the Documents, Communications, or information for which the protection is claimed together with the following (if applicable): the type of Document or Communication; the date or dates of the Document or Communication; the name, position, and address of each person who participated in the Document or Communication, to whom the Document or Communication was addressed, or to whom the Document or Communication or the contents thereof have been Communicated by any means; the general subject matter of the Document, Communication, or information; the specific basis for nonproduction or non-disclosure; and a description that you contend is adequate to support your contention that the Document, Communication, or information may be withheld from production and/or disclosure.   If a Document or Communication is withheld on the ground of attorney work product, also specify

8

whether the Document or Communication was prepared in anticipation of litigation and, if so, identify the anticipated litigation(s) upon which the assertion is based.

L.      If the answer to all or part of an Interrogatory is that you lack knowledge of the requested information, set forth such remaining information as is known to you and describe all efforts made by you or by your attorneys, accountants, agents, representatives, or experts, or by any professional employed or retained by you, to obtain the information necessary to answer the interrogatory.  If any approximation can reasonably be made in place of unknown information, also set forth your best estimate or approximation, clearly designated as such, in place of unknown information, and describe the basis upon which the estimate or approximation is made.

M.      In answering each Interrogatory, you shall identify each Document relied upon that forms the basis for your answer or in any way corroborates your answer or the substance of your answer.

N.      A response identifying Documents falling within the scope of these Interrogatories shall state that the Documents have or will be produced, unless the Interrogatory is objected to, in which event the reasons for objection shall be specifically stated.

O.      To the extent you object to any of the following Interrogatories, state each ground for your objection in detail. If you consider only a portion of the Interrogatory objectionable, respond to the remainder of the Interrogatory, and separately state the part of each Interrogatory to which you object and specify in detail the grounds for each objection.

## **INTERROGATORIES**

1.      Identify and Describe in Detail each Contact or Communication of any kind you had with each one of the other Defendants between January 2017 and August 13, 2017, including

the nature or content of the Contact or Communication, where and when the Contact or Communication took place, and anyone else who participated in the Contact or Communication.

2.      Identify all expenses You incurred in planning, organizing, or attending the Unite the Right rally and the sources of funding and method of payment used to satisfy those expenses.

3.      Identify and Describe in Detail each case in which You were charged in a Criminal Proceeding that resulted in a conviction, whether state or federal, including for each such case: the full title of the action, court, docket number, a description of the allegations, the disposition, and the sentence.

4.      Identify each legal matter, whether federal, state, criminal, civil, administrative, or otherwise, concerning the Events in which You have been or participated as a party or a witness, including but not limited to giving any testimony in depositions, hearings, trials, or any other legal proceeding.

5.      Describe in Detail  any instance in which You Advertised or promoted the Unite the Right rally, whether online or otherwise, including where, when, how, and for what period of time You displayed any Advertisement or Promotional Material and the content of such Advertisement or Promotional Material.

6.      Identify each Communication concerning the Events that You had with each member of Law Enforcement, whether before, after, or during the Events, including the name of the member of Law Enforcement, when, where, and how each Communication took place, and the nature or content of that Communication.

7.      Identify each Communication concerning the Events You had with any Government Official, whether before, after, or during the Events, including the name of the

10

Government Official, when, where, and how each Communication took place, and the nature or content of each Communication.

8.      Identify each Communication concerning the Events You had with any School Official, whether before, after, or during the Events, including the name of the School Official, when, where, and how each Communication took place, and the nature or content of that Communication.

9.      Describe any relationship You have had from January 2017 to the present with any of the Entity Defendants, including any titles, affiliations, positions, or roles You have held within any of those organizations, the responsibilities associated with each such title, affiliation, position, or role, and any responsibilities You had within any of those organizations that were not associated with any title, affiliation, position, or role

10.     For each Act of Violence perpetrated by or against a Defendant or a Plaintiff, identify and Describe in Detail each such Act of Violence, where and when such Act of Violence took place, who was involved in such Act of Violence, the nature of the Act of Violence, and any person known to You to have firsthand knowledge of such Act of Violence.

11.     Identify and Describe in Detail any Weapon You possessed or carried at any point during Unite the Right, including the kind of Weapon You possessed or carried, and when, where, why, and how You acquired that Weapon; if You did not possess or carry any Weapon during Unite the Right, you should so state instead.

12.     Identify and Describe in Detail any direction or encouragement You gave for any other person to bring a Weapon to Unite the Right, including the kind of Weapon, the time, place, and manner in which You Communicated the direction or encouragement to bring a

11

Weapon, and the person to whom You Communicated the direction or encouragement; if You did not provide such direction or encouragement, You should so state instead.

Dated:  October 29, 2019

Roberta A. Kaplan (*pro hac vice*)
Julie E. Fink (*pro hac vice*)
Gabrielle E. Tenzer (*pro hac vice*)
Michael L. Bloch (*pro hac vice*)
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: (212) 763-0883
rkaplan@kaplanhecker.com
jfink@kaplanhecker.com
gtenzer@kaplanhecker.com
mbloch@kaplanhecker.com

12

Of Counsel:

Karen L. Dunn (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Jessica Phillips (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Telephone: (202) 237-2727
Fax: (202) 237-6131
kdunn@bsfllp.com
wisaacson@bsfllp.com
jphillips@bsfllp.com

Robert T. Cahill (VSB 38562)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
rcahill@cooley.com

Alan Levine (*pro hac vice*)
Philip Bowman (*pro hac vice*)
COOLEY LLP
1114 Avenue of the Americas, 46th Floor New
York, NY 10036
Telephone: (212) 479-6260
Fax: (212) 479-6275
alevine@cooley.com
pbowman@cooley.com

Yotam Barkai (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
Fax: (212) 446-2350
ybarkai@bsfllp.com

David E. Mills (*pro hac vice*)
Joshua M. Siegel (VSB 73416)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Fax: (202) 842-7899
dmills@cooley.com
jsiegel@cooley.com

J. Benjamin Rottenborn (VSB 84796)
Erin Ashwell (VSB 79538)
WOODS ROGERS PLC
10 South Jefferson St., Suite 1400
Roanoke, VA 24011
Telephone: (540) 983-7600
Fax: (540) 983-7711
brottenborn@woodsrogers.com
eashwell@woodsrogers.com

*Counsel for Plaintiffs*

13

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2019, I provided copies of Plaintiffs' Second Set of Interrogatories to Individual Defendants and Plaintiffs' Second Set of Interrogatories to Entity Defendants via email to the following:

Justin Saunders Gravatt
David L. Hauck
David L. Campbell
Duane, Hauck, Davis & Gravatt, P.C.
100 West Franklin Street, Suite 100
Richmond, VA 23220
jgravatt@dhdglaw.com
dhauck@dhdglaw.com
dcampbell@dhdglaw.com

*Counsel for Defendant James A. Fields, Jr.*

Elmer Woodard
5661 US Hwy 29
Blairs, VA 24527
isuecrooks@comcast.net

James E. Kolenich
Kolenich Law Office
9435 Waterstone Blvd. #140
Cincinnati, OH 45249
jek318@gmail.com

*Counsel for Defendants Matthew Parrott,
Traditionalist Worker Party, Jason Kessler,
Nathan Damigo, and Identity Europa, Inc.
(Identity Evropa)*

Bryan Jones
106 W. South St., Suite 211
Charlottesville, VA 22902
bryan@bjoneslegal.com

*Counsel for Defendants Michael Hill,
Michael Tubbs, and League of the South*

John A. DiNucci
Law Office of John A. DiNucci
8180 Greensboro Drive, Suite 1150
McLean, VA 22102
dinuccilaw@outlook.com

*Counsel for Defendant Richard Spencer*

William Edward ReBrook , IV
The Rebrook Law Office
6013 Clerkenwell Court
Burke, VA 22015
edward@rebrooklaw.com

*Counsel for Defendants Jeff Schoep, National
Socialist Movement, and Nationalist Front*

Elliot Kline
eli.f.mosley@gmail.com

Robert Ray
azzmador@gmail.com

Vanguard America
c/o Dillon Hopper
dillon_hopper@protonmail.com

Matthew Heimbach
matthew.w.heimbach@gmail.com

Christopher Cantwell
christopher.cantwell@gmail.com


*[signature]*

Roberta A. Kaplan (*pro hac vice*)
Julie E. Fink (*pro hac vice*)
Gabrielle E. Tenzer (*pro hac vice*)
Michael L. Bloch (*pro hac vice*)
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: (212) 763-0883
rkaplan@kaplanhecker.com
jfink@kaplanhecker.com
gtenzer@kaplanhecker.com
mbloch@kaplanhecker.com

*Counsel for Plaintiffs*

2nd Set of Interrogatories, 8 March 2020

For Michael Hill

1. Jason Kessler: I had never met Jason Kessler in person between January 2017 and 13 August 2017. I had several phone conversations with him regarding my role as a speaker in the Unite the Right event and general questions about organizing the event.. In addition, I had several communications with Kessler via Facebook Private Messenger on the same general topics. Mr. Kessler first contacted me in the spring of 2017 (April, as best I recall) about me speaking at the Unite the Right event and The League of the South participating by asking our members to come to Charlottesville for the event. Once Kessler told me the main purpose was to show support for keeping the statue of Gen. Robert E. Lee in Lee (Emancipation) Park, I agreed to speak and to have The League participate officially in the event. Following that initial communication with Kessler, I had several more phone calls/Facebook PMs with him until shortly before the event itself on 12 August 2017. Most of these communications, as best I recall, concerned security measures (mainly getting the scheduled speakers safely to the park and out again in the face of heated opposition) and who might be added as additional speakers. Fairly early on in our conversations I told Kessler that The League normally provided for our own security, such as plans for a safe arrival and departure from the area, and that we would be handling these matters ourselves. Kessler informed me that the planning process for the event would, in part, be conducted on an internet platform called Discord. To my knowledge, and by my own instructions to my subordinates, we did nothing on Discord regarding planning for the Unite the Right event other than monitor the conversations. Otherwise, we did not, to my knowledge, participate in the planning sessions conducted on Discord and arranged by Kessler. Because of the turbulent circumstances in the streets of Charlottesville on 12 August 2017, and the shutting down of the Unite the Right event before the speeches even began, I did not see Kessler on that day.

Richard Spencer: I did not meet Spencer in person from January 2017 until 13 August 2017. I have had two or three phone conversations with him and exchanged a few emails. I don't recall any communications I had with him that were in regard to planning the Unite the Right event.

James Alex Fields, Jr.: I did not meet or communicate with Fields from January 2017 until 13 August 2017. In fact, I had never even heard of him before 12 August 2017.

Vanguard America: I knew generally about this organization, as it became part of a loosely-structured temporary alliance know as the Nationalist Front (which to my knowledge was the brainchild of Matthew Heimbach). The League participated in the Nationalist Front temporary alliance for the Unite the Right event. To the best of my recollection, I did not meet the leader of Vanguard America from January until 13 August 2017. Any contact we in The League may have made with them, through my subordinates, was in regard to getting into and out of the general area safely on 12 August 2017.

Andrew Anglin: I have never met Anglin or knowingly had any communications with him, to the best of my recollection.

Christopher Cantwell: I have never met Cantwell or knowingly had any communication with him, to the best of my recollection.

Matthew Heimbach: I communicated numerous time with Heimbach from January to 13 August 2017, in person, by phone, and by social media. I accepted an invitation from him for The League to participate in an event in Pikeville. KY, in April 2017, as part of a loose alliance know as the

Nationalist Front. We communicated during the summer of 2017, mainly by phone, about the logistics of getting into the downtown Charlottesville area and out again as safely as possible.

Matthew Parrott: Until I met him on 12 August 2013, I had had no previous contact with Parrott, to the best of my recollection.

Traditionalist Workers Party: See Matthew Heimbach.

Moonbase Holdings, LLC: I had no contact, to my knowledge, with this entity from January to 13 August 2013.

Robert "Azzmador" Ray: I had, to the best of my recollection, no contact nor communications with Ray from January to 13 August 2017.

Nathan Damigo:  I had, to the best of my recollection, no contact nor communications with Damigo from January to 13 August 2017.

Elliot Kline (aka Eli Mosely): I had, to the best of my recollection, no contact nor communications with Kline/Mosely from January to 13 August 2017.

Identity Europa: I had, to the best of my recollection, no contact nor communications with Identity Europa from January to 13 August 2017.

Nationalist Front: A loose (and temporary) alliance of four organizations—Traditionalist Workers Party, Vanguard America, National Socialists Movement, and The League of the South. It was organized, to the best of my knowledge, by Matthew Heimbach for the purpose of cooperating in the events in Pikeville, KY, and Charlottesville, VA (Unite the Right event) in 2017. It was dissolved in the months following the Unite the Right event.

Augustus Sol Invictus: I had, to the best of my recollection, no contact nor communications with Invictus from January to 13 August 2017.

Fraternal Order of the Alt-Knights: I had, to the best of my recollection, no contact nor communications with this group from January to 13 August 2017.

Michael "Enoch" Peinovich: I had, to the best of my recollection, no contact nor communications with Peinovich from January to 13 August 2017.

Michael Tubbs: Tubbs was my Chief of Staff during the period January through 13 August 2017. As such, I stayed in close touch with him regarding all League of the South operations. Our discussions during this period in question were largely about logistics, what League personnel would be coming to the Unite the Right event, and how we would plan for security in getting into and out of Lee/Emancipation Park.

Jeff Schoep: I met Schoep initially at the Nationalist Front sponsored event in Pikeville, KY, in April 2017. His group at the time, National Socialist Movement, was part of the Nationalist Front. I communicated with Schoep several times during the summer of 2017, mainly via email, regarding our logistical plans for getting into and out of the Lee/Emanicpation park area on 12 August 2017.

National Socialist Movement: See Jeff Schoep

Loyal White Knights of the KKK: I had, to the best of my recollection, no contact nor communications with this group from January to 13 August 2017.

East Coast Knights of the KKK: I had, to the best of my recollection, no contact nor communications with this group from January to 13 August 2017.

2. My expenses incurred in planning, organizing, and attending the Unite the Right event included a) the cost of fuel between Alabama and Virginia, which is broken down as follows: $23.20 to Quick Stop on 9 August; $27.00 to Sheetz on 10 August; $10.65 to unidentified provider on 11 August; $25.25 to Fastop on 13 August; and $34.70 to Shady's on 13 August. These were done via bank draft to The League of the South checking account at Alabama Credit Union. b) the cost of food: $9.60 to Polly's BBQ in NC on 10 August. Done via bank draft on League checking account at ACU. c) rental automobile from Enterprise, $338.15, paid for via personal Mastercard; lodging at SevenOaks Retreat Center, $260 paid in cash. The sources of the funds spent were 1) from League of the South dues and general donations and 2) my personal credit card and cash.

3. None

4. Besides being involved in the current Sines v. Kessler civil lawsuit, Michael Hill is a defendant in the following civil lawsuits: Civil Action No. 3:19-cv-00046, Harris v. Kessler and a civil action in Virginia state court (to the best of my recollection), information about which is in the possession of my attorney in Charlottesville.

5. As President of The League of the South, I posted two articles on our website (www.leagueofthesouth.com) during the period January 2017 to 13 August 2017. The first was posted on 9 June 2017 and was titled "League will be at Unite the Right rally, 12 August, Charlottesville, VA." It gave general information on the Unite the Right event, who, what when, where, and why. The second was posted on 7 August 2017, entitled "The League and the Unite the Right rally." It was my statement to our members. Here is the text of that statement:

A Statement on Legal Matters regarding The League of the South's Participation in the Unite the Right Rally
7 August 2017

On 12 August 2017, The League of the South is set to participate in the Unite the Right rally in Charlottesville, Virginia.

All members of The League, and of our Southern Defense Force (SDF), who attend this event will be required to abide by the following legal and moral constraints:

1. Obey all authorities charged with keeping public order at Lee Park and the surrounding areas. If you believe an order or command of a public official violates your right to free speech, assembly, or some other matter, report this to our League leaders and we will in turn report to our attorneys on the scene.

2. Obey all applicable laws and statutes regarding the possession and bearing of firearms and other weapons, clothing, and other accoutrements and accessories.

3. Be respectful of all public and private property.

4. Do not verbally incite illegal behavior.

5. Engage in violence, and at the proper level, only in defense of your own person, that of your compatriots, and your property. Stand your ground, speak your mind, and proclaim your message, but do not initiate physical contact with anyone who opposes you.

6. Be honorable in all your dealings.

Michael Hill
President, The League of the South

Both these statements are still available to be seen on our website.

I also used social media—my personal and League of the South Facebook accounts and my personal Twitter account—to help publicize the Unite the Right event. However, all of those account were shut down between mid-August and December of 2017. No longer having access to them, I cannot be more specific about what was posted regarding my efforts to advertise and/or promote the event in question.

6.  I had, to the best of my recollection, no communications with any law enforcement officials during the period under question.

7. I had, to the best of my recollection, no communications with any government officials during the period under question.

8. I had, to the best of my recollection, no communications with any school officials during the period under question.

9.  I have had no relationship with any of the defendants in Sines v. Kessler, other than the communications set forth in section 1, with the exception of the unofficial cooperation with the Nationalist Front, which continued until the spring/summer of 2018, at which time I decided that The League of the South would no longer work with other organizations who were a part of the Nationalist Front. I have held no titles, positions, and/or roles other than those described in sections 1 and 9.

10. I do not know any of the plaintiffs in Sines v. Kessler and am not aware of any acts of violence against them. Moreover, I am not personally aware of any acts of violence committed against any of the defendants in Sines v. Kessler.

11. I carried a concealed Glock model 30 handgun (.45 caliber) during the Unite the Right event. I possessed a concealed carry permit, issued by the State of Alabama, which covers my right to concealed carry in several states, including Virginia. I purchased the weapon, to the best of my knowledge, in 2012 in Killen, Alabama, from a local gun shop for the purpose of self defense.

12. I encouraged League of the South members who were planning to attend the Unite the Right event to carry whatever weapons that were legal under state and local law and that they thought they would need for their own self protection. This was done via an announcement on our website, www.leagueofthesouth.com on 7 August 2017. Here is the statement I made: "2. Obey all applicable

laws and statutes regarding the possession and bearing of firearms and other weapons, clothing, and other accoutrements and accessories." Also, this was included in the statement to our members: "5. Engage in violence, and at the proper level, only in defense of your own person, that of your compatriots, and your property. Stand your ground, speak your mind, and proclaim your message, but do not initiate physical contact with anyone who opposes you." The League of the South provided shields, which we made ourselves, for a dozen of our members. These were intended as defensive accoutrements and served us well as such.

Michael Dies

2ⁿᵈ Set of Interrogatories, 8 March 2020

For The League of the South

1. The League of the South is divided into three primary levels, from top to bottom: a) the national office in Killen, Alabama; b) the various State Chapters, each headed by a State Chairman who is selected by and serves at the pleasure of the League President; and c) local chapters, each headed by a local chairman who is selected by and serves at the pleasure of the State Chairman.

On the national level, The League has a Board of Directors, that is made up of three, five, or seven members (currently it is at three). We have a Staff Judge Advocate on the national level. We have a Chief of Operations on the national level. We have a Chief of Staff on the national level. We also have a Staff on each level—national, state, and local. There are seven staff positions on each level—a) personnel; b) intelligence and security; c) training/education; d) logistics; e) public relations; f) communications; and g) medical. Not all of these positions are filled at present on the state and local levels. Each staff level is headed by a Chief of Staff.

Following are the names of the people who served in these positions on the national level from January 2017 to January 2018: President: Michael Hill; Board of Directors: Michael Hill, Michael Tubbs, Mark Thomey, and Patrick Hines, plus one vacancy; National Staff: Chief of Staff: Michael Tubbs. Personnel: Michael Hill. Intelligence and Security: John Malone (deceased)/Paul Lawrence. Training: Gordie Lockerbie. Logistics: Jonathan Adams. Public Relations: Brad Griffin (aka Hunter Wallace); Communications: Patrick Hines. Medical: Zelena "Zee" Ritchie (aka Zee James). Staff Judge Advocate: A. Thomas Davis. Chief of Operations: Robert Baker.

State Chairmen: Alabama, Michael Whorton; Arkansas, Robert G. Miller; Georgia, Thomas Davis; Kentucky, Spencer Borum; Louisiana, John Malone (acting temporary); Mississippi, L. E. Matthews; Missouri, Robert Mills; North Carolina, Harold Crews; Oklahoma, Garry Solomon; South Carolina, Patrick Hines; Tennessee, Richard Hamblen; Texas, Luke Daggett; Virginia, Greg Randall; and West Virginia, William Milstead.

2. For core values and beliefs, see addenda #1, League of the South Core Beliefs Statement. We promote our core beliefs through our website, www.leagueofthesouth.com; through our quarterly tabloid, The Free Magnolia; through public speeches and demonstrations, rallies, etc.; and guest appearances on podcasts, radio shows, and other means of public communications.

3. An individual may apply for membership in The League of the South by sending in a membership application downloaded from our website, www.leagueofthesouth.com or by contacting us in the national office by phone, US mail, email, or social media and requesting an information packet which includes a membership application (which is printed in our quarterly tabloid, The Free Magnolia, a copy of which is included in the information packet). A sample copy of our prospect letter is included as addenda #2. We now require that each prospective member provide us a copy of his/her drivers' license or another official photo ID for security purposes. We also require a signature confirming the new member's adherence to our goals and principles, which are broadly speaking, the survival, well-being and independence of the Southern people. League membership is restricted to Whites who are heterosexual. We do not accept non-Whites or homosexuals in our organization. Though most League members are Christians, we do not require our members to hold those beliefs. However, we do not accept anyone who is overtly hostile to the Christian religion. Though we are limited in our ability to thoroughly vet all who apply for membership, we do look into their background and character as much

as possible with the resources we have available. If there is a question about an applicant's suitability for membership, it is discussed and decided, when necessary, by the LS Board of Directors, the Chief of Staff, and/or the applicable State Chairman, in conjunction with the League President. We have no initiation procedures or rituals.

4. a) Dr. Michael Hill, President, who accepted the invitation from Unite the Right organizer Jason Kessler to participate in the event. This invitation was accepted, as best I remember, in May 2017. Hill also directed the process of preparing the League of the South to go to Charlottesville on the weekend on 12 August 2017, to participate in the event (including providing two speakers, Hill and then-Arkansas State Chairman, Robert G. Miller) and return safely from the event. b) Robert Baker, The League of the South's Chief of Operations, was charged by Hill with making plans to get us safely into and out of Lee Park. By June 2017, to the best of my recollection, I had instructed Mr. Baker that we would not participate in Jason Kessler's security plan, which both Mr. Baker and I believed to be insufficient for our security. Thus Mr. Baker, in consultation with me, largely by phone conversation, formulated a plan to get us (and those who wished to participate with us in getting into and out of Lee Park) to the parking garage on East Market Street, to Lee Park, and back again to the parking garage, and from there out of Charlottesville proper. c) Jonathan Adams, our logistics officer, found our accommodations for the weekend of 12 August, handled the financial affairs in collecting money and paying for said accommodations. We stayed at Sevenoaks Retreat Center in Madison, VA (see addenda #3, rental agreement for Sevenoaks). d) Michael Tubbs, Chief of Staff, consulted with me, as necessary, about general planning and preparation for the event. e) John Malone, now deceased, our security office, consulted with me by telephone, as necessary, about the threats posed by Antifa, Black Lives Matter, and other potentially hostile groups who might be expected to oppose our presence at the Unite the Right event. From his information, we deduced that our members would be in possible danger from these groups, based on the latter's conduct at places such as Berkeley and Sacramento, CA, and various Trump presidential campaign rallies, at which Antifa in particular assaulted people with whom they disagreed politically. After consulting with Mr. Malone, we decided it would be necessary to advise our members attending the event to take defensive measures for their protection. Thus we advised them to consider protective accoutrements such as shields (which we provided to the number of 12), helmets, and other defensive items such as safety glasses, protective footwear, etc. f) Danny Hembree, a League of the South member, who volunteered to make our shields for the event. He made 12 of them, which we distributed to our members on 12 August, before leaving Sevenoaks for Charlottesville. g) Zelena "Zee" Ritchie (aka Zee James), our medical officer, who was instructed to prepare to treat various injuries, ranging from cuts and bruises to pepper spray and other airborne irritants. As it turned out, her presence was necessary to treat numerous people, our own as well as others, who were the victims of chemical agents as well as physical assault, especially from objects thrown at us by the counter-protesters. h) Brad Griffin, our PR chief, was asked by me to help publicize the event through his own non-League channels on social media. As best I remember, I handled all the pre-event PR on our website, www.leagueofthesouth.com. Not having access to my own or The League's previous Facebook or Twitter accounts, I cannot recall what either Mr. Griffin or I (or anyone else) may have done in publicizing or planning for the event beforehand through those channels. To the best of my recollection, these are all our members who participated in the planning and organization for the League in regard to the event.

5. To the best of my recollection, these are the League of the South members who attended the Unite the Right event in Charlottesville on 12 August 2017: Michael Hill, Michael Tubbs, Spencer Borum, Robert Baker, Brandon Richey, Ryan King, Clay Pinkston, Richard Hamblen, Rayn Owens, Patti Owens, Greg Randall, George Randall, Jessica Reavis, Tyler Davis, Chris Cedeno, Harold Crews, Randy Williams, Thomas Davis, Zelena "Zee" Ritchie (aka Zee James), Dustin Ritchie, Sara

Williamson, Jonathan Adams, Patrick Hines, Brad Griffin, Renee Griffin, Jody Huie, Walt Mansfield, Peter Kauffman, Garon Archer, Jim O'Brien, Candace O'Brien, Mary Barlow, Eddie Miller, Marshall Rawson, Garry Solomon, Shaun Winkler, William Hunter, Charles Hunter, Zachary Brown, Robert Miller. There were a few who claim to have attended the event who were not League of the South members at the time but have since joined our organization. I have not listed those simply because I cannot verify the veracity of all their claims. We keep no official roll or log book regarding which League of the South members attended the event. Thus, the above list is done primarily from memory and from inquiries to League members (e.g. "Were you at Charlottesville on 12 August for the Unite the Right event?").

6. To the best of my knowledge, the following means were used by League of the South members to communicate with one another from January 2017 to January 2018: a) in person communications; b) phone; c) text message; d) Signal; e) email; f) Discord; g) Gab; h) Twitter DM; I) Facebook PM; j) VK.

7. The following list of communications is presented to the best of my recollection. I no longer have access to the Twitter account or Facebook accounts I had in 2017; therefore, I am able only to present here the communications I had using other methods of which I still have access to. 1) Jason Kessler. To the best of my recollection and ability to access Twitter, Facebook, and phone logs from 2017, I, in my capacity as League of the South President, had several phone conversations with Mr. Kessler regarding my role as a speaker at the Unite the Right event and League participation therein. Also, I discuss with him general matters about organizing the event (especially logistics and security concerns). In addition, I had several communication with Kessler via Facebook Private Messenger on the same general topics, though I no longer have access to them because that account was closed down in August 2017. I cannot remember if we had any communication via Twitter (as I no longer have access to that account). I received an email from Kessler via my jmichhill@cs.com address on 14 June 2017, with an attached Operational Document regarding timetable and logistics. After studying this document, which raised, in my opinion, concerns regarding proper security, I decided that The League of the South would work up our own plan for logistics and security, especially getting into and out of Lee Park safely. After searching my email account, this is the only email I could find either from or to Mr. Kessler. 2) Richard Spencer. I don't recall The League of the South having had any communications with Mr. Spencer regarding any subject from January 2017 until 12 August 2017. 3) James Alex Fields, Jr. I don't recall The League of the South having had any communications with Mr. Fields regarding any subject from January 2017 until 12 August 2017. 4) Vanguard America. I don't recall The League of the South having had any communications with Vanguard America regarding any subject from January 2017 until 12 August 2017. 5) Andrew Anglin. I don't recall The League of the South having had any communications with Mr. Anglin regarding any subject from January 2017 until 12 August 2017. 6) Christopher Cantwell. I don't recall The League of the South having had any communications with Mr. Cantwell regarding any subject from January 2017 until 12 August 2017. 7) Matthew Heimbach: As League President, I communicated with Mr. Heimbach from January 2017 until 12 August 2017, in person, by phone, and by social media. No records were kept regarding specific topics discussed in person or by phone. I cannot recollect the specific details of any communications we had on social media because I no longer have access to my Twitter and Facebook accounts being used at that time. I did accept an invitation from Mr. Heimbach to participate in an event in Pikeville, Kentucky, in April 2017, as part of a loose alliance known at the Nationalist Front. We had further communications in the summer of 2017, mainly by phone, about the logistics of getting into downtown Charlotteville and out again as safely as possible on 12 August. I have no knowledge nor records of any other League of the South contact with Mr. Heimbach during this period. 8) Matthew Parrott. I don't recall The League of the South having had any communications with Mr. Parrott regarding any subject from January 2017 until 12 August 2017. 9) Traditionalist Workers Party. See Matthew Heimbach above. With the

exception of Mr. Heimbach, I don't recall The League of the South having had any communications with the Traditionalist Workers Party regarding any subject from January 2017 until 12 August 2017. 10) Moonbase Holdings, LLC. I don't recall The League of the South having had any communications with Moonbase Holdings, LLC, regarding any subject from January 2017 until 12 August 2017. 11) Robert "Azzmador" Ray. I don't recall The League of the South having had any communications with Mr. Ray regarding any subject from January 2017 until 12 August 2017. 12) Nathan Damigo. I don't recall The League of the South having had any communications with Mr. Damigo regarding any subject from January 2017 until 12 August 2017. 13) Elliott Kline (aka Eli Mosely). I don't recall The League of the South having had any communications with Mr. Kline/Mosely regarding any subject from January 2017 until 12 August 2017. 14) Identity Europa. I don't recall The League of the South having had any communications with Identity Europa regarding any subject from January 2017 until 12 August 2017. 15) Nationalist Front: The Nationalist Front, to the best of my knowledge, was founded and organized by Matthew Heimbach in the spring of 2017. Other than the communication mentioned above with Matthew Heimbach, we had no communication with the Nationalist Front other than participating as a part of this loose alliance at Pikeville, Kentucky (in April 2017) and Charlottesville, VA at the Unite the Right event (12 August 2017). 16) Augustus Sol Invictus. I don't recall The League of the South having had any communications with Augustus Sol Invictus regarding any subject from January 2017 until 12 August 2017. 17) Fraternal Order of the Alt-Knights. I don't recall The League of the South having had any communications with the Fraternal Order of the Alt-Knights regarding any subject from January 2017 until 12 August 2017. 18) Michael "Enoch" Peinovich. I don't recall The League of the South having had any communications with Mr. Peinovich regarding any subject from January 2017 until 12 August 2017. 19) Michael Tubbs. Mr. Tubbs is The League of the South's Chief of Staff. Our discussion from January 2017 until 12 August 2017, as they touched on the Unite the Right event, regarded a general discussion of logistics, what League personnel would be attending the event, and how we would handled the matter of security. Besides numerous phone calls, of which no record of the discussion was preserved, I had the following email contacts (on my jmichhill@cs.com account) with Mr. Tubbs. All communication were regarding League of the South general business that had nothing to do with the Unite the Right event: 1/3; 1/22; 1/23; 2/9; 2/14; 2/14; 2/25; 2/25; 3/21; 3/29; 4/20; 5/14; 5/16; 7/9; and 8/8. Any communications I may have had with Mr. Tubbs by Twitter or Facebook is no longer available to me. Mr. Tubbs and I texted back and forth to each other during the period in question on the following days: 2/18; 2/22; 3/5; 3/7; 4/26; 5/6; 5/7; 5/8; 5/31; 6/25; 6/26; 7/11; 7/12; 7/19; and 7/25. Most of these were discussion regarding League business that had nothing to do with the Unite the Right event. The ones that did concern the Unite the Right event had mainly to do with having our Chief of Operations, Robert Baker, contact local law enforcement in the Charlottesville area about our security and logistics concerns for the weekend. As best I recall, these are the only means of communication I had with Mr. Tubbs during this period. 20) Jeff Schoep. In my capacity as President of The League of the South, I communicated with Jeff Schoep, who in 2017 was the leader of the National Socialist Movement (NSM). To the best of my recollection, we communicated by phone, in person (at a Nationalist Front sponsored event in Pikeville, Kentucky, in April 2017) and by email. There is no extant record of our discussions by phone or in person. We did exchange a few emails on my jmichhill@cs.com account, dated 9 August 2017 (a formal announcement from NSM about their plans to participate in the Unite the Right event as part of the Nationalist Front; 15 and19 June, a request from Mr. Schoep for my bio and the bio I sent him; on 10 May we exchanged emails regarding The League of the South's participation in an event in New Orleans, LA, a few days prior; on 5 May about our upcoming event in New Orleans, LA. I have no recollection (or means of determining) whether I communicated with Mr. Schoep on Twitter and/or Facebook during this period. 21) National Socialist Movement. Other than my communications listed above with Jeff Schoep, I have no recollection of any other League of the South communications with the National Socialist Movement that were carried out or recorded during the period under question.

22) Loyal White Knights of the KKK. I don't recall The League of the South having had any communications with the Loyal White Knights of the KKK regarding any subject from January 2017 until 12 August 2017. 23) East Coast Knights of the KKK. I don't recall The League of the South having had any communications with the East Coast Knights of the KKK regarding any subject from January 2017 until 12 August 2017.

8. Because all individual League of the South members took care of their own expenditures for lodging at Sevenoaks Retreat (collected and paid by our then Logistics Chief Jonathan Adams), as well as food and travel expenses, The League of the South itself, as a separate entity, had no official expenses for the Unite the Right event. We did receive the following donations in order to help reimburse some of our members for gas, food, and lodging: $40.00 from Jean and Frank Allen (AL) in July 2017; $80.00 from Michael Messick (NC) in July 2017; and $40 from Randy Williams (NC) in July 2017. The only items provided our members by The League of the South were one dozen shields, which were donated to us free of charge by Alabama member Danny Hembree.

9. The League of the South, as an organization, has never been charged in a criminal proceeding.

10. Besides being involved in the current Sines v. Kessler civil lawsuit, The League of the South is a defendant in the following civil lawsuits: Civil Action No. 3:19-cv-00046, Harris v. Kessler and a civil action in Virginia state court (to the best of my recollection), information about which is in the possession of our attorney in Charlottesville.

11. The League of the South, through the direction of its President, Michael Hill, posted two articles on its website (www.leagueofthesouth.com) during the period from January 2017 until 13 August 2017. The first was posted on 9 June 2017 and was titled "League will be at Unite the Right rally, 12 August, Charlottesville, VA." It gave general information on the Unite the Right event: who, what, when, where, and why. The second was posted on 7 August 2017, entitled "The League and the Unite the Right rally." It was President Michael Hill's statement to League members about what would be expected of them if they attended the event in question. For the text of this statement, see the second set of interrogatories for Michael Hill, directive #5. Both of these statements are still available for viewing on our website. The League of the South also used social media, especially Facebook, to help publicize the Unite the Right event. However, all of these accounts were shut down shortly after the event. No longer having access to them, The League of the South cannot be more specific about what was posted therein regarding our efforts to advertise and/or promote the Unite the Right event.

12. In the summer of 2017, though I cannot recollect exactly when, I communicated to The League of the South Chief of Operation, Robert Baker, via phone to try and open communications with local (Charlottesville/Albemarle Co.) and/or state police in Virginia. The general purpose of this was twofold: 1) to determine what sort of threat we might be facing in the streets of Charlottesville, based on whatever information law enforcement might be willing and able to provide us; and 2) to let them know who we were, what our general plans were for arriving at and leaving from the general area of Lee Park, and if there were any special laws or regulations for the weekend of which we needed to be aware to be in compliance with local and state laws. Mr. Baker made calls to the Charlottesville Police Department, the Albemarle Co. Sheriff's Department, and the Virginia State Police. In all, according to Mr. Baker, he made around half a dozen calls to these agencies. No written or other records were kept and he cannot recall the names of anyone with whom he spoke. None of the calls, according to Baker, were productive in nature.

13. To the the best of my knowledge, The League of the South had no communications concerning the Unite the Right event with any government officials.

14. To the the best of my knowledge, The League of the South had no communications concerning the Unite the Right event with any school officials.

Answers provided for The League of the South by President Michael Hill

#1

## LEAGUE OF THE SOUTH
## CORE BELIEFS STATEMENT

At its founding meeting in June 1994, The League of the South adopted the following Statement of Purpose: "We seek to advance the cultural, social, economic, and political well-being and independence of the Southern people by all honorable means." *Our Core Beliefs Statement is a more detailed explanation of our views on the four areas set forth above—the cultural, social, economic, and political.*

### I. Cultural Independence

The League of the South believes that Southern culture is distinct from, and in opposition to, the corrupt mainstream American culture. Therefore, we stand for our own sublime cultural inheritance and seek to separate ourselves from the cultural rot that is American culture. We believe that

- The South still reveres the tenets of our historic Christian faith and acknowledges its supremacy over man-made laws and opinions; that our Christian faith provides the surest means of securing the welfare of all mankind; and that our primary allegiance is to the Lord Jesus Christ and His Holy Church.
- Our strongest and most enduring earthly affections and allegiances are to those people and places closest to us—family, friends, neighbors, villages, towns, cities, counties, and States. Conversely, our weakest attachments are to far-off abstractions such as "the nation," "the environment," or the "global community."
- Southern artists, writers, poets, musicians, and playwrights have produced world-class works of art and literature. Such endeavors must be nurtured and preserved for future generations of Southerners.
- Southerners are a people bound closely to the land. It is more than just a resource for production; it is who we are. It defines both our character and worldview.
- Southerners have respect for human life, in all its stages, as a gift from God. Life should be preserved, nurtured, and protected.

### II. Social Independence

The League of the South asserts that Southern society is radically different from the society impressed upon it by an alien occupier. American society today is egalitarian and Marxist and is devoid of any grace or charm. In contrast, we believe in a Southern society that

- Upholds the ontological or spiritual equality of all men before God and the bar of justice, while recognizing and rejoicing in the fact that it has neither been the will of God Almighty nor within the power of human legislation to make any two men mechanically equal.
- Is structured upon the Biblical notion of hierarchy. In short, a recognition of the natural societal order of superiors and subordinates where Christian charity (as found in the second Table of the Law) toward our neighbors produces harmony and stability. Christ is the head of His Church; husbands are the heads of their families; parents are placed over their children; employers rank above their employees; the teacher is superior to his students, etc.
- Recognizes and promotes the sanctity of Christian marriage as an image of the relationship between Christ and His Church; understands that loving and stable families are the backbone of society; stigmatizes perversity and all that seeks to undermine marriage and the family.
- Teaches and practices good manners and the famed "Southern hospitality," which are outward manifestations of the recognition that our fellow men are made in the image of God and should be treated according to God's law.
- Perpetuates the chivalric ideal of manhood—respect for, and protection of, our women, and the development of the virtues of honesty, courage, honor, and humility.
- Values and sustains true freedom of association for individuals, families, organizations, and other human institutions.

- Believes in the rule of law and the wise, benevolent, and righteous application of justice by ecclesiastical and civil authorities.

III. Economic Independence

The League of the South asserts that the system of fiat currency, fractional reserve banking, unfair trade agreements, outsourcing of jobs, and confiscatory taxation imposed by the American Empire have reduced considerably the Southern people's standard of living. We believe in an economic and financial system that

- Has a monetary system where the currency is fully backed by gold and silver bullion.
- Abolishes all forms of the "income tax" on individuals and families
- Has no central banking system
- Abolished all taxes on real property, both during the life of its owner and at his death, and established alloidal title to land as the only recognized form of ownership.
- Levies indirect taxation (e.g. sales and use taxes, tolls, etc.) as a reasonable and necessary means for the support of government functions.
- Enforces a "full disclosure" policy against banks that practice fractional reserve banking.
- Sets reasonable legal limits on usury.
- Establishes equitable and just trade agreements with foreign nations.
- Keeps regulation of business and commerce to a reasonable limit.

IV. Political Independence

The South's political ideals and principles are rooted in the assertion that our unalienable rights are a gift from God, not privileges that are granted or denied by any governmental authority; that a truly free people has the right and power to determine its own form of government; that governmental power should reside as close to the people as possible and that competing governmental bodies should have meaningful checks on one another's use of power. Another certainty is that the American Empire that now occupies the South believes in none of the aforementioned ideals and principles. To be truly free and self- governing, the South must throw off the yoke of imperial oppression. Therefore, The League of the South advocates the secession and subsequent independence of the Southern States from this forced union and the formation of a Southern republic. We envision a free Southern republic that

- Is a true constitutional confederation of sovereign, independent States who separately order and control their own internal affairs while working in unity with their sister States to conduct foreign affairs.
- Recognizes State representation in the legislature of the confederated States.
- Acknowledges that the individual States have constitutional rights of nullification, interposition, and secession.
- Practices a foreign policy of armed and vigilant neutrality (i.e. commerce and friendship with all, entangling alliances with none).
- Maintains secure borders and strictly limits immigration.
- Revives the use of State Militias in place of maintaining large, standing armies.
- Does not infringe upon the individual or collective right to purchase and own firearms of any type suitable for self-defense
- Restricts the right to vote solely to those who are recognized as citizens of one of the member States of the confederation.

#2

League of the South
P.O. Box 760
Killen, Alabama 35645

(256) 757-6789

www.leagueofthesouth.com

1 January 2020

John Doe
123 4th St.
Anytown, USA 12345

Dear Mr. Doe:

This is an invitation to you to apply for membership in The League of the South. We are a Southern nationalist organization, in existence since 1994, and are open to White, straight, gentile Southerners and others of like status and mind who support the reality of a free and independent South.

We seek the survival, well-being, and independence of the Southern people, our nation, and the establishment of a state that will uphold and protect our own interests. We must, first and foremost, have a secure homeland—Dixie—which we control for the furtherance of our own people and their prosperity.

To apply for membership, please submit the membership form which is contained in the copy of The Free Magnolia included in this packet. Also, submit a photocopy of your drivers license (both sides) for identification and security purposes. Once we receive your information and dues, we will make a decision on your application and get back to you. If you are not accepted, we will of course refund your dues immediately.

Once you become a member, you will be contacted by your State Chairman or another League officer and given the information you need to become active in our cause.

We hope that you will consider membership in The League. But we understand that it is not for everyone. We take our duty very seriously and expect all members to do the same. May God bless you and may He favor our noble cause.

All the best.


Michael Hill
President

*#3*

# SEVENOAKS RETREAT CENTER
# RENTAL AGREEMENT

403 Pathwork Way
Madison, VA  22727
(540) 948-3185 Rentals & Events Office/Gretchen's Office
(540) 948-3956 Fax



**SEVENOAKS**
Retreat Center

---

Dates: August 24th – August 27th, 2017          Deposit: $640                    Date Paid:

| Name of Group:<br>Private Retreat: Men's Group Retreat | **Total Amount Owed:** | |
|---|---|---|
| | **65 Guests:  (2) Nights / $40 per night** | **$5,200** |
| | **2 Days Exclusive use @ $200 per day** | **$400** |
| |    **(1)  Bonfire Saturday Evening** | **$35** |
| | | |
| | **Occupancy Tax $1 per guest per night** | **$130** |
| | **Total Due:** | **$5,730** |
| | **Lesss Deposit** | **$640** |
| | | |
| | **Balance Due Upon Arrival** | **$5,090** |
| Address 1: | [Madison Co. Occupancy Tax = $1 p/p p/night ] | |
| Address 2: | | |
| Contact: Jonathan Adams | Type Service:  Co-op Service | |
| Telephone: 336-957-7165 | Alternate Telephone: none given | |
| Email: beyondthe48@hotmail.com | Number of Guests: (65) | |

| You may arrive no sooner than: | 12:00 p.m. | On 8/11/17 |
|---|---|---|
| Guest will depart bedroom by: | 10:00 a.m. | On 8/13/17 |
| Guest may remain on the grounds until | 10:00 a.m. | On 8/13/17 |

**House Assignment:**
☒ All Lodging spaces and rooms

| Authorized Signature for Retreat | Date |
|---|---|
| | |
| *Paul Klinger* | 8/9/17 |
| Center Director | Date |

**This Men's retreat led by Jonathan Adams is both the Guest and Renter in this rental agreement document.**

**Renter as Guest Expectations:**  Renter is responsible for 100% of expected payment. Once the rental begins, Sevenoaks will not refund should you not show up or if you should leave prior to completion of the Personal Retreat event.

**Liability:** Renter assumes full responsibility for all damages incurred during the rental.  A credit card will be held on file to cover damages.  Sevenoaks will notify renter within 7 days of any damages incurred at which time the credit card on file will be charged.

**Cancellation:** Renter may terminate with a notice of at least 48 hours in advance of the date the rental is due to begin. (Any money pre-paid is non-refundable)
**Cancelling? Please call Paul Klinger: 540-948-6544**

Sevenoaks reserves the right to cancel the contract for unforeseen natural occurrences, including but not limited to fire and flood. In the event of an unforeseen natural occurrence, such as but not limited to snow, the renter will remain liable for the fulfillment of the contract if the Sevenoaks area itself is accessible and available (Highway 29 open, local roads and Sevenoaks driveway open; Charlottesville airport, bus lines or trains operating.)

If Sevenoaks is not accessible, Sevenoaks will offer the renter an alternate date.

**Sevenoaks reserves the right to cancel for "good cause" with no liability if renter's behavior is deemed damaging or potentially damaging to Sevenoaks.**

**Retreat Environment:** Sevenoaks is a retreat center that strives to maintain a healing environment for its guests. We ask that all renters respect the physical environment of this center. No violence, weapons or illegal drugs are allowed on the property.

Sevenoaks will provide no alcohol. Renters may bring and serve alcohol providing they have all required permits and are in adherence with the laws of the state of Virginia. Copies of all necessary paperwork will be provided to Sevenoaks **prior** to the rental start date.

- o **Type of service:**
    - o Guests will be given linens at the end of each assigned bed and will make and strip their own beds. Upon departure linens and towels are to be placed in the laundry rooms or hampers in each respective house.
    - o Before your arrival and to help avoid any confusion we ask that you relay the expectations of this service level to your guests with the understanding that the Renter or organizers of the group have chosen this discounted level of service—not Sevenoaks.

**Arrival & Departure Times:** You should arrive no more than one hour prior to the contracted time the rental begins and leave within one hour of the contracted end time unless prior arrangements have been made. You may be asked to check-out early but you will be allowed to walk the nature trails and enjoy outdoors until you wish to leave.

2                     Initial _____  Date _____

**Additional Guidelines:**

**Smoking:** No smoking is allowed in any building or on the grounds or forest area. Because of the grave danger of forest or brush fires, we require that guests smoke only on decks and porches where sand-filled pots for cigarette disposal are located. (Please note that not all decks are smoking decks.) A fine of up to $500 will be charged to renters or guests who do not observe this rule.

**Pets: We love animals** however the pets of guests are not allowed on property. Please contact us prior to your arrival if you need local pet boarding information.

We do not assume responsibility for **accidents, theft or losses** while rental guests are on the property.

**Lost and Found** items are kept for 30 days. If an item has not been reported missing or if it has not been picked up within three months, the item will be disposed of.  Sevenoaks will mail claimed items to the owner at their request and will ask for a credit card to cover the postage and handling.

**White towels are for showering only.** They may not be used at the pond, sweat lodge or river. Colored "Pond towels" are available for guest use and can be found under the sinks in the Center Building Men and Women's restrooms. Please leave these towels in your room upon departure.

**Blankets, bedspreads and pillows are intended for indoor use only.**

If a guest moves any **furniture or rugs, these items are to be returned in their original condition to the original set-up positions** prior to departure.

**Renter is responsible for replacement/repair costs for any furnishings, tokens, decor that are broken, damaged or stained.** Renter is responsible for reporting any damages that occur.

Please initial and date the bottom of the first two pages, and sign and date the bottom of this page acknowledging you have read this agreement and will adhere to all terms.


_____

Signature                                                                                           Date

Sevenoaks is a non-profit, tax-exempt educational corporation whose mission is to provide a healing environment for personal transformation and spiritual education. As part of our mission, we host a variety of other groups whose work overlaps ours in ways that we feel will further positive change in individuals and the world. We regard your work as compatible with our own, and therefore, we extend our facilities to you with the rental contract and supplement. For our files, please let us know your legal name: _____, Tax status_____, and Federal ID number _____.

3                          Initial _____   Date _____