1                    S. WISPELWEY

 2          UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF VIRGINIA
 3            Charlottesville Division
   _____
 4                                     :
   ELIZABETH SINES, SETH               :
 5 WISPELWEY, MARISSA BLAIR,           :
   TYLER MAGILL, APRIL MUNIZ,          :
 6 HANNAH PEARCE, MARCUS               :
   MARTIN, NATALIE ROMERO,             :
 7 CHELSEA ALVARADO, and               :
   JOHN DOE,                           :
 8                                     :
                  Plaintiffs,          :
 9                                     :   CIVIL ACTION NO.
              vs.                      :   3:17-cv-00072-NKM
10                                     :
   JASON KESSLER, RICHARD              :
11 SPENCER, CHRISTOPHER CANTWELL,      :
   JAMES ALEX FIELDS, JR.,             :
12 VANGUARD AMERICA, ANDREW            :
   ANGLIN, MOONBASE HOLDINGS,          :
13 LLC, ROBERT "AZZMADOR" RAY,         :
   NATHAN DAMIGO, ELLIOT KLINE         :
14 a/k/a ELI MOSLEY, IDENTITY          :
   EVROPA, MATTHEW HEIMBACH,           :
15 MATTHEW PARROTT,                    :
   TRADITIONALIST WORKER PARTY,        :
16 MICHAEL HILL, MICHAEL TUBBS,        :
   LEAGUE OF THE SOUTH, JEFF           :
17 SCHOEP, NATIONAL SOCIALIST          :
   MOVEMENT, NATIONALIST FRONT,        :
18 AUGUSTUS SOL INVICTUS,              :
   FRATERNAL ORDER OF THE              :
19 ALT-KNIGHTS, MICHAEL "ENOCH"        :
   PEINOVICH, LOYAL WHITE KNIGHTS      :
20 OF THE KU KLUX KLAN, and EAST       :
   COAST KNIGHTS OF THE KU KLUX        :
21 KLAN, a/k/a EAST COAST KNIGHTS      :
   OF THE TRUE INVISIBLE EMPIRE,       :
22                                     :   JOB NO: 181849
                  Defendants.          :
23 _____ :

24          TELEPHONIC ZOOM DEPOSITION OF
                   SETH WISPELWEY
25            Friday, July 24, 2020

```
1                S. WISPELWEY

2

3              Job No. 180216

4            Friday, July 24, 2020

5              9:33 a.m.(MST)

6

7

8

9

10        TELEPHONIC ZOOM DEPOSITION OF SETH

11  WISPELWEY, produced as a witness at the instance of

12  the Plaintiffs, and duly sworn remotely, by

13  agreement, was taken in the above-styled and

14  numbered cause before Dawn K. Larson, RDR, CRR, CRC,

15  reported by machine shorthand remotely  pursuant to

16  the Rules of Civil Procedure and any provisions

17  stated on the record or attached hereto.

18

19

20

21

22

23

24

25
```

```
1                S. WISPELWEY

2  APPEARANCES:

3  For the Plaintiffs:

4        JESSICA PHILLIPS, ESQ.
          Boies Schiller Flexner
5        1401 New York Avenue Northwest
          Washington, DC 20005

6

7  For the Defendants:

8        JAMES KOLENICH, ESQ.
          Kolenich Law Office
9        9435 Waterstone Boulevard
          Cincinnati, OH 45249

10

11        DAVID CAMPBELL, ESQ.
          Duane Hauck Davis Gravatt & Campbell
12        100 West Franklin Street
          Richmond, VA 23220

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                S. WISPELWEY
2             I N D E X
3  SETH WISPELWEY
4  EXAMINATION                      PAGE
5  By Mr. Campbell:              5, 214
   By Mr. Kolenich:                  99
6
   EXHIBITS
7
   Exhibit 1  Goad Gatsby Tweet      104
8
   Exhibit 2  Twitter response to Goad   104
9             Gatsby
10 Exhibit 3  Twitter account,       107
             re: milkshake
11
   Exhibit 4  8/12/17 Picture from Unite to 113
12            Right Rally, Charlottesville,
             Virginia
13
   Exhibit 5  Video of Wispelwey speaking  117
14
   Exhibit 6  Tweet from Wispelwey account 133
15
   Exhibit 7  8/13/2017 Boone Rising   148
16            Facebook Post
17 Exhibit 8  8/16/17 Slate article by  154
             Lithwick, Slate.com
18
   Exhibit 9  Photograph of possible   160
19            protestors
20 Exhibit 10 12/8/18 Wispelwey tweet   162
21 Exhibit 11 2017.08 Defend           193
             Charlottesville Document,
22            Re: Heather Wilson
23 Exhibit 12 Picture of Soviet flag   197
24
25
```

```
1                S. WISPELWEY
2          P R O C E E D I N G S
3          SETH WISPELWEY,
4  having been first duly sworn remotely to state the
5  whole truth, testified as follows:
6              EXAMINATION
7  BY MR. CAMPBELL:
8      Q.   Good morning, Mr. Wispelwey.  My name is
9  Dave Campbell, and I represent Defendant James
10 Fields pursuant to his car insurance.  And I had
11 some questions for you today but wanted to ask you a
12 first:  Have you ever given a deposition before?
13     A.   I have not, no.
14     Q.   Okay.  Just some general suggestions or
15 statements that help, basically, to help the court
16 reporter take our conversation down today.
17         Even though I'm sure you'll know where I'm
18 going with some of my questions, please try to let
19 me finish the question before you begin to answer
20 and then I'll try to make sure you're completely
21 done answering before I pose another question.
22         If we're both speaking at the same time,
23 it's very difficult for the court reporter to take
24 our conversation down.
25         Okay, sir?
```

Page 6

```
1              S. WISPELWEY
2      A.   Sounds good.
3      Q.   And can you hear me okay?
4      A.   I can hear you great.  Thanks.
5      Q.   Okay.
6           And if -- you can't see me; I can't see
7   you either.  I'm only participating by phone.  So
8   don't think I'm watching you or anything and I'm
9   posing these questions.  I'm just on the phone.
10          MR. CAMPBELL:  Before we get started, I
11  wanted to just ask counsel to confirm, as we've done
12  with the other depositions, to confirm that you
13  stipulate this deposition is valid under Rule 30 of
14  the Federal Rules even though the court reporter is
15  not physically present with the deponent swearing
16  him in.
17          Does everyone agree that this is a valid
18  Rule 30 deposition?
19          MS. PHILLIPS:  Yes.
20          Dave, this is Jessica Phillips with Boies,
21  Schiller & Flexner, LLP, on behalf of plaintiffs,
22  and we do stipulate.
23          MR. KOLENICH:  Jim Kolenich.  I stipulate.
24          MR. CAMPBELL:  Thank you both.
25
```

Page 7

```
1              S. WISPELWEY
2   BY MR. CAMPBELL:
3      Q.   All right.  Reverend Wispelwey, as I
4   indicated, the court reporter is taking down the
5   conversation, so we need verbal answers.  Shaking
6   your head or nodding your head -- obviously, I won't
7   have any idea being on the phone, but, also, if you
8   respond to a yes-or-no question in a manner "uh-huh"
9   or "huh-uh," we'll probably all know what you mean
10  here today, but months from now, it can cause
11  disagreement.
12          So I may ask you to confirm, "Was that a
13  yes?" or "Was that a no?"  I'm not trying to be
14  rude.  I just want to make sure we're clear for the
15  record, sir.
16          Is that all right?
17     A.   That sounds good.
18     Q.   Okay.  And if you need to take a break at
19  any time for any reason, just let me know.  We're
20  happy to do so.  I would just ask, if there is a
21  question pending, that you answer whatever that
22  question is.
23     A.   Sounds good.
24     Q.   Oops, sorry.
25          Are you currently on any pain medication
```

Page 8

```
1              S. WISPELWEY
2   or other drug that would affect your ability to
3   understand or answer my questions here today?
4      A.   No.
5      Q.   And you understand the oath that you gave
6   at the beginning of this deposition is the same as
7   if you were in front of a judge in court?
8      A.   Yes.
9      Q.   Okay.  All right.
10          Would you please state your name and
11  then -- you don't have to give your physical address
12  but the city and state where you reside.
13     A.   My name is Seth Wispelwey.  I reside in
14  Tucson, Arizona.
15     Q.   Okay.  And obviously we're primarily here
16  to ask you questions relating to the Unite the Right
17  rally in Charlottesville, Virginia, and the events
18  surrounding.
19          At the time of the rally, did you reside
20  in Charlottesville, Virginia?
21     A.   Yes.
22     Q.   Okay.  How long ago did you move from
23  Charlottesville, Virginia?
24     A.   I moved from Charlottesville, Virginia, in
25  July 2019.
```

Page 9

```
1              S. WISPELWEY
2      Q.   Did you move directly to Tucson?
3      A.   Yes.
4      Q.   All right, sir.  Let me ask you:  What did
5   you do to prepare for this deposition today?
6      A.   For this deposition today, I met a handful
7   of times with my attorneys to discuss what was
8   coming.
9      Q.   Okay.  And I'm not asking you and can't
10  ask you anything about your discussions with your
11  attorneys, but did you review any documents in
12  preparation for this deposition?
13     A.   Yes.  We reviewed a few documents.
14     Q.   Okay.  And do you recall the names of
15  those documents or what documents you reviewed?
16     A.   Yes.
17     Q.   What were they?  What were the names of
18  the documents?
19     A.   I don't know that they had formal names.
20  We looked at various articles and emails and logs of
21  text messages.
22     Q.   Were the emails emails sent and/or
23  received by you?
24     A.   Yes, most of them were.
25     Q.   Okay.  And how about the log of text
```

1                    S. WISPELWEY
2  messages?
3          Were those texts you sent or received?
4      A.  Yes.
5      Q.  Okay.  Were those texts messages -- were
6  they close in time to the rally on August 12 in
7  Charlottesville, Virginia?
8          MS. PHILLIPS:  Objection.  Form.
9      A.  Some of them --
10         MS. PHILLIPS:  Go ahead, Seth.  You may
11 answer.
12     A.  Some of them, yes.
13 BY MR. CAMPBELL:
14     Q.  Okay.  And the ones that weren't close in
15 time to August 12 -- and, again, if any were to or
16 from your counsel, I'm certainly not asking about
17 those.
18         What did -- the text messages that were
19 not close in time to August 12, what were they
20 discussing?
21         MS. PHILLIPS:  Object to form.
22         You can answer.
23     A.  I don't recall all of them.  There were
24 several.  There were some in 2018 related to
25 communicating with colleagues and friends about

1                    S. WISPELWEY
2  ongoing events or the one-year anniversary of Unite
3  the Right.
4  BY MR. CAMPBELL:
5      Q.  Understood.
6          And, yeah, I'm certainly not asking you
7  for, you know, a specific recount of the text chain.
8  I was just trying to get a general idea of what
9  other texts you were reviewing in preparation for
10 this deposition other than texts, you know,
11 involving the rally.
12         All right.  Anything else that you
13 reviewed in preparation for this deposition other
14 than the emails and text chains you were discussing?
15     A.  Not that I recall, no.
16     Q.  Okay.  For example, did you look at
17 discovery answers, interrogatory answers, that you
18 may have completed with counsel?
19     A.  Yes.  We did review at one point a couple
20 of interrogatory answers.
21     Q.  All right.  And as I understand it, you're
22 a reverend?  Is that accurate?
23     A.  Yes.
24     Q.  Okay.  So would you please recount for me,
25 post-high school, your education and training

1                    S. WISPELWEY
2  leading up to becoming a minister or reverend?
3      A.  Sure.  I completed an undergraduate
4  degree, a BA, at the University of Virginia in 2003.
5  I did my graduate work at Princeton Theological
6  Seminary in Princeton, New Jersey, and completed a
7  divinity degree with a specialty in pastoral care
8  and counseling at Boston College School of Theology
9  and Ministry in 2011.
10         I completed the requirements to become an
11 ordained Minister of Word and Sacrament with the
12 United Church of Christ in 2017, March of that year.
13     Q.  What did that involve, the becoming an
14 ordained minister with the United Church of Christ,
15 just generally?
16         MS. PHILLIPS:  Object to form.
17         You can answer.
18     A.  Generally, to become an ordained minister
19 in the United Church of Christ -- it is referred to
20 as a mainline protestant denomination in the United
21 States -- one has to be what is called a "member in
22 discernment" in covenant with a local church and
23 regional conference body for a period of around
24 two years and involves pulling together all of the
25 education accomplishments, writing, and additional

1                    S. WISPELWEY
2  education needed in things like polity and
3  governance as well as a paper of around 30 pages in
4  length documenting my understanding of my faith and
5  the denomination as well as approval --
6  BY MR. CAMPBELL:
7      Q.  Okay.
8          (Overlapping speakers.)
9      A.  Oh, I'm sorry.
10     Q.  No, no, no.  I apologize.
11     A.  As well as approval for a call, which
12 simply means, when first ordained, the local church
13 regional body agree to covenant in a particular
14 expression of how you'll be doing ministry.
15     Q.  Okay.  Do you have to do any, you know,
16 like, practice -- you know, like practice
17 ministering or preaching -- or however you would
18 describe it -- under the United Church of Christ?
19         MS. PHILLIPS:  Object to form.
20         Go ahead.
21     A.  Yes.  I interned as a hospital chaplain
22 for a year at Boston Medical Center.  I was a
23 chaplain at a university in the greater Boston area,
24 and a variety of other experiences go into the
25 determinations of certifying for ministry.

Page 14

S. WISPELWEY

1
2     So they were satisfied with the amount of
3  preaching and pastoral care I had done over the
4  course of my career up until that point.
5  BY MR. CAMPBELL:
6     Q.   Okay.  And what -- was it March in 2017 or
7  sometime in early 2017 you said you became an
8  ordained minister?
9     A.   That's correct, yes.
10    Q.   Okay.  And then how do you go about
11 getting assigned to a congregation?
12       Or how did you end up in Charlottesville,
13 Virginia, I guess, is a better way to ask it?
14    A.   My family and I moved back to
15 Charlottesville, Virginia -- it's where I grew up --
16 in the summer of 2013.  My covenant for ordination
17 was unique in that it -- but not out of left
18 field -- in that it was not for a specific
19 congregation but to pursue a ministry with a small
20 organization for artists and ministers that I ran.
21    Q.   What was the name of that organization?
22    A.   Restoration Village Arts.
23    Q.   And how many members were there at
24 Restoration Village Arts?
25       MS. PHILLIPS:  Objection.  Form.

Page 15

S. WISPELWEY

1
2       Go ahead.
3     A.   I'm not sure I understand the question.
4  It's -- Restoration Village Arts is not a membership
5  organization.
6  BY MR. CAMPBELL:
7     Q.   Okay.  So it's not akin to, like, having a
8  congregation or something like that; is that
9  correct?
10    A.   That's correct.  It's not a church in the
11 formal understanding of the word.
12    Q.   Could you kind of describe for me what you
13 might do in the average week or month in your
14 ministry at Restoration Village Arts?
15    A.   Sure.  At the time, the mission statement
16 of Restoration Village Arts was to be a learning,
17 education, and retreat center for artists and
18 ministers who are creating resources in today's
19 world that we determine to be in pursuit of ministry
20 and justice.  So we gave support in the form of tiny
21 grants, education opportunities and more for artists
22 and ministers working in a variety of different
23 fields.
24    Q.   Did you hold any sort of weekly or monthly
25 services or studies or anything of the sort?

Page 16

S. WISPELWEY

1
2     A.   No.
3     Q.   Okay.  Outside of your ministry with
4  Restoration Village Arts, did you attend weekly or
5  monthly services at any other church or religious
6  organization?
7     A.   Yes.
8     Q.   And where did you attend or go to church?
9     A.   I was a member and a regular attendee at
10 Sojourners United Church of Christ in
11 Charlottesville.
12    Q.   Okay.  Outside of your role in Restoration
13 Village Arts, did you have a leadership role in
14 Sojourners United Church of Christ?
15    A.   Yes.
16    Q.   What was that?
17    A.   My role was that of co-moderator within
18 the congregation.
19    Q.   Can you give me a very general idea what a
20 co-moderator's duties would entail?
21    A.   Sure.  The United Church of Christ is
22 what's called a "congregationalist denomination," so
23 authority and governance reside primarily at the
24 local level, and so the moderator or the
25 co-moderator, as there were two of us, are the

Page 17

S. WISPELWEY

1
2  conveners and sort of overseers of the church's
3  governing body which is called the council.
4     Q.   And approximately how many members were
5  there at Sojourners United Church of Christ?
6     A.   I'm not entirely sure.  I would say weekly
7  attendance at services was between 80 and 100, tops.
8     Q.   Okay.  And I'm sure that varied.  I
9  appreciate that.  I'm just sort of looking for a
10 general ballpark sort of idea.
11       All right.  So I wanted to kind of change
12 focus out of here a little bit and discuss for you
13 injuries or damages that you believe you sustained
14 as a result of the events of August 11 and 12 of
15 2017 in Charlottesville, Virginia.
16       So if you could, tell me any physical,
17 mental, emotional injuries that you sustained as a
18 result of the events of August 11 and 12.
19       MS. PHILLIPS:  Object to form.
20       Go ahead, Seth.
21    A.   Sure.
22       This won't be a comprehensive list, but I
23 was diagnosed shortly after Unite the Right with
24 acute anxiety disorder, which later manifested as
25 posttraumatic stress disorder; diagnosed with

Page 18

S. WISPELWEY

1
2 anxiety, acute stress, and other outcomes related,
3 falling under the umbrella of PTSD: Hypervigilance,
4 night terrors, and other terms that are escaping me
5 right at the moment.
6 BY MR. CAMPBELL:
7     Q.   I'm certainly not trying to cut you off.
8 If you have other responses -- and, also, I'd like
9 to indicate if at any time during this deposition
10 you think of additional information that you want to
11 add to a previous question, just interrupt me and
12 say:  "Hey, I thought of something else in response
13 to that question about injuries back at the
14 beginning."  That is perfectly fine.
15         Okay, sir?
16     A.   Sure, absolutely.
17     Q.   Let me ask:  Were you struck by
18 Mr. Fields' car on Water Street?
19     A.   No.
20     Q.   Were you physically present within,
21 say, 50 yards of the Fields' car attack on
22 August 12?
23         MS. PHILLIPS:  Objection.  Form.
24     A.   I don't know if it was 50 yards or not.  I
25 was about a block and a half away when it occurred.

Page 19

S. WISPELWEY

1
2 BY MR. CAMPBELL:
3     Q.   Okay.  In which direction?
4         Can you give me the intersection you were
5 at or a business or something like that?
6     A.   Sure.  I was west on Water Street up near
7 Escafé Restaurant.
8     Q.   Okay.  And following the incident, did you
9 go to the scene of the car attack?
10     A.   Yes.
11     Q.   And did you observe people with physical
12 injuries on the street at Water Street?
13     A.   Yes.
14     Q.   Okay.  Did you attempt to administer care?
15 First aid?  Anything like that?
16     A.   Yes.
17     Q.   Okay.  Do you know if you observed any of
18 the other plaintiffs in this lawsuit during your --
19 well, while you were at that location?
20     A.   I don't know.
21     Q.   Okay.  All right.
22         Did you have any other physical injuries
23 as a result of maybe some other attendee of Unite
24 the Right punching you, hitting you with a stick,
25 anything like that?

Page 20

S. WISPELWEY

1
2         MS. PHILLIPS:  Object to form.
3         Go ahead.
4     A.   No, no lasting physical injuries.
5 BY MR. CAMPBELL:
6     Q.   Well, and I -- that's a qualification.
7         I'm not just limiting it to lasting.  Even
8 if you had, you know, a bruise or cut that healed
9 within a couple days, that's -- you know, this is my
10 one opportunity to ask you about injuries, and I'd
11 like you to tell me if you even had what you would
12 consider minor physical injuries as a result of the
13 actions of any rally attendee on August 11 or 12?
14     A.   No.
15     Q.   Okay.  You mentioned you were diagnosed
16 with acute anxiety disorder and then later -- I
17 think the way you said it was "later developed PTSD
18 and associated symptoms."  So that's not a question.
19 And if it was, it would be a terrible one.
20         Are you aware of any doctor that diagnosed
21 you with PTSD as a result of the events of August 11
22 and/or 12?
23     A.   Yes.
24     Q.   Okay.  What was that doctor's name?
25     A.   The diagnosis first came from my licensed

Page 21

S. WISPELWEY

1
2 professional counselor, and then I met to discuss
3 with my primary care provider, Dr. Brian Uthlaut.
4     Q.   Okay.  Could you spell that for me and
5 possibly the court reporter, if you know how to
6 spell Dr. Uthlaut's last name?
7     A.   Sure.  Brian, B-r-i-a-n, Uthlaut,
8 U-t-h-l-a-u-t.
9     Q.   Okay.  Who was the licensed clinical
10 professional you were speaking of that initially
11 made the diagnosis?
12     A.   Carol Sims, S-i-m-s.
13     Q.   Thank you, sir.
14         And do you know about how long after
15 August 12 you were first diagnosed with acute
16 anxiety disorder?
17     A.   I don't remember exactly when, but it was
18 within the span of three or four weeks.
19     Q.   Okay.  And when is the first time you
20 sought any sort of medical and/or counseling
21 treatment following August 12?
22     A.   Within the same span.  Within three or
23 four weeks, I met with Carol Sims, Dr. Uthlaut and
24 then also received a referral to meet with a
25 licensed clinical social worker specialized in

Page 22

S. WISPELWEY

1   trauma care.

2      Q.   Okay.  And understanding you are not a

3   doctor -- and this may draw an objection from your

4   counsel -- what is your understanding or what were

5   you experiencing in the weeks after August 12 that

6   led you to go and seek treatment?

7          MS. PHILLIPS:  Object to form.

8          (Interruption.)

9          (Stenographer clarification.)

10  BY MR. CAMPBELL:

11     Q.   I imagine you would like me to restate the

12  question?

13     A.   Yes, please.

14     Q.   Okay.  Understanding you're not a medical

15  doctor, what is your understanding of what you were

16  experiencing that caused you to seek medical

17  treatment?

18         MS. PHILLIPS:  Objection.  Form.

19         You can answer.

20     A.   I am not a medical doctor, but I remember

21  the catalyzing event for reaching out for care

22  involved difficulty breathing, chest constrictions,

23  and, for lack of a better word, becoming locked up

24  and immobile at different points, unable to

Page 23

S. WISPELWEY

1   function.

2   BY MR. CAMPBELL:

3      Q.   Had you ever experienced anything like

4   that prior to the weeks following August 12, 2017?

5      A.   No.

6      Q.   I mean, to me -- also not being a medical

7   professional -- that sounds like something that

8   could be characterized as a panic attack.

9          Has any physician or therapist related or

10  described to you that what you were describing was a

11  panic attack?

12     A.   Yes.

13         MS. PHILLIPS:  Objection.  Form.

14         THE DEPONENT:  Oh, sorry.

15     A.   Yes.

16  BY MR. CAMPBELL:

17     Q.   And other than the catalyzing event you

18  just described and agreeing that we're -- neither of

19  us are medical professionals, have you had any other

20  such events which we could loosely characterize as

21  panic attacks?

22         MS. PHILLIPS:  Objection.  Form.

23         Go ahead.

24     A.   Since Unite the Right, these occurrences

Page 24

S. WISPELWEY

1   have transpired on different occasions.

2   BY MR. CAMPBELL:

3      Q.   Do you have any concept or can you give me

4   a ballpark of on how many different occasions you've

5   had panic attacks since Unite the Right?

6      A.   Sure.  I don't entirely recall, but at the

7   level of acuity that I experienced in that

8   catalyzing event, I would say around five.

9      Q.   Okay.  And I take it, from your answer,

10  you've had more than five that were of lesser

11  severity?

12     A.   Yes.

13     Q.   Okay.  Do you remember how long after

14  Unite the Right the initial catalyzing event

15  occurred?

16     A.   Yes.  Not exactly.  It was in early to

17  mid-September 2017.

18     Q.   Okay.  So in the same three to four weeks'

19  time period following August 12?

20     A.   Yes.

21     Q.   Following that event, did you go and seek

22  treatment at an emergency room?

23         MS. PHILLIPS:  Objection to form.

24         Go ahead.

Page 25

S. WISPELWEY

1      A.   No, I did not seek treatment at an

2   emergency room.

3   BY MR. CAMPBELL:

4      Q.   Okay.  Who was the first medical provider

5   you saw following what you've described as the

6   catalyzing event?

7      A.   Dr. Brian Uthlaut.

8      Q.   So you saw your primary care doctor first?

9      A.   Yes.  My father is also a physician, and I

10  spoke with him about the symptoms in his capacity as

11  well.

12     Q.   Okay.  What is your father -- where did

13  your father reside in August and September of 2017?

14     A.   Charlottesville, Virginia.

15     Q.   Okay.  Did you speak to him in person or

16  over the phone regarding what you experienced?

17     A.   In person.

18     Q.   Okay.  All right.  And so, again, I'm just

19  trying to get a general idea.

20         You described five what I will

21  characterize as "severe panic attacks" following

22  August 12.  Were they all in sharp succession in

23  September -- you know, in 2017, or were they kind of

24  spread out in the years that have passed since

**Page 26**

S. WISPELWEY

1
2 August 2017?
3         MS. PHILLIPS:  Objection.  Form.
4         Go ahead.
5     A.    The majority of acute incidences happened
6 in the more direct aftermath of August 2017 and the
7 first 12 months after.
8 BY MR. CAMPBELL:
9     Q.    Okay.  Let me ask this way:  For example,
10 have you had what you consider an acute panic attack
11 in the last 12 months?
12    A.    Yes.
13    Q.    And approximately when was that?
14    A.    May of 2020.
15    Q.    Okay.  And, again, understanding that
16 you're not a medical professional, what, if
17 anything, in your mind, triggered that acute panic
18 attack in May 2020?
19        MS. PHILLIPS:  Object to form.
20    A.    Acute stress and anxiety.
21 BY MR. CAMPBELL:
22    Q.    Acute stress and anxiety of what nature?
23        MS. PHILLIPS:  Object to form.
24    A.    There is a lot of things going on in life.
25 As this case has moved forward, reminders and

**Page 27**

S. WISPELWEY

1
2 scheduling created chest constriction and pain that
3 led me to go to the emergency room here in Tucson.
4 BY MR. CAMPBELL:
5     Q.    Okay.  And what emergency room?
6     A.    St. Joseph's Hospital.
7     Q.    What was your understanding of the
8 diagnosis, if any, at St. Joseph's Hospital
9 emergency room?
10        MS. PHILLIPS:  Object to form.
11    A.    I don't recall all that the emergency
12 doctor said it could have been.  He recommended
13 following up with my primary care provider here,
14 which I did.  I was prescribed a brief course of
15 medicine to help -- I don't know the medical term,
16 but lessen the severity of these kind of spasms in
17 my chest.
18        But they did not find -- I do remember
19 they did not find anything from my blood panel or
20 anything that was physiologically the cause.
21 BY MR. CAMPBELL:
22    Q.    The brief course of medicine, what was
23 that?  What prescription medicine was that?
24    A.    My -- I might screw up the pronunciation,
25 Omeprazole.

**Page 28**

S. WISPELWEY

1
2     Q.    Okay.  Had you previously been prescribed
3 Omeprazole -- or whatever the pronunciation is --
4 after August 12?
5     A.    No.
6     Q.    Had you been prescribed any prescription
7 medications after August 12 but before May 20?
8     A.    Yes.
9     Q.    Okay.  And what medications and by whom?
10    A.    I was prescribed Sertraline to help deal
11 with the anxiety and attendant additional symptoms
12 in the spring of 2019 by a resident working in
13 Dr. Uthlaut's office.
14    Q.    Did you have any prescriptions for anxiety
15 or anything else related to Unite the Right rally
16 between August 2017 and the spring of 2019?
17    A.    Yes.
18    Q.    What other prescriptions did you have?
19    A.    I was prescribed by Dr. Uthlaut a medicine
20 to help with sleep in September/October of 2017 when
21 I was experiencing a lot of difficulty sleeping --
22 night terrors and hypervigilance -- at night.  I
23 don't recall the exact name of it.
24    Q.    Was it something akin to Ambien, if you
25 know?

**Page 29**

S. WISPELWEY

1
2     A.    I don't know because I've never been
3 prescribed Ambien.
4     Q.    Okay.  All right.  And so other than those
5 two prescriptions -- and, again, not -- you know,
6 prior to the May 2020 prescription -- any other
7 prescription medications you received after Unite
8 the Right?
9     A.    I don't believe so, no.
10    Q.    Had you ever been prescribed any
11 medication for anxiety in, say, the 10 years before
12 Unite the Right?
13    A.    No.
14    Q.    Okay.  Did anything about Unite the Right
15 or any anxiety or related issues you were having --
16 did anything like that cause your relocation from
17 Charlottesville to Arizona?
18        MS. PHILLIPS:  Object to form.
19        THE DEPONENT:  Sorry.
20    A.    Yes.
21 BY MR. CAMPBELL:
22    Q.    Okay.  And -- yeah, that was a very bad
23 and convoluted question.
24        What caused your relocation from
25 Charlottesville?

Page 30

S. WISPELWEY

2    A.    There were a few different reasons we
3  moved to Tucson specifically.  My family was looking
4  to relocate, given some of the difficulty of
5  remaining in Charlottesville for us in the aftermath
6  of Unite the Right.  We chose Tucson specifically
7  related to health issues my mother-in-law was having
8  and to be near to her.
9    Q.    Okay.  And are you still a minister with
10  the Church of Christ?
11    A.    Yes.  Yes.
12    Q.    Do you have a congregation -- or however
13  you would describe it -- in Tucson?
14    A.    I do now.  I secured a position as interim
15  pastor of a local congregation.
16    Q.    Okay.  So in the -- so the next couple of
17  questions I'm going to ask you, I'm going to try and
18  focus in time, say, September of 2017 through the
19  end of the year in 2017.
20          Were you able to perform your normal
21  duties at Restoration Village Arts during September
22  to December 2017?
23    A.    No.
24          MS. PHILLIPS:  Object to form.
25          THE DEPONENT:  Sorry.

Page 31

S. WISPELWEY

2    A.    No.
3  BY MR. CAMPBELL:
4    Q.    Okay.  And what sorts of responsibilities
5  were you unable to fulfill during that time period?
6    A.    The responsibilities I was unable to
7  fulfill included not being able to accomplish the
8  basic missional objectives that we had been doing
9  prior, including offering retreat space and event
10  space to artists and ministers, basic human
11  resources tasks, and maintenance of the
12  organization.
13          I could go on and on, but the -- but I was
14  unable to continue the mission as it had existed
15  prior to the summer as we kind of dealt with the
16  fallout and cost of Unite the Right and my
17  experience therein.
18    Q.    Okay.  And was that due to the anxiety and
19  related symptoms you were experiencing?
20          MS. PHILLIPS:  Object to form.
21    A.    Yes.  That was the catalyzing factor.
22          Our program manager was also struggling
23  and determined it was in her best health interest to
24  step away from that role for similar reasons.  And
25  so the organization and our abilities to maintain

Page 32

S. WISPELWEY

2  became much more threadbare.
3  BY MR. CAMPBELL:
4    Q.    Did someone replace your role at
5  Restoration Village Arts?
6          MS. PHILLIPS:  Objection.  Form.
7    A.    No.  Since I was released from my role as
8  directing minister in early 2018, it has not taken
9  on the form or function that existed prior to Unite
10  the Right.
11  BY MR. CAMPBELL:
12    Q.    Okay.  How about, again, same time frame.
13          During the period from September to
14  December 2017, were you able to fulfill your
15  responsibilities as co-moderator at the church?
16    A.    No.
17    Q.    Okay.  Were you able to attend church from
18  September to December 2017?
19    A.    Yes.
20    Q.    Did someone else take your position as
21  co-moderator?
22    A.    Yes.
23    Q.    Who was that?
24    A.    His name was Dave -- I can't remember his
25  last name right now.

Page 33

S. WISPELWEY

2    Q.    Okay.  Did the original other co-moderator
3  remain on?
4    A.    Yes.
5    Q.    And what was his name -- his or her?
6    A.    Her name was Ava Baum, B-a-u-m.
7    Q.    Other than your responsibilities at
8  Restoration Village Arts and your responsibilities
9  as co-moderator at the church, did you have any
10  other jobs?
11          MS. PHILLIPS:  Object to form.
12          THE DEPONENT:  Sorry.
13    A.    In that period of time, no.
14  BY MR. CAMPBELL:
15    Q.    Okay.  In the period of time from
16  September to December 2017, did you own an
17  automobile?
18    A.    Yes.
19    Q.    Okay.  Were you able to drive your
20  automobile from the period of September to
21  December 2017?
22    A.    I remember that I used our automobile in
23  that time period.
24    Q.    Okay.  So the anxiety and PTSD symptoms
25  you were having didn't prevent you from operating a

**Page 34**

S. WISPELWEY

1
2 motor vehicle; is that correct?
3         MS. PHILLIPS:  Object to form.
4     A.   Not that --
5         THE DEPONENT:  Oh, sorry.
6     A.   Not that I recall, no.
7 BY MR. CAMPBELL:
8     Q.   Okay.  Were there any other activities of
9 normal daily living that you were incapable of
10 performing from September to December 2017 that you
11 believe are as a result of the effects of the Unite
12 the Right rally?
13     A.   Yes.
14     Q.   All right.  Tell me about those, please.
15     A.   They would vary, in large part, dependent
16 on when I would lock up or become nonfunctioning.
17         Generally, though, the ability to
18 socialize and go out in public became increasingly
19 difficult.  I felt much more secure in my home, and
20 so I stopped going out in public when I could --
21 whenever I could.
22     Q.   Were you able, for example, to go to the
23 grocery store to get food?
24         MS. PHILLIPS:  Object to form.
25         Go ahead.

**Page 35**

S. WISPELWEY

1
2     A.   Yes.  I believe I grocery-shopped during
3 that time.
4 BY MR. CAMPBELL:
5     Q.   Okay.  Were you able to care for yourself?
6 Like shower?
7     A.   Yes.
8     Q.   Okay.  And, again, these-- this current
9 section of questioning, I'm kind of asking about
10 September to December 2017.  If I'm moving beyond
11 that period, I'll let you know.
12         Okay, sir?
13     A.   Sure.
14     Q.   Okay.  How about, like, clean your house?
15         Were you able to perform regular
16 housecleaning tasks?
17     A.   I don't recall.
18     Q.   Were you married?
19     A.   Yes.
20     Q.   And prior to August 12, did you and your
21 spouse share household chores?
22     A.   Yes.
23     Q.   Did your spouse attend Unite the Right --
24 or, not attend, but counterprotest Unite the Right?
25     A.   Is the question --

**Page 36**

S. WISPELWEY

1
2         MS. PHILLIPS:  Object to form.
3         Go ahead.
4     A.   Is the question whether my spouse was out
5 in public on August 12, 2017?
6 BY MR. CAMPBELL:
7     Q.   Well, not just generally out in public,
8 but, like, out in the downtown Charlottesville,
9 Virginia, area.
10     A.   No.  My spouse was not out on August 12,
11 2017.  She was at our home.
12     Q.   Did you have children in August of 2017?
13     A.   Yes.
14     Q.   Following the events of August 12, 2017,
15 did you have to retain, like, a nanny or maid or any
16 other individual to assist with household tasks that
17 you did not have retained prior to August of 2017?
18     A.   Yes.
19     Q.   Okay.  And tell me about that.
20         Was it a maid? a nanny?  Both?
21         MS. PHILLIPS:  Object to form.
22     A.   Primarily housecleaning services.  My
23 spouse, to help with the load created by some of my
24 difficulties, solicited help.  I'm not sure exactly
25 the frequency, but yes.  The school year started

**Page 37**

S. WISPELWEY

1
2 shortly thereafter, so I don't believe we required
3 the services of a nanny.
4 BY MR. CAMPBELL:
5     Q.   Okay.  And in the period from August of --
6 sorry -- September to December 2017, did you go to
7 school functions for your children?
8     A.   No, not that I recall.
9     Q.   What would you do on an average week in
10 September of 2017?
11         MS. PHILLIPS:  Object to form.
12     A.   I don't fully recall all I was doing.
13 There was a lot of attention on our community
14 following Unite the Right and a lot of uncertainty
15 about our general safety and security; so I was
16 responding to different asks to show up and bear
17 witness for where different events might be taking
18 place but otherwise staying at home, turning off
19 social media and that sort of thing, and trying to
20 deal with the onslaught of asks.
21 BY MR. CAMPBELL:
22     Q.   What sort of asks?  What do you mean?
23     A.   There was a lot of attention and asks from
24 media outlets, from churches and denominations and
25 faith leaders from around the country wanting to

Page 38

S. WISPELWEY

1    know whether we could talk with them or help them.
2    It was an overwhelming amount of contact made.
3        Q.    I understand.
4        So people are asking you for some of your
5    time or to speak with them, that kind of thing?
6        A.    That's correct.
7        Q.    Okay.  Did you conduct any speaking
8    engagements in the period from September to
9    December 2017?
10       MS. PHILLIPS:  Object to form.
11       A.    Yes.
12   BY MR. CAMPBELL:
13       Q.    Okay.  And tell me any speaking
14   engagements you recall during that time period.
15       A.    I recall two, off the top of my head.  In
16   September of 2017, I agreed to speak at a seminary
17   outside Atlanta where a friend of ours -- who was a
18   donor to Restoration Village Arts, as a professor --
19   and I spoke on a panel in December of 2017 at the
20   request of a leader within our denomination.  And I
21   don't know if this counts, but I also spoke briefly
22   at a gathering for the National Council of Churches
23   in November of 2017.
24       Q.    Okay.  Did you give any interviews or
25

Page 39

S. WISPELWEY

1    speeches for anything nondenominational or not at
2    all related to your ministry or your church?
3        A.    No.  All of these engagements were related
4    to what had transpired in Charlottesville, Unite the
5    Right, and my work there.
6        Q.    So, for example, Mr. Martin, I believe
7    testified that he went on, like, Ellen DeGeneres.
8        Did you do any interviews on TV shows or
9    for news organizations or anything like that
10   following Unite the Right?
11       MS. PHILLIPS:  Object to form.
12       Go ahead.
13       A.    Between September and December?
14   BY MR. CAMPBELL:
15       Q.    Let's say between August 12, 2017, and
16   December 2017.
17       A.    I gave one TV interview the night of
18   August 12, 2017.  I don't believe there were any
19   other television-speaking engagements.  I spoke with
20   a few print outlets during that period of time, yes.
21       Q.    Okay.  Those are just kind of telephone or
22   video interviews, or did you actually physically go
23   somewhere to speak with a representative of the
24   print outlet?
25

Page 40

S. WISPELWEY

1        A.    No, those were all by telephone between
2    August 12 and December.
3        Q.    Okay.  The engagement you mentioned,
4    September 2017, when you spoke to the seminary
5    outside Atlanta, how many people were present at
6    your speech?
7        A.    I spoke with a small class of about 20 to
8    25 people, taught by my friend and our
9    organization's donor, and spoke at a chapel service
10   that I would put at about 75 people.
11       Q.    And then how about the gathering of
12   churches in November of 2017?  How many people were
13   present there when you spoke?
14       A.    Again, I would say about 75 people at the
15   gathering for National Council of Churches.
16       Q.    Okay.  And where was that?  Is it like at
17   a seminary, or was it at a public venue?
18       A.    I believe it was outside Washington, D.C.
19   in Silver Spring, Maryland, if I remember correctly.
20       Q.    Was it at a hotel or a convention center?
21       A.    It was at a hotel, yes.
22       Q.    Okay.  And then same question:  For the
23   December 2017 panel, how many people were present
24   when you spoke there?
25

Page 41

S. WISPELWEY

1        A.    Not many.  That was a gathering of faith
2    leaders.  I would say no more than 25.
3        Q.    Okay.  And in all of those -- or those
4    three -- I'm sorry -- speaking engagements, you were
5    discussing the events of August 11 and 12, 2017; is
6    that correct?
7        A.    Yes.
8        Q.    Okay.  All right.  Are you -- in your role
9    as a pastor or minister, are you a counselor for
10   others?
11       MS. PHILLIPS:  Object to form.
12       A.    I provide pastoral care and counseling as
13   a minister, though I'm not a licensed counselor.
14   BY MR. CAMPBELL:
15       Q.    Did you have any training for providing
16   pastoral care and counseling?
17       A.    Yes.
18       Q.    Okay.  What did that involve?  Just
19   generally.
20       A.    As noted earlier, my subspecialty with my
21   divinity degree is in pastoral care and counseling,
22   and that involves internship placements at a
23   hospital in Boston as well as the requirement to
24   take several courses in that arena, some of which
25

S. WISPELWEY

1
2 involved practical simulation of pastoral care and
3 counseling.
4    Q.   The internship at the hospital in Boston,
5 what was the name of that internship?
6        MS. PHILLIPS:  Object to the form.
7        Go ahead.
8    A.   I'm not sure it has a formal name within
9 the program I was doing at Boston College.  The
10 general term might be something like "field study,"
11 but I was under the direct supervision of one of the
12 certified chaplains at the hospital.
13 BY MR. CAMPBELL:
14    Q.   Okay.  In your education, did you have any
15 psychology classes?
16    A.   Yes.
17    Q.   Okay.  And was it one?  More than one?  A
18 handful?
19    A.   I would say a handful between undergrad
20 and then certainly in graduate school.
21    Q.   Okay.  And how about psychiatry?  Any
22 classes along those lines?
23    A.   I don't believe I took any psychiatry
24 classes.
25    Q.   Okay.  How about clinical counseling

S. WISPELWEY

1
2 classes?  Do you have any of those?
3    A.   Yes.  There were, in graduate school, a
4 couple courses taken in best practices for clinical
5 counseling.
6    Q.   Okay.  Is it fair to say you're familiar
7 with coping mechanisms and that sort of thing?
8    A.   I know the term.
9    Q.   Okay.  Were you familiar with general
10 indicators and impressions of PTSD as a result of
11 your education and training?
12    A.   Yes.
13    Q.   All right.  So I kind of wanted to switch
14 gears on you and ask you questions now about leading
15 up to August 11 and 12 of 2017.
16        Were you involved in any sort of community
17 engagement or planning to organize counterprotesters
18 to the Unite the Right rally?
19    A.   Yes.
20    Q.   And when did you first learn of the plan
21 for the Unite the Right rally?
22    A.   I first learned of -- I'm sorry.
23        MS. PHILLIPS:  Objection.  Form.
24        Go ahead and answer.
25    A.   I first learned of the plans for the Unite

S. WISPELWEY

1
2 the Right rally within one day of its announcement
3 by its organizer.
4 BY MR. CAMPBELL:
5    Q.   Okay.  Do you remember approximately when
6 that was?
7    A.   Approximately it was in mid, later May
8 2017, as I recall.
9    Q.   Okay.  And did you immediately begin
10 planning to organize counterprotests to the rally?
11        MS. PHILLIPS:  Object to the form.
12        Go ahead, Seth.
13    A.   I did not immediately begin planning
14 specifically for Unite the Right.  There were
15 upcoming events preceding it that were taking some
16 of our attention as well.
17 BY MR. CAMPBELL:
18    Q.   Okay.  So, when did you move to
19 Charlottesville, again?  I apologize.
20        I know you have already said this but --
21    A.   I moved back to Charlottesville, again, in
22 the summer of 2013.
23    Q.   Okay.  And then were you kind of
24 distance-learning -- for lack of an accurate
25 phrase -- in order to complete your divinity

S. WISPELWEY

1
2 training?  I thought you'd said that you completed
3 your training in March of 2017?
4    A.   I was ordained in March of 2017.  I had
5 completed all of the requirements outside of a
6 30-page paper by probably 2015.  I was employed
7 elsewhere prior.  I completed my paper and the final
8 purposes for ordination in the fall of 2016, but I
9 had already completed all of the requirements at
10 least a few years prior.
11    Q.   I understand.  Okay.
12        So you had been in Charlottesville for a
13 while?
14    A.   Yes.
15    Q.   Prior to -- okay.  All right.
16        So let me see.  So there was -- I'm just
17 going through a report here.  So I apologize, my --
18        So there was a May 13, 2017, rally or
19 demonstration in Charlottesville; correct?
20    A.   I believe so.
21    Q.   Okay.  Did you protest or counterprotest
22 that event on May 13?
23    A.   You're referring to the white supremacist
24 torch rally in Emancipation Park?
25

Page 46

S. WISPELWEY

1
2    Q.   Well, I think there -- at least according
3    to the Heaphy Report, there was an earlier event at
4    McGuffey Park, but I believe later that evening,
5    yes, so I'm kind of asking about both of those
6    events.
7         So, if it's described to me -- and I'm not
8    super familiar with this event -- as the Jackson
9    Park event.
10        Do you know what-- on May 13, do you know
11   what that's in reference to?
12        MS. PHILLIPS:  Objection.  Form.
13   A.   Yes.  Yes.  Earlier, the day of the torch
14   rally in Emancipation Park around the Robert E. Lee
15   statue, white supremacists also rallied around the
16   Stonewall Jackson statue.
17   BY MR. CAMPBELL:
18   Q.   Okay.  Did you counterprotest or protest
19   that event?
20        MS. PHILLIPS:  Object to form.
21   A.   I learned about both events after the
22   fact.  I attended a candlelight vigil following,
23   which I believe was the night after.
24   BY MR. CAMPBELL:
25   Q.   Gotcha.  The May 14 event?

Page 47

S. WISPELWEY

1
2    A.   Yes.  If that's when the candlelight vigil
3    was, that's what I attended.
4    Q.   Okay.  I understand.  All right.
5         And so then it looks like the next event
6    was a July 8 Ku Klux Klan rally; is that correct?
7    A.   Yes.  That's my memory of the next major
8    white supremacist event in Charlottesville.
9    Q.   Okay.  Did you protest or counterprotest
10   the July 8 Ku Klux Klan rally?
11        MS. PHILLIPS:  Object to form.
12   A.   Yes.
13   BY MR. CAMPBELL:
14   Q.   Okay.  And did you organize others to join
15   you in counterprotesting the Ku Klux Klan rally?
16        MS. PHILLIPS:  Object to form.
17   A.   Yes.
18   BY MR. CAMPBELL:
19   Q.   And can you give me some idea of what
20   you're doing when you're organizing a counterprotest
21   to any of these rallies?
22        MS. PHILLIPS:  Object to form.
23   A.   There is a lot of different ways to answer
24   that question because there's a lot of different
25   circumstances and things going on that summer, but,

Page 48

S. WISPELWEY

1
2    more broadly, I engage in interests that people of
3    faith and conscience have to stand up for their
4    community in a variety of ways and equipping them to
5    do that.
6    BY MR. CAMPBELL:
7    Q.   Are you -- were you active on social media
8    in trying to organize people to counterprotest the
9    July 8 KKK rally?
10        MS. PHILLIPS:  Object to the form.
11   A.   I'm not sure that I can say both of those
12   things are directly connected.  I had social media
13   accounts in the summer of 2017, and I also organized
14   people of faith and conscience to bear witness at
15   the KKK rally on July 8, 2017.
16   BY MR. CAMPBELL:
17   Q.   Okay.  Yeah, and I was -- the next
18   question was going to be about, you know, whether
19   you physically organized people at your church or
20   your organization or in other ways.  So I was kind
21   of -- the first question was, did you utilize social
22   media to try to get the word out about people
23   counterprotesting the July 8 rally?
24        MS. PHILLIPS:  Object to form.
25        Go ahead.

Page 49

S. WISPELWEY

1
2    A.   I believe so, yes.
3    BY MR. CAMPBELL:
4    Q.   And would you speak at church services in
5    order to attempt to get people to counterprotest the
6    July 8 rally?
7    A.   No.
8    Q.   Okay.  Would you put up flyers or posters
9    or anything like that in downtown Charlottesville to
10   alert people to the upcoming July 8 rally?
11   A.   No, I did not.
12   Q.   Okay.  So how -- other than on social
13   media, how would you -- what, if any, physical steps
14   would you take to organize a counterprotest to the
15   July 8 rally?
16   A.   At the time leading up to the July 8
17   rally, I was a participant and attendee at regular
18   gatherings of an entity called the Charlottesville
19   Clergy Collective.  When plans were made by the KKK
20   to hold the July 8 rally, a subcommittee of the
21   Charlottesville Clergy Collective was formed to
22   determine an ecumenical response from faith leaders
23   and people of faith in the area.
24        I served on that committee pulling
25   together different ideas to engage people who felt

## Page 50

S. WISPELWEY

1 called to respond in some way on July 8.  And so my
2 organizing -- insomuch as it was mine -- happened in
3 joint concert with colleagues across the area at
4 those meetings and advertising through our listservs
5 to different congregations.
6     Q.  I understand.
7         Did you go and physically speak at any
8 other congregation in the Charlottesville area as
9 part of the subcommittee in trying to organize a
10 counterprotest to the July 8 rally?
11    A.  No.  I don't recall doing that.
12    Q.  All right.  And then you physically went
13 and counterprotested the July 8 rally; is that
14 correct, sir?
15    A.  I was physically there, yes.
16    Q.  Okay.  And did you observe any violence --
17 and by "violence," I would say more than pushing and
18 shoving -- in or around the July 8 KKK rally?
19    A.  Yes.
20    Q.  Okay.  Tell me about what violence you
21 observed.
22    A.  I observed members of law enforcement
23 dragging counterprotesters.  I observed and
24 experienced being gassed with a chemical agent by

## Page 51

S. WISPELWEY

1 law enforcement.
2    Q.  Did you observe any violence precipitated
3 by any attendees of the KKK rally?
4        MS. PHILLIPS:  Object to form.
5    A.  No.
6 BY MR. CAMPBELL:
7    Q.  Okay.  From your perception, did law
8 enforcement keep attendees and counterprotesters at
9 the KKK rally separated?
10        MS. PHILLIPS:  Object to form.
11    A.  Yes.  Yes.
12 BY MR. CAMPBELL:
13    Q.  And how did they do that?  What method did
14 police use to keep the groups separated?
15        MS. PHILLIPS:  Object to form.
16    A.  On July 8, 2017, I observed metal barriers
17 placed in the park near the Stonewall Jackson
18 statue, one for the KKK and one -- and then outside
19 of that is where counterprotesters were.  I also
20 observed law enforcement create with their own
21 bodies and tools a pathway for the KKK to enter that
22 zone for their rally.
23 BY MR. CAMPBELL:
24    Q.  You mention that you saw law enforcement

## Page 52

S. WISPELWEY

1 dragging protestors at the KKK rally; is that
2 correct, sir?
3    A.  Yes.
4    Q.  Did you see law enforcement dragging any
5 rally attendees?
6    A.  No.
7    Q.  Okay.  And I think you mentioned you and
8 other protestors were gassed with a chemical agent
9 at the July 8 rally; is that correct, sir?
10        MS. PHILLIPS:  Object to form.
11    A.  Yes.
12 BY MR. CAMPBELL:
13    Q.  Did you observe whether any of the KKK
14 rally attendees were gassed with chemical agents?
15        MS. PHILLIPS:  Object to form.
16    A.  No.  I observed the KKK rally attendees
17 depart before the chemical dispersants were used.
18 BY MR. CAMPBELL:
19    Q.  Okay.  I understand.  All right.  In the
20 summer of 2017, did you identify as Antifa -- or
21 Antifa (pronouncing)?
22        MS. PHILLIPS:  Object to form.
23    A.  No.
24 BY MR. CAMPBELL:

## Page 53

S. WISPELWEY

1    Q.  Okay.  Are you a member of any political
2 organization with the explicit stated goal of
3 countering racism?
4        MS. PHILLIPS:  Object to form.
5    A.  I'm not sure what's --
6        MR. CAMPBELL:  You can just have a
7 continuing objection to form, if you'd like,
8 Counsel.
9        MS. PHILLIPS:  Okay.
10        Go ahead.
11    A.  No.
12 BY MR. CAMPBELL:
13    Q.  Okay.  Were you contacted by
14 Charlottesville Police Department in advance of the
15 Unite to Right rally?
16    A.  No.  And if I can clarify my previous
17 answer, the United Church of Christ as a
18 denomination has a platform that condemns racism.
19 So if that's to be understood as "membership," then
20 I want to say that I am a member of the United
21 Church of Christ, which explicitly condemns racism.
22    Q.  Gotcha.  And I appreciate that
23 clarification.  I was kind of indicating, like,
24 Black Lives Matter or Standing Up for Racial Justice

S. WISPELWEY

1
2  or an organization where essentially the sole goal
3  or main goal is racism.  But I certainly understand
4  and appreciate your clarification.
5       A.   Sure.  I occasionally contribute podcasts
6  to Showing Up for Racial Justice, Christian
7  podcasts.  That's put out weekly.
8       Q.   And thank you for correcting my misnomer.
9            All right.  So you contribute podcasts to
10 Surge on a weekly basis?
11      A.   Once a month or so, at most, I contribute
12 a podcast to what is kind of a side entity of Surge,
13 called Surge Faith.
14      Q.   And was that true in the summer of 2017?
15      A.   No.  That began earlier this year, 2020.
16      Q.   Okay.  All right.  So I think you've
17 already answered my question.  Charlottesville
18 Police didn't reach out to you or communicate with
19 you prior to Unite the Right.
20           Did any other governmental entity
21 communicate with you in advance of Unite the Right?
22           MS. PHILLIPS:  Objection.
23           Go ahead.
24      A.   Not that I recall, no.
25 BY MR. CAMPBELL:

S. WISPELWEY

1
2       Q.   For example, like Virginia State Police,
3  FBI.  No one like that communicated with you in
4  advance of August 12?
5       A.   I communicated with Charlottesville's
6  commonwealth's attorney, Joe Platania, who lived in
7  my neighborhood, and our children shared a bus stop.
8  He's a government official.
9       Q.   Was the nature of that communication just
10 kind of generally updating what was going on, or was
11 he asking you for input?
12           MS. PHILLIPS:  Object to form.
13      A.   As I recall, these were informal
14 conversations.  We shared our mutual concern about
15 our -- the concerns for the violence that was
16 planned at the Unite the Right rally.
17 BY MR. CAMPBELL:
18      Q.   What do you mean when you say "the
19 violence that was planned at the Unite the Right
20 rally"?
21      A.   I became aware in the summer of 2017 that
22 organizers and prospective attendees of Unite the
23 Right were planning to hurt and attack people at the
24 event.
25      Q.   And how did you become aware of that

S. WISPELWEY

1
2  information?
3       A.   There were a few Charlottesville community
4  members who made a presentation to Charlottesville
5  city council at a meeting in July 2017, I believe,
6  using documented evidence of online chats that
7  organizers and prospective attendees were having
8  about Unite the Right.
9       Q.   Do you know the source of those chats or
10 the platform?
11      A.   I don't recall all of the platforms.  I
12 believe they pulled from social media like Facebook,
13 as well as other online chat platforms.
14      Q.   Are you familiar with the platform
15 Discord?
16      A.   Yes.
17      Q.   Do you know whether Discord chats were
18 presented by Charlottesville community members at
19 that meeting in July of 2017?
20      A.   I don't recall if Discord was one of them.
21      Q.   Okay.  Were you involved in obtaining or
22 locating any of the information presented at that
23 meeting on July of 2017 -- in July 2017?
24      A.   No.
25      Q.   Did you do any kind of internet digging to

S. WISPELWEY

1
2  try and find information about organizers or
3  attendees for Unite the Right in advance of
4  August 2017?
5            MS. PHILLIPS:  Object to form.
6       A.   I'm not sure I would classify it as
7  digging, but through being present on social media
8  and some basic googling, I did search for and find
9  information on the organizers of the Unite the
10 Right, yes.
11 BY MR. CAMPBELL:
12      Q.   Okay.  And who did you understand to be
13 the organizers of Unite the Right?
14      A.   I understood Jason Kessler to be the
15 primary organizer and convener.  I also
16 understood -- there was a poster I had seen of
17 keynote speakers and various articles documenting
18 who the primary speakers were and considered them to
19 be organizers of the event as well.
20      Q.   Do you recall any names of those speakers?
21      A.   Yes.  From that poster that summer, I
22 recall Richard Spencer, Augustus Invictus, Matthew
23 Heimbach, Baked Alaska, and those were the names
24 that I remember at the time.
25      Q.   Okay.  Do you recall James Fields being

Page 58

S. WISPELWEY

1
2  listed as a keynote speaker?
3      A.   I don't recall.
4      Q.   Okay.  Do you recall ever hearing the name
5  "James Fields" before August 12, 2017?
6      A.   No, I don't recall.
7      Q.   Okay.  Do you recall any other people that
8  you perceived as organizers of Unite the Right other
9  than Kessler, Spencer, Invictus, Heimbach, and Baked
10 Alaska?
11         MS. PHILLIPS:  Object to form.
12      A.   Prior to Unite the Right, I learned the
13 name Eli Mosley and Mike Peinovich as well.  Andrew
14 Anglin.  These were the ones I remember learning and
15 reading about in different articles profiling
16 different folks coming to Unite the Right.
17 BY MR. CAMPBELL:
18      Q.   Okay.  How about Chris Cantwell?
19      A.   I don't recall.
20      Q.   Okay.  Did you conduct any sort of classes
21 or training for any of the people you were
22 encouraging to counterprotest Unite the Right?
23      A.   Yes.
24      Q.   Okay.  Tell me about that.
25           What did you do?

Page 59

S. WISPELWEY

1
2      A.   Is the question what we did to gather
3  people who were interested in counterprotesting?
4      Q.   Well, kind of what you did at the
5  gatherings of people who were interested in
6  counterprotesting.
7         MS. PHILLIPS:  Object to form.
8      A.   Sure.  A United Church of Christ colleague
9  and myself formed an entity we called Congregate,
10 and between July 8 and August 12, 2017, we invited
11 people who were interested -- people of faith who
12 were interested in responding to Unite the Right for
13 trainings.  That involved theological education,
14 singing, relationship building, and simulations for
15 how to stay calm in potentially volatile
16 circumstances.
17 BY MR. CAMPBELL:
18      Q.   Did any of the training involve
19 self-defense?
20      A.   I'm not sure what is meant by
21 "self-defense."  We encouraged people --
22      Q.   Any activity to --
23           (Interruption.)
24           (Overlapping speakers.)
25      A.   Go ahead.

Page 60

S. WISPELWEY

1
2      Q.   Any activity to defend oneself.
3      A.   Our trainings simply taught techniques to
4  protect oneself in potential instances of being
5  attacked or hurt and how to protect others but not
6  fight back.  Our mission was not to hurt or fight
7  back.
8      Q.   What sort of techniques to protect oneself
9  were taught at these meetings?
10      A.   I don't recall all of them.  We taught
11 people how to try to safely escape a live fire zone
12 if guns were being used, to, you know, zigzag and
13 stay low to the ground, to curl up in, like, a fetal
14 position and cover one's head and major organs if
15 being attacked or beaten, or how to cover someone
16 else up, those kind of practical things.
17      Q.   Okay.  Anything like how to stop someone
18 from attacking another counterprotester?
19         MS. PHILLIPS:  Object to form.
20      A.   If I'm understanding the question
21 correctly, only insomuch as how to protect the
22 person being attacked with one's own body, by
23 getting in between the violence and their body and
24 covering that person's body.
25 BY MR. CAMPBELL:

Page 61

S. WISPELWEY

1
2      Q.   Okay.  Was there any discussion of
3  defensive or self-protective items to bring to
4  counterprotest Unite the Right?
5         MS. PHILLIPS:  Object to form.
6      A.   No.  Our trainings were all about simply
7  bringing our bodies and nothing else.
8  BY MR. CAMPBELL:
9      Q.   Okay.  Was there -- were there ever any
10 Antifa present to assist in training at any of these
11 meetings?
12         MS. PHILLIPS:  Object to form.
13      A.   No.
14 BY MR. CAMPBELL:
15      Q.   Were you present at the August 11 torch
16 march, assuming you know what I mean by that?
17      A.   I was not physically at or near the
18 Rotunda or Thomas Jefferson statue.  Physically
19 near, I mean right there.  I was present across the
20 street at a church.
21      Q.   Could you see the torch march as it
22 approached the statue?
23      A.   Yes.
24      Q.   And did you see the torch march as it
25 approached the statue?

S. WISPELWEY

1
2     A.   Yes.  On two occasions, I stepped out onto
3  the top of the steps of the church across the street
4  and could see the torch bearers.
5     Q.   Did that cause you any fear or panic or
6  any related symptoms?
7     A.   Yes.
8     Q.   And what church -- what church were the
9  steps you were talking about you were standing on
10  top of?
11     A.   The name of the church is St. Paul's
12  Memorial Church.
13     Q.   Okay.  And how did you come to be at
14  St. Paul's Memorial Church on the evening of
15  August 11, 2017?
16     A.   Sure.  One of Congregate's organizing
17  efforts, one of our organizing efforts, was to hold
18  what we call a mass prayer meeting, an ecumenical
19  opportunity for people to sing and pray and hear
20  preaching on the occasion of this weekend.  We chose
21  St. Paul's because we wanted a congregation and
22  denomination that was open and affirming to all
23  people, which means they are accepting of all people
24  regardless of orientation and so on.  And because of
25  their size.

S. WISPELWEY

1
2     Q.   Do you have any concept of how many people
3  were at that mass prayer meeting on August 11, 2017?
4     A.   Yes.
5     Q.   How many people was that, sir?
6     A.   We stretched the max capacity of the
7  church.  So I can safely say there were around 700
8  people in the building, in the main sanctuary and
9  overflow areas.
10     Q.   And during the prayer meeting, was
11  counterprotesting Unite the Right on August 12
12  discussed?
13     A.   No.
14     Q.   During that prayer meeting, there was no
15  mention of counterprotesting Unite the Right the
16  following day?
17     A.   No.  There was no discussion of -- oh, go
18  ahead.  Sorry.
19          MS. PHILLIPS:  Object to form.
20          Go ahead, Seth.
21     A.   No.  The content of that service was more
22  of a worship service for the entire community.
23  That's what it was.
24  BY MR. CAMPBELL:
25     Q.   Okay.  But it was planned in response to

S. WISPELWEY

1
2  the Unite the Right rally; correct?
3     A.   Yes.  We were using the occasion of the
4  Unite the Right rally to hold a worship service.
5     Q.   Okay.  Were you -- did anyone from City of
6  Charlottesville or Charlottesville Police Department
7  discourage you from organizing counterprotesters to
8  attend Unite the Right?
9     A.   Yes.
10     Q.   And I'm not trying to hide the ball or
11  anything, so I'm just going to read a paragraph from
12  the Heaphy Report, and then I'm going to ask you if
13  the general idea of that paragraph is accurate.
14  Okay?
15          So this isn't a question.  I'm just going
16  to read one paragraph that -- and if anyone is, you
17  know -- cares to look or read along, it is Page 47
18  of the Heaphy Report.
19          (Overlapping speakers.)
20          MS. PHILLIPS:  Sorry, Dave, I was going to
21  ask you, do you have the document that you could
22  show Seth, so that he can read along?  Are you able
23  to share the document with your screen?
24          MR. CAMPBELL:  I'm not.  I'm just on the
25  phone.

S. WISPELWEY

1
2          MS. PHILLIPS:  Okay.
3          MR. CAMPBELL:  But I will read it slowly.
4          MS. PHILLIPS:  Okay.
5  BY MR. CAMPBELL:
6     Q.   All right.  Again, if anyone else wants to
7  read it, it is just above Subsection (2) on Page 47.
8  It says: "The City's attempts to discourage" -- I'm
9  sorry.  I may be -- yeah, this is the Klan rally.
10     A.   I have the Heaphy Report pulled up on my
11  computer, if that helps.  I can --
12     Q.   Sure.
13     A.   Okay.
14     Q.   So this is going to be jumping around,
15  then.  So Page 47, just above Section 2, with the
16  paragraph beginning with:  "The City's attempts to
17  discourage counterprotests at the Klan rally
18  alienated some members of this community."  And it
19  says: "Reverend Seth Wispelwey recalled that City
20  Manager Jones' and Chief Thomas' requests that
21  members of the clergy help 'tell the story' of the
22  day by discouraging attendance and promoting
23  alternative programs was not universally accepted."
24          Do you see -- are you in that general
25  paragraph, sir?

<div style="display:flex;">

<div>

Page 66

```
 1                    S. WISPELWEY
 2       A.   Yes.
 3       Q.   Okay.  And then:  "Wispelwey told us the
 4  request 'rubbed people wrong,' as alienating and
 5  patronizing, because some people felt strongly that
 6  they should confront the Klan and their hateful
 7  speech."
 8       So, again, I am in the wrong section, but
 9  does that paragraph accurately depict your reaction
10  or describe your reaction to City Manager Jones and
11  Chief Thomas requesting clergy to discourage
12  attendance and counterprotesting at the Klan rally?
13       MS. PHILLIPS:  Okay.  Yeah.  Just so the
14  record is clear, you had previously asked him with
15  regard to Unite the Right.  Now, you are asking him
16  whether that paragraph in the Heaphy Report is
17  correct as to the Klan rally; correct?
18       MR. CAMPBELL:  Yeah, I don't think I asked
19  him anything about Unite the Right.  But I did
20  preface my reading with an indication that I
21  believed that it had to do with the Unite the Right
22  rally.  But I don't think I asked him anything.
23  But, yes, I am definitely asking him now about the
24  Klan rally.
25       MS. PHILLIPS:  Okay.  For the record, you
```

</div>

<div>

Page 67

```
 1                    S. WISPELWEY
 2  definitely asked him about something with regards to
 3  the Unite the Right rally.  But, nonetheless, I now
 4  understand your request is with regard to the Klan
 5  rally.
 6       So, Seth, go ahead, and you may answer the
 7  question.
 8       MR. CAMPBELL:  And no speaking objections,
 9  if that's an objection, please.
10       A.   And can you please repeat the question?
11  BY MR. CAMPBELL:
12       Q.   Certainly.
13       The paragraph on Page 47 of the Heaphy
14  Report, does that accurately describe your response
15  or your feelings in response to requests by City
16  Manager Jones and Chief Thomas requesting clergy to
17  discourage counterprotests at the Klan rally?
18       A.   As stated, as documented in that
19  paragraph, I think that accurately describes what I
20  was communicating, which was that this was a
21  feeling that different community members had, yes.
22       Q.   Okay.  And was any of the -- do you recall
23  any of the discouragement by City Manager Jones and
24  Chief Thomas in discouraging counterprotest out of a
25  concern for safety?
```

</div>

</div>

<div style="display:flex;">

<div>

Page 68

```
 1                    S. WISPELWEY
 2       A.   I don't recall.
 3       MS. PHILLIPS:  Object to form.
 4       Go ahead.
 5       A.   I don't recall.
 6  BY MR. CAMPBELL:
 7       Q.   Yes, sir.
 8       Were there any similar communications in
 9  advance of the Unite the Right rally?
10       MS. PHILLIPS:  Object to form.
11       A.   I'm not sure what is meant by "similar
12  communications."
13  BY MR. CAMPBELL:
14       Q.   Did anyone from the City of
15  Charlottesville or the Charlottesville Police
16  Department reach out to leaders of faith and attempt
17  to discourage counterprotesting at the Unite the
18  Right rally?
19       A.   I don't recall in between July 8 and
20  August 12 city officials explicitly discouraging,
21  but they did meet with leaders of faith.
22       Q.   Okay.  And were you present at the
23  meetings with leaders of faith that you've just
24  described?
25       A.   Yes.
```

</div>

<div>

Page 69

```
 1                    S. WISPELWEY
 2       Q.   And what was the nature of discussion
 3  between city representatives and leaders of faith?
 4       A.   As I recall, Chief Thomas and at least a
 5  couple deputies came to a July meeting of the
 6  Charlottesville Clergy Collective to answer
 7  questions that faith leaders might have about what
 8  was going on and to impress the seriousness of the
 9  Unite the Right and their hopes that violence would
10  be avoided.
11       Q.   What do you mean by "impress the
12  seriousness of Unite the Right"?
13       A.   As I recall, from Chief Thomas's
14  statements at that meeting, he wanted faith leaders
15  to understand that the organizers of Unite the Right
16  were potentially very violent individuals, and that
17  the area around downtown on that weekend was going
18  to be unsafe.
19       Q.   So the Chief came to a meeting to warn you
20  and your group that the area around downtown
21  Charlottesville was going to be unsafe on August 12?
22       MS. PHILLIPS:  Object to form.
23       A.   That's my recollection, yes.
24  BY MR. CAMPBELL:
25       Q.   Okay.  All right.
```

</div>

</div>

Page 70

S. WISPELWEY

1
2      Despite that meeting, the Clergy
3  Collective decided to counterprotest downtown
4  August 12; correct?
5      MS. PHILLIPS:  Object to form.
6      A.   No.  The Clergy Collective did not.
7  BY MR. CAMPBELL:
8      Q.   The Clergy Collective did not
9  counterprotest on August 12?
10     A.   No.
11     Q.   Okay.  All right.  If you could scroll
12  down to Page 122 of the Heaphy Report.  And this may
13  be semantics.
14      Are you aware of members of the Clergy
15  Collective counterprotesting on August 12?
16     A.   Yes.
17     Q.   Okay.  So what is the distinction -- do
18  you mean like leadership of the Clergy Collective
19  didn't counterprotest but members did?
20     MS. PHILLIPS:  Objection.
21      (Overlapping speakers.)
22     A.   I'm sorry.  Go ahead.
23      As an organization, the Charlottesville
24  Clergy Collective did not lead or plan or organize a
25  counterprotest.  Congregate, as an entity did, and

Page 71

S. WISPELWEY

1  there were members of the Charlottesville Clergy
2  Collective, including myself, who were leaders
3  within Congregate.
4  BY MR. CAMPBELL:
5
6      Q.   Okay.  So you're also a leader of
7  Congregate Charlotte; correct, sir?
8      A.   Yes.  I'm a cocreator of Congregate.
9      Q.   Okay.  And I think you just described the
10  Congregate Charlottesville as an organizer of the
11  counterprotest?
12     A.   Yes.
13     Q.   Okay.  All right.  So then maybe it's a
14  better question-- maybe it's better if I phrase the
15  question more directly.
16      So, despite you being present and being
17  warned by the chief and the officers that downtown
18  Charlottesville on August 12 was going to be
19  dangerous, you decided Congregate Charlottesville
20  would still lead a counterprotest.
21      Is that accurate, sir?
22     MS. PHILLIPS:  Object to form.
23     A.   Yes.
24  BY MR. CAMPBELL:
25     Q.   You had been explicitly warned by police

Page 72

S. WISPELWEY

1
2  that there could be danger in downtown
3  Charlottesville on August 12?
4      MS. PHILLIPS:  Sorry.  Object to form.
5      Go ahead.
6      A.   Yes.
7  BY MR. CAMPBELL:
8      Q.   And you had -- were you present at the
9  July meeting?  I think you describe where community
10  members presented chats and Facebook evidence to the
11  city to let the city know that they perceived it
12  would be very violent on August 12?
13     MS. PHILLIPS:  Object to form.
14     A.   I don't believe I was in that particular
15  city council meeting.
16  BY MR. CAMPBELL:
17     Q.   You just kind of heard about it?
18     A.   I read the report that they submitted
19  online within a day or two.
20     Q.   Okay.  All right.  Tell me -- so kind of
21  moving on to August 12 -- well, where did you stay
22  the evening of August 11?
23     MS. PHILLIPS:  Dave, let me just interrupt
24  real fast.  We've been going for a little over an
25  hour.  May I just ask Seth if he's good to continue

Page 73

S. WISPELWEY

1
2  or if he would like a break?
3      MR. CAMPBELL:  Yeah.  Of course.  Of
4  course.  Absolutely.  My apologies.
5      MS. PHILLIPS:  Thank you.  I'll leave it
6  up to Seth.  If he wants to keep going, that's
7  great.  If he wants a break, that's fine, too.
8      THE DEPONENT:  Thank you.  After this
9  question, I would love a bathroom break.  It can be
10  brief, or if people need a longer one, that's fine
11  too.
12     MR. CAMPBELL:  You know what, it's
13  probably better just to do it before.  Because, I
14  mean, it's kind of, you know, going to be a sequence
15  of follow-up questions.  So this is a -- thank you
16  for interjecting, and this a great time.
17      If everyone -- five minutes?  Ten minutes?
18  Whatever you guys want to do is totally fine with
19  me.
20     MS. PHILLIPS:  What do you think, Seth?
21     THE DEPONENT:  We'll take a 10-minute
22  break, if that's all right?
23     MS. PHILLIPS:  That's perfect.
24     THE DEPONENT:  All right.  Thanks.
25     MR. CAMPBELL:  Great.  Thank you very

Page 74
1           S. WISPELWEY
2  much.  We'll go off the record.
3           (Brief recess.)
4  BY MR. CAMPBELL:
5      Q.   Reverend Wispelwey, right before we broke,
6  I was just discussing with you kind of transitioning
7  to the morning of August 12, 2017.
8           I think my last question was:  "Where did
9  you stay the night of August 11?"
10     A.   I stayed in my home the night of
11  August 11.
12     Q.   Okay.  Where did you go when you left your
13  home on the morning of August 12?
14     A.   The first place I went on the morning of
15  August 12 was I parked and went to First Baptist
16  Church on West Main Street in Charlottesville.
17     Q.   What time was that, sir, approximately?
18     A.   Shortly before 6:00 a.m.
19     Q.   Okay.  Was that for the sunrise meeting?
20         MS. PHILLIPS:  Object to form.
21     A.   Yes.  Congregate had organized a sunrise
22  worship service.
23  BY MR. CAMPBELL:
24     Q.   And was counterprotesting at the rally
25  discussed or mentioned at that sunrise meeting or

Page 75
1           S. WISPELWEY
2  service?
3      A.   Yes.
4      Q.   Was it understood that attendees of the
5  sunrise service would all be going to
6  counterprotest?
7      A.   No.
8      Q.   Okay.  How many people approximately
9  attended the sunrise service?
10     A.   I would say between 200 and 300.
11     Q.   And were those -- was the crowd -- if you
12  know, was the crowd of multiple denominations, or
13  were they predominantly members of First Baptist
14  Church?
15     A.   The attendees of the sunrise service were
16  overwhelmingly people of faith from a variety of
17  different traditions and locations.
18     Q.   Okay.  And where did you go when you left
19  the sunrise service?
20     A.   When I left the sunrise service, I walked
21  with a group of people of faith down West Main
22  Street towards the downtown mall to Emancipation
23  Park.
24     Q.   Was the purpose of your walking in that
25  direction to counterprotest Unite the Right?

Page 76
1           S. WISPELWEY
2      A.   Yes.
3      Q.   And do you know approximately how many
4  people were in the group of people of faith with
5  you?
6      A.   In the group I was with, there were no
7  more than 50 people.
8      Q.   If you know, did other groups leave the
9  sunrise service to other locations in downtown
10  Charlottesville?
11     A.   Yes.
12     Q.   Was that pursuant to a plan arrived at
13  during or prior to the sunrise service?
14     A.   Yes.
15     Q.   Okay.  And what was the plan?
16     A.   If the question is about the other group,
17  the plan was for people who felt called to join that
18  group to have a march to, if I recall, the Jefferson
19  School near the downtown mall and then to march to
20  McGuffey Park.
21     Q.   What was the plan for your group?
22     A.   The group I was with planned to be much
23  nearer to the planned Unite the Right rally to sing
24  and pray and bear bodily witness to what was
25  planned.

Page 77
1           S. WISPELWEY
2      Q.   And who was the leader of your group, if
3  there was a leader?
4      A.   There were a few different leaders.  I was
5  one of them as were Reverend Brittany Caine-Conley
6  and Reverend Osagyefo Sekou.
7      Q.   Could you spell the last Reverend's name,
8  please?
9      A.   O-s-a-g-y-e-f-o.  Last name Sekou,
10  S-e-k-o-u.
11     Q.   Thank you, sir.
12         Okay.  And as you're walking from the
13  sunrise service toward Emancipation Park, did you
14  observe any groups that you perceived to be rally
15  attendees?
16     A.   Yes.
17     Q.   What time approximately did your group
18  depart First Baptist Church to head towards
19  Emancipation Park?
20     A.   I believe we left First Baptist Church by
21  around 7:45 a.m. that morning.
22     Q.   And then can you give me some idea of how
23  long of a walk it was or would be from First Baptist
24  Church to Emancipation Park?
25         MS. PHILLIPS:  Object to form.

Page 78

S. WISPELWEY

2    A.   I'm not entirely sure.  I would say it's
3  about one mile.
4  BY MR. CAMPBELL:
5    Q.   Okay.  I suppose it very much varies
6  depending on how quickly you walk.
7         But about one mile in distance from First
8  Baptist Church to Emancipation Park?
9    A.   Yes.
10   Q.   And did you have any physical or verbal
11 encounters with any groups you perceived to be rally
12 attendees during your walk from sunrise service to
13 Emancipation Park?
14   A.   I don't know if they were rally attendees.
15 There was someone who yelled and heckled at us from
16 a vehicle during our walk.
17   Q.   Okay.  Any physical confrontations with
18 any groups of people you perceived to be rally
19 attendees?
20   A.   Not on the walk from the church to the
21 park, no.
22   Q.   And when you arrived at the park, can you
23 give me some frame of reference by street or
24 direction of where your group gathered when you
25 arrived at the area around Emancipation Park?

Page 79

S. WISPELWEY

2         MS. PHILLIPS:  Object to form.
3         Go ahead, Seth, if you know.
4    A.   Sure.
5         We gathered and stopped walking on Market
6  Street facing the park facing north.
7  BY MR. CAMPBELL:
8    Q.   Was there a particular reason that your
9  group planned to go to Market Street facing north
10 towards the park?
11        MS. PHILLIPS:  Object to form.
12   A.   Practically, that section of Market Street
13 was the only accessible place to gather as the other
14 three sides of the park on the streets had been
15 blocked off.
16 BY MR. CAMPBELL:
17   Q.   Prior to August 12, had any information
18 been communicated to you or anyone in Congregate
19 Charlottesville that you were aware of regarding the
20 manner by which rally attendees would access
21 Emancipation Park?
22        MS. PHILLIPS:  Object to form.
23   A.   Yes.
24 BY MR. CAMPBELL:
25   Q.   What were you told about how Unite the

Page 80

S. WISPELWEY

2  Right rally attendees would gain access to
3  Emancipation Park?
4    A.   As I recall, I heard many different
5  accounts of how rally attendees would enter the
6  park, some of it changing consistently in the days
7  leading up, on even being contradictory.
8         My understanding in the immediate days
9  leading up is that rally attendees might be led in
10 on the northeast corner on East Jefferson Street.
11   Q.   That would not be in the area where your
12 group was located; is that correct?
13   A.   That's correct.
14   Q.   Okay.  Was your intent in gathering where
15 you gathered in any part to block access to
16 Emancipation Park by any attendees?
17        MS. PHILLIPS:  Object to form.
18        Go ahead.
19   A.   No.
20 BY MR. CAMPBELL:
21   Q.   When your group arrived at Emancipation
22 Park, were there any -- did you see any groups of
23 rally attendees inside the park?
24   A.   Yes.
25   Q.   Okay.  All right.  Did there come a point

Page 81

S. WISPELWEY

2  where you and members of your group joined hands in
3  an attempt to prevent access to the park by any
4  rally attendees?
5         MS. PHILLIPS:  Object to form.  Asked and
6  answered.
7    A.   No.
8  BY MR. CAMPBELL:
9    Q.   Okay.  Did you ever join hands with
10 members of your group and form a line across Market
11 Street?
12   A.   Yes.
13   Q.   Okay.  What was the purpose of forming the
14 line across Market Street?
15   A.   When we were standing on Market Street,
16 our intent and plan was to form a loving presence
17 and witness from people of faith to sing and pray
18 and to peripherally mitigate the potential for
19 violence through doing so.
20   Q.   Okay.  And at some point as you joined
21 arms with others from your group across Market
22 Street, did you see a group of rally attendees
23 approaching?
24   A.   Yes.
25   Q.   Did you continue to remain in your

Page 82

S. WISPELWEY

1
2  position in locked arms with members of your group
3  across Market Street as the rally attendees got very
4  near to you?
5       MS. PHILLIPS:  Object to form.
6       A.   Yes.
7  BY MR. CAMPBELL:
8       Q.   Did there come a time where any rally
9  attendees made physical contact with you or any
10 member of your group?
11      A.   Yes.
12      Q.   Okay.  Tell me what happened then.
13      A.   There was a point where some of us
14 gathered on the steps that would lead in -- the
15 steps at the southeast corner of the park and Market
16 Street and what I believe is Second Street and
17 linked arms.  Shortly after we did that, a group of
18 white supremacists approached and, in pretty quick
19 succession, pushed right through us with their
20 shields and shoved us bodily out of the way.
21      Q.   Were you injured during that interaction
22 you just described?
23      MS. PHILLIPS:  Object to form.
24      A.   No, I was not injured physically.
25 BY MR. CAMPBELL:

Page 83

S. WISPELWEY

1
2       Q.   Okay.  Do you know if any other members of
3  your group were physically injured as a result of
4  that interaction?
5       A.   Yes, a couple were.
6       Q.   Okay.  Did you recognize by face and name
7  any of the individuals in the group with shields
8  approaching to attend the rally?
9       MS. PHILLIPS:  Object to form.
10      A.   No.
11 BY MR. CAMPBELL:
12      Q.   Okay.  Did you recognize the group those
13 individuals were associated with by any signs,
14 insignias, flags, or markings?
15      A.   Yes.
16      Q.   Okay.  And was it a sign?  Was it a mark
17 on the shield?  Was it a flag?
18      By what method do you believe you could
19 identify what group was approaching?
20      MS. PHILLIPS:  Object to form.
21      Go ahead.
22      A.   As I recall, it was their flags from this
23 particular group I recognized.
24 BY MR. CAMPBELL:
25      Q.   And what was the group that you recognized

Page 84

S. WISPELWEY

1
2  as being represented on the flags?
3       A.   To my recollection, the majority of flag
4  wavers in this particular group belonged to Identity
5  Evropa.
6       Q.   Prior to August 12, were you familiar with
7  the group Identity Evropa?
8       A.   Yes.
9       Q.   How were you aware of the group Identity
10 Evropa prior to August 12?
11      A.   From some basic research online and
12 understanding of who planned to attend Unite the
13 Right.
14      Q.   Other than Identity Evropa, what other
15 groups did you understand planned to attend Unite
16 the Right?
17      A.   It was my understanding prior to August 12
18 that groups named League of the South, The National
19 Socialist Movement, and others that I didn't have a
20 broad familiarity with prior planned to attend.
21      Q.   Okay.  All right.  So after the group
22 pushed through with shields, where did the group go?
23      MS. PHILLIPS:  Object to form.
24      A.   I'm not entirely sure.  I was focused on
25 regrouping with my fellow clergy and making sure

Page 85

S. WISPELWEY

1
2  everyone was all right.
3  BY MR. CAMPBELL:
4       Q.   Okay.  Was there anywhere else for them to
5  go beyond where you were on the steps other than
6  into the park?
7       MS. PHILLIPS:  Object to form.
8       A.   Yes.  It had been our observation that the
9  only access point for them to go was on the
10 southwest corner of the park.  We were on the
11 southeast.
12 BY MR. CAMPBELL:
13      Q.   Gotcha.
14      So the stairs you were standing on, the
15 park entrance behind you was closed; is that
16 correct?
17      A.   Yes.
18      Q.   During that encounter, did you observe any
19 rally attendee to be carrying a weapon?
20      A.   Yes.
21      Q.   What weapon or weapons did you observe?
22      A.   I considered -- I observed the poles and
23 the shields they carried as weapons.
24      Q.   Okay.  Any other weapon or weapons you
25 observed?

Page 86

S. WISPELWEY

2    A.    Not in that particular moment with that
3 group, no.
4    Q.    Okay.  Where did you go next, if anywhere?
5    A.    Our group regrouped, and we remained on
6 those stairs directly following.
7    Q.    Did your group remain on the stairs up
8 until the point unlawful assembly was declared?
9    A.    No.
10    Q.    Okay.  So whenever your group left that
11 position -- I think you said the southeast corner;
12 is that right?
13    A.    Yes.
14    Q.    So where did your group go when it left
15 the stairs on the southeast corner of Emancipation
16 Park?
17    A.    When we first left those stairs, we -- I'm
18 not sure where the entire group went.  I went to the
19 Market Street and then regrouped with some of our
20 group to go back to a restaurant on the other side
21 of the downtown mall for a brief period.
22    Q.    During your time on the stairs or on your
23 way to the restaurant, did you observe any physical
24 violence between rally attendees and
25 counterprotesters?

Page 87

S. WISPELWEY

2    A.    Yes.
3    Q.    Okay.  Can you tell me about the physical
4 violence you observed?
5    A.    Yes.  After Identity Evropa assaulted our
6 group, we regrouped on the stairs, and I observed a
7 large group of white supremacists coming down Market
8 Street towards the park.  They gathered at that
9 intersection -- or paused at that intersection for a
10 brief spell before charging at and attacking a
11 different group of counterprotesters on Market
12 Street to our right.
13    Q.    How would you identify the other group of
14 counterprotesters you're describing?
15        MS. PHILLIPS:  Object to form.
16    A.    I'm not sure how to identify them or who
17 they all were.
18 BY MR. CAMPBELL:
19    Q.    Okay.  It's not as if it was -- it wasn't
20 your other group; is that correct?
21    A.    Correct.  This was not a line of clergy.
22    Q.    Okay.  And there was nothing identifiable
23 about that group of counterprotesters involved in
24 the subsequent incident you just described?
25    A.    Nothing identifiable in the same way as

Page 88

S. WISPELWEY

2 the white supremacist group and flags that were
3 coming up Market Street.  It seemed to be a random
4 assortment of different people.
5    Q.    Okay.  The group of counterprotesters to
6 your right, were they carrying any flags?
7    A.    I don't recall seeing flags, no.
8    Q.    And did you observe physical violence like
9 punches and hitting and that sort of thing between
10 the two groups?
11        MS. PHILLIPS:  Object to form.
12    A.    Yes.  As stated, I saw the white
13 supremacists from League of the South, in
14 particular, charge at and attack this group.  At
15 that point, someone in our group ordered us to pull
16 back.  So we moved down Market Street away from
17 where the violence had occurred.
18 BY MR. CAMPBELL:
19    Q.    From your perspective, did all of the
20 violence you observed appear to be one-sided?  By
21 that I mean, perpetrated by the League of the South?
22        MS. PHILLIPS:  Object to form.
23    A.    Yes.  We pulled back, and that's what I
24 saw.
25 BY MR. CAMPBELL:

Page 89

S. WISPELWEY

2    Q.    Okay.  You didn't see any
3 counterprotesters even defending themselves by
4 striking at members of The League of the South?
5        MS. PHILLIPS:  Object to form.
6    A.    It was all a blur.  People were trying to
7 withstand the attack, and, as I said, we pulled back
8 and could not see the direct point of conflict from
9 that point onward.
10 BY MR. CAMPBELL:
11    Q.    I understand.
12        And then did you immediately head with
13 your group towards the restaurant you discussed
14 earlier?
15    A.    Not immediately, no.
16    Q.    Okay.  What was the name of the restaurant
17 you eventually headed for?
18    A.    It was called Escafé.
19    Q.    All right.  And where did you go after you
20 departed Escafé?
21    A.    After our group regrouped and made sure
22 people were okay and well-accounted for, we -- some
23 of us gathered to check in about what we might be
24 able to do or how to be present and walked back out
25 toward Market Street -- across the downtown mall

S. WISPELWEY

1
2 towards Market Street and towards Emancipation Park.
3     Q.    And was all of this prior to the
4 declaration of an unlawful assembly, all the stuff
5 we've been discussing?
6     A.    Yes.  The unlawful assembly was called or
7 proclaimed as we were leaving Escafé.
8     Q.    Okay.  And how far is the Emancipation
9 Park located from the where the car attack occurred?
10         MS. PHILLIPS:  Object to form.
11     A.    Emancipation Park is 2.5 blocks from --
12 2.5 or 3 blocks from where the car attack occurred.
13 BY MR. CAMPBELL:
14     Q.    Okay.  And that's down Market Street;
15 right?
16     A.    Yes.  The car attack occurred at
17 4th Street Northeast across the downtown mall.
18     Q.    All right.  During the entire time you
19 were downtown on August 12, did you ever observe any
20 violence perpetrated by individuals you perceived to
21 be counterprotesters?
22     A.    No, I did not.
23     Q.    Okay.  Did you ever observe people you
24 perceived to be counterprotesters throwing objects
25 towards the rally attendees?

S. WISPELWEY

1
2     A.    No, I did not.  I saw objects in the air.
3 I'm not sure where they were coming from.
4     Q.    But you didn't see any headed towards
5 Emancipation Park?
6     A.    No.
7         MS. PHILLIPS:  Object to form.
8     A.    No.  When I was directly by Emancipation
9 Park, our line was on the front line.
10 BY MR. CAMPBELL:
11     Q.    All right.  So I think you had testified
12 earlier that when the car attack occurred, you were
13 about a block and a half away.
14         Is my memory correct, sir?
15     A.    Yes.  I was near Escafé, so a couple
16 blocks is about accurate.
17     Q.    Okay.  And did you hear the incident?  Or
18 did you hear commotion?  What led you to go in that
19 direction?
20     A.    I went in that direction when a woman who
21 was very upset ran up towards Escafé and told us
22 that a car had just hit a bunch of people and that
23 it was really bad and that they needed help.
24     Q.    Did you immediately go to the area that
25 the woman described?

S. WISPELWEY

1
2     A.    Yes.  I stuck my head in the restaurant to
3 let the fellow faith leaders know, looked down the
4 street and saw that a serious scene was there, and
5 sprinted down there with a couple other clergy.
6     Q.    Okay.  And tell me what you saw when you
7 arrived at the scene.
8         If you need to take a break at any time,
9 it's -- I understand this is probably very difficult
10 for you, and I'm completely understanding if at any
11 point you need a break, sir.
12     A.    I appreciate it.
13         The first thing I remember seeing at the
14 corner of Fourth and Water was a young black woman,
15 glass, blood, writhing on the ground and crying out.
16         I saw two cars directly in front of me.
17 One was a van.
18         And I then turned onto Fourth Street there
19 at the entrance, and there were a lot of bodies on
20 the ground and medics attending to them, including,
21 like, doing CPR.  Myself and Reverend Seku asked one
22 of them "what can we do to help," and they asked for
23 help clearing out able-bodied people all around so
24 they could do their job.  So I turned around and
25 helped shepherd people to the sidewalks out of the

S. WISPELWEY

1
2 street and around and away from the bodies on the
3 ground.
4         At that point, the young man with the
5 young woman called out, apparently thinking I'm
6 Catholic, and said, "Father, this woman needs help"
7 and pushed this woman into my arms who was having a
8 total breakdown and was hurt.  I held her for a
9 while right there behind the van, brought her to a
10 fellow clergy member, at which point I helped
11 administer care and aid to other people who were
12 hurt, though not as grievously injured, including
13 people who were in shock and/or terrified because
14 they couldn't find their loved ones who had been
15 more grievously injured by the car.  And so I saw
16 everything.  I was moving around in that scene for a
17 couple hours.
18         Eventually, our group of Congregate came
19 together and helped put together rides for relatives
20 of people who had gone to the hospital, and they
21 couldn't find them and helped create a protective
22 barrier around those who needed most urgent need as
23 additional personnel showed up to the scene, like
24 fire engines and EMTs and that sort of thing.
25     Q.    You had indicated that a woman or

S. WISPELWEY

1
2   someone called out -- a man called out: "Father,
3   this woman needs help." Were you wearing, like,
4   your clerical clothing?
5       I apologize if I don't know the correct
6   word.
7       A.   That's accurate.  That entire day I was in
8   a full body-length, white clerical robe with a
9   red -- what is called a stole, but looks like a
10  scarf, draped around my neck.  So I was identifiable
11  as a clergy person.
12      Q.   Okay.  Were the other clergy people in
13  your group also similarly dressed in attire that
14  would let anyone easily identify them as members of
15  the clergy?
16      A.   Yes.  Not everyone in our group was
17  clergy.  Actually, only a handful were.  That
18  handful were in robes, but everyone was wearing a
19  stole, and most of them had the same color of stole
20  to be identifiable.
21      Q.   Understood.  All right.
22           Reverend, would you agree with me that all
23  the events you witnessed on August 12, 2017, were
24  disturbing?
25           MS. PHILLIPS:  Object to form.

S. WISPELWEY

1
2   BY MR. CAMPBELL:
3       Q.   Well, not the sunrise service.
4            All of the events associated with the
5   Unite the Right rally, would you agree all those
6   events were disturbing?
7            MS. PHILLIPS:  Object to form.
8       A.   Yes.  From the moment we came up towards
9   the Haven on Market Street at around 8:00 a.m.
10  through the rest of that evening was deeply
11  disturbing, yes.
12  BY MR. CAMPBELL:
13      Q.   Okay.  And how about -- did you observe
14  the torch march on August 11, 2017?  Was that also
15  disturbing to you?
16           MS. PHILLIPS:  Object to form.
17      A.   Absolutely.
18           THE DEPONENT:  I'm sorry.
19      A.   Absolutely, yes.
20  BY MR. CAMPBELL:
21      Q.   And how about the KKK rally you observed a
22  month earlier?
23           MS. PHILLIPS:  Object to form.
24      A.   The KKK rally was a unique kind of
25  non-rally.  That group was small.  I found the

S. WISPELWEY

1
2   iconography disturbing but not in the same way, no.
3   BY MR. CAMPBELL:
4       Q.   Okay.  So we discussed earlier in this
5   deposition the diagnosis of anxiety, the panic
6   attacks, and PTSD.
7            Can you differentiate the contribution or
8   effects of the scene of the car attack from all of
9   the other things you saw on August 11 and August 12?
10           MS. PHILLIPS:  Object to form.
11      A.   I'm not sure what is meant by
12  "differentiate."
13  BY MR. CAMPBELL:
14      Q.   Right.  So after August 12, you began
15  experiencing anxiety, you had a panic attack, you
16  had symptoms that have been diagnosed as PTSD;
17  correct?
18      A.   Yes.
19      Q.   Okay.  All right.  So do you believe that
20  you would have had any kind of anxiety, panic, or
21  PTSD-type symptoms as a result of the events of
22  August 11 and August 12, even had you not visually
23  observed the scene of the car attack?
24           MS. PHILLIPS:  Object to form.
25      A.   Yes, though in relation to the night

S. WISPELWEY

1
2   terrors I started experiencing where I would wake up
3   screaming and yelling and then not be able to sleep,
4   and the hypervigilance of checking the locks on my
5   daughter-- two in the immediate aftermath stand
6   out-- which is a nightmare that my daughter had been
7   hit by the car and I couldn't find her and was
8   yelling and crying out for her, that I was in that
9   nightmare reliving the scene specifically.
10  BY MR. CAMPBELL:
11      Q.   And I thought you said there were two
12  things that stood out?
13      A.   I'm sorry.
14           (Overlapping speakers.)
15      A.   It was a recurring dream.
16      Q.   I gotcha.  Okay.
17           But can you differentiate a percentage or
18  how much of your symptoms you feel are from the
19  scene of the car attack as opposed to the scene of
20  the torchlit march or the scene of white
21  supremacists pushing through your group with
22  shields?
23           MS. PHILLIPS:  Object to form.
24      A.   I'm not sure I can quantify it.  That
25  scene and being immersed in it and unsure what was

S. WISPELWEY

1
2  going on, with all the pain and terror and blood and
3  death, was uniquely awful.
4  BY MR. CAMPBELL:
5      Q.   That was worse than everything else you
6  had seen on August 11 and August 12; is that fair?
7      A.   Yes.  I would say objectively it was the
8  worst thing I had seen in the course of that
9  weekend.
10         MR. CAMPBELL:  All right.  Reverend, I
11  don't have any more questions for you at this time.
12  I appreciate your time and hope this wasn't too
13  awfully difficult to you.
14         And I pass the witness at this time.
15         I reserve the right, if I look over my
16  notes or something Mr. Kolenich asks or another
17  attorney prompts another question, but at this time,
18  I pass the witness.
19         Thank you, sir.
20         THE DEPONENT:  Okay.
21         MS. PHILLIPS:  Seth, before -- since this
22  is a good break time, I just want to check and see
23  if you want another small break or if you're good to
24  push on.
25         THE DEPONENT:  I'm good to push on.

S. WISPELWEY

1
2         MR. KOLENICH:  Actually, Jessica, can I
3  get five minutes?
4         MS. PHILLIPS:  That's fine with me.  Okay.
5         MR. KOLENICH:  Okay.  Thanks.  Off the
6  record.
7         (Brief recess.)
8                  EXAMINATION
9  BY MR. KOLENICH:
10     Q.   Good morning, Reverend Wispelwey.  My name
11  is Jim Kolenich.  I represent several of the
12  defendants you sued in the Unite to Right litigation
13  in Virginia.  Specifically, I represent Jason
14  Kessler, Nathan Damigo, Matthew Parrott, the
15  organization Identity Evropa, and the organization
16  Traditionalist Worker Party.
17         Are you familiar with Jason Kessler?
18     A.   Yes.
19         MS. PHILLIPS:  Object to form.
20         THE DEPONENT:  Sorry.
21  BY MR. KOLENICH:
22     Q.   How are you familiar with Jason Kessler?
23     A.   I've been familiar with Jason Kessler
24  since early 2017 as someone who resided in
25  Charlottesville, Virginia, and appeared publicly in

S. WISPELWEY

1
2  several contexts.
3      Q.   Do you recall what context those were?
4      A.   Yes.  I remember more specifically being
5  aware of who Jason Kessler was at Charlottesville
6  City Council meetings where he would speak during
7  public comment.
8      Q.   What did Mr. Kessler ordinarily discuss at
9  his public comment?
10         MS. PHILLIPS:  Object to form.
11     A.   I don't recall specifically.  He would
12  discuss many things.  I was also aware of who he was
13  as the person before early 2017, before I saw him in
14  person, as the person who was surfacing attention on
15  one of our city council members.
16  BY MR. KOLENICH:
17     Q.   Which council member was that?
18     A.   Wes Bellamy.
19     Q.   Why was he focusing attention on Wes
20  Bellamy?
21         MS. PHILLIPS:  Object to form.
22     A.   Wes Bellamy was one of the local leaders
23  calling for the removal of different statutes in
24  Charlottesville, and Jason Kessler was surfacing old
25  tweets, as I believe -- as I recall, of

S. WISPELWEY

1
2  Mr. Bellamy's.
3  BY MR. KOLENICH:
4      Q.   Do you recall the content of the tweets
5  that Mr. Kessler was surfacing?
6      A.   Yes, vaguely.
7      Q.   Can you describe them for us?
8      A.   As I recall, Dr. Bellamy had old tweets
9  that had disrespectful and derogatory language about
10  women.
11     Q.   Did it have any disrespectful or
12  derogatory women -- language about anything directed
13  toward anyone but women?
14     A.   I don't recall.
15         MS. PHILLIPS:  Object to form.
16         THE DEPONENT:  Sorry.
17     A.   I don't recall.
18  BY MR. KOLENICH:
19     Q.   Do you recall if it said anything
20  specifically about white people?
21         MS. PHILLIPS:  Object to form.
22     A.   No.
23  BY MR. KOLENICH:
24     Q.   Do you -- I'm sorry.  Withdrawn.
25         Do you know a person named Andy Ngo,

S. WISPELWEY

1
2  spelled N-g-o?
3      A.  I know of a person named Andy Ngo.
4      Q.  How do you know Andy Ngo?
5      A.  If we're discussing the same person, I
6  know of an Andy Ngo who I believe documents
7  different protest contexts.
8      Q.  To your knowledge, does he have an active
9  Twitter account?
10     A.  Yes, I believe so.
11     Q.  And did this person, Andy Ngo, cover
12  what's called antifa protesting?
13         MS. PHILLIPS:  Object to form.
14     A.  My understanding is that this is one of
15  the primary focuses of Andy Ngo's documentation,
16  yes.
17  BY MR. KOLENICH:
18     Q.  Do you have a Twitter account?
19     A.  I do.
20     Q.  What is your Twitter handle?
21     A.  Revsethdub.
22     Q.  Why did you choose that Twitter handle?
23     A.  I chose that because it's my designation.
24  I'm a Reverend, and the "dub" is for "W."  Wispelwey
25  is pretty complicated for folks.

S. WISPELWEY

1
2      Q.  The "dub" is for "W"?
3      A.  Yes.
4      Q.  To your knowledge, does "dub" have any
5  other common meanings?
6         MS. PHILLIPS:  Object to form.
7      A.  I'm familiar with "dub" in more of a
8  dictionary definition as someone can be dubbed
9  something, like a nickname.
10  BY MR. KOLENICH:
11     Q.  I'm showing you a Twitter feed.
12         Can you see it on the screen?
13     A.  Yes.
14     Q.  Do you see the tweet at the top of the
15  screen?
16     A.  Yes.
17     Q.  Can you read that for us?
18     A.  What I see says:  "Andy Ngo is a threat to
19  our community and provides kill lists for...let your
20  autofill take over."
21     Q.  Do you see that this tweet appears to have
22  been sent by Goad Gatsby?
23     A.  Yes.
24         MR. KOLENICH:  Jessica, I'll be making
25  this Exhibit 1.  I can't mark it just this second,

S. WISPELWEY

1
2  but this will be Exhibit 1.
3         (Exhibit 1 was marked.)
4         MS. PHILLIPS:  Okay.
5  BY MR. KOLENICH:
6      Q.  Did he tweet this to you?
7         MS. PHILLIPS:  Object to form.
8         Jim, can you put that back up so Seth can
9  see it again?
10         MR. KOLENICH:  Sorry.  What did I do?
11  Here it comes.  Is it back?
12         MS. PHILLIPS:  It is.
13     A.  Yes.
14         This does not look like a direct tweet.  I
15  don't have a recollection of it being sent to me.
16  BY MR. KOLENICH:
17     Q.  Okay.  No more questions about this page.
18         All right.  Showing you what will be
19  Exhibit 2.  Do you see the tweet at the top of the
20  screen?
21         (Exhibit 2 was marked.)
22     A.  Yes.
23  BY MR. KOLENICH:
24     Q.  Does that appear to be your Twitter
25  account?

S. WISPELWEY

1
2      A.  It appears to be, yes.
3      Q.  Does it appear that you are replying to
4  Goad Gatsby?
5      A.  Yes.
6      Q.  Can you read your reply?
7      A.  "Andy Ngo is a threat to our community and
8  provides kill lists for the future."
9      Q.  What did you mean by "Andy Ngo is a threat
10  to our community and provides kill lists for the
11  future"?
12     A.  I'm not sure I meant anything.  If this is
13  a response to the autofill request, this tweet was
14  created using the autofill feature of automatically
15  provided words on my phone.
16     Q.  Are you saying you didn't type that
17  response in?
18         MS. PHILLIPS:  Object to form.
19     A.  If this is my response, I supplied the
20  response, but probably most of it was provided
21  through the request to autofill.
22  BY MR. KOLENICH:
23     Q.  I'm not sure I understand.
24         You didn't actively type the words "and
25  provides kill lists for the future"?

S. WISPELWEY

1
2    A.   If I submitted this response, I probably
3  may have typed the beginning of the sentence, and
4  then the rest was provided automatically by my
5  iPhone software.
6    Q.   All right.  But you can see the message
7  that had been autofilled before you posted it to
8  Twitter?
9    A.   Yes.
10   Q.   Okay.  Do you remember sending this
11 response?
12   A.   I do not.
13   Q.   Do you have access to your Twitter account
14 presently?
15   A.   Yes.
16   Q.   Okay.  I will pull this exhibit down.
17 That was Exhibit 2.
18        Are you familiar with the concept of
19 "milkshakes" within the context of counterprotests?
20        MS. PHILLIPS:  Object to form.
21   A.   I have heard about milkshakes in the
22 context of counterprotesting.
23 BY MR. KOLENICH:
24   Q.   What do you understand "milkshakes" to
25 mean within the context of counterprotesting?

S. WISPELWEY

1
2    A.   I'm aware of a couple documented incidents
3  where different people had milkshakes poured on
4  them, I believe.
5    Q.   So by "milkshakes," you understand just a
6  regular milkshake, the type like you would get at
7  McDonald's or Burger King?
8    A.   That's correct, ice cream and milk.
9    Q.   So to your knowledge, there is nothing but
10 ice cream and milk in these milkshakes?
11        MS. PHILLIPS:  Object to form.
12   A.   That's what I understand a milkshake to
13 be.
14 BY MR. KOLENICH:
15   Q.   Have you ever seen the deployment of a
16 milkshake at a counterprotest?
17   A.   I have not, no.
18   Q.   Showing what will be marked Exhibit 3.
19        Do you recognize this as your --
20 withdrawn.
21        Do you recognize this as a message on your
22 Twitter account?
23        (Exhibit 3 was marked.)
24   A.   Yes.
25   Q.   Could you read that for us?

S. WISPELWEY

1
2        MS. PHILLIPS:  Objection.
3        Which portion?
4  BY MR. KOLENICH:
5    Q.   I'm sorry.  Just the portion above
6  where -- withdraw all that.
7        Let me open up the tools here, and I'll
8  highlight it.  The portion above the blue line I've
9  just drawn badly.
10   A.   What I see on my screen reads:  "Take your
11 MAGA-loving loved one out to Dairy Queen to discuss
12 the current state of things.  Order a milkshake.
13 When they justify concentration camps, spill your
14 milkshake on them.  Jesus got you."
15   Q.   Okay.  Thank you.
16        MR. KOLENICH:  Jessica, do you mind if I
17 remove the blue line, or should I leave it on there?
18        MS. PHILLIPS:  I'm fine with you removing
19 the blue line.
20        MR. KOLENICH:  If I can figure out how to
21 do it.  No secretary causes all kinds of problems.
22   Q.   There we go.  Thank you, Reverend.
23        You mentioned "Jesus got you."  Is that
24 what it said?
25   A.   Yes.

S. WISPELWEY

1
2    Q.   And you are a Christian reverend?
3    A.   I'm an ordained Minister of Word and
4  Sacrament in the United Church of Christ, which
5  identifies as a Christian denomination, yes.
6    Q.   What does it mean to be a "Christian
7  denomination"?
8    A.   It can mean many different things.  There
9  are many different types of Christian denominations.
10   Q.   What does it mean for your particular
11 denomination?
12   A.   The United Church of Christ is a
13 denomination that professes that God is alive and
14 well in the world, that God cares about loving
15 everyone, about justice and making things right and
16 fair for all.  We take our holy scripture seriously,
17 and we also believe that God is still speaking and
18 moving in the world through a living and active
19 spirit.  That would be the very short version.
20   Q.   By "God," do you mean "Jesus Christ"?
21   A.   I believe Jesus is and was and is a
22 manifestation of the purposes and dreams of God for
23 humanity and our world, yes.
24   Q.   Does your denomination have the sacrament
25 of baptism?

Page 110

S. WISPELWEY

1
2   A.   Yes.
3      Q.   Is it necessary in your denomination to be
4   baptized in order to be a Christian?
5      A.   No.  We do not require any creedal oaths
6   to identify as a Christian.  We have two sacraments,
7   communion and baptism.
8      Q.   In your denomination, what is the purpose,
9   then, of baptism?
10     A.   This is not -- I don't have any kind of
11  official statement memorized, but in my own words,
12  the purpose of baptism is to identify oneself with
13  the cleansing power of the Holy Spirit and a
14  recognition that following the living spirit of
15  Jesus lays claims on the life we want to live
16  growing forward.
17     Q.   Does your denomination have any sort of
18  position regarding Jews?
19     MS. PHILLIPS:   Object to form.
20     A.   I'm not familiar with any formal stance
21  regarding Jews in the United Church of Christ.
22  BY MR. KOLENICH:
23     Q.   Does your denomination admit the use of
24  violence, however minimal, such as pouring
25  milkshakes on people in spreading the works of

Page 111

S. WISPELWEY

1
2   Christianity?
3      MS. PHILLIPS:   Object to form.
4      A.   I'm not familiar with any formal statement
5   regarding milkshakes in the United Church of Christ.
6   BY MR. KOLENICH:
7      Q.   You are a reverend in the United Church of
8   Christ, are you not?
9      A.   Correct.
10     Q.   In your opinion as a reverend, is it
11  permissible to use violence to suppress what you
12  consider to be unacceptable behavior?
13     MS. PHILLIPS:   Object to form.
14     A.   No.  I do not believe in the use of
15  violence to -- in any context in my behavior or
16  actions as a reverend or Christian.
17  BY MR. KOLENICH:
18     Q.   You were present in Charlottesville on
19  August 12, 2017?
20     A.   Yes.
21     Q.   I believe you testified earlier that you
22  saw multiple acts of violence; is that right?
23     A.   Yes.
24     Q.   But you did not see any violent acts
25  perpetrated by counterprotesters?

Page 112

S. WISPELWEY

1
2      A.   In my experience -- in what I experienced
3   and observed on August 12, 2017, I did not see acts
4   of violence perpetrated by counterprotesters.
5      Q.   When did you arrive at the former Lee
6   Park?
7      A.   I arrived at Emancipation Park around
8   8:00 a.m. the morning of August 12, 2017.
9      Q.   Is that its current name?  Emancipation
10  Park?
11     A.   At the time it was called Emancipation
12  Park.  I believe there's an ongoing discussion, so
13  I'm not entirely sure if that's its current name.
14     Q.   Okay.  So when you say "Emancipation
15  Park," you mean the park where the Unite the Right
16  rally occurred that has a statue of General Lee in
17  it?
18     A.   Yes.  My memory is telling me that it
19  might be called Market Street Park now, but, yes,
20  Emancipation Park is the park with the statue of
21  Robert E. Lee in it.
22     Q.   Okay.  So it's -- we'll just call it
23  Emancipation Park for today since we are not certain
24  what its current name is.
25     Is that okay?

Page 113

S. WISPELWEY

1
2      A.   That's fine.
3      Q.   Do you -- all right.  So do you recall
4   what time you arrived at Emancipation Park on
5   August 12, 2017?
6      A.   Around 8:00 a.m.
7      Q.   And how many people were present when you
8   arrived around 8:00 a.m.?
9      MS. PHILLIPS:   Object to form.
10     A.   It's really hard to say.  There were
11  different people all within the vicinity in and
12  around the park.
13  BY MR. KOLENICH:
14     Q.   I'm going to show you Exhibit 4.
15  Probably.
16     (Exhibit 4 was marked.)
17     Q.   Are you able to see the picture on the
18  screen?
19     A.   Yes.
20     Q.   Is this a picture of August 12, 2017, in
21  Charlottesville, Virginia?
22     A.   Yes.
23     Q.   Can you identify any of the people in the
24  picture?
25     A.   Yes.

Page 114

S. WISPELWEY

1
2    Q.   Who can you identify?
3    A.   I can identify Eric Martin, Laura
4    Harrison.
5    Q.   I'm sorry to interrupt.
6         Can you identify -- when you recognize a
7    person, can you try to tell us where the person is
8    in the picture?
9    A.   Sure.  I am in roughly the middle of the
10   picture in the long white robe with the red stole.
11        I'm sorry.  Is the question to identify by
12   name different people I recognize?
13   Q.   Yes, if you could, and then do your best
14   to tell us where they are in the picture.
15   A.   Sure.  Directly to my right is Reverend
16   Brittany Caine-Conley.  Directly to her right is
17   Eric Martin.  Directly to my left is Mark Hasey.
18   Directly to his left is Ann Marie Smith.  Directly
19   to her left is Brandy Daniels.  Behind her in the
20   black coat and tie is Dr. Cornel West.  Behind Mark
21   Hasey, with her head turning upwards, is Rebekah
22   Menning.  A little closer to the foreground in
23   black, the African-American individual is Reverend
24   Osagyefo Sekou, and the photographer is someone
25   named Heather Wilson.

Page 115

S. WISPELWEY

1
2    Q.   Thank you.
3         Is that all the people you can recognize
4    at this time?
5    A.   Yes.
6    Q.   Directing your attention to what appears
7    to be a man standing in front of you, perhaps on a
8    lower step, he's wearing a black winter-type hat and
9    has a full beard, do you recognize that person?
10   A.   I do not.
11   Q.   Thank you.
12        Are you familiar with a person named Corey
13   Long?
14   A.   Yes.
15   Q.   How do you know Corey Long?
16        MS. PHILLIPS:  Objection to form.
17        Go ahead.
18   A.   If we're speaking of the same Corey Long
19   as an individual who attended Unite the Right as
20   a -- was a counterprotester to Unite the Right, most
21   well known for being shot at by a Klan member and
22   fashioning a device to defend himself.
23   BY MR. KOLENICH:
24   Q.   Can you describe the device he fashioned
25   to defend himself?

Page 116

S. WISPELWEY

1
2         MS. PHILLIPS:  Object to form.
3    A.   I'm not sure what all it entailed.  I
4    believe he used some kind of aerosol can with a
5    lighter to create a flame.
6    BY MR. KOLENICH:
7    Q.   Is it fair to say that would be called a
8    "homemade flamethrower"?
9         MS. PHILLIPS:  Object to form.
10   A.   That sounds accurate.
11   BY MR. KOLENICH:
12   Q.   Do you know what Mr. Long did with his
13   homemade flamethrower?
14   A.   I did not observe Corey Long or know who
15   he was on August 12, 2017.  Since that time, I have
16   seen pictures of who I understand to be Corey Long
17   pointing the flame he crafted towards steps going up
18   to Emancipation Park.
19   Q.   So he actively created a flame with this
20   homemade flamethrower?
21        MS. PHILLIPS:  Object to form.
22   A.   I don't know if he did all of those
23   actions.  I haven't seen any video.
24   BY MR. KOLENICH:
25   Q.   So you're not sure what he did on

Page 117

S. WISPELWEY

1
2    August 12, 2017?
3    A.   I'm not.  He's not an individual I'm
4    familiar with or know personally.
5    Q.   I'm going to show Exhibit 5.
6         MR. KOLENICH:  It's a video we're going to
7    play from 22 seconds, Jessica, for about maybe 10
8    seconds, 10 to 15 seconds.
9         MS. PHILLIPS:  Okay.
10        (Exhibit 5 was marked.)
11        MR. KOLENICH:  Of course, I'm going to
12   have to reload this.  I forgot to hit the video box.
13   Still Exhibit 5.
14   BY MR. KOLENICH:
15   Q.   Let me know if you have any trouble seeing
16   or hearing this, Reverend Wispelwey.
17        (Video played.)
18   Q.   Were you able to hear that?
19   A.   Yes.
20   Q.   And was that you in the video?
21   A.   Yes.
22   Q.   And what were you saying in that video?
23        MS. PHILLIPS:  Object to form.
24   A.   It was a little hard to hear with the
25   background noise.  It sounded like I said something

S. WISPELWEY

1
2  to the effect of "the conviction of Corey Long was
3  an unacceptable flexing of white supremacy in our
4  court system," and I missed the end of it.
5  BY MR. KOLENICH:
6      Q.  Okay.  But you were addressing the
7  conviction of Corey Long to that report?
8      A.  Yes.
9      Q.  But it's your testimony today that you
10 don't know what Corey Long did or didn't do?
11         MS. PHILLIPS:  Object to form.
12     A.  In answering the previous question, I
13 believe I was answering whether or not I knew what
14 he was doing that day.  All subsequent knowledge
15 came from reading stories and seeing the video of
16 him being shot at.  That's-- so since August 12,
17 that's the story I know.
18 BY MR. KOLENICH:
19     Q.  If you remember -- what was he convicted
20 of prior to you talking to this reporter?
21     A.  I don't remember the charge or what he was
22 convicted of.
23     Q.  Is it your understanding that he fashioned
24 this homemade flamethrower after he was shot at?
25         MS. PHILLIPS:  Object to form.

S. WISPELWEY

1
2      A.  I don't recall which event happened first.
3  I believe -- I don't recall.
4  BY MR. KOLENICH:
5      Q.  Okay.  Fair enough.
6          You didn't eyewitness this event, did you,
7  the flamethrower event?
8      A.  No.  I believe I was at Escafé when it
9  probably took place.
10     Q.  And did you eyewitness the shooting at
11 Corey Long?
12     A.  I did not eyewitness that.
13     Q.  How did you learn that that occurred?
14     A.  I saw a video of it.
15     Q.  To your knowledge, was anyone charged with
16 a crime for shooting at Corey Long?
17     A.  I believe so, but I'm not entirely sure.
18     Q.  Okay.  On the morning of August 12, did
19 you attend a service or a speech by Cornel West?
20     A.  On the morning of August 12, I attended a
21 service that had been put together by Congregate
22 Charlottesville.  Dr. Cornel West was one of the
23 speakers at that service.
24     Q.  Do you recall generally what Dr. Cornel
25 West said at that service?

S. WISPELWEY

1
2      A.  Generally, yes.  I actually stepped out
3  for a chunk of his sermon to connect with some of my
4  colleagues outside the church, but I remember
5  generally that it was an inspiring sermon, affirming
6  people's desire and spiritual calling to God's
7  vision for love and equality for all.
8      Q.  What do you mean by the phrase "love and
9  equality for all"?
10     A.  Out of my faith calling, I believe and
11 understand "love and equality for all" to be an
12 expression that each human being has inherent
13 dignity and value and worth and belovedness and that
14 we can all be a part of building a world with the
15 spirit of God that makes those things come true.
16     Q.  In your religious belief, is there a life
17 after death?
18     A.  My personal religious beliefs are
19 indeterminate on the matter.  I'm not sure it's
20 something I know or can know.
21     Q.  Is there an official position of the
22 United Church of Christ on the subject of a life
23 after death?
24     A.  I'm not actually sure.
25     Q.  Fair enough.

S. WISPELWEY

1
2          Do you recall Dr. Cornel West saying
3  something about counterprotesters being arrested on
4  August 12, 2017?
5          MS. PHILLIPS:  Object to form.
6      A.  Yes.  As I recall, generally, he was
7  inspiring people to follow the life-giving way
8  of God and the belief that humans belong to each
9  other, and they sometimes lead to arrest.
10 BY MR. KOLENICH:
11     Q.  Did you intend to prevent Unite the Right
12 protesters from entering Emancipation Park on
13 August 12, 2017?
14         MS. PHILLIPS:  Object to form.
15     A.  I did not believe we had the power to
16 actually prevent white supremacists from entering
17 the park.
18 BY MR. KOLENICH:
19     Q.  Okay.  Did you intend to attempt to stop
20 them from entering the park?
21         MS. PHILLIPS:  Object to form.
22     A.  No.
23 BY MR. KOLENICH:
24     Q.  I guess, for clarity, how do you want to
25 refer to Jason Kessler and his supporters as?  And

S. WISPELWEY

1
2  any phrase that you're comfortable with will do.
3         Is it "white supremacist" or something
4  else?
5     A.  I've been using that term because it's a
6  good catch-all term.
7     Q.  Okay.  So we'll call-- for purposes of
8  this deposition, we'll call Jason Kessler and any
9  other people that were supporting him on August 12
10  "white supremacists," and we'll call anybody else
11  "counterprotesters."
12        Is that fair?
13    A.  That works.
14    Q.  Okay.  So did you attempt to stop white
15  supremacists from entering Emancipation Park on
16  August 12, 2017?
17    A.  No.
18    Q.  Did you ever form a line linking your arms
19  together with other persons, other counterprotesters
20  on August 12, 2017?
21        MS. PHILLIPS:  Object to form.  Asked and
22  answered.
23        Go ahead.
24    A.  Yes.
25  BY MR. KOLENICH:

S. WISPELWEY

1
2     Q.  What was the purpose of forming that line?
3         MS. PHILLIPS:  Object to form.  Asked and
4  answered.
5         Go ahead.
6     A.  The initial line we formed was on Market
7  Street, just a simple single-file line.  And then I
8  was also part of a group that linked arms on the
9  southeast corner of the park, which was not an
10  entrance for access to the rally.
11  BY MR. KOLENICH:
12    Q.  Are you familiar with a group that is
13  generally referred to as "antifa"?
14    A.  I'm familiar with the term "antifa," yes.
15    Q.  What do you understand by the term
16  "antifa"?
17    A.  Antifa is, as far as I can tell, a
18  catch-all term for -- used primarily in the media to
19  refer to people who consider themselves antifascist.
20  I think it also has a second meaning that refers to
21  counterprotesters to what are considered fascists or
22  white supremacists.  It's just a generalizing term,
23  is my understanding of it.
24    Q.  In your understanding, does antifa have
25  any connection with use of violence in

S. WISPELWEY

1
2  counterprotesting white supremacists or fascists?
3         MS. PHILLIPS:  Object to form.
4     A.  In my understanding, antifa is not
5  actually a formal group.  So it is hard to designate
6  or define, for me, what they do or don't do.
7  BY MR. KOLENICH:
8     Q.  Would it be fair to say that certain
9  people identify themselves as antifa or
10  antifascists?
11    A.  I know people identify themselves as
12  antifascist.  I don't know how or in what ways
13  people identify as antifa.
14    Q.  Are people who identify themselves as
15  antifascists given to using any means whatsoever to
16  stop white supremacists from holding public space
17  and public rallies?
18        MS. PHILLIPS:  Object to form.
19    A.  I'm not sure what all the people who
20  identify as antifascist do or consider ways of
21  holding public space, if they are the same people or
22  not.
23  BY MR. KOLENICH:
24    Q.  Fair enough.  Are any people, to your
25  knowledge, who identify as antifascists given to use

S. WISPELWEY

1
2  of illegal means to stop white supremacists from
3  holding public rallies?
4         MS. PHILLIPS:  Object to form.
5     A.  I really can't say because I don't know
6  individuals that are defined as such.
7  BY MR. KOLENICH:
8     Q.  Is it your testimony that you don't know
9  any individuals who are antifascists?
10    A.  No, I'm sorry.  I meant -- I was saying
11  that I don't know people who identify as
12  antifascists and then talk about using any means
13  necessary to confront fascists.  I see online people
14  identify as antifascists.
15    Q.  But you don't know these people online who
16  identify as antifascists?
17        MS. PHILLIPS:  Object to form.
18    A.  It's hard to say specifically without
19  knowing who we are talking about.
20  BY MR. KOLENICH:
21    Q.  All right.  So it's possible that some of
22  the people online who identify as antifascists are
23  people that you know?
24    A.  It's possible.
25    Q.  Do you recall giving an interview on

1                    S. WISPELWEY
2  March 3, 2020, called "Lent 6, Sacred Conversations
3  to End Racism and European Voices"?
4        A.  I don't recall that particular interview.
5        Q.  Okay.
6        A.  From this year?  Of March?
7        Q.  The date I have is March 3, 2020, yes.
8        A.  I don't recall an interview of this March
9  on that.  The title of it, it sounds familiar, but
10  that's about it.
11       Q.  Fair enough.
12            Do you recall ever making the statement
13  "what was revealed through that process is that a
14  lot of them had their most potent identity in their
15  whiteness and their maleness, not their Christian
16  thing"?
17            MS. PHILLIPS:  Object to form.
18       A.  I don't recall making that particular
19  statement.
20  BY MR. KOLENICH:
21       Q.  Do you recall ever expressing the opinion
22  that it was racist to accuse counterprotesters of
23  violence?
24       A.  I don't recall making that --
25            (Overlapping speakers.)

1                    S. WISPELWEY
2            MS. PHILLIPS:  Object to form.  Object to
3  form.
4            Go ahead, Seth.
5        A.  I don't recall making that particular
6  statement.
7  BY MR. KOLENICH:
8        Q.  Have you ever accused anyone of being a
9  racist?
10       A.  I believe I have, yes.
11       Q.  And what do you understand by the term
12  "racist"?
13            MS. PHILLIPS:  Object to form.
14       A.  I'm sorry, was the question racist or
15  racism?
16  BY MR. KOLENICH:
17       Q.  It was racist, but you can answer however
18  you think best; define racism, whatever is most
19  useful.
20       A.  I would define "racism" as a set of
21  beliefs, actions, and policies that are brought to
22  bear to discriminate against people based on their
23  race.
24       Q.  So your understanding -- withdrawn.
25            In your understanding, it would be

1                    S. WISPELWEY
2  possible for white persons to be the victims of
3  racism?
4        A.  Theoretically, if someone was
5  discriminating against someone based on their race,
6  the actual color of their skin is immaterial to that
7  theoretical possibility.
8        Q.  I know we've used "white supremacist" to
9  describe Kessler and his supporters, but aside from
10  that, how do you understand the phrase "white
11  supremacy"?
12            MS. PHILLIPS:  Object to form.
13       A.  In my understanding, if I've entered a
14  definition, it is that white supremacy is a system
15  and actions and beliefs brought to bear to
16  specifically privilege those who are deemed or
17  called white over and against other races.
18  BY MR. KOLENICH:
19       Q.  And have you heard the phrase "structural
20  white supremacy"?
21       A.  I've heard that phrase, or a variation on
22  it.
23       Q.  And how do you understand that phrase or
24  its variation?
25            MS. PHILLIPS:  Object to form.

1                    S. WISPELWEY
2        A.  Structural or systemic white supremacy is
3  when the beliefs and actions of white supremacists
4  who believe white people are superior to other races
5  are codified into societal institutions and
6  organizations and governance.
7  BY MR. KOLENICH:
8        Q.  And is it your understanding that the
9  modern United States is structurally white
10  supremacists?
11            MS. PHILLIPS:  Object to form.
12       A.  I'm not a historian.  From what I have
13  read, I believe that there a is lot of evidence that
14  those who put in place societal structures,
15  institutions, and systems of governance in our
16  country were driven by beliefs that white people are
17  superior to other races.
18  BY MR. KOLENICH:
19       Q.  So is it your opinion that to remedy that
20  we should rework the governing structures of the
21  United States of America?
22            MS. PHILLIPS:  Object to form.
23       A.  That's a big question with a lot of
24  nuance.  And this is just my opinion that, as a
25  person of faith and my own particular value set, I

Page 130

S. WISPELWEY

1
2 believe we come closer to the dreams of the living
3 God by forming a society that treats all people
4 equally.
5 BY MR. KOLENICH:
6       Q.   And what do you mean by "equally" in
7 that -- in that -- or what did you mean by
8 "equally"?
9            MS. PHILLIPS:  Object to form.
10           Go ahead.
11      A.   For example, when I use "equally," that
12 there would be protections and safety measures put
13 in place to ensure that no one is discriminated
14 against, for example, based on their race.
15 BY MR. KOLENICH:
16      Q.   How would society go about ensuring that
17 no one was discriminated against based on their
18 race?
19           MS. PHILLIPS:  Object to form.
20      A.   That's a big question where I could think
21 of many examples.  I think there are a wide variety
22 of options available for people who live in such a
23 society like the United States to speak up and
24 advocate for policies and measures and ways of
25 relating to one another that further the vision of

Page 131

S. WISPELWEY

1
2 equality.
3 BY MR. KOLENICH:
4       Q.   Do you think existing laws are sufficient
5 to -- withdrawn.
6            Are existing laws -- withdrawn again.
7            Can existing laws sufficiently ensure this
8 vision of equality?
9            MS. PHILLIPS:  Object to form.
10      A.   I don't believe so, no.
11 BY MR. KOLENICH:
12      Q.   So what new types of laws or new laws
13 would be necessary to ensure the vision of equality?
14           MS. PHILLIPS:  Object to form.
15      A.   I'm not a legislator or a lawyer.  I can
16 think of one example regarding the Voting Rights Act
17 and what I understand is its need for robust renewal
18 to ensure voting protections, but that's my opinion.
19 BY MR. KOLENICH:
20      Q.   What is your understanding of -- no,
21 withdrawn.
22           Is it your understanding that non-white
23 people have difficulty casting their votes,
24 currently?
25           MS. PHILLIPS:  Object to form.

Page 132

S. WISPELWEY

1
2       A.   From the bit I've read and not being a
3 comprehensive scholar on the subject, it is my
4 understanding that there are measures in place right
5 now that make it difficult for everyone to have full
6 and equal access to the ballot box.
7 BY MR. KOLENICH:
8       Q.   Do you recall giving an interview to Slate
9 magazine on August 16, 2017?
10      A.   I remember giving an interview to Slate
11 magazine shortly after August 12, 2017, yes.
12      Q.   Do you recall that the interview dealt
13 with the subject of antifa?
14           MS. PHILLIPS:  Object to form.
15      A.   I recall the interview discussing the
16 different protesters and attendees at Unite the
17 Right, yes.
18 BY MR. KOLENICH:
19      Q.   Do you recall giving the quote: "They have
20 their tools to achieve their purposes and they are
21 not the ones I will personally use, but let me
22 stress that our purposes were the same.  Block this
23 violent tide and do not let it take a pedestal."
24      A.   Having not revisited the article or
25 interview in a long time, I'm not entirely sure that

Page 133

S. WISPELWEY

1
2 those are my words.
3       Q.   Do you agree with those words today as you
4 hear them?
5            MS. PHILLIPS:  Object to form.
6       A.   I agree with the idea that those who are
7 called to protest against white supremacists and
8 fascists share a similar goal of ensuring that those
9 ideologies do not advance further than they already
10 have.
11 BY MR. KOLENICH:
12      Q.   It's your testimony that you do not agree
13 that violent acts are an appropriate response --
14 withdrawn.
15           Is it your testimony that you do not agree
16 that the use of violence is appropriate in reaching
17 that goal?
18           MS. PHILLIPS:  Object to form.
19      A.   Yes.  I do not believe in violence as a
20 legitimate form of protest.
21 BY MR. KOLENICH:
22      Q.   Showing Exhibit 5 -- I'm sorry, Exhibit 6.
23           (Exhibit 6 was marked.)
24      Q.   Does this appear to be a tweet from your
25 Twitter account?

S. WISPELWEY

A. It appears to be, yes.
Q. Could you read the tweet above the box that begins "U.S."?
A. Sure. What I see reads: "Writing that 'protests turn violent' is violence. It is always code for oppressed folks and those in bodily solidarity not backing down to the perpetration, provocation, and escalation of state violence, accompanied by images of damage to inanimate objects. White supremacy reinforced."
Q. Thank you. So is the meaning of this tweet that it's white supremacy to prevent a crowd from burning down a building?
MS. PHILLIPS: Object to form.
A. No. The meaning in my tweet is directed to media narratives that excise human agency from the stories they are covering.
BY MR. KOLENICH:
Q. Okay. So is it fair to say that on this Exhibit 6, the part you did not read appears to be a news headline, stating "Protests Turn Violent in Minneapolis," and the accompanied picture appears to be a building on fire?
A. Yes. That's what I read and see.

S. WISPELWEY

Q. Do you understand that picture to be a police station in Minneapolis?
MS. PHILLIPS: Object to form.
A. I don't know what building that is.
BY MR. KOLENICH:
Q. Is it fair to say it's some building in Minneapolis that has been set on fire?
MS. PHILLIPS: Object to form.
A. Given the headline, I believe that's a safe assumption to make. Yes.
BY MR. KOLENICH:
Q. Okay. I am removing the exhibit. It's your testimony that that tweet -- withdrawn.
Does that tweet mean that the way things are phrased can be white supremacy?
MS. PHILLIPS: Object to form.
A. As I recall, when I posted it relatively recently, my issue was that there was not a larger context addressed in the headline, that phrasing "protests turned violent" does not specify or accurately describe what is actually going on.
BY MR. KOLENICH:
Q. Fair enough.
Is it your understanding that words can

S. WISPELWEY

constitute violence?
MS. PHILLIPS: Object to form.
A. I define for myself "actual violence" as harm intended and carried out on another human being physically.
BY MR. KOLENICH:
Q. Can that harm -- go ahead.
A. I was just saying physically.
Q. Physical harm. That's what you mean?
A. Yes.
Q. So merely insulting somebody cannot be violence, in your understanding?
A. Violence is a -- can be a complex and nuanced concept, that people can incite the kind of physical violence with their words, and using the word "violence" can be a shorthand for that direct connection.
Q. Okay. So let's try to break that answer down.
I believe you said that using the words can incite violence.
Is that accurate?
MS. PHILLIPS: Object to form.
A. Yes. I believe words are very powerful.

S. WISPELWEY

BY MR. KOLENICH:
Q. So then the -- in your understanding, again, the violence is not the words, however insulting, but an actual physical violent act that somebody else takes because of the words?
MS. PHILLIPS: Object to form.
A. Yes. I understand violence is really the result of bodily harm caused and inflicted on human individuals.
BY MR. KOLENICH:
Q. So your lawsuit against Jason Kessler is because you believe his words incited somebody else to commit violence, a violent act?
MS. PHILLIPS: Object to form.
A. Is the question related to why I'm a plaintiff in this case, or to what Jason Kessler did do?
BY MR. KOLENICH:
Q. Both. Please answer both of those.
A. Sure. I'm not sure what all Jason Kessler has done. I am a plaintiff in this case because I experienced and observed the violence of white supremacists who organized and attended Unite the Right in the summer of 2017, specifically August 11

Page 138

1                    S. WISPELWEY
2  and 12.
3        Q.    Were you physically present on
4  August 11, 2017?
5             MS. PHILLIPS:  Object to form.
6             Physically present where?
7             MR. KOLENICH:  I thought I got one past
8  you.  I think if I get one more consecutive, I get a
9  set of steak knives.  I don't know --
10  BY MR. KOLENICH:
11       Q.    I'm sorry, I withdraw the previous
12  question.
13             Were you physically present, Reverend, at
14  the torchlight rally at the UVA campus -- University
15  of Virginia campus -- on August 11, 2017?
16       A.    I was not physically on UVA's grounds when
17  the torchlight rally was happening.
18       Q.    Did you see any part of the torchlight
19  rally?
20       A.    Yes.
21       Q.    And where were you standing when you saw
22  part of the torchlight rally?
23       A.    When I saw the torchlight rally when it
24  was going on, I was standing on the top of the steps
25  of St. Paul's Memorial Church.

Page 139

1                    S. WISPELWEY
2        Q.    Where is St. Paul's Memorial Church in
3  relation to where the torchlight rally occurred?
4        A.    It's across and a little down the street
5  on University Avenue.
6        Q.    Okay.  So how much of the rally -- I'm
7  sorry.
8             How much of the torchlight rally could you
9  see from that location?
10             MS. PHILLIPS:  Object to form.
11       A.    What I saw was a large group of
12  individuals with flaming torches around the Thomas
13  Jefferson statue.
14  BY MR. KOLENICH:
15       Q.    Is that all you saw?
16             MS. PHILLIPS:  Object to form.
17       A.    At that point, that's what I saw of the
18  actual torchlit rally.
19  BY MR. KOLENICH:
20       Q.    How long did you observe the torchlight
21  rally?
22       A.    That particular moment, I was out there
23  for a few minutes.
24       Q.    So you only watched the torchlight rally
25  for a few minutes?

Page 140

1                    S. WISPELWEY
2        A.    Yes.
3        Q.    Did you observe any violent activity at
4  the torchlight rally?
5        A.    No.
6        Q.    Are you familiar with the phrase
7  "deplatforming"?
8        A.    Yes, I've heard that phrase.
9        Q.    What do you understands by the phrase
10  "deplatforming"?
11             MS. PHILLIPS:  Object to form.
12       A.    Yeah.  In the popular understanding of the
13  phrase that I'm familiar with, "deplatforming"
14  refers broadly to the process by which -- and this
15  is just my definition -- the process by which
16  individuals or perhaps groups lose access to their
17  communications or maybe funding platforms.
18  BY MR. KOLENICH:
19       Q.    Is it something you've ever tried to do to
20  an individual or group?
21             MS. PHILLIPS:  Objection.  Form.
22       A.    I'm not sure if I've ever explicitly done
23  that or not.
24  BY MR. KOLENICH:
25       Q.    You're not sure if you ever attempted to

Page 141

1                    S. WISPELWEY
2  deplatform an individual or a group?
3             MS. PHILLIPS:  Object to form.
4        A.    No, because I'm not entirely sure if my
5  definition of it is accurate.  I don't know.
6  BY MR. KOLENICH:
7        Q.    Limiting ourselves to your definition,
8  have you ever attempted to deplatform an individual
9  or group?
10       A.    Not that I recall.  I'm not sure what all
11  goes into it.
12       Q.    Reverend, is it near 12:00 p.m. where you
13  are?
14       A.    Yeah, just about.
15             MR. KOLENICH:  Would it be all right if we
16  took a lunch break at this time?  About 30 minutes?
17             THE DEPONENT:  That sounds good to me.
18             MS. PHILLIPS:  That works.
19             MR. KOLENICH:  Okay.  I'll see you back at
20  3:30 p.m. Eastern.  That is 12:30 Tucson time.
21             THE DEPONENT:  Yes.  That sounds good.
22             MS. PHILLIPS:  Okay.
23             MR. KOLENICH:  Okay.  Off the record.
24             (Whereupon, at 11:57 a.m., (PST) the
25  deposition was adjourned until 12:30 p.m., the same

Page 142

S. WISPELWEY

1    day.)
2    BY MR. KOLENICH:
3        Q.   Okay.  Reverend, directing your attention
4    back to August 12 at Emancipation Park, do you
5    recall -- withdrawn.
6            Do you know what the group League of the
7    South was wearing that day?
8        A.   I do not know what all members of League
9    of the South were wearing.
10       Q.   Are you familiar, as you sit here today,
11   with what any member of League of the South looked
12   like on August 12, 2017?
13           MS. PHILLIPS:  Object to form.
14       A.   Yes.
15   BY MR. KOLENICH:
16       Q.   Which members are you familiar with from
17   League of the South?
18       A.   To my recollection, League of the South is
19   identifiable predominantly by the colors black and
20   white on their flags and their dress.
21       Q.   Okay.  Did you see any persons you
22   understand to be League of the South members on
23   August 12, 2017?
24       A.   Yes.

Page 143

S. WISPELWEY

1        Q.   What did you see them doing?
2        A.   I saw who I understood to be League of the
3    South marching down Market Street from the east
4    towards Emancipation Park.
5        Q.   Did anyone push or attempt to otherwise
6    get through your clergy line at any time on
7    August 12, 2017?
8            MS. PHILLIPS:  Object to form.
9        A.   Yes.
10   BY MR. KOLENICH:
11       Q.   Were any of those persons understood by
12   you to be League of the South members?
13       A.   I don't know.
14       Q.   Fair enough.
15           Have you ever heard the phrase "community
16   self-defense"?
17       A.   Yes, I'm familiar with that phrase.
18       Q.   What do you understand by the phrase
19   "community self-defense"?
20       A.   In my limited understanding admittedly,
21   "community self-defense" is a broad term used by
22   people to refer to the ways they might try to keep
23   members of their community safe from violence.
24       Q.   Were you under the impression that the

Page 144

S. WISPELWEY

1    white supremacists intended to inflict violence on
2    August 12, 2017?
3            MS. PHILLIPS:  Object to form.
4        A.   Yes.
5    BY MR. KOLENICH:
6        Q.   Why were you under that impression?
7        A.   There are many reasons.  Most
8    specifically, I learned from a presentation by
9    community members to Charlottesville City's Council
10   that summer of documented plans by organizers and
11   prospective attendees of Unite the Right to inflict
12   violence at Unite the Right.
13       Q.   You learned by -- I'm sorry.  Withdrawn.
14           You learned this from community
15   organizers?
16       A.   Yes.  I learned of it in a presentation
17   documenting conversations organizers and prospective
18   attendees were having online.  This evidence and
19   presentation that was made to city council was then
20   posted online for public viewing.
21       Q.   So did you view it online?
22       A.   I did, yes.
23       Q.   Did you have any conversations one on one
24   or in a group with individuals who warned you about

Page 145

S. WISPELWEY

1    white supremacist violence on August 12, 2017?
2            MS. PHILLIPS:  Object to form.
3        A.   I believe I did have conversations about
4    white supremacist violence that was being planned
5    for August 11 and 12, 2017, with different people.
6    BY MR. KOLENICH:
7        Q.   All right.  To be clear, since my previous
8    question was horrible, you had these conversations
9    prior to August 11 and 12, 2017?
10       A.   Yes.
11       Q.   And who did you have these conversations
12   with?
13       A.   I'm not sure I could remember all of the
14   different conversations and individuals I talked
15   about the planned violence with.
16       Q.   Could you remember any of the individuals
17   that you communicated with on that subject?
18       A.   Yes.
19       Q.   Who are those individuals?
20       A.   I believe I discussed the planned violence
21   with my fellow Congregate organizers and clergy.
22       Q.   Can you give us the names of any
23   individuals that you so communicated with?
24       A.   Specifically I remember discussing what we

S. WISPELWEY

1   learned was planned with Reverend Brittany
2   Caine-Conley and Reverend Osagyefo Sekou.
3       Q.   Do you remember the substance of either of
4   those communications?
5       A.   I don't.
6       Q.   Are you familiar, Reverend, with the
7   phrase "diversity of tactics"?
8       A.   I'm familiar with that phrase, yes.
9       Q.   What is your understanding of the meaning
10  of the phrase "diversity of tactics"?
11      A.   From my understanding -- it's a relatively
12  new term to me over the past few years.  It refers
13  to the fact that there are different ways that
14  people counterprotest injustice and violence.
15      Q.   Is it your understanding that expressing
16  white supremacist speech constitutes violence?
17      MS. PHILLIPS:  Object to form.
18      A.   I believe in freedom of speech.
19  BY MR. KOLENICH:
20      Q.   So, to be clear, you do not consider
21  merely saying offensive white supremacist-type
22  things as violent?
23      A.   I agree.
24      Q.   You agree that white supremacist speech

S. WISPELWEY

1   standing alone is not violence.  Is that accurate?
2       MS. PHILLIPS:  Object to form.
3       A.   That's correct.  Correct.  I believe that.
4   BY MR. KOLENICH:
5       Q.   So is it your testimony that you did not
6   go to Emancipation Park on August 12 just because
7   the alt-right was going to express -- I'm sorry, the
8   white supremacists were going to express white
9   supremacist speech?
10      MS. PHILLIPS:  Object to form.
11      A.   There were many reasons we, clergy,
12  planned to be near Emancipation Park that day.
13  BY MR. KOLENICH:
14      Q.   Have you completed your answer?
15      A.   Yes.  I was just not sure if I fully
16  answered the question.
17      Q.   As best as you can today -- and I
18  understand we're a better part of three years later,
19  but as best as you can today, can you tell us each
20  of the different reasons that you went to
21  Emancipation Park on August 12, 2017?
22      A.   Sure.  To the best of my recollection, my
23  reasons and those I expressed to the group of people
24  who were with us for going to Emancipation Park on

S. WISPELWEY

1   August 12, 2017, were to create a loving, prayerful,
2   caring presence in the streets and a strong visual
3   statement of who we were and represented by wearing
4   our clerical garb.
5       Q.   What part of creating a loving presence
6   did joining your arms together and forming a line
7   play?
8       MS. PHILLIPS:  Object to form.
9       A.   As best as I can answer that, joining our
10  arms together is a sign, a visual symbol of our
11  togetherness and unity as well as a practical way of
12  making sure we did not get separated with a lot
13  going on all around us.
14  BY MR. KOLENICH:
15      Q.   Reverend, I'm showing you what I have as
16  Exhibit 7.
17      (Exhibit 7 was marked.)
18  BY MR. KOLENICH:
19      Q.   Do you recognize this to be a Facebook
20  post?
21      A.   It looks like a Facebook post, yes.
22      MS. PHILLIPS:  Jim, are you able to scroll
23  up so we can see, you know, who posted it or the
24  handle for Facebook?

S. WISPELWEY

1       MR. KOLENICH:  Yeah, I think I can.  Give
2   me a second.  There we go.
3       Can you see it?
4       MS. PHILLIPS:  Yes.
5   BY MR. KOLENICH:
6       Q.   All right.  So Reverend Boone Rising is
7   not your account; is that correct?
8       A.   That's correct.
9       Q.   Do you know whose account -- or are you
10  familiar with this account?
11      A.   I do not know who Boone Rising is, no.
12      Q.   I'm trying to highlight a portion here.
13  I'm failing, of course.
14      Do you see the highlighted portion stating
15  "from a clergy person in Charlottesville"?
16      A.   Yes.
17      Q.   Can you read the text below that all the
18  way to the bottom.
19      A.   Sure.  As I see it, it reads:  "A note on
20  the antifa.  They are the reason Richard Spencer did
21  not speak today.  They are the reason the Unite the
22  Right march didn't happen.  They strategically used
23  violent tactics to incite the Nazis asterisk to
24  violence such that the governor declared a state of

Page 150

S. WISPELWEY

1  emergency before noon, before the 'Unite the Right'
2  rally was scheduled to begin" --
3  Q.  I'm sorry to interrupt, Reverend.  That is
4  probably good enough.
5  Do you recognize that quote as something
6  that you said?
7  A.  No.
8  Q.  Very well.  I've taken the exhibit down.
9  Have you ever seen that quote before?
10  A.  No.
11  Q.  I'm sorry; your answer was no?
12  A.  Yeah, I'm sorry.  No.
13  Q.  Do you agree with the sentiments expressed
14  in the statement?
15  A.  I didn't read the entire statement.
16  Q.  Limiting ourselves to the portion you
17  read.
18  A.  Is it possible to see it again?  That was
19  my first time.
20  Q.  Yes.  Yes, it is.  It might take me just a
21  second.
22  I believe the portion you read is here,
23  highlighted.
24  MS. PHILLIPS:  Jim, what was the question
25

Page 151

S. WISPELWEY

1  again?
2  MR. KOLENICH:  Just does he agree with the
3  sentiments expressed in this paragraph that he read.
4  A.  No, because this was not my experience or
5  observation.
6  BY MR. KOLENICH:
7  Q.  Okay.  Thank you.
8  Did you ever make the statement:  "The
9  antifascist group saved my life and the lives of a
10  lot of clergy on Saturday"?
11  A.  I don't remember if I made that exact
12  statement.
13  Q.  Do you think it's possible you made that
14  statement or something similar?
15  A.  It is possible I said something similar,
16  yes.
17  Q.  So you agree that antifascist groups saved
18  your life on Saturday, August -- I'm sorry,
19  August 12, 2017?
20  MS. PHILLIPS:  Object to form.
21  A.  I do believe that other counterprotesters
22  bodily protected clergy, especially at a moment when
23  I feared for my life, yes.
24
25

Page 152

S. WISPELWEY

1  BY MR. KOLENICH:
2  Q.  When did you fear for your life on
3  August 12, 2017?
4  A.  There were many instances.  A couple
5  specific examples were when League of the South and
6  National Socialist Movement marched up Market Street
7  after the other group of white supremacists had
8  already assaulted and broken through our line.  I
9  observed a lot of weapons carried by white
10  supremacists which caused me to fear for my safety.
11  At the scene of the car attack, there was
12  a lot of confusion about what had happened and if it
13  was going to continue to happen, and seeing the
14  bodily cost and injuries made me fear for my safety
15  in the midst of that turmoil.
16  Later that evening, I found myself alone
17  downtown and feared for my safety as well.  And
18  there are several other instances, if we documented
19  the whole day.
20  I also feared for my safety before we were
21  assaulted when groups -- when members of the group
22  that broke through us shouted out "Let's kill the
23  faggot priests," and I understood that to be
24  directed at me and my group.
25

Page 153

S. WISPELWEY

1  Q.  You testified that groups shouted out
2  "Let's kill the faggot priests"?
3  A.  Yes.
4  Q.  Could you identify any of the groups or
5  any individuals within those groups?
6  A.  I don't know that I could identify any
7  individuals.  Some were carrying flags that I
8  understand to be part of the group Identity Evropa.
9  Q.  Could you describe those individuals any
10  further other than the flag they were carrying?
11  MS. PHILLIPS:  Object to form.
12  A.  The majority of them were wearing polo
13  shirts that were light colored, and they were
14  carrying shields and sticks.
15  BY MR. KOLENICH:
16  Q.  Could you describe the shields?
17  A.  Yeah.  As I recall, they were 2.5, 3 feet
18  wide and painted white primarily.
19  Q.  Did they have any words on them?
20  A.  I don't recall.  Some had markings.
21  Q.  Do you recall if they had symbols on these
22  shields?
23  A.  Yes, I believe so.
24  MS. PHILLIPS:  Objection to form.
25

Page 154

S. WISPELWEY

1
2  BY MR. KOLENICH:
3      Q.   Could you describe the symbols?
4      A.   The only ones I can recall at this point
5  were sort of in a cross fashion or "X" fashion.
6      Q.   What color were the symbols?
7      A.   I recall seeing white shields with black
8  crosses or Xs on them around that point in time.
9      Q.   Thank you.
10         Have you ever used the phrase "community
11  defense tools"?
12     A.   I believe so.
13     Q.   What did you mean by "community defense
14  tools"?
15     A.   I'm not sure.  I would probably need a bit
16  more context for when or where I used it.
17     Q.   I'm going to show Exhibit 8.
18         (Exhibit 8 was marked.)
19  BY MR. KOLENICH:
20     Q.   Can you see the article I've got on the
21  screen?
22     A.   Yes.
23         MS. PHILLIPS:  Jim, again, are you able to
24  scroll up so we can see the title of the article and
25  the date?

Page 155

S. WISPELWEY

1
2         MR. KOLENICH:  I am.  I've got to get my
3  bearings here.  I'm down a machine here.  I can't
4  tell what you guys are looking at.  Sorry.
5         MS. PHILLIPS:  Okay.
6         MR. KOLENICH:  Okay.  Here we go.  All
7  right.  I believe I'm at the top.
8  BY MR. KOLENICH:
9      Q.   Can you see the top of the article,
10  Reverend?
11     A.   Yes.
12     Q.   Does this appear to be the article in the
13  website Slate.com?
14     A.   Yes.
15     Q.   And can you see the date appears to be
16  August 2017.
17     A.   Yes.
18     Q.   I'm going to scroll back to the quote I
19  was going to ask about.
20         Highlighting this paragraph, do you
21  recognize that as something you told the reporter?
22     A.   Yes.
23     Q.   Okay.  And can you -- does this refresh
24  your recollection as to what you meant by "community
25  defense tools"?

Page 156

S. WISPELWEY

1
2      A.   Yes.  This appears to be a statement I
3  provided the author, Dahlia Lithwick, with -- or at
4  least an edited version of it.
5      Q.   Okay.  What did you mean by "community
6  defense tools" when you were talking to the
7  reporter?
8      A.   I'm rereading it for a second.
9         In this context, as I recall -- as I
10  mentioned and testified earlier, I don't know what
11  all different counterprotesters brought, but I meant
12  that what counterprotesters to the white
13  supremacists may have brought was in service of
14  self-defense against white supremacist violence.
15     Q.   Okay.  So by "may have brought in service
16  of self-defense," do you mean that anything they
17  brought whatsoever, as long as they were opposing
18  white supremacists, would be a community defense
19  tool?
20         MS. PHILLIPS:  Object to form.
21     A.   In this context, yes.  What
22  counterprotesters may have brought was in
23  self-defense against the violence that the white
24  supremacists aimed and planned and did instigate, as
25  stated further down.

Page 157

S. WISPELWEY

1
2  BY MR. KOLENICH:
3      Q.   Sorry, I messed up the screen.  There we
4  are.
5         All right.  I will take this exhibit down.
6         So the sticks and signs and other tools
7  that the white supremacists brought, those were not
8  self-defensive tools?
9         MS. PHILLIPS:  Object to form.
10     A.   I don't know about the entirety of what
11  the white supremacists brought.  I saw sticks and
12  poles and batons used by white supremacists to
13  attack counterprotesters is what I saw.
14  BY MR. KOLENICH:
15     Q.   These attacks that you saw, did you see
16  the very beginnings of the altercations?
17     A.   I saw the beginning of one altercation
18  when a large group of white supremacists came down
19  Market Street, paused, and charged at a group of
20  counterprotesters in attacking them, including the
21  attack on our clergy group on the steps.
22     Q.   All right.  So this particular incident is
23  what you have described before, when the persons
24  pushed into the clergy group?
25         MS. PHILLIPS:  Object to form.

Page 158

S. WISPELWEY

2   Go ahead.
3   A.   That's the particular incident I was
4   referring to there, yes.
5   BY MR. KOLENICH:
6   Q.   How many other incidents of violence did
7   you witness on August 12, 2017?
8   A.   I don't know the exact number.
9   MS. PHILLIPS:  Object to form.
10   Go ahead.
11   THE DEPONENT:  Sorry.
12   A.   I don't know the exact number.  I saw
13   additional acts of violence of white supremacists
14   beating counterprotesters with their hands when our
15   clergy group came back out from Escafé after the --
16   whatever it was, unlawful assembly had been declared
17   and groups of people were in the streets.
18   BY MR. KOLENICH:
19   Q.   Okay.  So you're unable to estimate how
20   many different acts of violence you witnessed on
21   August 12, 2017?
22   A.   It would be very hard to estimate a
23   ballpark number.  There was a lot of turmoil.
24   Q.   The turmoil you're discussing, was that
25   before an unlawful assembly was declared or after or

Page 159

S. WISPELWEY

2   part before/part after?
3   MS. PHILLIPS:  Object to form.
4   A.   Part before and part after.
5   BY MR. KOLENICH:
6   Q.   Would you say there was more turmoil
7   before or after the unlawful assembly was declared?
8   A.   I can only speak to what I saw
9   specifically.  It took different forms.  I would say
10   there was more turmoil before.
11   Q.   Okay.  And the turmoil that you witnessed,
12   were you able to identify any individuals that you
13   recognized being involved in the turmoil?
14   A.   No.
15   Q.   Were you able to recognize any groups that
16   were involved in the turmoil?
17   A.   Yes.  Specifically, League of the South
18   and the National Socialist Movement were part of
19   that group of white supremacists I saw attack
20   counterprotesters.
21   Q.   And it's your testimony that they
22   initiated attacks on counterprotesters who were --
23   withdrawn.
24   It's your testimony that they -- those two
25   groups initiated attacks on peaceful

Page 160

S. WISPELWEY

2   counterprotesters?
3   A.   Yes.  What I observed directly was that
4   there was a line of counterprotesters on Market
5   Street standing still, and League of the South and
6   National Socialist Movement, which I'm designating
7   based on the flags they were carrying and so on,
8   charged at them.
9   Q.   Okay.  I'm going to show you Exhibit 9
10   maybe.
11   Can you see the photo that I've marked as
12   Exhibit 9?
13   (Exhibit 9 was marked.)
14   A.   Yes.
15   BY MR. KOLENICH:
16   Q.   Do you recognize this as a scene from
17   Emancipation Park on August 12, 2017?
18   A.   I don't because I don't see any landmarks
19   that I recognize, just people.
20   Q.   Limiting ourselves, then, to the people,
21   would you say there are any white supremacists in
22   this picture?
23   MS. PHILLIPS:  Object to form.
24   A.   It's hard to say because I don't know who
25   all these people are.

Page 161

S. WISPELWEY

2   BY MR. KOLENICH:
3   Q.   Can you see my highlighter on the screen?
4   A.   Yes.
5   Q.   Limiting ourselves to this individual I'm
6   highlighting, does he appear to be a white
7   supremacist?
8   MS. PHILLIPS:  Object to form.
9   A.   From what I can see on my computer screen,
10   all I see is an individual with a helmet, backpack,
11   and a T-shirt.  So I can't say who that person is or
12   how they associate.
13   BY MR. KOLENICH:
14   Q.   Fair enough.
15   I'm now highlighting an individual who
16   appears to be wearing pink sunglasses.
17   Do you see that person?
18   A.   Yes.
19   Q.   Does he appear to you to be a white
20   supremacist or a counterprotester?
21   MS. PHILLIPS:  Object to form.
22   A.   For this, I'll have to repeat my similar
23   question.  I just don't have any knowledge or
24   context of what's going on or where this is, so I
25   can't say, and I don't see any labels or anything.

Page 162

S. WISPELWEY

1
2   BY MR. KOLENICH:
3        Q.   Okay.  So there's nothing in this picture
4   that would allow you to tell who is a white
5   supremacist or a counterprotester?
6        A.   That's correct.  I'm not sure when or
7   where this picture is taking place.
8        Q.   Fair enough.  Taking the exhibit down.
9             Going to show you Exhibit 10.
10            (Exhibit 10 was marked.)
11  BY MR. KOLENICH:
12       Q.   Do you recognize this as from your Twitter
13  account?
14       A.   Yes.  It appears that this is something
15  that I tweeted.
16       Q.   The tweet seems to reference the phrase
17  "diversity of tactics."
18            Do you agree?
19       A.   Yes.
20       Q.   What did you mean by "diversity of
21  tactics" in this tweet?
22       A.   I'm not entirely sure.  It looks to be a
23  reply to a preexisting Twitter conversation.  So
24  just with the context in front of me as I read it,
25  it appears that I am welcoming a unified outcome

Page 163

S. WISPELWEY

1
2   based on a diversity of tactics.
3        Q.   And understanding that you're not able to
4   see the rest of the Twitter conversation, do you
5   recall what you meant by "unified outcome"?
6        A.   I do not.
7        Q.   Further down in the tweet, there's the
8   phrase "TA strike."
9             Do you know what that means?
10       A.   I don't remember what that means.
11       Q.   And "using their energies to leverage
12  any/all power and influence."
13            Do you -- do you know what that phrase
14  means?
15       A.   It's really hard, if not impossible, for
16  me to say without the larger context of what was
17  going on in what appears to be December of 2018 that
18  I was replying to.
19       Q.   All right.  So it may mean different
20  things depending on what was being discussed in the
21  Twitter conversation?
22       A.   Yes.
23       Q.   Is it possible it meant the use of
24  violence?
25            MS. PHILLIPS:  Object to form.

Page 164

S. WISPELWEY

1
2        A.   I think that's impossible for me to say
3   because I'm not -- I don't know what "TA strike" is
4   referring to.
5   BY MR. KOLENICH:
6        Q.   All right.  So you can't say, just based
7   on what's on the screen, whether you were talking
8   about an acceptable use of violence or not?
9        A.   I do not believe the use of violence is
10  acceptable in protests, if that's what this is even
11  referring to, or other efforts.
12       Q.   Are there any circumstances where a use of
13  physical violence is acceptable?
14       A.   I do not believe in physical violence in
15  any circumstances.
16       Q.   Is it permissible to use violence to
17  defend your family?
18            MS. PHILLIPS:  Objection.  Asked and
19  answered.
20       A.   I believe that physical violence is not
21  acceptable in any circumstances.  I believe in
22  people's right to self-defense.
23  BY MR. KOLENICH:
24       Q.   So if I understand you, you mean that
25  physical violence is not acceptable, even in

Page 165

S. WISPELWEY

1
2   self-defense?
3            MS. PHILLIPS:  Object to form.
4        A.   I may need a little more clarity on the
5   question.
6            I do not believe in violence, and I
7   believe the -- as something for someone to do to
8   another person, and I do believe in a right to
9   self-defense in the question asked.
10  BY MR. KOLENICH:
11       Q.   I'm going to pull down the exhibit.
12            How would you go about engaging in
13  self-defense without the use of some violence?
14            MS. PHILLIPS:  Object to form.
15       A.   I'm not sure I understand the question
16  without a more specific context.
17            And, as I understand it, it assumes that
18  self-defense requires violence, but I'm not sure if
19  that's the case.
20  BY MR. KOLENICH:
21       Q.   I don't mean to assert that self-defense
22  requires violence; rather, I'm just trying to
23  explore what you mean by "self-defense."
24            Let me posit an example and see if that
25  helps us.  If you go to the store with your -- I'm

S. WISPELWEY

1    S. WISPELWEY
2  sorry, Reverend, do you have a wife and children?
3      A.   Yes.
4      Q.   How old are your children?
5      A.   I have one daughter who is 10 years old.
6      Q.   Okay.  So you go to the store, let's say
7  the grocery store, with your wife and daughter, and
8  Jason Kessler jumps out and begins attacking your
9  wife.  He has knocked her to the ground, he is
10 punching her in the head.
11          What are you permitted to do to defend
12 your wife?
13          MS. PHILLIPS:  Object to form.
14          Calls for speculation.
15     A.   If I'm speculating, when Jason Kessler
16 attacks my wife, I personally believe in putting my
17 body between the attacker and the victim.  I mean,
18 in this very hypothetical scenario, it would depend
19 on the degree of harm being done or committed
20 already whether my -- the victim needed bodily
21 protection or not, but I would put my body in
22 between the attacker and the victim.
23 BY MR. KOLENICH:
24     Q.   So it's your testimony that you would not
25 push/hit, attempt to disarm Mr. Kessler?

S. WISPELWEY

1      You would simply put yourself between him
2  and his victim?
3      A.   MS. PHILLIPS:  Object to form.
4      A.   Speaking hypothetically, that's what I
5  believe in and have trained to do, is to put my body
6  in between to try to stop the act of violence.
7  BY MR. KOLENICH:
8      Q.   Okay.  Thank you.
9          Leaving this example in the realm of
10 hypotheticals, you mention what you've trained to
11 do.
12          How have you trained to engage in these
13 self-defense activities?
14     A.   I wouldn't classify what I've trained to
15 do as self-defense.  I would actually call it
16 de-escalation techniques when violence is being
17 committed.  I've trained in different contexts with
18 different organizations on how to bring the spirit
19 of calm and resolve to those kind of circumstances.
20     Q.   Can you be more specific as to how you
21 trained in this de-escalation process?
22          MS. PHILLIPS:  Object to form.
23     A.   Sure.  Depending on the context, we have
24 simulated with groups I've worked with hypothetical

S. WISPELWEY

1  scenarios where there's an active shooter, where
2  there are violent actors, where there are, you know,
3  confrontations, and simulating the different roles
4  in their scenarios to mitigate harm towards others
5  and minimize damage to one's own body.
6          So specifically, that looks like a lot of
7  different things depending on the simulation.
8  BY MR. KOLENICH:
9      Q.   Okay.  Let's start with an active shooter.
10         What would your training have you do in
11 the face of an active shooter?
12         MS. PHILLIPS:  Object to form.
13         Go ahead.
14     A.   As I recall in the active shooter training
15 simulations, we simulated being -- like singing and
16 part of a march with arms linked, and it simulated
17 that there's an active shooter, and so the goal is
18 to stay low to the ground, zigzag and find cover,
19 and check in with others, as able.
20 BY MR. KOLENICH:
21     Q.   So part of your training is not to call
22 the police or otherwise summon help?
23         MS. PHILLIPS:  Object to form.
24     A.   No.  Seeking help, that is just in the --

S. WISPELWEY

1  when, literally, there's an active shooter, what to
2  do first and see what's possible for calling for
3  help once the extreme threat is done with.  I think,
4  you know, I don't know that we simulated calling
5  9-1-1, or anything.
6          The main simulation was just how to get to
7  safety immediately.  We didn't focus on processes
8  after that.
9  BY MR. KOLENICH:
10     Q.   Okay.  So the training did not include
11 identifying when it would be a safe time to call
12 9-1-1?
13     A.   That's correct.  These were more just
14 about -- in times where I've done these kinds of
15 trainings, just about focusing on bodily safety of
16 yourself and others.
17     Q.   Did I understand you to testify that part
18 of your simulation was walking arm in arm?
19     A.   Yes.  I recall times where we simulated
20 staying connected, linked arm in arm.
21     Q.   Did you deploy that same tactic on
22 August 12, 2017, at Emancipation Park?
23         MS. PHILLIPS:  Object to form.
24     A.   Yes.

Page 170

S. WISPELWEY

1
2  BY MR. KOLENICH:
3      Q.   So did you train for attendance at any
4  white nationalist political rally -- I'm sorry, a
5  white supremacist -- white supremacist political
6  rally?
7          MS. PHILLIPS:  Object to form.  Object to
8  form.
9          Go ahead.
10     A.   I'm sorry.  I'm not sure I understand the
11 question.
12 BY MR. KOLENICH:
13     Q.   Did you engage in training for how you
14 were going to conduct yourself at the Unite the
15 Right event on August 12, 2017, in Charlottesville,
16 Virginia?
17     A.   Yes.
18     Q.   And part of that training was that you
19 were going to link arms?
20     A.   Yes.
21     Q.   Did you throw yourself or put your body --
22 I'm sorry, withdrawn.
23          Did you put your body between any white
24 supremacists and any of their victims on
25 August 12, 2017?

Page 171

S. WISPELWEY

1
2      A.   Yes.
3      Q.   Do you recall specifically when you did
4  that?
5      A.   Yes.  I don't recall the time exactly.  It
6  was after the unlawful assembly or state of
7  emergency, one of the other had been declared, and
8  there were attacks going on in the street.  And when
9  our clergy group came back into the street, I saw a
10 counterprotester being beaten physically, and me and
11 another clergy member used our bodies to approach
12 and try to de-escalate that.
13     Q.   Could you be specific as to how you
14 approached and tried to de-escalate?
15     A.   Yeah.  We walked up, as I recall, and
16 attended to the person being beaten, and the person
17 beating them pulled away and kept moving down Market
18 Street.  By saying, "Are you okay?  Do you need
19 something," and putting our bodies in the way, and
20 the beating stopped.
21     Q.   So by putting your bodies in the way, do
22 you mean you stood between the attacker and the
23 victim, or did you lay down on top of the victim, or
24 how did that work?
25     A.   By standing and crouching next to the

Page 172

S. WISPELWEY

1
2  victim.  It was a tangle of body parts, so it was
3  impossible to get in between, but just by
4  approaching and saying, "Are you okay?" and coming
5  close, and helping them off the ground, the attacker
6  stopped.
7      Q.   All right.  This was after the unlawful
8  assembly was declared?
9      A.   Yes.
10     Q.   Okay.  Were there any other times you can
11 remember where you engaged in this de-escalation
12 technique on August 12, 2017?
13     A.   I don't recall any times that were that
14 literally physically close.  Our group of clergy
15 moved through the streets at that time, bringing a
16 watchful presence to potentially volatile situations
17 in hopes of creating calm and de-escalation of
18 potential volatility.
19     Q.   All right.  So, to be clear, there were no
20 actual additional incidents where you placed
21 yourself between an attacker and his victim?
22     A.   That's correct.
23     Q.   Were there any other incidents that you
24 would classify as de-escalation, even though you did
25 not place your body between an attacker and a

Page 173

S. WISPELWEY

1
2  victim?
3      A.   Yes.
4      Q.   How many such incidents were there?
5      A.   From my point of view, our entire presence
6  as visible clergy and people of faith in the streets
7  was a de-escalation tactic.  By creating a loving,
8  singing presence, our hope and idea is that we would
9  mitigate harm.  So everywhere we were, that would
10 prayerfully be the outcome.
11     Q.   Did you say you were singing -- I'm sorry.
12 Go ahead.
13         MS. PHILLIPS:  No, no.  Go ahead.  I was
14 just going to ask you if it's a good time for a
15 break at some point soon, but I didn't mean to
16 interrupt your question.
17         MR. KOLENICH:  That's okay.  That's all
18 right.  We'll come back to it.  We can -- what do
19 you want to take?  Five?  Ten minutes?
20         MS. PHILLIPS:  Is that okay, Seth?
21         THE DEPONENT:  Yeah, I'm good at the
22 moment if we want to finish a certain thread.
23         MS. PHILLIPS:  Okay.  Go ahead, Jim.
24 BY MR. KOLENICH:
25     Q.   Okay.  So, Reverend, did I understand you

Page 174

S. WISPELWEY

2  to say you were singing?

3      A.   Yes.

4      Q.   What were you singing, if you remember?

5      A.   I specifically remember that morning

6  singing "This Little Light of Mine" and another

7  gospel song called "Over my Head."

8      Q.   All right.  So did you chant along with

9  the counterprotester group at any point?

10         MS. PHILLIPS:  Object to form.

11     A.   No.  We led our own chants.

12 BY MR. KOLENICH:

13     Q.   All right.  So you never said "Whose

14 streets?  Our streets"?

15     A.   I don't recall chanting that on

16 August 12, 2017.

17     Q.   And on August 12, 2017, did you chant

18 "Black Lives Matter"?

19     A.   I don't recall.

20     Q.   Is it possible you chanted "Black Lives

21 Matter"?

22     A.   It is possible.

23     Q.   Is it possible you chanted, "Whose

24 streets?  Our streets"?

25     A.   I really don't have a recollection of

Page 175

S. WISPELWEY

2  saying that.  I don't believe so.

3      Q.   At the various times that you de-escalated

4  a situation, could you identify any of the people

5  that you perceived as an attacker?

6          MS. PHILLIPS:  Object to form.

7      A.   No.

8  BY MR. KOLENICH:

9      Q.   Can you describe them at all?

10         MS. PHILLIPS:  Object to form.

11     A.   Yes.  There were many people I'd identify

12 as an attacker.  Making a blanket description, I

13 could only say that they were white, or

14 white-identifying, and male.

15 BY MR. KOLENICH:

16     Q.   All right.  Let's focus on the first

17 incident you described, where you placed your body

18 as best you could between an attacker and a victim.

19         Do you recall testifying about that

20 incident?

21     A.   Yes.

22     Q.   Could you describe the attacker in that

23 incident in any detail?

24     A.   Just that it was a white male.

25     Q.   Do you remember what he was wearing?

Page 176

S. WISPELWEY

2      A.   I do not.

3      Q.   Do you remember if he was carrying any

4  sort of object?

5      A.   I do not.

6      Q.   Can you recall -- well, withdrawn.

7          Did you see any persons with what you

8  perceived as serious injuries on August 12, 2017?

9      A.   Yes.

10     Q.   How many persons did you see seriously

11 injured on August 12, 2017?

12         MS. PHILLIPS:  Object to form.

13     A.   That's difficult to say.  I'd say at least

14 about a dozen.

15 BY MR. KOLENICH:

16     Q.   Okay.  And were each of these individuals

17 counterprotesters, as best you could tell?

18     A.   Yes.

19     Q.   You did not see any white supremacists

20 injured?

21     A.   No, I did not.

22     Q.   Did you assist any of the injured persons

23 that you saw on August 12, 2017?

24     A.   Yes.

25     Q.   How did you assist them?

Page 177

S. WISPELWEY

2      A.   In various instances, I comforted people,

3  helped calm them down, prayed with them, and got

4  them connected to EMTs or to the hospital themselves

5  and facilitated rides, and that sort of thing.

6      Q.   All right.  How did you connect any of

7  them to EMTs?

8      A.   In that particular example, it was -- I

9  was thinking of the scene of the car attack, and

10 there were EMTs present when I needed to connect a

11 couple people to professional medical attention.

12     Q.   Did you witness the car attack?

13     A.   No.

14     Q.   How did you -- withdrawn.

15         When did you arrive near enough to the

16 scene of the car attack to assist people with

17 getting EMTs?

18         MS. PHILLIPS:  Objection.  Form.

19     A.   I arrived within the span of a few

20 minutes, I would say, to the scene of the car attack

21 from when it occurred.

22 BY MR. KOLENICH:

23     Q.   Jessica, I think he talked over you.  Was

24 that another objection to form?

25         MS. PHILLIPS:  Yeah, it's on the record.

S. WISPELWEY

1  I see it.
2      MR. KOLENICH:  Okay.  That's right.  You
3  have the live feed, I see.  I don't.
4  BY MR. KOLENICH:
5      Q.   Okay.  Reverend, you said "get rides to
6  the hospital"; is that correct?
7      A.   Yes.
8      Q.   How did you get people rides to the
9  hospital if it wasn't through EMTs?
10     A.   In addition to the most grievously injured
11 by the car attack, there were many other less
12 extreme injuries, huge contusions, abrasions and
13 that sort of thing, people going into shock, and
14 thanks to our Congregate network, I was able to call
15 a couple colleagues of mine at a nearby church where
16 they were providing safe space for people.
17          And as luck would have it, a couple of
18 them had parked at the Water Street garage, and so
19 they walked across the downtown mall and got their
20 car and brought additional people after enduring the
21 ambulances tending to the most grievously injured.
22     Q.   Were all of these injured people injured
23 in the car attack?
24     A.   That's my understanding, yes.

S. WISPELWEY

1
2      Q.   You testified earlier about your own
3  damages.
4          Do you recall doing that?
5      A.   Yes.
6      Q.   If I understood correctly, you, yourself,
7  were not physically injured at any point on
8  August 12, 2017?
9      A.   Correct.
10     Q.   But your testimony was that you had
11 flashbacks and other emotional difficulties; is that
12 accurate?
13         MS. PHILLIPS:  Object to form.
14     A.   Broadly speaking, yes.
15 BY MR. KOLENICH:
16     Q.   Is there any other damages you sustained
17 on August 12, 2017?
18     A.   Yes.
19     Q.   What were those?
20     A.   This won't be a comprehensive list.  I
21 experienced night terrors, hypervigilance,
22 immobility, chest pains and difficulty breathing
23 with various outcomes including the inability to
24 socialize or go out in public or be in crowds, the
25 inability to continue my full-time work, difficulty

S. WISPELWEY

1
2  sleeping.  And -- yeah, that's a variety of the
3  symptoms and outcomes I can recall right now.
4      Q.   Reverend, how old are you?
5      A.   I'm currently 39 years old.
6      Q.   So you were about 36 on August 12, 2017?
7      A.   Correct.
8      Q.   Had you ever experienced chest pains prior
9  to August 12, 2017?
10     A.   Yes.  In the year 2000, I experienced a
11 collapsed lung, and that hurt in my chest.
12     Q.   Thank you.
13          Limiting ourselves to chest pains without
14 some obvious cause, had you ever experienced that
15 prior to August 12, 2017?
16     A.   No.
17     Q.   But since August 12, 2017, you've
18 experienced chest pains that don't have an obvious
19 physical cause?
20     A.   Correct.
21     Q.   Could you be more specific about the chest
22 pains?  Such as, are they on one particular side of
23 your chest?
24     A.   No.  When they come, I feel like a
25 constriction and a burning under the sternum, and

S. WISPELWEY

1
2  resulting in difficulty breathing, sort of like an
3  ache as well and that sort of thing.  Almost --
4          (Overlapping speakers.)
5      Q.   How long after -- I'm sorry.  Go ahead.
6      A.   Oh, go ahead.  I just said like an
7  internal cramp.
8      Q.   How long after August 12, 2017, was your
9  first chest pain occurrence?
10     A.   I don't recall exactly when the first one
11 was.  I sought medical attention when they didn't
12 dissipate, I believe, at the very beginning of 2018.
13     Q.   And when did you move to Tucson, Arizona?
14     A.   July of 2019.
15     Q.   Have you -- I'm sorry.  Withdrawn.
16          Have your symptoms ameliorated since you
17 moved to Arizona?
18         MS. PHILLIPS:  Object to form.
19     A.   I still experience several of the
20 symptoms, including hypervigilance, including night
21 terrors.  They are less frequent than in the year or
22 two preceding.  There have been incidences in the
23 past year, yes.
24 BY MR. KOLENICH:
25     Q.   What do you mean by "hypervigilance"?

Page 182

S. WISPELWEY

1
2       A.   I'm not a medical professional, though it
3   is an official term to describe what I would say is
4   an over-alertness, and inabilities to sit still, to
5   constantly check on the safety of one's
6   surroundings.  It can manifest in different specific
7   ways, but being unable to relax and be calm, whether
8   in private or in public, because of a need to
9   constantly scan for potential threats.
10      Q.   And you attribute this to the Unite the
11  Right event on August 12, 2017?
12      A.   I do, yes.
13      Q.   And you're treating with at least one
14  medical professional?
15           MS. PHILLIPS:  Object to form.
16      A.   Yes.
17  BY MR. KOLENICH:
18      Q.   Does your medical professional agree that
19  your hypervigilance is attributed to
20  August 12, 2017?
21      A.   Yes.
22      Q.   Did the Alt-Right come to your home or
23  your place of work on -- I'm sorry.  We were calling
24  them white supremacists.  Withdrawn.
25           Did the white supremacists come to your

Page 183

S. WISPELWEY

1
2   home or your place of work on August 12, 2017?
3           MS. PHILLIPS:  Object to form.
4           Go ahead.
5       A.   I'm not aware of whether they did or not
6   on August 12.
7   BY MR. KOLENICH:
8       Q.   Did any white supremacists come to your
9   home or your place of work at any time prior to your
10  move to Arizona?
11      A.   Yes.  I recall on August 13, 2017, there
12  were men who appeared to be white supremacists
13  circling Sojourners United Church of Christ where I
14  and other parishioners were gathered.  That caused
15  us to lock down those who were in the church until
16  they left.  My place of work, for most of the
17  duration until the move to Tucson was my home.  So I
18  don't believe white supremacists came to my home in
19  that time.
20      Q.   The incident you just described on
21  August 13, 2017, what did you mean by "circling"?
22      A.   There were individuals driving in cars
23  around the property, pulling onto the property, and
24  getting out, who did not indicate they were there to
25  go to church.

Page 184

S. WISPELWEY

1
2       Q.   Did you recognize any of the individuals
3   who did not indicate they were there to go to
4   church?
5       A.   I did not.  They appeared to be, based on
6   what I had seen yesterday, dressed like Unite the
7   Right attendees.
8       Q.   To be clear, about "yesterday," you mean
9   August 12, 2017?
10      A.   Yes.  Sorry.  The day before.  That's
11  correct.
12      Q.   We all knew what you meant, but this is
13  getting typed, and we won't know when we go back to
14  read it.
15           All right.  Reverend, you don't, of your
16  own personal knowledge, know anything about what
17  Jason Kessler did on August 11 and 12, 2017, do you?
18           MS. PHILLIPS:  Object to form.
19           Go ahead.
20      A.   I did see Jason Kessler at least once on
21  August 11 and 12, on the evening of the 11th.
22  BY MR. KOLENICH:
23      Q.   What did you see him doing?
24      A.   I saw Jason Kessler right nearby outside
25  St. Paul's Memorial Church with a group of attendees

Page 185

S. WISPELWEY

1
2   of the torchlit rally, on the sidewalk, as I was
3   trying to leave the church with a few other faith
4   leaders.
5       Q.   All right.  And did you hear him say
6   anything?
7       A.   No.
8       Q.   Other than standing with the group of
9   persons holding torches, did you see him do
10  anything?
11      A.   No.  I was in my vehicle.
12      Q.   Why did you sue Jason Kessler?
13           MS. PHILLIPS:  Object to form.
14      A.   Is in reference to Sines v. Kessler case?
15  BY MR. KOLENICH:
16      Q.   Yes.
17      A.   I elected to be a part of this case
18  against Jason Kessler and other organizers and
19  attendees of Unite the Right, because I understood
20  them to have organized and facilitated violence
21  against our community, and believe there should be
22  some accountability for that.
23      Q.   Why did you understand Jason Kessler to
24  have facilitated violence against the
25  Charlottesville community?

Page 186

S. WISPELWEY

2      Ms. PHILLIPS:  Object to form.
3      Go ahead.
4      A.   I'm not familiar, aware of all the
5   organizing and actions of Jason Kessler that summer
6   and on August 11 and 12, but I know him to be the
7   primary organizer and convener of Unite the Right,
8   and that the organizers and prospective attendees
9   planned and did bring violence to our community.
10     Q.   What do you know about the planning of the
11  Unite the Right event on August 12, 2017?
12     MS. PHILLIPS:  Object to form.
13     A.   I know a good bit about the planning,
14  based on the presentation the community members
15  shared to Charlottesville city council in July or so
16  of that year, and in terms of further information
17  that has been surfaced since, that a lot of planning
18  happened in online chat rooms and groups.
19  BY MR. KOLENICH:
20     Q.   Have you reviewed the evidence uncovered
21  in the discovery of this case?
22     MS. PHILLIPS:  Object to form.
23     MR. KOLENICH:  Yeah, it's a really bad
24  question.  I'm going to withdraw it and try again.
25

Page 187

S. WISPELWEY

2  BY MR. KOLENICH:
3      Q.   Have you had an opportunity -- withdrawn.
4      Have you had an opportunity to review any
5   of the evidence that your lawyers have obtained
6   during the litigation of this case?
7      A.   Yes.
8      Q.   And what evidence have you reviewed?
9      A.   It's hard to say specifically because
10  there's a lot of evidence in this case.  I've
11  reviewed different things, including the evidence
12  put forth in the original complaints, and I try to
13  keep up with the ongoing litigation process.
14     Q.   Have you reviewed anything that you
15  understood to be Discord posts?
16     MS. PHILLIPS:  Object to form.
17     A.   Yes, I believe so.
18  BY MR. KOLENICH:
19     Q.   And did you see anything in those posts
20  that indicated that Jason Kessler was responsible
21  for your alleged injuries?
22     A.   I say yes.
23     MS. PHILLIPS:  Object to form.
24     A.   Oops, sorry.  Yes.
25

Page 188

S. WISPELWEY

2  BY MR. KOLENICH:
3      Q.   Can you specify what those items of
4   evidence were?
5      A.   In terms of what I remember from Jason
6   Kessler, specifically, in advance of Unite the
7   Right, I remember viewing of videos, he was
8   livestreaming from Charlottesville, drawing
9   attention to our plans to hold a worship service,
10  and asked other clergy to come.
11     It was clear he was advertising this to
12  perspective attendees of Unite the Right, other
13  white supremacists, in what I recall of the little
14  bit I've seen of the Discord logs, there were posts
15  made drawing additional attention to the faith
16  leaders and ourselves who had planned this, using
17  racial derogatory language.
18     Q.   Fair enough.  They used racial language
19  toward and you other clergy?
20     MS. PHILLIPS:  Object to form.
21     A.   Yes.  Yes.  That's what I recall.
22  BY MR. KOLENICH:
23     Q.   Reverend, do you identify as a white male?
24     A.   Yes.
25     Q.   What sort of racial language did they use

Page 189

S. WISPELWEY

2  toward you?
3      A.   I'm not aware of any racial language that
4   was directed at me, specifically.
5      Q.   Okay.  I must have misunderstood you.  I
6   thought you said -- or I thought you testified that
7   the white supremacists, or Kessler in particular,
8   used racialized language toward you and other
9   clergy.
10     Is that not what you meant?
11     A.   To be clear, and to specify, within these
12  posts was racist language directed at particular
13  individuals.  I particularly remember racist
14  language directed at Dr. Cornel West, for example,
15  in the larger context of drawing attention to clergy
16  efforts in Charlottesville.
17     Q.   Okay.  So they directed racialized
18  language at non-white members of the clergy.  Is
19  that accurate?
20     A.   According to my recollection, yes.
21     Q.   Yes.  Limiting ourselves to your
22  recollection of your review of the evidence, did
23  they direct any insulting language of any kind
24  toward you, personally?
25     A.   Yes.  But I don't know what exact time

S. WISPELWEY

1                    S. WISPELWEY
2   period we're talking about, but, yes, I was on the
3   receiving end of derogatory language.
4       Q.   Well, limiting ourselves to what you saw,
5   and the evidence that your lawyers have obtained in
6   litigating this case, did you see derogatory
7   language directed toward you personally in that
8   evidence?
9       A.   Yes.  I don't remember the specifics, but
10  I remember Jason Kessler in his videos broadcast to
11  other white supremacists, calling me and my fellow
12  organizers "fake clergy" and other terms, and I have
13  not done in any way a comprehensive review of the
14  Discord logs.
15      Q.   Understood.  And you're not responsible
16  for -- just trying to work with what you remember
17  seeing.
18      A.   Yeah.
19      Q.   Do you have any memory of seeing anything
20  that Nathan Damigo posted regarding you?
21      A.   I don't recall.
22      Q.   And why did you sue Nathan Damigo?
23      A.   Here, I would posit a similar version of
24  my previous answer, which is that the organizers and
25  attendees of Unite the Right carried out the

1                    S. WISPELWEY
2   violence that they planned in advance of Unite the
3   Right, and I suffered for that, as did others, and
4   I'm hopeful for some accountability in that regard.
5           MR. KOLENICH:  Can we go off the record
6   just a quick second?
7           MS. PHILLIPS:  Yes.  A break would be
8   great.  Can we take 10 minutes.  Is that okay?
9           MR. KOLENICH:  Yeah.
10          (Brief recess.)
11          MR. KOLENICH:  We're on the record.
12  BY MR. KOLENICH:
13      Q.   Reverend, are you familiar with Matt
14  Parrott, also known as David Matthew Parrott?
15      A.   I'm familiar with the name, yes.
16      Q.   Where do you recognize the name from?
17      A.   I recognize him as one of the key figures
18  from the white supremacists and Unite the Right.
19      Q.   So you understand him to be someone who
20  planned the Unite the Right for the white
21  supremacists?
22      A.   I don't know the specifics of his role,
23  but yes.
24      Q.   And that's the reason you sued him?
25      A.   The reason -- I'm sorry?

1                    S. WISPELWEY
2           MS. PHILLIPS:  Objection.  Form.
3           Thank you.
4       A.   The reason he's named as a defendant in
5   this suit on the part of -- is because the Unite the
6   Right organizers and attendees brought the violence
7   they planned to bring to Charlottesville and because
8   of the costs suffered to me and my community, and I
9   hope to see some accountability there.
10  BY MR. KOLENICH:
11      Q.   How did David Matthew Parrott plan
12  violence at the Unite the Right rally?
13          MS. PHILLIPS:  Object to form.
14      A.   I don't know all the specifics, off the
15  top of my head.
16  BY MR. KOLENICH:
17      Q.   Can you give any specifics at all?
18      A.   Not at this moment.
19          MS. PHILLIPS:  Object to form.
20      A.   I don't recall.
21  BY MR. KOLENICH:
22      Q.   Did you see David Matthew Parrott say or
23  do anything on August 12, 2017?
24      A.   I don't recall.
25      Q.   Did you see Nathan Damigo do anything or

1                    S. WISPELWEY
2   hear him say anything on August 12, 2017?
3       A.   I don't recall.
4       Q.   Other than what you've already told us,
5   did you see Jason Kessler do anything or hear him
6   say anything on August 12, 2017?
7       A.   I don't recall.
8       Q.   Reverend, I'm going to show you
9   Exhibit 11.
10          (Exhibit 11 was marked.)
11  BY MR. KOLENICH:
12      Q.   Do you see Exhibit 11 on your screen?
13      A.   Yes.
14      Q.   Do you see the item circled in red on your
15  screen?
16      A.   Yes.
17      Q.   Do you agree it says "February 8, 2018,
18  last modified by Seth Wispelwey"?
19      A.   Yes.
20      Q.   Do you recognize this document?
21      A.   It appears to be a portion of a screen
22  grab from something like a Google Drive.
23      Q.   And at the top of the screen grab, do you
24  see that it says "Shared with me, 2017.08, Defend
25  Charlottesville"?

S. WISPELWEY

1
2    A.    Yes.
3    Q.    Do you recognize that Google Drive file?
4    A.    Yes.
5    Q.    Do you recall modifying the Heather Wilson
6  Dust and Light Photo file?
7    A.    No.
8    Q.    So you do not remember deleting any
9  pictures from that file?
10   A.    No.  I don't think -- this was her Google
11 Drive, as I recall.
12   Q.    Would you agree that it says it was last
13 modified by Seth Wispelwey?
14   A.    Yes.
15   Q.    Do you recall having the ability to modify
16 that file?
17   A.    No.
18   Q.    Do you recall what the contents of that
19 file was?
20   A.    Yes.
21   Q.    What was the contents of that file?
22   A.    Heather Wilson is a professional
23 photographer.  This was a file folder filled with
24 photographs that she had taken the weekend of
25 August 11 and 12, 2017.

S. WISPELWEY

1
2    Q.    In Charlottesville, Virginia?
3    A.    Yes.
4    Q.    Did you turn this file over in discovery?
5    A.    I turned over all electronic files
6  requested of me by my attorneys in the discovery
7  process.
8    Q.    Okay.  So you don't know if you turned
9  this specific file over or not?
10   A.    I believe if these photographs were part
11 of my files, they were turned over in the discovery
12 process.
13   Q.    Okay.  I'm taking down the exhibit.
14         Reverend, did you associate with
15 Councilman Wes Bellamy during your time living in
16 Charlottesville?
17         MS. PHILLIPS:  Object to form.
18   A.    I'm not sure what's meant by "associate
19 with."
20 BY MR. KOLENICH:
21   Q.    Did you socialize with him?
22   A.    No, I would not say that we socialized.
23   Q.    Did you attend any public events with him?
24   A.    I attended city council meetings where he
25 was presiding as a council member, yes.

S. WISPELWEY

1
2    Q.    Did you attend any events other than city
3  council meetings with Wes Bellamy?
4    A.    Yes.  As I recall right now, I -- Council
5  Member Bellamy was in attendance at the sunrise
6  service the morning of August 12, 2017, at First
7  Baptist Church.  I don't recall any other public
8  events at this point.
9    Q.    Do you consider Wes Bellamy to be a
10 racist?
11         MS. PHILLIPS:  Object to form.
12   A.    I don't know Wes Bellamy well.
13 BY MR. KOLENICH:
14   Q.    Did you ever review the tweet that Jason
15 Kessler complained about made by Wes Bellamy?
16   A.    No.  My knowledge of that story was
17 whatever I read in The Daily Progress, the local
18 newspaper.
19   Q.    Do you recall what The Daily Progress
20 wrote about the content of Wes Bellamy's tweets?
21   A.    Just what I shared earlier, which is that
22 I remember that some of them were derogatory towards
23 women or perceived to be.
24   Q.    Okay.
25         MR. KOLENICH:  Bear with me, Reverend.  I

S. WISPELWEY

1
2  have to attempt to read my own desktop here.  Okay.
3  BY MR. KOLENICH:
4    Q.    Reverend, are you familiar with the hammer
5  and sickle symbol used by the Soviet Union?
6    A.    Yes.  I recall that the former Soviet
7  Union's flag had a sickle on it with some stars.
8    Q.    Do you recall it had a symbol generally
9  referred to as a hammer and sickle?
10   A.    Yes, that sounds familiar.
11   Q.    I'm going to show you Exhibit 12 just so
12 we're clear.
13         Can you see the flag on the screen?
14         (Exhibit 12 was marked.)
15   A.    Yes.
16 BY MR. KOLENICH:
17   Q.    Is that the Soviet flag that you were just
18 discussing?
19   A.    That's what I remember the flag of the
20 U.S.S.R. being, yes.
21   Q.    What do you mean by "U.S.S.R."?
22   A.    Sorry.  I just remember that being the
23 acronym for the Soviet Union.
24   Q.    So you don't know what that actually
25 stands for?

Page 198

S. WISPELWEY

1
2     A.    One of the Ss stands for Soviet Socialist
3  Republic, perhaps.
4     Q.    Can I take the exhibit down off the
5  screen?
6           You know what we're talking about now?
7     A.    Yes.
8     Q.    Did you see anybody with specific
9  reference to counterprotesters wearing that symbol
10 on August 12, 2017?
11    A.    No.
12    Q.    Did you see anyone carrying that flag on
13 August 12, 2017?
14    A.    No.
15    Q.    Do you consider yourself a Communist?
16    A.    No.
17    Q.    Do any of your fellow members of the
18 clergy collective consider themselves Communists, to
19 your knowledge?
20          MS. PHILLIPS:  Object to form.
21    A.    I don't believe so, no.  They have never
22 articulated that to me.
23 BY MR. KOLENICH:
24    Q.    Dr. Cornel West does not consider himself
25 a Communist, to your knowledge?

Page 199

S. WISPELWEY

1
2     A.    Not to my knowledge, no.
3     Q.    Does Wes Bellamy consider himself a
4  Communist?
5           MS. PHILLIPS:  Object to form.
6     A.    Not to my knowledge, no.
7  BY MR. KOLENICH:
8     Q.    Would you consider the Soviet Union worse
9  than the Nazis?
10          MS. PHILLIPS:  Object to form.
11    A.    I'm not sure what is meant by "worse"
12 necessarily.  And I'm not a historian, so I'm not
13 sure I can make a qualitative judgment there.
14 BY MR. KOLENICH:
15    Q.    Fair enough.
16          You are opposed to Nazis; is that right?
17    A.    Yes.
18          MS. PHILLIPS:  Object to form.
19    A.    Yes.
20 BY MR. KOLENICH:
21    Q.    Why are you opposed to Nazis?
22          MS. PHILLIPS:  Also object to form.
23          Go ahead.
24    A.    In my understanding, I'm opposed to the
25 ideology and expression of Naziism as it's rooted in

Page 200

S. WISPELWEY

1
2  a history of hate, genocide, and violence against
3  vulnerable people groups.
4  BY MR. KOLENICH:
5     Q.    Do you know anything about the history of
6  the Soviet Union?
7     A.    I know a little bit of history there.
8     Q.    What do you know about the history of the
9  Soviet Union?
10          MS. PHILLIPS:  Objection.
11          Go ahead.
12    A.    Very broadly -- again, not being a
13 historian and being a long time since I studied
14 European history, I am familiar with the formation
15 of what became the Soviet Union after the Russian
16 Revolution and its dissolution in around 1989 and
17 various leaders over the years since then -- or in
18 between that time period.
19 BY MR. KOLENICH:
20    Q.    Understood.
21          Are you familiar with the phrase
22 "Holocaust"?
23    A.    Yes.
24    Q.    What do you understand by the Holocaust?
25    A.    My understanding of the Holocaust is that

Page 201

S. WISPELWEY

1
2  it refers to the systematic murder and annihilation
3  of different people groups that Nazi Germany deemed
4  inferior, especially Jewish people.
5     Q.    Are you familiar with the phrase
6  "Holodomor"?
7     A.    I'm not familiar with that phrase.
8           MR. KOLENICH:  Ms. Court Reporter, that is
9  going to be H-o-l-o-d-o-m-o-r.
10          REALTIME STENOGRAPHER:  Thank you.
11 BY MR. KOLENICH:
12    Q.    Are you familiar with the allegation that
13 Soviet Union genocided tens of millions of its own
14 people?
15    A.    I am familiar that a lot of life was lost
16 during the Soviet Union under the rule of Stalin.
17    Q.    Are you aware that persons considering
18 themselves antifascist often use Soviet symbols on
19 their clothing and websites?
20          MS. PHILLIPS:  Object to form.
21    A.    No, I'm not familiar with that.
22 BY MR. KOLENICH:
23    Q.    You've never seen a Soviet symbol on an
24 antifascist website?
25          MS. PHILLIPS:  Object to form.

Page 202

S. WISPELWEY

1                 S. WISPELWEY
2    A.  I'm not sure what antifascist websites
3 are.  I've not seen the hammer and sickle on
4 websites I've visited.
5 BY MR. KOLENICH:
6    Q.  Are you familiar with the Twitter feed
7 called "Goad Gatsby"?
8    A.  Yes.
9    Q.  Do you know what individual runs that
10 Twitter feed or owns that Twitter feed?
11    A.  I'm familiar with who that individual is,
12 yes.
13    Q.  Who is that individual?
14    A.  That's an individual I've seen in public a
15 few times.  He's very recognizable.  I'm not sure,
16 even though, if that's his real name.
17    Q.  So you don't know his real name?
18    A.  No.
19    Q.  Are you familiar with a person named Emily
20 Gorcenski?
21    A.  Yes.
22    Q.  Is it your testimony you've never seen any
23 Soviet symbols on either of their social media
24 platforms?
25         MS. PHILLIPS:  Object to form.

Page 203

1    A.  Not that I recall.
2 BY MR. KOLENICH:
3    Q.  Fair enough.  Is there anything that you
4 haven't told us about what happened to you on
5 August 11 or 12, 2017?
6         MS. PHILLIPS:  Object to form.
7    A.  Yes.
8 BY MR. KOLENICH:
9    Q.  Okay.  So what haven't you told us so far?
10         MS. PHILLIPS:  Object to form.
11    A.  There's a lot that transpired on August 11
12 and 12, 2017, that I have memory of that we did not
13 cover in question and answer during this time.
14 BY MR. KOLENICH:
15    Q.  Can you tell me what those things are that
16 we have not covered?
17         MS. PHILLIPS:  Object to form.
18    A.  It would be difficult to cover all those
19 things because -- in a broad way for me because
20 there were a lot of different things going on that I
21 experienced.
22 BY MR. KOLENICH:
23    Q.  Are you saying you don't remember any of
24 them, as you sit here today?

Page 204

S. WISPELWEY

1         MS. PHILLIPS:  Object to form.
2    A.  No, I do remember.  I'm just not sure
3 where to start.
4 BY MR. KOLENICH:
5    Q.  Well, let's try to go chronologically.
6     What's the first thing that happened to
7 you that you haven't already told us?
8    A.  Starting on August 11, 2017?
9    Q.  Yes.  That will be fine.
10    A.  I remember pretty early on August 11,
11 2017, drinking my morning coffee and learning that
12 the white supremacists were planning to hold a
13 torchlit rally at the Rotunda that night and having
14 a couple conversations with my fellow Congregate
15 leaders because we realized that was right across
16 the street from where the worship service was
17 planned.  I remember that distinctly.
18    Q.  Okay.  What is the next thing that
19 happened to you that you haven't already told us?
20    A.  I don't recall.
21         MS. PHILLIPS:  Object to the form.
22    Jim, if you've got specific questions
23 about the day, ask him.  But, otherwise, you know,
24 is it your plan to take him chronologically through

Page 205

S. WISPELWEY

1 every single thing that happened on 11th and 12th?
2     MR. KOLENICH:  No.  No, it's not.
3 BY MR. KOLENICH:
4    Q.  Sorry if my question implied that,
5 Reverend.  I mean anything that you're complaining
6 about as part of your lawsuit, not every last thing
7 you did on August 11 and 12, 2017.
8     MS. PHILLIPS:  Okay.
9    A.  Okay.
10 BY MR. KOLENICH:
11    Q.  So are there things that you are seeking
12 compensation from my clients for that occurred to
13 you connected to this Unite the Right event on
14 August 11 and 12, 2017, or any other time that you
15 connect to the Unite the Right event that you
16 haven't already told us about?
17    A.  Sitting here right now, it's been a while
18 since I've read in detail the full 115-page-or-so
19 complaint or other documents.  And so it would be
20 hard to drill down on all those specifics and what
21 all the different points are at this moment.
22    Q.  Okay.  So is it fair to say that
23 everything that you wish to complain about regarding
24 my clients is contained somewhere in that 115-page

Page 206

S. WISPELWEY

1
2 Second Amended Complaint?
3     A.   I believe the bulk of the evidence and
4 documentation for the complaint is furnished in the
5 case file.
6     Q.   Believe me, I'm sympathetic to not being
7 able to remember what's in that complaint.
8         So, all of the damages that you're
9 alleging that you sustained are referenced in that
10 complaint?
11    A.   Yes, I believe so.
12    Q.   And all of the actions that you believe
13 justify suing my clients -- that is, Jason Kessler,
14 Nathan Damigo, Matthew Parrott, Identity Evropa, and
15 Traditionalist Worker Party -- are contained in that
16 complaint?
17        MS. PHILLIPS:  Object to form.
18    A.   I haven't read the fullness of the
19 complaint yet, but from what I recall at this
20 moment, yes.
21 BY MR. KOLENICH:
22    Q.   All right.  As far as you know, you didn't
23 forget to mention anything to your lawyers when
24 preparing to file the complaint; is that right?
25        MS. PHILLIPS:  Object to form.

Page 207

S. WISPELWEY

1
2         Wait, actually, hang on.  I'm sorry.  Let
3 me just read the question, Seth, because I want to
4 make sure it doesn't get anything you've
5 communicated with us.
6         Yeah, I'm just going to give you an
7 attorney-client privilege instruction on that
8 question.  To the extent that it requires you to
9 disclose anything, any communications between
10 yourself and your attorneys, I'm going to instruct
11 you not to answer.
12        Understood?
13        THE DEPONENT:  Understood.
14 BY MR. KOLENICH:
15    Q.   Do you remember if there is anything you
16 forgot to tell your attorney -- without telling me
17 what you said to your lawyers or what they said to
18 you, can you think of anything you forgot to tell
19 your attorneys prior to the filing of the Second
20 Amended Complaint?
21        MS. PHILLIPS:  Object to form.
22        But you may answer that question.
23    A.   Sure.  I don't remember, just sitting
24 right here, if I forgot everything since the
25 conversation took place over 2.5 years ago.  And I

Page 208

S. WISPELWEY

1
2 just don't recall, specifically.
3 BY MR. KOLENICH:
4     Q.   Fair enough.
5         What is your current status as to your
6 mental conditions that you're alleging as damages?
7         MS. PHILLIPS:  Object to form.
8         MR. KOLENICH:  That's a terrible question.
9 I'm going to withdraw that and have myself fined for
10 even asking that question.
11 BY MR. KOLENICH:
12    Q.   Are you improving?  Are your damages
13 improving presently?
14        MS. PHILLIPS:  Object to form.
15    A.   Without having the complaint in front of
16 me, I haven't read it recently, as I recall right
17 here, the severity has lessened over time from what
18 was wrought in August 11 and 12, 2017, and the
19 impact it has had on me.
20 BY MR. KOLENICH:
21    Q.   On August 11 and 12, 2017, were you afraid
22 of the white nationalists?
23    A.   I'm sorry, I didn't quite catch the
24 question.
25    Q.   On August 11 and 12, 2017, were you afraid

Page 209

S. WISPELWEY

1
2 of the white nationalists -- I'm sorry, the white
3 supremacists?
4     A.   That weekend I remember experiencing fear
5 of the white supremacists and the violence they
6 planned to cause.
7     Q.   Did you experience this fear before or
8 after you learned of the murder of Heather Heyer?
9         MS. PHILLIPS:  Object to form.
10        You can answer.
11    A.   I did not learn of the murder of Heather
12 Heyer until later that evening of August 12.  I knew
13 someone had been killed, but I experienced fear from
14 white supremacists earlier than the car attack, yes.
15 BY MR. KOLENICH:
16    Q.   What caused you to experience that fear?
17    A.   There are several different examples I
18 could give.  Seeing white supremacists heavily
19 armed, chanting hateful language.  As I noted
20 earlier, when the group ultimately assaulted us said
21 "let's kill the faggot priests" directed at us, and
22 when we saw another group of white supremacists
23 coming up the street, chanting as well, I acutely
24 remember being afraid that I could very possibly be
25 severely bodily injured.

Page 210

S. WISPELWEY

2  Q.   When you heard the white supremacists say
3  "let's kill the priests," did you actually believe
4  they were going to attempt to kill you?
5       MS. PHILLIPS:  Object to form.
6  A.   I knew that it was the white supremacists'
7  plan to initiate and carry out violence in
8  Charlottesville, as a member of a group that
9  included several people from marginalized groups
10  that are not white and male like myself, I believe
11  they intended to do us real harm, yes.
12  BY MR. KOLENICH:
13  Q.   Did they, in fact, attempt to do you any
14  harm at all?
15       MS. PHILLIPS:  Object to form.
16  A.   Shortly after that phrase was heard and
17  other invective was hurled at us, they physically
18  pushed right into us and broke right through us, so,
19  yes.
20  BY MR. KOLENICH:
21  Q.   You didn't consider that pushing and
22  breaking through you an attempt to kill you, did
23  you?
24       MS. PHILLIPS:  Object to form.
25  A.   These were events unfolding in rapid real

Page 211

S. WISPELWEY

2  time.  It felt like a very unsafe place.  I knew
3  they intended to do harm to individuals like our
4  group and, yes, I thought we were going to be hurt
5  by groups of white supremacists.
6  BY MR. KOLENICH:
7  Q.   That's not what I asked.
8       Did you think that they were attempting to
9  kill you by pushing through your line?
10       MS. PHILLIPS:  Object to form.
11  A.   Right in that moment?  I didn't know what
12  they were intending to do.
13  BY MR. KOLENICH:
14  Q.   You testified that you knew they were
15  planning to do violent acts.
16       How did you know that?
17       MS. PHILLIPS:  Object to form.  Asked and
18  answered.
19  A.   As mentioned earlier, the primary source
20  of my knowledge on that had to do with the
21  presentation made to Charlottesville city council
22  that documented online chats from organizers and
23  perspective attendees, and the language that was
24  being used by those attendees on August 12 that was
25  directed at us.

Page 212

S. WISPELWEY

2  BY MR. KOLENICH:
3  Q.   Do you admit that some of the
4  counterprotesters intended to violently oppose the
5  white supremacists?
6       MS. PHILLIPS:  Object to form.
7  A.   I don't know --
8       Ms. PHILLIPS:  You want him to testify
9  about the intent of other protesters?
10       MR. KOLENICH:  I'll let the question
11  stand.
12       MS. PHILLIPS:  You can answer it, if you
13  can.
14  A.   I can't really answer that.  I don't know
15  the intent of any other counterprotesters, only my
16  own.
17  BY MR. KOLENICH:
18  Q.   But you know the intent of the white
19  supremacist protester?
20  A.   I know what the white supremacists
21  documented online about what they hoped and planned
22  to do.
23  Q.   How many white supremacist protesters
24  showed up to Emancipation Park on August 12, 2017?
25       MS. PHILLIPS:  Object to form.

Page 213

S. WISPELWEY

2  A.   It would be hard to estimate, but I would
3  put it in the hundreds.
4  BY MR. KOLENICH:
5  Q.   Is it your testimony that each and every
6  one of those hundreds had the same intent to do
7  violence in Charlottesville on August 12, 2017?
8       MS. PHILLIPS:  Object to form.
9  A.   I feel like that's impossible to me to
10  answer not knowing the intent of hundreds of
11  individuals.
12  BY MR. KOLENICH:
13  Q.   Do you know the intent of each and every
14  member of the group Identity Evropa?
15  A.   I do not know all the members of Identity
16  Evropa.
17  Q.   Do you know the intent of all the members
18  of Identity Evropa that were present in
19  Charlottesville on August 12, 2017?
20  A.   I do not.
21       MR. KOLENICH:  Very well, Reverend.  Thank
22  you.  I have no further questions for you.
23       MR. CAMPBELL:  Hey, good afternoon.  This
24  is Dave Campbell.  I have just two or three
25  follow-ups.

Page 214

S. WISPELWEY

2  THE DEPONENT:  Okay.
3                EXAMINATION
4  BY MR. CAMPBELL:
5     Q.   Reverend Wispelwey, the incident you
6  described a while ago on August 13, with people you
7  perceived to be white supremacists circling the
8  church, I think -- do you recall that testimony?
9     A.   Yes.
10    Q.   Okay.  Did you call the police or file a
11 police report as a result of that incident on
12 August 13?
13    A.   I did not, no.
14    Q.   Did you observe police respond to anyone
15 else's call and come to the church on August 13?
16    A.   I don't recall, no.
17    Q.   Okay.  You were just discussing that you
18 knew the rally attendees intended violence,
19 primarily -- and this is rough.  You know, I'm just
20 trying to paraphrase, so if it's incorrect, please
21 clear me up.  But I think you said something along
22 the lines of you knew the intent was violence
23 largely because of a presentation of community
24 organizers, the presentation to the Charlottesville
25 City Council.

Page 215

S. WISPELWEY

2  Is that somewhat accurate?
3     MS. PHILLIPS:  Object to form.
4     Go ahead, Seth.
5     A.   Yes.  I knew about some of their plans
6  based on a presentation community members had made
7  to Charlottesville city leadership.
8  BY MR. CAMPBELL:
9     Q.   Okay.  And do you know the identities of
10 any of the community members that made the
11 presentation to Charlottesville leadership?
12    A.   I do not.
13    Q.   You don't know a single name of the people
14 that made the presentation to the Charlottesville
15 City Council you described in July of 2017?
16    A.   No.  I was not present at the city council
17 meeting.
18    Q.   Okay.  And I think you said you reviewed a
19 report that came out shortly after the meeting?
20    A.   Yes.  The presentation they made was
21 posted online shortly after.
22    Q.   Do you know where it was posted online,
23 sir?
24    A.   Yes.  I believe it was posted on the
25 website Medium.com.

Page 216

S. WISPELWEY

2     Q.   Medium.  Okay.
3          And I think you had indicated the report
4  outlined Discord and social media posts made by
5  organizers and attendees; is that correct?
6     MS. PHILLIPS:  Object to form.
7     A.   As I don't recall exactly what platforms
8  were surfaced, some as I recall were from Facebook
9  and other platforms.
10 BY MR. CAMPBELL:
11    Q.   Do you remember the identities of any
12 individual cited in that report that physically
13 attended the Charlottesville rally?
14    A.   I don't recall.  I don't remember the
15 identities of those in the report.
16    MR. CAMPBELL:  Okay.  All right.  Thank
17 you very much, Reverend.  I don't have any
18 additional questions, sir.
19    MS. PHILLIPS:  I don't have any redirect.
20 So I think we're done.
21    MR. KOLENICH:  Yeah.  We're done.  Off the
22 record.
23         I am going to order a copy of the
24 transcript, secondary to the Plaintiffs' standing
25 order.  I'll get these exhibits over to production.

Page 217

S. WISPELWEY

2     MR. CAMPBELL:  This is Dave Campbell.  I
3  would like a copy as well.  Etran only, if you can.
4  Have a good weekend.
5     MR. KOLENICH:  I am Etran only too.
6  Sorry.
7         WHEREUPON, the within proceedings were
8  concluded at the approximate hour of 2:34 p.m.,
9  (PST) on the 24th day of July, 2020.

Page 218
```
1                    S. WISPELWEY
2
                 REPORTER'S CERTIFICATE
3
4        I, Dawn K. Larson, Registered Diplomate
5   Reporter, Certified Realtime Reporter, Certified
6   Realtime Captioner, and Notary Public, do hereby
7   certify that, previous to the commencement of the
8   examination, the deponent was, by me, duly sworn
9   remotely by agreement of counsel to testify to the
10  truth.
11       I further certify this deposition was
12  taken remotely in shorthand by me and thereafter
13  reduced to typewritten form, that the foregoing
14  constitutes a true and correct transcript.
15       I further certify that I am not related
16  to, employed by, nor of counsel for any of the
17  parties or attorneys herein, nor otherwise
18  interested in the result of the within action.
19       In witness whereof, I have hereunto
20  affixed my hand and seal.
21  DATED: JULY 30, 2020
22  _____
            Dawn K. Larson, RDR, CRR, CRC
23          Notary Public
24
25
```

Page 219
```
1                    ERRATA SHEET
2   Case Name:
3   Deposition Date:
4   Deponent:
5   Pg.  No. Now Reads    Should Read  Reason
6   ___ ___ _____    _____   _____
7   ___ ___ _____    _____   _____
8   ___ ___ _____    _____   _____
9   ___ ___ _____    _____   _____
10  ___ ___ _____    _____   _____
11  ___ ___ _____    _____   _____
12  ___ ___ _____    _____   _____
13  ___ ___ _____    _____   _____
14  ___ ___ _____    _____   _____
15  ___ ___ _____    _____   _____
16  ___ ___ _____    _____   _____
17  ___ ___ _____    _____   _____
18  ___ ___ _____    _____   _____
19  ___ ___ _____    _____   _____
20
                          _____
21
                          Signature of Deponent
22
23  SUBSCRIBED AND SWORN BEFORE ME
    THIS ____ DAY OF _____, 2020.
24  _____
25  (Notary Public)   MY COMMISSION EXPIRES:_____
```

**1**

**10** 162:9,10 166:5 191:8

**11** 145:6,10 184:17, 21 186:6 193:9,10,12 194:25 203:6,12 204:9,11 205:8,15 208:18,21,25

**115-page** 205:25

**115-page-or-so** 205:19

**11th** 184:21 205:2

**12** 142:5,13,24 143:8 144:3 145:2,6,10 147:7,22 148:2 151:20 152:4 158:7, 21 160:17 169:23 170:15,25 172:12 174:16,17 176:8,11, 23 179:8,17 180:6,9, 15,17 181:8 182:11, 20 183:2,6 184:9,17, 21 186:6,11 192:23 193:2,6 194:25 196:6 197:11,14 198:10,13 203:6,13 205:8,15 208:18,21,25 209:12 211:24 212:24 213:7, 19

**12th** 205:2

**13** 183:11,21 214:6, 12,15

**1989** 200:16

**2**

**2.5** 153:18 207:25

**2000** 180:10

**2017** 142:13,24 143:8 144:3 145:2,6,10 147:22 148:2 151:20 152:4 155:16 158:7, 21 160:17 169:23 170:15,25 172:12 174:16,17 176:8,11, 23 179:8,17 180:6,9, 15,17 181:8 182:11, 20 183:2,11,21

**184:9,17 186:11 192:23 193:2,6 194:25 196:6 198:10, 13 203:6,13 204:9,12 205:8,15 208:18,21, 25 212:24 213:7,19 215:15**

**2017.08** 193:24

**2018** 163:17 181:12 193:17

**2019** 181:14

**2020** 217:9

**24th** 217:9

**2:34** 217:8

**3**

**3** 153:18

**36** 180:6

**39** 180:5

**7**

**7** 148:17,18

**8**

**8** 154:17,18 193:17

**9**

**9** 160:9,12,13

**9-1-1** 169:6,13

**A**

**ability** 194:15

**abrasions** 178:13

**acceptable** 164:8, 10,13,21,25

**account** 149:8,10,11 162:13

**accountability** 185:22 191:4 192:9

**accurate** 147:2 179:12 189:19 215:2

**ache** 181:3

**acronym** 197:23

**act** 167:7

**actions** 186:5 206:12

**active** 168:2,10,12, 15,18 169:2

**activities** 167:14

**actors** 168:3

**acts** 158:13,20 211:15

**actual** 172:20

**acutely** 209:23

**addition** 178:11

**additional** 158:13 172:20 178:21 188:15 216:18

**admit** 212:3

**admittedly** 143:21

**advance** 188:6 191:2

**advertising** 188:11

**afraid** 208:21,25 209:24

**afternoon** 213:23

**agree** 146:24,25 150:14 151:3,18 162:18 182:18 193:17 194:12

**ahead** 158:2,10 168:14 170:9 173:12, 13,23 181:5,6 183:4 184:19 186:3 199:23 200:11 215:4

**aimed** 156:24

**allegation** 201:12

**alleged** 187:21

**alleging** 206:9 208:6

**alt-right** 147:8 182:22

**altercation** 157:17

**altercations** 157:16

**ambulances** 178:22

**ameliorated** 181:16

**Amended** 206:2 207:20

**annihilation** 201:2

**antifa** 149:21

**antifascist** 151:10, 18 201:18,24 202:2

**any/all** 163:12

**appeared** 183:12 184:5

**appears** 155:15 156:2 161:16 162:14, 25 163:17 193:21

**approach** 171:11

**approached** 171:14

**approaching** 172:4

**approximate** 217:8

**Arizona** 181:13,17 183:10

**arm** 169:19,21

**armed** 209:19

**arms** 148:7,11 168:17 170:19

**arrive** 177:15

**arrived** 177:19

**article** 154:20,24 155:9,12

**articulated** 198:22

**assaulted** 152:9,22 209:20

**assembly** 158:16,25 159:7 171:6 172:8

**assert** 165:21

**assist** 176:22,25 177:16

**associate** 161:12 195:14,18

**assumes** 165:17

**asterisk** 149:24

**attack** 152:12 157:13,21 159:19 177:9,12,16,20 178:12,24 209:14

**attacker** 166:17,22 171:22 172:5,21,25 175:5,12,18,22

**attacking** 157:20 166:8

**attacks** 157:15 159:22,25 166:16 171:8

**attempt** 143:6 166:25 197:2 210:4, 13,22

**attempting** 211:8

**attend** 195:23 196:2

**attendance** 170:3 196:5

**attended** 171:16 195:24 216:13

**attendees** 144:12,19 184:7,25 185:19 186:8 188:12 190:25 192:6 211:23,24 214:18 216:5

**attention** 142:4 177:11 181:11 188:9, 15 189:15

**attorney** 207:16

**attorney-client** 207:7

**attorneys** 195:6 207:10,19

**attribute** 182:10

**attributed** 182:19

**August** 142:5,13,24 143:8 144:3 145:2,6, 10 147:7,22 148:2 151:19,20 152:4 155:16 158:7,21 160:17 169:23 170:15,25 172:12 174:16,17 176:8,11, 23 179:8,17 180:6,9, 15,17 181:8 182:11, 20 183:2,6,11,21 184:9,17,21 186:6,11

192:23 193:2,6
194:25 196:6 198:10,
13 203:6,12 204:9,11
205:8,15 208:18,21,
25 209:12 211:24
212:24 213:7,19
214:6,12,15

**author** 156:3

**aware** 183:5 186:4
189:3 201:17

---

**B**

**back** 142:5 155:18
158:15 171:9 173:18
184:13

**backpack** 161:10

**bad** 186:23

**ballpark** 158:23

**Baptist** 196:7

**based** 160:7 163:2
164:6 184:5 186:14
215:6

**batons** 157:12

**Bear** 196:25

**bearings** 155:3

**beaten** 171:10,16

**beating** 158:14
171:17,20

**before/part** 159:2

**begin** 150:3

**beginning** 157:17
181:12

**beginnings** 157:16

**begins** 166:8

**Bellamy** 195:15
196:3,5,9,12,15
199:3

**Bellamy's** 196:20

**bit** 154:15 186:13
188:14 200:7

**black** 142:20 154:7
174:18,20

**blanket** 175:12

**bodies** 171:11,19,21

**bodily** 151:23 152:15
166:20 169:16
209:25

**body** 166:17,21
167:6 168:6 170:21,
23 172:2,25 175:17

**Boone** 149:7,12

**bottom** 149:19

**break** 173:15 191:7

**breaking** 210:22

**breathing** 179:22
181:2

**bring** 167:19 186:9
192:7

**bringing** 172:15

**Brittany** 146:2

**broad** 143:22 203:20

**broadcast** 190:10

**broadly** 179:14
200:12

**broke** 152:23 210:18

**broken** 152:9

**brought** 156:11,13,
15,17,22 157:7,11
178:21 192:6

**bulk** 206:3

**burning** 180:25

---

**C**

**Caine-conley** 146:3

**call** 167:16 168:22
169:12 178:15
214:10,15

**called** 174:7 202:7

**calling** 169:3,5
182:23 190:11

**Calls** 166:14

**calm** 167:20 172:17
177:3 182:7

**Campbell** 213:23,24
214:4 215:8 216:10,
16 217:2

**car** 152:12 177:9,12,
16,20 178:12,21,24
209:14

**caring** 148:3

**carried** 152:10
190:25

**carry** 210:7

**carrying** 153:8,11,15
160:7 176:3 198:12

**cars** 183:22

**case** 165:19 185:14,
17 186:21 187:6,10
190:6 206:5

**catch** 208:23

**caused** 152:11
183:14 209:16

**chant** 174:8,17

**chanted** 174:20,23

**chanting** 174:15
209:19,23

**chants** 174:11

**charged** 157:19
160:8

**Charlottesville**
144:10 149:16
170:15 185:25
186:15 188:8 189:16
192:7 193:25 195:2,
16 210:8 211:21
213:7,19 214:24
215:7,11,14 216:13

**chat** 186:18

**chats** 211:22

**check** 168:20 182:5

**chest** 179:22 180:8,
11,13,18,21,23 181:9

**children** 166:2,4

**Christ** 183:13

**chronologically**
204:6,25

**church** 178:16
183:13,15,25 184:4,
25 185:3 196:7
214:8,15

**circled** 193:14

**circling** 183:13,21
214:7

**circumstances**
164:12,15,21 167:20

**cited** 216:12

**city** 144:20 186:15
195:24 196:2 211:21
214:25 215:7,15,16

**City's** 144:10

**clarity** 165:4

**classify** 167:15
172:24

**clear** 145:8 146:21
172:19 184:8 188:11
189:11 197:12
214:21

**clergy** 143:7 145:22
147:12 149:16
151:11,23 157:21,24
158:15 171:9,11
172:14 173:6 188:10,
19 189:9,15,18
190:12 198:18

**clerical** 148:5

**clients** 205:13,25
206:13

**close** 172:5,14

**clothing** 201:19

**coffee** 204:12

**collapsed** 180:11

**colleagues** 178:16

**collective** 198:18

**color** 154:6

**colored** 153:14

**colors** 142:20

**comforted** 177:2

**committed** 166:19
167:18

**communicated**
145:18,24 207:5

**communications**
146:5 207:9

**Communist** 198:15,
25 199:4

**Communists** 198:18

**community** 143:16,
20,22,24 144:10,15
154:10,13 155:24
156:5,18 185:21,25
186:9,14 192:8
214:23 215:6,10

**compensation**
205:13

**complain** 205:24

**complained** 196:15

**complaining** 205:6

**complaint** 205:20
206:2,4,7,10,16,19,
24 207:20 208:15

**complaints** 187:12

**completed** 147:15

**comprehensive**
179:20 190:13

**computer** 161:9

**concluded** 217:8

**conditions** 208:6

**conduct** 170:14

**confrontations**
168:4

**confusion** 152:13

**Congregate** 145:22
178:15 204:15

**connect** 177:6,10
205:16

**connected** 169:21
177:4 205:14

**constantly** 182:5,9

**constitutes** 146:17

**constriction** 180:25

**contained** 205:25
206:15

Index: content..exact

content 196:20

contents 194:18,21

context 154:16 156:9,21 161:24 162:24 163:16 165:16 167:24 189:15

contexts 167:18

continue 152:14 179:25

contusions 178:13

convener 186:7

conversation 162:23 163:4,21 207:25

conversations 144:18,24 145:4,9, 12,15 204:15

copy 216:23 217:3

Cornel 189:14 198:24

correct 147:4 149:8, 9 162:6 169:14 172:22 178:7 179:9 180:7,20 184:11 216:5

correctly 179:6

cost 152:15

costs 192:8

council 144:10,20 186:15 195:24,25 196:3,4 211:21 214:25 215:15,16

Councilman 195:15

counterprotest 146:15

counterprotester 161:20 162:5 171:10 174:9

counterprotesters 151:22 156:11,12,22 157:13,20 158:14 159:20,22 160:2,4 176:17 198:9 212:4, 15

couple 152:5 177:11 178:16,18 204:15

Court 201:8

cover 168:19 203:14, 19

covered 203:17

cramp 181:7

create 148:2

creating 148:6 172:17 173:7

cross 154:5

crosses 154:8

crouching 171:25

crowds 179:24

current 208:5

**D**

Dahlia 156:3

Daily 196:17,19

damage 168:6

damages 179:3,16 206:8 208:6,12

Damigo 190:20,22 192:25 206:14

date 154:25 155:15

daughter 166:5,7

Dave 213:24 217:2

David 191:14 192:11, 22

day 142:2,8 147:13 152:20 184:10 204:24 217:9

de-escalate 171:12, 14

de-escalated 175:3

de-escalation 167:17,22 172:11,17, 24 173:7

December 163:17

declared 149:25 158:16,25 159:7

171:7 172:8

deemed 201:3

defend 164:17 166:11 193:24

defendant 192:4

defense 154:11,13 155:25 156:6,18

degree 166:19

deleting 194:8

depend 166:18

depending 163:20 167:24 168:8

deploy 169:22

DEPONENT 158:11 173:21 207:13 214:2

derogatory 188:17 190:3,6 196:22

describe 153:10,17 154:3 175:9,22 182:3

description 175:12

designating 160:6

desktop 197:2

detail 175:23 205:19

difficult 176:13 203:19

difficulties 179:11

difficulty 179:22,25 181:2

direct 189:23

directed 152:25 189:4,12,14,17 190:7 209:21 211:25

directing 142:4

directly 160:3

disarm 166:25

disclose 207:9

Discord 187:15 188:14 190:14 216:4

discovery 186:21 195:4,6,11

discussed 145:21

163:20

discussing 145:25 158:24 197:18 214:17

dissipate 181:12

dissolution 200:16

distinctly 204:18

diversity 146:8,11 162:17,20 163:2

document 193:20

documentation 206:4

documented 144:11 152:19 211:22 212:21

documenting 144:18

documents 205:20

downtown 152:18 178:20

dozen 176:14

drawing 188:8,15 189:15

dress 142:21

dressed 184:6

drill 205:21

drinking 204:12

Drive 193:22 194:3, 11

driving 183:22

duration 183:17

Dust 194:6

**E**

earlier 156:10 179:2 196:21 209:14,20 211:19

early 204:11

east 143:4

edited 156:4

efforts 164:11

189:16

elected 185:17

electronic 195:5

else's 214:15

Emancipation 142:5 143:5 147:7,13,22,25 160:17 169:23 212:24

emergency 150:2 171:7

Emily 202:19

emotional 179:11

EMTS 177:4,7,10,17 178:10

end 190:3

enduring 178:21

energies 163:11

engage 167:13 170:13

engaged 172:11

engaging 165:12

entire 150:16 173:5

entirety 157:10

Escafé 158:15

estimate 158:19,22 213:2

Etran 217:3,5

European 200:14

evening 152:17 184:21 209:12

event 170:15 182:11 186:11 205:14,16

events 195:23 196:2, 8 210:25

evidence 144:19 186:20 187:5,8,10,11 188:4 189:22 190:5,8 206:3

Evropa 153:9 206:14 213:14,16,18

exact 151:12 158:8, 12 189:25

**EXAMINATION** 214:3

**examples** 152:6 209:17

**exhibit** 148:17,18 150:9 154:17,18 157:5 160:9,12,13 162:8,9,10 165:11 193:9,10,12 195:13 197:11,14 198:4

**exhibits** 216:25

**experience** 151:5 181:19 209:7,16

**experienced** 179:21 180:8,10,14,18 203:22 209:13

**experiencing** 209:4

**explore** 165:23

**express** 147:8,9

**expressed** 147:24 150:14 151:4

**expressing** 146:16

**expression** 199:25

**extent** 207:8

**extreme** 169:4 178:13

———————

**F**

**face** 168:12

**Facebook** 148:20, 22,25 216:8

**facilitated** 177:5 185:20,24

**fact** 146:14 210:13

**faggot** 152:24 153:3 209:21

**failing** 149:14

**fair** 143:15 161:14 162:8 188:18 199:15 203:4 205:23 208:4

**faith** 173:6 185:3 188:15

**fake** 190:12

**familiar** 142:11,17 143:18 146:7,9 149:11 186:4 191:13, 15 197:4,10 200:14, 21 201:5,7,12,15,21 202:6,11,19

**family** 164:17

**fashion** 154:5

**fear** 152:3,11,15 209:4,7,13,16

**feared** 151:24 152:18,21

**February** 193:17

**feed** 178:4 202:6,10

**feel** 180:24 213:9

**feet** 153:18

**fellow** 145:22 190:11 198:17 204:15

**felt** 211:2

**figures** 191:17

**file** 194:3,6,9,16,19, 21,23 195:4,9 206:5, 24 214:10

**files** 195:5,11

**filing** 207:19

**filled** 194:23

**find** 168:19

**fine** 204:10

**fined** 208:9

**finish** 173:22

**flag** 153:11 197:7,13, 17,19 198:12

**flags** 142:21 153:8 160:7

**flashbacks** 179:11

**focus** 169:8 175:16

**focusing** 169:16

**folder** 194:23

**follow-ups** 213:25

**forget** 206:23

**forgot** 207:16,18,24

**form** 142:14 143:9 144:4 145:3 146:18 147:3,11 148:9 151:21 153:12,25 156:20 157:9,25 158:9 159:3 160:23 161:8,21 163:25 165:3,14 166:13 167:4,23 168:13,24 169:24 170:7,8 174:10 175:6,10 176:12 177:18,24 179:13 181:18 182:15 183:3 184:18 185:13 186:2,12,22 187:16,23 188:20 192:2,13,19 195:17 196:11 198:20 199:5, 10,18,22 201:20,25 202:25 203:7,11,18 204:2,22 206:17,25 207:21 208:7,14 209:9 210:5,15,24 211:10,17 212:6,25 213:8 215:3 216:6

**formation** 200:14

**forming** 148:7

**forms** 159:9

**found** 152:17

**freedom** 146:19

**frequent** 181:21

**front** 162:24 208:15

**full** 205:19

**full-time** 179:25

**fullness** 206:18

**fully** 147:16

**furnished** 206:4

———————

**G**

**garage** 178:19

**garb** 148:5

**gathered** 183:14

**Gatsby** 202:7

**generally** 197:8

**genocide** 200:2

**genocided** 201:13

**Germany** 201:3

**give** 145:23 149:2 192:17 207:6 209:18

**Goad** 202:7

**goal** 168:18

**good** 150:5 173:14, 21 186:13 213:23 217:4

**Google** 193:22 194:3,10

**Gorcenski** 202:20

**gospel** 174:7

**governor** 149:25

**grab** 193:22,23

**great** 191:8

**grievously** 178:11, 22

**grocery** 166:7

**ground** 166:9 168:19 172:5

**group** 142:7 144:25 147:24 151:10 152:8, 22,25 153:9 157:18, 19,21,24 158:15 159:19 171:9 172:14 174:9 184:25 185:8 209:20,22 210:8 211:4 213:14

**groups** 151:18 152:22 153:2,5,6 158:17 159:15,25 167:25 186:18 200:3 201:3 210:9 211:5

**guys** 155:4

———————

**H**

**H-O-L-O-D-O-M-O-R** 201:9

**hammer** 197:4,9 202:3

**handle** 148:25

**hands** 158:14

**hang** 207:2

**happen** 149:23 152:14

**happened** 152:13 186:18 203:5 204:7, 20 205:2

**hard** 158:22 160:24 163:15 187:9 205:21 213:2

**harm** 166:19 168:5 173:9 210:11,14 211:3

**hate** 200:2

**hateful** 209:19

**head** 166:10 174:7 192:15

**hear** 185:5 193:2,5

**heard** 143:16 210:2, 16

**Heather** 194:5,22 209:8,11

**heavily** 209:18

**helmet** 161:10

**helped** 177:3

**helping** 172:5

**helps** 165:25

**Hey** 213:23

**Heyer** 209:8,12

**highlight** 149:13

**highlighted** 149:15 150:24

**highlighter** 161:3

**highlighting** 155:20 161:6,15

**historian** 199:12 200:13

**history** 200:2,5,7,8, 14

**hold** 188:9 204:13

**holding** 185:9

**Holocaust** 200:22, 24,25

**Holodomor** 201:6

**home** 182:22 183:2, 9,17,18

**hope** 173:8 192:9

**hoped** 212:21

**hopeful** 191:4

**hopes** 172:17

**horrible** 145:9

**hospital** 177:4 178:7,10

**hour** 217:8

**huge** 178:13

**hundreds** 213:3,6,10

**hurled** 210:17

**hurt** 180:11 211:4

**hypervigilance** 179:21 181:20,25 182:19

**hypothetical** 166:18 167:25

**hypothetically** 167:5

**hypotheticals** 167:11

**I**

**idea** 173:8

**identifiable** 142:20

**identify** 153:5,7 159:12 175:4,11 188:23

**identifying** 169:12

**identities** 215:9 216:11,15

**Identity** 153:9 206:14 213:14,15,18

**ideology** 199:25

**immediately** 169:8

**immobility** 179:22

**impact** 208:19

**implied** 205:5

**impossible** 163:15 164:2 172:3 213:9

**impression** 143:25 144:7

**improving** 208:12, 13

**inabilities** 182:4

**inability** 179:23,25

**incidences** 181:22

**incident** 157:22 158:3 175:17,20,23 183:20 214:5,11

**incidents** 158:6 172:20,23 173:4

**incite** 149:24

**include** 169:11

**included** 210:9

**including** 157:20 179:23 181:20 187:11

**incorrect** 214:20

**individual** 161:5,10, 15 202:9,11,13,14 216:12

**individuals** 144:25 145:15,17,20,24 153:6,8,10 159:12 176:16 183:22 184:2 189:13 211:3 213:11

**inferior** 201:4

**inflict** 144:2,12

**influence** 163:12

**information** 186:16

**initiate** 210:7

**initiated** 159:22,25

**injured** 176:11,20,22 178:11,22,23 179:7 209:25

**injuries** 152:15 176:8 178:13 187:21

**injustice** 146:15

**instances** 152:5,19 177:2

**instigate** 156:24

**instruct** 207:10

**instruction** 207:7

**insulting** 189:23

**intended** 144:2 210:11 211:3 212:4 214:18

**intending** 211:12

**intent** 212:9,15,18 213:6,10,13,17 214:22

**internal** 181:7

**interrupt** 150:4 173:16

**invective** 210:17

**involved** 159:13,16

**item** 193:14

**items** 188:3

**J**

**Jason** 166:8,15 184:17,20,24 185:12, 18,23 186:5 187:20 188:5 190:10 193:5 196:14 206:13

**Jessica** 177:23

**Jewish** 201:4

**Jim** 148:23 150:25 154:23 173:23 204:23

**joining** 148:7,10

**judgment** 199:13

**July** 181:14 186:15 215:15 217:9

**jumps** 166:8

**justify** 206:13

**K**

**Kessler** 166:8,15,25 184:17,20,24 185:12,

14,18,23 186:5 187:20 188:6 189:7 190:10 193:5 196:15 206:13

**key** 191:17

**kill** 152:23 153:3 209:21 210:3,4,22 211:9

**killed** 209:13

**kind** 167:20 189:23

**kinds** 169:15

**knew** 184:12 209:12 210:6 211:2,14 214:18,22 215:5

**knocked** 166:9

**knowing** 213:10

**knowledge** 161:23 184:16 196:16 198:19,25 199:2,6 211:20

**KOLENICH** 142:3,16 143:11 144:6 145:7 146:20 147:5,14 148:15,19 149:2,6 151:3,7 152:2 153:16 154:2,19 155:2,6,8 157:2,14 158:5,18 159:5 160:15 161:2, 13 162:2,11 164:5,23 165:10,20 166:23 167:8 168:9,21 169:10 170:2,12 173:17,24 174:12 175:8,15 176:15 177:22 178:3,5 179:15 181:24 182:17 183:7 184:22 185:15 186:19,23 187:2,18 188:2,22 191:5,9,11,12 192:10,16,21 193:11 195:20 196:13,25 197:3,16 198:23 199:7,14,20 200:4,19 201:8,11,22 202:5 203:3,9,15,23 204:5 205:3,4,11 206:21 207:14 208:3,8,11,20 209:15 210:12,20 211:6,13 212:2,10,17 213:4,12,21 216:21

14,18,23 186:5 187:20 188:6 189:7 190:10 193:5 196:15 206:13

217:5

**L**

**labels** 161:25

**landmarks** 160:18

**language** 188:17,18, 25 189:3,8,12,14,18, 23 190:3,7 209:19 211:23

**large** 157:18

**largely** 214:23

**larger** 163:16 189:15

**lawsuit** 205:7

**lawyers** 187:5 190:5 206:23 207:17

**lay** 171:23

**leaders** 185:4 188:16 200:17 204:16

**leadership** 215:7,11

**League** 142:7,9,12, 18,19,23 143:3,13 152:6 159:17 160:5

**learn** 209:11

**learned** 144:9,14,15, 17 146:2 209:8

**learning** 204:12

**leave** 185:3

**Leaving** 167:10

**led** 174:11

**left** 183:16

**lessened** 208:17

**leverage** 163:11

**life** 151:10,19,24 152:3 201:15

**light** 153:14 174:6 194:6

**limited** 143:21

**limiting** 150:17 160:20 161:5 180:13 189:21 190:4

**lines** 214:22

link 170:19

linked 168:17 169:21

list 179:20

literally 169:2 172:14

Lithwick 156:3

litigating 190:6

litigation 187:6,13

live 178:4

lives 151:10 174:18, 20

livestreaming 188:8

living 195:15

local 196:17

lock 183:15

logs 188:14 190:14

long 156:17 181:5,8 200:13

looked 142:12

lost 201:15

lot 148:13 151:11 152:10,13 158:23 168:7 186:17 187:10 201:15 203:12,21

loving 148:2,6 173:7

low 168:19

luck 178:18

lung 180:11

M

machine 155:3

made 144:20 151:12, 14 152:15 188:15 196:15 211:21 215:6, 10,14,20 216:4

main 169:7

majority 153:13

make 151:9 199:13 207:4

making 148:13 175:12

male 175:14,24 188:23 210:10

mall 178:20

manifest 182:6

march 149:23 168:17

marched 152:7

marching 143:4

marginalized 210:9

marked 148:18 154:18 160:11,13 162:10 193:10 197:14

Market 143:4 152:7 157:19 160:4 171:17

markings 153:21

Matt 191:13

Matter 174:18,21

Matthew 191:14 192:11,22 206:14

meaning 146:10

means 163:9,10,14

meant 155:24 156:11 163:5,23 184:12 189:10 195:18 199:11

media 202:23 216:4

medical 177:11 181:11 182:2,14,18

Medium 216:2

Medium.com. 215:25

meeting 215:17,19

meetings 195:24 196:3

member 142:12 171:11 195:25 196:5 210:8 213:14

members 142:9,17, 23 143:13,24 144:10 152:22 186:14 189:18 198:17 213:15,17 215:6,10

Memorial 184:25

memory 190:19 203:13

men 183:12

mental 208:6

mention 167:11 206:23

mentioned 156:10 211:19

messed 157:3

midst 152:16

millions 201:13

mine 174:6 178:16

minimize 168:6

minutes 173:19 177:20 191:8

misunderstood 189:5

mitigate 168:5 173:9

modified 193:18 194:13

modify 194:15

modifying 194:5

moment 151:23 173:22 192:18 205:22 206:20 211:11

morning 174:5 196:6 204:12

move 181:13 183:10, 17

moved 172:15 181:17

Movement 152:7 159:18 160:6

moving 171:17

murder 201:2 209:8, 11

N

named 192:4 202:19

names 145:23

Nathan 190:20,22 192:25 206:14

National 152:7 159:18 160:6

nationalist 170:4

nationalists 208:22 209:2

Nazi 201:3

Naziism 199:25

Nazis 149:24 199:9, 16,21

nearby 178:16 184:24

necessarily 199:12

needed 166:20 177:10

network 178:15

newspaper 196:18

night 179:21 181:20 204:14

non-white 189:18

noon 150:2

note 149:20

noted 209:19

number 158:8,12,23

O

object 142:14 143:9 144:4 145:3 146:18 147:3,11 148:9 151:21 153:12 156:20 157:9,25 158:9 159:3 160:23 161:8,21 163:25 165:3,14 166:13 167:4,23 168:13,24 169:24 170:7 174:10 175:6,10 176:4,12 179:13 181:18 182:15 183:3 184:18 185:13 186:2,12,22 187:16,23 188:20 192:13,19 195:17 196:11 198:20 199:5, 10,18,22 201:20,25

202:25 203:7,11,18 204:2,22 206:17,25 207:21 208:7,14 209:9 210:5,15,24 211:10,17 212:6,25 213:8 215:3 216:6

objection 153:25 164:18 177:18,24 192:2 200:10

observation 151:6

observe 214:14

observed 152:10 160:3

obtained 187:5 190:5

obvious 180:14,18

occurred 177:21 205:13

occurrence 181:9

offensive 146:22

official 182:3

one's 168:6 182:5

ongoing 187:13

online 144:19,21,22 186:18 211:22 212:21 215:21,22

Oops 187:24

opportunity 187:3,4

oppose 212:4

opposed 199:16,21, 24

opposing 156:17

order 216:23,25

organizations 167:19

organized 185:20

organizer 186:7

organizers 144:11, 16,18 145:22 185:18 186:8 190:12,24 192:6 211:22 214:24 216:5

organizing 186:5

**original** 187:12

**Osagyefo** 146:3

**outcome** 162:25 163:5 173:10

**outcomes** 179:23 180:3

**outlined** 216:4

**over-alertness** 182:4

**overlapping** 181:4

**owns** 202:10

**P**

**p.m.** 217:8

**pain** 181:9

**pains** 179:22 180:8, 13,18,22

**painted** 153:19

**paragraph** 151:4 155:20

**paraphrase** 214:20

**parishioners** 183:14

**Park** 142:5 143:5 147:7,13,22,25 160:17 169:23 212:24

**parked** 178:19

**Parrott** 191:14 192:11,22 206:14

**part** 147:19 148:6 153:9 159:2,4,18 168:17,22 169:18 170:18 185:17 192:5 195:10 205:7

**parts** 172:2

**Party** 206:15

**past** 146:13 181:23

**Paul's** 184:25

**paused** 157:19

**peaceful** 159:25

**people** 143:23 145:6 146:15 147:24

158:17 160:19,20,25 173:6 175:4,11 177:2,11,16 178:9, 14,17,21,23 200:3 201:3,4,14 210:9 214:6 215:13

**people's** 164:22

**perceived** 175:5 176:8 196:23 214:7

**period** 190:2 200:18

**permissible** 164:16

**permitted** 166:11

**person** 149:16 161:11,17 165:8 171:16 202:19

**personal** 184:16

**personally** 166:16 189:24 190:7

**persons** 142:22 143:12 157:23 176:7, 10,22 185:9 201:17

**perspective** 188:12 211:23

**PHILLIPS** 142:14 143:9 144:4 145:3 146:18 147:3,11 148:9,23 149:5 150:25 151:21 153:12,25 154:23 155:5 156:20 157:9, 25 158:9 159:3 160:23 161:8,21 163:25 164:18 165:3, 14 166:13 167:4,23 168:13,24 169:24 170:7 173:13,20,23 174:10 175:6,10 176:12 177:18,25 179:13 181:18 182:15 183:3 184:18 185:13 186:2,12,22 187:16,23 188:20 191:7 192:2,13,19 195:17 196:11 198:20 199:5,10,18, 22 200:10 201:20,25 202:25 203:7,11,18 204:2,22 205:9 206:17,25 207:21 208:7,14 209:9

210:5,15,24 211:10, 17 212:6,8,12,25 213:8 215:3 216:6,19

**photo** 160:11 194:6

**photographer** 194:23

**photographs** 194:24 195:10

**phrase** 143:16,18,19 146:8,9,11 154:10 162:16 163:8,13 200:21 201:5,7 210:16

**physical** 164:13,14, 20,25 180:19

**physically** 171:10 172:14 179:7 210:17 216:12

**picture** 160:22 162:3,7

**pictures** 194:9

**pink** 161:16

**place** 162:7 172:25 182:23 183:2,9,16 207:25 211:2

**Plaintiffs'** 216:24

**plan** 192:11 204:25 210:7

**planned** 145:5,16,21 146:2 147:13 156:24 186:9 188:16 191:2, 20 192:7 204:18 209:6 212:21

**planning** 186:10,13, 17 204:13 211:15

**plans** 144:11 188:9 215:5

**platforms** 202:24 216:7,9

**play** 148:8

**point** 154:4,8 173:5, 15 174:9 179:7 196:8

**points** 205:22

**poles** 157:12

**police** 168:23

214:10,11,14

**political** 170:4,5

**polo** 153:13

**portion** 149:13,15 150:17,23 193:21

**posit** 165:24 190:23

**possibly** 209:24

**post** 148:21,22

**posted** 144:21 148:24 190:20 215:21,22,24

**posts** 187:15,19 188:14 189:12 216:4

**potential** 172:18 182:9

**potentially** 172:16

**power** 163:12

**practical** 148:12

**prayed** 177:3

**prayerful** 148:2

**prayerfully** 173:10

**preceding** 181:22

**predominantly** 142:20

**preexisting** 162:23

**preparing** 206:24

**presence** 148:3,6 172:16 173:5,8

**present** 177:10 213:18 215:16

**presentation** 144:9, 17,20 186:14 211:21 214:23,24 215:6,11, 14,20

**presently** 208:13

**presiding** 195:25

**pretty** 204:11

**previous** 145:8 190:24

**priests** 152:24 153:3 209:21 210:3

**primarily** 153:19 214:19

**primary** 186:7 211:19

**prior** 145:10 180:8,15 183:9 207:19

**private** 182:8

**privilege** 207:7

**proceedings** 217:7

**process** 167:22 187:13 195:7,12

**processes** 169:8

**production** 216:25

**professional** 177:11 182:2,14,18 194:22

**Progress** 196:17,19

**property** 183:23

**prospective** 144:12, 18 186:8

**protected** 151:23

**protection** 166:21

**protester** 212:19

**protesters** 212:9,23

**protests** 164:10

**provided** 156:3

**providing** 178:17

**PST** 217:9

**public** 144:21 179:24 182:8 195:23 196:7 202:14

**pull** 165:11

**pulled** 171:17

**pulling** 183:23

**punching** 166:10

**push** 143:6

**push/hit** 166:25

**pushed** 157:24 210:18

**pushing** 210:21 211:9

**put** 166:21 167:2,6 170:21,23 187:12 213:3

**putting** 166:16 171:19,21

---

**Q**

**qualitative** 199:13

**question** 145:9 147:17 150:25 161:23 165:5,9,15 170:11 173:16 186:24 203:14 205:5 207:3,8,22 208:8,10, 24 212:10

**questions** 204:23 213:22 216:18

**quick** 191:6

**quote** 150:6,10 155:18

---

**R**

**racial** 188:17,18,25 189:3

**racialized** 189:8,17

**racist** 189:12,13 196:10

**rally** 150:3 170:4,6 185:2 192:12 204:14 214:18 216:13

**rapid** 210:25

**read** 149:18 150:16, 18,23 151:4 162:24 184:14 196:17 197:2 205:19 206:18 207:3 208:16

**reads** 149:20

**real** 202:16,17 210:11,25

**realized** 204:16

**realm** 167:10

**REALTIME** 201:10

**reason** 149:21,22 191:24,25 192:4

**reasons** 144:8 147:12,21,24

**recall** 142:6 153:18, 21,22 154:4,7 156:9 163:5 168:15 169:20 171:3,5,15 172:13 174:15,19 175:19 176:6 179:4 180:3 181:10 183:11 188:13,21 190:21 192:20,24 193:3,7 194:5,11,15,18 196:4,7,19 197:6,8 203:2 204:21 206:19 208:2,16 214:8,16 216:7,8,14

**receiving** 190:3

**recently** 208:16

**recess** 191:10

**recognizable** 202:15

**recognize** 148:20 150:6 155:21 159:15 160:16,19 162:12 184:2 191:16,17 193:20 194:3

**recognized** 159:13

**recollection** 142:19 147:23 155:24 174:25 189:20,22

**record** 177:25 191:5, 11 216:22

**red** 193:14

**redirect** 216:19

**refer** 143:23

**reference** 162:16 185:14 198:9

**referenced** 206:9

**referred** 197:9

**referring** 158:4 164:4,11

**refers** 146:13 201:2

**refresh** 155:23

**regard** 191:4

**relax** 182:7

**remember** 145:14, 17,25 146:4 151:12 163:10 172:11 174:4, 5 175:25 176:3 188:5,7 189:13 190:9,10,16 194:8 196:22 197:19,22 203:24 204:3,11,18 206:7 207:15,23 209:4,24 216:11,14

**repeat** 161:22

**reply** 162:23

**replying** 163:18

**report** 214:11 215:19 216:3,12,15

**reporter** 155:21 156:7 201:8

**represented** 148:4

**Republic** 198:3

**requested** 195:6

**requires** 165:18,22 207:8

**rereading** 156:8

**resolve** 167:20

**respond** 214:14

**responsible** 187:20 190:15

**rest** 163:4

**result** 214:11

**resulting** 181:2

**Reverend** 142:4 146:2,3,7 148:16 149:7 150:4 155:10 166:2 173:25 178:6 180:4 184:15 188:23 191:13 193:8 195:14 196:25 197:4 205:6 213:21 214:5 216:17

**review** 187:4 189:22 190:13 196:14

**reviewed** 186:20 187:8,11,14 215:18

**Revolution** 200:16

**Richard** 149:21

**rides** 177:5 178:6,9

**Rising** 149:7,12

**role** 191:22

**roles** 168:4

**rooms** 186:18

**rooted** 199:25

**Rotunda** 204:14

**rough** 214:19

**rule** 201:16

**runs** 202:9

**Russian** 200:15

---

**S**

**safe** 143:24 169:12 178:17

**safety** 152:11,15,18, 21 169:8,16 182:5

**Saturday** 151:11,19

**saved** 151:10,18

**scan** 182:9

**scenario** 166:18

**scenarios** 168:2,5

**scene** 152:12 160:16 177:9,16,20

**scheduled** 150:3

**screen** 154:21 157:3 161:3,9 164:7 193:12,15,21,23 197:13 198:5

**scroll** 148:23 154:24 155:18

**secondary** 216:24

**seeking** 168:25 205:12

**Sekou** 146:3

**self-defense** 143:17,20,22 156:14, 16,23 164:22 165:2, 9,13,18,21,23 167:14,16

**self-defensive**

157:8

**sentiments** 150:14 151:4

**separated** 148:13

**service** 156:13,15 188:9 196:6 204:17

**Seth** 173:20 193:18 194:13 207:3 215:4

**severely** 209:25

**severity** 208:17

**shared** 186:15 193:24 196:21

**shields** 153:15,17,23 154:7

**shirts** 153:14

**shock** 178:14

**shooter** 168:2,10,12, 15,18 169:2

**shortly** 210:16 215:19,21

**shouted** 152:23 153:2

**show** 154:17 160:9 162:9 193:8 197:11

**showed** 212:24

**showing** 148:16

**sickle** 197:5,7,9 202:3

**side** 180:22

**sidewalk** 185:2

**sign** 148:11

**signs** 157:6

**similar** 151:15,16 161:22 190:23

**simply** 167:2

**simulated** 167:25 168:16,17 169:5,20

**simulating** 168:4

**simulation** 168:8 169:7,19

**simulations** 168:16

Index: Sines..told

**Sines** 185:14

**singing** 168:16 173:8,11 174:2,4,6

**single** 205:2 215:13

**sir** 215:23 216:18

**sit** 142:11 182:4 203:25

**sitting** 205:18 207:23

**situation** 175:4

**situations** 172:16

**Slate.com** 155:13

**sleeping** 180:2

**social** 202:23 216:4

**Socialist** 152:7 159:18 160:6 198:2

**socialize** 179:24 195:21

**socialized** 195:22

**Sojourners** 183:13

**song** 174:7

**sort** 154:5 176:4 177:5 178:14 181:2,3 188:25

**sought** 181:11

**sounds** 197:10

**source** 211:19

**South** 142:8,10,12, 18,19,23 143:4,13 152:6 159:17 160:5

**Soviet** 197:5,6,17,23 198:2 199:8 200:6,9, 15 201:13,16,18,23 202:23

**space** 178:17

**span** 177:19

**speak** 149:22 159:8

**speakers** 181:4

**speaking** 167:5 179:14

**specific** 152:6 165:16 167:21 171:13 180:21 182:6

195:9 198:8 204:23

**specifically** 144:9 145:25 159:9,17 168:7 171:3 174:5 187:9 188:6 189:4 208:2

**specifics** 190:9 191:22 192:14,17 205:21

**speculating** 166:15

**speculation** 166:14

**speech** 146:17,19,25 147:10

**Spencer** 149:21

**spirit** 167:19

**Ss** 198:2

**St** 184:25

**Stalin** 201:16

**stand** 212:11

**standing** 147:2 160:5 171:25 185:8 216:24

**stands** 197:25 198:2

**stars** 197:7

**start** 168:10 204:4

**Starting** 204:9

**state** 149:25 171:6

**stated** 156:25

**statement** 148:4 150:15,16 151:9,13, 15 156:2

**stating** 149:15

**status** 208:5

**stay** 168:19

**staying** 169:21

**STENOGRAPHER** 201:10

**steps** 157:21

**sternum** 180:25

**sticks** 153:15 157:6, 11

**stood** 171:22

**stop** 167:7

**stopped** 171:20 172:6

**store** 165:25 166:6,7

**story** 196:16

**strategically** 149:23

**street** 143:4 152:7 157:19 160:5 171:8, 9,18 178:19 204:17 209:23

**streets** 148:3 158:17 172:15 173:6 174:14, 24

**strike** 163:8 164:3

**strong** 148:3

**studied** 200:13

**subject** 145:18

**substance** 146:4

**sue** 185:12 190:22

**sued** 191:24

**suffered** 191:3 192:8

**suing** 206:13

**suit** 192:5

**summer** 144:11 186:5

**summon** 168:23

**sunglasses** 161:16

**sunrise** 196:5

**supremacist** 145:2, 5 146:17,25 147:10 156:14 161:7,20 162:5 170:5 212:19, 23

**supremacist-type** 146:22

**supremacists** 144:2 147:9 152:8,11 156:13,18,24 157:7, 11,12,18 158:13 159:19 160:21 170:24 176:19 182:24,25 183:8,12,

18 188:13 189:7 190:11 191:18,21 204:13 209:3,5,14, 18,22 210:2 211:5 212:5,20 214:7

**supremacists'** 210:6

**surfaced** 186:17 216:8

**surroundings** 182:6

**sustained** 179:16 206:9

**symbol** 148:11 197:5,8 198:9 201:23

**symbols** 153:22 154:3,6 201:18 202:23

**sympathetic** 206:6

**symptoms** 180:3 181:16,20

**systematic** 201:2

---

**T**

**T-SHIRT** 161:11

**TA** 163:8 164:3

**tactic** 169:22 173:7

**tactics** 146:8,11 149:24 162:17,21 163:2

**taking** 162:7,8 195:13

**talked** 145:15 177:23

**talking** 156:6 164:7 190:2 198:6

**tangle** 172:2

**technique** 172:12

**techniques** 167:17

**telling** 207:16

**Ten** 173:19

**tending** 178:22

**tens** 201:13

**term** 143:22 146:13

182:3

**terms** 186:16 188:5 190:12

**terrible** 208:8

**terrors** 179:21 181:21

**testified** 153:2 156:10 179:2 189:6 211:14

**testify** 169:18 212:8

**testifying** 175:19

**testimony** 147:6 159:21,24 166:24 179:10 202:22 213:5 214:8

**text** 149:18

**thing** 177:5 178:14 181:3 204:7,19 205:2,7

**things** 146:23 163:20 168:8 187:11 203:16, 20,21 205:12

**thinking** 177:9

**thought** 189:6 211:4

**thread** 173:22

**threat** 169:4

**threats** 182:9

**throw** 170:21

**time** 143:7 150:20 154:8 169:12 171:5 172:15 173:14 183:9, 19 189:25 195:15 200:13,18 203:14 205:15 208:17 211:2

**times** 169:15,20 172:10,13 175:3 202:15

**title** 154:24

**today** 142:11 147:18, 20 149:22 203:25

**togetherness** 148:12

**told** 155:21 193:4 203:5,10 204:8,20

Index: tool..zigzag

205:17

**tool** 156:19

**tools** 154:11,14 155:25 156:6 157:6,8

**top** 155:7,9 171:23 192:15 193:23

**torches** 185:9

**torchlit** 185:2 204:14

**Traditionalist** 206:15

**train** 170:3

**trained** 167:6,11,13, 15,18,22

**training** 168:11,15, 22 169:11 170:13,18

**trainings** 169:16

**transcript** 216:24

**transpired** 203:12

**treating** 182:13

**Tucson** 181:13 183:17

**turmoil** 152:16 158:23,24 159:6,10, 11,13,16

**turn** 195:4

**turned** 195:5,8,11

**tweet** 162:16,21 163:7 196:14

**tweeted** 162:15

**tweets** 196:20

**Twitter** 162:12,23 163:4,21 202:6,10

**typed** 184:13

---

**U**

**U.S.S.R.** 197:20,21

**ultimately** 209:20

**unable** 158:19 182:7

**uncovered** 186:20

**understand** 142:23 143:19 147:19 153:9

164:24 165:15,17 169:18 170:10 173:25 185:23 191:19 200:24

**understanding** 143:21 146:10,12,16 163:3 178:25 199:24 200:25

**understood** 143:3, 12 152:24 179:6 185:19 187:15 190:15 200:20 207:12,13

**unfolding** 210:25

**unified** 162:25 163:5

**Union** 197:5,23 199:8 200:6,9,15 201:13,16

**Union's** 197:7

**Unite** 144:12,13 149:22 150:2 170:14 182:10 184:6 185:19 186:7,11 188:6,12 190:25 191:2,18,20 192:5,12 205:14,16

**United** 183:13

**unity** 148:12

**unlawful** 158:16,25 159:7 171:6 172:7

**unsafe** 211:2

---

**V**

**variety** 180:2

**vehicle** 185:11

**version** 156:4 190:23

**victim** 166:17,20,22 167:3 171:23 172:2, 21 173:2 175:18

**victims** 170:24

**videos** 188:7 190:10

**view** 144:22 173:5

**viewing** 144:21 188:7

**violence** 143:24

144:2,13 145:2,5,16, 21 146:15,17 147:2 149:25 156:14,23 158:6,13,20 163:24 164:8,9,13,14,16,20, 25 165:6,13,18,22 167:7,17 185:20,24 186:9 191:2 192:6,12 200:2 209:5 210:7 213:7 214:18,22

**violent** 146:23 149:24 168:3 211:15

**violently** 212:4

**Virginia** 170:16 195:2

**visible** 173:6

**visited** 202:4

**visual** 148:3,11

**volatile** 172:16

**volatility** 172:18

**vulnerable** 200:3

---

**W**

**Wait** 207:2

**walked** 171:15 178:20

**walking** 169:19

**warned** 144:25

**watchful** 172:16

**Water** 178:19

**ways** 143:23 146:14 182:7

**weapons** 152:10

**wearing** 142:8,10 148:4 153:13 161:16 175:25 198:9

**website** 155:13 201:24 215:25

**websites** 201:19 202:2,4

**weekend** 194:24 209:4 217:4

**welcoming** 162:25

**Wes** 195:15 196:3,9, 12,15,20 199:3

**West** 189:14 198:24

**whatsoever** 156:17

**white** 142:21 144:2 145:2,5 146:17,22,25 147:9 152:8,10 153:19 154:7 156:12, 14,18,23 157:7,11, 12,18 158:13 159:19 160:21 161:6,19 162:4 170:4,5,23 175:13,24 176:19 182:24,25 183:8,12, 18 188:13,23 189:7 190:11 191:18,20 204:13 208:22 209:2, 5,14,18,22 210:2,6, 10 211:5 212:5,18, 20,23 214:7

**white-identifying** 175:14

**wide** 153:19

**wife** 166:2,7,9,12,16

**Wilson** 194:5,22

**Wispelwey** 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1,18 194:1,13 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1,5 215:1 216:1 217:1

**withdraw** 186:24 208:9

**withdrawn** 142:6 144:14 159:23 170:22 176:6 177:14 181:15 182:24 187:3

**witnessed** 158:20 159:11

**women** 196:23

**words** 153:20

**work** 171:24 179:25 182:23 183:2,9,16 190:16

**worked** 167:25

**Worker** 206:15

**worse** 199:8,11

**worship** 188:9 204:17

**wrote** 196:20

**wrought** 208:18

---

**X**

**Xs** 154:8

---

**Y**

**year** 180:10 181:21, 23 186:16

**years** 146:13 147:19 166:5 180:5 200:17 207:25

**yesterday** 184:6,8

---

**Z**

**zigzag** 168:19