**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

ELIZABETH SINES, SETH WISPELWEY,
MARISSA BLAIR, APRIL MUNIZ, MARCUS
MARTIN, NATALIE ROMERO, CHELSEA
ALVARADO, JOHN DOE, and THOMAS
BAKER,

                        Plaintiffs,

v.

JASON KESSLER, et al.,

                        Defendants.

Civil Action No. 3:17-cv-00072-NKM

**JURY TRIAL DEMANDED**

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS HILL, TUBBS AND
LEAGUE OF THE SOUTH'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF MATERIAL FACTS ................................................................... 7

    A.    Overview of Unite the Right .............................................................. 7

    B.    Background on League of the South, Michael Hill, and Michael Tubbs ............. 9

        1.    Movant-Defendants consider Black people and Jews enemies of the White Race. ................................................................. 9

        2.    Movant-Defendants Seek to Expel Jews and Black people from "White Man's Land" .................................................. 11

        3.    The League of the South aligns itself with groups that share its racial animus towards Black people and Jews. .......................... 12

    C.    Movant-Defendants agree to participate in Unite the Right to stand with their allies against their "enemies." .................................. 13

    D.    Movant-Defendants Plan for Unite the Right in Coordination with other Defendants .......................................................... 14

    E.    Defendants' Use of Discord ............................................................. 15

    F.    Movant-Defendants Engage in Preparations ..................................... 16

    G.    The Friday Night Torch Rally ......................................................... 19

    H.    The Saturday March ........................................................................ 22

    I.    The Garage Attack .......................................................................... 25

    J.    The Fields Car Attack ..................................................................... 26

    K.    Post-Unite the Right Celebration and Aftermath ............................. 28

    L.    Movant-Defendants Spoliated and Refused to Produce Highly-Relevant Evidence ...................................................... 30

LEGAL STANDARD ............................................................................................. 33

ARGUMENT .......................................................................................................... 34

I.    MOVANT-DEFENDANTS CONSPIRED WITH THE OTHER DEFENDANTS TO ENGAGE IN RACIAL VIOLENCE AND INTIMIDATION IN VIOLATION OF § 1985(3) ...................................... 34

    A.    Movant-Defendants Conspired to Commit Racial Violence and Intimidation. ........................................................ 35

    B.    Fields Was a Co-Conspirator with Movant-Defendants. ................... 39

i

# TABLE OF CONTENTS
(continued)

|  |  |  | Page |
|---|---|---|---|
| II. | | MOVANT-DEFENDANTS WERE MOTIVATED BY A DISCRIMINATORY ANIMUS. | 41 |
| | A. | Section 1985(3) Applies to Violence Against Minorities and Their Supporters, Even if Defendants Label It "Political" Violence. | 41 |
| | B. | Movant-Defendants' Violence Was Motivated by Racial and Religious Animus, Not Counter-Protesters Blocking the Path to Emancipation Park | 47 |
| III. | | THE TORCH MARCH AND FIELDS'S ACTS WERE REASONABLY FORESEEABLE AND MADE IN FURTHERANCE OF THE CONSPIRACY | 47 |
| | A. | The Torch March was in Furtherance of the Conspiracy. | 49 |
| | B. | Fields's Car Attack was in Furtherance of the Conspiracy | 51 |
| IV. | | THERE ARE GENUINE MATERIAL FACTUAL DISPUTES REGARDING PLAINTIFFS' COMMON LAW CONSPIRACY AND 42 U.S.C. § 1986 CLAIMS | 53 |
| V. | | IF MOVANT-DEFENDANTS HAD NOT SPOLIATED AND REFUSED TO PRODUCE EVIDENCE, THERE WOULD BE EVEN MORE EVIDENCE SHOWING THEIR SUMMARY JUDGMENT MOTION FAILS | 54 |
| CONCLUSION | | | 55 |

# TABLE OF AUTHORITIES

**Page**

## Cases

*A Soc'y Without A Name v. Virginia*,
  655 F.3d 342 (4th Cir. 2011) ...........................................................42, 43

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..........................................................................33, 38

*Blumenthal v. United States*,
  332 U.S. 539 (1947)...............................................................................40

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993)..........................................................................43, 44

*Commercial Bus. Sys., Inc. v. Bellsouth Servs., Inc.*,
  453 S.E.2d 261 (Va. 1995).....................................................................53

*Evans v. Techs. Applications & Serv. Co.*,
  80 F.3d 954 (4th Cir. 1996) ...................................................................33

*Faiveley Transp. USA, Inc. v. Wabtec Corp.*,
  2011 WL 1899730 (S.D.N.Y. May 13, 2011) ........................................34

*Francis v. Giacomelli*,
  588 F.3d 186 (4th Cir. 2009) .................................................................42

*Frazier v. Cooke*,
  2017 WL 5560864 (E.D. Va. Nov. 17, 2017)..........................35, 38, 45

*Harrison v. KVAT Food Mgmt., Inc.*,
  766 F.2d 155 (4th Cir. 1985) ...................................................43, 44, 45

*Hill v. City of New York*,
  2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005) ........................................35

*Johnson v. Harron*,
  1995 WL 319943 (N.D.N.Y. May 23, 1995)...........................................53

*Kim v. Parcel K-Tudor Hall Farm LLC*,
  499 F. App'x 313 (4th Cir. 2012) ..........................................................33

*Kravitz v. U.S. Dep't of Commerce*,
  355 F. Supp. 3d 256 (D. Md. 2018).......................................................35

231922546

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Lee v. Town of Seaboard*,
863 F.3d 323 (4th Cir. 2017) ...........................................................................33, 38

*Lenard v. Argento*,
699 F.2d 874 (7th Cir. 1983) ...........................................................................40

*McManaman v. United States*,
327 F.2d 21 (10th Cir. 1964) ...........................................................................41

*Mendocino Envtl. Ctr. v. Mendocino Cty.*,
192 F.3d 1283 (9th Cir. 1999) ...........................................................................35

*N.A.A.C.P. v. Claiborne Hardware Co.*,
458 U.S. 886 (1982)...........................................................................53

*Novotny* v. *Great Am. Fed. Sav. & Loan Ass'n*,
584 F.2d 1235 (3d Cir. en banc 1978) ...........................................................................47

*Peck v. United States*,
470 F. Supp. 1003 (S.D.N.Y. 1979)...........................................................................47

*Pinkerton v. United States*,
328 U.S. 640 (1946)...........................................................................48

*Richardson v. Miller*,
446 F.2d 1247 (3rd Cir.1971) ...........................................................................45, 47

*Rodgers v. Tolson*,
582 F.2d 315 (4th Cir. 1978) ...........................................................................43

*S. U.S. Trade Ass'n v. Unidentified Parties*,
2012 WL 579439 (E.D. La. Feb. 22, 2012) ...........................................................................33

*Simmons v. Poe*,
47 F.3d 1370 (4th Cir. 1995) ...........................................................................35

*Sines v. Kessler*,
324 F. Supp. 3d 765 (2018) ........................................................................... *passim*

*Streett v. United States*,
25 F. Supp. 2d 721 (W.D. Va. 1998) ...........................................................................34

*Sturm v. Ross*,
11 F. Supp. 2d 942 (S.D. Tex. 1998) ...........................................................................33

iv

# TABLE OF AUTHORITIES
(continued)

Page

*United Bhd. of Carpenters & Joiners of Am. v. Scott,*
  463 U.S. 825 (1983).............................................................................................43, 44, 46

*United States v. Bonetti,*
  277 F.3d 441 (4th Cir. 2002) ...............................................................................48

*United States v. Caso,*
  935 F.2d 1288 (4th Cir. 1991) .............................................................................48

*United States v. Cassiere,*
  4 F.3d 1006 (1st Cir. 1993).................................................................................40

*United States v. Diebold, Inc.,*
  369 U.S. 654 (1962).............................................................................................33

*United States v. Friedman,*
  445 F.2d 1076 (9th Cir. 1971) .............................................................................41

*United States v. Newsome,*
  322 F.3d 328 (4th Cir. 2003) ..........................................................................40, 48

*United States v. Osborne,*
  532 F. Supp. 857 (W.D. Va. 1982) .............................................................40, 48, 52

*Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan,*
  518 F. Supp. 993 (S.D. Tex. 1981) .......................................................................37

*Waller v. Butkovich,*
  584 F. Supp. 909 (D. Md. 1984)......................................................................45, 46, 47

*Ward v. Connor,*
  657 F.2d 45 (4th Cir. 1981) .................................................................................43

*Wilson v. Prince George's Cty., Md.,*
  893 F.3d 213 (4th Cir. 2018)...............................................................................33

*Yesteryears, Inc. v. Waldorf Rest., Inc.,*
  730 F. Supp. 1341 (D. Md. 1989).........................................................................46

v

# TABLE OF AUTHORITIES
(continued)

**Page**

**Statutes**

42 U.S.C.
§ 1983(3)...................................................................................................46
§ 1985................................................................................................38, 53
§ 1985(3) .......................................................................................... *passim*
§ 1986......................................................................................................53

Civil Rights Act of 1871, Ch. 22, § 2, 17 Stat. 13 ........................................44

**Other Authorities**

Fed. R. Civ. P. 56(a) ....................................................................................33

Keri C. McGrath & Jennifer L. Pfeiffer, *Federal Criminal Conspiracy*, 36 Am.
Crim. L. Rev. 661 (1999)...........................................................................48

McGrath, *Federal Criminal Conspiracy*, 36 Am. Crim. L. Rev. .................52

231922546

Plaintiffs Elizabeth Sines, Seth Wispelwey, Marissa Blair, April Muniz, Marcus Martin, Natalie Romero, Chelsea Alvarado, John Doe, and Thomas Baker ("Plaintiffs"), by and through their counsel, respond in opposition to Defendants Michael Hill, Michael Tubbs, and League of the South's ("Movant-Defendants") Motion for Summary Judgment ("the Motion"), Docket Entry ("DE") 823.[1]

## PRELIMINARY STATEMENT

Movant-Defendants' Motion is a fictional portrayal of their participation in the events comprising the Unite the Right Rally in August 2017 ("Unite the Right," "UTR," "the Rally"). The Motion ignores the overwhelming evidence that demonstrates their leadership and participation in the conspiracy that produced the highly-organized, hate-filled, intentionally violent, racist and anti-Semitic demonstrations that comprised Unite the Right. The Motion must be denied.

As the evidence developed in discovery shows, Defendants, including Movant-Defendants, engaged in a conspiracy to commit violence against Black people and Jews and their supporters. The intent of Defendants' conspiracy was to intimidate Black people and Jews and their supporters from exercising their constitutional rights through threats of violence and actual violence during the Unite the Right weekend on August 11 and 12, 2017.

It is simply incredulous for Movant-Defendants to portray their false narrative at all, but even more to claim that there are no material facts in dispute for it, to wit: that they simply participated in a "free speech" rally unmotivated by their animus towards Black people and Jews; that they did not conspire with Defendants to engage in racially motivated violence the weekend

---

[1] References to Movant-Defendants' Motion, DE 823, are cited herein as ("Mot."), any other references to filings on the docket as cited as ("DE").

of August 11 and 12, 2017; and that Defendant James Fields, Jr. was not part of the same conspiracy.

Movant-Defendant Hill publicly implored his loyal members of the League of the South: ████████████████████████████████████████████████████ ████████████████████████ Movant-Defendant Tubbs led a column of hundreds of supporters, including Movant-Defendants, into battle on Saturday, pushing through crowds of counter-protestors ██████████████████████ Members of Movant-Defendant League of the South, including the League's Chief of Operations (Ike ████), National Logistics Officer (J.C. ████), and Public Relations Officer (Brad ████), coordinated with other Defendants in secret on the message platform Discord in planning the weekend—where in the lead up to Unite the Right Defendant Kessler described running over protestors like ██████████ just as Defendant Fields actually did on Saturday Afternoon.

In May 2017, using the pretense of demonstrations to preserve monuments in the City of Charlottesville dedicated to Civil War General Robert E. Lee, Defendants organized and held a conclave of white supremacists in a demonstration in Charlottesville that featured speakers proclaiming white nationalist ideology and ended with a march across Nameless Field on the University of Virginia Grounds during which participants carried torches and shouted anti-Semitic chants. Based on the success of the May event, Defendants Jason Kessler (himself a resident of Charlottesville) and Eli Mosely, a/k/a Elliot Kline, decided to plan a national rally in Charlottesville to bring together the white nationalist movement in one place, in one event.

Over the next several months, Kessler and Kline worked to organize the other Defendants, who represent the leading white nationalist voices and organizations in the country, to participate in what they called "Unite the Right" on August 11 and 12, 2017 in Charlottesville. The plan was

to bring a unified force of white nationalism to engage with and combat the classes of people they termed their "enemies," Black people and Jews and their supporters.

The evidence developed during discovery shows that nothing was left to chance. Defendants, including Movant-Defendant, planned the Nazi-inspired posters advertising the events; the uniforms worn by the different groups; the flags and shields that were carried; the weapons that could be brought; the speakers at the Rally and which groups to invite; the logistics of bringing such a large number of people to Charlottesville; the use of well-known techniques to instigate violence; and the phony cover that all violence would purportedly be in self-defense. All the planning and the events themselves were inspired by and included Third Reich symbols and imagery.

To kick off the weekend, Defendants planned a torch march for Friday night (the "Torch March") across the University of Virginia Grounds to the Rotunda—an event that Defendants deceptively withheld from their purported open discussions with the Charlottesville Police Department. The Torch March was literally terrifying – strategically deploying some 500 participants marching in formation at night with torches and uniforms and chanting in unison "Jews will not replace us," "into the ovens," and the Third Reich slogan "Blood and Soil." It culminated with the "troopers" descending the steps of the Rotunda under the leadership and command of Defendant Kessler, Mosley, Spencer, and others, to surround no more than 20 or 30 individuals who were peacefully counter-protesting the demonstration and had formed a circle around the Thomas Jefferson statue. The marchers attacked the small group with kerosene lighting fluid, mace, sticks, poles, and fists. While Movant-Defendant argue in their Motion that they cannot be held liable for any of the events at the Torch March because Hill and Tubbs did not personally attend, they ignore the fact that LOS members helped to plan to the Torch March and

other LOS Members, including Public Relations Chief Brad ███, participated in the Torch March and took part in this racially- and ethnically-charged intimidation and violence.

Saturday's rally was planned to feature speeches by the leading White Nationalist voices, including the Movant-Defendant Michael Hill of League of the South. The rally never occurred, however, because their violent attacks against Black people and Jews and their supporters, including Black Lives Matter, members of the clergy, students, and citizens of Charlottesville resulted in a declaration of unlawful assembly. As the evidence revealed in discovery shows, this was what Defendants had anticipated, planned, and hoped for. Movant-Defendants not only participated in attacks against their perceived enemies that had previously been discussed before the event, but they actually led hundreds of men into instigating and committing these attacks.

Unfortunately, the belated declaration of unlawful assembly did not thwart the plan for tragic violence on Saturday against the counter-protestors—violence Defendants both promoted and encouraged: namely, a car attack by Defendant James Fields, Jr. that killed one supporter and injured seven of the nine Plaintiffs in this case; a criminal assault of a Black man by at least five individuals, including a member of Movant-Defendant League of the South; and numerous incidents of street violence encouraged, initiated, led, and celebrated by Movant-Defendants. Hill, founder and president of League of the South, proclaimed that it was a ███████ even though the only events that took place on Saturday, August 12, 2017 were these violent confrontations. Movant-Defendant Tubbs proclaimed several times over that "James Fields did nothing wrong."

Against this well-documented background, Movant-Defendants move for summary judgment claiming that there are no disputed issues of material fact. Movant-Defendants insist the evidence will show they did not join a conspiracy to commit racially-motivated violence against Black people and Jews and their supporters; that the League of the South is a Southern and White

nationalist organization with no particular animus towards Black or Jewish people and their supporters; and that the events of Unite the Right are protected political speech under the First Amendment of the United States Constitution. Movant-Defendants contend that if the Charlottesville Police Department and Virginia State Police had done their job and cordoned off the two groups of demonstrators, no actual violence would have ensued.

As Plaintiffs demonstrate below, the Motion relies on three fictions, each easily shown to be false and a material issue of disputed fact by the evidence in the record:

First, Movant-Defendants claim that the League of the South's mission and their participation in UTR are not and were not animated by anti-Semitic and racist ideology, even if they are opposed to some Jewish organizations like the Anti-Defamation League and some black organizations like the NAACP and Black Lives Matter. However, the evidence developed during discovery abundantly shows that the mission as described in their many publications and their individual views as described in their public messaging and private communications are exactly the opposite. In each of their depositions, Hill and Tubbs admitted to the anti-Semitic and racist agenda of the League of the South and their respective views that the "Jewish problem" and the "Negro problem" were the true enemies of Southern Nationalism and the "white race."

Second, Movant-Defendants would have this Court believe that UTR was simply a political rally, pitting red state views against blue state views, or those who favor maintaining Civil War monuments against those opposed. To this end, Movant-Defendants claim that the adversary at the core of UTR was the political movement Antifa. But that sleight of hand – straight from the White Nationalist playbook on how to cover their tracks -- ignores that the true "enemies" of UTR participants were Black people and Jews and their supporters. Everything that Defendants planned and executed for UTR focused on these enemies, and on Antifa only as supporters of the Black

Lives Matter movement. Moreover, Movant-Defendants' brand of Southern and White Nationalism is not confined to a politically conservative ideology; if it were, there would have been no place for the infusion of Nazi imagery and symbols presented at UTR and in the secretly-planned Torch March, where participants, following the commands of Defendants, carried kerosene-lit torches, evoking KKK and Third Reich imagery, wore SS-type uniforms, marched in formation chanting anti-Semitic slogans such "Jews will not replace us," "into the ovens" and "Blood and Soil" and descended on and literally attacked 20-30 peaceful counter-protestors.

Third, Movant-Defendants contend that the planned and executed violence was all in self-defense and not core to the UTR conspiracy and that defendant James Fields acted alone. To the contrary, the evidence shows that the violence at UTR was critical to the planning and proceeded exactly as Defendants had planned. Tubbs emailed fellow League of the South members, including Hill, two months before UTR that he "hoped" for an opportunity to fight any counter-protestors and video footage from UTR shows him doing exactly that—proudly leading a marching column of the Defendant organizations into "battle." He also identified himself in a video standing over and watching a fellow League of the South member and others as they beat up a Black man with poles and shields after the rally was declared an unlawful assembly. The evidence also includes photographs of Defendant Fields participating in uniform with Defendant Vanguard America in Saturday's activities and shows that the Discord communications on the private planning channels that Defendants set up promoted, among other things, vehicular violence against counter-protestors like the car attack executed by Defendant Fields.

As set forth below, Movant-Defendants are simply arguing against the weight of the evidence, and they have failed to present a sufficient basis for summary judgment. The Motion should be denied.

## STATEMENT OF MATERIAL FACTS

### A.      Overview of Unite the Right

On May 13, 2017, Defendants Jason Kessler, Richard Spencer, Nathan Damigo, Matthew Heimbach, Identity Evropa, and members of Vanguard America, Traditionalist Work Party ("TWP"), and League of the South ("League" or "LOS"), among others, took part in a coordinated rally of hundreds of neo-Nazis bearing lit torches on a march through the city of Charlottesville in a display "reminiscent of the 3rd Reich". (Second Amended Complaint, DE 557 ("SAC") at ¶ 52.) While ostensibly to protect a statute of Confederate general Robert E. Lee, in reality the march was designed to intimidate and terrorize religious and racial minorities, specifically Jews and Black people. Following the event, which would become known as Charlottesville 1.0, Defendants celebrated. Vanguard America, for example, called the rally a ███████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████ (Ex. 4 at 2.)[2]

True to these words, Defendant Kessler quickly began to plan another rally in Charlottesville on August 11 and 12, 2017, which he called Unite the Right. Only weeks after Charlottesville 1.0, Kessler began recruiting alt-right organizations to participate in Unite the Right, including Defendants Kline, Heimbach, and the organizations comprising the Nationalist Front, namely Defendants LOS, TWP, NSM, and Vanguard America. Once again, the professed purpose of the rally was to protect the Lee statue – once again, Defendants' true intent was to call for a conclave of white nationalist organizations to come together and ultimately inflict violence on Jews, Black people, and their supporters. (*See*, *e.g.*, Ex. 71 ("Spencer Tr.") 143:21-144:3 (explaining his understanding that Kessler was interested in fighting counter-protestors); Ex. 106

---

[2] Citations to exhibits ("Ex.") refer to the exhibits attached to the declaration of Alan Levine, filed simultaneously herewith.

(Discord conversation contemplating use of riot shields to clear protestors from Emancipation Park, noting ████████████████████████).) Any claim that the event was intended as a First Amendment exercise is belied by Kessler's assertion that Defendants merely ████████████████████████████████████████ (Ex. 48 at 16.)[3] Likewise, in a draft LOS press release, Hill was silent as to the Lee Statue – instead, he exhorted LOS members to "defend the South and Western civilization from the Jew and his dark-skinned allies, be at Charlottesville on 12 August." (Ex. 90.)

Defendants primarily utilized an online messaging platform, called Discord, to facilitate their planning. Defendants chose Discord for its hosting of private, invite-only servers, which allowed Defendants to conduct their preparations in secrecy, and maintain control over information flow. This veil of secrecy was pivotal in planning Defendants' now infamous Torch March through the University of Virginia Grounds on August 11, 2017. Defendants intentionally failed to disclose the Torch March to law enforcement notwithstanding their purported cooperation with the Charlottesville Police Department for several months before the event.  Nor did Defendants seek a permit to conduct the march. Instead, Defendants instructed participants to maintain absolute secrecy surrounding the details of the event, warning them not to disclose the time or location of the meeting point. (*See e.g.*, Ex. 18; Ex. 115 at 2 ██████████████████████ ██████████████████████.) Defendants' concealment was designed to maximize the effect of the Torch March, instilling a new height of terror in Black people Jews, and those who support them.

Defendants' planning of the Torch March occurred in conjunction with planning for the main event of the weekend – the Saturday march and rally at the Robert E. Lee statue. Defendants,

---

[3] Kessler's flight of imagination went as far as describing picket signs as "free speech" implements that participants should bring to UTR and use as ██████████████ protestors. (*See* Ex. 68 ("Kessler Tr.") 376:18-379:4.)

for example, utilized Discord to plan and coordinate speakers for the event, including Hill. Defendants' Discord chats additionally reveal that Defendants fully expected and intended that Unite the Right would result in violence. (Ex. 112 ("████████████████████████ ███████████.) Indeed, Discord is riddled with Defendants' and their co-conspirators exhortations to commit violence at the rally, and Defendants openly discussed and advised participants to bring firearms and other weapons to the event, including knives, pepper spray, stun guns, and batons. (Ex. 118 ████████████████████████████████████████████████ █████); Ex. 113 ████████████████████████████████; Ex. 114 ███████████████ ████████████████████████.) It is accordingly unsurprising that the leader of Defendant Vanguard America testified that he "absolutely" expected violence to occur at Unite the Right." (Ex. 67 ("Hopper Tr.") 80:21-24, 120:24-121:3.)

**B.    Background on League of the South, Michael Hill, and Michael Tubbs**

**1.    Movant-Defendants consider Black people and Jews enemies of the White Race.**

The League of the South is a Southern Nationalist and White Nationalist organization founded by Michael Hill in 2004. Its mission is purportedly to "advance the cultural, economic, and political well-being and independence of the Southern people by all honorable means." (DE 823-22, Mot. at 9.) The seeming breadth of this mission is, in fact, cabined within the League's "uncompromising…vision" of the South as a "homeland for Whites." (DE 823-6.) Fueling its efforts to restore the South as "White Man's Land," is the League's opposition to what it considers "enemies" of the white race—Jews, Black people, and their supporters. (*Id.*)

The League unabashedly views Jews as its enemy, as well as an enemy of the white race generally. (Ex. 89 at 02:03-02:09, "[W]e stand for the white race against all of our enemies, particularly the Jew."; Ex. 145, "[Y]ou name your enemy as a prelude to fighting and destroying

him . . . and that enemy is the Jew you get that. j-e-w the Jew….").)  In a similar vein, LOS considers Black people inferior to whites, and a pestilence on white society. (*See, e.g.*, Ex. 30



); Ex. 36



).) The League further condemns "anti-white whites" (*i.e.*, white supporters of Black people and Jews). (DE 823-3 ("Hill Tr.") 35:24-36:11, ("[T]he [League's] enemies [are] not limited…to Jews and blacks. I have noted that there are many what I call antiwhite-whites who have positioned themselves to be our opponents.").)

Movant-Defendant Hill shares these views with the League of the South personally and in his capacity as the League's president. (*See, e.g*., Ex. 88 ("I pledge to be a white supremacist, a racist, an anti-Semite, a homophobe, a xenophobe, an Islamophobe, and any other sort of 'phobe that benefits my people, so help me God!").)  Movant-Defendant Tubbs' also shares these views; indeed, his Twitter is replete with racist and anti-Semitic tweets. *See e.g.* Ex. 97 (implying his racism is "Literally Hitler"); Ex. 98 (responding "Good for Libya" to a tweet discussing Libyan slavery); Ex. 99 ("Africans are not capable of Western Civilization"); Ex. 100 (Tubbs is offended by "Every Holohoax memorial" and "Every MLK statue.").[4]

---

[4] In fact, Movant-Defendant Tubbs also has a history of racially antagonistic and violent views towards Jews and African Americans. In 1991, Tubbs pleaded guilty to conspiracy charges relating to a plan to transport military-grade guns and explosives across state lines, in an apparent effort to target a list compiled by Tubbs of Black and Jewish-owned businesses. (Ex. 141 at 2.)  Evidence seized in investigating the conspiracy also showed Tubbs was setting up a group called "Knights of the New Order" with a group pledge, reading: "I dedicate my heart to oppose the enemies of my race, my nation, and the New Order. . . . I dedicate my life from this moment forward to fostering the welfare of the white Aryan race." (*Id.*)

### 2. Movant-Defendants Seek to Expel Black people and Jews from "White Man's Land"

One of LOS's fundamental principles is that the South should be returned to a white majority to the exclusion of Black people and Jews. (*See* DE 823-6, ("To us, Dixie is and should be White Man's Land. We are firm on the Negro Question and the Jew Question. And we make no apologies to anyone for what we believe or what we seek to accomplish for our people."); DE 823-13 ("[We seek] nothing less that the complete reconquest and restoration of our patrimony—the whole, entire South. And that means the South will once again be in name and in actuality White Man's Land…unhindered by parasitical 'out groups.'").)  To the extent any non-whites are permitted to remain in such a society, they would be subject to ███████████████████████ ███████████████████ (Ex. 36.)

Despite claiming it only seeks to establish a white-dominated South, the League actually advocates restoring "White hegemony" and "reconquering" North America and Europe ensuring its enemies (*i.e*., Black people and Jews) are ████████████████████████████ ████████████  (Ex. 87; *see also* Ex. 66 ("Hill Tr.") 58:15-17 ("[W]e have made it clear that our enemies are not welcome in our midst[.]").)

Movant-Defendants' hostility towards Black people and Jews is not simply a belief—Hill founded the League to create radical change rather than merely engage in educational or social endeavors. To this end the League incites its members and followers to agitate for a white-dominated society. (*See, e.g*., DE 823-13 ("Fight or die, white man", "Are you willing to fight for your flesh and blood, for your sublime civilization?"); Ex. 107 ("████████████████████ ██████████████████████████████████████████████████ ████████████████████.)

The League also undertakes efforts to intimidate their "enemies."  For example, a publicly released video showed Hill at a 2018 League event, surrounded by other League members glad in League apparel and holding League flags and Confederate flags, burning the Israeli flag and Talmud while calling for Jews to be expelled from the South:

> "A hundred and nine times in the history of the world the Jew has been banished from our midst. Lord, we ask that you make number 110 come soon for our Southland. . .We consign these to the holy fire of these ovens. For the Gentiles of the world we stand for the white race against all of our enemies, particularly the Jew, and all of these symbols represent that enemy, and we consign them to these flames tonight."  (Ex. 89.)

As a result of its racist and anti-Semitic views and activities, the League of the South has been designated a "hate group" by the Southern Poverty Law Center—a fact that the League is ███████████████████████████████████████ (Ex. 35.)

**3.      The League of the South aligns itself with groups that share its racial animus towards Black people and Jews.**

Defendants League of the South, TWP, NSM, and Vanguard America entered an alliance in Spring 2017 under the banner of the "Nationalist Front" to unite against their "common enemy." (Ex. 142.)

In remarks delivered at a Nationalist Front meeting in July 2017, Hill identified these common enemies as ████████████████████████████████████████ ████████████  (Ex. 29.)  Other members of the Nationalist Front affirmed the League's views. For example, Defendant Heimbach stated on behalf of TWP: ██████████████████████████ ███████████████████████████████ (Ex. 38.)

**C.      Movant-Defendants agree to participate in Unite the Right to stand with their allies against their "enemies."**

In Spring 2017, Kessler invited Hill to speak at Unite the Right and for the League to attend. (*See* Hill Tr. 95:9-14.)  Hill agreed and on June 9, 2017, the League issued a press release (penned

by Hill) announcing that it planned to attend Unite the Right along with prominent members of the Alt-Right and Alt-Light, including the other members of the Nationalist Front. (*See* Ex. 82.) Kessler sent Hill a secret operational guide which framed the purpose of Unite the Right as "█████

████████████████████████████████████████

████████████████ (Ex. 21 at 2.)

The League's decision to participate was consistent with its general strategy of partnering with other white supremacist groups, including those in the Nationalist Front, to fight against Jews, Blacks and their supporters. (*See, e.g.*, Ex. 87 (Whites must unite to show their enemies "how fierce White Devils can be" and in that "unity there is ultimate victory. . . the White World restored."); Ex. 16 ("I'm not too particular these days about who my allies are as long as they're focused on this particular enemy . . . [We will] sweep this red terror vermin off of our streets and into the sea where it belongs.").)

The League promoted Unite the Right internally and externally expressing this same goal. Hill emphasized that he wanted "an excellent turnout" for the event and that "Antifa, BLM, et al will be there to greet us! Don't miss out on the fun!" (Ex. 82.) And Hill publicly tweeted: "If you want to defend the South and Western civilization from the Jew and his dark-skinned allies, be at Charlottesville on 12 August." (Ex. 90; *see also* Ex. 58.) League members echoed Hill's comments. For example, the League's Tennessee Chapter posted on its Facebook account:

████████████████████████████████████████

██████████████████████████████ (Ex. 58.)

Other Defendants promoted Unite the Right in the exact same way. In a Press Release for Revolutionary Conservative, Defendant Augustus Sol Invictus wrote: ██████████████

████████████████████████████████████████

█████████ (Ex. 39). Parroting this language, Heimbach asserted on the Traditional Workers' website that ████████████████████ (Ex. 65 ("Heimbach Tr.") 502:6-24).

### D.   Movant-Defendants Plan for Unite the Right in Coordination with other Defendants

Kessler was initially encouraged to invite the League of the South to participate in Unite the Right not just because of their shared racial animus, but also because of the League's operational expertise. In early May, a member of Identity Dixie advised Kessler that ████████

████████████████████████████████████████

████████████████████████████████████████

████ (Ex. 47 at 17.)  Another told Kessler that ████████████████████

████████████████ because ████████████████████████

████████ (Ex. 54 at 54.)

After Kessler secured their participation, the League began coordinating and preparing for Unite the Right. Kessler added Hill to the official leadership group chat. (*See* Ex. 49.)  Hill also participated in official leadership calls with other defendants and co-conspirators including Kessler, ████████████, Eli Mosely/Elliott Kline, Augustus Invictus, and Vanguard America. (*See, e.g.*, Ex. 41; Ex. 81 ("Kline Tr.") 291:15-292:13.)

The League helped Kessler secure speakers for UTR. Hill put Kessler in contact with David Duke—prominent Neo-Nazi and founder of the Knights of the Ku Klux Klan—to give the ████ ████ at the Unite the Right after-party. (Ex. 25.)

The League also agreed to promote UTR (*see* Ex. 48) and did so through the official League of the South website, Facebook, Twitter, Southern Nationalist Radio and by word of mouth.

Members of the Nationalist Front described planning as "a joint operation" and acknowledged working together to prepare for Unite the Right. (*See* Ex. 96; Heimbach Tr. 537:11-

21.)  The League's National Logistics Officer J.C. coordinated and attended in-person meetings with other members of the Nationalist Front, including Defendant Heimbach and members of TWP and NSM, to plan for UTR. (Ex. 12; (Heimbach Tr. 572:7-14, 577:17-578:25.)

Defendant TWP specifically worked closely with the League. TWP designated member ██████████ to serve as its official point of contact with the League. (Heimbach Tr. 579:11-580:14.) Defendant Heimbach had close relationships with the League and had worked with Hill to plan and attend white nationalist events in the past. (Heimbach Tr. 544:12-16.)  Heimbach admitted that he discussed planning UTR with Hill. (Heimbach Tr. 545:7-9).  ██████ used Discord to coordinated a ████████████████████████████ convoy to Charlottesville with TWP members. (Ex. 11; *see also* Ex. 13 (███████████████████████ ████████████████████████)[5]

### E.    Defendants' Use of Discord

Defendants used the messaging platform Discord, among other methods, to coordinate for UTR. Kessler moderated, reviewed, and managed the Charlottesville 2.0 Discord Channel and invited VA, TWP, LOS, and others to discuss planning and preparations for UTR. (Kessler Tr. 145:24-147:8.)

League Member ██████████ joined the Charlottesville 2.0 Discord Channel under the alias "Crockett." (Ex. 48.) At Kessler's request, ██████ agreed to "invite all the League guys that are coming [to Unite the Right] into Discord." (*Id.*) ██████ also coordinated with ████████ ████████████████████████████████. (*See* Ex. 51 at 48-49.) Other League members who were active on Discord included ██████,

---

[5] In addition to coordinating the ████████ also used Discord to share anti-Sematic Nazi imagery just three days before UTR posting "████████ with a photo of an over, to which another poster replied ██████ ████████ (Ex. 9.)

handle ███████, who served as the League's National Logistics Officer and arranged transportation to Charlottesville (*see* Ex. 53 at 4; Hill Tr. 149:19-23), and Brad ████, the League's Public Relations Chief, who was invited to use Discord by Defendant Kessler (*see* DE 823-20 ("████ Tr.") 62:8-21).

Although Hill and Tubbs had personal Discord handles—███████████████████, respectively—both claim they were unable to use Discord because of "technical" difficulties. However, Defendant Kline testified that Tubbs participated in Discord leadership calls on behalf of LOS, (Kline Tr. 292:2-13, 296:7-14). On his part, Hill delegated responsibility for monitoring Discord to his Chief of Operations Ike ████ and reporting back to Hill what he saw. (Hill Tr. 78:6-10). ████ used the Discord handle ███████ to discuss the League's attendance at UTR with other participants. (*See, e.g.*, Ex. 10 at 5 (████r post on the Charlottesville General Channel: ██████████████████████████████████.) ████ held himself out as the ███████████████████████████ so the League could coordinate with them ████████████████████ DE 823-19 ("████ Tr.") 98:2-5.

## F.    Movant-Defendants Engage in Preparations

From the outset, Movant-Defendants expected Unite the Right to be a violent event and planned as such. The initial operational document Kessler sent Hill analogized Unite the Right to the violent encounter months earlier at the Battle of Berkeley (*see* Ex. 21 at 2) and Hill anticipated violence at Unite the Right based on his prior knowledge of this type of event (*see* Hill Tr. 125:12-14).

Rather than reconsidering attending UTR, encouraging members of the Nationalist Front not to go, advising Kessler to cancel the event, or notifying authorities of the risk, Movant-Defendants prepared for a fight. This was, in fact, part of the League's plan. Tubbs responded to

Hill's ██████████████████████████████████████████████████

(Ex. 123.)

While leadership handled high-level planning, each organization was responsible for preparing and organizing its own members. Hill told Tubbs that he would ████████████████ and asked Tubbs to ██████████████████████████ with assistance from ██████████ ████████████████████████████████████████████████ ██████████ (Ex. 121.)  Tubbs frequently reported back to Hill on how preparations were progressing and the activities his lieutenants were undertaking. (*See, e.g.*, Ex. 108.)

Tubbs in turn delegated responsibility for interacting with the Charlottesville police to ████, although they considered it a lost cause because the police chief was African American and the mayor was a "Jude Schwein" (German for Jewish pig). (*See* Ex. 122.)  Heimbach claimed that ████ served as ████████████████████ for the entire Nationalist Front, not just League of the South. (Ex. 85 at 8.)  ████r was also responsible for coordinating with other members of the Nationalist Front. (*See, e.g.*, Ex. 24 (on July 13, ████ writes Hill ████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████.)

Tubbs sent Hill a "uniform directive" laying out mandatory attire for League members attending UTR for the purpose of creating ████████████████████████ (Ex. 26.)  Other members of the Nationalist Front ██████████████████████████ adopted similar uniforms. (*See* Hopper Tr. 139:12-140:7.)  The League also commissioned a dozen custom riot shields for is members, (*see* Ex. 28), which were used as battering rams. (Following



17

Unite the Right, ███ noted that the League had used shields, clubs, and batons to ████████████ ████████ (Ex. 27.)

    The League also prepared to bring weapons to UTR. Kessler advised Hill that Virginia is an open carry state but he ██████████████████████████████████ (Ex. 55.) Members of the League researched Virginia weapons laws, including considerations for ██████████████████████████ (DE 823-15.) A League member also suggested they ██████████████████████████ although it is unclear whether a code word was selected. (DE 823-15.) On the day of the rally, Hill conceal carried a Glock 45. (Hill Tr.180:15-16). Other members of the League, including ████, carried firearms as well. (*See* ████ Tr. 86:19-23.) Prior to UTR, however, when the Charlottesville police contacted ████, the League's PR Chief, ████ told them that League's members would not be bringing weapons.(Ex. 57.)

    Throughout the planning process, the League took great efforts to keep their communications secret. In May, Hill issued a directive on behalf of the League restricting internet communications. (Ex. 107 ██████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████.) When electronic communications were necessary, the League used "ProtonMail" because of its security levels. (*See* Hill Tr. 83:23-84:17.)

    As the date of UTR drew closer, the League engaged in reconnaissance activities to scope out Lee Park and the surrounding areas. League members analyzed satellite maps, identified security cameras in proximity of the park, surveyed the area on foot before, and reported back to the League's leadership with their assessments. (*See* Ex. 23; Ex. 24.) Based on this analysis, ████

developed a plan for the League to meet at a JoAnn Fabrics on the outskirts of Charlottesville, caravan to a parking garage on Market Street, and develop a route into and out of the park. (Hill Tr. 200:2-9.)  The League's allies in the Nationalist Front agreed to participate in their Saturday operational plan. (Heimbach 535:6-10, 545:22-546:3.)

### G.     The Friday Night Torch Rally

On the evening of Friday, August 11, white supremacists, including many of Defendants, descended upon the University of Virginia Grounds carrying torches and chanting, among other things, "Jews will not replace us" and "Blood and Soil." (█████ Tr. 163:14-16, 164:2-4.)  The Torch March was planned well in advance (*see, e.g.*, Ex. 52), and the organizers were fully aware that it would evoke KKK and Nazi imagery (*see, e.g.*, Spencer Tr. 104:13-25).

Contrary to Hill's sworn testimony (Hill Tr. 138:17-22), the League learned of the planned Torch March weeks prior to UTR. Brad █████, the League's public relations officer, was involved in promoting, planning, and documenting the League's attendance at UTR. (*See* █████ Tr. 48:16-49:23.)  On or around July 3, 2017, Defendant Kessler told █████ that they were planning an evening torch march and advised him to ████████████████████████████████████ ████████████ (Ex. 52.)

Most League members traveled long distances and arrived at the League's compound outside of Charlottesville on the day of the Torch March; some like Tubbs did not arrive until the evening. (DE 823-61, Decl. of Michael Hill, at ¶ 22.) League leadership, including Hill, Tubbs, and Ike █████, Defendant Heimbach, and others attended a meeting at the compound that night to finalize plans for the following day and did not attend the Torch March. (Hill Tr. 129:20-130:4; DE 823-17 ("Tubbs Tr.") 49:18-50:17.)

Hill, however, appointed two individuals to observe on behalf of the League. (Hill Tr. 138:2-5.)  Numerous other League members actively participated in the torch march. █████

attended with at least two League members from Alabama, who had brought their own tiki torches. (███ Tr. 151:10-152:9, 155:11-22.)  According to League member Tyler ███ (later convicted of assaulting counter protestor Deandre ███), members from the League's Florida Chapter also participated. (Ex. 147).

Some of the attendees, including ███ (left), wore official League of the South polo shirts (███ Tr. 158:11-17):



As the marchers at the Torch March proceeded through the university Grounds and across The Lawn,—a UNESCO World Heritage Site consisting of academic buildings and student and faculty residences—and descended the many steps from the Rotunda to the Thomas Jefferson statue and approached a group of individuals, including Plaintiffs Romero and Doe, who were unarmed and had circled the statue in locked arms. (Ex. 78 ("Romero Tr.") 18:4-21; Ex. 75 ("Doe Tr.") 18:4-19:3.) The hundreds of marchers surrounded the circle of counter-protestors gathered around the statue and attacked them: hurling kerosene cans at them, jabbing them with lit torches, and spraying them with mace. (Doe Tr. 19:13-20:14.) The violence around the Plaintiffs' crowd

escalated to the point where Plaintiffs Romero and Doe no longer felt safe and were compelled to pass through the surrounding Torch March participants to escape. (Doe Tr. 20:15-21:14; Romero Tr. 19:12-22.) Police declared an unlawful assembly.

Plaintiffs Romero and Doe each suffered injuries as a result of this attack. Romero was targeted for verbal abuse based on her ethnicity, was sprayed with mace, and had to jump on the statue to avoid a tiki torch which was thrown at her feet. (Romero Tr. 19:12-22.) Romero continues to suffer nightmares and has trouble sleeping as a result of the events of August 11 and 12. (Romero Tr. 61:14-18.) Doe similarly had objects thrown at him and was pepper sprayed in addition to being kicked and punched by marchers at the Torch March and was "pummeled" by the mob before eventually being pushed off the statute. (Doe Tr. 20:4-21:14.) Doe also continues to suffer mental health issues since the events at UTR, including trouble sleeping due to depression and anxiety any time he is near the UVA rotunda. (Doe Tr. 42:11-22.)

Despite the violent confrontations at the torch march and wide-spread condemnation of the event as racist and anti-Semitic, Hill did not disavow the event (Hill Tr. 129:8-10); in contrast, he and other League members profusely praised it as ███████████████ ████ (Ex. 15 at 00:14:18. – 00:15:40). ████ pointed to the Torch March as a highlight of UTR and ██████████████████████ (Ex. 105.) In fact, the League viewed the violent torch march as such a success, they planned future League-organized torch rallies (Ex. 15 at 00:14:18. – 00:15:40), and within a few months had stockpiled torches and torch oil for just such an event. (*See* Ex. 22.)

### H.    The Saturday March

Friday evening, while some of the League members attended the Torch March, other members and Hill, Tubbs, and ████, met with Defendants including Heimbach, TWP members, and possibly Schoep to review logistics for the next day. (*See* Ex. 130; ████ Tr. 131:3-5; Tubbs

Tr. 65:4-6.)  At this meeting, Hill asked Tubbs to provide an overview of how the Nationalist Front

groups were going to convene before heading to downtown Charlottesville together. (Tubbs Tr.

49:13-17; 52:9-13.)

On Saturday August 12th, Movant-Defendants left their campground sometime between 6

or 7 in the morning. (Hill Tr. 199:16). Several League members open-carried firearms to the rally,

while Hill apparently cared a concealed firearm. (*See* Tubbs Tr. 84:18-20; Hill Tr. 180:14-18;

████  Tr. 86:19-23.)  As planned by ████ Movant-Defendants met with other Nationalist Front

members, including National Socialist Movement, Traditionalist Workers Party, Vanguard

America, the East Coast Knights, and others at a parking lot in front of JoAnn Fabrics outside of

the Downtown Charlottesville area before heading to the Market Street Parking Garage. (*See* ████

Tr. 135:10-16; Hill Tr. 154:7-17; 200:2-9 (referring to the plan as ████████ ); Ex. 96.)

The group, consisting of at least a hundred people, also included Defendants TWP, Heimbach, and

NSM. (Heimbach Tr. 638:2-18.)   The Nationalist Front members, including League members,

were in uniform wearing helmets, and carried shields, flagpoles, and pepper spray. (See ████

Tr. 141:21-142:18; Tubbs Tr. 85:13-16, 101:6-102:3; Ex. 101 at 00:00-00:35.) Before heading to

the Market Street Garage, ████ gave a speech to the group: ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████ (Ex. 40.) Notably, this speech had no mention of

avoiding or preventing violence. (*Id.*)

After leaving the parking area outside of JoAnne Fabrics, the Nationalist Front group formed a convoy to drive to the Market Street Garage in downtown Charlottesville. (Hill Tr. 200:2-9.)  Once the group reconvened in the Market Street Garage, the next objective was for the group to march to Emancipation Park. (█████ Tr. 145:19-21.)

Tubbs led the group, numbering in the hundreds in a column formation, from the Market Street garage toward the southeast entrance of Emancipation Park and along Market Street approaching stationary, peaceful counter-protestors who were shielding the clergy. (Tubbs Tr. 98:13-100:17; Ex. 101 at 00:30-01:05 [(depicting the NF column charging into unarmed counter-protesters).)  As described by co-Defendant Parrott, when the counter-protestors would not move aside, Tubbs led his column into battle, ██████████████████████████████████████ ██████████████████████████████████ (Ex. 116 at 2). In his charge, Tubbs and the men of the column pushed forward holding their shields and hit the counter-protestors with flagpoles. Video footage and photographs show demonstrators jabbing the poles at counter-protestors' faces. (Ex. 101 at 00:00-00:34 (Tubbs, Hill and members of the League and Nationalist Front holding shields and charging into counter-protestors); *see also* 50 (Tubbs pushing a LOS member with a flagpole into a group of counter-protestors); Ex. 69 ("Parrott Tr.") 226:3-24 (describing Tubbs leading the charge, and how the LOS men with shields put their "training" to work by using a shield wall to push through counter-protestors).)  While the counter-protestors tried to grab the flagpoles away, they were no match for Tubbs' Nationalist Front column who pushed the counter-protestors away, beating them with flag poles and shields.  (Ex. 101 at :00-34). Indeed, a NSM member described the resistance efforts by the counter-protestors as "feeble" compared to the highly-highly trained LOS men. (*See* Ex. 63 ("█████ 30(b)(6) Tr.") 355:20-356:18, 361:2-25.) Video and photographic evidence shows that Hill and Heimbach were at the front lines of the

violence with Tubbs. (*See* Ex. 92 at :00-:18 (Hill and Tubbs standing at the front of the Nationalist Front column with Heimbach, who yells "shields up" before charging into a group of counter-protestors); Heimbach Tr. 546:12-15; Ex. 86.) Hill later boasted about the fact on Twitter[6] as well:



At some point after the NF column led by Tubbs arrived at Emancipation Park, Unite the Right was declared an unlawful assembly by the governor of Virginia. Instead of avoiding the counter-protestors like ▮▮▮▮, Tubbs led a number of LOS members and others from the NF group in a second charge out of Emancipation Park, yelling "Follow me!" before barreling directly into the counter-protestors. (*See* Ex. 102 at :00-:18 (depicting the charge and LOS members clubbing and pushing counter-protestors with their shields); *see also* Ex. 1 (Tubbs VKontacte profile picture ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.) Video footage from another angle shows Tubbs throwing a counter-protestor to the ground after leading the charge into the crowd. (Ex. 124 at :00-:24).

During the charges in and out of Emancipation Park, Movant-Defendants engaged in numerous instances of violence. For example, during the first charge into Emancipation Park, a group of men in the NF column, including LOS members threw a sole woman counter-protestor to the ground at least two times. (Ex. 91 at :10-:19). Then, the men surrounded her and told her to

---

[6] One of Hill's Twitter handles was @71Rhodie.

"leave" and pepper-sprayed her, despite the fact that she was alone, unarmed, and not attacking them. (Ex. 92 at :42-57). Hill conceded that it was not an act of self-defense. (Hill Tr. 214:15-215:4.)  Similarly, Heimbach testified that while marching with LOS, he personally observed an LOS member trying to jab a counter-protestor with a flagpole and repeatedly pushing a counter-protestor to the ground. (Heimbach Tr. 649:14-651:14.) Further, Vasillios ████, who was in the NF column at the front near Tubbs and Heimbach at some point invoked his Fifth Amendment right against self-incrimination when asked if Tubbs assisted him in assaulting counter-protestors at Unite the Right, but answered "no" when asked if Heimbach assisted him in assaulting counter-protestors.  (*See* Ex. 70 ("████ Tr.") 243:13-19.) ████s also invoked his Fifth Amendment right against self-incrimination when asked whether Tubbs encouraged him to crack three skulls at Unite the Right. (████ Tr. 265:17-19.)

## I.      The Garage Attack

In addition to the various acts of violence detailed above, while heading back to the Market Street Parking Garage, LOS member Tyler ████ and a group of other UTR participants, including TWP member Daniel ████, brutally beat DeAndre ████, a black counter-protestor. ████, who struck ████ in the head with a wooden tire thumper, caused ████ to suffer severe cranial trauma and require stitches. (Ex. 148; *see also* Parrott Tr. 239:3-23.) ████ other injuries consisted of a spinal injury and broken arm. Tubbs was present for this attack, but did nothing to stop it—video footage documenting the attack shows Tubbs nonchalantly walking past the group while they repeatedly bludgeon ████ with various weapons. (*See* Ex. 104 at :0-:13; *see also* Ex. 103.) ████ was subsequently convicted for beating ████ after entering an Alford plea in February 2019.

## J.      The Fields Car Attack

After the unlawful assembly was declared, Defendant Fields turned his Dodge Charger onto 4th Street SE and faced a crowd of more than 100 counter protesters. (Ex. 73 ("Alvarado Tr.")

36:3-22; Ex. 77 ("Muniz Tr.") 31:4-20). He reversed, passed up opportunities to take a different route, accelerated "nearly full throttle" down 4th Street, and drove directly into the crowd.  (Ex. 140 at 11, 22; Ex 74 ("T. Baker Tr.") 24:4-14; Alvarado Tr. 37:17-38:10; Muniz Tr. 37:15-20).) The force of the car attack was strong enough to knock people out of their shoes and send bodies flying through the air. (Ex. 140 at 16-27; Ex. 76 ("Martin Tr.") 15:25-16:7; Muniz Tr. 36:24-37:5.) The crash injured dozens of people and resulted in the death of Heather ███. (Muniz Tr. 39:3-7; 43:15-22.)

Fields was affiliated with Defendant Vanguard America. He openly marched with members of Defendant Vanguard America at Unite the Right. (*See* Exs. 94 & 120.)  At the rally, Fields donned Vanguard uniform, consisting of a white polo and khaki pants. (*See id.*)  Fields also carried a shield emblazoned with Vanguard America's flag. (*See* Exs. 94 & 210.) Fields is pictured next to Vanguard America's leaders, including Thomas ████. (Ex. 95.)

Following Fields' murder of Heather ███, Vanguard America members openly discussed the negative ramifications of Fields' association with Vanguard America. (Ex. 111 at 3.) Although Vanguard's leaders repeatedly testified that they did not know members' identifying information, and that they intentionally avoided learning any such information for precisely this situation. (████  Tr. 114:3-5; 77:21-78:5), they admit that Fields was "part of the group." ████  Tr. 12:21-13:19). At least one Vanguard America member observed that Fields was ███████ ██ and that ██████████████████ (Ex. 111; *see also* ████ Tr. 145: 10-19; 146:24-147:2.)  Vanguard apparently was not too perturbed by this as they sent Fields a Christmas card in jail. (Ex. 93.)

Defendants frequently discussed exactly such an attack on Discord in the months leading up to Unite the Right. For example, in February 2017, Defendant Heimbach and Dillon ████,

the leader of Defendant Vanguard America, celebrated video of a protest in Berkeley, California, in which protestors were run over by a speeding vehicle, as ▮▮▮▮▮▮▮▮ and warned ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 110 at 2.) Similarly, in a Discord channel entitled #demonstrationtactics, Defendant Kessler reviled Black Lives Matter protesters, stating ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 44.) And, Defendants discussed employing such attacks at Unite the Right when they met in person. (Ex. 80 ("▮▮▮▮ Tr." 152:13-153:6; 153:23-155:2).)

Fields' car attack caused grievous injuries to the Plaintiffs in this case. Plaintiff Martin, who pushed Plaintiff Blair out of the car's path, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ which required surgery and two ankle screws. (Ex. 133 at 6.) Plaintiff Blair nevertheless herself sustained ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 132 at 7.) Plaintiff Baker was struck head on by Fields' car, launching him into the air over the windshield and causing ▮▮▮▮▮▮▮▮▮▮▮▮▮. (T. Baker Tr. 25:19-34:3.) Plaintiff Alvardo was also struck by Fields' car, suffering ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 131 at 7.) Plaintiff Romero was ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ (Ex. 135 at 8.) Plaintiffs Muniz and Sines only narrowly avoided being struck by Fields's car. Ex. 134 at 6-7); Ex. 136 at 6-7.) They and Plaintiff Wispelwey have suffered ▮▮▮▮▮▮▮▮▮▮▮▮▮ as a result of their proximity to the attack and witnessing the casualties from the attack. (Ex. 137 at 7.)

### K.     Post-Unite the Right Celebration and Aftermath

Even as the full extent of the violence at Unite the Right became widely known, Movant-Defendants did not disavow their roles at the rally. In contrast, they generally praised and celebrated the event.

In the aftermath, Hill described August 12 as "a great day" for the League. (Ex. 16 at 00.01.04-00.02.53 ("I couldn't be happier with the outcome of this for the League…it was a great day."); *see also* DE 823-16 ("The League of the South had a good day in Charlottesville, Virginia. Our warriors acquitted themselves as men. God be praised!"); Hill Tr. 237:20-24, ("I can account for the organization in general, and I was very happy with the way things turned out for us . . . that was a very successful day.").)

Hill specifically praised Tubbs's actions on behalf of the League (Ex. 16 at 00.01.04 to 00.02.53 ("[T]hings certainly went well on the ground for us, thanks largely to Mike Tubbs[.]"); Ex. 34 ("Mr. Tubbs indeed was much the warrior…I could not have been prouder[.]")), as well as the League's "warriors" in general (Ex. 16 at 00.01.04 to 00.02.53 (praising "all of our brave, brave warriors who refused to have their way barred to the park"); Ex. 34 (describing ███████ ████████████████████████████████████████████████████ ██████ )). On October 23, 2017, League member Jason ██████ wrote to Hill that ████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████ Hill responds: ██████████████████████████████████████ ██████ (Ex. 33 (emphasis added).)

Over the following months, Movant-Defendants continued to celebrate the events of August 12. Hill commissioned League of the South badges commemorating Unite the Right. (Ex. 32.) Hill boasted that the League that had ████████████████ (Ex. 31.) At its 2018 National

Conference, which was also attended by NSM leadership including Jeff Schoep, the League gave out awards for "valor" at Charlottesville. (*See* Ex. 56 at 4-5, █████████████████████ ████████████████████████████████████████████████████).)

In a speech at the 2018 Florida League of the South Conference, Hill reflected back at Charlottesville and forward toward the League's future:

> I'll remember that day forever, us leading that column down that street and that was a day of great pride and great accomplishment for us because ***we showed the enemy on that day we are here and we are not backing down from you or anybody else***. This is what it's going to take folks, it's going to take spitting in the eye of your enemy and looking him straight in the face and saying we're not afraid of you and we're not going anywhere until we win."

(Ex.145.)

Movant-Defendants and fellow members of the Nationalist Front congratulated and praised one another's performances. Defendant Matthew Parrot of Defendant TWP boasted: ████████

████████████████████████████████████████████████████████████

███████████████████████████████████ █ (Ex. 117.) Hill in turn told Parrott: ████████

████████████████████████████████████████████████ (Ex. 117.)

Defendant Jeff Schoep of Defendant NSM wrote ██████ a few days UTR that it was "an Honor to stand with our brothers in League of the South. . . Michael Tubbs who I had not met before clearing the way to get into the park was like a bulldozer."  (Ex. 14.) ███████ replied that "Last Saturday in Charlottesville was a day to remember. Standing again as one against that horde of untermenschen[7] did my heart good. Being in battle with our allies of the NSM made it an even greater day." (Ex. 14.)

---

[7] "Untermenschen" which is German for "inferior people" has been used by the KKK and the Nazis as a way to refer to the races whom must be exterminated, including Black people and Jews.

Movant-Defendants even stood by Fields after he was convicted of murdering Heather ███. In June 2020, Tubbs repeatedly retweeted "James Fields did nothing wrong." (Ex. 151.) The day Fields was convicted, Hill wrote that he ████████████████████████████ ████████████████████████████████ (Ex. 37.)

### L.   Movant-Defendants Spoliated and Refused to Produce Highly-Relevant Evidence.

After this litigation began, Tubbs—who is well aware of his discovery obligations—deleted relevant evidence, and encouraged other members of LOS to do the same.

First, Tubbs had an official LOS email account ████████████████ which he admitted contained communications relevant to this lawsuit. (Ex. 130.) On or before May 9, 2019, however, Tubbs intentionally deleted that account. (*See* Ex. 129; *see also* Ex. 139 (forwarding ProtonMail communication stating the account "was self-deleted").) He then bragged about it, posting on a Russian social media platform: ████████████████████████████ ██████████████████ (Ex. 129.) Plaintiffs were able to obtain a scattering of emails from the account Tubbs destroyed because they were produced by Defendant Hill and Brad ███, and they show that the account contained critical evidence in this case. For example, Tubbs wrote in an email that ████████████████████████████████████ while discussing UTR. (*See* Ex. 124.) Similarly, this account was used for communications about UTR preparations, including discussions about uniforms and firearms. (*See e.g.* Ex. 26 (Tubbs email sending draft League uniform directive); Ex 108 (email from Hill to Tubbs re: planning updates for UTR; DE 823-15 (email thread re: League members carrying firearms to UTR).)

Second, Tubbs produced 68 text messages to Plaintiffs spanning the time period of October 2015 to March 2019. But there is a four-month gap in his production during the critical time period when Tubbs and the other defendants were planning and attending the UTR rally. While Tubbs

produced text messages before April 2017 and after September 2017, he did not produce any text messages from the May-August 2017. We know he sent and received text messages about UTR during this time, because Defendant Hill produced texts with Tubbs during that period wherein they discussed planning and celebrating the UTR rally. (*E.g.*, Ex. 121, Ex. 122.)

Third, Tubbs encouraged LOS members to delete communications relevant to this case. For example, Tubbs encouraged at least four LOS members to delete their communications with Tyler ████, who participated in the well-publicized assault of counter-protester DeAndre ████ during the URT rally, and was later sentenced to two years' incarceration for the attack. Tubbs told them to ████████████████████████████████████████ ████████████████████████████████ (*See* Ex. 126; *see also id.* Exs. 125, 127, 128.)

Movant-Defendants also failed to produce documents from a number of social media and electronic mail accounts. They identified multiple online accounts that they admit contain information that is relevant to this case – but they have failed to produce *any* documents from them. This includes (1) a VKontakte account (which is a Russian social media platform) belonging to LOS; (2) two email accounts belonging to LOS ████████████████ ██████████████; (3) six Twitter accounts belonging to Hill and LOS (@Mickcollins1951, @51Ceanncinnidh, @71Rhodie, @BigChief1951, @MichaelHill51; @JameHill20651, and @occdissent); (4) two Gab accounts (an online social network) belonging to Hill ██████████████ and MichaelHill52); and (5) one Gab account belonging to LOS ██████████████).[8]

Again, Plaintiffs were able to obtain from other sources just a handful of documents from

---

[8] Counsel for Plaintiffs have emailed counsel for LOS Defendants over 20 times in an attempt to obtain the discovery to which they are entitled.

these accounts (*e.g.*, from the recipient of an email or message sent by Movant-Defendants). They show that these missing and deleted accounts contained a variety of highly-relevant and probative evidence. For example, the unproduced LOS Gab account contains messages discussing UTR and demonstrating animus toward Jews. (*See, e.g.*, Ex. 84.) Hill, a once-prolific tweeter, sent Tweets discussing UTR and demonstrating animus against Black people and Jews. ) *See e.g.* Ex. 90 ("If you want to defend the south and western civilization from the Jew and his dark-skinned allies, be in Charlottesville on 12th August"); DE 823-16 (on 8/12/2017 "The League of the South had a good day in Charlottesville, Virginia. Our warriors acquitted themselves as men."); Ex. 3 (Regarding UTR "I was there, in the middle of it all, leading the column that smashed through the leftist barricade . . . I would not go back and change a thing"); Ex. 2 (referring to black South Africans as ▮▮▮ who ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).) Indeed, Brad ▮▮▮, who is the owner of the LOS Twitter account, testified he used Twitter to plan UTR and communicate on behalf of LOS. (*See* ▮▮▮ Tr. 30:5-10; 60:18-21; 63:23-64:6; 65:9-13.)[910]

## LEGAL STANDARD

"Summary judgment is appropriate only when there are no material facts in dispute, and the moving party is entitled to judgment as a matter of law." *Wilson v. Prince George's Cty., Md.*, 893 F.3d 213, 218 (4th Cir. 2018) (citing Fed. R. Civ. P. 56(a)). In arriving at its determination, a court must view all evidence "in the light most favorable to the nonmoving party." *Kim v. Parcel K-Tudor Hall Farm LLC*, 499 F. App'x 313, 317 (4th Cir. 2012) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

---

[9] Counsel for LOS Defendants attempted to produce the Twitter accounts by filing Stored Communications Act Consent forms with Twitter. Through co-counsel, counsel for Plaintiffs learned that LOS Defendants did not complete the consent process correctly, and sent counsel for Defendants detailed instructions on 4/16/2020 regarding the correct procedure. (Ex. 138.) Since then, Plaintiffs' counsel have emailed counsel for Defendants at least 9 times to inquire about the status of Defendants' efforts, but Counsel for Defendant still has not re-submitted the forms.

[10] Plaintiffs reserve all rights to seek sanctions against Defendants (including Movant-Defendants).

(1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are matters for the fact finder and are improper at summary judgement stage. *Id.*; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017) ("Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." (quoting Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment)).

As such, "[i]t is well-settled law that affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to sustain a motion for summary judgment." *S. U.S. Trade Ass'n v. Unidentified Parties*, 2012 WL 579439, at *2 (E.D. La. Feb. 22, 2012); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) ("[W]e generally consider self-serving opinions without objective corroboration not significantly probative…."). Where "Defendant's motion for summary judgment relies solely on his self-serving affidavits for support, and because the Defendant's credibility is a fact issue to be decided by the jury, the Court must conclude that summary judgment is inappropriate…." *S. U.S. Trade Ass'n*, 2012 WL 579439, at *3; *Sturm v. Ross*, 11 F. Supp. 2d 942, 946 (S.D. Tex. 1998) (Rejecting Defendant's motion for summary judgment as it "erroneously relies exclusively on Defendants' own self-serving affidavits, and entirely disregards the fact that Plaintiff's account of the events differs substantially.").

A court should deny a motion for summary judgment that "is little more than a thinly disguised attempt to relitigate issues [the moving party] already lost on its motion to dismiss." *Faiveley Transp. USA, Inc. v. Wabtec Corp.*, 2011 WL 1899730, at *4 (S.D.N.Y. May 13, 2011). It is proper for a judge to employ the law of the case doctrine to deny a motion that "does not do

anything except restate previous arguments in another form." *Streett v. United States*, 25 F. Supp. 2d 721, 723 (W.D. Va. 1998) (internal quotes omitted).

**ARGUMENT**

**I.    MOVANT-DEFENDANTS CONSPIRED WITH THE OTHER DEFENDANTS TO ENGAGE IN RACIAL VIOLENCE AND INTIMIDATION IN VIOLATION OF § 1985(3)**

Movant-Defendants' Motion for Summary Judgment is premised on the fabrication that the Unite the Right weekend, which Movant-Defendants planned and participated in with the other Defendants in this action, was actually three separate, unrelated events. Thus, Movant-Defendant argue, they can only be held liable for the one in which they concede there is undisputed evidence that they participated. But Plaintiffs do not assert assault and battery claims against Movant-Defendant and this is not how conspiracy law works. Plaintiffs do not need to show evidence that Movant-Defendant' actions were a direct result of their physical injuries.  Rather, Plaintiffs need to show evidence that they were injured as a result of Movant-Defendants' plan to engage in racial violence and intimidation generally, and that their injuries were a reasonably foreseeable result of that plan. Plaintiffs have established that. The record is, in fact, replete with evidence that not only did Movant-Defendants agree to participate in the Unite the Right Rally and work with the other Defendants in this case to plan a two-day event with the goal of engaging in violence against and intimidating Black people and Jews and their supporters, but that they were included in the conspiracy for the express purpose of leading the violence at UTR.

"An actionable conspiracy under 42 U.S.C. § 1985(3) requires 'an agreement or a "meeting of the minds" by defendants to violate the claimant's constitutional rights.'" *Kravitz v. U.S. Dep't of Commerce*, 355 F. Supp. 3d 256, 270 (D. Md. 2018) (quoting *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995)). The law allows for quite a bit of leeway in Plaintiffs' proof because "conspiracies are by their very nature secretive operations," so they often "have to be proven by

circumstantial, rather than direct, evidence." *Hill v. City of New York*, 2005 WL 3591719, at *5 (E.D.N.Y. Dec. 30, 2005) (citation omitted). "[E]ach participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1302 (9th Cir. 1999) (citation omitted); *accord Frazier v. Cooke*, 2017 WL 5560864, at *3 (E.D. Va. Nov. 17, 2017).

### A.     Movant-Defendants Conspired to Commit Racial Violence and Intimidation.

Contrary to the fiction Movant-Defendants have created for purposes of their motion for summary judgment, the record is full of evidence that the LOS Defendants planned the Unite the Right Rally with the other defendants with the clear intention of committing racial violence and intimidation under the guise of "self-defense."

The evidence in the record clearly shows that LOS's entire ideology is rooted in fighting Black people and Jews and their supporters, whom LOS has termed their "enemies." (Ex. 82; *See, e.g.*, Ex. 66 (Whites must unity to show their enemies "how fierce White Devils can be" and in that "unity there is ultimate victory. . . the White World restored."); Ex. 16 at 49:22-49:31; 52:10-52:21 ("I'm not too particular these days about who my allies are as long as they're focused on this particular enemy . . . [We will] sweep this red terror vermin off of our streets and into the sea where it belongs.").)

To this end, LOS agreed to participate in UTR as an event aimed at opposing these enemies. (Ex. 21 (the purpose of Unite the Right was ███████████████████████████████ ████████████████████████████████████████████).) LOS trained its members in military operations, called them "warriors" and exhorted them to "fight," to "defend" the white race, and to show how "fierce" they could be. (████ Tr. 56:19-57:10, 57:18-19; Ex. 54; Ex. 112 (Hill wrote in a League of the South Facebook group that he wanted

███████████████████████████████████████████████████████████████████

██████████.)

LOS promoted the Unite the Right Rally both internally and externally with messages that clearly stated its intent to engage in racial violence and intimidation: "If you want to defend the South and Western civilization from the Jew and his dark-skinned allies, be at Charlottesville on 12 August." (Ex. 90.) This statement, and others used to encourage members to attend the rally emphasized the event's primary purpose of "fighting" the League's Black and Jewish "enemies" and their supporters. (Ex. 82 ("Antifa, BLM, et al will be there to greet us!  Don't miss out on the fun!"); Ex. 58 ████████████████████████████████████████████████████ █████████████████████████████████████████████████████████.) This language was consistent with that of other Defendant co-conspirators with whom Movant-Defendant worked closely, who similarly promoted Unite the Right as an opportunity to fight racial-minorities and their supporters. (Ex. 39 ████████████████████████████████ ███████████████████████████████████████████████████████████████); Heimbach Depo. 502:6-24 ██████████████████████████████).)

In furtherance of their plan to engage in racial violence and intimidation, Tubbs instructed LOS members to wear the LOS uniform to UTR for the purpose of creating "a unified appearance which promotes an image of organization, strength, discipline and will." In addition, LOS commissioned custom riot shields for its members to carry. (Tubbs Tr. 97:21-98:2; Ex. 26.)

This was not solely "rhetoric" as the LOS Defendants ask this court to find.  Tubbs admitted to actually ████████████ violence at the Rally. (Ex. 123.) Not only did LOS engage in this violent rhetoric, but on the day of the rally, they engaged in actual violence – led by Tubbs and Hill, LOS marched with Defendants Vanguard America, Heimbach and Parrott in military formation and used

shields, flagpoles and pepper spray to bash counterprotestors. (*See* Tubbs. Tr. 64:7-11; Ex. 83 (describing the Nationalist Front column with the League leading); Ex. 86; Ex. 91 at :10-19; Ex. 92 at :42-:57; Hill Tr. 214:15-215:4; Heimbach Tr. 649:14-651:14; Ex. 124 at :00-:24; Ex. 148; Ex. 146.) Plaintiff Wispelwey was injured by this violence. (DE 823-64, Wispelwey Tr., at 152:3-152:9.)

Courts have held that this type of evidence is sufficient to show an intent to participate in racial intimidation and violence. *See, e.g.*, *Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan*, 518 F. Supp. 993, 1001, 1016 (S.D. Tex. 1981) (noting that bringing a "security force" "dressed in military garb" to a rally and making comments like it "may become necessary to take laws into our own hands" and that it was "necessary to 'fight fight fight' and see 'blood blood blood' if this country was to survive[,]" coupled with overt acts was sufficient to convince the court that the "intended results of Defendants' actions was to interfere with the rights of the plaintiff class").

Movant-Defendants ask this Court to ignore their training and rhetoric about going to Charlottesville with the intention of "fighting" their "enemies," and instead to look only at the videos of the League marching to Emancipation Park and determine that they had acted only in self-defense. This requires the type of credibility determinations and drawing of inferences that are inappropriate on a motion for summary judgment. *Town of Seaboard*, 863 F.3d at 327; *Liberty Lobby*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). At the very least, there is a factual dispute regarding whether Movant-Defendants conspired to commit racial violence and intimidation and therefore Movant-Defendants' Motion should fail.

And, even if Movant-Defendant had not conspired to commit racial violence (which they did) it is sufficient that they conspired to commit racial intimidation for Plaintiffs' claims to be sustained. Despite Movant-Defendants' attempts to narrow the scope of § 1985(3) to conspiracies to commit racial violence, the language of the statute is not so limited.  To the contrary, § 1985 also prohibits conspiracies with a goal of racial intimidation. 42 U.S.C. § 1985(3) (prohibiting conspiracies to deprive the exercise of rights or privileges of the citizens of the United States "by force, *intimidation*, or threat") (emphasis added). *See also Frazier*, 2017 WL 5560864, at *3.

The Court should also deny Movant-Defendants' last-ditch attempt to make a purely legal argument that their violent speech cannot be considered as evidence of a conspiracy to commit racial intimidation and violence because it is protected by the First Amendment. (Mot. at 38-39.) Movant-Defendants do not present any evidence in support of this purely legal argument. The Court has already rejected this argument at the motion to dismiss stage and Movant-Defendants should not be allowed to relitigate it now. *Sines v. Kessler*, 324 F. Supp. 3d 765, 803-04 (2018).

### B.    Fields Was a Co-Conspirator with Movant-Defendants.

Movant-Defendants argue that there is no evidence in the record that Fields was part of the conspiracy. (Mot. at 28-29.) This is false. The evidence shows Fields was part of the conspiracy.

First, Fields marched with Vanguard America and carried a shield with Vanguard America's logo on it.  *Supra,* p. 26. Movant-Defendants admit this fact. (Mot. at 29.) They argue, without support, that these facts are "insufficient to prove [Fields] was a member of any conspiracy." (*Id.*) At the very least, these facts support that Fields was affiliated with Vanguard America, and thus he participated in the conspiracy as a member of that Defendant organization. The Court should deny the Motion on this basis alone.

However, Movant-Defendants ignore voluminous additional evidence that fields was part of the conspiracy. Fields marched with Vanguard America and chanted with them in several

locations. (Ex 60 at :11-1:56 (showing Fields marching, chanting, and holding shield with Vanguard America logo); Ex 59 at 1:21-1:57 (Fields chanting with Vanguard America); Ex. 61 at :22-28 (Fields marching with Vanguard America shield); *see also* Hopper Tr. 145:10-19; 146:24-147:2).) He wore the Vanguard America uniform of a white polo shirt and khakis. *Supra,* p. 26. Indeed, Fields stayed with Vanguard America throughout the event, and there is no evidence he left that group before the rally was declared an unlawful assembly.

Furthermore, Vanguard America members, including leaders, admit that Fields was "part of the group." *Supra,* pp. 26, 27.  At one point during the events, Fields was pictured next to Vanguard America's leadership, including Rousseau. (Ex. 95.) Vanguard America even sent Fields a Christmas Card. *Supra,* p. 27.

Courts find evidence based on similar conduct sufficient to prove participation in a conspiracy. *E.g.*, *Blumenthal v. United States*, 332 U.S. 539, 557-58 (1947) (inferring knowledge of the conspiracy based on Defendants' conduct); *Lenard v. Argento*, 699 F.2d 874, 879-80, 883 (7th Cir. 1983) (inferring participation in § 1985(3) conspiracy based on use of racial slurs and similar conduct); *United States v. Cassiere*, 4 F.3d 1006, 1016 (1st Cir. 1993) (holding that defendant's participation in conspiracy can be inferred from defendant's actions). Thus, the evidence in demonstrates that Fields participated in the conspiracy.

Moreover, Plaintiffs obtained all this evidence despite Fields's refusal to engage in even basic discovery. Fields failed to produce documents in this case, even those held by his own attorneys. (DE 783.) He defied a court order and refused to sign Stored Communications Act consent forms authorizing Defendants to access his social media accounts. (DE 760.) He has not answered Defendants' interrogatories. The Court should not permit Movant-Defendants to take advantage of Fields's discovery misconduct.

Movant-Defendants argue that they should not be liable for Fields's conduct because they claim that Fields acted alone. (Mot. at 29.) But as discussed above, the evidence clearly shows that Fields was a co-conspirator with Movant-Defendants even if they were unaware of his identity and even though they did not participate in all his acts. Movant-Defendants are liable for reasonably foreseeable acts taken in furtherance of the conspiracy. *E.g.*, *United States v. Newsome*, 322 F.3d 328, 338 (4th Cir. 2003); *see also United States v. Osborne*, 532 F. Supp. 857, 861 (W.D. Va. 1982) ("[I]t is not necessary [to] prove that a defendant knows of the existence of criminal activities in order to convict him of a conspiracy."). "[I]t is well established that one can be a party to a conspiracy even though he does not know of the existence or identity of all his co-conspirators, and even though he does not participate in all of their acts. Once the conspiracy exists, co-conspirators of whom a party to the conspiracy is unaware can bind him by their actions." *United States v. Friedman*, 445 F.2d 1076, 1080 (9th Cir. 1971) (internal citations omitted). It is not essential that each conspirator participate in all the activities of the conspirators in furtherance of the conspiracy or have knowledge of such activities. "It is sufficient if the conspiracy is established and that the convicted persons knowingly contributed their efforts in furtherance of it." *McManaman v. United States*, 327 F.2d 21, 25 (10th Cir. 1964). As discussed above, Movant-Defendants were parties to the same conspiracy as Fields. Movant-Defendants cannot escape liability by claiming ignorance of Fields's actions.

## II.  MOVANT-DEFENDANTS WERE MOTIVATED BY A DISCRIMINATORY ANIMUS.

### A.  Section 1985(3) Applies to Violence Against Minorities and Their Supporters, Even if Defendants Label It "Political" Violence.

Movant-Defendants argue Section 1985(3) does not apply to the violence they conspired to commit because it was "political" violence, and not based on any animus towards minorities or their supporters. (Mot., pp. 40-43.) This argument flies in the face of the facts and law because

Section 1985(3) does not allow Movant-Defendants to recast their racism and anti-Semitism as "politics" to escape liability. Similarly, the factual record in this case belies Movant-Defendants' attempts to recast their very clear and obvious animus toward Black people and Jews, as described above, as animus against solely the political movement they generally term "Antifa."

As an initial matter, Movant-Defendants' argument ignores the obvious fact that their "politics" *are* animus towards a protected class. The entire basis of Movant-Defendants' beliefs and activities – including the UTR rally -- is discrimination against Black people and Jews and their supporters. The record is overflowing with examples of their animus towards those groups, who the LOS declares are its "enemies." *Supra,* pp. 9-10. Among just a few examples, Movant-Defendants propose a "homeland for Whites," proclaims that "we stand for the white race against all of our enemies, particularly the Jew," and calls for Black people and Jews to be expelled from the South. *Supra,* pp. 11-12. And Hill, the leader of LOS, proclaimed "I pledge to be a white supremacist, a racist, an anti-Semite . . ." *Supra,* p. 10. And they channeled this racial animus into violence at the rally. LOS participated in and planned the UTR rally to show their enemies "how fierce White Devils can be," carried firearms, and researched Virginia weapons laws for "when the time comes to use deadly force" -- with Tubbs admitting ███████████████████████ ████████████████████████████████ *Supra,* p. 17. There can be no serious question that Movant-Defendants' "politics" and animus towards Blacks, Jews and their supporters are one in the same. And, even if Movant-Defendant intended to also target members of Antifa, that additional motivation does not immunize their intention of also targeting Black people and Jews and their supporters.

Movant-Defendants' argument also mischaracterizes what the evidence developed during discovery shows about Defendants conduct toward Antifa. Antifa's participation was as a

supporter of the protected racial class – namely, Black people and Jews – not as some isolated political opponent. This presents yet another question of material fact preventing summary judgment.

Movant-Defendants' argument also ignores the law. The issue when deciding racial animus under Section 1985(3) is whether Defendants were "motivated by a specific class-based, invidiously discriminatory animus." *Sines v. Kessler*, 324 F. Supp. at 780-81 (citing *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011); *Francis v. Giacomelli*, 588 F.3d 186, 196-97 (4th Cir. 2009)).) The fact that Movant-Defendants have chosen call their class-based hate "politics" does not change this analysis – it is still animus based on race and religion. *See United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 836 (1983) ("The predominate purpose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters."); *Ward v. Connor*, 657 F.2d 45, 48 (4th Cir. 1981) ("religious discrimination…falls within the ambit of § 1985([3])"). Section 1985(3) does not allow them to recast their racism and anti-Semitism as "politics" to escape liability. Racial animus is racial animus, whether political or otherwise.

Indeed, Movant-Defendants concede the animus requirement is satisfied "when it is clear that the alleged conspirators intended to target members or supporters of a protected class." (Mot. at 46.) There can be no question that is the case here. *Supra,* pp. 9-14. And, at a minimum, whether Movant-Defendants intended to target Black people and Jews and their supporters is a disputed fact, on which summary judgment cannot be based. *Supra,* pp. 9-14.

Not surprisingly, the only law Movant-Defendants cite for their spurious argument is easily distinguishable. In their Motion, Movant-Defendants cite cases where courts declined to find discriminatory animus because in those cases the activities were "purely" political. (*See* Mot. at 40 (citing cases).) The political beliefs in those cases, however, involved an alleged discriminatory

animus that had nothing to do with race or religion. *See, e.g.*, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 274 (1993) (alleged discriminatory animus was against those who permit abortion); *Rodgers v. Tolson*, 582 F.2d 315, 317 (4th Cir. 1978) (alleged discriminatory animus was against people who criticized "the manner in which the town of Centreville and Queen Anne's County are governed"); *Harrison v. KVAT Food Mgmt., Inc.*, 766 F.2d 155, 159, 163 (4th Cir. 1985) (alleged discriminatory animus was against Republicans); *Scott*, 463 U.S. at 826 (alleged discriminatory animus was "economic or commercial animus"). The fact that those cases found no Section 1985(3) claim when there was political activity *without* racial or religious animus does not mean the there is no Section 1985(3) claim when there is political activity *with* racial or religious animus.

Indeed, these cases show that "political" racial or religious animus *is actionable* under Section 1985(3). In *Bray*, the Supreme Court held that a purely political goal does not qualify for Section 1985(3) protection only if it is not associated with racism. *Bray*, 506 U.S. at 274 ("Whether one agrees or disagrees with the goal of preventing abortion, that goal in itself . . . does not remotely qualify for . . . such derogatory association with racism."). Again, here Movant-Defendants' goal *is* racism. *Supra,*, pp. 9-14. This, it clearly satisfies the animus requirement of a Section 1985(3) claim.

In *Scott*, the Supreme Court explained that Section 1985(3) was designed to address "animus against Negroes and *those who championed their cause*, most notably Republicans." *Scott*, 463 U.S. at 836 (emphasis added). Animus against people who are "championing" and "supporting" equal rights for Blacks is "political," yet the Supreme Court confirmed it is squarely within the activities that Section 1985(3) protects. *Id.*

Similarly, in *Harrison*, the Fourth Circuit explained the entire reason Congress enacted Section 1985(3) was to address the Ku Klux Klan's violent activities based on discrimination against Blacks, which were done in the name of *politics*:

> The statute's roots are the Civil Rights Act of 1871, Ch. 22, § 2, 17 Stat. 13, known as the Ku Klux Klan Act. The passage of the Ku Klux Klan Act was in response to widespread violence and acts of terror directed at blacks and their supporters in the postwar South. Violent resistance to the changes of the Reconstruction Era in many southern States, including the transition from a slave to a free society, was led by a coalition of some Southern Democrats and the Ku Klux Klan. The primary goal of this resistance was viewed by Congress as the dismantling of the system of reconstruction, as well as the dilution of political rights gained by blacks through the post-Civil War Constitutional Amendments. The result of the Klan's activities was to limit the degree to which reconstruction policy was successfully implemented. . . .
>
> Against this backdrop of political terrorism, Congress enacted § 1985(3), affording a remedy for the vindication of the civil rights of those being threatened and injured, notably blacks and advocates for their cause, including Republicans.

*Harrison*, 766 F.2d at 156-57 (internal citations omitted). Movant-Defendants' violent actions against Blacks, Jews, and their supporters – allegedly done in the name of "politics" -- is no different than the Ku Klux Klan's "political terrorism" that was the reason Congress enacted Section 1985(3) in the first place.

Importantly, unlike the cases that Movant-Defendant cite, when the courts do consider cases where there is animus against Black or Jewish people and their supporters, they find the same racial animus that is in play here. *See, e.g.*, *Frazier v. Cooke*, 2017 WL 5560864, at *3 (E.D. Va. Nov. 17, 2017) (finding that racial slurs yelled by the white defendants, coupled with the plaintiff being black was "sufficient to demonstrate that it is plausible Defendants tacitly agreed to intimidate, harass, and attack Happy because of his race."); *Waller v. Butkovich*, 584 F. Supp. 909, 937 (D. Md. 1984) (finding racial animus element satisfied where the class was defined as "advocates of equal rights for Black people"); *Richardson v. Miller*, 446 F.2d 1247, 1249 (3rd

Cir.1971) (white plaintiff successfully stated a cause of action under § 1985(3) where he alleged that he was fired for criticizing employer's racially discriminatory hiring practices and advocacy of racial equality in employment opportunities).

Perhaps recognizing the fatal flaw in their argument, Movant-Defendants try to sidestep this rule by claiming they somehow had no idea the counter-protesters "supported any racial, ethnic or religious group." (Mot. at 41.) That is nonsense. LOS went to the rally precisely *because* of the racial and religious groups they knew would be there. LOS said it was attending the rally for the explicit purpose of confronting its "enemies" (*i.e.*, Blacks, Jews, and their supporters), and urged people to attend so they could "defend the South and Western civilization from the Jew and his dark-skinned allies." *Supra,* p. 8; *see also* (" █████████████████████████████ █████████████████████████████████████████████████████████████████ ███████████ ).[11]

The fact that Movant-Defendants speculate (without evidence) that some counter-protesters might not have supported Blacks and Jews does not remove Defendants' violence from the realm of Section 1983(3). (Mot. at 41.) The law says this is irrelevant. "[A]ny person who is injured in his person or property as a result of a conspiracy of the prohibited type may bring suit under the statute, whether or not he is a member of the class against which the discriminatory animus was directed." *Waller v. Butkovich*, 584 F. Supp. 909, 937 n.8 (M.D.N.C. 1984) ("Violence against advocates of equal rights for Black people might reasonably be understood as third-party injury arising from discriminatory animus directed primarily at blacks, and only secondarily at

---

[11] In perhaps the greatest understatement of this litigation, Movant-Defendants concede that the counter-protesters "*may* have" intended to "support minority groups." (Mot. at 42.) (emphasis added).

their advocates."). Thus, even if Plaintiffs did not oppose discrimination against Blacks and Jews (they do), they can still maintain an action under Section 1985(3) as a matter of law.

Similarly, Movant-Defendants suggest they could not have had racial animus under Section 1985(3) because the counter-protesters "were predominately male and consisted mostly of white-skinned individuals." (Mot. at 41, 44.) They are wrong again. It does not matter if the counter-protesters (or the Plaintiffs) are Black or Jewish. Non-minority advocates targeted for that advocacy may still bring suit under§ 1985(3). *See Yesteryears, Inc. v. Waldorf Rest., Inc.*, 730 F. Supp. 1341, 1355 (D. Md. 1989) (collecting cases). It is well established that animus against advocates of equal rights for Black people is within the scope of activity against which Section 1985(3) is directed. *Scott*, 463 U.S. at 836 ("The predominate purpose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters."); *Novotny* v. *Great Am. Fed. Sav. & Loan Ass'n*, 584 F.2d 1235, 1244 (3d Cir. en banc 1978) ("In light of this [congressional] history, we do not believe that Congress intended to immunize Klansmen when their victims happened to be white."), *reversed on other grounds*, 442 U.S. 366 (1979); *Richardson* v. *Miller*, 446 F.2d 1247, 1249 (3d Cir.1971) (white plaintiff successfully stated a cause of action under § 1985(3) where he alleged that he was fired for criticizing employer's racially discriminatory hiring practices and advocacy of racial equality in employment opportunities); *Waller*, 584 F. Supp. at 936 (holding that "racial bias" includes "bias against supporters of blacks as well as against blacks directly"); *Peck v. United States*, 470 F. Supp. 1003, 1013 (S.D.N.Y. 1979). Therefore, the fact that some counter-protesters or Plaintiffs are white cannot shield Movant-Defendants from liability as a matter of law.

### B. Movant-Defendants' Violence Was Motivated by Racial and Religious Animus, Not Counter-Protesters Blocking the Path to Emancipation Park.

Movant-Defendants next argue that the violence they conspired to (and did) commit had nothing to do with race or religion, but was based on the counter-protesters blocking their access to Emancipation Park. (Mot. at 43-44.) Again, this argument flies in the fact of the facts. As shown in great detail above, Movant-Defendants attended the rally -- and urged others to join them there -- for the explicit purpose of engaging their Black and Jewish "enemies" and their supporters. *Supra,* p. 9-11. (Hill Depo. 35:24-36 ("the League's enemies are not limited to Jews and blacks. I have noted that there are many what I call antiwhite-whites who have positioned themselves to be our opponents.").)

## III. THE TORCH MARCH AND FIELDS'S ACTS WERE REASONABLY FORESEEABLE AND MADE IN FURTHERANCE OF THE CONSPIRACY.

Movant-Defendants argue that they should be dismissed because they did not participate in the Torch March and were not co-conspirators with Fields. (*E.g.*, Mot. at 27.) Both arguments are incorrect. As discussed above, Fields and Movant-Defendants are all part of the conspiracy, and the Torch March was carried out as part of the conspiracy. *Supra,* pp. 19-22; pp. 26-28. Therefore, Movant-Defendants are liable for injuries caused by the reasonably foreseeable acts of co-conspirators made in furtherance of the conspiracy. *United States v. Newsome*, 322 F.3d 328, 338 (4th Cir. 2003) (citing *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946)); *United States v. Bonetti*, 277 F.3d 441, 447 (4th Cir. 2002) ("[A defendant's] conspiracy conviction makes him liable for all substantive offenses of his coconspirator that are both reasonably foreseeable and in furtherance of the conspiracy.") (citing *Pinkerton*, 328 U.S. at 646-47). Any action by a co-conspirator that advances the overall objective of the conspiracy is done in furtherance of the conspiracy. *United States v. Caso*, 935 F.2d 1288, at *5-6 (4th Cir. 1991) (explaining that retaining stolen documents is an act done in furtherance of a conspiracy to obtain and sell the stolen

documents). "[I]t is not necessary [to] prove that a defendant knows of the existence of criminal activities in order to convict him of a conspiracy." *United States v. Osborne*, 532 F. Supp. 857, 861 (W.D. Va. 1982); Keri C. McGrath & Jennifer L. Pfeiffer, *Federal Criminal Conspiracy*, 36 Am. Crim. L. Rev. 661, 687-88 (1999) ("Once the existence of a conspiracy is established, only 'slight evidence' connecting the defendant to the conspiracy is needed for a conviction.").

"[U]nder conspiracy law, [a defendant] is liable for the conduct of all co-conspirators that was in furtherance of the conspiracy and reasonably foreseeable to him." *Newsome*, 322 F.3d at 338 (citing *Pinkerton*, 328 U.S. at 646-47). And, this Court has already explained that "[e]ach Plaintiff need not be able to point to an injury incurred from each Defendant. Instead . . . . Plaintiffs may hold each Defendant liable for the reasonably foreseeable acts of their co-conspirators." *Sines v. Kessler*, 324 F. Supp. 3d at 795.

### A.   The Torch March was in Furtherance of the Conspiracy.

The Torch March was an overt act in furtherance of the conspiracy that included Movant-Defendants. Movant-Defendants were aware of the Torch March prior to the night of August 11, members of the League of the South participated in the Torch March, the Torch March furthered the goals of the conspiracy, and the Plaintiffs' injuries stemming from the Torch March were reasonably foreseeable to Movant-Defendants. There remain triable issues of fact regarding Movant-Defendants' participation in the Torch March.

Movant-Defendants claim that they "took no part in the Torch March."  (MSJ at 29-30.) This is false. There is ample evidence to conclude that the Torch March was part of the conspiracy of which LOS Defendants were members. In their motion for summary judgment, Movant-Defendants admit to advanced knowledge of the Torch March. (MSJ at 29-30.)  They also admit that Hill sent members of the League of the South to attend the Torch March, ostensibly to "observe" the event. (MSJ at 30.)  In the months leading up to UTR, Brad ███, Chief of Public

48

Relations for League of the South, discussed the Torch March with Kessler on social media. (Ex. 52 at 16.) ████ is an agent of League of the South and has acted at the direction of both Hill and the League of the South. *Supra,* pp. 14-22. ████ agreed to bring tiki torches "to create buzz" and informed Kessler that ███████████████████████████ (Ex. 52 at 14.) Additionally, ████ exchanged emails with Andrew Anglin in July, 2017 in which he told Anglin: ████████████████████████████████████ ████████████████████████████████████ ████████ (Ex. 19.)

On the night of August 11, members of the League of the South, including ████, attended the Torch March. (*E.g.* ████ Tr. 155:11-16; *See Supra,* p. 20. ████ attended the Torch March wearing a League of the South polo shirt. (████ Tr. 158:11-17.) While ████ claims he did not attend the Torch March as a member of the League of the South, he stated in his deposition that he was at the Torch March with at least three other members of the League of the South. (████ Tr. 152:4-9.) ████ also denies carrying a torch, but he does admit that "some of my friends had torches who came with me." (████ Tr. 155:11-16.) Movant-Defendants further admit that the Torch March was unpermitted, occurred at night, was not explicitly for the purpose of protesting the removal of the Robert E. Lee statute, and was planned in secret without previously consulting with law enforcement. (Mot. at 30.) Such a rally would naturally lack law enforcement protection and coordination, which Movant-Defendants admit served the purpose at earlier rallies of keeping Movant-Defendants "physically separated [from] oppositionists." (Mot. at 11.)

The above evidence is sufficient to raise questions of fact regarding the nature of Movant-Defendants' participation in the Torch March. It is undisputed that Movant-Defendants were aware of the Torch March prior to the night of August 11 and that members of the League of the South

were present. The self-serving statements of Hill and ▮▮▮▮ after the Torch March took place are of limited probative value. *See Supra,* pp. 33-34. Moreover, their statements are directly contradicted by ▮▮▮▮ 's pre-Rally statements that he would attend the Torch March, bring tiki torches, and wanted to attend "to create buzz" and further the overall conspiracy. There are more than the actions of a mere "observer." The clandestine, unpermitted nature of the Torch March, conducted without the usual law enforcement security measures, could foreseeably lead to violence between marchers and "oppositionists," as by design no one was present who could keep the two sides "physically separated." The visuals of the Torch March, occurring the night before the gathering in Emancipation Park, *see Supra,* p. 20, and the scrum that ensued without police protection, furthered the goals of the conspiracy and "create[d] buzz" around UTR. Only a finder of fact can resolve this conflicting evidence and sufficient factual disputes exist to withstand a motion for summary judgment.

### B.      Fields's Car Attack was in Furtherance of the Conspiracy.

Fields's attack was also made in furtherance of the conspiracy. The goal of the conspiracy in this case was to intimidate and or commit violence against racial and religious minorities and their supporters. *Supra,* pp. 9-14; pp. 26-28. Fields's car attack advanced those goals by injuring Plaintiffs because of their perceived race or religion, or their perceived support for racial and religious minorities. *Supra,* pp. 9-14; *see* Ex 140 (Fields could see the crowd on 4th Street consisted of minorities and their supporters, backed up, then drove into it).

Movant-Defendants argue that Fields's attack was not a reasonably foreseeable. (Mot. at 50.) The Court has already held that specific facts alleged in the complaint were sufficient to establish Fields's attack was reasonably foreseeable if Plaintiffs could prove them. *Sines v. Kessler*, 324 F. Supp. 3d at 797. Plaintiffs have obtained evidence of those facts and more. Therefore, Fields's attack was foreseeable, and Movant-Defendants Motion must fail.

First, the Court pointed to the fact that "the exact possibility of running over counter-protestors was explicitly mentioned on the invite-only Discord platform before the events" indicated Fields's conduct was foreseeable. *Sines v. Kessler*, 324 F. Supp. 3d at 796. Several of these statements were produced during discovery. (Exs. 6, 8, 42.) And, Movant-Defendant had access to Discord and assigned a League member to monitor Discord on their behalf. *Supra,* p. 16. Thus, this indicator that Fields's attack was foreseeable has been satisfied.

Second, the Court noted that Defendants "planned to bring deadly weaponry to the event." *Sines v. Kessler*, 324 F. Supp. 3d at 796. "Allegations concerning this level of weaponry demonstrate that it was eminently foreseeable to Defendants that the rally could turn deadly." *Id.* Movant-Defendants planned to bring and actually brought weapons to Unite the Right. (Hill Tr. 180:15-16; ███ Tr. 86:19-23; DE 823-15 (LOS member advising about Virginia law on carrying fire arms and the conditions under which their use would be deemed self-defense)); *Supra,* pp. 16-19. Additionally, there were numerous posts on Discord announcing that Defendants and non-party co-conspirators were planning to bring weapons. (*E.g.*, Exs. 5, 43, 46.)

Third, the Court pointed to ratification of Fields's conduct after the attack occurred. *Sines v. Kessler*, 324 F. Supp. 3d at 796-97. Movant-Defendants ratified Fields's attack several times. *Supra,* pp. 28-30. Tubbs repeatedly insisted that "James Fields did nothing wrong." (Ex. 151.) Hill similarly expressed support for Fields's conduct after Fields's conviction. (Ex. 37.) Other Defendants and co-conspirators ratified Fields's car attack too. (Ex. 151; Ex. 111.)

Movant-Defendants try to get around this conclusion by arguing that they only agreed to participate in certain parts of the rally, so other conduct was not reasonably foreseeable. (Mot. at 50.) But a defendant may be liable for conspiracy even if he does not know about a specific act made in furtherance of that conspiracy. *Osborne*, 532 F. Supp. at 861; McGrath, *Federal Criminal*

*Conspiracy*, 36 Am. Crim. L. Rev. at 687-88 ("Once the existence of a conspiracy is established, only "slight evidence" connecting the defendant to the conspiracy is needed for a conviction.").

Additionally, Tubbs and Hill both ratified Fields's conduct. (Ex. 151; Ex. 37.) Movant-Defendants cannot now turn around and disclaim that Fields's attack was unforeseeable after signaling their approval of his actions that were in furtherance of the conspiracy. *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982) ("[A] finding that [a defendant] authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity."). The evidence demonstrates Fields's attack was foreseeable to all Defendants in the conspiracy, including Movant-Defendants. Therefore, the Motion should be denied.

## IV.   THERE ARE GENUINE MATERIAL FACTUAL DISPUTES REGARDING PLAINTIFFS' COMMON LAW CONSPIRACY AND 42 U.S.C. § 1986 CLAIMS

There remain triable issues of fact that must be resolved before Plaintiffs' common law conspiracy and § 1986 claims can be decided. For the reasons set forth above, Plaintiffs have set forth adequate evidence to survive summary judgment on their claims for violation of § 1985. *Supra,* pp. 34-53. Since Plaintiffs' § 1985 claim is sufficient to withstand summary judgment, summary judgment on Plaintiffs' claims under § 1986 and common law civil conspiracy should likewise be denied. When a court finds sufficient evidence to support a "§ 1985(3) claim, this same evidence is sufficient to withstand the . . . Defendants' motion for summary judgment with respect to plaintiff's § 1986 claim." *Johnson v. Harron*, 1995 WL 319943, *28 n.41 (N.D.N.Y. May 23, 1995) ("§ 1986 merely gives a remedy for misprision of a violation of 42 U.S.C. § 1985." (quotes omitted)). *Id.* at *26 n.39. In addition, the elements necessary to state a cause of action under § 1985 are substantially the same as those to establish common law civil conspiracy in Virginia. *Compare* 42 U.S.C.A. § 1985(3), *with Commercial Bus. Sys., Inc. v. Bellsouth Servs., Inc*., 453

52

S.E.2d 261, 267 (Va. 1995). As Plaintiffs have put forth sufficient evidence to survive summary judgment on their claims under § 1985, the Court should equally deny summary judgment on Plaintiffs' § 1986 and civil conspiracy claims.

**V.    IF MOVANT-DEFENDANTS HAD NOT SPOLIATED AND REFUSED TO PRODUCE EVIDENCE, THERE WOULD BE EVEN MORE EVIDENCE SHOWING THEIR SUMMARY JUDGMENT MOTION FAILS.**

While the facts and law discussed above demonstrates Movant-Defendants cannot prevail on their motion (and is more than sufficient to establish their liability), Plaintiffs would have even more evidence if Movant-Defendants had not engaged in the rampant spoliation of evidence and discovery abuses.

Movant-Defendants wholly failed and refused to comply with – and, in fact, openly defied -- their basic discovery obligations in this case. *Supra,* pp. 30-33. In the midst of this litigation, Tubbs purposely deleted the primary LOS email account he used to communicate with other defendants so Plaintiffs would not get documents from it, and then he bragged about deleting it. *Supra,* pp. 30-31. Tubbs also failed to produce his text messages around the time of the UTR rally on August 11-12, 2017, or from any time during the critical four-month period of May-August 2017 – *i.e.*, the time when he and the other defendants were in the final planning stages of their conspiracy and attended the UTR rally. *Supra,* pp. 30-31. Shockingly, Tubbs even encouraged LOS members to delete communications relevant to UTR. *Supra,* pp. 30-31.

Collectively, Movant-Defendants identified a dozen online accounts that contained information relevant to this case – but have failed to produce *any* documents from them. We also know that the documents Tubbs destroyed and that the other LOS Defendants refuse to produce include highly relevant and critical emails and other documents, because Plaintiffs were fortunately able to recover some of them from other sources. *Supra,* pp. 30-33. These include, for example, Tubbs admitting ███████████████████████████████████████

at the UTR rally, documents establishing their hate-based animus towards Blacks and Jews, and documents showing them planning and conspiring to commit violence at the UTR rally. *Supra,* p. 17.

While Plaintiffs have more than enough evidence to survive summary judgment (and prevail at trial), if Movant-Defendants' had not engaged in willful spoliation and a steadfast refusal to comply with their discovery obligations, Plaintiffs would be armed with even more evidence that shows Movant-Defendants' motion has no merit, and the Court should deny it with prejudice.

### CONCLUSION

For the reasons set forth above, Movant-Defendant's Motion for Summary Judgement should be denied.

Dated: September 4, 2020

Respectfully submitted,

/s/ *Alan Levine*
Alan Levine (*pro hac vice*)
Daniel P. Roy III (*pro hac vice*)
Amanda L. Liverzani (*pro hac vice*)
COOLEY LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6260
Fax: (212) 479-6275
alevine@cooley.com
droy@cooley.com
aliverzani@cooley.com

David E. Mills (*pro hac vice*)
Joshua M. Siegel (VSB 73416)
Caitlin B. Munley (*pro hac vice*)
Samantha A Strauss (*pro hac vice*)
Alexandra Eber (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Fax: (202) 842-7899
dmills@cooley.com
jsiegel@cooley.com

cmunley@cooley.com
sastrauss@cooley.com
aeber@cooley.com

*Of Counsel:*

Roberta A. Kaplan (*pro hac vice*)
Julie E. Fink (*pro hac vice*)
Gabrielle E. Tenzer (*pro hac vice*)
Joshua A. Matz (*pro hac vice*)
Michael L. Bloch (*pro hac vice*)
Emily C. Cole (*pro hac vice*)
Alexandra K. Conlon (*pro hac vice*)
Jonathan R. Kay (*pro hac vice*)
Benjamin D. White (*pro hac vice*)
Raymond P. Tolentino (*pro hac vice*)
KAPLAN HECKER & FINK, LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: (212) 763-0883
rkaplan@kaplanhecker.com
jfink@kaplanhecker.com
gtenzer@kaplanhecker.com
jmatz@kaplanhecker.com
mbloch@kaplanhecker.com
ecole@kaplanhecker.com
aconlon@kaplanhecker.com
jkay@kaplanhecker.com
bwhite@kaplanhecker.com
rtolentino@kaplanhecker.com

Robert T. Cahill (VSB 38562)
Scott W. Stemetzki (VSB 86246)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
rcahill@cooley.com
sstemetzki@cooley.com

J. Benjamin Rottenborn (VSB No. 84796)
Woods Rogers PLC
10 South Jefferson Street, Suite 1400
Roanoke, Va. 24011
Tel: (540) 983-7600
Fax: (540) 983-7711
brottenborn@woodsrogers.com

Karen L. Dunn (*pro se*)
William A. Isaacson (*pro se*)
Jessica E. Phillips (*pro hac vice*)
PAUL WEISS RIFKIND WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Fax: (202) 223-7420
kdunn@paulweiss.com
wisaacson@paulweiss.com
jphillips@paulweiss.com

Yotam Barkai (*pro hac vice*)
Katherine M. Cheng (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
Telephone: (212) 446-2300
Fax: (212) 446-2350
ybarkai@bsfllp.com
kcheng@bsfllp.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2020, I filed the foregoing with the Clerk of Court through the CM/ECF system, which will send a notice of electronic filing to:

Elmer Woodard
5661 US Hwy 29
Blairs, VA 24527
isuecrooks@comcast.net

James E. Kolenich
Kolenich Law Office
9435 Waterstone Blvd. #140
Cincinnati, OH 45249
jek318@gmail.com

*Counsel for Defendants Jason Kessler,
Nathan Damigo, Identity Europa, Inc.
(Identity Evropa), Matthew Parrott, and
Traditionalist Worker Party*

Bryan Jones
106 W. South St., Suite 211
Charlottesville, VA 22902
bryan@bjoneslegal.com

*Counsel for Defendants Michael Hill,
Michael Tubbs, and League of the South*

William Edward ReBrook, IV
The ReBrook Law Office
6013 Clerkenwell Court
Burke, VA 22015
edward@rebrooklaw.com

*Counsel for Defendants Jeff Schoep, National
Socialist Movement, and Nationalist Front*

Justin Saunders Gravatt
David L. Campbell
Duane, Hauck, Davis & Gravatt, P.C.
100 West Franklin Street, Suite 100
Richmond, VA 23220
jgravatt@dhdglaw.com
dcampbell@dhdglaw.com

*Counsel for Defendant James A. Fields, Jr.*

I further hereby certify that on September 4, 2020, I also served the following non-ECF participants, via electronic mail, as follows:

Christopher Cantwell
christopher.cantwell@gmail.com

Robert Azzmador Ray
azzmador@gmail.com

Elliott Kline a/k/a Eli Mosley
eli.f.mosley@gmail.com
deplorabletruth@gmail.com

Vanguard America
c/o Dillon Hopper
dillon_hopper@protonmail.com

Matthew Heimbach
matthew.w.heimbach@gmail.com

Richard Spencer
richardbspencer@gmail.com

/s/ *Alan Levine*
Alan Levine (*pro hac vice*)
*Counsel for Plaintiffs*