# EXHIBIT 67

```
                                                              Page 1
 1                        D. [Redacted for PII]

 2   UNITED STATES DISTRICT COURT

 3   FOR THE WESTERN DISTRICT OF VIRGINIA

 4   CHARLOTTESVILLE DIVISION

 5   --------------------------------x

 6   ELIZABETH SINES, et al.,

 7              Plaintiffs,              Civil Action No.

 8        v.                             3:17-cv-00072-NKM

 9   JASON KESSLER, et al.,

10              Defendants.

11   --------------------------------x

12

13

14        30(b)(6) VIDEOCONFERENCE DEPOSITION OF

15                  DILLON [Redacted for PII]

16               Scottsburg, Indiana

17             Tuesday, July 7, 2020

18

19   Reported by:

20   DEBORAH C. FUREY, RPR, CLR, CRI

21   JOB NO. 181414

22

23

24

25
```

```
 1                    D. [Redacted for PII]

 2

 3

 4

 5                    July 7, 2020

 6                    9:53 a.m.

 7

 8

 9         Videoconference Deposition of DILLON
10   [Redacted for PII], held remotely, before Deborah C. Furey, a
11   Registered Professional Reporter, Certified LiveNote
12   Reporter and Notary Public.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                              Page 12
 1              D. Redacted for PII
 2      appreciate that.
 3              (Reporter clarification.)
 4              THE WITNESS:  Yeah, I can't remember the
 5      name of it.  It was also started in Texas by a
 6      member who broke off several months after
 7      Patriot Front broke off.  And he was just
 8      getting very disgruntled with everything, so
 9      he went to start his own, like, little one-man
10      group, and it fizzled out after like a week or
11      so.  But I can't remember what he named it.
12      Something ridiculous.
13              THE COURT REPORTER:  Thank you.  Your
14      audio was much better there.
15              THE WITNESS:  Yeah.
16  BY MR. SIEGEL:
17      Q.   Mr. Redacted for PII, you said Vanguard had
18  suffered severe damages from the Charlottesville
19  rally.
20           What do you mean by that?
21      A.   Well, what I mean is, you know, our
22  organization -- during the Charlottesville rally,
23  you know, I wasn't -- I wasn't even at
24  Charlottesville, so an individual named Thomas
25  Redacted for PII was there, and he was basically in charge
```

1           D. [Redacted for PII]
2    of the group.
3              And, you know, he's the one who
4    basically allowed James Fields to just come in
5    and, you know, be a part of the group, even though
6    he wasn't an actual member.  So you have all of
7    this media and all of this press, you know, being
8    released, of James Fields being photographed with
9    our group.
10             And then, you know, the incident
11   happened.  And then a lot of flack came down on us
12   because of that.  And a lot of guys just -- they
13   just wanted to disappear because they didn't want
14   to be associated with that.  They didn't want
15   the -- how can I say this -- they didn't really
16   want the attention in front of, you know, the
17   world media.  So, you know, we lost a lot of
18   members after Charlottesville because a lot of
19   guys got scared.
20      Q.     What were they scared of?
21      A.     You know, being -- having their
22   information exposed, you know, losing their jobs,
23   basically how you would say, quote/unquote, dox'd
24   is what they were afraid of.
25             So especially a lot of individuals that

1        D. [Redacted for PII]

2 right there?

3   A. Yeah.

4   Q. Do you understand he was referring to

5 the Charlottesville 1.0 rally in May?

6   A. Yes.

7   Q. And he also says, "Brandon and Aaron are

8 in contact with the local planners."

9    Do you see that?

10   A. Yes.

11   Q. Who are Brandon and Aaron?

12   A. I can't remember.  I mean, I didn't

13 really go by individuals' first names and I tried

14 to forget people's first names quickly.  But I

15 want to say --

16   Q. One second.  Let me just ask you a

17 question, Mr. [Redacted for PII].

18    Why did you --

19   A. Yeah.

20   Q. -- forget people's first names quickly?

21   A. Well, because I didn't want, you know,

22 to know anything about them.  I wanted to keep

23 that kind of anonymity.  So if somebody would tell

24 me their name, I would be like, "Hey, I don't want

25 to hear your name.  You know, let's just go by

1              D. [Redacted for PII]
2     these handles to maintain that kind of security
3     and anonymity to where, you know, if anything
4     happens, you know, they don't have your
5     information and they only have my information."
6         Q.   And this is for other Vanguard members,
7     right?
8         A.   Yeah.
9         Q.   So you wanted to make sure you didn't
10    have any information about the real identity of
11    the Vanguard members.
12        A.   For the most part, yes.
13        Q.   Okay.  But Brandon and Aaron were
14    Vanguard America members, right?
15        A.   Yes.  But some individuals would go by
16    their first names.
17        Q.   Got you.
18             Who were the local planners that Thomas
19    [Redacted for PII] is referring to?
20        A.   I'm assuming the planners of
21    Charlottesville 2.0, which were potentially Nathan
22    Damigo, Richard Spencer, and Elliot Kline.
23        Q.   So you understood Thomas was telling you
24    that Brandon and Aaron, who were Vanguard members,
25    were in contact with the other planners of the
      [Redacted]

1              D. [Redacted for PII]
2   right?
3       A.    Yes.
4       Q.    Who made the shields?
5       A.    I want to say -- I can't remember his
6   name, but I know it was -- it was one of our
7   members who personally made the shields.
8       Q.    Do you know who designed them?
9       A.    That would -- it was in conjunction with
10  the individual who made them and Mr. [Redacted for PII].
11      Q.    Do you know whose idea it was to create
12  shields?
13      A.    We took that idea from a few other
14  organizations, actually, particularly
15  Traditionalist Workers Party, because we saw them
16  with shields, you know.
17            And we said, "Hey, we should probably
18  get those too," you know, to help protect us from
19  rocks and bottles and things like that, objects
20  that were being thrown at us.
21      Q.    So you expected there to be some level
22  of violence at the Charlottesville 2.0 rally?
23      A.    Oh, absolutely.  Of course.  I mean, you
24  always expect violence, you know, at any protest.
25  That's why you wear helmets.  That's why -- I

```
 1                    D. [Redacted for PII]
 2   their names?
 3        A.    No, I never knew all of everybody's
 4   names in Vanguard.  I would try to maintain that
 5   kind of anonymity as much as I could.
 6        Q.    Understood.
 7              There came a point on August 12th where
 8   you heard that James Fields ran his car into
 9   counter-protestors, right?
10        A.    Yes.
11        Q.    What was your reaction to hearing that?
12        A.    My reaction to hearing that was just
13   kind of, oh, boy, here we go, you know.  We had an
14   incident, something happened, and now we are going
15   to really have hell to pay for this, you know.
16              So that -- you know, I basically had
17   to -- our mindsets had to go into mitigation mode,
18   and try to mitigate this, you know, debacle as
19   much as humanly possible.
20        Q.    You heard that a woman named Heather
21   [Redacted for PII] was killed and many other people were
22   wounded by Mr. Fields, right?
23        A.    Yes.
24        Q.    How did you feel about that?
25        A.    Well, I felt kind of, you know,
```

1       D. [Redacted for PII]

2     A.    Yes.

3     Q.    And it's dated August 13th, 2017,
4  correct?

5     A.    Yeah.

6     Q.    So this is the day after the rally?

7     A.    Yeah.

8     Q.    And, again, do you see at the top of the
9  page, there's two Vanguard members talking about
10 Mr. Fields ramming his car into protestors.

11          Do you see that?

12    A.    Yes.

13    Q.    If you go to the bottom of the page, you
14 post, "One person died, sheesh!  There are
15 315,000,000 more people in this country."

16          Do you see that?

17    A.    Yes.

18    Q.    So earlier when you said that you felt
19 bad that Heather [Redacted for PII] was killed, you didn't feel
20 bad, did you?

21    A.    No, I legitimately felt bad that
22 somebody had to die, you know?  Somebody died.
23 It's always a tragedy when somebody dies.

24          But at the same time, I mean, you're at
25 this rally where you know violent -- violence is

1      D. Redacted for PII
2  more than likely imminent, so you can't go there
3  expecting to not be potentially injured.
4           So the way I see it is it's kind of like
5  a surfer.  A surfer goes out into the ocean and
6  surfs waves.  He shouldn't be surprised if he gets
7  attacked by a shark, because he chose to do that.
8           That was that woman's choice, was to go
9  out there, and it was that surfer's choice to go
10 surfing in the ocean with sharks.
11          So it's a tragedy that she had to lose
12 her life, but at the same time, it shouldn't be a
13 surprise to anybody.
14     Q.   So the counter-protestors who were
15 attacked by Mr. Fields should not have been
16 surprised that that's what happened because that's
17 what they should have expected at the rally?
18     A.   Absolutely.  You should always expect
19 the worst situation possible.  You expect and you
20 plan for the worst and you hope for the best.
21 That's what you should do.
22     Q.   But you said that they should have
23 expected that they would be attacked by one of the
24 people that's protesting to keep the statues
25 there?

1                    D. Redacted for PII
2    members are, right?
3        A.   No, I don't.  But according to the
4    logistics that Thomas planned, all of the members
5    were supposed to be in communication, and all of
6    those members were supposed to meet up in specific
7    parking garages and exchange shirts at these
8    parking garages.
9        Q.   Do you remember giving a deposition
10   previously in this case?
11       A.   Yes, I do.
12       Q.   Do you remember being asked about the
13   Vanguard uniform during that deposition?
14       A.   Somewhat loosely.
15       Q.   Do you remember you said it was a white
16   polo with khakis?
17       A.   Yes, it was a white polo with khakis.
18       Q.   And there was --
19       A.   But I remember also stating that a lot
20   of other organizations also wore the white polo
21   with khakis, such as Identity Evropa and a few
22   other organizations.
23            We tried to be -- a lot of the
24   organizations tried to be very, very similar in
25   our uniforms to promote uniformity.  The only

1           D. [Redacted for PII]
2  individuals or groups that didn't have these
3  uniforms, I believe, were Traditionalist Workers
4  Party and a few others.  But even League of the
5  South, they had khakis with a white polo, but
6  League of the South had their League of the South
7  emblem on it.  And you can --
8      Q.    Mr. [Redacted for PII] --
9      A.    Yes.
10     Q.    -- I think you -- listen to the question
11 I'm asking you and answer.
12     A.    All right.  Okay.
13     Q.    Do you remember giving a deposition in
14 this case?
15     A.    Yes.
16     Q.    And you were asked about the Vanguard
17 uniform during that deposition?
18     A.    Yes.
19     Q.    You testified that it was a white polo
20 with khakis, right?
21     A.    Yes.
22     Q.    You did not testify that it was a white
23 polo only that has the Vanguard emblem on it,
24 right?
25     A.    Yes.

```
 1                    D. [redacted]
 2     wanted to be seen in one of our groups,
 3     photographed, and then tried to pin an incident on
 4     our group.
 5          Q.    Do you see a user going by the handle
 6     "Pizarro-TN7965"?
 7          A.    Yes.
 8          Q.    Do you know who that person is?
 9          A.    No.
10          Q.    But they're a Vanguard member, right?
11          A.    Yeah.
12          Q.    And that person posted, "Alright, but he
13     was surrounded by us?  Wouldn't someone have
14     noticed?"
15                Do you see that?
16          A.    Yes.
17          Q.    Do you understand he's referring to
18     Fields?
19          A.    Yes.
20                MR. SIEGEL:  Could we go to the next
21     page, please.  Scroll down a little bit.  A
22     little bit more, please.
23          Q.    So do you see the user Pizarro posts,
24     "Because for all its (sic) worth, we fucking
25     killed someone."
```

1              D. [Redacted for PII]

2          Do you see that?

3     A.   Yes.

4     Q.   So he thought Vanguard killed somebody?

5     A.   Yes.

6     Q.   Okay. So several of your Vanguard
7  members were disagreeing with your statement that
8  Fields was an infiltrator.

9     A.   Well, a lot of Vanguard members didn't
10 know, because a lot of Vanguard members didn't go.
11 Even I didn't know at first because I didn't go,
12 so I had to get my information from Thomas,
13 because he was there and he was in charge.

14    Q.   But at this point, you said he was an
15 infiltrator, right?

16    A.   Yes. He infiltrated our ranks at
17 Charlottesville, even though he was not a member.
18 He was allowed into our ranks even though he was
19 not a member. So he was an infiltrator.

20    Q.   And another --

21    A.   He was allowed to infiltrate our ranks.

22    Q.   Mr. [Redacted for PII], please listen to my
23 question.

24         Another Vanguard member disagreed with
25 you and said, "We fucking killed someone," right?

1          D. [Redacted for PII]
2     A.   Yes.
3     Q.   I'd like to go to the next page, please.
4          And continuing on this conversation,
5     then you posted, "That person acted on his own
6     accord and under his own intention."
7          Do you see that?
8     A.   Yes.
9     Q.   You wrote that?
10    A.   Yes.
11    Q.   So again you're saying Fields did this
12    on his own?
13    A.   Yes.  He did.
14    Q.   That's what you're telling other
15    members?
16    A.   What was that?
17    Q.   That's what you're telling other
18    Vanguard members.
19    A.   Yes.
20         MR. SIEGEL:  And could you go to the
21    next page.  I think one more page, please.  Go
22    one more message, please, Julie.  Thank you.
23    Q.   Mr. [Redacted for PII], do you see at the bottom
24    here, the user Pizarro asks you, "So the official
25    story is that he was a plant."

1  D. [Redacted for PII]

2  C E R T I F I C A T E

3  I do hereby certify that I am a Notary Public
4  in good standing; that the aforesaid testimony was
5  taken before me at the time and place indicated;
6  that said deponent was by me duly sworn to tell
7  the truth, the whole truth and nothing but the
8  truth; that the testimony of said deponent was
9  correctly recorded in machine shorthand by me
10 and thereafter transcribed under my supervision
11 with computer-aided transcription; that the
12 deposition is a true and correct record of the
13 testimony given by the witness; and that I am
14 neither of counsel nor kin to any party in said
15 action, nor interested in the outcome thereof.
16    Witness my hand and official seal this 13th
17 day of July, 2020.

18
19  _____
20  Deborah C. Furey, Notary Public
21  My commission expires 1-11-2021
22
23
24
25