# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

ELIZABETH SINES, SETH WISPELWEY,
MARISSA BLAIR, APRIL MUÑIZ,
MARCUS MARTIN, NATALIE ROMERO,
CHELSEA ALVARADO, JOHN DOE, and
THOMAS BAKER,

                       Plaintiffs,

v.

JASON KESSLER, RICHARD SPENCER,
CHRISTOPHER CANTWELL, JAMES
ALEX FIELDS, JR., VANGUARD
AMERICA, ANDREW ANGLIN,
MOONBASE HOLDINGS, LLC, ROBERT
"AZZMADOR" RAY, NATHAN DAMIGO,
ELLIOT KLINE a/k/a/ ELI MOSLEY,
IDENTITY EVROPA, MATTHEW
HEIMBACH, MATTHEW PARROTT a/k/a
DAVID MATTHEW PARROTT,
TRADITIONALIST WORKER PARTY,
MICHAEL HILL, MICHAEL TUBBS,
LEAGUE OF THE SOUTH, JEFF SCHOEP,
NATIONAL SOCIALIST MOVEMENT,
NATIONALIST FRONT, AUGUSTUS SOL
INVICTUS, FRATERNAL ORDEROF THE
ALT-KNIGHTS, MICHAEL "ENOCH"
PEINOVICH, LOYAL WHITE KNIGHTS OF
THE KU KLUX KLAN, and EAST COAST
KNIGHTS OF THE KU KLUX KLAN a/k/a
EAST COAST KNIGHTS OF THE TRUE
INVISIBLE EMPIRE,

                       Defendants.

**Civil Action No. 3:17-cv-00072-NKM**

**JURY TRIAL DEMANDED**

## PLAINTIFFS' OPPOSITION TO DEFENDANTS JASON KESSLER, NATHAN DAMIGO, MATTHEW PARROTT, IDENTITY EVROPA, AND TRADITIONALIST WORKERS PARTY'S MOTION TO EXCLUDE EXPERT TESTIMONY

Plaintiffs' respectfully submit this opposition to a motion to exclude expert testimony filed by Defendants Jason Kessler, Nathan Damigo, Matthew Parrott, Identity Evropa, and Traditionalist Workers Party ("Defendants"). Specifically, Defendants seek to exclude or limit the testimony of: (i) Professors Peter Simi & Kathleen Blee; (ii) Stephen J. Fenton; and (iii) Dr. Deborah E. Lipstadt, Ph.D. (together, the "Experts"). Defendants' motion should be denied in its entirety.

## PRELIMINARY STATEMENT

In a 4-page submission bereft of almost any analysis, Defendants ask this Court to preclude preeminent experts in their respective fields from presenting their rigorous analyses to the jury in this complex case. Defendants do not challenge the extensive qualifications of the Experts, the methodologies they used, or the reliability of their findings. Rather, largely relying on specific, isolated, and acontextual portions of the pre-trial reports that the Experts served, Defendants primarily contend that on balance, the Experts' testimony should be excluded because its prejudicial value will outweigh its probative value under Rule 403. Their arguments have no merit. Each Expert's testimony is consistent with testimony that is routinely admitted to aid the jury in complex cases just like this one.

*First*, Defendants seek to exclude entirely the testimony of Professors Kathleen Blee & Peter Simi, renowned and award-winning sociologists who intend to testify as to their deep and long-standing understanding of the distinct culture of the white supremacist movement ("WSM") and their assessment, reached following a methodical analysis, that Defendants' language and conduct surrounding the Unite the Right ("UTR") events in Charlottesville, Virginia appears to have borrowed from the WSM playbook. Defendants summarily contend that Profs. Blee & Simi should not be allowed to testify because they will improperly "opine on another's credibility and

1

tell the jury what result it should reach." Mot. at 3. But Defendants' unsupported contentions have no basis in fact or law. Profs. Blee & Simi will not "tell the jury what result it should reach," nor will they make any credibility determinations. Their testimony will plainly help the jury understand the complex record in this case and is entirely appropriate under the case law.

*Second*, Defendants seek to bar Stephen J. Fenton, a crash reconstruction expert, from testifying about his robust analysis of the attack in which Defendant James Fields drove his car into a crowd of protestors at UTR, including seven Plaintiffs. Defendants contend that because Fields' murder conviction will be admissible at trial, and because Plaintiffs who were struck can themselves testify about their experiences, Mr. Fenton's testimony will be "needlessly cumulative" and therefore unduly delay the trial. Mot. at 4. These contentions are meritless. Mr. Fenton's highly technical and detailed analysis of the Fields' crash will go far beyond the limited nature of the fact of Fields' conviction or Plaintiffs' anecdotal testimony regarding the crash. Indeed, courts regularly allow crash reconstruction experts like Mr. Fenton to testify at trial.

*Finally*, Defendants seek to bar Dr. Deborah E. Lipstadt, Ph.D—a pre-eminent scholar on antisemitism who intends to testify about the antisemitic symbols, ideology, and rhetoric that were on display at UTR—from testifying about a discrete background section in her report. Specifically, Defendants seek to preclude Dr. Lipstadt from testifying as to her description of the development of antisemitism through the era of the Roman Empire. But Dr. Lipstadt's opinion on the role of antisemitism throughout the Roman Empire is part-and-parcel of her deep and longstanding expertise of the development of antisemitism, and precluding the jury from hearing her testimony on that discrete point would be senseless and create unnecessary confusion.

Defendants' motion should be denied.

## BACKGROUND

On July 20, 2020, Plaintiffs served the Experts' reports.  Defendants elected not to depose any of Plaintiffs' experts, or serve any rebuttal reports, but they did file the instant motion to exclude entirely the testimony of three of Plaintiffs' experts (Blee & Simi and Fenton) and to limit another (Lipstadt) from testifying about a discrete component of background content in her report.

***Professors Kathleen Blee & Peter Simi.***  Defendants seek to exclude the testimony of Profs. Blee & Simi, both renowned and award-winning sociologists who are pre-eminent experts in the field of group extremism in general and the WSM in particular.  *See* Exs. 1–2.[1]  In their report previewing their testimony, Profs. Blee & Simi draw on nearly 60 years (collectively) of research and scholarship to describe a distinct white supremacist culture that, throughout its lengthy history, has informed the (often coded) language, tactics, and symbols of those who are immersed in that culture.  Utilizing a meticulous and time-tested social-science methodology that "follow[ed] the research protocols that are standard in rigorous qualitative analyses in the social science," *see* B&S at 3, Profs. Blee & Simi then compared the distinctive features of that well-defined culture to the language, tactics, and symbols of Defendants in the lead up to and at UTR. Profs. Blee & Simi interpret Defendants' coded language, tactics, and symbols and opine that it exhibited many of the "core characteristics" of white supremacist culture—in other words, the Defendants "followed the playbook of the WSM," B&S at 63.

***Richard J. Fenton***.  Defendants also seek to exclude the testimony of Mr. Fenton, a licensed engineer and renowned crash reconstruction expert with over 30 years of experience, which has included providing testimony in numerous trials, and publishing over two dozen pieces,

---

[1] Defendants did not include the exhibits along with the versions of the Experts' reports that they attached to their motion, which included each of the Experts' curriculum vitae ("CV").  Plaintiffs thus attach hereto the CVs attached to the Experts' reports.  *See* Ex. 1 (Professor Blee's CV); Ex. 2 (Prof. Simi's CV); Ex. 3 (Mr. Fenton's CV); Ex. 4 (Dr. Lipstadt's CV).

most relating to academic reconstruction. *See* Ex. 3. Mr. Fenton will testify as to his reconstruction of the scene at which Defendant James Fields drove his car slowly down Fourth Street in Charlottesville, Virginia on August 12, 2017, reversed, and then sped forward into a crowd of pedestrians, including seven Plaintiffs. Mr. Fenton used a process called photogrammetry to analyze and re-create the position and movement of the individuals and vehicles impacted by Fields's car. Fenton Report at 2, 5-6. Photogrammetry is a method that is "widely accepted and used within the field of crash reconstruction," and encompasses techniques used to obtain measurements and three-dimensional positional data from photographs and videos. *Id.* at 2. Mr. Fenton also identified 13 publications that explain the techniques on which he relied. *Id.* at 2-3.

To gather the data for this analysis, Mr. Fenton used specialized 3D scanners to document the site's physical features and landmarks. *Id.* at 4-5. He used computer-modeling software to create a three-dimensional computer model of the location from those scans. *Id.* Next, he used specialized cameras to take photographs of the scene and overlay images of the crash site that matched the location, angle, focal length, and perspective of pictures taken of the collision as a background environment for the model. *Id.* at 5. Mr. Fenton then used videos, photographs, and other evidence in this case to map pedestrians and vehicles into that model to create a scientifically accurate depiction of the crash. *Id.* at 5-6. Mr. Fenton considered different approaches to analyzing the data, and compared his conclusions to a Crash Team Report written by the Virginia State Police, which was consistent with Mr. Fenton's conclusions. *Id.* at 21-22.

Mr. Fenton will testify to the rigorous process his team engaged in to assess the crash, which included (i) reviewing over 400 documents, including dozens of photos and videos of the incident, trial testimony from Fields's criminal trial, and sworn declarations of witnesses; (ii)

4

visiting and inspecting the crash site and taking photographs, measurements, and a three-dimensional scan of the scene; (iii) analyzing the technical specifications of Fields's car; (iv) inspecting the condition of and damage to Fields's car; (v) reviewing a crash report prepared by the Virginia State Police; (vi) developing a detailed timeline of Fields's actions; and (vii) producing a three-dimensional computer model of the crash site.

Arising out of that analysis, Mr. Fenton came to five principal conclusions regarding the crash:  (i) Fields was traveling approximately 31 mph at impact; (ii) Fields drove down Water Street towards a large group of pedestrians, stopped in view of the pedestrians, then reversed slowly back up Fourth Street away from the pedestrians, stopped his car north of the pedestrian mall, then sped forward and hit Plaintiffs in a crowd of pedestrians as he accelerated from approximately 13 mph to 31 mph; (iii) Fields braked to avoid bollards after hitting a speed bump at the intersection of Fourth and Main Streets, and then rapidly accelerated again and did not brake before hitting Plaintiffs, and, had Fields applied the brakes, he had space to stop without hitting anyone; (iv) Fields steered his vehicle away from bollards protecting a bike rack south of Main Street, and then steered back toward Plaintiffs as they were walking next to a pickup truck and could not escape his car; and (v) Fields could have exited the area before the crash without impacting any people or other vehicles. *Id.* at 2, 22.  Mr. Fenton also created a timeline with videos and photographs showing Field's movement at different times, which concisely lays out in chronological order the evidence showing exactly what Fields did before, during, and after he struck Plaintiffs. *Id.* at 9-16.

**Dr. Deborah E. Lipstadt, PhD**.  Finally, Defendants seek to exclude testimony stemming from two pages of the report of Dr. Lipstadt, one of the foremost experts on antisemitism who has had a particular focus "on the history of the Holocaust, history of antisemitism, development of

holocaust denial and antisemitic hate speech." Lipstadt at 1; *see also* Ex. 4. Dr. Lipstadt applied that expertise here by "assess[ing] the symbols and rhetoric displayed by the participants in the Unite the Right rally and . . . place[d] them in their proper historical and theoretical context." *Id.* To do so, Dr. Lipstadt first provided background information on antisemitism, and then "survey[ed] the antisemitic symbols and rhetoric used by Defendants at Unite the Right and link[ed] their explicit and implicit usages to their historical and cultural relevance." *Id.* at 2. In explaining the origins of those ideologies, symbols, and rhetoric, Dr. Lipstadt offered a "Brief History of Antisemitism," describing how modern antisemitism springs from a largely unbroken tradition dating back more than 2,000 years to "the split between Christianity and Judaism." Lipstadt at 6. In laying out this timeline, Dr. Lipstadt explained that antisemitism continued through the Roman Empire and the Middle Ages, where the Empire "depict[ed] Jews as not just having not accepted Christianity, but as having *rejected* it." *Id.* at 8. As Dr. Lipstadt explains, "[e]ventually, by the Middle Ages (10th-16th century), this formulation rendered Judaism as not just another religion, but as a degenerate faith." *Id.* For support, Dr. Lipstadt cited the works of Martin Luther, who "denounced the 'Papists' (Roman Catholics) for treating the Jews more like dogs than humans." *Id.* at 10.

## ARGUMENT

Federal Rule of Evidence 702 governs the admissibility of expert testimony. As a general matter, an expert witness "may testify in the form of an opinion" if she "is qualified as an expert by knowledge, skill, experience, training, or education," and her "scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702(a). The court serves a "basic gatekeeping" function for expert testimony, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999), meaning that it has a "responsibility to 'ensure[] that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task

at hand.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (quoting *Daubert v. Merrel Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)).

Expert testimony is "reliable" where "it is supported by adequate validation to render it trustworthy." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999) (citing *Daubert*, 509 U.S. at 592); *see also id.* at 261 ("In making its initial determination of whether proffered testimony is sufficiently reliable, the court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will depend on the unique circumstances of the expert testimony involved.").

Expert testimony is "relevant" if it "will aid the trier of fact to understand or resolve a fact at issue." *U.S. v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006) (citing *Daubert*, 509 U.S. at 592); *see also Kristensen v. Spotnitz*, 2011 WL 4380893, at *1 (W.D. Va. Sept. 21, 2011) (Moon, J.) ("'Relevant evidence' is liberally defined to include evidence which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" (quoting Fed. R. Evid. 401 and citing *Daubert*, 509 U.S. at 587 (1993); 4 Weinstein's Fed. Evid. § 702.03 (2020) ("trial courts ought to approach exclusion [of expert testimony] gingerly, and should admit the testimony if there is any chance at all that it will be beneficial to the trier of fact").

Expert testimony that would otherwise be properly admitted under Rule 702 may also be challenged as a general matter under Rule 403 if "'unfair prejudice *substantially* outweigh[s]' the testimony's probative value." *U.S. v. Campbell*, 963 F.3d 309, 314 n.1 (4th Cir. 2020) (quoting *U.S. v. Siegel*, 536 F.3d 306, 319 (4th Cir. 2008)); *see also Daubert*, 509 U.S. at 595; *U.S. v. Benkahla*, 530 F.3d 300, 310 (4th Cir. 2008) ("Rule 403 is not an injunction to exclude prejudicial evidence but a mandate, entrusted mainly to the trial court, to weigh prejudice against probative

value. . . . 'The mere fact that the [expert] evidence will damage the defendant's case is not enough—the evidence must be *unfairly* prejudicial, and the unfair prejudice must *substantially* outweigh the probative value of the evidence.'" (quoting *U.S. v. Hammoud*, 381 F.3d 316, 341 (4th Cir. 2004)).  In conducting this analysis, "the court must look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1135 (4th Cir. 1988) (quotation marks omitted); *see also U.S. v. Tillmon*, 954 F.3d 628, 643 (4th Cir. 2019) ("Rule 403 is a rule of inclusion, generally favoring admissibility" (quotation marks omitted)).

Each of the Experts' planned testimony easily satisfies the above standards.

## I.      Profs. Blee & Simi Should be Allowed to Testify

Expert testimony is admissible under Rule 702 where it is reliable and relevant and will aid the jury.[2]  Applying these standards, courts routinely allow experts to testify about their interpretations of complex and coded communications and behavior specific to a group with which the expert is deeply familiar.  *See U.S. v. Johnson*, 587 F.3d 625 (4th Cir. 2009); *U.S. v. Smith*, 919 F.3d 825 (4th Cir. 2019); *U.S. v. Palacios*, 677 F.3d 234, 244 (4th Cir. 2012); *U.S. v. Hassan*, 742 F.3d 104 (4th Cir. 2004).[3]  Relatedly, courts regularly admit testimony from experts—including social science experts—that opines on a party's conduct and situates it within the history, structure, and conduct of an organization or culture of which the party was allegedly affiliated because it offers relevant context that serves as a helpful aid to a jury in explaining a complex record.  *See,*

---

[2] To be clear, although Defendants raise no challenge to the reliability of Profs. Blee & Simi's opinions, any challenge would undoubtedly fail.  In this context, reliability can be assessed "based on [the expert's] extensive credentials and areas of expertise," with "publishing in a peer-reviewed publication . . . often [being] a hallmark of expert witness reliability." *Young*, 916 F.3d at 380 (affirming reliability of expert on white separatism and neo-Nazism).  An even cursory glance at Profs. Blee & Simi's CVs, *see* Exs. 1-2, demonstrates that their credentials and areas of expertise, and in particular their publication histories, make them unquestioned experts in the area of white supremacism and white supremacists.

[3] *See also U.S. v. Romero*, 189 F.3d 576 (7th Cir. 1999); *U.S. v. Wilson*, 634 F. App'x 718 (11th Cir. 2015) (unpublished); *U.S. v. Alzanki*, 54 F.3d 994, 1005-06 (1st Cir. 1995).

*e.g.*, *U.S. v. Young*, 916 F.3d 368, 381 (4th Cir. 2019); *U.S. v. Hammoud*, 381 F.3d 316 (4th Cir. 2004), *rev'd on irrelevant grounds*, 543 U.S. 1097 (2005); *see also U.S. v. Bankhla*, 530 F.3d 300, 310 (4th Cir. 2008).[4]  Under these principles, Profs. Blee & Simi's testimony will be reliable, relevant, and will aid the jury, and is therefore admissible under Rule 702.

### a.  Prof. Blee & Simi's Testimony is Relevant and Will Aid the Jury

At the outset, Profs. Blee & Simi's testimony identifying the overlap between Defendants' conduct and that of the WSM will plainly be relevant.  As Profs. Blee & Simi opine, the WSM is a discrete and insular cultural movement, involving "shared beliefs, values, language, understandings, practices and norms of behavior that create a sense of collective meaning and identity."  B&S at 6; *see also id.* ("Culture is a central concept in the social sciences, and the organizing principles of this report.").  And key components of the WSM's "cultural tool kit," *id.* at 7, are, to name a few, racial animus and the use and glorification of violence to achieve the movement's race-centered aims.  Of course, whether Defendants held a racial animus and whether that animus motivated them to agree to the use of violence at UTR will be central issues at trial.  Expert testimony on the WSM's history and characteristics is thus plainly relevant, particularly given Defendants' denial that they were motivated by race-based animus, asserting instead that their rhetoric and symbolism reflect merely benign "political" views.  *See* Dkt. No. 823 at 39; *see also, e.g. Young*, 916 F.3d at 381 (concluding that expert's "testimony assisted the jury by providing context for the historical backgrounds of and connection between Nazism and militant Islamism . . . the 'evidence in this case was complicated, touching by necessity on a wide variety of ideas, terms, people, and organizations'").  Further, that Defendants engaged in conduct and tactics that were plainly informed by their immersion in a singular group with a shared culture

---

[4] *See also U.S. v. Joseph*, 542 F.3d 13 (2d Cir. 2008); *Chavez v. Carranza*, 559 F.3d 486 (6th Cir. 2009); *U.S. v. Szehinskyi*, 104 F. Supp. 2d 480 (E.D. Pa. 2000); *Katt v. City of New York*, 151 F. Supp. 2d 313 (S.D.N.Y. 2001).

supports Plaintiffs' conspiracy allegations, another key issue to be disputed at trial.  *See, e.g.*, *U.S. v. Torralba-Mendia*, 784 F.3d 652, 663 (9th Cir. 2015) (where "the government charged [defendant] with a conspiracy [to smuggle aliens into the country]," expert "[e]vidence about the smuggling organization's methods helped prove the existence of a conspiracy and put [defendant's] actions in context."); *U.S. v. Chastain*, 198 F.3d 1338, 1349 (11th Cir. 1999) (noting that the expert "testimony was used to educate the jurors on the general techniques of drug smugglers about certain modifications that were made to Beatty's airplane that would make the plan more suitable for drug smuggling.  This information was clearly relevant to establishing the existence of a conspiracy to smuggle marijuana by using an airplane").

Further, Profs. Blee & Simi's testimony will aid the jury.  Their testimony will help the jury understand certain language and concepts that would not necessarily be comprehensible to a juror unschooled in the well-developed language and tactics of the WSM.  At the core of Profs. Blee & Simi's opinions is that a key tactic of the WSM is to employ evasive strategies to obscure from outsiders their involvement in the WSM.  *See* B&S at 11 ("In addition to coded words and symbols, the WSM circulates and relies upon an insider mode of communicating that we term 'double-speak' – language intended to deceive and convey multiple meanings.  Double-speak is a method of conveying white supremacist beliefs and intentions to those within the WSM culture while sending an innocuous meaning to outsiders.").

In particular, Profs. Blee & Simi opine that Defendants, consistent with the historical WSM, relied on "a coordinated strategy to obfuscate their aims through the use of 'double-speak,' 'front-stage/back-stage' behavior, and a discrete and new-age communication platform."  *Id.*  at 63.  For example, Profs. Blee & Simi interpret and contextualize references to the coded phrase "1488," which may seem innocuous, but , as Profs. Blee & Simi opine, "refer[s] jointly to the '14

words' of the white supremacist terrorist David Lane and the double 88 to mean 'Heil Hitler' because 'H' is the 8th letter of the alphabet." *Id.* at 4. Without the testimony of Profs. Blee & Simi, the jury might not receive that important context when presented with evidence that, for example, one of Defendants' online passwords was "StoptheHate1488." *Id.* at 41.

As a related example, Profs. Blee & Simi assess a statement by one defendant: "don't go around using the specific 14W [words]. It was written by a terrorist, not exactly what we want to use." *Id.* To the layperson taking that language at face value, this statement appears to be innocuous in that the speaker is trying to disavow any connection to the "terrorist." But, in Profs. Blee & Simi's opinion, this appears to be coded language emblematic of the WSM's historical use of "double speak" and is actually encouraging a connection with the "terrorist" rather than advocating a disavowal. Specifically, in Profs. Blee & Simi's experience, those "[w]ithin a white supremacist subculture" would likely interpret that message as placing particular emphasis on the word "specific," meaning that the speaker is admonishing listeners to avoid only using the *specific* 14 words, not the reference to them, because outsiders would see the connection to the "terrorist," but that the connection to the "terrorist" is actually a good thing. *Id.* This is the precise tactic of "double speak"—"a strategy intended to simultaneously reveal and conceal meaning embedded in words and to create plausible deniability for ideas or actions that would attract legal or social sanctions," that has been evident in the WSM for years. *Id.* at 11.

Profs. Blee & Simi identify several other examples of the WSM using this specific strategy in an attempt "to conceal from outsiders the WSM's continuing promotion—largely in cultural arenas and events restricted to insiders—of the racial and religious hatred associated with earlier white supremacist groups." *Id.* at 13. For instance, Profs. Blee & Simi opine that, within the subculture of white supremacism, the phrase "I was only joking" is "intended to be understood as

11

a parody, and is meant to immuniz[e] both the message and the messenger from negative consequences.  Outsiders are told to regard the message as a joke.  Insiders know it is not." *Id.* at 26.  This analysis will help the jury in assessing certain of Defendants statements, such as the statement by Defendant Christopher Cantwell:  "If you kill a Jew, the Jew in you dies I hear (This is a tasteless joke, relax kike)." *Id.* at 44.

Each of these tactics that are explained by Profs. Blee & Simi serves to intentionally obscure from lay observers group members' affiliation with the WSM and its associated tactics. Given their deep expertise of the WSM and its tactics, Profs. Blee & Simi are particularly suited to explain for the jury this complex and coded behavior.  Stated differently, it might not be apparent to the average juror that Defendants' conduct mirrors that of the WSM and Profs. Blee & Simi will be able to aid the jury in understanding that connection.[5]  Indeed, precluding Profs. Blee & Simi from testifying would simply allow Defendants to benefit from their purposeful obfuscation.

Courts routinely admit expert testimony that explains and contextualizes complex and coded communications of a discrete group or culture of which the expert has specific knowledge. For example, in *Hassan*, the Fourth Circuit approved expert testimony, just like Prof. Blee & Simi's, "about the 'meaning and context of various words and phrases used by Defendants which are commonly used by persons practicing extreme Islam'; the structure and leadership of groups adhering to the principles of Islamic extremism'; and the 'manner and means employed by extremist Islamic groups to recruit individuals and the process of radicalization which occurs within such groups."  742 F.3d at 130–31.  The Court concluded that the evidence in the case

---

[5] Given the purposefully coded and evasive language and conduct relied on by Defendants, this is not a situation in which an expert's testimony as to group behavior is so straight-forward that no expertise is needed to explain it. *See generally U.S. v. Garcia*, 752 F.3d 382 (4th Cir. 2014) (concluding that testimony from a witness acting both as a fact and expert witness in which she was "decoding" the defendant's use of the number "145" as a reference to the amount of grams of heroin at issue was unnecessary because the defendants could have achieved the same result by "simply pointing to the seizure of 145 grams of heroin.")

"involved terminology and concepts that were likely to be unfamiliar to jurors," and that "[i]n such settings, the relevance of expert testimony is quite evident." *Id.* at 131. Similarly, in *Johnson*, the Fourth Circuit affirmed the admissibility of drug trafficking experts who testified "that seemingly innocuous terms used in [defendants' telephone] calls, such as 'tickets' and 'T-shirts,' were actually code words for narcotics." 587 F.3d at 634. The Fourth Circuit concluded that the expert did far more than simply "pass[] along an important testimonial fact he learned from a particular interview;" rather, the "experts were applying their expertise, derived over many years and from multiple sources, to interpret the transcripts of phone conversations." *Id.* at 636; *see also U.S. v. Smith*, 919 F.3d 825 (4th Cir. 2019) (same); *U.S. v. Palacios*, 677 F.3d 234, 244 (4th Cir. 2012) (same).[6] Just as the experts in *Hassan* and *Johnson*,[7] Profs. Blee & Simi should be permitted to testify as to the "seemingly innocuous" and coded language, behavior, and tactics of adherents to the WSM.

Relatedly, the testimony that Profs. Blee & Simi plan to provide—in which social science experts compare observed behavior to that of a well-defined and insular group or culture that relies on idiosyncratic and often obscure conduct and communication strategies—is routinely admitted

---

[6] Notably, Profs. Blee & Simi's testimony is far *more* within the confines of admissible expert testimony than the testimony at issue in cases like *Johnson*, *Smith*, and *Palacios*. There, the expert testimony came from an individual serving the dual role of both expert and investigator on the criminal case. As numerous courts have held, this type of expert testimony is particularly circumspect given the danger that the expert and fact testimony will blend in the jury's minds. *See Smith*, 919 F.3d at 837 ("district courts must be vigilant to avoid the danger of confusing the jury when a case agent testifies as an expert"); *see also U.S. v. Baptiste*, 596 F.3d 214, 224 (4th Cir. 2010) (requiring safeguards for dual-role testimony); *U.S. v. Mejia*, 545 F.3d 179, 190 (2d Cir. 2008). Of course, these concerns have no applicability as to Profs. Blee & Simi.

[7] Many cases stand for these same principles. For example, in *Romero*, , the court allowed an expert to testify as to the seemingly innocent behavior of the typical child molester, noting that the expert's "testimony illuminated how seemingly innocent conduct such as Romero's extensive discussions with Erich about UFOs and his troubled home life could be part of a seduction technique." 189 F.3d at 585. Likewise, in *Wilson*, , the court allowed an expert who had reviewed the evidence in the record to provide "his opinion that the Appellants' conduct was consistent with that of Blood gang members" because it was "highly probative of the conspiracy charge." 634 F. App'x at 739. Indeed, the "essence of the conspiracy charge was that the Appellants were all members of the same street gang, and, as such, evidence of the Appellants' membership in or affiliation with the Blood gang tended to make the prosecution's theory of the case more likely. *Id.*; *see also id.* ("his testimony could have served only to clarify the gang references, symbols, and terminology present in the testimony and other evidence that had come before it").

as expert testimony to aid the fact finder.  For example, last year the Fourth Circuit approved similar expert testimony in *Young*.  There, Young was criminally charged with providing material support to an Islamist terrorist group.  When Young argued that he was entrapped, the government introduced evidence of his affiliation with Nazi groups to demonstrate that he was predisposed to provide material support to the terrorist group.  The government introduced the testimony of Dr. Daveed Gartenstein-Ross, an expert in, among other things, "white separatists and the neo-Nazi movement," who testified about "the convergence between Nazis and Islamist terrorists."  916 F.3d at 378, 379.  Just like Profs. Blee & Simi, Dr. Gartenstein-Ross relied on a "social sciences-based methodology" and "conducted his research 'through a comparative method,' focusing on primary sources, then comparing his conclusions against secondary sources and 'events on the ground.'"  *Id.* at 380.  In the end, Dr. Gartenstein-Ross "provid[ed] context for the historical backgrounds of and connection between Nazism and militant Islamism," which the Fourth Circuit concluded was properly admitted at trial.  *Id.* at 381. In particular: "As the 'evidence in this case was complicated, touching by necessity on a wide variety of ideas, terms, people, and organizations connected to radical Islam,' as well as white supremacism, the district court fairly concluded that the testimony would assist the jury in understanding evidence regarding predisposition."  *Id.* (quoting *United States v. Benkahla*, 530 F.3d 300, 309 (4th Cir. 2008)).  Just as an interpretation of Young's connections to Nazism was relevant to and helpful in understanding Young's alleged participation in a conspiracy motivated by Islamism, Defendants' connections here to the WSM are relevant to and helpful in understanding Defendants' participation in a conspiracy motivated by racial animus.

Similarly, in *Hammoud*, the Fourth Circuit affirmed the admission of expert testimony that, as with Profs. Blee & Simi's testimony, was based on a "methodology . . . generally employed

in the social sciences," and in which the expert "testified regarding the structure of Hizballah and identified its leaders" and "explained the significance of [defendant's] contact with those leaders." 381 F.3d at 337.  And notably, the expert there, analogous to Prof. Blee & Simi's anticipated testimony, "discussed the nature of Hizballah's funding activities with specific reference to [defendant's] activities . . . testimony [which] was critical in helping the jury understand the issues before it."  *Id.* at 338.  Similarly, in *U.S. v. Joseph*, 542 F.3d 13 (2d Cir. 2008), *abrogated on irrelevant grounds, U.S. v. Ferguson*, 676 F.3d 260, 276 n.14 (2d Cir. 2011), the court admonished the district court for excluding the testimony of a social science expert who would have interpreted defendant's sexually explicit online messages to an underage victim and situated them within "a distinct culture of the Internet in which one can become a 'fantasy character.'"  *Id.* at 21. According to the Second Circuit, the district court likely erred in precluding the testimony because "[a]lthough some jurors may have familiarity with Internet messaging, it is unlikely that the average juror is familiar with the role-playing activity that Dr. Herriot was prepared to explain in the specific context of sexually oriented conversation in cyberspace."  *Id.* at 22.  Moreover, the *Joseph* court expressly rejected the argument that the expert's testimony was unnecessary because other evidence, *i.e.*, the defendant's testimony, would sufficiently raise the issue to the jury.  *Id.* at n.10 ("when the Government implores a jury to find the defendant and his explanation not credible, we think the presentation of that explanation from a qualified expert would be significant, especially where the explanation is not one with which jurors are likely to have familiarity.").[8]

---

[8] *See also Chavez v. Carranza*, 559 F.3d 486, 496–97 (6th Cir. 2009) (affirming admission of expert testimony from a political scientist who was knowledgeable on the strategies and command structure of the El Salvadoran military to opine on the defendants' role and command responsibility in the El Salvadoran military in a case trying to hold defendant responsible for the actions of that military); *U.S. v. Szehinskyj*, 104 F. Supp. 2d 480, 482–83 (E.D. Pa. 2000) (permitting a historian to testify regarding Nazi documents that were in the record which he opined identified the defendant as a concentration camp guard); *Katt v. City of New York*, 151 F. Supp. 2d 313, 357 (S.D.N.Y. 2001) (permitting a sociologist—who had past experience with the NYPD and conducted significant academic research on the NYPD—to provide expert testimony on a culture in the NYPD that discourages misconduct complaints, given that the sociologist had "a basis from which to draw sound opinions or inferences from anecdotal or oral data").

Profs. Blee & Simi's testimony will aid the jury in understanding, situating, and contextualizing the complex record with which they will be presented. Thus, their testimony regarding the strategy and tactics of the WSM, and Defendants apparent use of those strategies and tactics, will be relevant and helpful to the jury and is therefore admissible under Rule 702.

### a.   Defendants' Specific Challenges Are Without Merit

With virtually no analysis whatsoever,[9] Defendants seemingly raise three challenges to Blee & Simi's testimony: that (i) they will improperly opine on witness credibility; (ii) they will "tell[] the jury what to think;" and (iii) their testimony is unfairly prejudicial. Mot. at 3. All are meritless. Despite selectively quoting a handful of words from Profs. Blee & Simi's report out of its necessary context, *see* Mot. at 3, Defendants offer no credible basis to exclude any portion of their planned testimony (let alone remotely offer a basis to exclude their testimony *entirely*).

### i.   Profs. Blee & Simi Have Not and Will Not Opine on any Witnesses' Credibility

Purportedly relying on *U.S. v. Cecil*, 836 F.2d 1431 (4th Cir. 1988) and *U.S. v. Lee*, 230 F.3d 1355, 2000 WL 1390856 (4th Cir. Sept. 26, 2000), Defendants contend that Profs. Blee & Simi's report "violates the legal prohibition on . . . opining on witness credibility." Mot. at 2–3. The argument is misguided. Where courts have criticized expert testimony because it improperly opined on witness credibility, it was because the expert opined on a witness' *capacity* to testify truthfully. For example, in *Cecil*, the Fourth Circuit concluded that the district court did not abuse its discretion in barring a criminal defendant from offering the testimony of an expert psychiatrist to opine that the key government witness testifying against him suffered from narcissistic personality disorder and was thus "incapable of telling the truth." 836 F.2d at 1440–41. The Court

---

[9] The Court should deny the Motion due to this lack of analysis alone. *See Fulton v. Nisbet*, No. 2:15-4355-RMG, 2018 WL 603486 at *3 (D.S.C. Jan. 29, 2018) (rejecting motion to exclude where the movant's arguments consisted of one sentence and a "boilerplate one-sentence conclusion" for which it "offer[ed] no argument or evidence to support").

noted that "the authorities seem uniform that a psychiatrist may not testify to the credibility of a witness; that issue is one for the jury." *Id.* at 1441 (collecting cases).[10]  This principle has no application here.  Profs. Blee & Simi do not remotely opine on the capacity of Defendants to truthfully testify.  Indeed, they say nothing of Defendants' mental capacities at all.  Rather, they assess Defendants' *conduct* and place it in context by using their expertise to compare it with that of the WSM.  At trial, Defendants' explanations of their conduct might differ from how Profs. Blee & Simi characterize it.  But just because Profs. Blee & Simi's opinion will suggest to the jury a conclusion different from what Defendants might testify to does not mean that Profs. Blee & Simi will be improperly opining on Defendants' credibility.  *See Lee*, 2000 WL 1390856, at *2 (quoting *U.S. v. Shay*, 57 F.3d 126, 131 (1st Cir. 1995)) ("no constitutional provision, law, or rule requires the exclusion of expert testimony simply because it concerns a credibility question").

### ii.  Profs. Blee & Simi Will Not Improperly "Tell the Jury What to Think"

Defendants also assert with little explanation that the testimony of Profs. Blee & Simi "violates the legal prohibition on telling the jury what to think."  Mot. at 3.  That's not accurate.

It is unclear what precisely Defendants believe Profs. Blee & Simi would tell the jury to think.  If, as is the most natural reading of their motion, Defendants' argument is that Profs. Blee & Simi will tell the jury to believe that Defendants' testimony is untruthful, the argument is meritless because, as discussed above, Profs. Blee & Simi's testimony will not serve that purpose.  Nor will Profs. Blee & Simi testify as to the credibility of Plaintiffs or any of their witnesses.  That Profs. Blee & Simi's testimony might "tend[] to corroborate the testimony of another witness is not grounds for exclusion."  *U.S. v. Fuertes*, 805 F.3d 485, 496 (4th Cir. 2015); *see also id.*

---

[10] Defendants citation to *Lee* is curious.  There, the Fourth Circuit affirmed that expert testimony about a witness's capacity to lie was admissible because it "merely defined the limitations of [the witness'] intellectual capabilities and left the ultimate determination as to whether or not she was telling the truth to the jury." 2000 WL 1390856, at *3. Further, *Lee* also noted that this credibility concern can be obviated by a targeted jury instruction.  *Id.*

("indeed, it is surely the case that most expert opinion evidence proffered by litigants is paired with lay evidence that is in some fashion supported by the expert opinion"); *see also U.S. v. Alzanki*, 54 F.3d 994, 1005–06 (1st Cir. 1995) (rejecting argument that testimony from a "victimologist" expert "amounted to impermissible 'bolstering' of the allegations of abuse made by [the alleged victim]," where the expert testified that the alleged victim's "behavioral response to the non-sexual abuse administered by [the defendants] was *consistent with the behavior of abuse victim's generally*," testimony which the court found "'reasonably likely' to assist the jury in understanding and assessing the evidence, in that the matter at issue was highly material, somewhat technical, and beyond the realm of acquired knowledge normally possessed by lay jurors.").

If Defendants suggest Profs. Blee & Simi's testimony would be improper because it would be opining on an ultimate issue, *i.e.*, "tell[ing] the jury what result it should reach," Mot. at 3, the argument fails for two reasons.  First, Profs. Blee & Simi do not offer any opinions about the existence of the alleged conspiracy, which is the ultimate issue in the case.  Rather, Profs. Blee & Simi assess Defendants' conduct and conclude that their conduct overlaps considerably with the WSM, which itself has intentionally utilized race-based violence.  As addressed above, this form of expert testimony is admissible.  *See supra* at p. 8.  Second, even if they did offer such an opinion (which they do not), it would be permissible under Rule 704(a), which expressly allows expert testimony on the ultimate issues in a case, especially in civil cases.  *See also U.S. v. McIver*, 470 F.3d 550, 561 (4th Cir. 2006) ("[Q]uestions of fact that are committed to resolution by the jury are the proper subject of opinion testimony.").

To the extent Defendants are concerned by the fact that Profs. Blee & Simi formed certain of their opinions through a detailed review of the factual record, the concern is unfounded.  *See* Fed. R. Evid. 703 (an "expert may base an opinion on facts or data in the case that the expert has

been made aware of"); *see also U.S. v. Smith*, 919 F.3d 825, 837 (4th Cir. 2019) ("An expert's methodology cannot be applied in a factual vacuum.  Thus, an expert in code or language must consider the context surrounding the language in determining the appropriate interpretation."). And to the extent that Defendants take issue with Profs. Blee & Simi's affirmative findings that the WSM (and Defendants) in fact use coded language and what that coded language means, that goes to the weight of their testimony, not its admissibility, and Defendants are of course free to cross-examine them on the subject at trial (and were free to depose them or submit rebuttal reports, but did neither).  *See U.S. v. Rangel*, No. 18-50406, 2020 WL 4475855, at *2 (9th Cir. Aug. 4, 2020)  ("The coded language expert explained how he applied his knowledge to interpret the words at issue. . . .  [Defendant's] characterization of the expert's opinions as 'speculative' bears on the weight of the testimony, not on its admissibility.")

### iii.   Profs. Blee & Simi's Testimony Will Not be Unfairly Prejudicial

Finally, the Court should reject Defendants' contention that Profs. Blee & Simi's testimony should be precluded because it will be "unfairly prejudicial" and thus should be excluded under Rule 403.  Mot. at 3.  Evidence should be excluded under Rule 403 only "when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence."  *U.S. v. Siegel*, 536 F.3d 306, 319 (4th Cir. 2008) (quoting *U.S. v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006)).  To be sure, linking Defendants to the WSM and its tactics is necessary to prove Plaintiffs' conspiracy claims, which to be successful will require the jury to find that Defendants conspired to commit racially-motivated violence in violation of the KKK Act.  *See Hassan*, 742 F.3d at 132 ("Although linking the appellants to extremist jihadist groups was undoubtedly prejudicial, it was not unfairly so. Indeed, the charges that were lodged against the appellants meant that the prosecution would necessarily seek to establish that link.").  Courts thus regularly admit, over Rule 403 challenges,

expert testimony linking defendants to violent groups and conduct where, as here, that link is inherent to the claims brought against them. *See id.*; *see also Williams*, 445 F.3d at 733 (concluding that testimony, including expert testimony, regarding defendant's uncharged murder was not overly prejudicial under Rule 403, noting that "[t]o be sure, the evidence of the Collins murder was prejudicial to Williams, as is all evidence tending to show a defendant's guilt").

## II.    The Court Should Not Exclude Mr. Fenton's Testimony.

Mr. Fenton's testimony as to the details of Defendant Fields' car attack during UTR is highly probative and will aid the jury and is therefore admissible under Rule 702. Indeed, courts regularly conclude that testimony from crash reconstruction experts meet the standard of Rule 702 because such testimony is "helpful to the jury." *U.S. v. Wiggins*, 708 F. App'x 105, 110 (4th Cir. 2017) ("All of this information [provided by the crash reconstruction expert] tended to indicate that Wiggins was driving in a reckless manner prior to the collision because: (1) Wiggins was straddling lanes of traffic at the time of impact; (2) he was travelling well in excess of the posted speed limit; and (3) he struck the truck from behind while the truck was traveling in the exit lane").[11] Not surprisingly then, Defendants do not challenge Mr. Fenton's planned testimony under Rule 702. Instead, Defendants seek to preclude Mr. Fenton's testimony as "needlessly cumulative" under Rule 403 because Fields's conviction for murder will be introduced at trial and Plaintiffs themselves will testify about the crash. *See* Mot. at 4.

---

[11] *See also Roberts v. Sunbelt Rentals, Inc.*, 2016 WL 1259414, at *4-5 (W.D. Va. Mar. 30, 2016) (admitting accident reconstruction as well as accompanying opinions about the accident); *Hubbard v. Commonwealth*, 12 Va. App. 250, 256 (Va. Ct. App. 1991) (affirming use of expert testimony to establish speed of vehicle in crash), *aff'd*, 243 Va. 1 (Va. 1992); *Engineering Design Techs., Inc.*, 2005 WL 6742496, *7-8 (E.D.N.C. Aug. 29, 2005) (expert summarizing evidence in the case); *Evans v. Oliver*, 905 F.2d 1529, 1990 WL 47718, at *1-3 (4th Cir. May 7, 1990) (unpublished) (admitting expert testimony about driver's braking); *Silverman v. U.S.*, No. 2011 WL 65487, at *3-4 (M.D.N.C. Jan. 7, 2011) (admitting expert testimony that driver "never applied the brakes" during accident); *Purvis v. Bryant*, 2018 WL 6604231, at *3 (D.S.C. Dec. 17, 2018) (admitting expert testimony about how drivers steered and corrected their vehicles in collision).

To be sure, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence." Fed. R. Evid. 403. Evidence is not excluded as cumulative under this standard, however, unless "'it adds very little to the probative force of the other evidence in the case so that if it were admitted its contribution to the determination of truth would be out-weighed by its contribution to the length of trial.'" *U.S. v. Fulcher*, 250 F.3d 244, 250 (4th Cir. 2001) (quotation marks omitted). Further, expert testimony is not "needlessly cumulative" just because it is consistent with other evidence in the case. *See Wickersham v. Ford Motor Co.*, 2016 WL 5349093, *11 (D.S.C. Sept. 26, 2016) ("[The challenged expert] opinions are only 'cumulative' in the sense that they offer the same conclusion. Not only is this overlap quite marginal, it actually enhances each opinion's probative value."); *Treadway v. Danieli & C. Officine Meccaniche SpA*, 2008 WL 5504710, *1 (W.D. Va. Aug. 15, 2008) (admitting multiple experts despite similar conclusions "because each witness has a different background and experience"); *see also U.S. v. Tillmon*, 954 F.3d 628, 642 n.5 (4th Cir. 2019) (rejecting argument that evidence was "needlessly cumulative" under Rule 403 because the rule "does not bar evidence merely because it overlaps with prior evidence").

Defendants argue that Mr. Fenton's testimony would be "needlessly cumulative" because (i) Fields's convictions will be admissible as evidence at trial, and (ii) Plaintiffs will testify about the car attack and their injuries.[12]  Mot. at 4.  Their argument has no merit.

At the outset, it is plain that Mr. Fenton's testimony will not be cumulative.[13]  No other witness will testify about Fenton's conclusions (in particular the precise speed, acceleration, and

---

[12] Defendants do not argue that Mr. Fenton is unqualified or that his findings are reliable.  Nor could they, given Mr. Fenton's rigorous analysis supported by time-tested methodologies that have consistently been accepted by courts, including regularly when presented by Mr. Fenton.

[13] Nor will it cause any undue delay.  *See* Mot. at 4.  Mr. Fenton is only one witness in a trial estimated to take four weeks.  Defendants do not and cannot explain why or how his testimony will cause an undue delay.

21

movement of Fields' vehicle), present the sequence of the crash in chronological order, or offer a crash reconstruction animation.  Indeed, even assuming Fields's convictions and sworn statements will be admitted into evidence,[14] it will not establish the same facts or provide the same value to the jury as Mr. Fenton's testimony.  *See supra* at pp. 3–5.  And although Plaintiffs may testify about what they saw and experienced during the crash, that testimony will not establish the same scientifically determined facts or provide the full sequence of Fields's movements discussed in the Mr. Fenton's report.  *See supra* at pp. 3-5.  Nor will any other witness in this case.  Therefore, Mr. Fenton's testimony will not be cumulative (let alone needlessly so), and the Court should deny Defendants' motion.  Indeed, to preclude Mr. Fenton's testimony on the ground that Plaintiffs will be able to testify sufficiently would question the propriety of ever introducing crash reconstruction expert evidence.  Yet, as discussed above, courts frequently do so.  *See supra* at pp. 20 & n.11.[15]

Further, even if Mr. Fenton's testimony were cumulative or were to lead to some undue delay (it will not), Defendants cannot demonstrate that either will "*substantially outweigh*" the probative value of the testimony.  *See supra* at p. 7.  Of course, evidence that is relevant to contested elements of claims are "highly probative."  *U.S.  v. Davis*, 711 F. App'x 148, 150 (4th Cir. 2018); *see also, e.g.*, *Leardini v. Charlotte Mecklenburg Bd. of Ed.*, 2012 WL 346674, *3 (W.D.N.C. Feb. 2, 2012) (intent and motive evidence relevant to plaintiffs' civil rights claims); *Wickersham*, 2016 WL 5349093 at *10 (where expert's testimony related to "a highly contested and critical component of this case . . . [t]his fact alone is sufficient to dispose of Ford's Rule 403

---

14 *See, e.g.*, Fed. R. Evid. 801(d)(2) (statements by opposing parties are not hearsay); Fed. R. Evid. 609 (permitting evidence of convictions).

15 Defendants' argument that Mr. Fenton's testimony will cause undue delay is unsupported.  Mot. at 4.  Mr. Fenton is only one witness in a trial estimated to take four weeks.  Defendants do not and cannot explain why or how his testimony will cause an undue delay.

argument"). As previewed above, Mr. Fenton's testimony is highly probative because it will help the jury understand the facts and decide several disputed issues in this case.

*First*, Mr. Fenton's testimony will help the jury decide whether Fields acted intentionally when he struck Plaintiffs with his vehicle, which will be relevant to several counts of Plaintiffs' complaint, including Count VI (assault and battery), and Count VII (intentional infliction of emotional distress). Mr. Fenton's opinions that Fields had time to view the pedestrians before backing up; could have left the area safely without striking anyone; backed up and then accelerated rapidly toward the pedestrians; did not apply his brakes (which were working); and steered toward the pedestrians such that they would be trapped against a pick-up truck will all help the jury decide whether Fields saw the pedestrians and intended to strike them. Fenton Report at 12-22.

*Second*, Mr. Fenton will help the jury determine whether Fields's conduct was motivated by racial animus or was offensive, outrageous, or intolerable. *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (requiring evidence of invidiously discriminatory animus to establish liability under 42 U.S.C. § 1985(3)); *Womack v. Eldridge*, 215 Va. 338, 342 (Va. 1974) (requiring outrageous or intolerable conduct, which "offends against the generally accepted standards of decency and morality," for intentional infliction of emotional distress). Evidence of a person's conduct is admissible to show his motive. *See Gen. Analytics Corp. v. CNA Ins. Cos.*, 86 F.3d 51, 54 (4th Cir. 1996) (explaining that evidence of a person's actions is admissible as circumstantial evidence of motive). Mr. Fenton will help establish the movements of Fields's car as he drove down Fourth Street and shows whether he was close enough to see the pedestrians on Fourth Street. Fenton Report at 12, 16–19. From these facts, a jury could infer that Fields saw that the pedestrians were a diverse crowd of counter-protestors before he reversed, helping the jury determine whether this was part of his motive for driving into them. The jury may also decide that

accelerating into a large crowd of pedestrians, without braking, "offends against the generally accepted standards of decency and morality," particularly when it is driven by racial animus.

*Finally*, Mr. Fenton will help the jury understand how Fields' car impacted Plaintiffs and thus the extent of Plaintiffs' injuries and damages, which are elements of every count.[16]

Thus, Mr. Fenton's testimony is highly probative, which will substantially outweigh any cumulativeness and undue delay.

## III.    Dr. Lipstadt Should Not be Precluded from Testifying as to Pp. 8–10 of Her Report

In her report, Dr. Lipstadt opines "on the history, ideology, symbolism, and rhetoric of antisemitism and how those features were on display at the Unite the Right rally."  Lipstadt Report at 1.   Courts routinely admit expert testimony providing such historical context.  *See supra* at pp. 13-14 (citing *Young* and *Benkahla*); *see also Langbord v. U.S. Dep't of Treasury*, 832 F.3d 170, 195 (3d Cir. 2016) (such testimony properly aids the jury "by surveying a daunting amount of historical sources, evaluating their reliability and providing a basis for a reliable narrative about that past" (quotation marks omitted); *Marvel Chars., Inc. v. Kirby*, 726 F.3d 119, 135–36 (2d Cir. 2013) (noting that an expert historian can aid the trier of fact by "synthesiz[ing] dense or voluminous historical texts" and offering "context that illuminates or places in perspective past events"); *Walden v. City of Chicago*, 755 F. Supp. 2d 942, 950 (N.D. Ill. 2010) (noting that a historian expert could "provide a unique perspective because he has researched and understands the historical context surrounding the events in this case").  In addition, courts regularly admit expert testimony interpreting a discrete group's coded and evasive language.  *See supra* at p. 12.

Defendants seek to preclude Dr. Lipstadt from testifying as to her "discussion of medieval, rather than modern history."  Mot. at 4.  In Defendants' view, "[t]his portion of the Lipstadt report

---

[16] Further, experts are permitted to summarize complex evidence for the jury.  *See Engineering Design Techs.*, 2005 WL 6742496, at *7–8.

should be excluded and the professor barred from including it in her testimony" because "[i]t has no 'fit' with the actual issues in the *Sines* case and will therefore not aid the jurors in understanding the evidence or determining a fact in issue. *Id.*[17] This contention has no merit.

Dr. Lipstadt's discussion of antisemitism's progression through the Middle Ages is plainly relevant to her opinion and would certainly aid the jury. As Dr. Lipstadt reported, "[t]o fully comprehend the events at Charlottesville, it is necessary to understand the origins and development of antisemitism, which has been properly described as the longest or oldest group-based hatred." Lipstadt Report at 6. Indeed, it is precisely Dr. Lipstadt's opinion that the "Unite the Right rally fits comfortably into this ancient antisemitic tradition," and that "the rally's organizers and attendees, including Defendants, drew from the same traditions and practices of their antisemitic forbears." *Id.* at 15. The relevance of Dr. Lipstadt's discussion of antisemitism in this era is to aid the jury in understanding that the ideas, symbols, and rhetoric that Defendants used at UTR did not arise in a vacuum, but rather sprung from an unbroken tradition. To arbitrarily exclude one small portion of that historical timeline would not just confuse the jury, it would be nonsensical.

## **CONCLUSION**

In light of the foregoing, this Court should deny Defendants' motion to exclude the Experts' reports and to preclude their testimony.

---

[17] Although, Defendants do not formally challenge Dr. Lipstadt's qualifications (for good reason, given her credentials and experience, *see supra* at pp. 5-6 and Ex. 4), they seem to suggest Dr. Lipstadt might not be qualified to explain the history of antisemitism in the Middle Ages because she "holds a professorship in 'Modern Jewish History.'" Mot. at 4. The suggestion is far afield. For one, one cannot become a renowned expert in modern history without developing a thorough understanding of the traditions from which that modern history sprung. And regardless, to suggest that Dr. Lipstadt's expertise is limited to "modern" antisemitism simply disregards her lengthy scholarship on the ancient history of antisemitism. *See* Ex. 4. Indeed, in Dr. Lipstadt's latest book, released just last year, she expressly discussed the "antisemitic tropes" that have been "found throughout two thousand years of antisemitic accusations," including ones that that "Jews persuaded the Roman Empire, then the rulers of Palestine and much of the rest of the world, to do their bidding and crucify Jesus." Dr. Deborah Lipstadt, *Antisemitism: Here and Now*, p. 144 (2019).

Dated: September 11, 2020

Respectfully submitted,

*/s/ Robert T. Cahill*

Robert T. Cahill (VSB 38562)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
rcahill@cooley.com

Of Counsel:

Roberta A. Kaplan (*pro hac vice*)
Julie E. Fink (*pro hac vice*)
Gabrielle E. Tenzer (*pro hac vice*)
Michael L. Bloch (*pro hac vice*)
Benjamin D. White (*pro hac vice*)
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: (212) 763-0883
rkaplan@kaplanhecker.com
jfink@kaplanhecker.com
gtenzer@kaplanhecker.com
mbloch@kaplanhecker.com
bwhite@kaplanhecker.com

Karen L. Dunn (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Jessica Phillips (*pro hac vice*)
PAUL WEISS RIFKIND WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006
Telephone: (202) 223-7300
Fax: (202) 223-7420
kdunn@paulweiss.com
wisaacson@paulweiss.com
jphillips@paulweiss.com

Alan Levine (*pro hac vice*)
Philip Bowman (*pro hac vice*)
COOLEY LLP
1114 Avenue of the Americas, 46th Floor
New York, NY 10036
Telephone: (212) 479-6260
Fax: (212) 479-6275
alevine@cooley.com
pbowman@cooley.com

David E. Mills (*pro hac vice*)
Joshua M. Siegel (VSB 73416)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Fax: (202) 842-7899
dmills@cooley.com
jsiegel@cooley.com

J. Benjamin Rottenborn (VSB 84796)
WOODS ROGERS PLC
10 South Jefferson St., Suite 1400
Roanoke, VA 24011
Telephone: (540) 983-7600
Fax: (540) 983-7711
brottenborn@woodsrogers.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2020, I filed the foregoing with the Clerk of Court through the CM/ECF system, which will send a notice of electronic filing to:

Justin Saunders Gravatt
David L. Hauck
David L. Campbell
Duane, Hauck, Davis & Gravatt, P.C.
100 West Franklin Street, Suite 100
Richmond, VA 23220
jgravatt@dhdglaw.com
dhauck@dhdglaw.com
dcampbell@dhdglaw.com

*Counsel for Defendant James A. Fields, Jr.*

Elmer Woodard
5661 US Hwy 29
Blairs, VA 24527
isuecrooks@comcast.net

James E. Kolenich
Kolenich Law Office
9435 Waterstone Blvd. #140
Cincinnati, OH 45249
jek318@gmail.com

*Counsel for Defendants Matthew Parrott, Traditionalist Worker Party, Jason Kessler, Nathan Damigo, and Identity Europa, Inc. (Identity Evropa)*

Bryan Jones
106 W. South St., Suite 211
Charlottesville, VA 22902
bryan@bjoneslegal.com

*Counsel for Defendants Michael Hill, Michael Tubbs, and League of the South*

William Edward ReBrook , IV
The Rebrook Law Office
6013 Clerkenwell Court
Burke, VA 22015
edward@rebrooklaw.com

*Counsel for Defendants Jeff Schoep, National Socialist Movement, and Nationalist Front*

I further hereby certify that on September 11, 2020, I also served the following non-ECF participants, via electronic mail, as follows:

Elliot Kline
eli.f.mosley@gmail.com

Matthew Heimbach
matthew.w.heimbach@gmail.com

Robert Ray
azzmador@gmail.com

Christopher Cantwell
christopher.cantwell@gmail.com

Vanguard America
c/o Dillon Hopper
dillon_hopper@protonmail.com

Richard Spencer
richardbspencer@icloud.com

/s/ Robert T. Cahill
Robert T. Cahill (VSB 38562)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
rcahill@cooley.com

*Counsel for Plaintiffs*

2