CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED

OCT 19 2020

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

Richard Spencer
PO Box 1676
Whitefish, MT 59937

## UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF VIRGINIA

## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| ELIZABETH SINES *et al.*, | Case No: 3:17-cv-00072-NKM |
| Plaintiffs | |
| vs. | **SUMMARY JUDGEMENT** |
| JASON KESSLER, *et al.*, | |
| Defendants | |

## DEFENDANT RICHARD SPENCER'S MOTION FOR SUMMARY JUDGEMENT

COMES NOW Defendant Richard Spencer, *pro se*, who moves for Summary Judgement, in accordance with Rule 56, as to all claims against him in the Plaintiffs' Second Amended Complaint.

### §1: Introduction

The events of August 11 and 12, 2017, evoke strong feelings among many, and they have been hotly debated over the past three years. They raise important questions regarding the status of Confederate monuments, protesting and violence, policing, "hate speech," and more. Such matters should be addressed and debated in an open society, by pundits, politicians, academics, and activists. But they are beyond the scope of civil litigation.

SUMMARY JUDGEMENT - 1

1        What is at issue for the Court is whether Defendant Richard Spencer should be held

2    responsible for damages to the Plaintiffs, specifically via Count I: 42 U.S.C. §1985 (c), Count II

3    42 U.S.C. §1986, and other laws. With regard to Mr. Spencer, the assembled evidence manifestly

4    and unambiguously fails to justify the application of these laws.

5        If the Plaintiffs seek to publicly demonstrate that Mr. Spencer is a dissident intellectual—

6    whose political and social views could fairly be described as outlandish, outmoded, illiberal, and

7    outrageous—then there is an abundance of evidence already in the public domain. If, however,

8    the Plaintiffs seek to prove that Mr. Spencer is personally liable for engaging in a conspiracy to

9    commit violence and deny civil rights, then we encounter a glaring absence of evidence that can

10   buttress such claims.

11       Mr. Spencer humbly pleads the Court for summary judgement. He does not, however,

12   hold an opinion of the status of his co-Defendants. The conspiracy alleged by the Plaintiffs—if

13   it, in fact, existed—did not involve Mr. Spencer. Summary judgement for him would thus not

14   affect the status of other Defendants.

15

16                   **§2: Conspiracy Theories**

17       An alleged conspiracy involving Mr. Spencer is an indispensable component of the

18   Plaintiffs' case, particularly regarding Virginia Code §8.01-42.1. Mr. Spencer has not been

19   prosecuted for any criminal act related to the events of Unite The Right (UTR). The Plaintiffs

20   allege, however, that Mr. Spencer and the other Defendants "conspired to plan, promote, and

21   carry out the violent events in Charlottesville" (Amended Complaint, ¶3). In other words, the

22   Defendants should be held responsible for the violence in August 2017 and the resulting injury to

23   the Plaintiffs—indeed, they planned for it and desired that it occur.

1    The Court should bear in mind that under *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007)

2    and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a cause of action must do more than rely on

3    conclusory references to "conspiracies" and "illegal acts." It follows that the Plaintiffs' Causes of

4    Action cannot be justified through their bold decelerations of a "white supremacist conspiracy,"

5    which are littered throughout the Complaint.

6    Moreover, if the word "conspiracy" is to hold water, then the Plaintiffs must prove that

7    Mr. Spencer was, in fact, actively engaged with other Defendants in the logistical planning of

8    UTR, as well as a campaign to promote violence and the violation of civil rights, in which the

9    Plaintiffs were snared.

10    During the summer of 2017, Mr. Spencer had no knowledge of the existence of eight (8)

11    of the twenty-three (23) entities or individuals named as his co-Defendants in the Complaint,

12    including James Alex Fields. Mr. Spencer had no correspondence with fourteen (14) of the

13    twenty-three (23) Defendants over the relevant period (Exhibit A). The sporadic communication

14    he had with other Defendants never involved the logistical planning of UTR, nor the injuring or

15    denying of civil rights to the Plaintiffs or any other party. Regarding Mr. Fields, who was

16    involved with the most serious act of violence: Mr. Fields recalls at one point sending an

17    unsolicited message to Mr. Spencer, which was never returned (Exhibit B). The Plaintiffs'

18    assertion that Mr. Spencer was involved in a 24-person conspiracy for violence and mayhem is

19    dubious (to say the least) from the outset.

20    Defendant Jason Kessler was the chief organizer and focal point of UTR and is thus the

21    critical figure in determining whether a malevolent conspiracy existed at all, and whether Mr.

22    Spencer was party to it. In his depositions in May 2018, Mr. Kessler stated that he aspired to be a

23    "spokesman" and "leader" of the Alt-Right movement and reported that, throughout the summer

SUMMARY JUDGEMENT - 3

1   of 2017, organizing UTR was his full-time occupation (See Exhibit C, pp. 130-131; Exhibit D, p.

2   242). If the Plaintiffs' alleged conspiracy existed, it must have operated through Mr. Kessler.

3          Mr. Spencer's communications with Mr. Kessler were minimal and distant, with many of

4   Kessler's messages receiving no response (Exhibit E). Over the course of 2017, Messrs. Kessler

5   and Spencer shared twenty-six (26) instances of direct communication via SMS/iMessages, and

6   participated in seven (7) phone call, totaling twenty-seven (27) minutes; they shared five (5)

7   emails, involving issues auxiliary to the rally: legal questions and public relations (Exhibit A).

8   No communication involved violence towards the Plaintiffs nor denying their civil rights. It

9   could be fairly stated that Spencer occasionally "consulted" with Mr. Kessler. For example, Mr.

10  Spencer suggested lawyers when Mr. Kessler's permit for the rally was revoked. Mr. Spencer

11  was also occasionally informed of progress on the legal front. But it is clear that in terms of

12  logistical planning, Mr. Spencer was simply out of the loop.

13         The initial advertisement for UTR—shown to Mr. Spencer on June 15, 2017—did not

14  include Mr. Spencer as a speaker or attendee. Mr. Spencer agreed to attend on June 16, after the

15  permit had been filed and after Mr. Kessler informed Mr. Spencer of the "full cooperation of the

16  police" (Exhibit E).

17         **Kessler:** We're ready to add your name when you give us the go ahead.

18         **Spencer:** Give me a few hours. Lots of people have told me that my name on the
           poster would make the event dangerous. Let me ask some people first. [...]

19         **Kessler:** We have the full cooperation of the police if you need it.

20         Mr. Spencer expressed reluctance on the basis that his presence might inspire violent

21  actions towards him and others by counter-protesters, as Mr. Spencer had recently been the

22  victim of a brazen and unprovoked attack on January 20, 2017.

23

           SUMMARY JUDGEMENT - 4

1       By June 2017, "Discord," a digital platform for gaming and networking, had become the

2 central hub for UTR. It was the communication vehicle for prospective attendees, and the

3 organizers used it for essential logistical planning. There was, in fact, a "Leadership" channel on

4 Discord, with Mr. Kessler designated as "Event Coordinator." According to Mr. Kessler, the

5 Discord channel was first created by an Identity Evropa (IE) member named "Erica," who then

6 transferred its ownership to Defendant Elliott Kline. Mr. Kessler claims that he involved Mr.

7 Kline in the initial process, in part, as a way of reaching out to Mr. Spencer and other figures as

8 guests at UTR (Exhibit D, pp. 237-238).

9       Mr. Spencer did not participate whatsoever in the "Charlottesville 2.0" Discord server,

10 nor was he invited to join any of its channels, "Leadership" or otherwise. This is made manifest

11 by the Discord archive at UnicornRiot.com (Exhibit F), as well as by Kessler's sworn deposition

12 (Exhibit C, pp. 144-148). Mr. Spencer did not participate in a single conference call of the

13 designated "Leadership," and he was absent during every planning session for organizers of both

14 the Friday-night torch march and aborted Saturday rally.

15       In his 2018 Deposition, Kessler states that he "believes" Spencer somehow indirectly

16 participated in the Discord forums through "designees," namely Brian Brathovd, "Kurt," and

17 Defendant Elliott Kline, whom Kessler assumed were employees of Spencer or The National

18 Policy Institute (NPI) (Exhibit D, p. 243). Kessler might honestly "believe" these persons to be

19 employees of Mr. Spencer or NPI, or somehow operating on Mr. Spencer's behalf, but this is

20 factually incorrect, and no evidence suggests otherwise. There is no correspondence between

21 Spencer and "Kurt" and/or "Erica" throughout the year 2017. Mr. Brathovd frequently

22 volunteered as Mr. Spencer's bodyguard; this was not the case, however, for UTR. Regardless,

23 Mr. Brathovd was never paid at any time for his services, nor was he in any contractual

SUMMARY JUDGEMENT - 5

relationship with Spencer or NPI. Mr. Kline, too, was never an employee of Spencer or NPI, nor was he ever paid for any services rendered. At the time, Mr. Spencer knew Mr. Kline as an energetic activist, who kept in touch with many figures in and around the Alt-Right.

Mr. Spencer's personal correspondence with Mr. Kline over the relevant period was extensive, and it has been reproduced in full in Mr. Spencer's Responses to Plaintiff's First Request for Documents and his Interrogatory Answers (Exhibits A and E). As seen here, Mr. Spencer was kept abreast of the challenges Mr. Kessler encountered in organizing UTR but only *after* decisions had been made and strategies were implemented (Exhibit E).

> **Eli Mosley:** Just got off the phone with Kessler and the ACLU. Basically, they said our choices are to file an injunction and possibly lose which might be a PR loss or they could file after they said they'd almost certainly win and be a PR win for us, Kessler, and them....
>
> **Richard Spencer:** I concur with your strategy.

Mr. Spencer's role in organizing UTR was entirely dispensable, and correspondence such as this represent him *at his most active in the process*: he offers an opinion on reports of an action that was already taken. There is no evidence that Mr. Spencer was witness to or participatory in the actual logistical planning of UTR or, more importantly, any potential encouragement of violence or the violation of civil rights.

### §3: The Application of Law

The crux of the §1986 law is as follows:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to

SUMMARY JUDGEMENT - 6

1
2

> the party injured, or his legal representatives, for all damages caused by such
> wrongful act, which such person by reasonable diligence could have
> prevented. . . .

3
4

Mr. Spencer had no knowledge of any planning to target or harm any Plaintiff, nor any

5

racial, ethnic, or religious group to which a Plaintiff belongs. There exists no evidence that

6

indicates otherwise. Additionally, there is no evidence that Mr. Spencer directed any harm

7

toward or the violation of the rights of any Plaintiff, nor was he in any position to prevent such

8

harm or violation of rights. During the Friday-night torch march and events on Saturday, Mr.

9

Spencer did not encounter any one of the Plaintiffs; it would thus be impossible for him to have

10

harmed any one of them or violated their civil-rights, or prevented others from doing so. If there

11

were a concerted effort to harm or violate the rights of the Plaintiffs, engaged in by Spencer's co-

12

Defendants or other parties, Spencer was unaware of it. And he would not have attended the rally

13

if he knew of such a scheme.

14

Turning to §1985, we are presented with the same glaring absence of evidence for any

15

relevance of this law:

16
17
18
19
20

> If two or more persons in any State or Territory conspire or go in disguise on the
> highway or on the premises of another, for the purpose of depriving, either
> directly or indirectly, any person or class of persons of the equal protection of the
> laws, or of equal privileges and immunities under the laws; or for the purpose of
> preventing or hindering the constituted authorities of any State or Territory from
> giving or securing to all persons within such State or Territory the equal
> protection of the laws

21

Additionally, in the context of §1985, the Plaintiffs claim that Spencer and others

22

violated their rights under the Thirteenth amendment and 42 U.S.C. § 1982, to be free of the

23

"badges and incidents" of slavery. The term "badges and incidents of slavery" has been the

SUMMARY JUDGEMENT - 7

1  subject of a contentious legal debate over interpretation. Some have sought to use an overly

2  broad definition of this phrase, arguing that any speech that might be offensive to African-

3  Americans can be viewed as a kind of reminder (or "badge") of slavery. But the phrase "badges

4  and incidents of slavery" must be understood in its historical context. "Badges" mean just that,

5  *actual badges* that identify slaves. Mr. Spencer agrees that all people should be free of such

6  badges. And there are no allegations or reports of Mr. Spencer attempting to put badges on

7  people against their will indicating that they are slaves.

8      Mr. Spencer was invited to speak at the UTR gathering, as Mr. Kessler's depositions and

9  various correspondences make clear. He travelled to Charlottesville by car from Alexandria,

10  Virginia, to express his views and lawfully protest in defense of a monument. He was not

11  involved in the violation of any civil rights of the Plaintiffs, nor was he in a position to prevent

12  others from doing so.

13      When Spencer was in a position to prevent harm, he acted appropriately. On Saturday,

14  August 12, at 12:38 PM ET—before the worst acts of violence took place in downtown

15  Charlottesville—Spencer published the following directive on Twitter (Exhibit G):

16          My recommendation: Disperse. Get out of Charlottesville city limits. State of
            emergency has been called.

17

18

19                    **§4: "Hate Speech" and Free Expression**

20      Many countries around the world have enacted laws regarding the content or viewpoint

21  of speech allowed to their citizens. The United States has not. And the U.S. Supreme Court has

22  been unambiguous in upholding the right to free speech—including speech that could fairly be

23  called "hate speech," that is, language that is derogatory to racial, ethnic, or sexual minorities. To

            SUMMARY JUDGEMENT - 8

cite a recent example—the Supreme Court heard the case of *Matal v. Tam*, 582 U.S. ___ (2017), which involved a musical group called "The Slants" (as in "slanty eyes"), a moniker that is likely offensive to Asian Americans. Here, the Justices unanimously ruled that a federal law prohibiting trademark names that are disparaging toward minorities is unconstitutional. Justice Anthony Kennedy:

> A law that can be directed against speech found offensive to some portion of the public can be turned against minority and dissenting views to the detriment of all. The First Amendment does not entrust that power to the government's benevolence. Instead, our reliance must be on the substantial safeguards of free and open discussion in a democratic society.

No U.S. law exists that could be applied to Mr. Spencer's expressions of sincerely held beliefs (for an example of his conviction, see Exhibit J). If such a law were hypothetically passed, it would almost certainly be struck down by the highest court.

Moreover, throughout their Complaint, the Plaintiffs have taken public statements by Mr. Spencer and others and imputed criminal and violent intentions. One example is the Plaintiffs' assertion that Mr. Spencer is "calling for an 'ethnic cleansing.'" (Amended Complaint, ¶21). This claim is repeated on the website "Integrity First America" (IntegrityFirstForAmerica.org), a non-profit group associated with two of the Plaintiffs' representatives. Mr. Spencer's supposed "call" for ethnic cleansing occurred in a speech given in 2013, entitled "Facing the Future as a Minority" (Exhibit H):

> [The Paris Peace Conference of] 1919 is a real example of successful ethnic redistribution—done by fiat, we should remember, but done peacefully.

SUMMARY JUDGEMENT - 9

It was President Woodrow Wilson and other world leaders who "called for ethnic cleansing" (in this sense), not Mr. Spencer. And to represent the passage above as Mr. Spencer's directive for violence at UTR is to stretch the human interpretative capacity beyond it limits.

The Plaintiffs' Complaint includes many other instances of speech or publications that are undoubtedly bold and likely offensive to some. For example: "Now it's time to dominate the streets" (Amended Complain, ¶86). These words were published, immediately before UTR, on a website that Mr. Spencer edited (Exhibit I). Similar pronouncements are voiced by almost every activist of every stripe and are best compared to rooting or cheerleading at a sports game: they might be brash and harsh, but they are never meant to be taken literally, and cannot be used as a basis for civil litigation. No individual or group actually "owns" or "dominates" public places, much like the Dallas Cowboys football team does not actually "crush" or "destroy" the Philadelphia Eagles, despite bold claims from fans. These are turns of phrases. And the statements cited in the Complaint cannot plausibly be represented, under the laws referenced above, as attempts to intimidate or harm the Plaintiffs or deny them civil rights. If they were, as Hamlet might say, who should 'scape whipping?

Nothing uttered or published by Mr. Spencer in or around UTR—even in his worst moments—rises to the level of "fighting words" as defined in *Chaplinsky v New Hampshire*, 315 U.S. 568 (1942); these are words that "by their very utterance, inflict injury or tend to incite an immediate breach of the peace" and are thus not fully protected by the First Amendment. But here, too, even "fighting words"—the most odious slurs and heinous emissions and displays— are not invisible to the Constitution. As addressed by Justice Antonin Scalia in *R.A.V., Petitioner, v. City of St. Paul, Minnesota*, 505 U.S. 377 (1992), laws applied to "fighting words" cannot themselves evince viewpoint discrimination. It follows that laws cannot be applied against strong

SUMMARY JUDGEMENT - 10

speech in such a way that evinces viewpoint discrimination. In other words, the Commonwealth of Virginia cannot "license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensbury Rules." Apropos of this case, the Plaintiffs cannot merely assert that Mr. Spencer is a "white supremacist" or "Nazi" and expect that to be sufficient for the application of laws (§1986 and §1985, for example) that would not be applied to racial egalitarians or anti-fascists. If a woman were injured or maligned in a demonstration in favor of religious tolerance and free school lunches, does she have a claim for damages from an activist on the basis that he once boldly declared "We own this town"? Presumably, she would not.

### §5: Conclusion

Mr. Spencer does not express an opinion on the status of Mr. Kessler and the other Defendants. Mr. Spencer was never in a position to ascertain fully his co-Defendants' motives and plans. Mr. Spencer's deeply held convictions are, undoubtedly, offensive to many; some might even call his more outrageous utterances "hate speech." But the question before the Court is *not* whether Mr. Spencer is a divisive personality. It is whether there is compelling evidence that he conspired to commit or inspire violence and the violation of the Plaintiffs' civil rights. Here, matters are not so controversial.

\* \* \*

Mr. Spencer humbly pleads the Court for summary judgement regarding all claims against him in the Plaintiffs' Second Amended Complaint

Mr. Spencer avers under oath that all statements made in this document are truthful.

Mr. Spencer requests that his Motion for Summary Judgement be addressed in Oral Arguments before the Honorable Judge Norman Moon.

SUMMARY JUDGEMENT - 11

1

2

3

4    The 14th of October, 2020.

5    _____

6                    Richard B. Spencer, *Pro Se*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

SUMMARY JUDGEMENT - 12

1 **CERTIFICATE OF SERVICE**

2 I certify that on the October 14, 2020, a true and correct copy of the foregoing Motion for

3 Summary Justice was mailed to the Clerk of the Court, which will provide electronic notice to all

4 counsel of record.

5

6

7

8 Richard B. Spencer, *Pro Se*

9

10

11 I further hereby certify that on October 14, 2020, I also served the following non-ECF

12 participants, via electronic mail, as follows:

13

14 Christopher Cantwell christopher.cantwell@gmail.com

15 Robert Azzmador Ray azzmador@gmail.com

16 Elliott Kline a/k/a Eli Mosley eli.f.mosley@gmail.com deplorabletruth@gmail.com

17 Vanguard America c/o Dillon Hopper dillon_hopper@protonmail.com

18 Matthew Heimbach matthew.w.heimbach@gmail.com

19

20

21

22

23

SUMMARY JUDGEMENT - 13