IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| ELIZABETH SINES, et al., | ) | Civil Action No. 3:17-cv-00072 |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION & ORDER |
| | ) | |
| JASON KESSLER, et al., | ) | |
|     Defendants. | ) | By:   Joel C. Hoppe |
| | ) |       United States Magistrate Judge |

This matter is before the Court on Plaintiffs' third motion for nondispositive Rule 37 sanctions against Defendant Elliott Kline (a.k.a. Eli Mosley). ECF No. 601 ("Pls.' 3d Mot. for Sanctions"); *see* Pretrial Order ¶ 13 (citing 28 U.S.C. § 636(b)(1)(A)), ECF No. 101. Kline, who is representing himself, ECF No. 347, did not file a response within fourteen days. Accordingly, I consider Plaintiffs' motion to be unopposed by Kline. Pretrial Order ¶ 7. Defendants Richard Spencer and Christopher Cantwell each filed a brief opposing Plaintiffs' requests for evidentiary sanctions, ECF Nos. 469, 637, to which Plaintiffs replied, ECF Nos. 475, 478, 641.[1] The matter has been fully briefed, *see* ECF Nos. 601, 604, 642, 645, 649, 682,[2] and may be decided without another hearing, *see* ECF Nos. 504, 600, 609, 632. Fed. R. Civ. P. 78(b); W.D. Va. Civ. R. 11(b). Plaintiffs' motion for sanctions, ECF No. 601, will be granted in part and denied in part.

I. The Legal Framework

Rule 37(b)(2) of the Federal Rules of Civil Procedure grants the district court where an action is pending broad discretion to impose sanctions whenever "a party . . . fails to obey an

---

[1] The documents at ECF No. 478 to 478-8 are certain exhibits to Plaintiffs' reply to Spencer's brief in opposition to Plaintiffs' first motion for evidentiary sanctions against Defendants Kline and Matthew Heimbach, ECF No. 475. These exhibits are sealed. *See* Order of Apr. 25, 2019, ECF No. 477.

[2] Docket entries 604 and 682 are sealed. *See* Oral Order, ECF No. 624; Order of Mar. 16, 2020, ECF No. 681. Redacted versions of these filings may be found at ECF No. 627 and ECF No. 679, respectively.

order to provide or permit discovery," Fed. R. Civ. P. 37(b)(2)(A).[3] *See Law Funder, L.L.C. v. Munoz*, 924 F.3d 753, 758 (5th Cir. 2019) ("Rule 37(b)(2)(A) allows a district court to impose a sanction when a party fails to comply with a discovery order, and the court has broad discretion in fashioning its sanction when it does so."). "The rule's language clearly requires two things as conditions precedent to engaging the gears of the rule's sanction machinery: a court order must be in effect, and then must be violated, before the enumerated sanctions can be imposed." *R.W. Int'l Corp. v. Welch Foods, Inc.*, 937 F.2d 11, 15 (1st Cir. 1991); *see also Carriage Hill Mgmt., LLC v. Bos. Lobster Feast, Inc.*, No. GJH-17-2208, 2018 WL 3329588, at *5 (D. Md. July 6, 2018); *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 518–20 (D. Md. 2010). "Courts are entitled to interpret broadly what constitutes an order" under this subsection. *REP MCR Realty v. Lynch*, 383 F. Supp. 2d 984, 998 (N.D. Ill. 2005) ("Although Rule 37 requires a party to violate a judicial directive in order to impose sanctions, a formal, written order to comply with discovery is not required." (quotation marks omitted)); *cf. Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 324 (4th Cir. 2001) (en banc) (recognizing "the rule in this circuit that a district court . . . is best able to interpret its own orders" (quotation marks omitted)). "[A]n oral directive from the district court provides a sufficient basis for Rule 37(b)(2) sanctions if it unequivocally directs the party to provide the requested discovery," *Halas v. Consumer Servs., Inc.*, 16 F.3d 161, 164 (7th Cir. 1994), or to conduct itself in a manner that will

---

[3] Federal courts also have inherent power to sanction conduct that offends the legal process, including a party's "fail[ure] to preserve or produce" discoverable information for another's use in litigation. *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450 (4th Cir. 2004); *see Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 497–99 (D. Md. 2000). In this case, Rule 37 provides an adequate framework for sanctioning Kline's repeated failures to obey court orders directing him to provide or permit discovery. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991) ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than [its] inherent power. But if in the informed discretion of the court, neither [a] statute or the Rules are up to the task, the court may safely rely on its inherent power.").

2

permit anticipated discovery, *see Victor Stanley*, 269 F.R.D. at 519–20 (party's failure to comply with court's oral directive to preserve relevant information provided basis for Rule 37(b)(2) sanctions).

Rule 37(b)(2)(A) "contains two standards—one general and one specific—that limit a district court's discretion. First, any sanction must be 'just'; second, the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery."[4] *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982). "Rule 37 sanctions must be applied diligently," *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763 (1980), "both as a matter of justice in the individual case and 'to deter others who might be tempted to similar conduct,'" *Lee v. Max Int'l*, 638 F.3d 1318, 1320 (10th Cir. 2011) (Gorsuch, J.) (brackets omitted) (quoting *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976)). *See Victor Stanley*, 269 F.R.D. at 533–34. Sanctions include orders deeming certain facts established, allowing or requiring an adverse inference, and entering default judgment against the disobedient party. *Id.* (citing Fed. R. Civ. P. 37(b)(2)(A)). These options are "flexible, selective, and plural. The district court may, within reason, use as many and as varied sanctions as are necessary," 8B Charles Wright & Arthur Miller, *Federal Practice & Procedure* § 2284

---

[4] "Instead of or in addition to" any orders issued under this subsection, "the court *must* order the disobedient party . . . to pay the reasonable expenses, including attorney's fees, caused by the failure [to obey a discovery order], unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C) (emphasis added). I previously ordered Kline to pay $12,538.33 in Plaintiffs' reasonable attorney's fees caused by his failure to obey at least four separate discovery orders. Mem. Op. of May 26, 2020, at 1, 4, 21, ECF No. 738 (citing ECF Nos. 287, 379, 383, 440); *see* Mem. Op. of Aug. 9, 2019, at 26, 33–36. This Memorandum Opinion and Order addresses Plaintiffs' "renewed" request for evidentiary sanctions against Kline. Pls.' 3d Mot. for Sanctions 4; *see* Order Finding Elliott Kline in Civil Contempt 13, 16 (taking second request under advisement), ECF No. 599 ("First Civil Contempt Order"); Order of June 21, 2019, at 1 (taking first request under advisement), ECF No. 508.

(3d ed. 2002), to achieve Rule 37's goals in a particular case, *see Victor Stanley*, 269 F.R.D. at 533–34.

The Fourth Circuit has "developed a four-part test for a district court to use when determining what sanctions to impose" under Rule 37(b)(2)(A). *Belk*, 269 F.3d at 348; *see S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). The court must consider: "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective." *S. States*, 318 F.3d at 597 (4th Cir. 2003) (quoting *Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians*, 155 F.3d 500, 504 (4th Cir. 1998)); *see Beach Mart, Inc. v. L&L Wings, Inc.*, 784 F. App'x 118, 123–24 (4th Cir. 2019) (citing Fed. R. Civ. P. 37(b)(2)(A)). Some sanctions, including an adverse inference, require the court to find that the disobedient party acted willfully or in bad faith. *Sampson v. City of Cambridge*, 251 F.R.D. 172, 181 (D. Md. 2008) (citing *Hodge*, 360 F.3d at 450–51); *cf.* Fed. R. Civ. P. 37(e)(2) (permitting an adverse inference where electronically stored information that should have been preserved for litigation was "lost because a party failed to take reasonable steps to preserve it and it cannot be restored or replaced through additional discovery," but "only upon finding that the party acted with intent to deprive another party of the information's use in the litigation"). The Fourth Circuit has not clearly defined the burden or standard of proof on a motion for sanctions under Rule 37(b). *Brooks Sports, Inc. v. Anta (China) Co., Ltd.*, No. 1:17cv1458, 2018 WL 7488924, at *11 (E.D. Va. Nov. 30, 2018), *adopted by* 2019 WL 969572, at *1 (E.D. Va. Jan. 11, 2019); *Glynn v. EDO Corp.*, Civ. No. 07-1660, 2010 WL 3294347, at *2 (D. Md. Aug. 20, 2010). "However, proving misconduct by 'clear and convincing' evidence, as opposed to by a mere preponderance,

certainly suffices," *Glynn*, 2010 WL 3294347, at *2, especially when the sanction does not result in dismissal or default judgment against the disobedient party, *see Anderson*, 155 F.3d at 504–05. Here, Plaintiffs produced persuasive evidence of Kline's willful disobedience to satisfy the more demanding "clear and convincing" standard. *See* Order Finding Elliott Kline Remains in Civil Contempt & Order to Surrender to USMS Custody 8, ECF No. 610 ("Second Civil Contempt Order"); First Civil Contempt Order 7–12.[5]

## II. Background[6]

On August 11–12, 2017, the "Defendants in this lawsuit, including the Ku Klux Klan, various neo-Nazi organizations, and associated white supremacists, held rallies in Charlottesville, Virginia. Violence erupted." Mem. Op. on Defs.' Mots. to Dismiss Am. Compl. 1; *see* Second Am. Compl. ¶¶ 1–7. These rallies are now known as "Unite the Right." Plaintiffs, several residents who were injured that weekend, contend that "this violence was no accident"— rather, they allege that Defendants "conspir[ed] to engage in violence against racial minorities and their supporters" in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1985, and related state laws. Mem. Op. on Defs.' Mots. to Dismiss Am. Compl. 1–2. "While ultimate resolution of what happened at the rallies awaits another day," the District Court has held the remaining Plaintiffs plausibly alleged that certain Defendants, Kline included, "formed a conspiracy to commit the racial violence that led to the Plaintiffs' varied injuries." *Id.* at 1.

---

[5] Pinpoint citations to documents electronically filed on the case docket, except for transcripts of court proceedings and depositions, typically use the header page numbers generated by CM/ECF and the exhibit labels assigned by the filing party. Pinpoint citations to transcripts use the number printed on the upper right-hand corner of the cited page.

[6] This section summarizes certain factual allegations in Plaintiffs' Second Amended Complaint. ECF No. 557. "While the Court does not repeatedly state 'Plaintiffs *allege* that Defendant *X* did *Y*,' this summary should not be taken as the Court's endorsement of one version of the facts." Mem. Op. on Defs.' Mots. to Dismiss Am. Compl. 3 (July 8, 2018), ECF No. 335.

Kline, who also goes by "Eli Mosley," is associated with the white-supremacist group Defendant Identity Evropa, which he led from August to November 2017. *See* Second Am. Compl. ¶¶ 29–30; Pls.' 3d Mot. for Sanctions Ex. A, Tr. of Elliott Kline Dep. 28–29, 48–49, 68 (Aug. 7, 2019), ECF No. 601-1 ("Kline Dep. Tr."). He "has described himself as the 'command soldier major of the 'alt-right.'" Second Am. Compl. ¶ 29. Kline played a central role in planning Unite the Right. *See* First Contempt Hr'g Tr. 56–57 (Nov. 25, 2019), ECF No. 600; Kline Dep. Tr. 26, 106; Pls.' Mot. for Sanctions Against Defs. Kline & Heimbach Ex. 3, Tr. of Jason Kessler Dep. 237 (May 16, 2018), ECF No. 457-3; *id.* Ex. 2, Tr. of Erica Alduino Dep. 189 (Dec. 3, 2018), ECF No. 457-2. Kline "communicated with [his] co-Defendants and others before, during, and after these events. Most of that activity occurred online." Mem. Op. of Aug. 9, 2019, at 7, ECF No. 539; *see id.* at 8–11. For example, Kline and Defendant Jason Kessler "moderated and managed" part of an online platform called Discord. Mem. Op. on Defs.' Mots. to Dismiss Am. Compl. 7. "This 'invite only' platform allowed Defendants and their chosen invitees to engage in private conversations during the lead up to the events." *Id.* (citing Am. Compl. ¶¶ 71–74). "Conversation on Discord included mundane planning details, racist 'jokes,' and concrete threats of violence," *id.* at 8, including running over counter-protestors marching in the streets, *id.* at 42–43.

In June 2017, "Kline drafted and circulated to 'group leaders' a working document titled 'Operation Unite the Right Charlottesville 2.0.'" Pls.' 3d. Mot. for Sanctions 6 (citing *id.* Ex. B ("Report Version: 6/11/2017 Initial OPORD"), ECF No. 601-2, at 2–8); *see also id.* at 15 (citing Kline Dep. Tr. 175–76, 371–73). As of June 11, the event was "being organized by" Kline and Kessler "with a few others" acting as event coordinators on Discord. *Id.* Ex. B, at 2, 6. Kline also oversaw "Information Sharing," and he instructed the "group leaders" who received his report to

"not discuss the specifics of this event outside of official discussion channels." *Id.* at 5 ("[W]e'd like to keep the info leaks to a minimum on certain things."). Kline listed his Discord username, a (610) phone number, and email address, and encouraged recipients to "[f]eel free to msg/call whenever." *Id.* at 6; *see also id.* at 4 ("If you'd like to volunteer . . . please contact Eli Mosley via Discord. . . ."). That July, Kline told Discord users on the "Charlottesville 2.0" server, which he controlled, that he would not tolerate them sharing any information about the event "outside of closed circles." Pls.' 3d. Mot. for Sanctions Ex. D, Eli Mosley, Discord (July 11, 2017 2:14 PM), ECF No. 601-4, at 8. In August, Kline shared updated versions of the "Operation Unite the Right Charlottesville 2.0" planning document listing the same Discord username and email address, but a new (347) phone number. *Id.* Ex. E ("Report Version: 8/8/2017 Security Orders"), ECF No. 601-5, at 3; *id.* Ex. F ("Report Version: 8/10/2017 Security Orders"), ECF No. 601-6, at 3. Kline told group leaders that this was his "direct contact information" and encouraged them to call or "message [him] directly for anything regarding the event." *Id.* ("Feel free to msg/call whenever.").

Kline, Kessler, and other Defendants also organized a "secret" torchlight parade through the University of Virginia's grounds on the night of Friday, August 11, 2017. *See* Second Am. Compl. ¶ 143. During one planning call on Discord, Kline told participants, "'We are doing a torch light event on Friday. Anyone who doesn't have tiki stuff now should go out and get it tonight or tomorrow morning and if you could get extras that would be great.'" *Id.* ¶ 146 (alteration omitted). On Friday evening, Kline posted on Discord that "everyone can start assembling at Nameless Field right now with your torches to start staging. We will step off from the field at 10 pm." *Id.* ¶ 151 (capitalization corrected). Kline "would later approvingly tweet [a] picture" of Defendant Christopher Cantwell "spraying pepper spray in a counter-protester's eyes,

saying 'He protect / He attack / But most importantly he got your back.'" Mem. Op. on Defs.'

Mots. to Dismiss Am. Compl. 33 (quoting Am. Compl. ¶ 172 (brackets omitted)).

Finally, Kline communicated with others on the ground in Charlottesville on August 12,

2017. He and Kessler "exhorted rallygoers to arrive before the park opened to form a 'white bloc

barrier . . . around the entire statue + podium. Given that they know we're coming, we'll all need

as many people as possible to be there right when the park opens.'" Second Am. Compl. ¶ 188

(alteration omitted). By 11:22 a.m., local law enforcement declared an unlawful assembly and

ordered everyone to leave. *Id.* ¶ 222. Several Defendants went to nearby McIntire Park where

they "discussed returning to Emancipation Park in defiance of police orders." *Id.* ¶ 230. Kline

went online looking for "people with guns: 'I need shooters,' he said. 'We're gonna send 200

people with long rifles back to that statue.'" *Id.*

*

Kline later testified that he made "five or six versions" of the "Charlottesville 2.0"

planning document, each several pages long, by typing and editing the document on his cell

phone. He did not use a computer to plan or communicate about Unite the Right. Pls.' 3d Mot.

for Sanctions 15 (citing Kline Dep. Tr. 175–76, 371–73); *see also* First Contempt Hr'g Tr. 34,

55–57; Second Contempt Hr'g Tr. 11–12 (Dec. 16, 2019), ECF No. 609; Tr. of Jan. 6, 2020

Status Conf. 10–11, ECF No. 632; Kline Dep. Tr. 107–08, 120–22, 175–76, 371–73, 376. Kline

had a computer before he moved to South Carolina in 2016 or 2017, but he did not take it with

him either because he "couldn't fit all of [his] stuff in the car," Kline Dep. Tr. 112, or because he

"dropped the computer" while moving "and it basically fell apart," First Contempt Hr'g Tr. 34;

*see also* Second Contempt Hr'g Tr. 11–12 ("[This was] a computer that I used before I was a

member of the Alt-right. The last time I had used it was in 2016, and it wasn't used for any

8

purposes related to Unite the Right or any communication. . . . [W]hen I moved back in 2016, that computer had been dropped, and it must have been thrown out when we were moving."). At Kline's first deposition in August 2019, Plaintiffs showed him several Discord chats from late March 2017 in which Kline referred to "my computer," "my PC," or "my home PC." *See* Pls.' 3d Mot. for Sanctions 14–15 (citing Pls.' Decl. in Supp. of 2d Mot. for Sanctions Ex. F, EliMosley#5269, Discord (Mar. 22, 2017 8:42 PM) ("I have the screen cap on my home PC"), ECF No. 566-6; *id.* Ex. G, EliMosley#5269, Discord (Mar. 22, 2017 5:02 PM) ("if he comes in and I have to defend myself all they have to do is look through my computer and im fucked so not really a good option"), ECF No. 566-7; *id.* Ex. I, EliMosley#5269, Discord (Mar. 31, 2017 10:38 PM) ("the phone is backed up on my PC"), ECF No. 566-9; *id.* Ex. H, EliMosley#5269, Discord (Mar. 22, 2017 4:45 PM) ("they share a wall with my computer"), ECF No. 566-8). Kline admitted under oath that he sent one Discord chat about someone "look[ing] through my computer," but explained that he must have been referring to the "computer screen" he and his girlfriend used "to watch Netflix and stuff like that" since they "didn't have a TV." Kline Dep. Tr. 401–03.[7]

### III. Procedural History

Plaintiffs filed this lawsuit on October 11, 2017. ECF No. 1. Kline was properly served with a summons and copy of the Complaint at his residence in Reading, Pennsylvania on October 27. ECF No. 62. Two weeks later, "Eli Mosley" told his Twitter followers, "[W]e still have a lot of legal battles ahead of us so check out IdentityEvropa.com for info on our case. I'll also be on a few podcasts this weekend chatting about this stuff since it is crucial that we

---

[7] In March 2020, Kline's now ex-girlfriend testified that when Kline moved into her South Carolina apartment in June 2017, he brought a tower computer and three flat-screen monitors. *See* ECF No. 682-2, at 105–06, 110–11. She observed Kline using the computer "all the time" and purchased an internet subscription for Kline because he "said that he couldn't plan the rally" without it. *Id.* at 107.

continue to win in court for the future of our people." Pls.' Mot. for Sanctions Against Defs.

Kline & Heimbach Ex. 6, at 3, @EliMosleyIE, Twitter (Nov. 9, 2017 5:13 PM), ECF No. 457-6.

On January 25, 2018, Plaintiffs served their Corrected First Set of Requests for

Production of Documents and First Set of Interrogatories on Kline through his then-counsel.[8] *See*

First Civil Contempt Order 6–7; Mem. Op. of Aug. 9, 2019, at 11–12, 14–16, 29. Those requests

sought "information and materials directly relevant to the claims and defenses in this case,"

Mem. Op. of Aug. 9, 2019, at 29, including copies of any "emails, text messages, recordings, or

social media content related to the preparation, planning, transportation to, or coordination for"

the August 11–12 events and information identifying "all means of communications used to

discuss the events, as well as the specific electronic devices used for such communications," *id.*

at 12 (cleaned up). Kline's proper responses or objections were due by February 26, 2018. *Id.* at

29. He did not respond in any fashion. *Id.*

Kline's actions in this case over the next eighteen months are well documented. *See, e.g.*,

Mem. Op. of Aug. 9, 2019, at 1–2, 12–17, 30 n.11 (March 2018 to July 2019); Order to Show

Cause & Certified Facts 8–12 (July to October 2019), ECF No. 584 ("Certification Order"); First

Civil Contempt Order 3–7, 9–12 (November 2019). In short, he disobeyed numerous court orders

to provide or permit discovery of relevant materials within his control "while the litigation

slowed and everyone else's costs piled up." Mem. Op. of Aug. 9, 2019, at 29. The first order,

issued at my initial conference call with the parties on March 16, 2018, was an oral directive that

---

[8] Kline was one of several Defendants who retained James Kolenich, Esq., and Elmer Woodard, Esq., to represent them in this matter beginning on December 1, 2017. ECF No. 131. In July 2018, I allowed Messrs. Kolenich and Woodard to withdraw from representing Kline because he had stopped communicating with them and refused their instructions to cooperate in discovery. *See* Order of July 25, 2018, ECF No. 347; Mem. Op. of Aug. 9, 2019, at 16–17. At the same time, I gave Kline an additional fourteen days, or until August 8, 2018, to answer Plaintiffs' amended complaint. Order of July 25, 2018, at 1; First Contempt Hr'g Tr. 4–5; *see* Fed. R. Civ. P. 12(a)(4)(A). Kline still has not filed any responsive pleading in this case. *See* Fed. R. Civ. P. 8(b)(6).

I expected everyone on the call, Kline's attorneys included, "to preserve any potentially relevant evidence" and that I took their "obligation to preserve this evidence very seriously." Tr. of Mar. 16, 2018 Conf. Call 24, ECF No. 282; *see* Mem. Op. of Aug. 9, 2019, at 12–13. The others were written orders setting out clear step-by-step instructions how Kline could "make good [his] discovery obligation" by deadlines repeatedly extended, *Lee*, 638 F.3d at 1321. Mem. Op. of Aug. 9, 2019, at 13–15, 17–20, 22; Order of Mar. 26, 2018, ECF No. 287; Order of Nov. 13, 2018, ECF No. 379; Stip. & Order of Nov. 19, 2018, ECF No. 383; Order of Mar. 4, 2019, ECF No. 440; *see also* First Contempt Hr'g Tr. 48–51, 75–76. Yet, Kline's "consistent 'practice from the very beginning [was] to ignore outright the court's orders or submit chaotically and defectively to them.'" Mem. Op. of Aug. 9, 2019, at 30 (quoting *Mut. Fed. Savs. & Loan v. Richards & Assocs.*, 872 F.2d 88, 94 (4th Cir. 1989)). Plaintiffs also produced evidence showing Kline was active on social media—even commenting about ongoing litigation—when he should have been participating in discovery and other pretrial proceedings.[9]

On October 30, 2019, I issued an Order to Show Cause and Certification Under 28 U.S.C. § 636(e)(6)(B)(iii), detailing Kline's habitual noncompliance with my discovery orders and general failure to participate in discovery. *See* Certification Order 4–12. The Order certified facts "show[ing] that Kline disobeyed seven court orders requiring him to provide or permit discovery of relevant materials and information for Plaintiffs' use in this litigation." *Id.* at 12 (citing ECF Nos. 287, 383, 397, 440, 508, 516, 538). It also found that "most" of Kline's answers to

---

[9] In late May 2018, Twitter user "Sheli Shmosley," an account that Kline has admitted he controlled, contradicted another user's description of the Unite the Right ("UTR") rally, tweeting "[that] is not in anyway [sic] how UTR happened. I can't say much more for obvious reasons but that's just untrue." Pls.' Mot. for Sanctions Against Defs. Kline & Heimbach Ex. 6, at 5, @Sheli_Shmosley, Twitter (May 27, 2018 7:47 PM); *see* Pls.' First Supp'l Br. in Supp. of 3d Mot. for Sanctions Ex. B, Email from E. Kline to K. Kim & M. Bloch (Dec. 4, 2019), ECF No. 604-2, at 2–3. Kline was still represented by counsel at this time. Mem. Op. of Aug. 9, 2019, at 30 n.11.

Plaintiffs' questions at his recent court-ordered deposition were "evasive, internally inconsistent, or simply not believable." *Id.* at 10; *see also id.* at 8–11 (discussing orders issued on June 21, July 3, and August 8, 2019). For example, Kline admitted that both the Court and Plaintiffs' counsel had contacted him at the correct email address, phone number, and physical address, but he testified that he "didn't know" which court conferences "he was supposed to attend" and that he "wasn't given a means" to provide the requested discovery. *Id.* at 10–11 (citing Kline Dep. Tr. 35–36, 38, 138, 140–42, 203–08, 239, 250–51, 266–67, 269–71, 291–302, 305, 318 (Aug. 7, 2019), ECF No. 566-3). Or, if Kline did receive this information, he just never bothered to do anything with it. *Id.* at 11 (citing Kline Dep. Tr. 203, 204–08, 291–92, 301, 303, 305). Kline also admitted that he had responsive information in his possession, his former counsel had explained he must preserve any potentially relevant evidence for discovery, and he understood his obligation to produce any requested materials to Plaintiffs' counsel. Yet, he never took any steps to preserve this information, such as backing up his emails or the contents of his phones. *Id.* (citing Kline Dep. Tr. 82, 91–92, 139, 209–10, 214–17, 219–21, 225–26, 229–33, 244–45, 273). Based on my familiarity with the protracted discovery in this case generally, and Kline's continued contumacious behavior in particular, I recommended that the Honorable Norman K. Moon, presiding District Judge, grant in part Plaintiffs' second motion for sanctions, find Kline in civil contempt, and impose graduated sanctions to coerce his compliance with my discovery orders. *See id.* at 12–13; Fed. R. Civ. P. 37(b)(2)(A)(iv). I also ordered Kline to appear in person before Judge Moon on November 25, 2019, to show cause why he should not be adjudged in contempt by reason of the facts certified in my order.

On November 14, Judge Moon issued his own Show Cause Order directing Kline to appear as scheduled on November 25 and giving him until 5:00 p.m. EST on November 21,

2019, to send to the Third Party Discovery Vendor specific electronic devices and social media credentials; to provide "full and complete written answers" to Plaintiffs' First Set of Interrogatories and Request for Production; to "confirm by email" to Judge Moon's Chambers, my Chambers, and Plaintiffs' counsel that "the above steps ha[d] been taken," and attach to the email a copy of his written answers to Plaintiffs' discovery requests; and to file any brief or response to the facts certified and the issues raised in my Certification Order that he wanted Judge Moon to consider at the contempt hearing on November 25. *See* First Show Cause Order ¶¶ 1–4, ECF No. 588.[10] At 1:26 a.m. on November 21, Kline emailed my Chambers and one of Plaintiffs' attorneys (but not Judge Moon's Chambers) claiming that he was having trouble accessing his email and communicating with the Court, he only just learned of the November 25 hearing, his car was not working and he could not afford to fix it, he planned to stay in New York until after Thanksgiving and therefore did "not think [he] could make" it to Charlottesville until early December, and he intended to comply with his discovery obligations. *See* Second Show Cause Order 1, ECF No. 591. The same day, Judge Moon issued a second Show Cause Order informing Kline that the contempt hearing would proceed as scheduled; reiterating the specific steps that Kline needed to take, by 5:00 p.m. that evening, to fulfil his outstanding discovery obligations; advising Kline that his failure to appear at the contempt hearing and to comply with Judge Moon's orders "could result in additional grounds of contempt"; and warning Kline that his failure to appear in person on November 25 could result in the Court issuing a bench warrant and directing the United States Marshals Service ("USMS") to arrest Kline,

---

[10] Judge Moon also invited Plaintiffs file a response by 5:00 p.m. EST on November 21, 2019. *See* Order of Nov. 14, 2019, ECF No. 587. Their "response stated, in relevant part: 'Plaintiffs agree entirely with the facts certified by Judge Hoppe.'" First Civil Contempt Order 3.

transport him to Charlottesville, and hold him in custody until he purged himself of contempt. *Id.* at 2–3. He also gave Kline one extra day to respond to my Certification Order. *See id.*

Kline emailed his response to the Court on November 22, 2019. He "did not directly challenge any of [my] certified facts or assert that they did not amount to civil contempt." First Civil Contempt Order 3. He briefly addressed a few issues raised therein, namely that "he had only just gotten access" to one cell phone; he "could not access his social media accounts, and so could not turn over credentials" to the discovery vendor; he "had not received a copy of Plaintiffs' discovery requests"; and he had "difficulties communicating with counsel or the Court" using the email address that he provided. *Id.* at 3–4.

Kline did appear for the contempt hearing on November 25, 2019. Not surprisingly, though, he "did not avail himself of th[e] off-ramp" Judge Moon gave him nearly two weeks earlier. *See* First Civil Contempt Order 1 ("[Kline] failed to complete his outstanding discovery obligations before the Contempt Hearing."). At the hearing, Judge Moon heard testimony from Kline and argument from the parties. He found "Kline's excuses for non-compliance with a multitude of court orders unbelievable, contradictory, and at odds with the plain facts in the record." *Id.* at 2; *see also* First Contempt Hr'g Tr. 49–51, 66, 68. Judge Moon adopted and entered as factual findings the facts in my Certification Order, *see* First Civil Contempt Order 4, noting that they "reflect[ed] a thorough examination of the record and [were] persuasive," *id.* at 2, in documenting "Kline's repeated failures to respond to discovery or discovery orders" over the previous twenty-two months. *See id.* at 4. Judge Moon further found that Kline's statements "about his inability to access his 'Eli F Mosley' email account [were] not credible" because "Kline testified at his August 7 deposition that he did have access to and was able to log into the account, and he confirmed to his former lawyer in June 2019 that [this] email [address] was

14

correct and Kline could check it." *Id.* at 5 (footnote citations omitted). Judge Moon also found that Kline had received Plaintiffs' written discovery requests in January 2018 and that Kline's explanation why he never responded to those requests was not credible considering his deposition testimony and representations to the Court in August 2019. *See id.* at 6–7. In short, Kline "continued to deflect blame off himself and onto others, at bottom, based upon excuses that he was too busy to respond." *Id.* at 7.

On November 27, 2019, Judge Moon issued a written order finding "Kline to be presently in contempt of court, and that each of the [four] elements of civil contempt ha[d] been shown by clear and convincing evidence." *Id.* at 9 (citing *JHT Tax v. H&R Block E. Tax Servs.*, 395 F.3d 699, 705 (4th Cir. 2004)). First, "[n]umerous valid orders," including those that I issued on July 3 and August 8, 2019, and that Judge Moon issued on November 14, 2019, "all required Kline" to take specific steps, within finite periods of time, to provide or permit discovery. *See id.* at 9–11. Second, the "Orders were in Plaintiffs' favor" because Plaintiffs were entitled to Kline's complete, timely responses to their valid discovery requests, *id.* at 10 (citing Fed. R. Civ. P. 33, 34), and the Orders were a "necessary step to ensure the collection of potentially discoverable information from Kline, and to guard against concerns [over] spoliation of discoverable information," *id.* at 11 (footnote citations omitted). Third, "Kline had actual and constructive knowledge of these Orders" and he violated their terms by failing to respond to Plaintiffs' written discovery requests, failing to produce electronic devices for imaging, and failing to provide complete and accurate information for all of his social media accounts. *Id.* at 9, 11 (footnote citations omitted). Finally, Plaintiffs "suffered harm as a result of Kline's continued violations of those Orders." *Id.* at 10, 12 (footnote citations omitted). Judge Moon found this harm "to be self-evident," but noted the "financial harm and harm and delay to [Plaintiffs']

15

ability to timely develop and present [their] case was ably articulated by Plaintiffs' counsel" at the contempt hearing. *Id.* at 12; *see also id.* at 10. Thus, Judge Moon would "impose upon Kline a fine of $200 per day of non-compliance, . . . payable to Plaintiffs." *Id.* at 13.

But Judge Moon also gave Kline an opportunity to purge himself of civil contempt—without paying any money—simply by completing step-by-step instructions to fulfil his outstanding discovery obligations. *See id.* at 13, 14–15. He suspended the imposition of sanctions for five days, "such that the first $200 fine would be incurred on Monday, December 2, 2019, at 5:00 P.M. EST, if Kline should remain in non-compliance on that date and time; and each subsequent daily $200 fine will be incurred at 5:00 P.M. EST, on each following day of non-compliance, and continuing until Kline purges himself of contempt." *Id.* at 13. "Should the imposition of such daily fines prove insufficient to achieve" compliance with the prior discovery orders, however, Judge Moon was "prepared to . . . incarcerate Kline until he purge[d] himself of contempt." *Id.* Judge Moon also set a second in-person hearing for December 16, 2019, to evaluate Kline's progress. *See id.* at 13–14. "In the interim, Kline's efforts should [have] demonstrate[d] a single-minded focus on purging himself of contempt." *Id.* at 14.

Kline did not take this off-ramp, either. *See* Second Civil Contempt Order 1. In fact, by the time Plaintiffs filed this third motion for sanctions on December 6, 2019, Kline had given them only a single document: a different version of the August 10, 2017 "Operation Unite the Right Charlottesville 2.0" planning document. *See* Pls.' 3d Mot. For Sanctions 16 (citing *id.* Ex G ("Report Version 8/10/2017 General Orders"), ECF No. 601-7, at 7–15. This version encouraged Unite the Right attendees to follow the Twitter handle "@NotEliMosley" for event updates, but it did not list Kline's phone number(s) or email address(es). *Id.* Ex. G, at 12; *see* Pls.' 3d Mot. for Sanctions 11–15 (discussing Kline's multiple phone numbers, email addresses,

16

and mobile electronic devices used in 2017). On December 5, Kline told Plaintiffs' counsel this was "the only document" he used for Unite the Right: "I would just edit the document on google docs and then send it to someone else to edit it and post it in the planning Discord. It was done as sort of a 'living document' where I would just keep editing the same one." *Id.* Ex. G, at 2 (Email from E. Kline to Y. Barkai, et al. (Dec. 5, 2019 3:31 PM)). Also on December 5, Kline sent his long-overdue answers to Plaintiffs' interrogatories in an unsigned half-page email to Plaintiffs' counsel. *See id.* at 16; First Civil Contempt Order ¶ 41(a); Second Civil Contempt Order 1; Fed. R. Civ. P. 33(b). His unsworn answers were materially incomplete, evasive, and, in some respects, contradicted by his earlier testimony. *E.g., compare* Pls.' 3d Mot. for Sanctions Ex. G, at 16 ¶ 4 ("The only other [e]lectronic devices I used were laptops owned by . . . Richard Spencer and Nathan Damigo"), *with* First Contempt Hr'g Tr. 21, 25, 30–31, 41, 58–59, 65, 67 (Kline testifying that he used a "family computer" to check emails), *and* Kline Dep. Tr. 115, 397–98 (Kline testifying that he used a "neighbor's computer" in 2017); *see* Second Civil Contempt Order 1, 9–11 (discussing material omissions and discrepancies). Kline did not email copies to Judge Moon's Chambers or to my Chambers as directed. *See* First Civil Contempt Order ¶ 41(a); Second Civil Contempt Order 9.

On December 10, 2019, Judge Moon issued another Show Cause Order directing Kline to file a "response addressing any and all steps [he had] taken to purge himself of contempt," including "**how and when**" he completed each discovery task outlined in the first Civil Contempt Order. Second Show Cause Order 2, ECF No. 602. Kline was supposed to email his response to Plaintiffs' counsel, Judge Moon's Chambers, and my Chambers by noon on December 13. *Id.* Judge Moon also ordered "Kline to bring with him to Charlottesville on

December 16, 2019, the home computer that he identified" and to give it to Plaintiffs so they could send it to the discovery vendor for imaging. *Id.*

Shortly before noon on December 13, Kline emailed his response to Plaintiffs' counsel and to my Chambers, but not to Judge Moon's Chambers as was required. *See* Email from "Eli Mosley" to Y. Barkai, et al. (Dec. 13, 2019 11:32 AM). That "response did not state 'how and when'" Kline completed each of the steps outlined in Judge Moon's prior contempt order. Second Civil Contempt Order 6. Kline argued that he was "entirely in compliance with [his] discovery obligations to the best of [his] ability," and he blamed Plaintiffs for not telling him "what else [he was] actually missing" since he could not access most of his social media accounts. The "home computer" that Kline had disclosed, which he now claimed did not even work "before, during[,] or after Unite the Right," was no longer stored in his hometown. *Id*; *see* Second Contempt Hr'g Tr. 12 ("I went and checked both those storage sheds and it was no longer there. . . . [I]t must have been thrown out when we were moving."). He also asked Judge Moon to postpone the second contempt hearing, or allow him to appear by telephone, because it would "be incredibly difficult" to make the ten-hour drive from upstate New York to Charlottesville. Judge Moon promptly denied that request. Order of Dec. 13, 2019, ECF No. 605.

 Kline appeared and testified at the second contempt hearing on December 16, 2019. As before, Judge Moon found "incredible Kline's assertion that the did not know" how to fully and completely respond to Plaintiffs' discovery requests. *See* Second Civil Contempt Order 9–10 (citing First Civil Contempt Order ¶ 41(a)). Indeed, the email and social media account information Kline omitted from his written responses was "discussed at length" during the first contempt hearing and "was also a key issue addressed throughout the Civil Contempt Order" issued on November 27, 2019. *Id.* at 10. "It could come as no surprise to Kline that Plaintiffs

sought discovery from those sources and that those sources should have been listed in Kline's answers" to the interrogatories. *Id.* Judge Moon also found that Kline did not "conduct a 'diligent search'" for any other social media credentials that should have been provided to the discovery vendor and did not "submit any declaration under oath stating with specificity the reasons why he had been unable to access credentials for any email and social accounts." *Id.* (citing First Civil Contempt Order ¶ 41(b)(i)–(ii)); *see also id.* at 11 ("This Court assessed Kline's demeanor in his responses to this Court's questions concerning his search for responsive documents and found unbelievable his explanations why he had only one responsive document." (citation omitted)). Thus, Kline failed to purge himself of contempt in these respects. *See id.* at 8–12, 13 (finding by clear and convincing evidence that Kline remained in civil contempt).

Nevertheless, Judge Moon did find that Kline had substantially "fulfilled any obligations with respect to" the requirements that he provide his Walmart phone and home computer to the discovery vendor for imaging and that he provided signed privacy and consent forms allowing the vendor to access identified social media accounts. *Id.* at 12–13 (citing First Civil Contempt Order ¶ 41(c), (d)); *see* Order of Jan. 7, 2020, at 2, ECF No. 621. Kline produced the Walmart phone, and he "testified under oath that his home computer could not be found." Second Civil Contempt Order 12. Plaintiffs also appeared to concede that Kline could not at that time "take any further steps to fill out privacy or consent forms for any other social media companies" because Kline maintained he did not have access to those accounts and he did "not recall" the email addresses associated with them. *Id.* at 13.

Having found that the more than $600 in monetary "sanctions imposed to date ha[d] not been sufficient to coerce Kline into compliance with this Court's orders," Judge Moon concluded "that more stringent sanctions [were] therefore appropriate and necessary to achieve this end."

*Id.* at 15. He ordered Kline to appear at the United States Courthouse in Charlottesville at noon

on Monday, January 6, 2020 and surrender himself to USMS custody. *Id.* at 16. Kline was to

"bring with him any and all documents, electronic devices, credentials to access e-mail and

social media accounts, and materials he would need to purge himself of contempt." *Id.* Judge

Moon reminded Kline that he "still ha[d] an opportunity to reduce his fines" and avoid

imprisonment "by completing the steps set forth in paragraph 41(a) and (b)" of the First Civil

Contempt Order. *Id.*

   Kline took "some steps" towards that modest goal between December 30 and January 2.

*See* Order for Elliott Kline to Surrender to USMS Custody 2, ECF No. 613 ("Surrender Order").

"For one, he submitted to Plaintiffs his long-outstanding responses to Plaintiffs' first set of

discovery requests, and they were signed and under oath, as was required." *Id.* He also "added

some more detail" to his earlier deficient answers. And he paid the $600 remedial fine

representing "three days of his civil contempt fines accumulated" as of December 5, 2019. *Id.*;

*see* Second Civil Contempt Order 13–14. "But the inquiry at th[at] very late stage of non-

compliance," just three days before Kline would surrender to USMS custody, was "not whether

Kline ha[d] taken *some* steps to purge himself of contempt." Surrender Order 3. Rather, Kline

needed to show that he "took all reasonable steps to ensure compliance." *Id.* (quoting *Schwartz v.

Rent-a-Wreck of Am.*, 261 F. Supp. 3d 607, 615 (D. Md. 2017) (emphasis omitted)). As of

Friday, January 3, Kline "inexplicably" still had not followed most of the Court's clear, step-by-

step instructions—including that he must send all required updates and responses to Judge

Moon's Chambers' email account, as well as to Plaintiffs' counsel and my Chambers' email

account. *See id.* And, Kline continued to claim that he had "just *one* document" responsive to

Plaintiffs' discovery requests even after Judge Moon concluded Kline's position was

"unbelievable" and that he "did not 'credit Kline's assertion that he conducted a reasonable and diligent search through all available accounts, electronic devices, and sources of records.'" *Id.* (quoting Second Civil Contempt Order 11).

Kline arrived at the federal courthouse in Charlottesville before noon on January 6, 2020. That afternoon, Judge Moon held a hearing with Kline and Plaintiffs' counsel to determine whether Kline remained in civil contempt, or whether he was "presently unable to comply with . . . or ha[d] substantially complied with the provisions in paragraph 41(a) and (b)" of the November 27, 2019 Civil Contempt Order. *See* Order of Jan. 7, 2020, at 1–2. Earlier in the day, "Plaintiff raised an as-yet-unanswered, substantial question whether Kline ha[d] 'fully and completely' responded" to their discovery requests or otherwise provided the discovery vendor "account credentials for 'every' social media or email account which may contain discoverable information," as required by paragraph 41. *Id.* at 2. Specifically, Plaintiffs identified Tweets that "appear[ed] to have been sent by Kline soliciting relevant photographic or other evidence about the Unite the Right rally to be sent to a 'CvilleReports' email address." *Id.* at 2–3; *see* Pls.' Supp'l Br. Ex. A, at 2–3, @ThatEliMosley replying to @NotEliMosley, Twitter (undated), ECF No. 615-1. Kline testified that he did not "recognize" this email address and did not "remember making [it] or anything like that." Tr. of Jan. 6, 2020 Status Conf. 9. He might have posted it on Twitter for someone else. *Id.* Judge Moon remanded Kline to custody so he could "conduct a diligent search of any and all documents to which he ha[d] access to uncover credentials for th[e] 'CvilleReports' email account," and "to demonstrate there [were] no other remaining accounts omitted" from his discovery responses. Order of Jan. 7, 2020, at 3 (citing First Civil Contempt Order ¶ 41(b)(i)). If Kline could not locate any such credentials, then he "must submit 'a declaration under oath and under penalty of perjury, to that effect, and which states with

21

specificity the reasons why such credentials are unavailable'" to him. *Id.* (quoting First Civil Contempt Order ¶ 41(b)(ii)).

Around 2:00 p.m. on January 7, Kline submitted a sworn declaration summarizing the "few things" he did to uncover the credentials for the CvilleReports email account. Kline Decl. 1, ECF No. 625. First, he tried the passwords associated with his other identified Gmail accounts. Those did not work.[11] Second, he noted Google could "send a verification number, but it doesn't tell you the phone number associated with the account." *Id.* It therefore did "not appear" to Kline that this Gmail "account [was] associated with [his] phone number." *Id.* Finally, he entered "all 3 of [his] email addresses as the recovery email" for a forgotten password, but "they did not work to recover anything." *Id.* Thus, Kline "conclude[d] that his account is not one that [he] had access to, and the [Twitter] post referencing it was to spread the word for someone else." *Id.* at 1–2. The following morning, Plaintiffs filed a response and exhibits showing that CvilleReports was registered to "Eli Mosley," Kline's confirmed online alias during the relevant period. *See* Pls.' Resp. to Kline Decl. 3 (citing *id.* Ex. A, Email from Identity Evropa to Eli Mosley <cvillereports@gmail.com> (Aug. 16, 2017 3:59 PM)). Printouts from Google's "Account Recovery" webpage showed that "Eli Mosley" added the phone number (***) ***-**29, and the email address dep***********@gmail.com, as methods to verify that the CvilleReports "account really belong[ed]" to him.[12] *Id.* Exs. B & C, ECF Nos. 631-2 to 631-3. Kline previously

---

[11] Plaintiffs asked the discovery vendor to try to access the CvilleReports account using these passwords as well, but the vendor was unsuccessful. Pls.' Resp. to Kline Decl. 5, ECF No. 631.

[12] Google's "account recovery" feature reveals only the first three characters and total number of characters of the alternative email address associated with the Gmail account for which one is trying to recover a forgotten password. Similarly, it reveals only the last two digits for the phone number associated with the Gmail account. Presumably only the actual account holder would have access to the alternative email address and phone number associated with the Gmail account one is trying to recover. *See* Pls.' Resp. to Kline Decl. 3 n.1, 4 n.2. In February 2020, Judge Moon noted that "Plaintiffs presented evidence and argument—to which Kline ha[d] not responded though afforded the opportunity (Dkt. 634, at 3)—that even when faced with severe sanctions and incarceration, he still may have lied under oath

stated under oath that the "primary communication device [he] used before, during and after the

[UTR] event" was an iPhone assigned the phone number (610) ***-**29. Kline's primary email

address, deplorabletruth@gmail.com, started with the same three letters and contained the same

number of characters as the CvilleReports account's recovery email. Yet, Kline insisted in

testimony before Judge Moon that he "did not know about this email address" before Plaintiffs

raised it at the January 6 status conference. *See* Tr. of Jan. 6, 2020 Status Conf. 26–27, 30–32,

35; *see also id.* at 9, 15–16, 22–23, 27, 32, 35–37 (Kline testifying that he did not remember

making or accessing the CvilleReports account). Plaintiffs were convinced that they would not

receive the emails Kline possessed in the CvilleReports account and that Kline could not "be

trusted to participate in this discovery process in good faith." Pls.' Resp. to Kline Decl. 2. Thus,

they did "not believe" that requiring Kline to spend any more time in jail would meaningfully

"resolve this interminable saga and move the case forward." *Id.* They asked Judge Moon to

authorize the discovery vendor to produce any presumptively responsive documents or

information recovered from Kline's electronic devices and social media accounts, including

CvilleReports@gmail.com, directly to Plaintiffs' counsel for review. *See id.* at 5–7. Kline did not

respond. *See* Order of Jan. 22, 2020, at 2, ECF No. 638; Order of Feb. 7, 2020, at 3.

Judge Moon released Kline from custody on January 8, 2020. *See* Release Order 4. "To

be clear," though, "Kline remain[ed] in civil contempt." *Id.* He still had not proven that he

purged himself of contempt while detained, that he was presently unable to comply with the

---

about this [CvilleReports] email account." Order of Feb. 7, 2020, at 3, ECF No. 644. Judge Moon could
not "simply accept Kline's word on the matter" considering this evidence and the record before the Court.
*Id.*; *see also* Order of Jan. 8, 2020, at 3 ("Plaintiffs' assertions at this stage are grave—that Kline has
persisted in lying to this Court under oath and under penalty of perjury, even while being held in
incarceration for civil contempt. And Plaintiffs have provided documentation and evidence in support."),
ECF No. 634 ("Release Order"); Tr. of Jan. 6, 2020 Status Conf. 39 (Judge Moon to Kline: "[T]he Court
has pretty much decided that your testimony is not credible. So we have to verify now. You have not even
complied enough for us to verify whether you are telling the truth and cannot do anymore.").

Court's orders, or that he had taken all reasonable steps to ensure he had substantially complied with those orders. *Id.* Nor had Kline "responded 'fully and completely' to Plaintiffs' discovery requests" or "turned over or provided access to any and all potentially relevant e-mail and social media accounts." *Id.* (citing First Civil Contempt Order ¶ 41(a)–(b)). But, Judge Moon agreed with Plaintiffs that "other measures besides further incarceration" and additional remedial fines would "most effectively secure Kline's compliance" with the discovery orders. *See id.* at 4–5 (noting that Kline incurred $5,800 payable to Plaintiffs for his noncompliance). He granted Plaintiffs' requests for an order authorizing the discovery vendor to give Plaintiffs' counsel direct access to presumptively responsive documents or information found on Kline's electronic devices and social media accounts, including CvilleReports@gmail.com. *See* Order of Jan. 22, 2020, at 2–3; Order of Feb. 7, 2020, at 3–4.[13] Judge Moon also directed Plaintiffs and Kline, by January 29, 2020, "to file briefs addressing any steps Kline ha[d] taken to either purge himself of contempt or any such additional measures or sanctions sought by Plaintiffs' from Kline's contumacy." Release Order 3.

Plaintiffs filed supplemental briefs reiterating their requests for evidentiary sanctions on January 29, February 7, February 12, and March 13, 2020. ECF Nos. 642, 645, 649, 679/682. Those briefs show that Kline has done absolutely nothing to purge himself of civil contempt. Moreover, Plaintiffs obtained third-party discovery indicating that Kline falsely testified— multiple times over many months—that the (347) phone number listed on certain versions of the "Charlottesville 2.0" planning document was not his and that he had "never" had a phone

---

[13] On February 12, 2020, Plaintiffs informed the Court that the discovery vendor "successfully access[ed] the email account CvilleReports@gmail.com by using Kline's deplorabletruth@gmail.com account as a recovery email address." Pls.' Third Supp'l Br. in Supp. of 3d Mot. for Sanctions 1 (citing *id.* Ex. B, Email from B. Williams to J. Phillips, et al. (Feb. 11, 2020 7:36 AM), ECF No. 649-2, at 2), ECF No. 649. They did not say whether this account contained any relevant content. *See id.*

number with that area code. *See* Pls.' Second Supp'l Br. in Supp. of 3d Mot. for Sanctions 2–4

(citing Pls.' 3d. Mot. for Sanctions Exs. E & F; Pls.' Second Supp'l Br. in Supp. of 3d Mot. for

Sanctions Ex. A, Google Voice Report 2–249 (May 19, 2017 to Jan. 2, 2018), ECF No. 657);

Second Contempt Hr'g Tr. 23–25; Tr. of Jan. 6, 2020 Status Conf. 16, 24), ECF No. 645. Google

Voice records for the (347) number—the same one listed on the Charlottesville 2.0 planning

documents—show that it was registered to an "Eli Mosley" and connected to the email address

deplorabletruth@gmail.com. Pls.' Second Supp'l Br. in Supp. of 3d Mot. for Sanctions Ex. A, at

2. Plaintiffs contend that Kline used this number for calls and text messages around the time of

the Unite the Right rally, including the weekend of August 11–12, 2017. Pls.' Second Supp'l Br.

in Supp. of 3d Mot. for Sanctions 3–4 (citing *id.* Ex. A, at 2). These records also "seem[] to

indicate that Kline forwarded incoming text messages and phone calls from the (347) number to

a (484) number during various periods from October to December 2017."[14] *Id.* at 4 (citing *id.* Ex.

A, at 2–249). The (484) area code is assigned to southeastern Pennsylvania, *id.*, which is where

Kline resided when he was served with this lawsuit on October 11, 2017, *see* ECF No. 62. On

January 6, 2020, Kline testified that he had a (484) phone number, in addition to the (610) phone

number listed on the June 2017 version of the "Charlottesville 2.0" planning document. *See* Tr.

of Jan. 6, 2020 Status Conf. 19–20, 22. He insisted that he'd "never" seen the (347) phone

number except on the Charlottesville 2.0 document. *Id.* at 20; *see also* Second Contempt Hr'g Tr.

23 ("I've never seen that number. I don't know where it's from. . . . I never had a 347 number

linked to me or anything like that."); *id.* at 25 ("I never used any 347 number or any number

during this, other than the (610) ***-**29 number.").

---

[14] It appears that Kline canceled the Google Voice service on January 2, 2018, *see id.* at 3–4, shortly after his former attorneys entered their appearance in this matter, ECF No. 131 (Dec. 1, 2017).

The Court has not heard from Kline since he was released from custody on January 8, 2020. *See* Order of Jan. 22, 2020, at 2; Order of Feb. 7, 2020, at 3; Fourth Disc. Order to Def. Elliott Kline (July 24, 2020) (granting Plaintiffs' motion to be reimbursed for reasonable fees and expenses incurred by Kline's failure to attend a properly noticed deposition on July 2, and to compel his attendance at a videoconference deposition on August 12, 2020), ECF No. 815.

## IV. Discussion

Plaintiffs' pending Rule 37 motion seeks three evidentiary sanctions against Kline. *See generally* Pls.' 3d Mot. for Sanctions 4, 18–22; Pls.' Resp. to Order of Jan. 8, 2020, at 2, 3–6, ECF No. 642; Pls.' Second Supp'l Br. in Supp. of 3d Mot. for Sanctions 4–5; Pls.' Third Supp'l Br. in Supp. of 3d Mot. for Sanctions 4; Pls.' Redacted Fourth Supp'l Br. in Supp. of 3d Mot. for Sanctions 4–5, ECF No. 679. First, they ask the Court to "deem [the] facts listed in Appendix A to this Motion established," Pls.' 3d Mot. for Sanctions 23, for purposes of the action. Fed. R. Civ. P. 37(b)(2)(A)(i). That list includes certain factual issues that Plaintiffs must prove at trial to hold Kline liable for conspiring to engage in violence against racial or religious minorities and their supporters. *Compare* Pls.' 3d Mot. for Sanctions 27–28, at § I ¶¶ 3–13 (proposed facts), *with* Mem. Op. on Defs.' Mots. to Dismiss Am. Compl. 13–21, 32–34, 41–44 (discussing the essential elements of a § 1985(3) conspiracy claim; summarizing Plaintiffs' factual allegations that Kline (a.k.a. "Eli Mosley") described himself "as 'command soldier major of the alt-right,' his use of Discord to share fighting tactics, and his alleged organization of attendees at the Friday night march"; concluding that the Amended Complaint "adequately alleged that he was part of a conspiracy to commit racial violence"; and concluding that certain Defendants' acts of violence resulting in Plaintiffs' injuries were "reasonably foreseeable to [their] co-conspirator Defendants"). For example, Plaintiffs propose the following language:

- "Kline entered into an agreement with one or more coconspirators to plan the Unite the Right event that took place in Charlottesville, Virginia on August 11 and 12, 2017." Pls.' 3d Mot. for Sanctions 27–28, at § I ¶ 3.

- "Kline entered into an agreement with one or more coconspirators to engage in racially-motivated violence" on August 11 and 12, 2017. *Id.* ¶¶ 4–5.

- "Kline was motivated by animus against racial minorities, Jewish people, and their supporters when conspiring to engage in acts of intimidation and violence on August 11 and 12, 2017." *Id.* ¶ 6

- "It was reasonably foreseeable to . . . Kline and intended by him that coconspirators would commit acts of racially-motivated violence and intimidation at the torchlight event," on August 11, *id.* ¶ 7, and at the Unite the Right rally on August 12, 2017, *id.* ¶ 8.

- "It was reasonably foreseeable to . . . Kline and intended by him that a coconspirator would engage in racially-motivated violence by intentionally driving a car into a crowd of counter-protestors on August 12, 2017." *Id.* ¶ 9.

- "Kline committed multiple overt acts in furtherance of the conspiracy he entered into to commit racially-motivated violence . . . on August 12, 2017." *Id.* ¶ 10.

- "Kline attended the torchlight march on August 11, 2017 and committed acts of intimidation and violence in furtherance of the conspiracy." *Id.* ¶ 11.

- "Kline attended the Unite the Right event on August 12, 2017 and committed acts of intimidation and violence in furtherance of the conspiracy." *Id.* ¶ 12.

- "Kline [later] ratified the racially motivated violence that occurred" at the Unite the Right events in Charlottesville on August 11–12, 2017. *Id.* ¶ 13.

Defendant Spencer (and, to a lesser extent, Defendant Cantwell) objected that most of Plaintiffs' proposed findings "are so broad" that they would "negate [his] defenses" and deprive him of his rights to due process and trial by jury. Def. Spencer's Resp. in Opp'n to Pls.' Mot. for Sanctions Against Defs. Kline & Heimbach 4, 6, ECF No. 469; *see also* Def. Cantwell's Resp. in Opp'n to Pls.' 3d Mot. for Sanctions 1, 4–5, ECF No. 637. Put differently, deeming these facts established would satisfy Plaintiffs' burden to prove at trial that "a conspiracy existed," there was "an

27

agreement to engage in racially, ethically and religiously motivated violence," and "it was foreseeable that a co-conspirator would commit racially motivated violence," including driving his car into counter-protestors. Def. Spencer's Resp. in Opp'n to Pls.' Mot. for Sanctions Against Defs. Kline & Heimbach 5–6. Plaintiffs replied that the proposed facts are "limited by their terms to apply exclusively to Kline" and "are little more than a proxy for the type of evidence that would have been admissible at trial anyway had Kline . . . chosen to participate" in discovery. Pls.' Reply to Def. Spencer's Resp. in Opp'n to Pls.' Mot. for Sanctions Against Defs. Kline & Heimbach 2, ECF No. 475; *see also* Pls.' Reply to Def. Cantwell's Resp. in Opp'n to Pls.' 3d Mot. for Sanctions 4–5, ECF No. 641. Plaintiffs still "must prove that 'each Defendant entered into an agreement with a specific co-conspirator to engage in racially motivated violence at the August 11th and 12th events.'" Pls.' Reply to Def. Spencer's Resp. in Opp'n to Pls.' Mot. for Sanctions Against Defs. Kline & Heimbach 3 (quoting Mem. Op. on Defs.' Mots. to Dismiss Am. Compl. 21) (emphasis omitted). Defendants' concerns about the "spillover effect of evidentiary rulings" against Kline, such as the risk that the jury will unfairly presume other Defendants also defied the Court's discovery orders, can be addressed with an appropriate limiting instruction. *See id.* at 2–6; Pls.' Reply to Def. Cantwell's Resp. in Opp'n to Pls.' 3d Mot. for Sanctions 5–8; Def. Spencer's Resp. in Opp'n to Pls.' Mot. for Sanctions Against Defs. Kline & Heimbach 1, 6.

Second, Plaintiffs ask the Court to "deem authentic for purposes of Rule 901 of the Federal Rules of Evidence . . . any documents that Plaintiffs have a good-faith basis to believe that Kline created, including all documents from the social media accounts listed in Appendix A to th[eir] Motion, as well as any photographs taken by or depicting Kline." Pls.' 3d Mot. for Sanctions 4 (citing Fed. R. Evid. 901(a)). That list includes sixteen different social media

accounts for which "Plaintiffs have a good-faith basis to believe . . . belong to Defendant Kline," including eight Twitter handles, four Discord usernames, and two Facebook accounts. Pls.' 3d Mot. for Sanctions 28–29, at § II ¶¶ 1–16. This proposed sanction would establish a factual presumption, subject to rebuttal by any Defendant, that certain documents or photographs Plaintiffs might offer into evidence at trial are "what the proponent claims" them to be, Fed. R. Evid. 901(a). *See* Pls.' Reply to Def. Spencer's Resp. in Opp'n to Pls.' Mot. for Sanctions Against Defs. Kline & Heimbach 8–9; *cf. United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009) ("The factual determination of whether evidence is that which the proponent claims is ultimately reserved for the jury. The district court's role is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic." (internal citation omitted)); *Orr v. Bank of Am.*, 285 F.3d 764, 776 (9th Cir. 2002) ("[W]hen a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties, subject to the right of any party to present evidence to the ultimate fact-finder disputing its authenticity. . . . [A]n inquiry into authenticity concerns the genuineness of an item of evidence, not its admissibility." (internal footnote and citation omitted)). Contrary to Spencer's concern that this sanction "implicates" other evidentiary rules, Def. Spencer's Resp. in Opp'n to Pls.' Mot. for Sanctions Against Defs. Kline & Heimbach 7 n.11 (citing Fed. R. Evid. 801)), establishing a rebuttable presumption that a document or photograph is *genuine* would not impact the trial judge's determination whether that item is *admissible* into evidence, *Orr*, 285 F.3d at 776; Pls.' Reply to Def. Spencer's Resp. in Opp'n to Pls.' Mot. for Sanctions Against Defs. Kline & Heimbach 8–9. *See generally Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 538–85 (D. Md. 2007) (explaining that ESI is admissible into evidence only if the court finds that it is relevant,

authentic, and offered in an acceptable format; its probative value is not substantially outweighed by a danger of unfair prejudice or certain other factors; and, if the ESI is a statement offered to prove the truth of the matter asserted, it either is not hearsay or it is admissible under an exception to the rule against hearsay (citing Fed. R. Evid. 401, 403, 801, 803, 804, 807, 901, 1001–1008)).

Third, Plaintiffs ask the Court to give the jury a permissive adverse-inference instruction grounded in Kline's admitted failures to preserve and produce relevant information and documents going to the heart of Plaintiffs' conspiracy claims against him. Pls.' 3d Mot. for Sanctions 24; *see also* Mem. Op. of Aug. 9, 2019, at 1, 25, 32. More specifically, they ask the Court to "instruct the jury that Kline chose to intentionally withhold his documents, and that the jury may draw adverse inferences from that fact, including that Kline chose to withhold such documents because he was aware that such documents contained evidence that Kline conspired to plan racially-motivated violence at Unite the Right." Pls.' 3d Mot. for Sanctions 24. No Defendant objected to this request.

*

Nearly three years ago, Plaintiffs served Kline with discovery requests for information and materials directly relevant to the claims and defenses in this case. His proper responses or objections were due by February 26, 2018. Kline did not respond. He then disobeyed multiple court orders—including my oral order of March 16, 2018, ECF No. 282, and my written orders of July 3 and August 8, 2019, ECF Nos. 516, 538—directing him to provide or permit discovery of the same materials within his control. *See* Mem. Op. of Aug. 9, 2019, at 12–13, 28 & n.10; First Civil Contempt Order 9–11. In August 2019, I found that Kline acted in bad faith by stonewalling and ignoring the Court's orders over the previous eighteen months—and that such

misconduct must obviously be deterred lest any other litigant think he or she can behave this way in federal court. Mem. Op. of Aug. 9, 2019, at 4, 29–31; *see Nat'l Hockey League*, 427 U.S. at 640–42; *Lee*, 638 F.3d at 1319 ("No one . . . should count on more than three chances to make good a discovery obligation."); *Young Again Prods., Inc. v. Acord*, 459 F. App'x 294, 301–04 (4th Cir. 2011); *Nw. Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 663 (7th Cir. 1994) ("Lawyers and litigants who decide that they will play by rules of their own invention will find that the game cannot be won."); *Progressive Minerals v. Rashid*, No. 5:07cv108, 2009 WL 2761295, at *4 (N.D. W. Va. Aug. 28, 2009); 8B *Federal Practice & Procedure* § 2281 (3d ed. 2002) ("[A]ny party or person who seeks to evade or thwart full and candid discovery incurs the risk of serious consequences."). I also found that Kline's "'repeated and ongoing misconduct'" thus far had "caused 'significant procedural . . . prejudice' to Plaintiffs' ability to resolve their claims in a just, speedy, and inexpensive manner." Mem. Op. of Aug. 9, 2019, at 33 (quoting *First Mariner Bank v. Resolution Law Grp.*, *First Mariner Bank v. Resolution Law Grp.*, 2014 WL 1652550, at *19 (D. Md. Apr. 22, 2014) (*First Mariner II*)). Plaintiffs expended enormous resources dealing with Kline's "unacceptable delays, obfuscations, and disregard for both their proper discovery requests and this Court's many orders trying to enforce them." *Id.* at 33 (citing *Diamond v. Mohawk Indus., Inc.*, No. 6:12cv57, 2014 WL 1404563, at *5–6 (W.D. Va. Apr. 10, 2014)); *see also id.* at 31–34; *cf. Saria v. Mass. Mut. Life Ins. Co.*, 228 F.R.D. 536, 540 (S.D. W. Va. 2005) (noting that plaintiff's "'pick-and-choose' approach to answering" discovery had "waste[d] the parties' own valuable discovery time and ultimately force[d] the court to clean up a mess which could have been altogether avoided").

In August 2019, however, "we [were] not yet to the point" that Plaintiffs could not "'present evidence essential to [their] underlying claim'" against Kline. Mem. Op. of Aug. 9,

2019, at 34 (quoting Pls.' Mot. for Sanctions Against Defs. Kline & Heimbach 21); *see also id.* at 25, 32–33. Moreover, Kline recently assured the Court and Plaintiffs that he understood his discovery obligations and he intended to comply with the Court's orders that he participate in good faith going forward. *See id.* at 27–29, 34–35. In my view, "production was preferable to evidentiary sanctions at th[at] point in the litigation." *Id.* at 26; *accord* First Contempt Hr'g Tr. 78 ("As Judge Hoppe said, it is possible that the requested evidentiary sanctions will become the only recourse available to [P]laintiffs, and he and this Court have taken those under advisement; but at present it is preferable that the facts and the evidence be uncovered rather than the case rely on evidentiary presumptions."). I explained that "it would be unjust for the Court to direct that Plaintiffs' version of 'designated facts be taken as established for purposes of the action,' Fed. R. Civ. P. 37(b)(2)(A)(i)," if Kline produced the discovery in enough time for Plaintiffs to prepare their case for trial. Mem. Op. of Aug. 9, 2019, at 34. I also would have a better sense of Plaintiffs' request for an adverse-inference instruction after counsel deposed Kline about what steps, if any, he took to preserve potentially relevant evidence. *Id.* (citing *Victor Stanley*, 269 F.R.D. at 525–26; *Sampson*, 251 F.R.D. at 181). Should Kline not follow through, however, the Court likely would have run out of options "other than to impose significant evidentiary sanctions." *Id.* at 35; *see also id.* at 34 ("Plaintiffs' requested evidentiary sanctions—including the adverse inference and an order deeming some of their proposed facts established—would be available, and certainly could be appropriate in this case, if Kline . . . fail[s] to produce the discovery from this point forward.").

**

Kline did not follow through. In fact, Kline responded to two federal judges' patient indulgence with broken promises, halfhearted steps towards compliance, and countless sworn

statements that were "evasive, internally inconsistent, or simply not believable." Certification Order 10; *see generally* Fourth Disc. Order to Def. Elliott Kline 1; Order of Jan. 22, 2020, at 1–3; Release Order 3–5; Tr. of Jan. 6, 2020 Status Conf. 28–39; Surrender Order 2–6; Second Contempt Hr'g Tr. 11–13, 36–40; Second Civil Contempt Order 1–2, 8–14; First Contempt Hr'g Tr. 3–5, 45–55, 57, 59–73; First Civil Contempt Order 4–7, 9–12; 75–79; Certification Order 9–12. On January 6, 2020, Judge Moon told Kline, "I've spent more time on your discovery issue than on all the other cases I've ever had in . . . 22 years. I never had to follow up with a magistrate judge in the manner I've had to in this case." Tr. of Jan. 6, 2020 Status Conf. 31–32. Kline stated that he understood, though he again tried to blame Plaintiffs' counsel for his failure to fulfill his discovery obligations. *Id.* at 32; *see also* First Civil Contempt Order 7. Two days later, Plaintiffs produced documentation that "Kline ha[d] persisted in lying to this Court under oath and under penalty of perjury, even while being held in incarceration for civil contempt." Release Order 3 (citing Pls.' Resp. to Kline Decl., ECF No. 631). Thus, there is no question that Kline disobeyed this Court's discovery orders in bad faith. *See, e.g.*, *Nat'l Hockey League*, 427 U.S. at 640, 643 (district court did not abuse discretion in finding "flagrant" bad faith "[a]fter seventeen months where crucial interrogatories remained substantially unanswered despite numerous extensions granted at the eleventh hour and, in many instances, beyond the eleventh hour," plaintiffs' broken promises to act by a date certain, and the court's repeated warnings that their failure to provide certain information could result in Rule 37 sanctions); *Young Again Prods.*, 459 F. App'x at 302 (finding bad faith where the "record reflect[ed] a pattern of noncompliance," including that the "district court was repeatedly compelled to admonish" sanctioned defendants "even after it warned them that it was going to take pretrial process 'very seriously,'" defendants "made no effort to acknowledge their obligations," and one defendant

tried "to pin the blame on her former attorney" who withdrew representation after defendant failed to cooperate and communicate with counsel); *Certain Underwriters at Lloyd's, London v. Advanfort Co.*, No. 1:18cv1421, 2019 WL 3366103, at *8 (E.D. Va. July 25, 2019) ("In the Fourth Circuit, bad faith includes willful conduct, where the party 'clearly should have understood his duty to the court' but nonetheless 'deliberately disregarded' it." (quoting *Rabb v. Amatex Corp.*, 769 F.2d 996, 1000 (4th Cir. 1985)); *cf. Plant v. Merryfield Town Ctr. Ltd. P'ship*, 711 F. Supp. 2d 576, 584, 587 (E.D. Va. 2010) (finding bad faith was "clearly evidenced" by plaintiffs' "repeated and flagrant disregard" for two of magistrate judge's discovery orders and "counsel's misrepresentation of material facts concerning plaintiffs' noncompliance" with them); *In re Derivium Capital*, 372 B.R. 777, 784–86 (Bankr. D.S.C. 2007) (finding that plaintiff acted in bad faith where, despite being given "a clear and fair warning that he must fulfill" discovery obligations or face "drastic" Rule 37 sanctions, plaintiff failed to respond to court-ordered discovery, engaged in "litigation tactic[s] designed to escape the ramifications" of disobeying the order, and "did not offer substantial excuses" for his noncompliance).

Next, I must decide which sanctions are "just" based on all the facts in this case and the claims at issue in the Court's prior discovery orders. *See Ins. Corp. of Ir.*, 456 U.S. at 707 (citing Fed. R. Civ. P. 37(b)(2)(A)); *S. New England Tele. Co. v. Global NAPs, Inc.*, 624 F.3d 123, 144 (2d Cir. 2010) ("[T]he district court is free to consider the full record in the case in order to select the appropriate sanction." (internal quotation marks omitted)). This requires me to consider the kind and degree of prejudice Kline's noncompliance caused Plaintiffs and whether alternative, less drastic sanctions would provide an effective remedy. *See Samsung Elecs. Co. v. NVIDIA Corp.*, 314 F.R.D. 190, 200–04 (E.D. Va. 2016).

Kline's noncompliance with the discovery orders "resulted in significant procedural and substantive prejudice" to Plaintiffs. *First Mariner II*, 2014 WL 1652550, at *19. I already awarded attorney's fees against Kline of $12,528.33 to sanction him for the procedural prejudice—namely "evasiveness, delay, and obfuscation," *id.* at *3—he caused Plaintiffs' ability to develop their case in a just, speedy, and inexpensive manner. *See* Mem. Op. of May 26, 2020, at 1, 4, 21; Mem. Op. of Aug. 9, 2019, at 33–35. Again, it is important that anyone contemplating similar tactics understand that he cannot avoid discovery in federal litigation— and especially not in response to a court order. Mem. Op. of Aug. 9, 2019, at 31 (citing *Progressive Minerals*, 2009 WL 2761295, at *4); *see also First Mariner Bank v. Resolution Law Grp.*, Civ. No. MJG-12-1133, 2013 WL 5797381, at *10 (D. Md. Oct. 24, 2013) (*First Mariner I*) ("[P]iecemeal, less than complete and slow production takes a toll and inflicts a disadvantage on the requesting party. . . . It is wearing, counter-productive, wholly unacceptable and sanctionable."); Fed. R. Civ. P. 37(b)(2)(C). "'[S]talling and ignoring the direct orders of the court with impunity' is 'misconduct' that 'must obviously be deterred'" and will be sanctioned as justice requires. *Young Again Prods.*, 459 F. App'x at 303 (quoting *Mut. Fed. Savs. & Loan*, 872 F.2d at 93).

I now have a clearer idea how Kline's failure to produce much of the requested discovery, or to give believable answers why the discovery did not exist, has harmed Plaintiffs' substantive ability to prove at trial their civil conspiracy claim against Kline. Certification Order 10–11; *see also* First Civil Contempt Order 10, 12; First Contempt Hr'g Tr. 74–75; Mem. Op. of Aug. 9, 2019, at 34–35. To start, as Plaintiffs pointed out in their first motion for sanctions, discovery was especially critical in this case because it is inherently difficult to prove a conspiracy. *See* Mem. Op. of Aug. 9, 2019, at 25, 32–33 (citing Pls.' Mot. for Sanctions Against

Defs. Kline & Heimbach 21–22). Even in criminal prosecutions, "a conspiracy is usually proven by circumstantial evidence" such as "a defendant's relationship with other members of the conspiracy, the length of this association, the defendant's attitude and conduct, and the nature of the conspiracy." *United States v. Yearwood*, 518 F.3d 220, 226 (4th Cir. 2008) (cleaned up); *see* Mem. Op. of Aug. 9, 2019, at 32 (citing *Yearwood*, 518 F.3d at 226). Plaintiffs sought from Kline "myriad communications, documents, and ESI" that could "help them prove that 'each Defendant entered into an agreement with a specific co-conspirator to engage in racially motivated violence at the August 11th and 12th events.'" Mem. Op. of Aug. 9, 2019, at 32 (quoting Mem. Op. on Defs.' Mots. to Dismiss Am. Compl. 21); *see* Pls.' Mot. for Sanctions Against Defs. Kline & Heimbach 21–22. Kline's failure to comply fully with court orders directing him to preserve and produce those same materials leaves an evidentiary gap justifying "appropriately tailored sanction[s]," *Doug's Word Clocks.com Pty Ltd. v. Princess Int'l*, 323 F.R.D. 167, 175 (S.D.N.Y. 2017), against him under Rule 37(b)(2)(A)(i). *Cf. Ins. Corp. of Ir.*, 456 U.S. at 699, 707–78 (explaining that district court's order deeming established the fact that defendants "had sufficient business contacts with Pennsylvania" to establish the court's personal jurisdiction over them was both "just," considering defendants made no effort to comply with "repeated orders" to supply the requested information about their contacts despite "repeatedly agree[ing] to comply . . . within specified time periods," and "related" to the matter at issue in the discovery orders); *GSI Tech., Inc. v. United Memories, Inc.*, No. 5:13cv1081, 2015 WL 12942202, at *2 (N.D. Cal. Oct. 23, 2015) ("Because the 30(b)(6) witnesses were plainly unprepared to testify knowledgeably about the Hardee document in violation of the court's order, discovery sanctions under Rule 37(b)(2)(A)(i) are warranted and the court orders the Hardee document deemed authenticated.").

Second, Kline's admission that he did not even try to preserve any relevant information—despite the fact his attorneys told him to do so—warrants an adverse-inference instruction under either Rule 37(e)(2) or the traditional "spoliation" standard. Spoliation is "the destruction or material alteration of evidence or . . . the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001). A party seeking spoliation sanctions must show that spoliation occurred and that the requested sanctions are warranted under governing law. *Blue Sky Travel & Tours, LLC v. Al Tayyar*, 606 F. App'x 689, 698 (4th Cir. 2015); *Sampson*, 251 F.R.D. at 181 (citing *Hodge*, 360 F.3d at 450–51). Rule 37(e) provides the legal framework for evaluating spoliation claims involving discoverable ESI, including text messages or online communications, not preserved for litigation. *See Jenkins v. Woody*, No. 3:15cv355, 2017 WL 362475, at *12, *14 (E.D. Va. Jan. 21, 2017). Under this Rule,

> a movant must satisfy four threshold requirements before a court decides if any spoliation sanction is appropriate: (1) ESI should have been preserved; (2) ESI was lost; (3) the loss was due to a party's failure to take reasonable steps to preserve the ESI; and (4) the ESI cannot be restored or replaced through additional discovery.

*Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 104 (E.D. Va. 2018). Rule 37(e)'s threshold elements mirror the traditional three-part test for spoliation, which requires the moving to party to show:

> (1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind"; and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Walker v. Owens*, No. 7:13cv425, 2016 WL 320998, at *2 n.3 (W.D. Va. Jan. 26, 2016) (quoting *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 509 (D. Md. 2009)); *see Steves & Sons*,

327 F.R.D. at 104 ("This analysis is similar to the Rule 37(e) framework, as it asks whether the responsible party had a duty to preserve, and breached that duty by failing to take reasonable steps to preserve."). "[A]ny level of fault, whether it is bad faith, willfulness, gross negligence, or ordinary negligence"[15] satisfies the culpability element, *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, Inc., 803 F. Supp. 2d 469, 497 (E.D. Va. 2011), whereas "the nuanced, fact-specific differences among these states of mind become significant in determining" any appropriate remedy or sanction for spoliation, *Victor Stanley*, 269 F.R.D. at 529. *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995).

Plaintiffs ask the Court to instruct the jury that "Kline chose to intentionally withhold his documents, and that the jury may draw adverse inferences from that fact, including that Kline chose to withhold such documents because he was aware that such documents contained evidence that Kline conspired to plan racially-motivated violence at Unite the Right." Pls.' 3d Mot. for Sanctions 24. An adverse inference helps "level[] the evidentiary playing field" when an adversary's "intentional conduct contributes to the loss or destruction of evidence" the movant could have used to support its case. *Vodusek*, 71 F.3d at 156. Rule 37(e) allows the court or a jury to "presume the [lost] information was unfavorable" to the responsible party "only upon finding that the party acted with the intent to deprive another of the information's use in the

---

[15] Negligence is a lack of due care, the failure to exercise the level of care expected of a reasonably prudent person acting under like circumstances." *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liability Litig.*, 299 F.R.D. 502, 519 (S.D. W. Va. 2014). "Gross negligence is the same as ordinary negligence, except in degree." *Id.* "In contrast, willfulness and bad faith require 'intentional, purposeful, or deliberate conduct,'" *id.* (quoting *Victor Stanley*, 269 F.R.D. at 530), undertaken with the knowledge that the evidence was relevant to some issue in the anticipated litigation, *see Hodge*, 360 F.3d at 450. "The fundamental element of bad faith spoliation is advantage-seeking behavior by the party with superior access to information necessary for the proper administration of justice." *In re Ethicon*, 299 F.R.D. at 519 (quoting *Micron Tech., Inc. v. Rambus, Inc.*, 645 F.3d 1311, 1326 (Fed. Cir. 2011)). Willfulness requires a slightly lesser showing "that the actor intended to destroy the evidence," *Victor Stanley*, 269 F.R.D. at 530, when he or she "knew the evidence was relevant to some issue" in anticipated litigation, *see Hodge*, 360 F.3d at 450.

litigation." *See* Fed. R. Civ. P. 37(e)(2)(A)–(B). Fourth Circuit precedent similarly requires a finding that the responsible party "acted either willfully or in bad faith in failing to preserve relevant evidence" before the court may impose an adverse inference against that party. *Sampson*, 251 F.R.D. at 181 (citing *Hodge*, 360 F.3d at 450–51).

Finally, Plaintiffs' requested evidentiary sanctions are appropriate. Kline can still defend himself at trial if he wants to, and the Court can narrowly tailor its sanctions to minimize any "spillover" effect on Defendants who did not disobey discovery orders. *See Peltz v. Moretti*, 292 F. App'x 475, 477–78 (6th Cir. 2008) (noting that the district court cannot deem facts established against defendant who did not disobey a discovery order). Further, more severe claim-dispositive sanctions such as default judgment, which Plaintiffs have not requested, would be unfair to Plaintiffs in these circumstances. Kline would be out of the case, and Plaintiffs still would not have information they believe necessary to prove their conspiracy claims against the remaining Defendants.

\*\*\*

Accordingly, Plaintiffs' third motion for sanctions against Defendant Elliott Kline (a.k.a. Eli Mosley), ECF No. 601, is hereby **GRANTED in part** and **DENIED in part** as follows:

1.  The following facts, listed in Appendix A to Plaintiffs' Motion, will be taken as established against Defendant Kline for purposes of the action:

    a.  Defendant Kline was a member of Identity Evropa from April 2017 through at least August 2017 (app. A § I ¶ 1);

    b.  Defendant Kline was one of the leaders of Identity Evropa from April 2017 through at least August 2017 (*id.* ¶ 2);

c. Defendant Kline entered into an agreement with one or more coconspirators to plan the Unite the Right event that took place in Charlottesville, Virginia on August 11 and 12, 2017 (*id.* ¶ 3);

d. Defendant Kline entered into an agreement with one or more coconspirators to engage in racially-motivated violence in Charlottesville, Virginia on August 11, 2017 (*id.* ¶ 4);

e. Defendant Kline entered into an agreement with one or more coconspirators to engage in racially-motivated violence at the Unite the Right event in Charlottesville, Virginia on August 12, 2017 (*id.* ¶ 5);

f. Defendant Kline was motivated by animus against racial minorities, Jewish people, and their supporters when conspiring to engage in acts of intimidation and violence on August 11 and 12, 2017 in Charlottesville, Virginia (*id.* ¶ 6);

g. It was reasonably foreseeable to Defendant Kline and intended by him that coconspirators would commit acts of racially-motivated violence and intimidation at the torchlight event in Charlottesville, Virginia on August 11, 2017 (*id.* ¶ 7);

h. It was reasonably foreseeable to Defendant Kline and intended by him that coconspirators would commit acts of racially-motivated violence and intimidation at the Unite the Right event in Charlottesville, Virginia on August 12, 2017 (*id.* ¶ 8);

i. Defendant Kline attended the torchlight march on August 11, 2017 (*id.* ¶ 11, cl. 1);

        j.   Defendant Kline attended the Unite the Right event on August 12, 2017 (*id.* ¶ 12, cl. 1); and

        k.   After the Unite the Right event in Charlottesville, Virginia on August 11 and 12, 2017, Defendant Kline ratified the racially-motivated violence at the event (*id.* ¶ 13).

2.   The Court **DENIES without prejudice** Plaintiffs' request for a court order taking as established the proposed facts that:

        a.   It was reasonably foreseeable to Defendant Kline and intended by him that a coconspirator would engage in racially-motivated violence *by intentionally driving a car into a crowd of counter-protestors* on August 12, 2017 (*id.* ¶ 9);

        b.   Defendant Kline *committed multiple overt acts in furtherance of the conspiracy* he entered into to commit racially-motivated violence at the Unite the Right event in Charlottesville, Virginia on August 12, 2017 (*id.* ¶ 10);

        c.   Defendant Kline *committed acts of intimidation and violence in furtherance of the conspiracy* at the torchlight march on August 11, 2017 (*id.* ¶ 11, cl. 2); and

        d.   Defendant Kline *committed acts of intimidation and violence in furtherance of the conspiracy* at the Unite the Right event on August 12, 2017 (*id.* ¶ 12, cl. 2).

The italicized language either is not supported by the record, *see id.* ¶ 9, or is too vague to justify the requested evidentiary sanction, *see id.* ¶ 10; *id.* 11, cl. 2; *id.* ¶ 12, cl. 2. Plaintiffs may

resubmit for the Court's consideration proposed findings that Kline committed *specific* overt acts or acts of intimidation and violence in furtherance of the agreement to commit racially-motivated violence.

3. All documents from the social media accounts listed in Appendix A to Plaintiffs' Motion (§ II ¶¶ 1–16) will be presumed "authentic," subject to rebuttal by any Defendant, for purposes of Rule 901 of the Federal Rules of Evidence.

4. Plaintiffs' request for a permissive adverse-inference instruction against Defendant Elliott Kline (a.k.a. Eli Mosley) is **GRANTED** subject to the presiding District Judge's final approval. Plaintiffs should submit their proposed language to the presiding District Judge in their proposed jury instructions.

**IT IS SO ORDERED.**

ENTER: November 30, 2020

Joel C. Hoppe
U.S. Magistrate Judge

42