```
1              IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF VIRGINIA
2                  CHARLOTTESVILLE DIVISION

3      ***************************************************************
       ELIZABETH SINES, et al.,
4
                                    CIVIL NO.: 3:17-CV-00072
5                                   December 17, 2020
                                    MOTION HEARING -
6           Plaintiffs,            VIDEOCONFERENCE

7        vs.

8      JASON KESSLER, et al.,      Before:
                                   THE HONORABLE NORMAN K. MOON
9                                  UNITED STATES DISTRICT JUDGE
            Defendants.            WESTERN DISTRICT OF VIRGINIA
10
       ***************************************************************
11
       APPEARANCES:
12
       For the Plaintiffs:
13
       ALAN LEVINE                 MICHAEL LOW BLOCH
14     Cooley LLP                  ROBERTA ANN KAPLAN
       1114 Avenue of the Americas, BENJAMIN DANIEL WHITE
15     46th Floor new York, NY 10036 Kaplan Hecker & Fink LLP
       212-479-6260                350 Fifth Avenue, Suite 7110
16     alevine@cooley.com          New York, NY 10118
                                   212-763-0883
17     DAVID E. MILLS             mbloch@kaplanhecker.com
       Cooley LLP                  rkaplan@kaplanandcompany.com
18     1299 Pennsylvania Avenue, NW bwhite@kaplanhecker.com
       Suite 700
19     Washington, DC 20004-2400   KAREN LEAH DUNN
       202-842-7800                Boies Schiller Flexner, LLP
20     dmills@cooley.com           1401 new York Avenue, NW
                                   Washington, DC 20005
21                                 202-237-2727
                                   kdunn@paulweiss.com
22     _____
                    Mary J. Butenschoen, RPR, CRR
23               210 Franklin Road, S.W., Room 540
                      Roanoke, Virginia  24011
24                    540-857-5100, Ext. 5312

25     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT
       PRODUCED BY COMPUTER.
```

```
 1    APPEARANCES: (Continued)

 2    For the Plaintiffs:

 3    JESSICA E. PHILLIPS
      Paul, Weiss, Rifkind, Wharton
 4    & Garrison LLP
      2001 K Street, NW
 5    Washington, DC 20006
      202-223-7300
 6    jphillips@paulweiss.com

 7
      For the Defendants:
 8
      JAMES EDWARD KOLENICH
 9    Kolenich Law Office
      9435 Waterstone Blvd., Suite 140
10    Cincinnati, OH 45249
      513-444-2150
11    Fax: 513-297-6065
      Email: Jek318@gmail.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (Proceedings commenced 10:00 a.m.)

2              THE COURT:  Okay.  Heidi, do you know if everyone is

3    on?

4              THE CLERK:  I think we have everybody present.

5    Would you agree, Mr. Bloch and Mr. Kolenich?

6              COUNSEL:  Everybody is here.

7              THE COURT:  You may call the case.

8              THE CLERK:  Yes, Your Honor.  This is Civil Action

9    Number 3:17-CV-00072, *Elizabeth Sines* and others versus *Jason*

10   *Kessler* and others.

11             THE COURT:  Plaintiffs ready?

12             MR. KOLENICH:  Yes.  Oh, sorry, Your Honor.

13             MR. BLOCH:  We're ready, sir.

14             THE COURT:  Defendants ready?  Okay, thank you.

15             We're here on the defendants' motion to exclude, but

16   before we begin I will remind any members of the public that

17   under Standing Order 2020-12, the Court's prohibition against

18   recording and broadcasting court proceedings remains in force.

19   Attorneys' staff and members of the public accessing this

20   hearing today may not record or broadcast it.

21             All right.  You may proceed.

22             MR. KOLENICH:  Thank you, Your Honor.  Jim Kolenich

23   for the moving defendants.  To clarify where we're at with

24   this motion, we have originally moved against three different

25   experts.  We've withdrawn that motion as to Lipstadt and

1    Fenton.  We're proceeding only against expert Peter Simi, the

2    joint report of Peter Simi, and Kathleen Blee.

3             THE COURT:  Okay.

4             MR. KOLENICH:  To begin, Your Honor, what we are not

5    doing or attacking is the qualifications of these experts, nor

6    are we attacking, as such, the methodology that they employed

7    in reaching their conclusions.

8             What we are objecting to comes under the heading of

9    relevance to much of their report.  Of course, an expert is

10   required to provide information that helps the trier of fact

11   to understand evidence and determine the facts at issue.

12   However, in doing so, they are not permitted to testify or

13   opine as to witness credibility or legal conclusion.

14            It's our assertion that this report is basically

15   shot through with an attempt to testify as to witness

16   credibility and also offers legal conclusions.

17            Now, in making that objection, we do not object to

18   the presentation of data from the record and even some

19   historical data that's not necessarily in the record in this

20   case.  That puts the defendants' comments and their activities

21   into historical context.  Certainly, that's appropriate and a

22   proper use of expert testimony, so that's not what we're

23   objecting to.

24            But I'd like to go through certain sections of the

25   expert report now, and it should only take a couple of

1    minutes, Your Honor, to highlight where the objection is.

2           I'll begin on page 2 where the experts say:  "The

3    coordinated race-based violence facilitated and committed by

4    defendants at UTR" -- which, of course, is the event in

5    question, Unite the Right -- "is emblematic of White -- of WSM

6    tactics."  White Supremacist Movement tactics, as they define

7    it.

8           So we object to the phraseology "White Supremacist

9    Movement".  Trying to just use the concept of "movement"

10   implies organization and implies conspiracy, and that is sort

11   of the subject at issue, the allegations in the plaintiffs'

12   complaint which the defendants are denying.  So this entire

13   way of framing the expert report is just sort of a

14   sophisticated attack on witness credibility.

15          Moving on to page 7 of the expert report, they state

16   that all white supremacists embrace and have defended violence

17   as a tactic to achieve a society that they are trying to gain.

18   This is --

19          THE COURT:  Excuse me.  What page was that?

20          MR. KOLENICH:  I'm sorry, the bottom of page 7 of

21   the report, Your Honor.

22          THE COURT:  Okay.  Are you going to come back and

23   speak to these issues or --

24          MR. KOLENICH:  Well, I'm going to go through them

25   and give them as examples of what we're objecting to.

1          THE COURT:  All right.

2          MR. KOLENICH:  And I think I've got all but maybe

3    one --

4          THE COURT:  Okay.

5          MR. KOLENICH:  -- but may not be the entire list,

6    Your Honor.

7          THE COURT:  Okay.

8          MR. KOLENICH:  Thank you, Judge.

9          Moving on to page 8:  The White Supremacist Movement

10   is coordinated primarily through a common culture that

11   sustains a shared set of interpretations and norms of

12   behavior.

13          Again, in the context of this report, that plainly

14   refers to violence.  The immediately preceding text refers to

15   Aryan Nations, Ku Klux Klan, and other groups that are known

16   to have engaged in criminal violence in the history of the

17   United States.

18          Moving on to page 10:  The rhetoric used by the

19   defendants or some of the defendants allows the White

20   Supremacist Movement to reinforce norms of violence.

21          Further on page 10, that this rhetoric allows

22   interested individuals -- and in this context I think the

23   individual interest is violence -- to evade detection by legal

24   authorities.

25          On page 11:  The rhetoric creates plausible

1    deniability for ideas or actions that would attract legal

2    attention and sanction.

3             On page 12:  The rhetoric operates on a broader

4    level to create deception about ideological and strategic

5    direction of the groups and networks.

6             Page 13:  They conceal the advocacy of violence by

7    use of this rhetoric.

8             Page 14 begins the experts subsection 8.  And

9    defendants object to the entirety of subsection 8 with the

10   exception of the historical review contained therein.

11            Of particular interest on page 19:  The WSM -- and

12   they link that to the defendants -- Glorifies Violence.  And

13   they go through examples of how they claim they are glorifying

14   violence.

15            That it Normalizes Violence, on page 20.

16            Page 26, that they deny that they normalize and

17   glorify violence by use of the rhetoric that defendants

18   engaged in by saying, "I was only joking" and similar type

19   language.

20            Now, in the midst of this, there's an example of the

21   thing we're not necessarily objecting to.  We are aware, of

22   course, that the Court is supposed to allow expert testimony

23   when at all possible under the modern standard.  So they block

24   quote something from Defendant Richard Spencer, where he says

25   that "politics is about the use of force."  That's the kind of

1   thing that we are not objecting to, Your Honor.  That's the

2   very words of a defendant.  That's the words he used.  But

3   what we are objecting to is them going on to tell the jury

4   what they are supposed to think about the words, which is what

5   they do throughout this report.

6          On page 41, it states:  "Defendants Utilized

7   Double-Speak When Planning and Organizing Unite the Right."

8          The clear import of this in the context of the

9   report, Your Honor, is that the defendants' organization was

10  just part of an a priori plan to perpetrate violence and then

11  cover it up.  Now, that's not part of the plaintiffs'

12  complaint.  Yes, the plaintiffs complain that the defendants

13  planned to engage in violence at Unite the Right, but in

14  practically 200 pages of operative complaint there's nothing

15  about a preexisting plan to cover up the plan.  I guess that's

16  sort of implicit in conspiracy, but still that's not something

17  we were charged with coming into the case.

18         Page 57:  "Defendants Recruited Participants That

19  Were Willing to Utilize Violence."

20         Now, that, again, is attacking witness credibility,

21  attacking the testimony that's already been elicited at

22  depositions regarding what defendants were up to.

23         Page 58, they have a section titled, "The Violence

24  Planned on Discord Played Out on August 11-12, 2017," in

25  Charlottesville.

 1              Page 60:  "The Defendants Ratified Their Use of

 2     White Supremacist-Style Violence After the Rally," and they

 3     give two quotes of interest.  Defendant Damigo:  "This was a

 4     huge victory for us."  And Defendant Parrott:  "Aside from

 5     having a couple men unfairly held behind the wire,

 6     Charlottesville was a tremendous victory."

 7              Both of these men addressed those quotes at

 8     deposition and --

 9              (Brief interruption.)

10              MR. BLOCH:  Sorry, Judge, I think we're good.  My

11     apologies.

12              THE COURT:  Okay, you may proceed.

13              MR. KOLENICH:  Thank you, Judge.

14              I believe I was quoting or giving the quote that

15     they assigned to Mr. Parrott.  "Aside from having a couple men

16     unfairly held behind the wire, Charlottesville was a

17     tremendous victory."

18              Again, both of these men dealt with these quotes at

19     deposition and offered alternate explanations, so allowing

20     expert opinion that they are lying in those alternate

21     explanations as part of a conspiracy to conceal their true

22     motives is attacking witness credibility.

23              Now, the Court doesn't have to accept my spin on

24     this expert report.  On page 63 as they conclude their report,

25     they just explicitly tell us that that's what they are doing.

 1    Specifically, the experts state, "In our opinion, this
 2    strategy was deliberately weaponized to provoke violence or
 3    planted to create a defense in advance of provoking the
 4    violent incident," and they give quotes in support of that.
 5            They also conclude, "The intentional use of violence
 6    to achieve their goals, and a coordinated strategy to
 7    obfuscate their aims through the use of -- quote, unquote --
 8    'double-speak,'" and various other academic terms is a
 9    conspiracy.  They've opined that the defendant did conspire
10    and that the defendants are lying about their alternate
11    explanations, right?  So that's what I have as to the actual
12    report.
13            So it's our contention that the use of the phrase
14    "White Supremacist Movement" is itself objectionable, that
15    they should stick with what is commonly found in academic
16    treatises -- racist, extremist, what they call themselves,
17    Nazis, that sort of thing -- rather than attempting to say
18    that there's some movement that these men are a part of which
19    is not even part of the plaintiff's allegations and is not,
20    you know, made more or less likely any element that plaintiff
21    is required to address.
22            And so legally what we're asserting is that they
23    cannot testify as to witness credibility, as to legal
24    conclusions, and they cannot impose a narrative on the record
25    evidence, create a strawman and impose on the record evidence.

1    I have just a couple supplementary legal citations I'd like to

2    provide, and then that will conclude my presentation.

3            All right.  As to impermissibility of testifying on

4    witness credibility, we cite *United States v. Dorsey*, 45 F. 3d

5    809 Fourth Circuit.  As to cannot testify as to legal

6    conclusions, *Forest Creek Associates*, 831 F. 2d 1238 Fourth

7    Circuit.  And as to the impermissibility of imposing a

8    strawman factual narrative on the record evidence, this is *In*

9    *Re: Longtop Financial Technicians Limited*, 32 F.Supp 3d 453.

10   That's out of the Southern District of New York.

11           Thank you, Your Honor.  That's all for the moving

12   defendants.

13           THE COURT:  Well, let me ask you this:  The Fourth

14   Circuit and I think most courts have upheld the -- that it was

15   proper to put on expert testimony that when one was saying one

16   thing they meant another, such as in the drug cases witnesses

17   will testify he wanted a pound of -- or a gram of girl and a

18   gram of boy, which would mean a gram of cocaine and a gram of

19   heroin.  I mean, that's been -- that type of testimony has

20   been admissible for a long time.  You don't dispute that, do

21   you?

22           MR. KOLENICH:  No, I don't, Your Honor.  I guess the

23   distinction I'm trying to draw is, you know, drug trafficking

24   is a well-known thing.  Law enforcement officers make arrests

25   based on if they can testify about it and what goes on with

1    it.

2              The defendants in this case organized the political

3    rally, a thing in itself legal, and so there's no history of

4    this -- this kind of double-speak in the context of a

5    political rally that the experts are trying to put in, in

6    contradistinction to drug trafficking and the use of whatever

7    language to conceal themselves from the police.

8              Here they are concealing -- I'm sorry, Judge.

9              THE COURT:  I'm sorry, I didn't mean to cut you

10   off.

11             MR. KOLENICH:  It's all right.  I was just

12   completing the -- adding to on to the thought that this is

13   conceptually distinct from drug trafficking.

14             THE COURT:  Well, the double-speak is throughout

15   history and throughout society no matter what.  It's not

16   limited to drugs or...  I mean, anyone that's doing something

17   they don't want another person to know about, outsiders to

18   know what they are doing, are apt to use some sort of

19   double-speak that will mean something to them and the person

20   they want to communicate with but would seem innocuous to a

21   third party.  I mean, such as where you take a case involving

22   organized crime.  If someone, you know, testified that the

23   leader said, "I wish he -- I wish he was in the witness

24   protection program," and you could put on maybe an expert

25   that -- that would know that in that guy's parlance that that

 1    meant that was an order to his underlings to kill the person,

 2    I mean, there wouldn't be a problem with that, would there?  I

 3    mean, it's not limited to drugs.  That's what I'm saying.

 4             MR. KOLENICH:  No, sir, it's certainly not.  I

 5    completely agree.  And then defense agrees that, yes, it's

 6    commonplace in all sorts of situations.

 7             And we're not -- we're not, you know, strictly

 8    speaking objecting to a lot of what they want to say.  This

 9    historical review of white racial rhetoric and the fact that

10    the instant defendants borrowed wholesale some of those

11    phrases, we're not objecting to that.  We're not objecting to

12    using their own words and showing how it ties in with some of

13    the groups that they are talking about in the past, even

14    though that might technically be inadmissible evidence.  I

15    think even that is proper.

16             But what we're saying is they go beyond just saying

17    look how similar this is, look how some of the rhetoric they

18    use actually stands for something else, and they move to this

19    is a conspiracy.  This is -- they are lying to you when they

20    say something else.  And I think that even in the criminal

21    context in the Fourth Circuit that's an attack on witness

22    credibility, an impermissible attack.  They can give all that

23    data, but the taking of that next step has to be the province

24    of the lawyers, you know, making legal argument, if that's

25    what it means.

 1              THE COURT:  All right.  In case I forget, I'm going

 2   to ask you to file with the Court a list of all the specific

 3   things you objected to now to be sure that I have them, okay?

 4              MR. KOLENICH:  Yes, sir, thank you.

 5              THE COURT:  All right, sir.  Counsel for plaintiffs?

 6              MR. BLOCH:  Thank you, Judge.  Judge, this is

 7   Michael Bloch on behalf of the plaintiffs, and it's our

 8   position that the motion to exclude expert testimony should be

 9   denied in its entirety.

10              I want to be very precise about what the experts

11   intend to testify to and what they do not intend to testify

12   to.  Mr. Kolenich, I believe, both in his argument today as

13   well as in his papers, has mischaracterized the intended scope

14   of their testimony.  Properly characterized, Judge, this type

15   of testimony has been routinely found by courts to be

16   relevant, reliable, and helpful to juries in complex cases

17   like this.

18              So just to be very clear about what the experts will

19   not testify to, they will not opine on whether or not there is

20   a conspiracy.  I think Mr. Kolenich just said they -- they

21   will say this is a conspiracy.  They will not say that.  They

22   will not offer testimony that this is a conspiracy.  They will

23   not opine on what any particular defendant intended.  They

24   will not opine on any defendant or witness' credibility.  They

25   are absolutely not going to say that any witness is lying, and

1    they do not say -- they do not state any sort of legal

2    conclusion.

3              Obviously, if there's a concern about that at trial,

4    that can be dealt with on an objection-by-objection basis at

5    trial, but -- but I'm here to say that, properly characterized

6    in this report and their testimony, they will not offer those

7    opinions.

8              I think it's important to contextualize the

9    individual statements that Mr. Kolenich has plucked out of

10   this 63-page report.  Because I think with the proper context

11   it's clear that this sort of testimony and the particular

12   testimony they will offer is absolutely permissible within the

13   Fourth Circuit and across the country.

14             As Mr. Kolenich notes, there's no objection to

15   reliability or qualifications or methodology.  These

16   professors are distinguished award winning sociologists.  They

17   have spent 60 years collectively studying and writing about

18   the White Supremacist Movement.  And what they have found in

19   their vast experience and what they intend to testify to is

20   that there is a distinct culture within the White Supremacist

21   Movement going back 150 years that has its own language, its

22   own tools, it's own tactics.  It's what the experts define in

23   their report on page 29 as the core characteristics of the

24   White Supremacist Movement.

25             Some of those characteristics include a racist

Sines v. Kessler - 12/17/2020                16

1    ideology, and I'm pulling from page 29 of the report, the

2    use of double speak to create plausible deniability for their

3    ideas and actions.  The conscious --

4         THE COURT:  Well, just a minute.  I mean, that's not

5    unique to the Supremacy White Movement, is it?  I mean, what's

6    unique to the White Supremacy Movement, is it --

7         MR. BLOCH:  It's one of what these experts find to

8    be an essential feature of white supremacists.  I agree with

9    you, there are other types of organized crime and types of

10   gangs, for example.  There are plenty of groups and actors in

11   society that also make use of double-speak.  But these experts

12   find that that is one particular feature of white supremacists

13   as well.

14        I would analogize, Judge, to one of the cases we

15   cite in our brief, which is *United States v. Wilson*, an

16   Eleventh Circuit case, which I will discuss a little bit in a

17   little bit more detail, but in that case Bloods street gang

18   experts were allowed to testify about, essentially, the core

19   characteristics of Bloods gangs.  And in addition to coded

20   language, those experts find that, for example, wearing red is

21   a core characteristic of Bloods gang.  Wearing red, obviously,

22   it's not something unique to Bloods gangs, but it is something

23   that those experts were allowed to say was a distinctive

24   characteristic of Bloods.

25        So in addition to those items, Judge, these experts

1    will also opine that there is an insider language and codes,

2    including frequent references to violence and genocide.  And

3    various specific tactics that white supremacists have used

4    throughout history to commit, facilitate, and promote the use

5    of violence.

6           Once they have established those core elements of

7    white supremacist culture, which it was my understanding there

8    was no objection to by Mr. Kolenich, they then examined the

9    specific language and conduct that these defendants used, and

10   they note the consistency between the defendants' language and

11   conduct and the language and conduct that constitute those

12   core characteristics of the White Supremacist Movement.

13          Generally speaking, their opinion, I think, can be

14   summed up by a phrase they use on page 63 in the conclusion

15   that defendants utilize White Supremacist Movement tactics in

16   planning Unite the Right.  They also put it defendants

17   reflect --

18          THE COURT:  Well, why is it important that you show

19   these are white supremacist tactics?  Why isn't it sufficient

20   just to prove that you had a conspiracy here and this is what

21   they did?

22          MR. BLOCH:  Well, I -- I would say two things,

23   Judge:  As -- you're right.  It is our burden to show that

24   there is a conspiracy.  And I believe showing that they are

25   familiar with and immersed in a culture of white supremacy

Sines v. Kessler - 12/17/2020            18

1   that has its own shared ideals and language and tactics is

2   relevant to our being able to argue that they were part of a

3   conspiracy.  That's number one.

4       And again, I would (internet disruption) case of *United*

5   *States v. Wilson* which we cite in our brief.  If I could just

6   pull up a quote from that case.  That court which allowed the

7   Bloods testimony and allowed the expert to testify as to the

8   core characteristics of Bloods and allowed the Court to

9   testify that the specifics -- the defendants in that case

10   acted consistently with what Bloods do historically --

11       THE COURT:  But the Bloods are an organized group,

12   aren't they?

13       MR. BLOCH:  They are.

14       THE COURT:  And the White Supremacy Movement is just

15   ideas, people with similar ideas communicating to one another.

16   They don't -- I gather there's no president, there's no

17   organization.

18       MR. BLOCH:  That's true, Judge.  What these experts

19   are prepared to testify to is that there's a distinctive

20   culture within the White Supremacist Movement, and that, I

21   think, Judge, is no different from a slew of cases that allow

22   similar testimony to similar amorphous movements, such as

23   cases in the Fourth Circuit that allow experts to testify

24   about Islamic extremism; cases that allow experts to testify

25   about drug traffickers do generally and what drug traffickers

Sines v. Kessler - 12/17/2020          19

1   do and say; or cases, for example, that talk about specific

2   discrete tactics of child molesters, which is not, obviously,

3   an organization, but is a -- is a somewhat definable group

4   that has its own sort of set of distinguished distinctive

5   language and culture.  All of those sorts of experts --

6         THE COURT:  Well, how -- how do these experts know

7   that it's distinctive if -- I mean, I know the experts

8   regarding the White Supremacy Movement, but how do they know

9   it doesn't permeate to society and be this (internet

10   distortion) other groups, too.

11         MR. BLOCH:  Well, I think part of it is the experts

12   go through it in terms of their methodology in making that

13   determination, which was incredibly methodical as laid out by

14   these experts in their report and not challenged by

15   Mr. Kolenich.

16         But I think it goes back to your earlier point,

17   Judge, that it's not saying that these particular tactics are

18   unique to white supremacists.  It is a tactic that white

19   supremacists historically have relied on and there has been a

20   distinctive culture that has developed that makes use of these

21   language and tactics.

22         THE COURT:  Well, you know, you could say the Nazis

23   had this particular language, I mean, did these things.  One

24   could also say the CIA probably used similar tactics, they had

25   different motives, different ideas, one we would say is good,

 1    the other not.  But I don't know why it's just insufficient to

 2    prove the conspiracy between the defendants if it can be done.

 3    I mean, you quote the -- you know, give the emails between

 4    them and it would be as simple as proving any other

 5    conspiracy.  It's rare, you know, in the major drug conspiracy

 6    that we have, you know, evidence about the international drug

 7    trade and all that.  We deal with the conspiracy before us.

 8              MR. BLOCH:  Judge, we -- we certainly can and will

 9    offer direct evidence of the conspiracy, but the question here

10    is whether the -- the testimony that these experts are

11    prepared to offer is helpful to the jury in making that

12    determination.

13              THE COURT:  Well, what -- I mean, what is it that

14    the jury could not understand from the evidence?  I mean, we

15    try conspiracy cases all the time, and the very -- I mean, if

16    you've been in a drug case, you know, it's -- it's not a tough

17    thing to prove a conspiracy.

18              MR. BLOCH:  Well, two things, Judge.

19              What will be helpful to the jury along those lines

20    from these experts is the interpretation of the coded language

21    and the deceptive tactics that these defendants used for the

22    very purpose of making it more difficult for law enforcement

23    to be accountable after the fact.

24              So these experts will testify, for example, that

25    when -- when these defendants used the number 88, for example,

1    that that is not an innocuous reference to a number, or to a

2    racecar driver, for example, as one of the witnesses has

3    testified to.  That, in fact, is a reference to Adolf Hitler,

4    that -- and it's a reference that's well-grounded in a

5    distinctive --

6              THE COURT:  Right.  And that's exactly the thing

7    that I think is admissible.  I don't see any problem with

8    that.

9              MR. BLOCH:  Judge, there are --

10             THE COURT:  That's like saying that "H" stands for

11   heroin or something like that, or "girl" means "cocaine".

12             MR. BLOCH:  Right.  And I would say a couple things

13   in response to that, Judge.

14             Number one, there's plenty of case law that says

15   that the admissibility of that kind of testimony is not just

16   limited to interpretation of coded language.  It's also --

17   they are also allowed to discuss conduct and situate it within

18   the context of the larger culture and explain why this

19   particular conduct historically is not itself innocuous.

20             So in this case, for example, the defendants spend a

21   great deal of time in the lead up to Unite the Right promoting

22   a idea within their followers that they are threatened -- that

23   there is an imminent threat to the white race and it comes

24   from Jewish people and black people.

25             The defendants will claim, as Mr. Kolenich has done

1    today, that that is part of a sort of speech that leads up to

2    a political rally that they were planning.  These experts will

3    testify that speech like that is a tactic, a well-established

4    tactic well-grounded in white supremacist culture that is

5    designed to make the -- make followers of white supremacy feel

6    like there is a threat of imminent danger and has to acting

7    accordingly.

8              As the experts point out, these sorts of -- that

9    sort of language is specifically designed to evoke outrage and

10   encourage a response.  That has happened historically in white

11   supremacy culture, and these defendants do that in this -- in

12   this case.  And the experts are prepared to say that that sort

13   of language is not just innocuous racism.  It's in fact a

14   well-designed tactic designed to encourage and facilitate

15   violence.

16             THE COURT:  Okay.  In this case, now, are you

17   asking -- will you be asking the jury to attribute to these

18   defendants violent acts by persons who are not named

19   defendants?

20             MR. BLOCH:  Well, Judge, what we --

21             THE COURT:  Or associated with the named defendants?

22             MR. BLOCH:  We -- what we -- we will establish

23   that -- we attempt to establish as a conspiracy to commit

24   race-based violence.  That the way -- the manner in which

25   these defendants engage in that conspiracy, some of which was

1      to commit violence themselves, some of which was to encourage

2      others to commit violence.  And so we will -- the violence

3      that was committed at Unite the Right, by and large, we will

4      attribute -- exclusively we will attribute to either the

5      defendants committed it or the defendants were in some way

6      responsible for facilitating it and that the violence was

7      reasonably foreseeable to each of these defendants.

8                  THE COURT:  Go ahead.

9                  MR. BLOCH:  So generally speaking, what these

10     experts do is they define these core characteristics, and they

11     opine that certain tactics that the defendants use are

12     consistent with those characteristics.

13                 As you know, Judge, and as laid out in our brief,

14     the -- and I won't go into too much detail about this, courts

15     routinely allow experts like social scientists to testify

16     about distinctive tactics or language of certain groups.  And

17     as I mentioned, it's not just well-defined groups.  It's drug

18     smugglers; could be specific gangs; could be Islamic

19     extremists.  These are all examples from cases cited in our

20     brief, many of which are within the Fourth Circuit.  That case

21     law is not just limited to interpretation of language, but

22     it's also -- it also deals with specific conduct of

23     defendants.  I would just note *United States v. Chastain*,

24     which is an Eleventh Circuit case where an expert -- expert

25     testimony was permitted on the subject of general techniques

1    of drug smugglers to discuss certain modifications that were

2    made to the defendant'a airplane, in that case, that made it

3    more suitable for drug smuggling.  And this I think goes back

4    to one of your questions, Judge, that the Court in that case

5    found that this information was clearly relevant to

6    establishing the existence of the conspiracy because those

7    defendants in that case were familiar with a shared set of

8    tactics and a shared set of ideas.

9              Another set of cases that deals with conduct

10   specifically in a sort of amorphous group is cases that deal

11   with grooming techniques of child molesters, such as *United*

12   *States v. Romero*, a Seventh Circuit case from 1999.

13             In that case an expert, who was an expert in social

14   exploitation of children, was permitted to testify about the

15   types of conduct child molesters typically engage in opining

16   that certain actions by the defendant, "Would be some

17   indication that the offender in question would act upon his

18   fantasies."

19             The Court recognized the value of that expert

20   testimony in explaining complicated criminal methodology that

21   may look innocent on the surface but is not as innocent as it

22   appears, which is the essence of what we have to deal with at

23   trial, is the defendants complaining that all of their conduct

24   is innocuous and joking and just a political rally.  In fact,

25   they are making use of tactics and language that is not

1    innocuous.  It may seem innocuous, but that's why courts have

2    permitted experts such as ours to explain how historically

3    those sorts of tactics are not innocuous.

4             Judge, with respect to the specific claim by

5    Mr. Kolenich that experts will opine on credibility or that

6    this is a sort of sophisticated way to sort of just opine on

7    credibility, it's absolutely not that.  He mentions the part

8    of the report where they talk about joking.  These experts

9    note in their report, and they will testify, that claiming

10   certain violent intentions is just a joke, is a form of

11   double-speak that white supremacists have engaged in for

12   decades.  The report actually cites to an article from 20

13   years before Unite the Right that talks about how the Klan has

14   used this tactic of claiming that they are joking to obscure

15   their violence for -- for decades.

16            The experts will not say -- to the extent a

17   defendant comes in and claims we were just joking, these

18   experts will not say that defendant is lying, or that

19   defendant was not joking, or that defendant is not credible.

20   What they will say is that there is a tactic of claiming you

21   are lying.  It goes back decades in the White Supremacist

22   Movement.  And that it appears that these defendants have

23   utilized a similar tactic.  It will be up to the jury to

24   decide whether or not that defendant is credible when that

25   defendant claims he's lying -- sorry, he's joking.

1          The cases that talk about credibility -- and

2     Mr. Kolenich cited a case just now, a new case that was not

3     cited in his brief, so I haven't had a chance to review it,

4     but the cases that are cited in the briefs and, generally

5     speaking, the cases that talk about opining on credibility,

6     prohibit expert testimony where an expert specifically opines

7     on the credibility of a specific witness and says this

8     particular witness is lying, or this particular witness is not

9     capable of telling the truth.  For example, a psychologist

10    that -- that's how this usually comes up, is a psychologist or

11    psychiatrist would testify that this particular witness is not

12    capable of telling the truth.  That particular testimony is --

13    is permitted.  And these experts won't come anywhere near

14    that.  The claim that "I was just joking" is a tactic

15    well-established in the White Supremacist Movement

16          I would also note, Judge, in *U.S. v Lee* which

17    Mr. Kolenich cites makes this point explicitly.  Courts

18    recognize that just because an expert's testimony might impact

19    someone's credibility doesn't make it inadmissible.  What Lee

20    says is, quote:  "No constitutional provision, law, or rule

21    requires the exclusion of expert testimony simply because it

22    concerns a credibility question."

23          That's -- if -- if experts were not allowed to

24    testify about anything that implicated credibility, there

25    would be far less expert testimony.  It may create an

1    inconsistency with certain defendants' testimony, but it's not

2    opining on any particular defendant's credibility.

3          And the other -- I think as I look at the list of

4    individual contextual lines that Mr. Kolenich has pulled out

5    of the brief, it seems like the vast majority of them deal

6    with commentary on violence.  And so I just want to deal

7    briefly with how these -- how these experts actually discuss

8    violence and how they intend to discuss it at trial.

9          Like double-speak and like language, they note in

10   their brief that there are well-established tactics, ways, in

11   which white supremacists have historically facilitated and

12   promoted violence.  And what they say, and I'm quoting from

13   page 2, what -- the opinion that they render is, "The

14   race-based violence facilitated and committed by defendants at

15   Unite the Right is emblematic of white supremacist tactics."

16         I mentioned one of the ways that they promote

17   violence.  Another way is -- goes to a line that Mr. Kolenich

18   pulled out of the brief, is they note that, historically,

19   white supremacists have glorified violence in an effort to

20   encourage others to commit violence.  They do that by

21   promoting and celebrating prior acts of violence by previous

22   white supremacists like Dylann Roof or Adolf Hitler.  And

23   they -- they note that the white supremacist culture

24   encourages the emulation of violent white supremacists by

25   celebrating prior acts of violence.  And they do it, Judge, in

1   characteristically coded deceptive ways.

2          So in -- for example, in the lead up to Unite the

3   Right, they won't necessarily -- sometimes they will, but they

4   don't generally always say you should do what Dylann Roof did,

5   or you should do what Adolf Hitler did.  They use -- they use

6   coded language.  So in the case of Dylann Roof, for example,

7   there's a reference on (internet distortion) to someone

8   saying, and it's mentioned in the report, quote, "I'm showing

9   up with a bowl cut."  A bowl cut is the haircut that Dylann

10  Roof used when he murdered nine people in the church in South

11  Carolina.  So this participant on the Charlottesville 2.0

12  server, the planning server that was used to plan the rally,

13  says, quote:  "I'm showing up with a bowl cut this time and

14  got to take the whole city to church."

15         To outsiders, that may appear to be an innocuous

16  reference to haircut.  These defendant -- these experts note

17  that that's not what it is.  Bowl cut is actually a specific

18  reference to a horrific act of violence committed by a white

19  supremacist.  And language like that is designed to encourage

20  others to emulate that behavior.

21         There are -- I won't go into it all.  It's all in

22  the report.  But that's the way in which they will discuss

23  violence.  It's specific tactics that are often coded that

24  serve to encourage violence.  And again, that kind of

25  testimony is --

1        THE COURT:  I can see that you could testify as to

2   what the haircut means.  You know, it's -- you know, it's

3   associating yourself with Roof.  But I think to take that --

4   I'm a little concerned that being able to go with that and say

5   that person is encouraging someone to do what Roof did in

6   Charlottesville, seems to me that's a -- right much of a

7   stretch.

8        MR. BLOCH:  Judge, they do not intend to say that

9   person was encouraging violence.  They don't go that far.

10  They will not opine that any specific person intended

11  anything.

12        What they will do is say that "This is -- this is

13  what the reference to Dylann Roof means.  This is what the

14  reference to haircuts means."  But they won't take the final

15  step of saying, therefore, we conclude that that person meant

16  X, Y, Z.  That's up to the jury to decide.  But that kind of

17  testimony I think is helpful to the jury because it gives

18  context and helps the jury interpret language that is

19  intentionally designed to conceal from outsiders violent

20  intent.

21        The -- this kind of testimony, Judge, and --

22        THE COURT:  I mean, why -- why isn't that just the

23  guy said, "I'm going to Charlottesville and I'm going to dress

24  like Dillon Roof."

25        MR. BLOCH:  Well --

 1              THE COURT:  I mean, you know, I think Freud said,

 2     "Sometimes a banana is just a banana."  I mean, why is that

 3     encouraging, necessarily encouraging -- like I say, he's

 4     encouraging people to dress like the guy, you know, and

 5     express his -- you know, his sympathy with the same kind of

 6     conduct.

 7              MR. BLOCH:  Judge, that -- fair question.  And the

 8     answer is:  If in fact is the case, which these experts say it

 9     is, that that sort of language has a well-defined preexisting

10     meaning, meaning pre -- before that person ever made that

11     comment, those words typically in this particular culture

12     meant a certain thing, then that testimony about that context

13     has been deemed --

14              THE COURT:  Okay.  Well, what did it mean when he

15     says, "I'm wearing a bowl haircut"?  I mean, we know who he's

16     emulating there.  But what is -- what is the message that they

17     are saying that conveys?

18              MR. BLOCH:  They will say that there's been a

19     historical well-established tactic of glorifying violence for

20     the purpose of encouraging others to commit violence.  So that

21     historically, before Unite the Right was ever an idea, white

22     supremacists have been encouraging their followers to commit

23     violence by making specific references like this to Dylann

24     Roof or Adolf Hitler or other violent white supremacists.  And

25     so that is a particular tactic that white supremacists have

Sines v. Kessler - 12/17/2020          31

1      used to encourage and facilitate violence.

2              They then will, and I believe can, under the case

3      law say something to the effect of that -- this particular

4      comment about the bowl cut appears to be an example of that

5      kind of tactic.  We don't know what that particular person

6      meant when that person said "bowl cut".  It's always

7      conceivable, and, perhaps, the jury could come to its own

8      conclusion that that person really was talking about haircuts.

9      What these experts will say, and I think is --

10             THE COURT:  Well, he said -- there's no question

11     he's talking about a haircut like this person he admires, and

12     the person he admired killed people in the church.

13             But I don't think you can ask the jury on that

14     statement to say that person was urging people to come and

15     kill people in Charlottesville.  I mean, I don't think an

16     expert can testify to that.

17             MR. BLOCH:  Well, again, I don't think they -- I

18     don't think they will make that last step.  And I think, if

19     they come close to it on any of these points, Mr. Kolenich can

20     object to it at trial, and we can deal with it on an

21     objection-by-objection basis at trial.

22             But I think this is an example of -- the "bowl cut"

23     statement is an example of both coded language, as well as a

24     destructive tactic.  That is normalizing violence, or

25     encouraging violence, within the group so that others might

1    act.

2              And if it is in fact true, which these experts say

3    it is, that that is something that over and over again from

4    the beginning of their existence white supremacists have

5    encouraged others to commit violence in this particular way, I

6    don't believe that testimony is improper even if it is in fact

7    true that -- that the jury may come to a conclusion about what

8    this particular person intended.  The experts won't say this

9    person wanted violence.  They will say this is an example of a

10   tactic that we have seen developed in the culture over 150

11   years.

12             I don't think it's different, Judge, in my view,

13   from, for example, testimony that -- I'm looking at *United*

14   *States v. Torralba-Mendia*, which is cited in our brief, 784

15   F.3d 652, Ninth Circuit case from 2015.  That in a case

16   charging a, "Conspiracy to smuggle undocumented immigrants,"

17   the expert was allowed to testify about what they called

18   common practices -- what they called common practices of alien

19   smuggling operations.

20             The Court said that evidence about the smuggling --

21   the smuggling organization's methods helped prove the

22   existence of a conspiracy and put the defendant's actions in

23   context.

24             I also think it is entirely on all fours with *United*

25   *States v. Wilson*, Eleventh Circuit case from 2015, where,

1    again, the charge was conspiracy to possess firearms and

2    further the crimes of violence.  This was the case where

3    defendants were members of the Bloods gang.  And that gang

4    expert in that case identified that, quote, Gang culture had

5    spread all over the country.  That expert, Quote, Identified

6    several gang identifiers that were unique to Bloods, including

7    that, quote, Blood gangs generally committed violent crimes

8    and carried firearms.

9           And I would note, Judge, which goes to your earlier

10   point, in that case the Bloods -- the sect of the Bloods gang

11   that was at issue in that case was a gang in Alabama.  This

12   particular expert was an expert in Bloods gangs in California

13   but was allowed to testify that there is a nationwide culture

14   that has distinctive characteristics.

15          The expert in that case then reviewed the evidence

16   in the case, interpreted statements in the case, opined that

17   the conduct of the defendants committing the crime alleged

18   was, quote, Conduct consistent with what he's seen in his

19   experience among Blood gang members.

20          He stated he had reviewed certain evidence in the

21   case, and when asked to comment on that evidence noted on the

22   record several gang identifiers present therein and he

23   reiterated the significance and the meaning behind each.

24          THE COURT:  Well, but the difference seems to be,

25   though, that the Bloods are an organized group.  That when you

Sines v. Kessler - 12/17/2020                    34

1     join the Alabama chapter of the Bloods you are taking

2     allegiance to the group as a whole.

3               It's not like if you join -- you join some local

4     group here that's -- or maybe one of these defendants' groups

5     you don't take allegiance to white supremacy.

6               MR. BLOCH:  Well, Judge, I would -- I hear that for

7     sure.  But there are plenty of cases, for example, that allow

8     experts to testify about Islamic extremism, for example, that

9     is I believe --

10              THE COURT:  Well, they are the cases would be

11    more -- more appropriate here, I think.  Or closer, more

12    analogous to --

13              MR. BLOCH:  Right.  Two things, Judge:

14              Number one, that -- a variation of the point you

15    just made was raised in this Bloods case.  And that's why I

16    note that the Bloods at issue in this case were in Alabama.

17    There was no specific allegiance to the specific Blood gang

18    that this expert had expertise in.  And nonetheless, the

19    expert was allowed to say that there's a gang culture, a Blood

20    culture, it sort of permeates the country, and there are

21    distinctive characteristics of it.

22              But I agree with you.  It's also analogous to cases

23    that talk about -- that experts were allowed to talk about

24    Islamic extremism in *United States v. Young*, which is a Fourth

25    Circuit case from last year, an expert was allowed to testify

1      about the crossover between Islamic extremism and white

2      supremacy.  It's a very similar testimony from what these

3      experts plan to offer in our case.

4              And I think one level removed from that are the

5      cases that where experts are allowed to talk about what drug

6      traffickers typically do or what drug smugglers typically do

7      or what child molesters typically do.  None of those cases

8      involve a specific discrete gang, or a discrete group.  But in

9      all of those cases experts were aloud to opine that there is a

10     distinctive kind of tactic that is well-established in these

11     groups and that when the defendants in those cases do that

12     tactic it is consistent with this tactic that we have seen

13     within the culture.  And that testimony is thought to be

14     helpful to juries, and, therefore, admissible because it gives

15     context to the conduct.

16             And I think, particularly, in a case like this where

17     these defendants are going to claim that all of their language

18     and conduct was innocuous, it is helpful for a jury to be able

19     to say, well, at least within the culture that these

20     defendants are a part of, it has been our opinion that that

21     conduct or that language is not in fact innocuous.

22             THE COURT:  Okay.  Let me ask you about on page 60

23     there's an opinion that begins:  "When defendants extended the

24     white supremacist culture into the Charlottesville 2.0 and

25     associated servers on Discord they likely knew that with some

1    encouragement users would urge each other toward the vision

2    for Unite the Right in the specific ways that the defendants

3    desired."

4            Is that an -- that's pretty much an opinion that

5    there was a conspiracy.

6            MR. BLOCH:  Judge, I'm sorry, I'm finding the quote.

7            Well, I'd say a few things.  Number one, as I

8    mentioned, they will not say that there's a conspiracy.

9            What they do say, and I think is consistent with

10   this comment, is that there is a distinctive culture; it does

11   include these tactics.  These defendants were knowledgeable

12   about the culture and that culture seems to have infused the

13   Charlottesville 2.0 server based on the language that we have

14   seen defendants use within the server.

15           And so that -- that I think is the intention of the

16   testimony.  And again, if there's any concern that they go too

17   far, which -- which they won't, that can be dealt with on an

18   objection-by-objection basis at trial.  But they will not

19   opine that there's a conspiracy.  They will not opine as to

20   what any specific defendant intended.

21           THE COURT:  All right.

22           MR. BLOCH:  There are -- I just want to mention very

23   briefly two arguments that were raised in the brief, in the

24   reply brief, that I wanted to respond to also --

25           THE COURT:  All right.

1          MR. BLOCH:   -- referenced today.

2          The cases that talk about experts stating legal

3    conclusions are far from what these experts intend to do.

4          I'm quoting from *U.S. v. McIver*, which is a case

5    that Mr. Kolenich cites in support of his claim that these are

6    legal conclusions that these experts intend to offer.  And

7    what that case says is that the cases that preclude expert

8    testimony for rendering legal conclusions are where, quote:

9    "The terms used by the witnesses have a separate distinct and

10   specialized meaning in the law different from the terminology

11   they typically use in their everyday vernacular, such as

12   rendering an opinion that defendant's actions constitute

13   extortion or that," in that case, "a dog bite constituted

14   deadly force."

15         These experts will not render any sort of opinion

16   like that.  They -- again, they won't say what anybody

17   intended.  They won't say there's a conspiracy.  They

18   interpret language.  They contextualize conduct within the

19   culture of the White Supremacist Movement.  None of that comes

20   anywhere close to the prohibitions on rendering legal opinions

21   as defined by the case law.

22         And finally, Judge, Mr. Kolenich makes an argument

23   that this testimony may run afoul of Rule 403.  And I would

24   just note that many of the cases that we cite that allow

25   expert testimony on distinct groups, on amorphous groups, also

1    consider challenges under Rule 403.  All of them reject those

2    challenges under 403.

3         I have not seen a case that -- that -- that

4    disallows this sort of testimony under Rule 403.  Mr. Kolenich

5    doesn't cite one.  And I would just point to one of the cases

6    we cited, *United States v. Hassan*, Fourth Circuit case from

7    2014.  Considering the 403 argument raised in that case, the

8    Court said, quote:  Although linking the appellants to

9    extremist Jihadist groups was undoubted prejudicial, it was

10   not unfairly so.  Indeed, the charges, which were conspiracy

11   in that case, that were lodged against the appellants meant

12   that the prosecution would necessarily seek to establish that

13   link.

14        Finally, Judge, I would note that, generally

15   speaking, it is our burden to prove that the defendant

16   conspired to commit racially motivated violence.  To do that

17   we need to discuss the motivations of the defendants.  And the

18   motivations of defendants are made clear through language and

19   conduct.  This is a culture, as the experts will explain, that

20   speaks, essentially, in code and symbols about violence.  And

21   it's our view that the jury won't understand that unless these

22   symbols and tactics are decoded for the jury.

23        The answer I believe, Judge, is not to exclude that

24   testimony.  It is for the defendant to cross-examine the

25   experts, or for the defendant to put on their own expert.  I

1    will note that -- that the defendants in this case chose not

2    to depose these experts.  They chose not to put on a rebuttal.

3    Instead, they filed this motion.  The answer to many of the

4    concerns that Mr. Kolenich is raising is to cross-examine, to

5    object at trial if there is a individual opinion that appears

6    to go too far, or to put on their own evidence.

7         But consistent with the spirit of Rule 702, which is

8    to exclude -- which is to allow expert testimony, that it

9    should be an exception and not the rule to limit or exclude

10   expert testimony, the answer here is not to exclude but is to

11   allow defendants to challenge at trial through the various

12   means that are available to them.

13        THE COURT:  All right.  Thank you.

14        Defendant wish to respond?

15        MR. KOLENICH:  Just generally, Your Honor, I don't

16   believe that Mr. Bloch's presentation of what the experts

17   intend to say and what they will not say is consistent with

18   the report that we got.  As to not -- given contrary experts,

19   obviously, there are financial limitations on these

20   defendants.  Obviously, we would have liked to do that, but

21   this is all they could afford.

22        I understand cross-examination and making objection

23   at trial.  However, I don't think that's proper for me to rely

24   on that where there is certain parts of their presentation

25   that exceed what the law allows.  So we disagree with

1   plaintiffs that there is no attack on witness credibility or

2   reaching of legal conclusions.  We think it's pretty explicit

3   in various parts of the report.

4           Now, relying on the Court's order to me to make

5   additional filings as to what specifically we're objecting to,

6   I would like to get the transcript of this hearing and I'll go

7   ahead and make that filing.  Other than that, I'm pleased with

8   our presentation for the defense this morning and thank the

9   Court for hearing us.

10          THE COURT:  Okay.  There's one other matter I think

11  we need to discuss pretty soon, and maybe now is the time.  We

12  have this case set I think to be tried in April and we have an

13  alternate date in October.  I, frankly, can't see any way that

14  we're going to be able to try a case in April, I don't think.

15  We're talking about being in a courtroom with more than 50

16  participants, I would think.  Considering all the plaintiffs,

17  all the defendants, all their attorneys and their associated

18  people who have to be there.

19          It seems to me we probably ought to be going on and

20  just saying, look, we'll try the case in October.  I don't see

21  the vaccine being readily available, and we don't want to get

22  into start this case and have one lawyer get sick and have --

23  I mean, there are too many moving parts, and one could go

24  wrong and we'd have to stop the trial, possibly have to stop

25  the trial.

 1          Any feeling about that from the plaintiff or the

 2     defendant?

 3          MR. KOLENICH:  For the defense, Your Honor, I

 4     understand what you're saying, and I concur that at least

 5     where I am in Ohio there's not going to be much, if any,

 6     vaccine to the general population by April.  So there's no

 7     objection to moving the trial off of April from my clients.

 8          MR. BLOCH:  Judge, I certainly appreciate the

 9     Court's concern.  I guess all I would ask is, obviously, there

10     are a lot of parties, a lot of lawyers on this side and a lot

11     of parties, and I know that our clients, as have everybody,

12     have waited a very, very long time to get this case tried.  I

13     guess I would ask for an opportunity to just discuss amongst

14     our team and respond.

15          I know that we were very hopeful that we would get

16     the case done in April.  That said, obviously, safety is the

17     most important thing and we don't want to jeopardize anybody's

18     health.

19          THE COURT:  Right.  Well, I mean, I'd like to get it

20     done in April, too, because we've got a number of cases

21     that -- criminal cases are our priority, and we haven't had a

22     criminal trial I think since February now, and we've got some

23     of those stacked up.  And I don't think we'll get to those in

24     April, either.

25          So anyway, I'll, you know, give you an opportunity

1   to speak to your people, but I think I'm going to make a

2   decision pretty quick, and I think we have to, you know, be

3   practical about it and err on the side of safety.  But also,

4   just we can't go into it with the hope that everything will

5   work out.  We know that it doesn't work that way when you've

6   got this many moving parts that this case has to go wrong.

7            So if you want to talk to your people, let me know

8   something quickly, but I'll -- the Court will have to -- it's

9   not necessarily going to be the opinion of any one person.  I

10  mean, the Court will have to make the decision based on what,

11  you know, the sign says out there regarding where the COVID

12  will be in April.

13           All right.  Thank you all.

14           MR. BLOCH:  Yes, sir.  Thank you, Judge.

15           THE COURT:  We'll recess.

16           MR. KOLENICH:  Thank you.

17           (The proceedings concluded at 11:09 a.m.)

18                          **CERTIFICATE**

19           I, Mary J. Butenschoen, certify that the foregoing

20  is a correct transcript from the record of proceedings in the

21  above-entitled matter.

22  /S/ Mary J. Butenschoen, RPR, CRR                 12/23/2020

23

24

25