IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| ELIZABETH SINES, et al., | ) | Civil Action No. 3:17-cv-00072 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION & ORDER |
| | ) | |
| JASON KESSLER, et al., | ) | |
| Defendants. | ) | By:   Joel C. Hoppe |
| | ) | United States Magistrate Judge |

This matter is before the Court on Plaintiffs' "Motion for Evidentiary Sanctions Against

Defendant Robert 'Azzmador' Ray and for an Order Directing Ray to Show Cause Why He

Should Not Be Held in Contempt of Court." ECF No. 750 ("Pls.' Mot. for Evid. Sanctions")

(citing Fed. R. Civ. P. 37(b)(2)(A)); *see* Pretrial Order ¶ 13 (citing 28 U.S.C. § 636(b)(1)(A)),

ECF No. 101. Plaintiffs ask the Court to find that Ray disobeyed a discovery order directing him

to produce certain documents and information, Order of May 18, 2020, ECF No. 728, and to

"instruct the jury that Ray chose to intentionally withhold his documents and that the jury may

draw adverse inferences from that fact, including that Ray chose to withhold such documents

because he was aware that such documents contained evidence that Ray conspired to plan

racially motivated violence at [the] Unite the Right" rally in August 2017. Pls.' Mot. for Evid.

Sanctions 1; *see generally id.* at 2–4. Ray, who is representing himself, ECF No. 583, did not

respond within fourteen days. Accordingly, I consider Plaintiffs' nondispositive motion to be

unopposed and can resolve it without another hearing. Pretrial Order ¶ 7; Fed. R. Civ. P. 78(b);

W.D. Va. Civ. R. 11(b); *see* Order Finding Robert Azzmador Ray in Civil Contempt ¶ 16 ("Ray

did not appear at the contempt hearing on September 14, 2020 at 2:00 p.m. ET, as ordered."),

ECF No. 877 (Sept. 16, 2020) (Moon, J.) ("Ray Contempt Order"). Plaintiffs' request for a

permissive adverse-inference instruction will be granted subject to the presiding District Judge's

1

final approval. *See* Mem. Op. & Order of Nov. 30, 2020, at 42, ECF No. 910. Their request for

another order directing Ray to show cause why he should not be held in contempt of court, *see*

ECF Nos. 848, 877, will be denied. Plaintiffs may file a petition setting out their reasonable

expenses, including attorney's fees, caused by Ray's failure to obey the May 18, 2020 discovery

order, ECF No. 728. *See* Fed. R. Civ. P. 37(b)(2)(C).

## I. The Legal Framework

Rule 37(b)(2) of the Federal Rules of Civil Procedure grants the district court where an

action is pending broad discretion to impose sanctions whenever "a party . . . fails to obey an

order to provide or permit discovery," Fed. R. Civ. P. 37(b)(2)(A). *See Law Funder, L.L.C. v.

Munoz*, 924 F.3d 753, 758 (5th Cir. 2019) ("Rule 37(b)(2)(A) allows a district court to impose a

sanction when a party fails to comply with a discovery order, and the court has broad discretion

in fashioning its sanction when it does so."). "The rule's language clearly requires two things as

conditions precedent to engaging the gears of the rule's sanction machinery: a court order must

be in effect, and then must be violated, before . . . sanctions can be imposed." *R.W. Int'l Corp. v.

Welch Foods, Inc.*, 937 F.2d 11, 15 (1st Cir. 1991); *see also Carriage Hill Mgmt., LLC v. Bos.

Lobster Feast, Inc.*, No. GJH-17-2208, 2018 WL 3329588, at *5 (D. Md. July 6, 2018); *Victor

Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 518–20 (D. Md. 2010). "Rule 37 sanctions

must be applied diligently" when a court order is violated, *Roadway Express, Inc. v. Piper*, 447

U.S. 752, 763 (1980), "both as a matter of justice in the individual case and 'to deter others who

might be tempted to similar conduct,'" *Lee v. Max Int'l*, 638 F.3d 1318, 1320 (10th Cir. 2011)

(Gorsuch, J.) (brackets omitted) (quoting *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427

U.S. 639, 643 (1976)). *See Victor Stanley*, 269 F.R.D. at 533–34. Available sanctions include

orders deeming certain facts established, permitting or requiring an adverse inference, and entering default judgment against the disobedient party. *Victor Stanley*, 269 F.R.D. at 533–34.

Rule 37(b)(2)(A) "contains two standards—one general and one specific—that limit a district court's discretion" in choosing what substantive sanctions to impose. *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982); *see* Fed. R. Civ. P. 37(b)(2)(C) (requiring courts to order the disobedient party, its attorney, or both to pay reasonable expenses caused by the party's failure to obey a discovery order, unless the failure was substantially justified or awarding expenses would be unfair). "First, any sanction must be 'just'; second, the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Ins. Corp. of Ir.*, 456 U.S. at 707 (citing Fed. R. Civ. P. 37(b)(2)(A)). The Fourth Circuit has "developed a four-part test for a district court to use when" making this determination.[1] *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 348 (4th Cir. 2001) (en banc); *see S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). The court must consider: "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective." *S. States Rack & Fixture*, 318 F.3d at 597; *see Beach Mart, Inc. v. L&L Wings, Inc.*, 784 F. App'x 118, 123–24 (4th Cir. 2019) (citing Fed. R. Civ. P. 37(b)(2)(A)). Some sanctions,

---

[1] The Fourth Circuit has not clearly defined the movant's burden of proof on a motion for sanctions under Rule 37(b). *Brooks Sports, Inc. v. Anta (China) Co., Ltd.*, No. 1:17cv1458, 2018 WL 7488924, at *11 (E.D. Va. Nov. 30, 2018), *adopted by* 2019 WL 969572, at *1 (E.D. Va. Jan. 11, 2019); *Glynn v. EDO Corp.*, Civ. No. 07-1660, 2010 WL 3294347, at *2 (D. Md. Aug. 20, 2010). "However, proving misconduct by 'clear and convincing' evidence, as opposed to by a mere preponderance, certainly suffices," *Glynn*, 2010 WL 3294347, at *2, especially when the sanction imposed does not result in dismissal or default judgment against the disobedient party, *see Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians*, 155 F.3d 500, 504–05 (4th Cir. 1998). Here, the result is the same under either standard because Plaintiffs produced clear and convincing evidence that Ray intentionally withheld requested discovery knowing that it was relevant to an issue in the case.

including an adverse inference, require the court to find that the disobedient party acted willfully or in bad faith. *Sampson v. City of Cambridge*, 251 F.R.D. 172, 181 (D. Md. 2008) (citing *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450–51 (4th Cir. 2004)).

## II. Background[2]

On August 11–12, 2017, the "Defendants in this lawsuit, including the Ku Klux Klan, various neo-Nazi organizations, and associated white supremacists, held rallies in Charlottesville, Virginia. Violence erupted." Mem. Op. on Defs.' Mots. to Dismiss Am. Compl. 1; *see* Second Am. Compl. ¶¶ 1–7. These rallies are now known as "Unite the Right." Plaintiffs, several residents who were injured that weekend, contend that "this violence was no accident"— rather, they allege that Defendants "conspir[ed] to engage in violence against racial minorities and their supporters" in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1985, and related state laws. Mem. Op. on Defs.' Mots. to Dismiss Am. Compl. 1–2. "While ultimate resolution of what happened at the rallies awaits another day," the District Court has held the remaining Plaintiffs plausibly alleged that certain Defendants, Ray included, "formed a conspiracy to commit the racial violence that led to the Plaintiffs' varied injuries." *Id.* at 1; *see id.* at 31.

\*

Plaintiffs allege that Ray is a neo-Nasi who lives in Texas. *See* Second Am. Compl. ¶ 27. In 2017, Ray and co-Defendant Andrew Anglin ran the Daily Stormer, a website they describe "'as a hardcore front for the conversion of masses into a pro-white, Anti-Semitic ideology,' to 'sell global white supremacy,' and to 'make a racist army.'" *Id.* ¶ 25 (alterations omitted); *see id.*

---

[2] This section summarizes certain factual allegations in Plaintiffs' Second Amended Complaint. ECF No. 557. "While the Court does not repeatedly state 'Plaintiffs *allege* that Defendant *X* did *Y*,' this summary should not be taken as the Court's endorsement of one version of the facts." Mem. Op. on Defs.' Mots. to Dismiss Am. Compl. 3 (July 8, 2018), ECF No. 335.

¶ 27. Ray wrote and published articles for the Daily Stormer. He also led the "Dallas Fort Worth Stormer Book Club," one of many local Daily Stormer groups across the country. *Id.* ¶ 27; *see id.* ¶ 25 ("Stormers have formed local chapters, called 'Stormer Book Clubs,' as part of Anglin's plan to 'build an invisible empire.'"); *id.* ¶ 92. ("Ray told Vanguard members in July 2017, 'You don't think the [Daily Stormer Book Clubs] have anything to do with books, do you? . . . Think boots, not books.'"). *See generally* Mem. Op. on Defs.' Mots. to Dismiss Am. Compl. 29–30.

Unite the Right featured prominently on the Daily Stormer website. Staff produced their own poster advertising the event, urging followers to "Join Azzmador and The Daily Stormer" in Charlottesville on August 12 "to end Jewish influence in America." Second Am. Compl. ¶ 90; *see also id.* ¶ 91 ("Using Daily Stormer's website, Defendants Anglin and Ray commanded the Daily Stormer community to attend ('You must make it there!').")." Anglin and Ray told Daily Stormer readers,

> We need to do everything we can to get as many people to attend this rally as possible. . . . There is a rising nationalist movement in America and it is not going away. Having thousands of nationalists come out for this rally will put the fear of god into the hearts and minds of our enemies.

*Id.* ¶ 91. Two articles posted on the Daily Stormer website instructed followers to bring tiki torches, pepper spray, flag poles, flags, and shields. Ray later shared a link to one of those articles, "Charlottesville: Why You Must Attend and What to Bring and Not to Bring!," on the social media platform "Discord." *Id.* ¶ 115. He also wrote on Discord that he'd "be there gassing these people" and his "guys will be ready with lots of nifty equipment." Pls.' First Mot. to Compel 6, ECF No. 673. Ray and Anglin "established 'meet ups' and chat rooms" on the Daily Stormer's website for rally attendees to "use throughout the weekend to coordinate their actions" once they were in Charlottesville. *Id.* ¶ 83. *See generally* Mem. Op. on Defs.' Mots. to Dismiss Am. Compl. 30.

5

Ray and other Defendants organized a "secret" torchlight march through the University of Virginia's grounds on the night of Friday, August 11, 2017. Second Am. Compl. ¶¶ 142–43. A message on the Daily Stormer website told rally attendees they were "required" to have tiki torches for a "torchlight ceremony," and instructed them to buy tiki torches and oil before coming to Charlottesville. *Id.* ¶ 145. "These torches were supposed to invoke the Ku Klux Klan's and Nazi's similar use of torches" to terrorize their victims. Mem. Op. on Defs.' Mots. to Dismiss Am. Compl. 9 (citing Am. Compl. ¶ 150); *see* Second Am. Compl. ¶ 149. As night fell on August 11, Ray and roughly "300 [other] neo-Nazis and white supremacists," Second Am. Compl. ¶ 152, "marched two-by-two up the Lawn, around the Rotunda, and towards a Thomas Jefferson statue on the far side of the Rotunda," Mem. Op. on Defs.' Mots. to Dismiss Am. Compl. 9 (citing Am. Compl. ¶¶ 159, 169). *See* Second Am. Compl. ¶¶ 149, 151–52, 158. They chanted racist slogans, "barked like dogs[,] and performed Nazi salutes." *See id.* ¶¶ 160–61. During the march, Ray stated,

> We are stepping off the Internet in a big way. . . . We have been organizing on the Internet. And so now they are coming out. We have greatly outnumbered the anti-white, anti-American filth. At some point we will have enough power that we will clear them from the streets forever . . . you ain't seen nothing yet.

*Id.* ¶ 87. He explained that they held the torchlight march because, "Our country is being usurped by a foreign tribe[] called the Jews. We are going to stop it." *Id.* ¶ 149. Ray and others gave orders to marchers, "telling them to get in specific formations and assigning people either to march with a torch or on the side as 'security.'" *Id.* ¶ 156. *See generally* Mem. Op. on Defs.' Mots. to Dismiss Am. Compl. 30–31.

While the march was supposed to be secret, about thirty counter-protesters, including two remaining Plaintiffs, reached the Jefferson statue before the marchers. *See* Second Am. Compl. ¶¶ 155, 163–66. "The counter-protestors linked arms and surrounded the statue, facing away

from it." Mem. Op. on Defs.' Mots. to Dismiss Am. Compl. 9 (citing Am. Compl. ¶ 164); *see* Second Am. Compl. ¶ 163. Marchers charged towards the counter-protestors, trapping them where they stood. Second Am. Compl. ¶¶ 165, 172. They kicked and punched the counter-protestors and, using their burning tiki torches as weapons, beat individuals onto the ground. *Id.* ¶ 167. At one point, "Ray shouted, 'The heat here is nothing compared to what you're going to get in the ovens!'" *Id.* ¶ 168. He later proclaimed that the marchers "went through [the protestors] like shit through a goose!" *Id.* ¶ 167. *See generally* Mem. Op. on Defs.' Mots. to Dismiss Am. Compl. 30–31.

Most of the remaining Defendants, including Ray, attended the main "Unite the Right" rally on Saturday, August 12. Second Am. Compl. ¶ 186. Ray carried a banner that read "Gas the kikes, race war now!" *Id.* ¶ 201. He also brought a "personal cameraman" with him to Charlottesville to record and broadcast the rally via a livestream on the Daily Stormer's website. Pls.' First Mot. to Compel 4; *see* Second Am. Compl. ¶ 201; Pls.' First Mot. to Compel Ex. 6, Azzmador, *The Battle of Charlottesville Full Video!*, Daily Stormer (Aug. 19, 2017), ECF No. 673-6. By 11:22 a.m., local law enforcement declared an unlawful assembly and ordered everyone to leave the small downtown park where the rally was supposed to be held. Second Am. Compl. ¶ 222. Ray went to nearby McIntire Park with several other Defendants. *Id.* ¶ 225. About an hour later, Daily Stormer told readers to "go to McIntire Park now," to "find Azzmador" or two other organizers, and to "not separate once [they were] behind one of these three men." *Id.* ¶ 226 (emphasis omitted). The same day, Ray told a reporter, "We're showing . . . this parasitic class of anti-white vermin that this is our country. This country was built by our forefathers. It was sustained by us. It's going to remain our country." *Id.* ¶ 225. On an episode of

the Daily Stormer's podcast, "The Krypto Report," Ray celebrated what happed in

Charlottesville as a success for the white-supremist movement. Pls.' First Mot. to Compel 7–8.

**

In June 2018, a grand jury sitting in Albemarle County indicted Ray on one count of

maliciously releasing a gas during the August 11 torchlight march. *See* Pls.' Mot. for Evid.

Sanctions Ex. E, Docket, *Commonwealth v. Ray*, No. CR-18-597 (Albemarle Cir. Ct. filed June

4, 2018), ECF No. 750-5. As of March 2021, Ray was listed as a fugitive in state court records.

Pls.' Mot. for Evid. Sanctions 4.

### III. Procedural History

Plaintiffs filed this lawsuit on October 11, 2017. ECF No. 1. Ray was personally served

with a summons and copy of the Complaint at a residential address in Frankston, Texas on

November 2. ECF No. 107. On January 25, 2018, Plaintiffs served their Corrected First Set of

Requests for Production of Documents and First Set of Interrogatories on Ray through his then-

counsel, Jim Kolenich, Esq.[3] Those requests sought "information and materials directly relevant

to the claims and defenses in this case," Mem. Op. of Aug. 9, 2019, at 29, ECF No. 539,

including copies of any "emails, text messages, recordings, or social media content related to the

---

[3] Ray was one of several Defendants who retained Mr. Kolenich to represent them in this matter beginning on December 1, 2017. ECF No. 131. In October 2019, I allowed Mr. Kolenich and his local co-counsel to withdraw from representing Ray because Ray had not been available by phone or email for most of the litigation and counsel had not been able to contact him at all for more than six weeks. Order of Oct. 28, 2019, at 1, ECF No. 583; Kolenich & Woodard Br. in Supp. of Mot. to Withdraw 1, ECF No. 530; *see also* Order of Oct. 22, 2018 (denying first request to withdraw), ECF No. 364; Order of Sept. 19, 2019 (denying second request), ECF No. 558. At the same time, I warned Ray that he was "proceeding pro se and, unless and until new counsel enters an appearance on his behalf," he was "solely responsible for conducting his defense in accordance with all rules, court orders, and deadlines in this case." Order of Oct. 28, 2019, at 2. I also gave him an additional fourteen days, or until November 12, 2019, to answer or otherwise respond to Plaintiffs' second amended complaint. *Id.* at 1; *see* Fed. R. Civ. P. 12(a)(4)(A). Ray has not filed any responsive pleading in this case since July 2018. ECF No. 343 (joint answer to first amended complaint); *see* Fed. R. Civ. P. 8(b)(6).

preparation, planning, transportation to, or coordination for" the August 11–12 events and information identifying "all means of communications used to discuss the events, as well as the specific electronic devices used for such communications," *id.* at 12 (cleaned up). Ray's proper responses or objections were due by February 26, 2018. *Id.* at 12 (citing Fed. R. Civ. P. 33(b)(2), 34(b)(2)).

In mid-March 2018, Plaintiffs' counsel informed me that "they had 'had not received any written responses to [their] requests for documents or [their] interrogatories from any of the defendants,' and 'none of the defendants had produced a single document.'" *Id.* (quoting Tr. of Mar. 16, 2018 Conf. Call, at 10, ECF No. 282). On March 26, I issued an Order denying another pro se Defendant's motion to stay discovery and giving Ray (and others) another twenty-one days to properly answer, respond, or object to Plaintiffs' first written discovery requests. Order of Mar. 26, 2018, at 3, ECF No. 287. Mr. Kolenich emailed Ray's sworn responses to Plaintiffs' counsel on April 18, 2018. *See* Pls.' Reply in Supp. of Mot. for Sanctions Against Defs. Kline & Heimbach Ex. 2, Def. Ray's Resps. to Pls.' First Interrogs. & Reqs. for Prod. of Docs. 2–6, ECF No. 488-2. Ray listed one email account, one cell phone, and five social media accounts that he used to communicate about Unite the Right. *Id.* at 2–3. His answers to each of Plaintiffs' eight detailed requests for documents were all the same: "None." *See id.* at 3–5.

That October, Plaintiffs filed a Motion to Compel Defendants to Permit Inspection of Imaging of Electronic Devices. ECF No. 354 ("Pls.' Mot. to Compel ESI"). Plaintiffs argued that imaging by a neutral third-party vendor was warranted "because Defendants' document production ha[d] been inadequate—indeed, nearly non-existent—in response to Plaintiffs' multiple attempts over the past five months to facilitate the discovery process" and "several Defendants ha[d] openly admitted that they intend[ed] to delete" nonprivileged ESI relevant to

the case. Pls.' Mot. to Compel ESI 9–10. Ray asserted that he could not afford to pay a third-party vendor to image his devices. *See* Defs. Cantwell & Ray's Resp. in Opp'n to Pls.' Mot. to Compel ESI Attach. 1, Decl. of Robert Ray, ECF No. 367-1.

On November 9, 2018, I held a hearing on the motion to compel ESI. *See* Tr. of Hr'g on Pls.' Mot. to Compel ESI, ECF No. 385. Plaintiffs and Defendants who appeared by counsel, including Ray, mostly resolved their disagreements over the proposed ESI protocol. I agreed that "ordering the parties to submit their electronic devices to a third-party vendor for imaging [was] necessary and appropriate to manage discovery in this action." Order of Nov. 13, 2018, at 1, ECF No. 379. As I explained at the hearing, Plaintiffs had waited almost ten months for Defendants to produce the requested documents, Tr. of Hr'g on Pls.' Mot. to Compel ESI 8 ("[T]hese discovery requests were issued in January; now it is November. And [that] is a significant delay."), and there were still concerns that "some relevant information may have been lost," *id.* at 27.

The Court entered the parties' "Stipulation and Order for the Imaging, Preservation, and Production of Documents" on November 19, 2018. *See* Stip. & Order 1–16, ECF No. 383. This Order binds Ray and sixteen other Defendants and was put in place specifically to help them "collect and preserve" ESI from identified social media accounts and "electronic devices that is potentially relevant to this litigation and/or responsive to Plaintiffs' discovery requests" served on January 25, 2018. *Id.* at 2 (punctuation altered). Plaintiffs agreed to front the costs of imaging and collecting this ESI, at least for the time being, to keep the case moving forward. The Order gave each Defendant twenty-eight days—i.e., until December 17, 2018—to "make available to the Third Party Discovery Vendor for imaging and collection any Electronic Devices or Social Media Account" credentials identified on the Defendant's sworn Certification form. *Id.* at 8. Ray submitted his certification form on January 22, 2019. *See* Order of May 18, 2020, at 2. He

identified as the devices and accounts with potentially relevant information one cell phone, two computers, and four previously undisclosed social media accounts. *See* Pls.' First Mot. to Compel 9 (Discord, Gab.ai, Krypto Report podcast, Twitter). Ray eventually gave the Vendor one cell phone, one computer, and credentials to one email account. *Id.*

On Monday, March 4, 2019, I ordered Ray and other Defendants bound by the Stipulation & Order to give their electronic devices and social media account credentials to the third-party discovery vendor by the end of that workweek. Order of Mar. 4, 2019, at 2. Ray told the Vendor that he did not remember the credentials for most of his accounts, including the Daily Stormer's online comment section. Two weeks later, Ray's (now former) attorney stated on the record, "it can't be right that [Ray] doesn't have Daily Stormer pass codes for the media" because he uses the comment section "on a daily basis" for his job. Tr. of Mar. 18, 2019 Mot. Hr'g 12–13, ECF No. 455. Mr. Kolenich also assured the Court that Ray would send his second computer to the vendor as soon as he got the first one back from them. *Id.* Plaintiffs' records show that FedEx delivered Ray's first computer to a residential address in Frankston, Texas on March 14, 2019. *See* Pls.' First Mot. to Compel 11. Although Ray apparently claimed that he sent his second laptop to the Vendor sometime that spring, the Vendor never received it and Ray never provided any tracking information. *See id.*; Pls.' Mot. for Evid. Sanctions Ex. C (May 2020 emails from the Vendor asking Ray to ship and provide tracking information for a second laptop and mobile device, and noting that "[t]he last communication [the Vendor] had directly with Mr. Kolenich regarding Mr. Ray's documents or devices dates back to September 11, 2019"), ECF No. 750-3.

In August 2019, I granted in part Plaintiffs' motion for Rule 37 sanctions against three other Defendants who had also failed to comply with my discovery orders. *See* Mem. Op. of

Aug. 9, 2019, at 22–27, 29–30. I denied Plaintiffs' request for an adverse-inference instruction and other evidentiary sanctions against those Defendants because at that point in the litigation the Court still had the option of "issuing one more very specific discovery order[,] this time under threat of arrest and detention[,]" to help Plaintiffs "'get the information that [they were] entitled to' and clearly still wanted." *Id.* at 27 (quoting Tr. of June 3, 2019 Hr'g on Pls.' Mots. for Sanctions 18, ECF No. 504)); *see also id.* at 33–35. Moreover, all three Defendants had recently stated on the record that they intended to comply with the Court's rules and orders, including orders directing each Defendant to appear and participate in good faith at a deposition by Plaintiffs' counsel devoted exclusively to that Defendant's conduct in pretrial discovery. *Id.* at 27–29; *see id.* at 34 ("The Court will also have a better sense of Plaintiffs' request for an adverse-inference instruction after counsel has deposed each Defendant . . . about what steps, if any, he took to preserve potentially relevant evidence."). But, I also recognized that "the Court will likely have run out of options other than to impose significant evidentiary sanctions" against any of these Defendants who did "not follow through" on his promises. *Id.* at 35; *see also id.* at 34 ("Plaintiffs' requested evidentiary sanctions—including the adverse inference and an order deeming some of their proposed facts established—would be available, and certainly could be appropriate in this case, if [Defendants] . . . fail to produce the discovery from this point forward."); *See* Mem. Op. & Order of Nov. 30, 2020, at 31–39 (granting most of Plaintiffs' requested evidentiary sanctions, including a permissive adverse-inference instruction, against one pro se Defendant).

That October, I held another status conference with the parties to discuss Ray's and other Defendants' outstanding discovery obligations and to set a timeline for the parties to complete pretrial discovery. Disc. Order of Oct. 28, 2019, at 1, ECF No. 582. On October 28, I issued an

order giving each Defendant seven days to contact the Vendor "to determine what specific information, if any, the Vendor need[ed] to access that Defendant's identified social media accounts and [electronic] devices." *Id.* at 2. Additionally, each Defendant had fourteen days to "give the Vendor the last known credentials used to access the identified social media accounts, regardless of whether the Defendant currently has access to the platform, or whether an account is active, inactive, or inaccessible." *Id.* The same day, I issued a separate order granting Mr. Kolenich's third motion to withdraw as Ray's attorney in this matter. The order warned Ray that he was "proceeding pro se and, unless and until new counsel enters an appearance on his behalf," he was "solely responsible for conducting his defense in accordance with all rules, court orders, and deadlines in this case." Order of Oct. 28, 2019, at 2. I also gave Ray fourteen additional days to answer or otherwise respond to Plaintiffs' second amended complaint. *Id.* at 1. He never responded.

Ray had until 5:00 p.m. EST on February 5, 2020, to give Plaintiffs' counsel "all discoverable material" responsive to their interrogatories and requests for production of documents. Order of Nov. 27, 2019, at 1, ECF No. 597. On March 11, Plaintiffs filed their first motion to compel against Ray, asserting that he still had not produced his second laptop or credentials for his Daily Stormer, Discord, Gab, Krypto Report, and Twitter accounts—even though he used some of those social media platforms as recently as February 6, 2020. *See* Pls.' First Mot. to Compel 9–13; *id.* Ex. 15, *TKR Live: State of the Union Special*, The Krypto Report (Feb. 6, 2020), ECF No. 673-15. Plaintiffs had "also discovered from documents in [Ray's] own production and from other Defendants' documents" that Ray failed to disclose "a second cell phone" that he used on August 12, 2017, a Skype account, and two Twitter handles that likely contained relevant ESI. Pls.' First Mot. to Compel 12–13. Plaintiffs asked the Court to issue an

order (1) compelling Ray to produce these devices and account credentials to the Vendor, and (2) instructing the Vendor to give directly to Plaintiffs' counsel, "without the opportunity for Ray's review," every document collected from his imaged "devices and accounts that hits on any search term" the parties previously agreed upon. *Id.* at 17. Ray did not respond. *See* Order of May 18, 2020, at 1, ECF No. 728.

I granted Plaintiffs' motion in its entirety. *Id.* at 3–6. The Court had already held that Plaintiffs were entitled to the requested material because it was directly relevant to their surviving claims and proportional to the needs of the case, considering the parties' relative access to such information, the parties' resources, the importance of the discovery in resolving the issues, and most Defendants' (including Ray's) apparent inability to locate and produce responsive documents and electronic information. *Id.* at 3 (citing ECF Nos. 379, 539). The Court also had ordered Ray many times to provide or permit discovery of the same material within his control by deadlines repeatedly extended. *Id.* (citing ECF Nos. 288, 383, 440, 539, 582, 597). Yet, it had been Ray's consistent "practice from the very beginning to ignore outright the court's orders or to submit chaotically and defectively to them." *Id.* (quoting *Mut. Fed. Savs. & Loan v. Richards & Assocs.*, 872 F.2d 88, 94 (4th Cir. 1989)). "Clearly, Ray's 'track-record of failing to fulfil his discovery obligations in a timely manner . . . ma[de] him [especially] ill-suited to participate in a discovery process that is predicated upon one's prompt and good faith compliance with discovery obligations.'" *Id.* (quoting Order of Jan. 22, 2020, at 3, ECF No. 638). The case needed to move forward.

Accordingly, I gave Ray one more chance to make good his discovery obligations. First, I instructed Plaintiffs' counsel to send Ray a blank copy of the ESI Certification form, which they could "modify . . . to request specific information consistent with this Order." *Id.* at 4. Plaintiffs

14

sent a copy of the modified form to Ray's email address of record later that afternoon.[4] *See* Pls.'

Mot. for Evid. Sanctions Ex. B, ECF No. 750-2, at 2. Second, I explained in detail the steps that

Ray needed to take and gave him specific deadlines to complete those tasks. Order of May 18,

2020, at 4–5.[5] Finally, I warned Ray that "his failure to fully comply with this Order may result

in the Court imposing sanctions under Rule 37(b)(2) of the Federal Rules of Civil Procedure

and/or directing Ray to show cause why he should not be held in contempt of court." *Id.* at 6

(emphasis omitted). Ray missed those deadlines. *See* Pls.' Mot. for Evid. Sanctions 2–3.

---

[4] Ray's email address, which is the same one he used to communicate about UTR and this litigation in 2017–2018, has been on file with the Court since at least November 2018, and was provided by Ray's then-attorney before he withdrew representation. *See* Ray Contempt Order 6 n.2 ("Ray had actual as well as constructive notice [of] these Orders and deposition notices which were sent to him at this email address, as well as on account of their being filed on the public docket in this action."); Staff Notes of Nov. 14, 2018; Oct. 3, 2019; and Oct. 25, 2019. The Clerk's Office has advised that emails sent to Ray at this address have not been returned as undeliverable. *See* Ray Contempt Order 6 n.2; Staff Note of May 18, 2020.

[5] More specifically, I gave him through May 22, 2020, to complete and return to the Vendor and Plaintiffs' counsel a new Certification form that: (a) identified all Social Media Accounts, as defined in ¶ 2(xi) of the Stipulation & Order and regardless of whether Ray had already disclosed them (e.g., Daily Stormer website, Krypto Report podcast, Gab.ai, Twitter), that may contain potentially relevant documents or files, including ESI such as video or audio recordings, photographs or digital images, and private or public messages, posts, and comments; (b) listed the complete and accurate last known credentials that Ray used to access each identified Social Media Account, regardless of whether Ray currently had access to the platform or whether an account was active, inactive, or inaccessible; (c) for any Social Media Account for which Ray could not remember or otherwise access such credentials, contained a statement describing all the steps Ray took to recover the information and stating why he was not successful; (d) identified all Electronic Devices, as defined in ¶ 2(vi) of the Stipulation & Order and regardless of whether Ray already identified them (e.g., second laptop), that he possessed from January 1, 2017 to May 18, 2020, that may contain potentially relevant documents, files, or ESI such as video or audio recordings, photographs or digital images, and text messages; and (e) was signed by Ray under penalty of perjury certifying that the information contained therein was true, correct, and complete to the best of his knowledge after he made a reasonable effort to search for and produce all requested information. *Id.* ¶ 3(a)–(e). I also gave him through May 26, 2020, to send to the Vendor all identified Electronic Devices that the Vendor had not yet received from Ray or his former attorneys, including the second laptop that Ray identified on his sworn Certification form in January 2019 and a second cell phone that Ray failed to identify in his previous discovery responses. *Id.* ¶ 4 ("Ray shall promptly provide any tracking information to the Vendor and to Plaintiffs' counsel."). The Order instructed the Vendor, on or before June 8, 2020, to "provide directly to Plaintiffs' counsel any and all ESI collected from Ray's social media accounts and devices that contain the agreed-upon search terms within the applicable date range." *Id.* ¶ 5 (citing Order of Jan. 22, 2020, at 2).

On May 7, 2020, Plaintiffs' counsel emailed Ray to ask about his availability for an oral deposition in June. *See* Pls.' Second Mot. to Compel Ex. B, ECF No. 803-2. When counsel did not hear back by June 5, they emailed Ray again to tell him that they would pick a date to depose him before the upcoming July 17 deadline and circulate a notice of his deposition. *Id.* Ex. C, ECF No. 803-3. On June 8, Plaintiffs properly noticed Ray's deposition to be held by videoconference beginning at 9:30 a.m. ET on July 13, 2020. *See* Ray Contempt Order 2; Order of July 23, 2020, at 1, ECF No. 814; Pls.' Second Mot. to Compel Ex., ECF No. 803-5; Fed. R. Civ. P. 30(b)(1). Ray did not appear.

On July 22, Plaintiffs served Ray with a revised notice rescheduling his video deposition for July 29, 2020, at 9:30 a.m. ET. *See* Ray Contempt Order 2 (citing ECF Nos. 818, 818-1). The next day, I granted Plaintiffs' second motion to compel, ECF No. 803, and issued an order directing Ray to appear by videoconference for his deposition on July 29, 2020. *See* Order of July 23, 2020, at 1.[6] I also warned Ray that the Court expected him to "appear and participate in good faith" at this deposition and "his failure to comply with this Order may result in a bench warrant being issued for his arrest and the United States Marshal taking him into custody and transporting him to this judicial district to appear and show cause why he should not be held in contempt of court." *Id.* at 1 (emphasis omitted). Again, Ray did not appear at his video deposition, and he did not tell Plaintiffs' counsel beforehand that he did not plan to attend. Show Cause Order 1, ECF No. 848 (Aug. 27, 2020).

On August 27, Judge Moon issued yet another order directing Ray to appear by video for his deposition, which had been rescheduled for 9:30 a.m. ET on September 14, 2020. *Id.* at 3. Judge Moon also ordered Ray to appear before him by video at 2:00 p.m. on September 14 to

---

[6] I also ordered Ray to reimburse Plaintiffs' reasonable fees and expenses caused by his failure to attend the July 13 deposition. *Id.* (citing Fed. R. Civ. P. 37(d)).

show cause why Ray should not be held in contempt of court for violating my July 23 Order compelling his attendance at the July 29 deposition. *Id.* at 2. The Show Cause Order provided step-by-step instructions (with clear deadlines) for Ray to participate in both his deposition and the contempt hearing, and invited the parties to offer argument or evidence as to "whether Ray should be adjudged in contempt of court, and regarding any appropriate sanction(s) to compel [his] compliance with court orders." *Id.*; *see id.* at 2–4; Ray Contempt Order 3–4; Order of Sept. 3, 2020, ECF No. 861. Judge Moon warned Ray that his failure to comply with the Order could result in the Court "issuing a bench warrant directing the United States Marshal's Service to arrest Ray and to transport him to Charlottesville, and to hold him in custody until he purges himself of contempt." Show Cause Order 4.

Neither the Court nor Plaintiffs' counsel ever heard from Ray, and he did not appear for either video proceeding on September 14. *See* Ray Contempt Order 1, 4. Thus, "[b]ecause Ray ha[d] repeatedly ignored and continue[d] to ignore court orders in this case," Judge Moon found him in contempt of court. *Id.*; *see also id.* at 6 n.2 (finding by clear and convincing evidence that "Ray had actual as well constructive knowledge" of the Court's orders and Plaintiffs' three deposition notices, which were sent to him at his email address of record and "filed on the public docket in this action"). "In view of Ray's continued refusal to comply" with court orders, *id.* at 8, trying to enforce Plaintiffs' diligent efforts "to get discovery to which they are entitled," *id.* at 7, Judge Moon found that issuing a bench warrant for Ray's arrest was the least severe tool left to secure Ray's full compliance. *See id.* at 7–8. Indeed, I had already imposed "monetary sanctions to no effect." *Id.* at 8. This Court issued an arrest warrant on September 16, 2020. As of today, "Ray is still absent from this case and proceeding in total disregard of court orders." *Id.*; *see* Fed. R. Civ. P. 4.1(b).

IV. Discussion

Plaintiffs ask the Court to give the jury a permissive adverse-inference instruction grounded in Ray's failure to comply with my May 18, 2020 Order compelling him to produce relevant information and documents going to the heart of Plaintiffs' conspiracy claims against him. Pls.' Mot. for Evid. Sanctions 1; *see also* Mem. Op. of Aug. 9, 2019, at 1, 25, 32. More specifically, they ask the Court to "instruct the jury that Ray chose to intentionally withhold his documents and that the jury may draw adverse inferences from that fact, including that Ray chose to withhold such documents because he was aware that such documents contained evidence that Ray conspired to plan racially motivated violence at Unite the Right." Pls.' Mot. for Evid. Sanctions 1. Ray did not oppose this request.

\*

Ray violated my May 18, 2020 Order directing him to provide or permit discovery of relevant materials within his possession or control. Thus, there is no question the Court should sanction Ray under Rule 37 "both as a matter of justice" in this case "and 'to deter others who might be tempted to similar conduct,'" *Lee*, 638 F.3d at 1320 (quoting *Nat'l Hockey League*, 427 U.S. at 643). *Accord* Mem. Op. & Order of Nov. 30, 2020, at 30–31 (pro se Defendant's pattern of "stonewalling and ignoring the Court's orders over the previous eighteen months" was "misconduct [that] must obviously be deterred lest any other litigant think he or she can behave this way in federal court"); Mem. Op. of Aug. 9, 2019, at 31–32 ("'It is important that [anyone] contemplating this type of tactic understand' that he cannot avoid discovery in federal litigation—and especially not in response to a court order." (quoting *Progressive Minerals v. Rashid*, No. 5:07cv108, 2009 WL 2761295, at \*4 (N.D. W. Va. Aug. 28, 2009))).

I must decide what sanction or sanctions are "just" based on all the facts in this case and the claims at issue in the May 18 discovery order. *See Ins. Corp. of Ir.*, 456 U.S. at 707 (citing Fed. R. Civ. P. 37(b)(2)(A)); *S. New England Tele. Co. v. Global NAPs, Inc.*, 624 F.3d 123, 144 (2d Cir. 2010) ("[T]he district court is free to consider the full record in the case in order to select the appropriate sanction." (internal quotation marks omitted)). This requires me to consider whether Ray violated that Order in bad faith, the kind and degree of prejudice that Ray's noncompliance caused Plaintiffs, and whether alternative, less drastic sanctions would provide an effective remedy. *S. States Rack & Fixture*, 318 F.3d at 597. Additionally, because Plaintiffs seek an adverse-inference instruction, they must show Ray knew these materials were relevant to some issue in the case and intentionally failed to produce them. *Hodge*, 360 F.3d at 450 (explaining that a court may impose "an adverse inference against a party whose intentional conduct causes not just the destruction of evidence, . . . but also against one who fails to preserve or produce evidence" relevant to the movant's case); *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155–56 (4th Cir. 1995) (noting that a party's decision to withhold documents or witness testimony "that naturally would have elucidated a fact at issue" may justify an adverse inference). "[S]uch an inference cannot be drawn merely from his negligent" failure to produce discovery. *Hodge*, 360 F.3d at 450.

**

"'Ordinary defendants must participate in the ordinary process of litigation,' *Mayfield v. Butler Snow LLP*, 3:17cv514, 2017 WL 5616017, at *3 (S.D. Miss. Nov. 21, 2017), even if they do not want to." Mem. Op. of Aug. 9, 2019, at 31. They cannot pick which discovery requests they respond to, *see* Order of May 18, 2020, at 2–5, refuse to acknowledge opposing counsel's efforts to obtain the discovery to which their client is entitled, *see* Ray Contempt Order 7, or

ignore court orders directing them "to provide or permit discovery 'of the same material within [their] control,'" Order of May 18, 2020, at 3 (quoting *Lee*, 638 F.3d at 1321). This Court warned Ray that it took pretrial discovery "very seriously," Tr. of Mar. 16, 2018 Conf. Call 24, ECF No. 282, and that he would be sanctioned if he did not comply with its orders, ECF Nos. 728, 814, 848. "Ray had actual and constructive knowledge" of the written orders because the Court sent them to his email address of record, and they were not returned as undeliverable. Ray Contempt Order 6 & n.2. Yet, he "made no effort to acknowledge [his] obligations." *Young Again Prods., Inc. v. Acord*, 459 F. App'x 294, 302 (4th Cir. 2011). Plaintiffs also produced evidence showing Ray was active on email and social media—even commenting about this litigation—while at the same time failing to participate in discovery and other pretrial proceedings. *See* Pls.' First Mot. to Compel Ex. 7; *id.* Ex. 15. "On these facts, [I] cannot interpret [Ray's] continued disregard for" this Court and its orders "as anything other than bad faith." *Young Again Prods.*, 459 F. App'x at 302 (finding bad faith where the "record reflect[ed] a pattern of noncompliance," including that the "district court was repeatedly compelled to admonish" sanctioned defendants "even after it warned them that it was going to take pretrial process 'very seriously'" and defendants "made no effort to acknowledge their obligations"); *see, e.g.*, *Nat'l Hockey League*, 427 U.S. at 640, 643 (district court did not abuse discretion in finding "flagrant" bad faith "[a]fter seventeen months where crucial interrogatories remained substantially unanswered despite numerous extensions granted at the eleventh hour and, in many instances, beyond the eleventh hour" and the court's repeated warnings that the party's failure to provide certain information could result in Rule 37 sanctions); *Certain Underwriters at Lloyd's, London v. Advanfort Co.*, No. 1:18cv1421, 2019 WL 3366103, at *8 (E.D. Va. July 25, 2019) ("In the Fourth Circuit, bad faith includes willful conduct, where the party 'clearly should have

understood his duty to the court' but nonetheless 'deliberately disregarded' it." (quoting *Rabb v. Amatex Corp.*, 769 F.2d 996, 1000 (4th Cir. 1985)); *cf. In re Derivium Capital*, 372 B.R. 777, 784–86 (Bankr. D.S.C. 2007) (finding that plaintiff acted in bad faith where, despite being given "a clear and fair warning that he must fulfill" discovery obligations or face "drastic" Rule 37 sanctions, plaintiff failed to respond to court-ordered discovery and "did not offer substantial excuses" for his noncompliance); *accord* Mem. Op. of Aug. 9, 2019, at 29–31 (finding that two other pro se Defendants acted in bad faith by stonewalling Plaintiffs' discovery requests, failing to acknowledge "the Court's and Plaintiffs' counsel's repeated efforts to contact them," and ignoring or not fully responding to discovery orders).

Ray's "repeated and ongoing discovery misconduct" throughout this litigation, including his failure to comply with the May 18 order, "resulted in significant procedural . . . prejudice," *First Mariner Bank v. Resolution Law Grp.*, Civ. No. MJG-12-1133, 2014 WL 1652550, at *19 (D. Md. Apr. 22, 2014), to Plaintiffs' ability to resolve their claims in a just, speedy, and inexpensive manner, Mem. Op. of Aug. 9, 2019, at 33. *See* Mem. Op. & Order of Nov. 30, 2020, at 35; Ray Contempt Order 7. "For a long time, [Plaintiffs] have had to deal with unacceptable delays, obfuscations, and disregard for both their proper discovery requests and this Court's many orders trying to enforce them." Mem. Op. of Aug. 9, 2019, at 33 (citing *Diamond v. Mohawk Indus., Inc.*, No. 6:12cv57, 2014 WL 1404563, at *5–6 (W.D. Va. Apr. 10, 2014)). And their attorneys have expended time and resources "well beyond that which [are] expected of a party to secure" discovery to which it is clearly entitled. Ray Contempt Order 7; *see also* Mem. Op. & Order of Nov. 30, 2020, at 31.

Ray's refusal to produce materials that he admitted under oath contain potentially relevant information, and which this Court repeatedly found discoverable under Rule 26(b), has

also harmed Plaintiffs' substantive ability to prove their conspiracy claim against him. *See* Mem. Op. & Order of Nov. 30, 2020, at 35. "[D]iscovery was especially critical in this case because it is inherently difficult to prove a conspiracy." *Id.* "Even in criminal prosecutions, 'a conspiracy is usually proven by circumstantial evidence' such as 'a defendant's relationship with other members of the conspiracy, the length of this association, the defendant's attitude and conduct, and the nature of the conspiracy.'" *Id.* at 36 (quoting *United States v. Yearwood*, 518 F.3d 220, 226 (4th Cir. 2008) (cleaned up)). Thus, Plaintiffs reasonably sought "myriad communications, documents, and ESI" that could "help them prove that 'each Defendant entered into an agreement with a specific co-conspirator to engage in racially motivated violence at the August 11th and 12th events.'" Mem. Op. of Aug. 9, 2019, at 32 (quoting Mem. Op. on Defs.' Mots. to Dismiss Am. Compl. 21). Ray's failure to comply with the May 18 order (and others) directing him to produce those materials potentially leaves an evidentiary gap justifying an "appropriately tailored sanction" against him, *Doug's Word Clocks.com Pty Ltd. v. Princess Int'l*, 323 F.R.D. 167, 175 (S.D.N.Y. 2017). *See* Mem. Op. & Order of Nov. 30, 2020, at 36.

A permissive adverse-inference instruction helps "level[] the evidentiary playing field" at trial by allowing the jury to presume missing evidence was unfavorable to a party who, knowing it was relevant to some issue in the case, intentionally lost, destroyed, or otherwise failed to produce the evidence. *Vodusek*, 71 F.3d at 156; *see Hodge*, 360 F.3d at 450. In August 2019, I found that an adverse inference "certainly could be appropriate in this case" if three other pro se Defendants, who had recently expressed their intent to comply with the court's discovery orders, "fail[ed] to produce the discovery from this point forward." Mem. Op. of Aug. 9, 2019, at 34; *see First Mariner Bank v. Resolution Law Grp.*, No. Civ. No. MJG-12-1133, 2013 WL 5797381, at *14 (D. Md. Oct. 24, 2013). But, I delayed imposing this sanction against any Defendant until

Plaintiffs could depose him about what steps, if any, he took to preserve potentially evidence. *See* Mem. Op. & Order of Nov. 30, 2020, at 31–33, 37–39. I later found that one Defendant's "failure to produce much of the requested discovery, or to give believable [deposition] answers why the discovery did not exist," *id.* at 35, warranted a permissive adverse-inference instruction at trial. *See id.* at 37–39.

Here, Plaintiffs did not get to ask Ray such questions under oath because, despite having "actual and constructive knowledge" that he was required to appear and participate in good faith, Ray failed to attend *three* properly noticed depositions upon oral examination by Plaintiffs' counsel. Ray Contempt Order 6–7. Again, I "cannot interpret [Ray's] continued disregard" for this Court and its orders "as anything other than bad faith." *Young Again Prods.*, 459 F. App'x at 302. On this record, Ray's decision to withhold materials and testimony that "naturally would have elucidated a fact at issue permits an inference" that he knew giving this information to Plaintiffs "would have exposed facts unfavorable" to him or his case. *Vodusek*, 71 F.3d at 156; *see Sampson*, 251 F.R.D. at 179 ("The reason relevance [of missing evidence] is presumed following a showing of intentional or willful conduct is because of the logical inference that, when a party acts in bad faith, he demonstrates fear that the evidence will expose relevant, unfavorable facts." (citing *Vodusek*, 71 F.3d at 156)).

Finally, sanctions less severe than a permissive adverse-inference instruction would not be effective in this situation. I already imposed "monetary sanctions to no effect," Ray Contempt Order 8, and Ray has demonstrated that he will not obey this Court's orders even under threat of civil contempt, arrest, and detention. *See id.* at 2, 6–8; Show Cause Order 1, 4; Order of July 23, 2020, at 1; Pls.' Mot. for Evid. Sanctions 4 ("Given that Ray has been a 'fugitive' from criminal charges for nearly two years now, *there is every reason to doubt* that the possibility of contempt

*would do anything to alter his behavior* in this case, including causing him to participate in the discovery process." (emphasis added)). A permissive adverse-inference instruction also will allow Ray to "defend himself at trial if he wants to" and will not have an impermissible "spillover" effect on any Defendant who did not disobey a discovery order. Mem. Op. & Order of Nov. 30, 2020, at 39.

***

Plaintiffs' "Motion for Evidentiary Sanctions Against Defendant Robert 'Azzmador' Ray and for an Order Directing Ray to Show Cause Why He Should Not Be Held in Contempt of Court," ECF No. 750, is hereby **GRANTED in part** and **DENIED in part** as follows:

1. Plaintiffs' request for a permissive adverse-inference instruction against Defendant Robert "Azzmador" Ray is **GRANTED** subject to the presiding District Judge's final approval. Plaintiffs should submit their proposed language to the presiding District Judge in their proposed jury instructions.

2. Plaintiffs' request for an order directing Ray to show cause why he should not be held in contempt of court for violating the May 18, 2020 discovery order, ECF No. 728, is **DENIED without prejudice**.

3. Plaintiffs may file a petition setting out their reasonable expenses, including attorney's fees, caused by Ray's failure to obey the May 18, 2020 discovery order. *See* Fed. R. Civ. P. 37(b)(2)(C).

It is so ORDERED.

ENTER: March 24, 2021

Joel C. Hoppe
U.S. Magistrate Judge