# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| ELIZABETH SINES, *et al.*,<br><br>                    *Plaintiffs*,<br><br>         v.<br><br>JASON KESSLER, *et al.*,<br><br>                    *Defendants.* | CASE NO. 3:17-cv-00072<br><br><br>MEMORANDUM OPINION<br><br><br>JUDGE NORMAN K. MOON |

   This opinion principally addresses whether Plaintiffs' experts (two sociologists who study white supremacy in the United States) can testify to a jury that groups in the white supremacist movement have developed and often employ "double-speak" or "just joking" strategies, which afford its adherents plausible deniability when conveying certain racist or violent messages. As Plaintiffs' experts describe it, outsiders would only hear an innocuous comment or think the speaker was making a tasteless joke, while those "in the know" would understand the hidden meaning. Plaintiffs are asserting that Defendants are individuals and groups that organized and conspired to commit racial violence at the "Unite the Right" rally held in Charlottesville on August 11 and 12, 2017. Plaintiffs' experts intend to testify that certain communications between Defendants and online comments they made were consistent with those strategies.

   Defendants Jason Kessler, Nathan Damigo, Matthew Parrott, Identity Evropa, and Traditionalist Workers Party ("Movant-Defendants"), have filed a motion to exclude such testimony. See Dkt. 826. In their view, that type of expert testimony would intrude upon the jury's province to determine their credibility and would violate case law prohibiting expert

testimony characterizing a fact witness as a liar. Movant-Defendants further argue that such testimony would improperly tell the jury what result to reach.

Movant-Defendants raise several other arguments. They challenge Plaintiffs' experts' description of a "white supremacist movement," with common traits including glorifying and normalizing violence. They argue that, by using that phrase, Plaintiffs are trying to build into expert witness testimony an improper shortcut to Plaintiffs' burden to prove an actual conspiracy amongst Defendants. Movant-Defendants also argue that allowing this testimony would be unfairly prejudicial.

The Court concludes that Plaintiffs' proposed expert testimony is proper. Expert testimony has long been allowed to explain to a jury the meaning of coded language. Plaintiffs' experts' intended testimony about "double-speak" and "just joking" strategies are akin to coded language meant to deceive outside groups about the meaning of conversations among those seeking to engage in illegal or violent conduct. Moreover, the experts' testimony is also grounded in numerous specific examples, and it fits well within the types of specialized knowledge that courts have regularly found helpful to a jury. While Movant-Defendants' position is not entirely without force in the abstract, on this record and considering the parties' arguments, there is little indication that the experts' testimony will stray into improper characterizations or subjects. For these reasons and the reasons that follow, the Court has denied the motion. See Dkt. 937. Defendants may later raise specific objections when the experts testify at trial.

Background

Kathleen Blee is a Professor of Sociology and Dean of the School of Arts and Sciences and the College of General Studies at the University of Pittsburgh. Dkt. 832-2 at 1 (Blee and

Simi expert report). Professor Blee "specializes in social movements, including racist/anti-Semitic and right-wing movements, racial violence, and microsociology." Id. Professor Peter Simi is an Associate Professor in the Department of Sociology at Chapman University. Id. He has "studied extremist groups and violence for more than 20 years, conducting interviews and observation with a range of violent gangs and political extremists." Id.

Plaintiffs retained Blee and Simi as expert witnesses, "to apply [their] expertise in the characteristics of the historical white supremacist movement to [their] examination of the materials in this case." Id. They were retained to "analyze whether the Defendants utilized the tools and tactics of the white supremacist movement in planning and implementing the events on August 11-12, 2017, in Charlottesville, Virginia." Id. As Plaintiffs' counsel describe it, Blee and Simi drew upon their research and scholarship "to describe a distinct white supremacist culture that, throughout its lengthy history, has informed the (often coded) language, tactics, and symbols of those who are immersed in that culture." Dkt. 871 at 3. Then, using a social-science methodology, Blee and Simi "compared the distinctive features of that well-defined culture to the language, tactics, and symbols of Defendants" leading up to Unite the Right. Id.

Based upon their experience and analysis and as described in their 60-plus page expert report, Blee and Simi reached the following conclusions: (1) "[t]he white supremacist movement (WSM) in the United States has consistently utilized, supported, and glorified violence as a strategy to promote its message and secure white supremacy," (2) "Defendants were active in and knowledgeable about the culture and networks of the WSM prior to [Unite the Right]," (3) Unite the Right "was organized to promote the agenda of the WSM," (4) "[t]o organize [Unite the Right], Defendants used the cultural symbols, rituals, slogans, language, and references to historical figures that are the hallmarks of the WSM," (5) "Defendants shaped and made use of

WSM culture and networks to recruit participants and to plan and execute [Unite the Right]," and (6) "[t]he coordinated race-based violence facilitated and committed by Defendants at [Unite the Right] is emblematic of WSM tactics." Id. at 2. In Blee and Simi's view, Defendants' conduct planning Unite the Right "quite plainly followed the playbook of the WSM." Id. at 63. They further concluded that "Defendants utilized WSM tactics, principally the reliance on racial animus as a motivator, the intentional use of violence to achieve their goals, and a coordinated strategy to obfuscate their aims through the use of "double-speak," "front-stage/back-stage behavior, and a discrete and new-age communication platform." Id.

At first, Movant-Defendants sought to exclude Blee and Simi's report "in [its] entirety," and to preclude them from testifying at all. Dkt. 826 at 1, 3. However, in their reply and later at oral argument, Movant-Defendants narrowed their position. Instead, they sought only to limit Blee and Simi's testimony in certain respects. Dkt. 880.[1] Movant-Defendants' briefs offered little description of those portions of the expert testimony they found objectionable.[2] Then, at oral argument, counsel for Movant-Defendants listed numerous excerpts from Blee and Simi's expert report he found objectionable. Dkt. 916 at 5–9 (Dec. 12, 2020 Hr'g Tr.). Although the Court offered Movant-Defendants' counsel the opportunity to submit a later memorandum further articulating the bases for their objections to specific portions of the report, id. at 14, 41–42, they never availed themselves of the opportunity.

---

[1] In addition, Movant-Defendants had originally sought to exclude testimony from two other experts proposed by Plaintiffs. Dkt. 826. However, in their reply brief, Movant-Defendants withdrew their objections to the other experts. Dkt. 880.

[2] See, e.g., Dkt. 880 at 2 & n.2 (arguing that "it would literally require a page by page analysis to specify each objectionable section of the report," and noting that they "intend[e]d to rely on oral argument for this purpose").

The issues Movant-Defendants do not challenge and thus that are conceded for purposes of this motion are significant. For instance, they do not object to:

- Blee and Simi's expert qualifications.[3]

- The methodology Blee and Simi employed in reaching their conclusions, or its reliability.[4]

- Testimony that includes "[t]he presentation of data from the record and even some historical data that's not necessarily in the record in this case" but that "puts the Defendants' comments and their activities into historical context."[5]

- Testimony about "a historical review of white supremacist language and similarities of Defendants['] rhetoric and processes with those historical examples."[6]

- Testimony "using [Defendants'] own words and showing how it ties in with some of the groups that they are talking about in the past …."[7]

Neither do (nor can) Movant-Defendants dispute that courts have long found admissible expert testimony that explains the meaning of coded language to a jury. Id. at 11. While counsel for Movant-Defendants initially argued for a distinction between admitting such testimony in the drug-trafficking context, counsel agreed that "double-speak" is not unique to drug trafficking but is "commonplace in all sorts of situations." Id. at 12–13.

---

[3] Dkt. 916 at 4 (explaining that Movant-Defendants were not "attacking … the qualifications of the experts").

[4] Id. (explaining that they were not "attacking, as such, the methodology that [Blee and Simi] employed in reaching their conclusions"); see also id. at 15 ("As Mr. Kolenich notes, there's no objection to reliability or qualifications or methodology.").

[5] Id. at 4.

[6] Dkt. 880 at 2; see also Dkt. 916 at 13 ("This historical review of white racial rhetoric and the fact that the instant defendants borrowed wholesale some of those phrases, we're not objecting to that.").

[7] Dkt. 916 at 13.

Notwithstanding such concessions, Movant-Defendants have raised several arguments to limit Blee and Simi's anticipated testimony.

First, Movant-Defendants challenge Blee and Simi's anticipated testimony that groups in the white supremacist movement engage in "double-speak," "just joking" or "front-stage/back-stage" strategies, as well as their testimony that a Defendant's or witness's communications in this case are consistent with such strategies. Second, Movant-Defendants challenge Blee and Simi's use of the term "white supremacist movement," as well as certain testimony regarding core characteristics of groups within that movement. Third, Movant-Defendants argue that Blee and Simi's testimony improperly attempts to opine on witness credibility, as well as on ultimate issues in dispute.

<u>Applicable Law</u>

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Rule 702 provides that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under Rule 702 and pursuant to the Supreme Court's decision in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 789 (1993), the district courts have a "gatekeeping role" so that

they may exclude unreliable expert testimony from the jury's consideration.[8] These principles apply to all proposed expert witnesses with specialized knowledge, and not just those based on scientific knowledge. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999). Expert testimony is admissible under Rule 702 "if it involves specialized knowledge that will assist the trier of fact in understanding the evidence or determining a fact in issue, and is both reliable and relevant." United States v. Young, 916 F.3d 368, 379 (4th Cir. 2019) (citing Daubert, 509 U.S. at 889–92). There is no requirement that the party seeking to introduce expert testimony "'prove' anything to the court before the testimony in question can be admitted," although, "[a]s in all questions of admissibility, the proffering party must come forward with evidence from which the court can determine that the proffered testimony is properly admissible." Maryland Cas. Co. v. Therm-O-Disc, Inc., 137 F.3d 780, 783 (4th Cir. 1998).[9]

District courts must be mindful of "two guiding, sometimes competing, principles" when considering whether to allow expert testimony. Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999). First, "Rule 702 was intended to liberalize the introduction of relevant expert evidence." Id. However, courts also must be cognizant that "[b]ecause expert witnesses have the potential to be both powerful and quite misleading," testimony that "has a greater potential to mislead than to enlighten should be excluded." Id.

---

[8] See also Fed. R. Evid. 702 advisory committee's note (2000 amends.) (explaining that the Rule 702 amendment "affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony").

[9] See also Fed. R. Evid. 702 advisory committee's note (2000 amends.) (explaining that "the admissibility of all expert testimony is governed by the principles of Rule 104(a)," and that, "[u]nder that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence").

A district court's gatekeeping role "is not intended to serve as a replacement for the adversary system," and therefore "the rejection of expert testimony is the exception rather than the rule." United States v. Smith, 919 F.3d 825, 835 (4th Cir. 2019) (quoting In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig. (No. II), 892 F.3d 624, 631 (4th Cir. 2018)) (cleaned up); see also Fed. R. Evid. 702 advisory committee's note (2000 amends.) ("A review of the caselaw after Daubert shows that the rejection of expert testimony is the exception rather than the rule.").

Several other rules of evidence are relevant. Rule 403 provides that: "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. In this context, "unfair prejudice" means "an undue tendency to suggest a decision on an improper basis," such as "an emotional one." Fed. R. Evid. 403, advisory committee's note (1972 proposed rules). The "mere fact that the evidence will damage the defendant's case is not enough—the evidence must be unfairly prejudicial, and the unfair prejudice must substantially outweigh the probative value of the evidence." United States v. Hammoud, 381 F.3d 316, 341 (4th Cir. 2004) (en banc) (internal quotation marks omitted; emphasis in original), vacated on other grounds, 543 U.S. 1097 (2005), relevant part of prior opinion reinstated, 405 F.3d 1034 (4th Cir. 2005); accord United States v. Grimmond, 137 F.3d 823, 833 (4th Cir. 1998) (explaining that "[e]vidence that is highly probative invariably will be prejudicial to the defense," but that Rule 403 only excludes "unfair" prejudice).

Lastly, under Fed. R. Evid. 704(a), "[a]n opinion is not objectionable just because it embraces an ultimate issue." The touchstone for expert evidence like lay evidence is that it

should be admitted "when helpful to the trier of fact." Fed. R. Evid. 704, advisory committee's note (1972 proposed rules).

Analysis

1.  *"Double-Speak" Testimony*

Movant-Defendants first seek to preclude Blee and Simi from testifying that the "white supremacist movement" or "WSM," utilizes strategies of "double-speak," "front-stage/back-stage behavior" or other methods of deniability. See Dkt. 916 at 6–8, 10.

Blee and Simi describe "double-speak" as "a strategy intended to simultaneously reveal and conceal meaning embedded in words and to create plausible deniability for ideas or actions that would attract legal or social sanctions." Dkt. 832-2 at 11. In this context, as Blee and Simi describe it, it is a "method of conveying white supremacist beliefs and intentions to those within the WSM culture while sending an innocuous meaning to outsiders." Id. Blee and Simi cite examples of coded words, expressions, or symbols associated with white supremacist groups that have this function. For instance, certain images that refer to pre-Christian Nordic religions may appear innocuous to outsiders but are "associated with sectors of white supremacism that adopt traditions of ancient Aryan spirituality." Id. They also cite the much more recent example of "Pepe," the "anthropomorphic frog meme," which on white supremacist communication forums is used "repeatedly to signify the ideas of racism and anti-Semitism," though "outside of white supremacism, Pepe lacks those connotations." Id. at 11–12.

However, Blee and Simi state that white supremacist groups' strategy of utilizing "double-speak" goes beyond the use of "symbols" to include "rebranding," "optics," and related recruitment efforts. Id. at 12–13. In their view, certain organizations' names like Identity Evropa (IE, now American Identity Movement) and Patriot Front have "intentionally and strategically

9

branded to appear to outsiders as fundamentally different from traditional white supremacist organizations to reduce stigma and appeal to mainstream populations." Id. at 13. Blee and Simi also describe how this strategy is meant to assist with recruitment, such as National Socialist Movement's decision to ban public displays of swastikas, or Identity Evropa's attempt to target potential college-age recruits with images of professional-looking IE members in business suits. Id. In Blee and Simi's view, these types of "cosmetic overhaul[s]" and "rebranding" attempts are meant "to conceal from outsiders the WSM's continuing promotion—largely in cultural arenas and events restricted to insiders—of the racial and religious hatred associated with earlier white supremacist groups," and "to conceal the WSM's advocacy of violence." Id.

They further describe social science research on language that has "identified how the tactic of joking can be used as a form of double-speak to deny culpability," and conclude that the WSM utilizes this and other strategies of deniability. Id. at 26–28; id. at 28 ("White supremacists intend these jokes to be obvious to those in the WSM and obscure to those outside the movement.").[10] Blee and Simi further draw upon numerous examples in the record, and conclude that Defendants' communications exhibited their "familiar[ity] with the concept of double-speak" and "front-stage," "back-stage behavior," and that they "frequently used cultural themes, graphics, symbols, and code words that are widely understood by those immersed in the white supremacist culture to convey a meaning to insiders that differs from its surface meaning." Id. at 41; see also id. at 41–47.

---

[10] Relatedly, Blee and Simi describe "front-stage," "back-stage" behavior as a strategy whereby people "present themselves differently when they are seeking to make an impression on others than they do in private." Dkt. 832-2 at 13–14. They assert that the WSM utilizes this strategy to "push[ ] adherents to infiltrate mainstream society by selectively limiting overt displays of their allegiance to white supremacism." Id. at 13.

Movant-Defendants have challenged aspects of Blee and Simi's testimony. See Dkt. 916 at 6–8, 10. They object to expert testimony that the WSM and certain Defendants employed a strategy of engaging in "double-speak" to: "create plausible deniability for ideas or actions that would attract legal or social sanctions," "conceal the WSM's advocacy of violence," and "create deception about the ideological and strategic direction of WSM groups and networks." Id. at 6–7 (challenge); Dkt. 832-2 at 11–13 (corresponding sections of report). And they object to Blee and Simi's testimony that new "social media and Internet platforms allowed white supremacists a level of anonymity that facilitated their ability to recruit and communicate among members and interested individuals while evading detection." Dkt. 916 at 6; Dkt. 832-2 at 10. In addition, Movant-Defendants also object to portions of the report addressing how WSM "utilizes strategies of deniability," Dkt. 832-2 at 26 (capitalization omitted), including testimony that, for "insiders to the WSM," the "claim 'I was only joking' is not actually true but meant to provide a defense against any challenges." Id. at 26–27; see also Dkt. 916 at 7–8.

Movant-Defendants argue that Blee and Simi's opinions are merely an improper "attempt to opine on another's credibility and to tell the jury what result it should reach," and to "tell the jury what they are supposed to think about" Defendants' words. Dkt. 826 at 3; Dkt. 916 at 8. Accordingly, in Movant-Defendants' view, if they were to deny "planning violence on Discord or anywhere else," or assert "that they reasonably believed people were joking when using certain rhetoric," they argue that Blee and Simi's testimony would improperly tell the jury that "Defendants' denials of a conspiracy or pre-existing violent plan are, more or less, scientifically established to be not credible." Id. Thus, Movant-Defendants argue that such testimony "violates the legal prohibition on telling the jury what to think and opining on witness credibility." Id.; see also Dkt. 880 at 3 (arguing that such testimony would improperly convey to the jury that

"Defendants are lying" when "they offer alternate and legally innocent explanations of the same rhetoric …"). Finally, Movant-Defendants contend that such testimony is "unfairly prejudicial." Dkt. 826 at 3.

Courts routinely admit expert testimony explaining the meaning of complex, obscure, or coded language to juries. See, e.g., Smith, 919 F.3d at 832, 836–38 (affirming admission of expert testimony explaining communications of the Baltimore street and prison gang, Black Guerilla Family, which mostly "took place in code—an assortment of slang, nicknames, and substituted words meant to prevent an outside listener from deciphering their meaning"); United States v. Johnson, 587 F.3d 625, 635 (4th Cir. 2009) (allowing expert testimony when it could "help the jury understand exchanges that might otherwise appear nonsensical or impenetrable"). Indeed, the advisory committee notes to the Federal Rules of Evidence provide that when those participating in a drug deal "regularly use code words to conceal the nature of their activities," expert testimony applying "extensive experience to analyze the meaning of the conversations" is testimony that "should be admitted." Fed. R. Evid. 702, advisory committee's note (2000 amends).

Expert testimony is also allowed when it provides the jury background on the history, structure, leaders, or operations of an unfamiliar organization or subculture, as that information often can further situate communications and other relevant evidence into context. See, e.g., United States v. Hassan, 742 F.3d 104, 130–31 (4th Cir. 2014) (affirming admission of expert testimony about the "meaning and context of various words and phrases used by the defendants which are commonly used by persons practicing extreme Islam," the "structure and leadership of groups adhering to the principles of Islamic extremism," and "the manner and means employed by extremist Islamic groups to recruit individuals and the process of radicalization which occurs

within such groups"); Hammoud, 381 F.3d at 337–38 (affirming admission of expert testimony about the structure, funding, and leaders of Hizballah, and "explain[ing] the significance of Hammoud's contact with those leaders"); United States v. Locascio, 6 F.3d 924, 936 (2d Cir. 1993) (explaining that expert testimony is appropriate "to help explain the operation, structure, membership, and terminology of organized crime families").

Such expert testimony is regularly admitted because it is often not only helpful but necessary for jurors to have an informed understanding of language. The Fourth Circuit has explained that expert interpretations of "gang and drug communications," for example, can be based on "years of investigatory experience and exposure" to many such conversations, and the expert may apply that experience "much like how foreign-language experts, such as Spanish interpreters, apply their training and experience to analyze the meaning of conversations." Smith, 919 F.3d at 836.

Lastly, myriad cases have allowed the admission of expert testimony to describe the meaning of white supremacist symbols, names, groups, or coded language, when such evidence was relevant to the issues at trial. See, e.g., Young, 916 F.3d at 379–80 (affirming admission of expert testimony regarding "white separatists and the neo-Nazi movement," and on the "historical backgrounds of and connection between Nazism and militant Islamism," when "the evidence in this case was complicated, touching by necessity on a wide variety of ideas, terms, people, and organizations connected to radical Islam, as well as white supremacism") (internal quotation marks omitted); People v. Lindberg, 190 P.3d 664, 697–701 (Cal. 2008) (finding expert testimony relevant for jurors who "might not have understood that symbols often associated with Nazis [ ] adorned some of the items found in defendant's bedroom," "[n]or would the jurors likely have recognized the names of the white supremacist leaders … noted in

13

the items seized"). Indeed, "[n]umerous decisions in federal and [ ] state cases also have upheld the admission of expert testimony to explain the culture and beliefs of White supremacy groups and gangs and to interpret tattoos, symbols, and graffiti associated with these groups when such evidence was relevant to the issues at trial." Id. (citing decisions from the Eighth, Ninth, and Eleventh Circuits, and various state courts). These principles supply the framework for Movant-Defendants' evidentiary challenges.

This authority establishes that expert testimony is admissible where it would help the jury understand hidden unlawful or violent meanings that underlie innocent-sounding language, and to provide the context and basis for the expert's interpretation, so that the jury can weigh the alternative interpretations. And that is what Plaintiffs' experts seek to do here. See, e.g., Smith, 919 F.3d at 830, 832, 836 (affirming admission of gang expert testimony interpreting conversations that "took place in code," including that the phrase "special light" meant an "authorization used by gang members … to kill another person"); Johnson, 587 F.3d at 634 (affirming admission of gang testimony that defendants' use of "seemingly innocuous terms" used in these calls like "tickets" and "T-shirts" were actually "code" for narcotics). Offering an alternative interpretation for language defendants used is the very point of such expert testimony. The fact that Plaintiffs' experts' interpretation may be different from Defendants' does not render it improper. Nor have Movant-Defendants challenged Blee and Simi's methodology or its reliability in how they reached their broader conclusions about the white supremacist movement's use of "double-speak" strategies, or as used by specific Defendants here. Moreover, the testimony Plaintiffs' counsel seeks to introduce is not the same thing as trying to introduce expert testimony that a fact witness lied in their testimony. Plaintiffs' counsel was unequivocal at

oral argument that Blee and Simi "are absolutely not going to say that any witness is lying," Dkt. 916 at 14, and the Court intends to hold them to that representation.

Movant-Defendants challenge Blee and Simi's anticipated testimony that "Defendants utilized double-speak when planning and organizing Unite the Right" Dkt. 916 at 8; Dkt. 832-2 at 41 (capitalization omitted). They contend that such testimony is irrelevant because it posits that Defendants organized an "a priori plan to perpetuate violence and then cover it up." Dkt. 916 at 8. However, Movant-Defendants argue that the complaint does not mention any "preexisting plan to cover up the plan." Id. Not so. In the complaint, Plaintiffs alleged just that—that Defendants conspired to perpetuate violence at Unite the Right and used various means to communicate those plans to co-conspirators, and that substantial efforts were made to shield those plans from public scrutiny and maintain plausible deniability to outsiders.

For example, in the complaint Plaintiffs described Defendants' use of public means of communication in organizing Unite the Right, including on the most prominent social media sites. E.g., Dkt. 557 (Second Am. Compl.) ¶¶ 67, 85, 86. However, the complaint also includes details about numerous Defendants' use of a non-public, "invite only" group on the social media platform Discord "as a tool to promote, coordinate, and organize the Unite the Right 'rally,' and as a means to communicate and coordinate violent and illegal activities 'in secret' during the actual events of that weekend." Id. ¶¶ 71–80. Indeed, following discovery, it appears that certain Defendants even exercised caution among the wide, non-public Discord audience and sought to ensure that Discord users "keep their most extreme ideas and feelings off the platform" and save them for yet more surreptitious means of communication, such as "burner phones." Dkt. 832-2 at 45–46. Even still, the complaint includes "countless exhortations to violence" in the non-public Discord group. Dkt. 557 ¶ 96 (citing examples).

The complaint also includes allegations that certain Defendants' references to "self-defense" were merely a "false narrative" and "pretext for violence." Dkt. 557 ¶¶ 103–04, 111. And it includes examples of certain Defendants' purportedly joking references to violence and racial violence. Id. ¶¶ 109–10, 115, 135. The complaint also describes how Defendant Kessler, when planning Unite the Right, sought to use the Confederate flag and other "confederate iconography" which they believed provided the "best optics" for recruitment. Id. ¶¶ 121–22. And Plaintiffs have brought numerous claims, including their claim that Defendants conspired to engage in violence and intimidation, and to violate the rights of Plaintiffs, black and Jewish people, and their supporters at Unite the Right. Id. ¶¶ 335–43. Movant-Defendants simply cannot credibly claim that such testimony is irrelevant to the issues raised in the complaint, or that they were not on notice that Plaintiffs raised such claims and were entitled to prove them to a jury with documents, fact, or expert witnesses. See Fed. R. Evid. 702(a) (expert testimony must help the jury "to understand the evidence or to determine a fact in issue"). Indeed, at argument Movant-Defendants' counsel even acknowledged that the complaint need not have expressly alleged a "preexisting plan to cover up the plan," as "that's sort of implicit in conspiracy." Dkt. 916 at 8.

Nor do Blee and Simi opine on these "double-speak" and "just joking" strategies in a vacuum. See Smith, 919 F.3d at 837 ("An expert's methodology cannot be applied in a factual vacuum. Thus, an expert in code or language must consider the context surrounding the language in determining the appropriate interpretation."). Beyond providing context drawn from history and common white supremacist tropes, e.g., Dkt. 832-2 at 11–14, 26–29, Blee and Simi cite numerous, specific communications and directives from Unite the Right organizers that tracked or exemplified such strategies.

For example, Defendant Andrew Anglin, founder and editor of the white supremacist website The Daily Stormer (for whom Defendant Robert "Azzmador" Ray was a writer) prepared a "Style Guide" for The Daily Stormer writers which instructed that: "[t]he tone of the site should be light," and cautioned, "[m]ost people are not comfortable with material that comes across as vitriolic, raging, nonironic hatred." Dkt. 832-2 at 41–42. The Style Guide further instructed that "[t]he unindoctrinated should not be able to tell if we are joking or not. There should also be a conscious awareness of mocking stereotypes of hateful racists. … This is obviously a ploy and I actually do want to gas kikes …" Id. at 42. Notably, the complaint quotes at length a post from The Daily Stormer which calls on supporters to "win this struggle and secure the existence of our people and future for white children. It is our destiny. **Next stop: Charlottesville, VA. Final stop: Auschwitz**. See ya there, faggots." Dkt. 557 at 29–30 (emphasis in original). In addition, Blee and Simi cite an excerpt from a May 2017 podcast in which Ray explained that humor is "a great icebreaker for people who are amenable to our ideas" and "a lot more effective than just being super serious all the time." Dkt. 832-2 at 42–43. Ray noted that this tactic "really keeps our opponents off balance, because they can't tell, they can never be certain, what things we're absolutely serious about, and what things we're joking about." Id. at 43.

Blee and Simi also cite an exchange between Defendants Jason Kessler and Matthew Heimbach planning Unite the Right, in which Kessler wrote that a KKK event in Charlottesville the prior month will "hurt the overall pro-white message," and sought to "convince them to come in plainclothes" to Unite the Right; he also wanted to "make sure everyone knows not to bring [N]azi or [K]lan iconography to the rally? … I don't want any swastikas or [Nazi] salutes at the event." Id. at 45. Blee and Simi wrote that in this exchange, Kessler "demonstrated his awareness

of the importance of 'optics' at [Unite the Right]," and that such requests were "consistent with the documented efforts of some WSM groups to rebrand themselves in recent years as closer to the political mainstream to attract new recruits while retaining their allegiance to the core beliefs and practices of white supremacism." Id. Movant-Defendants do not argue that these or other examples lack necessary context, and the Court finds they do at this juncture. Though, to be sure, at trial Plaintiffs must introduce sufficient factual context for particular examples of "double-speak" about which Blee and Simi will be called to testify so that a jury can weigh their methodology and interpretation of Defendants' words.[11] See Smith, 919 F.3d at 837 (noting what constituted necessary context for expert's interpretation of intercepted calls).

Blee and Simi's challenged testimony is undoubtedly relevant and helpful to a jury considering the merit of Plaintiffs' claims on these facts. Plaintiffs claim that Defendants conspired to engage in racially motivated violence at the Unite the Right events, in violation of 42 U.S.C. § 1985(3). One element Plaintiffs will need to prove at trial to prevail on their § 1985(3) conspiracy claim is that Defendants were motivated by racial animus. Sines v. Kessler, 324 F. Supp. 3d 765, 780 (W.D. Va. 2018); A Soc'y Without A Name v. Virginia, 655 F.3d 342, 346 (4th Cir. 2011). Plaintiff will further need to prove that each Defendant entered into an agreement with a specific co-conspirator to engage in racially motivated violence at the Unite the Right events. Sines, 324 F. Supp. 3d at 784. Blee and Simi's testimony on purposeful "double-speak," "just joking" and "front-stage/back-stage" strategies employed by these and other white

---

[11] Providing necessary context does not mean that Blee and Simi need, or should, be the focal point or conduit for Plaintiffs' evidentiary case. The more an expert witness becomes "more like a summary of the facts than an aide in understanding them," or "transforms into the hub of the case," the greater the risk that the expert will stray beyond permissible "specialized knowledge" allowable under Rule 702. See United States v. Rios, 830 F.3d 430, 414 (6th Cir. 2016) (citation omitted).

supremacist groups—which among other things they describe can serve a recruiting function—are relevant to the facts of this case and will be helpful to a jury. Specifically, such testimony will help a jury to determine whether Defendants' actions were motivated by racial animus, or whether they entered into agreements with specific co-conspirators to commit racially motivated violence at Unite the Right.

Nor can the Court conclude that this evidence is "unfairly prejudicial" to Defendants, in that it would prompt an "undue tendency to suggest a decision on an improper basis" such as "an emotional one." Fed. R. Evid. 403, advisory committee's note (1972 proposed rules). This evidence is relevant, and the fact that it is relevant and probative of Plaintiffs' claims may cause some prejudice to Defendants, but that is not the same thing as "unfair prejudice." Grimmond, 137 F.3d at 833. Moreover, to the extent there is any prejudice at all, the Court cannot conclude that undue prejudice would "substantially outweigh the probative value of the evidence." Hammoud, 381 F.3d at 341.

To be clear, Defendants will have the opportunity on cross examination to test the experts' methodology on these issues and its application to the facts of this case. Defendants also will be able to present their own narratives and explanations regarding any material statements or communications. And the jury will be able to weigh the evidence. Cf. Johnson, 587 F.3d at 636 (writing that the expert "conceded during cross-examination that there were some conversations in which the word 'tickets' was actually being used in its normal sense," rather than as code for narcotics). However, given Rule 702's intent to "liberalize the introduction of relevant expert evidence," Westberry, 178 F.3d at 261, and finding such expert evidence relevant here, and considering the substantial authority from the Fourth Circuit and elsewhere finding materially similar testimony admissible, the Court has rejected Movant-Defendants' evidentiary challenge.

2. *White Supremacist Movement Testimony*

Movant-Defendants argue that Blee and Simi should not be able to testify using "the phraseology 'White Supremacist Movement.'" Dkt. 916 at 5. In Movant-Defendants' view, the term "white supremacist movement" improperly "implies organization and implies conspiracy," and that is "the subject at issue." Id. Rather, they want Blee and Simi to "stick with what is commonly found in academic treatises," be it the terms "racist, extremist," or "what they call themselves, Nazis," etc. Id.

Movant-Defendants also object to Blee and Simi's anticipated testimony regarding certain traits, methods, or characteristics shared by various white supremacist groups. Dkt. 916 at 5–6. Movant-Defendants challenge Blee and Simi's anticipated testimony that (1) while WSM "branches" have "somewhat differing ideological emphases," "all embrace and have defended violence as a tactic to achieve a society in which the white race is completely dominant," Dkt. 832-2 at 7; (2) "the WSM is coordinated primarily through a common culture that sustains a shared set of interpretations and norms of behavior," including violence, id.; (3) "[t]he organizational structure of the WSM is decentralized, but the movement's culture is integrated with substantial agreement on core ideas and goals which allows the WSM to reinforce norms of violence and more general codes of conduct," id. at 10; and (4) that "[t]he WSM is characterized by the use of violence," id. at 14; see also id. at 14–25.

Indeed, Movant-Defendants object to the entirety of the section of the expert report entitled "[t]he WSM is characterized by the use of violence," id. at 14, with the notable "exception of the historical review contained therein," Dkt. 916 at 7. But most of that section of the report is "historical review" of white supremacist groups' use of and advocacy for racial

violence, although some of that is more recent. Id. at 14–25. It is therefore unclear what precisely Movant-Defendants object to in this regard.

To be clear, Blee and Simi have not coined a new phrase by describing and referring to the "white supremacist movement." Courts including the Fourth Circuit have long referred to the "white supremacist movement" or "white supremacy movement."[12] Movant-Defendants do not specify whether, in their view, Blee and Simi should be precluded from using this term because it is irrelevant, or unfairly prejudicial, or both. Regardless, the Court finds that the experts' use of the term and challenged statements related thereto are all relevant and would be helpful to a jury, and that their admission would not work any unfair prejudice against Defendants.

Again, Plaintiffs will have to prove, among other things, that Defendants were motivated by racial animus, and that Defendants entered into an agreement with one or more specific co-conspirators to engage in racially motivated violence at the Unite the Right events. See Sines, 324 F. Supp. 3d at 780, 784; A Soc'y Without A Name, 6555 F.3d at 346. Blee and Simi's challenged expert testimony on these issues is "specialized knowledge" that will be useful to a jury considering whether Plaintiffs have proven these elements of their claims on these facts. For example, Blee and Simi intend to testify about different "branches" of the "modern WSM," and—after discussing relevant history (which is not objected to)—the branches' embrace of

---

[12] See United States v. Miller, 849 F.2d 607, at *1 (4th Cir. 1988) (unpublished, per curiam) ("The indictment charges that the appellants Miller and Jackson conspired with their co-defendants … to steal military weapons, explosives, and equipment from the United States to be used by a group within the White Supremacist Movement, known as the Carolina Knights of the [KKK] and its successor, the White Patriot Party in connection with the maintenance, training, and equipping of a paramilitary armed force to further the goals of the White Supremacist Movement."); Person v. Miller, 854 F.2d 656, 665 (4th Cir. 1988) (rejecting argument that "no black citizen could ever serve as an impartial juror in an action involving a white supremacist, group or individual, as a party," and holding no basis to impute "bias to all those groups or individuals offended by the white supremacy movement").

violent tactics to secure a society with a dominant white race. Dkt. 832-2, at 7–8, 14–25. Such testimony will assist a jury with valuable historical background and specialized knowledge about connections or dissimilarities between these groups' ideologies, and their track record(s) of committing, inciting, or glorifying violence. The Court further concludes this testimony will be of assistance to a jury considering whether Defendants were motivated by racial animus and conspired to commit racially motivated violence, or whether, for example, they were merely expressing political or social views.

Moreover, that Plaintiffs would seek to introduce expert testimony addressing certain common beliefs, strategies, and violent tactics of various white supremacist groups is not only unsurprising but would also be uniquely helpful evidence to a jury in a conspiracy case that involves ten white supremacist organizations and fourteen individuals as defendants. Indeed, Plaintiffs' case is that Defendants engaged in a coordinated effort to organize "a plethora of white supremacist groups" to take part in and ultimately commit racial violence at the Unite the Right events. Sines, 324 F.3d at 784. The Fourth Circuit has affirmed the admission of expert testimony that "assisted the jury by providing context for the historical backgrounds of and connection between Nazism and militant Islamism," where the evidence was "complicated, touching by necessity on a wide variety of ideas, terms, people, and organizations." Young, 916 F.3d at 381. The trial in this case will also involve a "wide variety of ideas, terms, people, and organizations," and the Court concludes that the anticipated expert testimony by Blee and Simi on the "historical backgrounds of and connection between" branches of the white supremacist movement, will be relevant and useful to a jury. See id.

The Court further concludes that this challenged testimony would not be "unfairly prejudicial" to Defendants, such as would cause an "undue tendency to suggest a decision on an

22

improper basis." Fed. R. Evid. 403 & advisory committee's note (1972 proposed rules). To be sure, this case is about whether Defendants conspired to commit and sought to organize racial violence at the Unite the Right rally. Plaintiffs are asserting that Defendants are white supremacists. This challenged expert testimony would, among other things, describe the historical context for and common characteristics of groups in the white supremacist movement. While those positions would be unpopular to many, there is no "unfair prejudice" because that is what this case is about, and what Plaintiffs need to prove to make their case. See Hassan, 742 F.3d at 132 ("Although linking the appellants to extremist jihadist groups was undoubtedly prejudicial, it would not unfairly so. Indeed, the charges that were lodged against the appellants meant that the prosecution would necessarily seek to establish that link."). Even if the challenged expert evidence would create unfair prejudice—and there is none—its existence does not substantially outweigh its probative value.

The Court sees little cause for concern at this point that Plaintiffs' experts will, as Movant-Defendants believe, try to use this testimony as a shortcut to proof of actual evidence of a conspiracy. Plaintiffs' counsel repeatedly have stated that Blee and Simi will not testify to whether there was a conspiracy, or whether any Defendant entered into a conspiracy. See, e.g., Dkt. 871 at 18 (writing that Simi and Blee will not "offer any opinions about the existence of the alleged conspiracy"); Dkt. 916 at 14 ("So just to be very clear about what the experts will not testify to, they will not opine on whether or not there is a conspiracy."). Moreover, throughout the expert report, Blee and Simi acknowledge differences among the groups that comprise the white supremacist movement. E.g., Dkt. 832-2 at 7 (explaining that the "modern WSM" is "often described in terms of its four historical branches," which "have differing ideological emphases"); id. at 8 ("Periodic efforts to unify the WSM through umbrella groups have rarely been successful

for long."); id. at 9 ("The WSM—now as in the past—is highly decentralized."). To the extent

Blee and Simi offer testimony regarding certain "core characteristics" of the white supremacist

movement or commonalities between the groups, Defendants will be able to test those assertions

and the application of Blee and Simi's methodologies through cross examination, or introduction

of contrary evidence. In any event, when the Court solicits proposed jury instructions from the

parties before trial, the parties will be able to state their positions as to proper instructions for the

jury on the elements of conspiracy, the burden of proof, and jurors' purview to assign the weight

to be afforded the testimony of both expert and fact witnesses.

Movant-Defendants' motion to exclude Blee and Simi's testimony in this regard

therefore has been denied.

3. *Challenge that Experts Seek to Improperly Opine on Witness Credibility, or Testify as to Any Ultimate Issues*

Lastly, the Court finds no merit to Movant-Defendants' argument that Blee and Simi's

expert testimony improperly weighs Defendants' credibility or seeks to opine on ultimate issues

in the case. See Dkt. 826 at 3; Dkt. 880 at 3; Dkt. 916 at 8; Dkt. 832-2 at 57–58 (challenged

examples from report).

The Court has already described how Blee and Simi's testimony regarding the meaning

of coded or obscure language and symbols, and testimony regarding white supremacist groups'

use of "double-speak," "just joking," or "front-stage/back-stage" strategies are admissible. If

Blee and Simi seek to testify applying their social-science methodology to describe those

strategies, and to further opine on whether certain of Defendants' communications were

consistent with those strategies—assuming proper context is given and Defendants have the

opportunity to test those interpretations and offer contrary evidence—that testimony is

admissible. That is not improperly weighing in on any Defendant's or witness's credibility,

which is within the jury's sole purview. It is offering an interpretation of their language, based on specialized knowledge and a testable methodology. The fact that any Defendant or witness may have a different explanation from the experts does not make the expert testimony improper. Moreover, this case is far afield of the cases upon which Movant-Defendants rely for their credibility argument. See United States v. Cecil, 836 F.2d 1431, 1441–43 (4th Cir. 1988) (holding that "an opinion on the credibility of a witness by a psychiatrist is not allowable").

In any event, Plaintiffs' counsel acknowledged that their experts "will not opine on any defendant or witness' credibility," and that "[t]hey are absolutely not going to say that any witness is lying." Dkt. 916 at 14. Plaintiffs' counsel also clearly stated that their experts "will not opine on whether or not there is a conspiracy," and "they will not opine on what any particular defendant intended." Id. And they will not "state any sort of legal conclusion." Id. at 15. For these reasons, and with those limitations in mind acknowledged by Plaintiffs' counsel, the Court rejects Movant-Defendants' arguments that Blee and Simi's should be precluded from testifying or their testimony limited because it would improperly weigh on witness credibility or state a legal conclusion.

*        *        *

That the Court will allow Plaintiffs to offer Blee and Simi's proffered expert testimony (with the limits discussed above) does not mean it will be presented to the jury unassailable and unchallenged. As "safeguards" upon introduction of this as with any other expert testimony, Defendants certainly shall be afforded the "traditional and appropriate means" of challenging expert testimony, including by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Daubert, 509 U.S. at 596. Moreover, at a later date and after soliciting input from the parties, the Court intends to give detailed instructions to

the jury about how it is to consider expert testimony, including that it is the jury's role to determine the weight afforded to each expert's testimony, and that the jury are "the sole judges of the credibility of the witnesses and the weight their testimony deserves" for all witnesses—both fact and expert. Because the Court has found no basis in Movant-Defendants' arguments to preclude or limit Blee and Simi's proffered expert testimony, the Court has denied their motion to exclude, Dkt. 826. See Dkt. 937. This does not preclude Defendants from later raising specific objections in the course of the experts' testimony.

The Clerk of Court is directed to send a copy of this Memorandum Opinion to the parties.

Entered this ___15th___ day of April, 2021.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE