# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

|  |  |
|---|---|
| ELIZABETH SINES, SETH WISPELWEY, MARISSA BLAIR, APRIL MUNIZ, MARCUS MARTIN, NATALIE ROMERO, CHELSEA ALVARADO, JOHN DOE, and THOMAS BAKER,<br><br>      Plaintiffs,<br><br>v.<br><br>JASON KESSLER, RICHARD SPENCER, CHRISTOPHER CANTWELL, JAMES ALEX FIELDS, JR., VANGUARD AMERICA, ANDREW ANGLIN, MOONBASE HOLDINGS, LLC, ROBERT "AZZMADOR" RAY, NATHAN DAMIGO, ELLIOTT KLINE a/k/a/ ELI MOSLEY, IDENTITY EVROPA, MATTHEW HEIMBACH, MATTHEW PARROTT a/k/a DAVID MATTHEW PARROTT, TRADITIONALIST WORKER PARTY, MICHAEL HILL, MICHAEL TUBBS, LEAGUE OF THE SOUTH, JEFF SCHOEP, NATIONAL SOCIALIST MOVEMENT, NATIONALIST FRONT, AUGUSTUS SOL INVICTUS, FRATERNAL ORDER OF THE ALT-KNIGHTS, MICHAEL "ENOCH" PEINOVICH, LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN, and EAST COAST KNIGHTS OF THE KU KLUX KLAN a/k/a EAST COAST KNIGHTS OF THE TRUE INVISIBLE EMPIRE,<br><br>      Defendants. | **Civil Action No. 3:17-cv-00072-NKM**<br><br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFFS' SUBMISSION REGARDING
## VENUE FOR TRIAL AND TRIAL LOGISTICS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT ........................................................................................................................ 3

    I.     Charlottesville Is the Most Suitable Location for Trial (Question 3) .................... 3

         A.    Venue Is Proper in Charlottesville, but Not in Roanoke or Lynchburg ........................................................................................ 3

         B.    Section 1404(a) Does Not Authorize Transfer to Roanoke or Lynchburg ........................................................................................ 5

            1.    No Venue in Lynchburg or Roanoke ........................................... 5

            2.    Other Relevant Considerations ..................................................... 6

         C.    Section 1404(c) Does Not Authorize the Court to Transfer the Trial....... 16

    II.    Holding the Trial in Charlottesville Would Be Logistically Feasible and Enable the Parties to Mitigate the Health Risks Presented by COVID-19 (Question 1) ....................................................................................................... 18

    III.    Holding the Trial in the Charlottesville Courthouse Would Be Efficient, Manageable, and Safe (Question 2) ..................................................................... 20

         A.    Plaintiffs' Proposals for Logistics and Security........................................ 20

         B.    None of Defendants' Security Concerns Justify a Transfer...................... 22

    IV.    Plaintiffs Will Continue Their Efforts to Streamline the Trial (Question 4) ........ 25

CONCLUSION..................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Bd. of Trs., Sheet Metal Workers Nat'l Fund v. Baylor Heating & Air Conditioning, Inc.*,
  702 F. Supp. 1253 (E.D. Va. 1988) .................................................................................. 12, 24

*Cantwell v. Gorcenski*,
  No. 3:17-cv-89 (W.D. Va. 2017) ..................................................................................... 23, 25

*City of Charlottesville v. Penn. Light Foot Militia*,
  No. 3:17-cv-78-GEC ........................................................................................................ 16, 23

*Commonwealth v. Hernandez*,
  No. BR-CR-2013-00983 (Super. Ct. Mass., Bristol Cty. 2015) ............................................. 15

*Doe v. Bd. of Visitors of Va. Mil. Inst.*,
  No. 7:20CV00058, 2020 WL 2563289 (W.D. Va. May 20, 2020) .............................. 4, 5, 6, 17

*Elderberry of Weber City, LLC v. Living Centers-Se., Inc.*,
  No. 6:12-CV-52, 2013 WL 1164835 (W.D. Va. Mar. 20, 2013) ............................................... 6

*Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.*,
  No. 6:20-CV-54, 2020 WL 7407469 (W.D. Va. Dec. 17, 2020) ..................................... *passim*

*Florida v. Casey Anthony*,
  No. 48-2008-CF-015606 (Fla. 9th Cir. Ct. 2008) .................................................................. 16

*Florida v. Zimmerman*,
  No. 12-CF-1083-A (Fla. 18th Cir. Ct. 2013) ......................................................................... 16

*Gen. Creation LLC v. Leapfrog Enters., Inc.*,
  192 F. Supp. 2d 503 (W.D. Va. 2002) ................................................................................... 16

*Gentry Locke Rakes & Moore, LLP v. Energy Dev. Corp.*,
  No. 7:17-CV-102, 2017 WL 1498117 (W.D. Va. Apr. 25, 2017) ..................................... 12, 17

*Gilmore v. Jones*,
  370 F. Supp. 3d 630 (W.D. Va. 2019) ................................................................................... 23

*Givens v. Main St. Bank*,
  No. 5:08-CV-25, 2010 WL 2925942 (N.D. W.Va. July 22, 2010) .......................................... 14

*Glasser v. United States*,
  315 U.S. 60 (1942) ................................................................................................................ 13

*Gulf Oil Corp. v. Gilbert*,
  330 U.S. 501 (1947) ................................................................................................... 12

*Harris v. Kessler*,
  No. 3:19-CV-00046, 2020 WL 7029158 (W.D. Va. Nov. 30, 2020) ......................................... 23

*Heinz Kettler GMBH & Co. v. Razor USA, L.L.C.*,
  750 F. Supp. 2d, 667 (E.D. Va. 2010) ...................................................................................... 7

*JTH Tax, Inc. v. Callahan*,
  No. 2:12CV691, 2013 WL 3035279 (E.D. Va. June 6, 2013) ........................................... 16, 17

*Kessler v. City of Charlottesville*,
  No. 3:17-cv-00056 (W.D. Va.) ............................................................................................... 25

*Kessler v. City of Charlottesville*,
  No. 3:18-cv-00015 (W.D. Va.) ............................................................................................... 25

*Kessler v. City of Charlottesville*,
  No. 3:18-cv-00017 (W.D. Va.) ............................................................................................... 25

*Kessler v. City of Charlottesville*,
  No. 3:19-cv-00044 (W.D. Va.) ............................................................................................... 25

*In re Charlotte Observer*,
  882 F.2d 850 (4th Cir. 1989) .................................................................................................. 15

*In re Gibson*,
  423 F. App'x 385, 390 (5th Cir. 2011) .................................................................................... 16

*Minnesota v. Chauvin*,
  No. 27-CR-20-12646 (D. Minn. 2021) ................................................................................... 15

*McGraw-Edison Co. v. Van Pelt*,
  350 F.2d 361 (8th Cir. 1965) .................................................................................................. 10

*Mullins v. Equifax Info. Servs., LLC*,
  No. CIV.A. 3:05CV888, 2006 WL 1214024, (E.D. Va. Apr. 28, 2006) ................................. 16

*Rockingham Precast, Inc. v. Am. Infrastructure-Maryland, Inc.*,
  No. 5:11-CV-24, 2011 WL 5526092 (W.D. Va. Nov. 14, 2011) .............................................. 8

*Russell v. Wright*,
  No. 3:11-CV-00075, 2012 WL 868773 (W.D. Va. Mar. 13, 2012) ...................................... 7, 8

*Rust v. CommerceFirst Bank*,
  No. CIV. A. 3:07CV00052, 2008 WL 2074071 (W.D. Va. May 14, 2008) ............................ 12

*Snyder v. Phelps*,
No. RDB-06-1389, 2007 WL 3227213 (D. Md. Oct. 19, 2007) ............................................. 15

*Tharpe v. Lawidjaja*,
No. 6:12-CV-00039, 2012 WL 5336208 (W.D. Va. Oct. 26, 2012) ........................................ 13

*Thiel v. Southern Pacific Co.*,
328 U.S. 217 (1946) .................................................................................................................. 14

*Tusha v. Edge Mission Critical Sys., LLC*,
No. 12-CV-726, 2020 WL 6595211 (E.D. Va. Aug. 10, 2020) ..................................... 4, 6, 18

*United States v. Bakker*,
925 F. 2d 728 (4th Cir. 1991) .................................................................................................. 15

*United States v. Daley et al.*,
78 F. Supp. 3d 539 (W.D. Va. 2019) ....................................................................................... 23

*United States v. Fields.*,
3:18-cr-11-MFU (W.D. Va.) ..................................................................................................... 23

*United States v. Higgs*,
353 F.3d 281 (4th Cir. 2003) ................................................................................................... 14

*United States v. Jones*,
542 F.2d 186 (4th Cir. 1976) ................................................................................................... 15

*United States v. Manafort*,
No. 1:18-cr-00083-TSE (E.D. Va. 2019) ................................................................................ 24

*United States v. McDonnell*,
No. 3:14-cr-00012-JRS (E.D. Va. 2015) ................................................................................ 24

*United States v. Moussaoui*,
No. 01-455-LMB (E.D. Va. 2006) ........................................................................................... 24

*United States* v. *Roof*,
No. 2:14-472-RMG (D.S.C. 2015) ........................................................................................... 15

*United States* v. *Toushin*,
714 F. Supp. 1452 (M.D. Tenn. 1989) ................................................................................... 13

*United States* v. *Tsarnaev*,
No. 1:13-CR-10200 (D. Mass. 2015) ...................................................................................... 15

*Utterback v. Trustmark Nat'l Bank*,
716 F. App'x 241 (5th Cir. 2017) ............................................................................................ 10

*Va. Innovation Scis., Inc. v. Samsung Elecs. Co.*,
    928 F. Supp. 2d 863 (E.D. Va. 2013) ................................................................ 7, 12

*Van Dusen v. Barrack*,
    376 U.S. 612 (1964) ................................................................................................ 6

*W. Sur. Co. v. Marco Enters., Inc.*,
    No. 2:11-CV-408, 2011 WL 4434234 (E.D. Va. Sept. 22, 2011) ........................... 4

*White v. ABCO Eng'g Corp.*,
    199 F.3d 140, 144 (3d Cir. 1999) ........................................................................ 17

*Xcoal Energy & Resources LP v. Smith*,
    No. 2:07-CV-00057, 2009 WL 4884395 (W.D. Va. Dec. 11, 2009) ................. 15, 17

**Rules**

W.D. Va. Gen. R. 2(b) ................................................................................ 3, 4, 17, 18

**Statutes**

28 U.S.C. § 1391 ........................................................................................ 3, 4, 5, 24

28 U.S.C. § 1404 ...................................................................................... 5, 6, 16, 17

**Other Authorities**

15 Charles Alan Wright & Arthur R. Miller,
    Federal Practice and Procedure (4th ed. 2021) .................................................. 7, 16

32A Am. Jur. 2d Federal Courts § 1118 .................................................................... 4

## PRELIMINARY STATEMENT

This Court has asked the parties to address four questions aimed at determining the optimal environment and practices to most efficiently and safely try this case given the practical realities of COVID-19 and the potentially high-profile nature of the proceedings. We respond to each of the questions posed below. We begin out-of-order, however, with the Court's third question—"whether the Charlottesville federal courthouse is the best equipped and most suitable courthouse at which to hold this trial"—because it raises foundational questions of venue that are paramount. As explained below, black letter principles of law dictate only one result: venue is proper in the Charlottesville Division, but not in the Roanoke and Lynchburg Divisions. As such, transferring this case to Lynchburg or Roanoke for trial would be impermissible as a matter of law because the Court cannot transfer a case to a division where venue is improper.

But even if that were not the case, the trial should remain in Charlottesville for a host of other prudential reasons, many of which have already been identified by Your Honor. Charlottesville is where many of the Plaintiffs and third-party witnesses live and work, and where all of the Plaintiffs have friends and family. By contrast, not one of the Defendants lives or works in Lynchburg or Roanoke. A trial conducted elsewhere would cause Plaintiffs substantial professional, financial, and personal hardships, while the burden on Defendants would be similar if not the same as between Charlottesville, Lynchburg, or Roanoke.

Charlottesville is where Plaintiffs brought this lawsuit because Charlottesville is the community where the relevant events happened. Charlottesville is where nearly every single one of the many cases (criminal and civil) to have arisen out of the August 2017 Unite the Right "rally" has been adjudicated for the past three-and-a-half years, without incident. And Charlottesville is far better equipped to deal with the logistical, health, and safety concerns identified by the Court.

This trial belongs in Charlottesville, and it would be contrary to law and an abuse of discretion to move it elsewhere.

With regard to the Court's remaining questions, Plaintiffs have devoted a significant amount of time, effort, and resources to develop proposals to address the logistical, health, and safety concerns raised by the Court. We have proposed concrete solutions discussed below to minimize the parties' footprint in the courtroom and courthouse while maximizing safety, ensuring adequate representation of all parties, and maintaining public access. With respect to the health risks surrounding COVID-19 (the Court's first question), these proposals include limiting the number of Plaintiffs and counsel in the courtroom; allowing remote video participation for Defendants; abiding by health/safety precautions; and employing procedures followed by other courts to enable social distancing. Given its size and layout, Charlottesville is far better equipped than Lynchburg or Roanoke to facilitate these measures. Moreover, the COVID-19 vaccination rate is substantially higher in Charlottesville than in either Lynchburg or Roanoke such that transferring the trial to Lynchburg or Roanoke would needlessly increase the risk of COVID-19 exposure and infection for the parties, counsel, and potential jurors—some of whom may have preexisting health conditions or unvaccinated family members (including young children).

As for logistics concerning the courthouse (the Court's second question), Plaintiffs propose, among other measures, using the two hotels adjacent to the Charlottesville courthouse to serve as breakout rooms for Plaintiffs and Defendants (at Plaintiffs' expense) and contracting with a trial logistics vendor to provide audio or video access for the parties and counsel who are not present as well as members of the public and press. Plaintiffs have already worked with a leading security firm that has conducted extensive advance work, coordinated with local law enforcement,

and concluded that trial in Charlottesville would be manageable and safe. It would be very costly and burdensome this late in the game to try to recreate those measures at another location.

## ARGUMENT

### I.      Charlottesville Is the Most Suitable Location for Trial (Question 3)[1]

The Court has asked the parties to consider "whether the Charlottesville federal courthouse is the best equipped and most suitable courthouse location for trial" in light of all "relevant considerations." ECF No. 966. Before considering any logistical issues raised by this question, the Court must first resolve the threshold question of venue. The venue analysis here is straightforward. First, venue is proper in Charlottesville, but not in Roanoke or Lynchburg, since neither the parties nor the events giving rise to this case have the requisite nexus to Roanoke or Lynchburg. Second, this Court has no authority to transfer this case to Roanoke or Lynchburg because neither location is a "division where [this case] might have been brought." And third, even if the Court had such discretion, doing so would not only constitute an abuse of discretion, but also clear and indisputable error under the circumstances.

### A.      Venue Is Proper in Charlottesville, but Not in Roanoke or Lynchburg

Venue is governed by 28 U.S.C. § 1391 and W.D. Va. Gen. R. 2(b). Under Section 1391(b), venue is proper in "(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." 28 U.S.C. § 1391(b).

---

[1] "Reflecting the considerations above and other relevant considerations, whether the Charlottesville federal courthouse is the best equipped and most suitable courthouse at which to hold this trial." ECF No. 966.

Section 1391(b) must be read in conjunction with Local Rule 2(b), which provides that "civil actions for which venue is proper in the Western District 'must be brought in the proper division as well.'" *Doe v. Bd. of Visitors of Va. Mil. Inst.*, No. 7:20CV00058, 2020 WL 2563289, at *2 (W.D. Va. May 20, 2020) (quoting W.D. Va. Gen. R. 2(b)). "In determining whether divisional venue is proper, the court applies the statutory venue rules for federal district courts, and substitutes the word 'division' for the terms 'judicial district' and 'district.'" *Id.* Taken together, these rules contemplate two types of venue: district and divisional; if either is lacking, then venue is improper. *See Tusha v. Edge Mission Critical Sys., LLC*, No. 20-cv-00726, 2020 WL 6595211, at *4 (E.D. Va. Aug. 10, 2020) (quoting 32A Am. Jur. 2d Federal Courts § 1118).

Here, it is undisputed that venue is proper in the Charlottesville Division of the Western District of Virginia because "a substantial part of the events … giving rise to" Plaintiffs' claims unquestionably occurred in Charlottesville. *See* 28 U.S.C. § 1391(b)(2); W.D. Va. Gen. R. 2(b); *Doe*, 2020 WL 2563289, at *2 (where incident giving rise to case occurred in Lynchburg, venue was proper in Lynchburg and improper in Roanoke); *see also W. Sur. Co. v. Marco Enters., Inc.*, No. 2:11cv408, 2011 WL 4434234, at *2 (E.D. Va. Sept. 22, 2011).

The same straightforward application of the venue rules also leads to the conclusion that venue would be *improper* in Roanoke or Lynchburg for the following reasons:

- Venue is not proper in the Roanoke and Lynchburg Divisions under Section 1391(b)(1) because none of the Defendants resided in either location when this case was filed (and none resides there now). *See* 28 U.S.C. § 1391(b)(1); *see also* ECF Nos. 18–32, 42–50, 52, 127–130, 171–73, 188–195.[2]

- Even if a Defendant were a resident of Lynchburg or Roanoke, venue would not be proper in those divisions because not all Defendants reside in Virginia. *Doe*, 2020 WL 2563289, at *2 ("In this case, it is undisputed that some of the individual defendants reside in states

---

[2] The only Defendants whom Plaintiffs served in Virginia were Jason Kessler, who was living in Charlottesville; James Fields, who was incarcerated in Charlottesville at the time (he is now incarcerated in Missouri); Richard Spencer, who was then living in Alexandria; and Chris Cantwell, who was served in Charlottesville. *See* ECF Nos. 22, 23, 31, 53, 64, 65, 158.

other than Virginia. . . . . Therefore, venue is only proper in the Roanoke Division if a 'substantial part of the events or omissions giving rise to [Doe's claims] occurred' here."). At the time Plaintiffs brought this suit, nearly every Defendant (with the exceptions of Jason Kessler, Richard Spencer, James Fields, and Chris Cantwell) lived outside of Virginia. *See* ECF Nos. 18–32, 42–50, 52, 127–130, 171–73, 188–195. And that holds true today. It is Plaintiffs' understanding, for example, that Defendant Heimbach currently resides in Tennessee, Defendant Spencer resides in Montana, Defendant Schoep resides in Michigan, Defendant Hill resides in Alabama, and Defendant Tubbs resides in Florida.

- Venue is not proper in Roanoke or Lynchburg under Section 1391(b)(2) because a "substantial part of the events or omissions giving rise to the claim" did not occur in either division. *See* 28 U.S.C. § 1391(b)(2). Rather, as explained above, most (if not all) of the events and omissions giving rise to Plaintiffs' claims occurred in Charlottesville, where Plaintiffs properly brought this action. In fact, as discussed below, multiple Defendants have brought their own lawsuits arising out of Unite the Right, each of which has been adjudicated in Charlottesville.

- Finally, venue is not proper in Roanoke or Lynchburg under Section 1391(b)(3) because there is another division "in which an action may otherwise be brought as provided in this section," *see* 28 U.S.C. § 1391(b)(3): the Charlottesville Division. *See supra* p. 4.

## B. Section 1404(a) Does Not Authorize Transfer to Roanoke or Lynchburg

Under Section 1404(a), "'a district court may transfer any civil action to any other district or division where it might have been brought . . .' 'for the convenience of parties and witnesses' and 'in the interest of justice.'" *Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.*, No. 6:20-cv-54, 2020 WL 7407469, at *3 (W.D. Va. Dec. 17, 2020) (Moon, J.). Transferring this case to Roanoke or Lynchburg under Section 1404(a), however, would be improper for two independent reasons. First, the Court cannot transfer the case to Roanoke or Lynchburg because neither is a "division where [this case] might have been brought." 28 U.S.C. § 1404(a). Second, even if the Court had discretion to transfer this case to either division, every relevant factor weighs strongly in favor of maintaining Charlottesville as the appropriate venue.

### 1. No Venue in Lynchburg or Roanoke

Plaintiffs could not have brought their case in Lynchburg or Roanoke because, as explained above, venue would not have been proper in those divisions. *See Tusha*, 2020 WL 6595211, at *4

5

(Where "divisional venue is improper, venue is also improper."); *Doe*, 2020 WL 2563289, at \*2. Because divisional venue would be improper in Roanoke and Lynchburg, this Court lacks the authority to transfer this case under Section 1404(a). *See Elderberry of Weber City, LLC v. Living Centers-Se., Inc.*, No. 6:12-CV-00052, 2013 WL 1164835, at \*6 (W.D. Va. Mar. 20, 2013) (Moon, J.) (denying transfer because plaintiff could not "have brought this action in the proposed transferee district"); *see also Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) ("This transfer power is, however, expressly limited by the final clause of § 1404(a) restricting transfer to those federal districts in which the action 'might have been brought.'").

## 2.    Other Relevant Considerations

Even if divisional venue were proper in Lynchburg or Roanoke, that would only begin the inquiry. The Court would then be required to determine whether transfer of venue is warranted based on the following four factors: "(1) the weight given to the plaintiff's choice of venue, (2) convenience of the parties, (3) convenience of the witnesses, and (4) the interest of justice." *Emerson Creek Pottery*, 2020 WL 7407469, at \*3. Overall, "[u]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Id.* Here, all four factors strongly support the Plaintiffs' choice of forum, and the trial should be held in Charlottesville. As demonstrated by the overwhelming evidence supporting this submission, transferring the action to the Lynchburg or Roanoke Division would be patently erroneous.

**Plaintiffs' Chosen Venue.** The first factor—Plaintiffs' choice of forum—weighs heavily in favor of holding the trial in Charlottesville. "As a general matter, the plaintiff's choice of venue commands deference." *Russell v. Wright*, No. 3:11-cv-00075, 2012 WL 868773, at \*3, \*7 (W.D. Va. Mar. 13, 2012) (denying motion to transfer from Charlottesville to Lynchburg largely in deference to plaintiff's choice of venue). That choice is "entitled to 'substantial weight'" in this case because the "chosen forum" is Plaintiffs' "home forum" and "bears a substantial relation to

the cause of action." *Heinz Kettler GMBH & Co. v. Razor USA, L.L.C.*, 750 F. Supp. 2d, 667 (E.D. Va. 2010); *see Emerson Creek Pottery*, 2020 WL 7407469, at *3 (similar). Unlike Defendants, who came from all different parts of the country for a single weekend event in August 2017, most of the Plaintiffs called Charlottesville their home when the relevant events occurred, and many still do. *See, e.g.*, Ex. A (Decl. of Thomas Baker) ¶¶ 4, 6; Ex. B (Decl. of April Muñiz) ¶ 4; Ex. C (Decl. of Natalie Romero) ¶¶ 4, 16.

In addition, Charlottesville "bears a substantial relation to the cause of action." *Heinz Kettler GMBH*, 750 F. Supp. 2d at 667. The relevant events and injuries alleged in the Complaint occurred in Charlottesville. None of this should come as a surprise to Defendants, who nicknamed their violent rally "Charlottesville 2.0"—following the first torchlit march they conducted through the streets of Charlottesville earlier in the summer of 2017. *See supra* Part I.A. Consequently, "the connection between this [division] and the cause of action is sufficient to warrant the substantial deference generally given a plaintiff's choice of forum." *Va. Innovation Scis., Inc. v. Samsung Elecs. Co.*, 928 F. Supp. 2d 863, 870 (E.D. Va. 2013).

**Convenience of the Parties.** The second factor, convenience of the parties, also prohibits transferring this case to Roanoke or Lynchburg. Moving this trial would impose significant burdens on Plaintiffs, all of whom have a demonstrated interest in attending trial in Charlottesville. *See, e.g.*, *Russell*, 2012 WL 868773, at *4 (affording significant weight to location of and convenience to party witnesses); *Heinz Kettler GMBH*, 750 F. Supp. 2d at 668 ("[W]hen plaintiffs file suit in their home forum, convenience to parties rarely, if ever, operates to justify transfer.").

In evaluating this factor, the Court must consider the relative convenience to "*all* of the parties to the action, which means that their frequently competing conveniences must be taken into account." 15 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3849 (4th

ed. 2021) (emphasis added). The law is clear that "[t]ransfers of venue are not available merely to shift inconvenience from one side to another." *Rockingham Precast, Inc. v. Am. Infrastructure-Md., Inc.*, No. 5:11cv00024, 2011 WL 5526092, at *6 (W.D. Va. Nov. 14, 2011); *see Emerson Creek Pottery*, 2020 WL 7407469, at *3.

Plaintiffs here would be significantly inconvenienced—logistically, financially, and psychologically—if they were required to attend and testify at trial in Lynchburg or Roanoke. Multiple Plaintiffs currently live in or near Charlottesville—whereas none live in or near Lynchburg or Roanoke. *See, e.g.*, Ex. A (Decl. of Thomas Baker) ¶¶ 4, 6; Ex. B (Decl. of April Muñiz) ¶ 4; Ex. C (Decl. of Natalie Romero) ¶¶ 4, 16. As a result, Plaintiffs have employment, personal, and family responsibilities that would be impaired by having to spend hours commuting to and from Lynchburg or Roanoke for trial. *See, e.g.*, Ex. A (Decl. of Thomas Baker) ¶ 5; Ex. B (Decl. of April Muñiz) ¶¶ 5–6; Ex. D (Decl. of Marcus Martin) ¶ 4; Ex. C (Decl. of Natalie Romero) ¶¶ 5, 7, 13. To give one example, Plaintiff Muñiz works in a rented office space a few blocks from the Charlottesville courthouse, and has made arrangements to work during breaks during the trial; consequently, moving this trial to Lynchburg or Roanoke will jeopardize her ability to meet her professional obligations. *See* Ex. B (Decl. of April Muñiz) ¶ 6. Similarly, Plaintiffs Romero and Martin care for family members in or near Charlottesville and would be unable to do so if required to commute to Lynchburg or Roanoke for trial. *See* Ex. D (Decl. of Marcus Martin) ¶¶ 6, 10; Ex. C (Decl. of Natalie Romero) ¶¶ 7, 9.

Furthermore, Plaintiffs would have difficulty traveling from Charlottesville to Lynchburg or Roanoke on a daily basis. For example, for Natalie Romero, who was diagnosed with PTSD, acute anxiety, and stress after being struck with Defendant James Fields's car, the idea of driving herself from Charlottesville to Lynchburg or Roanoke each day to participate in trial is "terrifying."

Ex. C (Decl. of Natalie Romero) ¶ 9. Plaintiff Romero does not have a family member or friend who can drive her to and from Lynchburg or Roanoke; her family only has one vehicle; and seeking lodging in Lynchburg or Roanoke would impose additional burdens on her, especially given that she supports younger family members. *Id.* Similarly, Plaintiff Martin previously attempted to commute to Lynchburg on a daily basis, but that commute proved so difficult due to the pain in his leg (which was injured by Defendant Fields's car attack) that his employer arranged for him to work in Charlottesville instead. *See* Ex. D (Decl. of Marcus Martin) ¶ 7; *see also* Ex. A (Decl. of Thomas Baker) ¶ 6; Ex. E (Decl. of Devin Willis) ¶ 8.

In addition, trial in Lynchburg or Roanoke would also cause emotional and medical hardship for Plaintiffs because they all have family and friends in Charlottesville. *See, e.g.*, Ex. A (Decl. of Thomas Baker) ¶ 8; Ex. D (Decl. of Marcus Martin) ¶ 8; Ex. B (Decl. of April Muñiz) ¶ 8; Ex. C (Decl. of Natalie Romero) ¶¶ 6, 11; Ex. F (Decl. of Elizabeth Sines) ¶ 7; Ex. E (Decl. of Devin Willis) ¶ 9. Take for example Plaintiff Muñiz, who states that needing "to commute or relocate by myself to Lynchburg or Roanoke, away from my support system and the people I will need to lean on the most will be an extreme hardship." Ex. B (Decl. of April Muñiz) ¶¶ 7–8. For Plaintiff Baker, traveling to Lynchburg or Roanoke would separate him from his wife, his "primary support system," every day and would interfere with the medical care he is still undergoing as a result of the injuries he sustained at Unite the Right. Ex. A (Decl. of Thomas Baker) ¶¶ 7–9; *see also* Ex. C (Decl. of Natalie Romero) ¶ 11; Ex. F (Decl. of Elizabeth Sines) ¶ 7.

In balancing these interests against any purported inconveniences claimed by Defendants, the Court should not lose sight of the fact that Plaintiffs' emotional hardships stem from Defendants' conduct in the heart of Charlottesville. Defendants' unsupported claims that they feel

unsafe in Charlottesville four years after they traveled to Charlottesville from all over the country (including from Ohio, Michigan, and Texas) cannot outweigh Plaintiffs' legitimate concerns.[3]

In addition, Plaintiffs have devoted significant financial resources to conducting the trial in Charlottesville. In particular, the nonprofit organization that is funding Plaintiffs' out-of-pocket expenses for this litigation, including travel and lodging costs related to trial, has signed a contract with a Charlottesville hotel to provide lodging and workspace for Plaintiffs' counsel, expert witnesses, and other parties supporting Plaintiffs. *See* Ex. G (Decl. of Amy Spitalnick). Under that contract, the organization stands to lose more than $100,000 if the reservation is canceled. *See id.* None of those funds could be recovered or used for trial in another location. *See, e.g.*, *Utterback v. Trustmark Nat'l Bank*, 716 F. App'x 241, 245 (5th Cir. 2017) (affirming denial of transfer in part because "parties have since committed considerable time and resources to litigating" in plaintiff's chosen forum); *McGraw-Edison Co. v. Van Pelt*, 350 F.2d 361, 363 (8th Cir. 1965) (affirming denial of transfer in part because "there had occurred extensive preparation and expense on the part of" plaintiffs).

By contrast, before the Court first raised the possibility of a venue transfer of its own accord on June 4, 2021, Defendants had not once made any request for a change of venue or suggestion of inconvenience to them should the trial occur in Charlottesville (rather than Lynchburg or Roanoke). Not one of the thirteen Defendants who remain in this case live or work in Lynchburg

---

[3] Equally unavailing is Defendants' suggestion that the Court need not consider arguments related to "convenience of the parties" because Plaintiffs can simply testify remotely by Zoom. This claim ignores Plaintiffs' due process right to attend the trial and testify *in person* (in Charlottesville) and, as explained, Plaintiffs have already made plans to do so. *See Lane v. Tennessee*, 315 F.3d 680, 682 (6th Cir. 2003) ("Parties in civil litigation have an analogous due process right to be present in the courtroom and to meaningfully participate in the process unless their exclusion furthers important governmental interests."), *aff'd*, 541 U.S. 509 (2004); *Marks v. Mobil Oil Corp.*, 562 F. Supp. 759, 1983 (E.D. Pa 1983) ("A party to a lawsuit has a right to attend the trial absent an overwhelming reason to the contrary."), *aff'd*, 727 F.2d 1100 (3d Cir. 1984). Indeed, if Defendants are correct that Zoom technology not only solves any logistical concerns, but also allows trials to take place anywhere, it is not clear why Lynchburg or Roanoke presents any advantage over Charlottesville in any event.

10

or Roanoke, *see supra* pp. 4–5, so moving the trial to either of those locations could not possibly be more convenient for any of them. At the June 4 Court conference, Defendant Heimbach expressed concern regarding his ability to maintain employment while attending trial. *See* June 4, 2021 Hr'g Tr. 17, ECF No. 965. But that concern obviously would remain true if the trial were in Lynchburg or Roanoke and would be mitigated here by Plaintiffs' proposal (discussed below) that Defendants should be able to participate in the trial remotely if they so choose. While Heimbach also worried that he would be unable to obtain lodging in Charlottesville, *see id.* at 16, there are approximately three thousand hotel rooms in the Charlottesville area at a variety of price points.[4] And for Defendants who plan to travel to the area by air, Charlottesville is far more accessible than Lynchburg or Roanoke.

**Convenience of Witnesses.** The third factor, convenience of the witnesses, similarly supports holding the trial in Charlottesville. Beyond the hardship that would be imposed on Plaintiffs (all of whom will be witnesses at trial), many of Plaintiffs' non-party witnesses reside in Charlottesville as well. These include but are not limited to University of Virginia ("UVA") professors, a UVA administrator, and a UVA photographer who were eyewitnesses to the events of August 11, 2017, who will testify about the torchlit march they observed, as well as a third-party witness to the events of August 12, 2017, who will testify about the violence she observed. *See* Ex. H (Decl. of Michael Bloch) ¶¶ 4, 5. Transferring this case from Charlottesville to Lynchburg or Roanoke—particularly at this late stage—would be inconvenient for these witnesses, who would have to arrange travel and hotel accommodations that would otherwise be unnecessary.

---

[4] The Collyer Group, Inc., "Charlottesville Hotel Inventory," https://collyergroup.com/charlottesville-hotel-supply.

By contrast, Defendants have not identified a single witness who is located in Lynchburg or Roanoke or would otherwise be inconvenienced by keeping the trial in Charlottesville. Having failed to provide any evidence of inconvenience to their party or third-party witnesses, Defendants have not demonstrated that "the inconvenience to their witnesses is enough to merit transfer." *Emerson Creek Pottery*, 2020 WL 7407469, at *5; *see also Va. Innovation Scis.*, 928 F. Supp. 2d at 870; *Bd. of Trs., Sheet Metal Workers Nat'l Fund v. Baylor Heating & Air Conditioning, Inc.*, 702 F. Supp. 1253, 1258 (E.D. Va. 1988).

**Interest of Justice.** The interest-of-justice factor reflects "a preference for holding a trial in the community most affected." *Rust v. CommerceFirst Bank*, No. CIV. A. 3:07cv00052, 2008 WL 2074071, at *4 (W.D. Va. May 14, 2008) (Moon, J.). Put another way, there is always "a local interest in having localized controversies decided at home." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947).

Community Interests. Here, the Charlottesville community clearly has a strong interest in adjudicating the issues posed by this case in Charlottesville. As Plaintiff Sines explains, holding the trial in Charlottesville is important because "a trial involving events that greatly affected that community should occur in Charlottesville." Ex. F (Decl. of Elizabeth Sines) ¶ 6. Other Plaintiffs agree. *See, e.g.*, Ex. D (Decl. of Marcus Martin) ¶ 9 ("To move the trial to another location would take the trial away from the people of Charlottesville who need a sense of justice."); Ex. E (Decl. of Devin Willis) ¶ 8 ("It is important to me . . . to hear a jury of my peers render a verdict regarding the Defendants' conduct, who planned this event in my new home."); *see also* Ex. A (Decl. of Thomas Baker) ¶ 10; Ex. B (Decl. of April Muñiz) ¶ 9; Ex. C (Decl. of Natalie Romero) ¶ 16.

Accordingly, whatever the ultimate result, a trial in Charlottesville will be meaningful to the local community. *See, e.g.*, *Gentry Locke Rakes & Moore, LLP v. Energy Dev. Corp.*, No.

7:17-CV-102, 2017 WL 1498117, at *3 (W.D. Va. Apr. 25, 2017) ("interest in having local controversies decided at home[] strongly weighs in favor of transferring this case to the Abingdon Division" rather than Roanoke, including because, "[g]iven the dispute's central grounding in [Abingdon Division], the interests of justice will be served 'to have the local residents act as jurors for this case'"); *Tharpe v. Lawidjaja*, No. 6:12-CV-00039, 2012 WL 5336208, at *11 (W.D. Va. Oct. 26, 2012) (Moon, J.) ("interest of justice consideration weighs heavily against transferring the complaint" out of Virginia given that claims centered on "Defendant's alleged acts against Plaintiff that occurred in Virginia and were deliberately directed at a Virginia audience").

Such community interests are particularly acute where, as here, the demographics between the jury pools in the affected community and the proposed alternate venues differ in significant respects. Although the requirement that a jury be selected from a "cross section" of the community has its roots in Sixth Amendment criminal trials, courts have long held that civil trials also "necessarily contemplate[] an impartial jury drawn from a cross-section of the community." *Thiel* v. *Southern Pacific Co.*, 328 U.S. 217, 220 (1946). In criminal cases, courts have stressed that the ability of a jury to apply "contemporary community standards" to its decision outweighs the interests of a defendant in changing the trial's venue. *See, e.g.*, *United States* v. *Toushin*, 714 F. Supp. 1452, 1457 (M.D. Tenn. 1989). So too, in this case, should the community of Charlottesville have the opportunity to have its values reflected in the jury pool. A court "must not allow the desire for competent jurors to lead [it] into selections which do not comport with the concept of the jury as a cross-section of the community." *Glasser v. United States*, 315 U.S. 60, 86 (1942).

Health and Safety Concerns. Health and safety considerations provide further support for holding the trial in Charlottesville. As discussed below, the Charlottesville courthouse and

community are better equipped to mitigate the COVID-related health concerns and to address any security issues that may arise during trial. *See infra* Parts II & III.

Media/Publicity. At least one Defendant asserts that he will not be able to obtain a fair trial in Charlottesville because of a media "spectacle" that will somehow result in a "hanging court." Hr'g Tr. 23:13-20. To determine whether a change of venue is warranted based on pretrial publicity, a court must first evaluate "whether the publicity is so inherently prejudicial that trial proceedings must be presumed to be tainted." *Id.*; *see also United States v. Higgs*, 353 F.3d 281, 308 (4th Cir. 2003) (finding change of venue to be unnecessary where the press coverage was "more factual than inflammatory"). And even if there were potentially prejudicial press coverage, a court still must "take the second step of conducting a *voir dire* of prospective jurors to determine if actual prejudice exists," and change venue "[o]nly where *voir dire* reveals that an impartial jury cannot be impanelled *[sic]*." *United States v. Bakker*, 925 F. 2d 728, 732 (4th Cir. 1991).

Here, Defendants merely point to their fear of a media "spectacle" and do not allege that there has been *any* prejudicial (rather than factual) press about this case. That alleged concern does not support an assertion that a venue change would be in the interests of justice. *See Xcoal Energy & Resources LP v. Smith*, No. 2:07-CV-00057, 2009 WL 4884395, at *1–2 (W.D. Va. Dec. 11, 2009).[5]

Because the conduct at issue in this case occurred almost four years ago, the press coverage surrounding the events has diminished considerably. Therefore, the risk of a biased jury is purely speculative. *See Givens v. Main St. Bank*, No. 5:08-CV-25, 2010 WL 2925942 at *13 (N.D. W.Va. July 22, 2010) (denying plaintiff's motion to change venue where he had failed to cite any specific

---

[5] In fact, other Defendants expressly concede that it is "undeniably a matter of speculation whether a circus atmosphere will materialize" during the trial, ECF No. 974 at 4, further undermining Defendants' assertions of a "spectacle," *see* Hr'g Tr. 15, 23.

media coverage to support allegation that he could not receive a fair trial); Wright & Miller § 3854 (explaining that consideration of prejudice "does not merit judicial concern" where it is "matter of speculation," and that courts generally only give weight to "possibility of local prejudice" where "record contains a basis for concern about it"). Furthermore, prejudice based on the trial's location is unlikely given that social media and press today are national, instantaneous, and mostly online.

In any event, as noted above, even if Defendants could identify prejudicial press coverage that is localized in nature, the Court would still be required to "take the second step of conducting a *voir dire* of prospective jurors to determine if actual prejudice exists." *See United States v. Jones*, 542 F.2d 186 (4th Cir. 1976) (finding no error where the trial court denied relief on the grounds that it was "not sufficient . . . to allege simply adverse publicity 'without a showing that the jurors were biased thereby'"). The Fourth Circuit has held that "[v]oir dire is of course the preferred safeguard against this particular threat to fair trial rights." *In re Charlotte Observer,* 882 F.2d 850, 855 (4th Cir. 1989). In this case, Defendants' right to a fair trial would be protected by a carefully crafted jury selection process, where any prejudiced jurors can be sifted out through *voir dire*. *See Snyder v. Phelps*, No. RDB-06-1389, 2007 WL 3227213, at *1 (D. Md. Oct. 19, 2007).

Similarly, Defendants' unsupported claim that "the temperature is going to be lower[] in Lynchburg than it would be in Charlottesville," Hr'g Tr. 24:23-24, is wholly insufficient to justify the extraordinary step of transferring this case from Plaintiffs' chosen forum. Recent history is replete with examples where similarly high profile, emotionally-charged cases were fairly tried in the venue where the conduct at issue occurred.[6] Indeed, Defendant James Fields successfully

---

[6] *See also United States v. Tsarnaev*, No. 1:13-CR-10200-GAO (D. Mass. 2015) (Boston marathon bomber tried in the U.S. District Court for the District of Massachusetts, in Boston); *United States* v. *Roof*, No. 2:14-472-RMG (D.S.C. 2015) (white supremacist and neo-Nazi tried for Charleston church shooting that killed nine African Americans in the U.S. District Court for the District of South Carolina, Charleston Division); *Minnesota v. Chauvin*, No. 27-CR-20-12646 (D. Minn. 2021) (police officer charged with the murder of George Floyd tried in the U.S. District Court for the District of Minnesota, Hennepin County, in Minneapolis); *Commonwealth v. Hernandez*, No. BR-CR-2013-00983

obtained a fair criminal trial in Charlottesville Circuit Court despite multiple attempts to transfer venue.[7] If an impartial jury can be selected in Charlottesville for Defendant Fields' criminal trial, where his liberty was at stake, the same obviously can be done in this civil case—especially because we are now several years further away from the relevant events.[8]

Defendants have no answer to any of this. They have not articulated a single reason why the interests of justice would be better served by transferring the trial. Even applying the most generous interpretation to Defendants' vague, unsupported expressions of concern, Defendants fall far short of meeting their burden. *See Gen. Creation LLC v. Leapfrog Enters., Inc.*, 192 F. Supp. 2d 503, 505 (W.D. Va. 2002) (proponent of transfer bears burden of proof under 28 U.S.C. § 1404(a)); *Xcoal Energy & Resources LP*, 2009 WL 4884395.

## C.   Section 1404(c) Does Not Authorize the Court to Transfer the Trial

Section 1404(c) separately provides that "[a] district court may order any civil action to be tried at any place within the division in which it is pending." 28 U.S.C. § 1404(c).[9] But that provision provides no basis to transfer the trial in this case either, for three separate reasons.

---

(Super. Ct. Mass., Bristol Cty. 2015) (former NFL player tried for murder in county where crime was committed); *Florida v. Casey Anthony*, No. 48-2008-CF-015606 (Fla. 9th Cir. Ct. 2008) (mother tried for Orange County, Florida murder of daughter in the Circuit Court of the Ninth Judicial Circuit for Orange County, Florida); *Florida v. Zimmerman*, No. 12-CF-1083-A (Fla. 18th Cir. Ct. 2013) (police offer tried for the shooting for Trayvon Martin in Sanford, FL in Seminole County in the 18th Judicial Circuit for Seminole County, Florida).

[7] *See, e.g.*, Michael Burke, *Judge not changing venue in trial of Charlottesville suspect: reports*, The Hill (Aug. 30, 2018, 6:47 PM), https://thehill.com/blogs/blog-briefing-room/news/404476-judge-wont-change-venues-in-trial-of-charlottesville-suspect.

[8] Fields was tried and convicted in December 2018. *See* Sara Sidner, Kevin Conlon & Nicole Chavez, *James Fields convicted in Charlottesville death*, CNN (Dec. 7, 2018, 7:54 PM), https://www.cnn.com/2018/12/07/us/charlottesville-james-fields-trial/index.html.

[9] Defendants mistakenly attempt to invoke 28 U.S.C. § 1404(b) as a basis for interdivisional transfer. *See* ECF No. 974 at 2. However, the law is clear that Section 1404(b) only applies when all parties consent, which obviously is not the case here. *See, e.g.*, *In re Gibson*, 423 F. App'x 385, 390 (5th Cir. 2011) ("28 U.S.C. § 1404(b) . . . authorizes intra-district transfers of proceedings only when all of the parties consent or agree."); *JTH Tax, Inc. v. Callahan*, No. 2:12CV691, 2013 WL 3035279, at *2 n.3 (E.D. Va. June 6, 2013) ("[V]arious federal courts have held that a motion to transfer venue pursuant to § 1404(b) must be a joint motion that is not opposed by any party."); *Mullins v. Equifax Info. Servs., LLC*, No. CIV.A. 3:05CV888, 2006 WL 1214024, at *4 (E.D. Va. Apr. 28, 2006) (§ 1404(b) does not apply where "Plaintiff opposes transfer" and "a number of defendants have declined to join" motion); 15 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3809 (4th ed. 2021) ("[A]ny transfer under Section

*First*, it is hornbook law that Section 1404(c) "cannot be used to transfer any matter outside the division in which it was pending, but simply permits an order that the trial itself be had at another site in the same division." Wright & Miller § 3842. Because that statute only enables an action to be tried at a place "within the division," *i.e.*, within the Charlottesville Division, it does not authorize trial to be held in Lynchburg or Roanoke.[10]

*Second*, Section 1404(c) cannot reasonably be read to authorize trial in a place where venue does not exist. *See supra* Part I.A.I; *see Doe*, 2020 WL 2563289, at *2 ("Pursuant to Local Rule 2(b), civil actions for which venue is proper in the Western District 'must be brought in the proper division as well.'" (quoting W.D. Va. Gen. R. 2(b))); *Tusha*, 2020 WL 6595211, at *4 ("[W]here divisional venue is mandated by local rule . . . those mandates must be complied with . . . .").

*Third*, even if Section 1404(c) somehow authorized the Court to order trial in a division where divisional venue would be improper, the end result would still be the same as with the analysis under Section 1404(a). The Court's decision-making under Section 1404(c) "is properly guided by the same factors relevant to a Section 1404(a) analysis." *Gentry Locke Rakes & Moore, LLP v. Energy Dev. Corp.*, No. 7:17-CV-102, 2017 WL 1498117, at *3 n.4 (W.D. Va. Apr. 25, 2017). As explained above, those considerations weigh heavily against transferring the trial from Charlottesville to Lynchburg or Roanoke. *See supra* Part I.B.2.

---

1404(b) must be based upon 'motion, consent or stipulation of all parties.' Thus, all parties must agree to the transfer."). Even the Third Circuit case Defendants cite acknowledges that transfers under Section 1404(b) "require the consent of all affected parties." *White v. ABCO Eng'g Corp.*, 199 F.3d 140, 144 (3d Cir. 1999). And even if consent of all parties were not required, the Court would still have to "consider the same convenience and justice factors that are required to be analyzed in conjunction with a § 1404(a) motion." *JTH Tax*, 2013 WL 3035279, at *3.

[10] The Standing Order in re: Division of Cases Among District Judges does not compel a different result. That Standing Order provides that a district judge may reassign a "case on his/her docket to a judge in a rotation *in that division* with the consent of the judge to whom the case is reassigned." *In re: Division of Cases Among District Judges*, Standing Order No. 2021-8 (W.D. Va. Apr. 16, 2021) (Apr. 14, 2021) (emphasis added); *see also* W.D. Va. Gen. R. 2(d) ("Cases are assigned among the district judges pursuant to Standing Order, as amended from time to time").

## II.  Holding the Trial in Charlottesville Would Be Logistically Feasible and Enable the Parties to Mitigate the Health Risks Presented by COVID-19 (Question 1)[11]

This Court has asked the parties to propose "an optimal and manageable footprint" that ensures that each side is represented at trial, accounts for space limitations, and mitigates the potential risks presented by COVID-19. Plaintiffs remain committed to working with the Court, *pro se* Defendants, and defense counsel to ensure that the trial can be conducted in a safe, efficient, and fair manner. Plaintiffs therefore submit the following proposals regarding courtroom logistics:

- Plaintiffs are willing to limit the number of Plaintiffs in the courtroom to two at any given time. In addition, Plaintiffs are willing to limit the number of Plaintiffs' counsel to six or seven at a time. That yields a total of eight or nine people from Plaintiffs' side in the courtroom at any one time.

- Based on past conduct, it is unlikely that all of the thirteen Defendants who remain in this case will attend every day. Specifically, Plaintiffs anticipate that no more than eight Defendants will likely show up for trial consistently.[12] Of those eight Defendants, several are proceeding *pro se*, and those represented by counsel have a total of four lawyers. That yields a total of no more than twelve people from Defendants' side.

- Plaintiffs have no objection to the Court's suggestion that Defendants need not be physically present in the courtroom for every day of trial, may watch the trial remotely via video, and may testify remotely via video upon a demonstrated showing of need. If implemented, such a proposal not only would open up space in the courtroom and further minimize any COVID-related health risks, *but also would seriously undermine, if not eliminate altogether, Defendants' safety, lodging, and monetary concerns*.

- Plaintiffs and their counsel are willing to abide by any health and safety precautions required by the Court, including wearing masks, social distancing, and participating in any health assessment before entry into the courtroom. All of Plaintiffs' counsel can certify that any of them who will be present in the courtroom will be fully vaccinated, thus minimizing the need for social distancing between Plaintiffs' counsel and reducing the risk of transmission of COVID-19.

- Plaintiffs' counsel are willing to take any additional steps to minimize their courtroom footprint during trial (including questioning witnesses and arguing from the lectern or counsel table and displaying exhibits primarily in digital form).

---

[11] "What is an optimal and manageable footprint for the litigants, attorneys and staff for each side in the courtroom? Consideration shall be taken to ensure that each side is represented at trial, but also reflect space limitations and potential risks presented by COVID-19." ECF No. 966.

[12] As the Court is aware, Defendants Ray, Kline, and Vanguard America have rarely participated in this case, and Defendants Cantwell and Fields are currently incarcerated.

- • The Court may wish to employ other health and safety procedures followed by courts in other jurisdictions, including increased cleaning protocols, staggering the venire, limiting the number of public spectators and press in the courtroom at any given time, and a COVID-19 screening questionnaire in the jury summons packet.[13]

Plaintiffs respectfully submit that these proposals would be effective in the Charlottesville courthouse. Given its size and layout, the Charlottesville courthouse is actually better equipped than its Roanoke and Lynchburg counterparts to facilitate social distancing between parties, counsel, and staff. The Charlottesville courthouse has four courtrooms, three witness rooms, and a jury assembly room, which has previously been used as an overflow room. The Lynchburg courthouse, by contrast, is notably smaller (with, for example, only two courtrooms), and thus poses a challenge for social distancing. Roanoke poses even greater concerns since it is not a standalone courthouse; rather, courtrooms are located within the Poff Federal Building, a fourteen-floor high-rise housing 750 employees and regional branches of other federal services (*e.g.*, the Department of Veterans Affairs). Social distancing within a large, shared space would pose complications not present in Charlottesville.

Furthermore, Charlottesville is clearly the best location from a health and safety perspective. The vaccination rates in Lynchburg and Roanoke (31.7% and 45.5%, respectively for 1+ dose) are significantly lower than in Charlottesville (59%).[14] Lynchburg has more than five times the number of new cases per 100,000 inhabitants than Charlottesville, and the Lynchburg positivity rate is six times that of Charlottesville.[15] According to Virginia Vaccine Coordinator Dr.

---

[13] *See* United States District Court for the District of Columbia, Standing Order No. 21-20 (BAH); United States District Court for the District of Maryland, Standing Order 2021-07; United States District Court for the Eastern District of Virginia, General Order No. 2021-06.

[14] *See generally* https://covidactnow.org/us/virginia-va/?s=1903823.

[15] *Compare* https://covidactnow.org/us/virginia-va/county/lynchburg_city/?s=1903823 *with* https://covidactnow.org/us/virginia-va/county/charlottesville_city/?s=1903823 (as of June 6, 2021, Lynchburg had 7.9 new cases per 100,000 persons and a positivity rate of 4.2%, while Charlottesville had 1.5 new cases and a 0.7% positivity rate).

Danny Avula, Lynchburg's comparatively low vaccination rates are not driven by vaccine scarcity, but rather by vaccine hesitancy attributable in part to "false information."[16] Given that the surge in vaccine administration has mostly tapered off,[17] it seems unlikely that Lynchburg's vaccination rate will improve significantly by the time of trial. As a result, based on the COVID-19 Community Vulnerability Index, Lynchburg is more vulnerable than 80% of U.S. counties, and Roanoke is more vulnerable than 95% of U.S. counties, predominantly due to preexisting issues surrounding population density and health care access.[18] By comparison, Charlottesville is more vulnerable than 49% of U.S. counties.[19]

## III.   Holding the Trial in the Charlottesville Courthouse Would Be Efficient, Manageable, and Safe (Question 2)[20]

### A.   Plaintiffs' Proposals for Logistics and Security

As noted at the June 4 hearing, Plaintiffs are prepared to work with the Court, *pro se* Defendants, and defense counsel to minimize the number of personnel present in the courthouse at any given time. Plaintiffs propose the following steps to minimize the footprint of the trial:

- Plaintiffs are aware of at least two large hotels within close proximity of the courthouse in Charlottesville that can be utilized to significantly alleviate concerns regarding courtroom space.

---

[16] Taylor Coleman, *Vaccination Rates in Lynchburg Are Lower than the Surrounding Cities, Data Shows*, WSET (May 13, 2021), https://wset.com/news/coronavirus/vaccination-rates-in-lynchburg-are-lower-than-the-surrounding-cities-data-shows.

[17] *See, e.g.*, Dan Diamond, Dan Keating & Chris Moody, *Vaccination Rates Fall Off, Imperiling Biden's July Fourth Goal*, Wash. Post (June 6, 2021), https://www.washingtonpost.com/health/2021/06/06/vaccination-rates-decline-us.

[18] *See* https://precisionforcovid.org/ccvi. This data is discussed by Covid ActNow on the respective pages for the cities of Lynchburg and Roanoke. *See supra* n.14. A separate index, which evaluates risk based on COVID-19 transmission rates, classifies the greater Lynchburg and Roanoke areas as High Risk. See *Tracking coronavirus in Virginia: Latest Map and Case Count*, N.Y. Times (June 7, 2021), https://www.nytimes.com/interactive/2021/us/virginia-covid-cases.html. Note that some of the counties surrounding Lynchburg and Roanoke even fall into the Very High Risk category. *See id.*

[19] *See* https://precisionforcovid.org/ccvi. Its surrounding areas are in the Moderate Risk category. *See* https://www.nytimes.com/interactive/2021/us/virginia-covid-cases.html.

[20] "What is an efficient and manageable footprint of the trial in the courthouse? The Court shall consider any needed use of breakout rooms, video access for overflow members of the public or press, security considerations, and any requested or needed use of court facilities." ECF No. 966.

- Plaintiffs have secured for the duration of the trial conference room space at one of the hotels close to the courthouse in Charlottesville that can serve as a breakout room for Plaintiffs and their counsel and witnesses. Accordingly, Plaintiffs would not need a breakout room in the Charlottesville courthouse, which could be used for other purposes.

- Plaintiffs are aware of a separate hotel, equally close to the courthouse in Charlottesville, and have offered to reserve conference space in that hotel – at Plaintiffs' expense – that could serve as a breakout room for Defendants and their counsel and witnesses so that additional rooms would be available for other purposes in the courthouse.

- As mentioned at the June 4 hearing, Plaintiffs have received information from an experienced trial logistics vendor about arrangements that can be made to provide audio or video access for overflow members of the public or press, tailored to any specifications the Court and parties prefer. As noted in Ex. I (Decl. of Jesse W. Stevenson), these include the ability to broadcast the trial to any location outside of the courthouse via ZoomGov, the most secure Zoom platform available, and control (such as with the use of registration and passwords) who gets access to the broadcast. The Court could limit viewing based on any set of criteria, such as only parties and counsel or only individuals with media credentials. Impact is prepared to offer its services free of charge. If, for any reason, the Court or Defendants prefer a different vendor with similar capabilities, Plaintiffs would be happy to work with Defendants to facilitate that as well, just as we did with respect to our use of a joint document vendor during discovery.

*Second*, Plaintiffs have already spent significant time and energy well before the June 4 hearing preparing for security concerns that may arise during a trial in Charlottesville. As detailed in Ex. J (Decl. of Herman Weisberg), Plaintiffs have been working with SAGE Intelligence Group ("SAGE"), an investigation and security firm, which has conducted extensive advance work in Charlottesville in anticipation of trial. SAGE has communicated and coordinated with local law enforcement, including leadership in the Charlottesville Police Department and the U.S. Marshals Service, to create an operational plan for a trial in the Charlottesville courthouse. *See id.* at ¶ 6. SAGE employees have visited the courthouse to identify security vulnerabilities, determine the safest points of ingress and egress, and meet with courthouse security personnel to develop a plan for any security emergencies. *See id.* at ¶ 7.

In addition to investigating and preparing for any potential security concerns at the courthouse in Charlottesville, SAGE has also visited numerous hotels to identify the safest lodging

for Plaintiffs' counsel and expert witnesses. After consultation with local law enforcement and investigation in Charlottesville, SAGE has also developed an approved list of vendors for meals and deliveries in Charlottesville. Plaintiffs would be happy to provide any further information about SAGE's work to the Court on an *ex parte* basis given security concerns.

### B.     None of Defendants' Security Concerns Justify a Transfer

Some Defendants will undoubtedly attempt to invoke nebulous security concerns as a basis to override Plaintiffs' chosen forum. *See* Hr'g Tr. 13, 15 (Spencer), 16 (Heimbach); *see also* ECF No. 973. But Defendants' late-breaking safety concerns are both unsubstantiated and disingenuous.

First, there is no basis to believe that security concerns would be greater in Charlottesville than any other courthouse in the Western District. Plaintiffs have consulted with an expert in the field regarding security concerns posed by trial in Charlottesville relative to other locations. Oren Segal, Vice President of the Anti-Defamation League's Center on Extremism, noting that extremists have tended to travel from many different states to attend particular events, does not believe the specific location of the trial will likely "have an appreciable impact on extremists who may decide to protest the trial, demonstrate support for the defendants or otherwise show up." Ex. K (Decl. of Oren Segal) at ¶ 7. That is especially true given that the proceedings must be open to the public in Roanoke or Lynchburg, just as in Charlottesville, and are likely to draw the same level of public attention (particularly over the internet), including among Defendants' supporters.

Moreover, as noted above, virtually every one of the more than ten federal cases that have arisen out of Unite the Right has been adjudicated in the Charlottesville Division of the Western

District of Virginia, and many have been presided over by this Court.[21] *See* Ex. N (Other Lawsuits in Federal Court Relating to Unite the Right). To Plaintiffs' knowledge, in none of those federal cases has a single litigant moved for a change of venue or claimed that Charlottesville is somehow inadequate to protect against potential security concerns. Plaintiffs are not aware of any actual or threatened security issue that has arisen in or around the Charlottesville courthouse related to these cases. Plaintiffs are also unaware of any security issue for Defendants that has ever arisen surrounding the prior hearings or proceedings in this case, which Defendants have attended without incident.

To the extent that Defendants now raise security concerns for the first time in three-and-a-half years of litigation, *see, e.g.*, Hr'g Tr. 15–16, those conclusory and amorphous claims are legally insufficient to override Plaintiffs' substantial interest in having this case adjudicated in Charlottesville. *Cf. Bd. of Trustees, Sheet Metal Workers Nat'l Fund v. Baylor Heating & Air Conditioning, Inc.*, 702 F. Supp. 1253, 1258 (E.D. Va. 1988) (rejecting transfer where movant submitted "merely a conclusory statement that witnesses located in Indiana would be inconvenienced if the case were to go forward in Virginia").[22]

Indeed, Defendants' security concerns contradict their own behavior. Far from fearing for their safety in Charlottesville, Defendants repeatedly taunted the city and its residents after Unite

---

[21] *See, e.g.*, *Gilmore v. Jones*, No. 3:18-cv-00017 (Moon, J.); *United States v. Daley*, No. 3:18-cr-00025 (Moon, J.); *United States v. Fields*, 3:18-cr-00011; *Harris v. Kessler*, 3:19-cv-00046 (Moon, J.); *Cantwell v. Gorcenski*, 3:17-cv-00089 (Moon, J.); *City of Charlottesville v. Penn. Light Foot Militia*, 3:17-cv-00078; *see also infra* note 26 and accompanying text.

[22] In arguing that the trial should be transferred, Defendant Heimbach refers to certain actions of the Charlottesville Police Department nearly four years ago in connection with events whose nature Defendants intentionally concealed from law enforcement in the planning stages. *See* ECF No. 973. However, security expert Herman Weisberg of SAGE attests that he is in current discussions with the Charlottesville Police Department, who are actively taking necessary steps to ensure proper security during the trial as well as coordinating with the Virginia State Police. *See* Ex. J (Decl. of Herman Weisberg ¶ 7. Additionally, handling a White Supremacist rally to which thousands of people have been invited from all over the country is a fundamentally different undertaking from a security perspective than a trial taking place in a secure federal courthouse.

the Right in August 2017, voluntarily returning to Charlottesville again and again. At an "after party" after Heather Heyer was murdered, Defendant Spencer stated to a group that included co-Defendants Damigo, Kessler, and Kline, "We are coming back here, like, a fucking hundred times. I am so mad. I am so fucking mad at these people. They don't do this to fucking me. We are going to fucking ritualistically humiliate them. I am coming back here every fucking weekend if I have to." *See* Ex. H (Decl. of Michael Bloch ¶ 5 & Ex. 1 (Tr., Dep. of Richard Spencer 316:06-22, July 1, 2020)).[23] On October 7, 2017, five days before this lawsuit was filed, Spencer returned to Charlottesville to lead another torchlight march. Spencer dubbed that event "Charlottesville 3.0" and livestreamed it to his 70,000 followers on Twitter. He announced to a group of counter-protesters on UVA's campus that "[w]e're gonna come back again and again and again."[24] Given that backdrop, Spencer's and other Defendants' references to security concerns in Charlottesville ring particularly hollow.[25]

In fact, the Charlottesville cases discussed above actually include civil cases that multiple Defendants *in this case*—Cantwell, Kessler, Parrott, Identity Evropa, National Socialist Movement, and Traditionalist Worker Party—*filed as plaintiffs*. When Cantwell, Kessler, and other Defendants chose to file their own cases based on what happened in August 2017, they did so in Charlottesville and represented that venue was proper. *See, e.g.*, Complaint ¶ 2, *Cantwell v.*

---

[23] *See also* Igor Derysh, *Leaked Audio Purportedly Captures Richard Spencer's Racist, Violent Threats After Charlottesville*, Salon (Nov. 4, 2019, 6:30 PM), https://www.salon.com/2019/11/04/leaked-audio-purportedly-captures-richard-spencers-racist-violent-threats-after-charlottesville.

[24] Natalia Buenaventura, *White Supremacist Marchers Return to Charlottesville*, The Tab (Oct. 8, 2017), https://thetab.com/us/uva/2017/10/08/white-supremacist-marchers-return-to-charlottesville-7632.

[25] If, notwithstanding the foregoing, there were a proper basis for the Court to transfer this case from Charlottesville to another forum, and the Court remained inclined to do so primarily for security reasons, Plaintiffs respectfully submit that transferring this case to the Eastern District of Virginia would be far superior to transferring it to Roanoke or Lynchburg, because the Eastern District has not only larger, modern courthouses, but far more experience handling trials in high-profile, sensitive cases with security issues. *See, e.g.*, *United States v. Moussaoui*, No. 1:01-cr-00455-LMB (E.D. Va. 2006); *United States v. Manafort*, No. 1:18-cr-83-TSE (E.D. Va. 2019); *United States v. McDonnell*, No. 3:14-cr-00012-JRS (E.D. Va. 2015).

*Gorcenski*, 3:17-cv-00089 (Dec. 28, 2017), ECF No. 1 ("Venue is proper in the Western District of Virginia pursuant to 28 U.S.C. 1391(b) because Plaintiff's claims arose in Charlottesville, Virginia."); Complaint ¶ 19, *Kessler v. City of Charlottesville*, No. 3:19-cv-00044 (Moon, J.) (Aug. 12, 2019), ECF No. 1 (similar); Amended Complaint ¶ 9, *Kessler v. City of Charlottesville*, No. 3:18-cv-00107 (Moon, J.), ECF No. 2 (similar).[26]

## IV.    Plaintiffs Will Continue Their Efforts to Streamline the Trial (Question 4)[27]

Although this case has been strenuously litigated, as the Court is no doubt aware, counsel for both sides have maintained a productive working relationship. Plaintiffs are committed to working with Defendants and their counsel to streamline the trial by narrowing issues where possible and stipulating to agreed facts. Plaintiffs have contacted Defendants since the June 4 hearing to begin the meet-and-confer process, which we hope will begin in earnest next week.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court hold the trial in this matter in the Charlottesville federal courthouse. Plaintiffs look forward to working with the Court and Defendants to ensure a safe, fair, and efficient trial.

---

[26] *See also Kessler v. City of Charlottesville*, No. 3:17-cv-56-GEC; *Kessler v. City of Charlottesville*, No. 3:18-cv-00015-NKM-JCH15 (Moon, J.).

[27] "Steps that have been and can be taken in a pretrial posture, either by way of a meet-and-confer with the opposing parties, or under the auspices of the magistrate judge, to narrow the issues in genuine dispute and to enter into stipulations as to agreed facts." ECF No. 966.

Dated: June 11, 2021

Respectfully submitted,

Roberta A. Kaplan (pro hac vice)
Michael L. Bloch (pro hac vice)
Yotam Barkai (pro hac vice)
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: (212) 763-0883
rkaplan@kaplanhecker.com
mbloch@kaplanhecker.com
ybarkai@kaplanhecker.com

Of Counsel:

Karen L. Dunn (*pro hac vice*)
Jessica E. Phillips (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Fax: (202) 223-7420
kdunn@paulweiss.com
jphillips@paulweiss.com

Alan Levine (*pro hac vice*)
COOLEY LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6260
Fax: (212) 479-6275
alevine@cooley.com

David E. Mills (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Fax: (202) 842-7899
dmills@cooley.com

Robert T. Cahill (VSB 38562)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
rcahill@cooley.com

J. Benjamin Rottenborn (VSB 84796)
WOODS ROGERS PLC
10 South Jefferson St., Suite 1400
Roanoke, VA 24011
Telephone: (540) 983-7600
Fax: (540) 983-7711
brottenborn@woodsrogers.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2021, I filed the foregoing with the Clerk of Court through the CM/ECF system, which will send a notice of electronic filing to:

Elmer Woodard
5661 US Hwy 29
Blairs, VA 24527
isuecrooks@comcast.net

James E. Kolenich
Kolenich Law Office
9435 Waterstone Blvd. #140
Cincinnati, OH 45249
jek318@gmail.com

*Counsel for Defendants Jason Kessler, Nathan Damigo, Identity Europa, Inc. (Identity Evropa), Matthew Parrott, and Traditionalist Worker Party*

David L. Campbell
Justin Saunders Gravatt
Duane, Hauck, Davis & Gravatt, P.C.
100 West Franklin Street, Suite 100
Richmond, VA 23220
dcampbell@dhdglaw.com
jgravatt@dhdglaw.com

*Counsel for Defendant James A. Fields, Jr.*

Bryan Jones
106 W. South St., Suite 211
Charlottesville, VA 22902
bryan@bjoneslegal.com

*Counsel for Defendants Michael Hill, Michael Tubbs, and League of the South*

William Edward ReBrook, IV
The ReBrook Law Office
6013 Clerkenwell Court
Burke, VA 22015
edward@rebrooklaw.com

*Counsel for Defendants Jeff Schoep, National Socialist Movement, and Nationalist Front*

## CERTIFICATE OF SERVICE

I further hereby certify that on June 11, 2021, I also served the following non-ECF participants, via electronic mail and U.S. mail, as follows:

Richard Spencer
richardbspencer@icloud.com
richardbspencer@gmail.com

Christopher Cantwell
Christopher Cantwell 00991-509
USP Marion, 4500 Prison Rd.
U.S. Penitentiary
P.O. Box 2000
Marion, IL 62959

Vanguard America
c/o Dillon Hopper
dillon_hopper@protonmail.com

Robert "Azzmador" Ray
azzmador@gmail.com

Elliott Kline a/k/a Eli Mosley
eli.f.mosley@gmail.com
deplorabletruth@gmail.com
eli.r.kline@gmail.com

Matthew Heimbach
matthew.w.heimbach@gmail.com

Roberta A. Kaplan (*pro hac vice*)
KAPLAN HECKER & FINK LLP

*Counsel for Plaintiffs*