# EXHIBIT 3

Page 1

1          M. Parrott

2   UNITED STATES DISTRICT COURT

3   FOR THE WESTERN DISTRICT OF VIRGINIA

4   CHARLOTTESVILLE DIVISION

5   --------------------------------x

6   ELIZABETH SINES, et al.,

7           Plaintiffs,           Civil Action No.

8       v.                        3:17-cv-00072-NKM

9   JASON KESSLER, et al.,

10          Defendants.

11  --------------------------------x

12

13

14        VIDEOCONFERENCE DEPOSITION OF

15           MATTHEW DAVID PARROTT

16              Paoli, Indiana

17          Friday, June 26, 2020

18

19  Reported by:

20  DEBORAH C. FUREY, RPR, CLR, CRI

21  JOB NO. 180624

22

23

24

25

Page 282

M. Parrott

2  screenshots of text messages, correct?
3    A.  Yes.
4    Q.  And how did you choose which 30
5  screenshots to produce to us?
6    A.  I went back through my text messages and
7  found the messages that I believe pertained to
8  communications with the Unite the Right event.
9    Q.  But how did you decide what pertained to
10 Unite the Right?  Did you read every single text
11 message?  Did you use search terms?  How did you
12 filter?
13   A.  Because I don't communicate beyond my
14 friends and family on my phone, it was a rather
15 simple task of right around Unite the Right, there
16 was an explosion of these messages from strange
17 phone numbers that I knew pertained to Unite the
18 Right.
19   Q.  Okay.  But this was -- what we're
20 looking at in Exhibit 35 are the total documents
21 that you produced to us in April of 2018, correct?
22   A.  I only see one screenshot here, but I do
23 remember taking several dozens of screenshots of
24 the conversations and sending them to you, and
25 being satisfied that I had sent all of my text

Page 283

M. Parrott

2  communications pertaining to Charlottesville.
3    Q.  Okay.  And this was your effort to
4  respond to our document request in April of 2018,
5  correct?
6    A.  Yes.
7    Q.  Do you agree, Mr. Parrott, that you did
8  not produce to us a single text message to or from
9  Mr. Heimbach?
10   A.  I may or may not have.  I don't recall
11 that.
12   Q.  Well, why don't we quickly -- if you
13 want -- do you want to look at this production to
14 be able to answer whether or not you produced a
15 single text message from Mr. Heimbach?
16   A.  Are you asking me to look at my phone
17 versus this?  I will take your word if you insist
18 that I did not send any communication between me
19 and Heimbach.
20   Q.  I don't want you to take my word.  I'm
21 looking for your testimony.
22       Do you agree that, when you made this
23 document production in April 2018, you did not, in
24 fact, produce a single text message to or from
25 Matthew Heimbach?

Page 284

M. Parrott

2    A.  I don't know.  That seems peculiar.  I
3  don't recall failing to do that.
4    Q.  Do you agree that you did not produce to
5  us a single text message to or from Derrick Davis?
6    A.  I don't know whether I had a text
7  message with Mr. Davis.
8    Q.  Do you agree you did not produce to us a
9  single text message to or from Jason Augustus?
10   A.  That is quite likely.
11   Q.  Do you know if you produced a single
12 text message from any TWP member?
13   A.  I believe I produced Tony's text
14 messages.  I do not know who I -- I do not recall
15 who I sent messages from.  It was years ago.
16   Q.  In October -- sorry.
17       When you say Tony, Tony Hovater?
18   A.  Yes.
19   Q.  Okay.  In October of 2018, you were
20 ordered to produce your phone to a vendor for
21 imaging, right?
22   A.  Yes.
23   Q.  And you did produce the phone to the
24 vendor, right?
25   A.  Yes, I did.

Page 285

M. Parrott

2    Q.  And that's the Nokia phone that we've
3  been talking about?
4    A.  Yes.
5    Q.  Did you produce to the vendor the same
6  phone that you pulled these text messages from
7  that we see in Exhibit 35?
8    A.  Yes.
9    Q.  Before you produced the phone to the
10 vendor, did you delete any text messages?
11   A.  I do not believe so.
12   Q.  Can you be sure that you did not delete
13 any text messages from your phone?
14   A.  My only concern is I might have deleted
15 Mr. Heimbach or Jessica White's messages
16 pertaining to my divorce.  But I am confident that
17 that would be the scope of my message deletion.
18   Q.  Do you think it's possible you deleted
19 the text messages that you exchanged with
20 Mr. Heimbach?
21   A.  Yes, that is possible.
22   Q.  And we're talking about all --
23 withdrawn.
24       You're saying it's possible you deleted
25 all text messages between you and Heimbach from

Page 286

M. Parrott

the phone that you produced to the vendor, correct?

A. Yes, correct.

Q. And when is it that you think you may have deleted all text messages between you and Mr. Heimbach from your cell phone?

A. If that occurred, it would have been directly after the trailer park incident in which I was very distraught.

Q. Okay. So you're saying you may have deleted all text messages between you and Mr. Heimbach after March of 2018 from your cell phone, correct?

A. Correct.

Q. Mr. Parrott, you did delete all text messages with Mr. Heimbach after March of 2018, didn't you?

A. I don't know the answer to that question. I honestly don't. I believe we've pulled the direct cell phone tower records that we could perhaps review and compare them.

Q. What do you mean "cell phone tower records"?

A. Well, AT&T has been subpoenaed to

Page 287

M. Parrott

actually receive my SMS phone records for the relevant timeframe, which would allow us to find out whether Mr. Heimbach's text messages have been deleted or not.

Q. Okay. Well, you're aware that, when the vendor imaged your phone after you produced it, the vendor actually didn't find a single text message from prior to November of 2017 that concerned Unite the Right, correct?

A. We see these text messages right here. I'm confident that the phone contained and continues to contain a variety of messages pertaining to Unite the Right.

Q. Well, to be clear, what we see on the screen right now is Exhibit 35, right?

A. Yes.

Q. And these are screenshots of what you produced to us from your laptop, right?

A. Yes.

Q. But when the phone was given to the vendor to image, you're aware that the vendor did not find a single text message concerning Unite the Right prior to November of 2017?

A. That is possible.

Page 288

M. Parrott

Q. Is it possible that you deleted all text messages prior to November of 2017 that concerns Unite the Right?

A. It would have been all text messages with Mr. Heimbach at the time of the trailer park incident.

Q. The text messages that we see right now on the screen, Exhibit 35, are those text messages still in your phone?

A. They should be. I can look right now.

Q. Well, you're aware that the vendor didn't even find these text messages on your phone?

A. That would be a failure on the vendor's part, if that's the case.

Q. Well, did you delete text messages between you and any other TWP member at all?

A. Other than Mr. Heimbach and the former Ms. Parrott, no.

Q. So you also deleted text messages between you and -- is it Jessica Parrott?

A. Formerly Jessica Parrott.

Q. But you also deleted text messages between you and formerly Jessica Parrott?

Page 289

M. Parrott

A. Yes.

Q. And you did that before you turned the phone over to the vendor in this case?

A. Yes. It was before I turned the phone over to the vendor.

Q. And the text messages with Mr. Heimbach that you deleted, that happened before you turned the phone over to the vendor, correct?

A. That is correct.

Q. Now, you also disclosed another phone number on one of your certifications, correct?

A. Yes.

Q. And that phone number is 812-865-5512, right?

A. Yes.

Q. And what phone number is that?

A. That, I'm forgetting exactly how that played out, but with the Google Voice, you have your real phone number behind your phone number and then your Google Voice phone number.

Q. So is there a phone associated with the 812 number?

A. The Nokia.

Q. Okay. So that phone number is also

Page 290

M. Parrott

1  
2  associated with the same phone that your 8282
3  number is associated with, correct?
4      A.   That is correct.
5      Q.   The 812 number is a Google Voice
6  number?6.   The 317, my main number that I did my
7  text communication with is the Google Voice
8  redirection number.  The 812 number is the actual
9  cell phone tower, AT&T number.
10     Q.   Okay.  So if I called your cell phone
11 right now, I would call the 812 number?
12     A.   No.  Everyone is to call the 317 number.
13 It would ring at this phone number.  Either one
14 would work, actually.
15     Q.   Okay.  Well, did you text with
16 Mr. Kessler using the 812 number?
17     A.   I don't believe so, no.
18         MR. BLOCH:  Emily, can we show the next
19     exhibit?
20              (Exhibit 36 Parrott, Text messages,
21              11-22-17, no Bates stamps, was
22              marked for the purposes of
23              identification.)
24         MR. BLOCH:  I'm sorry.  I'm looking for
25     Tab 11.  It's my fault.

Page 291

M. Parrott

1  
2      Q.   Do you see what's on the screen,
3  Mr. Parrott, marked Exhibit 36?
4      A.   Yes.
5      Q.   And are these text messages that you
6  exchanged with Jason Kessler?
7      A.   Yes, they are.
8      Q.   And you're aware that Mr. Kessler's
9  number is 434-996-5567?
10     A.   That sounds correct.
11     Q.   And you were texting him from your 812
12 number, correct?
13     A.   Yes.
14     Q.   And can you just explain why that is?
15     A.   If you don't have wi-fi or data service,
16 and I believe I was in the hospital, it says "Wife
17 delivering" right there, and that's on my
18 daughter's birthday, November 22nd.  I believe I
19 completely lacked a data signal at all, which
20 requires you to fall back on your actual phone
21 number.
22     Q.   Okay.  What is it -- you say in the last
23 text, "Will you accept $200 in Bitcoin," correct?
24     A.   Yes.
25     Q.   What is it that you were paying

Page 292

M. Parrott

1  
2  Mr. Kessler for?
3      A.   I do not recall.
4      Q.   No idea?
5      A.   I don't have any idea whatsoever.  I
6  don't recall what I was paying him for.
7      Q.   Okay.  Other than the -- well, did you
8  ever have a disposable burner phone?6.  I did
9  purchase a second phone while -- during the two
10 separate six-week incidents where IDS Solutions
11 had my primary phone, so that I could do my day
12 job.  And I still possess that phone.  It's
13 currently deactivated.
14     Q.   Okay.
15         MR. BLOCH:  Can we look at Tab 14?
16              (Exhibit 37 Parrott, Twitter tweet,
17              2-22-19, Bates stamped
18              NOCUSTODIAN00002592, was marked for
19              the purposes of identification.)
20     Q.   Mr. Parrott, I'm showing you what I
21 believe is marked Exhibit 37.
22         And is this a tweet by you?
23     A.   Yes.
24     Q.   And you say at the bottom, "Fedposts
25 come at me on Facebook messenger, teacup

Page 293

M. Parrott

1  
2  pomeranians with funny captions come at me on
3  Signal on a disposable burner phone."
4      A.   I was making a joke, indicating that
5  disposable burner phones are a thing that
6  people -- people use.
7      Q.   Okay.  But you, yourself have never used
8  one?
9      A.   I, myself, have never used a disposable
10 burner phone.
11     Q.   Now, your e-mail account is
12 parrott.matt@gmail.com, correct?
13     A.   Correct.
14     Q.   And are you the only person that had
15 access to that account?
16     A.   Yes.
17     Q.   And you used that to communicate about
18 Unite the Right, correct?
19     A.   I believe so.
20     Q.   Have you ever deleted any e-mails
21 generated about Unite the Right from that e-mail
22 account?6.
23     Q.   Do you agree that, in that initial
24 production that we looked at in April, 2018, you
25 didn't send us a single e-mail from that account?