CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE
FILED
08/20/2021
JULIA C. DUDLEY, CLERK
BY: H. Wood
DEPUTY CLERK

United States District Court for
the Western District of Virginia
Charlottesville Division

Civil Action No. 3:17cv00072
Sines, et al Plaintiffs v. Kessler, et al, Defendants

Defendant Christopher Cantwell's August
11th 2021 Letter to the Court

On this fourth anniversary of Plaintiffs'
co-conspirators attacking me and my associates
and filing false police reports, I came across
two articles in the Wall Street Journal about
Plaintiffs' counsel which I thought might
prove helpful in illuminating the circumstances
of this fraud upon the Court.

In chronological order, I happened to be a few
days behind on the Business section, and today read
an August 4th piece in which the law firm Kaplan
Hecker and Fink issued a report claiming the
NCAA "undervalues" Women's basketball "in ways
that ~~the~~ normalize and perpetuate gender inequities"

The NCAA explains that this is because the
"Women's tournament lost $2.8 million in 2019"
and that this was the "largest loss of any
NCAA Championship"

See Exhibit A, + Exhibit A?

discovered that she has been aiding and abetting the soon to be former governor of New York in his sexual assault crime spree. Perhaps the most interesting detail noted in the article is that Kaplan provided advice to the so-called "Love-Gov" about an op-ed designed to discredit Lindsey Boylan, his first accuser. Exhibit B

Combined, these two pieces illustrate that Plaintiffs' counsel are motivated first by partisan political power, secondly by ideology, and one presumes money to be a tertiary concern. Truth would be fortunate to come in fourth, but thus far, we have yet to find it anywhere in their hierarchy of values.

When it becomes obvious to the Court that Plaintiffs' counsel brought this suit in bad faith, and have used this court to abuse the targets of their enmity for four long years, one hopes this pattern of behavior will be taken into consideration when crafting sanctions fit to deter future such misconduct.

Respectfully Submitted

# NCAA Found to Undervalue Women's Basketball

By Rachel Bachman
And Laine Higgins

The NCAA has undervalued its annual women's basketball tournament by tens of millions of dollars and should overhaul how it operates and sells rights to the event, according to a critical report by a law firm the NCAA hired to analyze gender inequities in its championships.

The NCAA's broadcast agreements, corporate sponsorships, revenue distribution, equity while at the same time increasing and diversifying the NCAA's revenue streams.

The NCAA hired the Kaplan firm in March, following the firestorm from a video posted to social media by Oregon women's player Sedona Prince showing a single skimpy weight rack at the women's tournament compared with a sprawling setup of equipment at the men's event. The Kaplan

I men's basketball over everything else in ways that create, normalize and perpetuate gender inequities," according to the 118-page report prepared by the law firm Kaplan Hecker & Fink LLC.

The report concludes that maximizing revenues from women's basketball and other

report details the vast difference between the 2021 men's and women's tournaments in areas including funding, food, Covid-19 testing, equipment, outdoor space and more.

The report's larger findings paint a much broader picture of what it describes as the NCAA's long-term neglect of the women's tournament. It criticizes the association for its lack of investment in and promotion of the event, and

takes aim at the NCAA's noncompetitive sale and packaging of the tournament broadcast rights.

The NCAA didn't respond to a request for comment.

In response to media inquiries during the basketball tournaments in March, the NCAA said the women's tournament lost $2.8 million in 2019, "the largest loss of any NCAA championship." *Please turn to page B7*

THE WALL STREET JOURNAL.                              * *

# BUSINESS NEWS

## Women's Hoops Seen Undervalued

*Continued from page B1*

Yet detailed estimates included in an addendum to the Kaplan report, prepared by a sports media rights consultant who worked for more than two decades as an NBA executive, paint a sharply different picture.

The women's basketball tournament could be worth $100 million a year in media-rights fees alone starting in 2025 after its current deal ends. That is according to an analysis led by Ed Desser, president of a California-based sports media rights consulting firm.

Instead, the NCAA bundled the women's tournament with 28 other sports championships and sold the entire package to ESPN for about $34 million a year, according to the report.

The report calls for a dramatic overhaul of nearly every aspect of how the NCAA stages the two tournaments, starting with holding both the men's and women's Final Fours on one weekend in one city, ideally starting in 2023 to maximize impact on future TV negotiations. That is "the best possible way to ensure that male and female players have similar, if not the same, experiences at the championships with respect to sponsorship,

gifts, signage, etc." it says.

It also says the NCAA should use the "March Madness" branding for both the Division I men's and women's basketball championships, starting immediately. The NCAA has for years withheld use of the powerful brand from the women even though its trademark allows it to be used for both tournaments, The Wall Street Journal reported.

NCAA staff involved in planning previous women's tournaments recounted repeatedly asking to use the branding but being rebuffed, with some being told it was "off limits" because of the NCAA's relationship with relationship with **ViacomCBS** Inc.'s CBS and **AT&T** Inc.-owned Turner Broadcasting, which share the rights to broadcast the men's tournament.

But according to the report, "no one at the NCAA was able to identify any instance in which CBS/Turner itself suggested that the women's tournament could not use March Madness—or even an instance in which the NCAA asked the broadcaster for its position on the issue."

Media rights to the women's basketball tournament should be sold separately instead of bundling them with other events, the report says, adding that the NCAA should negotiate for a new tier of its corporate sponsorship program that is tied specifically to the women's basketball championship.

Doing any or all of that would be highly disruptive to



The series could be worth $100 million a year in media-rights fees.

the universe of broadcast and sponsorship agreements that, according to the report, focus on the valuable men's basketball tournament at the expense of everything else.

The NCAA generates 72% of its total of about $1 billion in annual revenue from the men's basketball tournament, including ticket sales, the Kaplan report says. CBS/Turner paid the NCAA $850 million for media and broadcast rights for the men's tournament this year, and the contract increases at a fixed amount each year until it reaches $1.12 billion in its final year, 2032.

As part of that deal, CBS/Turner also controls the rights to the NCAA's corporate sponsorship program for all sports championships the NCAA runs, not just men's basketball.

Those sponsorship rights are worth an estimated $211 million this year—and CBS/Turner pocket that revenue, an arrangement that was reported by The Wall Street Journal earlier this year. (Top-division college football operates its own championship and sells its own sponsorships.)

The setup discourages NCAA corporate sponsors from advertising on broadcasts other than men's basketball, thus decreasing the value of those broadcasts, the report says.

It says that "to air advertisements during the women's basketball championship while reaping the benefits of the NCAA's brand, for example, a corporate sponsor must first buy into the expensive CBS/

Turner Corpora gram, and ther and separately pay for airtin women's baske ship."

Representati and Turner de ment.

The report though the wo ment audience i than the men's, trending in oppo Total viewing o tournament has 32% since 2015 carried on cal (ESPN), while to the men's event 40% despite be widely available

The report mends the NC some other part championship p ture rights nego would "likely at media entities, ESPN, to bid to events." Desser leagues believe packages, such and women's C Series, "will colle ate far more to each Champions present approac

The NCAA has non-men's baske onships up for co and has thus "for gle most crucia tactic in assurin fair market value property," the re

The report down the sizable how much the NC

*Exhibit A-2*

# BUSINESS NEWS



The series could be worth $100 million a year in media-rights fees.

*CARMEN MANDATO/GETTY IMAGES*

: says. ...A should Madness" Division basketball ...g imme-for years ...owerful ...en even ...llows it ...tourna-...Journal

in plan-...tourna-...eatedly ...ing but ...me be-...ts" be-...lation-... with ...S and ...Turner ...re the ...men's

the universe of broadcast and sponsorship agreements that, according to the report, focus on the valuable men's basketball tournament at the expense of everything else.

The NCAA generates 72% of its total of about $1 billion in annual revenue from the men's basketball tournament, including ticket sales, the Kaplan report says. CBS/Turner paid the NCAA $850 million for media and broadcast rights for the men's tournament this year, and the contract increases at a fixed amount each year until it reaches $1.12 billion in its final year, 2032.

As part of that deal, CBS/Turner also controls the rights to the NCAA's corporate sponsorship program for all sports championships the NCAA runs, not just men's basketball.

Those sponsorship rights are worth an estimated $211 million this year—and CBS/Turner pocket that revenue, an arrangement that was reported by The Wall Street Journal earlier this year. (Top-division college football operates its own championship and sells its own sponsorships.)

The setup discourages NCAA corporate sponsors from advertising on broadcasts other than men's basketball, thus decreasing the value of those broadcasts, the report says.

It says that "to air advertisements during the women's basketball championship while reaping the benefits of the NCAA's brand, for example, a corporate sponsor must first buy into the expensive CBS/

Turner Corporate Partner Program, and then turn to ESPN and separately negotiate and pay for airtime during the women's basketball championship."

Representatives from CBS and Turner declined to comment.

The report notes that although the women's tournament audience is much smaller than the men's, the events are trending in opposite directions: Total viewing of the women's tournament has increased by 32% since 2015 despite being carried on cable television (ESPN), while total viewing of the men's event has declined 40% despite being on more widely available network TV.

The report also recommends the NCAA break out some other parts of its sports-championship package in future rights negotiations. That would "likely attract multiple media entities, in addition to ESPN, to bid to telecast the events." Desser and his colleagues believe the smaller packages, such as the men's and women's College World Series, "will collectively generate far more total value for each Championship than the present approach."

The NCAA has never put its non-men's basketball championships up for competitive bid, and has thus "foregone the single most crucial negotiating tactic in assuring it is receiving fair market value for its media property," the report says.

The report also breaks down the sizable difference in how much the NCAA spends to

stage the tournaments.

In 2019, the most recent year for which complete figures are available, the men's basketball tournament cost $53.2 million to put on, and the women's basketball tournament $17.9 million. Although NCAA staff members understand that men's basketball is the organization's chief moneymaker, "the view that men's basketball is highly profitable and therefore worthy of increased investment has cultivated a culture within the NCAA in which men's basketball is not required to abide by many of the same budgetary constraints as women's basketball (or other sports)," the report says.

The report also found that the NCAA's tournament-related revenue distribution practices incentivized schools to prioritize their men's basketball teams. Schools receive annual payouts weighted based on how many games their men's teams play in the basketball tournament.

The NCAA offers no similar game bonuses for women's teams, which sends "a very clear and loud message to student-athletes, conferences, and schools about which sports matter and which sports do not," the report reads. It calls for the NCAA to gradually include women's tournament results in its fund-distribution criteria.

The NCAA didn't approve the Kaplan report or change any of its recommendations before it was issued, the report says.

...eport, ...s able ...ce in ... sug-...tour-...March ...tance ...d the ...n on

...the ...rna-...epa-...lling ...the ...the ...or a ...on-tied ...en's

...hat ... to

# Two Allies of Governor Hit by Probe's Fallout

By Talal Ansari

The chairwoman of the Time's Up advocacy group resigned Monday and the president of the Human Rights Campaign is under internal investigation as fallout from the report on New York Gov. Andrew Cuomo continues.

Roberta Kaplan, the Time's Up chairwoman and co-founder of the group's legal defense fund, stepped down amid concerns stemming from her work advising the embattled governor on harassment allegations against him. Time's Up is an advocacy organization founded by women in Hollywood to combat harassment and discrimination.

The moves come after the release of a 165-page report from the New York attorney general that found Mr. Cuomo harassed multiple women who worked for him in violation of state and federal law. The Democratic governor has called the report biased and repeatedly denied touching anyone inappropriately.

Ms. Kaplan reviewed an opinion article aimed at discrediting Mr. Cuomo's first accuser, Lindsey Boylan, according to the report.

The opinion article "denied the legitimacy of Ms. Boylan's allegations, impugned her credibility, and attacked her claims as politically motivated," the report states. Investigators said Mr. Cuomo asked that a draft of the opinion article be sent to Ms. Kaplan and others, and their report alleges that Ms. Kaplan suggested one change. The article was never published.

In a letter to the Time's Up board, Ms. Kaplan declined to discuss her involvement with the governor. She said she had "reluctantly come to the conclusion that an active litigation practice is no longer compatible with serving on the Board at Times Up at this time, and I hereby resign," she said.

Melissa DeRosa, a top aide to Mr. Cuomo who resigned on Sunday, is represented by Ms. Kaplan's law partner, Sean Hecker.

The Human Rights Campaign, an organization focused on advocacy for LGBT individuals, said it was investigating its president, Alphonso David, who previously worked as chief counsel and principal legal adviser to Mr. Cuomo.

Mr. David was also mentioned in the attorney general's report, which alleged that he released files containing confidential information about Ms. Boylan to a Cuomo aide while serving as president of the HRC. The confidential information was subsequently sent to reporters, the report states.

In a statement sent to HRC staff and shared on Twitter, Mr. David said that the attorney general's report contains "multiple inaccuracies" and that he was legally obligated to share the confidential information for a former client but he didn't have any involvement in its public dissemination.

SAINT LOUIS MO 630

17 AUG 2021 PM 8 L

◇◇009991-509◇◇
Clerk Us District Court
Western District Virginia
255 W MAIN ST
Room 304
Charlottesville, VA 22902
United States

Christopher Cantwell
Inmate #00991-509
USP/Marion
1500 Prison Rd.
P.O. Box 1000
Marion, IL 62959