# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| ELIZABETH SINES, *et al.*, | CASE No. 3:17-cv-00072 |
| *Plaintiffs*, |  |
| v. | MEMORANDUM OPINION |
| JASON KESSLER, *et al.*, |  |
| *Defendants.* | JUDGE NORMAN K. MOON |

In their motion for summary judgment, League of the South, the League's co-founder and President Michael Hill, and its "Chief of Staff," Michael Tubbs (collectively, "League of the South Defendants"), argue that they have demonstrated that there is no genuine dispute of material fact that they did not conspire with others to engage in racial violence at the "Unite the Right" rally held in Charlottesville on August 11 and 12, 2017. Thus, they argue that they are entitled to judgment as a matter of law. Accepting their argument, in other words, would hold that *no* reasonable jury could find in Plaintiffs' favor that League of the South Defendants conspired with *any other* person or organization to engage in racial violence at Unite the Right, based on the evidence in the summary judgment record and under governing law.

More specifically, League of the South Defendants argue that they should not be held responsible for certain Plaintiffs' injuries occurring at the "Torch March" on the evening of Friday, August 11, 2017, which they characterize as a "separate event" from the following morning's events of August 12, 2017, in which they were visibly and heavily involved. League of the South Defendants further contend that Defendant James Fields acted alone, and so they

should not be held responsible for the injuries he inflicted upon Plaintiffs when he drove into a crowd of counter-protestors on August 12, 2017, striking multiple Plaintiffs and killing Heather Heyer. In their telling, League of the South Defendants merely prepared to and were forced to "defend themselves" from "attacks of violent oppositionists." They further argue that the fact that in this rally "members of the League clashed with violent political opponents," does not support Plaintiffs' claims that they conspired to commit racial violence.

But Plaintiffs' evidence is not just that the all-white organization, League of the South, and Michael Hill and Michael Tubbs were mere participants or attendees at Unite the Right— advocating for a white supremacist ideology that Plaintiffs find repugnant. Rather, Plaintiffs have put forward substantial evidence tending to show that the League and its highest levels of leadership: *(1)* were heavily involved with Co-Conspirators and Co-Defendants (including Defendant Jason Kessler, Defendant Traditionalist Workers Party, Defendant National Socialist Movement, Defendant Vanguard America, the alliance of white supremacist groups Defendant Nationalist Front, and Defendant Matthew Heimbach, among others), planning many aspects of Unite the Right; *(2)* were motivated by animus against Black and Jewish individuals, and sought to motivate League members and others to attend Unite the Right to protect the white race against perceived Black and Jewish "enemies"; and *(3)* were sought out for a key role in Unite the Right precisely because of their physicality and training to fight, which they deployed at Unite the Right—as exhibited in numerous videos, including when Defendant Tubbs led a column of the League and other Nationalist Front members into a crowd of counter-protestors on August 12, yelling "Follow me!", before they charged and a melee ensued.

Weighing the evidence is a jury function. Making credibility determinations is a jury function. Determining the truth of the matter is a jury function. A judge's role on a motion for

summary judgment, by contrast, is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue of material fact for a jury to resolve at trial. Here, League of the South Defendants are the movants, asking the Court to rule on the evidence as a matter of law that no reasonable jury could find that any of them conspired to commit racial violence at Unite the Right. League of the South Defendants and their Co-Defendants will be able to make their case and present their narrative of Unite the Right to the jury as the factfinders. The jury may or may not be persuaded that their narrative represents the truth of the matter. However, because League of the South Defendants have not demonstrated there is no genuine issue of material fact and that they are entitled to judgment as a matter of law, the Court has denied their motion for summary judgment. The case will proceed to trial.

<u>PROCEDURAL BACKGROUND</u>

This Court previously considered and rejected motions to dismiss this lawsuit filed by many of the Defendants in this case, including League of the South Defendants. In that decision, the Court held that—taking Plaintiffs' allegations as true and drawing all reasonable inferences in their favor—"Plaintiffs have plausibly alleged the Defendants formed a conspiracy to commit racial violence that led to the Plaintiffs' varied injuries" at the Unite the Right rally in Charlottesville. <u>Sines v. Kessler</u>, 324 F. Supp. 3d 765, 773 (W.D. Va. 2018). Given the similarity in issues raised in the earlier motions to dismiss to the issues raised in the briefing on League of the South Defendants' summary judgment motion, the Court will lay out the basis for that prior decision in some detail.

As described in that decision, Plaintiffs are Charlottesville residents who allege that they each suffered injuries at or in connection with the rally. <u>Id.</u> at 774–75. Defendants include groups

and individuals who Plaintiffs alleged were involved in and responsible for organizing, planning, and executing the Unite the Right rally. Id. at 775–76.

Since Plaintiffs had alleged that Defendants formed a conspiracy pursuant to 42 U.S.C. § 1985(3), the law required Plaintiffs to "show an agreement or a meeting of the minds by [the] defendants to violate the [plaintiff's] constitutional rights." Id. at 783 (quoting A Soc'y Without A Name v. Virginia, 655 F.3d 342, 346 (4th Cir. 2011)). At that stage of the case, this meant that "Plaintiffs must allege each Defendant entered into an agreement with a specific co-conspirator to engage in racially motivated violence at the August 11th and 12th events." Id. at 784. The Court concluded that, with one exception, "Plaintiffs have adequately pled specific factual allegations that each moving Defendant … was part of a conspiracy to engage in racially motivated violence at the 'Unite the Right' events." Id.[1]

The Court considered Plaintiffs' allegations against each Defendant, including League of the South Defendants. Id. at 792–93. The complaint described League of the South as a white supremacist organization that was "allegedly in the heart of the violence that occurred on 12 August." Id. at 792. The complaint further alleged that the League had used online messaging platforms Discord and Facebook to communicate with its members about the event, and "coordinated with the other Defendants," including Defendant Jason Kessler, who "was perhaps the overarching organizer for the event." Id. at 784, 792. As recited in the complaint, Defendant Hill posted in a Facebook group before Unite the Right that he wanted "no fewer than 150 League warriors, dressed and ready for action, in Charlottesville, Virginia, on 12 August." Id. at 792. The complaint also described how League of the South and its members met Co-Defendants

---

[1] The Court did conclude that Plaintiffs had not pleaded such allegations against then-Defendant Michel Peinovich, and therefore dismissed Plaintiffs' claims against him. Id. at 784, 794–95.

"at a pre-set location in order to march to Emancipation Park in formation" on the morning of August 12. Id. at 792. Then League members followed Defendant Hill, carrying shields, rods, flags, and other weapons, and "[e]ither as they approached the park, or once they were already within it, Defendant Tubbs ordered League of the South members 'to attack by yelling "charge!"'" Id. When Tubbs gave "this command, the group streamed past him to attack counter-protestors." Id.; see also id. (quoting Noto v. United States, 367 U.S. 290, 297–98 (1961) ("mere abstract teaching … is not the same as preparing a group for violent action and steeling it to such action")).

Defendants Matthew Parrott and Matthew Heimbach are leaders of Defendant Traditionalist Workers Party (occasionally, "TWP"), which the complaint explained was an anti-Semitic organization with around 500 members. Id. at 791. Parrott described Tubbs as pushing "through the antifa like a Tyrannosaurus among raptors" during the fighting on August 12, and further wrote that "League fighters with shields put their training to work." Id. at 793. Upon consideration of those and other allegations, the Court ruled that Plaintiffs had "state[d] a claim that these three Defendants [(i.e., the League, Hill, and Tubbs)] entered into a conspiracy to commit racial violence." Id.

The Court then turned to the issue whether Plaintiffs' injuries resulted from overt acts committed in furtherance of the conspiracy, which reflected the fourth and fifth elements of the § 1985(3) claim. Id. at 795–97. The Court explained that "[e]ach Plaintiff need not be able to point to an injury incurred from each Defendant." Id. at 795. "Instead, because Plaintiffs have adequately pled that all [remaining] Defendants … were part of the conspiracy, Plaintiffs may hold each Defendant liable for the reasonably foreseeable acts of their co-conspirators." Id. (citing, e.g., Pinkerton v. United States, 328 U.S. 640, 647–48 (1946); United States v.

Newsome, 322 F.3d 328, 338 (4th Cir. 2003) ("[U]nder conspiracy law, [a defendant] is liable for the conduct of all co-conspirators that was in furtherance of the conspiracy and reasonably foreseeable to him.").

Considering the allegations in the complaint, the Court first held that Plaintiffs' injuries incurred during the torch march on the evening of August 11, 2017 (i.e., Plaintiffs Tyler Magill, John Doe, and Natalie Romero being pepper sprayed and assaulted at the base of the Thomas Jefferson statue), were "reasonably foreseeable consequences of the Defendants' conspiracy." Id. at 795–96. For instance, Defendant Robert "Azzmador" Ray—a writer at the Daily Stormer, who published "anti-Semitic and white supremacist content in support of the rally"—yelled "The heat here is nothing compared to what you're going to get in the ovens!", while torches were being thrown at those Plaintiffs. Id. at 789, 796. Defendants Christopher Cantwell and Richard Spencer "led the charge of marchers toward the statue," and "Cantwell sprayed pepper spray at counter-protestors at the foot of the statue." Id. at 796. Thus, the Court concluded that "[t]hese Plaintiffs have adequately pled their Section 1985(3) claims." Id.

Next, the Court held that Plaintiffs Marcus Martin, Marissa Blair, Chelsea Alvarado, Elizabeth Sines, and April Muñiz's injuries from Defendant Fields's car attack were "reasonably foreseeable" as well. Id. at 796–97. First, the Court noted that the complaint included specific allegations in which "the exact possibility of running over counter-protestors was explicitly mentioned on the invite-only Discord platform before the events" of Unite the Right. Id. at 796. Second, "the Defendants planned to bring deadly weaponry to the event," such as, for instance, Defendant Cantwell's description that he "came pretty well prepared for this thing today," "pulling out three pistols, two semi-automatic machine guns, and a knife." Id. And third, the Court noted allegations from the complaint that "multiple Defendants ratified Defendant Fields's

attack after the fact," which ratifications "plausibly demonstrate that Defendant Fields's actions were consistent with the conspiracy's avowed goals." Id. Accordingly, the Court held that Plaintiffs Romero, Martin, Blair, Alvarado, Sines, and Muñiz "have adequately pled Defendant Fields's attack was reasonably foreseeable to his co-conspirator Defendants," and thus they "may be liable for the overt act Fields[] took in furtherance of the conspiracy." Id. at 797.

The Court concluded its motion to dismiss opinion with a determination that "Plaintiffs have, for the most part," and with exceptions not relevant here, "adequately alleged that Defendants formed a conspiracy to hurt black and Jewish individuals, and their supporters, because of their race at the August 11th and 12th events." Id. at 797–98. The Court further held that Plaintiffs had adequately pleaded their claim under 42 U.S.C. § 1986, which was "dependent upon the existence of a claim under § 1985," and which survived for the same reasons. Id. at 798. In addition, the Court held that Plaintiffs' state-law claims for civil conspiracy and for violation of Virginia's hate crime statute also survived the motions to dismiss. Id. at 798–801.

The Court also considered Defendants' arguments that their conduct was protected by the First Amendment. Id. at 801–04. To be sure, the Court wrote, "some of the Defendants' behavior certainly was protected by the First Amendment," and "[p]icketing and marching protesting [the City's] decision" to rename Lee Park, "even if motivated by racist ideology … would be protected speech." Id. at 802 (citation omitted). However, the Court further explained that "[t]he First Amendment does not protect violence," and since Plaintiffs plausibly alleged that Defendants formed a conspiracy to commit racial violence, the First Amendment did not protect Defendants. Id. at 802. The Court noted that the complaint was "replete with specific allegations that extend beyond mere 'abstract' advocacy," id. at 803, and explained that, for instance, "[t]he allegations of physical assault are 'not by any stretch of the imagination expressive conduct

protected by the First Amendment,'" id. (quoting Wisconsin v. Mitchell, 508 U.S. 476, 484 (1993)).

   After this Court denied Defendants' motions to dismiss, Plaintiffs filed the operative second amended complaint, Dkt. 557, and the parties engaged in substantial discovery. Neither Plaintiffs nor other Defendants filed a timely motion for summary judgment—only League of the South Defendants. After the motion was fully briefed (Dkts. 823, 863, 878, 897), the Court heard argument on the motion. Thereafter, the Court issued an Order denying League of the South Defendants' motion for summary judgment for the reasons set forth therein and in this subsequent memorandum opinion. See Dkt. 938.


## LEGAL STANDARD

   "Summary judgment is appropriate only if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Tolan v. Cotton, 572 U.S. 650, 656–57 (2014) (quoting Fed. R. Civ. P. 56(a)). "The party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact." Sedar v. Reston Town Ctr. Prop., LLC, 988 F.3d 756, 761 (4th Cir. 2021) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." Libertarian Party of Va. v. Judd, 718 F.3d 308, 312–13 (4th Cir. 2013) (quoting Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012)). A fact is "material" if it "might affect the outcome of the suit under the governing law." Judd, 718 F.3d at 313 (quoting Henry v. Purnell, 652 F.3d 524, 528 (4th Cir. 2011) (en banc)). "Once the movant has made this threshold demonstration, the nonmoving party, to survive summary judgment, must demonstrate specific, material facts that give rise to a genuine issue."

Sedar, 988 F.3d at 761 (citing Celotex Corp., 477 U.S. at 323). A non-movant's position must be supported by more than "the mere existence of a scintilla of evidence" or "conclusory allegations or denials," to "preclude granting the summary judgment motion." Id. (citations omitted).

In ruling on a motion for summary judgment, the court must "adhere to the axiom that … '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" Tolan, 572 U.S. at 651 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" ruling on summary judgment. Anderson, 477 U.S. at 255. By contrast, a "judge's function" in ruling on a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. "A court improperly weighs the evidence if it fails to credit evidence that contradicts its factual conclusions or fails to draw reasonable inferences in the light most favorable to the nonmoving party." Sedar, 988 F.3d at 761. Accordingly, the court "may grant summary judgment only if it concludes that the evidence could not permit a reasonable jury to return a favorable verdict." Id.


BACKGROUND

The following facts are undisputed or presented in the light most favorable to the Plaintiffs, as the nonmoving parties on summary judgment. See Henry v. Purnell, 652 F.3d 524, 527 (4th Cir. 2011) (en banc). While the Court does not repeatedly restate that standard in this opinion throughout the background and analysis, that should not be taken as the Court's endorsement of one version of the facts, but merely the Court's application of this standard of review on this summary judgment record.

1.  <u>League of the South, Michael Hill, and Michael Tubbs</u>

Defendant League of the South is a corporate entity established under Alabama law. Hill Decl. ¶ 2, Defs Ex. 59 (Dkt. 823-61). Defendant Michael Hill is co-founder and President of League of the South. <u>Id.</u> ¶ 4; Hill Dep. 20:17-19, 30:16-20, Defs Ex. 2 (Dkt. 823-3). Defendant Michael Tubbs is the League's "Chief-of-Staff" and "State Chairman" of its Florida chapter. Tubbs Dep. 48:15-22, Defs Ex. 3 (Dkt. 823-17); Hill Dep. 228:3-8. League of the South had 237 dues-paying members last year. Hill Decl. ¶ 2.

League of the South is "a whites-only organization"—it has no Black or Jewish members. Hill Dep. at 33:2-9. It has described itself as the core of a "movement of real blood and soil Southern/White nationalists" who share a "vision of a Southern homeland for Whites," and that "Dixie is and should be White Man's land." Dkt. 823-6 at 1.[2] Further writing, "We are firm on the Negro Question and the Jew Question." <u>Id.</u>

Statements from the League, Hill and Tubbs described Black and Jewish people as "enemies," and as inferior to and a danger to White people—including in the run-up to and specifically to encourage attendance at Unite the Right. <u>E.g.</u>, Pls Ex. 29 (Dkt. 897-25) (Hill, writing the month before Unite the Right in a statement to the alliance of white supremacist groups, the Defendant Nationalist Front, that they were surrounded by "enemies who seek our destruction. From above, in the form of the international Jew and his white gentile traitor allies, to below, in the dark shape of the negro …"); Pls Ex. 90 (Dkt. 863-31) (Hill, tweeting: "*If you want to defend the South and Western civilization from the Jew and his dark-skinned allies, be at Charlottesville on 12 August.*") (emphasis added); Pls Ex. 58 (Dkt. 897-53) (statement from

---

[2] "Blood and Soil" was a slogan used in Nazi Germany from the 1930s, a fact which Hill, Tubbs, and other members in the League, understood. Hill Dep. at 48:11-17; Tubbs Dep. 57:17-19, Defs Ex. 3 (Dkt. 823-17); Griffin Dep. 181:23 – 182:5, Defs Ex. 5 (Dkt. 823-20).

League of the South's Tennessee chapter, "August 12th must be a defining moment for our people. We need you to stand in solidarity with us against the enemies of our folk, our blood, our soil, our kith and kin."); see also Pls Ex. 30 (Dkt. 897-26) (Hill, stating that "Negroes cannot maintain white civilization … they are a drag on and a danger to whites"); Pls Ex. 36 (Dkt. 897-32) (Hill, writing that "Negroes are incapable of creating or sustaining anything resembling Western civilization … The solution? Some degree of segregation (perhaps total?) and the restoration of white dominance through various Jim Crow type laws."); Pls Ex. 97 (Dkt. 863-38) (Tubbs, describing his level of racism as "Literally Hitler"); Pls Ex. 99 (Dkt. 863-40) (Tubbs, stating that "Africans are not capable of Western Civilization").

Indeed, Hill took a "pledge of allegiance" on the League of the South website, in which he "pledged to be a white supremacist, a racist, an anti-Semite, a homophobe, a xenophobe, an Islamophobe," and "any other sort of 'phobe'" that he believed "benefits [his] people." Dkt. 823-4 at 1. Hill further testified that the League's "enemies" are "not limited … to Jews and blacks. I have noted that there are many what I call antiwhite-whites who have positioned themselves to be our opponents." Hill Dep. 36:5-11. To be sure, Hill testified that when he "speak[s] on the League of the South website as its president," he is "speaking [his] own opinions" that "do not necessarily reflect the opinions or positions of the League of the South in general," nor are "all of these views [ ] accepted by every single league member …." Hill Dep. 31:23 – 32:3. But Hill also acknowledged, "I do represent the League." Hill Dep. 31:25. And on issues like League policy toward Black persons "as well as the Jewish Question," Hill has stated that his speeches over the years have "provided the foundation for what the LS has become today—a whites' only Southern nationalist organization whose goal is the survival, well-being, and independence of the Southern people (white) and the reclaiming of the South as White Man's Land." Pls Ex. 36

(Dkt. 897-32). As of 2017, Hill stated that the League's Board "support[s] my position to a man on this matter." Pls Ex. 36 (Dkt. 897-32).

Hill has attested that "[t]he League views globalism, third world immigration, and the ongoing 'civil rights' movement as a threat to Southern culture, history, and well-being," and that therefore the League "is active in politically opposing these trends." Hill Decl. ¶ 3. Hill stated that he believes "black and Jewish organizations have been openly hostile to our political views regarding the South," including "the ADL, the SPLC, the NAACP, Black Lives Matter, and other groups," and that he "sometimes refer to these groups as 'enemies' or 'opponents.'" Hill Decl. ¶ 6. Hill asserted that the founders of the League meant for it to be "politically active," and so they "did not seek 501(c)(3) tax-exempt status." Hill Decl. ¶ 3. League of the South also purports to advocate for the "southern US states to secede from the United [S]tates through lawful and peaceful means," and for "a return to a traditional, Christian-oriented Southern culture." Hill Decl. ¶ 2.

In their declarations, Hill and Tubbs attested that they take numerous precautions at League events "to ensure the safety of members." Tubbs Decl. ¶ 7, Defs Ex. 60 (Dkt. 823-62); Hill Decl. ¶¶ 10–11. Hill explained that the League has previously protested "the removal of monuments or flags representing Civil War-era figures or issues," and that before 2017, there were no "physical confrontations at League public events." Hill Decl. ¶¶ 7–8. However, Hill continued, beginning in 2017, "larger and more violent and aggressive groups" would oppose the League at public events, which he attributed to groups and individuals associated with "Antifa." Hill Decl. ¶¶ 8–10; see also Tubbs Decl. ¶¶ 4–6. In their declarations, Hill and Tubbs further attested that they "always instruct members to obey the law, avoid physical conflict, and to use force only in defense of self, property, and others." Tubbs Decl. ¶ 7; see also Hill Decl. ¶ 11.

12

2.  Nationalist Front

On May 13, 2017, Defendants League of the South, Traditionalist Workers Party, Vanguard America, Identity Evropa, and others, took part in a rally through Charlottesville, bearing lit torches—an event later known as "Charlottesville 1.0." Vanguard America issued a statement after the rally, writing that it "sent some of its best to stand alongside Identity Evropa, League of the South, and the Traditionalist Worker Party." Pls Ex. 4 (Dkt. 897-5 at 2). It further explained that "[t]he purpose of the gathering was not simply over some metal sculpture atop a pedestal in a small Southern City"—i.e., the planned removal of the statue of Confederate General Robert E. Lee—but "[i]t was about defending the images of White history, White heroes, and White America." Id. The statement continued: "The Jews and their liberal [S]habbos goyim, in a feverish haste and hubris, have decided to prematurely declare themselves the winner of their War of Attrition against the White man by tearing down our monuments …." Id. Hill attested that League of the South "did not plan, organize, contribute to, or *officially* attend any events in Charlottesville before August 2017." Hill Decl. ¶ 14 (emphasis added); Tubbs Decl. ¶ 8 (attesting he was "not aware of the League playing any role in planning or attending any events in Charlottesville before August 2017").

Days later—and three months before Unite the Right—Michael Hill announced the League's participation in and the formation of the "Nationalist Front." Pls Ex. 142 (Dkt. 863-53 at 2). The League's post was entitled: "Working with our nationalist allies." Id.; see also Hill Decl. ¶ 13 ("I made the decision for the League to be part of the Nationalist Front."). These groups included: League of the South, Defendant National Socialist Movement, Defendant Vanguard America, and Defendant Traditionalist Workers Party, which all joined the Nationalist Front. Pls Ex. 96 (Dkt. 863-37); Hill Dep. 45:12-18, 63:25–64:7; Griffin Dep. 103:4-8. Hill

13

wrote that he was "very happy that The League is now working with several other nationalist groups on the right," and confirmed that "[w]e look forward to forging even stronger bonds within this alliance." Pls Ex. 142 (Dkt. 863-53 at 2). Hill further exhorted that these nationalist groups "all have common ground as white men who are nationalists," and they "have the same common enemy." Id. Hill also testified in his deposition that "we thought the more people we had, the more secure we would be." Hill Dep. 103:8-9. The League participated in various events with its Nationalist Front allies, and that alliance was in effect at the time of Unite the Right. See, e.g., Tubbs Dep. 51:6-19, 51:24 – 52:2.

On July 3, 2017 (a month before Unite the Right), Hill wrote a "short address to our NSM [National Socialist Movement] compatriots" to be delivered at a Nationalist Front meeting in Tennessee on July 8, 2017. Pls Ex. 29 (Dkt. 897-25). Hill wrote that they were surrounded by "*enemies who seek our destruction. From above, in the form of the international Jew and his white gentile traitor allies, to below, in the dark shape of the negro*, Mestizo, and Muslim street thug, we are beset by those who despise us and all we hold dear." Id. (emphasis added). Hill continued that, "[a]s white men and women, we are the inheritors and sustainers of the greatest civilization the world has ever seen," however, "[a]s it is said: 'We must secure the existence of our people and a future for white children.'" Id. Accordingly, Hill continued, "*The time has come when white men of the West must put aside their petty differences and unite for our very survival and well-being*." Id. (emphasis added). The other members of Nationalist Front have written statements expressing similar views and objectives. For example, Defendant Heimbach stated on behalf of the Defendant Traditionalist Workers Party that "Our allies in the League of the South and other groups are also 100% racial nationalists." Pls Ex. 38 (Dkt. 897-34); see also Pls Ex. 4

(Dkt. 897-5 at 2) (Vanguard America "Why We Fight" statement, following "Charlottesville 1.0").

Each of the organizations in the Nationalist Front (Defendant League of the South, Defendant National Socialist Movement, Defendant Vanguard America, and Defendant Traditionalist Workers Party), all subsequently marched with the League at Unite the Right. Hill Dep. 65:24 – 66:6.

3. <u>League of the South Agrees to Participate in Unite the Right</u>

In the months leading up to Unite the Right, Defendant Kessler invited Hill to speak at and League of the South to participate in the rally, as others involved in its planning emphasized to Kessler their organizational experience. For example, in May 2017, Kessler was told that Brad Griffin and Dennis Durham from League of the South have "*got the experience and can put boots on the ground*," as did Defendant Heimbach from Traditionalist Workers Party and Evan Thomas from Identity Evropa. Pls Ex. 54 (Dkt. 897-49 at 26) (emphasis added). That month, a member of the group Identity Dixie also told Kessler that "*[t]he League has the ability to organize their people under their leadership with tight supervision. If you gather together key leaders and delegate your requirements they will be able to make things happen for you. They've got a lot of experience putting together rallies in this region." Pls Ex. 47 (Dkt. 897-42 at 20) (emphases added).

In the Spring of 2017, Kessler invited Hill to speak at Unite the Right and sought Hill to ask League of the South members to come support the rally; Hill "agreed to speak and to ask our people to attend" Unite the Right. Hill Dep. 95:7-16. League member Dennis Durham began communicating with Kessler about Unite the Right, asking for informational materials about "the Charlottesville event," suggesting Kessler create a "mission statement," saying "I'd like to

present something when I go to the LS National Conference." Pls Ex. 48 (Dkt. 897-43 at 6–7) (June 6, 2017). Durham followed up with Kessler, saying, "I'm going to ask Dr. Hill to post an announcement on the LS website about the rally. … He'll post an announcement for us on the website. Get me a list of groups attending and a mission statement if you could." Id. at 5 (June 7, 2017). Durham told Kessler that "Dr. Hill is interested in speaking at Charlottesville," and Kessler responded "If he wants to speak I'll add him to the list … He can begin promoting himself as a speaker at the event." Id.

On June 9, 2017, League of the South announced that it "will be participating in the Unite the Right rally in Charlottesville, Virginia, on 12 August." Pls Ex. 82 (Dkt. 863-23). In making the announcement on the League's website, Hill wrote that he "want[ed] an excellent turnout of Southern nationalists for this event. Antifa, BLM, et al will be there to greet us! Don't miss out on the fun! – Michael Hill." Id.

The announcement stated that Unite the Right "seeks to unify the right-wing against a totalitarian Communist crackdown, to speak out against displacement level immigration policies in the United States and Europe, and to affirm the right of Southerners and white people to organize for their interests …." Id. Hill was a "confirmed speaker" at Unite the Right, as were Defendants Kessler, Heimbach, Cantwell, Augustus Invictus, and others. Id.

Elsewhere, Hill emphasized the racial motivation for participating in the Unite the Right rally, tweeting: "*If you want to defend the South and Western civilization from the Jew and his dark-skinned allies, be at Charlottesville* on 12 August." Pls Ex. 90 (Dkt. 863-31) (emphasis added). League of the South's Tennessee chapter echoed the call, writing a month before the rally that "August 12th must be a defining moment for our people. We need you to stand in

solidarity with us against the enemies of our folk, our blood, our soil, our kith and kin."

Pls Ex. 58 (Dkt. 897-53).

4.  <u>League of the South's Preparations and Organization for Unite the Right, and Coordination with Other Defendants</u>

a.  *Operational Planning Document*

On June 14, 2017, Kessler sent Hill "the Operational Document for the August 12th

rally," which he described as a "secret document and the information is need to know only."

Pls Ex. 21 (Dkt. 897-17). The document was titled "Operation Unite the Right Charlottesville

2.0." <u>Id.</u> at 3. Its heading included a warning that it was "to only be shared with *group leaders*."

<u>Id.</u> (emphasis added). The "Groups/Sponsors" of the event listed in the document included

Defendants League of the South, Identity Europa, Vanguard America, Traditionalist Workers

Party, and others. <u>Id.</u>

According to the Operational Document, groups and individuals should use the online

messaging platform Discord in coordinating their participation in Unite the Right. <u>Id.</u> at 4 ("The

purpose of the Discord will be to coordinate between groups/individuals, plan travel/lodging

accommodations, and disseminate need to know information.").

b.  *Use of Discord*

League of the South used Discord to prepare for and organize Unite the Right in

coordination with other defendants. Defendant Kessler was an administrator or "moderator" of

the "Charlottesville 2.0 Discord Channel," and invited Defendants League of the South,

Vanguard America, Identity Evropa, Traditionalist Workers Party, and others to join Discord.

Kessler Dep. 145:15–147:-8, Pls Ex. 68 (Dkt. 897-58). Members of League leadership who

actively used Discord in their preparations for Unite the Right included the League's "Chief of

Operations" Robert Ike Baker, "National Logistics Officer" J.C. Adams, and "Public Relations

Chief" Brad Griffin, as well as League members, including Dennis Durham, who had been "State Chairman" of the League's Virginia chapter. Baker Dep. 96:17-19, Defs Ex. 4 (Dkt. 823-19); Griffin Dep. 63:2-11, Defs Ex. 5 (Dkt. 823-20); Pls Ex. 12 (Dkt. 897-12 at 4); Pls Ex. 51 (Dkt. 897-46 at 2); Hill Dep. 112:2-5.[3]

Hill testified that he had asked Baker to "monitor what was going on on Discord" and to "report" back "what he found." Hill Dep. 78:3-10. Baker used the Discord "handle" Baker#1372. Baker Dep. 97:16 – 98:5; see also Baker Decl. ¶ 7, Defs Ex. 62 (Dkt. 823-63) (attesting that Hill asked Baker to "plan the League's travel to and from the Unite the Right rally," and that Baker used Discord to do so). Baker communicated with Kessler and others planning or attending Unite the Right on Discord, and Baker described himself as the "point of contact to Kessler and the other organizers" of Unite the Right. Baker Dep. 97:15 – 98:1-5, 18-24 ("I'm POC for the League per Dr. Hill."). Days before Unite the Right, Baker wrote on Discord: "The League will be there in force. You may depend upon it." Pls Ex. 10 (Dkt. 897-11 at 6) (writing on Discord channel, "Charlottesville 2.0 #general_1").

League member Dennis Durham also arranged for another individual (Erika Smith) to create a specific, dedicated Discord channel for members of the various League of the South chapters. Pls Ex. 51 (Dkt. 897-46 at 2). Durham used the Discord handle "Crockett." Ex. 51 (Dkt. 897-46 at 2). Smith wrote, "I'll have specific channels just for members of organizations like Identity Evropa, TWP, League of the South, etc. Just ping me with your affiliation, and I'll grant you permission." Pls Ex. 51 (Dkt. 897-46 at 2). Kessler told Durham to "[g]o ahead and invite all the League guys that are coming [to Unite the Right] into the Discord." Pls Ex. 48

---

[3] Hill testified that, upon Baker's prompting, the League had just previously used Discord to help organize the League's participation in another event in Kentucky in April 2017. Hill Dep. 73:24 – 74:10.

(Dkt. 897-43 at 5). Durham responded that he would. Id. Kessler also provided a URL link to the Discord channel for Durham to share. Durham confirmed that he "told Dr. Hill that this event needs to be promoted as much as possible." Id. at 4.

Adams served as the League's National Logistics Officer and used the Discord handle JCAdams#7681 or JCAdams#A7681. Pls Ex. 53 (Dkt. 897-48 at 5); e.g., Pls Ex. 12 (Dkt. 897-12 at 4). Hill communicated with Adams regarding the League's involvement in Unite the Right. Hill Dep. 140:6-11, 149:19-23. Adams was responsible for organizing transportation and logistics. Id. Kessler added Adams to the Charlottesville 2.0 Discord channel in late June 2017. Pls Ex. 53 (Dkt. 897-48 at 4–5).

On June 30, 2017, Adams told Kessler: "… im down to help organize. im in LS and ID, and the TWP goys are my roommates and neighbors. Our house will be a vortex for the event. carpooling and convoying from here. i'll help in any way I can." Pls Ex. 53 (Dkt. 897-48 at 5). Kessler responded: "[o]rganizing would be helpful. The more people we can turn out the better." Id. at 4. Adams further offered to "reach out to LS ID and TWP groups and ask them to spread [flyers] as well." Id. at 3. On Discord, Adams described organizing a "hate van," saying "the hate van will come stocked with some shields from the TWP goys" to Charlottesville. Pls Ex. 11 (Dkt. 897-12 at 4) (posting on Discord channel, "Charlottesville 2.0 #carolinas); Pls Ex. 13 (Dkt. 897-14) (posting on Discord`: "August 12th Charlottesville 2.0 – Hate van ASSEMBLE!").

There is evidence to support the fact that while Hill and Tubbs had Discord handles, each attested having technical difficulties using or were unable to use Discord. Hill Dep. 77:18-21; Tubbs Dep. 195:20 – 196:24; Defs Ex. 17 (Dkt. 823-32); see also Dkt. 823 at 14. But Hill also testified that (1) he knew that Unite the Right organizers and participants were using Discord to communicate with one another about plans for the rally between June through August 2017, Hill

Dep. 77:11-15, that (2) he had asked Baker to "monitor what was going on on Discord" and to "report" back "what he found," id. 78:3-10, and that (3) Baker and other League leadership and members like Adams, Griffin and Durham who were active on Discord were in communication with Hill about preparations for Unite the Right, e.g., id. 140:6-21 (Griffin, Adams, Tubbs); id. 149:19-23 (Adams); Pls Ex. 48 (Dkt. 897-43 at 4–5) (Durham).

       c.   Organizing Unite the Right

Evidence in the record shows that the League engaged in extensive planning and coordination for various aspects of Unite the Right, both internally and with other groups and individuals. Hill asked Tubbs, "as my chief of staff, [to] assume responsibility for whatever operations we did in Charlottesville." Hill Dep. 78:24 – 79:2. In addition to Hill and Tubbs, others in League leadership involved in such efforts included the League's "Chief of Operations" Robert Ike Baker, "National Logistics Officer" J.C. Adams, and "Public Relations Chief" Brad Griffin.

Indeed, Co-Defendant National Socialist Movement later described Unite the Right as "a *joint operation by the Nationalist Front groups*, *including not only the NSM but our allies in the League of the South, American Vanguard, Traditionalist Workers Party* … and other allies." Pls Ex. 96 (Dkt. 863-37 at 2) ("Unite the Right: After Action Report")[4] (emphasis added). These groups all marched with League of the South Defendants at Unite the Right. E.g., Hill Dep. 65:24 – 66:6. In the months before Unite the Right, Defendant Kessler invited Hill into a leadership group chat and calls, which also included Defendants Elliott Kline (a/k/a Eli Mosley), August Sol Invictus, and Vanguard America, among others. E.g., Pls Ex. 41 (Dkt. 897-37); Pls

---

[4] There is no dispute that Nationalist Front groups included League of the South, *Vanguard America*, Traditionalist Workers Party, and National Socialist Movement, see, e.g., Hill Dep. 45:12-18, 64:2-8; Dkt. 823 at 12, notwithstanding the reference to "*American* Vanguard" in this document by Defendant National Socialist Movement.

Ex. 49 (Dkt. 897-44 at 3). Ike Baker, the League's Chief of Operations, further testified that he was the "point of contact to Kessler and the organizers" of Unite the Right. Baker Dep. 98:2-5 ("I was point of contact to Kessler and the organizers, so we could, in whatever way it turned out to be possible, coordinate with him and his fellow organizers."). Furthermore, Defendant Heimbach explained that Baker was also the "point of contact for the cops" for the entire Nationalist Front—not just for League of the South. Pls Ex. 85 (Dkt. 863-26 at 9). In addition, and as described below, Brad Griffin (the League's Public Relations Chief), offered to help Defendant Kessler organize the secret torch march the evening of August 11, 2017, including to secure tiki torches. Pls Ex. 52 (Dkt. 897-47 at 14–16).

Evidence in the record similarly shows substantial internal preparations for the League members attending Unite the Right, concerning a "League Directive" with mandatory uniforms, procuring custom riot shields, operational plans for transportation to and from Unite the Right, and use of force and deadly force. For instance, Tubbs sent Hill a "League Directive" on the "League Uniform" to be worn by its members during League events, which was meant to "promote a unified appearance which promotes an image of organization, strength, discipline and will." Pls Ex. 26 (Dkt. 897-22 at 2–3). League of the South members brought shields, clubs, batons, and other weapons to Unite the Right. See Pls Ex. 27 (Dkt. 897-23 at 2). Baker later described that "*many*" League members used these "*to great effect*" at Unite the Right. Id. (emphases added). In mid-July 2017, the League commissioned a dozen custom riot shields in anticipation of Unite the Right. Pls Ex. 28 (Dkt. 897-24); Tubbs Dep. 80:14-24 (Hill told Tubbs that "there would be shields available," and "there was a fellow in the [L]eague who was making 12 shields for use of League members in Charlottesville."). Before Unite the Right, there was discussion about League of the South's and other Defendants' aggressive use of shields at the

rally. Defendant Vanguard America's "security representative for Charlottesville" wrote to Defendant Heimbach weeks before Unite the Right, stating: "we may have to remove commie from Lee Park. *It's going to be up to Vanguard, TWP, LOS,* Stormers, TRS guys and unaffiliated allies. We are trying to get an initial estimate of *how many shields each organization will have* and men available." Pls Ex. 106 (Dkt. 897-70 at 2) (emphases added).

Hill and other members of the League also brought firearms to Unite the Right. <u>E.g.</u>, Hill Dep. 180:15-16; Baker Dep. 86:16-23; Dkt. 823-31 at 1 (League statement after Unite the Right that "we discouraged both long guns and knives," but left open "the option of concealed (with valid permit) or open carry of handguns"). In response to a report of unverified "information" that Antifa would "show up in large numbers" in Charlottesville with weapons intending to harm the rallygoers at Unite the Right, one member of League leadership suggested they "settle on a code word which lets our folks know to unleash hell on them," and that they would need "good radio communications capabilities on site," among other plans. Dkt. 823-15 at 2–3. The League's "Chief of Security & Intel" responded: "We do ALL of that every time …." <u>Id.</u> at 2. Moreover, he researched points of Virginia's self-defense laws for "when the time comes to use deadly force." <u>Id.</u> Similarly, on Discord, many users said they were bringing or encouraged others to bring firearms and other weapons to Unite the Right. <u>E.g.</u>, Pls Ex. 43 (Dkt. 897-39) ("I'm bringing Mosin-Nagants with bayonets attached … It will shoot clean through a crowd at least four deep."); Pls Ex. 5 (Dkt. 897-6 at 5) (one user recommended to the rally's "organizers" a "crowdfunding" campaign "to hand out pepper spray to fellow goers"); Pls Ex. 118 (Dkt. 897-79) ("We aren't open carrying. We have people who are concealed carrying. Those are the rules.").

In response to that report of unverified "information" of anticipated violence from Antifa that Hill sent to League leadership a month before Unite the Right, Tubbs responded to the League leadership: "I think we all assumed there would be (and *maybe even hoped for [violence]*."). Pls Ex. 123 (Dkt. 897-84). The leader of Vanguard America testified that he "absolutely" expected violence at Unite the Right. Hopper Dep. 80:21-24, 120:24 – 121:3, Pls Ex. 67 (Dkt. 863-16). Similarly, on the Charlottesville 2.0 Discord Channel, users expected, prepared for, and some even hoped for violence at Unite the Right. E.g., Pls Ex. 10 (Dkt. 897-11 at 3) ("fighting is an endurance sport," suggesting "workouts [in] the days leading up to Charlottesville"); Pls Ex. 112 (Dkt. 897-74) ("We want the left to get violent. That is the end goal.").

The Charlottesville 2.0 Discord channel contained numerous posts specifically describing running over protestors. See, e.g., Pls Ex. 6 (Dkt. 897-7 at 3) ("Is it legal to run over protestors blocking roadways? I'm NOT just shitposting. I would like clarification. I know it's legal in NC and a few other states. I'm legitimately curious for the answer[.]"); Pls Ex. 8 (Dkt. 897-9 at 3) ("I know NC law is on the books that driving over protestors blocking roadways isn't an offense. … Sure would be nice," posting a photo of a tractor, captioned: "Introducing John Deere's New Multi-Lane Protestor Digestor"); Pls Ex. 42 (Dkt. 897-38 at 38) ("In the event something happens cops will be involved and adjustments will have to be made to remove people from the scene," while another user posted a still-frame from a movie with a bus driving into crowd); Pls Ex. 44 (Dkt. 897-40) (in #demonstration_tactics channel, Defendant Kessler posted a picture of Black Lives Matter protestors, writing "… Too bad the civilians didn't just make new speed bumps for some of these scum"). In addition, users on Discord discussed chants for the "torch vigil"—e.g., League of the South's Baker suggested "Closed Borders, White Nations, Now we

start the Deportations!" Pls Ex. 10 (Dkt. 897-11 at 8); id. (another writing, "Whites have rights"); see also id. (another writing, "I've worked out some anti-Semitic verses … largely for my own amusement"); posted various anti-Semitic comments and posts, e.g., Pls Ex. 10 (Dkt. 897-11 at 4); and made statements about committing violence, including on Black and Jewish persons, e.g., Pls Ex. 6 (Dkt. 897-7 at 5) ("Studies show 999/1000 n[*]ggers and feminists fuck right off when faced with pepper spray"); Pls Ex. 9 (Dkt. 897-10 at 9) (poster replying to Adams: "get the ovens warned [sic] up goyim").

     5.   Unite the Right

        a.   The Torch March on August 11, 2017

Defendant Kessler, Defendant Richard Spencer, and others organized a secret march on the evening of August 11, 2017 through the grounds of the University of Virginia, in which the participants held torches and chanted "Jews will not replace us" and "Blood and Soil." Griffin Dep. 163:14-16, 164:2-4. Defendant Spencer and others knew before Unite the Right that Nazi Germany held torch marches in the 1930s and that the Ku Klux Klan used torches as a symbol of racial intimidation. Spencer Dep. 104:13-25, Pls Ex. 71 (Dkt. 863-20); Griffin Dep. 179:5-7; see also, e.g., Defs Ex. 35 at 0:00 – 4:00 (videos of torch march). The number of rally-goers in the torch march appeared to be in the hundreds. See id.

As the marchers proceeded through University of Virginia's grounds and descended the steps from the Rotunda to the Thomas Jefferson statue, a group of individuals—including Plaintiff Natalie Romero, who was unarmed—locked arms around the statue. Romero Dep. 18:9-13, Pls Ex. 78 (Dkt. 897-65 at 4); accord Doe Dep. 18:4-15, Pls Ex. 75 (Dkt. 897-62 at 4). Romero, who described herself as a person of color, was at the base of the statue and testified that she and some friends decided to "stay by the statue and say this is our university," and to

"link arms around the statue," but they "were not aware of the immense amount of people that would be coming towards us." Romero Dep. 18:9-13. When the marchers with lit Tiki torches circled Romero and a few other people of color around the statue, Romero explained that "we started getting yelled at, being told … things that definitely felt racially like very much directed toward just me and my friend … telling us to go back where we came from." Id. at 19:2-7; see also id. 18:24-25 ("A fight broke out in front of me and I was being yelled at."). Romero testified that the marchers "threw tiki torches" which "landed right at my feet" so she "had to jump up onto the statue," and she was sprayed with mace. Id. at 18:21-24, 19:12-20. Romero explained that the situation "felt very violent," and that she and her friend were afraid and ran through the crowd. Id. at 19:12-22; see also Defs Ex. 35 at 2:20 – 3:00 (depicting brawl, apparent use of pepper spray, wielder of tiki torch swinging it at another person).

A number of League members participated in the torch march. Griffin Dep. 151:10-12 (Griffin participated in the torch march), 151:7 – 152:9 (and attended with at least two League members); see also, e.g., Dkt. 823-10 (Hill stating that the torch march was "not our game," but that "[w]e are sending two observers" to the torch march); Pls Ex. 147 (Dkt. 863-58) (photo of individuals with lit torches at torch rally, stating, "Still getting chills from this, Fla League was there that night before the rally 😎"); Dkt. 897 at 28 (photos of Griffin and another individual wearing League of the South polo shirts at march). Hill testified that he discussed the League's plans for Unite the Right with Griffin, as the League's Public Relations Chief, and Tubbs, as the League's Chief of Staff, among others. See, e.g., Hill Dep. 140:19 – 141:2.

No later than a month before Unite the Right, Kessler told Griffin (the League's Public Relations Chief) about the torch march. Griffin's "understanding" was that "there w[ere] going to be three events that weekend: the surprise torch march, the rally, and an afterparty." Griffin

25

Dep. 152:12-22, 159:11-25. Though Griffin understood that the torch march "was going to be a surprise thing," Griffin Dep. 153:8-9, communications between Griffin and Defendant Kessler reflect that Kessler sought and secured his help with "promotion and logistics," including getting League members to attend and bring tiki torches. On July 3, 2017—a month before Unite the Right—Kessler and Griffin had the following exchange:

> Kessler: "We're going to do the tiki torches again in the evening."
>
> Griffin: "Ok great."
>
> Griffin: "*The main thing we got to do now is promotion and logistics*."
>
> Griffin: "We need everyone to use their platforms to advertise the rally. There is already going to be hundreds of people there. We can blow it up even bigger."
>
> …
>
> Kessler: "We need to get banners up on our websites, promote on podcasts and trend the hashtag #UniteTheRight"
>
> Kessler: "*Make sure your guys bring plenty of tiki torches*"
>
> Griffin: "*Yes, we have to create buzz*"
>
> Griffin: "That means talking about and pumping the event well in advance"

Pls Ex. 52 (Dkt. 897-47 at 16) (emphases added).

Kessler further wrote that "People should understand that for many this could be a legacy event in their careers." Pls Ex. 52 (Dkt. 897-47 at 14). Griffin responded: "[w]e're going to have 200 to 400 there. If we create enough excitement and do the logistics, we can draw in leaners." Id. Griffin also told Kessler that "creating buzz will pique interest and more people will come," "[t]he League and my guys are planning already." Id. at 14–15.

Other Defendants were at the torch march. Griffin, for instance, saw various Defendants there, including Defendants Christopher Cantwell, Robert Azzmador Ray, Augustus Sol Invictus,

and Kessler (afterward). Griffin Dep. 154:4 – 155:10. Griffin wore a polo shirt with the League of the South logo to the torch march. Id. at 158:11-15. Griffin and his group brought tiki torches with them to the march, and several carried lit torches. Id. at 155:11-13, 157:21-23, 157:4-6. Griffin testified that he and his group arrived at the torch march late and joined the line while the rally participants were marching through University of Virginia's grounds. Id. at 161:20 – 162:8. Torch march participants chanted "You will not replace us," "Jews will not replace us," and "Blood and Soil." Id. at 162:12 – 164:4. Griffin was aware that torch rallies were used by the KKK and in Nazi Germany, but he also stated that they were "common in Europe and common in American history." Id. at 164:13-14, 179:5-8, 181:3-5. Griffin further testified that he was close to the Jefferson statue, and saw the people at the torch march surround counter-protestors with their arms locked around the Jefferson statue. Id. at 165:7-14, 167:7-17. After the rally, Griffin wrote on Discord, using his Discord handle "Hunter Wallace," that "The scariest optics by far to normies was the torchlight [march]," and that the Saturday rally "was tame by comparison." Id. at 171:13 – 172:4; Pls Ex. 105 (Dkt. 897-69).

Neither Hill nor Tubbs attended the torch march on August 11. Hill Dep. 129:4 – 130:3; Tubbs Decl. ¶ 14. They and most of the League members arrived at a campground outside of Charlottesville that evening. Hill Decl. ¶ 22. Hill, Tubbs, Baker, Defendant Heimbach from Traditionalist Workers Party and others met at the campground to finalize plans for the next day. Hill Dep. 129:24 – 130:3. In their declarations, Hill and Tubbs wrote that "we" or "[t]he League" "did not participate in" the torch march on August 11. Hill Decl. ¶ 23; Tubbs Decl. ¶ 14. On the evening of the torch march, a League member told Hill in an email that "Torchlight rally time and location has been leaked and Antifa is posting that they will be there. If LS is in attendance, be cautious." Hill responded: "Thanks, but this is not our game. We are sending two observers."

27

Dkt. 823-10. While there appears to be little dispute Hill and Tubbs were aware of the torch march before it actually occurred, see, e.g., Hill Decl. ¶ 23 ("We informed our members that if they did choose to attend the torch rally, they would be doing it on their own, and not as representatives of the League."), Hill testified at one point that he did not have but a few hours' notice, Hill Dep. 136:17-22.

> b. The Saturday March

On the evening of Friday, August 11, 2017, Hill, Tubbs, and Baker and others met with Defendant Heimbach, who headed up Defendant Traditionalist Workers Party, in a meeting of those groups' leadership, to discuss logistics for the following day. Hill asked Tubbs to provide an overview how Nationalist Front groups were going to convene before heading to downtown Charlottesville together. See Tubbs Dep. 49:13 – 50:17 (describing attendees as Hill, Baker, Defendant Heimbach, and others); Baker Dep. 129:16 – 131:17 (describing briefing).

In the early morning hours of Saturday, August 12, League of the South Defendants left their campground and proceeded to a pre-set rallying point. Hill testified that they handed out shields to League members before they left, saying they were be used "for defensive purposes." Hill Dep. 148:2-5.[5] As planned by Baker, the League's "Chief of Operations," League of the South members met with Nationalist Front members, including Defendants National Socialist Movement, Traditionalist Workers Party, Vanguard America, and East Coast Knights, at a parking lot outside of downtown Charlottesville before heading to the Market Street Parking Garage. Hill Dep. 199:14 – 200:9; Baker Dep. 134:21 – 135:16, 140:2-5 ("We assembled outside of Charlottesville and drove into Charlottesville together, and then we actually staged to go to the

---

[5] Cf. Kessler Dep. 376:18 – 377:14 (testifying that he told participants at Unite the Right that they could "use free speech implements," like picket signs, "to defend [themselves] if the other side gets … violent").

park in the parking garage."). As later described by the National Socialist Movement, "[o]n Saturday morning, the *NSM and our [Nationalist Front] allies met at a pre designated rally point*." Pls Ex. 96 (Dkt. 863-37 at 2) (emphasis added). The group consisted of at least 100 people, including Hill, Tubbs, League of the South "rank-and-file guys," Traditionalist Workers Party, Heimbach, Jeff Schoep, National Socialist Movement members, and others. See Heimbach Dep. 638:2-25, Pls Ex. 65 (Dkt. 897-57); Hill Dep. 154:7-17 (describing "Operation Shoo Fly," which was the meeting "on the outskirts of Charlottesville on Saturday morning" of "all four of the groups … under the Nationalist Front banner," and then "proceeding from there into the parking garage on East Market Street").

In a speech to the assembled group, Baker said: "We're going to travel in a tight convoy downtown." Pls Ex. 40 0:00 – 0:10 (Dkt. 897-36) (audio file). He further said, "We're going to assemble there" in the parking garage. "We're going to march as a mass – this is the greatest assemblage of white identitarians I've personally ever seen." [Cheers]. "*We're going to take that park*! We just saw the 'alt right' and the 'alt light.' None of us are here because we're 'alt right' or 'alt light.' We're here because we're the hard right!" Id. 0:30 – 1:05.[6]

Defendant National Socialist Movement noted in its "after action" report of Unite the Right the "feelings of comradery and solidarity exhibited by the [Nationalist Front] members and supporters in attendance. Pls Ex. 96 (Dkt. 863-37 at 2). This document further described that when their "formation moved out into the streets," they were met with "an unruly mob of filthy left wing degenerates," which was "an unholy alliance of homosexuals and Blacks and self hating Whites," "as well as hard core Communists." Id. National Socialist Movement's statement

---

[6] Baker continued: "We intend to be the first ones in the park …. Why don't we decide if we let [Kessler] in the park." Id. 1:05 – 1:20.

specifically singled out League of the South for its physical confrontation of counter-protestors: "Our admiration and *thanks go out to the professionalism exhibited by the highly trained men at the League of the South who took point in the shield wall that pushed through the line of Red opposition* as well as the very tough groups of skins that were right there with them fighting their way through." Id. at 3 (emphasis added).

League of the South and the other Nationalist Front groups from the convoy met at the Market Street Parking Garage and began marching toward Emancipation Park, formerly called Lee Park. They wore uniforms and helmets, many carried shields and flagpoles, and some carried pepper spray and other weapons. See Pls Ex. 101 at 0:00 – 0:35 (video); Griffin Dep. 141:21 – 142:18. Video shows Tubbs and a League of the South member leading a column of League of the South and Nationalist Front members, then charging into stationary counter-protestors on Market Street. Pls Ex. 101 at 0:18 – 0:50; see id. at 0:25 – 0:30 (League of the South member Spencer Borum initiating charge, with Tubbs alongside him); Tubbs Dep. 100:24 – 101:8 (identifying Borum); Pls Ex. 50 (Dkt. 897-45) (photo of confrontation); see also Pls Ex. 101 at 0:30 – 0:35 (showing League member punching counter-protestor). Video from another vantage shows Defendant Heimbach at the front of the column—marching alongside Hill, Tubbs, League of the South, and others—and Heimbach yells "shields up!" just as the column charges into counter-protestors. Pls Ex. 92 at 0:00 – 0:20 (Dkt. 897-33) (video); id. at 0:15 – 0:20 (individual in the column uses flagpole as a weapon); id. at 0:30 – 1:00 (altercation with counter-protestor ends with League member pepper-spraying counter-protestor in face). Defendant Parrott, leader (along with Defendant Heimbach) of Defendant Traditionalist Workers Party, later described how, "with a full-throated rebel yell, the League broke through the wall of degenerates," Tubbs "pushed through the antifa [counter-protestors] like a Tyrannosaurus among

raptors," and "league fighters with shields put their training to work." Pls Ex. 116 (Dkt. 897-78 at 3); see also Parrott Dep. 226:3-24 (describing League fighters as "putting their training to work" by "lining up a shield wall" and "pushing through opposition"). Hill later said: "I was there, in the middle of it all, leading the column that smashed through the leftist barricade … I would not go back and change a thing." Pls Ex. 3 (Dkt. 897-4); see also Dkt. 897 at 32 & n.6.

In a later incident, Tubbs led a group of League of the South and members of Nationalist Front down the stairs out of Emancipation Park, and into a crowd. See, e.g., Pls Ex. 102 (Dkt. 863-42) (video); Pls Ex. 124 (Dkt. 897-99) (video). Tubbs yelled, "Follow me!", and then he and the League and Nationalist Front members charged into counter-protestors. Pls Ex. 102 at 0:00 – 0:20; see id at 0:08 – 0:10 (League member swinging wood club at counter-protestor's head); see also Pls Ex. 124 at 0:20 – 0:30 (Tubbs throwing counter-protestor to the ground).

c.   The Garage Attack

League of the South member Tyler Davis and numerous others beat a Black counter-protestor, DeAndre Harris, in the Market Street Parking Garage. See Pls Ex. 104 (Dkt. 863-45) (video); see also Hill Dep. 225:16 – 228:21 (describing Davis's involvement with the League); Tubbs Dep. 142:10-16 (acknowledging Davis was a member of the League involved in the beating of DeAndre Harris). They beat Harris while he was on the ground, using wooden clubs and weapons. Pls Ex. 104 at 0:00 – 0:25. Tubbs casually walked by as the violence unfolded. Id. at 0:05 – 0:15; see also Pls Ex. 103 (Dkt. 863-44) (photo). League of the South Defendants introduced video evidence of minutes before the attack on Harris appearing to show groups of rallygoers and a group including Harris taunting each-other. Defs Ex. 57 at 1:50 – 5:30 (video); see id. at 5:30 – 6:00 (showing periphery of attack on Harris). Davis subsequently entered an "Alford plea" and was convicted for beating Harris. E.g., Pls Ex. 148 (Dkt. 863-59).

   d.   The Fields Car Attack

After an unlawful assembly was declared, Defendant James Fields drove his car directly into a crowd of over a hundred counter-protestors, injuring dozens (including Plaintiffs Alvarado, Baker, Blair, Martin, Muniz, Romero, and Sines), and killing Heather Heyer. See C. Alvarado Dep. 36:3 – 38:25, Pls Ex. 73 (Dkt. 897-60); T. Baker Dep. 24:3 – 28:18, Pls Ex. 74 (Dkt. 897-61); M. Martin Dep. 15:25 – 16:18, Pls Ex. 76 (Dkt. 897-63); A. Muniz Dep. 31:3-24, 36:3 – 39:25, Pls Ex. 77 (Dkt. 897-64); Pls Ex. 132 (Dkt. 897-91 at 3); Pls Ex. 135 (Dkt. 897-94 at 3); Pls Ex. 136 (Dkt. 897-95 at 3–4).

Earlier that day, Defendant Fields had marched with Defendant Vanguard America. Pls Ex. 94 (Dkt. 863-35) (photo); Pls Ex. 95 (Dkt. 863-36) (photo); Pls Ex. 120 (Dkt. 897-81); see also Dkt. 823 at 29; Dkt. 897 at 38. He wore Vanguard America's uniform—a white polo shirt and khaki pants. See id. He carried a Vanguard America shield. See id. He marched and chanted with members of Vanguard America. Pls Ex. 59 at 1:21 – 1:57 (Dkt. 897-54) (video); Pls Ex. 60 at 0:11 – 1:56 (Dkt. 897-55) (video) (appearing to show Fields chant, "You will not replace us …," at 1:56). There is no dispute Fields was standing by the leadership of Vanguard America at one point at the rally. Pls Ex. 95 (Dkt. 863-36) (photo); Dkt. 878 at 3. At least one member of Vanguard America wrote afterward that Fields was "surrounded by us," and "[w]e fucking killed someone." Hopper Dep. 145:23 – 146:5, 146:22 – 147:2. Moreover, as previously described, in the run-up to Unite the Right, numerous posts on the Charlottesville 2.0 Discord channel discussed running over protestors. See, e.g., Pls Ex. 6 (Dkt. 897-7 at 3); Pls Ex. 8 (Dkt. 897-9 at 3); Pls Ex. 42 (Dkt. 897-38 at 38); Pls Ex. 44 (Dkt. 897-40). The record also includes testimony that, in the summer of 2017, Defendants Spencer, Kline, and several others discussed at a party whether someone at Unite the Right could drive into counter-protestor, i.e.,

whether it was legal to "use your vehicle to hit them, get them out of your way." Froelich Tr. 152:18 – 155:22. Pls Ex. 80 (Dkt. 897-67).

    6.  <u>Unite the Right Aftermath</u>

    In the days after Unite the Right, Hill summed up his perspective of the rally: "I couldn't be happier with the outcome of this for the League," and "It was a great day." Pls Ex. 16 at 1:00 – 1:30, 2:40 – 2:55 (Dkt. 863-5) (audio file). Hill further explained that it was a success not only so the League could "stand in defense" of the monument to General Lee, but because it promoted the League's "platform for putting out our southern nationalist message," and expressed that the League "look[ed] forward to cooperating with our allies in the Nationalist Front." <u>Id.</u> at 1:40 – 2:20. Hill specifically identified his thanks to the League's "operations chief, Ike Baker," for putting together their "operational plan," to Mike Tubbs, the League's "Chief of Staff," Spencer Borum, the League's "column leader," and "all of our brave warriors who refused to have their way barred to the park." <u>Id.</u> at 2:20 – 2:50; <u>see also</u> <u>id.</u> at 3:00 – 3:10 ("We led the charge … to get to the park to exercise our right to free assembly and free speech.").

    In numerous other occasions after Unite the Right, Hill not only acknowledged but boasted of the League's central role in the skirmishes on August 12. For instance, Hill later wrote to a prospective League member: "*Yes, we led the fight at C'ville.*" Pls Ex. 31 (Dkt. 897-27) (emphasis added). On another instance, Hill later expressed: "*I was there, in the middle of it all, leading the column that smashed through the leftist barricade* … I would not go back and change a thing." Pls Ex. 3 (Dkt. 897-4) (emphasis added). Several days after Unite the Right, Defendant Schoep of Defendant National Socialist Movement wrote Baker, saying that it was "an Honor to stand with our brothers in League of the South"—including Tubbs who "clear[ed] the way to get into the park like a bulldozer"—"I am honored to know you all and fight alongside you." Pls Ex.

14 (Dkt. 863-3). Baker wrote Schoep that "Standing again as one against that *horde of untermenschen* did my heart good,"[7] and "being in battle with our allies of the NSM made it an even greater day." Id. Baker further wrote that he believed "we who were present in Charlottesville that day *and who fought the jew directed communist horde* were present for the very genesis of the resurrection of our Folk." Id. In another instance, Defendant Parrott from Defendant Traditionalist Workers Party boasted: "Our guys kicked some ass, but I think the award has to at least be shared with the League. The antifa were fucked when our column appeared. 😊" Pls Ex. 117 (Dkt. 897-98).

Defendant National Socialist Movement issued an "After Action Report," which described Unite the Right as a "joint operation by the Nationalist Front groups, including not only the NSM but our allies in the League of the South, American Vanguard, Traditionalist Workers Party, East Coast Knights," and "other allies." Pls Ex. 65 (Dkt. 863-37 at 4). National Socialist Movement deemed Unite the Right "*a huge success* for the [Nationalist Front] allies," which "gave us an opportunity to assess our training programs in real life scenarios and will help critique cross organizational efforts moving forward." Pls Ex. 65 (Dkt. 863-37 at 4) (emphasis added). And it specifically wrote that "Our admiration and thanks go to the professionalism exhibited by the highly trained men at the League of the South who took point in the shield wall that pushed through the line of Red opposition," which it described as "an unholy alliance of homosexuals and Blacks and self hating Whites … as well as hard core Communists." Id. at 3–4.

---

[7] Plaintiffs describe "untermenschen" as a term used "by the KKK and the Nazis as a way to refer to the races whom must be exterminated, including Black people and Jews." Dkt. 897-37 & n.7; accord Roy H. Gordon, *The Eradication of Nazi Ideology and Terminology from the Current German Penal Code*, 17 Rutgers J. L. & Religion 182, 182 (Fall 2015) (writing that Nazi ideology espouses "the idea that while some people are elite, there are other inferior people, referred to as *untermenschen*, or subhuman").

34

In the aftermath of Unite the Right, Hill, Tubbs, and Co-Defendants expressed support for Fields. See, e.g., Pls Ex. 151 (Dkt. 863-62) (Tubbs, posting online that "James Fields did nothing wrong."); Pls Ex. 93 (Dkt. 863-34) (stating that Vanguard America sent Fields a Christmas card); Dkt. 878 at 3 (not contesting this and other evidence); Pls Ex. 37 (Dkt. 897-33) (Hill, writing: "Was not surprised at the Fields verdict. There is no justice for the White man in these damnable Jew-run courts.").

<u>REASONING</u>

League of the South Defendants filed their motion for summary judgment, arguing that there is no genuine dispute of material fact that they did not conspire to commit racial violence at Unite the Right, and thus they are entitled to judgment as a matter of law. Dkt. 823 at 5. They say that they only "prepared to defend themselves from the attacks of violent oppositionists," and at most, "engaged in spontaneous clashes" with them; but "clash[ing] with political opponents" is not a conspiracy to commit racial violence. Id. Moreover, League of the South Defendants argue that they cannot be held responsible for Plaintiffs' injuries caused by Defendant Fields, on the basis that he "acted alone." Id. at 4. Nor in their view can they be held responsible for any of the Plaintiffs' injuries at the torch march, which they contend was "planned and executed without" their involvement. Id.

The Court has concluded that League of the South Defendants have not shown there is no genuine dispute of material fact on any of these points, such that *no* reasonable jury could find in Plaintiffs' favor. Thus, League of the South Defendants are not entitled to judgment as a matter of law, and this case proceeds to trial.

1.  Count One: 42 U.S.C. § 1985(3)

Plaintiffs' first count claims that Defendants violated 42 U.S.C. § 1985(3). This statute

provides that:

> If two or more persons … conspire … for the purpose of depriving, either directly
> or indirectly, any person or class of persons of the equal protection of the laws, or
> of equal privileges and immunities under the laws … [and] if one or more persons
> engaged therein do, or cause to be done, any act in furtherance of the object of such
> conspiracy, whereby another is injured in his person or property, or depriving of
> having and exercising any right or privilege of a citizen of the United States, the
> party so injured or deprived may have an action for the recovery of damages
> occasioned by such injury or deprivation, against any one or more of the
> conspirators.

42 U.S.C. § 1985(3).

The Fourth Circuit has explained that the following elements are required to state a

Section 1985(3) claim:

> (1) A conspiracy of two or more persons, (2) who are motivated by a specific
> class-based, invidiously discriminatory animus, to (3) deprive the plaintiff of
> the equal enjoyment of rights secured by the law to all, (4) and which results in
> injury to the plaintiff as (5) a consequence of an overt act committed by the
> defendants in connection with the conspiracy.

A Soc'y Without A Name v. Virginia, 655 F.3d 342, 346 (4th Cir. 2011) (citing Simmons v. Poe,

47 F.3d 1370, 1376 (4th Cir. 1995)).

a.  Conspiracy

A conspiracy under Section 1985(3) "must show an agreement or a meeting of the minds

by [the] defendants to violate the [plaintiff's] constitutional rights." A Soc'y Without A Name,

655 F.3d at 346 (quoting Simmons, 47 F.3d at 1377). "[A]lthough an express agreement is not

necessary, the participants in the conspiracy must share the general conspiratorial objective …

[I]t simply must be shown that there was a single plan, the essential nature and general scope of

which was known to each person who is to be held responsible for its consequences." Simmons,

47 F.3d at 1378 (internal quotation marks omitted). To be sure, the Fourth Circuit has cautioned that it has "rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy, such that the claim can withstand a summary judgment motion," and the Fourth Circuit has "specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a conclusory manner, in the absence of concrete, supporting facts." Id. see also Sines, 324 F. Supp. 3d at 783.

By way of background, in the Court's decision on the defendants' motions to dismiss, the Court held that "Plaintiffs must allege each Defendant entered into an agreement with a specific co-conspirator to engage in racially motivated violence at the August 11th and 12th events." Id. at 784. And the Court concluded that, with one exception not relevant here, Plaintiffs had "adequately pled specific factual allegations that each moving Defendant," including League of the South Defendants, were "part of a conspiracy to engage in racially motivated violence at the 'Unite the Right' events." Id.

i. *Whether League of the South Defendants Conspired to Commit Racial Violence and Intimidation*

League of the South Defendants argue that they did not conspire with Co-Defendants to commit racial violence, and they were "not aware of a conspiracy by their co-defendants to commit racial violence." Dkt. 823 at 32. They contend that their communications with Co-Defendants all related to other things: (1) "Hill's only communications with Kessler related to who would be speaking at the rally and what steps were being taken to ensure their safety," Dkt. 823 at 32; see also Hill Decl. ¶ 16; (2) Hill and Baker's communications with Defendants Heimbach and Schoep "strictly concerned their plan to travel to and from the rally on August 12, 2017," Dkt. 823 at 33; see, e.g., Hill Decl. ¶ 16; (3) while Baker "listened to planning meetings on Discord," he "did not hear or see any content that suggested there was an actual conspiracy to

commit racial violence," Dkt. 823 at 33; <u>see also</u> Baker Decl. ¶ 7; and (4) neither Hill nor Tubbs "had any other contact with rally organizers in connection with" August 11 and 12's events, nor did they hear "rally organizers speak of plans to commit racial violence." Dkt. 823 at 33; <u>see also</u> Hill Decl. ¶ 15; Tubbs Decl. ¶¶ 8–10.

League of the South Defendants have not shown that there is no genuine issue of material fact on this issue. Rather, Plaintiffs have presented substantial evidence raising a genuine issue of material fact whether League of the South Defendants conspired with any other Defendant(s) to commit racial violence.

Numerous public and private statements by Hill and League of the South encouraged participation at Unite the Right to "defend" "Western civilization" and "white men" against their perceived "enemies"—specifically identified as Jewish persons, Black persons, and their "white gentile allies." For instance, Hill tweeted in the lead-up to Unite the Right: "*If you want to defend the South and Western civilization from the Jew and his dark-skinned allies, be at Charlottesville on 12 August*." Pls Ex. 90 (emphasis added). League of the South's Tennessee chapter also tweeted about Unite the Right: "August 12th must be a defining moment for our people. We need you to stand in solidarity with us against the enemies of our folk, our blood, our soil, our kith and kin." Pls Ex. 58. Hill also publicly encouraged "an excellent turnout of Southern nationalists for this event," teasing that "Antifa, BLM, et al will be there to greet us! Don't miss out on the fun!" Pls Ex. 82. In private in the month before Unite the Right, Hill wrote the League's "allies" in the Nationalist Front (Defendants Vanguard America, National Socialist Movement, and Traditionalist Workers Party) that they were surrounded by "enemies who seek our destruction," including "the international Jew and his white gentile traitor allies," and "the dark shape of the negro." Pls Ex. 29. Hill further urged his Nationalist Front allies: "The Time

38

has come when white men of the West must put aside their petty differences and unite for our very survival and well-being." Id. Other Defendants exhorted participation in "Unite the Right" for similar reasons. See, e.g., Pls Ex. 39 ("It is time that we Unite the Right! We don't agree on everything, but we have a common enemy: a singular, common threat in the globalists and their agenda to destroy the West," continuing, "Fighting in the streets has already begun …."); Pls Ex. 4 (Vanguard America "Why We Fight" statement, following "Charlottesville 1.0," posted on June 1, 2017: "It was about defending the images of White history, White heroes, and White America," from "[t]he Jews and their liberal [s]habbos goyim," who had "prematurely declare[d] themselves the winner of their War of Attrition against the White man ….").

Unite the Right later was described by Defendant National Socialist Movement as "a *joint operation by the Nationalist Front groups*, *including not only the NSM but our allies in the League of the South, American Vanguard, Traditionalist Workers Party* … and other allies." Pls Ex. 96 (emphasis added). These groups marched with League of the South Defendants at Unite the Right. E.g., Hill Dep. 65:24 – 66:6.

Evidence supports the fact that League of the South Defendants were brought into the fold of organizing Unite the Right because of their physicality and ability to put "boots on the ground." Pls Ex. 54. Evidence further supports the fact that that Defendants anticipated that League of the South Defendants would use violence at the rally. For instance, weeks before Unite the Right, Defendant Vanguard America's "security representative" told Defendant Heimbach: "we may have to remove commie from Lee Park. *It's going to be up to Vanguard, TWP, LOS,* Stormers, TRS guys and unaffiliated allies," saying he was getting "an initial estimate of *how many shields each organization will have* and men available." Pls Ex. 106 (emphases added). The League had commissioned a dozen custom riot shields in anticipation of

39

Unite the Right. E.g., Pls Ex. 28; Tubbs Dep. 80:14-23. The League's Adams stated on Discord that he was organizing a "hate van," writing: "the hate van will come stocked with some shields from the TWP goys" to Charlottesville. Pls Ex. 11; see also Pls Ex. 13 (Adams posting on Discord: "August 12th Charlottesville 2.0 – Hate van ASSEMBLE!"). Indeed, Tubbs wrote in an internal email to League leadership: "I think we all assumed there would be (and *maybe even hoped for [violence]*.")." Pls Ex. 123 (emphasis added).

The League's Baker spearheaded organizing the Nationalist Front Co-Defendants to meet on August 12 and proceed in a convoy to downtown Charlottesville, where they would all march together. Baker gave a speech to the group at that rallying point, calling them the "greatest assemblage of white identitiarians I've personally ever seen," shouting "*We're going to take that park!*" Pls Ex. 40 0:30 – 1:05 (emphasis added); see also id. ("None of us are here because we're 'alt right' or 'alt light.' We're here because we're the hard right!").

As described in Defendant National Socialist Movement's "after action" report of Unite the Right, when the Nationalist Front members' "formation moved out into the streets," they were met with "an unruly mob of filthy left wing degenerates," which was "an unholy alliance of homosexuals and Blacks and self hating Whites" that were "in the mix as well as hard core Communists." Pls Ex. 96. National Socialist Movement singled out League of South for praise, saying "Our admiration and thanks go out to the professionalism exhibited by the highly trained men at the League of the South who took point in the shield wall that pushed through the line of Red opposition …." Id.

Video shows Tubbs, Hill, League of the South members, and Defendants Heimbach and the other Nationalist Front groups, charging into stationary counter-protestors, Pls Ex. 101 at 0:00 – 0:50 (video); Pls Ex. 92 at 0:00 – 0:20 (video); Pls Ex. 50 (photo), with Heimbach yelling

"Shields up!" as the column smashed into counter-protestors, Pls Ex. 92 at 0:00 – 0:20. Later, Tubbs led a group of League and Nationalist Front members into a crowd of counter-protestors, yelling, "Follow me!" upon which they crashed into that crowd. Pls Ex. 102; Pls Ex. 124. Defendant Parrott later described that "league fighters with shields put their training to work," Pls Ex. 116 (Dkt. 897-78 at 3), by "lining up a shield wall" and "pushing through opposition," Parrott Dep. 226:3-24. Video depicts League of the South members engaging in numerous instances of violence upon counter-protestors. E.g., Pls Ex. 101 at 0:30 – 0:35 (punching counter-protestor); Pls Ex. 92 at 0:30 – 1:00 (using pepper spray on her); Pls Ex. 102 at 0:03 – 0:10 (League member swinging wood club at counter-protestor's head); Pls Ex. 124 at 0:20 – 0:30 (Tubbs throwing counter-protestor to ground).

Courts, including this Court in its earlier motion to dismiss decision, have held that conduct of this nature is sufficient to constitute a conspiracy to commit racial violence and intimidation. See, e.g., Sines, 324 F. Supp. 3d at 792– 93, 797; Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan, 518 F. Supp. 993, 1001, 1016 (S.D. Tex. 1981) (holding that bringing a "security force" who were "dressed in military garb," stating that it "may become necessary to take laws into our hands," and that it was necessary to "fight fight fight" and see "blood blood blood" "if this country was to survive," among other acts, "convince this Court that the predictable and intended result of the defendants' actions was to interfere with the rights of the plaintiff class").

To be sure, League of the South Defendants argue that they simply sought to "exercise their rights to engage in political discourse," and note that they "attended a number of political rallies before August 2017," which were "generally peaceful." Dkt. 823 at 33. Defendants point to some evidence to that effect, including declarations from Hill and Tubbs, that support that

history of League events. E.g., Hill Decl. ¶¶ 7– 10; Tubbs Decl. ¶¶ 4–7. League of the South Defendants further lay blame on "violent oppositionists" or "Antifa" for violence at Unite the Right and argue that they simply planned to defend themselves from "violent oppositionists," which, they further contend, does not support an inference of a conspiracy to engage in racial violence or intimidation. E.g., Dkt. 823 at 34–35 ("…in the interest of safety, movant-defendants prepared to defend themselves against violent oppositionists by bringing shields and other legally permissible accoutrements"); Hill Decl. ¶ 18 (attesting that "[w]hile planning for the League to attend the Unite the Right rally, I learned that Antifa had plans to violently disrupt the rally"); see also Tubbs Decl. ¶ 11.

Indeed, in their telling, League of the South Defendants assert that much of their conduct was done in the interest of self-defense, including (1) their decision to join the Nationalist Front, Hill Decl. ¶ 13 ("I decided the League would join the Nationalist Front in order that we might deter future violence from Antifa and other political adversaries …"); (2) planning and executing Baker's plan for the League and other Nationalist Front member groups to travel to and from Emancipation Park in a convoy, id. ¶ 17 (attesting that he and Baker "thought it would be much safer for all League members to arrive and depart as a group"); (3) the League's decision to march at Unite the Right with its Nationalist Front allies, id. ¶¶ 17–18; and (4) that they advised against certain types of weapons (knives and long guns), id. ¶19, but apparently supported use of shields, and "legally permissible accoutrements," Dkt. 823 at 35, all in the interest of self-defense.

League of the South Defendants also cite instances where they assert counter-protestors attacked them. See, e.g., Defs Ex. 48 (Dkt. 823-54) (incident report describing "[b]ottles, urine balloons, and pepper spray … thrown between protest groups"); Tubbs ¶¶ 15–16 (describing

42

items thrown at Unite the Right rallygoers and asserting that an "oppositionist" struck him in the head in an unprovoked attack"); <u>see also</u> Defs Ex. 38 at 0:00 – 0:03 (video, appearing to show aftermath of Tubbs's "Follow me!" charge). League of the South Defendants argue that they "did what they could to keep themselves safe and exercise their rights to speech and assembly," and while some may have "looked forward to defending themselves and clashing with political opponents who threatened them … [t]here is no evidence that they targeted any racial or religious group in these encounters." Dkt. 823 at 35.

League of the South Defendants' characterizations that their actions were motivated by considerations of self-defense are simply not susceptible to resolution on a motion for summary judgment. Their arguments require weighing of evidence and are grounded upon credibility determinations uniquely suited to resolution by the finder of fact rather than the Court on a summary judgment record. For example, while they assert that "Tubbs repeatedly tried to break up fights," <u>id.</u> at 34 (citing, <u>e.g.</u>, Defs Ex. 35 at 7:16 – 7:21 (video); <u>id.</u> at 9:20 – 9:31), other evidence including video evidence supports a contrary conclusion that Tubbs and League of the South Defendants *initiated* rather than tried to *stop* physical confrontations with counter-protestors, <u>see, e.g.</u>, Pls Ex. 101 at 0:00 – 0:50 (video); Pls Ex. 92 at 0:00 – 0:20 (video); Pls Ex. 102 (video); Pls Ex. 124 at 0:00 – 0:30 (video).

Similarly, notwithstanding League of the South Defendants' argument that "self-defense" considerations motivated them to make certain preparations for the rally—e.g., commissioning and organizing use of riot shields—Plaintiffs presented other, substantial evidence supporting a reasonable contrary conclusion that their planned use was aggressive and violent. <u>See, e.g.</u>, Pls Ex. 11 (Dkt. 897-12 at 4); Pls Ex. 13; Pls Ex. 28; Pls Ex. 106 (Dkt. 897-70 at 2) ("we may have to remove commie from Lee Park. It's going to be up to Vanguard, TWS, LOS …", and "We are

trying to get an initial estimate of how many shields each organization will have and men available"); Tubbs Dep. 80:14-23; Pls Ex. 116 (Dkt. 897-78 at 3); Parrott Dep. 226:3-24 (describing League fighters as "putting their training to work" by "lining up a shield wall" and "pushing through opposition").

So too with respect to League of the South Defendants' argument that their "clash with Antifa [counter-protestors] on Market Street is not evidence of a conspiracy because it was a spontaneous encounter." Dkt. 823 at 36–37. League of the South Defendants argue that they "had no idea that violent oppositionists would blockade a public street and that law enforcement would do nothing," and thus "they were left at an impasse"—in "the heat of the moment … faced with a lawless[ ] barrage of violence and opposition," they assert that they "chose to push through the blockade." Id. League of the South Defendants' narrative—that they "chose to push through the blockade" in a spontaneous manner motivated by fears of counter-protestor violence rather than because they planned to engage in racial violence and intimidation—is one they will be able to present to the jury. Like League of the South Defendants' arguments that "self-defense" was their motivating consideration before Unite the Right, substantial evidence in the record supports a reasonable contrary conclusion that this violence was not "a purely spontaneous act," see Hughes v. Ranger Fuel Corp., 467 F.2d 6, 10 (4th Cir. 1972), but rather that such violence had been the fruition of planning and training, e.g., Pls Ex. 106 (Dkt. 897-70 at 2); Pls Ex. 116 (Dkt. 897-78 at 3). Indeed, video evidence of League of the South's charges into crowds of counter-protestors appears to show a substantial time preceding—and deliberate actions culminating in each deliberate charge—which would undermine the argument that such actions were "spontaneous" reactions. E.g., Pls Ex. 101 at 0:00 – 0:30; Pls Ex. 102 at 0:00 – 0:20. All of which makes the issue unsuitable for resolution on summary judgment.

On a motion for summary judgment, viewing the evidence in the light most favorable to Plaintiffs as the non-movants, the Court concludes League of the South Defendants have not shown that there is no genuine issue of material fact that they did not engage in a conspiracy to commit racial violence and intimidation at Unite the Right. Rather, there is a genuine issue of material fact, requiring resolution by the jury as factfinder.

### ii.    Whether Fields Was a Co-Conspirator with Movant-Defendants

League of the South Defendants further argue that the claims of Plaintiffs who were injured in Fields's car attack should be dismissed, on the basis that League of the South Defendants "were not co-conspirators with Fields." Dkt. 823 at 28–29. They contend that "[t]here is no evidence that Fields conspired with any of the Defendants or Defendant organizations involved in this lawsuit," id. at 28, and that "Fields acted alone when he carried out the car attack," id. at 29. They further argue that Hill and Tubbs did not have any contact with Fields, Tubbs Decl. ¶ 9; Hill Decl. ¶ 16, and that "[t]here is no evidence that anyone in the League of the South has had any contact with James Fields." Id. at 29. The Court disagrees with League of the South Defendants' argument. Plaintiffs have produced substantial evidence raising a genuine dispute of material fact whether Fields was a member of a conspiracy to commit racial violence in which League of the South Defendants also were members, thus precluding these Defendants' request for summary judgment on the issue.

To begin, Plaintiffs produced substantial evidence supporting the existence of a conspiracy to commit racial violence and intimidation at Unite the Right to which League of the South Defendants and their Co-Defendant Vanguard America were members. See supra. Just a few months before Unite the Right, Defendants League of the South, Vanguard America, National Socialist Movement, and Traditionalist Workers Party, formed the "Nationalist Front"

alliance of white nationalist groups. Pls Ex. 96 (Dkt. 863-37); Hill Dep. 45:12-18, 63:25–64:8; Griffin Dep. 103:4-8. National Socialist Movement called Unite the Right a "joint operation by the Nationalist Front groups." Pls Ex. 96 (emphasis added). The month before Unite the Right, Hill privately conveyed to Nationalist Front groups that they were surrounded by "enemies who seek our destruction," including "the international Jew and his white gentile traitor allies," and "the dark shape of the negro," and urged "The Time has come when white men of the West must put aside their petty differences and unite for our very survival and well-being." Pls Ex. 29.

Weeks before the rally, Vanguard America's "security representative" told Defendant Heimbach: "we may have to remove commie from Lee Park. *It's going to be up to Vanguard, TWP, LOS,* Stormers, TRS guys and unaffiliated allies," saying he was getting "an initial estimate of *how many shields each organization will have* and men available." Pls Ex. 106 (emphases added). Baker, as the League's "Chief of Operations," organized a convoy of League of the South, Vanguard America, and the other two Nationalist Front groups, which met at the outskirts of Charlottesville and then drove downtown, staging to go to the park from there. See, e.g., Hill Dep. 154:7-17,199:14 – 200:9; Baker Dep. 134:21 – 135:16, 140:2-5; Heimbach Dep. 638:2-25; Pls Ex. 96 (Dkt. 863-37 at 2). League of the South marched with Vanguard America at Unite the Right. Pls Ex. 92; Pls Ex. 101 at 0:00 – 1:00; Hill Dep. 65:24 – 66:6.

Defendant Fields also marched with Defendant Vanguard America at Unite the Right. Pls Ex. 94 (Dkt. 863-35) (photo); Pls Ex. 95 (Dkt. 863-36) (photo); Pls Ex. 120 (Dkt. 897-81); see also Dkt. 823 at 29; Dkt. 897 at 38. He wore Vanguard America's uniform—a white polo shirt and khaki pants. Id. He carried a Vanguard America shield. Id. He marched and chanted with members of Vanguard America. Pls Ex. 59 at 1:21 – 1:57 (Dkt. 897-54) (video); Pls Ex. 60 at 0:11 – 1:56 (Dkt. 897-55) (video) (appearing to show Fields chant, "You will not replace us

…," at 1:56). There is no dispute Fields was standing by the leadership of Vanguard America at one point. Pls Ex. 95; Dkt. 878 at 3. At least one member of Vanguard America wrote afterward that Fields was "surrounded by us," and "[w]e fucking killed someone." Hopper Dep. 145:23 – 146:5, 146:22 – 147:2.

League of the South Defendants argue that there is a lack of evidence of a connection even between Fields and Vanguard America, supporting their claim that "Fields acted alone." Dkt. 878 at 4, id. at 3–5. However, that argument is less persuasive considering evidence in the record that Vanguard America purposefully avoided learning any identifying information about the identity of its members in interests of "security and anonymity." Hopper Dep. 77:11 – 78:16.

League of the South Defendants also assert that if "[Fields's] holding a shield and standing with members of Vanguard America" were sufficient "to prove he was a member of any conspiracy," that would mean "all rally goers would be co-conspirators with Fields." Dkt 823 at 29. Not so. Under conspiracy law, a member of a conspiracy "is liable for the conduct of all-coconspirators that was in furtherance of the conspiracy and reasonably foreseeable to him." Newsome, 322 F.3d at 338 (citing Pinkerton, 328 U.S. at 646–47). However, on League of the South Defendants' motion for summary judgment, the Court concluded that there was a genuine issue of material fact requiring resolution by the jury as factfinder whether Fields was a member of a conspiracy with League of the South Defendants to commit racial violence and intimidation at Unite the Right. And the Court further holds that Plaintiffs have demonstrated the existence of a genuine issue of material fact also requiring resolution by a jury whether Fields's car attack was reasonably foreseeable to League of the South Defendants. See infra. The requirement that these elements of a conspiracy be satisfied—as well as the elements of § 1985(3)—cabins the

scope of legal responsibility and undermines League of the South Defendants' slippery-slope argument that "all rally goers would be co-conspirators with Fields."

       b.   <u>Discriminatory Animus</u>

Next, Plaintiffs amply demonstrate the existence of a genuine issue of material fact that League of the South Defendants' actions were "motivated by a specific class-based, invidiously discriminatory animus." <u>A Soc'y Without A Name</u>, 655 F.3d at 346. Congress passed Section 1985(3) "to combat the prevalent animus against Negroes and their supporters," and the statute therefore reaches "class-based animus … against Negroes and those who championed their cause …." <u>United Bhd. of Carpenters & Joiners of Am., Local 610 AFL-CIO v. Scott</u>, 463 U.S. 825, 836 (1983); <u>see also</u> <u>Griffin v. Breckenridge</u>, 403 U.S. 88, 102 (1971) (holding that "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action"). However, Section 1985(3) does not "reach conspiracies motivated by economic or commercial animus." <u>Scott</u>, 463 U.S. at 838. And the Supreme Court has also declined to hold that Section 1985(3) proscribes "wholly non-racial, but politically motivated conspiracies." <u>Id.</u> at 836–37.

League of the South Defendants assert that Plaintiffs' claims fail because their actions did not demonstrate that "they were motivated by a class-based animus." Dkt. 823 at 45. According to League of the South Defendants, their actions were motivated not by *race*, but by *politics*. <u>Id.</u> at 5, 45–47. They contend that they "did not target members of a protected class," and that their "plans and actions were not directed toward any racial or religious group." <u>Id.</u> at 46. Rather League of the South Defendants assert that their "primary goal was to *politically* triumph over their opponents," that they had "traveled long distances to engage in a *political* rally," and that

they were "prepared to contend with *political opponents* who planned to use violence to silence them." Id. at 46–47 (emphases added).

There is ample evidence of racial animus in the record that Plaintiffs have at least raised a genuine issue of material fact on this element. Numerous public statements from League of the South Defendants openly reflecting racial animus encouraged participation in Unite the Right. See, e.g., Pls Ex. 90 (Hill: "*If you want to defend the South and Western civilization from the Jew and his dark-skinned allies, be at Charlottesville on 12 August*."); Pls Ex. 58 (Tennessee League of the South Chapter: "August 12th must be a defining moment for our people. We need you to stand in solidarity with us against the enemies of our folk, our blood, our soil, our kith and kin."); Pls Ex. 82 (Hill, encouraging "an excellent turnout of Southern nationalists for this event," when he announced League's participation at Unite the Right, teasing "Antifa, BLM, et al will be there to greet us! Don't miss out on the fun!").

Similarly, privately, the month before Unite the Right, Hill addressed Nationalist Front "allies"—with whom he was then coordinating Unite the Right—in his capacity as "President of The League of the South." Pls Ex. 29. There, he stated that they were surrounded by "enemies who seek our destruction," including "the international Jew and his white gentile traitor allies," and "the dark shape of the negro." Id. Hill urged his Nationalist Front allies: "The Time has come when white men of the West must put aside their petty differences and unite for our very survival and well-being." Id. And just before the clashes on the morning of August 12, Baker exhorted the gathered members of the Nationalist Front outside downtown Charlottesville, saying to a cheering crowd that they were the "greatest assemblage of white identitiarians I've personally ever seen" of the "hard right," and they were "*going to take that park*!" [Cheers]. Pls Ex. 40 at 0:30 – 1:05 (audio file).

Accordingly, while League of the South Defendants cite various statements to say that their actions were politically rather than racially motivated, Dkt. 823 at 45–47, such evidence must be viewed alongside other statements and record evidence that expressly reference racial motivations for not only participating in Unite the Right but engaging in violence there against Black and Jewish persons and those who supported equal rights. See Scott, 463 U.S. at 836 (holding that § 1985(3) reaches "class-based animus … against Negroes and those who championed their cause…."); see also Waller v. Butkovich, 584 F. Supp. 909, 937 (M.D.N.C. 1984) (holding that "[a]nimus against those who support the rights of black people is surely one of the badges of slavery against which the Thirteenth Amendment empowered Congress to act," citing the "clear Congressional intent [in § 1985(3)] to reach conspiracies so motivated," and thus, "the 'advocates of equal rights for black people' alternative provides the requisite animus allegation").

League of the South Defendants also argue that the counter-protestors with whom they clashed, in "their appearance and conduct," gave "no indication that they supported any racial, ethnic, or religious group." Id. at 41; see Pls Ex. 101 at 0:00 – 1:00 (video). Similarly, they argue that the group outside Emancipation Park "was amorphous and generally characterized only by political opposition to the rally," rather than support for any racial, ethnic, or religious group. Dkt. 823 at 42; but see Pls Ex. 124 at 0:00 – 0:15 (video showing Tubbs and League of the South members charged into counter-protestor at front of crowd with sign "Anti Racism Zone"); id. at 0:15 – 0:40 (crowd of counter-protestors holding "Black Lives Matter" signs). See also Dkt. 823 at 42– 44 (related arguments by League of the South Defendants).

However, statements from Co-Defendants and League of the South members would support the contrary conclusion—that League of the South Defendants were "motivated by a

specific class-based, invidiously discriminatory animus," in their physical confrontations with these counter-protestors. See, e.g., Pls Ex. 14 (Dkt. 863-3) (Baker wrote Defendant Schoep that "Standing again as one against that *horde of untermenschen* did my heart good," "being in battle with our allies of the NSM made it an even greater day," and "we who were present in Charlottesville that day *and who fought the jew directed communist horde* were present for the very genesis of the resurrection of our Folk.") (emphases added); Pls Ex. 96 (Dkt. 863-37 at 2) (writing that when their "formation moved out into the streets," they were met with "an unruly mob of filthy left wing degenerates," which was "an unholy alliance of homosexuals and Blacks and self hating Whites were in the mix as well as hard core Communists"); id. at 3 ("Our admiration and *thanks go out to the professionalism exhibited by the highly trained men at the League of the South who took point in the shield wall that pushed through the line of Red opposition* as well as the very tough groups of skins that were right there with them fighting their way through") (emphasis added). At bottom, Plaintiffs have introduced a substantial body of evidence from before, during, and after the Unite the Right rally that would tend to show that racial or otherwise invidiously discriminatory animus motivated their actions at Unite the Right.

To be sure, League of the South Defendants may argue to a jury that "[t]he Unite the Right Rally was a political event where political opponents clashed," and that their actions were not animated by racial or invidiously discriminatory animus. Dkt. 823 at 51. However, because Plaintiffs have put forward ample evidence giving rise to a genuine issue of material fact whether League of the South Defendants' actions were "motivated by a specific class-based, invidiously discriminatory animus," A Soc'y Without A Name, 655 F.3d at 346, Plaintiffs' claims survive. Defendants are not entitled to summary judgment on account of this element.

2. Whether the Torch March & Fields's Acts Were Reasonably Foreseeable and Made in Furtherance of the Conspiracy

a. The Torch March

League of the South Defendants also argue that the claims of the Plaintiffs who were injured at the torch march should be dismissed because "League of the South expressly did not participate in the Torch March and were not co-conspirators with those who committed violence at the March." Dkt. 823 at 29. They specifically point to an email on the evening of August 11, 2017 (the night of the torch march), in which a League member told Hill: "Torchlight rally time and location has been leaked and Antifa is posting that they will be there. If LS is in attendance, be cautious." Hill responded: "Thanks, but this is not our game. We are sending two observers." Dkt. 823-10. Instead, Hill, Tubbs, and many of the League of the South members were staying at a campground north of Charlottesville that evening, where they finalized plans for the following morning. Dkt. 823 at 29–30; Hill Dep. 129:24 – 130:3. Hill and Tubbs did not participate in the torch march. Hill Dep. 129:4 – 130:3; Tubbs Decl. ¶ 14. They also attest in their declarations that either "we" or the League did not participate in the torch march. Hill Decl. ¶ 23; Tubbs Decl. ¶ 14. See also Dkt. 823 at 49–50 (similarly arguing that actions at torch march were "beyond the scope" of League of the South Defendants' involvement in any conspiracy).

Notwithstanding the evidence cited by League of the South Defendants, Plaintiffs have put forward substantial, contrary evidence. And that evidence, if believed, would tend to support a reasonable conclusion that the Co-Conspirators' acts resulting in certain Plaintiffs' injuries at the torch march were reasonably foreseeable acts in furtherance of the conspiracy to which one or more League of the South Defendants were a party. For instance, evidence shows that Defendant Kessler informed the League's leadership (through its public relations officer, Griffin) about the torch march at least a month before the event, and that Griffin understood "there w[ere] going to

52

be three events that weekend: the surprise torch march, the rally, and an afterparty." Griffin Dep. 152:12-22, 159:11-25.[8] Kessler told him that *"[w]e're going to do the tiki torches again in the evening*," to which Griffin responded, "*Ok great … [t]he main thing we got to do now is promotion and logistics*." Pls Ex. 52 (Dkt. 897-47 at 16) (emphases added). Kessler then wrote, "We need to get banners up on our websites, promote on podcasts and trend the hashtag #UniteTheRight," and again, "[m]ake sure your guys bring plenty of tiki torches," to which Griffin responded, "Yes, we have to create buzz," and "[t]hat means talking about and pumping the event well in advance," Id. Later, Griffin also told Kessler "creating buzz will pique interest and more people will come," "[t]he League and my guys are planning already," and "[w]e're going to have 200 to 400 there. If we create enough excitement and do the logistics, we can draw in leaners." Id. at 14–15. Elsewhere, Griffin told Andrew Anglin: "Everyone is coming to Charlottesville. The League has a private summer retreat reserved for the weekend outside of town. … We're going to do the torchlight parade again." Pls Ex. 19 (Dkt. 897-15 at 5).

---

[8] To the extent League of the South Defendants assert they were not aware of certain aspects of the torch march, Hill testified that he discussed the League's plans for Unite the Right with Griffin, as the League's public relations officer, and Tubbs, as the League's chief of staff, among others. See, e.g., Hill Dep. 140:19 – 141:2. Moreover, "[a] defendant need not be aware of every aspect of the conspiracy to be convicted for participating in it," United States v. Williamson, 86 F.3d 1154 at * 3 (4th Cir. 1996) (table), and all that need be proven is a defendant "join[ed] the conspiracy with an understanding of the unlawful nature thereof and willfully join[ed] in the plan on one occasion … even though he had not participated before and even though he played only a minor part," id. (quoting United States v. Roberts, 881 F.2d 95, 101 (4th Cir. 1989)). Considering such record evidence that League leadership was aware of the torch march over a month before Unite the Right, see, e.g., Griffin Dep. 152:12-22, 159:11-25, and communicated with Defendant Kessler about "promotion and logistics," including bringing tiki torches, Pls Ex. 52 (Dkt. 897-47 at 16), Hill's deposition further supports a reasonable inference that those individuals relayed this information to him, as well as other information concerning preparations for their operations on August 12, 2017.

A number of League members were at the torch march. Griffin Dep. 151:10-12 (Griffin participated), 151:7 – 152:9 (attended with at least two League members); Pls Ex. 147 (Dkt. 863-58) (photo of individuals with lit torches at torch rally, stating, "Still getting chills from this, Fla League was there that night before the rally 😎"); Dkt. 897 at 28 (photos of Griffin and another individual wearing League of the South polo shirts at march). Griffin's friends brought torches. Griffin Dep. 155:11-16. They were close to the Thomas Jefferson statue as the torch march crowd encircled counter-protesters including certain Plaintiffs around the base of the statue. Id. at 165:7-14, 167:7-17. Griffin later wrote on Discord, "The scariest optics by far to normies was the torchlight [march]," and that the Saturday rally "was tame by comparison." Id. at 171:13 – 172:4; Pls Ex. 105 (Dkt. 897-69). Griffin also saw various Defendants at the torch march, including Christopher Cantwell, Robert Azzmador Ray, Augustus Sol Invictus, and Kessler (afterward). Griffin Dep. 154:4 – 155:10.

Plaintiffs' evidence, if believed, would tend to show coordination between the League's leadership and Defendant Kessler planning the torch march, including bringing tiki torches, creating "buzz", and coordinating "logistics" for the event, and that this was known to the League over a month beforehand. The League also had an on-the-ground presence at the march, some of whom carried torches, and were near the Thomas Jefferson statue as the rallygoers encircled counter-protestors and began to throw tiki torches at them, causing certain Plaintiffs' injuries. League of the South Defendants can present their narrative to a jury that the torch march on the evening of August 11, 2017, was a separate event from the rally the following morning of August 12, and that while they were involved in the latter, they were not involved in the former. However, such a determination requires resolution of genuine disputes of material fact, which cannot be resolved on summary judgment.

b.   The Fields Car Attack

The Court has already held that the specific facts listed in the complaint rendered Fields's attack reasonably foreseeable. See Sines, 324 F. Supp. 3d at 796–97. For one, as alleged in the complaint, "the exact possibility of running over counter-protestors was explicitly mentioned on the invite-only Discord platform before the events." Id. at 796. The Court also noted that Fields's attack was reasonably foreseeable considering allegations that "Defendants planned to bring deadly weaponry to the event." Id. And lastly, the Court cited multiple Defendants' comments that "ratified Defendant Fields's attack after the fact," which comments "plausibly demonstrate[d] that Defendant Fields's actions were consistent with the conspiracy's avowed goals." Id. at 796–97. Now, at this stage of the case and on this summary judgment record, Plaintiffs have produced substantial evidence supporting each of these points, undermining League of the South Defendants' request for summary judgment on this issue. Accordingly, League of the South Defendants' arguments that they are entitled to summary judgment because Fields "acted alone," e.g., Dkt. 823 at 27–29, or that Fields's attack was beyond the scope of any conspiracy, id. at 49–50, are without merit.

First, Plaintiffs have identified numerous statements on the Discord Charlottesville 2.0 channel, describing the possibility of running over counter-protestors at Unite the Right. See, e.g., Pls Ex. 6 (Dkt. 897-7 at 3) ("Is it legal to run over protestors blocking roadways? I'm NOT just shitposting. I would like clarification. I know it's legal in NC and a few other states. I'm legitimately curious for the answer[.]"); Pls Ex. 8 (Dkt. 897-9 at 3) ("I know NC law is on the books that driving over protestors blocking roadways isn't an offense. … Sure would be nice," posting a photo of a tractor, captioned: "Introducing John Deere's New Multi-Lane Protestor Digestor"); Pls Ex. 42 (Dkt. 897-38 at 38) ("In the event something happens cops will be

involved and adjustments will have to be made to remove people from the scene," while another user posted a still-frame from movie with bus driving into crowd); Pls Ex. 44 (Dkt. 897-40) (in #demonstration_tactics channel, Defendant Kessler posted a picture of Black Lives Matter protestors, writing "… Too bad the civilians didn't just make new speed bumps for some of these scum"). To be sure, League of the South Defendants assert that they had limited access to Discord, and that Hill and Tubbs were unable to access the invite-only platform. Dkt. 878 at 9–10. Even so, there is substantial evidence in the record that numerous members of League leadership actively used Discord in their preparations for Unite the Right, including the League's "Chief of Operations" Robert Ike Baker, "National Logistics Officer" J.C. Adams, and "Public Relations Chief" Brad Griffin, as well as League members, including Dennis Durham. Baker Dep. 96:17-19, Defs Ex. 4 (Dkt. 823-19); Griffin Dep. 63:2-11, Defs Ex. 5 (Dkt. 823-20); Pls Ex. 12 (Dkt. 897-12 at 4); Pls Ex. 51 (Dkt. 897-46 at 2). Indeed, Hill testified that he had asked Baker to "monitor what was going on on Discord" and to "report" back "what he found." Hill Dep. 78:3-10.

Second, League of the South Defendants "planned to bring deadly weaponry" to Unite the Right. Sines, 324 F. Supp. 3d at 796. Hill and others from the League brought firearms to Unite the Right, e.g., Hill Dep. 180:15-16; Baker Dep. 86:16-23, as did other Defendants. So too on Discord, many users said they were bringing or encouraged others to bring firearms and other weapons to Unite the Right. E.g., Pls Ex. 43 ("I'm bringing Mosin-Nagants with bayonets attached … It will shoot clean through a crowd at least four deep."); Pls Ex. 118 ("We aren't open carrying. We have people who are concealed carrying. Those are the rules."); Pls Ex. 5 (Dkt. 897-6 at 5) (one user recommended to the rally's "organizers" a "crowdfunding" campaign "to hand out pepper spray to fellow goers"). Third, League of the South Defendants as well as

Defendant Vanguard America expressed support for Defendant Fields after his car attack, which is some further evidence tending to show the car attack was in furtherance of the goals of the conspiracy. See, e.g., Pls Ex. 151 (Dkt. 863-62) (Tubbs, posting online repeatedly that "James Fields did nothing wrong."); Pls Ex. 93 (Dkt. 863-34) (Vanguard America sent Fields a Christmas card); Dkt. 878 at 3 (not contesting this and other evidence); Pls Ex. 37 (Dkt. 897-33) (Hill, writing: "Was not surprised at the Fields verdict ….").

Accordingly, League of the South Defendants have not demonstrated that they are entitled to summary judgment on this issue. They have not shown that there is no genuine issue of material fact that, as they argue, Defendant Fields's conduct was not reasonably foreseeable or in furtherance of the conspiracy.

3.   First Amendment Defense

League of the South Defendants argue that their "derogatory comments and political rhetoric are protected by the First Amendment and should not be construed as evidence of a conspiracy." Dkt. 823 at 38. They assert that their speech "is abstract political rhetoric," and that it was "intended and understood as abstract political rhetoric." Id. They further write that their "political communications use only vague terms," contrasted with the "specific" and "detailed" language at issue in the defendant's book in Rice v. Paladin Enterprises, 128 F.3d 233 (4th Cir. 1997), which gave instructions for how to carry out murder-for-hire and was deemed unprotected by the First Amendment. Id. League of the South Defendants further cite their "history of participating in peaceful political rallies," and the context of the League's statement saying it would attend Unite the Right (including "Don't miss out on the fun!") was, in their view, "context" that "suggests … engaging in speech as part of a political contest." Id. at 38–39.

This legal argument was largely already considered and rejected by this Court in its decision denying Defendants' motions to dismiss. Sines, 324 F. Supp. 3d at 801–04. To be sure, as the Court explained, "[p]icketing and marching protesting that decision" to rename the park, "even if motivated by racist ideology, would be protected speech." Id. at 802. Moreover, if League of the South Defendants had "only engaged in 'abstract' advocacy of violence, those statements would be protected." Id.; accord Rice, 128 F.3d at 243 ("[A]bstract advocacy of lawlessness is protected speech under the First Amendment."). However, "the First Amendment does not protect violence." Id. (quoting N.A.A.C.P. v. Claiborne Hardware Co., 458 U.S. 886, 916 (1982)). And so, if Defendants "have formed or are engaged in a conspiracy against the public peace and order" and thereby "transcend the bounds of the freedom of speech which the Constitution protects," any law holding them liable for such conspiracy does not violate the First Amendment. Id. (quoting, e.g., De Jonge v. State of Oregon, 299 U.S. 353, 365 (1937)). As a result, "[t]he First Amendment does not prohibit 'tort liability for … losses that are caused by violence and by threats of violence." Id. (quoting Claiborne Hardware, 458 U.S. at 916). Moreover, "allegations of physical assault are 'not by any stretch of the imagination expressive conduct protected by the First Amendment." Id. (quoting Wisconsin v. Mitchell, 508 U.S. 476, 484 (1993)).

The record on summary judgment is replete with substantial evidence of actions by League of the South Defendants at and in relation to Unite the Right, which extend well beyond mere "abstract" advocacy. Cf. Sines, 324 F. Supp. 3d at 803. Upon the relevant standard of review that "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," Tolan, 572 U.S. at 651, substantial evidence including video evidence would show that League of the South Defendants participated in if not initiated at least three

separate, large-scale, physical attacks upon counter-protestors at Unite the Right on Saturday, August 12, 2017. Those include (1) Tubbs leading an apparent phalanx of League of the South and Nationalist Front, charging into counter-protestors on Market Street, e.g., Pls Ex. 101 at 0:18 – 0:50; and (2) exiting Emancipation Park, Tubbs yelled "Follow me!", leading yet another charge of the League and others with shields who crashed into a crowd of counter-protestors, e.g., Pls Ex. 102; and (3) the attack upon black counter-protestor, DeAndre Harris in the Market Street Garage by a group including League member Tyler Davis and others, who struck Harris repeatedly with rods and other weapons while he was down on the ground, and during which Tubbs walked by casually without intervening in any way, e.g., Pls Ex. 104 at 0:00 – 0:13. Davis subsequently entered an "Alford plea" and was convicted of beating Harris. Pls Ex. 148 . All of this evidence that League of the South Defendants not only engaged in but initiated violent confrontations at Unite the Right substantiates the type of direct, violent conduct that was alleged in the complaint, which the Court found the First Amendment does not protect. See, e.g., Sines, 324 F. Supp. 3d at 803 (holding as unprotected allegation that Defendants "ordered others to 'charge!'"); accord id. (same, as to allegation that "Defendants directed a charge towards Plaintiffs while they were around the Jefferson statue"). "The First Amendment does not protect violence." Claiborne Hardware, 458 U.S. at 916. League of the South Defendants' First Amendment argument makes no attempt to address any of this violent conduct, nor this Court's prior ruling. Dkt. 823 at 38–39.

Nor do League of the South Defendants make any meaningful attempt to address the substantial other evidence of the League's organization for Unite the Right and coordination with Co-Defendants to that end. See id. at 38–39. For example, such efforts include commissioning custom riot shields for the League's use at Unite the Right, and organizing a "hate van" to Unite

the Right "stocked" with those shields. Pls Ex. 11 (Dkt. 897-12 at 4); Pls Ex. 27 (Dkt. 897-23 at 2); Pls Ex. 28 (Dkt. 897-24). There was discussion before Unite the Right that League of the South and Defendants Vanguard America, and Traditionalist Workers Party members would use shields in an aggressive posture. <u>See</u> Pls Ex. 106 (Dkt. 897-70 at 2) (Defendant Vanguard America's "security representative" wrote Defendant Heimbach stating: "we may have to remove commie from Lee park. It's going to be up to Vanguard, TWP, LOS .... We are trying to get an initial estimate of how many shields each organization will have ...."). Videos showed League members at Unite the Right using their shields while charging at counter-protestors. <u>E.g.</u>, Pls Ex. 101 at 0:20 – 0:50; Pls Ex. 102. After the fact, the League later said that "*many*" League members used shields and other weapons "*to great effect*" at Unite the Right. Pls Ex. 27 (Dkt. 897-23 at 2) (emphases added). Defendant Parrott further described League of the South fighters with shields as "*putting their training to work*": "lining up a shield wall" and "pushing through opposition," i.e., the crowds of counter-protestors. Parrott Dep. 226:3-24, Pls Ex. 69 (Dkt. 863-18) (emphasis added).

Other evidence shows that League of the South Defendants and its leadership organized the "convoy" of Nationalist Front groups to the rally and into a marching formation on Saturday, August 12, Pls Ex. 40 0:00 – 0:10 (Dkt.897-36) (audio file); Heimbach Dep. 638:2-25; served as the "point of contact" to the Charlottesville police for all Nationalist Front groups, according to Defendant Heimbach, Pls Ex. 85 (Dkt. 863-26 at 9); and coordinated with Defendant Kessler to promote and bring tiki torches to the torch march on Friday, August 11, Pls Ex. 52 (Dkt. 897-47 at 14–16 (Kessler: "*Make sure your guys bring plenty of tiki torches*"; Griffin: "*Yes*, *we have to create buzz*," and "[t]he League and my guys are planning already") (emphases added); <u>see also</u>, <u>e.g.</u>, Dkt. 897 at 18–19 (describing evidence that "League members analyzed satellite maps,

identified security cameras in proximity of the park, surveyed the area on foot before, and reported back to the League's leadership").

To the extent that League of the South Defendants address such conduct at all, they write simply that the League undertook "preparations to prevent conflict," which contribute to the "context" that the League was "engaging in speech as part of a political contest." Dkt. 823 at 39. But the Court cannot on this record and standard of review accept that characterization of their motivations that such preparations were just undertaken "to prevent conflict," on a motion for summary judgment. Neither could this Court hold (nor do League of the South Defendants support any argument that) such organizational efforts should be treated as mere "abstract advocacy" that they claim is protected. Dkt. 823 at 38–39; accord United States v. Miselis, 972 F.3d 518, 537–38 (4th Cir. 2020) (holding that "speech tending to organize a riot," which would include "communicating with prospective participants about logistics, arranging travel accommodations, or overseeing efforts to obtain weapons needed to carry out the planned violence," is speech that "doesn't implicate mere advocacy of lawlessness, and may thus be proscribed without reference to Brandenburg").

Some of League of the South Defendants' statements might, on their own, constitute protected speech. See, e.g., Dkt. 823 at 38–39 (citing Pls Ex. 90 (Dkt. 863-31) (Hill statement that: "If you want to defend the South and Western civilization from the Jew and his dark-skinned allies, be at Charlottesville on 12 August."). However, even if so, this Court also previously held that otherwise protected speech "might be taken as evidence that [a Defendant] gave other specific instructions to carry out violent acts or threats." Sines, 324 F. Supp. 3d at 803 (quoting Claiborne Hardware, 458 U.S. at 927). Further too, even protected speech, taken in light of surrounding context, "can serve as evidence of an agreement to commit violence." Id. So too

here. It is precisely that context—based upon evidence of League of the South Defendants'
violence on August 12, and extensive organizational planning for that day as well as the torch
march on August 11—that undermine League of the South Defendants' attempt to characterize
all their speech in relation to Unite the Right as protected "abstract advocacy." The elements
required to establish a claim under § 1985(3) work to ensure that there is a "careful parsing" of
allegations, required when "conspiracy or other unprotected speech 'occurs in the context of
constitutionally protected activity ….'" Id. (quoting Claiborne Hardware, 458 U.S. at 916).
Having found Plaintiffs have raised a genuine dispute of material fact that League of the South
Defendants entered into such a conspiracy to engage in racial violence at Unite the Right—
precluding the League's motion for summary judgment—the Court therefore holds that League
of the South Defendants' "general argument that [they] are immunized from liability by the First
Amendment fails" as well. See id. at 804.

    4.  42 U.S.C. § 1986 Claim

Plaintiffs' Count Two claims that League of the South Defendants violated 42 U.S.C.
§ 1986, which provides that "[e]very person who, having knowledge that any of the wrongs
conspired to be done," under § 1985 are about to be committed, and "having power to prevent or
aid in preventing the commission of the same, neglects or refuses to do so," shall be liable to the
injured party for the commission of such acts. As the parties acknowledge, the viability of a
§ 1986 claim is dependent upon establishing a § 1985 claim. Dkt. 823 at 48; Dkt. 897 at 52; see
Trerice v. Summons, 755 F.2d 1081, 1085 (4th Cir. 1985). League of the South Defendants'
arguments on this count reiterate their challenges to Plaintiffs' § 1985 claim. Dkt. 823 at 48.
Since the Court concluded that Plaintiffs provided adequate evidence to support the existence of
a genuine issue of material fact such that Plaintiffs' § 1985 claim survives summary judgment,

and absent separate argument based upon the record evidence and the law, the Court rejects League of the South Defendants' challenge to the § 1986 claim.

     5.  <u>Virginia Common Law Conspiracy Claim</u>

     League of the South Defendants also challenge Plaintiffs' claim for common law conspiracy under Virginia law. Dkt. 823 at 48–49; League of the South Defendants argue that, "because [they] did not conspire to intimidate or harm minorities, they were not part of a common law conspiracy." <u>Id.</u> at 48. They assert that, "[a]s with Section 1985(3), a successful common law conspiracy claim is predicated upon showing that the alleged co-conspirators had a common plan," and because they "engaged in no such plan and no Plaintiffs were harmed by [their] conduct," Plaintiffs' common law conspiracy claim fails. <u>Id.</u> at 49. The parties do not dispute that the elements of this Virginia conspiracy claim are substantially the same as those for a § 1985(3) conspiracy. <u>See</u> Dkt. 823 at 48–49; Dkt. 897 at 52–53; <u>see also</u> <u>Sines</u>, 324 F. Supp. 3d at 798–99 (holding, at the motion to dismiss stage, that the Court's "Section 1985(3) analysis also governs the analysis here" for the Virginia common law conspiracy claim). As the Court concluded above, Plaintiffs have raised a genuine issue of material fact whether League of the South Defendants conspired to commit racial violence and intimidation at Unite the Right. Thus as Plaintiffs' § 1985(3) claim survived League of the South Defendants' motion for summary judgment, so too do Plaintiffs' Virginia conspiracy claim.

<u>CONCLUSION</u>

     For these reasons as well as those set forth in this Court's prior Order, Dkt. 938, the Court concluded that League of the South Defendants' motion for summary judgment has been denied. Dkt. 823.

63

The Clerk of Court is directed to send a certified copy of this Memorandum Opinion to the parties.

Entered this ___3rd___ day of September, 2021.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE