**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

| | |
|---|---|
| ELIZABETH SINES, et al., | |
| *Plaintiffs,* | No. 3:17-cv-00072-NKM |
| v. | JURY TRIAL DEMANDED |
| JASON KESSLER, et al., | |
| *Defendants.* | |

**DEFENDANT MATTHEW HEIMBACH'S RESPONSE TO PLAINTIFFS'
SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION FOR SANCTIONS AGAINST HIM**

Defendant Matthew Heimbach ("Matthew") respectfully submits this Response to

Plaintiffs' Supplemental Memorandum of Law in support of their Motion for Sanctions against

him (ECF No. 1006).

**PRELIMINARY STATEMENT**

Plaintiffs' litigation strategy in this case boils down to the following:

1.  Make factually absurd, outlandish conspiracy allegations for which Plaintiffs
    know absolutely no evidence ever existed;

2.  Use their overwhelming resource differential to bury Defendants in onerous
    discovery; and

3.  When many of those Defendants (some of whom have no counsel) inevitably fall
    short of the demands of Plaintiffs' horde of high-powered, infinitely-monied
    attorneys, finagle the Court into giving adverse inferences to the jury on all of the
    allegations Plaintiffs never would have been able to otherwise support.

This Court should not allow itself to be conned by Plaintiffs' odious brand of

bootstrapping. Matthew's overall shortcomings in discovery may warrant the imposition of

monetary sanctions, such as attorneys' fees and costs, but not the kind of drastic evidentiary sanctions that would license Plaintiffs to affirmatively mislead the jury.[1]

The reality here is that Plaintiffs have already received voluminous discovery from Matthew or his co-Defendants, including from each of Matthew's primary sources of communication concerning the Unite the Right rally: Discord, Gmail/Google Docs, and the Traditionalist Worker Party ("TradWorker") e-mail/ticket system. Upon subjecting Plaintiffs' numerous discovery-related grievances to close scrutiny and analysis, what becomes apparent is that all of the allegedly "critical" ESI about which Plaintiffs are complaining would likely be needlessly cumulative, duplicative of evidence already produced by other Defendants, or unlikely to realistically be material to Plaintiffs' case.

## ARGUMENT

I.    **Since This Court's Previous Order Sanctioning Him, Matthew's Attempts, As a *Pro Se* Litigant with No Legal Background, to Meet His Discovery Obligations Have Not Been in Bad Faith.**

A.    **Matthew's Conduct in Discovery Has Dramatically Improved.**

Initially, Matthew was uncooperative in discovery; this is not disputed. In the face of the stark imbalance of the overwhelming amount of power and resources at Plaintiffs' disposal (indeed, one would be hard-pressed to recall another civil litigation with a more unseemly and patent bullying dynamic), Matthew stopped participating in discovery altogether. Fortunately, the Court's threats of holding him in contempt ultimately got through to Matthew, because he has

---

[1]    As counsel for another Defendant in this litigation eloquently stated, "Plaintiffs seek a spoliation instruction that directly contradicts information they have obtained in hundreds of thousands of documents from a myriad of sources. This constitutes an attempt by Plaintiff to avoid their burden of proof entirely and potentially to mislead the jury as to all Defendants." (ECF No. 1022 at 2.)

since submitted himself fully to the Court's jurisdiction and authority, making comparatively significant efforts to comply with his discovery obligations and the Court's orders. Even if Matthew's conduct was in bad faith prior to the Court's sanctioning him, since then, he has at least conducted himself in *better* faith. And while that may not be perfect, it is still not *bad* faith — which is required for the most drastic sanctions, such as adverse inferences, to be granted. *See, e.g.*, *Sampson v. City of Cambridge*, 251 F.R.D. 172, 181 (D. Md. 2008) (citing *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450-51 (4th Cir. 2004)).

**B.    Matthew's Use of a Durable Plastic Tub to Store Electronic Devices with Potentially Relevant ESI Was Reasonable in His Individual Circumstances.**

Plaintiffs cannot seem to bring themselves to stop bleating about the manner in which Matthew stored his devices to preserve them for litigation — specifically, that he used a durable plastic tub he purchased from Walmart.[2] During Matthew's deposition, Plaintiffs' counsel seemed to believe that wasn't even close to sufficient, asking questions like this:

```
14          Q    Did you ask anybody whether there was
15     anything you could do to preserve the contents of
16     that phone?
17          A    I assumed it just existing would be
18     sufficient.
19          Q    So is the answer, no?
20          A    Besides keeping it.  So --
21          Q    Did you take any steps to have the
22     contents of the phone preserved, like having it
23     imaged forensically?
24          A    Nope.
```

(Heimbach Dep. 317:14-24.)

_____

[2]    Sterilite® is one company who makes these; everyone knows what they look like. They are actually very durable. Maybe not exactly fireproof, but still very durable nonetheless.

Counsel's line of questioning could not possibly be more out of touch with the lives of the working class — as if, for example, Matthew — a nonlawyer with an income at or below the poverty line and two children to feed — was supposed to have immediately isolated all relevant ESI in his trailer park's Secure Document Repository Trailer, then contacted his private banker to ready the funds needed to hire an e-discovery forensic device imaging service.

In fact, Matthew put the devices all together in a durable plastic tub in which he kept things that he considered to be important. (Note to Plaintiffs' counsel: This is actually a very standard protocol amongst the hoi polloi for staying organized.) Regardless of whether or not it had a lid, when it comes to trailer folk and ESI security/preservation, a heavy-duty plastic tub is really about as good as it's ever going to get.[3]

Plaintiffs assert that what happened to Matthew in 2019 — that his ex-wife basically threw out the durable plastic tub (when she basically threw out *all* of Matthew's possessions) is "simply not credible." First of all, this kind of situation is actually rather common among jilted lovers, particularly those of the lower income brackets — as a mere cursory search of the internet reveals. *See, e.*g., Susan Farley, *Man arrested for burning ex-girlfriend's clothing*, FOX BANGOR (Aug. 1, 2019), https://www.foxbangor.com/news/item/man-arrested-for-burning-ex-girlfriends-clothing/ (burned ex's clothes, shoes, and backpack); Ken Sturtz, *Ithaca police: Ex-girlfriend pours bleach on man's flat-screen TV, clothes*, SYRACUSE.COM (Mar. 22, 2019), https://

---

[3]   Plaintiffs' counsel appears to consider the plastic tub problematic as a method of storage because it was "unlabeled" and "uncovered." One suspects that if it had been labeled, counsel would have insisted that it was "too conspicuous," and thus insecure. As for the plastic tub not being covered, it is difficult to imagine how a cover would have saved the contents from being (unlawfully) discarded by an angry spouse during a period of time (over a month) in which Matthew had no access whatsoever to the marital residence — having been prohibited by court order from being on the premises or anywhere nearby.

www.syracuse.com/crime/2015/12/cops_ithaca_woman_pours_bleach_on_ex-lovers_clothes_flat_screen_tv.html (self-explanatory); WORLD STAR HIP HOP, https://worldstarhiphop.com/videos/video.php?v=wshh905Kga7MDh4Grb9K (June 16, 2021) (destroyed spouse's clothes and personal items, and damaged his car); IE Staff, *Teen Allegedly Sets Fire to Car She Thought Was Her Ex-Boyfriend's – It Wasn't,* INSIDE EDITION (Sept. 6, 2016), https://www.insideedition.com/18478-teen-allegedly-sets-fire-to-car-she-thought-was-her-ex-boyfriends-it-wasnt (yes, it still counts). This was the same kind of ugly, thoughtless behavior (though perhaps less violent), just from Matthew's (now ex-) wife.

Also, she subsequently signed a notarized affidavit explaining the situation.[4] *See* Exhibit 2.

Plaintiffs insist that "At best, Heimbach was grossly negligent." (Pl. Supp. Mem. at 17.) The undersigned agrees with Plaintiffs' "grossly negligent" characterization. However, it is for this very reason that Matthew's conduct was *not* in bad faith, which is why an adverse inference should not be granted.

> "Adverse-inference instructions were developed on the premise that a party's intentional loss or destruction of evidence to prevent its use in litigation gives rise to a reasonable inference that the evidence was unfavorable to the party responsible for loss or destruction of the evidence. Negligent or even grossly negligent behavior does not logically support that inference. Information lost through negligence may have been favorable to either party, including the party that lost it, and inferring that it was unfavorable to that party may tip the balance at trial in ways the lost information never would have. The better rule for the negligent or grossly negligent loss of electronically stored information is to preserve a broad range of measures to cure prejudice caused by its loss, but to limit the most severe measures to instances of intentional loss or destruction."

---

[4]     The undersigned is informed that Plaintiffs' counsel is already aware of this document's existence.

Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment.

Plaintiffs' counsel cites *O'Berry v. Turner*, but it is inapposite. In *O'Berry*, plaintiffs asked defendants for very specific documents in their spoliation letter to the risk management division of defendants' trucking company, Archer Daniels Midland Company (a multibillion-dollar corporation). By contrast, Plaintiffs asked Matthew to produce generally relevant information, without making any extremely specific request as in *O'Berry*.

Further, the information requested by the plaintiffs in O'Berry is plainly obvious as to its substantial probative value in a case involving a vehicle accident with one of the defendant's truck drivers. Unlike the requests for production from Matthew that are at issue here, the requested driver's log in *O'Berry* is centrally relevant.

Also, multibillion-dollar corporation involving professionals, not a trailer park involving…well…non-professionals.

> **B.**     **Plaintiffs Did Not Fully Avail Themselves of the Court's Previous Remedies for Matthew's Discovery Deficiencies; Therefore, They Should Not Be Rewarded with the Most Drastic of Sanctions.**

Plaintiffs admit that the Court ordered Matthew to sit for an additional deposition "devoted exclusively to" all of these discovery-related issues, (Pl. Supp. Mem. at 7 (quoting ECF No. 508 at 4), meaning that Plaintiffs would be permitted to conduct a total of two full depositions of Matthew. Instead, *Plaintiffs took only one deposition of Matthew*, spending most of their time on these discovery-related issues, and comparatively little time on factual matters that actually concern the allegations of their Complaint. Having failed to first avail themselves fully of the less drastic sanctions imposed by the Court, (*see* Pl. Supp. Mem. at 15 (claiming that "deposing [Matthew] again would be fruitless")), they now ask it to skip directly to the most

drastic ones. This appears to be a pattern of behavior by Plaintiffs. (*See, e.g.*, ECF No. 1022 at 4-5 (noting that Plaintiffs are seeking adverse inferences without having first availed themselves of opportunity to notice and conduct in-person deposition).) It seems inequitable.

## II.    Adverse Inferences Are an Extreme Sanction That Would Be Manifestly Unjust Here.

Plaintiffs have not realistically been prejudiced by Matthew's shortcomings in discovery. Plaintiffs allege they have been prejudiced, and their case damaged, by Matthew's failure to produce access to certain physical electronic devices, hard copy documents, and social media and other online accounts.

### A.    Social Media and Online Accounts Generally

While Plaintiffs listed numerous social media and online accounts that they claimed were relevant to the litigation and allegedly held "critical" ESI, upon closer inspection, their assertions seem melodramatic and nebulous, amounting to little more than stagecraft. In attempting to create the impression that there were dozens of instances where Matthew did not comply with discovery, most of these sources would realistically contain no evidence useful to Plaintiffs, or would, at most, yield evidence that is needlessly cumulative and duplicative of that which Plaintiffs have already obtained from other Defendants.

Plaintiffs admit that certain third parties have been monitoring Matthew's online accounts for years, (*see, e.g.*, Bloch Decl. ¶ 8(b)), which is confirmed by the multitude of screenshots and archived links of his social media posts which Plaintiffs have obtained with little effort. In fact, there are quite a few of these types of stalkers, both paid and volunteer, who keep extensive files on pro-White advocates such as Matthew, and who would never miss documenting any of his posts that could even *potentially* be weaponized against him. This reality, which Plaintiffs'

counsel attempts to minimize and fails to fully impart to the Court (perhaps because of how obviously creepy and obsessive it is), fundamentally belies their claim that such missing ESI would have been helpful to their case. If Matthew posted something on social media, and it would have been even slightly helpful to Plaintiffs' case, it would undoubtedly have been screenshotted and/or archived by the "Nazarazzi," and Plaintiffs' counsel would have found it easily.

### B.    Gab

Plaintiffs argue Matthew used Gab to create "highly relevant" ESI, (Pl. Supp. Mem. at 4), such as a photo of himself and other TradWorker members at Charlottesville. This is simply not "highly relevant." It is undisputed that Matthew was present in Charlottesville. With thousands of photos and hundreds of hours of video from the event already available to Plaintiffs' counsel, it is *extremely* unlikely that additional photos exist which would be uniquely relevant and not duplicative or needlessly cumulative. Again, that Matthew and members of TradWorker attended the Unite the Right rally is not in dispute; therefore, the claim that there might have been more photos fails to demonstrate legitimate prejudice to Plaintiffs.

There is also a recurring theme in which Plaintiffs suggest they need to see what replies and "likes" were present on posts;[5] this again rings hollow as to the question of legitimate prejudice to Plaintiffs. Unless there was something so comically fantastical such as, "Please like

---

[5]      *See, e.g.*, Pl. Supp. Mem. at 4 ("Further, these third-party screenshots do not provide all data and metadata from Heimbach's underlying post; for example, they often do not show the date of the post, which users liked or replied to the post, or any replies Heimbach posted in response.")

this photo if you are already a part of, or wish to be included in, a civil conspiracy," the notion that "likes" are relevant and needed by plaintiffs to argue their case is dubious at best.

Plaintiffs also claim that they "could not recover [c]ontent from [Matthew's] Gab account that was never accessible to the public, such as direct messages." In mid-2017, both before and for at least several months after the Unite the Right rally, Gab's primitive direct message system — aside from being essentially unusable due to bugs and other technical problems — had a built-in feature (which could not be turned off) that all direct messages were automatically deleted from the chat, and from Gab's servers, 24 hours after being sent. Accordingly, not only would such messages be inaccessible by Matthew and Gab after 24 hours, they also would have been automatically deleted by Gab long before Matthew was under any duty to preserve them.

## C.    VK

Plaintiffs do not assert that Matthew's VK account contained anything that could possibly be considered legally significant. Rather, they believe only that he posted on one occasion about (public) "legal filings" made by another defendant in the case. (*See* Pl. Supp. Mem. at 4.)

(Heimbach Dep. 114:23-116:14; *see also id.* 112:23-24 (stating the VK account "was very rarely used").)

## D.    Facebook

Facebook banned Matthew's accounts on several occasions. Preservation of data for accounts banned by major social media platforms such as Facebook is virtually impossible, and is unreasonable to expect of any user when the actions of a third-party (*i.e.*, the platform's employees) permanently takes the account out of the user's possession, custody, or control. Being banned from these major platforms, including Facebook, always comes with no prior

```
          23              Q       And what kind of content did you post
                  about Unite the Right on your VK account?
          25              A       I can't recall.
   115:01                                M. HEIMBACH
          02              Q       You have no idea?
          03              A       It was like two years ago.
          04              Q       So is the answer to my question, no, you
          05      have no idea?
          06              A       No.
          07                      (Heimbach Deposition Exhibit No. 14
          08              was marked for the record.)
          09      BY MR. BLOCH:
          10              Q       If I could show you Exhibit No. 14,
          11      Mr. Heimbach.
          12                      Is this your VK account?
          13              A       Yes.
          14              Q       And is this a post that you made on
          15      February 16, 2019 to your VK account?
          16              A       Yes.
          17              Q       And in that post, do you say:  Reverend
          18      James Hart Stern is now the president and director of
          19      the National Socialist Movement according to legal
          20      filings?
          21              A       Yes.
          22              Q       And what legal filings are you referring
          23      to?
          24              A       Mr. Stern, I believe, had asserted that
          25      he had been given legal control of the board of
   116:01                                M. HEIMBACH
          02      directors of the National Socialist Movement.
          03              Q       And those are legal filings that
          04      Mr. Stern made in this litigation, right?
          05              A       Yes.
          06              Q       And, in fact, he made those filings in
          07      this litigation the day before you posted that on VK,
          08      right?
          09              A       I believe so, yes.
          10              Q       How did you become aware of Mr. Stern's
          11      filing?
          12              A       It was in the news.  I mean, a black
          13      civil rights activist taking over the NSM is
          14      newsworthy.
```

notice, any appeals process is seldom helpful, and all account information is deleted, thereby

leaving the user with no access to the data or any way to remedy the issue.

E.      Twitter

As with Facebook, when a user is banned from Twitter, their information is deleted, their access is revoked, and there is no way to obtain their account data.[6] In these circumstances, to impose a duty of preserving an account for impending litigation would be to require the user to somehow prevent the platform from banning them, which is obviously not possible.[7]

This unfortunate reality appears to have led to a rather oppressive situation in which the accounts and discourse of right-wing figures are involuntarily deleted by these platforms (frequently at the request, both explicit as well as implicit, of pro-censorship behemoths such as the Anti-Defamation League ("ADL") and the Southern Poverty Law Center ("SPLC")[8]), then that very same censorship is being perversely leveraged to seek an adverse inference in favor of Plaintiffs — whose entire claim is predicated on opposing the very same right-wing discourse and figures. In other words, the politically powerless Defendants, first censored by multibillion-dollar corporations that share the (institutionally dominant) political views of Plaintiffs and their counsel, then get punished by well-funded litigation for not having the ability to prevent

—————————

[6]      Even though a "permanently suspended" (*i.e.*, banned) Twitter user can still log in to their account, they are not permitted to utilize any data preservation/retrieval mechanisms the platform provides to active users. Moreover, frequently such accounts will simultaneously be "locked" by Twitter, requiring an SMS verification on a phone number to which the user no longer has access in order to even log in to the account.

[7]      Indeed, one of the many dangers and evils of censorship, whether by government or private social media platforms, is that it corrupts the public record, and this is merely one way in which that corruption manifests. For this reason alone, involuntary "memory holing" of user accounts and data by any major social media platform ought to be unlawful, at least without a prior court order.

[8]      The ADL and SPLC, as well as organizations affiliated with them, are widely known to work directly with these platforms in order to "flag" content and accounts for censorship, and *every single one* of these organizations shares the political views of Plaintiffs and their counsel.

themselves from being censored by those with different ideological views. Plaintiffs seek to

manipulate the Court into participating in this scheme; it should decline the invitation.

### F.     Discord

Plaintiffs acknowledge that "[Matthew] . . . submitted an accurate SCA consent form to

Discord, which allowed Plaintiffs to recover relevant content he generated on Discord." (Pl.

Supp. Mem. at 6 n.3; *see also id.* at 2 n.1 (stating that "[Matthew] . . . provided an SCA consent

to his Discord account").)

### G.     Google Drive/Gmail, Skype, and Signal

Plaintiffs acknowledge that Matthew provided access to his Google account (which

contained his writings and e-mails),[9] his Skype account, and his Signal account. (Pl. Supp. Mem.

at 2 n.1.)

### H.     Daily Stormer, Iron March, and Occidental Dissent

First off, the Daily Stormer ("DS") lost Matthew's data, not Matthew — who had no

prior notice of this, and no reason to believe that DS would suddenly lose all of their forums and

comments sections. Due to the aforementioned, relentless censorship efforts of left-wing pro-

censorship organizations like the ADL and SPLC, DS was forced to move domains and hosting

providers on numerous occasions in a short window of time; amidst all of this chaos, their

forums and comment sections were eventually lost. At no point in time did Plaintiffs or their

counsel register any concerns about these highly publicized censorship efforts potentially leading

to the loss of ESI relevant to their case. Nor did they ask this Court to intervene by, for example,

---

[9]     Access to Matthew's YouTube account was provided when he provided his Google
account information to Plaintiffs, as YouTube is owned by Google and the login credentials for
both are identical.

issuing injunctions against those participating in these censorship efforts, in order to ensure the preservation of relevant ESI for purposes of this litigation.

Contrary to Plaintiffs' arguments, Matthew did meet his obligation to preserve this information — *because he did not delete it or seek its deletion.* Rather, officious intermeddlers sharing the very same political views and objectives of Plaintiffs and their counsel (*i.e.*, "fighting the Nazis," or whatever delusional phraseology *du jour* they are using) got it deleted. Plaintiffs and their counsel no doubt celebrated the successful censorship of DS from the clearweb, which was unprecedented in its extent. They should not be rewarded with adverse inferences as a result of the (eminently predictable) consequences brought about by the actions of persons and entities who were directly, openly, and unapologetically interfering with the preservation of ESI in this litigation. Nor is it reasonable to blame Matthew for such actions.

Plaintiffs recovered 15 posts, July 2016 and February 2018, on Matthew's DS account. (Bloch Decl. ¶ 8(c).) However, they did not find anything Matthew may have "liked", "some embedded data from threads [Matthew] participated in was also lost," how long the account had existed, how many posts he wrote, "how many likes he received," and how many days he visited the site. (*See id.*)

Plaintiffs are arguing that because an account existed which was not fully discoverable as to details such as number of "likes" received, an adverse inference must be warranted. Even if Plaintiffs did know the length of time Matthew had an account with Daily Stormer or however many people viewed or liked his posts, that doesn't materially assist in proving a single one of Plaintiffs' allegations.

The Iron March forum and website were shut down by the creator. (*See* Heimbach Dep. 171:2-9.) Again, this is something entirely outside Matthew's control. Plaintiffs are obviously making extensively sweeping requests for every online account Matthew had, then asserting it is all somehow relevant to prove their conspiracy theory.

Matthew's deposition testimony makes it clear an account was created for him on Occidental Dissent. (*See* Heimbach Dep. 302:23-303:7.) Plaintiffs do not even make any claims as to the possible relevance of this account or its relation to the case. It is yet another example of Plaintiffs' asking for information they do not even assert is relevant in any way, then asking for an adverse inference if it is unable to be produced.

Plaintiffs were awfully adamant in their Supplemental Memorandum that these discovery deficiencies were totally egregious, and how this was about missing "critical" ESI. Yet, with these accounts, we see Plaintiffs just requesting a large number of online profiles from Matthew — some of which are entirely out of his control to recover or even preserve in any way outside of With these three accounts, we see plaintiffs requesting a large number of online profiles from Matthew, some of which are entirely out of his control to recover or even preserve in any way outside of perhaps taking screenshots of each post, in order to try to bootstrap a conspiracy that never existed. (Pro-White groups are not a monolith.) Granting an adverse inference would allow wild speculation as to what the accounts contained, and that would be unjust.[10]

### I.    Therightstuff.biz

Matthew's forum account on therightstuff.biz was deleted by the owners of the website. Matthew did not recall any of his posts on the forum to be relevant to the case. (*See* Heimbach

---

[10]     Plaintiffs' counsel

Dep. 161:14-168:6.) When a litigant does not recall a forum account as even being relevant, it would be an odd thing to punish him with sanctions for not preserving the account before it was deleted, by the site owner, in a manner totally out of his control.

### J.     TWP email and ticket system

Matthew explained in his deposition testimony that David Matthew Parrott ("David Matthew") maintained the TradWorker e-mail and ticket system, and Matthew believed that David Matthew had provided relevant discovery regarding the email and ticketing system. Further, Matthew explained he did not have the information and did not know how to obtain it, but was again of the belief it was already provided by David Matthew. (*See* Heimbach Dep. 260:6-261:21.)

### K.     GoyFundMe and Hatreon

Both of these fundraising platforms were shut down due to their credit card processing ability being ended (once again, by multibillion-dollar corporations that share the same political views as Plaintiffs and their counsel). (*See* Heimbach Dep. 176:15-176:23.)

### L.     PayPal

Again, Matthew's account was deleted without his prior notice or consent, and is beyond his control. PayPal deleted it. (*See* Heimbach Dep. 172:23-24.) And if the account had not been deleted, what might the plaintiffs expect to find here? Heimbach's deposition questions suggest that the "note" you can attach to payments might be evidence of Plaintiffs' conspiracy theory. But how would that look, *exactly*? Payments of different small amounts back and forth between Defendants, perhaps, as a kind of secret code? Hatching secret plans via the PayPal memo system?

### M.      One ASUS Laptop

Matthew stated the documents created using that laptop were writings and emails that were in a Google Drive and on a Gmail account, to which Matthew provided access for the plaintiff's counsel. (*See* Heimbach Dep. 207:6-16.) With this in mind, knowing potentially relevant documents related to this case were housed within Google's cloud services, it does not follow that the physical laptop itself would be particularly useful as a source of relevant, probative evidence.

### N.      Three cell phones

- Android phone

- Blackview BV 800 Pro

- Phone too new to possibly have anything relevant

Plaintiffs seem to make a big deal about "three phones" being used by Matthew. He never had more than one functioning phone in use at any given time. The third phone was provided in discovery, but had nothing relevant on the device. The second phone, the Blackview BV 800 Pro, was used by Matthew only months after the Unite the Right rally.

Regarding the Android, plaintiffs claim they did manage to recover text messages from other co-Defendants in the case. Any messages that were on the lost Android could have been found on phones of other Defendants. Plaintiffs specifically complain about two outgoing text messages from Michael Tubbs to Matthew sent on August 29, 2017 — *over two weeks after the Unite the Right rally*. This is really not the kind of thing adverse inferences are made of.

O.      **Relevant Hard Copy Documents**

Plaintiffs claim Matthew had "important hard copy documents," like letters to individuals in prison including Jacob Goodwin, Alex Ramos, and Daniel Borden. (Pl. Supp. Mem. at 4.) Letters that are sent to and from correctional institutions are frequently scanned and archived by the facility, and non-legal mail is opened and read by prison staff first. These were obviously "pen pal" letters ("Keep your head up," "Stay strong," etc.). Do Plaintiffs seriously contend that these letters would contain some kind of smoking gun, such as Matthew gleefully reminiscing about the alleged conspiracy? Plaintiffs paint a very odd and contradictory picture of Matthew, in which he is both a conspiratorial mastermind, and a bumbling fool who would make damning admissions in letters to prison inmates for which he knew his letter would be read by authorities. Certainly, both cannot be true.

### CONCLUSION

For the foregoing reasons, Plaintiffs' request for adverse inferences against Matthew should be denied.

Respectfully submitted,

*/s/ Joshua Smith*
Joshua Smith, Esq.
Pennsylvania Bar ID No. 207585
Smith LLC
807 Crane Avenue
Pittsburgh, Pennsylvania 15216
(917) 567-3168 (phone)
joshsmith2020@gmail.com

*Counsel for Defendants David Matthew Parrott, Matthew Heimbach, and Traditionalist Worker Party*

Dated: September 9, 2021

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 9, 2021, I filed the foregoing with the Clerk of Court through the CM/ECF system, which will send a notice of electronic filing to all counsel of record in the case, as well as all ECF-registered *pro se* parties.

I hereby further certify that on September 9, 2021, I served a copy of the foregoing on the following non-ECF *pro se* parties, via electronic mail, as follows:

Richard Spencer
richardbspencer@icloud.com
richardbspencer@gmail.com

Vanguard America
c/o Dillon Hopper
dillon_hopper@protonmail.com

Robert "Azzmador" Ray
azzmador@gmail.com

Elliott Kline a/k/a Eli Mosley
eli.f.mosley@gmail.com
deplorabletruth@gmail.com
eli.r.kline@gmail.com

I hereby further certify that on September 9, 2021, I served a copy of the foregoing on the following non-ECF *pro se* party, via first-class mail, as follows:

Christopher Cantwell (00991-509)
USP Marion
U.S. Penitentiary
P.O. Box 1000
Marion, IL 62959

*/s/ Joshua Smith*
Joshua Smith, Esq.
Pennsylvania Bar ID No. 207585
Smith LLC
807 Crane Avenue
Pittsburgh, Pennsylvania 15216
(917) 567-3168 (phone)
joshsmith2020@gmail.com

*Counsel for Defendants David Matthew Parrott, Matthew Heimbach, and Traditionalist Worker Party*

- 19 -