IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF VIRGINIA

Charlottesville Division

Elizabeth Sines, et al

    Plaintiffs

v

Jason Kessler, et al

    Defendants

Case No:  17-cv-072

## MOTION FOR LEAVE TO FILE INSTANTER

Comes now the Defendant, Christopher Cantwell, and, he hereby Moves this Court For Leave to File Instanter the attached Defendant Christopher Cantwell's Objection To The Magistrate's Order Imposing Evidentiary Sanctions Against Defendants Elliot Kline, Vanguard America, and National Socialist Movement (Doc 982) And The Report And Recommendation That Default Be Entered Against Defendant National Front (Doc 967) Pursuant To Fed.R.Civ.P. 72 And 28 USC §636. In support, Cantwell states as follows:

1) This Court has entered a number of orders either conditionally making adverse inferences and adverse findings of fact against Defendant Elliot Kline (Sines v Kessler 2020 US Dist LEXIS 223168 (WD Va 2020)) Vanguard America ("VA") (Sines v Kessler 2021 US Dist LEXIS 61074 (WD Va 2021)), National Socialist Movement ("NSM"), or, recommending that default be entered against Defendant Natoinalist Front ("NF") (Doc 962). These orders have all rested on findings of bad faith in the discovery process, bad faith which has not been alleged against Cantwell, a pro se prisoner, unlearned in the law, who has not been advised of his procedural rights to object pursuant to Fed.R.Civ.P. 72 or 28 USC §636.

-1-

2)  In certain circumstances, the failure to advise a pro se prisoner
    of his procedural right to object constitutes reversible error.   In
    Roseboro v Garrison 528 F 2d 309 (4th Cir 1975), the Fourth Circuit
    adopted the DC Circuit's reasoning in Hudson v Harley 412 F 2d 1091
    (DC Cir 1968) and found that the failure to give a pro se prisoner
    litigant reasonable notice of his procedural rights in opposing
    summary judgment constituted reversible error.   The Fourth Circuit
    has since expanded this to at least some situations in which a pro
    se litigant faces sanctions.   see, eg, Smith v Beavers 819 Fed Appx
    176 (4th Cir 2020).   And, a quick review of WestLaw or LEXIS NEXIS
    will show that this right is generally applied in proceedings where
    a motion is potentially dispositive of one or more claims.

3)  Here, Cantwell has been unaware of his procedural rights to object
    to the Magistrate's Report and Recomendations and other interlocutory
    orders pursuant to Fed.R.Civ.P. 72 or 28 USC §636;   further, because
    each of the interlocutory orders have been entered conditionally,
    subject to the acceptance of the District Judge, it is not clear that
    they have decided issues sufficiently to trigger the fourteen day
    objection period of Fed.R.Civ.P. 72.   The Fourth Circuit has never
    decided whether Roseboro would extend to a motion to sanction one's
    co-defendants, but, should judgment be entered against Cantwell in
    this matter, particularly given the adverse findings of fact suggest-
    ed against Kline and their near dispositive nature, this would al-
    most certainly be an issue that Cantwell would raise on appeal.

4)  Fortunately, the Court has a chance to cure any error by allowing
    Cantwell to make his objections instanter.   The objections to the
    Report and Recommendation have been made out of the time allotted
    by 28 USC §636, but, that deadline can be extended by the Court

for excusable neglect, and, here the conditions under which Cantwell has been transported and the unavailability of legal resources to help him articulate his case create that excusable neglect. The remainder of the Orders were only entered conditionally, and, thus, the fourteen day timeframe for objections arguable has not yet begun to run, but, if it has, again, excusable neglect exists where Cantwell has not had access to the necessary legal resources to state his position and discover his procedural rights. Further, all of these issues seem to be subject to final language to be determined in the jury instructions, and, thus, arguably, the time to object has also not yet begun to run.

Thus, for good cause shown and because Cantwell can show excusable neglect, this Court should grant leave to file the attached Objections instanter.

Respectfully Submitted,

Christopher Cantwell
USP-Marion
PO Box 1000
Marion, IL 62959

CERTIFICATE OF SERVICE
----------------------

I herey certify that this Motion for Leave to file Instanter was mailed to the Clerk of the Court for posting on the ECF, 1st Class Postage Pre-paid, and, handed to USP-Marion staff members Nathan Simpkins and Kathy HIll for electronic transfer to the Court pursuant to the Court's Order, this 10th day of September, 2021.

Christopher Cantwell

WESTERN DISTRICT OF VIRGINIA

Charlottesville Division

Elizabeth Sines, et al          [
                                [
        Plaintiffs              [
                                [
v                               [   Case No:  17-cv-072
                                H
Jason Kessler, et al            [
                                [
     Defendants                 [
                                [

DEFENDANT CHRISTOPHER CANTWELL'S OBJECTIONS TO THE MAGISTRATE'S

ORDERS IMPOSING EVIDENTIARY SANCTIONS AGAINST DEFENDANTS ELLIOT KLINE,

VANGUARD AMERICA, ROBERT RAY, AND NATIONAL SOCIALIST MOVEMENT (Doc 982),

AND THE REPORT AND RECOMMENDATION THAT DEFAULT BE ENTERED AGAINST DEFEND-

ANT NATIONALIST FRONT (Doc 967) PURSUANT TO FED.R.CIV.P. 72 AND

28 USC §636

--------------------------------------------------------------------------

Comes now the Defendant, Christopher Cantwell, and, he makes the follow-

ing Objections to the Magistrate's Order Imposing Evidentiary Sanctions

Against Defendant Elliiot Kline (Sines v Kessler 2020 US Dist LEXIS 223168

(WD Va 2020)) ("Kline Order"), Vanguard America ("VA") (Sines v Kessler

2021 US Dist LEXIS 61074 (WD VA 2021)) ("VA Order"), Robert Ray (Doc

933), and National Socialist Movement (Doc 982) And The Report And Rec-

ommendation That Default Be Entered Against Defendant Nationalist Front

("NF") (Doc 967) Pursuant To Fed.R.Civ.P. 72 And 28 USC  §636:

1) Cantwell has filed a prior Response To Plaintiff's Motion For Sanctions

   Against Defendant Matthew Heimbach (Doc 457, 539, 1006) ("Heimbach

   Response") in which he lays out the facts that he believes will be

   developed at trial. Heimbach Response para 8, and his argument why

   all adverse inferences or adverse findings of fact in this matter

   should be limited.  Heimbach Response para 9.  Cantwell hereby incorp-

-1-

orates this material by reference.  Fed.R.Civ.P. 10(c).

2)  In addition to the facts stated in <u>Heimbach Response</u>, Cantwell also

believes that, if he  is given a chance to fully and fairly litigate

this matter, the following facts will be developed:

a)  that, regardless of any proximate cause from an alleged "consp-

iracy", the immediate cause of James Fields driving into the

Antifa domestic terror organization's crowd was that a member

of the Antifa domestic terror affiliate Redneck Revolt, Dwayne

Dixon, pointed a rifle at Fields; and,

b)  that the deposition testimony of Plaintiff Natalie Romero, which

has not been provided to Cantwell but which he learned of from

<u>Doc 1040</u> p. 24-25, which will be demonstrated false by videotape

of the events of August 11, 2017.  In particular, while Romero

may not have been herself armed, she appeared as part of a group

of persons, many of whom were armed, that were affiliated with

the Antifa domestic terror organization, that her motive in ap-

pearing was not to voice support for Negroes or Republicans but

to engage in violence in furtherance of a Marxist political cause,

and, that, while one person in the nationalist march did throw

a tiki torch at a male, multiple "marchers" did not throw tiki

torches and no torch was thrown at Romero, among other falsities.

3)  Cantwell also notes that this Court has ruled, <u>Sines v Kessler</u> 2020

US Dist LEXIS 223168 (WD Va 2020) <u>LEXIS p</u> 50, that the imposition

of sanctions, including adverse inferences and adverse findings of

fact, requires a finding of "bad faith", and, that this Court has

made no finding of bad faith on Cantwell's part, heightening concerns

about spillover. <u>Kline Order</u> <u>LEXIS</u> p 6.

The Kline Order
----------------
4)  On November 30, 2020, this Court entered an Order granting non-dis-

-2-

positive evidentiary sanctions against Defendant Elliot Kline.

Kline Order. The Order was entered "subject to the presiding District Judge's final approval", and, to Cantwell's knowledge, no such approval has been yet given. Kline Order LEXIS p 69 (Cantwell does not have the physical order so he is relying on the pagination of the order by LEXIS NEXIS). The Order did not apprise Cantwell of his procedural right to object.

5) As noted in Hemibach Response, the allegation of "conspiracy" against Cantwell appears to stem entirely from an August 11, 2021, meeting he had with several persons, including Ray and Kline. Thus, Cantwell has a special interest in evidentiary sanctions entered against these Defendants, despite the fact that the meeting in question is on video, as there is a particularly heightened possiblity of "spillover" from said sanctions.

6) As the Kline Order notes, LEXIS p 11, sanctions must be "just" and related to the specific "claim" at issue in discovery. citing Ins Corp of Ir v Compagnie Des Bauxites De Guinee 456 US 694 (1984). Plaintiffs allege that Klline played a central role in planning "[the] United the Right [UTR]" event at issue here and that Kline circulated a document, "Operation Unite The Right Charlottesville 2.0" (though not to Cantwell), arranged the August 12, 2021, event (in which Cantwell was injured before he reached the demonstration area), tweeted pictures of Cantwell responding to an attack by the Antifa domestic terror organization (which Cantwell did not direct or have knowledge of), and, allegedly called for protestors to arm themselves in self-defense against the armed Antifa domestic terrorists that opposed them. Kline Order p 14, 17.

7) Because Cantwell is not reasonably alleged to have engaged in bad

-3-

faith during the discovery process and there is no good faith basis or foundation for the Plaintiff's belief that Cantwell entered into a conspiracy with Kline on August 11, 2021, or at any other date, Cantwell objects to the following facts recommended by the Magistrate be deemed established with regards to Kline:

a)  for facts (c)-(e), Kline Order LEXIS p 66-67, the phrase "Defendant Kline entered into an agreement with one or more coconspirators" should be amended to read "Defendant Kline entered into an agreement with one or more coconspirators who were not Christopher Cantwell";

b)  for fact (f), the phrase "racial minorities, Jewish people and their supporters" should be amended to read "Negroes and Republicans" as argued in Cantwell's Motion in Limine For a Determination That Bias Agaisnt Those Who Identify Aa "Jews" Is Not A Form Of "Class Based Invidiously Discriminatory Animus" Prohibited By 42 USC §1985(3);

c)  for facts (g)-(h), the phrase "It was reasonably forseeable to Defendant Kline and intended by him that coconspirators ..." should be amended to read "It was reasonably forseeable to Defendant Kline and intended by him that coconspirators who were not Christopher Cantwell ...". Additionally, the phrase "and intimidation" should be struck as acts of mere intimidation, or, as Cantwell will argue, any violence less than violence intended to cause bodily harm, and, thus, not misdemeanor assault, is necessary to constitute an attempt to impose the badges and incidents of slavery in violation of US  Const Amend XIII;

d)  for fact (k), the statement that "Defendant Kline ratified the racially motivated violence" is improper becuse it begs (i.e.,

-4-

talks past) the question of whether or not the violence was rac-
ially motivated. Cantwell's argument at trial will be that the
only racially motivated violence on August 11 or 12 was conducted
by the Antifa domestic terror organization, whose founding principle
is racial animus against white persons and white identity. To state
that Kline ratified "racially motivated violence" carries the pre-
sumption that the violence that Kline ratified, such as by posting
the picture of Cantwell, was racially motivated on Cantwell's part,
and, that is a factually incorrect statement that cannot be sup-
ported by the record, unless the Court were to find that the jury
can accept the word of Natalie Romero over that of video evidence
showing definitively that her recollections of the events of August
11, 2017, are untrue (which it can't, as Cantwell may argue in lim-
ine). Thus, Cantwell asks that the phrase "racially motivated vi-
olence" be amended to "events" or some other neutral term.

8) In the alternate, for each of facts (c)-(e), (g), and, (k), the
following statement should be appended:

"The inference may be drawn that the co-conspirators were [the
defaulting defendants, such as VA, NF, NSM, et al] but not Chris-
topher Cantwell [or any other non-defaulting defendant.]"

Vanguard America
----------------

9) On March 30, 2021, the Court entered an order conditionally granting
"a permissive adverse inference against Defendant Vanguard America."
VA Order. As with the Kline Order, Cantwell is unaware of the District
Court having adopted this Order.

10) As the Court notes in its Order of September 3, 2021, denying sum=
mary judgment to Defendant League of the South, Michael Hill and
Michael Tubbs, VA is a key Defendant in this matter because James

-5-

Fields appeared at the August 12, 2017, UTR event in a VA uniform, carried a VA shield, marched with the VA contingent, and, some person, presumably a VA member, took responsiblity for Fields' car accident after the events. Doc 1040 p 37. VA is the Defendant, if any, that thus connects Fields to the alleged conspiracy, as, as the Court also notes in Doc 1040 p 2, VA is connected to the "core" of any alleged conspiracy, Defendants Kessler, NSM, NF, Heimbach, "and others" (though not Cantwell).

11) Plaintiffs have sought a "permissive adverse inference" "including" that "Defendant Vanguard conspired to plan racially motivated violence at the Unite the Right rallies in August 2017." VA Order LEXIS p 30-31. As long as this refers to a VA intra-corporate conspiracy, Cantwell does not object. However, Cantwell does object to any phrasing that iimplicitly expands the conspiracy to any party that has not been found to have engaged in bad faith in fulfilling their discovery obligations, or, that refers to irrelevancies, such as bias against any group other than Negroes or Republicans.

Nationalist Front
------------------

12) The Magistrate has entered a Report and Recommendation ("R+R") that defendant NF be found in default and have default judgment entered against it. Doc 967. There is no evidence or reasonable basis for the Court to find that Cantwell was a member of the NF or its component organizations, Defendants NSM, TWP, VA,   East Coast Knights, and League of the South ("LoS"). Doc 1040 p 28. For example, when the NF gathered on August 12, 2017, Defendants NSM, TWP, VA, LoS, Hill, Tubbs, Heimbach, Schoep and others were present but Cantwell was not present. Doc 1040 p 29. As such, should any adverse inferences be drawn from the default of NF, this inference should not be

-6-

phrased in any manner prejudicial to Cantwell.

National Socialist Movement
---------------------------

13) Another opinion, Doc 982, recommend that an adverse inference be
    entered against Defndant NSM, though there is no proposed language.

14) Defendant NSM is not particularly important to Cantwell's case as
    there is no evidence of anything more than casual contacts between
    Cantwell and NSM members at any event at any time, including on
    Augsut 11 or 12, 2017. Stilll though, Cantwell should be protected
    against any spillover effect from NSM's bad faith conduct. Doc 982
    p 21-22.

15) Unlike Defendant VA, no specific language for this adverse inference
    is found in Doc 982. However, Cantwell objects to any adverse inf-
    erence phrased in a manner prejudicial to him.

Robert Ray
----------

16) Apparently, an Order has also been entered on March 24, 2021, grant-
    ing a conditional permissive adverse inference against Ray. Doc 933.
    Cantwell does not have the Order so it is difficult for him to ob-
    ject to it. However, Ray, like Kline, was present at the videotaped
    August 11, 2017, meeting with Cantwell were the Plaintiffs have fals-
    ely alleged that violence was planned. Thus, any adverse inference
    drawn against Ray is objected to insofar as it is phrased in a manner
    prejudicial to Cantwell. The pending Second Motion for Evidentiary
    Sanctions shall be addressed by separate response.

Respectfully Submitted,

Christopher Cantwell

IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF VIRGINIA

Charlottesville Division

| | | |
|---|---|---|
| Elizabeth Sines, et al | [ | |
| Plaintiffs | [ | |
| v | [ | Case No: 17-cv-072 |
| Jason Kessler, et al | [ | |
| Defendants | [ | |
| United States of America | [ | |
| Respondent | [ | |

MOTION TO ORDER THE UNITED STATES TO APPEAR

AND TO PROVIDE CANTWELL AND LAY COUNSEL WITH ADEQUATE

ACCESS TO THE ELECTRONIC MATERIALS

AND CANTWELL ADEQUATE PRINTING CAPABILITY

Comes Now the Defendant, Christopher Cantwell, and, he Moves this Court to Order the United States To Appear And To Provide Cantwell And his Lay Counsel, William A White, Adequate Access To The Electronic Materials including discovery and court filings, released by the Plaintiffs in this matter And Cantwell Adequate Printing Capability, including access to a printer and the ability to screenshot videos. In support, he states as follows:

1) Cantwell has previously filed a motion for extension of the discovery and trial deadlines which was supported by a declaration describing the difficulties he has had accessing the hundreds of files of electronic discovery and court filings that he had dumped on him by the defendants in April 2021; he hereby incorporates that declaration by reference herein.

agement Unit ("CMU").  Sworn Declaration Of Christopher Cantwell As
To The USP Marion CMU ("Cantwell CMU Decl") para 2.  Cantwell has
previously complained to this Court by letter brief about the cond-
itions at USP-Marion CMU and the delay of his commnications to and
from the Court.  At the USP-Marion CMU, Cantwell has access to a
single computer on the SHU on which he can view electronic documents
and discoveries that have been provided to him on a physical drive.
Cantwell CMU Decl para 3-4.  This computer lacks any printing abil-
ity, printer, or means to screenshot video.  Cantwell CMU Decl para
5.  Because of this, Cantwell cannot produce exhibits to his plead-
ings before this Court.  Cantwell CMU Decl para 6.

3)  Cantwell is also unlearned in the law and "legally illiterate".  Cant-
well CMU Decl para 7.  Cantwell is being assisted in this matter by
lay counsel, William A White, who is an experienced federal litigat-
or and has won a number of actions against the United States.  Cant-
well CMU Decl para 8-10;  Sworn Declaration of William A White
("White Decl") passim.  Cantwell needs White's assistance to artic-
ulate his position in this matter to the Court.  Cantwell Decl para
10, 12.  But, USP-Marion staff will not allow White to view Cant-
well's electronic discovery or electronic copies of court filings.
Cantwell Decl para 11.

4)  The right of a prisoner to access to the Courts was first recognized
in Ex Parte Hull 312 US 546 (1941).  In Cochran v Kansas 316 US 255
(1942), the Supreme Court first enumerated specific ways in which
prison staff were prohibited from infringing upon that right, in-
cluding using physical force to coerce an inmate from pursuing an
appeal, seizing the inmate's legal papers, and, delaying the mailing
of papers past court ordered deadlines.  In NAACP v Bulton 371 US

415 (1963), the Supreme Court recognized the free speech right of
lay parties to advise on litigation as long as they do not engage
in barristry, champetry, or, similar acts.  In <u>Johnson v Avery</u> 393
US 483 (1969), the Supreme Court recognized the right of prisoners
to lay counsel in the preparation of petitions for habeas corpus.
In <u>Wolff v McDonnell</u> 418 US 539 (1979), the Supreme Court extended
the right of lay counsel to the preparation of civil rights com-
plaints.  The Supreme Court has never specificlaly addressed whether
the right of lay counsel would extend to the defense of a civil mat-
ter, but, its logic in <u>Wolff</u> would imply that extension.  Specif-
ically, the right to lay counsel is derivative of the litigating
prisoner's right of access to the courts and is to ensure that pers-
ons "totally or functionally illiterate" or otherwise disabled or
disadvantaged in litigation are able to articulate their positions
to the Courts.  <u>Wolff</u>.

5)  Cantwell is not "totally or functionally illiterate" but he is leg-
ally illiterate, and, to date, the Plaintiffs have been using this
fact to run him over in this litigation.  Cantwell has defaulted a
number of important procedural rights and has allowed the bad be-
havior of his co-defendants lead to adverse influences and establish-
ed facts that severely disadvantage him.  He has also failed to make
a motion for summary judgment that would have at least severely nar-
rowed the issues that could be presented at trial in this matter.
And, to date, no defendant, included the represented defendants, have
raised even basic challenges to the Plaintiff's legal theories, like
the binding Fourth Circuit precedent that says that conspiracies
against "Jews"or any class other than Negroes and Republicans are
not actionable under 42 USC §1985(3).

6)  Further,J the United States Department of Justice has indicated that

-3-

it has a continuing interest in this matter and may still charge the defendants criminally in this matter; it is a standard DOJ tactic to use civil suits like this as a test run. Plaintiff's counsel, John Benjamin Rottenborn, is closely tied to the US Attorney's Office for the Western District of Virgnia through his wife, and, Timothy Heaphy, former US Attorney for the Western District of Virginia and someone who, through his wife, Lori Shinseki, has high level tied to the Democratic Party and the Obama administration, has also been personally involved in investigating this case. Thus, prison officials at the USP-Marion CMU also have a motive to interfere with any successul defense of this matter due to the political instructions of their masters in the current Biden administration.

7) Cantwell needs substantial assistance to prepare for trial in this matter and that means having someone with some understanding of the Federal Rules of Evidence and federal trial and motion practice assist him. That person is White, and, Cantwell needs White to have access to the electronic evidence and filings in this matter in order to advise Cantwell where the strengths and weaknesses are in the Plaintiff's case, how to develop his evidence, and, how to present his evidence. White also needs access to the Second Amended Complaint so he can determine exactly which torts are alleged against Cantwell, what their elements are, and, what the laws are that apply to Cantwell's case so that Cantwell can prepare jury instructions and motions in limine. And, White needs access to the expert reports so he can help Cantwell articulate motions in limine in regards to that evidence as well.

8) Because the United States is not a party to this matter, the Court needs to Order the United States, who is being served with this motion,

-4-

appear and answer why the Government's continuing to infringe Cantwell's right of access

to the Courts and not providing him adequate equipment and access to

lay counsel to articulate his position to the Court.

Thus, Cantwell asks that an appropriate order be entered on showing of

good cause pursuant to the All Writs Act 28 USC §1651 and the inherent

power of the court.

Respectfully Submitted,

Christopher Cantwell
USP-Marion
PO Box 1000
Marion, IL 62959

## CERTIFICATE OF SERVICE

I hereby certify that this Motion was mailed to the Clerk of the Court

for posting upon the ECF, 1st Class Postage Prepaid, this __9th day of

September, 2021, and, will be mailed to the US Attorney's Office for the

Western District of Virginia, the Federal Bureau of Prisons, and, US

Attorney General Merrick Garland, certified mail on that date or as soon

thereafter as USP-Marion authorities permit.

Christopher Cantwell

-5-

IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF VIRGINIA

Charlottesville Division

Elizabeth Sines, et al              [
                                    [
    Plaintiffs                  [
                                    [
v                                   [   Case No:   17-cv-072
                                    [
Jason Kessler, et al                [
                                    [
    Defendants                  [
                                    [

SWORN DECLARATION OF CHRISTOPHER CANTWELL AS TO THE UNITED

STATES PENITENTIARY ("USP") MARION COMMUNICATIONS MANAGEMENT UNIT ("CMU")
--------------------------------------------------------------------------

I, Christopher Cantwell, do hereby aver under penalty of perjury this
8th day of September,2021, that the following is true and correct:

1)  I am over the age of 18 and have personal knowledge of the following.

2)  I am a federal prisoner serving a sentence of 41 months imprison-
    ment in the United States Penitentiary ("USP") Marion Communications
    Management ("CMU").

3)  The USP-Marion CMU consists primarily of a single housing unit com-
    prised of four ranges;  one range "B-range" is set aside as a Spec-
    ial Housing Unit ("SHU").

4)  On the USP-Marion CMU's B-range is also a computer that inmates can
    use to view discovery;  acccess to this computer is at the discre-
    tion of staff and this is the only computer on which discovery in-
    formation can be viewed by inmates.

5)  The computer of para 4, supra, lacks a printer or a means of obtain-
    ing screenshots of video.

6)  Because of the facts of para 5, supra, I cannot produce from the dis-

-1-

covery or other electronically stored information that I do have .
documents that can be presented to the court.

7)  I am unlearned in the law and "legally illiterate".

8)  I am being assisted in this matter by lay counsel, William A White,
who is known to the Court, Plaintiffs, and, other Defendants and is
experienced in litigation as described in the attached declaration.

9) Specifically, for the past week, white and I have discussed the facts
of this case, trial preparation and strategy, as well as how the
Plaintiffs can be expected to present this case, what the witnesses
may testify to, what strategies can be used on direct or cross-exam-
ination of witnesses, what the Federal Rules of Evidence and Civil
Procedure are, what the elements are of the Plaintiff's claims, and,
many other legal issues.

10) Prior to my discussions with White, I did not understand the elements
of the Plaintiffs' claims, the required proofs, how my co-defendants'
defaults were being used to build a case against me by implication
falsely, my procedural rights in this matter and how to preserve and
enforce them, and, most elements of this case, trial procedure, the
rules governing this case, and, the law.

11) White is not being permitted by the USP-Marion CMU staff to view the
electronically released discovery and filings with me.

12) I need White to review the Second Amended Complaint, the expert re-
ports, and, the videos of the events complained of in this matter,
as well as the rest of the electronically stored information in this
matter so that he can advise me of my rights and help me articulate
my positions to the Court.

Christopher Cantwell

-2-

IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF VIRGINIA

Charlottesville Division

Elizabeth Sines, et al       [
                             [
     Plaintiffs              [
                             [
v.                           [    Case No:  17-cv-072
                             [
Jason Kessler, et al         [
                             [
     Defendants              [
                             [

## SWORN DECLARATION OF WILLIAM A WHITE

I, William A White, do herbey aver under penalty of perjury that the following is true and correct this 9th day of September, 2021:

1)  I am over the age of 18 and have personal knowledge of the following.

2)  I am a federal prisoner serving a term of 389 months imprisonment at the United States Penitentiary ("USP") -- Marion Communications Management Unit ("CMU").

3)  I have detailed elsewhere my involvement in infiltrating and disrupting the FBI's Counter-Terrorism Division's Domestic Terrorism Strategic Operations Section's Domestic Terrorism Operations Unit's control of the "white supremacist extremist' movement" during the period 2001-2008.  see, eg, United States v White WD Va Case No: 08-cr-054 Doc 411, et al;  United States v White MD Fl Case No: 13-cr-304 Doc 208.

4)  I act as lay counsel to many persons, primarily members of organiz-
    ations and governments hostile or adversarial to the United States.
    Cases I have litigated or am litigating include:

    a)  United States v Bin Laden SD NY Case No:  98-cr-1023 nunc sub
        nomine United States v al-Owhali 2nd Cir App No:  20-3174, in
        which I have obtained a certificate of appealability for members
        of al-Qaeda's military leadership wrongfully convicted of vi-
        olating 18 USC §924(c) in conjunction with the bombings of the
        US embassies in Nairobi and Dar Es Salaam;

    b)  United States v Kourani SD NY Case No:  17-cv-417, where I am
        working with a member of Hezbollah's Islamic Jihad Organization
        seeking en banc consideration on appeal of whether the disparate
        sentences handed down by strongly Israel-identified judges to
        Muslims accused of terrorism vis a vis non-Muslims with the
        same charges or not strongly Israel-identified judges to Muslims
        constitutes substantive and procedural unreasonableness;

    c)  Al-Kassar v Julian SD Ind Case No:  18-cv-086, where the Plaint-
        iff, brother in law of the Director of Syrian Intelligence and
        long time supporter of Palestinian liberation movements, was
        tortured by the Bureau of Prisons ("BOP") after refusing to
        assist the US war effort against his country;

    d)  United States v Duka D NJ Case No:  13-cr-3664, et al, the "Fort
        Dix Five" case which I understand was recently covered in The
        Intercept.  Here, I did essentially all of the research and the
        initial briefings arguing that Martinez v Ryan 132 S Ct 1309
        (2012) rulings on ineffectiveness of post-conviction counsel

-2-

particularly in the instant case where the defendants were con-
victed of conspiracy to murder by a jury that was not properly
instructed on the element of mens rea and are likely actually
innocent;

e) Smadi v Michaelis SD Ill Case No: 19-cv-217, where Muslim in-
mates were wrongfully denied access to Halal food;

f) Smadi v True 783 F Appx 633 (7th Cir 2019), where a Muslim
inmate was subjected to a number of arbitrary communications
restrictions and repeatedly issued disciplinary tickets because
of his mental illness, and, the District Court incorrectly
ruled that no relief was available for violation of federal
inmate's Constitutional rights.

5) Additionally, I have won several important rulings in my own cases,
most of which remain pending, including:

a) White v Berger 709 F Appx 532 (11th Cir 2017) and White v Berger
769 F Appx 784 (11th Cir 2019) (complementing me on my federal
motions practice) regarding the government's use of torture to
obtain my convictions in United States v White MD Fl Case No:
13-cr-304;

b) White v United States 2020 US Dist LEXIS 210326 (WD Pa 2020)
(R+R) (later adopted) finding that Post-Traumatic Stress Dis-
order ("PTSD") is a physical injury for purposes of the Prison
Litigation Reform Act ("PLRA").

6) I have also obtained the release from prison of several wrongfully
detained persons, including:

a) Daniels v Owens ND Ill Case No: 15-cv-5700, a 28 USC §2241 case
where the Petitioner, Sterling Daniels, had become involved in
a sexual relationship with a halfway house employee who wrote

him malicious disciplinary reports when he tried to break off the relationship, resulting in him being returned to prison administratively by the BOP to serve a 17 month term;  he was released in a settlement;

b)  <u>United States v Davis</u> ND Ill Case No:  13-cv-772, where an Assistant US Attorney presented to a Grand Jury testimony a Chicago police officer had previously given in a state court and which had been adjudicated  to be perjury by that court to obtain the indictment of Nichols Davis in a drug conspiracy, I wrote a motion to dismiss the indictment which was later adopted by Davis' counsel and which resulted in dismissal and Davis' release.

Having so averred, I sayeth no more under oath.

William A White #13888-084
USP-Marion
PO Box 1000
Marion, IL 62959

IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF VIRGINIA

Charlottesville Division

1064

9/13/21

Elizabeth Sines, et al                 [
                                        [
    Plaintiffs                          [
                                        [
v                                       [    Case No:  3:17-cv-072
                                        [
Jason Kessler, et al                    [
                                        [
    Defendants                          [
                                        [

RESPONSE TO THE MOTION TO SANCTION JAMES FIELDS
-------------------------------------------------

Comes Now the Defendant, Christopher Cantwell, and he makes the follow-
ing Response to the Motion to Sanction James Fields:

1)  Cantwell has previously responded to the similar Plaintiff's Motion
    To Sanction Defendant Matthew Heimbach ("Heimbach Response") in
    which he laid out what he believes the relevant facts developed at
    trial will be;  he now incorporates this by reference here.  Fed.R.
    Civ.P. 10(c).  To this, as in his Objections and Responses to the
    other similar motions, Orders and Report and Recommendation sanction-
    ing various of his co-defendants, he also states that he believes
    that, if this matter were to be fully and fairly litigated, the
    evidence would show that the immediate, predicate "but-for" cause
    of James Fields' car accident was Dwayne Dixon of the Antifa domest-
    ic group Redneck Revolt pointing an assault rifle at Fields, and,
    that the deposition testimony of Natalie Romero will be proven to
    be inaccurate and false by the videotape recording the events of
    August 11, 2017.

2)  Any line that the Plaintiffs may try to draw in this matter between
    Cantwell and Fields will be long and winding and connected with a
    few artificial bridges and leaps of the imagination.  As described

-1-

Doc 1040 p 17-24, there was intense planning for this event, in-
cluding a document "Operation Unite the Right Charlottesville 2.0",
use of Discord servers like the Southern Front, and plans for the
manufacture and deployment of shields and clubs as well as training
in their use. What is notable about all of this preparation is that
none of it included Christopher Cantwell. Similarly, when Fields
appeared at the August 12, 2017, event in a Vanguard America ("VA")
uniform, carrying a VA shield, and, marching with a group that in-
cluded the Nationalist Front ("NF"), the Traditionalist Workers
Party ("TWP"), the National Socialist Movement ("NSM"), and, several
of the sanctioned defendants who were members of those organizations,
Cantwell was not there.  Doc 1040 p 30-37.  And, in fact, none of
the Defendants with whom Cantwell is alleged to have conspired,
including Kline, Ray, and, Kessler, were there either;  Heimbach, in
fact, has testified that the plans for that day were kept separate
from Kessler's.  Doc 1006-2 p 102.  Thus, given the dearth of fact-
ual foundation for any connection between Fields and Cantwell, or,
between Cantwell and the joking talk of running people over that
apparently occurred on some Discord server, Cantwell is especially
sensitive to any adverse finding of facts that could wrongfully
link him to the car accident that klled Heather Heyer and injured
other members, supporters, and, associates of the Antifa domestic
terror organization.


3)  As this Court has noted, a finding of "bad faith" is required to
impose the kind of evidentiary sanctions suggested by the Plaintiffs
here, and, that defendants situated such as Cantwell must be protect-
ed from "spillover" effects from the bad faith conduct of other de-
fendants.  Doc 982 p 21-22;  Sines v Kessler 2020 US Dist LEXIS 223168
(WD Va 2020) LEXIS p 50.

⁴ ought to be some evidence to support that fact, and the fact
established should be clear and concise. Neither appears to be
the case for facts #42 and #47.

5)  As in other response motions and objections regarding sanctions
against Defendants, any allegation regharding agreements or forseeable
actions of co-conspirators should specifically exclude Cantwell.
Such as by appending "agreement with one or more coconspirators
**who were not Christopher Cantwell**". Or, "The inference may be
drawn thatthese co-conspirators were (sanctioned or defaulted
defendants) but not Cantwell.

6)  Any allegation regarding "racial minorities, Jewish people,
and, their supporters" should be amended to "Negroes (or appropriate
modern terminology  therefor) and Republicans" as argued in a
prior motion in limine.


Respectfully Submitted

Christopher Cantwell



CERTIFICATE OF SERVICE
-----------------------

I hereby certify that this Response to the Motion to Sanction
James Fields was mailed to the Clerk of the Court, 1st Class
Postage Prepaid, for posting to the ECF system to which all other
parties are subscribed, and that it was handed to USP Marion
Staff Kathy Hill or Nathan Simpkins for electronic filing pursuant
to the Court's prior order.



Christopher Cantwell

WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

1065

9|13|21

Elizabeth Sines, et al
Plaintiffs

      Civil Case No. 3:17-cv-000 72

v

Jason Kessler, et al
Defendants

DEFENDANT CHRISTOPHER CANTWELL"S PARTIAL EXHIBITS LIST

Comes Now the Defendant, Christopher Cantwell, and, he presents
this list of exhibits to be introduced at trial in the above
refernced matter. This list is described as "partial" because
Cantwell has still not been provided with discovery in this matter,
and has been deprived of access to all of his legal papers and
data by the United States government since April of 2021, less
than three weeks after having hundreds of documents and voluminous
discovery dumped on him by the Plaintiffs after fourteen months
of leaving him in the dark.

These exhibits were provided to Plaintiffs' counsel and Cantwell's
co-defendants and to the Court in January of 2020 as part of
his "Objection to Evidentiary Sanctions Against Defendant Kline"
(Kline Objection).

The naming conventions are imperfect, to say the least of it,
but they are preserved here for the sake of consistency. Most
notably, earlier numbered videos are clips from later numbered
source videos. For that reason, we begin by describing the source
material, beginning with Exhibit121-GorcenskiLS1.mp4,
Exhibit122-GorcenskiLS2.mp4, Exhibit123-GorcenskiLS3.mp4, and
Exhibit124-GorcenskiLS4.mp4. These four video files were downloaded
from the Periscope channel of Plaintiffs' co-conspirator Emily

1/21

of his many crimes. Periscope is (was) a live video streaming
service, once offered by the same company as Twitter. Gorcenski
used Periscope to live stream the events, and, importantly, to
conduct surveillance and recon for his co-conspirators against
the Defendants. These videos were live streamed on the UVA campus
on the evening of August 11th, they capture Plaintiffs' co-conspirators'
premeditation, the decidedly non-criminal behavior of the Defendants,
and the aftermath of the fighting at the Jefferson Monument.
Exhibit132-News2ShareAll.mp4 is a video compilation posted to
social media by Ford Fischer of News2Share. I do not posess the
unedited source video of this compilation, but this video is
used as source material in clips and compilations I produced.
Exhibit133-InvictusAll.mp4, as the name implies, is the live
stream video taken by Defendant Augustus Invictus on the evening
of August 11th on the UVA campus. It captures Defendants' procession
through the campus, and the fighting at the Jefferson Statue.

Exhibit134-RawAndUncut.mp4, unlike the name, is cut quite a bit.
This video compilation was posted to social media by persons
Cantwell cannot readily identify, and the video was provided
to Cantwell by Elmer Woodard during his criminal defense investigation.
The video captures, among other things, fighting on the evening
of August 11th at UVA.

Exhibit135-Getty.mp4 as the name and watermark imply, is sourced
from Getty Images, and contains video of the fighting on the
evening of August 11th at UVA.

Exhibit136-InsaneNewFootage.mp4 was also provided to Cantwell
by Elmer Woodard as part of the criminal defense investigation.
Its original source, as such, is not currently known to Cantwell.

of that name. Gorcenski retweeted the video claiming this was the clearest depiction of his involvement in the violence at UVA on August 11th. The original source of the video appears to be the YouTube personality known as "Baked Alaska", who was present at the event and live streaming to his audience.

Exhibit138-UnicornRiotAll.mp4 is an edited compilation video which depicts the fighting at UVA on the evening of August 11th.

The video was recorded and edited and released by the communist "media collective" and Plaintiffs' coconspirator known as "Unicorn Riot".

There were two other source videos provided to the Plaintiffs in discovery which were not part of the Kline Objection. These were Cantwell's body camera video from the Radical Agenda Listeners' Meetup, at which Plaintiffs' co-conspirators falsely reported Cantwell for brandishing motivated by animus toward homosexuals, and Cantwell's body camera video of the August 11th so-called "leadership meeting". The filenames of my local copies of these videos were Meeting.mp4 and IDidNotDraw.mp4.

With the source videos enumerated, we can describe the other exhibits in numerical order.

Exhibit1-Charge.mp4 is a clip from Exhibit134. This shows that, contrary to Plaintiffs' claims, there was no "charge" toward the so-called "counter protesters" at the Jefferson statue on the evening of August 11th at UVA. It also depicts Plaintiffs' co-conspirators in "Black Bloc" battle attire, dark sunglasses as a night time disguise, and confrontational with rallygoers, contrary to the claims of peaceful protesters with their arms

3/21

Exhibit2-Attack.mp4 is a clip from Exhibit133 showing Thomas Massey, a coconspirator of the Plaintiffs from "Philly Antifa" attacking a cameraman without provocation, and throwing water at rallygoers. Tim Heaphy's report on the weekend described this violence, correctly, as the first strike of the evening.

Exhibit3-Fight.mp4 and Exhibit4-CantwellDefends.mp4 are both clips from Exhibit138, focusing on different parts of that conflict as described in the Kline Objection.

Exhibit5-BlackMales.mp4 is sourced from a video watermarked with the website DanielShular.com, the entirety of which one hopes is being introduced by the Plaintiffs or another co-defendant. This segment of that video depicts several black males, one of which is presumably Plaintiff Doe (Cantwell still has no idea who John Doe is, and could not pick him out of a lineup), unafraid and unmolested as rallygoers encircled the Jefferson statue.

Exhibit6-CantwellMaced.mp4 is a video taken on August 12th by a witness who was walking behind Cantwell on their way to Lee Park. It captures the moment that Cantwell is pepper sprayeds without provocation by Plaintiffs' disguised co-conspirator, Mike Longo Jr.

Exhibit7-CantwellMacedFirstPerson.mp4 captures the same incident as Exhibit6, but from the handheld camera that Cantwell was carrying, his body camera having been stolen the night before by Plaintiffs' co-conspirator Lindsay Elizabeth Moers.

Exhibit8-CPDMisdemeanor.mp3 is a recording of a phone call between Cantwell and Detective Oberhauser (spelling uncertain) of the

4/21

Charlottesville Police Department. The Detective was following up with Cantwell regarding a complaint Cantwell had made regarding the above described unprovoked assault by Mike Longo Jr. The call takes place in late July or early August of 2018. In it, the detective informs Cantwell that Commonwealth's Attorney Joe Platania would only charge the crime as a misdemeanor, and that such a charge would not warrant extradition, and that for even this mockery of Justice to be obtained, Cantwell would have to appear before a local magistrate to take out the warrant. To the detective's credit, he seemed no happier about the issue than Cantwell, noting that "Even if I charged it as a felony" Platania would simply drop the charge, like he did for other of Plaintiffs' co-conspirators, even though "No doubt about it, you were assaulted that day".

Exhibit9-DontKill.mp4 is a video downloaded from Twitter showing Cantwell recovering from Mike Longo Jr.'s unprovoked pepper spray attack in Lee Park on August 12th. In it, a man can be seen saying to Cantwell "We're gonna kill em!" and Cantwell replies "Don't kill anybody, you'll make·· it worse!" which disproves Plaintiffs' repeated false claims that Defendants did nothing to stop or limit the violence of that day.

Exhibit10-MeetClip.mp3 is audio clipped from Cantwell's body camera video from the so-called "leadership meeting" on August 11th. It depicts Cantwell and Kessler discuss involving law enforcement in the torchlit march, and Cantwell conditioning his participation thereon.

Exhibit 11-MikeLongoCPReport is an opfficial document from the City of Philadelphia showing that Mike Longo Jr. was on probation

5/14

for his violent criminal habits at the time of the events in dispute.

Exhibit12-Heaphy.pdf is the "Independent" investigation report commissioned by the City of Charlottesville, issued by former federal prosecutor Tim Heaphy.

Exhibit13-GorcenskiDangerousAntifa.pdf is a collection of screenshots of Plaintiffs' co-conspirator Emily Gorcenski's Twitter feed. It shows Gorcenski's outspoken support for Antifa violence, and connections to Plaintiffs and Plaintiffs' counsel.

Exhibit14-UnnamedAndPseudonymous.pdf shows that much of Plaintiffs' fodder for bringing this suit comes from unattributed or unattributable social media accounts.

Exhibit15-CantwellPrelim.pdf is the transcript from Cantwell's preliminary hearing in the Albemarle County criminal matter. It shows that Plaint ffs' coconspirators Emily Gorcenski and Kristopher Goad contradicted sworn testimony to bring their stories into closer alignment with subsequently discovered video, resulting in the dismissal of the malicious injury charges against Cantwell, and Cantwell's resulting lawsuit for malicious prosecution.

Exhibit16-CantwellDiscord.pdf is a PDF printout of the UnicornRiot Discord leaks for Cantwell's username. This shows that the Plaintiffs' counsel knowingly and intentionally deceived this Court when filing this lawsuit by making demonstrably false claims about his Discord usage.

Exhibit17-CPDDetective20170717.mp3 is a recording of a phone call between Cantwell and Detective Wright (spelling uncertain) of the Charlottesville Police Department on July 17th 2017. In

and offers to keep her apprised of his plans. This, in stark contrast to the Plaintiffs and their co-conspirators, who had attorney Pam Starsia chase the police away (as will be shown in Exhibit44-LeftistLawyer.pdf).

Exhibit18-SMS.xlsx is a redacted version of Cantwell's text messages provided to Plaintiffs in discovery, for evidentiary purposes, that unredacted version is a better specimen.

Exhibit19-FightNarrated.mp4 is an edited video produced by Jared Howe, an associate of Cantwell's. It narrates the fighting Cantwell was involved in at UVA on August 11th, and disproves false claims made under oath by Plaintiffs' coconspirators Goad and Gorcenski.

Exhibit20-GorcenskiRelease.pdf is a copy of the release signed by Goad and Gorcenski. This "mutual release of all claims" resulted in the dismissal of Cantwell's malicious prosecution lawsuit against Goad & Gorcenski, as well as their counter claims.

Exhibit21-SignedPlea.pdf is a copy of the plea agreement sent to Cantwell by Commonwealth's Attorney Robert Tracci, concluding the Albemarle County criminal matter by pleading to misdemeanors with an effective sentence of time served.

Exhibit22-Cantwell-v-Gorcenski-Complaint is the malicious prosecution lawsuit filed agaiunst  Goad & Gorcenski by Cantwell.

Exhibit23-DixonConfession.mp4 is a video of Dwayne Dixon confessing his decisive role in the death of Heather Heyer, when he pointed an AR-15 at James Fields just before the crash.

Exhibit24-UTR-Updates-Blogpost.pdf is a PDF printout of a blog post at ChristopherCantwell.com by Defendant Cantwell, reflecting

7/21

In it, Cantwell warns his audience that they must be cautious
to obey the law, and comply with the orders of law enforcement,
especially if they are carrying firearms, which they should only
be doing if they have the authority to conceal.

Exhibit25-LawfullyOrganized.pdf is a DHS memo describing how
"anarchist extremists" have repeatedly attacked "lawfully organized"
white supremacist events, such as the one at the heart of this
dispute.

Exhibit26-SueANazi depicts the flamboyant behavior of Plaintiffs'
financier bragging about the ideological motivations for this
suit, and raising money to continue this abuse with the hashtag
#SueANazi.

Exhibit27-BreakTheBack.pdf is an article from the Jewish Telegrap-
-hic Agency, about an interview with Plaintiffs' counsel Roberta
Kaplan. Amongst other things, it exemplifies the hypocrisy of
Plaintiffs' claims, particular those of their "White supremacy
expert" that there is no such thing as humor or hyperbole in
the lexicon of their political opponents. The headline is "This
Jewish Lawyer Wants To Break The Back Of The Violent White Nationalist
Movement". For posting this article saying Cantwell would "have
fun" with her after prevailing in this litigation, Plaintiffs
moved to sanction Cantwell claiming that "have fun" was Nazi
code language for hate crime. Meanwhile, Jews can conspire to
break backs and nobody thinks twice about it.

Exhibit28-CapitalOfAntifa is a video from a Charlottesville City
Council meeting on August 21st 2017. At that meeting, Plaintiffs'
coconspirator Emily Gorcenski declares Charlottesville the "Capitol

8/21

standing ovation.

Exhibit29-ClarityofRupture.pdf is a blog post from Plaintiffs'
coconspirator ItsGoingDown.org, a clearinghouse for violent
Antifa propaganda. (Herein, this coconspirator will be referred
to simply as IGD). This post, like many others, predates the
events in dispute, and glorifies anarchist violence such as that
espoused by Plaintiffs and their coconspirators.
Exhibit30-ViolenceAgainstPolice.pdf is another IGD post glorifying
Plaintiffs signature violence in advance of the Events.

Exhibit31-IGDTorchMarch.pdf is an IGD post leaking the erstwhile
secret plans for Defendants' torchlit march through the UVA campus,
along with calls to stop it by any means necessary.

Exhibit32-MeetClip2.mp3  is another audio segment clipped from
Cantwell's body camera footage of the so-called "leadership
meeting".

Exhibit33-AntifaSpray.mp4 is a clip from Gorcenski's livestream
videos of August 11th, in which he says "we didn't spray shit.
Antifa didn't spray shit" essentially acknowledging that, in
this context, "We" is "Antifa".

Exhibit34-KesslerACLU-Win.pdf descibes Kessler's victory in
the court battle to see the permit for the rally honored.

Exhibit35-Glamour.pdf is an article from "Glamour" magazine showing
that Plaintiffs' counsel Roberta Kaplan is an ambulance chaser,
who conjured this lawsuit from her vivid imagination, knowing
it was a "long shot" legal theory, and then going out to find
clients of sufficiently low moral character to play victim.

Exhibit36-BikeLock.pdf is another article from IGD glorifying the felonious assault carried out by one Eric Clanton, dubbed "bike lock guy" for his weapon of choice in assaulting his political and ideological opponents. Plaintiffs' coconspirator Emily Gorcenski calls this a "myth" in one of his live stream videos, when he overhears Cantwell discussing the crime with a rallygoer at UVA.

Exhibit37.pdf is a screenshot of Gorcenski endorsing the "Diversity of Tactics" - a euphemism for Left wing criminal violence and property destruction, as elaborated on in Exhibit39.

Exhibit38-BlackBloc.pdf is an article from Police Magazine describing "Black Bloc" attire and strategy, such as was deployed by Plaintiffs and their co-conspirators.

Exhibit39-Diversity.pdf is an article from WagingNonViolence.com describing the true meaning of "Diversity of Tactics" to be violence and property destruction, such as is the pattern and practice of the Plaintiffs and their coconspirators.

Exhibit40-AttacksBeforeA12.pdf is an article from DailyCaller.com describing numerous acts of left wing violence against mainstream conservatives and Republicans, to say nothing of their habitual attacks on anyone who dares not cower at the accusation of racism, prior to the events of August 11th and 12th. This illustrates the perfectly reasonable concerns the Defendants had, and the preparations made for self defense. This in contrast to the absurd claim by Plaintiffs that "self defense" is Nazi code for "hate-crime".

Exhibit41-BirdDogging.pdf is an article from Breitbart.com describing the Left wing activist tactic of "Bird Dogging" - which is the

political opponents. Specifically it exposes how this tactic
was deployed by elements of the Hillary Clinton Presidential
Campaign to "create anarchy" around Donald Trump.

Exhibit42-SolidarityGJR.pdf is a post from Antifa group "Solidarity
CVille" encouraging Plaintiffs' co-conspirators to "resist" grand
jury subpoenas related to these events.

Exhibit43-SolidarityMeansSilence.pdf is another post from Plaintiffs'
coconspirators discouraging cooperation with law enforcement.

Exhibit44-LeftistLawyer.pdf is a letter from attorney Pam Starsia
to the Charlottesville Police, warning them to stay away from
Plaintiffs' coconspirators in advance of the Events in dispute.
This in stark contrast to Defendants' coordination with law enforcement,
and particularly Defendant Cantwell's conditioning his participation
thereon.

Exhibit45-GorcenskiDoxing.pdf is a collection of social media
screenshots from Gorcenski doxing rallygoers and generally taking
a great deal of pride and joy in that pattern of behavior.

Exhjibit46-VFArrest2.pdf is an article in the Daily Progress
about Plaintiffs' coconspirator being charged with a politically
motivated criminal assault for the second time.

Exhibit47-23ArrestedJ8 is an article in the New York Times describing
23 of Plaintiffs' coconspirators being arrested on July 8th 2017
for violent demonstrations in Charlottesville.

Exhibit48-J8Stream1.mp4 is a livestream video from Gorcenski
of the criminal mayhem he took part in on July 8th 2017.

11/21

of the criminal mayhem he proudly took part in on July 8th 2017.

Exhibit50-Pleasants.pdf is a DailyProgress article about the criminal mayhem on July 8th 2017. In it, Major Pleasants of the Charlottesville Police Department said of the Leftist rioters "You're damn right I gassed them, it needed to be done" and that the CPD was "under attack" by the rioters.

Exhibit51-WhoAreTheAntifa.pdf is an article in the Washington Post by Mark Bray, author of "Antifa: The Anti-Fascist Handbook". In it, Bray glorifies the violence of the Leftist rioters in Charlottesville, in keeping with the theme oif his book. Gorcenski subsequently shared the post, approving of its content.

Exhibit52-SethsBatallions.pdf is an article in Slate which describes an interview with Plaintiff Wispelwey. In it, @RevSethDub glorifies the violence of "Battalions of Antifa" who diversified his "peaceful" tactics with their "community defense tools".

Exhibit53-CBS19J8.pdf is an article in CBS19 describing the July 8th criminal mayhem.

Exhibit54-RevGor.pdf is a summary of Twitter interactions between Plaintiff Wispelwey and his coconspirator Emily Gorcenski.

Exhibit55-IGD-GJResist1.pdf is an IGD post encouraging Plaintiffs' coconspirators to resist grand jury inquiries regarding the Events in Dispute.

Exhibit56-GJResist2.pdf is another IGD post encouraging "Grand Jury Resistance"

Exhibit55-WantWar.pdf is more IGD war propaganda against bthe

12/21

Defendants in this case.

Exhibit56-URGangForces.pdf is a blog post by Plaintiffs' coconspirator, the communist "media collective" known as "Unicorn Riot" which will henceforth be described as UnicornRiot. This post, like many others, exemplifies the routine glorification of violence endorsed by one of Plaintiffs' closest allies.

Exhibit57-PittsburghTrumpAttack.pdf is yet another IGD post glorifying anarchist criminal violence.

Exhibit58-Atlanta.pdf is yet another violent IGD post.

Exhibit59-MayDay.pdf is yet another violent IGD post.

Exhibit60-IGDAgainstCiv.pdf is an IGD post specifically stating that they are ideologically "against civilization".

Exhibit61-IGDPrisonRebels.pdf is yet another violent IGD post glorifyuing  prison riots.

Exhibit62-IGDThrowingRocks.pdf is another violent IGD post, discussing the philosophical merits of throwing rocks at one's political opponents.

Exhibit63-IGDGloriousRiot.pdf is, well, take a guess.

Exhibit64-IGDJoinResistance.pdf is a violent IGD post recruiting others to join the mayhem.

Exhibit65-AnarchistsDestroy.pdf is still more IGD glorification of anarchist criminal violence.

Exhibit66-ProblemOfPeace.pdf is an IGD post condemning peaceful resolutions of conflict.

Exhibit67-IGDWarOnStreets.pdf is still more violent IGD propaganda.

Exhibit68-IGDWarOnStreetsFull.pdf is a detailed manual on how join anarchist "affinity groups" and wage war against civilization.

Exhibit69-IGDDefenseOfBloc.pdf is an ideological defense of black

13/21

Exhibit70-IGDWisdomOfRioters.pdf is exactly what you would predict from the filename.

Exhibit71-DrivenOutOfCville.pdf is an IGD post describing Plaintiffs' coconspirators "driving out" Defendants' associates from the city of Charlottesville prior to the Events in dispute.

Exhibit72-IGDSixMonths.pdf is an IGD post made six months after the events in dispute. In it, the author remarks about how Plaintiff Wispelwey told him or her that he supports the "diversity of tactics" and the author was awestruck that a "Reverend" would openly endorse criminal violence of the sort he habitually practiced with his "delegation".

Exhibit73-MasseySprayA12.mp4 is a video of Thomas Massey pepper spraying Defendants' associates without provocation on August 12th.

Exhibit73-PhillyCrewA12.mp4 shows a gang assault by Philly Antifa on August 12th.

Exhibit73-PhillyCreA12b is yet another video of criminal violence by Philly Antifa.

Exhibit74-PhillyCrewA12c is yet another video of criminal violence carried out by Philly antifa on August 12th.

Exhibit75-PhillyCrewA12d is still more Philly Antifa violence August12th.

Exhibit76-MasseyWaPo.pdf is an article in the Washington Post which quotes Thomas Massey, after having been arrested for participating in the Inaugeration Day riots agains President Trump, as saying "I wish it was more violent. I wanted to punch a Nazi".

Exhibit77-NJKeenan2011.pdf is an article from NJ.com showing that Plaintiffs' coconspirator Thomas Keenan ofd Philly Antifa

14/21

the better part of a decade across several US States.

Exhibit78-KeenanFightingAll.mp4 is a short clip from Exhibit137 showing Thomas Keenan throwing punches in a brawl that breakjs out near the Jefferson Statue.

Exhibit79-LovePark.pdf is an article from "Anti-Antifa" describing what came to be known as the "Love Park Four Incident", wherein Thomas Keenan and several coconspirators broke the windows out of a parked SUV while they were out hunting Nazis, and were subsequently arrested by the FBI agents who were inside the vehicle.

Exhibit80-Lovepark2.pdf is the same incident, described by the presumably less biased PhillyMag.com.

Exhibit81-EthnicIntimidation.pdf is a PhillyMag.com article about Thomas Keenan and Thomas Massey being arrested for Robbery and Ethnic Intimidation long after the events in dispute, showing that their criminal violence did not end after their assaults on the Defendants and their associates.

Exhibit82-EthnicIntimidation2.pdf is an update to the above mentioned story in PhillyMag.com

Exhibit83-EthnicIntimidation3.pdf is yet another such update.
Exhibit84-EthnicIntimidation4.pdf is yet another such update.

Exhibit85-A12Clash1.mp4 is video of fighting on August 12th.

Exhibit86-LuckyToHaveAShield.mp4 shows Tom Keenan attempting to pepper spray a rallygoer who was fortunate to be holding a shield.

Exhibit87-AntifaOnMe.mp4 shows Mike Longo Jr. near the Jefferson statue on August 11th, summoning his affinity group by saying "Antifa on me!".

Exhibit88-InfoWars1.mp4 shows Mike Longo Jr. pepper sprayuing a reporter from InfoWars.com without provocation. Longo is disguised

15/21

Exhibit89-Infowars2.mp4 is another camera angle of Longo's unprovoked assault on the InfoWars reporter.

Exhibit90-MoersBaton1.mp4 is a clip from Exhibit132 showing Plaintiffs' coconspirator Lindsay Elizabeth Moers swinging her expandable baton at rallygoers near the Jefferson Statue on August 11th at UVA.

Exhibit91-MoersBaton2.mp4 is a clip from Exhibit135, also showing moers swinging the weapon at rallygoers on August 11th at UVA.

Exhibit92-FBIBatonReceipt.pdf is a redacted version of a document sent to Cantwell by a podcast listener. The listener had contacted Cantwell about having taken that Baton from Moers on the evening of August 11th after Cantwell had been pepper sprayed during his thwarted attempt to disarm the woman. The listener offered the weapon to Cantwell "as a trophy" but Cantwell was more interested in evidence for his criminal trial and thus put the listener in contact with Elmer Woodard. Before Woodard could retreive the evidence, the FBI, having foun the lead by monitoring Cantwell's GMail account, seized it and provided this receipt to the listener.

Exhibit93-MoersJuly.mp4 shows Moers in another city engaged in violent crime in the months before the Events in dispute.

Exhibit94-AllAfterFight.mp4 is a clip from Exhibit133 showing aftermath oif the fighting on August 11th.

Exhibit95-PinDown.pdf is an article in the Guardian describing this litigation as a success, not for its merits, which are lacking, but for the fact the fact that it "pinned down" the growing Alt Right movement, which the author speculates would otherwise have gained mainstream acceptance.

Exhibit96-MintonMurder1a.pdf is a newspaper article describing

16/21

Plaintiffs' coconspirator Donald Minton's involvement in a murder

back when he was a Nazi skinhead gang member, prior to his rehabilitation and conversion to communist terrorism.

Exhibit97-MintonMurder1b.pdf is an update to the story described above.

Exhibit98-MintonMurder2.pdf is an update to Minton's murder saga.

Exhibit99-GorcenskiHeadcount.mp4 is a clip or compilation from Gorcenski's Livestream videos in which he counts rallygoers for the benefit of his awaiting coconspirators.

Exhibit100-GorcenskiViolentOp.mp4 is a clip from Gorcenski's 8/11 livestream in which he assures the FBI agents who are watching that this is not a "violent op".

Exhibit101-GorcenskiOnCivilRights.mp4 is a clip from Gorcenski's 8/11 livestreams in which he discusses his views on civil rights.

Exhibit102-SURJGFM.pdf shows Antifa group and Plaintiffs' coconspirator SURJ (Showing Up For Racial Justice) fundraising to bail out their coconspirators in advance of their crimes.

Exhibit103-BondFund.pdf shows another "Bond Fund" raising money before the crimes have been committed, demonstrating premeditation.

Exhibit104-UVAWNPoll.pdf is a poll from the University of Virginia showing substantial public support for White Nationalism.

Exhibit105-UVAReutersExtremePoll is another political poll done by UVA along with the Reuters News Agency.

Exhibit106-ABCNaziPoll.pdf is a poll conducted by ABCconcerning public opinion about "Nazis".

Exhibit107-RassAntifa17.pdf is a public opinion poll by Rassmussen regarding Antifa taken in 2017.

Exhibit108-RassAntifa18.pdf is another such poll taken in 2018.

Exhibit109-RassAntifa19.pdf is another such poll taken in 2019.

Exhibit110-HHBLMPoll17.pdf is a Harvard Harris public opinion

17/24

Exhibit111-RAMeetupMember.pdf is a blog post from ChristopherCantwell.com as it would be shown to paying members of the website. The post describes the August 11th "Radical Agenda Listeners' Meetup" which began in the Walmart Parking lot, and gives the member time and location.

Exhibit113-RAMeetupEmail.pdf is a GMail copy of the email that went out to subscribers about the Listeners' meetup. Notably, it does not contain time and location information, contradicting Gorcenski's sworn testimony at Cantwell's preliminary hearing.

Exhibit114-RAMeetupNonMember.pdf is the same blog post referenced in Exhibit111, as shown to a non-member. Notably, it lacks time and location details.

Exhibit115-BrandishingNews.pdf is an article from NBC12.com concerning the false brandishing allegation against Cantwell. Notably, it remains uncorrected to this day.

Exhibit116-WalmartAntifa.mp3 is an audio clip taken from Cantwell's body camera footage of the Walmart meetup.

Exhibit117-WalmartCops.mp3 is an audio clip taken from Cantwell's body camera footage of the Walmart Meetup.

Exhibit118-Gorcenski302.pdf is a copy of the FBI 302 report from Gorcenski's interview with the agents.

Exhibit119-MPAffidavit.pdf is a sworn statement by Gorcenski regarding his charges against me in Albemarle County.

Exhibit120-RA342.mp3 is the full audio, unedited, of my entire interview with Vice News Tonight. Both parts.

Exhibit121, 122, 123, and 124 were described at the start of this document.

Exhibit125-MoersTakesCamera.mp4 is a compilation video using source material from Exhibits 132 and 135, showing Lindsay Elizabeth

Moers stealing Cantwell's body camera on August 11th at UVA,
just as Cantwell is sprayed by Plaintiffs' co-conspirator "BeanyMan"
with pepper spray.

Exhibit126-CantwellArrives.mp4 is a clip from Gorcenski's live
stream videos showing the moment Cantwell arrives at UVA's "Nameless
Field".

Exhibit127-IfYouDontHaveATorch.mp4 is anopther clip from Gorcenski's
8/11 live streams, showing Defendant Kline telling rallygoers
what to do if they don't have a torch. This contradicts the
Plaintiffs' claim that Cantwell was slected for his willingness
to "get physical" with the so-called "counter protesters" - which
itself was a misquote from the Heaphy report.

Exhibit128-GorcenskiUnafraid.mp4 is a compilation of clips, in
chronological order, from Gorcenski's livestream videos. It illustrates
the performative nature of Gorcenski's various fits of panic
for the benefit of other cameras and narratives by showing him
within striking distance of rallygoers and mocking them to their
faces.

Exhibit129-GorcenskiRecon.mp4 is a compilation of clips, in chronological
order, from Gorcenski's live streams, showing Gorcenski performing
head counts, and reporting on the rallygoers movements, so that
his co-conspirators would be prepared for the awaiting ambush.

Exhibit130-Showtime.mp4 is a clip from one of Gorcenski's livestream
videoswhich begins just before the rallygoers reach the Jefferson
statue. In it, Gorcenski rushes ahead of the procession to his
awaiting coconspirators. As he approaches, he says "I'm blocking
my camera for a minute" so as to not identify the faces of the
violent criminals laying in wait. As Gorcenski reaches the statue,

19/21

without another word being exchanged, another coconspirator shouts "heads down ya'll", and once their faces are manually hidden, Gorcenski lifts the camera again, careful to film only the feet of his coconspirators, but occasionally lifting the camera to record the few uninvolved bystanders. Gorcenski then begins the performative fear routine made so laughable by Exhibit128. Exhibit131-GorcenskiGuiltyConscience.mp4 is a compilation of clips, in chronological order, from Gorcenski's livestream videos. It captures Gorcenski speaking for the benefit of the record about how this isn't a "violent op" and how the rallygoers have nothing to fear from Antifa.

Exhibit132, 133, 134, 135, 136, 137, and 138 were described at the start of this document.

Exhibit139-Aftershow.mp4 is a compilation video produced by Cantwell from several source videos, it includes slow and fast motion effects, annotations in text and with arrows pointing to important events, and scrrenshots from social media to provide context. The video shows definitively that Gorcenski was pepper sprayed by the same Antifa criminal as Cantwell, Beanyman, and at the same time. It shows that Gorcenski knowingly lied under oath, that his panic routine on his final livestream of the evening was entirely performative, and cumulatively it makes the premeditation of the attack circumstantially obvious.

In addition to these exhibits, there are dozens if not hundreds of images and screenshots of social media posts contaiuned in the Kline objection which I may seek to introduce. They are not listed here because I do not haveaccess to the document, and what little I do have access to cannot be easily reproduced on a typewriter. To the extent applicable, they are hereby incorporated by reference.

2021

have been operating with a budget in excess of $10,000,000. They
have had four years to conduct their  investigation. They have
issued subpoenas, conducted depositions, enjoyed the cooperation
of law enforcement, been darlings of the Leftist Press, and have
incurred all the benefits of this Court operating on the false
assumption that their Counsel have acted in good faith.

But as recently as my July 2021 deposition, Plaintiffs' counsel
Michael Block denied having seen the video of Lindsay Elizabeth
Moers stealing my body camera, even though he wrote the response
to my Kline objection. I subsequently wrote Mr. Bloch a letter,
urging him to avail himself of the truth. I subsequently sent
him other letters, such as about the settlement conference, and
stipulations, but he has not replied to any of them.

In the most charitable interpretation, Plaintiffs' counsel have
shielded their eyes from the truth. But multimillionaire Democrat
power players need not avail themselves of charity. They know
what happened here. Just like Roberta Kaplan knew what Andrew
Cuomo was doing while she aided the defamation of his accusers.

There was a conspiracy to violate civil rights in August of 2017.
The Defendants in this case were the victims of that conspiracy.
The Plaintiffs were, and are, the  conspirators. This suit is
an extension of that ongoing conspiracy. Plaintiffs' counsel,
if not planners from the beginning, are accessories after the
fact, and through their willful deception, they have conscripted
this Court to participate in their crimes, to great effect.

Respectfully Submitted
Christopher Cantwell

9-13-2021
2/(2/

WESTERN DISTRICT OF VIRGINIA

1066
9/13/21

Charlottesville Division

Elizabeth Sines, et al          [
                                [
    Plaintiff                   [
                                [
v                               [   Case No:3:17-cv-072-NKM
                                [
Jason Kessler, et al            [
                                [
    Defendants                  [
                                [

MOTION IN LIMINE FOR A DETERMINATION THAT ANIMUS AGAINST THE
DOMESTIC TERROR ORGANIZATION ANTIFA AND OTHER MEMBERS OF THE WOKE
PROGRESSIVE LEFT IS NOT A FORM OF "CLASS BASED INVIDIOUSLY DISCRIMI-
NATORY ANIMUS" PROHIBITED BY 42 USC §1985(3)
----------------------------------------------------------------------

Comes Now the Defendant , Christopher Cantwell, and, he Moves this Court
In Limine For A Determination That Animus Against The Domestic Terror
Organization And Other Members Of The Woke Progressive Left Is Not A
Form of "Class Based Invidiously Discriminatory Animus" Prohibited By
42 USC §1983(5). In support, he states as follows:

1)  In this matter, Plaintiffs are a group of members, supporters, or
    affiliates of the Antifa domestic terror organization who have ap-
    propriated the identity of "Negroes and Republicans", the only groups
    ever protected by US Const Amend XIII and 42 USC §1985(3), as a mask,
    similar to the masks that they wear during their terror attacks,
    in which to wage legal warfare as a continuation of the physical
    warfare they engaged in on the streets of Charlottesville August
    11 and 12, 2017.  The Court, relying on two overruled precedents,
    Vietnamese Fishermen's Association v Knights of the Ku Klux Klan
    518 F Supp 993 (SD Tx  1981) abrogated by United Brotherhood of
    Carpenters and Joiners Of America v Scott ("United Brotherhood")

-1-

463 US 825 (1983) and Waller v Butkovich 584 F Supp 909 (4th Cir 1984) abrogated by Harrison v HVAT Food Management 766 F 2d 155 (4th Cir 1985), has allowed the Plaintiff's theory that, as Communists who have taken upon themselves the mantle of the Negro they are a "protected class". However, the time has come to remove this veil and to find that the Plaintiffs are not heirs to the 1870s or 1960s Republicans or Civil Rights movement and that animus against them is not invidious.

2) Cantwell has previously, in his Response To Plaintiffs' Motion For Sanctions Against Defendant Matthew Heimbach ("Heimbach response") and elsewhere laid out what he believes the facts will be at trial. Particularly as regards the August 11, 2017, event, the evidence will show that Plaintiffs Romero and Doe knowingly associated with a group of armed men and women whom they knew to be in part consti- tuted of convicted felons and other criminals and whom they knew to use the name "Philly Antifa" and "SURJ Charlottesville" and whom they knew to affiliate with the Antifa domestic terror organization.

3) Cantwell has also laid out previously much of the current state of the law as regards 42 USC §1985(3) in his Motion In Limine For A Determination That Bias Against Those Who Identify As "Jews" Is Not A Form Of "Class Based Invidiously Discriminatory Animus" Prohibited By 42 USC §1985(3), and, Cantwell incorporates that argument here by reference.

4) The Supreme Court has, in the modern era, only once approved an action under 42 USC §1985(3), and, that was in Griffin v Brecken- ridge 403 US 88 (1971). There, the Plaintiffs were a group of Negroes, who, while travelling on the highways, were stopped by a group of men who blocked the road, forced them from the car at gunpoint,

-2-

and whipped them because they believed that they were Civil Rights
activists, i.e., that they were seeking equality of rights for
Negroes under the law. Then, in <u>United Brotherhood</u>, the Supreme
Court clarified who exactly was protected under 42 USC §1985(3),
stating:

> "It is a close question whether §1985(3) was intended to reach any
> class based animus other than animus against Negroes and those
> who championed their cause, most notably Republicans ... The
> predominant purpose of §1985(3) was to combat the prevailing ani-
> mus against Negroes and their supporters. The latter included
> Republicans generally, as well as others, such as Northerners who
> came South with sympathetic views towards the Negro."

<u>United Brotherhood</u> then went on to specifically exclude private
conspiracies against US Const Amend I protected rights and consp-
iracies motivated by economic resentments or class from 42 USC
§1985(3)'s ambit.

5) Since deciding <u>United Brotherhood</u>, the Supreme Court has consistently
ruled that the civil rights laws passed during Reconstruction have to
be interpreted in the social context of the 1870s and not in a modern
social context to determine whether or not a person is part of a
protected class. see, eg, <u>Saint Francis College v Al-Khazraj</u> 481
US 604 (1987) (interpreting 42 USC §1981, which is not dependent on
US Const Amend XIII as here); <u>Shaare Tefila Congregation v Cobb</u> 481
US 615 (1987) (interpreting 42 USC §1982, also not dependent on US
Const Amend XIII). This is part of a two part inquiry required to
establish liability under 42 USC §1985(3), first, an objective in-
quiry into whether or not the "class" involved is one protected
under US Const Amend XIII, and, second, the subjective inquiry into
whether or not the actual animus displayed was invidious and disc-

-3-

6)  The Supreme Court  clarified its understanding of the social context
of Reconstruction in <u>Briscoe v LaHue</u> 466 US 325 (1983):

"The Ku Klux Klan Act 17 Stat 13, was enacted April 20, 1871, less
than a month after President Grant sent a message to Congress de-
scribing the breakdown of law and order in the Southern States.
<u>Cong Globe</u>  42d Cong 1st Sess 236, 244 (1871).  During the debate,
supporters of the bill repeatedly described the reign of terror
imposed by the Klan ... arson, robbery, whippings, shootings,
murders ... These acts of lawlessness went unpunished ... because
Klan members and sympathizers controlled or influenced the admin-
istration of justice."

The Court went on to described how members of the Klan took an oath
to serve on juries and acquit fellow Klansmen and to serve as wit-
nesses to acquit fellow Klansmen.  It then found that "racist" police
officer and prosecutors lying on the stand to convict Negroes was
not the modern equivalent of this kind of lawless vigilante behavior
and refused to extend 42 USC §1985(3) to witnesses who lie to obtain
convictions.

7)  Similarly, Justice Blackmun, in his dissent in <u>United Brotherhood</u>,
stated that 42 USC §1985(3) could only be extended to "class[es] of
persons" who do not enjoy "the possibility of effective state enforce-
ment of their rights", a statement that the Fourth Circuit took to
heart in <u>Buschi v Klein</u> 775 F 2d 1240 (4th Cir 1985).  There the
Court ruled that "the class protected [by 42 USC §1985(3) and US
Const Amend XIII] can etend no further than to those classes of pers-
ons who are, so far as the enforcement of their rights is concerned,
'in ... circumstances similar to the victims of Klan violence.'"

-4-

706 F 2d 155 (4th Cir 1985), to explain that social conditions have changed so that the "Republicans" protected by 42 USC §1985(3) no longer include actual Republicans. It found that the reason that Republicans had been included in the protected classes under US Const Amend XIII and 42 USC §1985(3) was that:

"The failure or inability on the part of local southern govern-
ments to control the Klan was particularly troubling to Republican
Congressmen ... Republicans were discriminated [against] by the
apparent alliance between the Klan and Southern Democrats, which
Republicans viewed as a conspiracy to establish Democratic hegemony
in the South ..."

Harrison citing Randall, The Civil War And Reconstruction (1937) p 854-858; Comment, A Construction Of Section 1985(c) In Light Of Its Original Purpose 46 Univ of Chi L Rev 402 (1979); Note Federalism And Federal Questions: Protecting Civil Rights Under The Regime Of Swift v Tyson 70 Va L Rev 267 (1984).

9) In sum, Briscoe, Buschi and Harrison state that, in order for a class of people who are not Negroes to fall under the protection of US Const Amend XIII and, by extension, 42 USC §1985(3), they cannot be the "woke" victims of "oppression" of the moment de jure. This class of persons has to show that they are unable to avail them-selves of their rights because of a conspiracy between private vig-ilantes and the state, or, at least, some segment of state authority. This does not mean that the state has to participate in a US Const Amend XIII conspiracy, as all conspiracies to impose slavery are prohibited. But, for a political association, such as Antifa or woke progressives generally, to enjoy protection, they have to do more than claim to represent the interests of the Negro; they also

have to be subjected to lawlessness as a result of the state and

society's refusal to protect their legal rights.

10) The two cases that the Court has cited to protect the Antifa Plaint-
iffs as "Republicans" and "supporters of the Negro" are Vietnamese
Fishermen's Assoc v Knights of the Ku Klux Klan 518 F Supp 993 (5th
Cir 1981) and Waller v Butkovich 584 F Supp 909 (4th Cir 1984).
Vietnamese Fishermen's Association used a pre-United Brotherhood
definition of protected class to find that "immigrants and their
supporters" were a protected class; the Court's approach of sep-
arating national origin from race in Al-Khazraj makes it doubly
certain that "immigrants" would not be found to be protected under
US Const Amend XIII today, while "their supporters" would certainly
not qualify. Waller is remarkably similar to the instant factual
circumstances; there, the Communist Workers Party organzied a
"Death to the Klan" rally, appeared armed, and, brandished firearms
when a group of Klan demonstrators, organized by federal informants,
appeared to counter them. Local and state police refused to inter-
vene, and, the Klansmen were forced to defend themselves with long
guns; the gun battle ended in a slaughter of the Communist demon-
strators. The key factual difference here is that state and local
police withdrew police protection from the Charlottesville events
in support of the Antifa terror organization in the hopes that they
would murder the Defendants here, and, it was only by good fortune
that the outcome was avoided. Legally, however, Waller is on a weak
foundation. The Court explained the reasoning it used to sustain
the action in greater detail in Waller v Butkovich 605 F Supp 1137
(4th Cir 1985), where it found that "Communists" and "anti-Communists"
were both protected classes using a logic specifically rejected in
Harrison.

-6-

11)     Looking at the actual social situation in the United States today,

the Ku Klux Klan Act is more appropriately used against Antifa and
members of the woke progressive left to protect white working people
and their supporters than it is used to protect the Antifa domestic
terror organization.  Here, the Plaintiffs appeared at the Thomas
Jefferson statue (and, the next day, near Lee Park) armed, in battle
uniforms, intending to prevent the Defendants, who were peacefully
demonstrating, from travelling in a public right of way.  They at-
tacked the Defendants, and, then, they have falsely come into this
Court claiming to have been attacked, expecting that witnesses will
commit perjury and a jury will enter judgment in their favor based
upon fear of their vigilante-ism protected by the state.  Cantwell,
in his deposition (which he still does not have a copy of), describ-
ed the Plaintiffs as the "militia of the Democratic Party", which
is essentially the role played by the Klan in the 1870s.  One only
has to look over to the Plaintiff's table to see how the power
structure has lined up to protect the violence of the Plaintiffs;
$10 million dollars has been raised on their behalf

        with the hastag #SueANazi.  This case is not only sup-
ported by the state power structure, it is big business for that
power structure, while the Defendants are largely marginalized and
powerless people who, like Negroes in the 1870s South, cannot rely
on law enforcement to protect their rights.  How many rifle-wielding
Antifa have been arrested after these rallies?  How many federal
agents were sent in to infiltrate Antifa groups and arrest them
for their conspiracies to riot on August 11 and 12, 2017?  The ans-
wer is none, while federal and state authorities have poured crim-
inal charges on the white nationalist protestors.  US Const Amend
XIII was enacted to protect the powerless from being enslaved by

-7-

the powerful, not to protect those who wish to impose Soviet-style slavery on every man, woman, and, child in the United States from those who would resist them.

12) Further, the Antifa and woke-progressive Plaintiffs cannot reason-ably claim to be similarly situated to the Plaintiffs in <u>Griffin</u>, because the Plaintiffs in <u>Griffin</u> were perceived to be civil rights activists, seeking Negro equality.  The Antifa and woke-progressive Plaintiffs openly state that they do not wish to see equality, but, that they wish to use violence to harm white people;  their claim that this somehow advances the position of the Negro is not the kind of "support" for the Negro that §1985(3) envisions as protected. If these Plaintiffs had been part of a peaceful unarmed crowd call-ing for all to enjoy equal rights, then, perhaps they could claim the mantle of the 1870s Republicans or 1960s civil rights activists. But, their ideology of actively suppressing white identity through violence and their tactics of using physical violence, as well as their actually having appeared armed and looking for a fight put them beyond the law's protection.

13) Lastly, because of the social evil that Antifa and the woke pro-gressive represent, animus against them, even if they might other-wise constitute a protected class, cannot be considered "invidious"; it is a social good.  As will be developed at trial, the Plaintiffs in this matter believe in stripping whites of their civil rights, nominally to advance the Negro, actually to advance the kind of wealthy elite interests that have volunteered to appear in this matter to represent them.  This kind of movement, because it is anathema to the principles of America's Founding, as many of its members will openly admit, is not the kind of movement to ad-

-8-

vance those principles against whom animus might be "invidious".

Thus, as    there are good and rational reasons for opposing a movement that spent all of 2020 burning and looting American cities and trying to topple the lawfully elected, animus against the Plaintiffs is nopt prohibited by 42 USC §1985(3).


Respectfully Submitted,

Christopher Cantwell
USP-Marion
PO Box 1000
Marion, IL 62959


CERTIFICATE OF SERVICE
----------------------

I hereby certify that this Motion in Limine was mailed to the Clerk of the Clerk, 1st Class Postage Prepaid, for posting upon the ECF, to which all other parties are subscribed, and, handed to USP-Marion staff members Nathan Simpkins and/or Kathy Hill for electronic transmission to the Court, this 13th day of September, 2021.

Christopher Cantwell

-9-

WESTERN DISTRICT OF VIRGINIA

9/16/21

Charlottesville Division

Elizabeth Sines, et al

    Plaintiffs

v                     Case No:  3:17-cv-072-NKM

Jason Kessler, et al

    Defendants

MOTION IN LIMINE FOR A DETERMINATION THAT SIMPLE ASSAULT,
SIMPLE BATTERY, AND/OR, ANY OTHER ACT INCAPABLE OF CAUSING BODILY
HARM BUT INVOLVING THE USE OF FORCE IS NOT A "BADGE OR INCIDENT OF
SLAVERY" PROSCRIBED BY US CONST AMEND XIII
------------------------------------------------------------------------

Comes now the Defendant, Christopher Cantwell, and he hereby Moves this
Court for a Determination In Limine That Simple Assault, Simple Battery,
And/Or, Any Otrher Act Incapable Of Causing Bodily Harm But Involving The
Use of Force Is Not a "Badge Or Incident Of Slavery" Procribed by US
Const Amend XIII.  In support, he states as follows:

1) Cantwell has previously briefed this Court in his Motion in Limine For
   A Determination That Bias Against Those Who Identify As "Jews" Is
   Not A Form Of "Class Based Invidiously Discriminatory Animus" Pro-
   hibited By 42 USC §1983(3), Plaintiffs are proceeding in this action
   under a theory that Cantwell and his co-defendants conspired to impose
   the "badges and incidents of slavery" upon them in violation of US.
   Const Amend XIII.

2) US Const Amend XIII gives Congress the power to abolish all "badges
   and incidents" of slavery. Jones v Alfred H Mayer Co 392 US 409
   (1968).  These "badges and incidents" include racial violence direct-
   ed against Negroes; in passing the original of 42 USC §1985(3) in

-1-

Congress specifically found that "arson, robbery, whippings, shoot-
ings, [and] murder" and "murder, manslaughter, mayhem, robbery, as-
sault and battery, perjury, subornation of perjury, criminal ob-
struction of legal process or resistance of officers in discharge
of official duty, arson, or larceny" were among the badges and in-
cidents of slavery that it intended to prohibit. Briscoe v LaHue
466 US 325 (1983) citing Cong Globe 42d Cong 1st Sess 236, 244, 317
(1871). And, this was reaffirmed as recently as 2009, when Congress
passed the Matthew Shepard and James Byrd Jr Hate Crimes Prevention
Act of 2009, Oct 28, 2009, PL 111-84 Div E, 123 Stat 2190, stating
that, "eliminating racially motivated violence is an important
means of eliminating to the extent possible the badges, incidents
and relics of slavery and involuntary servitude." cited in United
States v Roof 225 F Supp 438 (D SC 2016).

3) The Supreme Court began defining what the term "violence" means when
used in law when it decided Leocal v Ashcroft 543 US 1 (2004), in
which it had to decide whether or not drunk driving involved the
"use of violence". In so doing, the Court found that "violence" means
"the use ... physical force against the person or property of anoth-
er." Then, in 2010, in Johnson v United States 559 US 133 (2010),
the Supreme Court clarified what "use of physical force" means. There,
the Supreme Court specifically rejected the idea that simple battery
was a form of "violence" as contemplated under federal law, noting
that "the lightest offensive touching" could constitute a battery,
while "'physical force' means violent force -- that is, force capable
of causing pain and injury to another person. see, Flores v Ashcroft
350 F 3d 666 (7th Cir 2003)". Johnson.

4) Statutes are read noscitur a sociis, and, that means that when "sev-

-2-

eral items in a list share an attribute [this] counsels in favor
of the other items as possessing that attribute as well." Beecham
v United States 511 US 368 (1994). Here, then, in 1871, Congress
gave a list of acts that it thought could constitute violations of
US Const Amend XIII for purposes of 42 USC §1985(3). While "assault
and battery" appears on that list, it is in the company of crimes
like arson, murder, and, robbery, all felonies. From this, as in
Johnson, and, given the continuing use of the term "violence" and
not "force" as Congressional examples of the "badges and incidents
of slavery", this Court should conclude that to violate someone's
rights under US Const Amend XIII, one must use physical force con-
stituting violence or a violent felony, and, not the mere offensive
touching that is the hallmark of simple assault and battery. Read
particularly in the context of the concern that 42 USC §1985(3)
not become a general tort statute, highlighted in Griffin v Brecken-
ridge 403 US 88 (1971), United Brotherhood of Carpenters and Joiners
of America v Scott 463 US 825 (1983), and, similar decisions, the
fact that there are alternate remedies at state law, including an
action for assault under common law, for such torts, this construct-
ion of 42 USC §1985(3) most accurately reflects Congressional intent.

Thus, for good cause shown, Cantwell asks that this Court rule in limine
that simple assault, simple battery, and/or, any other act incapable of
causing bodily harm but involving the use of force is not a "badge or
incident of slavery" proscribed by US Const Amend XIII.

Respectfully Submitted,

Christopher Cantwell
USP-Marion
PO Box 1000
Marion, IL 62959

-3-

Aristot~[?]
Inmate #00991-509

USP Marion
4500 Prison Rd.
P.O. Box 2000
Marion, IL 62959

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL®**

7021 0350 0000 6940 8810

Office of the Clerk
U.S. District Court for
the Western District of Virginia
Charlottesville Division
255 West Main Street
Room 304
Charlottesville, VA 22902