### UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

ELIZABETH SINES, SETH WISPELWEY, MARISSA BLAIR, APRIL MUÑIZ, MARCUS MARTIN, NATALIE ROMERO, CHELSEA ALVARADO, JOHN DOE, and THOMAS BAKER,

Plaintiffs,

v.

JASON KESSLER, et al.,

Defendants.

**Civil Action No. 3:17-cv-00072-NKM**

**JURY TRIAL DEMANDED**

## PLAINTIFFS' MOTION *IN LIMINE* TO PRECLUDE THE HEAPHY REPORT AND THE TESTIMONY OF TIMOTHY J. HEAPHY AT TRIAL

Plaintiffs respectfully submit this Motion *in Limine* to preclude Defendants from introducing the Heaphy Report and its contents at trial, and to preclude the related testimony of Timothy J. Heaphy.

### PRELIMINARY STATEMENT

Just three months after Unite the Right, a private law firm retained by the City of Charlottesville released a report entitled "Independent Review of the 2017 Protest Events in Charlottesville, Virginia" (hereinafter, the "Heaphy Report" or "Report," Ex. A). The Report, authored by Timothy J. Heaphy and a team of twenty other contributors, "tried to assemble a coherent narrative of the protest events" and issued numerous findings after interviewing "hundreds of witnesses" and reviewing thousands of documents regarding the violence that unfolded at Unite the Right. Defendants now seek to introduce the Heaphy Report in its entirety as a central pillar of their defense at trial—namely, to shift the blame of their racially motivated

violence onto others. The Court should reject that effort and preclude the Heaphy Report and any related testimony from Mr. Heaphy for at least two independent reasons.

*First*, the Report is textbook hearsay. Indeed, it consists of multiple layers of hearsay. It is itself an out-of-court statement—which is built upon countless second- and third-hand statements (often from unidentified or anonymous sources)—that Defendants seek to offer to establish the truth of the "findings" and conclusions asserted in the Report.

Because the Heaphy Report is hearsay, it is inadmissible unless it falls into an exception to the hearsay rule. It does not. For starters, the Report does not fit within the public records exception to hearsay—the only remotely conceivable exception that could apply—because it was not authored and adopted by a government agency. Rather, the Report was authored by private individuals at a private law firm (who acted independent of any government control or oversight). Nor does the Report fall within the so-called residual hearsay exception because it lacks all the hallmarks of "trustworthiness." For all these same reasons, the Court should also preclude the anticipated testimony of Timothy J. Heaphy (one of the authors of the Report), who, to Plaintiffs' knowledge, did not attend Unite the Right and has no firsthand knowledge of the events that occurred and thus would only be able to testify based on inadmissible hearsay.

*Second*, even if the Report and any related testimony could overcome these fatal hearsay objections, that evidence should still be precluded under Federal Rule of Evidence 403 because any limited probative value of such evidence would be far outweighed by a significant risk of misleading and confusing the jury.

Accordingly, the Court should preclude the Heaphy Report, its contents, and Mr. Heaphy's related testimony at trial.

## BACKGROUND

### I.     The Heaphy Report

On August 24, 2017, the City of Charlottesville retained Timothy J. Heaphy of the law firm Hunton & Williams LLP to issue a written report evaluating "the City's handling of the" Unite the Right rally. Heaphy Report at 9. The City asked Mr. Heaphy to offer "recommendations for potential changes in law and other actions for improved response to future events." *Id.* Mr. Heaphy was not the lone contributor to the Report: he acknowledged at least *twenty* other contributors, including over ten associates and staff members from Hunton & Williams and several outside "consultants." *Id.* at *xi-xii.*

The Report states that Mr. Heaphy and his team were "not . . . limited or directed in any way by any person or agency within City government," *id.* at *ix*, and that City government officials "stood back" as he and his team conducted their investigation, *id.* at 9. According to the Report, in an effort "to make sense of the tragic events" at Unite the Right, *id.* at *ix*, Mr. Heaphy and his team interviewed "hundreds of witnesses," "reviewed hundreds of thousands of documents, watched or listened to countless hours of video and audio recordings, and reviewed numerous still images," *id.* at 10. Notably, however, the Report does not provide a complete list of these witnesses, documents, records, or images.

Mr. Heaphy issued his final 207-page written report on November 24, 2017, a little over three months after the events described within the Report. The Report—which focused on "issues of public safety, communications, permitting, and interagency coordination"—contained sweeping conclusions about the violence that unfolded during Unite the Right. *Id.* at *ix*. For instance, the Report asserts that "police planning for August 12 was inadequate and disconnected," that "CPD devised a flawed Operational Plan for the Unite The Right rally," and that "[t]he planning and coordination breakdowns prior to August 12 produced disastrous results." *Id.* at 5-6.

The Report also states that "[w]hen violence was most prevalent, CPD commanders pulled officers back" on August 12. *Id*. at 6. And then, without engaging in any meaningful First Amendment legal analysis, the Report proclaims that "the City of Charlottesville protected neither free expression nor public safety on August 12." *Id*. at 7.

In support of those conclusions, the Report cites or paraphrases statements from a select few of the "hundreds of witnesses" interviewed by Mr. Heaphy and his team. *Id*. at 10. Although some of those witnesses were named, *see e.g.*, *id*. at 86 ("Captain Mitchell candidly admitted to us that, prior to August 12, he did not check to make sure CPD officers received sufficient training."); *id*. at 88 ("Lieutenant Hatter . . . told us that when he offered suggestions regarding plans for August 12 to Captain Mitchell, 'it was like talking to a brick wall.'"), many were not, *see, e.g.*, *id*. at 71 ("Officers told us that they were frustrated that their safety-focused information-gathering actions were construed as harassment."); *id*. at 98 ("We spoke to multiple officers at all levels who expressed concern that normal arrest procedures would put officers in harm's way."); *id*. at 136 ("The victim, a counter-protester who asked to remain anonymous, told us she was standing about where Preston had fired his gun, and she was yelling at the demonstrators as they walked by. One Unite The Right demonstrator walked up to her and punched her in the face.").

Notably, and relevant here, the Report is shot through with second and third-hand statements, including several from unnamed or "anonymous" sources. Here are just a few illustrative examples of the layers of hearsay scattered throughout the Report:

- "Signer told us that members of City Council were uniform in their interest in exploring the idea, a consensus reached through behind-the-scenes discussions in numbers small enough to avoid public-meeting requirements." *Id*. at 81.

- "Captain Mitchell told us that the command staff 'knew it [the rally] was going to happen in Emancipation Park no matter what.' Other officers conveyed to us that members of the command staff—including Chief Thomas and Captain Mitchell—expressed hope that the City would lose the lawsuit." *Id*. at 84.

- "[Captain Mitchell] told us that Captain Worsham and others offered some suggestions, such as checking backpacks and barring flagpoles, but overall deemed the plan 'fine as written.'" *Id*. at 87.

- "Captain Lewis spoke with a detective from Portland who had recently worked an event involving Antifa and the Alt-Right. He emphasized the importance of keeping protesters and counter-protesters separated and recommended the use of barricades as 'force multipliers.'" *Id*. at 88.

- "Sergeant Robert Haney described the instructions he received as 'do not interrupt mutual combat' unless someone is seriously injured." *Id*. at 98.

- "Lieutenant Hatter was also in communication with Jack Pierce, 'head of security' for Richard Spencer. Pierce confirmed to Hatter that an event would occur on August 11, but refused to provide details." *Id*. at 111.

- "Assistant City Manager Mike Murphy told us that he was told ACPD units were not available because the County did not want to have 'its logo associated' with Unite The Right." *Id*. at 101.

- "Nelson received a phone call from an anonymous source in the Charlottesville community with more specific details about an event at the University on Friday night. At 3:13 p.m., the source informed Nelson that Jason Kessler and other members of the 'alt-right' planned to march that evening on the University Grounds with torches." *Id*. at 112.

- "Lieutenant Crannis-Curl told Captain Shifflett that she was going 'off-plan' and was 'not going to send arrest teams into the street.' Shifflett told us that he thought nothing of her comment . . . ." *Id*. at 121.

- "Peyton told us that the CPD officer 'was clearly ordered to stand by the car no matter what happens, and she wasn't going to do a thing.'" *Id*. at 126.

- "That witness told us he saw a state trooper as he left the downtown area and told the trooper, 'I thought the police did a pretty bad job today.' The state trooper nodded and replied, 'It wasn't our call.'" *Id*. at 137.

- "Dan Haig, who was with the group from Justice Park, told us that when they arrived someone from the community ran out to tell them that the everything was safe and they should stop shouting." *Id*. at 142.

The Report also features second-hand references to the state-of-mind of (sometimes unnamed) actors or nebulous groups, such as "City leaders" or "the students involved." For instance, the Report asserts that "CPD commanders . . . *knew* the event would attract hundreds if not thousands of people on both sides. They also were *aware* that many attendees would be armed

. . . ." *Id.* at 4 (emphasis added). The Report goes on to say that "[i]n the face of strong community opposition to the Unite The Right rally, City leaders *wanted* to deny Kessler's permit application." *Id.* (emphasis added); *see also id.* at 85 ("Lieutenant Mooney told us that these verbal briefings on case law and code sections would have meant little to officers relatively new to the department."); *id.* at 118 ("Heinecke noted that the students involved had 'taken nonviolent training,' but were very frightened.").

## II.   Defendants' Anticipated Reliance on The Heaphy Report

Defendants have made no secret of their intent to rely on the Heaphy Report and its contents at trial. Defendants Jason Kessler, Nathan Damigo, Identity Evropa, Michael Hill, Michael Tubbs, League of the South, Jeffrey Schoep, and National Socialist Movement have listed the Report on their respective exhibit lists. *See* Dkt. 1142 at 1 (Oct. 2, 2021); Dkt. 1068 at 1 (Sept. 14, 2021) (incorporating Dkt. 823 at 38); Dkt. 1069 at 1 (Sept. 14, 2021) (listing Heaphy Report as sole exhibit). Furthermore, Defendant Christopher Cantwell has listed Mr. Heaphy (the principal author of the report) as a potential witness for trial. Dkt. 1086 at 2 (Sept. 20, 2021). And long before submitting their exhibit and witness lists, certain Defendants had referenced the Report in numerous filings and during discovery.[1] Given this course of conduct, there can be little doubt that Defendants plan on introducing the Heaphy Report, its contents, and related testimony from Mr. Heaphy at trial.

---

[1] *See, e.g.*, Mem. Mot. To Dismiss of Richard Spencer, Dkt. 209 at 18 (Jan. 30, 2018); Resp. Heimbach's Mot. To Dismiss, Dkt. 520 at 4 (July 11, 2019); Answer by Def. Christopher Cantwell, Dkt. 590 at 54, 69 (Nov. 15, 2019); *id.*, Dkt. 590-2 at 11; Obj. Ps.' Mot. For Evidentiary Sanctions, Dkt. 637 at 30, 44, 47 (Jan. 21, 2020); *id.*, Dkt. 637-1 at 55; *id.*, Dkt. 637-4 at 26; RE 966 Heimbach's Trial Venue Supp. Br., Dkt. 973 at 1 (June 11, 2021); Def. Schoep's Mot. For Inter District Transfer, Dkt. 977 at 5 (June 11, 2021); *see also* Ex. B, Def. Fields' Rule 26(a) Disclosures at 4 (Dec. 20, 2017); Ex. C, Defs. Initial Rule 26(a) Disclosures for Christopher Cantwell, Nathan Damigo, Matthew Heimbach, Identity Europa, Jason Kessler, Elliott Kline, National Socialist Movement, Nationalist Front, Matthew Parrott, Jeff Schoep, Traditionalist Worker Party, Vanguard America, and Robert Ray at 4 (Dec. 20, 2017); Ex. D, Defs. Initial Rule 26(a) Disclosures for Spencer at 4 (Apr. 9, 2018); Def. Jason Kessler's Resps. To Defs.' (*sic*) First Interrogs. and RFPs at 2 (Apr. 11, 2018), Dkt. 475-4; Ex. E, Def. Cantwell's Resps. and Objs. to Pls.' Second Set of Interrogs. at 14 (Nov. 25, 2019); Ex. F, Depo Tr. Excerpt of Christopher Cantwell at 320:12 (July 15, 2021).

Because the Heaphy Report is inadmissible hearsay and, in any event, would be unduly prejudicial, the Court should preclude Defendants from introducing the Report, its contents, and any related testimony from its principal author at trial.

## ARGUMENT

### I.      The Heaphy Report Is Inadmissible Hearsay

The Heaphy Report is an out-of-court statement that Defendants likely intend to offer as proof of the "findings" contained within the Report. That is textbook hearsay, and it must be excluded unless Defendants can show that it falls into an exception to the hearsay rules. *See* Fed. R. Evid. 802. They cannot meet that burden. The Report does not qualify as a "public record" because it was not authored, much less adopted, by a government official or agency. And no "exceptional circumstances" justify application of the residual hearsay exception. Accordingly, the Heaphy Report should be precluded as inadmissible hearsay. For the same reasons, Mr. Heaphy's anticipated testimony regarding the events that occurred during Unite the Right—which (like the Report) is not based on his firsthand knowledge—should also be precluded as inadmissible hearsay.

### A.      The Heaphy Report Is, and Contains, Hearsay

The Heaphy Report was authored by over twenty contributors based on interviews from "hundreds of witnesses" and a review of "hundreds of thousands of documents" (many of which go unnamed). *Id*. at 10. It contains countless conclusions, assertions, statements, and paraphrases from witnesses, including several "statements-within-statements" from anonymous or unnamed sources. *See supra* Background Part I (enumerating examples of conclusions and hearsay statements of Heaphy Report). For instance, the Report states that "police planning for August 12 was inadequate and disconnected," but none of the authors of the Report were present at Unite the Right or otherwise possess firsthand knowledge of how the City and its officers planned for or

responded to the events of August 11 and 12. *See id.* at 5. In addition, the Report includes numerous second- and third-hand statements from unnamed sources. Take, for instance, the following examples of obvious hearsay: "Signer told us that members of City Council were uniform in their interest . . . ." *id.* at 81; "He told us that Captain Worsham and others offered some suggestions . . . ." *id.* at 87; "Peyton told us that the CPD officer 'was clearly ordered to stand by the car no matter what happens, and she wasn't going to do a thing.'" *id.* at 126; "That witness told us he saw a state trooper [who] nodded and replied, 'It wasn't our call.'" *id.* at 137.

Consequently, the Heaphy Report (and its contents) is inadmissible hearsay that must be excluded from trial. *See, e.g., Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 263 (4th Cir. 2005) (affirming exclusion of written report "on the grounds that it suffered from multiple levels of hearsay"); *Tokio Marine & Fire Ins. Co. v. Norfolk & W. Ry. Co.*, 172 F.3d 44, at *2-3 (4th Cir. 1999) (table decision) (rejecting written report that contained numerous authors as hearsay); *Farrell v. Whitener*, No. 3:13CV530-FDW, 2015 WL 1457434, at *3 (W.D.N.C. Mar. 30, 2015) (calling into serious doubt a police report that contained "hearsay statement[s] of an unidentified informant").[2]

## B.    The Heaphy Report Is Not Admissible under the Public Records Exception

Defendants may attempt to argue that the Heaphy Report is admissible under the "public records" exception to hearsay. But that argument would be mistaken for three independent reasons.

*First*, the public records hearsay exception does not apply because the Heaphy Report was neither authored nor prepared by a public official or a public office. Under Federal Rule of

---

[2] To be sure, the Heaphy Report cites statements and interviews of certain individuals (including, for example, Defendants Kessler and Richard Spencer) whom Plaintiffs may have an opportunity to cross-examine regarding their firsthand observations of relevant events. But that does not alter the analysis with respect to the inadmissibility of the Heaphy Report itself, its contents, or the testimony of Mr. Heaphy—all of which constitute inadmissible hearsay that falls squarely outside the ambit of any exception.

Evidence 803(8), a public record may be admissible if it is "a record or statement *of a public office* [that] . . . sets out . . . in a civil case . . . factual findings from a legally authorized investigation." Fed. R. Evid. 803(8)(A)(iii) (emphasis added). But Mr. Heaphy, the principal author of the Report, is a private citizen who works for a private law firm. The Report's title begins with the words "*Independent Review*," and the Report notes explicitly that its authors had "not been limited or directed in any way by any person or agency within City government." Heaphy Report at *ix*. Accordingly, by definition, the Report does not qualify as a "public record" within the meaning of the hearsay exception. *See Jones v. Ford Motor Co.*, 204 F. App'x 280, 287 (4th Cir. 2006) (public records exception did not apply to "a private company's unreviewed investigation"); *see also Watts v. City of Hartford*, No. 3:00CV0681 (RNC), 2004 WL 717132, at *4 n.9 (D. Conn. Mar. 31, 2004) ("[T]he fact that the City commissioned Buracker, pursuant to a municipal ordinance, to perform the study does not render the consulting group a 'public agency.'").

*Second*, the Report does not set forth the "factual findings" of a public agency because they were never formally adopted by the City (or any other government entity). *See* Fed. R. Evid. 803(8)(A)(iii); *cf. United States v. Gray*, 852 F.2d 136, 139 (4th Cir. 1988) (draft report inadmissible because it was never adopted by government agency); *Anderson*, 406 F.3d at 264 (same). In fact, some Charlottesville City Council members explicitly *rejected* the findings of the Report. *See, e.g.*, NewsRadio WINA, *Fenwick: Heaphy Report is "biased", a "political whitewash*," https://wina.com/news/064460-fenwick-heaphy-report-is-biased-a-political-white wash/ (last accessed Oct. 1, 2021). For this reason, too, the Heaphy Report and its contents do not count as a public record under Rule 803(8).[3]

---

[3] Even if any data or information referenced in the Report would qualify as a public record, that would not render the Report or its contents admissible under that exception. *See McLean v. Leonard*, No. 5:14-CV-718-FL, 2016 WL 3448574, at *2 (E.D.N.C. June 17, 2016) (noting this argument "ignores the distinction between the publication and the data itself").

*Third*, even assuming the Heaphy Report qualified as a public record, several "negative factors" support its exclusion under the hearsay rules. *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 300 (4th Cir. 1984); *see also* Fed. R. Evid. 803(8)(B) (public records admissible only if "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness"). In assessing the trustworthiness of the Report, this Court may consider numerous factors, including any indicators of "unreliability, inadequate investigation, inadequate foundation for conclusions, invasion of the jury's province." *Distaff, Inc. v. Springfield Contracting Corp.*, 984 F.2d 108, 111 (4th Cir. 1993). Taken together, those considerations weigh heavily in favor of excluding the Report. As noted above, the Heaphy Report is a privately commissioned document, completed in three months, based on hundreds of witness interviews and countless documents. Many of those witnesses and documents remain entirely unknown to Plaintiffs and the Court, and therefore cannot be subject to cross-examination or adversarial testing. If that were not enough, the Report is replete with factual findings about the events of August 11 and 12 (many of which are disputed by the parties). With respect, those factual findings should be entrusted to the jury (not to Mr. Heaphy and his team of law firm associates). *See id.* Simply put, the Heaphy Report and its contents are highly unreliable, hotly disputed, and untrustworthy hearsay that must be precluded.

C.     **The Heaphy Report Is Not Admissible under the Residual Hearsay Exception**

The Heaphy Report also does not fall within the residual exception to hearsay. *See* Fed. R. Evid. 807. Under that exception, a court may admit otherwise inadmissible hearsay only if (1) "the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement" and (2) "it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a). The Fourth Circuit has

recognized that the residual exception was "meant to be invoked sparingly" and "used very rarely, and only in exceptional circumstances." *United States v. Heyward*, 729 F.2d 297, 299-300 (4th Cir. 1984) (internal citation and quotations omitted).

No exceptional circumstances justify the application of the residual hearsay exception here. As just explained, the Report and its contents suffer from significant concerns over trustworthiness, considering a dearth of explanation of its sources and details for its conclusions. *See supra* section I.B (detailing lack of trustworthiness of report); *United States v. Arigbede*, 854 F.2d 1318, at *4 (4th Cir. 1988) (table decision) ("Circumstantial guarantees of trustworthiness are lacking because the letterwriter's interest, if any, is clearly aligned with the defendant."); *W. Insulation, LP v. Moore*, 242 F. App'x 112, 122 (4th Cir. 2007) (same). Moreover, Defendants have not adduced any evidence to corroborate the Report or its contents. *See Heyward*, 729 F.2d at 300; *Arigbede*, 854 F.2d 1318, at *4; *Moore*, 242 F. App'x at 122. Lastly, the Report is not more probative than other evidence that Defendants may introduce; in fact, Defendants appear to concede as much, given that many of them have listed certain police officers who were cited in the Heaphy Report as potential trial witnesses. For all these reasons, the residual exception does not apply to the Heaphy Report.[4]

### D.     Mr. Heaphy's Anticipated Testimony Regarding Unite the Right Is Also Inadmissible Hearsay and Should Be Precluded

Defendant Cantwell has listed Mr. Heaphy as a potential trial witness. Although the nature of Mr. Heaphy's expected testimony is unknown, Plaintiffs anticipate that Mr. Heaphy's testimony will relate to the contents and statements made in the Report. The Court should also preclude Mr.

---

[4] For similar reasons, this Court should not take judicial notice of the Report or its contents, which lack the "high degree of indisputability" that is "the essential prerequisite" for judicial notice. Fed. R. Evid. 201, advisory committee note; *see also United States v. Daley*, 378 F. Supp. 3d 539, 547 (W.D. Va. 2019) (Moon, J.) (declining to take judicial notice of certain facts because the parties "disagree about the meaning to be ascribed to facts" (quotations omitted) (citing *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 216 (4th Cir. 2009)).

Heaphy from testifying at trial regarding his findings and conclusions regarding Unite the Right because his observations, just like the Heaphy Report, constitute inadmissible hearsay based on second- and third-hand statements of other individuals (some of whom are unnamed or anonymous). *See supra* Parts I.A-I.C.

## II. The Heaphy Report and Any Related Testimony Are Inadmissible under Rule 403

Even if the hearsay rules did not pose an insuperable barrier to admission of the Heaphy Report or Mr. Heaphy's related testimony, the Report and Mr. Heaphy's testimony should still be precluded under Rule 403 because any probative value of such evidence is substantially outweighed by the risk of prejudice and jury confusion. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

As an initial matter, the Report and any testimony from Mr. Heaphy lack any independent probative value, especially given that, as explained above, such evidence is highly unreliable and untrustworthy. Any negligible probative value offered by the Report is far outmatched by the risk of unfair prejudice to Plaintiffs and juror confusion. Permitting Defendants to introduce the Report would likely mislead the jury into accepting the veracity of the "findings" contained within the Report, even though those findings are in stark dispute and have never been tested through cross-examination or otherwise. Admission of the Heaphy Report could also lead to numerous "mini-trials" surrounding the Report, its authors, and its content—thus wasting time and diverting the jury's focus from the underlying issues of this case. *See Holley v. N.C. Dep't of Admin., N.C.*, 846 F. Supp. 2d 416, 434 (E.D.N.C. 2012). Finally, introduction of the Report could "confuse the jury and encourage a decision on an improper basis," leading the jurors "to deliberate on the correctness of the previous fact finding, rather than retaining the open-minded, first impression approach to

12

the issues our system prefers." *Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*, No. CIV. WDQ-08-2764, 2011 WL 862729, at *2 (D. Md. Mar. 10, 2011) (quotations omitted); *see also Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 714 (4th Cir. 2021) (affirming exclusion under 403 as misleading a jury because "a defendant may not use [law] enforcement authority's decision not to take action as a sword because inaction on the part of the government cannot be used to prove innocence." (internal quotations and citation omitted)). In short, even if Defendants could surmount the significant hearsay objections to the Heaphy Report and Mr. Heaphy's testimony, that evidence should still be excluded under Rule 403.

* * *

The Heaphy Report quotes and otherwise references many individuals who had firsthand knowledge of the relevant events. Defendants had ample opportunity to call these individuals as witnesses at trial. Having chosen not to call nearly all of those witnesses, Defendants cannot now circumvent the most basic rules of evidence by attempting to admit a 207-page out-of-court statement rife with multiple layers of hearsay in lieu of proper testimony by witnesses who can be cross-examined.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion *in Limine* to exclude the Heaphy Report, its contents, and any related testimony of Mr. Heaphy.

Dated: October 4, 2021

Respectfully submitted,

/s/ Jessica Phillips

Jessica Phillips  (*pro hac vice*)
PAUL WEISS RIFKIND WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006

Of Counsel:

Roberta A. Kaplan (*pro hac vice*)
Julie E. Fink (*pro hac vice*)
Gabrielle E. Tenzer (*pro hac vice*)
Michael L. Bloch (*pro hac vice*)
Yotam Barkai (*pro hac vice*)
Emily C. Cole (*pro hac vice*)
Alexandra K. Conlon (*pro hac vice*)
Jonathan R. Kay (*pro hac vice*)
Benjamin D. White (*pro hac vice*)
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: (212) 763-0883
rkaplan@kaplanhecker.com
jfink@kaplanhecker.com
gtenzer@kaplanhecker.com
mbloch@kaplanhecker.com
ybarkai@kaplanhecker.com
ecole@kaplanhecker.com
aconlon@kaplanhecker.com
jkay@kaplanhecker.com
bwhite@kaplanhecker.com

Jessica Phillips  (*pro hac vice*)
Karen L. Dunn (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Arpine S. Lawyer (*pro hac vice*)
Agbeko Petty (*pro hac vice*)
Giovanni Sanchez (*pro hac vice*)
PAUL WEISS RIFKIND WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Fax: (202) 223-7420
jphillips@paulweiss.com
kdunn@paulweiss.com
wisaacson@paulweiss.com
alawyer@paulweiss.com
apetty@paulweiss.com
gsanchez@paulweiss.com

Makiko Hiromi  (*pro hac vice*)
Nicholas A. Butto (*pro hac vice*)
PAUL WEISS RIFKIND WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990
mhiromi@paulweiss.com
nbutto@paulweiss.com

David E. Mills  (*pro hac vice*)
Joshua M. Siegel (VSB 73416)
Caitlin B. Munley  (*pro hac vice*)
Samantha A Strauss (*pro hac vice*)

Alan Levine (*pro hac vice*)
Philip Bowman (*pro hac vice*)
COOLEY LLP
55 Hudson Yards

14

Alexandra Eber (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Fax: (202) 842-7899
dmills@cooley.com
jsiegel@cooley.com
cmunley@cooley.com
sastrauss@cooley.com
aeber@cooley.com

New York, NY 10001
Telephone: (212) 479-6260
Fax: (212) 479-6275
alevine@cooley.com
pbowman@cooley.com


Robert T. Cahill  (VSB 38562)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
rcahil@cooley.com

J. Benjamin Rottenborn  (VSB 84796)
WOODS ROGERS PLC
10 South Jefferson St., Suite 1400
Roanoke, VA 24011
Telephone: (540) 983-7600
Fax: (540) 983-7711
brottenborn@woodsrogers.com


*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2021, I filed the foregoing with the Clerk of Court through the CM/ECF system, which will send a notice of electronic filing to:

Elmer Woodard
5661 US Hwy 29
Blairs, VA 24527
isuecrooks@comcast.net

James E. Kolenich
Kolenich Law Office
9435 Waterstone Blvd. #140
Cincinnati, OH 45249
jek318@gmail.com

*Counsel for Defendants Jason Kessler, Nathan Damigo, Identity Europa, Inc. (Identity Evropa), Matthew Parrott, and Traditionalist Worker Party*

David L. Campbell
Justin Saunders Gravatt
Duane, Hauck, Davis & Gravatt, P.C.
100 West Franklin Street, Suite 100
Richmond, VA 23220
dcampbell@dhdglaw.com
jgravatt@dhdglaw.com

*Counsel for Defendant James A. Fields, Jr*

Bryan Jones
106 W. South St., Suite 211
Charlottesville, VA 22902
bryan@bjoneslegal.com

*Counsel for Defendants Michael Hill, Michael Tubbs, and League of the South*

William Edward ReBrook, IV
The ReBrook Law Office
6013 Clerkenwell Court
Burke, VA 22015
edward@rebrooklaw.com

*Counsel for Defendants Jeff Schoep, Matthew Heimbach, Matthew Parrott, Traditionalist Worker Party, National Socialist Movement, and Nationalist Front*

Joshua Smith
Smith LLC
807 Crane Avenue
Pittsburgh, Pennsylvania 15216
joshsmith2020@gmail.com

*Counsel for Defendants Matthew Parrott, Matthew Heimbach, and Traditionalist Worker Party*

I hereby certify that on October 4, 2021, I also served the following non-ECF participants via mail or electronic mail:

Richard Spencer
richardbspencer@icloud.com
richardbspencer@gmail.com

Vanguard America
c/o Dillon Hopper
dillon_hopper@protonmail.com

Elliott Kline a/k/a Eli Mosley
eli.f.mosley@gmail.com
deplorabletruth@gmail.com
eli.r.kline@gmail.com

Christopher Cantwell
Christopher Cantwell 00991-509
USP Marion, 4500 Prison Rd.
P.O. Box 2000
Marion, IL 62959

Robert "Azzmador" Ray
azzmador@gmail.com

Dated: October 4, 2021

/s/ Jessica Phillips
Jessica Phillips  (*pro hac vice*)
PAUL WEISS RIFKIND WHARTON &
GARRISON LLP

*Counsel for Plaintiffs*

17