# EXHIBIT 1

Page 1

1                    STEVEN YOUNG

2           UNITED STATES DISTRICT COURT

3       FOR THE WESTERN DISTRICT OF VIRGINIA

4              CHARLOTTESVILLE DIVISION

5   --------------------------------- )

6   ELIZABETH SINES, et al.,          )

7              Plaintiffs,            )Case No.

8         vs.                         )3:17-cv-00072-NKM

9   JASON KESSLER, et al.,            )

10             Defendants.            )

11  --------------------------------- )

12

13

14           DEPOSITION OF STEVEN YOUNG

15   APPEARING REMOTELY FROM CHARLOTTESVILLE, VIRGINIA

16                  JULY 15, 2020

17

18

19

20

21

22

23

24  JOB NO. 180929

25  REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

Page 9

1        STEVEN YOUNG

2  unit as well as the SVU unit, and recently I got
3  switched over to patrol to become a road supervisor.
4      Q.  Okay.  Can you just generally give me a
5  little background about your training and
6  experience, when you first began law enforcement up
7  to August 12th?
8      A.  I joined the Charlottesville Police
9  Department, that's the only department I've worked
10 for, in January of 2011.  I spent three years on
11 night patrol and then a year on daylight patrol, and
12 then I guess up until August 12th I was a detective
13 for about two and a half years.  During that time I
14 worked mostly in property units in our burglary
15 unit, and then I'll say about March of 2017 I got
16 switched over to homicide and major case unit.  I've
17 been to several trainings regarding investigations,
18 a lot of 4th Amendment training, drug interdiction
19 training, all sorts of different kind of training.
20      Q.  Okay.  Do you have any military experience
21 prior to joining Charlottesville Police Department?
22      A.  Four years in the Marines and then four in
23 the Army.
24      Q.  All right.  So is the proper way to refer
25 to you now Corporal Young, Detective Young, or

1                    STEVEN YOUNG

2       A.   Sergeant Tony Newberry.

3       Q.   Thank you.  Sorry to interrupt.

4       A.   That's all right.

5       Q.   Go ahead.

6       A.   So by, say, you know, 12:30, 1:00
Emancipation Park had dispersed.  We received a call
from a man named Jack -- I'm not sure who that is or
what his real name is, but we just knew him as
Jack -- who was the head of Kessler's security and
he was requesting that we escort him back into the
park to retrieve all of their audio equipment, like
their microphones and all that kind of stuff.

             So we went to Emancipation Park, it was
empty for the most part, and we looked around for --
we told him you stay put, we'll get your equipment
and we'll bring it back, that way you're not going
to rile everyone up again.  We got to the park and
there was no audio equipment to be found.  So we
were just kind of looking around in the park and I
heard on the radio that something happened on the
downtown mall.

             One of the captains that was in the park
suggested that we go ahead and go over there to
Market Street because there was a hit and run and

Page 22

1                   STEVEN YOUNG

2  someone was injured, and then we heard on the radio

3  that there was a vehicle pursuit with the suspect

4  vehicle.  You know, hearing this on the radio we got

5  behind one of the officers that was in pursuit and

6  by the time we got to the intersection of Monticello

7  Road and Blenheim Avenue we parked and we realized

8  that the suspect was already taken out of the

9  vehicle.  I was one of the first ones to get to

10  Mr. Fields and I ended up arresting him.

11        I don't know how much you want me to go

12  into the arrest, but...

13     Q.  If I could, I would just back up a little

14  bit here and kind of break that down a little bit.

15        When you heard of a vehicle pursuit, do you

16  have any idea of a time frame or reference between

17  the report of the hit and run to the end of the

18  vehicle pursuit?  Do you know how long that took?

19     A.  So from the time I first heard of it when

20  the captain said, hey, something just happened on

21  the mall, you guys may want to go take a look, from

22  the time I heard that until the time I heard there

23  was a vehicle pursuit was less than a minute.  We

24  jumped in the van and we went lights and sirens, and

25  from the park to that intersection took maybe about

Page 29

1        STEVEN YOUNG

2        THE REPORTER:  Thank you.

3   BY MR. CAMPBELL:

4        Q.   Okay.  And following the arrest of Fields I

5   think you said you exercised some search warrants;

6   is that correct?

7        A.   Correct.

8        Q.   Did you seize his phone?

9        A.   Yes.

10        Q.   And did you seize anything else that was

11   present in the interior of the vehicle following the

12   arrest?

13        A.   No.  We seized the vehicle, but there was

14   not much in the vehicle at all other than his phone

15   and a couple of personal belongings that were not

16   really relevant.

17        Q.   Did you conduct any sort of deep dive or

18   search of his phone?

19        A.   So we seized the phone, and at the time

20   there was a parallel investigation going on and the

21   FBI took possession of the phone and they conducted

22   a search warrant as well and they had a down- -- if

23   you conduct a search warrant on a cell phone you get

24   essentially a spreadsheet and, you know, this huge

25   document of what's on that phone.  The FBI did that

Page 30

1         STEVEN YOUNG

2   and put it on a disk.  Because of the parallel

3   investigation I had to write a search warrant to

4   obtain that disk, which was actually in our police

5   department.  It's kind of confusing.  So they did

6   the indepth download of his phone, whereas I did the

7   search warrant to get that document.

8       Q.  Okay.

9           And have you reviewed the contents of the

10  report on the phone?

11      A.  Yes.

12      Q.  Did you -- at any point in your

13  investigation were you looking for communications

14  Fields may have had with any other event organizer

15  or rally attendee?

16      A.  Yes.

17      Q.  Did you find any such communications?

18      A.  No.

19      Q.  So it also looks like the -- I mean, from,

20  you know, attending some and watching some of the

21  criminal trial there was like GPS tracking

22  information; is that accurate?

23      A.  Correct.

24      Q.  And did you review that as well, Detective?

25      A.  Yes.

Page 35

1     STEVEN YOUNG

2     Q.  And are you aware of the name of any law
3  enforcement officer who actually witnessed the hit
4  and run incident?
5     A.  I tried to find someone, but no law
6  enforcement officer that I know of actually
7  witnessed the incident.
8     Q.  Okay.
9         And you testified earlier, I believe, that
10 you reviewed the phone downloaded information or
11 report looking for communications between Mr. Fields
12 and other rally attendees or organizers; is that
13 accurate?
14    A.  Yes.
15    Q.  Is it fair to say that if you found
16 evidence of such communication other people could
17 have been charged in association with Fields' hit
18 and run incident?
19    A.  Potentially, yes.
20    Q.  And no such criminal charges were ever
21 filed against any other rally attendee or organizer
22 in association with Mr. Fields' hit and run
23 incident; is that correct?
24    A.  Correct.
25    Q.  And Mr. Fields was never charged with any

Page 40

STEVEN YOUNG

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, TINA M. ALFARO, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 21st day of July, 2020.

My Commission expires October 31, 2020.

_____
NOTARY PUBLIC IN AND FOR THE
DISTRICT OF COLUMBIA