**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

ELIZABETH SINES, SETH WISPELWEY, MARISA BLAIR, TYLER MAGILL, APRIL MUNIZ, HANNAH PEARCE, MARCUS MARTIN, NATALIE ROMERO, CHELSEA ALVARADO, and JOHN DOE,

        Plaintiffs,

  -against-

JASON KESSLER, RICHARD SPENCER, CHRISTOPHER CANTWELL, JAMES ALEX FIELDS, JR., VANGUARD AMERICA, ANDREW ANGLIN, MOONBASE HOLDINGS, LLC, ROBERT "AZZMADOR" RAY, NATHAN DAMIGO, ELLIOT KLINE a/k/a ELI MOSLEY, IDENTITY EVROPA, MATTHEW HEIMBACH, MATTHEW PARROTT a/k/a DAVID MATTHEW PARROTT, TRADITIONALIST WORKER PARTY, MICHAEL HILL, MICHAEL TUBBS, LEAGUE OF THE SOUTH, JEFF SCHOEP, NATIONAL SOCIALIST MOVEMENT, NATIONALIST FRONT, AUGUSTUS SOL INVICTUS, FRATERNAL ORDER OF THE ALT-KNIGHTS, MICHAEL "ENOCH" PEINOVICH, LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN, and EAST COAST KNIGHTS OF THE KU KLUX KLAN a/k/a EAST COAST KNIGHTS OF THE TRUE INVISIBLE EMPIRE,

        Defendants.

No. 3:17-cv-00072 (NKM) (JCH)

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS DAVID MATTHEW PARROTT'S, MATTHEW HEIMBACH'S, AND TRADITIONALIST WORKER PARTY'S EMERGENCY INJUNCTION FOR PROTECTIVE ORDER TEMPORARILY RESTRICTING EXTRAJUDICIAL STATEMENTS BY PARTIES, THEIR COUNSEL, AND ANY ORGANIZATION FUNDING THIS LITIGATION**

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020; (212) 763-5000

## **TABLE OF CONTENTS**

**PAGE NO.**

**PRELIMINARY STATEMENT** ..................................................................................................1

**ARGUMENT**................................................................................................................................2

    I.     PETITIONERS SEEK AN IMPROPER PRIOR RESTRAINT ON SPEECH PROTECTED BY THE FIRST AMENDMENT ............................................................2

    II.    PETITIONERS CANNOT SHOW A COMPELLING INTEREST IN CONSTRAINING IFA'S, PARTIES', OR COUNSEL'S SPEECH ............................3

         A.     Petitioners cannot show a reasonable likelihood that the Court will be unable to seat and guide an impartial jury in this case to an impartial verdict. .........................................................................................................3

    III.   PETITIONERS' PROPOSED GAG ORDER IS NOT NARROWLY TAILORED, EVEN IF THEY COULD SHOW A COMPELLING INTEREST................................................................................................................10

**CONCLUSION** .........................................................................................................................11

## **TABLE OF AUTHORITIES**

**PAGE NO.**

**CASES**

*Alexander v. United States*,
  509 U.S. 544 (1993) ................................................................................................................. 2

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ................................................................................................................... 2

*Chaplinsky v. New Hampshire*,
  315 U.S. 568 (1942) ................................................................................................................. 3

*In re Charlotte Observer*,
  882 F.2d 850 (4th Cir. 1989) .................................................................................................. 10

*In re Murphy-Brown, LLC*,
  907 F.3d 788 (4th Cir. 2018) ............................................................................................ passim

*In re Russell*,
  726 F.2d 1007 (4th Cir. 1984) ................................................................................................. 4

*In re White*,
  No. 07 Civ. 342, 2013 WL 5295652 (E.D. Va. Sept. 13, 2013) ........................................... 3, 5

*Jones v. City of Danville*,
  No. 20 Civ. 00020, 2021 WL 3713063 (W.D. Va. Aug. 20, 2021) ............................... 6, 7, 10

*Neb. Press Ass'n v. Stuart*,
  427 U.S. 539 (1976) .............................................................................................................. 4, 7

*Skilling v. United States*,
  561 U.S. 358 (2010) .............................................................................................................. 4, 6

*U.S. ex rel. Davis v. Prince*,
  753 F. Supp. 2d 561 (E.D. Va. 2010) ............................................................................... 3, 4, 5

*United States v. Alvarez*,
  617 F.3d 1198 (9th Cir. 2010) .................................................................................................. 3

**OTHER AUTHORITIES**

Social Media,
  Christopher Cantwell, "Christopher Cantwell," Telegram (June 26, 2019),
  https://t.me/followchris ............................................................................................................ 8

Social Media,
  James Fry, "Jimmy," Telegram (Sept. 27, 2021), https://t.me/GDLCHAT ............................ 9

Social Media,
  James Kessler, @TheMadDimension, Twitter (Feb. 17, 2018) .................................................. 8

Social Media,
  Matthew Parrott, @TiffPollardFan, Twitter (Aug. 21, 2021) ...................................................... 8

Social Media,
  Michael Hill, "Southern Nationalist," Telegram (Apr. 30, 2021) ............................................. 8

Website,
  Anonymous, Stormfront (Feb. 1, 2021), https://www.stormfront.org ....................................... 8

Website,
  Avi Poster & Deborah Oleshansky, *How to dismantle the white supremacist movement: from Charlottesville to the U.S. Capitol*, Tennessean (Feb. 8, 2021), https://www.tennessean.com .......................................................................................... 8

Website,
  Christa Case Bryant & Patrik Jonsson, *Jason Kessler and the 'alt-right' implosion after Charlottesville*, Christian Science Monitor (Aug. 9, 2018), https://www.csmonitor.com ....... 8

Website,
  Cynthia Miller-Idriss, *Infowars' school shooting lies cost Alex Jones and put extremists on alert*, MSNBC (Oct. 5, 2021), https://www.msnbc.com ........................................................ 7

Website,
  David McNair, *Take-Aways: the Week in Review*, The DTM (Sept. 16, 2021), https://www.charlottesvilledtm.com ........................................................................................ 8

Website,
  Mark Hand, *White Supremacists To Return To Charlottesville For Civil Trial*, Patch (Sept. 22, 2021), https://patch.com ........................................................................................ 8

Website,
  Sasha Ingber, *Neo-Nazi James Fields Gets 2nd Life Sentence For Charlottesville Attack*, NPR (July 15, 2019), https://www.npr.org ............................................................................... 8

## PRELIMINARY STATEMENT

Three Defendants in this case, Matthew Parrott, Matthew Heimbach, and the Traditionalist Worker Party (collectively, "Petitioners") come to court with an extraordinary request: that this Court issue an order forbidding Integrity First for America ("IFA"), a non-party, from making *any* extrajudicial public statements about this case—and specifically from carrying out their core, constitutionally-protected mission, which is to advocate around and raise funds to pay for security and logistics for the plaintiffs and their trial team. The relief sought is nothing short of a prior restraint on sacrosanct First Amendment rights—and, beyond simply quoting and screen-grabbing the very fundraising events that they wish to suppress, Petitioners offer not a scintilla of evidence, and not a single case, in support of their request. Indeed, they make *no* effort to satisfy the rigorous standards that apply in this context, much less to demonstrate, as they must, that the Court's ordinary tools for ensuring a fair trial will not suffice here.

Petitioners could not make such showings in any event. Conveniently ignoring the many outlets that have reported on Defendants' activities and on this case for years, and the torrent of inflammatory speech that Defendants and their supporters have leveled at parties and counsel in recent months, Petitioners suggest that just *three* bits of IFA's speech—including a fundraiser that has now come and gone—*could* taint the pool of prospective jurors. This is woefully insufficient evidence to support a gag order, which must withstand strict scrutiny as a prior restraint on speech protected by the First Amendment.

There is no evidence that the speech Petitioners seek to restrain is "reasonably likely" to taint the jury pool; indeed, there is no evidence that anyone in the venire pool was even exposed to the speech Petitioners point to. There is also no evidence that, absent relief, the Court will be unable to guide whatever jury is ultimately empaneled to an impartial decision, using the

many tools at its disposal. At a broader level, a gag order in this case is unlikely to have any meaningful effect, given the nature of the public dialogue that already exists around this litigation. The public discourse—well beyond anything that IFA, the parties, and their counsel have offered—has been raging around this case since the case was filed. The same kinds of statements that Petitioners now take umbrage at have appeared as reportage in the mainstream press and are not materially different from statements Petitioners now wish this Court to prevent IFA from making. This is all quite apart from the hateful and inflammatory rhetoric that some Defendants and their partisans have injected into the discourse. From all of this, one conclusion emerges: Petitioners are not concerned about the impact of pre-trial publicity on the venire pool; rather, they are seeking to use the powers of this Court to prevent IFA from raising money, which will be used to keep Plaintiffs and their lawyers safe and to support the trial in Charlottesville later this month. For all these reasons, and more, Petitioners' request should be denied.[1]

## ARGUMENT

**I. PETITIONERS SEEK AN IMPROPER PRIOR RESTRAINT ON SPEECH PROTECTED BY THE FIRST AMENDMENT**

Gag orders like the one Petitioners seek, "[l]ike all court orders that actually forbid speech activities, . . . are prior restraints," and therefore bear "a heavy presumption against [their] constitutional validity." *In re Murphy-Brown, LLC*, 907 F.3d 788, 797 (4th Cir. 2018) (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)) (internal quotation marks omitted); *see also U.S. ex rel. Davis v. Prince*, 753 F.

---

[1] IFA also wishes to point out, and to preserve as an objection to the proposed relief, the fact that Petitioners never effected service of process on IFA. On September 28, 2021, IFA learned of the filing of the instant application from the public docket; it immediately alerted the undersigned counsel. To facilitate an orderly litigation of the issue, undersigned counsel immediately emailed Petitioners' counsel Josh Smith, Esq. and offered to accept service of process on behalf of IFA. Mr. Smith did not reply, and service on IFA has not been effected. That said, out of respect for the Court, IFA submits this memorandum on the merits for the Court's consideration.

Supp. 2d 561, 568 (E.D. Va. 2010) ("Broad gag orders are restraints on expression and raise First Amendment concerns."). As this Court has noted, all speech "is presumptively protected under the First Amendment unless it falls within 'certain well-defined and narrowly limited classes of speech.'" Mem. Opinion & Order (May 29, 2020), Dkt. 747 at 4 (quoting *In re White*, No. 07 Civ. 342, 2013 WL 5295652, at *38 (E.D. Va. Sept. 13, 2013) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942))); *see also United States v. Alvarez*, 617 F.3d 1198, 1217 (9th Cir. 2010), *aff'd*, 576 U.S. 709 (2012).

"Even among First Amendment claims, gag orders warrant a most rigorous form of review because they rest at the intersection of two disfavored forms of expressive limitations: prior restraints and content-based restrictions." *In re Murphy-Brown,* 907 F.3d at 796–97. A party seeking a gag order must therefore show that the gag order will withstand strict scrutiny, i.e., that the order (1) advances a compelling interest and (2) is narrowly tailored to serve that compelling interest. Petitioners here do not come close to making such a showing; indeed, they barely make the attempt. Accordingly, their motion must be denied.

## II.   PETITIONERS CANNOT SHOW A COMPELLING INTEREST IN CONSTRAINING IFA'S, PARTIES', OR COUNSEL'S SPEECH

There is no compelling interest furthered by a gag order where, as here, there is no proof that it is "reasonably likely" that the venire pool will be tainted without such a gag order. Indeed, in this case, it is entirely *un*likely that such an order would make any difference in the public discourse at all, given what has already been said and what others are sure to say about the case as the trial proceeds.

### A.   Petitioners cannot show a reasonable likelihood that the Court will be unable to seat and guide an impartial jury in this case to an impartial verdict.

Petitioners do not explicitly identify a compelling interest that their proposed gag order advances. Instead, they offer speculation that IFA's public statements, which are

3

indubitably protected speech, will somehow compromise the Court's ability to seat an impartial jury. Such speculation is not enough to identify a compelling interest in need of protection.

It is settled law in this Circuit that a compelling interest in fair trial rights exists "only when there is a 'reasonable likelihood' that a party would be denied a fair trial without the order under challenge." *In re Murphy-Brown*, 907 F.3d at 797 (citing *In re Russell*, 726 F.2d 1007, 1010 (4th Cir. 1984)); *Prince*, 753 F. Supp. 2d at 568 ("In the Fourth Circuit, district courts may restrict extrajudicial statements by parties and counsel only if those comments present a 'reasonable likelihood' of prejudicing a fair trial." (cleaned up)). Thus, "a gag order may issue only if there is a likelihood that 'publicity, unchecked, would so distort the views of potential jurors that [enough] could not be found who would, under proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court.'" *In re Murphy-Brown,* 907 F.3d at 797–98 (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 569 (1976)).

Plainly, publicity alone does not justify the issuance of a gag order; if it did, every high-profile case would result in speech being silenced. That is not the rule. In our constitutional system, speech is a privileged activity, and jurors and potential jurors are presumed to understand that out-of-court commentary—even highly emotional out-of-court commentary—is not the same thing as in-court evidence. "An impartial jury . . . need not be wholly unaware of information—including potentially prejudicial information—outside the record." *Id.* at 798; *see also Skilling v. United States*, 561 U.S. 358, 381 (2010) ("Prominence does not necessarily produce prejudice, and juror impartiality . . . does not require ignorance."). "Jurors are not that fragile." *In re Murphy-Brown,* 907 F.3d at 798. Accordingly, the question a court must decide is *not* "whether a case has garnered public attention" or "whether public

4

discussion of it risks revealing potentially prejudicial information," but instead whether it is "likely" the trial judge "will be unable to guide a jury to an impartial verdict." *Id.*

Importantly, the Court has already previously rejected parties' requests for gag orders in this case—precisely because the parties were unable to establish a compelling interest in their fair trial rights on the instant facts. In an order denying a Defendant's motion for a gag order restraining Plaintiffs' counsel's extrajudicial speech, the Court held that "nothing presented thus far suggests counsel's statements present a 'reasonable likelihood' of tainting the jury pool." Order (Mar. 22, 2018), Dkt. 285 at 3 (quoting *Prince*, 753 F. Supp. 2d at 568) (internal quotation marks omitted).[2]  As this Court has observed, "'[t]he preferred place' of free speech and expression 'in our constitutional scheme gives these liberties a sanctity and a sanction not permitting dubious intrusions.'" *Id.* (quoting *In re White*, 2013 WL 5295652, at *38) (cleaned up).

Petitioners have offered no evidence that the speech they now seek to restrain warrants the "dubious intrusion" of a gag order on non-party IFA—or, for that matter, any gag order on any party or attorney in this case. Petitioners do not argue that IFA's speech contains information that is not otherwise available to the public, or that it constitutes prejudicial evidence that may be excluded from trial. Instead, Petitioners object to how IFA, in its advocacy and fundraising speech, characterizes Defendants' beliefs—namely, with what Petitioners call "anti-White epithets (e.g., 'White supremacist,' 'neo-Nazi') and other invective." In addition to being offended by these characterizations, Petitioners speculate that such statements "could become

---

[2] On another application, the Court found that, even where a Defendant's extrajudicial speech came "close to . . . the line between protected speech and a true threat of physical violence," a gag order was improper because Plaintiffs had not shown either that the Defendant's speech was a "'true threat' of violence" or that "the fear of violence" attributed to [Defendant]'s comment has disrupted Plaintiffs' ability to prosecute this case." Mem. Opinion & Order, Dkt. 747 at 7 (quoting *In re White*, 2013 WL 5295652, at *36–61, *63–69, *71).

5

substantial enough" to irreparably taint the jury pool. Mot. for Protective Order (Sept. 27, 2021), Dkt. 1114 at 3–4.

But Petitioners provided no evidence from which the Court can conclude that IFA's speech *would* so taint the venire pool an impartial jury, and that the Court's many tools and instructions would *not* successfully guide a jury to an impartial verdict. Petitioners' only evidence is three pieces of IFA's speech, two of which are emails for which Petitioners offer no information about the recipients. They have not shown that any member of the venire has even *seen* this speech, much less that this speech has actually *prejudiced* so many members of the venire that it will be *impossible* for the Court to guide the eventual jury to an impartial verdict. They have not offered any evidence about the "size and characteristics" of the potential jury pool that would render it particularly vulnerable to being prejudiced by these three bits of speech. *Skilling*, 561 U.S. at 382 ("Given this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain."). They have not pointed to speech containing "evidence of the smoking-gun variety" which "readers or viewers could not reasonably be expected to shut from sight." *Id.* at 382–83. They've offered no evidence whatsoever that the jury pool will be irretrievably tainted. This ends the matter; Petitioners have failed to satisfy the first prong of the strict-scrutiny test. *See, e.g.*, *In re Murphy-Brown,* 907 F.3d at 798 (vacating a gag order where the district court found, "without adequate factual findings or development of a record," that a "'significant increase in trial publicity' supported the gag order"); *Jones v. City of Danville*, No. 20 Civ. 00020, 2021 WL 3713063, at *13 (W.D. Va. Aug. 20, 2021) ("defendants have failed to put forth sufficient facts to show that there is a 'reasonable likelihood' that they would be denied a fair trial absent a gag order" where "the only evidence offered is a handful of online articles, all of which appear to have been published" three

6

years prior); *see also Neb. Press Ass'n*, 427 U.S. at 583 n.10 (holding that, in a criminal case, evidence that public statements "tended clearly to connect the accused with the slayings" and "that it is already doubtful that an unbiased jury can be found" was insufficient to justify a blanket gag order). Crucially, Petitioners have failed to set forth any evidence suggesting that the Court cannot ensure impartiality of the jury "through use of larger jury pools, jury instructions, *voir dire*, and other tools." *Jones*, 2021 WL 3713063, at *13.

"If judges can guide the jury to an impartial verdict, then no gag order may issue." *In re Murphy-Brown,* 907 F.3d at 798.

### PETITIONERS CANNOT ESTABLISH THAT THE GAG ORDER THEY SEEK WILL HAVE A MEANINGFUL IMPACT ON THE PUBLIC DISCOURSE.

In order to establish a compelling interest in a gag order, Petitioners must also show that their proposed gag order would have an actual effect on the public discourse. *In re Murphy-Brown,* 907 F.3d at 798 ("Sometimes the inevitability of publicity surrounding civil proceedings will render a gag order entirely superfluous."). If a gag order would not "operate to prevent the threatened danger," *Neb. Press Ass'n*, 427 U.S. at 562, it may not issue.

This case and others arising from the Charlottesville Unite the Right rally have been the subject of extensive public dialogue in the local and national media for years, and more recently as the trial has approached—all having little or nothing to do with the IFA fundraising effort to which Petitioners now claim to take umbrage. Much of the discourse emanating from mainstream news sources and elsewhere—sources other than IFA, or the Plaintiffs, or their counsel—includes the exact same language that Petitioners now identify as "invective" warranting a blanket prior restraint.[3] Moreover, even as Petitioners object to IFA's speech and

---

[3] *See, e.g.*, Cynthia Miller-Idriss, *Infowars' school shooting lies cost Alex Jones and put extremists on alert*, MSNBC (Oct. 5, 2021), https://www.msnbc.com/opinion/infowars-school-shooting-lies-cost-alex-jones-put-extremists-alert-n1280803 (". . . less than a month before the trial in the suit against two dozen *white supremacist*

7

suggest that it has poisoned the well, Defendants themselves—including Petitioners—have engaged in substantial inflammatory public speech regarding this case, including repeated anti-Semitic, misogynist, and homophobic statements aimed specifically at IFA, its Executive Director Amy Spitalnick, and Plaintiffs' counsel Roberta Kaplan.[4]  Others who share Defendants' ideology but who are not parties to this lawsuit, including radio and podcast hosts and individuals on social media who direct similar language at Plaintiffs and counsel, have echoed and instigated this speech as well.  For example, as recently as September 28, 2021, James "Jimmy" Fry posted an image of an invitation to an IFA event featuring photos of

---

and extremist group leaders for allegedly plotting a conspiracy that led to violence at the Charlottesville rally. . . ." (emphasis added)); Mark Hand, *White Supremacists To Return To Charlottesville For Civil Trial*, Patch (Sept. 22, 2021), https://patch.com/virginia/fallschurch/white-supremacists-return-charlottesville-civil-trial; ("The return of the *neo-Nazis and white supremacists* who played a role in the weekend of violence in August 2017 will force many Charlottesville residents to relive the trauma." (emphasis added)); David McNair, *Take-Aways: the Week in Review*, The DTM (Sept. 16, 2021), https://www.charlottesvilledtm.com/p/take-aways-the-week-in-review-d37 ("Reminder: *white supremacy* goes on trial next month in the Sines v. Kessler lawsuit." (emphasis added)); Avi Poster & Deborah Oleshansky, *How to dismantle the white supremacist movement: from Charlottesville to the U.S. Capitol*, Tennessean (Feb. 8, 2021), https://www.tennessean.com/story/opinion/2021/02/08/dismantle-white-supremacist-movement-attend-feb-11-event/4444071001/ ("Sines v. Kessler details how the *white supremacist* organized "Unite the Right Rally" in Charlottesville was neither a peaceful counter-protest nor a demonstration of First Amendment speech, but rather a meticulously planned conspiracy to bring violence to Charlottesville and attack peaceful protesters." (emphasis added)); Sasha Ingber, *Neo-Nazi James Fields Gets 2nd Life Sentence For Charlottesville Attack*, NPR (July 15, 2019), https://www.npr.org/2019/07/15/741756615/virginia-court-sentences-neo-nazi-james-fields-jr-to-life-in-prison; Christa Case Bryant & Patrik Jonsson, *Jason Kessler and the 'alt-right' implosion after Charlottesville*, Christian Science Monitor (Aug. 9, 2018), https://www.csmonitor.com/USA/Politics/2018/0809/Jason-Kessler-and-the-alt-right-implosion-after-Charlottesville ("Numbering more than 500, Charlottesville was one of the largest gatherings of *white supremacists* in the modern era." (emphasis added)).

[4] *See, e.g.*, Matthew Parrott, @TiffPollardFan, Twitter (Aug. 21, 2021) ("The ENTIRE case for the plaintiffs consists of gaming the discovery process for the technical, procedural construction of adverse inferences stacked upon adverse inferences into a fully fabricated fictional case."); Michael Hill, "Southern Nationalist," Telegram (Apr. 30, 2021), https://t.me/sonat61 ("America is and has always been a country built and sustained for and by Whites. We're determined that a minority of jews and non-Whites will not get away any longer with their lies and subterfuge against the founding stock of this country. We are not afraid of ourselves, Miss Spitalnick, and if you're afraid of us, then it's because you know we're aware of your bad intentions towards us. The jew-black alliance is about one thing: gaining enough power to destroy White resistance to the overthrow of our civilization."); Anonymous, Stormfront (Feb. 1, 2021), https://www.stormfront.org/forum/t1330534/ ("Like her hyper-litigious Jewish co-ethnic Amy Spitalnick (Amy Spitalnick / 20/20 Judaism), Roberta A. Kaplan is obsessed with ethnocentric Whites and has been engaging in 'lawfare' in order to destroy any individual or movement that is even marginally pro-White, including Donald Trump and anyone else that these nation-wreckers slander with the 'Nazi[tm]' label."), Christopher Cantwell, "Christopher Cantwell," Telegram (June 26, 2019), https://t.me/followchris ("After this stupid kike whore loses this fraudulent lawsuit, we're going to have a lot of fucking fun with her."); James Kessler, @TheMadDimension, Twitter (Feb. 17, 2018) ("I'm never one to engage in conspiracy talk or blame everything on other ethnic groups but this Integrity First for America is a blatant front for powerful Jews to vent their ethnic hostility towards whites organizing as a political class.").

speakers, adding the following text: "Let's talk about K*kapalooza taking [p]lace in Charlottesville this October, and take a look at these freaks who should be caged."[5]



James Fry's speech would not be affected by the gag order that Petitioners seek.

Given the significant public dialogue around this case, any gag order restraining parties, counsel, or fundraising entities like IFA would be "entirely superfluous." *Murphy-Brown,* 907 F.3d at 798. For this reason as well, Petitioners cannot establish a compelling interest in such a gag order, and their petition must be denied.

---

[5] James Fry, "Jimmy," Telegram (Sept. 27, 2021), https://t.me/GDLCHAT.

9

## III. PETITIONERS' PROPOSED GAG ORDER IS NOT NARROWLY TAILORED, EVEN IF THEY COULD SHOW A COMPELLING INTEREST

Even if Petitioners could establish a compelling interest, they cannot show that their proposed gag order is narrowly tailored to further that compelling interest.

The test for "narrow tailoring" is one that focuses on options: is there a mechanism other than a prior restraint by which the harm feared can effectively be avoided? The answer, in this case emphatically, is yes. Courts have numerous tools by which they can ensure that parties receive a fair trial, pre-trial publicity notwithstanding. Such tools include expanded jury pools, *voir dire*, "cautionary jury instructions," and even jury sequestration. *In re Murphy-Brown,* 907 F.3d at 799. Gag orders are the rare exception; they are not the rule. In order for a Court to issue a gag order restraining anyone's speech, it must explain why those other powerful tools are insufficient to ensure jury impartiality in a particular case. *See id.* ("The gag order failed to explain if and why these alternatives had proven ineffective.").

The Fourth Circuit has specifically highlighted the judicial system's "abundant trust in *voir dire*." *Id.* (*Voir dire* "can serve in almost all cases as a reliable protection against juror bias however induced." (quoting *In re Charlotte Observer*, 882 F.2d 850, 856 (4th Cir. 1989)) (internal quotation marks omitted). As Petitioners themselves acknowledge, this Court has already "conclude[d] that extensive *voir dire* will be sufficient to overcome any contamination in the pool of prospective jurors." Mot. for Protective Order, Dkt. 1114 at 3. Petitioners have offered no evidence to suggest that *voir dire* is suddenly insufficient to ensure an impartial jury; no such evidence exists. Absent compelling evidence along these lines, Petitioners' proposed sweeping gag order is not "narrowly tailored" to serve a compelling interest; thus, it cannot lawfully be issued. *See Jones*, 2021 WL 3713063, at *14 (denying gag order where "the defendants seek to prohibit presumably all 'extrajudicial statements by

10

attorneys to the media, including, but not limited to, press conferences, press releases, or interviews,' without offering a single exception.").

## CONCLUSION

For the foregoing reasons, IFA respectfully requests that the Court deny Petitioners' motion for a protective order.

Dated: October 12, 2021

                                            EMERY CELLI BRINCKERHOFF
                                            ABADY WARD & MAAZEL LLP

                                                       /s/
                                            Andrew G. Celli, Jr.
                                            Noel R. León

                                            600 5th Avenue, 10th Floor
                                            New York, New York 10020
                                            (212) 763-5000
                                            acelli@ecbawm.com
                                            nleon@ecbawm.com

                                            *Attorneys for Integrity First for America*

                                            *Motions for pro hac vice admission pending*


                                            GRAVITT LAW GROUP, PLC

                                                     /s/ Matthew W. Evans
                                            Matthew W. Evans, VSB# 82081

                                            75 Maple Avenue
                                            P.O. Box 999
                                            Halifax, VA 24558
                                            Tel: (434) 476 6518
                                            Fax: (434) 476-7784
                                            matt@gravittlaw.com

                                            *Attorney for Integrity First for America*