# Exhibit D

1

2                UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF VIRGINIA
3                  CHARLOTTESVILLE DIVISION
                CASE NO.: 3:17-cv-00072-NKM
4

5

6  ELIZABETH SINES, SETH WISPELWEY,
   MARISSA BLAIR, APRIL MUNIZ, MARCUS
7  MARTIN, NATALIE ROMERO, CHELSEA
   ALVARADO, JOHN DOE and THOMAS BAKER,
8
        Plaintiffs,
9  v.

10 JASON KESSLER, et al.,

11      Defendants.
   _____/
12

13

14      REMOTE ZOOM VIDEO DEPOSITION OF DARYL DAVIS

15                 OCTOBER 12, 2021

16

17

18

19

20

21

22

23 Reported by:

24 GINA WILLIAMS, RPR, CRR, CRC

25 JOB NO. 201066

Page 2

1

2

3

4

5

6

7                           OCTOBER 12, 2021

8                             5:02 p.m.

9

10          Remote Video Deposition of DARYL DAVIS taken via

11   Zoom in the above-titled matter before Gina Williams,

12   Registered Professional Reporter and Certified Realtime

13   Reporter.

14

15

16

17

18

19

20

21                        REPORTER'S NOTE:

22       QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT
                 NECESSARILY REFLECT A DIRECT QUOTE
23

24

25

1

2   A P P E A R A N C E S:

3

4           PAUL, WEISS, RIFKIND, WHARTON & GARRISON

5           Attorney for Plaintiffs

6               2001 K Street NW

7               Washington, DC 20006

8       By:   WILLIAM ISAACSON, ESQ.

9             MAKIKO HIROMI, ESQ.

10            JESSICA PHILLIPS, ESQ.

11

12

13

14

15          THE REBROOK LAW OFFICE

16          Attorney for Jeff Schoep, Matthew Heimbach,

17          Matthew Parrott, Traditionalist Worker Party,

18          National Socialist Movement, and Nationalist

19          Front

20              6013 Clerkenwell Court

21              Burke, Virginia 22015

22      By:   WILLIAM REBROOK, IV, ESQ.

23

24

25

1

2   A P P E A R A N C E S (Continued):

3

4             DUANE, HAUCK, DAVIS, GRAVATT & CAMPBELL

5             Attorney for James A. Fields, Jr.

6                 100 West Franklin Street

7                 Richmond, Virginia 23220

8             By:  DAVID CAMPBELL, ESQ.

9

10

11            KOLENICH LAW OFFICE

12            Attorney for Jason Kessler, Nathan Damigo and

13            Identity Europa, Inc. (Identity Evropa)

14                9435 Waterstone Boulevard

15                Cincinnati, Ohio 45249

16            By:  JAMES KOLENICH, ESQ.

17

18

19  ALSO PRESENT:   PETE SIMI

20                  KATHLEEN BLEE

21                  ACACIA DIETZ

22

23

24  VIDEOGRAPHER:   JAAROME WILLIAMS

25

1                        D. DAVIS

2          MS. HIROMI:  We reached out to Mr. ReBrook, who

3     is the attorney for Mr. Schoep and NSM.  He was the

4     attorney who listed Mr. Davis on his witness list.  We

5     have reached out to confirm whether he and Mr. Davis

6     are planning on joining shortly, and we'll keep

7     everyone posted if we hear back.

8                        - - - -

9          VIDEOGRAPHER:  Good afternoon.  Due to the

10    severity of COVID 19 and following the practice of

11    social distancing, the court reporter and I will not be

12    in the same room with the witness.  Instead, we will

13    record this deposition remotely.

14         Will all parties stipulate to the validity of the

15    recording and remote swearing of the witness?

16         MR. ISAACSON:  This is William Isaacson for the

17    Plaintiffs.

18         Yes.

19         MR. KOLENICH:  Jim Kolenich for Defendants

20    Kessler, Damigo and Identity Europa.

21         Yes.

22         MR. CAMPBELL:  Dave Campbell for Defendant James

23    Fields.

24         Yes.

25         COURT REPORTER:  Anyone else?

1                           D. DAVIS

2        MS. DIETZ:  Acacia Dietz with ReBrook Law.

3        Yes.

4        VIDEOGRAPHER:  This is Media 1 of the remote

5   video deposition of Daryl Davis on October 12, 2021 at

6   5:02 p.m. in the matter of Sines, et al. versus Jason

7   Kessler, et al., in the United States District Court

8   for the Western District of Virginia, Case Number

9   3:17-cv-00072-NKM.

10       My name is JaaRome Williams with TSG Reporting.

11       Would counsel please introduce themselves for the

12  record.

13       MR. ISAACSON:  This is William Isaacson from the

14  Law Firm of Paul Weiss for the Plaintiffs.

15       MR. KOLENICH:  This is Jim Kolenich.  I represent

16  Defendants Jason Kessler, Nathan Damigo and Identity

17  Europa.

18       MR. CAMPBELL:  This is Dave Campbell.  I

19  represent Defendant James Fields.

20       MS. HIROMI:  Makiko Hiromi also for Plaintiffs.

21       THE WITNESS:  This is Daryl Davis, independent

22  witness for Jeff Schoep.

23       MR. ISAACSON:  All right.  Well, then Mr. ReBrook

24  is not on the line?

25       MR. REBROOK:  I'm sorry, I'm not?

D. DAVIS

1

2      MR. ISAACSON:  You are?  You didn't enter your

3  appearance.

4      MR. REBROOK:  I've said it three times now.

5      MR. ISAACSON:  Sorry.  We were entering

6  appearances, and I didn't hear you.

7      MR. REBROOK:  I'm here.

8      MR. ISAACSON:  Do you want to go ahead and enter

9  your appearance?

10      MR. REBROOK:  Edward ReBrook.  I am here.  I am

11  entered.

12                      - - - -

13  WHEREUPON,

14                      DARYL DAVIS

15  was called as a witness and, after having been first duly

16  sworn, was deposed and testified as follows:

17  EXAMINATION

18  BY MR. ISAACSON:

19      Q     Mr. Davis, my name is Bill Isaacson.  I'm an

20  attorney for the Plaintiffs in this case, and I'll be asking

21  you questions today.

22          If you don't understand one of my questions, I'd

23  appreciate it if you'd tell me, and I'll rework the question

24  for you.

25      A     Very well.  Good afternoon, Mr. Isaacson.

1                          D. DAVIS

2      Q      Now, you have been listed as a trial witness in

3  this case for the Defendant Mr. Schoep and the National

4  Socialist Movement.

5             Are you aware of that?

6      A      I'm aware that I am a witness for Jeff Schoep,

7  not the National Socialist Movement.

8             He was a part of that during that time that I

9  believe is in question, but I don't represent the National

10 Socialist Movement.  I represent Mr. Schoep or I'm

11 testifying on his behalf.

12     Q      And so coming in to today you did have an

13 understanding that Mr. Schoep had listed you as a witness in

14 this case, but not that the National Socialist Movement had

15 listed you as a trial witness.

16            Do I have that right?

17     A      That is correct.

18     Q      And how did you come to learn that you were being

19 asked to be a witness for Mr. Schoep in this case?

20     A      Because I've been working with Mr. Schoep for --

21            Well, I've known him since --

22            I've known him personally since 2016.  I was

23 aware of him long before that.  However, we've been working

24 closely together for several years now.

25     Q      But in terms of very specifically how you -- how

```
 1                        D. DAVIS

 2   did you come to learn that you would -- that you were being

 3   asked to be a witness for him in this case?

 4       A    Because I was asked by him and his people, you

 5   know, would I consider being a character witness.

 6       Q    All right.  And when you say "his people," who

 7   are you referring to?

 8       A    Jeff Schoep and Acacia Dietz.

 9       Q    And when was this request made?

10       A    This request was made probably I'd say maybe a

11   couple weeks ago -- officially made.

12       Q    And what do you mean by "officially"?

13       A    Like I was asked officially, you know, would you

14   consider being this, being a witness for this in this

15   particular case.

16            I had talked to Jeff, you know, a while back, you

17   know, maybe even six months ago or more, about his upcoming

18   thing.  And I said, hey, anything I can do to help, just let

19   me know.

20       Q    The --

21            When you were formally asked to be a witness or

22   to consider being a witness, was that an in-person meeting,

23   on the telephone, something else?

24       A    Via telephone.

25       Q    And Ms. Dietz and Mr. Schoep, were they both on
```

Page 10
```
 1                          D. DAVIS

 2   the telephone call?

 3        A    No.

 4        Q    Was it just Mr. Schoep?

 5        A    It was --

 6             At that particular time, just Ms. Dietz.

 7        Q    So Ms. Dietz reached out, and what did she say to

 8   you in that phone call?

 9        A    She said that we have this thing coming up, and

10   Jeff and I would like to know, you know, if you would

11   consider being a witness, and I said absolutely.

12        Q    And when she said "this thing coming up," what

13   was your understanding of "the thing"?

14        A    My understanding of "the thing" was the lawsuit

15   that is going to take place in Charlottesville -- or

16   regarding the incident in Charlottesville of August 12th.

17        Q    And did Ms. Dietz discuss with you what your

18   testimony as a witness would be about?

19        A    No, she did not.

20        Q    Did you have an understanding of what you would

21   have to offer as a witness in this case?

22        A    Oh, I know what I have to offer.  Yes, I do.

23        Q    Okay.  Would you --

24             What is it --

25             What is your understanding of what you have to
```

Page 11

                              D. DAVIS

1

2    offer as a witness in this case?

3        A    My understanding of what I have to offer as a

4    witness in this case is my testimony as to my relationship

5    with Jeff Schoep, both while he was in the movement and

6    after he has gotten out and during our time together, which

7    has been pretty extensive.

8        Q    And what --

9             And can you explain to me how your relationship

10   to Mr. Schoep provides -- gives you information that would

11   be relevant to this case?

12            What do you think you're going to be talking

13   about?

14       A    Well, I'm going to be talking about whatever you

15   ask me.  If I have information on that, I'll give it to you.

16       Q    Well, I'm not actually calling you as a witness.

17   So it's Mr. Schoep would be calling you as a witness.

18            So if you're not there as a witness, I won't be

19   asking you any questions.

20            What information do you believe you have that is

21   relevant to this case?

22       A    I believe I have a valid and relevant information

23   as to Mr. Schoep's past frame of mind and his current frame

24   of mind and the work that he has been doing since he has

25   left the movement, which I feel is very indicative of who he

Page 12

1                           D. DAVIS

2    is today.

3        Q     All right.  Now, when you say --

4              Just let me make sure I understand each piece of

5    that.

6              So in terms of his current frame of -- frame of

7    mind and the work that he's been doing since he left the

8    movement, what time period are you talking about?

9        A     I'm talking about from 2016 through 2021, five

10   years.

11       Q     But when you're describing his current frame of

12   mind and his current work, is that the time period --

13       A     I thought you said from the time he left the

14   movement and his current frame of mind.

15             Well, in 2016 he was still in the movement.

16       Q     So let me just make sure we're getting this

17   straight, and I apologize if I caused you any confusion.

18             But you talked about one thing you would talk

19   about is his current frame of mind and his current work.

20       A     Correct.

21       Q     When you're talking about that current frame of

22   mind and that current work, what time period are you talking

23   about?

24       A     I would say 2018 -- early 2018 through the

25   present.

Page 13

1                          D. DAVIS

2    Q     All right.  And when you talk about --

3    A     Maybe late -- maybe late 2017.  I don't have an

4  exact date.

5    Q     And when you say you would have information that

6  you think is relevant to this case about his past frame of

7  mind, what time period are you talking about?

8    A     I'm talking about 2016 and prior.

9    Q     2016 and prior to 2016?

10   A     That is correct.

11   Q     You met him in 2016; is that right?

12   A     Pardon me?

13   Q     You met him in 2016, I thought you told me.

14   A     That is correct, yes.

15   Q     But you'd be testifying about his state of mind

16  before 2016?

17   A     Sir, I've been doing this kind of work for 37

18  years.

19   Q     And when you say "this type of work," what

20  type --

21         Well --

22   A     Of working --

23         Of working in the arena of race relations.

24   Q     But in terms of your testimony about Mr. Schoep's

25  state of mind, would it be your intention to testify about

D. DAVIS

1

2  his state of mind during the time period before you met him?

3      A     Sure, absolutely.

4      Q     And that would be because of the expertise that

5  you believe you have from the field of your work; is that

6  right?

7      A     Yes, I have known --

8            I've known about him for a long time.  I've

9  followed his career for a long time.  Like I said, I've been

10  in this work for 37 years.

11           I knew his predecessor that gave birth to the NSM

12  long before he even joined it.

13     Q     So --

14           And if you were going to just discuss your

15  knowledge of Mr. Schoep's past frame of mind based on your

16  personal interactions, when would that begin?

17     A     That would probably begin back in the 1990s.

18     Q     Your personal interactions with Mr. Schoep?

19     A     You say personal --

20           Interactions with him in person you mean or my

21  observations of him throughout that time period?

22           I've seen --

23           I've seen him on TV talk shows.  I've seen him in

24  interviews.  I've read about him.

25           Like I said, I've been -- I've been doing this

Page 15

1                            D. DAVIS

2   kind of work for 37 years.

3           Now, I've only known him personally since 2016,

4   but that does not mean I didn't know anything about him

5   prior to that.

6       Q    And I appreciate you telling me this.  I just

7   want to make sure I get this straightened out.

8       A    Right.

9       Q    In terms of your personal knowledge from your

10  personal interactions, that began in 2016.

11          You had knowledge about him from before that from

12  things you observed about him, whether it's in television,

13  media, whatever else you saw about him in public sources?

14      A    That is correct.

15      Q    The --

16          And based only on your personal interactions with

17  him, if I could ask you to do that.

18      A    Sure.

19      Q    And just from this answer to not discuss the

20  things you learned from your expertise or what you heard in

21  the media, but based on your personal interactions with him

22  in 2016 and 2017, what would you say about his state of mind

23  during that period of time?

24      A    Well, in 2016 he was still involved with the NSM,

25  and I interviewed him myself personally one on one.  He was

Page 16

                              D. DAVIS

1

2  very friendly.  He was very intelligent.

3         I saw someone who had, I would say, taken a

4  different path, not a path that I would agree with.  But I

5  also found him to be someone who, if shown a different idea

6  and shown proof of a better path, that he would be one who

7  would consider it.

8         Now, that was back in 2016 when he was still

9  involved in the NSM.

10  Q     And would you say the same about him in 2017?

11  A     Well, you know, like I said, I reconnected with

12  him either late 2017 or early 2018.

13         He had gone --

14         He had gone quiet for a while, and quiet I mean

15  like, you know, sort of like off the radar.

16         I had his phone number, and I telephoned him to

17  see, you know, where he was.  And we talked on the phone,

18  and I could see that he was -- he was considering different

19  things, a different path.  So, you know, there was a

20  transition going on.

21  Q     And the phone call you're describing took place

22  in late 2017 or 2018; is that correct?

23  A     I believe so, yes.

24  Q     And so from 2016 or when you first met him until

25  that phone call in late 2017 to 2018, am I correct that what

Page 17

1                              D. DAVIS

2    you would have to testify about at this trial about Mr.

3    Schoep is that you thought he was someone who, if he was

4    offered the appropriate information, might consider a

5    different path?

6         A     That is correct.

7               You know, I mean, you know, there are people who

8    believe a certain way, you know.  They only know what they

9    know.  And until they are provided with a different

10   perception that resonates with them, they continue believing

11   that way.

12              And I believe that I offered Mr. Schoep a

13   different perception, and my belief turned out to be

14   correct.

15        Q     And you began offering him that different

16   perception in that phone call in late 2017?

17        A     No, sir.

18              I offered that --

19              I offered that to him in 2016 during my

20   interaction with him.

21        Q     Am I correct you did not feel you had any success

22   with him any earlier than late 2017 or --

23        A     No, I wouldn't -- I wouldn't say that.

24              I mean, we had -- we had conversations both on

25   camera and off camera.  And, like I said, I found him to be

                              D. DAVIS

1

2   very friendly, very accommodating, someone who was willing

3   to listen, someone who was entrenched in his views, but also

4   someone who would consider another point of view if it could

5   be validated, and I provided him food for thought.  I

6   believe --

7           Now, people don't change overnight like a light

8   switch, just flip it on and off, you know.  I think he had

9   that seed planted.  He had those ideas imparted to him that

10  I provided, and over time he thought about it.

11          I believe he had a little cognitive dissonance

12  where he struggled with something different, as we all do

13  sometimes when we have believed a certain way for so long.

14  And I think other influences came in that supported the

15  things, you know, that I shared with him, and over time he

16  made that transition to leave the National Socialist

17  Movement and change his direction.

18      Q    And just so I understand the testimony you would

19  be giving at trial about his past state of mind during this

20  period in 2016 until your phone call in late 2017 or

21  early -- or 2018, what you would have to say is that if he

22  was provided the right information, he might consider a

23  different path.

24          Is there anything else that you would have to say

25  about him at trial during that -- during that period of

```
 1                        D. DAVIS
 2   time?
 3        A     I'm sure there is but, I mean, it would depend
 4   upon what would be asked.
 5        Q     Is there anything else that you think that you
 6   would have to say that would be relevant to the case other
 7   than what I've just described?
 8        A     It depends --
 9              Again, it depends on what I'm asked.  I'm not
10   trying to be difficult.  I'm just --
11        Q     And I'm not suggesting you are being difficult.
12   The --
13              But my job is to learn what you would say at
14   trial.
15        A     Well, my job is to know what I'm going to be
16   asked.  I'm not just going to say any old thing.  I have to
17   be asked a particular question.
18        Q     Are you aware of any information that you think
19   is relevant to Mr. Schoep's state of mind -- relevant to
20   this case -- with respect to Mr. Schoep's state of mind in
21   2016 and 2017 other than that you believed he was the type
22   of person who, if he was given the right information, he
23   might consider a different path?
24              Are you aware of anything else other than that?
25        A     I really can't answer that at this time.  It's
```

Page 20

1                          D. DAVIS

2   just kind of vague to me.

3        Q     Now, did Ms. Dietz tell you anything about what

4   the plan would be for what you would say at trial?

5        A     No, she did not.

6        Q     Did Mr. Schoep have any discussions with you

7   about what you might say at trial?

8        A     No, he did not.

9        Q     Did anyone --

10              Has anyone had any discussions with you about

11   what you might say at trial?

12        A     No one has discussed anything with me in regards

13   to what I would say at trial.

14        Q     So as far as you know -- and people haven't been

15   talking to you.

16              But as far as you know in terms of his past state

17   of mind, what you would offer at trial is what you've said:

18   That if provided the right information, he might consider a

19   different path?

20              That's what you would talk about, as far as you

21   know?

22        A     That is one of the things, yes.

23        Q     The --

24              Do you have any knowledge of Mr. Schoep's conduct

25   on August 11 or August 12 in Charlottesville -- August 11 or

1                              D. DAVIS

2    August 12, 2017 in Charlottesville?

3        A      Only what I have seen that was filmed in the

4    media.

5        Q      Has Mr. Schoep ever discussed with you anything

6    about his conduct on those days?

7        A      Yes.

8        Q      And what has he told --

9        A      Well, I don't know about those days in

10   particular, but in reference to his past, you know, belief

11   system to his past ideology, if you will, which would

12   include those days.

13       Q      I'll come back and ask you about the ideology

14   that you just were referring to.

15              But just in terms of his conduct, has Mr. Schoep

16   told you about any of his conduct on August 11 or August 12

17   in Charlottesville?

18       A      No.

19       Q      Do you have any knowledge of Mr. Schoep's

20   involvement in any planning for the "Unite the Right" event

21   in Charlottesville?

22       A      No.

23       Q      You were not present in Charlottesville during

24   "Unite the Right"?

25              Am I right about that?

Page 22

1                            D. DAVIS

2        A    That is correct.

3        Q    And all of your knowledge of the "Unite the

4   Right" events would come from things that you've read in the

5   media or other public sources; is that correct?

6        A    That is not correct.

7             I know Jason Kessler pretty well, and I have met

8   with him many times even before that and after that.

9             So I'm familiar with him and his planning of it.

10       Q    All right.  So your knowledge of the events of

11  "Unite the Right" would be from what you've learned from the

12  media or public sources and from Mr. Kessler; is that

13  correct?

14       A    That is correct.

15       Q    And has Mr. Schoep ever expressed to you any

16  remorse about his conduct on August 11 or August 12?

17       A    Mr. Schoep has expressed remorse to me about his

18  belief system, his ideology, which would incorporate those

19  days that you mentioned, but not just specifically to those

20  days, from his life from joining that ideology 27 years ago

21  through the present -- well, rather through late 2017, early

22  2018.

23       Q    Now, my question wasn't quite about his beliefs.

24            So I understand now --

25       A    I thought you said about his remorse.

1                          D. DAVIS

2    Q    Remorse about his conduct.

3         So the --

4         So let me go over it again.

5         You've indicated that Mr. Schoep has indicated to

6    you remorse over his past beliefs and ideology, but has he

7    ever expressed remorse to you about his conduct in

8    connection with the "Unite the Right" events in

9    Charlottesville?

10   A    I'm not sure what you mean by "conduct."

11        Could you be a little more specific?

12   Q    I mean anything he did with respect -- in

13   connection with the "Unite the Right" events.

14   A    Well, he aired his views.  What I saw on the

15   media was him standing with a microphone or something airing

16   his views.  To me, that is part of conduct.  And what he was

17   expressing was his beliefs, which is what he has aired

18   remorse to me about.

19        So if you want to consider expressing one's

20   beliefs as part of his conduct then, yes, he has expressed

21   remorse about his conduct.

22   Q    All right.  Has he described to you whether he

23   was engaged in any violent acts on those two days?

24   A    No.

25   Q    Has he expressed any remorse for any physical

Page 24

                                    D. DAVIS

1

2   acts that he engaged in as part of the "Unite the Right"

3   events?

4        A     No, I'm not aware of any of that.

5        Q     Has he expressed any remorse for any involvement

6   he had in the planning of "Unite the Right"?

7        A     He has expressed remorse with being a part of it.

8        Q     And when you say "being a part of it," what do

9   you mean?

10       A     Being there, being there that day, partaking in

11  trying to promote that ideology.

12       Q     And when was the first time he expressed that

13  remorse?

14       A     Well, I would say probably during that phone call

15  and then throughout -- throughout our relationship since

16  then.

17       Q     So he first expressed some remorse about

18  attending the "Unite the Right" events in a phone call in

19  late 2017 or 2018 with you; is that right?

20       A     You know, you keep harping on those two days.  He

21  doesn't always get specific with those two days, you know.

22  He talks about his past, and his past includes those two

23  days.

24            MR. REBROOK:  This is Edward ReBrook.  Let me

25       stop you right there, Daryl.

Page 25

```
 1                          D. DAVIS
 2          If you all could just avoid putting words in his
 3     mouth and just listen to what he said rather than
 4     twisting it into something that it isn't.  I would
 5     appreciate it.
 6          And I'd also appreciate it if you didn't make me
 7     explain what I'm saying since you absolutely know what
 8     I'm fucking saying.  Thank you.
 9          MR. ISAACSON:  I don't --
10          That was not a proper objection, and no one was
11     quoting you, Mr. ReBrook.
12          MR. KOLENICH:  You can resume talking.
13          MR. ISAACSON:  I do appreciate that.
14  BY MR. ISAACSON:
15     Q    The --
16          Mr. Davis, did Mr. Schoep --
17          I understand Mr. Schoep expressed remorse for
18  ideology and beliefs over a period of time that would
19  include August 2017.
20          Did he ever express any remorse to you about
21  anything he did specifically in connection to the "Unite the
22  Right" events?
23     A    No.
24          I'll say, no, not by name.
25     Q    And have you had any discussions with Mr. Schoep
```

Page 26

                              D. DAVIS

1

2   about what you think you'd be able to testify about at this

3   trial?

4        A     I have not.

5        Q     Have you had any discussions with anybody before

6   this deposition about what you might be able to testify

7   about at this trial?

8        A     I have not.

9        Q     And do you intend to provide testimony that Mr.

10  Schoep did not engage in racially motivated violence on

11  August 11 or August 12 in Charlottesville?

12       A     I was not present in Charlottesville.

13             From what I saw, I did not see Mr. Schoep --

14             From what I saw in the media, I did not see Mr.

15  Schoep engaging in physical violence.

16             I saw a lot of physical violence that day in the

17  media.  I saw films of it, things like that.  I did not see

18  him engaging in physical contact or violence.

19             I saw him expressing his beliefs, beliefs with

20  which I did not agree, but -- you know, which may have

21  motivated different people to act in different ways, but I

22  did not see him engaging, as you put it, in physical

23  violence.

24       Q     You would not be able to testify about whether

25  Mr. Schoep engaged in racially motivated violence on

1                             D. DAVIS

2    August 11 or August 12 in Charlottesville, except based on

3    what you saw in the media; is that right?

4        A     I did not see Mr. Schoep engaging in any physical

5    violence myself.

6        Q     And all you saw was in the media?

7        A     All I saw of what?

8        Q     Of Mr. Schoep on those days.

9        A     That is correct.

10       Q     Do you intend to provide any testimony that Mr.

11   Schoep did not conspire with others to engage in racially

12   motivated violence in Charlottesville during the "Unite the

13   Right" events?

14       A     I have no knowledge of what he conspired, if you

15   want to call it that, or did not conspire to do.

16             All I saw of Mr. Schoep on those days, which you

17   mentioned being August 11 and August 12, 2017, all I saw of

18   Mr. Schoep on those days was what I saw that was on the

19   TV -- on the media.

20             I'm not aware of any meetings he may have had or

21   may not have had with anyone else, as you called, to

22   conspire.

23       Q     Let me ask you, if I can, a little about your

24   background.

25       A     Sure.

Page 51

1                          D. DAVIS

2      Q     Now, when you first met Mr. Schoep in 2016, how

3   frequently were you talking with him during 2016 and 2017?

4      A     I only spoke with him that one day in 2016 until

5   I -- you know, for the documentary.  I spoke with him on

6   camera and off camera.  And then I did not speak with him

7   again until I called him on the phone a little over a year

8   later, maybe late 2017 or early 2018.

9      Q     All right.  So your entire personal interactions

10  with Mr. Schoep from your first -- during 2016 and 2017 --

11              Let me start that over.

12              You met Mr. Schoep at a meeting you described in

13  2016, and you had no communications with him after that

14  until your phone call, which happened in either late 2017 or

15  2018; is that right?

16     A     That is correct.

17              I believe that I met him in 2016 -- in early

18  2016.  It may have been 2015 because the movie came out in

19  2016 but, you know, we were still filming in 2016.  You

20  know, I could have met him in 2015 late or early 2016.  I

21  don't recall the exact date.

22              I could get it for you, if you need it, but I

23  don't recall it off the top of my head.

24     Q     Would you --

25              Would you describe your first meeting with him in

1                               D. DAVIS

2    2015 or 2016?

3              What happened?

4    A     Okay.  Well, I was in Alabama, and I had gone to

5    the Southern Poverty Law Center to interview the people

6    there about white supremacy and do some other things while I

7    was there, interview some other people.

8              And Mr. Schoep had come down from Detroit.  I

9    believe it was Detroit.  He drove down.  The producers of

10   the movie, the documentary, had invited him to come down and

11   have a conversation with me.

12             I knew who he was.  I don't know that he knew who

13   I was, but I knew who he was.

14             And the way they had it set up, we were going to

15   sit in a little dive bar and -- hot dog/hamburger grill

16   place that was famous because Hank Williams, the father of

17   country music, who's from Montgomery, Alabama, used to

18   frequent there, and he wrote his big hit, "Hey, Hey,

19   Good-Looking" sitting at the bar -- at the counter there.

20             So they were going to set up a booth for Mr.

21   Schoep and I to sit across from one another and have this

22   conversation about white supremacy, my views, his views, et

23   cetera.

24             I was to wait in the hotel.  They had a rental

25   car for me.  And when they got it all set up and got the

```
 1                          D. DAVIS
 2   cameras all set and the lighting right and whatever else,
 3   they were going to notify me, call me, and I was to come in.
 4   Mr. Schoep would already be sitting at the table, and I was
 5   to come in, we would meet, sit down, and engage in the
 6   conversation.
 7             Well, they called me.  They said they were ready.
 8   And so I got inside the rental car.  I drove to the
 9   location.  And when I pulled up, Mr. Schoep was sitting
10   outside on this bench right outside this hot dog stand and
11   grill, sitting there with a young lady.
12             And, you know, I had never met him before, but I
13   knew who he was.  I had been seeing him for years, you know,
14   and I recognized him.  I thought the guy was supposed to be
15   inside.  Here he is sitting outside.
16             So I got out of the van, and I -- I mean the
17   vehicle, and I walked over, and I said, are you Jeff Schoep?
18   He said, yes.  I put my hand out, I shook his hand, and he
19   introduced his friend, and we just started talking.
20             We were having just a friendly conversation like
21   anybody else, nothing to do with race, this, that or the
22   other.  How you doing, blah, blah, blah?  Where did you come
23   in from?  How was your drive?  That kind of thing.  He was
24   just an ordinary friendly individual.
25             And I said, well, I guess, you know, we blew the
```

1                          D. DAVIS

2   producer and director's idea of me coming in and meeting you

3   for the first time on camera because here we are.

4           And so we talked a little bit more, and then we

5   headed on in.  And sure enough, you know, the producer and

6   director were in there, and they were shocked to see us come

7   in together, but they carried on with the film.

8           We sat down, and we began our -- we began our

9   conversation.  I asked him questions.  He answered them.  A

10  lot of it was friendly, and then at one point he flipped

11  into Neo-Nazi mode, I guess, and started advocating, you

12  know, for white supremacy, you know, that he would fight to

13  the last bullet, you know, for his people and this, that and

14  the other, and he says, you know, black people have the

15  NAACP and groups to advocate for black rights and, you know,

16  I have a group that advocates for white rights.

17          And I said, well, you know what?  The NAACP also

18  has white members, you know.  Do you have any black members

19  in your group?  Can I join your group?

20          No.  No.

21          And I said, well --

22          He says, you know, you have people who are

23  advocating for black rights.  You had Martin Luther King,

24  Jr.

25          And I said, so are you saying you're like a white

Page 55

                              D. DAVIS

1

2    Martin Luther King Jr or something?

3            You know, we went back and forth, and we had some

4    amusing moments where we both shared a laugh at something

5    that was ridiculous because I caught him in something that

6    he realized did not make any sense, and I pointed it out to

7    him, and we laughed about it, and he agreed, you know, that

8    he was flawed in his assertion.

9            And after that was all over, I pulled him aside

10   and talked with him privately about some things.  And he

11   gave me his phone number, I gave him mine, and we agreed to

12   stay in touch.  And the next time we got in touch was when I

13   called him about a year or so later.

14   Q    In late 2017 or 2018?

15   A    That is --

16        To the best of my knowledge, that would be right.

17   Q    So just so I can understand, so you had a meeting

18   with Mr. Schoep in connection with the documentary in

19   Montgomery, Alabama in 2015 or 2016; is that correct?

20   A    Correct.

21        You can --

22        You can get that documentary and see the

23   interaction on film.

24   Q    I'm aware of that.

25   A    Okay.

Page 56

D. DAVIS

1

2      Q      And you met him for a few minutes outside before

3   you went in to get filmed?

4      A      Correct.

5      Q      And was the rest of your interaction with him all

6   on film?

7      A      The rest of my interaction was on film.  And then

8   after the filming was over, I had some more interaction with

9   him just privately, he and I.

10      Q      And that private interaction after the filming,

11   did that last a few minutes?

12      A      Yes.

13      Q      And what was the amount of time you spent with

14   him on film?

15      A      I don't remember.

16           We probably spent over an hour but, you know, of

17   course they edited it down to, you know, a few minutes in

18   the movie.

19      Q      That's why I asked.

20      A      Yeah.

21      Q      So during the time you were filming, the time you

22   spent together was approximately an hour?

23      A      While we were filming, probably --

24      Q      So --

25      A      -- or more.

Page 57

                              D. DAVIS

1

2    Q     In terms of time you spent with him before your

3  phone call in 2017 and 2018, it was a few minutes before

4  filming, an hour -- approximately an hour during filming,

5  and a few minutes afterwards?

6         Do I have that right?

7    A     That is correct.

8    Q     And at one point during the filming, he flipped

9  into what you called "Neo-Nazi mode."

10        Is that correct?

11   A     That is correct.

12   Q     And one of the things he talked -- said is, I'm

13  going to fight for -- I'll fight for the last bullet for my

14  people?

15   A     I will fight to the last bullet for my people.

16   Q     Did you know of his involvement in forming the

17  Nationalist Front -- Mr. Schoep?

18   A     No.

19        I'm aware of the Nationalist Front but, no, I'm

20  not aware of that.

21   Q     Do you understand the Nationalist Front is an

22  alliance of organizations?

23   A     Yes.

24   Q     And an alliance of white supremacist

25  organizations?

1                          D. DAVIS

2        The time is 6:33 p.m.

3

4             (Whereupon, the deposition was concluded at

5        6:33 p.m.)

6                       _____

7                            DARYL DAVIS

8    Subscribed and sworn to before me this

9    ____ day of _____, 2021.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4          I, Gina Williams, Registered Professional

5    Reporter, certify that I was authorized to and did

6    stenographically report the foregoing deposition; and that

7    the transcript is a true record of the testimony given by

8    the witness; that the witness did not waive reading and

9    signing.

10         I further certify that I am not a relative,

11   employee, attorney, or counsel of any of the parties, nor am

12   I a relative or employee of any of the parties' attorney or

13   counsel connected with the action, nor am I financially

14   interested in this action.

15         IN WITNESS WHEREOF, I have hereunto set my hand

16   this 16th day of October, 2021.

17

18   _____

19             Gina Williams, RPR, CRR, CRC

20

21

22

23

24

25

Page 71

1                           D. DAVIS

2                          I N D E X

3    DARYL DAVIS

4         EXAMINATION BY ISAACSON                              7

5                       E X H I B I T S

6    EXHIBIT NO.:

7    (No exhibits marked.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    ERRATA SHEET

2   Case Name:

3   Deposition Date:

4   Deponent:

5   Pg.  No. Now Reads       Should Read  Reason

6   ____  ____ _____     _____   _____

7   ____  ____ _____     _____   _____

8   ____  ____ _____     _____   _____

9   ____  ____ _____     _____   _____
10  ____  ____ _____     _____   _____
11  ____  ____ _____     _____   _____
12  ____  ____ _____     _____   _____
13  ____  ____ _____     _____   _____
14  ____  ____ _____     _____   _____
15  ____  ____ _____     _____   _____
16  ____  ____ _____     _____   _____
17  ____  ____ _____     _____   _____
18  ____  ____ _____     _____   _____
19  ____  ____ _____     _____   _____
20

                         _____
21                       Signature of Deponent
22  SUBSCRIBED AND SWORN BEFORE ME
23  THIS _____ DAY OF _____, 2021.
24  _____
25  (Notary Public)   MY COMMISSION EXPIRES:_____