Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1                    UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF VIRGINIA
2                      CHARLOTTESVILLE DIVISION

3    ****************************************************************

4    ELIZABETH SINES, ET AL.,      CIVIL CASE NO.:  3:17CV72
                                   OCTOBER 28, 2021, 9:08 AM
5                                  JURY TRIAL, DAY 4
            Plaintiffs,
6    vs.

7                                  Before:
                                   HONORABLE NORMAN K. MOON
8    JASON KESSLER, ET AL.,        UNITED STATES DISTRICT JUDGE
                                   WESTERN DISTRICT OF VIRGINIA
9
            Defendants.
10
     ****************************************************************
11
     APPEARANCES:
12

13   For the Plaintiffs:        ALAN LEVINE, ESQUIRE
                                COOLEY LLP
14                              1114 Avenue of the Americas, 46th
                                Floor
15                              New York, NY  10036
                                212.479.6260
16
                                DAVID E. MILLS, ESQUIRE
17                              COOLEY LLP
                                1299 Pennsylvania Avenue, NW,
18                              Suite  700
                                Washington, DC  20004
19                              202.842.7800

20

21

22   Court Reporter:   Lisa M. Blair, RPR, RMR, CRR, FOCR
                        255 West Main Street, Suite 304
23                      Charlottesville, Virginia  22902
                        434.296.9284
24
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25   TRANSCRIPT PRODUCED BY COMPUTER.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

 1   APPEARANCES CONTINUED:

 2   For the Plaintiffs:          MICHAEL L. BLOCH, ESQUIRE
                                  ROBERTA A. KAPLAN, ESQUIRE
 3                                Kaplan Hecker & Fink LLP
                                  350 Fifth Avenue, Suite 7110
 4                                New York, NY  10118
                                  212.763.0883
 5
                                  KAREN L. DUNN, ESQUIRE
 6                                WILLIAM A. ISAACSON, ESQUIRE
                                  JESSICA E. PHILLIPS, ESQUIRE
 7                                Paul, Weiss, Rifkind, Wharton &
                                  Garrison LLP
 8                                2001 K Street, NW
                                  Washington, DC  20006
 9                                202.223.7300

10
     For the Defendants:          DAVID L. CAMPBELL, ESQUIRE
11                                Duane, Hauck, Davis, Gravatt &
                                  Campbell, P.C.
12                                100 West Franklin Street, Suite 100
                                  Richmond, VA  23220
13                                804.644.7400

14                                CHRISTOPHER CANTWELL, PRO SE
                                  #00991-509
15                                USP Marion
                                  4500 Prison Road, PO Box 2000
16                                Marion, IL  62959

17                                BRYAN J. JONES, ESQUIRE
                                  Bryan J. Jones, Attorney at law
18                                106 W. South Street, Suite 211
                                  Charlottesville, VA  22902
19                                540.623.6952

20                                JAMES E. KOLENICH, ESQUIRE
                                  Kolenich Law Office
21                                9435 Waterstone Blvd., Suite 140
                                  Cincinnati, OH  45249
22                                513.444.2150

23                                WILLIAM E. REBROOK, IV, ESQUIRE
                                  The ReBrook Law Office
24                                6013 Clerkenwell Court
                                  Burke, VA  22015
25                                571.215.9006

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  APPEARANCES CONTINUED:

2  For the Defendants:          JOSHUA SMITH, ESQUIRE
                                Smith LLC
3                               807 Crane Avenue
                                Pittsburgh, PA  15216
4                               917.567.3168

5
                                RICHARD SPENCER, PRO SE
6                               P.O. Box 1676
                                Whitefish, MT  59937
7

8  ALSO PRESENT:

9  Dillon Hopper, appearing via Zoom

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1                        I N D E X

2    Opening Statements:

3         By Ms. Dunn...........................................26

4         By Ms. Kaplan.........................................68

5         By Mr. Kolenich.......................................87

6         By Mr. Spencer........................................93

7         By Mr. Cantwell......................................114

8         By Mr. Campbell......................................144

9         By Mr. Jones.........................................147

10        By Mr. ReBrook.......................................151

11        By Mr. Smith.........................................163

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  (Proceedings commenced, 9:08 a.m.)

2          THE COURT:  Good morning.  Would the clerk call the

3  case, please.

4          THE CLERK:  This is Civil Action Number

5  3:17-cv-00072, Elizabeth Sines and others versus Jason Kessler

6  and others.

7          THE COURT:  Plaintiffs ready?

8          MS. DUNN:  Yes, we are, Your Honor.

9          THE COURT:  Defendants ready?

10         MR. CAMPBELL:  Yes, Your Honor.

11         MR. KOLENICH:  Yes, Your Honor.

12         MR. JONES:  Yes, Your Honor.

13         MR. SMITH:  Yes, Your Honor.

14         MR. CANTWELL:  Yes, Your Honor.

15         MR. SPENCER:  Yes, Your Honor.

16         THE COURT:  All right.  Before we begin, I will

17  remind everyone that under Standing Order 2020-12 and 2013-8

18  the Court's prohibition against recording and broadcasting

19  court proceedings remains in force.  Attorneys, parties, and

20  their staff and members of the public or press accessing this

21  proceeding today may not record or broadcast it.  That means no

22  photography, no using any video or audio recording device, no

23  rebroadcasting, live streaming or otherwise disseminating any

24  live or recorded video or audio in this proceeding.

25         Do we know where Mr. ReBrook is?

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1          MR. SMITH:  Your Honor, I saw him right outside when

2    I was coming in.  We were in line together.  He walked away for

3    a second and I haven't seen him since.  He might be on his way

4    up.

5          THE COURT:  All right.  We forwarded a set of

6    preliminary jury instructions.  I did make one substitution

7    this morning.  I don't think there's any question about the law

8    as stated.  After I sent the initial packet I thought the

9    instruction I substituted would be more helpful to the jury.

10         Are there any other matters that require the Court

11   taking up this morning?

12         MR. CANTWELL:  Judge, I have motions in to exclude

13   the plaintiffs' Discord exhibits as undisclosed.  And there's

14   been some dispute about the stipulations on these things.  I

15   understand that they're going to plan on introducing -- they

16   plan to introduce those exhibits during their opening

17   statement, and I thought it would be worth bringing this up

18   before they got started so I don't interrupt them.

19         THE COURT:  Did you all meet yesterday and confer

20   regarding what might be used in the opening statement?

21         MR. CANTWELL:  I have received this binder moments

22   ago with what the plaintiffs intend to introduce in their

23   opening statements.  And try though I might, I don't think I'm

24   going to be able to get through it before we get started.

25         THE COURT:  All right.  Well, is there anything --

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  did you all not confer, are you telling me?

2        MS. DUNN:  Judge, we --

3        MR. CAMPBELL:  David Campbell for Defendant Fields.

4  We did confer and work out any issues that counsel had with --

5  plaintiffs' counsel -- defense counsel had with plaintiffs' --

6        THE COURT:  All right.

7        MR. CANTWELL:  I spoke to Mr. --

8        THE COURT:  The opening statement is not evidence.

9  I'm going to tell the jury that.  And unless it's some

10 egregious sort of -- something that would be so prejudicial,

11 this Court doesn't normally interfere with the opening

12 statement.  I'll just tell the jury the opening statement is

13 not evidence.

14       MR. CANTWELL:  Excellent.  Okay.  Thank you.

15       THE COURT:  Anything else?

16       MS. KAPLAN:  One other housekeeping matter, Your

17 Honor.  This morning I was able to speak to Mr. Campbell and

18 Mr. Kolenich.  Sorry, can you not hear me?

19       THE COURT:  I'm sorry.  I just was not hearing you.

20       MR. SMITH:  I don't think the mic is picking it up.

21       MS. KAPLAN:  Can you hear me now?

22       This morning, Your Honor, I was able to speak to

23 Mr. Campbell and Mr. Kolenich about ways to expedite trial so

24 that if there's some time at the end of the day and it doesn't

25 make sense to get a witness into the courthouse with all the

8

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  logistics, we could not waste time.

2          One of the things we thought to do was, for example,

3  Defendant Azzmador, who Your Honor has issued a number of

4  orders against, we would like today, depending upon how things

5  go, or tomorrow, to read in -- to admit certain exhibits, to

6  read in portions of them that have already been admitted just

7  to kind of expedite things and fill time that way.  And I think

8  that defendants agree with that.

9          And to be clear, Your Honor, we would never read the

10 whole exhibits.  We would obviously move to have them --

11 they're already admitted, but read portions of them.  Again,

12 it's a good way to kind of make things go smoothly.

13         THE COURT:  All right.  Is there any problem with

14 that?  Seems okay.

15         MR. KOLENICH:  Not from counsel, Your Honor.

16         MR. CAMPBELL:  No, Your Honor.

17         MR. SMITH:  No, Your Honor.

18         THE COURT:  Okay.  All right.  Mr. ReBrook, did you

19 have any issues -- anything you need to bring up?

20         MR. REBROOK:  No, Your Honor.

21         THE COURT:  I'm glad to see you back.

22         MR. REBROOK:  Thank you, Your Honor.

23         MR. SMITH:  I received a message from Mr. Spencer.

24 He is going through security and is going to be up momentarily.

25         THE COURT:  Okay.

9

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1        MR. KOLENICH:  Your Honor, if I could bring just one

2   matter up.  I was -- I did not receive the email with the new

3   jury instruction this morning.  So I'm just seeing it now.  I

4   just want a couple of minutes to review it.

5        THE COURT:  Okay.  You can look at it.  It was in

6   the -- I think it was -- it's an instruction I give in every

7   conspiracy case.  I usually give it in the final package, but I

8   think it's appropriate to give it here.

9        MR. KOLENICH:  Yes, sir.  Can I go ahead and read it

10   for a few minutes.

11        THE COURT:  Go ahead.

12        MS. KAPLAN:  I'm so sorry.  One more thing, Your

13   Honor.  As Your Honor graciously agreed, we have the plaintiffs

14   downstairs who are ready for openings when Your Honor is ready.

15   We just have to figure out when you want them up and I

16   understand they will be sitting behind us in the jury box.

17        THE COURT:  Right.  Okay.  Call juror number 207.

18        I was told juror 207 reported yesterday that he may

19   have seen something reported that the trial was going to start

20   yesterday, and if he saw it on the news, I want to be sure he

21   didn't see anything else, other than that.

22        COURT SECURITY OFFICER:  Do you want him in here now?

23        THE COURT:  Yes.

24        (Pause.)

25        THE COURT:  All right, sir.  Before you sit down,

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   would you stand and be sworn, please.

2            (Juror sworn.)

3            THE COURT:  Have a seat, please, and take off your

4   mask.  Sir, I understand that you came in yesterday having

5   heard that the trial might -- was going to start yesterday

6   morning.  Can you tell me where you heard that?

7            MALE JUROR:  Where I heard the trial would start

8   yesterday morning?

9            THE COURT:  Uh-huh.

10           MALE JUROR:  No, they told us to come in.

11           THE COURT:  Who told you?

12           MALE JUROR:  It was on the phone to come in -- they

13   called me on the phone and told me to come to the courthouse.

14           THE COURT:  All right.  Have you -- have you read or

15   heard anything on the television about the case?

16           MALE JUROR:  No, I haven't.

17           THE COURT:  Television or anything else since then?

18           MALE JUROR:  No, sir, I haven't.

19           THE COURT:  All right.  Okay.  But it was your

20   understanding from the message you got on the telephone?

21           MALE JUROR:  Yes.

22           THE COURT:  All right.  Thank you.  You may go back

23   to the jury room.

24           (Juror out.)

25           THE COURT:  All right.  Are we ready to call the

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   jury?

2          MR. KOLENICH:  Yes, Your Honor.

3          THE CLERK:  Do you want the plaintiffs to be brought

4   up, Your Honor?

5          THE COURT:  Yeah, the plaintiffs can come on up.

6          MS. KAPLAN:  Okay.  Thank you, Your Honor.

7          THE COURT:  Let the plaintiffs come in.

8          Have defendants agreed upon the order in which you're

9   going to appear?

10         MR. JONES:  Yes, Your Honor.

11         MR. KOLENICH:  Yes.

12         MR. CAMPBELL:  Yes.

13         MR. SMITH:  Yes, Your Honor.

14   **(Jury in, 9:20 a.m.)**

15         THE COURT:  All right.  You may be seated.  Are the

16   plaintiffs on the way?

17         THE CLERK:  Are the plaintiffs on the way?

18         MS. KAPLAN:  Yes, they are.

19         THE COURT:  Please come forward.  Please come on in

20   and take a seat.

21         All right.  Would you call the jury, please?

22         THE CLERK:  Yes, Your Honor.  Juror 164, juror 168,

23   177, 207, 210, 212, 213, 233, 243, 265, 275, 288.

24         THE COURT:  You may swear the jury.

25         THE CLERK:  Ladies and gentlemen, would you please

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  rise.  Would you please raise your right hands and be sworn.

2  Do you and each of you solemnly swear that you will well and

3  truly try the issue joined between Elizabeth Sines and others

4  and Jason Kessler and others and a true verdict render

5  according to the law and the evidence?  You do?

6          You may be seated.

7          THE COURT:  Members of the jury, as I told you

8  yesterday, except when one is speaking, we will all wear a mask

9  over our nose and our mouth.  And I will do so when I quit

10 speaking.

11         This is a civil suit.  The plaintiffs are Elizabeth

12 Sines, Seth Wispelwey, Marissa Blair, April Muñiz, Marcus

13 Martin, Natalie Romero, Chelsea Alvarado, Devin Willis, and

14 Thomas Baker.  At times in these instructions and during trial

15 these individuals will be referred to collectively as "the

16 plaintiffs."

17         The defendants are Jason Kessler, Richard Spencer,

18 Christopher Cantwell, James Alex Fields Jr., Vanguard America,

19 Robert "Azzmador" Ray, Nathan Damigo, Elliot Kline, also known

20 as Eli Mosley, Identity Evropa, Matthew Heimbach, Matthew

21 Parrott, also known as David Matthew Parrott, and

22 Traditionalist Worker Party, Michael Hill, Michael Tubbs,

23 League of the South, Jeff Schoep, and National Socialist

24 Movement.  They may be referred to individually as a defendant

25 or collectively as "the defendants."

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    During the proceedings you may notice that not all

2  the plaintiffs will be physically present in the courtroom for

3  every day of the trial.  You must not consider this fact at all

4  during your deliberations or while evaluating the credibility

5  of any witness.  As a necessary means to reduce the risk of the

6  spread of COVID-19, I restricted the total number of persons

7  from the plaintiffs' side who may be present in the courtroom

8  at any given time; that is, except this morning during the

9  opening statements, I'm allowing the plaintiffs to sit in the

10  jury box.  As a necessary means -- as a necessary means to

11  spread reduce the spread of COVID-19, I made these

12  restrictions.  You must not hold that fact against them.

13    The Court has also permitted any party, including

14  defendants, to participate remotely in the trial under some

15  circumstances, also to reduce the spread of COVID-19.  And you

16  must not hold that against any party if they are not physically

17  present in the courtroom for every day of the trial.

18    It will be your duty to find from the evidence what

19  the facts are.  You and you alone will be the judges of the

20  facts.  You will then have to apply to those facts the law as I

21  give it to you.  You must follow that law whether you agree

22  with it or not.  Nothing I may say or do during the course of

23  the trial is intended to indicate or should be taken by you as

24  indicating what your verdict should be.

25    Now, I wish to say a few words about the burden of

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  proof which exists in this case.

2         In this civil case, plaintiffs each have the burden

3  of proving their claims against each defendant by what is

4  called the preponderance of the evidence.  This burden applies

5  to all plaintiffs' claims except their claim for intentional

6  infliction of emotional distress, which will be discussed

7  later.  In the same vein, the defendant has the burden to

8  approve any affirmative defenses that they may advance by a

9  preponderance of the evidence.  I will explain this more after

10 you have heard all the evidence.  But, now, keep in mind that

11 if you conclude that a party who has the burden of proof on an

12 issue establishes his or her position by a preponderance of the

13 evidence, you must decide that issue for the party.

14        The term "preponderance of the evidence" means

15 evidence which, as a whole, shows that the fact sought to be

16 proven is more probable than not; in other words, a

17 preponderance of the evidence means such evidence that

18 persuades you that a fact is more likely true than not.

19        In your mind, you may think of this as 51 percent

20 more likely than not.  In determining whether any fact and

21 issue has been proven by a preponderance of the evidence, you

22 may, unless otherwise instructed, consider the testimony of all

23 witnesses, regardless of who may have called them, and all

24 exhibits received in evidence, regardless of who may have

25 produced them.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1          You may have heard of the term "proof beyond a

2    reasonable doubt."  That is a stricter standard that is

3    applicable in criminal cases.  It does not apply in civil cases

4    such as this.  You should therefore put it out of your mind.

5          I wish to give you an overview of this case.

6          Now, as I said, this is a civil lawsuit brought by

7    multiple plaintiffs against multiple defendants, including

8    individuals and organizations, based on events that occurred in

9    Charlottesville, Virginia in August of 2017.  The plaintiffs in

10   this case claim that the defendants and others conspired to

11   commit racially motivated violence at an event the defendants

12   called Unite the Right, which was held in Charlottesville on

13   August 11 and 12, 2017.

14         Plaintiffs allege that the defendants helped to plan,

15   promote, or carry out racially motivated violent acts during

16   that event, and in doing so caused plaintiffs physical,

17   emotional, and monetary harm.  Such acts include a violent

18   torch march on August 11 and various acts of violence on

19   August 12, including a car attack that drove through a large

20   crowd of people which, plaintiffs assert, injured seven of the

21   nine plaintiffs in this case.

22         Some of the plaintiffs raise additional claims,

23   including that certain defendants subjected them to acts of

24   intimidation, harassment, violence, and vandalism based on

25   plaintiffs' race, religion, or ethnicity, and that defendant

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  James Fields committed assault, battery, and intentional

2  infliction of emotional distress.

3  Defendants dispute these claims, deny that they

4  conspired with anyone to commit violence, and contend that they

5  should not be held liable for these alleged actions and they

6  are not responsible for any injury or damages suffered by

7  plaintiffs.

8  This summary of the plaintiffs' position is intended

9  only as background information to help you understand the

10  nature of the case.  It is not evidence and may not be

11  considered as such.

12  The plaintiffs' and defendants' attorneys will have

13  an opportunity to make what is called an opening statement.

14  Opening statements are neither evidence or argument.  An

15  opening statement is an outline of what a party intends to

16  prove, offered to help you follow the evidence.  What the

17  attorneys say in their opening statements is not evidence.

18  After each party has had an opportunity to make an

19  opening statement, plaintiffs will present their witnesses, and

20  defendants may cross-examine those witnesses.  Then defendants

21  have an opportunity to call their witnesses and present their

22  evidence.  Plaintiffs may cross-examine any of defendants'

23  witnesses.  After the parties' main case is completed,

24  plaintiffs may be permitted to present rebuttal evidence.

25  Once again, I instruct you that your duty is to

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  consider the evidence and find what the facts are.  The

2  evidence from which you will find the facts will consist of the

3  testimony of witnesses, documents and other things received

4  into the record as exhibits, and any facts that the parties

5  agree are not disputed or such matters as I may instruct you to

6  find.

7          During the trial, it may be necessary for me to

8  confer with the parties and their lawyers out of your hearing,

9  or to conduct a part of the trial out of your presence.  I will

10 handle these matters as briefly and conveniently for you as I

11 can, but you should remember that they are a necessary part of

12 any trial.

13         My general procedure is to take a morning break, a

14 lunch break, and a midafternoon break; however, the trial

15 schedule is not written in stone.  If you become uncomfortable

16 and need to take an immediate break, please let the court

17 security officer know, and we will make accommodations.  We

18 want to make sure you are comfortable so you can concentrate on

19 what is being said and properly consider the evidence as it is

20 received.

21         The evidence from which you find the facts will

22 consist of the testimony of witnesses, documents and other

23 things received into the record as exhibits, and any facts that

24 the lawyers agree to or stipulate to or I may instruct you to

25 find, as I've already said.

18

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    Certain things are not evidence and must not be

2  considered by you.  I will list them for you now:  One,

3  statements, arguments, and questions by lawyers are not

4  evidence; two, objections to questions are not evidence.

5    Lawyers have an obligation to their clients to make

6  objections when they believe evidence being offered is improper

7  under the rules of evidence.  You should not be influenced by

8  the objection or by the Court's ruling on it.  If the objection

9  is sustained, ignore the question.  If it is overruled, treat

10  the answer like any other.  If you are instructed that some

11  item of evidence is received for a limited purpose only, you

12  must follow that instruction.

13    Testimony on any matter that the Court has excluded

14  or told you to disregard is not evidence and must not be

15  considered.

16    Anything you may have seen or heard outside the

17  courtroom is not evidence and must be disregarded.  You are to

18  decide this case solely on the evidence presented here in the

19  courtroom.

20    There are two kinds of evidence:  Direct and

21  circumstantial.  Direct evidence is direct proof of a fact,

22  such as testimony of an eyewitness.  Circumstantial evidence is

23  proof of facts from which you may infer or conclude that other

24  facts exist.  I will give you further instructions on these, as

25  well as other matters, at the end of the case.  But keep in

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   mind that you may consider both kinds of evidence.

2          You may also draw all reasonable and legitimate

3   inferences and deductions from the evidence.

4          As judges of the facts, it will be up to you to

5   decide which witnesses to believe, which witnesses not to

6   believe, and how much of any witness's testimony to accept or

7   reject.  This part of a jury's responsibility is referred to as

8   determining the credibility of witnesses.

9          Among the factors you may properly consider in

10  deciding whether a particular witness is credible or believable

11  are:  One, whether the witness has any motive or reason for

12  being either truthful or untruthful; two, any interest the

13  witness may have in the outcome of the case; three, whether

14  there is any appearance or indication of bias or prejudice in

15  the witness's testimony or conduct; four, the extent to which

16  other evidence supports or contradicts the testimony; five,

17  whether the witness is likely to recall or have knowledge of

18  the facts about which the witness is testifying.

19          Now, a few words about your conduct as jurors.

20          Excuse me.  I'm going to go to Instruction 12 and

21  read 11 at the end.

22          I know that many of you use cell phones, the

23  internet, and other tools of technology.  You must not talk to

24  anyone at any time about this case or use these tools to

25  communicate electronically with anyone about the case.  As I

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  said, this includes your family and friends.  You may not

2  communicate with anyone about the case through any means,

3  including your cell phone, through email, text messaging or

4  Snapchat or Twitter, or through any blog or website, including

5  Facebook, Google, LinkedIn, or YouTube.  You may not use any

6  similar technology or social media, even if I have not

7  specifically mentioned it in here.

8       I expect you will inform me as soon as you become

9  aware of another juror's violation of these instructions.  A

10 juror who violates these instructions jeopardizes the fairness

11 of the proceedings and a mistrial, which could result, which

12 would require an entire trial process to start over.

13      Depositions may be received in evidence.  A

14 deposition is a witness's sworn testimony that is taken before

15 trial.  During a deposition, the witness is under oath and

16 swears to tell the truth, and the lawyers for each party may

17 ask questions.  A court reporter is present and records the

18 questions and answers.  Deposition testimony may be accepted by

19 you, subject to the same instructions that apply to witnesses

20 testifying in open court.

21      Some of the deposition testimony that you may hear

22 will be a video recording of the deposition.  Some of the

23 deposition testimony that you may hear will be read out loud by

24 an attorney.  If the deposition testimony is read out loud, you

25 should not place any significance on the behavior or tone of

                    Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   the voice of any person reading the questions or answers.

2            As I explained to you earlier, plaintiffs allege that

3   the defendants in this case engaged in a conspiracy to commit

4   racially motivated violence in violation of federal law 42

5   U.S.C. 1985(3), and also in violation of Virginia law.

6            I will give you more detailed instructions on the

7   legal requirements to prove these claims after the close of the

8   evidence, but before the parties begin their opening statements

9   I want to provide you with a view general instructions

10  regarding the law of conspiracy to help you understand the

11  applicable legal principles.

12           First, a conspiracy is an agreement between two or

13  more persons to join together to accomplish some unlawful

14  purpose.  It is a kind of unlawful partnership in which each

15  member becomes the agent of every other member.  While the

16  plaintiffs must prove that the conspiracy -- that the alleged

17  conspiracy had an unlawful objective, the plaintiffs need to

18  prove that the conspiracy had only an unlawful purpose -- I'm

19  sorry.  Strike that.

20           Plaintiffs need not prove that the conspiracy had

21  only an unlawful purpose.  Co-conspirators may have legal, as

22  well as lawful, objectives.  A conspiracy may have several

23  objectives, but if any one of them, even if it is only a

24  secondary objective, is to violate the law, then the conspiracy

25  is unlawful.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1          Plaintiffs do not need to prove that the alleged

2     conspirators entered into any formal agreement or that they

3     directly stated between themselves all the details of the

4     scheme.

5          Plaintiffs are not required to produce written

6     contracts, or even produce evidence of an express oral

7     agreement, spelling out all the details of the understanding.

8     An informal agreement may be sufficient.  All plaintiffs must

9     show is that an overall unlawful objective was shared.

10         Plaintiffs are not required to show that all

11    defendants they allege as members of the conspiracy were, in

12    fact, parties to the agreement, or that all of the members of

13    the alleged conspiracy named were named or alleged in this

14    lawsuit, or that all of the people whom the evidence shows were

15    actually members of the conspiracy alleged to all of the means

16    or methods set out in the complaint.

17         By its -- by its very nature, a conspiracy is

18    clandestine and covert, thereby frequently resulting in little

19    evidence of such an agreement.  Therefore, plaintiffs may prove

20    a conspiracy by circumstantial evidence.

21         Circumstantial evidence tending to prove a conspiracy

22    may include evidence of a defendant's relationship with other

23    members of the alleged conspiracy, the length of such -- any

24    such association, the defendant's attitude and conduct, and the

25    nature of the alleged conspiracy.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1         Second, to prove a conspiracy, the plaintiffs will
2   have to show that at least one of the defendants took an overt
3   act in furtherance of the alleged conspiracy.

4         So what is an overt act?  The term "overt act" means
5   some type of outward, objective action performed by one of the
6   members of the alleged conspiracy which evidences that
7   agreement.  An overt act may be an act which is entirely
8   innocent when considered alone, but which is knowingly done in
9   furtherance of some object or purpose of the conspiracy.

10        Finally, because there are multiple defendants in
11  this case, you will also need to consider which of the
12  defendants, if any, was a member of the alleged conspiracy.

13        One may become a member of a conspiracy without
14  knowing all the details of the unlawful scheme or the
15  identities of all of the alleged conspirators.  If a person
16  understands the unlawful nature of a plan or scheme and
17  knowingly and intentionally joins in that plan or scheme on one
18  occasion, that is sufficient to prove that he or she was a
19  member of the conspiracy, even though the person had not
20  participated before, or even though the person played only a
21  minor part.

22        As discussed above, this is a federal civil action.
23  In this type of case, parties are entitled to the disclosure of
24  all relevant, non-privileged evidence the other side possesses
25  or controls, including relevant documents and electronically

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   stored information.  This pretrial process is known as

2   discovery.

3           During the discovery process in this case, I found

4   that defendants Elliot Kline, Robert "Azzmador" Ray, Vanguard

5   America, National Socialist Movement, and Matthew Heimbach

6   failed to comply with their discovery obligations, and as a

7   result, I will issue appropriate sanctions against each of

8   them.  The Court will instruct you at a later time with respect

9   to the particular nature of those sanctions.

10          You are cautioned, however, that each party is

11  entitled to have the case decided solely on the evidence that

12  applies to that party.  Each -- any sanction against these

13  parties I have mentioned have no bearing on the other parties,

14  and in any event does not relieve plaintiffs of their burden to

15  prove by a preponderance of the evidence the conduct committed

16  by the other defendants in the case.

17          Some evidence may be admitted for a limited purpose

18  only.  When I instruct you that an item of evidence has been

19  admitted for a limited purpose, you must consider it only for

20  the limited purpose and for no other.

21          Now, finally, a few more words about your conduct as

22  jurors.

23          First, I instruct you that during the trial you're

24  not to discuss the case with anyone or permit anyone to discuss

25  it with you.  This includes your family, friends, and those

                    Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   with whom you work, as well as your fellow jurors.  Until you

2   retire to the jury room at the end of the case to deliberate on

3   your verdict, you simply are not to talk about this case.

4            Second, do not read or listen to anything relating to

5   this case in any way.  If anyone should try to talk to you

6   about it, bring it to the Court's attention promptly.

7            Third, do not try to do any research or make any

8   investigation about the case on your own.

9            Finally, do not form any opinion until all the

10  evidence is in.  Keep an open mind until you start your

11  deliberations at the end of the case.

12           If you wish, you may take notes during the trial,

13  but, if you do, leave them in the jury room when you leave at

14  night, and remember that they are for your own personal use.

15  Be careful not to get involved in note-taking that you become

16  so -- that you become so distracted and miss part of the

17  testimony.  Your notes are only to aid your memory; and if your

18  memory later differs from your notes, rely upon your memory.

19           Do not be unduly influenced by the notes of another

20  person.  A juror's notes are not entitled to any greater weight

21  than the recollection of each juror concerning testimony.

22  Recalling the evidence is very important because this is not --

23  this is not a situation where -- sometimes you might see on TV

24  or something, where you will have a transcript of what went on

25  in the courtroom.  You're going to have to rely totally upon

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   the memory of the -- collective memory of the jury when you

2   decide this case.

3          All right.  Are plaintiffs ready to start the opening

4   statement?

5          Let me say -- I'll probably interrupt you at some

6   time to take a break.  You could maybe go about --

7          MS. KAPLAN:  Sure.  My friend and colleague Karen

8   Dunn is going to start, and then I will pick up at the very

9   end.  Thank you.

10          THE COURT:  Okay.  You may.

11          MS. DUNN:  Thank you, Your Honor.  We would like a

12   second just to move the podium.

13          THE COURT:  All right.

14          MS. DUNN:  Thank you.

15          Ladies and gentlemen of the jury, can you hear me?

16          Thank you.

17          Good morning.  My name is Karen Dunn, and today,

18   along with my partner and friend, Robbie Kaplan, we are going

19   to be presenting to you the plaintiffs' opening statement.

20          The purpose of the opening statement, as Judge Moon

21   just explained, is for us to give you a sense of what this case

22   is about and to show you what our evidence in this case is

23   going to show.  And I want to warn you from the beginning that

24   some of the evidence that you'll see is graphic and will

25   contain some disturbing images.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1      This case is a case about violence and intimidation

2  that was planned for months and culminated in a tragic and

3  violent weekend, August 11th and 12th of 2017, right here in

4  Charlottesville, Virginia.

5      (Video playing.)

6      MS. DUNN:  Your Honor, I think we're having an audio

7  problem.  So, with the Court's indulgence, if Mr. Spalding can

8  work that out.

9      (Video playing.)

10     MS. DUNN:  On August 11 of 2017, hundreds of white

11 nationalists from across the country came to Charlottesville.

12 As you will hear, they met up in darkness on UVA's college

13 campus.  They chanted:  "You will not replace us."  "Jews will

14 not replace us."  "Blood and soil," a phrase that you will hear

15 originated in Nazi Germany.

16     From there, you will see and hear that the white

17 nationalists climbed the steps of the Rotunda at UVA and

18 descended upon 20 to 30 peaceful, unarmed counter-protesters,

19 most of whom were students at UVA.  They had gathered at the

20 base of the Thomas Jefferson statue, and you will see that they

21 linked their arms.

22     The evidence in this case is going to show that the

23 white nationalists encircled the counter-protesters over ten

24 people deep, that they maced and physically attacked the

25 counter-protesters, that they screamed racial slurs at them in

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  their faces, and that they threw unidentified liquid at them

2  while wielding lit tiki torches.  You will hear in this case

3  how after the violence, Defendant Richard Spencer -- he's

4  sitting right over here -- the most prominent white nationalist

5  leader in the country, climbed up on the Thomas Jefferson

6  statue and declared victory.

7          The evidence will also show that the next morning

8  Defendant Spencer emailed his followers via his listserv

9  declaring that what happened at the torch march on August 11

10 was only the prequel.  And you will come to learn, ladies and

11 gentlemen, that he was right about that.  There was, in fact,

12 much more to come.  And the defendants in this case knew that

13 because their plans had been secretly in the works for months.

14         The evidence will show that the next morning, on

15 August 12th, the white nationalists came prepared to commit

16 violence.  They wore riot gear.  They marched in formation.

17 They carried shields that were later used to break through the

18 counter-protesters, and they carried flag poles that were later

19 used as weapons.  And then this happened.

20         Your Honor, it seems we're having some audio problems

21 with the video.  I think it's so important that the jury be

22 able to hear, as well as see, that we'd like a moment to fix

23 it.

24         THE COURT:  Well, can you fix it?

25         MS. DUNN:  Mr. Spalding is saying he thinks it's on

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    the Court's end.

2            Your Honor, do you think it makes sense to take a

3    break while this is fixed or should we wait?

4            THE COURT:  Okay.  We'll take a -- we'll go ahead and

5    take about a 20-minute break at this time and try to work this

6    problem out.

7            MS. DUNN:  Thank you.

8            THE COURT:  We'll let the jury go out first, please.

9            Let me remind you, though, do not discuss the case

10   amongst yourselves.  Do not carry on any discussion about the

11   case.

12   **(Jury out, 9:58 a.m.)**

13           (Recess.)

14           THE COURT:  All right.  I hope we're ready to

15   proceed.  I hope now maybe we can finish the plaintiffs'

16   opening statement before lunch.

17           MS. DUNN:  Yes, Your Honor.  It's a silver lining.

18   **(Jury in, 10:21 a.m.)**

19           THE COURT:  All right.  Be seated, please.  You may

20   proceed.

21           MS. DUNN:  Thank you, Your Honor.  And thank you,

22   ladies and gentlemen, for your patience.  Obviously unexpected

23   things are going to happen during our time together.

24           Because we feel it's so important that you see and

25   hear the evidence, we're going to replay the video that we

                 Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   showed you from August 11.

2               (Video playing.)

3               (Technical interruption.)

4               THE COURT:  Heidi, I think maybe this may be the

5   problem up here.  I'm trying to figure out -- maybe I hit

6   something.  Do you know how to correct it?

7               (Discussion off the record.)

8               MS. DUNN:  Should we try that one again?

9               (Video playing.)

10              MS. DUNN:  As we already discussed, ladies and

11  gentlemen, this is what Defendant Spencer declared to be only

12  the prequel.  The next day, August 12th, there were many

13  incidents of violence, as we'll discuss, and then this

14  happened.

15              (Video playing.)

16              At approximately 1:41 p.m. on August 12th, Defendant

17  James Fields, who had marched that day with another defendant,

18  Vanguard America, wearing the Vanguard America uniform and the

19  Vanguard America shield, got into his Dodge Challenger and

20  intentionally drove it into a group of peaceful

21  counter-protesters, killing a 32-year-old woman named Heather

22  Heyer and injuring many of the plaintiffs in this case.

23              It is our privilege, ladies and gentlemen, mine,

24  Robbie's, and our colleagues whom you'll meet, to represent

25  nine people who were victims of the violence on August 11th and

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   12th.

2           We represent people like Marcus Martin.  The evidence

3   is going to show that Marcus was hit directly by the car, as

4   you can see in this graphic photo.  He's the one circled in

5   red.  The evidence will show that Marcus's leg and ankle were

6   shattered when he pushed his fiance, Marissa Blair, out of the

7   way of the car.  And Marcus is going to tell you that while his

8   physical injuries may heal, his emotional injuries will not.

9           We represent people like Natalie Romero, whom you

10  will meet today.  Natalie had just returned from her first year

11  of college at UVA when she was struck by James Fields's car.

12  The impact of the car fractured her skull, lacerated her face,

13  and forever changed her life.  And Natalie is going to tell you

14  that every day when she wakes up and she looks at her face, she

15  is reminded about a nightmare that she can never forget.

16          In just a short while, Robbie is going to introduce

17  you to all of the plaintiffs, all of whom are here in court

18  today, sitting in the jury box.  Even though it's going to be

19  extremely difficult for them to come and tell you what happened

20  to them, they are going to tell their stories directly to you,

21  because, as they are going to explain, they believe the truth

22  about what happened in Charlottesville must be told.

23          So while, as I said at the beginning, this is a case

24  about violence and intimidation, for these plaintiffs, they

25  will tell you this is also a case about justice and about

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   accountability; accountability for those defendants who planned

2   and perpetrated this violence, thinking that they would get

3   away with it.  And so on behalf of our plaintiffs, we want to

4   tell you how deeply we appreciate your service on this jury.

5          We know, and, listening over the past few days of

6   jury selection, really understand how hard it is for you to

7   take time away from your families, away from your jobs, and

8   away from your lives.  But your service on this jury, ladies

9   and gentlemen, it is so important.

10         As Judge Moon explained to you this morning, you are

11  the finders of the facts.  The verdict in this case will be

12  your verdict and your verdict alone.  And at the end of this

13  case, our plaintiffs and we are going to ask you to hold the

14  defendants accountable.

15         As you've already heard this morning, Judge Moon will

16  instruct you on the law.  And he is going to instruct you in

17  this case about when a conspiracy to commit violence motivated

18  by racial hostility and hatred violates the laws of our

19  country.  And your job as the jury is to listen to that law

20  that Judge Moon instructs and apply it to the evidence that you

21  will see with your own eyes and ears in this case.  And we are

22  going to show you quite a lot of evidence.

23         We are going to show you evidence like this text

24  exchange between Defendant Christopher Cantwell and Defendant

25  Richard Spencer, both of whom are sitting right here in this

33

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   courtroom today.

2          This text exchange is from August 7th of 2017, just

3   four days before the violence in Charlottesville.  Defendant

4   Cantwell says to Defendant Spencer:  "I'm willing to risk a lot

5   for our cause, including violence and incarceration.  But I

6   want to coordinate and make sure it's worth it for our cause."

7   And Mr. Spencer responds:  "It's worth it.  At least for me."

8          Now, ladies and gentlemen, it is defendants' own

9   communications in this case that are going to show you that the

10  violence of August 11th and 12th was no accident; that the

11  defendants planned for violence, that they executed violence,

12  and that they celebrated and ratified and owned the violence

13  after the fact.  And that is what we are going to prove to you.

14         Now, before I introduce the defendants to you, there

15  is one thing I want to say at the outset.  And I want to be

16  very clear about this.  The plaintiffs in this case did not sue

17  the hundreds of white nationalists who came to Charlottesville

18  to march, to speak out about white nationalist beliefs, or to

19  have a rally.  And we want to stress:  There is nothing wrong

20  with that.  Everyone is entitled to their beliefs, no matter

21  what they are or who they are.

22         The plaintiffs in this case belief firmly in the

23  First Amendment, so much so that the evidence is going to show

24  that the reason that they were at some of these events on

25  August 11th and 12th is because they had come to peacefully

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   exercise their own First Amendment rights.  So this is

2   something we believe in.

3          The plaintiffs in this case only sued the leaders and

4   the organizers who planned the violence and the most violent

5   foot soldiers who carried it out.

6          The defendants in this case may want to focus this

7   case on politics, but that is not what the plaintiffs' case is

8   about.  Our case is about the planning, execution, and

9   celebration of racially motivated violence.  And I want to be

10  very clear about this:  Our case and our plaintiffs do not

11  condone violence by anybody.

12         The evidence is going to show you, ladies and

13  gentlemen, that many of the defendants were key players in the

14  white nationalist movement.  The evidence will show that many

15  of the defendants wanted to build a white ethnostate, a country

16  only for white people.  And that could only occur after a

17  violent race war.  So the evidence is going to show that they

18  wanted to build an army of white nationalists for what they

19  themselves named "the Battle of Charlottesville."

20         Now, there are a lot of defendants in this case, 20

21  individuals and organizations.  Believe it or not, during the

22  course of this trial, you are going to get to know all of them

23  very, very well.  You will learn how they are connected to each

24  other and how they are connected to the violence.

25         The judge has already instructed you on some of the

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    law of conspiracy.  Here's what he told you this morning.  He

2    said a conspiracy is an agreement between two or more persons

3    to join together to accomplish an unlawful purpose.  Plaintiffs

4    need not prove that the conspiracy had only an unlawful

5    purpose.  A conspiracy may have several objectives, but if any

6    one of them, even if it is only a secondary objective, is to

7    violate the law, then the conspiracy is unlawful.

8         Judge Moon told you that the plaintiffs do not need

9    to prove that the alleged conspirators entered into any formal

10   agreement, or that they directly stated between themselves all

11   the details of the scheme.  Plaintiffs are not required to

12   produce a written contract or produce any evidence of an

13   express oral agreement spelling out all the details of the

14   understanding.  Even an informal agreement may be sufficient.

15   All plaintiffs must show is that an overall unlawful objective

16   was shared.

17        Judge Moon also told you -- and you'll understand why

18   this is important when you see the evidence -- that, by its

19   very nature, a conspiracy is clandestine and covert, thereby

20   frequently resulting in little evidence of such an agreement;

21   and, therefore, plaintiffs can prove conspiracy by

22   circumstantial evidence, which may include evidence of a

23   defendant's relationship with other members of the conspiracy,

24   the length of any such association, the defendant's attitude

25   and conduct, and the nature of the alleged conspiracy.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1         And Judge Moon told you that you can become a member

2    of the conspiracy without knowing all the details of the

3    unlawful scheme or the identities of the other alleged

4    conspirators.  If a person understands the unlawful nature of

5    the plan or scheme and knowingly and intentionally joins in

6    that plan or scheme on one occasion, that is sufficient to

7    prove that he was a member of the conspiracy, even though that

8    person had not participated before, and even though he played

9    only a minor part.

10         Let's talk about the conspiracy we will prove in this

11   case.

12         The conspiracy in this case began when Jason Kessler,

13   a white nationalist activist from Charlottesville, reached out

14   to the three other men you can see on the screen:  Richard

15   Spencer, Eli Kline, who also went by Eli Mosley, and Matthew

16   Heimbach.  The evidence will show that Mr. Kessler knew that

17   Mr. Spencer, the most prominent white nationalist in America,

18   would help attract an army for the Battle of Charlottesville.

19         Mr. Kessler also reached out to Matthew Heimbach, the

20   founder of the Traditionalist Worker Party, who has described,

21   as you'll hear, Adolf Hitler as an inspiration.  The evidence

22   will show that Mr. Kessler specifically asked Mr. Heimbach to

23   invite violent skinhead groups to the event, and that

24   Mr. Heimbach complied.

25         Mr. Kessler also worked very closely with Eli Kline,

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   who was also very close to Mr. Spencer.  And Mr. Spencer, you

2   will hear, deputized Mr. Kline to make decisions for the both

3   of them.  Eli Kline, you will hear, literally wanted to

4   exterminate the Jews.

5           You will learn that the judge has already found that

6   Mr. Kline conspired to commit racially motivated violence, as

7   we will discuss.  And Mr. Kline and Jason Kessler, as the

8   evidence will show, communicated frequently and worked

9   full-time on planning the events of August 11th and 12th.

10          THE COURT:  Excuse me.  You said that the judge had

11  found that Mr. Kline conspired -- what we have decided -- what

12  I decided was that Mr. Kline, because he has not cooperated in

13  the case, given any evidence, he is deemed to have -- and that

14  doesn't mean that he conspired with any other defendant or

15  anything else, but by law Mr. Kline is deemed to have

16  conspired.  And the plaintiff has to prove that he conspired

17  with somebody else.  But just because he conspired, that

18  doesn't -- because I have deemed him conspired because he

19  failed to comply with the law that he was -- with regard to

20  this case, it doesn't mean that he conspired with anyone else

21  that is a defendant in the case.

22          It's very important you separate and understand that.

23  It will come up with regard to other defendants.  Other

24  defendants also who did not cooperate, they will by law be

25  deemed to have conspired.  It doesn't mean that I'm saying they

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    actually conspired.  I hope that's clear.

2            But, anyway, go ahead.

3            MS. DUNN:  Thank you, Your Honor.

4            Mr. Kline and Mr. Kessler worked full-time to plan

5    the events of August 11th and 12th.  Mr. Kline brought along

6    his white nationalist group called Identity Evropa, and had

7    weekly calls with Identity Evropa's founder, Defendant Nathan

8    Damigo.  Identity Evropa -- you'll hear about this group --

9    they're known for recruiting on college campuses.

10           You will see that Mr. Heimbach worked closely

11   organizing the event not just with Mr. Kessler and Mr. Kline,

12   but also with his long-time best friend, Matthew Parrott, a

13   computer programmer who, you will see, later encouraged anyone

14   associated with violence in Charlottesville to destroy

15   evidence.

16           Now, Mr. Heimbach then enlisted another group called

17   League of the South and its leaders, Michael Hill and Michael

18   Tubbs.  You will see evidence in this case, ladies and

19   gentlemen, that Defendant Hill posted on the League of the

20   South website his own Pledge of Allegiance, which stated:  "I

21   pledge to be a white supremacist, a racist, an anti-Semite, a

22   homophobe, a xenophobe, an Islamophobe and any other sort of

23   'phobe' that benefits my people, so help me God!"

24           Now, Eli Kline and Matthew Heimbach also reached out

25   to another group you'll hear about called Vanguard America.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  Vanguard America is another organization that believes America

2  should be a nation only for white people.

3           James Fields, the defendant we talked about who drove

4  the car that killed Heather Heyer, has admitted that he was

5  inspired by Richard Spencer and others to go to the Battle of

6  Charlottesville.  And you will see that, on that day of the car

7  attack, he marched with Vanguard America, wearing the Vanguard

8  America uniform and shield.

9           During the planning for Charlottesville 2.0, Dillon

10  Hopper, who you see in the center of the screen, was the leader

11  of Vanguard America and had communications with both

12  Mr. Heimbach and Mr. Kline.

13           Thomas Ryan Rousseau, who you see on the screen to

14  your left, also had communications with Mr. Kline and took

15  control of Vanguard just before Charlottesville 2.0 and led the

16  troops on the ground on August 12.

17           Mr. Heimbach from Traditionalist Worker Party also

18  connected Mr. Kessler, one of the lead organizers, to Defendant

19  Jeff Schoep, founder and commander for 25 years of the National

20  Socialist Movement, which describes itself as "America's Nazi

21  Party."  Mr. Schoep offered Mr. Kessler, for the Battle of

22  Charlottesville, men who were battle-tested in the streets.

23           You will hear that those four organizations, National

24  Socialist Movement, Vanguard America, League of the South, and

25  the Traditionalist Worker Party, and their leaders, Defendants

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   Heimbach, Schoep, Hill, Tubbs, Hopper, and Rousseau, formed an

2   alliance called the Nationalist Front to further their common

3   purpose and plan.  And all of these groups, ladies and

4   gentlemen, including Identity Evropa, are defendants also in

5   this case.  The defendants are both the groups and the

6   individuals.

7           Now, Defendant Kessler, the evidence will show, also

8   contacted Defendant Christopher Cantwell, a white nationalist

9   who, the evidence will show, was known for advocating violence

10  on his podcast to an audience that he will say contained armed

11  extremists.

12          And the evidence will show that Mr. Kline, who wrote

13  for the neo-Nazi publication called Daily Stormer, wanted to

14  involve more of the Stormers and their leader, Robert

15  "Azzmador" Ray, who was a prominent writer for the website.

16  Mr. Ray traveled to Charlottesville with Mr. Rousseau from

17  Vanguard America.  And Mr. Ray, who also refused to participate

18  entirely in this litigation, is similarly situated to what

19  Judge Moon just told you about Mr. Kline.

20          You will see evidence, ladies and gentlemen, that

21  leaders of this conspiracy inspired foot soldiers to carry out

22  the violence; not just inspiring James Fields, but also other

23  violent white nationalists like somebody you'll hear about

24  called Ben Daley and Vasilios Pistolis, both of whom you will

25  hear invoke their rights not to incriminate themselves under

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  the Fifth Amendment when we ask them about the violence in

2  Charlottesville.

3          As the evidence comes in, you are going to see,

4  ladies and gentlemen, all of the connections in the conspiracy.

5  You will hear that the defendants met in person.  You will hear

6  that they held weekly phone calls.  You will hear that they

7  communicated on a private chat platform called Discord; that

8  they communicated via other social media, through emails,

9  letters, through phone calls and texts.  And you will hear how

10  they celebrated each others' racially motivated violence.

11          By the time that we speak to you again in closing,

12  you will be able to make all of these connections that you see

13  on the screen yourself based on the evidence that we are going

14  to present to you in this trial.

15          So let's take a closer look at the conspiracy.

16          As I said, plaintiffs are going to prove that

17  violence was planned, that it was executed, and that it was

18  celebrated by the defendants.  So let's start with the

19  planning.

20          The evidence in this case is going to show that

21  defendants planned the conspiracy mostly through private

22  channels.  As we heard this morning, conspiracies tend to be

23  clandestine and secret.

24          This is an email on the screen now that you will see

25  from Defendant Michael Hill, the leader of League of the South.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   On May 17th, he issued this directive to his people.  He called

2   it an "Official Call for Resistance."  And he gave them

3   instructions on how to communicate.  He said:  "I want no

4   discussion here or elsewhere online of any resistance

5   strategies, tactics, logistics, plans, operations, or after

6   action reports.  Those all will be handled through secure

7   channels."

8        You will come to understand day by day, ladies and

9   gentlemen, that the defendants never expected their planning

10  communications to see the light of day, much less the inside of

11  a courtroom.

12       You will also learn in this case about a private chat

13  platform called Discord.  And we are going to show you that the

14  majority of the planning occurred over this chat platform

15  called Discord.  You will also hear that many of the

16  defendants' private Discord chats were unexpectedly made public

17  about four years ago, just prior to the time when plaintiffs

18  filed this lawsuit.

19       Now, defendants established what was called a

20  Charlottesville 2.0 server on Discord.  And that requires me to

21  explain that there was a Charlottesville 1.0 that we'll talk

22  about.  That event occurred earlier in 2017.

23       Within the Charlottesville 2.0 Discord server, you

24  are going to see many channels.  And channels are just like

25  chat rooms within the server where people can communicate.  And

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  what you see on the screen right now are some examples of the

2  channels that you will see where the defendants communicated to

3  plan Charlottesville 2.0.

4         Now, Charlottesville 2.0 wasn't the only server where

5  this planning went on, but it was one of the main servers.  And

6  so some of the channels you can see here have to do with

7  leadership meetings and discussions, with chants, with gear and

8  attire and other things.  But you'll also see, ladies and

9  gentlemen, that most of the groups who are defendants in this

10 case had their own channels on the Charlottesville 2.0 server

11 where some of their planning went on.  And you can see on the

12 screen the names Identity Evropa, League of the South,

13 Traditionalist Worker Party, and Vanguard America.  That's the

14 group that James Fields marched with.

15        To really understand what happened here in

16 Charlottesville on August 11th and 12th, we do need to go back

17 at least as far as April 15th of 2017.

18        Plaintiffs are going to show that a defendant named

19 Nathan Damigo -- he was head of Identity Evropa; he also went

20 by the Discord name "Fashy Haircut" -- punched a

21 counter-protester at an event in Berkeley, which made him

22 somewhat famous in the white nationalist movement.  Here's a

23 picture that you're seeing, and that you'll see in this case,

24 of that punch.  This event became known -- it was April 15th of

25 2017, and it became known as "the Battle of Berkeley."

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1      You will hear what Richard Spencer said in April of

2  2017 after the Battle of Berkeley.

3      While they work on that, I will just tell you what he

4  said, because it's on the screen.

5      He said:  "We have entered a new world.  We have

6  entered a world of political violence, and I don't think

7  anything is going to be the same."

8      You will also see evidence, ladies and gentlemen, of

9  Charlottesville 1.0, which I mentioned, when five of the

10  defendants -- Richard Spencer, Nathan Damigo, Eli Kline, Jason

11  Kessler, and Matthew Heimbach -- all gathered together on

12  May 13th, 2017 in Charlottesville.  They held a torch march,

13  just like at Charlottesville 2.0.  They gave speeches like this

14  one, where Richard Spencer talked about a meme that he was born

15  at the right time for the race war, after which the crowd

16  erupted in applause.  And that's what went on publicly.

17      But you will also see evidence from a private

18  afterparty on May 13th, following Richard Spencer's speech and

19  the torch march, where Defendants Spencer, Kline, and Heimbach

20  engaged in a chant of "Sieg Heil," which was the phrase used to

21  salute Adolf Hitler in Nazi Germany.

22      I would like to play you the video of that.

23      It's playing, but you can't hear it.

24      THE CLERK:  Matt, the IT guy said you need to stop

25  for a minute.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1        MS. DUNN:  Can we get the video and the audio

2   together?

3            (Video playing.)

4        MS. DUNN:  So as you will see, ladies and gentlemen,

5   the defendants in this group, which included Defendants

6   Spencer, Kline, and Heimbach, they don't know that this video

7   is being taken.  And what they say and do privately behind

8   closed doors is going to tell us a lot about their true motives

9   and plans in this case.

10        The evidence will show that the planning for

11   Charlottesville 2.0, the Battle of Charlottesville, began

12   shortly after Charlottesville 1.0.

13        This is a text exchange between Jason Kessler and

14   Richard Spencer from June 5th of 2017.  Mr. Kessler writes,

15   "We're going to start the promotional material for

16   Charlottesville 2:  Unite the Right:  Battle of

17   Charlottesville," and asks Mr. Spencer if he's going to be one

18   of the headliners for the events.  Mr. Spencer verifies the

19   date, August 12th, asks about the attendance of Mr. Damigo, and

20   then says, "I'm there."  He agrees.  And in response,

21   Mr. Kessler says, "We're raising an army my liege.  For free

22   speech, but the cracking of skulls if it comes to it."

23        So we are going to ask you, ladies and gentlemen, to

24   remember communications like this if the defendants tell you

25   that they didn't plan violence in Charlottesville.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1          On the very same day that Defendants Kessler and

2    Spencer were discussing raising an army for the cracking of

3    skulls, Defendant Matthew Heimbach exchanged messages on the

4    Discord server with Dillon Hopper, who went by Discord name

5    White-PowerStroke (Dillon), and you'll recall was the leader of

6    Vanguard America.  Defendant Heimbach writes, "Yep, so now

7    basically we've got 90 percent of the real orgs in America

8    together.  With the leadership being you, me, Jeff" -- that's

9    Jeff Schoep -- "and Dr. Hill."  That's Michael Hill of League

10   of the South.

11          Dillon Hopper, of Vanguard America, writes back, "Now

12   all we need is Spencer" -- Richard Spencer -- "and Damigo" --

13   Nathan Damigo.  And Mr. Heimbach responds, "Well, this is where

14   Charlottesville comes in.  We're all doing it together."

15   "We're all doing it together."

16          You will see very powerful evidence of conspiracy in

17   this case.

18          And even though we expect that at this trial the

19   defendants are all going to point fingers at one another and

20   say someone else was to blame, there will be no question that

21   at the time, they were all doing it together.

22          The evidence will show that on this very same day,

23   June 5th, Eli Kline committed to Jason Kessler that he would

24   help with the rollout.  That's the top text you see on the

25   screen.  On the bottom text between the two of them he wrote,

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   "You and I should get used to speaking daily now.  Now that

2   this is my full-time job, I'll be much more available to you."

3          And you will see evidence that the two of them were

4   the lead organizers of this event.

5          Two days after describing his work to plan the Battle

6   of Charlottesville as his full-time job, you will see that

7   Mr. Kline posted on Discord about his continued planning and

8   coordination efforts.  He wrote, "I've been working heavily

9   with VA guys for a while now, and we should have a conference

10  with some leadership on some stuff, including Charlottesville."

11         VA you will come to understand stands for Vanguard

12  America.  And you will learn during this trial, as you will see

13  in the picture on the right of this screen, Defendant Kline and

14  Defendant Fields were together on August 12th where Defendant

15  Fields is wearing the Vanguard America uniform, holding the

16  Vanguard America shield, shortly before he drove his car into a

17  crowd of people, including some of the plaintiffs that you see

18  in this courtroom today.

19         As the Judge has already told you, this case is about

20  a conspiracy to commit violence motivated by racial animus or

21  hostility.  And that includes racial and religious minorities

22  and their supporters.  We are going to show you in this case

23  that defendants came to Charlottesville with a plan for

24  violence, and with racial and religious hatred, and that they

25  used racial and religious hatred to motivate others to join.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1          For example, we will show you that Mr. Kline referred

2    to himself as the Judenjäger.  That means Jew hunter, and it's

3    also a Nazi phrase.  You will learn that incredibly,

4    Mr. Kline's actual job was working for an exterminator.  And

5    Mr. Kline's girlfriend at the time, who lived with him while he

6    planned these events -- her name is Samantha Froelich -- she

7    will testify via video for you that Mr. Kline wanted to kill

8    Jews instead of cockroaches, that he was excited to kill Jewish

9    people and that he would gas the kikes forever.  "Kikes" is a

10   slur for Jewish people, and the phrase "gas the kikes" is sadly

11   something that you will hear quite a lot in this case.

12          We will show you this letter, ladies and gentlemen,

13   where you can see Defendant Matthew Heimbach sent to his many

14   followers about August 12th.  These are to all the members of

15   the Traditionalist Worker Party:  "We need to scare these

16   people, and the way to achieve that is with numbers,

17   discipline, and determination.  We must send a message to the

18   Jewish oligarchs and their hordes of minions that we will not

19   go silently into the night as they desire.  No, we will fight

20   them, we will defeat them, and we will secure our people's

21   destiny."

22          Adolf Hitler famously said -- he quotes Hitler in his

23   letter -- "Those who want to live, let them fight, and those

24   who do not want to fight in this world of eternal struggle do

25   not deserve to live."

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1          And he closes this letter by saying, "So be there,

2    August 12th in Charlottesville, and let us tell the entire

3    world with a mighty and triumphant voice, we will not be

4    replaced."

5          You will hear audio evidence like this from Defendant

6    Chris Cantwell -- he's sitting right over there.  This is from

7    his podcast of January 2017.

8               (Video playing.)

9          And you will see social media posts like this one by

10   Defendant Michael Hill, the leader of League of the South.  He

11   says via tweet, "If you want to defend the South and Western

12   civilization from the Jew and his dark-skinned allies, be at

13   Charlottesville on 12 August."

14         You will see, ladies and gentlemen, that the planning

15   documents from the organizers and leaders are filled with

16   racial hatred and that they fully anticipate violence.

17         James Fields, as part of his criminal case,

18   acknowledged in court documents that he expressed and promoted

19   his view that white people are superior to other races and

20   peoples, expressed support of the social and racial policies of

21   Adolf Hitler and Nazi era Germany, including the Holocaust, and

22   espoused violence against African Americans, Jewish people, and

23   members of other racial, ethnic and religious groups he

24   perceived to be non-white.  And Mr. Fields admitted that he

25   also expressed these views directly in interactions with

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   individuals known to him.

2          So plaintiffs are not going to lack for evidence of a

3   racially motivated conspiracy in this case.

4          The evidence will show, ladies and gentlemen, that

5   not only did defendants and their co-conspirators plan

6   violence, they specifically discussed the tools of violence for

7   the Battle of Charlottesville.  And you will learn and come to

8   understand that they knew they couldn't show up in

9   Charlottesville with visible weaponry, so instead they

10  weaponized things like mace, which they refer to as "gas,"

11  their fists, shields, flag poles, and a car.  Things that we

12  don't usually think of as weapons.

13         And you will come to understand that that was

14  entirely the point: plausible deniability.  Just like mace and

15  shields and flag poles was a tool of this conspiracy.

16  Plausible deniability is when you set up a situation in such a

17  way that you can claim later you had nothing to do with it.  We

18  expect that is exactly what you will see and hear from the

19  defendants in this case.

20         Now, first let's talk about mace as a tool of

21  violence, which the evidence will show defendants also called

22  "gas," that you'll come to understand was another reference to

23  Hitler killing Jews.

24         Here are two private Discord posts you will see from

25  the summer of 2017.  In the top post, Dillon Hopper, the leader

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    of Vanguard America, the group that Fields marched with, says

2    that at Charlottesville he will give a six-word speech:  "Gas

3    the kikes, race war now."

4              Beneath that you will see that Defendant Robert

5    "Azzmador" Ray uses the exact same language, several weeks

6    later, about two weeks before August 11th.  He says, "I just

7    got done with an hours-long chat with some of the event

8    organizers and I feel better about the thing.  The plan is the

9    same:  Gas the kikes."

10             You will be able to tell that this was not a random

11   phrase or a one-off or a joke.  This was a plan discussed for

12   hours with the organizers of the Battle of Charlottesville of

13   August 11th and 12th.

14             And you will see, ladies and gentlemen, that the

15   defendants also planned for street brawls as a tool of

16   violence.  You will see Eli Kline, who also goes by Eli Mosley

17   on the Discord, you will see what he said:  "I think we are

18   going to see some serious brawls at Charlottesville next month

19   too, and we'll see blood on some of those white polos LOL."

20   The white polos that you see Mr. Kline talking about, that's a

21   reference to the dress code for Charlottesville 2.0, which were

22   white polos and khaki pants worn by many, including by James

23   Fields and others in Vanguard America.  And you'll see that in

24   video and in photographs of the day.

25             Now, just like mace and street brawls, the conspiracy

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  planned to use flag poles as tools of violence.  You will see

2  posts like this one by Michael Chesny.  He went by the Discord

3  handle, Tyrone.  And we are going to prove that he was a

4  co-conspirator.  He was assigned to organize transportation for

5  the event.  You will see in posts like this where he is posting

6  on the flags, banners and signs channel in the Charlottesville

7  2.0 server, somebody named Kurt says, "Impaling people is

8  always the best option, TBH," to be honest.  Then somebody

9  named Krystal.Night says "There are some really nice hard wood

10  poles that are two piece, but also cheaper ones that won't be

11  very useful to double as spears, LOL."

12          And Tyrone, Michael Chesny, who we'll prove is a

13  co-conspirator, says, "Agreed, @Kurt."  That's the first poster

14  in the chat.

15          So we talked about mace, talked about flag poles.

16  Let's talk about shields, using shields as weapons.  This is a

17  post by Defendant Ray in the general chat channel.  This is

18  just two days before the event.  And when he's saying here --

19  he says "@everyone," message to everyone:  "I couldn't possibly

20  be more proud of you guys or happier with the way these shields

21  turned out.  I will be both elated and humbled to stand with

22  you men and address the media and fight the hordes of filth and

23  scum.  This is our day.  Charlottesville will be ours.  Texas

24  will be ours.  The world will be ours."

25          So mace, street brawls, flag poles and shields.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   Let's talk about cars.  While watching somebody run over
2   counter-protesters may seem shocking for most of us, you will
3   come to understand that it was reasonably foreseeable as a
4   result of this conspiracy that a car could run over
5   counter-protesters.  You will see this post on the screen right
6   now from Defendant Heimbach.  This is from nine months before
7   James Fields drove his car into a group of counter-protesters.
8   He says, "Leftist protesters blocking the road with weapons,
9   threats and violence while making you fear for your life?
10  #hitthegas."

11         You will see this post by Defendant Cantwell:  "Hey
12  communists, remember this like your life depends on it, because
13  it does:  Blocking traffic is not peaceful protest, and every
14  person who reminds you of that without using his car, is giving
15  you more slack than you fucking deserve."

16         And you will see posts like this by Michael Chesny.
17  He went by Tyrone.  We just talked about him a few minutes ago.
18  He was the one in charge of transportation.  He posts in the
19  Charlottesville 2.0 server in the channel about shuttle service
20  information this fake advertisement for a multi-lane protester
21  digester.  And he says, "Sure would be nice."

22         So just like the other defendants, you will see James
23  Fields posted about driving his car into a group of protesters,
24  not once, but twice in May of 2017.  He says, "You have the
25  right to protest, but I'm late for work."

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1          And you, ladies and gentlemen, have seen and you will

2    see the photos of the actual car attack on August 12th in 2017.

3    And so you are going to be able to see how eerily similar these

4    posts were to the car attack that happened just three months

5    later.

6          So now that we've spoken about the planning and about

7    the conspiracy, I'd like to speak with you specifically about

8    the execution of the violence, first on August 11th, and then

9    on August 12th.

10         This is a map of UVA's college campus that we hope

11   will help you understand what happened on Friday night, August

12   11th.  The evidence will show that while plans for a rally on

13   August 12th were public, the defendants kept their plans for

14   the Friday night torch march a secret, at least from the people

15   of Charlottesville and from the University of Virginia.  The

16   hundreds of white nationalists who showed up from out of town,

17   however, they were in on the plan.  They all obtained their

18   torches in advance and gathered under cover of darkness at a

19   place called Nameless Field on the UVA campus.  That's all the

20   way to the right of the screen.

21         Now, you can see on this map that the most direct

22   route from Nameless Field to the Thomas Jefferson statue is to

23   walk down this road called University Avenue.  And remember,

24   Mr. Kessler is from Charlottesville.  He and Mr. Spencer both

25   went to UVA.  So they knew the grounds.  The evidence will show

55

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   that this is not the route that the white nationalists took

2   with their torches.  Instead, they took this long, more winding

3   route marked on this map by the yellow dots.  They passed the

4   library, the student union, the bookstore, a residential

5   college, the amphitheater, and eventually they walked straight

6   up what's called The Lawn.  And that's that patch of green you

7   see in the upper left-hand corner of the slide.

8          And that's where students and faculty live.  And it's

9   considered the heart of the UVA campus.  They marched right

10   down The Lawn to the Rotunda, which has steps that descend down

11   to the Thomas Jefferson statue.

12          You will see pictures of the scene around the statue

13   that night where approximately somewhere between 2- to 500

14   white nationalists surrounded about 20 to 30

15   counter-protesters, which were mostly students, including

16   plaintiffs here today, Devin Willis and Natalie Romero.

17          You will see with your own eyes, ladies and

18   gentlemen, that the students carried this banner which said "VA

19   students act against white supremacy," and that they kept their

20   heads down and their arms linked, unarmed, and you will hear,

21   terrified.

22          The evidence will demonstrate that the defendants in

23   this case engaged in violence.  In this photo you can see

24   Defendant Robert Ray.  He is the man in the hat with his left

25   arm outstretched, spraying someone with mace.  And you will

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   hear Mr. Ray, who went by "Azzmador," on video the next day

2   saying proudly that he personally gassed half a dozen kikes on

3   August 11.

4          Now, also in this photo you can see Defendant

5   Christopher Cantwell.  And it is a little bit difficult to see

6   what he is doing here.  Here is a closer-up view of

7   Mr. Cantwell on that same evening, also with his arm

8   outstretched, also spraying mace in someone's face.

9          Now, you will come to understand that other members

10  of the conspiracy did not walk away from the violence.  They

11  embraced it.  They owned it.  They promoted it.  And they

12  celebrated it.

13         This is a post that you will see on Twitter by Jason

14  Kessler.  You will see that he called the violence and

15  intimidation of August 11th, what Robert "Azzmador" Ray called

16  the gassing of kikes, "an incredible moment for white people."

17         You will see that James Fields also tweeted about

18  August 11th.  He retweeted Dr. David Duke, and that this was

19  also a celebration of the violence, saying that on August 11th,

20  "our people on the march," asking, "will you be there

21  tomorrow?"

22         And you will see this text between Eli Kline and

23  Jason Kessler telling each other what great work that they had

24  done, and looking ahead to the next day.  Mr. Kline says at

25  11:15 that night after the violence at the Thomas Jefferson

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  statue, "Great work.  Rest easy."  And Mr. Kessler responds,

2  "You've done excellent work too.  Let's knock this out of the

3  park tomorrow."

4          Now, August 12th, as you've heard, was the

5  long-scheduled Unite the Right event which was to take place in

6  what's called today Emancipation Park.  It had formerly been

7  called Lee Park, and that's the yellow box you see in the top

8  left of the slide.  This slide shows you some of the important

9  places that you will hear about related to events of August

10  12th.

11          On the morning of August 12th, the evidence will show

12  that one group of the defendants gathered in McIntire Park and

13  took vans to Emancipation Park.  Another group of defendants

14  met up and coordinated at the Market Street garage -- that's a

15  parking garage -- and headed west on Market Street towards

16  Emancipation Park.  You are going to hear evidence and see

17  evidence that members of the two groups coordinated with each

18  other throughout the day.  And we've also marked on this map

19  for you the intersection of Fourth and Water, because that's

20  where James Fields drove his car into the group of

21  counter-protesters.

22          You are going to see videos from August 12th.  You're

23  going to see a lot of videos from August 12th.  You will see

24  this video, which is one of Defendant Kline directing the first

25  group of his troops, including members of Defendants Identity

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  Evropa and Vanguard America, dressed in the uniform we talked

2  about of white polos and khakis.

3          (Video playing.)

4          You will see in videos and photographs, ladies and

5  gentlemen, Eli Kline leading men whose fists are taped up like

6  they're boxers.  And as predicted by Mr. Kline in the Discord

7  posts you saw earlier, you will actually see blood on the white

8  polos, including his.

9          Now, one of the people that Mr. Kline is leading on

10  August 12th, the evidence will show, and we will prove is a

11  co-conspirator, is a man named Benjamin Daley.  And he's the

12  blond individual with the sunglasses that you can see on the

13  screen.  You will hear that when we asked Mr. Daley whether he

14  choked a counter-protester and whether Mr. Kline and he threw

15  her off the sidewalk, he invoked his right under the Fifth

16  Amendment not to incriminate himself.

17          You will also see what happened when the National

18  Front defendants, that's Traditionalist Worker Party, League of

19  the South and National Socialist Movement, who were walking

20  west on Market Street, encountered counter-protesters standing

21  in the street.  You will see this video start with Defendant

22  Heimbach standing shoulder to shoulder with Defendants Hill and

23  Tubbs, and you will hear him give an order, "shields up," to

24  the troops.  You will see that shields were used as weapons and

25  not for protection.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1          (Video playing.)

2          You will hear, ladies and gentlemen, that after the

3   National Front defendants smashed their way through the

4   counter-protesters with shields, Defendant Tubbs led a charge

5   where one of the co-conspirators in this case rolled up his

6   flag and beat counter-protesters with it.  You can see

7   photographs of that on your screen.

8          The evidence will show that Vasilios Pistolis was

9   asked whether he brought that flag to use it as a weapon, and

10  he, too, invoked his rights under the Fifth Amendment not to

11  incriminate himself.

12         Ladies and gentlemen, you will also see this upcoming

13  tragic video from the Market Street garage that we talked about

14  where Defendant Tubbs watched as members of the Traditionalist

15  Worker Party and League of the South brutally attacked and beat

16  with flags and shields a 20-year-old special education aide

17  named DeAndre Harris.

18         (Video playing.)

19         As we told you, ladies and gentlemen, some of the

20  evidence in this case is truly difficult to watch.

21         You will hear that not only did the defendants in

22  this case plan and execute violent acts, but you will see they

23  ratified the violence, they owned the violence, and they

24  celebrated the violence.

25         The evidence will show that the leaders of this

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    conspiracy were very proud of what the Battle of

2    Charlottesville had accomplished.  They declared the event a

3    huge success, as you will see over and over, including what's

4    on the screen right now, which is the National Front's report

5    of what happened.  They called that an after-action report.

6            And as you will see, on August 13th, the day after

7    the violence occurred, Defendant Richard Spencer declared it to

8    be a huge moral victory in terms of the show of force.

9            You will see this post by Defendant Jeff Schoep, the

10   commander of the National Socialist Movement, NSM:  "It was an

11   honor to stand with you all in Charlottesville this weekend.

12   National Socialist Movement, Nationalist Front, Traditionalist

13   Worker Party, League of the South, Vanguard America."

14           And you will see this post by Michael Hill, leader of

15   League of the South:  "The League of the South had a good day

16   in Charlottesville, Virginia.  Our warriors acquitted

17   themselves as men.  God be praised!"

18           And you will see this post, ladies and gentlemen, by

19   Defendant Christopher Cantwell, who will speak with you later

20   today.  He says:  "If you think the alt-right is insignificant,

21   you might want to ask the bleeding commie filth we sent to the

22   morgue and hospitals how insignificant we are."

23           Ladies and gentlemen, the evidence will show that not

24   only did the defendants celebrate and ratify the violence

25   generally, they specifically celebrated the car attack.  So, in

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    case Mr. Cantwell tells you during this trial that he believes

2    in peaceful protest, you will see this post is what he thinks

3    democracy looks like.  This is the picture of Mr. Fields

4    driving his car into the crowd of counter-protesters at Fourth

5    and Water.

6            He and other defendants supported Defendant James

7    Fields in many other ways, too, that you'll hear about.  They

8    called him in jail repeatedly.  They wrote him letters of

9    solidarity and comfort.  They sent him Christmas cards.  They

10   put money in his account at the prison.  They asked him to put

11   them on his visitors' list.  And you'll hear that Mr. Kessler

12   attended Mr. Fields's criminal trial.

13           And so if the defendants get up here and they say how

14   sorry they are that all this violence happened and how it was

15   just James Fields's fault all alone, we will show you their own

16   words, their own posts, like this one from lead organizer Jason

17   Kessler.  On August 18th he posted:  "Heather Heyer was a fat,

18   disgusting Communist.  Communists have killed 94 million.

19   Looks like it was payback time."

20           Now, you may hear Mr. Kessler say something different

21   than this during this trial, but this post is not even from the

22   day of the car attack.  This was six days later, after he had

23   time to think about it, and this is what he has to say:  "It's

24   payback time."

25           So, as I said earlier, ladies and gentlemen, we are

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   going to show you a lot of evidence of this conspiracy; of the

2   planning, of the execution, of the celebration of the violence

3   that happened here in Charlottesville.  And we only have so

4   much time this morning, and so we can only show you some of the

5   evidence.  And as the jury, as we've talked about, your job is

6   to consider that evidence.

7           But you will also be able to consider that there was

8   evidence that you can't see, because in this case there is

9   evidence that went missing, or fell in the toilet, literally,

10  like Jeff Schoep's phone.

11          You will learn that eight of the defendants in this

12  case destroyed or refused to produce evidence.  And as I

13  already talked about, you will see that Defendant Matthew

14  Parrott, who is here with us in the courtroom today, posted

15  publicly on social media encouraging everyone involved in

16  violence in Charlottesville to delete the evidence.

17          For example, Vanguard America, as you've heard about

18  over and over -- the group that Eli Kline worked with so

19  closely, and the group that James Fields marched with

20  immediately before the car attack -- Vanguard America produced

21  no materials in this litigation.  You are going to see so much

22  evidence in this case.  They produced nothing.

23          We will ask you to think about, ladies and gentlemen,

24  whether it is believable to you that Vanguard America, a group

25  with an entire channel on the Discord server, that marched in

63

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   formation with pre-made shields, that they had no documents

2   relevant to this case.

3         The Court is going to instruct you about what

4   conclusions you can draw about the destruction of evidence.

5   You're going to see a lot in this case.

6         You will also be able to consider expert testimony in

7   this case.  I want to tell you about an expert that we will

8   present named Professor Peter Simi.  He is one of the country's

9   leading experts on violent extremism and on white supremacy.

10  Professor Simi will testify that, in his expert opinion, the

11  defendants used strategies of plausible deniability to avoid

12  accountability for what they had done.

13        They used doublespeak, which is language that is

14  designed to mean one thing to people on the inside and

15  something different to everyone else on the outside.

16        They talked in code, and Professor Simi will help you

17  decode their words.

18        They used humor.  Remember the post we saw that says

19  "LOL," laugh out loud.  They ended threatening posts with humor

20  and "LOL," so that later, they could say, as they might today,

21  and for sure will say during this trial, "We were just joking.

22  This is all a joke," as if somehow this could be a joke.

23        And they acted one way in public and another way in

24  private.  And this is something that Professor Simi is going to

25  call front-stage/backstage communication.  Remember the Sieg

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   Heil video.  Front-stage/backstage communications.

2          So we do expect, ladies and gentlemen, that

3   defendants will be able to show you some communications where

4   they're not using racial slurs, where they're not being

5   violent, because that's purposeful, you will see.  And we hope

6   that you will pay close attention to whether the defendants

7   knew they were being recorded, knew that their chats would come

8   out.  In other words, is what you're saying a front-stage or is

9   it a backstage communication?

10          And I talked earlier about a woman who you'll hear

11   testimony from whose name is Samantha Froelich.  And Samantha

12   Froelich lived with Eli Kline while he planned this.  She used

13   to be a member of the white nationalist movement.  She left the

14   movement.  And her testimony is an insider's perspective for

15   you about what was going on.  And she is going to tell you how

16   optics were so important.  She is going to tell you that,

17   rather than use racial slurs in public or do Nazi salutes, you

18   should wear loafers and slacks, so, for example, white polos

19   and khakis.

20          She is going to tell you also about plausible

21   deniability.  She doesn't know Professor Simi.  She is going to

22   independently tell you that a strategy of plausible deniability

23   is what was going on here.  After you see all the evidence in

24   this case, that strategy is going to leap off the page, ladies

25   and gentlemen.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1          Now, I also want to talk about one other thing that

2   Professor Simi will discuss with you, which is the tactic of

3   baiting and provoking targets to attack, something also called

4   triggering.  What you're seeing right now on the screen are two

5   Discord posts from two different defendants in the summer of

6   2017, Defendant Kessler and Defendant Ray.

7          On July 11th, Mr. Kessler says -- by the way,

8   Mr. Kessler also went by the name MadDimension.  So that's why

9   it says "MadDimension."  But that's Mr. Kessler.  He says:  "If

10  Bellamy shows up we talk shit and try to trigger a chimpout."

11         Wes Bellamy is the former vice mayor of

12  Charlottesville, and he's black.

13         Defendant Robert Ray posted on August 3rd -- very

14  close in time -- he says, talking about the upcoming Battle of

15  Charlottesville:  "I'm looking forward to BLM" -- that's Black

16  Lives Matter -- "more than Antifa.  Blacks are the easiest

17  people on earth to trigger.  I predict some gloriously

18  hilarious chimping."

19         So ladies and gentlemen, you will see two nearly

20  identical posts just a couple of weeks before, right before

21  August 11th and 12th, using the exact same racial slurs and

22  using the exact same language about triggering.

23         This is just the tip of the iceberg, ladies and

24  gentlemen.

25         There's other evidence that you will see which is

66

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    consistent with Professor Simi's expert opinion.  You will see

2    a style guide posted by The Daily Stormer, the most well-known

3    white supremacist website in the country, which took its name

4    from the Nazi Party's newspaper called Der Stürmer.  The Daily

5    Stormer style guide is very important to look at.  And it will

6    be admitted into evidence during this trial.  There's a lot in

7    it.  Some of it is on the screen in front of you.

8         The style guide says:  "Generally, when using racial

9    slurs, it should come across as half-joking -- like a racist

10   joke that everyone laughs at because it's true."  It goes on to

11   say that:  "The unindoctrinated should not be able to tell if

12   we're joking or not.  There should also be a conscious

13   awareness of mocking stereotypes of hateful racists.  I usually

14   think of this as self-deprecating humor.  I am a racist making

15   fun of stereotype of racists, because I have don't take myself

16   super-seriously.  This is obviously a ploy and I actually do

17   want to gas kikes.  But that's neither here nor there."

18        So if you hear defendants say that they don't really

19   mean they will gas kikes and many other people, and that they

20   don't really mean that they are trying to trigger black people,

21   something they refer to as a "chimpout," or they don't really

22   mean for people to run over counter-protesters with cars, you

23   will see the evidence yourself that shows you that that is what

24   they meant, because that's what actually happened.

25        So we expect that, when the defendants stand up here

                    Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   today, they are going to continue this strategy of plausible

2   deniability, of saying this case was not about their planning,

3   their execution, or their celebration of racially motivated

4   violence.

5           But at the end of the day, it is going to be the

6   evidence in this case, which is defendants' own words, their

7   own Discord posts, their own posts on other social media, their

8   own texts, their own audio, their own communication, photos and

9   videos, and tapes of their conduct on August 11th and 12th.

10  And that is what's going to show you, ladies and gentlemen,

11  what is true and what cannot be denied in this case.

12          And let me just take one example involving Defendant

13  Richard Spencer, who is sitting right over here.  This is what

14  he said when he thought no one recording him on the night of

15  August 12th, after the torch march, after the threats, after

16  the beatings, after the mace, after the shields, after the

17  flagpoles, after all the violence and the car attack that

18  killed Heather Heyer and injured so many other people.  This is

19  what he had to say.

20          (Video playing.)

21          Ladies and gentlemen, we are going to ask you to hold

22  them accountable on behalf of these plaintiffs.

23          THE COURT:  Ms. Kaplan, how long do you anticipate

24  you'll be?

25          MS. KAPLAN:  I speak way too fast, Your Honor, but I

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   assume about a half an hour.

2          THE COURT:  Members of the jury, can you sit another

3   half an hour?  Then we'll go to lunch.

4          MS. KAPLAN:  Ladies and gentlemen of the jury, you

5   have just heard Karen tell you about what the defendants did on

6   August 11th and 12th, 2017.  I'm now going to tell you about

7   what the plaintiffs were doing that same weekend.

8          The conspiracy to commit racially motivated violence

9   at issue in this case did not happen in a vacuum.  It

10  devastated the lives of many, many people, including our

11  plaintiffs.  As Karen mentioned, they are all sitting right

12  here in the courtroom today.  And I'm going to name them:

13  Marcus Martin, Marissa Blair, Elizabeth Sines, Thomas Baker,

14  April Muñiz, Chelsea Alvarado, Devin Willis, Natalie Romero,

15  and the Reverend Seth Wispelwey.

16         These are the nine brave plaintiffs who we have the

17  great privilege to represent.  I'm going to describe them to

18  you now based on the timeline of what happened and based on

19  their connection to the key events.

20         Natalie Romero and Devin Willis were about to start

21  their sophomore year at the University of Virginia when the

22  defendants came to town on August 11.  Devin was then 18 years

23  old, and Natalie was 20.

24         Natalie attended UVA on an academic merit-based

25  scholarship awarded to individuals with extraordinary

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   leadership potential.  She was the very first person in her

2   family ever to go to college.  Before she started at UVA, she

3   was a member of the Army Reserve Officer Training Corps, or

4   ROTC.  She had been awarded the Legion of Valor award, an honor

5   awarded to only seven cadets in the whole country.  In her

6   freshman year at UVA, she did well academically.  She was

7   selected to lead -- and was selected to lead a peer mentoring

8   program.  Ten days before the Unite the Right rally, she got

9   married.

10          Devin Willis also received scholarships to attend

11  UVA.  He quickly emerged as a leader on campus.  His freshman

12  year, he worked as a university tour guide and was involved in

13  a number of student groups, including the Black Student

14  Alliance, a group dedicated to supporting students from diverse

15  backgrounds.  The summer after his freshman year, Devin stayed

16  in Charlottesville while working at an internship at UVA about

17  environmental conservation.

18          On August 11th, Natalie and Devin were at a spaghetti

19  dinner at the home of one of their professors when they learned

20  that white nationalists were planning to march through campus

21  that evening.  Natalie and Devin drove to campus in a car with

22  a bunch of their friends who had attended the dinner.  Their

23  plan was to counter hate and stand up for their own school and

24  their own community.

25          Since they had heard that the white nationalists were

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  focusing on the Thomas Jefferson statue, that's where they

2  went.  They walked over to the statue and joined a group of

3  other students holding a sign that said, "VA students against

4  white supremacy."

5       At first, when they got there, the white nationalists

6  had not yet arrived, and so they and the other students were

7  standing there alone.  Natalie and Devin, who had been assigned

8  to be each other's buddy for the evening as a safety

9  precaution, held hands, and, with the other students, began to

10 chant:  "No Nazis, no KKK, no fascist USA."

11      (Video playing.)

12      That's Devin in the pink and white shirt, and that's

13 Natalie holding his hand.

14      Soon, after a while holding hands at the statue,

15 Devin and Natalie heard voices growing louder and louder and

16 louder from the other side of the Rotunda on the map that Karen

17 showed you.  As the voices grew louder, the sky around the

18 Rotunda literally began to glow from the flames of tiki

19 torches.  That's when Natalie and Devin saw approximately 300

20 to 500 men, many of them wearing white polos and khaki pants,

21 holding lit tiki torches, approaching.

22      And if you look here, you can see Devin -- Natalie,

23 it's hard to see -- and the other students around the statue.

24 And you can see in this video, as we're going to show, how they

25 were quickly surrounded.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1        As you can see, they have their backs to the Thomas

2   Jefferson statue, and their heads are down.

3        Within a matter of minutes, the scene looked like

4   this.  Again, you can see Natalie and Devin -- better, Devin --

5   around the statue.  Natalie and Devin at this point are trapped

6   against the Thomas Jefferson statue.  They were among a very

7   small group of UVA students of color there, face-to-face with a

8   crowd of torch-bearing men who screamed at them, made monkey

9   sounds at them because of their skin color, and told them to go

10  back to where they had come from.

11       Natalie and Devin are each going to testify soon in

12  this case, and they will each tell you that at that moment they

13  were completely terrified.  Devin will testify that he

14  literally believed that he was going to die.  Their fears were

15  justified, since soon, the men physically attacked them.  The

16  men with tiki torches threw lighter fluid and lit torches at

17  the students.  Natalie and Devin were doused with pepper spray.

18  Devin was kicked and punched repeatedly.  They each remain

19  haunted by what happened to them that night.

20       As Karen told you, after the defendants terrorized

21  Natalie and Devin, they celebrated.  The photos I just showed

22  you depicted what Jason Kessler called "an incredible moment

23  for white people."

24       Next up is Reverend Seth Wispelwey, who grew up in

25  Charlottesville.  He's a hometown boy, and at the time was a

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  local minister and a peace activist.  He had arranged for an

2  interfaith service to take place at St. Paul's Memorial Church

3  on the evening of August 11th, before the planned rally the

4  next day.  St. Paul's, of course, is just across University

5  Avenue from the Thomas Jefferson statue, just shouting distance

6  away from where we last saw Devin and Natalie.

7         On August 11, Reverend Wispelwey was leading a

8  service at St. Paul's Church with other faith leaders who had

9  gathered in Charlottesville from all over the country.  They

10 had come together to support each other and their community,

11 understanding that the next morning their town could well be

12 full of white nationalists.  They wanted to celebrate love and

13 peace in the face of the defendants' hate and calls for

14 violence.

15        Seth was there with his 7-year-old daughter you can

16 see in the photo on the right.  From inside the church, Seth

17 and the other congregants heard the other white supremacists

18 chanting "Jews will not replace us" as they marched across

19 campus.

20        Now, I know you have all heard the old adage, "A

21 picture is worth a thousand words."  Take a look for yourself

22 at the expressions on the faces of the people in the church

23 that night.  You can see for yourself how worried, how scared,

24 how terrified they were as they heard the chanting outside.

25 Seth barricaded the doors to the church to keep the people safe

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   and they sheltered in place, waiting and praying for the white

2   supremacists to leave.

3        I want to turn now to Elizabeth Sines, who at the

4   time was a law student at UVA.  Liz grew up in Garrett County

5   in western Maryland, which is in the Allegheny Mountains.  Her

6   father was a police officer and a veteran and her mom worked

7   for the state unemployment office.  Liz chose to go to law

8   school at UVA because she loved the town of Charlottesville.

9        On the night of August 11th, Liz learned on Twitter

10  about the torch march that was already happening on campus.

11  She and a law school classmate were shocked, and they went to

12  the main lawn to see things for themselves.

13       Liz tried to record things she saw as best she could

14  to make sure that people in and outside of Charlottesville knew

15  what was happening on her campus that night.  In order to do

16  so, Liz starting recording a video on her iPhone as the white

17  nationalists marched past her.

18       (Video playing.)

19       Liz then walked to the top of the steps of the

20  Rotunda, as Karen showed you earlier, and looked down.

21       Remember, Devin and Natalie are among the students

22  encircling the Thomas Jefferson statue.

23       (Video playing.)

24       Although the video that she took on her iPhone is

25  dark, Liz will tell you here in this courtroom that she then

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  watched the tiki torch-bearing crowd drag several students one

2  by one away from the base of the statue, punch them, push them

3  to the ground, kick them, and hit them with tiki torches.

4              (Video playing.)

5              In addition to Natalie, Devin, Seth, and Liz, you

6  will hear in this courtroom from two other witnesses who were

7  there at the Thomas Jefferson statue that night:  Dean Allen

8  Groves, and another UVA student, Diane D'Costa.  They too will

9  tell you what they saw with their own eyes and what they heard

10 themselves.

11             August 12, the next day, started out as more of the

12 same, but then became far, far worse.

13             Natalie and Devin had both planned to attend peaceful

14 counter-protests the next day, although they obviously each had

15 second thoughts after what happened on August 11.  They decided

16 to go because they were determined to show solidarity with

17 their friends.

18             Devin began the day at McGuffey Park, about two

19 blocks away from Emancipation Park, where the defendants had

20 planned to meet.  Counter-protesters met there, played music,

21 made speeches, and chanted things like "no justice, no peace,"

22 and "love, not hate."

23             Devin and others stopped a few hundred feet away from

24 the entrance to Emancipation Park.  Karen told you -- you

25 probably heard her tell you and remember -- that a group of

75

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  defendants gathered in the Market Street garage, walked down

2  Market Street to Emancipation Park, and violently broke through

3  a line of counter-protesters standing in the street.

4          Devin was in that line.

5          For the second time in less than 24 hours, Devin was

6  assaulted again by a group of white nationalists, who kicked

7  him, punched him, and pepper-sprayed him directly in the face.

8          Natalie had gone to Emancipation Park separately.

9  When she got there, she saw crowds of white nationalists with

10 helmets, body armor, weapons, and she saw people with pictures

11 of Adolf Hitler on their T-shirts.  While Natalie was at the

12 park, she was approach by a group of white men who spat in her

13 face and told her to go back to her country.  Then those same

14 men charged through her group, and Natalie was thrown on the

15 hood of a car.  Tragically, that was not the only physical

16 contact that Natalie had with a car that day.

17         Seth Wispelwey, who we saw last night at St. Paul's

18 Church, also planned to peacefully counter-protest on

19 August 12th, as he had promised his interfaith community he

20 would.  He got up early that morning to lead the community in

21 prayer at a sunrise service in downtown Charlottesville.  He

22 gathered with dozens of other clergy members and people of

23 faith to stand up for justice and against white supremacy.

24         Reverend Wispelwey formed a line and linked arms like

25 this with other clergy members as they kneeled and prayed

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   together in protest.  But then they, too, were attacked.  White

2   supremacists shoved Seth and the other clergy while spitting at

3   them and screaming:  "Kill the faggot priests."

4            But, as it turns out, the violence that Natalie and

5   Devin and Seth experienced on the morning of August 12th was

6   just the tip of the iceberg.

7            Chelsea Alvarado and April Muñiz each came to

8   downtown Charlottesville on August 12th to peacefully protest

9   as well.

10            Chelsea -- you can go to the next slide -- had

11   recently graduated from Sweet Briar College.  She was living in

12   Richmond, and she was working as a crisis counselor with people

13   suffering from trauma and mental illness and struggling with

14   homelessness.

15            On the morning of August 12th, Chelsea met up with

16   Natalie and walked to Emancipation Park.  Chelsea had a large

17   blue drum that she wore across her body that she wore to play

18   along with the songs and chants during the counter-protests.

19   You can see the blue drum in that photo.

20            At approximately 1:41 in the afternoon, Natalie and

21   the other counter-protesters, including April, headed toward

22   Water Street.

23            April had lived in the Charlottesville area for more

24   than 30 years.  In August 2017, she was working full-time as a

25   manager at a research firm.  She's a former Peace Corps

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  volunteer who loves to take photographs.

2  April went into town on August 12th to document what was

3  happening in her community.  She parked her car and walked over

4  to the Downtown Mall.  At around 1:41 in the afternoon, she

5  joined up with a crowd heading toward Water Street and she

6  decided to follow them.  That crowd was celebrating because

7  they mistakenly assumed that the white nationalists were on

8  their way out of town.

9      Marcus Martin and Marissa Blair were both born and

10 raised in Virginia.  Marcus is from Shipman and Marissa is from

11 Amherst.  They grew up near each other and they began dating in

12 2016.  On August 12th, 2017, Marissa was working as a paralegal

13 at a law firm here in town.  Heather Heyer also worked at that

14 same law firm and they had become close friends.  At the time,

15 Marcus was working as a landscaper.

16     Marcus and Marissa had been invited by Heather to

17 join the counter-protest on August 12th.  Marcus and Marissa

18 met Heather at a McDonald's parking lot near Fourth and Water

19 Streets.  In the early afternoon, Marcus, Marissa, Heather and

20 their friends were on Water Street.  They too believed the

21 white supremacists were on their way out of town and they felt

22 an overwhelming sense of relief.

23         (Video playing.)

24     Marissa and Marcus began walking with the crowd up

25 Fourth Street.  The time, again, was 1:41 in the afternoon.

7.8

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  The woman walking right in front of Marissa who you can see

2  with the black T-shirt and the braid swishing from side to side

3  was their friend, Heather Heyer.

4         Thomas Baker works in conservation and ecological

5  planning, and at the time of August 12th he had just moved to

6  Charlottesville with his wife several months earlier.  At that

7  time he was working as a horticulturist at a local nursery.  On

8  August 12th, Thomas felt compelled to go downtown to support

9  his new community.  When he got there he walked around for a

10  while until he joined a group of people walking up Water

11  Street.  He noticed the crowd's positive energy and followed

12  them as they turned left on Fourth Street.  He ended up right

13  next to Marcus and Marissa.  Again, it was approximately 1:41

14  p.m. in the afternoon.

15         Meanwhile, Liz Sines had had a morning meeting with

16  career services at UVA law school, but she decided to go join

17  the protesters after the meeting was over.  Shortly before 1:41

18  p.m, she too joined the crowd walking along Water Street.

19         You've heard me say 1:41 p.m. a lot, and that is

20  because at 1:41 p.m. on August 12th, 2017, Defendant James

21  Fields paused for a moment in a gray 2010 Dodge Challenger at

22  the top of Fourth Street.  He then stepped on the gas, just

23  like the tweet that Karen showed you from Matthew Heimbach, and

24  he plowed directly into the crowd of counter-protesters that

25  had converged at Fourth and Water Streets in front of him.  By

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  the grace of God he barely missed April, Liz and Marissa.

2  Natalie, Marcus, Chelsea and Thomas were not as lucky.  They

3  were all hit by his car.  Natalie was struck by the Dodge

4  Challenger with such force that she flipped through the air and

5  landed on the ground.  Someone pulled Natalie to safety on the

6  sidewalk and out of the path of Fields' car just before he

7  reversed it in order to run into the counter-protesters again.

8  This is Natalie minutes after the car attack.

9       Natalie lost consciousness at the scene and woke up

10  in the hospital in full traction.  The first thing that she

11  asked the nurses was:  Will I ever walk again?  Her skull was

12  fractured and her face was lacerated.  She sustained a

13  traumatic brain injury, which continues to affect her memory

14  and attention, among other things.  And you will hear directly

15  from Natalie about this herself later today.

16       Natalie has regained the ability to walk, but not

17  without difficulty.  When she was finally released from the

18  hospital, she had to use a wheelchair for over a month.  Then

19  she walked with a cane for two more months.  That whole time,

20  even in her home, she had to sleep in a hospital bed because

21  she couldn't get in and out of a regular bed herself.  She

22  missed the next semester of school.  For months she had to go

23  to seven doctors' appointments a week just to regain basic

24  functioning:  Physical therapy, occupational therapy, treatment

25  for ringing in her ears, appointments with neurologists and

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   more.

2          Natalie continues to live with scars on her face

3   that, as Karen has told you, remind her every single time that

4   she looks in a mirror of the absolute horror of what she

5   experienced that day.

6          Chelsea was playing that large blue drum that she was

7   wearing on her chest when James Fields hit her with his car.

8   She was thrown backwards onto the concrete curb.  She barely

9   managed to maneuver out of the way as she saw Fields put his

10  car into reverse.  Chelsea's body was covered with cuts and

11  bruises, and her knee immediately swelled up to three times its

12  normal size.

13         When the car hit the drum that Chelsea was wearing,

14  the drum slammed against Chelsea's side so that she had

15  abrasions and bruises and the outline of the drum strap against

16  her body.  Chelsea also sustained a severe concussion and

17  continues to suffer from injuries to her brain.  She continues

18  to struggle with severe anxiety, depression and other emotional

19  difficulties caused by what happened that day.

20         Here is -- here is Chelsea's drum next to a pool of

21  blood that was Natalie's blood on the street that day.

22         The man in the red and white sneakers with his body

23  in the air is Marcus Martin.  Just before the impact, Marcus

24  had the wherewithal to push his fiancee Marissa out of the way

25  of the car.  Fields hit Marcus with such force that Marcus's

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  body, as you see in this Pulitzer Prize-winning photo, flew

2  into the air and over the car and then fell to the ground.

3  Marcus scrambled to get out of the way and prayed to God that

4  Marissa was okay.

5       Marcus's shoe was knocked off his left foot when he

6  was hit by Defendant Fields's car.  Look at these photos.

7  Remember, a picture speaks a thousand words.  Look at these

8  photos.  As Fields reversed the car up the street, you can see

9  Marcus's shoe stuck in the front grille of the car and then

10  underneath it.

11       These are the shoes that Marcus was wearing that day.

12  They're a lot stronger than human body parts because they

13  actually look not too bruised.

14       Marissa couldn't find Marcus immediately after the

15  car attack.  She understandably panicked, wandering desperately

16  through the crowd looking for him until she found him crumpled

17  on the sidewalk.

18            (Video playing.)

19       Marissa finally found Marcus on the ground, unable to

20  move.  Marissa helped him stand up and get him into an

21  ambulance.  Marcus's leg, which was completely crushed by the

22  car, was obviously horribly injured.  His fibula was broken and

23  the ligaments were torn across his whole ankle and throughout

24  his leg.

25            At the hospital together, Marcus and Marissa learned

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   for the very first time that their close friend, Heather Heyer,

2   had been killed.  Marcus and Marissa have struggled to deal

3   with their pain and their injuries, both physical and

4   psychological, for the past four years.  Marcus's physical

5   recovery has been brutal.  For seven months he could barely

6   walk, which also meant he was unable to work.  Marcus and

7   Marissa got married after August 12th.  They struggled to

8   manage Marcus's physical care, and the pain and trauma he

9   experienced obviously put a heavy strain on their relationship.

10  Ultimately, the car attack cost them their marriage as well.

11         This is Thomas Baker.  While standing on Fourth

12  Street on August 12th, a newcomer to town, Thomas first heard

13  screaming and loud thumps.  Those thumps turned out to be the

14  sounds of other bodies getting hit by the car.  The car struck

15  Thomas's legs and his body was thrown over the hood.  His head

16  and upper body hit the windshield, causing him to flip over the

17  top of the car before he slammed to the ground.

18         This is what Thomas looked like in the hospital.  He

19  tore a ligament in his left wrist, cartilage in his right hip,

20  severely damaged his femur and his hip socket, and of course

21  sustained a concussion.  Thomas had cuts and bruises all over

22  his body, as you can see.  For months afterwards Thomas was in

23  so much pain that it hurt even to lie down.  He had difficulty

24  moving around and he struggled to meet the physical demands of

25  his job.  He tried physical therapy and he tried rehab, but

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  ultimately he had to undergo surgery to try to repair at least

2  some of the damage to his hip from August 12th.

3        Today Thomas walks with a limp and struggles with

4  chronic pain.  He can't run or play sports anymore, and he has

5  been told that he'll need a hip replacement in the future.

6        In addition to the physical pain, Thomas obviously

7  has suffered emotional difficulties that have impacted him and

8  his relationships severely.  And every single time that he sees

9  a car go by, even when it isn't even close to him, he struggles

10  with flashbacks from August 12th.

11        The near misses were also devastating.  April and Liz

12  were each nearly hit by Fields's car.  April walked with the

13  crowd and turned onto Fourth Street about a minute before the

14  car attack.  She was walking up the right side of the street

15  when Fields came speeding down.  She jumped out of the way, and

16  God willing, the car barely missed her.  She then saw the car

17  backing up towards her and went into a state of complete shock.

18  She fled into a vestibule on Water Street.  April remembers

19  weaving between people injured, lying on the ground and

20  bleeding.  Eventually someone was able to bring her over to a

21  medic tech.  April's work, her long-time relationship, and her

22  mental health have suffered tremendously as a result of what

23  she experienced on August 12th.

24        Liz Sines was also inches away from getting run over

25  by Fields's car.  You can see Liz in the red circle on that

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   photo.  Here's what she experienced in real time that day.

2          (Video playing.)

3          As you can see in that video and as you'll hear from

4   Liz herself in this courtroom, she struggled to record that

5   video, but she wanted to make sure that people both in and

6   outside of Charlottesville saw the truth of what had happened

7   that day.  And she is here today in this courtroom for that

8   very same reason.

9          Since August 12th, Liz has had anxiety, panic

10  attacks, insomnia, nightmares and difficulty focusing.  The

11  trauma she experienced that weekend still impacts her both

12  personally and professionally.

13         Although Devin and Seth weren't hit by the car, the

14  emotional impact of August 11 and 12 continues for them as

15  well.  When they heard the news about the car attack, they each

16  rushed to Fourth and Water Street.  What they saw there was

17  utter devastation, destruction and chaos, blood and bodies

18  everywhere, people covered in glass, medics administering CPR

19  and other life-saving treatments.

20         Seth helped clear the area for the medics and

21  provided support and assistance to those at the scene.  Devin

22  went looking for Natalie, but she had already been taken to the

23  hospital.  The next day Devin went to the hospital to see her,

24  where she was still in traction and unconscious.  Devin was

25  afraid that she was going to die.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1          It will be very difficult, ladies and gentlemen of

2    the jury, for the plaintiffs to recount for you what happened,

3    but you're going to hear them tell you about some of the very

4    worst moments in their lives.  When you do, remember what Karen

5    told you, that the defendants planned for violence, executed

6    violence, and then celebrated the violence, as she showed you

7    in those tweets and Discord posts from earlier today.

8          And think to yourself about who the plaintiffs are

9    and what they said.  Were plaintiffs really associated with

10   violent members of Antifa, as I'm sure you will hear from at

11   least certain of the defendants?  Or were they peaceful

12   protesters bravely committed to standing up for peace who were

13   terrified by what was happening and who were horribly injured

14   as a result?

15         Our plaintiffs have waited four long years for this

16   day.  In that time they've tried to move forward with their

17   lives as best they can.  Some have graduated from college.

18   Some have moved away.  Some have started new relationships.

19   Some have gotten new jobs.  But no matter what they do and no

20   matter how far away from Charlottesville they go, they continue

21   to carry with them the pain and trauma of what they experienced

22   those two days.

23         That's why you are here, so that this community, a

24   jury of their peers, can finally hear the truth about what

25   happened on August 11 and 12, 2017.  As Karen said, while this

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   case is about violence and hatred, it is also about justice and

2   accountability; accountability for those who planned and

3   perpetrated and celebrated the violence, and justice for the

4   plaintiffs who have lost so much.

5           The evidence you will see in this courtroom over the

6   next few weeks will be overwhelming.  By the end of the trial

7   it will be clear that the defendants conspired to commit

8   racially motivated violence and devastated the lives of our

9   clients.  Thank you very much.

10          THE COURT:  All right.  Thank you.  At this point

11  we're going to recess for lunch for one hour.  Operating on

12  that clock, at 12:15, we'll resume at 1:15.

13          And at this point, ladies and gentlemen of the jury,

14  I have to remind you, do not discuss the case with anyone at

15  lunch, even amongst yourselves.  Of course do not do any

16  research, do not remain within hearing of anyone discussing the

17  case.  I'm going to allow you to file out now to return at

18  1:15.  Just follow the marshal.

19  **(Jury out, 12:13 p.m.)**

20          THE COURT:  Okay.  I'll ask the plaintiffs to remain

21  and defendants may proceed.

22          All right.  The plaintiffs may proceed.  Thank you.

23          MS. DUNN:  Thank you, Your Honor.

24          MS. KAPLAN:  Thank you, Your Honor.

25          (Recess.)

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1          THE COURT:  Call the jury.

2  **(Jury in, 1:28 p.m.)**

3          THE COURT:  All right.  Be seated, please.

4          Members of the jury, sorry that we're late calling

5  you back.

6          All right.  Counsel for the defendants may begin.

7          Mr. Kolenich?

8          MR. KOLENICH:  Thank you, Your Honor.

9          Good afternoon.  As you remember, I represent Jason

10  Kessler, Nathan Damigo, and his organization, Identity Evropa.

11          This case, ladies and gentlemen, is a conspiracy

12  case.  The plaintiffs want you to believe and find that anybody

13  who had anything to do with the Unite the Right leadership

14  conspired to damage them in some way or other.

15          Now, at no time in this case will you hear Jason

16  Kessler or Nathan Damigo or his organization deny that these

17  plaintiffs have been injured; in many cases, very badly

18  physically injured.  Some of the other lawyers have a job to do

19  and they have to look into those injuries, but my clients are

20  not going to do that.

21          Moreover, my clients are not responsible for how

22  these other defendants choose to put in their case.  They will

23  put in their own case through their attorneys.  And that bears

24  a great similarity to the fact that they are not responsible

25  for what other leaders of Unite the Right chose to do on

                    Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   August 11th and 12th, 2017.

2           You heard it from the plaintiffs' own mouth:

3   "Antifa.  Antifa."  Now, why would they bring that up?  Because

4   these Antifa, these anti-fascists, are a big part of this case.

5   Why is Antifa a big part of this case?  Because they don't like

6   Jason Kessler.  They don't like his message.  They don't like

7   what they call fascists or Nazis.

8           Very well.  Nobody likes fascists or Nazis.  If you

9   haven't learned not to like my clients before you came in here

10  today for this case, you're going to learn throughout this

11  trial that the rhetoric they use, the positions they advocate,

12  are not likable things.  And in many cases, the people involved

13  in this are not likable people.  But that, ladies and

14  gentlemen, is 100 percent legally irrelevant.  Better lawyers

15  than I will ever be have stood before juries and pointed out --

16  and judges -- and pointed out that, if the First Amendment does

17  not protect the most reprehensible, the most disgusting, of

18  speech, then it doesn't protect anything.

19          Now, at no time in this case are Kessler and Damigo

20  or his organization going to tell you that the First Amendment

21  protects a conspiracy to commit a crime or a conspiracy to do

22  violence.  That is not our argument.  But you heard the

23  plaintiffs say this event had been planned for months.  But

24  what was being planned?

25          The evidence in this case will show that, in the mind

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  of Kessler, in the mind of Damigo, and the official acts of

2  their organization, the authorized acts of that corporation,

3  they were planning a political rally.

4          Yes, they planned for the possibility of violence.

5  There is no getting around that.  There will be no denials of

6  that from my clients.  But what violence were they planning?

7  They were planning for the possibility that the Antifa would

8  physically attack them on August 11th and 12th, 2017, as had

9  happened before.  You will learn in this case that the

10  anti-fascists go wherever the alt-right goes and they do what

11  they can to physically stop them from expressing their

12  reprehensible ideas, and they are not afraid to use violence to

13  do that.

14          The plaintiffs showed you a picture of Nathan Damigo,

15  my client, punching a female in the face.  Now, at opening

16  argument, we can't do anything with that.  That's the way

17  opening is.  During the trial, we can show you the rest of the

18  story.  When you see an exhibit, when you see a piece of a

19  deposition, any sort of demonstrative evidence, think:  What is

20  the rest of the story?  That is our job, to show it to you.

21          In Mr. Damigo's case, the evidence will show that

22  that female was physically attacking protesters with a broken

23  glass bottle, and he acted to defend those people.  And in

24  point of fact, in point of fact, in Berkeley, California, which

25  may well be the most liberal, anti-alt-right place in the

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  country, he was not charged with a crime for doing that, even

2  though the whole world knows he did it.

3          Moving on, ladies and gentlemen, this case is about

4  rhetoric.  That's all it is about from my clients' perspective.

5  It is about the First Amendment right to say whatever you want

6  and to hold whatever opinions you want.

7          It is very true that you cannot do whatever you want.

8  Now, these people said -- they hold opinions, and they express

9  those opinions, of utterly ridiculous things.  And you're going

10  to hear these things repeatedly throughout the trial.  They did

11  say them.  They did advocate for them.  But that is all my

12  clients did.

13          Okay.  You say:  No, no, no.  No, I remember the

14  plaintiffs' presentation.  I remember the texts.  I remember

15  the tweets.  Mr. Kessler spoke with -- Mr. Kessler spoke with

16  Mr. Spencer, or Mr. Damigo spoke with someone.  But what were

17  they doing?  Why were they speaking to him?  What were they

18  trying to accomplish?  They were trying to put together an

19  alt-right rally that could not be beaten down by these Antifa.

20          Jason Kessler, ladies and gentlemen, was scared.  He

21  was afraid of his event being ruined, but also of his own

22  person being assaulted.  He did the best he could, within the

23  limits of his abilities as Jason Kessler, to stop that from

24  happening.  He worked with the police, the Charlottesville

25  police, to protect this event.  He got a permit.  He did not

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  sneak into Charlottesville with a bunch of knuckleheads from

2  out of town and tear up the town.  He got a permit.  He begged

3  the police to protect his event.  You all know the story.  This

4  was not the Charlottesville police's finest day.  And in the

5  immediate aftermath of this event, the evidence will show, the

6  community thought so, too.  The community blames the police for

7  what happened.

8          Yes, they blame Kessler.  Yes, they hate Kessler.

9  And yes, in some moral sense, Kessler has some responsibility.

10 But bringing the Nazis to town and all the damage that happened

11 in the wake of that was not foreseeable to Mr. Kessler.  He

12 could not have known that this out-of-towner that he never met

13 was going to run into a crowd of people.

14         Nathan Damigo could not have known that anybody was

15 going to use a car and attack somebody.

16         And when you pay attention to the planning that was

17 made of this event, they aren't talking about a car or a gun or

18 a grenade or a bomb or anything that you would know would kill

19 somebody and was made for the purpose of killing somebody.

20 They're talking about signs.  You saw the plaintiffs' exhibits.

21 Picket signs and other such accoutrements of a rally.

22         Yes, they brought mace.  Many people carry mace to

23 protect themselves from physical assault.  Yes, it turns out

24 carrying mace is illegal in the state of Virginia, at least the

25 kind of mace they were carrying.  But these kind of

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  technicalities are not the plaintiffs' case.

2         The plaintiffs must prove to you that my clients

3  intended to hunt down and physically injure some persons who

4  were counter-protesting in Charlottesville, or at least were in

5  Charlottesville.

6         Now, at no time are you going to hear my clients

7  claim these plaintiffs are Antifa.  That is not part of our

8  defense.  What they are are innocent victims that were caught

9  in between Antifa and the alt-right, and the tragedy occurred.

10 You're going to hear an awful lot about their injuries.  As I

11 said, we're not going to attack the source of their injury,

12 which is the car, or the validity of their injuries, which is

13 medical evidence that you will see.

14        Our case is entirely this:  Rhetoric, language, is

15 protected.

16        Now, you heard the Court's instruction to you this

17 morning:  A conspiracy is an agreement.  You have to have made

18 some agreement with other members of the conspiracy to do the

19 general thing that was done.

20        Now, if you agree to yell at people and annoy them

21 and insult them and offend them, how is that an agreement to

22 run them over with a car?  Or if you agree to spit in their

23 face, how is that an agreement to kill somebody?  There is a

24 giant chasm between anything that you could possibly find

25 Kessler or Damigo or his organization agreed to and what

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  actually happened that day, and what actually injured these

2  plaintiffs.

3        There is more to the defense than that for the

4  organizational defendants.  There are technical legal defenses

5  that we will lay out the factual predicate for throughout the

6  trial as far as the group Identity Evropa.

7        I thank you for listening.  When we come to closing

8  arguments, you will find that there is a very notable lack of

9  evidence of an agreement between Kessler or Damigo and any of

10  the people who actually are responsible for the violence of

11  August 11th and 12th, 2017.

12        Thank you, ladies and gentlemen.

13        MR. SPENCER:  Good afternoon.

14        Anyone need only say the words "Charlottesville

15  rally," or "Unite the Right," or maybe even "August 2017," or

16  just "Charlottesville," in order to evoke very strong emotions,

17  and, in fact, quite a bit of pain, disappointment, anger, and

18  regret on all sides of the issue.  And that includes myself.

19        I have certain regrets about being involved in the

20  rally.  I have learned certain lessons.  But we are now here,

21  four years after the event, and emotions have subsided, and we

22  are in a position to revisit the matter, look on it with

23  clearer eyes, and apply the law accurately and fairly.

24        The purpose of an opening statement is to tell you

25  what this case is all about.  And I think I should -- before I

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  do that, I think I should tell you what it is not about.

2          The Charlottesville rally raises many important

3  questions for all of us, about statues of Confederate generals,

4  about the Civil War and how we remember it, about highly

5  controversial, sometimes stupid and disgusting, speech, and how

6  dissidents should be treated.  It has raised very important

7  issues about policing and the right of protesters and

8  counter-protesters and the duties of authorities to remain --

9  to maintain a safe, but also free, society.

10          These subjects should be debated by us.  They should

11  be talked about by journalists, academics.  They should be

12  talked about by each and every one of you, whether it's in your

13  local paper or at your local coffee shop or on social media.

14  These are important things.

15          But this case and this process is not about Robert E.

16  Lee.  It is not about the Civil War.  It is not about my

17  extremely controversial, though sincerely held, beliefs, which

18  I imagine most of you disagree with, and maybe vehemently

19  disagree with.  This case ultimately is not about the

20  scattered, often stupid ramblings and insults of the alt-right.

21  This case isn't about Donald Trump.  And this case isn't even

22  about who is ultimately responsible for the chaos and violence

23  that occurred across Charlottesville.

24          Sometimes in life there are things that are black and

25  white.  That very important question, which should be debated,

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  is quite gray.

2          We should remember that the Charlottesville rally,

3  Unite the Right, that I agreed to attend and speak at, at the

4  invitation of Jason Kessler, was preempted before anything had

5  been done or a word had been said.  A state of emergency was

6  declared before a single person took the stage or said a single

7  thing.  What was then called Lee Park and is now Emancipation

8  Park was evacuated by the police.  I was forcibly pushed out of

9  the park and maced by the police.

10          Both sides -- or I probably should say "all sides" of

11  this rally, because there are more than two -- were funneled

12  together onto Market Street, almost as if creating chaos was

13  the objective.  And that chaos descended into downtown

14  Charlottesville, where it reigned, and many people suffered and

15  were injured.

16          That -- those actions that led to that event are

17  actually not what this case is about.  Before I talk about

18  that, I'm going to talk a little bit about what this case might

19  mean to you.

20          Your deciding one way or the other, for the

21  plaintiffs or the defendants, or perhaps a complicated

22  combination of those two, says nothing -- absolutely nothing --

23  about what you sincerely believe.  I doubt the plaintiffs will

24  say this explicitly, but it's more or less implied, that you

25  are either on the side of the angels or you're on the side of

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  the devil incarnate, bad old Richard Spencer and the Nazis.

2         No.  Your decision is about the rational and fair

3  application of law.  Your sincerely held beliefs in your mind

4  and in your heart cannot be touched by this case, and they

5  cannot be affected by anyone.  Those are yours.  You are here

6  to make a rational application of the law, to apply the law

7  where it applies and nothing else.

8         Deciding on my behalf says absolutely nothing about

9  your feelings towards my sincerely held beliefs, towards my

10  failings of character.  You can go out and bash me on Twitter

11  after this is all done; that's basically what I'm saying.  And

12  you might.

13         But this case is really about something very

14  difficult in society.  It's something that we attempt to do,

15  and I don't think is really attempted anywhere else in the

16  world, or the whole universe, and that is to defend the rights

17  of someone you vehemently disagree with, to defend the

18  indefensible, to treat someone who you might find despicable

19  with fairness, to give a bad guy a fair shake.  That's hard.

20  And that is the challenge that you all -- that we all face in

21  this Court.

22         The plaintiffs are going to imply that this is an

23  up-down vote about what you believe.  It is absolutely not.

24         So what is this case about?  Well, the short answer

25  is that it is about whether I was involved in a malign

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  conspiracy to commit, direct, or in some way inspire racial

2  violence and the denial of civil rights.  In the plaintiffs'

3  view, the Charlottesville rally wasn't really about the statues

4  at all.  It wasn't about all those things that the planners

5  worked on tirelessly for weeks and for months.  All of that was

6  a ruse or bait.  It was really about getting people together so

7  their civil rights could be violated or they could be harmed or

8  injured in some way.

9          Now, getting more specific, you have been told, and

10 you'll learn again, that this is about the application of

11 Sections 1985 and 1986, Count 1, 42 of the US Code:  Whether I

12 myself, who was not involved in the logistical plannings of the

13 rally, and some of my co-defendants, who very much were, should

14 somehow be held accountable, somehow held liable, for injuries

15 that the plaintiffs sustained.

16          And I would second Mr. Kolenich in the sense that I

17 don't deny that they have been injured and that they have

18 suffered.

19          This isn't a criminal trial.  So the critical issue

20 is not guilt beyond a reasonable doubt.

21          It should be noted that over the past four years

22 since August of 2017, I have not been charged with any crime,

23 by the police, by the FBI, related to this matter.  I certainly

24 could have been detained and arrested on August 12th or the

25 night before in Charlottesville by the police.  I wasn't.  The

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  police, or any other law enforcement agency, could have used

2  Section 1985 to try me criminally.  They have not.  I have not

3  been questioned by these authorities.

4          THE COURT:  Mr. Spencer?  Excuse me.

5          I have ruled that it's not relevant whether anyone

6  else was arrested in this case.

7          MR. SPENCER:  Fair enough.

8          And thus, we are at a civil trial, at which the bar

9  is seemingly lower.  It's a preponderance of the evidence and

10  not guilt beyond a reasonable doubt.

11          The essence of Section 1985 is to prevent a

12  conspiracy to deny civil rights.  This is defined as two or

13  more persons who conspire for the purpose of depriving, either

14  directly or indirectly, any person or class of equal protection

15  under the law.

16          The plaintiffs are going to have to demonstrate that

17  to you.  And tough talk by me, bold words, that is simply not

18  enough.  We had to be aware that someone was going to commit

19  these acts, attempting to deny civil rights or attempting to

20  injure someone.  We had to want to do that ourselves.  We had

21  to want to engage in some kind of malign event for which a

22  rally was a mere ruse.

23          They will present many things that are shocking,

24  saddening -- no question -- sometimes embarrassing.  But they

25  won't present anything that demonstrates that I entered into a

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  conspiracy to commit civil -- to violate civil rights or commit

2  violence.  And that is what it is all about.

3        A conspiracy in itself is not malign.  We all

4  conspire to go to the movies or start a small business; or, in

5  this case, we can conspire to host a rally of a highly

6  controversial nature on a political event of the day to be held

7  in Charlottesville.  And I certainly was involved in that.  But

8  for the plaintiffs' case to hold water, they need to show some

9  kind of concerted impulse, if not outright directives, for

10 violence in the denial of civil rights.  Tough talk, bold

11 words, claims like "we're going to build an army for free

12 speech and crack some skulls if we have to," as Mr. Kessler

13 said, that is not nearly enough.  That's tough talk.  That's

14 childish -- maybe childish stuff.  That does not indicate

15 anything like a concerted plan to attack people.

16       Another strategy of the plaintiffs is to lump us all

17 together.  Thus, I'm responsible for what he said; he's

18 responsible for what I said.  After all, they're all in on it;

19 they're all in cahoots.

20       There are 23 defendants in the plaintiffs' amended

21 complaint.  Over the relevant period, I had no correspondence

22 whatsoever with 14 of them.  That's 60 percent of the people

23 that they claim I was in cahoots with.  The sporadic

24 communication I had with other defendants never involved

25 logistical planning of the rally.  I was an invited guest.  And

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   it never involved the denial of civil rights nor an attempt to

2   injure someone.  This assertion -- and it is an assertion that

3   is not grounded in evidence outside of tough talk -- that I was

4   involved in a 24-person conspiracy for violence and mayhem is

5   thus dubious from the outset.

6           Jason Kessler had become an acquaintance of mine

7   since late 2016.  He was not a friend.  Over the course of the

8   year of 2017, Mr. Kessler and I shared some 26 instances of

9   direct communication via iMessages.  We participated in seven

10  phone calls totaling 27 minutes.  I imagine you probably talked

11  a lot more with your car mechanic than Jason and I ever

12  discussed this malign conspiracy.

13          Christopher Cantwell, also an acquaintance, not a

14  friend.  We shared a few text messages, seven instances in

15  total, one phone call.  We ate lunch one time.

16          Nathan Damigo and Eli Mosley were, you could fairly

17  say, friends of mine at the time.  There was plenty of

18  communication, which I have -- I participated in this process,

19  I delivered to the plaintiffs in the discovery process.  Very

20  little of it was about logistics.  Very little of it was about

21  Charlottesville, in fact.  None of it involved inspiring

22  violence or violating civil rights.

23          Matthew Heimbach, one message, one brief phone call.

24          Michael Hill, Michael Tubbs and the League of the

25  South, no communication.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1          Jeff "Scoop" or Schoep is a man I only became aware

2   of due to this trial.  Needless to say, we never communicated

3   and I didn't know of his existence.

4          The National Socialist Movement, the Nationalist

5   Front, I knew nothing about.  Nada.  The Fraternal Order of the

6   Alt-Knights, nothing.

7          You can't build a 24 -- or 23-entity conspiracy on

8   this.

9          Defendant Jason Kessler was the chief organizer of

10  the Unite the Right rally.  And he is a critical figure in

11  determining whether any kind of malevolent conspiracy existed

12  at all or if I were a party to it.  Mr. Kessler aspired to be a

13  spokesman or leader for the alt-right movement.  And during the

14  summer of 2017 organizing this rally was his full-time job.

15         The initial advertisement for Unite the Right, which

16  was shown to me in mid June of 2017, did not include me as a

17  speaker.  I agreed to speak on June 16th after the permit for

18  an above-board legal rally had been filed and after Mr. Kessler

19  informed me of the, in his words, full cooperation of the

20  police.

21         I also expressed some wariness about participating in

22  the rally.  I had become -- by that time I had become a

23  notorious figure.  I knew that if I were there, Antifa would

24  want to come.  Antifa had attacked me physically on multiple

25  occasions and I was a bit wary of that, though I did agree.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    And I was excited about it.  I was excited to go to a rally

2    that was clearly getting interest from the whole alt-right

3    movement.  I was excited to speak before everyone, excited to

4    feel like a star, excited to say something powerful and bold,

5    excited to participate in the whole process.

6            I had been doing that over the course of 2016 and

7    2017.  I had spoken at multiple college campuses.  In fact, the

8    Texas A&M event was larger than Charlottesville, had a larger

9    counter-protest.  We took up -- or went to a football stadium.

10   I had spoken at other colleges.  We had hosted a free speech

11   rally in Washington, DC.

12           Yes, Antifa would sometimes show up.  Yes, harsh

13   words were said.  You could certainly find instances of pushing

14   and shoving.  But nothing like Charlottesville occurred in all

15   of those instances.

16           What was unique about this one?  Certainly not my

17   involvement.  Certainly not the involvement of some of the

18   co-defendants who attended those things.  What was unique about

19   the Charlottesville event was the policing strategy of the

20   municipality and in fact the state.  In all of those other

21   instances I said bold things, I pissed some people off, you

22   could say.  But the police protected speech and they protected

23   order.  And for such a controversial speaker in such a

24   hyper-polarized time, it was remarkable the degree to which

25   those events were, in fact, safe.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1           What was different about Charlottesville was not my

2   participation or the participation of some of the

3   co-defendants.  What was different was the policing and

4   security strategy.  That is what directly led to the chaos

5   first on Market Street, which then flowed into downtown

6   Charlottesville.  That strategy of the police is what is

7   ultimately responsible for the suffering and injury of the

8   plaintiffs, for which I have a great deal of empathy, and for

9   which I too am saddened.

10          That is absolutely not what I wanted.  I did not

11  suffer in the way that they did, but I was physically harmed in

12  Charlottesville.  I have been attacked regularly in broad

13  daylight, beginning in that year, 2017.

14          The plaintiffs played one clip from a podcast in

15  which I said that we are now living in an age of political

16  violence.  I meant that.  And that was true.

17          That's a now-notorious image of me being punched in

18  the head by a member of Antifa while I was speaking to the

19  press.  It became a meme on social media.  And it was actually

20  the subject of a sort of public debate.  This is an article in

21  the *New York Times* in which this idea of:  Should we feel bad

22  if a Nazi gets punched or, wink-wink, should we punch them

23  ourselves.  This was hotly debated among liberals and leftists

24  and Antifa and beyond.

25          When I said we're entering a realm of political

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   violence, this is what I am referring to.  Did I fear something

2   like that was going to occur at Charlottesville?  Absolutely.

3   Now, I did not myself carry a shield.  I did not carry a flag.

4   I did not carry anything resembling a weapon outside of a

5   pocket knife.  But I understand why many who attended desired

6   to do so.  I understand why many who attended thought, if we do

7   this thing, if we speak our mind, if we stand up for our

8   beliefs, they're going to come after us.

9        By June of 2017, Discord had become a very popular

10  discussion platform.  It was very popular on the alt-right and

11  other places as well.  It became a kind of central hub for

12  Unite the Right.  It was the communication vehicle for

13  prospective attendees, and organizers used it for logistical

14  concerns.  There was, in fact, a leadership channel on this

15  Discord server, as you will learn, with Mr. Kessler designated

16  as events coordinator.

17       This was it.  This was the central hub.  I did not

18  participate whatsoever in the Charlottesville 2.0 Discord

19  server, nor was I invited to.  I wasn't invited to the

20  leadership channels.  I wasn't invited to any channels.  This

21  is made manifest by the Discord archive, which you will see.

22       I was absent during every designated leadership phone

23  call on Discord and planning sessions for both the torchlight

24  march on Friday and for the aborted Saturday rally.  My role in

25  this event was, at least in terms of logistics, entirely

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   dispensable.  I was invited to speak.  I brought my fame or

2   infamy, depending on your perspective.  I certainly made sure

3   this event would be talked about in the *New York Times*, but I

4   played no role whatsoever in logistical planning of the rally

5   or any type of conspiracy to deny civil rights that potentially

6   might have occurred.

7           And so what we see with the plaintiffs' case against

8   me is an effort at lowering the bar.  This doesn't have

9   anything to do with any criminal accusations or arrest, as we

10  already discussed.  You can lower the bar.  They will not show

11  you anything that could plausibly be interpreted as a directive

12  or order for violence or unlawful acts.  Let's lower the bar.

13          Was Richard Spencer involved in logistical planning

14  of this event?  Did he originate Unite the Right?  No.  Let's

15  lower the bar.

16          Did he intend to speak and in some ways inspire

17  outrage?  Well, there we go.  My attendance, my intention to

18  speak boldly, this is implied -- it is implied that this led to

19  chaos, that I am somehow liable for injury and suffering by my

20  mere presence at the event.  Apparently through osmosis or

21  something my ideas were going to get out there and harm people.

22          That is not fair.  That is not an accurate

23  application of the law.  And to be honest, on some level that

24  is simply not serious.

25          This case -- and I agree with Mr. Kolenich on this --

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   really is about speech.  It's about shutting down the most

2   awful speech you could possibly imagine -- and I'm sure there

3   will be plenty of examples of that.  It's also an attempt to

4   silence more idealistic and articulate speech, not just me at

5   my worst moments but me at my best moments, when I sincerely

6   talk to the world about what I believe in.  This is an attempt

7   to use both of those things in order to claim that I am somehow

8   liable for injuries that I had nothing to do with.

9        The Supreme Court has been very clear about where

10  that type of thinking -- that is the logic that lies at the

11  heart of the plaintiffs' case -- leads.  Justice Anthony

12  Kennedy said -- and he said this about speech that was

13  absolutely awful, in this case directed towards Asian

14  Americans -- "A law that can be directed against speech found

15  offensive to some portion of the public can be turned against

16  minority and dissenting views to the detriment of all.  The

17  First Amendment does not entrust that power to the government's

18  benevolence.  Instead, our reliance must be on the substantial

19  safeguards of a free and open discussion in a democratic

20  society."

21        Members of the jury, you are those safeguards.  This

22  kind of logic can be used in all sorts of ways.  It might very

23  well right now be used against people you don't like and you

24  wouldn't like to associate with.  You might like to tell us to

25  shut up, which is of course your right.  That same logic can be

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   applied to all sorts of speech that is unpopular.  Over the

2   summer of 2020, many people sincerely took part in BLM -- Black

3   Lives Matter, that is -- protests.  Many of those eventuated in

4   vandalism, looting, violence, you'd probably call some of those

5   things riots.

6           THE COURT:  Mr. Spencer, I'm going to have to ask you

7   to try to stick to the facts of this case and not argue the

8   case at this point.  You can argue at the summation.

9           MR. SPENCER:  Okay.  Skip ahead.

10          The poet Robert Burns said that the best laid plans

11  of mice and men often go awry.  When I look back on

12  Charlottesville, I feel absolutely that my best laid plans went

13  awry.  I wanted to go and speak.  I view Charlottesville,

14  though it might be a kind of moral victory, as I said, in the

15  sense that we fought back in an extremely difficult situation,

16  I do view it as a kind of disaster and learning experience.

17          In a recorded rant that I engaged in that was played

18  to you that occurred after the event, I was in a state of

19  absolute frustration.  And I said things that are shameful and

20  embarrassing, and that I might never really live down.  Those

21  are indicative of a man who felt that everything had gone awry

22  that day.  Our plans for a rally, our plans to speak had been

23  spoiled.  And we were left with chaos and violence and just a

24  bad feeling all around.

25          The plaintiffs claim that that was the whole purpose

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   of the rally, that all of my plans had actually been fulfilled.

2   That was a great success.  It absolutely wasn't.  And my state

3   of mind of extreme frustration at that moment evinces a man who

4   felt that everything had gone wrong.  The conspiracy to host a

5   controversial rally had been destroyed and I was immensely

6   angry and frustrated.  That doesn't sound at all like a person

7   who planned for any of these things to take place.

8          Now, I'm going to talk briefly about the decision

9   that you need to make, and then I'm going to talk -- I'll

10  finish my remarks with the big picture.

11         I am here acting on my own behalf.  I represent

12  myself.  I remain agnostic about my co-defendants and their

13  status.  You are tasked with something quite difficult, or you

14  might be; and that is to separate the defendants.  Now, the

15  plaintiffs have tried to tie us all together in a kind of

16  string board of a conspiracy.  As Judge Moon has said, you

17  might need to make fine distinctions.  Deciding for the

18  plaintiffs on one matter need not imply that you decide for the

19  plaintiffs vis-à-vis me, and vice versa.  You have to look at

20  my situation as it is and make a decision:  Was there a

21  conspiracy, a malign conspiracy to deny civil rights at all?

22  If you decide there was, was Spencer a part of it?  Could he

23  have possibly been a part of it?

24         I will show you one matter -- this will of course be

25  introduced later.  The plaintiffs in a way want to have it both

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   ways.  They want to take things literally and figuratively.

2   When someone says something very harsh, they want you to take

3   that in the worst possible way possible.  In Kessler's words,

4   an army for free speech.  That must have been a real army to

5   attack people.  When someone says something jokingly or in a

6   kind of sophomoric or teenage fashion, well, we need to take --

7   that's just a code for something else.  That's all figurative.

8           This is what I tweeted, again, at the height of my

9   notoriety in August 2017 at 12:38, I believe p.m.  This is

10  while I saw Charlottesville descend into chaos.  This is before

11  the accident with the car and James Fields that led to death

12  and many of the injuries of the plaintiffs.  I tweeted this

13  out.  This was seen by 70,000 followers.  I have no doubt that

14  it was seen by thousands more.  "My recommendation:  Disperse.

15  Get out of Charlottesville city limits.  State of emergency has

16  been called."

17          Now, I guess the plaintiffs could call that plausible

18  deniability.  I don't know how that possibly makes sense.  I

19  was not in any kind of direct communication with James Fields

20  whatsoever or countless other people who engaged in violence.

21  I had no way to tell them, ah, this is all a sham.  No.  I was

22  saying what I meant and I meant what I said.  Charlottesville

23  went wrong.  The authorities had declared a state of emergency.

24  It is time to get out of Dodge.  That is the only context in

25  which a tweet like that makes sense.  Why would I do that

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   otherwise?  Why would I try to prevent more chaos and violence

2   and injury?  Why would I do that if I were part of this malign

3   conspiracy against the plaintiffs?  Why?

4            The fact is, I was not.  I was disturbed by the chaos

5   that I saw unfold.  I did not want anything like what happened

6   to have occurred, and I have been disturbed by it ever since.

7            Now, let me say one thing in closing on the big

8   picture.  Yes, this is about Sections 1985 and 1986, but I

9   think it's actually about something much bigger.  It's about

10  justice itself.  Justice, that word, we use it every day, but

11  we don't dwell on it enough and think about it seriously

12  enough.

13           For the purpose of this exploration, I'm going to

14  talk about two concepts of justice.  The first one we could

15  call rational or constitutional justice.  That is the fair and

16  reasoned application of a law, a clearly expressed law, in a

17  place where it is appropriate.  That is all of your challenge.

18  That's why you're here.  That is what this process is about.

19           But there's another kind of justice.  And I'm afraid

20  that type of justice is, in fact, much bolder than this

21  rational justice I just mentioned.  And I'm afraid that it has

22  a much stronger hold on us as human beings.  It is all too --

23           THE COURT:  Mr. Spencer, I hate to interrupt you, but

24  you're arguing again.  You'll have an opportunity --

25           MR. SPENCER:  This is a big-picture --

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

 1          THE COURT:  I know it's a big-picture thing, but this

 2   is a case between these plaintiffs and these defendants.  And

 3   the plaintiffs -- we're not sending a message here.  The

 4   question is:  Do the plaintiffs prove what they must prove to

 5   hold the defendants liable.  And I want the jury to understand

 6   they're not here except to make that decision.  And that's --

 7   the evidence and the law is what should control the decision,

 8   not the bigger picture.

 9          MR. SPENCER:  I agree with you.  What I'm trying to

10   warn them is about not doing that.  Could I finish that?

11          THE COURT:  I'll warn them about that.  You tell them

12   about your defense and that's what you're entitled to do, the

13   evidence you're going to put on in your defense.  And you can

14   argue at the end of the case.

15          MR. SPENCER:  Okay.  That's fair enough.

16          Over the course of this trial you will see evidence

17   of how I was invited to participate in the Charlottesville

18   rally, how I was excited about this prospect that had gained

19   so -- generated so much excitement in the alt-right movement.

20   It was clearly going to be something big.  You will not see

21   anything approaching a directive towards violence or the denial

22   of civil rights.  You might, I'm sure, if the plaintiffs do

23   their job, see me at my worst moments, see me painted in such a

24   fashion you might very well dislike me intensely.  But you will

25   not see anything resembling evidence that justifies the

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   application of Sections 1985 and 1986.

2          I would urge you to resist any impulse to make this

3   about anything other than the law, to make this about

4   scapegoating or purging bad feelings.  I would urge you to make

5   this about whether a directed, coordinated conspiracy actually

6   existed.  Thank you very much.

7          THE COURT:  All right.  Thank you, Mr. Spencer.

8          Members of the jury, I don't like to interrupt the

9   lawyers during their statement, but I will remind everyone I

10  made rulings.  I'm going to ask everyone to adhere to the

11  rulings I made.

12         There was mention that -- you may have a seat.

13         There was mention that no one was arrested, or that

14  Mr. Spencer was not arrested, or anyone else.  That's totally,

15  totally irrelevant.  Whether persons are arrested or not has

16  nothing to do with the civil case.  Even if a person is brought

17  into court in a criminal case and convicted, that doesn't

18  necessarily decide the civil case.  It's an entirely different

19  matter.

20         And I'd ask you to focus on what I will tell you the

21  plaintiffs have to prove in order for the defendants to be held

22  liable.  And that's what you should be focusing on during the

23  case.

24         I'm told we need to take a break.

25         Take about 15 minutes.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  **(Jury out, 2:26 p.m.)**

2              (Recess.)

3              THE COURT:  One of the jurors handed the marshal a

4  note that said:  "Do we have to make a judgment for or against

5  each defendant individually?"

6              I think all of you have covered that.  I guess I

7  could say so -- say it again.  I'll give the note to the clerk.

8  It was Juror 275.

9              MS. DUNN:  Your Honor, our concern is that it might

10 be somewhat suggestive if you say that after this opening

11 statement, and maybe Your Honor could fold it into some more

12 general instructions later.

13             THE COURT:  I'll wait until the end.  I think I told

14 them in the voir dire and it came up in the opening statement.

15 Mr. Kolenich mentioned it in his statement.  But I'll wait

16 until the closing.

17             MS. DUNN:  Thank you.

18             THE COURT:  I'll wait until we're finished with the

19 opening statements.

20             All right.  Who's next?

21             Mr. Smith, are you next?

22             MR. SMITH:  I think it's actually Mr. Cantwell.

23             MR. CANTWELL:  It's me, Judge.  Mr. Cantwell.

24             THE COURT:  Oh.  Mr. Cantwell.

25             Well, remain until the jury -- call the jury.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   **(Jury in, 2:45 p.m.)**

2          THE COURT:  Have a seat, please.

3          All right.  Mr. Cantwell?

4          MR. CANTWELL:  Thank you, Judge.

5          Check, check.  Can everybody hear me okay?

6          Ladies and gentlemen, thank you all so much for being

7   here.

8          I'm not used to this stuff, and I was really nervous

9   about the jury selection thing, but I think that this went

10  pretty well.  I'm reasonably happy with the outcome.  I think

11  you all are reasonably smart people, or better, and I think

12  before we're done here you're going to realize that I'm not

13  just blowing smoke at yous.

14         The plaintiffs are going to tell you that we're a

15  bunch of mean racists who take some perverse joy in harming

16  people because we believe that, deep down, our political goals

17  will be served by chaos and violence.  Now, if any of you have

18  ever had the intellectual curiosity to read *Mein Kampf*, or if

19  there's a conservative who is well enough informed to know the

20  difference between Marxism and National Socialism, you already

21  know that this is Mother Jones-level ideological nonsense.

22         We're talking about right-wingers here.  This is the

23  Unite the Right rally.  Mainstream Republicans may wish to

24  distance themselves from us on the subject of race, due in part

25  to meritless lawsuits like the one here.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1          But make no mistake about it:  This was a right-wing

2     event.

3          Right-wing ideology is characterized by a desire for

4     order, tradition, stability, and rules.  The use of force is

5     prohibited in all but defense of person and property and by

6     duly authorized agents of the government to enforce the law.

7     And if you've ever been involved in a violent, chaotic

8     situation before, then you understand that there is no paradox

9     in saying that these rules, the coercive powers of the state,

10    are in place to preserve our freedom.  I call this the ordered

11    liberty which is characteristic of Western civilization.  The

12    plaintiffs call it white supremacy.  And the difference between

13    me and your favorite respectable Republican is that I will

14    defend that way of life by any name.  I won't run away from it

15    just because some lunatic calls it racist and threatens to hit

16    me, which is exactly what happened at the Unite the Right rally

17    in August of 2017.

18         How does one go about uniting the right, if you

19    bother to think about that for a minute?  When we hear from the

20    plaintiffs' experts, they're going to tell us that the very

21    name of the event, "Unite the Right," was about white

22    supremacy.  But if any of you have ever casted a vote for a

23    Republican, you know that that's complete nonsense.  Do you

24    unite the right through violent crime?  No.  And anyone who

25    says otherwise is insulting your intelligence.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1        What is the principal divide on the ideological

2   right?  From our view, it's race.

3        There are people, some of them quite well-meaning,

4   who continue to take literally the demonstrably false idea that

5   all men are created equal.  Now, don't get me wrong.  That's a

6   fine legal concept, that we treat all of our citizens fairly

7   and according to the same set of rules.  But if all men were

8   literally created equal, the world would be an exceedingly dull

9   place.  Sure, there would be no Down's syndrome, there would be

10  no retardation, there would be no birth defects or racial

11  differences, if all men were literally created equal.  But then

12  we would lose that which the ideological left claims is our

13  greatest strength:  Diversity.  We wouldn't have it.  There

14  wouldn't be any such thing.  If we were all born the same, then

15  we truly would be the interchangeable machine parts they try to

16  make of us with their collectivist programs.  But the reason

17  these ideas always result in mass murder is because they are

18  contrary to the nature of the human organism.

19        We don't want to hurt people because they are

20  different from us.  A man is not equal to himself from one day

21  to the next.  "I am not equal to my co-defendants," you'll keep

22  hearing all of us say.  I am not looking for uniformity; just

23  order, stability, and a government which organizes policy in

24  tune with the nature of our existence.  Give me this and I will

25  live in peace with my neighbors, as I expect that all of you

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   likewise desire.

2           But if the people who want to insult me over my

3   political views call themselves a racial interest group, that

4   doesn't give license for them to break the law.  It doesn't

5   make their racial group better than mine.  And it doesn't

6   entitle them to relief from the laws at work in this case.

7           Black Lives Matter is an -- openly Marxist and openly

8   violent.  They can't hide behind race in this court.

9           I don't know my co-defendants well enough to speak

10  for them, but that's a fine summary of how I see things.  And

11  since what I'm talking about in terms of biological reality

12  cannot be changed through ideology, it is my idea that, to

13  unite the right, Republicans need to stop fearing the

14  accusation of racism.

15          A very wise man once told me that to solve the

16  problems in the black community, it's going to, quote, "require

17  that white people grow some backbone and courage and stop

18  fearing being called a racist."  His name was Walter E.

19  Williams, and you'll hear that name again before we're done.

20  That's how you unite the right, not with violent crime.

21          Violent crime unites the left.  That's why leftists

22  say things like ACAB.  "All cops are bastards" is what that

23  acronym stands for.  At the one-year anniversary of the Unite

24  the Right rally, on August 12, 2018, their celebration over the

25  victory -- their victory over truth, leftists marched with a

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    sign that said:  "Last year they came with torches.  This year

2    they come with badges."  They were comparing us to the police.

3    And before we arrived in Charlottesville in August of 2017,

4    they chanted:  "Cops and Klan go hand in hand," equating the

5    KKK with their local police department, because to them, we're

6    just like the cops.  And on that point I hope you agree with

7    them.  And there's going to be a lot of evidence to that effect

8    in this case.

9          The left-wing lexicon is a fascinating subject.  When

10   Blee and Simi, their experts on the white supremacist movement,

11   use the terms "doublespeak" and "strategies of deniability,"

12   remember Plaintiff Wispelwey's favorite catchphrase:

13   "Diversity of tactics."

14         "Diversity of tactics."  That's a key phrase I really

15   want all of you to remember throughout the course of this

16   trial.

17         You see, there are peaceful tactics and then there

18   are violent tactics, and then there are diverse tactics, which,

19   like all diversity, is the left's greatest strength.  The

20   diversity of tactics makes this lawsuit possible, because

21   right-wing rallies only turn violent when leftists attack the

22   right-wing ralliers.  But courts don't help confessed rioters.

23   You need somebody like Reverend Wispelwey to play the

24   sympathetic victim.  He says, "Oh, I'm the peaceful religious

25   figure illegally blocking a public roadway with my friends in

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   the revolutionary Communist Party.  If you hit me, you're

2   mean."

3           And then, as Reverend Wispelwey told Slate magazine,

4   "battalions of Antifa" show up with, quote, "community defense

5   tools."  That's what Plaintiff Wispelwey told Slate magazine in

6   an interview after these events.

7           So see how this works?  "Diversity of tactics" is a

8   left-wing euphemism for political violence which is given cover

9   by ostensibly nonviolent co-conspirators.

10           If you watched the news in the end of 2020, you heard

11   about another one of those words:  "Mostly peaceful protests."

12           The only time that you heard plaintiffs' counsel

13   mention Antifa in the course of their entire opening statement

14   was to deny any attachment to it.  And before we're done here,

15   you're going to know that that was a lie, and that should

16   really upset you.

17           News flash:  That's not how peaceful protest works.

18   If you tolerate the violence of your demonstration, it's a

19   riot.  That's how it works.

20           This famous image came out last year of Jim Acosta in

21   front of a burning building with the lower third of the scene

22   said "Fiery but mostly peaceful protest."  A lot of you saw

23   that.  No.  That's called arson.  And it's illegal.

24           Another left-wing euphemism --

25           THE COURT:  Mr. Cantwell, I hate to interrupt you,

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   but an opening statement is basically to tell the jury about

2   your defense, and not to make, you know, a speech about --

3              MR. CANTWELL:  The "diversity of tactics" line is a

4   phrase from Plaintiff Wispelwey, which I expect him to testify

5   to --

6              THE COURT:  You can tell them what you're going to

7   tell them about your beliefs --

8              MR. CANTWELL:  I expect --

9              THE COURT:  -- and what you can prove about someone

10  else --

11             MR. CANTWELL:  I expect Plaintiff Wispelwey --

12             THE COURT:  -- other plaintiffs.  All right?

13             MR. CANTWELL:  That's all right.

14             THE COURT:  Thank you, sir.

15             MR. CANTWELL:  When Mr. Wispelwey takes the stand, I

16  intend to ask him about a term called "community defense."

17  Now, that sounds nice, doesn't it, folks?  Almost borders on

18  Republican sloganeering.  Defense, community?  Where do me and

19  Ted Cruz sign up?  But remember what Reverend Wispelwey told

20  Slate:  Antifa had community defense tools, as in weapons.  And

21  community defense is something very different from

22  self-defense, otherwise they would just call it self-defense.

23  Community defense is the use of physical violence in advance of

24  what advocates say are undesirable political outcomes.  If

25  these people speak, they will gain power.  They will use it in

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    ways I disagree with.  So I will defend my community by using

2    violence to prevent them from speaking.  That's what community

3    defense is.

4          And you're going to hear Mr. Simi and/or Ms. Blee

5    testify that we use double-speak.  That's hypocrisy.

6          Let me move on to something that's probably already

7    painfully obvious.  I'm not a lawyer.  But contrary to the

8    popular cliche, neither do I have a fool for a client.  There's

9    no such thing as a public defender in civil court, and I'm

10   poor.  So I'm the best attorney that I can afford.  And I

11   didn't even stay at a Holiday Inn Express last night.  As a

12   matter of fact, I'm going to let you in on a little secret.  I

13   don't have to tell you this because it's actually not really

14   relevant to the details of this case.  But last night I stayed

15   at the Central Virginia Regional Jail.  And when this case is

16   over, I'm going back to a federal prison, win, lose or draw.

17   I'm a fairly recently convicted felon because my mouth gets me

18   into trouble a lot.  And last year I was convicted of

19   threatening a Nazi on the Internet because he wouldn't leave me

20   alone and he threatened the woman I wanted to marry.

21         I didn't have to tell you that, but there's like 100

22   different ways you might find out, and I don't want to step on

23   a landmine before we're done here and you think I was trying to

24   snow you.

25         I'm sorry.  Sometimes it's going to look like I don't

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   know what's going on, because I don't.  One of the ways I could

2   have stepped on that landmine is by coming out about some of

3   the difficulties I've had trouble preparing for this trial.  So

4   I'm going to ask you to bear with me while I find my way

5   through this thing.  And since I don't figure any of you are in

6   the habit of being jurors, I think that we're kind of in this

7   thing together.  And if I'm lucky, you're going to feel that

8   way too by the time we're done.

9          Here's one thing I do know:  I did not conspire to

10  commit racially motivated violence in August of 2017 or any

11  other time, and I didn't conspire to do any of this other crap,

12  either.  There's a few guys who were convicted of conspiracy to

13  riot.  And you'll notice before we're done here that those guys

14  are conspicuously absent from the courtroom.  I think only one

15  of them have been deposed, and in the testimony you're going to

16  see from him, the plaintiffs don't even ask the guy about our

17  relationship because they knew before they asked him that there

18  wasn't one.

19         I didn't invite those guys.  I don't think I ever met

20  those guys.  And let me tell you:  That makes it hard to

21  conspire.

22         There's a bunch of other people who should be in

23  prison for this thing.  We'll usually refer to them as Antifa,

24  Communists, Reds, that kind of thing.  You may recall, as I

25  said, the only time they mentioned this was to deny any

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   involvement with them.  And you're going to know that that's a

2   lie before we're done.

3            I really, really, really don't like these people.

4   And I'm toning it down right now because we're in polite

5   company.  I told you before that my mouth gets me in trouble.

6   And before we're done here, you're going to see how that might

7   turn out to be the case.  The plaintiffs are going to go

8   through every nasty thing I've said for the last decade and

9   that's why this thing is going to take a month.  There's really

10  just that much of it.

11           And that's partly because I'm a professional

12  entertainer.  It's what I do for a living.  I'm a very talented

13  and dare I say good-looking host and producer of a live,

14  uncensored, open phones talk show called the Radical Agenda.  I

15  made a brief attempt at standup comedy a few years back, I

16  started doing the YouTube thing, and then I was invited to be

17  the cohost of a nationally syndicated broadcast talk radio show

18  called Free Talk Live, which was nationally syndicated on over

19  160 FCC-regulated stations across this country.

20           Then my mouth got me in trouble.  Some left-wing

21  activist on Twitter, who happened to be black, tweeted at me

22  with some identity politics nonsense about feminism, like that

23  was going to intimidate me.  And to make the point that this

24  was not going to work on your humble correspondent, I gave him

25  a three-word answer.  And that answer was "shut up, nigger."

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  That's what I said to him.

2          And there's a lot more to it.  There always is.  And

3  we don't need to get into the weeds on this.  But depending on

4  how you calculate, you might say that that began the journey

5  that caused you and I to meet.  I got banned from Twitter.  I

6  got fired from the radio.  It made the news, and the publicity

7  got a lot of new people to check out my uncensored,

8  Internet-only entertainment product called the Radical Agenda.

9          On August 11 of 2017 this was how I made 100 percent

10  of my income.  I'm very good at my job, in part because I don't

11  care who I upset as long as I entertain my audience.  Though

12  largely based on true stories, the show is marketed as fiction

13  because it prioritizes entertainment value and shock value in

14  particular over accuracy.  That is a calculated business

15  decision, as well as a matter of artistic integrity.

16          And to this you might say isn't it a contradiction of

17  terms to prioritize integrity over accuracy?  And to this I

18  would respond absolutely not.  Not in art.  That's not how art

19  works and I am an artist.  In art, anything is possible.

20  Things like common sense extremism, which is the tag line, the

21  catch phrase of my product, the Radical Agenda.  Of course

22  "extreme" and "common" are contradictory terms.  It's either

23  or, a binary choice, it's like male or female.  It's impossible

24  to be both common and extreme.

25          So when I start the show and I say it's a show about

                    Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   common sense extremism where we talk about radical, crazy,

2   off-the-wall things like yada, yada, yada, that's me having

3   enough faith in you, the listener, to know that this is a gag.

4           I'm pretty sure the plaintiffs are going to play for

5   you a clip where I added sort of a disclaimer to the show intro

6   where I say specifically that, quote, "The listener is hereby

7   warned to interpret as fiction anything" --

8           (Reporter clarification.)

9           MR. CANTWELL:  That's my radio voice and it doesn't

10  work for the reporter.  I apologize, ma'am.

11          The quote was, "The listener is hereby warned to

12  interpret as fiction anything they are not able to verify in a

13  more reliable fashion."  That's the quote.

14          Ma'am, if I -- if I do that again and I just repeat

15  it slowly afterwards, would that work for you?  Because I kind

16  of want to get the idea across:  There's a theatrical component

17  to it.  I don't think I have a whole lot more of that anyway.

18          I made that decision right after this lunatic Bernie

19  Sanders supporter named James Hodgkinson tried to gun down the

20  Republican Freedom Caucus in Alexandria, Virginia.  Some of you

21  might remember that story.  It was right before the events at

22  the heart of this dispute.

23          That thing really bothered me for a number of

24  reasons, not the least of which, it was sort of a crescendo to

25  a lot of the political violence that was going on at the time.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   And as I said, it was in close temporal proximity to what we're

2   doing here.

3          I went to Charlottesville, Virginia in August of 2017

4   with that terrible event fresh in my mind.  The plaintiffs want

5   you to think that I added that disclaimer to my show because I

6   was planning to commit a crime, and this was my way of covering

7   it up or some kind of nonsense like that.  But before we're

8   done here, you're going to know that I'm not an idiot, and

9   since you're not either, I don't think you're going to buy it.

10          I'm going to do my best to make this fun for

11   everybody here.  If I can make plaintiffs' counsel laugh at

12   jokes they shouldn't be laughing at, like it's involuntary, I'm

13   going to consider myself very proud of myself.  But of course

14   here for our side anyway, accuracy matters more than

15   entertainment in this courtroom.  But then again, you've

16   probably noticed that most comedy, most art, most

17   entertainment, even the purest fantasy productions feature

18   monsters, wizards and ghosts, have enough truth in them to make

19   them real to us.

20          It's not a chore to suspend disbelief because we can

21   relate, whether it's a boy seeking a girl's affection, conflict

22   over scarce resources, or civilizational scale warfare, all of

23   our entertainment products -- books, movies, TV -- all involve

24   a plotline, a plotline with a conflict, a conflict which

25   appeals to our deepest Darwinian survival and reproduction

                    127

          Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   instincts.  And that is what the Radical Agenda is.

2          If you were paying any attention at all to what was

3   happening between 2014 and 2017, it should come as no surprise

4   at all to you that entertainment products emerged which

5   challenged and capitalized on the prevailing left-wing

6   narratives about race in America.  I am the host and producer

7   of one of the most commercially successful such products ever

8   created.  And that is why I'm being sued instead of the

9   hundreds of nobodies who came and risked their lives to see me

10  say something in public.

11         I'm not going to ask you for anything that I wouldn't

12  ask you to give a pornographer or a gangster rapper.  You don't

13  have to agree with me or like my artwork.  The truth is, you

14  don't even need to believe I'm particularly trustworthy,

15  although I'd like to think I am, and obviously that would be

16  ideal.  All you need to do is pay attention to the evidence in

17  this courtroom and do what Judge Moon tells you to do, and I'm

18  going to win this thing, no context.  It's not even going to be

19  close.

20         I am accused of participating in a racially motivated

21  violent criminal conspiracy, not hate speech, which for the

22  time being is still perfectly legal in the United States.  And

23  whatever they tell you, they would very much like that to

24  change.  I told you I was glad you were smart because I need

25  you to be.  The plaintiffs are going to try to trick you.  They

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    will show you racism and they will show you violence and they

2    will say, aha, gotcha, Nazi, racially motivated violence.

3         But smart jurors are going to notice a couple of

4    things conspicuously absent from that equation, most notably a

5    link between the racism and the violence.  A lot of these

6    plaintiffs look as white as me, and for the non-white

7    plaintiffs, with the exception of Mr. Fields's guilty plea,

8    you'll find no connection between the violence and the racism.

9    And I don't think that Mr. Fields's guilty plea is very

10   credible, actually, personally.

11        The other big glaring hole in this story is the

12   conspiracy.  If I show up in Charlottesville to say Nazi things

13   and some nutcase decides to commit a hate crime, I'm not

14   legally responsible for that, unless I enter into an agreement

15   with a co-conspirator to make this happen.

16        But there's not just holes in the story, there's also

17   a giant elephant in the room.  The plaintiffs are like racism,

18   violence, pay no attention to the armed communists who started

19   the fight or you're a racist too.  You might have noticed

20   weapons and protective gear and communist symbols in some of

21   the plaintiffs' opening exhibits.  So not only am I lucky that

22   you're smart, I'm also exceedingly fortunate that you're not a

23   bunch of sniveling cowards who would betray your civic duty to

24   avoid being called a racist.

25        Come to think of it, I'm also probably pretty

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  fortunate that you're not a bunch of closet racists, because

2  this way you don't need to hide your true views by throwing me

3  under the bus.

4          No matter how the plaintiffs or their parade of

5  partisan Democrat swindlers tries to frame it, this case is

6  about hate speech.  The plaintiffs are going to try to shoehorn

7  size 12 hate speech allegations into size 5 conspiracy heels.

8  They have to do this because the Constitution of the United

9  States gives them no other way to punish the people whose

10 speech they want outlawed.

11         They tell you they believe in freedom of speech.

12 You're going to know that's not true before we're done here.

13 And it should piss you off that they lied.

14         They've hired some very well-paid people to

15 complicate things, but at base, like I said before, this is

16 pretty simple.  Here's racism, here's violence.  Blame the

17 racists for the violence and give us lots of money from this

18 guy who can't afford a lawyer.  That's a trick and you

19 shouldn't fall for it.

20         Beyond the fact that you're smart, I don't think

21 you're going to fall for this because there's actually a lot of

22 evidence to the contrary, it turns out.  You see, I'm smart

23 too.  I don't think you're going to fall for this.  I'm sorry.

24 I knew there was going to be Antifa there.  And while most of

25 America only heard about them in 2020, me and my associates

                    Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  have known about them for many years.  They hunt us like

2  animals, and they are violent and they are dishonest.

3          So when I came to Charlottesville, I wore a body

4  camera.  You might have noticed it when the plaintiffs showed a

5  picture of me wearing the Radical Agenda T-shirt.  You might

6  have seen it clipped to my collar.  You're going to see at

7  least two videos from that during this trial.

8          Let's start with the obvious:  Why does the guy who

9  traveled across state lines to commit the crime wear a body

10  camera?  Why do his co-conspirators let him do something so

11  reckless?

12          Conspiracy, the judge told you, involves an unlawful

13  purpose.  The plaintiffs tell you that we came here planning to

14  get away with this.  Why am I recording video of the whole

15  thing?  I'm not a cop.  This wasn't a secret.  The plaintiffs

16  didn't have to drag this evidence out of me.  It wasn't found

17  in a search warrant.  I wore the body camera and recorded

18  because I was afraid that somebody might try to hurt me, and

19  I'd have to defend myself, and I wanted to make sure that

20  nobody had to take my word for what happened.

21          Again, I don't expect you to trust me.  That's the

22  whole entire point here.  I'd certainly prefer to earn your

23  trust, but one of the things you're probably going to hear me

24  say in several different interviews that gets played here,

25  because I say it all the time, is that I knew long before I

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   showed up in Virginia that I'm going to be a profoundly

2   unsympathetic defendant in a courtroom if I get charged with a

3   crime.

4          So I brought the body camera to protect myself.  And

5   as you're going to see before we're done here, it's a very

6   fortunate thing that I did.  It's also a good thing I saved the

7   videos before I went to University of Virginia on August 11th,

8   because the plaintiffs' co-conspirator, Lindsey Elizabeth

9   Morris, an Antifa criminal from Philadelphia, stole it from me.

10  And I should be able to show you two different angles of that

11  theft, from other cameras that picked it up.  More on that

12  later.

13         The first body camera video takes place in the

14  Walmart parking lot in Charlottesville on August 11, 2017 at

15  something we called the Radical Agenda listeners meet-up.  This

16  was the only event of the weekend that I could accurately be

17  described as having organized, and despite the best efforts of

18  Antifa, there was no violence at that event.

19         One of the ways I used to make money on the Radical

20  Agenda -- there's a premium content subscription service called

21  a paywall.  For a monthly fee, users gained access to

22  members-only, exclusive bonus content.  Since I was afraid of

23  Antifa, but I wanted to meet my listeners before the event, I

24  disabled news silence on the website and announced the meet-up

25  details behind that paywall so that only existing paying

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    customers could see it.  You couldn't find out I was going to

2    do it and then quick pay the ten bucks, okay?  Which tells you

3    something in and of itself:  I'm trying to avoid the people who

4    say I'm conspiring to attack them.

5         You're going to see a lot of that nonsense in this

6    case, and it's obviously ridiculous.  The plaintiffs told you

7    in their opening statement that the torch march of the evening

8    of August 11 was supposed to be a secret.  Okay.  So we had a

9    secret rally that was designed to attack a bunch of innocent

10   students.  Really?  Is that what they want you to believe?  You

11   should be insulted by that.

12        I've got some printouts from my website to show you

13   how that paywall feature works.  It works very well actually.

14   But that didn't stop Mike Longo, Jr. and Paul Minton and some

15   other Antifa criminals from confronting us in the Walmart

16   parking lot.  The logical conclusion is that they were paying

17   me money before this went down so that they could spy on me and

18   my listeners.  Who is conspiring against who here?  Huh?

19        But it gets worse than that.  You're going to see on

20   that video, I pull up to the Walmart, I get out of my car, I

21   wait for my listeners to show up.  They quickly do, we all get

22   to shaking hands.  We're having a fine time.  And then Antifa

23   shows up.  They're all white, as usual, but we know it's them

24   just because they've got that kind of scumbag look to them.

25   You know the type.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1       Now, I was legally carrying a gun at the time, a

2   Glock 19 semi-automatic pistol in my waistband in the small of

3   my back.  I tucked my shirt in behind the holster to let these

4   violent criminals know that violence was not going to be a

5   viable option for them that day, but I did not take it out of

6   the holster, point it or threaten them or any of the other

7   lunatic crap that they ran and told the 9-1-1 operator

8   immediately afterwards.

9       In the video you're going to see the cops show up,

10  and they question us, and they say hey, we got a report of a

11  guy that pulled a gun on someone.  And I say to the cops, hey,

12  I got a body camera right here.  I did nothing of the sort.  So

13  you go ahead, take this.  I'm happy to cooperate with you.  We

14  got nothing to hide.

15      But the cops didn't take my camera because the guy

16  who called in the false report didn't want to take credit for

17  making a false report.  The complainant didn't show up and the

18  police sent us on our way.

19      From there it was on to an interview I had scheduled

20  with a reporter from Vice News Tonight on HBO.  HBO, the

21  company that gave you The Sopranos and Game of Thrones and

22  stuff.  Great entertainment products, let's say.  I expect the

23  plaintiffs to play some choice clips from that slickly edited

24  Emmy Award-winning production from the Home Box Office company.

25  If necessary, I've got the full unedited audio of the two

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    interviews I did with that reporter in two different states

2    because I was concerned that she would take me out of context.

3    So I brought my own pocket audio recorder with me to make a

4    complete unedited recording.

5           So now, remember what I asked you to think about when

6    I told you that I had a body camera.  Ask yourself again:  Why

7    is the guy who is plotting to commit a crime hanging out

8    talking to reporters and creating unedited recordings for his

9    own release on his website?  Why are his co-conspirators going

10   along with all of this fame whoring?  Obviously this is the

11   behavior of an activist and a performance artist, not a

12   criminal conspirator.

13          But wait.  There's more.  Like a Billy Mays

14   commercial.  After the first Vice News interview, my

15   co-defendant Jason Kessler and someone who is conspicuously not

16   a co-defendant, who called himself Kurt Vandal, invited me to a

17   so-called leadership meeting.  You'll have the opportunity to

18   see those messages, I think, but it's just an undisputed fact

19   that I was invited at sort of the last minute.

20          Which brings us to an important point which you've

21   heard some of my co-defendants say, and I should touch on

22   briefly.  I don't really know my co-defendants that well.  As a

23   matter of fact, I noticed -- pardon me, Richard.  I noticed

24   Richard has like a stuffed animal in his bag there, and it

25   occurred to me, I didn't know that Richard had kids.  And if

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   you think that I'm going to enter into a criminal conspiracy,

2   risk going to prison, for a guy I don't even know if he's got

3   kids or not, you're out of your mind.  I wouldn't to that.

4   That's insane.

5            I really don't know my co-defendants.  I knew them

6   even less on August 11, 2017.  I shouldn't speculate too much

7   about what you're going to see regarding that, but you're not

8   going to see the kind of closeness that a conspiracy such as

9   the one alleged by the plaintiffs requires.  There's a lot of

10  "nice to meet you" type stuff going on here.

11           As a matter of fact -- pardon me while I try to piece

12  this all together here.  To the best of my knowledge, I have

13  never met Michael Hill and Michael Tubbs.  The first time I met

14  James Fields, I was in jail, and so was he.  The first time I

15  med Azzmador was at that leadership meeting on August 11.  The

16  first time I met Tom Rousseau was at the same meeting.  I saw

17  Jeff Schoep, or "scoop," whatever his name is, once before

18  C'ville at an event in Pikeville, Kentucky.  I might have

19  shaken his hand.  I don't really know if I did, to tell you the

20  truth.

21           I texted Matt Heimbach in Charlottesville.  "This is

22  Cantwell."  And it was just before -- I forget if it was August

23  11 or what it was.  I think it was August 11.  Because before

24  that day, he wouldn't have recognized my phone number to

25  receive a text from it.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1            The plaintiffs have told you that the majority of

2    planning was on Discord, but you might have noticed for all

3    their talk about me, they didn't show you any of my Discord

4    messages.  That's because they were thoroughly uninteresting.

5    And I only actually joined the Charlottesville 2.0 Discord, I

6    know it was in the month of August.  Let's just say August 1st.

7    It might have been later than that actually.  I was not an

8    administrator of the chat server.  I was not in any of the

9    leadership channels.  I think I posted to it maybe 13 times and

10   I had joined that month.

11           So not to throw the organizers of the event under the

12   bus or anything, but I just wasn't one of them.  It's just a

13   fact of this case.  I didn't conspire to hold a legal event,

14   much less commit a crime.  I was invited to speak by a

15   defendant by the name of Augustus Invictus, who has defaulted

16   on this suit, who isn't here.  So, you know, I don't know what

17   to say about what he did.

18           But I was only invited to the so-called leadership

19   meeting at the last minute after the location had changed.

20   Now, leaders make decisions like this, about changing the

21   location of the meeting.  They don't get informed of the

22   meeting's existence after the other guys' plan goes to pot.

23   But I did go to the so-called leadership meeting.  And the

24   plaintiffs allege that we conspired at that meeting to commit

25   racially motivated violence.  As a matter of fact, they didn't

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   mention that in their opening statement, which was kind of

2   interesting because they mentioned it in their complaint.

3          When I was -- when they served us with this lawsuit,

4   they didn't know I had that body camera video.  Now, I can tell

5   you that I -- spoiler alert:  I have a video of the meeting.  I

6   deny that I conspired to commit racially motivated violence

7   anywhere, much less at this meeting.  So they say there was a

8   racially motivated violent criminal conspiracy hatched at the

9   meeting.  I say there wasn't.  And guess what, there's a video

10  of the whole thing.

11         You will have the chance to judge for yourself who is

12  telling the truth, and more importantly, who is lying to you,

13  based on that video.

14         Now, you might be asking yourself, how did they get

15  this video?  Was it an undercover cop, a snitch, hot mic?  No.

16  It's my body camera tape.  I wasn't surreptitious.  It wasn't

17  accidental.  I was afraid that Antifa might try to hurt us, so

18  I was recording for my own protection.

19         And here we find ourselves facing nearly precisely

20  such a false accusation.  It's a good thing I never expected

21  you to take my word for it because we have an objective record

22  of the entire nearly two-hour meeting so you can judge what

23  happened without trusting anybody.

24         Since the plaintiffs allege a criminal conspiracy,

25  what's most important about this video is what you don't see.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  Same thing for the Walmart parking lot video.  So when it's my

2  turn to go here, if they let me, which I think they're going

3  to, we're going to watch this whole thing from front to back,

4  from beginning to end, because they say it's a violent criminal

5  conspiracy.  Let's see when I get out of my car and when I get

6  back into my car and you tell me when the crime happens.

7        Now, you will hear a couple of racist jokes.  We're

8  sort of notorious for these things.  You'll hear us talking

9  about pepper spray, firearms, armor.  You'll even hear some

10 brief mention of running people down with a vehicle and getting

11 in a gun fight.  But what you won't hear is a conspiracy to

12 commit any crime, much less a violent one.

13       You'll also hear me tell Jason Kessler, quote, "If

14 we're going to do it at all, I want the cops involved," end

15 quote.  You'll hear Jason agree, and Defendant Kline, who has

16 abandoned this litigation, but is on the video, he tells us

17 that the police are indeed on board.  Well, I guess this

18 conspiracy goes pretty deep, huh?  The cops are in on it now?

19       So after a long day of being conspired against but

20 conspiring against nobody, I go back to my hotel room without

21 my co-defendants, and the next time I see them is at the

22 University of Virginia.  I should be kind of careful about what

23 I say here because I don't actually know how much I'm going to

24 be able to get into evidence, but I am sure -- you've already

25 seen it.  They played it in their opening.  You see a picture

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  of me pepper spraying a guy.  And the plaintiffs are going to

2  say aha, gotcha, Nazi.  There's our hate crime.  But if you

3  paid any attention, you might have noticed that the guy I

4  pepper sprayed -- pretty white for a hate crime.  So I'm lucky

5  that you're smart.  Smart jurors ask questions like:  Hey, I

6  thought that guy Chris was all right.  Why did he pepper-spray

7  that guy?  And then you're going to be able to look at the

8  video.  And you're going to be like:  Wait a second.  That guy

9  was fighting before Chris pepper-sprayed him.  Aha.  I knew

10 Chris wouldn't pepper-spray a guy for no reason.

11        And you're going to notice, as I said:  Hey, wait a

12 second.  If this is some kind of racist conspiracy, why isn't

13 Chris pepper-spraying those black guys?  And the simple answer

14 to that is:  They weren't the threat.  They weren't fighting.

15        A fight broke out.  I wasn't happy about it.  I did

16 what I thought I had to do.  All the people fighting turned out

17 to be white.  If the blacks fought, I'd have fought the blacks.

18 I'm an equal opportunity guy.  I had nothing against those

19 white people for being white.

20        Now, you can imagine the body camera video of this

21 was pretty intense.  But, unfortunately, I don't have it.  The

22 camera got stolen during the fighting by Lindsey Elizabeth

23 Moore, who is a Philly Antifa.  You're going to see two

24 different angles of video that this happened.  And then I get

25 pepper-sprayed by the same guy you saw me pepper-spray in the

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  plaintiffs' opening statement.  And then I'm out of the fight

2  and it's basically -- it's basically over.

3       Now, that fight was pretty busy:  A lot of people, a

4  lot of different angles of video, a lot of action.  I'm going

5  to try to show you as much of it as I can.  Some of it is

6  pretty amazing, but I still don't totally get the rules of

7  evidence, so I'm not going to make a bunch of promises right

8  now, in case I can't keep them.

9       I can tell you what you're definitely not going to

10 see.  You're not going to see me pepper-spray a Jewish man

11 named Christopher Goad or a transgender Asian calling himself

12 Emily Gorcenski.

13      The plaintiffs are going to tell you that I pleaded

14 guilty to two counts of misdemeanor assault and battery, one on

15 each of these two names.  And it's true I pleaded guilty to

16 those two charges.  But that does not prove the plaintiffs'

17 claims.  They just told Mr. Spencer it doesn't matter that he

18 wasn't charged.  It doesn't matter that I was.  As a matter of

19 fact, I sued Goad and Gorcenski for malicious prosecution, and

20 to avoid liability for filing a false report, Goad and

21 Gorcenski signed a mutual release of all claims with me, so

22 they are not parties to this suit.  Neither is the guy that I

23 pepper-sprayed, by the way.  They are not parties to this suit.

24 They never were.  I can't sue them and they can't sue me.

25 That's the terms of our agreement.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1        What I actually pleaded guilty to wasn't actually

2    even an attack on either of these individuals.  They changed

3    their stories a few times.  But ultimately, they say that they

4    were affected by my overspraying when I pepper-sprayed the guy

5    you saw in the picture during plaintiffs' opening statements,

6    the guy we talked about before.  An accident, in other words.

7    That's what I pleaded guilty to.

8        Now, I could have gone to trial, but I was facing

9    40 years in prison if convicted.  And I was offered a plea

10   agreement:  Plead guilty to the misdemeanors and go home right

11   now, or go to trial and risk it all.  Ladies and gentlemen, I

12   am no coward.  But I am not stupid, either.  And with all due

13   respect to the process we're in the middle of, I don't trust

14   the system that much.  So if you tell me to choose between a

15   100 percent chance of going home right now with my Second

16   Amendment intact or the possibility, no matter how slim, that I

17   do 40 years in prison, I'm going home.  And anybody that don't

18   like it can kiss my ass.  You'd do it, too.

19       Now, the only reason I'm telling you this is because

20   it's true.  My conviction is not evidence of a racially

21   motivated violent conspiracy, and it wouldn't be even if it was

22   for something I actually did.  So that's August 11th in a

23   nutshell.  Long day, let me tell you.  Hell of a thing.  The

24   main event was scheduled for August 12th.  What a weekend.

25       Now, the thing about August 12th is I actually don't

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  know a whole lot about August 12, because I got pepper-sprayed

2  by Mike Longo, Jr. first thing in the morning, same guy who

3  confronted me at the Wal-Mart parking lot, same guy you'll see

4  in video on August 11th at UVA.  First thing in the morning, I

5  get pepper-sprayed as I'm literally walking to the park.  I'll

6  tell you what:  That kind of cramped my style a little bit.

7  Twice in as many days.

8       So after I got out of that park and my eyesight

9  recovered, I went back to my hotel room and found out about the

10  car wreck the same way most of you did.  Sad thing, let me tell

11  you.  Girl dead.  Bunch of people hurt.  Innocent man spends

12  the rest of his life in prison.  That was not nice.  It's

13  enough to make a man cry, matter of fact.  Made me cry.  The

14  whole thing, not the wreck itself.  The media gave me a

15  nickname.  There's a video of me that became rather famous, of

16  me in tears.  They called me the Crying Nazi.  Literally adding

17  insult to injury.  Fucking vultures.

18       So what I've told you here is what I can prove, at

19  least this much, to you.  I have higher ambitions for this

20  trial.  The easiest thing for me to do is come in here and say

21  I didn't do what they're accusing me of.  There's just no

22  evidence.  I don't have to do anything.  I don't have to go

23  through this spiel.  I don't have to show you what happened.  I

24  can sit in that chair and I can ask people:  Did I hurt you?

25  Did I conspire with you?  And everybody is going to say no,

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  because there's no evidence I conspired with anybody.

2          But what happened that day was important.  And what's

3  happening here is important, too.

4          My website is christophercantwell.net.  When this is

5  over, I hope you all become die-hard fans and together we can

6  try to save the country.  But for now, just try to find -- real

7  hard, try to find the part where I enter into an agreement with

8  a co-conspirator to commit a crime.  These guys are going to

9  waste a month of your life on that goal, and they're going to

10  fail, because it's not true, and they know it's not.  And that

11  should piss you off almost as much as it pisses me off, even if

12  you share their ideological viewpoint.  And I say that with all

13  sincerity, because as much as I don't want our politics going

14  any further left, I genuinely appreciate diversity of opinion

15  and lively debate.

16          Did I -- oh, that mic.  Sorry.

17          A lively debate -- I should skip that paragraph

18  after -- there are changes this country is going through.

19  Anybody who refuses to engage in an honest debate is going to

20  be left out of the conversation.  If you don't want me and my

21  associates ruling this country unopposed, you need to send a

22  very clear message to the violent Communists and the corrupt

23  elites that caused us to meet today.

24          Calling somebody a racist is not an excuse to use

25  violence.  If you want to avoid fascism in America, you'd do

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  well not to censor and disarm your populace.

2          Calling somebody a racist is not an excuse to abuse

3  the legal system.  And it's certainly no excuse to steal a

4  month from decent people like you.

5          Thank you very much for indulging me.  My name is

6  Christopher Cantwell, and I'm looking very much forward to your

7  verdict, unanimous or otherwise.  Thank you.

8          THE COURT:  All right.  Thank you.

9          Mr. Campbell?

10         MR. CAMPBELL:  Thank you, Your Honor.  May it please

11  the Court.

12         Good afternoon, ladies and gentlemen.  My name is

13  Dave Campbell, and I represent James Fields in this lawsuit.

14         I'm not here to defend hate.  I'm not here to defend

15  white supremacy.  I'm here to defend James Fields to the extent

16  that is possible.

17         In that regard, I'm not going to attempt to get you

18  to believe that Mr. Fields did not intentionally drive his

19  vehicle into a crowd of people, as you've seen in the video

20  multiple times, and will see many more times, I'm sure.

21         Similarly, I'm not going to try to make you believe

22  that Mr. Fields did not attend Unite the Right, that he did not

23  march with members of Vanguard America, or that he was not

24  given a shield of that same organization.  At the end of this

25  case, primarily, I will be asking you to be fair.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1          Now, the case against Mr. Fields is significantly

2     different from the co-defendants'.  Primarily, they all will

3     argue and present evidence to say that, yes, they conspired to

4     have the event, but that they did not conspire to commit

5     racially motivated violence.

6          As to Mr. Fields, pursuant to a federal plea

7     agreement he entered into, there is no question that he

8     committed racially motivated violence.  The defense as to

9     Mr. Fields is he didn't conspire.

10         I don't believe, despite a mountain of discovery and

11    a mountain of evidence that will be presented to you over the

12    course of four weeks, or nearly four week, that you will see

13    any communication, any email, any agreement between Mr. Fields

14    and any co-defendant.  In fact, I don't think you will hear

15    from any witness that anyone knew who James Fields was before

16    August 12th of 2017.

17         I ask that you look through the evidence that's

18    presented and see if any co-defendant, any organizer or alleged

19    organizer of Unite the Right, had any direct communications.

20    There's going to be a lot of evidence and -- sorry about that.

21         Can you all hear me okay without the microphone?

22         Again, I don't believe that evidence will be there.

23         So as to Mr. Fields, I believe this case has three

24    parts, okay?

25         The first part is compensatory damages for people

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  that Mr. Fields entered into a federal plea agreement that he

2  did intentionally drive into and strike with his vehicle.  As

3  to that, you will not hear any argument from me.  All of those

4  plaintiffs are entitled to compensatory damages.  Your mere job

5  here, in that regard -- and I don't mean to minimize the job

6  you have by saying "mere" -- but your only job in that regard

7  is to assess a fair amount of damages.  And that's entirely up

8  to you.  There won't be any argument in that regard from me.

9       The second portion of the case as to Mr. Fields is

10  conspiracy.  There, as we briefly discussed, I ask that you

11  keep your eyes on the evidence.  It's your decision.  If you

12  feel the plaintiffs have met their burden and proved a

13  conspiracy between Mr. Fields and anyone else you believe is an

14  organizer of the rally to undertake the acts that he undertook,

15  by all means, find on a conspiracy count for the plaintiffs.

16  If not, we ask that you find for the defense.

17       The third portion as to the case for Mr. Fields is,

18  because we've already discussed you will be finding a

19  compensatory damage amount as to anyone struck by his car,

20  anyone actually injured by his acts, without a doubt, you'll

21  also be asked to award what are called punitive damages to

22  Mr. Fields.  Now, those are beyond compensating people who are

23  injured, medical bills, pain and suffering, loss of wages, that

24  sort of thing.  You'll be asked for -- to award more by way of

25  punitive damages.  And I think you will probably be asked to

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    award that not just as to Mr. Fields, but probably to others.

2              And in that regard, I would simply point out to you

3    that, unlike all of the other co-defendants, you won't hear

4    from Mr. Fields here this week.  Unlike all the other

5    co-defendants, Mr. Fields is in federal prison for life, and

6    actually has 30 life sentences.

7              So to the extent that you are asked to punish

8    Mr. Fields, I simply will submit to you at the end of the case

9    that he's been punished.

10             Thank you for your time.

11             THE COURT:  All right.

12             MR. JONES:  Every one of us in this courtroom has a

13   difficult job to do, from defense attorneys to Judge Moon to

14   plaintiffs' attorneys to the court reporter trying to keep up

15   with everything.  But I think your job is the most difficult

16   because you have to you have to treat each individual party --

17   you have to treat each party individually.

18             There are nine plaintiffs and there are 20

19   defendants.  You have to look at all the evidence in the case

20   and apply it to each individual differently.

21             So what I would like to do is, for the three clients

22   that I'm representing, Michael Hill, Michael Tubbs, and the

23   League of the South, is provide some suggestions for how you

24   can focus your energy over the next couple of weeks.

25             My name is Bryan Jones, by the way.  I practice here

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   in Charlottesville, Virginia.

2           The first thing to consider as you're listening to

3   evidence over the next couple of weeks is:  What do Michael

4   Hill, Michael Tubbs, and the League of the South have to do

5   with James Fields?

6           As you're hearing tweets that Michael Hill posted,

7   text messages or emails -- as you're listening to the evidence

8   today, tomorrow, for the next couple of weeks, ask yourself:

9   What does that have to do with whether Michael Hill, Michael

10  Tubbs, and the League of the South were in a conspiracy with

11  James Fields and whether his car attack was part of that

12  conspiracy?

13          You saw the plaintiffs present their evidence on that

14  point.  It was a photograph of Eli Mosley or Elliott Kline,

15  whatever he goes by.  He was talking on the phone and walked

16  past Mr. Fields.  That's the evidence they have to show there

17  was a conspiracy and Mr. Fields was a part of it and his car

18  attack that was a part of that conspiracy:  Somebody walking

19  past Mr. Fields with a telephone.  That doesn't prove a

20  conspiracy.  That doesn't prove Michael Hill, Michael Tubbs,

21  and the League of the South were part of that conspiracy.  Just

22  because James Fields wore a white shirt and khakis and held a

23  shield doesn't make him part of this conspiracy.

24          The second suggestion I have is the torch march.  As

25  you're hearing evidence about the torch march, ask yourselves:

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  If Michael Hill and Michael Tubbs didn't attend the torch

2  march, did they conspire to commit violence at the torch march?

3          We know they weren't there and we know they didn't

4  conspire to commit violence there because, a few minutes before

5  the torch march, one of the other members of the League of the

6  South sends an email to Michael Hill.  He said:  "Apparently

7  Antifa has found out about the timing, the location of the

8  torch march.  If the League of the South is going to be there,

9  be careful."  This is before the torch march had even occurred.

10 And Michael Hill responded:  "Thanks, but this is not our game.

11 We are sending two observers."

12         Michael Hill lives in Alabama.  He was born in 1951.

13 That makes him 70 years old this year.  He's the oldest by far

14 of any of the defendants.  He's a retired college history

15 professor.  He founded the League of the South in 1994 to

16 promote the ideals of the Confederacy.

17         Around 2017, there was a lot of debate about

18 historical monuments and whether they should remain or whether

19 they should be taken out.  And Michael Hill and the League of

20 the South traveled around the south, held rallies at the sites

21 of these various historical monuments.

22         As a Confederacy-sympathizing organization, of

23 course, they were in favor of keeping the monuments where they

24 were.  That's why they came to Charlottesville.  Michael Hill,

25 Michael Tubbs, and the League were there for August 12th for

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

 1  the rally at Emancipation Park in front of the statue of

 2  General Robert E. Lee.

 3         Michael Hill drove straight from Alabama to

 4  North Carolina to carpool with another member of the League and

 5  drove straight to Madison, Virginia.  They had a campsite

 6  retreat where they stayed the night.  They didn't stop in

 7  Charlottesville.  Didn't attend the torch march.

 8         Michael Tubbs is 61 years old this year.  He's from

 9  Florida.  He joined the League of the South in the year 2000.

10  He drove up from Florida on August 11 and went straight to

11  Madison, Virginia, where the League of the South members were

12  staying that night.  He didn't stop in Charlottesville for the

13  torch march.  They were there for the rally at the Robert E.

14  Lee statue the next day.

15         The League of the South was worried about Antifa,

16  much like the other defendants.  You've heard about the Battle

17  of Berkeley.  You've heard about the clashes between Antifa and

18  the violent -- and other violent protest groups.  So they

19  prepared themselves -- prepared to defend themselves at the

20  rally in Charlottesville.  That's why they used secure

21  communications to try to prevent Antifa from finding out their

22  plans, finding out where they were.

23         So as we're listening to the evidence, remember those

24  two things.  What does that have to do with James Fields and

25  Michael Hill, Michael Tubbs, and the League of the South?  What

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  does that have to do with whether they're responsible for the

2  violence that happened at the torch march that they didn't even

3  attend?

4         The evidence is going to show that, basically, what

5  the plaintiffs have done in this case is thrown out a net into

6  the ocean, one of those commercial shipping nets that drags

7  along the ocean and picks up everything.  They've dumped it

8  right in front of you, and they're trying to tell you it's

9  all -- they're trying to tell you that everything that they've

10 ensnared in their conspiracy theory is good.

11        They're partly correct because they have, of course,

12 James Fields.  They have whoever committed the violence at the

13 torch march.  That's partly correct.  But Michael Hill and

14 Michael Tubbs and the League of the South don't belong there.

15 And at the end of this case, I'm going to ask you to find them

16 not responsible for the plaintiffs' injuries.

17        Thank you.

18        MR. REBROOK:  May it please the Court, Your Honor,

19 ladies and gentlemen of the jury.  Good afternoon.  My name is

20 Eddie ReBrook.  It is my opportunity, honor, and privilege to

21 give you my opening statement.

22        In fact, this will be the last time I ever give an

23 opening statement as a member of a defense team.  We'll both be

24 making history in this case, for good or for bad.

25        Who am I?  I am a lawyer.  I am a soldier, a former

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

 1  soldier.  I'm a father of a little girl, and I'm a

 2  thrice-vaccinated Democrat.  I cut for an odd defense attorney

 3  for this group of people.  I know that.  But these defendants

 4  also cut for very odd conspirators, which I hope to show you

 5  through the evidence we present in this case.

 6          Ladies and gentlemen, I do not envy your position

 7  today.  We all have places we'd rather be, myself included.  In

 8  fact, I think it's pretty much everywhere I'd rather be than

 9  here.  You all saw what I saw this morning, and it certainly

10  had an impression on me.  I'm disgusted by a lot of what I saw.

11          About ten years ago, while still a fresh-faced law

12  student, I took trial advocacy as an elective, and one of the

13  first lessons we learned regarding opening statements was to

14  attempt to humanize defendants, to try to make a jury see

15  themselves in those people that they are meant to judge.

16          I'm not going to do that.  I think it would be a

17  waste of your time, and it would be a waste of my time, for me

18  to try to humanize people who harbor beliefs that most of us

19  would spend our last breath opposing, for too much of this case

20  has focused on who these people are already, both in the news

21  and in the court of public opinion.  And, frankly, by doing so,

22  we're giving them exactly what they want every time they throw

23  a rally:  Attention.  Little people seeking attention.

24          The plaintiffs will spend the majority of this trial

25  repeating nasty, racist, and hateful hyperbole that the

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   defendants spewed back and forth at each other in internet chat

2   rooms.  You won't emerge from this trial liking these

3   defendants.  So why bother trying to get you to like them now?

4   It would be pointless.

5            If you want to like somebody, look at Heather Heyer.

6   If you have want to feel sorry for somebody, look at her

7   mother, who lost her only child when James Fields drove his car

8   into a crowd of people and killed her.  That is a fact.  And

9   it's undisputed.  And I'm not going to try to dance around it.

10  I'm not going to try to pretend that the victims aren't

11  victims.  They are.

12           But this case isn't about who we like and dislike.

13  No.  Ladies and gentlemen, this case is about vengeance and

14  assigning blame.

15           We're brought here today in this civil case -- not a

16  criminal case; that's been pointed out more than once to you --

17  because of the fallout of the Unite the Right rally and the

18  conditions that made that fallout happen.

19           The defendants have been accused of intentionally

20  conspiring to incite violence, a crime.  But as I just told

21  you, this isn't a criminal proceeding.  The standard here is

22  lower in a civil case than it is in a criminal proceeding.

23  There's a reason for that.  But make no mistake, the stakes

24  have never been higher, not just for my clients, not for the

25  victims of Charlottesville, but for our republic, because I

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  will agree with some of the co-defendants that this case,

2  despite what has been said, is, in fact, about free speech.

3         Now, last night while preparing to write this, I

4  looked up some of my favorite speeches from Hollywood movies,

5  from the internet, from history, trying to find a way to

6  encapsulate what it is I wanted to do in this case, where I

7  want to take you with the evidence, questions I want you to ask

8  and things I want you to keep in mind.  I don't know if any of

9  you have seen The American President, where Michael Douglas

10  says:  "America is not easy.  It's advanced citizenship.  You

11  have to want it.  You want free speech?  Let's see you

12  acknowledge a man who makes your blood boil, who is standing

13  center stage and advocating at the top of his lungs that which

14  you would spend a lifetime opposing at the top of yours."

15         This case is about a question of collective guilt.

16  Should all be blamed for the independent actions of others,

17  many who are unnamed, many who will never be inside this

18  courtroom?  You're going to hear from plaintiffs' witness

19  Professor Simi, a mind reader, who is going to come in here

20  with a crystal ball and tell you that people didn't mean what

21  they said and what they wrote, but that they mean these other

22  things that we're inferring that they said and that they wish

23  that they had written.

24         The evidence will prove that defendants got a permit

25  for their hate rally.  Odd behavior indeed for persons trying

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  to break the law.  One would think that would-be criminals

2  would want cops to not be around, but a permit would guarantee

3  that they would.  Unfortunately, a permit did not guarantee

4  that the police would do their duty.  Whether they weren't

5  prepared for the numbers, or whether they just didn't care

6  about the fallout, the fact is they did not protect and serve.

7        I want to point out to you, and I must remind you

8  throughout this case, that a conspiracy by its very definition

9  involves more than one person.  So even though it is an

10 undisputed fact that James Alex Fields ran his car into a crowd

11 of people causing irreparable harm, that is not in and of

12 itself a conspiracy.

13       In this case I don't represent all of the defendants.

14 I don't represent James Alex Fields and I don't represent

15 anyone you see in this room.  My clients are probably the most

16 nefarious and notorious clients in this case, other than James

17 Alex Fields.

18       I represent the former commander of the National

19 Socialist Movement, Mr. Jeff Schoep, and I represent the

20 National Socialist Movement itself.  What the evidence will

21 show you is that these particular defendants were not present

22 for the torch march, weren't even there.  It will show they

23 weren't present for James Alex Fields running his car into a

24 group of people.  They had already left and were heading back

25 to their hotel.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1          They heard about it the same way we heard about it:

2   On the news.  The evidence won't prove that there's any

3   connection between James Alex Fields and the other defendants,

4   that he acted alone.

5          Many years ago, before I became an attorney, before I

6   went to law school, I was a cadet at West Point, and I tried to

7   guide my ethics and my moral choices by what I learned in the

8   cadet prayer.  And if I could quote from it briefly, it's to

9   help us choose the harder right over the easier wrong, and to

10  never be content with a half truth when the full can be won.

11         We're going to be asking you, upon presenting you

12  this evidence, to make a choice.  You can choose the harder

13  right.  It's an unpopular choice and it's going to earn you the

14  scorn of the media, the press, many of your friends, and this

15  beautiful city.  It will require you to set aside the natural

16  human desire for vengeance and the desire to spread blame as

17  far and wide as possible.  I can tell you as the father of a

18  little girl, if a political person of any variety were to kill

19  my daughter, there is no length I would not go to to cause pain

20  to that person.  I get it.

21         Regardless, you can make a different choice.  You can

22  make an easier choice, and that's the choice that the

23  plaintiffs are going to ask you to make.  It will earn you more

24  than a few attaboys.  To make this choice will require you to

25  make inferences that the facts and the evidence do not support.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1           And ladies and gentlemen, I can't blame you if that's

2   the way you go.  We're all humans and we're all guided by our

3   emotions.  But we're asking you to do something that is not

4   particularly easy to do.  We're asking you to set those

5   emotions aside.  I'm having a hard time doing that right now.

6   But that is your duty, to set those emotions aside, look at the

7   facts, and ask yourself:  Can people that weren't even around

8   be blamed for the actions of another?  And if they can, how

9   much further can we spread the blame?  And will this type of

10  attitude and approach be limited to this case or will it set a

11  new precedent?  Because I can't guarantee you that the next

12  time we have a hearing like this that it will be against Nazis

13  and white supremacists.  It might be against people you agree

14  with.  It might be against people you support.

15          THE COURT:  I have to remind you this is not about

16  anything but have the plaintiffs or will the plaintiffs prove

17  the elements they must prove to recover against the defendants.

18  It's not for the greater good.  The only good that can come out

19  of this case is justice.  And justice will be that you decide

20  this case according to the law and based on the facts you hear

21  in the courtroom.  You set aside your preconceived notions and

22  focus on those issues.  Thank you.

23          MR. REBROOK:  Judge Moon is absolutely correct and I

24  cannot ask anything more of you.

25          But -- but if you do choose the easier right, it will

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  be difficult for me to say that it won't have consequences.

2          I'm not going to ask you to forget the disaster that

3  happened here or to feel empathy for some of the least

4  empathetic people I've ever met in my entire life.  What I do

5  ask you to do is to set aside their ugly beliefs and not allow

6  attorneys from another state, from New York, to come down here

7  to Virginia and whittle away at the First Amendment for the

8  purposes of vengeance.

9          MS. KAPLAN:  Your Honor, may I speak?  We've really

10  hesitated to say anything during openings.  You can see us

11  sitting here and really not trying to object.  But you just

12  instructed Mr. ReBrook not to talk about things outside the

13  case, and Mr. ReBrook just said it was about lawyers from New

14  York who come down here to whittle away the First Amendment.  I

15  think he just violated what you just told him he couldn't do.

16          MR. REBROOK:  Forgive me, Your Honor.

17          THE COURT:  Let me read it.

18          That's improper argument.  This is -- go back to what

19  I just said.  This is about the plaintiffs.  It's not the

20  lawyers' case.  It's not anyone's case but the individual

21  plaintiffs and the individual defendants and what is proven in

22  the case from the evidence here.  The lawyers are not on trial.

23  Thank you.

24          MR. REBROOK:  The evidence will show, ladies and

25  gentlemen, that this city was failed by those whose duty it was

159

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  to protect and serve.  If you choose -- if you choose to

2  believe the plaintiffs' evidence, you will be forcing white

3  nationalists more than to just their parents' basements.

4  You'll be forcing them underground.

5           And personally, I have to agree with Brad Pitt's

6  character from the film *Inglourious Basterds,* Lieutenant Aldo

7  Raines, when he said he likes his Nazis out in the open, he

8  likes them in uniform.  That way you can identify them, just

9  like that.

10          That won't be the case if they're underground.  You

11 must ask yourself where will they be more dangerous, in front

12 of you --

13          THE COURT:  Mr. ReBrook, you're continuing to -- I

14 don't know why you don't understand what I instructed you.

15 This -- you can confine your remarks to the defense you're

16 going to present, and your defense may not be that something

17 will happen or some message will be sent that will be the wrong

18 message, or anything to do with outside of what the Court is

19 going to instruct the plaintiff -- the jury that the plaintiff

20 has to prove in order to recover a verdict.  And to ask the

21 jury to consider other things, results other than what a proper

22 verdict ought to be, ramifications of the verdict, have nothing

23 to do with the jury's consideration.  Nothing whatsoever.  And

24 I hope the jury knows it.

25          This is a suit for money damages.  And the plaintiffs

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   have to prove they're entitled to it and they have to prove, if

2   they're entitled to money, how much.  And that's it.  That's

3   the only message you are to send here, is whether an individual

4   plaintiff is entitled to money and how much, and whether any

5   individual defendant is liable to the plaintiff for that amount

6   of money.

7           And so, I'm asking you to just put out of your mind

8   that this case is about some other principle or some other

9   problem.  Obviously, the rule of law is important.  If you

10  violate your duty, then you hurt the rule of law.  But if you

11  do your duty, follow the Court's instructions and try this case

12  solely according to the law and the evidence you hear in this

13  case, that is the greatest thing you can do.

14          The principles of this government have been set for a

15  long time.  And it's only when we adhere to those principles

16  that we help our system.  And it does not help if we

17  individually try to come into court and throw some -- send some

18  message, because if we do that, then we're not doing what the

19  founders decided the courts were supposed to do.  I mean, this

20  is a very important thing; that you decide the case solely

21  according to the law and to the evidence you hear in the

22  courtroom, not because you're trying -- you have some political

23  goal or some message you're trying to send somewhere.

24          So please proceed and adhere to my ruling.

25          MR. REBROOK:  Yes, Your Honor.  Apologies.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1           I actually think Judge Moon put it best.  To do your

2    duty is really all I can ask of you to do.  I have nothing

3    further.  Thank you.

4           THE COURT:  All right.  Who else?  We have Mr. Smith.

5    Will there be anyone after Mr. Smith?

6           MR. SMITH:  No, Your Honor.

7           THE COURT:  How long will you be?

8           MR. SMITH:  I don't know, but it might be a good idea

9    to take a break first.

10          THE COURT:  I just wanted to know how long you were

11   going to be.  If you're going to be five minutes, I don't need

12   to take a break.

13          MR. SMITH:  I was thinking somewhere around 20

14   minutes, Your Honor.

15          THE COURT:  All right.  Why don't we take a stretch

16   break and take about 10, 15, no more than 15 minutes.  When the

17   jury is ready to come back, we'll come back and we'll hear

18   Mr. Smith and then we will adjourn for the day.

19          Let me say this:  I know how to keep time, if nothing

20   else.  And don't ask for breaks unless it's absolutely

21   essential, because if we take a break -- if we go for an hour

22   and a half and take a 30-minute -- a 20-minute break and then

23   go another hour and a half for lunch and do the same in the

24   afternoon, we'll finish on time.  If we take a break now, we're

25   taking 15 minutes, maybe, to save 30, you know?  And it's

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   just -- it's not cost-effective.

2           MR. SMITH:  I'm sorry, Your Honor.  I thought that's

3   what Your Honor was getting at.

4           THE COURT:  I know, but we took one earlier.  That's

5   what I mean.

6           MR. SMITH:  I understand, Your Honor.

7           THE COURT:  And I did not have it scheduled.  I

8   thought it was some emergency.

9           MR. SMITH:  No.  No.  No.

10          THE COURT:  Okay.  I'm sorry.  Go ahead now.

11  **(Jury out, 4:08 p.m.)**

12          (Recess.)

13          THE COURT:  Ms. Kaplan, unless you've got a witness

14  that's going to be real quick, I might adjourn after we hear

15  the opening statements.

16          MS. KAPLAN:  I'm very glad to hear that, Your Honor,

17  because I told the witness she was excused for the day.  The

18  witness who is up next is not a short witness so I told her

19  that she probably wasn't getting on.

20          THE COURT:  I don't want to go past 5 o'clock.

21          MS. DUNN:  Your Honor, we could start with this

22  witness today.  We would not finish, but we could get her on

23  the stand and start with the examination if you would like.

24          THE COURT:  Okay.  All right.

25          MS. KAPLAN:  Would you prefer that, Your Honor?

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1          THE COURT:  Have her ready, but we'll see how long

2   Mr. Smith takes.  Bring the jury back.

3   **(Jury in, 4:21 p.m.)**

4          THE COURT:  Could we have the witness outside the

5   door?

6          All right.  Mr. Smith, you may proceed.

7          MR. SMITH:  Thank you, Your Honor.  Ladies and

8   gentlemen of the jury, good afternoon.  My name is Joshua

9   Smith.  I represent David Matthew Parrott, who is seated over

10  here, Matthew Heimbach, and Traditionalist Worker Party, which

11  is the political party that they formed together.

12          There's a weird idea in this country about the First

13  Amendment, this idea that it's like a literal shouting contest,

14  like you have one side talking and the other side can try to

15  drown the other side out, or sort of force them to be quiet,

16  and that's how the First Amendment works.  It isn't.

17          Let's say that I were to get a permit for some event

18  with the city.  I apply for a permit.  I get the permit.  There

19  isn't some sort of right, First Amendment right to

20  counter-protest that permitted event by, say, standing outside

21  of it and throwing stuff in to disrupt it or, again, drowning

22  it out so that they can't -- so that no one can hear what's

23  being said in that permitted event.

24          In fact, when somebody gets a permit, it's really

25  fundamentally the job of the police to make sure that that

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   permit is enforced and that the people that applied for the

2   permit aren't denied their First Amendment rights by those who

3   seek to disrupt whatever event they would like to hold and

4   they've been granted a permit for.

5           In this particular case, what we end up having is the

6   exact opposite of what the plaintiffs allege.  The plaintiffs

7   allege that the defendants conspired to deprive the plaintiffs

8   of their civil rights under the law.  And that's what gives

9   rise to a 1985 or 1986 action.

10          The thing is, what we know and what the evidence will

11  show is that when some of the attendees to this rally attempted

12  to get in -- and there were only two entrances to this park,

13  one on each side -- and everything else was blocked off so

14  there was no other way to get into the park where this

15  permitted rally was supposed to be held.

16          And in fact, by the way, it wasn't as if the city

17  didn't try to squelch this permit already.  They did.  They

18  said we're going to move this to another park.  That was a

19  problem because, well, as we know, the rally was about a statue

20  that was in that particular park.  So moving it to another park

21  really wasn't that good of an idea.  It took a federal lawsuit

22  to get a federal judge to say, no, you have to honor this

23  permit, City of Charlottesville.

24          And you'd think that would be enough to get the

25  police to do what they needed to do to make sure that those

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    rally-goers were able to exercise their First Amendment rights

2    safely.

3              Instead, we have a situation where, in addition to

4    the police sort of not doing a very good job that day, we have

5    at least one of the plaintiffs, Mr. Wispelwey, who wasn't, by

6    the way, involved in the James Fields car incident,

7    Mr. Wispelwey and his associates agreed that some of them in

8    his church, that some of them would go over to other permitted

9    events that were occurring that weekend.

10             There were permits taken out for a couple of other

11   events for a left-wing audience in various other parks around

12   Charlottesville.  It seems like a nice city; they have several

13   parks, and, you know, you can -- there are various permitted

14   events you can have at any of them.  So people had permits for

15   other events in other parks that day.  And the thing is, they

16   were very far away from each other, which is really what you'd

17   want because, again, the First Amendment is not a shouting

18   contest.  I can't just piggyback off of your permit by standing

19   outside and saying, "I have a permit to counter-protest your

20   event."  You have to get your own permit.  You can't assemble a

21   group of people together without a permit.  So if you want to

22   get a permit to counter-protest some other permitted event, you

23   have to get your own permit.

24             THE COURT:  Well, wait, Mr. Smith.

25   Counter-protesters did not have to have a permit to be there.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    There was no law -- I mean, what -- what --

2              MR. SMITH:  Well --

3              THE COURT:  No, I'm saying, Mr. Fields got a permit,

4    but other persons have a right to protest.

5              MR. SMITH:  Oh, I understand, Your Honor.

6              THE COURT:  And they don't have to have a permit to

7    protest.

8              MR. SMITH:  Well, Your Honor, the problem here --

9              THE COURT:  Okay.  I've ruled that they didn't have

10   to have a permit to protest.

11             Proceed.

12             MR. SMITH:  So even if you don't have to have a

13   permit to counter-protest --

14             THE COURT:  Just -- it's over.

15             MR. SMITH:  I understand.

16             THE COURT:  I've ruled.  Go on to another matter.

17             MR. SMITH:  Okay.

18             Mr. Wispelwey has admitted to blocking the entrance

19   to the park with some of his associates that chose not to go to

20   those other events at other parks, but rather to block the

21   entrance to the permitted event, thereby -- and, again, he

22   agreed with his associates to do this.  So that seems like an

23   agreement or a conspiracy to deprive the rally-goers, some of

24   whom are defendants here, of their civil or First Amendment

25   rights.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1          That's exactly what the plaintiffs are accusing the

2   defendants of doing.  That's weird.  Talk about unclean hands.

3          But more to the point, I represent three of the

4   defendants in this case.  I don't represent them all.

5   Obviously, James Fields has an attorney, and he's said what he

6   has said about that situation.  We're not here to defend James

7   Fields.  I'm here to defend David Matthew Parrott, Matthew

8   Heimbach, and Traditionalist Worker Party.  And the thing is,

9   as much as plaintiffs would like to claim that the evidence

10  shows some sort of conspiracy on their part or having

11  involvement on their part with Unite the Right, the reality is

12  that Mr. Kessler asked them to attend the event.  And they did.

13         They brought their political party, which is an

14  FEC-registered political party, or was at the time.  I don't

15  believe it's in existence still, but at the time it was an

16  FEC-registered political party, and they had 75, 100 members in

17  various states.  And -- sorry, my voice is just -- sorry about

18  that.

19         Thank you so much.  Sorry about that.  Starting to

20  get a little raspy there.

21         So just to fast-forward to the point here, Trad

22  Worker and Mr. Parrott and Mr. Heimbach are accused of

23  participating in this conspiracy.  Well, there's this torch

24  march, right?  We're told about this torch march.

25         The thing about it is, they didn't know about this

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  torch march.  They were never told.  They found out a couple of

2  hours before it was supposed to happen.  And when they did --

3  and by the way, that torch march was not a permitted event.

4  There was no permit obtained for that, unlike the Saturday,

5  August 12th event, okay?  And when Mr. Parrott, who runs TWP,

6  along with Mr. Heimbach, when they heard about this, they said,

7  "Absolutely not.  We are not going to this.  We did not agree

8  to this.  Trad Worker is not to go to this, and none of its

9  members are to attend this or have any part of it in any way."

10         The reason he did that is because, from the very

11  start, Mr. Parrott was extremely concerned about not just

12  everyone's safety, because Trad Worker and its members have

13  been attacked at other events that they've held, successfully,

14  but they've been attacked at these events numerous times, and

15  their state of mind was such that they knew that if they're

16  going to have any event whatsoever, they need to come prepared,

17  and that means defensive items like shields, helmets.  These

18  are important because, well, the political opposition is known

19  for throwing things that could hurt somebody if they got hit in

20  the head with it, all of these political tactics that you see

21  on the -- you know, on the news.  People talk about them.

22  It's -- you've probably seen this a lot.  You have to be

23  careful of these things these days.

24         I think Mr. Spencer may have had a point when he said

25  we are entering sort of an era of political violence and that

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    it's somehow now become acceptable.  We've gone from this idea

2    that, even if you don't like someone's message, you still need

3    to let them speak, because that's the kind of civil society we

4    have -- we've gone from that to, use violence to shut down the

5    speech you don't like.  And that's extremely -- an extremely

6    bad place for any republic like ours to be.

7           Now, Mr. Parrott, again, very concerned about

8    everybody's safety, but also very concerned about making this a

9    peaceful event.  So he sent out a series of emails to the

10   members of Trad Worker, and this was the only -- really the

11   only messages that the members were receiving.  This was their

12   source of information from Trad Worker about how this rally was

13   supposed to go or -- well, again, they were attending it, but

14   how they were supposed to attend it, the conduct that was

15   expected of them, okay?

16          And of course -- I believe for this rally there were

17   speakers planned.  There would probably be some socializing.

18   And then the plan is, of course, after all the speakers are

19   there and they speak and you have some socializing, everybody

20   just goes home.  That's the idea.  It's a political rally.

21   Everyone knows what that is.

22          Mr. Parrott made it very clear to his members that

23   they weren't to have any part of any kind of violent behavior.

24   And, again, this set of emails that he sent out really just

25   goes to show that quite a bit.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1           For example, let's look at this one.  It was sent out

2   on -- his first email was sent out on August 3rd, 2017, which

3   was about nine days before the rally.

4           Now, I should point out, you won't be able to see

5   this very well.  I just want you to see that there is, in fact,

6   an email.

7           MS. KAPLAN:  Your Honor, if this was produced in

8   discovery or if it's an exhibit, we'd like to be able to look

9   at it.  We can't see what's on our screen.

10          MR. SMITH:  I thought you already had it.  It's hard

11  to see on the screen because it just seems to be coming up

12  blurry.  Would you like to --

13          MS. DUNN:  Is there an exhibit number?

14          MS. KAPLAN:  Don't you have an exhibit number?

15          MR. SMITH:  I don't know which exhibit it is of

16  yours.

17          MS. KAPLAN:  Oh, it's one of our exhibits?

18          MR. SMITH:  It may be one of your exhibits, but I'm

19  not sure which order it was produced to you guys.  I know it

20  was produced, but --

21          THE COURT:  What is it?  Is that a message or

22  something?

23          MR. SMITH:  Yes, it's -- it's an email; series of

24  emails from Mr. Parrott to --

25          THE COURT:  Whoa, whoa, whoa.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1        MS. KAPLAN:  Your Honor, maybe we should come to side

2   bar.  Would that make sense?

3        MR. SMITH:  Apologies, ladies and gentlemen.  One

4   moment.

5           (Side bar.)

6        MS. KAPLAN:  Your Honor, we cooperated with defense.

7   We gave them examples of our exhibits.  You know, we gave them

8   notice.  We didn't get any notice from him.

9        I have no problem showing him a document, if it's a

10  document that's been produced in the case, but we can't see on

11  the screen.  I have no idea what it is.  I don't know if he

12  produced it.  I don't know if it's on our exhibit list.

13       THE COURT:  What is it?

14       MR. SMITH:  Your Honor, the first thing is that my

15  client informed me that this was produced in discovery.  I

16  don't know exactly when it was produced because, as Your Honor

17  is aware, I'm on the case rather recently.

18       THE COURT:  What is it?  You can't seen even see what

19  it is.

20       MR. SMITH:  It's just a series of emails in which

21  Mr. Parrott tells his members, "Here's what's expected of you

22  at the event, and we want this to be a safe event, and we want

23  this to be a peaceful event," which is central to their case,

24  Your Honor.

25       THE COURT:  Well, I know that.  But, I mean, has it

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   not been produced or what?

2          MS. KAPLAN:  I can't read it.

3          THE COURT:  Well, okay, but he proffers -- he's

4   proffered what it is.

5          MS. KAPLAN:  I think Mr. Bloch has more.

6          MR. BLOCH:  So it's been produced, but I don't

7   believe it's on our exhibit list.  I have to check that.  And

8   they don't have an exhibit list.

9          MR. SMITH:  But it has been produced, right?

10          MR. BLOCH:  It has been.

11          MR. SMITH:  And we did say it was going to be used in

12   the integrated pretrial order.  We did make reference to that.

13          MR. BLOCH:  I don't know about that, but I know they

14   have new exhibit lists.

15          THE COURT:  I'm going to let him --

16          MS. KAPLAN:  Do you have a copy of it that we can

17   read it while you're talking about it?

18          MR. SMITH:  Yeah, I can -- well --

19          MS. KAPLAN:  Not with you?  Okay.

20          Go ahead.  Sorry, Your Honor.

21          MR. SMITH:  You'll get it in evidence later.  The

22   whole thing will be there.  For now, we'll just read it.

23          (Side bar concluded.)

24          MR. SMITH:  Okay.  Sorry about that.

25          Like I was saying, Mr. Parrott was very concerned

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   about safety for this event.  And so you see, for example --

2   sorry.

3           So you see, for example, in this first email he

4   says -- and again, if you can't see this, we'll be introducing

5   it later; I just wanted to sort of indicate that this is the

6   part that says it, and I'll read it to you.  "This is a

7   peaceful event, and we ask that you think it through before you

8   carry your arms" -- because Virginia is an open-carry state --

9   "into the event grounds.  We are trying to not only be

10  peaceful, but to give that impression to all gathered.  There

11  will not be chanting of any sort or exchanges of vulgarities

12  with Bolsheviks or neoliberals.  We will not devolve the rally

13  into a shouting match."

14          This isn't the kind of thing that a conspiracy to

15  commit racially motivated violence looks like.

16          Let's look at the next email, which was sent

17  four days later, on August 7th, to TWP members.  There, we see

18  this:  "As a reminder to all attendees, if the enemy comes to

19  oppose us, we must under all circumstances follow the law and

20  work to deescalate conflict.  Do not bring any weapons, tools,

21  or implements that are illegal.  Comrades who have concealed

22  carry permits that are valid in Virginia are allowed to carry.

23  If we are attacked, we will follow the laws and defend

24  ourselves and our comrades, but under no circumstances will we

25  aim to provoke or incite conflict.  This means that we will not

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   be screaming at, cursing, insulting, or name-calling Antifa

2   while at the event."

3        That sounds pretty restrained to me:  "If we are

4   attacked, we will follow the laws."

5        They weren't there to commit crimes.  They worked

6   with the police to ensure their security at the event.  Unless

7   what the plaintiffs are saying is that the police also

8   conspired with the defendants, then I don't see how you really

9   can prove that somebody wanted to commit racially motivated

10  violence if they're working with the police to make sure their

11  legally permitted rally and court-ordered rally goes according

12  to plan.

13       Now, my clients worked with the police specifically

14  to make sure that their group was able to arrive and leave

15  safely.  Of course, that's not what happened, ultimately.

16       In the next email we see this:  "Our intel suggests

17  at this moment that our numbers will be strong enough and law

18  enforcement will be numerous enough that the event will only

19  have some isolated scuffles, if anything.  Be safe.  Use the

20  buddy system, and watch your back before and after the event,

21  as that's where our intel is suggesting the most safety risk

22  right now.  We're necessarily preparing for the worst, but

23  don't be alarmed by all the tactical planning."

24       Again, Trad Worker and its members have been attacked

25  before, viciously, at several of their previous rallies.  And I

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   should mention that, other than that, all of the rallies went

2   without incident.

3         Finally, we have this email, which was on

4   August 11th.  This is the fifth email that was sent to the

5   members.  It says:  "We've received numerous reports, many

6   confirmed, of violence breaking out already today.  It's vital

7   that you avoid any confrontation before the event, both for

8   your personal safety and because we need you with us at the

9   rally."

10        Trad Worker was interested in putting on a successful

11  rally, which was about a cause that they believed in, the

12  statue in the park and what that represents.  They weren't

13  looking to turn this into anything other than a political

14  rally.

15        This isn't the language of racially motivated

16  extremism.

17        Conspiracy theories can be a lot of fun.  Did we ever

18  really land on the moon?  We can talk about this stuff all day,

19  right?  It's fun to think about.  But in this case, the

20  plaintiffs' conspiracy theory doesn't come close to being an

21  actually legally actionable conspiracy.

22        The situation with James Fields is, of course, very

23  unfortunate.  It would be ridiculous for us to stand up here

24  and say that people that were, on video, hit by a car don't

25  have serious injuries.  I mean, cars do serious damage.  So

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  that makes sense.  We're not here to dispute the nature or

2  extent of those injuries.  But that is only because my clients,

3  Matthew, David Matthew, and Trad Worker, didn't have anything

4  to do with anything related to James Fields.

5       It turns out that James Fields not only didn't know

6  any of the defendants in this case -- no idea; he might have

7  heard of somebody on television, maybe, but there is no

8  evidence that he knew or communicated with any of these

9  defendants, ever.  And I know that my clients, and, I can

10  probably say, none of these defendants, even knew who he was.

11  Nobody knew who he was.

12       You know, if you're one of those people that goes for

13  government conspiracies -- and I don't, personally -- it is

14  kind of weird that -- here's this guy nobody has ever seen

15  before.  Nobody knows who he is.  He comes to this rally for

16  the first time.  He decides he's going to go to a rally and

17  stand up for his political beliefs.  He wears a uniform of an

18  organization that put out publicly, here's what our uniform is,

19  and he wore this uniform there, but my understanding is that

20  the organization didn't know who he was.  And this happens, the

21  situation with the car.  This happens.

22       Of course, from that, the alt-right and the far right

23  in general is defamed because of this.  They're connected with

24  this in some way.  Well, the thing is, there is no evidence

25  that connects James Fields to any of these people.  It's kind

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  of weird.

2         You know, we see there's movies like The Omen or --

3  Final Destination, I think, is another one.  It's almost like a

4  movie trope.  You have these movies where there's all these --

5  there's a weird sequence of events, and it ends in something

6  where somebody ends up dying.  This is a movie plot that --

7  there's several of them out there.  And it's just supposed to

8  be:  How -- what are the odds of that happening?  How do these

9  circumstances come together to create this bizarre situation?

10 Well, here, what we have is one of those kinds of situations.

11 The legally permitted rally-goers are not able to access the

12 park, and fighting breaks out.

13        The police -- and it turns out this was really the

14 objective of the police all along, was to let the parties fight

15 so that they can step in, declare an unlawful assembly, and

16 shut the whole thing down.  They knew that these groups don't

17 like each other, and they just wanted to let them go at it so

18 that they could declare an unlawful assembly and shut it down.

19        And what happened was when they -- when that

20 happened -- because, I mean, you don't have to be a rocket

21 scientist to figure out how that's going to go if you put those

22 groups close to each other.  And this is why it's such a

23 failure of local and city government here, because why didn't

24 you just keep the groups separate?  Why would you let them come

25 anywhere near each other?

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

 1          You have this group that's permitted to go to this

 2   rally.  Why let anybody else near that, if you had any

 3   suspicion that their intentions were impure?  Okay?  Let the

 4   people have their rally and let other people have their events,

 5   and we can avoid this kind of violence.  But the police didn't

 6   do that.

 7          And then when they were clearing the park, they

 8   pushed the legally permitted rally-goers directly into their

 9   political enemies, who were sitting right outside the park,

10   waiting for them.  The police pushed them right into their

11   political enemies.

12          And, of course, violence breaks out.  Well, that's

13   certainly predictable.  But what isn't predictable is that,

14   once the unlawful assembly is declared, they're pushed into the

15   other people and there's more violence, and all chaos is

16   breaking loose, and then the James Fields situation.  And in

17   all that chaos and everybody sort of, you know -- all the

18   disorganization, we end up with a situation where James Fields

19   ends up running into some people, killing one.

20          It's just bizarre how that happens because, if even

21   one tiny thing was different, even something like if the police

22   had declared an unlawful assembly a few minutes later, none of

23   this would have happened.  His car wouldn't have been in that

24   place at that time.  They -- the people that were on that

25   street that the car collided with, they wouldn't have been

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  there.  Nothing like this would have happened.

2           It takes a lot of moving parts to end up with

3  something like this.  And there isn't just one group of people

4  to blame here.  We'll talk more about it throughout this trial.

5  We'll talk more about who those groups are, but there isn't

6  just one group to blame.

7           But remember that fundamentally, the defendants, the

8  rally-goers, they had the permit.  That was supposed to be

9  honored.

10          I'm reminded of some images -- when I was a child, I

11  remember seeing these.  They're from, like, the 1950s, I think.

12  It's images after the *Brown v. Board of Education* decision of

13  the Supreme Court.  There was, of course, a lot of social

14  unrest about integrating the schools.  And the Supreme Court,

15  you know, required the schools to be integrated.  Some places

16  in the south were not abiding that.  And so there are images of

17  soldiers, military soldiers, United States, holding young -- or

18  perhaps I would say teenagers, high school students, at

19  gunpoint to march them off to school.

20          MS. KAPLAN:  Your Honor, I'm really -- it's late in

21  the day, so I apologize.  I'm really trying, but I don't

22  understand how anything about the implementation of the

23  *Brown v. Board* decision and police officers holding guns with

24  children has anything to do with this case, or --

25          MR. SMITH:  It's the --

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1          MS. KAPLAN:  Please.  Please.

2               (Overlapping speakers.)

3          MS. KAPLAN:  -- or is consistent with --

4          THE COURT:  Wait.  Wait.  Lawyers don't talk to each

5    other in court.

6          MR. SMITH:  I understand.  I'm sorry.

7          THE COURT:  You talk to me and so forth.

8          MR. SMITH:  I was going to say, the point is to show

9    that our law enforcement knows how to enforce court orders,

10   Your Honor.

11         THE COURT:  Okay.  But you're talking about something

12   in Arkansas somewhere.  Talk about this case.

13         MR. SMITH:  Okay.

14         THE COURT:  Talk about this case and the issues in

15   this case.

16         MR. SMITH:  Of course, Your Honor.  Yes.

17         THE COURT:  All right.

18         MR. SMITH:  I'm almost done.  And by the way, I'll be

19   going last throughout the trial.  So, you know, when you see

20   me, you know that you're almost on the -- just one more to sit

21   through.  Sorry about that.

22              As Mr. Spencer said, it's really time to revisit this

23   whole Charlottesville matter.  It's been four years.  Tempers

24   have cooled.  It's time to look at this with a clear head,

25   because I know that, since the event happened, I can't get

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1   beyond some very fundamental premises.

2           For example, the defendants in this case were the

3   ones that had the permit.  Why weren't their First Amendment

4   rights protected?  It wouldn't have been that hard to do.  It

5   would have just taken some people that wanted to make sure that

6   their rights were protected.  That's fundamentally the job of

7   the police and of government.  And they failed here.

8           Now, again, this isn't about -- this isn't about

9   politics, you know, sort of in general, or any political issue.

10  This isn't about Trump or Biden or anything like that.  It's

11  not like that.  This is fundamentally about one of the most

12  important things that makes our republic a civil republic:

13  Freedom of speech and the protection of that right.  Because if

14  you don't protect it, it's absolutely worthless.  It's not

15  worth the paper it's written on.

16          With a lot of these other defendants, you're going to

17  hear they weren't really connected to some of these things,

18  like my clients weren't connected to the torch march in any

19  way, like you saw in those emails.  When he heard about the

20  torch march, Mr. Parrott said, "Nobody is going, absolutely

21  not," and they did not go.  Now, if that doesn't show that

22  David Matthew, Matthew, and Trad Worker weren't extremely

23  intent of making sure they followed the law and the rules, I

24  don't know what would.

25          And finally, when the police did declare unlawful

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  assembly and sent everybody home, the thing is that David

2  Matthew, Matthew, and Trad Worker, all the members, they just

3  went home.  They did what they were told.  They were nowhere

4  near the area of any of the events.  They were already on their

5  way home when the James Fields incident happened.  That is

6  important to keep in mind.  Again, it's a weird set of

7  circumstances that ends up with somebody being hit by James

8  Fields's car, but that doesn't make those defendants, at least

9  many of them, responsible for that.

10         You're going to be tasked with one of the toughest

11  tests that you've ever had to go through here.  It's very hard

12  to look at a case like this and not feel emotional about what

13  happened to the plaintiffs.  Some of the injuries are really

14  bad.  It's very easy to do that.  Anyone can do that.  Anyone

15  can be emotional about that.  But the issue here is whether

16  those defendants are responsible for those injuries.  And

17  there's no connection between those plaintiffs and these

18  defendants.  Neither of them have any idea who the other is.

19         The evidence will show that some of these plaintiffs

20  never even heard of my clients.  Not even that they knew them

21  and they didn't like them; they never even heard of them.  They

22  didn't even know they existed.

23         Something bizarre is happening when people that have

24  no idea who each other are somehow find themselves on opposite

25  sides of a lawsuit.

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1          Perhaps this is an issue that is best sorted out in
2    the political arena, and not one in which we use the courts to
3    settle political disputes.  And in this case, I think what we
4    may have is that at these kinds of rallies, there's always this
5    fighting between these two groups, and one group decided,
6    "We're just going to use the courts to crush the other group
7    because we know that we can't actually take away their First
8    Amendment rights."
9          THE COURT:  Well, Mr. Smith, I just don't know where
10   you were when we have had the arguments this afternoon.
11         MR. SMITH:  I'm sorry, Your Honor.
12         THE COURT:  This is the same issue I've interrupted
13   umpteen people over.
14         MR. SMITH:  I'm sorry.  I got you.  I'm done.  I'm
15   all done.
16         THE COURT:  Okay.  Well.  Just don't do that.
17         MR. SMITH:  I'm sorry.
18         THE COURT:  You're through, you're saying?
19         MR. SMITH:  Yeah.
20         THE COURT:  Okay.
21         MR. SMITH:  I look forward to proving everything I've
22   said to you here today in the coming weeks.  Thank you.
23         THE COURT:  All right.  Ladies and gentlemen of the
24   jury, it's now five minutes to 5, and we're going to stop.
25         I think we've said enough, many times today, this is

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1  a case in which individual plaintiffs have to prove that they

2  are entitled to damages from are individual defendants.  You

3  try this case each person involved.  We're talking about a

4  conspiracy.

5          You're going to be given full instructions at the end

6  of the evidence, but basically, every party in the case, you

7  look at their responsibility and their liability separately.

8  And I think we made that clear.

9          But overnight, do not discuss the case with anyone.

10  Do not remain within hearing of anyone discussing the case.  Do

11  not read anything about it in the newspapers or any other

12  media.  Do not watch television or if it's -- I know -- if it

13  comes on, go away, cut it off.  Just please do not try to

14  acquire any information about the case except what you hear in

15  the courtroom for the next four weeks.

16          So you are excused at this time to follow the

17  directions you've been previously given concerning when to

18  appear tomorrow.

19  **(Jury out, 4:54 p.m.)**

20          THE COURT:  I don't know what sort of exit plan is

21  outside the door.  Just need to give the jury time to get off

22  the third floor.

23          MS. DUNN:  Your Honor, we wanted to flag one issue

24  and just to let the Court know we'll be submitting a letter

25  overnight.  Today in the openings we did work very hard to not

185

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1    interject during the openings and extend the same courtesy that

2    we were extended in our opening, but there were numerous

3    misrepresentations about the law, both of conspiracy and the

4    First Amendment.  There was one violation of one of Your

5    Honor's motions in limine.

6            So what we'd like to do is look at the transcript to

7    figure out exactly what was said and we'll submit a letter with

8    an appropriate request for the Court to consider overnight.

9            MR. SMITH:  Your Honor, if I could be heard very

10   quickly.  We'll also be submitting a letter.  During the

11   plaintiffs' opening I did hear the phrase "white supremacist"

12   used once, which Your Honor had commented he was not interested

13   in hearing.  It's inflammatory and it was used.  We didn't

14   interject at the time but we'll be submitting a letter to note

15   that for the record.

16           MS. DUNN:  Your Honor, just to respond to that, we

17   were very careful about this.  We did use the word "white

18   supremacist" to describe the expertise of Professor Peter Simi,

19   who is in fact an expert in that.

20           MR. SMITH:  That wasn't it, Karen.

21           THE COURT:  Okay.  You write your letter and you

22   respond to his letter.

23           MS. DUNN:  Thank you, Your Honor.

24           MR. SMITH:  Thank you, Your Honor.

25   (Proceedings concluded, 4:56 p.m.)

Sines, et al. v. Kessler, et al., 3:17CV72, 10/28/2021

1                        C E R T I F I C A T E

2       I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3  the United States District Court for the Western District of

4  Virginia, appointed pursuant to the provisions of Title 28,

5  United States Code, Section 753, do hereby certify that the

6  foregoing is a correct transcript of the proceedings reported

7  by me using the stenotype reporting method in conjunction

8  with computer-aided transcription, and that same is a

9  true and correct transcript to the best of my ability and

10 understanding.

11      I further certify that the transcript fees and format

12 comply with those prescribed by the Court and the Judicial

13 Conference of the United States.

14      /s/ Lisa M. Blair              Date: October 28, 2021

15

16

17

18

19

20

21

22

23

24

25