Sines, et al. v. Kessler, et al., 3:17CV72, 11/01/2021

1                   UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF VIRGINIA
2                     CHARLOTTESVILLE DIVISION

3 ****************************************************************

4 ELIZABETH SINES, ET AL.,    CIVIL CASE NO.:  3:17CV72
                              NOVEMBER 1, 2021, 9:00 AM
5                             JURY TRIAL, DAY 6
          Plaintiffs,
6 vs.

7                             Before:
                             HONORABLE NORMAN K. MOON
8 JASON KESSLER, ET AL.,      UNITED STATES DISTRICT JUDGE
                             WESTERN DISTRICT OF VIRGINIA
9
          Defendants.
10
  ****************************************************************
11
  APPEARANCES:
12

13 For the Plaintiffs:      ALAN LEVINE, ESQUIRE
                           COOLEY LLP
14                         1114 Avenue of the Americas, 46th
                           Floor
15                         New York, NY  10036
                           212.479.6260
16
                           DAVID E. MILLS, ESQUIRE
17                         COOLEY LLP
                           1299 Pennsylvania Avenue, NW,
18                         Suite  700
                           Washington, DC  20004
19                         202.842.7800

20

21

22 Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                        255 West Main Street, Suite 304
23                      Charlottesville, Virginia  22902
                        434.296.9284
24
  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25 TRANSCRIPT PRODUCED BY COMPUTER.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/01/2021

 1  APPEARANCES CONTINUED:

 2  For the Plaintiffs:          MICHAEL L. BLOCH, ESQUIRE
                                 ALEXANDRA K. CONLON, ESQUIRE
 3                               ROBERTA A. KAPLAN, ESQUIRE
                                 Kaplan Hecker & Fink LLP
 4                               350 Fifth Avenue, Suite 7110
                                 New York, NY  10118
 5                               212.763.0883

 6                               KAREN L. DUNN, ESQUIRE
                                 WILLIAM A. ISAACSON, ESQUIRE
 7                               ARPINE S. LAWYER, ESQUIRE
                                 JESSICA E. PHILLIPS, ESQUIRE
 8                               Paul, Weiss, Rifkind, Wharton &
                                 Garrison LLP
 9                               2001 K Street, NW
                                 Washington, DC  20006
10                               202.223.7300

11
    For the Defendants:          DAVID L. CAMPBELL, ESQUIRE
12                               Duane, Hauck, Davis, Gravatt &
                                 Campbell, P.C.
13                               100 West Franklin Street, Suite 100
                                 Richmond, VA  23220
14                               804.644.7400

15                               CHRISTOPHER CANTWELL, PRO SE
                                 #00991-509
16                               USP Marion
                                 4500 Prison Road, PO Box 2000
17                               Marion, IL  62959

18                               BRYAN J. JONES, ESQUIRE
                                 Bryan J. Jones, Attorney at law
19                               106 W. South Street, Suite 211
                                 Charlottesville, VA  22902
20                               540.623.6952

21                               ELMER WOODARD, ESQUIRE
                                 (Appearing via Zoom)
22                               Law Offices of Elmer Woodard
                                 5661 US Hwy 29
23                               Blairs, VA  24527
                                 434.878.3422

24

25

Sines, et al. v. Kessler, et al., 3:17CV72, 11/01/2021

1

2  APPEARANCES CONTINUED:

3  For the Defendants:          WILLIAM E. REBROOK, IV, ESQUIRE
                                (Appearing via Zoom)
4                               The ReBrook Law Office
                                6013 Clerkenwell Court
5                               Burke, VA  22015
                                571.215.9006
6
                                JOSHUA SMITH, ESQUIRE
7                               Smith LLC
                                807 Crane Avenue
8                               Pittsburgh, PA  15216
                                917.567.3168
9
                                RICHARD SPENCER, PRO SE
10                              P.O. Box 1676
                                Whitefish, MT  59937
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sines, et al. v. Kessler, et al., 3:17CV72, 11/01/2021

1                          INDEX OF WITNESSES

2    WITNESSES ON BEHALF OF THE PLAINTIFF:                    PAGE

3    DEVIN WILLIS

4     Direct Examination by Ms. Conlon                         8
      Cross-Examination by Mr. Jones                          17
5     Cross-Examination by Mr. Spencer                        53
      Cross-Examination by Mr. Cantwell                       92
6     Cross-Examination by Mr. Campbell                      157
      Cross-Examination by Mr. Woodard                       158
7     Cross-Examination by Mr. Smith                         178
      Cross-Examination by Mr. ReBrook                       214
8
     SAMANTHA FROELICH (By video)                   218

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sines, et al. v. Kessler, et al., 3:17CV72, 11/01/2021

1                          INDEX OF EXHIBITS

2    EXHIBITS ON BEHALF OF THE PLAINTIFF:

3           EXHIBIT:                  Marked      Received

4           3264                        23          23

5           3239                        43          --

6

7    EXHIBITS ON BEHALF OF THE DEFENDANT:

8           134                        131         131

9           133                        133         133

10          138                        131         131

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sines, et al. v. Kessler, et al., 3:17CV72, 11/01/2021

1  (Proceedings commenced, 8:59 a.m.)

2          THE COURT:  Good morning.  I think we've got another

3  minute, so we'll wait.

4          (Pause.)

5          Before we begin I'll remind everyone that under

6  Standing Order 2020-12 and 2013-8, the Court's prohibition

7  against recording and broadcasting court proceedings remains in

8  force.  Attorneys, parties, or their staff and any members of

9  the public or press accessing this proceeding today may not

10 record or broadcast it.  That means no photography, no using of

11 video -- video or audio recording device, no broadcasting, live

12 streaming, or otherwise disseminating any live or recorded

13 video or audio of this proceeding.

14          Okay.  Ready to call the jury back?

15          MS. KAPLAN:  Your Honor, before the jury comes back

16 would you like us to bring up the witness?  He's on the second

17 floor.

18          THE COURT:  Oh, yes, get him.

19          MS. KAPLAN:  Let's do that first so there's no

20 crossed paths.

21          THE COURT:  Yeah, I like to have the witness right on

22 hand.  I mean, just in general.

23          MR. CANTWELL:  I have an issue.

24          MS. KAPLAN:  We suggested that this morning, Your

25 Honor, but we were told by the marshals they didn't want him in

Sines, et al. v. Kessler, et al., 3:17CV72, 11/01/2021

1    the hallway.

2                THE COURT:  Okay.

3                Yes, sir?

4                MR. CANTWELL:  I was given on Friday a proposed

5    limiting instruction for the jury by the plaintiffs about the

6    deposition of Dillon Hopper, and today I was given a deposition

7    designation for Defendant Kline.  And I believe there's still

8    the outstanding matter of my objection to the plaintiffs'

9    deposition designations, particularly those that were not

10   properly noticed to me.

11               THE COURT:  Well, they're not coming up today, I

12   don't think, those two depositions.

13               MS. KAPLAN:  That's correct, Your Honor.

14               MR. CANTWELL:  Okay.  We'll do it another time, then?

15               THE COURT:  Excuse me?  Well, I'd rather do it -- I'd

16   rather get the jury in.

17               MR. CANTWELL:  That's fine with me, Judge.

18               THE COURT:  Okay.  Call the jury.

19               MR. SMITH:  Good morning, Your Honor.

20               THE COURT:  Good morning.

21   **(Jury in, 9:03 a.m.)**

22               THE COURT:  Be seated, please.

23               Good morning, ladies and gentlemen.  Glad to see you

24   back this morning.  I will remind everyone concerning the

25   COVID-19 health precautions, everyone should wear a mask over

D. Willis - Direct

1   your nose and mouth at all times, whether you're vaccinated or

2   unvaccinated, unless you are speaking on the record, in which

3   case you may remove your mask.  Please remain socially distant

4   and remember to conduct the required daily health assessments

5   to see if you have any symptoms that would preclude you from

6   coming in.  If so, you could always participate remotely by

7   videoconference.  That doesn't apply -- the jury cannot appear

8   by videoconference.

9           All right.  You may proceed with the witness.  The

10  witness has been sworn and he may have a seat and continue.

11          MS. CONLON:  Good morning.

12          THE WITNESS:  Good morning.

13          DEVIN WILLIS, CALLED BY PLAINTIFFS, RESUMED

14              DIRECT EXAMINATION (Continued)

15  BY MS. CONLON:

16  Q    So when you were here on Friday, we left off talking about

17  August 12th outside of the library.  I want to move forward and

18  ask, at some point, did you learn there had been a car attack?

19  A    At some point I did learn there had been a car attack.

20  Q    How did you learn about it?

21  A    I don't remember anymore exactly.  Well, I don't remember

22  which people were texting me at the time, but I do remember

23  seeing it on the news as well, and I was really concerned that

24  people I knew had been involved.

25  Q    Did you have any reason to think that people you knew were

D. Willis - Direct

1  at Fourth and Water Streets?

2  A    I believe so.  I knew that a lot of my friends had been in

3  the area.

4  Q    So what did you do once you found out about it?

5  A    I went to Fourth and Water.

6  Q    Do you recall what Fourth and Water looked like on August

7  12th when you got there?

8  A    Honestly, I don't recall many details.  I know that I went

9  looking for my friends.

10  Q    Did you find your friends?

11  A    I was -- I couldn't find Nat.

12  Q    Did you learn where Natalie Romero was?

13  A    Yeah, I'm pretty sure someone told me that she had been

14  taken to the hospital.

15  Q    At any point did you see Ms. Romero in the hospital?

16  A    Yes.  So the next day, August 13th, I spent part of the

17  day in the hospital with Natalie.

18  Q    What was seeing Natalie there like?

19  A    It was awful.  It was really horrible.  She was

20  unconscious and she looked like -- almost like crumpled up.

21  She looked almost lifeless.  You never want to see a close

22  friend in that state, and I didn't know if she was going to be

23  okay.

24  Q    What were the next days and weeks after August 12th like

25  for you?

D. Willis - Direct

1  A    It was mostly a blur.  I threw myself into overdrive.  I

2  wasn't sleeping.  I was constantly hustling, busy, trying to

3  find something productive or useful to do to make sense out of

4  what happened that weekend.  But it's such a blur now.  I

5  entered a really bad place.

6  Q    What do you mean when you say bad place?

7  A    In the weeks immediately afterwards I would say like -- I

8  would describe it as like -- like a tunnel vision, like I guess

9  an obsession with, like, trying to find something good or

10  productive or some meaningful outcome, right?  Like, no one

11  wants to watch a person lose their life, watch a close friend

12  become hospitalized and feel like it was pointless.

13      Yeah, I became exhausted, constant fatigue, and

14  overexertion.  It was horrible.

15  Q    How did the feelings that you were experiencing affect

16  your personal life?

17  A    Right.  So -- so yeah, so like after these events and

18  after this kind of like burst of -- of overwork and like, maybe

19  energy, things started to go really badly for me

20  interpersonally.  I became the opposite of myself.  I stopped

21  being an outgoing and -- yeah, I stopped being an outgoing and

22  sociable person.  I think I became very suspicious of people.

23  I became very withdrawn.  I mean, I would describe myself and I

24  think others would describe me as very not present at the time.

25  I became constantly distracted and was always getting

D. Willis - Direct

1  flashbacks of the events that happened, and it was an isolating

2  thing because I felt like I couldn't relate to anybody around

3  me anymore except for maybe a handful of people.  It was such a

4  lonely time.

5  Q    What were you having flashbacks to?

6  A    Mainly August 11th, being surrounded, the tiki torches.

7  It was one of the most distressing things that I've ever seen

8  and it's something that became almost like an intrusive

9  thought.  You're just trying to go about your day and function

10 like a normal student, but you just know that you were there

11 for this thing and other people weren't, and, you know, you

12 can't talk to anybody about it really.  It's not like a common,

13 ordinary experience.  I don't know how else to put it right

14 now.

15 Q    Thanks.

16     Did you notice any changes in your personality?

17 A    I mean, yes.  Yes.  So I think, like, loss of confidence

18 was a big one, and -- loss of confidence was the biggest one,

19 becoming -- sorry.  I'm struggling --

20 Q    It's okay.

21 A    -- to, like...

22 Q    It's okay.

23     Did what you experienced on August 11th or 12th change the

24 way you thought about yourself?

25 A    Absolutely.  I think I was really optimistic and

D. Willis - Direct

1    forward-looking and perhaps even naive about the world, the

2    country that I live in, and also like, me being black, right?

3    That's the first thing anyone sees about me.  And I think I

4    felt much more conscious of how that's a reality that impacts

5    my daily life after this.  Right?  Like, I became so much more

6    conscious of my race and my identity as a black person than I

7    was beforehand because I could no longer pretend that it

8    doesn't matter.

9    Q     You mentioned feeling isolated and lonely.  Did you

10   withdraw from any extracurriculars?

11   A     Yeah.  So that's when, you know, things just kind of go

12   from bad to worse.  So I had a really hard time, like,

13   readjusting to just being a regular student after these events.

14   Yeah, I told you the depression, the anxiety, the struggling to

15   function and keep up with, like, daily tasks obviously had a

16   really huge impact on my social life, my academic life, pretty

17   much every facet of my life.

18        And it was really bad socially because whereas beforehand,

19   like I said, I was very accustomed to being over-committed and

20   over-extended with my extracurriculars.  And in doing that and

21   taking that in stride, I suddenly had all these things on my

22   plate, all these clubs, these things that were really

23   meaningful and important because, you know, I don't come from,

24   like, a long line of educated people.  I felt like I had a

25   million opportunities on campus with different clubs,

13

D. Willis - Direct

1  organizations, institutes, fellowships, all that kind of stuff.

2  And I just no longer had the energy or the motivation to see my

3  responsibilities through, to see these opportunities through.

4  And I looked like somebody who was just shooting themselves in

5  the foot because nobody knew what was going on with me.

6  Q    Are there any particular groups or activities, clubs, the

7  things you've mentioned, that you remember withdrawing from?

8  A    Yes.  So my involvement with the Black Student Alliance

9  came to an end not long after these events.  I struggled and

10  stumbled through admissions and then departure from like

11  several, you know, quote unquote, prestigious organizations

12  that I should have been treating like massive opportunities,

13  but they just became things that were a burden on my daily

14  schedule because I could barely get out of bed.  Yeah.

15  Q    How did the feelings you were experiencing affect you

16  academically, apart from missing out on prestigious

17  opportunities at school?

18  A    Yeah, academically was more of the same story, if not

19  worse.  So in the fall, after August 11th and 12th, I was

20  really struggling to sleep, to get rest, to concentrate, to

21  participate.  And that really took a toll on my academic

22  performance.  I got the first F I've ever received in my life.

23  I failed an economics course.

24      And this kind of upward progress I had been making

25  academically, like all, I think, students are entitled to, just

14

D. Willis - Direct

1   kind of collapsed.  Right?  Like, the positive trend became the

2   exact opposite, and I was on academic probation that semester

3   and for several semesters afterwards.  It just felt like the

4   world was falling in, like I was losing everything.

5   Q    Were academics important to you?

6   A    They were extremely important to me.  I had really high

7   hopes of going to graduate school either immediately after or

8   shortly after completing undergrad, and you need a competitive

9   GPA to do those kinds of things.

10       I also was worried I wouldn't be able, for example, to get

11  into certain majors and participate in certain honor societies,

12  things that would have been really important to me, and still

13  are important to me, things that I wanted to go after, but I

14  felt like suddenly disqualified from, barred from.

15  Q    Is there any reason you cared so much about academic

16  success?

17  A    Absolutely.  Not just because of, like, where I wanted to

18  go in my personal life.  I'm not entitled to any of those

19  things.  It's as much about where I come from, right?  Like, so

20  I mentioned my family background, and just like -- yeah, like,

21  my people weren't allowed to attend school for a very long time

22  in this country.  And it's a point of pride in the family.  I

23  wanted to do well.  I'm an only child.  So I felt a lot of

24  pressure and like I was squandering opportunities by not giving

25  it my best, but I just didn't have it anymore.  I lost that

15

D. Willis - Direct

1    ability.

2    Q    Growing up, did your family make an effort to create

3    opportunities for you?

4    A    Could you rephrase the question.

5    Q    Sure.  Can you talk a little bit about any steps your

6    family might have taken to try to help you succeed when you

7    were growing up?

8    A    Yeah, absolutely.  So for the majority of my childhood we

9    were really poor, actually.  And my mom was really smart,

10   though.  And she always made an effort to make sure I was poor

11   in, like, good school districts and stuff.  So she actually

12   relocated herself and I from Detroit and from Chicago to the

13   DMV for a better life.  That was the whole pint.

14   Q    When you say DMV, what do you mean?

15   A    DC, Maryland, Virginia.

16   Q    So you came out to Virginia to get a better education?

17   A    Absolutely, yeah.  My mom came first, and she came looking

18   for work.  And then she found work and then she sent for me to

19   come join her a couple months later.

20   Q    How long did you struggle at school for after August 11th

21   and 12th?

22   A    Honestly, the rest of my time at UVA I felt like I was --

23   I wanted to come to that school and just hit the ball out of

24   the park, but I really felt like I was lucky to just graduate

25   on time.  Yeah.

D. Willis - Direct

1  Q     Did you experience any work-related difficulties as a

2  result of August 11th and 12th?

3  A     Yeah, so I talked about this really cool internship that I

4  was fortunate enough to get at the end of my freshman year

5  going into my sophomore year, and that was the job that, you

6  know, was the reason I happened to be in town when these things

7  were taking place.

8       And they did their best to be patient with me, but like,

9  there's no amount of graciousness that was able to save me from

10 getting fired.  I just could not deliver and I could not keep

11 up with my work responsibilities, and a job is a job, so I was

12 let go.

13 Q     Did you have any difficulties finding work after you

14 graduated?

15 A     Right.  Yes.  I had a really hard time finding work after

16 I graduated.  I'm very fortunate now, but like, I, you know,

17 went to this somewhat prestigious school and I was over -- I

18 was so involved and I participated and I gave it my all until I

19 couldn't anymore.  And then I ended up without the tools that I

20 was supposed to be paying for.  So like, the only job that I

21 could get after university with a surprisingly low GPA and no

22 work experience to speak of since -- after undergrad, right?

23 That meant that I basically could only get a job teaching

24 English as a second language in Mexico.

25 Q     Is that a well-paying job?

17

D. Willis - Cross

1  A    It's not a well-paying job.  Not a well-paying job.  I

2  applied to a lot of other jobs and it took a very long time

3  before anything could work out.

4  Q    So it's four years later since these events happened.  How

5  are you doing now?

6  A    I still struggle with a lot of the mental and emotional

7  things.  I still feel like I can't get back the things that

8  I've lost.  I struggle with the flashbacks a lot.  Nightmares

9  subsided until I came back here for this trial.

10      So -- but I would say that, like, a lot of things have

11  gotten better, you know, like, four years.  You have to keep

12  going with your life and it's, like, not going to be perfect.

13  But I'm proud of the progress I've made, but yeah, like, it's

14  still hard to be here and it's still hard to revisit certain

15  places.  It's still hard to look back at college as fondly as I

16  know people tell you you're supposed to because of what

17  happened.

18          MS. CONLON:  Thank you.  Nothing further.

19          THE WITNESS:  Thank you.

20          THE COURT:  Sir, go ahead.

21                    CROSS-EXAMINATION

22   BY MR. JONES:

23  Q    Good morning, sir.

24  A    Good morning.

25  Q    I represent Michael Hill, Michael Tubbs and the League of

18

D. Willis - Cross

1  the South.  I have a few questions for you this morning.

2       I'm going to pull up what's been admitted as PX3261.

3       Mr. Willis, can you see that on the screen?

4  A    Yes, sir.

5            MR. SMITH:  It's a little blur -- now it's good.  You

6  zoomed in, so it's good.

7   BY MR. JONES:

8  Q    You testified that you helped edit this document; is that

9  right?

10 A    Yes, sir.

11 Q    Did that include drafting parts of it?

12 A    I don't remember if I helped draft it.  I just know I

13 edited it.

14 Q    What do you mean by edited the document?

15 A    Checking for spelling, grammar, that sort of thing.

16 Q    So I'm going to scroll down her to this paragraph that

17 begins with "Organizer Walt," and then his last name is blanked

18 out.  I'll mark it on the screen here.  Actually, that's not

19 the right...

20      This paragraph right here, there's a sentence that begins

21 with "The intention of PARJ"; can you see that?

22 A    A sentence begins that way?  Where is it?

23 Q    So it's in the middle of that paragraph.

24 A    Yeah, I see it.

25 Q    So it says, "The intention of PARJ is to focus on lawful

19

D. Willis - Cross

1  assembly in support of direct actions in protest of the Unite
2  the Right rally."
3       What does "direct actions" refer to?
4  A    I think -- I'm not really sure what it means.  Are you
5  asking me to speculate?
6  Q    If you don't know, no, I'm not asking you to speculate.
7  Well, it comes up a couple other times in the document.  In
8  this paragraph, I'm going to start with the sentence here that
9  begins with "there will be information."  Do you see that?
10 A    "There will be information."  Yes, sir, I see it.
11 Q    So it says "There will be information, teach-ins, and
12 speakers, in addition to prayer and meditations, music and art,
13 and an opportunity for respite from direct actions taking place
14 around Emancipation Park."  Do you see that?
15 A    Yes.
16 Q    Some of the protest activity that you engaged in was
17 around Emancipation Park; isn't that correct?
18 A    That's correct.
19 Q    So does that help you sort of remember what "direct
20 actions" refers to?
21 A    I think I have an idea, but I think that, like, "direct
22 actions" is like a really broad term, like a net cast to
23 describe lots of protests that are distinct from, you know,
24 meditation and prayer, things like that.
25 Q    So it's sort of -- your understanding is that it's

D. Willis - Cross

1   distinct from meditation and prayer-type protest activities?

2   A    Right.

3   Q    And is broadly referring to various other protest

4   activities?

5   A    That is my understanding, but I don't feel like an expert

6   on this topic at all.

7   Q    So the paragraph underneath the one we just went over

8   begins with:  "We acknowledge."  Do you see that paragraph?

9   A    Yes, sir.

10  Q    So that first sentence of that paragraph says:  "We

11  acknowledge there will be a significant number of people in the

12  downtown area and urge all parties to engage in nonviolent

13  civil protest and to be prepared if engaging in direct action."

14       Do you see that?

15  A    Yeah.

16  Q    So I think you were sort of alluding to this a second ago,

17  but it seems like you've got nonviolent civil protest on the

18  one hand, contrasting with engaging in direct action; does that

19  sound right?

20  A    That's what this sentence kind of implies; but like I

21  said, my understanding was that -- like, for me personally --

22  and that's why I'm pretty sure I didn't write this -- like,

23  nonviolent sort of protest and direct action are usually the

24  same thing.

25            MS. KAPLAN:  Let me pause for one second.  The

D. Willis - Cross

1   realtime on our computers has stopped.  Mr. Shepherd -- is

2   there any way -- or can the clerk --

3              (Discussion off the record.)

4    BY MR. JONES:

5   Q    Do you mind, Mr. Willis, repeating what you just said

6   about direct -- is the realtime working?  Okay.

7        Do you mind repeating what you just said about your

8   understanding of direct action?

9   A    My personal understanding of direct action is that, like,

10  it's often the same thing as nonviolent civil protest, in my

11  personal understanding.

12  Q    Although you would acknowledge that in this document, they

13  appear to be sort of contrasted with each other, nonviolent

14  civil protest contrasted with direct action; isn't that

15  correct?

16  A    I mean, they're definitely written separately, yeah.  In

17  nonviolent civil protest and to be prepared if engaging in

18  direct action.

19  Q    Then that last sentence of that same paragraph says:  "We

20  ask that people coming downtown bring extra food and water to

21  share and to bring ponchos for rain, rather than umbrellas"; do

22  you see that?

23  A    Yes, sir.

24  Q    So the day of August 12th started for you at McGuffey

25  Park; is that right?

D. Willis - Cross

1   A     That is correct.

2   Q     And Black Lives Matter was also at McGuffey Park as part

3   of the protest; is that correct?

4   A     I'm not sure.  A lot of people were wearing Black Lives

5   Matter shirts.  I think people who identify with it were there.

6   Q     So there's a Facebook link at the bottom of this document

7   that we've got here.  And I'm going to pull up that link here.

8         Can you see that, Mr. Willis?

9   A     Yes.  This looks like an Eventbrite page.

10  Q     Do you know if you drafted this event page on Facebook?

11  A     I do not know if I drafted it.

12  Q     I'm going to scroll down.  Do you see that part I circled

13  there?

14  A     Yes.

15  Q     It says:  "Statements by Legal Aid Justice Center, Black

16  Lives Matter."  Do you see that?

17  A     Uh-huh, yes.

18  Q     So would it be safe to say that Black Lives Matter was

19  part of the group there at McGuffey Park that you were with?

20  A     Possibly.  They might have arrived after I left.  Like, I

21  wasn't there for the entirety of the programming.

22        I'm assuming that that's referring to just the Black Lives

23  Matter C'ville Chapter.

24  Q     You're not a member of Black Lives Matter, of any chapter?

25  A     I'm not a member of any chapters, no.

D. Willis - Cross

1  Q    And you weren't previously?

2  A    I was not previously.

3  Q    I'm going to pull up a video that the plaintiffs have

4  marked as PX3264.

5       Do you recognize this video, Mr. Willis?  Let me play it.

6  I'm going to cancel the audio first, and let's play it.

7       (Plaintiffs' Exhibit 3264 marked.)

8  A    I do recognize the video.

9  Q    You took the video, right?

10  A    I believe so, yes.

11  Q    I'm going to play the audio here.

12       (Video playing.)

13  BY MR. JONES:

14  Q    Did you take that video on August 12th?

15  A    Yes.

16  Q    And does that fairly and accurately represent what you

17  captured on August 12th in that video?

18  A    Yes, it does.

19        MR. JONES:  Your Honor, I'll move to introduce

20  PX3264.

21        THE COURT:  Be admitted.

22        (Plaintiff Exhibit 3264 admitted.)

23  BY MR. JONES:

24  Q    So in the video, you seem to be chanting:  "No justice, no

25  peace, no racist police"; is that right?

24

D. Willis - Cross

1  A    Yes, sir.

2  Q    Isn't that a Black Lives Matter chant?

3  A    I don't know if it's exclusively affiliated with Black

4  Lives Matter.  It was just the chant I was using.

5  Q    So yesterday you testified that the reason you went to the

6  Unite the Right rally on August 12th was to protest these

7  groups, these protest groups that were coming in.  Sometimes we

8  refer to them as white nationalists.

9       But here you are on August 12th chanting about racist

10  police.  Do you know why you were doing that?

11  A    Probably because other people were also doing it.

12  Q    So you tended to follow what other people were doing that

13  day?

14  A    I think in the purpose of, like, this song, yeah, like, if

15  someone was singing that -- you know, that's the point.  You

16  chant and you sing together.

17  Q    So there were times on August 12th when you didn't

18  necessarily do what you planned to do, but you followed what

19  other people were doing?

20  A    Maybe in the context of the songs.  I didn't, like, you

21  know, rigorously interrogate every single song that I sang.

22  Q    So what did you mean when you said "no justice, no peace,

23  no racist police"?  Were you referring to the Charlottesville

24  Police Department?

25  A    Yeah, I might have been speaking -- I might have been --

D. Willis - Cross

1   that song might have been addressed to -- like I said, I mainly

2   was singing it because other people were singing it.

3       I think my primary motivation for singing it was just,

4   like, being in community with the people who I had come to

5   protest with.  But I do think that, like, that's something I

6   believed at the time.  Like, yeah, you don't want racist police

7   anywhere; not in Charlottesville, not anywhere.  That's not

8   something...

9   Q   Okay.  And you testified on Friday that you were aware

10  that the protesters who were coming to protest at what was

11  referred to as Emancipation Park in 2017, you're aware that

12  they had a permit to protest there?

13  A   I'm aware they had a permit there.

14  Q   And the groups that you were counter-protesting with at

15  McGuffey Park, you guys had a permit for McGuffey Park; is that

16  right?

17  A   That is correct.

18  Q   And you testified that in the lead-up to August 12th, you

19  attended a meeting with the Charlottesville Chief of Police; is

20  that correct?

21  A   That is correct.

22  Q   Would that have been Chief Al Thomas?

23  A   I can't remember who the chief was.

24  Q   Was he an African American male?

25  A   I believe so.

D. Willis - Cross

1  Q    You said that the purpose was sort of to discuss how to

2  create a safe environment; is that right?

3  A    That's how I remember the meeting, yes.

4  Q    What sort of things did he suggest as far as how you could

5  accomplish that goal?

6  A    I only recall that I was there.  I don't remember, like,

7  the substance of the meeting.

8  Q    Okay.  So at some point you transitioned from McGuffey

9  Park to what was formerly called Emancipation Park; is that

10  right?

11  A    That's correct.

12  Q    And you set up outside the library, sort of just outside

13  of Emancipation Park?

14  A    Yes, on that corner, on the library side of that street.

15  Q    And you were there until you heard the police declaring an

16  unlawful assembly and clearing everybody from Emancipation

17  Park; is that right?

18  A    Yes.  I believe so.

19  Q    So you remained there the entire time until that unlawful

20  assembly was declared?

21  A    I don't remember ever stepping into the intersection for

22  more than a few minutes at a time.

23  Q    I'm just referring to that general area.

24  A    Then yes.  Yes.

25  Q    The intersection or that sidewalk area.

D. Willis - Cross

1   A    Yeah, that was my -- that's where I was.

2   Q    You said that you witnessed some people using sticks and

3   poles sort of as weapons to hit other people; is that right?

4   A    Yes.

5   Q    And did you notice any police presence there?

6   A    You know, when I remember it now, I can't even remember

7   where the police were standing; but I do know that there were

8   police, yes.

9   Q    There were some police there?

10  A    Yes.

11  Q    You don't know specifically where they were, but there

12  were police officers there?

13  A    Exactly.  I can't recall where they were standing, and

14  definitely not relative to me.

15  Q    You said that you were chanting various things, including

16  you were chanting "shut it down, shut it down"?

17  A    Yes.

18  Q    Was that another chant that you sort of took up with other

19  people you were with, or --

20  A    Yeah, I can't, like, remember if it was something that I

21  heard or something that, you know, I started.  I don't remember

22  anymore.  It's just a chant.

23  Q    So when you said "shut it down," you were talking about

24  the rally, right?

25  A    Yeah, I believe we were referring to the park.

28

D. Willis - Cross

1  Q    And you were referring to you trying to take direct action

2  to shut down the rally, correct?

3  A    No.  I think we were pleading for the police to shut the

4  rally down on our behalf, or on behalf of the public and public

5  safety.

6  Q    But you just testified you knew there was a permit, a

7  legal permit, to hold a rally, right?

8  A    Yes.  And I think that views about the propriety of

9  letting the rally go on, I think I probably felt like, after

10 what had happened to me the night before, that permit maybe was

11 not the best idea anymore.

12 Q    Did you notice people wearing red bandannas around their

13 neck?

14 A    I did not.

15 Q    You didn't.  Okay.

16      So I'm going to pull up PX3267.

17      (Video playing.)

18 BY MR. JONES:

19 Q    So when that video was introduced on Friday, you testified

20 that you took that video, correct?

21 A    Correct.

22 Q    And you took that video, you said, of mostly your fellow

23 UVA students?

24 A    Yes.

25 Q    And at that point you guys were creating a human chain or

D. Willis - Cross

1  blockade in the middle of Market Street; is that right?

2  A    We lined up on Market Street, yes.

3  Q    And you were in the middle of the street -- not you, but

4  your group?  You were --

5  A    Yes.  They were in the middle of the street.  Yes.

6  Q    And what was the purpose of that?

7  A    I think it was kind of similar to the demonstration and

8  the protest last night or the night before on the Jefferson

9  statue.  It was kind of symbolic, right?  It's like -- I mean,

10  the chant is "the people united will never be divided."  And

11  that's, I guess, how they wanted to demonstrate the people

12  uniting.

13  Q    So you could have demonstrated that you were united if you

14  stood at the side of the road and linked arms, couldn't you

15  have?

16  A    They could have, I suppose.

17  Q    So if you do that in the middle of the road, your

18  intention is to prevent people from walking down the road,

19  isn't it?

20  A    I don't really think so because there's also, like,

21  sidewalks to go around them, I think.  Yeah, that's something

22  I've always thought about is, like, yeah, they could have went

23  around us.  But...

24  Q    Okay.  So let's start from the front of this video here

25  and go through frame by frame.

D. Willis - Cross

1    Let's start with this gentleman here and see if this will

2   work to circle.

3    This gentleman, is he a UVA student?

4   A    That person is nonbinary, and they were a UVA student at

5   the time, yes.

6   Q    I'm going to circle this person here in the middle of the

7   screen.  Do you recognize that person?

8   A    I recognize the face, but I don't know this person very

9   well.

10  Q    Do you see what he's wearing around his neck?

11  A    Yes.

12  Q    What is that?

13  A    A red bandanna.

14  Q    You didn't notice that at the time?

15  A    I really didn't.  Like, I haven't seen the video, like,

16  that closely.  I probably just forgot that there were, in fact,

17  students with red bandannas.

18  Q    So I'm going to draw your attention to a flag here in the

19  background.  Do you see that red flag with the sickle?

20  A    I can't tell if it's a sickle, but I do see a red flag.

21  Q    Do you see that?

22  A    Yes.

23  Q    Can you tell that's a sickle?

24  A    Like, kind of.

25  Q    So that's the communist flag of the Soviet Union; isn't

31

D. Willis - Cross

1  that correct?

2  A    If that's a sickle, then that's probably what it is, yeah.

3  I think so.

4  Q    Do you remember seeing that among your fellow

5  counter-protesters on August 12th?

6  A    I didn't remember seeing it.  It didn't stand out to me.

7  Q    You forgot about that?

8  A    Yeah.

9  Q    Okay.  You didn't realize there were communist supporters

10  among the counter-protesters?

11  A    Yeah, I just wasn't really paying much attention to them.

12  I was, like, focused on the group that I had come with.

13  Q    What about this person here in the white shirt?  Do you

14  know her?

15  A    I don't know who that is.

16  Q    Do you see this person back there that I just circled?

17  A    Yes.

18  Q    Do you see the red bandanna around their neck?

19  A    I do.

20  Q    Is that something that you just didn't notice, either?

21  A    Probably -- I don't think so, no.  They don't look like

22  they're with this group.

23  Q    You didn't recognize that as a symbol of Antifa?

24  A    No, I didn't.

25  Q    These two individuals standing between the woman with the

D. Willis - Cross

1  white blouse and the person with the blue, do you recognize

2  them?

3  A    No, I do not recognize them.

4  Q    Were they UVA students?

5  A    I do not recognize them.

6  Q    How about this individual with the blue shirt and the hat?

7  A    I can't see their face.  I'm not sure who they are.

8  Q    What about this individual in the orange shirt?

9  A    I'm not sure who that is, either.

10  Q    Do you see what they have around their neck?

11  A    Yes.

12  Q    What is it?

13  A    A red bandanna.

14  Q    Is this your first time noticing that he's wearing a red

15  bandanna?

16  A    Yes.

17  Q    What about this individual right here?  Do you recognize

18  him?

19  A    I do not.

20  Q    It looks like he has, actually, an orange bandanna around

21  his neck, correct?

22  A    Correct.

23  Q    And I guess you can see a little bit better; do you see

24  the sickle flag in the background there?

25  A    I do, yes.

D. Willis - Cross

1   Q    Is that Natalie Romero?

2   A    That is Nat, yes.

3   Q    So if somebody would have said that Natalie was only

4   standing on the side of the road with a group of female

5   counter-protesters, that would be obviously incorrect, right?

6   A    I think there are females present.  I don't think that

7   this video invalidates that statement if someone said that.

8   Q    Is she standing in the middle of the road linking arms

9   with a white male here?

10  A    It looks like it.

11  Q    Do you recognize the male with the black?  Do you

12  recognize him?

13  A    I don't recognize him.

14  Q    Were these members of the band that you were with, these

15  people who have cymbals and a drumstick?

16  A    I think so, yes.

17         MS. CONLON:  Sorry about that.

18   BY MR. JONES:

19  Q    So this individual here in black holding what appears to

20  be some kind of a pole, do you see that?

21  A    Yes.

22  Q    Was that the type of pole that you saw being used as a

23  weapon that day?

24  A    I'm not sure.  I don't know.  I'm not sure what that is

25  that he's even holding.

34

D. Willis - Cross

1  Q    Well, you saw people using flagpoles and sticks as

2  weapons.  My question was:  Is that the type of -- I'm not

3  asking if you saw him use it as a weapon.  I'm just asking you

4  if that's the type of stick or pole you saw being used as

5  weapons that day.

6  A    I mean, if that's a flag, then it's a flag.  But yeah, for

7  sure, like a flag was one of the -- flags and flagpoles were

8  one of the weapons that I saw being used that day.

9  Q    This person is clearly a counter-protester, right?

10 A    That would be my best guess.  Like, I think so.

11 Q    So you're saying sometimes it's hard to tell, right?

12 A    Sometimes it is hard to tell.

13 Q    This person happens to be wearing all black with a black

14 bandanna across their face, correct?

15 A    Correct.

16 Q    You're inferring because he's standing with a group of

17 counter-protesters blocking Market Street that he is a

18 counter-protester, correct?

19 A    I mean, yeah, he's with some people I recognize, so I'm

20 assuming that he's not a Unite the Right person.

21 Q    Do you recognize either of these two people?  A person

22 with sunglasses holding a "melt the statues" sign, do you

23 recognize that person?

24 A    I do not recognize either.

25 Q    What about the gentleman standing next to her in a black

35

D. Willis - Cross

1   T-shirt?

2   A    I don't recognize this person.

3   Q    What about this person with glasses and a gray T-shirt?

4   A    No.

5   Q    What about this person here with a black T-shirt

6   underneath some sort of a button-up shirt?  Do you recognize

7   him?

8   A    No, I do not recognize that person.

9   Q    Do you see what appears to be a stick there in front of

10  him?

11  A    I do.

12  Q    Was that the type of implement you saw being used as a

13  weapon on August 12th?

14  A    Yeah, I saw people with sticks.

15  Q    Do you see that person there behind that I just circled?

16  A    Yes.

17  Q    What does that person have around their neck?

18  A    A rainbow bandanna.

19  Q    Do you see this person standing back behind there I just

20  circled?

21  A    Yes.

22  Q    What do they have around their neck?

23  A    A red bandanna.

24  Q    It seems safe to say that, actually, most of the people

25  that we just went through were not UVA students that you

36

D. Willis - Cross

1  recognized; isn't that right?

2  A    I recognize several UVA students in this video.  Also,

3  some of them were standing, like, behind the line as well, but

4  there was a lot of people who were unknown to me, who they

5  were.

6  Q    So my question was just -- I know you identified a few UVA

7  students there.  But isn't it correct that the majority of the

8  people that we just spoke about who were forming the human

9  barricade across Market Street were not UVA students that you

10  recognized?

11  A    I mean, I didn't recognize everyone personally.  I don't

12  know who was and was not a student.  Like, a lot of the people

13  looked really young, so I don't know about, like -- I think

14  some people probably weren't UVA students, but I think that at

15  the time they were standing in the student section with the

16  students, and, like, that's why I understood them as UVA

17  students.

18  Q    It's safe to say this isn't a group of UVA students

19  reading poetry in the park, isn't it?

20  A    I think it's safe to say that.

21  Q    So as you guys took positions across Market Street and

22  protesters arrived, walking down Market Street, did the police

23  intervene?

24  A    I don't remember seeing the police intervene.

25  Q    Did you ask the police why they didn't stop you from

                              D. Willis - Cross

1  blocking a public roadway and trying to prevent people from

2  attending a rally?

3  A    I didn't ask the police that.  And I don't feel like the

4  roadway was totally blocked.

5  Q    Do you know why the police were allowing you to do that?

6  A    I do not.

7  Q    Just if you know.  You don't?

8  A    Yeah, I'm not sure.

9  Q    Okay.  You testified that you were -- you used the word

10 "curious," you used the word "annoyed," that the protesters

11 were walking down Market Street and using that particular

12 entrance to go to the park; do you remember saying that on

13 Friday?

14 A    I do remember saying that.

15 Q    I'm going to pull up a map of downtown Charlottesville.

16      Do you see that?

17 A    Yes.

18            THE CLERK:  Mr. Jones, is this just a demonstrative?

19            MR. JONES:  Yes.

20 BY MR. JONES:

21 Q    So just to clear up a little confusion, we've been

22 referring to the park where the demonstration happened as

23 "Emancipation Park."  The name has changed to Market Street

24 Park.  But do you see the middle of the map there?

25 A    Yes, I see it.

38

D. Willis - Cross

1  Q    So I'll still call it "Emancipation Park," but that's the

2  park that I am referring to.

3       At the top left, do you see McGuffey Park?

4  A    Yes.

5  Q    And at the bottom right, there is the Market Street

6  garage; do you see that?

7  A    Yes.

8  Q    Right next to the Market Street garage is the

9  Charlottesville Police Department; do you see that?

10 A    Yes.

11 Q    So you're aware that the Market Street parking garage, the

12 main entrance and exit of that garage is right on Market

13 Street, correct?

14 A    Yes.

15 Q    If you would, please, draw the most direct route to

16 Emancipation Park from the Market Street parking garage.

17 A    Sure.  I think the most direct route is -- the drawing

18 feature is not working.

19 Q    Let me see if I can -- would it be that route?

20 A    Yes, I think so.

21 Q    And that's the entrance of the park where you were

22 standing with the other group of counter-protesters, correct?

23 A    Yes.

24 Q    So was there anything special about that particular

25 entrance to Emancipation Park for you?  Was there any

D. Willis - Cross

1  particular reason why you were trying to block that entrance to

2  the park?

3  A    I wasn't trying to block the entrance to the park.  If I

4  had to guess why we picked that corner, it's probably because

5  we also came from the east.

6  Q    Oh, you came from -- well, so do you mean because you went

7  from McGuffey Park to the bridge, and then --

8  A    Yes.  That's what I'm referring to.

9  Q    So let me clear the screen here.

10       So if -- if this entrance to Emancipation Park would have

11  been obstructed or blocked by counter-protesters, assuming for

12  the sake of argument that there were other possible entrances

13  to the park -- for example, let's assume that that second

14  circle at the top right corner of the park, let's assume that

15  was an available entrance for them to use.  If the lower

16  entrance where you were was blocked, they would have had to go

17  back one block up, one block and over a block, to get to that

18  entrance, correct?

19            MS. CONLON:  Objection, calls for speculation.

20            THE WITNESS:  And I still answer, right?

21            THE COURT:  Overruled.

22            Go ahead and answer.

23            THE WITNESS:  I answer?

24            I think that if the pathway to Market Street was

25  blocked the way it was when we were doing our symbolic, I

D. Willis - Cross

1   guess, stand, the next most efficient way would have been to

2   just use the sidewalk.  But after that, sure, you could go

3   around a block and into the park.

4    BY MR. JONES:

5   Q    So did you ever notice a time when the complete roadway

6   across Market Street was blocked?

7   A    I did not.

8   Q    You didn't notice that at all?

9   A    No, sir.

10  Q    So let's say, for example, if the entire roadway was

11  blocked by counter-protesters linking arms, the protesters

12  would have had to go three blocks in the outline I just

13  outlined, correct?

14  A    That seems like -- yeah.

15  Q    So is it your testimony today that you and your fellow

16  counter-protesters would simply have stayed at this entrance

17  and not have gone like this up to that entrance to try to block

18  that entrance as well?

19           MS. CONLON:  Objection.  Calls for speculation again.

20           THE WITNESS:  I'll just speak for myself.

21           THE COURT:  Overruled.

22           MR. JONES:  That's all I'm asking him to do.

23           THE COURT:  All right.  You answer the question.

24           THE WITNESS:  Okay.  I'm sorry.

25           Yeah, I'll just speak for myself.  I don't think the

D. Willis - Cross

1  objective was to -- you know, if they had used the sidewalk, I

2  wouldn't have jumped in front of them.  That wasn't the point

3  of that.  Like I said, it was mostly a symbolic sort of

4  standing up.  That's why there was music and stuff.

5  BY MR. JONES:

6  Q    If nobody was there at that entrance to show the symbolic

7  protest, you would have gone to a different location to have a

8  symbolic protest, correct?

9  A    Could you rephrase the question?

10  Q    The purpose of the symbolic protest was so people could

11  see the protest, correct?  You wanted people to see what you

12  were doing?

13  A    I think so.

14  Q    Particularly, you wanted the protesters to see what you

15  were doing, right?

16  A    I'm not sure.  Like, I think that --

17  Q    Who was your audience?

18  A    I think -- yeah, that's a good question, right?  I think

19  the audience is really more so other counter-protesters more so

20  than the protesters themselves.

21  Q    So when you're standing in the middle of the road blocking

22  the protesters from coming into the park, your audience is not

23  the actual protesters themselves?

24  A    I mean, pretty much, like, I mean, if you look at that

25  video, our back is to the people who are in Emancipation Park.

D. Willis - Cross

1   You know, we are -- I'm speaking for myself here.  Like, yeah,

2   it's -- it's a turn of phrase to say, like, standing up to

3   hate, and I'm like, that's a symbolic -- that's a performance

4   of that, standing up to hate.  And we did that in the street.

5   Q    Are you saying there were only protesters behind you or

6   didn't you testify that some protesters were coming down the

7   road towards you?

8   A    That's also true, yeah, but there were, like, protesters

9   in every direction from where I'm standing in that area.

10  Q    So isn't it true, if the protesters had tried to go to a

11  different entrance, you would have simply followed them and

12  made your ceremonial protest at a different entrance?

13  A    I don't think that's true.

14  Q    Can you speak for anybody else or just yourself?

15  A    Just myself.

16  Q    Did you participate in any of the logistics meetings with

17  the organizers of the protesters and the Charlottesville Police

18  Department?

19  A    With Unite the Right organizers and the Charlottesville

20  Police Department?  I don't recall if Unite the Right people

21  were there.  But I do just remember being at one meeting with

22  CPD.

23  Q    So you weren't aware of whether there was a -- an

24  understanding between the Charlottesville Police Department and

25  the protesters about where they would access the park; you were

D. Willis - Cross

1  not aware of that, were you?

2  A    I was not aware of that.

3  Q    That could also explain why they were using that entrance,

4  correct?

5  A    That could be an explanation, but it wasn't in my

6  knowledge at the time.

7  Q    Also the fact that it's the most direct route from the

8  parking garage could also be an explanation, correct?

9  A    That could be an explanation.

10 Q    So you testified that you were there at that corner of the

11 library until the unlawful assembly was declared, correct?

12 A    Yes, sir.

13 Q    I'm going to pull up a video, PX3239.

14     (Plaintiffs' Exhibit 3239 marked.)

15         THE CLERK:  Has this been previously admitted?

16     (Video playing.)

17  BY MR. JONES:

18 Q    Do you recognize where this is?

19 A    I'm not exactly sure where it is.

20 Q    Let me play a little bit more so you can see.

21         (Video playing.)

22     That's outside of Emancipation Park and the library,

23 right?

24 A    Yes.

25 Q    And you were stationed over in this area where I've

44

D. Willis - Cross

1  circled, right?

2  A    Either there or further to the right, yes.

3  Q    You testified that you came out to form this human

4  barricade across Market Street at least a couple times,

5  correct?

6  A    Yes.

7  Q    Could it have been more than a couple times?

8  A    I think it was a couple times.  I don't know how many

9  times.

10  Q    Could have been three, could have been two?  You don't

11  know exactly?

12  A    I'm not sure, yeah.  I don't remember too well.

13  Q    You testified that one of the times the group of

14  protesters that was arriving to the park that was walking along

15  Market Street towards the park was a group with older, bearded

16  men.  Didn't you say that?

17  A    Yes.

18  Q    I'm circling here, that's Michael Tubbs.  That's one of my

19  clients.  He appears to be an older man with a beard, correct?

20  A    Correct.

21  Q    Another circle here, that's Michael Hill, one of my other

22  clients.  He appears to be an older man with a beard, correct?

23  A    That's correct.

24  Q    Was this the group that you recall?

25  A    I'm really not sure.

D. Willis - Cross

1  Q    I'm going to back up here.  I've got a screenshot.  That

2  will be easier for us to go through.

3       Could you mark on this picture, if you can, where the

4  protesters who were arriving down Market Street could have gone

5  around this group of counter-protesters?

6  A    Yes.  They could have went on the other side of this white

7  vehicle, but I can't -- well, the drawing feature isn't

8  working, and also that part of the street is not pictured.

9       (Video playing.)

10  Q    So you're suggesting this group could have gone around

11  there to try to enter the park?

12  A    I was pointing to the side of the street but it doesn't

13  look -- they could have gone around either side of both white

14  vans.

15  Q    And I guess you're assuming that this group that's

16  blocking the roadway, completely blocking the roadway, they

17  wouldn't have just shifted over.  You're saying there's

18  something special about that particular spot of ground?

19  A    Could you rephrase the question.

20  Q    It's your belief that if they would have gone around the

21  back of that van, that this group of people that's completely

22  blocking the road, they would have just stayed where they're

23  at?  They wouldn't have shifted over to block --

24           THE CLERK:  Mr. Jones, did you intend to admit that?

25           MR. JONES:  (No verbal response.)

D. Willis - Cross

1          THE CLERK:  Okay.  Sorry.

2          THE WITNESS:  Yeah, I really don't think it would be

3    fair for me to speak on what they would do.  It is my belief

4    they wouldn't do that.  I think the point is like, you are

5    standing your ground and you are not being displaced or

6    whatever.  And that's like the whole gesture.  It's not about

7    following people and jumping in front of them.  But for myself

8    especially, I would not have shifted my -- where I was

9    standing.

10   BY MR. JONES:

11   Q    All right.  Let's go through this line of folks.  Starting

12   with this guy on the left, does he appear to be a UVA student?

13   A    He does not look like a UVA student.

14   Q    He's wearing all black; is that right?

15   A    He is wearing all black.

16   Q    The gentleman standing next to him, does he appear to be a

17   UVA student?

18   A    I mean, I don't think so.

19   Q    What's he wearing around his neck?

20   A    He's wearing a bandanna.

21   Q    What color is the bandanna?

22   A    Red.

23   Q    What about this person, do they appear to be a UVA

24   student?

25   A    They could be.  I don't know.  But I'll go with no.

47

D. Willis - Cross

1  They're not someone I recognize as a UVA student anyway.

2  Q    What about this person, do you recognize that person?

3  A    I don't know who that is.

4  Q    What's that person wearing around their neck?

5  A    A red bandanna.

6  Q    You really didn't notice any red bandannas that day?

7  A    I mean, I really didn't.  Like I said, like, I was mostly

8  concerned with and accounting for the people I came with.

9  Q    What about this person, do you recognize that person?

10 A    I do not.

11 Q    What about the individual with the blue shirt, sunglasses,

12 hat, do you recognize them?

13 A    No.

14 Q    What does that person have in their hand?

15 A    I really can't tell.

16 Q    Do you see that umbrella?  Let me circle it for you.

17 A    Okay.

18 Q    Is that an umbrella?

19 A    That looks like an umbrella.

20 Q    What about this person, do you see the red bandanna around

21 their neck?

22 A    I do.

23 Q    What about this individual, do you see them?

24 A    I see them.

25 Q    Do you see that they're holding what appears to be a

D. Willis - Cross

1   flagpole?

2   A    I see them holding a flag.

3   Q    Do you see the pole attached to the flag?

4   A    Like the one he's holding?

5   Q    Yeah.

6   A    I see the -- yeah.

7   Q    Was that the type of weapon you saw being used during

8   confrontations and conflicts that day?

9   A    Yes.

10  Q    Appears to be another -- let me zoom out.  Do you see

11  there's a second flag and a pole as well?

12  A    Yeah.

13  Q    That's also the kind of thing that was being used as a

14  weapon that day?

15  A    Yeah, it's also a flag.

16  Q    Do you recognize what that flag is?

17  A    I do not recognize what that flag is.

18  Q    So is there any space to go around these people straight

19  down Market Street?

20  A    I don't -- like -- like, are you asking about the entirety

21  of Market Street or just this section where they're standing?

22  Q    Well, so on the left, there's that white line --

23  A    Yes.

24  Q    -- that marks the edge of the road there.  And then all

25  the way over to where the van or whatever is parked right

D. Willis - Cross

1  there, is there any space for anybody to walk through there?

2  A    Yeah, not on the -- not really, no, not on the -- not on

3  the roadway.

4  Q    Fair to say that most of the folks here blocking the

5  roadway are not UVA students?

6  A    I think in this photo that seems like a fair thing to say,

7  but I don't know who these people are, so I can't confirm or

8  deny their affiliations to UVA.

9  Q    So you talked a lot about -- you talked some about the

10  rally in July, the Klan rally.  If I call it the July Klan

11  rally, do you know what I'm talking about?

12  A    Yes.

13  Q    And then contrasting that rally with the August 12th Unite

14  the Right rally.

15  A    Yes.

16  Q    You described the Klan rally as -- I mean, you saw some of

17  the Klan members had weapons, but otherwise it was an

18  uneventful, nonviolent rally; is that right?

19  A    For the Klan rally, yes.

20  Q    There was a pretty significant police presence at the Klan

21  rally, wasn't there?

22  A    Yes.

23  Q    In fact, the police were actually separating the

24  counter-protesters from gaining access to the Klan; isn't that

25  right?

50

D. Willis - Cross

1  A     I don't remember the details, but I know that they had a

2  park again.  So, like, counter-protesters were not in the park

3  for sure.

4  Q     And you were surprised that you experienced violence at

5  the August rally because you were assuming that the August

6  rally was going to be similar to the July rally where you

7  didn't experience violence; is that right?

8  A     Yes, that's correct.

9  Q     Couldn't it be that one of the reasons you experienced

10 violence at the August rally was that you were standing with

11 other counter-protesters blocking a public roadway, but in July

12 you didn't do that?

13 A     Could you rephrase the question, please?

14 Q     Couldn't the reason that you experienced violence in

15 August, and not in July, couldn't one reason for that be that

16 in August you were standing in the middle of a roadway blocking

17 the roadway, but in July you didn't do that?  Couldn't that be

18 a reason?

19 A     I mean, I don't think that standing in the road is like an

20 invitation to be attacked, but I think that one could say that,

21 yes.

22 Q     So you testified that you saw time and time again people

23 creating a barricade across Market Street and protesters

24 pushing through the barricade.  You saw that happen time and

25 time again, right?

D. Willis - Cross

1   A    I saw that happen --

2   Q    And after you saw that happen, you got up and blocked

3   Market Street, didn't you?

4   A    I don't know the exact, like, chronology, right?  Like the

5   video, the one that you know that I took, that seems to be

6   earlier in the day.

7   Q    And you're saying you did not, after seeing that happen

8   time and time again, you did not expect that it would happen to

9   you when you did it?

10  A    I don't know if I -- I don't know if I expected it or not.

11  I just know that each time I had the right to stand in the

12  street with my friends.

13  Q    You thought you had the right because the police didn't do

14  anything about it, right?

15  A    I don't think that had anything to do with how I

16  experienced the right to stand in the street.

17  Q    Have you ever in your life stood across a public roadway

18  with your friends linking arms before?

19  A    Before this incident, I don't think so.

20  Q    So why would you think that you had a right to do that?

21  A    Because that was a meaningful way of peacefully

22  counter-demonstrating what was happening in the park.

23  Q    When you say you had a right to do that, you mean you

24  thought it was legal for you to be doing that?

25  A    Yes.  It was a pedestrian roadway.  We were pedestrians.

D. Willis - Cross

1   Q    When you went to the August 12th rally that morning, did

2   you plan to stand across the roadway to obstruct traffic on

3   that road?

4   A    No.  That was impromptu.

5   Q    Similar to the "no racist police" chant, sometimes you get

6   caught up in the moment?

7   A    Yeah, the chants were also impromptu.

8   Q    Sometimes when you are faced with an emotional situation,

9   you get caught up in the moment; isn't that right?

10  A    No.  I just think those were things I didn't plan for and

11  I joined in on in the moment, but it wasn't like I got caught

12  up in the moment necessarily.  You know what I'm saying?

13  They're just things that weren't on the schedule for me, but

14  things that I took part in.

15  Q    So it was like a spontaneous act on your part?

16  A    Right.

17  Q    Now, this will come across as a strange question, but

18  isn't it true that all of the protesters that you could see

19  that were arriving at the park for Unite the Right, all of the

20  protesters were white; isn't that right?  Is that fair to say?

21  A    To my memory, but I'm sure they weren't all white.

22  Q    Do you there might have been some non-white protesters?

23  A    Yeah, I think that's a possibility.

24  Q    You don't recall seeing any of them?

25  A    I don't recall.

D. Willis - Cross

1    Q    Now, you weren't counter-protesting them because of their

2    race.  You were counter-protesting them because of their

3    political beliefs; isn't that right?

4    A    I was counter-protesting because of their message, yes.

5              MR. JONES:  Thank you, sir.  That's all the questions

6    I have.

7              THE WITNESS:  Thank you.

8              MR. SPENCER:  Would I be able to call up some of the

9    plaintiffs' evidence?  Is it on this computer?

10             MS. KAPLAN:  Well, your co-counsel knew how to do it

11   so maybe you should check with him.

12             MR. SPENCER:  Could I borrow your computer?

13             It's just one.

14                        CROSS-EXAMINATION

15    BY MR. SPENCER:

16   Q    Good morning, Mr. Willis.  Thank you for your testimony.

17   A    Good morning.

18   Q    You have said that you were a liberal arts guy at UVA, and

19   you studied political and social thought.  Is that a program or

20   a major?

21   A    It's a major, yeah.

22   Q    It's a major.  And did you graduate with that as your

23   major?

24   A    Yes.

25   Q    Good.

D. Willis - Cross

1    Could you give us an idea of some of the courses you took?

2    A    Right.  So some of the required courses before you apply

3    would be like modern political thought, which is like Western,

4    classical, like Aristotle and stuff.  Other courses that would

5    have been -- pretty much all the politics courses are

6    recommended.

7    Q    Did you study authors beyond ancient authors like

8    Aristotle?  Was it -- was it more about contemporary thought or

9    were you doing the whole history of political thought?

10   A    So the curriculum of the PST program is pretty broad.  I'm

11   getting some feedback.

12       The curriculum for PST is really broad.  Yeah, there's a

13   few classics in there, but we also read people like Nietzsche,

14   Isaiah Berlin.  It's pretty broad.  I couldn't even name --

15   Chimamanda Adichie -- I'm butchering her name.

16   Q    Could you repeat that real quick?

17   A    There's an author named Chimamanda, but I can't pronounce

18   her last name well.

19   Q    Okay.  What were some of the authors that you were

20   passionate about?  I know as a student we're able to choose

21   which courses we take.  So what struck you as important?

22   A    Yeah.  The Chimamanda Adichie book I remember had a big

23   impact on me.  It talks about, like, Nigeria during its civil

24   war in the '60s.  I remember I really enjoyed the Isaiah Berlin

25   element of the curriculum.  He's like a philosopher and he

D. Willis - Cross

1  writes about monism versus -- wait, monistic versus -- I'm

2  butchering it now.  It's been a while.  But he writes about

3  philosophy.  People like that.

4  Q    Isaiah Berlin, he's a liberal thinker, classical liberal

5  thinker; is that fair to say?

6  A    I don't know where you'd put him on the spectrum,

7  actually.  I'm not sure.

8  Q    Was free speech an important right for Isaiah Berlin?

9  A    I believe so.

10  Q    Is there anyone else?  Is the book that you were referring

11  to, is that Things Fall Apart?

12  A    No.  No.  No.  The book's called *Half of a Yellow Sun.*

13  Also, I'm remembering that what I liked about -- this is not

14  important, but what I liked about Isaiah Berlin is he seemed

15  very critical in both directions, actually.  Something I

16  remember about his work.

17  Q    What do you mean by that, "critical in both directions"?

18  A    Like, he's like a pretty relentless intellect.  I think

19  that, like, he could make critiques of the left and the right.

20  Q    I agree.  Was free speech something that he held sacred?

21  A    I believe so, yeah.

22  Q    Okay.  You were a member of the Black Student Alliance?

23  A    That's correct.

24  Q    Were you a member of that group throughout your time at

25  UVA?

1  A    No.  It was something that I didn't stick with later on in

2  my college career.

3  Q    Okay.  But you were a member of that group during the

4  events that are in question here?

5  A    Yes.

6  Q    Okay.  You testified that there is no racially exclusive

7  aspect to the Black Student Alliance.  So it might be strange

8  to ask, but could I join?

9  A    If you -- if you wanted to, yeah.

10  Q    Okay.  So --

11  A    While you were a UVA student.

12  Q    Right.  Did many -- could you give a rough makeup of the

13  Black Student Alliance in terms of demographics?

14  A    Sure.  So we don't have a lot of card-carrying members

15  because I think dues are not very strictly enforced.  But I

16  will say that, like, the executive boards, at least while I was

17  there, were mostly black students.  But like, the attendees of

18  our events were almost always really diverse, right?  So you

19  had all kind of people who would come to the events that we put

20  on.

21  Q    So is it fair to say that the Black Student Alliance, it

22  was about identity as a kind of general term?  It wasn't

23  racially exclusive but it was about black identity?

24  A    Yeah, I think it's a group that celebrates black identity,

25  for sure.  But membership was not exclusive.

D. Willis - Cross

1  Q      Is there a white student alliance on campus?

2  A      Not to my knowledge.

3  Q      Okay.  What would you think about such a group?

4  A      I don't know what I'd think about it.  I've never seen

5  anything like that.  I guess it just depends on what they were

6  up to.

7  Q      Okay.  So it would be about the politics of the group?

8  A      Right.

9  Q      How would you define the Black Student Alliance's

10 politics?

11 A      Its politics?

12 Q      Uh-huh.

13 A      I think the actual political activity they've done is

14 almost always concentrated on making the University of Virginia

15 a better place for black students.  And like, I think the

16 biggest item historically has been just increasing the number

17 of black students who are admitted to the university on an

18 annual basis.  So it's things like that that are pretty

19 practical.

20 Q      So supporting affirmative action, roughly, that was one of

21 the central goals?

22 A      Yeah, I think among other things, sure.

23 Q      Okay.  I want to go to July 8th.  This was a rally at

24 which I was not present or I don't think anyone here was

25 present.  Could you remind us why you -- why would you go to a

D. Willis - Cross

1  Klan rally?

2  A    Right.  To exercise free speech right.

3  Q    Okay.

4  A    Well, one, I told you I was in a lot of disbelief that it

5  was actually taking place.  I hadn't seen anything like that up

6  to that moment in my life.  So I wanted to, like, you know, go

7  see it for myself.  And then I also wanted to, you know, say my

8  piece and say that I don't stand for this, from a peaceful

9  distance, of course.

10  Q    That sounds good.

11  A    Yeah.

12  Q    On multiple times during your testimony on Friday you

13  described it as gross?

14  A    Uh-huh.

15  Q    Is that fair?  Would you like to remind us of your

16  feeling?  Gross, you mentioned a few times.  That stuck out to

17  me.  Is that how you felt?

18  A    That's the word I used.  That's how I felt, yeah.

19  Q    Okay.  Why would you go to something that's gross?

20  A    Well, if you hear something that you are opposed to is

21  taking place, and you can't believe that it's really taking

22  place -- like I said, I've never seen robed-up Klans members

23  before.  Wanting to go -- you know, it's kind of like being

24  thorough.  It's like okay, well, let me go see, right?

25  Q    Okay.  Were you a bit fascinated by something that's

D. Willis - Cross

1    gross?

2    A    For sure, yeah.  In part.  But more so disturbed.

3    Q    Okay.  I want to move ahead to the Unite the Right event

4    in August.  And I want to dwell a bit on evidence --

5    plaintiffs' evidence 3261 that we read.

6    A    The media advisory.

7            MS. KAPLAN:  Is that the document?

8            MR. SPENCER:  Yes.  That's on the screen.  Good.

9     BY MR. SPENCER:

10   Q    So Peoples Action for Racial Justice, could you remind me,

11   was this an organization that was created just for the Unite

12   the Right event or was this an organization that stretched out

13   longer?

14   A    If I'm not mistaken, it was ad hoc and it only existed for

15   the purposes of the McGuffey Park permit.

16   Q    Okay.  And so you have testified that you edited this

17   missive.  You didn't write it yourself.

18   A    That's my understanding -- I believe, yeah.

19   Q    Did you approve it, or of it?

20   A    Yeah, I think so.  I approved of it, yes.

21   Q    You approved it.  Okay.  I would like to go to the

22   paragraph that begins with "organizer Walt" and then there is a

23   redacted last name.  Could you read that paragraph for us?

24   A    The entire paragraph?

25   Q    Yes, please.

D. Willis - Cross

1  A    Yeah, if you like.  "Organizer Walt [redacted] said white

2  supremacy happens all the time.  It is the rule, not the

3  exception.  If the people of Charlottesville and the nation are

4  waiting for the right moment to organize for a racially just

5  and truly multicultural society, this is the moment to become

6  focused.  This is not about statues, it's about statutes.  The

7  PARJ will focus on what" -- it's a bit blurry --

8  Q    I can help you, if you want me to.

9  A    Okay.

10 Q    "Focus on what" --

11 A    Oh, yeah, yeah.  I'll carry on.  Thank you.

12      "The PARJ will focus on what citizens can do going forward

13 on August 13th to build a stronger community based on the

14 principles of racial harmony and justice."

15 Q    Okay.  So white supremacy happens all the time.  It is the

16 rule, not the exception.  Do you believe that we live in a

17 white supremacist society?

18 A    I think we live in a really complicated society, but --

19 and there's lots of white supremacy present in it.

20 Q    But it is the rule, and not the exception?

21 A    I think those are Walt's words, and I think that he kind

22 of meant it as a turn of phrase just to capture the magnitude

23 of how often it can take place.

24 Q    Is there white supremacy at the University of Virginia?

25 A    I think white supremacist things have happened at the

61

D. Willis - Cross

1  University of Virginia.

2  Q     They have happened in the past?

3  A     Yes.

4  Q     Or is their legacy still remaining at UVA?

5  A     Yeah.  It's another -- yeah.  Same as the country.  Same

6  as the society.  It's complicated.  And UVA has struggled with

7  its past.

8  Q     Uh-huh.

9        You go on to say, "this is not about" -- or excuse me.

10 Walt goes on to say, "this is not about statues."  So is it

11 fair to say that this was a group that had expansive ideals?

12 A     I think that when he's saying this is not about statues,

13 my understanding is that he's referring to Unite the Right's

14 organizers and those people.  Like it's not about statues for

15 that group of people.

16 Q     It says "this is a moment to become focused.  This is not

17 about statues."

18       I presume the "this" is referring to the moment.

19 A     You might be right.  I'm really not sure.  These are

20 Walt's words.

21 Q     That's fair.  They're Walt's words, but I am curious about

22 what he's saying.  "This is the right moment to organize for a

23 racially just and truly multicultural society."  Does that

24 strike you as expansive, well beyond the statues?

25 A     Organizing for -- it's multicultural -- for a racially

D. Willis - Cross

1   just and multicultural society.  I think that's a motivation

2   for, like, a lot of people, yeah.  That's why you think

3   standing up against hate in public is important, because it

4   says that you value these other things that are --

5   Q    Okay.

6   A    -- better.

7   Q    Does that include protesting the police?

8   A    I think to some people it does.

9   Q    Does that include protesting the university itself?

10  A    I think to some people it does.

11  Q    Okay.  I'd like to go to August 11th.

12        And perhaps you could remind me.  You were attending a

13  dinner at a professor's house?

14  A    Yes.

15  Q    And someone broke in -- those were your words -- and

16  announced that something was happening.

17        Could you remind me of what happened there?

18  A    Yeah, I'm not sure if you're quoting me directly, but

19  yeah, somebody came in.

20  Q    I didn't mean break in as in a criminal thing.  I meant

21  kind of broke into the room, is what you said.

22  A    Sure.  Somebody came in and let some people know that they

23  had heard that Jason Kessler and a handful of people are going

24  to, you know, give a speech or something somewhere on UVA

25  grounds.

D. Willis - Cross

1  Q    How did they hear about it?

2  A    I really don't know.  I don't know who the person was.

3  Q    Did they know something about where it would be?

4  A    I don't know if it was, like, their guess or if someone

5  had told them or what it was.

6  Q    Okay.  Their guess?

7  A    I heard this information very much secondhand from the

8  people who I knew well.

9  Q    Okay.  Why did you decide to go and attend it?

10  A    A couple of reasons.

11      I think that what stood out to me in the moment was that

12  all my friends had their mind made up about going.  You know,

13  who wants to be the odd friend out?

14      Two, I noticed that, like, it was a -- so Jason Kessler

15  was having this rally, and he's doing it on UVA grounds, as

16  opposed to the City of Charlottesville or any other place, and

17  he's not a student anymore.  I don't know if he ever was.  And

18  so it just felt like it was my business, because I was a

19  tuition-paying student at the time, and they could have done

20  this literally anywhere else.

21  Q    See, you mentioned that, a "tuition-paying student," on

22  Friday.

23  A    Yes.

24  Q    And you -- do you -- as a tuition-paying student, do you

25  have a right to determine the curriculum of the University or

D. Willis - Cross

1  what's said at the University?

2  A    No -- well, I'm not sure.  I'm not sure what my rights are

3  about determining the curriculum of the University.  I think

4  students should have an input about that kind of a thing, but I

5  think my point really is more about just the fact that, like, I

6  think that the students at the University in the moment should

7  get to decide what the narrative about the University is.

8       And if people who are not students are coming to say

9  racist and vitriolic things on the campus, then that's unfair

10  to the students who literally live on the campus, and in this

11  case literally live on the Lawn, to not be included in that

12  narrative, like, getting to say what the school represents or

13  whatever.

14       Do you get my point?

15  Q    Yes.  Is the fact -- I do get it.

16       Is the fact that some people weren't students, is that an

17  essential matter to any of this?

18       I mean, if a student were to participate in a rally for

19  something you disagreed with, would that actually change the

20  matter?

21  A    Could you rephrase the question?

22  Q    Sure.  Is the fact that Jason Kessler was not currently a

23  student at UVA, was that an essential matter in your

24  decision-making?

25  A    I do think it was a factor.

D. Willis - Cross

1   Q    It was a factor?

2   A    Just relative to the fact that there are students who very

3   much were in town and were occupying -- yeah, like, who are

4   inhabiting that space who probably --

5   Q    If a first-year UVA student, you know, tuition-paying UVA

6   student, wanted to hold a torch rally, would you have a

7   different opinion?

8   A    I'd probably be pretty confused, but -- it depends what

9   the rally was about.

10  Q    Well, I mean, a rally like Unite the Right.

11  A    Yeah, I'm not sure.

12  Q    You're not sure?

13  A    Yeah, I think that, like, students have protests all the

14  time.  Undergrad students have protests all the time, and that

15  is a normal thing.  It's not that common for older people who

16  are not students anymore to return to the University to have a

17  torchlit rally.

18       So I think, in your hypothetical, the first year is a

19  little less strange to me, although the tiki torch part is a

20  little --

21  Q    I get that.

22  A    Yeah.

23  Q    I mean, are you sure that -- withdrawn.

24       The fact that it wasn't a student played a major part in

25  your decision to counter-protest?

D. Willis - Cross

1   A    Well, I said it was the second reason.

2   Q    Okay.  Fair enough.

3        So who made the banner?

4   A    Some people there.

5   Q    Some people who were with you at the house?

6   A    Yes.  Yeah.

7   Q    At the dinner?  Okay.

8        Did you make it?

9   A    I don't know.  I very well could have helped paint a

10  letter or something, but I don't remember if I had any

11  authorship on the banner.  But people who were there made it,

12  for sure.

13  Q    Do you remember what it said?

14  A    I think it says "Virginia students act against white

15  supremacy."

16  Q    So you were referring -- were you referring to the white

17  supremacy in the society in the University itself, as you've

18  testified?

19  A    Well, I think that they made the banner in anticipation of

20  Unite the Right the next day.  So I think that in this case

21  it's referring to the rally-goers.

22  Q    How did you make your way down to the base of the

23  Jefferson statue?

24  A    I rode in a car and then I walked.

25  Q    Okay.  Why did you -- how and why did you choose to go to

D. Willis - Cross

1  the base of the Jefferson statue?

2  A    I actually don't know.  I was really more so following

3  other students who, you know, seemed a little more confident

4  about what we were doing.  And I remember that -- yeah, that

5  answers your question.  I was following other students.

6  Q    So did they have direct knowledge of the logistical map of

7  the torchlight rally?

8  A    I don't know, and I don't think so.

9  Q    You don't think so.  Well, why did you choose the

10 Jefferson statue?  Why go there?

11 A    I think that you guys are well-known for liking statues,

12 but also, I'm not sure if -- like, at least my understanding

13 and my recollection of the night is that, like, we go to the

14 statue and you all come to us.  Like, I don't think it was --

15 I'm not sure what your question is getting at, but I think --

16 Q    So the torchlight rally went to you?

17        MS. KAPLAN:  Excuse me.  Your Honor, he can't

18 interrupt the answers.  Mr. Spencer is interrupting Mr. Willis'

19 answers.  He should just let him finish answering and then he

20 can ask another question.

21        THE COURT:  All right.

22        THE WITNESS:  Thank you.

23        Could you repeat your question, Mr. Spencer?  I want

24 to make sure I'm answering it.

25  BY MR. SPENCER:

D. Willis - Cross

1  Q    Yes.  So are you claiming that the torchlight rally went

2  to you?

3  A    I'm claiming that I did not have advance knowledge of the

4  route that was intended for your torchlight rally.  And so I

5  went to the Jefferson statue with some friends, and then people

6  came over the Rotunda, and they came with torches, and

7  surrounded us.

8  Q    Did you and your friends assume that the torchlight rally

9  would end up at the Jefferson statue?

10 A    I don't know.  I really don't know.  But I know that I

11 didn't think that.

12 Q    Why were you there, then?

13 A    I was there with my friends.  I was there supporting my

14 friends.  And I thought that, like -- I'm pretty sure I

15 testified to this on Friday -- I was expecting a very kind of

16 token-level demonstration.  It's like, wherever Jason Kessler

17 and his handful of nationalists, his crew, wherever they're

18 having their hateful rally, we would probably just go there,

19 wave a sign, chant our songs, and that's it.  It wasn't --

20 Q    So wherever Jason Kessler is, you'd be there, if he were

21 engaging in some kind of demonstration?

22 A    On the grounds, I think, that night, that would be fair.

23 Q    When you first arrived at that statue, was anyone there

24 besides your group?

25 A    There were other people there, but I don't know who they

D. Willis - Cross

1  are.

2  Q    Were they protesters?

3  A    I'm not sure what they were doing.  That was actually very

4  confusing to me at the time.  I just remember that, yeah, there

5  were, like, a few people kind of like hanging out.

6  Q    Were they just hanging out?  I mean, it's a public place;

7  were they just hanging out?

8  A    Exactly.  It was unclear whether or not -- if they had

9  just been passing by or, like, what.

10 Q    How long did you wait at the base of the Jefferson statue?

11 A    It was a very brief amount of time.  I don't remember the

12 exact minutes, but it was not long.

13 Q    Is five minutes fair?

14 A    I don't know.

15 Q    Ten minutes?

16 A    I would hate to put a number.  But, like -- it was so

17 brief, you know?

18 Q    Okay.  Did you begin chanting before the torchlight rally

19 or march arrived at the statue?

20 A    No, I don't think so.  I think the chants began after we

21 had been approached.

22 Q    But did you establish yourself at the base of the statue?

23 A    We were in the process of trying to establish ourselves.

24 So I remember one thing that was particularly awful about the

25 whole thing was that we didn't have enough people to form the

D. Willis - Cross

1  ring around the base of the statue.  So we were trying to focus

2  on dealing with that before we were surrounded.

3  Q    You didn't have enough people?

4  A    We didn't have enough people.

5  Q    So you were in a kind of counter-protesting group, and you

6  didn't have enough of your colleagues surrounding; is that what

7  you're saying?

8  A    I think so.  I don't know if it was that other people --

9  yeah, that's what I'm saying.  I don't know if it was because,

10 you know, people that I had come with were on the fence about

11 joining, but I just do know that I was -- I could hear them

12 talking about it on the other side.  It's like, oh, we don't

13 have enough, we don't have enough, we don't have enough.

14 Q    Have enough for what?

15 A    To form a ring of people holding hands at the base of the

16 statue.

17 Q    How many people were in reserve for this counter-protest?

18 You didn't have enough of them.  How many people were in

19 reserve that you could have gotten out there?

20 A    I don't get what you mean by "in reserve."

21 Q    Well, I mean, who could you have called or, you know,

22 marshaled over to take part in your counter-protest?

23 A    I don't know.  Probably other students or -- like, that's

24 what I'm saying.  I don't know if there were other students who

25 were idling nearby who were on the fence about whether they

D. Willis - Cross

1    were going to do it or not.  I don't know what the deal was.

2    It didn't happen on my side of the statue.

3             THE COURT:  Mr. Spencer, we'll take a recess now for

4    about 20 minutes.

5    **(Jury out, 10:36 a.m.)**

6             (Recess.)

7             THE COURT:  Call the jury.

8             MS. KAPLAN:  Your Honor, Ms. Conlon was here a minute

9    ago and I turned around and turned back and she's not.  I sent

10   Mr. Bloch to go get her.  I apologize.

11            THE COURT:  Okay.

12   **(Jury in, 11:02 a.m.)**

13            THE COURT:  Everybody be seated.  Are you ready to

14   go?

15    BY MR. SPENCER:

16   Q    Hello again.

17   A    Hello.

18   Q    So you and your friends walked to the base of the

19   Jefferson statue.  Can you still not recall who was leading

20   that walk?

21   A    Absolutely, my fellow students.

22   Q    Your fellow students.  Was there anyone who had better

23   knowledge of the situation that knew to go to the Jefferson

24   statue?

25   A    I think there were older students who had a better

72

D. Willis - Cross

1  knowledge of who Jason Kessler is and things like that, but,

2  there was no leader and there was nobody who seemed to have the

3  master plan or something.

4  Q    But you all were in total agreement to go to the base of

5  the Jefferson statue?

6  A    It was kind of like follow.  I was following.

7  Q    Who was leading?

8  A    A group of people.  There wasn't like a clear leader or

9  anything like that.  It was kind of like -- I really can't

10  remember who was like, we need to -- I think it was like our

11  other friends were coming from somewhere else.  I'm not sure

12  where they were coming from.  And they had arrived on the

13  statue side of the Lawn and so we were going to meet them

14  there.

15  Q    Okay.  Who started the chant, "no Nazis, no KKK, no

16  fascist USA"?

17  A    I don't recall.

18  Q    Was that the main chant?

19  A    I don't think it was the main chant.  It was one of

20  several.

21  Q    What were some of the others?

22  A    "Black lives matter" was one of them.

23  Q    Okay.  And you started chanting these right away?

24  A    I believe so.

25  Q    Okay.  So before the torchlight rally came to you?

73

D. Willis - Cross

1   A      No.  No.

2   Q      Okay.

3   A      So we began our songs when we were beset upon by the tiki

4   torches.

5   Q      Okay.  Were you aware of myself, Richard Spencer, before

6   the torchlight rally?

7   A      I was aware of you.

8   Q      How did you become aware of me?

9   A      I think I had seen an article of you at UT Austin or

10  something like that.  I heard you were the leader of the

11  alt-right.  Or some school.

12  Q      Texas A&M?  Does that ring a bell?

13  A      Yeah, something like that.

14  Q      Did you happen to see me that night?

15  A      I wouldn't have known your face well enough to identify

16  whether or not I had saw you.

17  Q      Okay.

18  A      But I have since looked at pictures and videos and I've

19  seen you there.  So I'm sure that you walked in my line of

20  sight.  I just didn't know who you were at the time.

21  Q      Okay.  And being that I'm here now, so you can recognize

22  me -- I look more or less like I did then -- did you recall

23  seeing me?

24  A      My memory is not that strong.  I couldn't tell you if you

25  were one of the hundreds of faces, you know.

D. Willis - Cross

1  Q    Okay.  You mentioned in your testimony that you were

2  afraid of doxing.  Can you just remind us what that is?

3  A    Doxing is when people who have some issue with you take a

4  picture of your face or a video of your face, and either put

5  that on the Internet or they post, you know, your full name,

6  your address, other compromising information.  And the

7  objective is to intimidate you, either with plausible threats

8  or unplausible threats.  It's just very unnerving to have your

9  name and address published on the Internet.

10  Q    I agree with that.  Is attending a counter-protest a good

11  way of avoiding doxing?

12  A    I'm not sure.  It just depends on the character of the

13  people who are on the other side, if they're the type to try to

14  dox people.  Which not everybody is.

15  Q    When you attended the torchlight rally as a

16  counter-protester, and the next day when you gave a speech in a

17  public park, did you expect there to be some social media

18  around, maybe photos or tweets or live streams even?

19  A    I think everything kind of ends up on social media these

20  days, but it wasn't on the top of my mind, expecting those to

21  be recorded necessarily.  I gave the speech in person, you

22  know.

23  Q    Right.  But you just said social media is everywhere now.

24  A    Exactly.  Yeah.

25  Q    Okay.  Did you cover your face at any time?

D. Willis - Cross

1  A    Not during -- well, I covered my face when I was being

2  pepper-sprayed on the 12th, but at the park I did not cover my

3  face.

4  Q    Yeah, and what I mean by that is to wear a mask or

5  something --

6  A    Yeah, I did not.

7  Q    -- to obscure your visage.

8  A    No.

9        MS. KAPLAN:   I'm just going to remind the witness to

10 let him finish the question, and then answer.  This is not a

11 conversation.  It's question and answer.

12        THE WITNESS:   Thank you, yes.

13  BY MR. SPENCER:

14 Q    So you reasonably expected your face to get out there on

15 social media?

16 A    I don't think that I was thinking about that at the time.

17 Q    Well, you weren't -- okay.  When someone gives a public

18 speech in a public park, knowing that we live in a social media

19 age, is it reasonable to assume that your face and voice and

20 maybe name is going to get out there?

21 A    That is reasonable to assume.

22 Q    Okay.  So you weren't really that afraid of doxing?

23 A    I think the audience of the speech that I gave on the

24 morning of the 12th was different than the audience of people

25 who I was worried about doxing me on the evening of the 11th.

7.6

D. Willis - Cross

1   Does that make sense?

2         So on the morning of the 12th when I'm giving a speech to

3   people that share my views in a park that's permitted, I wasn't

4   worried about doxing.  But on the evening of the 11th when I

5   was surrounded by tiki torches, I was worried about doxing.

6   Q     But if it's on social media, it's in the public domain.

7   So it's out there.  It's not like you can control who sees

8   something on social media, right?

9   A     I think that's true, yeah.

10  Q     Okay.  So you weren't really that afraid of doxing?

11  A     I disagree with that because I think the point is that in

12  both instances I didn't have any control over who is recording

13  me.  In just one instance it made more sense to be afraid than

14  the other about who was recording and also what corners of

15  social media it may end up on.

16  Q     Okay.  You testified on Friday that at one point you --

17  when the full scale of the torchlight march was clear to you,

18  that you said -- in your words, "I'm ready to go"?

19  A     I said that, yes.

20  Q     Right.  So you wanted to leave the base of the statue?

21  A     Once I realized that the situation seemed life-threatening

22  and I felt -- yeah, I was nervous. I was terrified because I

23  thought, like, okay, I don't -- I'm not even sure if we can

24  leave and I want to leave.  And I don't want to see anybody get

25  hurt.  So yeah, I said, "I'm ready to go."

D. Willis - Cross

1  Q    And so you also testified that you saw a lot of fisticuffs

2  and pushing and kicking?  Those were actually your words?

3  A    Yes.  Well, I didn't say "fisticuffs."

4  Q    No, that was my word.  But you said --

5  A    Yeah, I saw a lot of -- I saw some fights.

6  Q    Kicking and punching is what you said?

7  A    Yeah.

8  Q    Do you think you could have reasonably run off?

9  A    No, I don't think I could have.

10  Q    Okay.  You also testified that, in your words, that after

11  there were some shoving and fisticuffs type stuff, that you

12  went back to, in your words, lick our wounds?

13  A    We didn't go back to the statue.  We walked to a space a

14  little away.

15  Q    That's what I meant.

16  A    Yeah.

17  Q    So you went off somewhere to lick your wounds?

18  A    Yes.

19  Q    And you felt that, in your words, watching someone

20  celebrate -- and I didn't quite hear what you said, but I think

21  you said was discouraging?

22  A    Yes.

23  Q    Watching someone celebrate was discouraging?

24  A    Watching white nationalists celebrate -- what your

25  celebration meant in that moment was discouraging to me, yes.

7.8

D. Willis - Cross

1  Q    You also had someone who poured milk in your eyes.

2  A    Not in my eyes.

3  Q    Not in your eyes, but you saw that happening?

4  A    Yeah, yeah.  So licking my wounds was a phrase of saying

5  we were doing basic first aid, checking on everyone, breathing,

6  flushing your eyes.  People were pouring milk on their eyes,

7  yes.

8  Q    So did you have some people in your group who acted kind

9  of like medics?

10  A    I think there was people in my group who knew first aid,

11  yes.

12  Q    And they were pouring milk in people's eyes?

13  A    Yes.

14  Q    Yeah.  Licking your wounds?

15  A    Yes.

16  Q    Did you feel like you were backing down from a fight?

17  A    No.  I felt like I had just been attacked and driven off

18  of the statue, and that that was like, in my 18-year-old

19  imagination, somehow embarrassing, but nothing -- that's pretty

20  much how I felt, you know, like --

21  Q    So it was embarrassing?

22  A    Yeah, but I think I was wrong about that.  You know, like,

23  I felt like we had come to, like I said, make this symbolic

24  gesture on the statue and stand up for these students who

25  weren't here and whose narrative about what it means to go to

D. Willis - Cross

1   UVA was being taken from them.  You know, all these things, and

2   I felt like we had failed.  We had not successfully out-chanted

3   and out-shouted you guys.  And I think that was like a naive

4   thing for me to feel, but that's what I mean when I say

5   embarrassed.

6   Q    Okay.  After you licked your wounds did you return to the

7   base of the statue?

8   A    No, I did not.

9   Q    I want to now move to August 12th.  You testified in your

10  words, "What we're doing is more important than ever."

11  A    Are those my words?

12  Q    Yes.

13  A    In my testimony on Friday?

14  Q    Yeah, your testimony on Friday, yes.

15  A    Yeah.

16  Q    So you concluded that after the Friday night torchlight

17  rally?

18  A    Yes.

19  Q    You just had to go back out there?

20  A    That's not what I meant.  I think I meant that because

21  my -- my preconception about Unite the Right being a peaceful

22  sequel to July the 8th was -- that idea was utterly proven

23  wrong the evening before.  That meant that my -- you know, my

24  responsibility to administer -- help administer what was

25  happening at McGuffey Park became more important because it was

D. Willis - Cross

1  something that could help keep people safe.

2  Q    Well, I mean, if there were fisticuffs and pushing and

3  shoving, why would you go back to the protest?

4  A    I talked about it in my testimony on Friday, like I had

5  responsibilities and I thought that I could do more good by

6  going and helping administer a safe space than by staying home

7  and --

8  Q    You had -- I'm sorry.

9         MS. KAPLAN:  Objection.

10  BY MR. SPENCER:

11  Q    I'm sorry.  You can finish if you like.  I'm sorry.

12  A    Thank you.  Yes, so my motivation for going out the next

13  day, like, definitely I was a little concerned and shaken up by

14  what happened the night before, but I also was, one, young and,

15  you know, not as cautious and as risk averse as I am now.  And

16  two, I had a responsibility at McGuffey Park to help administer

17  a safe space, and that seemed like a really important thing to

18  do after I saw how violent that group could be.

19  Q    So after you saw how violent it was, you felt a

20  responsibility to go out there and administer a safe space?

21  A    To help --

22  Q    Your zone?

23  A    To help run a safe space, I did feel like that was an

24  important thing to do that day.

25  Q    So after you licked your wounds, you woke up at 5:30 a.m.?

                          D. Willis - Cross


 1  A    About 5:30, sure.

 2  Q    That's what you -- yeah, that's what you --

 3  A    It was really early.  I think it was 5:30.

 4  Q    You claimed that you were able to shrug off what happened

 5  the day before?

 6  A    No.  I mean --

 7  Q    Those were your words.

 8         MS. CONLON:  Objection, Your Honor.  If Mr. Spencer

 9  is going to quote, it would be helpful to have a page number

10  and a line, since some of these don't seem to be direct.

11         THE COURT:  Take your mask off when you speak.

12         MS. CONLON:  I apologize.  If Mr. Spencer is going to

13  quote from testimony, it would be helpful to have a page and

14  line number.  I'm just asking, Your Honor.

15         THE COURT:  He's asking him about yesterday's

16  testimony?

17         MR. SPENCER:  Friday's.

18         MS. CONLON:  Friday's testimony, and he's telling the

19  witness quotes that he's saying the witness said.  We're trying

20  to follow along, so I was just asking if we could have a

21  page --

22         THE COURT:  It would be helpful, but I don't know how

23  practical -- if you don't recall making such a statement, say

24  so.

25         THE WITNESS:  Thank you, yeah.

82

D. Willis - Cross

1        THE COURT:  And I don't know whether you have a

2  transcript or he's asking from notes.

3        MR. SPENCER:  I'm going from notes, but I take

4  detailed notes.

5   BY MR. SPENCER:

6  Q    My recollection is you said you shrugged off what

7  happened; is that a fair thing to say?

8  A    I know I probably said something to the effect of I was

9  numb and in shock, which, you know, made it seem like -- yeah,

10  I was surprisingly numb and in shock and chose to keep moving,

11  you know.

12  Q    And you were able to wake up at the wee hours of the

13  morning?

14  A    I was able to wake up at 5:30, yes.

15  Q    You were ready to go back out there?

16  A    I was ready to go do my job.

17  Q    And your job was to establish a safe space?

18  A    Yeah.  I had been on the committee for the PARJ.  It was a

19  project that I had worked on.  I wanted to see it through.  And

20  yeah, I had already given my word that I would come and help

21  out with like water bottles, set up folding tables, that kind

22  of thing.  So in that context it would be really inappropriate

23  for me to just bail on what I said I would do.

24  Q    During the events of August 12th, on Friday you testified

25  to a chant -- and you can correct me if I'm wrong, but "the

D. Willis - Cross

1  people united will never be divided"; is that right?

2  A    Yes.

3  Q    Another chant was "shut it down, don't back down."

4  A    Yes.

5  Q    Okay.  What does "shut it down" mean?

6  A    Like I said, it's a chant, so it might have meant

7  different things to people, but to me I was referring to the

8  park and the demonstration.  Your demonstration, your rally.

9  Q    You wanted to shut it down?

10 A    I thought it would have been appropriate for someone like

11 the police to come and stop, take the permit away or

12 something --

13 Q    You wanted the racist police to shut down the Unite the

14 Right rally?

15 A    I didn't say the police were racist.

16 Q    Okay.  But you wanted the police department to shut down a

17 rally?

18 A    Yes, whose -- I wanted the police to shut down a rally

19 whose organizers had demonstrated that they had violent

20 intentions the evening beforehand.  That was something that

21 18-year-old Devin thought shouldn't be happening.

22 Q    "Don't back down."  What is that about?

23 A    To me, that just meant don't be intimidated.

24 Q    Don't be intimidated?

25 A    Yeah, by white nationalists.

84

D. Willis - Cross

1  Q    So you can lick your wounds and go back out?

2  A    I'm not even sure it meant to me; it probably was more

3  applicable to who I was telling to shut it down, which would be

4  like the police and like, older authorities.

5  Q    So you didn't want the police to back down?

6  A    Yeah, like, be tough on people who've demonstrated that

7  they've been violent.

8  Q    Be tough on people.  Okay.

9       Another chant that I just mentioned a few moments ago,

10 "the people united will never be divided."

11 A    Yes.

12 Q    Could you explain that?

13 A    I'm not sure which part you want me to explain.

14 Q    Well, we can go through all of it.  The people, who is the

15 people?

16 A    Like all people.  The people.

17 Q    All people?

18 A    Yes.

19 Q    Okay.  And united, what does that mean exactly?

20 A    I think it means together in community.

21 Q    Okay.  Is there a political component to that?  United,

22 kind of like the United States of America?  United in what?

23 Community -- united in what, is my question?

24 A    I think that's kind of the beauty of the phrase, is that,

25 like, it applies to different scenarios and people use it for

D. Willis - Cross

1  different things.  So I can't, like -- I don't want to pick

2  just one thing.  I think it just means people are stronger when

3  they work together.

4  Q    "Will never be divided."

5  A    Yes.

6  Q    So what if someone wants to be divided?

7         MS. CONLON:  Objection, Your Honor.  It's

8  speculation.  And we have been belaboring this now for a few

9  minutes.

10        THE COURT:  Well, he can tell what he -- he was

11  shouting a slogan.  He can tell what he meant.

12        MR. SMITH:  Your Honor --

13        MS. CONLON:  I just mean questions about what other

14  people meant.

15        MR. SPENCER:  I didn't ask any questions about what

16  other people meant.

17        THE COURT:  Nothing between the lawyers.

18        MR. SPENCER:  Okay.  Sorry.

19   BY MR. SPENCER:

20  Q    "Will never be divided."  What did that mean to you?

21  A    I think it meant that, like, people are better versions of

22  themselves and they are stronger as a community when they are

23  in community together.  And so like, you know, letting --

24  letting things divide people is more often than not not very

25  good.  That's all I meant.

D. Willis - Cross

1      I think it was really a celebration of all the people who

2  had come out to counter-protest against what Unite the Right

3  stood for.  It was a beautiful thing to me.

4  Q    Okay.  So it was directed at the other counter-protesters?

5  A    I think it was -- had more to do with us.  Yeah, exactly,

6  directed at the other counter-protesters, yes, that's correct.

7  Q    Okay.  On Friday, I'm sure you remember -- this is the

8  plaintiffs' Exhibit 3263.  I'm not sure I even need to show it,

9  but I guess I could.

10      3263, do you have that?

11      You don't have it?  Okay.

12      I'll remind you what that was.  You can look at that in

13  your binder, if you'd like.  You don't have the binder up

14  there?  Okay.

15      It's a picture of you holding a sign that has a clenched

16  fist.

17  A    Uh-huh.

18  Q    And you testified that you made that sign.

19  A    Yes.

20  Q    Well, what was that about?

21  A    I think the clenched fist means different things to

22  different groups, but I used it because it hearkens back to the

23  civil rights movement.

24  Q    The clenched fist hearkens back to the civil rights

25  movement?

87

D. Willis - Cross

1    A    Yes.

2    Q    But you said it could mean different things to different

3    people.  So what else could a clenched fist mean?

4    A    I don't know.  So many things.  Yeah, a lot of things.

5    I'm not sure.  A lot of movements have tried to use the fist,

6    but I think it's -- in my understanding was that it's most

7    famously associated with the civil rights movement.  That was

8    my intention when I used it.  Other BSA activist student people

9    have used it in the past.

10   Q    Was it ever used by a black power movement?

11   A    Black power movement used the fist before, yes.

12   Q    Was it ever used by communists?

13   A    I don't know, but probably.

14   Q    But it could mean different things to different people?

15   A    Yes.

16   Q    So it could be kind of ambiguity is part of the intrigue

17   of it?

18   A    No, I think the intrigue for me I said was the civil

19   rights movement.

20   Q    For you.

21   A    For me, yeah.

22   Q    Do white nationalists have the right to hold a

23   demonstration?

24   A    I think they have that right, yes.

25   Q    Okay.  But are they dividing a united community?

D. Willis - Cross

1  A    Are they dividing a united community?  I'm not sure.  I

2  don't think so.  I think that a lot of people who are white

3  nationalists are not in community with people who don't support

4  those views.  So --

5  Q    So the community doesn't include --

6           MS. KAPLAN:  Mr. Spencer, again, he was answering a

7  question.

8           THE COURT:  Did you finish your answer, Mr. Willis?

9           THE WITNESS:  Thank you.  So yeah, I'm just not -- I

10  don't think -- am I understanding the question correctly?

11  White nationalists, are they not dividing the community?

12   BY MR. SPENCER:

13  Q    That was my question, yes.

14  A    Okay.  I think a lot of people would describe white

15  nationalists as divisive.

16  Q    Are they -- are white nationalists part of the community?

17  A    They are part of some communities, and -- yeah, there's

18  different communities.  I don't know.  I'm not sure how you --

19  I'm not sure how to answer the question.  Like, I think that,

20  like, the community -- there isn't just one "the community,"

21  right?

22  Q    Well, why would you say "the community" if there's more

23  than one?

24  A    Like, I think it's kind of like -- like, how do I put

25  this?  Yeah, I'm not trying to, like, go off in the weeds.

D. Willis - Cross

1    I think it's just, like, a semantics thing.  "The people

2  united will never be divided" can and usually does imply all

3  people.  But, like -- and it's about establishing community,

4  and the beauty and the importance of establishing that

5  community.  That doesn't mean there aren't, like, obstacles to

6  building community or whatever it is.

7    So yes, it can be a true fact that white nationalists are

8  often divisive to communities, or some people find them

9  divisive.  And, like, people who have that background or once

10  were white nationalists, it doesn't mean they can't be a part

11  of the community or a community.  Like, there's so many

12  different ways to answer the question.

13  Q    I'm not sure I caught all that, but if someone is dividing

14  the community, what are your responsibilities as a member of

15  the community?

16  A    To try to get to the root of the issue and maybe resolve

17  whatever the misunderstanding is.  That's, like, a good way to

18  build community.

19  Q    By talking to people?

20  A    Talking is definitely always really good -- not always,

21  but usually really good.

22  Q    Not always?

23  A    Like, I just mean that people -- no one is required to

24  listen to hate speech.

25  Q    No one is required to listen to hate speech.  Okay.

90

D. Willis - Cross

1    So what do you do if someone is engaging in, in your

2  words, hate speech?

3  A    What do I do?

4  Q    Uh-huh.

5  A    It depends on the context.  Interpersonally, I typically

6  avoid people like that, remove myself from the situation.

7  Q    You didn't do that on the 11th and 12th?

8  A    That wasn't interpersonal.

9  Q    Well, there were people there?

10  A    Yeah, but they were strangers.  Like, you were a stranger

11  to me.  The tiki torchers were strangers to me.  You didn't --

12  excuse me.  I didn't register the pepper spray and the

13  threatening and the violence as an interpersonal place to try

14  to have a conversation.

15  Q    So did you feel that -- you've stated that you wanted to

16  establish a safe space on the 12th?

17  A    Yes.

18  Q    Would that include blocking people from traveling to a

19  permitted rally?

20  A    I don't think so, but, like -- well, two things.

21       The first thing is that, like, the safe space was in

22  McGuffey Park, and I think the event you're referring to didn't

23  happen there.

24       And the second thing is that, like, I talked about my

25  objective having nothing to do with blocking people's entrance

D. Willis - Cross

1  to the park.  It was more about making a symbolic gesture, and

2  that's why there was space left on the sidewalk for people to

3  go around us, and never mind the other possible entrances to

4  the park.

5  Q     Were you trying to create a safe space around the

6  Jefferson statue on Friday night?

7  A     I don't think so, no -- oh, wait, no, sorry.  That was,

8  like, an interesting turn of phrase.

9        By "safe space" -- a safe space is a place that you invite

10 people to, to -- where they can experience a respite from

11 oppression X, Y, and Z, hate speech, those kinds of things, but

12 that doesn't mean I did not want August 11th and North Plaza

13 and Jefferson statue to be a peaceful encounter.  I told you

14 that I went because I thought that it would be.

15 Q     Did you want to protect that area around the Jefferson

16 statue?

17 A     I don't think it was about protecting the area.  I think

18 it was about making a statement.  That's what demonstrations

19 and protests are about, is making a statement with your body,

20 peacefully.

21 Q     Is Thomas Jefferson a white supremacist?

22 A     Thomas Jefferson also has a really complex legacy and

23 history.  I know that he owned slaves.  I know that he's

24 somebody who -- there's a lot to say about Thomas Jefferson.

25 Q     Well, you can feel free to say it.

92

D. Willis - Cross

1    A    You asked me what I thought, if he was a white

2    supremacist.  I told you I think that, you know, analyzing his

3    legacy and stuff is a complicated thing to do.

4    Q    It's complicated.  Could you give us an overview?

5            THE COURT:  I think --

6            MR. SPENCER:  Okay.

7            THE COURT:  We're spending a lot of time on going

8    back to the statue and all that.

9            MR. SPENCER:  Okay.

10           THE COURT:  Can we move on?

11           MR. SPENCER:  No further questions.

12           THE COURT:  Thank you.

13           Any redirect?  I'm sorry.  Who's --

14           MR. SMITH:  I believe Mr. Cantwell is next.

15           MR. CANTWELL:  I'm next.

16           THE COURT:  Okay.

17           MR. CANTWELL:  Just a moment, Mr. Willis, please.

18           Do I need to do something to get the VGA on this

19    screen?

20           Oh, there we go.  It's done.  Excellent.

21                        CROSS-EXAMINATION

22    BY MR. CANTWELL:

23    Q    Mr. Willis, did you ever talk to a reporter named Michael

24    Bragg from *The Daily Progress?*

25    A    Afternoon.  I'm not sure.

93

D. Willis - Cross

1  Q    I'm sorry.  Could you say that again?

2  A    I'm not sure if I spoke to Michael Bragg.

3  Q    You're not sure if you spoke to Michael Bragg.

4       Do you read *The Daily Progress*?

5  A    Not -- no.  I'm aware of it, though.

6  Q    You're aware of it?

7  A    Yeah.

8  Q    Do you know if you were quoted in an August 19th article

9  by Michael Bragg titled "Students who confronted torch-bearers

10 demand UVA take action"?

11 A    I think so.  Could I see it?

12 Q    Maybe I could ask you -- I actually only have the one copy

13 here, sadly.  Maybe I could ask you about some of the quotes in

14 there?

15 A    Yeah, sure.

16 Q    And we'll go from there.

17 A    I'm pretty sure --

18      (Overlapping speakers.)

19      (Reporter clarification.)

20          THE WITNESS:  Apologies.

21          MR. CANTWELL:  Me too.  Sorry.

22 BY MR. CANTWELL:

23 Q    Do you know who Ian Ware is?

24 A    Yes.

25 Q    Did Ian Ware go with you to the Thomas Jefferson statue on

94

D. Willis - Cross

1  August 11th?

2  A    I believe so.

3  Q    Okay.  Do you know if Ian Ware was watching livestreams of

4  the torch march before it came to you?

5  A    I don't know.

6  Q    You don't know?

7  A    I don't know.  I don't know if he was.

8  Q    Did Ian Ware give you any information about the torch

9  march before the torch bearers arrived?

10  A    I don't remember.  I know that Ian was not in the car that

11  I took on the way there.

12  Q    He wasn't in the car that you took?

13  A    No.

14  Q    Who was?

15  A    Friends of mine.

16  Q    Who were --

17  A    Student friends.

18  Q    I'm sorry.  I didn't -- I apologize.  I cut you off.

19  Finish your answer.

20  A    Thank you.

21       Student friends of mine at the time.

22  Q    Could you tell me the names of those students, please?

23  A    I'm hesitant to name them.  Some of them live here.

24  Q    I was hesitant, too.

25            THE COURT:  You have to name them.

D. Willis - Cross

1          THE WITNESS:  I should say that?

2          MS. KAPLAN:  Can we approach, Your Honor?

3          THE COURT:  Okay.

4          (Sidebar.)

5          MS. KAPLAN:  Your Honor, we've heard the testimony --

6     we've heard the testimony about doxing.

7          THE COURT:  That doesn't make any difference.  I

8     mean, he's going to come into court and he's going to -- he's

9     got to reveal it.

10          MS. KAPLAN:  I'm not asking for -- I'm just telling

11    you, what he's saying is he's worried that his friends are

12    going to be doxed.  Can we start with first names, at least?

13          THE COURT:  I don't know where you're going with it,

14    but --

15          MS. KAPLAN:  He wants to identify all the other

16    people there.

17          MR. SMITH:  That's exactly what the plaintiffs have

18    wanted to do for a very long time.

19          THE COURT:  All these other people that were there.

20          MS. KAPLAN:  I'm okay.  I'm just trying to explain to

21    Your Honor.

22          THE COURT:  Overrule the objection.  I think he's got

23    a right to ask.

24          (Sidebar concluded.)

25     BY MR. CANTWELL:

D. Willis - Cross

1  Q    Could you tell me the names of the people in the car with

2  you?

3  A    I only remember two of -- I only remember two people I was

4  in the car with.  One is named -- like, I'm sorry, real

5  quickly --

6            THE WITNESS:  Judge, do I have to say names now?

7            THE COURT:  Yes.  You have to -- this is your

8  lawsuit, and this is information that they have a right to ask.

9            THE WITNESS:  I just wanted to know if that was,

10 like, protected information.

11           THE COURT:  You what?

12           THE WITNESS:  I apologize.

13           The names I remember are Ibby and Kendall.

14 BY MR. CANTWELL:

15 Q    I'm sorry.  What were those names?

16 A    Ibby and Kendall.

17 Q    A-B?

18 A    Ibby.

19 Q    Could you spell that?

20 A    I think it would be like I-B-B-Y.

21 Q    I-B-B-Y and Kendall?

22 A    Yes.

23 Q    And can you tell me Ibby and Kendall's last names?

24 A    That would be Kendall King.

25 Q    Kendall King and Ibby?

D. Willis - Cross

1  A     And Ibby Han.

2  Q     I'm sorry.  Say that again?

3  A     Ibby Han, H-A-N.

4  Q     H-A-N.  Thank you.

5        And how many people were in the car that you don't

6  remember?

7  A     Maybe two others.

8  Q     Two others?

9        Could you describe the two other people whose names you

10  don't remember?

11  A     All I remember about them is that they were students.  I

12  think I didn't know them because they went to -- they either

13  went to UVA and I didn't know them, or they went to a different

14  Virginia college.

15  Q     So you don't know if they were male or female?

16  A     I really don't remember.

17  Q     You don't remember if they were male or female?

18  A     I think they were behind me.

19  Q     You don't remember if they were black or white?

20  A     I remember them being white.

21  Q     They were white.  Okay.  So two white folks of unknown

22  sex.

23        Okay.  And you don't remember who told you about the torch

24  march, either, right?

25  A     I don't remember which individual broke the news to me.

D. Willis - Cross

1  Q     So you were -- you're at this -- was it a spaghetti

2  dinner, did you say?

3  A     It was a spaghetti dinner.

4  Q     And somebody comes into the room and says "the torches are

5  coming," and you guys all get in the car and go down there?

6  A     My memory of it is like:  I'm minding my business.  I'm

7  eating soup.  I'm hanging out with my friends.  We're making

8  posters and I don't -- I'm assuming someone came in and

9  informed people.  I think it is.  I don't remember exactly.

10 I'm pretty sure it was an older student, but I don't want to,

11 like, you know -- whatever.  Sorry.

12       The point is, is that, like, when I found out about the

13 fact that Jason Kessler was coming to UVA, it was because

14 somebody had kind of like gotten everyone's attention and said,

15 hey, this is happening.

16 Q     Okay.  You said -- have you done any study of American

17 history?

18 A     Some study of American history, yes.

19 Q     Does the name Paul Revere ring a bell?

20 A     I know who Paul Revere is, yes.

21 Q     So Paul Revere famously said, "the British are coming,"

22 something to that effect, right?

23 A     He did.

24 Q     Everybody remembers Paul Revere's name, right?

25 A     A lot of people.

D. Willis - Cross

1  Q    So the guy who says "the torches are coming" and you go

2  down there and you have this traumatic experience, you have no

3  idea who that person is?

4  A    I don't remember who that person is.  I don't think I even

5  knew at the time.

6  Q    Okay.  And pardon my memory and my notes here; were you

7  with Ms. Romero when this happened or -- you were at separate

8  places, right?

9  A    My memory is that Nat was with us.

10 Q    Oh, she was with you.  Okay.  But she wasn't in the car

11 when you went down there?

12 A    She was not in my car.

13 Q    Okay.  She went in a different car?

14 A    I don't know.

15 Q    Okay.  And you said that you -- was it Political and

16 Social Thought?  Is that the degree you got?

17 A    Yes.

18 Q    Okay.  Did you study Marxism in the course of that?

19 A    I don't remember.  I don't think we ever explicitly read

20 Marx.

21 Q    You don't remember if you ever studied Marxism in

22 Political and Social Thought?

23 A    I think, actually, yes.  No, we did have to read a section

24 of *Das Kapital*.

25 Q    So you read *Das Kapital*?

D. Willis - Cross

1   A    We read a section of *Das Kapital*.

2   Q    Did you ever read *The Communist Manifesto*?

3   A    No, not in Political and Social Thought.

4   Q    Really?  Okay.

5   A    Yeah, I don't think so, no.

6   Q    I'm sorry?

7   A    No.

8   Q    Okay.  Pardon me.  Just a second.  I apologize for being a

9   little out of sorts here.

10       (Pause.)

11       I guess I don't actually have to go to that.

12       So you get in the car from where you were at.  Where were

13  you that you had to take the car ride to the Jefferson statue?

14  A    The professor's house.

15  Q    You're at the professor's house.  So you get in the car.

16  And where did you guys park?

17  A    We parked behind some apartments on Jefferson Park Avenue.

18  Q    So you walk over to the statue and you link arms; you

19  catch back up with Ms. Romero, right?

20  A    Yes.

21  Q    And you're actually -- your arms are linked with

22  Ms. Romero's around the statue, right?

23  A    Yes.

24  Q    Okay.  And at some point did you hear somebody say "heads

25  down, y'all, heads down"?

101

D. Willis - Cross

1   A    I believe so, yes.

2   Q    You heard somebody say that, right?

3        Did you hear somebody else say, "okay, guys, this is

4   really important to us"?

5   A    I don't remember that.

6   Q    Did you hear somebody say, "there's a fucking lot of

7   them"?

8   A    I don't remember that.

9   Q    You don't remember that.

10       Okay.  Do you know who Emily Gorcenski is?

11  A    I don't.  I've heard of her name, but I don't know who she

12  is, or who they are.

13  Q    Who they are?

14  A    I'm just sensitive to people's pronouns.

15  Q    I understand.  So first you said you don't know who she

16  is, and then you said you don't know who they are, right?

17  A    Well, on the off-chance I had misgendered her, I wanted to

18  correct that.

19  Q    Do you know what Gorcenski's gender is?

20  A    I don't.

21  Q    You don't know if Gorcenski is transgender?

22  A    I do not.

23  Q    Are you on Twitter?

24  A    I have a Twitter.

25  Q    You're on Twitter?

D. Willis - Cross

1  A    I have a Twitter.  I don't use it much.

2  Q    Okay.  You don't use it much?

3  A    (No verbal response.)

4  Q    So you haven't, like, kept up-to-date on events with this

5  rally on Twitter at all?

6  A    Wait.  This rally?

7  Q    The events at the heart of this dispute, did you keep up

8  with news about the events from Twitter at all?

9  A    At the time, I don't think so.

10  Q    At the time, you don't think so.  Okay.

11       And I know I -- I jotted it down in my notes here.  What

12  injuries did you sustain on the evening of August 11th at the

13  statue?

14  A    Like I said, there was a lot of pepper spray on my side.

15  I believe your pepper spray was on my side.  And some brawls

16  broke out, and they appeared to be started by the mob.  And

17  they -- like, at least two or three of these people rolled and

18  they were fighting on the floor onto my legs.  And I was busy

19  holding hands, so I couldn't really move, and I had already

20  moved as high as I could on the statue.  So a lot of the

21  kicking and punching was hitting my legs.

22  Q    Okay.  Which mob was that?

23  A    It came from the direction of the tiki torches.

24  Q    So you're telling us that you know that the violence was

25  started by the people with the torches?

D. Willis - Cross

1  A    That's how it appeared to me at the time, yes.

2  Q    Okay.  Have you looked over any of the video from that

3  night?

4  A    I've seen, like, clips and pieces.

5  Q    Okay.  So you were affected by some pepper spray, you

6  said?

7  A    Yes.

8  Q    And did you say something about my pepper spray?

9  A    Yes.  I've seen a video of you spraying pepper spray about

10 where I'm standing.

11 Q    About where you're standing?

12 A    Yeah.  It's a picture, sorry.  Yes.

13 Q    Okay.  You've seen a picture of this?

14 A    Yes.

15 Q    So you haven't seen the video?

16 A    I don't know if there is a video or not.

17 Q    You don't know if there's a video or not?

18 A    I do not.

19 Q    Wow.  Okay.  Did you tell Michael Bragg that you had not

20 been injured?

21 A    Yes.  That interview took place -- I think it was Michael

22 Bragg, but I think I know which one you're referring to.

23      You know, I watched my friend almost die in the hospital

24 on Sunday.  I didn't really feel like telling any reporters

25 that I had been seriously injured.

D. Willis - Cross

1  Q    Did you seek first aid on the evening of August 11th?

2  A    Just the basic stuff, like flushing my eyes.

3  Q    Flushing your eyes?

4  A    Yes.

5  Q    Who flushed your eyes?

6  A    I don't remember who flushed my eyes.

7  Q    Did that person have a red bandanna?

8  A    I don't think so.

9  Q    So you don't know who did that?

10  A    No.  I -- yeah, no.

11  Q    You don't know if there's any pictures taken of that?

12  A    I don't know.

13  Q    Any video?

14  A    I don't know if there are.

15  Q    Did you bring your phone with you on the evening of

16 August 11th?

17  A    I don't remember.  I think so.

18  Q    You don't remember?

19  A    I was shown a photo that I took, apparently on the way

20 out.  So it makes me think I had my phone, but I don't remember

21 ever pulling it out.  My hands were busy.

22  Q    So you were shown a photo that you took, and so that makes

23 you think you might have had your phone?

24  A    Well, probably.  I'm just -- yeah.

25  Q    Did you have another camera that you might have taken that

D. Willis - Cross

1    photo with?  Is that the confusion?

2    A    I don't think so.  I was just answering on the spot.

3    Q    Okay.  You mentioned that you saw the torch bearers

4    carrying firearms on the UVA campus?

5    A    Yes.

6    Q    And to the best of your knowledge, that's not legal, is

7    it?

8    A    I don't know if it was legal or not.  I just know that,

9    like I said, when I was surrounded by known white nationalists

10   with flaming torches, it didn't make me feel better that I

11   could see that they were visibly armed.  I thought someone

12   might use that as a pretense to begin shooting.

13   Q    I'm sorry, I didn't actually catch your answer.  I

14   apologize.  Could you just repeat what you said?  I apologize.

15   A    Yeah.  So I'm saying that I remember vividly that a lot of

16   the tiki torchers had holstered weapons on their hips, and it's

17   like, it wasn't about the legality of them having weapons.  It

18   was about the fact that if there was a group of people who want

19   to shoot me for no reason, this would be it.  And I was really

20   worried about that.

21   Q    Right.  Could you try to conjure an estimate of how many

22   of the tiki torchers had a firearm on their hips?

23   A    I really couldn't guess.

24   Q    And did you -- you haven't seen any photographs of that,

25   have you?

D. Willis - Cross

1   A    I'm not sure.  I could have.  I'm not sure.

2   Q    You're not sure?

3   A    Yeah.

4   Q    To the best of your knowledge -- withdrawn.

5        When you said that my pepper spray was on your side, are

6   you saying that I pepper-sprayed you?

7   A    I'm saying that I have reason to believe that the pepper

8   spray that I choked on and that I needed to flush my eyes out

9   because of came from you, among other people.

10  Q    Did you talk to Commonwealth's Attorney Robert Tracci

11  about that?

12  A    I don't know who that is.

13  Q    Did you speak to a Commonwealth's Attorney about your

14  injuries?

15  A    I don't think so.

16  Q    Did you speak to the police about your injuries?

17  A    No.

18  Q    Okay.  Why not?

19  A    I was really busy that weekend.  I didn't think -- I never

20  made the time to go file a police report.  It seemed like they

21  were aware of what was going on.

22  Q    Did you hear any news stories about me being prosecuted

23  for what happened that night?

24  A    I don't think I've heard those stories.

25  Q    So it's your testimony today that you have not heard those

107

D. Willis - Cross

1  stories?

2  A    If you were prosecuted for something that happened that

3  night, I only know about it because you might have mentioned it

4  earlier in these court proceedings.  That's it.

5  Q    So before today, you've never heard that Christopher

6  Cantwell got prosecuted for anything that happened in

7  Charlottesville?

8  A    I think you mentioned that you had some prosecution over

9  something between you and someone else in the Walmart parking

10 lot or something.

11 Q    Just to be clear, I'm talking about, before we walked into

12 this courtroom, you had no idea that Christopher Cantwell was

13 prosecuted for anything that happened in Charlottesville that

14 weekend?

15 A    That is my understanding, yes.

16 Q    Okay.  Before today, did you tell anybody that you choked

17 on Christopher Cantwell's pepper spray?

18 A    Yes.

19 Q    Who?

20 A    My legal counsel.

21 Q    They didn't ask you about that during your direct

22 examination.  It seems like a relevant detail.  You're suing

23 me, right?

24 A    Oh, no.  It's just that, like, I don't think I had seen

25 the photo until after the deposition or something.

D. Willis - Cross

1   Q    I'm sorry.  After the deposition?

2   A    Yes.

3   Q    So you saw the photo after your deposition?

4   A    Yes.  Yeah, I continued to see photos.

5   Q    And then after you saw the photo, you said, wait a second,

6   I think Cantwell pepper-sprayed me?

7   A    Could you let me finish my answers, please?

8   Q    I apologize.  Please do.

9   A    Could you repeat your question?

10  Q    The first time you saw me was after your deposition?

11  A    The first time I saw you?

12  Q    Yeah.

13  A    In person?

14  Q    Well, the photograph in question.

15  A    Oh.  I don't know if it was the first time, but just the

16  incident that I remember, when you asked me about it.

17  Q    Do you remember what the date of your deposition was?

18  A    Sometime in July of 2020.

19  Q    So in June of 2020, if somebody said, "do you know who

20  Christopher Cantwell is," you would have said no?

21  A    I don't remember when I first became aware of you.  I may

22  have had -- I don't know.  Like, I may have had the ability to

23  identify you.  I had never looked at footage and events from

24  8-11 too closely, because I tried to avoid them unless it's

25  pertaining to this case.

D. Willis - Cross

1  Q    Okay.  When were you approached by -- when were you

2  approached about this lawsuit?

3  A    I became a plaintiff in October of 2017, if I'm not

4  mistaken.

5  Q    So pretty early on in the process, right?

6  A    I think so.  I really hardly remember the time period.

7  That's, like, peak -- well, yeah.

8  Q    I can't help but notice that you say "I don't remember" a

9  lot.  Is everything okay?

10  A    No, everything is not okay.

11  Q    Okay.  Is that something -- the memory gaps, did they form

12  after August 11th?

13  A    Yes.

14  Q    So prior to August 11th, mind like a steel trap, and then

15  afterwards you can't remember who you're in a car with or what

16  sex they are?

17  A    My memory -- my ability to remember things and to

18  concentrate and to be present was so much better before

19  August 11th and 12th.  I think going through something that

20  traumatic at 18, yeah, it really affected me.

21       And I also have tried to -- tried very hard to, like, let

22  go of certain memories from this period in my life.  It was

23  horrible.  All of 2017 was horrible.

24  Q    Yeah.  Well, 2017, I know, was a rough year.

25       You mentioned that you went to this -- was it June 8th or

D. Willis - Cross

1  July 8th, that Klan rally?

2  A    July 8th, 2017.

3  Q    All right.  And you have represented to us here today that

4  that was a peaceful event, right?

5  A    Yes.

6  Q    Do you recall that, like, 23-some people on your side got

7  arrested for that?

8  A    I didn't know those people.

9  Q    Okay.  Do you remember that the police had to deploy tear

10  gas?

11  A    I remember that the police were, yeah, kind of rough with

12  people.  But it didn't seem relevant.  That wasn't a question

13  that I was asked originally.

14  Q    Did you see police in riot gear?

15  A    I don't remember.

16  Q    Do you remember people chanting, "cops and Klan go hand in

17  hand"?

18  A    I don't have a strong memory -- I don't have a memory of

19  that, no.

20  Q    Are you familiar with that chant?

21  A    I've heard that chant before.

22  Q    Does that -- does that mean anything to you, "cops and

23  Klan go hand in hand"?

24  A    It's not something that I really used, not when I was

25  doing student activism.

D. Willis - Cross

1  Q    You prefer "no justice, no peace, no racist beliefs,"

2  right?

3  A    Yes.  That's my one.

4  Q    That's your one.

5       Okay.  So you told Michael Bragg at *The Daily Progress*

6  that you hadn't been injured, and then you were approached

7  about this lawsuit and then you were injured, right?

8  A    Like I said, I thought -- I was speaking to the media at a

9  time when I was really traumatized and probably shouldn't have

10 been.  But yeah, I said -- I minimized my injuries because it

11 just felt so -- Natalie is a close friend of mine.  I didn't

12 want to sensor myself, especially not -- you know, when is that

13 article from, two days after these things happened?

14 Q    August 19th is when it was published.

15 A    So about a week later.  Yeah, at the time I didn't think

16 talking about my injuries was appropriate.  But that was

17 something that I unlearned over time.

18 Q    Okay.  So you're involved with the -- was it the Black

19 Student Alliance or Association, which one was that?

20 A    It's called the Black Student Alliance.

21 Q    BSA, not to be confused with DSA, right?

22 A    Not to be confused with DSA.

23 Q    You know what the DSA is, though, don't you?

24 A    I know who the DSA are.

25 Q    What is the DSA?

D. Willis - Cross

1  A    DSA stands for Democratic Socialists of America.

2  Q    Are you involved with the DSA?

3  A    I am not involved with the DSA.

4  Q    Are any of your friends involved with the DSA?

5         MS. CONLON:  Objection, relevance.

6         THE COURT:  Sustained.  He said he's not involved.

7   BY MR. CANTWELL:

8  Q    You're involved with other, what you described as social

9  justice groups, right?

10 A    Mostly during that summer.

11 Q    Mostly during that summer?

12 A    Yes.

13 Q    You named Solidarity C'ville as one?

14 A    Yes.

15 Q    Maybe I'm incorrect here.  In my notes it says that you

16 said you were associated with BLM C'ville, but I think you

17 denied that when Mr. Jones was talking to you.  Can you

18 clarify?

19 A    I just denied that I was never a member.  My role that

20 summer was a liaison.  So I had to attend different meetings

21 from different groups and take notes and share notes.  That was

22 my thing.  It didn't make me a member of those groups.

23 Q    I appreciate you clarifying.  So you were a liaison -- was

24 that for the Black Student Alliance?

25 A    Yes.

113

D. Willis - Cross

1  Q    Okay.  So the Black Student Alliance, you were a liaison

2  to BLM C'ville?

3  A    Yes.

4  Q    And Solidarity C'ville?

5  A    Yes.

6  Q    What about SURJ?

7  A    I don't remember who SURJ are but that sounds right.

8  Q    Showing Up for Racial Justice, does that refresh your

9  memory?

10  A    Yes.

11  Q    So you had involvement with SURJ, right?

12  A    I had to attend meetings of SURJ as part of my job, at

13  least on one occasion.

14  Q    In your capacity as BSA liaison?

15  A    Yes.

16  Q    Did the BSA have a liaison to the DSA?

17  A    I don't think so.

18  Q    You don't think so.  Okay.

19       And PARJ, Peoples Action for Racial Justice, was that

20  just -- was that like an official organization or was that just

21  a Facebook page or?

22  A    It was more of an ad hoc committee that, like I said, it

23  existed for as long as it needed to, to make the PARJ happen on

24  the day of the 12th, but I don't think it existed beyond that.

25  Q    Okay.  Was that also your role, were you a liaison to that

D. Willis - Cross

1  or were you a part of this ad hoc thing or?

2  A    Well, honestly, the BSA, you know, it's an undergrad

3  student group so it wasn't that organized.  It was actually

4  never clear whether or not the PARJ stuff was like in my role

5  as BSA or just me as Devin Willis.  I'd like to think of it as

6  just me as Devin Willis.

7  Q    During the course of your direct examination, I found --

8  would you be surprised to find out that I found it conspicuous

9  how many times you insisted that you were involved in strictly

10 peaceful protests, that you would only be involved in strictly

11 peaceful protest?

12         MS. CONLON:  Objection, Your Honor.  This is

13 Mr. Cantwell testifying.  I understand he's *pro se*, but this

14 isn't a podcast.

15         THE COURT:  You're asking him if he would be

16 surprised at your reaction.  If you can ask him about what he

17 knows, not --

18         MR. CANTWELL:  I'll find a different way to address

19 the subject.

20         Let me pull up the exhibit here, 3261.  That's not

21 3261.  Plaintiffs' 3261.  I'm sorry, I think I might have -- I

22 know that you've updated your -- I'm sorry, I know that

23 plaintiffs' counsel has updated their exhibit list a few times.

24 When I pull up 3261 I'm pulling up a Discord post, but that

25 seems to be this August 8th letter for Peoples Action for

115

D. Willis - Cross

 1   Racial Justice, which is what I'm trying to pull up.

 2          MR. SMITH:  I have it here, if you need it.

 3   Obviously it needs to be put up on the board.

 4          MR. CANTWELL:  I guess I can probably do it

 5   without --

 6          THE CLERK:  You can use the document camera.

 7          MR. CANTWELL:  I can use the document camera?

 8          Could we show this to the jury, please.  Publish to

 9   the jury?

10          THE CLERK:  This is a previously admitted exhibit?  I

11   can't see the top of it.

12          MS. CONLON:  It is.  It's the previously admitted

13   exhibit.

14          THE COURT:  Is it admitted as an exhibit?

15          MR. CANTWELL:  I believe it is.

16          THE CLERK:  I believe this is 3261.

17          THE COURT:  All right.  Go ahead.

18    BY MR. CANTWELL:

19   Q    "The Peoples Action for Racial Justice will be a peaceful

20   protest against all forms of white supremacy, racial

21   intolerance and discrimination."

22        If somebody doesn't say that it's a peaceful protest, then

23   what is it?

24   A    I don't understand the question.

25   Q    I noticed that -- I'm sorry, go ahead.

D. Willis - Cross

1   A    If someone doesn't say that it's a peaceful protest, then

2   what is it?

3   Q    Yeah.

4   A    A protest.

5   Q    Okay.  So protests are peaceful by default is kind of the

6   idea, isn't it?

7   A    I don't know if protests are peaceful by default.  I don't

8   know a lot about the history of protests.  I just know

9   nonviolent protest has been the most popular and most effective

10  for a long time now.

11  Q    Okay.  So you have a degree in political and social

12  thought, and you're a liaison to various different social

13  justice groups, and you don't know if protest is peaceful by

14  default?  Like if we don't mention peaceful, then people might

15  get the idea that this is a good place to commit violence; is

16  that what you're saying?

17          MS. CONLON:  Objection to the form of the question.

18          MR. CANTWELL:  Let me rephrase.  Or withdrawn.

19   BY MR. CANTWELL:

20  Q    I noticed repeatedly it comes up in this document that

21  it's peaceful.  And as Mr. Jones pointed out with you, or as

22  you went over with Mr. Jones, there seems to be a contrast

23  between a different type of protest.  And that seems to be

24  acknowledged in this letter.  Is that fair to say?

25  A    I think the letter just focuses on asserting that this one

D. Willis - Cross

1    will be peaceful.  Right?  Like people -- that was the most

2    important thing they were trying to relay, is that like, the

3    purpose is peaceful, right?  Like, this is a document that

4    everyone is going to see.  It needs to make the intentions of

5    the people writing it clear.

6    Q    Other than the Unite the Right rally itself, were you

7    aware of protests that did not advertise themselves as

8    peaceful?

9    A    I was not.

10   Q    Have you ever heard the phrase "diversity of tactics"?

11   A    I've heard it here in this -- yes, I've heard the phrase.

12   Q    You've heard it before this courtroom, right?

13   A    Yes, yes.

14   Q    What does that mean?

15   A    Like -- and I mean, I've literally heard "diversity of

16   tactics," I've heard that from all -- like in sports or

17   something, I don't know, but I know that you're -- I know most

18   recently what comes to mind when you said it is, like, what you

19   said in this courtroom.

20   Q    So before I pointed out that "diversity of tactics" is a

21   euphemism for political violence, you had never -- that

22   definition never occurred to you before you heard me say it?

23   A    I don't know if it's a political euphemism for violence,

24   and I don't think I had a great command of what the term means

25   before you talked about it.

D. Willis - Cross

1  Q    So in your talks as liaison with Showing Up for Racial

2  Justice, they never mentioned diversity of tactics?

3  A    Not that I remember, no.

4  Q    Okay.  And in your dealings with Solidarity C'ville, you

5  never heard the phrase "diversity of tactics"?

6  A    No, not that I remember.

7  Q    And in your dealings with C'ville BLM, you never heard the

8  phrase "diversity of tactics"?

9  A    No, not that I remember.

10 Q    Okay.  You testified that you saw nobody act violently on

11 July 8th?

12 A    I testified that.

13 Q    Okay.

14 A    Well, I testified that it was a peaceful gathering.  Like,

15 I think -- yeah.

16 Q    You don't know why 23 people were arrested and police

17 deployed tear gas?

18 A    I think I had left already.

19 Q    You had left by that point.  Okay.

20      Do you agree with Walt's statement that white supremacy

21 happens all the time; it is the rule, not the exception?

22           MS. CONLON:  Objection, relevance as to whether

23 Mr. Willis agrees with a quotation by somebody else.

24           THE COURT:  Overruled.  He's expressing his own

25 opinions, if he agrees.

D. Willis - Cross

1          THE WITNESS:  Yeah, I think I agree with the first

2  clause, white supremacy is a frequent thing that happens in

3  this country and a lot of the world.  That's something that I

4  agree with.

5  BY MR. CANTWELL:

6  Q    In fact, Ms. Romero said that white supremacy is systemic;

7  do you agree with that?

8  A    I do agree with that.

9  Q    Did you go to the one-year anniversary of August 12th in

10 Charlottesville?

11 A    I don't remember.  I think very briefly.  I think there

12 was some stuff happening at the campus and I went.

13 Q    Could you -- well, let me put it differently:  Where were

14 you on August 12th, 2018?

15 A    I was in Charlottesville.

16 Q    Okay.  And when you were in Charlottesville on August

17 12th, 2018, did you see a sign that said, "Last year they came

18 with torches; this year they come with badges"?

19 A    I think so.

20 Q    You saw that sign, right?

21 A    I think so.  I can't remember if I had seen it in a photo

22 later on or if I saw it that day.  But I recognize the phrase.

23 Q    So just -- the theme here, you chant, "No justice, no

24 peace, no racist police."  Walt says, "White supremacy happens

25 all the time.  It is the rule, not the exception."  "Last year

D. Willis - Cross

1  they came with torches, this year they come with badges."

2       It sounds to me like you're not protesting something

3  that's unusual, right?

4  A    Is that a question?

5  Q    Yes.  Do you find that what we were attempting to do on

6  August 11th and 12th, 2017 was unusual?

7  A    Yes, it was unusual.

8  Q    Okay.  What was unusual about it?

9  A    The flaming torches and -- that part.

10 Q    Yeah, the torches were a nice touch.  You're right.

11      You said you know the students who were holding the

12 "Virginia students act against white supremacy" sign?

13 A    Yes.

14 Q    What were their names?

15 A    I just -- I really don't even know.  I only know one is

16 Luca Connolly.

17 Q    I'm sorry, Connolly?

18 A    I could be wrong about the last name, but the only person

19 I recognized in the photo for sure is a person named Luca.

20 Q    Could you tell me that first name again?  I'm sorry.

21 A    Luca.

22 Q    L-U-C-A?

23      And you think that's Luca Connolly?

24 A    I think so.

25 Q    So on your direct examination you said you know who those

D. Willis - Cross

1  students, plural, were.  Is that not the case?

2  A    I'm not, like -- yeah, so the case is that at different

3  times I remembered incorrectly who exactly is holding the thing

4  in the photo.  Right?  Like, for a while I thought one friend

5  had their hand on the banner, and then I saw a clip and that

6  friend is somewhere completely different than where I thought

7  they were.  So if it sounds like I'm moving about on this

8  issue, it's just because I want to be accurate, that's all.

9  Q    Okay.  So the only reason you're changing your testimony

10 is because you want to be accurate?

11 A    I don't think I'm changing my testimony as a --

12         MS. CONLON:  Objection, Your Honor, mischaracterizes

13 testimony.  This is page 178 of the transcript.

14         THE COURT:  It's an argumentative question.

15 Sustained.

16  BY MR. CANTWELL:

17 Q    You said -- I forget genuinely -- did you say that you

18 heard someone say "Heads down, y'all, heads down"?

19 A    Yes, but also it was in what we talked about beforehand,

20 just being like, hey, people are going to try to expose your

21 identity for retaliation possibly.  Make sure your face is

22 covered.

23 Q    Oh, who did you talk about that with?

24 A    I don't remember who individually said it.  That was just,

25 like, some wisdom.

D. Willis - Cross

1    Q    Just some wisdom?

2    A    Yeah.

3    Q    Okay.  Do you know a lot of people who got fired for being

4    anti-racist in 2017?

5    A    Got fired for being anti-racist?

6    Q    Yeah.

7    A    I don't think I know anybody personally who was fired for

8    that.

9    Q    Do you know anybody who had, like, their marriage ruined

10   because they opposed racism?

11            MS. CONLON:  Objection.  Relevance.

12            THE COURT:  Sustained.  This is just argument.

13    BY MR. CANTWELL:

14   Q    You testified that your -- I think you said your white

15   friends had formed a circle around you on the evening of August

16   11th to get you out of there.

17   A    They did.  It was a very brave thing.

18   Q    And what were their names?

19   A    It's the same crowd of people.  It's -- okay.  Yeah, so

20   someone named Lou, someone named Luca, someone named Kendall.

21   Someone named Ibby.  Someone named Ian.  Yeah, I don't want

22   to --

23   Q    So that would be Ian Ware?

24   A    Yes.

25   Q    So Ibby Han, Kendall, Luca and Lou --

D. Willis - Cross

1    A    Yeah.

2    Q    -- formed a circle around you?

3    A    Yes.  These are some of the people who I remember doing

4    that for me, yes.

5    Q    So at McGuffey Park on August 12th you said that people

6    were reading poetry?

7    A    Yes.

8    Q    And they were singing songs?

9    A    Uh-huh.

10   Q    And there was a band playing?

11   A    I don't know if the band came till later or not.

12   Q    Okay.  So it came a little later in the day --

13   A    I'm not sure.

14   Q    -- but at some point during the course of the day on

15   August 12th there was a band at McGuffey Park?

16   A    Yes.

17   Q    Now, you had, from McGuffey Park, you had some sort of

18   organized march that landed you in front of the library; is

19   that accurate?

20   A    Yes, we had a student march.  It was the same group of

21   people from the evening beforehand.  We had already planned to

22   do it.  That's why we had the band and everything.

23   Q    And whose plan was that?

24   A    I think it was all of our plan.  I don't remember who came

25   up with the idea.

D. Willis - Cross

1  Q    So you don't know whose idea it was to be in front of the

2  library?

3  A    I do not.

4  Q    Okay.  Pardon me for jumping around here, but did you

5  state that on the evening of August 11th you heard them

6  chanting "white power"?

7  A    I believe that's my testimony, yes.

8  Q    So now, I understand that you might have perceived some of

9  those chants to be white power chants, but were they chanting

10 the words "white power" specifically?

11 A    It was either "white lives matter" or "white power."

12 Q    "White lives matter" or "white power"?

13 A    Or both.

14 Q    Do you think there's much of a distinction between those

15 two phrases?

16 A    There's some distinction.

17 Q    Do you believe that there is a negative connotation

18 surrounding the phrase "white power"?

19 A    It depends on who you're asking, but yes.

20 Q    And do you think that same negative connotation applies to

21 "white lives matter"?

22 A    I think "white lives matter" has less of a negative

23 connotation.

24 Q    Right.  Okay.  And right now you're not sure which of

25 those chants you heard, right?

D. Willis - Cross

1   A      It could be either.  It feels like both.

2   Q      It feels like both?

3   A      Yeah.

4   Q      But you're not sure?

5   A      I'm not -- I'm pretty sure, yeah.  I'm pretty sure.

6   Q      I'm sorry, you're pretty sure what?

7   A      I'm pretty sure one or the other.  I may have mistook one

8   for the other, but I know at least one of those was said -- was

9   chanted.

10  Q      Okay.  Another thing you don't remember is the substance

11  of your meeting with the Charlottesville police chief, right?

12  A      Right.  I don't remember the details of it.  I remember

13  the building, that's about it, the room.

14  Q      Do you remember saying that you were chatting with the

15  drummer outside the library?

16  A      Yes.

17  Q      I see three men with drums.  Can you tell me which one of

18  them that was?

19  A      It's the person in the gray shirt.

20  Q      The person in the gray shirt that's covering his face?

21          THE CLERK:  Excuse me.  Can I ask what exhibit that

22  is?

23          MR. CANTWELL:  I'm sorry.  We're looking at

24  Plaintiffs' Exhibit 3268.

25  BY MR. CANTWELL:

126

D. Willis - Cross

1  Q     This man right here, right?

2  A     Yes.

3  Q     So you're chatting with the guy who doesn't want his

4  picture taken, right?

5  A     To me it looks like he's wiping sweat.

6  Q     And this guy is wiping sweat too, I take it?

7  A     Could be.  I'm not sure.

8  Q     It's a hot day, right?

9  A     Yeah.

10 Q     Yeah.

11       Could we bring this computer back over to my screen,

12 please.  It's no longer showing the jury, right?  We show that

13 just to the witness for now.

14       At some point on August 11th you decided that you -- you

15 wanted to leave after the torch marchers had surrounded you,

16 right?

17 A     Yes.  I told my friends I wanted to go.

18 Q     And any particular reason you didn't decide to do that

19 before you were surrounded?

20 A     Before we were surrounded I was still on the fence, but I

21 thought that I could -- I thought it would be okay.  After I

22 was surrounded, I changed my mind.  I feared for my life.  I

23 changed my mind.

24 Q     Okay.  I'd like to show Mr. Willis -- I have this as

25 the -- the file name that you've got will be CCEX134.

D. Willis - Cross

1          MS. CONLON:  Your Honor, before Mr. Cantwell does

2   that, we don't have any exhibits with the prefix CC.  My guess

3   is these have been since renamed.  So we need to know what --

4   what exhibit this is or what it used to be called, or be given

5   a list of how the new exhibits are named.

6          MR. CANTWELL:  Judge, I think that Mr. Bloch could

7   probably help them out.  I gave them -- I gave Mr. Bloch a

8   thumb drive this morning with these.  It would have been on the

9   exhibits list that I gave plaintiffs' counsel.  This would be

10  titled Exhibit 134, and then it had a broader description after

11  that description.

12         MS. CONLON:  If that was provided to us

13  electronically this morning right before court, it's something

14  I haven't seen.  Could the Court ask Mr. Cantwell to share the

15  original number of the exhibit just so we can get moving?

16         MR. CANTWELL:  It's 134.

17         MS. CONLON:  Oh, it's the same that it was.  Just a

18  new prefix?

19         MR. CANTWELL:  Yeah.

20         May I show this to the witness?

21         THE COURT:  You may.

22         (Video playing.)

23   BY MR. CANTWELL:

24  Q    Does that scene look familiar to you, Mr. Willis?

25  A    Yes.

D. Willis - Cross

1   Q    Can you point to me approximately where in this you are?

2   A    Yes.  Like there.

3   Q    Oh, okay.  I'm still looking at the screen on my laptop.

4   I didn't see your dot there.  Okay.  Thank you.

5        MR. CANTWELL:  I'd like to move this into evidence.

6        MS. CONLON:  Your Honor, this is an entire video and

7   Mr. Willis has been shown a single clip.  So if Mr. Cantwell

8   wants to move in this clip that Mr. Willis can authenticate, we

9   wouldn't object.  But if he's seeking to move in the whole

10  video from his exhibit list, something Mr. Willis has never

11  seen, then we would ask that he authenticate the video with

12  Mr. Willis first, the whole video.

13       MR. CANTWELL:  Judge, that sounds like a reasonable

14  request.  I don't have the capacity to cut clips out in a

15  courtroom.  And so --

16       MS. CONLON:  Then we would just ask that only this

17  clip that's been shown to the witness, just the time stamps

18  could be read into the record and that's the portion that could

19  be admitted.

20       MR. CANTWELL:  That sounds reasonable enough.  Does

21  that work, Judge?

22       THE COURT:  Works with me.  But I don't know how to

23  do it.

24       MR. CANTWELL:  How about I'll start playing the video

25  and we'll talk about it and then we'll figure out the time

D. Willis - Cross

1  stamps, and then once we're all okay with that, then we can

2  show it to the jury.  Does that work?

3          THE COURT:  What's the problem with this?  Is there

4  any prejudice to this --

5          MS. CONLON:  Your Honor, this is a defense exhibit

6  that the witness has never seen the whole video of.  So to use

7  this witness to authenticate an entire video that he's never

8  seen without having shown it to him, we would object to that on

9  lack of foundation.

10          THE COURT:  All right.

11          MR. CANTWELL:  And I'll -- for the Court's sake,

12  there is -- this video file that I have here does have

13  different segments to it which do not include Mr. Willis.  So I

14  think plaintiffs' counsel's concerns are reasonable.  So --

15          MR. SMITH:  Sounds like it needs to be clipped.

16          MR. CANTWELL:  I'm sorry.  I'm working through this

17  as we go.  So let me just show you this and we'll go from

18  there.

19          THE COURT:  There was an exhibit admitted showing him

20  at the -- at the statue.  Can't you use that one?

21          MR. CANTWELL:  This is a video file, and I'd like to

22  go over the video file with some of the audio, is the goal.

23          THE COURT:  Well, why don't we take a lunch recess

24  and -- so the jury doesn't have to sit here and wait.

25          MR. CANTWELL:  That sounds reasonable to me, Judge.

D. Willis - Cross

1          THE COURT:  Members of the jury, it's nearly 12:30.

2    Why don't we take a lunch recess now until 1:30.

3          And if you all would get that straightened out.

4    Let's get this worked out, though, before you leave for lunch.

5    **(Jury out, 12:24 p.m.)**

6          (Recess.)

7          MS. KAPLAN:  Before we begin, we're very close to

8    having a complete set of stipulations.  Could we just have

9    another two minutes to talk to him before we start?

10         THE COURT:  All right.

11         (Discussion off the record.)

12         MS. KAPLAN:  Thank you, Your Honor.

13         If we could put that on the record?

14         MR. BLOCH:  Sure.

15         MS. KAPLAN:  Okay.  Go ahead.

16         MR. BLOCH:  Your Honor, Mr. Cantwell approached us

17   during the break and asked us for potential stipulations to

18   some of the exhibits that he would like to show this witness,

19   and I believe we've reached an agreement.

20         The agreement is the plaintiffs will stipulate to the

21   admissibility of what is marked -- I believe it is

22   Mr. Cantwell's Exhibit 134, as well as Mr. Cantwell's

23   Exhibit 138.  Mr. Cantwell, in turn, will agree to the

24   authenticity of the production of Discord that plaintiffs

25   received pursuant to subpoena.

D. Willis - Cross

1          Your Honor, what that means is that I believe every

2    defendant here, represented and *pro se*, has now stipulated to

3    the authenticity of the Discord production, such that the

4    Discord production can be authenticated without a live witness

5    from Discord.  And that's my understanding of the agreement

6    that we've just reached.

7               (Defendants' Exhibits 134 and 138 marked.)

8               (Defendants' Exhibits 134 and 138 admitted.)

9          MR. CANTWELL:  I agree with that, Judge.

10         THE COURT:  Thank you.  Can we call the jury?

11   **(Jury in, 1:37 p.m.)**

12         THE COURT:  All right.  You may be seated.

13         You may proceed, Mr. Cantwell.

14         MR. CANTWELL:  Sorry.  Just a moment.

15    BY MR. CANTWELL:

16   Q    Mr. Willis, I'm going to show you -- this is Plaintiffs'

17   Exhibit 2695 that we've looked at before.

18         MR. CANTWELL:  Could we -- I believe this is already

19   in evidence.  Can we show this to the jury?

20         THE COURT:  Yeah.

21    BY MR. CANTWELL:

22   Q    Okay.  Mr. Willis, do you know who Lindsey Elizabeth Moers

23   is?

24   A    No.

25   Q    Do you know who Thomas Massey is?

D. Willis - Cross

1    A    No.

2    Q    Do you know who Thomas Keenan is?

3    A    No.

4    Q    Do you remember that woman that I've just circled there

5    from the evening of August 11th?

6    A    I do not.

7    Q    How about this man?  We're looking at his back right now,

8    but the blue shirt with the orange long-sleeved shirt

9    underneath it, does that ring a bell?

10   A    No.

11   Q    Okay.  And this person over in this corner with the camera

12   phone, you don't recognize that person?

13   A    No.

14   Q    Okay.  Those people that I pointed out to you, do you

15   think that if they were UVA students you would recognize them

16   or you would remember them?

17   A    If they were UVA students, would I know?

18   Q    Yeah.

19   A    It's possible there would have been UVA students I didn't

20   know, but...

21   Q    You couldn't be sure, in any case?

22   A    I couldn't be sure.

23   Q    Okay.  Thank you.

24          MR. CANTWELL:  This is just -- we're just showing the

25   witness this now, right?

D. Willis - Cross

```
 1              THE CLERK:  Correct.

 2              (Defense Exhibit 133 marked.)

 3    BY MR. CANTWELL:

 4    Q    Mr. Willis, I'm going to show you -- this is my

 5    Exhibit 133.  And you can see the frame that we're in, right?

 6    A    Yes.

 7    Q    I know it's a little bit blurry, but do you get an idea of

 8    what we're looking at?

 9    A    Yes.

10    Q    Okay.  Do you have an idea of where you are in this, or if

11    you're in this?

12    A    I can't see the statue very well, but I think --

13    Q    Let me start the video, and then we'll see if it becomes a

14    little bit easier to grasp.

15              MR. CANTWELL:  Oh, I should mute this.  I'm sorry.

16              (Video playing.)

17    BY MR. CANTWELL:

18    Q    Are you in this video?

19    A    I can't see myself well, but I believe so, yes.

20    Q    So you can't see yourself, or you can't see yourself well?

21    A    I can't see myself well.  I know where I'm standing in

22    this video.

23    Q    You know where you are in this video?

24    A    Yes.

25    Q    Would you mind circling that spot on there for me, please?
```

D. Willis - Cross

1  A    (Witness complies.)

2  Q    Okay.

3  A    Yes.

4        MR. CANTWELL:  I'd like to show this video to the

5  jury.

6        THE COURT:  You may.

7        Has this exhibit been admitted?

8        MR. CANTWELL:  This -- well, I'm sorry.  I would like

9  to admit a clip of this video.

10       THE COURT:  Okay.  It's admitted, and you may.

11       MR. CANTWELL:  So we're going to do this from 1446 to

12 1612 on Exhibit 133.  That's the goal here.  Now I'm going to

13 turn the volume on.

14       (Defense Exhibit 133 admitted.)

15 BY MR. CANTWELL:

16 Q    There's a couple of things I'm looking for here,

17 Mr. Willis.  If you see a pistol, if you hear "white power," if

18 you hear monkey noises, I want you to tell me to stop, okay?

19 A    Okay.

20 Q    Thank you.

21       (Video playing.)

22 A    I hear "white power."

23 Q    You hear "white power"?

24 A    Yes.

25 Q    Okay.  I'm sorry.  Let me go back there.

D. Willis - Cross

1        (Video playing.)

2        Did you know if it came in after -- somebody says -- not

3   to be argumentative here.  I heard somebody say "leftist scum."

4   Is it before or after "leftist scum"?

5   A    It's after I hear someone shout something about Antifa.

6   Q    Okay.  Let me go back a little bit.

7        I think by this point is when you said you had heard it.

8   So we heard -- suffice it to say you heard it in there.

9        So far they haven't begun chanting in unison, would that

10  be fair to say, at this point in the video?

11  A    Yes.  But he does it just before "leftist scum."

12  Q    Right before "leftist scum," you hear somebody say "white

13  power"?

14  A    Yes.

15  Q    Okay.  All right.  Fantastic.

16       (Video playing.)

17       Is that what you were referring to as monkey noises, this

18  (indicating), or is that something else?

19  A    I'm not --

20  Q    Not sure?

21  A    I'm not sure.

22  Q    Okay.  Let's continue.

23       (Video playing.)

24       Now, do you get an idea where we are in this video --

25  like, where the camera is?

D. Willis - Cross

1    A    Yes.

2    Q    Okay.  And do you have an idea -- can you point to where

3    you believe you are in this video?  I think you're blocked by

4    other people.

5    A    Yes.

6    Q    I'm going to go back two seconds and then we'll come

7    back -- well, maybe five seconds.

8         (Video playing.)

9    A    Yes.

10   Q    Is that you in the white shirt with something --

11   A    The pink shirt underneath --

12   Q    The pink shirt under the white shirt, is that you?

13   A    Yes.

14   Q    Okay.  Great.  Okay.  So let's continue.

15        (Video playing.)

16        Now --

17   A    Could you rewind that last part?

18   Q    I'll gladly rewind it in just a second.  I just want to

19   point somebody out real quick.

20        So this guy -- before, when we looked at the photograph,

21   you said you didn't recognize that guy, right?

22   A    I don't recognize that guy.

23   Q    But he's standing pretty much right in front of you,

24   right?

25   A    More or less.

D. Willis - Cross

1  Q    Okay.  So you want to rewind it, go back -- how about we

2  go back six seconds?  Does that work?

3  A    Sure.

4       (Video playing.)

5       This is like -- this may not be the only instance, but I

6  experienced the sounds that you hear at this time as, like,

7  some of the monkey noises, like the (indicating), and it

8  obviously breaks apart.

9  Q    Okay.

10 A    And there's some screeching.

11 Q    Okay.  All right.  Very good -- well, not very good.  I'm

12 sorry.  But at least we understand each other, I mean to say.

13      Okay.  So I'm going to go back just a little bit.  It's

14 going to be too much of me to ask if you recognize this guy,

15 obviously, right?  That's a little bit blurry.

16 A    I don't recognize that person.

17 Q    Okay.

18      (Video playing.)

19      Now, do you see that right there, where that camera gets

20 swatted out of that guy's hand?

21 A    I just saw it, yeah.

22 Q    Okay.  Let's just...

23      (Video playing.)

24      Just so we're clear, you haven't seen anybody else get hit

25 at this point, right?

D. Willis - Cross

1              MS. CONLON:  Objection, vague.  I guess I'd ask that

2   counsel clarify whether he means in this video or at this point

3   in time.

4              MR. CANTWELL:  Well, actually, I'll ask both

5   questions.

6    BY MR. CANTWELL:

7   Q    Before this moment, in your memory, was there any violence

8   at the August 11th thing?

9   A    I'm not sure, because this moment isn't in my memory.  I'm

10  looking at the floor when this takes place.

11  Q    When this happens, you're looking at the floor?

12  A    Yes.

13  Q    All right.  And so separate question now:  From what

14  you've seen in this video, does that look like the first time

15  somebody takes a swing at somebody?

16  A    I'm really not sure.

17  Q    Okay.

18  A    It's not the widest angle.

19  Q    Just within the context of what we're seeing here?

20  A    Sure.

21  Q    I can rewind.  Do you want to go back?

22  A    Yes, please.

23  Q    All right.  Let's do that.

24       So what did we say?  14:46 we start?

25       (Video playing.)

D. Willis - Cross

1      Just from this video -- what we've seen here; not an

2  overall statement of who's right or who's wrong -- from what

3  you've seen in this video, does it look like the guy with the

4  orange long-sleeved shirt under the blue short-sleeved shirt

5  takes the first swing?

6  A    I think he knocks the guy's phone out of his hand, yeah.

7  Q    Okay.

8      (Video playing.)

9      Unfortunately, that stops pretty quick, doesn't it?

10 A    Pardon?

11 Q    It stops pretty quickly, unfortunately, though?

12 A    Yes, fortunately.

13 Q    I think that that's where we said we were going to stop.

14 So let me pull up a different angle of video now.

15          MR. CANTWELL:  We've already stipulated to this one.

16 This is going to be -- this is 138, I believe we said, right?

17          MS. CONLON:  Yes.

18          MR. CANTWELL:  138, we stipulated to.  Okay.

19 Fantastic.

20          (Defendants' Exhibit 138 marked.)

21          (Defendants' Exhibit 138 admitted.)

22  BY MR. CANTWELL:

23 Q    So have you ever heard of a website called Unicorn Riot?

24 A    No, I have not.

25 Q    Have you ever heard of a website called itsgoingdown.org?

D. Willis - Cross

1  A    No.

2           THE CLERK:  Just for the jury, are you needing this

3  to be admitted?

4           MR. CANTWELL:  Yes.  Can we move this into evidence?

5  This is my Exhibit 138, and I'd like to move this into

6  evidence, publish it, and show it to the jury.

7           THE COURT:  You may.

8   BY MR. CANTWELL:

9  Q    Now, this video -- I'll pause it when it happens.  There's

10  a couple of times -- it's probably going to seem obvious to

11  everybody here, but just so we're clear what we're looking at,

12  there's a couple of edits in this video.  And so when they

13  happen, I'm going to pause, we'll acknowledge the edits, and

14  then we'll move on.

15       (Video playing.)

16  A    Would you still like me to stop you when I hear "white

17  lives matter," "white power," or the presence of firearms?

18  Q    If you hear "white power," definitely let me know.  I'd be

19  interested to know if that one happens.  Did you hear that in

20  here?

21  A    I think I just heard "white lives matter."

22  Q    Yeah.  Okay.  Very good.

23       Do you want me to rewind, see if we find a "white power"

24  in there?

25  A    I'm not hunting for one.  Please continue.

D. Willis - Cross

1      (Video playing.)

2  Q    Now, here's one of those very obvious edits by the good

3  folks over at Unicorn Riot, okay?

4      Is your screen as dark as mine over there?

5  A    Yes.

6  Q    Let me see if I can --

7          MR. CANTWELL:  Could we not show this to the jury for

8  a second?  I want to do something with the video and make sure

9  plaintiffs' counsel is okay with it, okay?  I want to change

10 the brightness on this, because I think it's a little bit

11 difficult to see.

12      (Pause.)

13 BY MR. CANTWELL:

14 Q    Is that a little bit better, Mr. Willis, a little bit

15 easier to see?

16 A    Maybe a little bit.

17          MR. CANTWELL:  Is this okay with you?

18          If this is okay with plaintiffs' counsel, I'll show

19 this again to the jury.

20          MS. KAPLAN:  We're just talking, Mr. Cantwell,

21 about -- the only difference you made was to make it brighter?

22          MR. CANTWELL:  That's all I'm trying to do, yeah.  On

23 my laptop screen this actually looks pretty okay.  I'm looking

24 at it on the screen that's on this podium, and it looks real

25 dark and hard to see and I'm wondering if anybody else had

D. Willis - Cross

1    experienced that.  So I turned up the brightness in order to

2    try to alleviate that problem.

3              MR. SPENCER:  It's slightly better.

4              MS. KAPLAN:  If it's just -- if all you're doing is

5    adjusting the brightness, that's fine.

6              MR. CANTWELL:  Yes.  Okay.  I'd like to show that

7    back to the jury, please.

8     BY MR. CANTWELL:

9    Q    Okay.  So let's go here.

10        (Video playing.)

11        So there's a man in a tank top there; do you see him?

12   A    Yes.

13   Q    And do you recognize -- this time we see the man with the

14   orange long-sleeve shirt and a blue sleeve shirt?

15   A    I didn't notice him.

16   Q    Let's go back a little bit then.

17        This man with the beard here, does that look sort of like

18   the guy we pointed to before that had the blue short-sleeve

19   shirt with the orange long-sleeve shirt?

20             MS. CONLON:  Objection, Your Honor.  Mr. Willis has

21   already testified he didn't see this person.  If Mr. Cantwell

22   wants to testify when he testifies about what he thinks the

23   video shows, that seems fine.  But asking Mr. Willis to try to

24   ID people he hasn't seen on these videos --

25             THE COURT:  Sustain the objection.

D. Willis - Cross

1              MR. CANTWELL:  That's fair.  Thank you.

2              (Video playing.)

3    BY MR. CANTWELL:

4    Q    Do you have an idea as to where this fight is happening,

5    Mr. Willis?

6    A    I can't tell.

7    Q    Okay.  Let's go a little bit further.

8              Earlier you testified that you saw the picture of me

9    pepper-spraying a man and you said that that seemed to be near

10   you, is what I'm trying to establish.

11   A    Yes, I did testify to that.

12   Q    Okay.  So I'll rewind a little bit, then.  Maybe you can

13   tell me if you know where this is happening.

14             (Video playing.)

15   A    Yeah.  Yeah.

16   Q    This is happening right by where you were or are, right?

17   A    Yes.

18   Q    Now, if I recall correctly, what it sounded like you were

19   testifying to is that this fight -- do you recognize the logo

20   on the back of my shirt there?

21   A    Is it the white logo?

22   Q    Yeah, the white logo on the black shirt; do you see that?

23   A    Yes.

24   Q    Okay.  I'm trying not to testify.  I'm trying to see if

25   your memory matches up with mine.  Is that the fight that you

144

D. Willis - Cross

1  said was at your feet before?

2  A    I'm not sure.  I've never seen this angle before, I don't

3  think.

4  Q    But do you have an idea of where we are on the statue?

5  I'm sorry, you were speaking.  I apologize.

6  A    Yes.  Thank you.  This is definitely happening on my side.

7  This looks like it could be the incident where you pepper-spray

8  someone in my direction and pepper-spray me in the fight that

9  breaks out on my feet, yes.

10 Q    Okay.  So just so we're clear, before today, you haven't

11 said that I pepper-sprayed you, right?

12 A    I don't think I've gone on record about it.

13 Q    So this is the first time that you said that I

14 pepper-sprayed you?

15 A    I think so.

16 Q    Okay.  All right.  Fantastic.  And so now we're in a

17 situation where the guy with the white logo on his shirt is

18 involved in a -- is that the fight that was at your feet

19 before?

20 A    I don't remember extremely well.  I remember it being at

21 my feet, like people rolling around.

22 Q    And so -- did you move to another part of the monument

23 before they were rolling around?

24 A    I don't remember clearly.  I think the rolling around and

25 the fighting at my feet where I couldn't escape is what

D. Willis - Cross

1  prompted me to say we need to leave.  I don't remember how

2  quickly we were able to go.

3  Q    This guy right here, that's not you, right?

4  A    I don't think so.

5  Q    Okay.  Let's rewind a little bit and see if we can find

6  you in this video.  I'm going to slow down this playback a

7  little bit.  Just slow motion, if that's okay.

8          MS. CONLON:  Your Honor, before Mr. Cantwell shows

9  the video altered to the jury we'd ask that plaintiffs' counsel

10  be able to view it before it's published in whatever way

11  Mr. Cantwell intends to do it.

12          THE COURT:  I'm sorry, I did not hear you.

13          MS. CONLON:  I apologize.  Before Mr. Cantwell

14  manipulates the video and shows it to the jury, I'm asking that

15  it be shown to plaintiffs' counsel beforehand so we can see if

16  we have an objection.

17          THE COURT:  Okay.

18          MS. CONLON:  Thanks.

19          MR. CANTWELL:  That's fine with me.  I should

20  probably mute it then, too right?

21          MS. CONLON:  Yes, please.

22          (Video playing.)

23          MR. CANTWELL:  It moves on to another area of the

24  video at that point.  Is that -- that portion of it, is that

25  okay?  Is that okay with plaintiffs' counsel?

D. Willis - Cross

1          MS. CONLON:  Yes.

2          MR. CANTWELL:  If we could show this back to the

3   jury, then.

4          (Video playing.)

5    BY MR. CANTWELL:

6   Q    So real quick, there's that moment you saw me pepper-spray

7   that guy right there, right?

8   A    Yeah, I think that's the one that was in the image I saw.

9          (Video playing.)

10  Q    Now, you can see there's another attempt at a pepper spray

11  deployment there, you saw that?

12  A    I did, yeah.

13         (Video playing.)

14  Q    Did you just see another pepper spray get deployed?

15  A    Yes.

16         (Video playing.)

17  Q    Did you just see some more pepper spray get thrown?

18  A    Yes.

19  Q    And so fair to say you're not sure if I pepper-sprayed

20  you, right?

21  A    I think the people -- I don't know who you're aiming for,

22  but I know that you're aiming at people who are standing very

23  near to where I'm standing, and you can see that it looks like

24  that's what prompts us to start running.

25  Q    That's fair.  Would it also be fair to say that the two

D. Willis - Cross

1    pepper spray deployments that came after I was pepper-spraying,

2    the two other ones, would it be fair to say those were sprayed

3    in a similar direction?

4    A    Yes.

5    Q    Okay.  Great.

6    A    Yeah, I did name you as one among other people.

7    Q    I'm sorry, say it again?

8    A    I think when we talked about it last time it was like -- I

9    said you were -- the video evidence is what made me believe you

10   were one among other people who sprayed me.

11   Q    Right.  Okay.  So now you're saying you got pepper-sprayed

12   multiple times?

13   A    I think I've always said that.  It was never clear what

14   direction it came from.

15   Q    How many times did you get pepper-sprayed?

16   A    I'm not sure.

17   Q    You're not sure.  Have you ever been pepper-sprayed before

18   August 11th?

19   A    No.

20   Q    Have you been pepper-sprayed since then?

21   A    I was exposed to it again the next day.

22   Q    You were exposed to it again the next day?

23   A    Yeah.

24   Q    Okay.  Do you think that getting pepper-sprayed was sort

25   of a memorable experience?

D. Willis - Cross

1   A    It was pretty memorable.

2   Q    Pretty memorable, but you're not sure how many times you

3   got pepper-sprayed?

4   A    I mean, I think you can kind of see from the video --

5   well, my memory of it is that a lot of it happened at once.  I

6   was choking, hiding my face and like struggling to breathe,

7   trying to get low, and then also trying to leave.  So I think

8   that there were other things at the top of my memory.

9   Q    That I can sympathize with.

10       Okay.  So let's see.  So by the time this fight happens at

11   that side of the statue, it looks like you're already gone,

12   doesn't it?

13   A    It might look like that, but I'm, one, pretty small...

14       (Video playing.)

15   Q    I'm going to pause this a couple of times.  I wonder if we

16   see you at some point and I just don't want to miss it.  Does

17   that work for you, sir?

18   A    Yes, we can look for that.

19   Q    Okay.

20       (Video playing.)

21   A    Yeah, so if you were to jump back one more frame --

22   Q    That was not one more frame.  I'm sorry about that.

23   A    One more.

24   Q    One more back or forward?

25   A    Forward.

D. Willis - Cross

1      One more.

2      Yes.  So, like, in the top left corner you can see a mass

3  of people who are still on the statue.  I believe that I'm

4  somewhere over there.

5  Q    Masked people did you say?

6  A    You see the shape of, like, one or two heads.  I don't

7  know which one is mine.  But I'm saying that that's about --

8  the frame demonstrates there's still more people behind the

9  people that are pictured.

10  Q    Just to be clear.  You're not saying they're wearing

11  masks.  You're saying you can see the silhouette of their

12  heads?  Is that --

13  A    Yes, more or less.

14  Q    Okay.  Thank you.

15           (Video playing.)

16  Q    And are you seeing some of the friends that circled you to

17  get you out of there at this point?

18           MS. KAPLAN:  You're asking in the video?

19           MR. CANTWELL:  Yes.

20           THE WITNESS:  It's impossible to ID them because you

21  can't see the entirety of our faces.

22           (Video playing.)

23   BY MR. CANTWELL:

24  Q    So the challenge that I'm finding here, when we get to

25  this frame here, you're not there, right?

D. Willis - Cross

1          MS. CONLON:  Objection, Your Honor.  Before the

2   witness responds, I would ask Mr. Cantwell stop editorializing

3   about his personal experience of asking these questions or

4   anything else.

5          THE COURT:  Just a minute.  I have to read this

6   because I can't understand you.

7          Okay.  The objection was to your inserting comments,

8   characterizing and making statements.  Just ask the question,

9   simple question.

10   BY MR. CANTWELL:

11  Q    Okay.  In this frame of the video, can you see yourself?

12  A    I can no longer see myself.

13  Q    Can you see any of the people who you earlier described as

14  having escorted you out of this situation?

15  A    I'm really not sure.  I think there's a lot of bodies

16  between myself and the camera, but I do see that, like, at this

17  point our circle has been broken.

18  Q    Okay.  All right.

19          (Video playing.)

20          We've obviously moved to another angle of video here.

21  If you can find yourself in this -- I know it's blurry, I'm

22  going to keep it in slow motion -- if you see yourself, holler.

23  A    Will you begin the video again in slow motion?

24  Q    I'll get back to this clip of it.  Right?

25  A    Okay.

D. Willis - Cross

1  Q    Yeah, I'll go back to the last frame of the other segment.

2         (Video playing.)

3  A    Yes, I see --

4  Q    I'm sorry, say that again, please.

5  A    I don't see myself exactly, but I see the crowd of people

6  that I'm with still.

7         (Video playing.)

8  Q    At this point do you see yourself in that video?

9  A    At this point you can see me in the crowd -- or me and my

10  friends have exited from the left.

11  Q    Okay.  So your friends have exited --

12  A    Yeah.  I think we're visibly trying to organize ourselves

13  and leave for the majority of this clip.

14  Q    Did you go to the screen left or your left in the video?

15  A    I went to my left in the video.

16  Q    Your left in the video.

17  A    So screen right.

18  Q    So you went towards -- would that be where the "Students

19  act against white supremacy" sign was?

20  A    Yes, I was moving in that direction.

21  Q    So you moved in that direction.  Okay.

22  A    Yes.

23         (Video playing.)

24         MR. CANTWELL:  The other one we stipulated to was

25  134, I think we said, right?

D. Willis - Cross

1          MS. CONLON:  Yes.

2     BY MR. CANTWELL:

3   Q    Let's pull up another video, Mr. Willis.

4        You're going to see some things that are not -- well, I

5   guess I should just get to the point where you are in --

6          THE CLERK:  Are you going to move for the admission,

7   Mr. Cantwell?

8          MR. CANTWELL:  I think we can show this to the jury.

9   We've stipulated to this, right?  Do you want to publish this

10  one to the jury?

11         MS. CONLON:  Yes.

12         MR. CANTWELL:  Maybe -- would it be proper to have

13  him testify to what he sees in a video that he's not in?  No?

14  Okay.  So let me skip ahead a little bit.

15         THE COURT:  Well, yes, he can -- if he sees a video

16  and he knows whether he's in it or not.

17         MR. CANTWELL:  Well, the first portion of it --

18   BY MR. CANTWELL:

19  Q    Mr. Willis, if you see a gun or you hear somebody say

20  "white power," let me know, okay?

21  A    Yes.

22       (Video playing.)

23  Q    Just so we're clear, at this point, you know where you are

24  in this video, right?

25  A    Yes.

D. Willis - Cross

1    Q     Would you mind circling yourself there?

2    A     (Witness complies.)

3    Q     Okay.  Great.

4          Ms. Romero had described the sound as we were coming as if

5    like the earth was growling.  You were able to hear the march

6    as it approached, right?

7    A     Yes.

8    Q     And I think, was it you that described -- I'm sorry, no,

9    that's Mr. Ware.  I'm not going to make you answer for his

10   words.  But suffice it to say -- well, were you nervous when

11   you started to hear people coming over those steps?

12   A     Extremely nervous.

13   Q     Okay.

14         (Video playing.)

15   A     Could you pause the video.

16   Q     Sure.

17   A     There's a gentleman just walks by with something strapped

18   to his thigh.  You have to rewind it a second or two.

19   Q     Okay.  We're at 5:33 here.

20             MR. CANTWELL:  If I put this back in slow mo, do you

21   think that'll incur any objections from plaintiffs' counsel?

22             MS. KAPLAN:  That's okay.

23             MR. CANTWELL:  Okay.

24             (Video playing.)

25    BY MR. CANTWELL:

D. Willis - Cross

1   Q    Do you think I should go back a little bit more, maybe?

2   A    I think so.

3   Q    All right.  Let's do that.

4        (Video playing.)

5        We're at 5:29 here.  And I'm pretty confident that was

6   before you said --

7   A    Yeah.  So can I circle the person?

8   Q    Yes.  Please do.

9   A    It's more visible when he's in motion, but if you follow

10  him when you walk, you can see on his left thigh there's

11  something large and shiny.

12       (Video playing.)

13  Q    Did we pass him again?

14  A    Yeah, he's gone already.  But, I mean, that was just...

15       (Video playing.)

16       There he was.

17  Q    Okay.  He's actually -- is this the guy you're talking

18  about?

19  A    I think so.

20  Q    Okay.  All right.  Now I've at least got the guy you're

21  talking about.  I apologize to keep doing this.  I just want to

22  be sure we got the right thing.

23            MS. CONLON:  Your Honor, before we continue down this

24  road, I'm going to object to this line of questioning.

25  Mr. Willis has already -- I mean, it's clear Mr. Willis is not

D. Willis - Cross

1  in this portion of the footage, which is fine for playing it,

2  but asking him about his opinion about whether he can see a gun

3  on a blurry video and making us sit here four times while we go

4  through it, a video that doesn't capture everyone there and

5  isn't taken from Mr. Willis's perspective is irrelevant and

6  improper opinion.  So we're going to ask that this stop.

7          THE COURT:  Well, he's not asking an opinion, is he?

8  He's asking if he sees a firearm; is that right?

9          MS. CONLON:  He's asking him to identify --

10          THE COURT:  Well, what is your question?

11          MR. CANTWELL:  The question was:  Let me know when

12  you see the gun, because earlier Mr. Willis testified that he

13  saw numerous rally-goers carrying firearms.  And I'm trying to

14  find those firearms.

15          MS. CONLON:  Your Honor, we're going to be here all

16  day if we play an 11-minute video over and over again.  It's

17  like a nightmarish Where's Waldo.

18          THE COURT:  He can show him pictures and ask him if

19  he sees anyone with a gun.  Obviously he can't see around a

20  person but that -- he can ask him if he sees anyone with a gun.

21          MR. CANTWELL:  I'll move on.  I'll move on.  It's

22  okay.

23          THE WITNESS:  I will say the question wasn't about

24  anyone with a gun.  You just said the gun recently.  But that's

25  neither here nor there.

D. Willis - Cross

1   BY MR. CANTWELL:

2   Q    Fair point.  So I'll take this out of slow mo and let's

3   just review the rest of the video.

4        (Video playing.)

5        Now, could you circle yourself in this video here, sir?

6   A    Somewhere in this vicinity.

7   Q    Okay.

8        (Video playing.)

9        Now, something happens in this video that we watched from

10  another angle earlier.  And it happens right about here.

11       I just want you to keep your eye on that section of the

12  screen, okay?

13       (Video playing.)

14       Does that look at all familiar?

15  A    (No audible response.)

16  Q    It doesn't.  Okay.

17       Suffice it to say, just from watching that video you just

18  watched, within that video, before that moment that I just

19  called out, did you see any violence happen up until that point

20  in this video?

21  A    I don't think so.

22  Q    Okay.  And you recognize these people by now, right?  Not

23  that you know them, but we saw them on other videos, right, the

24  guy with the blue shirt and the orange long sleeves?

25  A    We saw them on other videos.

D. Willis - Cross

1   Q    Yeah.  Okay.

2        (Video playing.)

3            MR. CANTWELL:  I think I may want to call Mr. Willis

4   again when I put on my case, but that's all my questions for

5   now.  Thank you, Judge.

6            THE COURT:  Thank you.

7            MR. CANTWELL:  Thank you, Mr. Willis.

8            THE COURT:  Mr. Campbell?

9                        CROSS-EXAMINATION

10   BY MR. CAMPBELL:

11   Q    Good afternoon, Mr. Willis.

12   A    Good afternoon.

13   Q    Pardon me.  Good afternoon.  I represent James Fields.  I

14   just had a couple of questions for you, Mr. Willis.

15        I believe you said you saw the car attack on the news; is

16   that correct?

17   A    Yes, sir.

18   Q    All right.  So from that I can infer you were not actually

19   hit by Mr. Fields's car, correct?

20   A    I was not hit by the vehicle.

21   Q    And you were not in the crowd of people at Fourth and

22   Water Street at the time of the car attack, correct?

23   A    That's correct.

24            MR. CAMPBELL:  Thank you, sir.  That's all the

25   questions I have.

D. Willis - Cross

1          THE WITNESS:  Thank you.

2          MR. SMITH:  Your Honor, I believe Mr. Woodard is

3   next.

4          THE COURT:  Mr. Woodard represents Mr. Kessler?

5          MR. SMITH:  Yes.  He's in for Mr. Kolenich today.

6          THE COURT:  Mr. Woodard is on Zoom.  And he's going

7   to -- Mr. Kolenich, who also represents Mr. Kessler, could not

8   be here, but Mr. Woodard is his co-counsel, but Mr. Woodard is

9   on Zoom and he will question the witness.

10          Go ahead, Mr. Woodard.

11          MR. WOODARD:  Can you hear me, Judge?

12          THE COURT:  Yes, I can.

13          MR. WOODARD:  Okay.  Thank you.

14                      CROSS-EXAMINATION

15   BY MR. WOODARD:

16   Q   Mr. Willis, I want you to focus on the beginning of this,

17   when you're there having a spaghetti and soup dinner.  That's

18   the time we're talking about, okay?

19   A   Really quickly, I'd just like to make it clear that no one

20   is on my screen.

21          MS. CONLON:  Is that something we can fix?

22          MR. WOODARD:  I can see me.

23          MS. CONLON:  Is there a way for us to have

24   Mr. Woodard appear on the screen in front of the witness?

25          THE COURT:  That's what we're trying to do.

D. Willis - Cross

1              Mr. Woodard, can you move so that you're more in the

2    middle of your screen?

3              That's better.

4              MR. WOODARD:  How's that?

5              THE COURT:  That's better.  Something was blocking

6    you on my screen.  That's good.

7              MS. CONLON:  May I ask if it's on the witness's

8    screen?

9              THE COURT:  No.

10             MS. CONLON:  Oh, it's still not.

11             THE COURT:  Can we get Mr. Willis's screen, the

12   witness's screen?

13             THE CLERK:  We're working on it.

14             THE COURT:  All right.  Mr. Woodard, you may proceed.

15    BY MR. WOODARD:

16   Q   Mr. Willis, I'd like to focus on the point in time when

17   you are at the UVA professor's house with your spaghetti and

18   soup dinner; is that okay?

19   A   That is okay.

20   Q   Now, before that point in time, had you ever met Jason

21   Kessler?

22   A   I had never met Jason Kessler before that.

23   Q   Had you ever seen Jason Kessler?

24   A   Only online.

25   Q   So your answer is yes?

D. Willis - Cross

1   A    Yes, online.

2   Q    Okay.  Did you see images of him, photographs of his face?

3   A    Yes.

4   Q    Would you have recognized him out on the street?

5   A    It's possible.

6   Q    Okay.  Now, what did you know about Mr. Kessler before the

7   soup and spaghetti dinner?

8   A    There was no soup.

9        I knew that he was from Charlottesville and that he was an

10  organizer of Unite the Right.  He had done some rallies in the

11  area for a long time, or for a while.

12       I knew what his face looked like because he did a lot of

13  livestreams and Instagram Lives and things like that.

14  Q    Okay.  Now, so correct me if I'm wrong:  You're at the

15  spaghetti-only dinner, and someone bursts into the room with

16  the news that Kessler and a handful of people are going to be

17  at the monument shortly; is that the situation?

18  A    Yeah, I remember someone came in, and then a little while

19  later there was an announcement.

20  Q    Okay.  Did the person who came in make the announcement?

21  A    I actually don't remember.  I don't think so.

22  Q    So -- and I believe you testified that y'all were busy

23  making the "UVA students against white supremacy" sign; is that

24  right?

25  A    Yeah, that and some other signs, I believe.

D. Willis - Cross

1   Q    Okay.  And so what was the compelling reason you left your

2   nice spaghetti dinner and sign-making -- I'll call it a party,

3   but that's not really the right word.  You chose to leave that

4   and go down to the monument, correct?

5   A    Correct.

6   Q    And what was -- what was it about Kessler and his handful

7   of people that was so compelling about you leaving that nice

8   situation and going out there to the monument?

9   A    What was it about Kessler, is your question, that made me

10  protest him?

11  Q    No.  You had two choices here:  You could stay there with

12  the after-dinner glow of the spaghetti, or you could hop in a

13  car and go some distance to the monument to do something

14  concerning Mr. Kessler.

15      Why was going to the monument more important than your

16  spaghetti dinner afterglow?

17  A    Well, to answer your question -- I think I touched on this

18  earlier -- I had two major motivations.

19      Like, one, I disagree with what Kessler stands for and I

20  wanted to do a peaceful demonstration when I heard that he was

21  having his own demonstration at my school.

22      And then, two, like, camaraderie.  To be with my friends.

23  And my friends also felt like a counter-demonstration was

24  necessary, and I wanted to join my friends.

25  Q    Okay.  So would it be fair to say it was a combination of

D. Willis - Cross

1    peer pressure and that y'all wanted to go down and

2    counter-protest?

3    A    I wouldn't agree to peer pressure.  We all had that in

4    common.  We didn't think Kessler's message was cool.

5    Q    Okay.  And so you decided to go down there and do

6    precisely what?

7    A    Wave our new sign.  Sing some chants.  Counter-protest

8    peacefully.

9    Q    Okay.  Okay.  Now, so you got in your car -- well, let me

10   go back.

11        So correct me if I'm wrong:  You went down there to

12   exercise your right to free speech, right?

13   A    That is correct.

14   Q    Okay.  So you get in your car.  You said you drove for

15   a ways and then had to get out and walk; is that right?

16   A    I didn't drive, but yes, that's correct.

17   Q    Well, you rode in a car?

18   A    Yes.

19   Q    Okay.  So you get down there.  Is it light or dark

20   outside?

21   A    It's dark.

22   Q    Okay.  So you get there and you park, I believe on the

23   street, and you walk up the steps; is that right?

24   A    What's that?  I don't think so.  Do you mean park on the

25   street and then walk up the steps of the Rotunda?

D. Willis - Cross

1   Q    To the monument, the Jefferson monument.

2   A    I'm --

3   Q    That's how you got --

4   A    No.  I'm walking down some steps to get there.

5   Q    Okay.  So you came down the Rotunda steps?

6   A    No, sir.  I came from East Range.

7   Q    Okay.  All right.  So you get there to the monument.

8   That's the point in time I'm talking about.

9        Now, I need to interrupt, and let's make sure we've got

10  the space right here.

11       You're familiar with where the Rotunda is vis-à-vis the

12  Jefferson monument, correct?

13  A    Yes.

14  Q    And Thomas Jefferson himself faces north, correct?

15  A    I don't remember which direction his face is facing.

16  Q    Okay.  Well, the Rotunda is on the south face of the

17  monument, correct?

18  A    Correct.

19  Q    And the sign and the sign people set up their sign on the

20  south face of the monument, correct?

21  A    Correct.

22  Q    So the west face of the monument -- from the Rotunda, the

23  west face of the monument would be to the left, correct?

24  A    Correct.

25  Q    And the east face of the monument would be to the right,

D. Willis - Cross

1    correct?

2    A    Correct.

3    Q    And towards the end of this thing, you and the sign people

4    went over to a bright light and set your sign back up, and that

5    was towards the east, correct?

6    A    I don't know what the "bright light" is about; but we did

7    move our sign to the east, yes.

8    Q    All right.  Now, when you arrived at the monument, how

9    many people were there?

10   A    I don't remember exactly.  Not many.

11   Q    Five to ten?

12   A    I really couldn't say.  More than ten.

13   Q    15?

14   A    Really not sure.  Of my friends, people that I knew, it

15   was about ten of them.

16   Q    Okay.  Okay.  And that number increased over time, didn't

17   it?

18   A    Yes.

19   Q    And ultimately, there were probably -- what, 40 or 50 of

20   your counter-protesters there, which includes your ten; is that

21   right?

22   A    No, that's not right.  It was way less.

23   Q    30?

24   A    Of people that I knew that were my friends who --

25   Q    No.  No.  That wasn't the question.  How many people

D. Willis - Cross

1   total, or how many counter-protesters total, got there?

2   A    At the base of the statue, if I had to ballpark it, if you

3   insist, maybe 15 to 20.

4   Q    That's when you arrived, right?

5   A    No, that was after we had everybody.  It was probably ten

6   when I arrived.  I came with one car full of people.

7   Q    Okay.  So it was about ten total when you arrived, and

8   then Natalie Romero and her car of people showed up, right?

9   A    They were there before us.

10  Q    Okay.  So the ten includes Natalie Romero and her vehicle?

11  A    To my knowledge, yes.

12  Q    Okay.  Now, over the next -- well, until -- looking at the

13  time between when you arrive and when you went out to the east

14  and set up your sign again, a whole bunch more

15  counter-protesters arrived, didn't they?

16  A    Could you repeat your question?

17  Q    Between the time you arrived at the monument and the time

18  you went out and set up your sign upside down by the east

19  light, more counter-protesters arrived, didn't they?

20  A    I don't really know if I would describe those people as

21  counter-protesters.  I don't know who they are.

22  Q    Were they carrying torches?

23  A    No.

24  Q    And they didn't come down with the rest of the torchlight

25  parade, did they?

D. Willis - Cross

1    A      No.

2    Q      And they stood right in front -- some of them stood right

3    in front of you, didn't they?

4    A      Yes.

5    Q      And then there was a space, and then there were all the

6    guys with the torches, correct?

7    A      For the most part, yes.

8    Q      Okay.  And by the time you all went through the crowd and

9    set up your sign upside down again, how many total people were

10   there clustered around the base of the monument?

11   A      I really would not know.  I could only see the handful

12   that were standing near me.  After we had returned from the

13   monument, the torches went out, so it was unclear who was who.

14   Q      Okay.  But my question goes to how many people.

15          I understand you could only see the ones around you, but

16   you went from the west side of the monument all the way to the

17   east side of the monument.  So you covered half of it?

18   A      And I talked about how, when we were doing that, I

19   couldn't see a thing because my friends were protecting me from

20   all sides.

21   Q      Well, we're not talking about when you left the monument

22   and went to the east light.  We're talking about when you left

23   the west side of the monument, when the fighting broke out, and

24   moved to the east side of the monument?

25   A      I don't understand what the question is.

D. Willis - Cross

1  Q    You were on the west side of the monument, correct?

2  A    Initially, yes.

3  Q    And you were linked arms, correct?

4  A    That's correct.

5  Q    So you were on the west side of the monument up until

6  about the time that the fighting broke out on the southwest

7  corner; is that right?

8  A    Yes.  That is correct.

9  Q    And then you left the west side of the monument, traveled

10 around the south face, and then wound up on the east face,

11 correct?

12 A    That is correct.

13 Q    And so you would have -- you would have traveled through

14 everybody that was around the monument from west to east,

15 correct?

16 A    I suppose, yes.

17 Q    And the people who were on the north and east side of the

18 monument, most of them wound up on the east side, correct?

19 A    I don't know.

20 Q    Well, were you standing on the east side of the monument

21 alone?

22 A    No, sir, but I told you I couldn't see anything.

23 Q    Okay.  Okay.  Now, when you got out there by the east

24 light -- well, strike that.

25      Okay.  Let's go back to -- let's go back in time to when

D. Willis - Cross

1    you arrived.  You link arms with the people who were chanting,

2    and you start chanting; is that right?

3    A    That is right.

4    Q    And one of the people you have linked arms with was

5    Ms. Romero, correct?

6    A    Correct.

7    Q    And you had -- I'm going to use ten for the number of your

8    guys, okay?

9         And so you had ten people chanting around the base of the

10   monument, correct?

11   A    Not immediately.  The chanting began once we saw tiki

12   torches.

13   Q    Okay.  Now, let's stop right there.

14        When you first saw the tiki torches, had you seen Jason

15   Kessler at any time that night?

16   A    Not to my knowledge.

17   Q    Is your answer no, you hadn't seen him?

18   A    Not to my knowledge; I don't think so.

19   Q    Well, no, you don't think so?  Do you remember seeing him

20   or not?

21   A    I don't remember seeing him.

22   Q    Okay.  All right.  So let's go to the time when the tiki

23   torches arrive.

24   A    Okay.

25   Q    Okay.  You're still on the west face of the monument,

D. Willis - Cross

1   correct?

2   A    Correct.

3   Q    And you're still linked arms with Natalie, correct?

4   A    You said at the time when the tiki torches are still up?

5   Q    They're arriving.

6   A    Yes, I'm still on the west face.

7   Q    And you're still linked arms with Natalie, correct?

8   A    Yes.

9   Q    And you all are chanting "no Nazis, no KKK, no fascist

10  USA," correct?

11  A    That was one of the chants.  I don't know what order the

12  chanting was in.  I think the first one was "black lives

13  matter."

14  Q    Okay.  Well, y'all are chanting?

15  A    Yes, sir.

16  Q    And y'all are chanting pretty loud, aren't you?

17  A    Yes.

18  Q    And you remember seeing the video that Mr. Cantwell just

19  showed you where the camera was sort of at the top of the steps

20  of the Rotunda, correct?

21  A    Yes.

22  Q    And isn't it true that you could hear from that microphone

23  the sort of 50/50 y'all chanting and 50/50 whatever the torch

24  guys had?

25  A    In that video, that's how it sounds, yes.

D. Willis - Cross

1  Q    Okay.  So would you say it was pretty loud?

2  A    Our chant?

3  Q    Well, the whole scene.

4  A    The whole scene was pretty loud.

5  Q    Okay.  Now, up until this point, you told me you didn't

6  see Jason Kessler.  Did you hear Jason Kessler?

7  A    I don't know what he would have sounded like.

8  Q    Well, you said you -- you said you were familiar with him

9  online because he had given a bunch of livestreams and

10 podcasts, I think.  So you would be familiar with his voice,

11 correct?

12 A    Not particularly familiar with it.  And I don't think I

13 would have been able to pick it out of that many voices.

14 Q    Okay.  So if I asked you the question, did you hear Jason

15 Kessler's voice, your -- would your answer be no?

16 A    My answer would be I'm not sure, because I could have or I

17 could not have.  I wouldn't have been able to ID his voice,

18 were I hearing it or not.

19 Q    So as far as you can tell, you didn't hear a recognizable

20 Jason Kessler voice; is that correct?

21 A    That's correct.

22 Q    Okay.  Let's pause right there for a second.

23      Now, you had been told that it was going to be Kessler and

24 a handful of people, correct?

25 A    Correct.

D. Willis - Cross

1   Q    And as these tiki torches are coming down the Rotunda,

2   it's a whole heck of a lot more than Jason Kessler and a

3   handful of people, isn't it?

4   A    Yes, a lot more.

5   Q    And -- say again?

6   A    A lot more.

7   Q    Okay.  And so the person who gave you that information

8   about Jason Kessler and a handful of people that you wanted to

9   run down and confront, that turned out not to be the case,

10  didn't it?

11         MS. CONLON:  Objection, argumentative.

12  Mischaracterizes testimony.

13         THE COURT:  Sustained.

14         MS. CONLON:  Move to strike.

15         MR. WOODARD:  I'll rephrase it, Judge.

16   BY MR. WOODARD:

17  Q    So correct me if I'm wrong:  The information that you were

18  given about it being Jason Kessler and a handful of people

19  turned out to be incorrect, right?

20  A    I think whoever said it was a handful was mistaken.

21  Q    Okay.

22         Now, let's focus on the time between the torches start

23  coming down the Rotunda steps and the time you were out there

24  by the eastern light with the sign upside down, okay?

25         Do you understand that?

D. Willis - Cross

1    A    Could you repeat that, please?

2    Q    From the time the torches start coming down the steps to

3    the time you all had made it out by the eastern light and had

4    your sign back up.

5    A    Okay.

6    Q    That's the time we're talking about.

7         Did you see Jason Kessler at any time during that time?

8    A    I don't know.

9    Q    Did you recognize Jason Kessler?

10   A    I did not recognize anyone in the crowd as Jason Kessler

11   that I saw.

12   Q    Did you recognize the voice of Jason Kessler?

13   A    I did not recognize the voice of Jason Kessler because I

14   didn't know it that well.

15   Q    Okay.  Okay.  Now, I want to focus on the time period

16   after you were out there by the eastern light with your sign.

17   A    Okay.

18   Q    Are you with me?  From that period on until the police

19   cleared the area, did you see or hear, or did you see

20   Mr. Kessler or recognize his voice?

21        MS. DUNN:  Objection, Your Honor.  Asked and

22   answered.  This witness has already said he doesn't know if he

23   saw him.  He doesn't know if he heard him.  We can speed this

24   up by just moving on.

25        THE COURT:  Sustained.

D. Willis - Cross

1              MR. WOODARD:  Your Honor --

2              THE COURT:  You can answer this question and then

3    let's move on.

4              MR. WOODARD:  Yes, sir.  That was --

5              THE COURT:  If you can answer the question one more

6    time.

7              MR. WOODARD:  Say it again, please.

8              THE COURT:  I was speaking to Mr. Willis.

9              THE WITNESS:  Yes.  I'll answer the question again.

10   I did not see or hear Jason Kessler, to my knowledge, on the

11   east side of the statue after we had been driven off of it.

12    BY MR. WOODARD:

13   Q    Okay.  Now, you have said that in your transit from the

14   base of the statue towards the eastern light that -- I'm going

15   to call them the sign people, for lack of a better term -- you

16   said the sign people clustered around you to protect you; is

17   that right?

18   A    That's correct.

19   Q    Was Natalie with you then?

20   A    Natalie was right next to me.

21   Q    Okay.  So correct me -- so isn't it true that Natalie was

22   in the center of that group and you were on the right flank of

23   that group?

24   A    I don't think that's true.  Are you talking about when our

25   friends are protecting us?

D. Willis - Cross

1   Q    When you're transiting from the base of the monument to

2   the eastern light.

3   A    Me and Natalie were side by side at the center of the

4   circle, yes.

5   Q    And you were on her right, correct?

6   A    I don't remember.

7   Q    And isn't it true that one of the sign people stopped and

8   turned around and yelled "black lives matter" at the crowd,

9   instead of protecting you?

10  A    I don't remember.

11  Q    Thank you.  I'm not sure if I'm done.  Let me check my

12  notes here.

13       One thing I would like to try to clear up, Mr. Willis, is

14  I'm confused about when you say that you were pepper-sprayed.

15  A    Pepper-sprayed shortly before and during the exit.

16  Q    Now, was that on the east side of the monument or the west

17  side of the monument?

18  A    So the pepper spray would have begun on the west side of

19  the monument, but continued through our transition to the east

20  side.  They were pepper-spraying the people who were protecting

21  me, but it's like a human body doesn't stop a large amount of

22  pepper spray.

23  Q    You're just confusing me even more, Mr. Willis.

24  A    I apologize.

25            THE COURT:  Well, no, don't comment, Mr. Woodard.

D. Willis - Cross

1          MR. WOODARD:  Yes, sir.

2          THE COURT:  Ask him a question.

3    BY MR. WOODARD:

4    Q    So you were on the west face of the monument, correct?

5    A    Correct.

6    Q    And you went around the south face of the monument to the

7    east face of the monument?

8    A    Correct.

9    Q    And were you hit repeatedly with streams of pepper spray

10   or did you move through clouds of pepper spray?

11   A    I don't think I'd be able to know the difference.

12   Q    Okay.  So it's possible that you were moving through a

13   residual cloud of pepper spray; isn't that right?

14   A    That is possible.

15   Q    Now, when you were transiting around the southeast corner

16   of the monument, did you see a man in a dark green shirt

17   wearing a stocking cap?

18   A    Dark green shirt wearing a stocking cap?

19   Q    Right on the southeast corner.

20   A    I don't know.  Probably not.

21          MS. KAPLAN:  Your Honor, may I approach the witness

22   and give him a bottle of water?

23          THE COURT:  You may.

24          THE WITNESS:  Please continue.

25   BY MR. WOODARD:

D. Willis - Cross

1  Q    Did you see the man in the green shirt and stocking cap
2  pepper-spray another person in a shirt that was almost the same
3  color, but had black hair and glasses, over there by the
4  southeast corner?
5  A    I don't remember if I saw something like this.
6  Q    Well, okay.  But you do remember you getting
7  pepper-sprayed over there?
8  A    Yes.
9  Q    Okay.  Now, how long after you got over there -- well,
10 strike that.  How long between the time you were on the east
11 face of the monument and the time that you made it out of the
12 crowd toward the eastern light?
13          MS. CONLON:  Objection, asked and answered.
14          THE COURT:  Overruled.  Answer the question.
15          MR. WOODARD:  What was your ruling, Judge?
16          THE COURT:  I instructed the witness to answer the
17 question.
18          THE WITNESS:  I apologize, Judge.  Your Honor, I did
19 not hear you.
20          I don't know how much time it took.
21  BY MR. WOODARD:
22 Q    Can you make an estimate?
23 A    Probably took a minute for us to get out of there.
24 Q    Okay.  And did you -- while you were on the eastern face
25 of the monument, before you left it, there was another pepper

D. Willis - Cross

1  spray release, correct?

2  A    I don't remember.  I just remember that there was pepper

3  spray on the way, like more so on the south side.

4  Q    Okay.  Do you remember hearing somebody say, "Antifa

5  gassed themselves"?

6  A    No.

7  Q    Okay.  Mr. Willis, are you familiar with the Oktoberfest

8  Torchlight Parade in La Crosse, Wisconsin?

9  A    No, sir.

10 Q    Are you familiar with the Seattle Seafair torchlight March

11 2021 in Seattle, Washington?

12 A    No.

13 Q    Are you familiar with the Deer Valley ski resort

14 torchlight march in Windsor, Connecticut?

15 A    No.

16        MS. CONLON:  Objection, Your Honor.  I'm not sure

17 what any of these other things have to do with this case.

18        THE COURT:  I don't either and I don't want to know.

19 I'm hoping he'll get through it and we'll be through with it.

20        MR. WOODARD:  Your Honor, I have one more question to

21 ask.  Can I ask it?

22        THE COURT:  Go ahead.

23  BY MR. WOODARD:

24 Q    Are you familiar with the Spokane, Washington torchlight

25 parade?

D. Willis - Cross

1  A    No.

2          MR. WOODARD:  Those are all my questions.

3          THE COURT:  All right.  Thank you.

4          All right.  Members of the jury, we're going to take

5  about a 20-minute recess now.

6  **(Jury out, 3:03 p.m.)**

7          (Recess.)

8          THE COURT:  Call the jury.

9  **(Jury in, 3:27 p.m.)**

10          THE COURT:  All right.  You may be seated.

11          Mr. Smith?

12                   CROSS-EXAMINATION

13   BY MR. SMITH:

14  Q    Good afternoon, Mr. Willis.  Thank you for being here.

15  A    Good afternoon.

16  Q    Can everybody hear me okay?

17       Great.

18       So I just have some assorted questions for you.

19       What's a white supremacist?

20  A    Someone who believes that white people are inherently

21  superior to all other people.

22  Q    To all other people?

23  A    Yes.

24  Q    Okay.  Do you believe that individual races, on average,

25  excel at certain things as compared to others?

D. Willis - Cross

1           MS. CONLON:  Objection, Your Honor.

2           MR. SMITH:  It's just a reasonable question following

3    up from his last answer.

4           THE COURT:  Overruled.  Go ahead.

5           THE WITNESS:  I don't believe that any one group or

6    race of people is predetermined to excel at one thing or

7    another.

8     BY MR. SMITH:

9    Q    Okay.  When did you first come to be aware of the name

10   David Matthew Parrott?

11   A    I don't remember.

12   Q    Okay.  Do you recognize that name?

13   A    Yes.

14   Q    How do you recognize it?

15   A    I recognize David Matthew Parrott as a defendant in this

16   case.

17   Q    Is there any other way in which you recognize him?

18   A    I just don't know enough about the guy.

19   Q    Okay.  Matthew Heimbach?

20   A    I've seen -- yeah, I know Matthew Heimbach from the case

21   and from opening statements, and from videos of him.

22   Q    Okay.  And the Traditionalist Worker Party -- it keeps on

23   doing that.  Maybe I'm getting too close to the mic.

24        The Traditionalist Worker Party, do you recognize that

25   name at all?

180

D. Willis - Cross

1   A    I do recognize the name.

2   Q    Okay.  How do you recognize it?

3   A    I recognize them as a defendant in the case, and I've,

4   like, done more, like, research to learn about them over the

5   years.

6   Q    So there was the -- this case seems to be divided up

7   into -- there's the torchlight rally on the 11th, right, and

8   then there is -- August 11th, and then there's the UTR rally on

9   August 12th during the day, right?

10       With regard to the torchlight rally, do you remember

11  seeing Mr. Parrott, Mr. Heimbach, or any member of his

12  political party there?

13  A    No, because I don't know their faces.

14  Q    Okay.  My clients told me not to ask this, but I really

15  want to ask it anyway --

16            MS. CONLON:  Objection, Your Honor.  I'm going to ask

17  that Mr. Smith refrain from remarks like that.

18            THE COURT:  Disregard the comment about whether his

19  clients wanted him to ask or not.

20   BY MR. SMITH:

21  Q    I just have to ask:  What do you think of Thomas

22  Jefferson?

23            MS. CONLON:  Objection, Your Honor.  We've been

24  through this.  We've heard multiple people ask Mr. Willis about

25  Mr. Jefferson.

D. Willis - Cross

1           MR. SMITH:  Well, I have my own way of asking about

2    this.

3           MS. CONLON:  It's hardly relevant at this point.

4           MR. SMITH:  It's the statue that they were gathered

5    around on Friday night.

6           THE COURT:  I think he's expressed how he feels about

7    Jefferson.  I don't think it would help to do it again.

8           Go ahead.  Answer the question.

9           THE WITNESS:  Thank you, Your Honor.

10           Oh, you want me to answer the question?

11           THE COURT:  Yes, sir.

12           THE WITNESS:  I think Thomas Jefferson has a

13    complicated legacy.  He's done a lot of good things and bad

14    things.

15    BY MR. SMITH:

16    Q    So why did you gather around the statue of Jefferson that

17    night?

18    A    I was mostly following the lead of my peers.

19    Q    Well, were they trying to preserve the statue or

20    something?  Were people attacking the statue, and so you linked

21    hands around it so as to preserve it or stop people from

22    attacking the statue or something?

23    A    I think all of my friends and peers were there for

24    different reasons.

25    Q    Is it possible they didn't really think that through?

D. Willis - Cross

1        MS. CONLON:  Objection, speculation.

2        THE COURT:  Sustained.

3        MR. SMITH:  Okay.

4   BY MR. SMITH:

5   Q    When you say things like "no fascist USA," do you think

6   people are alarmed to hear such a thing?

7   A    Not generally.  I think -- yeah.

8   Q    I mean, just to be clear, are you saying that you believe

9   that the United States in its current form is a fascist nation?

10  A    No.  I think the chant just means I'd prefer not to live

11  in a fascist version of the USA.

12  Q    I see.  And are you saying that you believe that exists

13  currently, and so you don't want to live in it now, or you

14  don't want it to become that, or what -- what exactly are you

15  saying?

16  A    I think I'm saying that -- well, for me, when I'm

17  speaking, I'm saying I don't want it to become a fascist

18  country.

19  Q    I see.

20       You said that, at the Klan rally that you attended, there

21  were people chanting "cops and Klan go hand in hand."  Was that

22  you that said that?

23  A    That was not me.

24  Q    Okay.  Do you remember that?

25  A    I don't.

D. Willis - Cross

1  Q    Okay.  On page 173 of Friday's transcript you said that --

2  oh --

3              MS. CONLON:  Sorry.  Go ahead.

4              MR. SMITH:  Do you guys have the transcript?

5              MS. CONLON:  Can you point to us the line number you

6  want?

7              MR. SMITH:  Yes.  I'm looking at line number 9.  Can

8  you put that on the screen?

9          I don't know how well it's going to come up there,

10 but I have highlighted the portion of the transcript I'm

11 talking about.

12 BY MR. SMITH:

13 Q    You say, "I'm not Jewish, but I know that 'you will not

14 replace us,' I think it's something white supremacists are

15 known for saying, and it's this idea that everybody who is not

16 also white is trying to replace them, which is" -- and you

17 didn't finish that sentence.

18     I thought you did, and I asked if you had said something

19 else, but you said no.  You sort of stopped at "which is."

20     Could you finish that sentence for us?

21 A    I don't remember what I was going to say, but let me look.

22 Q    Sure.

23 A    Oh, yeah.  If I really had to finish it, I would just

24 probably say, "which is false."

25 Q    Okay.  Why do you think it's false?

D. Willis - Cross

1  A    I think that -- I don't know what's in a white

2  supremacist's or a white nationalist's head when they say "you

3  will not replace us," exactly, but my understanding is that a

4  lot of it is, like, worried about literal being replaced, like

5  from immigration and what -- like that.  And I don't think

6  people immigrate here to replace white people.

7  Q    Is it really about intention?

8          MS. CONLON:  Objection, vague.  I'm honestly not sure

9  what that question means.

10         THE COURT:  Well, I don't know if it means --

11         MR. SMITH:  I'll withdraw the question, Your Honor.

12  I'll withdraw the question.

13   BY MR. SMITH:

14  Q    On page 157 of the transcript -- I'll just head down to

15  that, if that's -- if we could take it off of the screen for

16  just one second so I can change.

17      On page 157 you said that:  "It's like you feel sort of

18  indignant" -- it's at the bottom of the page, actually, or --

19  I'm looking at page 157, line 24.

20      "It's like you feel sort of indignant that these

21  people" -- I assume you mean the protesters that day -- "these

22  people want to, like, exercise their right to use hateful

23  speech and spread hateful ideologies."

24      What do you mean by "hateful speech"?

25  A    Would you like an example, like, what I mean by "hateful

D. Willis - Cross

1  speech"?

2  Q    No.

3  A    Oh, sure.  I understand.

4       I think by "hateful speech," I mean speech that's not

5  protected under the First Amendment, like hate speech, slurs,

6  death threats, things that don't have any constructive purpose.

7            MR. SMITH:  Your Honor -- do you believe -- sorry.

8   BY MR. SMITH:

9  Q   Do you believe that slurs, as you call them, are not

10 protected under the United States Constitution?

11           MS. CONLON:  Objection, Your Honor.  It's not a

12 civics class.

13           THE COURT:  Sustained.

14           MS. CONLON:  Mr. Willis isn't a lawyer.

15           THE COURT:  Sustained.

16           THE WITNESS:  Yeah, I really don't know.  I could be

17 mistaken, but...

18           MS. KAPLAN:  He said "sustained."  If he says

19 "sustained," you don't have to answer.

20           MR. SMITH:  It's okay.

21           THE WITNESS:  Sorry.  I didn't hear him well.

22  BY MR. SMITH:

23 Q   Mr. Cantwell turned everyone's attention to an article

24 earlier.  And in that article, you're quoted.  You said that:

25 "I understand that the letter of the law" -- well, this is in

186

D. Willis - Cross

1  regards to the University of Virginia sort of not wanting to

2  pursue any kinds of charges against the people that were

3  involved in the torchlight rally.  And you said that -- you

4  were upset with that?

5  A    I don't know what article we're talking about.

6  Q    Oh, it's called -- it's by Michael Bragg.  It's called

7  "Students who confronted torch-bearers demand UVA take action."

8  It's from August 19th, 2017.  It was published in *The Daily*

9  *Progress*, which I believe is a newspaper around here?

10 A    Yes.

11 Q    Yes?  Okay.

12      And so at the end of that --

13          MR. SMITH:  Do we have that -- can I take out that

14 thing on the side?

15          Thank you.

16 BY MR. SMITH:

17 Q    Okay.  So this page right over here, which would be --

18 does everyone have that?

19      So you say:  "I understand that the letter of the law is

20 important to the administration at UVA, but I think virtue

21 should be their priority."

22      What did you mean by that?

23 A    I think I meant that -- I'm sorry.

24          MS. CONLON:  Your Honor, I would ask that Mr. Smith

25 show Mr. Willis the portion directly above the quotation for

                              187

                        D. Willis - Cross

 1  context, since we can only see a small bit of the page here.

 2              MR. SMITH:  Yeah, sure.  I think that's a great idea.

 3              May I approach the witness?

 4              MS. CONLON:  There's a few sentences right above this

 5  one.

 6              THE COURT:  You may.

 7              MR. SMITH:  This is the part I just read.

 8              (Discussion off the record.)

 9              MS. CONLON:  Thank you.

10              MR. SMITH:  Sure.

11              THE WITNESS:  Yeah.  So in the section above I say,

12  "I'm frustrated by the trend of the University adopting a

13  passive attitude about the kind of environment we have here at

14  UVA."  And I think that's what I mean.

15              I think that the letter of the law is important, and

16  that's why I say it.  And I just talked about the fact that

17  virtue is important, too, and that there's a way, I think, that

18  they could have handled things more virtuously and more

19  obviously on the side that's not hateful.

20  BY MR. SMITH:

21  Q   Okay.  On page 176 of that testimony, you say:  "I think

22  torches and mobs are very well-known things, and -- yeah, the

23  torches, that's a weird thing to use."

24      I'm on page 176, line -- starting on line 4.

25      You say it's a very weird thing to use.  Why would you say

D. Willis - Cross

1  that?

2          MS. CONLON:  Your Honor, if Mr. Smith is going to

3  quote Mr. Willis's testimony, I'd ask he include the question

4  in addition to the answer, just for context for the witness,

5  who does haven't a transcript in front of him.

6          MR. SMITH:  Is it not coming up on the screen?

7          MS. CONLON:  Unless you can see it.

8          THE WITNESS:  I have it at this time, yes.

9          MR. SMITH:  Is it blurry for anybody?  Can everybody

10  see it up there?

11          MS. CONLON:  It's very blurry, but --

12          MR. SMITH:  Okay.  If you can't read it or something,

13  let me know.  I'm looking right up there.

14          THE WITNESS:  Could you repeat the question, please?

15          MR. SMITH:  Yes.

16  BY MR. SMITH:

17  Q   So the question there was:  "What about the rally-goers,

18  the torchlight rally-goers, made it look like a lynch mob to

19  you?"

20      You said:  "I think torches and mobs are very well-known

21  things and -- yeah, the torches, that's a weird thing to use.

22  It's 2000-whatever.  You can have a flashlight on your phone.

23  Fire is a very intentional thing, and it's a very scary thing."

24      What did you mean by "torches, that's a weird thing to

25  use"?

<sup>189</sup>

D. Willis - Cross

1   A     I guess I just mean that, like, you know, there's not

2   really any circumstances in 2000-whatever, 2017, that demand

3   fire as, like, the primary mode of lighting a thing.  Like,

4   there's phone flashlights.  There's light almost everywhere.

5   So fire is an intentional thing to use.

6       To me, it seems like that was an intentional choice to

7   hearken back to days of Klan lynchings and other famous

8   incidents of mob violence.

9   Q     Does the Klan have a monopoly on torches?

10           MS. CONLON:  Objection, argumentative.

11           THE COURT:  Sustained.

12    BY MR. SMITH:

13  Q     Do you believe that the Klan is the only group to have

14  used torches at all, for anything, ever?

15  A     No.

16  Q     Okay.  Other than a light on a phone, what other ways can

17  one light the way in front of them for a nighttime political

18  rally?

19  A     I'm not sure.  Yeah, I'm not sure.

20  Q     Okay.  Could one use a flashlight -- not one on a phone,

21  but just one that you would hold, like a Maglite flashlight or

22  something?

23  A     Sure.

24  Q     One could use a candle, perhaps, or a lighter, like a --

25  you know, a Bic lighter or something, holding it up to light

D. Willis - Cross

1  the way in front of them, right?  It would be pretty small, but

2  they could do it?

3  A    Maybe, like, a lantern that isn't an open flame.

4  Q    Sure, something like that.

5  A    Pretty popular option.

6  Q    But ultimately, there aren't a ton of ways that you could

7  light the way in front of you, right?

8  A    I think we named a few.

9  Q    So they chose torches?

10  A    I think it seemed like a choice.

11  Q    Do you believe that it made a lasting -- do you believe

12  that that aesthetic had a lasting effect?

13  A    On me, certainly.

14  Q    On people in general?

15         MS. CONLON:  Objection, calls for speculation.

16         THE COURT:  Sustained.  I don't know what --

17         MR. SMITH:  Your Honor, here's where I'm getting.

18   BY MR. SMITH:

19  Q    Would you say that people seem to remember the torchlight

20  rally because of that torch aesthetic?

21  A    I think they remember the rally for a lot of reasons.

22  Q    Okay.

23  A    But I would say the torches are effective.

24  Q    Okay.  Let's turn to August 12th, UTR, the daytime event.

25         You know what?  I've got one more question about that

D. Willis - Cross

1  whole torchlight thing, because no one asked it, and I just --

2  I have to know.

3      Did at any point in time when -- so my understanding is

4  that you're there, right, you're joining hands around the

5  statue, and there's people around you, right?

6      At any time, did you just try to walk past them to walk

7  out of the situation?

8  A    Repeat the question, please.

9  Q    At any time while you were -- so you were linking arms

10  around the Jefferson statue, right?  And there were people

11  around you.  At any time, did you just try to walk past them to

12  withdraw yourself from the situation?

13  A    No.

14  Q    Okay.  Did you consider doing that?

15  A    No.

16  Q    Okay.  You know, let's go to the 12th.

17      You mentioned in your testimony -- and I don't need exact

18  words here or anything.  But you mentioned that you had helped

19  plan one of the -- one of the sort of other permitted events

20  that were occurring on the 12th, correct?

21  A    That is correct.

22  Q    And you mentioned it was in McGuffey Park, correct?

23  A    That's correct.

24  Q    And there was -- you mentioned this organization called

25  the PARJ, P-A-R-J?

D. Willis - Cross

1   A     That's correct.

2   Q     Is it just a coincidence that it's, like, Park with a J at

3   the end, and that's the letter before K or something?

4   A     I actually never noticed that before.

5   Q     Oh, okay.  I didn't know what it was.

6         So it was People's Action for Racial Justice.

7         What does "racial justice" mean, by the way?

8   A     It means different things to different people.

9   Q     What does it mean to you?

10  A     Probably equity.  Equity -- equitable outcomes for all

11  groups.

12  Q     Okay.  You seemed proud of the work that you had done

13  with -- I can't remember his name.  Mr. -- you helped -- he was

14  the one that got the permits or something?

15  A     Walt.

16  Q     Right.  You were -- you seemed very proud of having worked

17  with him to put that together.  I can't help but notice,

18  though --

19         MS. CONLON:  Objection.  His question is already

20  editorializing.

21         MR. SMITH:  Your Honor?

22         THE COURT:  You can't -- you can't preface your

23  question.

24         MR. SMITH:  I understand.

25         THE COURT:  Just ask a question.

D. Willis - Cross

1           MR. SMITH:  Sure.

2     BY MR. SMITH:

3     Q    Given that you had planned this event at McGuffey Park,

4     you said that you later found yourself very near to

5     Emancipation Park, where the rally-goers had their permit for,

6     right?

7     A    Yes.

8     Q    How close were you to that park?

9     A    I was as close as the Jefferson-Madison Regional Library

10    is, which is on the adjacent corner.

11    Q    So very close?

12    A    Close.

13    Q    Okay.  How far is McGuffey Park from Emancipation Park?

14         In fact, do we have that map?  Can I bring it up?  Is that

15    possible?

16    A    McGuffey Park is about one block away from Emancipation

17    Park.

18    Q    Okay.  So how did you find yourself closer to Emancipation

19    Park than McGuffey Park that day?

20    A    I had an event -- or not an event -- I had to meet my

21    friends at a community center called The Bridge, and we did a

22    march from The Bridge to the corner of Jefferson-Madison

23    Regional Library.

24    Q    Okay.  I hope that everyone remembers the map from

25    earlier, but I think that this is probably --

D. Willis - Cross

1          THE COURT:  I don't think we could forget it.  We saw

2     it so many times.

3          MR. SMITH:  I agree, Judge.

4      BY MR. SMITH:

5     Q    Okay.  There was -- the entrance that we seem to be

6     concerned with here on Saturday is the southeast entrance; am I

7     right about that, the one that is in the bottom right-hand

8     corner?

9     A    That seems correct to me, yes.

10    Q    Right.  Okay.

11         You had joined hands with other groups, right -- other

12    people, other groups, other counter-protesters, if you will --

13    and you were standing in the roadway, correct?

14    A    I was at the end of the line.  So my feet were probably

15    still on the sidewalk, but yes, that was what the thing was

16    doing.

17    Q    And you said that the intention was not to block people

18    from moving past you, correct?

19    A    I think -- no, I said that the intention was about

20    standing up to hate, like, in a symbolic fashion.

21    Q    But doing that by blocking people from entering their

22    legally permitted event, correct?

23    A    I talked about the fact that the entrance was not blocked

24    in reality.  Sidewalks were available.  Alternative entrances

25    were available.

D. Willis - Cross

1  Q    Are you familiar with the mechanics of moving large groups

2  of people around?

3           MS. CONLON:  Objection, argumentative.

4   BY MR. SMITH:

5  Q    Do you understand that if you try to suddenly stop a group

6  of about several hundred people, that they would just fall over

7  themselves?

8           MS. CONLON:  Objection, argumentative.  Speculative.

9  Assuming facts not in evidence.

10          THE COURT:  Overruled.  Overruled.

11  BY MR. SMITH:

12  Q    You can answer.

13  A    Could you repeat the question?

14          MR. SMITH:  Can we have the question read back to the

15  witness, please?

16          (The requested portion of the record was read back.)

17          THE WITNESS:  They would just fall over themselves?

18  I don't understand that.

19  BY MR. SMITH:

20  Q    Well, you would have people in the front that would be

21  stopping.  The people behind them might not realize that they

22  had to stop, and then they would just start to trip over each

23  other.

24          MS. CONLON:  Objection.

25          THE WITNESS:  I don't recall any point in the day

D. Willis - Cross

1   where several hundred people trampled this group.

2          THE COURT:  All right.

3   BY MR. SMITH:

4   Q    Well, that's right, because they continued to march, and

5   that's what you're upset about.

6          MS. CONLON:  Objection.  Argumentative.

7          THE COURT:  Okay.

8          MR. SMITH:  Is that a question?

9          THE COURT:  Sustain the objection.  You cannot argue

10  with the witness.

11         MR. SMITH:  I understand, Judge.

12   BY MR. SMITH:

13  Q    If they had gone around you, as you say, would you have

14  just let them pass and that would have been the end of it?

15  A    For me personally, yes.

16  Q    Okay.  Do you think everyone else felt that same way?

17  A    I don't know how everyone else felt.

18  Q    So you were there; you were standing up to hate, right?

19  A    Yes.

20  Q    Blocking the way for them to get into their legally

21  permitted rally, right?  And you're telling us that if they

22  just walked around you, that you would have just let them go?

23         MS. CONLON:  Objection, asked and answered,

24  argumentative.

25         THE COURT:  Sustained.

D. Willis - Cross

1            MR. SMITH:  Okay.

2     BY MR. SMITH:

3    Q    You said that you needed to hide your face because you

4    were afraid of being doxed, to use that term.  We've already

5    talked about what it means.

6         Do you believe that when the media publishes a story about

7    someone who is said to be a white nationalist and they reveal

8    all about -- all their prior information and their entire life

9    history on a news site, do you believe that that's doxing?

10            MS. CONLON:  Objection.

11            THE COURT:  What's the -- he's told you what he

12   believed doxing was.  I mean, why -- that's not -- no one has

13   doxed --

14            MR. SMITH:  Your Honor, everyone at this defendants'

15   table has been doxed by the media.

16            THE COURT:  Well, he didn't do it.  He didn't do it,

17   did he?

18            MR. SMITH:  I'm sorry?

19            THE COURT:  He did not do it.

20            MR. SMITH:  I'm curious as to whether he thinks

21   that's doxing or not, because if he thinks it's not, then that

22   would make it okay to him, but if he thinks doxing is wrong,

23   then that would make that not so okay.

24            MS. CONLON:  But, Your Honor, his view of doxing is

25   irrelevant.

D. Willis - Cross

1          THE COURT:  I sustain the objection.

2          MR. SMITH:  Okay.

3    BY MR. SMITH:

4   Q    You said that you were confused as to why the rally-goers

5   didn't just sort of turn themselves up a different road to go

6   around you to go into the park, correct?

7   A    I was confused why they didn't use the sidewalk, and then

8   that follows, yes.

9   Q    Had you considered the possibility that the rally-goers

10  had been in contact with the police and that the police had

11  told them to enter the park by walking down that very road that

12  you were blocking?

13          MS. CONLON:  Objection.

14          THE WITNESS:  Had I considered that possibility?

15          MR. SMITH:  Uh-huh.

16          THE WITNESS:  I hadn't considered that possibility.

17  I mean, that's not my job.

18   BY MR. SMITH:

19  Q    If that were the case, would you feel --

20          THE COURT:  Well, wait a minute.  He doesn't -- about

21  his feelings --

22          MR. SMITH:  Okay.  I understand.

23          THE COURT:  He said he didn't --

24          MR. SMITH:  That's fine, Your Honor.

25   BY MR. SMITH:

D. Willis - Cross

1   Q    You said that -- on page 200 of the transcript, I'm

2   looking at -- ah, yes.  Okay.

3        Line 7, the question was:  "Did you see any weapons on any

4   of the white nationalists?"

5        And your answer was:  "Yes.  A lot of them had holstered

6   weapons, especially the men in the park, holstered weapons on

7   their hips that, just like July 8th, they were constantly

8   pointing to, armed with their pepper spray."

9        The sentence goes on for a little while.  I was really

10  talking about this holstered weapons part.  If a lot of people

11  had holstered weapons, and this is -- and this was, as you

12  allege, a conspiracy to commit racial violence, wouldn't you

13  expect those weapons to be, I don't know, discharged at some

14  point?

15          MS. CONLON:  Objection, argumentative.

16          THE COURT:  Sustained.

17   BY MR. SMITH:

18  Q    Do you think that the people with the holstered weapons

19  came to the rally to do violence?

20          MS. CONLON:  Objection, Your Honor.

21          MR. SMITH:  It's an ultimate issue in the case,

22  Judge.  He's a plaintiff.

23          THE COURT:  Well, you know, you ask these questions.

24  You ask him did they conspire to do something, and he says yes,

25  do you know the legal ramification of that?

D. Willis - Cross

1          MR. SMITH:  Yes, Judge.

2          THE COURT:  Well, if you want to risk that, that's

3    all right.

4          MR. SMITH:  I'll withdraw the question.

5     BY MR. SMITH:

6    Q    Was standing in the street blocking the way of the

7    rally-goers, was that something you would refer to as direct

8    action?

9    A    I don't think so.

10   Q    How did you expect that encounter to go on the street?

11   A    I expected them to change their course.

12   Q    To change their course and go around you?

13   A    Yes.

14   Q    And if other people then decided to continue to block

15   their way by moving to block them, what would they do then?

16   A    I don't know what they would do.

17   Q    You understand that if people just had to walk around you

18   every time you blocked an entrance to a permitted event, that

19   you could effectively end-run the entire First Amendment by

20   just never letting anyone get inside their permitted event,

21   right?

22          MS. CONLON:  Objection.  Argumentative.

23          THE COURT:  You can argue the case in summation, but

24   you may not argue it with the witness.

25          MR. SMITH:  I understand, Judge.

D. Willis - Cross

1   BY MR. SMITH:

2   Q    You said you believe that at some point you thought the

3   permit wasn't the best idea anymore?

4   A    I said that, yes.

5   Q    Okay.  Well -- never mind.  Withdrawn.

6        Did you know that a federal district court said that the

7   permit needed to be honored by the city of Charlottesville?

8            MS. CONLON:  Objection.

9            THE COURT:  That's just --

10           MR. SMITH:  Is that --

11           THE COURT:  Well, they have a permit and that's it.

12           MS. CONLON:  Your Honor --

13           THE COURT:  The discussion is over.

14           MR. SMITH:  Okay.

15           THE COURT:  You were here when we talked about this?

16           MR. SMITH:  Yeah, I think it may have preceded my --

17   I understand, Judge.

18   BY MR. SMITH:

19   Q    You said that the -- blocking the street on the 12th, you

20   said that was like the protest at the Jefferson statue, right?

21   A    In the sense that it was about what it represents.

22   Q    I see.  But physically it was different, right?  You were

23   joined hands around the Jefferson statue, but you weren't

24   blocking anyone's routes or anything, correct?

25   A    I don't think we were effectively blocking anyone's routes

D. Willis - Cross

1  on the 12th, either.

2  Q    Oh, okay.  So that was all just for show and it was a big

3  bluff?

4         MS. CONLON:  Objection, argumentative.

5         MR. SMITH:  I'm just curious, Your Honor.  I really

6  don't know.

7         THE COURT:  Overruled.  Go ahead.

8         THE WITNESS:  Maybe the first part of your question

9  makes more sense, which is the part, was it for show?  Yes, in

10  the sense that it's a performance.  It's a gesture.  It's

11  symbolic in the same way that circling hands around the

12  Jefferson statue was.  That's why there was still space on the

13  sidewalk for people to go around.

14  BY MR. SMITH:

15  Q    Did you see -- in that particular situation did you see it

16  as a possible outcome that the rally-goers might continue to

17  march forward to their permitted event?

18  A    Based off of how violent they were the evening beforehand,

19  I would say it crossed my mind, but I thought that they would

20  just go around.

21  Q    Did you agree with other people to join hands to block the

22  route?

23  A    Did I agree?  No, we never discussed it beforehand.

24  Q    You just naturally, organically just came together and

25  joined hands?

D. Willis - Cross

```
 1  A    Exactly, yes.

 2  Q    Oh.  Spontaneously?

 3  A    Yes.

 4  Q    Okay.  You said that you were pedestrians.  This was

 5  earlier today.

 6  A    Yes.

 7  Q    What would you call the rally-goers with the permit that

 8  were told by the police to enter through that particular

 9  entrance following a particular route; would you call them

10  pedestrians?

11  A    I didn't know about the police conversations about whether

12  or not they had been directed to that entrance, but yes, they

13  were walking.  They would be pedestrians.

14  Q    I see.  And so in that particular situation, what happens

15  when the two groups intersect?

16  A    They push through the middle and they knock everybody

17  down.

18  Q    You didn't really see that as a serious possibility,

19  though?

20           MS. CONLON:  Objection, asked and answered.

21           MR. SMITH:  I don't remember exactly what he said,

22  Judge.

23           THE COURT:  Sustained.

24           MR. SMITH:  Okay.

25   BY MR. SMITH:
```

D. Willis - Cross

1  Q    Did you do any advocacy for racial justice after

2  Charlottesville?

3  A    I'm not sure.  I was mostly doing stuff with my Black

4  Student Alliance.

5  Q    I think you said after that weekend you were involved with

6  a couple of -- a couple of groups on campus for various things

7  and then you sort of moved on.

8  A    Yeah, absolutely.  Yeah, so for a long period, but not too

9  long after the events, I was involved with a lot of campus

10 activism.

11 Q    This just takes me back to another question I was asking

12 before.  So you're over at the Emancipation Park, like right

13 around that area, and there's this -- your event at McGuffey

14 Park is going on.  What about McGuffey Park?  Why didn't you --

15 A    The state of emergency was called before I got back to

16 McGuffey Park.

17 Q    I see.

18     You said watching white nationalists celebrating was

19 discouraging and embarrassing?

20 A    I said it was discouraging.

21 Q    Why?

22 A    Because we wanted to have this peaceful symbolic protest

23 and we were attacked and we couldn't finish the protest.  So we

24 felt like we had -- or I felt like I had failed.  And I also

25 was the one that said it was our time to go.  So I think I felt

D. Willis - Cross

1   personally responsible.

2   Q    When did you say it was your time to go?

3   A    When people were brawling on top of me and pepper spray

4   was getting sprayed.

5   Q    I see.  You said that one of the reasons that you were

6   discouraged is that you believe that the white nationalists,

7   quote, out-chanted and out-shouted you?

8   A    Yeah.

9   Q    So do you think that the First Amendment is a literal

10  shouting contest?

11          MS. CONLON:  Objection, argumentative.

12          THE COURT:  Sustained.

13          MR. SMITH:  Sorry, Judge.

14  BY MR. SMITH:

15  Q    You were quoted as saying "shut it down" with reference to

16  the legally permitted rally.  Are you saying that you -- your

17  intentions were not to deprive them of their First Amendment

18  rights?

19          MS. CONLON:  Objection.

20          THE COURT:  You may answer the question.

21          THE WITNESS:  I was not saying that when I said "shut

22  it down."  That's not what I meant by that.

23  BY MR. SMITH:

24  Q    Okay.  By "it" you meant the rally, right?

25  A    Yes.

D. Willis - Cross

1  Q    Okay.  So when you said shut it, the rally, down, you're

2  saying you didn't actually mean shut the rally down?

3  A    Yes, I said those remarks after the rally-goers and

4  organizers demonstrated that they were interested in violence.

5  Q    You said no one is required to listen to what you call

6  hate speech.

7  A    When did I say that?

8  Q    I believe you said it earlier today.

9  A    Could you show me a line, please?

10 Q    I don't have that handy because it's just today -- just

11 earlier today.  I just wrote it down with quotes around it.

12 But do you believe that people are -- I mean, if I said no one

13 is required to listen to hate speech, would you agree with that

14 statement?

15 A    I just know that I said that in a context.

16 Q    Okay.  You understand that not listening can include

17 ignoring it, right?

18         MS. CONLON:  Objection, argumentative.

19         MR. SMITH:  I don't know what he understands, Your

20 Honor.  Remember, they were, you know -- he was talking about

21 he thought that other people had to go around him and stuff

22 like that.  I don't know what he understands.

23         THE COURT:  Well --

24         MR. SMITH:  I'll withdraw the question.

25         THE COURT:  We don't need to get into philosophical

D. Willis - Cross

1    arguments and questions on the Constitution.

2              MR. SMITH:  I understand.

3              THE COURT:  I'm going to instruct on the law what

4    their burden is.

5              MR. SMITH:  I'll withdraw the question.  It's fine.

6    It's not a problem.

7     BY MR. SMITH:

8    Q    So we're almost done.  Thank you for sticking with me

9    here.

10        You said that you had -- in setting up that -- that

11   McGuffey Park, the PARJ thing, right, McGuffey Park event,

12   right, you said that you had met with the Charlottesville

13   Police Department.  Did you know if any other groups had

14   coordinated the events of August -- you know, the to-be events

15   of August 12th, with the Charlottesville Police Department?

16   A    The to-be?

17   Q    Like the upcoming events?

18   A    Oh, to be.

19   Q    Yeah, sorry, that wasn't very well worded.

20   A    I don't know the extent to which other people cooperated

21   with the police department.

22   Q    You said you had a meeting, though, with them, right?

23   A    I was present for one meeting, yes.

24   Q    You said that "white lives matter" has a negative

25   connotation.  Can you explain that?

D. Willis - Cross

1            MS. CONLON:  Your Honor, objection.  Mischaracterizes

2    testimony.  He was asked about whether "white power" or "white

3    lives matter" has one.  He said "white power" had one, a

4    different one than "white lives matter."  We can go through the

5    transcript if Mr. Smith would like.

6            MR. SMITH:  Sure.  I'm pretty sure he said after that

7    that "white lives matter" has a negative connotation.  But...

8            THE COURT:  Okay.  Answer the question.  And when you

9    make an objection, please take your mask off so that I can

10   understand it.

11           MS. CONLON:  I apologize.  I will.

12           THE WITNESS:  Could you repeat the question, please.

13   BY MR. SMITH:

14   Q    Sure.  You said that "white lives matter," the phrase

15   "white lives matter" has a negative connotation.  Why do you

16   say that?

17   A    Because in a lot of communities it has a negative

18   connotation.

19   Q    Okay.  Why do you think it has a negative connotation?

20   A    There could be all kind of reasons, but I think the main

21   reason is probably just that people typically say it to silence

22   people who are saying black lives matter.

23   Q    You say to silence them.  Do you mean it somehow causes

24   them to not be able to talk?

25           MS. CONLON:  Objection, argumentative.

D. Willis - Cross

1          MR. SMITH:  I'm not sure what he means, Judge.

2          THE COURT:  Okay.  But --

3          MR. SMITH:  Silence is --

4          THE COURT:  -- the English language, he said it, you

5    heard it.  It means what it means to you, his answer.

6          MR. SMITH:  Okay.

7          THE COURT:  Okay.  We've discussed this so much all

8    day.

9          MR. SMITH:  I understand, Judge.  I'm almost done.

10          THE COURT:  You were here when you heard him testify

11    over and over about it.

12          MR. SMITH:  Yeah, Judge.

13    BY MR. SMITH:

14    Q    Would it surprise you to know that some of the defendants

15    in this case have been engaging in what you might refer to as

16    standing up for racial justice for decades now?

17          MS. CONLON:  Objection.  This question assumes facts

18    not in evidence.

19          MR. SMITH:  Pretty sure the plaintiffs put that in

20    evidence -- well, never mind, that was their opening statement.

21          MS. CONLON:  And whether Mr. Willis is --

22          MR. SMITH:  I'll withdraw the question, Judge.  It's

23    more appropriate for closing.

24          THE COURT:  Once again, I did not -- I cannot make

25    out your -- when you are making a speech, I cannot understand

D. Willis - Cross

1  you.

2          MS. CONLON:  I want you to hear my speeches, and I'm

3  sorry for that.  But it sounds like Mr. Smith is withdrawing

4  the question, so I won't burden the Court.

5          THE COURT:  Go ahead.

6   BY MR. SMITH:

7  Q    You mentioned that -- you remember the Black Student

8  Alliance.  I think someone asked you what would you think of a

9  white student alliance.  But I don't think that you said -- I

10 don't think you answered whether you would seek to shut down a

11 white student alliance.  Would you?

12         MS. CONLON:  Objection.

13         THE COURT:  I sustain the objection.

14 BY MR. SMITH:

15 Q    Currently you said you live in Mexico and you teach

16 English.

17 A    At the time of my deposition I was living in Mexico

18 teaching English.

19 Q    Oh, okay.  Do you believe that the events of that weekend

20 made you not want to pursue a career in racial justice advocacy

21 any further?

22 A    I think that weekend really damaged my motivation to

23 participate in almost every aspect of what I was doing.  So I

24 had to stop and just take time to heal for a very long time.

25 Q    Do you think that any people on the other side of things,

D. Willis - Cross

1  i.e., the defendants or anybody that attended that, do you

2  think they felt similarly?

3         THE COURT:  Well, wait a minute.  We don't have that

4  case.  He's testifying as to the effect upon him.  He's a

5  plaintiff in the case.

6         MR. SMITH:  Okay.

7   BY MR. SMITH:

8  Q    This is my last question.  On page 154 of the transcript,

9  line 5 -- or starting at line 3, you said, "I thought I also

10  had the right to be, like, yeah, I think I'm allowed to exist

11  and that what you're doing is gross."

12       You may have talked about this particular quote before,

13  actually.  And someone asked you, what do you mean by saying, I

14  think I'm allowed to exist?  And you said, "Yeah, like I think

15  they have a right to hate me.  I have a right to love me.  That

16  kind of a thing."

17       In your opinion, is what you're saying there.  That you

18  have a right to exist, isn't that very similar to what the

19  defendants were saying when they said, you will not replace us?

20         THE COURT:  You're arguing with the witness.  I mean,

21  that's not --

22         MR. SMITH:  I'm just asking him a question, Judge.

23         THE COURT:  What?

24         MR. SMITH:  I was just asking him if they aren't

25  saying the same thing.

D. Willis - Cross

1          THE COURT:  Well, that's what they -- I mean --

2          MR. SMITH:  It just seems so similar.

3          THE COURT:  That's what they said, I think.  I think

4   that's in evidence.

5          MR. SMITH:  Yes, it has been entered into evidence.

6          THE COURT:  It doesn't take an opinion -- well,

7   answer the question.  I'm sorry.  I'm getting --

8          MR. SMITH:  It's my last question, Judge.

9          THE COURT:  Sir, have you answered the question?

10          MR. SMITH:  Can we read it back?  Is that possible?

11          THE COURT:  Do you remember the question?

12          MS. CONLON:  Do I remember the question?

13          MR. SMITH:  I don't remember the exact wording.

14          MS. CONLON:  I don't remember the question but I will

15   say to the extent that Mr. Smith -- to the extent that

16   Mr. Smith is asking Mr. Willis to opine on comparing the

17   defendants' apparent philosophies to his own, it's not relevant

18   and it's improper.

19          MR. SMITH:  It's not my philosophy, Judge.  I'm just

20   asking a question.

21          THE COURT:  Well, I sustain the objection.

22    BY MR. SMITH:

23   Q    Do you believe that pro-white advocates --

24          THE COURT:  Wait.  Just back off so while you're

25   asking the question no one is popping the microphone.

D. Willis - Cross

1          MR. SMITH:  Yeah, I keep on getting that -- is it

2     because I'm too close to it?

3          THE COURT:  I don't know what pops it.  It might if

4     you touch it.  Try to ask a question without -- so we can hear

5     the whole question.

6          MR. SMITH:  Right.  Okay.

7      BY MR. SMITH:

8     Q    Do you believe that pro-white advocates, for example, the

9     defendants, but pro-white advocates in general have the right

10    to exist as well?

11    A    Yes, they have the right to exist.

12    Q    Do you believe they have the right to assemble peacefully?

13    A    Yes, they have the right to assemble peacefully.  I would

14    agree about peacefully.

15    Q    Do you believe that your actions on August 12th allowed

16    those pro-white advocates to assemble peacefully?

17         MS. CONLON:  Objection, Your Honor, relevance.

18    That's not the question here.

19         MR. SMITH:  I think the jury can understand, Your

20    Honor.

21         THE COURT:  The witness can take care of himself.

22    Answer the question, sir.

23         MR. SMITH:  It's okay, Your Honor.  He doesn't have

24    to.  No further questions.  I have everything I need.  Thank

25    you.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/01/2021

1          THE COURT:  All right.  Anyone else?  Will there be

2    any redirect?

3          MS. CONLON:  No, Your Honor.

4          THE COURT:  Okay.  Thank you, sir.  You may step

5    down.  Call the next witness.

6          THE WITNESS:  Thank you, Your Honor.

7          THE CLERK:  Your Honor.

8          THE COURT:  Excuse me.  Hold on.  Who's there?

9          THE CLERK:  Mr. ReBrook wants to cross-examine.

10         THE COURT:  Okay.  Mr. ReBrook is calling in.  We do

11   not have him on Zoom.  So it was not available.  But

12   Mr. ReBrook can remind us -- Mr. ReBrook, who are you

13   representing and then you may proceed.

14         MR. REBROOK:  Thank you, Your Honor.

15                    CROSS-EXAMINATION

16   BY MR. REBROOK:

17   Q    Good afternoon.  This is Edward ReBrook.  I am the

18   attorney for Mr. Jeff Schoep and the National Socialist

19   Movement.  Good afternoon.  I just have a few questions for

20   you.  This won't take long at all.  Can you hear me okay?

21   A    Yes.  Good afternoon.

22   Q    Good afternoon.  My first question is:  How did you know,

23   after the Charlottesville incident, after the Unite the Right

24   rally, how did you know which parties to sue?

25         MS. CONLON:  Your Honor, to the extent this

Sines, et al. v. Kessler, et al., 3:17CV72, 11/01/2021

1   question --

2          THE COURT:  It calls for attorney-client privilege, I

3   would think.

4          MS. CONLON:  Yes.

5          THE COURT:  I mean, Mr. ReBrook, and for the jury, I

6   mean, in a massive event, lots of people involved, you go to a

7   lawyer and it's up to the lawyer to advise you and tell you

8   who -- just the lawyer --

9          MR. REBROOK:  I'll withdraw the question, Judge.

10          THE COURT:  All right.

11          MR. REBROOK:  Understood, Judge.  I'll withdraw the

12   question.

13          THE COURT:  Okay.

14    BY MR. REBROOK:

15   Q    Let me ask a different question, which is:  During the

16   Unite the Right rally, were you able to identify the different

17   logos of the different groups that were present?

18   A    At the time that Unite the Right took place, I was able to

19   identify some logos more than others.

20   Q    Could you specifically identify the National Socialist

21   Movement and differentiate them from the other defendants?

22   A    The National Socialist Movement of the United States?

23   Q    Just the National Socialist Movement.

24   A    I don't think I would have been able to do that at the

25   time.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/01/2021

1  Q    Okay.  And would you be able to identify Mr. Jeff Schoep?

2  A    No, I would not have been able to.  I was a layperson.  I

3  didn't keep up with these people.

4  Q    I understand.

5          MR. REBROOK:  Thank you very much for answering my

6  questions.  I have nothing further.

7          THE WITNESS:  Thank you.

8          THE COURT:  All right.  Okay.  Is that all?  Okay.

9          MS. KAPLAN:  Excuse Mr. Willis, Your Honor?  Okay to

10  excuse Mr. Willis?

11          THE COURT:  Yes.  Can we start another witness?

12          MS. KAPLAN:  Given the timing, Your Honor, we are

13  going to play now videotaped testimony of Samantha Froelich.

14  She was referred to in the openings.  Ms. Froelich is a former

15  member of Identity Evropa.

16          MR. CANTWELL:  I object to that being entered.  I

17  don't believe I was properly noticed of Mr. Froelich's

18  deposition.

19          THE COURT:  Is this one of the --

20          MS. KAPLAN:  We believe there was no objection to

21  Ms. Froelich's testimony in his motion.

22          MR. CANTWELL:  I'm sorry?

23          MS. KAPLAN:  There was no objection to this

24  designated testimony in your motion, Mr. Cantwell.

25          MR. CANTWELL:  I entered -- my recollection of it was

Sines, et al. v. Kessler, et al., 3:17CV72, 11/01/2021

1    that I made a blanket objection to their deposition

2    designations.  And particularly those depositions that occurred

3    during the 14-month period where plaintiffs' counsel were

4    sending nearly all correspondence to my email address.

5            MS. KAPLAN:  Your Honor, the Court ruled on this.

6    You ruled with respect to four depositions.  They did not

7    include Mr. Froelich's deposition.  This has been ruled upon.

8            THE COURT:  Yes?

9            THE CLERK:  Mr. Woodard has an objection.

10           THE COURT:  Mr. Woodard has an objection?  Well,

11   Mr. Kessler -- was Mr. Kessler -- what's your objection,

12   Mr. Woodard?

13           MS. KAPLAN:  And Mr. Kolenich did not object to this

14   and he was the attorney representing the same client.  I don't

15   understand this right now.

16           MR. WOODARD:  It is not a blanket objection.  It is

17   my understanding that there may be hearsay responses in the

18   deposition.  So I would like to put on the record an objection

19   to any hearsay that may be in it.  If there is none, it's not

20   much of an objection.  But to the extent that there is hearsay

21   and Ms. Froelich is saying we were told, stuff like that, I'd

22   like to put an objection to that on the record beforehand so we

23   don't have to do it every sentence or something.

24           MS. KAPLAN:  Your Honor, we submitted these

25   designations October 4th.  They had a deadline to object based

Sines, et al. v. Kessler, et al., 3:17CV72, 11/01/2021

1  on our designations.  They did not do so.  And Mr. Kolenich,

2  his co-counsel, was fully involved in the case at that time.

3  They're waived.

4          THE COURT:  Overrule the objections.  You may read

5  the deposition.

6          MR. WOODARD:  Thank you, Your Honor.

7          (Video deposition of Samantha Froelich played.)

8          THE COURT:  All right.  Let's stop.  It's nearly 5

9  o'clock.  We'll stop right here and resume tomorrow morning.

10         Members of the jury, you're excused now.  Return at

11  the same time tomorrow.  Do not discuss the case with anyone or

12  let anyone discuss it with you.  Do not remain within hearing,

13  seeing, or anything concerning the case.  So you may be excused

14  at this time.  Thank you.

15  **(Jury out, 4:56 p.m.)**

16

17

18

19

20

21

22

23

24

25

Sines, et al. v. Kessler, et al., 3:17CV72, 11/01/2021

C E R T I F I C A T E

1

2       I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3   the United States District Court for the Western District of

4   Virginia, appointed pursuant to the provisions of Title 28,

5   United States Code, Section 753, do hereby certify that the

6   foregoing is a correct transcript of the proceedings reported

7   by me using the stenotype reporting method in conjunction

8   with computer-aided transcription, and that same is a

9   true and correct transcript to the best of my ability and

10  understanding.

11      I further certify that the transcript fees and format

12  comply with those prescribed by the Court and the Judicial

13  Conference of the United States.

14      /s/ Lisa M. Blair               Date: November 1, 2021

15

16

17

18

19

20

21

22

23

24

25