Sines, et al. v. Kessler, et al., 3:17CV72, 11/02/2021

1                UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF VIRGINIA
2                 CHARLOTTESVILLE DIVISION

3   ****************************************************************

4   ELIZABETH SINES, ET AL.,      CIVIL CASE NO.:  3:17CV72
                                  NOVEMBER 2, 2021, 9:03 AM
5                                 JURY TRIAL, DAY 7
           Plaintiffs,
6   vs.

7                                 Before:
                                  HONORABLE NORMAN K. MOON
8                                 UNITED STATES DISTRICT JUDGE
    JASON KESSLER, ET AL.,        WESTERN DISTRICT OF VIRGINIA
9
           Defendants.
10
    ****************************************************************
11
    APPEARANCES:
12

13  For the Plaintiffs:      ALAN LEVINE, ESQUIRE
                             COOLEY LLP
14                           1114 Avenue of the Americas, 46th
                             Floor
15                           New York, NY  10036
                             212.479.6260
16
                             DAVID E. MILLS, ESQUIRE
17                           COOLEY LLP
                             1299 Pennsylvania Avenue, NW,
18                           Suite  700
                             Washington, DC  20004
19                           202.842.7800

20

21

22  Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                     255 West Main Street, Suite 304
23                   Charlottesville, Virginia  22902
                     434.296.9284
24
    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25  TRANSCRIPT PRODUCED BY COMPUTER.

```
         Sines, et al. v. Kessler, et al., 3:17CV72, 11/02/2021


1   APPEARANCES CONTINUED:

2   For the Plaintiffs:          MICHAEL L. BLOCH, ESQUIRE
                                 ROBERTA A. KAPLAN, ESQUIRE
3                                Kaplan Hecker & Fink LLP
                                 350 Fifth Avenue, Suite 7110
4                                New York, NY  10118
                                 212.763.0883
5
                                 KAREN L. DUNN, ESQUIRE
6                                WILLIAM A. ISAACSON, ESQUIRE
                                 ARPINE S. LAWYER, ESQUIRE
7                                JESSICA E. PHILLIPS, ESQUIRE
                                 Paul, Weiss, Rifkind, Wharton &
8                                Garrison LLP
                                 2001 K Street, NW
9                                Washington, DC  20006
                                 202.223.7300
10

11  For the Defendants:          DAVID L. CAMPBELL, ESQUIRE
                                 Duane, Hauck, Davis, Gravatt &
12                               Campbell, P.C.
                                 100 West Franklin Street, Suite 100
13                               Richmond, VA  23220
                                 804.644.7400
14
                                 CHRISTOPHER CANTWELL, PRO SE
15                               #00991-509
                                 USP Marion
16                               4500 Prison Road, PO Box 2000
                                 Marion, IL  62959
17
                                 BRYAN J. JONES, ESQUIRE
18                               Bryan J. Jones, Attorney at law
                                 106 W. South Street, Suite 211
19                               Charlottesville, VA  22902
                                 540.623.6952
20
                                 JAMES E. KOLENICH, ESQUIRE
21                               Kolenich Law Office
                                 9435 Waterstone Blvd., Suite 140
22                               Cincinnati, OH  45249
                                 513.444.2150
23

24

25
```

Sines, et al. v. Kessler, et al., 3:17CV72, 11/02/2021

1   APPEARANCES CONTINUED:

2   For the Defendants:          WILLIAM E. REBROOK, IV, ESQUIRE
                                 (Appearing via Zoom)
3                                The ReBrook Law Office
                                 6013 Clerkenwell Court
4                                Burke, VA  22015
                                 571.215.9006
5
                                 JOSHUA SMITH, ESQUIRE
6                                Smith LLC
                                 807 Crane Avenue
7                                Pittsburgh, PA  15216
                                 917.567.3168
8
                                 RICHARD SPENCER, PRO SE
9                                P.O. Box 1676
                                 Whitefish, MT  59937
10
                                 DILLON HOPPER, PRO SE
11                               (Appearing via Zoom)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF WITNESSES

2    WITNESSES ON BEHALF OF THE PLAINTIFF:              PAGE

3    SAMANTHA FROELICH (Appearing by video)

4    MATTHEW HEIMBACH

5     Direct Examination by Ms. Dunn                      22
      Cross-Examination by Mr. Kolenich                  203
6     Cross-Examination by Mr. Spencer                   205
      Cross-Examination by Mr. Campbell                  219

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          INDEX OF EXHIBITS

2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

3        EXHIBIT:                Marked      Received

4        3839                                17          19

5        2033                     20          20

6        3818                     20          20

7        1006                     20          20

8        2481                     26          26

9        1824                     27          27

10       2911                     31          31

11       628                      32          32

12       2240                     35          35

13       939                      37          37

14       941                      38          38

15       2514                     40          41

16       2414                     41          41

17       672                      43          46

18       2499                     49          49

19       3336                     51          53

20       2560                     53          56

21       641                      58          58

22       1425                     62          63

23       2781                     77          78

24       635                      82          85

25       707                      85          86
```

```
 1                          INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3        EXHIBIT:                 Marked      Received

 4        579                        88          88

 5        1827                       91          91

 6        2728                       94          94

 7        1063                       99          99

 8        583                       101         101

 9        584                       103         103

10        587                       109         110

11        649                       124         124

12        615                       126         126

13        2221                      128         128

14        2901                      132         132

15        2368                      134         135

16        2268                      145         145

17        3317                      150         150

18        2468                      158         159

19        1811                      160         160

20        2435                      162         162

21        1888                      167         167

22        2260                      176         176

23        2217                      179         180

24        1177                      183         183

25        3257A                     184         184
```

```
1                        INDEX OF EXHIBITS

2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

3   EXHIBIT:              Marked      Received

4        2538                          185      203

5        2871                          203      203

6        2554                          192      193

7        1833                          197      197

8

9   EXHIBITS ON BEHALF OF THE DEFENDANTS:

10  EXHIBIT:              Marked      Received

11       1                           212      212

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  (Proceedings commenced, 9:03 a.m.)

2          THE COURT:  Good morning.  Be seated.

3          Call the case, please.

4          THE CLERK:  Yes, Your Honor.  This is Civil Action

5  Number 3:17-cv-00072, Elizabeth Sines and others versus Jason

6  Kessler and others.

7          THE COURT:  Plaintiffs ready?

8          MS. DUNN:  We are, Your Honor.

9          THE COURT:  Defendants ready?

10          MR. SMITH:  Yes, Your Honor.

11          MR. KOLENICH:  Your Honor, I have one or two issues

12  I'd like to bring up before the jury comes in.

13          THE COURT:  All right.

14          MR. KOLENICH:  Just relative to the video deposition

15  yesterday of Ms. Froelich, I understand that there was some

16  off-the-record discussion about how we're going to get

17  transcripts onto the docket.  I just wanted to put that on the

18  record, that we've had those discussions and that the

19  plaintiffs are working on how to get the testimony -- the

20  transcription of the testimony onto the docket so we have

21  something to work with later on in the case, rather than just

22  the notation that a video was played.

23          Secondarily, I'd like to bring up an issue that,

24  presumably, the plaintiffs are going to object to, and I'd

25  rather get that out of the way before the jury comes in, which

 1   is supplementing whatever deposition portions they put in with

 2   other parts of the deposition.  Now, yes, defendants, we ended

 3   up with a waiver argument yesterday.  And yes, defendants did

 4   not make counter-designations.  But unlike objections,

 5   counter-designations -- there's no explicit waiver provided for

 6   in the law as to counter-designations.  So we intend to put in

 7   other parts, at least potentially, of her deposition after

 8   they're done with the parts that they want to put in.  And if

 9   the Court is going to shoot me down on that, I'd like to have

10   that ruling before the jury so the jury doesn't see me getting

11   shot down on that issue.

12            MS. KAPLAN:  Good morning, Your Honor.  Let me take

13   all of those issues up.

14            On the transcript, it's my understanding that we've

15   worked something out with the court reporter.  We're in the

16   process of working something out where there will be a

17   reference in the transcript to an exhibit which will have the

18   portions of the transcripts that have been designated and

19   played before the jury.  And I think that's the best way to

20   accomplish that in accordance with local practice.

21            With respect to the issue Your Honor raised or Your

22   Honor's law clerk raised last night, we sent a letter --

23            THE COURT:  What about his issue?

24            MS. KAPLAN:  His issue with the counter-designations,

25   Your Honor, is that it was part of the pretrial order.  It was

 1   due a week after the designations.  They didn't do it.  They

 2   shouldn't be permitted to do it.  Parties have to file orders

 3   and comply with orders, as we have.  And we think Your Honor

 4   should stand on Your Honor's order.  In fact, Your Honor, as I

 5   recall, just issued a ruling this morning about your pretrial

 6   order being decided and done, and this was part of that.

 7          The only other thing I would say is if Your Honor is

 8   amenable to doing that, they shouldn't be able to interrupt the

 9   testimony.  They should propose counter-designations to us

10   which we can look at and see whether we agree or not, in

11   accordance with the system of the pretrial order, as it was

12   supposed to be.

13          MR. KOLENICH:  We certainly would not interrupt the

14   testimony, Your Honor.  Obviously, we would wait until they

15   were done, and then we can propose, you know, a very small

16   number of additional sections of the deposition we'd like to

17   put in.  Not that they would play it or publish it to the jury;

18   we could just read it, you know, because we don't have video.

19   And that's sort of -- that's sort of the good cause I'm trying

20   to show here, Judge.

21          They have an army of attorneys and a mountain of

22   money.  We have -- you know, even the limited staff that I have

23   refuse to work on this case, or begged to be allowed not to

24   work on this case.  So, yes, this slipped through the cracks.

25   And I'm not complaining about objections that should have been

1   filed, but the law allows us explicitly to put in other parts

2   of the deposition.

3            The normal practice is counter-designations -- I

4   understand that -- but it's not the same thing as the explicit

5   waiver provisions in the civil rules.

6            THE COURT:  Well, I don't know how I could rule until

7   they've had an opportunity to show what prejudice would be from

8   the parts you're going to designate.

9            MR. KOLENICH:  Very well, Your Honor.  I will get

10  that to them as quickly as possible and we'll proceed from

11  there.

12           THE COURT:  Okay.

13           MR. KOLENICH:  Thank you, Judge.

14           THE COURT:  But I haven't ruled, so...

15           MR. KOLENICH:  Thank you, Judge.

16           MS. KAPLAN:  Your Honor, just one clarification.  We

17  didn't send them videos.  We did what every lawyer does.  When

18  we made our designations, we read the transcript and we picked

19  the lines that we wanted to designate.  There was no fancy

20  pyrotechnics to it at all.

21           THE COURT:  Okay.  Before we begin, I will remind

22  everyone that under Standing Order 2020-12 and 2013-8, the

23  Court's prohibition against recording and broadcasting court

24  proceedings remains in force.  Attorneys, parties, or staff,

25  and members of the public or press accessing this proceeding

12

1  today, may not record or broadcast it.  That means no

2  photography, no using of any video or audio recording device,

3  and no rebroadcasting, livestreaming, or otherwise

4  disseminating any live or recorded video or audio of this

5  proceeding.

6          Just -- it's not by way of criticism, but we spent an

7  awful lot of time yesterday with the same witness saying the

8  same thing every time somebody cross-examined that witness,

9  and -- I don't know.  Every point doesn't have to be made eight

10 times.  Two or three times at most.  But I'd just caution, if

11 you would --

12         MR. SMITH:  I understand, Your Honor.  Be economical

13 about the questioning.

14         THE COURT:  Well, proceed better.  If you did not ask

15 the same question --

16         MR. SMITH:  Yes, Your Honor.

17         THE COURT:  And let me say, you've got a right to

18 show that these plaintiffs have a different view from you, and

19 that's -- shows their position in the case.  But it cannot get

20 to the point where either side is trying to convince the other

21 side in the case that they are right and the other side is

22 wrong.  You can bring out that view to show, you know, whatever

23 prejudice there might be, but just keeping that in mind.

24         MS. KAPLAN:  Your Honor, as you might imagine, we

25 have spent a lot of time thinking about that issue because

13

1   we're concerned about the time limits and the November 19th

2   date.  It's my understanding, for example, that Mr. Willis was

3   examined on direct for about an hour and a half and was

4   cross-examined for five hours.  If that continues to happen,

5   the November 19th date is going to be very hard to meet.

6          So I had some conversations with Mr. Campbell and

7   Mr. Kolenich, and we'll be back to Your Honor if we can come up

8   with something that may at least try to mitigate this problem

9   somewhat.

10          THE COURT:  Okay.  Now, with regard to the Froelich

11   deposition, by way of background, Mr. Campbell did file a

12   motion seeking to exclude as against him the deposition of the

13   witnesses Rousseau, Hopper, Griffin, and Isaacs, Dockets 1102,

14   1103, 1127.  Mr. Cantwell's motion was filed on September 21st,

15   2021.  The motion to exclude was granted in part and denied in

16   part on October 27 in Docket 1338.

17          However, in another filing, Mr. Cantwell did object

18   to, among others, the deposition testimony of Ms. Froelich

19   being used against him in Docket 1097, though he did not file a

20   motion to that effect.  The Court has also considered

21   plaintiffs' letter filing from this morning on the matter.

22          To be clear, a month ago Mr. Cantwell sought to

23   extend all discovery, pretrial, and trial deadlines in this

24   case 12 months on account of the delays in his receiving case

25   documents during his period of incarceration, Docket 1099.

1   Just before trial, following a letter from plaintiffs, the

2   Court told Mr. Cantwell that it was willing to sever the case

3   and allow Mr. Cantwell the time he wants to prepare his case;

4   however, at that point, being given the option to delay his

5   trial to get more time to prepare and engage in discovery,

6   Mr. Cantwell then opposed severance and opted to proceed with

7   the trial.  In that posture, the Court had difficulty seeing

8   prejudice to Mr. Cantwell by the admission of deposition

9   testimony of any witness taken while Mr. Cantwell was

10   incarcerated; however, in an abundance of caution, the Court

11   has denied plaintiffs' use of certain depositions at trial

12   against Mr. Cantwell without a limiting instruction.

13          As previously stated, given Mr. Cantwell's position

14   opposing severance, delay of his trial 12 months, the Court has

15   trouble seeing prejudice to Mr. Cantwell in this regard, but

16   out of an abundance of caution, the Court would intend to

17   instruct the jury using the limited instruction proposed by

18   plaintiffs, modified so that it would refer to Ms. Froelich,

19   such that the jury would not consider it with respect to

20   plaintiffs' case against Mr. Cantwell.

21          The instruction would also be repeated upon the close

22   of the evidence in the final jury instructions.  Okay?  And I

23   do propose to read the limited instruction to the jury.

24          Anything else on that?

25          MS. KAPLAN:  Your Honor, are you going to read that

15

1  right after the jury comes in?

2            THE COURT:  Yes.

3            MS. KAPLAN:  The one thing I might add -- you might

4  want to add to it is we're going to have about 45 minutes more

5  of Ms. Froelich, just so they kind of get the sense of what's

6  coming.

7            THE COURT:  Okay.  Well, I thought I'd read it.

8            MR. CANTWELL:  Yesterday when I objected to

9  Ms. Froelich's deposition designation, they had said that --

10 the plaintiffs told Your Honor that you had already ruled on

11 this.  If you could just -- if somebody could tell me what the

12 ECF number on that is -- I've sort of received a lot of papers

13 lately, and I obviously have missed something, and I'd just

14 like to update myself when I get back to the facility.  Or is

15 what you just read a ruling?  Is there another order coming

16 out?

17           MS. KAPLAN:  Your Honor, we have a copy of the letter

18 I filed this morning to the marshal, if you would be so kind to

19 hand it to Mr. Cantwell.

20           THE COURT:  I had not ruled on Froelich yet.  That

21 was with regard to other witnesses.

22           MR. CANTWELL:  Okay.

23           MR. SPENCER:  Your Honor, if it's an appropriate

24 time, could I ask the Court why Ms. Froelich isn't available as

25 a witness, why we are watching a deposition?

1              THE COURT:  I have no idea.

2              MS. KAPLAN:  It's my understanding, Your Honor, she's

3    outside the subpoena range.

4              THE COURT:  The Court only has subpoena power within

5    very limited jurisdiction.  I think Mr. Cantwell had many

6    witnesses he wanted subpoenaed, but they were beyond the power

7    of this Court to subpoena.

8              All right.  Anything else?

9              MS. DUNN:  Your Honor --

10             THE COURT:  Excuse me.

11             MR. CANTWELL:  I'll just note it seems to me a

12   difficult thing to imagine, in a conspiracy case, that a

13   limiting instruction such as the one I read with regard to the

14   second deposition of Dillon Hopper could possibly alleviate the

15   trouble that's being caused here.  If evidence --

16             THE COURT:  Well, Mr. Cantwell, look.  I gave you the

17   opportunity to sever your case.

18             MR. CANTWELL:  You did.

19             THE COURT:  And this is not something I'm making up,

20   this law.  This has been followed in other conspiracy cases.

21   So, I mean --

22             MR. CANTWELL:  Very well.

23             THE COURT:  -- the difficulty is there, of course.

24   It's sort of the unscrambling of eggs problem.  Nevertheless,

25   it's the law, and it's allowed.

1              MR. CANTWELL:  Understood.

2              THE COURT:  Okay.

3              MS. DUNN:  Your Honor, just two quick things.

4         First of all, we were asked to put on the record the

5    exhibit number of the Froelich deposition clip report.  It's

6    PX3839.

7              THE CLERK:  I'm sorry.  Could you say it one more

8    time?

9              MS. DUNN:  PX3839.

10             THE CLERK:  Are you moving to admit that, or are you

11   just putting that on the record?

12             (Plaintiffs' Exhibit 3839 marked.)

13             MS. DUNN:  We are going to move to admit it, but we

14   can do that now or after, whichever is more appropriate.

15        And then the only other thing, Your Honor, especially

16   because we have some *pro se* defendants, we are going to have

17   some cross-examination of defense witnesses, and we just ask

18   the Court to remind parties of the instruction that you can't

19   talk to the witness while they are in the middle of

20   cross-examination.

21             MR. SMITH:  Is there some reason why that's become an

22   issue?

23             MS. DUNN:  Your Honor, this is not something I wanted

24   to bring up in front of the jury, but because we have

25   defendants who are counseling themselves --

```
 1                THE COURT:  You mean once the witness takes the

 2   stand?

 3                MS. DUNN:  Yes, Your Honor.

 4                THE COURT:  A witness should not discuss the case

 5   until they have finished their testimony.

 6                MS. DUNN:  Thank you, Your Honor.  Appreciate that.

 7                THE COURT:  You don't get to -- you don't get to meet

 8   and discuss the testimony of a witness --

 9                MR. SMITH:  Oh, of course.  I understand what you're

10   saying.

11                THE COURT:  -- while the testimony is going on.

12                MR. SMITH:  Of course.

13                MR. CANTWELL:  Even I know that.

14                THE COURT:  Call the jury back.

15   (Jury in, 9:20 a.m.)

16                THE COURT:  Good morning, ladies and gentlemen.

17                There's one preliminary matter before we begin today,

18   and that has to do with the deposition of Ms. Froelich, whose

19   deposition you are in the middle of hearing.

20                Each party is entitled to have the case decided

21   solely on the evidence that applies to that party.  Some of the

22   evidence in this case is limited under the rules of evidence to

23   some of the parties, and cannot be considered against the

24   others.

25                Plaintiffs' deposition testimony from Ms. Froelich
```

1   should not be considered by you in connection with Defendant

2   Christopher Cantwell; however, the testimony may be considered

3   by you in connection with the other defendants.  The reason for

4   that is Mr. Cantwell was not present at the deposition.  So you

5   may not -- well, just follow that instruction.  And I'll read

6   it to you probably several times after this, but with regard to

7   other depositions.

8           All right.  You may proceed with the deposition.

9           (Pause.)

10          MS. DUNN:  Your Honor, Mr. Spalding says that he

11  needs about five minutes to figure out what's happening

12  technologically.

13          (Pause.)

14          THE CLERK:  He says for you to try again.

15          (Video deposition of Samantha Froelich played,

16  Exhibit Number PX3839.)

17          MS. DUNN:  Your Honor, we'd like to move in the

18  following exhibits that were used with Ms. Froelich's

19  deposition:  Plaintiffs' Exhibit 3839, Plaintiffs'

20  Exhibit 2033, Plaintiffs' Exhibit 3818, and Plaintiffs'

21  Exhibit 1006.

22          THE CLERK:  I'm sorry?

23          MS. DUNN:  1006.

24          THE COURT:  They will be admitted.

25          (Plaintiffs' Exhibit 3839 admitted.)

1          (Plaintiffs' Exhibits 2033, 3818 and 1006 marked.)

2          (Plaintiffs' Exhibits 2033, 3818 and 1006 admitted.)

3          MS. DUNN:  Thank you, Your Honor.

4          THE COURT:  Members of the jury, we'll take about a

5    20-minute recess, and I'll ask counsel to stay here a few

6    minutes.

7          You may take the jury.

8    **(Jury out, 10:26 a.m.)**

9          THE COURT:  I take it cross-examination -- the parts

10   that the defendant wishes to add to it, could they come up in

11   your case in chief if the Court allowed it?

12         MR. KOLENICH:  Yes, Your Honor.  I guess it would be

13   analogous to re-calling Froelich as a witness.  There's only

14   just a few discrete parts.  We certainly don't want to go on

15   and on for --

16         THE COURT:  Is there any objection now to his --

17         MS. KAPLAN:  So we were just looking at it during the

18   video playing.  We would -- we're obviously against it in

19   general, but if it was without waiver to any other objections,

20   to any other witnesses' designations or cross-designations for

21   not being within the pretrial order, that's one; two, if after

22   viewing it we were allowed to counter-designate, because we

23   think there's -- sometimes he has questions he didn't fully get

24   in, and he wanted to get those in; three, there are some

25   objections to the form that we would need Your Honor to rule on

1   so we can cut the testimony -- cut the video appropriately.

2            THE COURT:  Were there objections to form that

3   appeared in what she's already testified to?

4            MS. KAPLAN:  No, Your Honor.

5            THE COURT:  Okay.  Well, Mr. Woodard brought that up

6   yesterday.  Questions to form have to be brought up at the time

7   of the deposition.

8            MS. KAPLAN:  Of course, Your Honor.

9            And then, four, the last part, would be is if we can

10  agree to all that and Your Honor would be inclined to allow it,

11  then we would actually cut the video so that the jurors can

12  hear the video rather than playing it.

13           THE COURT:  Well, that's what I would prefer to do.

14           MR. KOLENICH:  That's acceptable, yes, sir.  No

15  objection.  They do have objections to form in some of the

16  sections that I'm requesting, if that's what the Court was

17  asking.

18           THE COURT:  What about form?

19           MR. KOLENICH:  I mean, they objected.  I think I

20  misunderstood, but they did --

21           THE COURT:  You objected to the form of the question?

22           MS. KAPLAN:  Yes, Your Honor, in some of the

23  counter-designations.  That should be easy for Your Honor to

24  resolve.  We can give you a handy set of papers to look at.

25           THE COURT:  Is that something, though, that could

M. Heimbach - Direct

1   come up in his -- I hate to -- if we could do that, go on with

2   this cross, and then take that up when you put on your case.

3               MR. KOLENICH:  Yes, sir.

4               MS. KAPLAN:  Yes, we can.

5               THE COURT:  Okay.  Thank you all.

6               MS. DUNN:  Thank you, Your Honor.

7               (Recess.)

8               THE COURT:  Are we ready for the jury?

9               MS. DUNN:  Yes, Your Honor.

10              THE COURT:  Ready to call the jury?

11              MR. JONES:  Yes, sir.

12              MR. KOLENICH:  Yes.

13              MR. SMITH:  Yes, Your Honor.

14              THE COURT:  Heidi?

15              THE CLERK:  Yes, sir.

16              THE COURT:  Call the jury.

17  **(Jury in, 10:53 a.m.)**

18              THE COURT:  All right.  You may be seated.

19              MS. DUNN:  Your Honor, plaintiffs call Defendant

20  Matthew Heimbach.

21         MATTHEW HEIMBACH, CALLED BY THE PLAINTIFFS, SWORN

22                      DIRECT EXAMINATION

23   BY MS. DUNN:

24  Q    Good morning, Mr. Heimbach.

25  A    Good morning.

M. Heimbach - Direct

1  Q    My name is Karen Dunn.  I'm one of the lawyers for the

2  plaintiffs in this case.

3  A    Yes, ma'am.

4  Q    Can you hear me?

5  A    Yes.

6  Q    Great.

7       Mr. Heimbach, you were the founder and chairman of the

8  Traditionalist Worker Party, also referred to as TWP or Trad

9  Worker; is that correct?

10 A    Yes.

11 Q    Okay.  And in 2017, the time period of the events in this

12 case that we've been talking about, you considered yourself to

13 be a white nationalist, correct?

14 A    Yes.

15 Q    And you also identified as a national socialist?

16 A    Correct.

17 Q    How many members were in the Traditionalist Worker Party

18 in 2017?

19 A    Between members and affiliates, several hundred.

20 Q    Did you keep a membership list with people's names on it?

21      (Pause.)

22           THE WITNESS:  Sorry.  Can you hear me now?

23           MS. DUNN:  I think we both have microphone

24 adjustments to do.

25           Great.

M. Heimbach - Direct

1  BY MS. DUNN:

2  Q    Did the Traditionalist Worker Party keep a membership list

3  with peoples' names on it?

4  A    I believe so, yes.

5  Q    And the Traditionalist Worker Party was governed by the

6  principles of Adolf Hitler's National Socialist German Workers'

7  Party, correct?

8  A    We were a political party that had our own unique 25-point

9  platform that was dedicated to the interests of white

10 working-class Americans.

11 Q    So we'll talk about the platform, but my question is

12 whether your party was inspired by or governed by the

13 principles of Hitler's party?

14         MR. SMITH:  Objection, Your Honor.  That's been asked

15 and answered.

16         THE COURT:  Overruled.

17         THE WITNESS:  We were inspired by a variety of

18 movements.  National socialism is not defined exclusively by

19 Adolf Hitler in Germany in the 1930s and '40s.  Arab Ba'athist

20 parties, national socialist organizations in a variety of

21 countries, we took inspiration from.

22 BY MS. DUNN:

23 Q    Sir.

24 A    Yes.

25 Q    Your counsel has time to ask you questions when he stands

M. Heimbach - Direct

 1  up, but this part is for you to answer my questions.

 2      So my question is --

 3          MR. SMITH:  Your Honor, objection.  Can we not have

 4  the plaintiffs' counsel talking to the witness like that?

 5          THE COURT:  Ask me and I'll instruct the witness.

 6          MR. SMITH:  Thank you, Your Honor.

 7          MS. DUNN:  Your Honor, will you please instruct the

 8  witness that his counsel will have time to ask him questions

 9  and to answer my question directly?

10          THE COURT:  Yes.

11          Answer her questions directly, and your counsel can

12  follow.

13          THE WITNESS:  Partially inspired, yes.

14  BY MS. DUNN:

15  Q    Partially inspired by Adolf Hitler?

16  A    Yes.

17  Q    And in 2017, sir, you looked up to Hitler and you thought

18  he was an inspiration for what you could achieve?

19  A    Yes.

20  Q    And you know that Hitler's party is also called the Nazi

21  party?

22  A    Yes.

23  Q    And you consider the word "Nazi" to be a slur?

24  A    Yes.  It was utilized going back to the 1920s as a slur

25  against national socialists.

M. Heimbach - Direct

1  Q    Right.  And so when people say the United States fought

2  the Nazis in World War II, you would consider that to be a

3  slur?

4  A    Yes.

5  Q    Okay.  And just like people once did with Hitler, members

6  of the Traditionalist Worker Party would salute you with a Nazi

7  salute; you recall that, right?

8  A    Yes.

9  Q    And you didn't discourage that?

10  A    No.

11  Q    And instead of "Heil Hitler," what did they say?

12  A    "Heil Heimbach."

13  Q    I'd like to show you on the screen, Plaintiffs' Exhibit

14  2481.  Do you see this?

15       (Plaintiffs' Exhibit 2481 marked.)

16  A    Yes.

17  Q    Do you see it's a post regarding yourself?

18  A    Yes.

19           MS. DUNN:  Your Honor, we'd like to admit PX2481.

20           THE COURT:  Be admitted.

21           (Plaintiffs' Exhibit 2481 admitted.)

22   BY MS. DUNN:

23  Q    And in this post, Mr. Heimbach -- it's on Twitter -- it

24  describes the crowd at an event in Pikeville, Kentucky giving

25  the Nazi salute and chanting "Heil Heimbach."  You see that,

M. Heimbach - Direct

1   right?

2   A     Yes.

3   Q     You know Adolf Hitler wrote a famous manifesto, it was

4   called *Mein Kampf*, and you've read it several times?

5   A     Correct.

6   Q     You wrote your own, although partially completed,

7   manuscript, which you called *White Juche*?  Is that the correct

8   pronunciation?

9   A     No, *White Juche*.  It's a Korean term for self-reliance.

10  Q     Right.  And so Juche is a principle that's been adopted by

11  the North Korean government; you're aware of that?

12  A     Yes.

13  Q     I'd like to show you Plaintiffs' Exhibit 1824, which is

14  your *White Juche,* your manuscript.

15           MS. DUNN:  And we move to admit this, Your Honor.

16           THE COURT:  Be admitted.

17           (Plaintiffs' Exhibit 1824 marked.)

18           (Plaintiffs' Exhibit 1824 admitted.)

19  BY MS. DUNN:

20  Q     All right.  So in the introduction of your manuscript,

21  Mr. Heimbach, you discuss how you were raised in a conservative

22  family, but you became disgusted with conservatism; is that

23  right?

24  A     Correct.

25  Q     That's your word, "disgusted," correct?

M. Heimbach - Direct

1  A    Correct.

2  Q    Directing your attention to page 3, you say:  "How could I

3  then swear allegiance to a flag and an empire that killed my

4  ancestors and their countrymen, burned our cities to the ground

5  and put us under the boot heel of tyranny by the American

6  central banks and capitalist industrialists?"  You see that?

7  A    Yes.

8  Q    So here you're saying you did not know how you could

9  pledge allegiance to the American flag?

10  A    Yes.

11  Q    Further down on page 3 you go on to say that part of what

12  brought you to national socialism is that you realized the

13  Constitution was a death cult that broke you out of the normal

14  conservative conditioning.  Do you see that?

15  A    Yes.

16  Q    Okay.  And so you go on to write -- and this is on page

17  14 -- how you found your inspiration in national socialism and

18  in Adolf Hitler, who you consider to be one of the greatest

19  European men to ever live.  Do you see that?

20  A    Yes.

21  Q    Okay.  And you even talk here about how when your newborn

22  son opened his eyes for the first time your first thought was

23  about Adolf Hitler?

24  A    Correct.

25  Q    And in 2017 you said that other white nationalists looked

M. Heimbach - Direct

1  up to you as their leader, who was fighting for them.  You

2  remember saying that?

3  A    I'm sure I did.

4  Q    You don't deny you did?

5  A    No.

6  Q    All right.  So let's talk about some of the events in 2017

7  that led up to Charlottesville 2.0, which was also known as the

8  Battle of Charlottesville.  So we just saw a post from

9  Pikeville, Kentucky, and that event was in April of 2017, and

10  that was the annual event for the National Socialist Movement;

11  am I right?

12  A    Correct.

13  Q    NSM?

14  A    Yes.

15  Q    And that's your co-defendant Jeff Schoep, that's his

16  group, or at least at the time was his group, correct?

17  A    Correct.

18  Q    All right.  And he was at that meeting in Pikeville?

19  A    Uh-huh.

20       MS. DUNN:  And Your Honor, we'd just like to show the

21  demonstratives that the jury has already seen from opening so

22  that Mr. Heimbach can identify Mr. Schoep.

23       THE COURT:  All right.

24  BY MS. DUNN:

25  Q    So this picture you see on the screen, this is Mr. Schoep.

M. Heimbach - Direct

1   A    Yes.

2   Q    That's right.  Okay.  Another person at the Pikeville

3   event was Michael Hill.  He leads League of the South.  And

4   Michael Hill is the person you're seeing to the left of your

5   screen with the hat, correct?

6   A    Correct.

7   Q    Okay.  And you've known Michael Hill since 2011; that's

8   right?

9   A    Yes.

10  Q    Because you used to be a member of the League of the

11  South.

12  A    Correct.

13  Q    All right.  We can take that down, Mr. Spalding.

14       So Mr. Heimbach, did you listen to the opening statements

15  in this case?

16  A    I did not.

17  Q    Okay.  Has anyone told you that Mr. Cantwell said that he

18  really didn't know his co-defendants?

19  A    I don't recall hearing that.

20  Q    Okay.  So Mr. Cantwell told the jury, he said, "I really

21  don't know my co-defendants, and I knew them even less on

22  August 11th of 2017."

23       And that's not true as to you, is it?  You knew

24  Mr. Cantwell by that time and you introduced him at the

25  Pikeville event, right?

M. Heimbach - Direct

1  A    I believe at the time of Pikeville I had only met

2  Mr. Cantwell in passing one time previously to that.  And that

3  would have been the second time, I believe, I would have met

4  Mr. Cantwell.

5  Q    So even though you say you had only met him in passing, do

6  you remember introducing him to a crowd of people and

7  describing him as a man who cares about the truth and is

8  willing to sacrifice for it?

9  A    Yes.

10  Q    All right.  And I'll show you PX2911.  Do you recognize

11  that as a picture of yourself and Mr. Cantwell?

12  A    Yes.

13           MS. DUNN:  Your Honor, we'd move to admit Exhibit

14  2911.

15           THE COURT:  It will be admitted.

16           (Plaintiffs' Exhibit 2911 marked.)

17           (Plaintiffs' Exhibit 2911 admitted.)

18  BY MS. DUNN:

19  Q    So if we could see, Mr. Spalding, the whole post.

20       This is a post by Mr. Cantwell from May 3rd, 2017; you see

21  that?  And that's a picture of yourself and Mr. Cantwell.  And

22  he says, "How I started hanging out with Nazis."  You see that?

23  A    Yes.

24  Q    When he says Nazis he's referring to you, presumably?

25  A    I presume.

M. Heimbach - Direct

1  Q    So just to be completely clear, by the time that you and

2  Mr. Cantwell ended up in Charlottesville for August 11th and

3  12th, you did already know each other?

4  A    Yes, I did know Mr. Cantwell, and was familiar primarily

5  with his podcast, the Radical Agenda.

6  Q    Which you later appeared upon.  Right?  You appeared on

7  his podcast?

8  A    Correct.

9  Q    But you knew him.  I just want to make sure there's no

10  question about that.

11  A    Yes.  I had met Mr. Cantwell previously to

12  Charlottesville.

13  Q    Another person who was at this Pikeville meeting is Dillon

14  Hopper.  And you see Dillon Hopper in the center there.  And he

15  was the leader of, at this time, of Vanguard America, right?

16  A    Correct.

17  Q    Okay.  I'd like to show you Plaintiffs' Exhibit 628.  You

18  recognize this as a picture of yourself and Mr. Hopper?

19  A    Yes.

20  Q    Okay.

21          MS. DUNN:  Your Honor, move to admit 628.

22          THE COURT:  It will be admitted.

23          (Plaintiffs' Exhibit 628 marked.)

24          (Plaintiffs' Exhibit 628 admitted.)

25

M. Heimbach - Direct

1  BY MS. DUNN:

2  Q    All right.  These are pictures of you, like -- that you

3  see on the screen that Mr. Hopper posted to Discord -- I

4  apologize.  It looks like somebody else posted this, that

5  somebody other than Mr. Hopper posted on Discord in May of

6  2017.  Do you see that?

7  A    Yes.

8  Q    Okay.  And this is a picture of Mr. Hopper Nazi saluting

9  you.  Do you see that?

10  A    Yes.

11  Q    And above the photo it says "Heil Heimbach," right?

12          MR. SMITH:  Your Honor, if I could object very

13  quickly to the characterization of "Nazi salute."  It's

14  actually referred to as a Roman salute.  Nazi was a slur, as we

15  just established.

16          THE COURT:  Overruled.  I think the witness is

17  testifying.  But you're testifying.  Let the witness testify.

18          MR. SMITH:  I understand, Your Honor.

19          MS. DUNN:  Thank you, Your Honor.

20   BY MS. DUNN:

21  Q    Mr. Heimbach, you're holding in your hand what's known as

22  a fasces.

23       And actually, Mr. Spalding, if we can go to the second

24  page so the jury can see it better.

25       This is what's called a fasces; you see that?

M. Heimbach - Direct

1    A    Yes.

2    Q    That's the original symbol of fascism, right?

3    A    It was original symbol of Rome.

4    Q    It's come to be a symbol of fascism?

5    A    Yes.

6    Q    Right.  And so what it is is it's an axe with sticks

7    wrapped around it to symbolize that an individual by itself can

8    be broken, but bound together with a strong cord, it's

9    unbreakable.  I have that right?

10   A    Yes.  That's why we have it in the halls of Congress as

11   well.

12   Q    Right.  I understand.  But this is a fasces that

13   Mr. Hopper made for you specifically.  And one of the reasons

14   he did that is to symbolize that you and the others at

15   Pikeville were stronger bonded together than you would have

16   been individually?

17   A    Yes.

18   Q    And prior to Pikeville you wrote a document called "The

19   Next Step of the Revolution"; do you remember that?

20   A    Yes.

21   Q    And that document began with a quote from Joseph Goebbels.

22   And he was, for everyone's edification, one of Hitler's closest

23   comrades.  He was the minister of propaganda for the Nazi

24   party.  And actually Hitler put it in his will that this was

25   the person to succeed him, right?

M. Heimbach - Direct

1  A    Correct.

2  Q    This is the quote that you used in your document that you

3  wrote called "The Next Step of the Revolution."  And it says,

4  "Whoever can conquer the street will one day conquer the state,

5  for every form of power politics and any dictatorship-run state

6  has its roots in the street."  Do you recall that?

7  A    I do.

8  Q    Okay.  I'd like to show you Plaintiffs' Exhibit 2240.

9       All right.  So you recognize this as a post that you made?

10 A    Yes.

11          MS. DUNN:  Okay.  Your Honor, we'd move to admit

12 2240.

13          THE COURT:  It will be admitted.

14          (Plaintiffs' Exhibit 2240 marked.)

15          (Plaintiffs' Exhibit 2240 admitted.)

16          MS. DUNN:  And if we could see the whole thing,

17 Mr. Spalding.

18  BY MS. DUNN:

19 Q    This is a post you made, Mr. Heimbach, on a social media

20 platform called Gab.  And Gab is used, among other -- by, among

21 others, white supremacists.  Is that correct?

22          MR. SMITH:  Objection, Your Honor.  Again, the term

23 "white supremacist" appearing in questioning.

24          THE COURT:  All right.  Sustained.

25          MR. SMITH:  Thank you.

M. Heimbach - Direct

1           MS. DUNN:  Your Honor, the question is whether Gab is

2    used by white supremacists.

3           THE COURT:  Well, that's argumentative and I think

4    you can -- you can use a nonpejorative term such as "white

5    nationalists" or whoever --

6    BY MS. DUNN:

7    Q    Okay.  Mr. Heimbach, you used Gab, the platform, correct?

8    A    I did.

9    Q    And Gab is very popular with the alt-right; you don't

10   disagree with that?

11   A    It was at the time, yes.

12   Q    And also with white nationalists, correct?

13   A    Correct.

14   Q    Okay.  And so in this post that you posted on Gab, it's

15   the same quote that says, "The reason we have marches and

16   public demonstrations is because, as Dr. Joseph Goebbels said,

17   'whoever can conquer the street will one day conquer the

18   state.'"  But then you go on to add your own language that

19   says, "If we are to win, we must march, we must take public

20   space, and we must push our enemies off our streets."  Do you

21   see that?

22   A    I do.

23   Q    And you believed that at the time?

24   A    Yes.

25   Q    Following the April 2017 Pikeville meeting, you attended

M. Heimbach - Direct

1   an event in Charlottesville on May 13th, 2017, and that's

2   become known as Charlottesville 1.0.  You remember that?

3   A    Correct.

4   Q    I'd like to show you a photograph, Plaintiffs' Exhibit

5   939.  This is a picture that you recognize, correct?

6   A    Correct.

7            (Plaintiffs' Exhibit 939 marked.)

8            MS. DUNN:  Your Honor, move to admit 939.

9            THE COURT:  It will be admitted.

10            (Plaintiffs' Exhibit 939 admitted.)

11    BY MS. DUNN:

12   Q    So this is a picture from May 13th of 2017.  And you're in

13   this photograph.  Do you see yourself?

14   A    Yes.  On the right-hand side of the photograph.

15   Q    Right.  And Mr. Spalding is going to help us with the

16   circles.

17        And where is Mr. Kline?

18   A    The left side of the photograph holding the banner.

19   Q    And Mr. Spencer?

20   A    Directly next to him.

21   Q    And Mr. Damigo?

22   A    Skip one and then the shorter fellow.

23   Q    He's the one in the sweater vest?

24   A    Correct.

25   Q    After this picture was taken there was also a public torch

M. Heimbach - Direct

1  march at Charlottesville 1.0?

2  A    Correct.

3  Q    And were the torches used because you didn't have

4  flashlights; you needed to light the way?

5  A    No, I don't believe so.

6  Q    And are you aware that the torch march was Nathan Damigo's

7  idea based on a torch march in Germany?  Did you know that?

8  A    No, I did not.

9  Q    All right.  And after the public events with

10 Charlottesville 1.0, there was a private after-party that you

11 attended, generally only attended by white nationalists.  You

12 recall that?

13 A    Yes.

14 Q    All right.  I'd like to show you Plaintiffs' Exhibit 941,

15 which is a Discord post.  You recognize yourself there?

16 A    Yes.

17        MS. DUNN:  Your Honor, we move to admit Plaintiffs'

18 Exhibit 941.

19        (Plaintiffs' Exhibit 941 marked.)

20        (Plaintiffs' Exhibit 941 admitted.)

21        THE COURT:  It will be admitted.

22  BY MS. DUNN:

23 Q    This is a photo of you, Mr. Spencer, and another

24 individual.

25 A    Correct.

M. Heimbach - Direct

1  Q    And it looks like you're in somebody's house for the

2  after-party.  Is that right?

3  A    Correct.

4  Q    That's Mr. Spencer next to you in the green?

5  A    Yes.

6  Q    And in this photo you and the other person next to you are

7  making the white power symbol with your hands; do you see that?

8  A    We are making an "okay" sign, yes.

9  Q    Are you going to deny that the reason you're making the

10 "okay" sign is because it's also the white power symbol?

11 A    Well, I would say the usage of that sign was to speak to

12 the hysteria, specifically of the media, that any sort of

13 symbol or any outlandish sort of thing could be turned into the

14 next news story of the alt-right.  So it was playing, really,

15 on the media that was so eager to jump onto any sort of

16 symbolism or things like that.  It's a joke, yes.

17 Q    So it's a joke, and your testimony is that the reason this

18 was posted in a private Discord chat is so the media would see

19 it?

20 A    Well, it was -- the picture was taken and distributed

21 other places, I believe, as well.

22 Q    Okay.

23 A    But the usage of the symbol, yes, was really a kind of

24 tongue-in-cheek sort of thing that really characterizes a lot

25 of the alt-right subculture.

M. Heimbach - Direct

1   Q    Okay.  At some point at the after-party you remember that

2   Mr. Spencer gave -- you wouldn't describe it as a speech, but

3   you would describe it as a pep talk, right?  Do you remember

4   that?

5   A    Yes, he gave some remarks.

6   Q    Right.  A pep talk.  That's what you called it?

7   A    Sure.

8   Q    All right.  And you say you don't remember what

9   Mr. Spencer said in the pep talk, right?

10  A    Not particularly.

11  Q    Can't remember anything?

12  A    I believe at the end of it we all said "hail victory."

13  Q    Great.  Let's look at that.  I think you're right about

14  that.

15       Can we look at Plaintiffs' Exhibit 2514.

16            (Plaintiffs' Exhibit 2514 marked.)

17            (Video playing.)

18  BY MS. DUNN:

19  Q    Mr. Heimbach, you've seen the video.  The jury has not

20  seen it yet.  Is this what you meant when you said "we all said

21  'hail victory'"?

22  A    Yes.

23            MS. DUNN:  Your Honor, we move to admit Plaintiffs'

24  Exhibit 2514 and show it to the jury.

25            THE COURT:  It will be admitted and you may show it.

M. Heimbach - Direct

1              (Plaintiffs' Exhibit 2514 admitted.)

2              (Video playing.)

3    BY MS. DUNN:

4    Q     You were here for Ms. Froelich's testimony, correct?

5    A     Correct.

6    Q     And you heard what she said about Sieg Heil; you heard

7    that?

8    A     Yes.

9    Q     Okay.  We have a screenshot, Plaintiffs' Exhibit 2414,

10   that's taken from this video.  You recognize yourself in this

11   screenshot, correct?

12             (Plaintiffs' Exhibit 2414 marked.)

13             THE WITNESS:  The back right of the photograph, I

14   believe.

15             MS. DUNN:  Your Honor, we move to admit 2414.

16             THE COURT:  Be admitted.

17             (Plaintiffs' Exhibit 2414 admitted.)

18   BY MS. DUNN:

19   Q     Okay.  Mr. Heimbach, can you identify yourself in this

20   photo, just show the jury?

21   A     Yes.

22   Q     If you write on the screen, we can see it.

23   A     Okay.  Would you like me to --

24   Q     Let's test it out.  There you are.

25         Can you also circle Mr. Spencer?

42

M. Heimbach - Direct

1  A    (Witness complies.)

2  Q    And are any of the other defendants in this photograph?

3  A    I'm not sure.

4  Q    And you're not going to deny that you and the rest of the

5  group and Mr. Spencer are doing a Nazi salute?

6         MR. SMITH:  Objection, Your Honor.  First of all,

7  "can we not deny," that is really an inappropriate phrasing.

8         THE COURT:  Sustain the objection.

9   BY MS. DUNN:

10  Q    All right.  Mr. Heimbach, you know what Discord is, right?

11  A    Yes.

12  Q    Discord is a free app.  It offers group chats.  You can

13  also share texts and videos and you can also communicate by

14  voice over Discord, right?

15  A    Correct.

16  Q    All right.  And Discord offers servers that are private,

17  invitation-only servers as places to communicate?

18  A    Correct.

19  Q    And you posted -- you yourself posted in the

20  Charlottesville 2.0 Discord server?

21  A    Several times, yes.

22  Q    Yes, you did that.

23         And in addition to the Charlottesville 2.0 server,

24  Traditionalist Workers Party had its own server on Discord and

25  you posted in that, correct?

M. Heimbach - Direct

1    A    Correct.

2    Q    And actually, you were one of the moderators of the

3    Traditionalist Workers Party server on Discord, which was

4    called tradworker, right?

5    A    Correct.

6    Q    Let's look at Plaintiffs' Exhibit 672.  And this is a

7    collection of posts on the Discord tradworker server, including

8    posts from you.  Your posts are on page 3.  Do you see that?

9         (Plaintiffs' Exhibit 672 marked.)

10   A    I do.

11   Q    Okay.

12        MS. DUNN:  Your Honor, move to admit Plaintiffs'

13   Exhibit 672.

14        MR. JONES:  If I could have a minute to review it,

15   Your Honor.  This is my first time seeing it.  How many pages

16   is it?  Just one?

17        MS. DUNN:  It's at least three.

18        MR. JONES:  Okay.  Could I see the three-page

19   document?

20        MS. DUNN:  It's on the screen.

21        MR. JONES:  I can't really see it on the screen.  I'm

22   sorry.

23        MR. CANTWELL:  Judge, Christopher Cantwell.  While

24   they look at the rest of this, I want to object to anybody --

25   any post from -- any Discord post from people we can't

44

M. Heimbach - Direct

1   identify.  I believe that that's hearsay.

2                THE COURT:  What is the exhibit?  Tell me what...

3                MS. DUNN:  Your Honor, it's Exhibit -- Plaintiffs'

4   Exhibit 672.

5                THE COURT:  What does it purport to be?

6                MS. DUNN:  It purports to be a Discord conversation

7   that involves the defendant, where he is conversing directly

8   with other people and responding to what they say.

9                MR. CANTWELL:  So the user name, if I understand, the

10  user name starting with K, is that what we're claiming is

11  Mr. Heimbach?

12               MS. DUNN:  No.  Mr. Heimbach, his Discord name is

13  Matthew Heimbach, and he is talking to various people on the

14  Discord Charlottesville 2.0 server.  And these are

15  conversations that were had with Mr. Heimbach and other people

16  in advance of Charlottesville 2.0.  And there's a lot of these

17  conversations in this case.  And people on Discord went by

18  pseudonyms.  They didn't use their own names.  And defendants

19  have stipulated to the authenticity of these documents.

20               THE COURT:  All right.

21               MS. DUNN:  So we are entitled to ask --

22               THE COURT:  There's evidence that the Discord

23  Charlottesville was used by Unite the Right, isn't it?

24               MS. DUNN:  Yes, Your Honor.

25               MR. JONES:  I think Mr. Cantwell is asking them to

M. Heimbach - Direct

1  articulate an exception to the hearsay rule for the non-Matthew

2  Heimbach statements in the exhibit.

3          MS. DUNN:  Your Honor, several things.  Some of these

4  posts come in under the co-conspirator exception, first of all.

5  Second of all, they're needed for context because they're

6  conversations that the defendants were involved in.  And the

7  third reason is they're not being admitted for the truth of the

8  matter asserted, but these are conversations the defendants

9  were all in as part of the planning of Charlottesville 2.0.

10         THE COURT:  Well --

11         THE WITNESS:  This was not in the Charlottesville

12  Discord.

13         MS. DUNN:  Your Honor, the witness also just

14  testified that this server, the Traditionalist Worker Party

15  server, was one he posted in in the run-up to the Unite the

16  Right.

17         THE COURT:  Who testified to that?

18         MS. DUNN:  This witness, Your Honor.

19         THE COURT:  Okay.  All right.  Overruled.

20         MS. DUNN:  Thank you.

21  BY MS. DUNN:

22  Q   Mr. Heimbach, have you had a chance to look at what's on

23  your screen?

24  A   Yes, ma'am.

25         MS. DUNN:  Your Honor, we move to admit 672.

46

M. Heimbach - Direct

1          THE COURT:  It will be admitted.

2          (Plaintiffs' Exhibit 672 admitted.)

3   BY MS. DUNN:

4   Q    Okay.  If you look, Mr. Heimbach, to the top of page 1,

5   somebody named Kombat-Unit says, "I mean, let's be real here,

6   we're very much for certain terrorists, right?  We're not Dubya

7   neocohens."  Do you see that?

8   A    I do.

9   Q    First of all, who is Kombat-Unit in real life?

10  A    I'm not sure.

11  Q    Okay.  And when Kombat-Unit, who you say you don't know,

12  is referring to "we're not Dubya neocohens," Dubya is a

13  reference to President George W. Bush, correct?

14  A    I believe so.

15  Q    And neocohens you understand used to be the word neocons,

16  like neoconservative, but is made neocohens because of its

17  reference to Jewish people.  Do I have that right?

18          MR. SMITH:  Your Honor, there's a lack of foundation

19  for that also.  She's asking what this person meant to

20  Mr. Heimbach, and he doesn't necessarily have personal

21  knowledge.

22          MS. DUNN:  Your Honor, I'm asking what Mr. Heimbach

23  would understand that to be.

24          THE COURT:  Yes.  Overruled.

25          THE WITNESS:  That would likely be in reference to

M. Heimbach - Direct

1   the neoconservative movement's pro-Israeli stance, yes.

2   BY MS. DUNN:

3   Q    The next poster, White-PowerStroke, in parentheses,

4   Dillon, that's Dillon Hopper?

5   A    I believe so.

6   Q    Who you earlier identified as the head of Vanguard

7   America, says, "Which terrorists?"  You see that?

8   A    Yes.

9   Q    And then Kombat-Unit states -- lists a very long list of

10  terrorist organizations, including Hezbollah and many that I

11  won't try to pronounce because they're in different languages.

12  He says, "Basically every single RWDS."  That stands for

13  right-wing death squad, do you see that?

14  A    I do.

15  Q    "The Order and McVeigh and Breivik if you're hardcore

16  enough."  Do you see that?

17  A    I do.

18  Q    And this is a conversation about which terrorist groups

19  those posters support and --

20        MR. SMITH:  Your Honor, I don't believe there's been

21  foundation established that these support any of those groups.

22        MS. DUNN:  Your Honor, I have not yet asked my

23  question.

24        THE COURT:  Go ahead.

25        MR. JONES:  Your Honor, I'll object.  It's hard to

M. Heimbach - Direct

1  know when something is a question and when she's

2  editorializing.  She's going really quick.

3          MR. SMITH:  I should note that plaintiffs' counsel

4  really harped on that yesterday.

5          THE COURT:  Yes.  You are adding --

6          MS. DUNN:  Thank you, Your Honor.

7   BY MS. DUNN:

8  Q    Mr. Heimbach, you would understand McVeigh to refer to

9  Timothy McVeigh who is responsible for the Oklahoma City

10 bombing?

11 A    Yes.

12 Q    If you look at page 2, Kombat-Unit goes on to say, "These

13 guys slay Jews and ISIS.  It's just great, right?  We want them

14 gone anyway and white blood doesn't get spilled more than is

15 necessary."  Do you see that?

16 A    I do.

17 Q    If you move to page 3 of this exhibit, in the center of

18 the page, or the top of the page, third line down,

19 White-PowerStroke (Dillon), Dillon Hopper is talking about

20 killing the Jews' first-born sons and turning their water into

21 bacon grease.  Do you see that?

22 A    Yes.

23 Q    And then you respond, responding to Kombat-Unit, who you

24 say you don't know, "I support any group that is fighting the

25 kikes and their minions."  You see that?

                        M. Heimbach - Direct

1    A    I do.

2    Q    And at the time of the events in this case, you also refer

3    to Jews as evil, genocidal and satanic lunatics, correct?

4    A    Correct.

5    Q    All right.  I'd like to show you Plaintiffs' Exhibit 2499.

6    This is also a Discord post.  It was produced in sort of a

7    strange fashion, so the formatting may look different.  But you

8    recognize this as a post that you made, correct?

9         (Plaintiffs' Exhibit 2499 marked.)

10   A    Correct.

11            MS. DUNN:  Your Honor, we move to admit 2499.

12            MR. JONES:  Your Honor, I haven't seen this yet

13   either.  I need to read the whole thing.

14            Are you introducing just Matthew Heimbach's statement

15   or the whole?

16            MS. DUNN:  Yes, we plan to only introduce

17   Mr. Heimbach's statement.

18            MR. JONES:  With the understanding that only

19   Mr. Heimbach's statement is being introduced, no objection.

20            MS. DUNN:  Your Honor, move to introduce Plaintiffs'

21   Exhibit 2499.

22            THE COURT:  Be admitted.

23            (Plaintiffs' Exhibit 2499 admitted.)

24    BY MS. DUNN:

25   Q    Mr. Heimbach, could you please read for the jury what you

50

M. Heimbach - Direct

1  posted?

2  A    "The total destruction of Jewry is the only way to ensure

3  that we no longer will be plagued by the eternal enemy of all

4  mankind.  If they are not destroyed in their entirety, they

5  will come back to attack and subvert all free peoples and

6  nations.  This is total war, because the Jews are waging total

7  war against us.  They want nothing less than the slavery of our

8  children and the destruction of our folk.  To do anything less

9  than wage a war of extermination against these vermin would be

10  a betrayal of our future generations.  We did not start this

11  war, but we will finish it, once and for all."

12  Q    You believed this in 2017?

13  A    Well, it's important to understand what we called in the

14  Traditionalist Worker Party "the Rockwell pivot."  Going

15  back -- I'm answering your question --

16  Q    Mr. Heimbach, it's okay.  Did you post this in 2017?

17  A    Yes.

18  Q    As a representation of your views?

19  A    As political speech with a specific purpose, as I was

20  saying, in reference to George Lincoln Rockwell.  Rockwell

21  specifically came from a vaudeville family, and he -- he

22  utilized --

23  Q    Mr. Heimbach --

24        MR. SMITH:  Please -- object to her interrupting the

25  witness.

M. Heimbach - Direct

1          MS. DUNN:  Your Honor --

2          THE COURT:  Excuse me just a minute.  Your attorney

3  can ask you what you meant.  The question was:  Did you post

4  it?

5          THE WITNESS:  Yes.

6          THE COURT:  And you said yes.  Okay.

7   BY MS. DUNN:

8  Q    I'd like to show you Plaintiffs' Exhibit 3336.

9       (Plaintiffs' Exhibit 3336 marked.)

10         MS. DUNN:  Again, here, we would only seek to

11  introduce this document for Mr. Heimbach's own post.

12         MR. SMITH:  Your Honor, the evidence is starting to

13  become cumulative at this point.

14         THE COURT:  Excuse me?

15         MR. SMITH:  The evidence is starting to become

16  cumulative and duplicative.  I suggest -- I would like to ask

17  the Court to ask counsel --

18         THE COURT:  Well, this is a different statement,

19  isn't it?

20         MR. SMITH:  It's different in text, but not in

21  character.

22         THE COURT:  Okay.  Overruled.

23         MS. DUNN:  Thank you, Your Honor.

24   BY MS. DUNN:

25  Q    Mr. Heimbach, you recognize this, correct?

52

M. Heimbach - Direct

1    A    Yes.

2    Q    Okay.  And this is a post that you made on February

3    24th -- I'm sorry, February 14th of 2018, on Valentine's Day;

4    do you recall that?

5    A    That looks like an accurate date, yes.

6    Q    Okay.  And on Valentine's Day of 2018 --

7              MR. SMITH:  Objection, Your Honor.  Why are we

8    mentioning Valentine's Day?

9              THE COURT:  I don't know.

10             MS. DUNN:  It's the date he posted it.

11             MR. SMITH:  No, the date was February 14th.

12             THE COURT:  What's the purpose?  You're beyond

13   August 12th.

14             MR. SMITH:  It's a form of editorializing, Your

15   Honor.

16             THE COURT:  Mr. Smith, don't --

17             MR. SMITH:  Sorry, Your Honor.

18             MS. DUNN:  Your Honor?

19             THE COURT:  Yes.

20             MS. DUNN:  This is the frame of mind that

21   Mr. Heimbach had during the time of the events of this case,

22   which -- Mr. Smith can't at once object it's cumulative and

23   then object there's a problem with this exhibit.  These were

24   Mr. Heimbach's own beliefs.

25             MR. SMITH:  I don't understand how --

53

M. Heimbach - Direct

1          THE COURT:  Well, you can ask him first, does he

2    still adhere to those -- at that time, were those his views?

3    BY MS. DUNN:

4    Q    At that time, did you state what it says in this post?

5          THE COURT:  And were they consistent with his views

6    on August 12th?

7    BY MS. DUNN:

8    Q    Is this consistent with your views at the time of the

9    Unite the Right?

10   A    Yes.

11         MS. DUNN:  All right.  Your Honor, we move to admit

12   this exhibit.

13         THE COURT:  All right.  You may post it.  But I'm

14   beginning to agree with Mr. Smith.  I think you've established

15   his feelings towards Jewish persons.

16         MS. DUNN:  Understood, Your Honor.

17         (Plaintiffs' Exhibit 3336 admitted.)

18    BY MS. DUNN:

19   Q    So in this post, Mr. Heimbach, you say:  "I hate Jews.  I

20   actually, truly, fucking hate them."  Right?

21   A    Correct.  Speaking of the organized Jewish community.

22   Q    Thank you.

23         MS. DUNN:  I'd like to play for Mr. Heimbach

24   Plaintiffs' Exhibit 2560.

25         (Plaintiffs' Exhibit 2560 marked.)

54

M. Heimbach - Direct

 1              (Video playing.)

 2   BY MS. DUNN:

 3   Q     Did you see that?

 4   A     Yes.

 5   Q     And you recognize that as a video of yourself and

 6   co-defendant Matthew Parrott?

 7   A     Correct.

 8              MS. DUNN:  Your Honor, move to admit 2560.

 9              MR. JONES:  Your Honor, I don't know anything about

10   this exhibit.

11              THE COURT:  I didn't see 2560.  Did it come up on the

12   screen?

13              MS. DUNN:  Would you like us, Your Honor, to replay

14   the video?

15              THE COURT:  No.  I just -- he said he didn't see it.

16   I didn't see it.

17              MS. DUNN:  It's not a long video.  Mr. Spalding is

18   putting it on the screen.

19              MR. JONES:  Is this an ABC Nightly News video?

20              THE COURT:  Are you objecting to it?

21              MR. JONES:  Well, I haven't seen it yet, but if this

22   is an ABC --

23              THE COURT:  I was waiting to see.  He said he didn't

24   see it.  I don't know.

25              MR. SMITH:  It's not showing up on this screen,

M. Heimbach - Direct

1  either.

2           MS. DUNN:  Your Honor --

3           MR. JONES:  If plaintiffs are trying to introduce an

4  ABC Nightly News cast, then yes, we are objecting to it.

5           MS. DUNN:  Your Honor, we are only introducing the

6  comments that the defendants in this case made.  Obviously,

7  anything ABC News were to say is not admissible, and I don't

8  believe can be heard in the clip that we're playing.

9           I will also note yesterday there were news clips

10 played, because a lot of the video in this case was aired on

11 the news.

12          THE COURT:  Is he on the video?

13          MS. DUNN:  Yes.

14          THE COURT:  Okay.  Well, he can identify himself and

15 what he said.

16          MS. DUNN:  Right.  That's all we're asking for.

17          MR. JONES:  They're asking for the whole video to be

18 admitted.  So if they want to ask him what he said and he can

19 identify, that's fine.

20          THE COURT:  Right.

21          MR. JONES:  But they can't introduce a whole

22 nine-minute video, a newscast.

23          MS. DUNN:  Understood, Your Honor.  That was not our

24 intention.

25          THE COURT:  Well, this is only to be considered as to

M. Heimbach - Direct

1    this witness.  Go ahead.

2              MS. DUNN:  Your Honor, this as a video of both

3    Mr. Heimbach and Mr. Parrott.  We do seek to admit just the

4    clip that we're playing, which is minute 1:52 to minute 1:56.

5              I think it's admitted.  Mr. Spalding, let's play it.

6              (Plaintiffs' Exhibit 2560 admitted.)

7              (Video playing.)

8     BY MS. DUNN:

9    Q    So you recognize yourself and Mr. Parrott in this video,

10   correct?

11   A    Yes.

12   Q    And you are screaming "the day of the rope is coming"?

13   A    Yes.

14   Q    Do you hear that?

15        And you're screaming "the day of the rope is coming" at

16   counter-protesters?

17   A    Organized anti-fascists, yes.

18   Q    Okay.  And Mr. Parrott is holding a sign that depicts a

19   person being hung with a rope; do you see that?

20   A    Yes, specifically Zionism.  That's a political statement.

21   Q    And the day of the rope is a scene from a book where race

22   traitors get hung, correct?

23   A    It's a reference to The Turner Diaries.

24   Q    And in The Turner Diaries, race traitors get hung; that's

25   right?

M. Heimbach - Direct

1    A     Indeed.

2    Q     And race traitors are white people who betray their own

3    race by supporting racial and religious minorities; do I have

4    that right?

5    A     Not exclusively.  The book also includes scenes of

6    politicians, newscasters, people that politically were opposed

7    to the ideology of the organization featured in the book.

8    Q     Right.  But Mr. Heimbach, I'd ask you just to answer the

9    question that I asked, which is:  Race traitors are white

10   people who betray their own race by supporting racial and

11   religious minorities; that's correct?

12   A     The political agenda associated with multiculturalism and

13   such.  So yes, those who betray their race.

14   Q     And the author of *The Turner Diaries*, who is that?

15   A     Dr. William Luther Pierce.

16   Q     And he became famous for murdering a Jewish talk show

17   host; that's correct?

18   A     No.  He was a doctor that ran the National Alliance, which

19   was a political organization.  He was never accused of any sort

20   of violent crimes.

21   Q     Okay.  So in August of 2017, is it true that you believed

22   white people who marry black people or have children are race

23   traitors?

24   A     Fundamentally, yes.

25   Q     We'd like to show you Plaintiffs' Exhibit 641.  These are

M. Heimbach - Direct

1    Discord posts made by you and others in the Discord server that

2    you moderated, the tradworker server.

3         These posts are made on June 17th of 2017; do you see

4    that?

5         (Plaintiffs' Exhibit 641 marked.)

6    A    Yes.

7              MS. DUNN:  Your Honor, we move to admit Exhibit 641.

8              MR. JONES:  Your Honor, I haven't seen these.  I need

9    a paper copy.  I can't see the screen.

10             (Pause.)

11             MR. JONES:  No objection.

12             THE COURT:  Be admitted.

13             MS. DUNN:  Thank you, Your Honor.

14             (Plaintiffs' Exhibit 641 admitted.)

15   BY MS. DUNN:

16   Q    Mr. Heimbach, in this Discord post in the Traditionalist

17   Worker Party server, directing your attention to page 2, so

18   here you and others, including, again, Kombat-Unit, are

19   discussing a young potential new member of the white

20   nationalist movement; do you see that?

21   A    Yes.

22   Q    And is this a potential new member of your own group, TWP?

23   A    Not sure of the context.

24   Q    Okay.  That's fair.

25        You write, "He's young, new to the movement."  And

59

M. Heimbach - Direct

1   Kombat-Unit responds, "He'll come around to RaHoWaism"; do you

2   see that?

3   A    Yes.

4   Q    And "RaHoWa" stands for "racial holy war"; is that

5   correct?

6   A    Correct.

7   Q    And RaHoWaism is the belief that white people should unite

8   and undertake a holy war against Jews and non-whites, correct?

9   A    Specifically, it's a religious tenet of specific sects of

10  Christian Identity.  So it's a religious view of one subculture

11  of white nationalism.

12  Q    Right.  But you don't disagree what I just said, that

13  RaHoWaism is the belief that white people should unite and

14  undertake a holy war against Jews and non-whites, and that

15  you're speaking about that here, RaHoWaism?

16  A    Sure.

17  Q    And that ideology was put forward by a group called the

18  Aryan Nations, which is a group that the FBI has identified as

19  a terrorist threat; you know that?

20            THE COURT:  Wait, wait, wait --

21            MR. JONES:  Your Honor, I'm going to object to that.

22            THE COURT:  Sustained.

23   BY MS. DUNN:

24  Q    And when you write --

25            MR. JONES:  I'll ask that that be stricken from the

60

M. Heimbach - Direct

1  record.

2          THE COURT:  Repeat the question -- strike that from

3  the record.

4          You are testifying.  That's not -- that's not --

5  that's not asking him a question.

6          MS. DUNN:  Your Honor --

7          THE COURT:  And it doesn't --

8          MS. DUNN:  Your Honor, respectfully, Mr. Heimbach is

9  giving historical context, and I expect that he will do that on

10 his direct exam, which has already been indicated.  This was

11 part of his deposition, and this is where this phrase comes

12 from.  So there -- that's the --

13         THE COURT:  Well, you can ask him if he believes it.

14         MS. DUNN:  This is the etymology of this phrase.  So

15 that is germane.  But I'm happy to move on.

16         THE COURT:  All right.

17 BY MS. DUNN:

18 Q    Mr. Heimbach, when you say "we all do," what you're saying

19 is "we all do come around to RaHoWaism"; correct?

20 A    Correct.  The term, however -- there was often a lot of

21 jokes in reference to the movement that was popularized during

22 the 1980s and 1990s and the subcultural memes of that

23 generation.  So yes, but that's not necessarily something to be

24 taken seriously.

25 Q    And when you write, "we all do come around to RaHoWa," you

M. Heimbach - Direct

1   were referring to white nationalists, correct?

2   A    Correct.  But as to your previous exhibit where you

3   brought up that I expressed support for non-white organizations

4   such as Palestinians and Houthis, the fact that it's a joke --

5            MS. DUNN:  Your Honor --

6            MR. SMITH:  Your Honor --

7            MS. DUNN:  Your Honor, Mr. Smith is going to have an

8   opportunity with this witness.

9            MR. SMITH:  Your Honor, they chose to call this

10  witness adversely during their case in chief.

11           THE COURT:  Well, okay.  What is your question?

12           MS. DUNN:  My question, which was also asked of

13  Mr. Heimbach and answered directly earlier in his deposition,

14  is whether, when he writes, "we all do come around to RaHoWa,"

15  he's referring to white nationalists.

16           THE COURT:  That's the question?

17           MS. DUNN:  That's the question.

18           THE COURT:  Can you answer that?

19           THE WITNESS:  Yes, within the context I previously

20  expressed.

21   BY MS. DUNN:

22  Q    All right.  And directing your attention to the date on

23  these posts, these posts are made on June 17th, 2017, which is

24  just two months before Charlottesville 2.0; is that right?

25  A    Correct.

M. Heimbach - Direct

1    Q    Okay.  Now, in May of 2017, Jason Kessler reached out to

2    you because he wanted to plan what became -- what ultimately

3    became Charlottesville 2.0 for the summer of 2017?

4              MR. KOLENICH:  Objection.  Assumes facts not in

5    evidence.

6              THE COURT:  Well, it's not --

7              MS. DUNN:  Your Honor, we're trying to get the facts.

8    These are questions.

9              THE COURT:  Okay.  But you're asking him about what

10   Mr. Kessler was thinking.

11             MS. DUNN:  Your Honor, with respect, I said "Jason

12   Kessler reached out to you."

13             I can rephrase.

14    BY MS. DUNN:

15   Q    I'll say:  Mr. Kessler reached out to you and you

16   understood him to want to plan Charlottesville 2.0?

17   A    Yes.

18             MS. DUNN:  Your Honor, we'd like to show this witness

19   Plaintiffs' Exhibit 1425.

20             (Plaintiffs' Exhibit 1425 marked.)

21    BY MS. DUNN:

22   Q    Do you recognize this to be a text exchange between

23   yourself and Mr. Kessler?

24   A    Yes.

25             MS. DUNN:  Your Honor, move to admit 1425.

M. Heimbach - Direct

1        THE COURT:  It will be admitted.

2            (Plaintiffs' Exhibit 1425 admitted.)

3   BY MS. DUNN:

4   Q    All right.  So, Mr. Heimbach, you spoke to Mr. Kessler

5   repeatedly about Charlottesville 2.0 throughout the summer of

6   2017.  That's correct?

7   A    Correct.

8   Q    All right.  And in your text messages you also arranged

9   phone calls.  So you had both texts and phone calls, correct?

10  A    Correct.

11  Q    And what we're seeing on the screen is from page 1 of a

12  long text string between yourself and Mr. Kessler.

13       And let's just go up to the top, Mr. Spalding.

14       He says:  "Hey, Matt, this is Jason Kessler.  I'd like to

15  organize another, much larger, event in Charlottesville later

16  this summer.  I wanted to invite you and pick your brain about

17  how to conceive this thing."

18       Do you see that?

19  A    I do.

20  Q    You say:  "Sounds great.  I'm at work now.  Wanna chat

21  tomorrow?"  And you did, in fact, talk to Mr. Kessler, correct?

22  A    I'm not sure.

23  Q    You don't remember that you spoke to him in the summer of

24  2017?

25  A    No.  I did.  I just don't know if I chatted with him that

M. Heimbach - Direct

1  next day.

2  Q    Okay.  Fair enough.

3       And if you look down on page 1, Mr. Kessler asks you:

4  "Supposedly the KKK" -- that's the Ku Klux Klan -- "are trying

5  to do a Charlottesville event in July.  I think that will hurt

6  the overall prowhite message.  Can we convince them to come in

7  plain clothes to the August thing instead?"

8       Do you see that?

9  A    I do.

10 Q    And you say:  "Let's set the dress code now, khakis and a

11 polo."  Correct?

12 A    Yes.

13 Q    And that did become the dress code for

14 Charlottesville 2.0, more or less?

15 A    Not for my organization.

16 Q    Right.  I agree with that.  But for some organizations,

17 the dress code that you suggested, khakis and a polo, became

18 the dress code, right?

19 A    Yes, as had been previously established at rallies.

20 Q    Right.  And so when you said "let's set the dress code

21 now" in this text exchange, which was on May 22nd, 2017, of

22 khakis and a polo, you agree that even though your organization

23 didn't adopt that dress code, others did, including Identity

24 Evropa and Vanguard America, correct?

25 A    I believe it was continuing the dress code they had

M. Heimbach - Direct

1   previously adopted.

2   Q    And you say that even though, in your message, you say

3   "let's set the dress code now," on May 22nd, 2017?

4   A    Yes.  For instance, the first Charlottesville event, that

5   was the dress code then.  Richard Spencer's speech at Auburn, a

6   variety of other times the alt-right met, khakis and a polo and

7   was just kind of a standard, easy to get, presentable uniform.

8   Q    And it was important that it be presentable, correct?

9   A    Yes.

10  Q    All right.  And so you just testified that, actually, the

11  Traditionalist Worker Party did not adopt the dress code that

12  you suggest here, but you had your own dress code.  That's

13  correct?

14  A    Correct.

15  Q    And that was to wear all black because black hides blood,

16  correct?

17  A    Well, we wore Dickeys, work pants, and work shirts,

18  because we are a working class party, and that's typical

19  working-class attire for factory workers across America.

20          MS. DUNN:  Your Honor, we'd like to pass up

21  Mr. Heimbach's deposition.

22          THE COURT:  You may.

23          MS. DUNN:  There are two depositions.  This one --

24  the one that the judge will need is the August 2020 deposition.

25   BY MS. DUNN:

M. Heimbach - Direct

1  Q    So, Mr. Heimbach, you just testified that the reason you

2  wore all black was because you're a working-class party, and

3  that's typical working-class attire.

4       You were deposed in this case.  Do you remember that?

5  A    Yes.

6  Q    And a deposition is under-oath testimony; you're aware of

7  that?

8  A    Yes.  There were multiple reasons why we chose the uniform

9  that we did.

10         MS. DUNN:  Your Honor, we'd direct the Court and

11  Mr. Heimbach to the 2020 deposition, page 622, lines 7 to 25.

12         Your Honor, may we play the clip?

13         THE COURT:  Yes.

14         THE CLERK:  What is this supposed to be played for?

15         MS. DUNN:  We'd like to play page 622, lines 7 to 25.

16         THE CLERK:  For everyone?

17         MS. DUNN:  Yes.

18         THE COURT:  Well, are you impeaching him with the

19  deposition?

20         MS. DUNN:  Yes, Your Honor.

21         THE COURT:  Well, why don't you just read the

22  question to him and ask him did he say it?

23  BY MS. DUNN:

24  Q    Mr. Heimbach, are you at page 622, 7 to 25 of your

25  deposition?

M. Heimbach - Direct

1  A    Yes.

2  Q    And is this what you said at that page and line that

3  you're looking at?

4  A    Yes.  And in reference to the question on line 15 and 16,

5  you asked one of the reasons why we chose that uniform.  And,

6  as I just said, there were multiple reasons why we chose the

7  uniform.  You didn't ask if that was the exclusive reason we

8  chose that uniform.

9           MS. DUNN:  Your Honor --

10          MR. JONES:  Mr. Heimbach's correct, Your Honor.

11          THE COURT:  Read the question and the answer and I'll

12  instruct the jury that's what's in the record.

13          So read the question and answer.

14   BY MS. DUNN:

15  Q    All right.  Mr. Heimbach, you were asked at your

16  deposition:  "TWP has a specific dress code, right?"

17       Answer:  "Yes."

18       Question:  "And what was it?"

19       Answer:  "Party T-shirt, black khaki work pants, and work

20  boots."

21       Question:  "So the TWP uniform was to wear all black,

22  correct?"

23       Answer:  "Yes."

24       Question.  "Isn't it true that one of the reasons that you

25  believed your members should wear all black is because black is

M. Heimbach - Direct

1  a good color to hide blood?"

2      Answer:  "Yes.  If someone is injured, it isn't a good

3  look if they're bleeding all over a white polo shirt."

4      Question:  "When you say it isn't a good look, what do you

5  mean?"

6      Answer --

7          MR. JONES:  Your Honor, I'm going to object.  This

8  part is not relevant.

9          THE COURT:  Were those questions asked of you and

10 were those your answers?

11         THE WITNESS:  Yes, I did respond that, when asked one

12 of the reasons we chose the uniform.

13         THE COURT:  Well, I mean, getting back to the

14 deposition --

15         THE WITNESS:  Yes.

16         THE COURT:  You were asked the questions and gave

17 those answers at that time?

18         THE WITNESS:  Yes.

19         THE COURT:  Okay.

20         THE WITNESS:  My answer --

21         THE COURT:  That's what the record shows.

22         MS. DUNN:  Thank you, Your Honor.

23  BY MS. DUNN:

24 Q   Mr. Heimbach, you agreed with Mr. Kessler that you would

25 bring TWP members to the event, correct?

M. Heimbach - Direct

1   A      Correct.

2   Q      And beyond TWP, your own party, Mr. Kessler asked you to

3   make sure certain groups attended on August 11th and 12th,

4   correct?

5   A      Yes.

6   Q      And he specifically asked you to reach out to a group

7   called the Hammerskins; do you remember that?

8   A      I believe so.

9   Q      And the Hammerskins are a skinhead group, correct?

10  A      Yes.

11  Q      And he also asked you to reach out to a group called the

12  Blood & Honour Social Club, which is also a skinhead group that

13  originated in England, correct?

14  A      Correct.

15  Q      And Mr. Kessler specifically requested that you ask these

16  groups to be present in Charlottesville because they were known

17  to be violent, correct?

18  A      I can't recall the specifics of our conversation.

19  Q      I direct you to your deposition at 517, lines 5 to 10.

20         You'll see in your testimony, Mr. Heimbach, you do not use

21  the word "violent," but you say "rough and tumble"; do you see

22  that?

23  A      Yes.  I said they were rough around the edges.

24  Q      So you were asked:  "Would it be fair to say that

25  Mr. Kessler reached out to you to ask you to reach out to the

M. Heimbach - Direct

1   other groups that are known to be violent to make sure they're

2   present at Charlottesville?"

3            MR. SMITH:  Your Honor, he didn't say "known to be

4   violent."  He said "rough around the edges."

5            THE COURT:  Well, read the question and the answer

6   again, as it's stated in the record.

7            MS. DUNN:  Yes, Your Honor.

8   BY MS. DUNN:

9   Q    "Would it be fair to say that Mr. Kessler reached out to

10  you to ask you to reach out to other groups that are known to

11  be violent to make sure they are present at Charlottesville?"

12  And your --

13  A    As I answered on line 23 and 24 --

14  Q    Mr. Heimbach, I think for this exercise I'm supposed to

15  read your answer.

16            THE COURT:  All right.  Let -- she can read the

17  question and the answer, and I will ask you if that question

18  was asked and if that was your answer.

19            THE WITNESS:  Yes, Your Honor.

20   BY MS. DUNN:

21  Q    And your answer was:  "That have a reputation of

22  perhaps -- of being, perhaps, rough and tumble, rough around

23  the edges, yes."

24       Do you see that is your answer at 9 and 10?

25  A    Yes.

71

M. Heimbach - Direct

1  Q    All right.  And you did reach out, at Mr. Kessler's

2  request, to each of those skinhead groups, knowing at the time

3  about their reputations, correct?

4  A    Yes.  And as I responded on line 23 and 24, I believe he

5  wanted to invite organizations that had -- would have a

6  deterrent effect.

7  Q    So your testimony, Mr. Heimbach, is that the purpose of

8  inviting violent -- or, I'm sorry, "rough and tumble" skinhead

9  groups was to make things less violent?

10 A    Yes.  So there would be a deterrence effect.

11 Q    I understand.

12         MS. DUNN:  All right.  Mr. Spalding, can we show the

13 opening slide depicting Mr. Kline?

14 BY MS. DUNN:

15 Q    Mr. Heimbach, just one more question.

16      You said you -- when I asked you whether the purpose of

17 inviting skinhead groups was to make things less violent and

18 you said there would be a deterrent effect, that people would

19 see the skinhead groups and be frightened; is that what you

20 mean?

21 A    No, not frightened.  But anti-fascists have a long track

22 record in this country of attacking legally permitted

23 demonstrations.  I believe the thought process would be they

24 would be less likely to want to assault members of the

25 Hammerskins than college students in white polos, thereby

M. Heimbach - Direct

1    reducing violence at the event.

2    Q    So your idea was more skinhead groups, less violence,

3    right?

4    A    There would be a deterrent effect from organized

5    anti-fascists attacking legally permitted demonstrators.

6    Q    If you'll look at the screen, there's a picture on the

7    screen of Mr. Kline.

8         You recognize Mr. Kline?

9    A    Yes.

10   Q    Okay.  And he also went by "Eli Mosley," as we've heard?

11   A    Yes.

12   Q    What did you call him?

13   A    "Eli" or "Mosley."

14   Q    All right.  And so in addition to Mr. Kessler, you also

15   communicated by phone and by text message with Eli Kline to

16   plan for Charlottesville 2.0, correct?

17   A    Correct.  Mr. Kline, in many ways, was the chief

18   organizer.

19   Q    Okay.  And you agree with me, then, that you spoke with

20   him on the phone and via text message multiple times during the

21   summer of 2017?

22   A    Correct.

23   Q    All right.  And you also spoke quite a lot to Defendant

24   Parrott, right?

25   A    Yes.

M. Heimbach - Direct

1  Q    And just one question:  You're aware that Mr. Kessler and

2  Mr. Kline work very closely together, aren't you?

3  A    Yes.  I believe there was some sort of breakdown in

4  communication between the two prior to the event.

5  Q    Right.  Well, we'll ask them about that, but you're aware

6  that they worked together to plan the Charlottesville 2.0

7  event?

8            MR. KOLENICH:  Objection, asked and answered.

9            THE COURT:  Overruled.

10            THE WITNESS:  Yes.

11  BY MS. DUNN:

12  Q    And you've known Matthew Parrott, who is right over here,

13  for a long time.  You've known him since 2012, correct?

14  A    Yes.

15  Q    All right.  And with the exception of your wife, you

16  considered Mr. Parrott to be your best friend, correct?

17  A    That sounds accurate.

18  Q    And you were both involved in the Traditionalist Youth

19  Network in 2013 and 2014, right?

20  A    Yes.  We founded it together.

21  Q    And you spoke regularly with Mr. Parrott since 2015,

22  correct?

23  A    Yes.  For a lot of the time we were next-door neighbors.

24  Q    And you're married to his ex-wife; is that right?

25  A    Formerly, yes.  Not currently.

M. Heimbach - Direct

1    Q     Formerly.

2    A     There's a lot of "formers" there.

3    Q     I apologize.  You were formerly married to Defendant

4    Parrott's former wife?

5    A     Correct.

6    Q     So you spoke to him you've said every day in the summer of

7    2017, right?

8    A     That sounds accurate, yes.

9    Q     And you sent text messages to Mr. Parrott about

10   Charlottesville 2.0, correct?

11   A     I'm sure I did.

12   Q     Well, you did, right?

13   A     Yes.

14   Q     Okay.  And even though he was your best friend and you

15   spoke with him every day and you texted with him in the summer

16   of 2017, you did not produce a single text message between you

17   and Defendant Parrott in this litigation, correct?

18   A     Yes, because my ex-wife threw out the phone in question

19   where those would have been.

20   Q     Right.  And we will talk about that.

21   A     Okay.

22   Q     But my question for now is you didn't produce to us a

23   single text message between you and your best friend who you

24   spoke to every day, including by text, correct?

25   A     Correct.

M. Heimbach - Direct

1   Q     Okay.  And so there's also no record of your verbal

2   communications with Mr. Parrott planning Charlottesville 2.0,

3   correct?

4   A     We often did not record one another as we sat and had

5   coffee together, correct.

6   Q     So there's no record of that that we have, correct?  And

7   there's no record of your written communications with

8   Mr. Parrott about Charlottesville 2.0; is that right?

9   A     Most of our communication was face to face.

10  Q     Okay.  But you would agree, you have not told us what

11  those face-to-face conversations contained, correct?

12  A     I believe I answered all the questions in the depositions.

13  Q     Okay.  But apart from that?

14  A     Apart from the depositions where you asked me all of those

15  questions?

16          MR. JONES:  Your Honor, I'm going to object.  It's a

17  misleading question.  It suggests they've had conversations

18  outside of depositions.

19          THE COURT:  He hasn't said he had any written

20  communication.

21          MS. DUNN:  Your Honor, respectfully, he did.  He said

22  that they had text messages which were written.

23          THE COURT:  Okay.

24          MS. DUNN:  And that they spoke every day.

25          THE COURT:  You took up texts.  Then you said other

7.6

M. Heimbach - Direct

1  written -- he didn't have the texts.  So I gather he's saying

2  he doesn't have the hard copy.  He didn't make a hard copy.

3        MS. DUNN:  Correct.  He -- he acknowledged he didn't

4  produce any written communications.  He also spoke verbally to

5  Mr. Parrott every day in the summer of 2017.

6        THE COURT:  Okay.  You don't -- I heard that.

7        MS. DUNN:  Okay.  All right.

8        THE WITNESS:  In regards to written communications,

9  you have the entirety of the tradworker Discord, of which there

10  was extensive communication, which you do have records for.

11  BY MS. DUNN:

12  Q    Right.  None of which was produced by you, correct?

13        MR. SMITH:  Your Honor, objection.  She's badgering.

14        THE COURT:  Sustained.

15   BY MS. DUNN:

16  Q    All right.  Mr. Heimbach, the Nationalist Front is an

17  organization or an alliance that you know about, correct?

18  A    A broad coalition.

19  Q    Okay.  It was originally called the Aryan National

20  Alliance when it was founded in 2016; you're aware of that?

21  A    By Jeff Schoep.

22  Q    You knew that that's what it was called, did you not?

23  A    Yes.

24  Q    All right.  And the Nationalist Front was an alliance of

25  organizations with a shared statement of principles, correct?

M. Heimbach - Direct

1   A    Correct.

2   Q    And there was an admission process to admit a group into

3   membership in the Nationalist Front; is that right?

4   A    Correct.  Such as rejecting white supremacy.

5         MS. DUNN:  Your Honor, we'd ask that the second half

6   of the answer be struck.  Mr. Smith can ask all these questions

7   on his exam.

8         THE COURT:  Excuse me.  Just a minute.

9         All right.  I'll strike that.

10        MS. DUNN:  Thank you, Your Honor.

11    BY MS. DUNN:

12   Q    All right.  Mr. Heimbach, we're going to show you

13   Plaintiffs' Exhibit 2781.  Do you recognize this as the

14   Nationalist Front website?

15        (Plaintiffs' Exhibit 2781 marked.)

16        THE WITNESS:  Yes.

17   BY MS. DUNN:

18   Q    And on the Nationalist Front website, if you look at page

19   1, it says that, "the Nationalist Front is not an organization

20   in itself.  It's an alliance of organizations."

21        Do you see that?

22   A    I do.

23   Q    And, "membership is only open to organizations with a

24   proven commitment to struggle for the white nationalist vision.

25   It's not open to individuals."

7.8

M. Heimbach - Direct

1        Do you see that?

2   A    I do.

3   Q    And it goes on to say that "Movement leaders were

4   encouraged to join the Nationalist Front to pool talent,

5   resources, and manpower with other nationwide, regional, and

6   local organizations."

7        Do you see that?

8   A    I do.

9   Q    And if you look at page 2 of the Nationalist Front

10  website, it goes on to say that the Nationalist Front wanted to

11  leverage the power of solidarity and -- let me start over.

12       "The Nationalist Front wanted to leverage the power of

13  solidarity and scale to raise voices and fists against the

14  organized left and globalist Jewish oligarchs."  Do you see

15  that?

16  A    I do.

17            MS. DUNN:  I'm sorry, Your Honor, I neglected to seek

18  to admit Exhibit 2781.

19            THE COURT:  All right.  Be admitted.

20            (Plaintiffs' Exhibit 2781 admitted.)

21            MS. DUNN:  Thank you.

22   BY MS. DUNN:

23  Q    Mr. Heimbach, I'm going to ask you a couple questions

24  about who was in the Nationalist Front, what organizations.

25       And I'd ask Mr. Spalding to put on the screen a

79

M. Heimbach - Direct

1  demonstrative that shows the organizations' logos.

2       So first of all, League of the South, do you see that?

3  A    I do.

4  Q    League of the South was in the Nationalist Front.  You're

5  aware of that?

6  A    Yes.

7  Q    And we already talked about that you knew Michael Hill for

8  quite a long time, right?

9  A    Yes.

10 Q    And you spoke with Michael Hill, the leader of League of

11 the South, about organizing Charlottesville 2.0, right?

12 A    Yes.

13 Q    And the National Socialist Movement, that's Jeff Schoep's

14 group, we talked about, right?

15 A    Yes, although I don't believe that would be an accurate

16 representation of their logo at the time of planning for

17 Charlottesville.

18 Q    Okay.  And Jeff Schoep you've known since 2013; that's

19 correct, right?

20 A    Yes.

21 Q    And you communicated extensively with Mr. Schoep regarding

22 Charlottesville 2.0, correct?

23 A    Extensively?  We did have communications.

24 Q    Okay.  I don't want to belabor this, but when you were

25 asked in your deposition whether you communicated extensively

M. Heimbach - Direct

1  you said yes; do you recall that?

2  A    I don't recall.  I guess we could say extensively.

3  Q    And Vanguard America was also a member of the Nationalist

4  Front.  You know about Vanguard America, right?

5  A    Yes.  But prior to Charlottesville they had a leadership

6  change that changed the relationships with the Nationalist

7  Front, I believe.

8  Q    Right.  So Dillon Hopper, the individual we talked about

9  earlier who on Discord was known as White-PowerStroke (Dillon),

10 he was, during some part of the planning of Charlottesville

11 2.0, he was the leader of Vanguard America, right?

12 A    Yes.

13 Q    And then Mr. Hopper had to step back and an individual

14 named Thomas Ryan Rousseau took over the leadership of Vanguard

15 America.  You recall that?

16 A    Correct.

17 Q    And you personally invited Vanguard America members to

18 Charlottesville 2.0, right?

19 A    Yes, but they ended up not participating, I believe, with

20 the Nationalist Front at Charlottesville.

21 Q    But you recall that you invited the Vanguard America

22 members to Charlottesville 2.0?

23 A    Yes.

24 Q    Did you personally invite other groups, other than the

25 ones that we've mentioned, which include the Hammerskins, the

M. Heimbach - Direct

1  Blood & Honour Social Club, Vanguard America?  Did you invite

2  others?

3  A    I had reached out to one of our comrades in Greece to see

4  if a member of the Golden Dawn party would come as a

5  representative.

6  Q    Did Golden Dawn attend at your request?

7  A    They did not.

8  Q    Did you invite Jeff Schoep's group, or did somebody else

9  invite them?

10 A    I believe I probably did.

11 Q    Did you invite -- we -- you already testified you invited

12 the Hammerskins and Blood & Honour Social Club at Mr. Kessler's

13 request.  Did you invite Vanguard America at somebody else's

14 request?

15 A    I don't recall.  We were in the Nationalist Front umbrella

16 together.  So I think that would have been a continuation of

17 our previous participation in rallies together such as the

18 peaceful rally in Pikeville, Kentucky.

19 Q    Did you -- do you recall whether -- I think you said that

20 you invited Jeff Schoep's group.  Do you recall whether

21 somebody asked you to do that or you did that on your own?

22 A    I don't recall.  Again, that would have been a

23 continuation of previous policy of holding peaceful, legally

24 permitted events across the country.

25 Q    Okay.  Well, let's talk about that.

M. Heimbach - Direct

1        Let's show you Plaintiffs' Exhibit 635.

2              (Plaintiffs' Exhibit 635 marked.)

3    BY MS. DUNN:

4    Q    All right.  And this is a Discord post by you in the lobby

5    of the tradworker Discord server.  Do you see this?

6    A    Yes.

7    Q    And this is a post that you made on June 5th of 2017.  You

8    say:  "All right, y'all.  August 12th is going to be a full

9    callout for our members."  Do you see that?

10   A    I do.

11   Q    And you testified earlier that at this time TWP had a

12   couple hundred members?

13   A    And associates, yes.

14   Q    And associates and supporters?

15   A    Yes.

16   Q    And how many -- if you include the associates and the

17   supporters, how many is that?

18   A    A couple hundred.

19   Q    Okay.  So a couple hundred includes those people?

20   A    Yeah.

21   Q    Okay.  And so one of the ways that you would reach out to

22   your full membership and supporters is through Discord,

23   correct?

24   A    Yes.

25   Q    And you testified just a moment ago that these groups'

M. Heimbach - Direct

1    attendance at Charlottesville 2.0 was really just a

2    continuation of what was happening before.

3         Do you remember that?

4    A    Sure.

5    Q    So on page 2 of this Discord post, Dillon Hopper, the head

6    of Vanguard America, responds to you.  You're talking about

7    Charlottesville 2.0.  And he responds, "Mind if we join in?"

8         Do you see that?

9    A    Yes.

10   Q    And you respond, "Good stuff.  I was planning on calling

11   you, by the way."

12        Do you see that?

13   A    Yes.

14   Q    And you say -- after you say "I was planning on calling

15   you," you say, "laugh out loud, it wouldn't be a party without

16   you and your boys."  And Mr. Hopper responds, "Fuck, yeah,

17   man."

18        Do you see that?

19   A    Yes.

20   Q    Okay.  All right.  So you understand that these Discord

21   posts show that you were -- Dillon Hopper was asking to be

22   invited and you were agreeing to invite him, correct?

23   A    Correct.

24   Q    And that's on June 5th of 2017.

25             MS. DUNN:  Your Honor, we move to admit Exhibit 635.

84

M. Heimbach - Direct

1            MR. JONES:  How many pages is it?

2            MS. DUNN:  Three.

3            MR. JONES:  Could I get a copy of that, please?

4            MS. DUNN:  Sure.

5            Your Honor, we move to admit this Exhibit 635.

6            THE COURT:  All right.  Have you had a chance to look

7   at it?

8            MS. DUNN:  And while we're doing this, I neglected to

9   admit 2781.  So we'd seek to admit that.

10           THE COURT:  2781 will be admitted.

11           MS. DUNN:  Thank you, Your Honor.

12           The posts we just looked at were from June 5th of --

13           THE COURT:  Just a minute.  Where are we?  He

14   objected or said he hadn't seen the exhibit.

15           MS. DUNN:  Your Honor, Mr. Jones has the exhibit.  I

16   also want to note that these exhibits have been on the exhibit

17   list and were produced years ago to the defense.

18           THE COURT:  All right.

19           MR. SMITH:  For the record, not all counsel have had

20   that particular production for years.

21           THE COURT:  Well, you had it before the trial.  I

22   mean, timely before the trial, right?

23           MR. SMITH:  That's right, Your Honor.  I'm not

24   objecting to it.

25           MR. JONES:  I just needed to review it, Your Honor.

                              M. Heimbach - Direct

1   I don't have the 100,000 pages of Discord learned to memory.

2   So I just needed to see it in advance.  I don't object.

3              THE COURT:  Okay.  Go ahead.  Be admitted.

4              MS. DUNN:  Thank you, Your Honor.

5              (Plaintiffs' Exhibit 635 admitted.)

6    BY MS. DUNN:

7   Q    So that was on June 5th, 2017.  On that same day, you

8   separately had a private Discord conversation with Dillon

9   Hopper.  And that's Plaintiffs' Exhibit 707.  I'm going to show

10  that to you on the screen.

11             (Plaintiffs' Exhibit 707 marked.)

12  BY MS. DUNN:

13  Q    Do you see this?

14  A    I do.

15             MS. DUNN:  Your Honor, we'd move to admit 707.

16             MR. JONES:  Same problem, Your Honor.

17             THE COURT:  All right.

18             MR. JONES:  I think plaintiffs know in advance which

19  exhibits they're going to use.  I think the easiest way to do

20  it would just be to provide those to us in advance.  There's

21  3,000 exhibits.

22             THE COURT:  Well, they need to know.  As he said, he

23  can't commit them to memory.  They need to know what's being

24  talked about.

25             MR. KOLENICH:  Judge, we do have these exhibits.  The

M. Heimbach - Direct

1  problem is we can't call up a document number.  There's no

2  search function available in the form we have them.  We have to

3  click through and it's a slow process.  We're trying to fix

4  that on our end and hopefully we can do that soon, but that's

5  why we can't just call up doc 635 or whatever.

6              MS. DUNN:  Until defense counsel can fix that

7  problem, we're happy to run the hard copy across the room.

8              THE COURT:  Okay.

9              MS. DUNN:  All right.  We'd move to admit 707.

10             THE COURT:  All right.  Okay.  It will be admitted.

11             MS. DUNN:  Thank you, Your Honor.

12             (Plaintiffs' Exhibit 707 admitted.)

13  BY MS. DUNN:

14  Q    Mr. Heimbach, if you could direct your attention to page 1

15  of this, it's a direct message exchange on Discord from June

16  5th between yourself and Mr. Hopper.  You say, "We want to do a

17  monthly call between you, me, Jeff, and Dr. Hill."

18       Do you see that?

19  A    I do.

20  Q    And Jeff -- well, you is you.  Me -- you is Dillon Hopper.

21  Me is you.  And Jeff is Jeff Schoep?

22  A    Yes.

23  Q    And Dr. Hill is Michael Hill, head of League of the South,

24  right?

25  A    Correct.

M. Heimbach - Direct

1  Q    You say, "The League is now on board."  And Mr. Hopper

2  says, "Oh, snap.  Sick."

3       Do you see that?

4  A    Yes.

5  Q    And then this goes on.  You say, "Yep, so now basically

6  we've got 90 percent of all the real orgs in America together

7  with the leadership being you, me, Jeff, and Dr. Hill.  So

8  that's a good table for us to sit at."

9       Do you see that?

10 A    Yes.

11 Q    And then Mr. Hopper responds, "Now all we need is Spencer

12 and Damigo."  Do you see that?

13 A    Uh-huh.

14 Q    And Spencer is Richard Spencer?

15 A    Yes.

16 Q    And Damigo is Nathan Damigo?

17 A    Yes.

18 Q    From Identity Evropa who we talked about earlier?

19 A    Correct.

20 Q    And he's in the same group as Eli Kline, correct?

21 A    Correct.

22 Q    And you reply, "Well, this is where Charlottesville comes

23 in.  We're all doing it together."

24      Do you see that?

25 A    Yes.

                              M. Heimbach - Direct

1   Q    I'd like to show you Plaintiffs' Exhibit 579.   This is a

2   Discord communication between yourself and Thomas Ryan

3   Rousseau, who went as Thomas Commander A770 on Discord.   Do you

4   see that?

5   A    Yes.

6               (Plaintiffs' Exhibit 579 marked.)

7   BY MS. DUNN:

8   Q    And as we discussed earlier, Thomas Ryan Rousseau had

9   taken over for Dillon Hopper in June of 2017 as the leader of

10  Vanguard?

11  A    Correct.

12              MS. DUNN:  Your Honor, we move to admit PX579.

13              THE COURT:  Be admitted.

14              MR. JONES:  Your Honor, I haven't seen it yet.  I'm

15  sorry.

16              THE COURT:  Okay.

17              MS. DUNN:  So I'll ask my colleagues, for the Discord

18  chats, if they could provide defense counsel with this exhibit.

19              (Pause.)

20              MR. JONES:  Thank you.

21              THE COURT:  All right.  It will be admitted.

22              MS. DUNN:  Thank you.

23              (Plaintiffs' Exhibit 579 admitted.)

24   BY MS. DUNN:

25  Q    Okay.  So if you look in the middle of the page, there are

M. Heimbach - Direct

1  some posts from June 28th of 2017.  And you say, "Hey, brother,

2  heard you're the new HNIC"?

3  A    Uh-huh.

4  Q    What does that stand for?

5  A    Head nigga in charge.

6  Q    And after you say that, Rousseau responds, "I am.  Dillon

7  decided to take a break.  So you can contact me about anything

8  as far as now goes."

9       Do you see that?

10 A    I do.

11 Q    And then you say, "Fantastic.  Well, would there be a good

12 time to do a phone conference?  For Charlottesville I wanna

13 have all the National Front groups on the same page."

14      Do you see that?

15 A    Yes.

16 Q    And here's your reference to Golden Dawn, who ultimately

17 didn't show up.

18 A    Correct.

19 Q    If you move now to the third page of this exhibit, a

20 little later in time, July 19th, the conversation with

21 Mr. Rousseau, head of Vanguard America, continues.  You say,

22 "We need plans.  The National Front (NF) has been charged with

23 taking the ground early, so I need to talk to you and get our

24 security leaders talking to one another."

25      Do you see that?

M. Heimbach - Direct

1  A    I do.

2  Q    And then a little bit lower down, you sent the phone

3  numbers of the security people for League of the South and for

4  your own group, TWP.

5       Do you see that?

6  A    Yes.

7  Q    And you tell Thomas Ryan Rousseau to call the security

8  people and say that you had sent him.

9       Do you see that?

10 A    I do.

11 Q    And your testimony in this case is that when Mr. Kessler

12 and Mr. Kline told you to take the ground early, for which

13 security leaders needed to be involved, what they meant was

14 just to arrive at the park earlier?

15 A    Yes.  There was discussion online where counter-protesters

16 had spoken about --

17 Q    Sir, was that your testimony?

18          MR. SMITH:  Can he finish his answer, Judge?

19          THE COURT:  Just answer -- can you answer the

20 question?

21  BY MS. DUNN:

22 Q    Was that your testimony?

23 A    I believe so, yes.

24          MS. DUNN:  We can take that down.

25  BY MS. DUNN:

M. Heimbach - Direct

1    Q    Okay.  So we talked about inviting groups and members to

2    Charlottesville 2.0.  But one of the other things you did to

3    coordinate Traditionalist Worker Party's involvement in

4    Charlottesville --

5              MR. SMITH:  Your Honor, these questions are becoming

6    very lengthy and editorialized.

7              THE COURT:  Overruled.

8     BY MS. DUNN:

9    Q    Mr. Heimbach, one of the other things that you did is you

10   provided promotional material to your members, correct?

11   A    Correct.

12   Q    All right.  We'll show you Plaintiffs' Exhibit 1827.

13             (Plaintiffs' Exhibit 1827 marked.)

14   BY MS. DUNN:

15   Q    And you'll recognize this as a document that you sent to

16   TWP members concerning Charlottesville?

17   A    Correct.

18             MS. DUNN:  Your Honor, we move to admit 1827.

19             THE COURT:  All right.  It will be admitted.

20             (Plaintiffs' Exhibit 1827 admitted.)

21    BY MS. DUNN:

22   Q    And it's a long document.  So I'm just going to direct

23   your attention, Mr. Heimbach, to the end of the document, the

24   last few paragraphs.  So in the last few paragraphs you say,

25   "My comrades, we stand with the ghosts of Dr. Pierce, Commander

M. Heimbach - Direct

1  Rockwell and so many other great men and women, all who are

2  urging us forward to secure the existence of our people and a

3  future for white children."  Do you see that?

4  A    I do.

5  Q    Then you quote Adolf Hitler, who says, "Those who want to

6  live, let them fight.  And those who do not want to fight in

7  this world of eternal struggle do not deserve to live."  Do you

8  see that?

9  A    I do.

10  Q    Then you continue, "Coming to this event will take

11  sacrifice from each of us," right?

12  A    Yes.

13  Q    "The enemy is mobilizing and is threatening to kill us,

14  but I know that our movement is made up of brave men, those who

15  want to fight, who want to struggle, and because of this drive,

16  will be victorious."  Do you see that?

17  A    I do.

18  Q    And then you close it out by saying, "So be there, August

19  12th in Charlottesville, and let us tell the entire world with

20  a mighty and triumphant voice, we will not be replaced."

21      Do you see that?

22  A    Yes.

23  Q    And this letter, did this go out to all 200 of your

24  members and supporters?

25  A    I believe that was for those that had signed up to attend,

M. Heimbach - Direct

1  but it might have gone out to the entire email list.  I'm not

2  exactly sure.

3  Q    To the entire what?

4  A    List of people that we had email contacts for.  I don't

5  know the specifics.  I didn't handle any of the tech elements.

6  Q    Mr. Parrott handled that?

7  A    Indeed.

8  Q    Okay.  And you said that this may have gone out via email.

9  How many people were on the email list, if you know?

10  A    I don't know.

11  Q    All right.  So you're familiar with what's called the 14

12  Words?

13  A    Yes, "We must secure the existence of our people and a

14  future for white children."

15  Q    Right.  And you cite the 14 Words here in your letter?

16  A    Yes.

17  Q    My apologies about earlier, and I appreciate the

18  correction.  The 14 Words was a slogan that was created by

19  David Lane?

20  A    Yes.

21  Q    Who was convicted of murdering --

22         MR. JONES:  Your Honor, I'm going to object to the

23  relevance of who David Lane was.

24         THE COURT:  Sustained.

25

94

M. Heimbach - Direct

1   BY MS. DUNN:

2   Q    And your reference to the 14 Words in this document is

3   about Charlottesville 2.0, correct?

4   A    Yes.

5   Q    And you separately wrote about the 14 Words in a different

6   document that you mentioned earlier called the 25-Point Plan of

7   the Traditionalist Worker Party.

8   A    Correct.

9   Q    And that document was also created in the summer of 2017,

10  right?

11  A    I believe so.

12  Q    All right.  Let's show you that document.  That's

13  Plaintiffs' Exhibit 2728.

14            (Plaintiffs' Exhibit 2728 marked.)

15  BY MS. DUNN:

16  Q    You recognize this as your 25 points?

17  A    Yes.

18            MS. DUNN:  Your Honor, we move to admit 2728.

19            THE COURT:  Be admitted.

20            (Plaintiffs' Exhibit 2728 admitted.)

21   BY MS. DUNN:

22  Q    And you circulated your 25-Point Plan to the

23  Traditionalist Worker Party and on Discord in the summer of

24  2017?

25  A    Correct.

M. Heimbach - Direct

1   Q    And it went out very widely, right?

2   A    Yes.

3   Q    And on the first page, you wrote that "The guiding

4   principle of the Traditionalist Worker Party is fighting for

5   the best interests and self-determination of whites in

6   America."

7   A    Correct.

8   Q    And you say that "The 14 Words best exemplifies the

9   mission of our movement."  Do you see that?

10  A    Yes.

11  Q    And the first point is self-determination.

12  A    Yes.

13  Q    Do you see that?

14       And under self-determination it says, "The Traditionalist

15  Worker Party shall establish an independent white ethnostate in

16  North America.  This nation will be a homeland for whites,

17  governed and built by our people and only for our people."

18       Do you see that?

19  A    Yes.

20  Q    And then a little lower down you say --

21            MR. SMITH:  Your Honor, I believe he is still

22  answering the question.

23            THE WITNESS:  Follow -- what follows is our support

24  for people of color to have self-determination and for those of

25  mixed communities that also want self-determination.  It's a

M. Heimbach - Direct

1  universal principle.

2  BY MS. DUNN:

3  Q    I understand that.  I'm focused on the independent white

4  ethnostate in North America.  So in the independent white

5  ethnostate in North America, black people would not be allowed

6  in the ethnostate?

7  A    As citizens, no.

8  Q    Right.  They would be -- it says they would be aliens,

9  right?

10 A    Yeah, or residents.

11 Q    And Hispanic people would not be allowed in the

12 ethnostate?

13 A    Correct.  They would have their own ethnostate.

14 Q    And Jews would not be allowed in the ethnostate in -- the

15 white ethnostate in North America, correct?

16 A    No.  They already have their own ethnostate.

17 Q    But the white ethnostate that is going to be in North

18 America, Jews would not be allowed in that?

19 A    Correct.

20 Q    Okay.  And you say that non-citizens, so Jews, Hispanics,

21 blacks and other minorities, people of color, would be subject

22 to laws for aliens.  So non-whites would be treated like aliens

23 in the North American ethnostate?

24 A    In --

25           MR. JONES:  Your Honor, I'm going to object to

M. Heimbach - Direct

1    relevance and the cumulative nature of this.  If we're going to

2    go through all 27 or however many pages --

3              MS. DUNN:  I do not plan to go through all 27.

4              MR. SMITH:  It's already been an hour and a half,

5    Your Honor.

6              THE COURT:  Overruled.

7              THE WITNESS:  They would not have voting privileges.

8    BY MS. DUNN:

9    Q    What else would they not have?

10   A    Well, they wouldn't be considered citizens.  So just like

11   any sort of -- you know, here in the United States there are

12   Native American tribes that have tribal autonomy, and land is

13   for that tribe and representation on tribal boards are for

14   members of that tribe.  So it's not even a foreign concept to

15   the United States as it stands.

16   Q    Okay.  So no voting.  No land.  Is that what you meant?

17   A    Correct.

18   Q    What else would they not have?

19   A    I mean, we don't have a parliament in session to come up

20   with all the laws, but the idea is that it would be a homeland

21   specifically for us, in concert with the establishment of other

22   homelands for people that want mixed communities and those that

23   want to have their own independent ethnostates.

24   Q    All right.  And --

25             THE COURT:  Let's stop right there.  It's 12:30.

M. Heimbach - Direct

1  We'll take a recess, lunch recess, until 1:30.

2            I'll caution the jury not to discuss the case with

3  anyone, allow anyone to discuss it with you, or remain in

4  hearing of anyone discussing it, or watch or listen on any

5  media, or so forth.

6            Recess until 1:30.

7  **(Jury out, 12:29 p.m.)**

8            (Recess.)

9            THE COURT:  All right.  Are you ready to call the

10  jury?

11            Did I understand you to say you're not going through

12  all 24 points?

13            MS. DUNN:  Correct.  Your Honor, we're done with that

14  document.  And the other thing that we did is we provided

15  copies of the Discord posts that we'll be using in the rest of

16  the exam.

17            THE COURT:  Good.  Thank you.

18            MS. DUNN:  Thank you, Your Honor.

19            THE COURT:  Call the jury.

20  **(Jury in, 1:36 p.m.)**

21            THE COURT:  All right.  Be seated.

22            You may resume.

23            MS. DUNN:  Thank you, Your Honor.

24   BY MS. DUNN:

25  Q    Mr. Heimbach, when we took a break we had just discussed

M. Heimbach - Direct

1  your inviting members and groups to Charlottesville 2.0?

2  A    Yes.

3  Q    Another thing that you did was provide shields to TWP

4  members for use in Charlottesville, correct?

5  A    Yes.  Following an FBI report that was in the news that

6  counter-protesters were planning to use projectiles, we thought

7  it was best to have a way to protect ourselves.

8           MS. DUNN:  Your Honor, I'd ask that the Court strike

9  the second half of Mr. Heimbach's response.

10          THE COURT:  Disregard everything after "yes."

11 BY MS. DUNN:

12 Q    Mr. Heimbach, I'm going to show you Plaintiffs'

13 Exhibit 1063, which is a communication with yourself and others

14 on the Charlottesville 2.0 server in the demonstration and

15 tactics channel; do you see that on the screen?

16 A    I do.

17          MS. DUNN:  Your Honor, we move to admit Exhibit 1063.

18          THE COURT:  Be admitted.

19          (Plaintiffs' Exhibit 1063 marked.)

20          (Plaintiffs' Exhibit 1063 admitted.)

21  BY MS. DUNN:

22 Q    So if you look the top of page 1, Mr. Heimbach, you begin

23 this post by saying:  "TWP has shields."  Then you say:  "Both

24 TWP symbols and Celtic crosses"; do you see that?

25 A    Yes.

M. Heimbach - Direct

1  Q    And then a little bit farther down the page, somebody

2  named AltRightVa writes:  "Shield wall sounds delightful."  Do

3  you see that.

4  A    I do.

5  Q    Then a little farther down the page, somebody named

6  Heinz - MI advises you that -- or advises that:  "If you use a

7  shield wall, people should know how to actually fight in the

8  shield wall."  Do you see that?

9  A    Yes.

10 Q    Who is Heinz - MI?

11 A    I'm not sure.

12 Q    And you agree that sometimes on Discord you would

13 communicate about plans with people whose actual names you did

14 not know?

15 A    Correct.

16 Q    He posts a YouTube link that says:  "Start with these.  Go

17 through all three parts.  They have incredibly good tips that

18 you won't get from studying riot shield tactics."  Do you see

19 that?

20 A    I do.

21 Q    I'm going to show you Plaintiffs' Exhibit 583.  You'll

22 recognize this as a private Discord chat that you had with

23 Heinz - MI.

24      This is not in the regular channel.  This is just between

25 the two of you.  Do you see this?

M. Heimbach - Direct

1   A    I do.

2              MS. DUNN:  Your Honor, move to admit PX583.

3              THE COURT:  Be admitted.

4              (Plaintiffs' Exhibit 583 marked.)

5              (Plaintiffs' Exhibit 583 admitted.)

6    BY MS. DUNN:

7   Q    You still say you don't know who this is?

8   A    Correct.

9   Q    But you agree this is the same individual we just spoke

10  about with the last document?

11  A    Correct.

12  Q    All right.  So in this Discord chat between the two of you

13  he says:  "Hey, Mr. Heimbach, I got placed in charge of

14  planning general security for Charlottesville."

15       It goes on to say:  "The plan right now is to essentially

16  form a shield wall around the speakers' front and sides.  We've

17  been drilling with shields for the past month and are going to

18  keep drilling up until the actual event.  We're bringing about

19  50 guys with us."

20       Do you see that?

21  A    I do.

22  Q    And then you respond:  "Fantastic."  And then you put him

23  in touch with TWP's security officer.  Do you see that?

24  A    Yes.

25  Q    So at this point, you're preparing to fight with a shield

M. Heimbach - Direct

1    wall of as many as 50 people?

2    A    To protect the speakers.

3            MR. SMITH:  I object to the question -- form of the

4    question, Your Honor.  She said -- could you --

5            MS. DUNN:  The question was, based on the exact

6    language of this document:  You are preparing to fight with a

7    shield wall of as many as 50 people?

8            THE WITNESS:  The plan was to form a shield wall

9    around the speakers' front and sides.

10           THE COURT:  Here again, this is one of those things

11   where you -- are you -- I don't know if you're seeking to

12   impeach him, or --

13           MS. DUNN:  No, Your Honor.

14           THE COURT:  You're not reading from the deposition,

15   though?

16           MS. DUNN:  No, I'm not reading from the deposition.

17           THE COURT:  Okay.  Repeat the question and let him

18   answer.

19    BY MS. DUNN:

20   Q    Mr. Heimbach, at this point, in this Discord chat, you are

21   preparing to fight with a shield wall of as many as 50 people,

22   correct?

23   A    To have a shield wall with as many as 50 people, correct.

24   Q    And the shield wall was to take place in the park,

25   correct?

M. Heimbach - Direct

1  A    Correct.

2  Q    Okay.  Please take a look at Plaintiffs' Exhibit 584.

3        (Plaintiffs' Exhibit 584 marked.)

4  BY MS. DUNN:

5  Q    You'll recognize this as another Discord exchange that you

6  had with somebody named Furor_Tuetonicus?

7  A    Yes.

8  Q    Again, like the last post, this is a communication just

9  between this individual and yourself.  Do you see that?

10  A    Yes.

11  Q    And you see that this is from July 21st of 2021 -- or, I'm

12  sorry, July 21st, 2017?

13  A    Yes.

14        MS. DUNN:  Your Honor, move to admit 584.

15        THE COURT:  Be admitted.

16        (Plaintiffs' Exhibit 584 admitted.)

17  BY MS. DUNN:

18  Q    Who is Furor_Tuetonicus?

19  A    I can't recall.

20  Q    Mr. Heimbach, if you look at this page -- look at the

21  entire page in front of you, Furor_Tuetonicus says to you:

22  "You still coming tonight at 7?"  And says:  "Ayy."  And then

23  you say:  "Yo yo."  He says:  "Did you get my text message?  My

24  phone's in the charger."  You arrange a phone call via Skype or

25  Discord.

M. Heimbach - Direct

1    Are you sure you don't know who this person is?

2  A    Not off the top of my head.  I was the leader of a

3  political party that had chapters all around the country.

4  Q    But this is a person who you corresponded with more than

5  once, you had phone calls and text messages with, and you're

6  saying here today that you do not know who this was?

7  A    No, not off the top of my head.  I talked to lots of folks

8  organizing our political party.

9  Q    But you will agree, then, that he was a member of TWP?

10  A    No.  I can't confirm that.

11  Q    Okay.  And even based on these texts talking about shields

12  for TWP, you will not agree with that?

13  A    Correct.  There are lots of organizations that we had open

14  lines of communication with.

15  Q    Right.  So you couldn't be sure; it could be somebody from

16  a different organization that you were talking to about the

17  shields?

18  A    Potentially.

19  Q    Okay.  What other organizations did you talk to about TWP

20  shields?

21  A    Primarily, those conversations would have been had, most

22  likely, by Cesar Ortiz, the head of our security.

23  Q    I'm asking about you.  You just testified that you talked

24  to other organizations about shields, about TWP shields.  Who

25  did you talk to?  What were you mentioning -- what were you

M. Heimbach - Direct

1   referring to in your testimony?

2   A    I believe I might have had a conversation with a member of

3   a pool party that was associated with the podcast The Right

4   Stuff, but that's not an organization.

5   Q    Okay.  So --

6   A    So individuals that met socially.

7   Q    Okay.  And when he says to you, "you mind calling real

8   quick," it seems like you probably had his phone number?

9   A    Most likely.

10  Q    Okay.  All right.  So --

11  A    Well, actually, my follow-up response for "Skype or

12  Discord would be fine," I think would indicate I probably did

13  not have his phone number.

14  Q    Okay.  But you don't disagree that you knew how to contact

15  him?

16  A    Sure.  I talked to lots of folks.

17  Q    Okay.  All right.  If you go to the bottom of page 2, your

18  post on July 21st, 2017, it says:  "But our riot shields

19  arrived."  And then if you continue -- that's the last post on

20  page 2.

21       If you continue to page 3 it says -- Furor_Tuetonicus says

22  to you:  "Are they our usual shields or actual riot shields?"

23  Do you see that?

24  A    I do.

25  Q    And you post below that and you assure Furor_Tuetonicus

M. Heimbach - Direct

1  that they're actual cop riot shields?

2  A     Yes.  They were police surplus.

3  Q     And that's different from TWP's usual shield?

4  A     Correct.  We had previously utilized handmade things.  So

5  this was police surplus.

6  Q     And are police surplus, police riot shields, are they

7  harder or more -- stronger material?  What's the difference?

8  A     Well, the primary difference is we were looking to emulate

9  the Nordic Resistance Movement, a national socialist

10 organization in the Scandinavian countries, and at their

11 rallies they utilized clear shields of the same design.  So we

12 were working to emulate their aesthetic.

13 Q     So it was aesthetic; it wasn't about the material of the

14 shield?

15 A     Yeah, aesthetic.

16 Q     So if you direct your attention now to page 4,

17 Furor_Tuetonicus writes to you:  "PS, I think I have a great

18 use for those riot shields in our hand.  I'll tell you over

19 call.  Best to leave sensitive planning to voice whenever

20 possible."  And you said:  "Agreed.  I'm free now."

21       Do you see that?

22 A     I do.

23 Q     So you had a conversation in July of 2017 regarding use of

24 riot shields that couldn't be put in writing with this person

25 named Furor_Tuetonicus, correct?

M. Heimbach - Direct

1    A    Based on his comment.

2    Q    But the answer is yes, correct?

3    A    Yes.  I have no idea of knowing what he was going to say.

4    Q    Mr. Heimbach, were you asked in your deposition whether

5    you had a conversation on July 21st of 2017 regarding a use for

6    riot shields that couldn't be put in writing with somebody

7    named Furor?

8    A    I don't recall, but if you can direct me to a page

9    number...

10   Q    That's okay.  Why don't you just tell us what was said in

11   that conversation?

12   A    I don't recall.  Riot shields are specifically defensive.

13   They're not offensive.

14   Q    But my question to you was whether you can tell the jury

15   what was said in that conversation about the riot shields.

16   A    No.  I had lots of conversations with lots of folks during

17   that time period.

18   Q    Okay.  All right.  And if you direct your attention to

19   page 5, Furor says:  "Hey, we need to talk.  Have you allocated

20   the shields?"  Do you see that?

21   A    I do.

22   Q    It was important to allocate the shields to the right

23   people, correct?

24   A    I think it more meant, were you going to have people there

25   to protect the speakers at the event.  The overall idea, as I

M. Heimbach - Direct

1  recall, for the security plan was to surround the speakers so

2  projectiles couldn't hit them while they were talking.

3        MS. DUNN:  So, Your Honor, I'd ask that that answer

4  be struck as nonresponsive.

5        MR. SMITH:  Your Honor, that answer was responsive.

6        THE COURT:  Well, overruled.  I think it's

7  generally -- go ahead.

8   BY MS. DUNN:

9  Q    So he's saying to you:  "Have you allocated the shields?"

10 Do you see that?

11 A    I do.

12 Q    Okay.  And did you in particular allocate the shields to

13 particular TWP members?

14 A    No.

15 Q    Who was responsible for that?

16 A    Well, this plan that was being discussed about protecting

17 the speakers never actually happened.  Communication between

18 organizers and the Traditionalist Worker Party fundamentally

19 broke down in the lead-up to the event.  So our participation

20 in their idea for shields around the speakers never manifested.

21 Q    Okay.  So your testimony is that you never allocated the

22 shields?

23 A    Well, we handed them out the day of the event, but it was

24 just kind of handing them out to folks.

25 Q    That was my question, sir, was whether you allocated the

M. Heimbach - Direct

1   shields to particular individuals.

2   A    Just handed them out.  Same with helmets, so folks would

3   have their heads projected against projectiles.

4   Q    So you handled out the shields randomly?

5   A    Essentially, yes.

6   Q    Okay.  If you will look at Plaintiffs' Exhibit 587.

7           (Plaintiffs' Exhibit 587 marked.)

8   BY MS. DUNN:

9   Q    And you'll recognize this, again, not as a Discord post in

10  the lobby where everyone could see it, but this is a direct

11  message exchange between yourself and one other individual; do

12  you see that?

13  A    Correct.

14  Q    The individual you were speaking with here is RCO Nick; do

15  you see that?

16  A    Yes.

17  Q    Who is Nick?

18  A    I can only ascertain from context that is he was

19  Vanguard's security representative for Charlottesville.

20  Q    And this Discord post, which is a one-on-one message

21  between you and RCO Nick, happens on July 23rd to 24th of 2017.

22  Do you see that?

23  A    I do.

24  Q    Okay.  And that is just two days after your discussion

25  with Furor_Tuetonicus about the riot shields, correct?

M. Heimbach - Direct

1  A    Correct.  But likewise, Vanguard America decided to do

2  their own thing during the Charlottesville event, so any

3  discussions never manifested.

4           MS. DUNN:  Your Honor, I'd ask the witness be

5  directed to answer the question.

6           THE WITNESS:  Could you repeat the question?

7  BY MS. DUNN:

8  Q    Yes.  It says:  And this post is just two days after your

9  discussion with Furor_Tuetonicus about the riot shields,

10  correct?

11  A    Correct.

12  Q    And it's two days after the discussion with

13  Furor_Tuetonicus where he says to you -- and you agree -- that

14  "sensitive planning should be left to voice whenever possible"?

15  A    Correct.

16  Q    If we look --

17           MS. DUNN:  Oh.  I apologize, Your Honor.  Move to

18  admit 587.

19           THE COURT:  Be admitted.

20           (Plaintiffs' Exhibit 587 admitted.)

21   BY MS. DUNN:

22  Q    All right.  So two days later, on July 24th, RCO Nick

23  writes to you:  "As you're probably already aware, we may have

24  to remove commie from Lee Park.  It's going to be up to

25  Vanguard, TWP" -- League of the South -- "LOS, Stormers" --

M. Heimbach - Direct

1    those are *The Daily Stormer*s -- "TRS" -- The Right Stuff, who

2    you just mentioned, those guys -- "and unaffiliated allies."

3        Do you see that?

4    A    I believe it's on the first page, but yes, I recall

5    reading that.

6            MS. DUNN:  Mr. Spalding, are you there?

7            THE WITNESS:  Now we are.

8    BY MS. DUNN:

9    Q    It's the first post?

10   A    Yes.

11   Q    Okay.  So Nick mentions Vanguard, TWP, LOS, Stormers, The

12   Right Stuff guys, and unaffiliated allies in his post about

13   needing to "remove commie from Lee Park."  You see that?

14   A    Yes, but once again, that never happened.  So...

15   Q    So that seems like a lot of manpower to "remove commie

16   from Lee Park" in the plans, all of those groups, including

17   most of the Nationalist Front and unaffiliated allies, no?

18   A    Well, the organized anti-fascist community said they were

19   bringing activists from around the country, including

20   paramilitary groups such as Redneck Revolt that are heavily

21   armed at all their demonstrations.

22   Q    I'm focusing your attention on this language of:  "As

23   you're probably aware, we may have to remove commie from Lee

24   Park."

25           And my question to you was:  This seems like a lot of

M. Heimbach - Direct

1  manpower for that task?

2         MR. SMITH:  Your Honor, calls for speculation.

3  Objection.

4         THE COURT:  Overruled.  He can answer.

5         THE WITNESS:  Given the numbers and militancy and

6  heavy firepower possessed by anti-fascist organizations around

7  the country that were seeking to prevent us from utilizing our

8  permit, no, I don't believe that would be extreme or excessive.

9  BY MS. DUNN:

10 Q    "Removing commie from Lee Park" sounds like a physical

11 activity, no?

12 A    I believe the general idea at the time was to arrive early

13 so that the park would be maintained for the permitted

14 rally-goers so no one else would be able to enter the park and

15 thereby deny us our permit.

16 Q    I'm focusing you on this language in the post that's

17 directed at you in this one-on-one conversation.  And my

18 question to you is whether "removing commie from Lee Park"

19 sounds physical to you.

20 A    Well, again, the idea of the plan of arriving before

21 counter-protesters seized the space to deny us our permit would

22 thereby mean it would be entirely peaceful.

23         MS. DUNN:  Your Honor, move to strike.

24         MR. SMITH:  Your Honor, that was entirely responsive.

25 We should move on.

M. Heimbach - Direct

1          THE COURT:  Okay.  You asked a question that could

2    have given an opinion.  It wasn't a yes-or-no answer,

3    necessarily.

4          MS. DUNN:  Your Honor, the question was whether

5    "removing commie from Lee Park" sounds physical to this

6    witness, yes or no.

7          THE COURT:  Well, it's not necessarily -- well, if he

8    can answer yes or no, answer.

9          THE WITNESS:  Not necessarily.

10    BY MS. DUNN:

11   Q    And there was no permit to physically remove commies from

12   the park, right?

13   A    Which is why the Traditionalist Worker Party did not

14   arrive early on the day of August 12th.

15          MS. DUNN:  Your Honor, again, move to strike.  The

16   question is simply, yes or no, was there a permit to physically

17   remove commies from the park?

18          MR. SPENCER:  That's a -- objection.  That's a

19   ridiculous question.

20          MR. SMITH:  Argumentative.

21          MR. JONES:  It's argumentative, Your Honor.

22          THE COURT:  That's not appropriate.

23          Can you answer the question?

24          THE WITNESS:  Could you repeat the question?

25    BY MS. DUNN:

114

M. Heimbach - Direct

1   Q    Yes.  You mentioned a permit.  My question is:  There was

2   no permit to physically remove commies from the park, was

3   there?

4   A    No, but there was also not a permit by armed anti-fascists

5   to deny us our First Amendment rights.

6          MS. DUNN:  Your Honor --

7          MR. SMITH:  Your Honor, she asked the question.

8          THE COURT:  They don't issue special permits to

9   remove people from the park.  He had a permit for whatever

10  affair they were having.

11         Let's move on.

12  BY MS. DUNN:

13  Q    Mr. Heimbach, you just said there was a plan to arrive

14  prior to the counter-protesters.  There was no need, therefore,

15  to confront counter-protesters outside the park, correct?

16  A    In terms of what?  Do you mean -- because the plan to

17  arrive early, we did not participate in.  So we would arrive at

18  the permitted time in accordance with the plan we had with the

19  Charlottesville Police Department.

20         So what's the context you're asking?  There were two

21  separate plans.  The plan we went with on the day of August

22  12th was the one we had made with the Charlottesville Police

23  Department on when to arrive and from what entrance to arrive

24  to.

25  Q    When you said you had a conversation with the police, who

M. Heimbach - Direct

1   is it you spoke to?

2   A    Primarily that was handled by Ike Baker, the head of

3   security for the League of the South.  He is the one who, to

4   the best of my knowledge, secured our permission to park in the

5   parking garage on Market Street directly next to the police

6   station, along with the time we were going to be entering the

7   park.

8   Q    Mr. Heimbach, will you please look at your deposition,

9   page 534, lines 16 to 22?

10  A    Which line?

11  Q    534, 16 to 22.

12  A    Yes.

13  Q    And you were asked the question:  "When you said you had a

14  conversation with local police about it, who is it that you

15  spoke to?"  And --

16  A    I believe I had a single conversation confirming the plan

17  with a Charlottesville police officer.  As I said in the

18  deposition, in all of my years of participating in organizing

19  rallies, I never had to take detailed notes on badge numbers,

20  but I confirmed that the plan was for us to be allowed to park

21  in the Market Street garage with the permission of the

22  Charlottesville Police Department and enter down Market Street

23  to the protest.

24         MS. DUNN:  Your Honor, move to strike.  I was in the

25  middle of reading a Q and A from Mr. Heimbach's deposition.  He

116

M. Heimbach - Direct

 1  testified here today when asked this same question that this

 2  was handled by Ike Baker.  In his deposition --

 3          THE WITNESS:  Primarily handled.

 4          MS. DUNN:  In his deposition his answer was, "I'm not

 5  sure.  I mean, you guys have my phone record.  So that should

 6  help maybe.  I can't recall any names.  I never needed to -- in

 7  all my years of organizing events I've never needed to write

 8  down the officer's name in question."

 9  BY MS. DUNN:

10  Q    Mr. Heimbach, were you asked that question and did you

11  give that answer?

12  A    Yes.  And as I just responded to you --

13  Q    Thank you, Mr. Heimbach.  Thank you.

14  A    -- I said primarily --

15  Q    Thank you, Mr. Heimbach.

16  A    Primarily handled by Ike Baker.

17  Q    So returning to Exhibit 587, further down the page after

18  RCO Nick talks about removing commie from the park, you say,

19  "12 police surplus riot shields, numbers right now 60-ish."

20          So in the last message we saw that you were contemplating

21  50 guys.  Is it fair to say that now it's up to 60?

22  A    In terms of Traditionalist Worker Party members planning

23  to currently attend the rally, yes.

24  Q    And how many in the shield wall?

25  A    Well, we had 12 shields, so.

M. Heimbach - Direct

1  Q    Allocated randomly?

2  A    Yes.

3  Q    All right.  If you look at page 2, RCO Nick asks I think

4  the same question I just asked:  "Is that 60 number just TWP?"

5  And you say it is.

6       And Mr. Spalding, if we could see the rest of this.

7       RCO Nick says, "Awesome, appreciate it.  Could get really

8  interesting."  Do you see that?

9  A    I do.

10  Q    And you agreed; do you see that?

11  A    Yes.

12  Q    And then you say, "It's really up to us.  If we don't take

13  the park, it's over before it began."

14       Do you see that?

15  A    I do.

16  Q    And RCO Nick says, "Exactly.  And we can't depend on

17  anyone outside of, as Ike described it, the hard right.  I'm

18  trying to get an official stance from IE right now.  If they

19  won't assist, I want it on record."

20       So just to break this down, Mr. Heimbach, when he says "we

21  can't depend on anyone outside of, as Ike discussed," that's

22  Ike Baker of League of the South, correct?

23  A    Correct.

24  Q    "Outside of the hard right."  He's saying the hard right

25  could be depended on to take the park, correct?

M. Heimbach - Direct

1  A     That seems reasonable.

2  Q     Is that what you took him to be saying?

3  A     Yes.

4  Q     And is it your testimony today that the hard right was

5  more likely to get somewhere early?

6  A     Sorry?  Would we be more likely than other rally attendees

7  to arrive early?

8  Q     Right.

9  A     Perhaps.

10  Q     Okay.  So -- because your previous testimony is that this

11  idea of removing commie from the park was part of a plan just

12  to get there early.  And so this post says the hard right could

13  be depended on to take the park.  So I want to know if your

14  testimony to us is going to be that the hard right was more

15  likely to get there early that day?

16  A     Sure, but the hard right organizations as Mr. Baker would

17  have described did not arrive early that day.

18  Q     Right.  I understand that.  I'm just trying to figure out

19  what it means that only the hard right could be depended on to

20  take the park.

21  A     Sure.

22  Q     I want to figure out if what you're saying, consistent

23  with your prior testimony, is that you were more likely just to

24  get there early.

25  A     Due to our organization and experience with events and

M. Heimbach - Direct

1    organizing, yes, that seems reasonable.

2    Q    So that's what you meant here?  That's what's being

3    discussed?

4    A    I believe so.

5    Q    Okay.  So if you look at the last line, then, RCO Nick

6    says, "Exactly."  We just talked about that part.  And he says,

7    "I'm trying to get an official stance from IE right now.  If

8    they won't assist, I want it on record."

9         So you are talking about something that IE may not be

10   willing to do, correct?

11   A    Correct.

12   Q    Okay.  And is it going to be your testimony that IE might

13   not be willing to get there early?

14   A    Identity Evropa and the Traditionalist Worker Party and

15   other organizations had a fraught relationship that was also

16   very much at odds with one another due to subcultural and class

17   differences.  So it was our opinion at the time that they

18   fundamentally could not be relied upon really for anything.

19   Q    And so when RCO Nick says "if they won't assist," this

20   means they won't assist with getting there early, they were

21   just --

22   A    To ensure that the park would remain in the hands of the

23   permit-goers.

24   Q    And so your testimony, just to put a fine point on this,

25   is not that the hard right could be relied upon to be more

M. Heimbach - Direct

1   violent or aggressive, and that that has nothing to do with why

2   other groups might not be willing to do it.

3          MR. SMITH:  Objection, argumentative, Your Honor.

4          THE COURT:  You may answer the question.

5          THE WITNESS:  I would say the discipline and

6   organization of groups such as myself were more reliable to

7   ensure that there wouldn't be violence.  We were used to,

8   unfortunately, being attacked by anti-fascists at

9   demonstrations.

10          MS. DUNN:  Your Honor, I'd move to strike.  I also

11   would like to publish this exhibit to the jury.  I think it's

12   been admitted, and I want to make sure we can display it.

13          MR. SMITH:  Your Honor, we oppose the motion to

14   strike.  The rest of that, you know, as far as admitting

15   evidence, we're fine with that.  But we don't believe that the

16   response should be stricken.

17          THE COURT:  Restate your question.  Strike that and

18   restate the question and let him give an answer.

19          MS. DUNN:  Your Honor, may we also publish the

20   exhibit that we're talking about?

21          THE COURT:  Yes.

22          THE CLERK:  Just to be clear for the record, what

23   exhibit is it?

24          MS. DUNN:  587.  Thank you.

25          Ms. Wheeler -- oh, thank you so much.

M. Heimbach - Direct

1   BY MS. DUNN:

2   Q    Okay.  So for the sake of the jury who is seeing this,

3   we're talking about the last post where -- well, Mr. Heimbach

4   says, "It's really up to us.  If we don't take the park, it's

5   over before it began."  And RCO Nick says, "Exactly.  And we

6   can't depend on anyone outside of, as Ike described it, the

7   hard right.  I'm trying to get an official stance from IE right

8   now.  If they won't assist, I want it on record."

9        Mr. Heimbach, I just want to ask you whether it's your

10  testimony, yes or no, that this has nothing to do with violence

11  or physical aggression, the idea of taking the park in a way

12  that IE might not want to participate in?

13  A    Self-defense, yes.

14  Q    Okay.  Earlier I thought you were saying this had to do

15  with they couldn't be relied upon to get there early enough.

16  A    Yes, but also we as an organization were used to being

17  attacked by armed anti-fascists that unfortunately has become a

18  norm across this country for even political conservatives.

19  Q    Okay.  But are you standing by your testimony that this

20  had to do with getting there early?

21  A    Yes.  Getting there early, and if we were attacked by

22  armed demonstrators, then we would defend ourselves.

23  Q    And you didn't think IE would be willing to do that?

24  A    No, they were more the boat shoes, bougie types.

25  Q    And they wouldn't be willing enough to use the physical

M. Heimbach - Direct

1  power as the hard right would be in a circumstance at the

2  event, correct?  That's what you're saying?

3  A    To defend themselves within the limits of the law, no, not

4  necessarily.

5  Q    Okay.  So we'll talk -- we will get to self-defense.  I

6  just want to make sure that we understand your testimony about

7  this particular exhibit.

8       Can we look at Plaintiffs' Exhibit 649.

9       Oh, I'm sorry, I apologize.  Mr. Heimbach, that exhibit

10 that we saw, does that say anything about self-defense?  Do you

11 see it anywhere in there?

12 A    No, but that would be generally understood.

13 Q    Right.  Instead of self-defense it talks about, "as you

14 may already know, we may have to remove commie from Lee Park."

15 Do you see that?

16 A    I do.

17 Q    And before I believe you said that had to do with getting

18 there early.  Is it now your testimony that you say that's

19 about self-defense?

20 A    Not necessarily.  There was the potential for self-defense

21 due to the threats of violence levied against our organization

22 and others on the weekend of August 12th, 2017.

23 Q    Mr. Heimbach, my question is before you said this had to

24 do with getting there early.  Is it now your testimony that

25 this is about -- this "remove commie" is about self-defense?

M. Heimbach - Direct

1          MR. SMITH:  Objection, asked and answered.

2          MS. DUNN:  Your Honor, this question has not been

3   answered.

4          THE COURT:  Answer the question, sir.

5          THE WITNESS:  There's a continuity of understanding

6   where the idea would be to arrive before anyone at the park

7   because there would be no points of contact.  Then if

8   counter-protesters attempted to seize the park through

9   violence, then there would be an understanding that we would

10  defend ourselves with purely defensive implements such as

11  shields.

12  BY MS. DUNN:

13  Q    And you don't see that anywhere in this post, correct?

14  A    I think that's kind of understood.  Not bringing weapons

15  but having defensive things such as shields would indicate

16  self-defense.

17  Q    I'm just asking, Mr. Heimbach, do you see that anywhere

18  here?

19  A    No, but that would be my understanding.

20  Q    Okay.  Let's move on to Plaintiffs' Exhibit 649.  This is

21  a collection of Discord posts in the tradworker server in the

22  lobby channel that includes posts by you.  Do you see this?

23  A    Yes.

24          MS. DUNN:  Your Honor, move to admit 649.

25          THE COURT:  It will be admitted.

M. Heimbach - Direct

1             (Plaintiffs' Exhibit 649 marked.)

2             (Plaintiffs' Exhibit 649 admitted.)

3    BY MS. DUNN:

4    Q    If you direct your attention to page 1, it's a few days

5    later now, July 29th of 2017, where someone writes to you, "I

6    am wondering what equipment like helmets do we need for

7    Charlottesville."  Do you see that?

8    A    I do.

9    Q    In response you write, "The party has ordered 40 helmets

10   for us, plus 12 military surplus helmets.  So the front lines

11   will have 12 riot shields, 52 helmets."  Do you see that?

12   A    I do.

13   Q    And then somebody writes in response to that, "Heil

14   Hitler."  Do you see that?

15   A    I do.

16   Q    If you go to page 2, you respond to this and you say, "It

17   will be solid alongside our League of the South and Vanguard

18   allies.  We'll have an unbreakable line."

19        And so is it fair to say that at this point you were

20   preparing an unbreakable line of TWP members and others,

21   including League of the South, with helmets and shields?

22   A    Well --

23   Q    That's fair to say, right?

24   A    The helmets, hard hats, because, again, working class, and

25   shields to protect ourselves at the rally, yes.

                              125

                    M. Heimbach - Direct

1   Q    So your testimony is that when people are talking about

2   helmets they're -- you want us to understand that as hard hats?

3   A    Yes.  The majority of them were OSHA-approved hard hats.

4   Q    Okay.  Please look at Plaintiffs' Exhibit 615.

5        And actually, sir, I just want to make sure I get a clear

6   answer to my last question.  The question was, so it's fair to

7   say --

8              MR. SMITH:  Your Honor, objection.  Can we not

9   editorialize like that, implying the last answer wasn't clear?

10             THE COURT:  Just state -- just ask a question.

11    BY MS. DUNN:

12   Q    So it's fair to say, Mr. Heimbach, that at this point you

13   were preparing an unbreakable line of TWP members and others,

14   including League of the South, with helmets and shields,

15   correct?

16   A    Correct, because the idea was that there would be elderly

17   folks, Russian Orthodox priests and women attending the event

18   with us.  So the --

19             THE COURT:  Don't -- after you answer the question,

20   don't expand on it because then they have to come back --

21             THE WITNESS:  I apologize, Your Honor.

22             THE COURT:  -- and clear that up.

23             THE WITNESS:  Then yes.

24    BY MS. DUNN:

25   Q    All right.  If you would look at Plaintiffs' Exhibit 615,

M. Heimbach - Direct

1    which is on your screen.  This is a Discord post by somebody

2    named Commander Davis.  It's in the lobby of the tradworker

3    server that you were one of the moderators of.  Do you see

4    this?

5    A    I do.

6                (Plaintiffs' Exhibit 615 marked.)

7    BY MS. DUNN:

8    Q    And Mr. Davis, his name is Derrick Davis, he marched with

9    you on August 12th.  And sometimes actually with his hand on

10   your shoulder so that you would not be separated.  Do you

11   remember that?

12   A    Yes.

13   Q    And Mr. Davis also made the armbands that TWP members,

14   including yourself, wore, right?

15   A    Correct.

16               MS. DUNN:  Your Honor, we move to admit 615.

17               THE COURT:  Be admitted.

18               (Plaintiffs' Exhibit 615 admitted.)

19    BY MS. DUNN:

20   Q    Okay.  So this is the post in the lobby of the tradworker

21   server.  They're photographs of shields, correct?

22   A    Correct.  Shields that, to the best of my knowledge, never

23   were brought to Charlottesville in any capacity.

24   Q    Mr. Heimbach, in your deposition were you asked:  "And

25   were these shields used?"  And did you answer, "I don't know if

M. Heimbach - Direct

1    those ever made it to Charlottesville or ever got used, to be

2    honest."  Was that your answer?

3    A    Yes.

4    Q    So they may have been.  You just didn't know at the time

5    of your deposition?

6           MR. SMITH:  Objection, Your Honor, calls for

7    speculation.

8           THE COURT:  Overruled.

9           THE WITNESS:  I don't believe I ever saw them.

10   Mr. Davis was very interested in woodworking as a hobby, and

11   made a variety of things as a personal project.

12   BY MS. DUNN:

13   Q    All right.  So is your testimony that this post, which is

14   from -- let's look at the date -- that this post has nothing to

15   do with -- well, let me ask this a different way:  Another TWP

16   member says in the same post that these are "kike-bashing

17   shields."  Do you see that?

18   A    I do.

19   Q    Okay.  And so your testimony is that this post is really

20   about Mr. Davis's woodworking hobby?

21   A    Indeed, because I don't believe those shields were ever

22   brought to Charlottesville.

23   Q    Well, in your deposition you said you weren't sure.  Now

24   you don't believe it.  Are you going to stand by your

25   deposition testimony?

128

M. Heimbach - Direct

1   A    I believe I'm expressing a very similar sentiment.

2   Q    But you agree, don't you, that these are photographs of

3   real shields that have nails sticking out of them, correct?

4   A    I don't -- well, I don't know if they have nails sticking

5   out of them.

6   Q    Why don't we look at the picture again, then.  Do you see

7   that?

8   A    Yes.  If you could zoom in, please.

9   Q    Can you see on -- actually both these shields have nails

10  sticking out of them.  You don't disagree with that, do you?

11  A    No, that looks like it.

12  Q    Okay.  Let's move along to Plaintiffs' Exhibit 2221.  This

13  is a post of yours.  You recognize it, correct?

14       (Plaintiffs' Exhibit 2221 marked.)

15  A    Correct.

16  Q    Is this a post in Gab?

17  A    I believe so.

18  Q    Okay.

19            MS. DUNN:  Your Honor, we move to admit 2221.

20            THE COURT:  Be admitted.

21            (Plaintiffs' Exhibit 2221 admitted.)

22   BY MS. DUNN:

23  Q    Okay.  So Mr. Heimbach, the picture that the jury is

24  seeing right now is a picture of TWP members at Charlottesville

25  on August 12th with the riot shields that you had provided,

M. Heimbach - Direct

1   correct?

2   A     Correct.

3   Q     Okay.  And we spoke earlier about the allocation of

4   shields.  Who are these people, if you know their identities?

5   A     It's hard to tell.

6   Q     Do you know who they are?

7   A     No, not for certain.

8   Q     How about at all?

9             MR. JONES:  Objection, calls for speculation.  Asked

10  and answered.

11            THE COURT:  Overruled.

12   BY MS. DUNN:

13  Q    Mr. Heimbach, please identify the people that we see in

14  this photograph.

15  A    I think one of them might be -- I don't know.  I wouldn't

16  want to speculate.

17  Q    Is one reason it's hard to see who they are that they're

18  wearing goggles over their faces?

19  A     Yes, so they wouldn't be pepper-sprayed and incapacitated

20  by anti-fascists.

21            MS. DUNN:  Your Honor, move to strike.  The question

22  is simply whether one of the reasons Mr. Heimbach is having a

23  hard time identifying his members is because they have goggles

24  on their faces.

25            THE COURT:  All right.  I'll strike all after "yes."

M. Heimbach - Direct

1  BY MS. DUNN:

2  Q    And then, Mr. Heimbach, if you look at the -- I'm sorry.

3  Mr. Spalding, can we keep up this post.

4      If you look at in particular these individuals all the way

5  on the left, is it your testimony that what they're wearing on

6  their heads are hard hats?

7  A    No, but those are not the helmets or hats provided.  The

8  ones on the right side of the photograph, however, are hard

9  hats.

10 Q    Okay.  But you are not going to disagree that all of these

11 people holding these TWP shields, that you put this -- that you

12 put in a picture on your own Gab account, that these are TWP

13 members, correct?

14 A    I believe so, or supporters.

15 Q    Okay.  All right.  Mr. Spalding, can we see the whole

16 post, please.

17     All right.  So Mr. Heimbach, you posted this under the

18 hashtag tradworker?

19 A    Uh-huh.

20 Q    It says, "We don't scream for the police like any old

21 veterans association, nor do we hide like cowardly members of

22 the bourgeoisie behind their fences and wait like cowards for

23 whatever fate has in store.  We step onto the streets and use

24 our fists against terror."  Do you see that?

25 A    I do.

M. Heimbach - Direct

1  Q    Again, you cite for this proposition that you're posting

2  under the Traditionalist Worker Party and your own name,

3  Dr. Joseph Goebbels, the prime minister of Hitler's party.

4  A    Yes.

5  Q    That's correct.

6  A    I believe he was speaking in reference to anti-fascist

7  violence at the time.

8  Q    But that's not what you put in your own post.  What you

9  put in your post was "We step onto the streets and use our

10 fists against terror," with a picture of your people that day.

11 Isn't that correct, sir?

12 A    The fists against terror would be in reference to the

13 hundreds of members of the SA who were wounded or killed as

14 they were attacked by their political enemies on the streets of

15 Germany.

16         MS. DUNN:  Your Honor, again, I move to strike.  I'm

17 asking Mr. Heimbach whether he posted this, not for an

18 exposition on what Dr. Goebbels meant.

19         THE COURT:  Motion granted.

20         MS. DUNN:  Thank you, Your Honor.

21 BY MS. DUNN:

22 Q    Mr. Heimbach, we're going to show you a screenshot that's

23 labeled PX2901.  Do you see this?

24 A    Yes.

25 Q    And you see in the back right of this screenshot there is

M. Heimbach - Direct

1   a TWP shield.  Do you see that?

2   A     Yes.

3           MS. DUNN:  Your Honor, move to admit 2901.

4           THE COURT:  Be admitted.

5           (Plaintiffs' Exhibit 2901 marked.)

6           (Plaintiffs' Exhibit 2901 admitted.)

7    BY MS. DUNN:

8   Q    Thank you.  And if we could display on the screen for the

9   jury, this is a screenshot from the beating of a man named

10  DeAndre Harris.  Do you know who DeAndre Harris is?

11  A     Individual who himself, right before this video -- or

12  screenshot is taken, viciously assaulted a man on the streets

13  of Charlottesville as counter-protesters were attempting to

14  leave the city in accordance with the governor's order.

15          MS. DUNN:  Your Honor, move to strike.  The question

16  was do you know who DeAndre Harris is.

17          MR. SMITH:  Your Honor, he answered the question.

18          THE COURT:  He answered the question.

19   BY MS. DUNN:

20  Q    And Mr. Heimbach, you know that Mr. DeAndre Harris was

21  found to have committed no wrongdoing.  You're aware of that,

22  aren't you?

23          MR. JONES:  Your Honor, I'm going to object.

24          THE COURT:  No, that's not --

25          MR. JONES:  Ask that be struck from the record.

M. Heimbach - Direct

1          MR. SMITH:  Absolutely that should be stricken.

2          THE COURT:  I sustain the objection.

3    BY MS. DUNN:

4    Q    I'd ask you -- actually, Mr. Spalding, can we put up this

5    Exhibit 2901 side by side with the prior exhibit that we just

6    talked about, Mr. Heimbach's post, 2221.

7          Now, Mr. Heimbach, all the way left in the photograph you

8    posted, this individual who you did not identify has a shield.

9    And if you could look at his necklace, do you see that?

10   A    I do.

11   Q    Okay.  And if we could close up on the individual who's

12   standing above Mr. DeAndre Harris, do you see this individual?

13   A    I do.

14   Q    Okay.  And you see the necklace and you see that the

15   necklace is the same and the shield is the same and the helmet

16   is the same and the goggles are the same.  Do you see that?

17   A    I do.

18   Q    Okay.  Are you willing to agree with me this is the same

19   person?

20   A    Yes.

21          MS. DUNN:  Your Honor, we'd like to play -- well,

22   first of all, Mr. Heimbach -- well, Your Honor, we'd like to

23   play Plaintiffs' Exhibit 2368 for the witness.  And the

24   question to the witness is whether he can see the TWP shields

25   in this video.

                              M. Heimbach - Direct


 1              (Plaintiffs' Exhibit 2368 marked.)

 2              (Video playing.)

 3              THE WITNESS:  Yes.

 4              MS. DUNN:  Your Honor, we move to admit 2368.

 5              MR. JONES:  Your Honor, I'm going to object.  He

 6    can't authenticate it.

 7              MS. DUNN:  Your Honor, we're asking him just to

 8    identify the shields of TWP and his co-defendant who we think

 9    he'll be able to recognize in the video.  This exhibit is

10    coming in anyway through that co-defendant.

11              MR. SMITH:  Since it's coming in, Your Honor, can we

12    also admit the video of DeAndre Harris right before this?

13              THE COURT:  Are you conducting an examination at this

14    time?  Please don't ask me -- I'm not running a law school.  So

15    don't ask me legal questions when you're not -- it's not your

16    turn.

17              Get back to what you were saying.

18              MS. DUNN:  Your Honor, we'd ask to play this video so

19    that Mr. Heimbach can identify the TWP shields that he has

20    discussed at length.

21              THE COURT:  Is this a -- I mean, something that was

22    filed?

23              MS. DUNN:  Yes.  Very much.

24              THE COURT:  Was there an objection to it?

25              MS. DUNN:  Excuse me?

M. Heimbach - Direct

1          THE COURT:  Was there any objection filed to it?

2          MS. DUNN:  None that I'm aware of.

3          THE COURT:  Okay.  I don't understand why there's an

4    objection now.

5          MS. DUNN:  Thank you, Your Honor.  May we play the

6    video?

7              (Plaintiffs' Exhibit 2368 admitted.)

8              (Video playing.)

9     BY MS. DUNN:

10   Q    Mr. Heimbach, in that video did you see people using TWP

11   shields to beat Mr. Harris?

12   A    Following Mr. Harris's unprovoked assault on an old man,

13   yes, it did appear TWP shields were used.

14         MS. DUNN:  Your Honor, we'd ask that if this

15   testimony is permitted, we be permitted to put in evidence that

16   Mr. DeAndre Harris was found through the courts of law and

17   so --

18         MR. JONES:  Your Honor, I'm going to object to this

19   statement being made in front of the jury.

20         THE COURT:  Can we agree, then, that none of the

21   defendants except Mr. Fields was charged with a crime?  That's

22   exactly what -- the type of evidence you're seeking to get in.

23   And none of the plaintiffs were charged with a crime; isn't

24   that correct?

25         MS. DUNN:  Your Honor, may we have a sidebar?

M. Heimbach - Direct

1          Thank you.

2          (Sidebar commenced.)

3          MS. DUNN:  Do you want me to go?

4          THE COURT:  Yes.

5          MS. DUNN:  Okay.

6          THE COURT:  I have sustained the objection to that

7   earlier.

8          MS. DUNN:  Here's the problem.  They keep opening the

9   door by assigning fault to a person who was beaten.  And so

10  here's what happened:  There were four individuals who were

11  convicted of assault, of beating Mr. DeAndre Harris.  This

12  witness wrote them letters, and very lovely letters.  And --

13         THE COURT:  So what?

14         MS. DUNN:  Well, because it's -- Your Honor has said

15  it's about the ratification of the violence.  And the issue is,

16  that is separate from the convictions, which I never would have

17  had to talk about, but this witness keeps saying he didn't --

18  you know, he's to blame for being beaten.  And he's not to

19  blame.

20         THE COURT:  I didn't hear him say that.

21         MS. DUNN:  He did.  He said that several times.

22         THE COURT:  He said -- he did, but that -- you didn't

23  move to strike that.

24         MS. DUNN:  Well, he -- I did, and he keeps saying it.

25         THE COURT:  Here's the thing.  Now, you think that

M. Heimbach - Direct

1  it's admissible that your side wasn't convicted of a crime.

2  But you don't think that --

3          MS. DUNN:  I don't think that.  I don't think that.

4  The problem is, this witness has now put it into evidence

5  several times.  I did object.

6          THE COURT:  Well, so what that -- so what that --

7          MS. DUNN:  He keeps saying it.

8          THE COURT:  -- some judge somewhere said that

9  Mr. Harris was not --

10         MS. DUNN:  I think it was a jury.

11         THE COURT:  -- was not involved?  Or a jury.  So

12  what?

13         MR. SMITH:  No, Your Honor -- Your Honor may --

14         THE COURT:  Excuse me.

15         MR. SMITH:  I'm sorry, Your Honor.  I'm sorry.

16         MR. LEVINE:  Your Honor, may I speak?

17         THE COURT:  Yes.

18         MR. LEVINE:  So the beating of the black man in the

19  garage is an event that's charged in the complaint as part of

20  the racially motivated violence in this case.

21         THE COURT:  Okay.  So why doesn't a jury verdict in a

22  criminal -- a jury -- was he charged with a crime?

23         MR. LEVINE:  No, Your Honor.  So four individuals

24  were charged with beating this man and were convicted.  The

25  defendants are trying to raise the argument that the man that

M. Heimbach - Direct

1  was beaten had -- several minutes or whatever before that

2  beating had himself struck somebody of the protesters.  That's

3  the facts that they're trying to elicit.  And --

4           THE COURT:  Tell me --

5           MR. LEVINE:  And -- Your Honor, one more sentence.

6  One more sentence.

7           THE COURT:  Where -- I mean, where is it that what

8  happened in another trial somewhere is admissible in this case?

9  That's what I don't understand.

10           MR. LEVINE:  The point -- Your Honor, they are

11  claiming that -- that it was an act of self-defense.

12           THE COURT:  Well, I don't care if they claim it.  You

13  can't call (inaudible) and ask her to come up here and

14  contradict it.  I mean, this witness is alive, right?

15           MR. LEVINE:  Mr. Harris?

16           THE COURT:  Yeah.  He can testify.

17           MS. DUNN:  We don't have him on our witness list,

18  Your Honor.

19           THE COURT:  Well, you don't get hearsay in.  I mean,

20  that's --

21           MR. LEVINE:  We're not.  All we're trying to do, Your

22  Honor, if they are opening the door to the fact that

23  Mr. Harris --

24           THE COURT:  No.  I'm going to slam the door right

25  now.  I mean, how you are hung up on this thing in this case is

M. Heimbach - Direct

1  beyond me.  Can't you prove that by the witnesses?

2          MS. DUNN:  I think --

3          THE COURT:  The guy is lying on the ground being

4  beaten with a stick.  That doesn't make it -- even if he ran

5  over somebody with a car, that doesn't justify somebody hitting

6  him.

7          MS. DUNN:  I agree with you.  I agree with you.  I

8  just -- what I was reacting to is the witness constantly saying

9  that it was this person's fault that he was -- that he was

10  beaten.  And I do think we would ask Your Honor to -- we would

11  move to strike that testimony, because it is not appropriate to

12  argue that it is this person's fault that he is being beaten.

13          MR. JONES:  He didn't say that.  All he said was that

14  Mr. Harris had struck somebody else.

15          MR. LEVINE:  No, viciously.  Viciously attacked an

16  elderly man.  That's pretty vicious.  It's on video, too.

17          (Overlapping speakers.)

18          MR. JONES:  We're going to ask Your Honor to play the

19  full video of the incident.

20          THE COURT:  Okay.

21          MS. DUNN:  All I want to do is have this witness

22  identify the use of the shields and a co-defendant.  That's

23  all.

24          MR. SPENCER:  Your Honor, if it would help matters

25  towards their resolution -- I'll just -- I'll say this:  If it

M. Heimbach - Direct

1   would help matters if we could agree that it could be

2   established to the jury that I have not been charged with any

3   crime, I would be willing -- why is that funny?

4          THE COURT:  Well, that's what I'm saying.  It doesn't

5   make any difference who was charged.

6          MR. SPENCER:  I get that, but there seemed to be a

7   suggestion that we could agree to that.

8          I would also prefer sarcastic guffawing --

9          THE COURT:  You may not speak to other lawyers.

10          MR. SPENCER:  Well, he may not sarcastically huff and

11   puff.

12          THE COURT:  Well, you can do it on your side.

13          (Overlapping speakers.)

14          MR. CANTWELL:  May I?

15          Judge, I'm surprised nobody else has brought this up.

16   The implication that they're making is that the beating of

17   DeAndre Harris was racially motivated.  Okay?  He's pointing

18   out that that's not the reason that those men are beating

19   him --

20          THE COURT:  Well, he knows -- was he there?

21          MR. CANTWELL:  He's well aware of the facts and the

22   issues.

23          (Overlapping speakers.)

24          THE COURT:  Was he there?

25          MR. CANTWELL:  No.

M. Heimbach - Direct

1          THE COURT:  Did he see Mr. Harris strike someone?

2          MR. CANTWELL:  I don't know.

3          THE COURT:  I don't think so.

4          All right.

5          MS. DUNN:  Thank you.

6          (Sidebar concluded.)

7          THE COURT:  Members of the jury, as far as it's been

8   developed in this case, this witness was not present when

9   Mr. Harris was beaten before, and he wasn't -- he didn't see

10  anything; is that correct, sir?

11         THE WITNESS:  Yes, Your Honor.

12         THE COURT:  You did not see Mr. Harris?

13         THE WITNESS:  Correct.  I was on the --

14         THE COURT:  Anything that he said regarding

15  Mr. Harris doing anything or whatever is not admissible.  And

16  you should disregard it.

17         And as far as that's concerned, anything that might

18  have happened, whether somebody was charged with an offense and

19  acquitted, or charged and even convicted, has nothing to do

20  with your decision in this case.

21         You decide this case based on the facts that you hear

22  and see in this case and not -- and generally, it's not going

23  to be admissible what might have happened in some other case,

24  unless somebody pled guilty, which -- that's an admission.

25         But anyway, disregard whether anybody else was

M. Heimbach - Direct

1    charged or not charged, and in particular what this witness

2    might have said about Mr. Harris, because he wasn't there.

3              Go ahead.

4              MS. DUNN:   Thank you, Your Honor.

5     BY MS. DUNN:

6    Q    Mr. Heimbach, my questions to you about this video have to

7    do with what -- the use of the TWP shields.

8         What did you see TWP shields used for in this video?  And,

9    if it's helpful, we can play it again.

10   A    It looked like there was an ongoing conflict by mutual

11   combatants.

12   Q    All right.  So did you see that in this video a man is

13   beaten using the TWP shields?

14   A    I wouldn't necessarily say "beaten."  As I said, there was

15   an ongoing conflict between mutual combatants.

16   Q    Did you see in this video a person with a clear TWP shield

17   shove Mr. Harris to the ground and kick Mr. Harris repeatedly

18   while he was on the ground trying to crawl away?

19   A    Yes.

20   Q    And did you see another TWP member chasing after

21   Mr. Harris as he stumbled to the ground?

22   A    I think that would be speculation to say that he was

23   chasing anyone.

24   Q    And your view of this video is that this is mutual

25   conflict?

M. Heimbach - Direct

1    A    Yes.

2    Q    And I will ask you, Mr. Heimbach, to identify in this

3    video co-defendant Michael Tubbs.  I think to do that we have

4    to show -- do you see Mr. Tubbs in this photograph?

5    A    I do.

6    Q    Okay.  Where is he?

7         I'll also ask you to identify whether you see the Vanguard

8    America shield in this video.

9    A    Yes.

10   Q    Where is that?

11        And in this video, do you also see the TWP armband?

12   A    Yes.

13   Q    And where is that?

14   A    (Indicating.)

15   Q    All right.  Thank you, Mr. Heimbach.

16        The Nationalist Front we talked about earlier also met in

17   person in July of 2017 in Tennessee, specifically to discuss

18   planning for Charlottesville 2.0, correct?

19   A    Yes, we had an event.

20   Q    And at the July 2017 planning meeting in Tennessee, there

21   were members of League of the South, NSM; Jeff Schoep was

22   there.  I have that all right, correct?

23   A    I believe so, yes.

24   Q    And a man named Michael Chesny was also there, correct?

25   A    Yes.

M. Heimbach - Direct

1  Q    And you're aware that Mr. Chesny's Discord name, the name

2  he went by on Discord, was Tyrone, correct?

3  A    Yes.

4  Q    Okay.  And you're also aware that Tyrone, or Mr. Chesny,

5  was placed in charge of transportation for Charlottesville 2.0,

6  correct?

7  A    Yes.

8  Q    All right.  And it's your testimony that this was a

9  meeting where planning for Charlottesville 2.0 was discussed, a

10  month ahead of time, people traveled from out of town, and the

11  only thing you can remember discussing at this planning meeting

12  was carpooling; is that correct?

13  A    I believe so.  We also had speeches that day, a meal,

14  fellowship.  So it was a busy day.

15  Q    Okay.  But when you were asked, "what specifically did you

16  discuss regarding Unite the Right at that meeting," you

17  answered:  "Primarily carpooling, I believe."

18       And you were asked:  "Anything else?"  And you said:  "Not

19  that I can recall"; is that accurate?

20  A    That would be accurate.  Most of the folks that were there

21  were from that region of Tennessee or close by.

22  Q    Okay.  So the fact that they were from nearby meant that

23  only carpooling would be discussed?

24  A    That would be the primary point of conversation.

25  Q    Okay.  Would you take a look at Plaintiffs' Exhibit 2268,

M. Heimbach - Direct

1   please?

2           (Plaintiffs' Exhibit 2268 marked.)

3   BY MS. DUNN:

4   Q    Do you recognize this as a post that you made on Twitter?

5   A    Yes.

6   Q    In November of 2016, less than a year before the car

7   attack in this case?

8   A    Less than a year before August 12th, 2017, correct.

9   Q    Are you -- I take it from your answer that you do not want

10  to call it a car attack; is that accurate?

11  A    I would say that is irrelevant to me.  Any capacity and

12  any reference I would have made the year previous to

13  Charlottesville has no context or connection whatsoever to

14  anything that happened in 2017.

15  Q    I'd move to strike.  The question is just whether -- I

16  asked you whether this was posted a year before the car attack.

17  And you declined to call it a car attack.  All I'm asking you

18  is whether you have a problem calling it a car attack.

19  A    I have no opinion on that subject.

20  Q    All right.

21          MS. DUNN:  So, Your Honor, we'd move to admit

22  Plaintiffs' Exhibit 2268.

23          THE COURT:  Be admitted.

24          (Plaintiffs' Exhibit 2268 admitted.)

25   BY MS. DUNN:

M. Heimbach - Direct

1  Q    In this tweet that you posted in November of 2016 you say:

2  "Leftist protesters blocking the road with weapons, threats and

3  violence while making you fear for your life?  #HitTheGas."

4       Do you see that?

5  A    Yes.

6  Q    And you did, in fact, post this?

7  A    Yes.

8  Q    Now, when you were asked about this post, your testimony

9  was that when you said "HitTheGas" and you posted a foot on a

10 gas pedal, what you actually meant was "don't get dragged out

11 of your vehicle"; do you recall that?

12 A    Yes.  Specifically referencing, for instance, the Reginald

13 Denny case of the LA riots, where a truck driver who did stop

14 during a riot was dragged out of his vehicle and almost beaten

15 to death, yes.

16 Q    Where does that appear in this tweet?

17 A    It does not specifically, but I did say folks with weapons

18 threatening you and making you fear for your life?  It's not

19 your duty or responsibility to be dragged out of your vehicle

20 and beaten to death.

21 Q    So all the people that saw this tweet were just supposed

22 to read into it that you meant all that, but it doesn't say any

23 of that here?

24 A    Well, I think it's generally clear, if you fear for your

25 life and folks with weapons are threatening your life, that

M. Heimbach - Direct

1  yes, escaping the situation would definitely be a wise thing.

2  I don't think that's a partisan position or issue.

3  Q    Wait.  So what you're trying to communicate is that if

4  there are protesters who are blocking the road, the right thing

5  to do is to run them over with a car?

6  A    With --

7            MR. SMITH:  Your Honor, argumentative.

8            THE COURT:  No, she's asking -- overruled.

9            Answer the question.

10            THE WITNESS:  No, because specifically blocking the

11  road, plus weapons, plus threats, plus violence, while making

12  someone in the vehicle fear for their life, is far different

13  than protesters who happen to be blocking a street.

14   BY MS. DUNN:

15  Q    Okay.  And does it have to be all three of those things to

16  justify getting run over?  Do you need weapons, threats, and

17  violence?

18            MR. SMITH:  Your Honor, calls for a legal conclusion.

19  Objection.

20            MS. DUNN:  This is his witness's post.

21            THE COURT:  Asking about his own opinion.

22            MR. SMITH:  She seems like she's asking him what the

23  law says as to self-defense.

24            MS. DUNN:  Your Honor, I'm asking for this witness's

25  opinion about his own post.

M. Heimbach - Direct

1          THE COURT:  Sir, just answer the question.

2          THE WITNESS:  I believe if your life is being

3    threatened by folks with weapons, not even hitting protesters,

4    but hitting the gas, so you don't get dragged out of your

5    vehicle like Reginald Denny, seems reasonable.

6    BY MS. DUNN:

7    Q    My question, Mr. Heimbach, is whether to justify that, in

8    your opinion, do you need weapons, threats, and violence, or

9    just one of those things?

10   A    Well, you said in reference to hitting protesters, and I

11   said nothing about hitting protesters.

12   Q    Your testimony is this is nothing about hitting

13   protesters?

14          MR. JONES:  Your Honor, I'm going to object.  What's

15   the relevance of his opinion on whether you need all three of

16   these things to this case?

17          THE COURT:  His motivation is part of the case.

18          THE WITNESS:  I have said nothing about hitting

19   protesters, simply not becoming victimized by sitting there and

20   risking being dragged out of your vehicle and killed.

21   BY MS. DUNN:

22   Q    Okay.  So your testimony, Mr. Heimbach, is that this tweet

23   that you tweeted -- not some private chat --

24   A    That says nothing about hitting protesters.  Simply

25   preserving one's own life.

M. Heimbach - Direct

1  Q    Okay.  So it doesn't say #PreserveOnesOwnLife.  It says

2  #HitTheGas, right?

3            MR. SMITH:  Your Honor, what kind of questions are

4  these?

5            THE COURT:  Let him answer the questions.

6            THE WITNESS:  Indeed, stepping on the gas would

7  remove your vehicle from you being in a situation where you are

8  dragged out of your vehicle and beaten to death, yes.  So

9  hitting the gas has nothing necessarily to do with striking any

10 protesters.  Simply removing yourself from the situation is --

11 again, I think is a reasonable, nonpartisan position.

12 BY MS. DUNN:

13 Q    And, Mr. Heimbach, one additional question on this topic,

14 then:  What constitutes, in your mind, sufficient cause for

15 somebody to get run over by a car in this kind of circumstance?

16 What do they need to actually do to warrant being run over by a

17 car?

18 A    Well, I have no comment on running over anyone with a car,

19 merely removing yourself by stepping on the gas, which is in

20 line with legislation that has been proposed and passed in

21 multiple states by state legislators -- legislatures, pardon

22 me.  This is not a radical or fringe position, that you have no

23 duty and responsibility to be beaten to death in your own car.

24 Q    Thank you, Mr. Heimbach.

25       You were planning to meet with Christopher Cantwell in

M. Heimbach - Direct

1   Charlottesville prior to August 11th and 12th, correct?

2   A    Correct.  I don't believe that meeting ever happened,

3   though.

4   Q    Okay.  But on August 10th you exchanged some text messages

5   with Mr. Cantwell.  And as we've discussed, we don't have any

6   of your text messages, but we do have some from Mr. Cantwell.

7   So we're going to put those on the screen for you.

8        It's PX3317.  Do you see this?

9            (Plaintiffs' Exhibit 3317 marked.)

10           THE WITNESS:  I do.

11  BY MS. DUNN:

12  Q    We did try to make this more readable.  The production

13  was -- the quality was not great.

14       All right.  So can you recognize these as texts between

15  yourself and Mr. Cantwell?

16  A    Yes.

17  Q    And on August 10th of 2017, Mr. Cantwell texts you:

18  "Still wanna meet up this evening?  What time?  I'm also

19  planning a meetup tomorrow at noon."

20       And so before Mr. Cantwell says "this is Cantwell, by the

21  way," you already had a plan to meet up, correct?

22  A    Potentially.  I can't recall specifically.

23           MS. DUNN:  Your Honor, I apologize.  I move to admit

24  3317.  I neglected to do that.

25           THE COURT:  Be admitted.

M. Heimbach - Direct

1        (Plaintiffs' Exhibit 3317 admitted.)

2    BY MS. DUNN:

3    Q    And you responded:  "Let's meet tomorrow," meaning

4    August 11th.  "I've been severely delayed by rain."  And then

5    he texts you back to use the Signal app to encrypt your SMS

6    messages; do you see that?

7    A    Yes.

8    Q    So Signal is an app that deletes your texts right after

9    you send them; you're aware of that?

10   A    Yes.

11   Q    And you didn't turn over to us any Signal chats in

12   discovery; you're aware of that?

13   A    Yes.

14   Q    And you've testified that you can't remember whether you

15   used Signal to communicate about August 11th and 12th, even

16   though here, Mr. Cantwell is telling you to speak with him via

17   this app; is that accurate?

18   A    Considering my text messages beyond that going forward are

19   still available, then I would say I most likely did not start

20   using Signal at that time.

21   Q    So your position today is that you didn't use it to

22   communicate?

23   A    I don't believe so.

24   Q    Okay.  You text him back that you have his back

25   100 percent.  That's after August 12th.  That's on the 16th; do

M. Heimbach - Direct

1   you see that?

2   A    Yes.

3   Q    And he says:  "Thanks."  And you say:  "Victory or death,

4   brother."  Do you see that?

5   A    Yes.

6   Q    And you've testified that when you said "victory or

7   death," what you meant was "meaning you win or you die."  Do

8   you remember that?

9   A    Yes, the concept that you keep struggling for your goals

10  or you die as you're working to achieve them.

11  Q    Okay.  So you were willing to die at the event on

12  August 11th and 12th, right?

13  A    Considering the amount of times I had been attacked by

14  anti-fascists or threats they had mailed to my house or

15  comments online, there was an understanding, to be a pro-white

16  advocate, that there was danger from the political opposition

17  that liked to chant things like "kill the Nazis, kill the

18  fascists," and they would do everything they could to try to

19  make that happen.

20  Q    So my question to you was just whether you were willing to

21  die at the event at August 11th and 12th -- or excuse me,

22  August 12th?

23  A    Yes.

24  Q    All right.  So you arrived --

25            MS. DUNN:  We can take this down, Mr. Spalding.

                          M. Heimbach - Direct

1   BY MS. DUNN:

2   Q     You arrived in Charlottesville on August 11th, and you

3   rented a cabin outside of town with about 15 other TWP members;

4   is that right?

5   A     Yes.

6   Q     Did you travel to Charlottesville with Defendant Parrott?

7   A     I believe so.

8   Q     You don't remember, but you think --

9   A     I believe so.

10  Q     Okay.  And you've said that you arrived around dinnertime.

11  What time was that, about?

12  A     I don't know, mid -- midafternoon-ish.

13  Q     So when you said "dinnertime," you meant midafternoon?

14  A     Well, there's dinner and supper in the south.  So...

15  Q     Right.  I'm just trying to get some clarity on the time.

16  A     Yes.  So midafternoon, I believe.

17  Q     Okay.  And what did you do after you got to

18  Charlottesville around dinnertime?

19  A     Went to the store, to Walmart, to get pizza, beer, snacks,

20  things like that.  Primarily talked to some journalists, lots

21  of journalists.  Talked with Matt Parrott and others.

22  Socialized.

23  Q     And did you meet with your membership?

24  A     Just the folks who were there at the cabin.

25  Q     Okay.  The jury has heard already about a torch march on

M. Heimbach - Direct

1   August 11th.  You did not attend the torch march on

2   August 11th, correct?

3   A    Correct.

4   Q    And your testimony at your deposition is that you

5   specifically instructed all your members and supporters not to

6   go because there wasn't a permit?

7   A    Correct.

8   Q    But you don't have anything in writing about this

9   directive that you say you gave to all your members and

10  supporters, right?

11  A    I believe the fact that our membership didn't attend the

12  event kind of speaks for itself.

13  Q    Well, we'll talk about that.  But my question to you is

14  whether you had anything in writing about this directive that

15  you say that you gave to all your members and supporters.

16  A    I believe Cesar Ortiz, our head of security, had texted

17  folks.

18  Q    Mr. Heimbach, in your deposition you were asked whether

19  you recalled a document that specifically instructed members of

20  the TWP not to attend the August 11th event, and you said:  "I

21  just remember saying it verbally"?

22  A    Yes.

23  Q    To your members?

24  A    To the folks who were at the cabin, and then other people

25  who had duties and responsibilities in the organization would

M. Heimbach - Direct

1   have handled it from there.

2   Q    Sir, in your deposition you were asked:  "And did you

3   attend the torch march?"  And your answer was:  "Nope.  And I

4   specifically instructed all TWP members and supporters not to

5   go because there wasn't a permit"?

6   A    Correct.

7   Q    Do you stand by that?

8   A    I do.

9   Q    And your lawyer, Mr. Smith, said in opening that you were

10  not told about the torch march; that you found out only a

11  couple of hours before it was supposed to happen?

12  A    I believe that would be accurate.

13  Q    Is it accurate?

14  A    I don't recall exactly when I first heard of the proposal

15  of the torch march.

16  Q    Okay.  But is your attorney correct that you heard about

17  it that day?

18           MR. JONES:  Your Honor, I'm going to object to

19  quoting attorneys' opening statements to a witness.

20           THE COURT:  Sustained.

21   BY MS. DUNN:

22  Q    Mr. Heimbach, when did you hear about the torch march?

23  A    Before the torch march; not by much, I don't believe, but

24  I don't recall exactly when.  I was busy with reporters.  I was

25  busy traveling hundreds of miles to the event, trying to manage

M. Heimbach - Direct

1  a lot of different balls in the air.  So I'm not exactly sure

2  specifically when, but we decided not to attend it.

3  Q    Okay.  So I just want to be clear:  Is it your testimony

4  that you got there around midafternoon, learned about the torch

5  march, and then called an all-member-and-supporter meeting

6  where you specifically told people not to attend the torch

7  march that night?

8  A    No.  As I said earlier, there would have been a delegation

9  of responsibilities where, after myself and Mr. Parrott

10  discussed it, we decided that we would not be attending the

11  torch march, and folks such as our head of logistics, Cesar

12  Ortiz, likely would have handled notifying individuals.

13  Q    Okay.  So when you said "I specifically instructed all TWP

14  members and supporters not to go," what you meant was somebody

15  else did that?

16  A    Well, I --

17            THE COURT:  Well, he meant what he said.  He said he

18  told Mr. Parrott.  We've gone over this about ten times.

19            MS. DUNN:  Understood, Your Honor.

20            All right.  So let's show the witness Plaintiffs'

21  Exhibit 2468.

22            THE COURT:  Let's take a recess right now for about

23  20 minutes.

24  **(Jury out, 2:56 p.m.)**

25            (Recess.)

M. Heimbach - Direct

1          THE COURT:  Ready to call the jury back?  Okay.  Call

2    the jury.

3    **(Jury in, 3:22 p.m.)**

4          THE COURT:  All right.  Be seated, please.  You may

5    proceed.

6          MS. DUNN:  Thank you, Your Honor.

7     BY MS. DUNN:

8    Q    Mr. Heimbach, before the break at some point you had

9    mentioned the police.  Do you remember that?

10   A    Yes.

11   Q    Do you remember that during the course of this case you

12   received questions and submitted sworn answers?

13   A    Yes.

14   Q    Okay.  And do you remember that you were asked to identify

15   any communications with a government official before, after, or

16   during the events?  Do you remember that?

17   A    Not off the top of my head.

18   Q    Do you recall that, in response to that question, number 7

19   in your interrogatory responses, you said:  "To my knowledge,

20   my only communication with government officials for this event

21   was during the event and calling Charlottesville PD

22   officers/assorted state police, quote, pigs, and, quote, class

23   traitors."  Do you remember that?

24   A    Yes.

25   Q    Okay.  In August of 2017 your mindset was that you saw

M. Heimbach - Direct

1    cops as traitors to your people and all humanity.  Do you

2    remember writing that?

3    A    Not off the top of my head, but that would probably be an

4    accurate statement.

5    Q    That's what you wrote in your manuscript that we discussed

6    earlier, *White Juche*.  Do you remember that now?

7    A    Yes.

8    Q    You also said that you believe "each cop works and fights

9    for the Jews, no exception."  Do you remember writing that?

10   A    Yes.

11   Q    And you said, "Putting on the uniform isn't honorable,

12   it's treason."  Do you remember writing that?

13   A    Yes.

14   Q    And those were your beliefs at this time, correct?

15   A    Yes.

16   Q    We briefly discussed the torch march, and I'd like to move

17   on from that.  I just have two additional questions.  If you

18   could look at Plaintiffs' Exhibit 2468, which is this exhibit.

19   Do you recognize in this picture, you see a man wearing a shirt

20   with the TWP logo?  Do you see that?

21        (Plaintiffs' Exhibit 2468 marked.)

22   A    Yes.

23   Q    Do you know who this is?

24   A    No.

25   Q    Okay.  And you recognize this to be a photo of the torch

M. Heimbach - Direct

1  march?

2  A    Yes.

3  Q    Okay.

4         MS. DUNN:  Your Honor, move to admit Exhibit 2468.

5         THE COURT:  Be admitted.

6         (Plaintiffs' Exhibit 2468 admitted.)

7   BY MS. DUNN:

8  Q    You also said, Mr. Heimbach, that you didn't support what

9  happened at the torch march, correct?

10 A    Correct.

11 Q    And yet the next morning you yourself posted photographs

12 from the torch march on Facebook saying, "we will not be

13 replaced, exclamation point, #charlottesville, #virginia,

14 #traditionalistworkerparty, #tradworker, #unitetheright."

15     So your testimony is you didn't support it but the next

16 day you told everybody on Facebook -- you posted photos with

17 the hashtag TWP and tradworker?  You don't deny that, right?

18 A    As the chairman of the party, most of my posts included

19 that, yes.

20 Q    Right.  As the chairman of the party, you posted in very

21 enthusiastic support of the torch march, correct?

22 A    Correct.

23 Q    And I'll just show you PX1811 very quickly, which is a

24 notification of this Facebook post that you made.  Do you

25 recognize that?

M. Heimbach - Direct

1   A      Yes.

2              MS. DUNN:  Your Honor, we move to admit 1811.

3              THE COURT:  Be admitted.

4              (Plaintiffs' Exhibit 1811 marked.)

5              (Plaintiffs' Exhibit 1811 admitted.)

6              MS. DUNN:  Thank you.

7   BY MS. DUNN:

8   Q      Okay.  So let's talk about August 12th.  On the morning of

9   August 12th you went to the parking lot of Joann's Fabric,

10  that's a store about 20 minutes outside of Charlottesville,

11  correct?

12  A      Correct.

13  Q      And 100 or more people gathered there with you, right?

14  A      Yes.

15  Q      That's about half of your membership and supporters that

16  you talked about earlier?

17  A      Sure.

18  Q      Why did you gather outside of town?

19  A      Well --

20  Q      And actually, strike that.  I apologize.

21         You were joined there by League of the South, right?

22  A      Yes.

23  Q      And that included Michael Hill, Ike Baker, and Michael

24  Tubbs, correct?

25  A      Correct.

M. Heimbach - Direct

1  Q     And Mr. Hill and Mr. Tubbs are defendants in this

2  litigation?

3  A     Yes.

4  Q     Was Brad Griffin there?

5  A     I'm not sure.

6  Q     Okay.  And other League of the South members like the rank

7  and file, they were there?

8  A     Yes.

9  Q     You were joined by NSM members, National Socialist

10 Movement?

11 A     Yeah.  They only had a very small handful, though.

12 Q     Okay.  Jeff Schoep was there?

13 A     Yes.

14 Q     Mike Schloer, Brian Culpepper, all there, right?

15 A     Yes.

16 Q     And other TWP members like Defendant Parrott and Derrick

17 Davis, Commander Davis that we talked about?

18 A     Correct.

19 Q     Okay.  And you were also joined there by the skinhead

20 groups you testified about earlier, the Hammerskins and the

21 Blood & Honour Social Club, correct?

22 A     Correct.

23 Q     And from Joann's Fabric your group then drove to the

24 Market Street garage, where you parked your car, correct?

25 A     Yes, the garage right next to the police station.

M. Heimbach - Direct

1  Q    And you put your car in the Market Street garage?

2  A    Yes.

3  Q    That same garage we just saw in the video, right?

4  A    Yes.

5  Q    And you lined up in the garage and led the group out of

6  the garage.  You remember that?

7  A    Yes.

8  Q    Okay.  I'm showing you Plaintiffs' Exhibit 2435.

9       You recognize yourself in this photo, as well as your

10 co-defendants, correct?

11 A    Yes.

12           MS. DUNN:  All right.  Your Honor, we move to admit

13 this Exhibit 2435.

14           THE COURT:  Be admitted.

15           MS. DUNN:  Thank you.

16           (Plaintiffs' Exhibit 2435 marked.)

17           (Plaintiffs' Exhibit 2435 admitted.)

18  BY MS. DUNN:

19 Q    Mr. Heimbach, let's talk a little bit about this

20 photograph.  You're on the left.  You can circle yourself, if

21 you want.  Can you do that?  If you touch the screen it circles

22 you.  There, I just did it.

23      And you're wearing a helmet.  You're all dressed in black,

24 correct?

25 A    Correct.

163

M. Heimbach - Direct

1    Q    And Mr. Hill is to your left?

2    A    Yes.

3    Q    This is Mr. Hill, correct?

4    A    Correct.

5    Q    And this is Defendant Tubbs right there, right?

6    A    Yes.

7    Q    And this is Commander Davis right behind you.  Do you see

8    that?

9    A    Yes.

10   Q    Okay.  So Defendant Hill has on the uniform that many in

11   the League of the South wore, khaki pants and black on top,

12   right?

13   A    Yes.

14   Q    Okay.  He's also got on black leather gloves in August.

15   Any idea why that was?

16   A    I couldn't begin to speculate.

17   Q    Okay.  And can we look at the glove itself?  If we could

18   just zoom in on that.  I know it's blurry.  Any idea what that

19   is on Mr. Hill's gloves?  It looks like some sort of metal?

20   A    I have no idea.  I didn't inspect the hand wear of my

21   friends.

22   Q    But looking at it, you can't tell?

23   A    I'm not sure what that is.

24   Q    But it's -- okay.  And if you zoom out, you can see

25   Mr. Hill is also carrying a cane?  You see that?

M. Heimbach - Direct

1  A    He is a senior citizen.  Yes.

2  Q    So I just want to make sure your testimony is that

3  Mr. Hill is carrying a cane because he is a senior citizen?

4         MR. JONES:  Your Honor, I'm going to object to his

5  foundation for knowing why Mr. Hill was carrying a cane.

6         THE COURT:  Sustained.

7   BY MS. DUNN:

8  Q    So somebody other than Mr. Hill also appears to have a

9  cane or a stick in this photo.  You can see it right there.  Do

10 you know whose that is?

11 A    I can only see the arm in the photo.  So I have no idea.

12 Q    Okay.  But you don't know who that is who is carrying the

13 cane or the stick right behind -- it looks like Mr. Tubbs is

14 right in front of that person?

15 A    I have absolutely no way of knowing.

16 Q    Okay.  And during that day, did you observe Mr. Hill use

17 his cane as a weapon?

18 A    No, I don't believe so.

19 Q    You didn't see that?

20 A    No.

21 Q    Okay.  So you circled Mr. Tubbs.  Mr. Tubbs, Defendant

22 Tubbs, is the person we just saw in the video with Mr. Harris,

23 correct?

24 A    Correct.  He's just standing there in the video.

25 Q    Okay.  And this whole line of men is marching down the

M. Heimbach - Direct

1  street.  You see that, right, in the middle of the street?

2  A    Men and women, but yes.

3  Q    Forgive me.  I didn't see any women there.

4  A    There were women with us that day.

5  Q    Okay.  And this -- the column is walking down the middle

6  of the street, correct?

7  A    Correct.  Going from the Market Street garage towards the

8  permitted rally.

9  Q    Right.  You're about a block away from Emancipation Park?

10 A    That sounds accurate.

11 Q    Yes.  And there are men with white shields with a black X

12 on the front in line behind Defendants Tubbs and Hill.  And

13 those are men from League of the South, correct?

14 A    Yes.

15 Q    That's what that X means, right?

16 A    It's the Southern Nationalist flag, yes.

17 Q    And you also marched that day with Defendant Parrott, even

18 though we can't -- I can't see him in this paragraph?

19 A    Yes.

20 Q    Okay.  Are any of the other people we discussed today in

21 this photograph, like, for example, Tyrone or any of your

22 co-defendants?

23 A    I don't believe so, and I don't believe Mr. Chesny even

24 attended Unite the Right.

25 Q    Okay.  All right.  So you walked west on Market Street

M. Heimbach - Direct

1   from the Market Street garage to Emancipation Park and, as we

2   discussed, you're walking down the middle of the street.

3        As you got closer to Emancipation Park you encountered

4   counter-protesters with their arms linked, correct?

5   A    With their arms linked, with poles in their hands, and

6   other counter-protesters that had pepper spray and firearms,

7   but yes, there were protesters with their arms linked.

8             MS. DUNN:  Objection, Your Honor.  Move to strike.

9        My question was just about whether the

10  counter-protesters had their arms linked.

11            THE WITNESS:  Yes.

12   BY MS. DUNN:

13  Q    Okay.  And when you encountered the counter-protesters

14  with their arms linked, you did not tell the people you were

15  leading to stop; is that correct?

16  A    There would be no way to notify a line of hundreds of

17  people to stop.  We didn't have radios or the ability.  We were

18  trying to walk to the permitted rally on the path that the

19  police had told us to.

20  Q    So is the answer to my question that you didn't tell the

21  people that you were leading to stop?

22  A    Correct.

23            MS. DUNN:  Your Honor, we'd like to play for the

24  witness Plaintiffs' Exhibit 1888.  The witness will recognize

25  himself in this video.

M. Heimbach - Direct

1          We're playing 0 to 1 minute.

2          THE COURT:  All right.  Be admitted.

3          MS. DUNN:  Thank you, Your Honor.

4          (Plaintiffs' Exhibit 1888 marked.)

5          (Plaintiffs' Exhibit 1888 admitted.)

6   BY MS. DUNN:

7   Q    Do you see yourself, Mr. Heimbach?

8   A    I do.

9   Q    I think the Court has admitted this, and we can play it in

10  real time for the jury as well.

11         (Video playing.)

12         All right.  So, Mr. Heimbach, at the beginning of this

13  video you yelled to your group, "shields up," and then they

14  charged into the crowd; is that correct?

15  A    A majority of the people appeared to be, potentially,

16  League of the South members, but I did say "shields up" because

17  projectiles were incoming.

18  Q    Okay.

19         MS. DUNN:  Mr. Spalding, let's play the beginning of

20  the video again.

21         (Video playing.)

22         MS. DUNN:  Mr. Spalding, you can stop.

23  BY MS. DUNN:

24  Q    Mr. Heimbach, right before you said "shields up," you said

25  "just another day in the park."  And, at least as I saw this

M. Heimbach - Direct

1  video, I didn't see any projectile and I didn't see you say

2  anything about any projectile?

3          MR. JONES:  Your Honor, I'm going to object to

4  Ms. Dunn characterizing the --

5          THE COURT:  Sustained.

6          MS. DUNN:  That's fair, Your Honor.  That's fair.

7   BY MS. DUNN:

8  Q    You don't disagree, Mr. Heimbach, that at the beginning of

9  that video, you said "just another day at the park" and then

10  you yelled "shields up," and then people charged forward with

11  their shields; you don't disagree with that?

12  A    No, I don't disagree.

13  Q    Okay.  We have taken some screenshots from this clip that

14  you just watched, and I want to ask you some questions about

15  that.

16  A    Sure.

17  Q    This is the first screenshot.  So you see here on the

18  screen that there is a man dressed all in black with a black

19  helmet and goggles who is in your group; do you see that?

20  A    Yes.

21  Q    And Mr. Davis is right in front of this individual.  Do

22  you see that?

23  A    Yes.

24  Q    Okay.  And this is a TWP member in your line, with a TWP

25  flag, who is stabbing counter-protesters with the end of the

M. Heimbach - Direct

1   flagpole.  You agree with that?

2   A   Well, I can't see the full context.  Perhaps the

3   individual was armed.  So context is important in this case, I

4   think.

5   Q   Okay.  We can play the video again, Mr. Heimbach, and you

6   can point out whatever context you see here.

7       I think we'll do that.  We can do that right now.

8       (Video playing.)

9           MS. DUNN:  Okay.  Thanks, Mr. Spalding.

10  BY MS. DUNN:

11  Q   Mr. Heimbach, you don't disagree that you saw that TWP

12  member stabbing counter-protesters with the end of a flagpole?

13          MR. SMITH:  Your Honor, I object to the

14  characterization "stabbing with a flagpole."

15          MS. DUNN:  Your Honor, Mr. Heimbach used that

16  language in his own deposition.

17          MR. SMITH:  I don't see how that makes it proper

18  here, Your Honor.

19          THE COURT:  Well, he can answer the question if he

20  knows, if he agrees with it, and if he saw someone stabbing

21  someone.

22          THE WITNESS:  I don't even see necessarily if that

23  individual made contact with anyone.  So I could not

24  affirmatively say that they did anything other than move a

25  flagpole vigorously.

M. Heimbach - Direct

1   BY MS. DUNN:

2   Q    Okay.  And you note, Mr. Heimbach, or at least you

3   wouldn't disagree, that this flagpole is already rolled up and

4   ready for use.  You don't disagree with that?

5   A    Well, not ready for use, but traditionally, going back

6   even thousands of years, the idea of capturing your enemy's

7   banner is something that happens all the time.  And it goes

8   into politics.  So I think the idea would be for people not to

9   be able to grab a flying flag to then have as some sort of sick

10  trophy.

11  Q    All right.  So, Mr. Heimbach, your testimony to the jury

12  is that what's going on here with this flagpole and this TWP

13  member is that they're capturing their enemy's banner?

14  A    No.  I'm saying having the flag rolled up is so the flag

15  could not be ripped off the pole by counter-demonstrators for

16  them to get a trophy.

17  Q    I see.  Let's look at the second screenshot.

18       All right.  So there is a man here in a black polo and a

19  vest with a khaki hat and khaki pants slamming a shield into

20  the counter-protesters who have their arms locked.  And I'll

21  circle the part I'm talking about.

22       Do you see that?

23  A    Yes.

24  Q    And you see that the counter-protesters have their arms

25  linked, correct?

M. Heimbach - Direct

1  A    Correct.  But I don't believe that's a Traditionalist

2  Worker Party member.

3  Q    Okay.  But this was somebody in your line, which included

4  League of the South, correct?

5  A    Well, I'm fundamentally not the babysitter of other

6  organizations and whatever their membership does.  I don't

7  believe that's a Traditionalist Worker Party member, and I was

8  already out of frame by then, trying to enter the park

9  peacefully.

10 Q    Okay.  You're aware, Mr. Heimbach, this is a case about

11 individuals and organizations, correct?  You understand that?

12 A    Sure.

13 Q    So you had marched in.  We just saw you with Mr. Hill.

14 He's right there.  Do you see him?

15 A    I do.

16 Q    Okay.  And the person who is pushing his shield into the

17 counter-protesters with their arms linked, that person is

18 wearing what you already testified was the League of the South

19 uniform.  You don't disagree with that, do you?

20 A    No.

21 Q    Okay.  And I think this is the case.  Is this -- this

22 looks to me very much like -- or strike that.

23     Mr. Heimbach, do you recognize that black helmet with the

24 white logo on the side as the TWP helmet?

25 A    Not necessarily.  There were folks with baseball helmets

M. Heimbach - Direct

1  you get at sporting goods stores and stuff like that.  So no.

2  I can't say that that looks like a hard hat.  We were the only

3  ones in hard hats that day.  But helmet-wise, no, I can't

4  confirm that.

5  Q    You wouldn't deny, would you, that TWP members wore -- in

6  fact, you wore -- black helmets with white logos on the side?

7  A    No.  To my knowledge, very few other TWP members had any

8  stickers or logos on their helmets or hard hats other than the

9  logo of our party on the front.

10          MS. DUNN:  Okay.  Mr. Spalding, let's just go to

11  2435.

12   BY MS. DUNN:

13  Q    Mr. Heimbach, your hat is a black helmet with a TWP logo

14  on the side, correct?

15  A    No.  That's actually a Celtic cross.

16  Q    Okay.  Fair enough.  But it's a white logo and a circle.

17  You don't disagree with that, correct?

18  A    Yes.  I was given a sticker prior to the rally that I put

19  on the helmet.

20  Q    Okay.

21  A    Before I was struck in the head with a bat.  Luckily, I

22  had a helmet on that day.

23          MS. DUNN:  Objection, Your Honor.  Move to strike.

24          MR. SMITH:  Can't object to that, Your Honor.

25          THE COURT:  Sustained.  Strike that.

M. Heimbach - Direct

1          MS. DUNN:  Thank you, Your Honor.

2          All right.  Mr. Spalding, can we go back to the

3  screenshot?

4  BY MS. DUNN:

5  Q    This is what we're talking about.  Mr. Heimbach, could

6  that logo we're zoomed in --

7  A    I mean, I don't see a pitchfork there.  So...

8  Q    Okay.

9  A    I could not positively identify that.

10  Q    Okay.  Where do you think you are at this time?

11  A    Well, it's hard to tell.  If you could back the video up a

12  few seconds, I could get context.

13  Q    That's okay.  Let's put in the third screenshot.

14      So the third screenshot is another man with a black polo

15  and khakis shoving a woman in a tank top and shorts.  Do you

16  see that?  He has both his hands on her?

17  A    Yes.

18  Q    Okay.  And he, too, is wearing a black helmet with a white

19  logo; do you see that?

20  A    Yes.  But that individual also has a League of the South

21  logo on his polo.  That's not a Traditionalist Worker Party

22  member.

23  Q    Correct.  Mr. Heimbach, League of the South and

24  Traditionalist Worker Party marched in together.  We saw you

25  shoulder-to-shoulder with Defendants Hill and Tubbs?

M. Heimbach - Direct

1  A    Yes.

2  Q    Okay.  Okay.  And in the fourth screenshot that we have,

3  there is a man with a black shirt and a helmet with long hair;

4  do you see that?

5  A    I do.

6  Q    And he is using a red shield to shove that same

7  counter-protester that we saw in the last shot?

8  A    Sure.

9  Q    And what's his shirt that he's wearing?  Do you recognize

10 that?

11 A    It looks like a Traditionalist Worker Party shirt.

12 Q    Yes.  You and I would agree that it is a Traditionalist

13 Worker Party shirt?

14 A    Yes.

15 Q    All right.  In the fifth -- oh, and you don't disagree

16 that this person seems to be shoving into people, into this

17 counter-protester, with a shield, that he's pushing the shield?

18 She's not pushing into him with the shield?

19        MR. SMITH:  Your Honor, objection.  Do we have the

20 video, or are we going to look at screenshots from the video?

21 Moments in time can misrepresent.

22        MS. DUNN:  Your Honor, we showed the video.

23        THE COURT:  She can show the video and stop and show

24 screenshots.

25        MR. SMITH:  All right.

M. Heimbach - Direct

1    BY MS. DUNN:

2    Q    Mr. Heimbach, you agree with me, right, that this person

3    is shoving the shield into the counter-protester, not that the

4    counter-protester is shoving herself into the shield?

5    A    Sure.  But I'm unsure of the exact context that led to

6    this exact moment.

7    Q    All right.  Let's put up the fifth screenshot.  You see a

8    man in a black polo, khakis, and baseball hat macing this same

9    counter-protester, correct?

10   A    Correct.

11   Q    Okay.  And now, everything that we just saw in the video

12   and in the screenshots occurred on Market Street, correct?

13   A    Correct.

14   Q    Not in Emancipation Park, correct?

15   A    We're right outside Emancipation Park at that point.

16   Q    But you agree this was not in the park?

17   A    Correct.

18   Q    Okay.

19   A    We were trying to enter the park for our legally permitted

20   rally.

21   Q    My question, Mr. Heimbach, is only whether this occurred

22   on Market Street, outside the park.

23   A    Yes.  As we were being blocked from entering the park,

24   yes.

25   Q    Okay.  All right.  Mr. Heimbach, please look at PX2260.

M. Heimbach - Direct

1   You'll recognize this as a Twitter post by Commander Davis --

2   that's Derrick Davis, who marched with you on August 12th --

3   and it's a photo of yourself.

4         Do you see that?

5   A    I do.

6              MS. DUNN:  Your Honor, move to admit 2260.

7              THE COURT:  Be admitted.

8              (Plaintiffs' Exhibit 2260 marked.)

9              (Plaintiffs' Exhibit 2260 admitted.)

10  BY MS. DUNN:

11  Q    Here's a post that Commander Davis tweeted and then

12  tradworker, your group, retweeted it; do you see that?

13  A    Yes.

14  Q    The picture Mr. Davis posted is of you and he, and you're

15  both wearing your helmets and your armbands.  Do you see that?

16  A    Yes.

17  Q    The date on this post is August 13th.  Do you see that?

18  A    I do.

19  Q    And the picture he's posting is from August 12th, correct?

20  A    Yes.

21  Q    And by the way, I just want to know:  Do you see this

22  backpack of the person all the way to the left?

23  A    Yes.  They have a backpack.

24  Q    Is that the same backpack that was in the screenshot that

25  we saw previously?  Let me find that.

M. Heimbach - Direct

1    Does that look familiar to you?  Is that the same person

2   in the backpack?

3   A    I can't tell.

4   Q    Returning, then, to --

5   A    They actually look like they could be different colors.

6   So I would likely argue no.

7   Q    Okay.  And Mr. Davis posts this picture of you and he on

8   August 12th and he says:  "In memory of plowing through a human

9   wall of communists."  Do you see that?

10  A    I do.

11  Q    And he says:  "We have passed and we shall pass again."

12  Do you see that?

13  A    Yes.

14  Q    And that seems to suggest that members of TWP will plow

15  through a human wall of communists again?

16  A    Well, actually, it's in reference to, during the Spanish

17  Civil War, the Republican forces had a rallying cry of "no,

18  pasarán," of "you shall not pass."  So the opposite, you know,

19  "si, pasarán," or "we shall pass and we shall pass again."

20  It's a reference to the Spanish Civil War.

21  Q    Right.  But when this is posted on Twitter on August 13th

22  saying "we shall pass again," you would agree that the message

23  to the people in the world is not about the Spanish Civil War.

24  It's about plowing through a human wall of communists, correct?

25  A    No.  I absolutely would say that those within our

M. Heimbach - Direct

1  subculture would know a rather obscure reference to the Spanish

2  Civil War as context, because anti-fascists commonly chant "no

3  pasarán."

4  Q    Are you going to deny that Commander Davis wrote "in

5  memory of plowing through a human wall of communists" because

6  that's what you did on August 12th?

7  A    Well, I walked through to the side, but...

8  Q    But he posted a picture of you?

9  A    Well, and himself, yes.

10 Q    Of you both?

11 A    Yes.  With a reference to the Spanish Civil War.

12        MS. DUNN:  Mr. Spalding, can we look at the whole

13 tweet?

14 BY MS. DUNN:

15 Q    Then tradworker, the organization, writes -- in response

16 to the mayor of Lexington, Kentucky making this announcement,

17 they say:  "Game on."  Do you see that?

18 A    Yes.

19 Q    And then can we just look at the -- at the full tweet,

20 where it says "tradworker," and it says:  "Traditionalist

21 Worker Party:  Local solutions to the globalist problem."

22        Do you see that?

23 A    I do.

24 Q    You were here this morning for Ms. Froelich's testimony,

25 where she said that "globalist" is another word for Jewish

M. Heimbach - Direct

1   people.  You were here for that, right?

2   A    Yes.

3   Q    She said "globalist" means Jewish person, "communist"

4   means Jewish person, and these are dog whistles that you would

5   use in everyday conversation to see if someone was on the same

6   wavelength as you mentally?  You were here for that, right?

7   A    Yes.  But respectfully, ma'am, we were very vocal and

8   didn't hide anything about our opposition to the organized

9   Jewish community or Zionism.  So there was no need for any sort

10  of dog whistle.  Our opposition was consistently opposed to

11  globalism in all forms.

12  Q    Did you ask Commander Davis to take down this tweet about

13  plowing through a human wall of communists?

14  A    I don't recall.

15  Q    You don't recall or you didn't?

16  A    I don't recall.

17  Q    You might have, you're saying?

18  A    Potentially.

19  Q    Okay.  All right.  So you mentioned, Mr. Heimbach,

20  projectiles.  Can you look at PX2217?

21          (Plaintiffs' Exhibit 2217 marked.)

22  BY MS. DUNN:

23  Q    Do you see this?

24  A    I do.

25  Q    Do you see yourself in this photo?

M. Heimbach - Direct

1   A    I do.

2                MS. DUNN:  Move to admit 2217.

3                THE COURT:  Be admitted.

4                (Plaintiffs' Exhibit 2217 admitted.)

5    BY MS. DUNN:

6   Q    Mr. Heimbach, in this photo you will see flying through

7   the air a bottle with something in it.  Do you see that?

8   A    I do.

9   Q    Okay.  You would agree with me that we can call that a

10  projectile, correct?

11  A    A bottle of water that was being returned to sender.  One

12  of the tactics that was utilized that day by anti-fascists was

13  to use frozen bottles of water and use those as projectiles

14  against us.  So to the best of my memory, that had already been

15  thrown at us, and was simply being returned to the initial user

16  of it.

17  Q    Okay.  So your testimony is you're just returning this

18  water bottle to somebody else.  That's your testimony?

19  A    After they had thrown it at us, yes.  That's a return to

20  sender.

21  Q    And the person who is throwing it -- I think we'll agree

22  it's obvious he's just thrown it -- is Cesar Ortiz, the TWP

23  member who you put in charge of security, correct?

24  A    Correct.

25  Q    Okay.  And that's you right there next to Mr. Ortiz,

M. Heimbach - Direct

1   correct?

2   A    Correct.

3   Q    And --

4          MR. SMITH:  Not in the circle, though, in the next --

5   off to his left, right?  Is that --

6   BY MS. DUNN:

7   Q    Mr. Heimbach, is this you?

8   A    Yes.

9          MR. SMITH:  Yes.  Okay.

10  BY MS. DUNN:

11  Q    And you're smiling, right?

12  A    I am.

13  Q    Okay.  And Commander Davis right next to you?

14  A    Yes.

15  Q    Seems like he might also be smiling.

16         MS. DUNN:  If we can zoom out, Mr. Spalding.

17  BY MS. DUNN:

18  Q    Let's talk about where you are in this photo where

19  Mr. Ortiz is throwing the projectile.  Do you recognize this

20  building in the back of the photo in the upper right?

21  A    I'm not sure what the building is, but we're on the steps

22  entering the park.

23  Q    Correct.  This is the Albemarle County Historical Society,

24  and it's just across Second Street --

25         MR. JONES:  Your Honor, I'm going to object to her

M. Heimbach - Direct

1   providing evidence.

2           MS. DUNN:  Withdrawn.  That's fair.  That's fair.

3    BY MS. DUNN:

4   Q    And so where you are in this photograph is on the

5   staircase at the southeast entrance to the park, correct?

6   A    Correct.  And that's a Traditionalist Worker Party member

7   that had been maced by anti-fascists.

8           MS. DUNN:  Your Honor, there's no question pending.

9           THE COURT:  Sustained.

10  BY MS. DUNN:

11  Q    Okay.  Now, Mr. Heimbach, your testimony is that you

12  withdrew from participating in the leadership discussion

13  channel on Discord two weeks before the event on August 12th.

14  Do you recall that?

15  A    Yes.  I'm not sure about the exact day, but we did decide

16  to come up with an entirely separate plan from the organizers.

17  As merely attendees of the event, we wanted to come up with our

18  own plan with the Charlottesville Police Department.

19  Q    Right.  But when you were asked in your deposition whether

20  the separate plan that you talk about is a different means of

21  entering the park, you responded "yes."  Do you recall that?

22  A    Yes.

23  Q    Yes.  All right.  And you still descended in

24  Charlottesville 2.0, and you still brought TWP members and

25  shields and flagpoles as you planned, correct?

M. Heimbach - Direct

1   A    Yes, because as the leader of a political party, I was --

2           THE COURT:  Please don't say why.

3           THE WITNESS:  Yes.

4           MS. DUNN:  Thank you, Your Honor.

5    BY MS. DUNN:

6    Q    All right.  So you had just testified that you had

7    withdrawn from the leadership discussion channel on Discord.

8           If you could take a look at Plaintiffs' Exhibit 1177, this

9    is a post on August 8th, just a few days before the events,

10   where you and others, including Tyrone -- Mr. Chesny -- are

11   talking in the leadership discussion on the Charlottesville 2.0

12   server.

13         Do you see that?

14         (Plaintiffs' Exhibit 1177 marked.)

15   A    Yes.  Specifically about finding a local lawyer, not

16   talking about organizing the event, because the City of

17   Charlottesville was trying to block our permit.

18           MS. DUNN:  Your Honor, objection.

19   BY MS. DUNN:

20   Q    The question was, having testified you had withdrawn from

21   the leadership discussion channel, do you see this post from

22   August 8th where you are posting in the leadership discussion

23   channel?

24   A    Yes, but what I meant was in reference to discussing the

25   actual organizing of attending the event.

M. Heimbach - Direct

1              MS. DUNN:  Your Honor, move to strike.

2              MR. SMITH:  Your Honor, he's trying to explain his

3     answer.

4              THE COURT:  Sustained.

5              MS. DUNN:  Thank you, Your Honor.

6      BY MS. DUNN:

7     Q    Now, you've also testified that in the lead-up to

8     Charlottesville 2.0, you weren't really on speaking terms with

9     Mr. Kline or Mr. Kessler.

10    A    That would be accurate.

11    Q    Okay.  Let's look at your phone records, which is

12    Plaintiffs' Exhibit 3257A.

13             (Plaintiffs' Exhibit 3257A marked.)

14             MS. DUNN:  I'd like to admit this, Your Honor, into

15    evidence.

16             (Plaintiffs' Exhibit 3257A admitted.)

17    BY MS. DUNN:

18    Q    Mr. Heimbach, you recognize these to be your phone

19    records, correct?

20    A    Correct.

21    Q    And your phone number in 2017 was 301-525-1474?

22    A    Correct.

23    Q    Is that right?  All right.  So the phone records are very

24    voluminous.  So we're going to show you a page with your calls

25    with Mr. Kline.

M. Heimbach - Direct

1      If you look at page 13, this reflects that you called

2  Mr. Kline at 5:49 p.m. on August 7th, five days before

3  Charlottesville 2.0.  Do you see that?

4  A    I do.

5           THE CLERK:  Ms. Dunn, did we get an admission on

6  these?

7           MS. DUNN:  I believe so but let me verify.

8           THE COURT:  It'll be admitted.

9           THE CLERK:  Thank you.

10          THE WITNESS:  What was shown was actually -- oh, yes,

11  that one.  Yes.

12          (Plaintiffs' Exhibit 3257A admitted.)

13   BY MS. DUNN:

14  Q    And if you look at page 15, there is a phone call with

15  Mr. Kline on August 12th at 7:29.  Do you see that?

16  A    Yes.

17  Q    Okay.  And it's also been your testimony that you did not

18  speak with Mr. Kline in person in Emancipation Park on August

19  12th, correct?

20  A    Not in Emancipation Park, no.  I don't think there's any

21  point in time we came in contact with one another.

22          MS. DUNN:  Your Honor, we'd like to play Exhibit 2538

23  from 2:10 to 2:40 as impeachment.

24          THE COURT:  All right.

25          (Plaintiffs' Exhibit 2538 marked.)

M. Heimbach - Direct

1              (Video playing.)

2              MS. DUNN:  Why don't we pause there.

3  BY MS. DUNN:

4  Q    Mr. Heimbach, do you recognize this to be yourself and

5  this to be Mr. Kline?

6  A    It looks like.  It was a very hectic day where folks were

7  trying to kill me.  I didn't remember a ten-second

8  conversation.  It wasn't memorable.

9  Q    But you don't deny that this is you and Mr. Kline in

10 Emancipation Park, correct?

11 A    Correct.

12 Q    And in this video Mr. Kline can be heard saying "McIntire"

13 to you.  Did you hear that?

14 A    I didn't hear it, but I believe you.

15 Q    Okay.  Would you like us to play it again?

16 A    I trust you.

17 Q    Okay.  And so Mr. Kline is telling you in this video --

18             MS. DUNN:  Your Honor, we move to strike the "people

19 are trying to kill me" statement in Mr. Heimbach's prior

20 answer.

21             THE COURT:  All right.  Sustained.

22  BY MS. DUNN:

23 Q    And Mr. Kline is telling you to go to McIntire Park from

24 Emancipation Park, correct?  You heard that?

25 A    Sure.

187

M. Heimbach - Direct

1    Q    Okay.  Can we look at 2871.

2              (Plaintiffs' Exhibit 2871 marked.)

3    BY MS. DUNN:

4    Q    Mr. Heimbach, do you see this photograph of yourself?

5    A    I do.

6    Q    What is this black string that's hanging out of your

7    shirt?

8    A    I was miked up for a news report, I believe.  There were

9    lots of reporters there that day that were embedded with us.

10   So that would have been the microphone has fallen off my lapel

11   by the look of it.

12   Q    Did you or other members of TWP have some radio

13   communication with others that day?

14   A    Not that I can recall.  I believe we had purchased radios,

15   but never got around to actually fully figuring them all out.

16   Q    So when did you purchase the radios?

17   A    I don't recall.

18   Q    And your testimony is that you bought radios for this

19   event, but you didn't use them?

20   A    The degree of disorganization amongst not only my

21   organization but the alt-right in general, due to the fact

22   we're all working class folks with jobs, families, and such,

23   yeah, sometimes things fell by the wayside.

24              MS. DUNN:  Your Honor, move to strike.

25              MR. SMITH:  Your Honor, I think he answered the

M. Heimbach - Direct

1    question sufficiently.

2            THE COURT:  Don't let him answer if you're going to

3    move to strike.  Once he finishes his answer, then raise the

4    question.

5            MS. DUNN:  Thank you, Your Honor.  I'm trying not to

6    cut him off.

7            MR. SMITH:  Thank you, Your Honor.

8            MS. DUNN:  But I can do that.

9     BY MS. DUNN:

10   Q    Okay.  Mr. Heimbach, so you have said in your testimony

11   that you wanted to leave the city to avoid conflict, but

12   instead of going back to the Market Street garage, you followed

13   Mr. Kline's instructions and you went to McIntire Park; is that

14   correct?

15   A    Yes, because there was an entire wall of anti-fascist

16   protesters, who had spent the last hour assaulting us, in

17   between us and going back to Market Street.

18           MS. DUNN:  Your Honor, I apologize.  I was too slow

19   to interrupt Mr. Heimbach and I move to strike.

20           THE COURT:  All right.  He answered your question

21   "yes," and the jury will disregard the remainder of the answer.

22           MS. DUNN:  Thank you.

23    BY MS. DUNN:

24   Q    All right.  Let's talk about your communications with

25   Mr. Kessler.  You said that you did not speak with Mr. Kessler

M. Heimbach - Direct

1  in the days leading up to Charlottesville 2.0.  You know that

2  Mr. Kessler's phone number is 434-996-5567?

3  A    If you say it.

4  Q    Well, this was discussed in your deposition.

5  A    Sure.  I don't know his phone number off the top of my

6  head.

7  Q    Okay.  Let's look at your phone records with respect to

8  Mr. Kessler.  You spoke to Mr. Kessler on August 7th, five days

9  before Charlottesville 2.0.  You called him at almost 5 p.m.

10 You left a voicemail.  Do you see that?

11 A    Yes.

12 Q    Mr. Kessler returned your phone call at 5:11 and you spoke

13 for seven minutes.  You then called Mr. Kessler again, left

14 another message.  He called you back five minutes later at

15 10:54 p.m. and you spoke for another seven minutes.  You also

16 spoke to Mr. Kessler on August 10th.  And now we're on page 14

17 of your phone records.  Mr. Kessler called you at 2:14 on the

18 10th and you spoke for six minutes.  Then you spoke also --

19          MR. JONES:  There needs to be questioning, not just

20 reading the records.

21          MS. DUNN:  Your Honor, I'm just trying to do this in

22 the interest of time.

23          THE COURT:  Well, she's reading from the -- if he

24 disagrees -- Mr. Heimbach, say so if you disagree, but this

25 seems the quickest way to get through it.

M. Heimbach - Direct

1          MS. DUNN:  Thank you, Your Honor.

2     BY MS. DUNN:

3   Q   Mr. Kessler called you at 2:14 p.m. on August 10th and you

4   spoke for six minutes.  And then you also spoke with

5   Mr. Kessler on August 11th when you arrived -- or after you

6   arrived in Charlottesville at 5:02.

7          And so we can agree, I would think, at this point that you

8   did have communications with both Mr. Kessler and Mr. Kline in

9   the days before Charlottesville 2.0, correct?

10  A   Sure.  As you can see from the phone records, there were a

11  lot of phone calls.  I just hadn't recalled talking to them.

12  Q   And even though you spoke to Mr. Kessler on August 7th,

13  10th and the 11th multiple times, it's your testimony he never

14  told you about the torch march that he led, correct?

15          MR. SMITH:  Your Honor, that mischaracterizes the

16  testimony, that he didn't speak to -- the records don't say

17  that he spoke to either of those people multiple times in a

18  single day every day.

19          THE COURT:  Overruled.  Go ahead, answer the

20  question, sir.

21  BY MS. DUNN:

22  Q   Even though you spoke to Mr. Kessler multiple times

23  including on August 7th, 10th and 11th, it's your testimony he

24  never told you about the torch march that he led on the 11th,

25  correct?

M. Heimbach - Direct

1  A     I can't recall discussing it with him.

2  Q     All right.  You also communicated with Mr. Kessler on

3  August 12th.  This is on page 16.  That's at 7:05 p.m.  And you

4  would agree with me that you also communicated with Mr. Kessler

5  via text.  And we saw your text messages earlier.

6  A     Yes.

7  Q     Okay.  All right.  On August 13th -- this is Exhibit 1425.

8  On August 13th -- this is in evidence -- you texted Mr. Kessler

9  about an upcoming press conference that you wanted TWP to be

10 involved with.

11 A     I actually didn't want TWP to be involved with as the

12 topic goes.  Mr. Kessler had asked for us to be there, if

13 memory serves, but he had said that he didn't want the

14 Traditionalist Worker Party to go as the Traditionalist Worker

15 Party.  So I informed him that then I had no interest in that.

16 Q     All right.  Mr. Spalding, let's go to pages 6 and 7.

17       Mr. Heimbach, you write to Mr. Kessler on August 13th, "We

18 literally bled yesterday as you all stood behind the barricades

19 safe and sound and then you're going to ask my men to protect

20 you again, but cut us out of the press conference?  That dog

21 don't hunt."  Do you see that?

22 A     Yes.  Because --

23 Q     And then Mr. Kessler says, "I plan to be standing up for

24 all of us, but the message has to be tightly controlled."  Do

25 you see that?

M. Heimbach - Direct

1  A    I do.

2  Q    Then you say, "I'll call you right back.  Okay, we'll be

3  team players, but we won't be disrespected.  We're either equal

4  partners or we're not.  You decide."  And Mr. Kessler says -- I

5  can barely read this.  "There are people who are going to try

6  to kill me if I don't get some security."  And you respond,

7  "Well, do you want to stand by TWP as partners?"  Do you see

8  that?

9  A    I do.

10  Q    And you're asking Mr. Kessler on August 13th whether he's

11  going to stand by TWP as partners, right?

12  A    Yes.

13  Q    Okay.  And it's also been your testimony that you didn't

14  see Richard Spencer at McIntire Park; do you remember that?

15  A    I believe I didn't see him at Emancipation Park.  I can't

16  recall, given the state of emergency, the pepper spray in my

17  face, and the general chaos of trying to disperse following the

18  governor's order, exactly who I talked to in McIntire Park

19  after marching miles and dealing with everything that we just

20  had dealt with.

21  Q    Okay.  But do you remember in your deposition being asked

22  whether you saw Richard Spencer at McIntire Park?

23  A    I don't recall.

24  Q    All right.  Let's show the witness 2554, please.

25            (Plaintiffs' Exhibit 2554 marked.)

M. Heimbach - Direct

1        MS. DUNN:  And I'm sorry, this is just minute 28:22

2   to 28:28.  It's very brief.

3            (Video playing.)

4   BY MS. DUNN:

5   Q    Do you see that, Mr. Heimbach?

6   A    I do.

7        MS. DUNN:  Okay.  And if we could move into evidence

8   2554 and play it for the jury?

9        THE COURT:  Be admitted.

10           (Plaintiffs' Exhibit 2554 admitted.)

11  BY MS. DUNN:

12  Q    Okay.  So you see Mr. Spencer, you see yourself, you see

13  Mr. Davis, correct?

14  A    Correct.

15  Q    Okay.  I believe David Duke is also in this video.  Was he

16  there in McIntire Park?

17  A    I believe so.

18  Q    And you saw him that day?

19  A    I believe so.

20  Q    All right.  So after August 11th and 12th, you said that

21  you believed that at Charlottesville your movement had, quote,

22  achieved all of its objectives.  Do you remember saying that?

23  A    Yes.

24  Q    And that was after the car attack and after all the events

25  of August 11th and 12th, correct?

M. Heimbach - Direct

1  A    Correct.

2  Q    And you said, "I think we did an incredibly impressive

3  job."  Do you remember that?

4  A    Not off the top of my head, but I'm sure I said something

5  like that.

6  Q    And on August 18th you said, "This is a stunning victory

7  for us.  We achieved all our objectives."  Do you remember

8  saying that to a news station?

9  A    Sure.

10 Q    You called this "the most amazing successful white

11 nationalist event of the past two generations."  Do you recall

12 that?

13 A    Yes.

14 Q    That was on your own podcast?

15 A    I said yes.

16 Q    Okay.  And you thought that Charlottesville 2.0 was a

17 stunning victory and a huge success, despite someone getting

18 killed by a car and many other people being injured, correct?

19 A    Which had nothing to do with us or the rally and happened

20 after the Traditionalist Worker Party and myself was already

21 out of the city.  I would view those as fundamentally separate

22 events.

23 Q    So your testimony, just to be clear, is that none of this

24 had anything to do with you?

25 A    In terms of James Fields, yes, that had absolutely nothing

M. Heimbach - Direct

1    to do with me, and the lack of attendance at the torch march.

2    So when I speak of Charlottesville, I'm fundamentally speaking

3    about the actual rally itself.

4    Q    All right.  So you mentioned James Fields.  You are aware,

5    aren't you, that Mr. Fields did hit the gas and drove through a

6    crowd of counter-protesters on August 12th and killed a woman

7    named Heather Heyer?  You're aware of that?

8    A    I am.

9    Q    And are you also aware that many of the plaintiffs in this

10   case were injured in that car attack?

11   A    I am.

12   Q    And you believe that James Fields did not do anything

13   wrong, correct?

14   A    I believe as it stands, the political nature of trials in

15   this country, it's hard to really know that day what --

16            MS. DUNN:  Your Honor, move to strike.

17    BY MS. DUNN:

18   Q    My question is you believe that James Fields did not do

19   anything wrong?

20            MR. SMITH:  He was answering that question, Your

21   Honor.

22            THE COURT:  Well, I think this is a question he has a

23   right to explain his answer.

24            MR. SMITH:  Thank you, Your Honor.

25            THE COURT:  You can withdraw the question or proceed.

M. Heimbach - Direct

1              MS. DUNN:  I can withdraw it, Your Honor.

2    BY MS. DUNN:

3    Q    Mr. Heimbach, are you aware that Mr. Fields's own lawyer

4    began this case by saying that Mr. Fields purposely drove his

5    car into a crowd?

6              MR. CAMPBELL:  Objection.  That's inappropriate.

7              THE COURT:  Strike.  Don't preface a question like

8    that.

9    BY MS. DUNN:

10   Q    Mr. Heimbach, when you were asked by a reporter if you

11   would disassociate from Mr. Fields, you said "not at all,"

12   correct?

13   A    I can't recall exactly saying that.

14   Q    You don't recall ever having said that?

15   A    I don't recall what interview or time that would have

16   been.

17   Q    Do you remember being asked in your deposition,

18   "Mr. Heimbach, were you asked by a reporter:  You're not going

19   to disassociate yourself from James Fields at all?

20        "Answer:  Yes.

21        "Question:  And did you respond in response to that

22   question, 'not at all'?

23        "Answer:  Yes, because I believe he acted in self-defense

24   and didn't commit a crime."

25   A    I don't recall saying that, but I do believe the fact --

M. Heimbach - Direct

1  Q    Mr. Heimbach --

2  A    Yes, ma'am.

3  Q    Were you asked that in your deposition and was that your

4  answer?  And if you're not sure, you can look at page 668,

5  lines 3 to 10.

6  A    I'll believe you.

7  Q    Well, it's important that you know whether you said this

8  or not.

9         THE COURT:  Well, he said -- the record reflects that

10  that's what the question was asked and that's what he

11  responded.

12   BY MS. DUNN:

13  Q    Okay.  Mr. Heimbach, take a look, please, at Plaintiffs'

14  Exhibit 1833.

15         (Plaintiffs' Exhibit 1833 marked.)

16  BY MS. DUNN:

17  Q    Do you recognize this?

18  A    It's a letter I wrote to James Fields.

19  Q    Right.  This is a letter you wrote to James Fields.

20         MS. DUNN:  Your Honor, we would move to admit 1833.

21         THE COURT:  Be admitted.

22         (Plaintiffs' Exhibit 1833 admitted.)

23   BY MS. DUNN:

24  Q    So let's look at your letter to Mr. Fields.  It begins by

25  saying, "Dear James, we've never met and you might not know who

M. Heimbach - Direct

1  I am.  I am the chairman of the Traditionalist Worker Party, a

2  national socialist organization that was there with you in

3  Charlottesville."  Do you see that?

4  A    I do.

5  Q    The second paragraph you say, "What we do have is a

6  connection as comrades."  Do you see that?

7  A    Yes.

8  Q    All right.  And in the third paragraph you can say, "I

9  know why you went to Charlottesville."

10      Let me back up.  "You are a good man.  I can tell from

11  everything I've read or heard about you.  I know why you went

12  to Charlottesville, because you want a future for yourself and

13  for our people."

14      And so, Mr. Heimbach, at this time you were telling

15  Mr. Fields that you understood why he went to Charlottesville,

16  correct?

17  A    To try and protect the confederate statues, yes.

18  Q    Where do you see that?

19  A    That's why we went to Charlottesville.

20  Q    Right.  But my question, Mr. Heimbach, is whether you were

21  communicating to him that you understood why he went?

22  A    To stand up for the confederate statues that were being

23  threatened with being torn down, which would have been --

24  Q    Mr. Heimbach, that's a different question.  It may be my

25  fault.  I'm asking you whether you were communicating to

M. Heimbach - Direct

1   Mr. Fields that you understood why he went, not what you

2   thought the explanation was?  You were saying to him, I

3   understand why you --

4            THE COURT:  You can answer that question yes or no.

5            THE WITNESS:  Yes.

6    BY MS. DUNN:

7   Q    And one reason you understood is because of your shared

8   beliefs with Mr. Fields, correct?

9   A    Sure.

10  Q    Sure, or yes?

11  A    Yes.

12  Q    Okay.  If you go to page 2 in your letter, the first

13  paragraph, at the end you say, "You, my friend, are a martyr

14  for our folk."  Do you see that?  It's at the end of the

15  paragraph.

16  A    Yes.

17  Q    And in the next paragraph you say, "The enemy has

18  imprisoned you because they are scared of the rise of

19  nationalism."

20       Who is the enemy to whom you refer in this sentence,

21  Mr. Heimbach?

22  A    The American empire, which is fundamentally hostile to the

23  continued survival of white Americans.

24  Q    And you continue that "You are a prisoner of war in this

25  fight, nothing less.  I think of this song" -- and I'm going to

M. Heimbach - Direct

1  mispronounce this name in German, but it's also called The Good

2  Comrade.  Then you write him -- you write the lyrics of this

3  song or poem.  Do you see that?

4  A    Yes.

5  Q    Can you read that song or poem?

6  A    "I once had a comrade.  You will find no better.  The drum

7  called to battle, he walked at my side, in the same pace and

8  step.  A bullet came a-flying.  Is it my turn or yours?  He was

9  swept away, he lies at my feet, like it were a part of me.  He

10 still reaches out his hand to me, while I am about to reload.

11 I cannot hold onto your hand.  You stay true, my good comrade."

12 Q    What's your understanding of the line "while I'm about to

13 reload"?

14 A    This is a German song that goes back far before World War

15 II that was traditionally utilized by German military units at

16 funerals and such.

17 Q    So "while I'm about to reload" is a reference to the

18 military, presumably to a weapon, correct?

19 A    Sure.

20 Q    Sure or yes?

21 A    Yes.

22 Q    Then you go on to say, "We have marched into battle

23 together, and while our foes have taken you, you are still here

24 with us in spirit."  Do you see that?

25 A    Yes.

M. Heimbach - Direct

1   Q    You say, "You will one day soon be free and you will be

2   given a hero's welcome when you come home.  I promise you, you

3   will not be forgotten."  And here you are talking about "our

4   foes," meaning your foes and James Fields's foes, our foes,

5   correct?

6   A    Yes.

7   Q    Then in the next paragraph you say, "Thank you for your

8   service to our people."  Do you see that?

9   A    Yes.

10  Q    And who are "our people"?

11  A    That would be white folks.

12  Q    So thank you for your service to white folks for what you

13  did.  When you say service, what are you describing?

14  A    Well, and this is important to clarify.  I'm not speaking

15  about the car accident.  I'm talking about the fact that I view

16  his prosecution as being severely politically motivated, a

17  modern political lynching.  And his service is continuing on to

18  fight for his innocence at the time I wrote this letter.

19  Q    Okay.  So your testimony is that when you're talking about

20  James Fields's service to our people, that's not a reference to

21  what happened on August 12th?

22  A    Yes, traditionally --

23  Q    Mr. Heimbach, it's just a yes or no question.

24  A    Yes.

25  Q    All right.  And then you say -- you offer him additional

M. Heimbach - Direct

1  support.  Did you also send him money?

2  A    I believe so.

3  Q    Okay.  And then you say, "Let's be in touch, because as a

4  man behind the wire, you deserve our support as a movement."

5  Do you see that?

6  A    Yes.

7  Q    You conclude by saying, "May God bless you and hail

8  victory."  And you sign your name.  Do you see that?

9  A    Yes.

10  Q    And then the quote below is by Sir Oswald Mosley.  We've

11  heard about this Mr. Mosley before.  Do you see that?

12  A    Yes.  Would you like me to read the quote?

13  Q    No, thank you.  After Mr. Fields killed Ms. Heyer, you

14  said, "She wasn't on her way to church and was blocking

15  traffic.  If you don't want shit, don't start shit."  Do you

16  recall saying that?

17  A    Not off the top of my head.

18  Q    That's not something you would remember if you said it?

19  A    I used to do a daily podcast.  So I said a lot of things

20  over the years.

21          MS. DUNN:  Your Honor, no further questions at this

22  time.

23          I'm sorry.  We have some exhibits that we need to

24  move.

25          MR. SMITH:  No objection to the exhibits, Your Honor.

203

M. Heimbach - Cross

1        MS. DUNN:  Your Honor, we move 2538 and 2871.

2        THE COURT:  They will be admitted.

3        MS. DUNN:  Thank you.

4        (Plaintiffs' Exhibit 2538 admitted.)

5        (Plaintiffs' Exhibit 2871 marked.)

6        (Plaintiffs' Exhibit 2871 admitted.)

7                    CROSS-EXAMINATION

8    BY MR. KOLENICH:

9    Q    Good afternoon, Mr. Heimbach.

10   A    Afternoon, Mr. Kolenich.

11   Q    Do you recall earlier today being asked about the phrase

12   "take the ground early"?

13   A    Yes.

14   Q    Do you still have your deposition transcript up there?

15   A    I do, sir.

16   Q    Could you please turn to page 566?

17        MR. SMITH:  You said 566?

18        THE WITNESS:  Yes, sir.

19   BY MR. KOLENICH:

20   Q    So would you agree with me that your testimony at

21   deposition was that this was your phraseology, not something

22   that Jason Kessler or Eli Mosley said to you?

23   A    Correct.

24   Q    Thank you.  In fact, would you agree with me that either

25   Kessler or Mosley asked your group to show up early?  That's

M. Heimbach - Cross

1  all they asked you to do?

2  A    I can't recall the specific conversations I had with them.

3  Q    Fair enough.  At any point in the preparations for August

4  11th and 12th or either one of those days, were you taking

5  orders from Jason Kessler?

6  A    Absolutely not.

7  Q    How about from Eli Mosley?

8  A    Absolutely not.

9  Q    What do you know about the command organization and

10 structure of Identity Evropa?

11 A    Absolutely nothing.

12 Q    What do you know about what Eli Mosley was supposed to be

13 doing for Identity Evropa on August 11th and 12th in

14 Charlottesville, Virginia?

15 A    Nothing.  That was an entirely separate organization that

16 was often hostile with my own.  So nothing.

17 Q    Thank you.

18      Do you recall the discussion about the phrase, "the hard

19 right"?

20 A    Yes.  I believe Mr. Ike Baker coined that phrase.

21 Q    All right.  Now, would you consider Identity Evropa to be

22 part of this hard right?

23 A    Absolutely not.

24 Q    Would you consider Jason Kessler to be part of this hard

25 right?

                              205

                      M. Heimbach - Cross


1   A    No.

2   Q    And what is the reason for not considering them part of

3   the hard right?

4   A    Identity Evropa was generally a far more bourgeoise

5   movement of upper class folks --

6              MS. DUNN:  Objection, Your Honor.  Foundation.

7              MR. KOLENICH:  I'm merely asking his opinion, Your

8   Honor.

9              THE COURT:  Well, he's accused of being related to

10  him -- having a relationship, so he can explain what that

11  means.

12             MR. KOLENICH:  Thank you, Your Honor.  Go ahead,

13  Mr. Heimbach.

14             THE WITNESS:  No.  Radically different subcultures,

15  radically different places in the movement.  Different

16  constituencies of members.  So very different from one another.

17  BY MR. KOLENICH:

18  Q    Would your organization have relied on Identity Evropa or

19  Kessler for physical defense at a public event?

20  A    No.

21             MR. KOLENICH:  Thank you.  I have no further

22  questions.

23             THE COURT:  Thank you.

24                        CROSS-EXAMINATION

25   BY MR. SPENCER:

M. Heimbach - Cross

1   Q    Hello.

2   A    Hello, Mr. Spencer.

3   Q    Mr. Heimbach, was I ever involved with any organization

4   that you ran or were intimately involved with?

5   A    No.

6   Q    Does that include the Traditionalist Worker Party?

7   A    It does.

8   Q    Does that include the League of the South?

9   A    Yes.

10  Q    Does that include the National Alliance?

11  A    Nationalist Front.

12  Q    Nationalist Front, excuse me.  Does that include the

13  Nationalist Front?

14  A    Yes.

15  Q    Did you ever provide security for me during the events of

16  Charlottesville or anything like that?

17  A    No.

18  Q    Did you ever provide me with a shield?

19  A    No.

20  Q    Or a helmet?

21  A    No.

22  Q    Did you ever give me advice with regard to security or

23  tactics or marching?

24  A    No, sir.

25  Q    Did I march with you in August of 2017?

M. Heimbach - Cross

1  A     No.

2            MS. DUNN:  Your Honor, may I request a brief sidebar?

3            THE COURT:  Okay.

4            (Sidebar commenced.)

5            MS. DUNN:  Your Honor, this is my question.

6  Mr. Spencer is leading this witness, having not established

7  that he is a hostile witness to Mr. Spencer.  And so I think

8  this is a real question about how these defendants,

9  co-defendants are going to be examined.  That has not been

10 dealt with legally.  But it is not -- I would say that they're

11 not allowed to lead because they are co-defendants in a common

12 defense agreement.  And I apologize for not thinking of this

13 earlier, but I don't think anybody did.  But there is not the

14 foundation for the *pro se* individuals or the counsel to lead

15 this witness.  So open-ended questions are fine, but this whole

16 line of questions is leading.

17           THE COURT:  In any respect that he has implicated you

18 or somebody, you may lead him, if he said something that you

19 disagree with.  But since he's not hostile to you, you

20 generally cannot lead a witness unless they're hostile to you.

21           MR. SPENCER:  I understand the idea of a leading

22 question.  Yeah.  I was asking --

23           MS. DUNN:  No.  I'm sorry, Mr. Spencer.

24           THE COURT:  I know they're factual, but they suggest

25 the answer.

M. Heimbach - Cross

1          MR. SPENCER:  I see what you're saying.

2          MS. DUNN:  Questions that start with "did" are

3   leading.

4          MR. SMITH:  You have to get more basic --

5          MR. SPENCER:  Okay.

6          MR. SMITH:  Baby steps to take him through the --

7          THE COURT:  Mr. Cantwell?

8          MR. CANTWELL:  If I could offer an example to just

9   try to clarify.  As opposed to was I involved with X

10  organization, my organization, would it be more appropriate to

11  say something to the effect of which of your organizations was

12  I involved with?

13         MR. SPENCER:  Oh, I see.

14         MR. CANTWELL:  Would that be more acceptable?

15         MS. DUNN:  It's more like --

16         MR. CANTWELL:  These are details that it's sort of

17  important that we get out.  If you'd like us to phrase the

18  question differently --

19         THE COURT:  Something like, Mr. Heimbach, to what

20  extent, if any, do you suggest that I was involved with your

21  company, or if I had anything to do with your organization,

22  describe what it would have been.

23         MR. CANTWELL:  Describe my involvement at TWP.

24         THE COURT:  Well, if I was involved -- just don't

25  suggest the answer.

M. Heimbach - Cross

 1              MR. SPENCER:  Thank you.

 2              (Sidebar concluded.)

 3    BY MR. SPENCER:

 4    Q    All right.  Could you describe my involvement with any of

 5    the aforementioned organizations?

 6    A    None, to my knowledge.

 7    Q    Okay.  We've seen evidence that you have gotten into some

 8    altercations in the process of a rally that you attended.  In

 9    your recollection, was I ever involved in any of these

10    altercations?

11    A    No, sir.

12    Q    Do you remember me being there in the vicinity in any

13    altercation involving the Charlottesville --

14    A    No.

15              MS. DUNN:  Objection, Your Honor.

16              THE COURT:  All right.  Mr. Spencer, you can ask him

17    if he saw you and where.

18              MR. SPENCER:  Okay.  I understand.

19              THE COURT:  Something to that effect.

20    BY MR. SPENCER:

21    Q    In any of these altercations that might have gotten

22    physical, did you happen to see me?

23    A    No.

24    Q    You were involved with logistical coordination with the

25    Charlottesville police.  And I'll just focus on this.  You have

M. Heimbach - Cross

1  testified to that fact?

2  A     Yes.

3          MS. DUNN:  Objection.

4          MR. SPENCER:  Well, I was just -- I haven't asked my

5  question yet.  I was just establishing --

6          MS. DUNN:  Objection.  Not the witness's testimony,

7  and so objection, misstates testimony and also leading.

8          MR. SMITH:  Your Honor -- you know what, I'll --

9          MR. SPENCER:  I can just rephrase.

10         THE COURT:  Did you say you were involved earlier

11 with the Charlottesville police coordination?

12         THE WITNESS:  Yes, Your Honor.  But Ike Baker of the

13 League of the South was the primary point of contact for our

14 overall plans, so yes.

15         THE COURT:  What is your question?

16  BY MR. SPENCER:

17 Q    Was I involved in any of those meetings that you

18 participated in of any nature, digital or physical, with the

19 Charlottesville police about logistics or safety of the rally?

20 A     No.  There was a total divorce between yourself and myself

21 in any of the lead-up.

22 Q    I want to go back and talk a little more generally.  Were

23 we in communication in the year leading up to the

24 Charlottesville rally?

25 A     To some degree.

M. Heimbach - Cross

1   Q    I would like to introduce -- this is in my evidence file.

2   This is just a screenshot of a text message.

3         MS. DUNN:  Your Honor, we just would ask Mr. Spencer,

4   if he knows, what is the exhibit number?

5         MR. SPENCER:  It's not -- I entered all my

6   Exhibits -- I'm introducing this because this came up during

7   your examination.  And this is in my exhibit list that was

8   given weeks ago.

9         THE COURT:  Does it have a number?

10        MR. SPENCER:  It does not have a number.

11        THE COURT:  How do we know --

12        MR. SPENCER:  Well, because I put this together today

13  because it's a direct response to the testimony of

14  Mr. Heimbach.

15        MR. SMITH:  I think what he's saying, Your Honor, is

16  it's a rebuttal exhibit so he didn't know he was planning to

17  introduce it.

18        THE COURT:  Can you get it on the screen?  I mean,

19  it's something that's been filed.

20        MR. SPENCER:  Yes.

21        THE COURT:  Right?  Okay.  Can you get it on the

22  screen?

23        MR. SPENCER:  It's on the screen right now.

24        THE COURT:  Okay.  Well, what's the issue?

25        Okay.  Go ahead.

M. Heimbach - Cross

1             MR. SPENCER:  And can that be published to the jury?

2             THE COURT:  Yes.

3             (Defendants' Exhibit 1 marked.)

4             (Defendants' Exhibit 1 admitted.)

5   BY MR. SPENCER:

6   Q    Mr. Heimbach, did you possess a phone number during the

7   period of these events, 301-525-1474?

8   A    Yes.

9   Q    Looking at this exhibit, do you recall sending me this

10  text message?

11  A    Not off the top of my head, but I believe I did.

12            MS. DUNN:  Your Honor, we would just request, because

13  this exhibit has no identifying information, it's a text, but

14  it has no phone numbers, we just would like to see the whole

15  exhibit.  Since it doesn't have a number, we can't look it up.

16            THE COURT:  Okay.  We need -- I mean, they need to

17  see it like Mr. Jones needed to see...

18            MR. SPENCER:  I don't know how I can show that to

19  you.  I mean, this was presented to you years ago originally,

20  and then I have -- again, because this was brought up today, I

21  brought this up.  I mean, I could --

22            MR. SMITH:  Your Honor --

23            MR. SPENCER:  We don't need it, I guess.  I could

24  move on without it.

25            MR. SMITH:  Perhaps we could have a quick sidebar

M. Heimbach - Cross

1    about this.

2             THE COURT:  No.  Can you find the whole -- I mean,

3    can you find the entire message?

4             MR. SPENCER:  I can.

5             THE COURT:  All right.

6             MR. SPENCER:  Could you turn the screen on here again

7    so I can find that?

8             THE CLERK:  It's showing on here.  Did it come

9    unplugged?

10            MR. SPENCER:  It's not showing here.

11            THE CLERK:  Is it VGA or HDMI?

12            MR. SPENCER:  It's HDMI.

13            I don't want to hold up the trial.  I can just move

14   on.  This was just supplementing.

15            THE COURT:  All right.

16    BY MR. SPENCER:

17   Q    Do you recall having a phone conversation with me in the

18   summer of 2017?

19   A    I believe so, yes.

20   Q    Do you recall anything about that conversation?

21   A    I think we mostly talked about our families, honestly.

22   Just friendly chitchat.

23   Q    Okay.  Before that call, had we been in communication in

24   some way?

25   A    Not that I can particularly think of.  Again, different

M. Heimbach - Cross

1  subcultures.

2  Q    Did we interact on social media?  Do you remember any

3  interaction on social media?

4  A    I might have followed you on Twitter.

5  Q    I'll bring you to Charlottesville 1 which occurred in May

6  of 2017.

7  A    Yes.

8  Q    Did you attend Charlottesville 1?

9  A    I did.

10 Q    Do you remember seeing me there?

11 A    Yes.

12 Q    Do you remember seeing me at an after-party?

13 A    Yes.

14 Q    Did we come together to that after-party?

15 A    Not together, no.

16 Q    Do you remember my general state at that after-party?

17 A    Not entirely.

18 Q    Okay.  Do you remember there being a lot of boisterous

19 singing and drinking and so on at that after-party?

20        MS. DUNN:  Objection, leading.

21 BY MR. SPENCER:

22 Q    What do you remember about that after-party?

23 A    It was a very enthusiastic sort of event where folks

24 thought it was a very successful demonstration.  So there was

25 food, music, drinking.

M. Heimbach - Cross

1   Q    Do you remember anyone being drunk at that after-party?

2   A    Yes.

3   Q    Do any names come to mind?

4   A    I mean, I would just have to go with a large percentage

5   probably of the folks that were there.  There was a lot of

6   celebration going on.

7   Q    Did I invite you to attend Charlottesville 1 in May?

8   A    I don't believe you did.

9   Q    Who invited you to attend Charlottesville 1 in May?

10  A    I believe I got an invitation initially from Derrick Davis

11  that had been in contact with local organizers.  He had friends

12  in different organizations.

13  Q    I would like to speak a little bit about ideological

14  questions.

15  A    Sure.

16  Q    Have you ever heard the term "ethnostate"?

17  A    Yes.

18  Q    Could you describe what that means to you?

19  A    Sure.  Well, the creation of an ethnostate would be a

20  racially homogenous nation that is essentially a Herrenvolk

21  democracy where a single people, culture, identity, would be

22  the ones who would be in charge of that region.

23  Q    Do you remember who coined that term, "ethnostate"?

24  A    I believe it's been used far before any of us got involved

25  in politics.

M. Heimbach - Cross

1   Q    Have you ever heard me discuss the ethnostate?  Or have

2   you ever heard me discuss that -- using that term, the

3   "ethnostate"?

4   A    I can't think specifically of a podcast or whatever where

5   you've touched on that.  I should have listened better, I

6   guess.

7   Q    Okay.  How would you describe the ethnostate?  Is the

8   ethnostate -- how would you describe the ethnostate in its

9   relationship to, say, activism?

10  A    Well, the goal would be to be able to have a movement that

11  was political in order to be able to achieve political goals.

12  In this case it would be self-determination in line with

13  international law.

14  Q    In terms of -- going back a little bit before 2017, what

15  was your impression of me, Richard Spencer, before the

16  Charlottesville rally?

17  A    It was a complicated view.  Kind of always viewed you as a

18  bit of a dandy.

19  Q    Okay.  Was I someone that you looked up to in terms of a

20  traditionalist workers movement?

21  A    No.

22  Q    Was I someone that you listened to in order to get

23  ideological advice?

24  A    No.

25  Q    Was I someone who you would listen to to get strategic

217

M. Heimbach - Cross

1   advice or safety advice?

2   A    No.

3   Q    Did you ever see me wear boat shoes?

4   A    Not sure off the top of my head, but it wouldn't surprise

5   me.

6   Q    There was a discussion during your testimony and just with

7   Mr. Kolenich as well about relying on people at this rally.

8   Could you rely on me?

9   A    No.

10  Q    I want to bring up something very quickly.  This came in

11  the plaintiffs' examination of you.  This is just to refresh

12  your memory.  This was Exhibit 0707.

13  A    It's not on my screen.

14       There we go.

15  Q    It's a bit hard to read.

16       So Dillon, that's Dillon Hopper?

17  A    Yes.

18  Q    Number 6190, he wrote, "Now all we need is Spencer and

19  Damigo."

20  A    Yes.

21  Q    What did you need us for?

22  A    I mean, I personally would have said nothing.  As the top

23  of the discussion said, I said that we had 90 percent of the

24  worthwhile activist groups in America, of which obviously

25  Identity Evropa and your section of the movement would have

M. Heimbach - Cross

1   comprised more than ten percent of the movement.  So when I

2   wrote that, I was not including your part of things.  So Dillon

3   said that we needed you guys.

4   Q    Okay.  Did you want me there?

5   A    In terms of at Charlottesville in general?

6   Q    Yes.

7   A    In politics in general?

8   Q    No, I would say Charlottesville.

9   A    Well, I mean, going to Charlottesville was primarily -- it

10  was going to be a big platform for our message.  In many ways I

11  would say yeah, I was hoping you would be there, but I was

12  hoping my speech would be better and, you know, I would view us

13  in many ways subculturally as in competition for one another

14  because the version of white advocacy that you had and I had

15  were so fundamentally different from one another, we really

16  weren't trying to go to the same end destination.

17            MR. SPENCER:  Thank you.  No further questions.

18            THE COURT:  Mr. Cantwell, do you have any questions?

19            MR. CANTWELL:  I was going to say, Judge, I'm happy

20  to get started, but I'm definitely going to take more than 13

21  minutes.  If you'd like me to get started, I will.

22            THE COURT:  Did you have any questions?

23            MR. CAMPBELL:  Your Honor, I do have only a few that

24  would easily fit in before we would need a break.

25            THE COURT:  Okay.

Sines, et al v. Kessler, et al., 3:17CV72, 11/02/2021

1                        CROSS-EXAMINATION

2    BY MR. CAMPBELL:

3    Q    Mr. Heimbach, I represent James Fields.  I have a couple

4    of questions for you.

5    A    Yes, sir.

6    Q    Prior to August 12, did you know the name "James Fields"?

7    A    No.

8    Q    Ever met James Fields, to your knowledge, before August

9    12?

10   A    No.

11   Q    Since August 12, and having seen photographs of Mr. Fields

12   presumably all over the Internet and newspapers and that sort

13   of thing, does that make you recall ever seeing James Fields at

14   any event you participated in prior to August 12th?

15   A    No.

16   Q    So Charlottesville 1.0, Pikeville, I don't know if you

17   went to Berkeley or whatever, any event, did you ever see James

18   Fields at any event prior to August 12?

19   A    No.

20   Q    In your mind, when was the Unite the Right rally over?

21   A    As soon essentially as the state of emergency was declared

22   and we dispersed from the park.

23            MR. CAMPBELL:  Thank you, sir.  I don't have any more

24   questions.

25            THE COURT:  Anyone going to take just about five

Sines, et al v. Kessler, et al., 3:17CV72, 11/02/2021

1  minutes?  Anyone on the Internet?

2         THE CLERK:  Mr. Hopper indicated he had no questions

3  and Mr. ReBrook has indicated he has questions.

4         THE COURT:  Okay.

5         THE CLERK:  Hang on, Mr. ReBrook is thinking.  One

6  second.

7         THE COURT:  Members of the jury, we'll take a recess

8  now until 9 o'clock tomorrow morning.  Same admonition.  Do not

9  discuss the case with anyone.  Do not allow anyone to discuss

10 it with you.  Do not remain within the hearing of anyone

11 discussing it.  And do not read, listen, or watch anything

12 pertaining to the case.

13        And you're excused at this time.  You may go with the

14 marshal.

15        THE CLERK:  Your Honor, Mr. ReBrook will have some

16 tomorrow morning.

17        THE COURT:  Who?

18        THE CLERK:  Mr. ReBrook tomorrow morning.

19 **(Jury out, 4:50 p.m.)**

20        MS. KAPLAN:  Your Honor, can we raise one

21 housekeeping matter?

22        THE COURT:  Yes.

23        MS. KAPLAN:  So, Your Honor, I'm very hopeful --

24 we've all been talking about scheduling.  I'm very hopeful

25 tomorrow that we'll get a chance to put on one of our experts,

Sines, et al v. Kessler, et al., 3:17CV72, 11/02/2021

1  Deborah Lipstadt, on the stand.  I think I mentioned earlier

2  I've had conversations with Mr. Campbell and Mr. Kolenich about

3  the exhibits I want to use.  We've made disclosure to all the

4  defendants about the exhibits.

5          The vast majority of them will be already in evidence

6  but there may be one or two that we'll have to get in later in

7  the case with other witnesses.  And I wanted to make sure that

8  would be okay with Your Honor, in terms of showing them to the

9  jury.  I won't admit them.

10          THE COURT:  They have been filed?

11          MS. KAPLAN:  No, not with Your Honor.  They've been

12  disclosed to the other side.

13          Oh, yes, they've all been produced, yes, Your Honor.

14          THE COURT:  Okay.  Well, if you'll vouch for the fact

15  they're going -- I will take your word for it that they're

16  admissible and so someone else will tie it in.

17          MS. KAPLAN:  Thank you, Your Honor.

18          MR. CAMPBELL:  Your Honor, just for my part anyway,

19  having reviewed all of them, I would concur.

20          MR. SMITH:  I don't have a problem with the exhibits

21  that were in Ms. Kaplan's email that she sent.

22          MS. KAPLAN:  Thank you, Your Honor.

23          MR. SPENCER:  Your Honor, I have one small thing.

24  The plaintiffs have been excellent at producing all of the data

25  on Discord, and I actually have a dedicated computer for that.

Sines, et al v. Kessler, et al., 3:17CV72, 11/02/2021

1  The issue was actually brought up by Mr. Jones this morning

2  regarding the fact that all of the evidence on Discord, which

3  is a huge amount, they are not labeled using the plaintiffs'

4  exhibits.

5          So for instance, when I was just using an exhibit to

6  remind Mr. Heimbach, I was able to find the hard copy of what I

7  wanted, but in the future I might want to use these exhibits.

8  And I've asked the plaintiffs in recess whether they could

9  allow me to have a cross-reference.  And they've been helpful,

10 but they really haven't offered anything.  I just simply want a

11 simple way to cross-reference the exhibits.

12          THE COURT:  Can you send them something that --

13          MR. SPENCER:  I could send a letter.

14          THE COURT:  -- whatever you have, and list as much

15 information as you have about it, and that should give them an

16 opportunity to maybe ferret out the exhibit by number.

17          MR. SPENCER:  I'll send you an email, but it's really

18 kind of like a cross-reference key so that when you put

19 forward -- I have your exhibit list.  So if you could just put

20 the exhibit list so that I could know the number, the file name

21 number on the Impact that I have on my computer.

22          MS. DUNN:  Your Honor, I don't know what that would

23 require as far as work.  I also think there's a little

24 disconnect, and maybe Mr. Kolenich or Mr. Jones can help us

25 out.  I think what Mr. Spencer needs is the exhibit by PX

Sines, et al v. Kessler, et al., 3:17CV72, 11/02/2021

1  number or by exhibit number, and I assume other counsel has

2  that.

3      MR. SPENCER:  I have that.  That's what I'm saying.

4  The file name on the -- you sent me a hard drive that I have

5  attached to a computer.  The file name in that hard drive,

6  there's no way to cross-reference to the exhibit number.

7      MS. KAPLAN:  I don't think we have that, Your Honor.

8  It doesn't exist.  I will say that all the exhibits have the

9  Bates number on them, as they always do.  So I don't know if we

10  can do much more than that.  We don't have the kind of key that

11  he's talking about.

12      MR. SPENCER:  I'll try again.  If you wouldn't mind,

13  I might send you an email.  Sometimes when it's in writing it's

14  a little more clear.

15      MS. DUNN:  That's fine.

16      MR. CANTWELL:  I seem to have gathered some

17  conversation about stipulations in email.  As we have sort of

18  established, I'm not big on emails these days.  So I have no

19  idea what's going on.

20  (Proceedings adjourned, 4:55 p.m.)

21

22

23

24

25

Sines, et al v. Kessler, et al., 3:17CV72, 11/02/2021

1                     C E R T I F I C A T E

2        I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3    the United States District Court for the Western District of

4    Virginia, appointed pursuant to the provisions of Title 28,

5    United States Code, Section 753, do hereby certify that the

6    foregoing is a correct transcript of the proceedings reported

7    by me using the stenotype reporting method in conjunction

8    with computer-aided transcription, and that same is a

9    true and correct transcript to the best of my ability and

10   understanding.

11       I further certify that the transcript fees and format

12   comply with those prescribed by the Court and the Judicial

13   Conference of the United States.

14       /s/ Lisa M. Blair                Date: November 2, 2021

15

16

17

18

19

20

21

22

23

24

25