Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

```
 1                  UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF VIRGINIA
 2                    CHARLOTTESVILLE DIVISION


 3   *************************************************************

 4   ELIZABETH SINES, ET AL.,    CIVIL CASE NO.:  3:17CV72
                                 NOVEMBER 3, 2021, 8:59 AM
 5                               JURY TRIAL, DAY 8
          Plaintiffs,
 6   vs.

 7                               Before:
                                 HONORABLE NORMAN K. MOON
 8                               UNITED STATES DISTRICT JUDGE
     JASON KESSLER, ET AL.,      WESTERN DISTRICT OF VIRGINIA
 9
          Defendants.
10
     *************************************************************
11
     APPEARANCES:
12

13   For the Plaintiffs:        ALAN LEVINE, ESQUIRE
                                COOLEY LLP
14                              1114 Avenue of the Americas, 46th
                                Floor
15                              New York, NY  10036
                                212.479.6260
16
                                DAVID E. MILLS, ESQUIRE
17                              COOLEY LLP
                                1299 Pennsylvania Avenue, NW,
18                              Suite  700
                                Washington, DC  20004
19                              202.842.7800

20

21

22   Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                       255 West Main Street, Suite 304
23                     Charlottesville, Virginia  22902
                       434.296.9284
24
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25   TRANSCRIPT PRODUCED BY COMPUTER.
```

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

```
 1   APPEARANCES CONTINUED:

 2   For the Plaintiffs:          YOTAM BARKAI, ESQUIRE
                                  MICHAEL L. BLOCH, ESQUIRE
 3                                ROBERTA A. KAPLAN, ESQUIRE
                                  JONATHAN KAY, ESQUIRE
 4                                Kaplan Hecker & Fink LLP
                                  350 Fifth Avenue, Suite 7110
 5                                New York, NY  10118
                                  212.763.0883
 6
                                  KAREN L. DUNN, ESQUIRE
 7                                WILLIAM A. ISAACSON, ESQUIRE
                                  ARPINE S. LAWYER, ESQUIRE
 8                                JESSICA E. PHILLIPS, ESQUIRE
                                  Paul, Weiss, Rifkind, Wharton &
 9                                Garrison LLP
                                  2001 K Street, NW
10                                Washington, DC  20006
                                  202.223.7300
11

12   For the Defendants:         DAVID L. CAMPBELL, ESQUIRE
                                  Duane, Hauck, Davis, Gravatt &
13                                Campbell, P.C.
                                  100 West Franklin Street, Suite 100
14                                Richmond, VA  23220
                                  804.644.7400
15
                                  CHRISTOPHER CANTWELL, PRO SE
16                                #00991-509
                                  USP Marion
17                                4500 Prison Road, PO Box 2000
                                  Marion, IL  62959
18
                                  BRYAN J. JONES, ESQUIRE
19                                Bryan J. Jones, Attorney at law
                                  106 W. South Street, Suite 211
20                                Charlottesville, VA  22902
                                  540.623.6952
21
                                  JAMES E. KOLENICH, ESQUIRE
22                                Kolenich Law Office
                                  9435 Waterstone Blvd., Suite 140
23                                Cincinnati, OH  45249
                                  513.444.2150
24

25
```

```
 1   APPEARANCES CONTINUED:

 2   For the Defendants:          WILLIAM E. REBROOK, IV, ESQUIRE
                                  (Appearing via Zoom)
 3                                The ReBrook Law Office
                                  6013 Clerkenwell Court
 4                                Burke, VA  22015
                                  571.215.9006
 5
                                  JOSHUA SMITH, ESQUIRE
 6                                Smith LLC
                                  807 Crane Avenue
 7                                Pittsburgh, PA  15216
                                  917.567.3168
 8
                                  RICHARD SPENCER, PRO SE
 9                                P.O. Box 1676
                                  Whitefish, MT  59937
10
                                  DILLON HOPPER, PRO SE
11                                (Appearing via Zoom)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           INDEX OF WITNESSES

2    WITNESSES ON BEHALF OF THE PLAINTIFF:              PAGE

3    MATTHEW HEIMBACH

4     Cross-Examination by Mr. ReBrook                    14
      Cross-Examination by Mr. Jones                      16
5     Cross-Examination by Mr. Cantwell                   40
      Redirect Examination by Ms. Dunn                    83
6     Recross-Examination by Mr. Cantwell                108
      Recross-Examination by Mr. Smith                   110
7
     DIANE D'COSTA
8
      Direct Examination by Mr. Levine                   112
9     Cross-Examination by Mr. Cantwell                  126

10   DEBORAH LIPSTADT, PH.D.

11    Direct Examination by Ms. Kaplan                   143
      Cross-Examination by Mr. Cantwell                  182
12    Cross-Examination by Mr. Campbell                  188
      Redirect Examination by Ms. Kaplan                 189
13
     ELLIOT KLINE (appearing by video)                   206
14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3        EXHIBIT:                Marked    Received

 4        2702                      27        35

 5        2722                      37        38

 6        2523                      84        84

 7        3840                      91        92

 8        3137                      93        93

 9        3472                     102       102

10        3304                     106       106

11        323                      122       122

12        2030                     164       --

13        3642                     166       --

14        2071                     206       --

15        2571                     175       --

16        3234                     206       --

17        341                      179       --

18        1057                     179       --

19        2390                     180       --

20        1979                     181       --

21        536                      206       206

22        581                      206       206

23        2797                     206       206

24        3710                     206       206

25        393                      206       206
```

```
 1                        INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3          EXHIBIT:                Marked     Received

 4          351                      206         206

 5          502                      206         206

 6          3693                     206         206

 7          3705                     206         206

 8          445                      206         206

 9          363                      206         206

10          396                      206         206

11          3700                     206         206

12          976                      206         206

13          979                      206         206

14          1109                     206         206

15          1184                     206         206

16          348                      206         206

17          349                      206         206

18          426                      206         206

19          448                      206         206

20          1128                     206         206

21          3766                     206         206

22          542                      206         206

23          506                      206         206

24          399                      206         206

25          375                      206         206
```

| | | Marked | Received | |
|---|---|---|---|---|
| 1 | INDEX OF EXHIBITS | | | |
| 2 | EXHIBITS ON BEHALF OF THE PLAINTIFF: | | | |
| 3 | EXHIBIT: | Marked | Received | |
| 4 | 3760 | | 206 | 206 |
| 5 | 3708 | | 206 | 206 |
| 6 | 403 | | 206 | 206 |
| 7 | 449 | | 206 | 206 |
| 8 | 450 | | 206 | 206 |
| 9 | 512 | | 206 | 206 |
| 10 | 356 | | 206 | 206 |
| 11 | 367 | | 206 | 206 |
| 12 | 358 | | 206 | 206 |
| 13 | 408 | | 206 | 206 |
| 14 | 409 | | 206 | 206 |
| 15 | 410 | | 206 | 206 |
| 16 | 412 | | 206 | 206 |
| 17 | 413 | | 206 | 206 |
| 18 | 414 | | 206 | 206 |
| 19 | 452 | | 206 | 206 |
| 20 | 415 | | 206 | 206 |
| 21 | 518 | | 206 | 206 |
| 22 | 376 | | 206 | 206 |
| 23 | 419 | | 206 | 206 |
| 24 | 420 | | 206 | 206 |
| 25 | 424 | | 206 | 206 |

```
 1                        INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3   EXHIBIT:                  Marked     Received

 4           3244                         206        206

 5           2738                         206        206

 6           2805                         206        206

 7           2810                         206        206

 8           2761                         206        206

 9           3234                         206        206

10           2112                         206        206

11           1991                         206        206

12           2071                         206        206

13   EXHIBITS ON BEHALF OF THE DEFENDANTS:

14   EXHIBIT:                  Marked     Received

15           LOS 2                         18         18

16           LOS 1                         21         21

17

18

19

20

21

22

23

24

25
```

1  (Proceedings commenced, 8:59 a.m.)

2          THE COURT:  Good morning.  Call the case.

3          THE CLERK:  Yes, Your Honor.  This is Civil Action

4  Number 3:17-cv-00072, Elizabeth Sines and others versus Jason

5  Kessler and others.

6          THE COURT:  Plaintiffs ready?

7          MS. KAPLAN:  We are, Your Honor.

8          THE COURT:  Defendants ready?

9          MR. KOLENICH:  Yes, Your Honor.

10          MR. SMITH:  Yes, Your Honor.

11          THE COURT:  Before we begin, I will remind everyone

12  that under Standing Order 2020-12 and 2013-8, the Court's

13  prohibition against recording or broadcasting court proceedings

14  remains in force.  Attorneys, parties, or their staff, and any

15  members of the public or press accessing this proceeding today,

16  may not record or broadcast it.  That means no photography, no

17  using of any video or audio recording device, rebroadcasting,

18  livestreaming, or otherwise disseminating any live, recorded

19  video or audio of this proceeding.

20          I have a few housekeeping remarks I'm going to make

21  regarding some of the matters that have come up.

22          First, if any party wishes to utilize an exhibit,

23  theirs or opposing counsel's, on cross, please make sure you

24  have that document or file readily accessible on your computer

25  or device.  Please also provide and state on the record the

1    exhibit number, for example, PX-300, or the relevant Bates

2    number, so all parties will be able to turn to the exhibit.

3           Second, to the extent a party wishes to utilize an

4    exhibit not previously admitted on direct examination, I note

5    that where discussions between the parties have taken place

6    beforehand, on several occasions they have appeared to reduce

7    potential areas in dispute and made cross-examinations run more

8    smoothly.

9           Third, a reminder for any counsel on Zoom who will be

10   examining a witness, or who wishes to make an objection, the

11   clerk has been allowing you access to take your microphone off

12   mute when you wish to ask a question or make an objection, and

13   you can always also message the clerk, Ms. Moody, to flag

14   something for her as well.  She has been raising issues for my

15   attention as they come in from the parties, attorneys, on Zoom.

16   I believe that process has been going smooth, and counsel have

17   been able to cross and raise objections where they have them.

18          And fourth, there have been a number of exhibits,

19   audio or video, that have been admitted with respect to only

20   particular portions or time stamps of the videos.  Currently

21   the whole videos are on the Box system for evidence.  The clerk

22   cannot move the whole videos to the folder for files admitted

23   for use by the jury until the clerk gets edited portions.

24          In those instances, can counsel offering the limited

25   clip of the video submit to the clerk's office the following

11

1    morning an edited clip, limited to the portions of the video

2    that were admitted into evidence?  And to make sure there is no

3    dispute about the portions of the edited video itself, counsel

4    should circulate the proposed edited video to opposing counsel

5    to confirm their agreement that the edited video captures the

6    portion to be admitted before sending it to the clerk's office.

7              Mr. Cantwell, IT is working on something to help you

8    out.

9              MR. CANTWELL:  Thank you.

10             THE COURT:  Okay.  That's all I had.

11             MS. KAPLAN:  Two very small matters, Your Honor.

12             Like Samantha Froelich's video that we showed

13   yesterday, we have videos ready for Defendants Hopper and

14   Kline.  We understand that Defendant Hopper is also the subject

15   of the letter we submitted last night, and we'll await Your

16   Honor's instructions on that.  But those are available as time

17   fillers today.

18             Also, we have a 45-minute or so presentation of

19   documentary evidence with respect to Defendant Ray.  Defendant

20   Ray, as Your Honor I'm sure is aware, has not participated in

21   any way in this case.  There's been no objection to those

22   exhibits and we'd like to present them, read portions of

23   them -- put them on the screen and read portions of them to the

24   jury.

25             THE COURT:  Okay.  I'm not sure I follow that.

1          Okay.

2          MR. KOLENICH:  Judge, we -- we may have some

3    objections regarding Dillon Hopper, but they can wait until

4    later when plaintiffs try to put something in.

5          As far as Mr. Ray, it's true we didn't object to the

6    exhibits themselves because Ray is an unrepresented party, but

7    the contents of the exhibits we haven't fully reviewed yet.  So

8    if it's all right, we could do that live while they're

9    presenting it or we could do that before they present it.  I

10   don't know if she wants to do that to start.  As far as I know,

11   Mr. Heimbach is still being examined.  So we could do that

12   while we're in process.

13         MS. KAPLAN:  On Ray, we sent them last week.

14   Hopefully you can look at them during Heimbach and maybe we can

15   reach agreement.

16         On Hopper, my wise colleague, Mr. Bloch, corrected

17   me.  He's not a defendant in the case.  He's not a party.  He's

18   a representative of Vanguard America that is a party.

19         MR. KOLENICH:  That raises a separate problem, Your

20   Honor.  Vanguard America is an unrepresented corporate

21   defendant.  They can't appear except through counsel.  So we

22   may object to Mr. Hopper being called as a corporate witness

23   when they had no ability to designate a corporate witness, and

24   so forth; they have to appear through counsel.  So if they have

25   evidence, documentary evidence or something like that, that's

13

1  one thing.  But calling Hopper as a witness may be

2  objectionable and we may want to posit an objection at that

3  point.

4          MS. KAPLAN:  Again, Your Honor, this was addressed in

5  our letter last night.  The law is very clear that when someone

6  testifies in a deposition, as Mr. Hopper did, as either a

7  30(b)(6) designee or as an official head of an entity, which he

8  testified he was, that evidence, that testimony is admissible,

9  regardless of availability or any other reason.

10          THE COURT:  Okay.  You all have the letter from last

11  night?

12          MR. KOLENICH:  I do have the letter.  I haven't

13  reviewed it.  It may well be they're correct and we would

14  concede the point.

15          THE COURT:  We haven't completely worked that out.

16          MR. KOLENICH:  Yes, Your Honor.

17          THE COURT:  Call the jury.

18          Where is the witness now?

19          THE CLERK:  Counsel agreed that Mr. ReBrook is going

20  next.

21          MR. KOLENICH:  Sure.

22          THE CLERK:  Mr. ReBrook will be next by phone.

23          THE COURT:  Okay.  Mr. Heimbach, you may come on

24  back.

25  **(Jury in, 9:07 a.m.)**

14

M. Heimbach - Cross

 1              THE COURT:  All right.  You may be seated.

 2              Good morning, ladies and gentlemen.  I'm glad to see

 3    you back this morning.  We'll proceed with the

 4    cross-examination of this witness.  I think Mr. ReBrook, who is

 5    on Zoom, will examine the witness next.

 6              Do you have him?

 7              THE CLERK:  I do, and he's unmuted, but he's not

 8    saying anything.

 9              Mr. ReBrook, are you there?

10              THE COURT:  If he's not there, let's pass him.

11              MR. REBROOK:  Hello.  This is Mr. ReBrook.  Can you

12    hear me?

13              THE COURT:  Yes.  Go ahead.

14              MR. REBROOK:  Are you ready for my cross-examination,

15    Judge?

16              THE COURT:  Yes.

17              MR. REBROOK:  Very well.

18              MATTHEW HEIMBACH, CALLED BY THE PLAINTIFFS,

19                           PREVIOUSLY SWORN

20                           CROSS-EXAMINATION

21     BY MR. REBROOK:

22    Q    Good morning, Mr. Heimbach.

23    A    Good morning, Mr. ReBrook.

24    Q    I just have a few questions for you.

25              First, you mentioned that all the defendants were on the

M. Heimbach - Cross

1  Discord.  Do you have any recollection of whether or not

2  Mr. Jeff Schoep was on the Discord?

3  A    I do not believe Mr. Schoep was present on the Discord, to

4  the best of my knowledge.

5  Q    There were some questions yesterday asking you about

6  wearing of clothes that concealed blood.  I wanted to ask if

7  the intention was to conceal the blood of other persons or the

8  blood of the wearer of the clothing?

9          MS. DUNN:  Objection, leading.

10         THE COURT:  I don't think the question suggests the

11  answer.  It gives him an option.  Overruled.

12         THE WITNESS:  That would be the wearers.  We had

13  gotten used to being attacked by anti-fascists with weapons

14  over an extended period of time.  So there was an understanding

15  projectiles being thrown or weapons being utilized against our

16  legally permitted rallies was unfortunately a norm.

17         THE COURT:  I'm going to instruct the witness just to

18  answer the question.  Don't do the anticipated follow-up.

19         THE WITNESS:  Yes, Your Honor.

20         THE COURT:  He can ask you why if he wants to.

21         THE WITNESS:  Yes.

22         THE COURT:  But it goes much better.  We take a lot

23  of time unscrambling this.

24         THE WITNESS:  Yes, sir.

25         THE COURT:  Go ahead.

M. Heimbach - Cross

1   BY MR. REBROOK:

2   Q    And then my last question is:  Yesterday you were quoted

3   as having quoted Adolf Hitler and a willingness to fight.  Do

4   you recall that quotation?

5   A    Yes.

6   Q    Okay.  Basically, I just want to understand if that -- if

7   that was figurative or literal.

8   A    That would be figurative.

9         MR. REBROOK:  I have no further questions.  Thank

10  you.

11        THE COURT:  Thank you.  All right.  Who's next?

12                    CROSS-EXAMINATION

13  BY MR. JONES:

14  Q    Good morning.

15  A    Good morning, sir.

16  Q    I represent Michael Hill, Michael Tubbs, and the League of

17  the South.

18       I'm going to start by asking you about

19  Charlottesville 1.0.  If I say "Charlottesville 1.0," do you

20  know what I mean?

21  A    Yes, sir.

22  Q    I'm going to show you what's been admitted as Plaintiffs'

23  Exhibit 0939.  I ask this to be published, please.

24       While we're waiting for it to load up, I'll start with a

25  few questions here.

17

M. Heimbach - Cross

1       What is this image?

2   A   That was an image taken at what was known as

3   Charlottesville 1.0 with attendees and speakers.

4   Q   Are Michael Hill or Michael Tubbs pictured in this image?

5   A   No, sir.

6   Q   Do you know whether they attended that rally?

7   A   They did not.

8   Q   You also mentioned a rally in Pikeville, Kentucky?

9   A   Yes, sir.

10  Q   Was that before the August 12th Charlottesville rally?

11  A   Yes.

12  Q   Did League of the South attend that rally?

13  A   They did.

14  Q   Do you know if Michael Hill and Michael Tubbs were there?

15  A   Mr. Hill was there.

16  Q   Okay.

17  A   I believe Mr. Tubbs as well.

18  Q   Do you know whether Antifa was there?

19  A   Yes, numerous Antifa organizations were there.

20  Q   And how are you able to identify somebody as being a

21  member of Antifa?

22  A   Several different ways.  As an example, in Pikeville, the

23  paramilitary Antifa militia Redneck Revolt was there.  They

24  wear red bandannas as their signifying uniform.  And generally

25  anti-fascists wear what they call black bloc, which is where

M. Heimbach - Cross

1  they wear all black so if they commit a violent act against

2  their political opposition, it's harder for police to identify

3  them.

4  Q    If we could take that off the screen, I'm going to pull up

5  another.  This I've marked as Defense 2.  It will be offered

6  by -- just put it under Jones.

7       Can you see this picture?

8  A    Yes, sir.

9            (Defendant LOS Exhibit 2 marked.)

10  BY MR. JONES:

11  Q    Does that picture accurately represent the Antifa presence

12  at Pikeville?

13  A    Some of them, yes.

14            MR. JONES:  Your Honor, I'm going to move to

15  introduce this as Defense 2.

16            THE COURT:  Did you -- I couldn't hear you.

17            MR. JONES:  Your Honor, I'll move to introduce this

18  as Defense 2.

19            THE COURT:  It will be admitted.

20            (Defendant LOS Exhibit 2 admitted.)

21            MR. JONES:  Can we publish this to the jury?

22            THE COURT:  You may.

23   BY MR. JONES:

24  Q    So how are you able to identify Antifa supporters in this

25  image?

M. Heimbach - Cross

1  A    The sign that they're holding glorifying the unprovoked

2  attack against Mr. Spencer would be one good indicator.  Also

3  the red bandannas.

4  Q    And can you tell whether Antifa is standing behind

5  anything?

6  A    Yes.  They're standing behind a police barricade.

7  Q    Were police present in Pikeville?

8  A    Yes.

9  Q    Did the police take any actions to keep Antifa separated

10  from the protesters in Pikeville?

11  A    Yes.  Each side had their designated space, so where we

12  had our permitted rally, and there was a street, and then there

13  were barricades that the counter-demonstrators, the Antifa,

14  were behind.  And there was a line of, I believe, Kentucky

15  State Troopers that were down the middle to ensure that

16  everyone stayed in their designated zones.

17  Q    Did you attend Pikeville with other members of the

18  Nationalist Front?

19  A    Yes.

20  Q    And who were the other members of the Nationalist Front?

21  A    At the time that would have been the Traditionalist Worker

22  Party, the League of the South, Vanguard America, and the

23  National Socialist Movement.

24  Q    Do you know whether James Fields attended Pikeville?

25  A    He did not.

M. Heimbach - Cross

1          MS. DUNN:  Objection.  Foundation.

2          THE COURT:  Sustained.  Well -- sustained.  He has to

3  show his basis for his knowledge.

4          MS. DUNN:  And move to strike the previous answer.

5          THE COURT:  Strike it.

6   BY MR. JONES:

7  Q    How many protesters with the Nationalist Front came to

8  Pikeville?

9  A    I would say probably between 150 to 200, maybe.

10 Q    Did you see James Fields among them?

11 A    I did not.

12         MS. DUNN:  Objection, Your Honor.  Same basis.

13         THE COURT:  Overruled.

14  BY MR. JONES:

15 Q    Was anybody injured in a car attack in Pikeville?

16 A    No one was injured in Pikeville.

17 Q    I'm going to pull up what's been previously admitted as

18 Plaintiffs' Exhibit 3239.

19      Mr. Heimbach, can you see this video?

20         (Video playing.)

21 A    Yes, sir.

22 Q    What does this video depict?

23 A    That depicts the entrance of the League of the South and

24 the Traditionalist Worker Party, among other folks, attempting

25 to enter the park.

M. Heimbach - Cross

1  Q    Is this another angle of a video, similar series of events

2  that we saw yesterday?

3  A    Yes, sir.

4  Q    So what is currently depicted in this video?

5         (Video playing.)

6  A    What is depicted is counter-demonstrators have blocked the

7  road and several of them have sticks in their hands.

8         MR. JONES:  Ms. Wheeler, could we publish this to the

9  jury?

10         THE CLERK:  I do not show this exhibit has been

11  admitted yet, Mr. Jones.

12         MR. JONES:  Your Honor, I move to admit PX3239.

13         THE COURT:  Be admitted.

14         (Plaintiffs' Exhibit 3239 admitted.)

15         MR. JONES:  Now, I'm going to pull up a screenshot of

16  this that I marked as Defense 1.  And I'm going to move to

17  introduce this screenshot as Defense 1 and request that it be

18  published.

19         THE COURT:  Be admitted.

20         (Defendant LOS Exhibit 1 marked.)

21         (Defendant LOS Exhibit 1 admitted.)

22   BY MR. JONES:

23  Q    Was this the group that you encountered as you walked down

24  Market Street towards Emancipation Park?

25  A    Yes, sir.

M. Heimbach - Cross

1  Q    If you can tell, is there any way around this group of

2  counter-protesters?

3  A    No, sir.

4  Q    Do you recognize any of the same Antifa clothing in this

5  group of protesters?

6  A    Yes.  Red bandannas.

7  Q    Do you know whether the color red signals a certain

8  political ideology?

9  A    Yes.  As featured in the previous exhibit, one of the

10 signs that they held where they put red in a different color

11 for rednecks that were opposing us, that generally represents a

12 far left political perspective.

13 Q    Would that be communism?

14 A    Generally, yes.

15         MS. DUNN:  Objection.  Foundation.

16         MR. SMITH:  Your Honor, it's his personal experience.

17 He's speaking to his personal experience.

18         THE COURT:  As to this witness's state of mind, it's

19 not -- will not be accepted for the truth, but rather for this

20 gentleman's opinion and state of mind at the time.

21  BY MR. JONES:

22 Q    I'm going to pull up what's been previously admitted as

23 Plaintiffs' Exhibit 3267.

24     Mr. Heimbach, can you see that?

25 A    Yes, sir.

M. Heimbach - Cross

1  Q    Can you see what I just circled on the screen?

2  A    Yes, sir.  It appears to be a flag of the Soviet Union.

3  Q    What color is that flag?

4  A    Red.

5  Q    Is that the basis for your knowledge that red represents

6  the Communist Party of the Soviet Union?

7  A    Among other things, yes.

8  Q    There was some talk on Discord before the rally about

9  communists being at the park.  Do you recall that?

10 A    Yes, sir.

11 Q    What did you mean by that?

12 A    Communists, members of Marxist organizations or

13 anti-fascist organizations.

14        MS. DUNN:  Objection, Your Honor.  The exhibit that

15 was shown was somebody else's words, and the question to the

16 witness was "what did you mean?"

17        MR. JONES:  I can ask him if he anticipated

18 communists being at the rally.

19        THE COURT:  All right.  I'm not following the

20 objection.  I'm sorry.

21  BY MR. JONES:

22 Q    Mr. Heimbach, there was some Discord -- I'll withdraw the

23 previous question.

24     As I previously said, there was some talk on Discord about

25 communists being at Charlottesville.

M. Heimbach - Cross

1    A    Correct.

2    Q    Did you anticipate communists being at the rally in

3    Charlottesville?

4    A    Yes.

5    Q    Did you -- if you know, did you see police intervening in

6    Charlottesville to prevent communist protesters from blocking

7    the street?

8    A    They did not intervene.

9    Q    I'm going to pull up what's previously been introduced as

10   PX0707.

11        On page 2 of this exhibit, at the bottom you made a

12   comment, "we're all doing it together"; is that right?

13   A    Yes, sir.

14   Q    When you made that comment, had you met James Fields?

15   A    No.

16   Q    Had you ever spoken to James Fields?

17   A    No.

18   Q    Did you know whether he was a member of any organization?

19   A    No.

20   Q    Did you know whether he would be in Charlottesville?

21   A    No.

22   Q    What were you referring to when you made that comment?

23   A    Merely that a variety of organizations would be going as

24   attendees to a legally permitted rally.

25   Q    Were you referencing the rally?  "We're all doing it

M. Heimbach - Cross

1  together."  Was "it" referring to the rally?

2  A    Yes.

3  Q    And when did the rally end?

4  A    When the governor ordered a state of emergency.

5  Q    And do you recall where you were when James Fields's car

6  attack occurred?

7  A    I was either on the way to a rented cabin or already in a

8  rented cabin outside of Charlottesville.

9  Q    You were not with James Fields at the time of the car

10 attack?

11 A    No, sir.

12 Q    Do you know who Samantha Froelich is?

13 A    Now I do.

14 Q    When you say now you do, what do you mean?

15 A    Due to her testimony earlier in the case.

16 Q    Did you know who she was before her deposition was played

17 in this case?

18 A    I don't believe so.

19 Q    Have you ever met her before?

20 A    I might have seen her at the first Charlottesville event,

21 but I don't believe I have ever spoken to her.

22 Q    Do you know whether anybody in the Traditionalist Worker

23 Party knows her?

24          MS. DUNN:  Objection, Your Honor.

25          MR. SMITH:  Well, if he knows, Your Honor.

M. Heimbach - Cross

1          MS. DUNN:  Objection.  Foundation.

2          THE COURT:  Sustain the objection.  You're asking

3   whether he knows whether anyone else knows.

4          MR. SMITH:  Oh, sorry.  You're right.

5          THE COURT:  I don't see how he could possibly have

6   that knowledge.

7          MR. JONES:  Well, I just -- if he doesn't, he can say

8   he doesn't --

9          THE COURT:  Well, I know, but it allows him to state

10  a fact that he could not possibly know.

11         MR. JONES:  Okay.  Thank you.

12   BY MR. JONES:

13  Q    I'm going to now pull up what was previously admitted as

14  PX2260.

15      Mr. Heimbach, can you see what's on the screen?

16  A    Yes, sir.

17  Q    This is the post, I believe it's a Twitter post.  It says,

18  "In memory of plowing through a human wall of communists."  Do

19  you see that?

20  A    Yes, sir.

21  Q    Is there any mention of race in this post?

22  A    Not at all.

23  Q    Do you consider communism to be a race?

24  A    No.  That would be a political ideology.

25  Q    So a reference to plowing through a human wall of

M. Heimbach - Cross

1    communists would be referencing politically motivated action,

2    not racially motivated action, correct?

3              MS. DUNN:  Objection, leading.

4              THE COURT:  Sustained.

5     BY MR. JONES:

6    Q    I'm going to pull up PX0583.  This was the Discord

7    conversation where somebody named Heinz referenced a shield

8    wall.  Do you recall that?

9    A    Yes, sir.

10   Q    Why -- did you believe it was important to have shields?

11   Did you believe it was important to have shields at

12   Charlottesville?

13   A    Yes.

14   Q    Why was that?

15   A    Specifically due to the ongoing examples of violence by

16   Antifa against not only ourselves, but by the summer of 2017,

17   against even Trump supporters at rallies and normal, everyday

18   folks that they disagreed with, even free speech events on

19   college campuses.  Antifa had a long track record of being

20   violent against people that they wanted to shut down.  So we

21   feared that they would once again try to attack us for

22   exercising our First Amendment rights.

23   Q    I'm going to pull up what's marked as Plaintiffs' Exhibit

24   2702.  I don't believe this has been previously admitted.

25              (Plaintiffs' Exhibit 2702 marked.)

28

M. Heimbach - Cross

1          (Video playing.)

2    BY MR. JONES:

3    Q    Do you recognize what this video shows?

4    A    It looks to be on the outside of Emancipation Park.

5          MR. JONES:  And for the record, this is Exhibit 2702.

6    I'm going to move to introduce just the portion starting at

7    3:08, and going to 3:13.

8          MS. DUNN:  Objection, Your Honor.  Foundation.  The

9    witness did not see this himself, and he actually says this

10   looks to be outside Emancipation Park.

11         MR. JONES:  Your Honor, this has been filed in the

12   case and Your Honor has repeatedly held that videos of the case

13   that have been filed can be admitted.

14         THE COURT:  What's your question concerning it?

15         MR. JONES:  Well, I'm going to play it for him.  Let

16   me ask the question and then I'll move to admit it.

17    BY MR. JONES:

18   Q    Can you see what's displayed on the screen?

19   A    Yes, sir.

20         (Video playing.)

21   Q    What do you see there on the screen?

22   A    It appears to be a Antifa --

23         MS. DUNN:  Your Honor, objection.  There's no

24   foundation for this.  This is not -- he has not identified

25   himself or that he was there.

M. Heimbach - Cross

1           MR. JONES:  Your Honor, I made a foundation objection

2    yesterday to a video and Your Honor admitted it because it had

3    been filed and there had been no objections.

4           THE COURT:  The video is admitted.  He can play it.

5    But the video speaks for itself, and unless he knows --

6           MS. DUNN:  Your Honor --

7           THE COURT:  I don't know how he knows -- if he can

8    explain why he knows something in the video, it's okay.

9           MR. JONES:  Your Honor, this is plaintiffs' exhibit.

10          THE COURT:  Okay.  I know.  You can play it for him.

11   But the question is:  How does he know who's throwing what?

12          MR. JONES:  I'm not asking him if he knows the

13   person.  I'm just asking --

14          THE COURT:  He doesn't have to know.  But he's

15   already said that the person was from a particular viewpoint or

16   organization.  And that's --

17          MR. JONES:  I'll ask him to explain how he knows

18   that.

19          THE COURT:  Well, that's what you have to --

20          MS. DUNN:  Your Honor, we object.  This is not an

21   admitted exhibit, and we'd ask that the witness testify to what

22   he personally saw --

23          THE COURT:  Has this video not been admitted?

24          MS. DUNN:  No.

25          THE COURT:  Well, it's been filed.  There's no --

M. Heimbach - Cross

1    it's authentic, right?

2            MR. JONES:  It's been filed by plaintiffs, Your

3    Honor.  There's no objection previously made to it.  It's the

4    same basis that videos were introduced yesterday.

5            MS. DUNN:  We do object to this exhibit, and there is

6    no foundation.  The witness has to be testifying and provide

7    personal foundation.

8            THE COURT:  If you all have admitted the -- if --

9    it's filed without objection.  I think you filed it, right?

10           MR. JONES:  That's correct.

11           THE COURT:  Is that what you're saying, the plaintiff

12   filed it?

13           MR. JONES:  That's correct.  It's PX, Plaintiffs'

14   Exhibit 2702.

15           MS. DUNN:  Your Honor, our understanding was not that

16   exhibits would come in without foundation.

17           THE COURT:  You mean you have to lay a foundation in

18   every exhibit you plan -- you haven't been doing this, have

19   you?

20           MS. DUNN:  Yes, Your Honor.  For this --

21           MR. JONES:  No, Your Honor.  Yesterday --

22           THE COURT:  Look, okay, the exhibit can be played.

23   The question is the propriety of what questions he's going to

24   be asked, because he didn't take it.  So he can identify anyone

25   he knows or tell us anything about any person.

M. Heimbach - Cross


 1          MR. JONES:  So --

 2          THE COURT:  He doesn't have to know the person, but

 3    if he's going to say anything about the person depicted in the

 4    film, he's going to have to have a foundation for his

 5    knowledge.

 6     BY MR. JONES:

 7    Q    Mr. Heimbach, were you at Emancipation Park on August

 8    12th --

 9    A    I was.

10    Q    -- 2017?

11    A    I'm sorry.  Yes.

12    Q    And were you inside the park?

13    A    At certain points, and on the outskirts at other points.

14    Q    Did you see any counter-protesters at -- in

15    Charlottesville on August 12th?

16    A    Yes.

17    Q    And generally speaking, where were the counter-protesters

18    located?

19    A    On the streets, often attempting to try to force their way

20    into the park.

21    Q    I'm showing you this picture.  Do you recognize this as a

22    street outside Emancipation Park?

23    A    Yes.

24    Q    And do you recognize the clothing worn by some of the

25    people in this picture?

M. Heimbach - Cross

1  A    Yes.   There appears to be an individual holding a club

2  with a red bandanna around his neck, and a masked individual

3  with sunglasses in front of him.

4  Q    What clothing would you identify that person as far as

5  whether they were a protester or a counter-protester?

6           MS. DUNN:  Objection, Your Honor.  Your Honor said he

7  has to identify something from his personal knowledge, not just

8  describe what any person might describe.  He's not a --

9           THE COURT:  The jury can decide -- will decide who

10 was there.  He can testify as to what he observes of his

11 knowledge that's in the photograph.  It will be up to the jury

12 to decide ultimately what is there.  Go ahead.

13  BY MR. JONES:

14 Q    What's the person in the white tank top doing?

15 A    Throwing a projectile.  And as to your earlier question

16 about outfits, generally anti-fascists would work to obscure

17 their faces to avoid prosecution potentially for violent acts

18 they committed.  So it would be likely that this would be a

19 counter-protester due to the fact he was not only wearing

20 sunglasses but obscuring his face while committing a violent

21 act.

22 Q    Which direction was he throwing the projectile, if you can

23 tell from your personal knowledge?

24 A    It appears based on the video he is throwing it at the

25 legally permitted Unite the Right demonstrators.

33

M. Heimbach - Cross

1        THE COURT:  Look.  Strike that.

2        MS. DUNN:  Your Honor --

3        THE COURT:  In his answer, he may not editorialize.

4        MR. JONES:  That's fine.  That's fine.

5        THE COURT:  I mean, go to the exhibit, if you want to

6   put it in, but he just cannot editorialize and characterize

7   what's going on.  The jury can see.

8        MR. JONES:  Your Honor, I'm going to move to admit

9   and ask to be published to the jury Plaintiffs' Exhibit 2702

10  from the 3:08 mark to the 3:13 mark.

11       MS. DUNN:  Your Honor, just procedurally, by the

12  logic here, the entire Discord server of Charlottesville 2.0

13  would come in, even if there was not a percipient witness that

14  participated in the exchanges or could testify to firsthand

15  knowledge.  And so we don't think there's foundation to this.

16  This individual is just describing what he thinks he sees on a

17  screen.

18       THE COURT:  Well, so far I've only ruled now that it

19  can come -- that he can play the exhibit --

20       MS. DUNN:  Right.  But --

21       THE COURT:  -- with limited questions.

22       MS. DUNN:  We do not think this is properly -- can be

23  properly admitted into evidence with no percipient witness and

24  no foundation.  And we just want to be clear because, if this

25  comes in with no percipient witness, no factual basis, doesn't

M. Heimbach - Cross

1  identify himself, wasn't there, then anything on the exhibit

2  list without foundation would likewise come in.  And we'd like

3  to discuss that, if that is how we're going to proceed.

4        MR. JONES:  I don't know.  Are they contesting the

5  authenticity of this video?

6        MS. DUNN:  Your Honor --

7        MR. JONES:  It's going to go on forever if every

8  video of Charlottesville that's been filed -- I mean --

9        THE COURT:  All right.  You may play the video.

10  Overrule the objection, but it's not precedent to anything

11  else.  I mean, these videos, unless you've got some evidence

12  that this is fraudulent or -- I mean, we've played parts of all

13  these videos that were taken.  I take it you -- it was at the

14  rally.

15        MS. DUNN:  Your Honor, that's insufficient because,

16  without a witness to testify to firsthand knowledge of the

17  video, there is not foundation for its admission or for the

18  testimony.  So, you know, we did show Mr. Heimbach exhibits

19  that he participated in or where he could recognize people in

20  the video or himself in the video, or the text or the Discord

21  post.  We were very careful about that.  So I think that we're

22  going to have a problem if both parties here are allowed to

23  just show videos and have witnesses without firsthand knowledge

24  talk about them and describe them and admit them.  I think it

25  will change the entire --

M. Heimbach - Cross


```
 1              MR. JONES:  We're fine to play every video of every
 2    minute of the rally --
 3              THE COURT:  Wait, wait, wait.
 4              MS. DUNN:  I think it will change the entire
 5    character of this trial.
 6              THE COURT:  What have you got to say?
 7              MR. JONES:  I said, we're fine for every minute of
 8    the rally to be played by video.
 9              THE COURT:  You what?
10              MR. SMITH:  Agreed.
11              MR. SPENCER:  Agreed.
12              MR. CANTWELL:  Agreed.
13              MR. JONES:  We're fine for every minute of the rally,
14    every video to be played to the jury.
15              MR. SMITH:  The more the merrier, Your Honor.
16              MR. JONES:  They're the ones trying to keep out the
17    video of the rally.
18              MS. DUNN:  Your Honor, this is posturing.  It will
19    change the entire character of this trial if every witness can
20    testify to anything that they didn't personally see or
21    experience.  That's just -- it's just not --
22              THE COURT:  Without comment, I'm going to let you
23    play this video.
24              MR. SMITH:  Thank you, Your Honor.
25                   (Plaintiffs' Exhibit 2702 admitted.)
```

M. Heimbach - Cross

1   BY MR. JONES:

2   Q    Did you -- at the rally, were you struck by any

3   projectiles?

4   A    Not myself personally.  I was struck in the head with a

5   bat or a flagpole, though.

6   Q    Do you know through your personal knowledge, personal

7   observations, whether any members of TWP were struck with

8   projectiles?

9   A    Yes.

10  Q    What types of projectiles were they struck with at the

11  rally?

12  A    Stones.  Frozen water bottles.

13  Q    I'm going to show you what's been admitted as Plaintiffs'

14  Exhibit 0615.

15       Do you recall seeing this yesterday during your testimony?

16  A    I do.

17  Q    Plaintiffs' counsel asked you about what appears to be

18  nails on that; is that right?

19  A    Yes, sir.

20  Q    Have you been deposed in this case?

21  A    Yes, sir.

22  Q    One time or more than one time?

23  A    Twice.

24  Q    And approximately how long were each of those depositions?

25  A    The entire day.  So multiple hours.

37

M. Heimbach - Cross

1  Q     Each of them approximately eight hours?

2  A     I believe so.

3  Q     Approximately 16 hours total?

4  A     That would sound accurate.

5  Q     And so far in this trial you've testified for almost a

6  full day; is that right?

7  A     Yes, sir.

8  Q     During your depositions and during trial, plaintiffs have

9  shown you pictures and videos from the rally; is that right?

10  A     Correct.

11  Q     Have they showed you a single picture or video of that

12  shield being used at the rally?

13  A     No, sir.

14  Q     I'm going to pull up PX2722.

15         MR. JONES:  Ms. Wheeler, has this been introduced

16  already?

17         THE CLERK:  I'm trying to look.

18         MR. JONES:  It looks to be the video of Mr. Heimbach

19  walking down Market Street.

20         THE CLERK:  I am not finding 2722.

21         MR. JONES:  Thank you.

22         (Plaintiffs' Exhibit 2722 marked.)

23   BY MR. JONES:

24  Q   Mr. Heimbach, do you recognize what's being shown to you

25  on the screen?

M. Heimbach - Cross

1    A    Yes, sir.

2    Q    Who is that?

3    A    Myself.

4    Q    What are you doing?

5    A    Walking down the street and speaking to a reporter.

6              MR. JONES:  Your Honor, I'm going to move to

7    introduce what's been marked as Plaintiffs' Exhibit 2722.

8              THE COURT:  It will be admitted.

9              (Plaintiffs' Exhibit 2722 admitted.)

10             MS. DUNN:  Your Honor, this is a 7-minute video.

11   We'd just like to know which portion of the video counsel plans

12   to introduce.

13             MR. JONES:  Go to the 4:42 mark of the video.

14             THE CLERK:  I'm sorry.  What was it, Mr. Jones?

15             MR. JONES:  4:42 mark of the video.

16             THE CLERK:  Thank you.

17    BY MR. JONES:

18   Q    Do you recognize what this is, Mr. Heimbach?

19   A    Yes, sir.

20   Q    What is it?

21   A    It is the street outside of Emancipation Park.

22             (Video playing.)

23   Q    Did you see that, Mr. Heimbach?

24   A    Yes, sir.

25   Q    What was that?

M. Heimbach - Cross

1  A    It appears to be a tear gas canister being flung by Antifa

2  at us.  By "us" I mean the Unite the Right attendees.

3  Q    I'm going to go to the 5:27 mark of this video.

4           (Video playing.)

5      Mr. Heimbach, do you see that?

6  A    Yes, sir.

7  Q    Are those Traditionalist Worker Party members?

8  A    No, sir.

9  Q    What are they wearing on their heads?

10 A    Black helmets.

11 Q    What do they have in their hands?

12 A    Clear shields.

13 Q    Can you tell whether they have anything protecting their

14 eyes?

15 A    Yes; face masks, it looks like.

16 Q    Mr. Heimbach, did you conspire -- so who are these people?

17 A    I believe they're Virginia State Police.

18 Q    Did you conspire with the Virginia State Police to wear

19 helmets to Charlottesville?

20 A    No, sir.

21 Q    Did you conspire with the Virginia State Police to bring

22 shields to Charlottesville?

23 A    No, sir.

24 Q    What type of formation are they standing in?

25 A    They're standing in a straight line, a shield wall.

M. Heimbach - Cross

1   Q     Was this the type of shield wall that you referenced?

2   A     Yes, sir.

3   Q     Did you conspire with the Virginia State Police to wear

4   protective covering over your eyes or TWP members' eyes?

5   A     No, sir.

6   Q     So based on the police officers in this image wearing

7   helmets, holding shields, standing in a shield wall, are they

8   part of a conspiracy to commit racially motivated violence?

9   A     No, sir.

10            MS. DUNN:  Objection, Your Honor.

11            THE COURT:  Sustained.

12            MR. JONES:  Thank you.  That's all the questions I

13   have.

14                     CROSS-EXAMINATION

15    BY MR. CANTWELL:

16   Q     Hello, Matthew.

17   A     Hey, Chris.

18   Q     At the time you were questioned by plaintiffs' counsel

19   yesterday, were you in any position whatsoever to comment on

20   the accuracy of my opening statement?

21   A     No, sir.

22   Q     Do you know the name of my youngest brother?

23   A     No, sir.

24   Q     Do you know how many sisters I have?

25   A     I do not.

M. Heimbach - Cross

1   Q    Do you know whether or not my parents are still married?

2            MS. DUNN:  Objection, Your Honor, relevance.

3            MR. SMITH:  Your Honor, this goes to whether he

4   knows --

5            THE COURT:  Overruled.  Overruled.  Go ahead.

6            THE WITNESS:  No.

7    BY MR. CANTWELL:

8   Q    Describe to the jury what role, if any, I played in the

9   Traditionalist Worker Party.

10  A    Zero.

11  Q    If I were a member of any other organization that

12  comprised the Nationalist Front, would you be in a position to

13  know that?

14  A    I believe I would have a good idea.

15  Q    Please describe for the jury what knowledge you have of my

16  position in any organization that comprised the Nationalist

17  Front.

18  A    None.

19  Q    Did you describe your plans for August 12th as totally

20  separate from -- I believe you described your plan as totally

21  separate for August 12th.  What was your plan totally separate

22  from?

23  A    Any other organizers.  We were merely attendees.

24  Q    Please describe for the jury what role, if any, I played

25  in what you described as your totally separate plan for

                              M. Heimbach - Cross

1   August 12th.

2   A     There was no point of contact.

3   Q     Are you, as of today, aware of a so-called leadership

4   meeting which occurred at McIntire Park on August 11th?

5   A     I believe, based on documents that have been submitted, I

6   know that meeting happened, but I wasn't there.

7   Q     When did you become aware of that meeting?

8   A     I believe based on evidence that was submitted in this

9   case, so after the fact.

10  Q     Please describe what role, if any, you played in that

11  leadership meeting on August 11th.

12  A     Zero.  I wasn't there.

13  Q     Do you recall the SMS conversation between us which was

14  Plaintiffs' Exhibit 3317?

15  A     Yes.

16  Q     And in the second message, you may recall that I say:

17  "This is Cantwell, BTW."

18        To the best of your knowledge, is "BTW" some kind of Nazi

19  code word?

20  A     No.  I believe it means "by the way."

21  Q     And that message -- do you remember the date on which that

22  message was sent?

23  A     Not specifically.

24  Q     Was it close to the events in question?

25  A     That would sound accurate.

43

M. Heimbach - Cross

1    Q    And if I had not told you the text was from me, would you

2    have known that it was from me?

3    A    No.

4    Q    Do you recall a later message in that exchange in which I

5    suggested an app called Signal?

6    A    Yes.

7    Q    And did you at some point begin using that application?

8    A    Yes.

9    Q    When was that?

10   A    I believe it was after the events of August 11th and 12th.

11   Q    And since that time, have you become familiar with the

12   user interface of that application?

13   A    Somewhat.

14   Q    In your experience, does Signal delete messages without

15   the user specifically activating that feature?

16   A    No, I don't believe it's an auto setting.

17   Q    Do you know the name of that feature in the app?

18   A    Not off the top of my head.

19   Q    Have you and I ever used that feature?

20   A    No.

21   Q    During the month of August 2017, did you use that feature

22   with any defendant in this case?

23   A    I don't believe so.

24   Q    Did you attend the event now commonly referred to as

25   Charlottesville 1.0?

M. Heimbach - Cross

1    A    Yes.

2    Q    Could you tell me approximately when you first became

3    aware of planning for that event?

4    A    It would have been close to the event.  I wasn't involved

5    in the planning or organizing of it.  I was merely invited as

6    an attendee.

7    Q    And when did the event actually transpire?

8    A    In May of 2017.

9    Q    May.

10        Was this event publicly promoted in advance?

11   A    No.

12   Q    Were you confronted by any sort of resistance at this

13   event?

14   A    Not any organized or violent resistance.

15   Q    Did you go looking for any?

16   A    No, sir.

17   Q    Did any violence transpire at the C'ville 1.0 event?

18   A    No, sir.

19   Q    If somebody were to review promotional material, media

20   that came out of the Charlottesville 1.0 event, what sort of

21   impression might they have gotten about that event?

22   A    That it was a positive, peaceful event focused on

23   maintaining historical statues.

24   Q    What did you think about the aesthetic of the torches?

25   A    I thought that it was very powerful.

M. Heimbach - Cross

1  Q    Describe for the jury what role, if any, I played in

2  Charlottesville 1.0.

3  A    None.

4  Q    Were you profoundly disappointed by my absence?

5  A    I wouldn't say so.

6  Q    Was anybody that you knew of profoundly disappointed by my

7  absence?

8  A    No.

9          MS. DUNN:  Objection, Your Honor, to the form of the

10  last question.

11          THE COURT:  Leading.  So sustained.

12   BY MR. CANTWELL:

13  Q    Okay.  Do you recall the first time we met?

14  A    Yes.

15  Q    When was that?

16  A    It was at a pub after a speech by Mr. Spencer at Auburn

17  University, I believe.

18  Q    And at that speech at Auburn University, were you inside

19  during Mr. Spencer's speech?

20  A    Yes.

21  Q    To the best of your knowledge, was I inside during

22  Mr. Spencer's speech?

23  A    I don't recall seeing you.

24  Q    Okay.  Do you recall seeing me outside?

25  A    No.

M. Heimbach - Cross

1  Q    Outside of the event, do you recall seeing any opposition?

2  A    Yes.  There were Antifa there.

3  Q    Do you recall a police presence at the Auburn event?

4  A    Yes.

5  Q    Are you aware of any injuries that occurred at the Auburn

6  event?

7  A    A Traditionalist Worker Party affiliate had his jaw broken

8  trying to go to his car.

9  Q    Are you aware of any counter-protesters that were -- any

10  opposition to the Spencer event that was injured at that event?

11  A    I don't believe so.

12         MS. DUNN:  Objection, Your Honor.  Form and

13  foundation.

14         THE COURT:  Well, he was asked was he aware.  And so

15  I think -- overruled.

16  BY MR. CANTWELL:

17  Q    When we met at this pub afterwards, do you recall if I had

18  any travel companions with me?

19  A    I'm not sure.

20  Q    When was the next time you and I met?

21  A    That would have been the rally in Pikeville, Kentucky, I

22  believe.

23  Q    Now, at the event in Pikeville, Kentucky, the plaintiffs

24  during your examination yesterday referenced the warm

25  introduction you gave me before the audience, which included a

M. Heimbach - Cross

1  favorable assessment of my character.

2       Could you please tell us, on what information did you base

3  that assessment?

4  A    We had a friendly conversation at Auburn and you had a

5  very popular podcast.

6  Q    During your questioning yesterday you were asked about the

7  substance of that introduction, and you said something to the

8  effect of that I stood up for the truth and was willing to

9  sacrifice for it.

10      What were you referencing in that?

11 A    Specifically being a pro-white advocate, the loss of

12 income, the deplatforming, the threat of physical violence

13 against you.  So being willing to stand up and speak your mind,

14 there's inherent risks and financial damages levied against you

15 merely for saying a protected legal opinion.

16 Q    If I were a liar, would you have a lower opinion of me?

17 A    I would.

18 Q    Other than me, which other of our co-defendants in this

19 case were present at the event in Pikeville, Kentucky?

20 A    The League of the South and its associated leadership, the

21 National Socialist Movement and Mr. Jeff Schoep, Matt Parrott.

22 Q    Please describe in as much detail as you can every

23 interaction that you witnessed between me and Jeff Schoep.

24 A    I can't recall any of them.

25 Q    Same question for Michael Hill.

48

M. Heimbach - Cross

1    A    Don't even know if you guys spoke.

2    Q    Same question for Michael Tubbs.

3    A    Same answer.  I don't even know if you guys spoke.

4    Q    Same question for Matthew Parrott.

5    A    You might have said hello to each other.

6    Q    Matt, if you heard me tell somebody that I barely knew my

7    co-defendants on August 11th, 2017, would I lose your respect?

8    A    No.

9              MS. DUNN:  Objection, Your Honor, form.

10             THE COURT:  Sustained.

11    BY MR. CANTWELL:

12    Q    Was there any violence at the Pikeville rally?

13    A    No.

14    Q    Do you recall at any time -- withdrawn.

15         When Mr. Jones was questioning you, you described that

16    there was barriers on either side of the street, correct?

17    A    Correct.

18    Q    At any time, did anybody associated with the

19    Traditionalist Worker Party attempt to cross those barriers?

20    A    Not to the best of my knowledge.

21    Q    Did anybody on the other side of the street try to cross

22    those barriers?

23    A    Not --

24             MS. DUNN:  Objection, Your Honor, foundation.

25    BY MR. CANTWELL:

49

M. Heimbach - Cross

1  Q    Did you witness anybody on the other side of those

2  barriers try to cross those barriers?

3  A    Everyone stayed in their space.

4  Q    Okay.  At the Pikeville event, you and I both gave

5  speeches which ended up on the Internet.  Were you aware of the

6  cameras?

7  A    Yes.

8  Q    Did you expect that the behavior captured on those cameras

9  would become public?

10  A    Yes.

11  Q    If you had to categorize the behavior and words caught on

12  camera as front-stage or backstage behavior, which would you

13  categorize them as?

14          MS. DUNN:  Objection, Your Honor.

15          THE COURT:  Overruled.

16          THE WITNESS:  Front-stage.

17   BY MR. CANTWELL:

18  Q    And during this decidedly front-stage display, did you

19  honestly express how you felt at that time about Jewish people?

20          MS. DUNN:  Objection, Your Honor, leading.

21          THE COURT:  Overruled.  It doesn't suggest the

22  answer.

23          MR. SMITH:  I don't think that's leading, Your Honor.

24          THE COURT:  Go ahead, sir.

25          THE WITNESS:  I don't remember everything I said

M. Heimbach - Cross

1    about that speech, but yes, everything I said, I believe would

2    be accurate.

3     BY MR. CANTWELL:

4    Q    To the best of your recollection, was anybody laughing

5    when you described those views?

6    A    Not to my knowledge.

7    Q    When you described those views, did you express a desire

8    to exterminate Jewish people?

9    A    I don't believe I said anything like that.

10   Q    Other times, when you did make genocidal remarks about the

11   Jews, if you did, did people in your company laugh?

12   A    Generally.

13   Q    What's your favorite Holocaust joke?

14   A    My favorite?

15   Q    I'll withdraw it.

16        In your leadership role with the Traditionalist Worker

17   Party, were you at all concerned with how the public perceived

18   your organization?

19   A    No.  I believe we had a very strong, powerful message.

20   Q    To clarify, did you desire to have a strong, powerful

21   message?

22   A    Yes.  To advocate for working families.

23   Q    And did you desire to be perceived in such a way?

24   A    Yes.

25   Q    Okay.  So you cared about how you were perceived?

M. Heimbach - Cross

1   A      Yes.

2   Q      Okay.  Could this concern be described as optics?

3   A      Basic political consideration, but sure.

4   Q      Are you aware of any other political organizations or

5   movements that care about how they're perceived by the public?

6   A      Literally every political movement that there is.

7   Q      Would it be a shorter list to describe movements that

8   don't care about how they're perceived by the public?

9   A      That would be accurate.

10  Q      Okay.  Yesterday plaintiffs' counsel asked you if the "OK"

11  hand symbol was -- and I'm paraphrasing -- some kind of white

12  supremacist dog whistle, and you seemed to find this line of

13  questioning amusing.  Could you describe what you found so

14  humorous about this inquiry?

15  A      Sure.  Well, it all -- the usage of that symbol began as a

16  joke, I believe, on one of the so-called chan websites, the

17  idea of:  What's the most outrageous thing that could be

18  presented to make the media and the organized leftist community

19  freak out and write endless articles and have all sorts of

20  opinions?  And the usage of "OK" is a normal symbol that is

21  utilized by schoolchildren to old folks.  So that was viewed as

22  a joke to, essentially, troll and bait the media, and they

23  absolutely fell for it.

24  Q      You used the word -- the phrase "the chans."  Now, is this

25  a reference to -- can you be more specific about what you mean

52

M. Heimbach - Cross

1  by "the chans," please?

2  A    Sure.  Websites such as 4chan, which are very popular with

3  teenagers.

4  Q    Was there another chans site?

5  A    There is 8chan.

6  Q    4chan, 8chan, 12chan, 16 --

7  A    All the chans.

8  Q    Withdrawn.

9     So 4chan is a website -- are the people on 4chan easily

10  identified?

11  A    No.

12  Q    And have 4chan pranks made the news a couple of times?

13  A    Yes.

14  Q    Is there any particular reason -- withdrawn.

15     Do you recall a similar interaction with plaintiffs'

16  counsel regarding the word "globalist"?

17  A    Yes.

18  Q    Are you using words like "globalist" or using things like

19  the "OK" hand symbol because you're afraid of being called a

20  racist?

21  A    No.

22  Q    Yesterday you used the term "Rockwell pivot."  Could you

23  please describe to the jury what you mean by this?

24  A    Yes.  One of the most important things to understand in

25  politics is, if a tree falls in the forest and no one hears it,

M. Heimbach - Cross

1  did it really happen?

2      So going back to the 1960s, World War II veteran commander

3  George Lincoln Rockwell wanted to advocate for white Americans,

4  but realized into one was coming to listen to hear his

5  organizing, so he created the American Nazi Party, which he

6  knew would be inflammatory and get the media there, and they

7  often would do stunts that would get media attention, at which

8  point he would follow that up with well-reasoned, thoughtful

9  arguments to advocate for white Americans.

10     So for ourselves, we refer to it as "the Rockwell pivot,"

11 that being controversial and having jokes was a way that --

12 that gets the media there, no controversy, no cameras, and then

13 we could talk about things like job programs, the opioid

14 epidemic, housing, healthcare, and the issues we substantively

15 cared about and were fighting for.

16 Q    Did you just tell us that a World War II veteran started

17 the American Nazi Party?

18          MS. DUNN:  Objection, Your Honor.  Objection.

19          THE COURT:  Overruled.

20          THE WITNESS:  Yes, and a large number of his

21 membership were World War II veterans.

22  BY MR. CANTWELL:

23 Q    Are you familiar with the phrase "agree and amplify"?

24 A    Yes.

25 Q    Could you please describe for the jury your understanding

M. Heimbach - Cross

1  of that phrase?

2  A    Sure.  Well, you constantly have to be able to politically

3  take a position, and then you kind of bring it up a little bit

4  to then be able to promote your specific position.

5  Q    You described the "okay" hand symbol as being a means of

6  trolling the media.

7  A    Absolutely.

8  Q    And did "agree and amplify" have anything to do with the

9  media?

10 A    Yes.  Again, controversy brings cameras.

11 Q    Mr. Heimbach, based on what you know about jails and

12 prisons, do you think you'd like to spend a whole lot of time

13 in one?

14 A    No.

15 Q    Okay.  During the events in dispute, did you at any time

16 hide your face from the cameras?

17 A    No.  We had reporters embedded with us actively.

18 Q    You were actively embedded with reporters?

19 A    Yes.

20 Q    Do you -- is it your experience with the media,

21 Mr. Heimbach, that they're particularly sympathetic to our

22 views?

23 A    They are absolutely hostile.

24 Q    Mr. Heimbach, if you were to commit some kind of crime in

25 front of a press camera, do you think that they'd help you

M. Heimbach - Cross

1  cover it up?

2  A    Not at all.

3  Q    Okay.  Have you ever heard the phrase "nationalism for all

4  peoples"?

5  A    Yes, I've said it myself.

6  Q    Could you please describe to the jury what your

7  understanding of that phrase is?

8  A    It's the idea that every group of people has a right to

9  their own ethnic identity, their own culture, and they have a

10 right to their own nation.  And that sentiment is in accordance

11 with the United Nations international law.

12 Q    Have you heard of Woodrow Wilson's -- is it 13 or 14

13 points?  Do you know what I'm talking about?

14 A    Yes, proposed after World War I.

15 Q    Can you relate that to the "nationalism for all peoples"

16 phrase?

17 A    Yes.  At the time the American president suggested that

18 every group of people had a right to self-determination in

19 their own respective homelands.  And the empires that were

20 forced on people, the Austro-Hungarian Empire, the Ottoman

21 Empire, etc. were fundamentally against the sovereignty of

22 individual people.  So the American government supported the

23 idea that every group of people should be able to control their

24 own destiny.

25 Q    Are you familiar with the name Marcus Garvey?

56

M. Heimbach - Cross

1    A    Yes.

2    Q    How about Malcolm X?

3    A    Yes.

4    Q    What do these two men have in common?

5              MS. DUNN:  Objection, Your Honor.

6    BY MR. CANTWELL:

7    Q    What do you understand these two men to have in common?

8              THE COURT:  Where are you going with this?

9              MR. CANTWELL:  The Marcus Garvey and Malcolm -- I

10   don't want to give the answer to the witness.

11             THE COURT:  What are you trying to prove?

12             MR. CANTWELL:  May we approach?  I think I'd be

13   leading the witness if I were to tell you in this way.

14             THE COURT:  Well, go ahead.  Just tell me.

15             MR. CANTWELL:  Marcus Garvey and Malcolm X are black

16   nationalists.  It's my understanding that the --

17             THE COURT:  All right.  You're going to show a lot of

18   background.  The plaintiff intends to show background of these

19   pro-right organizations.  If it has anything to do with the

20   establishment of your ideology or so forth, you may proceed.

21             MR. CANTWELL:  It is an ideological question I'm

22   asking Mr. Heimbach.

23   BY MR. CANTWELL:

24   Q    So at the risk of getting repetitive, Matt, could you

25   describe for the jury what, if anything, you -- what you

57

M. Heimbach - Cross

1   believe these two men have in common?

2   A    Yes.  Marcus Garvey, Malcolm X, Elijah Muhammad and

3   numerous other black organizers throughout our history have

4   supported the creation of their own nation-state run for and by

5   black people.

6   Q    Could you describe for the jury what if anything you

7   admire about these men?

8   A    They were advocates for their community and they wanted to

9   exercise self-determination.  That's why consistently myself

10  and the Traditionalist Worker Party has been supportive of any

11  ethnic group that wants to exercise self-determination.

12  Q    Yesterday there was some discussion about -- and I'm

13  probably going to mispronounce this -- I think the term was

14  White Juche?

15  A    Yes.

16  Q    Am I saying that right?

17  A    Yes, sir.

18  Q    Could you spell that, please?

19  A    Juche is J-U-C-H-E.

20  Q    I was so close.

21       Okay.  Could you briefly describe what the origin of that

22  phrase is?

23  A    Yes.  It's a Korean phrase.  The concept of Juche was

24  created by Kim Il-Sung, the first leader of the Democratic

25  People's Republic of Korea, also known as North Korea.  And

58

M. Heimbach - Cross

1  it's the Korean sentiment of self-reliance, that the Korean

2  people, after facing a horrific war where the United States

3  dropped more bombs on North Korea in terms of tonnage than we

4  dropped in the entire Pacific theater of World War II, the

5  nation was destroyed, and the Korean people could only truly

6  rely on themselves to be able to rebuild their nation and have

7  self-determination.

8  Q    Matt, you and I -- have you and I discussed North Korea

9  before?

10 A    I don't -- I'm not sure.

11 Q    Based on what you know about my political views, do you

12 think I'm a big fan of North Korea?

13 A    No, sir.

14 Q    Okay.  North Korea is governed by the Communist Party; is

15 that right?

16 A    Correct.

17 Q    Okay.  But you admire this regime in some way, do I

18 understand?

19 A    Yes.  I believe that the government of the Democratic

20 People's Republic of Korea advocates for Korean solutions to

21 their specific economic and geopolitical interests.

22 Q    Yesterday we heard Ms. Froelich testify that the alt-right

23 used the terms "Jews," "communists" and "Antifa"

24 interchangeably.  Is it your understanding that North Korea is

25 a Jewish country?

M. Heimbach - Cross

1   A    No.  It is a Korean country, much like China, which has

2   over 1 billion card-carrying Communist Party members, is a

3   Chinese country.

4   Q    Yesterday did I hear you correctly when you said -- did

5   you say that white supremacy was some sort of TWP entry

6   requirement?

7   A    We were actively opposed to white supremacy in all forms.

8   Q    Could you please try to -- could you help alleviate some

9   confusion that might arise when -- between, I suppose -- well,

10  I think you can understand how people might get confused.  Can

11  you try to help us out?

12  A    Sure.  Well, as I look at it, your ethnic community is

13  your extended family.  So I have two sons.  I'm a single father

14  right now.  And I care about my sons' future.  And that doesn't

15  mean that I hate my neighbors or I think my kids are better

16  than anyone else's kids, but as a nationalist, I have a primary

17  responsibility to my family, which would include my ethnic

18  extended family.  It's not about thinking we're better.  It's

19  just about duties and responsibilities and kinship.

20  Q    Were you at some point a member of the National Socialist

21  Movement?

22  A    Very briefly.

23  Q    Suffice it to say you are not still a member of the

24  National Socialist Movement, then?

25  A    I resigned.

M. Heimbach - Cross

1  Q     Okay.  When did that relationship end?

2  A     2018.

3            MS. DUNN:  Objection, Your Honor.  I believe there

4  was a motion on this issue.

5            THE COURT:  Refresh my recollection about it.

6            MS. DUNN:  Give me -- Court's indulgence, just one

7  moment, Your Honor.  I need to refresh my own recollection.

8            MR. CANTWELL:  Judge, for what it's worth, I think I

9  know where plaintiffs' counsel's confusion stems from and I'd

10  be happy to inform them.

11           MS. DUNN:  Maybe, Your Honor, we could have a quick

12  sidebar.

13           THE COURT:  Excuse me?

14           MR. SMITH:  Maybe we could have a quick sidebar, Your

15  Honor.

16           MS. DUNN:  Maybe, Your Honor, we could have a quick

17  sidebar to work this through.  I thought there was a motion on

18  this topic.

19           THE COURT:  Okay.  All right.  Come up.

20           (Sidebar commenced.)

21           MS. DUNN:  I'm going to ask my colleague,

22  Mr. Isaacson, to speak to this because he worked on the motion

23  that I think is relevant to this issue.  But I think the

24  general issue is testimony relevant to conversion ex post.  And

25  I know that this issue has arisen with regard to Mr. Schoep.

M. Heimbach - Cross

1  Mr. Isaacson is more up to speed on whether there's been a

2  ruling, but I think we should bring the Court up to speed.

3         MR. ISAACSON:  You'll remember, Your Honor, that you

4  granted a motion in limine with regard to Mr. Schoep's witness

5  and Mr. Schoep, who wanted to talk about what happened in 2018.

6         THE COURT:  The witness couldn't speak to Mr. Schoep.

7  I think that's the main thing.

8         MR. ISAACSON:  Well, you also --

9         THE COURT:  And I said it makes no difference if

10  somebody has changed their opinion.

11         MR. ISAACSON:  Yes, exactly.  Exactly.  Now the

12  questions are beginning to go to 2018 and afterwards, and

13  that's why Ms. Dunn wanted to know where this was going,

14  because it was after the events of Unite the Right.

15         THE COURT:  All right.

16         MR. CANTWELL:  I didn't want to interrupt but I can

17  save us some trouble.  This is not where I'm going with it.

18         MS. DUNN:  Oh, okay.

19         MR. CANTWELL:  Mr. Heimbach parted ways with the NSM

20  on unfavorable terms and he was called a communist on his way

21  out.  It's been stated that "Jews" and "communists" are

22  interchangeable terms, and so I'm trying to establish that that

23  is actually not the case in our culture.  That's what I'm

24  trying to establish.  I'm not going to try to talk about

25  anti-radicalization programming.

M. Heimbach - Cross

1          MS. DUNN:  Okay.

2          (Sidebar concluded.)

3          THE COURT:  We'll take a break in about ten minutes.

4    So go ahead.

5          MR. CANTWELL:  Okay.

6     BY MR. CANTWELL:

7    Q    When did your relationship with the National Socialist

8    Movement end, Mr. Heimbach?

9    A    In the end of 2018.

10   Q    Was it on good terms?

11   A    It was not.  I resigned and then they attempted to fire

12   me.

13   Q    Did a senior member of that group call you a communist on

14   your way out?

15   A    Yes.

16   Q    Are you or have you ever been Jewish?

17   A    I am not.

18   Q    On Discord we saw yesterday that you called a user named

19   Commander Thomas the HNIC, and when asked what that meant you

20   said "head nigger in charge."  Is this secret Nazi code

21   language?

22   A    No.  That comes from the rap community.

23   Q    Okay.  Is it your understanding that Commander Thomas was

24   black?

25   A    No.  He was a white man.

M. Heimbach - Cross

1  Q    Were you trying to insult him by calling him a nigger?

2  A    No.  It was a joke.

3  Q    Within the alt-right subculture was it unusual for those

4  immersed in this sort of social orbit to hurl derogatory racial

5  epithets at their white friends in contexts that might seem

6  bizarre to the uninitiated?

7  A    That would be accurate.

8  Q    Yesterday we saw several Discord conversations between you

9  and people you could not identify by their real name.  Was it

10  at all unusual for you to talk with unidentified

11  pseudononymous social media accounts online?

12  A    No.  Due to the nature of the threat of Antifa violence or

13  losing your job, losing your home by folks who would be doxed,

14  it was common for people to try and protect their identities.

15  Q    And when you interacted with such individuals, were you

16  conscious of the possibility that they might be infiltrators

17  who meant to do you and your associates harm?

18  A    Yes.

19  Q    Did you have any concern that they might be working for

20  the government?

21  A    There absolutely is that concern.

22        MS. DUNN:  Objection, Your Honor.  The question was

23  leading and I don't think the answer was permissible.

24        MR. CANTWELL:  I'll move on.

25        THE COURT:  All right.  Strike the question and

M. Heimbach - Cross

1   answer.  Go ahead.

2    BY MR. CANTWELL:

3   Q    In Plaintiffs' Exhibit 2871, we saw a wired microphone

4   hanging from your shirt.  Could you please tell us the purpose

5   of that microphone?

6   A    Yes.  I had been doing an interview with a news crew.

7   That was one of the plaintiffs' exhibit from earlier in the

8   day.  And they had miked me up as is common when you do

9   interviews.

10  Q    Have you ever communicated with me using a walkie-talkie?

11  A    No.

12  Q    Yesterday when plaintiffs' counsel asked you about your

13  use of radio communications, you said, "not that I recall."

14       Are you saying now that you don't recall or that you never

15  did speak to me using a walkie-talkie?

16  A    I don't believe I've ever spoken to you using a

17  walkie-talkie.

18  Q    In any of your dealings as a leader of the Traditionalist

19  Worker Party or anything connected to this event or any

20  activities as an activist for political and social change, have

21  you knowingly acted at the behest of any government, foreign or

22  domestic?

23  A    No.

24  Q    You mentioned earlier that you had an entirely separate

25  plan for August 12th from Jason Kessler.  But in the lead-up to

M. Heimbach - Cross

1  the events at the heart of this dispute, were you more involved

2  in the planning of the events?

3  A    In regards to the overall event?

4  Q    On the Charlottesville 2.0 Discord server, were you a

5  member of the leadership discussion channel?

6  A    Yes.

7  Q    Could you please describe to the jury my involvement with

8  that channel?

9  A    I don't even believe you were in it or participated.

10 Q    Did you have administrative or moderation privileges on

11 the Charlottesville 2.0 Discord server?

12 A    I don't recall.

13 Q    To the best of your knowledge, did I?

14 A    To the best of my knowledge, no.

15 Q    Yesterday there was some mention of a planning meeting in

16 July in Tennessee.  Was that -- was that for the

17 Charlottesville 2.0 demonstration?

18 A    It was a local event we were holding where logistics for

19 carpooling was discussed about Charlottesville.

20 Q    So there was an event in Tennessee in July that was

21 separate from this event, but you discussed transportation to

22 the Charlottesville 2.0 event while you were there?

23 A    Correct.

24 Q    Okay.  Could you please describe my involvement in that

25 meeting?

M. Heimbach - Cross

1    A    You weren't there.

2    Q    During the planning of Unite the Right, were you aware of

3    any deliberations or discussions about whether or not to invite

4    me to speak?

5    A    I don't believe I was involved in any of those

6    discussions.

7    Q    Yesterday the plaintiffs showed us some phone records

8    between you and Jason Kessler with the implication that you had

9    not --

10            MS. DUNN:  Your Honor, objection to this question,

11   which appears argumentative and characterizes the implication

12   that plaintiffs were trying to make.

13            THE COURT:  Sustained.

14            MR. CANTWELL:  I'll withdraw it.

15            THE COURT:  Okay.

16    BY MR. CANTWELL:

17   Q    Mr. Heimbach, at any point during the course of this

18   litigation have you falsely denied communicating with me?

19   A    No.

20   Q    In Plaintiffs' Exhibit 1827 you were quoted as saying "the

21   enemy is threatening to kill us."  Could you please elaborate

22   on that?

23   A    Yes.  Antifa organizers have very often attempted to

24   actually kill us by bringing weapons and attacking us.  So

25   there was a very real fear that Antifa were going to once again

M. Heimbach - Cross

1  try to kill us.

2  Q    In Plaintiffs' Exhibit 2268 you tweeted that it would be

3  better to hit the gas than be dragged out of your car and

4  beaten to death on November 14th, 2016.  And was there a

5  specific such incident you were thinking of when you tweeted

6  that?

7  A    Yes.  Specifically I was thinking about the Reginald Denny

8  case from the LA riots where a white truck driver stopped his

9  vehicle and was dragged out of the vehicle and nearly murdered

10  in front of the entire country.

11  Q    November 14th, 2016 would have been right after the

12  election of Donald J. Trump.  Can you please describe for the

13  jury how you perceived left-wing so-called protests in the

14  lead-up to --

15          MS. DUNN:  Your Honor --

16  BY MR. CANTWELL:

17  Q    -- and following of that election?

18          MS. DUNN:  Your Honor, objection.  Relevance and

19  potential --

20          THE COURT:  Sustained.

21          MS. DUNN:  Thank you.

22  BY MR. CANTWELL:

23  Q    At any of the protests surrounding the election of Donald

24  J. Trump did you see demonstrators blocking traffic?

25  A    Yes.

68

M. Heimbach - Cross

1  Q     Do you believe that any of those drivers had reason to

2  fear for their safety?

3  A     Potentially.

4  Q     Were you aware of legislation being proposed that would

5  legalize or otherwise indemnify a driver who kept going when

6  people illegally blocked traffic?

7  A     Yes.

8  Q     Could that legislation fairly be described as the product

9  of a fringe extremist in your opinion?

10         MS. DUNN:  Objection, Your Honor.  This line of

11  questioning --

12         THE COURT:  Sustained.

13         MS. DUNN:  And move to strike.

14         THE COURT:  Well, he didn't answer.  Strike the

15  question and answer.

16   BY MR. CANTWELL:

17  Q     Do you recall an assault suffered by our co-defendant

18  Richard Spencer on inauguration day?

19  A     Yes.

20  Q     Do you recall any viral hashtags or memes that were

21  spawned from that unprovoked assault?

22  A     Yes, such as #punchanazi.

23         MS. DUNN:  Objection, Your Honor.  There's quite a

24  lot of testifying in these questions.  We're trying to let it

25  go, but Mr. Spencer can testify to this assault himself.

M. Heimbach - Cross

1   Mr. Cantwell can testify to his own experiences.

2            (Overlapping speakers.)

3            THE COURT:  -- if he saw this before this, August 17,

4   if it had some effect upon his state of mind or actions.

5            MR. CANTWELL:  That's the direction I'm taking,

6   Judge.

7    BY MR. CANTWELL:

8   Q    In Plaintiffs' Exhibit 649 we saw mention of a bike lock.

9   Were bike lock references something that a particular

10  connotation -- that had a particular connotation within right

11  wing culture at this time?

12  A    Yes.  Not only -- before Charlottesville there had been

13  individuals, conservatives, Trump supporters that had been

14  attacked by Antifa with bike locks.  But even for myself it

15  goes back further, during a demonstration that was permitted in

16  Terre Haute, Indiana.  We were attacked by Antifa from Chicago

17  that came from out of state and attacked us with bike locks and

18  locks in socks.  They attacked us from behind.  So that's not

19  even new to 2017.  That was a common Antifa tactic.

20           THE COURT:  We're going to take about a 20-minute

21  recess now.

22  **(Jury out, 10:30 a.m.)**

23           (Recess.)

24           THE COURT:  Call the jury back.

25  **(Jury in, 10:53 a.m.)**

M. Heimbach - Cross

1            THE COURT:  You may be seated.  You may proceed.

2    BY MR. CANTWELL:

3    Q    Matt, before we went on the break we were discussing some

4    mention of a bike lock in a Discord server.  Do you remember

5    where we left off there?

6    A    Yes, sir.

7    Q    You described a series of events where those types of

8    seemingly innocuous tools have been turned into weapons against

9    you and your associates --

10            MS. DUNN:  Objection, Your Honor.  This is testifying

11    for Mr. Cantwell.  And he will have his own opportunity.

12    BY MR. CANTWELL:

13    Q    You described your experience with bike locks.

14            Was there an event involving a bike lock preceding the

15    events at the heart of this dispute which would have been known

16    outside of your social circle?

17    A    I don't believe known -- I'm not sure how well-known, but

18    I believe, the event you're referencing, there was perhaps --

19            MS. DUNN:  Your Honor, objection.  The question asks

20    about knowledge outside Mr. Heimbach's own social circle.  So

21    he cannot testify to that.

22            THE COURT:  Sustained.

23    BY MR. CANTWELL:

24    Q    Have you ever heard the moniker "bike lock guy"?

25    A    Yes.

71

M. Heimbach - Cross

1    Q     Who is Eric Clanton?

2    A     An anti-fascist.

3    Q     Do you recall seeing news stories about Eric Clanton?

4    A     Some.

5              MS. DUNN:  Objection, Your Honor.  Hearsay.

6              THE COURT:  It's not hearsay.  The question was had

7    he heard stories.  That's not hearsay.

8              MS. DUNN:  Your Honor, we also question the relevance

9    of this.  It seems pretty far afield.

10             THE COURT:  Well, you don't know yet.  He hasn't

11   asked a question other than "do you know."

12             Go ahead.

13    BY MR. CANTWELL:

14   Q    Mr. Heimbach, when you were discussing bike locks in the

15   Discord server, did that have some relation to the purchase of

16   shields and helmets?

17   A    Yes, simply because Antifa were known to utilize not just

18   weapons, but tools such as bike locks as improvised weapons.

19             MS. DUNN:  Objection, Your Honor.  Again, we just ask

20   the Court to instruct the witness to testify to his own

21   personal knowledge and beliefs.

22             MR. SMITH:  Your Honor, I believe that the witness

23   said that Trad Worker has been attacked with those very

24   weapons.

25             THE COURT:  If it influences his opinion as to

M. Heimbach - Cross

1  Antifa, he can testify as to whatever may have helped form his

2  opinion.

3   BY MR. CANTWELL:

4  Q    Yesterday you made several references to "militant

5  anti-fascists."  Are you aware of a term for these groups that

6  would be popularly understood today?

7  A    Antifa.

8  Q    And to the best of your knowledge, is Antifa the sort of

9  thing one carries a membership card for?

10  A    No.

11  Q    And in contrast, the TWP, was this something that it was

12  possible to verify someone's membership in as a factual matter?

13  A    Yes.  We were an FEC-registered political party.

14  Q    But for something like the alt-right or white nationalism,

15  setting aside "no true Scotsman"-type disputes, was this

16  something that somebody could be kicked out of?

17  A    No.

18  Q    So did you understand Antifa to have -- different views,

19  obviously, and tactics, but did you understand Antifa to have a

20  function more similarly to one of these structures than the

21  other?

22  A    Yes.  There was, to my understanding, no card-carrying

23  membership, but they existed to advance a specific political

24  agenda, usually through force.

25  Q    So if some militant anti-fascist who thinks it's okay to

M. Heimbach - Cross

1  punch a Nazi says "I'm not an Antifa member," would you

2  understand that to be unfalsifiable?

3           MS. DUNN:  Objection, Your Honor.

4           THE COURT:  Sustained.

5  BY MR. CANTWELL:

6  Q    Did you personally know anyone who had been harmed by

7  Antifa on August 11th, 2017?

8           MS. DUNN:  Objection, Your Honor.  Foundation.

9           THE COURT:  Sustained.

10   BY MR. CANTWELL:

11 Q    When you were approaching the events at the heart of this

12 dispute, did you have personal knowledge of individuals who had

13 been harmed by anti-fascists?

14 A    Yes.

15 Q    Did you fear for your safety on August 12th, 2017?

16 A    Yes.

17 Q    Did you fear for the safety of your men on August 12th,

18 2017?

19 A    Yes.

20 Q    Do you think -- in your conversations with other attendees

21 and planners, did you hear people voice their concerns about

22 their safety on August 12th, 2017?

23 A    Yes.

24 Q    In anticipation of this, was that why the TWP brought

25 shields and helmets?

74

M. Heimbach - Cross

1   A     Yes.

2   Q     If we could try to set aside race, religion, sexuality,

3   and the fact that they want you dead, do you think Antifa would

4   otherwise be good friends and business partners?

5          MS. DUNN:  Objection, Your Honor, argumentative.

6          THE COURT:  Sustained.

7   BY MR. CANTWELL:

8   Q     Is race your only disagreement with Antifa?

9   A     Not at all.

10  Q     Would you be okay with an all-white drag queen story hour?

11         MS. DUNN:  Objection, Your Honor.

12         THE WITNESS:  No.

13         THE COURT:  Sustained.

14  BY MR. CANTWELL:

15  Q     If a million French people immigrated to your neighborhood

16  illegally, refused to learn English, collected welfare, called

17  you names --

18         MS. DUNN:  Your Honor, objection.  And perhaps we

19  should go to sidebar to discuss.  This is leading,

20  argumentative, and testimony by the examiner.

21         THE COURT:  I sustain the objection.

22  BY MR. CANTWELL:

23  Q     Is race your only concern with regard to immigration

24  policy?

25  A     No, not at all.

75

M. Heimbach - Cross

1  Q    In Plaintiffs' Exhibit 2368 we saw a man named DeAndre

2  Harris get beaten by several men.  To the best of your

3  knowledge, was that beating racially motivated?

4  A    No.

5         MS. DUNN:  Objection, Your Honor.

6         THE COURT:  Sustain the objection.

7         MS. DUNN:  And we do move to strike this testimony.

8  This entire line of questioning is not proper.

9         THE COURT:  All right.  Yes.

10        Disregard the question and answer.

11  BY MR. CANTWELL:

12  Q    Did you hear a man shout "get the fuck out of here" in

13  that video?

14  A    Yes.

15  Q    Did you see anyone try to prevent him from leaving?

16  A    No.

17        MS. DUNN:  Objection, Your Honor.  I understand that

18  Mr. Cantwell is a *pro se* defendant, but --

19        THE COURT:  The video will speak for itself in that

20  regard.  So --

21        MR. CANTWELL:  Your Honor, if I could just be heard

22  on the question here.  My understanding was they played this

23  video for Mr. Heimbach and asked his opinions about the video.

24        MR. SMITH:  Several times, in fact.

25        MR. CANTWELL:  And I'm only trying to -- to

M. Heimbach - Cross

 1  cross-examine that line of questioning.  That's the goal here.

 2          MS. DUNN:  Your Honor, just to be clear, what we

 3  asked Mr. Heimbach was to identify the TWP shields in the video

 4  and his co-defendant, which he did.  And our position is the

 5  same.  This witness should be able to testify to his own

 6  firsthand knowledge.  We have given a lot of latitude here, but

 7  at a certain point, this is not -- should not be evidence in

 8  this case.

 9          THE COURT:  Well, the video will speak for itself.  I

10  mean, the witness is in no better position than the jury to say

11  what's on the video.

12   BY MR. CANTWELL:

13  Q    In Plaintiffs' Exhibit 1888 we saw you approaching Lee

14  Park with the library to your right-hand side.  Can you tell me

15  what, if any, of our co-defendants were with you at that time?

16  A    Dr. Hill and Michael Tubbs, and Matt Parrott was there.

17  Jeff Schoep as well.

18  Q    Were you present for the testimony of Devin Willis?

19  A    Some of the cross-examination.

20  Q    Did you hear Mr. Willis say that you could have just gone

21  around him?

22  A    I did hear that, yes.

23  Q    At some point following the events at the heart of this

24  dispute, did you become aware that I got pepper-sprayed?

25  A    Yes.

77

M. Heimbach - Cross

1   Q    Do you know where I was pepper-sprayed, Mr. Heimbach?

2            MS. DUNN:  Objection, Your Honor.

3            THE COURT:  Do you know of your own knowledge where

4   he was?

5            THE WITNESS:  I believe it was on Market Street.

6            MS. DUNN:  Objection, foundation.  Your Honor, the

7   witness did not see any of this himself.

8            THE COURT:  Well, I don't know.

9            MS. DUNN:  We don't know.

10           THE COURT:  Well, ask him where you were when you saw

11  what you're testifying to.

12           MS. DUNN:  Your Honor, the question --

13           MR. CANTWELL:  I'll withdraw it.  Withdrawn.

14           THE COURT:  Strike -- disregard the question and

15  answer that's subject.

16   BY MR. CANTWELL:

17  Q    Was it your understanding that you could have safely and

18  legally walked down any street and entered the park anywhere

19  you liked?

20  A    Yes.  In terms of the street on Market Street where the

21  police -- that was the plan that we had had, that we were

22  supposed to -- we had the right to walk down that street, yes.

23  Q    I'm sorry.  You're saying -- let me repeat the question

24  for you and --

25  A    I apologize.

M. Heimbach - Cross

1    Q    -- see if you actually understand it.

2         Was it your understanding that you could have safely and

3    legally walked down any street and entered the park anywhere

4    you liked?

5    A    Safely, no.  It should have been safely.

6    Q    Okay.  You had -- did you have a plan with the

7    Charlottesville Police Department of where to enter the park?

8    A    Yes.

9    Q    Okay.  And of the several entrances to the park, which did

10   you understand to be the safest?

11   A    The one closest to where the police had us park.

12   Q    And is that where we saw the clash in Plaintiffs'

13   Exhibit 1888?

14   A    Yes.

15   Q    Do you understand one of the allegations in this case to

16   be ratifying racially motivated violence?

17   A    Yes.

18   Q    The plaintiffs asked you if you said something to the

19   effect of "James Fields did nothing wrong."  Do you recall

20   that?

21   A    Yes.

22   Q    Do you believe that James Fields got a fair trial in

23   Charlottesville?

24   A    No.

25             MS. DUNN:  Objection, Your Honor.

79

M. Heimbach - Cross


1          THE COURT:  Sustained.

2    BY MR. CANTWELL:

3    Q    When you said --

4          MS. DUNN:  And move to strike.

5          I apologize, Your Honor.

6          THE COURT:  Disregard the question and answer.

7    Mr. Fields pled guilty, as I understand it, in Charlottesville.

8    And I don't --

9    BY MR. CANTWELL:

10   Q    When you said that James Fields did nothing wrong, did you

11   mean that you approved of a racially motivated murder?

12         MS. DUNN:  Objection, Your Honor, objection.  Leading

13   and argumentative.

14         THE COURT:  It's leading.  You can ask him what he

15   meant by it.

16    BY MR. CANTWELL:

17   Q    What did you mean when you said that James Fields did

18   nothing wrong?

19   A    I believed that, based upon the video evidence available,

20   that his vehicle had been attacked and he likely feared for his

21   life.

22   Q    Who is Dwayne Dixon?

23   A    A member of Redneck Revolt, the Antifa paramilitary

24   organization.

25   Q    Do you believe Dwayne Dixon is responsible for the death

M. Heimbach - Cross

1   of Heather Heyer?

2            MS. DUNN:  Objection, Your Honor.

3            THE COURT:  Sustained.

4   BY MR. CANTWELL:

5   Q   Have you ever posted to social media that Dwayne Dixon did

6   nothing wrong?

7            THE COURT:  Sustained.  Well...

8            MS. DUNN:  Thank you, Your Honor.

9    BY MR. CANTWELL:

10  Q   Before we wrap this up, let's spend a little time talking

11  about national socialism and Adolf Hitler, shall we?

12  A   Yes.

13  Q   Have you read *Mein Kampf*?

14  A   Yes.

15  Q   Have you read it more than once?

16  A   Yes.

17  Q   Have you read more than one translation of *Mein Kampf*?

18  A   Yes.

19  Q   In *Mein Kampf*, did Hitler talk about exterminating Jews?

20  A   No.

21  Q   Did he talk about gas chambers?

22  A   No.

23  Q   Did he talk about ovens?

24  A   No.

25  Q   Where and under what conditions was *Mein Kampf* written?

M. Heimbach - Cross

1  A     Adolf Hitler was imprisoned at the time.

2  Q     Do you know what he was imprisoned for?

3  A     Yes.  For what was known as the Beer Hall Putsch.

4  Q     And after the Beer Hall Putsch, did Hitler continue to

5  advocate for the violent overthrow of government?

6  A     No.  He utilized democracy to gather votes from the German

7  people to be democratically elected.

8  Q     Did he advocate for uncontrolled criminal mayhem in the

9  streets?

10 A     No.  He advocated for law and order.

11 Q     We hear these stories about so-called "Brownshirts"

12 terrorizing Germany prior to the National Socialist German

13 Workers' Party coming to power --

14         MS. DUNN:  Objection, Your Honor.  Objection.

15         (Reporter clarification.)

16 BY MR. CANTWELL:

17 Q     We hear these stories about Brownshirts --

18         MS. DUNN:  Your Honor, this is objectionable.

19         MR. CANTWELL:  Judge, I want to understand what

20 Mr. Heimbach's -- how Mr. Heimbach believes --

21         THE COURT:  Was he questioned about this?

22         MR. CANTWELL:  I'm about to get to the question.

23         THE COURT:  I mean, was he questioned on direct about

24 Brownshirts?

25         MS. DUNN:  No, Your Honor.

M. Heimbach - Cross

1          MR. CANTWELL:  No.  He was questioned about national

2    socialism, Judge.  I want to ask him about national socialism.

3    That's the goal.

4          THE COURT:  All right.  Ask him about national

5    socialism.

6     BY MR. CANTWELL:

7    Q    Would an informed supporter of Adolf Hitler approve of --

8          MS. DUNN:  Objection, Your Honor.  He's asking --

9          THE COURT:  Right.  Sustained.

10         MS. DUNN:  Thank you, Your Honor.

11    BY MR. CANTWELL:

12   Q    Do you recall Adolf Hitler talking about torches as a

13   symbol of racial and national revolution?

14   A    I don't recall any speeches of Hitler speaking of torches.

15   Q    Do you remember anything of that sort in *Mein Kampf*?

16   A    Not off the top of my head.

17   Q    What, if any, revolution or revolutions did Hitler talk

18   about in *Mein Kampf*?

19   A    The desire for a national revolution for the German

20   people.  And also attempted armed uprisings by left wing

21   organizations.

22   Q    And those armed uprisings, did Hitler view those

23   positively?

24   A    No.

25   Q    Have you ever unironically stated that Adolf Hitler did

M. Heimbach - Redirect

1  nothing wrong?

2  A    Yes.

3  Q    Do you believe that Adolf Hitler -- when you said that,

4  did you believe that Adolf Hitler murdered 6 million Jews?

5  A    No.

6           MR. CANTWELL:  No further questions.

7           THE COURT:  All right.  Thank you.

8           MR. SMITH:  Your Honor, I have no questions for

9  Matthew.  Thank you.

10          THE COURT:  Thank you.  You may step down.

11          Who is the next witness?  Oh.

12                    REDIRECT EXAMINATION

13   BY MS. DUNN:

14  Q    Mr. Heimbach.

15  A    Yes.

16  Q    Defense counsel asked you some questions about an event in

17  Auburn?

18  A    Yes.

19  Q    Do you recall that?

20       And that took place in April of 2017, the Auburn event,

21  correct?

22  A    Yes.

23  Q    And Mr. Spencer gave a speech; you remember that?

24  A    Correct.

25  Q    You attended and so did other Traditionalist Worker Party

M. Heimbach - Redirect

1  members?

2  A     Yes.

3  Q     Okay.  And you recall that you had shields at that event?

4  A     Yes.

5  Q     I'd like to play for Mr. Heimbach Plaintiffs' Exhibit

6  2523.

7          (Plaintiffs' Exhibit 2523 marked.)

8  BY MS. DUNN:

9  Q     Are you able to see that?

10 A     No.

11         MS. DUNN:  2523.

12         (Video playing.)

13  BY MS. DUNN:

14 Q     Do you recognize this video?

15 A     Yes.

16         MS. DUNN:  Your Honor, we'd like to play for the jury

17 Plaintiffs' Exhibit 2523 and move it into evidence.

18         THE COURT:  All right.  Be admitted.

19         MS. DUNN:  Thank you.

20         (Plaintiffs' Exhibit 2523 admitted.)

21         MS. DUNN:  Do we have audio?

22         (Video playing.)

23         MS. DUNN:  All right.  So Mr. Spalding, if you could

24 just play the beginning of that video.

25         (Video playing.)

85

M. Heimbach - Redirect

1   BY MS. DUNN:

2   Q    Mr. Heimbach -- pause there -- do you see yourself?

3   A    I do.

4          MS. DUNN:  Mr. Spalding, please continue.

5          (Video playing.)

6   BY MS. DUNN:

7   Q    All right.  And do you see yourself running with a shield?

8   A    Yes.

9   Q    Okay.  Keep going, please, with the video.

10         (Video playing.)

11         We can stop the video.  Mr. Heimbach, you recall being

12  asked about this in your deposition, correct?

13  A    I don't recall exactly.

14  Q    Okay.  You were asked whether this video shows you

15  charging toward a group of counter-protesters.  Do you recall

16  that your answer to that was yes?

17  A    Sure.  Yes.

18  Q    Okay.

19  A    For the purpose of we believed --

20  Q    I just want to establish that you and I do not agree -- do

21  not disagree --

22  A    Okay.

23  Q    -- that at the Auburn event that counsel asked you about,

24  that you are, in fact, with a shield and other TWP members

25  charging into a group of people?

M. Heimbach - Redirect

1  A    Charging in regards to we believed a comrade had been

2  caught and was potentially being attacked.

3  Q    Okay.  And so you believed that the belief that a comrade

4  had been caught was justification to run full force with your

5  shields into a group of people?

6           MR. SMITH:  Your Honor, that calls for a legal

7  conclusion.  Objection.

8           MS. DUNN:  Your Honor, I'm asking about his belief.

9           THE COURT:  Asking about his own belief.

10          THE WITNESS:  We made no contact with

11  counter-protesters.

12  BY MS. DUNN:

13  Q    Sir, that's not the question I asked you.  And actually,

14  if I can ask my colleague to bring me -- it's a transcript,

15  just so it's not confusing to everyone what's happening.  But

16  this way I can see your answers and my questions.

17       Thank you.

18       So my question to you was whether you believed that the

19  belief that a comrade had been caught, as you just testified,

20  was justification to run full force with other people into a

21  group of people?

22  A    Towards a group of people, not into a group of people.

23  Q    So --

24  A    I believe if there was a vicious assault happening against

25  someone who was caught by themselves, then yes, it would be

M. Heimbach - Redirect

1   understandable and reasonable to try and prevent a violent

2   assault against an individual.

3   Q    Okay.  But at no time, including in your deposition, did

4   you mention a violent assault.  This is the first time that

5   you've said that, even though you've been asked about this

6   video before, correct?

7   A    Yes.  It turns out the comrade --

8   Q    Sir, just, please, answer my question and then if your

9   counsel wants to ask you more, he can.

10  A    Sure.  No.

11  Q    And so I just want to make sure that we are all clear,

12  which is, based on your belief, your conduct in this video you

13  believe was justified?

14  A    Yes.

15  Q    As self-defense?

16  A    No one was ever struck.  So there was no self-defense

17  necessary to even discuss.  And the entire incident shown in

18  that video --

19  Q    Sir, you were asked --

20          MR. SMITH:  Can we let the witness finish, please.

21          MS. DUNN:  There was no question pending.

22   BY MS. DUNN:

23  Q    Sir, you were asked in your deposition:  "So you are

24  saying that the reason why you charged into a group of

25  counter-protesters with your shield was to defend somebody in

M. Heimbach - Redirect

1   the Traditionalist Worker Party?"

2        And you answered that question yes.  Do you recall that?

3   A    Yes.

4   Q    Okay.  And you stand by that answer, correct?

5   A    Yes.

6   Q    There was an event in Sacramento in July of 2017; you

7   recall that?

8   A    Yes.

9             MR. SMITH:  Your Honor.

10            MR. JONES:  I think this is beyond the scope.

11            MR. SMITH:  Yes, this is beyond the scope of

12   direct -- or beyond the scope of cross.  Sorry, Your Honor.

13            MS. DUNN:  Your Honor, it is not.  A substantial

14   amount of the direct examination was aimed at this idea of

15   self-defense at rallies.  And we are entitled to probe that

16   with this witness.

17            MR. SMITH:  No, Your Honor.  They're trying to get a

18   second chance at direct.

19            THE COURT:  Well, didn't you put on your evidence

20   concerning that with him on direct?

21            MS. DUNN:  No, Your Honor.  This is in direct

22   response to their examination that just happened where he's --

23            THE COURT:  We're going to have to go back now and

24   let all of these people come back if you bring up new stuff.

25            MS. DUNN:  Your Honor, this is going to be very

M. Heimbach - Redirect

 1  limited, but it is important because what he's describing is a

 2  world view, and we allowed a lot of questions about his

 3  general --

 4          THE COURT:  Come on.  Talk about this instead of all

 5  that's gone on before.  Let's talk about this question right

 6  now.  I mean, why are you going into some new event on

 7  redirect?

 8          MS. DUNN:  Your Honor, I think it will become

 9  obvious.  I think we've discussed that Mr. Heimbach is saying

10  the reason that he charged into a group of counter-protesters

11  is that he felt justified.  So understanding what he thinks is

12  justified is very germane to this case and to this witness, who

13  is a defendant.

14          THE COURT:  Well, he said he ran toward them

15  because -- in his deposition and here --

16          MS. DUNN:  Right.

17          THE COURT:  -- because he thought somebody else was

18  having --

19          MS. DUNN:  Right.

20          THE COURT:  -- was one of his --

21          MS. DUNN:  And what we are entitled to establish is

22  that this is a pattern, that this has happened before, and that

23  that's his view.

24          THE COURT:  Well, is it a pattern that he goes toward

25  a friend who's being attacked?  Is that what you're trying to

M. Heimbach - Redirect

1  establish?

2          MS. DUNN:  Two things, Your Honor.  It is a pattern

3  that -- that Mr. Heimbach and the members of the Traditionalist

4  Worker Party take action that they regard as self-defense, but

5  that will not be shown to be self-defense.  But the other --

6          MR. SMITH:  Your Honor --

7          THE COURT:  Do you have someone there that --

8          MS. DUNN:  What I'm going to ask him about is a logo

9  of his own party who is a defendant in this case.  I don't have

10  to go into the details of the event.  It's just he and the

11  Traditionalist Worker Party are defendants, and they -- this is

12  well within the scope.  He was also asked about many --

13  globally about prior events and his experience.

14          MR. SMITH:  The word "Sacramento" came up exactly

15  zero times in his cross-examination, I believe.

16          THE COURT:  I don't recall anything about Sacramento.

17          MS. DUNN:  Your Honor, we'd ask a small amount of

18  latitude.

19          THE COURT:  Go ahead.  Ask your question.  Let's see.

20   BY MS. DUNN:

21  Q   Okay.  Mr. Heimbach, we'd just ask you to take a look at

22  PX3820, what you're seeing on the screen.

23      Can we make that more visible?

24          MS. DUNN:  Oh, I apologize.  It's 3840, which could

25  have led to some confusion.

M. Heimbach - Redirect

1          THE CLERK:  3840?

2          MS. DUNN:  Yes.

3          (Plaintiffs' Exhibit 3840 marked.)

4          MR. JONES:  My exhibits stop at 3806.  How many other

5   exhibits past 3806 are there?

6          MS. DUNN:  Your Honor, I don't know the answer to

7   that question.  We, I am sure, have copies for defense counsel

8   and can get this over to them.

9          THE COURT:  Have you asked your question?

10   BY MS. DUNN:

11   Q    Mr. Heimbach, do you recognize this?

12   A    Yes.

13   Q    This is a logo and a patch.  It's a patch that you see

14   photographed here, but it was also used as a logo on the TWP

15   website; is that correct?

16   A    I don't believe a logo.  We only had one party logo.

17   Q    But you recognize this to be a TWP patch?

18   A    Not exclusively.

19   Q    How about at all, do you recognize it to be a TWP patch?

20   A    I don't believe it was an official patch.  If you're

21   referring to the events in Sacramento, there were different

22   organizations there.

23   Q    Mr. Heimbach, this patch was displayed by TWP members

24   after the incident in Sacramento.

25   A    Yes.

M. Heimbach - Redirect

1          MS. DUNN:  Yes.  Your Honor, we'd move to admit this

2    exhibit, 3840.

3          MR. JONES:  Your Honor, I don't think it's relevant.

4    It's not a shield.  I don't see how they've connected it.

5          MR. SMITH:  Agree, Your Honor.

6          THE COURT:  Who -- just a minute.

7          Okay.  Be admitted.

8          (Plaintiffs' Exhibit 3840 admitted.)

9          MS. DUNN:  Thank you, Your Honor.  We ask that this

10   be shown to the jury.

11    BY MS. DUNN:

12   Q    Mr. Heimbach, this patch that was made after the

13   Sacramento event in 2016, you would agree that it shows a man

14   striking another man from behind with a stick or a pole?

15   A    Yes.

16   Q    Thank you.

17        Mr. Heimbach, you were asked some questions about your

18   post from 2016 which showed a foot on a gas pedal and said "hit

19   the gas."  Do you remember that?

20   A    Yes.

21   Q    And you referenced Reginald Denny; do you remember that?

22   A    I do.

23   Q    The Reginald Denny incident happened in 1992, correct?

24   A    Correct.

25   Q    Okay.  You were also asked some questions about

M. Heimbach - Redirect

1   communications that you had with both Mr. Cantwell and

2   Mr. Spencer.  Do you recall that?

3   A    Yes.

4   Q    Both Mr. Cantwell and Mr. Spencer asked you questions

5   about communications with them, including phone calls and text

6   messages.  Do you recall that?

7   A    Yes.

8   Q    We'd like to show you Plaintiffs' Exhibit 3137.

9           (Plaintiffs' Exhibit 3137 marked.)

10  BY MS. DUNN:

11  Q    Now, you're aware, Mr. Heimbach, that plaintiffs filed

12  this lawsuit on October 11th of 2017, correct?

13  A    Yes.

14  Q    And this is a text communication that you see on the

15  screen from October 12th of 2017 --

16          MR. SMITH:  Your Honor, I'm going to object.  I don't

17  see how this is any part of the cross-examination that

18  occurred.  They're way outside the scope at this point.

19          MS. DUNN:  Your Honor, he was --

20          MR. SMITH:  Way outside, Your Honor.

21          MS. DUNN:  He was asked repeatedly about -- sorry, he

22  was asked repeatedly about communications between Mr. Cantwell

23  and Mr. Spencer and himself in order to establish the lack of

24  those communications and the metes and bounds.  And we are

25  entitled to ask about communications and lack thereof.

M. Heimbach - Redirect

1           THE COURT:  Is this something you did not enter --

2    you did not bring up on direct?

3           MS. DUNN:  It was not -- it had not been -- this is

4    proper redirect because it's directly responsive.

5           THE COURT:  Did you bring this up on direct?

6           MS. DUNN:  This exhibit, no.

7           THE COURT:  Okay.  Go ahead.

8           MS. DUNN:  Thank you.

9     BY MS. DUNN:

10   Q    Mr. Heimbach?

11   A    Yes.

12   Q    You recognize this to be a text message between yourself

13   and Mr. Spencer from October 12th, the day after this lawsuit

14   was filed.  Do you see that?

15   A    Yes.

16          MS. DUNN:  Your Honor, we'd ask that 3137 be admitted

17   and published.

18          THE COURT:  You're talking now about after the

19   events.  I mean, they've obviously been discussing the case

20   since it was filed.  But I mean, as I understood Mr. Spencer

21   and Mr. Cantwell's testimony is what they -- contacts they did

22   not have with him prior to Unite the Right, Charlottesville,

23   August 2017.

24          MS. DUNN:  Your Honor, as I understood it, it was

25   both during that time period and as related to those events.

M. Heimbach - Redirect

1   And so this -- this would be related.  We also --

2            THE COURT:  Well, I didn't understand it that way.

3   The jury will have to determine.  I think this is beyond the

4   scope.

5            MS. DUNN:  Okay.  Your Honor.  That's fair.

6            MR. SMITH:  Thank you, Your Honor.

7    BY MS. DUNN:

8   Q    So Mr. Heimbach, in 2017, on the topic of your

9   communications via telephone, which was raised by defense

10  counsel, you used an Android cell phone to discuss the events

11  in Charlottesville and to text with other defendants, correct?

12  A    Yes.

13  Q    And when we asked you in your deposition what you had

14  texted about, you said you couldn't remember anything that you

15  had texted to anybody.  Do you recall that?

16  A    Yes.

17  Q    And two months after this lawsuit was filed you replaced

18  your Android phone with a new cell phone.  It was a Blackview

19  800 Pro?

20  A    I believe so.

21  Q    Okay.  And you said that you did that because your

22  2-year-old had busted it beyond repair.  Do you remember that?

23  A    Yes.

24  Q    All right.  So you did not produce to plaintiffs in this

25  case anything from your Android phone that you used before,

M. Heimbach - Redirect

1   during, and after Charlottesville 2.0, correct?

2   A    No, because my ex-wife tossed it.

3   Q    Right.  So we'll talk about that.

4        MR. SMITH:  Your Honor, I don't think we should talk

5   about that.  That's way beyond the scope of direct and cross.

6   They had an opportunity to ask about all this, Your Honor.

7   They passed on it.

8        THE COURT:  It didn't come up on cross.

9        MS. DUNN:  Your Honor, Defendants Cantwell and

10  Spencer asked Mr. Heimbach about communications between these

11  defendants, and --

12       MR. JONES:  Before the --

13       MR. SMITH:  Yes, Your Honor.  They asked about before

14  the rally.

15       THE COURT:  Please don't interrupt.

16       MR. SMITH:  I'm sorry, Your Honor.  I thought --

17       MS. DUNN:  Thank you, Your Honor.  The reason that

18  communications do not exist in part is because we did not

19  receive in discovery any communications for Mr. Heimbach, and

20  there are reasons for that.  And so we are entitled, in

21  response to their saying what communications exist, to show the

22  jury that we did not receive communications and why that was.

23       THE COURT:  Well --

24       MR. SMITH:  That was --

25       THE COURT:  We don't know if that's why it was, but

97

M. Heimbach - Redirect

1  you can show -- you can bring out that --

2          MR. SMITH:  They want to do another direct

3  examination, Judge.

4          MS. DUNN:  Your Honor, we are just going to ask this

5  witness questions and he's answering them.  We're not -- if it

6  doesn't show why, it won't show why.  But we're entitled to ask

7  the questions.

8          THE COURT:  Well, ask relevant questions.

9          MS. DUNN:  Yes.

10  BY MS. DUNN:

11  Q   All right.  So we just discussed, Mr. Heimbach, that you

12  replaced the Android phone with a Blackview phone, and then you

13  used the new Blackview phone to send text messages concerning

14  Charlottesville 2.0?

15  A   I can't recall exactly what text messages I sent four

16  years ago.

17  Q   Right.  But you don't disagree, do you, with what you told

18  us in your deposition, is that you used that Blackview phone to

19  send text messages concerning Charlottesville 2.0?

20  A   Could be.

21  Q   Well, if you disagree with that, you can turn to your 2019

22  deposition, page 331 to 332, lines 23 to 18, but if you --

23          MR. SMITH:  Excuse me.  Are you saying you'd like to

24  admit that testimony?

25          THE COURT:  Please don't talk to the lawyer.

M. Heimbach - Redirect

1          MR. SMITH:  Your Honor, is counsel saying that she

2    wants to admit that testimony?  If so, she needs to show how

3    it's contrary to what he's saying now.

4          MS. DUNN:  Your Honor, Mr. Heimbach has testified

5    about two phones.  The first phone, he has agreed that he

6    texted and used the phone for communications about Unite the

7    Right.  The second phone we just discussed, I asked him whether

8    he had used that phone as well to send texts and to use the

9    phone for the Unite the Right planning.  He didn't remember.

10   And so I'm referring him to his deposition to refresh his

11   recollection about his testimony.

12         THE COURT:  All right.  Just read the question and

13   answer and let's go.

14   BY MS. DUNN:

15   Q    Mr. Heimbach, the question about the Blackview phone was:

16   "And you sent text messages on that phone concerning the Unite

17   the Right in some way, right?

18        "Answer:  Uh-huh.

19        "Question:  Is that a yes?

20        "Answer:  Yes."

21   A    Could you give me the page and line number again?

22   Q    331 to 332, line 23 on 331, line 18 on 332.

23   A    Okay.  Pardon me.

24   Q    Do you see that?

25   A    Yes, ma'am.

M. Heimbach - Redirect

1   Q    Okay.  All right.  So you've testified under oath that --

2   well, to begin with, the Android phone, we've agreed we didn't

3   get anything from that phone?

4   A    Correct.

5   Q    And we'll talk about that.  But you've also testified

6   under oath that the Blackview phone was replaced by your wife,

7   Jessica Heimbach, without your permission as an early birthday

8   present.  You recall that?

9   A    Yes.

10  Q    So you didn't produce the text messages that you sent and

11  received about Charlottesville 2.0 from the Blackview phone

12  either, correct?

13  A    Correct.

14  Q    Okay.  You also used an ASUS laptop to create documents

15  related to Charlottesville 2.0.  Do you recall that?

16  A    All of which were on Google Docs that I did supply to

17  plaintiffs.

18  Q    But you recall discussing that laptop?

19  A    Yes.

20  Q    And after this lawsuit was filed, you recall testifying

21  that the only effort you made to preserve evidence was to put

22  both the Android phone and the laptop in an unlabeled and

23  uncovered plastic tub.  You recall that?

24  A    I mean, I'm a working class guy that lived in a trailer at

25  the time.  A separate space that seemed appropriate.

100

M. Heimbach - Redirect

1  Q    I'm just asking whether it's accurate that that was your

2  only effort to preserve the evidence in this case after the

3  lawsuit was filed, was to put the phone and the laptop in the

4  tub?

5  A    Yes.  I believe that was sufficient.

6  Q    And at this point, even though you knew that the lawsuit

7  had been filed and you had a lawyer --

8            MR. SMITH:  Objection.  Counsel is editorializing and

9  she should just ask a question.

10           THE COURT:  Go ahead.

11   BY MS. DUNN:

12  Q    You've testified that you didn't tell your lawyer at the

13  time that the phone and the laptop were in a tub in your house?

14  A    I don't recall every conversation I had with my lawyer at

15  the time.

16  Q    And you claim that after a domestic dispute your ex-wife

17  gave your neighbors permission to dispose of the tub, correct?

18  A    Along with the rest of my stuff.

19  Q    Right.  And that's a different -- so the ex-wife

20  responsible for the phone that is not available to us was

21  Jessica Heimbach, right?

22           MR. SMITH:  Your Honor, can I request a sidebar,

23  please?

24           THE COURT:  Just a minute.

25           I don't think it's necessary.  Let's go.

M. Heimbach - Redirect

1  BY MS. DUNN:

2  Q    So with regard to the phone, that was -- that was replaced

3  as an early birthday present, that was your second wife?

4  A    Correct.

5  Q    And with regard to the disposal of the tub with the first

6  phone and the laptop, that was your first wife, correct?

7  A    Correct.

8  Q    And you've also testified that your second wife -- that

9  your second wife deleted your VK social media account after you

10  had an argument about taking out the trash.  Do you recall

11  that?

12  A    Yes.

13  Q    VK is like Russian Facebook, right?

14  A    Yes.

15        MR. SMITH:  Your Honor, objection.  I don't remember

16  counsel talking about VK ever in this case.  This is the first

17  time that word's ever come up.

18        THE COURT:  Okay.  It's come up now.  Go ahead.

19  BY MS. DUNN:

20  Q    And so your second wife, you said, deleted the VK social

21  media account after you had an argument about taking out the

22  trash, right?

23  A    Correct.

24  Q    That's the same wife who replaced your old phone as an

25  early birthday present, right?

M. Heimbach - Redirect

1   A    Correct.

2   Q    Okay.  And you have also said that your second wife did

3   the same thing with your Gab account, that she deleted it after

4   an argument about taking out the trash.  Do you remember saying

5   that?

6   A    Or similar argument.

7   Q    Right.  But do you remember saying that your second wife

8   deleted your Gab account after an argument about taking out the

9   trash?

10  A    Yes.

11  Q    Or a similar argument.

12      Okay.  And you said that you liked social media so much

13  that this was her way to get back at you, right?

14  A    Yes.

15          MS. DUNN:  Okay.  Your Honor, we'd like to play for

16  impeachment purposes Plaintiffs' Exhibit 3472.  It's hour

17  20:29, minute 38, to hour 2:30:25.  It's possible I read the

18  numbers wrong, but I'll fix the time stamp.

19          THE COURT:  All right.

20          MR. JONES:  What was the exhibit number?

21          MS. DUNN:  3472.

22          MR. JONES:  Okay.  Thank you.

23          (Plaintiffs' Exhibit 3472 marked.)

24          MR. KOLENICH:  Your Honor, we'd like to request some

25  sort of limiting instruction regarding this testimony of

M. Heimbach - Redirect

1  Mr. Heimbach.  She's going into great detail about discovery

2  violations.  There were motions about discovery violations and

3  limiting instructions.

4        THE COURT:  All right.

5        Members of the jury, if Mr. Heimbach has not done

6  anything regarding failure to make discovery, it is not to be

7  considered by you as evidence against any of the other

8  defendants.  It only pertains to him.

9        Some of the evidence in this case applies only to the

10  party that the Court tells you.  And you're required not to use

11  that evidence against any of the other parties.  You may use it

12  against the party directly involved.

13        Go ahead.

14        MR. CANTWELL:  Before we start with this, Judge,

15  they're about to play an audio clip.  This was a technical

16  concern that I had brought up earlier.  I may, or any of my

17  co-defendants may, wish to object to playing this audio, but

18  we're not able to hear the audio without playing it out loud in

19  this courtroom.  That's a challenge that I think we have.

20        THE COURT:  Well, we'll just have to --

21        MS. DUNN:  Your Honor, this is being used for

22  impeachment purposes.  So we can hand up to Your Honor a

23  transcript, but it's -- the rules that Mr. Cantwell just

24  articulated, which are proper in other circumstances, are not

25  for impeachment.

M. Heimbach - Redirect

1          THE COURT:  All right.  Go ahead.

2          (Video playing.)

3   BY MS. DUNN:

4   Q    Mr. Heimbach, I just want to make sure that you recognize

5   your own voice in this podcast.

6   A    I do.  And, respectfully, I wasn't about to announce to

7   Mr. Cantwell's audience private domestic disputes between my

8   wife at the time and I.  That would be wildly inappropriate, to

9   betray her confidence and things that happened privately behind

10  closed doors.

11  Q    So, Mr. Heimbach, your testimony, then, is when you said

12  on November 12th of 2018, during the time that this lawsuit was

13  going on, to Mr. Cantwell that you had to delete your account,

14  that that was not true, and that it's still true that your wife

15  deleted your Gab account after a domestic dispute about

16  throwing out the trash?

17  A    Correct.

18  Q    Okay.  And then when you go on to say "I had to delete my

19  account" and then you reference "my lawyer dealing with legal

20  stuff, he was like, 'uh, no,'" are you -- are you saying that

21  your lawyer dealing with your legal stuff knew that you had

22  deleted your Gab account?

23  A    I don't believe so.  Again, I don't think any personal

24  conflicts at my home was something I was about to broadcast to

25  a very wide audience.  That would be wildly inappropriate to

M. Heimbach - Redirect

1    do.

2    Q    But you don't deny that that's what we just heard you say

3    about your lawyer, correct?

4    A    Correct.

5              MS. DUNN:  Your Honor, at this time --

6              MR. SMITH:  Your Honor, if I could quickly:  We

7    should probably make a note as to which lawyer the witness is

8    talking about, if any.  It's not me.

9              THE COURT:  You can ask him.

10             MS. DUNN:  Your Honor, I have no further questions.

11             MR. CANTWELL:  May I recross?

12             MS. DUNN:  Oh.  I apologize.  I do actually have one

13    other question.

14             THE COURT:  Who was he talking -- who were you

15    talking to in that recording?

16             THE WITNESS:  Mr. Cantwell, Your Honor.

17             THE COURT:  You were talking to Mr. Cantwell?

18             THE WITNESS:  Yes, Your Honor.

19             THE COURT:  And when was that?  What was the date of

20    that conversation?

21             MS. DUNN:  Let me find it again.

22             November 12th of 2018.

23             THE COURT:  All right.  Okay.

24    BY MS. DUNN:

25    Q    I apologize.  One additional thing, Mr. Heimbach.  And

M. Heimbach - Redirect

1    this won't take very long.

2                    MS. DUNN:  Can we put up on the screen for

3    Mr. Heimbach 3304N?

4                    (Plaintiffs' Exhibit 3304N marked.)

5    BY MS. DUNN:

6    Q     Can you read this?

7    A     No.

8          Now I can.

9    Q     These are your interrogatory responses in this case.

10         You were asked on cross-examination by defense counsel

11   about your conversations with the Charlottesville Police

12   Department?

13   A     Yes.

14                   MS. DUNN:  I'd like to admit this into evidence,

15   3304N, and show the jury.

16                   THE COURT:  All right.  It will be admitted.

17                   (Plaintiffs' Exhibit 3304N admitted.)

18                   MS. DUNN:  Thank you.

19    BY MS. DUNN:

20   Q     Looking at Questions 6 and 7, these were questions where

21   we asked you to state under oath your answers?

22   A     Yes.

23   Q     And this was during the duration of this lawsuit, so some

24   time ago, closer in time to the events of 2017.  You understand

25   that?

107

M. Heimbach - Redirect

1    A    Yes.

2    Q    Okay.  And you see that Question 6 asks you to identify

3    each communication concerning the events you had with each

4    member of law enforcement, whether before, during, or after the

5    events?

6    A    Correct.

7    Q    Do you see that?

8         And your response is simply:  "Mr. Parrott and I called

9    Charlottesville PD and maybe some other agency, but I can't

10   recall exactly, to try to coordinate plans.  I can't recall who

11   exactly I spoke to or any other details of the interaction."

12        Correct?

13   A    Correct.

14   Q    And then Question 7, we asked you to identify each

15   communication concerning the events you had with any government

16   official, whether before, after, or during the events, and then

17   including details of that.

18        Do you see that?

19   A    Yes.

20   Q    And you say -- in response to this question asking about

21   before, after, or during the events, you say:  "To my

22   knowledge, my only communication with government officials for

23   this event was during the event and calling the Charlottesville

24   PD officers/assorted state police 'pigs' and 'class traitors.'"

25        Do you see that?

M. Heimbach - Recross

1   A    Yes.

2          MS. DUNN:  Thank you, Mr. Heimbach.  I have no

3   further questions at this time.

4          MR. CANTWELL:  May I recross?  Yes?

5          THE COURT:  Yes.

6          MR. CANTWELL:  Is this your device?

7          MS. DUNN:  Oh, I'm sorry.

8          MR. CANTWELL:  No problem.

9                    RECROSS-EXAMINATION

10   BY MR. CANTWELL:

11   Q    Mr. Heimbach, have you listened to more than one episode

12   of the Radical Agenda?

13   A    Yes.

14   Q    Have you heard the introduction to the Radical Agenda?

15   A    Yes.

16   Q    Can you tell us how the Radical Agenda is marketed?

17          MS. DUNN:  Objection, Your Honor.  Scope.

18          THE COURT:  Did this come up on redirect?

19          MR. CANTWELL:  They just played a clip from the

20   Radical Agenda.

21          MR. SMITH:  That's true, Your Honor.

22          MR. CANTWELL:  And so I'd like to --

23          THE COURT:  Was the clip involving you?

24          MR. CANTWELL:  Yes.  That's the clip that they just

25   played.

M. Heimbach - Recross

1            THE COURT:  All right.  Go ahead.

2   BY MR. CANTWELL:

3   Q    Do you understand the Radical Agenda to be an

4   entertainment product?

5   A    Absolutely.

6   Q    And is it your understanding that it would be legally

7   advisable to brag about destroying evidence in public?

8            MS. DUNN:  Objection, Your Honor.

9            THE WITNESS:  That would not be.

10            MS. DUNN:  Objection.  And move to strike.

11            THE COURT:  Sustained.

12   BY MR. CANTWELL:

13   Q    Mr. Heimbach, why did you say on my radio show that your

14   lawyer told you to destroy evidence?

15   A    Because --

16            THE COURT:  Go ahead.  Answer the question.

17            THE WITNESS:  Because the truth of having a domestic

18   dispute is something that's embarrassing and not particularly

19   fit to the audience of an entertainment program.  That's,

20   respectfully, no one's business but my own.

21   BY MR. CANTWELL:

22   Q    Did we laugh after you said that?

23   A    Yes.

24            MR. CANTWELL:  No further questions.

25            THE COURT:  All right.

M. Heimbach - Recross

1                    RECROSS-EXAMINATION

2   BY MR. SMITH:

3   Q    Mr. Heimbach, when you're referring to "a lawyer" told you

4   that, were you referring to me, Joshua Smith?

5   A    No.

6   Q    Was I your lawyer at the time that --

7              THE COURT:  Mr. Smith, why don't you --

8              MR. SMITH:  It's just these two questions, Your

9   Honor.

10             THE COURT:  Sir?

11             MR. SMITH:  Yeah.

12             THE COURT:  Well, it's just --

13             MR. SMITH:  You want me to go to the podium?  Okay.

14  BY MR. SMITH:

15  Q    Is that person that you were talking about, that lawyer,

16  is that person still your lawyer currently?

17  A    No.

18             MR. SMITH:  Okay.  No further questions, Your Honor.

19             THE COURT:  All right.  Thank you.

20             You may step down.

21             Call the next witness.

22             Members of the jury, you're going to hear this

23  instruction again, but you will hear about the duty to preserve

24  evidence and duty to make -- that there's a duty to disclose

25  all relevant and non-privileged evidence that either side

M. Heimbach - Recross

1    possesses.  They are to produce it for the other.

2           And you're going to hear that sanctions, certain

3    sanctions, will apply to anyone who doesn't properly make

4    discovery and doesn't properly preserve evidence in the case.

5    And you are cautioned, however, that each party is entitled to

6    have the case decided solely on the evidence that applies to

7    that party.

8           Any sanctions against these parties will have no

9    bearing on the other parties, and in any event does not relieve

10   plaintiffs of their burden to prove by a preponderance of the

11   evidence the conduct committed by the defendants in the case --

12   other defendants in the case.

13          All right.  You may proceed.

14          MS. KAPLAN:  Plaintiffs call Diane D'Costa, Your

15   Honor, and she will be examined by my colleague Mr. Levine.

16          THE COURT:  All right.

17          MR. SMITH:  Your Honor, may we --

18          (Discussion off the record.)

19          THE COURT:  Is the witness on the way?

20          MR. SMITH:  Your Honor, may I be excused with my

21   client?

22          THE COURT:  What?

23          THE CLERK:  He's asking if he and his client can be

24   excused from the courtroom.

25          MR. SMITH:  Is that okay?

D. D'Costa - Direct

1          THE COURT:  Yes.  You don't have to be here.

2          MR. LEVINE:  Your Honor, may I go get the witness?

3          THE COURT:  Well, I hope the witness is on the way.

4          MR. LEVINE:  She's right outside, Your Honor.

5          THE COURT:  Call the witnesses in.  Call the witness.

6          You may leave.

7          (Discussion off the record.)

8          MR. LEVINE:  Your Honor, could they wait until the

9    witness gets on the witness stand?

10         THE COURT:  What?

11         MR. LEVINE:  Could the defendants please wait until

12   the witness gets on the witness stand?

13         THE COURT:  No.  They can go on and leave.  It's just

14   taking too much time.  They can just leave.

15         MR. SMITH:  Thanks, Judge.

16         DIANE D'COSTA, CALLED BY THE PLAINTIFFS, SWORN

17                      DIRECT EXAMINATION

18    BY MR. LEVINE:

19   Q    Please state your name for the record and remove your

20   mask.

21   A    My name is Diane D'Costa, D-I-A-N-E, D, apostrophe,

22   C-O-S-T-A.

23   Q    Are you have currently employed?

24   A    I am.

25   Q    What do you do?

D. D'Costa - Direct

1   A    I am a middle school teacher in a charter school in DC.

2   Q    What is the highest level of your education?

3   A    A bachelor's degree from the University of Virginia.

4   Q    Was that here in Charlottesville?

5   A    Yes.

6   Q    When did you begin attending UVA?

7   A    I came in the fall of 2014.

8   Q    And when did you graduate?

9   A    The spring of 2018.

10  Q    Ms. D'Costa, do you identify with a particular religion?

11  A    I do.  I'm Jewish.

12  Q    And what was the makeup of your family's religious

13  situation?

14  A    Yeah, my mom was Jewish.  My dad is Catholic.  And we kind

15  of grew up celebrating all the holidays.

16  Q    Have you always identified as Jewish?

17  A    I have, and in my young adulthood really stepped into my

18  Jewish identity.

19  Q    Were you involved in organizations while you were an

20  undergraduate?

21  A    Many, yes.

22  Q    Could you please tell the jury what they were?

23  A    I was a resident advisor for first-year students.  I was a

24  tour guide.  I was part of the Jewish women's group at the

25  Hillel.  I did ceramics.  A number of things.

114

D. D'Costa - Direct

1   Q     Were you an officer of your class?

2   A     Oh, yeah.  I was vice president of my class.

3   Q     So in August of 2017, were you entering your senior year

4   at UVA?

5   A     Yes.

6   Q     Where were you scheduled to live?

7   A     I was selected to live on the Lawn.

8   Q     Could you please tell the jury what the Lawn is at UVA?

9   A     The Lawn is the historical part of our grounds.  It's

10  where the Rotunda is.  It was originally built in 1817.  There

11  are student Lawn rooms and professor pavilions with grass in

12  the middle.

13  Q     What is the -- what are the structures made of?

14  A     Yeah, it's, like, brick and wood.  All my furniture was,

15  like, oak.  It's, like, historical.  So it's preserved with,

16  like, the historical construction that they used; horse hair,

17  stuff like that.

18  Q     How did you get to be able to live there for your senior

19  year?

20  A     I applied at the end of my third year.

21  Q     And is it competitive to live on the Lawn?

22  A     Yes.  It's kind of a big deal.  There are, like, hundreds

23  of applicants for 53 rooms.

24  Q     And could you please describe a student's room on the

25  Lawn?

115

D. D'Costa - Direct

1  A    Yeah.  So the Lawn rooms are single rooms that open

2  straight to the outside.  So the outside door, if you open it

3  and look into the room, there's a window at the back.  There's

4  a fireplace on either side, a lofted bed, and a water cabinet

5  with a sink, and that's about it.

6  Q    So there are no bathrooms in the rooms?

7  A    No.  We would walk outside to the bathrooms.

8  Q    What is a pavilion?

9  A    The pavilions were -- well, they're two-story, like,

10 houses.  They have the modern amenities of kitchens and

11 bathrooms, but it's where professors live.

12 Q    When did you move into your room on the Lawn in August of

13 2017?

14 A    I moved in on August 11th of 2017.

15 Q    And just describe for the jury physically what the Lawn is

16 and where your room was in relation to it.

17 A    So the Rotunda is at the top of the Lawn, the north end of

18 the Lawn.  Then there's the West Lawn and the East Lawn, two

19 parallel tracks of student Lawn rooms, and professor pavilions

20 interspersed in between.

21      I lived in 48 East, which was on -- looking at the

22 Rotunda, the right side of the Lawn, further south.

23 Q    So if the Lawn was a football field, the Rotunda would be

24 at one set of the goal posts.  Where was your room in relation

25 to the Rotunda?

116

D. D'Costa - Direct

1  A   I was, like, kind of towards the other end of the goal

2  post, if it's a football field, and I was on, like, the

3  sideline on the right.

4  Q   Now, focusing in on August of 2017, before you moved into

5  your room on August 11th, had you heard anything about a Unite

6  the Right rally scheduled for Charlottesville?

7  A   I hadn't heard anything for the 11th.  I heard that

8  something might be happening at the Robert E. Lee statue

9  downtown, but I didn't have much more information than that.

10  Q   And when did you understand the events were scheduled for

11  the Robert E. Lee statue?

12  A   For the 12th.  I didn't know anything other than the 12th.

13  Q   Had you heard anything about who would be coming for that

14  rally?

15  A   I heard that it was white nationalists, the alt-right, who

16  wanted to organize around the statue.

17  Q   And after you moved in on August 11th, that Friday, what

18  did you learn, if anything, about plans for Friday night

19  activity?

20  A   I learned that evening that some of the alt-right white

21  nationalists might be coming to grounds or the Lawn that night.

22  I didn't know much information beyond that.

23  Q   Were you in your dorm room around 9:30, 10:00 at night on

24  Friday, August 11?

25  A   I was.

D. D'Costa - Direct

1   Q     What did you hear?

2   A     From inside my Lawn room, I could hear the chants of "you

3   will not replace us."  And then I heard "Jews will not replace

4   us," in that, like, rhythmic chant.

5   Q     And could you describe the tone of what you were hearing?

6   A     I could only describe it as like an angry mob.  It was

7   loud.  It kept going.  It was like this guttural belly chant

8   that just kept going, of, like, "Jews will not replace us,"

9   over and over again.

10  Q     Was your door closed at that time to the Lawn?

11  A     It was.

12  Q     Did you try to see what was going on?

13  A     Once I heard the chants, I looked out my peephole, and so

14  I was looking through that peephole to see what was happening.

15  Q     And how big was that peephole?

16  A     Maybe an inch, half an inch.

17  Q     And did you have your eye right at the peephole?

18  A     Once I heard the chants, I was staring through the

19  peephole, just trying to figure out what was happening on the

20  other side.

21  Q     What did you see?

22  A     Through the peephole I just saw, like, the flames going

23  from the south end of the Lawn north.  And I just saw, like, a

24  continual stream of flames.

25  Q     Were there people marching or walking?  What did you see

D. D'Costa - Direct

1   in respect of the flames?

2   A    I saw the people holding the flames marching up the Lawn.

3   Q    So you didn't just see one person standing through the

4   peephole?

5   A    No.  It was a mass.

6   Q    And where were the people in relation to your front door

7   that you were looking through?

8   A    My door opened straight onto the Lawn.  They were no more

9   than four yards in front of me.  Just the sidewalk and then the

10  grass, and they were right on the grass.

11  Q    Describe how you felt at that moment?

12  A    I was terrified.  As a Jewish person, hearing "Jews" --

13          MR. KOLENICH:  Objection.  Your Honor has ruled on

14  this, the emotional impact of third parties, as part of

15  pretrial.

16          MR. LEVINE:  Your Honor didn't rule on this.  This

17  witness --

18          THE COURT:  Not with regard -- she's not a plaintiff

19  in the case, right?

20          MR. LEVINE:  She's not, Your Honor.  But she's

21  describing for herself the events of August 11th.

22          THE COURT:  All right.  She's just telling her

23  present-sense impression.

24          MR. LEVINE:  Exactly.

25          THE COURT:  So that's fine.

D. D'Costa - Direct

```
 1            THE WITNESS:  It was terrifying.  I was scared for my
 2   life.  My chest, like, started tightening up, and there was
 3   ringing in my ears.  I was kind of in shock of what was
 4   happening and trying to process what was going on, but I was
 5   terrified.
 6   BY MR. LEVINE:
 7   Q    Could you tell before opening the door how many people
 8   were outside?
 9   A    I couldn't tell.  It was just a large crowd.
10   Q    How long were you looking through the peephole?
11   A    I was looking through the peephole for a good minute or
12   so.
13   Q    What happened next?
14   A    I got a knock on my door from Wendy Baucom.
15   Q    What did the person on the other side of the door say?
16   A    She said, "Diane, Diane, Diane" --
17            MR. KOLENICH:  Hearsay.
18            MR. LEVINE:  It's not offered for the truth, Your
19   Honor, just to explain what she --
20            THE COURT:  It's not hearsay.  Go ahead.
21            THE WITNESS:  She said, "Diane, Diane, Diane, come
22   with me."
23   BY MR. LEVINE:
24   Q    And did you open the door?
25   A    I did open the door for her.
```

D. D'Costa - Direct

1  Q    Did she come in your room?

2  A    She did.

3  Q    And what did she say to you?

4  A    She told me to come to her pavilion.

5        MR. KOLENICH:  Objection, hearsay.

6        MR. LEVINE:  Not offered for the truth, Your Honor,

7  just to explain what she did.

8        THE COURT:  It's just explaining why -- I assume she

9  did something else.  Go ahead.

10  BY MS. DUNN:

11  Q    And who is Dean Baucom?

12  A    Dean Baucom is the professor who lived closest to me in

13  Pavilion X.

14  Q    And what did you do next?

15  A    I flipped over a painting that had, like, Israeli flags on

16  it.  I took off my Hamsa necklace and my Shema ring and threw

17  it away and grabbed a sweater to leave.

18  Q    What is a Hamsa necklace?

19  A    It's a symbol in Judaism.  It's like an upside down hand

20  with, like, a protection from evil, with the evil eye.

21  Q    What is a Shema -- that's S-H-E-M-A.  What is a Shema

22  ring?

23  A    It's a --

24        MR. KOLENICH:  Your Honor, I apologize for objecting

25  again.  Could I request a continuing objection to any

D. D'Costa - Direct

1  description of the emotional impact on this witness pursuant to

2  my previous objection -- I understand it's overruled, but so

3  that I don't have to keep interrupting Mr. Levine?

4              THE COURT:  Yes.

5   BY MS. DUNN:

6  Q    What is a Shema ring?

7  A    The Shema is a prayer in Judaism.  It's like the Hebrew

8  letters in a circle just on the ring.

9  Q    Are you wearing it today?

10  A    Yeah.  It's this ring.

11  Q    Why did you cover these items?

12  A    I was hearing "Jews will not replace us" outside of my

13  door with people holding flames, and I was scared that if they

14  knew that I was Jewish or if there was any identifier of me

15  being Jewish, that I would have a threat to my personal safety

16  and my room would be a threat or a target.

17  Q    Did you leave with Dean Baucom's wife?

18  A    I did.

19  Q    And when you got outside your dorm room, what did you see

20  immediately?

21  A    I could see the mass of people carrying flames, walking,

22  marching towards the Rotunda.

23       I remember seeing a swastika tattooed to someone's arm.

24       And I just saw them carrying the torches, marching towards

25  the Rotunda.

D. D'Costa - Direct

1    Q    And what did you hear?

2    A    They were still chanting the "Jews will not replace us."

3    Q    Where did you go?

4    A    I went to Dean Baucom's pavilion, Pavilion X.

5    Q    And when you got into Dean Baucom's pavilion, where did

6    you go?

7    A    I went to the second-floor balcony that overlooks the

8    Lawn.

9    Q    And was that just up one floor?

10   A    Yeah.  It's the...

11   Q    Did you take any video while you were up on the balcony?

12   A    I did.

13         MR. LEVINE:  Can we please show the witness

14   Plaintiffs' Exhibit 323?

15         (Plaintiffs' Exhibit 323 marked.)

16   BY MR. LEVINE:

17   Q    And, without playing it for the jury, Ms. D'Costa, could

18   you identify it?

19         (Video playing.)

20         THE WITNESS:  Yeah, that's the Snapchat video that I

21   took.

22         MR. LEVINE:  Your Honor, we offer Plaintiffs'

23   Exhibit 323.

24         THE COURT:  Be admitted.

25         (Plaintiffs' Exhibit 323 admitted.)

D. D'Costa - Direct

1          MR. LEVINE:  And we ask that it be published for the

2   jury.

3               (Video playing.)

4    BY MR. LEVINE:

5   Q    Ms. D'Costa, you took that video?

6   A    I did.

7   Q    And how did you make the video in its current form?

8   A    I recorded it on Snapchat and then I used the Geofilter

9   that came up for the Lawn to put, like, "The Lawn" at the

10  bottom.  And then I typed the words over top.

11  Q    So the words, "From outside my door, I have no words,"

12  those are your words?

13  A    Yes.

14  Q    And you typed them at the time?

15  A    Yes.

16  Q    How did you feel looking down at the march from the

17  balcony?

18  A    It was scary.  It was intense.  I was shocked.  The Lawn

19  is, like, a very important part to UVA.  And so it was

20  terrifying and scary.  And then to hear that as a Jewish

21  person, I was just kind of in shock and in fear of what was

22  happening.

23  Q    Where were the marchers going that you were watching?

24  A    They came from the south end of the Lawn.  It almost

25  looked like a river of, like, flames.  So it was, like, from

D. D'Costa - Direct

1  the south end of the Lawn marching up towards the Rotunda.  And

2  I could see some folks coming from the alleyways of the Lawn

3  joining into the crowd marching towards the Rotunda.

4  Q    Now, was the Rotunda, or is the Rotunda elevated from the

5  Lawn itself?

6  A    Yeah.  There are stairs that lead up to the Rotunda on

7  either side.

8  Q    And what's on the other side of the Rotunda down the

9  stairs?

10  A    On the north end of the Rotunda is the Jefferson statue

11  on, like, the plaza, but it's down past on the north end.

12  Q    So can -- from the balcony of the Pavilion, could you see

13  down the stairs on the other side of the Rotunda?

14  A    No.

15  Q    Could you see the Thomas Jefferson statue?

16  A    No.

17  Q    Now, did there come a time when the marchers were -- and

18  the torches were out of your view?

19  A    Yes.

20  Q    What did you do after they left the Lawn?

21  A    I went back inside Pavilion X.

22  Q    And did you stay at Dean Baucom's house after that?

23  A    Just for like 10, 15 minutes.

24  Q    Did you go back and stay in your room that night?

25  A    I did not.  I didn't want to be anywhere near the Lawn

125

D. D'Costa - Direct

1  that night.

2  Q    What did you do next?

3  A    My friend, who lives in Charlottesville, texted me.  And

4  he said, you can stay at my parents' house in Charlottesville,

5  and I gladly took him up on that offer.

6  Q    So did there come a time when you left the Lawn to meet

7  your friend?

8  A    I did.

9  Q    How did that happen?

10 A    He pulled up in the alleyway right next to Pavilion X, and

11 I, like, ran out the back of the Pavilion straight to his car.

12 It was like I was fleeing my house and it, like, was wild

13 because I have memories of my family telling me stories of my

14 great-grandmother fleeing Poland.  And it felt like fleeing my

15 home from Nazis, but on the Lawn.

16 Q    What did you do the next morning?

17 A    I did not get much sleep at all that night.  I had

18 breakfast.  My friend dropped me back off at my Lawn room.  I

19 took a quick nap and I woke up to, like, alerts of state of

20 emergency, programming canceled.  So I drove straight back to

21 Maryland.

22 Q    Did you end up returning to UVA for senior year?

23 A    I did.

24 Q    Now, could you explain to the jury how you physically felt

25 over the next several days after August 11th?

126

D. D'Costa - Cross

1          THE COURT:  I think this -- she's adequately

2    explained what happened and the jury -- I think it gets

3    confusing to go into --

4    BY MR. LEVINE:

5    Q    Well, can you then just describe for the jury what you

6    witnessed Friday night.

7    A    I witnessed an overt act of antisemitism.  I saw --

8          THE COURT:  I wait, an overt -- you can describe what

9    you saw, but don't characterize it.

10          THE WITNESS:  I saw a mass of people carrying lit

11   torches chanting "Jews will not replace us," and I was very

12   confused as to why they were there.  The Robert E. Lee statue

13   is why I heard them coming.  And I don't know what Jews have to

14   do with Robert E. Lee.  And it was the most victim -- I was

15   beyond words seeing a mass of people chanting "Jews will not

16   replace us" with lit torches outside of my front door.

17          MR. LEVINE:  No further questions, Your Honor.

18          THE COURT:  All right.

19          MR. KOLENICH:  No questions for this witness, Your

20   Honor.

21          MR. CANTWELL:  I have some questions, thanks.

22          MR. JONES:  No questions from me.

23          MR. CANTWELL:  Pardon me just a second.  My laptop

24   logged me out for some reason.

25                         CROSS-EXAMINATION

D. D'Costa - Cross

1   BY MR. CANTWELL:

2   Q    Ms. D'Costa, you moved into UVA on August 11th?

3   A    For my fourth year, yes.

4   Q    For your fourth year, you were returning to UVA.  You had

5   been on campus for some period of time before that?

6   A    My first, second and third year.  I left for the summer

7   and came back.

8   Q    You were coming back.

9        Okay.  And so you then -- you had already known as you

10  were moving in about the August 12th event, you said, right?

11  A    I heard that something was happening August 12th.  I

12  didn't know the scale.  I didn't know anything else other than

13  that something was going to happen on the 12th.

14  Q    Prior to the arrival of the men with the torches, somebody

15  told you that something was going to happen that night on UVA

16  campus?

17  A    We didn't know if for sure people were coming to the Lawn.

18  It was "there is a possibility that they might come."  I didn't

19  know any information other than that.

20  Q    Who is "we" in that sentence?

21  A    We being residents who moved in to the Lawn on that day.

22  Q    Could you tell me the names of those residents, please?

23  A    The students?

24  Q    The students who knew that the torch-bearers were coming?

25            MR. LEVINE:  Objection, Your Honor.  Lack of

D. D'Costa - Cross

1    relevance.

2              MR. CANTWELL:  Judge, the torch march, per the

3    plaintiffs' own opening statement, was supposed to be a secret

4    event.  And somehow all these people know about it who are now

5    making all these statements in court.  And I want to know who

6    infiltrated our communications and confronted us and attacked

7    us at the Thomas Jefferson statue and then blamed us for that

8    violence.

9              MR. LEVINE:  Your Honor, object to Mr. Cantwell's

10   speech to the jury.  Press the relevance objection.

11             THE COURT:  Overruled.  Who told you?

12             THE WITNESS:  The senior resident of the Lawn at the

13   time, who got the information from the deans, who saw the

14   gathering happening at Nameless Field.  From my understanding

15   of how they got that information, once the torches were being

16   lit or people were organizing around Nameless Field, the deans

17   told the senior resident on the Lawn, who told me.

18    BY MR. CANTWELL:

19   Q    Okay.  I'm not familiar with the structure here, so if I

20   could go through this with you.  The senior resident of the

21   Lawn, did you say?

22   A    They're like the RA for the Lawn, the resident advisor,

23   the student who is in charge of the other students.

24   Q    And it was your understanding that the senior resident of

25   the Lawn had heard this from the dean?

D. D'Costa - Cross

1  A    The dean of students, or I don't know -- I frankly do not

2  know.  UVA administration at some point.

3  Q    From the administration.  Okay.

4       Are you familiar with a website called itsgoingdown.org?

5  A    No.

6  Q    Are you familiar with a website called Unicorn Riot?

7  A    No.

8  Q    Do you know who Emily Gorcenski is?

9  A    No.

10  Q    Are you a member of any activist groups?

11  A    No.

12       MR. CANTWELL:  I'm showing you Plaintiffs' Exhibit

13  323.  Could we show this again to the jury, please.  I think

14  this was just put into evidence.

15       I'm sorry.  I don't have my screen plugged in here.

16  I apologize.

17   BY MR. CANTWELL:

18  Q    So you were in your -- is it your dorm?

19  A    It's a Lawn room, but yes, a dorm room.

20  Q    Lawn room is the -- Lawn room, fair to say, is a

21  UVA-specific term for the dormitory where you were staying?

22  A    Yes.

23  Q    Okay.  And how far was that from Pavilion X?

24  A    Just two doors down.

25  Q    Oh, just two doors down?

D. D'Costa - Cross

1   A    Like the balcony stretches over the Lawn rooms and

2   Pavilion X is two doors from my room.

3   Q    And you said that you were inside of your dorm and you had

4   some kind of -- I'm paraphrasing -- Jewish symbolism within the

5   apartment there?

6   A    Yes.

7   Q    And you turned this dorm inside of the place?

8   A    I flipped my painting and I removed my jewelry.

9   Q    Okay.  And you did that to go two doors down?

10  A    Yes, before I left my room.

11  Q    And did you have to go outside of the building to get two

12  doors down?

13  A    Yes.  On the sidewalk.

14  Q    So you hid all your Jewish symbols inside your apartment

15  and you went outside, and then you went two doors down?

16  A    Yes.

17  Q    And from two doors down, then you went up to the second

18  story?

19  A    Yes.

20  Q    And that's where you shot this video?

21  A    From the balcony, yes.

22  Q    All right.  I'm going to play this video.

23          (Video playing.)

24      Now, did I hear you correctly, did you say you saw a

25  swastika tattoo on a man's arm?

D. D'Costa - Cross

1    A    When I was leaving my door.  So when I opened my door to

2    walk out with Wendy Baucom, the person closest to me had a

3    swastika.

4    Q    So it seems to me from this video that the people that

5    we're talking about are pretty far from Pavilion X.  Is that

6    fair to say?

7    A    No.  This is from the balcony, this is overlooking it,

8    like a bird's eye view.  When I saw that, they were not even me

9    to this table that I saw people marching in front of me as I

10   was leaving.

11          MR. LEVINE:  The witness is describing about 5 feet,

12   Your Honor.

13          THE COURT:  She said 12 earlier.  But let her

14   testify.

15    BY MR. CANTWELL:

16   Q    I'm sorry.  So you're saying that somewhere in the range

17   of 4 to 12 feet was the distance between you and these people

18   with the torches?

19   A    Yes.

20   Q    The whole of the people; it wasn't some stray person that

21   got away from the crowd?

22   A    The mass of the crowd was walking up the grass of the

23   Lawn, which was directly in front of my door.  This video is

24   from the balcony, right atop my room.

25   Q    The balcony on the second floor?

D. D'Costa - Cross

1  A    There is one floor and then, yes, the second floor.

2  Q    And so from the second floor, these specks of light off in

3  the distance, are you telling me that these are -- I mean, you

4  might be some number of feet above them, but you're saying this

5  is about 12 feet in front of the building?

6  A    In front of me when I was leaving my Lawn room.  So when I

7  was leaving my Lawn room, they were right outside the grass.

8  There is a walkway and then there is the grass.  I saw them in

9  front of me when they were in front of the grass, just a couple

10 of yards away.

11 Q    If that's the case, why would you leave the apartment?

12 A    There's no bathroom in the Lawn room.  I was by myself.

13 And my neighbor told me to come with her so that I was safe

14 with her, rather than by myself in a room without a bathroom,

15 without a back door.  The only way out was towards this crowd

16 of people marching with flames.

17 Q    I'm sorry, the only way to go to the bathroom is to go

18 outside?

19 A    Yes.

20 Q    Are you sure?

21 A    These were built in 1817.  We walk down the Lawn, go

22 behind and, like, go to the bathroom.  It's the historic part

23 of grounds.

24 Q    All right.  Well, okay.  Wow.  That's harrowing.

25      All right.  And so at the end of -- towards the end of

D. D'Costa - Cross

1  your testimony, I think that you declined to finish a sentence.

2  You said something to the effect of "it was the most victim,"

3  and then stopped.  What were you going to say?

4  A    It was the most traumatized I ever felt as a Jewish

5  person.  I was scared for my life.  I thought that I was going

6  to die if people knew who I was.  I had reason to believe with

7  lit flames in front of me that these people were angry, that

8  they were hating who I am.  And so it is the most traumatized I

9  have ever been as a Jewish person, having seen a mass of people

10  with lit torches chanting "Jews will not replace us."

11      And so I did feel victimized as a Jewish person living in

12  my home, being victim to this happening in a place that's very

13  important to me.

14  Q    Right.  Okay.  And so if they had been chanting "students

15  against Jewish supremacy," would you have felt better about it?

16  A    I don't think I would have felt good with anyone lighting

17  flames in front of my door.

18          MR. CANTWELL:  No further questions.  Thank you.

19          MR. CAMPBELL:  No questions, Your Honor.

20          THE COURT:  Anyone?

21          MR. SPENCER:  No questions.

22          THE COURT:  All right.

23          Members of the jury, this witness was allowed to

24  describe the events as they were taking place on the Lawn.  You

25  understand she's not a plaintiff in the case and you shouldn't

D. D'Costa - Cross

1    take her feelings and project them onto the plaintiffs.  But

2    she was allowed to testify as to what she saw, and she used

3    rather conclusory terms about, you know, horrific and -- I

4    don't know if she said that.  But it was -- they are allowed to

5    explain the experience that night, the event, the atmosphere

6    surrounding it and that type of thing.  She's not a plaintiff,

7    as I said.  But she was only allowed to testify as to what she

8    saw and the feelings and explain the event.

9          We're going to recess now until 1:30.  Do not discuss

10   the case with anyone.  Do not allow anyone to discuss it with

11   you.  Do not remain within hearing of anyone discussing the

12   case.

13   **(Jury out, 12:26 p.m.)**

14          (Recess.)

15          THE COURT:  Just a minute.  I want to mention a

16   couple of things before the jury comes back.

17          I'll just say this about the video exhibit that we

18   had come up earlier.  Before referring to any exhibit, whether

19   it's been admitted into evidence already or not, please refer

20   to it as a -- by number.  In any event, a witness -- this is

21   going forward.  A witness may only testify concerning contents

22   of a video based on personal knowledge of the matter, such as

23   first having the witness identify themselves in the witness --

24   in the video, and further eliciting a response that the video

25   fairly represents the situation depicted.  As I stated at the

D. D'Costa - Cross

1    outset of court today, the Court encourages parties to discuss

2    ahead of time any specific video exhibits sought to be

3    introduced on cross before the cross-examination itself.

4           With respect to that particular video, did you show

5    that, Mr. Kolenich?  I couldn't tell at the end whether you did

6    or not.

7           MR. KOLENICH:  I don't think I tried to put a video

8    in, Your Honor.

9           MR. JONES:  It was me.  It was Mr. Jones.

10           THE COURT:  Oh, I'm sorry.  Mr. Jones.  I'm sorry.

11           Did you show that video?

12           MR. JONES:  I actually don't know whether it was

13    admitted or not.  I think it was.

14           THE COURT:  Was it played to the jury?

15           THE CLERK:  It was.

16           THE COURT:  Okay.  All right.  But I allowed that in.

17    But it's questionable whether the proper foundation was laid in

18    that case.

19           I think -- Mr. Kolenich, did you show that to a

20    witness before?  I had seen that video before.

21           MR. KOLENICH:  It may have been a cross after I asked

22    some questions.  I'm fairly certain I haven't attempted to

23    introduce any exhibits or publish any to this point.

24           THE COURT:  Did you ask Mr. Willis about it?

25           MR. KOLENICH:  I don't recall crossing Mr. Willis,

D. D'Costa - Cross

1   because I was absent, Your Honor, on Monday.

2           MS. DUNN:  Your Honor, we don't believe this was

3   discussed, the video, or admitted, either.

4           One concern we have that we discussed over the break

5   is that defense counsel made a huge deal about plaintiffs not

6   wanting the jury to see the video.  That was not our objection.

7   We objected because it was not proper foundation.  And we would

8   ask the Court to instruct the jury that it was not proper

9   foundation.

10          It was, I think, very prejudicial.  Every defense

11  counsel said, let them see all the evidence.

12          THE COURT:  Okay.

13          MS. DUNN:  And that's not our point.  And I think it

14  was very, very unfortunate that that happened.

15          THE COURT:  Okay.  If you would suggest a curative

16  instruction, I would be happy to give one.

17          MS. DUNN:  Thank you, Your Honor.  We will write

18  something right now.  We appreciate it.

19          THE COURT:  Okay.

20          MS. DUNN:  Your Honor, we will write an instruction,

21  but just because we're at the beginning of this stage, two more

22  things.

23          One is it's improper to make comments like that in

24  front of the jury.  So we will think about what we can say that

25  won't compound the problem.

137

D. D'Costa - Cross

1          A second problem that we are having is, as you saw,

2     the defendants in their crosses -- or, I'm sorry, in their

3     directs, which are not supposed to be leading, are testifying,

4     including *pro se* defendants who are percipient witnesses.

5          These are both very large problems rights now.

6          THE COURT:  All right.  It's also a problem sometimes

7     with you.

8          MS. DUNN:  I understand, Your Honor.

9          THE COURT:  Okay.  So that applies across the board.

10         All right.  And then I wanted to mention something

11    with respect to the last witness, Ms. D'Costa's testimony.  To

12    the extent she was describing the events that she witnessed and

13    her perception of the event, the Court clarified -- attempted

14    to clarify for the jury that the testimony -- that she is not a

15    plaintiff and that any emotional impact she may have had

16    shouldn't be projected onto the plaintiffs.

17         The emotional impact of these events on third parties

18    came up in a form in the motion in limine in Docket 1148.  In

19    plaintiffs' opposition, they stated:  "Plaintiffs do not seek

20    recovery for the emotional distress of non-parties and do not

21    intend to argue or present evidence on that non-issue."

22         So I think that's where Mr. Kolenich was coming from

23    when he objects to -- he objected to that testimony.

24         MR. LEVINE:  Your Honor, Alan Levine for the

25    plaintiffs.  I read Your Honor's colloquy with Mr. Kolenich

D. D'Costa - Cross

1    during the pretrial conference, and the colloquy and the

2    Court's ruling related to a witness testifying about the

3    emotional experience of a plaintiff, and we said at the time we

4    wouldn't be calling any relative or mother to talk about the

5    personal experience of a plaintiff.  And I was very careful in

6    directing Ms. D'Costa's direct examination to only her personal

7    experience of what she saw, what she heard, and what she did.

8           THE COURT:  All right.  But you said plaintiffs did

9    not --

10          MR. LEVINE:  And we're not seeking any recovery --

11          THE COURT:  Okay.  But no more witnesses telling how

12   terrified -- no more non-parties saying how terrified they

13   were.

14          MR. LEVINE:  Your Honor, we don't have any other such

15   witness.

16          THE COURT:  Okay.

17          Yes?

18          MR. JONES:  Your Honor, if I can also just make a

19   point.  Yesterday during Matt Heimbach's direct examination,

20   the plaintiffs introduced the DeAndre Harris beating video, and

21   I made an objection about lack of foundation and authenticity

22   because Matt Heimbach did not personally see that incident.

23   And the Court allowed it in because it had been filed with the

24   Court and not objected to previously.  So that's why --

25          THE COURT:  What was the difference in those two?

D. D'Costa - Cross

1           MS. DUNN:  The difference is we showed Mr. Heimbach

2    the video because he had identified shields and an individual

3    that were in that video.  We asked him only questions about the

4    shields and what he would recognize in the video.

5           The video will come in later anyway through a

6    different witness who was physically there, and we made that

7    clear at the time.

8           MR. JONES:  It was admitted.

9           THE COURT:  All right.  Anything else on that?

10          MR. JONES:  No, Your Honor.  The same thing with all

11   those --

12          THE COURT:  Anyway, going forward, I hope we know --

13          MR. JONES:  That's clear, Your Honor.  And I

14   appreciate that.  But I will object to a curative instruction,

15   because I think it's happened to both sides.

16          MS. DUNN:  Your Honor, we disagree with that, and we

17   are writing up the curative instruction.

18          THE COURT:  Okay.

19          MS. DUNN:  Look, just to explain, we understand that

20   lawyer questions are not evidence.  And I think one issue

21   that's been happening here is Your Honor has said that to the

22   jury, and that certainly applies to my questions and Mr. Jones

23   and the other counsel.

24          We are having an issue that when Mr. Spencer and

25   Mr. Cantwell ask their questions in a leading and argumentative

D. D'Costa - Cross

1  way, they are percipient witnesses.  So it's different.  And we

2  ask that this gets sorted out, because it's very prejudicial,

3  what's happening.

4           THE COURT:  You've argued that point, and I think

5  it's well-taken.  We all understand.

6           Anyway, back to Ms. D'Costa.  The emotional impact of

7  these events on third parties came in in the form of a motion

8  in limine.  In plaintiffs' opposition, they stated:

9  "Plaintiffs do not seek recovery for emotional distress for

10 non-parties and do not intend to argue or present evidence on

11 that non-issue."  In oral argument on this issue, the Court

12 held that it would be inadmissible if plaintiffs sought to have

13 a third party, such as plaintiffs' mother, testify about her

14 daughter's injury and experience.  The oral order ended there

15 after limiting non-party testimony consistent therewith.

16          The Court allowed the testimony of Ms. D'Costa and

17 found her description of the relevant events and, to the extent

18 there was any prejudice to defendants arising therefrom, such

19 prejudice was not undue prejudice, since it was relevant to the

20 issue of animus and people's perception of defendants' acts,

21 and much of the witness's testimony to the effect was elicited

22 by defendant -- well, in particular, Mr. Cantwell in cross.

23          And I tried to tell the jury, and I think -- I said

24 it was a present-sense impression, which is not exactly the

25 right term, why something like that is admissible.  I think

D. D'Costa - Cross

1   it's more in terms of -- of a lay opinion, where a lay witness

2   might express an opinion about -- on what they saw in

3   describing what they saw.  And they, in general, are allowed to

4   explain why they -- you know, for the lack of -- they use some

5   conclusory language, for the lack of a better term.  But the

6   testimony explains how they came to whatever opinion they had.

7   They're not general experts.

8          Anyway, since that's not going to come up again,

9   we'll proceed.

10          Is that video, the one we're talking about, is that

11   likely to come up again?  I know I saw it before.  Somebody

12   pointed out the big gentleman in the --

13          MR. JONES:  I don't at present have any plans to.

14          THE COURT:  Can we bring in the jury and do that

15   later?

16          MS. KAPLAN:  Your Honor, would you like us to bring

17   the witness in?

18          THE COURT:  Excuse me?  You would like to have -- who

19   is the next witness?

20          MS. KAPLAN:  Professor Deborah Lipstadt.

21          THE COURT:  Okay.  That's the expert?

22          MS. KAPLAN:  Yes.  I'll just note for the record,

23   because she's an expert, she will not be testifying as a

24   percipient witness, obviously, about evidence in this case.

25          THE COURT:  You can go ahead and call her.

D. D'Costa - Cross

1          MS. DUNN:  Your Honor, may we hand this up for the

2     Court's --

3          THE COURT:  Put it on the screen so everybody can see

4     it.

5          MS. KAPLAN:  Plaintiffs call Professor Deborah

6     Lipstadt.

7               (Discussion off the record.)

8          MS. DUNN:  Can you see the whole thing, Your Honor?

9          THE COURT:  Was that -- it wasn't the last witness,

10    but --

11         MS. DUNN:  Oh, I apologize.  You're right.  It was

12    Mr. Heimbach.

13         THE COURT:  Yes.  Is that it?

14         MR. JONES:  Your Honor, again, I would object to

15    that.  I think we had the same problem with Matthew Heimbach.

16    Just because he recognizes a shield in a video does not make a

17    video admissible and able to come in through him.

18         THE COURT:  Well, it may -- I mean, he can identify

19    people in it.  At least -- I mean, in this instance

20    Mr. Heimbach did not -- as I recall, he didn't say that he saw

21    anyone.

22         All right.  Call the jury back.

23    **(Jury in, 1:52 p.m.)**

24         THE COURT:  Be seated.

25         I'm going to read something.

143

D. Lipstadt - Direct

1          Members of the jury, back when Mr. Heimbach was

2   testifying, defense counsel asked to admit a video and

3   plaintiffs objected on foundation grounds.  That objection was

4   well-founded.

5          Witnesses must testify to their personal knowledge.

6          The Court instructs you to disregard any comments by

7   defense counsel about plaintiffs' objections.  Lawyers on both

8   sides will make objections, and that is proper.  Objections are

9   not evidence in the case.

10          Anything else?

11          All right.  You may proceed.

12     DEBORAH LIPSTADT, PH.D., CALLED BY THE PLAINTIFFS, SWORN

13                        DIRECT EXAMINATION

14   BY MS. KAPLAN:

15   Q    Professor Lipstadt, what is your current job?

16   A    I'm currently the Dorot Professor of Modern Jewish History

17   and Holocaust Studies at Emory University in Atlanta, Georgia.

18   Q    What is your general academic focus as a scholar?

19   A    As a scholar, my focus is on the history of the Holocaust

20   and on contemporary manifestations of antisemitism.

21   Q    And for how long have you been teaching, Professor, at the

22   university level?

23   A    At the university level, since 1975.

24   Q    And just briefly, what's your educational background?

25   A    My educational background is I attended the City College

D. Lipstadt - Direct

1   of New York, part of the City University of New York, in New

2   York, and I studied for two years at the Hebrew University in

3   Jerusalem, and then got any MA and my Ph.D. from Brandeis

4   University.

5   Q     Thank you for reminding me, Professor, you used to live in

6   New York.  I currently live in New York, and we both have a

7   tendency to speak too quickly, so let's try to -- for both of

8   us, let's have a pact that we try to speak more slowly.

9   A     I've spent a lot of years in Atlanta, so I'm learning to

10  slow down.

11  Q     Professor, have you written any books as part of your

12  scholarship?

13  A     I have.  My first book was called *Beyond Belief:  The*

14  *American Press and The Coming of The Holocaust*.  And it

15  attempted to answer a question a student asked me in class:

16  What could the public have known -- not what the government or

17  State Department officials, but what could the public have

18  known during the Holocaust?  So that book dealt with the level

19  of information that was in newspapers.

20        My second book was a book exploring the phenomenon of

21  Holocaust denial.  It was called *Denying the Holocaust:  The*

22  *Growing Assault on Truth and Memory*.

23        And my third book was a book called *History on Trial:  My*

24  *Day in Court with a Holocaust Denier*, because my second book

25  precipitated a libel suit against me, and the third book was

D. Lipstadt - Direct

1    the story of that suit.

2         My fourth book was on the Eichmann trial in 1961 in

3    Jerusalem.  Adolf Eichmann was one of the chief operating

4    officers of the Holocaust and he was captured by the Israelis

5    and put on trial in Jerusalem in the early '60s.

6         And then after that I wrote a book on the Holocaust in

7    American culture, post-war, how through movies, through plays,

8    radio, books, how the American public began to understand and

9    see the Holocaust.

10        And the final book that I've written came out about a year

11   and a half ago.  It's called *Antisemitism:  Here and Now*.  And

12   it deals with contemporary antisemitism.

13   Q    In addition to all those books, Professor, have you -- do

14   you have occasion to write peer reviewed academic articles?

15   A    I do.  I write many peer reviewed academic articles.

16   Q    Can you give the jury just a sense of what topics those --

17   A    Generally all relating to these topics.  Some of those

18   peer review articles become parts of books eventually, but

19   dealing with aspects of history of the Holocaust, aspects of

20   antisemitism, how I understand antisemitism, exploring

21   different facets of it.

22   Q    And outside of the classroom at Emory, Professor, do you

23   have occasion to give public lectures?

24   A    I give many public lectures.  I'm what some people would

25   call a public intellectual.  I'm very much committed to the

D. Lipstadt - Direct

1  notion that the academic work I do should be made as widely

2  available to the public at large, even if they're not

3  specialists or academics.

4  Q    And again, just generally speaking, what was the general

5  topic of those lectures?

6  A    Of those talks?  In recent years, the general topic has

7  been a lot on contemporary antisemitism and Holocaust denial;

8  not exclusively, but in a great number.

9  Q    Have you ever served before as an expert witness in any

10  case?

11  A    I have not.

12        MS. KAPLAN:  Your Honor, I offer Professor Lipstadt

13  under Rules 702 and 703 as an expert to testify, expert in

14  antisemitism, including the history, rhetoric, language, and

15  symbols of antisemitism.

16        THE COURT:  All right.  No objection.  She may so

17  testify.

18   BY MS. KAPLAN:

19  Q    Professor Lipstadt, were you asked by the plaintiffs in

20  this case to render an opinion?

21  A    Yes.

22  Q    And what were you asked to do?

23  A    I was asked to examine the materials they sent to me,

24  which consisted of emails, podcasts, videos, written material,

25  and to look for evidence of antisemitism, Nazi symbolism,

147

D. Lipstadt - Direct

1  symbolism associated with the Third Reich, with the Hitler

2  regime, expressions of antisemitic ideology that were present

3  at the Unite the Right rally, march and rally, and around it.

4  Q    And after reviewing those materials, Professor, did you

5  form an opinion?

6  A    I did form an opinion.

7  Q    And what was that opinion?

8  A    That opinion -- I -- I don't -- I don't surprise easily.

9  I've been dealing with and writing about the Holocaust, one of

10 the worst genocides in human history, for many, many years.  So

11 very few things surprise me, but I was taken aback by the --

12          THE COURT:  Excuse me.  I have to stop now.

13          She can testify as to her opinion, but any -- I think

14 any emotional reaction -- that's not --

15 BY MS. KAPLAN:

16 Q    No emotional reaction, Professor.  Just what was your

17 opinion.

18 A    My opinion was -- my opinion was that there was a great

19 deal of overt antisemitism and adulation of the Third Reich

20 throughout the testimony -- throughout the evidence that I

21 looked at.

22 Q    And, Professor Lipstadt, were you asked -- was that the

23 only opinion you were asked to give?  Is that the only --

24 A    That's my area of expertise, yes.

25 Q    So were you asked to give an opinion about whether any of

D. Lipstadt - Direct

1  the defendants at all committed or were engaged in a conspiracy

2  to commit racially motivated violence?

3  A    I was not.  I have no expertise in that area.

4  Q    And after doing the work that you just described,

5  Professor, did you write a report?

6  A    I did.

7         MS. KAPLAN:  Your Honor, may I have permission to

8  approach?

9         THE COURT:  Yes.

10  BY MS. KAPLAN:

11  Q    Professor Lipstadt, could you tell me, is that the report

12  that you wrote?

13  A    Yes, it is.

14  Q    Okay.  That's not admissible, so I'm not seeking to admit

15  it into evidence, but I just want you to have it there in front

16  of you.

17      Now, let's back up for a moment, Professor.

18      How would you define the term "antisemitism"?

19  A    Simply put, I would say it's Jew hatred; hatred of someone

20  not because of what they do or who they are, but because they

21  are a Jew, simply put.  You know they're a Jew and you despite

22  them and you want -- maybe even want to do them harm.  That

23  would be my simple definition.

24  Q    How does antisemitism relate to the word "prejudice"?

25  A    Antisemitism is a prejudice.  If you think about the root

D. Lipstadt - Direct

1   of the word "prejudice," prejudge:  I've made up my mind.

2   Don't confuse me with the facts.  So that when you see a Jew,

3   you assume you know exactly what their financial status is, you

4   know what their morals are, you know what their politics are,

5   you know what their ethical behavior is, simply because they

6   are a Jew.

7   Q    And in the course of your career, Professor, have you

8   formed a view as to whether there are certain common

9   stereotypes or characteristics of antisemitism?

10  A    Yes.  I would say there's a template.  As is the case with

11  virtually every prejudice, there's a template of charges that

12  you find, if not all of them, a goodly number of them in --

13  present in antisemitic rhetoric or comments.  And there would

14  be four, which I could enumerate.

15  Q    If you could.

16  A    One having to do with inordinate financial power:  Jews

17  financially controlling banks, financially controlling the

18  economy.

19       One having to do with Jews being smart, but not smart in a

20  good way.  Smart in a malicious, in an evil way.  You know, I'd

21  use the word "clever"; conniving, crafty.

22       The third element I would say is Jews -- what I call --

23  what we might call in common parlance punching above their

24  weight:  Small in number, not a whole lot of them, but somehow

25  managing to control a major portion of society.

D. Lipstadt - Direct

1        And the fourth element I would put in there is the Jew as

2   a devil, or the Jew has ancient roots.  And it's migrated into

3   all different forms of antisemitism, in that the devil comes

4   and does his handiwork without your knowing it.  You don't know

5   you've been impacted by the devil.  You don't know you've been

6   harmed by the devil until the devil has come and gone.  So the

7   Jew works surreptitiously, secretly, behind the scenes, to do

8   harm to the general population for their own benefit.

9   Q    Professor Lipstadt, does antisemitism exist across the

10  political spectrum?

11  A    Antisemitism is ubiquitous.  It appears everywhere.  It's

12  across the political spectrum, across religious spectrums.  It

13  is -- in that sense, that's one of its unique qualities

14  compared to some other prejudices, that -- how it appears in so

15  many different forms.

16  Q    And what about geography?  Is antisemitism limited

17  geographically?

18  A    Well, we've seen -- its worst impact, of course, we saw in

19  Europe because of World War II; but no, it can be all over the

20  place.  It can be all over the place, even in places where

21  there are no Jews, because the idea is so old and has such long

22  legs, so to speak, that it pops up in -- and more than pops up,

23  but is rooted in other places.

24  Q    You've mentioned the Holocaust a couple of times already,

25  Professor Lipstadt.  If you could just explain to the jury,

D. Lipstadt - Direct

1  what was the Holocaust?

2  A    The Holocaust was the state-sponsored genocide by the

3  Third Reich, by the Nazis, by the Hitler regime, which was in

4  power from 1933 to 1945.  And it was a systematic plan to

5  annihilate all the Jews of Europe, and actually beyond as well.

6  And it didn't matter whether the Jew lived within German

7  territory or outside of German territory; it didn't matter if

8  they were of fighting age, or they were old and had to be

9  wheeled to the boxcars which took them to the gas chambers on a

10 gurney, or if they were a tiny baby.  It just didn't matter.

11 If you were a Jew or if they considered you a Jew -- conversion

12 did not help you.  Even if your parents converted, it did not

13 help you; they considered you a Jew.  You were to be

14 annihilated.

15    If I can give one historical fact to demonstrate this:

16 After the Americans and the British, the Allies, the Canadians,

17 landed at Normandy in June of '44 and after the Americans

18 already were in Italy and moving north and they had liberated

19 Rome, and the Soviets were coming west -- so, in other words,

20 the vice was tightening around the Nazis; it was clear they

21 were not going to win -- they took ships and went to the island

22 of Rhodes, where there was an ancient Jewish community from the

23 time predating Jesus, easily 2,500, 3,000 years old, and they

24 took those Jews to Auschwitz and murdered them because there

25 was such a determination to do this.

D. Lipstadt - Direct

1  Q    And excuse me, Professor, where is the Isle of Rhodes?

2  A    The Isle of Rhodes in the Mediterranean.

3  Q    There has been some discussion in this case already about

4  Hitler.  What was Hitler's role with respect to the Holocaust?

5  A    Hitler was the driving force.  He was the -- if you could

6  say "genius," evil genius who conceived of it.  He didn't plan

7  all of it.  He didn't tell his underlings exactly how to carry

8  it out, but he was very clear that every Jew must be destroyed.

9       That isn't what he says initially, but it's very clear

10 initially, even before he comes into power, that he believes

11 that, for Germany to be the strongest nation possible, it must

12 eliminate the Jews, because the Jews are the source of all

13 evil.

14 Q    And how many people, approximately, Professor, were killed

15 in the Holocaust?

16 A    When we talk about the Holocaust, we're talking primarily

17 about the murder of the Jews, and that's approximately

18 six million, though recent research by Father Patrick Desbois,

19 a French priest, argues that it's even more than that.

20      But it was not just Jews who were killed.  Gypsies, Roma,

21 Sinti were murdered.  If you disagreed, if you were considered

22 a political opponent, you might be murdered.

23      And this is speculation, but as a historian, it's -- many

24 historians argue that, had the Germans won the war, they

25 probably would have murdered many, many people.  They would

D. Lipstadt - Direct

1   have murdered religious leaders.  They would have murdered

2   Slavs.  They would -- and just left enough people to provide

3   them with food and to work for them.  But all those other

4   actions could have waited until after the war.  The only

5   systemized killing that they started even as the war was going

6   on was that of the Jews.

7   Q    And, Professor Lipstadt, I think you mentioned the number

8   six million.  How does that number relate to the overall Jewish

9   population in the world?

10  A    One of every three.  So if you were to take the Jewish

11  population on the eve of the Holocaust and count one, two,

12  three, one, two, three, they would have been murdered.

13  Q    Now, you mentioned earlier, talking about your books, that

14  there was -- I think it was a defamation trial against you in

15  the United Kingdom?

16  A    Yes, there was.  In my book, "Denying the Holocaust:  The

17  Growing Assault on Truth and Memory," I made brief reference, I

18  would say maybe 300 words, maybe not even that much, to a man

19  named David Irving, who was a writer, a writer of historical

20  works, who had become an overt Holocaust denier, denied that --

21  first he denied that Hitler had any role in the Holocaust, and

22  then afterwards he said there was no Holocaust.  And I wrote

23  that he was a Holocaust denier and I argued that Holocaust

24  denial is a form of antisemitism.

25        He -- once the book was published in England -- it was

D. Lipstadt - Direct

1  bought and published by Penguin UK -- he sued me for libel

2  there, and he was able to do that because I had, quote unquote,

3  done business in the UK by having a book published there.  It

4  was a very long trial of about ten weeks with a couple of

5  years' preparation before that.  And we won overwhelmingly.

6  The judge talked about his antisemitism, his racism, his

7  hatred, his twisting of historical facts, how he would take a

8  truth and twist it, and that it was done deliberately.  It

9  wasn't a mistake that might have happened in his work, but this

10  was a deliberate effort.

11 Q    That leads me to my next question, Professor.  Have you

12  ever heard the phrase "Holohoax"?

13 A    Yes.

14 Q    What does that mean?

15 A    It's a crude way of Holocaust denial, that the Jews have

16  pulled this hoax on the world by claiming there was a

17  Holocaust.  And of course it is so counter -- I mean, for

18  someone who believes in the Holohoax, or Holocaust denial, call

19  it whatever term you want, for them to be right, who -- I have

20  posed this question with my students:  Who would have to be

21  wrong?  Well, certainly all the survivors who tell their

22  stories and have given evidence.  But not just them.  All the

23  survivors, the Poles, the Russians, the Lithuanians who lived

24  in the towns and villages near the killing sites, near the

25  camps, who saw the trains going in day after day, coming out

D. Lipstadt - Direct

1   empty, who smelled the burning flesh, they would have to be

2   wrong.

3       The thousands of historians all over the world would

4   either have to have been duped or be in on the hoax.  And then

5   finally the Germans themselves.  There has never been a war

6   crimes trial for crimes against humanity, including the

7   Holocaust, where a Nazi war criminal has said it didn't happen.

8   They have said I didn't do it, or I had no choice, but never

9   that it didn't happen.

10  Q    Professor, are you familiar with a book called *Mein Kampf*?

11  A    Yes.

12  Q    What is *Mein Kampf*?

13  A    "Mein kampf" means my struggle.  It's a book that Adolf

14  Hitler wrote when he was in detention after his aborted attempt

15  to overthrow the -- Weimar Democratic Germany.  Germany had a

16  democracy between World War I and the Nazi rise to power.  And

17  he wanted to do a putsch, an overthrow, a coup d'etat, a coup

18  against the government.  And he was sentenced to approximately

19  two years in jail, and in very comfortable circumstances, he

20  wrote this book, "My Struggle."

21  Q    And what does he say about Jews in the book?

22  A    He talks about Jews as being not part of the Volk,

23  V-O-L-K, sort of the folk, the nation, that they are foreign to

24  it, that they are the source of all the troubles of Germany.

25  They and they alone are the backstabbers, the ones who stabbed

D. Lipstadt - Direct

1    Germany in the back and had it lose the war.  If there's a

2    problem in Germany, they are the ones responsible for it.

3    Q    Professor Lipstadt, are you familiar with the phrase

4    "Daily Stormer"?

5    A    Yes.

6    Q    What is that?

7    A    It's a -- first of all, the title is a play on a newspaper

8    that appeared in Nazi Germany, *Der Stürmer,* which was

9    published.  The publisher was a man named Julius Streicher, who

10   was one of the defendants on trial at the Nuremberg trials

11   after the war where the Allies, the British, the Americans,

12   French, etc, tried Nazi war criminals.

13       And it was replete with antisemitism.  The current

14   rendition is also replete with antisemitism, but instead of

15   being called -- it's clear that it's a play on the words "Der

16   Stürmer," *The Daily Stormer*.

17           MS. KAPLAN:  I'm going to ask Mr. Shepherd to put a

18   document that's already in evidence as Plaintiffs' Exhibit 2033

19   on the screen and ask him to turn to page 10.

20    BY MS. KAPLAN:

21   Q    And I want to look at the paragraph that begins "Prime

22   directive:  Always blame the Jews for everything."  Do you see

23   that, Professor?

24   A    Yes.

25   Q    The first paragraph, well, you can read it out loud if you

D. Lipstadt - Direct

1  want.  I want to hear your thoughts on that.

2  A    "As Hitler says, people will become confused and

3  disheartened if they feel there are multiple enemies.  As such,

4  all enemies should be combined into one enemy, which is the

5  Jews.  This is pretty much objectively true anyway, but we want

6  to leave out any and all nuance."

7  Q    And if you see above, the paragraph above the header,

8  Professor, there's a reference to *Mein Kampf*.  Do the ideas

9  expressed in that paragraph that you just read, are they

10  reminiscent of *Mein Kampf*?

11  A    They evoke, yes -- they are quite reminiscent of what's in

12  *Mein Kampf*.

13  Q    Can you explain?

14  A    That this was Hitler's -- he was, as I say, again, I'm

15  reluctant to call him a genius, but at the very least an evil

16  genius.  And he understood very well how propaganda works.  And

17  he understood that if you give people nuance and say, well,

18  this is the banks or this part was responsible for this -- this

19  suffering and this is responsible for another suffering, people

20  get confused.

21      But if you say to them, it's that one group, and you pick

22  a group which for millennia before that have often been blamed

23  for things, poisoning of wells when there was bubonic plague or

24  whatever it might have been -- people will be more ready to

25  accept it.  You simplify.  You simplify.  Again, this wasn't

D. Lipstadt - Direct

1  just Hitler.  It was Joseph Goebbels, the propaganda chief.

2  Take an idea, simplify it and repeat it and repeat it.

3  Q    I want to skip the paragraph and I want you to look at the

4  paragraph that begins, "This basically includes blaming the

5  Jews for the behavior of other non-whites."

6  A    "This basically includes blaming the Jews for the behavior

7  of other non-whites.  Of course, it should not be that they are

8  innocent, but the message should always be that if we didn't

9  have the Jews, we could figure out how to deal with the

10 non-whites very easily."

11 Q    Let me ask you a first question.  I want to take it in

12 pieces.  What does non-white mean?

13 A    People -- today we would use the term "people of color,"

14 anyone who doesn't look like a white person.  But that also

15 would include Jews.  Jews are not considered whites by people

16 who write these kind of things.

17 Q    And what is -- in terms of this kind of antisemitism,

18 what's the relationship between Jews and non-whites?

19 A    Well, this -- here what is being said and what's being

20 argued and what this is evocative of is what I would call the

21 replacement theory, white genocide replacement theory, which

22 argues that Jews control other non-whites in an effort to

23 destroy white society, to destroy white national societies, to

24 destroy societies which have been primarily white,

25 European-rooted, etc, and that you blame -- if you feel they're

D. Lipstadt - Direct

1  non-whites or people think the non-whites are doing bad things,

2  blame the Jews for it.

3          MS. KAPLAN:  You can take that down, Mr. Shepherd.

4          THE WITNESS:  Blame the Jews for it, but the message

5  is that it is the Jews' fault.

6  BY MS. KAPLAN:

7  Q    With respect to the United States, Professor Lipstadt,

8  what are the roots or the beginnings in the United States of

9  this idea of replacement theory?

10  A    You begin to see it first in the late 1960s, early 1970s,

11  though it begins to gain more traction in the '90s, when there

12  are at least legal changes in the status, in America's

13  treatment of or legal status of particularly the black

14  population, the African American population, with the voting

15  law, the civil rights law, housing bills, anti-discriminatory

16  bills.  And there were some -- some people who felt that -- who

17  were disturbed by this.

18      And they were convinced that the people of color could not

19  be doing this on their own.  There had to be someone behind the

20  scenes manipulating it, making it happen.  And that person --

21  in other words, the people of color were the puppets according

22  to this theory, and the Jew was the puppeteer.  The Jew was the

23  one controlling this development.

24  Q    Professor Lipstadt, are you aware of replacement theory

25  having any other names?

D. Lipstadt - Direct

1  A    White genocide replacement theory, white replacement

2  theory, sometimes it's called white Christian replacement

3  theory.

4  Q    Did you see -- in the materials you reviewed for this

5  case, Professor Lipstadt, did you see evidence of this idea of

6  replacement theory?

7  A    I saw it in an overwhelming fashion, more than I expected

8  to see it.  Certainly from the first night of the -- of the --

9  at the events at the University of Virginia with the march,

10  "Jews will not replace us," which confused many people because

11  they said what is that about?  What are they talking about

12  there?  But that's what that was about.

13  Q    Let's watch just a very quick clip of that.  Let's use,

14  Mr. Spalding -- and I apologize for calling you by the wrong

15  name.  But let's watch a clip of Plaintiffs' 3474, 1:50 to

16  2:10, which is in evidence.

17            (Video playing.)

18            MS. KAPLAN:  With the volume.  Can we get volume?

19            (Video playing.)

20  BY MS. KAPLAN:

21  Q    The jury has seen this a bunch of times so I think they

22  have the idea.

23       Professor Lipstadt, can you tell me whether the tiki

24  torches that you see in that video, whether they have any

25  resonance in terms of the issues you study?

D. Lipstadt - Direct

1  A    They definitely have resonance.  Though they've been used

2  in many places, and you could put one in your backyard to ward

3  off mosquitoes or something, but when used in a rally, with the

4  fire, with the marching, that is very much evocative, it

5  evokes, it reminds one who has studied this of the propaganda

6  techniques of the person I previously mentioned, Joseph

7  Goebbels, who was one of Hitler's closest associates.

8         Every time there was a major event, including on January

9  30th, 1933, the night Hitler became chancellor, he would

10  organize one of these marches, with fire, with the tiki

11  torches.  And they -- for a historian who studies this period,

12  the connection is absolutely clear.

13  Q    Professor, I'm going to ask Mr. Spalding to put up

14  Plaintiffs' Exhibit 1827, which was in evidence through

15  Mr. Heimbach, and I think the record reflects that it was

16  written by Mr. Heimbach.  And I want to look at the first

17  paragraph, and ask you, focusing on that paragraph and

18  especially the last sentence, what that says to you about this

19  kind of ideology at play, at least in this document?

20  A    Can I read it aloud?

21  Q    Please.

22  A    "The Unite the Right event in Charlottesville, Virginia,

23  on August 12th is going to be more than yet another successful

24  nationalist event for our rapidly growing and rapidly moving

25  cause.  It's going to be a defining rally, proving that the

D. Lipstadt - Direct

1   populist movement is built on a solid bedrock of nationalism

2   and that America's nationalists have finally set aside their

3   bickering, second-guessing, and factionalism, to deliver a

4   clear and simple white nationalist message:  We will not be

5   replaced."

6        So what I understood and what I see in that paragraph is

7   that this is going to be more than just a successful

8   nationalist rally, but it's going to be defining.  It's going

9   to be change -- a defining moment, and it's going to prove that

10  the populist movement, this far right wing movement, is built

11  on a solid bedrock of nationalism.  But it's to deliver a clear

12  and simple white nationalist message:  We will not be replaced.

13       So it's not just nationalism, that we're going to be --

14  affirm Americans and affirm our American identity, which is

15  quite common and can be a very positive thing, but it is a

16  white nationalist message.  And it is to some degree a call to

17  arms.  "We will not be replaced."  It's not just a rally to

18  make us feel good, to make us feel affirmed, we're strong in

19  number, but this is a call to battle.  We will not be replaced.

20  If someone is out to replace you and I'm calling you to come

21  together, and what's on the -- what's in the cards is a

22  possible elimination of your group, you get the message.  We

23  will not be replaced.

24  Q    And again, who -- people who have this view, what do they

25  have in mind in terms of who will be doing the replacing?

D. Lipstadt - Direct

1  A     Well, if they lose or if they don't succeed, the Jews will

2  do the replacing and they will use people of color to --

3  non-Christians to do their handiwork, but they will be doing

4  the controlling behind the scenes.

5  Q     I want to go down to the second paragraph from the bottom.

6  And if Mr. Spalding could highlight that.

7       And if you could look at that paragraph, Professor, and

8  ask you whether there's anything in that paragraph that has any

9  one of those four characteristics that you spoke about earlier.

10  A     "We need to scare these people, and the way to achieve

11  that is with numbers, discipline, and determination.  We must

12  send a message to the Jewish oligarchs" -- money -- "and their

13  hordes of minions that we will not go silently into the night

14  as they desire.  No, we will fight them.  We will defeat them.

15  We will secure our people's destiny."

16       So first there's the overt connection to Jewish oligarchs,

17  Jewish oligarchs controlling, controlling our future,

18  controlling who we are --

19  Q     Let me stop you for a second.  What does oligarch mean?

20  A     A fabulously wealthy person, and powerful because of their

21  wealth.

22       "We will not go silently into the night."  Silently into

23  the night doesn't mean just -- it means to disappear, to

24  disintegrate, you're going to not be anymore, the end of your

25  existence.

D. Lipstadt - Direct

1      "No, we will fight them.  We will secure our people's

2  destiny."  When you put it with some of the other things I've

3  read, again, it's a call to arms.  This is not come to an

4  important rally that will unite our parts and we'll be

5  stronger.  But this is a call to arms.  This is a call to

6  battle.

7  Q    I'm going to ask Mr. Spalding to put up Plaintiffs'

8  Exhibit 2030, which I'll represent is a tweet from one of the

9  defendants in this case, Michael Hill.

10      It's not yet in evidence, Your Honor, but I promise you

11 that it will be through Mr. Hill.

12              (Plaintiffs' Exhibit 2030 marked.)

13 BY MS. KAPLAN:

14 Q    Professor Lipstadt, again, talk about this idea of

15 replacement theory.  Can you tell me how this tweet relates to

16 that?

17 A    "If you want to defend the South and Western civilization

18 from the Jew and his dark-skinned allies, be at Charlottesville

19 on August 12."

20      So again, it builds on what -- or reaffirms strength, is

21 what I was saying earlier about the previous segments you had

22 me read, that this is not a rally just to strengthen our

23 movement.  To defend the South and Western civilization,

24 Christian civilization, from the Jew and his dark-skinned

25 allies.  In other words, the Jew controlling the allies, maybe

D. Lipstadt - Direct

1   working with them, but the Jews have control of these

2   dark-skinned allies -- be in Charlottesville on August 12th.

3            MS. KAPLAN:  I'm going to ask Mr. Spalding to put up

4   Plaintiffs' Exhibit 3642.

5            (Plaintiffs' Exhibit 3642 marked.)

6            MS. KAPLAN:  I'll represent to the Court that this is

7   a tweet -- the "NewGiantDad," Your Honor, is the Twitter handle

8   for Defendant James Fields.

9    BY MS. KAPLAN:

10  Q    And I'm going to ask you, Professor Lipstadt, to read the

11  words under the tweet and tell me if you know what they are.

12  A    "We must secure the existence of our people and a future

13  for white children."  That's often called the 14 Words.  You

14  often see the number 14 in white nationalist material, white

15  nationalist literature, etc, emails, publications.  And this is

16  what it is.  It's not, again, we must strengthen our movement,

17  but this is a battle to secure the existence of our people and

18  a future for the white children.  In other words, if we don't

19  secure our existence, our children have no future.  Again, a

20  call to arms.

21           MS. KAPLAN:  Your Honor, if I may, I understand that

22  under the rules as we previously discussed that both the prior

23  exhibit, which is 2030, and the current exhibit, 3642, can be

24  shown to the jury subject to us getting them in, which I assure

25  Your Honor, as we discussed, we will.

166

D. Lipstadt - Direct

1          So I don't think the jury has seen either of those.

2   So Mr. Spalding, let's put up 2030.

3          THE CLERK:  So you've moved for the admission?

4          MS. KAPLAN:  No, I'm not.  For an expert, you don't

5   have to.  We will get them into evidence later.

6          THE COURT:  All right.

7    BY MS. KAPLAN:

8   Q    So now the jury has it.  That's the tweet from Mr. Hill

9   that you were talking about?

10  A    Uh-huh.

11  Q    And then let's put up the tweet from Mr. Fields, which is

12  3642.  I apologize for not noticing that earlier.

13         And those words -- is 3642 published?

14         Okay.  And again we see the Twitter handle for Mr. Fields,

15  the NewGiantDad.  And those words underneath it are posted

16  above the photo of Adolf Hitler and the bird, those are the 14

17  Words?

18         (Plaintiffs' Exhibit 3642 marked.)

19  A    Correct.

20  Q    Now, why do you think someone would associate the 14 Words

21  with Adolf Hitler?

22  A    Why -- that statement?

23  Q    Yes.

24  A    Well, that's exactly what Hitler was saying.  That's

25  exactly what he was arguing, what he was proposing, what he was

D. Lipstadt - Direct

1    promulgating in his book, *Mein Kampf*, and in everything he did

2    afterwards.  That this is a war, not a war, just a war to win

3    territory, but this is a war of annihilation, either we

4    annihilate our enemies or they annihilate us.

5         And I think this speaks exactly to that, that there's no

6    living -- there's no doing it part way.  We have to do it all

7    the way.

8    Q    I'm going to now play again for both the witness and the

9    jury -- not yet in evidence but we're going to get it into

10   evidence later this afternoon -- a video, Plaintiffs'

11   Exhibit 207, of Defendant Robert "Azzmador" Ray giving a speech

12   after the Unite the Right rally in Charlottesville on August

13   12, 2017.

14              (Video playing.)

15        Now, Professor Lipstadt, given your expertise on the

16   history of antisemitism, can you please explain whether, and if

17   so, how these words relate to the kind of themes of

18   antisemitism that you've been discussing and that you talk

19   about in your report?

20   A    Well, they certainly -- when they talk about drinking our

21   blood, that goes back to one of the very old antisemitic myths

22   of Jews using the blood of Christian children to prepare their

23   matzah, the unleavened bread they eat on Passover.  And this

24   charge became so pernicious, so evil that you even had popes

25   saying this is not true.  And bishops and cardinals saying this

D. Lipstadt - Direct

1   is not true.  But it was something that did -- nonetheless, it

2   continues to exist, as we just heard.

3        Bury us in brown sludge, whether that -- that could have a

4   double meaning, brown sludge talking very distastefully and

5   disgustingly about people of color, but it also could mean Jews

6   causing disease, causing white people to suffer, one of the

7   charges in the Middle Ages.  I mentioned it earlier, when there

8   was bubonic plague across Europe, caused by rats -- we know

9   that -- but they accused Jews of poisoning the wells because

10  you had a familiar enemy.  When you said to people the rats

11  caused it, they looked -- everyone is dying because of the

12  rats?  No.  But when you say Jews poisoned the well, it fit

13  into their belief.

14       And again, the war of extermination.  I don't know if that

15  was his exact term, but this is a war to the end.

16  Q    I'm going to put up a document that came into evidence

17  yesterday, Professor Lipstadt.  It's a post by Defendant

18  Heimbach.  It's Plaintiffs' 2499.

19       And I would ask Mr. Spalding to highlight the one, two,

20  three, four, fifth -- oh, he's already done it -- post there

21  from Mr. Heimbach.

22       If you could read that and explain again for the jury how

23  and if so -- whether, and if so, how, the ideas expressed there

24  relate to your expertise as an expert in antisemitism?

25  A    "The total destruction of Jewry is the only way to ensure

D. Lipstadt - Direct

1  that we will no longer be plagued by the eternal enemy of all

2  mankind."

3      So can I parse it sentence by sentence?

4  Q    Please do.

5  A    Okay.  So the total destruction.  So in other words we're

6  not just saying limit the Jews' power, but we're talking this

7  is almost Hitlerian language, the total destruction of Jewry is

8  the only way that we will ensure that we will no longer be

9  plagued by the eternal enemy of all mankind.  So the Jew

10 becomes the enemy of everyone.

11     "If they are not destroyed in their entirety, they will

12 come back to attack and subvert all free people and nations."

13     So again, it's that idea that you have to bring to the gas

14 chamber the 91-year-old woman and you have to bring the little

15 baby born but a few days ago, because if either continues to

16 exist, you are in danger for your own existence.

17     "This is a total war because the Jews are waging a total

18 war against us.  They want nothing less than the slavery of our

19 children and the destruction of our folks -- our folk.  To do

20 anything less than wage a war of extermination against these

21 vermin would be a betrayal of our future generations."

22     The use of "vermin," very often it's a -- it's a trope,

23 it's a theme that you see, or a way of describing the Jew,

24 using the Jew, the Jew is vermin, the Jew is dirty, the Jew as

25 someone, a purveyor of disease.  So the word vermin there is

D. Lipstadt - Direct

1  not I think happenstance.

2      "Would be a total betrayal of our future generations.  We

3  did not start this war, but we will finish it, once and for

4  all."

5      So again, it picks up on the themes we've been seeing for

6  the past couple of minutes and a good portion of this time.

7  This is a total war.  This is a war that must be fought to the

8  end.  And it's not just in order for you to win that you wage

9  this war, but it's in order for you to survive.  It's what

10 academics might call an existential war for your very

11 existence.  This is for your existence, not for your being

12 stronger than your neighbors, not for getting the upper hand.

13 This is a war to the death because it's either you or them.

14 Q    I want to touch on now briefly, Professor, this idea of

15 the Jew as the master puppeteer that you talked about earlier.

16     I'm going to ask Mr. Spalding to put up another document

17 that came into evidence through Mr. Heimbach yesterday,

18 Plaintiffs' 1824.  It's a long document so I'm going to ask

19 Mr. Spalding to turn to page 52.

20     And let me ask you to begin with, have you heard the

21 expression "JQ"?  "JQ," Professor?

22 A    Oh, yes.  The Jewish question, yeah, sure.

23 Q    And I want you to look at the first two paragraphs, but

24 focusing more specifically -- no, I'm sorry, the second -- the

25 second and third paragraph, focusing specifically on the third

D. Lipstadt - Direct

1    paragraph.  And I want you, if you could read that and explain,

2    parse it any way you want, whether that is relevant to this

3    idea of the Jew as the master puppeteer?

4    A    "Jews do not only have a disproportionate control over

5    international finance, but the world media, the

6    military-industrial complex, and most social movements that

7    promote antisocial, anti-national values.  You cannot be a

8    nationalist and truly work to save your people if you do not

9    identify and act against the Jew as our primary enemy."

10        It reiterates many of them, brings them together.  The Jew

11   with his control -- disproportionate control over international

12   finance.  And I want to just point out something here, which I

13   haven't done before.  There may be a Jew who does something, a

14   Jew who is a chairwoman of a bank or chairman of a corporation,

15   but for this it becomes "the Jews," so that the Jew is always

16   seen in their entirety.

17        But the -- not only international finance, world media,

18   military-industrial complex, social movements, everything.

19   "You cannot be a nationalist and truly work to save your people

20   if you do not identify and act against the Jews as our primary

21   enemy."

22        So if you want to be a nationalist -- and I'll put in

23   there the word "white nationalist," to save your nation, don't

24   call yourself one unless you're identifying and acting against

25   the Jew as our primary enemy.  I think it's quite unambiguous.

D. Lipstadt - Direct

1  Q    And I want to go to the final paragraph there, and if you

2  could tell me whether that final paragraph, the one that

3  begins, "the Jew must be understood," if that expresses any of

4  the kind of core characteristics or stereotypes historically of

5  antisemitism?

6  A    "The Jew must be understood to defeat them.  And at their

7  core, they are the servants of chaos, destruction, and Satan

8  himself" -- Satan, of course, being another name for the devil,

9  as I said earlier.

10      "The Jews love to hide how many of them are involved in

11 the world-destroying" -- "in the world-destroying project of

12 globalism, capitalism, and communism, but the truth

13 eliminate -- illuminate them for the enemies that they are."

14      So once again, the Jew as controlling, the Jew as Satan,

15 the Jew as trying to control the whole world, capitalism and

16 communism.  You know, I always thought those two were counter,

17 you know, at odds with each other.  But they are enemies.  And

18 in order to avoid this chaos, this destruction, we must destroy

19 them.

20 Q    I want to turn now, Professor, to -- reference for Nazi

21 Germany or manifestations of Nazi Germany and Adolf Hitler.

22      And I'm going to ask Mr. Spalding to play a video that the

23 jury has already seen and is in evidence, Plaintiffs'

24 Exhibit 2514.

25           (Video playing.)

D. Lipstadt - Direct

1        What's going on in that video?

2    A    "Sieg Heil" was called in Germany the Hitler gruß, or the

3    Hitler greeting.  Sometimes it was "Heil Hitler"; sometimes it

4    was "Sieg Heil."  It means "Hail victory."  And it was directly

5    associated with the Third Reich, with the Hitler regime, so

6    much so that it became outlawed in Germany after the war.

7        But the only place -- there's some symbols that I found

8    that are very much associated with the Nazis, with the fascists

9    during World War II.  But they're also -- we can find them in

10   other places.  This is the only place we can find "Sieg Heil,"

11   "Heil Hitler."

12       I have a colleague at another university, born in Germany,

13   raised in a non-Jewish family, and the war ended when she was

14   5, I think, or something like that.  It was only after the war

15   ended that she was -- learned that there was -- that you said

16   "good morning" and you didn't say "Heil Hitler" when you woke

17   up and you greeted your parents.

18   Q    Professor, what was the gesture that the men in that video

19   were doing with their arm?

20   A    It's an outstretched -- it's an outstretched arm.  You see

21   it in many documentaries of the Third Reich.  There's a famous

22   documentary by Leni Riefenstahl, *Triumph of the Will*, which is

23   a documentary of a major Nazi rally, Nuremberg rally, in 1934.

24   You see people doing it passionately, to one another, but it's

25   "Hail victory," "Heil Hitler."

D. Lipstadt - Direct

1  Q     Have you heard of the phrase "blood and soil," Professor?

2  A     Yes.  "Blut und Boden" is the German way.  In fact, I

3  believe we heard it chanted, or I heard it in some the videos,

4  chanted from the Unite the Right rally.

5        And what it means is -- it has -- it's a German -- it was

6  very popular in Germany -- not solely in Germany -- before, but

7  certainly very much associated with, the Third Reich.  And what

8  it was saying, essentially, is:  If you are not of our blood,

9  and if you are not of our soil -- and that doesn't mean work

10  the soil, because there were many Jews in Germany who were in

11  agriculture -- but if you are not of us, from our very soil,

12  from our very blood, you are foreign to us.  You are an enemy

13  to us.  And if you try to pass as one of us, you're even more

14  dangerous, because we can't identify you.

15  Q     Professor Lipstadt, what does the word "kike" mean?

16  A     The word "kike" is equivalent to other derogatory terms

17  used for ethnic groups.  It's the word used for Jews.  We do

18  not know the exact origins.  Linguists have different theories

19  on it.  But it's an American term that became a derogatory term

20  to refer to Jews and is as unacceptable today as other

21  derogatory terms are for other groups.

22  Q     Have you seen it spelled, Professor, different ways?

23  A     Yes.  In some of the material that was sent to me to

24  review I saw repeatedly that it was spelled "kyak," K-Y-A-K,

25  which -- it's clear it had nothing to do with kayaking.  There

D. Lipstadt - Direct

1    was nothing about boating where it was spelled that way, but it

2    was clearly done and is often done in order to avoid the

3    filters that some of the social media platforms put up.

4    They'll pick up that word and they'll pull the post.  They

5    won't let you post it.  But if you -- "kyak," kayak is a sport,

6    so you can slip under the radar.

7    Q    I'm going to -- before I say that, did you see references

8    or use of the word "kyak" -- excuse me -- "kike" in the

9    materials you reviewed?

10   A    Both "kike" and "kyak."

11   Q    I'm going to show you a social media post -- don't put it

12   up yet, Mr. Spalding -- that's from Defendant Christopher

13   Cantwell.  It's on the social media website Minds or Wire.

14   It's from July 2017.  And it's been marked for identification

15   as Plaintiffs' Exhibit 2571.  And this will come in through

16   Mr. Cantwell.

17              (Plaintiffs' Exhibit 2571 marked.)

18   BY MS. KAPLAN:

19   Q    Can you read that social media post?

20   A    "America will never be free until the last kike is

21   strangled with the entrails of the last male Democrat."

22        So in order for America to be a free nation, the last Jew

23   must be strangled -- not just move away, but strangled -- with

24   the entrails of the last male Democrat.  So, you know, I think

25   it's pretty clear that this is a war to the end and the only

D. Lipstadt - Direct

1   way to win it is to kill every, as the term used in the post,

2   kike.

3   Q    I'm going to show another video of another part of a

4   speech that Mr. Ray gave at the Unite the Right rally on

5   August 12th, 2017.  This will come in through Mr. Ray.  It's

6   Plaintiffs' Exhibit 3234.

7       I want to show this to you in two pieces, although they're

8   short, Professor.

9       Let's start with the first piece, which is 2645 through

10  2719, Mr. Spalding.

11            (Video playing.)

12      Let's pause it right there.

13      I think we talked about this earlier, but *The Daily*

14  *Stormer* on the sign, that's *The Daily Stormer* we were talking

15  about earlier?

16  A    Yes.  That's right.  "End Jewish control" under -- or "of

17  America."

18  Q    Can you explain for the jury what Mr.-- I mean, the words

19  speak for themselves, but how what Mr. Ray was saying relate to

20  the themes we've been discussing today?

21  A    You're under control of a Semitic tribe -- the Jew -- and

22  it's control of the white people -- i.e., Jews are not white,

23  and they are out to destroy you.  And then the final phrase,

24  "Did Hitler do anything wrong?"  And yells:  "No."

25      And there's a certain irony in there, because there's both

D. Lipstadt - Direct

1  an adoption of Holocaust denial, "Holohoax," but at the same

2  time, "Did Hitler do nothing wrong?"  Well, in killing those

3  six million he didn't do anything wrong.

4  Q    I'm just going to play a second clip now that's 27:45 to

5  28:06.

6              (Video playing.)

7       What does "gas the kikes" mean?

8  A    Well, "gas the kikes" is quite clearly a reference to the

9  Holocaust:  Gas the Jews.

10       The Third Reich, together with its allies, killed

11  people -- primarily Jews, but not only Jews -- in a number of

12  ways.  One way was with bullets, the Holocaust by bullets, and

13  that's the work that I mentioned earlier of Father Patrick

14  Desbois, the French Catholic priest who has been working on

15  shooting sites in eastern Europe, where there were mass

16  shootings, but often very small, so we didn't know about them;

17  300 people there, 500 people there, et cetera, et cetera.  So

18  many people were killed by bullets.

19       If you're going to be murdered, it doesn't matter how, if

20  you're going to be murdered by a bullet or murdered by gas, but

21  the killing implement -- a gun can be used for many things.  It

22  can be used for protection.  It can be used to provide food for

23  your family.  It can be used for sport.  A gun has many

24  different purposes.  But the Third Reich recognized that they

25  wanted to kill all these Jews and there were just too many for

D. Lipstadt - Direct

1   them to shoot, and they worried about the emotional impact --

2   not on the victims, but there are memos where they talk about

3   the emotional impact on the killers, that our men and our boys

4   will become mean because they have to stand there at the pit

5   and shoot babies and old people and whomever, and the blood and

6   the guts is spilling -- flying all over their clothing, et

7   cetera -- they sought a faster, more efficient way of killing.

8   And they devised the system of gas chambers.

9       They had used them earlier, before the war, to kill people

10  who today we might call handicapped, people who were mentally

11  disabled, who had genetic diseases.  And they moved those gas

12  chambers, the workings of those gas chambers, to the death

13  camps.  And they devised ways of doing it and built special

14  apparatus for killing people.

15      The reason we focus so much on the gas chambers and the

16  gassings have become the symbol is that they served no other

17  purpose.  No -- there was nothing else you could do with those

18  implements except kill people quickly and efficiently and not

19  have the killers have to see -- you know, have to do the

20  shooting and see the dead victims.

21  Q   We're almost at the end, Professor, but I'm now going to

22  turn to some of the symbolism that was used at Unite the Right.

23      And I want, if you would, Mr. Spalding, to pull up

24  Plaintiffs' -- Plaintiffs' Exhibit 341, which is a Discord post

25  from Defendant Nathan Damigo.

D. Lipstadt - Direct

1     I'll represent that Fashy Haircut #9734 is Mr. Damigo.

2     And I'm going to ask you about the password that he states

3     there, "stopthehate1488."

4     What is 1488?

5     (Plaintiffs' Exhibit 341 marked.)

6  A    Well, the 14 Words; that we saw before.  And 88 is another

7  way of sort of getting under the radar.  H is the 8th letter of

8  the alphabet, so "Heil Hitler" is -- often, when people such as

9  Fashy Haircut #9734 wants to refer to Adolf Hitler, he'll refer

10 "88."  It's very common.

11 Q    Let's put up another Discord post, which is

12 Plaintiffs' 1057.

13     And I want to -- Mr. Spalding to focus on, actually, the

14 photograph there.

15     And if you could explain to the jury --

16     (Plaintiffs' Exhibit 1057 marked.)

17 A    Yes.

18 Q    Go ahead, Professor.

19 A    What you see in the center there on the segment of the

20 Confederate flag is what's called the dark sun.  And it's an

21 ancient Nordic symbol.  It's not unique to the Third Reich, but

22 it became one of the symbols used, certainly by the SS, the

23 unit of German forces that conducted the Holocaust, or was in

24 charge of the Holocaust.

25     And at one point Himmler, who was the head of the SS and

D. Lipstadt - Direct

1  who would have -- had he survived, would have become number two

2  once Hitler died, he built a spiritual retreat for the SS; not

3  a retreat where you go and relax and go fishing, but a

4  spiritual retreat where you would be reimbued with the Nazi

5  ideology, with the need to understand that what you are doing

6  is a glorious page, to quote Himmler, "a glorious page in

7  German history never to be written."  And in that castle which

8  he built for this SS retreat, in the mosaics on the floor you

9  have this symbol.  So it has become a popular symbol amongst

10 white nationalists.

11 Q    If I may, Professor, I apologize if you've already said

12 this, but how do you say in German "Black Sun"?

13 A    "Sonnen bund."

14 Q    Let's turn to the next exhibit, which is another

15 photograph.  It's Plaintiffs' 2390.  And this is a photograph

16 of Mr. Fields and some other gentlemen on August 12th.  And I

17 want you to focus on the symbol on those black shields,

18 including the one in the middle that Mr. Fields is holding.

19        (Plaintiffs' Exhibit 2390 marked.)

20 A    That is called the fasces, and it is a bundle of twigs

21 that has been bound together around an axe.  It was used in

22 many places.

23        In fact, you'll even find it if you go north a little bit

24 and visit Washington, DC and you visit the Lincoln memorial.

25 You'll find it there.  But there, it represents "e pluribus

D. Lipstadt - Direct

1   unum," one of the mottoes of the United States:  "In many, we

2   become one."  But it was then adopted also by the Italian

3   political party under Mussolini -- the Fascist Party, from

4   "fasces" -- and it became a symbol of fascism.

5        So for some people who want to avoid carrying something

6   like the swastika, this might be a good sort of secret

7   handshake.  You know, people in the club know what it means.

8   Q    One more, Professor.  Could we put up Plaintiffs'

9   Exhibit 1979?

10       This is a photograph from Unite the Right on August 12th.

11  And I'd like you to focus on that kind of square flag at the

12  top.

13       (Plaintiffs' Exhibit 1979 marked.)

14  A    It's called the Othala rune, and it's also an ancient

15  symbol, but it became very much associated with the Nazis.  And

16  some of the units; of the SS, of the German army, of ethnic

17  Germans, the unit that served in Croatia and killed thousands

18  of Croats.  This was a symbol.

19       So again, if you want to avoid certain symbols which we

20  immediately look at and know that that's a Nazi symbol, such as

21  the swastika, you might use something like this.

22           MS. KAPLAN:  Thank you for your time, Professor.  I

23  have no further questions.

24           THE WITNESS:  You're welcome.

25           THE COURT:  All right.  Before we start the

D. Lipstadt - Cross

1   cross-examination, I think we'll take a 20-minute recess and

2   then come back.

3   **(Jury out, 2:54 p.m.)**

4               (Recess.)

5               THE COURT:  Ready to call the jury?

6               MS. KAPLAN:  One very quick matter that the court

7   reporter asked me to put on the record.  I broke my own promise

8   and I spoke too fast, and so one exhibit that I mentioned was

9   207 was actually 2071, to clarify.  Apologize.

10  **(Jury in, 3:18 p.m.)**

11              THE COURT:  You may be seated.

12              Mr. Kolenich?

13              MR. KOLENICH:  I have no questions of this witness.

14              THE COURT:  All right.

15              MR. SPENCER:  I have no questions, Your Honor.

16              MR. CANTWELL:  Christopher Cantwell.  I do.

17                      CROSS-EXAMINATION

18   BY MR. CANTWELL:

19  Q    Hello, Ms. Lipstadt.  Did I say that right, Lipstadt?

20  A    Lipstadt.

21  Q    Can you see on your screen this social media post from me?

22  A    Yes.

23              MR. CANTWELL:  This is already in evidence, I

24  believe, Plaintiffs' 2571.  Can we show this to the jury?

25              THE COURT:  Yes.

D. Lipstadt - Cross


 1          MS. KAPLAN:  Just to clarify, Your Honor.  I don't

 2   think it was in evidence.  We were showing it to -- Professor

 3   Lipstadt is an expert.  But the jury did see it.

 4          MR. CANTWELL:  They did see it.  Okay.  So if we

 5   could put it back up in that case.

 6    BY MR. CANTWELL:

 7   Q    This post from me dated July 15, 2017, do you want to read

 8   that?

 9   A    "America will never be free until the last kike is

10   strangled with the entrails of the last male Democrat."

11   Q    Okay.  And do you understand that this quote is derived

12   from another quote?

13   A    No, I don't.

14   Q    Have you ever heard anything about the last aristocrat

15   being strangled with the entrails of the last priest?

16   A    Yes, but I don't connect it to this.

17   Q    Do you know what the origin of that quote is?

18   A    No, I don't.

19          MR. CANTWELL:  Okay.  And I think we already showed

20   the jury Plaintiffs' 2499 as well, right?

21          MS. KAPLAN:  Yes.

22          MR. CANTWELL:  So I'm just going to click over to

23   that tab, if that's all right.

24          THE COURT:  I think anything that Ms. Kaplan showed

25   the witness, you can assume you can use too.

D. Lipstadt - Cross

1          MR. CANTWELL:  Okay.

2     BY MR. CANTWELL:

3    Q    And so this was a post by Matthew Heimbach dated December

4    26, 2017.  That's right in the center there.  Do you see where

5    I'm referencing there?

6    A    Yes, I do.

7    Q    So this was a quote about the total destruction of Jewry,

8    right?

9    A    Yes.

10   Q    And before the letter T in the word "the," what character

11   is that before that?

12   A    It's a little vague but it looks like a quotation mark.

13   Q    That's a quotation mark.  And what about at the end of

14   that post?  At the end of that post, what is the character

15   that's at the end of the --

16   A    A quotation mark.

17   Q    So does that appear that Matthew Heimbach is quoting

18   somebody else?

19   A    It appears Matthew Heimbach has put quotations marks

20   around a sentence that he put up.

21   Q    And so in the course of your study of antisemitism did you

22   come across jokes about Jews?

23   A    Yes.

24   Q    And did you -- and in the course of that, did you come

25   across any jokes that were just jokes?

D. Lipstadt - Cross

1   A     I don't know what that means.

2   Q     You don't know what it means to make a joke about Jews?

3   A     I know what it means to make a joke about Jews.  I don't

4   know what you mean by "just jokes."

5   Q     Well, it seems to me that the implication that you're

6   drawing is that when people in these posts that you're looking

7   at in the activities of the defendants in this case, you're

8   saying that there is some kind of intent, a desire to destroy

9   the Jewish people.  And I'm just wondering if you ever come

10  across somebody who just makes an antisemitic joke from time to

11  time?

12  A     They may just be making an antisemitic joke, but the fact

13  that they're making an antisemitic joke is a pretty striking

14  thing, because if you make a joke at the expense of someone,

15  whether it's a joke of someone who is handicapped, a joke of

16  someone of color, and you say oh, it's just a joke, well, it

17  may not be just a joke.

18  Q     Is it your opinion as an expert that there's no such thing

19  as an innocent racist joke?

20  A     I would say I'm not an expert in jokes.  There are people

21  who work on that, who work on the rhetoric of jokes, etc.  But

22  as an expert in antisemitism and in hate generally, I would say

23  yes, that's correct.

24  Q     Okay.  So there's no such thing as an innocent antisemitic

25  joke.

186

D. Lipstadt - Cross

1     Have you ever heard the phrase, the saying, "two Jews,
2  three opinions"?
3  A     Yes.
4  Q     And tell me your opinion about that saying.
5  A     Jews are -- Jewish tradition is the debating tradition,
6  and you get many different opinions, and that there are
7  different opinions amongst Jews.  That's a characteristic.
8  Q     Is this a negative stereotype about the Jewish people?
9  A     Not necessarily.  Depends how it's used.
10 Q     Would you say that it's -- would you say there's any truth
11 to the stereotype from what you know?
12 A     No.
13 Q     There's no truth to "two Jews, three opinions"?
14 A     I have taught in an academic setting for 40 years, and put
15 two academics together, I'll get three opinions from them, too,
16 and they're not necessarily Jews.
17 Q     Fair enough.
18    You also testified that the torches in the torchlight
19 rally from August 11th, that they were -- I don't want to --
20 rather than me try to restate what you said, tell me what your
21 opinion was of the torches.
22 A     That those torches can have a benign import.  You can have
23 a couple in your backyard to ward off mosquitoes or other pesky
24 bugs.  But when used in a rally like that with the fire, with
25 the marching at night, they evoke something, a propaganda

D. Lipstadt - Cross

1    technique or practice that was very common in Nazi Germany.

2    Q    And I think the words that you used earlier were, "for a

3    historian who studies this period, the connotation is

4    absolutely clear."

5         What about for somebody who is not a historian who studies

6    the period?

7    A    I didn't say only for a historian.  I said for a historian

8    who studies the period.

9    Q    But for somebody who was not a historian who studied the

10   period, they might not be as aware of it?

11   A    They might.  They might not.

12   Q    What about somebody who had read *Mein Kampf*?

13   A    Not necessarily.

14   Q    In your report I think you quoted Dr. Edna Friedberg, her

15   piece in The Atlantic, saying that Hitler talked about the

16   torches in *Mein Kampf*.  Is that --

17   A    You'd have to show me that.

18   Q    Well, maybe we don't need to go into it.

19        If somebody were going to make a joke about Jewish people,

20   is there something that stands out about the Jewish people more

21   than other people in the course of history?

22   A    That's a very vague question.  I don't understand the

23   question.

24   Q    If somebody was going to make a joke about the Jewish

25   people, would the Holocaust be an easy target?

D. Lipstadt - Cross

1    A    I find it hard to imagine that using a genocide which

2    killed 6 million people, irrespective of their religion, their

3    identity, their nationality, a topic for jokes.

4            MR. CANTWELL:  Okay.  No further questions.

5            THE COURT:  Thank you.  Anyone else?

6            MR. CAMPBELL:  I have two questions, Judge.

7            THE COURT:  All right.

8                        CROSS-EXAMINATION

9      BY MR. CAMPBELL:

10   Q    Good afternoon, Dr. Lipstadt.

11   A    Good afternoon.

12   Q    I represent James Fields.  Just a couple questions for

13   you, Doctor.

14        The jury was shown Plaintiffs' 3642, which was a Twitter

15   post by @TheNewGiantDad which included, I think you said, the

16   14 Words?

17   A    Correct.

18   Q    And a photograph of Hitler.

19        Ma'am, you're not here to offer any testimony as to

20   whether that had any relation to the Unite the Right rally; is

21   that correct?

22   A    It was cited -- I believe it was cited at the Unite the

23   Right rally.

24   Q    Yes, ma'am.  But this post in April --

25   A    No.

D. Lipstadt - Redirect

1  Q    -- by a gentleman, you don't have any idea whether that

2  had anything to do with --

3  A    I do not.

4  Q    -- the planning or leading up to Unite the Right?

5  A    I do not.

6  Q    Just that it is an antisemitic post --

7  A    Clearly an antisemitic post.

8         MR. CAMPBELL:  Yes, ma'am.  Thank you.  I have no

9  more questions.

10        THE COURT:  Is that all, then?

11        MR. JONES:  No questions.

12        MS. KAPLAN:  Very, very brief, Your Honor.

13        THE CLERK:  No one on Zoom.

14                    REDIRECT EXAMINATION

15   BY MS. KAPLAN:

16  Q    Professor Lipstadt, do you remember that Mr. Cantwell just

17  asked you a bunch of questions -- not a bunch, a couple of

18  questions?

19  A    Yes.

20  Q    And do you recall that one of the documents he showed you

21  was Plaintiffs' Exhibit 2499.  If we could put that up on the

22  screen, please.

23  A    Uh-huh.

24  Q    And do you recall that with respect to that quote,

25  Mr. Cantwell asked you a series of questions or a couple of

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

1  questions about whether there was a quotation mark at the

2  beginning --

3  A    Right, correct.

4  Q    -- and at the end; do you recall that?

5  A    Yes, I do.

6  Q    Can you look at the quote right above it and please read

7  that into the record?

8  A    "Hey, by the way, what I've got y'all here, I'm writing

9  the section of the book on Jews.  Thoughts on this for a

10 closer?"

11 Q    And who posted that?

12 A    Matthew Heimbach.

13        MS. KAPLAN:  No further questions, Your Honor.

14        THE COURT:  Thank you.  All right.  Thank you.  You

15 may be excused.

16        Who is your next witness?

17        MS. KAPLAN:  So what we're going to do right now,

18 Your Honor, is put in -- make a presentation of documents from

19 Defendant Azzmador.  We're going to have a little bit of a

20 switching of the guard, Your Honor, if you don't mind.

21        MR. ISAACSON:  Your Honor, I will be publishing the

22 exhibits for Robert Ray.  We have agreed on these exhibits with

23 the defendants.  We have agreed that they may be admitted.

24 Rather than admit them one by one, I have a list of them that I

25 can give to the court reporter and the clerk so that they can

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

1    be admitted as a whole to save time.

2              THE COURT:  Thank you.

3              MR. ISAACSON:  I will be presenting evidence,

4    documents and videos, from Defendant Robert Ray, who is absent

5    from this proceeding.  And my name is Bill Isaacson.

6              Mr. Spalding?

7              The first exhibit is dated February 19th, 2017.  It

8    is from the Discord server that is stated at the upper

9    left-hand corner of this document.  This is Plaintiffs'

10   Exhibit 536 and it is part of the #general channel on this

11   server.  It is a post from Azzmador, which is the name that

12   Robert Ray uses on Discord.

13             And there you see his post on that day.

14             The next exhibit is dated March 4th of 2017.  This is

15   a direct message between Robert Ray, Azzmador, and Matthew

16   Heimbach.  You will see that Azzmador sends a link.  Matthew

17   Heimbach responds, and he says, "I'm gonna apologize in

18   advance.  I do not feel very well, but we are getting this

19   done."  The link was to Discord.  That was Exhibit 581.

20             Then we have here on the next page, after he says

21   that he doesn't feel very well, we're getting this done,

22   Azzmador says -- tells him where to click.  "No problem."

23             The next exhibit is Exhibit 2797.  You will see that

24   Robert Ray, Azzmador, is writing in *The Daily Stormer*.  This is

25   April 20th, 2017, Plaintiffs' Exhibit 2797.  This article that

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

1  he is writing under the name "Azzmador" is wishing "happy

2  birthday to my leader," who you see pictured there, Adolf

3  Hitler.

4           On the second page of the article, Robert Ray writes,

5  "Adolf Hitler was the greatest political leader of the 20th

6  century and most likely of all time.  He was a man of vision

7  and of action.  He loved his people and he came along at a time

8  when they needed him the most."

9           You will see on page 3 of this exhibit another photo

10  of Adolf Hitler with "Heil Hitler."

11           The next exhibit is Plaintiffs' Exhibit 3710.  It is

12  dated May 12th, 2017.  This is in the Aquilonia server on

13  Discord in the #general channel.  Azzmador writes, "This is the

14  modern era, Zeiger, we prefer aluminum baseball bats now."  And

15  then he talks about whacking someone's skull and the sound that

16  it will make.  And you can see that on your screen.

17           The next exhibit is dated June 15, 2017.  So this is

18  slightly less than two months to August 11th.  This is on the

19  Latveria Discord server in the #general channel.  And here you

20  can see what Azzmador, Robert Ray, posted that day.  That was

21  Exhibit 393.

22           The next exhibit is 351.  This is now June 29th of

23  2017 and this is a direct message between Azzmador, or Robert

24  Ray, and Andrew Anglin, another absent defendant, he of *The*

25  *Daily Stormer*.  And you can see where Andrew Anglin writes,

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

1   "Anyway the battle flag with a swastika in the middle would be
2   more triggering.  Otherwise I'd do straight battle flag."
3   Robert Ray, Azzmador, responds, "The swastika in the middle is
4   fine by me.  It might upset the neoconfederate guys not because
5   of the swastika but because they consider these flags sacred.
6   Either way is okay by me, though."
7           The next exhibit is Exhibit 502.  It is on the
8   Thunderdome server of Discord, which is *The Daily Stormer*
9   server.  It is dated June 29th.  And there you will see that
10  Robert Ray posts:  "Soon it will be doable.  I want to invest
11  in race-specific bioweapons."  And he makes reference to
12  something more specific.
13          The next exhibit is Plaintiffs' Exhibit 3693.  It is
14  dated July 16th, 2017, less than a month to August 11th, and
15  Robert Ray is posting on the Vanguard South District server in
16  the #general channel.  And he writes or posts:  "Hatred
17  absolutely comes naturally to us.  The Jews have spent two
18  millennia trying to purge it.  Hate may be the most important
19  attribute we ever had.  There is absolutely nothing wrong with
20  hate.  When one lacks hate, one will not act in the interest of
21  his race and nation.  It is natural and good that one hates
22  one's enemy."
23          The next exhibit is also dated July 16 of 2017.  It
24  is Exhibit 3705.  It is also in the Vanguard South District
25  Discord server in the #general channel, where Robert Ray

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

1  writes:  "When you go to war, you should always behave like

2  beasts, killing machines.  There is no place for codes and

3  treaties and 'fair treatment.'  War means the death of your

4  enemy, the destruction of his ability to ever challenge you

5  again, the erasure of his name and legacy from history.

6  Anything less is not victory."

7          The next exhibit is Exhibit 445 and is July 17, 2017,

8  again on the Vanguard South District server on the #general

9  channel.  Azzmador writes to someone named RCO Nick-TX:  "We've

10  been doing a background check via several methods and then

11  vetting in person."  He continues:  "The Discord thing is

12  serious business, though.  There's a lot of crossover between

13  these groups, and the servers all have to be airtight, and you

14  can't be letting people in there until they're at least vetted

15  to prospect level."

16          The next exhibit is 363.  This is a direct message on

17  July 18th, 2017.  This is -- Azzmador writes on that day:

18  "There are 2,000 Antifa coming.  You gonna represent?"  And he

19  continues:  "I'll be there gassing these people.  All that shit

20  is an excuse.  You're never gonna find an event that only has

21  people you like at it.  This is a war, not a party."

22          The next exhibit is dated July 18th, 2017.  It is

23  Plaintiffs' Exhibit 396.  It is in the Latveria Discord server

24  in the #general channel, where Azzmador writes:  "Apparently

25  one of the divisions going to the rally will be sporting

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

1  shields."  He continues:  "Good idea, but me personally, I
2  don't do shields and helmets.  I think being bareheaded and
3  barehanded as a prominent figure is a good look.  No fear,
4  etc."
5       The next exhibit is 3700, dated July 19th, 2017.
6  It's in the Vanguard South District server in the #general
7  channel.  Robert Ray writes:  "There was no program to kill
8  Jews.  They were forced to work for a few years and now we'll
9  never hear the end of it.  In many cases the Jews in the camps
10  fared far better than the German populations in the neighboring
11  towns."
12       The next exhibit is Exhibit 976.  It is dated
13  July 21st, 2019.  Now we are in the Charlottesville 2.0 Discord
14  server in the #general channel.  Robert Ray writes:  "Thus far,
15  I'm batting 1000.  No Antifa or oathcucker has been able to
16  withstand me and my bully squad at any event."
17       The next exhibit is Exhibit 979, dated July 22nd,
18  2017.  It is in the Charlottesville 1.0 server in the
19  #general_1 channel.  A poster named Ignis Faatus says:  "So I'm
20  thinking about renting a woodchipper from Home Depot for the
21  event."  Robert Ray responds:  "Portable ovens are where it's
22  at."
23       The next Exhibit is dated July 23rd, 2017.  It is
24  Exhibit 1109.  It is in the Charlottesville 2.0 server in the
25  channel called #safety_planning.  Someone named McCarthy says:

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

1    "Hey Azzmador, is there a single point of contact for all the
2    Stormer guys regarding security planning?"  Azzmador responds:
3    "No."  Tyrone, who has been identified as Michael Chesny in
4    this case, also responds:  "Stormer book clubs are highly
5    decentralized by design.  Even at the local level they are a
6    loose association of individuals.  A few small groups here or
7    there may be mobilized, but any actions for them might as well
8    be addressed to the event at large."  McCarthy says:  "All
9    right.  Well, if the Stormer guys are bringing shields and want
10   to hold a perimeter, have them get in contact with Heinz."

11          The next exhibit is dated July 23rd, 2017.  It is in
12   the Charlottesville 2.0 server in a channel titled
13   #antifa_watch.  It is Exhibit 1184.  Azzmador writes to someone
14   named Whiskey Sierra:  "If the police get stand down orders and
15   our whole mob shows up and Antifa is occupying the park there
16   is going to be an all out brawl.  Good.  Bring it on."  Tyrone,
17   Michael Chesny, says:  "What if we are sociopathic and want
18   them to show up, for... self-defense purposes?"

19          The next exhibit is a direct message.  It is
20   Exhibit 348.  It is dated July 23rd, 2017.  It is once more
21   with RCO Nick.  Robert Ray says:  "The last step is Kessler
22   himself.  DS" -- *Daily Stormer* -- "guys were giving him shit
23   over not having any Daily Stormer speakers at the event.  So he
24   contacted me last night and we're supposed to talk this
25   afternoon about me speaking."  He continues:  "And the last

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

1  thing he wants, if he's smart, is to have the 1488ers less than

2  enthusiastic."

3        The next exhibit, Exhibit 349, is dated July 23rd,

4  2017.  It is again a direct message with RCO Nick.  Robert Ray

5  writes:  "I'm a white supremacist.  Apparently that's the term

6  you have to use to be clear with these idiots."  RCO Nick

7  responds:  "Yeah, I say WN" -- which we believe is white

8  nationalist -- "because you can't confuse that."  Robert Ray

9  writes:  "Yeah, but even WN confuses people because they think

10  that means you'll settle for a little sliver of the USA as a

11  white reservation."

12        The next exhibit is Exhibit 426, dated July 23rd.

13  This is a post by Robert Ray, Azzmador, on a server called Bowl

14  Patrol.

15        The next exhibit is dated July 23rd, 2017.  It is

16  Exhibit 448.  It is in the Vanguard South District server in

17  the #general channel.  Robert Ray writes:  "Listen to me very

18  carefully.  Not a single Jew was gassed."

19        The next exhibit is also dated July 23rd, 2017.  It

20  is in the Charlottesville 2.0.  It is in the channel

21  #questions_for_coordinators where someone named

22  Stannisthemannis says:  "I'm conceal carrying.  I mean, I don't

23  go to the grocery store unarmed let alone this LOL.  But that's

24  for extremely last resort.  I have other less lethal

25  alternatives like a fire extinguisher, mainly in case we face

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

1   Molotovs."  Robert Ray writes:  "Well, I always come barehanded

2   and bareheaded, because officers don't duck LOL.  But my guys

3   will be ready with lots of nifty equipment."

4            The next exhibit is 3766, dated July 25th, 2017, and

5   it has this picture on page 2, which someone named Vic Macken

6   has sent to Robert Ray, and to which he responds:  "Ha ha."

7            The next exhibit is Exhibit 542.  It is dated

8   July 27, 2017.  Robert Ray writes in the server that is

9   identified up above in the #charlottesville-contact channel.

10  He says:  "Myself and some of the other Daily Stormer guys are

11  gonna be out front with a big bully squad hogging all the

12  attention and gassing all the kikes."

13           The next exhibit is dated July 28th, 2017.  It is in

14  the Thunderdome server, *The Daily Stormer* server, in the

15  #events channel.  Robert Ray writes:  "I just got done with an

16  hours-long chat with some of the event organizers and I feel

17  better about the thing.  The plan is the same:  Gas the kikes,

18  PR war now, plenty of trolling and lulz."

19           The next exhibit is Exhibit 399, July 30th, 2017, in

20  the Latveria server in the #general channel.  Someone named Lee

21  writes to Azzmador:  "Just as an FYI, I've got my travel booked

22  to Virginia.  Let me know when you've got logistics planned out

23  for the event."  Azzmador, Robert Ray, responds:  "Will do.

24  It's going along quite well actually.  My DFW" -- which we

25  believe is Dallas/Fort Worth -- "SBC" -- *Stormer* Book Club --

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

1   "guys are making shields, as are Vanguard and several others.

2   We already have several people bringing megaphones.  I have a

3   rough sketch of how we'll form up, and of course I'm bringing

4   the banner.  We'll have some guys hold that and we'll stand in

5   front of it."

6         The next exhibit is dated July 31st, 2017.  It is

7   Plaintiffs' Exhibit 375.  This is in the Azzmador server in his

8   #general channel.  He posts a link to Operational Security for

9   Right Wing Rallies, and he says:  "Everyone go to your local

10  Dollar Store or Walmart and get cheap tiki torches for the

11  Charlottesville event.  There will be a torch march."

12        The next exhibit is now dated August 1st, 2017.  It

13  is Exhibit 3760.  It is in the Thunderdome server of *The Daily*

14  *Stormer* in the #events channel.  Robert Ray writes:  "Wear a

15  Daily Stormer tee if you have one, a dark plain tee if you

16  don't.  Jeans or cargo pants.  New Balances or boots.  No

17  military attire other than boots if you like, etc."  Someone

18  posting under the name khaos156 says:  "I might show up with

19  Vanguard America wearing a Daily Stormer tee."  Robert Ray

20  responds:  "If you're a member of Vanguard, dress like them."

21  And khaos responds:  "Yep, I will personally."

22        The next exhibit is August 2nd, 2017, again in the

23  Thunderdome server in the #events channel.  Azzmador writes he

24  wants to gas two groups -- excuse me.  He says:  "Gas the dune

25  monkeys."  And then he says:  "Gas the N word too."

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

 1          The next exhibit is August 3rd, 2017.  It's in the

 2   Latveria Discord server in the #general channel.  Robert Ray

 3   writes:  "Yeah, it's a hardcore banner.  When it arrived and I

 4   unrolled it, it had visions of pogroms and gas chambers, LOL."

 5   He continues, in all capital letters:  "END JEWISH INFLUENCE IN

 6   AMERICA."  He says:  "Beautiful man."  Lee says:  "I think it

 7   says END JEWISH CONTROL OF AMERICA."  Robert Ray responds:

 8   "Yeah, maybe so.  It's in the container."

 9          August 3rd, 2017, Plaintiffs' Exhibit 449.  We are

10   again in the Vanguard South District server in the #general

11   channel.  Someone named SonderSchutz says:  "Ah, Antifa is

12   fucked now."

13          Azzmador responds:  "I'm looking forward to BLM more

14   than Antifa.  Blacks are the easiest people on earth to

15   trigger.  I predict some gloriously hilarious chimping."

16          Also on August 3rd, Plaintiffs' 450, also in the

17   Vanguard South server and in the #general channel, someone

18   posting under Hyperborean Vanguard posts this picture of

19   Vanguard helmets, and Robert Ray responds:  "You can get cheap

20   motorcycle helmets on Amazon that offer better protection and

21   look a lot cooler."

22          The next exhibit, also dated August 3rd, 2017,

23   Plaintiffs' Exhibit 5112.  It is in the Thunderdome server of

24   *The Daily Stormer* in the #events channel.  Someone named Pat

25   says:  "Hate things that are worthy of hate, and the Jews and

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

1  the antiwhite movement deserve a whole lot of hate."  And

2  Robert Ray responds:  "Yeah, hate and gas."

3          August 6, 2017, Plaintiffs' Exhibit 356.  This is a

4  direct message with Robert Ray and Thomas Commander, who has

5  been identified as Thomas Rousseau of Vanguard.  There you will

6  see the rally poster saying:  "Unite the Right.  Join Azzmador

7  and *The Daily Stormer* to end Jewish influence in America."

8          The next exhibit, August 7th, 2017, Plaintiffs'

9  Exhibit 367.  This is in the Azzmador server in the

10 #announcements channel.  Robert Ray writes:  "I need everyone

11 to get together, and by Tuesday night I need you guys to have

12 picked two officers, which for the time being will be known as

13 Storm leaders, from Stormers who are going to Charlottesville.

14 This is a temporary position.  You are not electing Stormer

15 Book Club officers.  It's just for the event.  I also need at

16 least two bodyguards, as the event planners said each VIP --

17 LOL, that just means a person speaking -- needs a security

18 detail.  I have already asked" -- and then there is a handle

19 there -- "to be the head of my security detail.  So one or two

20 volunteers to work with him will be fine.  Note:  One person

21 can be both security and a Storm leader.  The two positions

22 need not be mutually exclusive."

23          He continues:  "This is to ensure we will have order

24 and leadership with an agreed-upon hierarchy with the authority

25 to command our guys and make sure the group functions as a

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

1   unit, with no stragglers and no cowboys leaving the group for
2   one-on-one fights."

3            August 7, 2017, Plaintiffs' Exhibit 358.  Again,
4   these are direct messages with Robert Ray.  "I got to get to
5   work now," he says.  "Professional racism takes no breaks."
6   And then there's a winking smiley face.  White Trash says:
7   "Make it glorious, my friend.  I'll bring at least eight
8   shields."  Robert Ray responds:  "Okay.  Great."

9            August 7th, 2017, Exhibit 408.  The Latveria server
10  in the #general channel, to Andrew Anglin of *The Daily Stormer*,
11  Robert Ray writes:  "I'm writing a Charlottesville story now.
12  I've been in chats all evening getting everything coordinated
13  to get our guys supplied, updated, and secured with a ride to
14  the event and then another logistics chat with the organizers.
15  This shit is incredibly complex.  In the last three days I must
16  have spent 50 hours networking and planning with various groups
17  within and without the organization."

18           He also posted on August 7th, 2017, on the Latveria
19  server in the #general channel, this meme.

20           On August 8th -- that was Plaintiffs' Exhibit 409.

21           Plaintiffs' Exhibit 410 is on August 8th.  It's the
22  Latveria server in the #general channel. Azzmador writes:
23  "Yeah, our guys need to get a grip on the fact that they're
24  probably going have to physically fight these people.  A lot of
25  this wanting guns and such is driven by their belief that if

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

1    someone tries to attack them they can point a gun and it's

2    over.  That's far from true."

3            Also on August 8th, Plaintiffs' Exhibit 412.  This is

4    the Latveria server in the #general channel.  Azzmador writes:

5    "I guess I should put an update at THEW that says we're going

6    whether they give us the permit back or not."

7            Plaintiffs' Exhibit 413, also dated August 8th.  The

8    Latveria server in the #general channel.  Robert Ray writes:

9    "I posed this question to one of these cucked militia idiots

10   who posted a video saying they were gonna be there to prevent

11   violence.  I asked, how do you retards propose to prevent

12   violence by shooting people?  No reply thus far."  Andrew

13   Anglin responds:  "Yeah, you prevent violence by having big

14   guys, juiced or not, who are trained to fight."  Robert Ray

15   responds:  "We have those aplenty."

16           Also on August 8th.  This is the Latveria server in

17   the #general channel.  Azzmador says:  "My guys have built the

18   best, strongest shields you ever saw."  Andrew Anglin says:

19   "What you want are big guys ready to choke someone out in seven

20   seconds."

21           There are pictures of the shields on the following

22   pages.

23           Also on August 8th, 2017, in the Vanguard server in

24   the #general channel, Azzmador posts a link:  "Charlottesville,

25   we are still going.  Why you must attend and what to bring and

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

1    not to bring."  And Ronny TX posts this mockup picture of

2    Mr. Heimbach.

3            Plaintiffs' Exhibit 415, August 8th, the Latveria

4    server in the #general channel.  Azzmador says:  "The only

5    thing I'm gonna have is pepper spray and my commie-whacking

6    cane, LOL."  He says:  "The laws on the pepper spray are it's

7    fine if you spray an attacker, but you get charged if you hit

8    the wrong person.  That's why I told the readers to only get a

9    particular brand of pepper gel I use.  It's almost impossible

10   to hit the wrong person with it."

11           August 8th, Exhibit 518, the Thunderdome server of

12   *The Daily Stormer* in the #events channel.  Robert Ray writes:

13   "If you want to be armed, bring a shield, a flag on a flagpole,

14   and OC pepper gel."

15           On August 9th on the Azzmador server in the #general

16   channel, Azzmador writes to @everyone:  "I couldn't possibly be

17   more proud of you guys or happier with the way these shields

18   turned out.  I will be both elated and humbled to stand with

19   you men and address the media and fight the hordes of filth and

20   scum."  And then he writes, in all capital letters:  "THIS IS

21   OUR DAY.  CHARLOTTESVILLE WILL BE OURS.  TEXAS WILL BE OURS.

22   THE WORLD WILL BE OURS," above the picture of Adolf Hitler.

23           On August 9th, Plaintiffs' Exhibit 419.  In the

24   Latveria server in the #general channel, Robert Ray says:

25   "Check this out.  My boys have been hard at it," with this

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

1   picture of shields.

2            Also on August 9th, Plaintiffs' Exhibit 420.  In the

3   Latveria server on the #general channel, Robert Ray writes:  "I

4   think it's an awesome visual, and if there's a confrontation I

5   can say the word and these boys will form a phalanx and crash

6   into those fucks in a manner they'll never forget."

7            August 11, Plaintiffs' Exhibit 424, the Latveria

8   server, the #general channel, Robert Ray posts this picture.

9            The next exhibit is Plaintiffs' Exhibit 3244.

10           (Video playing.)

11           The next exhibit is from August 11, 2017.  It is

12   Plaintiffs' Exhibit 2738.  It is a picture of Robert Ray.

13           Also on August 11th, 2017 is Plaintiffs'

14   Exhibit 2805, a picture of Robert Ray.

15           Another picture from August 11, Plaintiffs'

16   Exhibit 2810.

17           Another picture, after the events we just saw on

18   August 11th, Robert Ray, Plaintiffs' Exhibit 2761.

19           Plaintiffs' Exhibit 3234 is a livestream by Robert

20   Ray on August 12.  It is clips from the livestream.

21           (Video playing.)

22           The next clip is at Emancipation Park that day.

23           (Video playing.)

24           The next exhibit is 2112, also at Emancipation Park

25   on August 12th.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

1           (Video playing.)

2           His last words there, which were cut off, were, "it's

3    humor, but we mean it."

4           Plaintiffs' Exhibit 1991 is Robert Ray talking to a

5    media outlet called Vice on August 12th.

6           (Video playing.)

7           The final exhibit, an excerpt was shown earlier this

8    afternoon.  This is the full speech of Azzmador reading a

9    speech by Andrew Anglin at an after-party on August 12th.  This

10   is Plaintiffs' Exhibit 2071.

11          (Video playing.)

12          MR. ISAACSON:  That concludes our presentation, Your

13   Honor, of the Ray evidence.

14          (Plaintiffs' Exhibits 2071, 3234, 536, 581, 2797,

15   3710, 393, 351, 502, 3693, 3705, 445, 363, 396, 3700, 976, 979,

16   1109, 1184, 348, 349, 426, 448, 1128, 3766, 542, 506, 399, 375,

17   3760, 3708, 403, 449, 450, 512, 356, 367, 358, 408, 409, 410,

18   412, 413, 414, 452, 415, 518, 376, 419, 420, 424, 3244, 2738,

19   2805, 2810, 2761, 3234, 2112, 1991, 2071 marked and admitted.)

20          THE COURT:  All right.

21          MS. KAPLAN:  Next, Your Honor, we're going to play

22   the videotaped deposition of Defendant Kline, also known as

23   Mosley.

24          MR. ISAACSON:  Elliot Kline.

25

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

1          (Video deposition of ELLIOT KLINE played.)

2

3          THE COURT:  All right.  Let's stop there and resume

4  tomorrow morning.

5          All right.  How much longer do we have on this?  I'm

6  not going to do it tonight, but just give me an estimate as to

7  how much more is left.

8          MS. DUNN:  20 minutes, Your Honor.

9          THE COURT:  We'll resume tomorrow morning.

10         Ladies and gentlemen of the jury, you'll be released

11  now, and I'll see you in the morning, again at 9 o'clock.

12         Of course, do not discuss the case with anyone or

13  allow anyone to discuss it with you or remain within hearing of

14  anyone discussing it.

15         I'll ask the lawyers to stay just a second after the

16  jury has gone.

17  **(Jury out, 4:56 p.m.)**

18         THE COURT:  I believe this is one of the depositions

19  that Mr. Cantwell objected to.  So I need to give that limiting

20  instruction regarding this deposition.

21         MR. CANTWELL:  Thanks, Judge.

22         MS. KAPLAN:  We agree, Your Honor.

23         THE COURT:  We'll do that in the morning, then.

24         MR. ISAACSON:  And, Your Honor, I'll hand up the

25  written list of the exhibits from the Ray presentation.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

1  (Proceedings adjourned, 4:57 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Sines, et al. v. Kessler, et al., 3:17CV72, 11/03/2021

1                    C E R T I F I C A T E

2        I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3   the United States District Court for the Western District of

4   Virginia, appointed pursuant to the provisions of Title 28,

5   United States Code, Section 753, do hereby certify that the

6   foregoing is a correct transcript of the proceedings reported

7   by me using the stenotype reporting method in conjunction

8   with computer-aided transcription, and that same is a

9   true and correct transcript to the best of my ability and

10  understanding.

11       I further certify that the transcript fees and format

12  comply with those prescribed by the Court and the Judicial

13  Conference of the United States.

14       /s/ Lisa M. Blair                Date: November 3, 2021

15

16

17

18

19

20

21

22

23

24

25