Sines, et al. v. Kessler, et al., 3:17CV72, 11/04/2021

```
 1                    UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF VIRGINIA
 2                      CHARLOTTESVILLE DIVISION


 3  ************************************************************

 4  ELIZABETH SINES, ET AL.,     CIVIL CASE NO.:  3:17CV72
                                 NOVEMBER 4, 2021, 9:03 AM
 5                               JURY TRIAL, DAY 9
            Plaintiffs,
 6  vs.

 7                               Before:
                                 HONORABLE NORMAN K. MOON
 8                               UNITED STATES DISTRICT JUDGE
    JASON KESSLER, ET AL.,       WESTERN DISTRICT OF VIRGINIA
 9
            Defendants.
10
    ************************************************************
11
    APPEARANCES:
12

13  For the Plaintiffs:      ALAN LEVINE, ESQUIRE
                             COOLEY LLP
14                           1114 Avenue of the Americas, 46th
                             Floor
15                           New York, NY  10036
                             212.479.6260
16
                             DAVID E. MILLS, ESQUIRE
17                           COOLEY LLP
                             1299 Pennsylvania Avenue, NW,
18                           Suite  700
                             Washington, DC  20004
19                           202.842.7800

20

21

22  Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                     255 West Main Street, Suite 304
23                   Charlottesville, Virginia  22902
                     434.296.9284
24
    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25  TRANSCRIPT PRODUCED BY COMPUTER.
```

Sines, et al. v. Kessler, et al., 3:17CV72, 11/04/2021

1  APPEARANCES CONTINUED:

2  For the Plaintiffs:            MICHAEL L. BLOCH, ESQUIRE
                                  EMILY C. COLE, ESQUIRE
3                                 ROBERTA A. KAPLAN, ESQUIRE
                                  Kaplan Hecker & Fink LLP
4                                 350 Fifth Avenue, Suite 7110
                                  New York, NY  10118
5                                 212.763.0883

6                                 KAREN L. DUNN, ESQUIRE
                                  WILLIAM A. ISAACSON, ESQUIRE
7                                 ARPINE S. LAWYER, ESQUIRE
                                  JESSICA E. PHILLIPS, ESQUIRE
8                                 Paul, Weiss, Rifkind, Wharton &
                                  Garrison LLP
9                                 2001 K Street, NW
                                  Washington, DC  20006
10                                202.223.7300

11
   For the Defendants:           DAVID L. CAMPBELL, ESQUIRE
12                                Duane, Hauck, Davis, Gravatt &
                                  Campbell, P.C.
13                                100 West Franklin Street, Suite 100
                                  Richmond, VA  23220
14                                804.644.7400

15                                CHRISTOPHER CANTWELL, PRO SE
                                  #00991-509
16                                USP Marion
                                  4500 Prison Road, PO Box 2000
17                                Marion, IL  62959

18                                BRYAN J. JONES, ESQUIRE
                                  Bryan J. Jones, Attorney at law
19                                106 W. South Street, Suite 211
                                  Charlottesville, VA  22902
20                                540.623.6952

21                                JAMES E. KOLENICH, ESQUIRE
                                  Kolenich Law Office
22                                9435 Waterstone Blvd., Suite 140
                                  Cincinnati, OH  45249
23                                513.444.2150

24

25

```
 1  APPEARANCES CONTINUED:

 2  For the Defendants:          WILLIAM E. REBROOK, IV, ESQUIRE
                                 (Appearing via Zoom)
 3                               The ReBrook Law Office
                                 6013 Clerkenwell Court
 4                               Burke, VA  22015
                                 571.215.9006
 5
                                 JOSHUA SMITH, ESQUIRE
 6                               (Appearing via Zoom)
                                 Smith LLC
 7                               807 Crane Avenue
                                 Pittsburgh, PA  15216
 8                               917.567.3168

 9                               RICHARD SPENCER, PRO SE
                                 P.O. Box 1676
10                               Whitefish, MT  59937

11                               DILLON HOPPER, PRO SE
                                 (Appearing via Zoom)
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                           INDEX OF WITNESSES

2     WITNESSES ON BEHALF OF THE PLAINTIFF:                    PAGE

3     ELLIOT KLINE (Video deposition played)                    16

4     RICHARD SPENCER

5      Direct Examination by Mr. Bloch                           18
       Cross-Examination by Mr. Kolenich                        192
6      Cross-Examination by Mr. Campbell                        206
       Cross-Examination by Mr. Jones                           208
7      Cross-Examination by Mr. Cantwell                        211

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3         EXHIBIT:                Marked      Received

 4         2553                      25           25

 5         2541                      26           27

 6         2556                      28           28

 7         2563                      45           45

 8         2489                      47           47

 9         2535                      53           53

10         2539                      54           54

11         2517                      56           59

12         4025                      57           59

13         4026                      57           59

14         4027                      57           59

15         4028                      57           59

16         4029                      57           59

17         2443                      61           61

18         2400                      66           66

19         3304                      67           --

20         3096                      70           --

21         1455                      70           70

22         91                        77           77

23         3101A                     82           82

24         3101B                     83           83

25         3101D                     83           83
```

```
 1                        INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3        EXHIBIT:                Marked      Received

 4        3103                      84          84

 5        2428                      88          88

 6        3113                      91          91

 7        3317                     102         103

 8        2408                     106         106

 9        2562                     107         107

10        2565                     115         115

11        3152                     117         117

12        2570                     118         118

13        2808                     124         124

14        2070                     128         128

15        3126                     129         130

16        3146                     134         134

17        3115                     135         136

18        3106                     136         136

19        3120                     138         139

20        2401                     141         141

21        2121                     146         146

22        3107                     147         147

23        2117                     152         154

24        2500                     155         155

25        3074                     161         161
```

```
 1                         INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3   EXHIBIT:                  Marked     Received

 4          3121                          162        162

 5          2505                          166        166

 6          3304H                         170        --

 7          2872                          171        171

 8          2527                          174        174

 9          3796                          175        175

10          3143                          178        178

11          3092                          178        179

12          3142                          181        181

13          3502                          182        182

14          3140B                         183        183

15          3140A                         183        184

16          3080                          184        184

17          3137                          186        186

18          1393                          186        186

19          3077                          187        187

20          3519                          187        187

21          2569                          191        191

22          3146B                         212        212

23          3146C                         212        212

24          3146D                         212        212

25          3435                          17         17
```

```
 1                          INDEX OF EXHIBITS

 2    EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3          EXHIBIT:                 Marked      Received

 4          0914                       17          17

 5          0561                       17          17

 6          1341                       17          17

 7          0733                       17          17

 8          0913                       17          17

 9          1976                       17          17

10          0909                       17          17

11          0785                       17          17

12          0487                       17          17

13          1326                       17          17

14          0815                       17          17

15          0818                       17          17

16          0811                       17          17

17          0812                       17          17

18          0776                       17          17

19          0796                       17          17

20          2010                       17          17

21          0808                       17          17

22          1301                       17          17

23          0930                       17          17

24          0809                       17          17

25          0805                       17          17
```

```
 1                        INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3        EXHIBIT:                 Marked      Received

 4        0832                       17           17

 5        1037                       17           17

 6        1288                       17           17

 7        1399                       17           17

 8        1400                       17           17

 9        1305                       17           17

10        3114                       17           17

11        0813                       17           17

12        3781                       17           17

13        0727                       17           17

14        3782                       17           17

15        0867                       17           17

16        1401                       17           17

17        1987                       17           17

18        2155                       17           17

19        2636                       17           17

20        1988                       17           17

21        2864                       17           17

22        1256                       17           17

23        1986                       17           17

24        1991                       17           17

25
```

10

1  (Proceedings commenced, 9:03 a.m.)

2           THE COURT:  Good morning.  Call the case.

3           THE CLERK:  This is Civil Action Number

4  3:17-cv-00072, Elizabeth Sines and others versus Jason Kessler

5  and others.

6           THE COURT:  Plaintiffs ready?

7           MS. KAPLAN:  We are, Your Honor.

8           THE COURT:  Defendants ready?

9           MR. JONES:  Yes, Your Honor.

10          THE COURT:  Before we begin I'll remind everyone that

11  under Standing Order 2020-12 and 2013-8 the Court's prohibition

12  against recording and broadcasting court proceedings remains in

13  force.  Attorneys, parties, members of their staff, any members

14  of the public or press accessing this proceeding today may not

15  record or broadcast it.  That means no photography, no using

16  any video or audio recording device, no rebroadcasting,

17  livestreaming or otherwise disseminating any live or recorded

18  video or audio of this proceeding.

19          A couple of things before we call the jury back.

20          First, concerning Dillon Hopper's depositions.

21  Mr. Kolenich, you said yesterday you may have an objection to

22  introduction of those depositions at trial but you had not yet

23  reviewed plaintiffs' letter of November 2nd.  In that letter

24  plaintiff argues that depositions of a Rule 30(b)(6) witness

25  may be used for any purpose, including at trial, even if the

1   same witness is available to testify.

2           Have you had a chance to review the letter, and if

3   so, do you still object or have any contrary authority?

4           MR. KOLENICH:  Yes, sir, I reviewed the letter.  Our

5   objection is based on the fact that a corporation cannot

6   participate in federal litigation, except through an attorney.

7   Now, at the time Vanguard allegedly designated a 30(b)(6)

8   witness, I don't believe they were a represented party.

9   Therefore no attorney designated a witness, therefore the

10  designation was not according to law.

11          I did look through my records, and I cannot find

12  where I assisted them in any way or made the designation.  If

13  I'm wrong about that, then the objection would have to be

14  withdrawn.

15          If they cannot participate in litigation, then they

16  cannot -- naming a 30(b)(6) witness is participating in

17  litigation; therefore, they can't name the witness and the

18  deposition shouldn't have happened.  It should not come into

19  evidence.  They're a defaulted -- not defaulted, but they're a

20  sanctioned party.  The plaintiffs have that.  They're not being

21  badly impacted by this objection, if it's granted.

22          MS. KAPLAN:  If you'd like me to respond, Your Honor,

23  I can.

24          THE COURT:  Let me say one thing.  32(a)(3) states

25  that an adverse party may use for any purpose the deposition of

1   a party or anyone who, when deposed, was a party's officer,

2   director, managing agent, or designee.  Case law cited by

3   plaintiffs in that letter made clear, as does the text, that

4   that includes at trial.  Moreover, Mr. Hopper qualified as such

5   an officer, director, managing agent, or designee when he was

6   deposed in 2019 and 2020.  Mr. Hopper was deposed as Vanguard

7   America's Rule 30(b)(6) designee.  He characterized himself as

8   the head of Vanguard America, and the Court has repeatedly

9   considered him an officer or managing agent of Vanguard

10   America.

11          The plain text of Rule 32(a)(3) and relevant

12   precedent cited by plaintiffs and otherwise considered by this

13   Court established that a party is permitted to introduce the

14   deposition of an adversary as part of their substantive proof,

15   regardless of their adversary's ability to testify at trial.

16          Accordingly -- okay.  What do you have to say?

17          MS. KAPLAN:  With respect to the question of Vanguard

18   America and having an attorney, Your Honor, they can't use it

19   as a sword and as a shield.  That's the problem.  Mr. Hopper,

20   as we understand it, has been Zooming in to this trial

21   periodically throughout the trial.  He is Zooming in.  He is

22   not a party, other than as a representative of Vanguard

23   America.  And according to what Mr. Kolenich just said, he

24   shouldn't have even been able to Zoom into the trial.

25          Secondly, Your Honor, there was kind of a long

13

```
 1   legacy -- which we can fill Your Honor in on.  I can get the
 2   pages -- before Magistrate Judge Hoppe on this.  And both of
 3   those depositions were done pursuant to the order of Magistrate
 4   Judge Hoppe that we were entitled to someone to ask questions
 5   about Vanguard America.  They were warned repeatedly that they
 6   should have an attorney.  They didn't have an attorney.  The
 7   depositions were ordered and they can't use this attorney
 8   argument as both a sword and a shield.
 9           MR. KOLENICH:  Your Honor, obviously I'm not speaking
10   for Vanguard America and have not -- you know, I've been
11   withdrawn for some time from their representation.  But any
12   evidence introduced, the jury is going to hear, and limiting
13   instructions or not, it may have a spillover effect on the
14   other defendants.
15           Now, it's true, and we admit, that an officer of a
16   corporation may be deposed, but they did a 30(b)(6) deposition,
17   which has the added benefit of binding the corporation.  You
18   know, they can't refute that or try to expand on it at trial.
19   They're stuck with it.  And so at least at a minimum I think
20   they shouldn't be stuck with the consequences of a 30(b)(6)
21   deposition because they could not name one at the point where
22   the plaintiffs took this deposition.  Magistrate Judge Hoppe
23   was wrong is our --
24           MS. KAPLAN:  If you believed Magistrate Judge Hoppe
25   was wrong, Mr. Kolenich, you should have appealed that order.
```

14

1   It's the law of this case and those depositions are valid.

2              THE COURT:  Don't --

3              MS. KAPLAN:  Excuse me, Your Honor.  I apologize.

4              THE COURT:  The ruling is plaintiffs may play the

5   deposition of Mr. Hopper as Vanguard America's officer or

6   managing agent subject to the Court giving the limiting

7   instruction of the second deposition as to Mr. Cantwell.

8              Next, the Court mentioned yesterday the parties

9   should work to supplement their exhibits with specific edited

10  clips of video or audio exhibits where only a portion of such

11  evidence was admitted from the larger video or audio files, and

12  that the edited clip should be provided to the clerk's office

13  the day following the introduction, after the parties have

14  consulted, to make sure the edited video represents portions

15  that should be admitted.

16             Is that process under way?  And is that going okay?

17             MS. KAPLAN:  I was just looking at my team, Your

18  Honor.  I hope it is.  And if it's not, it will be under way

19  immediately.

20             THE COURT:  I will remind the parties what the Court

21  said on Tuesday when plaintiffs first raised the issue with the

22  Court; that is defendants, in particular the *pro se* defendants,

23  and everybody must be careful to make sure that questions of

24  any co-defendants are not leading questions.  Questions should

25  be open-ended.  The questions themselves should not suggest the

15

1  answer.

2          Okay.  All right.  Mr. Kolenich, also yesterday you

3  filed an objection to certain portions of Mr. Kline's

4  deposition.  The Court notes that if objections are to be

5  raised and counsel seeks a resolution, the Court will require

6  counsel to raise the matter to the Court's attention no later

7  than the time of the relevant question and answer, and the

8  Court need -- the Court would need relevant deposition

9  transcript and line numbers at the time.

10         Am I right that the portions of the Kline deposition

11 played yesterday did not encompass any of the specific lines to

12 which you raised an objection in your letter yesterday?

13         MR. KOLENICH:  Yes, Your Honor.  We did meet and

14 confer before the deposition was played and worked all that

15 out.  So I have no additional objections pending.

16         THE COURT:  All right.  Okay.  I'm going to instruct

17 the jury when it comes in regarding Mr. Cantwell not being

18 bound by the Kline deposition.

19         All right.  Call the jury in.

20 **(Jury in, 9:13 a.m.)**

21         THE COURT:  All right.  Good morning, ladies and

22 gentlemen.  Everyone have a seat.

23         Before we resume with Mr. Kline's deposition, I want

24 to read this instruction to the jury.  I will remind you that

25 each party is entitled to have the case decided solely on the

1   evidence that applies to that party.  Some of the evidence in

2   this case is limited under the rules of evidence to some of the

3   parties and not -- cannot be considered against the others.

4           Plaintiffs' deposition testimony from Mr. Kline may

5   not be considered by you in connection with Defendant

6   Christopher Cantwell because of his inability and lack of

7   notice at the deposition.  However, it may be considered by you

8   in connection with the other defendants.

9           All right.  We may resume the deposition.

10          (Video deposition of Elliot Kline played.)

11          MS. DUNN:  Your Honor, this video is concluded.

12          We need to move exhibits into evidence.  It's a long

13  list, so it might take some time just to put it on the record.

14  We also need to move in the exhibits described in the Ray

15  presentation.

16          So if you'd like me to proceed, I can read the

17  exhibits from Mr. Kline's deposition.

18          THE COURT:  All right.

19          MS. DUNN:  We move PX-3435, PX-914 --

20          THE CLERK:  If you could go slowly, Ms. Dunn.  So the

21  first one was 3435?

22          MS. DUNN:  Yes.

23          THE COURT:  Are these the exhibits that were in the

24  deposition?

25          MS. DUNN:  Yes, Your Honor.

```
1              THE COURT:  Can we agree on those?

2              MR. KOLENICH:  We have no objection to any of the

3    exhibits shown in the video that we saw, and so if they want to

4    do that off the record, that's okay.

5              MS. DUNN:  That would be welcome.

6              THE COURT:  All right.

7              (Plaintiffs' Exhibits 3435, 0914, 0561, 1341, 0733,

8    0913, 1976, 0909, 0785, 0487, 1326, 0815, 0818, 0811, 0812,

9    0776, 0796, 2010, 0808, 1301, 0930, 0809, 0805, 0832, 1037,

10   1288, 1399, 1400, 1305, 3114, 0813, 3781, 0727, 3782, 0867,

11   1401, 1987, 2155, 2636, 1988, 2864, 1256, 1986, 1991 marked and

12   admitted.)

13             MR. CANTWELL:  If I could -- Christopher Cantwell --

14   just to be clear, the exhibits that they are entering in are

15   subject to the same limiting instruction, right?

16             THE COURT:  Correct.

17             MR. CANTWELL:  Okay.

18             THE COURT:  Anything that came up in the deposition

19   is not to be used in consideration of Mr. Kline, but it may be

20   used in consideration of all the other defendants.

21             MS. DUNN:  Your Honor, we can discuss this separately

22   outside -- you know, at sidebar, but some of these exhibits, I

23   would think all of them are separately admissible as evidence

24   in the case.

25             THE COURT:  Well, they may be separately admissible,
```

R. Spencer - Direct

1    if properly proven, as to Mr. Cantwell, but we'll take those up

2    separately.

3              MS. DUNN:  Yeah, let's take that up separately, if we

4    could.

5              And then with regard to the exhibits during

6    Mr. Isaacson's presentation of Mr. Ray's evidence, we have some

7    of -- we have the exhibit numbers for that.  If Your Honor

8    would like to handle that in the same way as Mr. Kolenich has

9    suggested, that would be fine with us.

10             MR. KOLENICH:  No objection, Your Honor.

11             THE COURT:  All right.  They will be admitted, then.

12             MS. DUNN:  Thank you, Your Honor.

13             THE COURT:  What's the next?

14             MR. BLOCH:  Judge, at this time, the plaintiffs call

15   Richard Spencer.

16             Judge, may I approach the bench with some documents

17   for the Court?

18             THE COURT:  Yes.

19        RICHARD SPENCER, CALLED BY THE PLAINTIFFS, SWORN

20                       DIRECT EXAMINATION

21             MR. BLOCH:  May I proceed, Your Honor?

22             THE COURT:  You may proceed.

23    BY MR. BLOCH:

24   Q    Good morning, Mr. Spencer.

25   A    Good morning.

R. Spencer - Direct

1  Q    Mr. Spencer, I want to start by talking about your

2  educational background.  Okay?

3  A    Yes.

4  Q    You graduated from the St. Mark's School of Texas,

5  correct?

6  A    Correct.

7  Q    That's a private school in Texas?

8  A    Correct.

9  Q    And you went to college here at the University of

10 Virginia, right?

11 A    Correct.

12 Q    You got a dual degree in both English and music history,

13 right?

14 A    English and music, yes.

15 Q    And you graduated with high distinction, right?

16 A    Correct.

17 Q    You then got a master's degree from the University of

18 Chicago, correct?

19 A    Correct.

20 Q    And you studied philosophy there?

21 A    Correct.

22 Q    And particularly, you studied German idealism, right?

23 A    Correct.

24 Q    You then entered a Ph.D. program at Duke University; isn't

25 that right?

R. Spencer - Direct

1  A    Correct.

2  Q    And there you studied post-German idealism as a doctoral

3  student, correct?

4  A    I don't want to get into the exact details.  I focused on

5  philosophy and the history of philosophy with an emphasis on

6  people like Nietzsche and Kant and so on.  So that's accurate,

7  more or less.

8  Q    Would you also characterize that as post-German idealism?

9  A    That would be fine, yes.

10 Q    You spent two to three years in that Ph.D. program, right?

11 A    Two years.

12 Q    Two years.  And in 2007 you left the program, right?

13 A    Yes.

14 Q    And you decided at that point that you didn't want to

15 pursue academia as a career, right?

16 A    Yes.  That's fair.

17 Q    You wanted to do something more public-facing; is that

18 fair to say?

19 A    Yes.

20 Q    You wanted to be able to share your views more widely with

21 others, right?

22 A    Yes.

23 Q    You wanted to build more of a platform to share your

24 views, right?

25 A    Yes.

R. Spencer - Direct

1  Q    And so you took a job at that point as a journalist,

2  right?

3  A    Yes.  I mean, my -- I was offered the job at the American

4  Conservative magazine, and that probably sparked my leaving

5  academia as well.  I was more excited by something that was a

6  little more public and timely and -- yeah.

7  Q    And you soon became an advocate for white people, right?

8  A    I don't think that's accurate, to be honest.

9  Q    You wouldn't call yourself an advocate for white people?

10  A    Oh, I think that's a fair statement during the time of

11  UTR, but if -- just keeping with the chronology of leaving

12  graduate school, I don't think that's the best way of putting

13  it, to be honest.

14  Q    At some point after leaving academia, would it be fair to

15  say that you became an advocate for white people prior to Unite

16  the Right?

17  A    Yes, if you would like -- I don't like using that term,

18  but if you would like to, I'm not going to get into a fight

19  over it.

20  Q    Okay.  Well, you spoke about your sincerely held beliefs,

21  right?

22  A    Yes.

23  Q    So let's talk about those beliefs, okay?

24  A    Okay.

25  Q    In 2017, you believed that black people and white people

R. Spencer - Direct

1   should be segregated, correct?

2   A    I mean, I'm not sure I used words like, "They should be

3   segregated."  I don't think that's quite accurate.

4   Q    You wouldn't say that you believed black people and --

5   well, you wouldn't say that you believed that the races should

6   be segregated?  You wouldn't say that?

7   A    This -- when you say -- I don't want to get into endless

8   disputes about this, because -- but if I could just concisely

9   express my view on the matter --

10   Q    Well, the question, Mr. Spencer, is:  Did you believe that

11   the races should be segregated, yes or no?

12   A    No.  That's not how I would think about my views.

13   Q    Well, you recall that you gave testimony previously in

14   this case, right?

15   A    Are you referring to the depositions?

16   Q    Correct.

17   A    Okay.

18   Q    You were deposed in this case, right?

19   A    Yes.  Yes, I remember that.

20   Q    And you were under oath at the time, right?

21   A    Right.

22   Q    And that means that you swore to tell the truth, right?

23   A    Yes.  If I used a word like "segregated" then, I'm really

24   not -- this is about language more than actual ideology.  If

25   you want to ask me a question about what I believe, I could

R. Spencer - Direct

1    concisely tell you, but it -- I might have used one word then,

2    used another words -- but it's not the word itself.  It's about

3    what I believe.  So I don't want to get into a dispute about

4    this, to be honest.

5    Q    I understand that.  My question -- and I'd ask you to

6    focus on my questions.

7    A    Okay.

8    Q    My question was:  You swore to tell the truth, right?

9    A    Yes, absolutely.

10   Q    And you did tell the truth, right?

11   A    Yes.

12   Q    And in that -- and that was July of 2020, right?

13   A    Yes.

14   Q    And in that deposition were you asked this question and

15   did you give this answer?

16       Question:  "And fair to say that another way of putting

17   that is you believe the races should be segregated, correct?"

18       Answer:  "Ultimately, yes."

19       Did you give that testimony?

20   A    I don't remember that exact, but I don't also think you're

21   misrepresenting me.  So that is fair.  And I don't want to

22   dispute that.  And I'm not lying now and I was not lying then.

23   It's simply a semantic issue.

24   Q    Right.  Mr. Spencer, I'm going to ask you to focus on my

25   questions, okay?  And the question here is --

R. Spencer - Direct

1          THE COURT:  Wait.

2          I'll just tell the jury that that's what the record

3   shows:  You were asked that question and you gave that answer.

4          THE WITNESS:  Yes, and I'm not disputing that.

5    BY MR. BLOCH:

6   Q    And you also believe that, in your words, "black and

7   Hispanic immigrants are part of an underclass we don't want in

8   our society," correct?

9   A    I said that, or was that -- that was the question?

10  Q    My question is:  Did you believe that?

11  A    That they're part of an underclass, no.

12  Q    Okay.

13         MR. BLOCH:  Could we show the witness PX-2553?  It's

14  audio.

15         Judge, I'd like to authenticate some audio with the

16  witness.  That is his voice on our exhibit list, and not

17  objected to.

18         With that said, I'd like to move it into evidence,

19  unless there's some way to play it for the witness so he can

20  hear his voice first.

21         THE COURT:  Well, do you want to authenticate --

22         MR. BLOCH:  I'd like to play a statement by

23  Mr. Spencer.  I don't believe there will be any dispute that it

24  was Mr. Spencer and it has not been objected to.

25         THE COURT:  Well, tell us when and where.

R. Spencer - Direct

1          MR. BLOCH:  It was on a radio show of sorts.  And I
2    believe it was August of 2017, but I need to check.
3          THE COURT:  Are you going to play it and ask
4    Mr. Spencer if he said it?
5          MR. BLOCH:  Correct.
6          THE COURT:  Okay.  Go ahead.
7          MR. BLOCH:  So at this point I'd move PX-2553 into
8    evidence.
9          (Plaintiffs' Exhibit 2553 marked.)
10          MR. JONES:  Is this the full two-hour recording, or
11    just the --
12          (Overlapping speakers.)
13          THE COURT:  -- for identification.
14          MR. BLOCH:  I'd like to play from 7:10 to 7:27,
15    17 seconds.
16          THE COURT:  Okay.
17          (Plaintiffs' Exhibit 2553 admitted.)
18          (Video playing.)
19    BY MR. BLOCH:
20    Q    Did you say that, Mr. Spencer?
21    A    That sounds like my voice, yes.
22    Q    And you also believed that, in your words, Hispanics and
23    African Americans have lower IQs than whites and are
24    genetically predisposed to commit crimes, right?
25    A    I will go through this.  I said a lot of people are going

R. Spencer - Direct

1  to be a part of an underclass.  Many of those people aren't

2  going to be part of an underclass.  In terms of -- no one is

3  genetically -- I mean, I -- there are average IQ differences

4  between the races, yes.  I am convinced of that fact.

5  Intelligence and average IQ is strongly correlated with social

6  dysfunction and crime and all sort of other things.

7  Q    Did you say, Mr. Spencer, that it is an empirical fact

8  that Hispanics and African Americans have lower IQs than whites

9  and are genetically predisposed to commit crimes?

10 A    Did I say those exact words?

11 Q    Correct.

12 A    Well, it sounds like you -- I don't believe I said those

13 exact words.  There are average IQ differences between the

14 races.  Intelligence in general is correlated with being a

15 functional person in society.  That's what I believe.

16          MR. BLOCH:  I'd like to show the witness PX-2541,

17 time stamp 2:25 to 2:38.

18          (Plaintiffs' Exhibit 2541 marked.)

19  BY MR. BLOCH:

20 Q    Mr. Spencer, is this a video of you being interviewed

21 prior to Unite the Right?

22 A    Yes.

23          MR. BLOCH:  I'd like to move 2541 into evidence, the

24 time stamp from 2:25 to 2:38.

25          THE COURT:  All right.  Any objection?

R. Spencer - Direct

1           MR. BLOCH:  And publish to the jury, please.

2           (Plaintiffs' Exhibit 2541 admitted.)

3           (Video playing.)

4           THE WITNESS:  She said --

5    BY MR. BLOCH:

6    Q    There's no question, Mr. Spencer.  The question is --

7    A    I'm not lying about what I believe.  I mean, there is an

8    issue of she represented something that Mother Jones said in

9    her own words, and I'm telling you how I understand these

10   things in my words.  I'm not misrepresenting anything.

11   Q    Mr. Spencer, let me ask the question.  Okay?

12   A    Okay.

13   Q    Did you say those things?

14   A    Did I say that there are average IQ differences between

15   races?  I've published books on the subject.  Yes, I believe

16   there are average IQ differences between races.

17   Q    Let me be more specific.

18   A    Okay.

19   Q    Did you say the words that are on the video showing that

20   you said those words?

21   A    I don't know if I -- those exact words -- I don't know why

22   we're getting hung up on exact terminology.  I have expressed a

23   very, very -- if not the same sentiment.

24   Q    Let me be a little bit more specific.

25        Was that you on that video?

R. Spencer - Direct

1   A    Yes.

2   Q    Now, you also had the belief in August 2017 and stated

3   that college bring in, quote, "Negroes with 80 IQs to go play

4   football and rape white cheerleaders."  Did you say that?

5   A    I don't remember saying that.

6              MR. BLOCH:  Could we show the witness PX-2556?

7              Again, Your Honor, this is audio.  It is the words of

8   Mr. Spencer.  I don't believe there will be any objection to

9   that.

10              THE COURT:  All right.  Go ahead.

11              MR. BLOCH:  I'd also like to move that into evidence,

12   PX-2556.  And just for the record, I'm only moving in time

13   stamp 1:49:57 to 1:50:05.

14              THE COURT:  All right.

15              (Plaintiffs' Exhibit 2556 marked.)

16              (Plaintiffs' Exhibit 2556 admitted.)

17              (Video playing.)

18              THE WITNESS:  That's my voice, yes.

19              MR. BLOCH:  I'd also like to introduce PX -- if we

20   could show the witness PX-2563.

21              (Plaintiffs' Exhibit 2563 marked.)

22   BY MR. BLOCH:

23   Q    And just take a look and affirm for me that that's you.

24              THE COURT:  All right.

25              (Video playing.)

R. Spencer - Direct

1          THE WITNESS:  Yes, that's me.

2          MR. BLOCH:  Judge, I'd like to move into evidence

3  PX-2563, from the time stamp 1:40 to 1:55, and publish to the

4  jury.

5          THE COURT:  All right.  You may.

6          (Plaintiffs' Exhibit 2563 admitted.)

7          (Video playing.)

8   BY MR. BLOCH:

9  Q   Did you say that, Mr. Spencer, in a speech in 2016?

10  A   Correct.

11          MR. BLOCH:  And if I could also introduce the same

12  exhibit from time stamp 0:41 to 0:50, please, and publish to

13  the jury.

14          (Video playing.)

15  BY MR. BLOCH:

16  Q   Mr. Spencer, did you also say that in that same speech?

17  A   Yes.

18  Q   When you said "For us, it is conquer or die," by "us" you

19  meant white people, correct?

20  A   Yes.

21  Q   One of the things that you advocate for, Mr. Spencer, is

22  the creation of a white ethnostate, correct?

23  A   Correct.

24  Q   And a white ethnostate is a homeland for white people,

25  right?

R. Spencer - Direct

1    A    Right.

2    Q    And you agree with me that the logistics of actually

3    separating the races is not easy, right?

4    A    Yes.  That's why the notion of an ethnostate, as I have

5    stated, it's a telos.  It's a big idea like communism.  Karl

6    Marx infamously never actually described what communism would

7    look like.  It's an ideal of reinstituting the Roman Empire.

8    It's a big, voluptuous idea, as I stated.

9    Q    Right.  It's a big idea.  And you agree with me that

10   actually accomplishing that is not easy, right?

11   A    No.

12   Q    And you also believe that the creation of a white

13   ethnostate could be, in your words, "bloody and terrible,"

14   right?

15   A    I'm sure I used words like "blood and tears," yes.  Yes.

16   Q    How about "bloody and terrible"?

17   A    I might have used those words.  I presume you're going to

18   quote them to me in a moment.

19   Q    You used those words, right, Mr. Spencer?

20   A    I'll take your word for it.  Yeah.  We don't have to go

21   through that.

22   Q    Well, don't take my word for it.

23              MR. BLOCH:  Let's -- can we --

24              THE COURT:  This is just getting tedious.  Show him

25   what he said and ask him if he did it.  There's nothing

R. Spencer - Direct

1   accomplished by paraphrasing or something what he might have

2   said and having him -- I mean, he's not denying anything.  And

3   so just show him up front and let's move on.

4           MR. BLOCH:  Understood, Judge.

5           Could we introduce or show the witness PX-2541,

6   please?

7           (Plaintiffs' Exhibit 2541 marked.)

8    BY MR. BLOCH:

9   Q    Mr. Spencer, is that you in that interview?

10  A    That's me, yes.

11          MR. BLOCH:  I would like to introduce PX-2541 from

12  6:30 to 7:04.

13          (Plaintiffs' Exhibit 2541 admitted.)

14          (Video playing.)

15   BY MR. BLOCH:

16  Q    Was that you, Mr. Spencer?

17  A    Yes.

18  Q    And you think that if an ethnostate were to ever arise, it

19  would arise after, in your words, "a cataclysm of a

20  geopolitical nature," correct?

21  A    Correct.

22  Q    And a cataclysm is a large-scale violent event, right?

23  A    Yes, but what I -- I was using terms like "crack-up."  I

24  do -- there are times in history where big imperial paradigms

25  break down.  You know, the Roman Empire fell.  There are major

R. Spencer - Direct

1  paradigm shifts.  And those are usually terrible --

2  Q    Mr. Spencer --

3  A    -- and something comes out of it.  I'm trying to actually

4  tell you what I think.

5  Q    Well, I'm going to ask you to answer my questions.  And my

6  question here was:  A cataclysm is a large-scale violent event,

7  correct?

8  A    There's more than violence about it, but yes, it's a

9  terrible trauma.  Yes.

10 Q    In other words, Mr. Spencer, a white ethnostate does not

11 arise without a race war, right?

12 A    I'm not sure I necessarily agree with that.

13 Q    Well, as an advocate for white people, you believe that

14 you are part of a movement, right?

15 A    During 2017, I felt like I was part of a movement.

16 Q    And, in other words, you were not just trying to do a few

17 speeches here and there; you were actually trying to effect

18 deep social change, right?

19 A    No, I was trying to do a few speeches here and there and I

20 was trying to change people's thinking.  And -- yeah, change

21 people's thinking on a wide scale, get my message across.

22 Q    Well, you were trying to effect social change, right?

23 A    I was trying to effect social change, yes.

24 Q    And you realize that you can't do that alone, right?

25 A    No.  I don't actually believe that.

33

R. Spencer - Direct

1  Q    A movement needs inspirational leaders, right?

2  A    Yes.  That's fair.

3  Q    And a movement needs followers, right?

4  A    Well, the movement is followers, yeah.

5  Q    Sure.  And a movement needs foot soldiers, right?

6  A    If that's metaphorical, yes.

7  Q    To build a movement, you need to attract a lot of people,

8  right?

9  A    Ultimately, a movement is about a lot of people.  It seems

10  like a tautology, is what you're saying.

11  Q    Well, in 2017, fair to say that you had built a

12  significant following?

13  A    I had built -- I was a well-known figure in 2017, yes.

14  Q    And you were the president of an organization called the

15  National Policy Institute, right?

16  A    Correct.

17  Q    And National Policy Institute is an organization that

18  advocates for the cause of white people; is that fair to say?

19  A    We cared about white people, yes.

20  Q    My question was:  It's an organization that advocates for

21  the cause --

22  A    That's fair, yes.

23  Q    NPI -- if I can call it NPI?

24  A    Sure.

25  Q    -- publishes reports, right?

34

R. Spencer - Direct

1   A     Sure.

2   Q     You personally co-wrote a report called Race 101, right?

3   A     Yes, I remember that.

4   Q     And, generally speaking, that report argues that the

5   average IQ for African Americans is significantly lower than

6   the average IQ of white Americans, right?

7   A     Yes.

8   Q     NPI had a listserv of a few thousand people, right?

9   A     Are you referring to an email list?

10  Q     Correct.

11  A     Yes.

12  Q     You had the ability to email the listserv, and that would

13  reach thousands of people, right?

14  A     Yes.

15  Q     You also, by the summer of 2017, had more than 70,000

16  followers on Twitter, right?

17  A     By the end of 2017, is what you said?  Or by the end of

18  the summer -- yes, I think that's more or less correct.

19        Twitter followers?

20  Q     Correct.

21  A     Yeah.

22  Q     You also had founded and become the American editor of a

23  website called alt-right.com, right?

24  A     I co-founded, yes, correct.

25  Q     And you actually coined the phrase "alt-right," correct?

R. Spencer - Direct

1   A    Yes.   There's a little bit of dispute there, but yes.

2   Q    You have given dozens of speeches on the topic of white

3   nationalism, right?

4   A    Yes.

5   Q    You would agree with me, Mr. Spencer, that you are a

6   powerful and bold speaker, right?

7   A    Thank you, Mr. Bloch.

8   Q    Do you agree with that?

9   A    Yes, I do.

10  Q    You know how to persuade people with your words, right?

11  A    Yes.

12  Q    And by 2017, you had become the most well-known alt-right

13  publisher and activist in the United States; isn't that true?

14  A    That's fair.

15  Q    And you had become one of the leaders of the white

16  nationalist movement in this country, right?

17  A    That's fair.

18  Q    And as a leader of the white nationalist movement, by

19  2017, you had developed relationships with other leaders in the

20  movement, right?

21  A    Yes.

22  Q    You were friends in 2017 with Nathan Damigo?

23  A    Yes.

24  Q    He was the leader of Identity Evropa, correct?

25  A    Correct.

R. Spencer - Direct

1  Q    You had collaborated with Mr. Damigo in multiple white

2  nationalist events prior to Unite the Right, right?

3  A    Correct.

4  Q    Elliot Kline was also an important friend of yours; isn't

5  that true?

6  A    For that three-month period before -- during the Unite the

7  Right event, yes, I think it's safe to say that he was a

8  friend, yes.

9        THE COURT:  Before we go on, we'll take about a

10 20-minute recess.

11 **(Jury out, 10:33 a.m.)**

12        THE COURT:  Call the jury back.

13 **(Jury in, 10:56 a.m.)**

14        THE COURT:  All right.  You may proceed.

15        MR. BLOCH:  Thank you, Judge.

16  BY MR. BLOCH:

17 Q    Mr. Spencer, going back to the question I asked before the

18 break, Elliot Kline was an important friend of yours in 2017,

19 correct?

20 A    Yes.

21 Q    And he was also a high-ranking member of Identity Evropa,

22 correct?

23 A    Correct.

24 Q    You collaborated with Mr. Kline on various projects

25 related to white nationalism, correct?

R. Spencer - Direct

1    A    Correct.

2    Q    You had discussed with him his views on black people,

3    right?

4    A    Probably.

5    Q    You were aware of --

6    A    I don't -- yes.  Yes.  I don't remember conversations like

7    that.

8    Q    You were aware of Mr. Kline's views regarding Jewish

9    people, right?

10   A    Yes.

11   Q    You had heard him say things like "gas the kikes," right?

12   A    Most likely.

13   Q    You first spoke with Jason Kessler in 2016; isn't that

14   right?

15   A    Yes.  I think we had a phone conversation in 2016.

16   Q    And then you met him again in January of 2017, correct?

17   A    Yes.

18   Q    You also knew Matt Heimbach prior to Unite the Right,

19   correct?

20   A    Yes.

21   Q    And you were aware of his reputation in the movement,

22   right?

23   A    Very aware, yes.

24   Q    And you're aware that in the movement he was known as a

25   neo-Nazi, right?

R. Spencer - Direct

1   A    Yes.

2   Q    You had attended white nationalist events with

3   Mr. Heimbach, right?

4   A    When?

5   Q    Well, you attended Charlottesville 1.0, for example?

6   A    Yes.

7   Q    You knew -- you also knew of Chris Cantwell for years

8   prior to Unite the Right, correct?

9   A    I'm not sure I would use the term "years."  I certainly

10  knew of him well before Unite the Right.  Maybe not years.

11  Maybe since 2016.

12  Q    Just going back to the testimony that you gave previously

13  in this case, were you asked this question and did you give

14  this answer, page 150, line 22:  "Okay.  I'd like to talk to

15  you about Chris Cantwell.  You knew Mr. Cantwell prior to Unite

16  the Right, correct?"

17       Answer:  "I met him -- I knew of him for a few years.  And

18  I met him in 2017."

19       Did you give that --

20  A    That's fair, yes.

21  Q    The question --

22  A    I don't want to get into tedious disputes.  I'm answering

23  your questions right now.  I knew of him for at least a year

24  before Unite the Right, that's fair.

25  Q    Just to be clear for the record, my question is:  Did you

R. Spencer - Direct

1  give that testimony?

2  A    Yes.

3  Q    You were also aware that Mr. Cantwell had a show called

4  Radical Agenda, correct?

5  A    Yes.

6  Q    And you were actually a guest on Radical Agenda prior to

7  Unite the Right, correct?

8  A    I don't -- I don't quite remember that, but that's quite

9  possible.

10 Q    Well, just let me know if this refreshes your

11 recollection.  In your previous testimony, page 152, line 20,

12 were you asked this question and did you give this answer?

13       "You have appeared on Mr. Cantwell's show before,

14 correct?"

15       Answer:  "I have appeared on it, yes."

16       Did you give that testimony?

17 A    Yes.

18 Q    And does that refresh your recollection?

19 A    Yes.  It does not quite refresh my recollection.  It

20 doesn't surprise me.

21 Q    And you've heard Mr. Cantwell express certain views of

22 Jewish people, right?

23 A    Yes.

24 Q    And of black people, right?

25 A    Yes.

R. Spencer - Direct

1  Q    You're aware that he has a reputation for being

2  antisemitic, right?

3  A    Yes.

4  Q    And for being racist, right?

5  A    Yes.

6  Q    Now, as a leader in the alt-right movement, you agree that

7  there are things that you will say in private that you won't

8  say in public, right?

9  A    Well, I think that's -- that holds for almost everyone on

10 earth, to be honest.

11 Q    And that includes you, right?

12 A    Yes.

13 Q    And as a leader you believe it's important to cultivate a

14 certain image, right?

15 A    Yes.

16 Q    In terms of things that you will say in private but won't

17 say in public, the word, excuse my language, "kike," that's

18 something that you'll use privately, but not publicly, right?

19 A    I don't believe in demeaning anyone to their face in

20 most -- in any circumstance.  That -- that's nasty.

21 Q    Well, so we can talk about why, and we will talk about why

22 you won't say those things publicly, but the question right now

23 is:  You agree that the word "kike" is a word that you use

24 privately but not publicly, right?

25 A    I have used that word privately, yes.

R. Spencer - Direct

1  Q    And the N word, for example, is a word that you will use

2  privately but not publicly, right?

3  A    In my life I have used that word privately.

4  Q    Let me ask the question again.  The N word is a word that

5  you use privately but not publicly, right?

6  A    When you say the word "use," I'm saying yes, that is not a

7  word to be used to demean anyone publicly.

8  Q    Referring to your testimony in this case, Mr. Spencer,

9  page 39, line 8, were you asked this question and did you give

10 this answer?

11     "So just to be clear, the term 'house N word' is something

12 that you would use privately but not publicly; is that

13 correct?"

14     Answer:  "Yes."

15     Did you give that testimony?

16 A    I'll -- I take your word for it.  I don't remember saying

17 that exactly.

18 Q    Well, you were at the deposition, too, right?

19 A    Of course I was.  You're being --

20         THE COURT:  Look.  Look.  Wait.  This is what I'm

21 talking about.  You've got -- one time, ask, was this question

22 asked and was this your answer?  Don't -- let's not just keep

23 going through this long thing to get to one -- I mean,

24 quibbling over one word or something.  It's just not

25 productive.

R. Spencer - Direct

1    MR. BLOCH:  Understood, Your Honor.

2    THE COURT:  Go ahead.

3  BY MR. BLOCH:

4  Q    Mr. Spencer, yes or no, did you give that testimony?

5  A    Yes.  I gave that testimony.  And I would like to say,

6  whenever you -- the word -- when you say "the N word," that is

7  what you would say publicly to refer to something, because it

8  is a nasty word.  So "house N word," that seems to be something

9  you would actually say publicly, because I think Bill Maher got

10 in trouble for this a few months ago.

11 Q    You're familiar with the Nazi salute?

12 A    Yes.

13 Q    The Nazi salute, that's something you would only do in

14 private settings, right?

15 A    Yes.

16 Q    And I think you alluded to this:  The reason that you only

17 do those sorts of things and say those sort of things privately

18 is because you understand that they are offensive to most

19 people, right?

20 A    Yes.

21 Q    In fact, they are reprehensible to most people, right?

22 A    I am not out here to demean or be nasty to someone in

23 public, yes.

24 Q    Right.  You would only use those words in private with

25 people who won't be offended by them; isn't that fair?

R. Spencer - Direct

1    A    Yes.

2    Q    You would only use that kind of language and those

3    gestures with people who share your goals, right?

4    A    Yes.

5    Q    People likely to be influenced by you, right?

6    A    I --

7              MR. CANTWELL:  Objection, calls for speculation.

8              THE COURT:  Overruled.  He can answer.

9              THE WITNESS:  Likely to be --

10             MR. BLOCH:  I'll withdraw the question, Your Honor.

11    BY MR. BLOCH:

12   Q    Mr. Spencer, you agree with me that, for example, Elliot

13   Kline doesn't find it offensive when you say the word "kike,"

14   right?

15   A    No, he wouldn't.

16   Q    And you claim that you are not a white supremacist, right?

17   A    Yes.

18   Q    And you would agree with me that a white supremacist is a

19   white person who seeks to rule over other races, right?

20   A    Yes.

21   Q    And you claim that you don't believe that white people

22   should rule over black people, right?

23   A    Yes.

24   Q    You claim that you don't believe white people should rule

25   over Jewish people, right?

44

R. Spencer - Direct

1  A    Yes.

2  Q    You claim that you don't look down on black people, right?

3  A    Yes.

4  Q    You claim that you don't look down on Jewish people,

5  right?

6  A    Yes.

7  Q    But you only claim those things publicly; isn't that true,

8  Mr. Spencer?

9  A    I claim those publicly and privately.  I think what you're

10  referencing is the tirade from August 2017 that was secretly

11  recorded.  And it was at the end of the day on that Saturday

12  after I had learned of the chaos in downtown Charlottesville,

13  of the death of a woman protester, of the death of police

14  officers.  I was in a state of absolute frustration and it was

15  a dark moment for me.  It was a terrible moment.  I would -- I

16  had a tirade in private, and I would never want to make that

17  public.  Someone secretly recorded it without my knowledge and

18  consent and published it, probably with the objective of

19  damaging me.  It is what it is.  It expresses childish,

20  terrible sentiments and I am ashamed of it.

21  Q    Mr. Spencer, would you agree with me that when you're in

22  private, speaking with people who share your views and agenda,

23  you had no problem saying any of those things?  Isn't that

24  true?

25  A    Saying slur words?  I'll certainly be looser with people

R. Spencer - Direct

1    in private, but I am not someone in private who is -- has a

2    foul mouth constantly.  I'm a lot like this and I'm a lot like

3    I am publicly when I'm in private, speaking in private.

4    Q    Well, let's -- I assume you have no objection to our

5    moving into evidence PX-2489?

6    A    That's the tirade?

7    Q    Correct.

8    A    I have no objection.

9         MR. BLOCH:  Judge, I would like to move that in and

10   publish it to the jury, please.

11             (Plaintiffs' Exhibit 2489 marked.)

12             (Plaintiffs' Exhibit 2489 admitted.)

13             THE COURT:  You may.

14             (Video playing.)

15             MR. BLOCH:  I believe there's a little bit more.

16             (Video playing.)

17   BY MR. BLOCH:

18   Q    Mr. Spencer, you said that on August 12th, 2017 in

19   Charlottesville, Virginia, right?

20   A    Yes.

21   Q    And to be clear, when you say, quote, "We're going to

22   destroy this fucking town," the town you're referring to was

23   this town, right?

24   A    Yes.

25   Q    And at the time, you were in a room with Nathan Damigo,

R. Spencer - Direct

1  Jason Kessler, Elliot Kline, and a few other white

2  nationalists, right?

3  A    As I remember, yes.

4  Q    And as you just testified, you believed that you were in

5  private, right?

6  A    I did.

7  Q    That recording was made secretly, right?

8  A    Correct.

9  Q    And when you said, "Little fucking octoroons.  My fucking

10  ancestors enslaved those little pieces of fucking shit.  I rule

11  the fucking world.  Those pieces of fucking shit get ruled by

12  people like me.  They look up and see a face like mine looking

13  at them.  That's how the fucking world works," isn't it true,

14  Mr. Spencer, that those are your sincerely held beliefs?

15  A    No.  There is a very stark differentiation between

16  sincerely held beliefs that I would define as something that

17  has been thought through and seriously criticized -- and

18  sincerely held belief could also be someone's religious

19  identity or spiritual identity.  That's how I would define a

20  sincerely held belief.

21       There are also moments like that that capture my most

22  childish, embarrassing sentiments, the animal brain, you could

23  say, where I say things like "I rule the fucking world," which

24  is obviously absurd.  That was me as a 7-year-old and it's a

25  7-year-old that's probably still inside me.  I'm ashamed of it.

R. Spencer - Direct

1  Those are not my sincerely thoughtful beliefs.  That is me at

2  my absolute worst.  And if I -- I won't dispute that that's me

3  because at the end of the day, I have to live with that, but

4  that is a childish, awful version of myself.

5  Q    Mr. Spencer, you believed that the movement that you had

6  been building had made a breakthrough in 2016, correct?

7  A    Correct.

8  Q    And the movement was building in 2017, right?

9  A    Correct.

10  Q    And you believed that the alt-right had a real opportunity

11  in 2017 to advance the goals that you had been advocating,

12  correct?

13  A    Correct.

14  Q    And one of your goals for the alt-right in 2017 was to,

15  quote, "dominate the streets," right?

16  A    Correct.  "Dominate the streets" is a metaphor for having

17  a presence and engaging in demonstrations and so on.

18         MR. BLOCH:  If I could, I'd like to introduce another

19  audio that is Mr. Spencer.  It's PX-2535.  And I'd like to move

20  it into evidence and publish it to the jury.

21         THE COURT:  All right.

22         (Plaintiffs' Exhibit 2535 marked.)

23         (Plaintiffs' Exhibit 2535 admitted.)

24         MR. BLOCH:  This is from time stamp 1:00:13 to

25  1:00:36.

R. Spencer - Direct

1   BY MR. BLOCH:

2   Q    Did you say that, Mr. Spencer, in 2017?

3   A    Yes.

4   Q    And when you say, "2017 is the IRL war," "IRL" stands for

5   "in real life," right?

6   A    Correct.

7          THE COURT:  Did you say what the date of that was?

8          MR. BLOCH:  October 2017.

9   BY MR. BLOCH:

10  Q    Mr. Spencer, you're familiar with the concept of

11  triggering?

12  A    Yes.

13  Q    And triggering is sending a message that provokes an angry

14  response, right?

15  A    Yes.

16  Q    You agree that one of the goals of white nationalist

17  rallies in 2017 was to trigger other people, right?

18  A    Yes.

19  Q    Now, there was a rally that took place in April of 2017 in

20  Berkeley, California, right?

21  A    April of 2017?

22  Q    Correct.

23  A    I believe so.  I don't know the exact date.

24  Q    You're familiar with the Battle of Berkeley, right?

25  A    Yes.

R. Spencer - Direct

1  Q     And that took place April 15, 2017, right?

2  A     Fair enough.  Yeah.

3  Q     And a number of white nationalist groups attended that

4  event, right?

5  A     Right.

6  Q     Including Identity Evropa and your friend Nathan Damigo?

7  A     Yes.

8  Q     And as we just discussed, that event became referred to as

9  "the Battle of Berkeley," right?

10 A     Right.

11 Q     And at the Battle of Berkeley, your friend Nathan Damigo

12 punched a 19-year-old woman in the face and knocked her down,

13 right?

14 A     Yes.  There was a melee in which people were getting

15 attacked and that's how it ended.

16 Q     So my question is:  Your friend, Nathan Damigo, punched a

17 19-year-old woman in the face and knocked her down, right?

18 A     Yes.

19 Q     And you're aware that the woman that he punched was

20 referred to by people in the alt-right as "Moldylocks," right?

21 A     I remember that.

22 Q     And that punch was captured on video, right?

23 A     Yes.

24 Q     And it became somewhat of an iconic moment in the

25 alt-right, right?

R. Spencer - Direct

1   A     Correct.

2   Q     Now, you didn't attend that event, right?

3   A     No.

4   Q     But you did actually watch videos of the violence that

5   occurred on social media at the time, right?

6   A     Afterwards, but yes.

7   Q     Well, virtually in real time, correct?  Same day?

8   A     Yes.

9   Q     And the day after the violence happened you spoke about it

10  on a video that you posted on alt-right.com, right?

11  A     I remember that, yes.

12  Q     And the video was called "What Berkeley Means"?

13  A     Probably, yes.

14  Q     You described on that video what happened at Berkeley was,

15  quote, "a new normal, a world of politicized violence," right?

16  A     Yes.

17  Q     You said that:  "War is politics by other means, but in a

18  way, politics is war by other means.  Politics is fundamentally

19  nonconsensual.  It is about the use of force," right?

20  A     That's true, yes.

21  Q     You said that, right?

22  A     Yes.

23  Q     You said:  "We are in a new world of political actors

24  occupying space," right?

25  A     Right.

R. Spencer - Direct

1   Q    And:  "Occupying space means physically, by force,

2   controlling a certain area for a certain period of time,"

3   right?

4   A    Yes.

5   Q    You agree that what happened at Berkeley was an example of

6   the alt-right occupying space, right?

7   A    Yes.

8   Q    And you testified previously in this case, in your

9   deposition, that you thought what happened at Berkeley was

10  unfortunate, right?

11  A    I'm sorry.  Could you repeat that?

12  Q    You testified in your deposition that you thought what

13  took place at Berkeley was, in your words, "unfortunate,"

14  right?

15  A    If that's what I said, that's what I said.

16  Q    Well --

17  A    We don't have to do this, Mr. Bloch.  Can you just ask --

18  Q    I'm asking if that's what you said.  If you want me to

19  refresh your recollection, I'm happy to.

20  A    If you want to ask me a question, I will articulate

21  myself.  But you're almost demanding that I remember the exact

22  wording from a deposition more than a year ago.  That's just

23  utterly unfair.

24  Q    In your deposition, page 67 --

25           MR. JONES:  Has Mr. Spencer been given a copy of the

52

R. Spencer - Direct

1    deposition?

2              THE WITNESS:  No.

3              MR. BLOCH:  Would you like a copy of the deposition?

4              THE WITNESS:  Sure.

5              Thank you.

6     BY MR. BLOCH:

7    Q    Turn to page 67, line 17.  Were you asked this question

8    and did you give this answer?

9         Question:  "Did you think it was unfortunate that there

10   was violence that broke out at the rally?"

11        Answer:  "No doubt."

12        Did you give that testimony?

13   A    67?

14        Are you sure that's page -- I mean, I really don't dispute

15   the sentiment that it was unfortunate.  It's just that you seem

16   to want to quote me directly all this time.

17   Q    I want to be precise with your words, Mr. Spencer.

18        (Overlapping speakers.)

19             THE COURT:  Tell him the page again and read the

20   question and the answer.

21   BY MR. BLOCH:

22   Q    Page 67, line 17, correct?

23   A    No, I have a different -- oh, this is Matthew Heimbach's

24   deposition.  Come on, guys.

25             MS. KAPLAN:  Our apologies, Your Honor.

53

R. Spencer - Direct

1            THE COURT:  Mr. Spencer, if the record shows that

2    question was asked and that was your answer --

3            THE WITNESS:  I don't -- I could hear myself saying

4    that, yes.  That sounds right.

5            THE COURT:  All right.  Go ahead.

6     BY MR. BLOCH:

7    Q    Isn't it true, Mr. Spencer, that the day after the Battle

8    of Berkeley, you thought that the footage of the fights that

9    you saw was, in your words, "quite beautiful"?

10   A    Did I say that?

11   Q    That's my question.

12   A    Can we -- can you instead show me evidence of what I said

13   and I can confirm it?  You seem to endlessly be going on this

14   trek where it's:  "Did you say that?"  I don't remember saying

15   that.  And then, "Oh, here it is," while I'm expressing the

16   same sentiment.  This is not helping this case.  I mean, this

17   seems to be a parlor trick, Mr. Bloch, to be frank.

18           MS. DUNN:  Could we introduce and publish to the jury

19   PX-2539 at 5:23 to 5:53?

20           THE CLERK:  PX-2539?

21           MR. BLOCH:  Correct.

22           (Plaintiffs' Exhibit 2539 marked.)

23           (Plaintiffs' Exhibit 2539 admitted.)

24   BY MR. BLOCH:

25   Q    Did you say those words, Mr. Spencer, in April of 2017?

R. Spencer - Direct

1  A    I was describing the aesthetics of the social media image.

2  And yes, I said those words.

3          MR. BLOCH:  And could we also play from 20:02 to

4  20:07?

5          (Video playing.)

6  BY MR. BLOCH:

7  Q    Did you say those words, Mr. Spencer?

8  A    That was me.  And yes, that is truthful.

9  Q    Now, you mentioned war a fair amount in that podcast,

10  right?

11  A    Probably.

12         MR. BLOCH:  And I'd like to introduce PX-2517, which

13  is Mr. Spencer's words, and publish to the jury.

14         (Plaintiffs' Exhibit 2517 marked.)

15         (Plaintiffs' Exhibit 2517 admitted.)

16         (Video playing.)

17  BY MR. BLOCH:

18  Q    Did you say those words we just heard, Mr. Spencer?

19  A    Yes.

20  Q    That was the question.

21      And you stated that the right reasons to go to war is

22  because you want to dominate somebody, you want to take their

23  territory, you want to take their women.  Someone else said:

24  "Or the nihilist desire to kill people."  You said:  "I agree.

25  That's also justified."  You refer to enslaving the Haitian

55

R. Spencer - Direct

1   population:  "That would be a proper war aim."

2        Did you say all those things?

3   A    I said all of those things.  This is all --

4   Q    That's the question, Mr. Spencer.  Just whether you said

5   them.

6   A    Yes.

7   Q    And so one of the things that you talk about in addition

8   to war is dominance, right?  Dominating people, right?  That's

9   something that you've talked about before?

10  A    This is all in the context of a podcast where we went into

11  kind of geopolitical speculation about world history.  I'm also

12  evoking a sentiment of every cause is justified by a good war,

13  which comes from Nietzsche's *Zarathustra*.

14       It's a provocative way of saying that world history is not

15  moral.  It's fundamentally amoral.  It's about -- at the end of

16  the day, world history is about these base desires, animal

17  desires.  And you can later rationalize that, but that's what

18  world history is fundamentally about.

19       These sentiments you might find offensive.  These

20  sentiments have been expressed by many more people than myself.

21  Q    Just to return to the question, did you say those words?

22  A    Yes.

23  Q    And if I could continue with the theme of dominance --

24           MR. BLOCH:  If I could introduce -- sorry, show the

25  witness and mark Exhibit PX-4025 for identification.

5.6

R. Spencer - Direct

1            Is that on the screen?

2               (Plaintiffs' Exhibit 4025 marked.)

3            MR. BLOCH:  Is that on the screen?  And just for the

4    record, I'm also handing copies of this to defense counsel, the

5    next four or five.

6     BY MR. BLOCH:

7    Q    Mr. Spencer, looking at what's on the screen as PX-4025,

8    is that a text message between you and Eli Mosley?

9    A    Yes.

10   Q    And that was sent on June 6, 2017, right?

11   A    Apparently, yes.

12           MR. BLOCH:  I'd like to move PX-4025 into evidence.

13           MR. JONES:  Your Honor, what does this have to do

14   with racially motivated violence and with this case?

15           MR. BLOCH:  Judge, I'm happy to move -- there's a

16   series which I just gave Mr. Jones.  And presumably he's read

17   them all and sees why it's relevant to racially motivated.  But

18   I'm happy to put them all in through Mr. Spencer, and then I

19   think that point will be clear.

20           THE COURT:  All right.  Go ahead.

21           MR. BLOCH:  So could we just show Mr. Spencer

22   PX-4025, 4026, 4028, 4029 -- I'm sorry; that was too fast --

23   PX-4025, 4026, 4028, and 4029?

24           THE WITNESS:  Could you put this into context?  I

25   mean, what is this about?  What is --

R. Spencer - Direct

1   BY MR. BLOCH:

2   Q    I'll ask you questions, Mr. Spencer.

3               (Plaintiffs' Exhibit 4026 marked.)

4               (Plaintiffs' Exhibit 4028 marked.)

5               (Plaintiffs' Exhibit 4029 marked.)

6               MR. JONES:  Your Honor, I don't know if the Court

7   ruled on my objection, but I think it's cumulative.  I don't

8   think it's relevant to the actual issues in this case.  I think

9   we need to move on.

10              THE COURT:  Well, I don't know what it is, first.  I

11  can't read the screen.  It's in such small font.

12              MR. BLOCH:  Mr. Spalding, could we add PX-4027?

13              (Plaintiffs' Exhibit 4027 marked.)

14  BY MR. BLOCH:

15  Q    Mr. Spencer, have you had an opportunity to view the text

16  messages on the screen?

17  A    Yes.  Now, I don't know who sent which message.  I see

18  that I'm in this conversation.  That's why I asked for it to

19  just be put into context.

20  Q    Do you see at the top of the message it says from Richard

21  Spencer?

22  A    Yes.

23  Q    And then below that it says --

24  A    Okay.  I get it now.

25  Q    Okay.  So did you send or receive each of these text

R. Spencer - Direct

1  messages in June of 2017?

2  A    Yes.

3          MR. BLOCH:  I would move PX-4025, 4026, 4027, 4028,

4  and 4029 into evidence, Your Honor.

5          MR. JONES:  Your Honor, this case doesn't even have

6  anything to do with Arabs, and it's about punching women.

7          THE COURT:  Did you respond to the relevance?  It's

8  an objection, I think, on relevance.

9          MR. BLOCH:  Sure.  It's a conversation between

10  Mr. Spencer and Elliot Kline the day after Unite the Right was

11  communicated between Mr. Kline and Mr. Spencer, where they're

12  talking about punching women, they're talking about disparaging

13  comments towards --

14          THE COURT:  When was that?  August --

15          MR. BLOCH:  -- towards racial minorities.

16          THE WITNESS:  Your Honor, I not being accused of

17  punching women.

18          THE COURT:  Wait.  Wait.  Excuse me.

19          What date is it?

20          MR. BLOCH:  June 6, 2017.

21          THE COURT:  That's not after Unite the Right, is it?

22          MR. BLOCH:  It's the date after Unite the Right had

23  begun being planned.

24          THE COURT:  Okay.  Overrule the objection.

25          Go ahead.

59

R. Spencer - Direct


1              (Plaintiffs' Exhibit 4025 admitted.)

2              (Plaintiffs' Exhibit 4026 admitted.)

3              (Plaintiffs' Exhibit 4027 admitted.)

4              (Plaintiffs' Exhibit 4028 admitted.)

5              (Plaintiffs' Exhibit 4029 admitted.)

6    BY MR. BLOCH:

7    Q    Mr. Spencer -- if I could just publish these to the jury,

8    starting with PX-4025.

9         Mr. Mosley texted you on June 6, 2017:  "Then punch a

10   woman in the face," right?

11   A    Yes.

12   Q    And you responded to that text, right?

13   A    Show me.

14   Q    And if we could go to the next text, you wrote:  "Dude,"

15   right?

16   A    I -- when you say "dude," it's kind of like, calm down.

17   That's just pretty vulgar and stupid.

18   Q    I see.  You wanted him to be less vulgar.  You were

19   telling him "don't be vulgar like that" by saying "dude"?

20   A    I don't know what this conversation is about.

21   Q    Okay.

22   A    And so I'm just trying to give -- you're publishing just

23   these little snippets of things.  I'm positive that if you look

24   through my entire library of text messages you can find me

25   saying stupid, vulgar, nonsensical, gross things.

R. Spencer - Direct

1   Q     Well, let's focus on --

2   A     What is the conversation?  Does it have any substance to

3   do with this case?

4   Q     Let's focus on these text messages.

5   A     Okay.

6   Q     And you wrote, "dude," right?

7   A     Right.

8   Q     And then if we could show the next text -- I believe we

9   missed --

10  A     This is from me?

11  Q     The next in sequence is PX-4028.  You wrote to Mr. Mosley:

12  "We don't punch women in the face," right?

13  A     Right.

14  Q     And then if we could go to the next message, you follow

15  that up with:  "That's something filthy Arabs would do," right?

16  A     Right.

17  Q     And then if we could go to the next one, you said to

18  Mr. Kline on June 6, 2017:  "We open-hand slap them to

19  demonstrate authority.  Otherwise we treat them well"; isn't

20  that right?

21  A     I wrote that, yes.

22  Q     Now, you have claimed, Mr. Spencer -- going back to the

23  issue of rallies, you have claimed that these rallies are about

24  free speech, right?

25  A     Yes.

R. Spencer - Direct

1  Q    Isn't it actually true, Mr. Spencer, that, for you, these

2  rallies are really about crushing your enemies?

3  A    No.  They're about sending a message.  If I'm honest, I

4  think I had some egotistical desires to be a star and speak

5  before a crowd and so on.  But no, they were about giving

6  speeches.  They're not about crushing people.

7  Q    Okay.  If we could just show the witness PX-2443.

8       Mr. Spencer, is this a tweet that you tweeted on

9  April 29th, 2017?

10  A    Yes.

11          MR. BLOCH:  I would offer this into evidence, Your

12  Honor.

13          THE COURT:  Be admitted.

14          (Plaintiffs' Exhibit 2443 marked.)

15          (Plaintiffs' Exhibit 2443 admitted.)

16   BY MR. BLOCH:

17  Q    On April 29th, 2017, which was two weeks after the Battle

18  of Berkeley, you wrote:  "1/ The @Oathkeepers are Boomer

19  goobers fighting for the right of 'liberalism' and

20  'neutrality.'  2/ We, on the other hand, don't care about

21  neutrality and liberalism.  We want to win.  Our message to the

22  #antifa is not 'muh free speech.'  Our message is," all caps,

23  "WE WILL CRUSH YOU."

24       Did you tweet that?

25  A    Yes.  This is tough talk, bold words.  This is a kind of

R. Spencer - Direct

1  equivalent of a peacock giving off its display.  What I

2  actually believe is something I can talk to you in a sober

3  fashion.  But in terms of stuff like that, I'm sure you can

4  find a million tough talk tweets by me, if you would like.

5      I don't see the relevance.  Most of that was done

6  publicly.  That's a Twitter account.  So that kind of screws up

7  your little private/public logic that you were putting forward.

8  But if you must.

9  Q    Let's talk more about what you did and said, okay?

10 A    Yeah.  I'm here to testify about what I believe.

11 Q    A couple weeks after the Battle of Berkeley there was

12 another white nationalist event referred to as Charlottesville

13 1.0, right?

14 A    Correct.

15 Q    And you helped organize Charlottesville 1.0, correct?

16 A    Yes, to a fairly limited degree, but I was aware that it

17 was happening and I helped out in organizing it.

18 Q    Didn't you refer to yourself as one of the co-organizers?

19 A    I might have, yes.

20 Q    And you were at a meeting at the Charles Martel Society

21 where the idea for Charlottesville 1.0 was hatched, right?

22 A    Correct.

23 Q    And Elliot Kline was also at that meeting, right?

24 A    Correct.

25 Q    Nathan Damigo was at that meeting?

R. Spencer - Direct

1  A    I don't quite -- yes.  I'll say yes.

2  Q    You also communicated with Jason Kessler prior to

3  Charlottesville 1.0, right?

4  A    I didn't -- I didn't communicate with Jason Kessler about

5  Charlottesville 1.0, to my recollection, but as I've already

6  stated, we had communicated sporadically since the winter of

7  2016.

8  Q    Didn't he email you prior to Charlottesville 1.0 and

9  reference that the rally would likely, quote, cause a stir in

10 the community?

11 A    I don't remember that directly, but if you're going to

12 show evidence, then that's the case.

13 Q    Well, did you agree with Mr. Kessler that Charlottesville

14 1.0 would cause a stir?

15 A    I agree with that sentiment, that it will cause a stir, no

16 doubt.

17 Q    And you attended Charlottesville 1.0, right?

18 A    Correct.

19 Q    And you met with a number of your co-defendants from this

20 case there, right?

21 A    Eli Kline, Nathan Damigo, yes.

22 Q    Matthew Heimbach?

23 A    He was there as well, yes.

24 Q    Jason Kessler was there as well?

25 A    Jason Kessler was there.  I think -- yes.

R. Spencer - Direct

1   Q    And there were approximately 200 people that showed up at

2   Charlottesville 1.0, right?

3   A    That sounds about right.

4   Q    And you were really happy about that, right?

5   A    Yes.

6   Q    And the reason why you were happy about it is because in

7   your mind the alt-right movement was still continuing to grow,

8   right?

9   A    Right.

10  Q    And one of the events that occurred at Charlottesville 1.0

11  was a dinner, right?

12  A    Yes.  Are you referring to the after-party?

13  Q    I'm referring to when there was a dinner where a number of

14  people gave speeches.

15  A    Yes, I remember that.

16  Q    Mr. Kessler gave a speech, right?

17  A    I wouldn't call it a speech, but he spoke.

18  Q    Mr. Damigo gave a speech, right?

19  A    Yes.

20  Q    You gave a speech, right?

21  A    Correct.

22  Q    And there were a couple hundred white nationalists in the

23  audience listening to you, right?

24  A    Yes.

25  Q    And in your speech at Charlottesville 1.0 you said -- you

R. Spencer - Direct

1    talked about a meme that said, quote, "I was born too late for

2    the Crusades.  I was born too early for the conquest of Mars,

3    but I was born at the right time for the race war," right?

4    A    I remember -- I remember referring to a meme that I had

5    seen that expressed -- lamented the fact that one was born

6    after the Crusades and before a sci-fi fantasy of the conquest

7    of Mars, yes.

8    Q    And what it says, just to be clear, is, "I was born too

9    late for the Crusades, I was born too early for the conquest of

10   Mars, but I was born at the right time for the race war,"

11   right?

12   A    That's what it says.

13   Q    After you said that, the group of approximately 200 white

14   nationalists you were speaking to exploded into cheers and

15   applause, right?

16   A    I bet they had seen that meme too.

17   Q    My question was --

18   A    Yes.

19   Q    And in addition to the speeches -- to the speeches, there

20   was a torch march, right?

21   A    Yes.

22   Q    And you carried a torch, right?

23   A    Correct.

24   Q    And if we could show the witness PX-2400.

25        Is that a fair and accurate depiction of you at

R. Spencer - Direct

1  Charlottesville 1.0?

2  A    Yes.

3        MR. BLOCH:  Your Honor, I would move PX-2400 and

4  publish to the jury.

5        THE COURT:  Be admitted.

6        (Plaintiffs' Exhibit 2400 marked.)

7        (Plaintiffs' Exhibit 2400 admitted.)

8   BY MR. BLOCH:

9  Q    Prior to Charlottesville 1.0, you were aware that the KKK

10  used torches as a symbol of racial intimidation, right?

11  A    Yes.

12  Q    And you were aware prior to Charlottesville 1.0 that torch

13  marches were something the Nazi party did in the 1930s, right?

14  A    Yes.  The idea that torchlight rallies are unique to those

15  two groups is ridiculous, but go on.

16  Q    Well, you claim that Charlottesville 1.0 had nothing to do

17  with Nazi symbolism; is that right?

18  A    Yes.

19  Q    Isn't it true, Mr. Spencer, that the idea for the torch

20  march came from Nathan Damigo, who wanted it to be like a torch

21  march in Germany?

22  A    I don't -- that might be correct --

23        MR. KOLENICH:  Objection to what Nathan Damigo did or

24  didn't intend.

25        THE WITNESS:  I don't remember who came up with the

R. Spencer - Direct

1   idea first exactly.  But the general sentiment is that mystery

2   and magic of fire and darkness.

3   BY MR. BLOCH:

4   Q    Isn't it true, Mr. Spencer, that in April of 2017

5   Mr. Damigo posted a link to a YouTube video of a torch march in

6   Germany and said, "the group should organize something like

7   this"?  Isn't that true?

8   A    I don't remember that.  You can show that to me.

9         MR. BLOCH:  Could we refresh the witness's

10  recollection with PX-3304H.

11  BY MR. BLOCH:

12  Q    Directing your attention to the screen, Mr. Spencer, do

13  you see --

14  A    Uh-huh.

15  Q    -- that post?

16  A    That's fair.  Germany.  I don't know -- I don't remember

17  the exact video of Germans carrying torches, but...

18  Q    Does that refresh your recollection that Nathan Damigo

19  sent you a Slack direct message posting a link to a YouTube

20  video of a torch march in Germany and says the group should --

21        MR. KOLENICH:  Your Honor, object again to

22  Mr. Spencer being used to say what Mr. Damigo thinks or said.

23  It's hearsay and this is a discovery document provided by

24  Spencer, not Damigo.

25        MR. BLOCH:  Your Honor, it was communicated to

R. Spencer - Direct

1   Mr. Spencer.  I'm asking about his understanding and awareness.

2              THE COURT:  If he acknowledges --

3              MR. BLOCH:  It's not offered for the truth --

4              THE COURT:  -- he got it from Mr. Damigo, he can say

5   what it said, but not -- the document speaks for itself.  He

6   cannot interpret what Mr. Damigo might have meant.

7              MR. BLOCH:  I agree, Judge.  My question is does this

8   refresh your recollection --

9              THE WITNESS:  No.  Mr. Bloch, I don't remember that

10  exact Slack message.  I understand he could have done that.

11  That seems reasonable.  But I'm trying to be as honest and

12  accurate as possible here.  I do not remember that.

13  BY MR. BLOCH:

14  Q    I appreciate that.  So after the torch march, you attended

15  an after-party, right?

16  A    Yes.

17  Q    And that was at a house rented by Identity Evropa?

18  A    Yes.

19  Q    Right?

20  A    Yes.

21  Q    The attendees were white nationalists, right?

22  A    Yes.

23  Q    Including Mr. Heimbach, Mr. Kline, Mr. Damigo, right?

24  A    They were there.

25  Q    And that was a private party, right?

R. Spencer - Direct

1  A    Yes.

2  Q    And I would like to show -- is PX-2541 in evidence?

3           MR. BLOCH:  If I could publish PX-2541.

4           THE COURT:  Go ahead.

5           (Video playing.)

6   BY MR. BLOCH:

7  Q    Mr. Spencer, that's you and other white nationalists

8  performing a call-and-response Sieg Heil Nazi salute at the

9  after-party at Charlottesville 1.0, right?

10  A    Yes.

11  Q    You didn't have any reason to believe that somebody might

12  be surreptitiously recording that, right?

13  A    I should have.  No, I had no reason to believe anybody was

14  recording that, no.  That was a -- again, this is a subcultural

15  thing of being outlandish and stupid while drinking.

16  Q    This was the 7-year-old you again?

17  A    I bet I was after, you know -- yeah, that's fair.

18  Q    You also -- let's just show the jury PX-0941.  Is that in?

19           THE CLERK:  This is previously admitted?

20           MR. BLOCH:  Yes, sorry.

21   BY MR. BLOCH:

22  Q    This is a photograph of you, Matthew Heimbach and Michael

23  Peinovich from the Charlottesville 1.0 after-party, right?

24  A    Correct.

25  Q    Okay.  We can take that down.  Thanks.

70

R. Spencer - Direct

1      Now, about ten days after Charlottesville 1.0, Mr. Kessler

2  reached out to you, right?

3  A     Could you refresh my -- I mean --

4  Q     Sure.  Could we show the witness PX-3096.

5           (Plaintiffs' Exhibit 3096 marked.)

6           THE WITNESS:  Okay.  So apparently Jason Kessler had

7  called me and I responded with a text message saying, "Can I

8  call you later?"

9  BY MR. BLOCH:

10 Q     So does that refresh your recollection that about ten days

11 after Charlottesville 1.0, Mr. Kessler reached out to you?

12 A     That sounds about right, yes.

13 Q     Okay.  And you also received a text from Mr. Kessler on

14 June 5th, 2017, correct?

15     And why don't we just -- let me show you, pull up PX-1451.

16 I'm sorry, 1455.  My apologies.

17           (Plaintiffs' Exhibit 1455 marked.)

18 BY MR. BLOCH:

19 Q     Mr. Spencer, are these a string of text messages between

20 you and Mr. Kessler?

21 A     Yes.

22           MR. BLOCH:  I would offer PX-1455 into evidence.

23           THE COURT:  Be admitted.

24           (Plaintiffs' Exhibit 1455 admitted.)

25

71

R. Spencer - Direct

1  BY MR. BLOCH:

2  Q     And on June 5th, Mr. Spencer, Mr. Kessler wrote -- let's

3  just be clear for the record, Mr. Kessler's number is the 434

4  number, right?

5  A     Yes.

6  Q     And he wrote to you, "We're gonna start the promotional

7  material for Charlottesville 2, Unite the Right, Battle of

8  Charlottesville.  Is your name going to be one of the

9  headlines?"  Right?

10 A     Yes.

11 Q     And you understood that to be an explicit reference to the

12 violence that had occurred at the Battle of Berkeley, right?

13 A     No.

14 Q     You asked him for a firm date, right?

15 A     Yes.

16 Q     You asked him whether Enoch and Damigo would be there,

17 right?

18 A     Right.

19 Q     And then you said on June 5th, "I'm there," right?

20 A     Right.

21 Q     You didn't say, "what do you mean, battle?"  Right?

22 A     It's his title for his event.  I don't know what to say.

23 Q     You didn't say -- okay.  Understood.  Withdrawn.

24       He then sent you a text later that day.  He said, "We're

25 raising an army my liege.  For free speech, but the cracking of

R. Spencer - Direct

1  skulls if it comes to it," right?

2  A    Yes.

3  Q    And you understood when you received that text in June of

4  2017 that Mr. Kessler was interested in fighting

5  counter-protesters at Unite the Right, correct?

6  A    I realized from that text message that he was a massive

7  dork, to be honest.

8  Q    So my question --

9  A    I'm not sure what's most concerning about that message.

10  The "my liege"?  I don't know what to say about that.  We're

11  raising an army for free speech to crack skulls.  That sounds

12  like tough talk, basically.  But again, it's the "my liege"

13  which seemed rather strange.

14  Q    So my question, Mr. Spencer, is you understood when you

15  received that text from Mr. Kessler that he was interested in

16  fighting counter-protesters at Unite the Right?

17  A    No.  I just expressed -- I just answered your question.  I

18  didn't respond to that message because it was so odd.

19  Q    Going back to your deposition testimony, page 143, line

20  21, right -- were you asked this question and did you give this

21  answer?

22      "Right.  My question is really about your understanding of

23  what he said.  You understood when you received that text in

24  June of 2017 that Mr. Kessler was interested in some degree in

25  fighting counter-protesters at Unite the Right, correct?"

73

R. Spencer - Direct

1      Answer:  "Correct."

2      Did you give that testimony?

3  A    Yes, I did.

4  Q    And after receiving that text you collaborated in certain

5  respects with Mr. Kessler regarding planning for Unite the

6  Right, correct?

7  A    We're getting into details here.  I would collaborate with

8  him in certain respects.  It depends on what you mean by

9  "planning," in the sense of I'm asking for a firm date of when

10  I am going to attend this event that I had been invited to.  I

11  didn't plan the logistics of the event, but when -- you know,

12  because I was a major figure, the most well-known person in the

13  alt-right, I think people would ask me a question, what do you

14  think about this, etc, and I would give a response.  That's how

15  I would describe it in toto.

16  Q    Well, we'll talk about what you actually did.  Were you

17  asked this question and did you give this answer under oath in

18  this case in your deposition testimony, page 150, line 17:  "Do

19  you dispute that you collaborated in certain respects with

20  Mr. Kessler regarding the planning for Unite the Right?"

21      Answer:  "I -- yeah, I don't dispute that statement."

22      Did you give that testimony?

23  A    Yes.  Again, Mr. --

24  Q    That's all I was asking you.

25  A    We're getting into these splitting of hairs.  I'm trying

74

R. Spencer - Direct

1  to give a fair and accurate response to your questions.  And

2  just simply bringing up the fact that I articulated myself

3  differently while expressing the same sentiment is not helpful.

4  Q    All right.  Well, let's talk about your communications

5  regarding Unite the Right.

6       You stated, Mr. Spencer, that, quote, "Over the course of

7  the year 2017 Mr. Kessler and I shared some 26 instances of

8  direct communication via iMessage.  We participated in seven

9  phone calls totaling 27 minutes.  I imagine you probably talked

10  more with your car mechanic than Jason and I ever discussed

11  this malign conspiracy."

12       Did you say that?

13  A    Yes.

14  Q    And I'd like to focus first on your claim that you

15  exchanged 26 text messages with Mr. Kessler.

16  A    I didn't say that.  That's a misrepresentation.  I said

17  27 -- or 26, whatever the number is -- instances.  What I was

18  referring to is the actual conversations at a particular amount

19  of time.  So I'm not referring to -- I did not refer to all of

20  the text messages.  I referred to a conversation.

21       So for instance, if you said, do you want to meet up for a

22  drink?  And I said yeah, sure.  Okay, let's go to this place.

23  That's three messages.  I'm referring to that as an instance of

24  communication.  And I think that's actually more accurate than

25  to count every message.

R. Spencer - Direct

1   Q    I see.  So when you said I shared -- Mr. Kessler and I

2   shared some 26 instances of direct communication --

3   A    That's what I was -- yes, as I just explained it, yes.

4   Q    I see.  You took the text messages that you had with Jason

5   Kessler and you grouped them in some way that you decided was

6   appropriate and told the jury, right?

7   A    I used that in the way -- in my interrogatory response, I

8   believe.  So that's how I was asked to detail all of my

9   communication -- communications with everyone.  And yes, I

10  would group those in a way that made sense.

11  Q    To you, right?

12  A    Well, that's -- that's -- made sense to me.  Of course,

13  I'm the one who's thinking, yes.  It's not a nonsensical

14  statement.

15  Q    Can we agree, Mr. Spencer, that just between the month of

16  June and October of 2017 alone you exchanged 149 text messages

17  with Mr. Kessler?

18  A    I could agree -- I mean, that's your count of the number

19  of messages for two people.  149 total, that sounds reasonable.

20  And that seems -- seems like my grouping of 26 instances of

21  text messages is highly reasonable in that case.

22  Q    Okay.  So at a minimum you can agree with me that -- can

23  we agree on that you exchanged 149 text messages with --

24  A    I'll agree with that, yes.

25  Q    You also claimed that over the course of 2017 you had

R. Spencer - Direct

1  seven phone calls with Mr. Kessler, correct?

2  A    I claimed that, yes.

3  Q    And just so we're clear, did you group -- when you say

4  seven phone calls, was that seven phone calls or did you group

5  a number of phone calls together and call that one phone call?

6  A    No.  I came up with that number by looking at my AT&T

7  wireless and I did a search of his number.  And that's how I

8  came up with that, and then I -- in my AT&T wireless report or

9  bill, it would have the minutes, and I added those together.

10 That's what I did.

11 Q    So you looked at your phone records, right?

12 A    Correct.

13 Q    And the seven phone calls that you claim you had with

14 Mr. Spencer --

15 A    Mr. Kessler.

16 Q    Sorry, with Mr. Kessler, those were calls that you had in

17 August, right, 2017?

18 A    I don't remember exactly.  I mean, no.  I don't know.

19 Could you show me something as opposed to asking me this so we

20 can stop doing this game.

21 Q    Why don't we also look at your phone records?

22 A    Okay.

23 Q    And I would like to introduce Mr. Spencer's phone records,

24 which I believe are stipulated to.  And if we could start

25 with --

R. Spencer - Direct

1           THE CLERK:  Is that an exhibit number, Mr. Bloch?

2           MR. BLOCH:  I'm sorry.  PX-0091.

3           THE COURT:  Be admitted.

4           (Plaintiffs' Exhibit 91 marked.)

5           (Plaintiffs' Exhibit 91 admitted.)

6     BY MR. BLOCH:

7     Q    Mr. Kessler --

8     A    Mr. Spencer.

9     Q    I'm sorry, I keep doing that.  I'm looking at Kessler.

10         Mr. Spencer, these are your phone records from May of

11    2017, correct?

12    A    Correct.

13    Q    And your -- this is your phone number?  This 571 number is

14    your number?

15    A    571, yes, that was my phone number.

16    Q    And 434 is Mr. Kessler's number?

17    A    Correct.

18    Q    And do you agree with me that this shows six phone calls

19    you had in May of 2017?

20    A    Yes.

21    Q    Okay.  And could we also look at the next set of calls.

22    Is this -- Mr. Spencer, does this depict a phone call you had

23    with Mr. Kessler in July?

24    A    Yes.

25    Q    And we're now at --

7.8

R. Spencer - Direct

1   A    26 seconds, is that what --

2   Q    The ET column shows that you spoke for a minute and 13

3   seconds?

4   A    Okay.  I understand, yeah.

5   Q    And that would make seven phone calls, right?

6   A    Yes.

7   Q    And if we could also show August.  And it looks like

8   there's another six phone calls, right?  On the 8th -- two on

9   the 8th, two on the 12th and two on the 13th, right?

10  A    Yes.

11  Q    So can we agree that that's actually 13 phone calls with

12  Mr. Kessler?

13  A    That's -- yes, that's how the math works.  I might have

14  been referring to -- some of these are 34 seconds.  That sounds

15  like a voicemail or something like that.  I referred to

16  conversations.  But I -- yeah, let's be accurate.  That adds

17  up.

18  Q    Could we just go back to that for a second just so we can

19  be clear on the times.

20  A    So the ET says 8 minutes and 9 seconds, correct?

21  Q    Right.  So the calls are 8 minutes, 6 minutes, 34 seconds,

22  2 minutes, 2 minutes, and a minute and 44 seconds, right?

23  A    Correct.

24  Q    And you just highlighted the one that was 34 seconds,

25  right?

R. Spencer - Direct

1  A    Well, I was highlighting that in the context of saying

2  that seems like I left a voicemail message or something.  A

3  34-second phone call seems very brief.

4  Q    Well --

5        MR. BLOCH:  We can take that down.  Thanks,

6  Mr. Spalding.

7   BY MR. BLOCH:

8  Q    So what you said was that you exchanged text messages,

9  right, and you exchanged seven phone calls.  And that's all you

10  said, right?

11  A    I said -- I said instances of text messages and then I

12  said phone calls.

13  Q    Right.

14  A    You know, I can -- if you want to correct me, then that's

15  good, because I want to be accurate.  I don't think that I was

16  mischaracterizing anything in the sense that that's a fairly

17  brief record of phone calls.

18  Q    Well, let's talk about what else there is.  So in addition

19  to the texts and the phone calls, there were emails, right?

20  A    There were a few emails, yes.

21  Q    In addition to the texts and the calls and the emails, you

22  also met with him in person to discuss Unite the Right,

23  correct?

24  A    Met with him in person to discuss Unite the Right.  I

25  think at the -- I think I might have seen him at the American

R. Spencer - Direct

1   Renaissance Conference very, very briefly, but we never had --

2   I don't remember an in-person meeting to discuss the event.

3   Q    So -- well, let's talk about the meeting you had at the

4   American Renaissance Conference.  That was in July of 2017,

5   right?

6   A    Correct.

7   Q    And you're saying that you just, what, happened to see him

8   there briefly; is that what you're saying?

9   A    He came up to me and wanted to talk and I kind of blew him

10  off.

11  Q    Okay.  So why don't we look at the text messages, PX, I

12  believe it's 1455.  And could we go to the time period of July

13  2017.

14        MR. BLOCH:  I'm looking for around July 28th or so.

15  I'm sorry, can you scroll down, Mr. Spalding.  No, other way.

16  Back down.  One more up.

17  BY MR. BLOCH:

18  Q    So in July 25th, 2017, Mr. Kessler says to you, "First,

19  sounds like we have a lot of organizations scrambling to get

20  speaking slots at the last minute.  I guess we're going to have

21  to expand this to a pretty long event to keep everyone happy."

22        You say, "Let's get people who are less interested to soak

23  food, five minutes max."  Right?

24        He says, "We'll accommodate as many people as we can, but

25  they'll need to make arrangements to get up front early,"

R. Spencer - Direct

1   correct?  Do you see that?

2   A    Yeah, I see all this.  I don't know what -- soak food?

3   That must be a misspelling.  I don't know what that means.

4   Q    We can agree you're discussing Unite the Right with

5   Mr. Kessler, correct?

6   A    Yes.  Yeah.

7   Q    You say, at 11 a.m. on that date, "Yes.  Are you going to

8   AmRen?"

9   A    Yes.

10  Q    And that's a reference to the American Renaissance

11  Conference, right?

12  A    Yes.

13  Q    And Mr. Kessler says yes, right?

14  A    Yes.

15  Q    And you said, "We can talk there," right?

16  A    Yes.

17  Q    He said, "Sounds good.  Looking forward to it," right?

18  A    Right.

19  Q    So in addition to the calls and the texts and the emails

20  and the in-person meeting, you also had specifically designated

21  middlemen to speak to Mr. Kessler for you on your behalf,

22  correct?

23  A    Yes.  I said, "Would you please speak with Greg Conte or

24  Eli Mosley?"  It was a way of not talking to him.

25  Q    It was a way of actually communicating with him, but

R. Spencer - Direct

1  through other people, right?

2  A    No.  I was not engaged in all of the organizing.  I never

3  did any of the security.  People like Greg Conte were really

4  enthusiastic about the security stuff.

5      I just didn't want to talk to Kessler, to be honest,

6  because I -- I don't really like him, to be honest.  And all I

7  needed to know about the event was when it is, where I show up.

8      I generally supported, you know, the event, particularly

9  because I was involved in it.  But if he wanted to talk about

10  something about security or when I should arrive or something

11  like that, he could do that with Greg Conte or Eli Mosley.  I

12  was fine with that.

13          MR. BLOCH:  Could we show PX-3101A?

14          (Plaintiffs' Exhibit 3101A marked.)

15  BY MR. BLOCH:

16  Q    And, Mr. Spencer, is this a text message between

17  Mr. Kessler and you on July 9th, 2017?

18  A    Yes.

19          MR. BLOCH:  I'd offer this into evidence.

20          THE COURT:  Be admitted.

21          (Plaintiffs' Exhibit 3101A admitted.)

22          THE WITNESS:  So this is from Mr. Kessler?

23   BY MR. BLOCH:

24  Q    So this is from Mr. Kessler, correct?

25  A    Yes.

R. Spencer - Direct

1  Q    And what he says to you is, "we should speak on Sunday,

2  later today, about how to prepare for August 12th.  Using

3  middle men all the way through isn't going to work.  We need to

4  roll up our sleeves," right?

5  A    It's quite -- yes.  It's quite obvious that I'm blowing

6  him off.

7  Q    Well, July 9th is also one of the days that we just saw on

8  your phone records that you actually called him, right?

9  A    I don't think -- I think that's accurate, yes.

10       Was that before or after this text?

11  Q    Well, we can go back to it, but if we look at --

12           MR. BLOCH:  Could we look at PX-3101B, please?

13           (Plaintiffs' Exhibit 3101B marked.)

14  BY MR. BLOCH:

15  Q    And you said on July 9th to Mr. Kessler, "hey, why don't

16  you talk to Eli and Greg Ritter about security," right?

17  A    Right.

18  Q    And then you gave him Greg's phone number?

19       I can show you that text if you don't recall it.

20  A    You don't need to show that to me.

21           MR. BLOCH:  If we could show PX-3101D.

22           (Plaintiffs' Exhibit 3101D marked.)

23   BY MR. BLOCH:

24  Q    Mr. Kessler responds to you on that date, "we've got

25  security on track.  I was more interested in talking to you

R. Spencer - Direct

1   about messaging and presentation," right?

2   A    Right.

3   Q    And again, that's the date that you had a phone call,

4   right?

5   A    If you could go back and see if that's before or after, I

6   think that's significant, but it might very well be after.  I

7   don't know.

8   Q    So the text that we just saw was at 3:14 p.m, right, where

9   he wants to talk to you about messaging and presentation,

10  right?

11  A    Right.

12  Q    And the phone call that you had with him on that date was

13  at 4:45 p.m., right?

14  A    So it was after?  What did you just say?  Could you repeat

15  that, please?

16  Q    The question is:  You spoke with Mr. Kessler after those

17  texts, right?

18  A    I asked you to repeat those time stamps.  I'm sorry.

19  3:14?  Okay.  And then we spoke for a minute and 13 seconds at

20  4:45.

21      I'm not sure how much messaging you can cover in a minute

22  13 seconds.

23          MR. BLOCH:  So could we also show PX-3103?

24          (Plaintiffs' Exhibit 3103 marked.)

25   BY MR. BLOCH:

                              R. Spencer - Direct

1   Q     Is this a text message between you and Mr. Kessler?

2   A     Yes.

3                MR. BLOCH:  I'd offer this into evidence.

4                (Plaintiffs' Exhibit 3103 admitted.)

5    BY MR. BLOCH:

6   Q     And you said to Mr. Kessler on July 23rd, "could you talk

7   to either Eli or Greg Ritter?  They make all decisions for me,"

8   right?

9   A     Correct.

10  Q     So let's talk briefly about who Greg Ritter is.

11        That's the Greg you're referring to in that text, right?

12  A     Correct.  Yes.

13  Q     Greg Ritter had an alias, right?

14  A     Well, "Greg Ritter" was the pseudonym.

15  Q     I see.  His real name was Greg Conte?

16  A     Correct.

17  Q     And he's also a white nationalist, right?

18  A     Correct.

19  Q     He worked with you at National Policy Institute, right?

20  A     Correct.

21  Q     Mr. Conte was your right-hand man with regard to your

22  involvement in Unite the Right, correct?

23  A     Correct.

24  Q     He was also your bodyguard at Unite the Right?

25  A     Yes.

R. Spencer - Direct

1   Q    You saw him multiple times a week during the summer of

2   2017, right?

3   A    Yes.

4   Q    And part of his job was to communicate with other

5   organizers of Unite the Right and report back to you, right?

6   A    Yes.

7   Q    Mr. Conte communicated with Mr. Kessler on your behalf

8   about Unite the Right, correct?

9   A    Yes.  I just would delegate security to Mr. Conte, just to

10  be precise.

11  Q    And so the question is:  Mr. Conte communicated with

12  Mr. Kessler --

13  A    Yes.

14  Q    -- on your behalf?

15  A    Yes.  Yes.

16  Q    Mr. Conte also communicated with Mr. Kline on a regular

17  basis about Unite the Right, correct?

18  A    Correct.

19  Q    Now, you stated that you didn't participate whatsoever in

20  the Charlottesville 2.0 server, correct?

21  A    Correct.

22  Q    But you agree with me that what you didn't say was that

23  Greg Conte, your right-hand man who you communicated with

24  multiple times a week, was on the Charlottesville 2.0 server,

25  right?

87

R. Spencer - Direct

1   A     I don't know if that's correct or not.

2   Q     You also had a guy named Jack Pierce who was in charge of

3   your security team, right?

4   A     Jack Pierce is a friend of Greg.

5   Q     So the question is:  A guy named Jack Pierce --

6   A     Greg -- Greg is someone that I spent quite a bit of time

7   with.  In terms of doing any kind of security or bodyguard

8   activity, that was something I simply left to him.  He wanted

9   to do that.  But in terms of other people, I mean, the only

10  person that I would really deal with was Greg.

11  Q     Well, Jack Pierce goes by "Ajax," right?

12  A     I think so, yes.

13  Q     He also was part of your security team, right?

14  A     Yes.

15  Q     And he, too, was on the Charlottesville 2.0 server,

16  correct?

17  A     I don't know that.

18          MR. BLOCH:  Your Honor, if I could just pause for a

19  moment, I would like to move into evidence, which I understand

20  I did not do, PX-3101B and PX-3101D, which are the text

21  messages that Mr. Spencer previously authenticated.

22          THE COURT:  All right.  Be admitted.

23          (Plaintiffs' Exhibit 3101B admitted.)

24          (Plaintiffs' Exhibit 3101D admitted.)

25   BY MR. BLOCH:

88

R. Spencer - Direct

1   Q     You have stated, Mr. Spencer, that you had no role

2   whatsoever in logistical planning of the rally or any type of

3   conspiracy, right?

4   A     Yes.

5   Q     And you agree with me that in your communications with

6   Mr. Kessler, one of the things you did is agreed to help him

7   promote the event, right?

8   A     I'm -- yes.  I mean, I'm not sure I used those words --

9   perhaps I did.  I'll answer yes just because -- let's move on.

10  Q     You agreed to allow your name to be on fliers promoting

11  the event, right?

12  A     Yes, I did.

13  Q     And you knew that having your name on the fliers would

14  make the event more significant, right?

15  A     Yes.

16          MR. BLOCH:  And if could just show Mr. Spencer

17  PX-2428.

18  BY MR. BLOCH:

19  Q     Do you recognize this, Mr. Spencer?

20  A     That's a tweet of mine where I'm tweeting out a poster of

21  the event.

22          MR. BLOCH:  I'd like to move this into evidence.

23          THE COURT:  Be admitted.

24          (Plaintiffs' Exhibit 2428 marked.)

25          (Plaintiffs' Exhibit 2428 admitted.)

R. Spencer - Direct

1  BY MR. BLOCH:

2  Q    This is one of the promotional posters of the event,

3  correct?

4  A    Correct.

5  Q    And it's got the names of a number of speakers and

6  attendees, right?

7  A    Right.

8  Q    Including yours?

9  A    Right.

10  Q    And it's also got these eagles on it, right?

11  A    Yes.

12  Q    Those eagles were also symbols that the Nazis used, right?

13  A    The Nazis used eagles, sure.

14  Q    And you tweeted out this promotional poster on June 16th,

15  2017 to your 70,000 followers, right?

16  A    Yeah, just to be -- I'm not sure I had 70,000 followers at

17  the time, but yes, I tweeted it out to my followers.  Probably

18  a little bit less than that, but...

19  Q    Maybe in the realm of 40,000 followers?

20  A    Somewhere in between there.  Let's not get caught up on...

21  Q    You also discussed -- we can take it down.

22       You also discussed with Mr. Spencer who else would speak

23  at the event, right?

24  A    Again, you're confusing my name with Mr. Kessler.  And

25  I'm -- it is getting a little bit offensive.

90

R. Spencer - Direct

1    Q    I'm sorry.

2    A    It's okay.

3    Q    My apologies.  I will work harder on that.

4         Mr. Spencer?

5    A    Yes.

6    Q    You discussed with Mr. Kessler who else would speak at the

7    event, correct?

8    A    Yes.

9    Q    You suggested speakers to Mr. Kessler that he should

10   invite, correct?

11   A    I did that, yes.

12   Q    You also promoted the people who would speak at the event,

13   correct?

14   A    Promoted, like sent out a tweet about someone who spoke at

15   the event?

16   Q    For example?

17   A    That's fair.

18   Q    You also helped Mr. Kessler obtain insurance for the event

19   when the insurance company rejected him, right?

20   A    I remember him talking to me about the insurance

21   rejection.  If you could remind me, did I make a suggestion in

22   that regard?

23   Q    Well, my question, Mr. Spencer, is:  Did you --

24   A    I remember him texting me at one point about losing

25   insurance.  And I'm sure I responded in some way, but, you

R. Spencer - Direct

 1  know, that's the limit of it.

 2  Q    In addition to Mr. Kessler, Elliot Kline was also one of

 3  the lead organizers of Unite the Right, correct?

 4  A    Yes.

 5          MR. BLOCH:  And if I could show the witness PX-3113.

 6          (Plaintiffs' Exhibit 3113 marked.)

 7  BY MR. BLOCH:

 8  Q    Is this a text between you and Eli Mosley, also known

 9  as -- Elliot Kline, also known as Eli Mosley?

10  A    Yes.

11          MR. BLOCH:  I'd like to move PX-3113 into evidence.

12          THE COURT:  Be admitted.

13          (Plaintiffs' Exhibit 3113 admitted.)

14  BY MR. BLOCH:

15  Q    Mr. Mosley said to you on June 5th, 2017, "I'm driving to

16  South Carolina now, 7 hours out.  When you get a chance, no

17  rush, let's chat about the Discord so I have some general

18  orders how you want that thing ran.  Also feel free to let me

19  know anything you want me working on this week and if O can

20  send me a calendar that would be great.  First thing tomorrow

21  morning I'm gonna be getting Charlottesville part two started

22  up as well as looking into the Saturday anti-Sharia stuff."

23          Did he send you that text?

24  A    Yes.

25  Q    That was on June 5th, right?

R. Spencer - Direct

1    A    Yes.  I think --

2    Q    The question, Mr. Spencer, was:  That was on June 5th,

3    right?

4    A    Yes.

5    Q    And June 5th was the same day Mr. Kessler texted you about

6    cracking skulls, right?

7    A    If that's correct, it is, yes.

8    Q    And so in addition to your communications with other

9    organizers, you communicated with Mr. Kline regularly

10   throughout the summer of --

11   A    I communicated with him regularly --

12   Q    If I could just finish the question --

13   A    You're misrepresenting something I believe.  The Discord

14   server right there was not the UTR Discord server.

15   Q    We'll talk about that Discord server, Mr. Spencer.  But my

16   question right now is:  You communicated with Elliot Kline --

17   A    Yes.  Of course.

18   Q    If you could, just let me finish the question for the

19   record so it's clear to everybody.  Okay?

20   A    Okay.

21   Q    You communicated with Mr. Kline regularly throughout the

22   summer of 2017 about Unite the Right, correct?

23   A    Correct.

24         MR. BLOCH:  And if we could introduce Mr. -- or we

25   could go back to Mr. Spencer's phone records and show the

R. Spencer - Direct

1   communications with Mr. Kline.

2   BY MR. BLOCH:

3   Q    These, Mr. Spencer, were the phone calls you had with

4   Mr. Kline in May, right?

5   A    Yes.

6   Q    Including calls of 38 minutes, 12 minutes, ten minutes,

7   nine minutes, right?

8   A    Yes.

9   Q    And if we could go to the next one, these are the calls

10  you had with Mr. Kline in June, right?

11  A    Yes.

12  Q    Including calls of 28 minutes, 27 minutes, 33 minutes,

13  19 minutes, et cetera, right?

14  A    Yes.

15  Q    And if we could go on, these are the calls that you had

16  with him in July, right?

17  A    Correct.

18  Q    And if we could go to August, these were the calls that

19  you had with Mr. Kline in August, correct?

20  A    Correct.

21  Q    And in addition to the phone calls you had with the lead

22  organizer of Unite the Right, you also texted with him nearly

23  every day, right?

24  A    That's accurate.

25  Q    And you also met with him in person, right?

R. Spencer - Direct

1   A    Yes.

2   Q    You actually had regular meetings during the summer of

3   2017 with Mr. Kline and two other people where you discussed

4   Unite the Right, correct?

5   A    Who are those two other -- just to refresh my memory, who

6   are the --

7   Q    Well, I'm asking you, Mr. Spencer, isn't it true --

8   A    We had -- we had regular meetings that -- I think there

9   was a suggestion of creating a kind of activism discussion, so

10  it would have included Unite the Right.

11  Q    So just to go back to my question --

12  A    Look, could we not?  I mean, I'm telling you my

13  recollection right now.  If you want me to -- if you want to

14  look at the deposition where I'm saying effectively the same

15  thing, that's fine.

16  Q    In your deposition in 2020, were you asked these questions

17  and did you give these answers under oath?

18       Page 125, line 7.

19       Question:  "Okay.  Fair to say you had a regular meeting

20  during the summer of 2017 about activism with Greg Ritter, Eli

21  Mosley, and Evan McLaren?"

22       Answer:  "Yes."

23  A    Yes.  You --

24  Q    Question -- I understand you don't want this next one

25  read, but -- question:  "And Charlottesville 2.0 was discussed

95

R. Spencer - Direct

1   at those meetings, correct?"

2        Answer:  "Yes."

3   A    I'm glad you read that.

4   Q    Mr. --

5   A    You just simply need to refresh my memory on something.  I

6   agreed -- I said that, yes.  And I agree with that, yes.

7   Q    The question, Mr. Spencer, which I need to ask for the

8   record, is:  Did you give that testimony?

9   A    Yes.

10             THE COURT:  The answer is still yes.  He's said it

11  now.  Go ahead.

12    BY MR. BLOCH:

13  Q    You also asked Mr. Kline to set up a separate Discord

14  server specifically for alt-right leaders in May of 2017,

15  correct?

16  A    Yes.

17  Q    And isn't it true that that separate Discord server was

18  intended in part to also be about Unite the Right?

19  A    Unite the Right would no doubt have been a subject on that

20  Discord server.

21  Q    You consulted with Mr. Kline as to who should be invited

22  to Unite the Right, correct?

23  A    Correct.

24  Q    You, for example, consulted with Mr. Kline about whether

25  David Duke should be invited, right?

R. Spencer - Direct

1   A    Are you talking about the UTR rally or the Discord server?

2   Q    The UTR rally.

3   A    Yeah, okay.  Well, see, you've jumped between two things

4   there.

5   Q    Let me be clear --

6   A    Okay.

7   Q    -- just so there's no confusion.

8        Isn't it true, Mr. Spencer, you spoke -- you communicated

9   with Mr. Kline about whether or not David Duke should be

10  invited to Unite the Right?

11  A    Yes, I remember that.

12  Q    And you thought he should be, right?

13  A    I -- I think I did say yes.

14  Q    You consulted with Mr. Kline on certain strategic issues

15  regarding Unite the Right, correct?

16  A    Yes.

17  Q    And would it be fair to say, Mr. Spencer, that during

18  those communications you developed a clear understanding of

19  what Mr. Kline's objectives were for Unite the Right?

20  A    Yes.  I -- your question is --

21  Q    You've answered the question.

22  A    Your question was, I had a clear understanding of Eli's

23  objectives, as I understood them?  Yes.

24  Q    Now, Mr. Heimbach testified yesterday, right?

25  A    Correct.

R. Spencer - Direct

1  Q    And you asked Mr. Heimbach questions, right?

2  A    Right.

3  Q    You asked -- well, you had a phone call with Mr. Heimbach

4  in May of 2017, right?

5  A    I remember around that time, yes.

6  Q    Right.  And that was about -- that was shortly after

7  Charlottesville 1.0, right?

8  A    Right.

9  Q    And in your questioning of Mr. Heimbach you asked him in

10 court yesterday what you guys talked about, right?

11 A    Yes.

12 Q    Now, you knew the answer to that, right?  You were on that

13 call, right?

14 A    Well, I didn't know his answer.

15          THE COURT:  Well --

16          THE WITNESS:  In the sense of -- I mean, I can

17 vaguely remember having that conversation, but I didn't know

18 exactly how he remembered it.

19  BY MR. BLOCH:

20 Q    Okay.  Well, what he said was, "I think we mostly talked

21 about our families," right?  Isn't that what he said?

22 A    I remember that.

23 Q    And isn't it true you also talked about white nationalism?

24 A    I -- that topic is so broad, but, I mean, I imagine that

25 came up, yes.

R. Spencer - Direct

1  Q    When you say the topic is broad, it doesn't include

2  talking about your families, right?  We can agree those are two

3  separate topics?

4  A    This is very pedantic, but yes.

5  Q    Isn't it true that on that call you also talked about

6  issues relating to white nationalism?  Right?

7  A    That topic is so broad that it can include most -- I

8  mean -- yes.  I mean, probably.  I don't remember exactly.

9  You're asking the topic of white nationalism.  That's so vague.

10 Q    Did you give -- were you asked this question and did you

11 give this answer under oath in this case in July of 2020?

12      Page 168, line 23.

13      "Okay, just to break that down a little bit, when you say

14 the conversation with Mr. Heimbach included big-picture stuff,

15 you mean you discussed issues relating to white nationalist and

16 white advocate generally; is that fair to say?"

17      Answer:  "Yes, that's fair to say."

18      Did you give that testimony?

19 A    Yes.  Again, it is synonymous with what I've just told you

20 in court.  I don't know why you keep bringing me back to this.

21 Q    Well --

22 A    I mean, I just said yes.  That's a vague question.  What

23 are you trying to prove?

24          THE COURT:  What is the point of what you're doing

25 when you go through this?  Are you testing his memory, trying

R. Spencer - Direct

1  to impeach him, or are you trying to get new evidence into the

2  case?  I would like to know.  I really would.

3          MR. BLOCH:  I think it's important, Judge, that the

4  jury understand that Mr. Heimbach and Mr. Spencer discussed

5  issues relating to white nationalism --

6          THE COURT:  All right.  But yesterday --

7          MR. BLOCH:  -- and possibly Unite the Right, in May.

8          THE COURT:  He's acting as his own attorney.  He

9  cross-examined the witness.  I mean, I would think you would

10  agree that any lawyer worth his salt would know the answer to

11  the question before he presented it to the jury.  There is

12  nothing that I think is relevant about that type of discussion.

13          MR. BLOCH:  Understood, Judge.

14          THE COURT:  I'm going to ask you to ask him -- don't

15  go through this thing where we take so much time, two or three

16  series of questions back and forth.

17          Read him what it is exactly as it is.  Ask him if the

18  question was asked and if the answer was given.  Because you

19  start -- you phrase it one way and then we go and quibble over

20  what -- these terms.  It's just taking too much time.

21          MR. BLOCH:  Understood, Your Honor.

22          THE COURT:  All right.  We'll recess now for lunch

23  until 1:30.

24  **(Jury out, 12:31 p.m.**)

25          (Recess.)

R. Spencer - Direct

1          THE COURT:  Call the jury back.

2          MR. BLOCH:  Judge, could I put one thing on the

3   record just while we're waiting for the jury?

4          THE COURT:  Go ahead.

5          MR. BLOCH:  So I apparently labeled an Exhibit 2541

6   and I should have said 2514.

7          THE COURT:  All right.

8   **(Jury in, 1:34 p.m.)**

9          THE COURT:  You may be seated.  You may resume.

10         MR. BLOCH:  Thank you, Judge.

11   BY MR. BLOCH:

12   Q    Mr. Spencer, I'd like to return to the topic of your

13   communications with some of your co-defendants.

14        You also communicated with Nathan Damigo regularly in the

15   summer of 2017, correct?

16   A    Yes.

17   Q    And you spoke with Mr. Damigo about Unite the Right,

18   correct?

19   A    I'm sure we did, yes.

20   Q    You had a weekly call with Damigo, Kline, and Mr. Conte in

21   the summer of 2017, correct?

22   A    To be accurate, I think we wanted to do that.  Whether

23   there was an actual weekly call remains -- I think that we

24   probably didn't actually have a weekly call, but it's certainly

25   true that we were in communication, Nathan Damigo, Greg Conte,

R. Spencer - Direct

1  and myself.  That is accurate.

2  Q     You had, fair to say, regular calls?

3  A     Yes, as I said.

4  Q     And you discussed Unite the Right on those calls, right?

5  A     Correct.

6  Q     Fair to say that you and Mr. Damigo also shared the same

7  objectives for Unite the Right, correct?

8  A     I --

9         MR. KOLENICH:  Objection as to what Mr. Damigo

10  thought or what his objectives were.

11         MR. BLOCH:  I'll withdraw it.  Judge, I'll rephrase.

12  BY MR. BLOCH:

13  Q     Fair to say that, as you understood Mr. Damigo's

14  objectives for Unite the Right, you shared those objectives?

15  A     As I understood them, yes.

16  Q     And part of Mr. Damigo's role was to encourage people

17  outside of Charlottesville to attend; isn't that right?

18  A     IE members, yes.

19  Q     Let's talk about Mr. Cantwell.  You stated that

20  Mr. Cantwell -- withdrawn.

21         You stated, quote, "Mr. Cantwell was an acquaintance, not

22  a friend.  We shared a few text messages, seven in total, one

23  phone call.  We ate lunch one time."

24         That's what you told this jury, right?

25  A     Yes.

R. Spencer - Direct

1  Q    And isn't it true, Mr. Spencer, just focusing on the

2  period between July 8th and August 16th, the reality is that in

3  just that period alone you exchanged 88 text messages?

4  A    88 text messages with Mr. Cantwell?

5  Q    Correct.  Isn't that true?

6  A    You can show me those.

7  Q    Okay.

8            MR. BLOCH:  Could we show Mr. Spencer Plaintiffs'

9  3317.

10           (Plaintiffs' Exhibit 3317 marked.)

11   BY MR. BLOCH:

12  Q    Are these text messages, Mr. Spencer, between you and

13  Mr. Cantwell?

14  A    Yes.  I think I might have been saying that -- using that

15  instances where I was saying that we would have an exchange and

16  I would count that as an instance.

17  Q    I see.  So when you said that --

18  A    This is like "definitely," "thanks for coming," "my

19  pleasure."  I just included that as a kind of instance, as just

20  a conversation.

21  Q    Okay.  But we can agree you didn't say "instance," right?

22  What you said is "we shared a few text messages, seven in

23  total"; isn't that what you said to this jury?

24  A    Yes.

25  Q    And in fact, the reality is you exchanged 88 text messages

R. Spencer - Direct

1   with Mr. Cantwell just in that six-week period alone, right?

2   A     Just in that six-week period?

3   Q     Why don't we --

4              MR. BLOCH:  Why don't I offer PX-3317 into evidence

5   so the jury can see.

6              THE COURT:  It will be admitted.

7              MR. BLOCH:  And if I could publish it.

8              THE COURT:  You may.

9              (Plaintiffs' Exhibit 3317 admitted.)

10   BY MR. BLOCH:

11   Q     Fair to say, Mr. Spencer --

12   A     Yes, I think you're fairly representing the text exchanges

13   between Mr. Cantwell and myself.

14   Q     And you also told this jury that you had one phone call

15   with your acquaintance, Mr. Cantwell, right?

16   A     That's what I calculated when I did my work on this, which

17   was months ago.  I looked through my phone records.  That's

18   what I calculated.  If you have more accurate information, then

19   that's good.  I'll accept more accurate information.

20   Q     Well, I have the same phone records that you have, right?

21             THE COURT:  Let's -- I think whatever you're trying

22   to accomplish by going through this exercise, it's now

23   becoming duplicative of other things.  You've made your point.

24   It's just being time-consuming.  You don't have to ask him

25   anything to put something in the record that he has said or

R. Spencer - Direct

1   done.  He's a party to the case.  He doesn't have to admit or

2   deny.  I mean, like I said, we've gone through the exercise I

3   think enough to establish whatever other objective you have

4   other than trying to get the information before the jury.

5            MR. BLOCH:  Understood, Judge.  My only objective is

6   to the extent there's been a misimpression left with the jury,

7   I'd like to correct it.

8            THE COURT:  Well, go ahead.

9            MR. BLOCH:  Could we show Mr. Spencer's phone

10  records.

11   BY MR. BLOCH:

12  Q    Mr. Spencer, this was a phone call that you had in July

13  with Mr. Cantwell, right?

14  A    Yes.

15  Q    And if we could show August.  You also had two phone calls

16  with Mr. Cantwell in August, right?

17  A    Yes.  Again, a five-second phone call, I probably didn't

18  count that.  A minute and 28, I don't...

19  Q    The second phone call that you're talking about was on

20  August 12th, right?

21  A    Yes.  A minute and -- yes.  Yes.

22  Q    We can take that down.  And in addition to texts and phone

23  calls, you also attended a number of white nationalist events

24  with your co-defendants?

25  A    I'm actually remembering something.  When I looked at the

R. Spencer - Direct

1   phone records, there was a distinction in my phone records
2   about whether the call was actually received; that is,
3   answered.  And I think I very well might not have counted calls
4   that were not answered.  So a four-second phone call, that
5   sounds like either a voicemail at most or a hangup.  So I'm not
6   trying to -- like, you can certainly fairly criticize anything
7   that I say.  But I'm certainly not trying to lie to anyone
8   here.  And if you show me different information, then I'll take
9   that.  And that's good because it's about getting at the truth
10  of the matter.
11  Q    It is.  And we can go through the phone records again.
12  A    All three of them?  Yes, sure.
13  Q    We, too, only showed phone calls that were connected.  But
14  let's talk about white nationalist events that you attended in
15  the summer of --
16  A    I'm not sure I would count a four-second phone call.  I
17  don't know what --
18  Q    Understood, Mr. --
19  A    -- you could possibly say in four seconds.
20  Q    Okay.  In addition to texts and phone calls, you also
21  attended events, white nationalist events with some of your
22  co-defendants, right?
23  A    Yes.
24  Q    Prior to Unite the Right?
25  A    Yes.

R. Spencer - Direct

1   Q    And one of the events you attended was a rally in

2   Washington DC in June of 2017?

3   A    Yes.  I remember that.  Yes.

4   Q    And you gave a speech at the rally?

5   A    Yes.

6   Q    Mr. Kessler spoke, right?

7   A    I don't quite remember him, but I think you're being

8   accurate.  So yes.

9   Q    And Mr. Damigo and Mr. Cantwell?

10  A    I remember both of them speaking, yes.

11  Q    And if we could show PX-2408 to Mr. Spencer.

12          (Plaintiffs' Exhibit 2408 marked.)

13  BY MR. BLOCH:

14  Q    Is that a fair and accurate depiction of you at that event

15  in June 2017?

16  A    Yes.

17          MR. BLOCH:  And if I could move that into evidence

18  and publish it to the jury?

19          THE COURT:  Be admitted.

20          (Plaintiffs' Exhibit 2408 admitted.)

21   BY MR. BLOCH:

22  Q    And to be clear, Mr. Spencer, this is a photograph taken

23  on June 25th, 2017 with your acquaintance, Mr. Cantwell, right?

24  A    Correct.

25  Q    And you tweeted that, that same day?

R. Spencer - Direct

1   A    Yes.

2   Q    And if we could show Mr. Spencer PX-2562.

3            (Plaintiffs' Exhibit 2562 marked.)

4            MR. BLOCH:  And I'm just focused on time stamp 10:27

5   to the end of the video.

6            (Video playing.)

7            THE WITNESS:  Okay.

8   BY MR. BLOCH:

9   Q    Is that you at that event?

10  A    Yes.

11           MR. BLOCH:  And I would offer PX-2562 into evidence

12  and show to it the jury.

13           THE COURT:  Be admitted.

14           (Plaintiffs' Exhibit 2562 admitted.)

15           (Video playing.)

16   BY MR. BLOCH:

17  Q    Mr. Spencer, that was a clip of Nathan Damigo speaking at

18  that event in June of 2017, correct?

19  A    Right.

20  Q    And at the end of his speech, as we just saw, he leads the

21  crowd in a chant of "Moldylocks," right?

22  A    Yes.

23  Q    And that reference is a specific reference to the violence

24  that Mr. Damigo committed at the Battle of Berkeley, correct?

25  A    That's a reference to, yes, that violence at Berkeley,

R. Spencer - Direct

1    yes.

2    Q    And on that video we see you pumping your fist along with

3    that chant, right?

4    A    Right.

5    Q    Also joining in that chant is Jason Kessler, right?

6    A    Right.

7    Q    Christopher Cantwell, right?

8    A    Right.

9    Q    And there are a number of flags in the background,

10   correct?

11   A    Correct.

12   Q    There's the Identity Evropa flag on the left?

13   A    Correct.

14   Q    There is the Traditionalist Worker Party next to the

15   Identity Evropa flag, right?

16   A    Could you -- I mean, I can't recognize --

17   Q    Is there a clearer?

18   A    I mean, I see Identity Evropa certainly, but I can't

19   simply represent that flag when it's --

20   Q    Is there any way to back it up, Matt, to where the flag

21   is...

22   A    It's a pitchfork flag.  As I understand it, that's the

23   Trad Worker, yes.

24   Q    And there's also a Vanguard America flag, right?  To the

25   right?

R. Spencer - Direct

1  A    I -- I don't know Vanguard America fairly well.  What does

2  that flag look like?  Or I guess I should say -- if you could

3  back it up I could see what it was.

4       It's an eagle.

5  Q    Do you see that flag?

6  A    Yes, I do.

7  Q    Okay.  Would it be fair to say, Mr. Spencer, that you,

8  Nathan Damigo, Christopher Cantwell, Jason Kessler were united

9  leading a chant celebrating the violence that occurred at

10 Berkeley about six weeks before Unite the Right; would that be

11 fair to say?

12 A    We're celebrating the Moldylocks -- yes.

13 Q    And then after that event, you had a party at your place

14 in Alexandria, right?

15 A    Correct.

16 Q    And your apartment was referred to as "the fash loft,"

17 right?

18 A    I'm sure people called it that, sure.

19 Q    You knew that, right?

20 A    I've heard that before, yes.

21 Q    "Fash" is short for "fascist," right?

22 A    Yes.

23 Q    And a number of your co-defendants attended that party,

24 right?

25 A    Yes.

R. Spencer - Direct

1   Q    Mr. Cantwell, right?

2   A    I don't remember exactly, to be honest.

3   Q    Would looking at your deposition testimony refresh your

4   recollection?

5   A    Well, it would be surprising if he weren't there.  So yes.

6   Q    We can agree he was there?

7   A    We can agree, yes.

8   Q    And Mr. Kline was there, right?

9   A    Yes.

10  Q    Mr. Damigo was there?

11  A    Yes.

12  Q    There were other members of the alt-right there?

13  A    Yes.

14  Q    And one of the things that you discussed at that party was

15  Unite the Right, correct?

16  A    I'm sure we discussed that at the party, yes.

17  Q    In fact, you had three to five parties in the summer of

18  2017 where Unite the Right was discussed, right?

19  A    There is no doubt that at a party we would discuss Unite

20  the Right, yes.

21  Q    So my question is:  You had three to five --

22  A    I just answered yes, Mr. Bloch.

23  Q    And those parties were private, right?

24  A    Yes.

25  Q    Nobody recorded those parties, right?

R. Spencer - Direct

1   A    Well, I don't know, but I hope not.

2   Q    Mr. Kline was present for most if not all of them, right?

3   A    Yes.

4   Q    Mr. Damigo was there for one or two of them, right?

5   A    Yes.

6   Q    And somebody named Samantha Froelich was also there for

7   those parties, right?

8   A    Yes.

9   Q    And Samantha Froelich was a member of Identity Evropa at

10  the time?

11  A    Yes.

12  Q    She was dating Elliot Kline at the time, right?

13  A    Yes.

14  Q    And you, in fact, met her at the Charlottesville 1.0

15  rally?

16  A    That was the first time I met her, yes.

17  Q    Now, you also told this jury that you had attended events

18  other than Charlottesville and, quote, "it was remarkable to

19  the degree to which those events were, in fact, safe," right?

20  A    Yes.

21  Q    And the other events that you attended were events where

22  you gave speeches on college campuses, right?

23  A    Yes.  I was referring to the Auburn event and that free

24  speech event, which was just shown, and Charlottesville 1, and

25  even I guess Texas A&M, which occurred in I believe November of

R. Spencer - Direct

1  2016.

2  Q    You mentioned Auburn, so let's talk about Auburn.  A

3  number of your co-defendants were there, right?  Mr. Cantwell

4  and Mr. Heimbach?

5  A    Yes.

6  Q    And isn't it, in fact, true, that there were fights with

7  counter-protesters at Auburn?

8  A    There's no doubt that there were fights with

9  counter-protesters, yes.

10 Q    And some counter-protesters were actually beaten pretty

11 badly, right?

12 A    You know, whenever there's a controversial event, there

13 was -- you could expect some kind of pushing, shoving,

14 fisticuffs.  That occurred all the time.  It occurs all the

15 time now.  "Beaten pretty badly" seems to suggest that it was a

16 one-sided thing.  It's a highly controversial event and people

17 get quite emotional.

18 Q    You also attended an event in April 2017 in Washington DC,

19 right?

20 A    Could you remind -- oh, the April event, that was the

21 protest against the Trump Syria strike?

22 Q    Correct.

23 A    Yes, I attended that, yes.

24 Q    And Mr. Kline was with you for that event, right?

25 A    Yes.

113

R. Spencer - Direct

1    Q    And he actually worked security for you, right?

2    A    Yes.

3    Q    And at that event there was a counter-protester who tossed

4    some glitter on you, right?

5    A    Yes.

6    Q    And in response to the glitter being tossed on you, isn't

7    it true that Mr. Kline chased after the person and clotheslined

8    him?

9    A    I need to say something about that.  And I think there

10   probably is a video of that event that you might be showing,

11   but I would say this.  Tossing glitter on someone almost

12   suggests it was like a party, like, you know, happy new year.

13   What he did was a glitter bomb.  That is, he ran up to me and

14   threw glitter on my face.  That, thankfully, was glitter.  It

15   could have been acid.  It could have been scalding hot water.

16   The attempt to do that is to intimidate and frighten me.  That

17   is Antifa.  They are not wishing me happy new year with a

18   glitter bomb, to put it mildly.  So yes, something like that

19   was very concerning.

20   Q    So an event that's supposedly terrifying is not something

21   you would refer to as no big deal, is it?

22   A    Well, you always have to put these things into context.  I

23   am not advocating for free school lunches, where you can go out

24   onto the streets and say, let's have more lunch for kids, and

25   no one disagrees with you.  We are advocating for some of the

R. Spencer - Direct

1  most controversial things in the modern political sphere.  At

2  that point in April we were actually attacking Trump for

3  sending a missile strike against Syria.

4       And beyond that, there's the whole context of the

5  alt-right and everything that was going on.  So in that

6  context, those events were relatively successful in the sense

7  that we were able to speak our message.  We were able to give a

8  speech or express ourselves.

9       Now, you can't expect any alt-right event to not involve

10 Antifa counter-protesting on some level.  Whenever we would do

11 any kind of demonstration, Antifa would be there.  So what is

12 remarkable is that we were able to get a message across,

13 despite the fact there were people who were willing to use

14 violence against us.

15      So I would count that as a, relatively speaking, a

16 success, and ultimately safe in the sense that tempers and

17 emotions are so hot that it's a good thing that we actually

18 were able to express ourselves.

19 Q   So I don't think you ever answered my question that in

20 response to the glitter being tossed on you, isn't it true that

21 Mr. Kline --

22           THE COURT:  Don't say -- he disagreed with you on

23 your characterization of "toss."  So I don't want to hear him

24 have to explain again why he doesn't agree with that.

25           MR. BLOCH:  Judge, I don't either.  Understood.  I

R. Spencer - Direct

1  don't believe he answered my question.

2          (Overlapping speakers.)

3   BY MR. BLOCH:

4  Q    Mr. Spencer, in response, did Mr. Kline chase after that

5  person and clothesline him?

6  A    Yes.

7  Q    And Mr. Kline later bragged that he gave that person 12

8  stitches, right?

9  A    I learned of that at this trial, but yes.

10 Q    And you actually spoke about that incident on your

11 podcast, right?

12 A    I might very well have.

13 Q    So why don't we show PX-2565 from 15 minutes to 15:22.

14          (Plaintiffs' Exhibit 2565 marked.)

15          (Video playing.)

16          THE WITNESS:  That is me.

17          MR. BLOCH:  And I would offer that PX-2565 into

18 evidence and show the jury, please.

19          (Plaintiffs' Exhibit 2565 admitted.)

20          (Video playing.)

21 BY MR. BLOCH:

22 Q    That's what you played on your podcast, right?

23 A    To be perfectly accurate, that's a YouTube video.  If we

24 call it a podcast, that's fine.

25 Q    Apologies.  You played that on your YouTube video?

R. Spencer - Direct

1   A    Correct.

2            MR. BLOCH:  Could we actually, Mr. Spalding, play

3   that another eight seconds or so just to see what Mr. Spencer

4   thought about the glitter bomb incident.

5            It would start at 15:22 is where you ended it.

6            (Video playing.)

7    BY MR. BLOCH:

8   Q    Did you say that?

9   A    Yes.

10  Q    Glitter, who cares, right?

11  A    Well, I was basically shrugging off what was ultimately

12  not an ultimately violent assault.  I certainly didn't report

13  that to the police or anything.  I was shrugging it off.  I

14  don't care, to be honest.

15  Q    You claimed the only thing different about Unite the Right

16  from those prior events was the policing strategy, right?

17  A    Yes.

18            MR. BLOCH:  If we could just show PX-3152.

19   BY MR. BLOCH:

20  Q    Is this a text you recognize, Mr. Spencer, from Greg Conte

21  to you on July 23rd, 2017?

22  A    Yes.

23            MR. BLOCH:  I would offer PX-3152 into evidence,

24  Judge.

25            THE COURT:  Be admitted.

R. Spencer - Direct

1              (Plaintiffs' Exhibit 3152 marked.)

2              (Plaintiffs' Exhibit 3152 admitted.)

3    BY MR. BLOCH:

4    Q    This is a text message from Greg Conte, who is your

5    right-hand man, right?

6    A    Yes.

7    Q    And he said to you, quote, "Aw, this is gay, looks like

8    there's about a 60-day wait time to get a concealed carry

9    permit approved, so I guess I'll miss out on any firefights at

10   Charlottesville."  And then he does a frowny face emoji, right?

11   A    I don't want to dispute the emoji.  I don't know what --

12   it's a frowny face, almost like a tongue sticking out.  Yeah,

13   what he's saying -- I don't know what he thinks, but I think he

14   was considering doing a concealed carry permit, he couldn't get

15   one, so he is not going to carry a weapon to Charlottesville.

16   And then he says, "so I guess I'll miss out on any firefights."

17   That sounds pretty humorous to me.

18   Q    That was three weeks before Unite the Right, correct?

19   A    Yes.

20   Q    Now let's move to two weeks before Unite the Right.  On

21   July 28th -- we talked about this a little bit -- you went to a

22   conference in Tennessee for the American Renaissance, right?

23   A    I remember that, yes.

24   Q    That's sometimes referred to as AmRen?

25   A    Yes.

R. Spencer - Direct

1   Q    And that's a group founded by Jared Taylor, right?

2   A    Correct.

3   Q    Jared Taylor is someone who advocates for ethnic

4   cleansing, right?

5   A    No.

6   Q    You agree with me the audience at AmRen is white

7   nationalists, generally speaking?

8   A    Generally speaking, yes.

9   Q    And Mr. Kessler was there, as we discussed, right?

10  A    Yes.  Yes, he was there.  I said yes.

11  Q    And you spoke to him there about Unite the Right, correct?

12  A    Extremely briefly, but yes.

13  Q    And you also gave a talk at the AmRen conference, right?

14  A    At that AmRen conference?

15  Q    Yes.

16  A    Yeah, I think I spoke at the end very briefly, yes.

17  Q    Okay.  So let me just show you PX-2570 at 1:09:51.

18       (Video playing.)

19  Q    Is that you, Mr. Spencer, giving that speech?

20  A    That is me.

21  Q    I would offer 2570 into evidence and publish to the jury.

22            THE COURT:  Be admitted.

23            MR. BLOCH:  Thank you, Judge.

24            (Plaintiffs' Exhibit 2570 marked.)

25            (Plaintiffs' Exhibit 2570 admitted.)

R. Spencer - Direct

1           (Video playing.)

2    BY MR. BLOCH:

3    Q    Did you say that, Mr. Spencer?

4    A    Yes, I did say that.

5    Q    Two weeks before Unite the Right?

6    A    Yes.

7    Q    And after -- after you said it would be hugely

8    traumatic -- hugely dramatic, probably hugely traumatic for the

9    liberal people of Charlottesville, you concluded the speech

10   with, "it's going to be fun, they will never forget it," right?

11   A    I trust you.  You're right.  Yes.  When I say hugely

12   traumatic for the liberals of Charlottesville, that's what I

13   said, it's kind of an "owning the libs" type thing.  They're

14   going to be up in arms, shrieking about, you know, Richard

15   Spencer, something like that.  That is what I meant.

16   Q    Okay.  Well, on August 6th, a week after that, you had

17   lunch with Christopher Cantwell in Virginia, right?

18   A    Yes.

19   Q    And at that lunch you discussed Unite the Right with him,

20   right?

21   A    I'm sure the topic came up, yes.

22   Q    And Mr. Cantwell texted you the next day, correct?

23   A    Well, I mean, I don't remember that exactly, but if you

24   show me.

25   Q    Let me show you.

R. Spencer - Direct

1   A    Okay.

2   Q    If we could show the text messages that have been

3   previously admitted.

4        So if I could focus your attention on cell number 476.

5   These are text messages that you exchanged with Mr. Cantwell,

6   right?

7   A    Yes.

8   Q    And where it says "2" in the G column, that's from

9   Mr. Cantwell, right?  That's a text sent by Mr. Cantwell?

10  A    I'll take your word for it.

11  Q    And Mr. Cantwell says on August 7th, 2017, "You got time

12  for a phone call in a little while?  I want to talk to you

13  about this permit issue."

14       And you say, "Could you talk with someone else and have

15  them relay the info to me?"

16       And he says, "I was interested in exchanging ideas with

17  you on the subject, but whatever.  I'll just deal with

18  Kessler."

19       You say, "Do you know a lawyer in Virginia?"

20       He says, "Can't say I do.  My concern is Kessler wants to

21  do it there regardless and I want to have his back, but I can't

22  risk my carry permit."

23       And you say, "We must proceed as planned," right?

24       Did I get that right so far?

25  A    So --

R. Spencer - Direct

1   Q    The question is just whether I read that correctly?

2   A    You read that correctly.  So 2 is Mr. Cantwell?

3   Q    Correct.

4   A    Right?  And then 1 is myself.  Okay.  Thank you.

5   Q    And then Mr. Cantwell says to you, "Sounds like the plan

6   just went up in smoke.  How far do we want to deviate seems to

7   be the question, and I agree that it must be minimal."

8        We can agree that you guys are talking about Unite the

9   Right, correct?

10  A    Yes.  More specifically, I think we're talking about --

11  this is when the permit was in jeopardy.  And so we're talking

12  about that.

13  Q    Okay.  And Mr. Cantwell says to you, "I'm willing to risk

14  a lot for our cause, including violence and incarceration.

15  Many in my audience would follow me there too, but I want to

16  coordinate and make sure it's worth it to our cause."

17       And you say, "It's worth it, at least for me," correct?

18  A    Yes.  I think the reference to --

19  Q    Mr. Spencer?

20  A    Well, no, I will talk.  That's when the permit was in

21  question.  So it was a matter of even if there's not a permit,

22  you know, are you going to go there anyway and speak your mind.

23  So yeah.

24  Q    Now, one of the things that you discussed with Mr. Kessler

25  in the lead-up to Unite the Right was someone named Wes

R. Spencer - Direct

1  Bellamy, right?

2  A    Yes.  To be accurate, I believe he talked about Wes

3  Bellamy in 2016 when I first spoke with him.  I'm not sure we

4  discussed him in the lead-up to the Unite the Right.  Maybe,

5  though.  I don't know.

6  Q    Would seeing your --

7  A    Sure.  Can you just show me what you want to talk about

8  first and then I can confirm it, as opposed to doing this

9  parlor trick?

10 Q    Well, Mr. Spencer, I'm asking you about your

11 recollection --

12 A    I don't remember --

13 Q    And if you testify inconsistently with how you've

14 testified under oath previously, I'm going to remind you of

15 that fact.  Is that okay?

16 A    Yeah.  What you are trying to do is ask me something

17 exceedingly specific, and I am honestly answering the question.

18 And then you say, oh, wait a minute, I've got this; let me pull

19 a card out of my sleeve.  It's just absurd at some level.  If

20 you just ask me a direct question, I will answer it as honestly

21 as I can.  If you want to show me any kind of message, I will

22 address that.  But just playing this trick over and over again

23 is not helpful to this process.

24        MR. BLOCH:  Your Honor, I'm going to move to strike

25 and ask that the witness be instructed that when he testifies

R. Spencer - Direct

1  inconsistently with how he's testified under oath it is my job

2  and obligation to read him his deposition testimony.

3         THE COURT:  Well, why don't you -- if you do that,

4  then he has to, you know, comply with it and answer.  But in

5  the interest of time, may I suggest that you -- if you have

6  information you want to put before the jury about what he said,

7  that you read -- you read it into -- the exact text to him and

8  have him admit or deny and save the preliminaries?

9         MR. BLOCH:  Understood, Judge.

10  BY MR. BLOCH:

11  Q    Would it be fair to say, Mr. Spencer, that you had

12  decidedly negative views towards Wes Bellamy in the lead-up to

13  Unite the Right?

14  A    That's fair.

15  Q    And would it be fair to say that part of the reason you

16  hated Wes Bellamy was because he was black?

17  A    I don't quite think that's fair, actually.

18  Q    Is it your testimony that racial animus had nothing to do

19  with your hatred of Wes Bellamy?

20  A    I didn't say "hatred."  You're again putting words into my

21  mouth.  It's absolutely fair to say that I saw Wes Bellamy as

22  someone who was opposed to the objectives of Unite the Right,

23  which was to maintain the statues.  So is he a kind of

24  political adversary or something?  Do I hate him because he is

25  black, which is what you're suggesting?  No.

R. Spencer - Direct

1           MR. BLOCH:  Could we show Mr. Spencer PX-2808?

2           (Plaintiffs' Exhibit 2808 marked.)

3  BY MR. BLOCH:

4  Q    Mr. Spencer, is this a tweet that you recognize?

5  A    Yes.

6  Q    And you sent this tweet, right?

7  A    Yes.

8           MR. BLOCH:  And I'd offer 2808 into evidence and

9  publish it to the jury.

10          THE COURT:  Be admitted.

11          (Plaintiffs' Exhibit 2808 admitted.)

12 BY MR. BLOCH:

13 Q    Mr. Spencer, you tweeted this on August 10th, 2017, right?

14 A    Yes.

15 Q    And it depicts Wes Bellamy caught in a net, right?

16 A    Correct.

17 Q    As if Wes Bellamy is some sort of monster, right?

18 A    Well, it's a scene from the action/sci-fi Starship

19 Troopers, yes.  It's one of these memes where you superimpose

20 faces onto a movie for, you know, hilarity to ensue.

21 Q    Can we agree that this is an inherently dehumanizing photo

22 that you tweeted of Wes Bellamy?

23 A    It is -- I have seen millions of photos of me like this.

24 This is a meme.  It is -- yes, he is depicted as a kind of

25 sci-fi monster.  So it is, in that sense, inherently

R. Spencer - Direct

1    dehumanizing.  This is par for the course on social media.  So

2    to exaggerate it, I think, is out of bounds.

3    Q    Were you asked in your deposition testimony, page 236,

4    line 4:  "Do you agree with me it's a particularly dehumanizing

5    image of Wes Bellamy you tweeted out on August 10th?"

6         Answer:  "Yes.  He's been turned into an alien monster, so

7    it's inherently dehumanizing."

8         Did you give that testimony?

9    A    That is what I just said, Mr. Bloch.  That is absolutely

10   synonymous with what I just said in court.  And if I don't use

11   the exact wording, it's as if you want to prove that I'm lying.

12   This is getting ridiculous.

13   Q    In this tweet you specifically tagged Wes Bellamy, right?

14   A    Yes.

15   Q    And when you do that, he gets a notification of the post,

16   right?

17   A    Right.

18   Q    And what you wrote on the photograph is the words, "it's

19   afraid," right?

20   A    I did not write that on the photograph.  Someone else made

21   that meme.  It was probably sent out to me first and I copied

22   the image and then tweeted it out myself.

23   Q    And it says --

24   A    "It's afraid," yes, which is a line from Starship

25   Troopers.

R. Spencer - Direct

1  Q    And do you agree with me -- well, withdrawn.

2       Did you give this testimony, Mr. Spencer, page 237,

3  line 10, line 12?

4       "Do you agree with me that the import of this image you

5  tweeted out on August 10th was" --

6  A    Do you want to keep reading?  I mean, you just keep doing

7  this.  I mean --

8  Q    Do you --

9  A    I used different words.

10 Q    I'm going to read your testimony --

11 A    A year has passed.  I will use different wording.  I have

12 said the exact same thing, Mr. Bloch.

13 Q    Here's my question, Mr. Spencer.

14 A    Yes.

15 Q    Did you testify that the import of this image you tweeted

16 out on August 10th was that Wes Bellamy should be afraid of the

17 upcoming alt-right rally in Charlottesville?

18 A    I said that, yes.

19 Q    Now, during this time you had also been drafting a

20 manifesto, right?

21 A    This is -- what do you mean by "manifesto"?  You mean the

22 alt-right -- the Charlottesville Statement?

23 Q    Correct.

24 A    Yes.  I had worked on that, yes.

25 Q    That was a manifesto that you drafted with Augustus

127

R. Spencer - Direct

1  Invictus, right?

2  A    Yes.  It was his idea.  And he contributed --

3  Q    Mr. Spencer --

4  A    I'm answering the question so that they will have an

5  accurate representation.  And I'm actually saying that I wrote

6  the majority of it.

7  Q    That's the question.

8  A    Yes.

9  Q    So they've answered it?

10  A    Yes.

11  Q    Mr. --

12  A    Let me say that so we don't have cross-talk.

13       It was Augustus Invictus' idea.  I remember that I met

14  him.  He contributed some things to it.  I also ran it by some

15  other people, but effectively I wrote it.  The language is

16  mine.

17  Q    And you chose to publish it on August 11th, right?

18  A    Correct.

19  Q    And you tweeted it to your followers, right?

20  A    Yes.

21            MR. BLOCH:  And if I could show Mr. Spencer PX-2070.

22  BY MR. BLOCH:

23  Q    Is that the manifesto?

24  A    "A Metapolitical Manifesto for the Alt-Right Movement,"

25  yes.

R. Spencer - Direct

1          MR. BLOCH:  And I would move 2070 into evidence and

2   publish it to the jury.

3          THE COURT:  It will be admitted.

4          (Plaintiffs' Exhibit 2070 marked.)

5          (Plaintiffs' Exhibit 2070 admitted.)

6   BY MR. BLOCH:

7   Q    Now, the first three sections of the manifesto that you

8   wrote with Mr. Invictus were "Race," "Jews," and "The

9   Ethnostate," right?

10  A    Yes.

11  Q    "Race" begins with:  "Race is real.  Race matters.  Race

12  is the foundation of identity," right?

13  A    Correct.

14  Q    The section on Jews says that "Jews are an ethnoreligious

15  people distinct from Europeans," right?

16  A    Yes.

17  Q    Essentially, that Jews are not white, right?

18  A    Yes.

19  Q    And the third category is called "The Ethnostate," right?

20  A    Correct.

21  Q    It says:  "Nations must secure their existence and

22  uniqueness and promote their own development and flourishing,"

23  right?

24  A    Correct.

25  Q    And that states, effectively, the alt-right's desire for

R. Spencer - Direct

1  an ethnostate, right?

2  A    Yes.  I mean, it says -- it's a -- yes.  It says the state

3  is an existential entity.  So it's for everyone throughout

4  time, yes.

5  Q    Isn't it true, Mr. Spencer, that what you actually wrote

6  in "The Ethnostate" is coded language for the 14 Words; isn't

7  that true?

8  A    No.

9  Q    Well -- so the 14 Words is "we must secure the existence

10 of our people and a future for white children," right?

11 A    Yes.

12 Q    And this says, "nations must secure their existence and

13 uniqueness and promote their own development and flourishing,"

14 right?

15 A    Yes.

16 Q    And you actually wrote a draft of this document before you

17 published it, right?

18 A    I'm sure I did, yes.

19        MR. BLOCH:  And so if we could show PX-3126.

20        (Plaintiffs' Exhibit 3126 marked.)

21 BY MR. BLOCH:

22 Q    Mr. Spencer, is this an email that you sent on August 10th

23 to Augustus Invictus?

24 A    Yes.

25        MR. BLOCH:  I would offer this into evidence.

R. Spencer - Direct

1           THE COURT:  Be admitted.

2           (Plaintiffs' Exhibit 3126 admitted.)

3    BY MR. BLOCH:

4    Q    And, Mr. Spencer, this is a draft of the Charlottesville

5    Statement, right?

6    A    Yes.

7    Q    And you sent it to Mr. Invictus on August 10th, right?

8    A    Yes.

9    Q    And there is a section, if we can go to the next page,

10   that says, "all nations and all identities have a prerogative

11   to secure their existence and uniqueness and promote their own

12   development and flourishing," right?

13   A    Right.

14   Q    That's what ultimately became your section about "The

15   Ethnostate," right?

16   A    Right.

17   Q    But in your draft, the title for this section was "14,"

18   right?

19   A    Right.  I think it's expressing the same sentiment as the

20   14 Words, yeah.  But I -- it's not code.  I mean, it is what it

21   is.

22           MR. BLOCH:  We can take that down.

23           Could we just put that back up for one second?

24   BY MR. BLOCH:

25   Q    I just want to be clear for the jury.  None of the other

R. Spencer - Direct

1  sections are labeled with a number, right?  One is called "The

2  Baby Boomers," "The State," "Education," "The Police," et

3  cetera, right?

4  A    Right.

5           MR. BLOCH:  We can take that down.  Thanks.

6  BY MR. BLOCH:

7  Q    And if we can go back to the Charlottesville Statement

8  itself, the fourth category was called metapolitics, right?

9  A    Yes.

10 Q    And what that says is the alt-right -- well -- "spirit is

11 the wellspring of culture and politics is downstream of that.

12 The alt-right wages a situational and ideological war on those

13 deconstructing European history and identity," right?

14 A    Right.

15 Q    And so you had referred to, in this manifesto, a

16 "situational and ideological war" the night before Unite the

17 Right, correct?

18 A    Yes.

19 Q    And you also have a section on "White America"?

20 A    Okay.

21 Q    Right?

22 A    Right.

23 Q    I'm sorry.  If we can go down to part 6?

24 A    "Europe."

25 Q    Right.  You say, "Europe is our common home, and our

R. Spencer - Direct

1  ancestors' bone and blood lie in its soil," right?

2  A    Yes.

3  Q    And this is a reference to the Nazi slogan "blood and

4  soil," right?

5  A    No.  I mean, "ancestors' bone and blood," that's saying

6  that there are people who lie in the soil.  I mean, you could

7  say you could compare it to "blood and soil," but it's kind

8  of -- I don't know what to say.  It's not a code.  It's not

9  necessarily totally different.  It's not a code for that.  It

10  is what it is.  I write what I mean, and it's right there.

11  Q    So you also say, "the so-called 'refugee crisis' is an

12  invasion, a war without bullets" --

13  A    "War without bullets."  I remember writing that, yes.

14  Q    -- "taking place on the field of race," right?

15  A    Right.  Race, religion, sex, and morality, yes.

16  Q    This is the second reference to war in this three-page

17  document, right?

18  A    Perhaps.  I mean, I'm sure there are lots of references to

19  war, and obviously it's a metaphor that's very powerful.

20  Q    And there's also a section on firearms, right?

21  A    Yes.  Please read that.

22  Q    That says, "all US citizens, all Europeans, should have

23  the right to bear arms as a means of protecting themselves and

24  their families and enjoying the manly support of hunting,"

25  right?

<sup>133</sup>

R. Spencer - Direct

1   A    Absolutely, yes.

2   Q    And then you have a section on "The Left," right?

3   A    Yes.

4   Q    Which says "leftism is an ideology of death and must be

5   confronted and defeated," right?

6   A    Yes.

7   Q    Would it be fair to say, Mr. Spencer, that this manifesto

8   that you published the night before Unite the Right was a white

9   supremacist declaration of war?

10  A    No.  I mean, again, we need to define things like

11  "declarations of war."  Whenever there's -- even the word,

12  like, "political campaign" is a war metaphor.  It's a campaign

13  that you want to win and defeat your enemy.  This is rhetoric

14  that everyone uses and that is poetic and is powerful, which is

15  why people use it.  Of course I would, too.  But to say this is

16  a war document is absurd.

17  Q    So on the day that you -- well, you released this on

18  August 11th, right, and that's when you drove to

19  Charlottesville?

20  A    Correct.

21  Q    And you stayed at an Airbnb with Greg Conte and someone

22  named Matthew Warner?

23  A    Correct.

24  Q    And Matthew Warner was actually chief of staff of Identity

25  Evropa?

R. Spencer - Direct

1   A    Correct.

2   Q    You also on August 11th, when you arrived in

3   Charlottesville, you had lunch with David Duke, right?

4   A    I remember we went -- yes.

5   Q    And you were joined there by Greg Conte and Elliot Kline,

6   right?

7   A    I don't remember Elliot being there, but I was there.  I

8   remember David Duke being there, and Greg was there, of course.

9   Yes.

10  Q    And how about Jack Pierce, Ajax, your security guy?

11  A    He was probably there.

12  Q    And there was also a group text that was set up for the

13  weekend, right?

14  A    Likely.  I mean, show me.

15          MR. BLOCH:  Why don't we introduce PX-3146?

16          THE COURT:  Be admitted.  Go ahead.

17          (Plaintiffs' Exhibit 3146 marked.)

18          (Plaintiffs' Exhibit 3146 admitted.)

19   BY MR. BLOCH:

20  Q    Is this a text, Mr. Spencer, that you received on

21  August 11th?

22  A    Yes.

23  Q    And on that group is Augustus Invictus, right?

24  A    Yes.

25  Q    Nathan Damigo?

R. Spencer - Direct

1   A    Yes.

2   Q    Chris Cantwell?

3   A    Yes.

4   Q    Michael Hill?

5   A    Yes.

6   Q    Jason Kessler?

7   A    Yes.

8   Q    And some other 951 number, correct?

9   A    Yes.

10  Q    And you agree with me that everybody on this group text is

11  a leader of Unite the Right?

12  A    Yeah, sure.  I mean, more -- yes.

13  Q    And -- we can take that down.  Thanks, Matt.

14  A    What does the text say?

15  Q    That text said "negative," right?

16  A    Okay.

17  Q    You also --

18            MR. BLOCH:  Can we show him PX-3115?

19            (Plaintiffs' Exhibit 3115 marked.)

20  BY MR. BLOCH:

21  Q    That's a text -- do you recognize that text?  Is that from

22  Mr. Mosley to you?

23  A    Yes.

24            MR. BLOCH:  And so I would move in PX-3115.

25            THE COURT:  Be admitted.

R. Spencer - Direct

1        (Plaintiffs' Exhibit 3115 admitted.)

2   BY MR. BLOCH:

3   Q    Mr. Mosley texted you an August 11th, "Never mind, I'll

4   just text you.  We're canceling the afterparty to the general

5   public, but still having one for leadership and VIP," right?

6   A    Yes.

7   Q    And so he's referring to you in that text as leadership,

8   right, or VIP?

9   A    Or VIP.  I mean...

10  Q    On the evening of August 11th you -- and let's just show

11  it so there's no confusion.  PX-3106.

12       Do you recognize that, Mr. Spencer, as a text from

13  Mr. Kessler to you on August 11th?

14  A    Yes.

15       MR. BLOCH:  And I'd like to move this into evidence,

16  Your Honor, and publish it to the jury.

17       THE COURT:  Be admitted.

18       MR. JONES:  What was the number of that?

19       MR. BLOCH:  3106.

20       (Plaintiffs' Exhibit 3106 admitted.)

21  BY MR. BLOCH:

22  Q    Mr. Kessler texted you at 5:38 p.m. on August 11th, "I'm

23  sure you already know, but leadership meeting tonight 7 p.m. in

24  McIntire Park," right?

25  A    He texted that, yes.

137

R. Spencer - Direct

1   Q    Fair to say that Mr. Kessler regarded you as one of the

2   leadership?

3   A    Perhaps.  I don't speculate on how he regarded me.  He's

4   telling me about a leadership meeting, but I don't believe I

5   attended.

6   Q    Right.  So you didn't attend that meeting, right?

7   A    No.

8   Q    And, in fact, you told the jury that you were absent

9   during every planning session for both the torchlight march on

10  Friday and the aborted Saturday rally, right?

11  A    Right.

12  Q    But what you didn't tell the jury is that you sent Greg

13  Conte to that meeting on your behalf, right?

14  A    I didn't tell them that because that's not how I would

15  characterize it.  I mean, Greg was very enthusiastic about

16  security and so on.  And he attended that meeting, I believe,

17  at least.

18  Q    Did you give this testimony under oath, Mr. Spencer,

19  page 255, line 18?

20       Question:  "And so you were invited, in fact, to the

21  leadership meeting, correct?"

22       Answer:  "Yes."

23       Question:  "Are you saying you did not attend the meeting

24  itself?"

25       Answer:  "No, I did not attend it."

R. Spencer - Direct

1      Question:  "Okay.  But Greg Conte did attend the meeting

2  on your behalf, correct?"

3      Answer:  "You could say that, on my behalf, yeah.  I mean,

4  I was not involved in this stuff, but Greg attended it."

5      Question:  "Okay.  And after attending the meeting, did he

6  report back to you on what was discussed at the meeting?"

7      Answer:  "He reported back some basic stuff, such as we

8  were meeting at Nameless Field and so on."

9      Did you give that testimony, Mr. Spencer?

10  A    Yes.  Once again, I have expressed identical sentiments

11  using different words.  I don't know why you're doing this.

12  Q    And about an hour before you were going to go to the

13  march, you sent an email to the NPI listserv, right?

14  A    Quite probably.  I'll take your word for it.

15          MR. BLOCH:  Let's show PX-3120.

16          (Plaintiffs' Exhibit 3120 marked.)

17  BY MR. BLOCH:

18  Q    Is this an email, Mr. Spencer, that you sent to the NPI

19  listserv?

20  A    Just to be accurate, I -- this has refreshed my memory.

21  Just to be accurate, I believe Evan McLaren did that.  Again,

22  it's a listserv that I owned, so, I mean, I'll take

23  responsibility for it.  But he was sending these emails at the

24  time.  But -- I mean, let's not do this again.

25  Q    Could we just scroll down?

R. Spencer - Direct

1   A     Yes.

2   Q     So let's move that into evidence and we can talk about it.

3   A     Yeah.

4           MR. BLOCH:  Judge, I offer PX-3120.

5           THE COURT:  Be admitted.

6           (Plaintiffs' Exhibit 3120 admitted.)

7    BY MR. BLOCH:

8   Q    So, Mr. Spencer, you're saying that this is an email that

9   somebody else wrote under your name; is that --

10  A     Correct.  Yes.

11  Q    So this is -- there were times, you would agree, that you

12  had other people acting for you on your behalf; is that right?

13  A     Yes.

14  Q    Okay.  But you actually signed, or your name is at the

15  bottom of this document, right?

16  A     Yes.

17  Q    And it went from your email address to your followers at

18  NPI, correct?

19  A     Correct.

20  Q    And what was written was -- and this is about -- just to

21  be clear, this is at 7:54 p.m. on August 11th, right?

22  A     Yes.

23  Q    And you wrote, "as I write, the stage is being set for a

24  historic victory for our movement and our people in

25  Charlottesville," right?

R. Spencer - Direct

1  A    Right.

2  Q    You said, "we are in this game" -- "we are in this

3  game" -- I'm sorry.  Is that on the next page?

4       "We are in this game for victory, not forehead pats.

5  There would have been no challenge for others to join if we had

6  not stood up first and said to the world, 'You will not replace

7  us.  You cannot replace us," right?

8  A    Correct.

9  Q    And that was, in fact, the chant that -- one of the chants

10 that you all chanted during the torch march that happened an

11 hour later, right?

12 A    Right.

13 Q    And you also said, "Figureheads of conservatism write

14 articles, send tweets, and even testify before Congress in

15 lofty rhetoric expressing how important freedom of speech is to

16 them.  But they never take personal risk to defend that freedom

17 and retreat from the field of battle whenever those risks

18 arise.  Their words lack even symbolic meaning," right?

19 A    Very well-written.  Yes.

20 Q    And you would agree with me that an hour after you sent

21 the email talking about advancing on the field of battle, you

22 participated in an all-out attack on a number of

23 counter-protesters at the Thomas Jefferson statue, correct?

24 A    Absolutely not.  Again, the way you're expressing it --

25 "an all-out attack"?  I was not involved in even anything like

R. Spencer - Direct

1    that on August 11th.

2          Secondly, that is rhetoric.  You know, we are going to

3    take the field of battle.  That is clearly rhetorical.  And

4    again, in the literal, actual realm, I was not engaged in an

5    all-out attack on anyone.

6          MR. BLOCH:  Well, let's show Mr. Spencer PX-2401.

7    BY MR. BLOCH:

8    Q    Do you recognize this tweet as something you sent out --

9    A    Yes.

10   Q    -- on August 11th?

11        And you tweeted this out right around the same time that

12   you sent that email, right?

13   A    Yes.

14          MR. BLOCH:  And if I could introduce this, Judge, and

15   publish to the jury.

16          THE COURT:  Admitted.

17          (Plaintiffs' Exhibit 2401 marked.)

18          (Plaintiffs' Exhibit 2401 admitted.)

19          THE WITNESS:  I am responding to the militarized

20   police presence.  And I said it's become a war zone, yes.

21    BY MR. BLOCH:

22   Q    Right.  So an hour before -- approximately an hour before

23   the torch march, you tweeted out, "C'ville's become a war zone.

24   #charlottesville," correct?

25   A    Yes.

R. Spencer - Direct

1  Q     You then met at Nameless Field before the torch march,

2  right?

3  A     Yes.

4  Q     And Mr. Kessler was there, right?

5  A     Yes.

6  Q     Mr. Cantwell and Mr. Kline were there?

7  A     Yes.  I mean -- yeah.

8  Q     There were hundreds of white nationalists gathered, right?

9  A     Correct.

10 Q     And I want to ask you, Mr. Spencer, about the torch march

11 itself, but let's step back for a second --

12 A     Okay.

13 Q     -- for some context.

14        You graduated, as we discussed, from the University of

15 Virginia, right?

16 A     Yes.

17 Q     And you are, therefore, familiar with the demographics of

18 the student body, right?

19 A     Well, I was familiar with them around the turn of the

20 century.  I'm sure they changed a little bit in the subsequent

21 15 years.

22 Q     Okay.  But you would agree it's a fairly diverse

23 community?

24 A     Fairly -- yes, sure.

25 Q     And that there's an active Jewish community, right?

143

R. Spencer - Direct

1    A     I imagine there is, sure.

2    Q     And you're also familiar with the layout of the campus,

3    right?

4    A     Yes.

5    Q     So could we show the demonstrative that was used in

6    opening?

7          Do you see that, Mr. Spencer?

8    A     Yes.

9    Q     Is that a -- is that a depiction of UVA's campus?

10   A     Yes.

11   Q     And Nameless Field is right here, right, where I've just

12   marked?

13   A     Yes.

14   Q     And the Thomas Jefferson statue is here?  And I'm marking,

15   for the record, the little pink dot on the screen; is that

16   right?

17   A     That's how I would understand it, yes.

18   Q     And you agree with me that to get from Nameless Field to

19   the Thomas Jefferson statue, one could walk this way down

20   University Avenue, as I have depicted on the screen, correct?

21   A     That's very possible.

22   Q     But you didn't go that way, right?

23   A     We did not.

24   Q     What you did instead is you started here at Nameless

25   Field, right?

144

R. Spencer - Direct

1    A      Right.

2    Q      And then you marched up this way, correct?

3    A      You know, I don't -- I don't really want to quibble here,

4    but I don't think that's quite accurate.  But again, I'm going

5    on memory.  So I might be wrong, and it's not a huge

6    difference.

7    Q      Fair.

8    A      But would you like me to --

9    Q      Sure.  Why don't you mark which direction you think you --

10   A      Okay.  Again, this is at least how I remember it.  And

11   obviously it's a fact; someone else could report on it and it

12   doesn't make such difference.

13          I believe we went this way and then around and then

14   entered the Lawn at some point, perhaps around the computer

15   lab -- what was the computer lab when I was there -- and then

16   marched this way.  That's at least how I remember it.

17   Q      That's fair.

18               MR. BLOCH:  Just for the record, Mr. Spencer has

19   marked the route that they took on the screen in blue.

20   BY MR. BLOCH:

21   Q      Focusing on this area here, I'm marking with my finger in

22   pink.  That area is called the Lawn, right?

23   A      Right.

24   Q      And college students live in those houses, right?

25   A      Right.

145

R. Spencer - Direct

1  Q      It's a residential area?

2  A      Right.

3  Q      The people that populate those houses are not legislators,

4  right?

5  A      No.  Future legislators, perhaps.

6  Q      They're not businesses, right?

7  A      Right.

8  Q      They're just college kids?

9  A      Right.

10  Q      The plan was for hundreds of white nationalists to march

11  through campus the way you've marked down the Lawn, carrying

12  lit torches, chanting "Jews will not replace us" within

13  approximately 10 to 15 feet of a residential area, right?

14  A      Walking through a residential area, yes.

15  Q      And would you agree with me, Mr. Spencer, that this is

16  likely to be intimidating to the students that happen to be on

17  campus?

18  A      I'm sure that they would see it as, wow, this is a

19  powerful protest, if you want to say that that's intimidating.

20  It was meant to be a powerful statement.  There's no question.

21  Q      Did you testify that this was likely to be intimidating to

22  students who happen to be on campus?

23  A      I'm sure I did.  You don't have to point out the page

24  number.

25  Q      And in fact, Mr. Spencer, you led the torch march, right?

R. Spencer - Direct

1  A    No.

2          MR. BLOCH:  Could we show PX-2021.

3          (Plaintiffs' Exhibit 2121 marked.)

4          THE COURT:  Yes.

5          MR. BLOCH:  2121.  Sorry.

6  BY MR. BLOCH:

7  Q    Do you recognize this, Mr. Spencer, as a --

8  A    Yes.

9  Q    This is a video you put out the night of August 11th after

10 the torch march, right?

11 A    Yes.

12         MR. BLOCH:  I would offer PX-2121 into evidence.

13         THE COURT:  Be admitted.

14         (Plaintiffs' Exhibit 2121 admitted.)

15         MR. BLOCH:  And if we could just play for the jury

16 from time stamp 1:51 to 2:00.

17         (Video playing.)

18 BY MR. BLOCH:

19 Q    Did you say that, Mr. Spencer?

20 A    I said I was at the lead, yes, I said that.

21 Q    With respect to the torch march, right?

22 A    Yes.

23         MR. BLOCH:  And if we could show Mr. Spencer first

24 PX-3101.

25         I'm sorry.  Correct.  3107.

R. Spencer - Direct

1              (Plaintiffs' Exhibit 3107 marked.)

2    BY MR. BLOCH:

3    Q    Do you recognize this text message as a text from

4    Mr. Kessler --

5    A    Yes.

6    Q    -- to you?

7         And I would move this in, Judge, 3107, please.

8              THE COURT:  Be admitted.

9              (Plaintiffs' Exhibit 3107 admitted.)

10     BY MR. BLOCH:

11   Q    This was a text that Mr. Kessler sent you on August 11th

12   at approximately -- or exactly 10:15 p.m.  And the text is,

13   "Come out front," right?

14   A    Right.

15   Q    And what that text meant was, come out to the front of the

16   torch march to get the march started, right?

17   A    I -- I mean, it -- he texted -- so this is during the

18   beginning of the torch march?

19   Q    Correct.

20   A    Okay.  So "come out," you know -- yeah, I mean, I was

21   certainly at the front.  I mean, we could quibble about who's

22   leading.  And I don't want to do that.  But I -- I remember

23   he -- I remember absolutely seeing Jason Kessler there.  But it

24   was his event.  I was in the lead, I think that's fair, at the

25   front of the torch march.  "Come out front," I think he's

R. Spencer - Direct

1   trying to get my attention, though, to talk to me.  I mean, I

2   don't know.  Out front --

3   Q    You agree that this is out front to start the torch march,

4   right?

5   A    I think he is trying to get my attention, come out front,

6   come up to the lead, so he wanted to see me.  That's what I

7   think that means.

8   Q    And you marched near Mr. Kessler, right?

9   A    I was near Mr. Kessler, yes.

10  Q    And I believe we've all heard all this, but there were

11  various chants during the march, right?

12  A    Right.

13  Q    "Blood and soil," "Jews will not replace us," right?

14  A    Those were chants, yes.

15  Q    And you marched through the Lawn and then up the back of

16  the Rotunda, right?

17  A    Right.  Yes.

18        MR. BLOCH:  And could we put that demonstrative back

19  up.

20   BY MR. BLOCH:

21  Q    Just to be clear for the jury, the building that I'm

22  circling here is the Rotunda, right?

23  A    Right.

24  Q    And so you come down this way, down the Lawn, and then

25  there's like a little sort of pathway --

R. Spencer - Direct

1   A    Right.

2   Q    -- around the Rotunda?

3   A    Yes.

4   Q    And so you went this way, right?

5   A    Right.

6   Q    And then you come out, when you go around that pathway, to

7   the front of the Rotunda, right?

8   A    Correct.

9   Q    And then there's a series of steps down from the front of

10  the Rotunda, correct?

11  A    Yes.

12  Q    And this, again, that I'm circling is the Thomas Jefferson

13  statue, right?

14  A    Right.

15  Q    And so you at some point with the torch marchers got to

16  the top of the steps of the Rotunda looking down at the Thomas

17  Jefferson statue, correct?

18  A    Correct.

19  Q    And when you got to the top of the steps you could see at

20  that point that there were students encircling the statue,

21  right?

22  A    That's the first time I saw them, yes.

23  Q    And you could see from that vantage point that they were

24  standing there locking arms, right?

25  A    Yes.

R. Spencer - Direct

1          MR. BLOCH:  And could we just actually show -- this

2    is already in evidence -- CC134 from 4:30 to 5.

3          (Video playing.)

4          MR. BLOCH:  You can stop it there.

5     BY MR. BLOCH:

6    Q    That's taken from essentially your vantage point, right,

7    at the top of the -- I'm not saying you took the video, but

8    that's essentially the view from --

9    A    From the top of the Rotunda.

10   Q    Correct?

11   A    Yes.

12   Q    To the Thomas Jefferson statue.  And so you could see at

13   that point when you were there that there was nothing

14   separating you and the students, right?

15   A    You're talking about the students that are surrounding the

16   statue?

17   Q    Correct.

18   A    There's nothing -- yes.

19   Q    There was no barricade, right?

20   A    There's no barricade.

21   Q    There was no police there, right?

22   A    I think some police might have been there, but I generally

23   agree with you.  I don't want to quibble.

24   Q    Well, you didn't call the police, right?

25   A    I did not call the police, no.

R. Spencer - Direct

1    Q     What you did -- and you didn't decide to take the protest

2    somewhere else on campus, right?

3    A     No.

4    Q     You didn't decide to direct the torch march to a place

5    away from the students, right?

6    A     No.

7    Q     You decided to walk down the steps and surround them at

8    the statue so that they couldn't get out, right?

9    A     The idea -- always the idea was to end up at the Jefferson

10   statue.  I remember hearing that.  So we, again, did what was

11   the general direction, and we ended up at the statue.

12   Q     My question was --

13   A     There was no objective to surround people.  That happened

14   because there were counter-protesters who were surrounding the

15   statue and they were outnumbered by a great, great deal.

16   Q     Right.  They were outnumbered about 25 to 1, right?

17   A     That sounds fair.  Maybe more.

18   Q     And isn't it true that at that point the decision was made

19   to walk down towards the students and surround them?

20   A     Well, what I'm saying is that from what I remember, the

21   idea was always to end up at the Jefferson statue.

22   Q     I understand that, Mr. Spencer --

23   A     So that it would be proper to say the decision was made

24   not to go elsewhere.  The decision was made to end up at the

25   Jefferson statue.

R. Spencer - Direct

1  Q    And I'm focused right now on the point when you're at the

2  top of the steps.

3  A    Okay.

4  Q    And the decision was made at that point to surround the

5  students, right?

6  A    The decision was made to go to the Jefferson statue.  We

7  ended up -- it's clear that we ended up surrounding the

8  students.  It's just you're trying to characterize it as that

9  was the name of the game or something.  The idea, as I

10 understood it, was always to end up there.  And we did end up

11 surrounding them for a time as a matter of fact.

12 Q    Did you testify at some point:  "The alt-right made the

13 decision to surround the statues, correct?"

14       Answer.  "Yes."

15       Did you testify to that?

16 A    "Surround the statues," I'm sure I did say that, yes.

17 Q    My apologies.  To surround the students, correct?

18 A    Students?  Okay.  You know -- yes.  I don't think you're

19 lying.  I probably said that.  I am just adding context here.

20 Q    And if we could introduce or show Mr. Spencer first

21 PX-2117?

22 A    What page was that on, just for my --

23 Q    Page 280, line 4.

24            (Plaintiffs' Exhibit 2117 marked.)

25

R. Spencer - Direct

1  BY MR. BLOCH:

2  Q    Could we show Mr. Spencer --

3  A    You actually -- "And whose decision was it to surround the

4  students encircling the statue," was your question.  I said, "I

5  don't think it was any one person's decision, as if it were, I

6  did not see it.  It just seemed to kind of occur organically

7  because there were all these people.  We were in a long

8  procession and we ended up at the statue so there was a kind of

9  bottleneck and it just kind of naturally seemed to form a

10 circle.  I didn't hear anyone say, you know, next step,

11 encircle them, or anything.  It just seemed to naturally

12 occur."

13      So again, I'm expressing the same sentiment using

14 different words.  As always --

15 Q    So just a couple things.  First of all, you left out the

16 question I did read to you, right, which is, "At some point the

17 alt-right made the decision to surround the students" --

18 A    Surround the students encircling the statue --

19 Q    I read that correctly, didn't I?

20 A    No, I actually read that, too.

21 Q    Right.  And you said that you didn't hear anyone say, next

22 step, encircle them or anything, right?

23 A    Right.  I did say that, yes.

24 Q    So why don't we show Mr. Spencer PX-2117 at 21:07 to

25 21:43.  And just take a look, Mr. Spencer, tell me if you

R. Spencer - Direct

1    recognize it.

2                  (Video playing.)

3    A    Yes, that's me at the torch march.

4                  MR. BLOCH:  One moment.  Court's indulgence.

5                  (Plaintiffs' Exhibit 2117 marked.)

6                  MR. BLOCH:  Judge, I would offer PX-2117 into

7    evidence from the time 21:07 to 21:43.

8                  THE COURT:  Be admitted.

9                  MR. CANTWELL:  What was the exhibit number?

10                  MR. BLOCH:  2117.

11                  (Plaintiffs' Exhibit 2117 admitted.)

12                  (Video playing.)

13     BY MR. BLOCH:

14   Q    Mr. Spencer, that's a video of you standing near the

15   Thomas Jefferson statue in the group, right?

16   A    Correct.

17   Q    And you agree with me that somebody near you said, quote,

18   "We need some more people to fill in this way to block these

19   guys off"?

20   A    I did not hear that.  I heard -- I guess it was the person

21   taking the video saying "this is the speaker for the evening.

22   It's my guy."  I heard that.  I did not hear what you just

23   said.

24   Q    Okay.  Let's play the last ten seconds or so of the video.

25   A    Okay.  I'll listen.

R. Spencer - Direct

1          (Video playing.)

2  Q    Did you hear that, Mr. Spencer?

3  A    I heard it this time.  "We need some more guys to fill in

4  this way to block them off," is that --

5  Q    "To block these guys off."

6  A    "To block these guys off."

7  Q    Now, the fact of the matter is, Mr. Spencer, you

8  surrounded them at the statue and you wouldn't let them out;

9  isn't that true?

10  A    They were surrounded, and for a time they were fully

11  surrounded.  They eventually did leave.

12  Q    And my question is you surrounded them at the statue and

13  would not let them out, right?

14  A    For a time, yes.

15  Q    Let's show Mr. Spencer PX-2500, please.

16          THE CLERK:  I'm sorry, I can't hear you, Mr. Bloch.

17  BY MR. BLOCH:

18  Q    Do you recognize this, Mr. Spencer, as a tweet you sent?

19  A    Yes.

20          MR. BLOCH:  I would offer this into evidence and

21  publish, please.

22          (Plaintiffs' Exhibit 2500 marked.)

23          (Plaintiffs' Exhibit 2500 admitted.)

24   BY MR. BLOCH:

25  Q    This is a tweet, Mr. Spencer, that you sent -- that you

156

R. Spencer - Direct

1  tweeted on August 11th, correct?

2  A    Yes.

3  Q    And you're replying to a tweet that says, "They surrounded

4  us at the statue.  They wouldn't let us out," right?

5  A    Yes.

6  Q    And you retweeted that with a quote, and your quote was

7  "fact checked, true," right?

8  A    Yes.

9  Q    Thanks.  And would you agree with me, Mr. Spencer, that

10  the reason why you were trying to pin them in at the statue was

11  as a sign of dominance?

12  A    Yes.

13  Q    Now, you stayed at the Thomas Jefferson statue from the

14  beginning to the end, right?

15  A    The end of?  Of the evening?

16  Q    The evening.

17  A    As I remember it, yes.

18  Q    And isn't it true, Mr. Spencer, that you did not see any

19  of the students do anything aggressive to the alt-right?

20  A    I didn't -- I saw -- as I testified, I believe earlier as

21  well, I remember seeing evidence of pushing and shoving going

22  on.  Now, who started it, I don't know.  I remember seeing

23  that.  In terms of the plaintiffs, I do not remember seeing the

24  plaintiffs at all on that night.  And I don't remember seeing

25  the plaintiffs engage in aggressive action.  That is true.

157

R. Spencer - Direct

1  Q    On July 1st of 2020 when you were deposed in this case,

2  referring to page 279, line 16, were you asked this question

3  and did you give this answer.

4       Question:  "All right.  Focusing on my question, other

5  than the torch being knocked down, you didn't see any of the

6  students doing anything aggressive or threatening to the

7  alt-right, correct?"

8       Answer:  "No.  No overt assault.  I did not see an overt

9  assault."

10       Question:  "Let's just be clear about my question:  You

11  did not see anything --"

12       Answer:  "I did not see anything.  I did not report

13  anything.  No, I did not see anything like that."

14       Did you give that testimony?

15  A    I gave that testimony.  Again, I'm expressing the exact

16  same sentiment.

17  Q    Mr. Spencer --

18  A    Above I said I probably saw a little bit of pushing and

19  shoving, but that's the most.  So I've reiterated myself on

20  both occasions.  I mean, I did not see any assault on the

21  plaintiffs nor did I see the plaintiffs engage in aggressive

22  action.

23  Q    Are you again reframing my question to be from the

24  students who were there to just the plaintiffs, Mr. Spencer?

25  Is that what you're --

R. Spencer - Direct

1   A    No, I'm trying to be accurate.  As I have said, I can

2   remember seeing pushing and shoving.  And I'm not expressing an

3   opinion on who pushed or shoved first, actually.  I just

4   remember seeing some of those things.  I do not remember seeing

5   the plaintiffs.  And I do not remember seeing them engage in

6   anything aggressive.  I've said this about three times now.  I

7   mean, is that clear?

8   Q    Do you agree with me that, nonetheless, counter-protesters

9   were injured, right?

10  A    Yes.

11  Q    You actually heard a counter-protester crying for a medic,

12  right?

13  A    I remember hearing -- I remember hearing someone cry

14  "medic, medic."  I do remember that, yes.

15  Q    And you thought that was funny, right?

16  A    Well, I mean, I don't know.  Funny, I mean, again, are you

17  going to show me -- I remember hearing someone say "medic,

18  medic."  That does ring a bell.

19  Q    Could we show PX-2121, which I believe is in evidence.

20  This is again the periscope video that you released yourself on

21  August 11th, right?

22  A    Well, let me see before I --

23  Q    Let's go to 4:44.

24       (Video playing.)

25       Did you say that, Mr. Spencer?

159

R. Spencer - Direct

1   A    Yes, I did.

2   Q    And you're aware that one of your co-defendants, at least

3   one of your co-defendants, was charged with criminal behavior

4   that night, right?

5   A    I -- yes.  I mean, I don't know exactly what you're

6   referring to, but I can imagine.

7   Q    Despite everything that happened, despite where you were

8   during all the violence around the Thomas Jefferson statue, you

9   actually testified under oath in this case that there was,

10  quote, no violence on the night of the torch march, right?

11  A    It's very important to define words.  I have said over and

12  over that I saw pushing and shoving.  And there are fights and

13  so on that I've heard about and been revealed.  If I've said

14  something like there was no violence, that's in comparison with

15  some of the things that we saw on August 12th.

16          THE COURT:  Let's take about a 20-minute recess now.

17  **(Jury out, 3:00 p.m.)**

18          (Recess.)

19          THE COURT:  Call the jury back.

20  **(Jury in, 3:27 p.m.)**

21          THE COURT:  All right.  You may be seated.

22          MR. BLOCH:  May I proceed, Your Honor?

23          THE COURT:  You may.

24  BY MR. BLOCH:

25  Q    Mr. Spencer, after what you observed at the Thomas

R. Spencer - Direct

1  Jefferson statue, you then climbed up on the statue and gave a

2  victory speech; isn't that true?

3  A    I remember climbing up and saying some bold words.  Maybe

4  calling it a speech might be a bit much, but...

5           MR. BLOCH:  Let's show PX-2117 at 24:42, please.

6           (Plaintiffs' Exhibit 2117 marked.)

7           (Video playing.)

8  BY MR. BLOCH:

9  Q    Mr. Spencer, is that the words that you said on

10  August 11th at the Thomas Jefferson statue?

11  A    Yes.

12  Q    And you heard people yelling "hail Spencer," right?

13  A    Right.

14  Q    And they yelled "hail victory," right?

15  A    I heard that, yes.

16  Q    And "this is what victory looks like," right?

17  A    Did I say that?

18  Q    I believe you said that.

19  A    Okay.  Yes.

20  Q    And you said "alt-right, we own these streets, we occupy

21  this ground, we won," right?

22  A    Yes.  I heard that.

23  Q    And after those words you went back to your Airbnb, right?

24  A    Correct.

25           MR. BLOCH:  Could we show Mr. Spencer PX-3074?

R. Spencer - Direct

1              (Plaintiffs' Exhibit 3074 marked.)

2    BY MR. BLOCH:

3    Q    Do you recognize this as a text, Mr. Spencer, that you

4    received after the torch march on August 11th?

5    A    Okay.  Yes.

6              MR. BLOCH:  I'd offer this into evidence, Judge.

7              THE COURT:  Be admitted.

8              (Plaintiffs' Exhibit 3074 admitted.)

9    BY MS. DUNN:

10   Q    And this is a text that you received from someone named

11   "Daniel @Arktos."  And he says, "Hi.  Me, Chris, and D'Marcus

12   recently arrived at the inn where Evan stays.  Congrats on a

13   successful torch march," right?

14   A    Yes.

15   Q    And can we show -- well, let me just ask you, and I can

16   show you the text if you want.

17   A    Okay.

18   Q    Did you respond to that, "yeah, it was great"?

19   A    That sounds about -- sounds like -- right, yeah.

20   Q    You were pleased with what took place at the torch march,

21   right?

22   A    Generally speaking, yes.

23             MR. BLOCH:  And if we could show PX-2121 at 3:52,

24   this is the Periscope video that you put out.

25             (Video playing.)

R. Spencer - Direct

1          (Plaintiffs' Exhibit 2121 marked.)

2     BY MR. BLOCH:

3     Q     And you told your followers, members, listening to this

4     Periscope video that "we occupied space," right?

5     A     Yes.

6     Q     And you didn't say anything in the Periscope video about

7     "we should tone down the violence for tomorrow" or anything

8     like that, right?

9     A     I don't know if I did or not.  Again, occupying space is

10    about what it is.  It's about making a demonstration and going

11    out there and being bold and getting a message across.  It's

12    not about violence.  I think that's what you're trying to

13    conflate.  It's not about going out there to engage in pushing

14    matches.  It's about going out there and being:  We're here,

15    we're proud we're here.  That's what it's about.  That's what

16    every demonstration is about.

17    Q     So if we could show PX-3121, this is -- do you recognize

18    this, Mr. Spencer, as an email from you?

19    A     Yes.

20          MR. BLOCH:  I would move 3121 into evidence.

21          THE COURT:  Be admitted.

22          (Plaintiffs' Exhibit 3121 marked.)

23          (Plaintiffs' Exhibit 3121 admitted.)

24    BY MR. BLOCH:

25    Q     This is an email that you sent on 9 a.m. the morning of

R. Spencer - Direct

1    August 12th, right, to your NPI listserv, right?

2    A    Yes.  Just for the sake of accuracy, I take responsibility

3    because it is my list.  Evan McLaren, as I remember, wrote it,

4    but again, it's coming from me, so I'll -- you know, that's

5    fair.

6    Q    And it's got your name at the bottom, right?

7    A    Yes.

8    Q    And what this email says is, "as I write this, people are

9    getting in their cars and traveling to Charlottesville to be

10   part of what they saw on TV and the internet last night.  Our

11   numbers are growing, and so is the intensity of our movement,"

12   right?

13   A    Right.

14   Q    You also stated in this email that you sent on August 12th

15   that "this is only the prequel," right?

16   A    That's -- that is -- that's what I wrote, yes.

17   Q    You said, "nothing could have prepared us for the energy

18   and fellowship we felt last night at the University of

19   Virginia.  And imagine, this is only prequel," right?

20   A    Yes.

21   Q    Now, you did in fact attend Unite the Right on

22   August 12th, correct, the second event of Unite the Right,

23   correct?

24   A    Yes.

25   Q    And you went to McIntire Park, right?

R. Spencer - Direct

1   A    That was where people were meeting up beforehand, yes.

2   Q    And that's where you went?

3   A    That's where I went, yes.

4   Q    You joined a number of other white nationalists there,

5   right?

6   A    Correct.

7           MR. BLOCH:  And if we could just show PX-2570.

8           (Plaintiffs' Exhibit 2570 marked.)

9           THE CLERK:  Is this previously admitted?

10          MR. BLOCH:  Sorry, the time stamp --

11          THE WITNESS:  That's afterward.

12          MR. BLOCH:  Correct.

13          So the time stamp I'm looking for -- my apologies --

14  is 1:19:00.

15  BY MR. BLOCH:

16  Q    Is that you, Mr. Spencer, walking into McIntire Park?

17  A    That's my back, yes, in blue.

18          MR. BLOCH:  If I could admit 2507 at that time

19  stamp --

20          (Discussion off the record.)

21          MR. BLOCH:  The exhibit number is PX-2570, and the

22  time stamp is 1:19:00 to 1:19:19, and if we could publish it to

23  the jury.

24          (Video playing.)

25   BY MR. BLOCH:

R. Spencer - Direct

1  Q    Mr. Spencer, that's you walking into McIntire Park with

2  your group, right, the morning of August 12th?

3  A    Correct.

4  Q    And you then met with David Duke in McIntire Park, right?

5  A    I'm not sure I did that in the morning.  I do remember

6  seeing him at McIntire Park.

7  Q    Okay.

8  A    That comes afterward.

9        MR. BLOCH:  So let's play from 1:19:29 to 1:19:35.

10       PX-2570.

11       (Video playing.)

12 BY MR. BLOCH:

13 Q    Does that refresh your recollection?

14 A    I'm trying to be as accurate as possible here.  I think

15 that was -- yes, I mean, I kind of remember seeing him later,

16 but that seems to be right.  So if he was there, he was there.

17 Yeah.

18 Q    You saw him twice, actually, on August 12th, right?

19 A    Okay.  I mean...

20 Q    That's --

21 A    Yeah, I'm not going to dispute obvious evidence, yes.

22 Q    So that's you meeting with David Duke at some point on

23 August 12th, and you're discussing with him the fact that there

24 are Jews running this country, right?

25 A    He was saying that, yes.

R. Spencer - Direct

1   Q    And you were saying -- you agreed with that?

2   A    Yes, I mean, sure.

3   Q    And if we could show PX-2505.

4        (Video playing.)

5        Do you recognize that, Mr. Spencer?

6   A    Yes.

7             MR. BLOCH:  I'd offer this into evidence, Your Honor,

8   2505.

9             THE COURT:  Be admitted.

10

11            (Plaintiffs' Exhibit 2505 marked.)

12            (Plaintiffs' Exhibit 2505 admitted.)

13  BY MR. BLOCH:

14  Q    Mr. Spencer, is this a photograph of you addressing the

15  crowd of white nationalists at McIntire Park on August 12th?

16  A    I think that's me addressing the media.  I'm sure there

17  are some alt-right people there, too.  But I believe that

18  happened after the rally.

19  Q    Well --

20  A    Because it's the white shirt.  Because I did change

21  shirts.  I'm just trying to be accurate.

22  Q    That's fair.  If we could just back it out and show that

23  the tweet was sent at 10:38 a.m., right?

24  A    I'm really not trying to get in an argument about this.  I

25  wonder if there's a time zone issue there, because I changed

R. Spencer - Direct

1    shirts after I left Charlottesville.

2    Q    Well, you --

3    A    And I was wearing a white shirt.  That's how I remember.

4    Q    Well, you actually gave inspiring words to the folks

5    gathered in McIntire Park both in the morning as well as after

6    the unlawful assembly was declared; isn't that true?

7    A    I'm sure that's true, yes.

8              MR. BLOCH:  We can take that down.

9    BY MR. BLOCH:

10   Q    At some point you made your way over to Emancipation Park,

11   right?

12   A    Right.

13   Q    And you've claimed here that you were concerned that you

14   might get attacked at this rally, right?

15   A    Yes.

16   Q    And yet isn't it true, Mr. Spencer, that prior to

17   attending Unite the Right you had no communication whatsoever

18   with law enforcement?

19   A    I communicated with the law enforcement in Alexandria,

20   Virginia, as I did, and I told him where we were going to be.

21   I at no point in my memory communicated with Charlottesville

22   law enforcement.

23   Q    So you're saying when you left for the event, you told

24   police officers in your hometown of Alexandria that you were

25   leaving, right?

R. Spencer - Direct

1  A    Yes.

2  Q    And you had no communication with law enforcement --

3  A    To my recollection --

4  Q    -- in Charlottesville?

5  A    -- I had no communication with Charlottesville law

6  enforcement.

7  Q    And nobody from your security detail communicated with the

8  police; isn't that right?

9  A    I'm not saying that.

10  Q    Well, I'm asking you:  Isn't it true that nobody in your

11  security detail communicated with the police?

12  A    I can't say that.

13  Q    Referring to page 203, line 2 of your testimony, were you

14  asked this question and did you give this answer.

15      Question:  "Did you have any understanding that anybody

16  was communicating with the police that was in your security

17  detail?"

18      Answer:  "Not in my security detail, no."

19      Did you give that testimony?

20  A    Yes.  And it's the same sentiment using different words.

21  It's my understanding --

22          THE COURT:  Excuse me.  What was different about the

23  two?

24          MR. BLOCH:  I asked him, isn't it true nobody in your

25  security detail communicated with the police, and he said I

R. Spencer - Direct

1  can't say that.  And so I was just reading him where it seemed

2  like he answered that much more directly.

3            THE COURT:  Okay.  But it just repeated the same

4  thing.  It was not that different.  That's not -- I don't know

5  what -- that's not impeachment.

6            MR. BLOCH:  Understood, Your Honor.

7            THE COURT:  I mean, you're entitled to read it --

8  because he's a party you can read anything he said, but you

9  just can't ask and answer and ask the same thing over.

10            MR. BLOCH:  Judge, if he would answer my question and

11  he would answer it truthfully and consistently, I wouldn't have

12  to read the deposition.

13            THE COURT:  Well, you didn't have -- sir, we went

14  through what the question was and his answer.  You read the

15  question from the deposition and the answer, and they were

16  essentially the very same thing.  And you shouldn't imply that

17  they're different.

18            MR. BLOCH:  Okay.  I'll move on, Judge.

19   BY MR. BLOCH:

20  Q    Mr. Spencer, you were asked in discovery in this case to

21  identify each communication you had with each member of law

22  enforcement concerning the events of August 11th and 12th,

23  correct?

24  A    Yes.

25  Q    And you answered that question, right?

R. Spencer - Direct

1    A    Yes.

2         MR. BLOCH:  And if we could show Mr. Spencer PX-3304H

3    on page 38.

4         (Plaintiffs' Exhibit 3304H marked.)

5    BY MR. BLOCH:

6    Q    And you signed these statements --

7    A    Yes.

8    Q    -- under penalty of perjury, right?

9    A    Yes.

10        MR. BLOCH:  Sorry, page 38.

11    BY MR. BLOCH:

12   Q    And in answer to the question about each communication you

13   had with each member of law enforcement, whether before, during

14   or after the events --

15   A    Okay.

16   Q    -- you wrote -- let me just read it.  You wrote:  "I spoke

17   to local police and the state police as I was being expelled

18   from Emancipation Park on August 12th.  I asked police officers

19   how to leave, and they pointed me to Market Street.  I do not

20   know their names."

21        Is that what you said?

22   A    Yes.  Mr. Bloch, you were talking about my entrance to the

23   park and what was going on before the rally.  And at least the

24   way I understood the question was did I have any preliminary

25   discussions with police or anything like that.  I didn't.  And

                         R. Spencer - Direct

1    I also can't tell you for certain what Greg Conte did or what

2    other people did.

3        Now, what I said there is also accurate.  After the state

4    of emergency -- and we'll get there, I know, and you can ask me

5    this again, but once we -- once the state of emergency was

6    declared, I remember asking -- there was a state or local

7    police.  I remember asking them, how do I get out of here?  And

8    so I don't know their names.  I don't know their badges.  It

9    was a crazy time at that point.

10       So I am answering these things truthfully.

11   Q    And that's the time period I'm focused on is after

12   unlawful assembly.

13   A    That's where we are now.  When I answered that question I

14   didn't speak to law enforcement, the way I understood it was we

15   were moving up to the rally.  I mean, I'm trying to answer

16   these as honestly as possible.  You seem to try to nitpick.

17   It's just --

18   Q    Could we introduce PX-2872.

19       Is that a fair and accurate depiction of you at that same

20   moment that we're talking about on August 12th?

21   A    Yes.

22             (Plaintiffs' Exhibit 2872 marked.)

23             MR. BLOCH:  So I would offer 2872 into evidence.

24             THE COURT:  Be admitted.

25             (Plaintiffs' Exhibit 2872 admitted.)

R. Spencer - Direct

1    BY MR. BLOCH:

2    Q    Mr. Spencer, is this when you were asking police

3    officers --

4    A    No.

5    Q    -- how to find the exit?

6    A    No, it was not.  That's when we were being expelled.  So

7    would you like me to talk about this or do you want to ask the

8    questions?

9    Q    I'd like for you to answer my questions.

10   A    No, is the answer to the question you just asked.

11   Q    So at some point after -- at some point an unlawful

12   assembly was declared, right?

13   A    Yes.

14   Q    And you were ordered to leave, right?

15   A    Yes.

16   Q    And you refused to leave, right?

17   A    We passively resisted, yes, for a time.

18   Q    Well, you actually screamed at police officers that

19   they're going to have to drag you out of here, right?

20   A    Yes.

21   Q    And then they did, right?

22   A    Not exactly dragged me out of there, but they definitely

23   used a police wall to force us off the field.

24   Q    And you were maced by the police, right?

25   A    Correct.

R. Spencer - Direct

1           MR. BLOCH:  We can take that down, thanks.

2    BY MR. BLOCH:

3    Q    And at 12:38 -- I believe you talked about this in your

4    opening statement -- you tweeted, "My recommendation, disperse,

5    get out of Charlottesville city limits, state of emergency has

6    been called," right?

7    A    Yes.

8    Q    And you stated to the jury that you did this to try to

9    prevent more chaos and violence and injury, correct?

10   A    Yes.

11   Q    You said you did that because it was time to get out of

12   Dodge, right?

13   A    Yes.

14   Q    And because you were disturbed by the chaos you saw

15   unfold, right?

16   A    Yes.

17   Q    You, in fact, Mr. Spencer, did not get out of Dodge at

18   that point, right?

19   A    I was never in downtown Charlottesville.  And I did

20   eventually leave the park when we were expelled by police.

21   Q    Well --

22   A    And I was talking to other people that it's good to get

23   out.  I mean, the state of emergency had been called.  I had

24   seen some images of chaos in downtown.  The whole thing was

25   going south.

R. Spencer - Direct

1  Q    Well, what you did is you went back to your Airbnb and you

2  made another video for your followers, right?

3  A    I don't think that's actually correct.  I went to Daniel

4  Friberg's -- we went to Daniel Friberg's motel, I believe.  So

5  just to be accurate.

6  Q    But you made another video, right?

7  A    Right.

8  Q    And you tweeted it out 13 minutes after that tweet about

9  disperse, right?

10 A    Okay.

11 Q    Is that right?

12 A    I assume you're correct in the chronology.

13 Q    So can we show Mr. Spencer PX-2527.

14       (Video playing.)

15 Q    Is that you, Mr. Spencer?

16 A    That is me, yes.

17       MR. BLOCH:  I would move in PX-2527 from 1:45 to

18 2:31, please.

19       THE COURT:  Be admitted.

20       (Plaintiffs' Exhibit 2527 marked.)

21       (Plaintiffs' Exhibit 2527 admitted.)

22       (Video playing.)

23  BY MR. BLOCH:

24 Q    Mr. Spencer, did you say that and send that video out the

25 afternoon of August 12th?

R. Spencer - Direct

1   A    Yes.

2   Q    And when you say "Mr. Bellamy is a house you know what,"

3   what is it you're referring to?

4   A    I think it's the house N word.

5   Q    And if we could also show another portion of that video a

6   little bit later, 2:56 to -- sorry, 2:56 to 3:23.  This is

7   PX-2527.

8        (Video playing.)

9   Q    Did you say that, Mr. Spencer, on August 12th?

10  A    Yes.

11  Q    That's a video that you tweeted out -- well, let's show

12  the tweet.  Can we show PX-3796.

13       Do you recognize that as a tweet, Mr. Spencer?

14  A    Yes, I do.

15           MR. BLOCH:  I'd like to move PX-3796 into evidence.

16           THE COURT:  Be admitted.

17           (Plaintiffs' Exhibit 3796 marked.)

18           (Plaintiffs' Exhibit 3796 admitted.)

19  BY MR. BLOCH:

20  Q    This is a tweet that you sent out with that video that we

21  just played, right?

22  A    Yes.

23  Q    And that tweet -- and it's titled "A message for

24  Charlottesville"?

25  A    Yes.

R. Spencer - Direct

1  Q    And the tweet went out at 12:51, right?

2  A    Yes.

3  Q    And that's 13 minutes after you sent the disperse tweet,

4  right?

5  A    Those are not contradictory messages in the slightest bit,

6  Mr. Bloch.  I'm saying we're going to come back.  We're not

7  going to back down in the sense that a state of emergency was

8  declared before any speeches were given.  And, you know, I was

9  obviously angry, as I state there.  "We'll be back," "we're not

10 backing down" is just "rah rah rah."

11      In terms of the tweet about get out of town, disperse,

12 that was meant for as many people who could see it at that

13 time.  The state of emergency had been called.  It's a good --

14 I had seen some images of chaos going on.  It's a good idea to

15 get out of there.  Those are not contradictory messages in the

16 slightest bit.

17 Q    After -- we can take that down.  Thanks, Matt.

18      After you tweeted that video you then went back to

19 McIntire Park, right?

20 A    I think eventually -- maybe before that.  I'm not exactly

21 positive on that chronology, but if you have time stamps, then

22 that's fair.

23      Look, I'm just simply saying, you know, I'm not positive

24 about the exact chronology.  Is that -- if you're representing

25 it that way, then I trust you.

R. Spencer - Direct

1  Q    Did you go to McIntire Park after an unlawful assembly was

2  declared?

3  A    Yes, that's correct.

4  Q    And when you arrived there, there were other white

5  nationalists there, right?

6  A    Yes.

7  Q    And at this point you agree with me you were outraged,

8  right?

9  A    Yeah.

10 Q    And you spoke to a number of people at McIntire Park,

11 right?

12 A    Yes.

13 Q    And a number of your co-defendants were there, right?

14 A    Likely.  I don't know for sure, but yes.

15 Q    And you gave another set of words, right?

16 A    I remember -- I remember speaking, yes.

17 Q    And if we could show PX -- this is already in -- 2570 from

18 5:24 to -- sorry, from 4:24 to 4:35.

19      (Video playing.)

20 Q    Did you say those words in McIntire Park, Mr. Spencer?

21 A    Yes.

22 Q    And if we could introduce or show Mr. Spencer PX-3143.

23 This is a text.

24      Is this a text, Mr. Spencer, that you received from

25 Mr. Kessler at 2:18 on August 12th?

R. Spencer - Direct

1    A    Yes.

2             MR. BLOCH:  Judge, I offer PX-3143 in evidence and

3    publish to the jury.

4             THE COURT:  You may.

5             (Plaintiffs' Exhibit 3143 marked.)

6             (Plaintiffs' Exhibit 3143 admitted.)

7     BY MR. BLOCH:

8    Q    This is a text, Mr. Spencer, you received from Mr. Kessler

9    at 2:18 on August 12th.  And you said, "We're still meeting at

10   the after-party location" -- I'm sorry.  Mr. Kessler says,

11   "We're still meeting at the after-party location at 5 p.m.

12   Capacity is only 150 so leaders and essential people only.  We

13   need to talk about how we move forward.  Potentially having a

14   press conference in the near future to get our side of the

15   story out."  Right?

16   A    I see that, yes.

17   Q    And so Mr. Kessler was inviting you to the after-party

18   location for leaders and essential people only, right?

19   A    That's what he says, yes.

20   Q    And you then, if we could show -- sorry, we read this,

21   that he wanted to talk about how to get your side of the story

22   out, right?

23   A    Right.

24   Q    And if we could show Mr. Spencer PX-3092.

25             (Plaintiffs' Exhibit 3092 marked.)

179

R. Spencer - Direct

1  BY MR. BLOCH:

2  Q    Do you recognize this as a text, Mr. Spencer, from Eli

3  Mosley to you at 6:38 on August 12th?

4  A    I see that.

5          MR. BLOCH:  I would like to move this into evidence,

6  Judge.

7          THE COURT:  Be admitted.

8          (Plaintiffs' Exhibit 3092 admitted.)

9   BY MR. BLOCH:

10 Q    So at 6:38 p.m, Mr. Spencer, on August 12th you received a

11 text message from Eli Mosley that says, "Basically when you get

12 here, grab a drink, say a couple of words while everyone cheers

13 and then we're going to head upstairs with the people that

14 matter and talk about a press release.  Kyle Bristow is

15 suggesting that we do it."  Right?

16 A    Right.

17 Q    Now, you didn't have any -- no one had told you at that

18 point that you were a suspect in anything that happened that

19 day, right?

20 A    No one has ever told me that I'm a suspect in anything

21 that happened that day, Mr. Bloch.

22 Q    And Kyle Bristow is an attorney, right?

23 A    Yes.

24 Q    And he's an attorney that represents white nationalists,

25 right?

180

R. Spencer - Direct

1  A    He has done that in the past, yes.

2  Q    And Elliot Kline had told you that Kyle Bristow was

3  suggesting a press strategy, right?

4  A    Yes.

5  Q    And the leadership meeting that Mr. Kessler and Mr. Kline

6  are talking about in these texts, you did attend that meeting,

7  right?

8  A    Yes.

9  Q    That was actually the meeting where you did the tirade,

10 right?

11 A    Yes.

12 Q    Now -- we can take that down, Matt, thank you.

13      In the immediate aftermath of what happened on Saturday,

14 you and other leaders of the event initially decided to

15 coordinate a message to the press, right?

16 A    That was the idea behind that meeting, was, you know,

17 this -- so many things had happened, we definitely want to tell

18 our side of the story, you know, and having a clear and

19 consistent message is the best way to do that, sure.

20 Q    And initially your plan was to involve Mr. Kessler in the

21 coordination of that press strategy, right?

22 A    Yes.  I assumed so, yeah, that he would --

23 Q    And you've testified today that you don't like

24 Mr. Kessler, right?

25 A    I'm afraid so.

181

R. Spencer - Direct

1   Q    And isn't it true, Mr. Spencer, that the day after Unite

2   the Right you actually made a tactical decision to separate

3   yourself from Mr. Kessler?

4   A    You could say that, yes.  I felt like there was no point

5   in -- really in working with him in any way, yes.

6   Q    And so if we could just show Mr. Spencer 3142.

7        Do you recognize this as a text you sent to Greg Conte and

8   Evan McLaren on August 13th, I believe?

9   A    It's from myself to Greg Conte, yes.  To Evan and Greg,

10  yes.

11            MR. BLOCH:  Judge, I would offer PX-3142 into

12  evidence.

13            THE COURT:  Be admitted.

14            MR. BLOCH:  And published, please.

15            (Plaintiffs' Exhibit 3142 marked.)

16            (Plaintiffs' Exhibit 3142 admitted.)

17            MR. BLOCH:  And so -- if we could see the date.

18   BY MR. BLOCH:

19  Q    Mr. Spencer, on August 13th at 9:42 a.m. you sent a text

20  message to Greg Conte and Evan McLaren and you said, "Maybe a

21  strategy is to separate ourselves from Kessler," right?

22  A    Yes.

23  Q    And once you made that tactical decision, you texted him

24  to say you were separating from him, correct?

25  A    Texted Kessler?

R. Spencer - Direct

1   Q    Correct.

2   A    I -- probably the case, yes.

3   Q    And you said -- why don't we just show PX-3502.  Is this a

4   text message that you sent to Mr. Kessler on August 13th?

5   A    Yes.

6            MR. BLOCH:  I would move 3502 into evidence.

7            (Plaintiffs' Exhibit 3502 marked.)

8            THE COURT:  Be admitted.

9            (Plaintiffs' Exhibit 3502 admitted.)

10   BY MR. BLOCH:

11   Q    Mr. Spencer, you texted Mr. Kessler on August 13th after

12   you had made the choice to separate yourselves from him, that,

13   quote, "You are not listening to leadership," right?

14   A    Yes.

15   Q    You then --

16            MR. BLOCH:  We can take that down.  Thanks.

17   BY MR. BLOCH:

18   Q    You then coordinated your own press strategy with Nathan

19   Damigo and Greg Conte, correct?

20   A    Correct.

21   Q    You in fact came up with a set of talking points, right?

22   A    I'm sure I did.

23   Q    And you came up with a set of talking points so that

24   everyone in your group stayed on message, right?

25   A    Right.

R. Spencer - Direct

1    Q    And the talking points that you came up with so that

2    everybody stayed on message were, police broke up peaceful

3    rally, forced us into dangerous space with Antifa, right?

4    A    Again, if you show that -- that sounds right.  If you show

5    it to me, I can confirm.

6              MR. BLOCH:  If we could show first 3140B and then

7    3140A.

8              (Plaintiffs' Exhibit 3140A marked.)

9              (Plaintiffs' Exhibit 3140B marked.)

10    BY MR. BLOCH:

11    Q    Is this a text you received?

12    A    Yes.

13              MR. BLOCH:  I would move 3140B into evidence, Judge.

14              THE COURT:  Be admitted.

15              (Plaintiffs' Exhibit 3140B admitted.)

16    BY MR. BLOCH:

17    Q    Mr. Spencer, you received a text message at 8 p.m. on

18    August -- 8:05 p.m. on August 13th, 2017.  It said, "Richard,

19    Scott, Megan's friend, also did security for Jason.  I was

20    asked to be on a podcast and talk about our event.  Is there a

21    talking points type memo that you have that I can emphasize so

22    we're all staying on message?  I assume we're condemning the

23    violence and condemning the Charlottesville police department

24    for not enforcing our permit which ultimately led to violence?"

25    A    Yes.

R. Spencer - Direct

1    Q    And then if we could show 3140.

2         Is that a text message you sent in response, Mr. Spencer?

3    A    Yes.

4              MR. BLOCH:  I would move 3140A into evidence.

5              THE COURT:  Be admitted.

6              (Plaintiffs' Exhibit 3140A admitted.)

7     BY MR. BLOCH:

8    Q    And the talking points you came up with so that everyone

9    stayed on message were:  Police broke up peaceful rally, forced

10   us into dangerous space with Antifa, right?

11   A    Yes.

12             MR. BLOCH:  We can take that down.

13    BY MR. BLOCH:

14   Q    Now, you became aware of a lawsuit that had been filed

15   against you and all organizers of the rally on August 15th,

16   right?

17   A    That sounds right.

18   Q    And if we could show Mr. Spencer PX-3080.

19        Is that a text message you received?

20   A    Yes.

21             MR. BLOCH:  I would move PX-3080 into evidence and

22   published, please.

23             THE COURT:  Be admitted.

24             (Plaintiffs' Exhibit 3080 marked.)

25             (Plaintiffs' Exhibit 3080 admitted.)

R. Spencer - Direct

1  BY MR. BLOCH:

2  Q    Mr. Spencer, you received a text message on August 15th,

3  2017 from Evan McLaren.  It says, "Big lawsuit against you and

4  us.  All organizers included."  Right?

5  A    Yes.

6  Q    Now, Evan McLaren was a friend of yours, right?

7  A    He still is, yes.

8  Q    Still is.  And he was present for the meetings that you

9  had over the summer about Charlottesville, right?

10 A    I'm sure he was.

11 Q    And knowing you and the role that you played in all of

12 this, he seems to have regarded you as an organizer, right?

13 A    He said "you and us.  All organizers included."  I mean,

14 yes.  I mean, I was the most famous man in the alt-right.  I

15 think if there was going to be any -- you know, any kind of

16 suit or something like that, it would involve me.

17 Q    You then became aware of this lawsuit on August -- excuse

18 me, October 12th, right, 2017?

19 A    That sounds right.

20 Q    And would it be fair to say that you immediately began

21 coordinating again with your co-defendants?

22 A    I mean, you can show me this.  I'm sure that I coordinated

23 in some fashion with someone when a lawsuit is coming my way.

24 Q    Well, you immediately -- if we could show 3137.

25      Is this a text message that you sent to Matthew Heimbach

R. Spencer - Direct

1  on October 12th, 2017?

2  A    Yes.

3         MR. BLOCH:  I would move this into evidence, Judge,

4  PX-3137.

5         THE COURT:  Be admitted.

6         (Plaintiffs' Exhibit 3137 marked.)

7         (Plaintiffs' Exhibit 3137 admitted.)

8   BY MR. BLOCH:

9  Q    And on October 12th, 2017, you texted Matthew Heimbach and

10  said, "Don't say anything.  Establish legal defense fund."

11  Correct?

12  A    I said that.

13         MR. BLOCH:  If we could also show PX-1393.

14         (Plaintiffs' Exhibit 1393 marked.)

15   BY MR. BLOCH:

16  Q    Do you see this text message, Mr. Spencer?

17  A    I do.

18  Q    And is this --

19  A    I think it's to me.

20  Q    Is this a text that you received from Mr. Kessler on

21  October 12th?

22  A    Yes.

23         MR. BLOCH:  I would move 1393 into evidence.

24         THE COURT:  Be admitted.

25         (Plaintiffs' Exhibit 1393 admitted.)

R. Spencer - Direct

1   BY MR. BLOCH:

2   Q    And Mr. Kessler texted you on October 12th, 2017 and said,

3   "We need to have a coordinated response.  Enough with the

4   infighting," right?

5   A    Yes.

6           MR. BLOCH:  Now, if we could also show Mr. Spencer

7   PX-3077, as well as 3519.

8           THE CLERK:  I'm sorry.  Can you say that again?

9           MR. BLOCH:  3077.

10           THE CLERK:  And?

11           MR. BLOCH:  And 3519.

12           (Plaintiffs' Exhibit 3077 marked.)

13           (Plaintiffs' Exhibit 3519 marked.)

14   BY MR. BLOCH:

15   Q    Is this a text, Mr. Spencer, that you received from Colton

16   Merwin and responded to?

17   A    Yes.

18           MR. BLOCH:  I would move PX-3077 and 3519 into

19   evidence.

20           THE COURT:  Be admitted.

21           (Plaintiffs' Exhibit 3077 admitted.)

22           (Plaintiffs' Exhibit 3519 admitted.)

23   BY MR. BLOCH:

24   Q    You received a text, Mr. Spencer, from Colton Merwin on

25   March 12th, 2018 at 7:25 p.m., and he says:  "Myself and Jamie

R. Spencer - Direct

1   Troutman have been talking it over and we think a black-white

2   (alt-right/black nationalist) alliance might be necessary to

3   win over normies and have plausible deniability of

4   racism/hatred.  We'd love to meet up to talk more in-depth

5   about this idea."  Right?

6   A     Okay.  Yes.

7   Q     And you responded:  "I agree and I like it," right?

8   A     Yeah.  I like the idea of reaching out to black

9   nationalists.  I think it's a good idea.

10  Q     And particularly just focusing your attention on the part

11  where you say -- could I see the -- it "might be necessary to

12  win over normies and to have plausible deniability of racism,"

13  would it be fair to say that you discussed the idea of joining

14  with a black group to make yourselves seem less racist?

15  A     That's what Colton said.  I agreed with the idea.  I've

16  never been against those types of ideas in terms of, if there

17  can be some way that a group that is not white, but actually

18  can see eye-to-eye that we can do something together or at

19  least talk with each other, I'm -- I'm totally for that idea,

20  however you want to do it, however you want to think about it.

21  I'm not sure that linking up with black nationalists would win

22  over normies, to be honest.  But I'm pro-that idea still.

23  Q     You agree that there's nothing in the text from Mr. Merwin

24  that says there's any reason to do this other than winning over

25  normies and having plausible deniability?

R. Spencer - Direct

1   A    I just described my reasoning.  That is Colton's

2   reasoning.  This is my reasoning, as I have expressed.

3   Q    I'm almost done here, Mr. Spencer.

4        Mr. Spencer, you claim that what you wanted to do at Unite

5   the Right was give a speech, right?

6   A    Yes.

7   Q    And you claim that you were hoping to hear other people

8   give speeches, right?

9   A    Yes.

10  Q    And you claim that you were hoping that it was peaceful,

11  right?

12  A    Yes.

13  Q    And would it be fair to say that none of those things were

14  achieved?

15  A    Unfortunately, yes.

16  Q    In fact, what happened is you didn't get to give a speech,

17  right?

18  A    Right.

19  Q    Nobody from the alt-right got to give a speech, right?

20  A    Right.

21  Q    It was, in fact, incredibly violent, right?

22  A    It turned out to be tragic.  Absolutely.

23  Q    One woman was killed, right?

24  A    Yes.

25  Q    Dozens were maimed, right?

190

R. Spencer - Direct

1  A    Yes.

2  Q    And you told this jury last week that you have, quote,

3  "regrets" about being involved in the rally, right?

4  A    Yes.

5  Q    You told the jury last week that you thought

6  Charlottesville was a disaster, right?

7  A    Yes.

8  Q    And that sounds like the right thing to say in court,

9  doesn't it?

10  A    It's also the truthful thing.

11  Q    Well, you were interviewed hours after Heather Heyer was

12  killed, right?

13  A    I might have been.

14  Q    And what you said then was that it was a huge moral

15  victory in terms of the show of force, right?

16  A    I remember saying something to that effect.  I think it

17  was to the *New York Times*.

18  Q    And you also said in another interview that day that Unite

19  the Right "felt like a win because we demonstrated our

20  resolve," right?

21  A    That rings a bell of what I said.

22  Q    You thought at the time that Charlottesville was, quote,

23  "an amazing event because people were willing to occupy space,"

24  right?

25  A    I have said that.  I've -- you've already shown me images

R. Spencer - Direct

1  or audio of my saying that.  So yes, that rings true.

2           MR. BLOCH:  And if we could show Mr. Spencer PX-2569.

3           (Plaintiffs' Exhibit 2569 marked.)

4  BY MR. BLOCH:

5  Q    From 1:08:21.  This is -- it's actually audio is the

6  most -- it's video, but it's the audio that I want to play.

7       Is this you talking, Mr. Spencer?

8  A    Yes, that's me talking.

9           MR. BLOCH:  So I would move PX-2569 into evidence

10 from 1:08:21 to 1:08:57.

11          THE COURT:  Be admitted.

12          (Plaintiffs' Exhibit 2569 admitted.)

13          (Video playing.)

14  BY MR. BLOCH:

15 Q    Mr. Spencer, you said that Charlottesville "remains an

16 amazing event in terms of everyone working in parallel," right?

17 A    Yes.  I meant that.  I mean, thousands of people came to

18 one spot and were attempting to have a demonstration about a

19 very controversial subject.  And so that remains what it is.  I

20 have very complicated feelings towards Charlottesville,

21 particularly as I look back.

22 Q    What you said was "the sense of togetherness and boldness

23 and power was amazing"?

24 A    All of that -- all of that is true, particularly on Friday

25 night.  You know, there was a sense of coming together and so

R. Spencer - Direct

1   on.  Again, I have a complicated view of Charlottesville.  And

2   I do have a great deal of regrets, and I was aware on

3   August 12th that we had run up against a brick wall, as I said,

4   that this turned very tragic and a disaster.  That was one of

5   the reasons why you can see, as evidenced in many of the things

6   you've played, that I was in a state of extreme agitation.  And

7   I was deeply frustrated.

8        I did say -- I think I did tell the *New York Times* it was

9   a moral victory.  I think you -- a moral victory is another

10  word for a loss.  That's what you say when, well, we did

11  something right, but it all didn't work out.  And that is -- I

12  have complicated feelings on that day.  I had intense emotions

13  on the day of August 12th, particularly after learning about

14  deaths and serious injuries and just chaos.

15       As time has gone on, I do have a complicated retrospective

16  look-back at Charlottesville.  And there are a lot of different

17  emotions.  Some things actually were good from my perspective.

18  There was a lot that's very bad.  And, you know, I do have

19  regrets as well.  That is my human response to being involved

20  in this incident.

21  Q    So the question was:  What you said was "the sense of

22  togetherness and boldness and power was amazing."  Did you

23  say --

24  A    Those were some good things, as I just said, yes.  There

25  were some good things and many tragic things.

193

R. Spencer - Cross

1  Q    Isn't it true, Mr. Spencer, that the reason why you

2  thought Charlottesville was amazing is because you accomplished

3  exactly what you set out to do?

4  A    Absolutely not.

5         MR. BLOCH:  I have nothing further, Judge.

6         THE COURT:  All right.

7                     CROSS-EXAMINATION

8  BY MR. KOLENICH:

9  Q    Good afternoon, Mr. Spencer.

10 A    Good afternoon.

11 Q    As you're aware, I represent Jason Kessler, Nathan Damigo,

12 and Identity Evropa; do you recall that?

13 A    Yes.

14 Q    Do you still have your deposition up there?

15 A    I do.

16 Q    Would you please turn to page 188?

17 A    Got it.

18 Q    Would you agree with me that on page 188 you testified

19 that Elliot Kline stopped often at your Alexandria, Virginia

20 residence during the summer of 2017?

21 A    Yes.

22 Q    Why did Mr. Kline stop often at your residence in the

23 summer of 2017?

24 A    Well, Eli Kline was just very energetic, and he -- as he's

25 bragged about in much of the evidence that we've seen, he

R. Spencer - Cross

1    wanted to just be talking to everyone and be everyone's friend,

2    and I think he accomplished that for at least a short period of

3    time.  So he would stop by for all sorts of reasons.  Many of

4    those had nothing to do with the UTR rally.

5         But yes, throughout the summer of 2017, he would stop by

6    and talk and all sorts of things like that.

7    Q    Did you tell Mr. Bloch that he provided bodyguard services

8    for you at one point?

9    A    He has done that.  So on April -- in April of 2017 we did

10   a demonstration that was unrelated to Unite the Right, and he

11   was a bodyguard then.  And I don't believe he acted as a

12   bodyguard during the Charlottesville event.

13   Q    When he's provided bodyguard services to you, was he also

14   a member of Identity Evropa?

15   A    I believe so.

16   Q    Was he an officer of Identity Evropa?

17   A    In April of 2017?

18   Q    Yes.  Yes.

19   A    I don't know the ins and outs of it, to be honest, but I

20   don't think so.

21   Q    Very well.  Can you explain how a member of Identity

22   Evropa came to be employed by you as a bodyguard?

23   A    He was not employed in the sense of being paid.  It was a

24   volunteer.  I think he wanted to be around Richard Spencer who

25   at the time was a -- you know, an anti-celebrity of sorts.  I

R. Spencer - Cross

1    think he wanted to be around there -- around me.

2    Q    Do you recall telling Mr. Bloch about a movement -- do you

3    recall -- withdrawn.

4         Do you recall when Mr. Bloch asked you about starting a

5    movement?

6    A    I vaguely recall that.

7    Q    Mr. Bloch asked you:  "Does not a movement need leaders,

8    followers, and foot soldiers?"  Do you recall that?

9    A    I recall that, yes.

10   Q    You're aware that in the summer of 2017 -- well,

11   withdrawn.

12        Are you aware that in the summer of 2017 Identity Evropa

13   was the largest alt-right organization in the United States?

14   A    That doesn't surprise me to learn that it was the largest.

15   Q    Are you aware how many members they had, dues-paying

16   members, at the time?

17   A    I don't know the exact number.  I never looked into it,

18   but I don't know.

19   Q    If I told you it was well in excess of 1,000, would you

20   have any reason to doubt that?

21   A    Well in excess of 1,000?

22   Q    Yes.

23   A    I just simply don't know.  That sounds like a little much,

24   to be honest, if I'm just answering honestly, but I don't know

25   the exact numbers.

R. Spencer - Cross

1  Q    You seem surprised, Mr. Spencer.  Did you not just a

2  moment ago tell me that you didn't really know anything about

3  the inner workings of Identity Evropa?

4  A    Well, that's what I'm saying.  I don't know the inner --

5  excuse me.

6       I don't know the inner workings of Identity Evropa.

7  That's what I'm saying.  I'm a little bit surprised by saying

8  well in excess of 1,000.  I'm just estimating.  I don't know.

9  Q    Why would you be surprised if you don't know anything

10 about their interior matters?

11 A    I have no idea what you're getting at.  I mean, I'm simply

12 thinking about groups.  That number surprises me a bit.  But I

13 don't know.

14          THE COURT:  Well, you asked him a question and he

15 gave you his answer.  So...

16          MR. KOLENICH:  Yes.

17          THE COURT:  I mean, that's why he gave you an answer.

18          MR. KOLENICH:  Thank you, Your Honor.

19  BY MR. KOLENICH:

20 Q    Mr. Spencer, you testified you know who Greg Conte is; is

21 that correct?

22 A    Yes.

23 Q    Who is Greg Conte?

24 A    Greg Conte was a friend of mine and we had a podcast,

25 among other things.  He worked with me in all sorts of ways.

R. Spencer - Cross

1  Q    And was he not also supposed to be a member of Identity

2  Evropa?

3  A    I don't know whether he was a member or not.  It wouldn't

4  surprise me, but I simply don't know.

5  Q    Did you tell Mr. Bloch that you sent Greg Conte to a

6  leadership meeting at McIntire Park?

7  A    I don't think I used -- are those the exact words I used?

8  Q    I'm asking you.

9  A    I sent -- no, I don't think I said I sent.

10 Q    Would you please turn to page 177 of your deposition?

11 A    Okay.

12 Q    Page 177, line 14.

13      Question:  "Okay, but Greg Conte would communicate with

14 other organizers like Kessler and Kline and then report back to

15 you whenever you needed to know about Unite the Right,

16 correct?"

17 A    Right.

18 Q    Your answer:  "Yes, or not report back to me, yes."

19      Question:  "Okay, but that was, however -- however well he

20 did that job, that was a component of his responsibilities,

21 correct?"

22      Your answer:  "Correct."

23      Do you see that testimony?

24 A    Yes.

25 Q    Did you say that?

R. Spencer - Cross

1    A    I said that testimony, yes.

2    Q    Could you explain how it is that Greg Conte has

3    responsibilities towards you?

4    A    Well -- you want me to explain that to you now?

5    Q    Yes, please.

6    A    Okay.  Greg Conte was very enthusiastic about things like

7    security and demonstrations and so on.  So he was in charge of

8    that kind of stuff for me.  And he would report back to me

9    or -- as I was suggesting, or not.  He kind of would just act

10   on his own.  He was the rather silent type.  I mean, I don't

11   know what to say.  I said that.  That's accurate.

12   Q    Let me see if I understand.  Mr. Kline provided bodyguard

13   services to you because he's enthusiastic to be around you and

14   Mr. Conte went to leadership meetings and reported back to you

15   because he's enthusiastic about reporting back to you; is that

16   your testimony?

17   A    No.

18   Q    Did you not just use the phrase "enthusiastic" to respond

19   to both questions?

20   A    I said Greg Conte is enthusiastic about doing activism and

21   demonstrations and about security matters and so on.  That's

22   what I just said.  I don't know what you're getting at.

23   Q    Allow me to be explicit.  I'm getting at:  Were you not

24   paying these men to provide services for you?

25   A    I was not paying Elliot Kline.  Greg was paid, I think at

R. Spencer - Cross

1  some point, but Greg was much closer to me.

2  Q    Mr. Spencer, what is your source of income?

3  A    My source of income -- what, during 2017?

4  Q    Sure.

5  A    Was donations.  It was a -- yes, it was donations to the

6  various things that I would do.

7  Q    So alt-right donations?

8  A    Right.

9  Q    What was, if you know, Identity Evropa's source of income?

10 A    Dues --

11          MR. BLOCH:  Objection, foundation, Judge.

12          THE WITNESS:  Right.  That's actually -- from what I

13 understand, dues and donations --

14          MR. BLOCH:  Objection, Judge.

15          THE COURT:  Excuse me?

16          MR. BLOCH:  I'll withdraw, Judge.

17          MR. KOLENICH:  I'll restate the question -- I'm

18 sorry.  Withdraw the prior question.

19          THE COURT:  I'm sorry.  I got a note and I was

20 looking at the note.

21          MR. KOLENICH:  That's all right, Your Honor.  We've

22 withdrawn everything that we were talking about.  We'll start

23 over.

24  BY MR. KOLENICH:

25 Q    Did Eli -- sorry.

R. Spencer - Cross

1      Did Elliot Kline, or Eli Mosley, ever talk to you about

2    Identity Evropa's source of income?

3    A    I'm sure he talked to me about it at some point, but

4    again, it's a membership organization.  It's fair to assume

5    that its -- the income is based on dues.

6    Q    Very well.  Did Greg Conte ever talk to you about Identity

7    Evropa's source of income?

8    A    I don't think so, no.

9    Q    You told Mr. Bloch about a man named Evan McLaren, did you

10   not?

11   A    Yes.

12   Q    Was he a member of Identity Evropa?

13   A    I think so.

14   Q    What did he do for you?

15   A    He was executive director and just all-around

16   collaborator.  On the podcast --

17   Q    Executive director of -- I'm sorry.  Are you done with

18   your answer?

19   A    Well, I'll finish.  Executive director of NPI.  And we did

20   podcasts.  We were friends as well.

21   Q    So he was employed by you at NPI?

22   A    Yes.

23   Q    Did you tell Mr. Bloch that you attended a meeting with

24   David Duke, Greg Conte, and Elliot Kline at one point?

25   A    Yes.  I believe when we arrived in Charlottesville we went

R. Spencer - Cross

 1   and grabbed a bite to eat and a drink and David Duke came and

 2   wanted to meet me.

 3   Q    Very well.  Mr. Spencer, is it true that your credit card

 4   was once rejected for a $4 tab at a coffee house?

 5   A    That was -- I think that happened in 2018.

 6        Not quite.  I don't think it was actually rejected.  And

 7   it was at a bar.  I remember that became a meme on Twitter

 8   because there's a bar in Whitefish that I don't go to because I

 9   think they dislike me pretty intensely there.  And that became

10   a meme.  I'm not sure it was actually rejected, but yeah.

11   Q    All right.  So your answer is you're not sure?

12   A    I was correcting you.  You said a coffee house.

13        THE COURT:  What's the point?  What is the relevance

14   of this?

15        MR. KOLENICH:  Could I have one or two more

16   questions?

17        THE WITNESS:  I mean, I've had my credit cards --

18        THE COURT:  All right.

19        THE WITNESS:  -- rejected plenty of times --

20        THE COURT:  Okay.  Mr. Spencer --

21        THE WITNESS:  -- for various reasons.

22        THE COURT:  Let him ask a question.  Go ahead.

23    BY MR. KOLENICH:

24   Q    Mr. Spencer, is it not true that in the summer of 2017 you

25   were attempting to grow your own organization within the

R. Spencer - Cross

1  alt-right?

2  A    Sure.  I mean, I don't know what to say.  I'm always

3  trying to grow.  That's just kind of almost a redundant

4  question.

5  Q    Were you trying to grow your own dues-based organization

6  within the alt-right?

7  A    When?

8  Q    In the summer of 2017?

9  A    No.

10  Q    No?

11  A    No.

12  Q    You didn't want to grow the movement?

13  A    I didn't say that.  I just said -- you asked, do you want

14  to grow your organization?  Of course.  That seems almost a

15  redundant question.

16     Did you want to grow a dues-paying organization in the

17  summer of 2017?  The answer is no.

18  Q    Did you send Elliot Kline and tell him to join the group

19  Identity Evropa?

20  A    No.

21  Q    Did you tell Greg Conte to join the group Identity Evropa?

22  A    No.

23  Q    Did you tell Evan McLaren to join the group Identity

24  Evropa?

25  A    No.

R. Spencer - Cross

1  Q    Do you know why Elliot Kline was pushed out of Identity

2  Evropa by Nathan Damigo?

3  A    I don't know.

4  Q    Do you know the time frame that happened?

5  A    If -- you can correct me if I'm wrong -- I believe it was

6  October of 2017.

7  Q    So in the immediate aftermath of the Unite the Right

8  event?

9  A    Not exactly the immediate aftermath, but in the aftermath.

10 Q    Mr. Spencer, do you recall in several of the videos you

11 were shown by the plaintiffs that you were walking behind an

12 Identity Evropa flag?

13 A    Yes.  That would happen.

14 Q    How often did you communicate with Elliot Kline in the

15 runup to Unite the Right?

16 A    We communicated quite a bit.

17 Q    What does "quite a bit" mean, if you could quantify that?

18 A    If not every day, certainly many times per week.  There

19 were a lot of text messages about all sorts of things.

20 Q    Mr. Spencer, were you attempting through your employment

21 or other relationship with Kline, McLaren, or Conte to take

22 control of the group Identity Evropa?

23 A    No.  We finally got to the conspiracy theory.  I'm happy.

24 No.  It's amusing, but no.

25 Q    So you've heard this allegation before?

R. Spencer - Cross

1   A    The amount of allegations I have heard about me is

2   unfathomable.  I have not -- I guess I probably heard something

3   like this.  I was wondering what you were getting at.  That's

4   cute.  No.

5   Q    So you recognize what I'm getting at now?

6   A    I recognize what you're getting at, which is that people

7   make all sorts of unfounded claims about me.  And here is yet

8   another.

9   Q    On the subject of unfounded claims, Mr. Damigo --

10           MR. KOLENICH:  Could we see Plaintiffs' 2514 again,

11   please?

12           (Video playing.)

13           MR. KOLENICH:  Could you stop it?  Could you just

14   play it muted?  I'd like the witness to just focus on the

15   images.

16           Is it possible to go frame-by-frame or more slowly?

17   No?  Okay.

18   BY MR. KOLENICH:

19   Q    Mr. Spencer, could you please watch this video and just

20   tell us when you see Nathan Damigo?

21   A    Someone -- I'm not sure -- someone sort of looked like

22   Nathan Damigo that I saw, but I'm not positive about that.

23           MR. KOLENICH:  Could you run the video again, please?

24           (Video playing.)

25           THE WITNESS:  Yeah, I'm wondering if that -- I can't

<sub>205</sub>

R. Spencer - Cross

1  tell for certain.  You know, I wouldn't want to identify anyone

2  in that.  I can identify myself.  I wouldn't want to identify

3  anyone.  It's blurry and their faces are obscured, and they're

4  not --

5  BY MR. KOLENICH:

6  Q    Did you not tell Mr. Bloch that Nathan Damigo was in this

7  video?

8  A    I didn't say that he was in that video.  I think I said

9  that he was at that party.

10 Q    Is it your testimony, sir, to this jury that in the runup

11 to Unite the Right in the summer of 2017 you were not, in fact,

12 sending your employees into Identity Evropa to take control of

13 that organization?

14 A    Yes.  I'm telling them that.  That's absurd.

15 Q    Who was Elliot Kline working for at the Unite the Right

16 event?

17 A    He was working for Identity Evropa.  He was not my

18 bodyguard, nor was he around me at the time.

19 Q    He was providing bodyguard services to you, right?

20 A    He provided bodyguard services for me.  This is amusing.

21 He provided bodyguard services for me in April at a completely

22 unrelated demonstration.

23 Q    He met with you frequently at your residence in

24 Alexandria, Virginia?

25 A    Yes.

R. Spencer - Cross

1  Q    Mr. Conte had obligations to report to you,

2  responsibilities to you, correct?

3  A    Yes.

4  Q    And Mr. McLaren was actually employed by you at the NPI;

5  is that correct?

6  A    Yes.

7  Q    And yet you're telling this jury that you had nothing to

8  do with those men joining IE; is that correct?

9  A    Yes.  I think they joined -- I think Evan joined long

10  before he came to work for me.  But I don't know.

11         MR. KOLENICH:  Thank you, Mr. Spencer.  I have no

12  further questions.

13         THE COURT:  Okay.  Let me bring up one thing here.

14         Dillon Hopper, who is on Zoom, is asking if there

15  will be a time for him to ask Mr. Spencer questions.  He's not

16  a lawyer and he's not permitted to represent him and he's not a

17  party.  So I don't know of any way he has a right to ask any

18  questions.  So his answer is no.

19         MR. KOLENICH:  Yeah, I don't think he can, Your

20  Honor.

21         THE COURT:  Okay.  Who is next?

22         MR. CANTWELL:  I could go.  I don't know if any of my

23  co-defendants have shorter things.  I'm probably going to be a

24  little while, Mr. Spencer.

25         Do you have many questions, Mr. Jones?

R. Spencer - Cross

1          (Discussion off the record.)

2              MR. JONES:  Do you want to go first?

3              MR. CAMPBELL:  Sure.

4                      CROSS-EXAMINATION

5   BY MR. CAMPBELL:

6   Q    Good afternoon, Mr. Spencer.

7   A    Good afternoon.

8   Q    As you know, I represent James Fields.

9   A    Yes.

10  Q    Just a few questions for you.

11       Prior to August 12th, did you know the name James Fields?

12  A    No.  I learned of it from the news after the car incident

13  was reported.

14  Q    Yes, sir.  And following that, you've seen his picture

15  many times, I'm sure?

16  A    Yes.

17  Q    Did that refresh your recollection or do you recall ever

18  seeing James Fields at any alt-right rally, event, planning

19  meeting, or anything along those lines?

20  A    I had no communication with James Fields whatsoever.  I've

21  never had communication with James Fields, to my knowledge.

22  But I do know him simply from the media reports.

23  Q    And in your mind, when was the Unite the Right rally over?

24  A    Well, I think you could say when the state of emergency

25  was called.  I mean, that's when -- around noon on August 12th.

R. Spencer - Cross

 1  That's when it was just clear that no Unite the Right rally was

 2  going to really take place.  So that's how I would understand

 3  it.

 4  Q    And do you recall some of the planning materials and the

 5  fliers and that sort of thing, some of which were shown to you

 6  during your testimony earlier today?

 7  A    I recall those, yes.

 8  Q    Do you recall them listing a location and a time for the

 9  Unite the Right rally to begin?

10  A    Yes.  I believe it was noon on -- in Lee Park or

11  Emancipation Park.

12          MR. CAMPBELL:  Thank you, sir.  I don't have any more

13  questions.

14          THE WITNESS:  Thank you.

15          MR. CAMPBELL:  Thank you, Your Honor.

16                      CROSS-EXAMINATION

17   BY MR. JONES:

18  Q    Good afternoon.  I represent Michael Hill, Michael Tubbs,

19  and League of the South.

20  A    Yes.

21  Q    During your testimony you testified that there were some

22  of the groups that attended -- that were planning on attending

23  the rally that splintered off from Jason Kessler's plans for

24  the rally.  Do you remember that?

25          MR. BLOCH:  Objection.  Mischaracterizes testimony.

209

R. Spencer - Cross

1          THE COURT:  Well, repeat that.  Listen, Mr. Spencer,

2    carefully.

3          Okay.  Go ahead.

4          MR. JONES:  I'll just rephrase.

5     BY MR. JONES:

6    Q    Do you recall testifying earlier today that there was a

7    group of people or organizations coming to the Unite the Right

8    that developed a different set of plans from Jason Kessler's

9    main set of plans?

10          MR. BLOCH:  Objection.  Mischaracterizes testimony.

11          THE COURT:  Well, the jury has to recall what the

12    evidence was.  Do you recall -- what did you testify to in that

13    regard?

14          THE WITNESS:  I'm not sure I testified to that.

15     BY MR. JONES:

16    Q    You don't recall?  Okay.  That's fine.

17         What year did you graduate from UVA?

18    A    2001.

19    Q    And you testified that although there was some dispute,

20    you're one of the -- if not the person who coined the term

21    "alt-right"; is that right?

22    A    Correct.

23    Q    Approximately when did that happen?

24    A    It was while I was involved with a group called the

25    Mencken Club, and that was around a figure named Paul

R. Spencer - Cross

1   Gottfried, who was a mentor of mine.

2   Q    Can you tell me a year, approximate year?

3   A    I'm kind of refreshing my memory as I go.  He wrote an

4   article about something like an alt-right.  I remember titling

5   it when I was editing Taki's Magazine, "The Rise of the

6   Alt-Right" or something like that.  So if I were to give a

7   year, maybe 2009 or something like that when I started using

8   the term "alternative right."  And I actually started a website

9   called "alternativeright.com" in 2010.  So it was around that

10  period that the alt-right term began circulating.

11  Q    Do you know or would you consider white nationalism and

12  southern nationalism to be distinct from each other?

13  A    They are distinct, yes.

14  Q    If you know, what groups represent southern nationalism?

15  A    Well, I've -- I know of the League of the South.  I know

16  of Dr. Michael Hill.  I know of figures like Brad Griffin who

17  have more of a southern populist bent.

18  Q    And what groups -- specifically we'll just limit this to

19  the groups that attended the Unite the Right rally.

20  A    Okay.

21  Q    What groups that attended the Unite the Right rally would

22  you describe as white nationalist groups?

23  A    Well, probably most all of them who are defendants.  I

24  think we're using the term -- you know, there are obviously

25  plenty of disagreements and people have kind of different

R. Spencer - Cross

1   foundations and principles, but if we're using "white

2   nationalism" as a kind of broad stroke or tenet, I would say

3   that kind of fairly characterizes most all of them.

4   Q    So you attended the torch march on August 11th.

5   A    Yes.

6   Q    Did you see Michael Hill or Michael Tubbs at the torch

7   march?

8   A    I don't remember seeing them.

9   Q    Do you know whether they were involved in planning the

10  torch march?

11  A    I have no --

12          MR. BLOCH:  Objection, foundation.

13          MR. JONES:  I think he can answer if he knows

14  whether -- if he --

15          THE WITNESS:  I don't know that.  I have no idea.

16   BY MR. JONES:

17  Q    Do you remember whether you asked anybody who worked for

18  you, like Greg Conte, to contact Michael Hill or Michael Tubbs

19  to plan for the torch march?

20  A    I don't think I asked Greg Conte or anyone like that to

21  contact Michael Tubbs, no.

22          MR. JONES:  That's all the questions I have, thank

23  you.

24          THE COURT:  All right.

25          MS. KAPLAN:  Can I just grab our computer, Your

R. Spencer - Cross

1    Honor.

2                        CROSS-EXAMINATION

3     BY MR. CANTWELL:

4    Q    Hello, Mr. Spencer.

5    A    Hello.

6    Q    There are four text messages which I'd like to bring up

7    one right after the other.  And perhaps it would be better if I

8    just said them all right up front.  I think plaintiffs' counsel

9    brought up Plaintiffs' Exhibit 3146A, and I'd like to bring in

10   3146B, 3146C --

11             THE CLERK:  Are these new exhibits?

12             MR. CANTWELL:  I believe they are.

13             THE CLERK:  Can you slow down and repeat it.

14             MR. CANTWELL:  I'm sorry.  I think plaintiffs'

15   counsel brought in -- I think 3146A has been admitted into

16   evidence.  I'd like to bring in 3146B, 3146C, and 3146D.

17             (Plaintiffs' Exhibits 3146B, 3146C, and 3146D

18   marked.)

19             MR. CANTWELL:  If we can do that, I'd like to publish

20   my screen to the jury while I show these to Mr. Spencer.

21             THE COURT:  Go ahead.

22             (Plaintiffs' Exhibits 3146B, 3146C, and 3146D

23   admitted.)

24    BY MR. CANTWELL:

25   Q    Richard, the text message that plaintiffs' counsel showed

213

R. Spencer - Cross

 1  you, which was a group message from Augustus Invictus to --

 2  this is 3146A we're looking at.  I think that's on your screen.

 3  This was from Augustus Invictus to Nathan Damigo, me, a number

 4  that we don't have identified here, Mr. Hill, Mr. Kessler, and

 5  that seems to be the end of that list.  That sound about right

 6  to you?

 7  A    That's what it looks like, yes.

 8  Q    In the body of the message it just says "negative."

 9  A    Right.

10  Q    And the time on that is 6:54 p.m, right?

11  A    Right.

12  Q    I'm sorry.  Wait a second.  I've got two different times

13  here.  Oh, that's the read date.  The date is -- the date and

14  time is 5:56 -- I was looking at the read date, it's below

15  that.

16  A    Right.

17  Q    I'm going to go back over here to 3146D.  And we will

18  notice, I think, the time is different.  The time is 5:52,

19  which is earlier than 5:56, right?  So it's the same people in

20  that message except it's from Jason Kessler to Nathan Damigo,

21  Christopher Cantwell, 951 number, Augustus Invictus, Michael

22  Hill.  And this is from your iPad, so presumably you're on this

23  as well, right?

24  A    Right.

25  Q    The first message in this chain is, "Getting a lot of

R. Spencer - Cross

1   requests from press.  If you're interested in speaking to them

2   and want me to pass on your contact info, let me know."  That

3   look about right to you?

4   A     Yeah, I actually remember that.

5   Q     You remember getting that message?

6   A     I do.

7   Q     And when plaintiffs' counsel asked you about this message

8   chain, they asked you if everybody on that list were leaders --

9   A     Right.

10  Q     -- of the event, right?

11        Were you here for my opening statement?

12  A     Yes, I was.

13  Q     Did your hear me deny that I was --

14        MR. BLOCH:  Objection.

15        THE COURT:  Just ask him a question, not --

16   BY MR. CANTWELL:

17  Q     Okay.  Describe, if you would --

18        THE COURT:  Just a minute.  What's the objection?

19  Because I know in your examination several times you referred

20  to an opening statement.

21        MR. BLOCH:  He's asking the witness if the witness

22  heard Mr. Cantwell deny in his opening statement.  And I

23  assume -- I don't know where that was going, but that's an

24  improper -- it's irrelevant and an improper line of cross.

25        MR. CANTWELL:  I can rephrase the question.

R. Spencer - Cross

1           THE COURT:  Go ahead.

2    BY MR. CANTWELL:

3  Q    Could you please describe my leadership role in Unite the

4  Right?

5  A    As I understand it, I don't know exactly your leadership

6  role in Unite the Right.  You were a personality who was

7  involved in some fashion.  You were set to speak.  I don't know

8  the degree to which you helped organize.  I don't know all your

9  plans because I was not with you during most of the time.

10 You -- again, you were a personality podcaster, etc, who was

11 invited there.  That's how I understand it.

12 Q    Right.  You mentioned I was a podcaster, and I see in this

13 message here -- well, what happened here?

14      In this message chain that we're looking at, Mr. Kessler

15 is asking -- because he was getting a lot of requests from the

16 press, right?

17 A    Right.

18 Q    And so -- yeah, so there's that.  There's another thing --

19 A    I think he's sending out -- he's sending out a message to

20 other people who are well-known or open advocates, just saying

21 would you like to talk to the press.

22 Q    So at least from -- would it be fair to say that from the

23 context of that message, there is not a clear indication that

24 the people on that message are leaders of the event; is that

25 fair to say?

R. Spencer - Cross

 1              MR. BLOCH:  Objection.  The document speaks for

 2    itself, Judge.

 3              THE COURT:  Answer the question, if you know.

 4              THE WITNESS:  There is no -- there is nothing more

 5    that that document says.  It does speak for itself.  There's

 6    nothing more that that document says other than a bunch of

 7    journalists are contacting me.  Do you guys want to talk to

 8    them.  That's all that it says.

 9    BY MR. CANTWELL:

10    Q    To the best of your knowledge, did I end up speaking to

11    journalists at the Unite the Right rally?

12    A    I'm sure you did, yes.

13    Q    Might have heard something about that?

14    A    Yeah.

15              MR. CANTWELL:  All right.  And then I believe

16    Plaintiffs' Exhibit 2562 I believe is already in evidence.  Is

17    that fair?  Is that right?

18              THE CLERK:  Yes.

19    BY MR. CANTWELL:

20    Q    And so, you were asked by plaintiffs' counsel about a

21    chant at this DC free speech rally about Moldylocks, right?

22    A    Yes.

23    Q    I believe plaintiff's counsel asked you if I was joining

24    in that chant, and I believe you answered in the affirmative;

25    does that sound accurate?

R. Spencer - Cross

1            MR. BLOCH:  Objection.  Mischaracterizes testimony.

2            MR. CANTWELL:  I apologize.  Well, let me just play

3    this and then I'll ask you a question about this exhibit that

4    was brought up by plaintiffs' counsel.

5            (Video playing.)

6     BY MR. CANTWELL:

7    Q    I think you and I can agree I'm right about here; is that

8    right?

9    A    Yes.

10   Q    So I'm just going to go ahead and play that video.

11       (Video playing.)

12   Q    You see me drinking my Gatorade while that chant was going

13   on?

14   A    I did.  To be perfectly fair, you were not chanting

15   alongside the other people chanting "Moldylocks," for whatever

16   that's worth.

17   Q    Okay.  Just grab a couple papers.

18       You know what?  Since we have a limited amount of time

19   here, would plaintiffs' counsel, could you pull up my text

20   messages with Mr. Spencer?  Could you guys do that for me?

21           MR. BLOCH:  Sure.

22           MR. CANTWELL:  Thank you.  This computer, I don't

23   have the capacity to pull up spreadsheets and I believe that's

24   the format I gave that to you in.

25    BY MR. CANTWELL:

R. Spencer - Cross

1  Q    Okay.  And so I think -- I'm sorry, let me get my bearings

2  here.

3  A    This reminds me of something.

4          THE COURT:  Wait a minute.  What's the question?

5          THE WITNESS:  Okay.

6   BY MR. CANTWELL:

7  Q    The question is what does this remind you of, Mr. Spencer?

8  A    This reminds me of something --

9          MR. BLOCH:  Objection, Judge, to what the text

10 messages remind him of.

11         THE COURT:  What is the question?

12  BY MR. CANTWELL:

13 Q    We're looking at August 7th right now, and we're all the

14 way at the bottom?  I'm a little bit confused.  Here we go.

15     I'm seeing my messages with Mr. Spencer go from August 7th

16 to -- all right.  Okay.  I'm thinking that this -- I apologize.

17 Okay.  Now I have my bearings.

18     Could we go up one message at a time just so I have this

19 particular conversation in my view.  Just scroll up so I see

20 who's at the top of the screen.

21     Okay.  Wait.  All right.  "Leaving now.  See you soon."

22     I asked you on August 7th, 2017, "You have time for a

23 phone call in a little while?"

24     (Reporter clarification.)

25     On August 7th, 2017, I said, "You got time for a phone

R. Spencer - Cross

1    call in a little while?  I want to talk to you about this

2    permit issue."

3         Do you recall this conversation, Mr. Spencer?

4    A    I remember seeing this earlier, yes.

5    Q    Okay.  Would it be fair to say you sort of blew me off

6    there?

7    A    Yes.

8    Q    Later on in that conversation I say to you, "My concern is

9    Kessler wants to do it there regardless and I want to have his

10   back, but I can't risk my carry permit."  Right?

11   A    Right.

12   Q    You say, "We must proceed as planned."  I say -- what's

13   the next message there, Mr. Spencer, from me?

14   A    "Sounds like the plan just went up on smoke."  I presume

15   you meant in smoke.  "How far do we deviate seems to be the

16   question.  I agree that it must be minimal."

17   Q    Then the next message is also from me.  Would you read

18   that also?

19   A    "I'm willing to risk a lot for our cause, including

20   violence and incarceration.  Many in my audience would follow

21   me there too, but I want to coordinate and make sure it's worth

22   it to our cause."

23   Q    And Mr. Spencer, risk is -- would you say that risk is

24   something that is sort of inherent in our line of work?

25   A    Absolutely.  Yes.

R. Spencer - Cross

1  Q    Okay.  And --

2           THE COURT:  Okay.  We're at a point we can stop until

3  tomorrow.

4           MR. CANTWELL:  Okay.

5           THE COURT:  Members of the jury, we're going to

6  recess now until 9 o'clock tomorrow morning.  Do not discuss

7  the case with anyone or remain within the hearing of anyone

8  discussing it.  Don't watch TV, listen to anything at all.

9  Thank you.  You may retire.

10  **(Jury out, 4:55 p.m.)**

11           THE COURT:  See you all at 9 o'clock.

12  (Proceedings adjourned, 4:56 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

R. Spencer - Cross

1              C E R T I F I C A T E

2      I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3  the United States District Court for the Western District of

4  Virginia, appointed pursuant to the provisions of Title 28,

5  United States Code, Section 753, do hereby certify that the

6  foregoing is a correct transcript of the proceedings reported

7  by me using the stenotype reporting method in conjunction

8  with computer-aided transcription, and that same is a

9  true and correct transcript to the best of my ability and

10 understanding.

11      I further certify that the transcript fees and format

12 comply with those prescribed by the Court and the Judicial

13 Conference of the United States.

14      /s/ Lisa M. Blair                Date: November 4, 2021

15

16

17

18

19

20

21

22

23

24

25