Sines, et al. v. Kessler, et al., 3:17CV72, 11/5/2021

```
 1                   UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF VIRGINIA
 2                    CHARLOTTESVILLE DIVISION

 3  *************************************************************

 4  ELIZABETH SINES, ET AL.,    CIVIL CASE NO.:  3:17CV72
                                NOVEMBER 5, 2021, 8:59 AM
 5                              JURY TRIAL, DAY 10
          Plaintiffs,
 6  vs.

 7                              Before:
                                HONORABLE NORMAN K. MOON
 8                              UNITED STATES DISTRICT JUDGE
    JASON KESSLER, ET AL.,      WESTERN DISTRICT OF VIRGINIA
 9
          Defendants.
10
    *************************************************************
11
    APPEARANCES:
12

13  For the Plaintiffs:    ALAN LEVINE, ESQUIRE
                           AMANDA LIVERZANI, ESQUIRE
14                         COOLEY LLP
                           1114 Avenue of the Americas, 46th
15                         Floor
                           New York, NY  10036
16                         212.479.6260

17                         DAVID E. MILLS, ESQUIRE
                           COOLEY LLP
18                         1299 Pennsylvania Avenue, NW,
                           Suite  700
19                         Washington, DC  20004
                           202.842.7800
20

21

22  Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                      255 West Main Street, Suite 304
23                    Charlottesville, Virginia  22902
                      434.296.9284
24
    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25  TRANSCRIPT PRODUCED BY COMPUTER.
```

Sines, et al. v. Kessler, et al., 3:17CV72, 11/5/2021

1  APPEARANCES CONTINUED:

2  For the Plaintiffs:          MICHAEL L. BLOCH, ESQUIRE
                                EMILY C. COLE, ESQUIRE
3                               ROBERTA A. KAPLAN, ESQUIRE
                                Kaplan Hecker & Fink LLP
4                               350 Fifth Avenue, Suite 7110
                                New York, NY  10118
5                               212.763.0883

6                               KAREN L. DUNN, ESQUIRE
                                WILLIAM A. ISAACSON, ESQUIRE
7                               ARPINE S. LAWYER, ESQUIRE
                                JESSICA E. PHILLIPS, ESQUIRE
8                               Paul, Weiss, Rifkind, Wharton &
                                Garrison LLP
9                               2001 K Street, NW
                                Washington, DC  20006
10                              202.223.7300

11
   For the Defendants:          DAVID L. CAMPBELL, ESQUIRE
12                              Duane, Hauck, Davis, Gravatt &
                                Campbell, P.C.
13                              100 West Franklin Street, Suite 100
                                Richmond, VA  23220
14                              804.644.7400

15                              CHRISTOPHER CANTWELL, PRO SE
                                #00991-509
16                              USP Marion
                                4500 Prison Road, PO Box 2000
17                              Marion, IL  62959

18                              BRYAN J. JONES, ESQUIRE
                                Bryan J. Jones, Attorney at law
19                              106 W. South Street, Suite 211
                                Charlottesville, VA  22902
20                              540.623.6952

21                              JAMES E. KOLENICH, ESQUIRE
                                Kolenich Law Office
22                              9435 Waterstone Blvd., Suite 140
                                Cincinnati, OH  45249
23                              513.444.2150

24

25

3

```
 1  APPEARANCES CONTINUED:

 2  For the Defendants:            WILLIAM E. REBROOK, IV, ESQUIRE
                                   (Appearing via Zoom)
 3                                 The ReBrook Law Office
                                   6013 Clerkenwell Court
 4                                 Burke, VA  22015
                                   571.215.9006
 5
                                   JOSHUA SMITH, ESQUIRE
 6                                 (Appearing via Zoom)
                                   Smith LLC
 7                                 807 Crane Avenue
                                   Pittsburgh, PA  15216
 8                                 917.567.3168

 9                                 RICHARD SPENCER, PRO SE
                                   P.O. Box 1676
10                                 Whitefish, MT  59937

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        INDEX OF WITNESSES

2   WITNESSES ON BEHALF OF THE PLAINTIFF:                    PAGE

3   RICHARD SPENCER

4    Cross-Examination by Mr. Cantwell                        12
     Cross-Examination by Mr. ReBrook                         58
5    Redirect Examination by Mr. Bloch                        60

6   ROBERT "IKE" BAKER (Video deposition played)

7   MICHAEL HILL

8    Direct Examination by Mr. Levine                         66
     Cross-Examination by Mr. Jones                          160
9    Cross-Examination by Mr. Spencer                        176
     Cross-Examination by Mr. ReBrook                        181
10   Cross-Examination by Mr. Cantwell                       182
     Cross-Examination by Mr. Kolenich                       187
11
    THOMAS BAKER
12
     Direct Examination by Mr. Miller                        190
13   Cross-Examination by Mr. Spencer                        225
     Cross-Examination by Mr. Cantwell                       227
14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXHIBITS

 2    EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3          EXHIBIT:                  Marked      Received

 4          3819                        10          10

 5          4000                        66          66

 6          1566A                       67          67

 7          1564                        70          70

 8          1899                        72          74

 9          1921A                       75          75

10          1567                        77          77

11          1923                        79          79

12          1923F                       79          79

13          198                         82          82

14          1551                        84          85

15          1537                        86          87

16          1545                        87          88

17          1918                        91          92

18          1554                        97          97

19          2858                       102         103

20          1560                       104         105

21          1562                       106         107

22          3801                       107         109

23          1553                       110         110

24          3800A                      115         115

25          2101                       116         116
```

```
 1              INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3   EXHIBIT:           Marked      Received

 4        2857                    122        123

 5        2883A                   123        --

 6        3842                    133        133

 7        3239A                   139        139

 8        1888A                   150        150

 9        1568                    155        155

10        1904                    157        157

11        1379A                   157        158

12        2063                    159        159

13        1505A                   209        209

14        287                     210        210

15        291                     211        211

16        300                     212        212

17        294                     214        215

18        295                     215        215

19        3328A                   221        221

20        3328B                   223        223

21   EXHIBITS ON BEHALF OF THE DEFENDANTS:

22        EXHIBIT:            Marked     Received

23        CC-127                  42        --

24        LOS-010                162        162

25        LOS-035                167        167
```

```
1                        INDEX OF EXHIBITS

2   EXHIBITS ON BEHALF OF THE DEFENDANTS:

3           EXHIBIT:                 Marked      Received

4           LOS-020                     171          172

5           CC-3239C                    184         184

6           CC-73A                      185         185

7           IE-1409                     189         189

8           313                         236         --

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  (Proceedings commenced, 8:59 a.m.)

2          THE COURT:  Good morning.  Call the case, please.

3          THE CLERK:  Yes, Your Honor.  This is Civil Action

4  Number 3:17-cv-00072, Elizabeth Sines and others versus Jason

5  Kessler and others.

6          THE COURT:  Before we begin, I will remind everyone

7  that under Standing Order 2020-12 and 2013-8, the Court's

8  prohibition against recording and broadcasting court

9  proceedings remains in force.  Attorneys, parties and their

10  staff, and members of the public or press accessing this

11  proceeding today may not record or broadcast it.  That means no

12  photography, no use -- using any video or audio recording

13  device, no rebroadcasting, livestreaming, or otherwise

14  disseminating any live or recorded video or audio of this

15  proceeding.

16          Before we call the jury, I want to raise a few

17  issues.  But first, are the plaintiffs ready?

18          MS. KAPLAN:  We are, Your Honor.

19          THE COURT:  Defendants ready?

20          MR. KOLENICH:  Yes, Your Honor.

21          MR. JONES:  Yes.

22          THE COURT:  Okay.  I would remind everyone that

23  witnesses should be answering the questions presented directly

24  and forthrightly.  To the extent any witness wishes to raise an

25  ancillary matter or go beyond the question asked, that matter

9

1    can be brought out in cross-examination or redirect or when

2    it's that party's turn to present their affirmative case.

3          Counsel on either side have been asking to strike

4    nonresponsive answers that go beyond the question asked, and in

5    many instances the Court has done so, where the answer really

6    went beyond the question.

7          I would also remind all parties that objections

8    should be raised succinctly:  Relevance, leading questions, et

9    cetera; maybe a few words of description.  The Court will ask

10   for further elaboration, if necessary.

11         There are a number of exchanges -- there were a

12   number of exchanges yesterday concerning objections to

13   testimony, the method of impeachment, and -- and the most

14   efficient manner to do so.  The Court intends to remind the

15   jury this morning that such exchanges should not distract them

16   from their role to listen and to find the facts of the case;

17   that statements, arguments, or questions by lawyers are not

18   evidence; that is, it is counsel's responsibility to raise

19   objections that the Court -- that the Court and that the

20   Court's statements, except other instructions or sustained

21   objections, should not be taken as expressing any view on the

22   evidence.

23         The Court has considered plaintiffs' counsel's letter

24   last night regarding efforts to streamline the trial, which

25   include calling fewer witnesses and also limiting the amount of

1  time on direct.

2         This is just for information, what sort of goes on in

3  the background.  The Court wants to advise the parties that one

4  of the jurors has expressed concern about being able to drive

5  after daylight savings time based on concerns about driving in

6  the dark.  The Court, through our clerk's office and the

7  administrative office of the courts, has been able to offer

8  several options to assist the juror with respect to this.  I'm

9  going to do everything we can to keep the jury together.  So

10  just to let you know that's going on.

11         All right.  Are there any other matters we need to

12  take up before the jury returns?

13         MS. DUNN:  Your Honor, we've been asked just to put

14  on the record the introduction of the Kline deposition clips

15  that were played yesterday.  It's Exhibit PX-3819.  So we'd

16  just move that into evidence.

17         THE COURT:  All right.  I mean, that's done.

18         MR. KOLENICH:  No objection.

19         MS. DUNN:  Thank you, Your Honor.

20         (Plaintiffs' Exhibit 3819 admitted.)

21         MR. CANTWELL:  Judge, I'd just point out there was

22  some concern about the limiting instruction yesterday with

23  regard to those exhibits.  I brought it up and plaintiffs'

24  counsel seemed to be under the impression that they were

25  admissible against me for some other reason, and I think that

1  that's just something I wanted to bring up before we move

2  forward.

3          THE COURT:  Well, they may well be.  I mean, if they

4  are authenticated by somebody at court, I think --

5          MR. CANTWELL:  That would make perfect sense.  I'm

6  just perhaps unfamiliar with how these things are delineated

7  for the jury when they go into their deliberations, if they've

8  got a pile of evidence for everybody or a pile of evidence for

9  Christopher Cantwell, if these things are, for lack of a better

10 term, fungible.

11         THE COURT:  They'll be handled by instructions as

12 best we can.

13         MR. CANTWELL:  Okay.

14         THE COURT:  Okay.  Call the jury back.

15 **(Jury in, 9:05 a.m.)**

16         THE COURT:  All right.  Good morning.  Thank you for

17 being here.  Before we begin I'm just going to read an

18 instruction to you.  It's something you've already heard

19 several times, but just to remind you.

20         The evidence from which you will find the facts will

21 consist of the testimony of witnesses, documents and other

22 things received into the record as exhibits, and any facts that

23 the lawyers agree to or stipulate to or may instruct you to

24 find.  Certain things are not evidence and must not be

25 considered by you, including statements, arguments, and

R. Spencer - Cross

1   questions by lawyers are not evidence.  Objections to questions

2   are not evidence.  Lawyers have an obligation to their clients

3   to make objections when they believe evidence being offered is

4   improper under the rules of evidence.

5          You should not be influenced by the objection or by

6   the Court's ruling on it.  If the objection is sustained,

7   ignore the question.  If it's overruled, treat the answer like

8   any other.

9          If you are instructed that some item of evidence is

10  received for a limited purpose only, you must follow that

11  instruction.  Testimony or any matter that the Court has

12  excluded or told you to disregard is not evidence and must not

13  be considered.  Anything you may have seen or heard outside the

14  courtroom is not evidence and must be disregarded.

15         Anything I may have said in instructing a witness or

16  an attorney concerning anything should not be considered by you

17  that I have an opinion on the evidence or anything else in the

18  case.  Except for my instructions to you on the law of the

19  case, you should not consider anything else that I might say.

20         All right.  You may proceed, Mr. Cantwell.

21  RICHARD SPENCER, CALLED BY THE PLAINTIFFS, PREVIOUSLY SWORN:

22                 CROSS-EXAMINATION (Continued)

23  BY MR. CANTWELL:

24  Q    Hello, Richard.

25  A    Good morning.

R. Spencer - Cross

1           MR. CANTWELL:  Could I ask plaintiffs' counsel again

2    to bring up the text messages between myself and Mr. Spencer

3    that we were looking at yesterday when we left off?

4           THE COURT:  Yes.

5           MR. CANTWELL:  Thank you.

6    BY MR. CANTWELL:

7    Q    Let's see here.  Could we scroll down a little bit more?

8    Okay.  I think that's where we want to be.  All right.

9         Mr. Spencer, when we left off yesterday we were looking at

10   this text exchange between us where I said I was willing to

11   risk violence and incarceration for our cause.  Does that ring

12   a bell to you?

13   A    Yes.

14   Q    Mr. Spencer, are there many people in this country who

15   would break the law to hurt you?

16           MR. BLOCH:  Objection.

17           THE COURT:  Sustained.

18           MR. CANTWELL:  I'm not sure what I did that was

19   objectionable.  If I could understand the objection I'll try to

20   avoid doing it again.

21           THE COURT:  What are you trying to prove, I guess?

22           MR. CANTWELL:  I'm talking about risking violence and

23   incarceration, and so I'm trying to -- and I think it was

24   implied yesterday that this was some sort of statement of

25   criminal intent.  And I would like to show that --

14

R. Spencer - Cross

1           THE COURT:  You can ask him what he meant by that.

2           MR. CANTWELL:  This is what I said to him.

3           THE COURT:  What you said to him?

4           MR. CANTWELL:  I said to him that I was willing to

5   risk violence and incarceration.  This is part of a line of

6   questioning where I'm going to get to a point real soon.

7           THE COURT:  You can ask him about his own -- how he

8   felt about his personal security.

9   BY MR. CANTWELL:

10  Q    Mr. Spencer, do you sometimes fear for your safety?

11  A    Yes.

12  Q    Why do you fear for your safety?

13  A    Well, beginning in 2017, I attended the presidential

14  inauguration, and I was actually giving an interview to a

15  journalist, and we were near a counter-protest to the

16  inauguration.  And someone jumped out of the crowd and first

17  punched me.  It was a bit of a glancing blow.  And then I

18  continued to talk to the journalist.  I guess I'm like that.

19          But then he came out and landed a forearm on my head, gave

20  me a concussion.

21          THE COURT:  Well, okay.  Just in general express --

22          THE WITNESS:  Okay.  I generally -- I'm sorry if I'm

23  storytelling here.

24          I -- throughout 2017 I received countless threats of

25  various kinds to my life, through the mail, on social media,

R. Spencer - Cross

1    and so on.

2             I think also what was implied, what you were saying

3    is, this is when the permit for the Unite the Right rally was

4    in some dispute.  I believe the city wanted to withdraw it and

5    so on.  And I think the idea is that --

6             THE COURT:  I think you're going beyond.

7             THE WITNESS:  Okay.  Throughout the course of 2017 I

8    received countless threats to my life and some actual attacks

9    in broad daylight.  So yes.

10    BY MR. CANTWELL:

11   Q    Did some of those threats and attacks come from an

12   identifiable group?

13   A    Yes.

14   Q    What was that group?

15   A    Antifa.  The so-called Antifa, yes.

16   Q    Okay.  And do you understand it to be a common Antifa

17   tactic to fake victimhood after --

18             MR. BLOCH:  Objection.  Foundation.  Leading.

19             THE COURT:  Well, it's leading.

20    BY MR. CANTWELL:

21   Q    Mr. Spencer, do you recall any stories in the news in 2016

22   and 2017 about people who got arrested after defending

23   themselves against Antifa?

24             MR. BLOCH:  Objection.

25             THE COURT:  You're asking -- are you asking him to

16

R. Spencer - Cross

1  testify as to Antifa?

2          MR. CANTWELL:  I'm asking him about his recollection

3  of what was going on at the time this exchange happened.  I'm

4  trying to establish the context --

5          THE COURT:  Is your ultimate goal to prove your

6  actions or his?  He can explain why he did something, but he

7  cannot explain why you did something.

8          MR. CANTWELL:  In this exchange Mr. Spencer does not

9  seem to think it odd that I'm --

10         MR. BLOCH:  Objection, Judge.

11         MR. CANTWELL:  I'm talking to the judge.

12         MR. BLOCH:  Well, the jury is in the room so I would

13  request a sidebar if Mr. Cantwell is going to make a

14  presentation to the jury.

15         THE COURT:  No, I don't need a sidebar.  You can ask

16  him anything about Antifa that you and he experienced together.

17  BY MR. CANTWELL:

18  Q   Mr. Spencer, did you think it at all odd that I mentioned

19  violence and incarceration in this context to you?

20         MR. BLOCH:  Objection.

21         THE COURT:  Go ahead.

22         THE WITNESS:  No, I didn't think it was odd.

23         THE COURT:  Okay.  That's the answer.

24         THE WITNESS:  Okay.

25  BY MR. CANTWELL:

R. Spencer - Cross

1  Q    Why did you not think it was odd?

2  A    Antifa was a very real thing during that point.  They

3  would often engage in violent tactics or sometimes

4  passive-aggressive tactics.  And it was something that any

5  person would have to fear.

6       I would add that at any controversial rally, really, of

7  any kind, I think you have to at least have in the back of your

8  mind, you know, there are some people where emotions are really

9  hot and there could be some kind of violence.

10 Q    And in instances where violence takes place, does law

11 enforcement typically get involved afterwards?

12          MR. BLOCH:  Objection to what law enforcement

13 typically does.  Foundation.

14          MR. CANTWELL:  I'll withdraw it.

15          THE COURT:  Sustained.

16  BY MR. CANTWELL:

17 Q    I take it you understand risk then?

18 A    Yes.

19 Q    And based on your understanding of risk, when one is

20 willing to risk something, are the risk and the desired outcome

21 typically the opposite?

22          MR. BLOCH:  Objection.  Objection, Judge.

23  BY MR. CANTWELL:

24 Q    Richard, when you are willing to risk something, is that

25 the desired outcome?

R. Spencer - Cross

1  A    No.  That's the undesired outcome.

2  Q    So if somebody is willing to risk violence and

3  incarceration, is that typically what they're trying to

4  accomplish?

5  A    No.

6           MR. BLOCH:  Objection to what people are typically

7  trying to do, Judge.

8           THE COURT:  All right.

9           MR. BLOCH:  Judge, could I ask that the witness wait

10 for a ruling on the objection before answering.

11          THE COURT:  Please do, Mr. Spencer.

12          THE WITNESS:  I will.

13          MR. CANTWELL:  I can move on.

14          THE COURT:  Move on, because you're getting about him

15 and not you.

16          MR. CANTWELL:  Okay.

17  BY MR. CANTWELL:

18 Q    Yesterday there was some testimony about -- whether it was

19 you, or I think it was -- was it Paul Gottfried, founded the

20 alt-right?

21 A    Yes.  There's a little bit of a controversy of who --

22          THE COURT:  Okay.  You explained that yesterday.

23          THE WITNESS:  I explained it yesterday.  Yeah, Paul

24 Gottfried and myself.

25

R. Spencer - Cross

1  BY MR. CANTWELL:

2  Q    Is Paul Gottfried Jewish?

3  A    Yes.

4  Q    So you and Paul Gottfried together, you and a Jewish man

5  founded the alt-right; is that fair to say?

6  A    That's fair to say.  He was my mentor.

7  Q    Your mentor was a Jewish man?

8  A    Yes.

9  Q    Okay.  Good to know.

10      But disputes over the founding or coining of the term,

11  when most people think of the alt-right, who do they think of?

12  A    They think of --

13          MR. BLOCH:  Objection.  Objection to what most

14  people -- Judge, again, I would ask that the witness wait until

15  an objection is ruled on.  And I'm objecting to what most

16  people think of as calling for speculation.

17          THE WITNESS:  I apologize for that.  I heard you.

18          THE COURT:  I just think that is so innocuous.  I

19  mean, it's just -- let's move on.  It's not -- it has -- it's

20  not worth the time.  It doesn't prove anything.  The whole

21  subject is --

22  BY MR. CANTWELL:

23  Q    Mr. Spencer, do you see yourself as the leader of the

24  alt-right?

25  A    During 2017 I saw myself as the leader of the alt-right,

R. Spencer - Cross

1  yes.

2  Q    And as this figurehead for this alternative right

3  movement, did you get invited to all the big public events for

4  the big tent mainstream right?

5  A    The mainstream Republican right?  No.  They have yet to

6  invite me to their events.

7  Q    Did you desire in 2017 to make the alt-right a mainstream

8  movement?

9  A    Absolutely.  That was my fundamental goal.

10 Q    And was this a desire you spoke of with others?

11 A    Yes.  I spoke about it publicly, for one thing, but yes,

12 that was my desire, to replace conservatives, to make it a

13 mainstream movement.

14 Q    Mr. Spencer, are you under the impression that violent

15 crime is popular?

16 A    I don't know how to answer.

17 Q    You don't know if violent crime is popular?

18 A    Could you rephrase that?

19 Q    Do you think that violent crime would be a good way to

20 take the alt-right mainstream?

21 A    No.

22           MR. BLOCH:  Objection.

23           THE WITNESS:  Gosh, I'm sorry.

24           MR. CANTWELL:  There's an objection.

25           THE WITNESS:  We spoke at the same time.

R. Spencer - Cross

1          THE COURT:  I didn't hear an objection.

2          MR. BLOCH:  Objection, Judge.

3          THE COURT:  Overruled.

4   BY MR. CANTWELL:

5   Q    So Mr. Spencer, if you wanted your mainstream political

6   movement, why were you encouraging your supporters to engage in

7   racially motivated violence?

8   A    I was not encouraging them to do that.

9   Q    Yesterday we saw the deposition of Elliot Kline.  Did you

10  notice that he frequently summed up many mentions of violence

11  that were brought up as being a joke?

12          MR. BLOCH:  Objection, leading.  Testifying by

13  Mr. Cantwell.

14          THE COURT:  Sustained.

15  BY MR. CANTWELL:

16  Q    In your experience was violent humor part of alt-right

17  culture?

18  A    Yes.  There was a subculture in which it was the coolest

19  thing in the world to be as edgy as possible, and, you know,

20  very juvenile and silly.  But yes, it was almost a kind of, I

21  don't know, heavy metal group of:  I want to be as -- you know,

22  I'm the edgiest of them all.  That was almost the vibe of the

23  alt-right at the time.

24  Q    And during your testimony in this courtroom you made

25  several attempts to -- well, I should rephrase that.

R. Spencer - Cross

1       Yesterday several references were made -- you were quoted

2  several times of making references to battles or wars or this

3  sort of thing.

4  A     Right.

5  Q     And you had explained that that was rhetoric.  Have you

6  studied the subject of rhetoric?

7  A     Yes.

8  Q     What books on the subject have you read?

9  A     On the subject of rhetoric?

10 Q     Yeah.

11 A     Well, I'll have to go back.  I've read quite a bit of

12 Jacques Barzun on how to write clearly and succinctly in terms

13 of rhetoric.  I've read so much philosophy that I feel like

14 I've imbibed rhetorical techniques through reading.  And I have

15 attempted to use rhetoric, sometimes successfully, sometimes

16 not.  You kind of learn --

17            THE COURT:  Is there any particular source you want

18 to question him about?

19            MR. CANTWELL:  No.  I genuinely didn't know the

20 answer to the question.  So I asked it.

21 BY MR. CANTWELL:

22 Q     Mr. Spencer, if you ask somebody a rhetorical question, do

23 you expect an answer?

24 A     No.

25 Q     And when you discuss a rhetorical battle, fight or war,

23

R. Spencer - Cross

1  what do you expect?

2  A    When I use a word like this is a battle, a great battle

3  for the soul of the West or things like that, I'm speaking in

4  metaphors.  It is a spiritual battle or verbal battle or so on.

5  This is how almost every activist or politician uses language.

6  Q    Ever watch GI Joe as a kid?

7         MR. BLOCH:  Objection.

8         THE WITNESS:  I did, yes.

9         MR. CANTWELL:  There's an objection.

10        MR. BLOCH:  He answered it.

11  BY MR. CANTWELL:

12  Q    Do you remember "Knowing is half the battle"?

13  A    I remember that slogan, yes.

14  Q    Have you observed that hyperbole is a useful tool in the

15  rhetorical toolbox?

16  A    Hyperbole is definitely a tool that I reach for in my

17  toolbox quite a bit.  It's a way of being provocative and in a

18  way changing somebody's mind to kind of shock them out of their

19  original opinion and open up their mind to my message.

20  Q    What about metaphor?

21  A    I mean, language itself is a metaphor on some level, but,

22  you know, I -- yes, I think of myself as being poetic at times.

23  So I absolutely use metaphor all the time.

24  Q    Have you ever heard the term "zombie apocalypse"?

25  A    Yes.

24

R. Spencer - Cross

1    Q    And what do you understand the zombie apocalypse to be?

2              MR. BLOCH:  Objection to what the zombie apocalypse

3    means, Judge.

4              THE COURT:  Did that come up in his testimony?

5              MR. BLOCH:  Absolutely not.

6              MR. CANTWELL:  This is leading to something else.

7    BY MR. CANTWELL:

8    Q    Do you recall mention of RaHoWa being made during the

9    course of this trial, Mr. Spencer?

10   A    Yes.

11   Q    Do you take RaHoWa to be a literal thing?

12   A    No.  I think it was actually a rock band that coined that,

13   if I'm correct, but -- I think I'm correct about that.  It's a

14   racial holy war.  Again, this is -- I would chalk this up to

15   being edgy and so on.  It's obviously a metaphor.  A holy war

16   is obviously a metaphor.

17   Q    Does RaHoWa have any relationship to zombie apocalypse?

18             MR. BLOCH:  Objection to zombie apocalypse and its

19   relationship to anything in this case.

20             THE COURT:  Tell us what --

21             MR. CANTWELL:  Okay.  I mean, the idea behind zombie

22   apocalypse is it's this chaotic, end-of-the-world type of

23   situation, and it's not -- it's a purely fantastical, fictional

24   scenario used frequently by people in Second Amendment circles

25   and whatnot.  But I'll move on because now I've ruined the

R. Spencer - Cross

1   joke.  Thanks.

2          THE COURT:  Okay.

3   BY MR. CANTWELL:

4   Q    Do you recall a Democrat campaign slogan about a supposed

5   war on women being waged by the Republican Party?

6          MR. BLOCH:  Objection, Judge.

7          THE COURT:  Overruled.

8          THE WITNESS:  I remember that slogan, yes.

9   BY MR. CANTWELL:

10  Q    How about the Ron Paul Revolution?

11  A    I was a part of the Ron Paul Revolution.

12  Q    Do you have any casualty estimates for those conflicts?

13         MR. BLOCH:  Objection, argumentative, relevance.

14         THE COURT:  I think I know where he's going with

15  this.  Go ahead, answer the question.

16  BY MR. CANTWELL:

17  Q    Do you know how many people died in the war on women or

18  the Ron Paul Revolution?

19  A    I don't think anyone died as a result of these, you know,

20  political campaigns.

21  Q    Thank you.  In your efforts to grow the alt-right and your

22  various interests therein, did you find yourself interacting

23  with many libertarians or former libertarians during the course

24  of that?

25  A    Yes.

26

R. Spencer - Cross

1  Q    Among the libertarians, did you ever find yourself

2  debating something known as the non-aggression principle?

3  A    Yes.

4  Q    What do you understand the non-aggression principle to be?

5          MR. BLOCH:  Objection, relevance.

6          THE COURT:  Overruled.

7          THE WITNESS:  The non-aggression principle is -- it

8  is a basis of libertarianism and liberalism.  I certainly read

9  much about this.  And it is a notion that force is only

10 justified in self-defense.  So you do not use aggression

11 against anyone; however, if someone aggresses against you, you

12 are allowed, if not required -- allowed to fight back with all

13 you've got.

14  BY MR. CANTWELL:

15 Q    And do you understand the non-aggression principle to

16 curtail what most people would -- withdrawn.

17     In the libertarian lexicon do you understand normal

18 functions like taxation and arresting drug dealers to count as

19 violations of the non-aggression principle?

20 A    I think for many libertarians they would consider a

21 parking ticket to be an aggression.  Again, I might have some

22 libertarian leanings here and there.  I'm not a libertarian.

23 But I think serious libertarians believe that taxation,

24 incarceration, preventing you from using drugs or something,

25 that is in itself a kind of aggression by the government.

R. Spencer - Cross

1       Again, these are not my views, but I understand them and

2   have respect for them.

3   Q   But you would actually have to debate these terms, these

4   ideas, if you're trying to bring people over from

5   libertarianism to the alt-right; would that be fair to say?

6           MR. BLOCH:  Objection, Judge, to this line of

7   questioning.  They're debating libertarianism which didn't come

8   up in my cross yesterday, hasn't come up in this case, is not

9   relevant.

10          MR. CANTWELL:  Judge, what came up in his

11  cross-examination was Mr. Spencer's use of strong language.

12  And I'm trying to get to the reasons that he would be speaking

13  in those terms.  And to do that, I have to illustrate how he

14  gets to that language.  This case involves ideology.  There's

15  no other way for me to do this.

16          THE COURT:  Overruled.  Go ahead.

17          MR. CANTWELL:  Thank you.

18          THE WITNESS:  Yes, when I had graduated from college,

19  I was actually part of -- to a limited degree, a part of the

20  anti-war movement, the opposition to the Iraq War.  I read --

21          THE COURT:  Wait a minute.

22          THE WITNESS:  I'm --

23          THE COURT:  Mr. Spencer.  We don't need his history.

24  Now, you ask the question.

25          THE WITNESS:  Okay.  So --

28

R. Spencer - Cross

1              THE COURT:  No, Mr. Spencer, let -- go ahead.

2              MR. CANTWELL:  Allow me to ask a more succinct

3    question.

4     BY MR. CANTWELL:

5    Q    To bring people over to your side from the libertarian

6    movement, Mr. Spencer, would you have to justify government

7    force, using the language as they understood it and used it

8    themselves?

9    A    Yes.

10   Q    Was there any other political movement which served as a

11   more fruitful recruiting ground for the alt-right than

12   libertarianism?

13   A    I'm not sure.  That certainly was -- many people are

14   libertarians who might be inclined towards the alt-right, but

15   I'm not sure about if it's the most.

16   Q    Okay.  Up there, fair to say?

17   A    You could say that.

18   Q    Okay.  Did this influence the way you discussed the use of

19   force?

20   A    Perhaps to a small degree.

21   Q    During your testimony yesterday you said that you were not

22   a white supremacist, but you're comfortable using the term

23   "white nationalist" as a sort of blanket term for all the

24   various groups that attended the Unite the Right rally.

25        Could you please describe what you perceive the difference

R. Spencer - Cross

1  to be between white supremacy and white nationalism?

2  A    Right.  I think we are using these terms as blanket terms

3  for convenience.  I would say that something like the British

4  Empire could be considered -- could be accurately considered

5  white supremacist.  I'm not sure there are really -- or slave

6  owners could be considered white supremacists, I think,

7  accurately.  I'm not sure we -- in the modern age or the 21st

8  century we have anything like true white supremacy going on.  I

9  think white nationalism is probably a better catch-all --

10          THE COURT:  The question, though, is what is your

11  opinion of what white supremacy is as opposed to white

12  nationalism.

13          THE WITNESS:  I would -- if I were to use the term

14  "white supremacist" accurately and not just as an insult, I

15  would say that, yes, something like the British Empire control

16  of India or a slave owner would be a white supremacist.  That's

17  how I would use that term accurately.

18   BY MR. CANTWELL:

19  Q    You were quoted yesterday saying something to the effect

20  that the ethnostate would come about as a result of a

21  geopolitical cataclysm.

22  A    Yes.

23  Q    Are you familiar with the term "accelerationism"?

24  A    Yes.

25  Q    What is an accelerationist?

R. Spencer - Cross

1  A    I think it's someone who wants to bring about a cataclysm

2  faster.

3  Q    Are you an accelerationist?

4  A    No.

5  Q    When Mr. Heimbach said he did not consider you to be part

6  of the hard right, were you insulted?

7  A    No.

8  Q    Do you see yourself in any sort of competition with

9  accelerationists, the hard right, or both?

10              MR. BLOCH:  Objection.

11              THE COURT:  Overruled.

12              THE WITNESS:  I think that's fair to say.  I want my

13  version of the alt-right to succeed and to predominate, sure.

14  BY MR. CANTWELL:

15  Q    And in that competition, would you find it helpful to

16  avoid appearing weak?

17  A    Yes.

18  Q    When did you and I first meet?

19  A    I believe we first met in Alexandria, Virginia when you

20  came down, and I think we ate lunch at a pub, if I'm correct.

21  Q    Was that before the DC free speech rally event?

22  A    It's the summer of 2017.  Some of these things might blend

23  together. I was at a DC free speech rally, and you were -- we

24  chatted.  We took a selfie.  So, you know, my dates might not

25  be perfectly accurate, but we encountered each other a few

R. Spencer - Cross

1    times.

2    Q    Would it be fair to say you had known me by reputation

3    previously?

4    A    Yes.

5    Q    And moving on to the DC free speech rally, whether that

6    was in proximity to that lunch or not, do you recall sort of a

7    security briefing drawn up on either a chalkboard or a

8    whiteboard in your apartment?

9    A    Yes.

10   Q    Who gave that briefing?

11   A    I presume Greg Conte did.

12   Q    Greg Conte.

13   A    I'm not positive, though.

14   Q    Was Kurt there?

15   A    Kurt, yeah, there is a fellow named Kurt.  I don't

16   remember him exactly.  So I don't want to speculate too much

17   where my memory is --

18   Q    What about Defendant Kline?  Was he there?

19   A    Yes.

20   Q    Okay.  Do you have any recollection of what plan was drawn

21   up on that chalkboard or whiteboard?

22   A    I don't have any real accurate recollection of the exact

23   plan.  It was just about getting in and out from the Mall, the

24   Washington Mall area, smoothly.

25   Q    There was some -- was there some concern for our safety

R. Spencer - Cross

1  going into that event?

2  A    Yes.

3  Q    Yesterday you described an afterparty at your apartment

4  following that DC free speech rally.  Do you recall if I stayed

5  very long for that event?

6  A    I actually don't recall your being there.  So I don't -- I

7  don't recall your being there at all, really, but...

8  Q    Very good.

9       During the planning for that DC free speech event, was I

10 scheduled to be a speaker or was that a spontaneous decision?

11 A    I don't know the answer to that question.

12 Q    At the event commonly known as C'ville 1.0, was I present?

13 A    I don't think you were.

14 Q    Was I involved in the planning for that event?

15 A    No.

16 Q    Did I attend the afterparty?

17 A    I don't remember you at all.

18 Q    At that afterparty, do you have some idea of how many

19 people were present?

20 A    The afterparty that I attended?

21 Q    Yeah.  I believe we watched a video of that yesterday.

22 A    Right.  I would say there might have been 50 people around

23 and about.

24 Q    Did you know all of them personally?

25 A    No.

33

R. Spencer - Cross

1  Q     Did you have any reason to expect they would keep your

2  secrets?

3  A     Yeah, I -- no.  I -- there are these parties and people

4  are doing all -- there's a lot of drinking.  People are acting

5  like idiots, you know, to put it casually.  I think I, probably

6  naively, thought that it's a private event and this is not

7  something you want to broadcast.  But I ultimately had no real

8  reason to trust all of these people.

9  Q     Earlier we were talking about violent humor, rhetoric,

10 hyperbole, that sort of thing.  But violence isn't just a

11 theoretical exercise for you and me, is it?

12 A     No.

13 Q     You mentioned earlier you had been punched in the face.

14 Was that on Inauguration Day in Washington DC?

15 A     Yes.

16 Q     And when you stated that we were entering a world of

17 political violence and that nothing would be the same, did that

18 interaction -- was that interaction fresh in your mind?

19 A     Absolutely, yes.

20 Q     Not long before the events at the heart of this dispute,

21 did you hear about a shooting at a baseball practice in

22 Alexandria, Virginia?

23            MR. BLOCH:  Objection, relevance.

24            THE COURT:  Overruled.

25            THE WITNESS:  Yes.  I remember hearing about this.  I

R. Spencer - Cross

1  believe a senator was involved.

2   BY MR. CANTWELL:

3  Q    Do you remember the name of the shooter?

4  A    I don't remember the name of the shooter, no.

5  Q    Did you fear for your safety going into Charlottesville in

6  August of 2017?

7  A    Yes.

8  Q    Did you believe that the threats to your safety would

9  increase or decrease if you displayed that fear in public?

10 A    Yes.  I wanted to seem tough and strong.

11 Q    I'm going to repeat the question.

12 A    Okay.

13 Q    Did you believe that the threats to your safety would

14 increase or decrease if you displayed that fear in public?

15 A    Oh.

16        MR. BLOCH:  Objection, asked and answered.

17        THE COURT:  He didn't answer.

18        Go ahead.  Answer the question.

19        THE WITNESS:  That's a difficult question.  Would the

20 threats increase if I showed fear or would they increase --

21        THE COURT:  Well, if you don't have -- he's asking --

22 if you don't have --

23        THE WITNESS:  Yeah, it's --

24        THE COURT:  If you don't have an answer to it, don't

25 answer.

35

R. Spencer - Cross

1           THE WITNESS:  I might not have an answer to that

2     question.  It's a difficult one.

3      BY MR. CANTWELL:

4     Q    Fair to say you didn't want to display your fear in

5     public?

6           MR. BLOCH:  Objection, leading.

7           THE COURT:  Sustained.

8      BY MR. CANTWELL:

9     Q    Following the Unite the Right rally, you continued on

10    something of a speaking tour; is that right?

11    A    Yes.

12    Q    And at some point did you call that tour off?

13    A    Yes.

14    Q    Did that have something to do with Antifa violence?

15          MR. BLOCH:  Objection, Judge, relevance, leading.

16          THE COURT:  Sustained.  It's leading.

17     BY MR. CANTWELL:

18    Q    What was the reason that you called off the tour?

19          MR. BLOCH:  Object, Judge.  Just to be clear, he's

20    talking about events that post-dated Unite the Right.

21          THE COURT:  Well, did you not ask anything about

22    things that post-dated Unite the Right?

23          MR. BLOCH:  I did.  But he's talking --

24          THE COURT:  So overruled.

25          Go ahead.

36

R. Spencer - Cross

1          THE WITNESS:  Yes.  I did appear on colleges, I

2    believe, twice after that, and particularly at the last event

3    it seemed like scuffles outside of the event were overshadowing

4    the event itself to the point where even, in the last one, I

5    was not able to speak.

6          So earlier, before Unite the Right, Texas A&M being

7    an excellent example, I was able to give a speech for an hour.

8    Very controversial, but I was able to deliver a message and

9    take questions.

10         At some point the conflicts made the speech just

11   irrelevant, and I actually -- I publicly called it off for

12   those reasons.

13    BY MR. CANTWELL:

14   Q    And when you called it off, did you make a video about

15   that?

16   A    I did.

17   Q    In that video, did you state that Antifa was winning

18   because they were willing to go further than anyone else?

19   A    I did state that.

20   Q    What did you mean by that?

21   A    They had successfully escalated to a point where the --

22   they had escalated matters to a point where it's not about a

23   speech and it's not about Richard Spencer talking about his

24   views; it is about, let's just get into a fight.  And it

25   overshadowed me.  It overshadowed my message.  It made me look

R. Spencer - Cross

1   bad, for lack of a better term.  And I started to have a kind

2   of sick feeling about all of this, where it wasn't leading

3   anywhere good.  I wanted to be a public figure, and instead I

4   was -- it was every -- you know, when I would speak someplace,

5   oh, there would be Antifa fights with supporters.  It was

6   depressing.

7   Q    Mr. Spencer, wasn't violence your desired outcome?

8   A    No.

9   Q    We heard yesterday that you wanted to dominate the

10  streets.  Why not just keep on going?

11  A    Yeah, when I say that, that -- dominating the streets

12  means that we would demonstrate that we would be out there in

13  space, standing tall, speaking our views.  That is what I meant

14  by that.

15  Q    So you were unwilling to go to the same lengths as Antifa?

16  A    Yes.

17  Q    You testified that part of your role in planning the Unite

18  the Right rally was to suggest speakers; is that right?

19  A    Yes.  I suggested a number of speakers.

20  Q    Was I one of the speakers you suggested?

21  A    No.

22  Q    Were you privy to a deliberation on my attendance?

23  A    I wasn't privy to that.

24  Q    As of August 10th, 2017, did you know me to have a

25  reputation for harming innocent people?

R. Spencer - Cross

1  A    To be --

2              MR. BLOCH:  Objection.

3              THE COURT:  Overruled.

4              You've been asking Mr. Spencer about his associates

5  and what they believed.  So go ahead.

6              THE WITNESS:  To be frank, Mr. Cantwell, you did have

7  a bit of a reputation as a hothead.

8   BY MR. CANTWELL:

9  Q    Did you -- did you know me to have a reputation for

10 harming innocent people?

11 A    I'm not going to -- no.  I'm not going to make an opinion

12 on any -- anything --

13 Q    I'm not asking --

14             MR. BLOCH:  If he could let the witness finish.

15             THE COURT:  He's not asking for your opinion.  He's

16 asking, did you know of his reputation.

17             THE WITNESS:  Yeah.  I'll articulate it this way:

18 You definitely had a reputation of being a hothead and -- I

19 think that's all I'll say.

20  BY MR. CANTWELL:

21 Q    Was it your impression that I had cultivated that

22 reputation?

23 A    I didn't know.

24 Q    Okay.  As of August 10th, 2017, had you heard about any

25 act of violence being attributed to any of my listeners?

R. Spencer - Cross

1   A    I've never heard of any of that, no.

2   Q    Okay.  As of August 10th, 2017, had you ever heard of any

3   political event I was involved in becoming violent?

4   A    I had not heard of that, no.

5   Q    Yesterday you testified that you had created a separate

6   Discord server for alt-right leaders.  Please describe for the

7   jury what role, if any, I had on that server.

8   A    To be accurate, I think I suggested that Eli create a

9   server for alt-right leaders.  Things like that had been

10  created in the past and they didn't go anywhere, like a Twitter

11  DM group that didn't go anywhere.

12       I don't think he actually did that, at least to my

13  knowledge.  So the alt-right leader server does not exist, to

14  my knowledge.  I never took part in it, to my memory.  But your

15  name did not come up in any of these suggestions.

16  Q    Okay.  Let's talk about August 11th.  Did you attend the

17  so-called "leadership meeting" at McIntire Park on August 11th?

18  A    No.

19  Q    Do you know about an itsgoingdown -- I'm sorry.  Are you

20  familiar with a website called itsgoingdown.org?

21  A    I'm familiar with the website, yes.

22  Q    Did you know of a post on itsgoingdown.org that had

23  exposed our plans for the torchlight march that evening?

24  A    I did not know about that in particular, no.

25  Q    Did somebody convey to you the substance of the McIntire

R. Spencer - Cross

1  Park meeting?

2  A    No.

3  Q    What time did you arrive at Nameless Field?

4  A    I don't remember the exact time.  Night had fallen by the

5  time that I arrived at Nameless Field.

6  Q    Were you aware of an instruction to cut the tiki torches

7  to a shorter length than is sold in stores?

8  A    I was not aware of that instruction.  I didn't carry a

9  tiki torch on August 11th, to my memory.

10 Q    Okay.  I think yesterday we saw a photograph of you

11 holding a tiki torch.  Was that from the first event?

12 A    That was from Charlottesville 1.0, yes.

13 Q    Yesterday you illustrated a lengthy route that the torch

14 march took through the UVA campus.

15 A    Uh-huh.

16 Q    Do you know if that was the original plan or if the plan

17 had changed at some point?

18 A    I don't know the details of it.  I remember everyone had

19 massed in Nameless Field and I remember telling Kessler, "Why

20 don't we walk up this alley?"  I remember suggesting that.  But

21 I don't know of the previous plan.

22     I am familiar with the campus.  So I remember suggesting,

23 oh, let's -- let's -- this is a -- kind of immediate way.

24 Let's start walking up there.

25 Q    Are you saying that the -- the route that we took, was

41

R. Spencer - Cross

1  that your idea?

2  A    I don't think the whole route was my idea.  But I remember

3  there was a little bit of a -- I don't think "dispute" is the

4  right word with Mr. Bloch, where I -- I said, at least to my

5  memory, I think we actually walked by the bookstore.  There's

6  an alleyway by the bookstore.  It's my recollection that I

7  remember I saw Kessler there and I was like, "Well, I think

8  this would be a good way."  I do vaguely remember that, but...

9  Q    Before you made that suggestion, did you know of a planned

10  route?

11  A    I did not know of the planned route, no.

12  Q    Okay.  And were you up towards the front of the formation

13  in the torch march?

14  A    I was up towards the front at the beginning, but things

15  would kind of shift and change.  So I'm not sure -- when we

16  came out of the Rotunda, I'm not sure if I was actually at the

17  lead at that point.  But I remember simply telling Jason

18  when -- Mr. Kessler when he was there, "Okay, let's get this

19  going" kind of thing.  So, you know, it was -- it was fluid.  I

20  think that's a good way to describe it.

21  Q    Okay.  Before we started marching, were you up towards the

22  front?

23  A    Before we started marching, I was up towards the front,

24  yes.

25  Q    Okay.  And did your hear Defendant Kline giving people

R. Spencer - Cross

1    instructions at the front of that formation?

2    A    I don't remember seeing Mr. Kline -- I don't have strong

3    memories of seeing Mr. Kline at all during that -- during the

4    torchlight rally.  And I don't remember him giving

5    instructions, no.

6    Q    If I were to play for you video of him giving those

7    instructions, would it refresh your memory?

8    A    It might.

9    Q    I'd like to show Mr. Spencer that video.  That's my

10   Exhibit 127.

11            THE CLERK:  Has this been admitted, Mr. Cantwell, or

12   no?

13            MR. CANTWELL:  This has not been admitted yet.

14            (Defendant Cantwell Exhibit 127 marked.)

15            MR. CANTWELL:  I'll mute this and see if he remembers

16   the scene before we play the audio.

17            THE CLERK:  Mr. Cantwell, I'm not seeing your

18   computer.

19            MR. CANTWELL:  Oh, I'm sorry.  My screen is not

20   connected.  I apologize.

21            (Video playing.)

22    BY MR. CANTWELL:

23   Q    Mr. Spencer, I know this scene is kind of blurry, but does

24   it look familiar to you?

25   A    It looks familiar.

R. Spencer - Cross

1          MR. CANTWELL:  May I add this to evidence and show it

2     to the jury?

3          MR. BLOCH:  Objection.  There's absolutely no

4     foundation, Judge.  The fact that the video looks familiar to

5     him does not suggest that Mr. Spencer has personal knowledge of

6     what's in the video.

7          MR. CANTWELL:  You know, we raised this technical

8     issue earlier.  I have no way of playing audio without playing

9     it out loud.  Should I turn the sound on and see if he heard

10    it?

11         THE COURT:  You're trying to get him to see Mr. Kline

12    making a speech, right?

13         MR. CANTWELL:  Mr. Kline give some instructions, and

14    I want to ask Mr. Spencer about those instructions.  He says he

15    doesn't recall.  I asked him if I could refresh his memory by

16    showing him video.

17         THE COURT:  All right.  You can refresh his memory,

18    but don't show it to the -- beyond anyone but him.

19         MR. CANTWELL:  The only way for me to do that --

20    could I give him some headphones that he could hear this some

21    way?  Because there's audio.

22         THE COURT:  Maybe so.  That would be --

23         MR. CANTWELL:  Sorry?

24         THE COURT:  Maybe so.

25         MR. CANTWELL:  Maybe so?

44

R. Spencer - Cross

1          THE WITNESS:  There are headphones right here.

2          THE COURT:  I don't know that -- Heidi, can we do

3  that?

4          THE CLERK:  Yes, Your Honor.

5          MR. CANTWELL:  Maybe the thing to do here is -- I can

6  ask Mr. Spencer this question when I bring my own case up.

7  I'll put that off for later.

8          THE COURT:  Okay.

9   BY MR. CANTWELL:

10  Q    Did you see me on the UVA campus on the evening of

11  August 11th?

12  A    I do remember seeing you.

13  Q    Do you remember if I had a torch in my hand?

14  A    I don't remember that, but I do remember seeing you during

15  the march.

16  Q    Do you recall what you saw as you walked down the stairs

17  towards the statue?

18  A    Kind of -- I mean, kind of a vague...

19  Q    All right.  Yesterday Mr. Bloch asked you about students

20  with their arms linked around the statue; do you recall that?

21  A    Right.

22  Q    When we came down those stairs, was that all you saw at

23  the bottom of the statue?

24          MR. BLOCH:  Judge, I'm going to object.  If I'm

25  correct, I believe Mr. Cantwell has put a photograph on the

R. Spencer - Cross

1    screen for Mr. Spencer.  I don't believe he made that clear for

2    the record.  I'm not sure why it's there.

3             MR. CANTWELL:  I apologize.

4             MR. BLOCH:  It's on our screen.  I believe it's on

5    Mr. Spencer's screen.

6             MR. CANTWELL:  I'll withdraw that question.

7             Mr. Spencer, I'm showing you Plaintiffs'

8    Exhibit 2695, which I believe has already been entered into

9    evidence.

10            Could we publish this and show to it the jury,

11   please?

12            THE COURT:  Yes.  I think it's already in evidence.

13            MR. CANTWELL:  Yes.

14    BY MR. CANTWELL:

15   Q    Mr. Spencer, do you recognize this man?

16   A    No, I don't.

17   Q    Do you know who Emily Gorcenski is?

18   A    I know of her, yes.

19   Q    Do you know if Emily Gorcenski was at the monument that

20   night?

21   A    Yes, I believe she was.  I don't remember seeing her while

22   I was there in person, but I remember seeing evidence of that

23   on social media afterwards.

24   Q    Okay.  And to the best of your knowledge, is Emily

25   Gorcenski a UVA student?

R. Spencer - Cross

1    A    I have no idea.

2    Q    Do you know Emily Gorcenski to be associated with Antifa?

3    A    I -- I don't.  Antifa is not a membership organization.

4    So it's kind of like asking "are you associated with white

5    nationalism" or something.  I don't know that much about her.

6    Q    Do you understand Emily Gorcenski to be sympathetic to

7    your political views?

8    A    No.  She's highly -- not at all sympathetic.

9    Q    Do you know if Emily Gorcenski is transgender?

10   A    That is my understanding.

11   Q    Do you remember seeing this woman at the statue on

12   August 11th?

13   A    I don't remember that woman.

14   Q    I know we're looking at his back, but does this guy stand

15   out to you at all?

16   A    He doesn't.

17   Q    Richard, did you expect counter-protesters to be waiting

18   for us at the statue?

19   A    No.  My -- I mean, it's always a possibility in the back

20   of your mind, of course, but my understanding was that it was a

21   kind of flash mob where it was not previously announced.  It

22   was just kind of a show and then you leave.

23   Q    Was it your understanding that the torch march was

24   supposed to be a secret?

25   A    Yes, that was my understanding.

R. Spencer - Cross

1  Q    Yesterday plaintiffs' counsel played for you a video clip

2  for you in which somebody said "we need more people to block

3  these guys off," or something to that effect.  Do you recall

4  that audio?

5  A    Could you repeat that, please?

6  Q    Somebody in the video was -- you were in the video, and

7  somebody said "we need more people over here to block these

8  guys in," or something to that --

9  A    Oh, I remember that piece of evidence, yes.

10  Q    And when Emily Gorcenski tweeted that the rally-goers

11  would not let them leave, you tweeted at Emily Gorcenski and

12  you said, "Fact check:  True"; do you remember that?

13  A    I do remember that, yes.

14  Q    Mr. Spencer, what would you have done if one of these

15  counter-protesters said "excuse me" and tried to walk past you?

16          MR. BLOCH:  Objection, speculation.

17          THE COURT:  Well, he knows what he -- maybe he knows

18  what he would have done.

19          MR. CANTWELL:  I'm asking Mr. Spencer about his

20  intent.

21          THE COURT:  Answer the question.

22          THE WITNESS:  Yes, I would have let them walk by.

23  There were actually a few moments that I remember distinctly

24  for whatever reason.  I remember -- well, I was there with Greg

25  and some other people.  There was a very burly, in my humble

48

R. Spencer - Cross

1  opinion --

2          THE COURT:  I think he's answered the question.

3          THE WITNESS:  Okay.  That actually happened.  There

4  were times when someone was clearly a counter-protester and

5  clearly hostile and we actually did get a little distance so

6  that nothing happened.

7          MR. CANTWELL:  As a matter of fact -- I'm looking for

8  this in my notes, Judge.  I don't know if plaintiffs' counsel

9  can save me the time by telling me which exhibit of theirs that

10 was when somebody said "we need more people to block them in."

11 I'd like to pull that video up, if I could.

12          Is that 2117?

13          MR. BLOCH:  I think that's right.

14          MR. CANTWELL:  Now, Plaintiffs' Exhibit 2117 --

15          MR. BLOCH:  It's a clip of 2117.

16          MR. CANTWELL:  Right.  I am going to ask to play more

17 of Plaintiffs' Exhibit 2117, which is also -- part of that

18 video is already in evidence as my exhibit -- that would be my

19 exhibit -- I apologize.  I have that as my Exhibit 133.

20          This is the video that was recorded by Augustus

21 Invictus that night.  That was his livestream video.

22          Would there be any objection to adding the entirety

23 of Plaintiffs' Exhibit 2117 to evidence?

24          MR. BLOCH:  There is, Judge.  There's no foundation.

25 And I'd like to approach on this issue, if there's more.

R. Spencer - Cross

1        THE COURT:  All right.

2        (Sidebar.)

3        MR. CANTWELL:  The situation that Mr. Spencer just

4   described of a man walking past him trying to get out, the

5   so-called "counter-protesters" leaving the scene, there's

6   actually a good bit of that at the end of Plaintiffs'

7   Exhibit 2117.  I'd like to show that.

8        THE COURT:  What's the problem?

9        MR. BLOCH:  The problem is that -- I mean, he can

10  obviously -- Mr. Spencer can authenticate any portion of the

11  video that he's in.

12       THE COURT:  Well, isn't the video authenticated?

13       MR. BLOCH:  Only a small clip of it that Mr. Spencer

14  is in.

15       Mr. Cantwell is now trying to put in a 30-minute

16  video.  We put in about 40 seconds of it that Mr. Spencer is

17  in.  There's all kinds of commentary.  There's voiceovers.

18  There's --

19       MR. CANTWELL:  For one thing, there's actually two

20  portions of that video that have already been admitted.  I

21  admitted part of it under another exhibit number.  I have it

22  and they have it.  We have it in as --

23       MR. BLOCH:  It's about a minute and a half total

24  that's in.

25       MR. CANTWELL:  So there's a couple of things here.

R. Spencer - Cross

1          Now, to accomplish what I'm trying to accomplish

2    right now, I do not need to enter the entire 30-minute video.

3          MR. BLOCH:  That's what you just offered in evidence,

4    right?

5          MR. CANTWELL:  I did, yes.  Okay?  So to accomplish

6    what I'm trying to accomplish in this moment, I can accomplish

7    it without the entire 30-minute video.  I'm acknowledging that,

8    okay?  I would like to introduce the entire 30-minute video for

9    a few reasons.  One is, it captures the entire thing, and I

10   think that that's helpful, but I anticipate this objection.

11         So Mr. Spencer identifies a portion of the video.

12   There is --

13         THE COURT:  Can he identify the portion you want to

14   show?

15         MR. CANTWELL:  I don't think that he's in the frame

16   when I'm going to show what I want to show.

17         MR. BLOCH:  Judge, just to give a little more

18   context, this is a video filmed by a former defendant who has

19   defaulted.  He is giving commentary the entire course of the

20   video.  It's 30 minutes.  There's all kinds of hearsay.

21         THE COURT:  Well, the 30 minutes is off -- he's taken

22   that off the table.  But what is -- I mean, what is it?  He

23   wants to show just the video of somebody --

24         MR. BLOCH:  My understanding is that he wants to show

25   a portion of the video that Mr. Spencer is not in, did not

R. Spencer - Cross

1    observe in real time, has no personal knowledge of.  He just

2    wants -- so there is no foundation for it.

3         MR. CANTWELL:  I'm actually not certain where

4    Mr. Spencer is in that portion of the video.

5         I am aware of portions of the video where Emily

6    Gorcenski, who is an open Antifa, is standing in the middle of

7    this crowd with no threats to her safety.  I am aware of a

8    portion of this video during the same portion where Paul Minton

9    and Thomas Keenan, who are both from Philadelphia Antifa, are

10   just walking through the crowd nonchalantly with no concern for

11   their safety.

12        THE COURT:  He doesn't know Emily, but does he know

13   the other people?

14        MR. CANTWELL:  I don't know.

15        THE COURT:  Well, okay.  It's not authenticated.

16   You've got to put it in through some witness who can

17   authenticate that that's what happened.

18        MR. CANTWELL:  Okay.  Thank you, Your Honor.

19        (End sidebar.)

20    BY MR. CANTWELL:

21   Q    Was the decision to circle the monument made before or

22   after we saw the counter-protesters?

23   A    It was made after.  It seemed to be a kind of collective

24   movement around the monument.

25   Q    Before we saw the counter-protesters, what did you

52

R. Spencer - Cross

1  understand the plan to be once we got to the statue?

2  A    To go to -- to the degree that I understood it, it was

3  pretty vague, but it was about going to the statue and being

4  around it and, you know, doing some kind of display, chant, and

5  then leave.

6  Q    I'm sorry.  Did you say that before we went to the statue,

7  the plan was to be around the statue?

8  A    Yes.

9  Q    And that was somehow --

10 A    I guess both -- I mean, I don't know of any real specific

11 details about what was going to happen.  It was a just organic

12 movement.  But going to the statue, I mean, generally speaking,

13 yeah, it was about amassing around the statue and saying bold

14 stuff and then leaving.

15 Q    Prior to seeing the counter-protesters, the plan was to be

16 around the statue?

17 A    Correct.

18 Q    Thank you.

19      Did you punch, kick, pepper-spray, or otherwise attempt to

20 inflict pain upon anyone that night?

21 A    No.

22 Q    Did you personally witness any Unite the Right attendee

23 attack innocent students that night?

24 A    I did not witness -- the answer is no.

25 Q    Thank you.

53

R. Spencer - Cross

1      At some point did you become aware that I had been

2  arrested for my role in the fighting?

3  A    I -- the fighting during the torch march?

4  Q    At the torch march did you become aware at some point that

5  I had been arrested for my role in that?

6  A    I was not aware of that.

7  Q    You never heard that I was arrested?

8          MR. BLOCH:  Objection, asked and answered.  Leading.

9          THE COURT:  Overruled.  Go ahead.

10          THE WITNESS:  I did hear that you had been arrested.

11  I remember seeing that on social media, but I don't remember

12  that being in connection to the torchlight rally.  But again, I

13  wasn't paying attention to you that much, to be honest.

14   BY MR. CANTWELL:

15  Q    Okay.  Please describe for the jury what role, if any, I

16  played in the National Policy Institute.

17  A    No role.

18  Q    Please list for the jury all of the organizations you

19  believe me to be a leader of in a white nationalist movement.

20  A    I would say you were the leader of the Radical Agenda

21  podcast.  I can't name another.

22  Q    Do you have any estimation of how many people are in the

23  organization Radical Agenda podcast?

24  A    Perhaps one --

25  Q    Okay.

5.4

R. Spencer - Cross

1   A     -- maybe another.

2   Q     Thank you.

3          MR. BLOCH:  Judge, I would ask that the witness be

4   allowed to answer the questions.

5          THE COURT:  I think the witness has answered.

6          MR. BLOCH:  Well, Mr. Cantwell is consistently trying

7   to cut him off in the middle of his answers.  So I would ask --

8          THE COURT:  I don't perceive that to be the case.

9   But answer the -- let the witness answer.

10         MR. CANTWELL:  Fair enough, Judge.  Thank you.

11   BY MR. CANTWELL:

12   Q     Please describe for the jury what role, if any, I played

13   in developing your plans for August 11th and 12th?

14   A     You played no role.

15   Q     Do you recall getting a text message from me encouraging

16   you to install an app called Signal?

17   A     I don't recall that outside of I glanced at that on --

18   when the full text message conversation in toto was produced, I

19   remember seeing that out of the corner of my eye, but I don't

20   recall that in the sense it's part of my memory of the event,

21   just to be specific.

22   Q     Okay.  Did you at some point install this app?

23   A     At some point I installed the Signal app, yes.

24   Q     Approximately when was that?

25   A     I don't know when.

R. Spencer - Cross

1  Q     Have you since become familiar with how that app works?

2  A     Yes.  I'm familiar with how it works.  I think it's an

3  end-to-end encryption.

4  Q     In your experience does that app delete messages without

5  the user specifically instructing it to?

6  A     I know that that's an option, but the answer is no.  You

7  have to choose that option.  So for instance, I have not chosen

8  that option.  I didn't use that app with anyone involved with

9  this.

10 Q     Okay.  I guess that answers my next two questions.

11       In your leadership role in the alt-right and at NPI in

12 particular, did you care about your public image?

13 A     Yes.

14 Q     Can you think of any political organization that does not

15 care about their public image?

16 A     Of course not.

17 Q     Could this concern be described as optics?

18 A     Yes.

19 Q     Are you familiar with the term "agree and amplify"?

20 A     I'm -- yes, I'm familiar with it.

21 Q     Could you please describe what that phrase means to you?

22 A     Well, it is what it is.  You -- when someone says

23 something, you agree and then amplify it; that is, increase it

24 or make it more outrageous or outlandish.

25 Q     Could this be described as a media strategy?

R. Spencer - Cross

1    A    Yes.

2    Q    Based on what you know about jails and prisons, do you

3    think you'd like to spend a whole lot of time in one?

4    A    No.

5    Q    At any time on August 11th or 12th did you hide your face

6    from any camera?

7    A    No.

8    Q    Did you speak to reporters?

9    A    Yes.

10   Q    Have you ever heard the phrase "nationalism for all

11   peoples" before I said it in the courtroom with Mr. Heimbach?

12   A    Yes, I've heard that many times.

13   Q    What does that phrase mean to you?

14   A    I think it's -- it means that yes, we are nationalistic.

15   We want our own place with language and borders and identity,

16   etc, but we actually support that cause for everyone.

17   Q    Are you familiar with the name Marcus Garvey?

18   A    Yes, I am.

19   Q    How about Malcolm X?

20   A    Yes.

21   Q    What do these two men have in common?

22   A    They are black nationalists, you could say.  I think

23   Marcus Garvey took it a step further by being a leader of a

24   back to Africa program, a kind of we're going to have a --

25             MR. BLOCH:  Judge, I'm going to object.  This is very

R. Spencer - Cross

1    far afield.

2             THE COURT:  Well, he's answered the question.  Move

3    on.

4     BY MR. CANTWELL:

5    Q    Yesterday we saw a video of you talking about Wes Bellamy,

6    and you indicate -- do you recall indicating during that video

7    that you actually respected black nationalists?

8    A    Yes, absolutely.

9    Q    And did you publish that -- withdrawn.

10        We also saw a text message from somebody to you suggesting

11   that we should embrace black nationalists as some sort of PR

12   strategy.  Do you recall that message?

13   A    I recall it, yes.

14   Q    Do you recall which one of these messages came first?

15   A    I don't recall which came first.

16   Q    You don't recall if you made the video first or if you got

17   the text message first?

18   A    I don't recall.  I mean, I've always been in support of

19   black nationalism.  So it doesn't matter.

20   Q    Was the text message the reason you made that video?

21   A    No.

22   Q    In any of your dealings with NPI or in your connection

23   with the events at the heart of this dispute, or in connection

24   with your activism for social and political change, have you

25   knowingly acted at the behest of any government agency, foreign

R. Spencer - Cross

1    or domestic?

2    A    No.

3    Q    Is race your only problem with Antifa?

4    A    No, not at all.

5    Q    Is race your only concern regarding immigration?

6    A    No.

7    Q    Do you believe the fight involving DeAndre Harris was

8    motivated by the color of Harris's skin?

9             MR. BLOCH:  Objection.

10            THE COURT:  Sustained.

11   BY MR. CANTWELL:

12   Q    Have you ever read *Mein Kampf*?

13   A    No.

14   Q    No?

15   A    No, I have not.

16            MR. CANTWELL:  No further questions.

17            THE COURT:  Anyone else?

18            THE CLERK:  Judge?

19            THE COURT:  Yes.

20            THE CLERK:  Mr. ReBrook by Zoom.

21            THE COURT:  All right.  Mr. ReBrook.

22            MR. REBROOK:  Your Honor, can you hear me?

23            THE COURT:  Yes.

24                      CROSS-EXAMINATION

25   BY MR. REBROOK:

59

R. Spencer - Cross

1  Q    Mr. Spencer, good morning.

2  A    Good morning.

3  Q    Mr. Spencer, was Jeff Schoep involved with any of the

4  planning with you for the Unite the Right rally?

5  A    I have no idea about Jeff Schoep's involvement in any way.

6  So the answer is no, he was not involved in any of the planning

7  that I did for Unite the Right, to attend.

8  Q    And would you be able to recognize Mr. Schoep if you saw

9  him?

10 A    No.

11          MR. REBROOK:  I have no further questions.

12          THE COURT:  All right.  Thank you.  Anyone else on

13 Zoom?

14          All right.  Mr. Spencer, since you represent

15 yourself, you have a right to cross-examine yourself, but only

16 with regard to the direct examination.

17          THE WITNESS:  As tantalizing as it is to have a

18 conversation with myself, I'm going to refrain and simply --

19 when I present my affirmative case.

20          THE COURT:  You can testify later.

21          THE WITNESS:  Yes.

22          THE COURT:  All right.  Any redirect?

23          MR. BLOCH:  Judge, we do have very brief redirect.

24 It does require the pulling up of a video, which would take a

25 few minutes.  Is it possible to take our morning break?

R. Spencer - Cross

1          THE COURT:  No.  How much time is it going to take?

2     I'd like to take the break -- we have scheduled breaks.

3          MR. BLOCH:  Understood.  I'd say five minutes.

4          THE COURT:  Well, we may as well take a break.

5     Ladies and gentlemen, we'll take a 20-minute recess now.

6     **(Jury out, 10:13 a.m.)**

7          (Recess.)

8          THE COURT:  Call the jury back.

9     **(Jury in, 10:38 a.m.)**

10          THE COURT:  All right.  You may be seated.

11          Proceed.

12          MR. BLOCH:  May I proceed, Your Honor?

13                    REDIRECT EXAMINATION

14     BY MR. BLOCH:

15    Q    Good morning, Mr. Spencer.

16    A    Good morning.

17    Q    Mr. Spencer, Mr. Cantwell asked you this morning a

18    question:  "At the torch march, did you become aware at some

19    point that I had been arrested for my role in that?"

20          You answered:  "I was not aware of that."

21          He then asked you:  "You never heard that I was arrested?"

22          You answered:  "I did hear that you had been arrested.  I

23    remember seeing that on social media, but I don't remember that

24    being in connection to the torchlight rally."

25          Do you remember giving that testimony?

R. Spencer - Cross

1   A    Yes.

2   Q    Isn't it true, Mr. Spencer -- and if we could just show

3   the text messages between Mr. Cantwell and Mr. Spencer.

4        Do you agree with me, Mr. Spencer, that on August 16th,

5   four days after the torch march -- sorry, five days after the

6   torch march, Mr. Cantwell texted you and he said -- if we can

7   show the content; I don't think we can see the whole thing --

8   "I've got a warrant out for my arrest from UVA."  And you

9   responded:  "I'm very sorry to hear that.  Stay strong.  Is it

10  just in Virginia and for what?"

11       And Mr. Cantwell responded:  "I figure it's for the torch

12  march brawl."

13       Did you exchange those text messages with Mr. Cantwell

14  five days after the torch march?

15  A    Yes.

16            MR. BLOCH:  We can take that down.

17   BY MR. BLOCH:

18  Q    You also were just asked about whether you attended the

19  meeting in McIntire Park on August 11th, right?

20  A    By Mr. Cantwell, yes.

21  Q    Mr. Cantwell just asked you that.  And --

22  A    Could you just be specific about which meeting you're

23  talking about?

24  Q    So Mr. Cantwell asked you, did you attend the so-called

25  leadership meeting in McIntire Park?

R. Spencer - Cross

1   A     Yes.

2   Q     And that's the meeting in McIntire Park on August 11th,

3   right?

4   A     Yes.  I understand that.

5   Q     Now, in your deposition testimony at page 269, line 18,

6   were you asked these questions --

7   A     Could I see the --

8   Q     Sure.

9   A     -- record, please?

10        Thank you.

11  Q     Were you asked these questions, and did you give these

12  answers, Mr. Spencer?

13        Question:  "Did you see other people?  Did you see other

14  people with weapons?"

15        Answer:  "As we were headed to the torch march, I think we

16  might have picked up Evan McLaren" --

17  A     Hold on.

18  Q     -- "and I remember seeing some of these guys who were

19  engaged in open carry, and that was a bit concerning."

20        Question:  "Just to be clear, there were other white

21  nationalists in the group marching with you that had guns on

22  them, correct?"

23        Answer:  "I saw that in the park.  I'm not sure I saw

24  anyone with a weapon in the march itself.  That was in McIntire

25  Park beforehand."

R. Spencer - Cross

1    Did you give that testimony?

2  A    Could you -- could you -- you said 216?

3  Q    269?

4  A    Oh, 269.  I misunderstood you.

5  Q    So the question, Mr. Spencer -- referring to 269, line 18,

6  to 270, line 6, the question is:  Did you give that testimony?

7  A    Yes.

8         MR. BLOCH:  I have nothing further, Judge.

9         THE WITNESS:  That was in reference to a different

10 meeting in the park.  The security meeting is the one that I

11 did not attend.  There was a gathering in the park on the

12 morning before August 12th that I have not disputed that I was

13 there.  So you're conflating two different things, a

14 mischaracterization.

15  BY MR. BLOCH:

16 Q    So you're saying there was a -- an additional meeting that

17 you did attend in McIntire Park on August 11th; is that --

18 A    No.

19 Q    -- your testimony?

20 A    On August 12th, in the morning, people gathered at

21 McIntire Park.  We've seen images of that.  That's what I'm

22 referring to, unless I'm -- unless it's a different park and

23 I'm just making that mistake.  But to the extent that I

24 understand it, there was a security meeting on August 11th at

25 McIntire Park that I did not attend.  And then on August 12th,

Sines, et al. v. Kessler, et al., 3:17CV72, 11/5/2021

1  before the rally itself and -- and after, there were large

2  gatherings of UTR attendees.  So that's what I was referring

3  to.

4  Q    So you're saying that's what you were referring to when

5  you were talking about seeing all the people with guns, is on

6  August 12th?

7  A    I think I said I might have seen someone doing an open

8  carry on August 12th when we -- when everyone was amassed there

9  and there was just a huge amount of people.  That's what I was

10 referring to.

11 Q    Okay.  And just to be clear on what your actual testimony

12 was, page 269, line 18, were you asked:  "Did you see other

13 people?  Did you see other people with weapons?"

14      Answer:  "As we were headed to the torch march, the

15 torchlight, I think we might have picked up Evan McLaren" --

16 A    Right.

17 Q    -- "and I remember seeing some of these guys who were

18 engaged in open carry, and that was a bit concerning."

19      Was that your testimony?

20 A    Yes.

21           MR. BLOCH:  I have nothing further.

22           THE COURT:  All right.  Thank you.

23           Mr. Spencer, you may step down.

24           Call your next witness.

25           MS. KAPLAN:  Our next witness will be a very short

Sines, et al. v. Kessler, et al., 3:17CV72, 11/5/2021

1   video, seven minutes, of Ike Baker.

2            THE COURT:  All right.

3            MR. CANTWELL:  Judge, do we need the same limiting

4   instruction?

5            THE COURT:  Is this one your --

6            MR. CANTWELL:  I believe so.

7            THE COURT:  Whose deposition did you say this is,

8   ma'am?

9            MS. KAPLAN:  Ike Baker, Your Honor.

10           THE COURT:  Is he one of the ones that Mr. --

11           MS. KAPLAN:  Yes.  Yes, Your Honor.

12           THE COURT:  All right.

13           Members of the jury, I'm going to read this

14   instruction to you about this particular deposition coming up.

15           I'll remind you that each party is entitled to have

16   the case decided solely on the evidence that applies to that

17   party.  Some of the evidence in this case is limited under the

18   rules of evidence to some of the parties and not -- cannot be

19   considered against the others.

20           Plaintiffs' deposition testimony from Mr. Baker may

21   not be considered by you in connection with Defendant

22   Christopher Cantwell because he was not at the deposition or

23   otherwise notified.  However, it may be considered by you in

24   connection with the other defendants.

25           All right.  You may proceed to play the deposition.

66

M. Hill - Direct

1          MS. KAPLAN:  Thank you, Your Honor.

2               (Video deposition of Robert "Ike" Baker played.)

3          MS. KAPLAN:  Your Honor, plaintiffs call Defendant

4    Michael Hill.

5          MS. DUNN:  Your Honor, we'd just like to enter into

6    evidence PX-4000, the report for the deposition that was just

7    played.

8               THE COURT:  The report for the deposition?

9               Go ahead.

10              That will be admitted if there's no objection.

11              (Plaintiffs' Exhibit 4000 marked.)

12              (Plaintiffs' Exhibit 4000 admitted.)

13         MICHAEL HILL, CALLED BY THE PLAINTIFFS, SWORN

14                    DIRECT EXAMINATION

15   BY MR. LEVINE:

16   Q    Good morning, Dr. Hill.

17   A    Good morning.

18   Q    You founded the League of the South in 1994; is that

19   correct?

20   A    Yes.

21   Q    And you've been president of the League of the South since

22   its founding; isn't that correct?

23   A    Yes.

24   Q    By 2016, the League had how many state chapters?

25   A    This would be off the top of my head, but I would say

M. Hill - Direct

1   probably about 15 or so; most of the Southern states and a few

2   states outside of the South.

3   Q    And the League of the South had a website, correct?

4   A    That's correct.

5   Q    And you used that website to publish statements by you and

6   about the work of the League of the South, correct?

7   A    Largely me.

8             MR. LEVINE:  Could we mark Plaintiffs' Exhibit 1566A,

9   show it to the witness?

10            (Plaintiffs' Exhibit 1566A marked.)

11   BY MR. LEVINE:

12   Q    Is that the League of the South website?

13   A    Yes, it is.

14   Q    And is that a statement that you published on it on

15   August 18, 2016?

16   A    Yes, it is.

17            MR. LEVINE:  We offer it in evidence, Your Honor.

18            THE COURT:  Be admitted.

19            (Plaintiffs' Exhibit 1566A admitted.)

20            MS. DUNN:  We ask to publish it for the jury, Your

21   Honor.

22            THE COURT:  You may.

23   BY MR. LEVINE:

24   Q    Now, you published on the League of the South website on

25   August 18, 2016 something you called "My Pledge of Allegiance,"

M. Hill - Direct

1   correct?

2   A    That is correct, sir.

3   Q    And in that document -- which was for your 65th birthday,

4   correct?

5   A    I think that would be correct.

6   Q    And if we go down to third to the last paragraph, could

7   you read that, please, to the jury?

8   A    Yes.  I'll be glad to.

9        "So whatever time the Lord of Hosts -- whom I gladly will

10  serve with all my heart, mind, and strength -- may allot for me

11  from here to the end, I pledge to spend fighting to restore the

12  South as White Man's Land.  I do this because I believe in the

13  admonition in 1 Timothy 5:8.  'But if any provide not for his

14  own, and specially for those of his own house, he hath denied

15  the faith, and he is worse than an infidel.'"

16  Q    Would you please continue to this next paragraph?

17  A    "So, in direct contradiction to the politically correct

18  dictates of the current day, I pledge to be a white

19  supremacist, a racist, an anti-Semite, a homophobe, a

20  xenophobe, an Islamophobe, and any other sort of 'phobe that

21  benefits my people, so help me God!"

22  Q    You can take that down.

23       So in the summer of 2016, you identified yourself as a

24  white supremacist, correct?

25  A    I identified myself as all the things I just read out,

M. Hill - Direct

1  including as a white supremacist, sir.

2  Q    And you identified yourself as a racist, correct?

3  A    I did identify myself as a racist, sir.

4  Q    And you identified yourself as an anti-Semite; isn't that

5  right?

6  A    I did.  Yes, sir, that is correct.

7  Q    And you held these views the following year, in 2017,

8  correct?

9  A    My views did not change.

10  Q    And you held these views in 2018; is that correct?

11  A    My views have not changed.

12  Q    And you held -- hold these views today; is that right?

13  A    I still hold the views.  I do not deny any of these views.

14  I held them then; I held them now -- hold them now.

15  Q    And the League of the South is dedicated to Southern/white

16  nationalism; isn't it?

17  A    The League of the South is a Southern nationalist

18  organization.  We have been since the very beginning.

19  Q    And Southern white nationalism seeks to create a white

20  Aryan homeland; isn't that right?

21  A    We seek to create a white homeland, right.

22  Q    And that means -- and that means, in your vision,

23  returning black people to their status under Jim Crow; is that

24  right?

25  A    I've never said that.

M. Hill - Direct

1            MR. LEVINE:  Please mark Plaintiffs' Exhibit 1564.

2            (Plaintiffs' Exhibit 1564 marked.)

3   BY MR. LEVINE:

4   Q    Is your email address during 2017 jmichhill@cs.com?

5   A    It is.

6   Q    And do you recognize this as an email you sent on

7   April 22, 2017?

8   A    Yes, I do.

9            MR. LEVINE:  We offer it, Your Honor.

10           THE COURT:  Be admitted.

11           (Plaintiffs' Exhibit 1564 admitted.)

12           MR. LEVINE:  We ask that it be published to the jury,

13  Your Honor.

14           THE COURT:  You may.

15   BY MR. LEVINE:

16  Q    Did you state on April 22nd, 2017, "Negroes are incapable

17  of creating or sustaining anything resembling Western

18  civilization"?

19  A    Yes, I did.

20  Q    And later on in that paragraph you say, quote, "However,

21  when the civil rights revolution undermined white resolve and

22  the Negro was freed from white oversight and domination, he

23  became a menace to himself, to whites, and to civilization in

24  general"?

25  A    Yes, I did.

71

M. Hill - Direct

1   Q    "The solution?  Some degree of segregation -- perhaps

2   total -- and the restoration of white dominance through various

3   Jim Crow-type laws."

4        Did you write that?

5   A    I did.  Yes, I did.

6   Q    Does that refresh your recollection that you have said

7   that?

8   A    Yes.  I said Jim Crow-type laws.  I did not say Jim Crow

9   laws.  Words are important, sir.

10  Q    Now, you actually -- take that down, please.

11       You actually believe that black people are inferior to

12  white people, don't you?

13  A    I believe that there is an innate difference that's

14  reflected by IQ, and I believe history shows that white

15  civilization is clearly superior in its entirety to any other

16  civilizations created by any other races, yes.

17  Q    I asked you, sir, if, in fact, you believe that black

18  people are inferior to white people.

19  A    Not in every case, sir.  In some cases, yes; in some

20  cases, no.

21  Q    I asked you, sir, if you have taken the position that

22  black people are inferior to white people.

23  A    And I answered your question, sir.  In some cases, yes; in

24  some cases, no.

25            MR. LEVINE:  Mark Plaintiffs' Exhibit 1564.

72

M. Hill - Direct

1  BY MR. LEVINE:

2  Q    I'm showing you an Exhibit 1564, the same exhibit that we

3  just read from.  It's a different paragraph in the same email.

4  Do you see it, the top paragraph?

5  A    Yes, I do.

6  Q    It says -- were these your words:  "Negroes are incapable

7  of creating or sustaining anything resembling Western

8  civilization and they know this"?

9  A    Yes, they are.

10 Q    It's your view that those words don't mean that you

11 believe that black people are inferior to white people?

12 A    In creating civilizations, yes.  In other areas of life,

13 no.

14 Q    So in your words, sir, the League of the South is firm on

15 the Negro question and the Jew question; isn't that right?

16 A    Please define the term "firm."

17 Q    I'm quoting you, sir.

18 A    Thank you for telling me that.  Would you please put up

19 the place where I said that?

20         MR. LEVINE:  Let's mark Plaintiffs' Exhibit 1899.

21         (Plaintiffs' Exhibit 1899 marked.)

22 BY MR. LEVINE:

23 Q    Is this a League of the South website statement by you

24 from August 13, 2018, on the one-year anniversary of Unite the

25 Right?

73

M. Hill - Direct

1  A    Yes.  I'll correct that.  It's the one year and one day

2  anniversary.

3  Q    Can we just go back to the last exhibit before we proceed

4  here?  The top paragraph, the last sentence I failed to read

5  said, "some degree of segregation -- perhaps total -- and the

6  restoration of white dominance through various Jim Crow-type

7  laws.  Otherwise, there will be escalating conflict that likely

8  will end in race war."

9       Did you say that?

10 A    Yes, I did, sir.

11 Q    Let's go back to the League of the South website.  This

12 was on the anniversary of the Charlottesville 2.0; is that

13 right?

14 A    The one year and one day anniversary, sir.

15 Q    And can we go down to -- the jury will have this to read

16 at their deliberations, but I want to go down to the fourth

17 paragraph where it says "some on both the left and the right."

18 Do you see that?

19 A    I do.

20 Q    In the middle there, does it say, "Rather, we" -- and

21 you're referring to the League there, correct?

22 A    That is correct.

23      MS. KAPLAN:  I don't think this document is

24 published.  I apologize.

25      THE CLERK:  It has not been moved for admission.

M. Hill - Direct

1          MR. LEVINE:  I move to admit the exhibit, 1899.

2          THE COURT:  It will be admitted.

3          (Plaintiffs' Exhibit 1899 admitted.)

4          MR. LEVINE:  Thank you.  Ask it to be published to

5    the jury.

6          THE CLERK:  It is.

7          MR. LEVINE:  Excuse me, Your Honor.

8     BY MR. LEVINE:

9    Q    So is this a statement that you published on the League of

10   the South website?

11   A    Yes, it is.

12   Q    And did you say there in the middle, starting with the

13   word "rather":  "Rather, we see ourselves as the heart and soul

14   of the hard right, an uncompromising movement of real blood and

15   soil Southern/white nationalists who will not compromise our

16   vision of a Southern homeland for whites.  To us, Dixie is and

17   should be white man's land.  We are firm on the Negro question

18   and the Jew question.  And we make no apologies to anyone for

19   what we believe or what we seek to accomplish."

20        Did you say that to the League on August 18, 2018?

21   A    Yes, I did.

22   Q    Now -- you can take that down.

23        For you, Dr. Hill, you not only consider yourself an

24   antisemite, but for you the Jewish person and the Jewish people

25   are your enemies; is that right?

75

M. Hill - Direct

1  A    Because of things as a historian that I have learned, I

2  see a lot of animosity on the part of the Jewish people.

3          MR. LEVINE:  Your Honor, could you direct the witness

4  to answer the question?

5          THE COURT:  Answer the question.

6          THE WITNESS:  Repeat the question, please.

7          MR. LEVINE:  Would the reporter please read it back?

8          (The requested portion of the transcript was read

9  back.)

10          THE WITNESS:  Yes.

11          MR. LEVINE:  Please mark Plaintiffs' Exhibit 1921.

12          (Plaintiffs' Exhibit 1921A marked.)

13   BY MR. LEVINE:

14  Q    You went to Tennessee in 2018 to speak to League members

15  and supporters; is that right?

16  A    I do believe that date is correct, sir.  If I see what

17  you're referring to in reference to it, I can confirm it.

18  Q    Please take a look at the video on your screen.

19          (Video playing.)

20      Is that you speaking?

21  A    That is me.

22          MR. LEVINE:  I offer Plaintiffs' Exhibit 1921A.

23          THE COURT:  It will be admitted.

24          (Plaintiffs' Exhibit 1921A admitted.)

25          MR. LEVINE:  I ask that it be published to the jury.

M. Hill - Direct

1              (Video playing.)

2              MR. LEVINE:  Take that down.

3    BY MR. LEVINE:

4    Q    And that night, at the end of that video, at the end of

5    your speech, you burn the Israeli flag, correct?

6    A    Correct.

7    Q    You burn a book, the Talmud, which is a Jewish religious

8    book, correct?

9    A    That is correct, sir.

10   Q    And you burned the Communist Manifesto by Karl Marx; is

11   that correct?

12   A    That's right.

13   Q    You burned Karl Marx's Communist Manifesto because Karl

14   Marx was Jewish, correct?

15   A    Because he was Jewish and because we're against communism.

16   Q    And in your view, Jews are responsible for communism,

17   right?

18   A    That's correct, sir.

19   Q    And allies of Jews and black people are also your enemies,

20   aren't they?

21   A    In some cases.

22   Q    They're what you call anti-white whites, right?

23   A    That's correct.

24   Q    Now, you also believe that violence is necessary to

25   achieve the Southern/white nationalist society that you

77

M. Hill - Direct


1   envision; isn't that right?

2   A    It might be.  I'm not sure that it would be in all cases.

3           MR. LEVINE:  Let's put up Plaintiffs' Exhibit 1567.

4           (Plaintiffs' Exhibit 1567 marked.)

5   BY MR. LEVINE:

6   Q    Is this an email from you to the League of the South board

7   of directors in June of 2016?

8   A    Yes, it is.

9           MR. LEVINE:  I offer it, Your Honor.

10          THE COURT:  Admitted.

11          (Plaintiffs' Exhibit 1567 admitted.)

12          MR. LEVINE:  Can we publish it for the jury, Your

13  Honor?

14          THE COURT:  You may.

15   BY MR. LEVINE:

16  Q    In the third paragraph of this email, do you say, quote,

17  "We Southern nationalists, white Southerners, will have no part

18  of any of this.  In fact, we are willing to fight, kill, and

19  die to stop it.  We see the future of our posterity at stake.

20  To do nothing, or to stop with half measures, is to assure the

21  destruction of their future."

22       You said that, correct?

23  A    I said that, yes.

24  Q    And these -- take that down, please.  These are not just

25  words to you; isn't that right, Dr. Hill?

78

M. Hill - Direct

1  A     Repeat the question, please.

2  Q     These words are not just words to you?

3  A     I'm not sure I understand the meaning of that question.

4  They are the words that I wrote, sir.

5  Q     And by those words, you mean what those words say; isn't

6  that right?

7  A     Normally, sir, I do mean what I say.

8  Q     And your view is that you and your League members are

9  going to have to use violence or have to be prepared to use

10 violence to achieve the white nationalist society that you

11 envision?

12 A     We are prepared to do whatever is necessary to preserve

13 our civilization, which the previous paragraph that you didn't

14 read explained.

15 Q     Well, you also gave a speech at the Florida state

16 conference of League of the South in 2018, correct?

17 A     I do believe that's correct.

18 Q     And you were invited there to speak by your co-defendant

19 Michael Tubbs, correct?

20 A     That is correct.

21 Q     And you were making reference to Charlottesville 2.0,

22 correct?

23 A     I'm not sure.  You'll have to show me what you're speaking

24 of here.

25 Q     Let's please put Plaintiffs' Exhibit 1923 on the screen.

M. Hill - Direct

1    Can you identify yourself at the League conference there?

2  A    Yes.

3          MR. LEVINE:  We offer it in evidence, Your Honor,

4  Plaintiffs' Exhibit 1923C.

5          THE COURT:  Be admitted.

6          (Plaintiffs' Exhibit 1923C marked.)

7          (Plaintiffs' Exhibit 1923C admitted.)

8          MR. LEVINE:  I ask that it be published for the jury.

9          (Video playing.)

10  BY MR. LEVINE:

11  Q    When you used the word "warrior" there, you meant it both

12  literally and figuratively; isn't that right?

13  A    I meant it in both ways, yes, sir.

14  Q    Thank you.  When you spoke to the members of the League of

15  the South in Florida, the street battle and fighting at

16  Charlottesville 2.0 was exactly the kind of battle that you

17  planned for; isn't that right?

18  A    No, it isn't right.

19          MR. LEVINE:  Please play for the jury 1923F.  May I

20  publish that for the jury, Your Honor?

21          THE COURT:  You may.

22          (Plaintiffs' Exhibit 1923F marked.)

23          (Plaintiffs' Exhibit 1923F admitted.)

24          MR. LEVINE:  Yes, the Court said "you may."

25          (Video playing.)

M. Hill - Direct

1        MR. LEVINE:  Thank you.

2   BY MR. LEVINE:

3   Q    Now, it's Jason Kessler that invited you to participate in

4   Charlottesville 2.0; is that right?

5   A    That's correct.

6   Q    And he invited you to be a speaker; is that right?

7   A    That is right.

8   Q    And he also wanted League of the South's participation; is

9   that right?

10  A    He didn't ask for that directly.  I don't recall.  But I

11  offered it.

12  Q    And you understood that Charlottesville 2.0 would be a

13  first of its kind rally of all the alt-right groups in the

14  United States?

15  A    Is that a question?

16  Q    Yes.

17  A    Yes, I did.

18  Q    And Kessler not only invited you to be a speaker, but he

19  wanted -- he invited you to participate in the planning for the

20  event; isn't that right?

21       MR. KOLENICH:  Objection.  It's leading the witness.

22       THE COURT:  Well, overruled.  He's obviously adverse.

23  Go ahead.

24  BY MR. LEVINE:

25  Q    You may answer.

M. Hill - Direct

1    A    Okay.  Would you repeat the question, please.

2            MR. LEVINE:  Would the reporter please read back the

3    question.

4        (The requested portion of the transcript was read back.)

5            THE WITNESS:  He asked me specifically about helping

6    him get some speakers.  I don't recall any real details about

7    the planning.  He seemed to have that pretty well at hand at

8    the time he invited me.

9     BY MR. LEVINE:

10   Q    You accepted the invitation to speak, correct?

11   A    Yes, I did.

12   Q    You accepted the invitation for the League to participate;

13   is that correct?

14   A    That's correct.

15   Q    You announced to the membership your participation,

16   correct?

17   A    That's right.

18   Q    Your role as a speaker at the event on Saturday was

19   announced on a flier, correct?

20   A    It was.

21   Q    Could we show the jury -- or first have Dr. Hill identify

22   Plaintiffs' Exhibit 198.  Do you recognize that?

23   A    Yes, I do.

24       (Plaintiffs' Exhibit 198 marked.)

25           MR. LEVINE:  We offer it in evidence, Your Honor.  We

M. Hill - Direct

 1  ask it be published to the jury.

 2             THE COURT:  I thought it was already in.

 3             MR. LEVINE:  I'm not sure this one is in.

 4             THE COURT:  Okay.  Go ahead.  Admit it.  It may be

 5  published.

 6             (Plaintiffs' Exhibit 198 admitted.)

 7  BY MR. LEVINE:

 8  Q    That identifies Dr. Michael Hill, correct?

 9  A    That's right.

10  Q    Along with Richard Spencer, defendant here, correct?

11  A    That's right.

12  Q    Defendant Jason Kessler, correct?

13  A    Yes.

14  Q    Defendant Chris Cantwell, correct?

15  A    Yes.

16  Q    Defendant Matt Heimbach, correct?

17  A    Yes.

18  Q    Now, you assigned roles to various League members to lead

19  different aspects of the League's participation in

20  Charlottesville 2.0, didn't you?

21  A    That's correct.

22  Q    And you asked Michael Tubbs to be your chief of

23  operations, correct?

24  A    No, that's not correct.  Michael Tubbs is my chief of

25  staff.

M. Hill - Direct

1  Q     And you asked him to be involved in the operation that

2  day?

3  A     Yes, I did.

4  Q     And you asked Brad Griffin, a member of the League, to

5  handle public relations, correct?

6  A     That is correct.

7  Q     And you knew that planning for Charlottesville 2.0 was

8  taking place on the Discord server; is that right?

9  A     Yes, I knew there was a Discord server.

10 Q     And you knew that access to the Discord server was for

11 those that would be involved in planning for Charlottesville

12 2.0, correct?

13 A     As I understood it, yes.

14 Q     And you were invited to designate someone from the League

15 to be -- to have access to the Discord server to participate in

16 the planning, correct?

17 A     I was actually asked myself to be on the Discord server,

18 but I was not.  And somebody took my place to monitor it.

19 Q     And monitor it and participate, correct?

20 A     To monitor mainly.  After we found out about the Discord

21 server, I think I asked Mr. Baker, Ike Baker, to be our monitor

22 there.  I don't recall if I asked him to be an actual

23 participant.

24 Q     And Ike Baker was the gentleman that the jury just saw in

25 the deposition, correct?

M. Hill - Direct

1    A    That's correct.

2    Q    And you asked him to be your point of contact on the

3    Discord server, correct?

4    A    I'm not sure if I used that term, "point of contact," but

5    he was asked by me to monitor the Discord server for our

6    benefit.

7    Q    And you stayed involved in general strategy, and everyone

8    reported to you; isn't that right?

9    A    Could you be a little bit more clear when you say

10   "everyone," sir?

11   Q    All of the people that you had asked to do -- to take

12   assignments on behalf of the League reported back to you; isn't

13   that right?

14   A    Within the League, yes.  Everybody who I asked reported

15   back to me.  I'm the president.

16          MR. LEVINE:  And let's mark Plaintiffs' Exhibit 1551.

17          (Plaintiffs' Exhibit 1551 marked.)

18    BY MR. LEVINE:

19   Q    Can you identify this as an email you sent on July 12th to

20   Michael Tubbs?

21   A    Yes.

22          MR. LEVINE:  We offer Exhibit 1551, Your Honor.

23          THE COURT:  Be admitted.

24          (Plaintiffs' Exhibit 1551 admitted.)

25          MR. LEVINE:  We ask that it be published to the jury.

85

M. Hill - Direct

1            THE COURT:  It may.

2     BY MR. LEVINE:

3     Q    Does this say, "Had a good talk with Ike Baker tonight.

4     On-the-ground planning for Charlottesville is coming along

5     nicely.  Still a lot to do, but the Pikeville template on a

6     larger scale.  Looks like it will work well there.  He will be

7     in touch with us both as things progress"?

8            Did you report that to Tubbs?

9     A    Yes, I wrote that.

10    Q    And that was based on Ike Baker's reporting to you,

11    correct?

12    A    It was based on Ike Baker's planning for the League of the

13    South's part in this operation.  I don't think it had to do

14    with anything external to the League of the South.

15    Q    When it came to discussing plans with Kessler, you didn't

16    have any intermediary, did you?

17    A    Not as I recall.  I think my discussions with Mr. Kessler

18    were done one on one between him and myself.

19    Q    And in the spring of 2017, you called on members of the

20    League to stand up in resistance; isn't that right?

21    A    If you have something that you can refer me to that you're

22    speaking of, I can confirm or deny it, sir.

23            MR. LEVINE:  Let's mark Plaintiffs' Exhibit 1537.

24            (Plaintiffs' Exhibit 1537 marked.)

25    BY MR. LEVINE:

M. Hill - Direct

1  Q    Is this an email from you to members of the board of

2  directors of League of the South from May 2017?

3  A    Yes, it is.

4  Q    And did you say in the middle of this message:  "This is

5  an official call for resistance.  I have spoken with many of

6  you at length, face to face, about the nature of such

7  resistance.  You know what it means.  That is all I will say

8  specifically in this matter.  Obviously, Facebook and other

9  Internet platforms are either controlled by the enemy or

10  monitored by authorities that care not what happens to us and

11  our civilization.  Therefore, I want no discussion here or

12  elsewhere online of any resistance strategies, tactics,

13  logistics, plans, operations, or other action reports.  Those

14  will all be handled through secure channels."

15       Did you say that to the board?

16  A    Yes, I did.

17            MS. KAPLAN:  Mr. Levine, this is not published to the

18  jury.

19            MR. LEVINE:  Withdrawn.  Your Honor, can we publish

20  that for the jury just so it's before them.  I've read it.  So

21  I'm not going to go back through it, Your Honor.

22            THE COURT:  You may publish it.  I thought we had

23  ruled.

24            THE CLERK:  He didn't move to admit, Your Honor.

25       (Plaintiffs' Exhibit 1537 admitted.)

M. Hill - Direct

1  BY MR. LEVINE:

2  Q    Did I just read from it to the jury, Dr. Hill, correctly?

3  Did I just read from it correctly to the jury?

4  A    Oh, yes, as far as I could tell, you did.

5  Q    And that was a warning to the League members to be careful

6  what they said on Facebook and other Internet channels,

7  correct?

8  A    Yes, that's correct.

9  Q    Now, you continued to talk with Kessler about plans for

10 Charlottesville 2.0; is that right?

11 A    Can you give me a time frame that you're speaking of here,

12 sir?

13 Q    July.

14 A    I'm not -- I can't recall.  I may have spoken with

15 Mr. Kessler in July.  I don't have any records before me to

16 show that and it's been four years ago.  So I can't remember.

17 Q    Please put up Plaintiffs' Exhibit 1545 and show it to

18 Dr. Hill.

19     Is this an email message from you to Ike Baker?

20        (Plaintiffs' Exhibit 1545 marked.)

21        THE WITNESS:  Well, actually, no, the one at the top

22 I think is from Ike Baker to me.

23 BY MR. LEVINE:

24 Q    Yeah, but I think -- go down further there.  All the way

25 at the bottom.  Right there.

88

M. Hill - Direct

1           July 13, 2017 at 1:10 p.m; do you see that?

2    A    Yes, I do.

3    Q    And is that your message to Ike Baker?

4    A    Yes, it is.

5                MR. LEVINE:  We offer it in evidence, Your Honor.

6                THE COURT:  It will be admitted.

7                (Plaintiffs' Exhibit 1545 admitted.)

8                MR. LEVINE:  I'd like to publish it for the jury,

9    Your Honor.

10               THE COURT:  You may.

11   BY MR. LEVINE:

12   Q    Did you say in this message, "Ike, I spoke with

13   Mr. Kessler about inviting David Duke to speak.  He agreed to

14   have him give the keynote speech at the after-event gathering"?

15   A    Yes.

16   Q    So it was you that spoke with the defendant Kessler,

17   proposed speaking to Duke, and then you went ahead and spoke to

18   Duke, correct?

19   A    That is correct.  Mr. Kessler asked me if I would approach

20   Mr. Duke.  He knew that I knew him, and yes, I did approach

21   Mr. Duke on Mr. Kessler's behalf.

22   Q    Thank you.

23   A    I just didn't know what date it was, sir.

24   Q    And you did speak with Duke and arrange for his

25   attendance, correct?

M. Hill - Direct

1    A    I did speak with Mr. Duke and to the best of my knowledge

2    I put him in contact with Mr. Kessler, and they made the

3    arrangements.

4    Q    Now, you also worked with other white nationalist

5    organizations to achieve a big turnout at Charlottesville 2.0,

6    correct?

7    A    No, that's not correct, sir.  That's not the reason that

8    we worked with those groups.

9    Q    Well, in early 2017 Matthew Heimbach invited you, for

10   League of the South, to join a group he proposed to call the

11   Nationalist Front; is that right?

12   A    That is correct.

13   Q    And the Nationalist Front was Heimbach's brainchild,

14   correct?

15   A    I don't know that for a fact, sir.

16   Q    Were you deposed in this case?

17   A    Yes, I was.

18   Q    And was that on June 18, 2020?

19   A    I suppose it was.  Yeah, that's what it says on my copy

20   here.

21   Q    And were you asked this question and did you give this

22   answer at page 65:  "Okay.  Mr. Hill, there is a question

23   pending.  I asked you, do I understand from your answer to the

24   interrogatories that the Nationalist Front was, in your words,

25   the brainchild of Matthew Heimbach and that it was Matthew

M. Hill - Direct

1  Heimbach that asked you to participate in that organization; is

2  that right?"

3      Answer:  "To the best of my recollection, sir, that is

4  correct."

5      Were you asked that question and did you give that answer?

6  A   Yeah, that was my answer, and it was to the best of my

7  recollection.

8      I have no direct evidence that Mr. Heimbach was the

9  originator of the Nationalist Front.  That is what I heard.

10 That's why I gave my answer that I did.

11 Q   And Heimbach told you that the Nationalist Front would

12 bring together the Traditionalist Worker Party, correct?

13 A   Yes, the Traditionalist Worker Party would be a part of

14 that.

15 Q   And that was his organization, correct?

16 A   That is correct.

17 Q   And that would also include the Defendant David Matthew

18 Parrott from the Traditionalist Worker Party, correct?

19 A   Yes.

20 Q   And he also told you that it would include the National

21 Socialist Movement, correct?

22 A   That is right.

23 Q   And that's led by Jeffrey Schoep, correct?

24 A   Yes.

25 Q   And he also told you that it would include the Defendant

M. Hill - Direct

1  Vanguard America, correct?

2  A    That's right.

3  Q    And so the Nationalist Front and Vanguard America was led

4  by Dillon Hopper; is that right, at that time?

5  A    As best I understood.

6  Q    And the Nationalist Front was an alliance of these groups,

7  all that shared a similar white nationalist belief and goals,

8  correct?

9  A    Some of the same goals.  I wouldn't say all.

10  Q    And they shared the same common enemy, correct?

11  A    I'm not sure that that's correct, sir.  I can't speak of

12  who all the enemies of these other groups are; only mine.

13  Q    Those enemies included the Jew, correct?

14  A    As far as I could tell, yes.

15  Q    And black people, correct?

16  A    I'm not sure -- I'm not sure about that.

17  Q    Well, let's look at -- and you announced this alliance to

18  the League of the South, correct?

19  A    I -- I'm sure I did.  I don't recall the occasion.

20         MR. LEVINE:  Let's take a look at Plaintiffs'

21  Exhibit 1918.

22         (Plaintiffs' Exhibit 1918 marked.)

23  BY MR. LEVINE:

24  Q    Is this the League of the South website from May 15th,

25  2017?

92

M. Hill - Direct

1   A    Yes, it is.

2   Q    And this is a statement by you on the website?

3   A    It appears to be such.

4           MR. LEVINE:  We offer Plaintiffs' Exhibit 1918.

5           THE COURT:  Be admitted.

6           (Plaintiffs' Exhibit 1918 admitted.)

7           MR. LEVINE:  And we'd ask it be published for the

8   jury, Your Honor.

9           THE COURT:  You may.

10  BY MR. LEVINE:

11  Q    Did you say here, "Working with our nationalist allies"?

12  A    Yes, I did.

13  Q    And does it say in the first paragraph, "I am very happy

14  that The League is now working with several other nationalist

15  groups on the right.  We have the same common enemy, and we

16  agree on many points -- political, economic, and social.  We

17  look forward to forging even stronger bonds with this

18  alliance"?

19       Did you say that?

20  A    I did.

21  Q    And in fact, the League wouldn't have attended

22  Charlottesville 2.0 unless you understood that all of the

23  participants and speakers shared the same white nationalist

24  beliefs; isn't that right?

25  A    No, that's not right.  We all didn't share the exact same

M. Hill - Direct

1 beliefs.  Some we shared; some we differed on.

2 Q    In the deposition on June 18, 2020, at page 109, I'm

3 asking you, Dr. Hill, whether you were asked this question, and

4 did you give this answer?

5    Question:  "But did you ever -- would you have gone and

6 asked the League of the South members to go if you didn't

7 understand that the participants and the speakers were going to

8 share your white nationalist philosophy?"

9    Answer:  "I would not have gone had I thought that they

10 would have been in opposition to it."

11    Were you asked that question and did you give that answer?

12 A    Yes, I did.

13 Q    Now, you knew from Kessler that Heimbach was involved in

14 planning Charlottesville 2.0, correct?

15 A    I was told that he would be a participant and a speaker.

16 I was not told the degree of his planning in this event.

17 Q    You knew that Schoep was involved in planning

18 Charlottesville 2.0, correct?

19 A    I knew that he was involved.  I knew he was going to be a

20 speaker, or I knew his -- excuse me.  I knew his group was

21 involved.  I did not know the extent of his planning in this

22 event.

23 Q    Were you asked these questions and did you give these

24 answers at page 72 of the deposition?

25    Question, at page 72:  "Now, during August of 2017 --

M. Hill - Direct

1    during June, July, and August, did you work with the

2    organizations in the Nationalist Front to participate in the

3    Unite the Right rally?  Isn't that right?"

4        Answer:  "That is correct."

5        Question:  "And you coordinated certain operational

6    matters with Mr. Schoep on behalf of the National Socialist

7    Movement, correct?"

8        Answer:  "That is correct."

9        "And you coordinated and participated with Mr. Heimbach on

10   behalf of the Traditionalist Worker Party; is that correct?"

11       Answer:  "That is correct."

12       "And you understood and you had your own contacts with

13   Mr. Kessler; is that right?"

14       "Yes, I was -- I was in personal contact with Mr. Kessler

15   on several occasions."

16       Were you asked those questions and did you give those

17   answers, sir?

18   A    I did.  I was asked those questions and I gave those

19   answers, yes.

20   Q    Now, you had a conversation with Ike Baker, who suggested

21   that he, Ike Baker, talk with Jeff Schoep, so about the

22   National Socialist Movement's participation in

23   Charlottesville 2.0, correct?

24   A    That is correct, to discuss logistics of getting to the

25   event, getting out safely, getting in safely, things like that.

M. Hill - Direct

1  Q    And participating with them, correct?

2  A    Well, yes, participating with them in getting in and

3  getting out of the event, the logistics of it.

4  Q    And participating with the National Socialist Movement in

5  the events of the day; isn't that right?

6  A    That's a very general statement.  That's what I'm saying,

7  sir.  The events of the day included getting into the park and

8  getting out of the park.  So yes, in that context.

9  Q    Now, let's go -- and Baker -- you told Baker to be sure

10  that Jeff Schoep was on board, correct?

11  A    Can you show me?  I can't remember that.  If you can show

12  me something I can confirm or deny it, sir.

13  Q    And didn't Baker report back to you that Schoep was

14  100 percent on board?

15  A    I don't recall that exact language, but I do recall him

16  telling me that Schoep and the National Socialist group would

17  be participating.

18          MR. LEVINE:  Let's mark Plaintiffs' Exhibit 1545.

19  This is already in evidence.

20          THE COURT:  If you're going to -- trying to impeach

21  him, just -- he -- if you ask him a question and if it's not

22  precisely what's in the record, then you go back and read it as

23  if it's inconsistent.  Ask him -- if you're going to do that,

24  pose the question and answer to him first so we can avoid that

25  kind of implication.

M. Hill - Direct

1          MR. LEVINE:  Well, Your Honor -- I hear the

2    instruction, Your Honor.

3          I'm marking Plaintiffs' Exhibit 1545, which is

4    already in evidence, and ask that this portion be published for

5    the jury in the middle, from July 13.

6    BY MR. LEVINE:

7    Q    It's a message from Ike Baker to you?

8    A    Yes, it appears to be so.

9          MR. LEVINE:  Could we publish this to the jury?

10          THE COURT:  Yes, sir.

11          MR. LEVINE:  Thank you.

12    BY MR. LEVINE:

13    Q    Ike Baker says to you:  "Jeff Schoep is 100 percent on

14    board, sir.  He accepted our terms unequivocally and without

15    hesitation. he also asked to be kept abreast and that I

16    coordinate NSM participation with two of his people, one of

17    whom I'm well acquainted with, the other whom I have met.  I

18    will of course be circumspect in what information is passed

19    along."

20          Is that what Ike Baker said to you?

21    A    Yes, sir.

22    Q    And in fact, when the time got closer to the date for

23    Charlottesville 2.0, you sent a written speech for NSM

24    encouraging their participation and asked Ike Baker to read for

25    you at their general meeting; isn't that right?

M. Hill - Direct

1  A    That is correct.

2  Q    Let's mark Plaintiffs' Exhibit 1554.

3       Is this a copy of the speech that you wrote and sent to

4  Ike Baker to deliver for you?

5       (Plaintiffs' Exhibit 1554 marked.)

6  A    It appears to be.

7  Q    So this was a speech by you as head of the League of the

8  South to be delivered to the membership of the National

9  Socialist Movement encouraging their participation in Unite the

10 Right; is that right?

11 A    I'm not sure that it was just to encourage their

12 participation, but yes, it was sent to them at this meeting

13 that Mr. Baker attended.

14           MS. KAPLAN:  Mr. Levine, did you --

15           MR. LEVINE:  I'm about to.

16           I'm offering Plaintiffs' Exhibit 1545 [sic].

17           THE COURT:  Be admitted.

18           (Plaintiffs' Exhibit 1554 admitted.)

19           MR. LEVINE:  And I ask that it be published to the

20 jury now.

21           THE COURT:  You may.

22  BY MR. LEVINE:

23 Q    And this is a speech in your words, correct?

24 A    Yes, it is.

25 Q    But let's go to the third paragraph.  Next paragraph --

M. Hill - Direct

1  I'm sorry -- third.  Third.

2      It says:  "Such a sublime civilization is a great blessing

3  that we as men of the West are morally obligated to defend and

4  nourish for the benefit of generations of our people to come.

5  As it is said, 'We must secure the existence of our people and

6  a future for white children.'"

7      What you put in quote there and repeated for the speech

8  are 14 Words; isn't that right?

9  A    Yes, sir.  That is correct.

10  Q    And those 14 Words are code words for white supremacists

11  like you; isn't that right?

12  A    No.

13  Q    Well, these 14 Words were written by a gentleman, Lane;

14  isn't that right?

15  A    As best I understood, they were written by a man named

16  David Lane.

17  Q    And they are used by people throughout the white

18  nationalist movement; isn't that right?

19  A    That is correct.

20  Q    And they mean to preserve the culture of white people to

21  the exclusion of Jews and black people; isn't that right?

22  A    That's not what it says.  It says --

23  Q    But that's what you understand it means; isn't that right?

24  A    Oh, I understand it to mean what it says, sir.  Words have

25  meanings.  I'm looking at the words here and I see nothing

M. Hill - Direct

1   about the Jews or blacks in that.  I see about preserving white

2   civilization and white children.  So let's be precise about the

3   words, sir.

4   Q    Is it your testimony, Dr. Hill, that these 14 Words are

5   not known code words for antisemitism in America?

6   A    Known by whom?

7   Q    Answer my question.

8           MR. JONES:  Objection, asked and answered, about a

9   minute ago.  We already went through this.

10   BY MR. LEVINE:

11   Q    Is it your testimony, Dr. Hill, that these 14 Words are

12   not 14 code words known by white nationalists and white

13   supremacists like yourself?

14   A    I can't define these terms for anyone but myself, sir.  I

15   know what you're getting at and I know where this came from.

16   You're asking me to give you a definition of this based on

17   somebody else's perception of it.  I can only give you my

18   perception of what these words mean.

19   Q    David Lane wrote these words?

20   A    Yes, that's what I understand, that David Lane wrote the

21   words.

22   Q    And what did you understand he wrote these words about?

23           MR. JONES:  Objection, calls for speculation.

24           THE COURT:  Well, his understanding.  He's speaking

25   for himself.  If he has an understanding of what the words

M. Hill - Direct

1   meant other than what the words say, he may answer the

2   question.  Not what Mr. Lane meant, but what he perceives the

3   words mean.

4    BY MR. LEVINE:

5   Q    Is it your testimony to this jury, Dr. Hill, that when you

6   used those 14 Words you weren't making reference to the 14 code

7   words that are known in the United States by white supremacists

8   like yourself as standing for hatred of Jews and black people?

9   A    In the context I wrote these words in this piece that you

10  have up on the screen.  I wrote this.  And the words mean what

11  the words say.  And there is no mention in here of anything

12  that you have just said.  I have white children myself and I am

13  defending them.  And that's basically what I mean when I define

14  this term.

15  Q    The whole point, Dr. Hill, is that these words are code

16  words --

17          MR. JONES:  Your Honor, I'm going to object at this

18  point.  He's asked this question five times, same question.

19  Michael Hill has provided his answer.

20          MR. LEVINE:  I'll move on, Your Honor.

21   BY MR. LEVINE:

22  Q    Now, isn't it a fact, Dr. Hill, that you wanted a public

23  confrontation with any protesters that would be there to speak

24  out at Charlottesville 2.0?

25  A    Would you repeat that question?  I didn't hear the last

M. Hill - Direct

1  part of it.

2           MR. LEVINE:  Your Honor, I'm going to just go back

3  one second before I do that.

4           Please put the exhibit back up.

5   BY MR. LEVINE:

6  Q    Right after the paragraph that we just read that I asked

7  you about that has the 14 Words, do you see that?

8  A    Yes.

9  Q    Would you please read to the jury what you wrote for the

10 speech in the next sentence -- next paragraph?

11 A    The next paragraph?

12 Q    Yes.

13 A    Beginning with the word "but"?

14 Q    Yes.

15 A    "But we are compassed around with enemies who seek our

16 destruction.  From above, in the form of the international Jew

17 and his white gentile traitor allies, to below, in the dark

18 shape of the Negro, mestizo, and Muslim street thug, we are

19 beset by those who despise us and all we hold dear."

20 Q    Continue, please.

21 A    The next one?

22 Q    Yes.

23 A    "The time has come when white men of the West must put

24 aside their petty differences and unite for our very survival

25 and well-being.  It is in that spirit of cooperation and mutual

M. Hill - Direct

 1  respect that I bring these words to you today through the voice

 2  of my trusted brother and compatriot, Ike Baker."

 3         MR. LEVINE:  Thank you.  Take that down.

 4   BY MR. LEVINE:

 5  Q    So now going to the next subject, sir, isn't it a fact

 6  that you wanted a public confrontation with any protesters that

 7  would be there to speak out at Charlottesville 2.0?

 8  A    No.

 9  Q    You expected counter-protesters, including BLM supporters,

10  at 2.0, didn't you?

11  A    We expected counter-protesters, yes.

12  Q    And you thought a street confrontation with them would be

13  fun, didn't you?

14  A    I don't recall having ever said that anything like that

15  would be fun.

16         MR. LEVINE:  Let's mark Plaintiffs' Exhibit 2858.

17         (Plaintiffs' Exhibit 2858 marked.)

18   BY MR. LEVINE:

19  Q    Is this a message you sent out to the League of the South

20  on June 9th, 2017?

21  A    Yes, it is.

22         MR. LEVINE:  We offer it in evidence, Your Honor.

23         THE COURT:  Be admitted.

24         (Plaintiffs' Exhibit 2858 admitted.)

25         MR. LEVINE:  We ask that it be published for the

M. Hill - Direct

 1   jury, Your Honor.

 2            THE COURT:  You may.

 3    BY MR. LEVINE:

 4   Q    Please read the first paragraph of that message that you

 5   wrote to the membership.

 6   A    All right.  "The League of the South will be operating in

 7   the Unite the Right rally in Charlottesville, Virginia on

 8   12 August.  Below is the initial announcement of the event.  I

 9   want an excellent turnout of Southern Nationalists for this

10   event.  Antifa, BLM, and others will be there to greet us.

11   Don't miss out on the fun."

12   Q    Now, you didn't mean fun like tailgating at a game.  You

13   meant a sick kind of fun like street violence; isn't that

14   right?

15            MR. JONES:  Objection, argumentative.

16            THE COURT:  Sustained.

17    BY MR. LEVINE:

18   Q    Or when you were talking about fun, you were talking about

19   mixing it up with the counter-protesters; isn't that right?

20   A    No, it isn't right.

21   Q    Didn't you actually use those words shortly after

22   Charlottesville 2.0, boasting about 2.0?

23   A    What words, sir?  Be clear.

24   Q    "Public confrontation."

25   A    I don't know if I used that -- those particular words.  If

M. Hill - Direct

1  you can show me, I can either confirm it or deny it.

2          MR. LEVINE:  Let's mark Plaintiffs' 1560.

3          (Plaintiffs' Exhibit 1560 marked.)

4   BY MR. LEVINE:

5  Q    This was in September of 2017, correct?

6  A    Yes.

7  Q    This was in connection with talking about a rally or

8  demonstration in Tennessee or Kentucky, correct?

9  A    Yes, it appears to be.

10 Q    And in the second paragraph you said:  "For instance, we

11 wanted a public confrontation in Charlottesville for the world

12 to see, and we got it.  Do we want another or do we want a

13 carefully arranged event mainly for staged optics?"

14      Did you make that statement?

15 A    Yes, I did make that statement.

16 Q    And isn't it a fact, Dr. Hill, that staged optics included

17 baiting Antifa and BLM?

18 A    No.

19 Q    Wasn't baiting Black Lives Matter and Antifa part of

20 precipitating the public confrontation?

21 A    No.

22 Q    Didn't you say in this email right in the paragraph above

23 it, about going to Tennessee or Kentucky, "we will invite" --

24          MR. LEVINE:  Your Honor, could we publish this for

25 the jury?

M. Hill - Direct

1           THE COURT:  I said that you may.

2           MR. LEVINE:  I keep forgetting, Your Honor.  It's not

3   the habit for my court.

4           (Plaintiffs' Exhibit 1560 admitted.)

5    BY MR. LEVINE:

6   Q    You said there:  "For instance, we wanted a public

7   confrontation in Charlottesville for the world to see, and we

8   got it."  Did you use those words, sir?

9   A    Yes, I did.

10  Q    Those are your words, right?

11  A    Oh, yes, they're my words, sir.  Absolutely.

12  Q    And isn't it a fact that the public confrontation that you

13  were looking for would come from baiting Antifa and Black Lives

14  Matter supporters?

15  A    No.  It was not.  We wanted to face our political

16  opponents.

17  Q    Well, didn't you say to your people on September 12th,

18  right in the paragraph above that:  "We will invite our

19  Nationalist Front allies to participate and will use this as

20  'bait' to draw Antifa, BLM, etc. out as public opposition"?

21       Didn't you say that?

22  A    Yes.  Yes, I said that.  We want public opposition to our

23  political rallies.

24  Q    And isn't it the fact that the "staged optics" that you

25  were talking about was baiting Antifa and Black Lives Matter to

M. Hill - Direct

1  come out to have a public confrontation with you?

2  A    Would you repeat that question, please?

3         MR. LEVINE:  Please read it back.

4         (The requested portion of the record was read back.)

5         THE WITNESS:  We wanted to have a political rally

6  where we had opposition because it makes good optics.

7  BY MR. LEVINE:

8  Q    But the opposition wasn't to talk back and forth; it was

9  to engage in street violence with them.  Isn't that right?

10 A    That is incorrect, sir.

11 Q    In fact, you praised Michael Tubbs, your chief of staff,

12 for engaging in that very street fighting; isn't that right, at

13 Charlottesville?

14 A    If you have evidence, I can deny it or confirm it, sir.

15 Show me the evidence.

16        MR. LEVINE:  Let's mark Plaintiffs' Exhibit 1562.

17        (Plaintiffs' Exhibit 1562 marked.)

18  BY MR. LEVINE:

19 Q    Is this an email to you at webmaster@dixienet.org?

20 A    Yes, it is.

21        MR. LEVINE:  I offer it in evidence, Your Honor.

22        THE COURT:  Be admitted.

23        MR. LEVINE:  I ask that it be published for the jury,

24 Your Honor.

25        THE COURT:  It may be.

107

M. Hill - Direct

1              (Plaintiffs' Exhibit 1562 admitted.)

2              MR. LEVINE:  Let's go to the comment that he's

3    responding to.

4    BY MR. LEVINE:

5    Q    This is from someone who writes to you:  "Mr. Michael

6    Tubbs was on Fox News leading the troops into battle and

7    coordinating attack.  The presence of League of the South at

8    Virginia was both impressive and inspiring.  I want to thank

9    Mr. Tubbs and those who made the trip to Virginia to engage

10   with the enemy face-to-face on ground of our own choosing.

11   Thank you for defending the honor of the Southern people."

12         And you wrote back in response to that:  "Mr. Tubbs indeed

13   was much the warrior, as were all of our men who joined us at

14   Charlottesville.  I could not have been prouder of them."

15         That's what you wrote, correct?

16   A    That is correct.

17   Q    And take a look at Plaintiffs' Exhibit 3801.

18              (Plaintiffs' Exhibit 3801 marked.)

19   BY MR. LEVINE:

20   Q    Is this tweets by you?

21   A    I presume they are.  I don't have access to that Twitter

22   account anymore.

23   Q    But you used a Twitter account?

24   A    I did, yeah.  I did use a Twitter account at that time.

25   Q    And you used the address @michaelhill51?

M. Hill - Direct

1   A    Yes, I believe so.

2   Q    And, by the way, @occdissent, that was Brad Griffin,

3   correct?

4   A    I believe it was.  I can't say for sure, but I think it

5   was.

6   Q    And did you say here:  "Will do, sir.  But Mr. Tubbs will

7   be the first to say that he fought beside many brave warriors

8   that day"?

9        Did you say that?

10  A    As best I remember, I did.

11  Q    And you also said to Brad Griffin:  "Yes, Mr. Tubbs was

12  everywhere the chaos was"?

13  A    Yes.  There was a lot of chaos that day.

14  Q    And you delegated the lead role, the role of leading the

15  League members on Saturday, to Mr. Tubbs because you knew you

16  could count on him to lead the League soldiers into battle;

17  isn't that right?

18  A    I appointed Mr. Tubbs to take care of our on-the-ground

19  activities that day.  I did.

20  Q    You actually had -- you actually had Mr. Tubbs leading the

21  group because he was 6'5" and was very intimidating, right?

22  A    No.  I had Mr. Tubbs leading the group because he's my

23  chief of staff.

24            MR. LEVINE:  Let's put that last exhibit back up,

25  please, this Twitter.  I offer those in evidence, Your Honor.

M. Hill - Direct

1          THE COURT:  Be admitted.

2              (Plaintiffs' Exhibit 3801 admitted.)

3          MR. LEVINE:  Ask that they be published for the jury.

4          THE COURT:  You may.

5   BY MR. LEVINE:

6   Q    You said there, "Mr. Tubbs was everywhere the chaos was";

7   is that correct?

8   A    That's correct.

9   Q    And you had Tubbs leading the group because he's a large

10  intimidating figure; isn't that right?

11  A    I had Mr. Tubbs leading the group, as I've already

12  answered you, sir, because he's my chief of staff.

13  Q    And you know that Mr. Tubbs likes to be leading the group;

14  isn't that right?

15  A    Could you be a little bit more specific about that?

16  Q    Do you know that Mr. Tubbs likes to be in the center of

17  violence?  Isn't that right?

18          MR. JONES:  Objection on whether he knows what

19  Mr. Tubbs likes or doesn't like.

20          THE COURT:  Sustained.

21   BY MR. LEVINE:

22  Q    You know that Mr. Tubbs was hoping for a violent encounter

23  that day?

24          MR. JONES:  Same objection, Your Honor, on what

25  Mr. Tubbs was hoping.

M. Hill - Direct

1           THE COURT:  You can ask him if he knows.

2    BY MR. LEVINE:

3    Q    Didn't Mr. Tubbs tell you that he was hoping for violence

4    that day?

5    A    I don't recall him ever using the terms that he was hoping

6    for violence that day.

7           MR. LEVINE:  Let's mark Plaintiffs' Exhibit 1553.

8           (Plaintiffs' Exhibit 1553 marked.)

9           MR. LEVINE:  Your Honor -- I'm sorry.

10   BY MR. LEVINE:

11   Q    Dr. Hill, is this an exchange of emails between you and

12   Mr. Tubbs from July 7?

13   A    Yes, it is.

14          MR. LEVINE:  I offer it, Your Honor.

15          THE COURT:  Be admitted.

16          (Plaintiffs' Exhibit 1553 admitted.)

17   BY MR. LEVINE:

18   Q    And did you write -- can we publish it for the jury, Your

19   Honor?

20          THE COURT:  You may.

21   BY MR. LEVINE:

22   Q    And did you write to Mr. Tubbs and others that you

23   received a call -- it's published to the jury -- that you

24   received a call from the organizer of the upcoming

25   Charlottesville event, that he heard -- "yesterday he heard

M. Hill - Direct

1  from what I consider to be a reputable source, one with whom

2  I've had direct dealings, on an Antifa strategy meeting held

3  very recently in DC.  According to the info I received, that

4  meeting was a hot and contentious one between those who want to

5  continue to back off in order to fool the opposition by

6  no-showing, as Antifa had recently done in Houston and

7  Gettysburg, and those who would want to ramp up the violence to

8  a hot and heavy level.  The latter, a majority, won, and

9  reportedly will have its way."

10     Then did Mr. Tubbs -- "The upshot is this:  Antifa indeed

11  will show up in large numbers in Charlottesville.  And they,

12  according to what I've been told, will have explosives,

13  firearms, and various other weapons with the intent to use them

14  against us."

15     And what did Mr. Tubbs respond to you, Mr. Hill?  He said

16  to you -- publishing this for the jury, the last paragraph,

17  please -- no, the first paragraph.  This is Mr. Tubbs to you,

18  Dr. Hill:  "Even though we haven't had any hard intel so far to

19  make us believe there was going to be violence, I think we all

20  assumed there would be and maybe even hoped for it."

21     That's what he said to you, right?

22  A    Yes, that's what he said.

23  Q    So he did tell you that he was hoping for violence, didn't

24  he?

25  A    No, he didn't tell me he was hoping for anything.  "Maybe

M. Hill - Direct

1  even hoped for it" doesn't define anyone in particular, sir.

2  It could be anybody.

3  Q    You prepared your League warriors for violence that day,

4  didn't you?

5  A    We prepared to defend ourselves, sir, because we knew the

6  nature of Antifa.

7  Q    You directed shields to be fabricated for use by the

8  League's soldiers; isn't that right?

9  A    Shields were offered to me by one of our members and I

10 accepted the offer.

11 Q    You knew shields could be used on offense; isn't that

12 right?

13 A    Pretty much anything can be used defensively, sir.

14 Q    I said offensively.

15 A    Oh, I'm sorry.  Anything can be used offensively.

16 Q    You knew shields could be used offensively and

17 defensively, right?

18 A    Say the last part again.

19 Q    You knew the shields could be used offensively, as well as

20 defensively, right?

21 A    Yes.  As a historian I'm very much aware of how shields

22 have been used in the past.

23 Q    Now, the shields you had made to order by someone in the

24 League, right?

25 A    No.  I didn't have them made to order.  He made them and

M. Hill - Direct

1  presented them to me by his own volition.

2  Q    And you talked to -- that's Danny Hembree, right?

3  A    That's correct.

4  Q    And you talked to him about making those shields before

5  you ever got this notice in July about Antifa coming; isn't

6  that right?

7  A    Yes, that is correct.

8  Q    Because you thought shields would make the League members

9  look formidable; isn't that right?

10 A    No.  They were for defensive purposes, sir.

11         MR. LEVINE:  Can we show the witness a document from

12 June 29, 2017.

13         THE CLERK:  Does this document --

14         MR. LEVINE:  I'm not offering it.

15  BY MR. LEVINE:

16 Q    Would you please read that last sentence to yourself,

17 Dr. Hill?

18 A    Yes, I did.

19 Q    Does that refresh your recollection --

20 A    Yes, it was.

21 Q    -- that you believed that the shields would be a

22 formidable sight?

23 A    Yes, I said that.

24 Q    And you also wanted your League of the South warriors to

25 wear helmets; isn't that right?

M. Hill - Direct

1  A     I didn't require it and I didn't wear one myself, but we

2  recommended it if they felt like it would be a defensive

3  measure they wanted to do, yes.

4  Q     And you wanted the League of the South men to carry flags

5  so flagpoles could be used as weapons; isn't that right?

6  A     Anything, pretty much, sir, can be used as a weapon,

7  including a flagpole.

8  Q     And you wanted League of the South men to wear the same

9  uniform to present as organization strength and discipline;

10  isn't that right?

11  A     That's correct.

12  Q     And that included khaki pants, black shirt with

13  embroidered League emblem, and cargo boots; isn't that right?

14  A     That is correct.

15  Q     And you even carried a concealed weapon; isn't that right?

16  A     That is correct.

17  Q     And you carried a stick pole yourself, didn't you?

18  A     I carried a walking stick.

19  Q     And you used that walking stick to attack

20  counter-protesters; isn't that --

21  A     I did not use that walking stick to attack

22  counter-protesters.

23          MR. LEVINE:  Let's put up Plaintiffs' Exhibit 3800A.

24          (Plaintiffs' Exhibit 3800A marked.)

25

M. Hill - Direct

1    BY MR. LEVINE:

2    Q    Is that a picture of you?

3    A    Yes.  It is.

4    Q    At Charlottesville 2.0 on Market Street?

5    A    Yes, it's a picture of me.

6              MR. LEVINE:  I offer it in evidence, Your Honor.

7              THE COURT:  It will be admitted.

8              (Plaintiffs' Exhibit 3800A admitted.)

9              MR. LEVINE:  I ask that it be published for the jury,

10   Your Honor.

11             THE COURT:  It may be.

12   BY MR. LEVINE:

13   Q    Is that a picture of you sticking your walking stick into

14   a counter-protester?

15   A    No, it's a picture of me trying to wrest my walking stick

16   away from somebody who grabbed it from me.  If you look

17   closely, you can see his hand on my walking stick and I'm

18   trying to get it back from him.

19   Q    It wasn't because you were sticking your walking stick

20   into him and then he was trying to grab the stick away so it

21   wouldn't be inflicting pain on him?

22   A    No.  My walking stick was grabbed by him first and I

23   wrested it away from him.

24   Q    Now, as you got closer to August 11th and 12th you called

25   out for your members to join you in Charlottesville; isn't that

M. Hill - Direct

1    right?

2    A    Repeat that question, sir.

3    Q    As you got closer to August 11th and 12th, you called out

4    for your League of the South members to join you in

5    Charlottesville; isn't that right?

6    A    If you can show me evidence, I can deny or confirm it.

7    Q    Well, take a look at Plaintiffs' Exhibit 2101.

8    A    Yes.  I issued that statement.

9          (Plaintiffs' Exhibit 2101 marked.)

10   BY MR. LEVINE:

11   Q    2101 is a tweet that you put out, correct?

12   A    I guess that's a tweet.

13          MR. LEVINE:  We offer it, Your Honor.

14          THE COURT:  It will be admitted.

15          (Plaintiffs' Exhibit 2101 admitted.)

16          MR. LEVINE:  We ask that it be published for the

17   jury, Your Honor.

18          THE COURT:  It may be.

19    BY MR. LEVINE:

20   Q    And you put out this message on your Twitter account;

21   isn't that right?

22   A    I presume.  As I said, I don't have access to that account

23   anymore, but I do remember making that statement.

24   Q    And the statement is, for the jury to see, "If you want to

25   defend the South and Western civilization from the Jew and his

M. Hill - Direct

1   dark-skinned allies, be at Charlottesville on 12 August."

2        That's what you said, right?

3   A    That is correct.

4   Q    You were actually hoping to recruit people with that

5   message; isn't that right?

6   A    No, I don't remember that being necessarily.  I could be

7   mistaken.  If you have evidence, I can confirm or deny it, sir.

8   Q    Were you asked this question and did you give this answer

9   at page 121 of your deposition, a question referring to this

10  document:  "And you were calling for all people if they agreed

11  with you to defend the South and Western civilization from the

12  Jew and his dark-skinned allies to go to Charlottesville on 12

13  August, correct?"

14       Answer:  "Yes.  That was a call to the general public.  We

15  had hoped to have people contact us and maybe they would,

16  before they went to Charlottesville, become a member of the

17  League of the South."

18  A    Okay.

19  Q    "And that happened on a number of occasions.  We got new

20  members from calls like that."

21       Were you asked that question and did you give that answer?

22  A    Yes, that's -- I did, and I just simply had forgotten

23  about the reason for putting this statement out.

24  Q    Now, when you put that statement out, Dr. Hill, to the

25  general public, you didn't say, if you want to defend democracy

M. Hill - Direct

1  from Antifa, did you?

2  A    No.  It says what it says.

3  Q    You said defend the South from the Jew and his

4  dark-skinned allies; isn't that right?

5  A    That is correct, sir.

6  Q    And there's nothing political about that tweet; isn't that

7  right, Dr. Hill?

8  A    It's all political as far as I'm concerned, sir.

9  Q    That's a call -- a racial call to come to Charlottesville

10  2.0, isn't it?

11  A    That's a political call in my opinion, sir.  You may

12  disagree, but my opinion is it's a political call.  And it was

13  made to not the general public, sir, but to my Twitter

14  followers, which at that time I'm not sure how many there were.

15  Q    This was a call to battle to advance your racially

16  motivated objectives; isn't that right?

17  A    No, it's not, sir.  It was a political call to join us at

18  Charlottesville for a Unite the Right rally to defend our

19  civilization.

20  Q    It's defending the civilization from the Jew, your enemy,

21  correct?

22  A    That's correct.

23  Q    And his dark-skinned allies, black people, correct?

24  A    Not just black people but any non-whites that oppose us.

25  Q    And it says nothing about Antifa, does it?

M. Hill - Direct

1            MR. JONES:  Your Honor, I'm going to object as asked

2    and answered.

3            THE COURT:  It is, and it speaks for itself.

4            MR. JONES:  It's also misleading because counsel

5    knows --

6            MR. LEVINE:  Your Honor --

7            MR. JONES:  -- this is Twitter and there's only 123

8    characters allowed on Twitter.  So he can't possibly say

9    everything he wants to say in a Twitter post.

10            MR. LEVINE:  Your Honor, object to that --

11            THE COURT:  Sustained.

12            MR. LEVINE:  -- argument to the jury.

13            THE COURT:  Sustained.  Disregard that statement.

14            MR. LEVINE:  Now, Friday -- you can take that down.

15    BY MR. LEVINE:

16    Q    Friday, the League -- Friday the League made arrangements

17    to stay outside Charlottesville at a compound, correct?

18    A    Yes.  We stayed at the Sevenoaks Retreat outside of

19    Charlottesville.

20    Q    And you arrived at that compound on Friday night, correct?

21    A    No, sir.  We arrived at different times.  I think I got

22    there sometime, to the best of my recollection, the early

23    afternoon, maybe, just to make sure everything was in order

24    there for us.

25    Q    And you attended a planning meeting on Friday night at the

M. Hill - Direct

1    League's compound?

2    A    I not only attended it, sir, I directed it.

3    Q    And Heimbach was present with you?

4    A    I don't recall Mr. Heimbach being there.  It's possible

5    that he was, but it was mainly League people and I think it may

6    have been exclusively League people.  I don't recall

7    Mr. Heimbach having been there.  He could have come onto the

8    premises later on during the meeting.  I don't recall it.  If

9    you have evidence of what you're saying, I can confirm or deny

10   it, sir.

11   Q    And Cesar Ortiz, Mr. Heimbach's security man, was there?

12   A    I don't recall.

13   Q    And you had that planning meeting on Friday night and

14   that's why you couldn't go to the torch march; isn't that

15   right?

16   A    Well, obviously, sir, you can't be two places at one time.

17   Q    I asked you, sir, you had the planning meeting, and that's

18   why you didn't go to the torch march --

19   A    And I'm trying to answer --

20   Q    -- isn't that right?

21   A    I'm trying to answer you, sir, if you give me a moment.

22   You can't be two places at one time.  But another thing, we had

23   never planned on going to a torch march because to my knowledge

24   I didn't find out about the torch march until sometime very

25   close to the time that the torch march took place.  And the

M. Hill - Direct

1    torch march was not a permitted event.  We went up to

2    participate in the event of August the 12th, the Unite the

3    Right rally.

4              MR. LEVINE:  Your Honor, I move to strike the answer

5    as not responsive.

6              THE COURT:  I don't see the problem with the answer.

7    He's saying why he doesn't agree with you.  That's all.

8    BY MR. LEVINE:

9    Q    Were you asked this question at page 129 of the deposition

10   and did you give this answer?

11   A    What page, sir?

12   Q    129.  "You didn't decide not to participate in the

13   torchlight rally for tactical reasons; you decided not to

14   participate because you had a group meeting regarding the next

15   day; isn't that right?

16        "Yes, that's exactly right.  We wanted to make sure that

17   our plans for getting in and out of Charlottesville safely were

18   what they should be.  And that's why we met the previous night

19   and did not attend the torchlight rally."

20        Were you asked that question and did you give that answer?

21   A    Yes, I did give that answer and I was asked that question.

22             THE COURT:  Mr. Levine, that's exactly what I was

23   talking about earlier.  If you're planning to do all that, that

24   is not even hardly material.  And to waste time trying to

25   impeach somebody over that -- if you're going to read it

M. Hill - Direct

1   anyway, read it to him to begin with and we could have avoided

2   a page of --

3            MR. LEVINE:  Your Honor, with respect, if there

4   wasn't the continued answer to the first question, I wouldn't

5   have read it, but I felt that it was --

6            THE COURT:  Well, you've had the time to read, and

7   it's like all the others.  Go ahead.

8    BY MR. LEVINE:

9   Q    You weren't opposed to torchlight rallies for tactical

10  reasons; isn't that right?

11  A    I'm not opposed to torchlight rallies for tactical

12  reasons, no.

13  Q    And in fact, you appointed a couple of people to go to the

14  torchlight rally for you as observers, right?

15  A    That is correct.

16  Q    And other members of the League attended the torchlight

17  rally, right?

18  A    I don't know there were.  There possibly could have been

19  some there, but they were not there in their official capacity

20  as League members.

21           MR. LEVINE:  Let's look at Plaintiffs' Exhibit 2857.

22           (Plaintiffs' Exhibit 2857 marked.)

23   BY MR. LEVINE:

24  Q    Is that a picture of Brad Griffin?

25  A    As best I can tell, it is, yes.

M. Hill - Direct

1              MR. LEVINE:  We offer it, Your Honor.

2              THE COURT:  Be admitted.

3              (Plaintiffs' Exhibit 2857 admitted.)

4              MR. LEVINE:  Ask that it be published for the jury.

5              THE COURT:  You may.

6    BY MR. LEVINE:

7    Q    That's Brad Griffin in his League of the South black polo

8    with emblem; isn't that right?

9    A    Yes, it is.

10   Q    And you know a man by the name of Tyler Davis?

11   A    Do I know a man by the name of Tyler Davis?  Yes, I do.

12   Q    And he's a League member, correct?

13   A    He was at the time of the Unite the Right rally.

14   Q    Let's look at Plaintiffs' Exhibit 2883A.

15             (Plaintiffs' Exhibit 2883A marked.)

16   BY MR. LEVINE:

17   Q    Do you recognize this Twitter from Tyler Davis of the

18   Florida League?

19   A    No, I've never seen it before, as far as I can remember.

20             MR. LEVINE:  We offer -- we offer 2883A, Your Honor,

21   as a picture from the torchlight rally.

22             THE COURT:  Is that enough to authenticate a

23   photograph?

24             MR. LEVINE:  Well, it's a screenshot, Your Honor, of

25   all of the videos that have been admitted in evidence here.

M. Hill - Direct

1    THE COURT:  Is it already in evidence?

2    MR. LEVINE:  This particular one is not, Your Honor.

3    THE COURT:  Well --

4    MR. LEVINE:  I'll ask the question differently, Your

5  Honor.

6   BY MR. LEVINE:

7  Q    Did you know, Dr. Hill, that the Florida League was there

8  that night?

9  A    No, I didn't.

10 Q    You knew that the torchlight -- torch march was planned

11 before it happened; isn't that right?

12 A    Yes, technically it is.  I knew beforehand, not long

13 beforehand.

14 Q    You knew early enough to ask some members to go there for

15 you; isn't that right?

16 A    Yes, I did.

17 Q    And you never disavowed the torch march; is that right?

18 A    Oh, no, I never disavowed it.

19 Q    In fact, you were impressed with the torch march; is that

20 right?

21 A    It was very impressive looking on video, sir, it was.

22 Q    And you went on the League of the South podcast and

23 praised the torch march; isn't that right?

24 A    I praised the optics of it, sir.  I said it looked very

25 good and we might even want to do one in the future.

125

M. Hill - Direct

1  Q    And one of the things that was a big part of the optics

2  was the chanting; isn't that right?

3  A    No.  The optics for me were the torches and the darkness

4  there, sir.  I mean, I'd use different chants.

5          MR. LEVINE:  What was the last answer, please?  Could

6  the reporter read it back?

7      (The requested portion of the transcript was read back.)

8  BY MR. LEVINE:

9  Q    But you do agree that chanting in unison was a big part of

10 the particular event; isn't that right?

11 A    Yes, I do agree that chanting in unison has a tremendous

12 impact on the optics of a torch march.

13 Q    And you knew when you said and praised the rally that one

14 of those chants was "Jews will not replace us"; isn't that

15 right?

16 A    I can't remember exactly when I found out that was part of

17 it.  So I couldn't say.  If you have evidence that would show

18 that I did, I can confirm or deny it, sir.

19 Q    And you knew that another chant was "blood and soil";

20 isn't that right?

21 A    I'll give you the same answer I just gave.  If you can

22 show me -- I don't know if I knew that until sometime

23 afterwards.

24 Q    Well, if you praised the torch march, you must have

25 watched a video of it; isn't that right?

M. Hill - Direct

1   A    Yes, I had seen some videos.  I'm not sure that I listened

2   to the sound of them.  I think somebody played one for me or I

3   played it.  But I didn't pay that much attention to what the

4   chants were.  I was impressed by the visual optics of it, sir.

5   Q    Is it your testimony, Dr. Hill, that in watching a video

6   of the torch march, you didn't take notice of the chant, "Jews

7   will not replace us"?

8   A    I can't remember exactly when I looked at the entire torch

9   march video and audio, sir.  I can't remember if it's before

10  the 23rd of August at the time you're talking about the podcast

11  where I discussed this with Mr. Harold Crews.

12  Q    Now, Saturday morning --

13          MR. LEVINE:  Your Honor, I'm about to start another

14  area.

15          THE COURT:  All right.  We'll recess for lunch now.

16  It's 12:30.  We'll recess until 1:30.

17          Do not discuss the case with anyone or allow anyone

18  to discuss it with you.  Do not remain within hearing of anyone

19  discussing the case.  We'll see you back at 1:30.

20  **(Jury out, 12:28 p.m.)**

21          (Recess.)

22          THE COURT:  Ready to call the jury?

23          MS. KAPLAN:  We are, Your Honor.

24          THE COURT:  Call the jury.

25  **(Jury in, 1:35 p.m.)**

                         M. Hill - Direct

1              THE COURT:  All right.  Be seated, please.

2              And you may resume, Mr. Levine.

3              MR. LEVINE:  Thank you, Your Honor.

4    BY MR. LEVINE:

5    Q    Dr. Hill, I want to turn to Saturday, August 12th, 2017.

6         Is it correct that you and your League of the South convoy

7    departed the campgrounds and drove to a meeting place with

8    others from the Nationalist Front?

9    A    Yes, that's correct.

10   Q    And going back, when you understood from Jason Kessler

11   what the plans were for the day, the only part of the plans

12   that you didn't like for League of the South were the

13   transportation piece:  How you were getting into town, how you

14   were getting into the park, and how you were getting out of

15   town.  Isn't that right?

16   A    We were concerned about the safety -- safety issues

17   involved in the logistics of getting in and out.

18   Q    And you asked Ike Baker to take care of that?

19   A    Yes, Ike Baker took care of the logistics in that -- in

20   that sense, the getting in and getting out of town, yes.

21   Q    And your conversation with Ike Baker was, go talk to the

22   Nationalist Front people and make sure that all of them are

23   100 percent on board with how you were going to take League of

24   the South in and out, right?

25   A    Yes.  We needed one coordinated plan for everybody to meet

M. Hill - Direct

1   and get in together and get out together.  So yes, that's true.

2   Q    And so when you said in Exhibit -- I think it was 1545,

3   your exchange with Ike Baker at the bottom -- and we published

4   this for the jury.  It's in evidence.  Go down farther.

5        Yeah.  He told you -- Ike said, "I'm arranging a

6   conversation with Schoep and upon his acceptance of the

7   conditions you laid out last night, planning of Operation Shoo

8   Fly begins in earnest," right?  And that's what Baker told you

9   he would do, correct?

10  A    Hold on just one minute.  Let me read this.

11       Yes.  From what I understand this was an operation

12  regarding the logistics of getting in and out of the --

13  Q    Right.  And by the way, in that email you had told -- you

14  had talked to Ike Baker about David Duke, right?

15            MR. LEVINE:  Scroll down, Mr. Spalding.

16            THE WITNESS:  Yes.  I did talk to Mr. Kessler and

17  Mr. Baker about the -- about getting in touch with Mr. Duke.

18  Mr. Duke is a friend of mine.  So...

19  BY MR. LEVINE:

20  Q    And Mr. Duke, that's David Duke, who was formerly Grand

21  Wizard of the KKK?

22  A    One and the same.

23  Q    And you knew him from your activities in the movement?

24  A    Yes.  I first met David back in the 1990s.

25  Q    Okay.  And now going back, Baker reports to you that the

M. Hill - Direct

1  Nationalist Front people are 100 percent on board, right?

2  A    Yes.  With the logistics plan of getting in and out, yes.

3  Q    And so you then meet all together as planned that morning,

4  correct?

5  A    That is correct.

6  Q    And you're at the Market Street garage, and before that,

7  at another location with the other organizations that are in

8  the Nationalist Front, correct?

9  A    That's correct.  We met on the outskirts of the town of

10 Charlottesville at a -- I think there was a Walmart and a JoAnn

11 Fabrics there, a large parking lot.  Early Saturday morning, we

12 met there, convoyed into the parking garage by the police

13 station on East Market Street.

14 Q    Now, you knew that morning from talking to Ike Baker that

15 Baker had actually never come to Charlottesville before that

16 day to figure out the logistics, right?

17 A    Yes.  It was too far for him to come.  He did a lot of

18 Google Maps studies, aerial map studies, and devised a plan

19 there from that.

20      But the Friday that we got in, we came -- we drove around

21 town several times.

22           MR. LEVINE:  Your Honor, this will go a lot faster if

23 I can ask the questions and he just answers the questions.

24           THE COURT:  All right.  Just answer his questions

25 directly, please.

M. Hill - Direct

1          THE WITNESS:  Yes, Your Honor.

2    BY MR. LEVINE:

3    Q    You learned from Ike Baker, that Saturday morning or

4    before, that he had never visited Charlottesville physically to

5    make those logistics plans; isn't that right?

6    A    Yes.  I learned before that Saturday morning.

7    Q    And you learned that Ike Baker worked from aerial

8    photographs, correct?

9    A    Yes.  That is correct.  Largely from aerial photographs.

10   Q    And you knew that Ike Baker was talking with Heimbach and

11   Schoep, others in the Nationalist Front, to coordinate all of

12   this, right?

13   A    That is correct.

14   Q    So you knew that Baker knew Heimbach and was talking to

15   Heimbach and was reporting to everybody so that he, Baker,

16   would coordinate all this, right?

17   A    Yes.  Baker was coordinating the logistics.

18   Q    And he selected the garage -- Baker selected the Market

19   Street garage because it was easy to get in and out of town

20   with lots of cars, right?

21   A    Not the only reason.  Another reason, it was by the police

22   station.  We thought that would be security for the cars.

23   Q    Now, Ike Baker told you before that Saturday morning that

24   he had tried to contact the local police, the Charlottesville

25   Police Department, and they were not cooperative at all and

131

M. Hill - Direct

1  gave him no advice; isn't that right?

2  A    Well, no.  He told me -- I think he managed to talk to one

3  person there.  I don't remember the person's name, and I don't

4  think he did, either, but he generally said they were not

5  cooperative.

6  Q    Didn't he tell you that none of the calls were productive

7  in nature?

8  A    Yeah, basically so.

9  Q    And you actually filed an answer in this case where you

10  said, quote:  "In all, according to Mr. Baker, he made around

11  half a dozen calls to these agencies.  No written or other

12  records were kept, and he cannot recall the names of anyone

13  with whom he spoke.  None of the calls, according to Baker,

14  were productive in nature," closed quote.

15      You filed that document in connection with this case?

16  A    Yes.  I filed it based on what Mr. Baker had told me.

17  Q    So when you, on behalf of the League and the Nationalist

18  Front, decided to march down Market Street, it wasn't because

19  the police told you to; isn't that right?

20  A    No, they didn't tell us to march down East Market Street.

21  Q    And in fact, it wasn't because the police recommended that

22  you march down Market Street; isn't that right?

23  A    Well, they didn't say one thing or another.

24  Q    You could have gone into Emancipation Park from the

25  southwest entrance that Kessler was arranging; isn't that

M. Hill - Direct

1   right?

2   A    Well, we could have, but we made a decision not to because

3   we didn't like the security plan that Mr. Kessler had.

4   Q    So you decided, with no influence from the police, that

5   you would park the convoy in the Market Street garage, get in

6   formation, and march the couple of blocks down Market Street to

7   Emancipation Park, correct?

8   A    Yes.  And the police knew we were going to do that.

9   Q    How did the police know you were going to do that?

10  A    Because Mr. Baker called and told them.  He simply never

11  got a response.

12  Q    That doesn't -- that doesn't -- that's not reflected in

13  the document you filed.

14  A    Mr. Baker said that he talked to one policeman and told

15  him our plans.

16  Q    He didn't say that to you that you filed with this Court.

17  A    He said in his deposition this morning that he called a --

18  I think it was a Newberry or a Dewberry and spoke to him, and

19  what Mr. Baker told me was he let them know that we were

20  planning on parking at the Market -- East Market Street garage.

21       I don't know if they responded to that or not.

22  Q    You don't even --

23  A    But that's what Mr. Baker told me.

24  Q    The jury heard the deposition.  I'm not going to repeat

25  what Ike Baker said in his deposition, but you, Dr. Hill, have

M. Hill - Direct

1  filed a document in this court that doesn't say anything about

2  what Ike Baker supposedly said to the police; isn't that right?

3  A    I did, because it's not something that I had any personal

4  knowledge or personal -- I did not talk to the police myself.

5  I don't know what they said.  I'm merely going by what

6  Mr. Baker said.

7            MR. LEVINE:  Can we put up Plaintiffs' Exhibit 3842?

8  Let's go to the very end.

9            (Plaintiffs' Exhibit 3842 marked.)

10  BY MR. LEVINE:

11  Q    Are you looking there, Dr. Hill?

12  A    Yes.

13  Q    Does that say "Second Set of Interrogatories, 8 March

14  2020, for Michael Hill"?  Does it, sir?

15  A    Yes.

16            MR. LEVINE:  Go to the end, please, Mr. Spalding.

17  BY MR. LEVINE:

18  Q    Is that your signature?

19  A    Yes, it is.  Yes.

20            MR. LEVINE:  Your Honor, we offer Plaintiffs'

21  Exhibit 3842 and ask it be published to the jury.

22            (Plaintiffs' Exhibit 3842 admitted.)

23            MR. LEVINE:  Please, Mr. Spalding, go to the answer

24  to Question 12.

25            THE COURT:  Read the question.

M. Hill - Direct

```
 1            MR. LEVINE:  Pardon?

 2            THE COURT:  Read the question, too.

 3            MR. LEVINE:  The interrogatory question?

 4            THE COURT:  Yeah, if that's what he's answering.  I

 5  mean --

 6            MR. LEVINE:  Okay.

 7            That's definitions.  Keep going.

 8            I think it's actually number 5 or 6.  The witness

 9  numbered his answers that weren't consistent with the

10  questions.

11            Okay.  Yes.

12   BY MR. LEVINE:

13  Q    So were you asked to identify each communication

14  concerning the events that you had with each member of law

15  enforcement, whether before, after, or during the events,

16  including the name of the member of law enforcement, when,

17  where, and how each communication took place, and the nature or

18  content of that communication?

19       Do you recall that was the question?

20  A    Yes, I do.

21  Q    Okay.  So let's go to your answer, which is identified as

22  paragraph 12.

23       And you signed this on behalf of League of the South,

24  correct?

25  A    Yes, I did.
```

135

M. Hill - Direct

1   Q    And you also signed it on behalf of yourself?

2   A    That is correct.  That is correct.

3   Q    And do you -- did you say in that document at the last

4   sentence:  "In all, according to Mr. Baker, he made around half

5   a dozen calls to these agencies" -- referring above, ladies and

6   gentlemen of the jury, to Charlottesville Police Department,

7   Albemarle County Sheriff's Department, and Virginia State

8   Police.  "No written or other records were kept, and he cannot

9   recall the names of anyone with whom he spoke.  None of the

10  calls, according to Baker, were productive in nature."

11       That's what you swore to?

12  A    Yes, absolutely.  And they weren't productive in nature.

13  Q    And in that statement you don't have anything about what

14  Mr. Baker said in that one call; isn't that correct?  Can we

15  agree to that?

16  A    Yeah, in this statement.  In this statement I don't have

17  any of that.

18  Q    And whether Mr. Baker testified this morning to what he

19  said or not is for the jury's recollection, but isn't it a

20  fact -- isn't it a fact, Dr. Hill, that you didn't walk down

21  Market Street because the police told you to?

22  A    No, they didn't tell us to.  They didn't tell us not to.

23  Q    And you didn't walk down Market Street because you told

24  them you were and they winked at you; isn't that right?

25  A    Mr. Baker -- yes.  We never made contact with the police

136

M. Hill - Direct

1    and got a response from them after Mr. Baker called to let them

2    know that's where we were going to be parking.

3    Q    But you don't know what Mr. Baker said to the police;

4    isn't that right?

5    A    All I know is what Mr. Baker told me that he told the

6    police.

7    Q    But that's not in the answer to number 12, is it?

8    A    Yes, it isn't, but none of the calls, according to

9    Mr. Baker, were productive.  And that's simply what I meant.

10   We never got the response from the police that we wanted; that

11   is, "Yeah, we'll make sure that, you know, your cars are safe,"

12   and all that kind of stuff.  So we made the decision on our

13   own.

14   Q    I'm asking you a different question, Dr. Hill.

15        Isn't it a fact that you did not say --

16             MR. JONES:  Objection, asked and answered.

17             THE COURT:  Sustained.

18    BY MR. LEVINE:

19   Q    There's no evidence, other than your say-so right here

20   today, what Mr. Baker purportedly said to the police about the

21   march that day; isn't that right?

22   A    Yes, that's absolutely right.  So I think we should

23   probably drop the subject, since we have no evidence one way or

24   the other.

25             THE COURT:  All right.  That will be decided by

M. Hill - Direct

1  the -- well, go ahead.  Go ahead.

2   BY MR. LEVINE:

3  Q    You knew, Dr. Hill, that the permit for Saturday's rally

4  was for Emancipation Park, correct?

5  A    Yes, I knew that the rally was going to be at Emancipation

6  Park, and the permit was for the rally.

7  Q    And you knew that the permit did not include a march on

8  Market Street, didn't you?

9  A    Let's see.  There seems to be a way of getting into the

10 park, sir, that includes going in one of the four entrances.

11 How do you get to the entrances, sir, if you don't walk down

12 the street to get there?

13 Q    I'm asking you, Dr. Hill, if League of the South and

14 Nationalist Front had a permit to march as if it were a parade

15 down Market Street as part of the permit for the rally.  Yes or

16 no?

17 A    No.

18 Q    And you could have gone into Emancipation Park in the way

19 that Kessler had worked out, in the southwest corner; isn't

20 that right?

21 A    I don't know what way he worked out in the southwestern

22 corner.

23 Q    Because you wanted to bring the League, its members, its

24 shields, its flags, down Market Street in a column as if these

25 were soldiers going to war; isn't that right?

M. Hill - Direct

1   A      That is incorrect, sir.

2   Q      What you wanted was the public confrontation --

3          MR. JONES:  Your Honor, this is getting

4   argumentative.  I'm going to object.

5          THE COURT:  All right.  Don't -- ask a question.

6   BY MR. LEVINE:

7   Q      What you wanted, Dr. Hill, was the public confrontation

8   that would come about from the League of the South column

9   marching down Market Street; isn't that right?

10  A      That is completely wrong, sir.  We wanted to get into the

11  park safely.

12  Q      As you started that march down Market Street, you knew

13  there was going to be that public confrontation; isn't that

14  right?

15  A      That is incorrect, sir.

16  Q      Couldn't you see ahead of you counter-protesters

17  arm-in-arm in the street in the place where you were expecting

18  to walk through?

19  A      Once we got down the street a block or so, we could see

20  that opposition described just as you said, sir, locked

21  arm-in-arm barring a public street that was open for foot

22  traffic.

23  Q      And you don't dispute that when you got to them

24  face-to-face, Mr. Tubbs just kept barreling right through them

25  with the shields to get into the park?

139

M. Hill - Direct

1   A    We made our way into the park, sir, through that group who

2   would not move aside.  They locked arms.  They wouldn't move.

3   We made our way into the park.

4   Q    And you made -- you made your way into the park by

5   initiating a violent encounter with them; isn't that right?

6   A    We walked through them and there was violence on both

7   sides, sir.  There were fights on both sides.

8   Q    Let's look at Plaintiffs' Exhibit 3239A.

9        We'll run it a little, Dr. Hill, and then see if you

10  identify your group before we offer it.

11           (Plaintiffs' Exhibit 3239A marked.)

12           MR. LEVINE:  Wait a couple of seconds.  Come back.

13           THE WITNESS:  Yes, that's us.

14           MR. LEVINE:  Your Honor, we offer Plaintiffs' Exhibit

15  3239A into evidence and ask that it be published for the jury.

16           THE COURT:  Okay.  It will be admitted and you may

17  publish.

18           (Plaintiffs' Exhibit 3239A admitted.)

19           MR. LEVINE:  Your Honor, could we play this?  In the

20  interest of time, we only did a certain segment.

21           (Video playing.)

22           MR. LEVINE:  Stop it right there.

23   BY MR. LEVINE:

24  Q    Now, that's Michael Tubbs in the middle, correct?

25  A    Yes.  The gentleman that you circled is Michael Tubbs.

M. Hill - Direct

1  Q     And next in with the white cap, that's you, correct?

2  A     That's correct.

3  Q     And right before he went behind the body was Matthew

4  Heimbach, correct?

5  A     I didn't see that.

6  Q     And this -- the League of the South and Nationalist Front

7  people are spread out down the street behind you, correct?

8  A     That is correct.

9  Q     And these are the shields that you had made?

10 A     That's right.

11 Q     And there were a dozen of them given to men up front,

12 correct?

13 A     There were a dozen of them given to men in the front, yes.

14 Q     And this is a League banner, flag, correct?

15 A     Yes, that's the Southern Nationalist flag.

16 Q     And this flag?

17 A     Confederate battle flag.

18 Q     Now, we stopped the video right here, Dr. Hill, but am I

19 correct that you and Mr. Tubbs didn't stop walking at any

20 point?  Isn't that right?

21 A     I'm not sure, sir.

22 Q     Well, let's --

23 A     I would have to see the video to confirm or deny that.

24 Q     We'll roll the videotape.

25             (Video playing.)

M. Hill - Direct

1           MR. LEVINE:  Okay.  Stop it, Mr. Spalding, please,

2    and go back.

3    BY MR. LEVINE:

4    Q    Dr. Hill, I'm going to play it one more time from the

5    beginning so you can see as much of the march as is on the

6    video.

7           (Video playing.)

8         Thank you.

9         Do you agree with me, Dr. Hill, that the evidence shows

10   that you and Michael Tubbs led the Nationalist Front column up

11   Market Street to those counter-protesters without stopping?

12   A    The certain -- I saw certain people in the column stop.

13   There were certain others in the column who did not stop.

14   Q    But isn't it a fact that Mr. Tubbs and you did not stop?

15   A    I would have to -- I'd have to see it again, because I was

16   just trying to focus on a certain part of it.  Could you have

17   it replayed?

18   Q    Absolutely, sir.

19           (Video playing.)

20   A    Yes, from what I saw, some -- there were some who stopped.

21   Some with the shields went ahead, but the main body of the

22   column stopped.

23   Q    Stopped where?

24   A    Stopped about 30 feet or so behind the initial

25   confrontation.

M. Hill - Direct

1   Q    But Mr. Tubbs and you, in the front of the column, did not

2   stop; isn't that right?

3   A    I think we -- I lost sight of myself.  I know that part of

4   our folks there did not stop.  They slowed down.  But the main

5   column did stop.  And the purpose of that was to --

6   Q    Dr. Hill, I'll play it one more time, sir.

7           (Video playing.)

8       And please look for this fact so that you can answer this

9   question:  Isn't it a fact that you and Michael Tubbs, leading

10  the column, did not stop marching down the street until they

11  started to push into the counter-protesters?  Isn't that right?

12  No one is stopping there, correct?

13  A    Right.

14  Q    Okay.  And Tubbs is continuing, correct?

15  A    Yes.  There are people behind that main group, though,

16  that stopped.

17  Q    But Tubbs isn't, correct?

18  A    According to this video, no.

19  Q    Okay.  And was there any policemen in those 30 feet that

20  you saw that you spoke to?

21  A    I saw a policeman -- no, not in that 30 feet.  But behind

22  that, on the approach, there was a policeman that I looked over

23  at and he just simply gave me the:  We're not going to do

24  anything.  We're standing aside.

25  Q    That was your impression?

143

M. Hill - Direct

1   A    That was my impression.  Exactly.

2   Q    Said nothing?

3   A    No, said nothing.

4   Q    And you kept walking and Tubbs kept walking?

5   A    Yes.  Yes, we kept walking.

6   Q    And the fact is that the counter-protesters were standing

7   still, correct?

8   A    Yes, the counter-protesters were standing still.

9   Q    And Tubbs led the column behind him with shields and

10  helmets into those counter-protesters; isn't that right?

11  A    That is correct.

12  Q    And used the shields for offense, just like you said in

13  the podcast you would use them for; isn't that right?

14  A    The shields were used to push through the crowd to protect

15  our people behind them from objects that were being thrown and

16  objects that were being swung at our people.

17  Q    Now, you actually testified -- on your deposition, were

18  you were asked this question and did you give this answer at

19  page 180?

20  A    What page?

21  Q    180.  Question:  "So it's your testimony that the way you

22  proceeded unilaterally moving into the protesters' shields was

23  an act of self-defense for" --

24      And you answer, interrupting the question:  "It was an act

25  of self-defense for our liberty to exercise our First Amendment

M. Hill - Direct

1    rights."

2        So you were asked that question and you gave that answer;

3    is that right?

4    A    Yes, that's correct.

5    Q    Now, after Mr. Tubbs and you and the others push your way

6    into the crowd, you come back, you push again, you end up

7    getting up the steps into Emancipation Park, correct?

8    A    That's correct.

9    Q    And shortly after that happens, unlawful assembly is

10   declared, correct?

11   A    I don't know if "shortly," how long it was.  It seemed

12   like it was maybe an hour and a half.

13   Q    And -- an hour and a half?

14   A    I'm guessing.  I don't know exactly.

15   Q    And during that time there was a lot of fighting on the

16   street, right?

17   A    Yes, there was quite a few scuffles that took place out in

18   the street.

19   Q    And you and the League of the South members were up in the

20   park where you had wanted to be, right?

21   A    Yes, we were in the park at that time and I had assigned

22   Mr. Tubbs and the shield-bearers to guard the entrance to the

23   park where Antifa could not get in.

24   Q    Now, you never ended up setting up in Emancipation Park

25   that day, right?

M. Hill - Direct

1  A    Excuse me, rephrase that.  Setting up, did you say?

2  Q    You never set up for the rally in Emancipation Park that

3  day, did you?

4  A    I can't speak to that.  I don't know --

5  Q    You never?

6  A    Well, I never.  I never found Mr. Kessler to ask where I

7  was supposed to speak.

8  Q    And you never spoke that day; is that right?

9  A    No, I never spoke that day.  You know that.

10 Q    Dr. Hill, I'm asking you questions.

11       THE COURT:  Okay.  Let's go on.  Don't make comments,

12 Dr. Hill.  Answer his questions.  Go ahead.

13  BY MR. LEVINE:

14 Q    You never spoke that day and no one gave any speech that

15 day in Emancipation Park where the rally was supposed to be;

16 isn't that right?

17 A    That's right.

18 Q    Just a lot of violence, right?

19 A    There was a good deal of violence that day, yes.

20 Q    And when unlawful assembly was declared, you went to

21 McIntire Park, correct?

22 A    Yes.  I did.

23 Q    And you saw Richard Spencer there?

24 A    No, I did not see Mr. Spencer there, to my knowledge.

25 Q    Did you see Mr. Heimbach there?

M. Hill - Direct

1  A    I don't recall.

2  Q    Who do you recall seeing there?

3  A    I recall seeing Mr. Spencer Borum, who escorted me there

4  when the unlawful assembly was declared.  I can't remember

5  exactly who I saw there because once I got there my objective

6  was to find a ride back to the East Market Street garage to get

7  back to my automobile.

8              THE COURT:  Did you say Mr. Spencer escorted you

9  there?

10             MR. LEVINE:  No, it's Spencer Borum, Your Honor.

11 BY MR. LEVINE:

12 Q    And that's a member of League of the South.  Correct?

13 A    That is correct.

14             THE COURT:  All right.  Thank you.

15 BY MR. LEVINE:

16 Q    And that's the gentleman next to you in the video, right?

17 A    I'd have to identify him.  There were several people next

18 to me.

19 Q    But the course of that morning, just lots of violence,

20 right?

21 A    There was a lot of violence that morning, sir.

22 Q    In and around Market Street, correct?

23 A    In and around the entire area of the park.

24 Q    And in and around McIntire Park, correct?

25 A    I didn't see any at McIntire Park.

M. Hill - Direct

1    Q    In and around McIntire Park?

2    A    Not that I saw.  I was not at McIntire Park for very long.

3    Q    And there was violence all day; isn't that right?

4    A    I don't know about all day.  I know that the time that we

5    were there, from the time we marched down Market Street until

6    we left, there was violence pretty much that whole time.

7    Q    Well, there was the violent death caused by James Fields

8    driving his car into the people on Fourth Street; isn't that

9    right?

10   A    That was after the rally.  That was after Unite the Right.

11   Q    I'm asking you whether that was during the course of the

12   day.

13   A    It was during the course of the day, but not the course of

14   the rally.

15   Q    There wasn't a rally, was there, Dr. Hill?

16   A    Well, there was a permitted gathering in Emancipation or

17   Lee Park.

18   Q    But the permit was for an event that we just established

19   never took place; isn't that right?

20   A    Well, now, it depends on how you define the event.  If the

21   event was only the speeches.  But the event was the gathering

22   of people in the park as well.

23   Q    Most of the people didn't end up gathering in Emancipation

24   Park; isn't that right?

25   A    No, absolutely not.  That park was full.  When we got

M. Hill - Direct

1   there, half the park was full of people that had come from

2   McIntire Park.

3   Q    Mingling around, correct?

4   A    Mainly where?

5   Q    Mingling.  No speeches were made, correct?

6   A    No.  There were no speeches made.

7   Q    So there were violence out on the street, correct?

8   A    Yes.  There was violence out on the street.

9   Q    By participants from the alt-right in the rally, right?

10  A    By participants of the alt-right and by participants of

11  Antifa and Black Lives Matter.

12  Q    Exactly.  Exactly the public confrontation that you were

13  looking forward to; isn't that right?

14  A    That is absolutely wrong, sir.

15  Q    And there was the violent death for the woman by James

16  Fields's accident and the injuries to lots of plaintiffs from

17  the activities that day, some of whom are plaintiffs in this

18  case, right?

19              MR. JONES:  Object to the form of the question.

20              THE COURT:  Sustained.

21              THE WITNESS:  I don't know the extent of anybody's

22  injuries.

23  BY MR. LEVINE:

24  Q    And violence Friday night against college students from

25  UVA; isn't that right?

M. Hill - Direct

1  A    I have no idea, sir.  I was not at the torchlight march.

2  Q    You know some of them are plaintiffs in this case?

3  A    So they say.  I'm just talking about things I witnessed,

4  sir.  I was not a witness to that.

5  Q    Isn't it a fact, Dr. Hill, that the League of the South

6  message that you wanted to communicate on Saturday was that the

7  League and its allies would own the streets, and anyone who

8  sought to demonstrate against them would be met with violence?

9  Wasn't that your message?

10 A    No.  That was not my message.

11 Q    And isn't it a fact that this was exactly what you were

12 looking forward to when you sent that Twitter that said if you

13 want to defend Southern nationalism and Western civilization

14 from the Jew and his dark-skinned allies, come 12 August?

15 A    Absolutely not.

16 Q    You agree with me, don't you, that League members

17 initiated some of this violence, don't you?

18 A    Yes, there were some League members that engaged in some

19 violence that they initiated.

20 Q    Let's mark Plaintiffs' Exhibit 1888.

21      (Video playing.)

22 Q    Is that you with Mr. Heimbach?

23 A    Yes.  Right here?  Yes.

24 Q    Is that from the march that day?

25 A    It appears to be.

M. Hill - Direct

1          MR. LEVINE:  We offer Exhibit Plaintiffs' 1888A in

2    evidence and ask it be published.

3          (Plaintiffs' Exhibit 1888A marked.)

4          THE COURT:  It's admitted and it may be published.

5          (Plaintiffs' Exhibit 1888A admitted.)

6          MR. LEVINE:  Can we publish it, Your Honor?

7          THE COURT:  Yes.  We don't have to get to that third

8    step.  As soon as I say it can be published, it -- I'm not

9    controlling --

10         MR. LEVINE:  Oh, okay.

11         Can we go back, Spalding.  We can't hear.  Could you

12   roll it from the top with the sound.

13         (Video playing.)

14         MR. LEVINE:  Still can't hear it, sir.

15         (Video playing.)

16         MR. LEVINE:  Stop right there.

17    BY MR. LEVINE:

18   Q    Can you identify, even without the sound there, do you

19   identify League of the South members with the black polo and

20   the emblem?

21   A    Yes, I can.

22   Q    And there are several of them, correct?

23   A    Quite a few.

24   Q    And they're surrounding a woman dressed in black, correct?

25   A    I was not sure if that was a woman or not.

M. Hill - Direct

1   Q    They're surrounding a person dressed in black?

2   A    Okay.  That's better.

3   Q    Let's just roll back a little, Mr. Spalding, because I

4   want to ask a question.

5             (Video playing.)

6   Q    So those are all League members, correct, the three black

7   helmets and the three black polo shirts with the emblem?

8   A    As far as I can tell, the three in the middle there are

9   League members.

10  Q    And this person, that's the woman I'm talking about,

11  correct?

12  A    Okay.  I gotcha.

13  Q    Okay.

14  A    I can't --

15  Q    I would like you to focus, sir, on what the League of the

16  South members are doing to that woman.  And then I'm going to

17  ask you a question, if we can get the technology.

18        (Video playing.)

19  Q    That was a League member macing her in the face, correct?

20  A    It happened so quickly, I was not focused there.  Could

21  you run that back, please.

22  Q    Yes.

23        (Video playing.)

24  Q    Hold it right there.

25        Who is this, Dr. Hill?

M. Hill - Direct

1   A    I'm not sure.  I can't get a good look.

2   Q    Isn't that Ike Baker?

3   A    No, that's not Ike Baker.

4   Q    No?  Who is it?

5   A    I don't know.

6   Q    That's a League member, correct?

7   A    Yes, it is a League member.  At least he has a League

8   shirt on.

9   Q    And this fellow with his hand stretched out, he's a League

10  member?

11  A    I think so.

12  Q    And this guy is a League member?

13  A    I don't know about that.  That guy, I don't recognize and

14  that doesn't look like anybody that I recognize with a League

15  helmet or he does haven't a League emblem on his shirt.

16  Q    And the one right behind him?

17  A    I believe that was a League member.

18  Q    Okay.  And they pushed the woman down.  And then when she

19  got up, maced her, correct?

20  A    Yes, that's correct.  I presume that's mace.

21  Q    That wasn't self-defense, was it?

22  A    I didn't see the context of what happened before it.  I

23  don't know what started the fight.  I don't know what started

24  the pushing and shoving.

25           THE COURT:  Didn't you see the little before that?

M. Hill - Direct

1  BY MR. LEVINE:

2  Q    Isn't it a fact, Dr. Hill, that you would not consider

3  that an act of self-defense?

4  A    As I said, sir, I would have to see the whole context.  I

5  don't know what started the pushing and shoving in the

6  beginning.

7           THE COURT:  Can you just go back.

8           MR. JONES:  Your Honor, I'm going to object.  I think

9  the video speaks --

10          (Overlapping speakers.)

11          THE COURT:  -- see a couple of seconds before that.

12          MR. LEVINE:  Okay.

13          (Video playing.)

14          MR. LEVINE:  Hold it, Spalding.

15 BY MR. LEVINE:

16 Q    Now, the woman didn't have any kind of weapon in her

17 hands; isn't that right?

18 A    I don't know.  It's all happening --

19 Q    Well, from what you can see?

20 A    -- so fast, I couldn't see.

21 Q    And in fact, the woman was walking out and away the other

22 side of Market Street when one of the League members pulled

23 her, turned her around and threw her to the ground; isn't that

24 what happened?

25 A    I don't -- I don't know if that's what happened or not.

M. Hill - Direct

1    Q    Well, let's look.

2         (Video playing.)

3    A    It appears the gentleman -- well, that approached her

4    pushed her down on the ground.

5    Q    And isn't it a fact, Dr. Hill, in your deposition you

6    admitted this was not an act of self-defense by a League

7    member?

8    A    I think I admitted that the spraying of the mace or pepper

9    spray or whatever it was was not an act of self-defense.  I

10   can't remember about the other.

11   Q    Now -- thank you.  Take that down.

12        Now, as I asked you just before, the violence that day on

13   August 12 included the killing of a woman by the name of

14   Heather Heyer, correct, by James Fields?

15   A    Yes.

16   Q    And after the events, you never condemned that killing

17   publicly for the League; isn't that right?

18   A    I think that is correct.

19   Q    You didn't even express remorse for that killing on behalf

20   of the League; is that correct?

21   A    I think that is correct, sir.

22   Q    In fact, when Mr. Fields was convicted by a jury in

23   Charlottesville for that killing, you criticized that verdict

24   as -- saying, quote, "There is no justice for the white man in

25   these damnable Jew-run courts.  And if a man cannot get justice

M. Hill - Direct

1   in a corrupt legal system, what recourse does he have?"

2       Didn't you say that?

3   A    I'd like to see the document where you allege that I say

4   that to see whether I can confirm or deny it.

5   Q    I'm showing you Plaintiffs' Exhibit 1568.

6           (Plaintiffs' Exhibit 1568 marked.)

7   BY MR. LEVINE:

8   Q    Is this an email from you on December 8th, 2018?

9   A    Yes, it is.

10          MR. LEVINE:  We offer it, Your Honor, and seek to

11  publish it for the jury.

12          THE COURT:  Be admissible.

13          (Plaintiffs' Exhibit 1568 admitted.)

14   BY MR. LEVINE:

15  Q    Did you not say to -- who is that?  Sam Dickson?

16  A    Yes.

17  Q    He's a white nationalist down in Georgia, right?

18  A    That's correct.

19  Q    He was at Charlottesville 1.0, right?

20  A    I'm not sure.

21  Q    Did you say to Sam, quote, "Was not surprised at the

22  Fields verdict.  There is no justice for the white man in these

23  damnable Jew-run courts"?  Did you say that?

24  A    I wrote that, yes.

25  Q    So you were actually telling Sam Dickson that the local

M. Hill - Direct

1  Charlottesville state courts are, quote, Jew-run; is that

2  right?

3  A    I was speaking in general terms.

4  Q    That's general?  Sounds pretty specific to me.

5  A    Well, the general --

6          THE COURT:  Wait a minute.  Now we're quarreling.

7  Don't argue back and forth.

8   BY MR. LEVINE:

9  Q    And your co-defendant, Michael Tubbs, actually tweeted

10  several times, "James Fields did nothing wrong"; isn't that

11  right?

12  A    You can ask Mr. Tubbs about that.

13  Q    You don't know that?

14  A    I've heard that -- I've heard it was alleged that he

15  tweeted that.

16  Q    So after 2.0 -- Charlottesville 2.0, and in spite of the

17  fact that there was no rally and no speeches, you actually said

18  to League members that you wouldn't change a thing about

19  Charlottesville 2.0, despite everything that happened?  Didn't

20  you say that?

21  A    Yes, I did.

22  Q    And you said that -- can we mark Plaintiffs' Exhibit 1904.

23          (Plaintiffs' Exhibit 1904 marked.)

24  BY MR. LEVINE:

25  Q    Is that your Twitter account, @71Rhodie?

M. Hill - Direct

1    A    I did have a Twitter account at one time by that name.

2    Q    And is that your message?

3    A    That's my message.

4              MR. LEVINE:  We offer it and ask that it be published

5    to the jury.

6              THE COURT:  Be admitted, may be published.

7              (Plaintiffs' Exhibit 1904 admitted.)

8    BY MR. LEVINE:

9    Q    And in fact, Dr. Hill, you also said that you couldn't be

10   happier with the outcome of Charlottesville 2.0 for the League;

11   isn't that right?

12   A    Can you show me where I said that?

13             MR. LEVINE:  Let's mark Plaintiffs' Exhibit 1379B.

14             (Plaintiffs' Exhibit 1379B marked.)

15   BY MR. LEVINE:

16   Q    Actually you go on a podcast with Howard -- Harold Crews,

17   right, regularly?

18   A    For a while it was regular.

19   Q    And Harold Crews is also a member of League of the South?

20   A    Was at that time.

21   Q    And the podcast was offered for the membership, correct?

22   A    Well, not just the membership.  Anyone who wanted to

23   listen.

24   Q    General public?

25   A    Right.

M. Hill - Direct

1  Q    And were you on a podcast with Harold Crews a few days

2  after Charlottesville 2.0?

3  A    I think I was on a podcast with Mr. Crews on the 23rd of

4  August, which would have been 11 days later.

5  Q    That's this podcast.

6         MR. LEVINE:  We offer it and ask that it be

7  published, Your Honor.

8         THE COURT:  You may.

9         (Plaintiffs' Exhibit 1379B admitted.)

10        MR. LEVINE:  That was a long conversation with

11  Mr. Crews.  We're going to just publish a certain piece of it,

12  Your Honor.

13        THE COURT:  All right.

14        (Video playing.)

15  BY MR. LEVINE:

16  Q    Is that your voice?

17  A    That's my voice.

18        (Video playing.)

19  Q    Is that your voice, sir?

20  A    That is my voice.

21  Q    You also said on Twitter on August 12th that your

22  warriors -- warriors -- had acquitted themselves as men, didn't

23  you?

24  A    I certainly did, sir, and I'd say it again.  They

25  certainly acquitted themselves as men.

M. Hill - Direct

1  Q    Let's show Plaintiffs' Exhibit 2063.  Is that your Twitter

2  from that day?

3  A    Yes, it is.

4  Q    August 12th, 2017?

5  A    Yes.

6          MR. LEVINE:  We offer it in evidence and ask that it

7  be published.

8          THE COURT:  Be admitted and may be published.

9          (Plaintiffs' Exhibit 2063 marked.)

10         (Plaintiffs' Exhibit 2063 admitted.)

11  BY MR. LEVINE:

12  Q    That was your statement at 2:30 on Saturday afternoon,

13  correct?

14  A    2:25 to be exact, but yes.

15  Q    "The League of the South had a good day in

16  Charlottesville.  Our warriors acquitted themselves as men.

17  God be praised."

18      You never gave a speech, right?

19  A    That is correct.

20  Q    There was no rally, correct?

21  A    I would dispute that.

22          THE COURT:  Wait.  Wait.  This dispute has taken

23  place a little while ago.  So don't do it again.

24          MR. LEVINE:  No further questions on direct, Your

25  Honor.

M. Hill - Cross

1          MR. KOLENICH:  Your Honor, we're going to depart from

2   the usual order so Mr. Jones can question his client.

3          THE COURT:  All right.  Mr. Jones.

4                      CROSS-EXAMINATION

5    BY MR. JONES:

6   Q    Now, you obviously know this, but I'm just going to say

7   this for the purposes of the record.  I represent Michael Hill,

8   Michael Tubbs and the League of the South.

9        Sir, how old are you?

10  A    I'm 69 years old.

11  Q    And how old were you when the League was founded in 1994?

12  A    I think I would have been 42.

13  Q    And does the League have a position on the removal of

14  historical Confederate monuments?

15  A    Yes, we have from our entire existence been willing to go

16  wherever we needed to go, and I've given many, many speeches in

17  defense of Confederate monuments, flags, different things.  So

18  yes, we've had a policy since the beginning that we will defend

19  these and we'll go different places to do so.

20  Q    Was the League engaging in those types of activities in

21  the year leading up to Charlottesville 2.0?

22  A    Yes.  We had been to New Orleans in, I believe, the first

23  weekend in May to defend the Robert E. Lee statue in New

24  Orleans.  We did so without any violent events taking place.

25  We came to Charlottesville to do the same thing.

M. Hill - Cross

1   Q    Now, I'm going to ask if we can publish what's been

2   previously admitted as PX-1537.

3        I've got it on the screen there in front of you, Dr. Hill.

4   In this email you say, "I want no discussion here or elsewhere

5   of any resistance strategies, etc.  Those will be handled

6   through secure channels."

7   A    Yes.

8   Q    Why did you say that?

9   A    Basically because everywhere that we went to defend

10  monuments or statues or flags or whatever, if there were public

11  information given out, we knew that Antifa and maybe Black

12  Lives Matter would be there to oppose us.  And we wanted to try

13  and keep that from happening because the purpose of our going

14  to places like New Orleans and Charlottesville was to be seen

15  publicly opposing our enemies politically because it helped us

16  with recruiting.

17  Q    So this is an email discussing how you would like the

18  League of the South to communicate; is that correct?

19  A    Yes.  Absolutely.  That's it.

20  Q    If you can review it, do you see any mention of using code

21  words or code language?

22  A    No.

23  Q    Do you see any mention of using front-stage/backstage

24  communication?

25  A    No.  Until I heard that term yesterday, I never -- I've

M. Hill - Cross

1  never even heard it before.

2            MR. JONES:  I'm going to pull up what's been marked

3  as Defendants' Exhibit 010.

4            (Defendant LOS Exhibit 010 marked.)

5  BY MR. JONES:

6  Q    Sir, do you see this email?  I'm going to zoom in a little

7  bit here.

8  A    Yes.

9  Q    Was that an email exchange between you and somebody named

10 Gordy Lockerbie?

11 A    Yes, it is.

12           MR. JONES:  Your Honor, I'm going to move that this

13 be introduced as Defendants' Exhibit 010.

14           THE COURT:  Be admitted.

15           (Defendant LOS Exhibit 010 admitted.)

16 BY MR. JONES:

17 Q    Now, in this email on August 11th, 2017 at 7:48 p.m, can

18 you read what Gordy Lockerbie wrote, sir?

19 A    Yes.  Mr. Lockerbie wrote, and I quote:  "Torchlight rally

20 time and location has been leaked and Antifa is posting that

21 they will be there.  If LS" -- which means League of the

22 South -- "is in attendance, be cautious.  Gordy Lockerbie."

23 Q    And what was your response to that email?

24 A    My response was:  "Thanks, but this is not our game.  We

25 are sending two observers."

M. Hill - Cross

1  Q    Was this a private email?

2  A    As far as I knew, yes.

3  Q    Did you ever expect this to see the light of day?

4  A    No, I didn't.

5  Q    This was before you knew about any violence occurring at

6  the torch march; is that right?

7  A    Oh, yes, absolutely.

8  Q    I'm going to ask you about the next day, the 12th of

9  August.  What was the purpose of the League attending the

10  rally?

11  A    We came to defend the statue of Robert E. Lee.  We came

12  to -- I obviously came to give a speech, which never occurred,

13  of course.

14       We came -- largely, we do these things in part as

15  recruiting efforts.  When we face our political enemies and we

16  do it effectively, we tend to gain membership.  So we enjoy

17  political events like this, and, you know, cultural events, and

18  it was obviously focused on the Lee statue.

19  Q    Was this your first time attending or participating in an

20  event organized by Jason Kessler?

21  A    Yes, it was.

22  Q    And was it the last time?

23  A    Yes.

24  Q    I'm going to pull up what's been previously admitted as

25  PX-1551.

M. Hill - Cross

1       Sir, do you recognize this email?

2   A   Yes, I do.

3   Q   Is it an email about the planning for Charlottesville?

4   A   Yes.

5   Q   So it appears to say that:  "On the ground planning for

6   Charlottesville is coming along nicely.  Still a lot to do, but

7   the Pikeville template, on a larger scale, looks like it will

8   work well there."

9       Do you see that?

10  A   Yes, I do.

11  Q   Was "the Pikeville template" some kind of a code word?

12  A   No.  It was the logistics plan that was developed by

13  Mr. Ike Baker to get us into the protest area and out of it

14  safely where there wouldn't be any conflict with Antifa or any

15  other counter-protesters who showed up.

16  Q   So at Pikeville was there -- were any protesters hit by

17  any vehicles?

18  A   No.

19  Q   Were any, as far as you know --

20          MR. LEVINE:  Objection, relevance, Your Honor, and

21  beyond the scope.

22          THE COURT:  Well --

23          MR. JONES:  Your Honor, this email --

24          THE COURT:  Pikeville came up.  Overruled.

25  BY MR. JONES:

M. Hill - Cross

1  Q    So it was your intention to participate in Charlottesville

2  in the same manner you had in Pikeville; is that right?

3  A    Yes.  That is true.

4  Q    If you know, was there a conspiracy to commit racial

5  violence in Pikeville?

6  A    None that I knew of.

7  Q    Again, was this a private email?

8  A    Yes.  As far as I can -- yes, it was a private email.

9  Yes.

10 Q    Did you ask any members of the League to get in touch with

11 the Charlottesville police in advance of the rally?

12 A    I asked Mr. Ike Baker if he would attempt to do that.

13 Q    And why did you do that?

14 A    We wanted to let them know that our plans were to park in

15 the parking garage on East Market Street for security of our

16 automobiles and also because it was a fairly close location to

17 the park, only a couple of blocks away, and we would not have

18 that long a walk to get into the park.

19 Q    I'm going to ask that we publish what's been previously

20 admitted as PX-1553.

21      Sir, do you see this email on the screen?

22 A    Yes, I can.

23 Q    It references some intelligence you received about an

24 Antifa strategy meeting in DC; is that right?

25 A    That's right.

M. Hill - Cross

1  Q    And it appears that this email was sent on July 7th, 2017;

2  is that right?

3  A    That's correct.

4  Q    If we could go to the second page of this, that paragraph

5  beginning with "the upshot is this," do you see that?

6  A    Right.

7  Q    It says:  "And they, according to what I've been told,

8  will have explosives, firearms, and various other weapons"; is

9  that right?

10 A    That's correct.

11 Q    Now, Mr. Levine asked if this was the email that prompted

12 you to make shields; do you remember that?

13 A    I remember him asking me that, yes.

14      MR. LEVINE:  Objection, Your Honor.  Misstates the

15 testimony.

16      THE COURT:  I'm sorry.  Mr. Levine, I didn't hear

17 you.

18      MR. LEVINE:  I said, objection, Your Honor, it

19 misstates the testimony.

20      THE COURT:  Oh.  Well, the jury has to remember what

21 the testimony was.  I can't recall it verbatim at this point.

22      So go ahead.

23 BY MR. JONES:

24 Q    Sir, was this the first time in your life that you had

25 heard that Antifa was a potentially violent organization?

M. Hill - Cross

1   A    No, sir.  I had heard that many, many times before.

2   Q    So you weren't surprised by the information in this email?

3   A    Not at all.

4   Q    Have you heard of the Battle of Berkeley?

5   A    Yes, I have.

6   Q    And that was in April of 2017, correct?

7   A    I think that's correct, sir.

8   Q    Sir, I'm going to show you what's been marked as Defense

9   Exhibit 035.

10           (Defendant LOS Exhibit 035 marked.)

11  BY MR. JONES:

12  Q    Sir, do you recognize what's shown on the screen there?

13  A    Yes, I do, sir.

14  Q    Is that something that you posted on the League of the

15  South website on August 7th, 2017?

16  A    Yes, it is.

17           MR. JONES:  Your Honor, I'll move to admit this.

18           MR. LEVINE:  No objection.

19           THE COURT:  Be admitted.

20           (Defendant LOS Exhibit 035 admitted.)

21  BY MR. JONES:

22  Q    Now, in this post on the League website, what are you

23  advising the League members to do?

24  A    I'm advising them, first and foremost, to obey all the

25  authorities that are charged with keeping public order at Lee

M. Hill - Cross

1    Park, or Emancipation Park, and the surrounding areas.  If you

2    believe an order or command of a public official violates your

3    rights to free speech, assembly, or some other matter, report

4    this to our League leaders and we will in turn report to our

5    attorneys on the scene.

6         Secondly, obey all applicable laws and statutes regarding

7    the possession and bearing of firearms and other weapons,

8    clothing, and other accoutrements and accessories.

9         Three, be respectful of all public and private property.

10        Four, do not verbally incite illegal behavior.

11        Five, engage in violence and at the proper level, only in

12   defense of your own person, that of your compatriots, and your

13   property.  Stand your ground, speak your mind, and proclaim

14   your message, but do not initiate physical contact with anyone

15   who opposes you.

16        Six, be honorable in all your dealings.

17   Q    And why did you post that?

18   A    Because I wanted our League members who were going to know

19   up front how they were to conduct themselves, what they were to

20   do, and specifically what they were not to do.

21   Q    Now, in the lead-up to Charlottesville, were you aware of

22   the use of a Discord server to communicate?

23   A    Yes, I was aware of the existence of a Discord server.

24   Yes.

25   Q    Did you delegate to somebody the use of Discord for

M. Hill - Cross

1    monitoring purposes?

2    A    I asked Mr. Ike Baker to do that.  He had created a

3    Discord server for the League for the Pikeville event, so I

4    knew he was familiar with the platform.  So I asked him to

5    monitor what was going on on the Charlottesville Discord

6    server.

7    Q    Now, where did you and other members of League of the

8    South stay the Friday night before the rally?

9    A    We stayed at a place called Sevenoaks outside of

10   Charlottesville.

11   Q    Why did you stay there?

12   A    Our logistics officer who I charged with finding lodging

13   for us found the place, recommended it to me.  I checked into

14   it, and it was big enough for the number of people that we had,

15   which was, like, 70, 75 people, I think, coming with us.  So we

16   got it on the recommendations of our logistics officer.

17   Q    I'll talk to you about the actual rally that Saturday.

18        When you arrived at the Market Street parking garage --

19   A    Right.

20   Q    -- do you know whether the streets leading up to

21   Emancipation Park were open for vehicle traffic?

22   A    We didn't know the status of that -- of that street until

23   we got over to the parking garage.

24   Q    So when you got there, what was the status of that street?

25   A    It was closed to automobile traffic and available only to

M. Hill - Cross

1  foot traffic.

2  Q    Was there some other rally happening that day?

3  A    Well, I've heard -- I don't know anything in particular,

4  but I've heard that some of the counter-protesters had rallies

5  planned in some of the other close-by parks.

6  Q    So what you're saying is, based on the fact that there was

7  a permit for Emancipation Park, the streets around Emancipation

8  Park were blocked off; is that right?

9  A    Yes, they were.

10 Q    Who blocked off the streets?  Do you know?

11 A    Well, from what we were able to see -- oh, you mean

12 officially blocked the streets to automobiles?

13 Q    Yeah.

14 A    I suppose the local law enforcement did.

15 Q    I'm going to show you --

16        MR. JONES:  I believe it's been previously admitted

17 as Defense 001.  Please correct me if I'm wrong, Ms. Wheeler.

18        THE CLERK:  Let me look real quick.

19        It has.

20        MR. JONES:  Did you say it has?

21        THE CLERK:  Yes, it has.

22        MR. JONES:  If we could publish that, please.

23 BY MR. JONES:

24 Q    Sir, do you recognize what's in that picture?

25 A    Yes, I do.

M. Hill - Cross

1    Q    It appears that there are both Caucasian and African

2    Americans standing in that line; is that correct?

3    A    That is correct.

4    Q    Can you point out the African Americans in that line?

5    A    (Witness complies.)

6    Q    Thank you.

7    A    Unless I missed something, I see two.

8    Q    Thank you.

9         MR. JONES:  I'm going to pull up what's been marked

10   as Defense Exhibit 020.

11        (Defendant LOS Exhibit 020 marked.)

12   BY MR. JONES:

13   Q    Sir, can you see what's on the screen there?

14   A    Yes, I can.

15   Q    And what is that?

16   A    I see our people meeting with the counter-protesters, and

17   I see Michael Tubbs.  And I see --

18   Q    Do you recognize what's displayed in that video?

19   A    I do.

20        MR. JONES:  Your Honor, I'll introduce this.

21        MR. LEVINE:  No objection.

22        THE COURT:  Be admitted.  Be published.

23        (Defendant LOS Exhibit 020 admitted.)

24   BY MR. JONES:

25   Q    Sir, do you recognize this person right here?

M. Hill - Cross

1  A    Well, I just circled that person a moment ago in the

2  previous picture.

3  Q    That's the same person you just circled?

4  A    Yes, one of the two African Americans that I circled in

5  that front line.

6  Q    Can you explain why, in a conspiracy to engage in racially

7  motivated violence, Mr. Borum would have pushed through the

8  line where the Caucasians were standing and not the African

9  Americans?

10 A    No, I can't explain that.

11 Q    So you said -- approximately how long did you stay in the

12 park?

13 A    You know, everything was kind of hectic and chaotic.  I

14 said earlier about an hour and a half.  It may not have been

15 quite that long.  It was at least -- you know, I think at least

16 an hour or so, but maybe a little bit longer.

17 Q    What were you doing while you were in the park waiting?

18 A    Well, the first thing I did was try to locate Mr. Kessler,

19 because I wanted to know where the platform would be for the

20 speeches to be made and what time I needed to speak, how long I

21 needed to speak, and, you know, things that you would normally

22 want to find out if you were a speaker at a rally.  So...

23 Q    Now, in what was introduced as PX-1904 --

24       MR. JONES:  Why don't we go ahead and pull that up?

25 BY MR. JONES:

M. Hill - Cross

1  Q    Sir, do you recognize what's on the screen there?

2  A    Yes, I do.

3  Q    You state:  "Sir, I was there."

4       What are you referring to there?

5  A    That we were on East Market Street trying to get into the

6  park on Saturday, August the 12th.

7  Q    Are you referring to the rally?

8  A    I was referring to, basically, the attempt for us to get

9  into the park and into the rally.

10 Q    Were you referring to the James Fields car attack that

11 occurred two hours after the rally?

12 A    No, sir.  I'm not.

13 Q    Were you referring to the torch march that you did not

14 even attend?

15 A    No.

16 Q    Did you attend any afterparties with Mr. Spencer, Identity

17 Evropa, Samantha Froelich?

18 A    No, sir.  We had -- we had a little afterparty at

19 Sevenoaks, but it was mainly -- it was for League members.

20 Q    I'm going to ask you some questions about the other

21 defendants in this case.

22      Do you consider yourself a follower of Richard Spencer?

23 A    No.

24 Q    Do you consider yourself a follower of Jason Kessler?

25 A    No, sir.

174

M. Hill - Cross

1   Q     What about Eli Mosley?

2   A     No, sir.

3   Q     Chris Cantwell?

4   A     No, sir.

5   Q     Jeff Schoep?

6   A     No.

7   Q     Nathan Damigo?

8   A     No, sir.

9   Q     Matt Heimbach?

10  A     No, sir.

11  Q     David Parrott?

12  A     No, sir.

13  Q     James Fields?

14  A     No, sir.

15  Q     Have you ever spoken to James Fields?

16  A     I did not know who James Fields was until I heard his name

17  in the media.  Never met him.  Never even knew he existed.

18  Q     You don't know his Twitter handle?

19  A     No, I had no idea.

20  Q     You're not a follower of his on Twitter?

21  A     No.

22         MR. JONES:  Thank you.  That's all the questions I

23  have.

24         THE COURT:  We'll take about a 20-minute recess now

25  and then come back.

M. Hill - Cross

1    **(Jury out, 2:54 p.m.)**

2              (Recess.)

3              THE COURT:  Do you all have any estimate of how long

4    this is going to continue?

5              MR. SPENCER:  I'm going to be fairly brief.

6              THE COURT:  No, I mean the whole trial.

7              MR. SPENCER:  Oh.

8              MS. KAPLAN:  Your Honor, we were actually just

9    discussing that with Mr. Campbell.  We do think it may make

10   sense for the plaintiffs' side and the defendants' side to try

11   to have some kind of meet and confer over the weekend about how

12   many trial days defense counsel thinks they will need and we

13   certainly have been -- if you saw, trying to cut things down

14   and can try to cut things down more, and maybe report to you

15   back on Monday, if that makes sense.

16             THE COURT:  Yes.  The marshals service needs to

17   schedule all the people coming and going, and they're anxious

18   to know.

19             MS. KAPLAN:  I can imagine they are, Your Honor.

20             THE COURT:  Okay.  As soon as you know something, let

21   me know.

22             MS. KAPLAN:  Sure.

23             THE COURT:  Call the jury.

24   **(Jury in, 3:19 p.m.)**

25             THE COURT:  All right.  Be seated.  And you may

M. Hill - Cross

1   proceed, Mr. Spencer.

2                        CROSS-EXAMINATION

3    BY MR. SPENCER:

4   Q    Hello.  I'm Richard Spencer and I'm acting on my own

5   behalf.

6   A    Hello, Mr. Spencer.

7   Q    So you've testified, Dr. Hill, that you are the founder

8   and long-time president of the League of the South.

9   A    Correct.

10  Q    In that capacity, would you handle, say, applications for

11  the League, people who wanted to join or support you in some

12  way?

13  A    No.  I have an office manager who deals with that issue.

14  Q    But she keeps you abreast of matters?

15  A    Oh, yeah.

16  Q    Over the past quarter century have I ever attempted -- has

17  Richard Spencer ever attempted to become a member of the League

18  of the South?

19  A    No.

20  Q    Are you aware of my donating or supporting your

21  organization?

22  A    No.

23  Q    Okay.  At one point during your testimony there -- it was

24  made mention of a fellow named Spencer Borum?

25  A    Correct.  Right.

M. Hill - Cross

1    Q    And he is a League member?

2    A    He was a League member at the time of Charlottesville 2.0.

3    Q    Okay.  Is it safe to say that his first name is my

4    surname?

5    A    Yes.

6    Q    And we are different individuals?

7    A    Completely different individuals.

8    Q    I just wanted to make that clear.  Thank you.

9    A    Right.

10   Q    I want to go a little bit on the long term now.  Have you

11   ever been in communication with Richard Spencer over the past,

12   say, five to seven years?

13   A    Yes, I have.  You extended an invitation to me to speak at

14   the National Policy Institute, I guess maybe five or six years

15   ago, and I was unable to speak.

16   Q    Right.  That was around five years ago?

17   A    I would say, yeah, around five years ago.

18   Q    Do you remember why you decided not to speak?

19   A    Yes, I do.  I'm a Christian.  There was an avowed

20   homosexual on the list of speakers.  I didn't know that when I

21   accepted the invitation.  When I found it out I called you up

22   and I declined.

23   Q    Okay.  So it wasn't your cup of tea?

24   A    No, it just wasn't my cup of tea.

25   Q    That's fair.

M. Hill - Cross

1          So during your initial testimony and examination, there

2    was discussion about why speeches weren't given during the

3    Unite the Right rally.  To your understanding, when was the

4    rally proper supposed to begin?

5    A    I believe, if memory serves me well, it was to be sometime

6    around noon.

7    Q    Right.  And was it your -- under your understanding, what

8    would that event be like beginning around noon?

9    A    Well, you know, we'd have -- I don't know how many

10   speakers were scheduled, but all the people who were gathered

11   in the park would turn their attention toward wherever the

12   speaker's platform was and we would have a number of speeches.

13   People would enjoy the speeches, enjoy the fellowship,

14   whatever.  But of course, that never happened.

15   Q    So why -- did you plan on giving a speech?

16   A    Yes, I had the notes for a speech in my pocket.

17   Q    The notes for your speech.

18        What were some of the themes you were going to talk about?

19   A    I was --

20             MR. LEVINE:  Objection.

21             THE COURT:  Overruled.

22             THE WITNESS:  I was going to talk about the necessity

23   of defending our Southern cultural heritage.  And the example I

24   would have used that day, of course, would have been the statue

25   of Robert E. Lee in what at the time I think was called Lee

179

M. Hill - Cross

1  Park.  That was going to be my main focus.  It was going to be

2  a short speech, probably ten minutes, or maybe 15 at the most.

3  BY MR. SPENCER:

4  Q    Why didn't you deliver the speech?

5  A    Because the rally was declared an unlawful assembly and we

6  were driven out of the park by the authorities.

7  Q    Thank you.  I want to focus on a time period between

8  Charlottesville 1 in May and Charlottesville 2 or the Unite the

9  Right rally in August.

10 A    Okay.

11 Q    Do you remember having any communication with Richard

12 Spencer in that time period?

13 A    No, sir, I don't.

14 Q    When you attended the Unite the Right rally, did you ever

15 see Richard Spencer in person, up close?

16 A    If I did, I don't remember it.  I don't think that I did.

17 Q    Did you ever have a conversation with Richard Spencer at

18 any point in August of 2017?

19 A    No.

20 Q    When you were marching down Market Street towards the

21 park, did you happen to see Richard Spencer?

22 A    No, I didn't.

23 Q    Were you -- well, you answered that.

24      To your understanding, who was the chief organizer of the

25 Unite the Right rally?

M. Hill - Cross

1   A     Jason Kessler.

2   Q     Were you in conversation with him at some point?

3   A     I had several conversations with Mr. Kessler, yes.

4   Q     Who invited you to speak at the rally?

5   A     Jason Kessler.

6          MR. SPENCER:  No further questions.  Thank you.

7          THE COURT:  Okay.

8          MR. CAMPBELL:  I don't have any questions for this

9   witness, Your Honor.

10         THE COURT:  Mr. ReBrook -- is Mr. ReBrook on the

11  phone?

12         THE CLERK:  He is.

13         THE COURT:  Does he have questions?

14         All right.  If he doesn't answer, we'll have

15  Mr. Cantwell.

16         MR. CANTWELL:  Do you want me to get started while we

17  wait for Mr. ReBrook?

18         THE COURT:  Well, I don't know that he's coming back.

19  I'll let you finish.

20         MR. CANTWELL:  I'm sorry?

21         THE COURT:  I'm saying if you start, I'm going to let

22  you finish.  I'm not going to interrupt you for Mr. ReBrook.

23         MR. CANTWELL:  Does it look like we're going to get

24  Mr. ReBrook soon?

25         THE COURT:  Is he on the line?

181

M. Hill - Cross

1    THE CLERK:  Mr. ReBrook, do you have any cross-exam?

2    THE COURT:  All right.  Mr. Cantwell.

3    MR. CANTWELL:  Very good.

4    THE CLERK:  He's here now.

5    THE COURT:  Does he wish to --

6    THE CLERK:  Mr. ReBrook, do you have any

7    cross-examination?

8    MR. REBROOK:  I do, ma'am.

9                        CROSS-EXAMINATION

10   BY MR. REBROOK:

11   Q    Dr. Hill, good afternoon.

12   A    Good afternoon, Mr. Cantwell.

13   Q    This is Edward ReBrook.  I'm the attorney for --

14   A    Oh, I'm sorry.

15   Q    -- Mr. Jeff Schoep and the NSM.

16   A    Yes, good afternoon.

17   Q    Thank you for coming in and for your very metered and

18   polite testimony.

19   A    Sure.

20   Q    I just have a few questions.  First is, were you involved

21   with any aspects of planning for the Unite the Right rally with

22   Mr. Jeff Schoep?

23   A    Yes, we coordinated logistics of getting in and out of the

24   city and in and out of the rally, I guess you might say, with

25   Mr. Schoep and others who were in the Nationalist Front.

M. Hill - Cross

1  Q    Okay.  And beyond logistics, were there any discussions of

2  your intentions for the rally?

3  A    No, not that I recall.

4  Q    And do you recall seeing Mr. Schoep or any other members

5  of the NSM at the torch march?

6  A    No.  I was not at the torch march myself.

7  Q    Did the two representatives that you sent to the torch

8  march, did they report having seen Mr. Schoep or any member of

9  the NSM?

10 A    No, they didn't.

11        MR. REBROOK:  That's all the questions I have.  Thank

12 you very much.

13        THE WITNESS:  Thank you, sir.

14        THE COURT:  Thank you.  Okay.  Mr. Cantwell.

15                    CROSS-EXAMINATION

16  BY MR. CANTWELL:

17 Q    Hello, Dr. Hill.

18 A    Hello, Mr. Cantwell.

19 Q    When you were questioned by plaintiffs' counsel there was

20 some mention of the Pikeville model; do you recall that?

21 A    I do.

22 Q    And this was what might be described as a white

23 nationalist event in Pikeville, Kentucky in 2017?

24 A    I'd say so, yes.

25 Q    Do you recall seeing me at that event?

M. Hill - Cross

1  A    No, sir, I don't.

2  Q    Okay.  Well, it's nice to meet you, then.

3  A    Nice to meet you.

4  Q    Had you heard of me before that event?

5  A    I think I had.

6  Q    Okay.  Suffice it to say you didn't invite me to that

7  event?

8  A    No, sir, I didn't.

9  Q    To the best of your knowledge, am I a member of the League

10 of the South?

11 A    No, sir, you're not.

12 Q    Did I have anything to do with your plans on August 11th

13 or 12th?

14 A    No, sir, you did not.

15 Q    Okay.  I'd like to play -- we've looked at Plaintiffs'

16 Exhibit 3239A a few times.  That's cut up into three clips.

17 One of them is 3239C, and I'd like to -- I'll play that for

18 Mr. Hill as soon as I get this hard drive back on.  Sorry.

19      While I wait to get that back up, Mr. Hill, from what you

20 know about jails and prisons, do you think you'd like to spend

21 a great deal of time in one?

22 A    No, sir, I would not.

23 Q    Did you hide your face from any cameras on August 11th and

24 12th?

25 A    I did not.

184

M. Hill - Cross

1   Q    Do you recognize the scene on your screen, Mr. Hill?

2   A    Yes, I do.

3          MR. CANTWELL:  Can I add Plaintiffs' Exhibit 3239C to

4   the evidence and publish it to the jury?

5          THE COURT:  You may.

6          MR. LEVINE:  No objection.

7          (Plaintiffs' Exhibit 3239C marked.)

8          (Plaintiffs' Exhibit 3239C admitted.)

9   BY MR. CANTWELL:

10  Q    Mr. Hill, I'd like to call your attention to the right

11  side of the screen here.  Do you see where I'm circling?

12  A    I do.

13  Q    Do you know if any League of the South members made black

14  and pink shields?

15  A    No, we had no black and pink shields.

16  Q    Do you know if any League of the South members wore pink

17  helmets?

18  A    No, sir, we have better style than that.

19  Q    Okay.  That's good to know.

20       (Video playing.)

21       Mr. Hill, while you were formed up in this area -- this is

22  right in front of what used to be Lee Park, I believe, correct?

23  A    Yes.

24  Q    And while you were formed up over there, did you smell

25  pepper spray?

185

M. Hill - Cross

1    A    Yes, I did.

2    Q    I'm going to show Mr. Hill what I have as CCEX073A.  That

3    would be my Exhibit 73 on the list that I initially offered the

4    plaintiffs before the Court's order on filenames.

5         Do you recognize this scene, Mr. Hill?

6    A    I don't think I witnessed it in person, but I certainly

7    can tell where it is.

8    Q    Okay.  Is that -- are those League of the South shields?

9    A    Yes, they are.

10   Q    And do you recognize the scene, the background, the area

11   that that's happening in?

12   A    Yes, I do.

13   Q    And you said that you smelled pepper spray, right?

14   A    Yes.

15        MR. CANTWELL:  I'd like to add CCEX73A to evidence

16   and publish it to the jury.

17        MR. LEVINE:  No objection.

18        THE COURT:  You may do so.

19        (Defendant Cantwell Exhibit 73A marked.)

20        (Defendant Cantwell Exhibit 73A admitted.)

21    BY MR. CANTWELL:

22   Q    What's this look like to you, Mr. Hill?

23   A    Looks like pepper spray.

24   Q    And does this appear to be a backpack on this man here?

25   A    It does.

M. Hill - Cross

1   Q    I'm going to play this video.  It's only 21 seconds.

2            (Video playing.)

3        Do you see he's wearing an orange hat and sunglasses

4   there?

5   A    Yes.

6   Q    Okay.  The man who sprayed the pepper spray, he walks off

7   into the sunset there.

8        All right.  Have you ever read *Mein Kampf*?

9   A    Yes.  I've read it as a graduate student in a German

10  history class that I took at the University of Alabama.

11  Q    Do you know the circumstances under which *Mein Kampf* was

12  written?

13  A    I think so, yes.

14  Q    Could you describe those circumstances?

15  A    Well, I think that it was written while Adolf Hitler was

16  in Landsberg Prison after having been put there for his part in

17  the Putsch of 1923, I believe.

18  Q    And that would be -- commonly be referred to as the Beer

19  Hall Putsch?

20  A    Yes, the Beer Hall Putsch in Munich.

21  Q    Following that, to the best of your knowledge, did Adolf

22  Hitler advocate for the violent overthrow of government?

23  A    Not that I know of.  I think he was elected by a

24  democratic process.

25  Q    And did Adolf Hitler advocate for violent criminality in

187

M. Hill - Cross

1   the streets?

2   A    Not that I'm aware of.

3        MR. CANTWELL:  No further questions, sir.  Thank you.

4        THE WITNESS:  Thank you.

5        THE COURT:  All right.

6                    CROSS-EXAMINATION

7   BY MR. KOLENICH:

8   Q    Good afternoon, sir.

9   A    Good afternoon, sir.

10  Q    I'm one of the attorneys who represents Jason Kessler.

11       You recall when Mr. Levine was questioning you he showed

12  you some emails wherein it stated that Mr. Kessler had agreed

13  for David Duke to come to the rally?

14  A    Right.

15  Q    Were those emails entirely accurate, sir?

16  A    I'm not sure.  The Duke thing got kind of confused.  I

17  recommended him to Jason, and after that happened I don't know

18  what happened with bringing Duke to speak at that afterparty.

19  Q    In fact, sir, didn't your member Ike Baker have a problem

20  with Mr. Kessler because Mr. Kessler did not want David Duke to

21  speak at the rally?

22  A    I do remember that there was some disagreement over that

23  with Mr. Baker.

24  Q    Do you recall, sir, on August 12th in the parking garage,

25  before your group began to march, Mr. Baker giving a speech?

M. Hill - Cross

```
 1  A    I think Mr. Baker did -- I'm not sure if it was in the
 2  parking garage.  I can't remember if it was there or at the
 3  place that we assembled to go to the parking garage.
 4       I know he gave a speech.  I'm not sure exactly where it
 5  was.
 6  Q    Very well.
 7            MR. KOLENICH:  Could I get Plaintiffs' Exhibit 1409?
 8            Judge, I'd like to play a section of this audio, see
 9  if it refreshes the witness's recollection.
10            THE COURT:  All right.
11            (Video playing.)
12   BY MR. KOLENICH:
13  Q    Is that Ike Baker?
14  A    Yes.
15            (Video playing.)
16  Q    That's good enough.  Thank you.
17       That was Ike Baker speaking?
18  A    That was Ike Baker speaking.
19  Q    Does that refresh your recollection that Ike Baker had a
20  problem with Jason Kessler?
21  A    Yes, it does.
22  Q    In fact, sir, you already told Mr. Levine that you were
23  not following Mr. Kessler's plan for how and when to enter the
24  park; isn't that right?
25  A    That's exactly right.
```

M. Hill - Cross

1   Q    So when you left the parking garage and marched toward the

2   park and you saw all those people lined up on the street, you

3   did not make an effort to go to where Mr. Kessler thought you

4   should be; you just proceeded straight ahead.  Is that right?

5   A    Yes.  We proceeded into the southeast entrance to the

6   park.

7   Q    Very well.  At any time during the Unite the Right event

8   or its preparation were you taking instructions from

9   Mr. Kessler?

10  A    No.

11  Q    Did you ever enter into an agreement with Mr. Kessler for

12  the perpetration of any race-based violence?

13  A    No.

14  Q    To your knowledge, did Mr. Kessler have an agreement with

15  any member of the Nationalist Front?

16  A    No.

17           MR. KOLENICH:  Thank you, sir.  No further questions.

18       We would move to admit 1409 as Kessler Exhibit A.

19           THE COURT:  Be admitted.

20       (Defendant Kessler Exhibit 1409 admitted.)

21           THE COURT:  All right.  Thank you, sir.  You may step

22  down, unless there is some redirect.

23           MR. LEVINE:  No, Your Honor.

24           THE COURT:  Okay.  Thank you.

25           Who is the next witness?

T. Baker - Direct

1          MS. KAPLAN:  Plaintiffs call Plaintiff Thomas Baker

2   to the stand.

3          MR. MILLS:  Good morning, Your Honor.  David Mills

4   for the plaintiffs.

5          THOMAS BAKER, CALLED BY THE PLAINTIFFS, SWORN

6                    DIRECT EXAMINATION

7   BY MR. MILLS:

8   Q    Good afternoon, Mr. Thomas.

9   A    Good afternoon.

10          THE COURT:  Wait just a minute.  Were you going to

11   hand those out?

12          (Discussion off the record.)

13          THE COURT:  You may proceed.

14          MR. MILLS:  Thank you, Your Honor.

15    BY MR. MILLS:

16   Q    Good afternoon, Mr. Baker.  I'm sorry I said Mr. Thomas.

17   A    Good afternoon.

18   Q    Could you please introduce yourself to the jury?

19   A    Yes.  My name is Thomas Baker.  I'm a resident here in

20   Charlottesville.

21   Q    And where did you go to college?

22   A    I went to university at the State University of New York

23   College of Environmental Science and Forestry in Syracuse, New

24   York.

25   Q    What did you -- so you studied conservation biology.  What

T. Baker - Direct

1   year did you graduate?

2   A    My bachelor's degree, I graduated in 2012.

3   Q    And did you get a graduate degree there?

4   A    I did, yes.  I received that in 2017.

5   Q    And what was that in?

6   A    That was in landscape architecture.

7   Q    And what do you do for a living here in Charlottesville?

8   A    Here, I own my own practice as an ecological consultant.

9   I work on large landscape planning, really integrating

10  agricultural practices with the ecological health of

11  properties.

12  Q    And how long have you been doing that?

13  A    About five years now, almost five years.

14  Q    Mr. Baker, are you married?

15  A    I am married, yes.

16  Q    How long have you been married?

17  A    Four years.

18  Q    I'd like to turn to the events in question here.

19       Where were you living in August of 2017?

20  A    I was living in Charlottesville.

21  Q    How long had you lived in Charlottesville at that point?

22  A    Just since that previous May.

23  Q    Did you become aware of an event called Unite the Right?

24  A    Yes.  At some point I would have -- I would have become

25  aware of it.  I don't recall exactly when.

T. Baker - Direct

1  Q    How would you have become aware of Unite the Right?

2  A    It was really kind of the buzz around town.  Everyone was

3  talking about it.

4  Q    What did you believe at that time Unite the Right was

5  about?

6  A    You know, we had heard that it was -- there was a

7  discussion of removal of the statues in town, specifically the

8  Lee statue; but being a resident here, starting to build

9  friends here, it was very clear that that discussion, what was

10 happening about Unite the Right, very far transcended the

11 removal of the statues.

12 Q    What do you mean by that?

13 A    It was clear some of the groups that were coming in and

14 some of the individuals that were coming and -- I knew of these

15 individuals, the town knew of these individuals and groups, as

16 being racist, antisemitic, homophobic, violent.

17     I also had discussions with a lot of friends about the

18 removal of the statues.  A lot of this was civil.  And what

19 was -- the individuals and groups coming to town, it was just

20 very clear and obvious that that was not what this was about.

21 Q    Mr. Baker, did you have a view yourself about the removal

22 of the statue, the Lee statue?

23 A    At the time I was undecided.  I think it's a really

24 important discussion to have about public space, how we tell

25 history in public space, how people experience public space,

T. Baker - Direct

1    and I thought there was a really intelligent discussion to have

2    about that.  But at the time I was undecided.

3    Q    Had you ever been to an event like Unite the Right in the

4    past?

5    A    No.

6    Q    Why did you decide to go downtown to Charlottesville for

7    this one?

8    A    A few reasons.

9        One, so -- my wife and I, we had just moved here.  Didn't

10   have friends here.  Didn't have family.  So being a new member

11   of this city, I want to show support and be present for them

12   and with them.

13       It was also very clear that the people that were coming --

14   this is not going to be the right word; I don't mean to

15   minimize it, but they were bullies, and it was incredibly

16   important to -- for me to, one, be present for my new community

17   that I was a part of, but also to stand up to these bullies

18   that were intentionally trying to instill fear to this new city

19   and my community.

20   Q    Was there a particular reason why you felt like you needed

21   to stand up for this?

22   A    Yes.  One, yes, to be -- you know, to be present for my

23   new community, to show support to them.

24       But also, importantly, really importantly, to -- when you

25   know something is right and you might be fearful to stand up

194

T. Baker - Direct

1   for it, that's the time you actually need to.  And so it was

2   incredibly important to me, because of some fear, to be present

3   and to be counted, and to stand up to that.

4   Q    What made you believe that they were bringing violence

5   into Charlottesville?

6   A    Just knowing some of the groups that were coming in, some

7   of the individuals that were participating, I knew that they

8   had a history of violence, specifically racist, antisemitic

9   violence.

10            MR. JONES:  I'm going to object to the lack of

11   foundation on that.

12            THE COURT:  Sustained.

13   BY MR. MILLS:

14   Q    Just tell us what you believe.  Why did you go that day?

15   A    I specifically went that day to be a community member, and

16   to be counted in support of my community and to stand up to

17   these outsiders, these bullies that were coming in.

18   Q    You say they were outsiders.  How did you know they were

19   coming from out of town?

20   A    Again, it was kind of the buzz around town.

21        I did know at least one of the individuals -- Jason

22   Kessler, I knew he was local.  He was the only one that I knew

23   was local.  But these other groups, I knew that they weren't

24   Charlottesville-based groups.  And it was -- yeah, just kind of

25   the buzz around town.  Everyone was talking about it, and it

T. Baker - Direct

1  was clear that they weren't locals.

2  Q    You mentioned a couple of people that you knew were

3  coming.  Who else did you know was coming?

4  A    The only other person I would have known would have been

5  Richard Spencer.

6  Q    At this time, in August of 2017, did you know about

7  something called Antifa?

8  A    No, I can't -- at that time, I may have, but I can't

9  recall any -- I don't think that I did.  I don't think I knew

10 anything specific about Antifa at that time.

11 Q    Were you ever a member of Antifa or an adherent to its

12 ideology, to the extent you understand what it is?

13 A    No.

14 Q    Did you belong to any groups or social justice

15 organizations at that time?

16 A    No.

17 Q    Have you ever?

18 A    No.

19 Q    Before you went on that Saturday, which was August 12th,

20 had you heard about the events of August 11th, that Friday

21 night?

22 A    I would have heard about them.  I wouldn't have known

23 details, but I would have known that there was a large group of

24 white supremacists and neo-Nazis that went to the University of

25 Virginia and had instigated violent encounters on students --

T. Baker - Direct

1  on students there around the Jefferson statue.  I would have

2  known general details about that, but nothing -- nothing

3  specific.

4  Q    Knowing that, were you worried about violence when you

5  went on Saturday?

6  A    Yes, I was.

7  Q    Did you do anything to prepare for violence or potential

8  violence that Saturday?

9  A    No, except to -- except to be committed to stay away

10  from -- physically stay away from any of that or any potential

11  confrontations.

12  Q    How did you plan to stay away from it if you were going?

13  A    Just physically.  I didn't want to have any of my near

14  proximate adjacencies be near anyone that was fighting or near

15  anyone that I thought was going to be confrontational.  So it

16  was to maintain physical distance.

17  Q    Did you bring any weapons with you when you went downtown?

18  A    No.

19  Q    At some point you did go downtown on August 12th?

20  A    Yes.

21  Q    About what time did you go?

22  A    It would have been around 10:30 to 11, somewhere around

23  there.

24  Q    Where did you come from?

25  A    I had immediately come from work.  I was a

197

T. Baker - Direct

1    horticulturalist at the time.

2    Q     And what were you wearing?

3    A     Would have been wearing cargo shorts, a plain colored

4    green or gray shirt, Merrell hiking shoes; again, normal attire

5    for work.

6    Q     Did you go by yourself or with others?

7    A     I went alone.  I was dropped off by my wife that morning.

8    Q     Your wife dropped you off?

9    A     Yes.

10   Q     She didn't go with you to the event?

11   A     She did not.

12   Q     And why is that?

13   A     Similar to me, she was -- she was fearful of the potential

14   violence that was -- that could have occurred.

15   Q     Mr. Baker, she let you go anyway?

16   A     It was a really serious point of contention with her, but

17   I had convinced her that I would stay away from any potential

18   violence.  When she dropped me off, you know, she had told me

19   just to be safe and to not get hurt.

20   Q     Did you have any understanding when you went who the

21   counter-protesters would be?

22   A     The City of Charlottesville.  Just the community.

23   Q     Were you aware of any groups that were planning to go as

24   counter-protesters that day?

25   A     I knew that there would be some church groups.  I don't

T. Baker - Direct

1  know specifically -- I don't recall specifically which ones,

2  but aside from just general community members, a few church

3  groups I would have known.

4  Q    So your wife dropped you off.  Did she say anything before

5  she dropped you off?

6  A    Yeah, she did.  Yeah, and it was -- she was not happy that

7  I was going, but she did -- she did tell me that I needed to be

8  safe and to not get hurt.

9  Q    Where did your wife take you?

10 A    I don't remember the name of the street, but it was

11 somewhere near where the juvenile court is.

12 Q    And where did you go from there?

13 A    From there, I started walking -- it would have been west

14 towards what is now Emancipation Park.

15 Q    And where did you go once you got close to what's now

16 known as Emancipation Park?

17 A    There's a library very close to Emancipation Park, just

18 across the street.  There's a good vantage point there.  It's

19 kind of up on a little knoll and it felt like a secure place.

20 I had the library behind me, and you could kind of see

21 everything in front of you and you were a good distance from

22 any potential conflict.

23        MR. MILLS:  Matt, can we put up the demonstrative

24 exhibit?

25 BY MR. MILLS:

T. Baker - Direct

1  Q    Is this a map that you recognize of Charlottesville and

2  the area you were in?

3  A    Yes.

4  Q    Can you just put a small X on Emancipation Park?

5  A    (Witness complies.)

6  Q    And can you just draw an arrow the direction you walked

7  when you went toward that park?

8  A    Yeah, it would have been -- I don't remember exactly, but

9  it would have been something like this, I believe.

10 Q    You can stop there.

11 A    Okay.

12 Q    And then where were you perched by the library?

13 A    By the library, I was right there.

14 Q    What did the scene look like by the time you got -- first,

15 let me ask you:  Again, what time was that approximately?

16 A    Around 10:30 or 11.

17 Q    And what did that scene look like?  Were you able to see

18 the park itself?

19 A    Yes, I could see the park well.  The scene, it looked like

20 there were -- you could -- so the park was pretty well-occupied

21 by groups that were in consistent uniforms, khaki pants and

22 white shirts, a lot of individuals wearing just black, but

23 uniformed individuals.

24      Outside of the park was a diversity of groups or

25 individuals, just community members, and I did see some people

T. Baker - Direct

1  who had their arms locked.

2      And also smaller groups of protesters, again, in similar

3  uniforms -- khaki pants, white shirts, all black -- coming into

4  the park in kind of smaller groups.

5  Q    Was there police on the scene?

6  A    There were some police on the scene.  I remember there was

7  a police car also directly -- almost directly in front of me.

8  Q    Could you put a small X where that police car was?

9  A    Yeah.  I believe it was around here, somewhere at that

10  intersection.

11  Q    What happened after you arrived?  What did you observe?

12  A    So when I arrived, again, the park was full of protesters.

13  I saw smaller groups of protesters coming in.  As they were

14  coming in, especially the ones with the shields, were just

15  smashing through the counter-protesters.

16      Once -- once the park was really kind of full, and there

17  weren't a lot of protesters coming in, a lot of -- a lot of the

18  protesters were then charging out of the park, literally

19  yelling "charge" out of the park, and smashing into the

20  counter-protesters.

21  Q    Let me ask you about the first thing you said, the people

22  coming into the park.  You described that as smaller groups of

23  protesters; is that right?

24  A    Yes.

25  Q    You earlier said that there were some people that you saw

T. Baker - Direct

1  with their arms locked.  Were those counter-protesters?

2  A    Yes, they would have been.

3  Q    Okay.  There has been some testimony about protesters

4  coming in and being blocked by counter-protesters.  Did you

5  observe a scene that looked like that to you?

6  A    I wouldn't characterize it as blocking.

7  Q    How would you characterize it?

8  A    I guess it was maybe more of a gesture.  They were just

9  individuals that had their arms locked across the street, not

10 fully blocking the street.

11 Q    Did you observe them threatening the protesters?

12 A    No.

13 Q    Could you see whether the protesters could get around the

14 counter-protesters?

15 A    They could have gotten around them on the sidewalk.  I'd

16 walked around them to get where I was standing.

17 Q    Could you observe whether they even tried to get around

18 the counter-protesters?

19 A    No.  They absolutely did not try.  They intentionally ran

20 through them.  They did not try to go around them.

21 Q    And how close were you to this scene that you observed?

22 A    It would have been about 40 or 50 feet or so.

23 Q    What happened?  You then described that there were some

24 incidents within the park?

25 A    Yes.

T. Baker - Direct

1  Q     Would you describe that for the jury, please?

2  A     Yes.  Most notably, what I remember was in smaller groups

3  the protesters would charge out of the park, sometimes actually

4  yelling "charge," and they would run into the

5  counter-protesters, hit them with their shields, also their

6  flagpoles, whatever else that they had on them, and then they

7  would actually run back.  They would run back into the park.

8  So they would just come out, have these quick attacks and then

9  run back into the park.

10       The counter-protesters, one, when that would happen, some

11 would run away.  Some would stand and defend themselves and hit

12 back, but that was really one of the more -- the most

13 memorable.  And that happened -- that happened often.

14 Consistently, they were running out of the park and running

15 back into the park, "they" being the protesters.

16 Q     About how many times did you observe this type of charging

17 out of the park by the protesters?

18 A     A dozen, maybe.  About a dozen sounds fair.

19 Q     Did you ever see the counter-protesters charge into the

20 park?

21 A     No.

22 Q     Did you ever see the counter-protesters group up in

23 formations like that and attack anybody?

24 A     No.

25 Q     Did you see anything else occurring in the park?

T. Baker - Direct

1    A    No, I didn't see anything else occurring in the park.

2    Skirmishes like that, like I just described, and similar

3    skirmishes, attacks to do that.

4    Q    Did you ever see anything being thrown that day?

5    A    I did, yes.

6    Q    What did you see?

7    A    Especially with the cop car in front of me; it was getting

8    pelted with items from inside of the park.  Like, I can't

9    identify what some of those were.

10        I know some of them were balloons.  There were some other

11   objects.  I'm not entirely sure.  But I did see a lot of

12   throwing, yes.

13   Q    This was the white police car that you've marked on this

14   map?

15   A    Yeah, that's right.

16   Q    And how could you tell that those things were coming from

17   inside -- the projectiles were coming from inside the park?

18   A    It was just blatantly clear in which direction and

19   where -- in which direction these items were coming from and

20   where they were originating from, and that was from inside the

21   park.

22   Q    Where was your focus?  What were you looking at primarily

23   that morning?

24   A    I was focused on -- I was very much focused on the inside

25   of the park.  I don't remember counter-protesters throwing

T. Baker - Direct

1   things into the park.  I can't deny that that happened, but it

2   was very clear that the aggression was so one-sided.

3       You know, I did not want to be in any sort of

4   confrontation that day.  So my focus was very much on where I

5   had perceived the aggression coming from, and that was from

6   inside the park.  If the counter-protesters, even in

7   self-defense, had -- you know, were defending themselves, it

8   did not even remotely justify the level of violence and

9   aggression that was coming from the protesters inside the park.

10  Q    Were you there when the police declared an unlawful

11  assembly that morning?

12  A    Yes, I was there.

13  Q    How did you know that was happening?

14  A    I believe I even heard it on speakerphones, megaphones,

15  but it was declared an unlawful assembly.  I remember there was

16  a line of police inside of the park in the north and pushed --

17  were kind of pushing from north to south.

18  Q    Could you draw an arrow on the map that you have in front

19  of you the direction that the police were?

20  A    Yes.

21       (Witness complies.)

22  Q    The violence that you observed, the protesters charging

23  out of the park, did that occur before or after the unlawful

24  assembly was declared?

25  A    Before.

T. Baker - Direct

1   Q    By the way, Mr. Baker, did you take pictures that day?

2   A    I did take pictures that day.

3   Q    Do you have an iPhone or a camera?

4   A    I did.  It was -- later on in the day, when I was hit by

5   the car, it had shattered my phone.  Actually, the FBI tried to

6   get images off my phone.  They couldn't retrieve them.

7   Q    After the unlawful assembly was declared, where did you

8   go?

9   A    After the unlawful assembly, I -- I had watched that

10  happen.  So I stayed at the library for a little while and had

11  observed that happening.  I had never seen something like this

12  before, so it was interesting to just kind of observe it.

13       But then I just started to walk around town and see what

14  was going on.

15       I had seen, you know, protesters gathering in groups and

16  leaving.  So I was curious what the -- kind of the dynamics

17  were.  So I was just walking around town.

18  Q    Let me bring you to a point on Water Street.  Did you end

19  up on Water Street at some point?

20  A    Yes, I did.

21  Q    And did you see people there?

22  A    Yes.

23  Q    Let's go back to the map.  And can you identify where

24  Water Street is and the direction you were walking?

25  A    Yes, I can identify it.

T. Baker - Direct

1  Q    Okay.  Can you just draw an arrow in the direction you

2  were walking?

3  A    Yes.

4       (Witness complies.)

5       Once I was on Water Street I started to walk in this

6  direction, down towards Fourth Street.

7  Q    Thank you.

8       And about what time is it that you're walking down Water

9  Street in this direction?

10 A    It must have been sometime around 1:30, quarter after 1,

11 sometime around there.

12 Q    Did you join the group of individuals that were walking

13 down Water Street?

14 A    Yes, I did.

15 Q    Now, earlier you said that you were avoiding crowds and

16 people.  Why would you join this crowd?

17 A    This was a very different crowd.  They were joyous.  It

18 was celebratory.  It was peaceful, and it was a group of people

19 that I felt safe and comfortable being around.

20      At this point I also believed that the protesters had

21 left.  So generally, I felt safe, and this group felt like a

22 good group of people.

23 Q    What were they doing?

24 A    There were some banners and signs and some chants, but in

25 general it was an environment of joy and celebration and

207

T. Baker - Direct

1   kindness.

2   Q    What were they celebrating?  Could you tell?

3   A    I can only -- I'm guessing it was similar to what I felt

4   at that time, which was happiness that the protesters had left

5   and that this violence wasn't -- these protesters, these

6   outsiders, had left and this violence had left our city, so it

7   felt safe again.

8   Q    Did you know anybody in that crowd?

9   A    No, I did not.

10  Q    Did you see anyone with weapons in that crowd?

11  A    No.

12  Q    Did you see anyone threatening anyone in that crowd?

13  A    No.  And actually, in particular, I remember one of the --

14  one of the defining moments for me being okay with joining this

15  crowd was there were other cars coming down Fourth Street in

16  the opposite direction that we were walking, and the

17  counter-protesters would -- slowly, but they would spread apart

18  to let the cars come through.  So I specifically remember

19  feeling it was safe.  It was joyous, celebratory.  No one was

20  doing anything illegal.

21  Q    So what happened next?

22  A    So what happened next was we took a left up Fourth Street.

23  Q    Could you draw that?

24  A    Walking towards the Downtown Mall.

25  Q    Could you draw that with an arrow?

T. Baker - Direct

1  A    Yes.

2        (Witness complies.)

3        I believe Fourth Street is here, and we were starting to

4  walk up that way.

5  Q    Once you started walking up Fourth Street, was this the

6  same crowd that you had described before?

7  A    Yes.

8  Q    Were these the same people that you had seen as

9  counter-protesters at the Emancipation Park area?

10 A    Yes.  It was the same people.

11 Q    And can you just tell the jury what happened next?

12 A    So took a left up Fourth Street.  At this point I was

13 nearing the front of this group of people.  And it wasn't long

14 after walking up Fourth Street that I had heard -- you don't

15 forget the sound, no other way to describe it, but these

16 loud -- I heard thumps.  I'd seen bodies in the air.  And at

17 that -- I mean, this all happened in maybe a matter of a

18 second, a couple of seconds would be extremely generous.  It

19 was probably less than a second, that I witnessed that.  And

20 then the car was directly in front of me.

21 Q    What did you do?

22 A    It's funny.  Not having time to really think --

23 Q    Go ahead.

24 A    So as the car was directly in front of me, I kind of like

25 tried to get light on my feet, just kind of instinctual, almost

T. Baker - Direct

1   to jump a bit, although I didn't jump.  I'd done that, and the

2   car had -- I was just off-center of the car, and it hit my

3   lower half.  And because I think I was a little light on my

4   feet it then propelled my face and my chest, my torso into the

5   windshield of the car and then it flipped me over top of the

6   car, and I had landed -- I had landed on my side, on my back

7   and my side.

8   Q    I'll show you a video without sound.  It's a video marked

9   Plaintiffs' Exhibit 1505A.  It's just a clip.

10              (Plaintiffs' Exhibit 1505A marked.)

11              (Video playing.)

12  BY MR. MILLS:

13  Q    Do you recognize this video?

14  A    Yes.

15  Q    And what is that a video of?

16  A    That's a video of the crowd that I was in that day, going

17  up Fourth Street.

18              MR. MILLS:  Your Honor, I'd move to admit 1505A.

19              THE COURT:  Be admitted.

20              (Plaintiffs' Exhibit 1505A admitted.)

21              MR. MILLS:  Could you please play this for the jury.

22              (Video playing.)

23   BY MR. MILLS:

24  Q    Mr. Baker, you described bodies being hit by the vehicle

25  and sounds that you heard.  Could you please describe -- it's

T. Baker - Direct

1   hard to hear those sounds in the video.  Could you describe

2   those for the jury?

3   A    Yes.  It's -- I can't think of any other descriptors to

4   describe it.  It's the sound of metal crashing into bodies.

5   Very, very distinctive thumps and screams.  And I can't think

6   of any other word -- any other way to describe it other than

7   metal smashing through bodies.

8   Q    I'm going to show you Plaintiffs' Exhibit 287.  Do you

9   recognize that?

10        (Plaintiffs' Exhibit 287 marked.)

11  A    Yes, I do.

12  Q    What is that a picture of?

13  A    That is a picture of the crowd that I was in that day,

14  just as the car was crashing into it.

15  Q    Fair and accurate picture of that crowd just before the

16  car struck it?

17  A    Yes.

18        MR. MILLS:  Your Honor, I'd move for admission of

19  Plaintiffs' Exhibit 287.

20        THE COURT:  Be admitted.

21        (Plaintiffs' Exhibit 287 admitted.)

22        MR. MILLS:  If we could blow that up, please,

23  Mr. Spalding.

24   BY MR. MILLS:

25  Q    Can you see yourself in this picture, Mr. Baker?

T. Baker - Direct

1    A    Yes, I can.

2    Q    Can you circle yourself?

3    A    (Witness complies.)

4    Q    I'd like to show you Plaintiffs' Exhibit 291.  Do you see

5    yourself -- I mean, sorry, do you recognize that photo?

6         (Plaintiffs' Exhibit 291 marked.)

7    A    Yes, I recognize that photo.

8    Q    What's that a photo of?

9    A    That is a photo of James Fields's car that day crashing

10   through the crowd of protesters.

11   Q    Is that just a couple seconds --

12   A    Counter-protesters, I'm sorry.

13   Q    Is that just a couple seconds after the photo I just

14   showed you?

15   A    Yes, that's right.

16   Q    And it's a fair and accurate depiction of that?

17   A    Yes.

18           MR. MILLS:  Your Honor, I'd move for the admission of

19   Plaintiffs' Exhibit 291.

20           THE COURT:  Be admitted.

21           (Plaintiffs' Exhibit 291 admitted.)

22   BY MR. MILLS:

23   Q    Mr. Baker, can you see yourself in this photograph?

24   A    Yes.

25   Q    Can you please circle yourself.

T. Baker - Direct

1      Thank you.

2      I'd like to show you Plaintiffs' Exhibit 300.

3          (Plaintiffs' Exhibit 300 marked.)

4  BY MR. MILLS:

5  Q    Do you recognize that?

6  A    Yes.

7  Q    What is that a photo of?

8  A    James Fields's car after hitting the group of

9  counter-protesters.

10 Q    Is that a fair and accurate picture of the car after it

11 hit you?

12 A    Yes, it is.

13         MR. MILLS:  Your Honor, I'd move for admission of

14 Plaintiffs' Exhibit 300.

15         THE COURT:  It will be admitted.

16         (Plaintiffs' Exhibit 300 admitted.)

17  BY MR. MILLS:

18 Q    Mr. Baker, can you see particularly where on that car your

19 body hit the windshield?

20 A    Yes.

21 Q    Can you put an X on that spot?

22 A    (Witness complies.)

23 Q    What do you recall about hitting the windshield, if

24 anything?

25 A    Again, it's similar to the sounds.  I don't know how else

T. Baker - Direct

1   to describe this.  It was catastrophically violent, the

2   feeling.  If you can imagine getting crushed by a speeding

3   piece -- by a car, by speeding metal.  But it's like the force

4   doesn't leave the body.  It's -- the violence that your body

5   absorbs, it's impossible to describe, but it's like it just

6   doesn't leave and you absorb the entirety of that impact.

7   Q    You say that you then were flipped over the car.  What

8   happened then?

9   A    I flipped over the car.  I had landed, I believe it was

10  like on my right side and back mostly.  And, you know, the

11  first -- I was so absolutely confident that that was -- that I

12  was going to die at that moment, so once I hit the ground it

13  was -- you have so much adrenaline going through your body and

14  I was in such shock that I didn't die, your kind of instincts

15  take over.  So I immediately just tried to sense if I could

16  walk, because what I had seen was the car hit, and then it

17  started to reverse again.  And as it was reversing, I remember

18  thinking I'm not -- I'm absolutely not going to survive getting

19  hit a second time.  So I just got up as fast as I could to get

20  myself to safety.  And, you know, again, brains and bodies are

21  weird.  So I saw this guy on the ground.  I don't think he was

22  hit by the car, but he was definitely a bit shell-shocked -- a

23  bit.  Incredibly shell-shocked.  His eyes were just wide open,

24  he was frozen.  I don't know why I did this, but I just picked

25  him up.  And then right after that got myself to what I felt

T. Baker - Direct

1  was safety.

2       And I tripped or I stumbled, I can't remember exactly what

3  happened.  But I fell, and when I fell, it was, just as fast as

4  the adrenaline came into my body, it left.  It left just as

5  fast.  And so I had felt just extreme indescribable pain.  And

6  I was collapsed on the street -- or the sidewalk at that point.

7  Q    Were you taken to the hospital at that point or some point

8  thereafter?

9  A    Yeah, shortly thereafter I was put into someone's car and

10 taken to the hospital.

11 Q    Do you know who took you?

12 A    I don't.

13 Q    Where was your wife during this?

14 A    She was home.

15 Q    I'd like you to take a look at Plaintiffs' Exhibit 294,

16 please.

17      Do you recognize that photo?

18      (Plaintiffs' Exhibit 294 marked.)

19 A    Yes.

20 Q    What is it a photo of?

21 A    That is a photo of me in the hospital the day --

22 immediately after getting hit by the car.

23 Q    Is it a true and accurate depiction of what you looked

24 like that day?

25 A    It is.  Yes.

T. Baker - Direct

1          MR. MILLS:  Your Honor, I move to admit Plaintiffs'

2    Exhibit 294 into evidence.

3          THE COURT:  Be admitted.

4          (Plaintiffs' Exhibit 294 admitted.)

5          MR. MILLS:  Can you show two photos at once,

6    Mr. Spalding?  I'd like to also show, not to the jury yet,

7    Plaintiffs' Exhibit 295.

8          (Plaintiffs' Exhibit 295 marked.)

9    BY MR. MILLS:

10   Q    Mr. Baker, can you see 295?

11   A    Yes.

12   Q    What is that?

13   A    That is a photo of me in the hospital that day after

14   getting hit.

15   Q    Also a true and accurate picture of you in the hospital?

16   A    Yes, it is.

17         MR. MILLS:  Your Honor, I'd like to move for

18   admission of Plaintiffs' Exhibit 295.

19         THE COURT:  Be admitted.

20         (Plaintiffs' Exhibit 295 admitted.)

21   BY MR. MILLS:

22   Q    Mr. Baker, what do these photos show?

23   A    It shows me sometime -- I don't know exactly how long

24   after getting hit by the car.  Long enough after where they had

25   temporarily casted my arm and I was cleaned up at that point.

T. Baker - Direct

1   I had a bandage on my nose, but I was cleaned up.

2   Q    Does this fairly show the swelling that occurred in the

3   aftermath of this car attack?

4   A    No.  It does not.  When I got to the hospital that day,

5   the swelling was so severe in my arm and my hip -- and I had

6   cuts, bruises, swelling, head to toe, on my entire body.  The

7   swelling was so severe that when they did the X-rays, they

8   couldn't tell if anything was broken.  So I had to come back,

9   it was about a week after that, to have further tests.

10  Q    By the way, did your wife take these photos?

11  A    No, she did not.

12  Q    Where was she?

13  A    She was not allowed into the hospital.  It was pretty

14  chaotic.  And actually, at the time the hospital misinformed

15  her that I wasn't even there.  So.

16  Q    When did you next see her?

17  A    Six to eight hours later.

18  Q    Could you just briefly tell the jury what injuries you

19  sustained as a result of this attack?

20  A    Yes.  So I had a concussion.  I had lacerations all over

21  the body, bruising all over the body.  I had a torn ligament in

22  my left wrist and I had a torn labrum to my right hip.

23  Q    You mentioned a concussion.  Could you tell us briefly

24  about that?

25  A    Yeah, it was, you know, a week, two weeks of fogginess,

T. Baker - Direct

1    memory was a bit foggy, some confusion.  Pretty typical

2    symptoms of a severe concussion.

3    Q     What happened to your wrist?

4    A     My wrist had a torn ligament near my thumb.

5    Q     What medical care did you get for your wrist?

6    A     It was casted for, it was about six weeks or so.  The type

7    of injury, the type of ligament tear that it was, they didn't

8    want the cast to be on for too long because you needed to get

9    mobility back in.  I guess the joint tends to get, like,

10   permanently stiff if it's left in for too long.

11        So it was about six weeks, I believe, with a cast and then

12   a sling for a short amount of time.  But it was -- I don't know

13   the exact time, but it was -- it was definitely a few months

14   for my wrist until I was able to use it functionally again.

15   Q     You're able to use it functionally now?

16   A     Yes.

17   Q     What is the prognosis for your wrist?

18   A     I'm told to likely experience arthritis in the future.

19   Q     You also mentioned an injury to your hip.  Can you please

20   describe that to the jury?

21   A     Yeah, that one was much more severe.  So it was -- my

22   labrum -- the labrum is like -- it's a major ligament around

23   the hip.  And it basically acts as a suction cup that keeps the

24   hip -- the femur head kind of suctioned inside the hip socket.

25   And that was -- it was almost completely torn off the hip.  So

T. Baker - Direct

1    it was about a three-quarter tear around the hip.

2         And actually, the injury was a lot worse, but that wasn't

3    discovered until I ended up eventually getting surgery for

4    this.

5    Q    You didn't get surgery right away?

6    A    No.  So my surgeons said that sometimes the labrum can

7    heal.  In my case, it was very unlikely, but they said it can

8    heal sometimes.  And because the surgery can be so serious and

9    its impacts of the surgery can be so serious, they recommended

10   that maybe I try physical therapy for a while.

11        So I tried physical -- and the point of physical therapy

12   for the labrum tear, actually, is to get blood flow to that

13   area, because you don't have much blood flow in the labrum.  So

14   the more you can get blood flow into it, the faster it can

15   heal.  But that didn't work.  It got progressively worse and

16   worse.  I think I did physical therapy for a month and a half

17   or so.  It got worse and worse.  I tried steroid shots.

18   Nothing -- nothing fixed it.  The pain was incredibly severe

19   and only got worse.

20   Q    So what happened after that did not work?

21   A    After that didn't work, I ended up getting surgery in

22   December of that year.

23   Q    What date; do you remember?

24   A    Yes, it was the day after my birthday.  It was December

25   13th.

T. Baker - Direct

1  Q    Can you tell the jury a little bit about that surgery?

2  A    Yeah.  So for the surgery they had to dislocate the hip,

3  and what they found was there was additional damage done to my

4  femur head and my hip socket.  So the way they describe it is

5  plastic surgery for the hip.  They had to shape it and reform

6  both the hip socket and the femur head.

7       Then they put four screws -- I believe it was four screws

8  into my hip, permanent screws with permanent sutures that keep

9  the labrum attached to the bone.

10 Q    Was the hip socket damaged as well?

11 A    Yes, it was.

12 Q    Was the surgery successful?

13 A    As far as it could be, yes, the surgery was successful.

14 Q    What does that mean, as far as it could be?

15 A    So the surgery worked.  It did what it was supposed to do,

16 but I've lost significant mobility in my hip.  Chronic pain.

17 Permanent, too.  These are not -- these are not things that

18 are -- that are going to be remedied.

19 Q    What about the recovery process for the surgery?

20 A    Yes.  So the recovery process, I was immobile for some

21 time.  I couldn't -- I could do nothing by myself for several

22 weeks without any help.  So I was on crutches for, I believe it

23 was around six weeks, give or take.  Then I used a cane for a

24 while.  But it was -- I also did physical therapy for months.

25 But it wasn't until around the eight-month mark that I was

T. Baker - Direct

1   actually able to start getting back into a consistent physical

2   routine.

3   Q     Does that injury cause any other issues for your body?

4   A     Yes.  So it's been -- in terms of a complex, a medical

5   complex, it's been getting quite worse.  The hip is attached to

6   a lot of other muscles and tendons.  So what it has created is

7   I have a tilt now in my pelvis.  And because of that, it then

8   creates a serious strain on my lower back.  So now I have this

9   complex of a extremely tight hip, really constant pain in that.

10  Also now in the lower back too.

11  Q     You said that the pain is permanent.  Can you describe

12  what that pain is?

13  A     Yeah.  It varies.  And now being four years later and

14  living with it every day, it feels pretty normal most days, but

15  it can be severe.  Sitting for long periods of time, standing

16  for long periods of time, that -- long periods being, you know,

17  an hour to two hours gets significant discomfort in it.  So

18  constant shifting around, trying to get in new positions.  But

19  it's a pain that's -- it's chronic.  It's -- annoying is not

20  the way to put it.  There's no way to escape it.  I've been

21  told, you know, I could get medication for it or something, but

22  I've been trying physical therapy.  I've been trying medical

23  massage, anything to not -- if this is going to be a permanent

24  injury, I don't want to rely on something like pharmaceuticals

25  to -- that's not a resolution.

T. Baker - Direct

1  Q    Let me move forward, get you off the stand a little bit

2  more quickly.

3       Take a look at Plaintiffs' Exhibit 3328A.

4           (Plaintiffs' Exhibit 3328A marked.)

5  BY MR. MILLS:

6  Q    Do you recognize that?

7  A    Yes, I do.

8  Q    What is that?

9  A    It is a chart describing my past medical expenses and

10 treatments and subsequent costs of that.

11 Q    Have you reviewed the underlying exhibits that this chart

12 summarizes?

13 A    Yes.

14 Q    Is the summary accurate?

15 A    Yes, it is.

16           MR. MILLS:  Your Honor, I'd move to admit Plaintiffs'

17 Exhibit 3328A.

18           THE COURT:  It will be admitted.

19           (Plaintiffs' Exhibit 3328A admitted.)

20  BY MR. MILLS:

21 Q    I'm just going to ask you about one entry so we can

22 understand how this chart works.  Let's go to the very first

23 entry and just explain how that works to the jury.

24 A    Yeah, so it describes -- it shows what the treatment was,

25 which was an emergency room visit on the date of August 12th of

T. Baker - Direct

1  2017, with the exhibit numbers, which are the summary of the

2  charges that day, and then the subsequent total cost.  So the

3  summary of all of those -- of all of those charges.

4  Q    Okay.  Then I'm just going to quickly go to entry 17.  Is

5  that the surgery on December 13th that you described to the

6  jury?

7  A    Yes, that's right.

8  Q    Did these -- you can take that down, thank you.

9       Do these injuries interfere with your work?

10  A    Yeah, significantly.  So at the time I was a

11  horticulturalist at a nursery where I managed -- it was my

12  responsibility to manage the health of all of the plants in the

13  greenhouse and outside.  And so what that entailed was a lot of

14  independent moving of trees, heavy objects, but it included a

15  lot of lifting, which I just -- either I wasn't able to do at

16  all on my own, or I had to ask a lot of the staff to help and

17  things like that.

18      I was also responsible for a lot of the shipments that

19  came in.  Again, something I couldn't -- I could no longer

20  manage on my own and I had to overly rely on other staff to

21  help.

22  Q    Did you miss work as a result?

23  A    Yes, I did.

24  Q    Approximately how much from that job?

25  A    Approximately 21 days.

223

T. Baker - Direct

1   Q    Did you miss work from your subsequent job as well?

2   A    Yes, I did.

3   Q    About how many days?

4   A    That would have been about 15 days.  Again, that's

5   conservative, but that's pretty accurate.

6   Q    I'm going to show you Plaintiffs' Exhibit 3328B.  Have you

7   seen that before?

8        (Plaintiffs' Exhibit 3328B marked.)

9   A    Yes.

10  Q    What are the underlying exhibits that support that

11  summary?

12  A    They would be paystubs and W2s.

13  Q    This is an accurate summary of the lost work wages?

14  A    Yes, it is.

15       MR. MILLS:  Your Honor, I'd like to move to admit

16  Plaintiffs' Exhibit PX-3328B.

17       THE COURT:  It'll be admitted.

18       (Plaintiffs' Exhibit 3328B admitted.)

19  BY MR. MILLS:

20  Q    Mr. Baker, have you experienced emotional or mental trauma

21  as a result of this attack?

22  A    Yes.

23  Q    Would you please tell the jury about that.

24  A    So, flashbacks that are triggered by almost -- you name

25  it.  Generally if I'm in a -- if things are calm, I'm feeling

T. Baker - Direct

1  peaceful, someone drops a book, it throws your brain back into

2  that exact moment.  It's incredibly paralyzing.

3  Q    Is there an experience you had when you were with your

4  family, with your wife?

5  A    Yes, the first time I ever experienced this -- prior to

6  August 12th I had nothing like this.  I can't remember what

7  this date was but it was sometime after August 12th, we were on

8  vacation in New Jersey, walking down a boardwalk, and I

9  remember kids playing tag, and one of them just ran past me and

10 yelled, and I literally just got paralyzed in that moment.  It

11 was the first time I've ever experienced something like that.

12 So I had no clue what was going on until a few seconds.

13     The memory -- the emotional state that put me into is so

14 distinct that I was aware of what was happening, but it's

15 been -- I couldn't even tell you the number of times events

16 like that have happened since.

17 Q    Have you also had panic attacks?

18 A    Yes.  Also something I never experienced before.  First

19 time I had one I literally thought I was having a heart attack.

20 I totally mistook that.

21 Q    The last thing I'd like to ask you about are to describe

22 your physical condition today versus what it was like prior to

23 August 12th, 2017?

24 A    Prior to August 12th I had -- I had no physical issues.  I

25 was perfectly healthy.  I played a lot of soccer, played a lot

T. Baker - Cross

1    of lacrosse, competitive sports, I ran a lot, did a lot of

2    hiking, strenuous, challenging hiking.  It was really fun.  And

3    these are just not -- these are just not things I can do

4    anymore.

5    Q    Are the physical limitations that you're experiencing now,

6    your ability to play sports and run and go hiking, are they

7    permanent?

8    A    Yes, these are permanent.

9            MR. MILLS:  Thank you for your testimony today,

10   Mr. Baker.

11           THE COURT:  Thank you.  Cross?

12           MR. CAMPBELL:  Your Honor, I have no questions for

13   this witness.

14                        CROSS-EXAMINATION

15    BY MR. SPENCER:

16   Q    Good afternoon, Mr. Baker.

17   A    Good afternoon.

18   Q    My name is Richard Spencer and I'm acting on my own

19   behalf.

20       So you -- in your testimony, you made mention of hearing

21   about the rally; it was the buzz around town?

22   A    Yes.

23   Q    And you said that you didn't -- you weren't aware of many

24   of the groups who were attending?

25   A    Correct.

226

T. Baker - Cross

1  Q    But you mentioned two names who you were aware of, or

2  which you were aware of.  And that was Mr. Kessler and myself,

3  Richard Spencer?

4  A    Yes.

5  Q    So how did you become aware of Richard Spencer?

6  A    I can't recall specifically.  Either through, you know,

7  the buzz around town, or maybe something on social media

8  somewhere.  I can't recall specifically.

9  Q    Okay.  You recall you might have heard about me on social

10 media?

11 A    Perhaps that's true.

12 Q    Okay.  And how did you hear about Mr. Kessler?

13 A    It would have been similar.  Either someone around town or

14 social media or -- yeah, it would have been similarly.

15 Q    And how did you understand Mr. Kessler in relationship to

16 the Unite the Right rally?

17 A    I understood that he was a racist, a white supremacist.

18 Q    But with regard to the rally?

19 A    Oh, excuse me.  That he was -- I would have known that he

20 was an organizer, a leader of that to some degree.

21 Q    Okay.  That's how you understood Mr. Kessler?

22 A    Yes.

23 Q    So you've said that you did know about Richard Spencer,

24 myself, in some way?

25 A    Yeah.

227

T. Baker - Cross

1  Q    During August 12th you've described how you went near the

2  park, Lee or Emancipation Park, and then you circled back

3  around.  At any point did you see me?

4  A    I very well may have, but I wouldn't have -- at that time

5  I wouldn't have recognized -- I didn't know your appearance.

6  So I wouldn't have been able to pick you out even.

7  Q    Okay.  So that was throughout the entirety of the day of

8  August 12th, you -- you had a -- is this a fair representation,

9  you had a vague notion of who I was?

10  A    Yes.

11  Q    Right.  But you did not see me throughout that entire

12  process?

13  A    No, I can't recall that I specifically saw you.

14            MR. SPENCER:  Okay.  No further questions.  Thank

15  you.

16                      CROSS-EXAMINATION

17   BY MR. CANTWELL:

18  Q    Hello, Mr. Baker.  I'm Christopher Cantwell.

19  A    Hello.

20  Q    Did I catch correctly -- did you say that you don't know

21  exactly how you found out about the rally?

22  A    Yes.

23  Q    Do you know who Emily Gorcenski is?

24  A    No.

25  Q    Do you know who Kristopher Goad is?

T. Baker - Cross

1   A    No.

2   Q    Do you know who Thomas Keenan is?

3   A    No.

4   Q    Do you know who Lindsey Elizabeth Moers is?

5   A    No.

6   Q    Do you know who Thomas Massey is?

7   A    No.

8   Q    Do you know who Dwayne Dixon is?

9   A    No.

10  Q    You said you knew the people who were coming were bullies?

11  A    Not an entirely accurate word, but yes.

12  Q    I'm sorry.  Is that not what you testified to?

13  A    Yes.  I also believe I testified that I didn't mean to

14  minimize the actions that day by using the word "bully."  So

15  it's much more severe than "bully," but yes, I did say that.

16  Q    So what you mean to say is that we're worse than bullies,

17  and you were trying to find an appropriate word; is that what

18  you mean to say?

19  A    Yes.

20  Q    Okay.  And you knew that the people who were coming had a

21  history of racist and antisemitic violence?

22  A    Yes.

23  Q    Can you speak to the specifics of that history?

24  A    No, I can't speak to -- I mean, I knew that groups like

25  the KKK were involved, which has a very obvious history.  But I

T. Baker - Cross

1   wouldn't have -- at that time, I wouldn't have known the

2   specifics of these details because this was -- this was done in

3   private.  This was -- this was -- these groups and individuals

4   conspired to do this.  So there's no way that I would have --

5           MR. JONES:  I'll object to the foundation on that

6   testimony.

7           THE COURT:  Sustained.  Strike the last --

8   BY MR. CANTWELL:

9   Q    Did you witness any conspiring?

10          THE COURT:  Excuse me.

11          Ask the jury to disregard the last two sentences of

12  the witness.

13   BY MR. CANTWELL:

14  Q    You stated that you knew that these groups had a history

15  of racist and antisemitic violence.  Is it your testimony today

16  that all you knew about that was the reputation of the KKK?

17  A    The KKK, Jason Kessler.

18  Q    Okay.

19  A    Yes.

20  Q    Is it --

21          MR. KOLENICH:  Objection.  Lack of foundation.

22   BY MR. CANTWELL:

23  Q    Is it your testimony today that you knew that Jason

24  Kessler had a history of racist and antisemitic violence?

25  A    Yes.  At least racist -- racist rhetoric and instigatings,

T. Baker - Cross

1  yes.

2  Q    The question was:  Is it your testimony today that on

3  August 12th, 2017 you knew that Jason Kessler had a history of

4  racist and antisemitic violence?

5              MR. MILLS:  Objection.  Argumentative.

6              THE COURT:  He can answer.

7              Answer the question, sir, if you can.

8              THE WITNESS:  Violence, I don't know, but definitely

9  rhetoric and instigation for sure.

10  BY MR. CANTWELL:

11  Q    So you knew that Jason Kessler had said racist things?

12  A    Yeah.  Again, specifics I can't recall, but yes.

13  Q    Okay.  Well, we're in a courtroom, so specifics would be

14  nice, especially when we're talking about violence, don't you

15  think?

16              MR. MILLS:  Objection.  Move to strike that improper

17  question.

18              THE COURT:  Wait just a minute.

19              Strike that.  Sustain the objection.

20   BY MR. CANTWELL:

21  Q    Is it now your testimony that on August 12th, 2017 you had

22  no information linking Jason Kessler to racist or antisemitic

23  physical violence?

24  A    That might be safe to say, sure.

25  Q    But earlier you did say that:  "These people, I knew they

T. Baker - Cross

1   had a history of racist, antisemitic violence."  You said that

2   before, right?

3   A    That's correct.

4   Q    Okay.  Is there any other defendant in this case who you

5   knew on August 12th had a history of racist and antisemitic

6   violence?

7   A    Did you ask prior to August 12th?

8   Q    Yes.  That's the question.  I'll follow up.

9        Prior to August 12th, did you know that anyone -- that

10  anyone attending the rally had a history of racist and

11  antisemitic violence?

12  A    Specific people, no.

13  Q    Okay.  But you knew they said racist things, right?

14  A    Yes.

15  Q    Is that just about as bad?

16  A    No, not at all.

17  Q    You said at that time you may have known about Antifa; you

18  weren't sure?

19  A    Yeah, I can't recall anything specific that I would have

20  known about them at that time.

21  Q    Okay.  And you had lived in Charlottesville since May of

22  2017?

23  A    Yes.  That's right.

24  Q    And you didn't bring your wife with you because she feared

25  the violence that might occur?

T. Baker - Cross

1   A     It was her choice.

2   Q     It was her choice.  Okay.

3         You said that you knew a few church groups would be

4   protesting, right?

5   A     Yes.

6   Q     Or counter-protesting, perhaps would be the -- to keep

7   everybody on straight terms.

8   A     That's right.

9   Q     Do you know anything about the Clergy Collective?

10  A     No.

11  Q     Congregate C'ville?

12  A     No.

13  Q     On August 12th, 2017 did you know plaintiff Seth

14  Wispelwey?

15  A     No.

16  Q     You said you can't deny that projectiles launched into the

17  park?

18  A     Correct.

19  Q     And you said that the FBI couldn't get images off your

20  phone; is that right?

21  A     That's right.

22  Q     So you had taken some pictures during that day?

23  A     Yes.

24  Q     No video?

25  A     No, not that I recall.

T. Baker - Cross

1   Q    Not that you recall?

2   A    Correct.

3   Q    So you might have taken some video?

4   A    No, I'm confident that I did not take video.

5   Q    Okay.  Did you see anybody wearing red bandannas among the

6   counter-protesters?

7   A    Not that I recall.

8   Q    Not that you recall.  You said that none of the

9   counter-protesters were carrying weapons, though, right?

10  A    No.

11  Q    Did you see any counter-protesters carrying flagpoles?

12  A    Yes, I had seen flags with counter-protesters.

13  Q    Do you recall if any of those flagpoles could have been

14  used as a weapon?

15  A    I had seen protesters use flagpoles as weapons.

16  Q    So one side has flagpoles, they're weapons; the other side

17  has flagpoles, they're not, right?

18          MR. MILLS:  Objection, argumentative.

19          THE COURT:  Sustained.

20  BY MR. CANTWELL:

21  Q    On August 12th, 2017, you became aware that a flagpole

22  could be used as a weapon, right?

23  A    I had witnessed it on that day.  Yes.

24  Q    And you saw counter-protesters carrying flagpoles, right?

25  A    I did see counter-protesters carrying --

234

T. Baker - Cross

1  Q    But you testified that you didn't see counter-protesters

2  carrying weapons, right?

3  A    Correct.

4  Q    Did you see counter-protesters carrying shields?

5  A    Not that I recall.

6  Q    Not that you recall?  Okay.

7       Did you see counter-protesters wearing helmets?

8  A    I do believe I remember seeing bicycle helmets.

9  Q    Did you see any bicycle helmets on people that weren't

10 riding bicycles?

11 A    Yes.  They were not riding bicycles at the time.

12 Q    Okay.  Did you see anybody wearing goggles?

13 A    No, I don't recall that, either.

14 Q    No, or you don't recall?

15 A    No, I do not remember that.

16 Q    Did you see anybody wearing respirators?

17 A    Similar:  No, I don't remember.

18 Q    Do you know what I mean when I --

19 A    Yes.

20 Q    -- when I ask that question?

21 A    Yes.

22 Q    And you described the atmosphere of the crowd -- I just

23 jotted down some keywords here -- as joy, kindness, happiness,

24 celebratory.  Those are all fair adjectives to describe what

25 you experienced in that crowd?

T. Baker - Cross

1    A    The crowd on Water Street, yes.

2    Q    The crowd on Water Street.  And the crowd then turned onto

3    Fourth Street and that's where you got hit by the car, right?

4    A    Yes.

5    Q    Okay.  And you didn't see anybody carrying baseball bats,

6    clubs; nothing like that, right?

7    A    No, not that I recall.

8              MR. CANTWELL:  I'm going to play for the witness --

9    this is -- once I get this thing back up again; I'm sorry --

10   Plaintiffs' Exhibit 0313.

11             (Video playing.)

12   BY MR. CANTWELL:

13   Q    Do you recognize this scene right here?

14   A    Yes.

15   Q    Now, I understand it would probably be difficult to pick

16   your face out of this, but you see about -- you expect that

17   you're in this frame, right?

18   A    Yeah, somewhere.

19   Q    Do you want to just put a dot wherever you think you are,

20   approximately?

21   A    Oh, a dot I couldn't do, but I could circle an area.

22   Q    Yeah, whatever -- you know, the basic idea.

23   A    Yeah, somewhere --

24        (Witness complies.)

25   Q    In that general vicinity, fair to say?

236

T. Baker - Cross

1   A    Yeah.

2   Q    All right.  I want you to keep your eye right here, okay?

3        If I can get this thing to work.  Of course this happens.

4   Pardon my technical issues.  Just a moment.

5        Did you see that guy smack James Fields' car with a club?

6            MR. MILLS:  Objection to the characterization.

7   That's not what that shows.

8            THE COURT:  Sustained.

9            MR. CANTWELL:  Let's bring this back out.  I need a

10  moment to fix something so I can put the video in slow motion.

11           This is Plaintiffs' 313.  I put it in, hit slow

12  motion, slow down, three more times, and I'm just going to play

13  this for the witness.

14           (Defendant Cantwell Exhibit 313 marked.)

15           (Video playing.)

16  BY MR. CANTWELL:

17  Q    Is this a fair and accurate depiction of the moment that

18  you were struck by James Fields' car?

19           MR. MILLS:  Object to foundation.  This is clearly

20  not something this witness could have seen from his vantage

21  point.

22           THE COURT:  Well, sustained.  It's obvious.

23  BY MR. CANTWELL:

24  Q    Did you see anybody wearing masks?

25  A    I don't specifically remember that.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/5/2021

1  Q    You don't specifically remember that?

2  A    I do remember seeing some -- there were people dressed as

3  clowns.

4  Q    Dressed as clowns.  You didn't see this guy?

5  A    I didn't see that person.

6  Q    Did you see anybody wearing leaded gloves?

7  A    Leaded gloves?

8  Q    Like, gloves with metal on them?

9  A    No.

10 Q    So you didn't see this guy?

11 A    No.

12 Q    And no baseball bats, right?  You didn't see any baseball

13 bats?

14        THE COURT:  I think he's already said he did not.

15 BY MR. CANTWELL:

16 Q    You didn't see this guy, right?

17 A    First time I've seen that picture.

18        MR. CANTWELL:  No further questions.

19        THE COURT:  Okay.  Is that all, then?

20        MR. MILLS:  Nothing further.

21        THE COURT:  Okay.  Thank you.

22        Ladies and gentlemen of the jury, we'll take a

23 weekend recess now.  We'll see you back at 9 o'clock on Monday.

24        Next week, next Thursday is Veteran's Day and that is

25 a holiday.  So we will not hold court on Thursday.  We will

Sines, et al. v. Kessler, et al., 3:17CV72, 11/5/2021

1    hold court on Friday, not on Thursday, but every other day next

2    week.  There will be four days next week.

3           Thank you.  We'll recess court.

4           MS. KAPLAN:  Your Honor, can we raise one thing after

5    the jury leaves?

6           THE COURT:  Okay.

7    **(Jury out, 4:50 p.m.)**

8           THE COURT:  All right.

9           MS. KAPLAN:  Your Honor, we had a very brief colloquy

10   before Mr. Baker took the stand.  As you know, we addressed

11   this in our letter this morning as something we were thinking

12   about.

13          In order for us to effectively plan to get this trial

14   done in the dates contemplated by Your Honor, it would be

15   extremely helpful for us to hear from the other side how many

16   trial days they think they need.  We can then work around that.

17   I know they may not have spoken to each other about it, but if

18   they could do that and give us that information sometime this

19   weekend, that would -- it's kind of hard to plan without

20   knowing.

21          THE COURT:  Can you all come up with something by

22   Monday?

23          MR. JONES:  Yes.

24          MR. KOLENICH:  Yes, sir.

25          MR. SPENCER:  By Monday, you said?

Sines, et al. v. Kessler, et al., 3:17CV72, 11/5/2021

1           MR. KOLENICH:  Judge, I have just one matter, just

2   housekeeping.  It appears I didn't specify the times of the

3   audio I played for the witness.  I'd just like to put on the

4   record that it was from approximately 1:00 to 1:22.  That's

5   Exhibit 1409.

6           THE COURT:  All right.

7           MS. KAPLAN:  Your Honor, one more thing.  If I could

8   get over the weekend, like, Sunday, then we could spend Sunday

9   planning with that information.

10          THE COURT:  Okay.  Can you all --

11          MR. SPENCER:  Yes, sir.

12          MR. KOLENICH:  Yes, sir.

13          MS. KAPLAN:  Thank you.

14  (Proceedings adjourned, 4:51 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Sines, et al. v. Kessler, et al., 3:17CV72, 11/5/2021

1                    C E R T I F I C A T E

2        I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3    the United States District Court for the Western District of

4    Virginia, appointed pursuant to the provisions of Title 28,

5    United States Code, Section 753, do hereby certify that the

6    foregoing is a correct transcript of the proceedings reported

7    by me using the stenotype reporting method in conjunction

8    with computer-aided transcription, and that same is a

9    true and correct transcript to the best of my ability and

10   understanding.

11       I further certify that the transcript fees and format

12   comply with those prescribed by the Court and the Judicial

13   Conference of the United States.

14       /s/ Lisa M. Blair                Date: November 5, 2021

15

16

17

18

19

20

21

22

23

24

25