Sines, et al. v. Kessler, et al., 3:17CV72, 11/8/2021

```
 1                   UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF VIRGINIA
 2                      CHARLOTTESVILLE DIVISION

 3   *************************************************************

 4   ELIZABETH SINES, ET AL.,     CIVIL CASE NO.:  3:17CV72
                                  NOVEMBER 8, 2021, 8:59 AM
 5                                JURY TRIAL, DAY 11
             Plaintiffs,
 6   vs.

 7                                Before:
                                  HONORABLE NORMAN K. MOON
 8                                UNITED STATES DISTRICT JUDGE
     JASON KESSLER, ET AL.,       WESTERN DISTRICT OF VIRGINIA
 9
             Defendants.
10
     *************************************************************
11
     APPEARANCES:
12

13   For the Plaintiffs:      ALAN LEVINE, ESQUIRE
                              COOLEY LLP
14                            1114 Avenue of the Americas, 46th
                              Floor
15                            New York, NY  10036
                              212.479.6260
16
                              DAVID E. MILLS, ESQUIRE
17                            COOLEY LLP
                              1299 Pennsylvania Avenue, NW,
18                            Suite  700
                              Washington, DC  20004
19                            202.842.7800

20

21

22   Court Reporter:   Lisa M. Blair, RPR, RMR, CRR, FOCR
                       255 West Main Street, Suite 304
23                     Charlottesville, Virginia  22902
                       434.296.9284
24
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25   TRANSCRIPT PRODUCED BY COMPUTER.
```

Sines, et al. v. Kessler, et al., 3:17CV72, 11/8/2021

 1  APPEARANCES CONTINUED:

 2  For the Plaintiffs:          MICHAEL L. BLOCH, ESQUIRE
                                 ROBERTA A. KAPLAN, ESQUIRE
 3                               Kaplan Hecker & Fink LLP
                                 350 Fifth Avenue, Suite 7110
 4                               New York, NY  10118
                                 212.763.0883
 5
                                 KAREN L. DUNN, ESQUIRE
 6                               WILLIAM A. ISAACSON, ESQUIRE
                                 Paul, Weiss, Rifkind, Wharton &
 7                               Garrison LLP
                                 2001 K Street, NW
 8                               Washington, DC  20006
                                 202.223.7300
 9

10  For the Defendants:          DAVID L. CAMPBELL, ESQUIRE
                                 Duane, Hauck, Davis, Gravatt &
11                               Campbell, P.C.
                                 100 West Franklin Street, Suite 100
12                               Richmond, VA  23220
                                 804.644.7400
13
                                 CHRISTOPHER CANTWELL, PRO SE
14                               #00991-509
                                 USP Marion
15                               4500 Prison Road, PO Box 2000
                                 Marion, IL  62959
16
                                 BRYAN J. JONES, ESQUIRE
17                               Bryan J. Jones, Attorney at law
                                 106 W. South Street, Suite 211
18                               Charlottesville, VA  22902
                                 540.623.6952
19
                                 JAMES E. KOLENICH, ESQUIRE
20                               Kolenich Law Office
                                 9435 Waterstone Blvd., Suite 140
21                               Cincinnati, OH  45249
                                 513.444.2150
22

23

24

25

Sines, et al. v. Kessler, et al., 3:17CV72, 11/8/2021

1   APPEARANCES CONTINUED:

2   For the Defendants:          WILLIAM E. REBROOK, IV, ESQUIRE
                                 (Appearing via Zoom)
3                                The ReBrook Law Office
                                 6013 Clerkenwell Court
4                                Burke, VA  22015
                                 571.215.9006
5
                                 JOSHUA SMITH, ESQUIRE
6                                (Appearing via Zoom)
                                 Smith LLC
7                                807 Crane Avenue
                                 Pittsburgh, PA  15216
8                                917.567.3168

9                                RICHARD SPENCER, PRO SE
                                 P.O. Box 1676
10                               Whitefish, MT  59937

11                               DILLON HOPPER, PRO SE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sines, et al. v. Kessler, et al., 3:17CV72, 11/8/2021

1                        INDEX OF WITNESSES

2    WITNESSES ON BEHALF OF THE PLAINTIFF:              PAGE

3    DILLON HOPPER (Video deposition played)

4    MICHAEL TUBBS

5     Direct Examination by Mr. Levine                14
      Cross-Examination by Mr. Jones              57, 97
6     Cross-Examination by Mr. Spencer               100
      Cross-Examination by Mr. Cantwell              100
7     Cross-Examination by Mr. ReBrook               111
      Redirect Examination by Mr. Levine             114

8    MARISSA BLAIR

9
      Direct Examination by Mr. Mills                 59
10    Cross-Examination by Mr. Campbell              83
      Cross-Examination by Mr. Cantwell              85

11

12   THOMAS ROUSSEAU (Video deposition played)

13   VASILIOS PISTOLIS (Video deposition played)

14

15

16

17

18

19

20

21

22

23

24

25

Sines, et al. v. Kessler, et al., 3:17CV72, 11/8/2021

| | | | |
|---|---|---|---|
| 1 | INDEX OF EXHIBITS | | |
| 2 | EXHIBITS ON BEHALF OF THE PLAINTIFF: | | |
| 3 | EXHIBIT: | Marked | Received |
| 4 | 711 | 13 | 13 |
| 5 | 3820 | 13 | 13 |
| 6 | 953 | 13 | 13 |
| 7 | 428 | 13 | 13 |
| 8 | 3804 | 13 | 13 |
| 9 | 708 | 13 | 13 |
| 10 | 1103 | 13 | 13 |
| 11 | 721 | 13 | 13 |
| 12 | 609 | 13 | 13 |
| 13 | 3355 | 13 | 13 |
| 14 | 724 | 13 | 13 |
| 15 | 722 | 13 | 13 |
| 16 | 723 | 13 | 13 |
| 17 | 2386 | 13 | 13 |
| 18 | 3862 | 13 | 13 |
| 19 | 2866 | 15 | 15 |
| 20 | 2865 | 19 | 20 |
| 21 | 1914 | 21 | 21 |
| 22 | 1539 | 114 | 114 |
| 23 | 2001A | 38 | 39 |
| 24 | 1600 | 44 | 44 |
| 25 | 1920 | 49 | 49 |

Sines, et al. v. Kessler, et al., 3:17CV72, 11/8/2021

```
 1                         INDEX OF EXHIBITS

 2    EXHIBITS ON BEHALF OF THE PLAINTIFFS:

 3    EXHIBIT:                 Marked      Received

 4          2867B                          97          97

 5          297A                           70          70

 6          165A                           73          73

 7          161                            74          74

 8          153                            77          77

 9          3325                           79          79

10          2867A                          97          97

11          2867C                          97          97

12          2867D                          97          97

13          2867E                          97          97

14          2867F                          97          97

15          0991                          120         120

16          0334                          120         120

17          1443                          120         120

18          1057                          120         120

19          38480                         120         120

20          3849                          120         120

21          2594                          120         120

22          1009                          120         120

23          3853                          120         120

24          2686                          120         120

25          2696                          120         120
```

Sines, et al. v. Kessler, et al., 3:17CV72, 11/8/2021

1                        INDEX OF EXHIBITS

2    EXHIBITS ON BEHALF OF THE PLAINTIFFS:

3           EXHIBIT:              Marked      Received

4           2688                    120         120

5           2702                    120         120

6           1888                    120         120

7           2597                    120         120

8           2592                    120         120

9           2701                    120         120

10          3855                    120         120

11          2649                    120         120

12          3856                    120         120

13          3858                    120         120

14          3859                    120         120

15          1977                    120         120

16          2638                    120         120

17   EXHIBITS ON BEHALF OF THE DEFENDANTS:

18          EXHIBIT:              Marked      Received

19          CC-1360                 86          86

20          CC-297                  88          88

21          LOS-72                  98          98

22          LOS-66                  98          98

23          LOS-73                  98          98

24          CC-3237                102         102

25          CC-86                  109         109

Sines, et al. v. Kessler, et al., 3:17CV72, 11/8/2021

1   (Proceedings commenced, 8:59 a.m.)

2          THE COURT:  Good morning.  Call the case, please.

3          THE CLERK:  Yes, Your Honor.  This is Civil Action

4   Number 3:17-cv-00072, Elizabeth Sines and others versus Jason

5   Kessler and others.

6          THE COURT:  Plaintiffs ready?

7          MS. DUNN:  We are, Your Honor.

8          THE COURT:  Defendants ready?

9          MR. JONES:  Yes, Your Honor.

10          MR. KOLENICH:  Yes, Your Honor.

11          MR. CAMPBELL:  Yes, Your Honor.

12          MR. CANTWELL:  I have two short technical points, if

13   I could.  It's Christopher Cantwell.

14          On this computer, I don't currently have a way of

15   viewing spreadsheets, which has caused me to not be able to

16   look at some of the evidence here.

17          And also, I don't have a way of passing -- I don't

18   have -- I know that we have the Box.com situation, but I

19   understandably do not have internet access on this computer,

20   which leaves me without any way of passing files to the Court

21   or to plaintiffs' counsel -- any easy way of doing that,

22   anyway.

23          THE COURT:  All I can do is let IT talk to you.  I

24   have no --

25          THE CLERK:  I'll let Scott know.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/8/2021

1          MR. CANTWELL:  Thank you.

2          THE CLERK:  Also, someone is trying to enter the Zoom

3   call called "Trial Team."  That's not sufficient to identify

4   who it is when we have a witness.  So I need to know who "Trial

5   Team" is.  They're not responding when I inquire.  Does anybody

6   know who might be trying to admit under that guise?

7          I'll leave them in the waiting room.

8          MS. KAPLAN:  I'll check with my team.  I honestly

9   have no idea, but I'll send them an email to make sure, if it's

10  them, that they confirm.

11          THE COURT:  Before we begin, I'll remind everyone

12  that under Standing Order 2020-12 and 2013-8, the Court's

13  prohibition against recording and broadcasting court

14  proceedings remains in force.  Attorneys, parties, or their

15  staff, and any members of the public or press accessing this

16  proceeding today, may not record or broadcast it.  That means

17  no photography, no using of any video or audio recording

18  device, no rebroadcasting, livestreaming, or otherwise

19  disseminating any live or recorded video or audio of this

20  proceeding.

21          Are there any other matters we need to take up before

22  the jury is called?

23          If not, we'll call the jury.  And do we have a

24  witness on the stand?

25          MS. KAPLAN:  We're going to put up a video of Thomas

Sines, et al. v. Kessler, et al., 3:17CV72, 11/8/2021

1  Hopper, Your Honor.  It should take about 45 minutes -- Dillon

2  Hopper.  I'm sorry.  Dillon Hopper.  I apologize.  I misnamed

3  him.

4          THE COURT:  Call the jury.  I do have an instruction

5  regarding Mr. Cantwell and Mr. Hopper.

6          Is this -- there are two depositions.  Are you

7  reading both of them?

8          MS. DUNN:  We will play both of them today, Your

9  Honor, although not in succession.  So we plan to play --

10          THE COURT:  Which one does -- one, he has notice of,

11  I think.

12          SPEAKER:  I think the 2019 one, he has notice of.

13          MS. DUNN:  I apologize, Your Honor.  There are two

14  Dillon Hopper videos.  He has notice of the 2019, but not the

15  2020.

16          THE COURT:  Okay.  Tell me now:  Do I need to read

17  the notice, the instruction, now, for this one, or for the next

18  one?

19          MS. DUNN:  They're all together, right, in one video?

20          (Discussion off the record.)

21          MS. DUNN:  We would suggest reading the instruction

22  because the videos are condensed.

23          THE COURT:  Okay.

24  **(Jury in, 9:04 a.m.)**

25          THE COURT:  Good morning, ladies and gentlemen.  I

11

Sines, et al. v. Kessler, et al., 3:17CV72, 11/8/2021

1   hope you had a restful weekend and we're happy to see you back

2   this morning.  We're going to proceed with the deposition of

3   Mr. Dillon Hopper.

4          Anyway, in this particular case I need to read this

5   limiting instruction to you.

6          I will remind you that each party is entitled to have

7   the case decided solely on the evidence that applies to that

8   party.  Some of the evidence in this case is limited under the

9   rules of evidence to some of the parties and cannot be

10  considered against the others.

11         Plaintiffs are introducing two depositions of

12  Mr. Hopper.  Plaintiffs' deposition testimony from Mr. Hopper's

13  second deposition may not be considered by you in connection

14  with Defendant Christopher Cantwell because of his lack of

15  notice and ability to be at the deposition; however, it may be

16  considered by you in connection with the other defendants.

17         With respect to Mr. Hopper's first deposition, it may

18  be considered by you in connection with all defendants,

19  including Mr. Cantwell.  And the lawyers will point out those

20  distinctions, I think, for you as we go along.

21         All right.  You may play the deposition.

22         (Video deposition of Dillon Hopper was played.)

23         THE COURT:  Just a minute.  I'm going to stop this,

24  ask to pause for a moment.

25         Members of the jury, this is the deposition that

Sines, et al. v. Kessler, et al., 3:17CV72, 11/8/2021

1  should not be considered with regard to Mr. Cantwell.  It can

2  be considered with regard to other defendants.

3          Thank you.  You may start up again.

4          (Video deposition of Dillon Hopper played.)

5          MS. KAPLAN:  Your Honor, I believe that concludes the

6  video.

7          Plaintiffs next call Michael Tubbs, who I understand

8  is testifying by video, by Zoom.

9          MS. DUNN:  Your Honor, while we get set with that,

10  we're asked to read the exhibits into the record for which we

11  move admission from the deposition that was just played:

12  PX-711, PX-3820, PX-0953, PX-0428, PX-3804, PX-0708, PX-1103,

13  PX-0721, PX-0609, PX-3355, PX-0724, PX-0722, PX-0723, and

14  PX-2386.

15          THE COURT:  They'll be admitted.

16          (Plaintiff Exhibits 711, 3820, 0953, 0428, 3804,

17  0708, 1103, 0721, 0609, 3355, 0724, 0722, 0723, and 2386

18  admitted.)

19          MS. DUNN:  We also need to move PX-3862 and PX-3863,

20  which are the clip reports from the 2019 and 2020 depositions.

21          THE COURT:  They'll be admitted.

22          MS. DUNN:  Thank you, Your Honor.

23          (Plaintiff Exhibits 3862 and 3863 admitted.)

24          MR. LEVINE:  May I approach, Your Honor?

25          THE COURT:  You may.

M. Tubbs - Direct

1           (Pause.)

2              THE COURT:  All right.  You may proceed.

3              Has he been sworn?

4          MICHAEL TUBBS, CALLED BY THE PLAINTIFFS, SWORN

5                      DIRECT EXAMINATION

6  BY MR. LEVINE:

7  Q    Mr. Tubbs, you're a member of the League of the South; is

8  that correct?

9  A    That is correct, sir.

10 Q    And you joined League of the South in the year 2000,

11 correct?

12 A    Yes.

13 Q    You joined after hearing Michael Hill speak; is that

14 correct?

15 A    Yes.

16 Q    And you joined the Florida chapter of League of the South,

17 correct?

18 A    Yes.

19 Q    And you joined because League of the South represented

20 your views of Southern white nationalism; is that correct?

21 A    The League of the South represented my views of Southern

22 nationalism.

23 Q    And you believe that the organization best represented

24 your views about the defense of the Southland and her people,

25 correct?

M. Tubbs - Direct

1  A    That is correct.

2  Q    And you had those views in 2000, when you joined, correct?

3  A    Yes.

4  Q    And you had those views in 2017, at the time of

5  Charlottesville 2.0, correct?

6  A    I did.

7  Q    You had those views in 2018, correct?

8  A    I've had those views until today, sir.

9  Q    And in fact, when you were younger, you pledged, quote:

10  "I dedicate my heart to oppose the enemies of my race, my

11  nation, and the new order.  I dedicate my life from this moment

12  forward to fostering the welfare of the white Aryan race."

13      Isn't that right?

14  A    Do you have the evidence that I can refresh my memory on

15  that with?

16  Q    Sure.  I'm going to show you what's been marked for

17  identification as Plaintiffs' Exhibit 2866.  And take a look at

18  that on the bottom of page 2 in quotes.

19      (Plaintiffs' Exhibit 2866 marked.)

20  A    I don't see anything, if you're showing it to me.

21          THE CLERK:  Just one moment.

22          MR. LEVINE:  Can we publish -- not publish.  Can we

23  show that to the witness, please?

24          THE WITNESS:  It disappeared from the screen, if you

25  mean to have it in place.

M. Tubbs - Direct

1          THE COURT:  Could you just read it to him and tell

2   him where it's published and the date and so forth?

3          MR. LEVINE:  Your Honor, I just read it to him.  The

4   quote was --

5          THE COURT:  Well, tell him when -- where you're

6   reading it from.

7          THE WITNESS:  I'll tell you what.  I accept that as

8   my current feelings, yeah, today.

9          MR. LEVINE:  And can we show the witness Plaintiffs'

10   Exhibit's 1899?

11          THE COURT:  Yes.

12          MR. LEVINE:  This is in evidence.  So please show it

13   to the jury.

14          It's in evidence, Your Honor, so it can be published

15   to the jury.

16          THE COURT:  Show it, if you can.

17    BY MR. LEVINE:

18   Q    Do you recognize that page on the League of the South

19   website, Mr. Tubbs?

20        Can we show him the front page first, please, before the

21   yellow highlighted part?

22        Mr. Tubbs, do you recognize this as the League of the

23   South website?

24        Have we lost you, Mr. Tubbs?

25   A    Are you not hearing me?

M. Tubbs - Direct

1  Q    No, we're not, sir.

2       Do you recognize this exhibit from the League of the South

3  website?

4  A    Yes.  I recognize that as being the League of the South

5  website.

6  Q    And you recognize that front page as a statement of

7  Michael Hill's from the first anniversary of Charlottesville

8  2.0 on August 13, 2018?

9  A    Yes, I do.

10 Q    And do you see in the highlighted paragraph Mr. --

11 Dr. Hill said, starting from the word "to us":  "To us, Dixie

12 is and should be white man's land.  We are firm on the Negro

13 question and the Jew question and we make no apologies to

14 anyone for what we believe or what we seek to accomplish for

15 our people"?  Do you see that?

16 A    The writing is too small for me to actually read it, but

17 from your quote, yes, I understand that.

18 Q    And you agreed with that, correct?

19 A    I'll agree with that 100 percent, sir.

20 Q    And go back to the exhibit, please.

21      Do you see the sentence above it says, "We," meaning the

22 League, "see ourselves as the heart and soul of the hard right,

23 an uncompromising movement of real blood and soil

24 Southern/white nationalists who will not compromise our vision

25 of a Southern homeland for whites"?  Do you see that?

17

M. Tubbs - Direct

1       Mr. Tubbs?

2  A    Yes.  I see that.

3  Q    And the words "blood and soil" is a term used by the Nazis

4  referring to an Aryan nation that wouldn't have any Jewish

5  people; is that right?

6  A    I know that the Nazis used the term "blood and soil," as

7  have many nationalist organizations throughout history.  What

8  the Nazis exactly meant by that, I don't know.  But I

9  understand that Southern nationalism uses "blood and soil" to

10 represent the blood of their people and the soil we live on.

11 Q    And when Michael Hill said "we are firm on the Negro

12 question," you understood he meant black Americans should be

13 returned to Jim Crow status in the South; isn't that right?

14 A    I believe he did say that.

15 Q    And you knew that's what he meant, correct?

16 A    Could you restate that question, please?

17 Q    And you knew what he meant, correct?

18 A    When you say returning to Jim Crow?

19 Q    Correct.

20 A    Can you hear me?

21 Q    No.  Please answer the question.

22 A    I'm having difficulty apparently with the audio here.  Are

23 you not able to hear me?

24 Q    Yes.

25              THE COURT:  We hear you.

M. Tubbs - Direct

1              THE WITNESS:  I will -- if Dr. Hill wrote that, then

2    I agree with Dr. Hill.

3    BY MR. LEVINE:

4    Q    Take a look at Plaintiffs' Exhibit 2865.  I'm going to ask

5    you to look at it -- not for the jury yet.  It's not in

6    evidence.

7         Would you please take a look at this document, Mr. Tubbs.

8    It's a tweet by you in response to several pictures and texts.

9    Do you recall this tweet?

10             MR. LEVINE:  Don't highlight it yet, please,

11   Mr. Spalding.

12   BY MR. LEVINE:

13   Q    Do you recall this tweet, sir, your tweet?  Mr. Tubbs?

14             THE CLERK:  He's there.

15             THE WITNESS:  Are you not able to hear me?

16   BY MR. LEVINE:

17   Q    Now we can hear you, sir.  Is that your tweet?

18   A    Yes, that is my tweet.

19             MR. LEVINE:  Thank you.  We offer it in evidence,

20   Your Honor, and ask that it be published to the jury.

21             THE COURT:  All right.  It will be admitted and may

22   be published.

23             THE WITNESS:  Can you hear me?

24             MR. LEVINE:  Yes.

25             (Plaintiff Exhibit 2865 marked.)

M. Tubbs - Direct

1        (Plaintiff Exhibit 2865 admitted.)

2    BY MR. LEVINE:

3    Q    Mr. Tubbs, there are four pictures on that tweet, correct?

4    A    That is correct.

5    Q    And one of the pictures is of a group of men clumped --

6    sitting together.  Another is a picture of three black men

7    behind a cage, correct?

8    A    So it would appear.

9    Q    And another picture is a row of black men in a file,

10   correct?

11   A    That is correct.

12   Q    And then there is a picture of two people in what look

13   like army fatigues standing over a group of people that are

14   sitting down, correct?

15   A    Yes.

16   Q    And go back to the text, please.

17        And on top, there is a tweet that says, "There is whole

18   slave trade happening in Libya."  Do you see that?

19   A    I do see that.

20   Q    And you go to the bottom, your tweet was:  "Good for

21   Libya."  Isn't that right?

22   A    That is correct, sir.

23   Q    And let's go to Plaintiffs' Exhibit 1914.  Is this another

24   tweet by you, a retweet by you?

25   A    It appears to be so.

M. Tubbs - Direct

1           MR. LEVINE:  We offer it, Your Honor, and ask that it

2   be published to the jury.

3           THE COURT:  Be admitted.  May be published.

4           (Plaintiff Exhibit 1914 marked.)

5           (Plaintiff Exhibit 1914 admitted.)

6   BY MR. LEVINE:

7   Q    You are -- now, when someone -- when you retweeted a

8   tweet, that means you're communicating approval, correct?

9   A    Sometimes it means you are communicating an approval.

10  Sometimes it's just something you find interesting that you

11  want to look at later.

12  Q    Well, here there is a tweet, you retweeted Industrial

13  1347's tweet, quote, "Africans are not capable of Western

14  civilization," correct?

15  A    That is correct.

16  Q    And that person was responding to the text below it,

17  correct?

18  A    I believe so.

19  Q    You can take that down.  Now, would you please put up --

20  publish for the jury the beginning of Plaintiffs' Exhibit 1914

21  that is in evidence -- I'm sorry, 1921 that is in evidence.

22       Now, Mr. Tubbs, do you recall this video of Michael Hill

23  in Tennessee at a League of the South meeting in 2018?

24  A    Yes, I do recall.

25  Q    And you weren't at that event, correct?

M. Tubbs - Direct

1    A    No, I was not, sir.

2    Q    You saw this video, which was on YouTube, sometime after

3    that event, correct?

4    A    Yes.

5    Q    And you listened and watched that video from beginning to

6    end; isn't that right?

7    A    Yes, I did.  Yes, I did.

8    Q    And at the end -- and you saw in that video Michael Hill

9    burn a flag of the state of Israel, the Jewish religious book,

10   the Talmud, and the book of the Communist Manifesto by Karl

11   Marx, correct?

12   A    Yes, I did see that.

13   Q    And at the end of that video, at the end of his speech

14   Mr. Hill says, quote, "For the gentiles of the world, we stand

15   for the white race against all our enemies, particularly the

16   Jew."  He said that, correct?

17   A    I believe he did, yes.

18   Q    And you agreed with that statement, correct?

19   A    You're coming in broken, sir.  My computer is showing --

20   is reading "your network bandwidth is low."  You're coming in

21   broken and distorted, sir.

22        Could you repeat that.

23   Q    You share Dr. Hill's views, correct?

24   A    Yes, I do, sir.

25   Q    Now -- take that down, please.

M. Tubbs - Direct

1      I'm directing your attention to the spring of 2017,

2   Mr. Tubbs.  You learned that Michael Hill had been invited to

3   speak at a rally that was going to be called Charlottesville

4   2.0 that was scheduled for August 12th, 2017 in

5   Charlottesville, Virginia, correct?

6   A    Yes, sir.

7   Q    And you learned that Michael Hill had decided that the

8   League of the South would participate, correct?

9   A    Yes.

10  Q    And Michael Hill asked you to assist him with

11  Charlottesville 2.0, and you agreed, correct?

12  A    I did agree, sir.  Yes.

13  Q    Please show the witness Plaintiffs' Exhibit 1539.

14      Mr. Tubbs, I'm going to move some of this along.  Do you

15  recall if Mr. Hill texted you, quote, "Speaking of the

16  Charlottesville event, I'd like for you to once again be in

17  command of general operations with Ike, Dennis Durham and

18  whomever else we decide as your lieutenants, with specific

19  operational assignments.  I'll again handle overall strategy."

20  He sent you that text, correct?

21  A    That is correct, sir.

22  Q    And you accepted the position, correct?  And you said yes?

23  A    I don't believe there's any evidence that I answered that

24  text in the affirmative or the negative.  If you have any

25  evidence to support one way or the other, I'd like to see it.

M. Tubbs - Direct

1    However, I was prepared to assist Dr. Hill and the League of

2    the South in anything that was required of me.

3    Q    And you knew that Michael Hill had asked someone else in

4    the League to make shields for the League of the South soldiers

5    to carry, correct?

6    A    I wouldn't define League of the South members as soldiers,

7    but I do know that some shields were offered to Dr. Hill for

8    that event, yes.

9    Q    And you gave out instructions for what the uniform would

10   be, correct?

11   A    Yes, I did.

12   Q    And you sent a uniform directive to the members, correct?

13   A    It was a reminder of the basic League uniform that was

14   already in effect and it was not something that was specific

15   for Charlottesville.

16   Q    And you sent out the reminder because you wanted to

17   promote a unified appearance at Charlottesville 2.0, correct?

18   A    Absolutely.

19   Q    And that uniform included khaki pants, black shirt with

20   the League of the South embroidered emblem, and cargo boots,

21   correct?

22   A    Cargo boots?

23   Q    Yes.

24   A    Is that what you said?

25   Q    Yes.

M. Tubbs - Direct

1   A     Cargo boots?

2   Q     Yes.

3   A     I'm not aware of anything called cargo boots, but black

4   boots were the uniform.

5   Q     And now, as you were coming up to August 11th, Dr. Hill

6   kept you in the loop, correct?

7   A     Yes, he did.

8   Q     And he did that by phone and text, correct?

9   A     Yes.

10  Q     Very little email, correct?

11  A     I don't recall.  Probably not.

12  Q     And how did you get to Charlottesville for August 11th?

13  A     I drove my personal vehicle.

14  Q     And where do you live, sir?

15  A     Jacksonville, Florida.

16  Q     When did you arrive in Charlottesville area?

17  A     I didn't actually go to Charlottesville Friday night.  I

18  went to our lodging facility which I believe was located in

19  Madison, Virginia.  I never actually went into Charlottesville.

20  Q     And when did you get to the campground in Madison?

21  A     It was very late at night.  I'm thinking perhaps 11 p.m,

22  around that time.

23  Q     And when you arrived you had a meeting with Michael Hill

24  and a man by the name of Matt Heimbach, correct?

25  A     Yes.  I was late to that meeting and those two gentlemen

M. Tubbs - Direct

1    were there, among others.

2    Q    And you knew Matt Heimbach was there for the

3    Traditionalist Worker Party, correct?

4    A    Yes.  Matt Heimbach was representing the Traditionalist

5    Worker Party.

6    Q    And you knew by that time that League of the South had

7    formed an alliance with Matt Heimbach to create something

8    called the Nationalist Front, correct?

9    A    I was aware of that, sir.

10   Q    And that was an organization of similarly minded white

11   nationalist groups, including the Traditionalist Worker Party,

12   the National Socialist Movement, Vanguard America, and your

13   group, League of the South, correct?

14   A    I wasn't aware that Vanguard America was a part of that,

15   but I was aware of Traditionalist Worker Party and NSM.

16   Q    And a decision was made that night that you would all go

17   directly to a garage in Charlottesville called the Market

18   Street garage early Saturday morning, correct?

19   A    The plan did involve heading up to the Market Street

20   garage, but we had to stop at a parking lot to link up with

21   other people to convoy to that garage.

22   Q    And the convoy was to include people that were in one of

23   the four groups of the Nationalist Front, correct?

24   A    I am certain that members of the Nationalist Front were in

25   that convoy.  There may have been other organizations

M. Tubbs - Direct

1  represented as well.

2  Q    And the decision was made to meet at the garage, park the

3  vehicles in the garage, and then march in unison to

4  Emancipation Park, correct?

5  A    I believe it was called Lee Park at that time, but yes,

6  that was the plan, was to march from the parking garage to Lee

7  Park.

8  Q    And apparently the idea of just parking your cars in the

9  garage and everyone going individually in the park was

10  rejected; is that right?

11  A    I'm sorry, sir, you were coming in broken and distorted at

12  the beginning of your statement.  Could you repeat that

13  statement, please, sir?

14  Q    It's clear, isn't it, that the idea of all of you just

15  parking your cars in the garage and getting to the park on your

16  own was rejected?  Yes or no, sir?  Yes or no?

17  A    I'm sorry, sir, we seem to be having some technical

18  difficulty, but I understood you to say that our plan was to

19  park our cars in the garage and move to the...

20  Q    The plan was to park --

21  A    I'm sorry, sir.  I'm not hearing you.  Could you repeat

22  that?

23  Q    The plan was to park your cars in the garage and move in

24  unison as a group marching down Market Street; isn't that

25  right?

27

M. Tubbs - Direct

1   A    Yes, that is correct.

2   Q    And the idea that --

3   A    Yes, that is accurate.

4   Q    The idea of just parking your cars and everybody getting

5   to Lee Park themselves was rejected; isn't that right?

6   A    Yes, it was rejected because we believed it was too

7   dangerous for us to move as individuals.

8   Q    Isn't it a fact that everybody could have simply parked

9   their cars in that garage or other garages and gotten to the

10  park on their own, right?

11  A    With the large number of people who had parked their cars

12  in that garage, we would all be moving down the street at the

13  same time anyway and it would not be as you said.

14  Q    Well, you wouldn't need -- the plan was to march in unison

15  as a column together, right?

16  A    Yes, I believe that was already stated clearly, sir.

17  Q    But if people just decided to walk on their own, they

18  wouldn't need shields and poles and helmets if they just

19  appeared individually; isn't that right?

20  A    I'm not sure I understand your reasoning as to why an

21  isolated individual would need less protection than a group.

22  Q    Well, you don't --

23  A    I find that ridiculous.

24  Q    You don't think that marching in unison with shields and

25  poles and flags and helmets creates the appearance of soldiers

M. Tubbs - Direct

1   off to war?

2   A    What was the last part of that sentence, sir?

3   Q    You don't think -- wasn't it the plan that you would be

4   marching in unison with helmets, shields, and flags to appear

5   to be soldiers going to battle?

6   A    I don't remember any discussion of any LARPing activity of

7   appearing as soldiers.  Our goal was to get from the Market

8   Street garage to Lee Park with as little incident as possible.

9   Q    But you wouldn't need shields and helmets if everybody

10  just parked on their own and got to the park themselves, would

11  they?

12  A    I think that's a ridiculous estimate of the situation to

13  believe that people could walk individually unmolested to Lee

14  Park without any danger.

15  Q    If they didn't have shields and helmets and flags that

16  would be showing their identification, they could have; isn't

17  that right?

18  A    We were still wearing our League uniforms and our people

19  were singled out throughout the course of the day for merely

20  wearing their League uniform.  So no, it would not be safe to

21  move as individuals from the parking garage to Lee Park.

22  Q    The fact is, you knew there were going to be

23  counter-protesters outside the park; isn't that right?

24  A    Yes, we heard there were going to be violent communists

25  and extremists, including Antifa and BLM, somewhere around the

M. Tubbs - Direct

1   park that day.

2   Q    And what you wanted, and what Dr. Hill wanted, and what

3   the League wanted was a public confrontation with those

4   counter-protesters before you even got into the park; isn't

5   that right?

6   A    Could you repeat what it is you think that we wanted?

7   Q    Isn't it a fact that what you wanted was a public

8   confrontation with those counter-protesters before you ever got

9   into the park?

10  A    I'm not sure I understand that question.  Our sole

11  mission, once leaving the parking garage, was to enter the

12  park.  That was the only purpose of that route.

13  Q    I'm going to ask, please, to publish Plaintiffs'

14  Exhibit 1560 for the jury.  It's in evidence.  And ask you,

15  Mr. Tubbs, to look at paragraph 2 of this document, which is an

16  email from Michael Hill to you and others.

17       Do you see -- do you see -- Mr. Tubbs, in the second

18  paragraph, if you could highlight it from the words "for

19  instance" to the end of the paragraph.

20       Do you see in --

21  A    Part of my -- I'm sorry.  Go ahead.

22  Q    Do you see in September 2017 Michael Hill said to you and

23  others about a new event, he said, quote:  "For instance, we

24  wanted a public confrontation in Charlottesville for the world

25  to see, and we got it."

M. Tubbs - Direct

1      You see he said that to you in an email, correct?

2   A    Yes, I see that.

3   Q    So at least Dr. Hill wanted a public confrontation with

4   those counter-protesters, correct?

5           MR. JONES:  Objection as to what Dr. Hill wanted,

6   Your Honor.

7           THE WITNESS:  It would appear so.

8           THE COURT:  His statement --

9           MR. LEVINE:  And you didn't disagree with -- I moved

10  on.

11          THE COURT:  He objected to what Dr. Hill wanted.  I

12  said the statement --

13          MR. LEVINE:  You didn't disagree --

14          THE COURT:  You can ask him if he agrees with the

15  statement.

16   BY MR. LEVINE:

17  Q    You didn't disagree with Mr. Hill there, did you?

18  A    No, I did not disagree with Dr. Hill.

19  Q    So if you -- isn't it a fact -- if you didn't want a

20  public confrontation with the counter-protesters, and what you

21  really wanted was to be in the park to hear speeches, you could

22  have found a safer way of getting into the park without

23  fighting with the counter-protesters; isn't that right?

24  A    When we left the parking garage, the shortest distance to

25  Lee Park took us along that street.  We did not know that we

M. Tubbs - Direct

1    were going to be violently engaged between the parking lot and

2    the entrance to Lee Park.

3    Q    I'm not asking you about the closest distance.  I'm asking

4    you about the manner in which you went from the garage to the

5    park, sir.

6    A    The manner in which we left the garage on our way to the

7    park was the safest way to prevent individual injury to our

8    people.

9    Q    Isn't it a fact, Mr. Tubbs, that it was actually more

10   important to you for a public confrontation with the

11   counter-protesters than going to listen to a bunch of speeches

12   in the park?

13   A    A public confrontation can mean many things, including

14   political speech confrontation.  For anybody that's never had

15   their nose broken in a fight, which I suspect there are several

16   present, nobody wants a physical confrontation, if they can

17   avoid it.

18           THE COURT:  All right.  I think all this is

19   cumulative on this subject.

20           MR. LEVINE:  I'm moving on.

21           THE COURT:  We'll take a break now for 20 minutes.

22           Mr. Tubbs, we'll be back in 20 minutes.

23   **(Jury out, 10:30 a.m.)**

24           (Recess.)

25           THE COURT:  Bring the jury back.

M. Tubbs - Direct

1  **(Jury in, 10:51 a.m.)**

2            THE COURT:  All right.  You may be seated.

3            MR. LEVINE:  Thank you, Your Honor.

4  BY MR. LEVINE:

5  Q    Early in -- Mr. Tubbs, so early in the morning -- you left

6  the campground early in the morning, correct?

7       Mr. Tubbs, can you hear me?

8  A    I can hear you fine, sir.

9  Q    You left the campground early Saturday morning for

10 downtown Charlottesville, correct?

11 A    Yes, that's correct.

12 Q    And you drove to a place called JoAnn Fabrics and met up

13 with everybody, correct?

14      Did you hear my question, sir?

15 A    The last question I heard was, did we meet in that parking

16 lot, and I said, yes, sir.

17 Q    And Ike Baker was there, your colleague at League of the

18 South, correct?

19 A    Yes, he was.

20 Q    And he made a speech to all that were assembled to march

21 with you, correct?

22 A    I believe he did give a speech, though I don't recall the

23 contents of the speech.

24 Q    Well, do you remember Exhibit 1409?  It's in evidence.

25 Maybe I'll just read a part of it to you and see if it

33

M. Tubbs - Direct

1   refreshes your recollection so we can move on.  Do you remember

2   he said:  "We're going to assemble in that parking garage, and

3   we're headed to the top floor so that we've got open air around

4   us.  We're going to assemble there.  We're going to march as a

5   mass.  This is the greatest assemblage of white identity Aryans

6   I've personally ever seen.  We're going to take that park.  We

7   just saw the alt-right and the alt-light.  None of us are here

8   because we're alt-right or alt-light.  We're here because we're

9   the hard right."

10       You heard him say that, correct?

11  A    I don't recall the contents of his speech, but that sounds

12  appropriate.

13  Q    And the whole point of the plan was that you were going to

14  march as a mass, correct?

15  A    Yes, that was the plan.

16  Q    But you didn't have to, quote, "take the park," closed

17  quote, because you had a permit for your rally in the park;

18  isn't that right?

19  A    I'm sorry, could you repeat that question?

20  Q    You didn't have to, quote, "take the park," closed quote,

21  because you had a permit for the rally in the park; isn't that

22  right?

23  A    That sounds correct, sir.

24  Q    You didn't have a permit for marching en masse to the

25  park; isn't that right?

M. Tubbs - Direct

1    A    I'm not aware of who secured the permit or what the permit

2    included.

3    Q    Isn't it a fact --

4    A    The streets were closed off to vehicle traffic and foot

5    traffic only, and we took advantage of that.

6    Q    Isn't it a fact that the permit could have included a

7    parade or use of the streets, and it didn't?

8         MR. JONES:  Your Honor, I'm going to object.  Calls

9    for speculation and foundation.  He's already answered.

10        THE COURT:  He didn't get the permit.  Mr. Kessler

11   got the permit, I believe.

12   BY MR. LEVINE:

13   Q    You knew the permit did not include the street; isn't that

14   right?

15        MR. JONES:  Asked and answered.  Objection.

16        THE COURT:  Sustained.

17        THE WITNESS:  I didn't know anything about what the

18   permit included, and frankly, I didn't care.

19    BY MR. LEVINE:

20   Q    So let's go to Plaintiffs' Exhibit 3239A.  I just want to

21   show you a clip from the march and then ask you some questions

22   about yourself.

23        Can you see this, Mr. Tubbs?

24   A    Yes.

25   Q    Thank you.

35

M. Tubbs - Direct

1       (Video playing.)

2              MR. LEVINE:  Stop it, please.

3    BY MR. LEVINE:

4    Q    Is that you in front?  Mr. Tubbs, is that you in front?

5    A    I'm sorry, your video is not showing, sir.

6         There we go.  Yes, that's me, sir.

7    Q    And you were in the front of the column, correct?

8    A    I was in the front of the column, yes.

9    Q    Leading the League members and others behind you, correct?

10   A    I'm sorry, sir.  You're coming in distorted, but I believe

11   your question was I was leading the column; is that correct?

12   Q    Yes.

13   A    According to plaintiffs' counsel the other day they said

14   Matt Heimbach was leading that column, but if you want me to

15   lead that column, I'll gladly lead it, sir.

16   Q    Well, Mr. Tubbs, you were in front leading the column;

17   isn't that right?

18              THE COURT:  It's asked and answered.  He said that

19   over and over.

20              THE CLERK:  He can't see it when the jury can't see

21   it.

22    BY MR. LEVINE:

23   Q    Did you stop when you were walking along to ask any police

24   officers if you could march through the counter-protesters?

25   A    I believe it was understood that we have the right to

M. Tubbs - Direct

1  enter the park due to our permit.  There were police officers

2  to the right side of our column in front of the library, as was

3  stated by Plaintiff Baker the other day.  And there was a line

4  of Virginia State Police alongside between the library and Lee

5  Park.

6            MR. LEVINE:  Can we show the video to the jury,

7  please?

8            THE COURT:  Yes.

9            MR. LEVINE:  It's in evidence.

10           THE COURT:  Yes.

11           (Video playing.)

12           MR. LEVINE:  Stop it.

13 BY MR. LEVINE:

14 Q    Can you hear me, Mr. Tubbs?

15 A    Yes, I hear you, sir.

16 Q    Isn't it a fact that from the time you started to walk

17 towards the counter-protesters you didn't stop to talk to any

18 policemen?  Isn't that right?

19 A    That is correct.

20 Q    And when you didn't get through the protesters the first

21 time, you regrouped and tried again; isn't that right?

22 A    That is incorrect, sir.  We successfully got through the

23 counter-protesters the first time.

24 Q    Can we please show the jury 3239C?  It's already admitted

25 in evidence.

37

M. Tubbs - Direct

1        (Video playing.)

2   Q     Thank you.  Did you see that portion of the video, sir?

3   A     Yes, I did.

4   Q     And does that show you regrouping and making a second

5   incursion through the counter-protesters?

6   A     There was no second incursion necessary.  After we went

7   through the first time all we had to do was reorganize

8   ourselves and walk into the park.

9   Q     So what we were looking at was your gathering together to

10  walk into the park after you got through the counter-protesters

11  the first time?

12  A     Yes, that is correct.

13  Q     Now, when you finally got in the park, Mr. Tubbs, you

14  didn't just go into the park; you stayed on the steps and

15  engaged the counter-protesters; isn't that right?

16  A     Upon entering the park we realized that counter-protester

17  demonstrators were attempting to enter the park and attack our

18  people with both thrown objects and hand weapons.  So we took

19  up a position at the base of the stairs to separate our people

20  from the counter-protesters, yes, sir.

21           MR. LEVINE:  Can we show the witness Plaintiffs'

22  Exhibit 2001A.

23           (Plaintiff Exhibit 2001A marked.)

24  BY MR. LEVINE:

25  Q     Is that you, Mr. Tubbs?

38

M. Tubbs - Direct

1   A    I'm waiting for the picture to appear, sir.

2            THE CLERK:  Has this been admitted?

3            MR. LEVINE:  No, I'm going to show you --

4            MR. JONES:  You can admit it.  I don't object.

5            MR. LEVINE:  We offer 2001A into evidence.

6            THE COURT:  Be admitted.

7            (Plaintiff Exhibit 2001A admitted.)

8            MR. LEVINE:  And we ask it be published for the jury.

9            THE COURT:  Publish it.

10   BY MR. LEVINE:

11   Q    So Mr. Tubbs, I'm going to play this for the jury and then

12   I'll ask you questions.

13       (Video playing.)

14            MR. LEVINE:  Stop it.

15            Continue.

16            (Video playing.)

17            Stop it.

18   BY MR. LEVINE:

19   Q    I'm putting a circle around you.  Is that you, Mr. Tubbs?

20   A    Yes, it is.

21   Q    Finish the video, please.

22       (Video playing.)

23       Now, did you see yourself waving in a "follow me" hand

24   motion to your League of the South members?

25   A    Yes, I saw that in the video.

M. Tubbs - Direct

1  Q    So you actually, after fighting your way into the park on

2  the steps with your men, you actually waved your men and went

3  back down into the street to further physically fight with the

4  counter-protesters; isn't that right?

5  A    We had friends and allies in the street who were being

6  brutally victimized by Antifa and their fellow travelers and we

7  went to their rescue as best we could.

8  Q    The video shows you going to a certain person,

9  body-slamming them, and then you leave and walk back into the

10 park; isn't that what the video shows?

11            THE COURT:  Why don't we show the video --

12            THE WITNESS:  I don't recall --

13            THE COURT:  Not just in bits and pieces.  Show the

14 video from a point to the end.

15            MR. LEVINE:  I just did that, Your Honor.  I showed

16 this whole segment.  I did.  I'm just asking him one question

17 now about it and then --

18            THE COURT:  You're telling him what it says.  Let him

19 tell it.  If he describes it wrong, the jury can tell.

20            MR. LEVINE:  Can we play it one more time for him.

21 I've asked him a question.

22            (Video playing.)

23  BY MR. LEVINE:

24 Q    This is -- Mr. Tubbs?

25 A    Yes, I'm listening.

M. Tubbs - Direct

1   Q    This is the physical violence that you were looking

2   forward to; isn't that right?

3   A    Any time there's physical violence, somebody gets hurt,

4   and nobody ever looks forward to such a thing.  No, I was not

5   looking forward to physical violence.  But if it came my way, I

6   was prepared to do whatever was necessary to make sure that me

7   and my friends were not injured and would come out on top of

8   it.

9   Q    This last video, Mr. Tubbs, shows that you left the inside

10  of the park area where you had a permit for a rally and went

11  back into the street to physically fight with

12  counter-protesters; isn't that right?

13  A    I think we've already covered that.  Yes, that is

14  absolutely correct, coming to the rescue of our friends and

15  allies who were being beaten by the communists.

16  Q    And there isn't any evidence that the person you threw to

17  the ground then joined you back in the park, is there?

18  A    I don't know.  I believe the person that I threw to the

19  ground was one of our allies I was trying to break up from a

20  fight.  I think he was with Identity Evropa or Identity Dixie,

21  one or the other.

22  Q    No one follows you after you take -- throw the person to

23  the ground, do they?

24  A    I don't know.  Do they?

25              MR. LEVINE:  I'd just ask we play it one more time,

M. Tubbs - Direct

1   Your Honor, and then we'll move on.

2           THE COURT:  We'll have it by memory by then, I think.

3   Go ahead.

4           (Video playing.)

5    BY MR. LEVINE:

6   Q   Isn't it a fact, Mr. Tubbs, that the video shows that the

7   person that you body-slammed to the ground was then dragged by

8   counter-protesters to safety?

9   A   I don't know.  I can't -- I can't determine from that

10  video.  And you could determine even less if you were on the

11  ground in the middle of that chaos, what was going on.  If you

12  say that's the case, so be it.  I don't care.  We did what we

13  had to do that day for our friends and allies.

14  Q   And against your enemies, correct?

15  A   Yes, there were definitely enemies out there trying to

16  hurt us and kill us, yeah.

17  Q   And after Charlottesville 2.0 was all over, Michael Hill

18  applauded you for leading the warriors in that street fighting,

19  didn't he?

20  A   He might have.  I don't recall.

21  Q   Plaintiffs' Exhibit 1923 is in evidence.  Do you remember

22  when Michael Hill came to the League of the South's state

23  conference in 2018 at your invitation?

24  A   I believe I do, sir.

25  Q   And do you remember he made a speech that day?

M. Tubbs - Direct

1    A    Yes, he did.

2    Q    And did he say, quote, "And when you stand up like we

3    stood up in the streets of Charlottesville, Virginia -- and I

4    can tell you this, there have been very few moments in my life,

5    if any, that I have been so proud, marched down the street or

6    anywhere side by side with someone like Mike Tubbs, and I'll

7    remember that day forever because we showed the enemy on that

8    day we are here and we are not backing down from you or anybody

9    else"?

10        Do you remember he said that about you that day?

11   A    I don't recall those words, but I don't doubt that he said

12   it.  And I'll tell you, it was also the proudest moment of my

13   life on the streets of Charlottesville that day.  I have no

14   regrets about it.

15   Q    And you know that David Matthew Parrott from National

16   Socialist Movement applauded you too, right?

17   A    I don't believe Matthew Parrott is a member of the

18   National Socialist Movement, but I don't doubt that he might

19   have said something to that effect.

20   Q    Do you remember he said, quote, "Michael Tubbs, an

21   especially imposing League organizer, towered over and pushed

22   through Antifa like a tyrannosaurus among raptors as League

23   fighters with shields put their training to work"?  He said

24   that about you that day, right?

25   A    I do recall something to that effect.

M. Tubbs - Direct

1  Q    And didn't you learn after Charlottesville 2.0 that your

2  show of street violence actually helped recruit new members to

3  the League?

4  A    I don't doubt that it did.

5  Q    Hill didn't give a speech that day, right?

6  A    No, he did not have an opportunity.  It was declared an

7  illegal assembly before the speakers were scheduled to speak.

8  Q    But the League recruited new members from its

9  participation that day, right?

10  A    I believe it did.

11  Q    And it did because of your show of physical force with

12  your colleagues; isn't that right?

13  A    I can't speak for what each new recruit gave as an excuse

14  for them joining the League.  I don't know.  That would be

15  supposition on my part.

16  Q    Let's show Plaintiffs' Exhibit's 1600 to the witness.

17       Did you, during 2018, exchange text messages on VK with a

18  League member by the name of Charleen Braun?

19  A    Yes, I did.

20            MR. LEVINE:  We offer Plaintiffs' Exhibit 1600 and

21  ask that it be published to the jury.

22            THE COURT:  Be admitted, published.

23            (Plaintiff Exhibit 1600 marked.)

24            (Plaintiff Exhibit 1600 admitted.)

25   BY MR. LEVINE:

M. Tubbs - Direct

1   Q    Please highlight the bottom half.

2        Now, starting at 1505 p.m. on September 16th, 2018, it

3   says -- she says to you, "That video of the burning is going

4   crazy on Twitter.  Really hate that you won't be in Tennessee

5   with us.  I understand, though."

6        And you respond, "It's been hard for me to do the

7   traveling I used to."

8        And she then says, "I bet.  You will be missed, especially

9   if there is confrontations.  Your presence is always a great

10  thing to witness."

11       And you said, "I pray I don't miss any good violence."

12       And then she responds, "LOL."

13       And then you respond -- she responds, "I must admit, when

14  recruiting, besides Paddy's video, I share pictures of

15  Charlottesville and of you and your, uh, background, if you

16  will.  What a total badass you are.  You helped me recruit

17  twenty-something guys."

18       And you responded, "I pray I can live up to the stories."

19       And she said, "You already have."

20       That was the exchange with Charleen Braun that day,

21  correct?

22  A    That is correct.

23  Q    And in fact, in July of 2017, the month before

24  Charlottesville 2.0, you were telling Hill the very same thing,

25  that you were hoping for violence; isn't that right?

45

M. Tubbs - Direct

1  A    You'll have to refresh my memory.

2  Q    Let's look --

3  A    As I'm sure you will.

4  Q    Let's look at Plaintiffs' Exhibit 1553 in evidence.

5      This was the day on July 8th that you learned that there

6  was information that Antifa was going to be at the event,

7  right?

8  A    I believe so.

9  Q    In fact, you were told that Antifa was coming with

10 weapons; isn't that right?

11 A    I can only guess.  That sounds correct.

12 Q    And you responded to Michael Hill, quote, "Even though we

13 haven't had any hard intel so far to make us believe there was

14 going to be violence, I think we all assumed there would be and

15 maybe even hoped for it."

16     That's what you wrote, correct?

17 A    Yes, that is what I wrote, sir.

18 Q    So even though you testified earlier before the break that

19 when you marched down the street you didn't know you would be

20 violently engaged, that wasn't really 100 percent true, was it?

21 A    Well, it says we don't have any hard intel so far to make

22 us believe.  So we had no idea what we were getting ready to

23 face when we left that parking garage.

24 Q    But you were hoping for it, weren't you?

25 A    I believe it says -- and we've covered this before in a

M. Tubbs - Direct

1  deposition -- I said, "maybe even hoped for it."  That is in

2  relation to "we have all assumed."  That includes a lot of

3  people.  I don't doubt there were some people at the Unite the

4  Right rally who were hoping for violence.  I am absolutely

5  certain of it.

6  Q    And that included you; isn't that true, Mr. Tubbs?

7  A    We had a column of women, elderly and disabled people

8  moving from the parking garage to Lee Park.  So no, we did not

9  hope to have any of those individuals suffer violence at the

10 hands of Antifa and their communist allies, no.

11 Q    Didn't you say to Charleen, quote, "I pray I don't miss

12 any good violence," closed quote?

13 A    If there's going to be any violence at any League event, I

14 want to be there to defend my friends and extended family.  I

15 am not going to miss it.  I am not going to betray them.  It is

16 my duty to be there to assist my family.

17 Q    Now, at some point the state of emergency was declared and

18 you had to disperse, correct?

19 A    That is correct.

20 Q    And you walked back down Market Street to the garage,

21 correct?

22 A    Eventually, yes.

23 Q    And when you arrived at the entrance to the garage you saw

24 a beating in progress, didn't you?

25 A    I saw several beatings in progress, yes, I did.

M. Tubbs - Direct

1  Q    And can we publish Plaintiffs' Exhibit 1920.

2       This is an exhibit in evidence.  Is that you with the red

3  circle around your face?

4  A    Yes, that's me.

5  Q    And you saw this beating of these four men with sticks and

6  shields beating the black man on the ground, correct?

7  A    Before my attention was focused on --

8  Q    Please, Mr. Tubbs?

9  A    -- on the ground --

10 Q    Mr. Tubbs?

11          THE COURT:  Wait.  Wait.  Let him answer.

12          MR. LEVINE:  He's not, Your Honor.  It's a yes or no

13 answer -- question.

14          THE WITNESS:  No, it's not.  It's not a yes or no

15 answer.  I am speaking to the jury here.  I am defending myself

16 for my actions on August 12th --

17          THE COURT:  Wait, wait, Mr. Tubbs.  Do answer the

18 question.

19          MR. LEVINE:  Please, reporter, read the question

20 back.

21          THE WITNESS:  I am responding to the question if

22 you'd allow me to continue.

23          THE COURT:  We're going to strike the old question,

24 answer the new question or repeat --

25          MR. LEVINE:  I'd like the reporter to read it back.

M. Tubbs - Direct

1      (The requested portion of the transcript was read back.)

2              THE WITNESS:  Yes, I saw that.

3              MR. LEVINE:  We offer Plaintiffs' Exhibit 1920.

4              THE COURT:  Is that the one that was just played?

5              MR. LEVINE:  Yes.

6              THE COURT:  I thought that was already in evidence.

7              MR. LEVINE:  I thought so, Your Honor.  I may have

8  been wrong.

9              THE CLERK:  I could not find it.

10             MR. LEVINE:  Okay.  We offer 1920, Your Honor.

11             THE COURT:  Go ahead.

12             MR. LEVINE:  Publish it for the jury.  Thank you.

13             THE COURT:  You may.

14             (Plaintiff Exhibit 1920 marked.)

15             (Plaintiff Exhibit 1920 admitted.)

16  BY MR. LEVINE:

17  Q    Isn't it a fact, Mr. Tubbs, that you walked right by this

18  beating to the rear of the garage after seeing that there

19  wasn't any League of the South member that you could see

20  involved?

21  A    I walked past that beating and several others, sir.  Yes,

22  I did.

23  Q    You didn't see a League of the South member, Tyler Davis,

24  because he had his back to you; isn't that right?

25  A    I don't recall why I did not see Tyler Davis.  Anybody who

M. Tubbs - Direct

1    has been in a violent situation knows that there are certain

2    physiological effects on the human body that limit your

3    perceptions, including tunnel vision, and other -- other

4    factors.  So in the middle of chaos, it was difficult to

5    determine what exactly was going on.

6    Q    Shortly after Charlottesville 2.0 that day, you learned

7    that the Charlottesville Police Department was investigating

8    the League of the South member, Tyler Davis, for his

9    involvement; isn't that right?

10   A    I understood that somebody was investigating, yes.

11   Q    And Tyler Davis was a League member from your Florida

12   chapter; isn't that right?

13   A    Yes, he was.

14   Q    And can we show the witness 2883, Plaintiffs' Exhibit

15   2883A.

16        Is this a tweet from Tyler Davis about the Florida League?

17   A    I don't see anything on my screen yet, sir.

18        THE CLERK:  This is not admitted.  Mr. Levine, this

19   has been shown but not admitted.

20        MR. LEVINE:  Right.  I'm going to show it now and

21   then admit it.

22        THE CLERK:  He can only see the feed that the jury

23   sees.

24        MR. LEVINE:  Can we get a stipulation this is from

25   Mr. Davis?

M. Tubbs - Direct

1          THE COURT:  Go ahead and show it to him.  It's not

2    prejudicial.

3          (Plaintiff Exhibit 2883A marked.)

4    BY MR. LEVINE:

5    Q    This is a tweet from Tyler Davis:  "Still getting chills

6    from this.  Florida League was there that night before the

7    rally," with a picture of the torch march.

8    A    I see that.  Yes, I see it.

9    Q    And you know he was in the Florida League and was at the

10   rally Friday night, right?

11   A    I had no idea that any Florida League members were

12   attending the torch rally the night before.  I only see Tyler

13   Davis in that picture.

14   Q    You came to know that he was, correct?

15   A    I did not know until you just now alleged that Tyler Davis

16   was in that torchlight ceremony four years later.

17          MR. LEVINE:  We offer 2883A, Your Honor.

18          THE COURT:  Be admitted.

19          (Plaintiff Exhibit 2883A admitted.)

20   BY MR. LEVINE:

21   Q    Now, you came to learn that Tyler Davis was arrested and

22   was in jail for the beating of that black man, correct?

23   A    Yes, I did.

24   Q    And you learned that the police had his phone, correct?

25   A    We believe that somebody had his phone.

M. Tubbs - Direct

1  Q    And you learned that Davis was trying to contact his

2  League of the South friends otherwise, correct?

3  A    I was told that Tyler Davis' phone was being used to

4  attempt to contact people.

5  Q    And you decided to contact League members that were --

6  that friended Tyler Davis, and to get them to delete him as a

7  contact to keep them away from the police, correct?

8  A    I'm sorry.  Can you repeat that question, please?  You're

9  coming in broken.

10  Q    You decided that you would reach out to League of the

11  South members that had friended Tyler Davis to tell them to

12  delete his contact from their phones so that the police

13  wouldn't be able to contact them; isn't that right?

14  A    Rather than specific Florida League members, I went

15  through Tyler Davis' friend list on a social media platform and

16  contacted those people on his friends list to let them know

17  there was something suspicious going on with Tyler Davis'

18  phone, and that they should unfriend him.

19  Q    Because you wanted to keep the League relationship with

20  Tyler Davis out of the case involving the beating; isn't that

21  right?

22  A    No, sir, that's not the case.  I wanted to protect people

23  from whatever nefarious activity seemed to be going on with

24  whoever seemed to control Tyler Davis' phone when he was in

25  jail.

M. Tubbs - Direct

1  Q    Let's show Plaintiffs' Exhibit 1600.  It's, I think,

2  already in evidence.  Page 8.  This is Charleen Braun texting

3  with you.  She's one of the people that you contacted, right?

4  A    Yes, she was.

5  Q    Do you see there, February 5th, 2018, you said, quote:

6  "You are friends with Tyler Davis.  The feds apparently have

7  possession of his phone and Tyler has been friending people

8  while he is in jail.  You need to remove him from your friends

9  list immediately and delete any conversations you might have

10 had with him via Signal, Messenger, or any other format."

11      Do you see that?

12 A    Yes, I do see that.

13 Q    And you did that also with another League member, Jessica

14 Reavis, correct?

15 A    That is a cut-and-paste statement by me that I sent to

16 everyone that I knew who was on Tyler Davis' friend list.

17 Q    And that included Jessica Reavis, correct?

18 A    Most likely, yes, sir.

19 Q    And it included a guy by the name of Bryan McCoy, correct?

20 A    I'm sorry.  You came in broken up.  Everything after "a

21 guy by the name of."

22 Q    You did the same with respect to a League member by the

23 name of Bryan McCoy?

24 A    As I stated, that is a cut-and-paste statement that I sent

25 to many people.  Bryan McCoy might possibly have been one of

53

M. Tubbs - Direct

1  the recipients.

2  Q    And you sent the same message to Brad Griffin, correct?

3  A    More than likely.

4            THE COURT:  He's going to be saying this as to

5  everyone.

6            MR. LEVINE:  I'm done, Your Honor.  I was going to

7  offer them in evidence, but I'm not going to.  It's too long,

8  Your Honor.

9  BY MR. LEVINE:

10 Q    And in fact, you took other steps to limit the evidence of

11 your conversations with others about Charlottesville 2.0,

12 didn't you?

13 A    I don't believe that is true at all, sir.  You'll have to

14 refresh my memory.

15 Q    Didn't you delete a whole lot of emails out of your

16 mailbox in the spring of 2019?

17 A    As I covered in my deposition, I was having problems with

18 my ProtonMail account.  I believed it was because it was

19 overloaded and unable to function because of volume.  So I

20 deleted a lot of ads and nonsense materials out of it.  Yes, I

21 did.

22 Q    And your phone that you used from April to September of

23 2017 was lost, correct?

24 A    It was severely damaged and I had to replace it.

25 Q    Now, go to a new subject.

5.4

M. Tubbs - Direct

1    Later in the day on August 12th, you learned about James

2   Fields' car attack on the counter-protesters in downtown

3   Charlottesville, correct?

4   A    Yes.  I think it was the day after it happened.  I think I

5   learned about it then, or perhaps on the way home.

6   Q    And you weren't upset for the victim who died, were you?

7   A    It's always a tragedy when people are killed or injured,

8   but it was -- the way that I received the information was the

9   same way that I received information about anybody else's

10  death.  It was on television.  And I didn't feel that there was

11  an emotional connection to me or anything that happened in that

12  incident.

13  Q    In fact, you tweeted "Fields did nothing" wrong six times

14  in May and June of 2020; isn't that right?

15  A    I don't remember the number of times I did that, but I

16  know I did it at least once.

17  Q    You did it in response to a car attack in San Jose,

18  California, correct?

19  A    I don't recall, but I may have.

20  Q    You tweeted "Fields" --

21  A    I'm not sure what that has to do with James Fields.

22  Q    You tweeted "Fields did nothing wrong" in response to a

23  car attack on Black Lives Matter protesters in downtown

24  Tallahassee on May 30th, 2020, didn't you?

25  A    I may have.  I don't know for a fact.

M. Tubbs - Direct

1          MR. LEVINE:  Could we --

2          THE COURT:  Well, he -- Mr. Tubbs, you don't deny you

3  may have done it as many as six times?

4          THE WITNESS:  That is correct, Your Honor.

5          MR. LEVINE:  Can we put -- Your Honor, could I put

6  one of them up?

7          THE COURT:  No.  No.  No.  Let's go on.  He said it.

8  It's proven.  Go on.

9          MR. LEVINE:  I would like the -- at least one of

10 these tweets in evidence, Your Honor.

11         THE COURT:  He has admitted it.  I'm just -- we're

12 going to move on.  Now go on.

13         MR. LEVINE:  Your Honor, I would like to offer

14 Plaintiffs' Exhibit 2867A through F, which is the six tweets

15 that he -- that he sent.

16         THE COURT:  I've ruled you may not proceed with this

17 just in the interest of time.  It's cumulative.  There's no --

18 he hasn't denied it.

19         MR. LEVINE:  Your Honor, the tweet itself has its own

20 meaning, Your Honor, and we should be entitled for the jury to

21 see it.

22         THE COURT:  Okay.  I look forward to it.  Go ahead.

23         MR. LEVINE:  Thank you.  I'll just do one of them,

24 Your Honor.

25         THE CLERK:  Could I have that exhibit number again?

M. Tubbs - Cross

1    I'm sorry.

2            MR. LEVINE:  2867B.

3            THE CLERK:  B?

4            THE COURT:  This is why I told you over and over:

5    Put these things up first, and we don't have to take ten or

6    15 minutes to get to them.

7            Go ahead.  Don't answer me.  Go ahead.

8            (Plaintiff Exhibit 2867B marked.)

9     BY MR. LEVINE:

10   Q    Is that your tweet, Mr. Tubbs?

11   A    Yes, it is.

12   Q    And you did that six times, correct?

13   A    If you say I did, I'll go with that.

14   Q    And three of those were in response to car attacks on

15   counter-protesters, correct?

16   A    I don't know if you could categorize them as attacks.

17   They were probably defensive movements.

18           MR. LEVINE:  No further questions, Your Honor.

19           THE COURT:  All right.  Who's next?

20                        CROSS-EXAMINATION

21    BY MR. JONES:

22   Q    Good morning, sir.  Just for purposes of the record, I

23   represent Michael Hill, Michael Tubbs, and League of the South.

24        Can you hear me all right?

25   A    Yes, sir.  Good morning.

57

M. Tubbs - Cross

1  Q    Sir, you mentioned that you are part of the Florida

2  chapter of the League of the South; is that right?

3  A    Not only am I part of it, sir, I am --

4  Q    Just to move things along, I think you said you are the

5  chairman of the Florida chapter; is that right?

6  A    That is correct, sir.

7  Q    Now, did you attend the torch march on August 11th in

8  Charlottesville?

9  A    No, I did not, sir.

10 Q    Did you instruct anybody to attend on your behalf?

11 A    No, sir.  I'm not even aware there was a torchlight march

12 scheduled.

13 Q    When did you become aware of the torch march?

14 A    It wasn't until the next day, at the rally, August 12th.

15 Q    All right.  Now I'm going to have a few questions about

16 the rally for you on Saturday, August 12th.

17      Sir, I'm going to pull up a video that's been marked as

18 Plaintiffs' Exhibit 2702.

19           THE CLERK:  Is this admitted?

20           MR. JONES:  I believe it is, but I'm going to be

21 asking we begin from 4:11.  I can pull it up myself if --

22           THE CLERK:  I cannot.

23  BY MR. JONES:

24 Q    Sir, can you see that video?

25      Mr. Tubbs, can you hear me?

                        M. Blair - Direct

1              THE CLERK:  Are you plugged into HDMI?

2              MR. JONES:  I am.  If that causes problems, I can...

3              THE CLERK:  No.  I think we've lost him.  He's

4      disconnected from the Zoom call on his end.

5              Can you reach out to him and ask him to call back?

6      He may not realize he's disconnected.

7              MR. JONES:  Sure.  Do you want to --

8              (Pause.)

9          MS. KAPLAN:  Our next witness is a live witness.  Do

10     you want us to do that?

11             THE COURT:  Yes.

12             MS. KAPLAN:  Okay.  We call plaintiff Marissa Blair

13     to the stand.

14             MS. DUNN:  Ms. Blair may need two minutes to get here

15     from downstairs.

16           MARISSA BLAIR, CALLED BY THE PLAINTIFFS, SWORN

17             MR. MILLS:  Your Honor, David Mills, plaintiffs.  Are

18     you ready?

19             THE COURT:  You may proceed.

20                          DIRECT EXAMINATION

21      BY MR. MILLS:

22     Q    Good afternoon.

23     A    Good afternoon.

24     Q    Could you please introduce yourself to the jury?

25     A    My name is Marissa Blair.

M. Blair - Direct

1  Q     Ms. Blair, where did you go to college?

2  A     I went to college at James Madison University here in

3  Virginia.

4  Q     And did you get a graduate degree as well?

5  A     Yes.  I have a juris doctorate that I got from Charlotte

6  School of Law in Charlotte, North Carolina.

7  Q     What year was that?

8  A     That was in 2014.

9  Q     Are you an attorney now?

10  A     Yes.  I just found out I passed a couple of weeks ago.

11  Q     Passed the bar?

12  A     Yes, sir.

13  Q     Congratulations.

14  A     Thank you.

15  Q     Are you currently employed?

16  A     I am, yes.

17  Q     What do you do?

18  A     I am a contract negotiator in the legal department of a

19  global financial company.

20  Q     Is that an attorney position?

21  A     No, it's not.  I held this position before I passed.

22  Q     Okay.  And where do you currently live?

23  A     I currently live here in Charlottesville, Virginia.

24  Q     Were you living in Charlottesville in the summer of 2017?

25  A     I was not.  In the summer of 2017 I was living in Amherst,

M. Blair - Direct

1    Virginia, which is about 50 miles south of here, towards

2    Lynchburg.

3    Q    Were you working in Charlottesville at that time?

4    A    Yes, I was.  I commuted back and forth Monday through

5    Friday from Amherst to Charlottesville.

6    Q    Are you familiar with the Unite the Right event that took

7    place in Charlottesville in the summer of 2017?

8    A    Yes, I am.

9    Q    When did you first learn about the Unite the Right event?

10   A    I first learned about the Unite the Right event about a

11   week or two prior to the event happening.

12   Q    I'd like to show you what's already been admitted as

13   Plaintiffs' Exhibit 198.

14        I'm not sure if the technology is working.

15        There we go.  Can you see this on your screen, Ms. Blair?

16   A    Yes, sir.

17   Q    What is that?

18   A    That is a digital flier I saw on social media promoting

19   the Unite the Right event.

20   Q    At the time you saw this flier in advance of the event,

21   Unite the Right event, what was your understanding, what was

22   your belief, about what the event was about?

23   A    It was my understanding that the event was about, one, the

24   removal of the Confederate Robert E. Lee statue in

25   Charlottesville; but also just to come to Charlottesville and

61

M. Blair - Direct

promote hate speech, hateful ideology.  Yeah, that was my --

that was my belief.  It wasn't anything that I supported.

Q    Any particular type of hateful ideology that you expected

was coming?

A    Yeah.  I expected racism.  I thought neo-Nazis were going

to be there, so antisemitic speech.  There are Confederate

flags in the flier, so I definitely felt there was some racism

and antisemitic.

Q    Did you know any of the people before that who were

planning to attend and speak?

A    So I knew of Jason Kessler just because he was a resident

of Charlottesville and kind of knew him from just around

Charlottesville.  But that was the only one I knew before

actually seeing this flier.

Q    What, if anything, on the flier gave you any impressions

about what the Unite the Right event might be?

A    So just looking at it, immediately it gave me Nazi vibes.

There's no swastikas on here, but I'm not even sure what the

eagles are.  There are, like I mentioned before, the

Confederate flags, and it looks like an army of people

marching.  I thought it was a rally, not so much a march; but

it did -- it has "march on Charlottesville," exclamation point,

at the top.

Q    When did you decide that you would attend or at least go

down to Charlottesville on the 12th of August, 2017?

M. Blair - Direct

1  A    So I decided that I was ultimately going to go the night

2  before.  So August 11th, after I saw a video of the tiki torch

3  rallies that were held that night.

4  Q    How did you come to see that?

5  A    A friend of mine posted a video on Facebook of the march,

6  and it just -- it looked like something out of a history book.

7  So something from civil rights, Martin Luther King.  It just

8  looked very intimidating.  And I decided I wanted to go and

9  stand up for the people of Charlottesville and stand in

10 solidarity with them.

11 Q    You thought it was intimidating.  Why did that make you

12 more likely to go?

13 A    All those, you know, people may be intimidating.  That

14 doesn't mean you should be afraid.  People can try to

15 intimidate you.  But we didn't plan to go be at the march.  We

16 wanted to go be around the people of Charlottesville to show

17 our support.  So although it was intimidating, that was at

18 nighttime.  You know, the next day was going to be light

19 outside.  I figured there would be a lot of security.  So I

20 wasn't afraid of going in any way.

21 Q    Were you at all concerned that there might be guns at the

22 event?

23 A    No, I wasn't concerned.  I am a big believer in Second

24 Amendment rights.  We have the right to bear arms.  Where I

25 grew up in Amherst, I went to high school with guys who would

M. Blair - Direct

1   have shotguns in the back of their truck when they came to

2   school.  Guns don't scare me.  You can have a gun and not shoot

3   someone.

4   Q    Did you ultimately go downtown on Saturday, August 12th?

5   A    Yes.

6   Q    And how did you get there?

7   A    I drove.  So I drove me and my fiance at the time, Marcus

8   Martin.  We drove from Amherst to Charlottesville.

9   Q    And did you pick anyone up along the way?

10  A    Yes.  We picked up my friend Courtney Commander when we

11  got to Charlottesville, and we were meeting my other friend

12  Heather Heyer at the Downtown Mall.

13  Q    Just to ask you:  Is Courtney Commander -- is Commander

14  her real name, or is that a nickname?

15  A    Commander is her real name.  It's on her birth

16  certificate.  It's not a nickname or anything.  It's a pretty

17  cool name.  Yes, that is her name.

18  Q    Who is she?

19  A    Courtney Commander is one of my friends.  I worked at a

20  law firm in Charlottesville with her and Heather Heyer, the

21  other friend that we were meeting when we got down there.

22  Q    About what time did you arrive in Charlottesville?

23  A    We arrived in Charlottesville about 12:00, 12:30, in

24  between that time.

25  Q    Do you know whether you arrived before or after the

M. Blair - Direct

1   governor had declared a state of emergency?

2   A     So we arrived to the downtown area after the state of

3   emergency was declared.  When we got to pick up Courtney on

4   Fifth Street in Charlottesville on the way to meet Heather, she

5   somehow found out -- she told us, hey, the governor declared a

6   state of emergency.

7   Q     Did that fact change your plans at all?

8   A     No, it didn't, because from what I knew of the state of

9   emergency, it didn't say, go home, leave Charlottesville.  I

10  assumed it had something to do with the rally, but we weren't

11  going anywhere near where the rally was supposed to be located.

12  So we just went to meet Heather.  She was already there.

13  Q     Do you know where the rally was supposed to be located?

14  A     I know it was supposed to be in the park where the Robert

15  E. Lee statue was, but I at that time was living in Amherst, so

16  I wasn't completely familiar with Charlottesville.  So I knew

17  where it was supposed to be, but I couldn't point you in that

18  direction without a GPS.

19  Q     That was the area you were planning to avoid?

20  A     Yes, that is the area we were planning to avoid.

21  Q     Why were you planning to avoid that?

22  A     We didn't -- well, I personally didn't want any type of

23  drama or confrontation or arguments.  Marcus at the time was

24  also on probation.  So I assumed that that's the type of

25  people -- the protesters that were attending the Unite the

M. Blair - Direct

1   Right rally, they use intimidating tactics.  So just like the

2   torch rally the night before, I felt like they were going to,

3   in essence, poke a sleeping bear, so try to get some reaction

4   out of people.  And I didn't want myself nor Marcus to be

5   around that area or that type of atmosphere.  I just wanted to

6   find people that were happy and supporting people that may not

7   be like them.

8   Q    Were you -- who were you with during that day?

9   A    It was myself, my then-fiance Marcus Martin, Courtney

10  Commander, and Heather Heyer.

11  Q    At some point did you join a larger crowd on Water Street?

12  A    Yes, we did.

13  Q    I'd like you to look at the demonstrative map that we've

14  been using.  Do you recognize that map?

15  A    Yes.

16  Q    Can you just blow it up a little bit bigger, please.  I

17  mean, sorry, make it -- yeah, back out there.

18       Okay.  Can you see Water Street on this map?

19  A    Yes, I can.

20  Q    Okay.  Can you just please draw an arrow in the direction

21  that the larger crowd that you joined was walking?

22  A    Yeah.  So we joined them about here.

23  Q    I'm not sure that that's -- is that working?

24  A    No.

25  Q    If you press the lower right-hand corner of the screen, it

M. Blair - Direct


1   should then give you the ability to draw.

2   A    All right.

3   Q    If there's no objection, I can try to do that from this

4   screen and you tell me if it's accurate.

5   A    Yeah, sure.  If you move your cursor -- oh, yes.

6   Q    Is that right?

7   A    Correct.  Yeah, it's a little bit prior to it, like right

8   before that last alley; but yes, that is correct.

9   Q    That's Water Street?

10   A    Yes.

11   Q    When you say you were with a larger crowd at that point,

12   can you please just describe the mood of the crowd?

13   A    Yeah.  It was a very happy, joyous crowd.  It immediately

14   kind of caught our attention.  They were a diverse group of

15   people.  I saw people giving hugs, handing out snacks and

16   water.  There were clowns in the crowd, people waving rainbow

17   flags.  They were generally happy and joyous, and I just -- you

18   know, we attracted to them because that's what -- the type of

19   atmosphere we wanted to be around.  We wanted to be around

20   happy people, as I always call them.

21   Q    If I talk about protesters and counter-protesters, do you

22   know what I'm talking about?

23   A    Yes, I do.

24   Q    Was this a crowd of protesters or counter-protesters or

25   something else?

M. Blair - Direct

1    A    Counter-protesters.

2    Q    Was that obvious to you?

3    A    Yes.  Very obvious.

4    Q    Did you see anybody in this crowd behaving violently or

5    threatening?

6    A    No.

7    Q    Did you see anyone in this crowd with any guns?

8    A    No.

9    Q    How about any other weapons?

10   A    No.

11   Q    At this time, at that time of that event, were you

12   familiar with the term "Antifa"?

13   A    No, I was not.

14   Q    When did you learn about Antifa?  About when?

15   A    Shortly after the events, probably even that night or the

16   day before, a lot of talk of Antifa was going around and people

17   wanted to know if we were part of Antifa or Black Lives Matter.

18   And I had never heard of the group before, so I actually had to

19   Google it.  And at that time I figured out who they were, a

20   little research.

21   Q    So is it fair to say you're not a member of Antifa?

22   A    No, I am not.

23   Q    Have you ever been?

24   A    No, I have not been.

25   Q    How about Black Lives Matter?

M. Blair - Direct

1  A     No, I am not, nor have I been.

2  Q     Are you a member of any other social justice or other

3  activist group?

4  A     No.

5  Q     Were you at the time?

6  A     No.

7  Q     To your knowledge, if you know, were any members of Antifa

8  marching in this crowd?

9  A     Not to my knowledge.  Like I said, I didn't know who

10 Antifa was and I didn't -- you know, that didn't stand out to

11 me at all.  I don't think there were, to my knowledge, at the

12 time.

13 Q     Were you still with Marcus and Heather and Courtney at

14 that time?

15 A     Yes.  Marcus, Heather, Courtney and I all joined the

16 crowd.  Heather actually was supposed to go to work.  She was

17 planning to go to work right after she had been with us for a

18 while.  But we saw this crowd of, you know, happy people, the

19 counter-protesters, and she decided to stay a little bit

20 longer.

21 Q     And she was working at the law firm with you at that

22 point?

23 A     Yeah, she was working at the law firm as a paralegal, but

24 she also had a part-time job as a waitress.

25 Q     Were you recording video when you were walking with this

M. Blair - Direct

1   crowd?

2   A    Yes, I was.

3   Q    I'd like to show you, without showing the jury,

4   Plaintiffs' Exhibit PX-297A.

5            (Video playing.)

6        Have you seen this before?

7   A    Yes, I have.

8   Q    Is this the video you recorded that day?

9   A    Yes, it is.

10  Q    Is it a fair and accurate portrayal of the day?

11  A    Yes.

12           MR. MILLS:  I move to admit the video, Your Honor.

13           THE COURT:  Be admitted.

14           (Plaintiff Exhibit 297A marked.)

15           (Plaintiff Exhibit 297A admitted.)

16           MR. MILLS:  I'll play it for the jury.  I'm going to

17  stop it a couple of seconds in and have you identify --

18           (Video playing.)

19  BY MR. MILLS:

20  Q    Do you see yourself?

21  A    Yes, I have on the lightly colored blue hat.  It's like a

22  jeans color hat.

23  Q    You're in the foreground at the bottom?

24  A    Yes.

25  Q    Do you see Marcus?

M. Blair - Direct

1   A    Yeah, Marcus is the one in the red baseball cap right

2   behind me.

3   Q    Right here?

4   A    Yes, that is Marcus.

5   Q    Play it a little further.

6        (Video playing.)

7        If you could stop it there.  The person in the foreground

8   there, who is that?

9   A    That's Heather Heyer.  She's the one with the braided

10  ponytail.

11  Q    And she's wearing a black shirt and I think black pants.

12  What is that?

13  A    Yeah, so like I mentioned earlier, she was going to leave

14  from there and go to work.  So that's what she wore to work as

15  a waitress was all black.

16  Q    Keep playing.

17       (Video playing.)

18       Can we please tell the jury what you just watched?

19  A    Yeah, that is the video that I was recording when we got

20  with a crowd of counter-protesters.  And when you hear all the

21  commotion, it's when the car slammed through the group of the

22  people that we were walking with, and the aftermath of it.

23  Q    Were you hit by the car?

24  A    No, I wasn't.  It barely missed me.

25  Q    Why not?

M. Blair - Direct

1    A    Marcus pushed me out of the way. I was thrown to the

2    sidewalk.

3    Q    And what was the scene immediately after the car attack?

4    A    It was complete terror.  It was terror, chaos, confusion.

5    We didn't know exactly what had happened.  It all happened so

6    fast.  After I was thrown to the ground, we actually -- I say

7    "we" -- me and Courtney Commander, who I was there with, she

8    was beside me, and we saw the car back up.

9         So I actually ran across the street in an alley because I

10   was afraid the car would come back and ram the

11   counter-protesters again.  So I tried to go to what I thought

12   was safe.  But the scene was complete terror.

13   Q    What was your first thought after the car attack?

14   A    After I got out of the way, I was looking for Marcus.  I

15   didn't know -- I saw Courtney.  I didn't know where Marcus was.

16   Q    What did you do?

17   A    I went and I tried to find him.  You can hear in the video

18   me yelling his name.  I went to where the car -- where we were

19   last walking up Fourth Street and I found his hat.  He had on

20   that red baseball cap, and it was covered in blood.  So after

21   that -- after that I didn't really want to look on the ground.

22   I was really afraid that, you know -- after I see blood on the

23   hat that he was wearing.  So I kept calling his name and I kept

24   calling his name and eventually my voice kind of fades because

25   I couldn't find him.  But I heard people calling my name.

7.2

M. Blair - Direct

1        And this was after I stopped the video.  I wanted to stop

2   it sooner, but my hands wouldn't stop shaking.  And I heard

3   people calling my name.  And someone found me and grabbed me by

4   the hand and took me to Marcus.

5   Q    And how did you -- did you know the people that took you

6   to him?

7   A    No, I did not.

8   Q    Where was he?

9   A    He was on the sidewalk to the left-hand side like we were

10  walking up Fourth Street.  So on the sidewalk.

11  Q    I'm going to show you Plaintiffs' Exhibit PX-165A.  Do you

12  recognize that photo?

13  A    Yes.

14  Q    What is that a photo of?

15  A    That's a photo right after I found Marcus.

16  Q    Is it a true and accurate photograph?

17  A    Yes.

18           MR. MILLS:  I'd ask -- move this into evidence.

19           THE COURT:  Be admitted and published.

20           (Plaintiff Exhibit 165A marked.)

21           (Plaintiff Exhibit 165A admitted.)

22  BY MR. MILLS:

23  Q    Is that the scene of you when you first discovered Marcus

24  by the side of the road?

25  A    Yes, it is.

73

M. Blair - Direct

1  Q    I'd like to look at PX-161, please.  Do you recognize

2  that?

3  A    Yes, I do.

4  Q    Is that a photograph of you and Marcus?

5  A    Yeah.  That's the photo of me helping Marcus to the

6  ambulance.  His leg -- you know, he couldn't put any pressure

7  on it so I had to help him.

8  Q    Is that a true and accurate photograph?

9  A    Yes.

10            MR. MILLS:  Move to admit, Your Honor.

11            THE COURT:  You may publish.  Admitted.

12            (Plaintiff Exhibit 161 marked.)

13            (Plaintiff Exhibit 161 admitted.)

14  BY MR. MILLS:

15  Q    Could you describe the feeling at that moment that you

16  had?

17            THE COURT:  Is she a plaintiff?

18            MR. MILLS:  She's a plaintiff, Your Honor.

19            THE COURT:  Okay.

20            THE WITNESS:  I was confused.  I was scared.  I was

21  worried about all the people that were there.  It was a

22  complete terror scene.  It was blood everywhere.  I was

23  terrified.  I didn't know exactly what was happening, why it

24  was happening.  I knew Marcus was alive, thankfully.  I was

25  alive.  We didn't know where Heather was.

7.4

M. Blair - Direct

1  BY MR. MILLS:

2  Q   When did you first learn that Heather had died in the

3  attack?

4  A   At the hospital.  I was in a room with other people that

5  were waiting for people who were badly injured.  And I heard

6  someone say, "Did you hear that girl died?"  And I immediately

7  knew we didn't -- I say "we."  Me nor Courtney Commander, which

8  I said she -- I knew she was okay.  She did go back to see if

9  Heather's car was gone.  We were hoping Heather just got to her

10 car and left.  But I was told a girl died.  So I went to an

11 attending at the hospital and said it's a girl that was with

12 us.  Her name is Heather Heyer, white, 32.  Eventually an

13 officer came and took me in a room and confirmed the identity

14 and told me Heather was the girl that died.

15 Q   What did you do then?

16 A   I dropped to my knees.  I'll never forget.  He just kind

17 of said, I'm sorry to tell you that was your friend.  I was

18 sitting in a chair and I literally had to drop to my knees and

19 I just, I sobbed.

20 Q   Please just briefly tell the jury your relationship with

21 Heather and what she was like.

22 A   Yeah, so I met Heather when I started working at the law

23 firm in Charlottesville.  She was already working there and we

24 quickly became friends, which I always find is odd.  You know,

25 you work with someone for eight hours a day, most of the time

M. Blair - Direct

1  you don't want to see them afterwards until the next day.  But

2  Heather and I -- I don't consider many people friends.  I can

3  count the number of friends that I have on two hands and that's

4  pushing it.  And Heather was one of those people.

5      We communicated through texts and saw each other before

6  work, after work, ate lunch together.  She had a dog and I had

7  a dog.  So neither one of us had children.  So we kind of

8  connected through that.  Heather would always say that I was an

9  optimist and she was a realist, so we balanced each other out

10  very well.

11      But me and Heather were -- like I said, she was one of my

12  good friends.  She was very real, which I appreciated in this

13  day and age.  She didn't sugarcoat anything.  She had great

14  conversation.  We could talk about anything from memes to, you

15  know, what was going on in the world to anything.  She was

16  just -- she was a good friend.  If you Googled a good person,

17  like, as cliche as it sounds, Heather would pop up.  She cared

18  about people.

19  Q    Ms. Blair, were you injured physically in the car attack?

20  A    I was.  But not as bad as most people.  When we -- when me

21  and Marcus were in the ambulance -- or headed to the hospital,

22  there was a woman in a stretcher in the ambulance with a neck

23  brace on.  So yeah, I had physical injuries, but I'm lucky.

24  Q    Still, would you please describe those physical injuries

25  for the jury?

M. Blair - Direct

1  A    Yeah.  I had a large hematoma, like a big bruise on my

2  left-hand -- or my left thigh.  I had some scrapes and

3  scratches on my left arm.  It was a gash on there as well.  And

4  I had a lot of pain in my left side, my rib area.  It hurt to

5  cough or sit down for too long.

6  Q    I'll show you PX-153.  Do you recognize this photograph?

7  A    Yes.

8  Q    What is that a photo of?

9  A    That's a photo of the large hematoma I was just

10  mentioning.  It's on my -- it looks like it's on my right leg,

11  but it's taken in the mirror so it's actually my left side.

12  Q    Is it a true and accurate photo of what that looked like

13  at the time?

14  A    Yes, it is.

15         MR. MILLS:  I'd move to admit, Your Honor.

16         THE COURT:  Be admitted.  You may publish.

17         (Plaintiff Exhibit 153 marked.)

18         (Plaintiff Exhibit 153 admitted.)

19  BY MR. MILLS:

20  Q    How long did that hematoma last?

21  A    About two or three months.

22  Q    You said you landed on your side.  Can you please describe

23  that pain on your side as well?

24  A    Yeah.  So like I said, I felt like people -- Marcus broke

25  his leg.  So, you know, pain in my side, it hurt to -- you

77

M. Blair - Direct

1  know, I kind of -- make sure you sit up straight and can't, you

2  know, like, cough or -- I couldn't laugh, as rarely as I did

3  that far after, but it didn't heal up on its own.  So I did

4  eventually seek medical attention for it.  But it was just a

5  soreness that lasted for a while.

6  Q    What was the medical attention you sought for that?

7  A    I went to the doctor and they suggested X-rays.  I

8  described my condition and they just did X-rays to make sure it

9  wasn't anything more serious.

10 Q    Did you ever get medication prescribed for any aspect of

11 your injuries?

12 A    Yeah.  I was finding it hard to sleep.  So I did get

13 prescribed Ambien to help sleep.

14 Q    Did you incur expenses as a result -- medical expenses as

15 a result of the treatment that were caused by this event?

16 A    Yes, I did.

17 Q    I'm going to show you PX-3325.  Have you seen this before?

18 A    Yes, I have.

19 Q    What is it?

20 A    It is a summary of the medical expenses from my physical

21 and emotional injuries on August 12.

22 Q    Have you reviewed the underlying exhibits that support

23 this chart?

24 A    Yes, I have.

25 Q    Is the summary accurate?

M. Blair - Direct

1  A    Yes, it is.

2              MR. MILLS:  Your Honor, I'd move to admit the

3  summary.

4              THE COURT:  Be admitted.

5              (Plaintiff Exhibit 3325 marked.)

6              (Plaintiff Exhibit 3325 admitted.)

7  BY MR. MILLS:

8  Q    I'm not going to go through these with you, Ms. Blair, but

9  do these show the different treatments you had, the dates of

10 the treatment, the numbers of the supporting documents and the

11 costs of those treatments?

12 A    Yes, sir.

13 Q    Did you suffer emotionally from the events of August 12th

14 as well?

15 A    Yes.  My emotional scars were way worse than my physical

16 ones.

17 Q    Did the death of Heather cause emotional trauma for you?

18 A    Yeah, it did.  No one expects, especially when you're like

19 in that peaceful group, nobody expected -- or would expect for

20 your friend to be killed for standing up for what she believes

21 in right in front of you.  At times I felt guilty because she

22 was about to leave to go to work, and we found this crowd and

23 she stayed.  If you see where Heather was in the video, she was

24 standing right in front of me.  So it's also kind of like, why

25 is Heather gone and I'm still here, which is, you know, like

79

M. Blair - Direct

1    survivor's guilt or something of the sort.  But yeah, I've

2    never had a friend die, much less like that.

3    Q    In addition to the loss of your friend Heather, did what

4    happened to Marcus affect you as well?

5    A    Yeah.  Our relationship certainly changed after that.

6    Marcus -- I always say Marcus was really angry about it and I

7    was more sad.  So usually in a relationship when one person is

8    sad the other one kind of helps to cheer them up and uplift

9    them.  And we were both just really dealing with a lot of

10   trauma.  So our relationship definitely suffered.

11   Q    Did you notice that his personality changed as a result of

12   August 12th?

13   A    Oh, yeah.  He was a lot more frustrated.  At the time I

14   think Marcus was 27.  So a 27-year-old man, he liked to play

15   sports and do for his self.  And he couldn't do that.  So he

16   was frustrated at small things.  And I tried to do what I

17   could, but it's -- you know, he couldn't do for his self and I

18   know that that affected him mentally.

19   Q    How did it affect your relationship with him?

20   A    The biggest thing that me and Marcus argued about before

21   August 12th, 2017 was what we were going to eat that night.

22   And now it was, you know, just little things that he would be

23   frustrated with or that I was more short-tempered with.  So we

24   did argue a lot more.  We certainly grew apart after that.

25   Q    Are you two still together?

M. Blair - Direct

1  A     No.  We got a divorce.

2  Q     Do you attribute that to what happened on August 12th?

3  A     I do.

4  Q     What was the emotional effect on you?  You talked about

5  Heather and about Marcus.  What about taking care of yourself?

6  A     I -- it was really hard to do after August 12th.  I had so

7  much on my plate, I put myself to the back burner.  I've always

8  thought of myself as a pretty strong person, so I figured I

9  could push through it.  But like I said earlier, my emotional

10 scars are way worse.  I was depressed.  I'm typically a happy

11 person.  Super depressed, anxious.

12 Q     Do you ever experience flashbacks or things like that,

13 panic attacks as a result of this?

14 A     Yes, I still do to this day.

15 Q     Could you describe that for the jury?

16 A     So to this day if I see a Dodge Challenger I immediately

17 flash back to that time.  There was a time one of my friends

18 wanted to rent a Dodge Challenger to go on a trip.  I'm like,

19 nope, going to have to get another car.  I'm not doing that.

20       Crossing streets, I will have flashbacks.  Loud noises, I

21 get distracted very easily, which I used to not.  I can't even,

22 like, stay focused to read a book.  I haven't read a book since

23 2017 and that's something I used to love to do.

24 Q     How has it affected you, if at all, at work?

25 A     So immediately after, I had just started at my new job.

M. Blair - Direct

1  So I was terrified I was going to get fired.  I couldn't really

2  keep up.  What I do, it takes a lot of reading, attention to

3  detail, deadlines.  So I was really nervous that I wasn't going

4  to be up to the task that they had hired me for.  So I was

5  afraid that my professional career was going to suffer in

6  terrible ways.

7  Q    Do you think it took you longer to pass the bar because of

8  this?

9  A    Yeah, I mean, like I said, I used to love to read.  Now I

10 read a page and have to go back and read it again.  I tried to

11 even listen to audio books. I can't even do that without --

12 it's like my attention isn't -- I have, you know, a graduate

13 degree.  I have never been like this after August 12th, 2017.

14 It changed my mental state.

15 Q    Are there physical things that you can no longer do as

16 easily?

17 A    So physically, no.  It's more like I said, again, the

18 emotional scars.  Like, I used to run by myself.  I don't do

19 that anymore.  I just recently, maybe the last month, started

20 running with a running group, but I still get very anxious over

21 it.  Shortly after, I couldn't take trips too much just

22 because, you know, you have to, like, stand up.  But yeah,

23 mostly, like I said, emotional more so than physical.

24 Q    These emotional issues that you have had, did you have

25 emotional issues like this before August 12th of 2017?

82

M. Blair - Cross

1  A    No.  I was a pretty stable individual.  I like to think of

2  myself as one.

3  Q    Do you believe the emotional trauma that this has caused

4  is permanent?

5  A    I hope not, but I'm working on it every day.  I just hope

6  that it gets better.

7              MR. MILLS:  Thank you, Ms. Blair, for your testimony.

8              THE WITNESS:  Thank you.

9              THE COURT:  Who plans to cross-examine this witness?

10             MR. KOLENICH:  I have no questions for this witness,

11 Your Honor.

12             MR. SPENCER:  I have no questions.

13             MR. CAMPBELL:  Your Honor, I have like two questions.

14             THE COURT:  All right.

15                      CROSS-EXAMINATION

16  BY MR. CAMPBELL:

17 Q    Good afternoon, Ms. Blair.

18 A    Good afternoon.

19 Q    I represent James Fields.  Ma'am, I just had a question or

20 two for you.  I think you testified that you saw a digital

21 flyer for Unite the Right on social media, correct?

22 A    Correct.

23 Q    And I assume you're not a member in any way or support any

24 group participating in Unite the Right or anything like that?

25 A    No, sir.

M. Blair - Cross

1  Q    So it would have just been public on social media?

2  A    Yes.

3          MR. CAMPBELL:  Thank you, ma'am.  I don't have any

4  additional questions.

5          THE COURT:  All right.

6          MR. CANTWELL:  I have some questions.  Should I go?

7          THE COURT:  Sir?

8          MR. CANTWELL:  It's Christopher Cantwell.  I can go

9  now.

10         THE COURT:  Okay.  Can you finish up in about ten

11 minutes?

12         MR. CANTWELL:  I'm sorry, what?

13         THE COURT:  I was saying can you finish up in about

14 ten minutes?

15         MR. CANTWELL:  I can't finish in ten minutes.  Do you

16 want to go to lunch first?

17         THE COURT:  Well, yeah, it's been an hour and a half.

18 We'll take a lunch recess now.

19         Members of the jury, do not discuss the case with

20 anyone or let anyone discuss it with you, or remain within

21 hearing of anyone discussing it.  You may recess now until

22 12:20 -- 1:20.  I'm sorry.  It's 12:20 now.  1:20.

23 **(Jury out, 12:18 p.m.)**

24         (Recess.)

25         THE COURT:   Call the jury.

M. Blair - Cross

1   (Jury in, 2:04 p.m.)

2                THE COURT:    Mr. Levine, I'm going to allow you to put

3   on the record -- admit those tweets, not now, but when -- you

4   can do it on redirect when Mr. Tubbs comes back.  I think,

5   consistent with some earlier rulings, the Court may -- I

6   referred to them in earlier rulings.  He acknowledged them.

7   There's no objection to them coming in.  There's no objection

8   to him testifying to authenticate them.

9                MR. JONES:    There's no objection, Your Honor.

10  (Jury in, 2:04 p.m.)

11               THE COURT:  Members of the jury, I'm sorry.  We had

12  technical problems again.  Sorry for the delay.

13               Mr. Cantwell, you can move on around.

14                          CROSS-EXAMINATION

15  BY MR. CANTWELL:

16  Q.     Hello, Ms. Blair.

17  A.     Hello.

18  Q.     You described the crowd you were with as -- I think you

19  said -- pardon me.  I'm still putting myself together here.

20         Did you say there were clowns in the crowd you were

21  marching with?

22  A.     Yes.

23  Q.     Okay.  On your screen, is this the crowd you were marching

24  with?

25  A.     Yes.

85

M. Blair - Cross

1    Q.      You see those?  Those are the clowns right there?

2    A.      Yes.

3                  MR. CANTWELL:    Can I add Plaintiffs' 1360 to evidence

4    and publish it to the jury, please?

5                  THE COURT:    You may.

6                  (Plaintiff Exhibit 1360 marked.)

7                  (Plaintiff Exhibit 1360 admitted.)

8    BY MR. CANTWELL:

9    Q.      For the jury's sake, those are the clowns you were

10   referencing, right?

11   A.      Yes.

12   Q.      You said the people you were marching with, they didn't

13   have any weapons, right?

14   A.      Not that I saw, no.

15   Q.      What about flagpoles?

16   A.      I did see someone waving a rainbow flag, so it had to be

17   on a pole.

18   Q.      Just the one rainbow flag on the pole?

19   A.      That's the one that distinctly sticks in my memory.

20   Q.      Off the top of your head, you don't remember any other

21   flags?

22   A.      Off the top of my head, no.

23   Q.      Any other, like, clubs or striking weapons?  Anything like

24   that?

25   A.      No.

M. Blair - Cross

1    Q.    Did you see this man with the red baseball bat there?

2    A.    No, I did not.  There was a lot of people.

3    Q.    Did you see anybody wearing masks or bandannas?

4    A.    At the time, my recollection, no, I didn't.

5    Q.    Did you see anybody wearing goggles?

6    A.    No.

7    Q.    So you didn't see this woman with the goggles and the

8    white bandanna?

9    A.    Those look like sunglasses to me.

10   Q.    I'm talking about the goggles on top of her head.

11   A.    I don't know if that's what that is.

12   Q.    We'll get back to her.  That's fine.

13         Did you see anybody with red bandannas?

14   A.    At the time, no, that didn't stick out in my memory.

15   Q.    What about black bandannas?

16   A.    No.

17   Q.    You didn't see anybody with a black bandanna?

18   A.    I wasn't paying attention for bandannas.

19   Q.    All right.  Fair enough.

20         So we'll probably want to take my screen up -- there we

21   go.  Fantastic.

22         I think -- well, Plaintiffs' 297 is in evidence, I think,

23   right?  That's Marissa Blair's video, is it?  If not, I'd like

24   to -- I'd like to put in 297, the whole video, if possible.

25   Can we add 297 to evidence and publish it to the jury?

M. Blair - Cross

1          THE COURT:    You may.  Go ahead.

2          MR. CANTWELL:    I have just had a slight technical

3   problem.  So bear with me.  I'm sorry.

4                 (Defendant CC-297 marked.)

5                 (Defendant CC-297 admitted.)

6   (Video playing.)

7   BY MR. CANTWELL:

8   Q.     Did you see anybody wearing a helmet?

9   A.     I saw medics wearing a helmet.

10  Q.     You saw medics wearing helmets?

11  A.     Yeah, what I believe were medics.  They had red crosses on

12  book bags.

13  Q.     So anybody with a helmet would have had a red cross on a

14  book bag, you're thinking?

15          MR. MILLS:    Objection, argumentative, Your Honor.

16          MR. CANTWELL:    I'm just trying to clarify, Judge.

17          THE COURT:    Anyone she saw maybe.

18  BY MR. CANTWELL:

19  Q.     Anyone who you saw with a helmet would have had a red

20  cross to the best of your recollection?

21  A.     No, not necessarily.  I just specifically recall a medic

22  with a helmet.

23  Q.     This is your video, right, Ms. Blair?

24  A.     Yes.

25  Q.     There's those clowns we were talking about before?

M. Blair - Cross

1   A.      Yes.

2           (Video playing.)

3   Q.      What's that chant?  Do you hear that?

4   A.      Yes.

5   Q.      What's that?

6   A.      "Whose streets?  Our streets."

7   Q.      And Ms. Blair, you don't think of that as a violent chant,

8   right?

9   A.      No.

10  (Video playing.)

11  Q.      Do you see some more flags over here?

12  A.      Yes.

13  Q.      Red ones?

14  A.      Yes.

15  Q.      Nothing stands out in your memory about those flags,

16  right?

17  A.      No.

18  (Video playing.)

19  Q.      Okay.  Do you see that man with the red bandanna right

20  there?

21  A.      Yes, I do.

22  Q.      Okay.

23  (Video playing.)

24  Q.      And that man with the red bandanna right there?

25  A.      Yes, I do.

M. Blair - Cross

1   Q.      Do you see anybody wearing like a -- I don't know if you

2   know what I mean when I say a respirator.  Almost like a gas

3   mask.  Did you see anybody wearing anything like that?

4   A.      No, I did not.

5   (Video playing.)

6   Q.      Do you have any idea what this pink thing around this

7   woman's neck is?

8   A.      No.  I don't know what that object is.  I don't know if

9   it's around her neck, but no.

10  (Video playing.)

11  Q.      That woman with the sunglasses again, do you see her?

12  A.      Yes.

13  Q.      Can you tell what's on top of her head there?

14  A.      No, I can't.

15  (Video playing.)

16  Q.      That's Marcus behind you, right?

17  A.      Correct, in the red baseball cap.

18  Q.      What's that on Marcus's water bottle?

19  A.      It actually looks like a bandanna.

20  Q.      It looks like a black bandanna on Marcus's water bottle,

21  right?

22  A.      Yes.

23          (Video playing.)

24  Q.      I'm sorry we have to go through this part.

25          (Video playing.)

M. Blair - Cross

1        Do you remember seeing this man with a mask on?

2    A.    No, I do not.

3    Q.    But you can see who I'm talking about, right?

4    A.    I don't see a mask on him.  It's actually pretty blurry.

5        (Video playing.)

6    Q.    Do you see this guy with the red helmet on?

7    A.    I see that.

8    Q.    Do you see any red crosses on his backpack?

9    A.    No.

10        (Video playing.)

11    Q.    I'm going to go back to that man with the red helmet real

12   quick.

13        (Video playing.)

14    Q.    Do you see that camouflage jacket that came into the

15   corner real quick?

16    A.    Yes.

17    Q.    Do you remember seeing that man?

18    A.    No.  It was total chaos.  I was only trying to find my

19   fiance.

20        (Video playing.)

21    Q.    That doesn't refresh your memory?

22            MR. MILLS:    Objection.  Your Honor.  This is not the

23   same video, and no foundation for this.

24            MR. CANTWELL:    I'm just showing it to the witness

25   right now.

M. Blair - Cross

1          THE COURT:    Anything to refresh her memory.

2          MR. MILLS:    This is not being -- okay.

3          THE COURT:    Go ahead.  What's your answer?

4          THE WITNESS:    Can you repeat the question.

5   BY MR. CANTWELL:

6   Q.     Seeing this man right here, does that refresh your memory

7   who the man in the camouflage jacket is?

8   A.     No.  It does not.  I do not know that man.

9   Q.     Never seen that guy?

10  A.     No.

11         THE COURT:    She was not up there.

12         MR. CANTWELL:    What's that?

13         THE COURT:    She's testified, I think, that she was

14  not in that area, I believe.

15         MR. CANTWELL:    She -- this man was captured --

16         THE COURT:    Go ahead.  It did not refresh her memory.

17  Move on.

18   BY MR. CANTWELL:

19  Q.     So you had never heard of Antifa when you went down to --

20  went down to the march on August 12th?

21  A.     That's correct.

22  Q.     So you didn't hear anything -- what did you hear about

23  the -- I'm sorry.  You went to the march on August 12th after

24  hearing about what happened on August 11th at UVa; is that

25  right?

M. Blair - Cross

1   A.      After seeing a video of the torch rally, I decided to go.

2   Q.      Do you know who published that video?

3   A.      My friend Courtney Commander who was with us on August

4   12th.

5   Q.      Courtney Commander was there on August 11th?

6   A.      Yes.

7   Q.      Do you know who Emily Gorcenski is?

8   A.      No.

9   Q.      No?

10  A.      No.

11  Q.      Not even today you don't know?

12          MR. MILLS:    Objection, asked and answered.  Badgering

13  the witness.

14          THE COURT:    Sustained.

15  BY MR. CANTWELL:

16  Q.      Have you ever heard of a Web site called itsgoingdown.org?

17  A.      Not to my recollection, no, I have not.

18  Q.      Have you ever heard of Unicorn Riot?

19  A.      At the time of August 12th I had not.

20  Q.      You've heard of them since?

21  A.      During this testimony, yes, I have heard.

22  Q.      And it was your understanding that the purpose of the

23  rally was to promote hate speech?

24  A.      Amongst other things, yes.

25  Q.      What is hate speech?

M. Blair - Cross

1   A.      It's speech that is hateful against a certain person,

2   religion, just for what they believe in, who they identify with

3   or who they were born as.

4   Q.      You said Marcus was on probation at this time?

5   A.      Correct.

6   Q.      What for?

7              MR. MILLS:    Objection, Your Honor.

8              THE COURT:    Sustained.

9   BY MR. CANTWELL:

10  Q.      So you didn't know about Antifa when you went down there

11  on August 12th, but you found out afterwards; is that right?

12  A.      Correct.

13  Q.      And how do you feel knowing that you were marching with

14  Antifa?

15             MR. MILLS:    Objection, no foundation and irrelevant.

16             THE COURT:    Sustained.

17  BY MR. CANTWELL:

18  Q.      What did you find out about Antifa after the march?

19             MR. MILLS:    Objection, beyond the scope, irrelevant.

20             THE COURT:    It's irrelevant, but not beyond the

21  scope.

22  BY MR. CANTWELL:

23  Q.      I'm showing you Plaintiffs' Exhibit 291.  I'm not sure if

24  this one is already in evidence or not.  Is it?

25             MR. MILLS:    Yes, it is.

94

M. Blair - Cross

1        MR. CANTWELL:   Okay.  I'd like to publish this and

2    show it to the jury.

3        THE CLERK:   I do not find that one in evidence.

4        (Video playing.)

5    BY MR. CANTWELL:

6    Q.   Do you recognize that black flag?

7    A.   No, I do not.

8    Q.   Do you recognize that red fist?

9    A.   Not at the time, I did not, no.

10   Q.   What do you recognize it as now?

11   A.   I think it's Antifa, but I can't be positive.

12   Q.   You said you haven't been able to read a book since 2017?

13   A.   No.

14   Q.   Can't even listen to audio books?

15   A.   That's correct.

16   Q.   How long ago did you pass the bar exam?

17   A.   Just got the results in October.

18   Q.   And how long ago did you take it?

19   A.   I took it in July this year.

20   Q.   Okay.  So you haven't been able to read a book since 2017,

21   but you passed the bar exam in July?

22   A.   Correct.  You don't have to read a book to pass the bar.

23   You study law.

24   Q.   You don't -- I'm sorry.  Are you saying studying law

25   doesn't involve reading books?

M. Blair - Cross

1    A.      I would have to know what your definition of a book is.

2    When I think of a book, it's like a story.  I will say I did

3    have to read to pass the bar, but I will say that it was way

4    more difficult than it would have been prior to August 17th.

5    I'm ashamed to say how much I cried between those times trying

6    to juggle everything and remember everything, but I take it as

7    a positive step forward.

8    Q.      I would certainly agree.

9            MR. MILLS:     Objection to the commentating on

10   responses.

11           THE COURT:     Sustained.

12    BY MR. CANTWELL:

13   Q.      I'm just trying to understand.  Are you saying you've had

14   trouble reading fiction?

15   A.      No.  Just trouble concentrating in general.

16   Q.      But you think you've had more trouble concentrating on

17   reading, like, a story than reading a book about the law?

18   A.      So I think it's difficult to explain what or how I

19   studied.  You know, you read law and learn rules.  I did manage

20   to do it, but it wasn't as easy as school was.  I've always

21   been fairly smart in school.  So I could tell mentally that I

22   was not at the level that I was prior to August 2017.

23           MR. CANTWELL:    No further questions.  Thank you.

24           THE COURT:     Thank you.  Any redirect?

25           MR. MILLS:    No, Your Honor.

M. Tubbs - Cross

1          THE COURT:    Thank you.  You may stand down.

2          Do you have Mr. Tubbs?

3          MR. JONES:    Is Mr. Tubbs available?

4          THE COURT:    Excuse me?

5          MR. JONES:    Sorry.

6          It appears he is available.

7          THE COURT:    We'll finish with Mr. Tubbs.

8          MR. JONES:    Thank you, Your Honor.

9          THE COURT:    Members of the jury, I rather abruptly

10   ruled that Mr. Levine could not put in the -- but one of the

11   tweets, I think, in which Mr. Tubbs had said that Mr. Fields

12   had done nothing wrong.  I am going to allow him to insert all

13   of the tweets in the record without -- and Mr. Tubbs has

14   acknowledged that he sent those tweets.  So they will be in the

15   record of the case.

16          All right.  Anything else?

17          MR. LEVINE:    Do you want me to give the Court the

18   exhibits now, Your Honor?

19          THE COURT:    Yes, go ahead.

20          MR. LEVINE:    That would be Plaintiffs' Exhibit 2867A

21   through 2867F.  Thank you, Your Honor.

22          (Plaintiff Exhibits 2867A, 2867B, 2867C, 2867D, 2867E

23   and 2867F marked and admitted.)

24      MICHAEL TUBBS, CALLED BY PLAINTIFFS, PREVIOUSLY SWORN

25                      CROSS-EXAMINATION

97

M. Tubbs - Cross

1    BY MR. JONES:

2    Q.     Sir, can you hear me?  This is Bryan Jones.  Mr. Tubbs?

3    A.     Yes, sir, I can hear you fine.

4    Q.     Thank you.

5              MR. JONES:    I've spoken with opposing counsel.  And

6    Your Honor, I'm going to move to introduce PX-2702 from 4:11 to

7    6:10.  I'm not going to show them to the jury at this time.

8              And then Defendants' Exhibit 72 from 59 seconds to 7

9    minutes.  And then there are two images, Defense Exhibit 66 and

10   73.

11             And I just have a few more questions for Mr. Tubbs.

12             (Defendant LOS Exhibits, 72, 66 and 73 marked.)

13             (Defendant LOS Exhibit 72, 66 and 73 admitted.)

14   BY MR. JONES:

15   Q.     Mr. Tubbs, did you suffer any injuries at the rally?

16   A.     Yes, I did, sir.

17   Q.     Can you describe the injuries you suffered?

18   A.     When we encountered the Antifa roadblock I was struck in

19   the head several times by at least two people.  In front of the

20   stairs I was struck in the head by a Black Lives Matter sign.

21   I was hit by thrown objects three or four times, and I received

22   pepper spray and had to be treated three times by our medics

23   for pepper spray.

24             THE COURT:    Mr. Tubbs, your camera is not on your

25   face.  Can you adjust the camera or move in front of the

M. Tubbs - Cross

1    camera?  Now you're back where you were.  Move to your right.

2              That's better.  Yeah, that's better.

3              THE WITNESS:    Sorry, Your Honor.

4              THE COURT:    Well, you're still a little off screen.

5    Move to your right.

6              That's good.

7              THE WITNESS:    Thank you, Your Honor.

8     BY MR. JONES:

9    Q.     Now, Mr. Tubbs, what is the relationship between

10   individual state chapters of the League of the South and the

11   main League of the South?

12   A.     We're basically independent entities, much like states are

13   to the United States.

14   Q.     So you're saying the Florida chapter is a separate legal

15   entity from the League of the South main --

16   A.     Yes, sir.  Yeah, we're registered in the state of Florida.

17   Q.     Before August 12th had you ever heard of James Fields

18   before?

19   A.     No, sir.

20   Q.     You had never met or spoken to him, to your knowledge?

21   A.     Never.

22   Q.     What about Jason Kessler, had you ever met or spoken to

23   Mr. Kessler?

24   A.     No, sir.

25   Q.     Did you conspire with any of the defendants to commit

M. Tubbs - Cross

1  racially motivated violence in Charlottesville?

2  A.      No, sir, not at all.

3              MR. JONES:    Thank you.  That's all the questions I

4  have.

5              THE WITNESS:    Thank you, sir.

6              THE COURT:    Let's see.  Anyone else have any

7  questions?

8              MR. SPENCER:    I have some very brief questions.

9              THE COURT:    All right.

10                        CROSS-EXAMINATION

11  BY MR. SPENCER:

12  Q.      Hello, Mr. Tubbs.  This is Richard Spencer and I am acting

13  on my own behalf.

14  A.      Good afternoon, sir.

15  Q.      Good afternoon.  At any point on August 11th did you

16  happen to see me in your vicinity?

17  A.      No, sir.

18  Q.      At any point on August 12th did you happen to see me in

19  your vicinity?

20  A.      Not that I recall, sir.

21  Q.      Have we ever been in any communication whatsoever?

22  A.      No, sir, not at all.

23              MR. SPENCER:    Thank you.  No further questions.

24              MR. CANTWELL:    I have a few, Judge.  Cantwell.

25                        CROSS-EXAMINATION

M. Tubbs - Cross

1   BY MR. CANTWELL:

2   Q.      Hello, Mr. Tubbs.

3                 MR. CANTWELL:    Do we still have Mr. Tubbs here?

4                 THE COURT:    Is Mr. Tubbs still on?

5                 THE CLERK:    Yes.

6                 THE WITNESS:    Pardon me, Your Honor?

7                 THE COURT:    I was just checking to see if you were

8   still there.

9   BY MR. CANTWELL:

10  Q.      Hello, Mr. Tubbs.  This is Christopher Cantwell.  Can you

11  hear me?

12  A.      Yes.  Yes, Your Honor.  I am here.  I did receive a

13  notice.

14                THE COURT:    Do you have a question?

15  BY MR. CANTWELL:

16  Q.      Mr. Tubbs, do you recall a rally in Pikeville, Kentucky

17  that you attended?

18  A.      I'm sorry, sir, you're coming in broken up.  Could you

19  repeat your question, sir?

20  Q.      Yes.  Did you attend a rally in Pikeville, Kentucky?

21          I'll try it one more time.

22          Did you attend a rally in Pikeville, Kentucky?

23  A.      No, sir, I did not.

24  Q.      Oh, you did not.  Okay.

25          Is this the first time we've ever spoken?

M. Tubbs - Cross

1    A.      Yes, it is, sir.

2    Q.      Okay.

3                MR. CANTWELL:    Now, I would like to show Mr. Tubbs

4    Plaintiffs' Exhibit 3237 starting at 10:14.  I understand that

5    we have a technical limitation here, that we can't do that

6    without showing it to the jury at the same time.  Right?

7                I'll represent that we're going to see Mr. Tubbs in

8    this video very shortly, and he'll be able to identify himself.

9    Can we could that?

10               THE COURT:    Go ahead.

11               MR. CANTWELL:    Plaintiffs' 3237.

12               (Plaintiffs' Exhibit 3237 marked.)

13               (Plaintiffs' Exhibit 3237 admitted.)

14   BY MR. CANTWELL:

15   Q.      Mr. Tubbs, I'm going to play a video for you.  I'm going

16   to pause it a couple times and ask you questions about it,

17   okay?

18               THE WITNESS:    Yes, sir.

19               MR. LEVINE:    Can we have it identified first, please,

20   Your Honor?

21               THE COURT:    Do you have a number?

22               MR. CANTWELL:    Plaintiffs' Exhibit 3237.

23               THE CLERK:    Mr. Cantwell, what was the time stamp?

24               MR. CANTWELL:    10:14.

25               THE COURT:    Thank you.

M. Tubbs - Cross

1          MR. CANTWELL:    Can I play the video?  Are you going

2  to tell me no, or -- I'll just play it.

3          MR. LEVINE:    Your Honor, there's no foundation for

4  what this video is, of when, where, what day.

5          MR. CANTWELL:    The video is outside of -- it's

6  August 12th.  There's Mr. Tubbs.

7  BY MR. CANTWELL:

8  Q.     Is that better?

9  A.     Yes, sir, I see it plainly.

10 Q.     You see yourself there, Mr. Tubbs?

11 A.     I do, sir, yes.

12 Q.     So can --

13         MR. CANTWELL:    I imagine you want an end time stamp

14 to enter this into evidence, right?

15         I want to move this from -- let's say until -- from

16 10:21 to 19:00, I want to move this into evidence.

17         MR. LEVINE:    Your Honor, I have no objection to that

18 screenshot, but I don't know what the balance is.  The jury saw

19 a different video of the same scene during the direct

20 examination that the court limited.  So I don't know about the

21 relevance of these six or eight minutes that Mr. Cantwell wants

22 to introduce, which is after Mr. Tubbs will be out of the

23 picture.

24         MR. CANTWELL:    The goal is to show a different angle

25 of, essentially, the same scene.  Judge, I think that there is

M. Tubbs - Cross

1   more to see here.

2            THE COURT:    All right.

3            (Video playing.)

4   BY MR. CANTWELL:

5   Q.     So that's you entering the park, right, Mr. Tubbs?

6   A.     Yes, sir.

7            (Video playing.)

8   Q.     Are these some of the men that you were with?

9   A.     Yes, sir.

10  Q.     Does that man appear to be in distress right here?

11  A.     Yeah.  He's been pepper-sprayed, sir.

12            MR. LEVINE:    Objection, relevance, Your Honor.  This

13  is not something that Mr. Tubbs saw at the time.  So I don't

14  know --

15            THE COURT:    I don't know whether he saw it or not.

16            MR. LEVINE:    So the foundation of his ability to

17  review a video that is not of an event that he was -- saw at

18  the time, I think is -- lacks foundation.

19            MR. CANTWELL:    Mr. Tubbs just identified that man as

20  one of his men, presumably trying to enter the park with him,

21  got pepper-sprayed on the way in.

22            THE COURT:    Okay.  He can testify it's one of his

23  people.

24            MR. CANTWELL:    Okay.

25            THE COURT:    But not --

M. Tubbs - Cross

1          THE WITNESS:    He was not a League member, but he was

2    one of our allies.  I recognize him from that day.

3          (Video playing.)

4          MR. LEVINE:    Your Honor, I object on -- we object on

5    foundation grounds.  The Court hasn't permitted these just kind

6    of movie pictures of these events that aren't related to

7    incidents.

8          THE COURT:    Ask Mr. Tubbs if he --

9          MR. CANTWELL:    The operative part I'm really kind of

10   looking for is in about 45 seconds, Judge.

11         THE COURT:    Is he in the...

12         MR. CANTWELL:    What I believe right now is I believe

13   he's behind the camera.  Okay?

14   BY MR. CANTWELL:

15   Q.    Mr. Tubbs, does this scene look familiar to you.

16   A.    That's the scene that I saw for most of the day there,

17   sir.

18   Q.    And at some point in the course of --

19         THE COURT:    You've got to identify this particular

20   tape.

21         MR. CANTWELL:    The frame jumps several times in the

22   course of this video that's in plaintiffs' exhibit list, is --

23   BY MR. CANTWELL:

24   Q.    Are you able to identify this scene, Mr. Tubbs?

25   A.    Yes, sir.  That's -- we're entering the park and I see

M. Tubbs - Cross

1   some banners of NSM moving towards the stairs.  We're looking

2   at it from the stairs out into the center of the intersection.

3   Q.      So, Mr. Tubbs, do I recall correctly that the NSM was

4   behind the League of the South?

5   A.      Yes, they were, sir.

6   Q.      And is that an NSM banner right there?

7   A.      Yes, it is.

8   Q.      Do you see what's on that man's face, Mr. Tubbs?

9              MR. LEVINE:    Objection, Your Honor.  We object for

10  the same reasons that we were objecting during Marissa Blair's

11  testimony, for a lack of foundation here.

12             THE COURT:    Well, he says he's on the steps looking

13  into this --

14             MR. LEVINE:    I don't think that's his testimony, Your

15  Honor.  He just -- Mr. Cantwell just said that Mr. Tubbs was

16  behind this.

17             MR. CANTWELL:    I said the exact opposite.

18             THE COURT:    All right.  Go ahead.  Go ahead.

19   BY MR. CANTWELL:

20  Q.      Mr. Tubbs, can you see what's on that man's face in the

21  circle there?

22  A.      Yes.  That's a respirator.

23  Q.      Does it appear to be pink in color?

24  A.      Yes, it is.

25  Q.      Thank you.

M. Tubbs - Cross

1      Do you recognize these people who are walking into the

2  park right now, Mr. Tubbs?

3  A.    Yes.  They are members of Traditionalist Worker Party.

4  Q.    And were you witnessing this scene as it was happening?

5  A.    Yes, I was.  I was already in the park, looking back to

6  make sure everybody was able to get in okay, and our people

7  were continuously being assaulted and had objects thrown at

8  them.  That's why their shields are up in that fashion.

9  Q.    Mr. Tubbs, did you see these shields before you guys

10  started walking towards the park?

11  A.    Yes.

12  Q.    Do you know if they were all banged up like that before

13  you started marching?

14  A.    They were fairly new shields.

15  Q.    Thank you.

16      Now, Mr. Tubbs, earlier during your direct examination I

17  believe you said that you ran out into the crowd because you

18  saw people being beaten; is that right?

19  A.    That is correct.

20  Q.    Is this that scene?

21  A.    This is one of several scenes.  On our way into the park,

22  Antifa and their allies were constantly attacking us.

23  Q.    And Mr. Tubbs, did you see anybody with pink helmets that

24  day?

25  A.    Yes, I did.

M. Tubbs - Cross

1    Q.      Pink helmets like those?

2    A.      Yes, sir.

3    Q.      Did any members of League of the South have pink helmets,

4    Mr. Tubbs?

5    A.      Not a chance, sir.

6    Q.      Does this man look familiar to you, Mr. Tubbs, the man in

7    the orange hat?

8    A.      Yes, sir.

9    Q.      Where do you know that man from, Mr. Tubbs?

10   A.      He was in the crowd throughout the day, causing us

11   trouble.

12   Q.      So this is not the first time you've seen that man strike

13   somebody?

14   A.      No, sir.

15   Q.      Okay.  Does he appear to be wearing a backpack?

16   A.      I didn't catch that, sir.

17              MR. LEVINE:    Your Honor, we object on leading

18   grounds.  This witness --

19              THE COURT:    Sustained as to leading.

20              (Video playing.)

21   BY MR. CANTWELL:

22   Q.      Is that you, Mr. Tubbs?

23   A.      I believe that is, sir.  I can't really tell.

24   Q.      I'm going to rewind a little bit, Mr. Tubbs.

25   A.      Yes, sir.

M. Tubbs - Cross

1           (Video playing.)

2    Q.    Is that you?

3    A.    It appears to be so, sir, yes.

4    Q.    Why did you run into that melee, Mr. Tubbs?

5    A.    Any time that I was engaged in a melee outside the park,

6    it was because our friends and allies were being brutalized by

7    Antifa, and I was trying to break things up.

8           (Video playing.)

9           MR. CANTWELL:    I guess we can stop this video here,

10   actually.  I'm going to stop this at 12:46 and close it.

11           I'd also like to show Mr. Tubbs -- this would be

12   CCEX-086, which is -- this is not in evidence yet.  This would

13   have been Exhibit 86 on my exhibits list I had given the

14   plaintiffs before trial.

15           (Defendant Cantwell Exhibit 86 marked.)

16    BY MS. DUNN:

17   Q.    Is that you right there, Mr. Tubbs?

18   A.    I'm sorry.  Your picture is not coming up on my screen.

19   Q.    Oh.  I apologize.

20           THE CLERK:    He can't see it because it has not been

21   admitted.

22           MR. CANTWELL:    I think the plaintiffs can recognize

23   Mr. Tubbs in that image.

24           MR. LEVINE:    Yes.

25           MR. CANTWELL:    Can we publish that to the jury and

M. Tubbs - Cross

1    show it to Mr. Tubbs, please?

2                    THE COURT:   Yes.

3                    (Defendant Cantwell Exhibit 86 admitted.)

4    BY MR. CANTWELL:

5    Q.    Do you recognize that sign, Mr. Tubbs?

6    A.    Yes, sir.  It was right in front of my face on entering

7    the park.

8    Q.    What does that sign mean to you, Mr. Tubbs?

9    A.    Well, first, it's a left fist, and left is associated

10   with -- left fist is associated with communism and, of course,

11   the left in general.

12   Q.    Thank you.  Do you recognize this scene, Mr. Tubbs?

13   A.    I know it well, sir.

14                    (Video playing.)

15   Q.    Mr. Tubbs, when the people who were blocking your path,

16   when they stopped fighting, did you go after them more?

17                    MR. LEVINE:   Objection, leading.

18                    THE COURT:   Sustained.

19                    MR. LEVINE:   We move to strike the answer, Your

20   Honor.

21                    THE COURT:   Did he answer?  I don't see an answer.

22   Did he make -- give an answer?

23                    MR. LEVINE:   I thought I heard it, but if it's not

24   there, Your Honor, then...

25    BY MR. CANTWELL:

M. Tubbs - Cross

1   Q.      I'm bringing up 3239A.  This is already in evidence.

2                   (Video playing.)

3           Mr. Tubbs, do you know who that man in the blue is with

4   the sunglasses?

5   A.      I do not know him personally, but I believe he is one of

6   the assailants in the parking garage that beat three of our

7   members, or our allies.

8   Q.      You said you saw him in a parking garage?

9   A.      The photo is not very clear from where I'm sitting, but he

10  appears to be one of them, yes.

11  Q.      I'm going to bring back up -- I think it was CCEX-86.  I'm

12  going to get him from a different angle for you, Mr. Tubbs.

13  A.      Yes, sir.

14  Q.      That's probably not much help, right?

15  A.      Yeah.

16  Q.      No.  Never mind.

17          Sorry.  Withdrawn.

18  A.      I don't believe that is the man that I originally thought

19  it was when you asked me earlier.

20                  MR. CANTWELL:    All right.  No further questions.

21  Thank you.

22                  THE COURT:    Okay.  Anyone else?  Anyone on Zoom?  All

23  right.

24                  MR. REBROOK:    This is Edward ReBrook.  I have a few

25  questions, if I may, Your Honor.

M. Tubbs - Cross

1        THE COURT:    All right.

2                        CROSS-EXAMINATION

3    BY MR. REBROOK:

4    Q.    Mr. Tubbs, good afternoon.

5    A.    Good afternoon.

6    Q.    I understand that you know Jeff Schoep; is that correct?

7    A.    I know of Jeff Schoep.  I don't know him well.  I might

8    have met him once or twice briefly.

9    Q.    Were you involved in any sort of planning of the Unite the

10   Right with Mr. Schoep?

11   A.    No, sir.

12   Q.    Okay.  Were you present at the torchlight march?

13   A.    No, sir, I was not.

14   Q.    And what time did you all leave the Unite the Right rally?

15   A.    That is difficult to say, sir.  It wasn't long after the

16   attack on us in the parking garage.  We moved upstairs, got in

17   our vehicles, and left quickly after that.

18   Q.    You had mentioned seeing some of the counter-protesters

19   and Antifa members throw items at the protesters.  Could you

20   expand on that a bit?

21        MR. LEVINE:    Objection.

22        THE WITNESS:    Yes, sir.  There was a wide and varied

23   assortment of objects thrown at us.

24        One of the most memorable was some sort of blue

25   liquid concoction that had some sort of acid in it that stained

M. Tubbs - Cross

1    our clothes and burned our skin, and one of our League members

2    had some severe burns on his forearms where they were exposed.

3              There was also water bottles filled with urine,

4    frozen water, cans filled with concrete, and some random --

5    like, concrete and asphalt, stones, that had been collected

6    from somewhere.

7              That's pretty much the majority of what we

8    experienced.

9    BY MR. REBROOK:

10   Q.    And were you involved with any sort of planning activities

11   for Unite the Right with any NSM members?

12   A.    The closest I could say that we were -- I was engaged with

13   any planning was Friday night, when I arrived late, there was a

14   meeting in progress at the lodging facility.  And I believe

15   Jeff Schoep was there, but all we were discussing was the

16   logistics of moving from the lodging facility to the parking

17   garage.

18   Q.    Okay.  So at what point did you discuss causing violence?

19   A.    There was never -- never any discussion of that nature in

20   any of the planning that I heard.

21              MR. REBROOK:    I have no further questions, Your

22   Honor.

23              Thank you, sir.

24              THE WITNESS:    Thank you, sir.

25              THE COURT:    Okay.  Mr. Levine, if you have any

M. Tubbs - Cross

1    redirect.

2                    MR. LEVINE:    Just a couple.

3                    First, housekeeping:  We had marked Plaintiffs'

4    Exhibit 1539, which was the email between Mr. Hill and

5    Mr. Tubbs about Mr. Tubbs participating in the operations.  And

6    I'd like to move that into evidence.

7                    MR. JONES:    No objection.

8                    THE COURT:    Be admitted.

9                    (Plaintiff Exhibit 1539 admitted.)

10                          REDIRECT EXAMINATION

11    BY MR. LEVINE:

12   Q.      Now, Mr. Tubbs, you testified on cross that the Florida

13   state chapter was separate from the national League of the

14   South that Mr. Hill was president of; is that your testimony?

15   A.      Yes, sir.  We have a wide latitude of sovereignty in the

16   Florida League.

17   Q.      You also are number two in the League of the South

18   nationally; isn't that right?

19   A.      Could you define "number two"?

20   Q.      I think that was Mr. Hill's testimony, that you were chief

21   of staff.  Are you chief of staff for League of the South?

22   A.      No.  The number two -- the number two person in the League

23   of the South below Dr. Hill is an executive officer.  Chief of

24   staff comes below that.

25   Q.      But you are chief of staff of the national League of the

M. Tubbs - Cross

1    South, correct?

2    A.      That is correct, sir.

3    Q.      And you were there -- and you were chief of staff of

4    League of the South in August of 2017, correct?

5    A.      I was chief of staff, but you might be confused about what

6    the duties of a chief of staff are versus the chief of

7    operations.

8    Q.      When Dr. Hill asked you to assist with him on August 11th,

9    it was as chief of operations of national League of the South

10   participating in the event; is that right?

11   A.      Actually, chief of operations was Ike Baker.

12   Q.      But when he asked you to handle the -- join him in

13   handling the operations of League of the South in

14   Charlottesville 2.0, he asked you as an officer of the national

15   organization, right?

16   A.      Yes.  And I was duty-bound to perform any task that he

17   required of me.

18   Q.      Mr. Tubbs, you were deposed in this case on June 19th,

19   2020, correct?

20   A.      I believe that's the correct date, sir.

21   Q.      And you were shown a video of August 12th and of pushing

22   into the counter-protesters to get into the park, weren't you?

23   A.      Yeah, you showed us a video of us meeting the

24   counter-protesters.

25   Q.      And were you asked this question and did you give this

M. Tubbs - Cross

1   answer?

2            Question:  "So the testimony -- your testimony is you

3   don't really recall the events that you just saw on the video?"

4            Answer:  "From the time that I was attacked by the rioters

5   blocking the street until the time we entered the park, it was

6   very fuzzy."

7            Were you asked that question and did you give that answer?

8   A.      Yeah, it was a little fuzzy.

9                 MR. LEVINE:    No further questions, Your Honor.

10                THE WITNESS:    Yes, I was a little fuzzy, but I wasn't

11   unconscious.

12                THE COURT:    All right.  Are they all the questions

13   for Mr. Tubbs?

14                Mr. Tubbs, you may step down.

15                THE WITNESS:    Thank you very much, Your Honor.

16                THE COURT:    Okay.  All right.

17                Who's the next witness?

18                MS. KAPLAN:    Your Honor, next we have a video

19   testimony from Thomas Rousseau.

20                THE COURT:    Is this -- is this --

21                MR. LEVINE:    Your Honor, just -- could we get copies

22   of the Defendants' Exhibits 66 and 73?  I don't think we have

23   copies of that, Your Honor.

24                THE COURT:    All right.

25                They were admitted, right?

M. Tubbs - Cross

1      MR. LEVINE:    Yes.

2      MR. JONES:    I'll send them right now.

3      MR. LEVINE:    Thank you.

4      THE COURT:    Now, is Mr. Rousseau one of the

5  depositions that Mr. Cantwell was not --

6      MS. KAPLAN:    He is, Your Honor.

7      THE COURT:    All right.

8      Members of the jury, I'm going to have to read this

9  to you again.

10      As I said earlier, each party is entitled to have the

11  case decided solely on the evidence that applies to that party.

12  Some of the evidence in this case is limited under the rules of

13  evidence to some of the parties and cannot be considered

14  against the others.

15      Plaintiffs' deposition testimony from Mr. Rousseau

16  may not be considered by you in connection with Defendant

17  Christopher Cantwell because of his inability to be at the

18  deposition and noticed.  However, it may be considered by you

19  in connection with the other defendants.

20      All right.  You may play the deposition.

21      MS. KAPLAN:    Thank you, Your Honor.

22      (Video deposition of Thomas Rousseau played.)

23      THE COURT:    Let's stop right here and take about a

24  20-minute recess.

25      MS. KAPLAN:    Of course, Your Honor.

M. Tubbs - Cross

1    **(Jury out, 3:24 p.m.)**

2                    (Recess.)

3                    THE COURT:    Maybe at the end we'll talk a little bit

4    about scheduling for the rest of the time.

5                    MS. DUNN:    I'm sorry, Your Honor.  I didn't --

6                    THE COURT:    After the jury is discharged, we'll talk

7    about scheduling and see where we are.

8                    MS. KAPLAN:    We think that's a great idea.  Thank

9    you, Your Honor.

10   **(Jury in, 3:47 p.m.)**

11                   THE COURT:    All right.  You may be seated and we'll

12   proceed with the deposition.

13                   (Video deposition of Thomas Rousseau played.)

14                   MS. KAPLAN:    That's it for Mr. Rousseau, Your Honor.

15                   We have some exhibits we'd like to have admitted.

16                   THE COURT:    Okay.

17                   MS. KAPLAN:    I understand that one is being emailed

18   to me as I speak, Your Honor.  One second.

19                   You know what?  I apologize, Your Honor.  It's not

20   coming through.

21                   We have one more video that's a half an hour to close

22   out the day, and then I can admit the exhibits -- is that

23   okay? -- after both.

24                   Would that work, Your Honor?

25                   THE COURT:    Yes.

M. Tubbs - Cross

1    MS. KAPLAN:    So we're now calling, by video, a third

2  party, Vasilios Pistolis.

3    THE COURT:    Is it really a half an hour, or more like

4  45 minutes?

5    MS. KAPLAN:    My post, it says 30 minutes -- 33, I'm

6  told.

7    THE COURT:    Do you have anything less than that?

8    MS. KAPLAN:    No.  I'm seeing no.

9    THE COURT:    Okay.  Go ahead.

10    MS. KAPLAN:    Okay.  Thank you, Your Honor.

11    (Video deposition of Vasilios Pistolis played.)

12    THE COURT:    All right.  Members of the jury, we'll

13  recess now until 9:30 tomorrow morning.  Do not discuss the

14  case with anyone or allow anyone to discuss it with you or

15  remain in anyone's hearing.

16    MS. KAPLAN:    Your Honor, I forgot to remind you that

17  with respect to Mr. Pistolis, Mr. Cantwell gets the same

18  instruction.  I apologize.  We showed them together.  So it

19  applies to both.

20    THE COURT:    Members of the jury, I'll remind you

21  before you leave that this last deposition that you heard

22  cannot be considered in connection with Defendant Christopher

23  Cantwell because of his inability to be at the deposition and

24  not have notice; however, it may be considered by you in

25  connection with the other defendants.

M. Tubbs - Cross

1        So I'm going to allow you to leave now.  Thank you so

2  much for being here.  Goodbye.

3  **(Jury out, 5:07 p.m.)**

4            THE CLERK:    Did you mean 9:00?

5            THE COURT:    I meant 9:00.  What did I say?

6            MS. KAPLAN:    Your Honor, I know you wanted to excuse

7  the jury.  I do have the exhibits to read.  I can do those now,

8  or hand a document, whatever --

9            THE COURT:    You can go on and do it.

10            MS. KAPLAN:    I'm sorry, I didn't hear you.

11            THE COURT:    I said it's okay.  Go ahead.

12            MS. KAPLAN:    So for Rousseau, the clip report is

13  Plaintiffs' Exhibit 3861 and the exhibits which we'd like to

14  admit into evidence are Plaintiffs' 0991 -- these will all be

15  plaintiffs' exhibits -- 0334, 1443, 1057, 38480.  I need to

16  check that because it seems too long.  I'll double-check that.

17            3849, 2594, 1009, 3853, 2686, 2596, 2688, 2702, 1888,

18  2597, 2592, 2701, 3855, 2649, 3856, 3858, 3859, 1977, 2638,

19  3803.  And again, I'll get that other one for you.  I

20  apologize.

21            And then for Mr. Pistolis, Plaintiffs' 0991, 0334,

22  1443, 1057.  I'm still seeing this strange number.  I've got to

23  check this one.  3849, 2594.

24            THE CLERK:    I'm sorry, after 3849?

25            MS. KAPLAN:    3849, 2594, 1009, 3853, 2686, 2696,

M. Tubbs - Cross

1  2688, 2702, 1888, 2597, 2592, 2701, 3855, 2649, 3856, 3858,

2  3859, 1977, and 2638.  Sorry for the long list.

3           (Plaintiffs' Exhibits 0991, 0334, 1443, 1057, 38480,

4  3849, 2594, 1009, 3853, 2686, 2696, 2688, 2702, 1888, 2597,

5  2592, 2701, 3855, 2649, 3856, 3858, 3859, 1977, 2638 marked and

6  admitted.)

7           THE COURT:   All right.  I understand you all have

8  been talking about scheduling.  Where do we stand?

9           MS. KAPLAN:    So, Your Honor, we spent a lot of time

10  this weekend sending emails to the defendants and kind of

11  thinking it through.  And we thought that the best way to save

12  time at this point, because we're sure Your Honor wants to end

13  as scheduled, as we all do too, is to agree to do our direct

14  exam of Mr. Kessler and Mr. Cantwell on defendants' case

15  because they intend to speak in defendants' case, and

16  Mr. Spencer said he wanted to call Mr. Kessler as part of

17  defendants' case.  Mr. Kolenich I understand is agreeable to

18  that.  Mr. Cantwell I understand has objected.  I'm not sure

19  why he's objected, but obviously it would save time if we don't

20  have to have people come to the stand twice.

21           So that's one part of it.  And obviously if that were

22  to happen, we'd want an agreement that there's not a limitation

23  to scope, that Your Honor would give an instruction as to why

24  this is happening, etc.  But we can work all that out.

25           Let me just go through -- do you want to talk to

M. Tubbs - Cross

1   Mr. Cantwell or should I go through all three elements?  I have

2   two other parts of it.  Do you want me to continue?

3          THE COURT:    Yes.

4          MS. KAPLAN:    The other thing we'd like to do -- and

5   we're going to send a stipulation to defendants today when we

6   get back from court -- is to stipulate as to plaintiffs'

7   compensatory damages, of the kinds of things you've heard some

8   of the plaintiffs read, we'll just do a stipulation.  If

9   defendants can agree to that, we can eliminate two witnesses

10  that way, two of our damages witnesses.

11          And if that's all true, given what defendants we

12  understand have said they need -- and we've got emails from all

13  of them, I think other than Mr. Cantwell -- we had a

14  conversation with Mr. Smith -- we think if that's true we can

15  be done with our case this Friday.  And that's losing Veterans

16  Day, obviously.  That would then give defendants a whole entire

17  week to put on their case.  We think that's probably enough

18  even to do closings based on what we understand they intend to

19  put on.

20          THE COURT:    Anything you all would add?

21          MR. KOLENICH:    I think we generally agree with that.

22  She correctly represented my agreement, but we're having some

23  discussions about the stipulations as to damages.  I'm not sure

24  the defense is going to be able to completely agree on that as

25  far as eliminating those two witnesses, or both of them.

M. Tubbs - Cross

1    THE COURT:    Are you trying to stipulate the doctor

2    bills and things?

3    MS. KAPLAN:    Yes, compensatory damages and future

4    medical bills, yes, Your Honor.

5    THE COURT:    You're just talking about bills?

6    MS. KAPLAN:    Just numbers, correct.

7    MR. KOLENICH:    We don't have a problem with the

8    people hit by the car, Your Honor, or the ones physically

9    injured in that incident, and I think we probably can stipulate

10    to that, but as far as these emotional damages and PTSD and

11    things like that, that can be even more specific.  My local

12    counsel is raising quite an objection to that.  He states

13    jurors in this jurisdiction do not give out very much in the

14    way of awards for those types of damages.  Some of their

15    plaintiffs were not involved in the car incident or were not

16    hit in any way by the car.  I'm not sure we can stipulate on

17    that.

18    MS. KAPLAN:    I am relatively optimistic, Your Honor,

19    because I don't think the numbers, frankly, are that high for

20    those witnesses.  Maybe you should see what we give you and

21    then we can discuss.

22    MR. KOLENICH:    Granted, I haven't reviewed the

23    complete proposed stipulation.  So maybe that'll be a nonissue.

24    THE COURT:    Did you have something, Mr. Cantwell?

25    MR. CANTWELL:    I've been asked to -- I don't exactly

M. Tubbs - Cross

1    understand the terminology here, but my intention, since

2    there's been no evidence of a violent racist conspiracy here,

3    is to, after the plaintiffs put their case on, is to move to

4    dismiss under Rule 50 because there's no evidence of a violent

5    racist conspiracy here and there's no reason for us to have to

6    put on a defense.  That's my view of it.

7              THE COURT:    All right.  Well, we'll have to --

8              MS. KAPLAN:    Your Honor, we would obviously -- we

9    understand that argument.  We would obviously ask that Your

10   Honor leave our case open until we've finished the examinations

11   of Messrs. Kessler and Cantwell.  But we think already there's

12   more than enough evidence in the record for Your Honor to deny

13   such a motion.

14             THE COURT:    Let me figure out how to do that.  Do you

15   believe the defendant can put his case on in three days?  I

16   think we're going to need -- I think you're going to have to

17   finish the evidence by Wednesday, probably.

18             MR. KOLENICH:    For the represented parties, that

19   shouldn't be a problem, Your Honor, although I haven't

20   conferred with Mr. Smith, but I take it the plaintiffs have.  I

21   understand the unrepresented parties are going to need an

22   equivalent amount of time.  I don't know that the defense case

23   in total can go in in three days.  I don't think that's an

24   accurate representation of where we're at.

25             THE COURT:    The verdict form is so complicated, it's

M. Tubbs - Cross

1    going to take the jury a little while to do this.

2                    MS. KAPLAN:    So we would be very regretful if we had

3    to go over to the next week, but we think there's enough time

4    to maybe go over to that Monday or Tuesday, have them

5    deliberate on Tuesday and then get --

6                    THE COURT:    What if we change the plans and work this

7    Thursday?

8                    MS. KAPLAN:    Oh, that would be great, Your Honor.

9                    THE COURT:    No, I'm not giving you any more time, but

10   to give them another day.

11                   MR. KOLENICH:    That's all right with us, Judge, but

12   we already did tell the jury they were getting Thursday off.

13   So who knows what their plans have been made.

14                   THE COURT:    Well, I know, and it's complicated to

15   undo it.

16                   MS. KAPLAN:    If you wanted to do their day Thursday,

17   that's great.  We have witnesses coming on Friday from out of

18   town, but we have no issue with that at all.

19                   THE COURT:    We can check with the jury.  The jury

20   might rather finish up this week than finish up and not --

21                   MR. KOLENICH:    Yes.

22                   MS. KAPLAN:    The only other thing I have to add, Your

23   Honor, is Mr. Smith did not send an email back.  He had a

24   conversation with my colleague, Michael Bloch.  He really

25   wouldn't commit to what he was doing in terms of his case.  And

M. Tubbs - Cross

1    he said he didn't really mind if it went past Thanksgiving.

2    We're working with what we have.  I don't expect that he's

3    going to have a lot, but I'm a little bit in the dark about

4    that.

5                    THE COURT:    All right.  I'll think about it

6    overnight.  Thank you.

7                    Let me go back to this Thursday thing.  Have any of

8    you made arrangements to be out of town or anything Thursday?

9                    MR. KOLENICH:    No, sir.

10                   MR. CAMPBELL:    I have, Your Honor, but not anything I

11   can't change if the Court so requires.

12                   MS. KAPLAN:    We're not going anywhere, your Honor.

13   We'll be here.

14                   MS. DUNN:    Your Honor, one other thing is that

15   presumably Mr. Smith will be here tomorrow because one of his

16   clients is testifying.  And so we would suggest that maybe the

17   Court can engage this topic tomorrow when he's here.

18                   THE COURT:    Okay.  Thank you.  We'll recess.

19   (Proceedings concluded, 5:17 p.m.)

20

21

22

23

24

25

M. Tubbs - Cross

1                    C E R T I F I C A T E

2        I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3    the United States District Court for the Western District of

4    Virginia, appointed pursuant to the provisions of Title 28,

5    United States Code, Section 753, do hereby certify that the

6    foregoing is a correct transcript of the proceedings reported

7    by me using the stenotype reporting method in conjunction

8    with computer-aided transcription, and that same is a

9    true and correct transcript to the best of my ability and

10   understanding.

11       I further certify that the transcript fees and format

12   comply with those prescribed by the Court and the Judicial

13   Conference of the United States.

14       /s/ Lisa M. Blair               Date: November 8, 2021

15

16

17

18

19

20

21

22

23

24

25