Sines, et al. v. Kessler, et al., 3:17CV72, 11/9/2021

1          UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF VIRGINIA
2            CHARLOTTESVILLE DIVISION

3  **************************************************************

4  ELIZABETH SINES, ET AL.,    CIVIL CASE NO.:  3:17CV72
                               NOVEMBER 9, 2021, 9:00 AM
5                              JURY TRIAL, DAY 12
         Plaintiffs,
6  vs.

7                              Before:
                               HONORABLE NORMAN K. MOON
8                              UNITED STATES DISTRICT JUDGE
   JASON KESSLER, ET AL.,      WESTERN DISTRICT OF VIRGINIA
9
         Defendants.
10
   **************************************************************
11
   APPEARANCES:
12

13 For the Plaintiffs:     ALAN LEVINE, ESQUIRE
                           COOLEY LLP
14                         1114 Avenue of the Americas, 46th
                           Floor
15                         New York, NY  10036
                           212.479.6260
16
                           MICHAEL L. BLOCH, ESQUIRE
17                         EMILY C. COLE, ESQUIRE
                           ROBERTA A. KAPLAN, ESQUIRE
18                         Kaplan Hecker & Fink LLP
                           350 Fifth Avenue, Suite 7110
19                         New York, NY  10118

20

21 Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                    255 West Main Street, Suite 304
22                  Charlottesville, Virginia  22902
                    434.296.9284
23
   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
24 TRANSCRIPT PRODUCED BY COMPUTER.

25

Sines, et al. v. Kessler, et al., 3:17CV72, 11/9/2021

1  APPEARANCES CONTINUED:

2  For the Plaintiffs:          KAREN L. DUNN, ESQUIRE
                               WILLIAM A. ISAACSON, ESQUIRE
3                              JESSICA E. PHILLIPS, ESQUIRE
                               Paul, Weiss, Rifkind, Wharton &
4                              Garrison LLP
                               2001 K Street, NW
5                              Washington, DC  20006
                               202.223.7300
6

7  For the Defendants:         DAVID L. CAMPBELL, ESQUIRE
                               Duane, Hauck, Davis, Gravatt &
8                              Campbell, P.C.
                               100 West Franklin Street, Suite 100
9                              Richmond, VA  23220
                               804.644.7400
10
                               CHRISTOPHER CANTWELL, PRO SE
11                             #00991-509
                               USP Marion
12                             4500 Prison Road, PO Box 2000
                               Marion, IL  62959
13
                               BRYAN J. JONES, ESQUIRE
14                             Bryan J. Jones, Attorney at law
                               106 W. South Street, Suite 211
15                             Charlottesville, VA  22902
                               540.623.6952
16
                               JAMES E. KOLENICH, ESQUIRE
17                             Kolenich Law Office
                               9435 Waterstone Blvd., Suite 140
18                             Cincinnati, OH  45249
                               513.444.2150
19

20                             WILLIAM E. REBROOK, IV, ESQUIRE
                               (Appearing via Zoom)
21                             The ReBrook Law Office
                               6013 Clerkenwell Court
22                             Burke, VA  22015
                               571.215.9006
23
                               JOSHUA SMITH, ESQUIRE
24                             Smith LLC
                               807 Crane Avenue
25                             Pittsburgh, PA  15216
                               917.567.3168

```
 1   APPEARANCES CONTINUED:

 2   For the Defendants:          RICHARD SPENCER, PRO SE
                                  P.O. Box 1676
 3                                Whitefish, MT  59937

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                            INDEX OF WITNESSES

2    WITNESSES ON BEHALF OF THE PLAINTIFF:              PAGE

3    CHELSEA ALVARADO

4     Direct Examination by Ms. Phillips                 9
      Cross-Examination by Mr. Cantwell                 34
5     Cross-Examination by Mr. ReBrook                  47

6    MATTHEW PARROTT

7     Direct Examination by Mr. Bloch                   48
      Cross-Examination by Mr. Kolenich                203
8     Cross-Examination by Mr. Spencer                 211
      Cross-Examination by Mr. Campbell                216
9     Cross-Examination by Mr. Jones                   217
      Cross-Examination by Mr. ReBrook                 223
10    Cross-Examination by Mr. Cantwell                224
      Cross-Examination by Mr. Smith                   240

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3        EXHIBIT:              Marked      Received

 4        281                      18          18

 5        307                      22          22

 6        62                       24          24

 7        3321A                    28          29

 8        50                       30          31

 9        2371                     50          50

10        604                      51          51

11        2369                     54          54

12        2376                     57          57

13        1841                     65          65

14        3379                     76          76

15        2433                     83          83

16        622                      85          86

17        600                      87          87

18        602                      90          91

19        618                      94          94

20        619                      97          97

21        675                     101         101

22        607                     105         105

23        601                     107         107

24        2372                    109         109

25        2781                    114         114
```

1                          INDEX OF EXHIBITS

2    EXHIBITS ON BEHALF OF THE PLAINTIFF:

3    EXHIBIT:                  Marked      Received

4         685                              131        132

5         2373                             145        145

6         3545                             159        159

7         340                              160        160

8         1875                             161        161

9         2378                             164        164

10        1892                             165        165

11        2410                             167        167

12        3394                             169        169

13        1028                             171        171

14        2370                             173        173

15        2436                             174        174

16        2375                             176        176

17        2093                             179        179

18        2476                             185        185

19        3870                             192        192

20        3871                             192        192

21        3872                             192        192

22        3873                             192        192

23        3874                             192        192

24        2540                             196        196

25

```
 1                        INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE DEFENDANTS:

 3          EXHIBIT:                Marked     Received

 4          CC-1503                    40         40

 5          CC-319                     46         --

 6          CC-2133                   232        232

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  (Proceedings commenced, 9:00 a.m.)

2          THE COURT:  Good morning.  Call the jury.

3          While the jury is coming, I'll just tell you all that

4  we -- the clerk, my clerk and one of the deputy clerks saw the

5  jury and asked them about the possibility of their working

6  Thursday.  They're going to let us know something by lunch.

7          MS. DUNN:  Thank you, Your Honor.

8          MS. KAPLAN:  Your Honor, I assume if that happens you

9  saw my letter saying --

10         THE COURT:  I'm sorry.

11         MS. KAPLAN:  I apologize.  Assuming that happens, I

12  assume you saw my email that said we're okay going through

13  Thursday for our case and then they can start on Friday, which

14  seems more practical and reasonable.

15         THE COURT:  All right.

16         MR. CANTWELL:  Judge, to stick with that timetable, I

17  think we may need to address -- the jury is --

18         THE COURT:  We'll talk about it later.

19         MR. CANTWELL:  All right.

20  **(Jury in, 9:02 a.m.)**

21         THE COURT:  Be seated.  Good morning, ladies and

22  gentlemen.  Before we begin, I'll remind everyone that under

23  Standing Order 2020-12 and 2013-8, the Court's prohibition

24  against recording and broadcasting court proceedings remains in

25  force.  Attorneys, parties, their staff and any members of the

9

C. Alvarado - Direct

1  public or press accessing this proceeding today may not record

2  or broadcast it.  That means no photography, no using of video

3  or audio recording devices.  No rebroadcasting, livestreaming

4  or otherwise disseminating any live or recorded video or audio

5  of this proceeding.

6        Okay.  We will call the next witness.

7        MS. KAPLAN:  Your Honor, plaintiffs call Plaintiff

8  Chelsea Alvarado.

9        THE COURT:  Where is this witness?

10       Where is the witness?

11       MS. PHILLIPS:  She's right outside.

12     CHELSEA ALVARADO, CALLED BY THE PLAINTIFFS, SWORN

13       THE COURT:  All right.  Take your mask off.

14       You may proceed.

15       MS. PHILLIPS:  Thank you, Your Honor.

16                        DIRECT EXAMINATION

17  BY MS. PHILLIPS:

18  Q    Good morning, Chelsea.

19  A    Good morning.

20  Q    Can you please introduce yourself to the jury?

21  A    My name is Chelsea Alvarado.

22  Q    Chelsea, what city and state do you currently live in?

23  A    Sterling, Virginia.

24  Q    How long have you lived in Sterling?

25  A    A little over a year.

C. Alvarado - Direct

1  Q     And where did you grow up?

2  A     Fairfax County, Virginia.

3  Q     So also in Northern Virginia?

4  A     Yes.

5  Q     Have you lived in Virginia your whole life?

6  A     Yep.

7  Q     Chelsea, what is your educational background?

8  A     So I graduated from Sweet Briar College in 2017 with a

9  bachelor's of science in psychology, and then I am currently in

10 a part-time master's program in data science through UVa.

11 Q     I'm sorry, through the University of Virginia?

12 A     Yes.

13 Q     Chelsea, are you also employed?

14 A     Yes.

15 Q     What is your job?

16 A     I'm a junior biomedical data scientist.

17 Q     And for whom do you work?

18 A     A small contractor that collaborates with the NIH.

19 Q     And when you say NIH, what is the NIH?

20 A     The National Institutes of Health.

21 Q     And what do you do as a junior biomedical data scientist?

22 A     Well, I'm still kind of like in training, but primarily

23 it's just using, like, fancy computer algorithms and just

24 applying them to large data sets.  Specifically for my work

25 it's genomic data, because we're working on Alzheimer's and

11

C. Alvarado - Direct

1   dementia research.

2   Q    How long have you been a junior biomedical data scientist?

3   A    A month and a week.

4   Q    And what was your job prior to your current position?

5   A    I was a connectome annotator, which is just a really fancy

6   name for a research technician.

7   Q    You said a research technician?

8   A    Yeah, a research technician.

9   Q    And where were you employed as a research technician?

10  A    The Janelia Research Campus, which is a part of the Howard

11  Hughes Medical Institute.

12  Q    Chelsea, the jury has heard about events that happened on

13  August 11th and August 12th, 2017, here in Charlottesville,

14  Virginia.  Were you at any of those events?

15  A    I was present on August 12th.

16  Q    Where were you living on August 12th, 2017?

17  A    Richmond, Virginia.

18  Q    And did you travel from Richmond to Charlottesville on

19  August 12th?

20  A    Yes.

21  Q    Why did you go to Charlottesville that day?

22  A    I mean, some friends had invited me and I thought about it

23  a little bit and really, I mean, just having -- you know, being

24  born in Virginia, grown up in Virginia, attended college in

25  Virginia, I just felt very strongly that I wanted to, you know,

C. Alvarado - Direct

1    be there and symbolically represent and basically just, you

2    know, stand up for what I believed in, which was just -- I just

3    didn't agree with what the other party was -- what their

4    message was.

5          So, you know, I just wanted to be there and be, like, I'm

6    not scared of your message.  You know, I wanted to represent

7    what I believed Virginia was -- you know, what it stands for.

8    Q    Had you ever attended an event like this before?

9    A    No.

10   Q    Do you recall when you learned that this event on August

11   12th was going to happen?

12   A    Yeah.  I believe it was like the Tuesday or the Wednesday

13   before it happened.

14   Q    Before August 12th?

15   A    Yes.

16   Q    So that same week?

17   A    Yeah.

18   Q    And do you recall how you learned about it?

19   A    A couple of friends had told me about it and asked me if I

20   wanted to attend.

21   Q    When did you arrive in Charlottesville on August 12th?

22   A    That morning, around like 8:30 or 9 in the morning.

23   Q    And did you drive in with anyone else?

24   A    No.

25   Q    Did you plan to meet anyone in Charlottesville?

13

C. Alvarado - Direct

1  A      Just the friends that had invited me.

2  Q      Do you recall where you parked?

3  A      Some residential street near downtown.

4  Q      Chelsea, did you have any weapons on you that day?

5  A      No.

6  Q      Did you have any flags or banners or signs with you that

7  day?

8  A      No.

9  Q      Did you have anything that you could throw or that could

10  be used as a weapon?

11  A      Uh-uh, no.

12  Q      That's a no?

13  A      Yes.

14  Q      What did you have with you on August 12th, 2017?

15  A      I just had my cellphone, a drawstring bag, my car keys and

16  I had my health insurance card because I had lost my license,

17  which turned out to be under some clothes in my room.

18  Q      What were you wearing that day, if you recall?

19  A      Yeah, I was wearing a pair of blue skinny jeans, a pair of

20  my Doc Martens, which are just boots, a band T-shirt and a hat.

21  Q      Do you recall where you went after you parked on that

22  residential street?

23  A      Yeah, so I ended up walking to what I now know as the

24  Bridge.

25  Q      Something called "the Bridge"?

14

C. Alvarado - Direct

1   A    Yeah.

2   Q    And what specifically did you do while you were at the

3   Bridge?

4   A    I mean, I waited around for my friends to show up.  I was

5   just kind of like observing what was going on since I didn't

6   particularly know what to expect.  You know, someone brought a

7   bunch of instruments and was like, hey, you know, anyone who

8   wants to participate with, like, the chants and play music, go

9   ahead and pick some.  It was a different arrangement of stuff.

10  And I went ahead, and I wanted this, like, small drum, but

11  someone grabbed it before I could get to it.  So I ended up

12  with a larger drum, probably like this size.

13  Q    What did the drum look like?

14  A    It was fairly large and metallic blue.

15  Q    Why did you choose the drum?

16  A    Well, I mean, like, growing up, I had played, like, the

17  violin and in college I learned the cello.  I had always wanted

18  to, like, learn how to play the drums, because I would see the

19  drum line in high school and I thought it was super cool.  I

20  was like, oh, let me give it a shot.

21  Q    After you met up with your friends near the Bridge, where

22  did you go?

23  A    I guess we ended up walking towards Emancipation Park.

24  Q    And did you end up at Emancipation Park?

25  A    On the outskirts of it.

15

C. Alvarado - Direct

1          MS. PHILLIPS:  Your Honor, with permission, I'd like

2    to put up the demonstrative of the map of Charlottesville, and

3    specifically Emancipation Park.

4          THE COURT:  You may.

5          MS. PHILLIPS:  Thank you.

6          Matt, can you blow up the area around Emancipation

7    Park, please.

8     BY MS. PHILLIPS:

9    Q    And Chelsea, if you can identify on your screen there --

10   it's a touch screen, you can go ahead and mark it.  If you can

11   identify where you were located around Emancipation Park,

12   please.

13   A    Right about there.

14   Q    Thank you.  And what were you doing when you were standing

15   on that corner?

16   A    I was just playing the drum, trying to, like, pick up on

17   the beat of the chants to just match up with it.  That was

18   really it.

19   Q    Did you participate in any of the chants as you beat your

20   drum?

21   A    No, because I'm really bad at doing more than one thing at

22   once.  So I could only focus on one thing.

23   Q    Chelsea, did you see any violence occur from where you

24   were standing that day on August 12th, 2017?

25   A    Yeah.  So I'm pretty sure -- it was pretty hard to see

C. Alvarado - Direct

1   things, but I did experience -- one event that I did experience

2   was behind me where, you know, the protesters were coming in, I

3   did hear, like, something going on.  So I turned around and I

4   saw what I presumed to be one of the alt-right members with,

5   like, a flag, like, jabbing at somebody along the side of the

6   sidewalk who would I assume be a counter-protester.

7   Q    Okay.  And you said that you assumed it was an alt-right

8   person.  Why did you make that assumption?

9   A    Yeah, because the person who was, you know, jabbing, he

10  was dressed very similarly to the large group that was, like,

11  around him.  So just out of, you know, knowing that there was,

12  like, uniforms going on and a dress code amongst them, it just

13  made sense, since the counter-protesters, as far as I know,

14  didn't have a dress code.

15  Q    The individual that you saw, was that person part of a

16  larger group heading toward the park?

17  A    Yeah.

18  Q    At some point did you leave the area around Emancipation

19  Park?

20  A    Yeah, when the state of emergency was declared.

21  Q    Where did you go when you left Emancipation Park?

22  A    We walked up, I believe, Second Street, and then we

23  stopped by, like, this park next to what I believe is the

24  circuit court.  We were there for a few minutes, and then we

25  walked to McGuffey Park.

17

C. Alvarado - Direct

1  Q     What did you do at McGuffey Park?

2  A     I mean, I sat down because I was tired.  I was hot and I

3  was carrying this drum.  And then people were just, like,

4  talking, eating food because there was, like, snacks and stuff.

5  At one point I joined in.  Like, they were having a good jam

6  session and I thought it would be kind of fun.

7        And then, yeah, I was just kind of like sitting around and

8  just, like, listening to people and trying to, you know, see

9  what was going on.

10 Q     At some point did you leave McGuffey Park?

11 A     Yeah.

12 Q     Did you end up at the intersection of Fourth and Water?

13 A     Yes.

14 Q     And what happened when you were at that intersection?

15 A     So, I mean, all I can really remember is that people at

16 the front were saying "to the left," "to the left."  So I just

17 followed along and turned left at Fourth Street.  Yeah.

18 Q     And after you turned left up onto Fourth Street, what

19 happened at that point?

20 A     I mean, I guess we walked up for -- not far, maybe like a

21 minute, and then, you know, next thing you know, the attack

22 happened.

23 Q     And when you say "the attack happened," what do you mean?

24 A     James Alex Fields Jr.'s car plowed into the crowd.

25 Q     And were you hit?

C. Alvarado - Direct

1  A     Yes.

2  Q     Can you tell the jury how the car struck you?

3  A     Yeah.  So I had the drum on my right side.  And then, I

4  mean, I presume, based off of how I saw the drum afterwards,

5  that the car hit my drum first and then the force of that threw

6  me to the side, to the left side.

7           MS. PHILLIPS:  Your Honor, I'd like to show the

8  witness Plaintiffs' 0281, please.

9           THE COURT:  Bring that up.

10           MS. PHILLIPS:  Chelsea, let me know when it comes up

11  on your screen.

12           THE WITNESS:  That's good.

13   BY MS. PHILLIPS:

14  Q     Do you recognize this photo?

15  A     Yes.

16  Q     What is it?

17  A     The car plowing into the crowd.

18           MS. PHILLIPS:  Your Honor, I'd like to admit PX-0281

19  and publish it to the jury, please.

20           THE COURT:  Be admitted and you may publish.

21           (Plaintiff Exhibit 0281 marked.)

22           (Plaintiff Exhibit 0281 admitted.)

23   BY MS. PHILLIPS:

24  Q     Chelsea, do you recognize the item to the right of the car

25  in this photograph?

C. Alvarado - Direct

1    A    Yes.

2    Q    What is that?

3    A    The drum I was carrying.

4    Q    And can you just sort of put a little dot on the drum,

5    please.

6    A    (Witness complies.)

7    Q    And do you see any part of your body in this photograph?

8    A    I see my right arm.

9    Q    Can you make a little mark on where you see your arm.

10   A    (Witness complies.)

11   Q    Can you tell where the rest of your body is in this

12   photograph?

13   A    No, I don't see my blue jeans, so I can only assume at

14   that point I was, like, in the air.

15   Q    Do you see anyone else you recognize in this photograph?

16   A    Yeah, Natalie Romero.

17   Q    Can you please circle where you see Natalie Romero in this

18   photograph?

19   A    (Witness complies.)

20   Q    Do you recall what happened to you after you were struck

21   by the vehicle?

22   A    Yeah.  So from what I can remember, I got up really fast

23   as soon -- I guess as soon as I kind of knew what was happening

24   just out of habit, since I played, like, recreational sports

25   all through my life and it's just kind of a habit to, as soon

20

C. Alvarado - Direct

1   as you fall, to get back up.  And I remember I turned around --

2   I turned around and at some point I saw, like, Natalie propped

3   up against that pickup truck that you see in the picture.  I

4   very quickly just got myself up against the wall really fast

5   because I was scared that we were going to get hit again.

6   Q    And what did you see next after you pressed yourself up

7   against the wall?

8   A    Yeah.  The car reversing.

9   Q    What did you do after the car reversed?

10  A    I mean, I very quickly looked for Natalie, but she was

11  already, like, being helped by a bunch of people.  So I didn't

12  really want to add on to, like, what was going on there.  So I

13  was kind of like standing to the side.  There was this one girl

14  who was, like, on the ground next to me.  She was visibly in

15  pain.  So I was trying to help her as best I could, but she

16  had, like -- I believe, like, dislocated her shoulder.  So

17  there wasn't really much I could do.

18       But, yeah -- and then apparently at some point during that

19  I had, like, Facetimed my mom to tell her something had

20  happened.  I guess she, like, booked it down to Charlottesville

21  from Northern Virginia at that point.

22  Q    Do you know -- do you know the individuals who were

23  treating Natalie that you said you saw?

24  A    No.

25  Q    At some point did you provide any assistance to Natalie?

C. Alvarado - Direct

1  A    I helped walk her to an open street once she had been --

2  finished being helped.

3  Q    And why did you do that?

4  A    Because, you know, I knew her and I had been walking up

5  with her from, like, McGuffey Park to that point.  And, yeah, I

6  just tried to find one of my other friends I recognized to help

7  me try to get help for her because I didn't really know what to

8  do because myself, I was in shock as well.

9  Q    Were you able to get her into an ambulance?

10  A    Yeah, eventually, yes.

11  Q    And after Natalie was in the ambulance, what happened --

12  what happened to you?

13  A    Yeah, so, I mean, like, I think what's like a fire

14  battalion chief also came along with the ambulance because I

15  guess, like, whoever had called had said that I needed help as

16  well.  And, I mean, he came and, like, put me in the car.  And

17  then a police officer came and, like, briefly questioned me for

18  what I had seen.  And then the fire battalion chief took me to

19  the medical tent behind the hospital.

20  Q    What happened at the medical tent?

21  A    I mean, I got checked out at that point.  I had a lot of

22  lower body pain from being hit.  And then they also, like,

23  checked my upper body because I had had this, like, burning in

24  my, like, armpit area, right armpit area.  But like, because

25  the shirt I was wearing at the time was kind of long-sleeved,

22

C. Alvarado - Direct

1  they couldn't really check it out.  It turns out it had been

2  like a rope burn from where the strap of the drum had, like,

3  ripped off.

4       Then I remember, I asked if my ankles were okay because I

5  had injured them quite a few times playing sports.  And they

6  said no, your boots saved you. I was like, okay, good.  Then I

7  just waited for my mom to show up.

8  Q    How long were you in the medic tent?

9  A    Probably about a little over an hour.

10 Q    And did your mother eventually come?

11 A    Yes.

12       MS. PHILLIPS:  I'd like to show the witness

13 Plaintiffs' 0307, please.

14       THE COURT:  You may.

15       (Plaintiff Exhibit 0307 marked.)

16 BY MS. PHILLIPS:

17 Q    Chelsea, do you recognize this photograph?

18 A    Yes.

19 Q    What is it?

20 A    You can see the drum I was wearing, and then there's

21 Natalie's blood.

22       MS. PHILLIPS:  Your Honor, I'd like to admit

23 Plaintiffs' 0307 and publish it to the jury, please.

24       THE COURT:  Be admitted.

25       (Plaintiff Exhibit 0307 admitted.)

C. Alvarado - Direct

1  BY MS. PHILLIPS:

2  Q    Chelsea, can you please use the screen in front of you to

3  circle the drum?

4  A    (Witness complies.)

5  Q    And can you use the screen in front of you, please, to

6  circle Natalie's blood?

7  A    (Witness complies.)

8  Q    Thank you.

9        MS. PHILLIPS:  You can take that down, Mr. Spalding.

10  Thank you.

11  BY MS. PHILLIPS:

12  Q    Chelsea, did you sustain any physical injuries from the

13  events of August 12th, 2017?

14  A    Yeah.  So primarily I had contusions, which is just a

15  fancy word for bruises, on both of my, like, upper thighs.  I

16  had a hematoma on my left knee, and then I had a bunch of,

17  like, cuts and scrapes on my hands and my arms.

18  Q    I'd like to show the witness Plaintiffs' 0062, please.

19        Is it up on your screen?

20  A    Yeah.

21  Q    Okay.  Great.

22        Chelsea, do you recognize this photograph?

23  A    Yes.

24  Q    Did you take this photograph?

25  A    Yeah.

C. Alvarado - Direct

1          MS. PHILLIPS:  Your Honor, I would like to admit

2   Plaintiffs' 0062 and publish it to the jury, please.

3          THE COURT:  It'll be admitted and may be published.

4          (Plaintiff Exhibit 0062 marked.)

5          (Plaintiff Exhibit 0062 admitted.)

6    BY MS. PHILLIPS:

7   Q    Chelsea, what does this photograph show?

8   A    My left knee.

9   Q    And on what date did you take this photograph?

10  A    I believe the Monday after, so the 14th of August.

11  Q    And do you know where you were when you took this

12  photograph?

13  A    I was at Patient First.

14  Q    Why were you at Patient First?

15  A    Because on the 13th I had started experiencing symptoms of

16  what I believed to be a concussion.  So my friend took me the

17  following day to Patient First.

18  Q    And did they treat you at Patient First?

19  A    Yes.

20  Q    Did they diagnose you at Patient First?

21  A    Yes.  So they said that I had a concussion and to go to

22  the ER to get checked out by them.

23  Q    Did you go to the emergency room?

24  A    Yes.

25  Q    Do you recall which emergency room you went to?

C. Alvarado - Direct

1  A     I believe it was the Bon Secours in Mechanicsville,

2  Virginia.

3  Q     What treatment, if any, did you receive for the

4  concussion?

5  A     So I ended up going to concussion therapy, yeah.

6  Q     And what does that involve?

7  A     So in this therapy program it was primarily, like,

8  exercises -- vestibular exercises.  So, like, exercises with

9  your eyes, like, training your eyes, and then, like, balance

10 exercises.

11 Q     For how long did you receive that concussion therapy?

12 A     I think somewhere between two and three months.

13 Q     Did you experience any cognitive symptoms as a result of

14 the concussion?

15 A     Yes.

16 Q     Can you tell the jury a bit about those, please?

17 A     Yeah.  I mean, it was, like, quite an assortment of

18 symptoms.  But at first it was, like, headaches.  I had really

19 bad, like, balance issues.  Like, I would wake up the morning

20 and I would feel like one of those, like -- those, like,

21 inflatable things you see in front of car dealerships that are

22 like, woo.  So that was, like, really bad.

23     I had a really hard time, like, looking at text, books,

24 cell phones.  So I couldn't look at screens for more than,

25 like, a minute or two initially.

26

C. Alvarado - Direct

1    So that was initially the symptoms I experienced.  But

2    then it kind of, like, transitioned into issues with, like,

3    focus, concentration, speech issues; like, general, like, speed

4    of thinking.

5    Q    You said that you developed some speech issues.  Can you

6    explain what that was?

7    A    Yeah.  So, I mean, two things I can remember best are,

8    one, I would talk way faster than I could think.  So a lot of

9    times, like, my words just came out as, like, jumbles.

10   And then the other one was, like, I would often, like,

11   flip my sentences and stuff.  So, like, if you can think of,

12   like, any common phrase, I would put the end at the start and

13   the start at the end.

14   Q    You referenced headaches.  Approximately how long did the

15   headaches last?

16   A    So initially they were really bad and they would happen

17   multiple times a day for, like, the first month or so.

18   Eventually they started becoming less frequent and not as bad.

19   I want to say by the end of the year, they became a lot more

20   sporadic.  But, like, even to this day I still get them.

21   Q    I'm sorry.  You said you still get them to this day?

22   A    Yeah.

23   Q    Prior to 2017, did you have any history of headaches?

24   A    No.  I had never had a headache in my life.

25   Q    Did you experience dizziness as a result of the

27

C. Alvarado - Direct

1  concussion?

2  A     Yes.

3  Q     And how long did that dizziness last?

4  A     Like, the really bad dizziness lasted for about a month,

5  two months.  But even now I still get, like, pretty bad vertigo

6  when I, like, get up too fast or -- yeah.

7  Q     And you described for the jury some of the cognitive

8  problems that you experienced as a result of the concussion.

9  Do any of those cognitive issues, the speech issues you talked

10 about, the speed of thinking, do those still affect you today?

11 A     Yeah.  So I still have a really hard time with, like,

12 focusing, concentrating.  My speed of thinking is still, like,

13 very slow.  Like, prior to the accident, like, I was very fast

14 to think.  Like, you know, I didn't need things explained too

15 much to me in detail, but now I have to, like, break things

16 down step by step, which really slows me down.

17 Q     And how do those affect your role -- your current role as

18 a data research scientist?

19 A     Yeah, so an article that would have taken me maybe, like,

20 two hours to read prior to the accident now takes me, like, all

21 day to, like, read and, like, annotate, because, like, I'll get

22 distracted very easily.  I get up and I do other things because

23 I just can't focus.

24       And when it comes to, like, writing out, like, code and

25 messing around with that kind of stuff, it's just, like, very

28

C. Alvarado - Direct

1   hard.  I have to, like, search up very, like, rudimentary

2   things and build my way up to what the problem is.

3   Q    Have you learned to cope with those cognitive issues?

4   A    I try my best, but it's hard.

5   Q    Putting aside the concussion, did you experience any other

6   physical pain as a result of the car attack?

7   A    I did develop some, like, lower back pain, about, like, a

8   few weeks after the attack.

9   Q    And did that resolve at some point?

10  A    I want to say about, like, a month or two.  Yeah.

11       MS. PHILLIPS:  I'd like to show Chelsea Plaintiffs'

12  3321A, please.

13            (Plaintiff Exhibit 3321A marked.)

14   BY MS. PHILLIPS:

15  Q    Chelsea, do you recognize this?

16  A    Yes.

17  Q    What is it?

18  A    Just, like, medical costs.

19  Q    Okay.  Is this a chart describing your past medical

20  expenses resulting from the car attack?

21  A    Yes.

22  Q    And have you reviewed the underlying exhibit that this

23  chart summarizes?

24  A    Yes.

25  Q    And is this summary chart accurate?

C. Alvarado - Direct

1   A    Yeah.

2          MS. PHILLIPS:  I'd like to admit Plaintiffs' 3321A,

3   please.

4          THE COURT:  Be admitted.

5          MS. PHILLIPS:  Thank you.

6          (Plaintiff Exhibit 3321A admitted.)

7    BY MS. PHILLIPS:

8   Q    Chelsea, were you employed in August of 2017?

9   A    Yes.

10          MS. PHILLIPS:  Mr. Spalding, you can take that down.

11   Thank you.

12    BY MS. PHILLIPS:

13   Q    Where were you employed in 2017?

14   A    A Village Youth & Family Services.

15   Q    Was that in Richmond?

16   A    Yes.

17   Q    What did you do there?

18   A    I was a crisis counselor.

19   Q    What impact, if any, did the injuries that you sustained

20   from the car attack have on your ability -- your short-term

21   ability to do that work?

22   A    Yeah.  So, I mean, I was in a lot of pain for, like, the

23   first few weeks, like, just general body pain.  So the job

24   itself required me to spend, like, all day with clients and,

25   you know, like, drive them around to, like, resources in the

C. Alvarado - Direct

1  community.  So that really impacted it.  I couldn't drive for a

2  few weeks because just, like, my ability to drive and navigate

3  was just, like, very messed up at that point.  I couldn't find

4  myself around, even with, like, a GPS on.  I would miss turns

5  all the time.

6  Q    Was that previously a problem for you?

7  A    No.  I was like a human GPS.

8  Q    Before the car attack?

9  A    Yeah.

10 Q    Were you -- did you miss any work after the car attack

11 happened?

12 A    Yes.

13 Q    How much work did you miss?  For how long?

14 A    About, like, a month and a half.

15       MS. PHILLIPS:  I'd like to show the witness

16 Plaintiffs' 0050, please.

17       (Plaintiff Exhibit 0050 marked.)

18  BY MS. PHILLIPS:

19 Q    Chelsea, do you recognize this document?

20 A    Yes.

21 Q    It's small print.  Mr. Spalding will blow it up for you.

22 There you go.

23     What is this document?

24 A    A tweet I had made.

25 Q    This was a tweet from 2017?

31

C. Alvarado - Direct

1   A    Yes.

2   Q    Is your Twitter handle Burnt Chicken Nugget?

3   A    It was at the time.

4            MS. PHILLIPS:  Your Honor, I'd like to move into

5   evidence Plaintiffs' 0050 and publish it to the jury.

6            THE COURT:  Be admitted, and you may publish.

7            MS. PHILLIPS:  Thank you.

8            (Plaintiff Exhibit 0050 admitted.)

9   BY MS. PHILLIPS:

10  Q    You posted, "I've already missed a week of work cause of

11  this concussion.  I feel the debt seeping into my bones."

12       Is this a tweet about your having to miss work as a result

13  of the concussion?

14            THE WITNESS:  Yes.

15            MS. PHILLIPS:  You can take that down, Mr. Spalding.

16  Thank you.

17  BY MS. PHILLIPS:

18  Q    Do you recall when you were able to return to work?

19  A    I believe it was late September, early October of 2017.

20  Q    And approximately how many hours a week did you work at

21  your job as a crisis counselor in August of 2017?

22  A    Yeah, so prior to the attack I was working about 40 to

23  45 hours a week.  It just really depended on how the client was

24  feeling.

25  Q    And what did you earn as a crisis counselor at A Village

C. Alvarado - Direct

1   Youth & Family Services?

2   A    I was making $18 an hour.

3   Q    After you returned to work, did you have any other issues

4   performing your job?

5   A    Yeah.  So, I mean, indirect -- like, work with clients, it

6   was really difficult to balance my own personal issues that

7   were going on at the time and then at the same time, you know,

8   trying to help the client address what they were going through

9   and trying to help them.  It was very hard.

10       And then on top of that, after, the, like, six to

11   eight hours I would spend a day with the client, depending, it

12   was just very hard to have to go home and then work on

13   documentation.  So I'd go from working to going home to working

14   again, until I fell asleep, and just kind of repeat that cycle

15   over and over.

16   Q    Did you eventually leave that position?

17   A    Yes.

18   Q    Chelsea, did you seek counseling or therapy after the car

19   attack?

20   A    I did.

21   Q    Why did you do that?

22   A    I mean, it was just a lot to process.  I was, like, in a

23   place where I was very lonely.  I was isolated.  I didn't have

24   any family in the area.  Any friends I had made at that point,

25   I had only had for about a month, so I didn't particularly

C. Alvarado - Direct

1   have, like, a solid relationship with them.  So I didn't feel

2   comfortable going to them.  So I figured going to therapy might

3   help me, you know, try to sort out everything that was going on

4   and help me move on.

5   Q    Did you receive any diagnoses?

6   A    Yeah.  So, I mean, depression, anxiety, and PTSD.

7   Q    Sorry.  You said depression, anxiety, and PTSD?

8   A    Yes.

9   Q    What kind of PTSD symptoms did you have?

10  A    I mean, I had nightmares for the first few weeks, like,

11  every night.  I had flashbacks; especially, like, when I would

12  hear certain sounds, it would bring flashbacks to me.  So,

13  like, sounds of, like, tires squealing or, like, metal

14  crunching, like if a car hit another car.  Really, any loud

15  noises would, like, really, like, scare me, kind of, like, set

16  me off.

17  Q    Did you suffer from any triggers?

18  A    Yeah.  So those sounds.  For a short period of time,

19  really seeing any type of, like, gray sports car would set me

20  off and, like, just kind of like scare me.  I couldn't stand,

21  like, on the side of the road, particularly, like, in downtown

22  Richmond, because the cars are so close to you it would, like,

23  scare me.  And I would just kind of try to avoid walking on the

24  sidewalks.

25  Q    And you mentioned a depression diagnosis.  How did that

34

C. Alvarado - Cross

1  manifest itself?

2  A    Yeah, so, I mean, I had, like, no energy.  I didn't want

3  to leave my house or my apartment.  You know, I isolated for a

4  little bit, not for too long.  I would, like, kind of try to

5  cope with the isolation and loneliness with alcohol.  Just in

6  general, I was very withdrawn, and just kind of like -- I was

7  just, like, sad and everything felt kind of pointless for quite

8  some time.

9  Q    You also mentioned anxiety.  How long did your anxiety

10 last?

11 A    It never particularly stopped.  I've been able to manage

12 it with medication.  But -- yeah.

13 Q    Chelsea, do you still seek mental health treatment?

14 A    Yes.

15         MS. PHILLIPS:  No further questions.

16         THE COURT:  Thank you.

17         MS. PHILLIPS:  Thank you, Chelsea.

18         THE COURT:  Any cross?

19         MR. SMITH:  Nothing, Your Honor.

20         MR. CANTWELL:  I will.

21         MR. SPENCER:  I have no questions.

22         MR. CANTWELL:  Cantwell will.

23                    CROSS-EXAMINATION

24  BY MR. CANTWELL:

25 Q    Hello, Ms. Alvarado.

35

C. Alvarado - Cross

1  A     Hi.

2  Q     You said some friends invited you to the August 12th

3  event?

4  A     Yeah.

5  Q     Which friends?

6  A     They were just some friends I had met in Richmond through

7  a childhood friend.

8  Q     What were their names?

9  A     I mean, the ones I can remember are Natalie Romero.

10 Kendall King.  Luca -- I don't know Luca's last name.  And, I

11 mean, there was another friend I had known since childhood, but

12 we kind of, like, reconnected.  And their name is Liza.

13 Q     Liza?

14       Did Ms. Romero tell you what happened the night before at

15 UVa?

16 A     No.

17 Q     Ms. Romero invited you to the August 12 event, but didn't

18 tell you what happened the night before?

19 A     She wasn't one of the ones who directly invited me.  And I

20 wasn't in contact with her prior.  I had just, like, seen her

21 that week before, but I wasn't in constant communication with

22 her.

23 Q     I'm sorry.  Who did directly invite you?

24 A     I can't remember who it was, but it was, like, someone in

25 that group.

C. Alvarado - Cross

1   Q    You can't remember.  Okay.

2        And whoever it was, they didn't tell you about what had

3   happened the night before at UVa?

4   A    No, because I presumed they were busy handling that.  And

5   I wasn't particularly concerned, because I wasn't even supposed

6   to go that day.

7   Q    You presumed that they were busy handling it, as in you

8   already knew about it?

9   A    No, but, like, they weren't communicating with me because,

10  you know, they were probably busy.  No one was texting me or

11  anything like that.

12  Q    Okay.  So in any case, when you arrived on August 12th,

13  you had no idea what happened the night before?

14  A    I mean, I think I had seen, like, a BuzzFeed article.  But

15  I wasn't, like, busy with that, or keeping up with that.  I had

16  other things to do.

17  Q    So you read a BuzzFeed article that said there was

18  violence at UVa the night before?

19  A    I honestly can't remember.

20  Q    Ms. Romero [sic], when you attended the August 12th events

21  did you understand there to be violence the prior evening?

22       I'm so sorry.  You're Ms. Alvarado.  I apologize.

23  A    Yeah.  I honestly can't remember.

24  Q    You can't remember?

25  A    (No verbal response.)

C. Alvarado - Cross

1  Q     Okay.  You can't remember what side street you parked

2  down, either?

3  A     No.  I presume it was near the bridge.

4  Q     Okay.  And when you found yourself outside of Emancipation

5  Park, playing the drums, did anybody in particular tell you to

6  stand right there?

7  A     No.  I had a buddy that I had been assigned.  I didn't

8  know who she was -- like, I had never met her prior to being

9  paired up with her -- but we were supposed to stay together.

10 Since I had the drum and had limited mobility, I just figured

11 it would be best to, like, stand off to the side and just mind

12 my own business.

13 Q     I'm sorry.  So you had a buddy that you didn't know?

14 A     Yeah.  So, like, at the bridge, like, people paired up.

15 And like I said prior, I wasn't supposed -- like, I had -- due

16 to work, I wasn't supposed to go on August 12th.  So, like, I

17 didn't have, like, somebody that, like, I had prearranged to,

18 like, be buddies with.  So people who didn't have buddies at

19 the time just kind of, like, got randomly paired up.

20 Q     I'm sorry.  Was the buddy system part of a plan?

21 A     I mean, I just -- like, when I was at the bridge, they

22 were like, people need to buddy up.  And they were like, if you

23 don't have a buddy, stand over here, and then they just kind

24 of, like, paired us up.

25 Q     Did your friends who invited you seem to be aware of this

C. Alvarado - Cross

1    plan?

2    A    I mean, everybody kind of had already had a close friend.

3    So -- I mean, I don't know if they knew or not.

4    Q    Why not buddy up with one of your friends who invited you?

5    A    Because they all already had partners.

6    Q    They already had partners.  Okay.

7         When you were being examined by plaintiffs' counsel, they

8    asked you if you saw any violence.  And my notes here say that

9    you said it was pretty hard to see things.

10        Can you elaborate on what was difficult to see?

11   A    I'm 5'3" and a half.  So most people are taller than me.

12   So, I mean, I just couldn't see past people, for the most part.

13   If I wanted to see anything, generally I would have to, like,

14   get on my tiptoes.  And even then it was a very limited view.

15   Q    So you meet up with your buddy on the bridge.  They take

16   you over to -- I guess that's the library that you're in front

17   of, right?

18   A    I guess so, yeah.

19   Q    The building with columns in front of it?

20   A    Yeah, I'm not from Charlottesville.  So I assume that's

21   what it is.

22   Q    And you said you heard something, you turned around, and

23   you saw somebody jabbing someone with a flag?

24   A    Yes.

25   Q    And did you see anybody who you didn't assume to be a

C. Alvarado - Cross

1  rally-goer engaging in any violence?

2  A    I'm sorry.  Could you repeat that?

3  Q    You assumed that the person who jabbed the person with the

4  flag was a rally-goer, right -- well, somebody who was

5  attending the rally, right?

6  A    Yeah.

7  Q    Because of their clothing; is that right?

8  A    Yes.

9  Q    Did you see anybody who you did not presume to be a

10 rally-goer engaging in any violence?

11 A    I can't say that I did.

12 Q    You can't say that you did or you didn't?

13 A    Like, I can't remember.

14 Q    You can't remember if you saw any other violence?

15 A    No, because I was preoccupied with my drum.

16 Q    You were preoccupied with your drum.

17       And did you have the drum when you came?

18 A    No.  People were just like -- they had laid out

19 instruments at the bridge and they just, like, let people pick

20 them if they wanted to.

21 Q    Just take this drum, walk away?  Were you expected to

22 return the drum?

23 A    Yes.

24 Q    Okay.  Who were you supposed to return the drum to?

25 A    Some guy.  I don't know who they were.

C. Alvarado - Cross

1  Q    So I think you said at Fourth Street and Water Street you

2  heard people chanting, "to the left," right?

3  A    Yes.

4  Q    I'm going to show you Plaintiffs' Exhibit 1503, and you

5  tell me if that's a fair and accurate depiction of that moment,

6  okay?

7  A    Okay.

8            (Video playing.)

9  Q    Is that the crowd that you were marching with?

10 A    Yeah.

11 Q    I'm going to rewind this a little bit.  I want to observe

12 some things about that crowd that you're marching with.

13 A    Okay.

14           MR. CANTWELL:  Can we admit Plaintiffs' 1503 into

15 evidence and publish it to the jury?

16           THE COURT:  It's been admitted.

17           MR. CANTWELL:  Has 1503 been admitted?

18           THE CLERK:  It has not.

19           THE COURT:  Okay.  It's admitted, then.

20           (Plaintiff Exhibit 1503 marked.)

21           (Plaintiff Exhibit 1503 admitted.)

22           MR. CANTWELL:  Please pardon my technical

23 difficulties.  Give me just a second here.

24           (Video playing.)

25  BY MR. CANTWELL:

C. Alvarado - Cross

1  Q    Do you remember that chant, the "Black Lives Matter"

2  chant?

3  A    I don't remember it.

4            (Video playing.)

5  Q    Now, it was established you didn't bring any flags or

6  anything like that with you, right?

7  A    No.

8  Q    And no weapons?

9  A    No.

10 Q    All right.  Did you see any flagpoles in the crowd that

11 you were marching with?

12 A    I mean --

13           MS. PHILLIPS:  Objection.  When?

14           MR. CANTWELL:  I'm sorry.

15           MS. PHILLIPS:  Objection.

16           MR. CANTWELL:  Objection?  Okay.

17           THE COURT:  Overruled.

18 BY MS. PHILLIPS:

19 Q    Did you see any flagpoles?

20 A    I mean, I'm sure I did.  But I just didn't process them.

21 So I don't remember.

22 Q    Did you see anybody wearing helmets?

23 A    I did on the other side; so not the counter-protesters.

24 But I wasn't particularly looking for what people were wearing

25 that day.

42

C. Alvarado - Cross

1   Q    So you saw helmets when you were over by Emancipation

2   Park, but did you see helmets on Water Street?

3   A    I wasn't paying attention to what people were wearing.  I

4   was just walking.

5   Q    Well, just to be clear, I think that you just said that

6   you saw helmets on one side, but not the other side.  And now

7   we're over on Water Street, and you just don't know?

8   A    I'm not saying that.  I mean, I could have seen them, but

9   I just didn't process them.

10  Q    Okay.  What about people wearing masks?

11  A    Like, can you be more specific as to what you mean by

12  "mask"?

13  Q    Well, in 2017 I am sure you'll recall that was unusual.

14  Did you see anybody covering their face?

15  A    I mean, I don't remember what anyone specific, but I know

16  people were wearing, you know, like, bandannas and stuff.

17  Q    Okay.  Did you notice anything in particular about the

18  bandannas?

19  A    No.  I wasn't looking for anything.

20  Q    Did you see people wearing red bandannas?

21  A    I wasn't paying attention to the color of them.

22  Q    But did you see some of those people covering their faces

23  with the bandannas?

24  A    I can't say that I did.

25  Q    Can't say that you did?

C. Alvarado - Cross

1    A    Again, I wasn't looking for what other people were doing.

2    Q    Okay.

3            (Video playing.)

4        Is that sort of like the red bandannas you saw?

5    A    Again, I didn't pay attention to the color of the

6    bandannas.

7    Q    Did you see anybody carrying baseball bats?

8    A    I don't remember anyone.

9            (Video playing.)

10   Q    Do you notice that sign with the red fist?  Does that mean

11   anything to you?

12   A    No.

13   Q    Okay.  Did you notice several of those signs while you

14   were marching?

15   A    I mean, I remember seeing signs, but I don't remember any

16   of the information or, like, anything that was on the signs.

17   Q    Okay.

18           (Video playing.)

19       Do you remember that chant, the "Whose streets?  Our

20   streets"?

21   A    No.  I don't remember it specifically.

22   Q    Do you perceive that to be a violent chant?

23   A    No.

24   Q    Okay.

25           (Video playing.)

44

C. Alvarado - Cross

1      Did you see this man while you were there?

2  A    No.

3  Q    With the black bandanna and the, like, armor and stuff.

4  You didn't see him?

5  A    No.  There was a lot of people.

6  Q    Okay.

7           (Video playing.)

8      Did you notice this man with the red helmet?

9  A    I mean, not at the time, no.

10 Q    Okay.

11          (Video playing.)

12     Let's move on to something else.

13     So I think that when you were up here, they showed us --

14 the attorneys, they showed us -- it was 0281.

15          MR. CANTWELL:  Can I run over and get something out

16 of my folder there real quick?

17          THE COURT:  Okay.

18  BY MR. CANTWELL:

19 Q    Okay.  So we established that Plaintiffs' Exhibit 0281,

20 that's a fair and accurate depiction of the moment that you got

21 hit by the car.  We saw your drum over there in the corner,

22 right?

23 A    Yeah.

24 Q    Let's take another look at another moment in there, 0291.

25     Now, you don't have anything to do with Antifa, right?

C. Alvarado - Cross

1    A    No.

2    Q    Do you know what Antifa is?

3    A    Prior to the events, I had heard the name, like, a couple

4    of times, probably, on the news, but I wasn't, like, familiar.

5    Q    So you had heard news about Antifa?

6    A    I had heard the name mentioned.

7    Q    Did you hear it mentioned in the news?

8    A    Yes.

9    Q    So you were aware, then, that Antifa is a violent

10   political organization, right?

11           MS. PHILLIPS:  Objection.

12           THE COURT:  Sustained.

13    BY MR. CANTWELL:

14   Q    Were you aware of Antifa's history of violence?

15   A    No.

16   Q    Were you familiar with any Antifa symbols?

17   A    No.

18           MR. CANTWELL:  Plaintiffs' Exhibit 0291 is already in

19   evidence.  Can we publish that to the jury?

20           THE COURT:  Yes.

21    BY MR. CANTWELL:

22   Q    Ms. Alvarado, at any time while you were marching did you

23   see that Antifa flag?

24   A    No.

25   Q    But this is a fair and accurate depiction of the moment

46

C. Alvarado - Cross

1  that you were hit by the car, right?

2  A    Yeah.

3  Q    Okay.  You can take that down.

4       I think you testified that after you got hit you were able

5  to see the car pulling away?

6  A    Yeah, I saw the car reverse backwards.

7  Q    I'm showing you Plaintiffs' Exhibit 0319, and I want to

8  know if this is a fair and accurate depiction of the car

9  pulling away.

10      (Plaintiffs' Exhibit 0319 marked.)

11         MS. PHILLIPS:  Objection, Your Honor.  That's -- the

12  car pulling away is not what's being shown on this video.

13         MR. CANTWELL:  Well --

14         THE COURT:  Sustained.

15         MR. CANTWELL:  Move forward a little bit and then

16  we'll get to that part, okay?

17         (Video playing.)

18   BY MR. CANTWELL:

19  Q    Is that a fair and accurate depiction of the car pulling

20  away?

21         MS. PHILLIPS:  Objection, Your Honor.  Chelsea had

22  testified she had been hit by the car and was pushed up against

23  this --

24         THE COURT:  Sustained.

25         MR. CANTWELL:  Okay.  No further questions.

47

C. Alvarado - Cross

1          THE COURT:  Thank you.  All right.  Any redirect?

2          MS. PHILLIPS:  No, sir.

3          THE COURT:  Thank you.  All right.  Who's the next

4   witness?

5          MS. KAPLAN:  Plaintiffs call Defendant Matthew

6   Parrott, Your Honor.

7          THE COURT:  All right.

8          THE CLERK:  Your Honor, Edward ReBrook has some

9   cross.

10         THE COURT:  What?

11         THE CLERK:  Edward ReBrook has some cross.

12         THE COURT:  Tell him -- just a minute.  Mr. ReBrook

13  wanted to ask you a couple of questions.

14         All right.  Mr. ReBrook, go ahead.

15         MR. REBROOK:  Thank you, Your Honor.

16                      CROSS-EXAMINATION

17   BY MR. REBROOK:

18  Q   Ms. Alvarado, thank you for coming in and giving

19  testimony.  I can only imagine how difficult it must be to

20  relive this trauma and I have no interest in exacerbating that,

21  so I'm going to keep this very short.

22  A   Okay.

23  Q   You mentioned that you weren't paying attention to what

24  people were wearing.

25  A   Yeah.

48

M. Parrott - Direct

1   Q    Can you recognize the difference between the logos and the

2   symbols worn by the attendees?

3   A    No.

4   Q    Okay.  So would you be able to identify who among the

5   attendees were members of the National Socialist Movement

6   specifically?

7   A    No.

8        MR. REBROOK:  I have no further questions.  Thank you

9   again, Ms. Alvarado.

10        THE COURT:  Thank you.  You may be excused now.

11        Mr. Parrott, you may come up.

12     MATTHEW PARROTT, CALLED BY THE PLAINTIFFS, SWORN

13        THE COURT:  Go ahead, please.

14                    DIRECT EXAMINATION

15   BY MR. BLOCH:

16   Q    Good morning, Mr. Parrott.

17   A    Good morning, Mr. Bloch.

18   Q    Mr. Parrott, I want to talk a little bit about your

19   background, okay?  You have a background in computer

20   programming, right?

21   A    Yes.

22   Q    And information technology?

23   A    Yes.

24   Q    And you've been programming since elementary school,

25   right?

M. Parrott - Direct

1   A     Yes.

2   Q     You're in fact fluent in a number of computer coding

3   languages, right?

4   A     Yes.

5   Q     You've worked in IT professionally, right?

6   A     Yes.

7   Q     You spent five years as an analyst in IT at a utility

8   corporation?

9   A     Yes.

10  Q     Fair to say you have substantial experience in the field

11  of information technology?

12  A     Yes.

13  Q     And substantial experience in computer programming, right?

14  A     Yes.

15  Q     Now, you consider yourself a white nationalist; isn't that

16  true?

17  A     Yes.

18  Q     And you have advocated for a white ethnostate, right?

19  A     Yes, but not as it is necessarily defined in this context.

20  Q     You have advocated for a white ethnostate, correct?

21  A     Yes.

22  Q     And a white ethnostate is a nation that consists only of

23  white people, right?

24  A     Only white people as citizens.  You would have permanent

25  residents, tourists, visitors, just like Japan is a Japanese

M. Parrott - Direct

1   ethnostate.  And it would categorically preclude any forced

2   migrations or any violations of anyone else's human rights.

3   But yes.

4   Q    And you believe that the Jewish community is, in your

5   words, actively hostile to white Americans, right?

6   A    The organized Jewish community, yes.

7   Q    I'd like to introduce or show Mr. Parrott Plaintiffs'

8   2371, please.

9        Mr. Parrott, do you recognize this as a tweet by you?

10  A    I believe it's a Gab post, but yes.

11  Q    Gab post.

12          MR. BLOCH:  Judge, I offer Plaintiffs' 2371 into

13  evidence and would like to publish to the jury, please.

14          THE COURT:  Be admitted.  You may publish.

15          (Plaintiff Exhibit 2371 marked.)

16          (Plaintiff Exhibit 2371 admitted.)

17  BY MR. BLOCH:

18  Q    Mr. Parrott, this is a post you posted on Gab in June of

19  2016, right?

20  A    Yes.

21  Q    And what you wrote at the bottom there is, quote, "Fuck

22  the Jews.  They're the problem."  Right?

23  A    Yes.

24  Q    Would it be fair to say, Mr. Parrott, that in 2017 you

25  hated Jews?

M. Parrott - Direct

1  A    No.   The organized Jewish community as a political

2  vehicle.

3  Q    Could we show Plaintiffs' 0604, please.

4      Mr. Parrott, do you recognize this as a Discord post that

5  includes a post by you?

6  A    Yes.

7           MR. BLOCH:  And I would offer Plaintiffs' 0604 into

8  evidence and publish to the jury, please, Judge.

9           THE COURT:  You may.  Admitted, and you may publish

10  it.

11           (Plaintiff Exhibit 0604 marked.)

12           (Plaintiff Exhibit 0604 admitted.)

13   BY MR. BLOCH:

14  Q    Mr. Parrott, just to be clear, you had a Discord account,

15  right?

16  A    Yes.

17  Q    And your Discord account handle was parrott#6331, right?

18  A    Yes.

19  Q    And this document is a Discord post that contains a post

20  that you made on January 29, 2017, right?

21  A    Yes.

22  Q    You're posting in what's called the tradworker server,

23  right?

24  A    Yes.

25  Q    And that was a server hosted by Traditionalist Worker

52

M. Parrott - Direct

1  Party, right?

2  A    Yes.

3  Q    And in the group's server on January 29, 2017 did you

4  write, quote, "My hatred really only extends towards Jews and

5  insecure hillbillies who signal left for elite status.  Every

6  other group is merely a value-neutral obstacle to work around"?

7  Did you write that?

8  A    Yes.  The complete context of that is I was arguing

9  against general racial hatred as can be seen above in the chat,

10 and I specifically said Jews who signal for elite status.

11 Q    Right.  And just to be clear, just to go back to my

12 question, what you wrote was "my hatred really only extends

13 towards Jews," right?

14 A    Yes.

15 Q    And you're familiar with Adolf Hitler?

16 A    Yes.

17 Q    And you agree that he's responsible for the death of

18 millions of Jews in the Holocaust?

19            MR. SMITH:  Objection, Your Honor, relevance.

20            THE COURT:  Overruled.

21            THE WITNESS:  I am not a historian and do not know

22 the exact number, but I do believe that his regime was

23 responsible for war crimes during World War II, including

24 against the Jewish people.

25  BY MR. BLOCH:

M. Parrott - Direct

1   Q    Are you denying that he is responsible for the death of

2   millions of Jews in the Holocaust?

3   A    I am not denying that.

4   Q    And you've read -- well, withdrawn.

5        Would you agree that you have stated that Hitler is,

6   quote, "more of an influence and inspiration to you than any

7   living American"?

8   A    His social and economic policies, yes.

9   Q    Right.  And my question is, did you write that he is "more

10  of an influence and inspiration to you than any living

11  American"?

12  A    Yes.

13  Q    And you've read Hitler's book, *Mein Kampf*, right?

14  A    Yes, I have.

15  Q    And in *Mein Kampf* one of the passages is, quote, "If at

16  the beginning of the war and during the war 12- or 15,000 of

17  these Hebrew corruptors of the nation have been subjected --

18  had been subjected to poison gas, then the sacrifice of

19  millions at the front would not have been in vain."

20       Did he write that?

21  A    He did.  I assume he did.  I do not recall that passage.

22  Q    But you found *Mein Kampf* to be inspirational, right?

23  A    Its social and economic policy prescriptions, yes.

24  Q    I see.  But not the killing of Jews part?

25  A    Yes.

54

M. Parrott - Direct

1          MR. SMITH:  Your Honor, objection.  I don't think

2     there was anything about killing Jews in *Mein Kampf*.  So I

3     think he's -- the question is objectionable.  I'm not sure what

4     ground exactly but it's objectionable.

5          MR. BLOCH:  Judge, he answered.  I'm happy to move

6     on.

7          THE COURT:  The question -- he's answered.  Go ahead.

8      BY MR. BLOCH:

9     Q    Mr. Parrott, is it true you have stated that *Mein Kampf* is

10    closer to your heart than anything to be found on a mainstream

11    conservative's bookshelf?

12    A    Yes.

13    Q    And you've also written that it is important to be, quote,

14    "a credible threat to global Jewry," right?

15    A    A credible political threat, yes.

16    Q    Could we show Mr. Parrott PX-2369, please.

17         (Plaintiff Exhibit 2369 marked.)

18    BY MR. BLOCH:

19    Q    Do you recognize this, Mr. Parrott, as a VK post by you in

20    September of 2017?

21    A    Yes.

22         MR. BLOCH:  I'd like to admit this and publish to the

23    jury, please, Judge.

24         THE COURT:  Be admitted.  You may publish.

25         (Plaintiff Exhibit 2369 admitted.)

55

M. Parrott - Direct

1   BY MR. BLOCH:

2   Q    Mr. Parrott, on September 13th, 2017, one month after

3   Charlottesville, did you write, quote, "I exist for three

4   reasons alone:  One, to tell minorities they can't have my

5   shit; two, to tell Jews their Holocaust is fake; and three, to

6   tell women to calm down"?

7        Did you write that?

8   A    I did write that obvious joke.

9   Q    I see.  That's an obvious joke to you?

10  A    Yes, it follows the rules of three, escalating to the most

11  outrageous thing you can do, which is tell a woman to calm

12  down.  That's why it's funny.

13  Q    Let's talk about -- you can take that down.

14       Let's talk about your views regarding black people, okay?

15  You think black people have lower IQs than white people, right?

16  A    IQ is not the measure of a man.

17  Q    And my question, Mr. Parrott, is you think black people

18  have lower IQs than white people, right?

19  A    On average, yes, though there are plenty of blacks who are

20  more intelligent than myself.

21  Q    Now, if we could show Mr. Parrott PX-0604, please.

22           And if you could show the second page.

23           Mr. Parrott, is this -- PX-0604, is this a set of

24  Discord posts including a post by you in the tradworker server?

25  A    Yes.

M. Parrott - Direct

1          MR. BLOCH:  I would move PX-0604 into evidence and

2    publish to the jury, please, Judge.

3          THE COURT:  Be admitted and you may publish.

4     BY MR. BLOCH:

5    Q    Could you -- if we could go to the top, just so we could

6    have some context.  This is a conversation in the tradworker

7    Discord server, right?

8    A    Yes.

9    Q    And the top post is by somebody named Kombat-Unit 484.

10   And Kombat-Unit 484 says, "Actually I got really well along

11   with the sand N word girl back then, but she f-ing hated N

12   words as well.  They torched a car in front of her house."

13        Do you see that?

14   A    Yes.

15   Q    And then if you go down to your post later in the

16   conversation, you wrote, quote, "I don't hate dogs for being

17   stupid.  Most of the hatred of Negroes is rooted in trying to

18   pretend they're something they're not."

19        Did you write that?

20   A    I did write that.  And once again, in context, I am

21   arguing against racial hatred.

22   Q    I see.  Your post, "I don't hate dogs for being stupid.

23   Most of the hatred of Negroes is rooted in trying to pretend

24   they're something they're not," that's your idea of arguing

25   against racial hatred; is that your testimony?

M. Parrott - Direct

1  A    Within this context where the people above me were arguing

2  for hating people for being less intelligent, I was arguing

3  that it's not proper to hate people for being less intelligent.

4  Q    Okay.  And we can take that down.  If we could show

5  Mr. Parrott PX-2376.

6            (Plaintiff Exhibit 2376 marked.)

7  BY MR. BLOCH:

8  Q    Mr. Parrott, is this a post by you on Gab in September of

9  2017?

10 A    Yes.

11           MR. BLOCH:  I'd move this into evidence, Judge, and

12 publish to the jury, please.

13           THE COURT:  Be admitted.

14           (Plaintiff Exhibit 2376 admitted.)

15  BY MR. BLOCH:

16 Q    Mr. Parrott, on September 9th, 2017 you wrote, "These two

17 competing visions" -- withdrawn for one second.  There's a

18 photograph of Wes Bellamy, correct?

19 A    Attached to the news article, yes.

20 Q    And he's an African American politician from

21 Charlottesville, correct?

22 A    Yes.

23 Q    And above that picture you wrote, "These two competing

24 visions for America's future are entirely incompatible.  There

25 isn't a mutual respect and shared stake necessary for

M. Parrott - Direct

1  compromise and conciliarity.  None of this is going to stop

2  until people like him fear us again because fear and force are

3  the only language they comprehend."

4       Did you write that?

5  A    I did write that.

6            MR. BLOCH:  We can take that down.

7   BY MR. BLOCH:

8  Q    Now, I want to talk a little bit about your relationship

9  with Matthew Heimbach, okay?

10 A    Okay.

11 Q    You've known Matthew Heimbach for at least eight years,

12 correct?

13 A    Yes.

14 Q    And you met him at a conference hosted by American

15 Renaissance; is that right?

16 A    Yes.

17 Q    American Renaissance is a white nationalist publication?

18 A    Yes.

19 Q    And after meeting him at an -- can I call it AmRen?  Do

20 you know what I mean by that?

21 A    Yes, I do.

22 Q    After meeting Mr. Heimbach at an AmRen conference in 2013

23 you became close, right?

24 A    Yes.

25 Q    The two of you bonded over your shared interest in white

59

M. Parrott - Direct

1  advocacy, among other things, right?

2  A    Yes.

3  Q    When you met Mr. Heimbach you believed that he was of the

4  view that white people were superior to black people, right?

5  A    I don't believe that at any time either of us held that

6  view.  I do not hold the view.  I am a Christian.  I believe

7  everyone is equal in the eyes of God.  That doesn't mean we all

8  have the same qualities.  I do not know exactly where

9  Mr. Heimbach was at that time.  I don't recall.

10  Q    Mr. Parrott, you gave testimony previously in this case,

11  right?

12  A    Yes.

13  Q    You were deposed?

14  A    Yes.

15  Q    Right?  And when you gave your deposition you were under

16  oath, right?

17  A    Yes.

18  Q    Meaning you had sworn to tell the truth, right?

19  A    Yes.

20  Q    Just like you've sworn to tell the truth today, right?

21  A    Yes, sir.

22  Q    And in your deposition in June of 2020 were you asked this

23  question and did you give this answer?  And I'm referring to

24  page 63, line 23, Question:  "And how would you characterize

25  Mr. Heimbach's view with respect to black people?

M. Parrott - Direct

1        "Mr. Heimbach when he first arrived was a conservative

2   rainbow confederate who had followed the old white nationalist

3   idea of believing black people are inferior but portending of

4   holding the wrath of fetter view in public.  And I encouraged

5   him over the years to have a more nuanced attitude toward

6   ethnic identity."

7        Question:  "Just to clarify, when you first met

8   Mr. Heimbach it was your belief that he believed white people

9   were superior to black people, correct?"

10       Answer:  "Yes."

11       Did you give that testimony under oath?

12  A    It appears that I did.

13  Q    You also agree that Mr. Heimbach was antisemitic, right?

14  A    Depending on the definition, yes.

15  Q    And in that same deposition, on page 64, line 11, were you

16  asked, Question:  "Mr. Parrott, is it your belief that

17  Mr. Heimbach in 2017 was antisemitic?"

18       Answer:  "Yes."

19       Did you give that testimony?

20  A    I assume so.  I do not -- I do not recall, but it does

21  seem accurate.

22       MR. BLOCH:  Judge, could we just confirm the record

23  reflects he gave that testimony.

24       THE COURT:  Well, it's in -- no one questions it's in

25  the record and I'll instruct the jury that that's what the

M. Parrott - Direct

1   record shows, that he was asked that question and he gave that

2   answer.

3            MR. BLOCH:  Thank you, Judge.

4    BY MR. BLOCH:

5   Q    And to be clear, you didn't say anything in that answer

6   that it depends on the definition of antisemitism, right?

7   A    I did not at that time, no.

8   Q    Or any time, right?

9   A    I have outside of the court opined on the broad meaning of

10  antisemitism and how it can mean a wide range of things from

11  opposing Israeli policy up to an actual hatred of Jews for

12  being Jews.  It's not clearly defined and I regret in my

13  deposition so simply answering such a difficult question.

14  Q    By 2017, Mr. Parrott, Matthew Heimbach was one of your

15  best friends, right?

16  A    Yes.

17  Q    And at the time you lived about 100 feet from him, right?

18  A    Yes.

19  Q    You saw or spoke to him most days that year, right?

20  A    Yes.

21  Q    And he still is a close friend, right?

22  A    Yes.

23  Q    You and Mr. Heimbach are also related through marriage;

24  isn't that true?

25  A    It's an extremely complicated situation.  We no longer

M. Parrott - Direct

1  have any formal relationship of any kind.

2  Q    Well, Mr. Heimbach used to be married to somebody named

3  Brooke Heimbach, right?

4  A    Yes.

5  Q    And Brooke Heimbach is your stepdaughter, correct?  Is

6  that right?

7  A    That is correct.

8  Q    Therefore, Mr. Heimbach's children with Brooke Heimbach

9  are your step-grandchildren; isn't that true?

10  A    Yes.

11  Q    Now, you and Mr. Heimbach have collaborated on many white

12  nationalism causes for a number of years leading up to Unite

13  the Right, correct?

14  A    Yes.

15  Q    You've attended white nationalist events together, right?

16  A    Yes.

17  Q    If we could just show PX-2560, which I believe is already

18  admitted, from 1:52 to 1:56.

19      Is it already in?  Could we publish that to the jury and

20  play it.

21      (Video playing.)

22      Is that you, Mr. Parrott, standing next to Mr. Heimbach?

23  A    Yes.

24  Q    And you have a placard in your hands, right?

25  A    Yes.

M. Parrott - Direct

1  Q    And the placard shows a silhouette of a Jewish person

2  getting lynched, right?

3  A    That is absolutely false.  It is showing the word

4  "Zionism."  You see to the right of me it says "communism."  I

5  did not create those signs and I regret holding those signs

6  because they're certainly bad optics, but it does not represent

7  hanging a Jewish person.

8  Q    Zionism is another word in your view for organized Jewry;

9  is that right?

10  A    The majority of the world's Zionists are not Jewish.

11  Q    Okay.  And your problem with this particular placard is

12  that it's bad optics, right?

13  A    It can be easily, as we see here, misrepresented.

14  Q    And you're standing next to Mr. Heimbach, who is yelling,

15  "The day of the rope is coming," right?

16  A    Yes.

17  Q    And he's yelling that at a group of counter-protesters,

18  right?

19  A    Yes.

20  Q    And that phrase is a reference to a book about the mass

21  lynchings of reported race traitors, right?

22  A    Yes.

23         MR. BLOCH:  Now -- we can take that down, thanks.

24   BY MR. BLOCH:

25  Q    You and Mr. Heimbach have founded a number of white

M. Parrott - Direct

1   nationalist organizations together, right?

2   A    I believe only Traditionalist Youth Network and its

3   evolution into the Traditionalist Worker Party.

4   Q    Okay.  So you have founded two white nationalist

5   organizations together; is that right?

6   A    Yes.

7   Q    And you cofounded Traditionalist Worker Party, right?

8   A    Yes.

9   Q    So I just want to talk briefly about some of the

10  fundamental principles of TWP, okay?

11  A    Yes.

12  Q    TWP is a national socialist organization, right?

13  A    Yes.

14  Q    It was modeled after the Nazi Party in Germany, right?

15  A    Partially.  It had a wide range of influences, including

16  traditionalism, and cannot be accurately described as merely

17  copying the NSDAP.

18  Q    So we can agree that the Nazi Party was one influence on

19  TWP, right?

20  A    Yes.  Its social and economic policies.

21  Q    Not the Jew-killing policies?

22  A    Not the Jew-killing policies.  I strongly am opposed to

23  that as a Christian.

24  Q    And TWP advocates for a white ethnostate, right?

25  A    It advocates for identity and ethnicity for all, for

M. Parrott - Direct

1  self-determination for all, up to and including white people,

2  yes.

3  Q    So just to boil that down, TWP advocates for a white

4  ethnostate, right?

5  A    Yes.

6  Q    And if we could show Mr. Parrott PX-1841.

7       Mr. Parrott, this is a copy of the TWP membership guide,

8  right?

9  A    Yes.

10  Q    And you cowrote that with Mr. Heimbach in 2016, right?

11  A    Yes.

12       MR. BLOCH:  Could we introduce PX-1841 into evidence

13  and publish to the jury.

14       THE COURT:  Be admitted, and you may publish.

15       MR. BLOCH:  Thank you, Judge.

16       (Plaintiff Exhibit 1841 marked.)

17       (Plaintiff Exhibit 1841 admitted.)

18   BY MR. BLOCH:

19  Q    Now, when new members joined TWP, they received a copy of

20  this membership guide, right?

21  A    For a while, yes.

22  Q    And supposedly this guide encapsulates TWP's principles,

23  right?

24  A    Yes.

25  Q    And one of the things it makes clear is that TWP as an

M. Parrott - Direct

1  organization is proudly antisemitic, right?

2  A    It might say that, yes.

3  Q    And there is a section of the guide devoted to the Jewish

4  question, right?

5  A    Yes.

6  Q    And that's -- the Jewish question is a popular topic in

7  white nationalist circles, right?

8  A    Yes.

9  Q    And this guide says that Jewish people are a separate

10 ethnic group from Europeans, right?

11 A    Yes.

12 Q    It says they're a foreign tribe, right?

13 A    Yes.

14 Q    And that one of the goals of TWP is to remove Jewish

15 people from positions of power and influence, right?

16 A    It would be to create an independent separate community

17 where they would not be welcomed.

18 Q    So if we could go to the top of page 34.

19      The guide that you wrote with Mr. Heimbach states, "The

20 Traditionalist Worker Party knows who our enemy is and they

21 will not be forgotten.  Both organized Jewry and their gentile

22 collaborators will be removed from their positions of power and

23 influence."  Right?

24 A    That was written, but in the complete context of the

25 membership guide, it's clear that it's not speaking of

M. Parrott - Direct

1    persecuting anybody within the overarching American society.

2    Earlier Heimbach spoke of the Native American reservations as a

3    model for ethnic identity within the American context.

4    Q    Did I read that correctly?

5    A    You did read it correctly, yes.

6    Q    Now --

7         MR. BLOCH:  We can take that down.  Thank you.

8     BY MR. BLOCH:

9    Q    You and Mr. Heimbach tout the fact that TWP is an

10   FEC-registered political party, correct?

11   A    Yes.

12   Q    And in fact, Jewish people are explicitly forbidden from

13   being members of your political party, right?

14   A    I don't actually recall if that's the case.

15   Q    Could we look at --

16   A    If you could refresh me.

17   Q    -- page 32, the first full paragraph.

18        What the membership guide states is, "The Traditionalist

19   Worker Party as a party that fights for white working families

20   does not believe that Jews should have a place in membership or

21   leadership in our movement."  Right?

22   A    Okay.  Thank you for clarifying.

23        MR. BLOCH:  We can take that down.

24    BY MR. BLOCH:

25   Q    Now, I want to talk a little bit about your specific role

M. Parrott - Direct

1   in TWP, okay?

2       You and Mr. Heimbach are co-equal leaders of TWP, right?

3   A   At the time we were, yes.

4   Q   In 2017?

5   A   Yes.

6   Q   And you had a broad range of leadership responsibilities,

7   right?

8   A   Yes.

9   Q   Mr. Heimbach was primarily responsible for TWP's external

10  communications, right?

11  A   Yes.

12  Q   Mr. Heimbach acted as TWP's spokesperson, right?

13  A   Yes.

14  Q   You were really responsible for almost everything else,

15  right?

16  A   That's a bit of a flattering overstatement, though I did

17  have many responsibilities.

18  Q   Fair to say that you -- your responsibilities are less

19  social, external, than Mr. Heimbach's?

20  A   Yes.  I'm introverted and -- yes.

21  Q   And now, you could, if you wanted to, you had the

22  authority to speak on behalf of TWP, right?

23  A   We tried to make it a habit when speaking on behalf of TWP

24  that both of us check the statements.  Yes, we could -- we

25  could both speak on behalf of TWP, but as a habit, I believed

M. Parrott - Direct

1   that some of his ideas I didn't think were proper party policy

2   and he had the same opinion about mine.

3   Q    But you did have the authority to speak on behalf of the

4   organization, right?

5   A    Yes.

6   Q    But you thought of yourself more of as what you call an

7   underboss for Mr. Heimbach, right?

8   A    We were co-equal.

9   Q    But you thought of yourself as an underboss, right?

10  A    I might have stated that.

11  Q    You did state that, right?

12  A    Okay.  Yes.

13  Q    And "underboss" is a Mafia term, right?

14  A    I suppose so.

15  Q    Usually the underboss is the second most important person

16  in a crime family, right?

17  A    I did not associate it with organized crime.  I just

18  thought of it as a person who is very important on the back

19  end.  I didn't have any criminal connotations with that remark.

20  Q    So you did, at times, delegate some of the day-to-day

21  decision-making to other TWP members, right?

22  A    Yes.

23  Q    But, in essence, the buck stopped with you and

24  Mr. Heimbach, right?

25  A    Yes.

70

M. Parrott - Direct

1  Q    Now, you also had responsibilities as TWP's chief

2  information officer, right?

3  A    Yes.

4  Q    And as the chief information officer, you ran the web

5  server, right?

6  A    Yes.

7  Q    You administered TWP's website?

8  A    Yes.

9  Q    You managed TWP's emails, right?

10  A    Yes.

11  Q    You managed TWP's membership management services?

12  A    To the extent it was managed, yes.

13  Q    And you handled technology-related issues for the

14  organization, right?

15  A    Generally speaking, yes.

16  Q    You would communicate internally to TWP members about IT

17  issues, right?

18  A    Yes.

19  Q    And you created and administered TWP's social media

20  accounts, right?

21  A    I don't know if I administered all of them or what the

22  timeline would be for that, but I was involved in the social

23  media of the project, yes.

24  Q    And just to be totally clear, you were asked this question

25  and gave this answer, page 69, line 11:  "And you created and

71

M. Parrott - Direct

1  monitored the TWP social media accounts?"

2      Answer:  "The monitoring was on and off, but yes, I

3  generally created and administered those accounts."

4      Did you give that testimony?

5  A    Yes.  And that's consistent with my previous answer.

6  Q    Now --

7          MR. SMITH:  Your Honor, it is consistent with his

8  previous answer.  Perhaps Mr. Bloch should be sure it's

9  actually contradictory before he tries to impeach the witness

10  with prior testimony.

11          MR. BLOCH:  Judge, I object to the commentary in

12  front of the jury.

13          THE COURT:  Since he's a party to the case, he can

14  read any former statement that he might have made, and it may

15  be received as evidence in the case.

16  BY MR. BLOCH:

17  Q    You, Mr. Parrott, instructed TWP members on how to conduct

18  themselves with regard to social media, right?

19  A    There was an attempt.

20  Q    That's part of your responsibilities, right?

21  A    Yes.

22  Q    And you had all of those responsibilities in the summer of

23  2017, leading up to Unite the Right, correct?

24  A    Yes.

25  Q    And you worked on TWP matters almost every day over that

72

M. Parrott - Direct

1  summer, right?

2  A    That might be an overstatement, but yes.

3  Q    Now, as you mentioned earlier, optics are important to

4  TWP, right?

5  A    Optics are important to every organization, though when we

6  say "optics," we mean behaving better and performing better,

7  not misrepresenting what we believe.  We have always been

8  rather forthright with our positions.  You saw in the

9  membership guide, we clearly stated our position on the

10  sensitive issues and did not pretend to be something we were

11  not.

12  Q    I see.  So when I asked you about optics, you wanted to

13  make clear that you weren't presenting deceptive optics; is

14  that right?

15  A    That's correct.

16  Q    But to go back to the question, optics were important,

17  right?

18  A    Sure.

19  Q    And we will certainly talk more about the rules that were

20  purported to be rules in the membership guide, but for now I

21  want to ask you:  You agree with me that, as one of the leaders

22  of TWP, you wanted to project a certain image of the

23  organization to the public, right?

24  A    Yes.

25  Q    And part of your role was to protect TWP's image, right?

73

M. Parrott - Direct

1   A    As has already been stated, Mr. Heimbach was more of the

2   public-facing member of the organization, though I was involved

3   in those decisions and conversations relating to and around

4   that.

5   Q    So the question, Mr. Parrott, is:  Part of your role was

6   to protect TWP's image; isn't that right?

7   A    Yes.  It was the job of every member to protect the image

8   of the organization.

9   Q    But it was particularly something you were focused on,

10  right?

11          MR. SMITH:  Your Honor, objection, asked and

12  answered, like, twice.

13          THE COURT:  Sustained.

14   BY MR. BLOCH:

15  Q    Now, you would agree with me, Mr. Parrott, that you can

16  affect an organization's image in a number of different ways,

17  right?

18  A    Sure.

19  Q    One way is to tell the members of the organization to

20  behave in a certain way in public, right?

21  A    Yes.

22  Q    You could tell your members how to dress, right?

23  A    Yes.

24  Q    You could tell your members how to conduct themselves,

25  right?

74

M. Parrott - Direct

1   A    Yeah.  These are independent adults, so they would better

2   be understood as suggestions, but yes.

3   Q    You could put out statements on the organization's behalf,

4   right?

5   A    Yes.

6   Q    You did some of that, right?

7   A    Yes.

8   Q    And another way to affect an organization's image is to

9   write statements after an event to characterize what happened

10  in the way you want to frame it, right?

11  A    Yes.

12          THE COURT:  We'll stop for about 20 minutes now and

13  take a recess.

14  **(Jury out, 10:30 a.m.)**

15          (Recess.)

16  **(Jury in, 10:52 a.m.)**

17          THE COURT:  You may be seated.

18          You may proceed.

19          MR. BLOCH:  Thank you, Judge.

20   BY MR. BLOCH:

21  Q    Mr. Parrott, we were talking about the various ways that

22  you can affect the image of an organization, right?

23  A    Yes.

24  Q    And I had asked you if another way to affect an

25  organization's image is to write statements after an event to

M. Parrott - Direct

1    characterize what happened, right?

2    A    Yes.

3    Q    And sometimes that process is called "spin," right?

4    A    Sure.

5    Q    And as the person -- as a person responsible for

6    protecting TWP's image, you engaged in each of those tactics,

7    right?

8    A    I think calling it a "spin tactic" when it is quite often

9    my honest opinion is deceptive, but yes.

10    Q    Well, you did all the things we talked about, right?  You

11    told people how to behave ahead of time.  You wrote about

12    events after the fact.  You engaged in all of those sorts of

13    practices in order to affect the image of TWP, right?

14              MR. SMITH:  Your Honor, objection.  This is that spin

15    that counsel was just talking about.

16              THE COURT:  Overruled.  Go ahead.

17              THE WITNESS:  I did seek to put the best face forward

18    for the organization, yes.

19     BY MR. BLOCH:

20    Q    And like the Nazi Party, TWP had --

21              MR. SMITH:  Objection, relevance.

22              MR. BLOCH:  Judge, if I could finish the question.

23              THE COURT:  Overruled.

24     BY MR. BLOCH:

25    Q    TWP has a propaganda department, right?

7.6

M. Parrott - Direct

1              THE COURT:  Well, that's -- I mean -- go ahead.  Go

2  ahead.

3              Well, the question is so argumentative.

4              MR. BLOCH:  I can rephrase, Judge.

5  BY MR. BLOCH:

6  Q    Did the Traditionalist Worker Party have a propaganda

7  department?

8  A    Yes, it did.

9              MR. BLOCH:  Could I show the witness 3379.

10  BY MR. BLOCH:

11  Q    Is what's being shown on your screen, Mr. Parrott, are

12  these some of the items put out by the propaganda department of

13  TWP?

14  A    Yes.

15              MR. BLOCH:  I would like to move PX-3379 into

16  evidence and publish to the jury, please.

17              THE COURT:  Be admitted.

18              (Plaintiff Exhibit 3379 marked.)

19              (Plaintiff Exhibit 3379 admitted.)

20   BY MR. BLOCH:

21  Q    So this is a -- as we noted, an example of some of the

22  propaganda put out by TWP, right?

23  A    Yes.

24  Q    And if we could go down to page 17 of the document.  This

25  is one of the approved images for TWP, right?

77

M. Parrott - Direct

1    A    Yes.

2    Q    And that image depicts a white man doing a Nazi salute,

3    right?

4    A    I would consider it a Roman salute, but yes.

5    Q    "Roman salute" and "Nazi salute" are fairly synonymous,

6    right?

7    A    Yes.

8    Q    And it would be fair to say TWP generally speaking

9    embraced the Nazi or Roman salute?

10   A    We tried to actually discourage them at our events and

11   discouraged them being in Charlottesville because they can be

12   provocative.

13   Q    Right.  So you discouraged them publicly, right?

14   A    Yes.

15   Q    And you -- we can take that down.  Thanks.

16        You actually, as you mentioned, you specifically advised

17   TWP members not to do Nazi salutes in public, right?

18   A    No.  We -- in situations where we felt like safety was

19   imperative and we didn't want to escalate a conflict, we would

20   discourage the salute.  We weren't trying to hide what we are.

21   And what you just presented was right there at the very front

22   of our website.

23   Q    Did you not specifically advise TWP members not to do a

24   Nazi salute at Unite the Right?

25   A    I did advise members not to do a Nazi salute at Unite the

78

M. Parrott - Direct

1   Right.

2   Q     And so, even though the Nazi salute was a generally

3   accepted salute for the party, you advised TWP members not to

4   do it at public events like Unite the Right, correct?

5   A     There were public events where it was done.  We considered

6   it an informal thing.  I always felt it was LARPing.  Me and

7   Mr. Heimbach had kind of different perspectives on that.  But

8   at an event of this nature we were careful to not engage in

9   that sort of provocation.

10  Q     You did specifically advise TWP members to be mindful of

11  optics at Unite the Right, didn't you?

12  A     Yes.

13  Q     And I want to talk about some of the rules that TWP had

14  related to optics, okay?

15  A     Okay.

16  Q     If we could go back to the membership guide.  I believe

17  it's 1841.

18        This is the membership guide we talked about earlier,

19  right?

20  A     Yes.

21  Q     And if we could go to the top of -- just to be clear, this

22  includes some rules of conduct, right, for TWP members?

23  A     It's been several years, so I can't speak to everything in

24  it.

25  Q     Well, let's go to the top of page 13.  This talks about

M. Parrott - Direct

1  basic principles of dress and language and conduct at public

2  events and demonstrations, right?

3  A    Yes.

4  Q    And then it says, "Members must avoid using racial slurs

5  either in public or private," right?

6  A    Yes.

7  Q    And so on paper, this was made to make it look like TWP

8  was a group that wanted to avoid using racial slurs, right?

9  A    This was not really a public-facing document.  This was

10 something we printed up for people who had already paid money

11 to join the party.  This was an aspirational, as it is with

12 many people's private lives, they try to avoid cursing or

13 saying inadvisable things.

14 Q    You stated in this sort of official membership guide that

15 one of the rules was to avoid racial slurs either in public or

16 private, right?

17 A    Yes.

18 Q    And this was disseminated to, among other things, all TWP

19 members, right?

20 A    Yes.

21 Q    And if we could show PX-0604, please.  This is already in.

22 We've talked about this earlier.  This is a tradworker

23 Discord -- this is a post that you're part of in the tradworker

24 Discord server, right?

25 A    Yes.

M. Parrott - Direct

1  Q    If you look at Gabriel 5455, Gabriel says, "If a N word

2  gives me a high five, which happens on a daily basis, I have

3  the urge to go wash my hands."  Right?

4  A    It comes as a surprise to absolutely nobody that offensive

5  language was used in presumably private conversations within

6  the white nationalist community.  But as you see below that, I

7  am trying to discourage what I regard as vulgar hatred.

8  Q    Let's go step by step.  My question is, that's what

9  Gabriel said, right?

10 A    Yes, it is what Gabriel said.

11 Q    And we can agree that the N word is a racial slur?

12 A    Yes.

13 Q    And we can agree that your supposed rule in the membership

14 guide said that members are to avoid racial slurs in public or

15 private, right?

16 A    Yes.

17 Q    And if we go down to -- the post below that is "LOL.  I'm

18 in Africa so I have no respite from them," right?

19 A    Yes.

20 Q    And then that's where you say, "My hatred really only

21 extends towards Jews and insecure hillbillies" and so on,

22 right?

23 A    "Who signal left for elite status."  It's very important

24 you finish the sentence because I'm making a political

25 statement there.

M. Parrott - Direct

1  Q    You didn't say something like, hey, don't use racial

2  slurs, right?

3  A    Not in this particular snapshot, though there's a wealth

4  of evidence of me saying to knock it off and me kicking people

5  from the server who were carried away.

6  Q    So you're saying that so-called rule about not using

7  racial slurs in public or private, that was a rule that you

8  enforced; is that what you're saying?

9  A    Aspirationally and imperfectly, yes.

10 Q    Isn't it true, Mr. Parrott, that no TWP member was ever

11 disciplined for using a racial slur in private or public?

12 Isn't that true?

13 A    These are all grown men, and this is an Internet chat

14 server, a gaming chat server.  There were people who were

15 kicked from the server for saying inflammatory and

16 inappropriate remarks, but I have no -- I have no latitude to

17 spank these men.

18 Q    Turning to your deposition testimony, page 81, line 24,

19 were you asked this question and did you give this answer:

20 Question:  "Was anybody ever disciplined in any conceivable way

21 for using a racial slur in public or in private?"

22      Answer:  "I don't recall.  No."

23      Did you give that testimony?

24 A    I appear to have given that testimony, sir.

25      Am I impeached again?

M. Parrott - Direct

1  Q    And you had just testified that the reason apparently why

2  some of these racial slurs happened was because these are grown

3  men, right, and you have no latitude, I think you said, to

4  spank these men, right?

5  A    Yes.

6  Q    So it was just a problem you couldn't control, right?

7  A    We did have relatively good control over that.  It was not

8  perfect and we did not aim for perfection.  Our concern was to

9  tone it down, to not -- our goal was not to have an

10 organization where everybody says the perfect thing or avoids

11 these magic words the whole time.  It was not a grave concern.

12 But our concern was making sure that we weren't centered on

13 racial hatred, that we were centered, like the earlier evidence

14 you showed, that this needs to circle back to being for our

15 people, rather than against other people.

16        So it was just a general attempt to discourage the

17 mentality behind using racial slurs more than some sort of, you

18 know, every time somebody says a racial slur, you know --

19 Q    Could we show the witness PX-2433.  This is another

20 Discord post that you posted, right, and produced in a

21 different format, right?

22 A    Yes.

23        MR. BLOCH:  And if we could move this exhibit into

24 evidence and publish to the jury?

25        Judge, may we admit Plaintiffs' --

M. Parrott - Direct

1          THE COURT:  Yes.  Be admitted and you may publish.

2               (Plaintiff Exhibit 2433 marked.)

3               (Plaintiff Exhibit 2433 admitted.)

4   BY MR. BLOCH:

5   Q    Mr. Parrott, this is a post that you yourself did in

6   Discord on October 27, 2017, where you said, "This is a channel

7   where we can and should confirm that Wes Bellamy is a N word,"

8   right?

9   A    Yes.  Wes Bellamy is --

10  Q    The question is just did you say that?

11  A    Yes, I did.

12  Q    And just to be clear for the record, the actual text

13  doesn't say N word, right?  You actually said --

14  A    I said the meme "Wes Bellamy is a nigger" is part of our

15  political opposition to Mr. Bellamy.  It was not intended as a

16  broad racial thing, but yes.

17  Q    You agree, Mr. Parrott, that TWP members repeatedly used

18  racial slurs in public and private, right?

19  A    "Repeatedly" carries a lot -- is carrying a lot here, but

20  yes.

21  Q    And so can we agree that the so-called rule in this

22  membership guide about avoiding racial slurs was just for show?

23  A    As previously stated, this membership guide was for

24  members who were already deeply indoctrinated into our world

25  view.  And we as an organization engaged in less of that than I

M. Parrott - Direct

1    would argue many of our peers.  I believe we were largely

2    successful, but our goal, as I said, was not to be the word

3    police.

4    Q    Now, TWP is a corporation, right?

5    A    Yes.

6    Q    It's a limited liability corporation registered in North

7    Carolina, right?

8    A    At the time it was registered in North Carolina.

9    Q    And when you say "at the time," you mean at the time of

10   Charlottesville 2.0, right?

11   A    Yes.

12   Q    And there is another TWP LLC that was registered in

13   Michigan, right?

14   A    Yeah.  We moved the organization to Michigan shortly

15   thereafter.

16   Q    Now, I want to talk a little bit about some of the modes

17   of communication that TWP used, okay?

18        You agree that you used various social media platforms to

19   discuss white nationalism, right?

20   A    Yes.

21   Q    TWP had its own Discord server, right?

22   A    Yes.

23   Q    And we've talked about this.  It's called tradworker?

24   A    Yes.

25   Q    You were the moderator of the tradworker server?

M. Parrott - Direct

1    A    A moderator.

2    Q    Meaning you were one of the moderators?

3    A    Yes.

4    Q    You could view any public posts on the tradworker server,

5    right?

6    A    Yes.

7    Q    And as the moderator you could delete public posts in the

8    tradworker server, right?

9    A    Yes.

10   Q    Now, the tradworker server had a channel called the lobby,

11   right?

12   A    Yes.

13   Q    And you understood that posts in the lobby channel of the

14   tradworker server could be viewed by anybody, right?

15   A    Yes.

16   Q    Including police, right?

17   A    Yep.

18   Q    Including journalists, right?

19   A    And Antifa.

20   Q    And so you told people in the Discord server to be careful

21   about what they wrote in the public channel, right?

22   A    Yes.

23            MR. BLOCH:  Could we show the witness PX-022.

24            (Plaintiff Exhibit 0622 marked.)

25

M. Parrott - Direct

1  BY MR. BLOCH:

2  Q    This is a post by you in the tradworker server, correct?

3  A    Yes.

4        MR. BLOCH:  I'd move PX-0622 into evidence, Judge.

5        THE COURT:  Be admitted and be published.

6        (Plaintiff Exhibit 0622 admitted.)

7  BY MR. BLOCH:

8  Q    And on April 24th of 2017 backstreetgoy wrote, "Nothing is

9  gonna get done until we gas all the kikes," right?

10 A    He did say that, yes.

11 Q    And then he follows that with "All of them.  Period."

12 Right?

13 A    Yes.

14 Q    And just to be clear, the phrase "gas the kikes" is

15 referring to murdering Jewish people, right?

16 A    It had become somewhat of an ironic meme at that time, but

17 it certainly does refer to that, yes.

18 Q    And we can agree that "kike" is a slur for Jewish people?

19 A    Yes.

20 Q    And in response, you didn't say something like, hey,

21 please don't talk about murdering Jewish people, right?

22 A    Right.

23 Q    And you didn't say, hey, backstreetgoy, the membership

24 guide prohibits slurs in public or private, right?

25 A    Yeah.

87

M. Parrott - Direct

1  Q    What you said was, quote, "Try to keep the hardliner stuff

2  off the public chat," right?

3  A    Yes.

4  Q    You said, "It protects you"?

5  A    Yes.

6  Q    And can we agree that backstreetgoy was not disciplined in

7  any way for that kind of language?

8  A    I would have to check to see the server roles.  I do

9  remember I routinely banned people who kept saying over-the-top

10 nonsense in the lobby or anywhere.  It was an inadequate

11 response on my part, and I regret that.

12            MR. BLOCH:  Now, if we could show the witness

13 PX-0600.

14            (Plaintiff Exhibit 0600 marked.)

15  BY MR. BLOCH:

16 Q    Mr. Parrott, this is a Discord post in the tradworker

17 server that includes a post by you, right?

18 A    Yes.

19 Q    And on -- if we could introduce this and show the jury,

20 Judge?

21            THE COURT:  Okay.  Be admitted.

22            (Plaintiff Exhibit 0600 admitted.)

23  BY MR. BLOCH:

24 Q    On January 28th, 2017, you stated, "Am I structuring this

25 correctly?  I have this lobby which is public, then I have a

M. Parrott - Direct

 1  voice and text channel which people who I ascribe the role of

 2  'vetted' are able to see."  Right?

 3  A    Yes.

 4  Q    So you had set up an area of private communications that

 5  could be made over the tradworker server in a voice and text

 6  channel, right?

 7  A    The tradworker channel over here on the left, as you see,

 8  was the vetted channel.

 9  Q    So my question is:  You set up a voice and text channel --

10  A    Yes.

11  Q    -- that was private for vetted people, right?

12  A    Yes.

13  Q    And the people who you vetted for that private channel

14  were TWP members, right?

15  A    No.  As it states right here, "you now have a vetted role,

16  even though I don't know who you are."

17       It was just people who seemed -- we made an arbitrary

18  judgment on that, and certainly can't speak to everybody in

19  every gaming server chat channel.

20  Q    So in your deposition testimony, page 89, line 5, were you

21  asked this question and did you give this answer:  "How did you

22  vet people that got into the private area when it existed?"

23       And you answered, "Ours is a subculture where people

24  confirm that they've been around for an extended period of

25  time.  They often show an old social media post or blog post

M. Parrott - Direct

1   confirming that their identity has been around for a while.

2   Some of them are known, known to me or other principals or

3   major people.  It's a fuzzy process."

4        Question:  "Who is it that you were trying to only let

5   into the private vetted area?"

6        Answer:  "Actual members."

7        Question:  "Of TWP?"

8        Answer:  "Yes."

9        Did you give that testimony?

10  A    Yes, which explicitly says it's a fuzzy process.

11  Q    And at some point you abandoned these private modes of

12  communication on the TWP server, right?

13  A    I don't recall the exact timeline of that.  The general

14  narrative was I was trying to get people away from the Discord

15  server, which I regarded as insecure and inappropriate, and

16  they refused to do so because everybody wanted to be on

17  Discord.

18  Q    So just to be clear with my question, the question was:

19  At some point you abandoned the private server, right?

20  A    At some point, yes.

21  Q    And you're familiar with the messaging platform Telegram,

22  right?

23  A    Yes.

24  Q    And that was another social media platform that was used

25  to discuss white nationalism and various issues, right?

M. Parrott - Direct

1   A    I don't believe I was using Telegram during the relevant

2   period.  But yes, it is -- it is a communication app.

3   Q    And you would agree that Telegram is dramatically more

4   secure than Discord, right?

5   A    Oh, heavens, yes.

6   Q    And by that I mean that it's much harder for third parties

7   to get at the messages on Telegram, right?

8            MR. SMITH:  Objection, calls for speculation.

9            THE COURT:  Well, if he knows.  You may answer if you

10  know the answer.

11           THE WITNESS:  I think it does promote superior

12  privacy, yes.

13   BY MR. BLOCH:

14  Q    Makes it harder for, for example, law enforcement to

15  access the messages, right?

16  A    I think that's a misrepresentation.  It might, yes.

17  Q    You can set Telegram to a setting so that messages will

18  automatically delete after they're sent, right?

19  A    Yes.  And on Discord you can delete messages as well.

20           MR. BLOCH:  If we could show the witness PX-0602,

21  please.

22           (Plaintiff Exhibit 0602 marked.)

23   BY MR. BLOCH:

24  Q    This is a Discord post that you're a part of, right?

25  A    Yes.

M. Parrott - Direct

1          MR. BLOCH:  I'd move 0602 into evidence.

2          THE COURT:  Be admitted.

3          (Plaintiff Exhibit 0602 admitted.)

4   BY MR. BLOCH:

5   Q    And if we could go to page 7.  And on January 29th, 2017,

6   did you write, quote, "Anybody need to convey any shady shit

7   with me can message me on Telegram.  Every time I've tried to

8   get people to send PGP encrypted emails or even keep shady shit

9   on Telegram, they refuse to do it."

10          Did you write that?

11  A    I did write that, yes.

12          MR. BLOCH:  Thanks, Mr. Spalding.

13  BY MR. BLOCH:

14  Q    Now, let's turn to TWP's approach to rallies, okay?

15  A    Yes.

16  Q    TWP would attend rallies, right?

17  A    Yes.

18  Q    And attended a number of rallies before Unite the Right,

19  correct?

20  A    Dozens.

21  Q    And you were asked in your deposition, page 102, line 24,

22  Question:  "What was the purpose of rallies generally?"

23          Answer:  "Politics is a primate sport and if you're not

24  able to assert yourself in your own streets and neighborhoods

25  then you're politically invisible and powerless."  Right?

M. Parrott - Direct

1  A     Yes.

2  Q     You also believed rallies were important to combat

3  organized Jewry, right?

4  A     Politically, yes.

5  Q     And regarding violent protests in particular, you were

6  asked this question and you gave this answer, page 124, line 25

7  in your deposition:  Question:  "Right.  It's generally true

8  for TWP that violent protests are opportunities for you to

9  fund-raise, correct?"

10       Answer:  "That is correct."

11       Did you give that testimony?

12  A     I wrote, "Any time there is a newsworthy event it is a

13  fundraising event."

14       You seem to be skipping several lines here.  And then you

15  write, "Well, the particularly violent events are opportunities

16  for fundraising for you; isn't that true?"

17       I write:  "That's generally true in any protest."  And

18  then you write:  "Right.  It's generally true for TWP?"

19       So in the deposition, as now, I concede to the fact that

20  any time we were on the news it was technically a fundraising

21  event.  You deliberately misrepresented it here and here as

22  that was the goal, was to fund-raise off violence, which was

23  never my intended statement.

24  Q     So why don't we actually read, if you're going to back it

25  up, why don't we read the question that you left out, which

93

M. Parrott - Direct

1    was, line 16, Question:  "Do you agree that you saw the

2    violence that occurred at Auburn as a good opportunity to

3    fund-raise for TWP?"

4         Answer:  "Any time there's a newsworthy event, it's a

5    fundraising event, yes."

6         Did you give that testimony as well?

7    A    That's utterly consistent with what I just said.

8    Q    Without the question part, right?

9    A    Sure.

10   Q    Do you agree with me, Mr. Parrott, that the more violent

11   you could make a rally, the more money you could make for your

12   organization?

13             MR. SMITH:  Objection, Your Honor.

14             THE COURT:  I heard two people talking at once.

15   What's your answer?

16             THE WITNESS:  That is a despicable misrepresentation

17   of our party's plans and platform.  We always put safety at the

18   very first priority above all else at our events.

19   BY MR. BLOCH:

20   Q    Well, in April of 2017 there was an event at Auburn

21   University, right?

22   A    Yes.

23   Q    And Defendant Spencer was speaking there, right?

24   A    Yes.

25   Q    Mr. Heimbach attended the event for TWP, right?

94

M. Parrott - Direct

1  A    Yes.

2  Q    As did other TWP members?

3  A    Yes.

4  Q    And you actually watched the Auburn event on a livestream,

5  right?

6  A    Yes.

7  Q    And you posted about it in real time on the tradworker

8  server, right?

9  A    Yes.

10          MR. BLOCH:  And if we could show PX-0618.

11          (Plaintiff Exhibit 0618 marked.)

12          MR. BLOCH:  Is this in evidence?  If I could --

13  BY MR. BLOCH:

14  Q    This is a Discord post that you're a part of, right,

15  Mr. Parrott?

16  A    Yes.

17          MR. BLOCH:  I would move 0618.

18          THE WITNESS:  Be admitted.

19          MR. BLOCH:  Thank you, Judge.

20          (Plaintiff Exhibit 0618 admitted.)

21   BY MR. BLOCH:

22  Q    And you wrote -- this is while the Auburn events are

23  taking place, right?

24  A    Yes.

25  Q    And you wrote, "A lot of the folks in the other factions

M. Parrott - Direct

1  are getting very excited.  Try to remind folks not to throw the

2  first punch or be too aggressive.  It's important for lawfare

3  and optics that we be going about our business and they

4  instigate," right?

5  A    I 100 percent stand behind that statement.

6  Q    Well, just to define some of these terms, lawfare refers

7  to litigation, right?

8  A    Yes.  We were very concerned that at some point there

9  would be an attempt to perform a strategic lawsuit against

10 public participation to destroy our organization, which has

11 been what has occurred.

12 Q    So just to go back to my question, lawfare means

13 litigation, right?

14 A    Yes.

15 Q    And that can include lawsuits against white nationalists,

16 right?

17 A    Yes.

18 Q    It could also include criminal charges against white

19 nationalists, right?

20 A    Sure.

21 Q    And part of your job as the guy who thinks about TWP's

22 image was to think about how to best position yourself for the

23 eventual civil or criminal suit that might arise from your

24 activities, correct?

25 A    Correct.  But we're walking very far afield of the quote,

M. Parrott - Direct

1  which I explained, the other -- many other factions are getting

2  very excited.  Let's turn down the temperature on this.

3  Q    Turn down the temperature.  Is that what you wanted to do

4  in this exchange?

5  A    Yes.  Absolutely.  That's what it says there.  People are

6  getting excited.  Let's make sure we do not throw the first

7  punch or be too aggressive.  Are we reading the same thing,

8  sir?

9  Q    We are and we'll read more of it.

10 A    Okay.

11 Q    So do you agree that you were telling your followers that

12 it's important for legal and optics purposes that it seem like

13 counter-protesters were the instigators of any violence?  Do

14 you agree with that?

15 A    No.  It says "do not throw the first punch or be too

16 aggressive."  It doesn't say seem to not throw the first punch

17 or seem to not be too aggressive.  It's clearly a statement

18 telling them to not instigate or be too aggressive.

19 Q    In your deposition testimony which you gave under oath in

20 2020, page 118, line 7, were you asked this question and did

21 you give this answer, Question:  "And you were telling TWP

22 members that it's important for lawfare that counter-protesters

23 be seen to instigate the violence in that post, correct?"

24      Answer:  "Yes."

25      Did you give that testimony?

M. Parrott - Direct

1  A     Yes, I did.

2  Q     And you have claimed in court that you wanted the police

3  to keep counter-protesters separate from the white

4  nationalists, right?

5  A     Yes.

6  Q     Because you believe that when the police do their jobs, it

7  prevents violence, right?

8  A     Yes.

9  Q     And you just wanted to turn down the temperature, right?

10  A     Yep.  Absolutely, sir.

11          MR. BLOCH:  If we could show the witness PX-0619.

12          (Plaintiff Exhibit 0619 marked.)

13  BY MR. BLOCH:

14  Q     And if we could go to the bottom.  I'm sorry.

15      This is a Discord post from the tradworker server that you

16  were a part of, right?

17  A     Yes.

18          MR. BLOCH:  Moving PX-0619 into evidence, and we'd

19  like to publish it, Judge.

20          THE COURT:  Be admitted.

21          (Plaintiff Exhibit 0619 admitted.)

22   BY MR. BLOCH:

23  Q     And if we could go to the bottom of page 3, you at this

24  point are continuing to monitor what's going on at Auburn,

25  right?

M. Parrott - Direct

1  A    Yes.

2  Q    And on April 18th, you wrote:  "Looks like the cops are

3  actually doing their jobs this time, unfortunately."  Right?

4  A    Yes.  That was clearly in jest.

5  Q    And if we could go on to the next page, you follow that

6  with:  "Wanted to watch Heimbach chimp out on livestream,"

7  right?

8  A    Yes, we were all watching -- watching the live footage and

9  lamenting that it was boring to watch because everything was

10 going safely.  That was the joke.

11 Q    I see.  So can we go back to page 3?

12      Tom, before you said "looks like the cops are doing their

13 jobs, unfortunately," he wrote:  "I hope the dancing guy and

14 drummer get punched," right?

15 A    He did write that, yes.

16 Q    And to be clear, "chimp out on livestream," the phrase

17 "chimp out" is a racist term that means to behave irrationally

18 aggressively, right?

19 A    In this -- in this term, contrary to popular belief,

20 Heimbach is a white man, and I was clearly using it to --

21 it's -- a chimpanzee is understood to be a creature that

22 behaves like a chimpanzee.  If it's being used against black

23 people, it certainly can be a racial epithet.  But to take it

24 in this context, I certainly was not intending any kind of

25 racial slur.

M. Parrott - Direct

1  Q    No racial connotation to this use of the phrase "chimp

2  out"; is that right?

3  A    We are in a racist Discord, okay?

4  Q    So --

5  A    We're not --

6  Q    My question, Mr. Parrott --

7           MR. SMITH:  Your Honor, can David Matthew please

8  finish?

9           MR. BLOCH:  Judge, I'd ask that he answer my

10  questions.

11          THE COURT:  Okay.  What is your question?

12   BY MR. BLOCH:

13  Q    There is, according to you, no racial connotation to the

14  use of the words "chimp out" here, right?

15          MR. SMITH:  That's been -- objection, asked and

16  answered.

17          THE COURT:  Sustained.

18   BY MR. BLOCH:

19  Q    In your deposition testimony, Mr. Parrott, were you asked

20  this question and did you give this answer?

21       Question:  "What is a chimp out?"

22       Answer:  "A chimp out is when somebody becomes

23  irrationally aggressive."

24       Question:  "Okay.  Is there a racial connotation to that

25  phrase?"

M. Parrott - Direct

1    Answer:  "There is, though for several years it has become

2    a very general term in our community.  Like I say, the original

3    connotation comes from the '90s race riots, which were

4    described by white nationalists at the time as 'chimpouts,'

5    describing the black rioters as chimps."

6         Did you give that testimony?

7    A    I gave that testimony, sir, but if you read your own

8    testimony, you'll see I said that it's become a general phrase

9    for behaving irrationally.  I don't understand the rules in

10   this Court, but this -- next question.

11   Q    Now, in fact, there was violence at Auburn, right?

12   A    I was not -- I was not there at Auburn.  I understand one

13   of our people, his jaw was broken by radical Antifa aggressors

14   while he was attempting to attend a permitted event.

15   Q    I see.  That's the only violence you're aware of?

16   A    Like I say, I did not attend the event, and I barely

17   recall the event.  But I'm very confident that if there was

18   violence, it was defensive, because if it weren't, we would

19   have been arrested.  We do not get the benefit of the doubt

20   like Antifa do.

21         MR. BLOCH:  So if we could introduce PX-0675 or show

22   Mr. Parrott.

23   BY MR. BLOCH:

24   Q    And confirm for me that this is a post in the tradworker

25   server that you're a part of.

M. Parrott - Direct

1   A    Yes.

2            MR. BLOCH:  I move 0675 into evidence.

3            THE COURT:  Be admitted.

4            (Plaintiff Exhibit 0675 marked.)

5            (Plaintiff Exhibit 0675 admitted.)

6    BY MR. BLOCH:

7   Q    Mr. Parrott, is this something you posted in the

8   tradworker server that day --

9   A    Yes.

10  Q    -- related to the events at Auburn?

11  A    Yes.  Antifa picked a fight with Trad Worker.

12  Q    And if we can take that down.

13       And this is what we were referring to when you said that

14  the violence that occurred at Auburn created a good opportunity

15  to fundraise for TWP, right?

16  A    No.  You put those words in my mouth in the deposition and

17  now are trying to turn it around as if I was making that

18  statement.  I grudgingly admit that being on the news, even

19  negatively, is a fundraising situation for any organization.

20  All press is good press in that very broad term when you asked

21  me that.  And now you're trying to present us as if we're going

22  around harming people for money.  It's totally incongruous.

23  Q    Well, let's talk about Sacramento.

24  A    Let's talk about Sacramento.

25  Q    TWP attended a rally in Sacramento, right?

M. Parrott - Direct

1  A    Yes, we did.

2  Q    This was a white nationalist rally?

3  A    This rally was to go to the California State House and

4  protest how radical Antifa were attacking Trump rallies at that

5  time.  This was during the primaries and during the election.

6  And every time there was a Republican event in California, just

7  normal families, concerned families attempting to show up to

8  support the presidential campaign, were getting savagely

9  beaten.  And 30 of our men with a proper permit, attending at

10  the proper time, unarmed, attended the State House to protest

11  that violence.

12  Q    So you agree it was a white nationalist rally?

13  A    I just explained to you that it was a rally against Antifa

14  violence at the State House.  It was -- the goal was -- I'm

15  very happy to say that I'm a white nationalist.  This was a

16  white nationalist group.  But it is an improper

17  characterization of the rally to say it was a white nationalist

18  rally.

19  Q    Well, do you agree that a number of counter-protesters

20  were stabbed at that rally?

21  A    That is my understanding.

22  Q    And there was a man named Will Planer that went to that

23  rally, right?

24  A    Yes.  Will Planer protected himself, defended himself, and

25  we stand behind his -- what he needed to do to get through 300

M. Parrott - Direct

1    people who were trying to kill him.

2                 MR. BLOCH:  So if we could show PX-3840, which I

3    believe is already in evidence.  And if we could show to it the

4    jury.  It's already admitted.

5    BY MR. BLOCH:

6    Q    Mr. Parrott, this is a patch that was created after the

7    Sacramento rally, right?

8    A    Yes.

9    Q    It actually depicts the incident of violence that Will

10   Planer was involved in, right?

11   A    Yes.

12   Q    And Will Planer in this depiction is the guy in black with

13   the stick, right?

14   A    Yes.  Once again, we're taking a snapshot of a melee and

15   trying to pretend like that's all that was going on when

16   Mr. Planer was fighting for his life.

17   Q    I see.  And the red person in the patch that you all

18   created was -- depicts the person that Will Planer struck,

19   right?

20   A    Yes.

21   Q    And this actually depicts the actual positioning of those

22   two people when that incident happened, right?

23   A    This was not a Trad Worker patch, but I suppose it does

24   certainly capture that one snapshot of the event, yes.

25   Q    Right.  Well, you've seen that video, right?

104

M. Parrott - Direct

1   A    Yes, I have.

2   Q    And this -- the way this is depicted, this is Will Planer

3   standing behind a counter-protester who was kneeling, facing

4   away from him, when Mr. Planer struck him in the back of the

5   head with a stick; isn't that true?

6   A    That one keyhole snapshot that you're referring to is

7   true.

8   Q    And you have described this incident as, quote, "textbook

9   self-defense," right?

10  A    Yes.  If you have over 300 people swarming at you with

11  weapons to kill you, then whatever you need to do to get out of

12  that situation -- this person was an aggressor earlier in the

13  day, or mere seconds before this -- yes.

14  Q    Mr. Planer was convicted of felony assault charges for

15  that, right?

16  A    Mr. Planer had a hung jury, which was incredible given

17  that it was the Bay Area, and then pled to time served, which

18  in my opinion is as close as exoneration as you're going to get

19  in the Bay Area of California.

20  Q    So, to go back to my question, Mr. Planer was convicted of

21  felony assault charges, right?

22  A    Sure.

23  Q    There was another -- we can take that down.  Thanks.

24       There was another event in Anaheim, right, in February

25  2016?

M. Parrott - Direct

1   A     We were not at Anaheim in any capacity.

2   Q     But you're aware that a number of counter-protesters were

3   stabbed at Anaheim, right?

4   A     I'm vaguely familiar with that event.  That does not have

5   anything to do with Trad Worker, yes.

6   Q     Sorry.  My question is:  You are aware that a number of

7   counter-protesters were stabbed?

8   A     Yes.

9   Q     And if we could show PX-0607.

10       Do you recognize this, Mr. Parrott, as a tradworker

11   Discord post that you're a part of?

12   A     Yes.

13            MR. BLOCH:  Offer PX-0607 into evidence.

14            THE COURT:  Be admitted.

15            (Plaintiff Exhibit 0607 marked.)

16            (Plaintiff Exhibit 0607 admitted.)

17    BY MR. BLOCH:

18   Q     On January 29th, 2017, you stated:  "Sacto was incredible

19   and it could only happen in California because of the tight gun

20   laws," right?

21   A     Yes.

22   Q     And that's a reference to Sacramento, right?

23   A     Yes.

24   Q     And then at the bottom of the next page you write,

25   "Anaheim was awesome, too," right?

M. Parrott - Direct

1  A    I wasn't referring specifically to the stabbings.  I was

2  referring to the fact that Antifa fucked around and found out.

3  Q    What you were saying was "awesome" was the fact that

4  Antifa, quote, "fucked around and found out"?

5  A    Yes, sir.  Antifa were attacking normal and not even

6  political radicals like myself -- they were attacking normal

7  families attempting to attend a mainstream political event.

8  And ever since 2016, this country has done nothing to stop

9  radical Antifa from attacking a broad range of the political

10 process, not just including themselves.  And at some point,

11 somebody has to do something about that.

12            MR. BLOCH:  Your Honor, I'm going to move to strike

13 that answer.

14            MR. SMITH:  Your Honor, that was responsive to the

15 question that was asked.

16            THE COURT:  Overruled -- wait.  Wait.

17            Sustain the objection.  Leave the answer.

18            MR. BLOCH:  If we could show Mr. Parrott 0601.

19 BY MR. BLOCH:

20 Q    Mr. Parrott, is this a tradworker post that you're a part

21 of?

22 A    Yes.

23            MR. BLOCH:  I offer 0601 into evidence.

24            THE COURT:  Be admitted.

25            (Plaintiff Exhibit 0601 marked.)

M. Parrott - Direct

1            (Plaintiff Exhibit 0601 admitted.)

2   BY MR. BLOCH:

3   Q    In this post, Mr. Parrott, Kombat-Unit says:  "There was

4   some sort of nationalist presence on the street, but absolutely

5   nothing like you're seeing today," right?

6        And you write in response:  "We're definitely trying to

7   mobilize street action, and I understand that's the most

8   important thing," right?

9   A    Yes.

10  Q    And that was a comment that you made in the beginning of

11  2017, right?

12  A    Yes.

13  Q    Now, staying on the topic of other rallies, after Anaheim

14  and Sacramento, there was a white nationalist rally in

15  Berkeley, California, right?

16  A    Trad Worker had nothing to do with that event, sir.

17  Q    So my question is:  There was a white nationalist rally in

18  Berkeley, California, right?

19            MR. SMITH:  Your Honor, objection.  We should perhaps

20  stick to rallies that Trad Worker was somehow involved in.

21            MR. BLOCH:  Judge, or rallies that Mr. Parrott

22  commented favorably on.

23            I'm sorry.  Judge, did you overrule the objection?

24            THE COURT:  Answer the question.

25            THE WITNESS:  I should answer the question, sir?

M. Parrott - Direct

1           THE COURT:  Yes, sir.

2           THE WITNESS:  Yes, there was a -- I don't know if it

3   could be properly described as a "white nationalist rally," but

4   there was an event.

5    BY MR. BLOCH:

6   Q    Well, there was a lot of violence at that event, right?

7   A    As I understand, yes.

8   Q    And the most prominent act of violence happened when

9   Nathan Damigo punched a woman and knocked her down, right?

10          MR. SMITH:  Objection, Your Honor.

11          THE COURT:  Overruled.  It's been in evidence.

12          MR. SMITH:  Yeah, that's fine.

13          THE WITNESS:  Moldylocks -- Moldylocks was there to

14   attack them, and yes, he did -- he did punch her in

15   self-defense.

16   BY MR. BLOCH:

17   Q    You called her "Moldylocks" because that's the disparaging

18   term that white nationalists used to refer to her; is that

19   right?

20   A    It's been used earlier in the case.  I was just being

21   specific.  I was not trying to insult the individual.

22          MR. BLOCH:  Now, if we could show Mr. Parrott

23   PX-2372.

24   BY MR. BLOCH:

25   Q    This is a post that you posted, right, on the Trad Worker

M. Parrott - Direct

1   Twitter account?

2   A    Yes.

3          MR. BLOCH:  I move 2372 into evidence and ask to

4   publish it to the jury, please.

5          THE COURT:  Be admitted.

6          (Plaintiff Exhibit 2372 marked.)

7          (Plaintiff Exhibit 2372 admitted.)

8    BY MR. BLOCH:

9   Q    Mr. Parrott, you wrote on Twitter, after this event in

10  Berkeley:  "We congratulate Identity Evropa on their Berkeley

11  victory.  Encourage folks to attend Auburn and hope to see you

12  in Pikeville, too," right?

13  A    Yes.

14  Q    And by "victory," you mean victory in a fight, right?

15  A    I mean the -- the rally was successful.  There are many

16  ways a rally can be victorious.  We considered Pikeville a

17  rousing victory despite not a single person being harmed.  In

18  fact, it was because not a single person -- there was not a

19  single punch thrown.  That was -- we celebrated that even more,

20  and called -- after Pikeville, we called it "the Pikeville

21  template" because we were so excited about the police

22  cooperating and us being able to turn out in large numbers, and

23  both sides were able to say their piece, including the opposing

24  side were able to say their piece.

25          There are a lot of ways an event can be a victory.

M. Parrott - Direct

1        But yeah, if we're attacked and we prevail against that

2    attack, that would certainly be a victory as well.

3    Q    So I was asking about the Identity Evropa event in

4    Berkeley, and you were talking about Pikeville.  So my question

5    here is:  When you said, "We congratulate Identity Evropa on

6    their Berkeley victory" --

7             MR. SMITH:  Objection, Your Honor.  Argumentative,

8    mischaracterizes testimony.

9             MR. BLOCH:  By "victory," you meant --

10            THE COURT:  The jury will remember the testimony.

11            Go ahead.

12   BY MR. BLOCH:

13   Q    You meant victory in a fight, right?

14            THE COURT:  Now, wait.  You've already asked him

15   that.

16            MR. BLOCH:  Well, he responded with a speech about a

17   different event.  But I'll move on.

18            THE COURT:  Well, okay --

19            MR. SMITH:  That's on the tweet that is right in

20   front of him.  So yes, he mentioned that.

21    BY MR. BLOCH:

22   Q    Mr. Parrott, you have also personally, yourself, punched

23   counter-protesters, right?

24   A    I believe the only time I did that was at the Terre Haute

25   incident in approximately 2014, when I -- I don't even know if

M. Parrott - Direct

1   I did then.  I'm quite the physical coward, and typically I'm

2   running around trying to manage things.  I don't -- I'm not

3   much of a fighter.

4   Q    And referring to that time you punched a counter-protester

5   yourself, you wrote that, quote, "it feels great," right?

6   A    Yes.  He had just attacked an old man who was standing

7   there with a sign.  He had come up behind him and punched him

8   in the back of the head, knocking him down.  And yes, I did

9   disable the gentleman and turned him over to the Terre Haute

10  City Police.

11  Q    Every single act of violence that you or any TWP member is

12  involved in, in your mind, is self-defense; isn't that right?

13            MR. SMITH:  Objection, Your Honor, argumentative.

14            THE WITNESS:  If it weren't, we would have been

15  arrested, sir.  There were cameras at all of these events, and

16  everyone was aware of that.  It's actually -- it seems like an

17  absurd statement, but when you look at how much political

18  opposition there is to us, and how much interest there is in

19  prosecuting us, absolutely.  I would go just about that far,

20  sir.

21  BY MR. BLOCH:

22  Q    Now, let's talk about your connections to other

23  defendants, okay?

24  A    Sure.

25  Q    Now, you agree with me that from your tame in the white

M. Parrott - Direct

1  nationalist movement, you've become familiar with a number of

2  other defendants in this case, right?

3  A    Yes.

4  Q    You know Jeff Schoep, right?

5  A    Not very well, but yes.

6  Q    You've known him for about seven years, right?

7  A    Yes, but I've maybe only had two or three conversations

8  with the man.

9  Q    Well, isn't it true that you helped him develop the

10  website for Nationalist Front?

11  A    He had very little input on the website development, but

12  yes, that was one of our conversations.

13  Q    Isn't it true you were involved in a conversation between

14  Mr. Schoep and Mr. Heimbach regarding the long-term goals of

15  the Nationalist Front?

16  A    I'm not denying that I've had conversations with

17  Mr. Schoep over the years.  I'm happy to own that.  In that

18  example, it was very much Heimbach talking to Schoep and then

19  me talking to Heimbach after he talked to Schoep.  That was

20  generally how Trad Worker worked, was Heimbach would go out and

21  communicate with people and coordinate with people, and I would

22  talk to him afterwards and we'd arrive at conclusions about

23  what to do.

24  Q    So when I asked you if you were involved in a conversation

25  between Mr. Schoep and Mr. Heimbach regarding the long-term

M. Parrott - Direct

1  goals of the Nationalist Front, is the answer to that question

2  yes?

3  A    I do not know.

4  Q    You don't know the answer to that question?

5         MR. SMITH:  Objection.  Asked and answered.

6         THE COURT:  Sustained.

7         THE WITNESS:  I would be happy, if -- if we have any

8  evidence, like I said, I'm not opposed to agreeing to that.  I

9  just don't want to closely agree to something that's

10  counterfactual and that I don't recall.  It's been several

11  years.

12   BY MR. BLOCH:

13  Q    In your deposition on page 135, line 19, were you asked

14  these questions and did you give these answers?

15      Question:  "And you worked with Mr. Schoep on the

16  development of the Nationalist Front website, correct?"

17      Answer:  "Correct."

18      "What does that entail?"

19      Answer:  "The Nationalist Front website was an attempt to

20  create an affiliated collection of groups that share similar

21  vision and projects and goals."

22      Question:  "What did you do to work on the website with

23  Mr. Schoep?"

24      Answer:  "I created the website.  He said it looked good."

25      Question:  "And did you talk to him about the goals and

M. Parrott - Direct

1   principles of the Nationalist Front?"

2        Answer:  "I was involved in conversation between him --

3   me, him, and Heimbach about the long-term goals of the

4   Nationalist Front, yes."

5        Did you give that testimony?

6   A    I gave that testimony, but I interpolated Mr. Heimbach in

7   there to indicate that it was a three-way conversation, which

8   is consistent with what I just said.

9   Q    Now, if we could show PX-2781, please.

10       Is this the Nationalist Front website, Mr. Parrott?

11  A    Yes, it is.

12            MR. BLOCH:  I would move 2781 into evidence.

13            THE COURT:  Be admitted.

14            MR. BLOCH:  Publish to the jury.

15            (Plaintiffs' Exhibit 2781 marked.)

16            (Plaintiff Exhibit 2781 admitted.)

17   BY MR. BLOCH:

18  Q    The website you worked on with Mr. Schoep, if we can go to

19  the next page -- and the website says:  "The Nationalist Front

20  will leverage the power of solidarity and scale to raise our

21  voices and our fists against the organized left and the

22  globalist Jewish oligarchs," right?

23  A    Yes.

24  Q    And this was part of the mission of the Nationalist Front,

25  right?

115

M. Parrott - Direct

1   A     Yes.

2   Q     Right?

3   A     Yes.

4   Q     Now, you're also familiar with Dillon Hopper, right?

5   A     Yes.

6   Q     Mr. Hopper was the leader of Defendant Vanguard America

7   for part of 2017, right?

8   A     For part of 2017, yes.

9   Q     And Vanguard was a member of the Nationalist Front, right?

10  A     Vanguard was not a member of the Nationalist Front at the

11  time of the rally due to their internal divisions, but there

12  was a period where Vanguard was a member of Nationalist Front.

13  Q     You had planned the rally in Pikeville with Mr. Hopper,

14  right?

15  A     Yes.  They were a member of Nationalist Front at that

16  time.

17  Q     I see.  So your testimony is that Vanguard was not a

18  member of Nationalist Front only for that small period that

19  included Unite the Right, but they were before and after?

20  A     No.  In July or June, somewhere around there,

21  immediately -- shortly before Unite the Right, there was the

22  huge rift where Thomas started making decisions antithetical to

23  Dillon, and that rift survives to this day.  It wasn't that

24  they stopped briefly this permit.

25        For instance, Vanguard America attended the torch march,

M. Parrott - Direct

1    which Nationalist Front groups all decided not to go to.  They

2    were in direct communication.  They did not attend with us on

3    Market Street.  They, at the time of Unite the Right, were

4    categorically not behaving or functioning or on any level with

5    Nationalist Front.

6         And at Pikeville, a few months earlier, they were with

7    Nationalist Front.  And the leadership shakeup there -- which

8    is out of my wheelhouse, but -- at the time of Pikeville, they

9    were in Nationalist Front, yes.

10   Q    You're also familiar with Defendant Chris Cantwell, right?

11   A    Yes.

12   Q    And you met him at the rally in Pikeville, right?

13   A    Yes.

14   Q    And when you met him, your impression of Mr. Cantwell was

15   that he was volatile, right?

16   A    I did not mean that with any kind of violent connotations.

17   He's a radio shock jock, and he's very much how he is.  Some

18   people put on a persona with the radio.  He's every bit

19   100 percent Mr. Cantwell in private, too.  I found him an

20   amusing character.

21   Q    Did you find him to be volatile when you communicated with

22   him at Pikeville?

23   A    I have already answered that question.

24   Q    Is the answer yes?

25   A    The answer is socially volatile.

M. Parrott - Direct

1  Q    Now, you also were familiar with his views on race, right?

2  A    Vaguely.

3  Q    Well, in 2017, isn't it true that you thought Mr. Cantwell

4  was racist?

5       MR. SMITH:  Objection, Your Honor.  Isn't

6  Mr. Cantwell going to be testifying in the case?  Can't they

7  ask him what his views on race are?

8       THE COURT:  Well, he wants to show what this

9  defendant's impression was.

10      MR. SMITH:  Okay.

11      THE WITNESS:  I -- vaguely and broadly speaking, I

12  would perhaps say yes, but I can't really speak for

13  Mr. Cantwell's views.  And if I did on page 196 of the

14  deposition, then that was narrow on my part.

15  BY MR. BLOCH:

16  Q    On page 139 of the deposition were you asked this question

17  and did you give these answers?

18      Page 139, line 12:  "Would you say Mr. Cantwell is

19  antisemitic?"

20      "I would say he is antisemitic, yes."

21      "Would you say Mr. Cantwell is racist?"

22      Answer:  "He might not be anymore, but at the time, at the

23  relevant time, he was, yes."

24      Did you give that testimony?

25  A    Yes.  And that was an error on my part.  I apologize to

M. Parrott - Direct

1   the Court.

2   Q    An error because now you're in court being accused of

3   being a co-conspirator of his; is that why it was an error?

4   A    I was being accused of being a co-conspirator of his, too.

5   I did not realize during the time I was taking this deposition

6   that there would be this --

7   Q    That there would be a record of it?

8          MR. SMITH:  Can the witness please -- can the witness

9   please -- can the witness please finish?

10          THE COURT:  Let him finish his answer.

11          THE WITNESS:  I did not know that every single jot

12   and tittle would be analyzed to this degree.  The word "racist"

13   is very vague, and if I'm being led into a rhetorical trap,

14   then I need to be very careful with my wording.

15          I did not understand while giving this deposition

16   that the term "racist" would then be redefined out from under

17   what I meant it in the deposition.

18   BY MR. BLOCH:

19   Q    You've also known Defendants Michael Hill and Michael

20   Tubbs, right, for about six years?

21   A    I don't know either gentleman.  I have interacted with

22   them superficially at events.

23   Q    Is it true that you have known them for about six years?

24   A    Superficially, yes.

25   Q    When you say "superficially," isn't it true that you've

M. Parrott - Direct

1  attended white nationalist conferences and events with both

2  Michael Hill and Michael Tubbs?

3  A    Yes.

4  Q    And isn't it true that prior to Unite the Right, you had

5  spoken with both of them about TWP and League of the South?

6  A    I don't know if I actually spoke with them leading up to

7  Unite the Right, but I have spoken with them in the past.  I do

8  not recall the specific conversations.

9  Q    You've known Defendant Richard Spencer for at least a

10 decade, right?

11 A    Yes.

12 Q    You actually worked for a website that he ran, right?

13 A    I don't recall working for a website he ran.

14      I would like to put on the Court record that Mr. Spencer

15 and I have always been frenemies with very different political

16 orientations and have not had any meaningful collaboration.

17 Q    Well, there's no question, Mr. Parrott.

18      I asked you if you worked for a website that he ran and

19 you said, "I don't recall that."  And then I noticed that

20 Mr. Spencer also shook his head at you; right?

21          MR. SPENCER:  I did not.

22          THE WITNESS:  Honestly, I don't -- I don't see how

23 that's relevant.  I certainly don't care, and I would be --

24          MR. SMITH:  Your Honor, I think Mr. Spencer was

25 shaking his head because he's puzzled as to what the website

120

M. Parrott - Direct

1  was.  Nobody seems to be sure --

2           THE COURT:  Let's move past this.  What's your

3  question other than what --

4  BY MR. BLOCH:

5  Q    Were you asked this question in your deposition and did

6  you give this testimony?

7       Question, page 145, line 7:  "Have you collaborated with

8  Mr. Spencer in any way on white nationalist causes?"

9       Answer:  "Yes.  I was a writer at his original Alternative

10  Right website.  I have worked with him over the years."

11  A    Okay.  There's the understanding.  I was genuinely

12  puzzled.  I am also an essayist.  I'm not just a web designer.

13  And I did submit a couple posts to his old alternativeright.com

14  website about a decade ago.  I certainly did not do his IT and

15  would not have been trusted to do his IT, but I did contribute

16  to that blog.

17  Q    I see.  You submitted a couple of blogs here and there?

18           MR. SMITH:  Objection, asked and answered, Your

19  Honor.

20           THE COURT:  Sustained.

21  BY MR. BLOCH:

22  Q    Well, if we go on, page 45, line -- 145, line 14, and the

23  question is:  "How long were you a writer -- I'll withdraw the

24  question.  I believe you're talking about

25  alternativeright.com?"

M. Parrott - Direct

1       Answer:  "Yes."

2       Question:  "How long were you a writer there?"

3       Answer:  "I would guess two years, perhaps."

4       Did you give that testimony?

5   A   Yes.

6   Q   And so when you said no to that and Mr. Spencer shook his

7   head at you at the same time, you were both wrong, right?

8           THE COURT:  All right.

9           THE WITNESS:  This is writing --

10          (Overlapping speakers.)

11          MR. SMITH:  Your Honor --

12          THE COURT:  Just a minute.  Counsel, you may not

13  testify.  We're getting off on things, these side issues and

14  things like that.

15          MR. BLOCH:  Understood, Judge.  I would ask that

16  anybody on the defendants' side not gesture to the witness.

17          MR. SPENCER:  I did not --

18          (Overlapping speakers.)

19          THE COURT:  I didn't see anything.  I was looking at

20  you.  I don't -- I mean --

21          MR. BLOCH:  Understood, Judge.  I'll keep going.

22   BY MR. BLOCH:

23  Q   Mr. Parrott, you also became familiar with Mr. Spencer's

24  views, right, prior to Unite the Right?

25  A   Yes.

M. Parrott - Direct

1  Q    And you would agree that he was antisemitic?

2  A    What does it say in the deposition, sir?

3  Q    Do you need the deposition testimony to answer that

4  question?

5  A    Given the nature of this process, this is not what I

6  originally presumed, and I -- yes.

7  Q    On page 147, line 21, Question:  "Okay.  Would you say

8  that Mr. Spencer is antisemitic?"

9       Answer:  "Yes."

10      Did you give that testimony?

11 A    I did.

12 Q    You also knew Nathan Damigo prior to Unite the Right,

13 correct?

14 A    Very superficially.

15 Q    Well, you had known him for at least five years, right?

16 A    Very superficially.

17 Q    You met him at a private white nationalist event in

18 California, right?

19 A    Yes, in which he showed up, said he didn't want to be

20 there, and then left.  And we were perturbed by that, but yes.

21 Q    You've attended white nationalist events with Mr. Damigo,

22 right?

23 A    Private.

24 Q    Private white nationalist events, is that what you're

25 saying?

M. Parrott - Direct

1    A    I believe so.  I believe -- and if you have countervailing

2    evidence, I believe I've only met him and interacted with him

3    one time.

4            MR. BLOCH:  Judge, I'm moving on to another topic.

5    Happy to keep going, happy also to take a break, whatever the

6    Court would prefer.

7            THE COURT:  It's not time for a break.

8            MR. BLOCH:  I'm sorry?

9            THE COURT:  It's not time for a break.

10           MR. BLOCH:  Okay. understood.

11    BY MR. BLOCH:

12   Q    Mr. Parrott, let's talk about Unite the Right, okay?

13   A    Yes, sir.

14   Q    You were one of the main organizers of Unite the Right

15   from TWP, correct?

16   A    From TWP, for our attendance at Unite the Right, yes.

17   Q    And Matthew Heimbach was another main organizer for TWP,

18   right?

19   A    Yes.

20   Q    And the two of you made important decisions about Unite

21   the Right together, right?

22   A    Yes.

23   Q    You also involved somebody named Cesar Ortiz in the

24   planning; isn't that true?

25   A    Yes, it is.

M. Parrott - Direct

1  Q    Mr. Ortiz was a TWP member at the time, right?

2  A    Yes.

3  Q    And part of the reason that you chose him to help organize

4  Unite the Right was because of his military experience, right?

5  A    Yes.  He had -- he had a tremendous bearing.  He was an

6  inspiration to the men.  And he was, in my opinion, the reason

7  that Trad Worker got in and out without any significant issues.

8  He did an incredible job.

9  Q    The way Trad Worker got in and out in your mind you would

10  characterize as not any significant issues; is that right?

11  A    Given the opposition and given the historically

12  unprecedented absence of any law enforcement throughout the

13  entire time of our permitted event, the fact that we managed to

14  get into the event and then get out of the event when the event

15  was over without any major injuries or issues was an incredible

16  success for us, yes.

17  Q    And you -- so you, Mr. Heimbach, and Mr. Ortiz worked

18  together to plan Unite the Right, correct?

19  A    Yes.  Well, we planned our attendance at Unite the Right,

20  okay?

21  Q    Fair to say you each shared the same objectives for Unite

22  the Right?

23  A    Generally speaking.

24  Q    And you agree with me that you were actively involved in

25  the planning of Unite the Right with Mr. Heimbach by early June

                        M. Parrott - Direct

 1  2017, correct?

 2            MR. SMITH:  Objection.  Mischaracterizes testimony.

 3            THE COURT:  Well --

 4            MR. SMITH:  It's argumentative.

 5            THE COURT:  He hasn't testified about that, I don't

 6  think.  Overruled.  Go ahead.  Answer the question, sir, if you

 7  can.

 8            THE WITNESS:  I don't remember exactly the timeline

 9  on things, but at some point around June was when we became

10  aware of Unite the Right and became -- decided we would most

11  likely be attending the Unite the Right event.

12   BY MR. BLOCH:

13  Q   Well, the timeline is important.  So let's make sure we

14  have it accurately.

15      In your deposition at page 173, line 24, were you asked

16  this question and did you give this answer?  Question:  "And

17  you agree that you and Mr. Heimbach were actively planning for

18  Unite the Right since early June, correct?"

19      Answer:  "Yes."

20      Did you give that testimony under oath?

21  A   Yes, I did.

22  Q   Yes?

23  A   Yes.

24  Q   And that testimony that you gave under oath, was it true?

25  A   Yes.

M. Parrott - Direct

1   Q    And you and Mr. Heimbach each had your own set of

2   responsibilities for planning Unite the Right, correct?

3          MR. SMITH:  Objection.  Mischaracterizes testimony.

4   The testimony that was read said "planning for Unite the

5   Right"; it didn't say "planning Unite the Right."  I think

6   counsel is trying to mislead with this line of questioning.

7          MR. BLOCH:  Judge, I again object to the commentary.

8          THE COURT:  All right.  Don't -- the witness has to

9   listen to the question and answer the question.

10          THE WITNESS:  As stated, we were never organizers of

11   Unite the Right.  We were attending a preexisting event as

12   invited guests of an event that was planned by others.  We

13   planned our attendance.  And yes, that process began informally

14   and organically.  I don't remember any, like, assigned, this is

15   your job, that's your job, at any point before August.

16          MR. BLOCH:  One moment, Judge.  It's very important

17   that we're accurate on this.

18          THE COURT:  Don't make such comments.  It's all --

19   the jury will decide what's important.

20          (Pause.)

21          MR. BLOCH:  All right.  We'll come back to this.

22   Let's just -- let me just be clear about what you're saying

23   here.

24    BY MR. BLOCH:

25   Q    You're saying, we were attending a preexisting event as

127

M. Parrott - Direct

1  invited guests of an event that was planned by others, right?

2  A    Yes.

3  Q    Isn't it true that Mr. Kessler texted Mr. Heimbach in May,

4  I believe 22nd of 2017, that he wanted to start the

5  conversation about Charlottesville 2.0?  Isn't that true?

6  A    That is correct, yes.

7  Q    And that's Matthew Heimbach, your best friend and

8  cofounder of TWP, right?

9  A    Codirector, yes.

10 Q    And isn't it also true that, among other things,

11 Mr. Heimbach created a TWP channel in the Charlottesville 2.0

12 server, which included Jason Kessler on June 5th, 2017; isn't

13 that true?

14 A    I believe it is true.  Yes.

15 Q    You agree with me that Mr. Heimbach handled many of TWP's

16 external communications about Unite the Right, correct?

17 A    Yes.

18 Q    And that included communicating with Defendant Jason

19 Kessler, right?

20 A    Yes.

21 Q    Mr. Heimbach was actually in charge of coordinating with

22 law enforcement, right?

23 A    I don't recall.

24 Q    And in addition to handling external communications,

25 Mr. Heimbach helped you and Mr. Ortiz coordinate the

M. Parrott - Direct

1   on-the-ground plans for Unite the Right?

2   A    Yes.

3   Q    Your responsibilities focused more on managerial matters;

4   would that be fair to say?

5   A    Yes.

6   Q    You were tasked with things like vetting who would attend

7   the event from TWP, right?

8   A    Yes.

9   Q    You gave internal directions to TWP members, right?

10  A    Yes.

11  Q    You gave TWP members directions about how to conduct

12  themselves before, during, and after the rally, right?

13  A    Probably.

14  Q    And you worried about things like optics and lawfare,

15  right?

16  A    Everyone in the organization worried about those two

17  things.

18  Q    Well, in other words, one of the things that you were

19  actively considering while planning Unite the Right was that

20  you might be sued after Unite the Right, correct?

21  A    Yes.  We were -- Unite the Right was distinct because we

22  had the ACLU going in, and we thought this was an excellent

23  opportunity to show up in a large contingent.  And with the

24  National Guard there, we were very confident that there would

25  not be any major violence and it could be a turning point where

M. Parrott - Direct

1  Antifa realized that attacking our events would not be

2  successful.

3       We had to prove that attacking our events would not work.

4  And Unite the Right was the largest gathering of Antifa, and we

5  saw this as an opportunity to work along with the ACLU and city

6  and state government to properly plan this with a lot of

7  advance lead time.  They had months and months to plan this

8  through.  And to this day, I do not understand why the National

9  Guard were there if they weren't there to maintain order.

10           MR. BLOCH:  Judge, I move to strike everything in

11  that answer after the word "yes."

12           MR. SMITH:  No, Your Honor, I think that was a

13  responsive answer.

14           THE COURT:  Mr. Bloch, you let the witness go on and

15  on and on.  We've heard it now.  Stop him if he's answered your

16  question.  The question -- I mean, he's explaining his answer,

17  I guess.  I don't know what he's doing.  So if you do, stop him

18  in time.

19           MR. BLOCH:  I was trying to be respectful.

20   BY MR. BLOCH:

21  Q    Well, in planning for Unite the Right, Mr. Parrott, you

22  took specific steps to prepare for the possibility that you and

23  your group may be sued, right?

24  A    Yes.

25  Q    And one of the things you did was put Cesar Ortiz in

M. Parrott - Direct

1  charge, right?

2  A    We did not do that to stop from being sued.  We did that

3  because we trust him to perform an excellent job, which he did.

4  Q    Isn't it true that part of the reason you put Cesar Ortiz

5  in charge is because you felt he understood and spoke in the

6  language of legal concerns?  Isn't that true?

7  A    I don't exactly recall that, but he was very mindful of

8  the need to have a strictly safe, defensive event.

9  Q    In your deposition, page 181, line 4, were you asked this

10  question and did you give this answer:  "And why was Mr. Ortiz

11  chosen to help organize Unite the Right?"

12      Answer:  "Mr. Ortiz is a very intelligent and level-headed

13  man who commands the respect of people following him, and he

14  has military experience which gives him the bearing that makes

15  him an effective leader, and he also understood and spoke in

16  the language of legal concerns."

17      Did you give that testimony?

18  A    Yes.  And I fully stand behind that testimony, yes.

19  Q    Would it be fair to say -- do you agree with me,

20  Mr. Parrott, that you had actually specifically worked out a

21  plan for how to help white nationalists who got arrested at

22  Unite the Right?

23  A    I believe we had the Charlie plan for potential civil

24  disobedience.  It wasn't really executed.  I don't recall.

25  Maybe you can help me.

131

M. Parrott - Direct

1    Q    Well, in your testimony, page 236, line 7, were you asked

2    this question and did you give this answer.  Question:  "Was

3    there a plan in place for people who got arrested at Unite the

4    Right?"

5         Answer:  "I don't recall exactly what that plan would be."

6         Question:  "Okay.  But you remember that there was a plan

7    worked out ahead of time for people -- for white nationalists

8    that got arrested, correct?"

9         Answer:  "Yes."

10        Did you give that testimony?

11   A    Yes.  I gave that testimony.

12   Q    Now --

13   A    I mentioned in the follow-up that that was referring to

14   the Charlie teams, as I had discussed earlier.

15   Q    So if we could show the witness PX-0685.

16        Mr. Parrott, is this a Discord post in the tradworker

17   server including conversations by you?

18   A    I am only introducing the two people and then I do not

19   participate in the conversation.

20   Q    Okay.  But this is a Discord post in the tradworker server

21   including communications by you?

22   A    Yes.

23             MR. BLOCH:  I move 0685 into evidence, Judge.

24             THE COURT:  Be admitted.

25             (Plaintiff Exhibit 0685 marked.)

M. Parrott - Direct

1        (Plaintiff Exhibit 0685 admitted.)

2     BY MR. BLOCH:

3  Q    Mr. Parrott, this is a series of posts in the tradworker

4  server, right?

5  A    Yes.  In the intel channel on the tradworker Discord

6  server, yes, sir.

7  Q    Right.  Thank you.  And the -- you kick it off at the top

8  by saying in April 21, 2017, "This channel is for intelligence

9  discussions.  It contains only the directors and @Dr.Cocopuff

10 who's old school trusted and shares Max Macro's gift for

11 intelligence gathering," right?

12 A    Yes.

13 Q    And "directors" refers to directors of TWP, right?

14 A    Yes.

15 Q    And that means you, Mr. Heimbach, Mr. Macro, and somebody

16 named Derrick Davis, right?

17 A    I don't believe Derrick Davis was a director.  Maybe he

18 was.  I don't remember.

19 Q    He was the regional coordinator for Virginia, wasn't he?

20 A    Yeah, and that's not a director.  That's why the

21 confusion.  I do recall this and I do see him showing up later.

22 For whatever reason, he was certainly in there.

23 Q    And Dr. Cocopuff is a guy named Cory Smith who was a TWP

24 member in 2017, right?

25 A    Yes.

M. Parrott - Direct

1  Q    And you go on to say, "The presence of this group is never

2  to be discussed outside this group.  We must have more mature

3  and effective intelligence and we need a game plan for

4  manifesting that," right?

5  A    Yes.

6  Q    And you later say, "Whether you or Max or you and Max wish

7  to take the lead on fleshing that out, you'll have the party's

8  full support," right?

9  A    I did say that.

10  Q    And Max Macro at the time was TWP's chief financial

11  officer; isn't that right?

12  A    Yes, it is.

13  Q    And we talked about Derrick Davis also shows up in this

14  channel, right?

15  A    Yes.

16  Q    And in addition to being the regional director for TWP for

17  Virginia, he was TWP's quartermaster, right?

18  A    Which was inclusive of flag design, yes.

19  Q    And he actually marched with you and Mr. Heimbach at Unite

20  the Right, correct?

21  A    Yes.

22  Q    He was Mr. Heimbach's body man at Unite the Right,

23  correct?

24  A    No.  He was merely with Mr. Heimbach.  Mr. Heimbach has

25  never had a bodyguard.

<sup></sup>

M. Parrott - Direct

1   Q    So -- but he marched with the two of you guys that day,

2   right?

3   A    Yes, sir.

4   Q    And you created and moderated this intel channel; isn't

5   that true?

6   A    Yes, I did.

7   Q    And if we could go to the bottom of page 2, you all are

8   discussing at this point gathering intelligence; is that right?

9   A    I ceased participating in this conversation, and once I

10  found out about the conversation later, I was like, oh, mercy,

11  this is not productive, and closed the channel.  But yes.

12  Q    Okay.  So the question is:  You were -- at this point, the

13  folks in the channel that you moderated and created were

14  talking about intel gathering, right?

15  A    Yes, they were.

16  Q    And at the bottom of page 2, Max Macro says, "At some

17  point we gotta exploit internal factional rivalries via false

18  flag attacks based on said humiliating info," right?

19  A    Yes, he did say that.

20  Q    And a false flag attack is an operation where an act is

21  committed by one party but designed to make it look like it was

22  committed by somebody else, right?

23  A    That is what the term -- yes.

24  Q    And in this case what he's talking about is attacks that

25  are made to look like they were done by Antifa; isn't that

135

M. Parrott - Direct

1  right?

2          MR. SMITH:  Objection, Your Honor.  That's

3  argumentative.

4          THE COURT:  Overruled.

5          THE WITNESS:  Especially in this context, I don't

6  care to speculate on what Mr. Macro was actually thinking.

7  BY MR. BLOCH:

8  Q    Okay.  Well, why don't we look at his actual words.  If we

9  go to the bottom of page 2 -- I'm looking for where he says,

10  "That should be the basic game plan."

11  A    Might be on the next page.

12  Q    Try the next page.  Max Macro says, "Yeah, I think that

13  should be the basic game plan, pool intel on Antifa then start

14  a bunch of infighting through false flags, take them out that

15  way city by city," right?

16  A    Yes, that's what he said.

17  Q    So what he's talking about when he says false flag attacks

18  is creating the impression that Antifa was behaving violently;

19  isn't that right?

20  A    He's clearly talking about starting drama within Antifa

21  private circles, I believe, as I understand it.  But once

22  again, what he's referring to there is really out in deep water

23  for me.  This was not a productive conversation and it wasn't a

24  conversation I participated in.  And to my knowledge, nothing

25  from this conversation ever manifested in reality.

                            M. Parrott - Direct

1   Q    Well, we'll talk about that, too, but --

2              MR. SMITH:  Your Honor, objection.  Can we -- the

3   commentary in between questions.  Your Honor reminded counsel

4   about this already.

5              THE COURT:  He said something about talking later.

6   Go ahead.

7    BY MR. BLOCH:

8   Q    If we can go to the bottom of page 9.  At the bottom of

9   page 9, in this channel that you created and moderated, that

10  you just claimed you bailed out of or something, Max Macro on

11  May 2nd says, "Oh, yeah, @MatthewHeimbach, @parrott, make sure

12  to include in the writeup how Antifa threatened to ambush us

13  but pussed out," right?

14  A    Yes, he did say that.

15  Q    And then if we could go on, he says, "even if it

16  technically wasn't Antifa," right?

17  A    He did say that.

18  Q    And the tag, when he specifically tags you and

19  Mr. Heimbach, that gives you and Mr. Heimbach a notification,

20  right?

21  A    I don't think I'm alone here in saying that I have never

22  been one to check all of my notifications.

23  Q    Well, can we agree that what Mr. Macro is effectively

24  telling you to do here is to do a writeup that includes false

25  information about Antifa's violence at a particular event?

M. Parrott - Direct

1  A     He was talking about how Antifa --

2  Q     I'm sorry?

3  A     He was referring to how Antifa weren't violent.  How

4  Antifa threatened to ambush us and then didn't.  He's

5  claiming -- and I'm speaking inappropriate here because I'm

6  trying to get inside this man's mind, but he's saying that

7  we're going to write up articles about how Antifa didn't attack

8  us.  He's saying the exact opposite of what you're suggesting.

9            THE COURT:  All right.  We'll stop here for lunch for

10  an hour.

11            MR. BLOCH:  Judge, may I follow up with one question?

12            THE COURT:  Go ahead.

13   BY MR. BLOCH:

14  Q     Did you give this testimony, Mr. Parrott, under oath, page

15  192, line 15:  Question:  "Well, if you continue on in the

16  channel, if we go to the bottom of page 9, Max Macro writes,

17  'oh, yeah, Matthew Heimbach, Parrott, make sure we include in

18  the writeup how Antifa threatened to ambush us but pussed out

19  even if it technically wasn't Antifa.'"

20       Answer:  "I do see he stated that."

21       Question:  "And he's effectively telling you to do a

22  writeup that includes erroneous information about Antifa's

23  violence at a particular event, correct?"

24       Answer:  "That appears to be the statement, yes."

25       Did you give that testimony, Mr. Parrott?

M. Parrott - Direct

1   A    Sir, if you read here, it says erroneous information about

2   Antifa violence.  And this is erroneous information about

3   Antifa not being violent.  The two statements are perfectly

4   congruous.

5   Q    So my question, Mr. Parrott, is:  Did you give that

6   testimony?

7   A    Yes, I did.

8            THE COURT:  All right.  Members of the jury, we'll

9   take a lunch recess now.  Do not discuss the case with anyone

10  or allow anyone to discuss it with you or remain within hearing

11  of anyone discussing the case at lunch.  We'll recess until

12  1:20.

13  **(Jury out, 12:20 p.m.)**

14            (Recess.)

15            THE COURT:  All right.  The jury has said they will

16  cooperate and work Thursday because they want to get out.

17  They're expecting -- they want to finish.

18            MS. KAPLAN:  That doesn't surprise me at all, Your

19  Honor.  We see that as a great development.  We will finish our

20  case we hope on Thursday.

21            The one question that we didn't have answered that

22  would be extremely helpful is if Mr. Smith, who I don't see,

23  hasn't told us who and -- whether he intends to call his own

24  clients in this case and what else he intends to do.  So it's

25  hard to budget with that.

M. Parrott - Direct

 1            THE COURT:  Okay.  Well, anyway, we're going to --

 2            MS. KAPLAN:  One more point, Your Honor, is

 3   Mr. Schoep, Defendant Schoep was unable to be here on Thursday

 4   so we'll have to do him on Friday.  We apologize for that.

 5   Mr. ReBrook couldn't get him here for Thursday.

 6            THE COURT:  Okay.  We're going Thursday.  You all can

 7   think about this, about the Rule 50.  The Supreme Court of the

 8   United States has pointed out that very few judges grant the

 9   Rule 50, I would say, in the middle of the trial -- at the end

10   of plaintiffs' evidence.  And they discourage it.  They say

11   that it's best that the judge take it under advisement and

12   decide it at the end.

13            One time I have -- in 24 or 25 years on this Court, I

14   have done that, where I've granted a Rule 50 motion at the end

15   of the plaintiffs' case, and that was where the expert flipped

16   on the plaintiff.  So I'll just tell you that I would

17   anticipate not giving a ruling on the Rule 50 motion, if that's

18   going to influence anybody's thinking.

19            Okay.  We can go ahead.

20            Call the jury.

21   **(Jury in, 1:26 p.m.)**

22            THE COURT:  All right.  You may be seated.

23            You may proceed.

24            MR. BLOCH:  Thank you, Judge.

25    BY MR. BLOCH:

M. Parrott - Direct

1  Q    Mr. Parrott, we were looking at Plaintiffs' 0685, which

2  was the #intel channel that you moderated and created, right?

3  A    Yes.

4  Q    And turning to page 10 of that document, Max Macro, who is

5  the TWP -- I believe he was chief of staff?

6  A    CFO.

7  Q    CFO?

8  A    He handled a lot of our financial paperwork.

9  Q    He writes at the top:  "Oh, yeah, here's a psyop idea,"

10  right?

11  A    Yes.

12  Q    And "psyop" refers to a psychological operation which is

13  manipulating people psychologically, right?

14  A    Yes.

15  Q    And what he suggests is using "false flags, smear and

16  troll attacks to start fightings between patriotard militias

17  and Antifa," right?

18  A    He did write that, yes.

19  Q    And then Mr. Smith agrees with him.  He says -- that's

20  Dr. Cocopuff -- "Not a half bad idea."  And then he says:  "The

21  idea of making fake propaganda for them would be great, like

22  brutally anti-white stuff," right?

23  A    That is what they say.

24  Q    And if I could just review your deposition testimony

25  interpreting these posts, you were asked these questions and

M. Parrott - Direct

1  you gave these answers on page 193, line 25.

2      Question:  "Okay.  So what Dr. Cocopuff and Max Macro are

3  discussing in this channel that you've created is putting out

4  fake propaganda to make it seem as if Antifa is stating violent

5  intentions, fair to say?"

6      And you answered:  "Yes, that's their conversation."

7      Right?

8  A    Yes.  That was my answer.

9  Q    And so if we go to page 11, in the middle of the page, Max

10 Macro says:  "So team white's gotta start targeting them while

11 pretending to be Antifa," right?

12 A    By "targeting," I believe he was talking about the psyops

13 targeting, but yes.

14 Q    Right.  That's what Max Macro said, "pretending to be

15 Antifa," right?

16 A    That's what he said, yes.

17 Q    And then if we go to page 15.  And at the top, Max Macro

18 says:  "Do you guys think it would be good to make generic

19 Antifa pages, or maybe something more local and focused like a

20 fake Pikeville Antifa page, then using that to antagonize the

21 militias, which feeds into false flagging this Pikeville For

22 Unity and Equality rally," right?

23 A    That is what they said.

24 Q    And then he goes on to say -- Dr. Cocopuff agrees:  "Dude,

25 yes.  I had a fake Antifa Facebook and was going around on

142

M. Parrott - Direct

1   churches and gun shops/gun clubs and harassing them," right?

2   A    That is what he said.

3   Q    And Facebook -- "FB" refers to Facebook?

4   A    Yes.

5   Q    So we can agree that Mr. Smith was stating that he

6   pretended to be Antifa and he targeted and harassed people in

7   gun shops and gun clubs, right?

8   A    That is what he is stating, yes.

9   Q    Then if we go to the top of page 19 --

10        MR. SMITH:  Your Honor, I'm kind of wondering what

11   the relevance of this is.  Dr. Cocopuff isn't a defendant in

12   this case, as far as I know.

13        THE COURT:  Well, he can ask the questions.

14   BY MR. BLOCH:

15   Q    So, just going back to 19, this is the channel you

16   created, moderated, and participated in?

17   A    It is incorrect to say that I moderated this conversation.

18   I was a moderator, but I clearly was not participating in this

19   conversation.

20   Q    At then the top of page 19, Commander Davis -- that's

21   Derrick Davis, right?

22   A    Yes, it is.

23   Q    And on May 24th, 2017, he writes:  "Southern Virginia is

24   my Antifa honeypot.  Feel free to use for intel gathering,"

25   right?

143

M. Parrott - Direct

1      And then Dr. Cocopuff says:  "Okay.  I'm trying to make

2   this dank operation up for tactical trolling and the subversion

3   of Antifa, some COINTEL pro-type shit," right?

4   A    That is what they said.

5   Q    And then Mr. Davis responds to the link that Dr. Cocopuff

6   sent around and he says:  "Can now send out Antifa mobs in

7   Charlottesville," right?

8   A    That is what he stated.

9   Q    And he said that on June 2nd, 2017, right?

10  A    Yes.

11  Q    And that is a week after Mr. Kessler talked to

12  Mr. Heimbach about collaborating on planning Charlottesville,

13  right?

14  A    I don't know.

15  Q    And just to be clear, Derrick Davis is discussing the

16  prospect of using deception to create the appearance that

17  Antifa is going to be violent at Charlottesville, correct?

18  A    That is what -- appears to be what he is saying, yes.

19  Q    Now, you knew, Mr. Parrott, that there would be

20  counter-protesters at Unite the Right, correct?

21  A    Yes, I did.

22  Q    And you understood that the counter-protesters likely to

23  show up, generally speaking, would be supporters of racial and

24  religious minorities, right?

25  A    The opposition is a wide range of Marxists, leftists, and

M. Parrott - Direct

1  other groups.  There certainly was a lot of multiculturalism

2  and stuff, yes, but it was a statue and heritage event.  It was

3  not a white people versus black people event.

4  Q    Now, you also gave this testimony on page 249, line 11,

5  question:  "Do you agree with me, Mr. Parrott, that the

6  alt-right showed up to Unite the Right prepared to fight?"

7       Answer:  "Yes."

8       Did you give that testimony?

9  A    Yes.

10 Q    You and Mr. Heimbach decided that TWP members should bring

11 shields to Unite the Right, correct?

12 A    Yes.

13 Q    And you also participated in discussions with TWP members

14 about whether to bring weapons, right?

15 A    There was a lot of Second Amendment talk about what --

16 whether concealed or open carry could or could not be used.  We

17 attempted to discourage that altogether.

18 Q    Well, you stated in your deposition testimony, page 172,

19 line 17, question:  "And you said you were opposed to TWP

20 members bringing weapons to Unite the Right?  You agree that

21 position did not prevail, correct?"

22      Answer:  "That position did prevail, and to my knowledge

23 not a single person brought an offensive or a weapon to Unite

24 the Right."

25      Question:  "Not a single person from TWP brought a firearm

M. Parrott - Direct

1  to Unite the Right?"

2       Answer:  "That's correct."

3       "Not a single TWP member brought a club to Unite the

4  Right?"

5       Answer:  "I do not recall for certain.  I do not believe

6  they did."

7       Did you give that testimony?

8  A    Yes, I did.

9            MR. BLOCH:  Can we show PX-2373?

10  BY MR. BLOCH:

11  Q    Is that, Mr. Parrott, a photograph of you on August 12th?

12  A    Yes, it is.

13            MR. BLOCH:  I move this exhibit into evidence and ask

14  to publish it to the jury.

15            THE COURT:  Be admitted and published.

16            (Plaintiff Exhibit 2373 marked.)

17            (Plaintiff Exhibit 2373 admitted.)

18   BY MR. BLOCH:

19  Q    Mr. Parrott, that's you at Unite the Right, and behind you

20  is a TWP member holding a club, right?

21            MR. SMITH:  Objection, Your Honor.

22            THE WITNESS:  I don't see the TWP insignia.  He

23  doesn't appear -- I do not recognize him.  He's not wearing the

24  same style of helmet that we purchased in bulk.  I don't recall

25  seeing him there, but he -- if you look on his right shoulder,

M. Parrott - Direct

1   left -- your left, he has some kind of other insignia.  So I

2   cannot say one way or another who that gentleman is.

3   BY MR. BLOCH:

4   Q    So the guy standing in all black with the black

5   construction helmet, surrounded by other TWP members, that's

6   not a TWP member; is that your testimony?

7   A    I do not know.  He is not wearing the standard outfit that

8   everyone else has worn.  I do not recognize him.  I cannot say

9   one way or another.

10  Q    Okay.  We can take that down, Mr. Spalding.

11       Now, you're familiar with the term "RaHoWa," right?

12  A    Yes.

13  Q    And "RaHoWa" is short for Racial Holy War, right?

14  A    Yes.  It is a cringe '80s meme.

15  Q    And in your deposition testimony at page 61, line 2, were

16  you asked this question and did you give this answer?

17       "And there are white nationalists that believe the race

18  war was going to continue at Unite the Right, correct?"

19       Answer:  "There are white nationalists who arrived at

20  Unite the Right with that impression, yes."

21       Did you give that testimony?

22  A    Yes, I did.

23  Q    Now let's talk about Charlottesville 2.0 itself.

24       TWP rented a cabin near Charlottesville for Unite the

25  Right, correct?

M. Parrott - Direct

1  A     Correct.

2  Q     And you stayed in that cabin on the 11th and 12th?

3  A     Yes.

4  Q     Along with a number of other TWP members, right?

5  A     Yes.

6  Q     And on the morning of August 12th, you went to a store in

7  a strip mall, right, before heading to the park, JoAnn Fabrics?

8  A     Yes.

9  Q     You met up with other defendants at JoAnn Fabrics?

10 A     Yes.  We met up with the Market Street crew, League of the

11 South, and NSM.

12 Q     Right.  And also, you met with members of the Hammerskins,

13 right?

14 A     I do not recall.  It's a possibility.

15 Q     Turning to page 222 of your deposition testimony --

16 page 22, line 17, question:  "The Hammerskins were there,

17 right?"

18       Answer:  "Yes."

19       Did you give that testimony?

20 A     I did. that's a slightly separate question than what I was

21 just asked, but I'm not contending that the Hammerskins weren't

22 at JoAnn Fabrics, nor at the event.

23 Q     So just to be clear, the question I asked you was:  You

24 also met up with members of the Hammerskins at JoAnn Fabrics,

25 right?

M. Parrott - Direct

1           MR. SMITH:  Objection, asked and answered.

2           MR. BLOCH:  Judge, may I be heard?

3           THE COURT:  Okay.

4           Answer the question, sir.

5           THE WITNESS:  I do not recall the Hammerskin

6  Motorcycle Club being at JoAnn Fabrics.  I'm not disputing it.

7  I simply do not recall.

8  BY MR. BLOCH:

9  Q    And does seeing your deposition testimony to that effect

10 refresh your recollection that they were, in fact, there?

11 A    Well, at JoAnn Fabrics versus at the event are two

12 separate questions.  I am confused as to which one you're

13 asking.

14     I was aware.  I don't think I actually ever even saw them,

15 or know exactly what they looked like.  And I might have

16 remembered better years ago when I did this deposition.  I

17 don't know -- if it says in here -- what the status was on

18 that.

19 Q    So when you say you did this deposition years ago, you did

20 the deposition on June 26, 2020, right?

21 A    Yes.

22 Q    And by the way, to be clear, you were represented by a

23 lawyer at that deposition, right?

24 A    Yes, I was.

25 Q    And you've had the opportunity to review your deposition

M. Parrott - Direct

1  transcript since then, correct?

2  A    I have, though it's -- between this and for corporate,

3  we're talking about several hundred pages here, and I have not

4  fully.

5  Q    And for a year since you did the deposition, you've had

6  the opportunity to make any corrections that you want to the

7  testimony, correct?

8  A    Yes.

9  Q    And you have not corrected the testimony one word,

10  correct?

11  A    I have not availed myself of that opportunity.

12  Q    So --

13  A    Am I actually contradicting myself on the motorcycle club?

14  I don't know where I am.

15         THE COURT:  All right.  Let's just clear this up.

16         The record is what it is, and you don't dispute the

17  record.  You just -- you can -- the record speaks for itself.

18  BY MR. BLOCH:

19  Q    You agree with me, Mr. Parrott, that the Hammerskins are a

20  skinhead organization with a well-established reputation for

21  street violence, right?

22  A    They are associated with a skinhead subculture.  I

23  don't -- I believe their reputation for violence is a bit

24  exaggerated.

25  Q    Did you testify that the Hammerskins have a

150

M. Parrott - Direct

1   well-established reputation for street violence?

2   A     I don't recall what I testified.

3   Q     Page 227, line 18, were you asked these questions and did

4   you give these answers?

5         "Okay.  Now who are the Hammerskins?"

6         Answer:  "The Hammerskins are a venerable old skinhead

7   organization."

8         Question:  "And you agree they've got a well-established

9   reputation for street violence, right?"

10        Answer:  "Yes."

11        Did you give that testimony?

12   A     It appears I did.

13   Q     Now, from JoAnn's -- JoAnn Fabrics, you went to the Market

14   Street garage, correct?

15   A     Yes.

16   Q     And the plan was for the groups in the parking garage to

17   march from the parking garage to Emancipation Park, right?

18   A     Yes.

19   Q     And I'm going to read your testimony on this point from

20   your deposition, page 221, line 4.

21        Question:  "Well, when you were in the garage, did you

22   have any awareness that there were counter-protesters around

23   Emancipation Park?"

24        Answer:  "Yes."

25        Question:  "And how did you get that information?"

M. Parrott - Direct

1      Answer:  "Everybody had cell phones.  Everybody was

2  talking to everybody else.  I believe it might have been

3  visually apparent."

4      Question:  "So while you were in the garage, at the Market

5  Street garage, you were aware that there were

6  counter-protesters assembling in your path to Emancipation

7  Park?"

8      Answer:  "Yes."

9      Question:  "Did you do anything with that information?"

10      Answer:  "No.  We assembled as planned for that

11  contingency, to have our shields at the front and push through

12  the Antifa into the park."

13      Question:  "Now, when you were in the Market Street garage

14  and you learned of this information, you didn't know

15  specifically who was in the path to Emancipation Park,

16  correct?"

17      Answer:  "Correct."

18      Did you give that testimony under oath?

19  A    I did.

20  Q    And then you lined up in the garage with Matthew Heimbach

21  at the front with Michael Hill and Michael Tubbs, right?

22  A    Yes.

23  Q    And you began to march towards the counter-protesters,

24  right?

25  A    We began to march towards our permitted event, sir.

M. Parrott - Direct

1   Q    Now, to be clear about timing, this march into the park

2   happened before unlawful assembly had been declared, right?

3   A    Yes.

4   Q    And you were somewhere in the middle of the pack?

5   A    Yes.

6   Q    And as you got closer to the counter-protesters, you heard

7   what you described as, quote, "a full-throated rebel yell,"

8   right?

9   A    Yes, I did.

10  Q    And that was a war cry that came from League of the South,

11  correct?

12  A    That's how I described it, yes.

13  Q    And at that point, as planned, Michael Tubbs led the

14  charge through a crowd of counter-protesters, correct?

15  A    I did not actually witness that event.  My description was

16  based on hearsay, but as I understand it, the League of the

17  South succeeded in entering our permitted event despite people

18  who were illegally disrupting our freedom of movement.

19  Q    You gave this testimony under oath last year, page 226,

20  line 2.

21       Question:  "And at that point, isn't it true that Michael

22  Tubbs led a charge through the counter-protesters?"

23       Answer:  "Yes."

24       Question:  "And you stated at that point that the League

25  fighters with shields 'put their training to work,' correct?"

153

M. Parrott - Direct

1        Answer:  "Yes."

2        Question:  "And what training are you referring to there?"

3        Answer:  "I'm referring to basic blocking tactics, lining

4    up a shield wall, and pushing through -- pushing through the

5    opposition."

6        Question:  "Okay.  What's a shield wall?"

7        Answer:  "A shield wall is when the shields are lined up

8    to stop any projectiles or fists or anything else getting

9    through to harm any of our members."

10       Question:  "And is it also true that the shield walls are

11   used to break through groups of counter-protesters?"

12       Answer:  "Yes."

13       Did you give that testimony?

14   A    Yes, I did.

15   Q    And at that point, while there is fighting taking place,

16   do you agree with me that Identity Evropa sent a detachment of

17   fighters to assist you and relay intelligence to Jason Kessler?

18            MR. SMITH:  Objection.  What's the foundation for

19   this question?

20    BY MR. BLOCH:

21   Q    Mr. Parrott, were you present on August 12th --

22            MR. SMITH:  Excuse me.  I don't believe the judge has

23   ruled.

24            THE COURT:  Are you laying the foundation?

25            MR. BLOCH:  Judge, he just testified he's in a group

M. Parrott - Direct

1   of white nationalists marching through Market Street to break

2   through the counter-protesters lined up outside Emancipation

3   Park.

4           MR. SMITH:  The question was already saying that

5   there was fighting going on.  So somehow counsel jumped ahead.

6           MR. BLOCH:  Judge, I can rephrase if it's helpful.

7           THE COURT:  Repeat the question.

8    BY MR. BLOCH:

9   Q    After the point at which Michael Tubbs and others led the

10  charge into counter-protesters -- do you know where I'm talking

11  about in time?  Do you understand?

12  A    I understand.  These were from watching videos, open

13  source videos and speaking to other people.  And that was the

14  basis for my deposition, yes.

15  Q    Okay.  And isn't it true that Identity Evropa sent a

16  detachment of fighters to assist you and relay intelligence to

17  Jason Kessler?  Isn't that true?

18  A    That was after the event was already secured, after we had

19  achieved the shield wall at Market Street.  Our goal was to get

20  in, put the shield wall behind us, and that way we're in our

21  permitted event.

22      Identity Evropa did send people to assist.  It was

23  colorful language to call them "fighters" or whatever.  But

24  there was communication with Identity Evropa to figure out what

25  was going on at southeast Market Street, yes.

M. Parrott - Direct

1          MR. BLOCH:  One moment, Judge.

2          (Pause.)

3   BY MR. BLOCH:

4   Q    Mr. Parrott, did you write that:  "Michael Tubbs, an

5   especially imposing League organizer, towered over and pushed

6   through the Antifa like a Tyrannosaurus among raptors as League

7   fighters with shields put their training to work"?  Did you

8   write that?

9   A    I did write that, yes.

10  Q    And then did you go on -- you talk about Cesar Hess, and

11  then you say:  "While most of the Identity Evropa men were

12  occupied with other fronts, they sent a detachment of fighters

13  to assist us and to relay intelligence to Jason Kessler and

14  other organizers.  They offered more fighters, but we had our

15  positions amply covered."

16         Did you write that?

17  A    I did write that.

18  Q    Now, turning to your testimony at page 225, line 6, were

19  you asked, question:  "And you said that, quote, 'We all,

20  united, decisively won the fight,' correct?"

21         Answer:  "Yes."

22         Did you give that testimony?

23  A    Yes, I did.

24  Q    You also testified on page 228, line 21, question:  "Did

25  you once write, Mr. Parrott, after Unite the Right, regarding

156

M. Parrott - Direct


1   Unite the Right, that you, quote, 'beat the living shit out of

2   your enemies,' end quote?"

3          Answer:  "I did write that, yes."

4          Did you give that testimony?

5   A    I gave that testimony about the event.  I did not lay a

6   hand on anybody during the entire event.

7   Q    Now, at some point the police declared an unlawful

8   assembly and ordered everybody to leave Emancipation Park,

9   correct?

10  A    Yes.

11  Q    And you intentionally disobeyed that order, right?

12  A    Yes.  We had -- in the email dispatches we sent, we had

13  spoken about --

14  Q    So Mr. Parrott, my question was:  You intentionally

15  disobeyed that --

16          MR. SMITH:  Can the witness please finish answering

17  the question, Judge?

18          THE COURT:  He said yes.

19   BY MR. BLOCH:

20  Q    And you were then arrested for failure to disperse,

21  correct?

22  A    Very peacefully and respectfully with the officer, yes.

23  Q    And -- well, you looked at the officer at that point and

24  said, "We will not be replaced," correct?

25          MR. SMITH:  Objection, argumentative.

M. Parrott - Direct

1          THE WITNESS:  We did say that.

2          THE COURT:  No, that's --

3   BY MR. BLOCH:

4   Q    And you were ultimately convicted of that crime, right?

5   A    Yes.

6   Q    You were aware of an assault that took place in the Market

7   Street garage, correct?

8   A    I was not aware of that until much later.

9   Q    At some point, you became aware of it, and watched the

10  video of it, right?

11  A    Yes.

12  Q    And one of the people that beat up Mr. DeAndre Harris was

13  a guy named Daniel Borden, right?

14  A    Yes.

15  Q    And Daniel Borden was a TWP member who marched with you

16  that day, right?

17  A    I do not know whether he was actually with us on the

18  Market Street thing.  I presume he was.

19  Q    So my question was:  Daniel Borden was a TWP member that

20  marched with you that day, right?

21  A    I believe so.

22          MR. BLOCH:  And I would like to play, Judge, for the

23  witness the DeAndre Harris video so that he can identify Daniel

24  Borden, the TWP member in the video.

25          THE WITNESS:  May we play it from the very beginning?

M. Parrott - Direct

1    THE COURT:  Can you put a clip of it up there?

2    MR. BLOCH:  Like a screenshot?

3    THE COURT:  Yeah.

4    MR. BLOCH:  Sure.  I think so.

5    Matt, if you pause it at the 0:06 mark.

6  BY MR. BLOCH:

7  Q    So I'm showing PX-2368, which is now paused on the screen.

8    You agree with me, Mr. Parrott, that Daniel Borden is the

9  guy in the flannel shirt with the white construction helmet

10  with the board raised over his head, about to strike DeAndre

11  Harris?

12  A    Well, this has always confused me about this situation.  I

13  believe he was a dues-paying member, but he was clearly not

14  wearing the Trad Worker uniform or with Trad Worker.  So I'm

15  honestly, sincerely just confused about what his status was at

16  that time.

17  Q    Okay.  So my question is just about:  Who is he?  You

18  agree that --

19  A    Yes.

20  Q    -- I've identified Daniel Borden correctly?

21  A    Yes.

22  Q    And if we could just -- I guess let's look at PX-3545.

23    Is that a different photograph of Mr. Borden on

24  August 12th?

25  A    Yes, it is.

M. Parrott - Direct

1          MR. BLOCH:  I would offer PX-3545, Your Honor.

2          THE COURT:  Be admitted.

3          MR. BLOCH:  And published, please.

4          THE COURT:  Admitted.

5          (Plaintiff Exhibit 3545 marked.)

6          (Plaintiff Exhibit 3545 admitted.)

7   BY MR. BLOCH:

8   Q    This is another photograph of Mr. Borden from August 12th,

9   correct?

10  A    Yes.

11  Q    And he's wearing that white construction helmet that

12  appears to say "Commie Killer" on the front, right?

13  A    It does.

14  Q    We can take that down.

15       Now, you supported Mr. Borden while criminal charges were

16  pending against him, right?

17  A    Yes, I did, because I watched the entire video.

18  Q    And you said that you felt a sense of moral responsibility

19  to support him; is that right?

20  A    Well, yes.

21  Q    You helped arrange counsel for him, right?

22  A    Yes.

23  Q    You hosted fundraisers for his legal defense?

24  A    I didn't directly host the fundraisers, but I was

25  supportive of that process.

160

M. Parrott - Direct

1   Q    And if we could show PX-0340, please.  This is a Discord

2   post that you're involved in, right, Mr. Parrott?

3   A    Yes.  Where I say "Dan Borden was one of the men who

4   fought back during the parking garage incident"?  That line

5   right there?

6   Q    Right.  That's what I'm focused on, actually.

7           MR. BLOCH:  If we could just offer this into

8   evidence.

9           THE COURT:  Be admitted.

10          (Plaintiff Exhibit 0340 marked.)

11          (Plaintiff Exhibit 0340 admitted.)

12   BY MR. BLOCH:

13   Q    And so, Mr. Parrott, you described in this post

14   characterizing what Mr. Borden did as fighting back; is that

15   right?

16   A    Yes.  Mr. Harris had brutally assaulted an elderly

17   gentleman who had not been engaged in any combat immediately

18   before the video that's been repeatedly shown.

19   Q    DeAndre Harris was tried and acquitted; isn't that right?

20          MR. JONES:  Your Honor, I'm going to object.  Your

21   Honor has already ruled on the admissibility of that fact.

22          THE COURT:  I have.  I sustain the objection.

23   BY MR. BLOCH:

24   Q    Now, later on you state in that same post -- somebody

25   named Zebo says, "A couple of the other guys involved in that

M. Parrott - Direct

1  altercation reached out to me.  I'm going to try and remember

2  their names and contact info," right?

3  A    Yes.

4  Q    Are you aware that Mr. Kessler by this point was going by

5  "Zebo" on Discord?

6  A    Yes.

7  Q    What you wrote in response was, "I have a very bad memory

8  and do not write down any names of people involved."  Is that

9  right?

10  A    I did write that, yes.

11  Q    Something you didn't want to keep a record of, fair to

12  say?

13  A    I don't remember my exact state of mind at the time.

14  Q    Now, if we could show PX-1875.  Is this a tweet that you

15  posted -- that you tweeted, Mr. Parrott?

16  A    I cannot possibly endorse this tweet strongly enough, sir.

17  Q    So is the answer yes?

18  A    Yes.

19          MR. BLOCH:  If we could offer 1875.

20          THE COURT:  Be admitted.

21          (Plaintiff Exhibit 1875 marked.)

22          (Plaintiff Exhibit 1875 admitted.)

23  BY MR. BLOCH:

24  Q    What you stated, Mr. Parrott, was, "As with Heather Heyer,

25  the DeAndre affair was a case in which the police deliberately

M. Parrott - Direct

1   provoked violence and stood down with the expectation that

2   nationalists would be harmed or worse.  Sue Charlottesville,

3   DeAndre.  We were just trying to get to our cars."

4        Is that right?

5   A    Yes.

6              MR. BLOCH:  We can take that down, Matt, thank you.

7   BY MR. BLOCH:

8   Q    Now, you've stated, Mr. Parrott, that your objectives for

9   Charlottesville were for it to be nonviolent, right?

10  A    Yes.

11  Q    You claim that you wanted a peaceful and successful event?

12  A    Yes.  Like the event immediately before it and immediately

13  after it which had large crowds and no violence.

14             MR. BLOCH:  Judge, I'm going to move to strike

15  everything after "yes" and ask that the witness just answer the

16  question so we can move this along.

17             THE COURT:  Sustained.  Strike everything after

18  "yes."

19   BY MR. BLOCH:

20  Q    Now, you agree with me, Mr. Parrott, that Unite the Right

21  was anything but peaceful, right?

22  A    It is my opinion that relative to the complete absence of

23  police and the number involved, that it could have gone way

24  worse than it did.

25  Q    Now, you wrote -- if we could show the witness PX-2379.

M. Parrott - Direct

1    Do you agree with me, Mr. Parrott, that you wrote on

2  September 15th, "Aside from having a couple men unfairly held

3  behind the wire, Charlottesville was a tremendous success"?

4  A    Our participation in Charlottesville was a success.  The

5  Heather Heyer incident, the helicopter incident, and the torch

6  march had nothing to do with us and does not -- we have --

7  that's outside of the scope of what we achieved.  We went

8  through Market Street.  We got to our event without any

9  significant injuries or incidents, and then we got back.

10  Q    So you don't -- just to be clear -- I misstated a word.

11  Let me be clear about what you wrote.  "Aside from having a

12  couple men unfairly held behind the wire, Charlottesville was a

13  tremendous victory."  Did you write that?

14  A    Yes, I did.

15  Q    And if we could -- you said, "It was a culmination of the

16  momentum which began with the successful Battle of Sacramento

17  and led up to our decisively defeating the single greatest mob

18  of anti-white radicals in American history in a brutal street

19  battle."  Did you write that?

20  A    I did write that.

21  Q    You said, "The alt-right is not a pathetic and faceless

22  Internet fad, but a fearsome street-fighting force which the

23  state and the media now understand to be the greatest enemies."

24  Did you write that?

25  A    I did.

M. Parrott - Direct

1    Q    Okay.  We can take that down.  Can we show the witness

2    PX-2378.

3              (Plaintiff Exhibit 2378 marked.)

4    BY MR. BLOCH:

5    Q    Is this a Gab post by you?

6    A    Yes.

7              MR. BLOCH:  I offer this into evidence, Judge, and

8    ask that it be published.

9              THE COURT:  Be admitted and published.

10             (Plaintiff Exhibit 2378 admitted.)

11    BY MR. BLOCH:

12   Q    Did you post, Mr. Parrott, on August 22, 2017, "We

13   demonstrated strength and were chased off by the National

14   Guard, not the radical -- not the leftist radicals.  We

15   achieved our prerogatives in Charlottesville and aren't

16   actually dependent on money and media favor the way our

17   opponents are anyway."  Did you write that?

18   A    I did.  And it's an accurate statement.

19   Q    Now, these writings and posts that you -- I just asked you

20   about, those occurred before you were sued in this case, right?

21   A    Yes.

22   Q    And you were sued in October of 2017, right?

23   A    Yes.

24   Q    And you've posted a number of things about this incident

25   on social media after you were sued as well, correct?

M. Parrott - Direct

1    A    Yes.

2    Q    So let's put up PX-1892.  This is a tweet by you, right,

3    Mr. Parrott?

4    A    Yes.

5         MR. BLOCH:  And on -- I ask that this be admitted,

6    Judge, and shown to the jury, please.

7         THE COURT:  What are you waiting for?

8         MR. BLOCH:  I'm sorry.  I just asked that this

9    exhibit be admitted and published.

10        THE COURT:  Okay.

11        (Plaintiff Exhibit 1892 marked.)

12        (Plaintiff Exhibit 1892 admitted.)

13   BY MR. BLOCH:

14   Q    Mr. Parrott, did you write on Twitter on December 3rd,

15   2018, "we weren't" -- well, just to be clear, just for context,

16   the top tweet is "C'ville was an AmNat scheme from day one with

17   IE leading the charge.  Nationalist Front all knew that it was

18   a bad idea to venture to a town that blue, but got caught up in

19   their call for unity."

20   A    I did write that.

21   Q    Then you go on to say, "We weren't even invited until the

22   last minute when it became clear that it was possibly going to

23   involve physical risk," right?

24   A    Yes.  I wrote that.

25   Q    When you say in this tweet that we weren't even invited

M. Parrott - Direct

1   until the last minute, that's not true, right?

2   A    I guess it's -- I don't know exactly when we were clued in

3   on the process.  We were always a little bit on the outside of

4   the process.  But yeah, I think that statement might be

5   inaccurate.

6   Q    Well, you do know when you were clued in, right?  Wasn't

7   it May 22nd by text from Jason Kessler to Matthew Heimbach?

8   A    I did not know about that at the time.  Based on the

9   information I have now after researching all this for the past

10  few weeks, yes, this statement is incorrect.

11  Q    Your best friend who lived 100 feet away from you and your

12  partner in white nationalist causes didn't tell you that he was

13  talking to Jason Kessler in May about the biggest white

14  nationalist event in American history?

15  A    Either he didn't tell me or I don't recall him telling me

16  in this context.

17  Q    So let's put up PX-2410, please.

18       Mr. Parrott, is this another tweet by you?

19  A    I can only read the bottom one, but yes.

20  Q    That's the one I'm focused on.  Is the tweet at the bottom

21  by you?

22  A    Yes.

23       MR. BLOCH:  I offer 2410 into evidence, Your Honor,

24  and ask that it be published?

25       THE COURT:  Be admitted.  Publish.

M. Parrott - Direct

1            (Plaintiff Exhibit 2410 marked.)

2            (Plaintiff Exhibit 2410 admitted.)

3    BY MR. BLOCH:

4    Q    Mr. Parrott, you also tweeted on December 19th, 2018:

5    "I'll never understand how Unite the Right, which we grudgingly

6    agreed to at the last minute and had no control over, has gone

7    down in movement lore as pretty much my idea," right?

8    A    I did write that, yes.

9    Q    Now, you and your friend Matthew Heimbach claim that TWP

10   had a separate plan from the rest of the organizers, right?

11   A    Yes.

12   Q    And specifically this supposed separate plan was to

13   separate TWP from Defendants Kessler, Kline, and Identity

14   Evropa, right?

15   A    It wasn't to separate from them.  It was because we did

16   not like their plan.  There were certainly personality

17   conflicts involved, but ultimately I had a decade of experience

18   with political organizing at the time, and the other

19   Nationalist Front groups had a wealth of experience.

20   Mr. Schoep has been doing this for decades as well.  We felt

21   like we wanted to do it our way, and we did not -- we did not

22   like the way that the other groups were doing it.

23        So the Nationalist Front, the Market Street crew, did

24   their own thing.

25   Q    And just focusing on who you claim this plan was separate

M. Parrott - Direct

1   from, it was separate from Defendants Kessler, Kline, and

2   Identity Evropa, right?

3   A    It was separate from them, yes.

4   Q    And the supposed separate plan primarily involved a

5   different means of entering the park; isn't that right?

6   A    Arriving entirely separately and autonomously, yes.

7   Q    To enter the park, right?

8   A    Yes.

9   Q    And now, Nathan Damigo was the head of Identity Evropa at

10  the time, right?

11  A    Yes.

12  Q    And isn't it, in fact, true, Mr. Parrott, that Mr. Damigo

13  actually walked into Emancipation Park with you and the

14  Traditionalist Worker Party?

15  A    I was not aware until I was shown that video in my

16  deposition.  It was clear that he had snuck in that way.  It

17  was difficult to get into the park because of the Antifa

18  presence.  I assume, without having spoken to him, that he used

19  a crowd of nationalists to rapidly weave his way through to

20  ensure his safety against the Antifa mob.

21  Q    Just to sneak in to be walking in with TWP?

22  A    Yes.

23  Q    Can we show PX-3394.  And I'm looking specifically at 9

24  seconds.

25              (Video playing.)

M. Parrott - Direct

1  Q     This is you in that video, correct, Mr. Parrott?

2  A     Yes, I believe that's me right here.

3            MR. BLOCH:   Judge, I would ask that 3394 be admitted

4  into evidence and published to the jury from the 9 second part

5  to 1:13.

6            THE COURT:   All right.   Be admitted.   You may

7  publish.

8            (Plaintiff Exhibit 3394 marked.)

9            (Plaintiff Exhibit 3394 admitted.)

10           (Video playing.)

11   BY MR. BLOCH:

12  Q    If we could just pause it right there.   That's you, right,

13  Mr. Parrott?

14  A     Yes, it is.

15  Q    And you're shepherding people into Emancipation Park,

16  right?

17  A     Yes.

18  Q    If we could keep going.

19           (Video playing.)

20  Q    If we could pause it right there.   Sorry.   You'll see once

21  the bald head disappears, that's a TWP member.   We're still in

22  the midst of TWP members walking into the park, correct?

23  A     Yes.

24        (Video playing.)

25  Q     We can pause it right there.   So the gentleman -- well,

M. Parrott - Direct

1   yeah, the circle is Nathan Damigo, right?

2   A    Yes.

3   Q    And the person right in front of Mr. Damigo is another TWP

4   member?

5   A    Yes.

6   Q    And if we could keep going.

7        (Video playing.)

8   Q    If we could pause it right there.  Can we pause it, Matt?

9        Sorry.  These are more TWP members, right?  You can tell

10  by the insignia on the shirt, right?

11  A    Very peacefully walking into the park.

12  Q    This is after the charge through the counter-protesters,

13  right, just in terms of time?

14  A    Immediately after, yes.  Our goal was to peacefully walk

15  into the park and not provoke conflict, as can be seen in this

16  video.

17  Q    And if we can just finish the video, Matt.

18       Okay.  We can pause right there.  And you also walked in

19  with Mr. David Duke, correct?

20  A    David Duke walked in with us without our foreknowledge or

21  permission.  I am sure he wasn't at the parking garage and I am

22  positive that we did not plan to enter together.  It's clear

23  what happened here, which is that they needed to get into the

24  park, and go in --

25  Q    So my question is that --

M. Parrott - Direct

1          MR. SMITH:  Could the witness please finish answering

2   the question.

3          MR. BLOCH:  Judge, I'm trying to save time here.

4          MR. SMITH:  I don't think you are.

5          THE COURT:  Okay.  Don't talk to each other.  All

6   right.  Were you finished with your answer?

7          THE WITNESS:  Yes, I am finished with my answer.

8          THE COURT:  Go ahead.

9          MR. BLOCH:  We can take that down, Matt, thanks.

10   BY MR. BLOCH:

11  Q    Just returning to this concept of a so-called separate

12  plan, if we could introduce PX-1028.  Now, is this a post by

13  you, Mr. Parrott, in the Charlottesville 2.0 server?

14  A    Yes.

15          MR. BLOCH:  And that's -- if we can move this in and

16  publish it to the jury, please?

17          THE COURT:  You may admit it.

18          (Plaintiff Exhibit 1028 marked.)

19          (Plaintiff Exhibit 1028 admitted.)

20   BY MR. BLOCH:

21  Q    Mr. Parrott, you posted in the Charlottesville 2.0 server

22  on August 13th, 2017, "Can anybody confirm Heimbach's safety?"

23  Right?  And Jason Kessler responded, "Heimbach was okay when I

24  talked to him earlier today," right?

25  A    Yeah.

M. Parrott - Direct

1   Q    And you wrote, "Excellent.  Thank you, Mr. Kessler,"

2   right?

3   A    Yes.

4   Q    And so it seems apparent that Mr. Kessler had spoken to

5   Mr. Heimbach that day even before you were in touch with

6   Mr. Heimbach; isn't that right?

7   A    That is correct.

8   Q    And you also -- we can take that down.  Thanks, Matt.

9        We discussed the fact that you were arrested at Unite the

10  Right, correct?

11  A    Yes.

12  Q    And on August 14th, two days after the rally, you reached

13  out to Mr. Kessler about that, right?

14  A    I believe -- I don't know.  I don't recall.

15  Q    Do you recall giving testimony that you spoke to

16  Mr. Kessler on August 14th?

17  A    I have a strong feeling that I did.  What page are we

18  going to?

19  Q    236.

20       236, line 25, Question:  "I see.  So there was -- you had

21  a conversation after Unite the Right regarding a shared legal

22  response with Mr. Kessler and Mr. Spencer; is that right?"

23       Answer:  "With only Mr. Kessler.  I was just aware that

24  Mr. Spencer had been arrested."

25       Question:  "Okay.  But you had a conversation after Unite

M. Parrott - Direct

1  the Right with Mr. Kessler about a shared legal response?"

2       And you answered "Yes," correct?

3  A    Yes, I did.

4  Q    And does that refresh your recollection that you had a

5  call with Mr. Kessler and it was on August 14th, 2017?

6  A    I honestly -- I straight up forget it, but I stipulate to

7  the accuracy of the conversation.

8  Q    And just returning to the concept of the separate plan, if

9  we could show the witness PX-2370.  Is this something you

10 posted on Gab on August 19th, 2017, Mr. Parrott?

11 A    Yes, it is.

12          MR. BLOCH:  I would move this into evidence, Judge,

13 and ask that it be published to the jury.

14          THE COURT:  Be admitted and published.

15          (Plaintiff Exhibit 2370 marked.)

16          (Plaintiff Exhibit 2370 admitted.)

17 BY MR. BLOCH:

18 Q    Mr. Parrott, you posted on Gab on August 19th, 2017,

19 quote, "I still stand with Jason Kessler," right?

20 A    I did write that, yes.

21 Q    And if we could show the witness PX-2436.  Is this a

22 Discord post by you, Mr. Parrott?

23 A    Yes.

24          MR. BLOCH:  And I move 2436 into evidence and ask

25 that it be published, Your Honor.

M. Parrott - Direct

```
1            THE COURT:  Be admitted.  You may publish.

2            (Plaintiff Exhibit 2436 marked.)

3            (Plaintiff Exhibit 2436 admitted.)

4     BY MR. BLOCH:

5     Q    Now, Mr. Parrott, did you write on November 5th, 2017,

6     quote, "We're debuting the Charlottesville defense fund next

7     week which will include Vanguard, Trad Worker, Borden, Goodwin,

8     and Kessler as part of a unified legal defense project

9     inclusive of the criminal defense of the arrested men, the

10    civil defense of the organizations and individuals being sued

11    and the prospective counterclaims."  Did you write that?

12    A    I did write that.  I don't know --

13            MR. SMITH:  Your Honor, objection.  What's the

14    relevance of this?  They were already sued.  Of course they're

15    going to have a legal defense.

16            THE COURT:  Overruled.

17            MR. CANTWELL:  Wasn't there a motion in limine about

18    fundraising?

19            MR. SMITH:  There was.

20            MR. BLOCH:  Judge, I do not see the relevance of any

21    of these stray comments.

22            THE COURT:  Go ahead.

23            MR. BLOCH:  Thank you, Judge.

24    BY MR. BLOCH:

25    Q    Just to clarify, I think we know who Vanguard, Trad Worker
```

175

M. Parrott - Direct

1    and Kessler are.  Borden is Dan Borden and Goodwin is Jacob

2    Goodwin and those were two people that were arrested in the

3    beating of DeAndre Harris, right?

4    A    In defending themselves against DeAndre Harris, yes, sir.

5    Q    Both were convicted, right?

6         THE COURT:  I thought I ruled that all these

7    convictions were not admissible in evidence.

8         MR. BLOCH:  Judge, I'm responding to the witness

9    claiming it was self-defense.

10        THE COURT:  Well, it's not proper.  And I've ruled

11   that and you should not bring it up.

12        Members of the jury, disregard whether anyone was

13   arrested, convicted or what.  This case is to be tried on the

14   evidence that you hear in the courtroom when you assess fault,

15   not what some other court might have done.

16        MR. BLOCH:  We can take that down, Matt, thank you.

17    BY MR. BLOCH:

18   Q    Mr. Parrott, initially you, Mr. Kessler, Mr. Heimbach,

19   TWP, Identity Evropa, and Nathan Damigo all shared the same

20   counsel in this case; isn't that right?

21   A    Yes.

22   Q    And that's no longer the case, right?

23   A    That is no longer the case.

24   Q    Now, if we could show the witness PX-2375.

25        Mr. Parrott, is this a Gab post that is sharing a Facebook

M. Parrott - Direct

1   post?

2   A    Yes.

3   Q    By you?

4   A    It appears as such.

5            MR. BLOCH:  I would offer this into evidence, Judge.

6   This is 2375.

7            THE COURT:  Be admitted.  Publish.

8            (Plaintiff Exhibit 2375 marked.)

9            (Plaintiff Exhibit 2375 admitted.)

10   BY MR. BLOCH:

11   Q    Mr. Parrott, did you write, focusing on the Facebook post,

12   "I just donated $14.88 to Cantwell's jail atm.com account.

13   Apparently a cracker's got to be an inmate in order to be

14   allowed to fund-raise with a regular credit card"?  Did you

15   write that?

16   A    Yes, I was referring to the fundraising deplatforming that

17   made it to where we could barely afford to even be here today.

18   Q    I'm focused on the first sentence which is the $14.88 that

19   you donated to Mr. Cantwell's account, right?

20   A    Yes.

21   Q    What's the significance of donating $14.88 to his account?

22   A    That's a meme to signal to him that I'm a fellow white

23   nationalist.  14 stands for the 14 Words, and 88 stands for

24   Heil Hitler.  It was a light-hearted, joking way to let him

25   know that he had allies on his side.

M. Parrott - Direct

1    Q    You also wrote about James Fields, right?

2    A    Yes.

3    Q    You wrote after Unite the Right that you fully sympathize

4    with and support him, right?

5    A    Yes, I also sympathize with the victims.

6    Q    And you posted about Mr. Fields on Facebook after Unite

7    the Right as well; isn't that true?

8    A    Repeat the question, please.

9    Q    Isn't it true that you also posted on Facebook that

10   Mr. Fields was a TWP member for life?

11   A    Immediately after the incident I did post that as a show

12   of support for a man I believed at the time was being

13   wrongfully accused.

14   Q    Now, Mr. Parrott, I'd like to talk to you now about the

15   evidence that you were required to turn over in this case,

16   okay?

17   A    Okay.

18   Q    Now, you were sued in October of 2017, right?

19   A    Yes.

20   Q    And as of that time you were aware that evidence was going

21   to be important, right?

22   A    Yes.

23   Q    And in January of 2018 you received requests for documents

24   from the plaintiffs, right?

25   A    Yes.

M. Parrott - Direct

1  Q    And you knew that you had a legal obligation to comply

2  with those requests, right?

3  A    Yes.

4  Q    And the requests asked for, among other things, all

5  documents in your possession regarding Unite the Right,

6  correct?

7  A    Correct.

8  Q    And that specifically included a request for documents

9  from your social media accounts, right?

10 A    Yes.

11 Q    It specifically included electronic content from your

12 cellphone, correct?

13 A    Correct.

14 Q    And you were specifically instructed that you were under a

15 legal obligation to preserve all documents related to Unite the

16 Right, correct?

17 A    Correct.

18 Q    Now, you had an active Facebook account in 2018, right?

19 A    Yes.

20 Q    You were Facebook friends with other organizers of Unite

21 the Right?

22 A    I do not recall.  I don't even know if I had an active

23 Facebook account at that time.  At some point I was

24 deplatformed from Facebook, but I do not recall when.

25 Q    If we could show PX-2093.  And if we could -- is this a

M. Parrott - Direct

1  Facebook post, Mr. Parrott, that you made on February 8th,

2  2018?

3  A    Yes.

4         MR. BLOCH:  I ask that this be moved into evidence,

5  Your Honor.

6         THE COURT:  Be admitted.

7         (Plaintiff Exhibit 2093 marked.)

8         (Plaintiff Exhibit 2093 admitted.)

9   BY MR. BLOCH:

10 Q    This is February 8th.  That was two weeks after receiving

11 the plaintiffs' written document request, right?

12 A    Yes.

13 Q    And what you wrote is, "General note:  If you were

14 involved in any altercation in C'ville and you haven't disabled

15 your social media, you should do so.  I know it's a bit late

16 for some folks, obviously.  But just in case there's anybody

17 out there reading this who's out there who hasn't taken that

18 step, do so.  It doesn't matter if you actually did anything.

19 Everybody is getting a ride, even if it's totally obvious that

20 they're not convictable," right?

21 A    Yes.

22 Q    And you're aware, Mr. Parrott, that after you posted that

23 on Facebook, a host of electronic evidence in this case went

24 missing?

25 A    I don't think that's an accurate representation of what's

M. Parrott - Direct

1  going on.  I was fully compliant with the discovery process.

2  After sending this, I was advised that this was an ignorant

3  thing to say to tell people to disable their accounts because

4  it creates the situation we have here.  And I became fully

5  compliant with the discovery process.

6  Q    Well, we will certainly talk about whether or not you were

7  fully compliant with the discovery process.  But what I'm

8  focused on right now --

9         MR. SMITH:  Your Honor, I'd like to request a

10  sidebar.

11         THE COURT:  Okay.

12         (Sidebar.)

13         MR. SMITH:  Your Honor, the discovery failures in

14  this case were Mr. Heimbach, not Mr. Parrott.  There were zero

15  motions for sanctions filed for Mr. Parrott or TWP.  They had

16  their chance to ask Mr. Heimbach those things.  They passed it

17  up in favor of asking stupid things like what he said in a

18  tweet five years ago.

19         MR. BLOCH:  That's absolutely not true.

20         MR. SMITH:  That's exactly what happened, Judge.

21         THE COURT:  What do we have -- have we got the order

22  on Parrott?

23         MR. BLOCH:  There is a host of document destruction

24  by Mr. Parrott.

25         THE COURT:  Did Judge Hoppe hear anything regarding

M. Parrott - Direct

1    sanctions against Mr. Parrott?

2         MR. SMITH:  There were never any sanctions imposed

3    against Mr. Parrott.  There was never a motion for sanctions

4    against Mr. Parrott.

5         THE COURT:  Did you file any sanctions against

6    Mr. Parrott?

7         MR. BLOCH:  There were no sanctions.  We didn't move

8    for sanctions, but there's a host of document destruction.  We

9    chose --

10        THE COURT:  Okay.

11        MR. BLOCH:  -- not to move for sanctions, but we'll

12   move right now if that's what we need to do to ask questions

13   about it.

14        THE COURT:  Go ahead.  He can show if he -- it

15   doesn't make any difference whether it's in the report.  If

16   he's got it now, he can bring it --

17        MR. SMITH:  He wants to ask about Mr. Heimbach and

18   his situation as opposed to Mr. Parrott.

19        THE COURT:  Well, he can ask about Mr. Parrott.  He

20   can ask about Mr. Parrott.  He's the witness.

21        MR. SMITH:  Sure.  Yeah.  Of course.  Yeah.

22        MR. BLOCH:  Judge, my plan is to ask Mr. Parrott, but

23   I also plan to ask him about his awareness about other people's

24   document destruction as well, including his best friend who he

25   texted with, Mr. Heimbach.

M. Parrott - Direct

1          MR. SMITH:  This is an attempt to try to get it in

2    another way.  They had an opportunity to question Mr. Heimbach

3    directly about it.  They passed it up.  They shouldn't be able

4    to.

5          MR. BLOCH:  We did.

6          MR. SMITH:  No, you didn't, actually.

7          MR. BLOCH:  Yeah, we did.

8          THE COURT:  Go ahead.

9          (Sidebar concluded.)

10   BY MR. BLOCH:

11   Q    Mr. Parrott, you're aware that after you posted --

12   withdrawn.

13          You're aware, Mr. Parrott, that every single social media

14   account that Matthew Heimbach was on that concerned Unite the

15   Right has been either disabled or deleted since you were sued

16   in this case; were you --

17          MR. SMITH:  Objection, Your Honor.

18          THE COURT:  Overruled.

19          (Reporter clarification.)

20          MR. BLOCH:  Let me ask it again without the

21   objection.

22   BY MR. BLOCH:

23   Q    You're aware, Mr. Parrott, that every single social media

24   account that Matthew Heimbach was on that concerned Unite the

25   Right has been either disabled or deleted since you were sued

M. Parrott - Direct

1   in this case?  You're aware of that?

2   A    The term "deleted" is carrying a lot of water here, as

3   Mr. Heimbach is Mr. Heimbach.  And he routinely was

4   deplatformed from his services.

5   Q    Okay.  So my question was whether you're aware that every

6   single social media account that he was on that concerned Unite

7   the Right has been deleted or disabled since --

8         MR. SMITH:  Objection, Your Honor.  That's false and

9   mischaracterizes, well, several aspects of this proceeding that

10  have already been --

11        MR. BLOCH:  Judge, I'm going to ask that --

12        MR. SMITH:  I'm allowed to object.

13        MR. BLOCH:  Judge, can we approach?

14        THE COURT:  No.  I'm not going to approach again.

15        Ask the question.  The witness can answer the

16  question.  We don't need to talk about it.

17   BY MR. BLOCH:

18  Q    Are you aware, Mr. Parrott, that your best friend, Matthew

19  Heimbach, gave sworn deposition testimony to the effect that

20  every single social media account that Mr. Heimbach was on that

21  concerned Unite the Right that has been either disabled or

22  deleted -- sorry -- has been either disabled or deleted?

23        MR. SMITH:  Objection.  Mischaracterizes

24  Mr. Heimbach's testimony.

25        THE COURT:  Overruled.

M. Parrott - Direct

1          MR. BLOCH:  Judge, Mr. Smith cannot keep giving false

2    impressions to the jury.  It's not true.

3          THE COURT:  I overruled the objection.  And you go

4    ahead.  Please.

5          MR. BLOCH:  Understood.  One moment, Judge.

6     BY MR. BLOCH:

7    Q    You're aware, Mr. Parrott, that all of Mr. Heimbach's

8    electronic devices that he used to communicate about Unite the

9    Right have disappeared since you were sued in this case?

10   A    I do not know if that's a fair characterization or not.

11   Q    Were you aware that Jeff Schoep's phone fell in the

12   toilet?

13   A    I had heard a rumor about that.

14   Q    How about Dillon Hopper's phone was electrocuted?  Did you

15   hear about that in the beginning of 2018?

16   A    I did not hear about that.  That's a far cry from

17   disabling your social media accounts, though.

18   Q    Now, about a month after you posted what you posted on

19   Facebook, you also --

20          MR. BLOCH:  Could we show the witness PX-2476?

21   BY MR. BLOCH:

22   Q    Is that post by you on Gab, Mr. Parrott?

23   A    Yes.

24          MR. BLOCH:  I move 2476 into evidence and ask that it

25   be shown to the jury, please.

M. Parrott - Direct

1              THE COURT:  Be admitted.

2                  (Plaintiff Exhibit 2476 marked.)

3                  (Plaintiff Exhibit 2476 admitted.)

4    BY MR. BLOCH:

5    Q    If we could -- perfect.  Thanks.

6         Now, you posted -- Mr. Parrott, this is approximately

7    march of 2018, right?

8    A    Yes, March 13, 2018.

9    Q    And you wrote, "I hereby fully and permanently resign from

10   Trad Worker," right?

11   A    Yes.

12   Q    And then, "I will be making no further public comments.

13   God bless," right?

14   A    I did post that.

15   Q    And then after, you posted, "All of the information

16   systems are completely air-gapped and will be destroyed within

17   a few hours in order to guarantee all membership information

18   literally no longer exists anywhere," right?

19   A    I did post that, but the context is highly important in

20   this case.

21   Q    Okay.  We'll get there, but did you post that?

22   A    Yes, I did.

23   Q    And you added, "To clarify, the information was scrubbed

24   on account of widespread concern about the data's security.  It

25   was a practical security step, not a political act," right?

M. Parrott - Direct

1  A     I did post that.

2  Q     Now, you also texted -- we can take that down.   Thanks.

3        You texted with your best friend, Matthew Heimbach, at

4  least on a weekly basis about Unite the Right, correct?

5  A     I do not recall how frequently I texted him.

6  Q     Well, in your deposition on page 160, line 2, were you

7  asked these questions and did you give these answers?

8        Question:  "Now, how often did you text Mr. Heimbach about

9  Unite the Right prior to the rally?"

10       Answer:  "I believe it was very minimally."

11       Question:  "Well, would you say once a week?"

12       Answer:  "I would guess once a week."

13       Did you give that testimony?

14 A     Yes, I gave that guess.

15 Q     And those text messages with Matthew Heimbach, you know

16 that you were required to preserve and produce to the

17 plaintiffs in this case, right?

18 A     Yes.

19 Q     And instead of producing them, you, in fact, deleted all

20 text messages between you and Mr. Heimbach, right?

21 A     I did, due to the context of the situation here, and not

22 due to this case.

23 Q     And as you know, Mr. Heimbach, too, destroyed his cell

24 phones before producing any documents, right?

25 A     I don't believe it's an accurate characterization that he

187

M. Parrott - Direct

1   destroyed his cell phones.

2   Q    Do you agree with me that his cell phones disappeared

3   before any content could be recovered?

4   A    I believe that's accurate, yes.

5   Q    And as a result of your mutual behavior, this jury --

6              MR. SMITH:  Objection.  "Mutual behavior" sounds like

7   he's testifying.

8              THE COURT:  Sustained.

9    BY MR. BLOCH:

10  Q    As a result, Mr. Parrott, this jury will not see a single

11  text message between you and Matthew Heimbach, correct?

12  A    Correct.

13  Q    Now, your ex-wife, Jessica Parrott, was also a member of

14  TWP, right?

15  A    Yes.

16  Q    And you deleted all of your text messages with her, right?

17  A    Yes, because there was a dramatic domestic incident in

18  which I deleted my messages from both my wife and her lover,

19  which was Mr. Heimbach at that time.  It had nothing to do with

20  this case, and I did not intend to interfere with the discovery

21  process in this case.  It was a grave error.

22  Q    You also didn't provide any text messages you exchanged

23  with TWP member Derrick Davis about Unite the Right, correct?

24  A    I believe we didn't have any text messages.

25  Q    You also didn't produce any text messages with Tony

M. Parrott - Direct

1  Hovater, right?

2  A    I don't know if I texted.  You have the phone apps with

3  Discord and everything on your phone.  It's not customary to

4  use a telephone messaging service for these things.

5       I don't -- I did not at any time attempt to erase any

6  information pertaining to this trial.  I -- after the domestic

7  incident, I deleted Mr. Heimbach and my wife at the time from

8  my phone.  And that was the scope of it.

9  Q    Well, let's talk about whether it was the scope of it.

10      You also maintained a definitive attendance list of TWP

11  members and supporters, right?

12 A    As stated, we had the Stripe account and we were

13 deplatformed from Stripe, and that's what we had used to manage

14 our membership services.  And there were attempts and

15 half-gestures, but we never got a proper membership management

16 service back online in the relevant time frame.

17 Q    So the question is:  There was a -- you maintained a

18 definitive attendance list of TWP supporters and members,

19 right?

20 A    No.  I just answered that question, that there was -- the

21 membership list was broken at the time of Unite the Right.

22 Q    On page 164 of your deposition testimony which you gave

23 last year, were you asked this question and did you give this

24 answer?

25      "Okay.  There was a definitive attendance list, correct?"

M. Parrott - Direct

1  A    Okay.  I apologize.  I was thinking membership list.

2       Yes.  There was a -- the attendance list for Unite the

3  Right was in the Mailchimp mailing list, and which I -- I made

4  every effort to try to attain that from Mailchimp, and

5  Mailchimp did not cooperate with my repeated attempts to try to

6  retrieve that information for you guys.

7  Q    So to be clear, the definitive attendance list was also

8  deleted, right?

9  A    By Mailchimp, not by me, sir.

10 Q    Now, one of your responsibilities in this case was to

11 produce TWP documents in addition to your own documents, right?

12 A    Yes.

13 Q    And you claim that you contacted Max Macro.  Remember Max

14 Macro?  He was the guy who was creating the fake Antifa

15 accounts?

16 A    Yes.

17 Q    You claim that you contacted Max Macro to ask him for TWP

18 documents, right?

19 A    Yes.

20 Q    And you claim that you asked him for TWP communications on

21 his electronic devices, right?

22 A    Yes.

23 Q    Max Macro refused to produce any of the TWP communications

24 that he had on his devices, right?

25 A    I assume so.  I don't exactly recall his status on that.

M. Parrott - Direct

1  Q     Tony Hovater was also a high-ranking member of TWP at the

2  time of UTR, right?

3  A     Yes.

4  Q     And he also refused to cooperate with the discovery

5  process, right?

6  A     Yes.

7  Q     In fact, instead of complying with court orders to produce

8  TWP documents to plaintiffs, he, Mr. Hovater, resigned from

9  TWP, right?

10 A     Yes.  We leaned on him to the maximum of our ability to

11 attempt to achieve his cooperation, and up to and including

12 essentially firing him.  And that's the most I could do.

13 Q     Now, you had mentioned earlier Mailchimp, rate?

14 A     Yes.

15 Q     And you used a system called Mailchimp to send emails to

16 TWP members, right?

17 A     Yes.

18 Q     And you used Mailchimp for the TWP newsletter service,

19 right?

20 A     Yes.

21 Q     And you used Mailchimp to contact TWP members on the Unite

22 the Right attendance list throughout the summer of 2017, right?

23 A     Yes.

24 Q     And you just talked about how the definitive attendance

25 list was deleted because Mailchimp had been disabled and you

M. Parrott - Direct

1  just couldn't recover it, right?

2  A    Yes.   Mailchimp deplatformed us, and that's a prevailing

3  theme throughout this trial, is attempting to comply with

4  discovery while the different services are actively deleting

5  our accounts.

6  Q    Right.   Including Mailchimp, right, which you said was

7  responsible for deleting documents such that you couldn't

8  recover the attendance list, right?

9  A    I repeatedly attempted to get Mailchimp's legal department

10 to cooperate with me and failed to do so.

11 Q    Well, in August of 2017 you sent -- this is prior to the

12 rally -- you sent what you called five official dispatches

13 about Unite the Right, right?

14 A    Yes.

15 Q    And if I could -- these are the emails that your counsel

16 spoke about in his opening statement, right?

17 A    Yes.

18         MR. BLOCH:   And if I could just offer PX-3870, 3871,

19 3872, 3873, and --

20         THE CLERK:   Mr. Bloch, I'm sorry.   I didn't know you

21 were going to start.   Could you please start those over?

22         MR. BLOCH:   I'm sorry.   Do you want the numbers?

23         THE CLERK:   Yes, please.

24         MR. BLOCH:   PX-3870 all the way to 3874.

25         THE CLERK:   Thank you.

192

M. Parrott - Direct


1          MR. BLOCH:  Now, if I could just -- I assume no

2    objection moving these into evidence.

3          THE COURT:  Be admitted.

4          (Plaintiffs' Exhibits 3870, 3871, 3872, 3873, and

5    3874 marked.)

6          (Plaintiffs' Exhibits 3870, 3871, 3872, 3873, and

7    3874 admitted.)

8     BY MR. BLOCH:

9    Q    Now, these were supposedly -- let's take it down for one

10   second, and then we'll come back to it.

11        These were supposedly the official communications about

12   Unite the Right, correct?

13   A    Yes.

14   Q    And these emails went out in the first week of August

15   2017, right?

16   A    Yes.

17   Q    And the emails went to approximately 60 or 70 people,

18   right?

19   A    Yes.

20   Q    Now, these documents were produced on the Mailchimp

21   system, right?

22   A    Yes.

23   Q    And somehow, even though you weren't able to recover any

24   other documents from the Mailchimp account, you managed somehow

25   to preserve these five emails; isn't that right?

M. Parrott - Direct

1  A   Absolutely correct, sir.  Those are emails that were sent

2  out.  So the administrative functionality of the Mailchimp

3  where the attendance list would be was deleted, while I still

4  fully complied with my entire massive Gmail account, which

5  included -- I did not pull those.  You'll see that they're from

6  my Gmail service.  They are not from the Mailchimp

7  administrative interface, which I did not have access to.

8  Q   Well, we just established that you sent emails to other

9  people throughout the summer of 2017, right?

10 A   Yes.

11 Q   And so all of a sudden, for some reason, it was only these

12 five emails that you managed to preserve from all of the other

13 documents that were destroyed; is that --

14        MR. SMITH:  Objection.  That absolutely

15 mischaracterizes testimony, the facts, everything.  What is

16 going on?

17        THE COURT:  Overruled.

18        All right.  The jury will understand, remember the

19 evidence, and decide -- work that out.

20        THE WITNESS:  There were other Mailchimp emails

21 delivered, but yes, it is a natural thing that when you lose

22 your mailing list provider, you still have in your email inbox

23 copies of the emails that were sent.  They don't get deleted.

24 Like, when somebody deletes their account, it doesn't delete

25 the emails they had already sent.  I've produced gigabytes upon

M. Parrott - Direct

1   gigabytes data for you, sir.

2   BY MR. BLOCH:

3   Q    So, to be clear, these were the only documents that

4   survived the Mailchimp purge; isn't that right?

5   A    You have my entire Gmail account, sir.

6   Q    I understand that, Mr. Parrott.  I'm focused on the

7   documents that you claim were preserved -- were sent out over

8   the Mailchimp system.  And you agree with me that these are the

9   only five documents that survived; isn't that right?

10  A    I believe there were other Mailchimp posts from earlier

11  that would be in the Gmail.  I don't -- I don't recall exactly

12  the scope of how much we used Mailchimp.  I'm pretty confident

13  that there were other Mailchimp emails.  I can follow up on

14  that question.

15  Q    Were you asked this question and did you give this answer

16  under oath last year?

17       Question, page 315, line 18:  "And other than those five

18  official dispatches that you produced, are you aware of any

19  other documents from the Mailchimp system that were produced to

20  plaintiffs in this case?"

21       Answer:  "I am not."

22       Did you give that testimony?

23  A    I did give that testimony, though any email that went out

24  would have a copy in my Gmail account.

25  Q    Isn't it true, Mr. Parrott, that when you drafted these

—

M. Parrott - Direct

1  emails in the week leading up to Unite the Right, you did so

2  with eventual litigation in mind?

3  A    I had eventual litigation in mind at all times, sir,

4  except for on the night of the incident.

5  Q    So let's look at some of these emails.

6        If we could show PX-3870.

7        This is an email sent on August 3rd, 2017, right?

8  A    Yes.

9  Q    And this was written by Cesar Ortiz, right?

10  A    Yes.

11  Q    And he's the guy you had on the team because he understood

12  and spoke the language of legal concerns, right?

13  A    Yes.

14  Q    And then this email announces a series of rules for

15  behavior, right?

16  A    I believe so.

17  Q    And you said, "There will not be any chanting"?

18  A    Well, Cesar wrote it and I edited it.  Everything that

19  went through here, whether it was for me, Heimbach, or Cesar,

20  was edited or proofed by myself.  I don't know if this is the

21  email that says that.  I don't see it yet.  But I know one of

22  them -- I do recall one of them says that.

23  Q    So if you go down to where we are -- there.

24        "There will not be chanting of any sort or exchanges of

25  vulgarities," right?

M. Parrott - Direct

1    A    Yes.

2    Q    And so you were telling TWP members that there was,

3    essentially, no cursing allowed at Unite the Right?

4    A    Yes.

5         MR. BLOCH:  If we could just show PX-2540 -- show the

6    witness.  Sorry.

7         If you go past the first -- starting there.

8    BY MR. BLOCH:

9    Q    Do you recognize that, Mr. Parrott, as a man standing

10   amongst TWP folks on August 12th?

11   A    Yes.

12        MR. BLOCH:  I move 2540 into evidence.

13        THE COURT:  Be admitted.

14        (Plaintiff Exhibit 2540 marked.)

15        (Plaintiff Exhibit 2540 admitted.)

16    BY MR. BLOCH:

17   Q    If we could just publish this to the jury.  I'd just note

18   that there's a second or two at the beginning that is a

19   different scene that I'm not focused on, because the audio

20   carries over.

21   A    Understood.

22        (Video playing.)

23   Q    And so this is a group of TWP folks hanging around, it

24   looks like, right, on August 12th?

25   A    Yes.

197

M. Parrott - Direct

1  Q    And this person is wearing a TWP shirt, right?

2  A    I don't believe he is.

3  Q    Could we --

4           (Video playing.)

5  Q    If we could pause.  Just real quick, Mr. Parrott --

6  A    I see the F right there.  Yes, he is wearing a Trad Worker

7  shirt.

8  Q    Okay.  And he was saying that one of the values that you

9  all were standing for was killing Jews; is that right?

10  A    He was clearly doing the same rule of thirds comedy we had

11  referred to earlier, where you say increasingly absurd things.

12  He was making a joke, one that was discouraged by leadership,

13  but at no point were any Jews gassed during the Unite the Right

14  rally.

15  Q    Do you mean other than the five or six that Mr. Azzmador

16  bragged about having, quote, "gassed" on the morning of

17  August 12th?

18  A    I'm not familiar with that.  To the best of my knowledge,

19  absolutely no Jews were gassed during the entire event.

20  Q    Okay.  Now, going back to this email, there was a rule

21  that there was no chanting, right?

22  A    Yes.

23  Q    Can we agree that there was, in fact, chanting at Unite

24  the Right?

25  A    I would be surprised if there was chanting.  As the

M. Parrott - Direct

1   events -- people got swept up in the moment, I'm sure the

2   policies were broken here and there by individuals, but I do

3   not personally recall any chanting.

4   Q    Is it similar to the membership guide that says nobody

5   should use racial slurs?  Sort of a similar idea?

6   A    The similar idea is that you aspire to something and then

7   the human experience is what it is.  And it doesn't always

8   quite...

9   Q    So if we can go to the next email, 3871 --

10  A    Wait.  Was there chanting?

11  Q    Well -- yeah, let's talk about chanting.

12       By the way, is it your testimony that you're not sure

13  whether there was chanting or not at Unite the Right?

14  A    By -- I don't recall any organized chanting by Trad Worker

15  members.

16  Q    And would that have been inappropriate, in your view, by

17  Trad Worker members?

18  A    We were trying to discourage that kind of thing.

19  Q    So if we look at the email that was sent out four days

20  later, this is another one of these so-called five official

21  dispatches, right?

22  A    Yes.

23  Q    And if you go down to the fourth paragraph, it says,

24  "There will be a series of chants given in rounds of threes

25  that will be given to rally attendees prior to the event,"

M. Parrott - Direct

1   right?

2   A    Yes.  I don't remember what those were or if they even

3   happened.

4   Q    And so you said that even though you guys were, in your

5   words, trying to discourage that kind of thing?

6   A    Well, we wanted to avoid any bad optics chants that might

7   spontaneously break out.  And I guess there was some difference

8   between me, Cesar, and Heimbach over whether to pre-approve

9   chants or have no chants.  And yeah -- yeah, you have found an

10  inconsistency in our communications.

11  Q    This so-called official dispatch also says that -- this is

12  where we see that "the Roman salute should not be used," right?

13  A    Yes.

14  Q    And then there was a directive that TWP members were to

15  smile?

16  A    Yes.

17  Q    And according to these official emails, the reason why you

18  wanted everybody to smile was because you hoped that the smiles

19  would intimidate your opponents, right?

20  A    I don't recall that.  We wanted to project a positive

21  image.  We wanted to look like we were winning.  And we wanted

22  to win.  Smiles have a radiance about them, sir.

23  Q    And so am I right that what it says is:  "Nothing

24  intimidates our opponents more than confidence and each and

25  every attendee needs to radiate positivity, which is

M. Parrott - Direct

1  contagious, after all.  Smile," right?

2  A    Yes.

3  Q    And so it was the smiles that the TWP leadership was

4  hoping would intimidate the counter-protesters --

5          MR. SMITH:  Objection.  The text of the document

6  speaks for itself, Your Honor.

7          MR. BLOCH:  If I could just finish the question.

8          THE COURT:  Well, you've got it -- do you have to

9  just keep on going with this?

10         MR. BLOCH:  Understood, Judge.  I'll move on.

11  BY MR. BLOCH:

12 Q    There's also a reminder in this email that there are no

13 swastikas or Third Reich symbols, right?

14 A    Yes.

15 Q    And if we could just go -- so if we could go to the end

16 of -- is there a next page?  And so that directive comes in the

17 second-to-last paragraph:  "No Third Reich symbols," right?

18 A    Yes.

19 Q    And about -- we can go to the next page, about five lines

20 later, in the same email, it ends with:  "Hail victory," right?

21 A    Yes, it does.

22 Q    And "hail victory" is the English for the Third Reich

23 slogan "Sieg Heil," right?

24 A    We don't consider that an explicitly German phrase, but

25 yes, "hail victory" was something we commonly did.

M. Parrott - Direct

1  Q    So if we could go to the August 9th official dispatch,

2  this August 9th email from Cesar Adolfo, this is another one of

3  the five emails that survived the mass destruction of TWP

4  messages and documents --

5            MR. SMITH:  Objection.  Counsel is testifying.

6            THE COURT:  Sustained.

7  BY MR. BLOCH:

8  Q    Now, even though these documents are supposedly the

9  official dispatches, you make reference in this email to a

10  phone tree that you're creating so that -- to allow mass texts

11  with everybody who is attending, right?

12  A    Yes.  We never implemented that.  I was working on

13  implementing that.  As we discussed in the deposition, I had

14  announced that we would do that, and we did not pull that

15  together in time for the event.

16  Q    Okay.  Well, what you say is:  "Please respond to this

17  email with your mobile phone number to be included on that

18  list," right?

19  A    Yes, I do say that.

20  Q    And you did receive responses -- email responses, right?

21  A    I assume.

22  Q    And those emails didn't survive the purge, right?

23  A    Those emails are on the tradworker server, which was

24  handed over to you in its entirety.

25  Q    Now, you also say in this email that you have three

M. Parrott - Direct

1   categories of rally attendees, right?

2   A    Yes.

3   Q    Alpha teams are anyone who is female, under 18, elderly,

4   disabled, dox-sensitive, or unwilling to fight, right?

5   A    Yes.

6   Q    And then a Bravo team is for people willing and able to

7   fight if it comes to it, right?

8   A    Yes.

9   Q    And then the Charlie team are people willing to risk

10  arrest, right?

11  A    I was the only member of Charlie team.  Yes.

12  Q    And you say at the end of this email, this supposedly

13  official dispatch, you say, quote, "It will be crawling with

14  Antifa terrorists all weekend and they're reportedly seeking

15  opportunities to ambush us individually," right?

16  A    Yes.

17  Q    And you agree with me that even though the official

18  dispatch says there were Antifa terrorists seeking to ambush

19  you, you did absolutely nothing with that information, right?

20  A    What do you mean, I did absolutely nothing with that

21  information?

22  Q    You did -- well --

23  A    That's why we had shields and helmets, sir.

24          THE COURT:  All right.  We'll take a 20-minute recess

25  now.

M. Parrott - Direct

1    **(Jury out, 2:55 p.m.)**

2               (Recess.)

3               THE COURT:  Call the jury.

4    **(Jury in, 3:15 p.m.)**

5               THE COURT:  You may be seated and you may proceed.

6               MR. BLOCH:  Thank you, Judge.  I have no further

7    questions for this witness.

8               THE COURT:  Cross-examination?

9               MR. KOLENICH:  Yes, Your Honor.

10                        CROSS-EXAMINATION

11    BY MR. KOLENICH:

12   Q    Mr. Parrott, do you recall testifying at deposition on

13   July 10th, 2020?

14   A    Yes.

15   Q    In that deposition do you recall being asked about a

16   lawsuit in the Southern District of Ohio that TWP was involved

17   in?

18   A    Yes.

19   Q    Do you recall being questioned about a declaration you

20   filed in that lawsuit?

21   A    Yes.

22   Q    Do you further recall that the declaration you filed was,

23   in fact, false?

24   A    I learned later that it had been a false statement and I

25   needed to correct that, yes.

M. Parrott - Direct

1   Q    Nevertheless, the declaration contained false information,

2   did it not?

3   A    Yes, it did.

4   Q    And you signed your name to that declaration?

5   A    Can you refresh my memory on what the declaration referred

6   to?

7   Q    Well, we don't really need to know the contents of it.

8   Just you did sign the declaration?

9   A    I think it matters a lot whether this is --

10         THE COURT:  You just said -- is there only one that

11   you've done this?

12         THE WITNESS:  Yes.  It was later shown to be false,

13   despite my best recollection at the time.

14    BY MR. KOLENICH:

15   Q    Very well.  So you'll agree with me that just because you

16   write something down and then sign your name to it does not

17   mean that the information in such a document is true, correct?

18   A    Unfortunately, yes.

19   Q    So you spoke with Mr. Bloch about an article that you

20   wrote wherein you said IE sent fighters and other such things,

21   correct?

22   A    Yes, I did.

23   Q    But just because you wrote it and signed your name to it,

24   as we've just established, doesn't make it true; is that right,

25   Mr. Parrott?

M. Parrott - Direct

1  A    Well, that wasn't something I was being deposed on and it

2  was definitely a flowery explanation of Mr. Kessler -- perhaps

3  speculatively, there were people from IE who asked us how we

4  were doing, and it was described in this flowery manner.  So I

5  don't believe it was a false statement, but it was

6  definitely -- it was for the website.  It was not intended to

7  be a legal document, yes.

8  Q    Could I ask you to clarify that, Mr. Parrott.

9  Specifically how does asking how you're doing turn into sending

10 fighters?

11 A    We were trying to stop the Market Street -- to hold the

12 line on Market Street and he sent people.  I understood them to

13 be people to help us hold Market Street.  That was an

14 assumption on my part that I don't have any firm base for.

15 Q    Are you aware that Mr. Heimbach has already testified in

16 this trial?

17 A    Yes.

18 Q    Were you in the room when he testified?

19 A    Yes, I was.

20 Q    Do you recall Mr. Heimbach testifying that Identity Evropa

21 is not part of the hard right?

22 A    Identity Evropa is not part of the hard right.

23 Q    In fact, Mr. Heimbach admitted that he would never count

24 on Identity Evropa in a fight; did he not testify to that?

25 A    He did --

M. Parrott - Direct

1            MR. BLOCH:  Objection, leading.

2            MR. KOLENICH:  It's an adverse witness, Your Honor.

3            THE COURT:  Go ahead.

4            THE WITNESS:  He did testify to that.

5   BY MR. KOLENICH:

6   Q    Is it also your understanding that TWP would not count on

7   Identity Evropa in a fight situation?

8   A    Yes.

9   Q    And the reason for that being that they are not part of

10  the hard right, they are not fighters?

11  A    That is not how I would characterize it.

12  Q    How would you characterize it?

13  A    The hard right have decades of experience with these sorts

14  of events, whereas Identity Evropa and similar groups have a

15  very different perspective and different understanding of event

16  organizing.  We simply were not on the same page socially,

17  strategically.

18  Q    Understood.  Do you know who Justin Burger is?

19  A    I do not recall.

20  Q    Might that have been an online handle for a TWP member?

21           MR. BLOCH:  Objection to the leading.

22           THE WITNESS:  I don't recall.

23           THE COURT:  Sustain the objection.  He's answered.

24           MR. KOLENICH:  Your Honor, may I approach the witness

25  to attempt to refresh his recollection?

M. Parrott - Direct

1            THE COURT:  Yes.

2    BY MR. KOLENICH:

3  Q    Mr. Parrott, would you have a look at the text messages on

4  the screen?

5  A    Yes.

6            MR. BLOCH:  I'm sorry, Judge, could we see --

7            MR. KOLENICH:  That's the only copy I have.

8            (Overlapping speakers.)

9            MR. BLOCH:  -- what Mr. Parrott is being refreshed

10  with?

11           THE COURT:  Yes.

12           MR. KOLENICH:  All right.  You've seen it?

13           THE WITNESS:  Yes, I have.

14           MR. KOLENICH:  (Showing counsel documents.)

15   BY MR. KOLENICH:

16  Q    Mr. Parrott, does what you viewed on the screen refresh

17  your recollection?

18  A    It doesn't actually refresh my recollection at all.  I do

19  not remember that conversation.  I do not remember him.

20  Q    You don't remember Justin Burger?

21  A    I don't.

22  Q    Very well.  Do you recall a so-called coup, C-O-U-P, chat

23  involving yourself, Mr. Heimbach, a person named Hannah, and

24  the subject matter being Jason Kessler?

25  A    I don't remember that.

M. Parrott - Direct

1        MR. KOLENICH:  Your Honor, could I have just a moment

2   to get some additional recollection information?

3        Your Honor, may I approach the witness?

4        THE COURT:  You may.

5        MR. KOLENICH:  (Showing counsel computer screen.)

6   BY MR. KOLENICH:

7   Q    Go ahead, Mr. Parrott.  Please hang onto the machine and

8   scroll up.

9   A    I'm sorry.  I'm trying to be fast with this.

10       I do not see myself in this.  Am I in this?

11  Q    Mr. Parrott, yes, I believe you are a participant in that

12  conversation; however, your name does not appear.  Screen names

13  are used.

14  A    I don't use aliases.  So I don't know what other alias I

15  would use.

16       I do know there was definitely some division over

17  respecting Mr. Kessler's decision-making, and there was

18  certainly drama.

19  Q    Fair enough, Mr. Parrott.  Could you please describe the

20  drama and the division regarding Mr. Kessler and TWP working

21  with him?

22  A    We tried to keep it under wraps because we didn't feel it

23  was good, but we did not like Mr. Kessler's decision-making.

24  We did not like the planning and coordinating decisions they

25  were making.  We felt like we were smarter than him and we were

M. Parrott - Direct

1  going to do it our own way.

2  Q    So to be clear, you were not working with or taking

3  direction or cooperating with Mr. Kessler in the runup to Unite

4  the Right?

5  A    There are, like, messages that, like -- that were shown

6  earlier that show me working with him on ancillary matters, but

7  we were definitely -- we made a decision, the Market Street

8  crew made a decision to not listen to Mr. Kessler and to do our

9  independent autonomous approach and departure from the event.

10 Q    Okay.  So when the Market Street crew -- that is, the

11 Nationalist Front groups; is that correct?

12 A    Yes.

13 Q    -- walked into a crowd of people that the video has

14 already been shown --

15 A    Yes.

16 Q    -- that was --

17          MR. BLOCH:  Objection to the characterization.

18 BY MR. KOLENICH:

19 Q    When the League of the South met and the rest of the

20 Nationalist Front --

21          THE COURT:  Excuse me.

22          Overruled.  Go ahead.

23          MR. KOLENICH:  Thank you, Your Honor.

24  BY MR. KOLENICH:

25 Q    When the League of the South members and the Nationalist

M. Parrott - Direct

1  Front group encountered the people with their arms linked at

2  the Market Street entrance, that was contrary to what

3  Mr. Kessler had told you guys to do?

4  A    I think "contrary" would be an incorrect characterization,

5  but Mr. Kessler had nothing to do with that incident.

6  Q    He did not tell you to go into that entrance, did he?

7  A    He did not tell us to go into that entrance.

8  Q    He told you to go into a completely other entrance, didn't

9  he?

10          MR. BLOCH:  Objection to the leading.

11          THE COURT:  Well, it seems at this point they are

12  adverse to one another and maybe together in other areas.  But

13  in this regard, he's an adverse witness.

14          Go ahead.

15          THE WITNESS:  Okay.  Can you repeat the question?

16  I'm sorry.

17  BY MR. KOLENICH:

18  Q    Mr. Kessler told you --

19          MR. KOLENICH:  I'm sorry.  Can the court reporter

20  read back the question?

21          (The requested portion of the record was read back.)

22          THE WITNESS:  I don't believe he told us to go into

23  the other entrance.  I believe at that time that he understood

24  that we were no longer answering to him.  He did not tell us to

25  do something else.  I don't -- like I say, Mr. Heimbach did a

M. Parrott - Direct

1    lot of the communication, and I'm not really -- I don't really

2    understand how, play-by-play, that all worked out, other than

3    knowing that the Market Street crew were doing their own thing.

4    BY MR. KOLENICH:

5    Q    Fair enough.

6         Last question, Mr. Parrott.

7         Earlier, you were speaking to Mr. Bloch about a video

8    showing Mr. Damigo and a person named David Duke walking into

9    the park amongst TWP members; do you recall that video?

10   A    Yes, I do.

11   Q    You attempted to explain that video and Mr. Bloch

12   curtailed your answer because he considered it nonresponsive.

13        Would you like to complete your answer now, sir?

14   A    My answer, as I was attempting to explain, was that we had

15   no event coordination with Mr. Damigo, with Mr. Duke.  I did

16   not even know Mr. Duke was going to be there.  I don't recall

17   them at the garage, and I feel like that would have definitely

18   stuck out, if Dr. David Duke were at the garage, or Nathan

19   Damigo, for that matter.

20        It is -- I am very confident in stating that at no point

21   did we conspire to enter the park with Mr. Damigo or Mr. --

22   Dr. Duke.

23              MR. KOLENICH:  Thank you.  No further questions.

24              THE COURT:  All right.

25                        CROSS-EXAMINATION

M. Parrott - Direct

1   BY MR. SPENCER:

2  Q    Hello.

3  A    Hello.

4  Q    My name is Richard Spencer, and I'm acting on my own

5  behalf.

6       So earlier today, mention was made of the website

7  alternativeright.com?

8  A    Yes.

9  Q    Could you tell us a little bit about what you know of that

10 website?

11 A    Alternativeright.com was the first flagship of the

12 alternative right, I'm thinking in 2010.  It might have been

13 earlier than that.  It might have been -- it was a long time

14 before the event.  And it was a -- very much an intellectual,

15 for the most part, outlet for ideas, for alternative right-wing

16 ideas, and contained mostly big brain think peaces.

17 Q    Who founded that website?

18 A    I believe it was yours truly -- or you.

19 Q    Right.  In his examination of you and during the

20 deposition and here today, there was -- mention was made of

21 your working for that website.  Could you clarify what -- how

22 you participated in some way?

23 A    Okay.  I submitted a couple -- I do not know the exact

24 number -- perhaps two or three; I don't recall -- blog posts

25 that were published.  I was published at alternativeright.com,

M. Parrott - Direct

1   but I had no involvement whatsoever with the leadership, with

2   the technology, with any other aspect of the right, than

3   submitting posts that ended up being published.

4   Q    Were you paid to be a writer?

5   A    I don't believe so.  I very rarely got paid to write.

6   Q    Have I ever paid you as a worker?  I as Richard Spencer,

7   have I ever paid you as a worker of mine in any capacity?

8   A    No.

9   Q    I want to discuss just a little bit about the

10  Traditionalist Worker Party.  Was I, Richard Spencer, ever a

11  member of Traditionalist Worker Party?

12  A    No.

13  Q    Did I ever participate in your Discord server for TWP?

14  A    No.

15  Q    Did I ever participate in the Discord server for the

16  Charlottesville Unite the Right rally, to your knowledge?

17  A    To my knowledge, no.

18  Q    Who invited Traditionalist Worker Party to participate in

19  the Charlottesville Unite the Right event?

20  A    I understand that Mr. Kessler directly engaged

21  Mr. Heimbach at some point in June.  I do not know the exact.

22  Q    In terms of the broader Nationalist Front, that included

23  Traditionalist Worker Party, Jeff Schoep and the National

24  Socialist Movement, and maybe something else?

25  A    Vanguard --

M. Parrott - Direct

1  Q    Vanguard America.  Okay.

2  A    -- had their situation in July and were not members of the

3  Nationalist Front or coordinating with --

4  Q    Okay.  Not terribly important.

5       Was I ever involved in the formation of the Nationalist

6  Front in any capacity?

7  A    No.

8  Q    Mention was made of a unified legal defense project -- do

9  you remember those wordings?

10 A    Yes.

11 Q    -- that, I guess, resulted after the Unite the Right

12 rally?

13 A    There was talk of that, but it did not come together as it

14 had been described.  There was a backchannel attempt to put

15 something together that did not succeed.

16 Q    You mentioned a few organizations and names.

17 A    Yes.

18 Q    Was Richard Spencer among them?

19 A    I don't believe so.

20 Q    To your knowledge, was I arrested during the Unite the

21 Right rally?

22 A    I don't remember.

23 Q    Okay.  So there has apparently been some kind of dispute,

24 on August 12th and in testimony, about groups going their own

25 way.

M. Parrott - Direct

1        You entered the park as part of, in your words, a Market

2   Street crew, and other people entered the park in other ways?

3            MR. BLOCH:  Judge, I'm going to object to the form of

4   this narrative question.

5            THE COURT:  Well, it's just a preface to another

6   question, I would think.

7            Go ahead.

8    BY MR. SPENCER:

9   Q    During your entrance to the park, did you ever see me,

10  Richard Spencer, at any point?

11  A    No.

12  Q    In determining that you were going to go your own way, was

13  I ever involved in any kind of decision-making with that?

14  A    No.

15  Q    Did you feel like you needed to inform me of your

16  decision-making?

17  A    No.

18  Q    Do you remember seeing me at any point on August 12th?

19  A    I don't believe I saw you the entire day.

20  Q    Did we have any communication -- during the period of May

21  2017 with Charlottesville 1.0 and Charlottesville 2.0,

22  August 11th and 12th, did we have any kind of communication?

23  A    I don't believe we had any communication at all.

24  Q    Any face-to-face?

25  A    No.

216

M. Parrott - Direct

1   Q    Did I come to your villa?

2   A    No.

3   Q    Did you -- okay.

4        No communication?

5   A    No communication.  No interaction.

6   Q    Who was -- who was the organizer of Unite the Right?

7   A    On paper, it was Mr. Kessler.

8             MR. SPENCER:  No further questions.

9             THE COURT:  Sir?

10                        CROSS-EXAMINATION

11  BY MR. CAMPBELL:

12  Q    Good afternoon, Mr. Parrott.

13       Prior to August 12th, did you know the name James Fields?

14  A    No, I did not.

15  Q    Ever met James Fields before August 12th?

16  A    No, I did not.

17  Q    All right.  And in the follow-up news coverage and

18  internet and whatnot following August 12th, I'm sure you saw

19  his picture many times, in many different forms?

20  A    Yes, I did.

21  Q    Did that refresh your recollection, or do you ever recall

22  seeing James Fields at any white nationalist event?

23  A    No.

24  Q    And I think you had indicated that you had organized such

25  events for decades and had dozens of rallies, correct?

M. Parrott - Direct

1  A    Yes.

2  Q    Ever seen Mr. Fields at any of those events?

3  A    No, sir.

4  Q    In your mind, when was the Unite the Right rally over?

5  A    When the state of emergency was called.

6       MR. CAMPBELL:  Thank you, sir.  I don't have any more

7  questions.

8       THE COURT:  Thank you.

9       Do you mind waiting for Mr. ReBrook?  We've got him.

10      MR. JONES:  That's fine.

11      THE COURT:  Thank you.

12      Okay.  Mr. ReBrook, you may proceed.

13      Is he there?

14      THE CLERK:  He was.

15      THE COURT:  Mr. ReBrook?

16      Okay.  Mr. Jones?

17      Tell him to stand by.

18      THE CLERK:  Okay.

19                    CROSS-EXAMINATION

20  BY MR. JONES:

21  Q    Good afternoon, sir.  I represent Michael Hill, Michael

22  Tubbs, and the League of the South.

23  A    Good afternoon.

24  Q    You mentioned during your testimony a rally in Pikeville?

25  A    Yes.

M. Parrott - Direct

1  Q    And you referenced the Pikeville template?

2  A    Yes, I did.

3  Q    What did you mean by "the Pikeville template"?

4  A    The Pikeville template is where -- and a lot of it had to

5  do with the total event management experience.  We wanted it to

6  be safe, legal, and fun.

7       In previous rallies, we had had people show up and then

8  they go home.  And we wanted to make sure we had, like,

9  festivities before and after to make it more of a positive

10 total experience for the members.  But central to the Pikeville

11 narrative was coordinating with the police, with a large group,

12 with a stadium-style strategy, to where there would be no

13 actual meaningful interface between the two -- between the

14 opposing sides, like you had in Pikeville, and then also in

15 Shelbyville, which was also...

16 Q    Was the League of the South present at Pikeville?

17 A    Yes, it was.

18 Q    Did you see Michael Hill?

19 A    I saw him.

20 Q    As far as you know, was James Fields there?

21 A    No.

22 Q    Was anybody injured in any car attacks in Pikeville?

23 A    No.

24 Q    There was some discussion about -- on Discord where some

25 of Traditionalist Worker Party members were discussing

M. Parrott - Direct

1  psychologically manipulating Antifa.  Do you recall that during

2  your direct testimony?

3  A    Yes, I recall that.

4  Q    I'm going to show you what's been previously introduced as

5  Defense Exhibit 1 and ask that be published to the jury.

6        Do you see that, Mr. Parrott?

7  A    Yes, I do.

8  Q    Do you see the person I circled there?

9  A    Yes.

10 Q    Did you psychologically manipulate that person to obstruct

11 a public roadway?

12            MR. BLOCH:  Objection.

13            THE WITNESS:  I don't believe I did.

14 BY MR. JONES:

15 Q    What about this person?

16 A    I don't believe so.

17 Q    What about that person?

18 A    No.

19            MR. BLOCH:  Objection, Judge.

20 BY MR. JONES:

21 Q    What about this person?

22            THE COURT:  Just a minute.

23            MR. BLOCH:  Argumentative, leading.

24            THE COURT:  You're asking a leading question.

25 Rephrase your question.

M. Parrott - Direct

1  BY MR. JONES:

2  Q    To your knowledge, did you psychologically manipulate that

3  person into obstructing this public roadway?

4              MR. BLOCH:  Objection.

5              THE WITNESS:  I did not.

6              THE COURT:  That's still leading.  That's still

7  leading.  You can ask him what he did -- what he knows, what he

8  did; what he knows about that.

9  BY MR. JONES:

10  Q    Do you know whether you, in fact, psychologically

11  manipulated this person into standing in the public roadway?

12  A    I did not --

13              THE COURT:  That's leading, too, because you're

14  putting the information into it and asking for a yes answer,

15  suggesting a yes answer, or no.

16              MR. JONES:  Thank you, Your Honor.

17  BY MR. JONES:

18  Q    Were you deposed in this case?

19  A    Yes.  Twice.

20  Q    Were those both a full day?

21  A    Yes.

22  Q    Did plaintiffs show you a single instance from August 12th

23  where you psychologically manipulated an Antifa

24  counter-protester?

25              MR. BLOCH:  Objection, Judge.

M. Parrott - Direct

1            THE COURT:  Well, let's -- do you know what he means

2      when he says "psychologically manipulating"?  Mr. Parrott, do

3      you understand what he's asking you when he asks did you

4      psychologically manipulate any person?

5            THE WITNESS:  Yes.  I fully understand.

6            THE COURT:  Tell us if any persons at that rally,

7      that you had anything to do with psychologically, or if you

8      attempted in any way to manipulate anyone.

9            THE WITNESS:  I have seen no evidence whatsoever,

10     throughout this expansive thing, of --

11           MR. BLOCH:  Judge, I object to his characterization

12     of all of the evidence he has seen, and I move to strike that

13     answer.

14           MR. JONES:  I think that's within his personal

15     knowledge.  He can testify to that, Your Honor.

16           THE COURT:  Yeah, he can testify -- well, we don't

17     know what all he's seen.

18           So just testify as to what you did with regard to

19     impressing upon -- activities upon persons who were not part of

20     your group, but were of the opposition.

21           THE WITNESS:  Okay.

22           I have a rule to never be clever, and I did not

23     engage in psyops to pretend to be Antifa or to manipulate

24     Antifa at any time.

25     BY MR. JONES:

222

M. Parrott - Direct

1   Q    There was a part of the DeAndre Harris Market Street

2   garage video shown to you.  Do you recall that, earlier today?

3   A    Yes, I do.

4   Q    Now, you referenced earlier parts of that video; is that

5   right?

6   A    Yes.

7   Q    Have you seen earlier parts of that video?

8   A    Yes, I have.

9   Q    There was also a reference to an email I think you sent

10  out to Traditionalist Worker Party members about smiling --

11  A    Yes.

12  Q    -- do you recall that?

13       Okay.  Do you recall whether anyone was injured by

14  observing somebody smile at the rally?

15  A    Not to my recollection.

16  Q    Did you conspire with Michael Hill, Michael Tubbs, or the

17  League of the South to commit racially motivated violence by

18  smiling at the rally?

19  A    I did not.

20  Q    Did you keep track of whether any of the Traditionalist

21  Worker Party followed your directive to smile at the rally?

22  A    I kept no formal data on that matter.

23  Q    Did you discipline anybody for not following that

24  directive?

25  A    No, I did not.

M. Parrott - Direct

1        MR. JONES:  Thank you.  That's all the questions I

2   have.

3        THE COURT:  Is Mr. ReBrook back?  If he's not --

4        THE CLERK:  He is.

5        THE COURT:  Have we got him?

6        Mr. ReBrook?

7        MR. REBROOK:  Judge, can you hear me?

8        THE COURT:  Yes.

9        MR. REBROOK:  Very good.  My apologies for the

10  technical mishap.

11                    CROSS-EXAMINATION

12  BY MR. REBROOK:

13  Q    Mr. Parrott, how are you this afternoon?

14  A    I'm doing very well, sir.

15  Q    Excellent.  I just have a few brief questions.

16       Was Jeff Schoep in any way involved in planning the Unite

17  the Right rally with you?

18  A    I do not believe me and him did any of the planning

19  together, no.

20  Q    Did you witness Mr. Schoep perpetuate any act of physical

21  violence during the Unite the Right rally?

22  A    I did not --

23            MR. BLOCH:  Objection, foundation.

24            THE COURT:  Were you in a position to see Mr. Schoep

25  at the rally?

224

M. Parrott - Direct

1          THE WITNESS:  Yes, I was.

2     BY MR. REBROOK:

3     Q    Did you at any time during the rally see Mr. Schoep engage

4     in acts of physical violence?

5     A    I did not.

6     Q    Did you see any member of the NSM engage in acts of

7     physical violence?

8     A    I do not recall seeing that.

9          MR. REBROOK:  I have no further questions.

10          THE COURT:  Thank you.

11          All right.  Mr. Cantwell?

12                    CROSS-EXAMINATION

13     BY MR. CANTWELL:

14     Q    Mr. Parrott, how are you?

15     A    I'm doing very well, Mr. Cantwell.

16     Q    There was a joke referenced during your direct examination

17     which I'm hoping you can ruin by explaining.  There was

18     something about -- something about threes.  Do you know what

19     I'm talking about?

20     A    Yes.  That came up twice during my direct examination,

21     oddly enough.

22     Q    What's the bit?

23     A    Well, here is a --

24     Q    You know what?  I'm sorry.

25          MR. CANTWELL:  Could we -- I believe Plaintiffs'

M. Parrott - Direct

1  Exhibit 2369 is already in evidence.  Can we publish this and

2  show to it the jury, please?

3          THE COURT:  Yes.

4   BY MR. CANTWELL:

5  Q    All right.  So if you could, read that initial post there,

6  and then let's ruin the joke by explaining it, please.

7  A    Yes, sir.

8       "I exist for three reasons alone:  To tell minorities that

9  they can't have my shit, to tell Jews their Holocaust is fake,

10 and to tell women to calm down."

11 Q    Now, what's so funny about that, Mr. Parrott?

12 A    Well, you're expecting an escalation.  And then the final

13 one is to tell women to calm down.  As a husband and a family

14 man, that is the most awful thing that you can possibly do, and

15 that's -- that's the joke.

16 Q    Okay.  And are you familiar with an art form called haiku?

17 A    Yes.

18 Q    Could you describe what a haiku is?

19 A    I don't remember the exact structure, the specific

20 structure of haikus, but it's a highly structured meme

21 template, if you will, that is very similar to -- you know,

22 each haiku has a structured format that you work within.

23 Q    A meme template.  There's a rhythm to it?

24 A    Yes.

25 Q    And without -- and if you fall into the rhythm and you

M. Parrott - Direct

1  know the joke, fair to say that there's -- therein the punch

2  line lies, right?

3  A    Yes.

4  Q    So somebody who is not initiated in the culture might find

5  that a little bit odd, fair to say?

6            MR. BLOCH:  Judge, I'm going to object to the

7  leading.

8            MR. CANTWELL:  Okay.

9            Now, we saw another exercise of something similar, I

10  believe in what was -- well, wait a second.  What was the file

11  name on that?

12            There was a video file that you played -- plaintiffs'

13  counsel played.  I have this -- when I pull this up here, it

14  says "State of Emergency Declared After White Nationalist

15  Gathering in Charlottesville."  Does plaintiffs' counsel know

16  which video I'm talking about, which plaintiffs' exhibit file

17  that is?

18            MR. BLOCH:  No.

19            THE WITNESS:  I do recall what Mr. Cantwell...

20            MR. CANTWELL:  Bear with me one moment, folks.  I'm

21  very sorry.

22            Does plaintiffs' counsel recall a video they played

23  where a gentleman said, "three, kill Jews"?

24            MR. BLOCH:  Yes.

25            MR. CANTWELL:  Can you tell me what exhibit number

M. Parrott - Direct

1    that is?

2              MR. BLOCH:  2540.

3              MR. CANTWELL:  2540.  All right.

4              I have Plaintiffs' Exhibit 2540 pulled up.  I believe

5    this is already in evidence.  I've got it cued up to that

6    moment, and I'd like to publish this and show it to the jury.

7              THE COURT:  All right.

8              (Video playing.)

9     BY MR. CANTWELL:

10   Q    Now, real quick, did he say "Republican values"?

11   A    Yes.

12   Q    Are you at all familiar with the platform of the

13   Republican party?

14   A    I am.

15   Q    Do you know of anything in there about killing Jews?

16   A    No.

17   Q    Now, does that line fit the format of that joke you were

18   describing to us a moment ago, Mr. Parrott?

19   A    Yeah.  It's inverted, where he does banal things, and then

20   he ends it with a -- yeah, it's a similar.

21   Q    Right.  The -- our identity, free markets --

22   A    And then the punch line, yes.

23   Q    There we go.  All right.  Well, that's -- that's good.

24             MR. CANTWELL:  And pardon my note-taking, but

25   plaintiffs' counsel also pulled up an image of a Discord post

M. Parrott - Direct

1    about -- where Mr. Parrott had said "this is the Discord where

2    we say Wes Bellamy is a nigger."  Can we -- can I get that

3    exhibit number?  I'm sorry.

4    BY MR. CANTWELL:

5    Q    While we wait for that, Mr. Parrott, do you -- plaintiffs'

6    counsel asked you if I was a racist; do you recall that?

7    A    Yes.

8    Q    And he asked you if I was an antisemite?

9    A    Yes.

10   Q    Do you think I care if anybody calls me a racist or an

11   antisemite?

12            MR. BLOCH:  Objection to what this witness thinks

13   Mr. Cantwell cares about.

14            THE COURT:  Sustained.

15            MR. CANTWELL:  Okay.  Fine.

16            Two, three, four -- 244 -- 2433.  Thank you.  2433.

17    BY MR. CANTWELL:

18   Q    I believe Plaintiffs' Exhibit 2433 is already in evidence.

19   Okay.  Great.  We published it to the jury.

20        So, Mr. Parrott, on October 27, 2017, you say, "This is

21   the channel where we can and should confirm that Wes Bellamy is

22   a nigger."

23        What channel was this?

24   A    I believe that was the first post in the private vetted

25   tradworker channel.  It was the -- the implied joke is that you

M. Parrott - Direct

 1  can say more -- you can speak more freely.

 2  Q    And so in a tradworker channel, why would it -- why would

 3  saying Wes Bellamy is a nigger imply more freedom of speech?

 4  A    Using that kind of language, it's racially insensitive and

 5  it's not something for public speech.  And even now I'm

 6  sensitive to the fact that it could be hurtful to people, and

 7  that's not my intent with that.  I have a problem with

 8  Mr. Bellamy.  There were probably more professional ways to

 9  deal with my problem with Mr. Bellamy.

10  Q    Was it unusual in alt-right circles to say Wes Bellamy is

11  a nigger?

12  A    That was a standard meme.

13  Q    Okay.  So fair to say that what comes across here as you

14  just being cruel had a prior reference?

15  A    Yes, that Mr. Bellamy has a long history of vitriolic

16  anti-white statements.

17  Q    Do you remember some of those?

18  A    I do not recall them right offhand, but they were quite

19  choice and he definitely was fair game for ribald humor.

20  Q    Do you recall if Wes Bellamy's tweets about white

21  people --

22          MR. BLOCH:  Objection, Judge.

23  BY MR. CANTWELL:

24  Q    -- had anything to do with the motivation for the Unite

25  the Right rally?

M. Parrott - Direct

1          THE COURT:  What was the objection?

2          MR. BLOCH:  Relevance and hearsay.  He's testing

3    about the content of somebody else's tweets.

4          MR. CANTWELL:  My question is about the motivations

5    for the rally.

6          THE COURT:  Overruled.  Go ahead.

7          THE WITNESS:  On Plaintiffs' Exhibit 2533 we have a

8    video that clearly explains our motive for the rally that was

9    cowritten by Mr. Heimbach and I, in which we explicitly claim

10   that we were attending to rally because of the Confederate

11   statues, because of the heritage issue.  My great, great,

12   great-grandfather Henry Clay Parrott fought in the 48th

13   Virginia Infantry Regiment, and we were very sincerely there

14   for the statues.

15         MR. CANTWELL:  Can we take my screen away from the --

16   unpublish my screen.  Thank you.

17   BY MR. CANTWELL:

18   Q    I don't think we need to publish this one, but Plaintiffs'

19   Exhibit 2376 is a Gab post from you where you say on an article

20   about Wes Bellamy, you say, "These two competing visions for

21   America's future are entirely incompatible.  There isn't a

22   mutual respect and shared state necessary for compromise and

23   conciliarity.  None of this is going to stop until people like

24   him fear us again because fear and force are the only language

25   they comprehend."

M. Parrott - Direct

1      Do you recall making that post?

2    A    Yes, I do.

3    Q    Mr. Parrott, do you understand the process that we're

4    going through right now, do you understand this to be

5    voluntary?

6    A    I'm not voluntarily here.  I'd rather be home with my

7    family, like many of us.

8    Q    Do you understand government action generally to be a

9    voluntary or compulsory institution?

10             MR. BLOCH:  Objection.

11             THE COURT:  Overruled.

12             THE WITNESS:  It's a compulsory institution.

13   BY MR. CANTWELL:

14   Q    So when we're talking about political power, what are we

15   ultimately talking about?

16   A    We're talking about making people do things under the law.

17   Q    And Wes Bellamy was the mayor of Charlottesville, right?

18   A    Yes.

19   Q    So he had political power?

20   A    Yes.  And if one were to read the article, I was very much

21   speaking about him politically.  This could be misrepresented

22   as me saying black people need to fear us, which was not -- not

23   my statement.

24   Q    Do you remember posting on August 1st -- I don't have the

25   date here.  Well, do you see the post on your screen there?

M. Parrott - Direct

1   A    Yes, I do.

2   Q    Do you recall when that is from?

3   A    August 1st.

4   Q    And do you recall what year that's from?

5   A    I assume 2017 before the event.

6   Q    Okay.

7   A    Yes.  Definitely.

8   Q    Do you remember making this post?

9   A    Yes, I do.

10          MR. CANTWELL:  Can we publish this and show to it the

11  jury?  This is Plaintiffs' Exhibit 2133.

12          THE COURT:  Has it been admitted?

13          MR. CANTWELL:  Can we move it into evidence, publish

14  it and show to it the jury, please.

15          THE COURT:  All right.  Be admitted.

16          (Plaintiff Exhibit 2133 marked.)

17          (Plaintiff Exhibit 2133 admitted.)

18   BY MR. CANTWELL:

19  Q    Could you read that to me, please?

20  A    Yes.  "There's this impression that the Unite the Right is

21  a white nationalist event.  This is false.  Unite the Right is

22  a broad unity event for every single faction of the right with

23  the balls to stand and fight for our heritage against the

24  nightmare swarm of Marxist degenerates.  It just happens that

25  only white nationalists got the balls to hold the line when the

M. Parrott - Direct

1  media tries to divide and conquer."

2  Q    And so the Unite the Right rally has been described almost

3  exclusively as a white nationalist event, right?

4  A    Yes, and that's absurd.  There were people of color on our

5  side.  I remember being beside a black gentleman with the

6  Alt-Knights who was fighting for our heritage and identity as

7  well.

8  Q    You know the name Mike Cernovich?

9  A    Yes.

10  Q    Do you remember if he was planning on attending at some

11  point?

12  A    I don't recall what the play-by-play was on that.

13  Q    Okay.  Do you remember any alt-lite figures who punched

14  out before the event went down who were planning on attending?

15  A    I believe Gavin McInnes bowed out.

16  Q    And what is the alt-lite?

17  A    The alt-lite would be people who like to sort of have

18  contrarian objections to mainstream politics without actually

19  coming out and being explicitly in favor of anything, like

20  Mr. McInnes uses irony very heavily.  He doesn't stand for

21  anything.  You try to pin him down on any issue and it's like

22  trying to catch slime.  And that's my opinion of the alt-lite.

23  Q    Wasn't the goal of the Unite the Right rally -- or was it

24  the goal of the Unite the Right rally to unite these two sides?

25  A    It was.

M. Parrott - Direct

1  Q    Did that work out?

2  A    It doesn't appear to have succeeded.

3  Q    Okay.  Thanks.

4          MR. CANTWELL:  I believe Plaintiffs' Exhibit 2371, I

5  believe this is already in evidence, right?  It's a Gab post, I

6  believe.  I'd like to publish this and show to it the jury.

7          THE COURT:  You may.

8   BY MR. CANTWELL:

9  Q    Could you read that post for me, Mr. Parrott?

10 A    "Sorry about all the obfuscation and intellectualizing on

11 Facebook.  Fuck the Jews.  They're the problem."

12 Q    Is this front-stage or backstage behavior, Mr. Parrott?

13         MR. BLOCH:  Objection.

14         THE COURT:  Overruled.

15         THE WITNESS:  This was on my Gab.

16 BY MR. CANTWELL:

17 Q    Is your Gab public, Mr. Parrott?

18 A    Yes, it is.

19 Q    So you knew that people were going to read this?

20 A    Yes.

21 Q    Were you trying to hide your political views when you

22 stated this?

23 A    No, I do not attempt to hide my political views.  Never be

24 clever.

25 Q    The TWP membership guide, that was backstage behavior,

M. Parrott - Direct

1    right?

2           MR. BLOCH:   Objection, leading.

3     BY MR. CANTWELL:

4    Q    Who was the TWP membership guide intended to be seen by?

5    A    The TWP membership guide was printed for members and

6    mailed to new members.

7    Q    Was it published on the website?

8    A    I don't actually recall whether it was.  It might have

9    been, but I don't believe making a special post of it.

10   Q    You said you had read *Mein Kampf* when you were questioned

11   by plaintiffs' counsel, right?

12   A    20 years ago, yes.

13   Q    20 years ago.

14        Plaintiffs' counsel read to you a quote about poison gas;

15   do you recall that?

16   A    Yes.  And I did not recall that from *Mein Kampf*.

17   Q    Do you recall if Hitler had ever inhaled poison gas?

18   A    I believe he had.

19   Q    Do you recall him talking about that in *Mein Kampf*?

20   A    It's been 20 years, but it seems consistent with it, with

21   his World War I veteran status.

22   Q    Plaintiffs' counsel asked you about your views about race

23   and IQ; do you recall that?

24   A    Yes.

25   Q    Have you ever read Charles Murray's *The Bell Curve*?

M. Parrott - Direct

1  A    I have.

2  Q    And does that come across as a racist screed to you?

3  A    It is not a racist screed.  It is an Ivy League scholarly

4  review of the peer-reviewed scientific literature on the

5  matter.

6  Q    Was there any profanity in that book?

7  A    There was not.

8  Q    Was there any advocacy of violence in that book?

9  A    No.

10 Q    Was there any advocacy of criminal behavior in that book?

11 A    No.

12 Q    What did you believe the thrust of the book to be?

13 A    The thrust of the book was that there are broad average

14 differences in g, which is a general intelligence factor.  He

15 made very clear to point out that g is not everything, and that

16 there is a lot of diversity within those ranges.  It's a

17 complicated statistical matter.  It's a very long book.  And

18 the takeaway simply that white people are better than black

19 people would grossly mischaracterize his work.

20 Q    Is it your opinion, Mr. Parrott, that white people with

21 low IQs are useless?

22        MR. BLOCH:  Objection, leading.

23        THE COURT:  Overruled.

24        THE WITNESS:  It is not my opinion that white people

25 with low IQs are useless.

M. Parrott - Direct

1   BY MR. CANTWELL:

2   Q    Is it your opinion that all white people have high IQs?

3   A    It is certainly not.

4   Q    You mentioned to plaintiffs' counsel that there are black

5   folks out there that are smarter than you, I think?

6   A    Yes.

7   Q    Do you want to name a couple?

8   A    I don't know.  Clarence Thomas?

9        THE COURT:  I don't think you need to go there.

10  BY MR. CANTWELL:

11  Q    Does the name Thomas Sowell ring a bell?

12  A    Yes, he's a very bright gentleman.  I've read much of his

13  work.  This is cliche, but I have black friends who are smarter

14  than me on social media who I engage with routinely and with an

15  attitude of mutual respect.

16  Q    I think it came out during questioning that you met

17  Mr. Heimbach at the American Renaissance Conference, or one of

18  them?

19  A    Yes, sir.

20  Q    And is that put on by a man by the name of Jared Taylor?

21  A    Yes, it is.

22  Q    Do you know Jared Taylor to use a lot of profanity?

23  A    He does not.

24  Q    Do you know Jared Tyler to advocate violence?

25       MR. BLOCH:  Objection, Judge, to leading and the

M. Parrott - Direct

1  relevance of this line of questioning.

2         THE COURT:  Mr. Cantwell is not a lawyer and these

3  questions are so innocuous.  I mean, to go back and reframe

4  them, I mean, is it that prejudicial to you?  Well, don't

5  object unless it's something prejudicial.  I mean -- go ahead.

6  Ask the question.

7   BY MR. CANTWELL:

8  Q    Do you know Jared Taylor, the guy who runs American

9  Renaissance, do you know him to advocate violence?

10 A    Never.

11 Q    Do you know him to have an unkind word about anybody?

12 A    Not to my knowledge.

13 Q    Could you characterize -- what sort of event is the

14 American Renaissance Conference?

15 A    The American Renaissance Conference is essentially about

16 white identity.  It is not accurately described as a white

17 nationalist conference.  It is an academic conference that

18 explicitly eschews any kind of political program.

19         THE COURT:  Did this come up on direct?

20         MR. BLOCH:  No.

21         MR. CANTWELL:  Plaintiffs' counsel said that they met

22 at the American Renaissance Conference.

23         THE COURT:  Yeah, but that's not -- you've talked

24 about it enough.

25         MR. CANTWELL:  Okay.  I'll move on.

M. Parrott - Direct

1    BY MR. CANTWELL:

2    Q    Mr. Parrott, what role if any did I have in your plans for

3    the Unite the Right rally?

4    A    None.

5    Q    Did you attend an August 11th leadership meeting at

6    McIntire Park?

7    A    I did not.

8    Q    Have you and I ever exchanged a text message?

9    A    I don't believe so.

10   Q    Was I in the TWP channel on the Charlottesville 2.0

11   Discord?

12   A    No.

13   Q    Was I in the tradworker Discord?

14   A    I don't believe so, no.

15   Q    Max Macro talked about these false flag attacks in the

16   intel channel.  Did you ever carry out any of those attacks?

17   A    Absolutely not.

18   Q    Did you have an Antifa flag at the site of James Fields's

19   car crash?

20   A    I did not.

21   Q    Did you ever have an Antifa flag made up?

22   A    No.

23   Q    Does the TWP have a lot of resources?

24   A    No, sir.

25   Q    You posted on social media that people should disable

M. Parrott - Direct

1  their social media; do you recall that?

2  A    I did post that, yes.

3  Q    And have you ever disabled a Facebook profile before?

4  A    Yes, I have disabled a Facebook profile before.

5  Q    Does disabling a Facebook profile delete the data?

6            MR. BLOCH:  Objection.

7            THE WITNESS:  No, it does not.

8            THE COURT:  You can ask him -- I mean --

9   BY MR. CANTWELL:

10  Q    Is it your understanding, Mr. Parrott, that disabling

11  Facebook deletes the data?

12  A    It absolutely does not.  I have disabled my Facebook and

13  then re-enabled it.  It is not -- it is not destruction of

14  data.

15  Q    So when you posted for people to disable their social

16  media, were you telling them to destroy evidence?

17  A    I was not.

18            MR. CANTWELL:  Thank you, Mr. Parrott.  No further

19  questions.

20            THE WITNESS:  Thank you.

21                         CROSS-EXAMINATION

22   BY MR. SMITH:

23  Q    How many rallies has TWP, Trad Worker, put on either --

24  how many rallies has TWP held or participated in over the

25  years?

M. Parrott - Direct

1   A    I believe roughly a dozen as Traditionalist Worker Party.

2   It gets fuzzy because Trad Youth was a different organization

3   and I held rallies with different organizations before then.

4   Council of Conservative Citizens...

5   Q    Okay.  Let's just stick with --

6   A    Yes.

7   Q    -- Trad Worker.  How many rallies would you say that Trad

8   Worker held?

9   A    I don't know the exact number.  I'm thinking around ten.

10  Q    Okay.

11  A    Maybe more.

12  Q    Let's talk about some of those.  What was the first rally

13  that you recall?

14  A    The first rally as Traditionalist Worker Party would have

15  been around 2015.  They all blur together.  I know one of the

16  first rallies of Traditionalist as me and Heimbach

17  collaborating would be the pro-Syrian rally against the Syrian

18  civil war in Michigan in 2013.

19  Q    Was that rally, in your opinion, a success?

20  A    Yes, very much so.

21  Q    Why was it a success?

22  A    Because we had a couple dozen people show up.  We had a

23  good turnout.  We did get some small-time media coverage of our

24  event that we believed was favorable to our position.  We got

25  the word out that we were protesting America's involvement in

M. Parrott - Direct

1  the Syrian civil war.

2  Q    This was back in which year again?

3  A    I believe 2013-ish.

4  Q    So after that, did you hold any other -- did Trad Worker

5  hold any other rallies?

6  A    Yes.

7  Q    Okay.  Give me another example?

8  A    Oh, jeez.  Wide open like that, there were so many.  There

9  was a Columbus Day event in Philadelphia where we went to a

10 Christopher Columbus statue.  There was a large Antifa presence

11 there and there was a large nationalist presence there.  We

12 were one group among many.

13 Q    Which year was this?

14 A    I believe that was 2015.  There were others in between

15 there.  Unless I have a proper list, I can't --

16 Q    Okay.

17 A    I know I'm missing some.  There were a lot.

18 Q    We'll get to that list that you were talking about.

19       So this Columbus Day rally in Philadelphia, would you say

20 that rally was a success?

21 A    Oh, huge success, yes.

22 Q    Why would you say that?

23 A    We celebrated Columbus Day, had great fellowship

24 afterwards.  Had relatively positive media coverage.  And

25 despite the large turnout of -- well, it was mainly leftists

243

M. Parrott - Direct

1   more than Antifa.  There was an Antifa presence, but it was

2   more liberal counter-protesters, there was no violence.  There

3   was no -- there was no incident with that.  Everybody had a

4   good time.  It was definitely more fun.

5   Q    After that Columbus Day rally in 2015, what other rallies

6   did Trad Worker put on?

7   A    I mean --

8   Q    You said like ten.  Just give me another one.

9   A    Well, I'm trying to think.  All I can think about because

10  of this deposition is Pikeville, Shelbyville, and Unite the

11  Right.

12  Q    Well, let's talk about Pikeville.  You said Pikeville was

13  a big success, right?

14  A    Oh, absolutely.

15  Q    And the reason for that was because there was no violence

16  at Pikeville, right?

17         MR. BLOCH:  Objection to the leading.

18         THE COURT:  Sustained.

19   BY MR. SMITH:

20  Q    Why would you say -- so did you believe that Pikeville was

21  a success?

22  A    Yes.

23  Q    And why did you think that?

24  A    Pikeville was a success because a large number of our

25  people, hundreds of our people, gathered in Pikeville with

M. Parrott - Direct

1  great fellowship, great media exposure, got our message out,

2  and there was a canned food drive associated with Pikeville

3  that was very successful.  And there were even -- there was

4  a -- there were even some locals who climbed over the barricade

5  to be with our group, which was one of the more inspiring

6  moments for me where you actually achieved real community

7  outreach.

8  Q    Did you participate -- Did Trad Worker hold a rally in

9  2015 in Cincinnati?

10  A    I think -- I think there were two in Cincinnati.  There

11  was a white lives matter rally about some criminal case.  I

12  don't remember the details of it, but I remember it went

13  successfully and safely and funly.

14      There was also -- they had attempted to have a BLM event,

15  like a media event, and we, quote unquote, crashed it by being

16  behind the cameras.  That was a lot of fun and that was

17  definitely a positive event.

18  Q    Was there an event in 2015 in Bloomington, Indiana?

19  A    I'm not sure if that was 2014 or 2015.  Perhaps 2015.

20  Yes.  Tim Wise, an anti-white speaker, was speaking on the

21  campus, and we attended to peacefully protest his event.  There

22  was a large Antifa turnout on Kirkwood.  There was a large

23  leftist turnout.  But the police successfully managed the event

24  and nobody was -- nobody was hurt.

25  Q    Was there also another Tim Wise related protest in 2013?

245

M. Parrott - Direct

1   A    Yes.  At that one, where I had -- it was referenced

2   earlier as the one where I threw a punch.  A small contingent

3   of Antifa radicals came down from Chicago and attacked us with

4   lock in sock, beat up the old man we were with, and we managed

5   to disable one of them.  But we were there holding signs and

6   peacefully protesting Tim's campus event, and were assaulted.

7   It went rather well.  The man recovered and he ended up joining

8   us later for drinks.

9   Q    That's good.

10       Was there a protest that Trad Worker held in 2013 that

11  related to Boxcar Books?

12  A    Yeah, that's the one with the terrible sign, with the

13  Zionism sign beside the communism sign.  That was a leftist,

14  Marxist bookstore at Indiana University Bloomington that we

15  went to protest.

16  Q    Was there any violence at that?

17  A    There was no violence whatsoever.

18  Q    Another peaceful event?

19  A    Yes.

20  Q    Let's see.  In 2013 was there a pro-Assad rally that

21  you --

22  A    We already mentioned that, up in Michigan, against the

23  American involvement in the Syrian civil war.

24  Q    Forgive me.  There's just so many peaceful events Trad

25  Worker put on I lost --

246

M. Parrott - Direct

1          MR. BLOCH:  Objection to the commentary, Judge.

2          MR. SMITH:  Withdrawn.

3   BY MR. SMITH:

4   Q    In 2011 was there a protest that Trad Worker held

5   regarding Senate Bill 590?

6   A    Well, that was before I met Mr. Heimbach.  So it would

7   probably be before the relevant term.  But it was at the

8   statehouse and there was certainly no violence.

9   Q    Let's talk about some of these other events that we've

10  heard about, specifically Sacramento.

11  A    Yes.

12          MR. SMITH:  At this time I'd like to request a

13  sidebar.  There's an evidentiary issue, Judge.

14          THE COURT:  Okay.

15          (Sidebar.)

16          THE COURT:  Okay.

17          MR. SMITH:  Your Honor, we've recently come into some

18  evidence on October -- on October 21st, one of the defendants

19  in this case, Nathan Damigo, received a document from the

20  California Highway -- from the Department of California Highway

21  Patrol in California that related to the Sacramento event back

22  in 2016 pursuant to a Freedom of -- California Public Records

23  Act request, FOIA request.  The document demonstrates a

24  conspiracy to commit racially motivated violence against

25  members of the Traditionalist Worker Party by Antifa.  And it

247

M. Parrott - Direct

1  lays it out in great detail.  We'd like to introduce this as

2  evidence, Judge.

3          THE COURT:  What could possibly be --

4          MR. SMITH:  First of all, this investigation, this is

5  what a conspiracy to commit racially motivated violence against

6  permitted rally-goers looks like.

7          THE COURT:  Any objection to that?

8          MR. BLOCH:  Oh, yeah.

9          MR. SMITH:  Of course there would be objections.

10          THE COURT:  Under what rule of evidence is it

11  admissible?

12          MR. SMITH:  Well, these are public records, Your

13  Honor.

14          THE COURT:  Well, have they been presented to anybody

15  before today?

16          MR. SMITH:  Your Honor, the earliest that this could

17  have been presented was October --

18          THE COURT:  But this is the first time it's been

19  presented, right?

20          MR. SMITH:  We just came into it, Judge.

21          THE COURT:  Okay.  Well, it's too late.

22          MS. KAPLAN:  It was emailed to us literally

23  20 minutes ago.

24          MR. SMITH:  The document --

25          THE COURT:  Too late.

M. Parrott - Direct

1          MR. SMITH:  -- only came to Mr. Damigo on the 21st,

2     Judge.  It didn't exist before that.

3          THE COURT:  Well, the 21st is -- what's today?

4     November-something?

5          MS. KAPLAN:  Today is November 9th.

6          THE COURT:  It's too late.

7          MR. SMITH:  It goes to state of mind, Your Honor.

8          THE COURT:  State of mind?

9          MR. SMITH:  Yes.  This is what TWP has to deal with,

10    with every single event they put on.

11         THE COURT:  Okay.  He can testify about his state of

12    mind, not the state police's state of mind.  He can testify as

13    to his state of mind.  But he didn't have that.  He just got

14    that.  So it didn't affect his state of mind back in August.

15         MR. SMITH:  Well, the events that occurred there --

16         THE COURT:  Look I'm ruling it's not admissible.

17    It's too late.  It's not proper.

18         MS. KAPLAN:  To the extent there are documents that

19    he's had since October 21st --

20         MR. SMITH:  No, no, I didn't have this since

21    October 21st.

22         MS. KAPLAN:  All the parties in this case have to

23    produce documents that they want to use.

24         THE COURT:  Right.  I'm ruling.

25         MS. KAPLAN:  Okay.

M. Parrott - Direct

1          (Sidebar concluded.)

2    BY MR. SMITH:

3    Q    You spoke about the Sacramento event?

4    A    Yes.

5    Q    Tell me everything you know about the Sacramento event.

6    A    What I know --

7              THE COURT:  Well, not everything.  Something that --

8    you have to steer him to something relevant to this case.

9    BY MR. SMITH:

10   Q    Was TWP, Trad Worker -- I'm sorry, was there violence

11   committed against Trad Worker at the Sacramento event?

12   A    Yes, premeditated violence.

13             MR. BLOCH:  Objection.

14   BY MR. SMITH:

15   Q    Can you tell me about that, please?

16   A    Yes.  The Antifa planned and executed to --

17             MR. BLOCH:  Objection, Your Honor.

18             THE COURT:  What's the objection?

19             MR. BLOCH:  Among other things, foundation.  He's

20   testifying to the supposed mindset of a cause, Antifa, as to

21   what they planned and executed with no basis.

22             THE COURT:  Sustain the objection.  He can testify

23   somebody got hurt, but he can't testify about motivation.

24   BY MR. SMITH:

25   Q    Do you know who committed the attacks against Trad Worker

M. Parrott - Direct

1  members?

2           THE COURT:  He has to have a foundation for knowing.

3  He has to have perceived something in order to testify about

4  it.

5           THE WITNESS:  Several of our members were --

6           MR. BLOCH:  Objection.

7           THE COURT:  What is the question?

8   BY MR. SMITH:

9  Q    Were there any Trad Worker members that were attacked by

10 Antifa at this event?

11          MR. BLOCH:  Objection.

12          THE COURT:  He can testify if any were attacked that

13 he saw, and he can describe those persons.  If he doesn't know

14 someone was Antifa, he can't call it.  He can describe the

15 person --

16          MR. SMITH:  Okay.  That's fine.

17          THE COURT:  -- that might have done it.

18          MR. SMITH:  I can rephrase the question.

19  BY MR. SMITH:

20 Q    Were there any Trad Worker members that were attacked by

21 anybody?

22 A    Yes.

23 Q    Okay.  Tell me about that.

24          MR. BLOCH:  Objection, Judge.  Mr. Parrott was not

25 present for that rally.  So any testimony is by definition

M. Parrott - Direct

 1  based on hearsay.

 2          THE COURT:  Well, that's what I said.  He had to have

 3  perceived it.  Was he there?

 4          THE WITNESS:  I was not there.

 5          THE COURT:  Okay.  That ends it.

 6   BY MR. SMITH:

 7  Q    Were you present at any rallies at which Trad Worker

 8  members were attacked?

 9  A    Oh, yes.

10  Q    Okay.  So tell me about that.

11          MR. BLOCH:  Objection.

12          MR. SMITH:  It seems like they're trying to --

13          THE COURT:  You have to ask a person a question so

14  that the other side knows what type of evidence you're trying

15  to elicit so they will know if they have need to object to it.

16   BY MR. SMITH:

17  Q    At which rallies were you present where Trad Worker

18  members were attacked?

19  A    Well, the Unite the Right, Trad Workers were attacked.  At

20  Terre Haute, Trad Workers were attacked.  There -- I said there

21  were no incidents that --

22          THE COURT:  What does Terre Haute mean?  When was

23  Terre Haute?

24          THE WITNESS:  2014, sir.

25          THE COURT:  Okay.

M. Parrott - Direct

1          THE WITNESS:  At the Bloomington event, our people

2   were attacked repeatedly, though there were no major -- there

3   were no injuries, and we regarded it as an event.  Everybody

4   recovered and partied the next night with their ice packs.

5   BY MR. SMITH:

6   Q    But they were still attacked?

7   A    Yes.

8   Q    Do you know who attacked them?

9   A    It was -- they were definitely wearing the clothes and

10  accoutrements of Antifa.

11  Q    Okay.  And that was --

12          MR. BLOCH:  Object to the foundation of that, Judge,

13  and move to strike.

14          MR. SMITH:  There's been substantial foundation.

15          THE COURT:  He can describe what they were wearing

16  and what he knows about what they were wearing.

17   BY MR. SMITH:

18  Q    Just to be clear, were we talking about Bloomington or

19  Terre Haute?

20  A    Well, both, but I was speaking about Bloomington.  We had

21  already spoken about Terre Haute, how we were attacked with the

22  lock and socks.

23  Q    So Trad Worker -- with this history of Trad Worker members

24  being attacked at these events, Trad Worker needs to take

25  safety very seriously, correct?

M. Parrott - Direct

1          MR. BLOCH:  Objection to the commentary and the

2  leading.

3          THE COURT:  Sustained.

4   BY MR. SMITH:

5  Q    What's Trad Worker's position on safety?

6  A    Safety first.  Safely go have fun.

7  Q    Can you expand on that?

8  A    Yes.  We were very sensitive to, around 2015, as the Trump

9  primaries were building up, the Antifa radicals, the opposition

10 to us, became far more aggressive, well-funded, and --

11         MR. BLOCH:  Objection, Judge.

12         THE WITNESS:  They were attacking us from --

13         MR. BLOCH:  There's no foundation.

14         THE COURT:  Don't answer.

15         A question like "expand on" is not a proper question.

16  BY MR. SMITH:

17 Q    How was Trad Worker concerned about safety?

18 A    Trad Worker was concerned about our safety based on having

19 been attacked at multiple events.

20 Q    Okay.  And how does it take precautions to deal with that

21 safety problem?

22 A    We were wearing shields and helmets and staying together

23 in a group.  We were discouraging people from going anywhere

24 solo.  We were very cognizant of transportation issues to make

25 sure nobody got stranded.  The shields, the helmets, and the

M. Parrott - Direct

1  gathering all together was the foundation of it.

2  Q    Okay.  Were you present for anything involving DeAndre

3  Harris?

4  A    I was not present during that, no.

5  Q    Okay.  Let's talk about those emails that you wrote.

6       One second, please.  Sorry.

7       So that first email, "Charlottesville event cooperation"

8  is the subject?

9  A    Yes.

10 Q    You're familiar with it.  I believe plaintiffs' counsel

11 has introduced those as PX-3870 to 3874.

12 A    I don't recall the exact number.  I presume.

13 Q    So in the first email -- hopefully this comes up on the

14 screen.

15      Now, I don't know how well you'll be able to see this.

16 A    I can read it very clearly.

17 Q    Great.  Would you read that email to us, please?

18 A    "This will be the first of a series of emails that will be

19 sent in reference to Charlottesville.  First of all, I want to

20 address the basics for the upcoming event and what will be

21 required of us within the Nationalist Front and Traditionalist

22 Worker Party ranks.  Our uniform will be head-to-toe black.

23 Pants can be fatigues or black slacks, footwear comfortable and

24 also black, boots preferable for males, with the party shirt.

25 Flags and other official party regalia are also allowed and

M. Parrott - Direct

1   shall be addressed here shortly in better detail.  Please be

2   advised that if you need a shirt or if the one you currently

3   have is not in serviceable condition that we will need your

4   sizes and quantities."

5   Q    So this is uniform stuff, right?

6   A    Yes.

7   Q    And it goes on, still talking about the uniform.  Then

8   there is this thing about the shield squad.

9        Can you read that paragraph for us?

10  A    Yes.

11       "TWP will have a full shield squad as well as have our own

12  security detail and medical team.  As it stands, those

13  designated for those roles will be wearing helmets, shields,

14  and other security-related items at all times and will be under

15  direct command of a squad leader from our own ranks.  Our

16  medics will be marked as medical with the pertinent armband and

17  helmet.  We also have helmets to give others that will be

18  detailed on the spot for response teams, and those shall be

19  addressed on the upcoming days."

20  Q    Okay.  So security detail, medical team, medics?

21  A    Yes.

22  Q    Okay.  What is that paragraph in there about Virginia

23  being an open carry state?

24  A    There was --

25  Q    Can you read that for us?

M. Parrott - Direct

1  A    Yes.  Excuse me.

2       "Virginia is an open carry state and weapons are allowed

3  within our ranks.  I do ask" -- it bounced on me.

4  Q    Oh.  Sorry.

5  A    "I do ask that if you have a concealed permit that you

6  conceal at all times.  If you carry a rifle, do so slung

7  properly and securely."

8  Q    Keep going.

9  A    "This is a peaceful event and we ask that you think it

10 through before you carry your arms into the event grounds.  We

11 are trying to not only be peaceful, but to give that impression

12 to all gathered.  There will not be chanting of any sort or

13 exchanges of vulgarities with Bolsheviks or neoliberals.  We

14 will not devolve the rally into a shouting match.  The use of

15 the Roman salute is completely" --

16 Q    Okay.  You can stop.  We already heard about that.

17      And this particular email was written by Cesar?

18 A    Yes.  Edited and delivered by me.

19 Q    Okay.  Now, that's August 3rd.  So that was nine days

20 before Unite the Right?

21 A    Yes.

22 Q    Okay.  Now, let's go to this second email that was sent

23 out, and the date of that is August 7th, 2017.  So four days

24 later.

25      And, again, these all went to Trad Worker members, right,

M. Parrott - Direct

1  all these emails?

2  A    These went to the attendees.

3  Q    Okay.  So what is the -- can you start with the paragraph

4  that says:  "As a remainder to all attendees"?  Do you see

5  that?

6  A    Yes.

7  Q    Can you read that paragraph for us?

8  A    "As a reminder to all attendees, if the enemy comes to

9  oppose us, we must under all circumstances follow the law and

10  work to deescalate conflict.  Do not bring any weapons, tools,

11  or implements that are illegal.  Comrades who have concealed

12  carry permits that are valid in Virginia are allowed to carry.

13  If we are attacked, we will follow the law and defend ourselves

14  and our comrades, but under no circumstances will we aim to

15  provoke or incite conflict."  Bold:  "This means we will not be

16  screaming at, cursing, insulting, or name-calling Antifa while

17  at the event."

18  Q    The plaintiffs in this case are alleging that you mean the

19  opposite of that when you say that; is that correct?

20  A    Yes.

21         MR. BLOCH:  Objection.

22  BY MR. SMITH:

23  Q    So when you say this, you mean what you say?

24  A    Yes.  This was backstage.  This was for -- only people who

25  had signed up to attend and had passed the vetting process were

M. Parrott - Direct

1  going to be reading these emails.

2  Q    When you say -- so you said "nothing intimidates our

3  opponents more than confidence and each and every attendee

4  needs to radiate positivity, which is contagious, after all.

5  Smile."

6       Were you -- plaintiffs' counsel seemed to imply that you

7  were trying to -- saying that people should intimidate other

8  people with their smiles --

9            MR. BLOCH:  Judge, I object --

10            MR. SMITH:  It was his characterization, Your Honor.

11            MR. BLOCH:  -- as to what I was insinuating.

12            MR. SMITH:  He said it explicitly.

13            THE COURT:  Don't characterize, please, plaintiffs'

14  counsel's --

15   BY MR. SMITH:

16  Q    Were you saying that members of Trad Worker should

17  intimidate people with smiles?

18  A    No.  I don't believe smiling is an aggressive intimidation

19  tactic.  I believe that it projected positivity and encouraged

20  the right atmosphere for the event that we were going for.

21  Q    No alcohol rule?

22  A    Yes.  We -- it was no alcohol before or during the event.

23  People were encouraged to party it up after the event.  I did

24  not party it up, because I don't drink.

25  Q    Okay.  So that was the second email you sent out to Trad

M. Parrott - Direct

1  Worker members.  The third one came the same day, correct?

2  A    Yes.

3  Q    So again on August 7th.  What is this third email about?

4  A    The third email was about the permit.  Our permit had been

5  revoked by the City of Charlottesville, and there was all kinds

6  of emergency work to see if it would be reinstated or not.  We

7  were telling people that they should still plan to come because

8  we had contingency plans for just a meet-and-greet or

9  something.  We didn't want for attendance to be depressed by

10  the controversy over whether or not our permit would hold.

11  Q    And you noted that there was some sort of similar

12  situation?

13  A    Yes.  I believe it was Auburn with Mr. Spencer a few

14  months earlier.

15  Q    Tell me about Auburn.

16  A    Well, I didn't attend Auburn.

17          MR. BLOCH:  Object to the relevance of Auburn, Judge.

18          MR. SMITH:  I think the plaintiffs raised it several

19  times.

20          MR. BLOCH:  Did not raise this issue with respect to

21  Auburn, Judge.

22          THE COURT:  It's come up several times.

23          Go ahead.

24          THE WITNESS:  Okay.

25          With Auburn, there -- they attempted to withdraw the

M. Parrott - Direct

1  event.  They attempted to cancel Mr. Spencer's venue, and he

2  had to pursue legal action to reinstate his venue, but

3  attendance had been depressed by that situation, okay?

4         Trad Worker ended up attending that.  One of our

5  members was injured by the opposition at that, while attempting

6  to attend a completely legal political event.

7  BY MR. SMITH:

8  Q   Was Trad Worker -- were all of Trad Worker's members

9  ultimately able to attend that event?

10 A   I know some were.  I don't know exactly how many of the

11 people who attempted to attend got into the venue.

12 Q   Is it possible that some people who wanted to attend the

13 event were denied that ability?

14 A   It's possible.

15 Q   Okay.  There was another event where Trad Worker was

16 attending that Richard -- that Mr. Spencer was holding?

17 A   Yeah.  Michigan State University in East Lansing, I

18 suppose.

19 Q   Okay.  When was that?

20 A   That was in March of 2018.  I did not attend that.

21 Q   Was there a similar situation to what happened in Auburn?

22        MR. BLOCH:  Object to relevance.

23        THE COURT:  2018?  2018 is after the event in

24 Charlottesville.

25        MR. SMITH:  Yes, Your Honor.

M. Parrott - Direct

1          THE COURT:  So it shouldn't have anything to do with

2    influencing anything about Charlottesville.

3          MR. SMITH:  Okay.

4          THE COURT:  Was Auburn before or after?

5          MR. SMITH:  I think Auburn was -- Auburn was --

6          THE WITNESS:  It was before.

7          MR. SMITH:  Before, Your Honor.

8          THE COURT:  Okay.

9          MR. SMITH:  Apparently Michigan State was after.

10   BY MR. SMITH:

11   Q    So in that third email you were talking -- you said that

12   you were talking about how people should still plan to attend

13   even if there is an issue with the permit?

14   A    Yes.

15   Q    Okay.

16   A    Well, plan to come to Charlottesville.  We did not

17   instruct people to violate any orders.  We were just like,

18   continue your travel plans, and we're going to figure out what

19   we're going to do.

20   Q    Right.  Now, on August 9th, which was two days later, the

21   fourth email in this series was sent out.  Again, this one is

22   signed by you.

23        There's these mentions of Alpha, Bravo, and Charlie teams.

24   Can you tell me about that?

25   A    Yes.  There was a controversy going into the rally over

M. Parrott - Direct

1    whether women and teenagers and people with health issues

2    should even be attending.  There was a lot of media suggesting

3    that this was going to be a big fight.  I was confident that it

4    would not end up that way.

5        And the way we planned it out was we had the Alpha team,

6    who were people who were designated to be -- like, women,

7    children, older people, people with disabilities, people who

8    don't want to fight.

9        Bravo team were people who would be attending even if it

10   did look like a risky event going in.

11       And then Charlie team were people who were willing to

12   civilly disobey if the City of Charlottesville unfairly revoked

13   our permit.  And that was more just a legal strategy that only

14   I participated in.  I snuck up behind the National Guard

15   instead of the statue, and was arrested, while Mr. Heimbach led

16   the Alpha and Bravo teams out.

17       If you remember an earlier video, it shows Mr. Heimbach

18   directly before --

19           MR. BLOCH:  Judge, I object to the narrative.  The

20   question was about Alpha, Bravo, and Charlie teams.

21           MR. SMITH:  I was interested to hear what the witness

22   was explaining.

23           THE COURT:  Well, I don't know if he's still talking

24   about those or not.

25           Are you still talking about the Alpha --

M. Parrott - Direct

1              THE WITNESS:  Yes, I am, Your Honor.

2              THE COURT:  Go ahead.

3              THE WITNESS:  Okay.

4              There's the video clip where Mr. Heimbach says, "Just

5     another day at the park," immediately before walking into the

6     human wall.

7              What he was referring to there was an argument

8     between me and him where he said it didn't look like Alpha team

9     should be able to go in, and I told him -- I said, "They have

10    the National Guard here.  There's not going to be any major

11    incidents."  I said, "They have the Virginia State Police here.

12    They have enough people here.  This will be -- and my exact

13    words were -- "This will be a walk in the park."

14             And he had looked ahead and seen the situation, and

15    was basically making fun of my analysis, because it was clear

16    that this was not going to be a walk in the park to him at that

17    time.

18    BY MR. SMITH:

19    Q    We've heard testimony earlier in the trial about -- about

20    what we call counter-protesters that were blocking the way of

21    the Market Street crew to get into the southeast entrance to

22    the park.

23    A    Yes.

24    Q    Was there any space to the sides of the people that were

25    blocking the road to go around?

M. Parrott - Direct

1    A    I know there was talk about us supposedly squeezing

2    between the vans that were on the sidewalk around --

3    Q    Well, somebody seemed upset that you just simply didn't

4    take everyone and move around --

5             MR. BLOCH:  Object to what "somebody seemed upset"

6    to, Judge.  It's not a question.  It's commentary.

7             THE WITNESS:  Okay.

8             I was not in the front, but it is my analysis that

9    there was not a better way to get into the park.  There was not

10   some sort of alternative way.  We took the shortest, most

11   wide-open, most sensible route from the parking garage to our

12   permitted venue.

13   BY MR. SMITH:

14   Q    And you coordinated with the police on that, correct?

15   A    Yes.  We --

16            MR. BLOCH:  Objection to the leading.

17   BY MR. SMITH:

18   Q    And did you coordinate with the police at all?

19            THE COURT:  Wait.

20            THE WITNESS:  Yes, through the Nationalist Front.

21   The League of the South communicated our plans --

22            THE COURT:  Well --

23            THE WITNESS:  -- to the police.

24            THE COURT:  Get back to -- did he -- did you

25   coordinate?

M. Parrott - Direct

1              THE WITNESS:  I did not directly coordinate.

2              THE COURT:  What do you know about somebody else

3    coordinating the police?

4              THE WITNESS:  I know from what I was told by people

5    at the event at the time.

6              THE COURT:  All right.  That's hearsay.

7              THE WITNESS:  Okay.

8     BY MR. SMITH:

9    Q    There's a fifth email in that sequence in which you also

10   again sort of remind people about Alpha, Bravo, and Charlie

11   teams, and you also talk about a rally point?

12   A    Yes.

13   Q    These five emails, these were received by every Trad

14   Worker member that was going to the event, correct?

15   A    Yes, every attendee, Trad Worker attendee.

16   Q    You said -- I'm sorry.  Withdrawn.

17        There was some talk about something -- some sort of

18   declaration under oath that was made?

19   A    Yes.  That was a technical matter about --

20   Q    This is before I became your attorney, right?

21   A    Yes.

22        I had agreed that Traditionalist Worker Party only existed

23   as an FEC registered corporation -- or FEC registered party,

24   and not as a corporation.  And I hadn't been very familiar with

25   the actual paperwork, and I had made a false statement that

Sines, et al. v. Kessler, et al., 3:17CV72, 11/9/2021

 1  Traditionalist Worker Party was not incorporated, okay?  There

 2  was a serious error, technical error, that had to be addressed.

 3  Q    But you didn't intend to lie, did you?

 4            MR. BLOCH:  Objection to leading.

 5            THE COURT:  Sustained.

 6  BY MR. SMITH:

 7  Q    Did you intend to make a false statement?

 8            MR. BLOCH:  Object to the leading.

 9            THE COURT:  Sustained.

10            You know that's leading.  Don't do that.

11   BY MR. SMITH:

12  Q    Was your mistake that you made on the declaration an

13  intentional mistake?

14  A    It was not.

15  Q    Okay.  Did you -- excuse me.  Withdrawn.

16       Did you conspire with anyone to commit racially motivated

17  violence?

18  A    Absolutely not.

19            MR. SMITH:  I have no more questions, Judge.  I have

20  everything I need.  Thank you.

21            THE COURT:  Thank you.  All right.

22            Is that all?

23            MR. BLOCH:  Yes, Judge.  No questions from the

24  plaintiffs.

25            THE COURT:  Okay.  Thank you.  All right.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/9/2021

1     Members of the jury, I think this is a good place to
2  stop.  It's five minutes to 5, and we'll recess until 9:30 --
3  I'm sorry -- 9 o'clock.  We -- usually, it's always 9:30, but
4  this trial is 9 o'clock.  9 o'clock tomorrow morning.
5     Of course, do not discuss the case or allow anyone to
6  discuss it with you.  Do not remain within hearing of anyone
7  discussing it or do any research on anything about the case,
8  listen or watch anything about it.
9     You're excused at this time.
10 **(Jury out, 4:53 p.m.**)
11     THE COURT:  Anything we need to take up before we
12 leave?
13     MS. DUNN:  Not from the plaintiffs, Your Honor.
14     MR. SMITH:  Not at this time, Your Honor.
15     MR. CANTWELL:  I was just handed this this morning
16 about a plaintiffs' exhibit from The Daily Stormer.  I don't
17 urgently need to be heard on this right now, but I'd like to
18 talk about it before a decision is made about it.
19     THE COURT:  Before what?
20     MR. CANTWELL:  I'm sorry, Judge.  This document was
21 handed to me today by plaintiffs' counsel about they're trying
22 to introduce an exhibit that's an article from The Daily
23 Stormer.  That's Andrew Anglin's website, the defaulted
24 defendant.  I have some opinions about this, but I just got it
25 today.  I don't need to be heard on it right now, but before a

Sines, et al. v. Kessler, et al., 3:17CV72, 11/9/2021

 1  decision is made on their letter here, I'd like to be heard on

 2  it.

 3          MS. KAPLAN:  Your Honor, to clarify, we're not asking

 4  it to be admitted.  We're asking to be able to use it with the

 5  testimony of Pete Simi, who is our expert, under Rule 703.  And

 6  of course Mr. Cantwell is obviously free to respond.  That

 7  testimony will be on Thursday.

 8          THE COURT:  All right.  I haven't seen the letter.

 9          MR. SPENCER:  Have we made a decision about Veterans

10  Day?

11          THE COURT:  Yes.  We're going to be here.  We will

12  hold court on Veterans Day.

13  (Proceedings adjourned, 4:55 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Sines, et al. v. Kessler, et al., 3:17CV72, 11/9/2021

1               C E R T I F I C A T E

2        I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3    the United States District Court for the Western District of

4    Virginia, appointed pursuant to the provisions of Title 28,

5    United States Code, Section 753, do hereby certify that the

6    foregoing is a correct transcript of the proceedings reported

7    by me using the stenotype reporting method in conjunction

8    with computer-aided transcription, and that same is a

9    true and correct transcript to the best of my ability and

10   understanding.

11       I further certify that the transcript fees and format

12   comply with those prescribed by the Court and the Judicial

13   Conference of the United States.

14       /s/ Lisa M. Blair              Date: November 9, 2021

15

16

17

18

19

20

21

22

23

24

25