Sines, et al. v. Kessler, et al., 3:17CV72, 11/10/2021

```
1                    UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF VIRGINIA
2                      CHARLOTTESVILLE DIVISION

3    *************************************************************

4    ELIZABETH SINES, ET AL.,     CIVIL CASE NO.:  3:17CV72
                                  NOVEMBER 10, 2021, 8:56 AM
5                                 JURY TRIAL, DAY 13
            Plaintiffs,
6    vs.

7                                 Before:
                                  HONORABLE NORMAN K. MOON
8                                 UNITED STATES DISTRICT JUDGE
     JASON KESSLER, ET AL.,       WESTERN DISTRICT OF VIRGINIA
9
            Defendants.
10
     *************************************************************
11
     APPEARANCES:
12

13   For the Plaintiffs:        ALAN LEVINE, ESQUIRE
                                COOLEY LLP
14                              1114 Avenue of the Americas, 46th
                                Floor
15                              New York, NY  10036
                                212.479.6260
16
                                ALEXANDRA EBER, ESQUIRE
17                              DAVID E. MILLS, ESQUIRE
                                COOLEY LLP
18                              1299 Pennsylvania Avenue, NW,
                                Suite  700
19                              Washington, DC  20004
                                202.842.7800
20

21

22   Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                      255 West Main Street, Suite 304
23                    Charlottesville, Virginia  22902
                      434.296.9284
24
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25   TRANSCRIPT PRODUCED BY COMPUTER.
```

```
 1   APPEARANCES CONTINUED:

 2   For the Plaintiffs:          EMILY C. COLE, ESQUIRE
                                  ROBERTA A. KAPLAN, ESQUIRE
 3                                Kaplan Hecker & Fink LLP
                                  350 Fifth Avenue, Suite 7110
 4                                New York, NY  10118
                                  212.763.0883
 5
                                  KAREN L. DUNN, ESQUIRE
 6                                WILLIAM A. ISAACSON, ESQUIRE
                                  JESSICA E. PHILLIPS, ESQUIRE
 7                                Paul, Weiss, Rifkind, Wharton &
                                  Garrison LLP
 8                                2001 K Street, NW
                                  Washington, DC  20006
 9                                202.223.7300

10
     For the Defendants:          DAVID L. CAMPBELL, ESQUIRE
11                                Duane, Hauck, Davis, Gravatt &
                                  Campbell, P.C.
12                                100 West Franklin Street, Suite 100
                                  Richmond, VA  23220
13                                804.644.7400

14                                CHRISTOPHER CANTWELL, PRO SE
                                  #00991-509
15                                USP Marion
                                  4500 Prison Road, PO Box 2000
16                                Marion, IL  62959

17                                BRYAN J. JONES, ESQUIRE
                                  Bryan J. Jones, Attorney at law
18                                106 W. South Street, Suite 211
                                  Charlottesville, VA  22902
19                                540.623.6952

20                                JAMES E. KOLENICH, ESQUIRE
                                  Kolenich Law Office
21                                9435 Waterstone Blvd., Suite 140
                                  Cincinnati, OH  45249
22                                513.444.2150

23

24

25
```

```
 1  APPEARANCES CONTINUED:

 2  For the Defendants:          WILLIAM E. REBROOK, IV, ESQUIRE
                                 (Appearing via Zoom)
 3                               The ReBrook Law Office
                                 6013 Clerkenwell Court
 4                               Burke, VA  22015
                                 571.215.9006
 5
                                 JOSHUA SMITH, ESQUIRE
 6                               (Appearing via Zoom)
                                 Smith LLC
 7                               807 Crane Avenue
                                 Pittsburgh, PA  15216
 8                               917.567.3168

 9                               RICHARD SPENCER, PRO SE
                                 P.O. Box 1676
10                               Whitefish, MT  59937

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF WITNESSES

 2   WITNESSES ON BEHALF OF THE PLAINTIFF:          PAGE

 3   MARCUS MARTIN

 4    Direct Examination by Mr. Mills                9
      Cross-Examination by Mr. Cantwell            30
 5
     SETH WISPELWEY
 6
      Direct Examination by Ms. Kaplan             34
 7    Cross-Examination by Mr. Spencer             71
      Cross-Examination by Mr. Campbell            84
 8    Cross-Examination by Mr. Jones               85
      Cross-Examination by Mr. Cantwell            99
 9
     NATHAN DAMIGO
10
      Direct Examination by Ms. Phillips          157
11    Cross-Examination by Mr. Spencer            211
      Cross-Examination by Mr. Campbell           229
12    Cross-Examination by Mr. Jones              230
      Cross-Examination by Mr. Cantwell           235
13    Recross-Examination by Mr. Spencer          245

14    MICHAEL CHESNY (Video deposition played.)

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3        EXHIBIT:                 Marked      Received

 4        0271                       13          13

 5        0273                       14          14

 6        0285                       14          14

 7        0236                       17          17

 8        3662                       19          19

 9        0164                       21          21

10        0158                       22          22

11        3324A                      22          22

12        1512                       23          23

13        3324B                      27          27

14        1514                       29          29

15        2105A                      42          42

16        1908A                      45          45

17        2105B                      47          47

18        3269                       49          49

19        2104B                      50          50

20        3271                       52          53

21        2105C                      54          54

22        3270                       56          56

23        3234D                      57          57

24        3234E                      59          59

25        3239D                      61          61
```

1                           INDEX OF EXHIBITS

2    EXHIBITS ON BEHALF OF THE PLAINTIFF:

3           EXHIBIT:                  Marked      Received

4           1909A                       64          64

5           3327                        67          67

6           2850                       160         160

7           0341                       161         161

8           0882                       163         163

9           3761                       169         169

10          2365                       171         171

11          1965                       173         173

12          2210A                      173         --

13          0920                       176         176

14          2855                       181         181

15          0067                       182         182

16          1273C                      188         188

17          1303                       189         189

18          3082B                      191         191

19          3082C                      191         191

20          1273A                      193         193

21          1273B                      193         193

22          3084A                      194         194

23          0880                       201         201

24          0881                       201         201

25          0891                       204         204

```
 1                        INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3   EXHIBIT:                 Marked      Received

 4          0892                          205          205

 5          0844                          206          206

 6          0846                          207          207

 7          0848                          207          207

 8          1851A                         208          208

 9          1851B                         209          210

10
     EXHIBITS ON BEHALF OF THE DEFENDANTS:
11
            EXHIBIT:                  Marked    Received
12
            RS-1010                     71        71
13
            LOS-3234                   119       119
14
            CC-52                      138       138
15
            CC-010                     142       142
16
            CC-018                     148       148
17
            CC-3234                    154       154
18
            CC-4                       156       156
19
            CC-6                       156       156
20
            CC-8                       156       156
21
            CC-10                      156       156
22
            CC-18                      156       156
23
            RS-1009                    219       219
24

25
```

1   (Proceedings commenced, 8:56 p.m.)

2           THE COURT:  Good morning.  Before we call the jury,

3   just a couple of things.  Again I will remind everyone that

4   under Standing Order 2020-12 and 2013-8, the Court's

5   prohibition against recording and broadcasting court

6   proceedings remains in force.  Attorneys, parties, and their

7   staff and any members of the public or press accessing this

8   proceeding today may not record or broadcast it.  That means no

9   photography, no using of any video or audio recording device,

10  no rebroadcasting, livestreaming or otherwise disseminating any

11  live or recorded video or audio in this proceeding.

12          Now, as I understand it, you all have not been able

13  to reach an agreement.

14          MS. KAPLAN:  Unfortunately, Your Honor, yes, that's

15  the case.  Some of the defendants were willing to negotiate but

16  some of them just rejected the whole idea, so it didn't seem

17  worth pursuing it further.

18          THE COURT:  Then we'll just proceed with the case.

19          MS. KAPLAN:  It will probably require us to call a

20  couple of witnesses on Friday, Your Honor.  But as always,

21  we'll try to be as expeditious as possible.

22          THE COURT:  That has to do with all witnesses, right?

23          MS. KAPLAN:  I agree, Your Honor.

24          THE COURT:  The case is proceeding as normally a case

25  would proceed.

M. Martin - Direct

1          MS. KAPLAN:  You have my word.  Thank you.

2          THE COURT:  All right.  See if there's anything else

3    we needed to take up.

4          All right.  Thank you.  Call the jury.

5          MR. MILLS:  Your Honor, should I have the first

6    witness come in?

7          THE COURT:  Yes.

8          THE CLERK:  Judge, I need to call in.  The public

9    line dropped.  I'm going to call back in.

10          THE COURT:  All right.

11    **(Jury in, 8:59 a.m.)**

12          THE COURT:  You may be seated.  Call the next

13    witness.

14          MS. KAPLAN:  Plaintiffs, Your Honor, call Plaintiff

15    Marcus Martin.

16          THE COURT:  Marcus Martin.

17          (Pause.)

18          MS. KAPLAN:  I apologize, Your Honor.  I know he's

19    here.  There must have been some miscommunication bringing him

20    up.  I saw him this morning.

21          MARCUS MARTIN, CALLED BY THE PLAINTIFFS, SWORN

22                         DIRECT EXAMINATION

23     BY MR. MILLS:

24    Q    Good morning, sir.

25    A    Good morning.  How are you?

M. Martin - Direct

1   Q    Pull that a little closer.

2   A    Good morning.  How are you?

3   Q    Good.  Could you please introduce yourself to the jury?

4   A    My name is Marcus Martin.

5   Q    Where do you live?

6   A    I live in Lynchburg, Virginia.

7   Q    Where?

8   A    Lynchburg, Virginia.

9   Q    Where did you get your education?

10  A    Nelson County High School.

11  Q    Are you currently employed, Mr. Martin?

12  A    Yes, sir.

13  Q    And where are you employed?

14  A    I work at a concrete company.

15  Q    Okay.  You're familiar with the Unite the Right event in

16  Charlottesville on August 12th, 2017?

17  A    Yes, sir.

18  Q    Where were you living in August of 2017?

19  A    I was living in Amherst, Virginia.

20  Q    Where is Amherst, Virginia?

21  A    30 miles south of here.

22  Q    Okay.  Did you work in the Charlottesville area?

23  A    Yes, sir.

24  Q    Did you consider yourself a part of the Charlottesville

25  community at that time?

M. Martin - Direct

1  A     Yes, sir.

2  Q     Did you go downtown Charlottesville on Saturday, August

3  12th?

4  A     Yes, sir.

5  Q     Who did you go with?

6  A     I went with myself, my fiancee, Marissa, Heather Heyer and

7  Courtney Commander.

8  Q     And who is Courtney?

9  A     It's a friend of Marissa's from Miller Law Group.

10 Q     And who is Heather Heyer?

11 A     Another friend from Miller Law Group.

12 Q     What were you wearing that day when you went downtown?

13 A     I was wearing a red ball cap, a white shirt and some tan

14 khaki shorts, and red and white shoes.

15 Q     Did you bring anything with you that day?

16 A     I brought my cellphone, a bottle of water and I had a

17 black bandanna.

18 Q     Why a bandanna?

19 A     It was a hot day.

20 Q     Did you bring any weapons with you?

21 A     No, sir.

22 Q     Mr. Martin, I'm going to jump forward.  Did you find

23 yourself on Fourth Street at some point that day?

24 A     Yes, sir.

25 Q     And who were you walking with at that point?

M. Martin - Direct

1  A     Courtney, Marissa and Heather.

2  Q     Were you walking up Fourth Street with a crowd of people?

3  A     Yes, sir.

4  Q     Could you please describe for the jury the position of the

5  people, you and the people you were walking with?

6  A     It was our friend Courtney standing right here, and there

7  was Heather.  Behind Heather was Marissa, and directly behind

8  Marissa was me.

9  Q     Could you please tell the jury what happened as you were

10 walking up Fourth Street?

11 A     I got a notification on my phone that Marissa was going

12 live on Facebook.  So I wanted to go live.  So I was looking

13 down, and then I was -- and you heard tires screech and I just

14 look up and you just see bodies flying everywhere.  So I pushed

15 Marissa out of the way.  I pushed Marissa out of the way and I

16 tried to get out of the way, but I was struck by the car.

17 Q     So were you able to push Marissa out of the way of the

18 car?

19 A     Yes, sir.

20 Q     Were you able to get out of the way?

21 A     No, sir.

22 Q     What happened to you?

23 A     As it hit me, it tossed and turned me through the air.

24 Q     Okay.  I'm going to show you Plaintiffs' Exhibit PX-0271,

25 a photograph.  Do you recognize this photo?

13

M. Martin - Direct

1   A    Yes, sir.

2   Q    What is it a photo of?

3   A    It's a photo of -- it's a picture of the car attack.

4   Q    Is it a fair and accurate photograph of that event at that

5   time?

6   A    Yes, sir.

7            MR. MILLS:  I'd move to admit 271, Your Honor.

8            THE COURT:  Be admitted.

9            THE CLERK:  It's already admitted.

10           (Plaintiff Exhibit 271 marked.)

11           (Plaintiff Exhibit 271 admitted.)

12  BY MR. MILLS:

13  Q    While we're waiting for that to come up for the jury to

14  see, could you just tell the jury what this shows.

15  A    It shows him actually running his car -- the initial hit.

16  Q    Do you see yourself in that picture?

17  A    Yes, sir.

18  Q    Could you just circle yourself?

19  A    (Witness complies.)

20  Q    I'm going to show you another photograph, PX-273.  Do you

21  recognize that photograph?

22  A    Yes, sir.

23  Q    What is that a photo of?

24  A    A couple of seconds from the last picture.

25  Q    Okay.  Is it a true and accurate photograph as well?

M. Martin - Direct

1  A    Yes, sir.

2           MR. MILLS:  I'd move to admit, Your Honor.

3           THE COURT:  Be admitted.

4           (Plaintiff Exhibit 273 marked.)

5           (Plaintiff Exhibit 273 admitted.)

6  BY MR. MILLS:

7  Q    Could you please circle yourself in that photo?

8  A    (Witness complies.)

9  Q    Is that what you were describing, that the car went

10 through and you were tossed and turned?

11 A    Yes, sir.

12 Q    I'm going to show you -- the last of the three pictures is

13 PX-285.  Do you see that photograph?

14 A    Yes, sir.

15 Q    Is that a fair and accurate photograph of the same scene a

16 couple seconds later?

17 A    Yes, sir.

18           MR. MILLS:  Move to admit, Your Honor.

19           THE COURT:  Be admitted.

20           (Plaintiff Exhibit 285 marked.)

21           (Plaintiff Exhibit 285 admitted.)

22 BY MR. MILLS:

23 Q    Do you see yourself there, sir?

24 A    Yes, sir.

25 Q    Could you please circle you?

M. Martin - Direct

1   A      (Witness complies.)

2   Q      Can you see Heather Heyer in this photograph?

3   A      Yes, sir.

4   Q      Where is she?

5   A      (Witness complies.)

6   Q      Thank you.

7          Mr. Martin, can you describe for the jury what happened

8   after you hit the ground behind the car?

9   A      I jumped onto -- there was this -- a Tundra right there.

10  I tried to get on the hood of it.

11  Q      Why did you do that?

12  A      To get out of the way of him reversing.

13  Q      You saw him reversing?

14  A      I didn't see him reversing, but I didn't know what just

15  hit me, so I had to get out of the way of whatever it was.

16  Q      Did you make it up onto the truck?

17  A      Yes, sir.

18  Q      How were you able to do that?

19  A      Adrenaline.

20  Q      What happened next?

21  A      I jumped down off the truck.  I took a step with my right

22  foot and then I took a step with my left and then everything

23  just pushed up and I collapsed.

24  Q      What happened after that?

25  A      I had medics running up to me asking me what's wrong?

M. Martin - Direct

1   What's going on?  And I just wanted them to find Marissa.

2   Q    What did you do?

3   A    I gave a brief description of what she was wearing and

4   just told them to go find her.

5   Q    And did you find her?

6   A    Yes, sir.

7   Q    How did that happen?

8   A    The medics -- the medics who came, and as they came, I

9   told them, just find Marissa, just find Marissa.  And then I

10  heard her voice and laid eyes on her.  Then I could worry about

11  myself.

12  Q    Were you taken to the hospital?

13  A    Yes, sir.

14  Q    So you said Marissa had not been hit by the car; is that

15  correct?

16  A    No, sir, she didn't get hit.

17  Q    How about Courtney?

18  A    No, sir.

19  Q    What about Heather?

20  A    Yeah, she got hit.

21  Q    When did you find out that Heather Heyer was the woman who

22  had gotten hit and died in that car attack?

23  A    When I was in the hospital.

24  Q    How did you find out?

25  A    Marissa text me.

M. Martin - Direct

1  Q    How did you feel about that once you heard that?

2  A    Hurt to know that a person you came with, life was taken

3  away from.

4  Q    You said that you were wearing red shoes?

5  A    Yes, sir.

6  Q    Did you have both of those shoes when you got to the

7  hospital?

8  A    No, sir.

9  Q    How many did you have?

10 A    Only had one.

11 Q    What happened to the other one?

12 A    From the impact of me landing on the ground, it came off.

13 Q    I'm going to show you a photo marked PX-236.

14      Do you recognize that photograph?

15 A    Yes, sir.

16 Q    What do you recognize in that photograph?

17 A    I recognize the car that hit us, my shoe, the Downtown

18 Mall.

19 Q    Is this a fair and accurate photo of those things?

20 A    Yes, sir.

21           MR. MILLS:  Your Honor, I move to admit.

22           THE COURT:  Be admitted.

23           (Plaintiff Exhibit 236 marked.)

24           (Plaintiff Exhibit 236 admitted.)

25  BY MR. MILLS:

M. Martin - Direct

1  Q    I don't think you need to circle it, Mr. Martin.  Is that

2  your red shoe?

3  A    Yes, sir.

4  Q    Can you tell the jury a little bit about those shoes?

5  A    They were -- I got them from Marissa for a Christmas

6  present because I miss the shoe and I'm a big sneakerhead.  So

7  I was just telling her about it, and I woke up one morning on

8  Christmas and there was a box there and it was those shoes.

9  Q    What are those shoes?  What's special about those?

10 A    Just the meaning from who they came from.

11 Q    What kind of shoes are they?

12 A    They're Jordans.

13 Q    Are those hard to get?

14 A    Yes, sir, they were very rare.

15 Q    Did you ever get that -- how did you get that missing shoe

16 back?

17 A    We went to a memorial on the street where it all happened

18 and Marissa was pushing my wheelchair and I just happened to

19 stare over to the right and I seen it.

20 Q    I want to show you a physical exhibit, PX-3662.  May I

21 approach the witness, Your Honor?

22        THE COURT:  You may.

23  BY MR. MILLS:

24 Q    Mr. Martin, are those the shoes that you were describing

25 to the jury?

19

M. Martin - Direct

1   A    Yes, sir.

2   Q    How can you tell which one is which?

3   A    Because they had to cut this one off my foot.

4   Q    Thank you.

5        What were your injuries -- I'm sorry, I move to admit

6   PX-3662, Your Honor.

7                THE COURT:  Be admitted.

8                (Plaintiff Exhibit 3662 marked.)

9                (Plaintiff Exhibit 3662 admitted.)

10   BY MR. MILLS:

11  Q    What were your injuries, Mr. Martin, as a result of the

12  car?

13  A    I had a shattered left leg.  My ankle was really -- was

14  fractured really bad, and I had complete ligament damage in my

15  foot.

16  Q    Could you speak up and tell the jury if there were any

17  other injuries that you suffered on that morning?

18  A    I had a couple of scrapes on my right leg and what I've

19  come to learn today is I had a brain injury.

20  Q    What did your foot or ankle look like at the time when you

21  got to the hospital?

22  A    If this is my leg, my foot was like this.

23  Q    What did they have to do at that point to realign it?

24  A    They had to reset the bones and stuff like that.

25  Q    Did you go home from the hospital that same day?

M. Martin - Direct

1  A    Yes, sir.

2  Q    And why is that?

3  A    Didn't trust anybody.  Just wanted to be in the comfort of

4  my home.

5  Q    Were you able to get surgery on your leg or ankle on that

6  day?

7  A    No, sir.

8  Q    Why is that?

9  A    Because it was too swollen.

10 Q    When did you get -- did you get surgery on it?

11 A    Yes, sir.

12 Q    When was that?

13 A    The 18th, I believe.

14 Q    Four days later?

15 A    Yes, sir.

16 Q    What did the surgery entail?

17 A    They gave me two screws and just a lot of complications.

18 Q    After the surgery, did you have anything -- did you have a

19 cast on your leg?

20 A    Yes, sir.

21 Q    Were you able to walk on your own?

22 A    No, sir.

23 Q    Could you please tell the jury what your recovery process

24 was like, how long it was before you could walk again?

25 A    It was about eight months.  Went from a wheelchair to

M. Martin - Direct

1   crutches to a little scooter to a walking boot.

2   Q    I'd like to show you Plaintiffs' Exhibit PX-164.   It's a

3   photograph.

4        Do you recognize that?

5   A    Yes, sir.

6   Q    What is that a picture of?

7   A    That's a picture of me.   That's a picture of me in the

8   cast with the crutches.

9   Q    Is that before the surgery?

10  A    Yes, sir.

11  Q    Is it a true and accurate picture of you before the

12  surgery?

13  A    Yes, sir.

14            MR. MILLS:  Move to admit, Your Honor.

15            THE COURT:  Be admitted.

16        (Plaintiff Exhibit 164 marked.)

17        (Plaintiff Exhibit 164 admitted.)

18   BY MR. MILLS:

19  Q    I'm going to show you Exhibit PX-158.  Do you recognize

20  that?

21  A    Yes, sir.

22  Q    What is that a picture of?

23  A    That's a picture of me and Marissa, but that's a picture

24  of me in the hospital bed after surgery.

25  Q    Is it a true and accurate picture of that?

M. Martin - Direct

1  A    Yes, sir.

2            MR. MILLS:  Move to admit, Your Honor.

3            THE COURT:  Be admitted.

4            (Plaintiff Exhibit 158 marked.)

5            (Plaintiff Exhibit 158 admitted.)

6   BY MR. MILLS:

7  Q    Mr. Martin, I'd like to show you a chart, PX-3324A.  Do

8  you recognize this?

9  A    Yes, sir.

10 Q    What is it?

11 A    It's a summary chart of my medical records.

12 Q    Have you reviewed the underlying records to see whether

13 this is an accurate summary?

14 A    Yes, sir.

15 Q    Is it an accurate summary?

16 A    Yes, sir.

17            MR. MILLS:  I move to admit 3324A, Your Honor.

18            THE COURT:  Be admitted.

19            (Plaintiff Exhibit 3324A marked.)

20            (Plaintiff Exhibit 3324A admitted.)

21  BY MR. MILLS:

22 Q    You mentioned earlier that you had a head injury.  Were

23 you diagnosed with that injury at the time?

24 A    No, sir.

25 Q    How did you come to learn that you had a head injury?

M. Martin - Direct

1   A    Just not feeling right.  Just knowing something isn't

2   right.  And I just thought it would go away, but it never did.

3   Q    What was that feeling that wasn't right?

4   A    Anger, trust issues, having bad flashbacks.

5   Q    Did you talk to Marissa about possibly having a head

6   injury?

7   A    Yes, sir.

8   Q    Did you text her about it?

9   A    Yes, sir.

10  Q    I'd like to show you PX-1512.  Do you recognize this?

11  A    Yes, sir.

12  Q    What is it?

13  A    It's the message that I sent to Marissa.

14  Q    It's dated February 20, 2018.  Did you send that text to

15  Marissa on that date?

16  A    Yes, sir.

17           MR. MILLS:  Your Honor, I'd move to admit.

18           THE COURT:  Be admitted.

19           (Plaintiff Exhibit 1512 marked.)

20           (Plaintiff Exhibit 1512 admitted.)

21  BY MR. MILLS:

22  Q    Who is "my baby"?

23  A    That's Marissa.

24  Q    This talks about "the blow" and "shook something up."

25  "Something isn't right, and I can feel it."

24

M. Martin - Direct

1        What is the blow that you were talking about?

2   A    The car attack.

3   Q    Why didn't you talk to a doctor about this injury at the

4   time?

5   A    Because I thought it would just go away.  I thought it was

6   just normal after going through something like that.  Like,

7   you're going to be foggy a little bit.  I just thought it would

8   go away.

9   Q    Did you ever talk to a doctor about it?

10  A    Yes, sir.

11  Q    What doctor did you talk to?

12  A    Dr. Webb, I believe her name is.

13           MR. MILLS:  Thank you.  You can take that down.

14   BY MR. MILLS:

15  Q    Mr. Martin, have you ever been diagnosed with

16  post-traumatic stress disorder, PTSD?

17  A    Yes, sir.

18  Q    When was that diagnosis?

19  A    Two months prior to the attack, from Eugene Cash,

20  psychiatrist.

21  Q    You said two months prior?

22  A    Two months after.  Sorry.  I apologize.  Two months after

23  August 12th I met with a guy named Eugene Cash.

24  Q    Did you seek counseling to deal with that?

25  A    Yes, sir.

M. Martin - Direct

1    Q    Did that work for you?

2    A    No.

3    Q    As a result of the injuries you've described to the jury,

4    are there activities that you used to do before August 12th,

5    2017 that you can no longer do?

6    A    Yes, sir.

7    Q    Could you please describe them?

8    A    I can't play basketball anymore.  I can't really lift

9    weights.  Can't put any weight on my leg.  And I can't play

10   softball.

11   Q    Was basketball a big part of your life?

12   A    Yeah, a big part.

13   Q    How about softball?

14   A    Yeah, a big part.

15   Q    Were you pretty good at that?

16   A    Yes, sir.

17   Q    Can you play basketball at all anymore?

18   A    No, sir.  Just -- I don't.  Just the fear of jumping and

19   coming down on that leg is not -- yeah.

20   Q    How about softball?

21   A    I can't run past first base.

22   Q    How about working out?  Can you work out at all?

23   A    Yeah, I can do upper body stuff, but when it comes to

24   putting weight, extra weight on my leg, I just don't want to

25   deal with the pain.

M. Martin - Direct

1   Q    Has it affected your ability to drive?

2   A    Yes, sir.

3   Q    How so?

4   A    I can't drive for a long period of time.

5   Q    What happens if you do?

6   A    It starts aching.

7   Q    Do you still feel pain from these injuries?

8   A    Yes, sir.

9   Q    How often?

10  A    Like, it just happens.  It just -- if I walk up an incline

11  a certain way, if I jerk my leg a certain way, it's a sharp

12  pain that comes through.

13  Q    How do you manage the pain?

14  A    I just deal with it.  I rub it, pat it.  I just deal with

15  it.

16  Q    Have your injuries affected -- did they affect your

17  ability to work in 2017, 2018?

18  A    Yes, sir.

19  Q    What were you doing at those times?

20  A    In 2017 I was working at JW Townsend, a landscaping

21  company.

22  Q    Did you miss work as a result of your injury in 2017?

23  A    Yes, sir.

24  Q    Did you miss work as a result of your injury in 2018?

25  A    Yes, sir.

M. Martin - Direct

1   Q     I'm going to show you PX-3324-B.  Do you recognize that?

2   A     Yes, sir.

3   Q     What is that?

4   A     It's a summary chart of my lost wages.

5   Q     Have you reviewed the underlying exhibits that support

6   this chart?

7   A     Yes, sir.

8   Q     What are those exhibits?

9   A     My 2017 tax return, as well as my '18, and paystubs.

10  Q     Is this an accurate summary of the lost wages that you

11  suffered as a result of this event?

12  A     Yes, sir.

13              MR. MILLS:  Move to admit PX-3324B, Your Honor.

14              THE COURT:  Be admitted.

15              (Plaintiff Exhibit 3324B marked.)

16              (Plaintiff Exhibit 3324B admitted.)

17   BY MR. MILLS:

18  Q     Mr. Martin, have you experienced any emotional or mental

19  trauma as a result of the events of August 12, 2017?

20  A     Yes, sir.

21  Q     What issues have you had?

22  A     I have real bad anger issues that stem from this, not

23  being able to stay on task and stay -- concentrate on one

24  thing.

25  Q     Have you experienced flashbacks or things like that?

M. Martin - Direct

1   A    Yes.

2   Q    Could you please describe that to the jury?

3   A    I was cutting on the median one day at the landscaping

4   company.  And then I was looking down.  Then I looked up and

5   like, the car was literally, like, right there.  And my body

6   just locked up.  Just froze.

7   Q    Had you experienced that before?

8   A    Not before August 12, no.

9   Q    How about after, have you had other experiences like that

10  after August 12?

11  A    Yes, sir.

12  Q    Has the emotional trauma affected your relationships with

13  friends and family?

14  A    Yeah.

15  Q    Please briefly tell the jury about that.

16  A    People just didn't want to be around me because of what it

17  had done to me.  And it pushed -- it pushed one of the best

18  things that ever happened to me out of my life.

19  Q    What was that?

20  A    Marissa.

21  Q    I'm going to show you Plaintiffs' Exhibit PX-1514.  Do you

22  recognize this, Mr. Martin?

23  A    Yes, sir.

24  Q    What is this?

25  A    It's a message that I sent Marissa.

M. Martin - Direct

1  Q    It's a text message dated February 6, 2018?

2  A    Yes, sir.

3  Q    Is it a true and accurate depiction of that text message?

4  A    Yes, sir.

5         MR. MILLS:  Move to admit, Your Honor.

6         THE COURT:  Be admitted.

7         MR. MILLS:  Thank you.

8         (Plaintiff Exhibit 1514 marked.)

9         (Plaintiff Exhibit 1514 admitted.)

10         THE COURT:  I'm watching this, and so if you don't

11  change the tone of your voice, I don't pick up the motion.

12         MR. MILLS:  Sorry.  That's admitted and shown to the

13  jury.  Thank you, Your Honor.

14  BY MR. MILLS:

15  Q    Mr. Martin, who is "baby work"?

16  A    That's Marissa's work phone.

17  Q    Could you please read the message that you sent to her on

18  that date?

19  A    "I know I have to get back to that happy place in my life

20  and I've never been there before you but I was there for so

21  long until August 12th happened and it really has fucked me up,

22  Rissa."

23  Q    Did Marissa also have emotional injuries as a result of

24  August 12th?

25  A    Yes.  Marissa was an emotional wreck.

M. Martin - Cross

1   Q    Do you still experience the effects of August 12th in your

2   life today?

3   A    Yes, sir.

4   Q    Do you believe they'll ever go away?

5   A    No.

6            MR. MILLS:  Mr. Martin, thank you for your testimony.

7            THE WITNESS:  Thank you.

8            THE COURT:  All right.  Any cross?

9            MR. KOLENICH:  No, sir.

10           MR. CAMPBELL:  No questions, Your Honor.

11           MR. SPENCER:  I have no questions.

12           MR. CANTWELL:  I will.

13                       CROSS-EXAMINATION

14   BY MR. CANTWELL:

15   Q    Hello, Mr. Martin.

16   A    How are you doing?

17   Q    Doing all right.

18        You said you brought a black bandanna with you that day?

19   A    Yes, sir.

20   Q    Do you often carry a black bandanna?

21   A    No.  I normally have a towel.

22   Q    You normally have a towel?

23   A    Yes, sir.

24   Q    So today it was hot so you brought your black bandanna

25   instead?

31

M. Martin - Cross

1  A    That was the only thing that was in my vehicle.

2  Q    So you keep a black bandanna in your vehicle?

3  A    It was just there.

4  Q    Just happened to be there?

5  A    Yes, sir.

6  Q    When did you buy the black bandanna?

7  A    I can't recall, but it was in my car.

8  Q    Do you think it was recently?

9  A    Recently?

10  Q    I mean, not -- recently at the time.

11  A    No.  It was just in there.

12  Q    Did you notice other people wearing bandannas that day?

13  A    Yeah.

14  Q    Did you notice anything about the colors of the bandannas?

15  A    Wasn't paying attention to it.

16  Q    Did you notice anybody wearing bandannas over their face?

17  A    No.

18  Q    No.

19       At the time were you aware that it's illegal to wear a

20  mask in Virginia?

21            MR. MILLS:  Objection, Your Honor.  It's beyond the

22  scope.  He didn't testify about any of this stuff.

23            THE COURT:  Well, it's irrelevant to this case.

24            MR. CANTWELL:  Okay.

25   BY MR. CANTWELL:

M. Martin - Cross

1  Q    Did you see anybody that you were marching with carrying

2  weapons?

3  A    No.

4  Q    Did you see anybody you were marching with carrying

5  flagpoles?

6  A    No.

7  Q    Did you see anybody you were marching with carrying signs?

8  A    There were signs, yeah.

9  Q    Did you see one of those signs had a raised red fist?

10 A    I didn't pay attention that much.

11 Q    How did you find out about the demonstration that day?

12 A    The demonstration meaning what?

13 Q    The Unite the Right rally.

14 A    It was the talk of the town.

15 Q    It was the talk of the town.

16      Give me just a moment here.  I'm sorry.

17      Do you know what Antifa is?

18 A    I didn't until August 12th happened.

19 Q    On August 12th, you found out?

20 A    No, after.

21 Q    After August 12th?

22 A    After.

23 Q    Did you find out after August 12th that Antifa was a

24 violent group?

25           MR. MILLS:  Objection, Your Honor.  Irrelevant.  He

M. Martin - Cross

1    didn't know at the time.

2              THE COURT:  Sustained.

3     BY MR. CANTWELL:

4    Q    Mr. Martin, I'm showing you Plaintiffs' Exhibit 0291, and

5    I'd like to --

6              MR. CANTWELL:  This is already in evidence.  I'd like

7    to publish it and show it to the jury.

8              THE COURT:  You may.

9     BY MR. CANTWELL:

10   Q    Mr. Willis, do you recognize this photograph?

11             MR. MILLS:  Sorry.  It's Mr. Martin.

12    BY MR. CANTWELL:

13   Q    I'm sorry, Mr. Martin.

14   A    Yes, sir.

15   Q    Okay.  And do you see some flags in that photograph?

16   A    Yeah.

17   Q    Did you see this flag when you were marching with

18   everybody?

19   A    No.  I wasn't paying attention to anything at that moment.

20   Q    And you didn't see this raised communist fist?

21   A    I didn't see anything at that moment.

22             MR. CANTWELL:  No further questions.

23             THE COURT:  All right.  Thank you.

24             Any redirect?

25             MR. MILLS:  No, Your Honor.

S. Wispelwey - Direct

1          THE COURT:  All right.

2          Mr. Martin, you may step down.

3          Next witness?

4          MS. KAPLAN:  Yes.  Plaintiffs call Reverend Seth

5    Wispelwey.  We just need a moment to bring him up.

6          SETH WISPELWEY, CALLED BY THE PLAINTIFFS, SWORN

7                    DIRECT EXAMINATION

8     BY MS. KAPLAN:

9    Q    Good morning, Reverend Wispelwey.

10   A    Good morning.

11   Q    What is your profession?

12   A    I'm a pastor.

13   Q    Are you a pastor in any particular Christian denomination?

14   A    I'm an ordained minister in the United Church of Christ.

15   Q    Just generally, very briefly and generally speaking, what

16   are the beliefs of the United Church of Christ?

17   A    Sure.  The United Church of Christ is what's called a

18   mainline Protestant denomination.  There's about a million

19   members nationwide.  We're congregationalists, which means that

20   governance and authority is determined at the local level, and

21   then we have structures all the way up to a national level.

22        Broadly speaking, United Church of Christ believes that

23   God is alive and moving in our world today and driving us all

24   to love and justice.

25   Q    Again, Reverend, I'm going to ask you a big question, but

S. Wispelwey - Direct

1    I'd like you to give me a relatively small answer.  Do you have

2    your own personal theology?

3    A     Possibly.  I don't know if we have until Sunday to go

4    through it.

5    Q     If you could, just do it very briefly.

6    A     Sure.  A personal theology of mine would be that I believe

7    that there is a living and loving God, a spirit among us that

8    loves each human being wholeheartedly, unconditionally.  And I

9    am most compelled -- I'm a Christian minister -- by the way and

10   words and ministry of Jesus of Nazareth, who I believe modeled

11   that love and relationship and deeds, and more in prayerfully

12   working to follow that as best I can.

13   Q     Where did you grow up, Reverend?

14   A     I grew up right here in Charlottesville, Virginia,

15   kindergarten through college.  And then moved back for several

16   years starting in 2013.

17   Q     And where did you go to college?

18   A     I went to the University of Virginia.

19   Q     And did you attend graduate school?

20   A     I did.

21   Q     Where did you attend graduate school?

22   A     I attended graduate school, completed my pastoral ministry

23   degree, at a combination of Princeton Theological Seminary and

24   Boston College School of Theology and Ministry.

25   Q     Now, I think you just mentioned that you moved back to

S. Wispelwey - Direct

1   Charlottesville in 2013.

2   A    Uh-huh.

3   Q    At that point in time, did you have a family?

4   A    Yes, I was with my spouse at the time and my daughter.

5   Q    I want to move forward in time up to 2017, Reverend.

6        In the summer of 2017, what were you doing day-to-day?

7   A    Starting at the beginning of 2017, I had taken over as

8   directing minister of a small nonprofit meant to serve artisan

9   ministers.

10  Q    What was that called?

11  A    Oh, sure.  The name of the nonprofit was Restoration

12  Village Arts.

13  Q    Were you also a member of a church here in town?

14  A    I was.  I was a member and also a part -- a chair on the

15  governing board of Sojourners United Church of Christ here in

16  town.

17  Q    Did there come a point in time, Reverend Wispelwey, when

18  you learned about plans for a Unite the Right rally here in

19  Charlottesville?

20  A    Yes.

21  Q    How did you learn about that?

22  A    As I recall, I learned about it the day or two after the

23  permit application was initially filed by Jason Kessler.  I

24  think that was in May of 2017.

25  Q    And after learning about that, what did you do?

S. Wispelwey - Direct

1   A    I was involved in a lot of community support efforts that

2   summer.  There were a lot of events going on, but specifically

3   for Unite the Right, a United Church of Christ colleague and I

4   fell compelled to start an entity we called Congregate as a

5   means of giving people faith and conscience in an area an

6   avenue to show up in loving support for our community for what

7   we understood was going to be, potentially, a very serious and

8   violent event.

9   Q    Did you do any work that summer, Reverend Wispelwey, in

10  connection with the local black community?

11  A    Yes.  So I found myself lucky enough to be in relationship

12  and professional colleagues with different members of the

13  African American community, pastors, dear friends of mine I had

14  reconnected with from high school -- I went to Charlottesville

15  High School -- and others, just in being part of the community,

16  members of different groups and conversations who I count as

17  friends and colleagues.

18  Q    And did those people in the African American community you

19  were talking to, did they have particular concerns about the

20  planned Unite the Right rally?

21  A    Yeah.  So a big mission purpose of Congregate was, number

22  one, to provide an opportunity for people of faith who were

23  concerned about the plans for Unite the Right, but didn't quite

24  know how to show up, and we wanted to provide different avenues

25  for loving support.  But the real driving focus was friends and

S. Wispelwey - Direct

1    colleagues of mine who are black and Jewish, Muslim, queer, and

2    more were articulating in our relationships, in our

3    conversations, that the plans for Unite the Right were an

4    existential threat, that they feared not just for the

5    well-being of our community, but for their bodily safety, and

6    as friends and colleagues in ministry and the roles that we

7    have asked us to show up in solidarity, asked me.

8    Q    So just in very practical terms, Reverend, what did

9    Congregate do that summer leading up to August to prepare for

10   Unite the Right?

11   A    Practically, the most consistent thing we did was hold

12   weekly gatherings at a local church.  And those were spaces

13   for, well, singing, singing gospel and freedom songs,

14   theological conversations about:  What is the role of people of

15   faith in this work, in public?  What does faith look like in

16   public?  And then we would also see where people felt called to

17   be a part of support.  There were a lot of different avenues,

18   as I mentioned.

19        We would simulate safe practices in volatile situations as

20   well, and just kind of build the spiritual muscles for being a

21   calm and loving presence in an uncertain situation.

22   Q    So I think you referenced it, Reverend, but I just want to

23   be clear for the jury.  Was Congregate doing trainings for

24   people that summer?

25   A    Yes.

S. Wispelwey - Direct

1  Q    What kind of trainings?

2  A    The trainings really encapsulated much of what I just

3  shared:  Singing, theological conversation, and then

4  simulations for how to act safely, lovingly, and clear-eyed in

5  potentially volatile situations, while also trying to get

6  across our own story and message.

7  Q    And about how many people would show up to those weekly

8  meetings or trainings?

9  A    From the beginning of July until mid-August, I'd say we

10  had about 60 to 80 each week at those trainings, different

11  community members.

12  Q    And about how many local faith leaders were involved in

13  Congregate?

14  A    On any given week, I'd say fellow ordained clergy from

15  different faith traditions were a dozen or maybe a few more

16  each week.

17  Q    Reverend, did Congregate have a view about the use of

18  violence in terms of protesting?

19  A    Yes.  We were explicitly a nonviolent entity, yes.

20  Q    Now, I want to move to the day of August 11th, which is

21  the day before Unite the Right rally.  What were Congregate's

22  plans for that day?

23  A    Our big plan for August 11th, 2017 was we had planned what

24  we called a mass prayer meeting in the spirit of the civil

25  rights movement, a big worship service with singing and

S. Wispelwey - Direct

1   speaking and sermons for the Charlottesville community.

2   Q    And why did you want to do that on August 11th?

3   A    So on the occasion of the Unite the Right weekend, we felt

4   called as members of our community to, out of our many faith

5   traditions and our many identities and our love for

6   Charlottesville, to use that as an opportunity to respond by

7   telling a different story of what's possible when people gather

8   together.

9        We knew a lot of people were -- I knew a lot of people

10  were scared and hurt and confused.  And this was meant to be a

11  centering place to get right with the spirit and talk and sing

12  in clear terms about what's possible, that we don't -- our

13  motto that summer, Congregate's motto was:  "Love over fear."

14  So it was a chance to infuse a bit of that.

15  Q    Where did you hold that service?

16  A    That was at St. Paul's Memorial Episcopal Church on the

17  UVA Corner, near UVA.

18  Q    And why did you decide to use St. Paul's?

19  A    A few reasons.  One of my dear clergy friends was a part

20  of Congregate and was an associate pastor there.  But

21  especially for two reasons.

22       One was its size.  It was a large sanctuary that could

23  hold hundreds.  And then also, we wanted a church or

24  congregation that was explicitly open and affirming in its

25  doctrinal creeds to all people, regardless of their identity,

S. Wispelwey - Direct

1  sexual orientation, religion, and so on.

2  Q    Approximately how many people were there that night,

3  Reverend?

4  A    We stretched the limits of the fire code, I would say.

5  Based on what I know the capacity of the church to be, and

6  standing room only, it was -- we had 700 people there.

7  Q    I'm going to show you a video clip.  It's just going to be

8  you seeing it right now.  It's kind of a -- just one isolated

9  scene from that clip.  I'm going to ask you if you can tell me

10 what it is.

11         MS. KAPLAN:  I'm going to tell the Court, Your Honor,

12 that this comes from a clip that was done by Katie Couric.  We

13 have been very careful to mute out any hearsay by Katie Couric.

14 So you may hear no volume and then volume, and that's why we

15 did that.

16         So could you just show the Reverend the clip,

17 Mr. Spalding?  It's Plaintiffs' Exhibit 2105A.

18 BY MS. KAPLAN:

19 Q    Do you see that there, Reverend?

20 A    I don't see anything on the screen.  I'm sorry.

21       There it is.

22 Q    Okay.

23 A    That's me.

24 Q    And where was that photo taken?

25 A    This is in front of St. Paul's Church.

S. Wispelwey - Direct

1  Q    Okay.  We're going to play the clip, muting out --

2          MS. KAPLAN:  Well, Your Honor, I offer this clip into

3  evidence, Plaintiffs' Exhibit 2105A.

4          THE COURT:  Be admitted.

5          MS. KAPLAN:  And I'm going to ask Mr. Spalding to

6  play it, again using the instructions I just said, and publish

7  to the jury, and then I'm going to ask you some questions about

8  it, Reverend.  Is that okay?

9          THE WITNESS:  Sure.

10          (Plaintiff Exhibit 2105A marked.)

11          (Plaintiff Exhibit 2105A admitted.)

12          (Video playing.)

13  BY MS. KAPLAN:

14  Q    Reverend, I'm going to ask you a couple of questions about

15  that.  First of all, you were interviewed by Katie Couric that

16  day?

17  A    I was.

18  Q    And did her crew kind of follow you and other people

19  around?

20  A    They did, yes.

21  Q    What was your understanding of why that was?

22  A    Oh, sure.  As I recall, I was approached by a couple of

23  community members who were kind of handling a lot of the media

24  requests that were starting to flood in that week with the

25  expected rally.  And I was asked if I was okay being a part of

S. Wispelwey - Direct

1  this, that Katie wanted community members specifically who had

2  grown up in Charlottesville and had been here for a long time.

3  So I was one of those few people that she featured.

4  Q    At the beginning of the video, Reverend, you see people

5  coming into the church.  Was that before the service?

6  A    That's right.

7  Q    And in the interview with Katie Couric you're holding

8  someone.  Who is that?

9  A    That's my daughter.  She wanted to hold close.

10 Q    And at the last end of the video clip which you see here,

11 there's a still.  I take it that's inside the service itself?

12 A    Yes.

13 Q    Can you just give the jury -- set the scene.  Give the

14 jury a sense of what was going on in that service.

15 A    Well, the service, or at least the planned service, was,

16 and for everything else that transpired, it was a mountaintop

17 experience for me, and for many others, at least from the

18 feedback I've gotten.  The spirit was alive, for lack of a

19 better word.  The gospel singing, the freedom songs; we were so

20 lucky to have a national leader in my own denomination give the

21 sermon; and faith leaders had come from all around the region

22 and country to be a part of this kind of multifaith kind of

23 offering.

24 Q    And I apologize, Reverend, for my ignorance.  What do you

25 mean when you say "mountaintop experience"?

44

S. Wispelwey - Direct

1   A    What do I mean?  I mean the experience, the aliveness, the

2   joy was just soaring.  It was just kind of carrying us through.

3   The first couple of hours flew by.  And I think -- it felt like

4   a real manifestation of our motto, as I remember, to concretely

5   project love over fear for folks.

6   Q    Now, did you have occasion to speak at the service that

7   night?

8   A    I did, briefly.

9   Q    And what was your role in speaking?

10  A    My role was to do the offertory call.  We at a certain

11  point in the service shared -- I shared with folks that if they

12  were having a good time and believed in what we were doing, I

13  shared a bit of what Congregate had been up to that summer,

14  what we hoped to be up to the next day.  It came with some just

15  practical costs for the food and drink and so on.

16  Q    Kind of like passing around the collection plate?

17  A    Exactly.

18  Q    I'm going to ask Mr. Spalding to show you a photograph,

19  Plaintiffs' Exhibit 1908A, just to you for now, and ask you if

20  you recognize that.

21  A    Yes.

22  Q    Is that you speaking at the service?

23  A    That's me doing what I just described.

24       MS. KAPLAN:  Your Honor, I'd like to move to admit

25  and publish to the jury Plaintiffs' Exhibit 1908A.

S. Wispelwey - Direct

1        THE COURT:  Be admitted.

2            (Plaintiff Exhibit 1908A marked.)

3            (Plaintiff Exhibit 1908A admitted.)

4   BY MS. KAPLAN:

5   Q    Now, did there come a time, Reverend, when you learned

6   that there was a tiki torch march that was getting close to

7   St. Paul's?

8   A    Yes.

9   Q    When did that happen?

10  A    As I recall, the service was running a little long, but we

11  were nearing the end with some of our last singing, and through

12  a group message chain with my fellow clergy colleagues and a

13  couple of people who were out in front of the church learned

14  about the torch march.

15  Q    I'd like to put up a demonstrative that's been used in

16  this case before.  It's a demonstrative of the UVA campus,

17  Mr. Spalding.

18       Do you have that on the screen in front of you, Reverend?

19  A    Yes.

20  Q    Can you show where St. Paul's is on this demonstrative and

21  then where -- your understanding of where the marchers were

22  congregating?

23  A    Sure.

24  Q    Excuse me for using that word.  No pun intended, but where

25  the marchers were ending up.

S. Wispelwey - Direct

1  A    No, that's okay.

2      So St. Paul's Memorial Church is right there.  And the

3  torch march completed -- that's where the Thomas Jefferson

4  statue is.

5  Q    So once you became aware that there was this tiki torch

6  rally going on kind of catty-cornered across the street, did

7  you decide whether or not to communicate that to the people

8  sitting in the congregation?

9  A    Yes.  I -- the first time I heard that the march was

10  approaching the church, we didn't know where it was headed.  We

11  actually thought it was approaching the church.  We didn't know

12  what we couldn't see, so I went out.  Couldn't see.  And then I

13  went out again, as I recall, and saw the torches, later, just

14  right through the trees there.

15      In conversation and messaging with my colleagues, as I

16  mentioned, we were winding down our service, winding down our

17  singing, and got a word in to our song leader, and he made the

18  announcement to the church, had them sit down.  We really

19  didn't want to create a panic.  Like, it was full.  We had

20  people of all ages and backgrounds there.  And said, you know,

21  we've got a situation outside.  We're going to keep singing.

22  And this is -- it's all right, but we're going to -- no one go

23  out the front doors right now.  That was the initial

24  announcement.

25  Q    I'm going to show you a photograph that's been marked --

S. Wispelwey - Direct

1   just to you, again, Reverend -- as Plaintiffs' Exhibit 2105B.

2   It's a still from the Couric documentary.  I'm going to ask you

3   if you recognize that.

4   A    Yes.

5   Q    Could you just tell me what it is?

6   A    So this looks like right after we've delivered the news at

7   the end of the service that folks have got to sit tight; try

8   not to worry, but there is reason to worry, and we're just not

9   going anywhere just yet; we think it's in everyone's best

10  interest; that there is a threat outside.

11         MS. KAPLAN:  Your Honor, I move to admit Plaintiffs'

12  Exhibit 2105B and publish to the jury.

13         THE COURT:  Be admitted, and you may publish.

14         (Plaintiff Exhibit 2105B marked.)

15         (Plaintiff Exhibit 2105B admitted.)

16  BY MS. KAPLAN:

17  Q    Now, did there come a time, Reverend, when you began to

18  think about evacuating the church?

19  A    Yes.  It was hot in there.  It was late.  People had come

20  who had relied on public service rides, public transportation.

21  And trying to get the best information we could, which is that

22  the torch rally was across the street, we started to talk to

23  people -- this happened in stages, and then we stopped it.  But

24  we started evacuating people out the back of the church,

25  through the kitchen, as I recall, and then the side and the

S. Wispelwey - Direct

1  back alleys down Chancellor Street.

2      For folks who might not have had someone, we insisted on a

3  buddy system, that they meet their new best friend, because we

4  really wanted to make sure people got to their cars safely.

5  But there were so many people, we had people go out in groups.

6  Q    At some point, Reverend, were you successful in getting

7  everyone out?

8  A    Yes.  It took a while, but yes.

9  Q    When you say a while, approximately how long did that

10 take?

11 A    I don't think the church was fully empty of attendees

12 until maybe 11:30.

13 Q    I'm going to show you, Reverend, a photo that's been

14 marked as Plaintiffs' Exhibit 3269 and ask if you recognize

15 that photo.

16 A    I do.

17 Q    Can you tell me what you're seeing?

18 A    So that's a picture someone took of me holding my daughter

19 after the service.  I was trying to get people some rides.

20      So she was supposed to have a sleepover at my folks' that

21 night.  That's actually -- I can see the back of my mom in

22 there.  And so she was old enough -- she was 7 at the time --

23 to know what her parents were about and doing, knew it was

24 serious, knew that it was hateful, knew that it was a threat to

25 her, and she freaked out, for lack of a better word.  I can

S. Wispelwey - Direct

1   only describe it as a panic attack.  She was crying

2   uncontrollably.  Wouldn't leave.  She's looking back at the

3   front door and --

4           MR. KOLENICH:  Objection, Your Honor.  This violate

5   motion in limine regarding third parties.

6           THE COURT:  Sustained.

7           MS. KAPLAN:  Your Honor, move to admit Plaintiffs'

8   Exhibit 3269 and publish to the jury.

9           THE COURT:  Be admitted.

10          (Plaintiff Exhibit 3269 marked.)

11          (Plaintiff Exhibit 3269 admitted.)

12   BY MS. KAPLAN:

13  Q    I want to move on to August 12th, Reverend Wispelwey.

14  What's the first thing you did on August 12th?

15  A    I woke up early, about 5:15, and headed over to First

16  Baptist Church on West Main Street, where Congregate had

17  planned another service, a sunrise worship service, at 6 a.m.

18  Q    Now, give what had happened the night before, did you and

19  the other members of Congregate consider changing your plans

20  for August 12th?

21  A    We -- I had stayed up late the night before until almost

22  3, 3:30, as I recall, with my fellow clergy colleagues and

23  friends in the community, trying to learn what exactly had

24  happened at UVA around the statue, getting information on that,

25  and if that early violence had -- would change our plans for

S. Wispelwey - Direct

1   the day.  But in the end we decided that our presence and the

2   story we hoped to bring should continue.

3   Q    So how many people were at the service at First Baptist

4   Church?

5   A    It was more between 200 and 300, as I recall.

6   Q    And what kind of church is -- it's obviously Baptist, but

7   what kind of church is First Baptist Church?

8   A    There are other affiliations, but First Baptist is a

9   historical African American congregation here in town that I

10  know was founded right after the Civil War, after emancipation.

11  Q    I'm going to show again a still from a clip to you that's

12  Plaintiffs' Exhibit 2104B at 08, Reverend, and I'm going to ask

13  if you recognize that.

14  A    Yes.

15  Q    Could you just tell me what that is?

16  A    Yes.  That's a clip from the sunrise service.

17         MS. KAPLAN:  Your Honor, I move to admit Plaintiffs'

18  Exhibit 2104B and to play it for the jury.

19         THE COURT:  Be admitted.

20         (Plaintiff Exhibit 2104B marked.)

21         (Plaintiff Exhibit 2104B admitted.)

22         MS. KAPLAN:  You can go ahead and play it,

23  Mr. Spalding.

24         (Video playing.)

25   BY MS. KAPLAN:

S. Wispelwey - Direct

1  Q    So again, like I did with the service the night before on

2  August 11th, just give the jury a sense of what it was like

3  there that morning at First Baptist Church.

4  A    Sure.  The service was a little different, a little less

5  formal in terms of its flow and programming.  It was -- it was

6  a waking up.  It was a spiritual get-up-and-go was our goal.

7  It was early.  And we wanted to sing.  We heard some inspiring

8  words.

9      And also, then the folks who showed up that morning were

10 the ones out of, you know, the different Congregate trainings

11 who had come from around the community and country who wanted

12 to show up in loving presence that day.

13 Q    You just mentioned people who had come from around the

14 country.  Can you give the jury -- don't list the whole list,

15 but a sense of some of those people who came and were with you

16 that morning?

17 A    Sure.  So in later July, partly out of a recognition of

18 the seriousness of the plans as we understood them for Unite

19 the Right, and also our desire to have a strong show of

20 support, Congregate put out a call asking for anyone else who

21 felt called to support Charlottesville on August 11th and 12th

22 to come.  And folks did.  It was incredible.

23     Some of the folks that stand out to mind to me are Lisa

24 Sharon Harper, Dr. Cornel West, Reverend Susan Frederick-Gray.

25 There were many.

S. Wispelwey - Direct

1  Q     After the sunrise service had concluded, what did you do

2  next?

3  A     So when the service concluded, I and the other leaders of

4  Congregate, we had a group prayer and then those who felt

5  called to march to McGuffey Park were dismissed to go do that.

6  And there were different events and offerings for the day,

7  including some we had helped do.  And then I and several other

8  clergy and folks got in a two-line column and walked downtown

9  past this courthouse onto the Downtown Mall and up to Market

10 Street.

11 Q     About what time in the morning was that, Reverend?

12 A     I think we got to Market Street in front of Emancipation

13 Park around 8:15 a.m. at the latest.

14           MS. KAPLAN:  I'm going to ask Mr. Spalding to show

15 Mr. Wispelwey a photograph, Plaintiffs' Exhibit 3271.

16 BY MS. KAPLAN:

17 Q     I'm going to ask you if you recognize that.

18 A     I do.

19 Q     What is it?

20 A     That's a photo of those of us who walked to Market Street.

21 And I'm in there.

22           MS. KAPLAN:  Your Honor, I move to admit and publish

23 to the jury.

24           THE COURT:  Be admitted.

25           (Plaintiff Exhibit 3271 marked.)

S. Wispelwey - Direct

1          (Plaintiff Exhibit 3271 admitted.)

2     BY MS. KAPLAN:

3     Q    Now, just real briefly, some of those faith leaders who

4     came from other parts of the country, are any of them there in

5     that photo with you?

6     A    They are.

7     Q    Can you just identify one or two?

8     A    Sure.  I see Dr. Cornel West.  I see Reverend Susan

9     Frederick-Gray linking arms with me.  Lisa Sharon Harper is

10    over there to the left as well.

11    Q    So -- and this is the group that you walked with over to

12    Emancipation Park, correct?

13    A    That's correct.

14    Q    What did you do when you got to Emancipation Park?

15    A    So we walked up by The Haven, which was there on our left

16    at the intersection.  And once we turned onto Market Street, we

17    pulled out into a single-file line in front of the sidewalk

18    facing the park.

19    Q    I'm going to ask Mr. Spalding to put up the demonstrative

20    we've been using of downtown Charlottesville.

21         And can you show the jury, Reverend, where you lined up as

22    you just described it?

23    A    Sure.  The line was right there in front of the sidewalk

24    in the street.

25    Q    And did it last almost that whole length of the park?

54

S. Wispelwey - Direct

1  A    Almost the whole length.  We only had maybe 40 to 50

2  people.

3  Q    I'm going to show you a still from a video clip,

4  Plaintiffs' Exhibit 2105C, Reverend, and ask if you recognize

5  it?

6  A    Yes.

7  Q    And what is that?

8  A    That appears to be us turning the corner onto Market

9  Street.

10        MS. KAPLAN:  Your Honor, I move to admit Plaintiffs'

11  Exhibit 2105C and play it for the jury.

12        THE COURT:  Be admitted.

13        MS. KAPLAN:  Please play it, Mr. Spalding.

14        (Plaintiff Exhibit 2105C marked.)

15        (Plaintiff Exhibit 2105C admitted.)

16        (Video playing.)

17  BY MS. KAPLAN:

18  Q    Does this video, Reverend, show what you just described to

19  the jury, walking up and forming a line?

20  A    Yes.  That was early in the morning.

21  Q    Did you see -- at the time did you see any members of

22  Unite the Right coming into Emancipation Park?

23  A    In the clip or --

24  Q    In the clip or --

25  A    For two, two and a half hours, groups of Unite the Right

S. Wispelwey - Direct

1  attendees were walking from the east and then entering the park

2  in the southwest corner, so to my left, and chanting, yelling a

3  lot of slogans and slurs at us.

4  Q    And you see -- you said verbally and you see in the video

5  that the faith leaders are linking arms.  What was the point of

6  that?

7  A    Linking arms had a couple purposes for us.  One was

8  practical.  We were in a single-file line and as the population

9  kind of grew in the park and then also behind us with community

10 members, it was a practical way of staying connected, not

11 losing touch because there was a lot going on.

12     And then spiritually, it just signifies unity.  There was

13 a lot of beautiful traditions and people represented in our

14 line, and it was the visible faithful presence we wanted to

15 communicate, that we were bound together.

16 Q    Now, at this point in time when you're standing, as I

17 understand, in a line outside the south of Emancipation Park

18 with your face to the park, your back to Market Street, were

19 you blocking any entrances to Emancipation Park?

20 A    No.

21 Q    At some point, Reverend, did you kneel?

22 A    Yes.

23 Q    Why did you do that?

24 A    I think it was in the midst of singing and praying.

25 Again, it was part of our goal to visibly represent --

S. Wispelwey - Direct

1  physically represent our motto of love over fear.  As I

2  mentioned, a lot of hateful stuff was getting thrown at us and

3  yelled at us for a couple hours.  And prayer or kneeling in my

4  tradition and many others is a form of supplication, of saying

5  we are vulnerable, but we are also not afraid.

6         MS. KAPLAN:  Mr. Spalding, can you show the Reverend

7  Plaintiffs' Exhibit 3270.

8  BY MR. MILLS:

9  Q    And Reverend Wispelwey, can you identify that photo?

10 A    Yes.  That's -- I'm sorry.

11 Q    The jury can't see it yet.  Can you explain what's in it?

12 A    Yes.  That's me and my colleagues and friends kneeling.

13        MS. KAPLAN:  Your Honor, I move to admit and publish

14 Plaintiffs' Exhibit 3270.

15        THE COURT:  Be admitted.

16        (Plaintiff Exhibit 3270 marked.)

17        (Plaintiff Exhibit 3270 admitted.)

18  BY MS. KAPLAN:

19 Q    Now, Reverend Wispelwey, did there come a time when you

20 and your group of fellow faith leaders moved from the line

21 parallel to the south edge or the south border of Emancipation

22 Park to another place?

23 A    Yes.  A group from that line and I moved a little later

24 that morning to the steps at the southeast intersection.

25 Q    And can we put up the Charlottesville demonstrative again,

S. Wispelwey - Direct

1  Mr. Spalding?

2      Can you show the jury where you originally were and where

3  you moved to?

4  A    Sure.  I was originally right around there, and then me

5  and a group moved right there.

6  Q    Now, I'm going to show you a video, Reverend, just for

7  you, no sound, Plaintiffs' Exhibit 3234D, and tell me if you

8  recognize that.

9      (Video playing.)

10 A    I do.

11         MS. KAPLAN:  You can pause it, Mr. Spalding.

12  BY MS. KAPLAN:

13 Q    What do you see in that video?

14 A    So I see at this --

15 Q    Let me withdraw that question.  Are you in that video?

16 A    Yes.  I can make out my forehead and receding hairline in

17 the back of the group where we were.

18 Q    And that was at the corner when you moved to the steps as

19 you just described?

20 A    Yes.

21         MS. KAPLAN:  Your Honor, I move to admit Plaintiffs'

22 Exhibit 3234D and play it for the jury.

23         THE COURT:  Be admitted.

24         (Plaintiff Exhibit 3234D marked.)

25         (Plaintiff Exhibit 3234D admitted.)

58

S. Wispelwey - Direct

1              (Video playing.)

2    BY MS. KAPLAN:

3    Q    Can you tell the jury, Reverend, what you recall happening

4    at that point as depicted in this video?

5    A    So from where I stood, I was on the back.  I and some

6    others were actually looking towards the park just to make sure

7    that all was well on all sides of us.  I think shortly before,

8    right before that video was taken, I heard yelling -- I don't

9    really want to say it, but I heard yelling, "kill the faggot

10   priests."  And then the next thing I knew and experienced was

11   jostling and then getting pushed aside, and I was pushed, along

12   with colleagues, I was near the lip of the sidewalk steps,

13   pushed, tripped, and so then tripped and into the bushes.

14        When I stood up and got my bearing again, a large man was

15   just kind of standing over me and yelling "fuck you, faggot"

16   over and over in my face.  And took stock of what happened.  As

17   can be seen in the video, the group parted after the men with

18   the shields just bashed right through.  And once we realized

19   everyone was okay enough, just kind of regrouped, what had

20   happened.  Everyone was in shock.  I think it just caught

21   everyone by surprise.

22   Q    Now, Reverend, was the intention -- withdrawn, Your Honor.

23        Reverend, was this entrance, the southeast corner of the

24   park, was this an entrance that was being used for people to

25   get into the park that day?

S. Wispelwey - Direct

1  A      No.

2  Q      And why is that?  Explain why not.

3  A      As we had seen for like two, two and a half hours that

4  morning, everyone attending Unite the Right was going to the

5  southwest corner.  That was the only entrance.  And you could

6  see these four-foot, I guess, metal barriers at the southeast

7  corner.  I was facing back when that attack happened.  The only

8  entrance was at the southwest corner.

9  Q      I'm just going to put up the demonstrative really briefly

10 of downtown Charlottesville.  What was the entrance where

11 people were coming in?

12 A      The only entrance people were going in that morning into

13 the rally area was on this corner.

14 Q      And that's based on what you saw?

15 A      Yes.

16 Q      And you mentioned some metal barriers.  I'm going to show

17 just you for now a photo that's a still from the video we just

18 looked at, Plaintiffs' Exhibit 3234E.  Do you see that?

19 A      I do.

20 Q      And are those the metal barriers you were just referring

21 to?

22 A      Those are the barriers I saw around the rally area.

23         MS. KAPLAN:  Your Honor, I move to admit and publish

24 to the jury Plaintiffs' Exhibit 3234E.

25         THE COURT:  Be admitted.

S. Wispelwey - Direct

1          (Plaintiff Exhibit 3234E marked.)

2          (Plaintiff Exhibit 3234E admitted.)

3   BY MS. KAPLAN:

4   Q    Now, during the scene you just described, Reverend, I

5   think you mentioned -- and I apologize for repeating it too,

6   that you heard "kill the faggot priest."  Was other stuff being

7   screamed at the clergy members as those UTR protesters were

8   walking by and then through?

9   A    In the video, yes, I also heard "move the fuck aside,

10  clergy," while they were pushing through.

11  Q    What did the clergy members you were with decide to do

12  next?

13  A    It was a sobering moment.  We checked in as a group, as I

14  recall.  We were rattled and wanted to understand what had just

15  happened, what was our witness.  You could kind of feel the

16  dread, the temperature kind of raising around us.  And so I and

17  some of the other leaders of Congregate decided it was still

18  worth making a presence, recognizing that this was an intense

19  situation, but put us as the leaders out in front and lower on

20  the steps.

21         We had some conversations with some other

22  counter-protesters there who wanted to know whether we were

23  okay, what we were about, and we said yes, we're here.  We're

24  committed to nonviolence and we want to still be a visual

25  witness here.  And then that's when we saw another large group

S. Wispelwey - Direct

1  coming up the street.

2  Q    Can you tell the jury about the other large group that you

3  saw coming up the street?

4  A    Sure.  So we weren't kind of regrouped very long when

5  coming over the lip of Market Street and coming down towards

6  the library, towards the park, a huge group of men were walking

7  with shields, flags, different insignias.  A large group, yeah.

8  Q    I'm going to ask Mr. Spalding to play a video that's

9  already in evidence, 3239D, for both you and the jury since

10  it's in evidence.

11             THE CLERK:  3239D?

12             MS. KAPLAN:  3239D.

13             THE CLERK:  I find 3239 but I don't find D.

14             MS. KAPLAN:  Why don't you just play the beginning of

15  3239.  That would work.

16             (Video playing.)

17             MS. KAPLAN:  You can stop it right there.

18             (Plaintiff Exhibit 3239D marked.)

19             (Plaintiff Exhibit 3239D admitted.)

20   BY MS. KAPLAN:

21  Q    Is that the group of men you were just referring to in

22  your testimony, Reverend?

23  A    Yes.

24  Q    Did there come a time when you learned about the James

25  Fields car attack?

S. Wispelwey - Direct

1  A      Yes.

2  Q      How did you learn about that?

3  A      When I learned about the car attack I was at that point

4  I'd say about a block and a half up Water Street.  A restaurant

5  owner who liked what Congregate was about at the time was

6  running Escafe.  And so that had been set aside as a safe space

7  for us, for anyone who wanted, you know, to just check in and

8  get a bite maybe.

9       So I was just at the entrance to the patio there when a

10  woman ran in the entrance of the patio.  She was extremely,

11  extremely upset.  I thought she needed help.  I asked her,

12  please come sit down.  What do you need?  Are you okay?  She

13  said no, no, no.  A car has hit somebody right down the street.

14  It's hit some people.  People are badly hurt.  You need to

15  come.  You need to come.

16       She was just dry heaving and trying to get it out.  And I

17  stuck my head in the restaurant and yelled to my clergy

18  colleague, apparently a car has hit a bunch of people.  People

19  are hurt.  We need to go.  We need to go.  Stepped out into the

20  street.  Could see a scene for sure, and started running.

21  Q      And when you got to the corner of Fourth and Water Street,

22  what did you see?

23  A       It was awful.  It was -- as I got to the corner there was

24  a young black woman writhing on the ground.  People were

25  attending to her.  And there were two smashed cars and there

S. Wispelwey - Direct

1  was glass everywhere.  There was blood everywhere.  I turned

2  the corner with one of my clergy colleagues.  There were a lot

3  of bodies on the ground.  Right there I asked -- there were

4  people performing CPR on a woman.  And right next to them, just

5  kind of yelled in their ears, what do you need?  How can we

6  help?  And they said, we need space.  We need space.  Please

7  help clear the street.

8       So we turned around, and at that point more of my

9  Congregate colleagues were catching up, and so we helped clear

10 the road.  And aside from the people that, like, medics were

11 attending to, there was a lot of other injuries and shock.  A

12 guy yelled out while I was trying to clear the street,

13 "Father" -- I guess thinking I'm Catholic -- "Father, this

14 woman needs help."

15      People were just shoving people in our arms.  We were

16 trying to get them to safety.  I didn't know what had happened.

17 It was just -- it was awful.

18 Q    I'm going to ask Mr. Spalding to show you a clip of a

19 video, which is Plaintiffs' Exhibit 1909A, just for you right

20 now, Reverend.  Can you tell me whether you see yourself in

21 that clip?

22 A    Yes.

23      MS. KAPLAN:  Your Honor, I move to admit Plaintiffs'

24 Exhibit 1909A and play it for the jury.

25      THE COURT:  Be admitted.

S. Wispelwey - Direct

1              (Plaintiff Exhibit 1909A marked.)

2              (Plaintiff Exhibit 1909A admitted.)

3              MS. KAPLAN:  If we could play that, please,

4    Mr. Spalding.

5              (Video playing.)

6     BY MS. KAPLAN:

7    Q    Is that video an obviously much shorter representation of

8    what you were just describing at the scene?

9    A    Yeah, that's shortly after we got there.  I think the

10   first fire engine was kind of close on my heels when I had been

11   running down.  The attack had just happened.

12   Q    About how long did you stay there at Fourth and Water?

13   A    At Fourth and Water, I stayed there with my colleagues a

14   good couple hours.  We were getting -- so the folks who were

15   very grievously injured had to be taken in ambulances.  But

16   there were people with huge contusions, people in shock, just

17   collapsing.  It was so hot.  Couldn't find loved ones.  So

18   that's where a lot of -- we obviously never prepared for

19   something like this.  A lot of our training worked out well

20   because I was able to get on the phone, yelling to my friend

21   Rabbi Rachel and Elaine:  We need rides.  We need help.

22        There were a lot of people couldn't find loved ones,

23   trying to get to the hospital, but couldn't go in ambulances.

24   So they were parked nearby and -- I prayed with people.  I got

25   them connected to their loved ones when EMTs or law enforcement

S. Wispelwey - Direct

1   wouldn't let them come.  A whole lot.

2   Q     Reverend Wispelwey, switching topics, have the events of

3   August 11th and 12th, 2017 impacted your mental and

4   psychological health?

5   A     Yes.

6   Q     Can you please explain?

7   A     In a variety of ways.  I have lost a lot of function I

8   used to have and take pride in.  A month after August 2017 I

9   was diagnosed with acute stress disorder, which became a

10  post-traumatic stress disorder diagnosis.  I was just

11  exhibiting all the symptoms.  And I've had trouble sleeping

12  ever since.  High anxiety, night terrors, hypervigilance.  A

13  tremendous cost socially, professionally, and just

14  physiologically to all of that.  It's been rough.  That's a

15  short summation.

16  Q     I want to just pick out a couple of the symptoms that you

17  mentioned, Reverend.  What are night terrors?

18  A     Well, as I've come to find out, they are nightmares to the

19  nth degree.  I woke up -- I started waking up for the first

20  time in my life yelling and screaming after just horrible

21  dreams, where I'd be reliving, like, the car attack scene or

22  reliving something else in the streets.  But it was like my

23  daughter I couldn't find, you know, a mix of details.

24        And then the hypervigilance would kick in and I'd start,

25  like, obsessively kind of checking the locks, checking on her

S. Wispelwey - Direct

1  well-being, that sort of thing.

2  Q    What about panic attacks?  Do you have panic attacks?

3  A    Yes.

4  Q    Can you describe that a little bit to the jury?

5  A    Yeah, for me I tend to lock up, get frozen.  It's not like

6  this hyperventilating thing.  I start to experience a burning,

7  like, constriction.  We've looked for physiological causes, and

8  it's not there.  I even had an endoscopy.  But when anxiety

9  starts to rise, or I feel a threat or there's a trigger, for

10  lack of a better word, I'll kind of lock up and then I'll have

11  this kind of radiating attack where I'm basically in bed for a

12  couple hours.  But it's gone as long as 18 hours before.

13  Q    Are there things that you could do -- I think you've kind

14  of obliquely referenced this, Reverend.  But are there things

15  you were able to do before August 2017 that you are no longer

16  able to do today?

17  A    I couldn't work full-time for the first couple years.  And

18  even now it's one of the hardest things.  I have a temporary

19  job, which felt like a safe enough entry point back into

20  working, but the pandemic has made it longer and more tiring.

21  Socially, I can't go out like I used to, or like I used to want

22  to.  Everyone who knows and loves me knows I'm an extrovert or

23  know I was.  I don't actually know what I am anymore.  But I --

24  I prefer a small, very trusted group of friends if I'm going to

25  go out, whether to eat, and large crowds, public -- yeah, it's

S. Wispelwey - Direct

1    all a lot.

2         I can keep going.  I've gotten some prescriptions for some

3    of this and that helps mellow things a little bit.  I know I'm

4    not the only one who was impacted this way, but that's my part

5    of it.

6    Q    I'm going to ask Mr. Spalding to show you on your screen,

7    Reverend, Plaintiffs' Exhibit 3327.  Do you recognize that

8    document?

9    A    Yes.

10   Q    And what is it?

11   A    This looks like a chart related to therapies, costs, some

12   emergency ones specifically related to impacts of August 11th

13   and 12th and my experiences.

14              MS. KAPLAN:  Your Honor, move to admit Plaintiffs'

15   Exhibit 3327 and publish to the jury.

16              THE COURT:  Be admitted.

17              (Plaintiff Exhibit 3327 marked.)

18              (Plaintiff Exhibit 3327 admitted.)

19    BY MS. KAPLAN:

20   Q    Just a couple more questions, Reverend.

21   A    Sure.

22   Q    Before August 11th and 12th, 2017, were you in contact

23   with anyone you understood to be a member of Antifa?

24   A    No.

25   Q    Did you -- before August 11th and 12th, 2017, had you even

S. Wispelwey - Direct

1  heard that word before?

2  A    Not that I recall.  It was new to me.

3  Q    You've been quoted, I believe, as saying, Reverend, that

4  "Antifa saved my life on August 12th."  Do you recall that?

5  A    Yes.

6  Q    Can you explain for the jury what you meant by that,

7  Reverend?

8  A    Sure.  So as I recall, I was asked, along with several

9  other friends and community members, to write some words for an

10  article in the aftermath of August 11th and 12th.  I -- at the

11  time a debate was roiling nationwide about violence and

12  responsibility and so on.  And I wanted to share that in my

13  experience -- I had just learned the term "Antifa" around then.

14  So for me, it was a catchall for counter-protesters who I

15  didn't know, who didn't seem to have affiliations, not, you

16  know, branded like the Unite the Right attendees.

17      I said they saved my life and our lives because in that

18  clip earlier of League of the South and the NSM walking up, at

19  that point these other counter-protesters who I was just

20  lumping together as Antifa, had moved bodily in front of us.

21  And I legitimately -- we -- I legitimately feared for our

22  safety, thought I was going to take one on the chin at best.

23  And they bodily moved up so they were physically in front, like

24  this, of us on Market Street.  And League of the South and the

25  other groups charged right into them and that gave us -- they

S. Wispelwey - Direct

1    took the hit.  They took the hit.  And we pulled back onto

2    Market Street to take stock all over again.  So that's what I

3    meant.

4    Q    One more question, Reverend.  I think you've tweeted

5    before that "Jesus is Antifa."  Do you recall that?

6    A    I think I have tweeted that, yes.

7    Q    Can you explain to the jury what you meant by that?

8    A    The short answer is it was a social media type way of

9    saying I believe Jesus is or would be against fascism.  More

10   broadly, as I said earlier, I believe in a living and loving

11   God that imbues each of us with an inherent belovedness and

12   dignity and worthwhile equality, no matter who we are.  And I

13   believe Jesus modeled that in his relationships and ministry.

14       I understand in a short definition fascism to be a form of

15   governance -- authoritarian governance that seeks to privilege

16   and put on a pedestal a few and give all rights to a few based

17   on nationality or race, while explicitly keeping others down

18   and deprived of rights and equality and dignity and safety

19   based on their nationality, race, or religion.

20       So very simply, I strongly believe that the dream that

21   runs counter to the dreams of God and the visions of God for

22   this world and all of humanity, and using a term that has now

23   become a lot of things in the popular imagination and media,

24   this was my way of putting something out into the Twitter-verse

25   that simply said that Jesus as I understand him is against

S. Wispelwey - Direct

1  fascism because Jesus is for all of us and does not seek

2  violence on one -- certainly not for who someone is.

3  Q    One final question, Reverend.  Why did you join the others

4  in bringing this case?

5  A    I joined this case for a few reasons.  I've talked a

6  little bit about the costs.  I experienced damage.  I am

7  wounded badly by the events of that summer, while being still

8  proud of what I was able to do and what I wanted to do.  I am

9  certainly not the only one -- there's the other plaintiffs, of

10  course, and so many loved ones here in this community who were

11  wounded as well, in all -- physically, mentally, emotionally.

12  And being a part of this case as a person of faith and as a

13  pastor, I believe that truth is something that sets us free and

14  that there is a lot of truth from the events of that summer

15  that needs to be surfaced.  And it just felt like an

16  opportunity to use my presence and experience and who I am to

17  try to find a bit of accountability.

18      I believe God is a God of love and justice, and there is

19  no justice without repair and truth and an accounting, and that

20  these things prayerfully lead to repentance.

21              MS. KAPLAN:  Thank you very much, Reverend Wispelwey.

22              THE COURT:  All right.  Members of the jury, we'll

23  take a 20-minute recess right now.

24  **(Jury out, 10:29 a.m.)**

25              (Recess.)

71

S. Wispelwey - Cross

1          THE COURT:  All right.  Call the jury.

2    **(Jury in, 10:50 a.m.)**

3          THE COURT:  All right.  You may be seated.

4          And you may proceed, Mr. Spencer.

5                    CROSS-EXAMINATION

6    BY MR. SPENCER:

7    Q    Hello, Mr. Wispelwey.  Thank you for your testimony.

8    A    Hi.

9    Q    My name is Richard Spencer, and I'm acting on my own

10   behalf.

11        Shortly after the August 12th Unite the Right the rally,

12   do you remember being interviewed in the news media?

13   A    Yes.

14   Q    Do you remember an interview on MSNBC?

15   A    I do.

16   Q    If you could glance at your screen, is that a fair and

17   accurate representation of that interview?

18   A    Yes.

19          MR. SPENCER:  I would move to introduce Defendants'

20   Exhibit 1010 and publish to the jury.

21          MS. KAPLAN:  No objection.

22          THE COURT:  Be admitted.

23          (Defendant Spencer Exhibit 1010 marked.)

24          (Defendant Spencer Exhibit 1010 admitted.)

25   BY MR. SPENCER:

S. Wispelwey - Cross

1  Q    So we can see your face, but I think the audio is

2  important.

3           MR. SPENCER:  So, Heidi, perhaps I'll start to play

4  it and we can work on the audio.

5           Okay.  I think that's just coming on my computer.  I

6  can turn up the volume here.

7           Should the audio -- the audio will go through the

8  HDMI cable, correct?  Or do I need to do something else?  I can

9  plug in this cable.

10          All right.  We'll try that again.

11          We're not getting audio on this.  Could the -- I

12  would like to play the audio.  This is words, which are

13  important.  Could anyone with technical --

14          THE CLERK:  He's working.  He's typing right now.

15          MR. SPENCER:  He's working on it?  Okay.  I could

16  discuss something else, or should I just wait for him to come?

17          THE CLERK:  He trying to set up your laptop to send

18  audio through HDMI.  It's not doing that as an output.  You

19  need to select it.

20          MR. SPENCER:  See if this works.

21          I would like to play this for the jury, please.

22          (Video playing.)

23  BY MR. SPENCER:

24  Q    Did you say those words?

25  A    I did.

73

S. Wispelwey - Cross

1  Q    Do you still believe that Thomas Jefferson is a godfather

2  of white supremacy?

3  A    As I said, in many ways I believe him to be the godfather

4  of white supremacy in our country, meaning as a founding father

5  he wrote and articulated, in private correspondence and some of

6  our founding documents, ideas and beliefs that are racist and

7  that were codified into how the United States came into being.

8  Q    So you consider your church to be mainline Protestant; is

9  that what I heard?

10 A    The United Church of Christ as a denomination is what's

11 called a mainline Protestant denomination.  Others would

12 include, for example, the Evangelical Lutheran Church of

13 America, Presbyterian Church USA, that sort of thing.

14 Q    Are Episcopalians brothers in Christ?

15 A    Yes, they're also considered mainline Protestant.

16 Q    Okay.  So you -- so you consider -- you are Protestants.

17 Do words like "sola scriptura" ring a bell to you?

18 A    They ring a bell.

19 Q    Could you briefly explain them for everyone to help us

20 out?

21 A    I haven't heard the term "sola scriptura" since college.

22      So I grew up in a more rigid -- surrounded by a more rigid

23 theological -- what's called a reform tradition.  "Sola

24 scriptura" means only scripture, meaning, as best I can

25 remember -- and my Latin is rusty, too -- we derive all we know

74

S. Wispelwey - Cross

1  and have and can be only from scripture.  That's my best guess

2  and recollection.

3  Q    That's your best guess?  Do you think there are other

4  Protestants who might have a different view of that than you?

5           MS. KAPLAN:  Your Honor, objection.  He asked him

6  what his understanding was.  He gave it.

7           MR. SPENCER:  I was trying to help him out.

8           MS. KAPLAN:  He's not an expert on Christian

9  theology.

10          MR. SPENCER:  Clearly.

11          THE COURT:  Let's move on.  This is not relevant.

12 BY MR. SPENCER:

13 Q    So you claim that Yahweh, Lord God, will judge Thomas

14 Jefferson.  What do you mean by that as a pastor?

15 A    What I said in the clip was that Thomas Jefferson knew at

16 the end of his life that God would judge America's original

17 sin.

18     To unpack that a little further, he wrote in resources

19 that are available -- I think the exact quote is:  "I shudder

20 to think that God is just," and he was talking about the

21 institution of chattel slavery.  He knew it was wrong.  He

22 knew -- he felt -- he was terrified he would go to hell for the

23 life he had lived as an enslaver of human beings.  So his fear

24 was of judgment.

25 Q    How does one, according to your tradition, get to heaven?

S. Wispelwey - Cross

1  A    This is a lot to unpack, because I'm not sure, actually,

2  what, if any, formal doctrinal creed the United Church of

3  Christ has on heaven and hell and the afterlife.  As I

4  mentioned, we are congregationalists earlier.  So a lot of

5  governance comes from the local church.  I don't recall if we

6  have a specific getting to heaven or if that's even a necessary

7  precursor to faith.

8           THE COURT:  Let's move on past this --

9           MS. KAPLAN:  I apologize, Your Honor.

10          THE COURT:  -- and just concentrate on the issues in

11  the -- what?

12          MS. KAPLAN:  I didn't hear the word "heaven."  I

13  would have objected.  I couldn't hear him.  I would have

14  objected to that.

15          MR. SPENCER:  I think this is actually very

16  important, Your Honor.

17          THE COURT:  I don't think this is relevant to any of

18  the issues.  It's just too far afield from any of the issues in

19  the case.

20          MR. SPENCER:  Respectfully, Your Honor, I am

21  suggesting that Mr. Wispelwey is an activist, and that he

22  had -- he is claiming to be motivated by God and the word of

23  Jesus of Nazareth.  I am suggesting that he is motivated by

24  activism, left-wing activism.  And I am attempting to

25  demonstrate that.  I don't want this to be a theology lesson --

S. Wispelwey - Cross

1          THE COURT:  Okay.  Go ahead.

2          (Overlapping speakers.)

3          MR. SPENCER:  -- because he doesn't seem prepared for

4  that.

5          THE COURT:  -- heaven and all that.

6          MS. KAPLAN:  Your Honor, I don't think Reverend

7  Wispelwey's views or understandings of heaven have anything to

8  do with whether he's a --

9          THE COURT:  I think most of his testimony was not

10  relevant to the issues in this case.  But they're in.  Nobody

11  objected to them.  You can cross-examine to some extent, but

12  let's move on because it's not important.  Go ahead.

13   BY MR. SPENCER:

14  Q    I guess I'll try this.  Did God love the Canaanites?

15          MS. KAPLAN:  Your Honor, objection.  The Canaanites?

16          MR. SPENCER:  This is a terribly important aspect of

17  this.

18          THE COURT:  Answer the question, sir, if you can.

19          THE WITNESS:  As testified earlier, I believe the

20  living and loving God and spirit that infuses and I believe

21  surrounds all life carries a beloved divine image into every

22  human person.

23  BY MR. SPENCER:

24  Q    And yet he ordered -- what is your understanding of what

25  Yahweh ordered the tribes of Israel to do to the Canaanites in

S. Wispelwey - Cross

1   the Book of Joshua?

2           MS. KAPLAN:  Your Honor, we're getting really far

3   afield here.

4           MR. SPENCER:  This is terribly important, Your Honor.

5           THE COURT:  It started out far afield.  Don't spend

6   too much time here.  Let's move on.  Answer the question.

7           THE WITNESS:  As I recall -- are we talking about

8   Jericho?

9           MR. SPENCER:  Yes.

10          THE WITNESS:  As I recall, there's a story in the

11  Hebrew scriptures where Joshua believes that God has ordered

12  him to take by force a land believed to be flowing with milk

13  and honey, and that if they march around the city walls enough

14  times and blow their horns, the city will crumble without --

15  without a punch being thrown.

16   BY MR. SPENCER:

17  Q    What happened to the inhabitants of that city?

18  A    According to the story that's laid down in Hebrew

19  scriptures -- I don't recall.  I remember the walls tumbling

20  down, as the story is told.  And I would need my memory

21  refreshed on what happened to all of the inhabitants of that

22  city.

23  Q    Is it safe to say that it was a bloody mess?

24  A    I would need my memory refreshed.

25  Q    All right.  You are a pastor.  This is the Bible I'm

S. Wispelwey - Cross

1   talking about.

2           MS. KAPLAN:  Your Honor, it's not a question.

3           THE COURT:  You have to take the answer.

4    BY MR. SPENCER:

5   Q    Have you read the Bible?

6   A    I have.

7   Q    Have you read the Old Testament?

8   A    The Hebrew scriptures?

9   Q    Yes.  But I'm not just referring to the Pentateuch.  The

10  Old Testament.

11  A    The Hebrew scriptures, I've read them.

12  Q    Yes.  Are there laws in the Hebrew scriptures against

13  slavery?

14  A    The Bible, Hebrew and Christian testament, says a lot of

15  different things about slavery.

16  Q    Right.  Are there laws regarding the treatment of slaves

17  in the Old Testament, the Pentateuch, more specifically?

18  A    I believe so, yes.

19  Q    Could you represent those briefly for us?

20          MS. KAPLAN:  Your Honor, again, I understand Your

21  Honor's instruction, he's given latitude, but he's asking him

22  for the rules about slavery in the Old Testament?

23          MR. SPENCER:  I'm proving that he --

24          THE COURT:  I sustain the objection.

25          MR. SPENCER:  Okay.  I'll move on.

S. Wispelwey - Cross

1    BY MR. SPENCER:

2    Q    Is it safe to say that you are more motivated by another

3    cause than anything that you have read in the Bible?

4    A    No.

5    Q    You're not.  You derive your own personal spirit and so on

6    from what you've read in the Bible, if you have read it?

7    A    I have read the Bible.  To me it's a living document, a

8    conversation that people are having with God as they understand

9    God throughout the centuries, a conversation that continues

10   today.  In the United Church of Christ we say that God is still

11   speaking with a comma.

12   Q    What is that --

13   A    I'm sorry?

14   Q    What does that mean?

15        MS. KAPLAN:  Mr. Spencer, let him finish an answer

16   and then you can ask a question.

17        THE COURT:  Do not address --

18        MS. KAPLAN:  Sorry, Your Honor.

19        THE WITNESS:  It means what I said, that the living

20   spirit is alive today and in prayerful communion in the reading

21   of scripture and relationship and modeling as best we can who

22   Jesus was, is, and will be for us, that the conversation is

23   ongoing.  I am not just contractually obligated to say that; it

24   is my animating purpose.  I would point to my entire so-called

25   career as animated by what I believe God is calling me to do.

S. Wispelwey - Cross

1   BY MR. SPENCER:

2   Q    So were you -- before the events of Unite the Right, were

3   you aware of me, Richard Spencer?

4   A    I was.

5   Q    You were?  How did you become aware?

6   A    Things I read online.  There were different profiles.  I

7   remember seeing a video, as well.

8   Q    So you read some of the magazine profiles?

9   A    Yes.

10  Q    Okay.  And did you read a video -- you said you watched a

11  video?  What are you referring to?

12  A    As I recall, being aware of who you were around the time

13  of the inauguration early in 2017, a video surfaced of you

14  leading a chant with the Nazi salute saying "Hail Trump."

15  Q    Okay.  Did you -- so were you on social media at the time?

16  A    Yes.

17  Q    Which social media platforms?

18  A    At the time of January 2017?

19  Q    Yes.  There about.

20  A    Facebook and Instagram.

21  Q    And Instagram.

22       Okay.  Do you remember any other videos of me?

23  A    I do not.

24  Q    You don't?  A punch, does that come to mind?

25  A    I have seen a video of you getting punched, yes.

S. Wispelwey - Cross

1   Q     Okay.  Did you retweet that?

2   A     No.

3   Q     You didn't?

4         What do you think about that?

5   A     I am against violence -- violence that causes physical or

6   bodily harm against people.

7   Q     You -- we just watched today some images of you and Katie

8   Couric.  So was that CBS News?

9   A     As I recall, it was some combination of ABC News and

10  National Geographic, whatever that series premiered on.

11  Q     Katie Couric is a well-known presenter.  I believe she

12  actually graduated from UVa.

13        So how did she end up at your church?

14  A     As shared earlier, I was approached by a couple of

15  community members who were media liaisons.  There were a lot of

16  media requests coming in that week, I guess, and was informed

17  that she and her team were doing some docuseries.  And she has

18  a lot of personal ties to Charlottesville.  The way it was

19  explained to me is she wanted to feature, I guess, people who

20  were involved, for this episode that was going to be about a

21  larger national conversation, but people who were involved in

22  Charlottesville who also had grown up most of their lives

23  there.  So I was asked if I would be one of those people.

24  Q     And so you had -- this was leading up to Unite the Right.

25  That was to be featured in it prominently.  Am I understanding

S. Wispelwey - Cross

1  that correctly?

2  A    In the week prior.  I met her only the day before, the day

3  of August 11th.

4  Q    Why would you expose yourself to that?  Why would you -- I

5  mean, I understand that she invited you, but why would you go

6  out of your way to take part in such a video?

7  A    I don't know that I would classify anything I did as going

8  out of my way.  I had that five-minute interview with her

9  before the church service.  And for me and Congregate as a

10  whole, it felt important for telling our story that

11  Charlottesville was unifying around love and hope and support

12  for the community.  And this is who I was as someone from

13  Charlottesville with a whole lot of relationships going back

14  decades.  So it seemed like a natural connection for the work

15  we were trying to do that summer.

16  Q    Yes.  You said you were going to stand up in the face of

17  evil.

18  A    Uh-huh.

19  Q    What did you mean by that?

20  A    To try to put it into a short answer, you know, our goal

21  was what was also shown previously about our presence in the

22  streets, not just what I did with that line on Market Street,

23  but we had whole groups of folks providing care and

24  refreshments, water, safe space at First United Methodist

25  Church.  It was a chance to stand up, symbolically and

S. Wispelwey - Cross

1   literally in my case, against what we perceived as evil.

2   Q    As evil.  So you went out of your way to take part in

3   standing up against evil and in your words it was an

4   existential threat?

5   A    Yes, for many of my dear friends and colleagues, the Unite

6   the Right rally, what we learned about it, plans for it as it

7   approached, was a source of great fear, Jewish and black and

8   queer friends especially.

9   Q    Did you assume a certain amount of risk in standing up to

10  evil?

11  A    Yes, I believe so.

12  Q    So during August 12th -- so you've testified that you knew

13  something about me.  Might have read an article here and there.

14  A    (No verbal response.)

15  Q    On August 12th, did you see me at any time?

16  A    I don't believe so, no.

17  Q    All right.  I guess that answers questions.  You never saw

18  me at the park on August 12th?

19  A    No.

20  Q    Okay.  Were you aware of my religious leanings, my

21  background?

22  A    I am not aware.

23  Q    You're not aware.

24       Okay.  But fellow Protestants are brothers in Christ in

25  your view?

S. Wispelwey - Cross

1    A    I'm not sure exactly what's meant by "brothers in Christ."

2    Q    Okay.  Fellow Protestants more or less believe what you

3    believe?

4    A    I think it depends on the denomination.  The United Church

5    of Christ has what's called shared communion with a few other

6    denominations, but I don't subscribe to a belief that just

7    because someone calls themselves a Christian that means we all

8    universally believe or express our faith in the same ways.

9    Q    Fair enough.  But if one repents and puts his faith in

10   Jesus Christ, is he saved?

11          MS. KAPLAN:  Your Honor, relevance to that if one

12   repents and puts his faith in Jesus Christ, is he saved.

13          THE COURT:  Sustained.  I don't -- I don't think

14   this --

15          MR. SPENCER:  Okay.  That's fine.  Withdrawn.  No

16   further questions.  Thank you.

17                    CROSS-EXAMINATION

18    BY MR. CAMPBELL:

19   Q    Hello, Reverend Wispelwey.  I represent James Fields.

20   Just had a couple of questions for you.

21          Reverend, as I understand your testimony earlier, you were

22   not in the crowd at Fourth and Main at the time the car attack

23   occurred, correct, sir?

24   A    That's right.  I was right up the street when it occurred.

25   Q    I think a block and a half?

S. Wispelwey - Cross

1  A    Yes, sir.

2  Q    And then all of the medical treatment that you had and

3  claimed in this lawsuit was all therapy, correct?

4  A    Therapy, prescriptions, emergency room visits, just

5  general PCP, primary care provider visits related to concerns I

6  had around all of the above.  So no, not just therapy.

7  Q    Okay.  I didn't see those on the exhibit that your counsel

8  admitted into evidence.  I apologize.  I did see one emergency

9  room visit in 2020 for anxiety; is that correct?

10 A    Uh-huh.

11        MR. CAMPBELL:  Thank you, sir.  I don't have any more

12 questions.

13        THE COURT:  All right.  Thank you.  Anyone else?

14                      CROSS-EXAMINATION

15 BY MR. JONES:

16 Q    Good morning.  I represent Michael Hill, Michael Tubbs and

17 the League of the South.

18     You testified that you arrived on Market Street in front

19 of Emancipation Park at approximately 8:15 at the latest that

20 morning; is that right?

21 A    That's my best guess.

22 Q    And initially you took a position lining up single file on

23 Market Street, some of you guys facing the park, maybe some

24 people facing the street; is that right?

25 A    That's correct.  There were different times over those

S. Wispelwey - Cross

1  first two, two and a half hours where sometimes we would

2  alternate facing forward, backwards, but mostly facing the

3  park.

4  Q    And for the first couple of hours, as far as you could

5  tell, all of the rally attendees were coming in from the

6  southwest entrance; is that right?

7  A    Yes.  They were walking in front of us on the sidewalk or

8  the little embankment up to the metal barriers or sometimes

9  behind our line, which is when we would sometimes switch back

10 and forth.  They would go down to the far end of our line from

11 where I was and up into the park down by The Haven.

12 Q    And then at some point you moved from your position single

13 file along Market Street to the top of the stairs of the

14 southeast entrance to the park; is that correct?

15 A    Yes.

16 Q    And that's the entrance that's close to the library and

17 the Paramount?

18 A    That's correct.

19 Q    And why did you move over there?

20 A    Combination of reasons.  Again, one practical, one

21 spiritual or mission-driven.  The practical being there was a

22 lot more people in the park, a lot of groups walking in front

23 or behind and in a single file line we were feeling

24 increasingly just vulnerable and exposed and we couldn't hear

25 ourselves singing as much.

87

S. Wispelwey - Cross

1    So it was for safety reasons, but also putting together

2  that almost everybody was coming from that direction, we wanted

3  to move our witness to that place, again, to try to diffuse

4  tension also was our purpose because the street was getting

5  very full.

6  Q    And so at some point after you guys moved to the position

7  at the top of the stairs at that southeastern entrance, groups

8  began coming down Market Street from the opposite direction,

9  attempting to enter the park from that entrance; isn't that

10 right?

11 A    They were coming in from the same direction they had been

12 coming from, so I guess from the east.  But yeah, when we

13 were -- when our group was assaulted, like when I was shoved,

14 that group came right up those steps on the southeast side.

15 Q    So that group in particular, you're talking about the

16 video that we watched?

17 A    Yes.

18 Q    That group came down from the area of the Market Street

19 parking garage down Market Street, correct, from that

20 direction?

21 A    I believe so.  Again, at the first kind of iteration of

22 our gathering on the steps, I was actually facing back towards

23 the park on the back.  So I didn't see their full approach for

24 that group.

25 Q    So I'm going to pull up what's been admitted as

S. Wispelwey - Cross

1    Plaintiffs' Exhibit 3234 here and ask that it be published to

2    the jury.  This is starting at the 5:23 mark.  I'll just

3    quickly play it and see if you can recognize where this is

4    located.

5         (Video playing.)

6    A    I recognize.

7    Q    That's the sign for the library, correct?

8    A    Uh-huh.

9    Q    And then --

10   A    Yes.

11   Q    Do you see where I circled there?

12   A    I do, yes.

13   Q    Is that the entrance of the park that you were standing

14   at?

15   A    Yes.  It looks approximately correct, yeah.

16   Q    And so I don't know if you -- there's this group of rally

17   attendees that are approaching the park and about to access

18   that entrance to the park.  Do you see that?

19   A    Yes.

20   Q    I'm going to clear the screen here.

21        (Video playing.)

22        So were you part of this group here that's standing at the

23   top of the stairs?

24   A    Yes.

25   Q    See if we can get a good still frame so we can see where

S. Wispelwey - Cross

1   you're at.  Do you see yourself in that picture?

2   A    I do in this frame, yes.

3   Q    Do you mind circling, please, where you're standing.

4   A    (Witness complies.)

5   Q    And at this point it appears that you are looking towards

6   the street and not towards the park; is that right?

7   A    Well, my body is facing the park.  It looks like I'm

8   looking to the side.

9   Q    Okay.

10       (Video playing.)

11       So now that group of rally attendees is starting to

12   approach your group at the top of the stairs.  Do you see that?

13   A    Yes.

14   Q    I believe you testified that as these -- this group of

15   rally attendees entered the park here, you were pushed and

16   fell; is that correct?

17   A    Yes, from when they pushed through us, there was jostling

18   and shoving.  I couldn't see it because again my back -- it all

19   happened very fast -- and lost my balance and stumbled into the

20   bushes.

21   Q    So you were standing behind some other people who were in

22   that line; is that correct?

23   A    That's correct, towards the end.

24   Q    So you are not sure who shoved you into the tree; is that

25   fair to say?  Or did you see who shoved you?

90

S. Wispelwey - Cross

1    A    I don't know who exactly pushed.  It all happened really

2    fast.  There was a lot of movement.

3    Q    So as the group of rally attendees were starting to make

4    their way up those stairs, did you see them do that?

5    A    See them move up the stairs?

6    Q    Yeah.

7    A    No.  The first thing -- that I knew something was

8    happening was getting pushed.

9    Q    You didn't see them start approaching the stairs at all?

10   A    I did not see them.  I heard yelling.  I knew there was a

11   group of people behind me.

12   Q    You were obviously aware that they had a permit to

13   demonstrate in the park that day, correct?

14   A    I knew that there was a permit for the Unite the Right

15   rally.

16   Q    Okay.  And you were asked about this -- a separate

17   incident where a group that included the League of the South

18   was coming down Market Street.  That's a separate incident from

19   the video I just showed you; is that right?

20   A    That's correct.

21   Q    And you testified that the reason you tweeted "Antifa is

22   Jesus" is because in this instance you felt that these

23   counter-protesters, or as you referred to them, Antifa,

24   protected you; is that right?

25              MS. KAPLAN:  Objection, Your Honor.  That was not the

S. Wispelwey - Cross

 1  testimony.  The testimony was --

 2          THE COURT:  Well, don't instruct.  He can -- the

 3  witness can answer the question.

 4          MS. KAPLAN:  But his question said he testified --

 5          THE COURT:  Wait.  Wait.  Wait.  He can ask the

 6  question.  The witness has to recall what the witness said.

 7  And he doesn't have to agree to the characterization by the

 8  lawyer.

 9          THE WITNESS:  So I think we talked about two

10  different pieces in the media.  One was this piece written

11  right in the aftermath of August 11th and 12th where I

12  testified that what I understood or was just encapsulating as

13  Antifa saved my life.  If I've tweeted "Jesus is Antifa," where

14  Jesus is the subject, Antifa is the object, that probably came

15  at least two years later.

16  BY MR. JONES:

17  Q    Correct me if I'm wrong, but didn't you testify that the

18  reason you said Antifa is -- the reason that you tweeted that,

19  you don't deny you tweeted that, do you?

20  A    I have tweeted "Jesus is Antifa."

21  Q    Correct me if I'm wrong, but you testified on direct that

22  the reason you tweeted that was because in this particular

23  sequence of events, you felt that Antifa protected you from the

24  rally attendees.  Is that correct or is that incorrect?

25          MS. KAPLAN:  Objection.

92

S. Wispelwey - Cross

1              THE WITNESS:  That's incorrect.

2     BY MR. JONES:

3     Q    In this image can you identify yourself at all?

4     A    It's small and blurry but I know where I am and I can see

5     who I am, yes.

6     Q    Where are you in this image?

7     A    Right there.

8     Q    Is that at the top of the stairs?

9     A    Or halfway down.

10    Q    You're familiar with this.  You grew up in Charlottesville

11    so you're familiar with this street?

12    A    Yes.

13    Q    That's a good 20 yards away from that, maybe more?

14    A    Yes, more or less.

15    Q    So it's not your testimony today that Antifa protected you

16    from the rally-goers by blocking the road here.  You're not

17    saying that, are you?

18    A    I'm a little confused.  Are we talking about the testimony

19    or the article?

20    Q    I'm asking you if, today, if you would testify that Antifa

21    was protecting you here.  Were they or were they not?

22    A    Yes, I believe they bodily took a hit that otherwise would

23    have come for us 20 or so yards further down the road.

24              THE CLERK:  Mr. Jones, are you expecting this to be

25    shown to the jury?  You didn't identify it or say it was

93

S. Wispelwey - Cross

1    previously admitted.

2            MR. JONES:  I'm sorry.  This is Defense Exhibit 1.

3    If this could be published.  Thank you, Ms. Wheeler.

4            THE COURT:  Is this a different exhibit?

5            MR. JONES:  It's Defense Exhibit 1.

6            THE CLERK:  Previously admitted.

7            THE COURT:  It will be admitted.

8     BY MR. JONES:

9    Q    Do you have any other images or videos or know of any

10   where Antifa protected you on August 12th?

11   A    I'm not sure how to answer that.  I've seen lots of video

12   and images.  I have some that are on my computer from that day,

13   but I myself did not take any video or photos during that day.

14   Q    Did you provide those videos to your attorneys?

15   A    I did, yes.

16   Q    You didn't see any of those videos during your direct

17   examination, did you, this morning?

18            MS. KAPLAN:  Objection, Your Honor, relevance.

19            THE COURT:  Overruled.  Go ahead.  You may answer the

20   question.

21            THE WITNESS:  Is the question the videos that have

22   been on my computer, did I see any of those this morning?

23    BY MR. JONES:

24   Q    The question was:  You testified that you provided videos

25   to your attorneys where what was depicted in the video was

S. Wispelwey - Cross

1  Antifa protecting you on August 12th.  You testified you gave

2  those videos to your attorneys.

3  A    No, I'm sorry.  I gave over my hard drive which has a lot

4  of photos and videos on it, including some of the events from

5  that weekend.  I don't know or believe or can't think of any

6  that depict this scene or similar moments that exist on my hard

7  drive.

8  Q    So I'm just trying to -- so previously you testified that

9  you had videos showing Antifa protecting you on August 12th.

10  Now you're saying you do not.  Is that right?

11        MS. KAPLAN:  Objection, Your Honor.  That's not the

12  testimony.

13        THE COURT:  Sustained.

14  BY MR. JONES:

15  Q    So do you or do you not have videos on your hard drive of

16  Antifa protecting you on August 12th?

17  A    I don't believe so.

18  Q    And the only image or video you were aware of of Antifa

19  protecting you is this image where you are standing up on the

20  stairs 20 yards behind them; is that correct?

21  A    This is not my video.  I testified to my experience.

22  Q    The question was:  This is the only video or image that

23  you are aware of where you are claiming that Antifa is

24  protecting you; is that correct?

25  A    I think what I'm trying to say is that this is a video

S. Wispelwey - Cross

1  similar to the one earlier that depicts the moment that I was

2  describing in that original Slate article.

3  Q    So in your theology -- so you testified that you did tweet

4  "Antifa is Jesus."  In your theology, is Jesus sinless?

5          MS. KAPLAN:  I'm sorry, is Jesus what?  Sinless?  I'm

6  having a hard time hearing --

7          THE COURT:  Please don't.

8          MS. KAPLAN:  I just can't hear the word, Your Honor.

9          THE COURT:  Well, don't ask him.  Stand up and object

10  or something.  You don't have to stand up, but --

11          MS. KAPLAN:  Could you ask Mr. Jones to -- I couldn't

12  hear the last word.

13          MR. JONES:  Court Reporter, do you mind reading back

14  the question?

15          (The requested portion of the transcript was read

16  back.)

17          THE WITNESS:  I did not testify that I tweeted

18  "Antifa is Jesus."  The tweets in question are "Jesus is

19  Antifa."

20          And "is Jesus sinless" is a big question, having a

21  lot to do with the question and nature of how we understand

22  what sin is to be.

23          I believe Jesus modeled holistically the dreams and

24  love and purposes of God here on earth, calling us to do the

25  same, and did it beyond reproach.

96

S. Wispelwey - Cross

1  BY MR. JONES:

2  Q    Your testimony is that you believe Jesus was beyond

3  reproach; is that what you said?

4  A    I believe that Jesus modeled the dreams and visions of God

5  and did it in such a way that was beyond reproach.

6  Q    You also testified that before August 12th, you did not

7  know Antifa.  Did you say that?

8  A    I said I believe I only learned the term around that time,

9  around that event that summer.

10 Q    And then your tweet "Jesus is Antifa" was several years

11 after August 12th; is that right?

12 A    I believe so, yes.

13 Q    So that was after you had had the chance to review a lot

14 of the footage from August 12th; is that correct?

15 A    Yes.  I've seen a lot of footage from that entire weekend.

16         MR. JONES:  Thank you.  That's all the questions I

17 have.

18         THE COURT:  All right.

19         MR. CANTWELL:  Judge, could I please request a very

20 quick sidebar, actually?

21         THE COURT:  What?

22         MR. CANTWELL:  Could I please request a very quick

23 sidebar?

24         THE COURT:  Okay.

25         (Sidebar commenced.)

97

S. Wispelwey - Cross

1         MR. CANTWELL:  I have several tweets from

2   Mr. Wispelwey which I would like to move into evidence.  These

3   were in -- we've shown these to plaintiffs before, but they're

4   not in as exhibits.  I have seven of them here.  And these are

5   largely rebuttals to what we've heard today.

6         THE CLERK:  The reporter can't hear you.

7         MR. CANTWELL:  Sorry.  I have seven tweets from

8   Reverend Wispelwey which I would like to move into evidence.

9   They are not currently exhibits, but they were embedded in

10   my -- in my January 2020 filing when I was objecting to

11   evidentiary sanctions against Defendant Kline.  You guys have

12   seen them, but they're not in evidence.

13         MS. KAPLAN:  Your Honor, if he wants to use a

14   document, that's fine, but he has to give us a copy of the

15   document.  I can't properly represent my client if it's just on

16   his computer.

17         MR. CANTWELL:  I will happily give you those.  I gave

18   Mr. Bloch a thumb drive the other day.  I haven't gotten that

19   thumb drive back.  I can drag and drop them immediately, if you

20   like.

21         MS. KAPLAN:  You can use anything you want, arguably,

22   to cross-examine a witness.  Whether they come into evidence, I

23   don't know.  I need to see them.

24         MR. CANTWELL:  And I'm happy to do that.

25         THE COURT:  Okay.  Well, just ask him if he made the

S. Wispelwey - Cross

1  statement.

2           MS. KAPLAN:  Can we first have him send us a copy,

3  because I didn't know from the thumb drive if this is -- or

4  show them to me for two minutes, Your Honor.

5           MR. CANTWELL:  Do you want me to show you?  I'm happy

6  to show you right now.

7           (Pause.)

8           MS. KAPLAN:  Okay.

9           (Pause.)

10          Okay.  I mean, I don't know how Senator Cruz comes

11  in.

12          MR. CANTWELL:  He's responding to Senator Ted Cruz.

13  I'm actually primarily interested --

14          MS. KAPLAN:  I think if he wants to focus on this

15  one, Your Honor, on what he's already testified to, that's

16  fine.  I think putting in the politics of Senator Ted Cruz

17  would be prejudicial and irrelevant.

18          THE COURT:  Doing what?

19          MS. KAPLAN:  He's responding to a Ted Cruz tweet.

20  All the rest of the stuff I have no problem with.

21          THE COURT:  Well, if he responds to it, what would be

22  the difference?

23          MS. KAPLAN:  Because I thought there was an interest

24  to try to keep extraneous political debates out of the trial.

25          THE COURT:  Well, this gentleman's testimony is

S. Wispelwey - Cross

1   extraneous.  I mean, ask him why he's in this suit.  That's

2   what I've been saying all along.  This is not -- this is a

3   personal injury case.

4          MS. KAPLAN:  Well, he did reference his injuries,

5   Your Honor.

6          THE COURT:  Okay.  But you ask him why --

7          MS. KAPLAN:  But his first answer was about his

8   injuries.

9          THE COURT:  No.  He says he's here because -- that

10  he's in this suit -- just tangentially about his injuries.

11         MS. KAPLAN:  He first said his injuries and then he

12  said other reasons.  Defendants have asked every plaintiff

13  those questions.

14         THE COURT:  Okay.  Go ahead.

15         MS. KAPLAN:  Is there more?

16         MR. CANTWELL:  Ready to move on?

17         MS. KAPLAN:  That's fine.

18         (Pause.)

19         If you give me a thumb drive I'll drag and drop

20  these.

21         (Sidebar concluded.)

22                      CROSS-EXAMINATION

23   BY MR. CANTWELL:

24  Q    Hello, Reverend.

25  A    Hi.

S. Wispelwey - Cross

1  Q    So the article we were talking about was in Slate

2  magazine, right?

3  A    That's right.

4        MR. CANTWELL:  I have that article as CCEX-052, 052,

5  and I'd like to publish that and show to it the jury, please.

6        MS. KAPLAN:  No objection.

7        THE COURT:  Be admitted.

8        MR. CANTWELL:  I need to put my screen on here.

9        (Defendant Cantwell Exhibit 052 marked.)

10       (Defendant Cantwell Exhibit 052 admitted.)

11 BY MR. CANTWELL:

12 Q    You said that Antifa saved your life twice that day,

13 actually, right?

14 A    It does say that, yes.

15 Q    I know Mr. Jones was showing you the scene where there was

16 the line of them out in front of the library and you're

17 blocking the entrance to what was Lee Park.

18      What was the other time that that happened?

19 A    I actually don't recall what I meant by saying twice.

20 Q    Well, actually, as you go on, there was actually many

21 times, right?

22 A    I'm not sure what's being referred to.

23 Q    "Indeed, they saved my" -- I'm sorry -- "many lives from

24 psychological and physical violence," right?  I'm sorry.  It

25 wasn't your life many times.  It was many lives, right?

S. Wispelwey - Cross

1      And in fact, you stated that without Antifa there, the
2  body count could have been much worse, right?
3  A    I say I believe the body count could have been much worse,
4  as hard as that is to believe.
5      I don't see anything that says "without Antifa there."
6  Q    But that's actually the whole entire point of the piece,
7  right?  "I am a pastor from Charlottesville, and antifa saved
8  my life twice on Saturday.  Indeed, they saved many lives from
9  psychological and physical violence -- I believe the body count
10  could have been much worse, as hard as that is to believe."
11  And, of course, between "violence" and "I believe" there's a
12  dash and not a period.
13      And you wrote this, right?
14  A    Yes.  This is an edited version of something I submitted.
15  Q    Oh, somebody else edited it before publishing it, you're
16  saying?
17  A    Yes, I believe so.
18  Q    So do you think that that's an editorial mistake, that
19  they connected the body count to Antifa?
20          MS. KAPLAN:  Objection, Your Honor, argumentative.
21          THE COURT:  Overruled.
22          THE WITNESS:  No, I don't think mistake.  The
23  sentiment is that, without what I was herding into an umbrella
24  term of "antifa" as I understood it, without other
25  counter-protesters in addition to those I knew and had showed

S. Wispelwey - Cross

 1  up with myself, that a lot more people could have been hurt

 2  than already tragically were.

 3   BY MR. CANTWELL:

 4  Q    So let's try to figure out who is Antifa and who is just a

 5  regular counter-protester.  So how are you identifying the

 6  people who are actually Antifa?

 7  A    As mentioned earlier, it was a new term to me, and it was

 8  a catch-all.  I didn't know -- there weren't any unifying

 9  identifying markers to many of these other counter-protesters.

10  So it was just:  Here are these other people who I understand

11  to be against fascism.  So the shorthand in the literal sense,

12  I don't know anyone who identifies as Antifa.

13  Q    What's your relationship with Emily Gorcenski?

14  A    I know who that is.

15  Q    Could you describe your relationship with Emily Gorcenski,

16  please?

17  A    Sure.  It's primarily -- I know who she is through social

18  media.  I follow her on Twitter.  I believe I've met her once

19  in person.

20  Q    You met Emily Gorcenski only once?

21  A    I believe so, yes.

22  Q    How long have you been following Emily Gorcenski on

23  Twitter?

24  A    That's a good question.  I wasn't active on Twitter until

25  after the events of -- that we're discussing.  So I know -- my

S. Wispelwey - Cross

1    best guess would be sometime within the calendar year between

2    August 12th, 2017 and August 12th, 2018.  But that is just a

3    guesstimate.

4    Q    Okay.

5    A    I was -- I learned who she was in that year.

6    Q    You mentioned the name of a group that you're involved in

7    as Congregate C'ville; is that right?

8    A    Yes.  I cocreated Congregate in the summer of 2017.

9    Q    That was just before the events in dispute, right?

10   A    It was something my colleague and I had been discussing in

11   several months prior, but it took increasingly concrete form in

12   May or June of 2017.

13   Q    May or June of 2017.

14        And was -- Congregate split off from another organization

15   that had preexisted, right?

16   A    No.

17   Q    What is Congregate's relationship with the Clergy

18   Collective?

19   A    Sure.  If we're talking about the Charlottesville Clergy

20   Collective, I was a member of that the entirety of 2017 and

21   sometime beyond as well.

22        The Charlottesville Clergy Collective is a

23   relationship-building entity here in town meant to connect

24   faith leaders who wanted to have deeper relationships.  A very

25   well-respected, long-time African American pastor here in town

S. Wispelwey - Cross

1   felt motivated to start it in the wake of the Charleston

2   massacre at Emanuel Church, saying, I'd like to better know who

3   I'm serving in ministry with here in this town.

4       Congregate was explicit -- I know because I wrote this

5   letter to the whole collective -- that we did not want to

6   replace or subvert the Clergy Collective.  We just recognized

7   that different people felt called to show love and support for

8   the community in different ways, and we were going to be having

9   weekly gatherings to equip people to do that in particular

10  ways.

11      I still attended Clergy Collective meetings that entire

12  summer.  And every member of Congregate, I believe, who was

13  clergy was also a member of the collective.

14          MR. CANTWELL:  Could we unpublish my screen from the

15  jury so I can post something else up?

16          Thank you.

17  BY MR. CANTWELL:

18  Q    You spoke to Tim Heaphy when he was conducting his

19  investigation of the events in dispute here, right?

20  A    I recall speaking to Tim Heaphy one time.

21  Q    Okay.  And do you remember what you were speaking to Tim

22  Heaphy about?

23  A    Yes.  As I recall, in the time I did give him, we spoke

24  about events leading up to and through July 8th of 2017 and

25  maybe a little bit beyond.  He wanted to meet with me further,

S. Wispelwey - Cross

1    but I declined.

2    Q     Did you talk to Tim Heaphy about the differences between

3    the clergy collective and Congregate C'ville?

4    A     I don't fully recall.

5    Q     Tell me about the term "C'villeity."

6    A     If we're talking about a play on Charlottesville's

7    abbreviation, which is C'ville, with I-T-Y ended to it, that

8    was -- my recollection is hazy, but a drive or maybe a branding

9    exercise.  I don't really recall what "C'villeity" referred to,

10   but the term is something I recall.

11   Q     Wasn't it true that the reason you founded Congregate

12   C'ville was because you thought that C'villeity was a problem?

13   A     We founded Congregate C'ville for two reasons.

14         One was a lot of people of faith and conscience in the

15   area were supremely troubled by the continuous inbreaking of

16   white supremacist threats and threats of violence and wanted a

17   way to show up in love and support.

18         And the second was because friends and colleagues I hold

19   very near and dear who are black, Jewish, and more were asking

20   for support and solidarity from their colleagues, that this is

21   not a time to be neutral, but to show up in the name of the

22   love we profess.

23         So Congregate had a nice kind of one-two punch purpose for

24   existing.  Me and my colleagues felt like we could try to

25   bridge that gap.

S. Wispelwey - Cross

1   Q    It was time to stop being civil with the racists, right?

2   A    That's not a phrase or sentiment that was any part of our

3   mission statement.

4   Q    That's not what C'villeity is all about?

5   A    I'm not sure what we're talking about with C'villeity.

6   Q    And did you attend the Klan rally on -- I think it was

7   July 8th?

8   A    I did.

9          MS. KAPLAN:  Beyond the scope, Your Honor.

10          THE COURT:  Go ahead.

11          THE WITNESS:  Yes, I did.

12   BY MR. CANTWELL:

13   Q    And how did that work out?

14   A    I'm not sure what's being meant by "work out."

15   Q    That was sort of a preview for the August 12th events,

16   wasn't it?

17   A    I'm not sure.  A preview for whom?

18   Q    Isn't it true that 23 people got arrested at the July 8th

19   Klan rally?

20   A    I know there were some arrests.  I don't know the number.

21   Q    Do you know if -- did the police deploy tear gas?

22   A    They deployed some kind of chemical agent.  I don't know

23   if it was tear gas, but yes, they did.

24   Q    Do you know the police said they were under attack from

25   the protesters?

S. Wispelwey - Cross

1    A     I don't recall hearing that.

2    Q     Do you know if many of the people who attended August 12th

3    had also been at the July 8th Klan rally?

4    A     I have no way of knowing.  I know a few clergy members

5    because we were together on both days.

6    Q     Did you tell Mr. Heaphy that you felt it was important to

7    confront the Klan and their hateful speech?

8              MS. KAPLAN:  Objection, Your Honor.  This is the

9    subject of a motion in limine.

10             MR. CANTWELL:  I'm not trying to introduce --

11             THE COURT:  Anything he said, he can ask him about.

12   Anything that he said.

13             THE WITNESS:  I'm sorry.  Can you repeat the

14   question?

15   BY MR. CANTWELL:

16   Q     Did you tell Mr. Heaphy that you thought it was -- you

17   felt strongly that you had to confront the Klan and their

18   hateful speech?

19   A     I don't recall what I said to Mr. Heaphy.

20   Q     Is that your sentiment?  Do you feel that way?

21   A     Feel what way?

22   Q     That you have to confront hateful speech?

23   A     I mean, there's a context and a time for everything.  I

24   feel called to show up in the name of love when people are in

25   fear and feeling under attack, certainly my friends and

S. Wispelwey - Cross

1   colleagues.

2   Q    At the July 8th event, did you tell Tim Heaphy that you

3   were concerned about the lack of, quote, "nonviolence and

4   deescalation training"?

5   A    I don't recall sharing the sentiment with him.

6   Q    Have you engaged in nonviolence training?

7   A    Yes.

8   Q    Okay.  Have you given these training workshops?

9   A    Yes.

10  Q    And I understand that it seems to be implied by the name,

11  but what's the purpose of nonviolence training?

12  A    Nonviolence training can encapsulate a whole wide array of

13  different methodologies for telling one's story in public; but

14  first of all, it helps to know what folks' commitments are and

15  then to say, out of the spirit we feel led by, we will show

16  ourselves and do our part nonviolently.

17  Q    And you've expressed that you are totally committed to

18  nonviolence; that's right?

19  A    Yes.

20  Q    And what about if the people who are on the same side as

21  you are not so committed to nonviolence?  Then what?

22           MS. KAPLAN:  Objection, Your Honor.

23           THE COURT:  Sustained.  Vague question.

24           MR. CANTWELL:  If I could understand what was just

25  sustained, I'll try to avoid repeating the mistake.

S. Wispelwey - Cross

1          THE COURT:  Well, the question is just so vague it's

2    not -- it's loose.

3     BY MR. CANTWELL:

4    Q    When was the first time you heard the phrase "diversity of

5    tactics"?

6    A    I'm not sure.  Sometime within the past few years, I've

7    become aware of the term.

8    Q    And what does that mean, "diversity of tactics"?

9    A    To me -- and this is really only my definition -- a

10   diversity of tactics, yes, I understand and divine that as a

11   grassroots organizer, which is the majority of what my career

12   has been, which is that tactics are the methodologies with

13   which we pursue goals.

14       So a lot of my career is focused on advocacy for bills for

15   poor and hungry people.  Different tactics for accomplishing

16   that are writing a letter to your member of Congress, calling

17   them, maybe publishing an op-ed in the paper.

18       It really, I guess, depends on the context, but my

19   definition of it is that it's exactly what it sounds like, I

20   guess.  It's different ways of achieving similar goals.

21   Q    Different ways of achieving different goals.  And it

22   depends on the context.

23       What about in the Antifa context?  What does "diversity of

24   tactics" mean when we're talking about Antifa?

25            MS. KAPLAN:  Objection, Your Honor.  Given his

S. Wispelwey - Cross

 1  testimony about Antifa, he can't possibly answer that question.

 2          THE COURT:  Well, let him speak for himself.

 3          Can you answer it or not?

 4          THE WITNESS:  I'm not sure what "the Antifa context"

 5  means.

 6   BY MR. CANTWELL:

 7  Q    On August 11th, did your church conduct nonviolent direct

 8  action training?

 9  A    So I wasn't pastor of a church on August 11th, number one.

10  And then, number two, we did an orientation training for those

11  guests of ours who had come from around the country in the

12  afternoon at St. Paul's.

13  Q    St. Paul's would have been the place that hosted an

14  interfaith sermon featuring Cornel West, right?

15  A    St. Paul's is the church where we had our big mass prayer

16  meeting that night.  Dr. West was one of the featured speakers,

17  but not the featured preacher.

18  Q    Somebody wrote an article describing a meeting with a

19  local radical minister deeply involved with the struggle in

20  C'ville.  Does that sound like you?

21  A    The person who wrote the article or the person they're

22  talking about?

23  Q    The person they're talking about.

24  A    Can you read the description again?  I'd have to see what

25  we're referring to.

S. Wispelwey - Cross

1  Q    "We were able to meet with a local radical minister deeply

2  involved with the struggle in C'ville and discussed the

3  church's worries, plans, and needs for the upcoming troubles.

4  The good Reverend shared with us that he had personally been

5  doxed and the church had received multiple threats and white

6  nationalists were attempting infiltration."

7       Does that sound like you?

8  A    I had not been doxed, or was not doxed up until that

9  point.  And I'm not sure who the "we" is that we're talking

10  about, or any infiltration of the church.

11  Q    Do you know of a website called itsgoingdown.org?

12  A    I've heard of it, yes.

13  Q    You've heard of it?

14  A    Yes.

15  Q    Do you follow itsgoingdown.org on Twitter?

16  A    I believe so, yes.

17  Q    Have you ever interacted with itsgoingdown.org on Twitter?

18  A    Not that I recall, but it's possible.

19  Q    Have you created a sermon based on an itsgoingdown.org

20  blog post?

21  A    I really can't say.  I don't know.

22  Q    Maybe I could refresh your memory.  Let's see here.

23       Does that refresh your memory, Mr. Wispelwey?

24  A    This looks like a tweet I wrote.

25            MS. KAPLAN:  Objection, Your Honor.  The --

S. Wispelwey - Cross

1          MR. CANTWELL:  This is not -- I'm not putting this

2     into evidence.  I'm just trying to refresh the witness.

3          MS. KAPLAN:  The foundation for the question is about

4     a sermon.  I don't understand what Mr. Cantwell is talking

5     about.

6          THE COURT:  Well, he's asking --

7          MR. CANTWELL:  The source is itsgoingdown.org.

8          THE COURT:  All right.  If -- he's showing it to

9     refresh his recollection, so it doesn't have to come into

10    evidence.  It doesn't have to be admissible.

11     BY MR. CANTWELL:

12    Q     So have you ever formed a sermon based on a blog post from

13    itsgoingdown.org?

14    A     No, I don't believe so.

15    Q     Can you try to explain what I'm looking at here?

16          MS. KAPLAN:  Objection.

17          THE COURT:  He said it's his tweet, so...

18          THE WITNESS:  Sure.  This looks like I am sharing on

19    Twitter an article I read -- an article, and that I've taken a

20    quote out of the piece and said that "this is today's sermon."

21    So my best guess is that I'm saying that the quote I've pulled

22    out is, like, today's nugget of truth or something.

23    BY MR. CANTWELL:

24    Q     Okay.  So -- I understand that.

25          MR. CANTWELL:  This is CCWS001.  We just talked about

S. Wispelwey - Cross

1    this at sidebar.  I'd like to publish it.  I'd like to move it

2    into evidence, publish it, and show it to the jury.

3             MS. KAPLAN:  No objection, Your Honor.

4             THE COURT:  You may admit it.

5             (Defendant Cantwell Exhibit 001 marked.)

6             (Defendant Cantwell Exhibit 001 admitted.)

7    BY MR. CANTWELL:

8    Q    Can you read that for us, Seth?

9    A    Sure.  This looks like a tweet reply of mine to several

10   other accounts, but what I say is, "A quote-unquote diversity

11   of tactics, well organized and committed to, quote-unquote,

12   unified outcomes is always welcome.  Hopefully most of those

13   not down with the TA strike are using their energies to

14   leverage any and all power and influence towards the same end."

15   Q    And that was aimed at Jalane Schmidt, right?

16   A    It appears she is one of the three accounts I'm responding

17   to, yes.

18   Q    Can you please describe your relationship with Jalane

19   Schmidt?

20   A    Jalane is someone who is a good friend of mine.

21   Q    Do you know Jalane to go by "Jalane Smash the Fash

22   Schmidt"?

23   A    I may have seen that on Twitter online somewhere sometime.

24   Q    Now I'm showing you CCWS002.  I'd like to add this to

25   evidence and publish it to the jury.

114

                          S. Wispelwey - Cross

1              THE COURT:  No objection, it will be admitted.

2              (Defendant Cantwell Exhibit 002 marked.)

3              (Defendant Cantwell Exhibit 002 admitted.)

4   BY MR. CANTWELL:

5   Q    This is another tweet of yours.  Can you read your portion

6   of this to me, Seth?

7   A    Sure.  In this tweet I'm quote-tweeting another one, and I

8   say, "We must all be gravely concerned and alert to the fact

9   that Democrats are not leading us out of this or protecting us

10  from it.  Antifascism is community defense.  We keep us safe.

11  When Democratic leadership decides to do that, then we can

12  talk.  Pass it on."

13  Q    And who is it you're quote-tweeting, Seth?

14  A    This is a Twitter account @socialistdogmom.

15  Q    And what is socialistdogmom portraying herself as today in

16  this tweet?

17             MS. KAPLAN:  Your Honor, I'm sorry, is the question

18  about the tweet or is it about today?

19  BY MR. CANTWELL:

20  Q    In this tweet, I know that socialistdogmom is the @ sign.

21  But what is socialistdogmom styled as in this tweet, Seth?

22  A    You're referring to the profile name?

23  Q    Yeah, what's the profile name, Seth?

24  A    "Molly Conger, communist degenerate."

25  Q    And you know Molly Conger, right?

S. Wispelwey - Cross

1   A     I know who that is.

2   Q     When did you meet Molly Conger?

3   A     I don't recall when I first met her.  I've crossed paths

4   with her a few times.

5   Q     Before or after August 12th?

6   A     It would have been after.

7   Q     And do you know Molly Conger to be Antifa?

8   A     No.

9   Q     Just a communist degenerate?

10  A     I don't know.  This is the chosen handle.

11  Q     Okay.  What is community defense, Seth?

12  A     Community defense is a term I've also kind of learned in

13  the past four years plus.  I think it encapsulates a lot of

14  things.  To me, it means a lot.  When you're community feels

15  under attack, threatened, community defense looks like a lot of

16  things.  To me, it looked like showing up in prayer and song

17  and solidarity, providing refreshments in the streets.  This is

18  a way to defend the life of our community.

19       It can mean providing first aid or being a legal observer

20  if we're talking about rallies and protests.  But, you know, it

21  means -- it can actually mean so many beautiful rich things, is

22  how I've come to understand it.  Like advocating for livable

23  wages or affordable housing.  That's how I hear it talked about

24  a lot here in Charlottesville.

25  Q     So community defense is similar to diversity of tactics,

116

S. Wispelwey - Cross

1  then, right?

2  A    Yeah, I think it depends a lot on the context.

3  Q    Okay.  Well, let's talk about the context then.  So if we

4  could go back to the Slate piece.  This is already in evidence.

5  If we could publish my screen.

6      This is CCEX052.  So right after we get done with you

7  saying the body count could have been much worse, as hard as

8  that is to believe, you say, "Thankfully, we had robust

9  community defense standing up to white supremacist violence

10 this past weekend.  Incredibly brave students held space at the

11 University of Virginia and stared down a torch-lit mob that

12 vastly outnumbered them on Friday night.  On Saturday,

13 battalions of anti-fascist protesters came together on my

14 city's streets to thwart the tide of men carrying weapons,

15 shields and Trump flags and sporting MAGA hats and Hitler

16 salutes and waving Nazi flags and the pro-slavery stars and

17 bars."

18     Battalions of Antifa, right?

19 A    Battalions of anti-fascist protesters.

20 Q    Is there a difference between anti-fascist protesters and

21 Antifa?

22 A    To me, you know, this was four-plus years ago, "Antifa"

23 was just a catchall term for counter-protesters.  I didn't know

24 "anti-fascist" is more of a unifying definable term for what

25 protesters may have been against.

117

S. Wispelwey - Cross

1    Q    But in 2019 you did not say Jesus is anti-fascist, did

2    you?

3    A    It's possible I did.

4    Q    You said Jesus is Antifa, right?

5    A    I tweeted that, yeah.

6    Q    "Out of my faith calling," you say, "I feel led to pursue

7    disciplined, nonviolent direct action and witness.  I helped

8    lead a group of clergy who were trained and committed to the

9    same work:  To hold space on the front line of the park where

10   the rally was to be held.  And some of us tried to take the

11   steps to one of the entrances.  God is not okay with white

12   supremacy, and God is on the side of all those it tries to

13   dehumanize.  We feel a responsibility to visibly, bodily show

14   our solidarity with the oppressed and the marginalized."

15        Is that what you wrote to Slate magazine?

16   A    It is.

17   Q    What do you mean, to bodily show your solidarity?

18   A    To show up in person.  And I'd compare that against the

19   faith leaders in Charlottesville who thought having prayer

20   meetings miles away was somehow a response that was going to

21   have a similar effect.

22   Q    Okay.  Now we're getting somewhere.  Is that the split

23   between Congregate and Clergy Collective?

24   A    I'm not sure what is meant by "the split."

25   Q    "A phalanx of neo-Nazis shoved right through our human

S. Wispelwey - Cross

1   wall," right?

2   A    Yes.  I wrote that.  If that's the question.

3   Q    So you formed a wall.  The goal was to block the path,

4   right?

5   A    The goal was not to block the path.  That was not an

6   entrance to the park.

7   Q    That was not an entrance that you were blocking?

8   A    It was not possible unless someone climbed over the

9   four-foot barriers to get into the rally area on the southeast

10  side, that I could see.

11  Q    All right.  Let's check on that.  I'm talking about when

12  you were blocking the entrance to the park, not when you were

13  out in the street.  You know what I'm talking about, right?

14  What Mr. Jones was showing you, you were circling, that's not

15  an entrance to the park?

16  A    It's an entrance to the park in total.  It's not an

17  entrance to the rally area.  It was not possible to enter the

18  Unite the Right area.  There were metal barriers on the

19  southeast side.

20  Q    My question was you were blocking the entrance to the

21  park, right?

22  A    Yes.

23  Q    Okay.  And so the answer to that question is yes, isn't

24  it?

25          MS. KAPLAN:  Objection.

S. Wispelwey - Cross

1           THE COURT:  Answer the question.

2           THE WITNESS:  So I could say that our bodies were

3   blocking several of the steps, but I don't think we were

4   blocking the park entrance.

5    BY MR. CANTWELL:

6   Q    Okay.  I guess we'll have to pull this up and go through

7   it, then.  If we could unpublish my screen while I pull this

8   up.

9       (Video playing.)

10      Now, you said before they -- well, we'll get to that.

11   Plaintiffs' Exhibit 3234 is what I've got up here.  If I recall

12   correctly, there's a portion of this is in evidence, but not

13   the whole thing.  I'd like to admit from 5:31 until 8 minutes.

14   Any objection?

15           THE COURT:  Go ahead.

16           MR. CANTWELL:  So if we could admit that to evidence

17   and publish my screen and show it to the jury and we'll go

18   through this with Mr. Wispelwey.

19           (Plaintiff Exhibit 3234 marked.)

20           (Plaintiff Exhibit 3234 admitted.)

21           (Video playing.)

22    BY MR. CANTWELL:

23   Q    So you guys, you're not blocking the entrance to the park,

24   is that your testimony today?

25   A    I think our bodies are blocking a entrance to the wider

S. Wispelwey - Cross

1    park.  My testimony earlier was I think related to whether I

2    was blocking an entrance to the rally.

3    Q    Are you blocking the park in this video, Mr. Wispelwey?

4    A    I'm one of several clergy and folks standing with our arms

5    linked at the top of the steps.

6    Q    You're bodily confronting the people whose political

7    opinions you don't like, right?

8    A    We're doing several things.  We link arms for our own

9    protection and vulnerability, and also trying to create a

10   powerful visual symbol that shows people that people of faith

11   stand with them.

12   Q    I'm sorry, did you say you link arms for your own

13   protection and vulnerability?

14   A    Yes.

15   Q    Those would seem to me to be contradictory terms.  Could

16   you explain to me?

17   A    Yeah, it came out a little awkward, but together, you

18   know, linking arms, you can stay connected to -- when a lot is

19   going on, practically, because bodily we are vulnerable

20   individually.

21   Q    And so, when you link arms you block the path of people

22   who are trying to go through, right?

23   A    If someone was going to try to walk through where we were

24   linked arms, and those arms weren't unlinked, technically that

25   would be a blockage until it was sorted out.

S. Wispelwey - Cross

1  Q    Okay.  Let's watch this get sorted out, shall we?

2       (Video playing.)

3       Is this what you described as "a phalanx of neo-Nazis

4  shoved right through our human wall"?

5  A    I believe that's what I was referring to, yes.

6  Q    Yeah.  So I was listening there, and I missed the

7  screaming and the spitting of homophobic slurs and obscenities.

8  Did you catch those?

9  A    Where are you referring to?

10 Q    "A phalanx of neo-Nazis shoved right through our human

11 wall with 3-foot-wide wooden shields, screaming and spitting

12 homophobic slurs and obscenities at us."

13      Is that what you told Slate?

14 A    Yes.

15 Q    Did I miss something?

16          MS. KAPLAN:  Not a question, Your Honor.

17          THE COURT:  Sustained.

18 BY MR. CANTWELL:

19 Q    If I go back and play that video again, do you think we'll

20 hear the homophobic slurs and the screaming?

21 A    Yes.  I thought I heard what I testified to earlier in

22 there when we just watched it.  I heard the "move the fuck

23 aside, clergy."  That video angle doesn't show the man who was

24 standing over me, who shoved and was also cursing me.

25 Q    So somewhere out of the video frame you're saying that in

S. Wispelwey - Cross

1   this moment that we just watched, in another angle of video,

2   there's a man standing over you?

3   A    I don't know about any other angle of video that exists.

4   Q    Let's give this another look, shall we?

5        (Video playing.)

6        So I think it's fair to say that some people said some not

7   nice things as they walked past you guys; right?

8   A    I think that's fair to say.

9   Q    But once you got out of the way, nobody hit yous, did

10  they?

11  A    No.  Once they bashed through my colleagues with the

12  shields and pushed them to the side, our group pulled back and

13  made way for them.

14  Q    And it seemed to me that they sort of like moved their

15  wall in one way, almost like a door opening; is that right?

16  A    Yeah, I believe someone had said "let them pass."

17  Q    And once you let them pass, problem solved, right?

18            MS. KAPLAN:  Objection, Your Honor.

19            THE WITNESS:  I'm not sure what problem we're

20  referring to.

21  BY MR. CANTWELL:

22  Q    The problem created by you blocking the entrance to the

23  park.

24  A    You mean their assault on us?  If that was a problem, then

25  yeah, assaulting us completed their objective.

123

S. Wispelwey - Cross

1   Q    And just so -- we don't actually see an assault in that

2   video, do we?

3   A    I see the incident as I know it occurred from an angle,

4   but I've seen it several other ways.

5   Q    Okay.  And we don't have another angle of video, though,

6   right, to the best of your knowledge?

7   A    They took my phone.

8   Q    They took your phone?  Who took your phone?

9   A    I don't have another video here in court.

10  Q    I'm sorry, you have another video somewhere else?

11  A    No.

12  Q    So what do you mean?  What is this about a phone?

13  A    It was an awkward way of saying I don't have another

14  video.

15  Q    All right.  We can take this down from the screen.

16       "The white supremacists did not blink at violently plowing

17  right through clergy, all of us dressed in full clerical garb.

18  White supremacy is violence.  I didn't see any racial justice

19  protesters with weapons."

20       Is that still true, Mr. Wispelwey?

21  A    Yes.  In my experience of that day, I did not see

22  counter-protesters with weapons.

23  Q    "As for Antifa, anything they brought I would only

24  categorize as community defense tools and nothing more."

25       What does that mean?

S. Wispelwey - Cross

1    A     Which part?

2    Q     Yeah, let's just read the full sentence back.  "White

3    supremacy is violence."  Period, new sentence.  "I didn't see

4    any racial justice protesters with weapons; as for Antifa,

5    anything they brought I would only categorize as community

6    defense tools and nothing more."

7         What are community defense tools in the Antifa hands in

8    the context of this paragraph, Reverend Wispelwey?

9    A     Sure.  So as I testified earlier, the context of this

10   paragraph is working with my limited understanding of the

11   meaning of the word "Antifa," again, as a catchall for

12   protesters.  What I directly witnessed and experienced that day

13   in terms of the group of counter-protesters I'm referring to

14   was seeing a large column of men come up Market Street, charge

15   right into that --

16              MR. JONES:  Objection.  Nonresponsive.

17              THE COURT:  Who's objecting?

18              MR. JONES:  The question was what are community

19   defense tools.

20              MR. CANTWELL:  I'd just as soon let the witness

21   answer, personally.

22              THE COURT:  Let's go back to what the question was:

23   What are community defense tools?

24    BY MR. CANTWELL:

25   Q     In the context of this paragraph, Reverend --

S. Wispelwey - Cross

1          THE COURT:  Let him answer that question.  What are

2     community defense tools?

3          THE WITNESS:  Sure.  So as I was saying, in the

4     context of this paragraph, community defense tools are whatever

5     these other counter-protesters may have brought with them that

6     day.  What they may have brought, I don't know, because I

7     didn't see.  Once they were attacked, our group pulled back.

8          THE COURT:  Well, you say "I would only categorize as

9     community defense tools."  Can you say what you're categorizing

10    as community defense tools?

11         THE WITNESS:  Yeah.  Hypothetically what they may

12    have brought.  I really didn't know.

13    BY MR. CANTWELL:

14    Q    Are flagpoles community defense tools?

15    A    I don't -- not to me, no.

16    Q    Is pepper spray a community defense tool?

17    A    Not to me, no.

18    Q    Reverend Wispelwey, the sentence says, "I didn't see any

19    racial justice protesters with weapons; as for Antifa, anything

20    they brought I would only categorize as community defense tools

21    and nothing more."

22         Isn't it true, sir, that in this sentence you are

23    acknowledging that Antifa has weapons and you're justifying

24    their use of those weapons based on the reason that they're

25    using them?

S. Wispelwey - Cross

1  A    I don't see myself saying anyone had weapons.

2  Q    You don't see racial justice protesters with weapons, but

3  Antifa, they've got community defense tools, and that's just

4  whatever they happened to be having hypothetically, you don't

5  remember, right?

6  A    Yeah, by writing "anything they brought I would only

7  categorize," because at the time there was this roiling debate

8  about, quote unquote, both sides.  And what I directly saw and

9  experienced was the white supremacists attack, these other

10 counter-protesters then pulled back.  So I'm speaking

11 hypothetically to something I don't really know.

12 Q    What is a battalion?

13 A    A battalion is a group usually -- a group of people in

14 formation, in my understanding.  It's usually a military term.

15 Q    It's a military term, right?  The key operative word is

16 "battle," right?

17 A    I don't know that that's the case, or what the etymology

18 is.

19 Q    So battalions of Antifa with community defense tools saved

20 your life from violence.  Is that what you told Slate magazine?

21 A    I believe that's a good summation of what I felt to be

22 true at the time, yes.

23 Q    And community defense and diversity of tactics are

24 basically the same thing, right?

25 A    No.

S. Wispelwey - Cross

1  Q    I apologize.

2         MS. KAPLAN:  Your Honor, we're really getting into

3  asked and answered here.

4         THE COURT:  Sustained.

5         MR. CANTWELL:  Okay.  If we could unpublish my

6  screen.

7   BY MR. CANTWELL:

8  Q    Do you remember somebody offering to assist with the

9  physical security of the church on the evening of August 11th?

10  A    No.  I -- well, yes, I believe a colleague may have

11  approached -- been approached by law enforcement.

12  Q    Do you remember anybody who was decidedly not law

13  enforcement offering to assist with the security of the church

14  on the evening of August 11th?

15  A    I do not.

16  Q    On the evening of August 11th you never said, "Sure, we

17  could use an extra set of hands but we recognize and appreciate

18  the diversity of tactics.  Perhaps what is just as important is

19  that the Nazi torchlight march is opposed and disrupted"?

20  A    I don't recall saying that, let alone to who.

21  Q    I'm showing you CCWS004 which I'd like to move into

22  evidence and publish to the jury.

23         MS. KAPLAN:  No objection, Your Honor.

24         THE COURT:  Did you say no objection?

25         MS. KAPLAN:  Yes, Your Honor.

S. Wispelwey - Cross

1          THE COURT:  Okay.  It's admitted.  Go ahead.

2          (Defendant Cantwell Exhibit 004 marked.)

3          (Defendant Cantwell Exhibit 004 admitted.)

4    BY MR. CANTWELL:

5    Q    And so here, somebody says Antifa is a terrorist

6    organization, and you reply to say that Jesus is Antifa, right?

7          THE COURT:  What date is this?

8          MR. CANTWELL:  This is after the events.  This is in

9    2019.

10         THE COURT:  How far after the events?

11         MR. CANTWELL:  It's 2019.

12         MS. KAPLAN:  Two summers from the event, Your Honor.

13   BY MR. CANTWELL:

14   Q    Right?

15   A    Yes, this looks like an exchange from 2019 in July.

16   Q    And at the bottom, what do you say on July 19th, 2019?

17   A    This is the last tweet?

18   Q    Yeah, what's the bottom there?  Antifa isn't a group.

19   A    I'm responding to a commenter underneath this initial post

20   saying "Antifa isn't a group, bot.  And even if it was, nothing

21   wrong with making fascists afraid."

22   Q    Nothing wrong with making fascists afraid in the way that

23   Antifa does, right?

24   A    I don't know what Antifa does.

25   Q    Of course you don't.  Okay.

S. Wispelwey - Cross

1        MS. KAPLAN:  Objection to the commentary, Your Honor.

2        THE COURT:  Sustained.

3        MS. KAPLAN:  Move to strike, Your Honor.

4        THE COURT:  Be stricken.

5        MR. CANTWELL:  This is CCWS006 which I'd like to move

6  into evidence and publish to the jury.

7        THE COURT:  All right.  Be admitted.

8           (Defendant Cantwell Exhibit 006 marked.)

9           (Defendant Cantwell Exhibit 006 admitted.)

10  BY MR. CANTWELL:

11  Q    Can you read that to us, Seth?

12  A    "White comfort, and therefore white supremacy, maintains

13  so much equity thanks to the self-serving quote unquote grace

14  we give each other for being quote unquote well-meaning."

15        And this is a tweet that it appears that I wrote.

16  Q    Yeah.  And are you saying here that white comfort is white

17  supremacy?

18  A    What I think I'm saying is that white comfort is a piece

19  of what adds to white supremacy.

20  Q    And white supremacy is terrorism, right?

21  A    I think the enacting of white supremacists' ideologies and

22  policies creates a lot of fear and terror for a lot of folks

23  who are subjected to them, yes.

24  Q    So white comfort is white supremacy and white supremacy is

25  terrorism?

S. Wispelwey - Cross

1           MS. KAPLAN:  That's not what he said, Your Honor.

2           MR. CANTWELL:  Let's move on.

3           MS. KAPLAN:  Motion to strike.

4           THE COURT:  Okay.  Well, you can answer the question.

5   BY MR. CANTWELL:

6   Q    Is that how you feel?  White comfort is white supremacy,

7   white supremacy is terrorism?

8   A    These are complicated and complex topics.  I don't know if

9   we're talking about the tweet anymore but --

10          THE COURT:  If you can't answer the question, it's

11  all right to say you don't know.

12          MR. CANTWELL:  We'll move on.

13          This is CCWS008.  It's already published.  I want to

14  move this into evidence and we'll show it to the jury.

15          THE COURT:  All right.  It will be admitted.

16          (Defendant Cantwell Exhibit 008 marked.)

17          (Defendant Cantwell Exhibit 008 admitted.)

18  BY MR. CANTWELL:

19  Q    So in this tweet someone who calls himself Turner says,

20  "Okay, because hate speech shouldn't even be a thing."  And

21  then what do you say to them, Seth?

22          MS. KAPLAN:  Would you call him Reverend Wispelwey.

23   BY MR. CANTWELL:

24  Q    I'm sorry.  Reverend Wispelwey, what do you say to Turner

25  about hate speech?

S. Wispelwey - Cross

1   A     In this response -- I'm not aware of the entire exchange

2   that was going on because it seems to be part way through.  My

3   reply is, "Take it up with your private corporation and their

4   policies you're using.  In other news, hate speech leads to

5   physical violence, and some upcoming cases are going to set a

6   good new precedent on that.  XO."

7   Q     You're talking about this litigation, aren't you, Seth --

8   Mr. -- Seth -- Reverend Wispelwey, I'm sorry.

9   A     I don't recall what cases, plural, I was referring to.

10  Q     You believe that hate speech leads to violence, right?

11  A     I believe hate speech has the ability to lead to physical

12  violence against those whom it targets.

13        I believe when the divine image, the belovedness of each

14  individual, is denigrated, it can start to sow seeds of

15  permission to see other human beings as less than human.  When

16  people do that, it leads them to believe they can hurt that

17  person, more than likely.

18  Q     And I think that you described this as an existential

19  threat, right?

20  A     I'm not sure what "this" is.

21  Q     During your direct testimony, did you describe the Unite

22  the Right rally as an existential threat?

23  A     As I recall, when testifying about "existential threat," I

24  was referring to my reasons for forming Congregate and

25  providing a physical presence out in the community; that dear

132

S. Wispelwey - Cross

1   friends and colleagues of mine who are Jewish, queer, black,

2   Muslim, and more saw the planned rally and the plans for

3   violence as an existential threat to their well-being and

4   safety within the community as targeted groups.

5   Q    And what did you know about a plan for violence?

6   A    I knew that violence was being discussed and planned for

7   Unite the Right due to a presentation that was made to the

8   Charlottesville City Council sometime that summer by some

9   community members.

10  Q    Do you know who gave that presentation?

11  A    I don't.

12         THE COURT:  All right.  We'll stop here for one hour

13  for lunch.

14         Members of the jury, during the recess do not discuss

15  the case with anyone.  Do not allow anyone discuss it with you.

16  Do not remain within the hearing of anyone discussing it.

17         All right.  You may recess.

18  **(Jury out, 12:30 p.m.**)

19         (Recess.)

20         THE COURT:  I understand counsel had something they

21  want to bring up before.

22         MR. MILLS:  Yes, Your Honor.  This is David Mills for

23  the plaintiffs.

24         We're planning on doing a presentation of evidence

25  related to Mr. Fields tomorrow.  We provided it all to defense

S. Wispelwey - Cross

1  counsel yesterday and I've been working with Mr. Campbell,

2  counsel for Mr. Fields, on the presentation.  He had a couple

3  of things he wanted to object to.

4        We worked out everything except two quick issues and

5  we need the Court to rule on them, if I could just describe

6  those and we can get your ruling and we'll be ready to go for

7  tomorrow and make it efficient.

8        THE COURT:  Okay.  Do we have to do it right now?

9  Can you tell me what they are?

10       MR. MILLS:  Yes.  Very quick, there's two categories.

11  They're very simple.

12       One of them is two photographs that were taken in

13  James Fields's bedroom.  That was the way it was when he left

14  to come to the Unite the Right.  It shows a large amount of

15  Adolf Hitler and Nazi paraphernalia.  We think that's highly

16  relevant and probative in this case, not just to show that he's

17  a racist, but that he adheres to the same beliefs as many of

18  the defendants in this case.  And it shows a propensity to

19  violence.  And I think that's incredibly important in this

20  case.

21       The second category is two jail calls.  We narrowed

22  it down to just two.  One of them, he calls Heather Heyer and

23  sort of a -- calls her a communist and says that she's part of

24  "the enemy," which I think is very important to show what his

25  motivation -- again, not just that he drove into a crowd for

S. Wispelwey - Cross

1   racial animus, but that he was part of this same belief system

2   about attacking the enemy at the Unite the Right.  And the

3   other is a jail call where he says there should be a whites

4   only nation and that it should be a dictatorship and Richard

5   Spencer should be the head of it.

6        MR. CAMPBELL:  Yeah, Judge, I agree that we have had

7   fruitful negotiations and narrowed the issues that we have in

8   dispute.  There was -- the plaintiffs conceded and took some

9   exhibits out that I was just worried were cumulative or

10  duplicative, or objected on that basis.

11       As to these two issues that we were unable to reach

12  agreement, Your Honor, they are two photographs of Fields's

13  bedroom, basically, that show a picture of Adolf Hitler and a

14  flag in his bedroom.  Judge, those are cumulative.  They are

15  prejudicial.  They are not probative.  There are going to be 30

16  tweets admitted into evidence, following the narrowing-down of

17  cumulative tweets, to more than demonstrate to the jury that

18  Mr. Fields was certainly a fan of Adolf Hitler, had the

19  14 Words listed in multiple tweets, and --

20       THE COURT:  All right.  Well, I think they're

21  admissible, given all the evidence we have had.

22       MR. MILLS:  Thank you, Your Honor.

23       MR. CAMPBELL:  And then the other issue, Judge, were

24  two jailhouse phone calls.  So these are recorded.  Clearly

25  they're after the events of August 12, and they're Mr. Fields

S. Wispelwey - Cross

1  speaking with his mother.  They are completely tangential, in

2  my mind, and incredibly prejudicial.

3       Heather Heyer is not a plaintiff in this case, Your

4  Honor.  There is a case where her estate is suing Mr. Fields.

5  The only purpose is just to poison the jury even further,

6  wherein -- in one of the calls he basically refers to her in

7  derogatory terms, and that doesn't add anything to the case.

8  Your Honor, as the Court knows, we're going to enter -- or I

9  believe plaintiffs, in the list of documents provided to me,

10 include the sentencing against Fields.  They include the

11 initial charges.  We're going to have the plea agreement, and

12 the sentencing is not on the list.  I believe it's the initial

13 complaint, the plea agreement.

14      And so, Judge, the jury is going to have evidence

15 that Fields admitted he committed these acts intentionally.  I

16 think we will hopefully get the sentencing in and that sort of

17 thing, Judge.  So just to have him calling Heather Heyer, who

18 is not a party to this case, a bad name, referring to her in a

19 derogatory manner, doesn't add anything to this case, Judge.

20 It's prejudicial and it doesn't any probative value.  The other

21 call, basically all it is is he says Mr. Spencer should be the

22 president.  This is after the events of August 12th.

23      There's plenty of other exhibits that are going to

24 come in pursuant to the discussions that indicate that he

25 tweeted at Mr. Spencer; not that he ever received any sort of

S. Wispelwey - Cross

1  reply, but that he was obviously a big fan.  So, again, Judge,

2  that --

3          THE COURT:  Okay.  Well, I think they're admissible.

4  Similar evidence has been admitted to all the other defendants.

5  I think it's all admissible.

6          MR. MILLS:  Thank you, Your Honor.

7          MR. SPENCER:  Your Honor, can I --

8          THE COURT:  Did you introduce the tennis shoes?

9          MR. MILLS:  Yes, sir.

10         THE COURT:  At the end of the trial, could we

11  substitute a photograph of those?

12         MR. MILLS:  Absolutely.

13         THE COURT:  Thank you.

14         MR. SPENCER:  Your Honor, may I add something to this

15  discussion?

16         THE COURT:  Yes.

17         MR. SPENCER:  As I have expressed earlier, I often

18  just simply need a little bit of a nudge, as it were, in terms

19  of looking at the evidence.  I have all the evidence on hard

20  drives that are labeled.

21         The plaintiffs seem to be having discussions with

22  Mr. Cantwell, which seems completely appropriate, just about

23  what's being filed.

24         If I could just ask you, when you're doing something

25  that directly affects me like this and I might object to it, if

S. Wispelwey - Cross

1   you could simply help me out a little built as a *pro se* client

2   and just give me a little bit of extra help, that would be

3   helpful.  I mean, I know it's not required, but if it's

4   something that I might object to, like these claims that he's

5   made, if it's something I might object to, it's just a lot

6   easier if we can work together.  So I'm always open to any

7   discussion with you.

8              MR. MILLS:  Absolutely, Your Honor.  In fact, we did

9   provide all this by email to counsel and defendants in advance.

10  But I take the point that Mr. Spencer is making, and we

11  absolutely will do that.

12             THE COURT:  If you could do that, that would be good.

13             MR. MILLS:  Absolutely.

14             THE COURT:  Call the jury back, please.

15  **(Jury in, 1:40 p.m.)**

16             THE COURT:  You may be seated and you may resume.

17   BY MR. CANTWELL:

18  Q    Welcome back, Reverend Wispelwey.

19       We were looking at a tweet from you from July 11th, 2019.

20  It's CCWS008.  It's already been published to the jury.

21       Can we bring that back up, please?

22       And when we left off, we were saying that hate speech

23  leads to physical violence; do you remember that?

24  A    Yes.

25  Q    Does hate speech lead to physical violence because your

S. Wispelwey - Cross

1   friends use violence against people who engage in hate speech?

2   A    Can you repeat the question, please?

3   Q    Does hate speech lead to physical violence because your

4   friends use violence against people who engage in hate speech?

5           MS. KAPLAN:  Objection, foundation, Your Honor.

6           THE COURT:  Overruled.

7           THE WITNESS:  I can't think of friends who use

8   violence against people engaged in hate speech.

9           (Defendant Cantwell Exhibit 52 marked.)

10          (Defendant Cantwell Exhibit 52 admitted.)

11   BY MR. CANTWELL:

12   Q    Let's go back over to my Exhibit 52.  It's already

13   published to the jury.  It's already in evidence.

14       Do you use community defense tools, Reverend Wispelwey?

15   A    As I recall stating earlier, "community defense tools" can

16   mean a broad spectrum of all sorts of ways to take care of

17   one's community in the face of threats and violence.

18       If pressed -- it's not a common part of my lexicon, but if

19   pressed, I'd say that community defense tools that I use are

20   showing up in civic engagement related to public policy

21   advocacy, letters to the editor, calling on elected leaders,

22   that sort of thing, showing up with physical presence, as on

23   the weekend of August 11th and 12th with our services and

24   presence in the street.  That sort of thing.

25   Q    Okay.  So the question was:  Do you use community defense

S. Wispelwey - Cross

1   tools?  And the answer was yes or no.

2            MS. KAPLAN:  That was asked and answered, Your Honor.

3            THE COURT:  Go ahead.  Answer the question.

4            THE WITNESS:  If defining "community defense tools"

5   as a way that one might support one's community in the face

6   of --

7            THE COURT:  You can answer the question.  You've

8   defined it.

9            THE WITNESS:  Yes.

10    BY MR. CANTWELL:

11  Q   You do.  Okay.  Because you told Slate, "I didn't see any

12  racial justice protesters with weapons; as for antifa, anything

13  they brought I would only categorize as community defense tools

14  and nothing more.  Pretty much everyone I talk to agrees --

15  including most clergy."

16       Hang on a second.  That's not the one I was looking for.

17  Here we go.

18       "It was then that Antifa stepped in to thwart them.  They

19  have their tools to achieve their purpose, and they are not the

20  ones that I will personally use, but let me stress that our

21  purposes were the same:  Block this violent tide and do not let

22  it take the pedestal."

23       So in this paragraph are we talking about something other

24  than community defense tools, then?

25            MS. KAPLAN:  Objection.  I think it's vague the way

S. Wispelwey - Cross

1  it's asked.

2        MR. CANTWELL:  Would you like me to rephrase, Judge?

3        THE COURT:  No.  He can answer the question.

4        THE WITNESS:  Can you repeat the question?

5  BY MR. CANTWELL:

6  Q   I'll tell you what:  I'll read this paragraph and then

7  I'll ask.

8        "A phalanx of neo-Nazis shoved right through our human

9  wall with 3-foot-wide wooden shields, screaming and spitting

10 homophobic slurs and obscenities at us.  It was then that

11 antifa stepped in to thwart them.  They have their tools to

12 achieve their purpose, and they are not the ones that I will

13 personally use."

14       So here, are we talking about other tools that are not

15 community defense tools?

16 A   It's possible.  My best guess is, really, it has to do

17 with the tools of using one's own body in self-defense when

18 physically attacked.

19 Q   What kind of tools do Antifa use?

20 A   I couldn't say.  I didn't see any.

21 Q   You weren't sure about the tools that they have to achieve

22 their purposes when you wrote this paragraph?

23 A   Right.  As stated earlier, a lot of this was kind of

24 hypothetically stepping into a roiling debate in the aftermath

25 of those events, rejecting that there was a moral equivalency.

S. Wispelwey - Cross

1    But as far as my personal, direct experience, I saw white

2  supremacist groups attack these counter-protesters, who I

3  lumped all together using this term, and then we pulled back

4  and I couldn't see what was going on from there.

5  Q    You use that term there, "moral equivalency," and I think

6  earlier you said something about "both sides."  Is that kind of

7  in the same category of complaint that you have?

8  A    I'm not sure what category we're discussing.

9  Q    Moral equivalency -- what are you referring to, moral

10  equivalency?

11  A    When I just mentioned that, as I recall, in the weeks

12  after August 11 and 12, 2017, there was a lot of commentary,

13  nationally, internationally, even, around cause and effect.

14  And there were people trying to downplay the plans that were

15  executed by the Unite the Right attendees.  And as someone who

16  had feared for his life and had felt like my life was protected

17  against the fascists and white supremacists, I felt like those

18  were unfair comparisons, to put those on the same level.

19  Q    Reverend Wispelwey, would it be fair to say that there was

20  violence on both sides that weekend?

21  A    I didn't personally witness that.

22  Q    Okay.  Okay.  So the Antifa have their tools to achieve

23  their purpose.  They saved your life from violence, but they

24  didn't do any violence, right?

25  A    I didn't witness any.

S. Wispelwey - Cross

1  Q    You didn't witness any violence by the Antifa as they were

2  saving your life from violence --

3           MS. KAPLAN:  Your Honor, it's been asked and answered

4  now a half-dozen times.

5           THE COURT:  Sustained.

6           MR. CANTWELL:  Okay.  Let's take this down off the

7  screen while I pull something else up.

8           This is CCWS010, which I'd like to show -- move into

9  evidence and publish to the jury.

10           THE COURT:  It will be admitted.

11           (Defendant Cantwell Exhibit 010 marked.)

12           (Defendant Cantwell Exhibit 010 admitted.)

13   BY MR. CANTWELL:

14  Q    So, Reverend, let's start at the top.  What does this

15  tweet from March 14, 2019 say?

16  A    Would you like me to read it?

17  Q    Yes, please.

18  A    It says:  "There are way too many 'well-meaning'

19  progressive white folks who think confronting white

20  supremacists is 'violence,' that we should 'just ignore them'

21  or we give them 'what they want.'  What they want is pain and

22  death.  We stop it by confronting and deplatforming it.

23  Jesus."

24  Q    And is that what you were referencing about hate speech?

25  Deplatforming?

S. Wispelwey - Cross

1  A    I'm not sure I understand what the reference is to "hate

2  speech."

3  Q    What is deplatforming?

4  A    Deplatforming -- and this is just my understanding and

5  definition -- has to do with when someone, or perhaps a group,

6  loses access to online communications, usually, or their

7  fundraising platforms.

8  Q    What about a park?

9  A    I'm sorry.  What was that?

10 Q    What about use of a park?

11 A    If there was a platform there and they didn't have it, I

12 could see how that definition comes.

13 Q    If a group of people got a permit to demonstrate in a park

14 and they were deprived of the opportunity, would that be a form

15 of deplatforming?

16 A    I think getting into the definition and verb of the word,

17 to be deplatformed in that instance would assume that someone

18 had done something to do that.

19 Q    The next thing you say there, what's the next thing?

20 A    This appears to be part of a Twitter thread.  The next

21 tweet says:  "White supremacy is terrorism.  Yes, literally."

22 Q    Is Thomas Jefferson a terrorist?

23 A    I'm not a historian.  I did not live at the same time he

24 did, so I can't say.

25 Q    What's the next one?

S. Wispelwey - Cross

1    A    "Islamophobia is terrorism.  Yes, literally."

2    Q    What is Islamophobia?

3    A    To me, I would define it as the hatred of and fear of

4    those who are Muslim or appear to be.

5    Q    "Phobia" generally describes an irrational fear, right?

6    That's what a phobia is?

7    A    According to the dictionary, I think.  But I don't have

8    the dictionary in front of me.

9    Q    But what you were saying, in any case, there is that

10   Islamophobia is hatred and fear of Muslim peoples, right?

11   A    Yes.  And the stirring up of that kind of thing.

12   Q    Okay.  So hatred and fear is terrorism?

13   A    I think there are -- again, not as a historian, but from

14   the reading I do in the news and elsewhere, I think there are

15   serious consequences towards directing hatred and fear towards

16   particular people groups, yes.

17            MS. KAPLAN:  Your Honor, these are indeed

18   Mr. Wispelwey's tweets, so I'm not objecting, but at a certain

19   point we're getting pretty far afield here.

20            MR. CANTWELL:  What I'm -- there's a purpose here,

21   Judge.

22            THE COURT:  All right.  What --

23    BY MR. CANTWELL:

24   Q    If people were committing terrorism in Charlottesville,

25   would it justify using force to stop them, in your view,

S. Wispelwey - Cross

1   Reverend Wispelwey?

2          MS. KAPLAN:  Objection, Your Honor.  I don't even

3   know what that question means.

4          THE COURT:  Well, maybe the witness does.

5          Can you answer the question?

6          THE WITNESS:  Can you repeat it?

7   BY MR. CANTWELL:

8   Q    What do we do to terrorists in the United States,

9   Reverend Wispelwey?

10          MS. KAPLAN:  Objection, Your Honor.

11          THE COURT:  Sustained.

12          MR. CANTWELL:  I'll move on.

13   BY MR. CANTWELL:

14   Q    What is cis-het patriarchy?

15          MS. KAPLAN:  Again, Your Honor, we're getting pretty

16   far afield.

17          MR. CANTWELL:  We discussed this tweet.  If you don't

18   want me to ask about --

19          THE COURT:  Go ahead.

20   BY MR. CANTWELL:

21   Q    What is cis-het patriarchy?

22   A    What are you referring to?  A tweet?

23   Q    The tweet that's on the screen, the one that you tweeted

24   on March 14, 2019.

25   A    Cis-het -- "cis" is a shorthand way of saying "cisgender,"

S. Wispelwey - Cross

1  someone who identifies with their gender as it was assigned at

2  birth.

3      "Het," I believe, is a shorthand for "hetero," as in

4  heterosexual.

5      And "patriarchy" is the system through which male -- men

6  are privileged, given power and authority, at the expense of

7  other people's safety, security, wealth, and so on.

8      So put it all together and it's saying, essentially,

9  straight men born that way at birth as assigned is what it is.

10 Q    Is cis-het patriarchy an unusual state of affairs?

11 A    I'm not sure I understand the question.

12 Q    Do you perceive our society to be based on cis-het

13 patriarchy?

14         MS. KAPLAN:  Objection, Your Honor.  It's really

15 irrelevant.

16         MR. CANTWELL:  It's not, I guarantee you.

17         THE COURT:  Okay.  Answer the question, sir.

18         THE WITNESS:  Again, not being a historian, but I

19 believe going back to the founding of the United States, that

20 there's been a pretty clear record in our founding documents in

21 a lot of places that, in spite of professing a desire for

22 equality for all, that really, it was the rights of men that

23 were prioritized over and against others, and that there have

24 been, for example, suffrage battles in the centuries since to

25 get to an actual true meaning of equality.

S. Wispelwey - Cross

1  BY MR. CANTWELL:

2  Q    But to varying degrees, that state of affairs persists

3  until this day, does it not?

4          MS. KAPLAN:  Objection, Your Honor.  This is a

5  political debate at this point.

6          MR. CANTWELL:  This is not a political debate.

7          THE COURT:  You can answer this question.

8          I've said before you can question them about their

9  beliefs, but you can't try to persuade the witness to agree

10  with you.

11          MR. CANTWELL:  That's not the goal.

12   BY MR. CANTWELL:

13  Q    Do you believe that, today, we live in a patriarchal

14  society?

15          THE COURT:  All right.  That's neither here nor there

16  for this case.

17          MR. CANTWELL:  If cis-het patriarchy is terrorism and

18  we live in cis-het patriarchy today, that's relevant to the

19  details of this case.  He's stopping terrorism by confronting

20  the people he believes are committing terrorism with their

21  ideas, their views.  They view us as terrorists.  That's what

22  I'm trying to get at, Judge.

23          THE COURT:  All right.  Well, has he said that he is

24  trying to stop you with terrorism?

25          MR. CANTWELL:  I didn't say that.

S. Wispelwey - Cross

1          THE COURT:  I mean, it doesn't -- if you want to

2   prove that he's trying to stop you with terrorism, that's okay.

3   But we don't need to go into all the reasons he might not like

4   you.

5          MR. CANTWELL:  Fair enough.

6          I'm going to show you CCSW018 and I would like to

7   move this into evidence and publish this to the jury.

8          THE COURT:  Be admitted.

9          (Defendant Cantwell Exhibit 018 marked.)

10          (Defendant Cantwell Exhibit 018 admitted.)

11   BY MR. CANTWELL:

12   Q    Could you read that tweet from July 2nd, 2019, Reverend,

13   please?

14   A    Sure.  I'm quoting a tweet that says:  "Both sides?  Not

15   quite.  30-plus years of Antifa activity in the US:  One

16   fatality caused by someone linked to Antifa.  20 years of

17   far-right extremist activity in the US:  670 fatalities, 3,053

18   injuries, and 4,420 violent attacks."

19          My quote tweet comment -- which appears to be part of a

20   thread, so I don't have the full context at all of what I was

21   following -- says:  "If you have the privilege of questioning

22   the value of punching Nazis/fascists, save your breath and

23   don't.  Lives are on the line and yours clearly isn't.  Maybe

24   speak up after embodying solidarity with those most targeted.

25   Better yet, buy a milkshake."

S. Wispelwey - Cross

1  Q    And I'm having a little trouble here determining your

2  valuation of punching Nazis.  Could you clarify, please?

3  A    I am not making an evaluation.  I'm against violence.

4  Q    So you say that somebody shouldn't question the value of

5  punching Nazis there; isn't that what you're saying?

6  A    I am, it appears -- again, without the full context, a

7  little tricky, but -- having an issue with those who I think

8  treat the targeting of people for who they are as a thought

9  exercise.  And I'm really making an appeal that more people of

10 goodwill and conscience need to step up, but certainly not

11 endorsing punching.

12 Q    How would buying a milkshake help?

13 A    Help what?

14 Q    "Maybe speak up after embodying solidarity with those most

15 targeted.  Better yet, buy a milkshake."

16      Do you know where I'm going with this, Reverend Wispelwey?

17 A    I'm not quite sure.

18 Q    You don't know what I'm talking about with milkshakes?

19 A    I'll need a little more context.

20 Q    Why did you say, "Better yet, buy a milkshake"?

21 A    I don't recall.  I'm not sure when this --

22 Q    Okay.

23 A    -- tweet is from.

24 Q    Okay.

25 A    What larger conversation this is a part of.

S. Wispelwey - Cross

1   Q    We can take this down and I'll try to refresh his memory.

2        Do you remember this tweet about milkshakes, Reverend?

3   A    I'm not sure I remember it, but I see it.

4   Q    Milkshakes, yelling in restaurants, deplatforming

5   dehumanizers, oil and ice cream?  Nothing?

6   A    Is the question if I remember it?

7   Q    Who is Andy Ngo?

8   A    Andy Ngo, if we're talking about the same person, I

9   understand to be a self-proclaimed journalist who covers

10  different rallies and protests.

11  Q    Andy Ngo ever get a milkshake?

12  A    I don't know.

13  Q    You don't know.  So you're just randomly talking about

14  milkshakes on Twitter, then?

15  A    I don't think randomly.  I'm sure there was a reason.

16  Q    Do you remember news stories about Antifa throwing

17  milkshakes on conservative activists?

18  A    I don't know who threw milkshakes.  I do remember news

19  stories where neofascist politicians had a milkshake poured on

20  them once or twice.  I don't know by who.

21  Q    Okay.  So you remember people getting milkshakes poured on

22  them?

23  A    Yes.  I remember reading something online about it.

24  Q    Do you think that happened around the time that you were

25  tweeting about milkshakes being the solution to your political

S. Wispelwey - Cross

1   problems?

2           MS. KAPLAN:  Objection.

3           THE COURT:  Overruled.

4           THE WITNESS:  Yes, I'm sure that's probably pretty

5   closely connected to the context here from early 2019.

6    BY MR. CANTWELL:

7   Q   Okay.  So now you remember these two tweets where you were

8   endorsing throwing milkshakes on people, right?

9   A   Which two tweets?

10  Q   This one and the other one.  I can pull it back up again

11  if you like.  "Milkshakes, yelling in restaurants,

12  deplatforming dehumanizers, these are the tools of liberated

13  and clear conscience.  Oil and ice cream."  Right?

14  A   Yes.  And in comparison, the oil is the first line, I

15  think:  "Political violence is children dying in cages with our

16  tax dollars."

17  Q   And the children dying in cages, this was about when

18  Donald Trump was putting illegal immigrants in detention,

19  right?

20  A   The tweet says it's from May 2019.  So the time frame of

21  asylum-seeking migrants being caged and living in squalor with

22  our tax dollars sounds right.

23  Q   So because Donald Trump puts kids in cages, you think it's

24  okay to throw milkshakes on your political opponents?

25  A   As I recall, the context of this was that there was again

S. Wispelwey - Cross

1  a roiling debate nationwide about the appropriate uses of

2  protest in response to human rights concerns.

3            THE COURT:  This question is about the milkshakes.

4  What did you mean and under what circumstances does the

5  milkshake come up?

6            THE WITNESS:  Under these circumstances it appears I

7  am referencing milkshakes and yelling in restaurants and so on

8  as not the moral equivalent of caging children.

9  BY MR. CANTWELL:

10 Q    So lawful government activity, assault, you choose

11 assault?

12           MS. KAPLAN:  Objection, Your Honor.

13           THE COURT:  Overruled.  Go ahead.  Answer the

14 question.

15           THE WITNESS:  I'm not sure I consider -- or I'm not a

16 lawyer, but I don't know that having a milkshake poured on

17 one's self is assault.

18 BY MR. CANTWELL:

19 Q    Do you have another definition of unwanted touching?

20 A    I'm not sure what we're referring to.

21 Q    You don't think it's assault to go up and throw a

22 milkshake on somebody because you don't like their politics?

23 A    Again, I'm not a lawyer, so I can't say.

24           THE COURT:  Just in your own sense of how you live.

25           THE WITNESS:  Sure.

S. Wispelwey - Cross

 1            THE COURT:  You can answer the question.  You don't
 2   need to be a lawyer.
 3            THE WITNESS:  I think violence is physical harm
 4   intended and carried out on another human person.  I have my
 5   doubts that having a milkshake poured on one's self is going to
 6   lead to a hospital visit.
 7   BY MR. CANTWELL:
 8   Q    So pepper spray is okay, then?
 9   A    I don't think so.  I think that would lead to physical
10   harm.
11   Q    I mean, somebody gets pepper-sprayed, they recover from
12   it, don't they?
13   A    Again, it leads to physical harm.  So they might recover.
14   I don't know.  It's not the same thing, though.
15   Q    So your dedication to nonviolence, suffice it to say is
16   not offended by throwing milkshakes on people because of their
17   political views?
18   A    Again, this is a point of comparison.
19            THE COURT:  Well, he didn't ask for a comparison.
20   Can you just answer.  And then move on after this.
21            MR. CANTWELL:  I will, Judge.
22            THE WITNESS:  Can you repeat the question?  I'm
23   sorry.
24   BY MR. CANTWELL:
25   Q    Your purported dedication to nonviolence stops at

154

S. Wispelwey - Cross

1  milkshakes?

2  A    I don't seem to have much of an issue with it, no.

3  Q    Okay.  Did you tell Tim Heaphy that the police, quote,

4  became the enemy to many in the crowd at the July 8th Klan

5  rally?

6  A    It's possible.  Can we pull up the context?

7          MS. KAPLAN:  No, we cannot.

8          MR. CANTWELL:  I think we can just refresh his

9  memory, right?  I'm not trying to show this to the jury.

10          THE COURT:  Well, that's --

11          MR. CANTWELL:  I'm not trying to put this into

12  evidence, Judge.  I'm just asking --

13          THE COURT:  I don't think it's relevant to this case.

14   BY MR. CANTWELL:

15  Q    Okay.  I think we're just about done.  I've got one more

16  thing for you.

17      This is Plaintiffs' Exhibit 3234.  We watched a little bit

18  of this before.  And I just want to check one more thing before

19  we wrap this up.

20      (Video playing.)

21          MR. CANTWELL:  This is already in evidence.  I'd like

22  to publish it and show it to the jury.  We're at 6:54 at this

23  point.

24              (Plaintiff Exhibit 3234 marked.)

25              (Plaintiff Exhibit 3234 admitted.)

S. Wispelwey - Cross

1   BY MR. CANTWELL:

2   Q    Now, Reverend Wispelwey, you testified that after the guys

3   with the shields came through that line, somebody stood over

4   you and berated you in some way; is that a fair assessment of

5   your testimony?

6   A    That's correct.  As I gathered myself, yes.

7        (Video playing.)

8   Q    Is that Cornel West right there, Reverend?

9   A    Yes, that's Dr. West.

10       (Video playing.)

11  Q    Reverend, did Cornel West stand with his back to you and

12  do nothing while somebody stood over you and berated you?

13  A    I don't know what all he did.  I think he was the one that

14  said "help move them aside."  There was men all around us.  He

15  was one who was also shoved.

16  Q    So when you were on the ground getting berated, they all

17  just stood with their arms linked with their backs to you,

18  right?

19  A    As I recall, it happened slightly before this.  I can see

20  myself right there getting up.

21  Q    Oh, rewind it then.

22       (Video playing.)

23       Now, does it look like the clergy just all sort of moved

24  to one side to let them in there?

25  A    It looks like that.

S. Wispelwey - Cross

1  Q    And are they still -- they've still got their arms linked,

2  right?

3  A    Yes.

4        (Video playing.)

5  Q    And none of those God-fearing people turned around to help

6  you?

7            MS. KAPLAN:  Objection, Your Honor.

8            THE COURT:  Sustained.

9   BY MR. CANTWELL:

10 Q    None of those people turned around to help you?

11           MS. KAPLAN:  Objection, Your Honor.

12           THE COURT:  Well, did anyone help you?

13           THE WITNESS:  Yes, the group I was a part of, my

14 friend Brittany helped pick me up.

15 BY MR. CANTWELL:

16 Q    I guess it was after this, then?

17 A    No, it was during that.  We were, again, back behind --

18 Q    Back behind with none of the cameras watching.

19           MR. CANTWELL:  Okay.  Thank you, Reverend Wispelwey.

20 No further questions.

21           (Defendant Cantwell Exhibits 4, 6, 8, 10 and 18

22 marked and admitted.)

23           MS. KAPLAN:  One question, Your Honor.

24           THE COURT:  All right.

25                        REDIRECT EXAMINATION

N. Damigo - Direct

1   BY MS. KAPLAN:

2   Q    Reverend Wispelwey, one quick question.  In that video

3   that you were just watching with Mr. Cantwell, I think it's

4   Plaintiffs' 3234, did you hear the white nationalists coming in

5   saying "roof, roof, roof, roof"?

6   A    Yeah, that's the yelling and screaming, the huffing and

7   puffing really loud, yeah.

8            MS. KAPLAN:  Thank you.

9            THE COURT:  I just want to clear up one thing.  Did

10  you sustain physical injury?

11           THE WITNESS:  I was scuffed up, but nothing that

12  bothered me for more than a day.

13           THE COURT:  Well, I just want to be sure the nature

14  of the claim.

15           MS. KAPLAN:  We don't have any claim for

16  Mr. Wispelwey -- Reverend Wispelwey, excuse me -- with respect

17  to physical injury, Your Honor.

18           THE COURT:  All right.  Thank you.

19           Okay.  Next witness?

20           MS. KAPLAN:  Plaintiffs call Defendant Nathan Damigo,

21  Your Honor.

22        NATHAN DAMIGO, CALLED BY THE PLAINTIFFS, SWORN

23                    DIRECT EXAMINATION

24  BY MS. PHILLIPS:

25  Q    Good afternoon, Mr. Damigo.

N. Damigo - Direct

1   A      Good afternoon.

2   Q      Mr. Damigo, in 2017 you considered yourself to be a white

3   nationalist, correct?

4   A      I believe so.

5   Q      And you believed in 2017 that America was founded for

6   white people; isn't that right?

7   A      Yes.

8   Q      In 2017 you advocated for a white ethnostate?

9   A      Yes.

10  Q      And racial minorities would not be welcome to live in this

11  white ethnostate, correct?

12  A      Not necessarily.

13  Q      In 2017 you believed that, theoretically speaking,

14  violence might be needed to create this white ethnostate,

15  right?

16  A      I do not recall.

17          MS. PHILLIPS:  Ms. Dunn, if you don't mind handing

18  Mr. Damigo his two depositions in this case.

19  BY MS. PHILLIPS:

20  Q      Mr. Damigo, do you recall being deposed twice in this

21  case?

22  A      Yes.

23  Q      And you were under oath both times, correct?

24  A      Yes.  Which one am I looking at here?

25  Q      I'll refer you to it.  So there was one deposition of you

N. Damigo - Direct

1  that occurred on June 10th, 2020.  And if you could take a look

2  at that, specifically page 90.  And I'll direct you to lines 4

3  through 7.

4      I asked you this question:  "And in 2017 you believed that

5  violence might be needed to create the white ethnostate,

6  correct?"

7      And you answered:  "Theoretically speaking."

8      Does that refresh your recollection?

9  A   Is this 90 of my first deposition or my second?

10 Q   It should be your first, the one on 6-10.  I believe the

11 second was on -- I want to say 6-28.  No, 6-22.

12 A   I'm sorry, I'm not finding it here.  You said page 90.

13 Q   Correct.  Page 90, lines 4 through 7.

14 A   I see here my answer to that question was "theoretically

15 speaking."

16 Q   Correct.  Great.

17      MS. PHILLIPS:  Mr. Spalding, I'd like to show

18 Mr. Damigo Plaintiffs' 2850 at 5:50, please.

19 BY MS. PHILLIPS:

20 Q   Mr. Damigo, this will just play on your screen and I'll

21 ask you to identify yourself if you see yourself in the video.

22      (Video playing.)

23      Is that you, sir?

24 A   Yes, it is.

25 Q   Do you recognize this as a Periscope video that you took?

N. Damigo - Direct

1   A    Yes, I do.

2          MS. PHILLIPS:  Your Honor, I'd like to move to admit

3   PX-2850 and publish it to the jury.

4          THE COURT:  Be admitted and you may publish.

5          MS. PHILLIPS:  Thank you.

6          (Plaintiff Exhibit 2850 marked.)

7          (Plaintiff Exhibit 2850 admitted.)

8          MS. PHILLIPS:  Mr. Spalding, if we could play that

9   video.

10         (Video playing.)

11   BY MS. PHILLIPS:

12   Q    Mr. Damigo, you're referring to yourself there as the

13   racist?

14   A    Yes.

15         MS. PHILLIPS:  I'd like to show Mr. Damigo

16   Plaintiffs' 0341, please.

17         THE COURT:  You may.

18   BY MS. PHILLIPS:

19   Q    Mr. Damigo, your user name on Discord was Fashy Haircut,

20   correct?

21   A    Yes, it was.

22   Q    Your Honor, I would like -- well, let me ask you this,

23   Mr. Damigo.  Do you recognize these as direct messages between

24   yourself, Fashy Haircut, and a Discord user by the name of Karl

25   North?

N. Damigo - Direct

1  A     Yes, I do.

2              MS. PHILLIPS:  Your Honor, I'd move to admit

3  Plaintiffs' Exhibit 0341, please, and publish that to the jury.

4              THE COURT:  Be admitted.

5              (Plaintiff Exhibit 0341 marked.)

6              (Plaintiff Exhibit 0341 admitted.)

7  BY MS. PHILLIPS:

8  Q     And here you write at the top post, "user name,

9  @antiwhitereport"; do you see that?

10 A     Yes, I do see that.

11 Q     Just below that you say "Password:  Stopthehate1488."

12 Then under that you say, "That's the Twitter.  I would like you

13 to start building up a following with it by posting articles

14 like the one I posted already."

15     So Mr. Damigo, in the Twitter account password the 14 in

16 1488 refers to the 14 Words, correct?

17 A     Correct.

18 Q     We've heard about those 14 Words at this trial, but you

19 understand that was a white supremacist slogan coined by David

20 Lane?

21 A     I understand it as a statement that was made by him.

22 Q     And the number 88 in that password is a reference to "Heil

23 Hitler," since H is the eighth letter of the alphabet, correct?

24 A     Yes.

25              MS. PHILLIPS:  You can take that down, Mr. Spalding,

N. Damigo - Direct

1  thank you.  I'd like to show Mr. Damigo Plaintiffs' 0882.

2  BY MS. PHILLIPS:

3  Q    Mr. Damigo, do you recognize this as a post made by you,

4  Fashy Haircut, in the Identity Evropa server on Discord

5  #antifawatch; do you see that?

6  A    Yes, I do see that.

7  Q    And you recognize this as a post that you made?

8  A    Yes.  I made it to --

9  Q    Mr. Damigo, it was a yes or no question.

10  A    Yes, I made it to the other members to let them know what

11  was coming our way, that we were being attacked quite a bit by

12  Antifa and just saying welcome --

13          THE COURT:  Okay.  Wait.

14          MS. PHILLIPS:  I would move to strike his answer as

15  nonresponsive, Your Honor, past the --

16          THE COURT:  Just answer the question.  She didn't ask

17  you why.  She just asked you if you did.

18          THE WITNESS:  Yes.

19          MS. PHILLIPS:  Okay.  Thank you very much.  Your

20  Honor, I'd like to move this into evidence.  This is

21  Plaintiffs' 0882.

22          THE COURT:  Be admitted.

23          MS. PHILLIPS:  And I'll publish it to the jury,

24  please.

25          THE COURT:  You may.

N. Damigo - Direct

1                (Plaintiff Exhibit 0882 marked.)

2                (Plaintiff Exhibit 0882 admitted.)

3    BY MS. PHILLIPS:

4    Q     So on March 8th, 2017 you posted:  "The lines between

5    politics and violence is blurring.  Welcome to fourth

6    generation warfare."  You posted that, correct?

7    A     Yes, I did.

8                MS. PHILLIPS:  Okay.  Thank you.  You can take it

9    down, Mr. Spalding.

10   BY MS. PHILLIPS:

11   Q     Now, Mr. Damigo, your path to radicalization happened

12   while you were in prison, correct?

13   A     I would say that at that time I came to an understanding

14   of the effects of race and identity and their impacts on

15   society.

16   Q     So is the answer to my question yes?

17   A     Yes.

18   Q     And in prison you read David Duke's *My Awakening,* correct?

19   A     Yes, I did.

20   Q     You know that David Duke is the former grand wizard of the

21   KKK?

22   A     Yes.  And it was very informative.

23   Q     In fact, David Duke's books played a huge part in your

24   radicalization, correct?

25   A     Absolutely.

N. Damigo - Direct

1  Q    Mr. Duke was an inspiration for you?

2  A    Yes.  He had taken quite a bit of time to compile a lot of

3  information that was being omitted from mainstream arguments on

4  politics.  And I spent quite a few years tracking down a number

5  of those sources.  And -- on all sides of the issues.  That's

6  something I really liked about the book, was he presented

7  numerous debates from various sides, and it was very

8  informative.  And I was able to track down all those sources

9  and confirm what he had to say on those things.

10 Q    You felt you owed a lot to him, correct?

11 A    Yes.

12 Q    And you've always been a big fan of his?

13 A    Yes.

14 Q    Mr. Damigo, in 2017 you believed that black people were

15 genetically and intellectually inferior to white people,

16 correct?

17 A    No.  I think it's more complex than that.  I think you

18 have to talk about specific measurements if you're going to

19 answer questions of inferiority or superiority.

20 Q    Well, you believed black people -- sorry, I didn't mean to

21 interrupt you.  Are you done?

22 A    Yeah, I'm done.

23 Q    You believe that black people have higher rates of crime

24 across the board that's out of proportion to their

25 socioeconomic status, correct?

N. Damigo - Direct

1  A     According to FBI crime statistics, yes.

2  Q     My question was is that your belief?

3  A     Yes, I believe those statistics are accurate.

4  Q     Again, my question was --

5        MR. KOLENICH:  Your Honor, objection.  He's already

6  testified that he is a racist, referred to himself as a racist

7  at that time.

8        THE COURT:  Okay.  So you don't have to go too far.

9        MS. PHILLIPS:  Understood.  Thank you, Judge.

10  BY MS. PHILLIPS:

11  Q     And the difference you believe is a matter of genetics and

12  genetic distribution, correct?

13  A     I think that plays a major role, yes.

14  Q     You also think that Jewish people, black people, and their

15  supporters are responsible for a mainstream genocidal campaign

16  against white people, correct?

17  A     I think there are a lot of parties involved with that,

18  including white people, ethnomasochists, capitalists, people

19  who are involved in mass immigration for greed or other

20  purposes.  But yes, I do think that there are some Jews and

21  some blacks that are very much involved with that as well.

22  Q     In 2017 you saw Jewish people as nonwhite individuals and

23  you saw Jewish culture as anti-white, correct?

24  A     Yes, that's correct.

25  Q     Mr. Damigo, I want to talk to you a little bit about

166

N. Damigo - Direct

1  Identity Evropa.  Okay if I call it IE?

2  A    Yes.

3  Q    Great.  So you founded IE in 2016, correct?

4  A    Yes.

5  Q    And one of the goals of IE was to promote the idea of a

6  white ethnostate?

7  A    Yes.

8  Q    IE only admitted people of European non-Semitic heritage?

9  A    That's correct.

10 Q    And in fact the application form for membership into IE

11 required a person to identify if they were an individual of

12 European non-Semitic heritage, correct?

13 A    Yes, it did.

14 Q    And the purpose of that was to screen out anybody who was

15 of Semitic heritage?

16 A    Yes.

17 Q    So a Jewish person could not join IE, correct?

18 A    No.

19 Q    And black people could not also join IE, correct?

20 A    No.

21 Q    Ultimately the only people who were allowed to join IE

22 were white people of European heritage, correct?

23 A    Yes.

24 Q    And in 2017 IE's views were the same as your personal

25 views, correct?

N. Damigo - Direct

1   A      Yes.

2   Q      Now, IE members often communicated with one another on

3   Discord?

4   A      Yes.

5   Q      And there was an IE server we've seen on the Discord,

6   correct?

7   A      Which Discord are you referring to?

8   Q      I'm referring to the Identity Evropa server on Discord.

9   A      All right.  Yes.

10  Q      And IE members would get an invite to the IE Discord when

11  they joined IE, correct?

12  A      Yes.

13  Q      And you had to be an IE member to post in the IE server?

14  A      Yes, in the IE Discord server, yes.

15  Q      And you created that IE server, right?

16  A      Yes, I did.

17  Q      You were the owner of the IE server on Discord?

18  A      Yes, I was.

19  Q      And you would agree with me that you used the IE server

20  quite often, particularly in the summer of 2017?

21  A      Yes.

22  Q      Okay.  Mr. Damigo, you attended an event that took place

23  in Berkeley, California on April 15, 2017, correct?

24  A      Yes, I did.

25  Q      And that became known as the Battle of Berkeley, right?

N. Damigo - Direct

1  A    Yes, it did.

2  Q    And you attended Berkeley as a representative of IE?

3       Why don't I do it this way.  At your deposition you were

4  asked this question:  "Did you attend on behalf of Identity

5  Evropa?"  And you gave this answer:  "Pretty much anywhere I

6  went was generally -- those events, I mean, just as the founder

7  of the organization, it was generally considered I was

8  representing the organization."

9       So does that refresh your recollection that you attended

10 Berkeley as a representative of IE?

11 A    Yes.

12 Q    And other IE members like Brodie Sutherland and Rob Rundo

13 also attended Berkeley, right?

14 A    I know Brodie Sutherland was an IE member.  I don't know

15 if Rob was an IE member at that time.

16 Q    He was, though, at some point, yes?

17 A    I'm not sure.

18 Q    And some of the members of the Rise Above Movement, also

19 known as RAM, those guys were at Berkeley too, correct?

20 A    Yes, I believe some of them were there.

21 Q    And do you recall an individual who went by the Discord

22 handle FemaCampBandLeader?  You testified in your deposition

23 that you called him Fema for short.  Do you recall that?

24 A    Yes.

25 Q    And he was an IE member who ran boxing training before the

N. Damigo - Direct

1   Battle of Berkeley, correct?

2   A    Yes.

3   Q    And you attended at least one of those trainings, correct?

4   A    Yes, I did.

5         MS. PHILLIPS:  Mr. Spalding, if we could show

6   Mr. Damigo Plaintiffs' 3761, please.

7   BY MS. PHILLIPS:

8   Q    Mr. Damigo, do you recognize these as posts, at least some

9   of which you have made?

10        Again, your handle, Fashy Haircut, is at the top there; do

11  you see that?

12  A    Yes, I do.

13        MS. PHILLIPS:  Your Honor, I would move to admit

14  Plaintiffs' 3761, please, and publish it to the jury.

15        THE COURT:  Be admitted.

16        MS. PHILLIPS:  Thank you.

17        (Plaintiff Exhibit 3761 marked.)

18        (Plaintiff Exhibit 3761 admitted.)

19        MS. PHILLIPS:  Mr. Spalding, if you can go to page 2,

20  the very last page -- thank you -- and the very last post.

21   BY MS. PHILLIPS:

22  Q    That's BrodieCA.  You understand that's the handle for

23  Brodie Sutherland?

24  A    Yes, I do.

25  Q    And in the last post there, he says:  "Another great

N. Damigo - Direct

1  training day.  Honestly, you guys motivate the hell out of me.

2  I'm looking forward to practical application coming up.  Hail

3  victory."

4       Now, you previously testified in your deposition that when

5  he wrote "hail victory," that he was invoking a Nazi salute,

6  correct?

7  A    I don't recall.  Could you point to something?

8  Q    Sure.  If you go to your deposition from June 10th, take a

9  look at page 111 and I'll direct you to line 20.

10 A    Okay.  I see my answer was:  "Yes.  Yes, I do."

11 Q    So you understand when he wrote "hail victory," he was

12 invoking a Nazi salute?

13 A    Yes.

14 Q    And this post was from April 9th, 2017, correct?  Do you

15 see that?

16 A    Yes, I do.

17 Q    That was six days before the Battle of Berkeley?

18 A    Yes, it was.

19           MS. PHILLIPS:  You can take that down, Mr. Spalding.

20           I'd like to show Mr. Damigo Plaintiffs' 2365, please.

21 BY MS. PHILLIPS:

22 Q    And, again, if you can take a look and see if you can

23 identify yourself in that photograph, Mr. Damigo.

24 A    Yes.  I'm the individual with the megaphone.

25           MS. PHILLIPS:  Okay.  Great.

N. Damigo - Direct

1              Your Honor, I'd like to move to admit PX-2365 and

2    publish it to the jury.

3              THE COURT:  You may.  It's admitted.

4              (Plaintiff Exhibit 2365 marked.)

5              (Plaintiff Exhibit 2365 admitted.)

6              MS. PHILLIPS:  I'm sorry?  I didn't hear you.

7              THE COURT:  It's admitted.

8              MS. PHILLIPS:  Okay.  Thank you.

9     BY MS. PHILLIPS:

10   Q    And Mr. Damigo, the screen in front on you is actually a

11   touchscreen.  If you could circle yourself, that would be

12   great.

13        And that's Ben Daley of the Rise Above Movement directly

14   to your right, correct?

15   A    I'm not sure.  I know those guys were there, but I don't

16   know them all by name.

17   Q    Okay.  You understand that the individuals in gray with

18   the skeleton masks and the matching yellow sunglasses, those

19   are all members of the Rise Above Movement, correct?

20   A    I don't know that for sure.  They are certainly wearing

21   matching skull masks.  That was a common thing at that point in

22   time.  But I do not know who all the members of the Rise Above

23   Movement are.  In fact, that was actually the first time I had

24   met any of them, and I hadn't even heard the name of the

25   organization at that point.

172

N. Damigo - Direct

1  Q    And this is you, along with the members -- some of the

2  members of RAM, ripping a banner from the hands of

3  counter-protesters, correct?

4          MR. KOLENICH:  Objection.  Mischaracterizes

5  testimony.

6          MS. PHILLIPS:  What?  What was the question?

7          MR. KOLENICH:  She already asked him if he knows the

8  Rise Above Movement members, and he testified he did not.  So

9  now she's trying to get him to agree to it, slipping it into a

10  question.

11          MS. PHILLIPS:  I'll rephrase.

12          THE COURT:  Rephrase.

13   BY MS. PHILLIPS:

14  Q    Is this you and other individual who are wearing gray with

15  skull masks and yellow goggles or glasses, sunglasses, ripping

16  the banner from -- ripping a banner from the hands of

17  counter-protesters?

18  A    Yes.

19          MS. PHILLIPS:  You can take that down, Mr. Spalding.

20  Thank you.

21          And if you can show Mr. Damigo Plaintiffs' 1965.

22  BY MS. PHILLIPS:

23  Q    Mr. Damigo, you'll see this is a similar photograph.  Do

24  you see yourself in that photograph?

25  A    Yes, I do.

N. Damigo - Direct

1          MS. PHILLIPS:  Your Honor, I would move to admit

2   Plaintiffs' 1965.

3          THE COURT:  Be admitted.

4          MS. PHILLIPS:  Publish to the jury?

5          THE COURT:  You may.

6          (Plaintiff Exhibit 1965 marked.)

7          (Plaintiff Exhibit 1965 admitted.)

8   BY MS. PHILLIPS:

9   Q    This is the same scene we just saw in the previous

10  exhibit, correct, Mr. Damigo?

11  A    That is correct.

12         MS. PHILLIPS:  You can take that down.  Thank you,

13  Mr. Spalding.

14         Can you please show Mr. Damigo 2210A?

15         (Plaintiff Exhibit 2210A marked.)

16  BY MS. PHILLIPS:

17  Q    Mr. Damigo, do you recognize yourself in this photograph?

18  A    Yes, I do.

19  Q    And you're on the left, correct?

20  A    Yes, I am.

21  Q    Okay.  And this is you in this photo, posing with these

22  other individuals with the skull face masks and the gray shirts

23  and the yellow goggles, posing with the banner that you had

24  just helped rip away from the counter-protesters, correct?

25  A    Yes.  We are posing with the By Any Means Necessary

N. Damigo - Direct

1   terrorist organization's banner.

2           MS. PHILLIPS:  Your Honor, I would move to strike

3   everything that came after "yes."

4           THE COURT:  Sustained.

5   BY MS. PHILLIPS:

6   Q    And the individual on the far right is Brodie Sutherland,

7   correct?

8   A    Yes.

9   Q    And that's -- you've testified he was an IE member; at

10  least he was in 2017?

11  A    Yes.

12  Q    And you and Brodie were with these same individuals

13  throughout the day on April 15th, 2017 at the Battle of

14  Berkeley, correct?

15  A    Yes, I believe so.

16          MS. PHILLIPS:  You can take that down.  Thank you,

17  Mr. Spalding.

18  BY MS. PHILLIPS:

19  Q    Mr. Damigo, you attended the events that took place in

20  Charlottesville on May 13th, 2017 that came to be known as

21  Charlottesville 1.0, correct?

22  A    Yes.

23  Q    And IE members also attended this event?

24  A    Yes.

25  Q    Elliot Kline and Richard Spencer, Matt Heimbach, Jason

N. Damigo - Direct

1  Kessler, they were all there, correct?

2  A    It was about four years ago.  I don't recall off the top

3  of my head all of who was there.

4  Q    Okay.  It was your idea to plan the event, correct?

5  A    I believe so.

6  Q    And you also worked with other alt-right groups to plan

7  this event, correct, including the Traditionalist Worker Party

8  and Vanguard America?

9  A    Some of their members came out.  I told our members that

10 if -- if they knew people who they felt trustworthy and would

11 not leak the fact that we were having an event -- we didn't

12 want Antifa coming out and attacking us -- then it was okay for

13 them to come.  And many of them did.

14         MS. PHILLIPS:  Your Honor, I would again move to

15 strike everything after "yes."

16         THE COURT:  Sustained.  Strike.

17         MS. PHILLIPS:  Thank you.

18         THE WITNESS:  Did I say "yes" to that?

19         MR. JONES:  Your Honor, he actually didn't say "yes."

20         MS. PHILLIPS:  Well, let me refresh his recollection

21 with his deposition, then.

22 BY MS. PHILLIPS:

23 Q    Take a look at June 10th, 2020.  I'll direct you to 146,

24 line 7.

25 A    You said page 2020?  Sorry.

176

N. Damigo - Direct

1   Q    I'm sorry.  Your June 10th deposition, since there are

2   two, and I'm directing you to page 146.

3          MS. PHILLIPS:  Let's do it this way.  Can you show

4   him Plaintiffs' 0920, please?

5   BY MS. PHILLIPS:

6   Q    Mr. Damigo, do you recognize your posts in this Discord

7   server alt-right-events-project, #general channel?

8          THE WITNESS:  Yes.  That appears to be my account.

9          MS. PHILLIPS:  Your Honor, I would move to admit into

10  evidence Plaintiffs' 0920.

11         THE COURT:  Be admitted.

12         (Plaintiff Exhibit 0920 marked.)

13         (Plaintiff Exhibit 0920 admitted.)

14  BY MS. PHILLIPS:

15  Q    And I'll direct your attention to the fourth line down.

16  You say on March 18th, almost a full month before the event

17  itself:  "Should be big.  We are working with other alt-right

18  groups on this."

19         So does this refresh your recollection that you worked

20  with other alt-right groups on Charlottesville 1.0.

21  A    Yes.  Specifically --

22  Q    It was just a yes or no question, Mr. Damigo.

23  A    Oh.  Okay.

24  Q    Thank you.

25         MS. PHILLIPS:  You can take this down, Mr. Spalding.

N. Damigo - Direct

1   Thank you.

2   BY MS. PHILLIPS:

3   Q    Okay.  Charlottesville 1.0 also included a torch march

4   that you participated in, correct?

5   A    Yes, it did.

6   Q    And you came up with the idea for the torch march and you

7   suggested it to other organizers, Mr. Spencer, Mr. Kline, and

8   Mr. Evan Thomas, correct?

9   A    Yes.

10  Q    And you got the idea for the torch march from a YouTube

11  video of a torch march in Germany; do you recall testifying to

12  that in your deposition?

13  A    It was originally a torch march in France, but also one in

14  Germany, yes.

15  Q    Okay.  Well, the only one that you referenced in the Slack

16  channel to these individuals was one from Germany, correct?

17  A    Yes, that was the only link I could find.  The other link

18  was kind of hard to find, oftentimes.

19  Q    And you at no point testified about any France torch

20  march, correct, in your deposition?

21       I'll direct you to line -- or excuse me, to page 156, 3

22  through 18.  You can take a look.

23  A    Which page was that again?  I'm sorry.

24  Q    No problem.  Page 156, 3 through 18.

25       I'll go ahead and read it for the record.

N. Damigo - Direct

1      You were asked this question:  "And I want to direct your

2  attention to the first April 4th entry.  Do you see that?"

3      Answer:  "Yes, I see that."

4      Question:  "Okay.  It says Damigo posts a link to the

5  YouTube video of a torch march in Germany and says that the

6  group should organize something like that.  Do you see that?"

7      Your answer:  "Yes."

8      Question:  "And so that's where you got the idea for the

9  torch -- the torch rally from?"

10     Answer:  "Yeah.  There were several different marches that

11 I had seen.  I don't recall that specific one, but..."

12     "We talked a bit about" --

13     Question:  "We talked a bit about" --

14     "Yes, we had seen some torchlight marches.  Sorry about

15 that."

16     "That's okay."

17     Do you see that?

18 A   Yes, I do.  So I didn't say France specifically, but I had

19 said that I had seen several different torch marches, and

20 that's the one I was referencing.

21 Q   The one in Germany, correct?

22 A   The one in France and Germany, yes.

23 Q   But, again, you only specifically referred to the one in

24 Germany?

25          THE COURT:  Let's move on.  That's not impeachment.

N. Damigo - Direct

1          MS. PHILLIPS:  Sure.

2     BY MS. PHILLIPS:

3  Q    Mr. Damigo, you knew that torches and fire invoke Nazi

4  Germany for Jews and their supporters, correct?

5  A    I'm sorry.  Could you repeat that question?

6  Q    Sure.  You knew that torches and March invoke Nazi Germany

7  for Jews and their supporters?

8  A    I'm sorry.  Is this something out of a deposition?

9  Q    I'm asking you.

10  A    Yeah.

11  Q    At the time in 2017 when you came up with the idea for the

12  torch march, did you understand that torches and fire invoke

13  Nazi Germany for Jews and their supporters?

14  A    I do not recall thinking about that.

15  Q    And did you know at the time in 2017 that torches and fire

16  invoke traditions of the KKK for black people and their

17  supporters?

18          MR. JONES:  Objection as to what does -- what invoke

19  in other people and whether he knows how other people feel.

20          THE COURT:  Well, he can answer the question.  I

21  mean, the question is --

22          MS. PHILLIPS:  The question was about his knowledge.

23          THE COURT:  And so it goes to his motivation.

24  Whether it's fact or not, it's what he felt or knew or had an

25  opinion about.

180

N. Damigo - Direct

1          THE WITNESS:  I was aware that the Klan had in the

2    past used torchlit rallies, like many other organizations and

3    movements, some peaceful and some not peaceful.

4    BY MS. PHILLIPS:

5    Q    You gave a speech at Charlottesville 1.0, correct?

6    A    Yes.

7    Q    And in that speech you referred to Mr. Spencer as "my boy

8    Richard"; do you recall that?

9    A    No.  But I might have.

10   Q    Okay.  And you said in that speech that you were "truly

11   inspired" by seeing Richard in Hungary being arrested and you

12   knew he was a man after your own heart after that; do you

13   recall that?

14   A    I don't recall the speech at all, but I do recall that

15   sentiment.

16          MS. PHILLIPS:  Let's go ahead, Mr. Spalding, and

17   we'll show first to Mr. Damigo Plaintiffs' 2855.

18   BY MS. PHILLIPS:

19   Q    Is that you, Mr. Damigo?

20   A    Yes, it is.

21          MS. PHILLIPS:  Your Honor, I'd like to move

22   Plaintiffs' 2855 into evidence and publish it for the jury.

23   We're just going to play the very last part of your speech here

24   at the clip.

25          THE COURT:  Be admitted.  Go ahead.

N. Damigo - Direct

1       MS. PHILLIPS:  Thank you.

2       (Plaintiff Exhibit 2855 marked.)

3       (Plaintiff Exhibit 2855 admitted.)

4       (Video playing.)

5       THE COURT:  What's the purpose of this?

6       MS. PHILLIPS:  Just confirming what he said.

7       THE COURT:  Well, you know, there are lots of things

8  he said in his life that are not material, particularly to this

9  case.  And you can only impeach somebody on something material.

10      MS. PHILLIPS:  I wasn't trying to impeach him.  I was

11  just trying to get that into evidence.

12      THE COURT:  Well, please.  I mean, this is something

13  that's gone on that's really taken up a lot of time.  Witnesses

14  are taking much more time than they need because we go through

15  this little --

16      MS. PHILLIPS:  Understood, Your Honor.

17      THE COURT:  It's not -- I'll tell you, it's not

18  helpful.

19      MS. PHILLIPS:  I'll move on.  Thank you.

20  BY MS. PHILLIPS:

21  Q   Mr. Damigo, you met Jason Kessler in 2017, correct?

22  A   Yes.

23  Q   And you understood that Charlottesville 2.0 was

24  Mr. Kessler's idea?

25  A   Yes, it was.

N. Damigo - Direct

1  Q    And you had a conversation with him about his idea for the

2  event, correct?

3  A    Yes, I did.

4  Q    And he invited you to attend?

5  A    Yes.

6         MS. PHILLIPS:  Let's put up Plaintiffs' 0067.

7  BY MS. PHILLIPS:

8  Q    Mr. Damigo, these are your certified phone regards from

9  AT&T.  And you'll see at the very --

10        MS. PHILLIPS:  Can you go down to page 347,

11 Mr. Spalding, please?  Thank you.

12 BY MS. PHILLIPS:

13 Q    And you'll see at the top, Mr. Damigo, on the top left it

14 says "voice usage for," and then there's a 408 number, and I

15 won't say the rest of it, but if you could confirm that that's

16 your phone number, please.  Maybe Mr. Spalding could -- there

17 we go.

18      That's your phone number, correct?

19 A    Yes, that was my phone number at the time.

20        MS. PHILLIPS:  Your Honor, I'd move Plaintiffs' 0067

21 into evidence, please.

22        THE COURT:  Admitted.

23        (Plaintiff Exhibit 0067 marked.)

24        (Plaintiff Exhibit 0067 admitted.)

25        MS. PHILLIPS:  And we'll just go down to line -- can

N. Damigo - Direct

1   you go to entry 509, Mr. Spalding?  It just reflects that phone

2   call between Mr. Kessler and Mr. Damigo.

3          Oh, sorry.  Line 509.  There we go.  Thank you.

4   BY MS. PHILLIPS:

5   Q    Do you recognize the 434 number there as Mr. Kessler's

6   number?

7   A    I never memorized his number, but I'll accept that it's

8   his number.

9   Q    Okay.  And so you see the date on this is May 24th of

10  2017?

11  A    Yes, I do.

12         MS. PHILLIPS:  Okay.  Thank you very much.  You can

13  take that down now, Matt.  Thank you.

14  BY MS. PHILLIPS:

15  Q    After that call, Mr. Damigo, you spoke with Mr. Kessler

16  about Charlottesville 2.0 several times during the summer of

17  2017, correct?

18  A    I recall talking maybe two times with him.

19  Q    Okay.  Do you recall previously testifying that you spoke

20  with him in May, June, July, and August of 2017?

21  A    I recall during my deposition, if we could look at it,

22  phone calls being brought up.  I asked at the time of the

23  deposition if those phone calls went through, and I wasn't

24  given an answer.  And I wasn't sure how to read the data at the

25  time of my deposition.  I should have probably asked.

N. Damigo - Direct

1   Q     Were you asked this question?

2         "Okay.  So, Mr. Damigo, you spoke on the phone with

3   Mr. Kessler in May, June, July, and August of 2017, correct?"

4         And you gave the answer:  "It looks so."

5   A     Do you know what page that is?  I'd like to look at it.

6   Q     Sure.  163.

7               THE COURT:  I hope this is really important.

8               MS. PHILLIPS:  I'll move on, Your Honor.

9   BY MS. PHILLIPS:

10  Q     Mr. Damigo, at Mr. Kessler's request, you agreed to

11  promote the event to IE members so that they would attend

12  Charlottesville 2.0, correct?

13  A     Yes.

14  Q     And Mr. Kessler wanted you to attend UTR as well, correct?

15  A     Yes, he did.

16  Q     And I believe you decided to attend at least by July 10th,

17  2017; does that sound right?

18  A     Yeah, that sounds about right.

19  Q     And Mr. Kline was a member and leader of IE in 2017,

20  correct?

21  A     Yes.

22  Q     He became a member of IE in September of 2016.  Are you

23  aware of that?

24  A     That sounds about right.

25  Q     And you and Mr. Kline shared the same views about Jewish

N. Damigo - Direct

1  and black people, correct?

2  A    Generally speaking.

3  Q    And you were the leader of Identity Evropa during the

4  planning of Charlottesville 2.0?

5  A    Say that again.

6  Q    Sure.  You were the leader of Identity Evropa during the

7  planning period for Charlottesville 2.0?

8  A    Yes.

9  Q    And you had a rule that IE members were not allowed to

10 partake in any activism without express permission, correct?

11 A    Yes.

12 Q    You had the authority to approve activism for IE members,

13 of course?

14 A    Yes.

15 Q    And Mr. Kline also had authority to approve activism for

16 IE?

17 A    Yes.  At a certain point, I don't remember exactly when,

18 but I was becoming overwhelmed and needed to start delegating

19 things out to something else.  So, yes, I had given him that

20 permission; but it wasn't like a blanket ability to do any type

21 of activism.  It was only for specific types of activism.

22 Q    You trusted Mr. Kline to approve activism for IE members,

23 correct?

24 A    Yes, after I had a number of conversations with him about

25 what I expected.

N. Damigo - Direct

1   Q    Yeah.  You had several conversations with him, right,

2   about what was acceptable and what wasn't?

3   A    Yes.

4   Q    And you understood that Mr. Kline was working with

5   Mr. Kessler to organize Charlottesville 2.0, right?

6   A    That was my understanding.

7   Q    And you knew that Mr. Kline was one of the primary

8   organizers of the event, right?

9   A    I knew he was very, very involved with Kessler on it, and

10  he had been very helpful for us with previous events.

11  Q    Okay.  And Mr. Kline checked in with you during the

12  planning of Charlottesville 2.0?

13  A    From time to time he would give me updates as to what him,

14  Kessler, and whoever else they were working with had decided on

15  things.

16  Q    And you relied on him to coordinate with the other groups

17  that were planning to participate in the event?

18  A    I mostly relied on him just to give me information about

19  what was going on.

20  Q    Okay.  Were you asked this question and did you give this

21  answer in your deposition?

22       Question:  "And you relied on Mr. Kline to coordinate with

23  other groups that were planning to participate in UTR?"

24       Answer:  "For any information involved with, yes, making

25  decisions on that, yes."

N. Damigo - Direct

1        Do you remember testifying to that?

2   A    That sounds about like what I just said.  What page is

3   that?

4   Q    Sure.  224, line 25, to 225:5.

5            THE COURT:  Well, if it sounds about like what he

6   said, isn't that enough?

7            MS. PHILLIPS:  It wasn't what he said, Your Honor.

8   It was not what he said.  What he said was he relied on

9   Mr. Kline to give him information.

10           THE COURT:  He said, "That sounds about like what I

11  said."

12           MS. PHILLIPS:  I understand, except for if you look

13  at what his answer was, it was "I relied on Mr. Kline to

14  provide me information."  What he testified to in his

15  deposition was that he relied on Mr. Kline -- yes, the answer

16  to my question, which was to coordinate with other groups, was

17  yes.  So that's not what he testified to here.

18           THE COURT:  Well, he just said today -- you said

19  something and he said, "That sounds about like what I said."

20           MS. PHILLIPS:  I understand that's what he said, and

21  I'm showing him that that's not what he just testified to.

22           THE COURT:  Well, what did you read to him -- what

23  question did you ask first?  Then he agreed with you, and now

24  you're saying that you asked him -- tell him he said

25  something -- did you suggest he said something he didn't say?

N. Damigo - Direct

1          MS. PHILLIPS:  My question, Your Honor, was:  "You

2  relied on Mr. Kline" --

3          THE COURT:  Okay.  Look.  I don't want to add to the

4  time.  My fault.  Go ahead.

5          THE WITNESS:  Which page was that that you're looking

6  at?

7          MS. PHILLIPS:  It was on 224.

8          THE COURT:  And it would really help if you would

9  just start out giving the page and let him -- and not go

10  through all of this stuff and then go to the page where he's

11  going to stop and look for it.

12          MS. PHILLIPS:  Understood.  Thank you.

13  BY MS. PHILLIPS:

14  Q    Mr. Damigo, we'll move on.

15      IE was paying Mr. Kline a salary during the time period

16  that he was planning Charlottesville 2.0 with Mr. Kessler,

17  correct?

18  A    I don't recall the specific dates.  I know at some point

19  that summer we were looking at starting to pay him.

20  Q    Okay.  Thank you.  Just to refresh your recollection,

21  we'll put up Plaintiffs' 1273C.

22      (Plaintiff Exhibit 1273C marked.)

23          MS. PHILLIPS:  Mr. Spalding, if you can -- yeah.  Can

24  you show him his phone number, please?

25  BY MS. PHILLIPS:

N. Damigo - Direct

1  Q    Do you recognize this as a text message between you and

2  Mr. Kline?

3  A    Yes, I do.

4  Q    And you say, "I'm going to move forward tomorrow to get

5  you on the payroll," correct?

6  A    Yes, I see that.

7  Q    And this is dated July 1st, 2017?

8  A    Yes, it is.

9  Q    So does it refresh your recollection now that Mr. Kline

10 was on the payroll July 2 or around that time?

11 A    That we were working to get him on the payroll.  I'm not

12 sure how long that took.

13 Q    Understood.  And at some point you --

14       MS. PHILLIPS:  You can take that down, Mr. Spalding.

15 Thank you.

16 BY MS. PHILLIPS:

17 Q    At some point, Mr. Damigo, you nominated Mr. Kline to be

18 the IE PR representative for Charlottesville 2.0, correct?

19 A    I don't recall.  It's been a really long time.  It's been,

20 like, four years.

21 Q    Understood.  I will see if this refreshes your

22 recollection.

23       MS. PHILLIPS:  Mr. Spalding, if you can bring up

24 Plaintiffs' 1303, please.

25       (Plaintiff Exhibit 1303 marked.)

N. Damigo - Direct

1    BY MS. PHILLIPS:

2    Q    Does that refresh your recollection, Mr. Damigo?

3    A    That's language that Mr. Kessler used, not myself.

4    Q    I understand that.  I'm asking you if it refreshes your

5    recollection that you nominated Mr. Kline to be the IE PR

6    representative.

7    A    I never used those words with Kessler when I spoke with

8    him.  When I had spoke with Kessler, I told him I probably

9    wasn't even going to go to the event because I was too busy.  I

10   was in college and had a girlfriend, had a lot going on, and it

11   was my understanding that Kline was already talking with him.

12   So I said, yeah, just, you know, go ahead and talk to Kline,

13   and he'll fill me in on whatever.

14   Q    Okay.  Thank you.  You can take that down.

15        Moving on to Mr. Spencer, you exchanged text messages with

16   Mr. Spencer that summer of 2017, correct?

17   A    I'm sure I did.

18   Q    You had Skype calls with him that summer leading up to

19   Charlottesville 2.0?

20   A    Probably.

21   Q    Okay.  And telephone conversations with him each month in

22   the spring and summer of 2017?

23   A    I know we had calls quite often.  I was trying to help him

24   with a college tour that he was trying to do and put on.  So we

25   were talking about various projects, I think, at that time.

N. Damigo - Direct

1  Q    And you discussed holding a weekly call with him leading

2  up to Charlottesville 2.0, correct?

3  A    I don't recall.

4         MS. PHILLIPS:  Let's go ahead and show Mr. Damigo

5  Plaintiffs' 3082B.

6         Let's also go ahead and just show him 3082C.  Thank

7  you.

8  BY MS. PHILLIPS:

9  Q    You can see these side by side.  Do you recognize these as

10 text messages when yourself and Mr. Spencer?

11       And he suggests -- well, I'll wait and get your answer,

12 and then I'll publish to the jury.  Thank you.

13 A    Yes, I do recognize that.

14 Q    For both of those exhibits, Mr. Damigo?

15 A    Yeah, that looks like my phone number.

16 Q    Okay.  Great.

17       MS. PHILLIPS:  Your Honor, we move into evidence

18 Plaintiffs' 3082B and 3082C.

19            THE WITNESS:  Be admitted.

20       (Plaintiff Exhibits 3082B and 3082C marked.)

21       (Plaintiff Exhibits 3082B and 3082C admitted.)

22 BY MS. PHILLIPS:

23 Q    So Mr. Spencer says to you:  "Let's set up a weekly or

24 fortnightly conference call on events"; do you see that?

25 A    Yes, I do.

N. Damigo - Direct

1  Q    And you respond -- oh, excuse me.  Then he writes back:

2  "Eli, Greg Ritter, you, me"; do you see that?

3  A    Yes, I do.

4  Q    So he's suggesting weekly or fortnightly calls between

5  you, him, Mr. Kline, and Greg Ritter, correct?

6  A    Yes.

7  Q    And Mr. Ritter is also known as Greg Conte, correct?

8  A    I believe so.

9  Q    And he was an IE member, correct?

10 A    I'm not sure.

11 Q    You also spoke with Mr. Spencer in July 2017 about

12 Mr. Spencer hiring Mr. Kline, correct?

13 A    I don't recall.  It's been four years.

14       MS. PHILLIPS:  Okay.  Let's look at Plaintiffs'

15 1273A, please, Matt.

16 BY MS. PHILLIPS:

17 Q    Do you recognize this as a text message between yourself

18 and Mr. Kline?

19 A    Again, I don't know Kline's phone number by heart, but if

20 you're saying this is Kline.

21 Q    Go ahead and take a look at page 200, 8 through 11 in your

22 deposition and I'll show you Mr. Kline's phone number there.

23 And this is again your June 10th deposition.

24       Do you see the 610 number there?

25 A    Yes, I see you presenting that to me.  I'm fine to operate

N. Damigo - Direct

1  on the fact that that's probably his number.

2  Q    Just confirming.

3  A    Thank you.

4  Q    Okay.  Great.  So if you look at the body -- well, let me

5  move it into evidence.

6         MS. PHILLIPS:  Your Honor, I'd move into evidence

7  1273A, please, publish it to the jury.

8         THE COURT:  Be admitted.

9         (Plaintiff Exhibit 1273A marked.)

10        (Plaintiff Exhibit 1273A admitted.)

11  BY MS. PHILLIPS:

12  Q    It says, "Okay, talked to Richard.  He's going to have

13  Greg Ritter talk to you tomorrow."  Do you see that?

14  A    Yes, I do.

15  Q    Let's -- we can take that down and put up Plaintiffs'

16  1273A, please.  Oh, I'm sorry, 1273B.

17       Same thing, your text messages with Mr. Kline, same day.

18  And you write to Mr. Kline, "Said he is down to hire you."  Do

19  you see that?

20        (Plaintiff Exhibit 1273B marked.)

21  A    Yes, I do.

22  Q    So again, does this refresh your recollection that you had

23  conversations with Mr. Spencer about hiring Mr. Kline?

24  A    Yes, it does.

25  Q    Okay.  Great.

N. Damigo - Direct

1        MS. PHILLIPS:  You can take that down, please.

2  BY MS. PHILLIPS:

3  Q   You also reached out to Mr. Spencer about lodging plans

4  for the weekend of Charlottesville 2.0, correct?

5  A   I don't recall.

6  Q   Okay.  Let's put up Plaintiffs' 3084A, please.  Do you

7  recognize these as text messages between yourself and

8  Mr. Spencer from August 4th, 2017?

9  A   Yes, I see that.

10  Q   Okay.

11        MS. PHILLIPS:  Your Honor, I'd move to admit

12  Plaintiffs' 3084A and publish to the jury.

13        THE COURT:  Be admitted and you may publish.

14        (Plaintiff Exhibit 3084A marked.)

15        (Plaintiff Exhibit 3084A admitted.)

16  BY MS. PHILLIPS:

17  Q   You say here, "Is the fash loft going to be parked next

18  weekend?  I'm trying to look at my options as far as lodging."

19  Do you see that?

20  A   Yes, I do.

21  Q   Does that refresh your recollection that you spoke with

22  Mr. Spencer about lodging plans for the weekend of 2.0?

23  A   It doesn't surprise me that I would talk to him about

24  something like that.

25  Q   My question was does this refresh your recollection that

N. Damigo - Direct

1  you did so in this text?

2  A    Yes, I guess.

3          MR. SPENCER:  Objection, she's misstating evidence.

4  That's August 4th, 2017, the fash loft was in Alexandria,

5  Virginia.  This is deceptive presentation of evidence.

6          THE COURT:  You can object, but I don't --

7          MR. SPENCER:  What is the name of that exhibit?

8          MS. PHILLIPS:  Sure.  It is -- the number is 3084A.

9  And it's into evidence now.

10          We can take that down.  Thank you.

11   BY MS. PHILLIPS:

12  Q    Mr. Damigo, you would agree that IE, your organization,

13  helped with a lot of the planning and organizing for UTR,

14  correct?

15  A    There were a lot of members involved with the organizing,

16  yes.

17  Q    Okay.  Great.  And that included Mr. Kline acting as one

18  of the primary organizers, right?

19  A    Yes.  He was very involved with Kessler from my

20  understanding.

21  Q    Okay.  And Erica Alduino was also involved for a time with

22  the organizing; is that correct?

23  A    I think so.

24  Q    She was an IE member?

25  A    Yes.

N. Damigo - Direct

1   Q    And a Discord user called Ajax, he was also an IE member,

2   correct?

3   A    Yes, he was.

4   Q    Okay.  And he was involved with some organizational

5   aspects of Charlottesville 2.0?

6   A    I'm not sure.

7   Q    Okay.  And you gave IE -- excuse me, IE members permission

8   to attend Charlottesville 2.0, correct?

9   A    Yes, I did.

10  Q    And IE members, at least some of them did attend, correct?

11  A    Yes.

12  Q    Okay.  And you approved equipment for IE members to use at

13  UTR, correct?

14  A    Yes.  Originally I had planned on banning --

15  Q    It was a yes or no question, Mr. Damigo.

16  A    Yes, I had.

17  Q    You approved the use of shields, correct?

18  A    Yes, I did.

19  Q    You approved the use of helmets, correct?

20  A    Yes, I did.

21  Q    You approved the use of gloves, correct?

22  A    Yes, I did.

23          THE COURT:  All right.  We'll take about a 15-minute

24  recess -- 20-minute recess.

25  **(Jury out, 3:03 p.m.)**

N. Damigo - Direct

1          (Recess.)

2          THE COURT:  I'm going to alert you we have a juror

3    that's not feeling too well, but he's going to come back in the

4    courtroom.  And I've instructed if he feels bad he can get up

5    and leave.  And when I see him go, I'll stop everything.

6          We think he has an upset stomach.  I don't think it's

7    anything with COVID.

8          MS. KAPLAN:  I was just going to say, Your Honor, I'm

9    so sorry about that.

10   **(Jury in, 3:25 p.m.)**

11         THE COURT:  All right.  You may be seated and we'll

12   proceed.

13         MS. PHILLIPS:  May I begin, Your Honor?

14         THE COURT:  You may.

15         MS. PHILLIPS:  Thank you.

16    BY MS. PHILLIPS:

17   Q   Mr. Damigo, I'm just going to go back to Charlottesville

18   1.0 for one quick question.  Were you asked this question and

19   did you give this answer in your deposition:  Question:  "And

20   this is a Discord post in the alt-right-events-project and

21   #general channel by Evan Thomas.  Do you see that?"

22         Answer:  "Yes, I do."

23         Question:  "This is being marked as Exhibit 20 to the IE

24   deposition and this is an April 7th, 2017 post.  Mr. Thomas

25   says, 'In case anyone missed it, my point from last night is

N. Damigo - Direct

1    that there is an even greater need to have the rally now.

2    We'll address this Trump issue.  Richard will certainly address

3    it during a press conference and by interviews with journalists

4    covering our events.  Sure, we don't want to see the statue

5    removed but the truth is the rally was never about the Lee

6    statue.  It's about the development of our movement.  It's

7    about increasing our ability to exploit circumstances in the

8    real world and attract more activists to our cause.  Everything

9    we do for our cause has led to high quality growth of our

10   ranks.'  And then he goes on to say: 'Creating a large

11   influential movement is our primary task and the bulk of our

12   activities must be directed toward its achievement.'  Do you

13   see that?"

14        Your answer:  "Yes, I do."

15        Question:  "And was that IE's goal in planning

16   Charlottesville 1.0?"

17        Answer:  "Yeah, I'd say that would sum it up pretty good."

18   A    Do you know what page that is?  I didn't want to interrupt

19   you.

20   Q    Sure.  Again, this is in your June 10th deposition.  It's

21   page 151:11 through 152:21.  And my question is just --

22             THE COURT:  We were missing a juror.

23             MS. KAPLAN:  I think he just came back in, Your

24   Honor.

25             THE COURT:  I know.  But he didn't hear that.

N. Damigo - Direct

1          MS. KAPLAN:  That's true.

2          MS. PHILLIPS:  Would you like me to read it again?

3          THE COURT:  We're starting from scratch.

4          MS. PHILLIPS:  Okay.  No problem.

5          MS. KAPLAN:  Rewind.

6          MS. PHILLIPS:  Thank you, Your Honor.

7   BY MS. PHILLIPS:

8   Q    Mr. Damigo, I'll direct you.  Are you ready?  Yes, the

9   June 10th, 2020 deposition.  Are you there?

10  A    Yes.

11  Q    And it should be line -- page 151.

12       Question:  "And this is a Discord post in the

13  alt-right-events-project and the #general channel by Evan

14  Thomas?  Do you see that?"

15       Answer:  "Yes, I do."

16       Question:  "This is being marked as Exhibit 20 to the IE

17  deposition, and this is an April 7th, 2017 post, and Mr. Thomas

18  says:  'In case anyone missed it, my point from last night is

19  that there is an even greater need to have the rally now.

20  We'll address this Trump issue.  Richard will certainly address

21  it during the press conference and by interviews with

22  journalists covering our events.  Sure, we don't want to see

23  the statue removed, but the truth is the rally was never about

24  the Lee statue.  It's about the development of our movement.

25  It's about increasing our ability to exploit circumstances in

N. Damigo - Direct

1  the real world and attract more activists to our cause.

2  Everything we do for our cause has led to high quality growth

3  of our ranks.'  And then he goes on to say:  'Creating a large,

4  influential movement is our primary task, and the bulk of our

5  activities must be directed towards its achievement.'  Do you

6  see that?"

7       Answer:  "Yes, I do."

8       Question:  "And was that IE's goal in planning

9  Charlottesville 1.0?"

10      Answer:  "Yeah, I'd say that would sum it up pretty good."

11      Do you recall that question and answer?

12 A   I recall the question.  Unfortunately, I'm not finding it

13 here in the deposition.

14          MR. KOLENICH:  It's in the June 22nd.  I think you

15 said June 10th.

16          MS. PHILLIPS:  Oh, okay.  Like I said, we'll move on.

17 Mr. Spalding --

18          THE COURT:  We can instruct the jury that the record

19 shows that question was asked and the answer was given.

20          MS. PHILLIPS:  Appreciate it.  Thank you.

21          Can we show Mr. Damigo Plaintiffs' 0880?

22 BY MS. PHILLIPS:

23 Q   Mr. Damigo, do you recognize this as a Discord post of

24 yours?  That's your handle, Fashy Haircut?

25 A   Yes.  That appears to be a post I made in 2016.

N. Damigo - Direct

1  Q    October 16, 2016, correct?

2  A    Yes.

3        MS. PHILLIPS:  We'd move to admit Plaintiffs' 0880,

4  Your Honor, and publish it to the jury.

5        THE COURT:  Be admitted.

6        (Plaintiff Exhibit 0880 marked.)

7        (Plaintiff Exhibit 0880 admitted.)

8  BY MS. PHILLIPS:

9  Q    And in this post you write:  "@everyone I need someone to

10  make a fake Antifa account and stand by for further

11  instructions."

12       You posted that, correct?

13  A    Yes, I did.

14       MS. PHILLIPS:  Mr. Spalding, let's show 0881.

15  BY MS. PHILLIPS:

16  Q    Again, Mr. Damigo, I'll ask you if you recognize this

17  Discord post by you, Fashy Haircut, also made on October 16,

18  2016?

19  A    Yes, I do.

20       MS. PHILLIPS:  And I'd move to admit that as well,

21  Your Honor -- that's Plaintiffs' 0881 -- and publish that to

22  the jury, please.

23       THE COURT:  Be admitted and may be published.

24       (Plaintiff Exhibit 0881 marked.)

25       (Plaintiff Exhibit 0881 admitted.)

N. Damigo - Direct

1  BY MS. PHILLIPS:

2  Q    And you post:  "Actually, as many people as possible need

3  to create accounts.  Create multiple if possible.  Make them as

4  realistic as you can, and then post the link to the account

5  here so other people can follow them, making them look more

6  realistic.  I need a small, fake Antifa army."

7       And you posted that, correct?

8  A    Yes, I did.

9       MS. PHILLIPS:  Can you take that down, Matt?  Thank

10  you.

11   BY MS. PHILLIPS:

12  Q    On August 12th, Mr. Damigo, you decided to stay at

13  Emancipation Park after the state of emergency was declared and

14  defy police orders, correct?

15  A    Yes, that is correct.

16  Q    And I believe you previously testified that Richard

17  Spencer, Brodie Sutherland, Kilian Glish, and Evan McLaren

18  stayed with you in the park; is that correct?

19  A    Are you -- are you referring to something in the

20  deposition?

21  Q    I am, yes.

22  A    Oh.

23  Q    I can just read it into the record again.

24       Question:  "Who else" --

25            THE COURT:  Just a minute.  Was that the juror or was

N. Damigo - Direct

1  that -- the person who left?  Who left the courtroom?

2           BAILIFF:  That was a reporter.

3           THE COURT:  Oh.  Go ahead.  I'm sorry.

4   BY MS. PHILLIPS:

5  Q    Were you asked this question and did you give this answer?

6        Question:  "Who else decided to stay with you?"

7        Answer:  "There were a number of other people.  I recall

8  Richard Spencer being there.  I recall Brodie being there.  I

9  recall Kilian being there.  And I think Evan McLaren was there,

10 too."

11       Question -- we'll leave it at that.  So --

12 A    Sounds about right.

13 Q    And you were arrested after you refused to leave the park?

14 A    Yes, I was.

15 Q    On the evening of August 12th, 2017, you attended an

16 afterparty to celebrate with other rally attendees, correct?

17 A    Yes, I did.

18 Q    And people were celebrating, drinking, talking, and

19 enjoying themselves?

20 A    Yes, they were.

21 Q    And in the wake of Charlottesville 2.0, you stated that

22 you believed it was a huge success, correct?

23 A    Yes.  At the time I did state that and did believe that.

24 Q    And you left Charlottesville and went and stayed with

25 Mr. Spencer for a few days after Charlottesville 2.0, correct?

N. Damigo - Direct

1    A    Yes, I believe so.

2    Q    You organized a private press conference for August 14th

3    with Mr. Spencer, correct?

4    A    Yes, we did.

5    Q    And Mr. Kline was there as well?

6    A    I believe he was.

7         MS. PHILLIPS:  I would like to show Mr. Damigo

8    Plaintiffs' 0891.

9    BY MS. PHILLIPS:

10   Q    This is a Discord post in the Identity Evropa server by an

11   individual j_von_ought on August 12th, 2017; do you see that?

12   A    Yes, I do.

13   Q    And you have testified that you owned the Identity Evropa

14   server and you created it and everybody who posted in the

15   Identity Evropa server was an Identity Evropa member, correct?

16   A    Yes.

17        MS. PHILLIPS:  I would like to enter this into

18   evidence, Your Honor.  This is Plaintiffs' 0891.

19        MR. CANTWELL:  Objection, hearsay.

20        MS. PHILLIPS:  Your Honor, this is not hearsay.  It's

21   not being offered for the truth of the matter.

22        THE COURT:  It will be admitted.

23        (Plaintiff Exhibit 0891 marked.)

24        (Plaintiff Exhibit 0891 admitted.)

25    BY MS. PHILLIPS:

N. Damigo - Direct

1   Q     If we could -- it's already published.

2         J_von_ought said:  "Today we won and took control of the

3   narrative."  Do you see that?

4   A     Yes, I do.

5             MS. PHILLIPS:  We can take that down.  Mr. Spalding,

6   let's put up Plaintiffs' 0892.

7   BY MS. PHILLIPS:

8   Q     Mr. Damigo, this is another post in the Identity Evropa

9   server, the C'ville 2.0 channel, by somebody named Zachary

10  O'Ray; do you see that?

11  A     Yes, I do.

12            MS. PHILLIPS:  Your Honor, move again to admit

13  Plaintiffs' 0892.

14            THE COURT:  Be admitted.

15            MS. PHILLIPS:  If we can publish it to the jury as

16  well.

17            THE COURT:  You may.

18            (Plaintiff Exhibit 0892 marked.)

19            (Plaintiff Exhibit 0892 admitted.)

20  BY MS. PHILLIPS:

21  Q     This is a post from August 12th.  It says:  "Excellent

22  work out there tonight @everyone.  This is just the beginning.

23  It is afraid, but the war goes on."

24        We can take this down.  And we'll put up Plaintiffs' 0844.

25        This is another post by an Identity Evropa member in the

N. Damigo - Direct

1   Identity Evropa server, the #general channel.  This is texan-tx

2   from August 12th, 2017; do you see that?

3   A    Yes, I do.

4           MS. PHILLIPS:  Your Honor, we move Plaintiffs' 0844.

5           THE COURT:  Be admitted.

6           MS. PHILLIPS:  We'll publish it to the jury, please.

7           THE COURT:  You may.

8           (Plaintiff Exhibit 0844 marked.)

9           (Plaintiff Exhibit 0844 admitted.)

10  BY MS. PHILLIPS:

11  Q    This individual says:  "Honestly, this is a huge victory."

12       Do you see that?

13  A    Yes, I do.

14          MS. PHILLIPS:  We can take that down.  Thanks, Matt.

15  BY MS. PHILLIPS:

16  Q    We'll put up Plaintiffs' 0846.  This is another post by

17  another Identity Evropa member in the Identity Evropa server.

18       Do you see that?

19  A    Yes, I do.

20  Q    And this is also from August 12th --

21  A    Yes, it is.

22  Q    -- 2017?

23          MS. PHILLIPS:  Your Honor, we move 0846 and publish

24  it to the jury, please.

25          THE COURT:  Be admitted and you may publish.

N. Damigo - Direct

1              (Plaintiff Exhibit 0846 marked.)

2              (Plaintiff Exhibit 0846 admitted.)

3   BY MS. PHILLIPS:

4   Q    In this post, another IE member posts:  "Today is a net

5   victory.  All of our guys who were there are great men."

6        Do you see that?

7   A    Yes, I do.

8              MS. PHILLIPS:  You can take that down.  Thank you.

9    BY MS. PHILLIPS:

10  Q    Now, after August 12th, 2017, Mr. Damigo, you were praised

11  by IE members, correct?

12  A    Yes, I believe some did.

13             MS. PHILLIPS:  Mr. Spalding, if we could put up

14  Plaintiffs' 0848, please.

15  BY MS. PHILLIPS:

16  Q    Do you see if you look, Mr. Damigo, the fourth post down

17  is by you, Fashy Haircut, on August 14, 2017.

18       Do you see that?

19  A    Yes, I do.

20             MS. PHILLIPS:  Your Honor, we'd move

21  Plaintiffs' 0848, please, and publish it to the jury.

22             THE COURT:  Be admitted.  You may publish.

23             (Plaintiff Exhibit 0848 marked.)

24             (Plaintiff Exhibit 0848 admitted.)

25   BY MS. PHILLIPS:

N. Damigo - Direct

1   Q    If you have look at the second post down, frog posts:

2   "Thanks for everything you did for our people this weekend

3   @Fashy Haircut."

4        Do you see that?

5   A    Yes, I do.

6   Q    Then you responded:  "No problem, man.  Fuck the police."

7        Do you see that?

8   A    Yes, I do.

9   Q    In the seventh post down, SoCalFashAttackCA writes to you:

10  "Yeah, man, this is a great organization."  Then underneath

11  that he says:  "I am proud to be part of it.  Hail victory."

12       Do you see that?

13  A    Yes, I do.

14  Q    You can take those down.  Let's put up Plaintiffs' 1851A.

15       Do you recognize this, Mr. Damigo, as a text message

16  between you and Patrick Casey, your -- yeah, 408 number up on

17  the screen?  Do you see that?

18  A    Yes.  I recognize it now.

19            MS. PHILLIPS:  Your Honor, we'd move into evidence

20  Plaintiffs' 1851A, please.

21            THE COURT:  Admitted, and you may publish.

22            (Plaintiff Exhibit 1851A marked.)

23            (Plaintiff Exhibit 1851A admitted.)

24            MS. PHILLIPS:  Thank you.

25   BY MS. PHILLIPS:

N. Damigo - Direct

1  Q    And the body says -- I'm sorry.

2        First, this is a text message from August 14th, 2017,

3  correct?

4  A    Yes, it is.

5  Q    And the body says:  "Should we shut down the intel server?

6  Should I issue an announcement reminding our members not to

7  talk to the police?"

8  A    Yes, I see that.

9  Q    We'll put up your response.

10        MS. PHILLIPS:  If we can put up 1851B, please.

11  BY MS. PHILLIPS:

12  Q    And Mr. Damigo, do you recognize this again as a text

13  message between you and Patrick Casey?

14  A    Yes, I see that.

15  Q    This is also from August 14th, 2017?

16  A    Yes, I see that.

17  Q    And your response is:  "Yes, on both accounts," correct?

18  A    Correct.

19  Q    You can put that down.  Thank you.

20        MS. PHILLIPS:  Oh, I'm sorry.  Mr. Spalding reminds

21  me that I should move this into evidence, Your Honor.  I would

22  like to admit 1851B and publish it to the jury, please.

23        THE COURT:  Be admitted.

24        MS. PHILLIPS:  Thank you.

25        (Plaintiff Exhibit 1851B marked.)

N. Damigo - Direct

1          (Plaintiff Exhibit 1851B admitted.)

2    BY MS. PHILLIPS:

3   Q    Mr. Damigo, at the conclusion of Charlottesville 2.0, you

4   praised Mr. Kline for his work in organizing the event,

5   correct?

6   A    I do not recall if I did or not.

7   Q    Were you asked this question and did you give this answer?

8        Question:  "So Mr. Kline was celebrated as doing an

9   excellent job and deserving the highest praise from the entire

10  organization, correct?"

11       Answer:  "Yes."

12       Do you remember that?

13  A    No.  Is that somewhere in the deposition we went over?

14  Q    It is.  If you look in the 6-22 deposition, the second

15  one, at 2:39.

16            THE COURT:  If you'll tell me the -- just state the

17  line.

18            MS. PHILLIPS:  Sure.  It's lines 17 through 20 in

19  your 6-22-2020 deposition.

20            THE COURT:  Members of the jury, the record shows

21  that question was asked and that was his answer.

22            MS. PHILLIPS:  Thank you, Your Honor.

23   BY MS. PHILLIPS:

24  Q    Approximately two weeks after Charlottesville 2.0, you

25  turned Identity Evropa over to Mr. Kline because you trusted

N. Damigo - Cross

1  him to lead the organization that you founded, correct?

2  A    I had begun to hand it over to him.  He was operating as

3  the --

4  Q    Is the answer yes?

5  A    Well, no, because I never really fully handed it over to

6  him.

7  Q    Okay.  Were you asked this question and did you give this

8  answer?

9       Question:  "Shortly after the Unite the Right rally you

10  turned Identity Evropa over to Mr. Kline, correct?"

11       Answer:  "That is correct."

12  A    As the CEO.

13           MS. PHILLIPS:  I have no further questions, Your

14  Honor.

15           THE COURT:  Thank you.  All right.

16           Who wants to cross?

17           MR. KOLENICH:  No questions, Your Honor.

18                        CROSS-EXAMINATION

19   BY MR. SPENCER:

20  Q    Hello.  My name is Richard Spencer and I am acting on my

21  own behalf.

22       So, Mr. Damigo, you were the founder and leader of

23  Identity Evropa?

24  A    Yes, that is correct.

25  Q    Was I, Richard Spencer, ever a member of Identity Evropa?

N. Damigo - Cross

1  A     No, you weren't.

2  Q     Did I ever seek to become a member?

3  A     No.

4  Q     Mention was made of two events that I want to talk about.

5        Mention was made of a Berkeley event that -- I guess in

6  2017, that became known as the Battle of Berkeley.

7              MR. SPENCER:  And Heidi, I'm not seeing this on --

8  there we go.

9              THE CLERK:  I'm sorry.  The wrong thing was selected

10 on our end.  Sorry.

11  BY MR. SPENCER:

12 Q     There was an event in Berkeley in 2017 -- not -- there we

13 go -- that became known as the Battle of Berkeley.

14       You remember that?

15 A     Yes, I do.

16 Q     You were involved personally with that demonstration?

17 A     Not as far as organizing goes, but I was there, yes.

18 Q     Okay.  Did you see me at the Battle of Berkeley event in

19 2017?

20 A     No.

21 Q     Did you invite me or think that I was there or anything

22 like that?

23 A     No.

24 Q     Do you remember another event at Berkeley where you might

25 have seen me?

N. Damigo - Cross

1   A     Yes, I do.

2   Q     In 2016?

3   A     Yes.

4   Q     Okay.  Could you describe that event?

5         And I also -- this is -- I would like to submit this

6   article as -- well, I'll first of all ask you:  Does this

7   article ring a bell for you?

8         It was a UC Berkeley campus website discussing a safe

9   space event at the California Berkeley campus in Sproul Square.

10  Does that ring a bell for you?

11  A     Yeah, the event, absolutely.

12             MS. PHILLIPS:  Objection, Your Honor.  This is an

13  article.  It is not evidence.  Mr. Damigo did not offer this

14  article.

15             MR. SPENCER:  I'll grant that.  That's fine.  This

16  was just simply to refresh his memory and show an image of the

17  event.  That's the only reason.  It's not worth it to argue

18  about it.

19   BY MR. SPENCER:

20  Q     Okay.  Could you describe -- did I have a hand in planning

21  that event?

22  A     I believe I planned that and invited you to it.

23  Q     Okay.  Could you describe what happened at that event,

24  what it was about?

25  A     Sure.  The purpose of it was to start a discussion on

N. Damigo - Cross

1   college campuses for an open debate on issues of race and

2   identity and a lot of positions that were being omitted from

3   college lectures and textbooks and so on.  We figured we would

4   do it at Sproul Plaza because it's very symbolic as the -- kind

5   of known as the home of freedom of speech.

6   Q    Right.  And was there a lot of vigorous debate at that

7   event?

8   A    There was some good debating going on and a lot of

9   discussion.

10  Q    Was anyone harmed physically at all at that event?

11  A    No.

12  Q    Thank you.  So that was an event that we did together at

13  Berkeley in 2016.

14       Mention was also made of Hungary, and the plaintiffs

15  showed a video in which you said something to the effect of

16  "you were my kind of guy because you got arrested at Hungary."

17       Do you remember that?

18  A    Yes, I do.

19  Q    Okay.  I'm simply showing this to refresh your memory.

20  This is another article.

21            MR. SPENCER:  Are you going to object to my posting

22  this article?

23            MS. PHILLIPS:  I'm going to object to you posting the

24  article for the jury to see.  If you would like to refresh his

25  recollection, you may do that.

N. Damigo - Cross

1          MR. SPENCER:  Okay.

2     BY MR. SPENCER:

3     Q     So when you referred to -- in that group setting, you

4     referred to "Richard is my kind of guy, he got arrested at

5     Hungary," were you -- what were you referring to, exactly?

6     A     So that was a little bit of a tongue-in-cheek reference in

7     the sense that I myself had, tragically, spent a little bit of

8     time incarcerated; however, I found that when you were held

9     for, you know, 24 or 48 hours in Hungary -- you know, you were

10    going there to have a speech and to discuss matters of

11    international importance --

12          MS. PHILLIPS:  Your Honor, he's testifying about what

13    Mr. Spencer did.  I will object on the basis of foundation.

14          MR. SPENCER:  He's testifying about his memory and he

15    was not there.

16          THE COURT:  But what does --

17          MS. PHILLIPS:  You just said he was not there.

18          THE COURT:  But Hungary has nothing do with -- so far

19    what's been done with this case.

20          MR. SPENCER:  I agree.  The plaintiffs brought up

21    Hungary as a way of --

22          THE COURT:  Everything they bring up doesn't -- we

23    don't have to go down every -- and I'm not accusing them of

24    this, but anytime -- you know, there are lots of rabbit trails

25    that come up in cases, and we don't have to go down all of

N. Damigo - Cross

1  them.

2          MR. KOLENICH:  Since the Court is sustaining the

3  objection, I would move to strike the entire answer of the

4  witness.

5          THE COURT:  All right.  Sustained.  Strike.

6   BY MR. SPENCER:

7  Q    Mr. Damigo, were you aware that I was arrested for

8  attempting to hold a conference, and not for any crime that

9  would have been a crime in the United States?

10 A    Yes.

11         MS. PHILLIPS:  Objection.

12         MR. SPENCER:  Thank you.

13         MS. PHILLIPS:  It's a leading and argumentative

14 question.

15         THE COURT:  Well, he answered the question.

16 BY MR. SPENCER:

17 Q    So I was not a member of IE.  Did I ever -- who was

18 allowed to be involved in the IE Discord?

19 A    Only IE members.

20 Q    Okay.  Did I ever jump in there, to your recollection?

21 A    Not that I recall, no.

22 Q    Do you -- during discovery, were you able to look over the

23 text message correspondence that we had over the course of

24 2017?

25 A    I'm not sure I had much of a chance to look at all of

N. Damigo - Cross

1   that.  It was on some sort of database that was very confusing

2   to me, and I didn't really know how to use it.

3   Q    Did you have a phone number at the time, area code 408 --

4   and then to go on?

5   A    (No verbal response.)

6   Q    Okay.  I would like -- do you -- do you see what's on your

7   screen right there?

8   A    Yes, I do.

9   Q    Is that --

10          MS. PHILLIPS:  Your Honor, I'm going to ask what this

11   document is.

12          MR. SPENCER:  It's the full text correspondence

13   between Mr. Damigo and I.

14          MS. PHILLIPS:  What's the defense exhibit, please?

15          MR. SPENCER:  The defense exhibit is Defense

16   Exhibit 1009.

17          MS. PHILLIPS:  Thank you.

18    BY MR. SPENCER:

19   Q    Does this look like a fair and accurate representation of

20   our text message correspondence over that period?

21          MS. PHILLIPS:  May I please request that you scroll

22   back up so that I can see?

23          MR. SPENCER:  Sure.

24          MS. PHILLIPS:  Where is the phone number, either of

25   the phone numbers?

N. Damigo - Cross

1            MR. SPENCER:  You might have to take my word on this.

2    I would never --

3            MS. PHILLIPS:  Objection, Your Honor.

4            THE COURT:  Well --

5            MS. PHILLIPS:  Was this produced to plaintiffs?

6            THE COURT:  Look, look --

7            MS. PHILLIPS:  Sorry.

8            THE COURT:  I don't want to go into trial 101, but

9    there's no colloquy between lawyers and parties.

10           MS. PHILLIPS:  Understood, Your Honor.

11           THE COURT:  So what's your issue?

12           MS. PHILLIPS:  Your Honor, I'd like to know whether

13   this was produced to plaintiffs, number one, and number two, I

14   don't see any phone numbers or identifiers on this document.

15           THE COURT:  The question -- I mean, I guess it was a

16   filed document.  I don't know.

17           MR. SPENCER:  This was given to you quite some time

18   ago, and I reproduced this in a more readable form now.  I

19   mean, this is taken directly -- this is downloaded directly

20   from my messages.

21           MS. PHILLIPS:  Okay.

22           THE COURT:  Well, he doesn't -- I mean, if he

23   recognizes the conversation --

24           MS. PHILLIPS:  I said okay.

25           THE COURT:  Okay.

N. Damigo - Cross

1   BY MR. SPENCER:

2   Q    I would like to go to two things --

3            THE CLERK:  Is it admitted, Your Honor?

4            THE COURT:  Yes.

5            (Defendant Richard Spencer Exhibit 1009 marked.)

6            (Defendant Richard Spencer Exhibit 1009 admitted.)

7   BY MR. SPENCER:

8   Q    I would like to take you to August 4th, 2017.

9        This was submitted in a different form by the plaintiffs.

10  And you are on the left-hand side there, Mr. Damigo.  It says:

11  "Is the fash loft going to be parked next weekend?"  I presume

12  that's a typo for "booked" or something like that.  "Parked"

13  seems -- but do you see that?

14  A    Yeah.  That's definitely a typo.

15  Q    Yes.  Okay -- oh, you said "packed."  You corrected it.

16  So "packed."  Okay.

17       And I said:  "We could fit you in."  You said:  "Awesome,

18  thanks."  That is August 4th.

19       Now, when you say the words "fash loft," what are you

20  referring to?

21  A    I believe that was the DC-area apartment you had for a

22  while.

23  Q    Does Alexandria, Virginia ring a bell?

24  A    Alexandria.  There it is.  Yeah.

25  Q    So it's in Virginia.

N. Damigo - Cross

1     Now, the term "fash loft," is that something we might

2  associate with your moniker, Fashy Haircut?  How would you

3  characterize such language?

4  A    I would say that runs along a similar vein.  It was common

5  to use "fash" as short for "fascist."

6  Q    Right.  Is it -- would you characterize that as

7  tongue-in-cheek?

8  A    Yes.

9  Q    So this is referring to Alexandria, Virginia, correct, and

10 you're effectively asking, could I sleep over at your place?

11 A    Yes.

12 Q    Right.  This is not referring to Charlottesville,

13 Virginia, correct?

14 A    No, not Charlottesville.  I actually stayed by myself when

15 I came down here.

16 Q    Okay.

17 A    For the rally.

18 Q    Did we stay in the same lodging -- during the Unite the

19 Right event, did we stay in the same lodging?

20 A    No.  I stayed by myself about 50 miles out of the city

21 limits.

22 Q    Did we coordinate in terms of lodging for the

23 Charlottesville event?

24 A    No.

25 Q    Did we communicate up until, I guess, August -- withdrawn.

N. Damigo - Cross

1       I also want to go an earlier part that was brought up in

2  your testimony about events.

3       So this takes place on June 12th, 2017.  And you ask:  "If

4  there is a good time to talk tonight, let me know."

5       And I responded:  "Yeah, let's set up a weekly or

6  fortnightly conference call on events.  Eli, Greg Ritter, you,

7  and me."

8       "Okay, cool" was your response.  "For tonight or

9  Wednesday?"

10      Now, when I used the plural, "events," what do you think I

11 was referring to?

12           MS. PHILLIPS:  Objection.  Speculation.

13           THE COURT:  Well, did he -- he sent him a message.

14           What did you understand the message to mean to you?

15           THE WITNESS:  So as I mentioned earlier in my

16 testimony, about that time we were working on trying to get you

17 booked for numerous college tours, and that's, I think, what

18 this is in reference to.

19 BY MR. SPENCER:

20 Q    Okay.  Who, to your knowledge, was the organizer of the

21 Charlottesville Unite the Right rally on August 12th?

22 A    That would be Kessler.

23 Q    Yes.

24      I'd like to go a little bit before this -- after.  Excuse

25 me.  I want to take you to June 17th, 2017.

N. Damigo - Cross

1      Do you remember this snippet of a conversation?

2      Shakespeare?  Does that ring a bell?

3  A    Yes.  Yes, I do remember.

4  Q    So I say on June 17th:  "I'm totally at war with the

5  'alt-lite' at this point."

6      And you say:  "Still on for next weekend?"

7      And then you say:  "Jack Posobiec is a" -- nasty word.

8      And then you represent or you reproduce a tweet in which I

9  say publicly:  "I absolutely support the arrest and

10 imprisonment of Laurie Loomer and other 'Alt-Light' activists

11 who behave like Antifa."

12     Does this ring a bell for you?  What were we talking

13 about?

14 A    I believe Laura Loomer had, like, ran onto the stage of

15 some event or other, and you were considering taking those

16 types of actions in order to gain more attention for --

17 Q    When you say "we"?

18 A    Oh, excuse me.  Identity Evropa was -- and myself was

19 looking at doing that type of activism, not for the purpose of

20 shutting down events but for the purpose of just getting our

21 message out there and making a statement.

22 Q    Did I respond positively to shutting down artistic events?

23 A    No.  It does not appear so.

24 Q    I said, "Don't do anything that disrupts free speech.

25 They disrupted a play for God's sake.  It's a very bad look.

N. Damigo - Cross

```
 1   Don't disrupt plays, art, or other people speaking.  It's a
 2   terrible look.  They are using Antifa tactics."
 3   A    Yes, I see that.
 4   Q    Yes.  Do you remember that as a -- did you view me as
 5   someone during the summer of 2017 who was at all interested in
 6   disrupting anyone's free speech of any kind, whether a
 7   Shakespeare production or a political speech?
 8             MR. KOLENICH:  I object to this line of questioning
 9   as irrelevant.
10             THE COURT:  Sustained.
11    BY MR. SPENCER:
12   Q    How would you characterize our dispute?
13   A    Just a disagreement --
14             THE COURT:  Let's confine it to --
15             MR. SPENCER:  I'll move on.
16             THE COURT:  -- August 12.
17    BY MR. SPENCER:
18   Q    Okay.  On August 12th -- so let's go to the rally itself.
19   On August 11th, do you remember seeing me at the torchlight
20   march?
21   A    On August 11th?
22   Q    Yes.
23   A    I wasn't even there.
24   Q    Okay.  So the answer is no?
25   A    No.
```

N. Damigo - Cross

1  Q    On August 12th, just to remind everyone, were we staying

2  in the same house or anything like that?  Were we

3  communicating?

4  A    No.

5  Q    Okay.  Do you remember seeing me on August 12th?

6  A    I might have seen you in the -- yeah, I did see you August

7  12th, yeah.

8  Q    Okay.  So when we -- everyone had to deal with entering

9  the park, entering Lee or Emancipation Park on August 12th.

10  How did you do that?

11  A    There had been a bunch of vans that had been rented out

12  and they were supposed to, from what I was told, they were

13  supposed to go directly to the front of the park and drop

14  people off so they didn't have to walk between

15  counter-protesters and there wouldn't be any sort of scuffles

16  or any problems.  And for whatever reason, I was told by Kline

17  that morning that the law enforcement was changing up

18  everything --

19            MS. PHILLIPS:  Objection, Your Honor.

20            THE WITNESS:  -- and they weren't --

21            MS. PHILLIPS:  I would object on the basis of

22  hearsay.  He's testifying about what somebody else told him.

23            THE COURT:  All right.  Sustained.

24   BY MR. SPENCER:

25  Q    You mentioned these vans.  Who rented these vans?

N. Damigo - Cross

1   A    I'm not sure who actually went and rented them, but we had

2   been asked to donate -- we as in IE had been asked to donate

3   money for them.  And it was explained to me that it would be

4   for the purpose of getting everyone to the park safely.  And so

5   I thought it was a good idea and I put the money up.  I think

6   it was like $600 or maybe a little bit more.  I don't remember

7   the exact amount.

8   Q    Did I put up any money for these vans to your knowledge?

9   A    Not to my knowledge, no.

10  Q    Did I ride in these vans?

11  A    I do not know.

12  Q    Okay.  That's fine.  So how did you enter the park on

13  August 12th; do you remember?

14  A    So myself and multiple other people were dropped off about

15  two blocks away from the park, and I remember it being strange

16  because I thought we were supposed to be getting out right at

17  the park.  And again, I was told, no, everything has been

18  changed up.  So we're getting out here two blocks away.  And as

19  I turned around, I think -- is that Market Street that was the

20  road that everybody was going down?

21  Q    I believe so, if I can represent that.

22  A    So there was just a lot of people heading in that

23  direction.  We all kind of just jumped in.  There was -- as we

24  got closer to the park, there were counter-protesters

25  surrounding us on all sides, and we just -- I was a little

N. Damigo - Cross

1    nervous someone was going to jump out and attack me and

2    whatnot, but I just walked with everybody else up into the

3    park.

4    Q    Okay.  When was -- so when you were entering the park --

5    so we're kind of right before the event -- did you see me near

6    you at any time?

7    A    No, not -- not when entering the park, I don't recall

8    seeing you.

9    Q    When was the first time you saw me on August 12th?

10   A    I believe I might have seen you that morning in the

11   staging area at the park on the outside of town where we were

12   shuttling vans from.  I think I might have seen you there.

13   Q    Were you scheduled to speak, to your knowledge, at the

14   Unite the Right rally?

15   A    Not originally, but I had been given a slot.

16   Q    Okay.  Who gave you that slot?

17   A    Kessler.

18   Q    Did you -- were you able to say any words in a speech

19   format at Unite the Right?

20   A    No.

21   Q    What happened after -- or around noon of August 12th, what

22   happened?

23   A    We were all -- we had all gotten into the park and we were

24   standing around.  And that's actually I guess the next time

25   during the day that I saw you.  We were all waiting for the

N. Damigo - Cross

1  sound equipment to come.  And there were numerous people I

2  recall asking law enforcement who were kind of standing on the

3  side, hey, when can we bring this stuff in?  When can we start

4  setting up?  This rally is about to start.  And they were kind

5  of acting funny.  And then all of a sudden they came out and

6  called a state of emergency and kicked us out.

7  Q    When you say "they were kind of acting funny," who are you

8  referring to?

9  A    Law enforcement was.

10 Q    And what did they do after the state of emergency was

11 declared?

12 A    They came out in full riot gear.  They lined up on one

13 side of the park and pushed us all out into where all the

14 counter-protesters --

15      MR. KOLENICH:  Your Honor, I object.  All of it is

16 outside the scope of the direct examination.

17      THE COURT:  Well, he's a party to the case.  So I

18 think that's an exception.  Go ahead.

19      MR. KOLENICH:  I'd make a second objection that it's

20 irrelevant to the claims, where the police were standing and

21 all this stuff.  It's a conspiracy case.  None of this has

22 anything to do with any communications either of these

23 individuals had.

24      MR. SPENCER:  I'll speed this up.

25      THE COURT:  There are no injuries from anything the

N. Damigo - Cross

1    police did at that point?

2              MR. SPENCER:  No.

3              THE COURT:  Okay.

4     BY MR. SPENCER:

5    Q    Were we in communication -- after we were expelled from --

6    was I there during that expulsion?

7    A    For a short time and then you left.

8    Q    Okay.  Were we in communication directly afterward?  Were

9    we together?  Were we talking?  Were we in any kind of

10   communication?

11   A    No, I was arrested and detained for about an hour and then

12   let go with a ticket or something.  And someone escorted me to

13   my vehicle.  I told law enforcement I didn't feel safe just

14   being released in the immediate area.  And they said there was

15   nothing they could do and they let me go.  I saw a couple of

16   people that looked recognizable, looked like they were there

17   for the UTR rally and asked them if I could walk with them for

18   safety purposes.  And then they were kind enough to give me a

19   ride back to my car.  I went to Taco Bell.  And then -- yeah.

20   Q    How long were you detained after -- to give a rough

21   timeline, if you were detained, say, 15 or 20 minutes after the

22   state of emergency was declared?  To your recollection how long

23   were you detained by the police?

24   A    It was somewhere in the ballpark of 45 minutes, maybe a

25   little longer.

N. Damigo - Cross

1    Q    So up until -- would it be safe to say that up until about

2    1:30 you were incommunicado?

3    A    Yes.

4    Q    Do you remember seeing me after the -- after the event?

5    A    No.

6              MR. SPENCER:  Thank you.  No further questions.

7                         CROSS-EXAMINATION

8     BY MR. CAMPBELL:

9    Q    Afternoon, Mr. Damigo.  I represent James Fields.  Prior

10   to August 12 did you know the name James Fields?

11   A    No.

12   Q    And having seen pictures all over the internet and that

13   sort of thing of his face since August 12, have you ever met

14   him prior to August 12?

15   A    No, I have not.

16   Q    Have you ever seen him at any sort of rally, event, any

17   political rally or anything like that?

18   A    No, I've never seen him before.

19   Q    When was the Unite the Right rally over in your mind?

20   A    After we -- like when we all got pushed out of the park

21   and it was canceled.

22   Q    The state of emergency --

23   A    The state of emergency, yeah.

24             MR. CAMPBELL:  Thank you, sir.  I don't have any more

25   questions.

230

N. Damigo - Cross

1                       CROSS-EXAMINATION

2    BY MR. JONES:

3    Q    Good afternoon, sir.  I represent Michael Hill, Michael

4    Tubbs and the League of the South.

5         There was some discussion on Discord about the creation of

6    fake Antifa accounts.  Do you recall that?

7    A    Which -- are you referring to the IE Discord?

8    Q    Yes.

9    A    Yes, there was back in 2016.  That lasted all of about 24

10   to 48 hours and everyone thought it was a dumb idea.  So we

11   didn't pursue it any further.

12   Q    During the course of any of your depositions or in the

13   course of your trial have plaintiffs shown you any evidence

14   that fake Antifa accounts played any role at the Unite the

15   Right rally?

16   A    I haven't seen anything.

17   Q    You also made a statement about Unite the Right.  And one

18   of the things you said was that it was not about monuments.  Do

19   you recall that?

20   A    That I said that?

21   Q    Yeah.

22   A    Or that someone else said that?

23   Q    Whichever way you recall it.  How do you recall it?

24   A    If you could point towards the statement or something,

25   that would be appreciated.

N. Damigo - Cross

1  Q    I don't have the statement on me now, but I'll move on.

2       Plaintiff Wispelwey described Antifa or anti-fascist

3  counter-protesters earlier this morning.  We went over this.

4  He said battalions of anti-fascist protesters came forward to

5  thwart the tide of men carrying -- and then it refers to the

6  protesters, you.

7       Would you agree or would you disagree with his

8  characterization of Antifa?

9           MS. PHILLIPS:  Objection.

10          THE COURT:  Sustained.

11          MR. JONES:  What's the basis of the objection?

12          THE COURT:  He can testify as to his understanding,

13 but he's not called upon to say what -- someone else's beliefs.

14          MR. JONES:  I'm just asking if he agrees or disagrees

15 based on his attendance at the rally.

16          THE COURT:  I sustained the objection.  He can give

17 his own opinion and the jury can weigh the two opinions.

18 BY MR. JONES:

19 Q    Okay.  You attended the rally on August 12th; is that

20 correct?

21 A    Yes, that's correct.

22 Q    Did you see any counter-protesters?

23 A    Yes, I did.

24 Q    What did you see counter-protesters doing?

25 A    As we were walking in, they were on both sides of me.  It

N. Damigo - Cross

1  was a very tense situation, and I was actually very surprised

2  something didn't kick off while I was walking through.  I

3  noticed a lot of very identifiable symbols with organizations

4  that would typically be considered Antifa.

5           MS. PHILLIPS:  Objection on the basis of foundation.

6  Mr. Damigo just testified about something being typically

7  considered Antifa.

8           MR. JONES:  Is there a dispute that he doesn't know

9  what Antifa looks like?  I can go down that road and we can

10  spend time establishing -- he was in Berkeley, he was at --

11           THE COURT:  Well, the minister said he talked about

12  Antifa being there.  He apparently recognized them.

13           MR. JONES:  I'm happy to establish the foundation.

14           THE COURT:  Just ask what characteristics of

15  people -- of Antifa, what are the characteristics of Antifa

16  that people would be looking for.

17   BY MR. JONES:

18  Q    When you say that you saw people who you would

19  characterize as Antifa at the rally, can you describe the

20  foundation for how you know that?  What's the basis of your

21  personal knowledge?

22  A    So Antifa is both a larger movement, but there are actual

23  organizations that self-identify as anti-fascists.  Many of

24  them are anarchists and communist in nature, although there's a

25  lot of liberal Democrats and socialists as well involved with

N. Damigo - Cross

1    some of these organizations.  And there are a range of symbols

2    that they typically use to identify themselves.

3              MS. DUNN:  Objection, Your Honor.  Again, what's the

4    foundation for Mr. Damigo's testimony right now?

5              THE COURT:  Sustained.  He has to say how he knows

6    what he knows.

7              MR. JONES:  I'm trying to --

8    BY MR. JONES:

9    Q    Can you say how you know what you know about Antifa?

10             THE COURT:  Well, let's put it this way:  What

11   impression -- when you speak of Antifa and you said there was

12   someone there, what did you see about them that made you

13   conclude that they were Antifa?

14             THE WITNESS:  So there are flags that are black and

15   red that stand for anarchism and communism and the coalition

16   between the two.  There are other symbols such as the iron

17   hammer and sickle of communism that I saw walking in.  There

18   were -- there's three downward-facing arrows, which is a

19   longstanding actual Antifa -- I think it's called the --

20             MS. PHILLIPS:  Objection, Your Honor.  Again, he has

21   not established how he knows this.  He's just testifying about

22   it.

23             THE COURT:  Well, can you say how you know this?

24             THE WITNESS:  I have reviewed a wide range of

25   websites that are identifying themselves as Antifa and have

N. Damigo - Cross

1  targeted me, myself personally and threatened me and my family.

2  And I have --

3          MS. DUNN:  Objection as hearsay, Your Honor.

4          THE COURT:  Well, if it explains why he believes they

5  were Antifa, the jury will understand that he doesn't know

6  what's in the hearts of any of the people there.  They may have

7  been dressed like clowns or whatever.  But if he can explain

8  why he thought they were Antifa, you can consider it not for

9  the truth that they were Antifa, but that's why he thought in

10 his mind they were Antifa.

11         MS. PHILLIPS:  Thank you, Your Honor.

12         THE COURT:  Thank you.

13  BY MR. JONES:

14 Q    Do you have a military background?

15 A    Yes, I do.

16 Q    Are you familiar with the term "battalion"?

17 A    Yes, I am.

18 Q    What's a battalion?

19 A    It's typically about four platoons, I think.  It's been a

20 while.

21 Q    How many men are generally in a battalion?

22 A    You're looking at probably 120.

23 Q    Do battalions train together?

24 A    Yes, typically they do.

25 Q    Is it important for battalions to be organized?

N. Damigo - Cross

1   A    Yes, it is.

2              MR. JONES:  Thank you.  That's all the questions I

3   have.

4              THE COURT:  All right.

5                         CROSS-EXAMINATION

6    BY MR. CANTWELL:

7   Q    Hello, Mr. Damigo.  Is it Damigo or Damigo?

8   A    It's Damigo.

9   Q    Damigo.  Okay.

10  A    Thank you.

11  Q    Have we ever met before today?

12  A    No.

13  Q    Have we ever exchanged a text message?

14  A    No.

15  Q    Have we ever communicated using a walkie-talkie?

16  A    No.

17  Q    Do you and I understand a secret code language that nobody

18  else understands?

19  A    No.

20  Q    You said IE put up money for the vans that were

21  transporting people, I think from McIntire Park to what ended

22  up being a couple blocks away from what was Lee Park, right?

23  A    Yes.

24  Q    And you testified that it was originally your

25  understanding that the vans were going to get you right up to

N. Damigo - Cross

1  the park, right?

2  A    Right to the front of the entrance, yes.

3  Q    And you found out about a change of plans the morning of

4  the event; is that right?

5  A    Yes.

6  Q    And you found out about that change of plans from Eli

7  Kline?

8  A    Yes.

9  Q    Who had previously informed you of the plan to get you

10 right up to the park?

11 A    Kline.

12 Q    And when was the last time that that plan was confirmed?

13 A    I'm not sure.  It's been a long time and I wasn't involved

14 with that sort of planning or anything with the event.

15 Q    What was your understanding of what had changed?

16 A    While people were being shuttled over to the other park

17 from McIntire, at a certain point I saw Kline and he looked

18 very exasperated.  I said, hey, what's going on, man.  He said,

19 the cops are --

20          MS. PHILLIPS:  Objection on the basis of hearsay,

21 Your Honor.

22          MR. CANTWELL:  I'm just asking his understanding of

23 it.

24          MS. PHILLIPS:  No, he was testifying about what

25 somebody else told him.  That's hearsay.  In fact, it appears

N. Damigo - Cross

1  to be double hearsay.

2          THE COURT:  Wait a minute.  He's talking about what

3  Kline said, right?

4          MS. PHILLIPS:  He's talking about what police

5  officers allegedly told Mr. Kline who then told Mr. Damigo.

6  It's double hearsay.

7          THE COURT:  Okay.  Sustain the objection.

8          Well, but if it explains why he did anything, it

9  doesn't come in for the truth, but rather to explain.  But if

10  you're just asking him what Kline said, then it's hearsay.

11          MR. CANTWELL:  Let me try to do this a different way.

12   BY MR. CANTWELL:

13  Q    Your original plan, as you understood it, was the police

14  were on board to get you safely into the park; is that right?

15  A    That was my understanding.

16  Q    And your understanding was the police changed the plan?

17  A    That was my understanding --

18  Q    Okay.

19  A    -- at the time.

20  Q    And you got that understanding from Eli Kline?

21  A    Yes.

22  Q    Okay.  Did you attend a so-called leadership meeting on

23  August 11th in McIntire Park?

24  A    No, I did not.  I was not there.

25  Q    Did you have a representative there?

N. Damigo - Cross

1  A   I don't know all of who was there.

2  Q   Nobody was acting on your behalf at the meeting?

3  A   Not on my behalf, no.

4  Q   Did anybody relay to you the substance of the meeting?

5  A   No.

6  Q   Did you understand the circumstances of our permit for

7  August 12th?

8  A   Yes.

9  Q   Did you understand that we were supposed to have one

10 section of the park or another part?

11 A   No.  So my understanding of the permit was that there had

12 been some issues with the city over it being issued in the

13 first place, and Kessler had to go to court in order to win the

14 right to --

15 Q   Once the permit is in place, did you understand that there

16 was some territorial limitation on what we were supposed --

17 what part of the park we were supposed to occupy?

18 A   No, that had never been communicated to me.

19 Q   To the best of your knowledge, did I have anything to do

20 with Identity Evropa?

21 A   Absolutely not, no.

22 Q   There was never any Discord --

23 A   No.

24 Q   Did you see me at the Battle of Berkeley?

25 A   No.

N. Damigo - Cross

1    Q    Was I at any of these boxing trainings?

2    A    No.

3    Q    Let me get my laptop real quick.  I'm sorry.  One second.

4         (Pause.)

5         You recall a sign that the plaintiffs showed you that you

6    were holding at Berkeley, said "By any means necessary"?

7    A    Yes, I do.

8    Q    Was that an Identity Evropa sign?

9    A    No, it was not.

10   Q    What did you understand that sign to mean?

11   A    So there's an organization that's been around for decades

12   called By Any Means Necessary.  It actually has a much longer

13   name than that, but BAM is what they're referred to as short.

14   There's a woman there who runs it, at least, in the Bay Area

15   called Yvette Felarca.  She attacked people at TWP and was

16   arrested for that.  She took credit on Tucker Carlson's show

17   for --

18             MS. PHILLIPS:  Objection, Your Honor.  This is not

19   answering the question.

20             THE COURT:  Sustained.

21   BY MR. CANTWELL:

22   Q    What does the phrase "by any means necessary" mean?

23   A    That means to obtain an objective by any means that are

24   available to you.

25   Q    Would that include the use of physical violence?

N. Damigo - Cross

1   A    Yes.

2   Q    And you obtained that banner from people who were opposed

3   to you; is that what I understand?

4   A    There were a bunch of people who came out and were

5   throwing objects at us that morning that led to multiple riots.

6   I had glass bottles, rocks and other objects thrown at me

7   throughout that day, as well as explosives, fireworks and

8   M-80s, which is like a quarter of TNT.

9   Q    Suffice it to say the Battle of Berkeley was a hectic

10  situation?

11  A    Yes, it was.

12  Q    Okay.  Moving back to the Unite the Right rally, you

13  had -- did you have any say in who the speakers were going to

14  be for that event?

15  A    At Unite the Right?

16  Q    Yeah.

17  A    I believe that at a certain point I might have been asked

18  if it was okay, if I was okay with David Duke speaking.  I

19  don't remember who asked me that, but I recall saying I didn't

20  have a problem with it.

21  Q    Were you privy to any deliberations on my attendance?

22  A    No.

23  Q    I think you testified that you had obtained shields and

24  other protective equipment for the Unite the Right rally?

25  A    We had a list of equipment that was listed as acceptable

N. Damigo - Cross

1  for people to buy if they want to for their own protection.

2  That included shields, helmets, and gloves.

3  Q    And are you aware of an incident involving Defendant

4  Spencer at the Inauguration Day festivities in Washington, DC

5  where he got punched?

6  A    Yes.  I was actually maced that same day in Berkeley by a

7  masked man who maced me while I was covering an event Yvette

8  Felarca was putting on there in protest.  And he sprayed me

9  with mace as I was talking to some students, ran down the side

10  of the building, turned around, called me a fascist and ran

11  off.

12  Q    Who is Eric Clanton?

13  A    Eric Clanton is also known as the bike lock guy.  He was

14  arrested and eventually found guilty of assaulting numerous

15  people with a bike lock.

16        MS. PHILLIPS:  Objection, Your Honor, foundation.

17        THE COURT:  Sustained.

18   BY MR. CANTWELL:

19  Q    Were you aware of a shooting that happened in Alexandria,

20  Virginia, not long before the events at the heart of this

21  dispute?

22        MS. PHILLIPS:  Objection, your opinion, to relevance.

23        MR. CANTWELL:  I'm trying to figure out why he

24  thought he might need protective equipment, Judge.

25        THE COURT:  Well, just ask him.

N. Damigo - Cross

1   BY MR. CANTWELL:

2   Q    Did you fear for your safety when you arrived in

3   Charlottesville?

4             THE COURT:  No.  You're leading him.  Ask him why --

5   BY MR. CANTWELL:

6   Q    Why did you obtain shields and other protective equipment?

7   Why did you authorize those things for your members?

8   A    The reason for that is I had been -- prior to the August

9   11th and 12th rallies, I had been assaulted myself on numerous

10  occasions.  I had been at various events where I had witnessed

11  Antifa riot and burn down college campuses and cause, like,

12  hundreds of thousands of dollars' worth of damage.  And --

13            MS. PHILLIPS:  Objection to foundation.

14            THE COURT:  Well, whatever --

15            MS. PHILLIPS:  "Hundreds of thousands of dollars of

16  damage"?

17            THE COURT:  -- informed his desire to have this

18  equipment is admissible.  It doesn't go to the truth of it, but

19  it goes to why he had the state of mind that he did.

20            MS. PHILLIPS:  Thank you.

21  BY MR. CANTWELL:

22  Q    And so suffice it to say you had seen some trouble that

23  you thought might be revisited?

24  A    Absolutely, yes.

25  Q    Is race your only difference with Antifa?

243

N. Damigo - Cross

1          MS. PHILLIPS:  Objection, foundation.

2          THE COURT:  Well, he knows what his difference with

3   Antifa is.

4          MS. PHILLIPS:  Well, how does he know what Antifa's

5   beliefs are?

6          THE COURT:  He was sitting here today and heard the

7   Reverend talk about Antifa.  He was here all day, wasn't he?

8          MS. PHILLIPS:  Objection.  I don't believe

9   Reverend Wispelwey testified at all about Antifa beliefs.  In

10  fact, Reverend Wispelwey testified he was not Antifa.

11         THE COURT:  Well, he testified he was not Antifa, but

12  it's certainly the antithesis of these defendants.

13         MR. CANTWELL:  Maybe I can fix this.

14         THE COURT:  All right.

15   BY MR. CANTWELL:

16  Q    On August 12th, 2017, were you familiar with a political

17  movement known as Antifa?

18  A    Yes.

19  Q    And on August 12th, 2017, did you perceive Antifa to be

20  your ally?

21  A    No.

22  Q    Do you have disagreements with that movement other than

23  the subject of race?

24  A    Yes.

25  Q    Are you familiar with the beliefs of that movement?

N. Damigo - Cross

1    A    Yes.

2    Q    Do you think they have good ideas about economics?

3    A    No.

4    Q    Is race your only concern with regard to immigration?

5    A    No.

6    Q    Would you be okay with an all-white drag queen story hour?

7    A    No, I would not.

8    Q    Have you ever been a Radical Agenda Premium Member?

9    A    No.

10   Q    Were you in the Charlottesville 2.0 Discord

11   #leadership-discussion channel?

12   A    I wasn't in that server at all.

13   Q    You weren't in the Charlottesville 2.0 server at all?

14   A    No, I wasn't.

15   Q    Were you in the Radical Agenda Discord server?

16   A    No.

17            MR. CANTWELL:  No further questions.  Thank you.

18            THE COURT:  Okay.  Thank you.  Mr. ReBrook?

19            Mr. ReBrook?

20            MR. REBROOK:  Yes, Your Honor.  I don't have any

21   questions for this witness.

22            THE COURT:  Okay.  Anyone else?

23            MR. SPENCER:  Very brief, just two more questions, if

24   that's all right.

25            THE COURT:  All right.  Go ahead.

N. Damigo - Recross

1          MS. KAPLAN:  Your Honor, he already crossed -- he

2     already spoke.

3          MR. SPENCER:  I know.  I missed something under our

4     notes.

5          MS. KAPLAN:  Your Honor, we're under great time

6     pressure here.  He doesn't get two chances to cross-examine.

7          THE COURT:  Well, no, you don't get two chances, but

8     I've never been in a case where somebody said they forgot to

9     ask a question and we didn't let them ask it.

10          MR. SPENCER:  Thank you.  I'll be very brief.

11                         RECROSS-EXAMINATION

12     BY MR. SPENCER:

13     Q    You testified today that Eli Kline, also known as Eli

14     Mosley, joined Identity Evropa in September of 2016.  Does that

15     sound about right?

16     A    Yes.

17     Q    Was Eli Kline in my employ or, to your knowledge, did I

18     know Eli Kline at that point when he joined?

19          THE COURT:  He doesn't know who you know.

20          MR. SPENCER:  Fair enough.

21     BY MR. SPENCER:

22     Q    Was Eli Kline ever on the IE payroll?  There was a

23     discussion of this mention made.

24     A    I believe he was shortly.  It was a very short period of

25     time, but I think he was.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/10/2021

1           MR. SPENCER:  Okay.  No further questions.  Thank

2  you.

3           THE COURT:  Okay.  Thank you.

4           MS. KAPLAN:  Your Honor, given the remaining time,

5  plaintiffs are now going to play a short video that should fill

6  the remaining time of Michael Chesny.

7           MR. CANTWELL:  Judge, I believe this is subject to

8  the limiting instruction.

9           THE COURT:  Yes.

10           You may step down.

11           Members of the jury, this deposition is about to be

12  read and -- do you all agree this is one that Mr. Cantwell was

13  not --

14           MS. KAPLAN:  Yes, Your Honor.

15           MS. DUNN:  Yes, Your Honor.

16           THE COURT:  All right.

17           Members of the jury, I've read the instruction to you

18  a number of times that Mr. Cantwell -- there are witnesses whom

19  Mr. Cantwell did not get notice of and was not able to attend

20  their deposition.  And so you are not to consider this

21  deposition of Mr. Kline [sic] in -- concerning any case against

22  Mr. Cantwell, but you may consider it concerning the other

23  defendants.

24           All right.  Go ahead.

25           MS. KAPLAN:  Thank you, Your Honor.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/10/2021

1          (Video deposition of Michael Chesny was played.)

2          THE COURT:  Stop it now and we'll pick it up in the

3   morning.

4          Members of the jury, we're going to recess now until

5   9:00 tomorrow morning.  Do not discuss the case with anybody,

6   do not allow anyone to discuss it with you or remain within

7   hearing of anyone discussing it.  You're excused now.

8   **(Jury out, 4:59 p.m.)**

9          MS. KAPLAN:  Your Honor, could we have one

10  housekeeping matter?  I want to talk about the Rule 703 letter

11  with respect to Pete Simi, the letter we put in about Rule 703.

12          THE COURT:  About the rule what now?

13          MS. KAPLAN:  There is a document we want to use with

14  our expert, Pete Simi, that was a Daily Stormer article.

15  Andrew Anglin, who defaulted in this case, was the editor of

16  Daily Stormer.  It was posted to Discord by Defendant Ray.  It

17  is the type of material that experts of this sort typically

18  rely on.  It was relied on by Professor Simi in his report.  We

19  don't seek to admit it.  We just want to be able to show it to

20  Professor Simi and talk about it tomorrow during his expert

21  testimony.

22          MR. KOLENICH:  Your Honor, I think we -- I discussed

23  this with the plaintiffs, and as long as they don't show it to

24  the jury, we would not object.

25          MS. KAPLAN:  I think we can work around that, Your

Sines, et al. v. Kessler, et al., 3:17CV72, 11/10/2021

1   Honor.

2             THE COURT:  All right.

3   (Proceedings adjourned, 5:01 p.m.)

Sines, et al. v. Kessler, et al., 3:17CV72, 11/10/2021

1                    C E R T I F I C A T E

2        I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3    the United States District Court for the Western District of

4    Virginia, appointed pursuant to the provisions of Title 28,

5    United States Code, Section 753, do hereby certify that the

6    foregoing is a correct transcript of the proceedings reported

7    by me using the stenotype reporting method in conjunction

8    with computer-aided transcription, and that same is a

9    true and correct transcript to the best of my ability and

10   understanding.

11       I further certify that the transcript fees and format

12   comply with those prescribed by the Court and the Judicial

13   Conference of the United States.

14       /s/ Lisa M. Blair                Date: November 10, 2021

15

16

17

18

19

20

21

22

23

24

25