Sines, et al. v. Kessler, et al., 3:17CV72, 11/11/2021

1              UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF VIRGINIA
2                 CHARLOTTESVILLE DIVISION

3  ****************************************************************

4  ELIZABETH SINES, ET AL.,      CIVIL CASE NO.:  3:17CV72
                                 NOVEMBER 11, 2021, 9:00 AM
5                                JURY TRIAL, DAY 14
           Plaintiffs,
6  vs.

7                                Before:
                                 HONORABLE NORMAN K. MOON
8                                UNITED STATES DISTRICT JUDGE
   JASON KESSLER, ET AL.,        WESTERN DISTRICT OF VIRGINIA
9
           Defendants.
10
   ****************************************************************
11
   APPEARANCES:
12

13 For the Plaintiffs:        ALAN LEVINE, ESQUIRE
                              COOLEY LLP
14                            1114 Avenue of the Americas, 46th
                              Floor
15                            New York, NY  10036
                              212.479.6260
16
                              DAVID E. MILLS, ESQUIRE
17                            CAITLIN B. MUNLEY, ESQUIRE
                              JOSHUA SIEGEL, ESQUIRE
18                            COOLEY LLP
                              1299 Pennsylvania Avenue, NW,
19                            Suite  700
                              Washington, DC  20004
20                            202.842.7800

21

22 Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                    255 West Main Street, Suite 304
23                  Charlottesville, Virginia  22902
                    434.296.9284
24
   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25 TRANSCRIPT PRODUCED BY COMPUTER.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/11/2021

1   APPEARANCES CONTINUED:

2   For the Plaintiffs:          YOTAM BARKAI, ESQUIRE
                                 EMILY C. COLE, ESQUIRE
3                                ROBERTA A. KAPLAN, ESQUIRE
                                 Kaplan Hecker & Fink LLP
4                                350 Fifth Avenue, Suite 7110
                                 New York, NY  10118
5                                212.763.0883

6                                KAREN L. DUNN, ESQUIRE
                                 WILLIAM A. ISAACSON, ESQUIRE
7                                JESSICA E. PHILLIPS, ESQUIRE
                                 Paul, Weiss, Rifkind, Wharton &
8                                Garrison LLP
                                 2001 K Street, NW
9                                Washington, DC  20006
                                 202.223.7300
10

11  For the Defendants:          DAVID L. CAMPBELL, ESQUIRE
                                 Duane, Hauck, Davis, Gravatt &
12                               Campbell, P.C.
                                 100 West Franklin Street, Suite 100
13                               Richmond, VA  23220
                                 804.644.7400
14
                                 CHRISTOPHER CANTWELL, PRO SE
15                               #00991-509
                                 USP Marion
16                               4500 Prison Road, PO Box 2000
                                 Marion, IL  62959
17
                                 BRYAN J. JONES, ESQUIRE
18                               Bryan J. Jones, Attorney at law
                                 106 W. South Street, Suite 211
19                               Charlottesville, VA  22902
                                 540.623.6952
20
                                 JAMES E. KOLENICH, ESQUIRE
21                               Kolenich Law Office
                                 9435 Waterstone Blvd., Suite 140
22                               Cincinnati, OH  45249
                                 513.444.2150
23

24

25

```
 1   APPEARANCES CONTINUED:

 2   For the Defendants:            WILLIAM E. REBROOK, IV, ESQUIRE
                                    (Appearing via Zoom)
 3                                  The ReBrook Law Office
                                    6013 Clerkenwell Court
 4                                  Burke, VA  22015
                                    571.215.9006
 5
                                    JOSHUA SMITH, ESQUIRE
 6                                  (Appearing via Zoom)
                                    Smith LLC
 7                                  807 Crane Avenue
                                    Pittsburgh, PA  15216
 8                                  917.567.3168

 9                                  RICHARD SPENCER, PRO SE
                                    P.O. Box 1676
10                                  Whitefish, MT  59937

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX OF WITNESSES

 2   WITNESSES ON BEHALF OF THE PLAINTIFF:            PAGE

 3   MICHAEL CHESNY (Video deposition played.)

 4   JAMES FIELDS (Evidence read into the record.)

 5   PETER SIMI, PH.D.

 6    Direct Examination by Ms. Kaplan               36
      Cross-Examination by Mr. Kolenich              93
 7    Cross-Examination by Mr. Spencer              112
      Cross-Examination by Mr. ReBrook              121
 8    Cross-Examination by Mr. Campbell             134
      Cross-Examination by Mr. Jones                141
 9    Cross-Examination by Mr. Smith                157
      Cross-Examination by Mr. Cantwell             178
10    Redirect Examination by Ms. Kaplan            209

11   APRIL MUNIZ

12    Direct Examination by Ms. Phillips            214
      Cross-Examination by Mr. Spencer              234
13    Cross-Examination by Mr. Campbell             238
      Cross-Examination by Mr. Cantwell             242
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3        EXHIBIT:                 Marked     Received

 4        1136                       16         16

 5        0819                       16         16

 6        3434                       16         16

 7        0593                       16         16

 8        1174                       16         16

 9        1171                       16         16

10        1125                       16         16

11        1182                       16         16

12        1060                       16         16

13        2879                       16         16

14        1144                       16         16

15        1119                       16         16

16        1027                       16         16

17        1017                       16         16

18        1153                       16         16

19        1031                       16         16

20        1007                       16         16

21        2088                       16         16

22        3895                       16         16

23        0003                       36         36

24        0002                       36         36

25        3636                       36         36
```

```
1                          INDEX OF EXHIBITS

2    EXHIBITS ON BEHALF OF THE PLAINTIFF:

3         EXHIBIT:                 Marked      Received

4         3621                       36          36

5         3642                       36          36

6         3643                       36          36

7         3622                       36          36

8         3624                       36          36

9         3626                       36          36

10        3628                       36          36

11        3629                       36          36

12        3574                       36          36

13        3631                       36          36

14        3573                       36          36

15        3577                       36          36

16        3579                       36          36

17        3578                       36          36

18        3650                       36          36

19        3575                       36          36

20        3633                       36          36

21        3617                       36          36

22        3594                       36          36

23        3600                       36          36

24        3607                       36          36

25        3611                       36          36
```

```
 1                          INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3          EXHIBIT:                 Marked     Received

 4          3614                        36         36

 5          3613                        36         36

 6          3596                        36         36

 7          3587                        36         36

 8          3586                        36         36

 9          3588                        36         36

10          3590                        36         36

11          3591                        36         36

12          3592                        36         36

13          3593                        36         36

14          3595                        36         36

15          3598                        36         36

16          3582                        36         36

17          3585                        36         36

18          3627                        36         36

19          3900                        36         36

20          3901                        36         36

21          3902                        36         36

22          3903                        36         36

23          3904                        36         36

24          3905                        36         36

25          3632                        36         36
```

```
 1                        INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3        EXHIBIT:              Marked      Received

 4        3906                    36          36

 5        3907                    36          36

 6        3908                    36          36

 7        3610                    36          36

 8        3909                    36          36

 9        3612                    36          36

10        3615                    36          36

11        3589                    36          36

12        3608                    36          36

13        3583                    36          36

14        3584                    36          36

15        3616                    36          36

16        3618                    36          36

17        1966                    36          36

18        3606                    36          36

19        0313                    36          36

20        0317A                   36         36

21        3440                    36          36

22        3443                    36          36

23        3444                    36          36

24        0204A                   36          36

25        0204B                   36          36
```

```
 1                          INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3        EXHIBIT:                 Marked      Received

 4        0219                       36          36

 5        0219A                      36          36

 6        1410                       81          --

 7        2777                       83          --

 8        0562                       91          --

 9        3432                       92          --

10        0955                       93          --

11        1166                       52          --

12        1694                      219         219

13        1692                      220         221

14        3320A                     229         229

15        3320E                     233         233

16

17   EXHIBITS ON BEHALF OF THE DEFENDANTS:

18        EXHIBIT:                 Marked      Received

19        CC-1353                   242         242

20

21

22

23

24

25
```

1  (Proceedings commenced, 9:00 a.m.)

2           THE COURT:  Good morning.  I have your letter.  After

3  we get through the witness, I'll give an instruction, curative

4  instruction.

5           MS. DUNN:  Thank you.

6           THE COURT:  All right.

7           MS. KAPLAN:  Your Honor, before the jury comes in,

8  one issue, which I was just discussing with Mr. Kolenich -- we

9  understand Mr. Cantwell, who can obviously speak for himself,

10  has a very long video he wants to play as part of defendants'

11  case, over two hours, which we believe will start as early as

12  tomorrow, as Your Honor is aware.

13           I don't know if it's possible, but is it -- and I

14  hate to even ask this, because I understand all the issues with

15  the marshals and everything, but would it be possible for him

16  to have a couple of hours sometime after court today with a

17  computer so that rather than having to watch the whole thing

18  and have him point sections out, he can figure out what the

19  time is?  I think it would be much more efficient with the jury

20  that way.

21           THE COURT:  Mr. Cantwell?  I mean, answer.  First of

22  all, can you do that if you have the time?

23           MR. CANTWELL:  I'm not entirely certain what they're

24  trying to accomplish other than -- the purpose of showing the

25  whole video is that there is a distinct absence of something

```
 1   happening, okay?  And so it had occurred to me that I could cut

 2   out -- there are some segments where there's literally no

 3   talking, and I could certainly see it being reasonable to cut

 4   those portions of it out.  I'm not sure how much of the video

 5   consists of that and how much time that would actually save.  I

 6   would be happy to -- if given the opportunity, I'd be happy to

 7   use whatever resources were made available to me to reduce the

 8   time span of the video as much as possible; however, the

 9   purpose of showing the entire thing is to display the distinct

10   absence of something.  So cutting out large segments of

11   discussion would seem to defeat the purpose, if that makes

12   sense.

13           THE COURT:  Okay.  Well, I mean, it doesn't make any

14   sense to play a lot -- just filler.  I mean --

15           MR. CANTWELL:  I'm also --

16           THE COURT:  We'll have to talk to the marshals.

17   That's not an easy thing.  I can't resolve it.

18           MR. CANTWELL:  It's my expectation that at 5 p.m. the

19   staff of the Central Virginia Regional Jail are going to show

20   up at this place planning to take me back.  I'm certain that

21   the Court has obviously the power to make people change their

22   behavior, no question about it.  But I'm happy to do what the

23   Court sees fit.  It just hits me out of nowhere.  I don't know

24   exactly what I'd be expected to accomplish here.

25           THE COURT:  Well, just cut out anything that's
```

12

1   irrelevant.  It's just like you wouldn't get on the witness

2   stand and say this minute nothing happened, this minute

3   happened, and go through that.  I mean, you would just play

4   things at significant times.

5            I mean, you're only -- you were not around on the

6   12th, right, as far as being at this park?

7            MR. CANTWELL:  My understanding is that bears

8   distinctly little relevance in the question of a conspiracy.

9   So I got maced first thing in the morning while I'm trying to

10  get into the park by their pal, right?  And so, yeah, I wasn't

11  around for any of this stuff --

12           THE COURT:  Okay.  Well --

13           MR. CANTWELL:  -- you know, but I was at this

14  so-called --

15           THE COURT:  We'll talk with the marshals and see what

16  can go -- yes, sir.

17           MR. JONES:  Your Honor, I just want to go back to

18  this curative instruction.  I don't object to the Court giving

19  a general instruction about the statements of the attorneys and

20  the statements of the judge are not considered evidence, but to

21  selectively quote statements that he made on direct without

22  also quoting what he admitted on cross, which was that his

23  objectives were the same as Antifa, Jesus is Antifa -- so to

24  just quote what he said on direct I think is prejudicial and

25  misleading to the jury.  And we'd ask that his quotes from

13

 1  cross-examination be admitted as well.

 2          THE COURT:  Okay.

 3          MS. KAPLAN:  I don't have any issue with Your Honor

 4  taking out the quotes.  What the curative instruction I think

 5  is intended to do --

 6          THE COURT:  I think I'll just tell them to disregard

 7  what I said, that they have to consider all of his testimony,

 8  and what I said is not an accurate description of his entire

 9  testimony.

10          MS. KAPLAN:  I think that will be fine, Your Honor.

11  Thank you.

12          THE COURT:  All right.  Call the jury, please.

13          MR. CANTWELL:  One more thing real quick.  I'm sorry.

14          THE COURT:  Well, call the jury.

15          MR. CANTWELL:  Okay.

16          THE COURT:  No, you can go ahead.  It takes them a

17  while to come around.

18          MR. CANTWELL:  There was this issue of a blog post

19  which the plaintiffs were hoping to have Mr. Simi testify

20  about.  I don't know what all the limits are.  The original

21  proposal I understand was to show it to the jury.  Mr. Kolenich

22  yesterday said if they don't show it to the jury, we don't have

23  a problem.

24          I have a problem with Mr. Simi basing much of his

25  testimony on this document because the author of that document

14

1    is suited for some substantial cross-examination.  He is a

2    self-described troll who is on the Internet saying that he

3    infiltrates movements to make them look bad by behaving poorly.

4    And this document is basically an effort to get adverse

5    inferences without the assistance of the Court, trying to claim

6    that because we subscribe to an ideology, that we're destroying

7    evidence.  That testimony I think is probably outside the realm

8    of his expertise to the extent that any exists, and I don't

9    think it's proper.

10            MS. KAPLAN:  Your Honor, first of all, as we

11   explained in our letter, Mr. Simi relied on this in his report.

12   It's clearly usable as 703 material.  We agreed to only

13   actually point out one paragraph in the entire report and not

14   to show it to the jury, as I agreed with Mr. Kolenich.

15            But I just have to make a point here, Your Honor.

16   Mr. Cantwell can have whatever -- please make sure the jury

17   doesn't come in.  Mr. Cantwell can have whatever ideology he

18   has.  That's one thing, and it's somewhat related to this case.

19   I understand that.  But to write in court pleadings that are

20   filed in a public court that the author of this article,

21   "there's no secret that he hails from Jewish ancestry," that

22   "Simi is in no position to comment on the Jewish author's

23   mindset" is not appropriate, Your Honor, for the dignity of a

24   federal court.

25            He can have his beliefs.  He cannot put beliefs that

1   are prejudicial in a federal court filing.

2           THE COURT:  Look, I've already ruled that this

3   witness can testify.  We've had hearings on this and I'm going

4   to stick to the ruling I've had.  She can testify as to what

5   she relied upon, and you can ask her -- you can cross-examine

6   her about that.

7           MR. CANTWELL:  Very good.

8           THE COURT:  Is the jury on the way?

9   **(Jury in, 9:07 a.m.)**

10          THE COURT:  All right.  You all may have a seat.

11  Good morning, ladies and gentlemen of the jury.  Glad to see

12  you back this morning.

13          You may proceed with the deposition.  I'm sorry.

14          Before we begin, I need to remind everyone that under

15  Standing Order 2020-12 and 2013-8, the Court's prohibition

16  against recording and broadcasting court proceedings remains in

17  force.  Attorneys, parties and their staff and any members of

18  the public or press accessing this proceeding today may not

19  record or broadcast it.  That means no photography, no using

20  any video or audio recording device, no rebroadcasting,

21  livestreaming, or otherwise disseminating any live or recorded

22  video or audio of this proceeding.

23          I don't think you called the case, have you?

24          THE CLERK:  No, Your Honor.

25          THE COURT:  Call it.

```
 1              THE CLERK:  This is Civil Action Number 3:17-cv-72,

 2    Elizabeth Sines and others versus Jason Kessler and others.

 3              THE COURT:  Plaintiff ready?

 4              MS. KAPLAN:  We are, Your Honor.

 5              THE COURT:  Defendants ready?

 6              MR. KOLENICH:  Yes, sir.

 7              THE COURT:  All right.  You may proceed with the

 8    remainder of the video.

 9              MS. KAPLAN:  Exactly, Your Honor, thank you.

10              (Video deposition of Michael Chesny played.)

11              MS. KAPLAN:  Your Honor, plaintiffs offer Plaintiffs'

12    Exhibit -- I'm just going to read them slowly, Ms. Wheeler,

13    because I know I've been difficult on this in the past and I

14    apologize.  Plaintiffs' Exhibit 1136, Plaintiffs' Exhibit 0819,

15    Plaintiffs' Exhibit 3434, PX-0593, PX-1174, PX-1171, PX-1125,

16    PX-1182, PX-1060, PX-2879, PX-1144, PX-1119, PX-1027, PX-1017,

17    PX-1153, PX-1031, PX-1007, and finally, PX-2088.  And the clip

18    report for Mr. Chesny's video, which the jury just saw, is

19    Plaintiffs' Exhibit 3895.

20              THE COURT:  All right.  They will be admitted.

21              (Plaintiff Exhibits 1136, 0819, 3434, 0593, 1174,

22    1171, 1125, 1182, 1060, 2879, 1144, 1119, 1027, 1017, 1153,

23    1031, 1007, 2088, and 3895 marked.)

24              (Plaintiff Exhibits 1136, 0819, 3434, 0593, 1174,

25    1171, 1125, 1182, 1060, 2879, 1144, 1119, 1027, 1017, 1153,
```

1  1031, 1007, 2088, and 3895 admitted.)

2          THE COURT:  Who will be the next witness?  Will it be

3  live?

4          MS. KAPLAN:  The next presentation, Your Honor, will

5  be a presentation by Mr. Mills of the Fields evidence, the

6  evidence related to James Fields.

7          THE COURT:  Before that witness -- have you called

8  the witness?  Where is the witness?

9          MR. MILLS:  I'm going to make a presentation like

10  Mr. Isaacson did with regard to Mr. Ray.

11          THE COURT:  Okay.  Let me take care of this other

12  thing.

13          Members of the jury, yesterday during the testimony

14  of Mr. Nathan Damigo, an issue came up about his foundation of

15  any knowledge about Antifa, and I made remarks and a ruling on

16  that that he -- referring back to Reverend Wispelwey's

17  testimony.  And I did not give a complete and accurate

18  statement of all of his testimony.  And you should disregard it

19  because you have -- I was ruling on a motion, and when I rule

20  on a motion, that's not something for you to be concerned with.

21          And I don't want to confuse the issue about what the

22  Reverend said and what Mr. Damigo said.  But I will say

23  Mr. Damigo should not rely upon -- what the Reverend said is

24  not a foundation for what Mr. Damigo said.  And you'll just

25  have to remember all of the Reverend's testimony and don't draw

1  any inference from anything I may have said, because it would

2  be improper to do so, and it's improper for me to make

3  statements that reflect on anyone's testimony, because you are

4  to disregard -- other than what I tell you is the law, or

5  instructions I specifically give you, you should disregard

6  anything that I say to the lawyers or about how -- in this

7  case, how I interpreted Reverend Wispelwey's testimony during

8  the trial.

9       It's up to you to find the facts, not me.  And I'll

10  just tell you to disregard anything I say when I'm talking to

11  lawyers or instructing a witness on how to testify.  Anything

12  like that is something you are sworn not to rely upon.

13       Thank you.  You may proceed.

14       MR. MILLS:  Thank you, Your Honor.

15       Good morning.  My name is David Mills, representing

16  the plaintiffs.

17       Your Honor, just as my colleague, Mr. Isaacson, did

18  last week for Defendant Ray, we'd like to present exhibits

19  concerning Defendant James Fields.  We've obtained stipulations

20  or admissions of authenticity for these exhibits and we

21  provided them all to defendants in advance.  We've resolved all

22  objections that have been raised and we seek admission into

23  evidence of the following exhibits.

24       Unless you prefer otherwise, rather than admit them

25  one by one as I present them to the jury, I have a list that I

19

1    can give to the court reporter and the clerk at the end of the

2    presentation and have them admitted as a group.  If you prefer,

3    I can move them admitted in advance, but I do want to show them

4    to the jury.

5             THE COURT:  All right.  I have no preference.

6             MR. MILLS:  We'll do it at the end, then.

7             THE COURT:  Whatever is easiest for the clerk.  I

8    think when you're referring to an exhibit, you ought to -- the

9    jury ought to know the number.  So the record should reflect

10   the number.

11            MR. MILLS:  I will definitely do that.

12            The following exhibits consist of documents,

13   photographs and audio and video recordings and admissions and

14   stipulations from and concerning James Fields.  We will ask the

15   Court at the end to admit them into evidence so you will have

16   them with you in your deliberations.

17            The first exhibit I would like to show you is

18   Plaintiffs' Exhibit PX-03.  It's a photograph of Mr. Fields's

19   bedroom in Ohio which was taken on August 13th, 2017, the day

20   after Unite the Right.

21            The next exhibit is Exhibit 2, Plaintiffs' Exhibit 2.

22   It's a closeup photograph of Mr. Fields's bedside table in his

23   bedroom, also taken on August 13th, 2017.

24            The next exhibit is Plaintiffs' Exhibit 3636.  It's a

25   post by Mr. Fields from his Twitter account on April 4, 2017,

1    retweeting another post.  It states, "You are on a great

2    mission."  This Twitter post is from a Twitter account,

3    TheNewGiantDad.  Before trial, Mr. Fields was asked to admit

4    that he used the user name, TheNewGiantDad, for his Twitter

5    account.  Mr. Fields admitted that he did.  Defendant James

6    Fields has stipulated that he was the only known user of the

7    Twitter account @TheNewGiantDad.  The user names of other

8    Twitter users who are not defendants or otherwise relevant to

9    this case have been redacted from this post, as you can see

10   here and on several other exhibits that we'll show you.

11        The next exhibit is Plaintiffs' Exhibit 3621.  It's a

12   post by Mr. Fields from his Twitter account on April 7, 2017.

13   It states, "I'm a nationalist and as a nationalist, I'm more

14   than willing to murder threats to my nation like you, Rick."

15        The next is Plaintiffs' Exhibit 3642.  It's a post by

16   Mr. Fields from his Twitter account on April 11, 2017.  It

17   recites the 14 Words:  "We must secure the existence of our

18   people and a future for white children."

19        The next exhibit is Plaintiffs' Exhibit 3643.  It's a

20   post by Mr. Fields from his Twitter account on April 17, 2017.

21        Next is Plaintiffs' Exhibit 3622.  It's a post by

22   Mr. Fields from his Twitter account on April 22nd, 2017.  It

23   states, "To be honest, the time for war began years ago.

24   #hitlerwasright."

25        The next is Plaintiffs' Exhibit 3624.  It's a post by

1  Mr. Fields from his Twitter account on April 25, 2017,

2  retweeting another post.  It states, "They want you dead, white

3  man, and they're celebrating every time one of us dies off.

4  Stick together and fight back."

5          Next is Plaintiffs' Exhibit 3626.  It's a post by

6  Mr. Fields from his Twitter account on April 27, 2017.  It

7  states, "Black, Negro, someone of mostly African descent.  They

8  aren't European.  Filthy degenerate."

9          Next is Plaintiffs' Exhibit 3628.  It's a post by

10  Mr. Fields from his Twitter account on May 8, 2017.  It states,

11  "Violence is the only solution.  We have no other options.

12  Voting will solve nothing.  The police and courts won't

13  convict."

14          Next exhibit is Plaintiffs' Exhibit 3629.  It's a

15  post by Mr. Fields from his Twitter account on May 8, 2017.  It

16  states, "Defense of self requires you to kill those who would

17  cause your death.  Violence is our only hope for survival as a

18  people."

19          Next exhibit is Plaintiffs' Exhibit 3574.  It's a

20  direct message Mr. Fields sent from his Instagram account on

21  May 12th, 2017.  It states, "When I see protesters blocking,"

22  and it contains a picture of a car running through a crowd of

23  people.

24          This is Plaintiffs' Exhibit 3631.  It's a post by

25  Mr. Fields from his Twitter account on May 14, 2017.  It

1   states, "Blacks make up only 12 percent of the population yet

2   commit over 50 percent of violent crimes.  The average black

3   has an IQ of 65 to 75, the range of a retard."  Again, the

4   accounts to whom Mr. Fields sent this message are not

5   defendants in this case and the names have been redacted.

6          The next exhibit is Plaintiffs' Exhibit 3573.  It's a

7   post by Mr. Fields from his Instagram account on May 16, 2017.

8   It contains a picture of a car running through a crowd of

9   people.  This Instagram post is from the Instagram account

10  TheBigBoss1337.  Before trial Mr. Fields was asked to admit he

11  used the user name TheBigBoss1337 for his Instagram account,

12  and Mr. Fields admitted that he did.  Mr. Fields has stipulated

13  he was the only known user of that Instagram account.

14         This is Plaintiffs' Exhibit 3577.  It's a series of

15  posts by Mr. Fields from his Instagram account on May 31, 2017.

16  They state, "No, you get out.  You filthy N word.  And soon you

17  filthy apes will be sent back to the jungle."

18         The next exhibit is Plaintiffs' Exhibit 3579.  It

19  contains direct messages Mr. Fields sent from his Instagram

20  account on June 5, 2017.  One of them states, "Shit's going to

21  hit the fan and you kikes will know the wrath of the west once

22  more."

23         The next is Plaintiffs' Exhibit 3578.  It's a post by

24  Mr. Fields from his Instagram account on June 18, 2017.

25         Next is Plaintiffs' Exhibit 3650.  It's a direct

23

1   message Mr. Fields sent from his Twitter account on July 8,

2   2017.  It actually contains seven separate pictures, including

3   pictures of Zyklon B gas used to kill Jews during World War II.

4   This is the first image.  This is the second image.  This is

5   the third image.  This is the fourth.  This is the fifth.  This

6   is the sixth.  And this is the last in Mr. Fields's direct

7   message on Twitter on July 8, 2017.

8          The next exhibit is Plaintiffs' Exhibit 3575.  It's a

9   series of posts by Mr. Fields from his Instagram account on

10  July 14, 2017.  The messages read, "Hitler was right," "The

11  Holocaust is a lie," "Heil Hitler," and "The 14 Words."

12         The next exhibit is Plaintiffs' Exhibit 3633.  It's a

13  post by Mr. Fields from his Twitter account on July 18, 2017.

14  It states, "Human beings in general are animals.  Europeans are

15  superior sub-species.  You should take a course on evolution

16  sometime, N word."  And it contains an image of a black man,

17  Patrick Ewing, and a gorilla.

18         The next exhibit is Plaintiffs' Exhibit 3617.  It's a

19  post by Mr. Fields from his Twitter account on July 9, 2017,

20  retweeting another post.  It contains a digital flyer for the

21  Unite the Right event in Charlottesville on August 12, 2017.

22  It identifies, among others, Richard Spencer, Jason Kessler,

23  Baked Alaska, Augustus Invictus, Christopher Cantwell, Matt

24  Heimbach, and Dr. Michael Hill.

25         Defendant James Fields has stipulated to the

1  following facts:  Defendant Fields followed David Duke on

2  Twitter.  Defendant Fields followed co-defendant Richard

3  Spencer on Twitter.  Defendant Fields followed co-defendant

4  Augustus Sol Invictus on Twitter.

5          The next 16 exhibits are posts by Mr. Fields in which

6  he tagged or retweeted Richard Spencer.  We'll go through these

7  fairly quickly.  This is Plaintiffs' Exhibit 3594.  It's dated

8  March 19, 2017.

9          The next is Plaintiffs' Exhibit 3600, dated March 19,

10  2017, also tagging Richard Spencer.

11          The next is Plaintiffs' Exhibit 3607, dated April 14,

12  2017.

13          Plaintiffs' Exhibit 3611 is dated May 8, 2017, also

14  tagging Richard Spencer, and it states, "It's time to buy

15  rifles."

16          The next is Plaintiffs' Exhibit 3614, dated June 6,

17  2017, tagging Richard Spencer.

18          Next is Plaintiffs' Exhibit 3613, dated June 6, 2017.

19          Next is Plaintiffs' Exhibit 3596, dated March 19,

20  2017.

21          Next is Plaintiffs' Exhibit 3587, dated March 8,

22  2017.

23          Next is Plaintiffs' Exhibit 3586, dated March 8,

24  2017, also tagging Richard Spencer.

25          Next is Plaintiffs' Exhibit 3588 from March 8, 2017,

25

1    again tagging Richard Spencer.

2             Next is Plaintiffs' Exhibit 3590, dated March 15,

3    2017.

4             Plaintiffs' Exhibit 3591 is dated March 15, 2017.

5    This one retweets a message from Richard Spencer.

6             Plaintiffs' Exhibit 3592 is dated March 15, 2017,

7    tagging Richard Spencer.

8             Plaintiffs' Exhibit 3593 is dated March 18th, 2017.

9             Plaintiffs' Exhibit 3595 is dated March 19, 2017,

10   tagging Mr. Spencer.

11            Plaintiffs' Exhibit 3598 is dated March 19, 2017.

12            Next exhibit is Plaintiffs' Exhibit 3582.  It's a

13   series of text messages Mr. Fields sent to his mother on

14   Thursday August 10, 2017.  It contains an image of Wes Bellamy

15   in a net that Richard Spencer had tweeted that same day.

16            The next eight exhibits are posts by Mr. Fields from

17   his Twitter account which tag or retweet David Duke.  This one

18   is Plaintiffs' Exhibit 3585 and is dated March 1st, 2017.

19            Next is Plaintiffs' Exhibit 3627 dated May 6, 2017,

20   tagging David Duke.

21            The next is Plaintiffs' Exhibit 3900, dated May 11,

22   2017.

23            The next is Plaintiffs' Exhibit 3901, dated August 2,

24   2017.

25            The next is Exhibit 3902, dated May 11, 2017.

1              Next is Exhibit 3903, dated July 9, 2017, also

2    tagging Dr. David Duke.

3              Next is Plaintiffs' Exhibit 3904, dated July 9, 2017.

4              Next is Exhibit 3905, dated July 9, 2017.

5              The next four exhibits are posts by Mr. Fields from

6    his Twitter account which tagged Baked Alaska.  They're all

7    dated July 8, 2017, the date of the KKK rally in

8    Charlottesville.

9              This one is Plaintiffs' Exhibit 3622 and contains the

10   14 Words.

11             The next one is Plaintiffs' Exhibit 3906.

12             The next is Plaintiffs' Exhibit 3907.

13             The next is Plaintiffs' Exhibit 3908.

14             The next is Plaintiffs' Exhibit 3610.  This is a post

15   by Mr. Fields from his Twitter account on April 29, 2017 which

16   tags Defendant Nathan Damigo.  It says, "Defending the innocent

17   is a good idea.  Defending private property is a good idea.

18   Both require force."

19             This is Plaintiffs' Exhibit 3909.  It's a post by

20   Mr. Fields from his Twitter account on April 16, 2017,

21   retweeting another post that contains a video of Nathan Damigo.

22             Next is Plaintiffs' Exhibit 3612.  It's a post by

23   Mr. Fields from his Twitter account on May 17, 2017 which

24   retweets a message from @occdissent, which is the Twitter

25   account of League of the South member Brad Griffin.

1              Next is Plaintiffs' Exhibit 3615.  This is a post by

2   Mr. Fields from his Twitter account on July 20, 2017 which tags

3   Brad Griffin at that same address.

4              Next is Plaintiffs' Exhibit 3589.  This is another

5   post by Mr. Fields from his Twitter account.  This one is dated

6   March 12, 2017 and it retweets a message from Brad Griffin.

7              Next is Plaintiffs' Exhibit 3608.  This is another

8   post by Mr. Fields from his Twitter account dated April 29,

9   2017, retweeting a message from Brad Griffin.

10             Mr. Fields was asked to admit the following

11  statements and he gave the following responses:

12             Request:  Admit that you arrived in Charlottesville,

13  Virginia in the early morning of August 12, 2017.  Response:

14  Admitted.

15             Request:  Admit that prior to August 12, 2017 you

16  knew the uniform of Vanguard America was a white polo shirt and

17  khaki pants.  Response:  Admitted.

18             Admit that during the Unite the Right rally in

19  Charlottesville, Virginia, on August 12th, 2017 you wore a

20  white polo shirt.  Admitted.

21             Admit that during the Unite the Right rally in

22  Charlottesville, Virginia on August 12th, 2017 you wore khaki

23  pants.  Admitted.

24             Admit that you communicated with members of Vanguard

25  America at the Unite the Right rally that took place on August

1 | 12, 2017.  Admitted.

2 | Admit that during the Unite the Right rally in

3 | Charlottesville, Virginia on August 12, 2017 you held a shield

4 | that displayed a symbol of Vanguard America.  Admitted.

5 | Admit that at the Unite the Right rally on August 12,

6 | 2017 you engaged in chants promoting or expressing white

7 | supremacist and other racist and antisemitic views.  Admitted.

8 | Admit that you received Christmas cards from Vanguard

9 | America.  Admitted that Fields received Christmas cards from

10 | Vanguard America in prison.

11 | Mr. Fields has also stipulated that he was in

12 | McIntire Park after the state of emergency was declared on

13 | August 12, 2017.

14 | Admit that you have used the term "race traitors" to

15 | refer to counter-protesters at the Unite the Right rally that

16 | took place on August 12, 2017 in Charlottesville, Virginia.

17 | Admitted.

18 | Admit that you have used the term "communists" to

19 | refer to counter-protesters at the Unite the Right rally in

20 | Charlottesville on August 12, 2017.  Admitted.

21 | This is Plaintiffs' Exhibit 3583.  It's a series of

22 | text messages that Mr. Fields sent to his mother on August 11,

23 | 2017, the Friday of the Unite the Right event in

24 | Charlottesville.  Mr. Fields's mother wrote, "Be careful."

25 | Mr. Fields responded, "We're not the ones who need to be

1   careful," and included a picture of Adolf Hitler.  That was

2   Plaintiffs' Exhibit 3583.

3           This is Plaintiffs' Exhibit 3584.  It's a series of

4   text messages that Mr. Fields sent to his mother on Saturday,

5   August 12th, 2017 at 3:05 a.m.  It contains images of the torch

6   march in Charlottesville from the night of August 11.

7           This is the next page of the same exhibit,

8   Plaintiffs' Exhibit 3584, which shows the same text string from

9   the Saturday morning of the Unite the Right event on August

10  12th.  Mr. Fields's mother texts to her son:  "Oh, my.  Sounds

11  dangerous."  And Mr. Fields responds:  "No.  It's all good.

12  Our guys had a couple hundred while Antifa only put out 20.

13  We're expecting around a thousand for today's event.  It's made

14  the news and it's trending.  Mostly white males age 20 to 30

15  with some teens."

16          The next exhibit is Plaintiffs' Exhibit 3616.  It's a

17  post by Mr. Fields from his Twitter account at 5:33 a.m. on

18  August 12th, 2017, the Saturday of Unite the Right, in which

19  Mr. Fields tagged Richard Spencer.

20          This is Plaintiffs' Exhibit 3618.  It's another post

21  by Mr. Fields from his Twitter account, four minutes later, at

22  5:37 a.m. on August 12th, in which Mr. Fields retweets a post

23  from David Duke about the torch rally which says, "Happening

24  now at UVa.  Our people on the march.  Will you be here at

25  #unitetheright tomorrow?"

30

 1              This is Plaintiffs' Exhibit 1966.  It's a picture of

 2   James Fields on August 12, 2017.

 3              This is Plaintiffs' Exhibit 3606.  It's a post by

 4   Mr. Fields from his Twitter account on August 12th at 12:44

 5   p.m., less than an hour before the car attack, in which

 6   Mr. Fields tagged Richard Spencer, Brad Griffin, and David

 7   Duke, with the message, "Shut it down."

 8              THE COURT:  Would you say exactly what you mean by

 9   tagged?

10              MR. MILLS:  Yes, sir.

11              THE COURT:  In light of that -- just using that to

12   explain it.  I'm not sure everyone understands that.

13              MR. MILLS:  When you post something on Twitter and

14   you tag somebody, that message goes directly to that person's

15   account.

16              THE COURT:  Okay.  It's not repeating what somebody

17   said?

18              MR. MILLS:  That's retweeting, would be repeating

19   what somebody said.  Tagging is sending your own message, and

20   when you tag somebody, that person is notified specifically of

21   that particular post.

22              The next exhibit is Plaintiffs' Exhibit 0313.  This

23   is a short video of Mr. Fields driving his Dodge Challenger

24   less than an hour later on August 12, 2017.

25              (Video playing.)

1               The next is Plaintiffs' Exhibit 317A.  It's another

2    short video of Mr. Fields driving his Dodge Challenger on

3    August 12, 2017, this one taken from the helicopter.

4               (Video playing.)

5               The next exhibit is Plaintiffs' Exhibit 3440.  It's

6    an indictment in a criminal prosecution that was brought

7    against Mr. Fields after the events of August 12th.  It charged

8    Mr. Fields with one count of committing a hate crime resulting

9    in death, and 28 counts of committing a hate crime involving an

10   attempt to kill.  It's eight pages long.  We're just going to

11   flip through it quickly but you'll have it available to you.

12   This is the first page, second page.  Matt, I'm going to let

13   you just flip through it.

14              The next exhibit is Plaintiffs' Exhibit 3443.  This

15   is Mr. Fields's guilty plea in that criminal case in which he

16   pled guilty to Counts one through twenty-nine of the

17   indictment.  It is signed by Mr. Fields on March 27, 2017.

18        The next exhibit is Plaintiffs' Exhibit 3444.  This is a

19   document from Mr. Fields's criminal case, that same criminal

20   case, called a statement of offense.  It was signed by him on

21   page 3 on January 3rd, 2018.  Mr. Fields's statement of offense

22   states in part as follows -- I'm not going to read all of it,

23   but some of it.

24        "This statement of offense briefly summarizes the facts

25   and circumstances surrounding the defendant's criminal

conduct."   Third paragraph, "Defendant James Alex Fields Jr.
acknowledges and agrees that in proving the elements of the
crimes to which he is pleading guilty, the United States can
establish the following facts beyond a reasonable doubt and
that these facts constitute an adequate basis for his pleas of
guilty."

     "Prior to August 12, 2017, Defendant Fields obtained
multiple social media accounts which he used to express his
beliefs regarding race, national origin, religion and other
topics.   On these accounts Fields expressed and promoted his
view that white people are superior to other races and peoples,
expressed his support of the social and racial policies of
Adolf Hitler and Nazi-era Germany, including the Holocaust, and
espoused violence against African Americans, Jewish people and
members of other racial, ethnic and religious groups he
perceived to be non-white.   Fields also expressed these views
directly in interactions with individuals known to him."

     "In or around the spring and summer of 2017, an event
referred to as the Unite the Right rally was organized and
scheduled to occur on August 12th, 2017, at Emancipation Park
in Charlottesville, Virginia, which is within the Western
District of Virginia.   The rally was widely promoted on social
media and Internet sites associated with white supremacist
individuals and groups, and it was scheduled to feature a
lineup of well-known white supremacist leaders."

33

1          "On or about the afternoon of August 11th, 2017, Defendant

2     Fields departed Maumee, Ohio, driving his gray Dodge Challenger

3     bearing Ohio license plate GVF-1111, and arrived in

4     Charlottesville, Virginia in the early morning of August 12,

5     2017."

6               MR. CANTWELL:  Excuse me.  I'm sorry to interrupt.  I

7     have to object.  He misread one of those paragraphs and I'd

8     like him to go back and read it, Judge.  He read "white

9     supremacist leaders."  It says "white supremacist speakers."

10    And that's important to the details of this case.

11              MR. MILLS:  I'm happy to correct that, Your Honor.

12              THE COURT:  All right.

13              MR. MILLS:  If you would go back to the carryover

14    paragraph, Matt.

15         The last sentence in that paragraph is:  "This rally

16    was widely promoted on social media and Internet sites

17    associated with white supremacist individuals and groups and

18    was scheduled to feature a lineup of well known white

19    supremacist speakers."

20              Let's skip to -- "On the morning of August 12th,

21    2017, Defendant Fields arrived in and around the immediate

22    vicinity of Emancipation Park in Charlottesville, Virginia, to

23    attend the Unite the Right rally.  Multiple groups and

24    individuals espousing white supremacist and other antisemitic

25    and racist views also attended the rally.  That morning these

1  rally participants, including Fields, engaged in chants

2  promoting or expressing white supremacist and other racist and

3  antisemitic views."

4          "On August 12, 2017, Defendant Fields drove his car

5  onto Fourth Street, a narrow, downhill, one-way street in

6  downtown Charlottesville.  At or around the same time, a

7  racially and ethnically diverse crowd had gathered at the

8  bottom of the hill at the intersection of Fourth and East Water

9  Streets.  Many of the individuals in the crowd were celebrating

10 as they were chanting and carrying signs promoting equality and

11 protesting against racial and other forms of discrimination."

12         "Fields slowly proceeded in his vehicle down Fourth

13 Street toward the crowd and stopped and observed the crowd

14 while idling in his vehicle.  With no vehicle behind him,

15 Fields then slowly reversed his vehicle back up Fourth Street

16 toward the top of the hill, near the intersection of Fourth and

17 East Market Streets.  At or around that same time, the members

18 of the crowd began to walk up Fourth Street from Water Street

19 toward Market Street, populating the streets and sidewalks

20 between the buildings on Fourth Street."

21         "Having reversed his car to a point at or near the

22 top of the hill at the intersection of Fourth and Market

23 Streets, Defendant Fields stopped his vehicle.  Fields then

24 rapidly accelerated forward down Fourth Street in his vehicle,

25 running through a stop sign and across a raised pedestrian

35

 1   mall, and drove directly into the crowd.  Fields's vehicle

 2   stopped only when it struck another stopped vehicle near the

 3   intersection of Fourth and Water Streets.  Fields then rapidly

 4   reversed his car and fled the scene."

 5           "As Fields drove into and through the crowd, Fields

 6   struck numerous individuals, killing Heather Heyer, as listed

 7   in Count One of the indictment, and causing bodily injury or

 8   attempting to cause bodily injury using his vehicle, a

 9   dangerous weapon, to the following individuals," who I will not

10   list.

11           "Defendant Fields drove into the crowd because of the

12   actual or perceived race, color, religion, and/or national

13   origin of individuals in the crowd.  And his actions in doing

14   so were willful and included an attempt to kill."

15           The next exhibit -- two exhibits, Exhibits 204A and

16   204B, they are an audio recording and a transcript of a

17   telephone call between James Fields and his mother on

18   November 22nd, 2017.

19           Matt, please play the recording and show the

20   transcript to the jury.

21               (Recording played.)

22           Next exhibit -- two exhibits, 219 and 219A, an audio

23   recording and a transcript of a telephone call between James

24   Fields and his mother on March 21, 2018.

25               Please play the recording and show the transcript.

P. Simi - Direct

1          (Recording played.)

2          MR. MILLS:  Your Honor, I move for admission into

3   evidence the exhibits I just presented to the jury, and if I

4   may approach I have a list of those exhibits to provide to the

5   clerk to make sure they have all the numbers.

6          THE COURT:  All right.  They'll be admitted.

7          (Plaintiff Exhibits 03, 2, 3636, 3621, 3642, 3643,

8   3622, 3624, 3626, 3628, 3629, 3574, 3631, 3573, 3577, 3579,

9   3578, 3650, 3575, 3633, 3617, 3594, 3600, 3607, 3611, 3614,

10  3613, 3596, 3587, 3586, 3588, 3590, 3591, 3592, 3593, 3595,

11  3598, 3582, 3585, 3627, 3900, 3901, 3902, 3903, 3904, 3905,

12  3622, 3906, 3907, 3908, 3610, 3909, 3612, 3615, 3589, 3608,

13  3583, 3584, 3616, 3618, 1966, 3606, 0313, 317A, 3440, 3443,

14  3444, 204A, 204B, 219 and 219A admitted.)

15         MS. KAPLAN:  Your Honor, plaintiffs call to the stand

16  Professor Pete Simi.

17         Your Honor, just as a preliminary matter, we have a

18  handful of demonstratives that Professor Simi put together.  We

19  will not be moving to admit them, but we will show them to

20  Professor Simi and to the jury.  They're basically just bullet

21  points.

22         PETER SIMI, PH.D., CALLED BY THE PLAINTIFFS, SWORN

23                    DIRECT EXAMINATION

24   BY MS. KAPLAN:

25  Q    Good morning, Professor Simi.

P. Simi - Direct

1   A     Good morning.

2   Q     Why don't you give your full name for the record?   I

3   apologize.

4   A     Sure.   Peter George Simi.

5   Q     And, Professor Simi, what is your current job?

6   A     I'm an associate professor of sociology at Chapman

7   University.

8   Q     And how long have you been at Chapman University?

9   A     This is my fifth year there.

10  Q     And where -- I apologize.   Where is Chapman University

11  located?

12  A     It's in Orange County in southern California.

13  Q     Before teaching at Chapman, did you teach somewhere else?

14  A     Yes, I did.

15  Q     Where was that?

16  A     University of Nebraska.

17  Q     For how long?

18  A     13 years.

19  Q     And you mentioned that you were a professor of sociology,

20  Professor.   Again, I apologize for my ignorance, but how you

21  define sociology?

22  A     Broadly speaking, the study of human behavior and the

23  study of society.

24  Q     And within sociology, do you have a particular area of

25  academic focus?

P. Simi - Direct

1  A    Yes.  Hate crime, hate groups, and domestic terrorism.

2  Q    And how long have you been working in that field, sir?

3  A    Since 1996.

4  Q    Can you please describe your academic background for the

5  jury, starting with college?

6  A    Sure.  I earned a bachelor's degree from Washington State

7  University, a master's and a Ph.D. in sociology from the

8  University of Nevada, Las Vegas.

9  Q    In the course of your academic career, Professor, have you

10 had occasion to publish peer reviewed academic articles?

11 A    Yes, I have.

12 Q    Approximately how many?

13 A    Over 50.

14 Q    Have you had occasion to write a book?

15 A    Yes, I have.

16 Q    Can you name that book?

17 A    Sure.  *American Swastika:  Inside the White Power*

18 *Movement's Hidden Spaces of Hate.*

19 Q    Is this a copy of the book you wrote, sir?

20 A    Yes, it is.

21 Q    In addition to your articles, to the book, have you had

22 occasion to consult with parties as a consultant or an expert

23 in legal cases?

24 A    Yes, I have.

25 Q    And about how many times have you done that?

P. Simi - Direct

1  A    About a dozen.

2  Q    And just generally speaking, without getting into too much

3  detail, Professor, what kinds of consultations or opinions have

4  you been asked to give?

5  A    I've been asked to assess issues related to hate crime and

6  domestic terrorism, and in particular involvement in the white

7  supremacist movement.

8  Q    Were those criminal or civil cases?

9  A    All of them were criminal.

10 Q    And in those criminal cases, do you always conclude that a

11 particular individual was associated with a white supremacist

12 movement?

13 A    No, I have not.

14 Q    Have you ever testified in court before, Professor, as an

15 expert witness?

16 A    Yes, I have.

17 Q    How many times?

18 A    One time.

19 Q    And in that case, on which side of the case did you

20 testify?

21 A    I was asked to work on that case by the prosecution.

22 Q    And what was the defendant charged with in that case,

23 again, just very generally?

24 A    Sure.  Two counts of murder and one count of attempted

25 murder.

P. Simi - Direct

1  Q    Were you qualified by the Court as an expert to testify in

2  that case?

3  A    Yes, I was.

4  Q    And what were you asked -- what did you testify about?

5  A    I was asked to assess the defendant's -- some of the

6  defendant's statements prior to the crimes in question as to

7  whether they were consistent with white supremacist beliefs.

8  Q    And did you conclude that that was the case, Professor?

9  A    Yes, I did.

10  Q    And what was the verdict in that case?

11  A    He was found guilty on all charges.

12  Q    In addition to the articles, the books, et cetera, do you

13  have occasion to give lectures or trainings about your

14  expertise for various groups?

15  A    Yes, I have.

16  Q    And about how many of those have you done?

17  A    Well over 100.

18  Q    And can you, just -- again, given that it's 100, I don't

19  want you to give me a list of a hundred people, but just give

20  the jury a general sense of the kinds of groups that you've

21  done those trainings for, given lectures?

22  A    Sure.  United States Congress, the FBI's National Training

23  Academy at Quantico, the Federal Bureau of Prisons, Department

24  of Homeland Security.

25  Q    Now, Professor, I want to go back to your book for a

P. Simi - Direct

1    little bit.

2         What was -- it's called *American Swastika*, as you've

3    mentioned.  What's your book about?

4    A    Broadly speaking, it's about the culture of the white

5    supremacist movement, and in particular the central role that

6    violence plays in it.

7    Q    And how did you go about doing this book?  Did you do

8    research?

9    A    Yes.

10   Q    And what kind of research did you do?

11   A    The term is ethnographic fieldwork.

12   Q    And what does that mean, sir?

13   A    Basically, ethnographic fieldwork is the idea that one of

14   the most effective ways of learning about individuals or groups

15   or cultures or communities is to go to them directly:  Spend

16   time with them, interact with them, observe them, conduct

17   interviews with them.  Really try and immerse yourself in their

18   world and try and see things from their perspective as much as

19   possible.

20   Q    Have you prepared a slide, Professor, in connection with

21   your testimony that summarizes the ethnographic fieldwork you

22   did in connection with the book *American Swastika*?

23   A    Yes, I have.

24   Q    I'm going to ask Mr. Spalding to put up on the screen

25   slide 1.

P. Simi - Direct

1      Professor, before I get there, have you heard of the

2   phrase or the term "embedding"?

3   A    Yes, I have.

4   Q    Is that the same thing as ethnographic fieldwork, as

5   you've described it?

6   A    It is a term sometimes used to describe fieldwork, yeah.

7   Q    Can you please explain to the jury the ethnographic

8   fieldwork that you did in connection with your book *American*

9   *Swastika* specifically?

10  A    Sure.  Starting in 1997, I started making contact with

11  active members of white supremacist groups across the United

12  States, primarily in the southwest to northwestern part of the

13  US.

14      I was able to gain access to the individuals.  They were

15  willing to allow me to spend time with them.  They would let

16  me, in some cases, crash on their living room couch, or if they

17  had a spare bedroom, they'd allow me to stay in the spare

18  bedroom.  So this really gave me an opportunity to really kind

19  of see firsthand, up close, their activities, their daily life,

20  allowed me and gave me an opportunity to attend larger

21  gatherings, like cross burnings, swastika burnings, neo-Nazi

22  music shows.

23      So I was really able to gain pretty substantial access and

24  spend a lot of time, literally thousands of hours, in the field

25  with individuals actively involved in white supremacist

43

P. Simi - Direct

1    groups -- as you can see here, it involved 45 house visits

2    across multiple states -- and met with members across a wide

3    range of different groups that are part of the white

4    supremacist movement.

5    Q    And is it fair to say -- I'm looking at bullet two -- that

6    you conducted approximately -- well, not approximately -- 222

7    interviews with 128 active and former members of the white

8    supremacist movement?

9    A    Yes, that's accurate.

10   Q    Okay.  Now, Professor, are you aware -- I assume you

11   are -- that in this case there are a number of individual

12   defendants who are alleged to be associated with white

13   nationalism?

14   A    Yes.

15   Q    And in connection with this ethnographic fieldwork that

16   you did, did you have occasion to meet directly with any of the

17   individual defendants in this case?

18   A    No, I have not.

19   Q    Are you also aware, Professor, that in this case, as

20   defendants, there are a number of groups or entities?

21   A    Yes, I am.

22   Q    In your ethnographic fieldwork that you've just been

23   talking about, did you have occasion to meet with other members

24   of any of those groups or entities?

25   A    Yes, I have.  Identity Evropa, the National Socialist

44

P. Simi - Direct

1  Movement, and Vanguard America.

2          MS. KAPLAN:  Your Honor, I offer Professor Simi under

3  Rule 702 to testify as an expert in the white supremacist

4  movement and the culture of the white supremacist movement.

5          THE COURT:  He may so testify.

6          MS. KAPLAN:  Now, Mr. Spalding, if you could turn to

7  slide 2.

8   BY MS. KAPLAN:

9  Q   Professor Simi, if you could, could you please -- let's

10 just start at the very beginning.

11     Can you explain what you mean when you say "the white

12 supremacist movement"?

13 A   Yeah, happy to.

14     I think it's really important to first start with the word

15 "movement."  What we're talking about here is really an

16 organized effort to transform society by a collection of

17 individuals and organizations.  We're not talking about a

18 random individual who may express a racist idea over the

19 holidays with their relatives.  We're talking about something

20 very different than that.

21     This is, again, something that you think of, really, kind

22 of three core elements here we're talking about.  We're talking

23 about organizations and individuals that share a culture, that

24 have common strategies, and common goals.

25     So when you think about culture, of course, culture is

P. Simi - Direct

1   essentially what makes us human in many respects.  Culture is

2   the gel or the glue that binds us, all of us, individuals,

3   together in some form or another.  So the white supremacist

4   movement is really organized around this common culture.

5        What you're not dealing with when we talk about the white

6   supremacist movement is that it's not a central command

7   structure.  There's no CEO for the white supremacist movement.

8   So what you have is something that's really bound together and

9   organized through this common culture.  And a central part of

10  the common culture is the reliance and use of common

11  strategies, not the least of which is the focus on the

12  necessity and the effectiveness for using violence to achieve

13  your goals.

14       In the case of the white supremacist movement, I would say

15  the key goal is really the development of a white homeland, or

16  sometimes referred to as an ethnostate.

17  Q    What do you mean when you say "white ethnostate,"

18  Professor?

19  A    It comes in slightly different versions, varieties, but

20  the general idea is that a geographic area within the United

21  States, potentially the entire United States, but certainly a

22  geographic area within the United States would be carved out

23  and would be exclusively the domain of white people.  In some

24  versions, so-called -- the term they would use is

25  "nonwhites" -- would be allowed to reside there, but in a very

46

P. Simi - Direct

1  formalized subordinate position or status.

2  Q    Professor Simi, based on your fieldwork and your academic

3  studies, do you believe that there are certain core

4  characteristics of the white supremacist movement?

5  A    Yes.

6  Q    And I'm going to ask Mr. Spalding to flip to slide 3.

7  Excuse me.  I keep losing my voice.  I apologize.

8      Are those the core or common characteristics you believe

9  exist?

10 A    Yes.

11 Q    And can you please -- just very briefly, because we're

12 going to spend most of your testimony talking about them, could

13 you just briefly walk the jury through them?

14 A    Sure, sure, just real briefly.

15     The first one, racist ideologies, you can think of that as

16 essentially the foundation for the movement.  It's the roadmap

17 that provides them a way of looking at the world.

18     Second is the use and glorification of violence.  Again,

19 the violence, in many respects, is central in terms of the key

20 strategy that they view as necessary to achieve the goals that

21 they have for the movement.  The violence, the glorification in

22 particular, provides a certain kind of energy for the culture

23 that we were just talking about.

24     And then third, front and backstage behavior and the focus

25 on optics.  One of the things that's kind of the most general

P. Simi - Direct

1   kind of findings about human behavior within sociology and

2   other disciplines that study human behavior is that our

3   behavior varies across different types of situational contexts.

4   So sociologists use the terms "front and backstage behavior" as

5   one way to try and understand how our behavior varies in

6   different types of settings.

7        And then third is the tactic or strategy of creating or

8   generating plausible deniability.  The best way to think about

9   plausible deniability is that, basically, it's an effort by an

10  individual or an organization to preemptively kind of shield

11  themselves from being blamed or held responsible for

12  wrongdoing, including criminal conduct in some cases.

13  Q    Now, Professor Simi, did you come up with these core

14  characteristics on your own, or are these generally -- do other

15  people in your field agree with you on this?

16  A    Yes, they -- this is not something I came up with on my

17  own.  This is something that -- these characteristics exist

18  within the wider study or field that looks at the white

19  supremacist movement.

20  Q    Now, I want to turn to this case, Professor.

21       Do you -- in this case, did you work alone, or did you

22  work with someone else?

23  A    I worked with someone else.

24  Q    And who is that person?

25  A    Professor Kathleen Blee.

P. Simi - Direct

1    Q    And is she a professor somewhere?

2    A    Yes, the University of Pittsburgh.

3    Q    And what kind of work did you and Professor Blee do in

4    this case?

5    A    Well, in short, we reviewed a very, very large volume of

6    different types of materials:  Video, text, social media --

7    Q    I'm going to interrupt you for a second, Professor, and

8    put up a slide that I think you prepared of that.

9         If we could put up slide 4, Mr. Spalding.

10        Go on, Professor.  I apologize.

11   A    Oh, no.

12        As I was mentioning, we reviewed a substantial amount of

13   material that included texts, emails, different social media

14   platforms; in particular, a real substantial focus on Discord.

15   Over 575,000 posts were analyzed as part of our analysis, as

16   well as thousands of images.

17        We also reviewed deposition transcripts and trial

18   testimony.

19   Q    Now, Professor, how long have you and Professor Blee been

20   doing this work in this case?

21   A    In this case, we signed our letter of engagement in

22   January of 2019.

23   Q    And about how many hours did you devote to the work on

24   this case?

25   A    Approximately about 1,000 hours, thereabouts, each of us.

49

P. Simi - Direct

1   Q     And after reviewing the materials that you just went

2   through on slide 4, did you and Professor Blee form an opinion

3   in this case?

4   A     Yes, we did.

5   Q     And what is that opinion?

6   A     That the defendants relied on the core characteristics of

7   the white supremacist movement when they organized the Unite

8   the Right event in August of 2017.

9   Q     Were you asked, Professor, you or Professor Blee, asked to

10  give an opinion as to whether any defendant or group of

11  defendants in this case engaged in a conspiracy to commit

12  racially motivated violence?

13  A     No, we were not.

14  Q     And did you and Professor Blee create a report summarizing

15  your opinions?

16  A     Yes, we did.

17         MS. KAPLAN:  Your Honor, may I approach?

18         THE COURT:  Yes.

19   BY MS. KAPLAN:

20  Q     Professor, is that the report that you and Professor Blee

21  did in this case?

22  A     Yes, it is.

23  Q     Again, that's not admissible, so I'm just going to leave

24  it there in front of you.

25  A     Okay.

P. Simi - Direct

1  Q    Now, before we get to the meat of your testimony, I want

2  to talk about one preliminary matter, and that is the Discord,

3  the 557,000 Discord posts that you talked about.

4           MS. KAPLAN:  And, Your Honor, I apologize.  I had

5  intended to pass out binders to everyone, and I'm going to ask

6  my colleague to do that now.

7           THE COURT:  Go ahead.

8   BY MS. KAPLAN:

9  Q    Now, looking at this slide, it says that you reviewed

10 575,000 posts on Discord.

11      Let me begin by just asking the very basic question:  What

12 is Discord?

13 A    Yeah, it's a communication platform that was originally

14 developed primarily for online gaming.  And since that time

15 it's really expanded in terms of its usage by, you know,

16 segments of the population more broadly.

17 Q    And why did you review such a large volume of posts on

18 Discord, Professor?

19 A    Well, while not exclusively, UTR was, though, centrally

20 organized on Discord.

21 Q    And when you say "UTR," you mean Unite the Right?

22 A    Yes.  Yes.

23 Q    And prior to this case, Professor Simi, had you had

24 occasion to look at posts on Discord?

25 A    Yes.

P. Simi - Direct

1    Q    And why is that?

2    A    At some point I became aware that white supremacists had

3    kind of started gravitating towards Discord to use for

4    communication purposes.  So as part of my more broad research,

5    I've been following kind of the use of technology since 1996

6    among white supremacists.  And so, you know, as different

7    platforms became more prominent among white supremacists,

8    that's something I tried to keep track of and aware of.

9    Q    And what's your understanding, Professor, of why white

10   supremacists or members of the white supremacist movement kind

11   of became attracted to Discord?

12   A    I would say it kind of comes down to two main things.

13        One is that Discord is an encrypted platform, so it

14   provides a degree of secrecy, privacy, and that's something the

15   white supremacists are interested in, in terms of for

16   communication purposes.

17        And then I would say the second aspect is because it was

18   originally developed primarily for online gamers, that that was

19   a large population that white supremacists saw for recruitment

20   potential.  And this is consistent with the white supremacist

21   movement's history of trying to identify different subcultures

22   that they can use, basically, for recruitment purposes, trying

23   to immerse themselves in that subculture to some extent, and

24   essentially try to recruit new adherents from that.

25   Q    I'm now going to have Mr. Spalding put up a page from

P. Simi - Direct

1   Discord.  Very briefly, I just want you to walk through with me

2   and kind of translate it for the jury, if you understand what

3   I'm saying.

4   A    Sure.

5        MS. KAPLAN:  I'm going to ask Mr. Spalding to put up

6   Plaintiffs' Exhibit 1166.

7        (Plaintiffs' Exhibit1166 marked.)

8        THE WITNESS:  Okay.

9   BY MS. KAPLAN:

10  Q    Now, let's start at the top left corner.

11  A    Okay.

12  Q    It says in the top left corner, "Charlottesville 2.0"?

13  A    Yeah.

14  Q    What does that mean?

15  A    So in the top left corner, "Charlottesville 2.0" is the

16  name of the server.  And if you think about it this way,

17  Discord -- you have servers, and that's like the highest level

18  organization, and then within a server you can have different

19  channels, and then of course within the servers and channels

20  you have users.

21       So it kind of goes three levels for Discord:  Servers,

22  channels, and then users.

23  Q    You just led me to my next question, Professor, which is:

24  Underneath "Charlottesville 2.0" there's a whole bunch of --

25  kind of a column of words.  What are they?

53

P. Simi - Direct

1  A    Yeah.  So those would be names of different channels that

2  are organized under Charlottesville 2.0.

3  Q    And before we get to the channels, let me go back for a

4  second.

5       In addition to the Charlottesville 2.0 server, did you and

6  your colleague, Professor Blee, review other servers in

7  connection with your work in this case?

8  A    Yes, we did.

9  Q    Okay.  Now, going back to the channels:  So when you look

10 at it, several of these channels have geographic names

11 associated with them.  I think it says "Carolinas,"

12 "California," "Florida"?

13 A    Yep.

14 Q    What's your understanding of what those channels were?

15 A    Well, our understanding of that is that there was efforts

16 as part of the organization to make sure and have as much

17 geographic distribution as possible, in terms of trying to get

18 as big a turnout and ensure that as many people from across the

19 country who might be interested in attending were being,

20 essentially, organized through these channels.

21 Q    There are also some channels here, as I read it,

22 Professor, that seem to correspond to the names of defendant

23 entities in this case.

24 A    That's right.

25 Q    Do you see those?

54

P. Simi - Direct

1  A    Yes, I do.

2  Q    Can you point out one or two of those?

3  A    Sure.  Traditionalist Worker Party is kind of towards the

4  bottom there.  It's fourth up.

5  Q    And what's your understanding of what that channel was

6  within the Charlottesville 2.0 server?

7  A    Well, these are kind of organization-specific channels.

8  They're not exclusively for those organizations, necessarily,

9  but a lot of the discussions would be more specific to those

10 organizations.

11 Q    And am I correct, Professor Simi, that for some of the

12 organizations -- I think Tradworker is probably a good example.

13 They had their own server, Tradworker's server, and they also

14 had channels within the Charlottesville 2.0 server; did I get

15 that right?

16 A    Yes, you did.

17 Q    Now, it's my understanding, Professor, that we've prepared

18 a chart.  It's really more than -- it's just two pieces of

19 paper -- that summarize all the servers and channels that you

20 and Professor Blee looked at in this case; is that correct?

21 A    That's correct.

22 Q    And I'm going to ask Mr. Spalding to put that up just

23 briefly.  There's a lot of words on there?

24 A    It's a lot of stuff.

25 Q    And if you could go to the second page, too.

55

P. Simi - Direct

1    Is that a true and accurate listing of the channels and

2  servers that you and Professor Blee reviewed in this case?

3  A    Yes, it is.

4  Q    Let's go back to Plaintiffs' Exhibit 1166.

5    Let's move now to the right.  And at the top of the middle

6  on the right it says "leadership-discussion."  What does that

7  mean?

8  A    So that would be the name of this particular channel,

9  where this thread or conversation is happening beneath it.

10 Q    And underneath that, just underneath that, there is a

11 bolded language that says "Tyrone #4532."  What does that mean?

12 A    Well, so Tyrone #4532 would be a username, or sometimes

13 referred to as a handle, for a person that's making those

14 messages.

15 Q    Am I have correct that on this page, there are a number of

16 usernames or handles?

17 A    Yeah, it looks like there's three or four.

18 Q    Sitting here today, Professor, do you understand who the

19 people are who are associated with these usernames or handles?

20 A    Yes.

21 Q    Can you just explain to the jury?

22 A    Sure.  Tyrone is Michael Chesny.  Reinhard Wolff is

23 Patrick Casey from Identity Evropa.  Matthew Heimbach is

24 somewhat self-explanatory.  And Thomas Commander is Thomas

25 Rousseau from Vanguard America.

56

P. Simi - Direct

1   Q    Now, could anyone on Discord post a message on the

2   #leadership-discussion channel?

3   A    No.  Our understanding is that was an invite-only.

4   Q    And what do you mean by "invite-only"?

5   A    Well, one of the functionalities of Discord is that you

6   can create some of the channels to be invite-only.  So in other

7   words, a person to join that channel would have to receive kind

8   of a special invitation, basically.

9   Q    And who has the ability to issue that kind of invitation?

10  A    Our understanding is it's moderators and administrators.

11  As part of their kind of administrative authority, that would

12  fall under that.

13  Q    And with respect to the Discord servers that you and

14  Professor Blee looked at in this case, are you familiar with

15  who the administrators or moderators were?

16  A    Yes.  We did become familiar.

17  Q    And who, to the extent you know, who were those

18  individuals?

19  A    Our understanding is Mr. Kessler, Damigo, Kline,

20  Mr. Parrott, Mr. Heimbach, and Mr. Ray.

21  Q    Now, I want to go back to the core characteristics,

22  Professor.  And I'm going to ask Mr. Spalding to put up on the

23  screen a slide -- I believe it's slide 6.

24  A    Okay.

25  Q    Could you walk the jury through what you mean by core

57

P. Simi - Direct

1    characteristic 1 in terms of the opinion that you've given.

2              MR. CANTWELL:  I'm sorry, I have to object here.  Is

3    leading allowed with an expert witness?

4              THE COURT:  Well --

5              MS. KAPLAN:  I don't think I led.

6              MR. CANTWELL:  You're literally putting up a slide

7    show for him to comment on.

8              THE COURT:  It's proper to lead to bring things

9    along, a preliminary question to get to the substance.  It

10   moves it faster.

11             MR. CANTWELL:  Okay.  Very good.

12             THE COURT:  Go ahead.

13    BY MS. KAPLAN:

14   Q    Professor Simi, could you just walk, almost like you're

15   lecturing to students, but a lot briefer, could you walk the

16   jury through this?

17   A    I promise I'll be brief.

18        So as I mentioned earlier, the racist ideology, the way to

19   think about this is kind of as a roadmap or a foundation for

20   the white supremacist movement.  And one of the key aspects of

21   the racist ideology is that -- so for the perspective of the

22   white supremacist movement, race is the central kind of

23   organizing principle for understanding the world.  And it's a

24   very rigid way of defining race.  So these are very rigid

25   categories.  There's no ambiguity here.  Literally things are

58

P. Simi - Direct

1  very cut and dry in terms of racial categories.

2      And they believe that essentially there are ingroups and

3  outgroups, and that some racial -- the white race is

4  essentially the ingroup and other racial groups would be

5  defined as outgroups.  Now, "ingroup" and "outgroup" sounds

6  somewhat innocuous here.  What's important to recognize is by

7  outgroup, we're talking about the outgroups are associated with

8  substantial kind of negative characteristics.  They're viewed

9  as enemies of sorts.  So the term "racial enemy" is often used

10 to describe outgroups.  They're viewed as combatants of sorts.

11     They are described in ways -- for instance, Jewish people

12 would be part of the outgroup, and they're described as

13 essentially evil, corrupt, that they can't be -- they can't

14 live among society.  They basically contaminate society.

15     Blacks are viewed as also part of this outgroup and are

16 viewed as inherently inferior, as prone to criminality.  So

17 we've heard a lot so far during the trial about the idea that

18 blacks on average have lower IQs.  This is again part of this

19 idea of inferiority among aspects of the outgroup that's very

20 prominent in their world view.

21     The ingroup, on the other hand, whites are kind of

22 valorized, right, and seen as kind of leading to all the

23 greatest scientific advancements and cultural breakthroughs and

24 so forth.  As you see on the slide here, the list of outgroups

25 certainly extends beyond Jewish people and blacks.  It's

P. Simi - Direct

1    actually quite a long laundry list of folks that they view as

2    adversaries and as threats in some form or another.

3    Q    Professor Simi, there's been an awful lot of testimony in

4    this case about these issues so I'm not going to belabor the

5    point.  I just want you to look at one exhibit, which is

6    Plaintiffs' Exhibit 426.

7    A    Okay.

8    Q    Which was admitted yesterday, I believe.  No, it was

9    admitted earlier in the case.

10        And can you please explain to this -- to the jury how this

11   exhibit reflects or is consistent with what you were just

12   talking about?

13   A    Yeah.  I mean, this is a very grotesque illustration of

14   exactly what we were just talking about.  And so you see right

15   at the very top a racial slur, the N word is used in bold, and

16   then below that a paragraph where the additional slurs are used

17   multiple times and variations of the N word.  And also I would

18   draw your attention to, in that paragraph, the way in which the

19   language is treating black people in terms of almost describing

20   them as being owned, as possessing a black.  So there's this

21   sense of kind of an association with slavery here that's kind

22   of built in to this description.

23        In the middle of the image then you see this instrument

24   that's being sold as part of this.  And essentially it's a

25   weapon of sorts where you have a sharp edge that's being used

P. Simi - Direct

1   on one end and then a spot to hold a person's head on the

2   other, and then you get the illustration of how this is to be

3   used where you have a black person essentially in bondage.

4   Their feet are tied, their hands are tied.  The sharp

5   instrument appears to be inserted into their rectum.  Their

6   head is placed -- confined in that.  And what appears to be a

7   family is standing by kind of holding, again, possessing,

8   enslavement.

9        So all the things we were just discussing in terms of

10  racist ideology pretty well captured in this image.  And I

11  should say that this type of image in my experience over the

12  last 25 years is very prominent, very prevalent within the

13  white supremacist movement, as you see this kind of graphic,

14  grotesque, dehumanization of people that they consider to be

15  part of the outgroup.

16           MS. KAPLAN:  I know, Your Honor, it's time for the

17  morning break.  I have three more questions about this exhibit

18  and then we can move on.  Does that make sense?

19           THE COURT:  All right.

20   BY MS. KAPLAN:

21  Q    So Professor Simi, this document, for lack of a better

22  term, this image is so out there, I have to ask you the

23  question:  Is this meant to be -- is imagery like this meant to

24  be serious or is it just a joke?

25  A    In my experience, looking at the white supremacist

P. Simi - Direct

1   movement, their culture more broadly, this type of image is --

2   while they may derive pleasure from it by looking at it and

3   laugh and joke about it, it is meant to be taken also

4   simultaneously very seriously and represents the kind of

5   dehumanization that they believe is absolutely normal; it's

6   natural to view blacks as inferior and needing this kind of

7   treatment, subordination.  So in that respect it's meant to be

8   taken very seriously, and it is a sincere expression of their

9   ideology within their culture.

10  Q    Two more quick questions, Professor, and then we can break

11  and move on. I couldn't help but notice that this is posted on

12  Discord by Defendant Azzmador in the server Bowl Patrol, and in

13  the channel if I got this right, #bowlnut_gallery.

14  A    Yeah, that's correct.

15  Q    Do those phrases have any meaning?

16  A    They do.  The word "bowl" in different variations is used

17  quite frequently and has been since 2015.  And the reason for

18  that is in 2015 Dylann Roof walked into a historic black church

19  in Charleston, South Carolina and gunned down nine individuals

20  who were trying to engage in their Bible study for that day.

21       Roof at the time, or at least in some of the images -- and

22  I should say that Roof did that -- based on what he said, based

23  on what he wrote, his manifesto, he did that as a way to help

24  start the race war.

25       At the time, or at least at various points in time, Roof

P. Simi - Direct

1   had what's sometimes referred to as a bowl haircut, kind of

2   like square.  And in the efforts to essentially kind of

3   celebrate or valorize Roof's violence that day, the term has

4   kind of caught on within white supremacist circles, within the

5   culture.  And so you'll see various references to bowl cuts,

6   Bowl Patrol, so forth and so on.

7   Q    If you were to see a collection of white nationalists

8   chanting "roof, roof, roof," would that in your opinion,

9   Professor, be a reference to Dylann Roof?

10  A    I believe it would be.

11         MS. KAPLAN:  It's okay to break now, Your Honor.

12         THE COURT:  All right.  We'll recess now for 30

13  minutes -- 20 minutes.

14  **(Jury out, 10:32 a.m.**)

15         (Recess.)

16  **(Jury in, 10:56 a.m.)**

17         THE COURT:  All right.  You may be seated and

18  proceed.

19         MS. KAPLAN:  May I proceed, Your Honor?

20         THE COURT:  Yes.

21   BY MS. KAPLAN:

22  Q    Professor Simi, I'd like to now turn to common

23  characteristic number two, glorification and use of violence.

24  A    Okay.

25  Q    And I'm going to ask Mr. Spalding to put up slide 7.

P. Simi - Direct

1    Can you please, again, as a professor, explain to the jury

2   what you mean by this?

3   A    Sure.  For the white supremacist movement, violence is the

4   way they understand the world.

5        What I mean by that is that they view violence as

6   necessary and natural.  They view it as, to resolve conflict,

7   it's required.  So violence is very central to not only how

8   they see the world, but to how they think actions need to be

9   taken in terms of different courses of action and specific

10  tactics.  Violence is very central to that.  And when you see

11  the culture, you see substantial amounts of expressions related

12  to violence.  So you see it in slogans.  You see it in key

13  terms, codes, and so forth.

14       You also see very specific discussions of how to conduct

15  violence; so, in other words, tactical discussions about the

16  most effective ways to commit violence.

17       And then third is this aspect that celebrates Adolf

18  Hitler, very central, very core to the white supremacist

19  movement.  Admiration of Hitler, I think, puts it mildly.  It's

20  really a reverence for Hitler.  And so you see consistent use

21  of images related to Hitler, references to Hitler, and just,

22  frankly, a celebration of Hitler, Nazi Germany, and what they

23  believe that Nazi Germany was able to accomplish, including the

24  execution of the Holocaust.

25  Q    Now, just a very brief detour about history, Professor.

P. Simi - Direct

1      This use and glorification of violence as you just

2  described it, does that go back in history in connection with

3  the white supremacist movement in the United States?

4  A      Yes.  It really goes back to the very beginning.

5      So if we look at the origins of the US white supremacist

6  movement and trace it back to the original founding of the Ku

7  Klux Klan, which happened shortly after the US Civil War,

8  during the Reconstruction era, the Klan and similar groups that

9  formed were very much committed to violence.  They utilized

10  violence to accomplish their strategies.

11      That continued into the 20th century as the white

12  supremacist movement grew and broadened.  You continued to see

13  a very central reliance and promotion of violence.  And

14  certainly that's continued into the 21st century.

15  Q    I'm going to ask you now, Professor, about a number of

16  words or phrases that the jury has heard a lot about in this

17  case.  You can be brief because, again, they've heard about it,

18  but I just wanted to kind of get your expert take on them.

19  A      Sure.

20  Q    Let's start with white genocide theory, Professor.  What

21  is that?

22  A    In a nutshell, it's the idea that the white race is on the

23  verge of extinction due to a variety of forces at play, in

24  particular what they call an international Jewish conspiracy,

25  that has essentially orchestrated an effort to eradicate the

P. Simi - Direct

1  white race.  And in the near future, white people will cease to

2  exist if the current trends continue.

3  Q    And is that related to the idea of replacement theory?

4  A    Yes.  In many respects, I would say you could use those

5  interchangeably.

6  Q    And how does this idea of white genocide relate to this

7  theme of violence?

8  A    Well, if you believe that your people are on the verge of

9  extinction, which they do, then they believe that violence is

10  necessary -- it's a necessary course of action to prevent that

11  from happening.  They view violence as essentially self-defense

12  to prevent white genocide from happening.

13  Q    I'm going to put up a document that I believe came into

14  evidence just this morning, Plaintiffs' Exhibit 3600.

15  A    Okay.

16  Q    And if you could, walk the jury through this document,

17  Professor.

18  A    Sure.  Start with the RealGiantDad, the Twitter handle

19  which is Mr. Fields, and notice that there is a tweet at

20  Richard Spencer, and then a message:  "Defending one's own

21  people isn't a persecution of others.  The white race has a

22  right to exist."  And then you see a visual image which appears

23  to be a family of some kind with a child in the middle, text

24  above that says "Love your race," and then text below that

25  says, "Stop white genocide."

P. Simi - Direct

1   Q    What's going on here, Professor?

2   A    Well, essentially you have this message that, if you love

3   your race, you will certainly be committed to stopping white

4   genocide, and then of course the subtext to stopping white

5   genocide is that that requires the use of violence.

6   Q    And given the imagery in this Twitter post, is there a

7   kind of doublespeak going on here?

8   A    In a way, you could say that, yeah, because at the top

9   here you have this phrase "love your race," which some people

10  might see that and say:  Okay, well, that seems somewhat,

11  maybe, innocuous.  Then you have this family that looks like a

12  happy family, nonthreatening.  But then this part about "stop

13  white genocide," which, again, for those in the know, they

14  understand that to stop white genocide, that's a call to

15  violence.

16  Q    I want to ask about another similar phrase, 14 Words.  And

17  again, I don't want to belabor the point, because there's been

18  a lot of evidence in this case about it.  What are the 14

19  Words?

20  A    "We must secure the existence of our people and a future

21  for white children."

22  Q    Is the 14 Words a phrase or slogan that's used within the

23  white supremacist movement?

24  A    One of the most prominent.

25  Q    And again, the jury has heard a little bit about this, but

P. Simi - Direct

1   can you just explain who wrote them and who that person was?

2   A    Sure.  David Lane, who ultimately died in prison being

3   convicted for involvement in domestic terrorism, he was a core

4   member of the Silent Brotherhood, sometimes referred to as The

5   Order, that was an active terrorist underground cell in the

6   1980s.  They assassinated Alan Berg, a Denver radio talk show

7   host who was Jewish.  They killed other people.  They robbed

8   armored trucks and so forth and so on.

9        David Lane penned that while he was in prison.

10             MR. REBROOK:  Your Honor, there's a serious feedback

11   issue occurring right now.  I believe it has to do with the

12   microphone.

13             THE COURT:  Can you cut out whatever channel that is

14   that's coming in on?

15             (Discussion off the record.)

16             THE WITNESS:  I think that about wraps it up.

17   BY MS. KAPLAN:

18   Q    In your work in general preceding this case in the white

19   supremacist movement, have you had occasion to see use of the

20   14 Words?

21   A    Yes.  Very much.

22   Q    And did you see it used in the materials you reviewed in

23   this case?

24   A    Yes, absolutely.

25   Q    And just generally speaking, how is it used?  Like, where

P. Simi - Direct

1   do you tend to see it?

2   A     You know, it's very prevalent.  So you'll see it in things

3   like T-shirts, tattoos; you'll make references to it in music

4   songs; you'll -- kind of greetings and salutations.  People use

5   it in their emails, or use it in their usernames in some cases.

6   It's -- frankly, I would say it's ubiquitous within the white

7   supremacist movement.

8   Q     And what connection, if any, do the 14 Words have to the

9   issue of violence?

10  A     Very close, very strong, in the sense that "we must secure

11  the existence of our people and a future for white children"

12  suggests -- the subtext is that, in order to do that, violent

13  means are necessary.

14  Q     I'm going to talk about another phrase, a kind of meme

15  that's come up in this case.  And that's the Day of the Rope.

16  A     Okay.

17  Q     What's the Day of the Rope, Professor?

18  A     It's a phrase that is pulled from the book *The Turner*

19  *Diaries*.  And *The Turner Diaries* was written by William Pierce,

20  who founded the National Alliance.  He was one of -- the

21  National Alliance was one of the leading neo-Nazi organizations

22  in the 1980s and '90s.

23     *The Turner Diaries* is -- essentially, the best way to

24  describe it, I would say, is a white supremacist kind of

25  fantasy futuristic novel that depicts a coming white

P. Simi - Direct

1  revolution.  And at some point during the coming white

2  revolution, the white revolutionaries are able to gain kind of

3  a stronghold in California, where they conduct what becomes

4  termed "the Day of the Rope."  It's a mass execution of what

5  they call "race traitors"; that is, white people who have

6  betrayed the white race or betrayed the cause.

7      In the book, it's politicians and journalists and white

8  women who had engaged in interracial relationships.  They're

9  literally hung from -- in a mass style, hung from -- I believe

10  it was lampposts in the book.  And because of the popularity of

11  *The Turner Diaries* within the white supremacist movement,

12  including partly inspiring Tim McVeigh and the Oklahoma City

13  bombing, because of the prevalence of *The Turner Diaries*, this

14  term, the Day of the Rope, is really popular.  It's a widely

15  used kind of frame of reference and slogan of sorts.

16  Q    Now, we already talked a bit about the white ethnostate,

17  Professor.  In terms of the white supremacist movement, how do

18  they believe the white ethnostate is to be achieved?

19  A    Largely, the idea is that violence is necessary to create

20  the white ethnostate.  There's some differences in terms of at

21  what point, you know, this is going to happen, but largely the

22  white ethnostate will require a major battle, offer referred to

23  as "the race war."

24  Q    I'm going to ask Mr. Spalding to put up another document

25  that came into evidence this morning, Plaintiffs' Exhibit 3628.

P. Simi - Direct

1        And if you could, walk the jury, Professor, through this.

2   A    Sure.  Again, NewGiantDad, Mr. Fields.  The text is:

3   "Violence is the only solution.  We have no other options.

4   Voting will solve nothing.  The police and courts won't

5   convict."

6   Q    What's going on here, Professor?

7   A    Well, you have a very clear call to violence.  The idea

8   that, again, the system is so corrupt, things are so bad, from

9   their vantage point, that the only way to deal with this

10  situation is through the use of violence, through a violent

11  revolution of sorts, to the point of really pointing out very

12  clearly that the current system in terms of voting, the current

13  system in terms of the courts and police, are completely

14  ineffective, and so therefore that's why this revolution is

15  necessary.

16  Q    Now, another term that's come up a lot in this case,

17  Professor, is "race war."  Can you explain what that means

18  within the context of the white supremacist movement?

19  A    Yeah.  I mean, it's their idea that a major, a great

20  battle will occur between the races at some point in the

21  future.  It's a necessity, it's inevitable in many respects,

22  and it's through the race war that, potentially, a white

23  ethnostate could come.

24  Q    What's the view on when this race war is going to occur?

25  A    There's some -- I would say some variability there.  You

71

P. Simi - Direct

1   have some people actually say we're in the early stages,

2   essentially, of the race war.  You have some people, certainly,

3   who focus on opportunities to fight, you might say, skirmishes

4   or small battles in preparation for the race war.  And then as

5   far as exactly when the full-fledged race war will occur, it's

6   somewhat ambiguous, you might say.

7   Q   Now, the word "war," Professor, can be used in a lot of

8   different contexts.  For example, President Johnson had a war

9   on poverty, as I recall.

10      How is the word "war" being used here?

11  A   My understanding of studying this over the last 25 years

12  is that this is not meant to be taken figuratively.  This is

13  meant -- the race war is described in very literal terms, in

14  specific terms, in concrete terms.  And it's celebrated, you

15  know, the prospect, and the early battles are celebrated.

16  Q   I'm going to ask Mr. Spalding to play a clip which is

17  Plaintiffs' Exhibit 3349A.  And I'll represent that it's a clip

18  from Mr. Cantwell's podcast, The Radical Agenda, on August 7th,

19  2017.

20          (Recording playing.)

21  Q   Can you explain, Professor, what's going on in that?

22  A   Well, there's quite a bit going on there, frankly.

23  Certainly there's a call to violence, multiple times.  There is

24  reference to genocide.  There's reference to gassing.  There's

25  obviously a clear expression of antisemitism.  There is a

P. Simi - Direct

1  mentioning of communism and that Jewish people are responsible

2  for communism.  There's a number of different themes kind of

3  present in that short clip.

4  Q    Now, you also hear in that clip, Professor, Defendant

5  Cantwell laughing.  Is this kind of juxtaposition between

6  very -- how should I put it -- direct and radical language,

7  juxtaposed with laughing, is that something that you commonly

8  see within the white supremacist movement?

9  A    Yeah.  I mean, I can't tell you how many times over the

10  last 25 years I've seen similar instances where violent

11  references, violent rhetoric, is coupled with a type of joking

12  or humor, really creating a type of double meaning, to where

13  you have the expression advocating violence, but then cloaked

14  with some reference to humor.

15  Q    And you mentioned that in that clip you could hear

16  Mr. Cantwell talk about Jews and talk about communists.  Is

17  there a link in the white supremacist movement between Jews and

18  communists?

19  A    Yes.  Generally speaking, the white supremacist movement

20  believes that Jewish people are responsible for creating

21  communism.

22  Q    I'm going to look at another document and I'll ask you to

23  look at another document now, Professor.  It's Plaintiffs'

24  Exhibit 1060, which I believe was admitted this morning.

25      And if you would, Professor, in order to save time, could

73

P. Simi - Direct

1  you just take the jury through this document and kind of

2  explain what's going on and why it's relevant to your opinion?

3  A     Sure.  So it starts out on the first page with --

4  Q     I think you need to go back to the first page,

5  Mr. Spalding.

6  A     -- with what appears to be a younger person holding this

7  flag, and then that's followed by a link to Amazon for the

8  purchase of a flagpole.  And then you see on page 2 what ends

9  up happening is a very kind of fairly in-depth discussion or

10 conversation about the use of weapons, flagpoles, what makes

11 for the best kind of weapon in terms of the length of flagpole.

12 There's reference to an axe handle and its use as a weapon.  So

13 you get this really almost kind of mundane conversation or

14 discussion about particularities as it relates to what makes a

15 flagpole a good weapon.

16     At some point -- I believe it's on page 2 -- yeah, right

17 in the middle here, you can see Tyrone says:  "Are you trying

18 to impale people?"  So there's that reference, which then at

19 the very end you get a very graphic visual image of what you

20 might describe as mass casualty violence, in that all these

21 people have been impaled on these appear to be long kind of

22 posts, poles; spears of some kind, possibly.

23     And so you get the kind of, again, juxtaposition or

24 combination of this very kind of mundane conversation about how

25 to best use weapons and kind of tactical, then coupled with

P. Simi - Direct

1  this very graphic imagery about mass casualty violence.

2  Q     I should have asked this, but where is this conversation

3  taking place?

4  A     Yes, it's on the -- appears to be the Charlottesville 2.0

5  server under the #flags_banners_signs channel.

6  Q     And the kind of juxtaposition between where to go on

7  Amazon to buy something and then this image that you just

8  talked about, is that kind of juxtaposition something you

9  commonly see within the white supremacist movement?

10 A     Yes, it is.

11 Q     Can you expound, explain?

12 A     Sure.  What we're dealing with here is a culture of

13 violence when we talk about the white supremacist movement.

14 It's not really all that different than a culture of violence

15 you'd find with, say, the Mafia, organized crime, Al-Qaeda,

16 ISIS, a longstanding conventional street gang in terms of its

17 culture of violence.

18      So the culture of violence with the white supremacist

19 movement, one of the things that a culture of violence needs to

20 do is try and normalize violence.  So these kind of

21 conversations are important from a cultural standpoint in terms

22 of helping normalize violence and make it seem kind of more

23 common and mundane.

24 Q     I'm going to show one more Discord discussion like that --

25 I think it's like that -- and that is Plaintiffs' 1144 that I

P. Simi - Direct

1   believe also came in this morning.

2        And can you explain that to the jury, Professor?

3   A    Sure.  It appears to be two bus-like vehicles that are

4   driving through a large crowd of people.  And there is a first

5   message; just beneath the visual image there is a text that

6   says, "This will be us," followed by a message -- another

7   message from Tyrone saying, "I know NC law is on the books that

8   driving over protesters blocking roadways isn't an offense.

9   This is crossover for this channel and #VA-law" -- which, by

10  the way, #VA-law is also another channel that's under the

11  Charlottesville 2.0 server.  So the --

12  Q    Let me interrupt you for a second.  What channel was this

13  taking place in?

14  A    This one is the #shuttle_service_information channel.

15  Q    Please go on.

16  A    Sure.  So you get the -- kind of the back-and-forth

17  between the channels in terms of where they're

18  cross-communicating about issues, and this particularly

19  referencing statutory issues as it applies to being able to run

20  over people.

21       Let's see.  Next -- yeah, so then this bleeds into the

22  next page where you have this -- another Tyrone message:  "Sure

23  would be nice."  And then this kind of visual image that has

24  text at the top that says:  "Introducing John Deere's new," and

25  then you see this farm equipment displayed, and then below that

P. Simi - Direct

1   it says "multi-lane protester digester."  So you get a

2   reference to this kind of vehicle which, obviously, if that

3   were to be used would likely injure, if not kill, people if

4   they were used on protesters.

5        And I believe the message below -- is there -- I believe a

6   message about -- yeah, so then you get a response to that that

7   says:  "I'm renting a 15-passenger van and bringing a group

8   from the SC/central NC area.  We'll be arriving on August 11th

9   and leaving August 13th.  I'd like to volunteer our van for

10  whatever it can be used for while we're up there.  Most of us

11  are staying at the NC Haus."

12  Q    And let me just point out:  Who is the person with the

13  Discord handle MadDimension#8652?

14  A    Jason Kessler.

15  Q    And I have to say, Professor, it's kind of striking, the

16  juxtaposition, again, here, talking about shuttles and vans and

17  talking about running people over.

18       Can you explain that to the jury?

19  A    Yeah, again, just to reiterate, this normalization of

20  violence is really important.  For any culture where violence

21  is central, the more you can normalize it, the easier it is for

22  members of that culture to commit violence.

23  Q    Now, I want to touch very briefly on Adolf Hitler.

24  A    Sure.

25  Q    And you talked about that briefly, but why is Hitler so

P. Simi - Direct

1  important in the white supremacist movement?

2  A    Well, as I mentioned before, there's a real reverence for

3  Hitler and, from their perspective, what they would say he was

4  able to accomplish.

5      So they see Nazi Germany and the Holocaust as an

6  accomplishment to be revered, to be admired, that he was a

7  great, quote/unquote, "statesman" for his people.  So in that

8  respect, he's the type of leader that you want to try to

9  emulate, and what he was able to do in Nazi Germany is

10 something -- is kind of a model of sorts.  It's a role model of

11 sorts.

12 Q    In the materials you reviewed with Professor Blee, did you

13 see examples of this kind of reverence for Hitler in the

14 Charlottesville 2.0 and other Discord servers, et cetera?

15 A    Yes, we did.

16 Q    Now, just a couple of days ago, Professor, Defendant

17 Matthew Parrott testified, right where you are, that, while he

18 admired Hitler, it was not for his policies, his racial

19 policies toward the Jews; it was for his economic and social

20 policies.

21     In your review of the materials -- let's start with the

22 white supremacist movement generally -- have you seen a lot of

23 evidence of people saying they just admire Hitler for his

24 economic and social policies?

25 A    No, I'm not familiar with that.

P. Simi - Direct

1  Q    And did you see any evidence of that kind of discussion in

2  the materials you reviewed here?

3  A    No.

4  Q    Now, I'm going to show you a document that's been marked

5  as Plaintiffs' Exhibit 409.  And if you could just explain to

6  the jury what they're looking at.

7  A    Sure.  So you get the visual image.  It says, "Get in,

8  loser" at the top.  Then you have this image of Adolf Hitler

9  and others who were part of Nazi Germany.  And then it says,

10 "We're invading Charlottesville," with an exclamation point.

11       And again, you know, just signifying this interest, this

12 tendency within the white supremacist movement, to really want

13 to associate images and ideas, and, frankly, themselves, to

14 Adolf Hitler and Nazi Germany.

15 Q    Just kind of a housekeeping question, Professor.  What

16 Discord server is this posted in?

17 A    The server is -- see if I can pronounce it -- Latveria.

18 Q    And the channel?

19 A    Is #general.

20 Q    And who posted it?

21 A    Mr. Ray.

22 Q    And is this one of the Discord discussions that you

23 reviewed with Professor Blee in your work in this case?

24 A    Yes, it is.

25 Q    So is it fair to say that there are discussions about

7.9

P. Simi - Direct

1  Charlottesville in other Discord servers outside of just

2  Charlottesville 2.0?

3  A     Yes, there were.

4  Q     I'm going to go now to common characteristic three, and

5  I'm going to ask Mr. Spalding to put up slide 8.  And again, if

6  you could kind of explain this to the jury, Professor.

7  A     Sure.  I mentioned earlier toward the beginning that one

8  of the key findings, just in general, is that, you know, we

9  don't all -- we behave differently in different situational

10 contexts.

11     So if you think about a teenager, they may behave quite

12 differently in front of their parents than they do with their

13 friends.  Okay?  So sociologists use these terms "front and

14 backstage" as a way to try to understand different contexts

15 that may shape or influence our behavior and how we use those

16 different contexts in different ways.

17     So with front stage, think about that as more of a public

18 setting.  So there would be -- front stage behavior would be

19 occurring in more public settings, typically larger audiences,

20 where you're trying to kind of present yourself in the most

21 positive light.  And that's the reference to optics, which is

22 kind of the notion of kind of presenting a public relations,

23 right, version.

24     Then with the backstage, think of that more in terms of

25 kind of private settings where a person might kind of,

P. Simi - Direct

1   quote/unquote, "let their hair down," and act in a way that may

2   be quite different than on the front stage.  They may feel much

3   more kind of comfortable behaving in certain ways and they

4   wouldn't feel as comfortable doing that on the front stage.

5        So, you know, you can think about optics and associate

6   that with the front stage, and then more secretive

7   communication and behavior would be more backstage.

8   Q    Now, these terms, "front stage" and "backstage,"

9   Professor, did you come up with them, or are they more widely

10  used?

11  A    No, they're much more widely used within sociology.

12  Q    And is this distinction between front stage and backstage

13  something that you believe is prevalent within the white

14  supremacist movement?

15  A    Yes, very much so.

16  Q    And again, going back in history, can you give an example

17  of this from at least 20th century history?

18  A    Sure.  If we were to go back to, say, the late '70s into

19  the 1980s, there was an effort that was referred to as the

20  "suits-and-tie approach" that involved folks like David Duke

21  and others within the white supremacist movement who were,

22  essentially, trying to present themselves in terms of their

23  appearance in ways that kind of blended in more with the

24  mainstream.  They started using terminology like "white civil

25  rights," "white heritage" as a way to try and promote the white

P. Simi - Direct

1   supremacist movement so that it sounded less threatening, it

2   sounded more innocuous.  And so that would be a good example of

3   what we're talking about here.

4   Q    Are you familiar with the phrase, Professor,

5   "organizational rebranding"?

6   A    Yes.  That would be a strategy where an organization, in

7   this case, essentially tries to change their appearance in a

8   way that they believe will be more successful or effective for

9   presenting themselves.

10  Q    And are you aware of an example of that within the white

11  supremacist movement?

12  A    Yeah.  For instance, the National Socialist Movement at

13  some point dropped the use of the swastika because they

14  believed that, by doing that, it would help their appearance in

15  terms of the more public realm; in terms of optics, frankly.

16  Q    I'm going to ask Mr. Spalding to put up Plaintiffs'

17  Exhibit 1410.  And if you could, explain to the jury first what

18  this document is, and then we'll talk about it.

19       (Plaintiffs' Exhibit 1410 marked.)

20  A    Sure.  It appears to be an email from Jason Kessler to

21  Commander Schoep.

22  Q    And Commander Schoep, who is that?

23  A    Jeff Schoep.

24  Q    Is he a defendant in this case?

25  A    Yes, he is.

P. Simi - Direct

1  Q    And I would like to direct your attention to -- if

2  Mr. Spalding could highlight the second full paragraph on the

3  top email.  Can you read that, Professor Simi, and explain

4  what's going on?

5  A    Sure.  "The number one thing you guys can do is show up in

6  plain clothes without flags or, quote, white supremacist

7  symbols, ready to participate in and protect our event.  There

8  will be a thousand or more Antifa and shit libs eager to start

9  violence."

10 Q    So you were just talking about the National Socialist

11 Movement.  Does Jeff Schoep have a connection to the National

12 Socialist Movement?

13 A    Yes.

14 Q    What's being discussed here?

15 A    Sure.  Well, you can see it's pretty -- in many respects

16 straightforward in the sense that Mr. Schoep is being advised

17 that you can show up, but we don't want you to show up with,

18 quote, white supremacist symbols.  In other words, we want to

19 avoid the bad optics.  We want to be able to present ourselves

20 in a way that won't be immediately kind of associated with the

21 white supremacist movement.  So it's a way to kind of

22 camouflage ourselves.

23 Q    I want to go down to the email below.  And I apologize; I

24 think I've taken it in reverse order.  I think that was the

25 original email.  Mr. Spalding -- I believe that was written by

P. Simi - Direct

1    Jeff Schoep, correct?

2    A    Yes.

3    Q    And if Mr. Spalding could highlight the last sentence in

4    the second paragraph, and if you could explain that.

5    A    Sure.  So it says, "Keep in mind, we have ceased use of

6    the swastika as of November 2016.  So you will see swastikas in

7    some of the videos which were filmed before then."

8    Q    So what's going on here?

9    A    Again, this is actual direct reference to what I mentioned

10   earlier about the NSM ceasing use of the swastika, again, for

11   very explicit purposes in terms of optics, not because they had

12   disavowed the swastika and what it's associated with in terms

13   of Nazi Germany.  In fact, you can see clearly that's not the

14   case just by this email.

15   Q    I'm going to ask -- I'm going to turn now to Plaintiffs'

16   Exhibit 2777, but I don't want Mr. Spalding to put it up on the

17   screen.  And if you could just look at it in your binder, that

18   would be helpful.  Do you have your binder there?

19        (Plaintiffs' Exhibit 2777 marked.)

20   A    I'm sorry, what was the number again?

21   Q    Plaintiffs' Exhibit 2777.

22   A    There we go.

23   Q    Again, just answering my question here, Professor,

24   limiting yourself to my question, what is this document?  What

25   does it say this document is?

P. Simi - Direct

1  A    The title of the document is "Operational Security for

2  Right Wing Rallies."

3  Q    Where was it published?

4  A    *The Daily Stormer.*  If I may?

5  Q    Please.

6  A    You'll notice, like I said, the title is "Operational

7  Security for Right Wing Rallies."  That's also a good example

8  of what we're talking about here in terms of optics, front

9  stage.  *The Daily Stormer* is one of the leading neo-Nazi

10 websites in the world, frankly.  Very clearly not a generic

11 right wing organization.  And yet they use that term very

12 specifically as, again, part of an optics kind of strategy or

13 ploy.

14 Q    And what's the date of this article?

15 A    Appears to be July 31st, 2017.

16 Q    Okay.  Now, I'd like you to turn to page 2 of the

17 document.  And I just want to focus only on the first paragraph

18 on page 2.  And if you could read that and then explain what's

19 happening.

20 A    Sure.  "Don't bring your usual phone.  It might get stolen

21 by Antifa or captured by law enforcement.  And data on it might

22 be used to identify or incriminate you.  You and your boys

23 should bring burner phones with brand-new accounts for group

24 communication in a chat room created specifically and

25 temporarily for that event only.  Don't call" -- excuse me.

P. Simi - Direct

1   "Don't call normie phones with your bad goy phone.  Make sure

2   it is a totally contained thing and that the buck stops there

3   insofar as data trail."

4   Q    Can you explain what's going on there, Professor?

5   A    Yeah.  So you have again just generally speaking a good

6   example of the interest in communicating in secretive and

7   private ways within the white supremacist movement.  You see

8   here a very specific reference to burner phones, which are

9   phones that you may use for a short period of time and can

10  discard and the usage can't necessarily be traced to you

11  personally.  So you get basically a directive of sorts to use

12  burner phones, to be careful.  So again, it's just underscoring

13  what we would expect to see with the backstage type of

14  behavior.

15  Q    I'd now like to turn to Plaintiffs' Exhibit 1537, which is

16  in evidence.  You can put it up on the screen, Mr. Spalding.

17       And can you explain for the jury what this document is and

18  what's going on here?

19  A    Yes.  It appears to be an email from Mr. Hill, from the

20  League of the South, to, it looks like their staff.

21  Q    And if you could just discuss what's happening in that

22  first paragraph in the document.

23  A    Yes.  Would you like me to read the paragraph?

24  Q    Sure.

25  A    Okay.  "Since the summer of 2015, the campaign of cultural

P. Simi - Direct

1  cleansing against the traditional South has increased in its

2  pace and ferocity.  I will not --"

3          MR. JONES:  Your Honor, I'm going to make an

4  objection.  The Professor has testified he has never met

5  Michael Hill, he's never interviewed anybody from the League of

6  the South, that he's never conducted any investigation or

7  research in Virginia or the South.  And I'm going to object to

8  his foundation for knowing the meaning and content of this

9  email.

10         MS. KAPLAN:  I'm happy to respond to that, Your

11  Honor, but I don't think that's a proper objection for expert

12  testimony.

13         THE COURT:  What's your question?

14   BY MS. KAPLAN:

15  Q    Are you familiar with the organization League of the

16  South, Professor?

17  A    Yes, I am.

18  Q    Have you studied it?

19  A    Yes, we have.

20  Q    Do you know who its leadership is?

21  A    Yes.

22  Q    Okay.  Now, I'm just going to go quickly here, then,

23  because I take the point about moving quickly.  And let's go to

24  the last sentence that begins "therefore."

25  A    "Therefore, I want no discussion here or elsewhere online

P. Simi - Direct

1  of any resistance strategies, tactics, logistics, plans,

2  operations, or after action reports.  Those will be handled

3  through secure channels."

4  Q    Is this consistent with your views about front-stage and

5  backstage tactics?

6  A    Yes, it is.

7  Q    Can you explain?

8  A    Again, clear directive that, as it relates to resistance

9  strategies and such, that we want those handled on some type of

10  back channels, a more secretive, protected, private way of

11  communicating about these issues.

12  Q    I'm going to move to slide 9, Professor, which is the last

13  or the fourth core characteristic, and again, if you could walk

14  the jury through that.

15  A    Yeah, again, just kind of refresh.  Plausible deniability,

16  when we talked about that as a kind of key, core characteristic

17  of the white supremacist movement, this is an effort by an

18  individual or organization to essentially shield themselves

19  from being blamed for wrongdoing, including criminal conduct.

20      And what we see with the white supremacist movement more

21  broadly is a series of different ways that they try and

22  generate plausible deniability.  So first would be doublespeak,

23  which can be described as an intentionally deceptive way of

24  communicating.  If you ever heard the phrase somebody speaking

25  out of both sides of their mouth, that would be an example of

P. Simi - Direct

1  doublespeak.

2     Lots of insider language and codes and specific references

3  that would require kind of an insider's knowledge and

4  contextual knowledge of that frame of reference.

5     We talked about joking and the use of humor earlier.

6  That's certainly a key aspect by which they develop plausible

7  deniability, because they can talk about violence, they can

8  advocate for violence, and then say, well, it was just a joke.

9     And then lastly is this idea of triggering in order to try

10  and provoke violence.  Now, what we mean by triggering is

11  instances where you have an individual or individuals who

12  approach someone in a very hostile manner, using essentially

13  harassment-style techniques, in order to try and generate an

14  aggressive response on the part of that person, which would

15  then allow the folks that are doing the triggering to respond

16  with violence themselves, and then after the fact be able to

17  claim essentially self-defense of some kind.

18  Q    Now, is there one document that you and Professor Blee

19  reviewed in this case, Your Honor -- excuse me, not Your Honor,

20  Professor Blee, that best exemplifies common characteristic 4?

21  A    Yes.  We -- we believe *The Daily Stormer* style guide.

22  Q    I'm going to ask Mr. Spalding to put that up on the

23  screen.  It's in evidence, Plaintiffs' Exhibit 2033.

24     I'm going to ask Mr. Spalding to turn to page 11 of that

25  document, and to focus on exactly the paragraph that's up, the

P. Simi - Direct

1    paragraph L-U-L-Z.

2    A     Okay.

3    Q     If you could kind of read that -- you don't have to read

4    the whole thing out loud, but point out any important language

5    and explain it to the jury.

6          You can highlight that, please, Mr. Spalding.

7    A     "The tone should be light."  I want to pop down to "the

8    unindoctrinated should not be able to tell if we're joking or

9    not."  This is a really key statement in this passage here

10   because they're really being very clear about this issue about

11   doublespeak and using jokes with double meaning so that for

12   people on the outside, they're not going to necessarily know

13   whether it's a joke or not, but people on the inside understand

14   that jokes are meant to be taken seriously in many respects

15   within the white supremacist movement in terms of its messages

16   advocating for violence.

17         It goes on to say, I'm making -- "I'm a racist making fun

18   of stereotypes of racists because I don't take myself

19   super-seriously."  But then now this next statement is also

20   especially important.  "This is obviously a ploy" -- again,

21   this is exactly what we mean here -- "and I actually do want

22   to" -- excuse me -- "I actually do want to gas kikes.  But

23   that's neither here nor there."

24         So you get a very clear expression of how they're using

25   these strategies, and also a clear expression about the

P. Simi - Direct

1  violence that they want to commit.

2  Q    I want to look at one more passage in that document,

3  Professor.  It's at page 15, the top sentence.  I think it's a

4  carryover, though, from the bottom of page 14, if Mr. Spalding

5  wants to show the header.

6       If you could explain that to the jury, Professor.

7  A    Sure.  It says "It's illegal to promote violence on the

8  Internet.  At the same time, it's totally important to

9  normalize the acceptance of violence as an eventuality or

10 inevitability."

11      Again, this really frankly underscores exactly what we

12 were talking about earlier in terms of the importance for

13 cultures of violence like the white supremacist movement to

14 normalize violence, right?  And it's plain as day in that

15 statement there.

16 Q    I want to turn -- and I want to do this briefly because

17 again it's come up a lot in the case -- use of code language,

18 etc.

19      You heard used in the white supremacist movement the

20 number 88?

21 A    Yes.

22 Q    And what is that supposed to refer to?

23 A    Yeah, so it's a code that's used widely in the white

24 supremacist movement.  Eight -- or H is the 8th letter of the

25 alphabet.  So 88, HH, which stands for Heil Hitler.

P. Simi - Direct

1   Q    And similarly 14?

2   A    Yes.  "We must secure the existence of our people and a

3   future for white children."

4   Q    And is the number 14 used in a similar manner?

5   A    Yes, very much so.

6   Q    And I'd now like you to take a look at -- I want to turn a

7   little bit to joking and humor.  I want to turn to Plaintiffs'

8   Exhibit 562.  Can you explain -- before you get to that, is

9   this on Discord?

10        (Plaintiffs' Exhibit 562 marked.)

11  A    Yes.

12  Q    And what's the server?

13  A    Alt-right.

14  Q    And what's the channel?

15  A    #general.

16  Q    And who's doing the posting?

17  A    Radical Agenda.

18  Q    Do you understand that to be associated with an

19  individual?

20  A    Yes.

21  Q    And who is that?

22  A    Chris Cantwell.

23  Q    And if you could talk about the message that's posted

24  there.

25  A    Sure.  And again, I apologize for the language here.  "If

                              92

P. Simi - Direct

 1  you kill a Jew, the Jew in you dies with him I hear."  And then

 2  parentheticals, "This is a tasteless joke, relax kike."

 3  Q     Is that consistent with what we looked at in the *Daily*

 4  *Stormer* style guide, Professor?

 5  A     Very much so.

 6  Q     Now, in terms of moving on to this concept of triggering,

 7  can we look at Plaintiffs' Exhibit 3432.  And which server is

 8  this in?

 9        (Plaintiffs' Exhibit 3432 marked.)

10  A     The Discord stuff.

11  Q     And the channel is #general?

12  A     That's right.

13  Q     Who's posting here?

14  A     MadDimension.

15  Q     And who is that handle associated with?

16  A     Jason Kessler.

17  Q     And could you read this and explain.

18  A     Sure.  "This was the doing of my group.  We triggered this

19  Jew into attacking one of our guys and charged him with

20  assault."

21  Q     Is this consistent with what you've been talking about,

22  Professor?

23  A     Yes, it is.

24  Q     Can you explain?

25  A     Sure.  Again actually the very word "triggered" is used in

P. Simi - Direct

1    the statement as a strategy clearly that these individuals,

2    Mr. Kessler and his group, were utilizing to try and

3    essentially provoke this person into attacking them, and that

4    that was then used to essentially charge that person with

5    assault.  So again, this is, again, kind of part of this

6    strategy of being able to provoke people to the point of

7    violence and then have this plausible deniability, this

8    built-in self-defense.

9    Q    One final document, Professor, Plaintiffs' Exhibit 955.

10   And if you could just explain what this is, where it's being

11   posted, and what's going on.

12        (Plaintiffs' Exhibit 955 marked.)

13   A    Sure.  This one is in Charlottesville 2.0 server.  And

14   it's under the #general channel.  And it's posted by

15   MadDimension, which again is Mr. Kessler.  And the statement

16   says, "I 100 percent agree with @SaintCharles.  If you want a

17   chance to crack some Antifa skulls in self-defense, don't open

18   carry.  You'll scare the shit out of them and they'll just

19   stand off to the side."

20   Q    Can you explain, Professor?

21   A    Again, you get this specific reference, expression of

22   wanting to commit violence, "if you want a chance to crack some

23   skulls."  So you get that.  And then it's coupled with, but, of

24   course, we want to do it in self-defense.  So you get the

25   qualifier included with the statement.  Then you get a

94

P. Simi - Cross

1   discussion about how to best provoke them and that if you do

2   open carry, you're likely to intimidate them to the point where

3   a confrontation would be less likely.  Of course the idea here

4   is we want a confrontation.  We want a confrontation to be most

5   likely.  So how do we go about doing that so we can then crack

6   some skulls.

7            MS. KAPLAN:  No further questions, Your Honor.

8            THE COURT:  Cross.

9            MR. KOLENICH:  Thank you, Your Honor.

10                      CROSS-EXAMINATION

11    BY MR. KOLENICH:

12   Q    Morning, Professor.

13   A    Morning.

14   Q    My name is Jim Kolenich.  I represent Jason Kessler,

15   Nathan Damigo, and the group Identity Evropa.

16   A    Okay.

17   Q    Do you recall testifying earlier about the participants in

18   the #leadership-discussion channel?

19   A    I do.

20   Q    Do you recall who you identified as being in that

21   discussion channel?

22   A    As moderators or administrators?

23   Q    As even participants, but go ahead.  Did you identify

24   moderators and administrators?

25   A    That was part of the testimony.

95

P. Simi - Cross

1  Q    Go ahead.  Could you identify them again, if you recall?

2  A    Sure.  Mr. Kessler, Parrott, Kline, Heimbach, Ray, and

3  Damigo.

4  Q    Okay.  Now, would these moderators and administrators also

5  be participants in the #leadership channel?

6  A    Yes, by definition.

7  Q    So they would be in the #leadership channel somewhere,

8  otherwise they wouldn't be moderators or leaders or

9  participants, correct?

10 A    If I understand your question, yeah.

11 Q    You're identifying them as being in that channel because

12 they posted somewhere in the channel; isn't that right?

13 A    No.  We're identifying them as moderators or

14 administrators.

15 Q    What would be the difference between a participant and a

16 moderator?

17 A    Well, a participant are the people doing the actual posts

18 theoretically.  I mean, you could, you know, have -- you could

19 never participate -- if you created a server as an

20 administrator, as a moderator, you might never post

21 theoretically.

22 Q    Where would we find this list of moderators on the

23 Discord?

24 A    We were able to determine to the best of our knowledge

25 from either deposition testimony or essentially looking at the

P. Simi - Cross

1   posts in Discord, which sometimes basically would reveal who

2   moderators and/or administrators were.

3          MR. KOLENICH:  Your Honor, may I approach the

4   witness?

5          THE COURT:  Yes, sir.

6    BY MR. KOLENICH:

7   Q    Sir, I'm handing you --

8          MS. KAPLAN:  I just want to see.

9   BY MR. KOLENICH:

10  Q    Professor, would you mind taking the device.  It's owned

11  by the Kolenich law office.  No worries if you drop it.

12  A    I won't drop it.

13  Q    That is, Professor, would you agree with me, the

14  #leadership channel from the Charlottesville 2.0 server?

15  A    It does appear to be, yes.

16  Q    Would you be kind enough to tell me if you find Nathan

17  Damigo listed anywhere in that -- in the #leadership-discussion

18  channel?

19  A    You may have -- you may -- the moderators and

20  administrators that we identified were across multiple servers.

21  Not exclusively.  So when I reference moderators and

22  administrators and those specific names, they're not exclusive

23  to Charlottesville 2.0.  That would be across all of the

24  different servers that we analyzed.

25  Q    I see.  I don't know that that was clear to me in your

P. Simi - Cross

 1  earlier testimony.  So Nathan Damigo may --

 2  A    I apologize if it wasn't clear.

 3  Q    Not a problem.  You don't have to apologize to me,

 4  Professor.

 5       You may have been referring to Nathan Damigo being a

 6  moderator or an administrator of the Identity Evropa channel?

 7  A    That's correct.

 8  Q    I'll retrieve my device now.

 9       Your Honor, may I approach?

10       Professor, do you recall testifying about -- well,

11  obviously you've testified about front-stage and backstage

12  behavior; is that correct?

13  A    That is correct.

14  Q    And that is a relatively common sociological doctrine or

15  theory?

16  A    Term, yeah, that's used to describe different types of

17  behavior.

18  Q    Okay.  Could you tell us how widespread is it in your

19  profession to apply front-stage/backstage theory to white

20  supremacists?

21  A    Can you -- when you say widely, what does that mean?

22  Q    Does anyone besides you apply it?

23  A    Yes, it has been.

24  Q    Are you referring to Professor Blee?

25  A    No, beyond Professor Blee and myself.  It's been --

P. Simi - Cross

1  Q     Can you name the academics who apply it to --

2  A     Sure.  Mitch Berbrier at the University of Alabama has

3  written fairly extensively on the white supremacist movement

4  and its use of kind of front and backstage aspects and

5  impression management, which is a related term to front and

6  backstage.

7  Q     I'm sorry, what was that, the second term you used?

8  A     Impression management.

9  Q     Could you define impression management, please.

10 A     Sure.  It's related to in front stage when, again, as I

11 mentioned, tend to be more public.  You're trying to manage --

12 it's pretty straightforward.  You're trying to manage the

13 impression of others in terms of how they look at you, how they

14 see you.

15 Q     All right.

16 A     Betty Dobratz also, Stephanie Shanks-Meile, and then

17 Richard Mitchell is another person who has written on this

18 topic about front and backstage behavior.

19 Q     Thank you, Professor.  I think those are sufficient

20 examples.  It's your testimony that all the academics you just

21 mentioned apply front-stage/backstage to white supremacists?

22 A     That is my testimony.

23 Q     Thank you.  Sir, how rigorous would you say the

24 examination of white supremacists is within your profession?

25 Is there a -- by that I mean is there objective standards that

P. Simi - Cross

1  you apply to reach your conclusions, or is it more fuzzy than

2  that?

3  A    No.  It's based on social scientific research methods that

4  are used throughout the discipline for the study of any topic,

5  including the white supremacist movement.  There's no special

6  standards that are different for studying the white supremacist

7  movement than studying any other issue that a sociologist might

8  study.

9  Q    Well, you've gone through various examples of ridiculously

10  awful language that the white supremacists use, have you not?

11  A    That seems fair.

12  Q    But your ultimate conclusion is that this is used to

13  communicate actual intent that wouldn't be obvious from the

14  words used?

15  A    It seems like, I mean, when you say intent, I would be a

16  little bit -- I mean, I guess, what do you mean by that word?

17  Q    Let me ask you.  Is there any part of your opinion that

18  deals with the intent of the speakers here?

19  A    As it relates to what?

20  Q    As it relates to anything, the intent to take action of

21  any kind.

22  A    Again, we were not asked to opine on the conspiracy

23  specifically.  So certainly not in that respect.  What we found

24  in our analysis and examination was that the conduct in terms

25  of organizing UTR was consistent with the core characteristics

P. Simi - Cross

1   that have already been identified as it relates to the white

2   supremacist movement.

3   Q     Professor, are you familiar with any research on

4   radicalization more generally?

5   A     Yes.  Very.

6   Q     Are you familiar with the findings that very few persons

7   considered radicalized actually engage in violent behavior?

8   A     I'm familiar with that.

9   Q     Could you speak in terms of percentages, how few people

10  actually go on to violent behavior?

11  A     No one could speak in that --

12  Q     Can't be done?

13  A     It can't be done.

14  Q     But you would agree with "few"?

15  A     What you're talking about as far as number of individuals

16  who radicalize in terms of their attitudes and beliefs, you're

17  going to have a portion of that who will radicalize in terms of

18  committing violent action.  So the number of people who have

19  the radical attitudes or beliefs is certainly going to be

20  larger than those who actually commit actual violent actions.

21  Q     Now, is it the conclusion -- or is it your opinion,

22  Professor, that having the beliefs inevitably leads to violent

23  actions?

24  A     We've never said inevitably.

25  Q     Very well.  Immersing yourself in the beliefs, I think you

P. Simi - Cross

1  testified earlier about a core characteristic of the belief

2  system is white genocide or something like that?

3  A    I guess I'm not clear on what your question is.

4  Q    Well, if you have a belief that whites are being

5  genocided, is it your opinion, is it what you're telling this

6  jury that that would lead to you committing violent acts?

7  A    It's not a simple, you have that belief and then you

8  automatically commit an act of violence.  But certainly the

9  slogan, the 14 Words, the credo, the 14 Words is a call for

10  violence.  And certainly it would increase the likelihood for a

11  person, if they felt deeply attached to and committed to the 14

12  Words, it would increase the likelihood that they would be

13  willing to engage in violent action.

14  Q    How is the 14 Words a call for violence?

15  A    "We must secure the existence of our people and a future

16  for white children."  The subtext of that, the widely known

17  within the movement, is to do that, that requires violence.

18  Q    Isn't it possible --

19  A    As Mr. Damigo stated at one point --

20  Q    Sorry, Professor, you answered my question.

21  A    Okay.

22  Q    Isn't it possible that -- I can't even repeat the 14

23  Words -- I never remember them -- but "secure the existence,"

24  "white children," isn't that possible that that means political

25  revolution?

P. Simi - Cross

1  A    Violent political revolution, is that what you mean?

2  Q    No, I don't.  I mean voting-based political revolution.

3  Have more white children, therefore take over the voting.

4  A    I think it's clear, given the fact that the 14 Words was

5  penned by a convicted terrorist who took part in the murder of

6  multiple people and committed other violent crimes, that it's

7  widely understand within the white supremacist movement that

8  this is not about a peaceful transition in terms of electing a

9  new official.

10  Q    All right.  Professor, you just testified that there's

11  radicalized people, and few -- I think we agreed on the phrase

12  "few" -- of those people actually go on to commit violence.

13  A    No, actually I did not say a few.  I said a portion that

14  would be smaller than the larger number of folks who have the

15  violent attitudes or beliefs.  "Few" is I think inaccurate in

16  terms of characterizing --

17  Q    "A few" is an overstatement, but a smaller number than --

18  less than half?

19  A    I'm not willing to quantify it because literally not a

20  person in the world could quantify it.  I can't testify to

21  something that --

22  Q    You won't even say less than half?

23  A    No, I can't do that.  That would be inaccurate on my part.

24  Q    Professor, are you an anti-fascist?

25  A    Am I an anti-fascist?

P. Simi - Cross

1  Q    That is correct.

2  A    In other words, do I think fascism, like Nazi Germany and

3  the Holocaust?

4  Q    No.  No.  No.  Are you a member of Antifa?

5  A    You're asking me if I'm a member of Antifa?

6  Q    That is correct.

7  A    No, sir, I'm not.

8  Q    Do you follow any Antifa accounts on Twitter?

9  A    Well, if I -- I mostly follow white supremacist accounts

10  on Twitter.  I don't use Twitter personally.  I use it as part

11  of my research.

12  Q    Understood.

13  A    Are there Antifa accounts that I follow to gather

14  additional information about white supremacist groups?  That's

15  possible, although I couldn't tell you that for sure right off

16  the top of my head.  But this all would be explicitly for the

17  purpose of following white supremacists as part of my research.

18  Q    What can you tell us about the group Antifa?

19  A    Sir, not much.

20       MS. KAPLAN:  Objection, Your Honor, that's beyond the

21  scope.  He's not an expert on Antifa.

22       MR. KOLENICH:  He just testified he follows Antifa

23  accounts as part of his research on white supremacy, which is

24  directly within the scope of what he's here to testify about.

25       THE COURT:  He hasn't said anything about his

P. Simi - Cross

1    expertise or anything -- he hasn't testified about Antifa.

2             MR. KOLENICH:  I think it's permissible to

3    demonstrate bias of an expert witness, though, Your Honor.

4             THE COURT:  Well, you can demonstrate the bias, but

5    he said -- if he's a member or something like that or follows

6    the beliefs --

7             MR. KOLENICH:  Right.  He's denied he's a member.  So

8    I'm not asking him any further questions about that.

9             THE COURT:  Sir?  I'm sorry, I didn't --

10            MR. KOLENICH:  I'm sorry, Your Honor.  I'm not going

11   to ask him any more questions about membership in Antifa.

12            THE COURT:  Okay.

13    BY MR. KOLENICH:

14   Q    Professor, have you stated that it is impossible not to

15   choose a political opinion as an expert?

16   A    Have I stated that?

17   Q    Yes.

18   A    You'd have to refresh my memory.

19   Q    Well, we'll go with your memory for now, Professor.

20   A    Could you restate the quote?  Is that a quote?

21   Q    I have a quote.

22   A    Okay.

23   Q    It's a quote given, allegedly, in a radio interview.  I'm

24   afraid I do not have the date of the radio interview handy.

25   The quote is:  "Impossible not to choose a political opinion as

P. Simi - Cross

1  an expert, and that's not a bad thing," closed quote.

2  A    I'd like to see that, if possible.  "Impossible not to

3  choose a political opinion," and then what was the rest of it?

4  Q    -- "as an expert, and that's not a bad thing."

5  A    And what's the -- can you give me a little bit of the --

6  is this kind of just -- I mean, it seems like a statement.

7  What's the larger context of the conversation?

8  Q    This was on a podcast.  The name I have is -- well, the

9  title of the episode, I guess, is "What do we know about hate?"

10  I'm afraid that's the best I can do this morning, Professor.

11  If you don't remember, you don't remember.

12  A    No, I certainly don't remember that.  I do a lot of

13  interviews and podcasts and so forth, so...

14  Q    Perfectly acceptable answer.  Thank you.

15       Have you ever stated, sir, that your objective is

16  dismantling groups like the alt-right groups that are

17  defendants in this case?

18  A    You know, I consider -- if you think about, like, a cancer

19  researcher, cancer researchers certainly typically are

20  interested in both prevention and intervention.  So if you have

21  somebody studying breast cancer or lung cancer, rarely is that

22  person going to be completely dispassionate and not be

23  concerned or care at all about how to prevent lung cancer or

24  breast cancer, how to intervene, and how their research can

25  help do that.

P. Simi - Cross

1      So am I interested in helping prevent and intervene in

2   violent white supremacy in some small way through my research?

3   The answer is absolutely yes.

4   Q      So you've analogized white supremacy to cancer, and you

5   put the --

6   A      Researchers, the research part.

7   Q      You slipped the word "violent" in there.  So you only

8   oppose violent white supremacy?

9   A      The white supremacist movement, as the four core

10  characteristics clearly indicate, violence is at the core.  So

11  it really isn't a thing that -- you can't really detach,

12  dissociate the white supremacist movement from violence.

13  Q      So you've discussed a few violent incidents.  I believe

14  you discussed Dylann Roof; is that correct?

15  A      That's correct.

16  Q      Which other specific violent incidents did you discuss

17  today?

18  A      You'd have to refresh my memory.

19  Q      I was hoping you'd refresh mine.

20  A      Do you want to talk about the violence in the white

21  supremacist movement, how much occurs?

22  Q      Go ahead.  Please go ahead.  Which other specific --

23  A      We talked about the Silent Brotherhood, obviously, the

24  underground terror cell that David Lane and the 14 Words was a

25  part of.

107

P. Simi - Cross

1   Q    David Lane is an inmate.  Does that organization still --

2   A    Well, he's deceased now.

3   Q    He died in custody?

4   A    He did.

5   Q    Is that organization still extant?

6   A    Oh, no.  They've been defunct for quite some time.  They

7   were active in the 1980s.

8   Q    Let's see if we can confine ourselves to organizations

9   that still exist in some form or individuals that have -- such

10  as Mr. Roof, that committed violent acts that these people

11  might have ever heard of, these defendants in this case.

12       Do you have any specific examples of that?

13  A    Well, I mean, obviously, David Lane --

14           MS. KAPLAN:  Objection, Your Honor, that's a very

15  broad question.

16           MR. KOLENICH:  The Professor invited it.  He said,

17  how long would you like to talk about it?

18           MS. KAPLAN:  The Professor is not engaged in a

19  conversation.

20           THE COURT:  He asked him, do you have any specific

21  examples of organizations that still exist in some form or

22  individuals such as Mr. Roof that committed violent acts that

23  these people might have ever -- did you say "ever" or "never"

24  heard of?

25           MS. KAPLAN:  Can we have the question read back,

P. Simi - Cross

1   please?  It's after little hard to hear from up there.

2              MR. KOLENICH:  I'll withdraw the question.  Thank

3   you, Madam Court Reporter.  We'll try it again.

4    BY MR. KOLENICH:

5   Q    So you recall discussing Dylann Roof?

6   A    Yes, I do.

7   Q    And he shot up a church of worshipers who were African

8   Americans?

9   A    Yes, he did.

10  Q    In fact, isn't it true that they invited him in, they let

11  him sit down, they prayed with him --

12  A    Yes.

13  Q    -- and then he pulled out a gun and shot all of them?

14  A    Yeah.

15  Q    Now, Professor, forgive me, I'm struggling to understand

16  what merely saying racist things online has to do with that

17  behavior.  What in the defendants' rhetoric even remotely

18  suggests engaging in that level of depravity and fraud, looking

19  these people right in the face for who knows how long and then

20  shooting them?

21             MS. KAPLAN:  Objection to form, Your Honor.

22             THE COURT:  Overruled.  You can answer the question

23  if you can.

24             THE WITNESS:  Celebrating the Holocaust, the

25  slaughter of 12 million.  Talking about gassing entire groups

P. Simi - Cross

1    of people, throwing the Turks in the ocean.  I mean, do you

2    want me to go on about some of the statements that are calling

3    for mass gassing --

4    BY MR. KOLENICH:

5    Q    The jury is well familiar with the statements these

6    defendants have made.  No party in this case is attempting to

7    defend those statements on their face as reasonable things.

8             THE COURT:  Don't -- you can ask him a question, but

9    don't instruct him.

10            MR. KOLENICH:  Yes, sir.

11   BY MR. KOLENICH:

12   Q    Now, if I understand your point correctly, Professor, they

13   discuss and appear to celebrate violence, and not only

14   violence, but mass casualty events, perpetrated not only by

15   individuals, but by governments; is that what you're trying to

16   say?

17   A    Yes.  And then in addition to that, they also talk about

18   violence in very specific terms and discuss very specific

19   strategies and tactics.  Again, what we know about violence

20   from a threat assessment perspective is when you start really

21   kind of making more specific references to places, people,

22   dates, times, that typically suggests a greater degree of

23   threat in terms of those statements.  And we see quite a bit of

24   very specific references in terms of how to commit violence.

25   Q    Do you know anything about the First Amendment, Professor?

P. Simi - Cross

1  A    I'm not a legal scholar, but I'm generally as a general

2  citizen familiar with the First Amendment.

3  Q    Understood.  I'm going to suggest to you that, no matter

4  how violent the rhetoric, the law protects it.  Will you accept

5  that premise, since you're an expert witness and we can speak

6  in hypotheticals?

7  A    Okay.  Can you restate that again?

8  Q    No matter how violent the rhetoric, no matter how

9  offensive the rhetoric, it is protected by the First Amendment?

10  A    My understanding is that there is a threshold.

11  Q    There are certainly limits, Professor.  The First

12  Amendment does not protect criminal conspiracies, obviously.

13  It doesn't protect any kind of conspiracy --

14          MS. KAPLAN:  This is a speech, Your Honor.  It's not

15  a question.

16          MR. KOLENICH:  He asked for the limits.  I'm giving

17  him a hypothetical.

18          THE COURT:  All right.  Ask him the question.

19          MR. KOLENICH:  Thank you.

20   BY MR. KOLENICH:

21  Q    If I understand you correctly, you're citing a lot of very

22  horrific rhetoric and then attempting to link that to an actual

23  violent event; is that right?

24  A    That's not our opinion.  Our opinion is -- again, to

25  restate it -- the defendants utilized the core characteristics

P. Simi - Cross

1  of the white supremacist movement in planning the August 2017

2  UTR.

3  Q     And the core characteristics of the white supremacist

4  movement are horrific rhetoric, a horrific philosophy, and then

5  what?  Plausible deniability?

6  A     I'll just give them to you again:  Racist ideology,

7  central role of violence, front and backstage, and plausible

8  deniability.  Correct.

9  Q     Now, your explanation of plausible deniability was, if I

10  recall correctly, that don't carry -- by way of example, "Don't

11  bring guns because it will scare the Antifa away and we won't

12  get to beat them up"; is that correct?

13  A     That's correct.

14  Q     But now, if you don't carry guns and if you don't initiate

15  the contact and if the Antifa comes and attacks you, is it not

16  legal, is it not lawful, to defend yourself?

17            MS. KAPLAN:  Your Honor, that is beyond the scope.

18            THE COURT:  That's beyond his --

19            MR. KOLENICH:  Withdrawn.

20  BY MR. KOLENICH:

21  Q     All right.  Are you saying it is in any way part of the

22  white supremacist movement, part of their violent ethic -- is

23  that your opinion, that their violent ethic is induce the

24  Antifa come to the event, induce the Antifa to attack us, so

25  that we can hit them?

P. Simi - Cross

1    A    Triggering and provocation is part of the white

2    supremacist movement culture more broadly.  It would also

3    include targeting specific individuals, those that they believe

4    associate with Antifa and otherwise.

5    Q    Have you not stated, in fact, that there is a longstanding

6    amount of hatred and conflict between Antifa and white

7    supremacists?

8    A    Could you be a little more specific and maybe refresh my

9    memory?

10   Q    Is that your opinion as you sit here today?

11   A    That there is a longstanding conflict between -- well,

12   various groups that espouse antiracism of various sorts --

13   there is -- certainly you have Anti-Racist Action, Skinheads

14   Against Racial Prejudice; these are all kind of predecessors

15   that -- where there have been conflicts, that white

16   supremacists see these folks as adversaries and antagonists and

17   certainly, you know, have engaged in conflict with these folks.

18   Q    Do the white supremacists see these folks you just

19   mentioned as a threat?

20   A    They believe that anyone who is not part of their cause is

21   a threat, is an adversary, is an enemy.

22   Q    A more particularized kind of threat, a threat that's

23   going to physically assault them at their political rallies?

24   A    They express that idea, certainly.  That is something they

25   talk a lot about, and you see this in their literature and so

P. Simi - Cross

1   forth.

2          MR. KOLENICH:   Thank you, Professor.  I have no

3   further questions.

4                     CROSS-EXAMINATION

5    BY MR. SPENCER:

6   Q     Good afternoon.

7   A     Good afternoon.

8   Q     Professor, before this morning, have we encountered each

9   other in person or through any kind of communication?

10  A     Not to my knowledge.

11  Q     Okay.  Have you ever reached out as a means of doing an

12  ethnographic study of me?

13  A     No, I have not.

14  Q     Okay.  You've testified that the Unite the Right rally was

15  centrally organized on Discord; is that fair?

16  A     Although not exclusively, yes, a lot of the organization

17  did happen on Discord.  I think that's a fair statement.

18  Q     Okay.  And Discord, you've also characterized as a -- I

19  think the word "secret" was used, a secret means of

20  communication, or a secure means of communication?

21  A     It has those features.

22  Q     Okay.  So that's what a straight dope is?

23  A     Excuse me.

24  Q     That's where you could find the straight dope, using a

25  casual expression?  Do you understand what I'm saying?

P. Simi - Cross

1    A    I see what you're saying.

2    Q    Not actual dope.  You know what I mean.

3         That's where you could find backstage behavior and truth,

4    so on?

5    A    Different kinds of -- kind of more private, secure,

6    secretive platforms, certainly you would see some degree of

7    backstage behavior.

8    Q    Some degree?  Okay.  Well, where --

9    A    For example --

10   Q    -- would there be more backstage?

11   A    If you didn't think your platform was secure or private

12   any longer, then of course that would change things, in terms

13   of --

14   Q    Fair enough.

15   A    -- if you have thought it had been compromised, for

16   example.

17   Q    Fair enough.

18        What was my handle or username on Discord?

19   A    We were not able to determine that to our knowledge.  You

20   know, obviously handles can be aliases, secretive.  So we were

21   able to determine some and not others.  And so I have no idea

22   whether you were using Discord or not.

23   Q    Did you have -- do you have any reason to believe that I

24   was involved in the Unite the Right server, or any related

25   server, on Discord?

P. Simi - Cross

1  A    No.  Just the organization beyond Discord, certainly.

2  Q    What does that mean, "the organization beyond Discord"?

3  A    Discord wasn't the only way in which Unite the Right was

4  organized.  Certainly there were other communications happening

5  between individuals such as yourself about the event.

6  Q    I want to move briefly to some of the tweets that were

7  brought into evidence that involve a Twitter handle that I

8  presume is James Fields, and I have no reason to dispute that.

9  A    Okay.

10 Q    So when someone -- when you tag someone on Twitter or

11 Instagram -- I think those are more or less the same thing --

12 what are you doing, exactly?  What happens when you simply put

13 someone's handle in a public tweet that you make?

14 A    Well, they're going to receive some type of notification.

15 It would show up on their Twitter feed, if we're talking about

16 Twitter, that so-and-so had tagged them in a message.

17 Q    In the mentions?

18 A    Yeah.

19 Q    Yeah.  Have you ever tagged someone, like a public

20 figure -- like Donald Trump, Meryl Streep, whoever -- in your

21 social media?  Or is that something common, a lot of people do

22 that?

23 A    Yeah, you're asking the wrong person.  I've never --

24 literally never tweeted in my life.

25 Q    Okay.

116

P. Simi - Cross

1   A     But I'm familiar with --

2   Q     You're familiar with that?  Okay.

3         Was I -- during the summer of 2017, was I a public figure

4   of some kind?

5   A     Yeah, as a leader within the white supremacist movement.

6   Q     Is it fair to say that a lot of people who were plugged

7   into social media had read something about me and -- I hesitate

8   to use the word "celebrity," exactly, but you know what I

9   mean -- a public figure that someone might want to tag for a

10  reason?  Is that a fair statement?

11  A     Yeah, it's fair to say that someone who's an adherent and

12  involved in the white supremacist movement would admire your

13  status as a leader and would like to communicate with you.

14  Q     Do you have any knowledge of people well beyond the white

15  nationalist movement tagging me often?

16  A     I really can't answer that question.  I'm sorry.

17  Q     Fair enough.

18        Is someone who gets tagged in a message, are they in some

19  ways responsible for the content of the message in which

20  they're tagged?

21  A     The person who is tagged did not write the message.  So --

22  Q     Thank you.

23        Mention was made of Dylann Roof during your testimony?

24  A     Uh-huh.

25  Q     In your research, or have you been -- have you become

P. Simi - Cross

1   aware of critical comments I've made about Dylann Roof?

2   A    You'll have to refresh my memory.

3   Q    I wrote a long article condemning him on a website that I

4   edited.  Does that -- you might not have read it, certainly,

5   but does that surprise you?

6   A    No, it doesn't surprise me.

7   Q    Okay.

8   A    It's a common strategy within the white supremacist

9   movement, to --

10  Q    Okay.  That's enough.  That's enough.  Strategy, I guess.

11       During the summer of 2017, were you aware of any

12  commentary I had on Zionism and the state of Israel?

13  A    Can you be a little more specific?

14  Q    Aware of, perhaps, a television interview that I did on

15  Israeli television?

16  A    Would you like to show me that?

17  Q    I guess I could.  I thought you might be aware of it.  I

18  could show that to you.

19  A    Off the top of my head, no, I'm sorry.  I apologize.

20  Q    Oh, no, that's not your fault.

21       In your broad knowledge of me, do I usually go on --

22  appear on Israeli television in order to insult and humiliate

23  them?

24            MS. KAPLAN:  Objection, Your Honor.

25   BY MR. SPENCER:

P. Simi - Cross

1   Q    Have you seen me -- in your research, have you encountered

2   any kind of television interviews that I've done?

3   A    Yes, we have.

4   Q    Do I engage in dehumanizing or insulting behavior?

5   A    In some cases.

6   Q    Okay.

7   A    Would you like examples?

8   Q    No.  Are you aware of my efforts in publishing books?

9   A    In publishing books?  You'll have to tell me -- I mean,

10  what's the specific question?

11  Q    Are you aware of Radix or Washington Summit Publishers?

12  A    Yes.

13  Q    How do you understand those organizations?

14  A    As generally part of this kind of universe of this

15  movement, in terms of trying to produce certain kinds of

16  literature, certain types of ideas on so-called "race realism,"

17  emphasizing issues across a host of different --

18  Q    Are you aware of Radix Journal?

19  A    Yes.

20  Q    Okay.  Good.  Are you aware of my publishing essays and

21  entire books by Jews?

22  A    Okay.

23  Q    Well, are you -- "okay" is a little bit -- are you aware

24  of that?

25  A    I wasn't specifically aware of that prior to you saying

                              119

                          P. Simi - Cross

1   it.

2   Q     Do names like Paul Gottfried or Byron Roth ring a bell?

3   A     Yes, Paul Gottfried certainly.

4   Q     He -- that rings a bell?  Okay.  Who is he?

5   A     Someone you worked with earlier in your involvement, and

6   somebody who -- you know, arguably, depending on who you ask,

7   there's some question about the "alt-right" terminology, but

8   certainly he was promoting this term early on.

9   Q     By publishing essay collections by Jews and full-length

10  books by Jews, was I attempting to dehumanize them?

11  A     It's not necessarily a contraindication.  Because you

12  published something doesn't mean you still can't hold --

13            MR. JONES:  Your Honor, I'm going to object.  It was

14  a yes-or-no question.  We'll ask the Court to strike the

15  answer.

16            MS. KAPLAN:  It was not --

17            THE COURT:  I don't think he's asking --

18  BY MR. SPENCER:

19  Q     Is publishing --

20            THE COURT:  Mr. Spencer was asking him his opinion of

21  what Mr. Spencer was doing, and I don't think that's

22  necessarily a yes-or-no answer.

23   BY MR. SPENCER:

24  Q     Are you finished?

25  A     Yeah, I don't think that that's necessarily an indication

P. Simi - Cross

1  of a lack of antisemitism because you published a person -- a

2  Jewish author.

3  Q    Well, I asked if that was an attempt to dehumanize anyone

4  by publishing books?

5  A    That publishing part, no.  Not that specifically.

6  Q    In publishing books -- so you are -- you've testified that

7  you are aware of my publishing efforts?

8  A    Yes.

9  Q    What kind of audience do you think long, heavily footnoted

10 academic books are aimed at, in your opinion?

11 A    I guess I'm not 100 percent clear on what the question --

12 what you're getting at with that question.

13 Q    Who was I aiming to reach by publishing books that sold in

14 the hundreds of copies and were, arguably, boring?

15 A    People that would find the arguments and the topics and

16 the points of focus of interest, obviously.

17 Q    Was my -- do you think anyone got riled up by that -- that

18 kind of --

19         MS. KAPLAN:  Objection, Your Honor.

20         THE COURT:  Sustained.

21 BY MR. SPENCER:

22 Q    Are you aware of my so-called critical commentary on white

23 genocide theory?

24 A    You'd have to refresh my memory.

25 Q    Are you aware that I -- are you aware that I have

121

P. Simi - Cross

1   criticized that kind of idea as false and unhelpful?

2   A    I mean, that's -- I guess there's maybe some inconsistent

3   things in your record on the idea.

4   Q    You can't quite fit me into the box you want?

5   A    Well, I mean, that's actually part of --

6           MR. SPENCER:  No further questions.  Thank you.

7           MS. KAPLAN:  Your Honor, I think he should be

8   permitted to answer the question.  I understand that

9   Mr. Spencer didn't like the answer that was coming, but he

10  asked the question.

11          MR. SPENCER:  I did like the answer he gave.

12          THE COURT:  Okay.  Is there a question hanging?  Is

13  this --

14          MS. KAPLAN:  The question was:  "You can't quite fit

15  me into the box you want?"  And then he cut Mr. Simi off.  I

16  think it's clear on the transcript.

17          THE COURT:  Well, it's an argumentative question.

18          MS. KAPLAN:  That's okay.  I hear you, Your Honor.

19  Thank you.

20          THE COURT:  Okay.  Mr. ReBrook wants to question.

21          MR. REBROOK:  Yes, Your Honor.

22                     CROSS-EXAMINATION

23   BY MR. REBROOK:

24  Q    Good afternoon, Professor Simi.  My name is Edward

25  ReBrook, and I'm the attorney for Mr. Jeff Schoep and the

P. Simi - Cross

1  National Socialist Movement.

2  A    Good afternoon.

3  Q    You mentioned ethnographic fieldwork.  How long have you

4  been conducting ethnographic fieldwork?

5  A    Since 1997.

6  Q    Okay.  Over what time frame did you conduct ethnographic

7  fieldwork with the National Socialist Movement?

8  A    That would have been between 1997 and 2004, and then more

9  recently as part of what's also -- it's similar to ethnographic

10 research, but life history interviews with former members of

11 various white supremacist groups.

12 Q    Who specifically within the NSM did you conduct

13 ethnographic fieldwork with?

14 A    Are you asking for an individual's name?

15 Q    Yes.

16 A    Yeah, I'm sorry, as part of research we're bound by

17 federal what are called Institutional Review Board regulations

18 through the Department of Health and Human Services, and being

19 able to -- you know, mentioning someone's name would be a

20 violation of confidentiality regulations that are part of those

21 sets of protocols and procedures.

22 Q    I understand.  Well, let me ask you more specifically --

23 or more generally:  Did you do any ethnographic fieldwork with

24 any NSM members who were present at the Unite the Right rally?

25 A    You know, that's not a question I could answer.

123

P. Simi - Cross

1  Q    I'm not asking for a specific name.  I'm just asking if

2  you did any work with people that were at the rally.

3  A    I don't know each person from NSM who attended the UTR

4  rally.  So that determination would be --

5           THE COURT:  Well, do you know any person who was at

6  the rally that you interviewed?

7           THE WITNESS:  Not to my knowledge.

8  BY MR. REBROOK:

9  Q    Okay.  Did you read any postings from NSM defendants that

10  were on the Discord?

11  A    Now, keep in mind we have no way of knowing, in many

12  cases, exactly who is and who isn't on the Discord.  So giving

13  you a blanket statement to that question would really not be

14  necessarily possible because of that.  So I guess I would say

15  that first.

16  Q    Okay.  That's a fair answer.  So, to your knowledge, were

17  there any NSM members on the Discord?

18  A    Well, again, that is not a question you can answer,

19  because you have people on Discord who are using aliases and

20  aren't necessarily indicating who they are.  So, you know, it's

21  a question that I really can't answer yes or no.

22  Q    Okay.  So you don't know; would that be fair to say?

23  A    Yeah, that -- that's fair.

24  Q    You mentioned backstage behavior.  Did you witness any

25  backstage behavior by NSM members in relation to the planning

P. Simi - Cross

1  of the UTR?

2  A    Well, we discussed some emails as part of the testimony

3  that are, I think, very good examples about the optics on the

4  front stage that are being discussed in more private

5  communication.  So certainly those would be examples.

6  Q    Okay.  And you mentioned plausible deniability?

7  A    Uh-huh.

8  Q    Would actively seeking out the presence of law enforcement

9  be considered an act that's in furtherance of plausible

10 deniability?

11 A    Can you be a little bit more specific?

12 Q    Yes.  Would going out of the way to make sure that police,

13 specifically the Charlottesville police, were present for the

14 Unite the Right rally, would that be an act that's in

15 furtherance of plausible deniability?

16 A    You know, I mean, again, I would say that that goes beyond

17 what we're asked to do in this assignment in terms of our

18 report and what we were looking at.  And so, you know,

19 communication with law enforcement and what role that did or

20 didn't play is, again, not part of, really, what we analyzed

21 and examined.

22 Q    Perfectly fair answer, sir.

23      You mentioned impression management.  Is impression

24 management unique to white supremacist groups?

25 A    No.  It's a term that's used broadly to characterize human

P. Simi - Cross

1   behavior more broadly.

2   Q    So is a person on a first date conducting impression

3   management?

4   A    That would be a good example.

5   Q    Are you currently engaging in impression management?

6   A    We all are.

7   Q    Very good.  Is it fair to say that you can definitively

8   discern the meaning of words and phrases that might not be able

9   to be discerned by a casual observer?

10            (Reporter clarification.)

11            THE COURT:  Repeat the question, please.

12  BY MR. REBROOK:

13  Q    Is it fair to say that you can definitively discern the

14  meaning of words that a casual observer might not be able to

15  discern?

16            MS. KAPLAN:  Objection, Your Honor.  I don't

17  understand the question.

18            THE COURT:  Well, if the witness understands the

19  question, he may answer it.

20            THE WITNESS:  It was a -- kind of a -- maybe if you

21  did it one more time, it might be a little clearer.  I'm not

22  sure.  It seems a little unclear.

23   BY MR. REBROOK:

24  Q    What I'm asking, sir, is:  Can you tell a deeper meaning

25  of words and phrases used by, say, members of the white

P. Simi - Cross

1  supremacist movement that casual observers wouldn't understand

2  the meaning of?

3  A    Yes.  I mean, that's part of the research methodology.

4  That's part of the ethnographic fieldwork.  That's part of

5  immersing yourself in that world in order to try and develop a

6  deeper understanding that would be very different than a casual

7  observer.  So, yes, very much.

8  Q    Okay.  So in your expert opinion, are there any words and

9  phrases that white supremacists can say in public spaces that

10  will guarantee violence?

11  A    That will guarantee violence?

12  Q    Yes.

13  A    You know, that's -- that's a strong word, right?  When

14  you're saying guaranteeing.  So the question is asking

15  something that -- I don't know of any words that we could say

16  would guarantee violence.  I mean, that's like -- you're saying

17  guarantee.  I assume that to mean 100 percent certainty.

18  Q    Okay.  How about more likely than not?

19  A    Well, I think certainly that's part of the triggering and

20  the provocation is that white supremacists do understand that

21  there are certain words that if they use those are more likely

22  to generate, you know, more aggressive reaction on the part of

23  those that they're targeting.  So I think they do have a

24  good --

25  Q    Okay.

P. Simi - Cross

1    A    Yeah.

2    Q    That's a very good answer.  Thank you.

3    A    Sure.

4    Q    With regard to triggering, is it your testimony that

5    persons who are triggered are not responsible for their violent

6    responses to other people's words?

7    A    No, it is not, sir.

8    Q    Okay.  Is the concept of triggering in relation to white

9    supremacists, is that different than, say, a wife beater

10   claiming that his battered spouse provoked him?

11          MS. KAPLAN:  Objection, Your Honor.

12          THE COURT:  I think he can answer the question.

13          THE WITNESS:  Apologies, but you're going to have to

14   give me that one more time.

15   BY MR. REBROOK:

16   Q    Okay.  Is it your opinion that triggering, is that

17   different than a wife beater claiming that his battered spouse

18   has provoked him?

19   A    The battered spouse has provoked him, is that different?

20   Q    That the battered spouse triggered their beater?

21   A    How do you mean a battered spouse triggered -- I'm not

22   seeing --

23   Q    I'm asking if a person who is beaten by their husband, are

24   they responsible for that beating?

25   A    Of course not.

P. Simi - Cross

1  Q    You mentioned that violence is how white supremacists see
2  the world.  Can you tell how all groups see the world or just
3  white supremacists?
4  A    I guess I'm not following your question.  I don't study
5  all groups.  I study the white supremacist movement.  That's
6  what I'm here to --
7  Q    That's fair.  That's fair.
8       Is violence an idea or an action?
9  A    Is violence an idea or an action?  There are violent
10 actions and there are violent ideas.
11 Q    Okay.  And to your mind has anyone ever been harmed by a
12 violent idea?
13 A    I mean, I don't know if you want to get in the weeds here,
14 but actually there is a line of research in the neuroscience
15 that shows abusive words actually can have quite debilitating
16 consequences in terms of neuro development, emotional
17 development, psychological development.  I'm not suggesting
18 that -- anything legally in regards to that, but as far as
19 scientifically, what we know, yeah, there is this line of
20 research that does find that.
21 Q    Okay.  And is hate speech violence?
22 A    Is hate speech violence?  Hate speech often involves
23 references to violence as far as using terms related to
24 violence, both in terms of --
25 Q    But is it violence in and of itself?

P. Simi - Cross

1         MS. KAPLAN:  Again, Your Honor, he has to allow him

2   to finish answering the question.

3         THE WITNESS:  I thought I previously distinguished

4   between violent ideas and violent action.

5   BY MR. REBROOK:

6   Q    Okay.  I'll accept that and move on.  That's fine.

7   A    Okay.

8   Q    Okay.  In your opinion is veneration of violence a

9   uniquely white supremacist attitude?

10  A    No, it's not.  And I think I mentioned some other cultures

11  of violence, like Al-Qaeda, ISIS, and so forth.

12  Q    Would it be fair to say that Americans in general venerate

13  violence?

14  A    I guess you'd have to be a little more specific.  I'm not

15  sure I follow the question exactly.

16  Q    Violent films, violent books, the number one writer for

17  fiction novels in the United States is Dean Koontz, who writes

18  about the murder of women.  Is that a veneration of violence?

19  A    Can you define veneration.  I just want to be very --

20  Q    Attraction to violence.

21  A    There's certainly lots of movies and books that discuss

22  violence, yeah, I would agree with you.

23  Q    Do you have a rough idea of how many white supremacists

24  were present at the Unite the Right rally?

25  A    I've heard estimates.

P. Simi - Cross

1  Q    Can you tell me what those estimates are?

2  A    I've heard ballpark estimates between 3- or 400 up to well

3  over 500.  To be honest, though, I don't have a good way of

4  knowing the accuracy of these estimates.

5  Q    And have you heard any rough numbers on how many persons

6  were physically harmed at that rally?

7  A    I have certainly obviously heard of the fatality, and then

8  I've -- I think I've heard not a specific number, but I've

9  heard dozens in terms of individuals injured.

10 Q    Okay.  And specifically removing persons that were harmed

11 by James Alex Fields, do you have a rough idea of how many

12 people were injured apart from him, apart from his actions?

13 A    I don't.  I don't have an estimate to offer.  I know there

14 were injuries aside from --

15          (Overlapping speakers.)

16          THE COURT:  You're talking over him, Mr. ReBrook.

17          THE WITNESS:  I'm sorry.

18          THE COURT:  No, you finish what you were saying.

19          THE WITNESS:  What I was saying is I know there were

20 injuries, but I don't have an estimate to offer as far as

21 injuries outside of the car attack.

22 BY MR. REBROOK:

23 Q    Did you research only counter-protesters who were injured?

24 A    We didn't research injuries.  That wasn't part of our

25 assignment.  So when I say I've heard dozens and that I know

P. Simi - Cross

1  there were injuries beyond the car attack, that really wasn't

2  part of our assignment.  I say that because of somebody who

3  has, you know, followed what happened here in 2017 in a more --

4  a general way, and then obviously as a researcher.  But our

5  assignment for this case in particular did not involve

6  assessing numbers of injuries, who was injured or anything

7  along those lines.

8  Q    That's fair.  Did you read any communications between

9  James Alex Fields and Mr. Jeff Schoep?

10  A    Again, you know, in some cases communications are

11  happening and we're not aware.  But to our knowledge, no.

12  Q    You mentioned impaling people.  In your research did you

13  discover that any people at the Unite the Right rally had been

14  impaled?

15  A    I am not aware of any people being impaled at Unite the

16  Right.

17  Q    Are you aware of any people at Unite the Right being

18  injured by John Deere farming equipment?

19  A    Not to my knowledge.

20  Q    As part of your research into white supremacist groups,

21  did you specifically have to deceive people within those

22  groups?

23  A    Can you be a little more specific?

24  Q    In your book, *American Swastika,* did you say that you

25  snickered at racist jokes that you personally found appalling?

132

P. Simi - Cross

1   A    Yes.  That's true.

2   Q    I have no further questions.  Thank you, Professor.

3   A    Thank you.

4            THE COURT:  Thank you.  We'll recess now for lunch

5   until 1:35.  And do not discuss the case with anyone or allow

6   anyone to discuss it with you or remain within hearing of

7   anyone discussing the case.  And we'll recess now till 1:35.

8   **(Jury out, 12:33 p.m.)**

9            (Recess.)

10           THE COURT:  All right.  Was there something to come

11  up beforehand, before we call the jury?

12           MS. KAPLAN:  It's okay, Your Honor.

13           MR. CANTWELL:  Have we called the jury yet?

14  Something I want to bring up very quickly.  They brought up --

15           THE COURT:  Wait.

16           MR. CANTWELL:  I'm sorry.

17           THE COURT:  Was there something before --

18           MR. CANTWELL:  There's something that came up --

19           THE COURT:  No.  I thought that --

20           MS. KAPLAN:  There was an issue that I brought up

21  with Your Honor's law clerk about potential impeachment that

22  Mr. Smith might have used or intended to use with respect to

23  Liz Sines who we hope will testify this afternoon, and making

24  sure he's aware that would violate the Court's motion in limine

25  order.  But I don't think we need to address it unless Your

P. Simi - Cross

1    Honor wants to.

2            In other words, Mr. Smith designated testimony to

3    impeach Liz Sines that is about Your Honor's law clerk that is

4    directly contrary to Your Honor's motion in limine and order on

5    that subject.  I wanted to make sure he's aware, since he's on

6    the phone, I didn't want it to just be blurted out.

7            MR. SMITH:  I wasn't planning on actually

8    cross-examining Ms. Sines.  So I don't think it's an issue.  I

9    don't really know why that was in there.  Sorry about that.

10           MS. KAPLAN:  Terrific, Your Honor.  No issue then.

11           MR. CANTWELL:  The thing I wanted to bring up --

12   Christopher Cantwell -- is in the operative complaint, the

13   plaintiffs claim that the "woof woof woof" noises were barking

14   like dogs, and they seem to have changed the allegation in

15   their questioning of their expert witness, claiming that this

16   is chanting of Dylann Roof.  And I am not sure if that is

17   proper or if there's a jury instruction or --

18           THE COURT:  The witness testifies and the jury -- it

19   doesn't make any difference.  The opening statements are not

20   evidence.

21           MR. CANTWELL:  This is not about the opening

22   statements.  This is about the operative complaint.  It's my

23   understanding --

24           THE COURT:  Oh, the complaint.

25           Well, the witness can testify.  He's not bound by

P. Simi - Cross

1    anything in the complaint.

2          MR. CANTWELL:  Very good.

3          THE COURT:  Call the jury.

4          MS. DUNN:  Your Honor, we did have one issue that we

5    should handle -- that we believe we should handle at sidebar.

6          THE COURT:  We'll do that while the jury is coming

7    in.

8          (Sidebar commenced.)

9          MR. MILLS:  Your Honor, this is a very specific

10   issue.  We wanted you to be aware that Mr. Kessler -- we have

11   talked to Mr. Kolenich about this and I don't think he's in

12   disagreement, but he's here and he has copies.  Mr. Kessler has

13   been tweeting every day, which is fine, about what's happening

14   in the courtroom.  We have a very specific issue, which is that

15   he has accused three witnesses specifically of perjury in

16   publicly issued tweets.  And we just think that that can't be

17   appropriate for a party in this case, especially while a

18   witness is still testifying or before the jury has begun

19   deliberations.

20         THE COURT:  All right.

21         MR. KOLENICH:  Jim Kolenich, Your Honor, for

22   Mr. Kessler.  They did show me the tweets.  I did verify with

23   Mr. Kessler that he posted them and he has either removed them

24   or reworded them at this time.

25         THE COURT:  All right.  Instruct him that he's not to

P. Simi - Cross

1    comment on the veracity of any witness until after the case is

2    over.  Say what he likes, but not when the jury -- we're not

3    locking the jury up at night.  It's not appropriate, because we

4    don't know how -- what could get out.  We don't -- it's just

5    not appropriate.  So no one should be commenting about the

6    witnesses' testimony at this time.

7              MR. KOLENICH:  Understood, Your Honor.  Thank you.

8              MR. MILLS:  Thank you, Your Honor.

9              (End sidebar.)

10             THE COURT:  All right.  You may -- yes, sir.  Thank

11   you.

12             MR. CAMPBELL:  Thank you, Your Honor.

13                        CROSS-EXAMINATION

14    BY MR. CAMPBELL:

15   Q    Good afternoon, Professor Simi.

16   A    Good afternoon.

17   Q    I represent James Fields.  And in that regard, I believe

18   you had testified earlier that it was clear the majority of the

19   planning was done on Discord.  Did I understand that correctly,

20   sir?

21   A    Yes, a large portion.

22   Q    Not all of it?

23   A    Yeah.

24   Q    And the planning was centrally located on Discord I think

25   may have been the phrase.

136

P. Simi - Cross

1   A     That sounds fair.

2   Q     Are you aware of any Discord post in any way related to

3   Unite the Right authored by anyone even alleged to have been

4   James Fields?

5   A     We know Mr. Fields had an account on Discord.  And so

6   without knowing what the handle is, I really can't answer that

7   question.

8   Q     Fair to say you're not aware of any post that was authored

9   by James Fields on Discord about Unite the Right?

10  A     Yeah, I don't know because --

11  Q     Don't know one way or the other?

12  A     Yeah, exactly.

13  Q     Fair enough.  Professor, how about tweets?  Did you review

14  any tweets authored by James Fields about planning Unite the

15  Right?

16  A     Specifically about planning Unite the Right?

17  Q     Yes, sir.

18  A     No, we did not.

19  Q     How about Instagram posts?  Similar to how I believe you

20  testified, I'm rather unfamiliar with social media, but did you

21  review in the course of preparing to give your expert opinion

22  in this case any Instagram posts authored by James Fields that

23  relate to planning Unite the Right?

24  A     No, we did not.

25  Q     And would you agree with me, Professor, that not knowing

P. Simi - Cross

1    one way or the other whether James Fields posted on Discord

2    could not be a basis for an expert opinion that he planned or

3    helped plan Unite the Right?

4    A    Keep in mind our opinion here, you know, as far as our

5    assignment, is not relevant in terms of conspiracy.  We're

6    looking at the defendants and their involvement in terms of how

7    Unite the Right was planned, their involvement in the culture

8    of the white supremacist movement.

9    Q    Yes, sir.

10   A    You know, our opinion is that we found that the defendants

11   utilized the tactics in terms of the core characteristics of

12   the white supremacist movement.

13   Q    Yes, sir.  I believe your testimony earlier, though, was

14   defendants organized Unite the Right.  So my question pares

15   that down to what is the basis for an opinion, if you hold that

16   opinion, that Fields organized Unite the Right?

17            MS. KAPLAN:  Objection, Your Honor.  Foundation.  I

18   don't think that was exactly the testimony.

19            THE COURT:  He can clear it up.  Just to get it

20   clear.

21   BY MR. CAMPBELL:

22   Q    Did you testify earlier defendants organized Unite the

23   Right?

24   A    I said that the organization of Unite the Right was

25   consistent with the core characteristics of the white

P. Simi - Cross

1  supremacist movement.

2  Q    Okay.  So you do not hold the opinion that Fields

3  organized or helped organize Unite the Right?

4  A    Can you restate the question?

5  Q    Yes, sir.  So you don't hold the opinion that Fields

6  helped organize the Unite the Right rally?

7  A    That wasn't our assignment.

8  Q    Okay.  You're not here to offer that opinion maybe is a

9  better way to put it?

10 A    Okay.  That's fair.

11 Q    Thank you, sir.

12      And sir, do you agree with my assessment that tagging

13 someone in a tweet is not communicating with them; it is

14 attempting to communicate with them?

15 A    I think that's debatable.

16 Q    Okay.  Well, wouldn't -- so in order to communicate with

17 someone you tagged in a tweet, you'd have to know more as to

18 whether that person ever did anything in response to a

19 notification, ever opened a link, ever looked at anything,

20 right?

21 A    Yeah, without that information, that is hard to determine.

22 Q    There's just an attempt to communicate with someone,

23 correct?

24 A    It's, yeah -- it may have been communication, though.

25 Without additional information you just wouldn't be able to say

                              P. Simi - Cross

1    one way or the other really.

2    Q    Yes, sir.  Absolutely fine.

3         So it is clear from the evidence that was shown in this

4    case, and some of which you looked at and commented on today,

5    but also other evidence in the case, that Mr. Fields tweeted at

6    Richard Spencer with what I would characterize as kind of

7    general Nazi tropes, that sort of thing.

8         So I'm just asking your opinion.  Is repeatedly posting

9    Hitler photos and that sort of thing, is that front-stage or

10   backstage?

11   A    Repeatedly posting Hitler photos, as far as where?

12   Q    So for example, the one tweet that I specifically recall

13   you commenting on in this case was the white family and

14   reference to "our children," that kind of thing that I think

15   you had testified was kind of a typical Nazi-type trope with

16   undercurrents and that sort of thing, right?

17   A    Uh-huh.

18   Q    Okay.  And so if you're posting Nazi emblems, Nazi

19   slogans, pictures of Hitler, is that front-stage or backstage?

20   A    It would depend on the -- it would depend on the context

21   as far as the social media platform, who the audience was.  It

22   would also depend on the specific message or images, because as

23   in the example that you used, that one to outsiders might not

24   necessarily appear to suggest association or involvement in the

25   white supremacist movement, or any indication about advocacy

P. Simi - Cross

 1  for violence.  But to insiders, it would.

 2       So sometimes front and backstage, there is a -- there is

 3  nuances in terms of it's not a rigid distinction that can

 4  always be made that something is clear front and clear

 5  backstage, that we're talking about these different aspects of

 6  behavior that, depending on the context, you know, whether you

 7  determine it to be front or backstage would depend.

 8  Q    Fair enough.  Thank you, Professor.  But pictures of

 9  Hitler, that's not backstage, right?

10  A    No, that would not be -- no, that would not be typically,

11  as you say -- front stage or backstage?

12  Q    I said it would not be backstage?

13  A    Yeah.  That's fair.

14  Q    Just a couple more questions, sir.  Prior to August 12th,

15  I know you had said that even before being retained in this

16  case you already were studying and kind of keeping your eye on

17  this area.  Is that a fair characterization?

18  A    Can you be a little more specific about, when you say

19  "area"?

20  Q    White supremacy, white nationalism.

21  A    Sure, since 1996.

22  Q    Yes, sir.  So prior to August 12, 2017, had you heard of

23  Richard Spencer?

24  A    Sure.  Yes.

25  Q    Had you heard of Nathan Damigo?

P. Simi - Cross

1   A     Yes, I had.

2   Q     Had you heard of Christopher Cantwell?

3   A     Yes, I had.

4   Q     Had you heard of Jeff Schoep?

5   A     Yes, I had.

6   Q     Had you heard of Matt Heimbach?

7   A     Yes, I had.

8   Q     Had you heard of David Parrott?

9   A     Yes, I had.

10  Q     Had you heard of Jason Kessler?

11  A     Prior to Unite the Right?

12  Q     Yes, sir.

13  A     Probably not.

14  Q     How about Azzmador Ray?

15  A     Yes, I had.

16  Q     Heard of him?  How about James Fields?

17  A     No, I did not.

18        MR. CAMPBELL:  Thank you, sir.  I don't have any more

19  questions.

20        THE COURT:  All right.  Thank you.

21                    CROSS-EXAMINATION

22   BY MR. JONES:

23  Q    Good afternoon, sir.  My name is Bryan Jones.  I represent

24  Michael Hill, Michael Tubbs and the League of the South.

25        MS. KAPLAN:  You might want to take that document

P. Simi - Cross

1    down.  There's a document on the screen that may be privileged.

2    BY MR. JONES:

3    Q    Are you being paid for your testimony today?

4    A    Yes, I am.

5    Q    And how much have you been paid?

6    A    I haven't been paid anything yet, but I was offered

7    30,000.

8    Q    And who offered to pay you that 30,000?

9    A    IFA.

10   Q    Who is that?

11   A    Integrity for America.

12   Q    What's their relationship to this litigation?

13   A    I don't think I -- they have supported the litigation.  I

14   can't say more formally than that.  It's really not my purview

15   and I don't think I'm the best person to answer that question.

16   Q    The people paying you $30,000, you don't know?

17   A    Well, first of all, we took the case pro bono when we

18   signed our letter of engagement in 2019, and this was

19   relatively recently offered to us through the attorneys that we

20   were working with.  So yeah, I mean --

21   Q    So they're working with the attorneys on the plaintiffs'

22   side; is that what you're saying?

23            MS. KAPLAN:  Objection, Your Honor.

24            THE COURT:  Well, he can go into who -- if he knows

25   who's paying him.

P. Simi - Cross

1              THE WITNESS:  I'm sorry, could you restate the

2      question.

3      BY MR. JONES:

4      Q    It's your understanding that IFA, the group that has

5      promised to pay you $30,000 for your work and testimony in this

6      case, is associated with the attorneys for the plaintiffs in

7      this case?

8      A    That's my understanding.

9      Q    Are you part of the board for a group called Life After

10     Hate?

11     A    Yes, I am.

12     Q    Are you familiar with an individual named Samantha

13     Froelich, who is a member of that group?

14     A    Yes, I am.

15     Q    Are you familiar with her involvement in this case?

16     A    That's how I'm familiar with her.

17     Q    Okay.  You testified that you had studied the League of

18     the South.  Do you remember saying that?

19     A    Yes, as part of the white supremacist movement.

20     Q    So you also described some of your research as

21     ethnographic fieldwork.  Does that sound right?

22     A    Yeah, that's correct.

23     Q    And the demonstrative that was put up on the screen said

24     that you have been conducting fieldwork and interviews with

25     white supremacist organizations from 1997 to 2021; is that

P. Simi - Cross

1    right?

2    A    That's correct.

3    Q    And that your research focuses on the Southwest and

4    Northwest United States; is that right?

5    A    That was specifically in reference to folks that I had

6    embedded with and were doing the house visits with.

7    Q    So an important part of your research as a sociologist is

8    to embed with the subjects that you are studying; is that

9    correct?

10   A    Yeah, for ethnographic fieldwork, that's a standard

11   aspect.

12   Q    And those were people in Arizona, California, Nevada and

13   Utah; is that correct?

14   A    That's correct.

15   Q    These are the people who you'll sleep on their couch or

16   stay in their spare bedrooms; is that right?

17   A    That's correct.

18   Q    And why is it important to do that as part of your

19   research?

20   A    Well, as I indicated earlier in terms of ethnographic

21   fieldwork, it gives you a vantage point in terms of trying to

22   develop a deep understanding of whatever it is you're studying,

23   whether it's individuals or groups or culture or community.  It

24   allows you to kind of try and see things from their

25   perspective, see how they understand the world.

P. Simi - Cross

1  Q     That's the type of thing you can't necessarily get by just

2  maybe reading statements from them or looking at their website,

3  right?

4  A     Well, oftentimes ethnographic --

5  Q     It was just a yes or no question.

6  A     Can you restate it again, please?

7  Q     The types of benefits that you can get from doing

8  ethnographic fieldwork, those are different from the types of

9  benefits and information you get from just looking at someone's

10 website or reading statements by them; isn't that right?

11 A     In some cases.  I would have to say that's actually a

12 pretty complicated question, because it involves different

13 types of research methodology and their benefits, and of course

14 any method has both pros and cons, benefits and weaknesses.  So

15 I would have to say that is -- I would have to say:  Sometimes.

16 Q     Now, you've never slept on Michael Hill's couch, have you?

17 A     No, I have not.

18 Q     You've never stayed in Michael Tubbs's spare bedroom, have

19 you?

20 A     No, I have not.

21 Q     You've never even met or interviewed anybody in the League

22 of the South, have you?

23 A     That's correct.

24 Q     Would it be fair to say from an academic standpoint, then,

25 when you say that you have studied the League of the South,

P. Simi - Cross

1  your study has been fairly superficial?

2  A    I don't think that's fair.

3  Q    You don't think that's a fair characterization?

4  A    No.

5  Q    Have you ever written an article about the League of the

6  South?

7  A    As part of our research, we write broadly about different

8  facets of the white supremacist movement.  That would certainly

9  include the League of the South.

10  Q    You've mentioned the name "League of the South" in an

11  article that you've published?

12  A    I mean --

13  Q    Yes or no.  Have you?

14  A    I've published over 50 articles and books, so to tell you

15  off the top of my head every group that I've mentioned in

16  writing would be very difficult.

17  Q    So the research that you've done with folks in Arizona,

18  California, Nevada, and Utah, as a sociologist, would you agree

19  that people in California are different from people in, say,

20  Alabama or Florida?

21  A    That's a fair statement.

22  Q    Would it be fair to say that people who are 70 or 61 years

23  old are different from 30-year-olds?  Would that be a fair

24  statement?

25  A    That's a fair statement.

147

P. Simi - Cross

1   Q    The things that motivate a 70-year-old, 61-year-old, would

2   be different from the things that motivate a younger person;

3   wouldn't that be a fair statement?

4   A    Partly why we've tried to generate a wide distribution in

5   terms of ages, and regions, for that matter.  In fact, the

6   fieldwork conducted in Idaho involved people from all over the

7   country.  So --

8   Q    That was in Idaho?

9   A    Yeah.  It --

10  Q    What part of the United States is Idaho?

11  A    If you'd allow me to explain, it involved, obviously, that

12  Idaho is in the --

13            MR. JONES:  Your Honor, it's nonresponsive.  It is --

14            MS. KAPLAN:  I don't know, Your Honor, how Mr. Jones

15  could know it's nonresponsive.  He's cutting him off.

16            THE COURT:  I don't need everybody talking.

17            Go ahead and ask him a question.  And he has a right

18  to explain.  But he can answer.

19   BY MR. JONES:

20  Q    So we talked about joking, people using humor.  As a

21  sociologist, would it be a fair statement to say that humans

22  use humor to bond and connect with each other?

23  A    It's a fair statement.

24  Q    And that's across the board?  Generally all humans are

25  that way; would that be fair to say?

P. Simi - Cross

1  A     Yeah, generally speaking.

2  Q     Would it be fair to say that people joke about what they

3  know, the things that they know about?  So a lawyer might joke

4  about the law and a doctor might joke about medicine; would

5  that be fair to say?

6  A     Seems reasonable.

7  Q     Would it be fair to say that somebody involved in the

8  white nationalist movement would joke about things related to

9  the white nationalist movement?  Would that be fair to say?

10 A     Yes.

11 Q     Is it your testimony that every time a defendant in this

12 case says "I was just joking when I said that," that you're

13 able to tell whether that's true or not?

14 A     That wasn't part of our opinion.  Our opinion is that the

15 role of humor and joking within the white supremacist culture

16 has a certain degree of prominence and that there is often a

17 kind of doublespeak aspect to it, a double-meaning aspect to

18 it.

19       We've never offered an opinion that would allow us to

20 characterize each and every person and the jokes that they told

21 at various specific points in time.  We're talking, as a core

22 characteristic, this is a prominent theme within the movement.

23 Q     Professor Simi, would it be your opinion that someone who

24 opposes the removal of Confederate monuments was part of the

25 white supremacist movement?

P. Simi - Cross

1  A    Can you restate that?

2  Q    Would it be your opinion that somebody who opposes the

3  removal of Confederate monuments or statues is part of the

4  white supremacist movement?

5  A    If your question is that piece of information without any

6  other details, then I would say no.

7  Q    Now, in the 25 years of research you've done on the -- as

8  you refer to it, as "the white supremacist movement," I'm

9  assuming you've come across groups who oppose the white

10 supremacist movement; would that be a fair statement?

11 A    I guess it depends on what you mean by "come across."

12 It's not been a point of focus or study.

13 Q    Are you aware of the existence of groups that oppose the

14 white supremacist movement?

15 A    Yes.

16 Q    And are you aware that some of those groups use violence

17 to oppose the white supremacist movement?

18 A    I know that white supremacists certainly focus on that

19 issue quite a bit, and talk a lot about the threat that they

20 believe different groups that oppose them --

21 Q    So was the answer to my question that you are -- that,

22 yes, you are aware that the groups that oppose the white

23 supremacist movement sometimes use violence?

24 A    I'm not -- again, this is not something I've looked at

25 specifically as part of my research.  This is not part of my

P. Simi - Cross

1  focus.  I'm not here today to talk about groups that oppose the

2  white supremacist movement, beyond how white supremacists see

3  that and their perceptions.

4  Q    So you've never -- you said that white supremacists often

5  talk about their opponents being violent.  You just said that,

6  right?

7  A    I did say that.

8  Q    And you've never checked to see if that's correct or not?

9  You've never done that before, in 25 years?

10 A    Am I aware that -- of people who have said that who have

11 then -- who have actually been involved in incidents of

12 violence with people that oppose them?  Yeah, but I don't know

13 what those -- necessarily, those circumstances were.  I don't

14 know the details.  I don't --

15 Q    I'm not asking for details.

16         MS. KAPLAN:  Please stop interrupting, Mr. Jones.

17 He's answering your question.

18         THE COURT:  Ms. Kaplan, don't instruct the lawyers.

19         MS. KAPLAN:  I'm sorry, Your Honor.  I apologize.

20         THE COURT:  Have you finished your answer, sir?

21         THE WITNESS:  Yes, sir.

22  BY MR. JONES:

23 Q    It was just a general question.  So is the answer to that

24 question yes, you are aware that some of the groups that oppose

25 the white supremacy movement use violence?  Are you aware of

P. Simi - Cross

1   that, yes or no?

2   A    Yes, I'm aware that white supremacists certainly talk a

3   lot about that.

4   Q    Okay.  That wasn't the question.  Did you misunderstand

5   the question?

6   A    I think you're asking me a question that -- you're

7   asking -- would require details about individual claims about

8   folks that oppose the white supremacist movement, in terms of

9   whether they are --

10  Q    So let me try to get at it through a different route.

11          MS. KAPLAN:  Your Honor, he just interrupted him

12  again.

13          THE COURT:  Well, do you have a question that you

14  have not answered, sir?

15          I'll ask the witness:  Sir, are you finished

16  answering the question?

17          THE WITNESS:  Yes, that's fine.

18          THE COURT:  Go ahead.

19   BY MR. JONES:

20  Q    So you've been doing this for 25 years?

21  A    That's correct.

22  Q    Since 1996?

23  A    That's correct.

24  Q    You just testified that people in the white supremacist

25  movement talk about people who oppose them using violence.

P. Simi - Cross

1  They talk about that all the time, don't they?

2  A    It is a prominent theme.

3  Q    Is it your testimony that you have never followed up to

4  see whether that is actually the case or not?

5  A    That's not what I said.  I said I don't have specific

6  details about all of the different expressions or claims that

7  are made by white supremacists about this type of antagonism in

8  terms of their perception that they're victims of violence.  I

9  don't have details on those claims that would be -- seem to be

10 what you're asking for in terms of, am I aware that those

11 claims are accurate or not.

12 Q    You've never come across a single instance of somebody who

13 opposes the white supremacy movement using violence?

14 A    There are documented cases of that, certainly.

15 Q    Okay.  So I guess, to go back, you are aware that

16 opponents of the white supremacy movement -- as you said,

17 there's documented incidents of this -- you're aware that they

18 do use violence?

19 A    That's a fair statement.

20 Q    Okay.  Thank you.

21      Are you aware of the term "doxing"?

22 A    Yes, sir.

23 Q    And that's another thing that members in the white

24 supremacy movement are worried about, right?

25 A    I don't think it's exclusive to the white supremacist

153

P. Simi - Cross

1  movement.

2  Q    Right.  But it is something that members of the white

3  supremacist movement are worried about, right?

4  A    That's a fair statement.

5  Q    And that's one reason that they wouldn't want their cell

6  phone to get into the hands of Antifa, right?  They would be

7  worried about doxing; would that be a fair statement?

8  A    That's certainly something they talk about.

9  Q    The consequences for people in the white supremacist

10  movement when they're doxed are pretty significant, right?

11  A    I guess what do you mean by "significant"?

12  Q    They can lose their jobs; they can be disowned by their

13  families?

14  A    There are instances of --

15  Q    They can go to jail?

16  A    There are instances of those things happening.

17  Q    Would those be pretty significant consequences?

18  A    They seem like it, yeah.

19  Q    So on -- you reviewed over 600,000 -- well, not over --

20  575,000 Discord messages, approximately?

21  A    Approximately.

22  Q    Spent over -- approximately 1,000 hours?

23  A    Approximately.

24  Q    And you testified that you were able to determine that

25  somebody using the handle "Tyrone" was Michael Chesny; is that

154

P. Simi - Cross

1  right?

2  A    That's correct, sir.

3  Q    You had to do a little bit of digging to find that out,

4  because there was nothing about Michael Chesny in the name

5  "Tyrone"; is that fair to say?

6  A    Yeah.  Well, we didn't just use Discord to make those

7  determinations; also deposition testimony and -- yeah.

8  Q    So you spent some time trying to figure out the identity

9  of the people who were posting on Discord; is that fair to say?

10 A    That really wasn't a major part of our focus, in terms of

11 our -- our assignment was not to track down who individual

12 users were based on their handles.

13 Q    Now, you were working on this case with an academic named

14 Kathleen Blee; is that right?

15 A    That's correct.

16 Q    And you worked pretty much hand-in-hand with her

17 throughout this whole case; is that right?

18 A    As a collaborative -- yeah, collaborative relationship.

19 Q    And you've known her for a while; isn't that true?

20 A    Yes, that's correct.

21 Q    And you've authored articles with her, correct?

22 A    Yes, we've coauthored together.

23 Q    And throughout your work on this case, you used a

24 particular methodology; is that fair to say?

25 A    Yes, very much.

155

P. Simi - Cross

1  Q     Is that the type of methodology that you generally use in

2  your academic work?

3  A     Yes.

4  Q     And that type of methodology would be, you don't start

5  with the conclusion and look for facts to support that; you

6  start with the evidence and you go where it leads.  Would that

7  be a fair description of the methodology you use?

8  A     Very much.

9  Q     Is that the methodology you used in this case?

10 A     Yeah, absolutely.  It's referred to as induction.  It's an

11 inductive process.

12 Q     So plaintiffs' counsel submitted a CV for Professor Blee.

13 A     Okay.

14 Q     And she gave a speech at the University of Florida in

15 2014.  I'm going to show you part of that and ask if you agree

16 with a statement she made.  I'm going to walk over to --

17             THE COURT:  Is your microphone working there?

18             MR. JONES:  If I could have permission to approach

19 the witness, Your Honor --

20             THE COURT:  You may.

21             MR. JONES:  -- I'll just play it.

22             THE WITNESS:  You say this was 2014?

23             MR. JONES:  That's right.

24             MS. KAPLAN:  I'd like to watch it myself, Your Honor.

25             THE COURT:  Yes.

P. Simi - Cross

1          Are we supposed to be hearing that?

2          MR. JONES:  Just the witness.

3          (Video playing for witness.)

4    BY MR. JONES:

5    Q    Did you hear that?

6    A    Yeah, but if you want to read it, that would be great.

7    Q    Sure.  So Kathleen Blee said that -- your coauthor of this

8    report said:  "It was important for them to know that I was

9    going to say negative things about them" -- referring to

10   members of the white supremacist movement -- "before doing the

11   research because, first of all, you get a lot of blowback if

12   you don't."

13        Did you hear that?

14   A    I did hear that.

15   Q    Do you agree with that methodology?

16   A    That's not really -- that's not really a research

17   methodology.  It's a practice related to ethics in terms of,

18   her determination was that it was -- I should say ethics and

19   safety, for that matter.

20        Her determination, clearly, was that it needed to be

21   acknowledged up front, that she needed to present that up

22   front, in part because when you're dealing with a movement that

23   idolizes Adolf Hitler, expresses support for the Holocaust, for

24   lynching, for violence more broadly, clearly there are going to

25   be some negative things that are said as part of documenting

P. Simi - Cross

1   these -- these findings.  That's pretty hard to avoid.  I mean,

2   imagine trying to study serial killers and not say anything

3   negative, right?

4   Q    Well, but you're also worried if you say anything positive

5   you'll get blowback, right?

6   A    No.  My understanding of what she said was in reference to

7   blowback from white supremacists, that --

8   Q    So she said that:  "It was important that they knew in

9   advance before I conducted my research that I was going to say

10  negative things about them"; otherwise, "you get blowback if

11  you don't."

12      So are you saying that the white supremacist movement

13  would give her blowback if she said positive things about them?

14  A    I guess I took it that she was suggesting that if she

15  wasn't kind of up front and transparent in that respect, that

16  after the fact there would be blowback from the white

17  supremacists.

18  Q    Isn't it true that, as you were reviewing the 575,000

19  Discord posts and spending 1,000 hours on this case, you

20  already had the end conclusion in your mind because you were

21  worried about blowback if you didn't?

22  A    That's not a fair characterization.

23              MR. JONES:  Thank you.  That's all the questions I

24  have.

25              THE COURT:  All right.

P. Simi - Cross

1          MR. CANTWELL:  Is Mr. Smith going to go next?  Did he

2    talk to you?

3          THE COURT:  No.  He wanted to go last, I think.

4          THE CLERK:  He doesn't have a preference.

5          MR. CANTWELL:  I think Mr. Spencer was texting with

6    Mr. Smith during the --

7          MR. SPENCER:  Why don't we just have Mr. Smith go?

8          MR. CANTWELL:  Is Mr. Smith ready?

9          THE COURT:  Is he there?  Mr. Smith?

10          MR. CANTWELL:  All right.  I'll go.

11          Is he ready?

12          MR. SMITH:  I just -- I need video of me.

13          Okay.

14          THE COURT:  Go ahead.

15                    CROSS-EXAMINATION

16    BY MR. SMITH:

17   Q    Okay.  Mr. Simi, so let me get this -- okay.  All right.

18   Okay.  I couldn't see you there for a second, sir.

19       So let me get this straight.  You're being paid by the

20   plaintiffs to come in here and say that the defendants' words

21   don't mean what the defendant says they mean, or even what the

22   dictionary says those words mean, but rather what the

23   plaintiffs say the defendants' words mean, correct?

24          MS. KAPLAN:  Objection, Your Honor.

25          MR. SMITH:  It's a tricky question, I guess, and a

P. Simi - Cross

 1   little bit -- but I can -- I can --

 2            THE COURT:  Well, look, I think the witness can

 3   handle this himself.

 4            Go ahead.

 5            THE WITNESS:  No, that's not accurate.

 6    BY MR. SMITH:

 7   Q    Okay.  Why not?

 8   A    Well, let's unpack the question.  It was a little bit, you

 9   know, kind of multifaceted.

10       Do you want to repeat it and I'll tell you which parts are

11   inaccurate?

12   Q    Okay.  So you're being paid by the plaintiffs, or their

13   lawyers, I suppose, to say -- to come in here into court and to

14   say that the -- that the defendants' words --

15   A    Okay.  Can I stop you there?

16   Q    Sorry, there's a -- yeah.

17   A    They're not paying us to say anything.  They asked us --

18   they gave us an assignment.  They provided us with substantial

19   amounts of material.  We have, you know, professional

20   standards, research methodology, that we rely on to review that

21   material, to analyze the material and offer an opinion.  We're

22   not simply just being paid to say X, Y, Z.

23   Q    Okay.  So what's a white supremacist?  You used that term

24   a lot, and I just -- I think we should figure that out, what

25   that means.

P. Simi - Cross

1    A    Sure.  Sure.

2    Q    So tell me.

3    A    One of the core characteristics we talked about of the
4    white supremacist movement -- again, we're not talking about
5    just a random individual.

6         What we're talking about is, first of all, the white
7    supremacist is, you know, in terms of, when you think about the
8    ingroup/outgroup, you would have a high degree of explicit bias
9    that would be directed towards aspects of the outgroup; in this
10   case, different -- people of color, Jewish people, so forth.
11   There's a sense that these individuals are inferior in some
12   respects, or represent kind of an existential threat in some
13   respects, in the case of Jewish people, and that this is the
14   outgroup.

15        And then the ingroup in this case would be white people,
16   and the belief that the white race is superior in certain
17   respects; is, you know, essentially responsible for most of
18   history's advancements in terms of civilization and science and
19   culture and so forth.  And so stick that together --

20   Q    Is -- right.  Sorry.

21   A    Okay.  And --

22   Q    Is that not -- is that not accurate, the thing about the
23   advancements in technology and such?  Is that not accurate?

24   A    Is that a serious question?

25   Q    I don't know.

P. Simi - Cross

1  A    I'd like you to restate that, because I want to make sure

2  I understood you correctly.

3  Q    Are you saying that whites are not responsible for most

4  major advances in technology?

5            MS. KAPLAN:  Objection, Your Honor.  This is so

6  outside the scope and so argumentative.

7            MR. SMITH:  I don't think it is, Your Honor.  I think

8  that he literally said exactly the opposite of that.

9            THE COURT:  The witness is not here to testify

10  about -- he's not testifying about the relative merits of

11  whites as opposed to other persons.  He's here testifying --

12  the subject was the question of white supremacy.

13            MR. SMITH:  Yeah.  We were talking about that, right?

14            THE COURT:  He's not -- he is not expressing an

15  opinion in favor or against either side.  He's expressing the

16  results of his research and a professional opinion.  That's

17  what an expert does.  It's not...

18   BY MR. SMITH:

19  Q    So is "white supremacist" just -- is that code for

20  anything?  Is that a kind of code?

21  A    I guess, can you be a little more clear?  I'm not sure

22  what you're getting at.

23  Q    Well, can you please define "white supremacist" for me?

24  Just -- I don't mean give me an example of a white supremacist,

25  but rather just give me a definition, a framework within which

P. Simi - Cross

1  we can put this.

2  A    Okay.  It would be individuals and organizations that

3  believe the white race is superior and have high levels of

4  explicit bias that's directed towards those they consider to be

5  outgroups, such as Jewish people, blacks, and other people of

6  color.

7  Q    Nonwhites, you mean?

8  A    That would be a term that white supremacists would use,

9  yes.

10  Q    They use the term "nonwhites"?

11  A    Use it very frequently to describe what we're referring

12  here to today as "outgroup."

13  Q    Okay.  So you're saying that "nonwhite" is a kind of white

14  supremacist code to recognize that there are a group of people

15  that are not white?  To recognize them as nonwhite is white

16  supremacist code; is that what you're saying?

17          MS. KAPLAN:  Objection, Your Honor.  That's --

18          MR. SMITH:  I don't know.  I think it's a fair

19  question, Judge.

20          THE COURT:  Can you answer that question?

21          MR. SMITH:  It's just yes or no.

22          THE COURT:  No, it's not a yes or no.

23          Can you answer that question, sir?

24          THE WITNESS:  Sure, Your Honor.

25          No, I did not say that.  I said it's a term that's

P. Simi - Cross

1   used among white supremacists to describe various different

2   groups of people of color, that that is a term that they often

3   will use, is "nonwhite," which reflects their --

4   BY MR. SMITH:

5   Q    Okay.

6   A    Go ahead.

7   Q    Okay.  So do you believe that China has a Chinese

8   supremacy problem?

9            MS. KAPLAN:  Objection, Your Honor.

10           MR. SMITH:  No, Your Honor, that's an absolutely

11   relevant question here.

12           THE COURT:  What's the relevance?

13           MR. SMITH:  It goes to antiwhite bias.  It goes to

14   antiwhite bias, Your Honor.  These are white nationalist

15   organizations that are on trial.

16           MS. KAPLAN:  It's completely beyond the scope, Your

17   Honor.

18           THE COURT:  Well, bias is never beyond the scope.

19   Tell me how you're getting bias out of that.

20           MR. SMITH:  You were talking to me, Your Honor?

21           THE COURT:  Yes.

22           MR. SMITH:  Well, if he, for example, only believes

23   that whites should be deprived of an ethnostate, whereas every

24   other race has an ethnostate, and he thinks that whites

25   shouldn't, that would seem to be antiwhite bias, and that would

P. Simi - Cross

1   show -- that would be relevant here.

2                THE COURT:  You're asking, is that his opinion?

3                MR. SMITH:  Well, we can -- I was planning on getting

4   there within a series of a few questions, but we can ask him

5   straight-up.

6                THE COURT:  Well, let's ask him that right now.

7                Did you get the gist of what he's driving at?

8                THE WITNESS:  Your Honor, I'm here as an expert on

9   the white supremacist movement, not on China.  So it seems like

10  a fairly bizarre question.

11               MR. SMITH:  Well, I was talking about whites.  Do you

12  think whites should --

13               THE COURT:  I think he's asking you only white --

14  only -- I'm not sure what you're asking.

15               MR. SMITH:  I got you, Your Honor.  I understand why

16  it's confusing.

17  BY MR. SMITH:

18  Q    It's just -- the question is:  Do you believe that every

19  race should have their own ethnostate, except for whites?

20  A    Do I believe that every race should have their own

21  ethnostate but whites?  Is that the question?

22  Q    Yeah.  Sure.  That's good.  We can start with that.

23  A    No.  No, I don't believe that.

24  Q    Do you think that other races should be entitled to have

25  ethnostates in their ancestral homelands?

P. Simi - Cross

1          MS. KAPLAN:  Your Honor, this is really far afield.

2          THE COURT:  That's sustained.  You're getting too far

3  away.  That's not -- he's answered your first question.

4          MR. SMITH:  I can't imagine how this is far afield.

5   BY MR. SMITH:

6  Q     Okay.  So you were talking about impression management;

7  that was a phrase you used?

8  A     That's correct.

9  Q     That seemed to me -- and correct me if -- you know, I

10  could be mistaken about this, but the way you were describing

11  it, it seemed just like that was like any PR firm, you know,

12  like, public relations.  It seemed like that was exactly what a

13  PR firm would do, right?

14  A     Yeah, as we stated, front and backstage are not unique

15  to -- these terms aren't unique to the white supremacist

16  movement.  Impression management isn't, either, and as you just

17  stated, neither is PR.

18  Q     Right.  It's so common it's literally its own industry.

19  A     I don't --

20  Q     I don't know.  Is it -- is it just a problem when

21  pro-white advocates engage in it?  Is it then somehow nefarious

22  and wrong?

23  A     I'm not clear on your question.

24  Q     Is impression management some sort of problem when

25  pro-white advocates engage in it?

166

P. Simi - Cross

1  A    We're here to offer an opinion about the core

2  characteristics about the white supremacist movement.  One of

3  those core characteristics is the front and backstage aspects

4  of the behavior that we're discussing today.

5  Q    You know, that's -- I'm glad you brought that up, that

6  front backstage thing.  That is perfect because, did you

7  know -- and I learned this only recently -- did you know that

8  in Japan there's something called honne and tatemae -- I think

9  that's how you say it -- and honne refers to a person's true

10  feelings and desires, and tatemae refers, contrastingly, to the

11  behavior and opinions one displays in public?  It's a

12  distinction that started to be made in the post-war era.  And

13  in fact, this is considered by -- this divide of -- this

14  public/private divide is considered by some to be of paramount

15  importance in Japanese culture.

16      Did you know that?  I just found this out.

17          MS. KAPLAN:  Your Honor, objection.  He's not an

18  expert on Japanese culture.

19          THE COURT:  Well, he has not passed judgment on the

20  backstage and front stage.  He's just saying that --

21          MR. SMITH:  Your Honor, but I think he has.

22          THE COURT:  Well, he said --

23          MR. SMITH:  Oh, but I think he has passed judgment,

24  Your Honor.

25          THE COURT:  Wait a minute.  He agreed with you that

P. Simi - Cross

1   that's -- that PR firms do this.

2            MR. SMITH:  So the front stage/backstage thing, it

3   exists and it's totally -- he's totally fine with it?  Because

4   it doesn't seem like he's totally fine with it.  It seems like

5   he's upset with --

6            THE COURT:  Well, he doesn't have to be fine with it.

7   He's just explained his opinion.

8            MR. SMITH:  Okay.  So he's explaining something that

9   exists in, like, every aspect of every culture, and -- okay.

10  Fine.

11  BY MR. SMITH:

12  Q    I'm curious about this one.  Did you say "the 12 million"

13  earlier?

14  A    Can you be a little bit more specific?  12 million what?

15  Q    I think -- I don't know.  You said -- I remember hearing

16  the phrase "the 12 million."  I was just checking on that.  Do

17  you remember what I'm talking about?

18  A    You're going to have to refresh my memory.

19  Q    It was a little earlier.  You know, I'm thinking that

20  somebody else might be able to ask you about that.  I'll just

21  mark that as --

22  A    Okay.

23  Q    -- nonresult.  So have you ever seen a terrorist try to

24  claim self-defense before?  You were talking about how, you

25  know, there appears to be a plan where somebody is going to,

P. Simi - Cross

1   like, I don't know, run people over and then try to claim

2   self-defense for that.

3           THE COURT:  Wait a minute.  You've asked -- you asked

4   one question.  Then you went on to something else.  You asked

5   about a terrorist.  What was your question?

6           MR. SMITH:  I was just going through some assorted

7   questions.  I'm sorry they didn't thread together, Judge.  Some

8   of these are -- there was a lot to ask him about in his direct.

9    BY MR. SMITH:

10  Q    So, let's see here.  Oh, you're not a psychiatrist, right?

11  A    No, I'm not, sir.

12  Q    Okay.  You're not a psychologist either?

13  A    No, I'm not, sir.  I'm a sociologist.

14  Q    So you're not a medical doctor of any kind?

15  A    No.  I have a Ph.D.  I'm not a medical doctor.

16  Q    Okay.  So you were talking about how whites view Jews as

17  an outgroup.  Do other races view races other than their own as

18  an outgroup?  Is that a common thing amongst races, if you

19  know?

20          MS. KAPLAN:  Objection, Your Honor.

21          MR. SMITH:  I don't know, Your Honor, if he's an

22  expert in that or not.

23          MS. KAPLAN:  Very vague, Your Honor.  I'm not sure I

24  understand.

25          THE COURT:  You can answer.

P. Simi - Cross

1          MR. SMITH:  He was talking about how there's ingroup

2    outgroup behavior, and he talks about it in whites.  I was just

3    wondering if he's aware of any other races that engage in that

4    behavior.  Like are any other races tribal --

5          THE COURT:  Can you answer the question?

6          THE WITNESS:  Okay to answer?

7          THE COURT:  Yes, answer the question.

8          THE WITNESS:  Ingroup/outgroup dynamics are certainly

9    not restricted to white supremacists.

10   BY MR. SMITH:

11   Q    So you know Israel has an ethnostate now?  Ever since I

12   think like 1948 or somewhere in the late --

13         THE COURT:  Mr. Smith, he's not here to say what's

14   good or bad.  He just said that he did the research on what he

15   called the white supremacy situation.

16         MR. SMITH:  I know, Your Honor.

17         THE COURT:  They fit a certain criteria.

18         MR. SMITH:  I get what you're saying.

19         THE COURT:  He didn't express any opinion as to

20   whether it was good or bad.

21         MR. SMITH:  Well, he did testify that part of this

22   whole white supremacist thing is that whites -- it's anyone who

23   wants an ethnostate for whites in any form, no matter how small

24   it would be, they would be a white supremacist.  And I'm just

25   wondering -- so Israel has an ethnostate.  Are its citizens,

P. Simi - Cross

1  like, Jewish supremacists?  Is that how that works?

2          THE COURT:  Maybe --

3          MR. SMITH:  I think it's a fair question.

4          THE COURT:  If he understands --

5          MR. SMITH:  Sure.

6          THE COURT:  -- let him answer.

7          THE WITNESS:  Sir, actually, you mischaracterized the

8  testimony.  The testimony was that one of the primary goals of

9  the white supremacist movement is to essentially develop or

10 create a white homeland.  I didn't say that -- I'm not sure

11 exactly how you phrased it, but anyway, that's the testimony,

12 that one of the primary goals of the white supremacist movement

13 is the creation of a white homeland.

14 BY MR. SMITH:

15 Q   You have no view on -- you have no normative view on the

16 creation of a white homeland or the existence of a white

17 homeland?

18 A   I'm not here to talk about norms as it applies to myself.

19 I'm here to talk about my opinion and Professor Blee's opinion

20 on the white supremacist movement.

21 Q   I don't know if you remember this.  Hillary Clinton, she

22 got skewered by the media or something because she said

23 something about a public/private -- just having a

24 public/private distinction, it being important.  And people

25 were very angry about that.  I was just wondering, was that --

P. Simi - Cross

1   was she a white supremacist?  It's front-stage/backstage stuff,

2   right?

3            MS. KAPLAN:  Your Honor, objection.

4            THE COURT:  Well, Mr. Smith, that's just -- the

5   question makes no sense.

6            MR. SMITH:  Sorry, Your Honor.  I'll withdraw it.

7            THE COURT:  He has said that front-stage/backstage

8   does not -- is not confined to white supremacy.

9            MR. SMITH:  Okay.  You know what?  That was -- I

10  think that was my bad handwriting.  I probably misread that

11  one.  Sorry.  I'm coming up to the end.  Maybe one or two more.

12   BY MR. SMITH:

13  Q    So you mentioned that another form of white ethnostate

14  would be, like, where there would be, like, a supermajority

15  white population and then there would be minorities that

16  would -- they would live there, but they wouldn't be citizens

17  or have voting rights necessarily.  Does that characterize it

18  correctly?

19  A    That's consistent.  They'd be subordinated to white

20  authority in a very formal respect, something like -- well, go

21  ahead.

22  Q    Well, I was going to say, there is this place -- and, you

23  know, I've never been there, but it's called Singapore, and

24  they have -- that's the setup that they have there pretty much.

25  You've heard of that, right?

P. Simi - Cross

1          MS. KAPLAN:  Your Honor, now we're talking about

2    Singapore?

3          MR. SMITH:  Well, it's just -- that's the thing that

4    he says is horrible.  It would be the worst thing ever if white

5    people were to have an ethnostate of this type, but Singapore

6    has it and people seem to like it.

7          THE COURT:  Mr. Smith, you're mischaracterizing the

8    testimony.

9          MR. SMITH:  Okay.  Sorry, Your Honor.

10    BY MR. SMITH:

11   Q    So you know the protester digester, whatever that was?

12   You know what I'm talking about?  That image.  I don't know

13   who --

14   A    Yes, sir.

15   Q    -- you know that's not a real thing, right?  Okay.

16   A    I'm sorry.  I said yes, sir, I know what you're talking

17   about.  What's the question?

18   Q    You know that's not a real thing, right?  That doesn't

19   actually exist, right?

20   A    Thank you.

21   Q    I mean, you were aware of that, right?

22   A    That that farm equipment doesn't exist; is that your

23   question?

24   Q    Well, I don't know, the protester digester, that's not a

25   thing.  You're aware of that, right?

P. Simi - Cross

1  A    I know that there was an image of a piece of farm

2  equipment that I assume is a real thing, yeah, that there is

3  farm equipment that would resemble something to that effect.

4  Q    And you would -- okay.

5  A    That's how I described it when I described the image.  I

6  said it was farm equipment.

7  Q    I see.  Does that seem realistic to you, like a realistic

8  scenario?

9  A    I think you're missing the point.

10  Q    I don't know.  Is there a point?

11        MS. KAPLAN:  Your Honor, please direct Mr. Smith.

12  This isn't a conversation.  It's Q and A.

13        THE COURT:  Well --

14        MR. SMITH:  I like to think of cross-examination as a

15  conversation between the attorney and the witness.

16        THE COURT:  I know you might like to think so but --

17        MR. SMITH:  Sorry, Your Honor.

18        THE COURT:  -- you ask questions, let him answer.

19        MR. SMITH:  Okay.  I was just trying to keep it

20  lively for everybody.  I'm sorry.

21   BY MR. SMITH:

22  Q    Have you received any money from any -- do you receive any

23  money from organizations known as the ADL or the SPLC?  I can

24  ask those one at a time if you -- like, do you receive any

25  money from the ADL, the Anti-Defamation League?

P. Simi - Cross

1    A    No, sir, I have not.

2    Q    Do you receive any money from the SPLC or the Southern

3    Poverty Law Center?

4    A    No, sir, I have not.

5    Q    Do you work with anyone who does, if you know?

6    A    I wouldn't know, sir.  That's not a question I would

7    normally ask.

8    Q    Simon Wiesenthal Center?

9    A    No, sir.

10   Q    Any other similar organization that I haven't mentioned?

11              MS. KAPLAN:  Objection.

12              THE COURT:  Overruled.

13   BY MR. SMITH:

14   Q    Any other -- any other pro-Jewish organization that I

15   haven't mentioned?

16   A    I don't even know what that means, sir.

17   Q    What pro-Jewish means?

18   A    Yeah, I mean, do you care to define that?

19   Q    Well, what does pro-black mean?

20              MS. KAPLAN:  Your Honor, if he wants to ask him

21   whether he knows anyone who received money from organizations,

22   he can say what they are.

23              THE COURT:  Ms. Kaplan, let -- the witness --

24              MR. SMITH:  He has to know what --

25              THE COURT:  He can answer the question.  But

P. Simi - Cross

1   Mr. Smith --

2           MR. SMITH:  She does this every time, Judge.  I feel

3   like -- it is relevant.

4           THE COURT:  You don't have to go through every list.

5           He's asking you, I think --

6           MR. SMITH:  You're right.

7           THE COURT:  -- do you receive any income or money

8   from any organization that supports Jewish issues.

9           THE WITNESS:  Not that I'm aware, sir.

10   BY MR. SMITH:

11  Q   Okay.  So this is -- like, this is my last sort of line of

12  questioning here.

13      All right.  So there's a lot of talk in this whole thing

14  about -- I think there was a lot of talk in the Discord or on

15  Twitter or whatever about gassing the kikes, right?  Right?

16  A   That's correct.

17  Q   I think that was something that you -- right.  Okay.  And

18  this is supposed to be some sort of phrase that gets used a

19  lot.  So you said that you were embedded with the Nazis for 20

20  years or something, right?

21          MS. KAPLAN:  Objection, Your Honor.

22          MR. SMITH:  I thought that was what the -- there was

23  something about --

24          THE COURT:  Overruled.  He didn't say Nazis, to my

25  recollection, but he can --

P. Simi - Cross

1          MR. SMITH:  Oh, like, well, you know, I was just --

2          THE COURT:  -- answer the question.  White

3    supremacists.

4    BY MR. SMITH:

5    Q    Yeah, whatever, like, you know, whatever groups you

6    were -- you know, you did that for like 20 years, right?

7    A    Yes.  The embedding was done between 1997 and 2004.

8    Additional research including intensive life history interviews

9    have been done since then, to the present.

10   Q    And you say that they're saying this phrase all the time

11   and -- are they doing that all the time?

12   A    Can you restate the question?

13   Q    Yeah.  So you say -- you said that they say this phrase

14   all the time.  Do they do it all the time; i.e. do they gas the

15   kikes all the time?

16   A    Members of the white supremacists, including folks that I

17   spent substantial amounts of time with, have extensive violent

18   histories that includes involvement in hate crimes, domestic

19   terrorism, and the like.  So I suppose the answer is actually

20   yes.

21   Q    Right.  I was speaking -- I was speaking specifically

22   about gassing the kikes; i.e, in other words, gassing, killing

23   with poison gas Jews.  That's what I'm -- that in particular,

24   because that's what that means, right?

25   A    Well, it is a reference to violence certainly more

P. Simi - Cross

1   broadly.  But as far as your question, I am not aware of any of

2   my research subjects, to use your words, actually using gassing

3   to kill Jewish people.

4   Q    Well, wait a second.  But wait.  Because there was a post.

5   I remember there was a post from Discord.  It was that guy

6   Azzmador -- I forget his last name -- Robert Ray or something.

7   He said something about having gassed six kikes.

8   A    Well, he's not a research participant.  I thought you were

9   asking me about folks that I studied.

10  Q    Yeah, but he said --

11              THE COURT:  Wait.  Wait.  Wait.

12              MR. SMITH:  Well, he was in --

13              THE COURT:  Mr. Smith, you asked him were the people

14  gassing the kikes all the time.

15              MR. SMITH:  Right.

16              THE COURT:  The answer to that was no.

17              MR. SMITH:  Right.

18              THE COURT:  And you know that --

19              MR. SMITH:  Right.

20              THE COURT:  -- so you don't have to go beyond that --

21              MR. SMITH:  Well, he said -- right, Your Honor.  He

22  said he's never seen it.  But this guy Azzmador, he had this

23  post on Discord where he said --

24              (Overlapping speakers.)

25              THE COURT:  Now you're saying Azzmador said something

178

P. Simi - Cross

1  and he --

2          MR. SMITH:  Well, he said he --

3          THE COURT:  -- that doesn't impeach this witness.

4          MR. SMITH:  Well, nobody knows -- I mean, like, what

5  did Azzmador mean?

6          THE COURT:  All right.  Look --

7          MR. SMITH:  Did he mean that he did it?

8          THE COURT:  Look, Mr. Smith, go to another subject.

9          MR. SMITH:  I thought this -- I thought --

10          THE COURT:  Go to another subject.

11          MR. SMITH:  I'm sorry, Your Honor.  I thought this --

12          THE COURT:  Go to another subject.

13          MR. SMITH:  All right.  All right.  I will.  I just

14  thought -- I thought this guy was the code reader.  He was like

15  the Mentalist.  And I'm just -- I'm disappointed.  I'm sorry.

16  I have no further questions, Your Honor.

17          THE COURT:  All right.  Thank you.

18                    CROSS-EXAMINATION

19   BY MR. CANTWELL:

20  Q    Good afternoon, Mr. Simi.

21  A    Good afternoon, Mr. Cantwell.

22  Q    Part of your report, you said that the white supremacist

23  movement is characterized by a high degree of internal

24  conflict; is that right?

25  A    That's correct.

P. Simi - Cross

1  Q    Suffice it to say it's difficult to paint us all with a

2  broad brush?

3  A    There are common core characteristics, but certainly there

4  are also internal differences.  That's fair.

5  Q    You also said it's highly decentralized, yet coordinated;

6  is that right?

7  A    Yes, that's correct.

8  Q    In the course of your research of the subject matter, have

9  you come across what might be described as antisemitic

10 conspiracy theories?

11 A    Within the white supremacist movement?

12 Q    Yeah.

13 A    Very much.

14 Q    Is the theory of Jews being responsible for capitalism and

15 communism one of those things?

16 A    There is discussion of both of those things, that's

17 correct.

18 Q    Do you find in the white supremacist movement that

19 they're -- the targets of their enmity, they're often trying to

20 have it both ways?

21 A    Yes.  And oftentimes within extremist ideologies there are

22 kind of internal inconsistencies that seem from the outside a

23 little bit odd, but within the movement they seem to be able to

24 navigate and negotiate those inconsistencies quite well.

25 Q    Within extremist movements there's these sort of apparent

P. Simi - Cross

1  internal inconsistencies, you said?

2  A    Yeah, if you look at the broader study of extremism, this

3  is not an uncommon thing to be observed.

4  Q    Prior to being contacted in relation to this lawsuit, how

5  many full episodes of the Radical Agenda had you listened to?

6  A    I would say probably a couple.  I mean, you know, maybe --

7  yeah, not a huge number certainly.  Not nearly as many as I've

8  listened to since working on the case.

9  Q    So prior to being contacted for this lawsuit it's your

10 testimony today that you've listened to two full episodes of

11 the Radical Agenda from beginning to end?

12 A    No, because I couldn't tell you exactly how many.

13 Q    Is it less than five?

14 A    Yes.

15 Q    Okay.  Is it more than one?

16 A    That's fair to say.

17 Q    Okay.  And after being contacted for this lawsuit you've

18 listened to more full episodes of the Radical Agenda?

19 A    That's correct.

20 Q    About how many?

21 A    Quite a few.  We had -- I don't have the exact number off

22 the top of my head.  Again, you have to keep in mind we

23 reviewed literally thousands and thousands of documents as part

24 of this analysis.

25 Q    I'm talking about a podcast here.  It's pretty different

P. Simi - Cross

1  from a document.  Would it be more than 20 episodes?

2  A    Approximately.  I would say around -- no, I would say less

3  than that.

4  Q    Less than 20 episodes?

5  A    Yeah, I would say in the dozen, in that kind of --

6  Q    Somewhere -- somewhere between ten and 15?

7  A    That's fair.

8  Q    Who decided which episodes of the Radical Agenda you were

9  going to listen to?

10 A    Keep in mind, you're asking questions of myself, but I had

11 a partner.  We divided up the labor in various ways in terms of

12 all the different material.  So I guess you'd have to repeat

13 your question again.

14 Q    Who decided which episodes of the Radical Agenda you were

15 going to listen to?

16 A    That would have been between Professor Blee and myself, we

17 developed a strategy for going through the material.

18 Q    Was this material given to you by the plaintiffs' counsel

19 in this case?

20 A    All of the material we reviewed for this case was provided

21 to us.

22 Q    Okay.  So you didn't go on christophercantwell.com and go

23 find the Radical Agenda.  This was given to you by plaintiffs'

24 counsel, right?

25 A    Yeah, as I said, all of the material was.

P. Simi - Cross

1  Q     Before this lawsuit as well?

2  A     No, of course not.

3  Q     But you had listened to the Radical Agenda -- full

4  episodes of Radical Agenda prior to being contacted by

5  plaintiffs' counsel, right?

6  A     That's a fair statement.

7  Q     And who decided which of those episodes you would listen

8  to?

9  A     For the case?

10 Q     Prior to being contacted for this lawsuit.

11 A     I mean, it was -- it would have been -- I mean, I review a

12 substantial amount of material related to the white supremacist

13 movement on a regular basis in order to essentially continue to

14 try and monitor and look for kind of current trends and aspects

15 of the culture.  Now that I'm not doing embedded fieldwork, I

16 continue to look at things online.  So, you know, it's a lot of

17 reviewing this type of material.

18 Q     Is this material sometimes fed to you by activists?

19 A     No.  I don't conduct research with activists in terms of

20 them feeding me material.  That's not part of any research

21 methodology I'd ever utilize.

22 Q     What is the research methodology by which you've decided

23 to listen to the Radical Agenda?

24 A     For this case?

25 Q     Prior to this case.

P. Simi - Cross

1    A    Prior to this case, I wasn't necessarily -- I was trying

2    to maintain some degree of familiarity with different aspects

3    of the movement.  So it wasn't that I was necessarily

4    conducting a specific analysis of the Radical Agenda.  It would

5    be more this is something that seems to be related.  Let's get

6    a better sense of and try to understand it a little bit better.

7    Q    Prior to being contacted by plaintiffs' counsel, the

8    episodes you listened to, can you tell me anything specific

9    about those episodes?

10   A    Well, I mean, in general the material we reviewed related

11   to the Radical Agenda has a lot of -- a substantial amount of

12   antisemitism.  There are more broad themes as it relates to,

13   you know, racism, white supremacy.  Can I recite to you an

14   episode off the top of my head?  I'm sorry, I can't do that.

15   Q    Can you tell us anything about the Radical Agenda that

16   isn't boilerplate white supremacist commentary?

17   A    I guess I don't understand the question.

18   Q    You've answered it.  Thank you.

19        Are you familiar with Ibram X. Kendi?

20   A    Yes.

21   Q    Michelle Alexander?

22   A    Yes.

23   Q    Robin DiAngelo?

24   A    Yes.

25   Q    Would it be fair to broadly characterize their work as

P. Simi - Cross

1    critical race theory?

2    A    This is quite a controversial topic, isn't it?

3    Q    Indeed it is.

4    A    You would I think better be positioned to ask them

5    themselves how they characterize themselves and where they

6    would fall in terms of whether they think they see themselves

7    and their work as critical race theory.

8    Q    Does critical race theory influence your work at all?

9              MS. KAPLAN:  Your Honor.

10             THE COURT:  He can answer that.  I mean, I'm not

11   saying it's a proper question.  I'm just saying he can answer

12   it quicker than I can deal with it.

13             MS. KAPLAN:  I hear you, Your Honor.

14             THE COURT:  Go ahead.

15             THE WITNESS:  Go ahead?

16             THE COURT:  Yes.

17             THE WITNESS:  I'm certainly aware of critical race

18   theory.  I've read work that's described as critical race

19   theory by the legal scholars themselves who initiated this

20   framework back in the '70s, '80s.  So I'm certainly aware.  As

21   part of my graduate school training, certainly read articles

22   associated with that body of work.

23   BY MR. CANTWELL:

24   Q    Would it be fair to say that an understanding of critical

25   race theory is important to understanding white supremacy?

P. Simi - Cross

1  A    I think that's -- partially.  I would say partially.  I

2  think you could -- certainly there are people, myself included,

3  who have studied the white supremacist movement that, you know,

4  really haven't necessarily specifically utilized the framework

5  of critical race theory.  But certainly critical race theory

6  would provide a vantage point for looking at the white

7  supremacist movement.

8  Q    Would it be fair to say that critical race theory views

9  American society as a fundamentally white supremacist

10  institution?

11          MS. KAPLAN:  Your Honor, we're really getting far

12  afield.

13          MR. CANTWELL:  He's an expert on white supremacy.

14          THE COURT:  He is not testifying as to what's good

15  and what's bad.  He's testifying that in his study of white

16  supremacy movement and so forth, that there are these

17  particular criteria or particular factors appear.  And I don't

18  think he's been called upon to pass judgment.

19          MR. CANTWELL:  Judge, I'm not asking him to make a

20  value judgment.

21          THE COURT:  But you're not going to go down the road

22  with critical race theory.  I mean, is it necessary to his

23  opinion?  Unless he says it's necessary --

24          MR. CANTWELL:  If I could just have a moment to

25  explain my train of thought here.  If you want to do sidebar,

186

P. Simi - Cross

1    I'd be happy to do that.

2              THE COURT:  Let's go on.

3     BY MR. CANTWELL:

4    Q    It's your view that the white supremacist movement is

5    categorized by violence, right?

6    A    It's a core characteristic.

7    Q    Are you aware of other definitions of white supremacy that

8    don't view it that way?

9    A    Not the white supremacist movement.  It seems to be you're

10   now kind of pivoting to a broader usage of the term.

11   Q    People like Robin DiAngelo would say that the status quo,

12   the normal state of affairs in the United States is white

13   supremacy, right?

14             MS. KAPLAN:  Your Honor, this is so far afield.

15             MR. CANTWELL:  It's not.

16             THE COURT:  Well, look, you're debating whether white

17   supremacy is good or bad.

18             MR. CANTWELL:  That's not what I'm doing.  I'm

19   debating whether it's violent.  And whether it's violent is at

20   the heart of his testimony.  Whether it's violent.  I'm not

21   asking him to say yes or no.  Maybe he thinks violence is good,

22   for all I know.  That's not the question.

23             MS. KAPLAN:  He just explained, Your Honor --

24             MR. CANTWELL:  He's saying -- excuse me.

25             THE COURT:  Look.  Look.  Ms. Kaplan, please.  It's

187

P. Simi - Cross

1    hard enough to deal with --

2              (Overlapping speakers.)

3              MR. CANTWELL:  Give me one moment to explain my train

4    of thought, please.

5              THE COURT:  Yes.

6              MR. CANTWELL:  Okay.  I'm not asking him to say good

7    or bad.  I'm not trying to get good or bad out of him.  He is

8    here to say that the white supremacist movement is

9    characterized by violence, okay?  There are other definitions

10   of that term and there are other people who see it differently

11   who are considered experts in their field.

12             And so I'm asking him about specific -- a specific

13   point of view that says America is a fundamentally white

14   supremacist society.  And I want to discuss that frame of

15   thought with the expert.

16             THE COURT:  You can ask him if he's aware of it.

17   It's not going to be a discussion between him and you about

18   that because that's not the subject.  You can ask him if there

19   are other people that have other opinions, other experts that

20   have other opinions.  That's fine.  But we don't have to get

21   into everybody else's opinion in any sort of depth.

22             MR. CANTWELL:  It's not my goal to get into everybody

23   else.

24             THE COURT:  Go ahead.

25    BY MR. CANTWELL:

P. Simi - Cross

1  Q    So, would it be fair to say that experts in their field

2  who look at things through the framework of critical race

3  theory view America as a fundamentally white supremacist

4  institution?

5  A    There are lots of discussions as part of the critical race

6  theory framework that discuss institutional racism or

7  institutional white supremacy.  I think I may be able to help

8  out, though, here.  Our opinion is not about that.  It's about

9  the white supremacist movement.  To my knowledge, I know of no

10 one -- no scholar who studies the white supremacist movement

11 that doesn't also focus on the extent to which violence is at

12 the core of that movement.

13 Q    Okay.  Thank you.

14 A    Sure.

15 Q    When is a racist joke just a joke?

16 A    Our opinion is not focused on making individual

17 determinations about this issue.  Our opinion is about the

18 cultural importance of humor, and in particular violent humor,

19 within the white supremacist movement, and the extent to which

20 there are pretty clear indications of double meanings.  I think

21 we looked at the *Daily Stormer* guide where you have these very

22 clear statements within the movement where humor is meant to

23 convey these double meanings.

24 Q    That's the *Daily Stormer* style guide you're referring to.

25 A    That's just one example, but that is a very clear example.

189

P. Simi - Cross

1  Q    How did you come into possession of the *Daily Stormer*

2  style guide?

3  A    Again, all the material we reviewed for this case was

4  provided to us.

5  Q    So the plaintiffs provided you with all the Radical Agenda

6  episodes, all the Discord posts, and the *Daily Stormer* style

7  guide?

8  A    The attorneys that we worked with provided us the

9  materials for us to review.

10  Q    Do you know how the plaintiffs came into possession of the

11  *Daily Stormer* style guide?

12  A    No, sir, I do not.

13  Q    Do you know how the *Daily Stormer* style guide became

14  public?

15  A    Off the top of my head, I do not.

16  Q    But the *Daily Stormer* style guide is public, isn't it?

17  A    That's a fair statement.

18  Q    So the *Daily Stormer* style guide is front-stage behavior,

19  is it not?

20  A    I think you're misunderstanding front-stage.  Something --

21  just because it's out in the public doesn't mean it's

22  front-stage.

23  Q    So public behavior not front-stage behavior, you might

24  understand how I could be a little bit confused by that.  Can

25  you help me out?

P. Simi - Cross

1  A    Sure.  These terms are -- like I said, they are

2  sociological terms that are used to understand and explain

3  human behavior.  So that's understandable.

4  Q    Could you help alleviate my confusion?

5  A    Sure.  So you indicated that the style guide was made

6  public.

7  Q    It was, right.  And so is this not something that the

8  publisher sought to convey to the public?

9  A    At that point, yes.

10 Q    Okay.  So the *Daily Stormer* style guide is an example of

11 front-stage behavior?

12 A    It has -- well, in the public realm -- first of all, you

13 would have to define "public."  How public are we talking?

14 Q    The *Daily Stormer* style guide, I've seen this published by

15 the *Huffington Post*, so I'd go ahead and say it seems to me

16 this is pretty public.  Are you disagreeing with that

17 assessment?

18 A    No, that's fair.

19 Q    So this is front-stage behavior, right?

20 A    Not necessarily, because it has, again, aspects in it that

21 were meant for insiders in terms of those, you know, that are

22 described as "in the know" to, you know, essentially lay out

23 these kind of directives that are in the guide.  Does it

24 have -- once it's out in the public domain, it does have some

25 front-stage aspects at that point.

P. Simi - Cross

1  Q    Just so we're clear -- let me find the operative portion

2  of this before we move on.  Here we go.

3           MR. CANTWELL:  Can I show this on my screen to the

4  witness here?  I'm on the VGA line.

5           THE WITNESS:  Okay.

6           MR. CANTWELL:  Now, I think -- this is in evidence,

7  right, *The Daily Stormer* style guide?

8           MS. KAPLAN:  It is, Your Honor.

9           MR. CANTWELL:  Can we publish this to the jury,

10  please?

11   BY MR. CANTWELL:

12  Q    So I think when you were questioned by plaintiffs'

13  counsel, we were looking under the section called "Lulz."  Does

14  that ring a bell to you, sir?

15  A    That's right, sir.

16  Q    And we addressed the point where he said:  "This is

17  obviously a ploy and I actually do want to gas kikes.  But

18  that's neither here nor there," right?

19  A    Yes.

20  Q    Did you categorize that as backstage behavior while you

21  were discussing it with plaintiffs' counsel?

22  A    We used this as an example, actually, of doublespeak, in

23  the sense of that there are double meanings here and it's an

24  intentionally deceptive type of communication where -- you

25  know, basically suggesting one thing for one audience and

192

P. Simi - Cross

1  something that would have a different meaning for another

2  audience that might not have the same information.

3  Q    Okay.  And the section here is titled "Lulz."

4       "Lulz" is some kind of internet slang; is it not?

5  A    That's my understanding.

6  Q    Do you know what "lulz" means?

7  A    I believe it refers to, essentially, internet humor,

8  issues related to internet humor.

9  Q    So under the section titled "Lulz," Andrew Anglin, the

10  publisher of *The Daily Stormer*, said:  "This is obviously a

11  ploy and I actually do want to gas kikes."  And this is

12  doublespeak, right?

13  A    It is a type of doublespeak, our understanding.

14  Q    *The Daily Stormer*, they're a defendant in this suit,

15  right?  You know that?

16  A    That's my understanding.

17  Q    And you were able to look at discovery in this case?

18  A    Yes, the materials that we were provided.

19  Q    Did you receive any discovery from *The Daily Stormer*?

20  A    We were provided materials by the attorneys and we

21  reviewed that material.

22  Q    Did you read any of Andrew Anglin's internal emails?

23  A    Again, based on how much information we went through, not

24  off the top of my head.  But that is a difficult question to

25  answer in terms of every specific type of material that we went

P. Simi - Cross

1   through.

2   Q    Would it be fair to say that you don't recall reading any

3   private communications pertaining to the Defendant *The Daily*

4   *Stormer*?

5   A    That would be fair.

6   Q    Okay.  So you don't really know what *The Daily Stormer*

7   does backstage at all, do you?

8   A    Is that a question?

9   Q    Yes.

10  A    I think that's -- I would say that's an inaccurate

11  characterization.

12  Q    What do you know about *The Daily Stormer*'s backstage

13  behavior?

14  A    I think this style guide gives a pretty good indication of

15  some aspects of --

16  Q    This public style guide gives you an aspect of what *The*

17  *Daily Stormer* does behind the scenes?

18  A    Well, it gives us a sense of the kind of motivations, some

19  of the tactics, strategies in terms of what *The Daily Stormer*

20  would like to do as far as how it would like to proceed.

21       We, of course, went through the document earlier, in

22  addition to this, discussed that during the direct testimony,

23  that provided directives that were pretty clearly indicative of

24  backstage recommendations in terms of behavior, about how to

25  proceed in a more secretive, guarded manner in terms of using

P. Simi - Cross

1  things to try to conceal your identity and communicate in ways

2  that would be more protected.

3  Q    Oh, so now you're talking about the Operational Security

4  for Right-Wing Rallies.  That's a different document, right?

5  A    Yes.

6  Q    And that was also published publicly, right?

7  A    Yes.

8  Q    Okay.  We can take my screen down, if you would, please,

9  from the jury.

10      And so that was published on *The Daily Stormer*, July 31st,

11  2017, right?

12  A    I believe that's true.

13  Q    This is -- I think you have the binder there.  It's

14  PX-2777, right?

15  A    Okay.

16          MS. KAPLAN:  Your Honor, we're happy to publish this

17  before the jury.

18          MR. CANTWELL:  Well --

19          MS. KAPLAN:  If Mr. Cantwell wants to open the door,

20  we're happy to publish this before the jury and move to admit.

21   BY MR. CANTWELL:

22  Q    Who wrote that piece?

23  A    It says "weev."

24  Q    You know who weev is, right?

25          THE CLERK:  I'm sorry, are we admitting it and

P. Simi - Cross

1  publishing it?

2           THE COURT:  No, not yet, unless Mr. Cantwell wants it

3  published.

4           MR. CANTWELL:  I'm not trying to publish this to the

5  jury.

6   BY MR. CANTWELL:

7  Q    You know who weev is?

8  A    Yes, sir.

9  Q    What's his real name?

10 A    Andrew Auernheimer.

11 Q    Auernheimer?

12 A    Excuse me.  I mispronounced it.

13 Q    Do you know if he is a defendant in this case?

14 A    Not to my knowledge, sir.

15 Q    Do you know what country he was residing in when he wrote

16 this article?

17 A    Not off the top of my head.

18 Q    Did you see any discovery from Andrew Auernheimer?

19 A    No, sir.

20 Q    Do you know Andrew Auernheimer's ethnic background?

21 A    Yes.

22 Q    What is it?

23 A    As far as I understand, Jewish.

24 Q    So Andrew Auernheimer is writing for *The Daily Stormer* and

25 he's Jewish, right?

P. Simi - Cross

1    A    Correct.

2    Q    And he is telling people really convenient things for the

3    plaintiffs about destroying evidence, right?

4    A    Can you restate that?

5         MS. KAPLAN:  Your Honor, we move for the admission of

6    the document.  This is -- he can talk about the -- as soon as

7    he goes beyond that, it should be admitted and the juror should

8    see it.

9         MR. CANTWELL:  Excuse me.  I didn't file a lawsuit

10   about race.

11        THE COURT:  No, no, no.

12        Overruled.  Go ahead.

13   BY MR. CANTWELL:

14   Q    Is *The Daily Stormer* -- how did you describe *The Daily*

15   *Stormer*?  What is *The Daily Stormer*, sir?

16   A    Well, it's an organization that's pretty openly neo-Nazi

17   in terms of its beliefs.  Obviously has a webpage.  It has a

18   web presence.  There's Daily Stormer book clubs that have been

19   organized over the years.  They've engaged in various types of

20   gatherings in terms of, not only online, but offline as well.

21   Q    Did you describe them as "one of the most popular neo-Nazi

22   websites on the planet"?

23   A    We described them that way in our report, yes, sir.

24   Q    And weev, Andrew Auernheimer, is a contributor to *The*

25   *Daily Stormer*; is that right?

P. Simi - Cross

1    A    Yes, sir.

2    Q    I think he's been described as the CTO?

3    A    Okay.

4    Q    He's a senior partner in that enterprise of some sort; is

5    that fair, to categorize him as that?

6    A    That seems accurate.

7    Q    And so *The Daily Stormer* is run by a Jew, and he's

8    publishing things for operational security at right-wing

9    rallies that are now being used as evidence against the

10   defendants in this case; is that a fair statement, sir?

11   A    You'd have to --

12             THE COURT:  That's argumentative.

13   BY MR. CANTWELL:

14   Q    Is it a fair statement that *The Daily Stormer*, which is

15   run by a Jew, is now being used as evidence in this case

16   against these defendants?

17   A    It is something we discussed during my direct testimony.

18   It was part of it, the exhibit.

19   Q    And so *The Daily Stormer* style guide, which is from *The*

20   *Daily Stormer*, which is run by a Jew, is your example of

21   doublespeak, right?

22   A    Yes.

23   Q    Okay.  So a Jewish white supremacist is engaging in

24   doublespeak.  Gotcha.

25   A    He would not be the first Jewish white supremacist.

P. Simi - Cross

1   Q    He certainly would not be.  Could you tell me about some

2   more of them?

3   A    Are you familiar with Daniel Burros, a member of the Ku

4   Klux Klan who was Jewish?

5   Q    He was a Jewish Klan member?

6   A    Yes, sir.

7   Q    And what did he do?

8   A    Well, he ultimately committed suicide.

9   Q    Shame.

10       Plaintiffs' 0426 I'm going to bring up here.  Pardon my

11  technical difficulties.  I'll be with you in just a moment.

12  A    Sure.

13  Q    You mentioned that Discord was encrypted.  Did you say

14  that on your direct examination?

15  A    That's my understanding of Discord, is that it's

16  encrypted, or offers encryption.

17  Q    You're not an expert on encryption, are you?

18  A    Absolutely not.

19  Q    Is it your understanding that encryption would make it

20  sort of difficult to sort of have the display that we've had

21  here about Discord?

22  A    I guess I'm not sure what --

23  Q    I'm sorry.  I'll withdraw it.  That's poorly worded.

24  A    Okay.

25            MR. CANTWELL:  Okay.  This is Plaintiffs'

P. Simi - Cross

1   Exhibit 0426, and I believe it's already in evidence.  And if

2   that is the case, then I would -- I'd like to publish it to the

3   jury.  All right?

4           THE COURT:  You may.  Go ahead.

5   BY MR. CANTWELL:

6   Q    So we're looking at this.  You described this image here,

7   the nigger tote.  This was posted by Azzmador, right?

8   A    That's correct.

9   Q    And Azzmador is another contributor to *The Daily Stormer*,

10  right?

11  A    That's correct.

12  Q    And Azzmador is a defendant in this case, isn't he?

13  A    Yes, he is.

14  Q    Do you recall reviewing any discovery provided by

15  Azzmador?

16  A    I guess I'm not sure what you mean by "provided by

17  Azzmador."  We certainly reviewed materials about Azzmador.

18  Q    Did you see Azzmador's private emails?

19  A    Again, we reviewed a lot of different documents.

20  Q    Would it be fair to say that at this moment you can't

21  recall reading of any of Robert "Azzmador" Ray's private

22  emails?

23  A    Right off the top of my head, no.

24  Q    And so when we were going over --

25          THE COURT:  We're going to take a recess now for

P. Simi - Cross

1  20 minutes.

2         MR. CANTWELL:  Okay.  Great.

3  **(Jury out, 3:07 p.m.)**

4            (Recess.)

5         THE COURT:  You may be seated.  You may proceed.

6   BY MR. CANTWELL:

7  Q    Okay.  So as we left, we established that this was --

8  Defendant Robert Azzmador Ray published this image on -- this

9  Discord image.  Do you remember what we're talking about?

10 A    Yes.

11 Q    We established that the thing in the top left of these

12 Discord images, that's the server, right?

13 A    Yes.

14 Q    And what server is this posted in, sir?

15 A    Bowl Patrol.

16 Q    And the channel, what's that?

17 A    #bowlnut_gallery.

18 Q    Would it be fair to say the list of channels almost

19 exclusively have something to do with bowl something on there?

20 A    That seems fair.

21 Q    And we established that the bowl thing, the bowl cut,

22 that's a Dylann Roof reference, right?

23 A    That's correct.

24 Q    How much of the Unite the Right organizing was done on the

25 Bowl Patrol server?

P. Simi - Cross

1  A     I would say it's not a huge portion.

2  Q     Would it be fair to say that you cannot currently recall

3  any Unite the Right organizing that went on in the Bowl Patrol

4  server?

5  A     Again, you're asking me to, you know, off the top of my

6  head.  And it's been quite some time since we reviewed all this

7  material.  So I just want to be careful as far as, you know,

8  being overly specific without that information in front of me.

9  Certainly, like I said in my testimony, it's not a large

10  amount.

11  Q     Okay.  You know who the Bowl Patrol is, right?

12  A     Yeah.  I mean, I guess it depends what you mean by that.

13  Q     The name Vic Mackey ring a bell?

14  A     Yes, it does.

15  Q     What's Vic Mackey's real name?

16  A     Off the top of my head I couldn't tell you.

17  Q     Do you know Vic Mackey's ethnic background?

18  A     Off the top of my head, no.

19  Q     Safe to say none of the defendants in this case are

20  members of the Bowl Patrol, to the best of your knowledge?

21  A     Yeah, I wouldn't be able to answer that question.

22  Q     So to the best of your knowledge, none of the defendants

23  in this case are members of the Bowl Patrol?

24  A     I don't know.

25  Q     So the answer to the question is yes, to the best of your

P. Simi - Cross

1   knowledge, none of the defendants in this case are the Bowl

2   Patrol; is that fair to say?

3   A    I don't think that's a reasonable answer at all.

4   Q    Okay.

5   A    I don't know.  Why would I say --

6   Q    So I say -- would it be fair to say --

7            (Overlapping speakers.)

8            THE COURT:  Wait.  Wait.

9            MS. KAPLAN:  Your Honor.

10           THE COURT:  Look --

11           MR. CANTWELL:  He's answered the question.  You're

12   right.

13   BY MR. CANTWELL:

14   Q    You said that the white supremacist movement takes this

15   image very seriously; is that an accurate representation of

16   your testimony?

17   A    Images like this?

18   Q    Yes.

19   A    Yes, sir.

20   Q    How many nigger totes were sold?

21   A    That's not a question I can answer.

22   Q    You can't say that the answer to that question is zero,

23   sir?

24   A    How would I be able to say that?

25   Q    Okay.  So you're not sure if maybe 500 of these things

P. Simi - Cross

1   were produced and sold to attendees of the Unite the Right

2   rally.  You think that might have occurred?

3   A    Our opinion about this image and others like it is not

4   that they're merchandise that are being sold as we speak.  It's

5   the underlying themes of promoting violence that this image and

6   its dehumanization of those that are considered to be racial

7   enemies or adversaries that are so explicit in both the visual

8   image as well as the text.  That's what our opinion in

9   reference to this specific image is, not about the number of

10  products that were sold or whether it's even sold at all.

11  Q    So -- have you ever written or spoken in favor of laws

12  prohibiting so-called hate speech?

13  A    Have I ever -- can you restate that?

14  Q    Have you ever written or spoken in favor of laws

15  prohibiting so-called hate speech?

16  A    Not to my knowledge.

17  Q    Not to your knowledge or no?

18  A    No.  I mean, unless you have something to show me, as far

19  as I know, no.

20  Q    I'm just interested --

21            (Overlapping speakers.)

22  A    Yeah, no.

23  Q    This report is the first time you've done that, then?

24            MS. KAPLAN:  Objection, Your Honor.

25            MR. CANTWELL:  Withdrawn.

P. Simi - Cross


1          We can take this down from the screen.

2     BY MR. CANTWELL:

3     Q    I'm showing you Plaintiffs' Exhibit 0562.

4          I think this is already in evidence.  Is it?

5               MS. KAPLAN:  I don't think so.

6               MR. CANTWELL:  Okay. well, I know we showed it for

7     him.

8               MS. KAPLAN:  I have no problem with you showing it to

9     the jury.

10              MR. CANTWELL:  That's fine.  If we could just put

11    this up on the screen.

12              (Plaintiffs' Exhibit0562 marked.)

13    BY MR. CANTWELL:

14    Q    Do you recall this, Mr. Simi?

15    A    Yes.

16    Q    Do you want to read to me what we're looking at here?

17    A    "If you kill a Jew, the Jew in you dies with him, I hear.

18    This is a tasteless joke.  Relax, kike."

19    Q    And this is in the alt-right Discord server, right?

20    A    That's correct.

21    Q    And did you testify that you thought that I took this very

22    seriously?

23    A    No.  That was not what was stated.

24    Q    Is this front-stage or backstage behavior?

25    A    This is an example of how humor is used within the white

205

P. Simi - Cross

1  supremacist movement.  As you'll recall, we talk about it in

2  those terms.  We talk about it in the terms of, again, more of

3  a doublespeak type of instance in terms of how humor is both

4  conveying violence and simultaneously making the claim that

5  it's just a joke.

6  Q    So I asked you just a moment ago if it was your testimony

7  that I took this seriously.  And you said that that wasn't your

8  testimony.  Now you're saying that I'm telling other people

9  that it's just a joke, but there's some other purpose?

10 A    Well, you said did I testify.  And the words that you used

11 were not -- I don't recall using those specifically.  But

12 clearly, yes, when you talk about a double meaning and an

13 advocacy for violence, an advocacy for violence is a serious

14 matter.

15 Q    But this seems like front-stage behavior, doesn't it?

16 A    Again, we use this as an instance of doublespeak.

17 Q    Does the parenthetical content of this suggest that I

18 think that Jews are listening?

19 A    Restate that.

20 Q    Does the parenthetical content, the portion of this that's

21 in parentheses, indicate that I think the Jews might be

22 listening?

23 A    Again, our opinion in this case is not to get inside your

24 mind and tell you what you think.  That's not what our effort

25 was.  That's not what our assignment was.  We're looking for

P. Simi - Cross

1   markers of the core characteristics that are representative of

2   the white supremacist movement's culture.

3   Q    What I'm trying to get at is one of those elements of the

4   white supremacist culture, which is the front-stage/backstage

5   behavior.  I'm trying to get you to tell me if you can assess

6   whether this is front-stage or backstage behavior based on the

7   part where I say "this is a tasteless joke, relax kike," as if

8   the Jews are listening.  Do you think that indicates that I

9   think I'm front-stage or backstage?

10  A    I already answered the question that this is an example of

11  doublespeak.

12  Q    Well, does doublespeak happen in front and backstage?  If

13  it's doublespeak, does that have anything to do with

14  front-stage or backstage?

15  A    Doublespeak can occur in both front or backstage.

16  Q    So doublespeak is behavior that we're presenting in the

17  public, right?

18  A    Doublespeak is intentionally deceptive communication where

19  the same message can have one meaning to insiders -- that is,

20  folks who are kind of inside and have contextual understanding

21  of what's meant -- and then simultaneously, that same message

22  can have a different meaning to outsiders who don't have that

23  contextual understanding.

24  Q    I thought you just got done saying you weren't going to

25  get inside my head.  Now you know my intent?

P. Simi - Cross

1              THE COURT:  Look, you're just quarreling with the

2      witness.  Let's move on to another subject.

3              MR. CANTWELL:  You got it.

4      BY MR. CANTWELL:

5      Q    You said the white supremacist movement sees commies as a

6      threat; is that right?

7      A    I'm sorry --

8      Q    Commies?  Commies are a threat to the white supremacist

9      movement?  Or at least white supremacists believe that?

10     A    White supremacists do discuss the threat of commies.

11     Q    Do you believe that's a particularly unique feature of

12     white supremacy?

13     A    I believe white supremacists discuss it substantially and

14     it's a substantial feature of the white supremacist movement.

15     Q    Would it be fair to say that communism has a very broad

16     range of opponents who are not white supremacists?

17             MS. KAPLAN:  Your Honor, again, that's not the point

18     of his testimony.  That's not the point of his report.

19             THE COURT:  Well, I understand that.  Can you answer

20     the question, sir?

21             THE WITNESS:  It's really beyond the scope of my

22     opinion here in this case and certainly my expertise.

23     BY MR. CANTWELL:

24     Q    It's beyond the scope of your knowledge whether people

25     other than white supremacists oppose communism?

P. Simi - Cross

1  A    I'm here as an expert.  So my expert knowledge is, yes, I

2  don't study communism.

3  Q    In your report you're indicating that the seemingly

4  imagined threat of communism is used as a justification for

5  violence by white supremacists.  Is that a fair assessment of

6  what you're portraying?

7         THE COURT:  The word "commie" has been defined other

8  than those who believe in communism in this case.  Other people

9  have been considered commies by some of the witnesses who were

10  not necessarily communists.

11         MR. CANTWELL:  I understand that, Judge.  The

12  witness's report indicates, if not the direct testimony, that

13  the white supremacist movement is -- the implication, anyway,

14  is that we're conjuring up enemies as a justification for

15  initiatory violence.  I would like to analyze that accusation,

16  if I could.

17         THE COURT:  Well, okay, one question.  Let's go.

18   BY MR. CANTWELL:

19  Q    Would it be fair to say that communism has a very broad

20  range of opponents who are not white supremacists?

21  A    I guess we're right back to where we started.

22  Q    Have you ever heard the phrase "better dead than red"?

23  A    I have heard that.

24  Q    Fair to say this catch phrase is not limited to the white

25  supremacist movement?

                                P. Simi - Cross

1   A    That's fair to say.

2   Q    And the implication there is not just that someone will

3   slit their wrist if the wrong guy wins the election, right?

4              MS. KAPLAN:  Your Honor, look at the question.

5              THE COURT:  I think you've gone into this far enough.

6   It's not productive of anything.

7   BY MR. CANTWELL:

8   Q    Did you make any effort to know anything about who and

9   what the defendants claim caused the violence at the Unite the

10  Right rally?

11  A    That was not part of our assignment.

12  Q    Have you ever read Mark Bray's book, *Antifa:  The*

13  *Anti-Fascist Handbook*?

14  A    No, I have not.

15             MR. CANTWELL:  No further questions.

16             THE COURT:  Okay.  All right.  Does anyone else have

17  any?

18             MS. KAPLAN:  Just some very brief redirect.

19             THE COURT:  Okay.

20                      REDIRECT EXAMINATION

21  BY MS. KAPLAN:

22  Q    Just a couple of questions, Professor, in redirect.

23  A    Okay.

24  Q    You mentioned -- and I apologize I don't remember which

25  counsel asked you -- but you mentioned during cross-examination

210

P. Simi - Cross

1   that you knew of Samantha Froelich from this case; do you

2   recall that testimony?

3   A    Yes, I do recall that.

4   Q    Other than watching her video in this case, the video of

5   her deposition testimony in this case, have you ever had any

6   occasion to meet with or otherwise come into contact with

7   Samantha Froelich?

8   A    I have never met her or had any sort of contact other than

9   reading her deposition and viewing it.

10  Q    Now, you testified in response to some questions on

11  cross-examination that you've been offered 33,000 -- excuse me,

12  $30,000 in this case, correct?

13  A    That's correct.

14  Q    As compensation.  And I think you testified, am I correct,

15  that you've worked a thousand hours?

16  A    Approximately.

17  Q    When you work in those other cases that you talked about,

18  the criminal cases that we talked about, what feels like a long

19  time ago, what's your normal hourly rate?

20  A    It ranges, but typically around 250 to $300 an hour.

21  Q    And if you divide $30,000 by a thousand hours, what's the

22  hourly rate you're being paid in this case?

23  A    I'm a little tired so my math is probably not so good, but

24  it's less than normal.

25  Q    Would you agree with me -- and my math is worse than

P. Simi - Cross

1   yours -- would you agree with me that 30,000 divided by a

2   thousand is $30 per hour?

3   A    Yes.

4   Q    Mr. Jones asked some questions of you about something that

5   your partner in this matter, Professor Blee, said in 2014 in

6   Florida; do you recall that?

7   A    Yes, I do recall that.

8   Q    Let me ask you a couple of follow-up questions.

9   A    Sure.

10  Q    Am I correct that you last embedded with members of the

11  white supremacist movement in 2004?

12  A    That's correct.

13  Q    That was 17 years ago?

14  A    That's correct.

15  Q    Fair to say you were a younger man then?

16  A    Quite a bit.

17  Q    Fair to say that you're white?

18  A    It is fair to say that.

19  Q    Fair to say that you're a man?

20  A    That's fair too.

21  Q    Do you think it was easier and safer for you to embed with

22  members of the white supremacist movement than it would have

23  been for Professor Blee?

24  A    Yes, I think that's accurate.

25  Q    Defendant Cantwell asked you a question about PX-2233, I

P. Simi - Cross

1  believe that's it, which was the *Daily Stormer* style guide; do

2  you recall that?

3  A    Yes, I do recall.

4  Q    And there was a lot of questions back and forth about

5  whether it was front-stage and backstage.

6       Isn't it true, Professor Simi, that the *Daily Stormer*

7  style guide was actually leaked after it was written in 2017?

8  A    That's my understanding.

9  Q    Mr. Cantwell also asked you some questions about a

10 document called *The Daily Stormer Operational Security for*

11 *Right Wing Rallies;* do you remember that?

12 A    Yes, I did.

13       MS. KAPLAN:  Don't put that up, Mr. Spalding.

14 BY MS. KAPLAN:

15 Q    You said it was written by a person named "weev"?

16 A    Yes, that's what it states here.

17 Q    You mentioned his real name.  I've already forgotten what

18 it was.  And you said it was written -- I think you recalled it

19 was written July 31 in 2017?

20 A    Yep.

21 Q    I want to show you and show the jury Plaintiffs' Exhibit

22 375, which is already admitted into evidence.  Could you tell

23 the jury what you're looking at here.

24 A    Once again, can we blow it up a little bit.

25      Yeah, so more Discord.

P. Simi - Cross

1  Q    And this is in the Azzmador server?

2  A    That's correct.

3  Q    And there's -- the first message is from Defendant

4  Azzmador?

5  A    Yep.

6  Q    And he's circulating something around?

7  A    Yeah, it looks to be a link to the *Daily Stormer*

8  operational security.

9  Q    For?

10 A    For right wing rallies.

11 Q    And what's the date of that post?

12 A    Appears to be July 31st, 2017.

13 Q    And that was the day, as you'll recall, that the article

14 was written?

15 A    That's correct.

16 Q    And what does Mr. Azzmador say in his very next post,

17 Professor?

18 A    It says, "@everyone, go to your local dollar store or

19 Walmart and get cheap tiki torches for the Charlottesville

20 event.  There will be a torch march."

21        MS. KAPLAN:  No further questions, Your Honor.

22        THE COURT:  All right.

23        MR. KOLENICH:  Your Honor, can I ask a brief

24 follow-up on the subject of the Life After Hate organization?

25        THE COURT:  No, I'm going to stop.

A. Muniz - Direct

1          MR. KOLENICH:  Yes.

2          THE COURT:  You're excused.

3          MS. DUNN:  Your Honor, plaintiffs will next call

4 April Muñiz.  And we also have a number of exhibits to read

5 into the record from a deposition we played last week.  So we

6 could do that while the witness comes to the courtroom.

7          THE COURT:  All right.

8          MS. DUNN:  Your Honor, plaintiffs move from the

9 Rousseau 2019 deposition, PX-2015, PX-387, PX-2018.  From the

10 Rousseau 2020 deposition we move PX-3821, PX-382, PX-386,

11 PX-3822, PX-381, PX-706, PX-355, PX-580, PX-356, PX-3823,

12 PX-465, PX-3824, PX-458, PX-1168, PX-456, PX-467, PX-987,

13 PX-468, PX-383, PX-462, PX-469, PX-715, PX-473, PX-384, PX-476,

14 PX-3825, PX-3829, PX-3830A, PX-2390.  Your Honor, there are

15 several more.  I can finish --

16          THE COURT:  No, finish now.

17          MS. DUNN:  PX-3831, PX-3832, PX-2389, PX-3826,

18 PX-3833, PX-3834, PX-1985A, PX-2861, PX-2862, PX-2864, PX-2385,

19 and PX-3865, which is the clip report.  Thank you, Your Honor.

20          (Plaintiff Exhibits 2015, 387, 2018, 3821, 382, 386,

21 3822, 381, 706, 355, 580, 356, 3823, 465, 3824, 458, 1168, 456,

22 467, 987, 468, 383, 462, 469, 715, 473, 384, 476, 3825, 3829,

23 3830A, 2390, 3831, 3832, 2389, 3826, 3833, 3834, 1985A, 2861,

24 2862, 2864, 2385, and 3865 admitted.)

25          APRIL MUÑIZ, CALLED BY THE PLAINTIFFS, SWORN

A. Muniz - Direct

1                    DIRECT EXAMINATION

2    BY MS. PHILLIPS:

3    Q     Good afternoon, Ms. Muñiz.

4    A     Good afternoon.

5    Q     Will you please introduce yourself to the jury?

6    A     My name is April Muñiz.  I am 53 years old, 31-year

7    resident of the Charlottesville, Albemarle area.

8    Q     And are you a plaintiff in this case?

9    A     I am a plaintiff in this case, yes.

10   Q     Could you please tell the jury a bit about your

11   educational background, Ms. Muñiz?

12   A     Sure.  I have a bachelor of arts in psychology and modern

13   dance from James Madison University and a master of science in

14   health science from George Washington University.

15   Q     Ms. Muñiz, what is your ethnic background?

16   A     I'm Mexican American.

17   Q     Where do you currently work?

18   A     I currently work at a company called Paradigm.  It's a

19   healthcare data analytics company headquartered in Chicago, and

20   I am a senior project manager.

21   Q     How long have you been in that role?

22   A     I began working there in January of this year, 2021.

23   Q     And can you please tell the jury why you're here today,

24   Ms. Muñiz?

25   A     I am here today because on August 12th, 2017 I witnessed a

A. Muniz - Direct

1   horrific car attack and I'm here to find some accountability

2   for that and to stand up for those people --

3           THE COURT:  Wait.  Wait.  The lawsuit does not allege

4   any more than an injury, I gather.  And she's suing for -- this

5   is not -- it's not proper to come in and say you have some

6   greater plan than the lawsuit itself.

7           THE WITNESS:  I'd like to hold those accountable for

8   my injuries.

9   BY MS. DUNN:

10  Q    Okay.  Thank you, Ms. Muñiz.

11  A    Okay.

12  Q    Were you at the torch march on Friday night, August 11th?

13  A    No, I was not.

14  Q    Were you in downtown Charlottesville on Saturday, August

15  12th?

16  A    Yes, I was.

17  Q    Okay.  Why did you go downtown that day?

18  A    I went downtown that day because I had heard of the Unite

19  the Right rally and really wanted to stand up with my

20  community.  I wanted to bear witness to the events of the day.

21  I wanted to support the local businesses who had indicated that

22  they were fearful that they were going to lose business that

23  day.

24  Q    Okay.  Do you recall what time you got downtown?

25  A    Yeah, just before noon.

A. Muniz - Direct

1  Q    And were you with anyone or meeting anyone?

2  A    No.  I went alone.

3  Q    Did you bring any weapons with you that day?

4  A    No, I did not.

5  Q    Did you bring any signs or flags or banners with you that

6  day?

7  A    No, I did not.

8  Q    What did you bring with you that day?

9  A    I brought a cellphone, a camera, and a little fanny pack

10  with my money and ID in it.

11  Q    And where did you go when you got downtown?

12  A    So I went straight from my car to Emancipation Park.  And

13  when I got there, it was pretty empty.  And I was a little

14  confused about that, because I thought I was arriving just as

15  the rally was supposed to start.

16  Q    So you got there after the state of emergency was

17  declared?

18  A    I did, yes.

19  Q    And what did you do after you saw that nothing was

20  happening at Emancipation Park?

21  A    I wandered around a little bit and went to one of the

22  alternate parks where I knew there was permitting to do other

23  things.  There was not much happening there, either, so I

24  basically found myself walking back to my car.

25  Q    And at some point did you end up at the intersection of

A. Muniz - Direct

1  Fourth and Water Street?

2  A    I did.

3  Q    And what happened when you found yourself at the

4  intersection of Fourth and Water Street?

5  A    I ended up at Fourth and Water Street after first

6  observing a crowd of people coming down Water Street going

7  east.  And I thought, oh, these are -- these look like the

8  people I've been looking to stand with today.  Here they are.

9       And so they were walking down the street.  I watched them;

10 I took pictures of them, kind of was cheering them on.  They

11 seemed pretty celebratory.  And then I looked to the left as

12 they passed me and I saw another group of people, very similar

13 people, and they sort of joined like two rivers.  And I

14 thought, well, I'll just join in.

15 Q    And do you recall where you were when you joined into the

16 group?

17 A    Yeah.  I was at First and Water Street.

18 Q    Okay.  And in terms of:  Were you in the front of the

19 group or the middle of the group or the back of the group?

20 A    I was sort of in the back of the group that I joined, but

21 by the time we joined the other as I kind of got in the middle,

22 I sort of became in the middle.  And then I worked my way to

23 the front, since I was there by myself and pretty nimble and

24 really wanted to take some photographs, because it was a pretty

25 cool-looking crowd to be in.

A. Muniz - Direct

1  Q    And did you see any cars at the intersection of Fourth and

2  Water when you reached that point?

3  A    I did.  I saw two cars at the intersection, just sort of

4  waiting for us to pass by.

5  Q    Okay.

6          MS. PHILLIPS:  Mr. Spalding, if we can show Ms. Muñiz

7  Plaintiffs' 1694, please.

8  BY MS. PHILLIPS:

9  Q    Ms. Muñiz, do you recognize this photograph?

10 A    I do.

11 Q    What is it?

12 A    This is a photograph of, basically, right as we were

13 turning from Water Street up Fourth Street.  It's a one-way

14 street.  You can see the DO NOT ENTER sign.  And there are two

15 cars stopped, as I mentioned, waiting for us to pass by.

16 Q    Do you see yourself in this photograph?

17 A    I do.

18          MS. PHILLIPS:  Your Honor, I would move into evidence

19 Plaintiffs' 1694 and publish it to the jury, please.

20          THE COURT:  Be admitted and you may publish it.

21          (Plaintiffs' Exhibit1694 marked.)

22          (Plaintiffs' Exhibit1694 admitted.)

23 BY MS. PHILLIPS:

24 Q    Now that the photograph is up for the jury, the screen in

25 front of you is a touchscreen.  If you can circle yourself,

A. Muniz - Direct

1  that would be great.  Thank you.

2  A     (Witness complies.)

3  Q     After the crowd turned up Fourth Street, do you recall

4  what happened next?

5  A     Yes.  Very quickly, as we turned -- in fact, you can see

6  it in this picture -- by the time I got just past that

7  telephone pole, a car came careening into the crowd.

8  Q     And what did you see when the car came careening into the

9  crowd?

10  A     Just a minute.

11      I saw the car just, really, as it was hitting this white

12  car and the people that were around that white car.

13      I saw people flying into the air.  I saw shoes and water

14  bottles flying into the air.  I saw many other people injured

15  lying all over the floor and screaming.  It was the most

16  horrific thing I've ever seen.

17  Q     Can you describe for the jury what you heard?

18      It's okay.  Take your time.

19  A     Yes.  I heard -- I heard the sound of metal hitting

20  bodies.  I don't know how else to describe it; it's metal on

21  flesh, and metal on metal.  As I mentioned also, lots of

22  screaming and agony.

23          MS. PHILLIPS:  Mr. Spalding, can we show Ms. Muñiz

24  Plaintiffs' 1692, please?

25              (Plaintiffs' Exhibit1692 marked.)

A. Muniz - Direct

1   BY MS. PHILLIPS:

2   Q    Ms. Muñiz, do you recognize this photograph?

3   A    Yes, I do.

4         MS. PHILLIPS:  And Mr. Spalding, are you able to pull

5   the photograph down so that we -- there we go.  Thank you very

6   much.

7   BY MS. PHILLIPS:

8   Q    Do you see yourself in this photograph?

9   A    Yes, I do.

10        MS. PHILLIPS:  Your Honor, I'd like to introduce

11  Plaintiffs' 1692 and publish it to the jury, please.

12        THE COURT:  Be admitted.

13        (Plaintiffs' Exhibit1692 admitted.)

14  BY MS. PHILLIPS:

15  Q    Ms. Muñiz, again, can you circle yourself so the jury can

16  see you in this picture?

17  A    Yes.  (Witness complies.)  Maybe.

18  Q    Is that you right there?

19  A    Yes, that is me.

20  Q    What happened after you saw the vehicle come down and hit

21  individuals and these other cars?

22  A    Immediately after, I stood there for a few seconds and

23  looked at the carnage that was in front of me.  And very

24  quickly, that Dodge Challenger backed up, just as quickly as it

25  had come down the hill.  And when it did that, it hit more

A. Muniz - Direct

1   people.

2        You can kind of see in this picture -- let me see if I can

3   draw here.  This actually is Marcus Martin, and he's leaning on

4   a truck there.  And as I recall, he actually cleared that

5   truck, but there was another person standing right there as

6   this car was backing up.  And it squished her between the

7   Challenger and the truck, really right in my view.

8   Q    How did you feel when you saw the car backing away?

9   A    I was terrified.  And I had an immediate sense that the

10  only reason he would be backing away would be to come right

11  back at us to plow us all down.

12  Q    What did you do after that?

13  A    Many people started yelling, "Run, run, run."  And I did.

14  I ran down the hill in that direction and around the corner.

15  This is the Charlottesville Albemarle Community Foundation

16  building, and there's an alcove right on Water Street, and I

17  tucked in there to hide.

18  Q    At some point, did you leave the scene?

19  A    Yes.  I left there rather quickly because other people

20  were doing the same thing and they filled it up.  And I had

21  already experienced feeling like I was going to get trampled

22  when I was running there.  I had stepped over injured people,

23  and so I was very fearful of getting trampled.  And I left that

24  alcove and crossed Water Street, and then turned back to look

25  at what had just happened.

A. Muniz - Direct

1  Q    And after you walked across the street, were you able to

2  leave the scene?

3  A    Not right away.  I think as soon as -- I watched that

4  scene, really, until the -- I watched people helping the

5  injured people.  It was basically just this crowd there.

6  Nobody else was coming to the scene to help us.  And finally a

7  fire truck came down Water Street.

8       And I think at that point I was able to release, and I

9  just crumpled to the floor and was really crying hysterically.

10 Somebody in the crowd came over to help me and asked if they

11 could help me, asked if I was there with anybody.  A street

12 medic asked, sort of yelling, "Does anybody need help?"  And

13 she called him over and he, you know, looked me over and said I

14 was in shock.  And they were really trying to get me up and

15 away from the scene.  And it took a while for them to convince

16 me that it was safe to get up and walk on that street again.

17      So they finally did.  It was probably ten minutes with

18 them.  And we walked east on Water Street.  They told me they

19 were taking me to a church that had been set up as a first aid

20 center.

21 Q    Okay.  Architectural the church was?

22 A    First United Methodist, right behind Emancipation Park.

23 Q    And did you receive treatment at that church?

24 A    Yes, I did.  I did receive treatment at that church.

25 Q    What kind of treatment did you receive at the church?

A. Muniz - Direct

1  A    I was brought in to see a certified trauma therapist who

2  was there waiting to see patients that day.

3  Q    And did you spend some time with that individual?

4  A    Yeah.  I spent a couple of hours with her.

5  Q    Do you recall what kind of treatment was administered to

6  you?

7  A    Yeah.  It's a therapy called EMDR.  It stands for eye

8  movement desensitization and reprocessing.

9  Q    And you said you received treatment for a couple of hours.

10 Was that continuous treatment?

11 A    No.  I was really in a disassociated state.  And I

12 understand that she worked with me for about an hour to get me

13 out of that state, to understand that I was no longer at the

14 scene, that I was safe, that I could think enough that she

15 could talk to me.

16     And at that point there was -- the room was set up to hold

17 two people and two therapists, and somebody else came in the

18 room to see the other therapist.  There was just a small fabric

19 panel between us.  And she sat down.  She had just arrived, so

20 she was visibly upset.  And she said that she had been giving

21 CPR to somebody on the street and wanted to know how they were,

22 and somebody came in and told her that person had -- had died.

23 And so she lost control.

24     I immediately went back into that state of terror again.

25 And all I could think of was all of those people that I had

A. Muniz - Direct

1  seen, and that surely many of them had died.

2  Q    What time did you leave the church that day?

3  A    About 4:30.

4  Q    And how did you do once you eventually got home that

5  evening?

6  A    I was a wreck.  I was in bouts of crying and just -- just

7  zoning out.

8  Q    Were you able to sleep that evening?

9  A    No.  I had insomnia that night and I've really had a lot

10  of insomnia ever since then.  I also, when I did drift off, had

11  horrific night terrors, reliving that scene.

12  Q    Did the events of August 12th affect you in any lasting

13  way?

14  A    Oh, yeah.  It upended my life.  It affected me every way

15  you can think of:  Emotionally, mentally, socially, physically,

16  professionally.

17  Q    Okay.  I want to talk to you about each of those.

18       I'd like to talk about the mental and emotional effects.

19  Did you continue to seek counseling after August 12th?

20  A    Yes.  The therapist that I saw at the church actually sent

21  me away with an appointment to see her that same week, and I

22  have continued to see her ever since.

23  Q    Do you see her on a -- well, how frequently do you see her

24  now?

25  A    At the beginning I was seeing her twice a week, and then

A. Muniz - Direct

1  once a week, and then once a month.  Now I'm really seeing her

2  on an as-needed basis, but, you know, every few months we have

3  a check-in.

4  Q    Did that certified trauma specialist ever provide you with

5  a diagnosis?

6  A    She did.  In fact, she's provided me with two diagnoses.

7       The first was acute stress disorder, which -- people are

8  more familiar with the second diagnosis, which is

9  post-traumatic stress disorder.  Acute stress disorder is

10 similar to that, but it's bound by a time frame.  It happens to

11 trauma victims either immediately at trauma or within the first

12 month.  If you go longer than those first four weeks, it turns

13 into, diagnostically, PTSD.

14 Q    Do you suffer from triggers, Ms. Muñiz?

15 A    Oh, yes.

16 Q    What kind of things trigger you?

17 A    A variety of things trigger me.  A lot of them are related

18 to cars, no doubt.  Whenever I see a Dodge Challenger -- the

19 Charlottesville Police Department has a Dodge Challenger with

20 tinted windows that looks just like that, so I see that pass by

21 me more often than I'd like.

22      For a while, lots of white cars in a row would trigger me,

23 because there were so many just rented white vans and cars in

24 town that day.

25      The sound of a helicopter triggers me because there was a

A. Muniz - Direct

helicopter flying above us at that moment.  And, of course, we
live right near a medical trauma center that has Pegasus flying
in all the time.

Q    What happens when you're triggered?

A    It depends.  The worst triggers cause full-blown panic
attacks.  Others are less severe and cause my anxiety level to
rise very quickly; might hyperventilate.  And, you know,
those -- I'm learning to sort of settle myself down faster out
of those.

Q    Besides seeing this certified trauma therapist, have you
sought any other treatment for the emotional effects of the
trauma?

A    Yeah.  So for the first six weeks or so -- time is very
difficult for me to remember, but -- my whole central nervous
system, my whole body felt like it was just vibrating.  I was
getting help.  I was going through EMDR therapy.  I was living
my life a little bit, but I could not stop vibrating.

     It's not exactly like shaking, like you'd think.  It's
just like your whole body is innervated.

     So the therapist asked that I -- or suggested that I go
see a body worker who specializes in craniosacral and vagal
therapy that is specifically meant to calm that autonomic
nervous system.

Q    And did that craniosacral therapy help?

A    It did, yes.

A. Muniz - Direct

1   Q     And do you have any coping mechanisms that you utilize to

2   help you avoid being triggered?

3   A     Oh, yeah.  I avoid big crowds for sure.  I try to

4   meditate.  I do some yoga.  I basically do a lot of avoidance.

5   Q     Okay.  You had mentioned that the effects of August 12th

6   impacted you physically.  How were you affected physically?

7   A     So I was not injured by the car that day; however --

8   Q     You mean physically?

9   A     Physically injured -- thank you -- by the car that day.

10        I, however, was planning to have a surgery for a condition

11  I had called pelvic organ prolapse. I had had that condition

12  for almost two years.  It was very painful, and I was finally

13  at the point -- I had had to go to physical therapy to get to

14  the point where I could have that surgery.  And it was

15  scheduled for sort of mid-September --

16  Q     Of 2017?

17  A     -- of 2017.

18        So I went to that doctor's appointment, the presurgical

19  appointment, ready to hear that I was going to have surgery the

20  next week.  And instead I heard:  "You are in such a state, I

21  am not going to touch your body.  It cannot go through the

22  physical trauma of a surgery.  And we're going to postpone it

23  indefinitely."

24  Q     Did you have end up having the surgery at some point?

25  A     A year later.

A. Muniz - Direct

1  Q    When was that?

2  A    In July of 2018.  I had to get through a lot of therapy

3  and EMDR therapy.  And by the time I did, it was about March or

4  April when I was allowed to start physical therapy again to

5  prepare my body for that surgery.

6  Q    Okay.

7        MS. PHILLIPS:  Mr. Spalding, I'd like to show

8  Ms. Muñiz 3320A.  Thank you.

9  BY MS. PHILLIPS:

10  Q    Ms. Muñiz, do you recognize this?

11  A    I do.

12  Q    What is it?

13  A    This is a summary of the expenses I have had since

14  August 12th, 2017.

15  Q    Is it your medical treatment?

16  A    Yes, it's my -- it's my -- all of my medical treatment.

17  Q    Okay.  Have you reviewed the underlying documents that

18  this chart is based on?

19  A    I have.

20  Q    And is this summary accurate?

21  A    It is.

22        MS. PHILLIPS:  Your Honor, I'd move to admit

23  Plaintiffs' 3320A, please.

24        THE COURT:  It will be admitted.

25        (Plaintiffs' Exhibit 3320A marked.)

A. Muniz - Direct

1          (Plaintiffs' Exhibit3320A admitted.)

2     BY MS. PHILLIPS:

3     Q     Ms. Muñiz, I want to talk with you about your return to

4     work.

5          Were you able to return to work immediately after the car

6     attack?

7     A     Oh, no.  No.

8     Q     Okay.  At some point were you able to return to work?

9     A     Yeah.  I returned to work three months later.

10    Q     And at the time, where were you employed?

11    A     I was employed at a contract research organization called

12    Atlantic Research Group.

13    Q     And what was your role there?

14    A     I was the director of clinical operations.

15    Q     Can you briefly explain your responsibilities in that

16    former role?

17    A     Sure.  So this company did a lot of drug development work

18    for rare diseases.  And my role and my team -- I managed a

19    group of about 25 people and three managers who monitored

20    clinical trials at medical institutions around the United

21    States and Canada.  And also, a separate group within that

22    group handled all of the federal regulatory documentation that

23    goes along with clinical trials.

24    Q     Do you recall when you went back to work?  You said it was

25    three months?

A. Muniz - Direct

1  A    Yes.  I went back November 1st, 2017.

2  Q    Okay.  And did you resume at full time?

3  A    No.  I went back part time until January 3rd, 2018.

4  Q    And did that time off impact your position at ARG?

5  A    Oh, yeah.  So while I was out I was keeping in touch with

6  my boss.  And about three weeks in, she told me that they had

7  decided to give my job to somebody else and that when and if I

8  returned, there would be a different job there for me.

9  Q    How did the new job compare to the old job?

10  A    Night and day.  The old job, as I mentioned, I was

11  overseeing 25 people who traveled a lot and were responsible

12  for some very important things.  I was part of -- a very

13  instrumental part of our management team, part of our sales

14  team, helped make corporate decisions.

15     My new job was to create a training program for recent

16  college graduates to introduce them to our industry.  I was

17  taken off the management team and basically kind of tucked in a

18  corner and left to create training materials.

19  Q    At some point, did you leave that role?

20  A    I left that role in June of 2018, when they asked me to

21  leave.

22  Q    And when you say they asked you to leave, were you

23  terminated?

24  A    I was terminated.

25  Q    And what is your understanding as to why you were

A. Muniz - Direct

1  terminated?

2  A    I believe that my personality had changed so much -- I was

3  socially reserved and I really -- when they switched my role

4  like that, I lost all confidence in my ability to lead.  And I

5  think they felt the same way.

6  Q    Ms. Muñiz, I'm going to show you -- well, let me ask you a

7  question about your current position.

8       Are you -- well, what did you do for work after you left

9  ARG?

10 A    Yeah, so as I mentioned, I was scheduled -- I had to wait

11 that year to have surgery, and I was now scheduled to have that

12 surgery in July.  It had a six-week recovery period.  And they

13 laid me off just weeks before that surgery, knowing that that

14 surgery would happen.

15      So I really couldn't work.  I couldn't collect

16 unemployment because I wasn't able to even be available to

17 work.  And so I searched for work while I was out and found a

18 part-time job that I had had previously, as a Peace Corps

19 campus recruiter at UVA.  That's a job I had when I first

20 returned from the Peace Corps in 2012.

21      And they were very friendly people.  I knew they would be

22 very accepting of me and my need to continue therapy.  And it

23 was a part-time role that would allow me the time to do that.

24 Q    And for how long were you in that role?

25 A    I committed to the academic year of 2018 to '19, so

A. Muniz - Direct

1   August '18 to May of '19.

2   Q    And what did you do after that for work?

3   A    After that, I took a position trying to get back into

4   clinical research with the School of Medicine, working in their

5   clinical trials office.

6   Q    When you say the School of Medicine, what do you mean?

7   A    The University of Virginia School of Medicine.

8   Q    And how did your salary at the UVA School of Medicine

9   compare to what you were making at ARG?

10  A    Oh, about 70 percent -- 65, 70 percent.

11  Q    At some point, were you able to get a full-time position

12  at your salary level from August of 2017?

13  A    Yes.  Finally, this year, in January.

14        MS. PHILLIPS:  Okay.  Mr. Spalding, I'd like to show

15  Ms. Muñiz Plaintiffs' 3320E.

16        (Plaintiffs' Exhibit3320E marked.)

17  BY MS. PHILLIPS:

18  Q    Ms. Muñiz, do you recognize this?

19  A    I do.

20  Q    And what is it?

21  A    This is a summary of my lost wages from August of 2017

22  through the end of December, January 2020.

23  Q    Did you review the documents that this chart is based on?

24  A    I did.

25  Q    Is it an accurate summary of your lost wages?

234

A. Muniz - Cross

1    A    It is.

2            MS. PHILLIPS:  Your Honor, I'd move Plaintiffs' 3320B

3    into evidence.

4            THE COURT:  Be admitted.

5            (Plaintiffs' Exhibit 3320B admitted.)

6    BY MS. PHILLIPS:

7    Q    Ms. Muñiz, I have just one question left for you.

8        It's been four years since the car attack.  Do you feel

9    like you've gotten back to your old self at this point?

10   A    No.  I don't think I'm ever going to get back to my old

11   self.  As I mentioned, this whole experience really upended my

12   life and I -- through lots of therapy and time, I've learned

13   how to manage being my new self, a different person, and I kind

14   of have been given some tools to figure out how to do that.

15           MS. PHILLIPS:  Thank you very much.  I have no

16   further questions.

17           THE COURT:  All right.

18           MR. KOLENICH:  No questions, Your Honor.

19                       CROSS-EXAMINATION

20   BY MR. SPENCER:

21   Q    Good afternoon.  My name is Richard Spencer and I'm acting

22   on my own behalf.

23   A    Yes, I know.

24   Q    Okay.  Your name is pronounced Mrs. Muñiz; is that

25   correct?

A. Muniz - Cross

```
1   A      Ms. Muñiz.

2   Q      Ms. Muñiz.  Okay.

3          So you've testified that you went to the Unite the Right

4   rally around noon?

5   A      Uh-huh.

6   Q      Is that correct?

7   A      That's correct.

8   Q      So had you done some preparation before deciding to attend

9   the rally?

10  A      None at all.

11  Q      But you did a basic amount to know when it was set to

12  start?

13  A      Sure.  I knew what time it was.  I knew that -- where it

14  was.  And I knew that there were some events in the parks on

15  either side of it that would be alternate places for me to go

16  if I found the rally boring.

17  Q      Okay.  Were you aware of me, Richard Spencer, before the

18  rally?

19  A      Not before -- well, I think in preparation for the rally,

20  it was in the news.  And there was a lot of coverage of you and

21  Jason Kessler because you were both UVA graduates.

22  Q      Right.  So being that I'm here in the courtroom with you

23  today, if you look back on what happened, did -- at any point

24  on August 12th, did you ever see me?

25  A      No.
```

A. Muniz - Cross

1  Q    Okay.  So you entered Emancipation Park and you described

2  it as empty?

3  A    Well, I didn't enter Emancipation Park.  I walked by it.

4  And it was empty, yes.

5  Q    Right.  Okay.  What was your understanding at the time of

6  why it was empty?

7  A    Well, at first I didn't know.  There were some people kind

8  of milling about, and I asked them, and they said that a state

9  of emergency had been called.

10  Q    Okay.  You don't strike me as someone who wanted -- sought

11  out violence at all.  So what were some of your notions going

12  into the rally?  Why did you want to go there and take part in

13  some way?

14  A    So I've been a resident of this area for 31 years.  I

15  moved here to start my adult life and I consider it my home.

16  And I really wanted to -- I kind of took offense that a group

17  of people were coming here with different beliefs than I --

18  much stronger, different beliefs than I had.  I didn't think

19  they shouldn't have them; I didn't think they shouldn't talk

20  about them; but I did want to watch and observe and sort of

21  stand in witness to it with my community.

22  Q    So needless to say, you were not seeking out to get into

23  some kind of confrontation, right?

24  A    I was definitely not.

25  Q    Maybe a verbal confrontation at most?

A. Muniz - Cross

1   A    Not even.

2   Q    Not even that.  Okay.  That sounds right.

3        And then you said that you kind of milled around.  You

4   might have thought about going to another park and then you

5   kind of entered a crowd that was downtown and you described it

6   as celebratory in some way?

7   A    It was, yes.

8   Q    So this case is terribly fraught with politics and

9   accusations of hatred and the race issue and all of it.  I

10  don't even need to tell you that.

11       But it ultimately is a conspiracy charge.  You are

12  claiming that you've suffered post-traumatic stress disorder or

13  some mental distress of some kind after the event took place

14  downtown because due to your witness of a horrific car

15  incident.

16  A    Correct.

17  Q    Correct?  So how would the organizers of the Unite the

18  Right plan on that taking place?  How could they have -- so you

19  have testified that you went to the park to hear speeches or

20  see what was going on, right?

21  A    Yes.

22  Q    How could they have masterminded a situation in which

23  downtown descended into chaos and a terrible event and a death

24  occurred?

25            MS. PHILLIPS:  Objection, Your Honor.  Ms. Muñiz was

A. Muniz - Cross

 1   injured on August 12th, sought counsel, and the conversations

 2   about how the case --

 3              THE COURT:  Sustain the objection.

 4              MS. PHILLIPS:  Thank you, Your Honor.

 5    BY MR. SPENCER:

 6   Q    Is it in your mind that -- in your mind the grouping in

 7   downtown was somehow coordinated by the organizers; is that

 8   true?

 9   A    I'm not sure what you mean by "the grouping downtown."

10   Q    Well --

11              THE COURT:  Mr. Spencer, she doesn't -- she could

12   have been asleep on the corner and somebody wheeled her there

13   in a wheelchair.  She doesn't have to know anything about what

14   went on before.  That's why people hire lawyers, to investigate

15   and bring a case that they think.  There's no requirement that

16   the individual plaintiff know all the details of what brought

17   about the accident.

18   BY MR. SPENCER:

19   Q    So that was not your state of mind at the time.  Your

20   state of mind at the time --

21              THE COURT:  Let me say something else.  If you get

22   the wrong answer and they say yes, Mr. Spencer, I think so,

23   that's evidence against you.

24              MR. SPENCER:  Okay.  No further questions.

25              THE COURT:  All right.

A. Muniz - Cross

1          MR. CAMPBELL:  May I approach counsel for one quick

2    question, Your Honor?

3          THE COURT:  You may.

4                    CROSS-EXAMINATION

5     BY MR. CAMPBELL:

6    Q    Good afternoon, Ms. Muñiz.  I represent James Fields in

7    this lawsuit.

8         Ma'am, as I understand your testimony, you were not struck

9    by Mr. Fields's car, correct?

10   A    I was not struck by the car.

11   Q    You were not struck by any debris or any person propelled

12   by the car, correct?

13   A    I was pushed and shoved by people getting out of the way

14   of the car, but I was not physically injured by that.

15   Q    Yes, ma'am.  Okay.  And as you said, no physical injury.

16   It was emotional, mental trauma are the injuries you claim?

17   A    Exactly, yes.

18   Q    And that's from seeing the attack and seeing others hurt?

19   A    Yes.

20   Q    Ma'am, can you very briefly describe what EMDR is?

21   A    Yes.

22   Q    First of all, that's the therapy, right?

23   A    That is the therapy.  Eye movement desensitization and

24   reprocessing, it's called.  It's a therapy, as I understand it,

25   that's really designed for trauma victims.  It originally

A. Muniz - Cross

1    started with an eye movement back and forth, your eyes going

2    back and forth as you were receiving cognitive therapy

3    treatment, to separate the bodily response to an event from the

4    mental memories of the event.  It has since moved along and

5    instead of eye movement they use little tapping devices in your

6    hand.

7    Q    So basically you kind of relive the event you witnessed

8    and rapidly move your eyes side to side or make a tapping?

9    A    Yes, I've relived that moment so many times in the last

10   four years.

11   Q    Yes, ma'am.  All right.  And then, so I think you said you

12   arrived downtown around noon?

13   A    Uh-huh.

14   Q    And the rally was over?

15   A    It was over.

16   Q    I wanted to go through very briefly the employment

17   situation.  So it looks like from the exhibit that your counsel

18   presented to you and introduced into evidence that there was a

19   period of time when you were unable to work at all from

20   immediately following, from the day of the incident until I

21   believe it was October 31st; is that correct?

22   A    Correct.

23   Q    And then there was a period following that where you went

24   back part-time from November 1st through the end of the year

25   pretty much?

A. Muniz - Cross

1  A    Correct.

2  Q    And then January 3rd, I think you said?

3  A    That was the first working day of the year.

4  Q    Yes, ma'am, with the New Year's holiday, that sort of

5  thing.  Then you worked full-time at your same place of

6  employment through June of 2018?

7  A    Yes, the beginning of -- I think the first week of June.

8  Q    Okay.  And were you let go because you were upset over the

9  job change or the reduction in your role?

10  A    I had come to terms with that change.  Like I said, I

11  believed that the management team really, having taken me off

12  the management team before I even returned to work, they just

13  lost confidence that because I was out and because they knew I

14  was dealing with mental health issues, they just didn't think I

15  could handle it.  And yeah, they really stopped talking to me.

16  They put me in an office in the corner and didn't really have

17  many conversations with me.

18  Q    Understood.  And the medical treatment that you're

19  claiming, the therapy as a result of the incident, I believe

20  according to the exhibits totaled just over $7,000?

21  A    Yes, I believe that's what I said.

22  Q    And your claim for lost wages is $203,000?

23  A    It might have said 204,000, but yes.

24       MR. CAMPBELL:  My apologies.  I don't have any more

25  questions.  Thank you, ma'am.

A. Muniz - Cross

1              MR. JONES:  I don't have any questions.

2              MR. CANTWELL:  I do.

3              Earlier we had seen a video shot from a helicopter

4  and I believe that video was entered into evidence.  What I

5  have on my screen right now is Plaintiffs' Exhibit 1353, which

6  I believe is a still frame from that helicopter shot.  If

7  that's accurate, I'd like to move it into evidence and publish

8  it to the jury.

9              THE COURT:  If you can find it.

10             MS. PHILLIPS:  No objection.

11             THE COURT:  Is it in evidence?

12             MR. CANTWELL:  1353, Plaintiffs' Exhibit 1353, I

13  would like to put it into evidence and show it to the jury.

14             MS. PHILLIPS:  No objection.

15             THE COURT:  Be admitted.

16             (Plaintiffs' Exhibit1353 marked.)

17             (Plaintiffs' Exhibit1353 admitted.)

18                      CROSS-EXAMINATION

19  BY MR. CANTWELL:

20  Q    So are you able to tell the orientation of which street is

21  where looking at this shot, Ms. Muñiz?

22  A    Maybe if you just give me a sec.

23       Yes, I believe this is the parking garage.

24  Q    Can you show me where --

25  A    That is Water Street and I believe that is Fourth Street.

243

A. Muniz - Cross

1  Q    Okay.  Thank you for helping me out with that.  So it
2  would be fair to say the car crash happened right about there;
3  is that right?
4  A    Yes.
5  Q    Okay.  Any idea how many people are there?
6  A    A couple hundred, maybe more.
7  Q    You said you brought a camera with you?
8  A    I did.
9  Q    Did you take some pictures?
10 A    Yeah.
11 Q    Shoot any video?
12 A    Yes.
13 Q    Was that -- was those photos and video, were they provided
14 in discovery in this case?
15 A    Yes, they were.
16 Q    Did you take any pictures of anybody wearing a mask?
17 A    I don't remember.
18 Q    If we could take this down from the jury, I'm going to try
19 to refresh her memory.
20      Do you remember that?
21 A    I remember that very well, yes.
22 Q    Is that from August 12th?
23 A    It is.
24 Q    So you took a photo of somebody wearing a mask?
25 A    I took a photo of Barack Obama kissing Michelle.

A. Muniz - Cross

1   Q    Do you see the man with the mask?

2   A    I do see it, but that's not what I was taking a photo of.

3   Q    Do you see the man carrying the club?

4   A    I don't.  And I also don't remember taking pictures in

5   black and white.  Has this been altered?

6   Q    So I am looking at what was delivered to me by plaintiffs'

7   counsel in this case.  I have this as a Bates number MUÑIZ

8   00000573.  That's what I have this as.

9   A    Okay.

10  Q    And that's the image that I have.  Now, I think that -- I

11  don't know if there's any way for me to lighten this image

12  because I have this much clearer on my screen than it's

13  appearing on that one.  But can you see something in the hand

14  of the man that's circled in purple there?

15  A    Yes.

16  Q    Okay.  Other than him, do you remember anybody carrying

17  weapons?

18  A    No.

19  Q    Do you remember anybody wearing helmets?

20  A    Yes.

21  Q    You remember people wearing helmets.  Do you remember if

22  any of the people wearing helmets were wearing camouflage?

23  A    I don't remember that.  I remember several of them had

24  GoPro cameras attached to their helmets, and press badges.

25  Q    Do you remember anybody who was wearing a helmet who did

A. Muniz - Cross

1  not appear to be press?

2  A    I probably did.

3  Q    Did you see anybody wearing helmets that was covering

4  their face?

5  A    Like a motorcycle helmet covering your face?

6  Q    No, I mean like a bandanna.

7  A    I don't recall.

8  Q    Do you remember if anybody else was wearing bandannas?

9  A    I think there were plenty of bandannas there.  I had a

10  bandanna with me.

11  Q    You had a bandanna?

12  A    Uh-huh.

13  Q    What color was your bandanna?

14  A    Gray.  It's pretty hot in August.  People tend to carry

15  bandannas with them.

16  Q    Is that a thing?

17  A    It's a thing.

18  Q    So large numbers of people show up and lots of them have

19  the same color bandannas, and that's the weather you're

20  thinking?

21  A    I don't know about the color, but many people carry

22  bandannas to wipe sweat off them in July and August.

23  Q    Did you notice a lot of people with red bandannas in that

24  crowd you were marching with?

25  A    I did not notice it at the time.

246

A. Muniz - Cross

1  Q    Did you notice a lot of people with black bandannas?

2  A    There was a lot of black in general on people that day.

3  Q    A lot of black in general that day.  Hot day, though,

4  right?

5  A    I was wearing black.

6  Q    So this is Plaintiffs' 1694.  This is already in evidence.

7  We can publish this and show it to the jury.

8       So I think we said -- let me see if I can zoom this in a

9  little bit, actually.

10      That's you, right?

11 A    That is me, yes.

12 Q    That guy look familiar to you?

13 A    I recall him from seeing this picture.

14 Q    You don't recall seeing him that day?

15 A    No.

16 Q    Does he appear to be wearing a mask?

17 A    I suppose that could be a mask or a shadow, but maybe.

18 Q    I'll zoom in a little more.

19 A    It looks to be like a gaiter.

20 Q    A gaiter?

21 A    Something you wear around your neck and pull up.

22 Q    So he appears to be wearing sunglasses, too, right?

23 A    He does.

24 Q    He appears to be wearing a helmet?

25 A    He does.

A. Muniz - Cross

1   Q    So he's got a gaiter, sunglasses, and a helmet?

2   A    Yeah.  It's a pretty colorful crowd.

3   Q    What about the guy right in front of him?

4   A    I'm not sure I see a guy.  I see another helmet.

5   Q    Yeah.

6   A    Is that what you're referring to?

7   Q    Can you tell anything about the jacket that the man with

8   the helmet in front of him is wearing?

9   A    Not really.

10  Q    Let me see if we can zoom this in a little bit more, if it

11  helps.

12  A    Could you get rid of that circle?

13  Q    Yeah, I will. I'm going to zoom this in and then I'll move

14  this over and put the circle there.  Unfortunately we're

15  getting a little pixillated at this zoom level, but this is the

16  guy I'm talking about.  Does that sort of resemble camouflage?

17  A    It could be.

18  Q    And then there seems to be three guys with helmets all

19  right near each other, huh?

20  A    There does.

21  Q    Do you remember this sign?

22  A    I don't remember it from the day, but I see it in this

23  picture.

24  Q    That mean anything to you?

25  A    Sure.  That fist, it says right there, it means

A. Muniz - Cross

1    solidarity.  I've seen that fist my whole life.

2    Q    That raised fist means solidarity?

3    A    I grew up in the civil rights movement era, yes.

4    Q    Okay.

5    A    I saw a picture of that same fist with a fork in it

6    earlier in the day at a snack station.

7    Q    With a fork in it at a snack station?

8    A    Uh-huh.

9    Q    That's like a Charlottesville restaurant or something?

10   A    No.  I think it was a play on the image.

11   Q    I'm saying -- is the snack station a brand name?

12   A    No.  No.  I'm saying at the alternate park that I wandered

13   through, there was a snack station set up with water and

14   snacks.

15   Q    I see.  So on August 12th somebody was selling snacks or

16   giving away snacks?

17   A    Giving away, yes.

18   Q    And they had the raised left fist with a fork in its hand?

19   A    You can probably find the picture in the file.  I took a

20   picture of it.  It was funny to me.

21   Q    And we see that fist again here and again here, right?

22   A    Yes.  "Defend women's rights" with the fist.

23   Q    Right.  We see this guy.  He's got that red flag there,

24   right?

25   A    Uh-huh.

A. Muniz - Cross

1   Q    What's that red flag on?

2   A    What's it on?

3   Q    Yeah.

4   A    A flagpole.

5   Q    Now I'm showing you Plaintiffs' Exhibit 1692 which I

6   believe is already in evidence.  I'd like to publish this and

7   show it to the jury.

8        Did you see this flag that day?

9   A    No.  I did not see that.  I was too busy looking at this

10  scene that you see in front of you.

11  Q    I understand, but you didn't see that logo anywhere else

12  that day?

13  A    I don't even see what that logo is right now.

14  Q    Okay.  You don't recognize it in any case.  Fair enough.

15       Could you point yourself out in this image again?  I'm

16  sorry.  Or do I even have you in the frame?

17  A    Can you scroll up?

18       Yes.  I am there.

19  Q    So you're right about there.  And were you there as the

20  car came down the street and crashed or did you move up after

21  the crash or...

22  A    I was right about there.

23  Q    Okay.  So -- all right.  This is Plaintiffs' Exhibit 0313.

24  I believe it's already in evidence.  And I'd like to show it to

25  the jury.  I'm going to play this in slow motion.

A. Muniz - Cross

1  A    Can you get rid of that circle.

2  Q    Yes, I will.  Thank you.

3          (Video playing.)

4      Are you able to see yourself in this or do you have an

5  idea about where we are?  This is less than a minute before the

6  crash.

7  A    Yeah, I know where this vantage point is.  I'm familiar

8  with the street.  This is at the top of the street because

9  these newspaper machines are up there, as is the motorcycle

10 parking.  And I was -- if you can see a telephone pole way in

11 the distance, I was near that telephone pole.

12 Q    You were near the telephone pole.

13 A    So I cannot see myself in this picture.

14 Q    That's a good reference point.

15     Okay.  Excuse me one second while I pull that back up.

16     (Video playing.)

17     I want you to keep your eye right there.  Did you see

18 somebody swing something at that car?

19 A    Could you replay it?

20 Q    Sure.

21 A    Without that circle.

22 Q    Yes.

23 A    Yes, I see somebody swinging at the back light.

24 Q    Did you see anybody else carrying clubs, weapons, bats,

25 that sort of thing?

A. Muniz - Cross

1    A    I didn't recognize any that day.

2    Q    Did you recognize any of the chants of the people that you

3    were walking with?

4    A    Sure.

5    Q    Can you tell me a couple of them?

6    A    When I joined the crowd people were chanting "black lives

7    matter."  And at that point we were chanting "Whose streets?

8    Our streets."

9    Q    "Whose streets?  Our streets."  And you don't perceive

10   that to be a violent chant, do you?

11   A    It seemed like a celebratory chant.

12   Q    Earlier that chant was described as about dominating

13   physical space.  Did you perceive it that way?

14   A    I perceived it as retaking space.

15   Q    Retaking space.  Okay.  Did you hear anybody chanting

16   anything about Antifa?

17   A    No.

18   Q    Did you hear "ah, anti, antifa, antifascista"?

19   A    Nope.

20   Q    And you definitely would have heard that if you were in

21   the presence, right?

22   A    Well, no.  You can hear that's a pretty noisy crowd and I

23   was in the middle of a sea of people.  Somebody could have said

24   it.  I just don't recognize it or recall.

25   Q    Suffice it to say you did not hear the crowd in unison

A. Muniz - Cross

1  making that chant?

2  A    No, I did not hear that.

3           MR. CANTWELL:  We can take this down.  Now I'm

4  showing the witness Plaintiffs' Exhibit 0291, which is in

5  evidence, and I'd like to show this again to the jury.

6  BY MR. CANTWELL:

7  Q    Do you remember seeing this black Antifa flag while you

8  were chanting --

9           MS. PHILLIPS:  Objection, Your Honor, there's no

10 foundation for anybody having testified so far that that is an

11 Antifa flag.

12          THE COURT:  Sustained.  You can stop.

13  BY MR. CANTWELL:

14 Q    Do you remember seeing that flag while you were marching

15 with those folks?

16 A    No.  As you can see there's a lot of flags.  I don't

17 remember seeing that one in particular.

18 Q    Do you know what Antifa is?

19 A    I have come to understand it a little bit.  I did not know

20 what Antifa was at the time.

21 Q    On August 12th, 2017, you had never heard of Antifa?

22 A    No, I had not.

23 Q    Okay.  Since then, have you come to recognize Antifa

24 symbols?

25          MS. PHILLIPS:  Objection, relevance.

253

A. Muniz - Cross

1        THE COURT:  Sustained.  She didn't know at the time.

2        MR. CANTWELL:  That's fine.

3   BY MR. CANTWELL:

4   Q    You said you got first aid at the United Methodist Church?

5   A    I got trauma therapy there.

6   Q    You got it on August 12th, right?

7   A    Yes.

8   Q    Okay.  You had seen a certified trauma therapist there?

9   A    Yes.

10  Q    They were -- was the church seem prepared to provide

11  substantial medical assistance?

12  A    It appeared to have a first aid station in it and a trauma

13  therapist at least.  I was pretty out of it when I entered and

14  left that building.

15  Q    Do you know if any of the people who treated you were

16  wearing red bandannas?

17  A    The medic on the street that helped me up and took me

18  there was wearing a red bandanna.

19  Q    But none of the medics inside the church were wearing red

20  bandannas to the best of your recollection?

21  A    Like I said, I don't know.  I was kind of out of it.

22  Q    Were there many people in the church when you went there?

23  A    Again, I don't really recall.

24  Q    Did you see anybody changing their clothes in the church?

25  A    I don't think so.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/11/2021

1   Q    After this, did you attend a DC march against white

2   supremacy?

3   A    I did, yes.

4   Q    Have you attended other such events since August 12th?

5   A    What do you mean by "such events"?

6   Q    Have you attended political marches, rallies, that sort of

7   thing?

8   A    I attended that march, a part of that march.  And I recall

9   standing at the Freedom of Speech Wall here in Charlottesville

10  while we listed out the names of black individuals that had

11  been killed at the hands of the police.

12  Q    Right.  Okay.  You said that you get nervous when you see

13  rows of white cars because of the vans that rally attendees

14  drove to the park in?

15  A    Yes.

16          MR. CANTWELL:  Thank you very much.  No further

17  questions.

18          THE COURT:  All right.

19          MS. PHILLIPS:  Nothing on redirect, Your Honor.

20          THE COURT:  Thank you.  You may step down.  I guess

21  we may as well stop unless you've got a two-minute witness.

22          MS. DUNN:  We have a witness who will be somewhere in

23  the 20 to 30-minute range, but she's here and we could start,

24  Your Honor, if you'd like.

25          THE COURT:  We only have 7 minutes before 5.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/11/2021

1      Members of the jury, we're going to recess now until

2  9 o'clock tomorrow morning.  Over the night do not discuss the

3  case with anyone or allow anyone to discuss it with you or

4  remain within hearing of anyone discussing it.  We'll see you

5  back here tomorrow morning at 9 o'clock.

6  **(Jury out, 4:51 p.m.)**

7      MS. DUNN:  Your Honor, we could discuss scheduling,

8  if you'd like.

9      THE COURT:  Do what?

10      MS. DUNN:  We could discuss scheduling, if you would

11  like, for a few minutes.

12      THE COURT:  All right.  Go ahead.

13      MS. DUNN:  Your Honor, we -- our remaining witnesses

14  are ready to go.  They're not long.  We have the plaintiff that

15  we were just going to call, we can call tomorrow.  The two

16  damages witnesses, because we have no stipulation, and then

17  Mr. Schoep, who is a defendant, could only come tomorrow.  So

18  we would -- we'll call him as well.

19      After that, we would have two witnesses, Mr. Kessler

20  and Mr. Cantwell, but there has been discussion about the

21  defense calling them, so they only have to come once to save

22  time.

23      With regard to Mr. Kessler, we discussed with some

24  defense counsel earlier, we discussed with Mr. Kolenich,

25  Mr. Spencer and Mr. Jones in particular.  Mr. Spencer plans to

                  Sines, et al. v. Kessler, et al., 3:17CV72, 11/11/2021

 1  call Mr. Kolenich -- I'm sorry, apologies, Mr. Kessler.  I

 2  believe he's going to call him on Monday.  And then we would --

 3  can cross-examine after the defense counsel are done examining

 4  Mr. Kessler.  So we just wanted to say that we would keep our

 5  case open for Mr. Kessler and Mr. Cantwell to testify and rest

 6  after that.

 7            THE COURT:  Okay.  Is that a problem?

 8            MR. CANTWELL:  I object to them keeping their case

 9  open.

10            THE COURT:  What about Mr. Kessler's attorney?

11            MR. KOLENICH:  That's precisely what we discussed,

12  Your Honor.  She accurately represented the situation.

13            THE COURT:  Well, it will remain open.  You can make

14  your motion whenever, but...

15            MS. DUNN:  The question remains, Your Honor -- and I

16  think defense counsel and Mr. Cantwell and Mr. Spencer are

17  discussing this -- we should not fill the day tomorrow.  We do

18  have some video after that, but there may be time in the day

19  tomorrow when the defense would call witnesses.  So I don't

20  know if they've decided who those witnesses would be --

21  obviously, we'd like notice of that today, tonight -- but I

22  just wanted for everybody to be on the same page.

23            THE COURT:  Who is going first tomorrow?

24            MR. KOLENICH:  It will not be me, Your Honor, and

25  Mr. Kessler will not be here until Monday.  So we know it won't

Sines, et al. v. Kessler, et al., 3:17CV72, 11/11/2021

1    be Mr. Kessler.

2              THE COURT:  I think it's optimistic to think you're

3    going to get all those witnesses in.

4              Well, tomorrow when they finish, I'm going to call on

5    somebody over on this side.

6              MR. KOLENICH:  Yes, sir.

7              MS. DUNN:  Thank you, Your Honor.  We appreciate it.

8    (Proceedings adjourned, 4:56 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sines, et al. v. Kessler, et al., 3:17CV72, 11/11/2021

C E R T I F I C A T E

1

2      I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3  the United States District Court for the Western District of

4  Virginia, appointed pursuant to the provisions of Title 28,

5  United States Code, Section 753, do hereby certify that the

6  foregoing is a correct transcript of the proceedings reported

7  by me using the stenotype reporting method in conjunction

8  with computer-aided transcription, and that same is a

9  true and correct transcript to the best of my ability and

10  understanding.

11      I further certify that the transcript fees and format

12  comply with those prescribed by the Court and the Judicial

13  Conference of the United States.

14      /s/ Lisa M. Blair                Date: November 11, 2021

15

16

17

18

19

20

21

22

23

24

25