Sines, et al. v. Kessler, et al., 3:17CV72, 11/12/2021

```
 1                 UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF VIRGINIA
 2                   CHARLOTTESVILLE DIVISION

 3   **************************************************************

 4   ELIZABETH SINES, ET AL.,      CIVIL CASE NO.:  3:17CV72
                                   NOVEMBER 12, 2021, 8:56 AM
 5                                 JURY TRIAL, DAY 15
             Plaintiffs,
 6   vs.

 7                                 Before:
                                   HONORABLE NORMAN K. MOON
 8                                 UNITED STATES DISTRICT JUDGE
     JASON KESSLER, ET AL.,        WESTERN DISTRICT OF VIRGINIA
 9
             Defendants.
10
     **************************************************************
11
     APPEARANCES:
12

13   For the Plaintiffs:          EMILY C. COLE, ESQUIRE
                                   ALEXANDRA K. CONLON, ESQUIRE
14                                 ROBERTA A. KAPLAN, ESQUIRE
                                   JONATHAN R. KAY, ESQUIRE
15                                 Kaplan Hecker & Fink LLP
                                   350 Fifth Avenue, Suite 7110
16                                 New York, NY  10118
                                   212.763.0883
17

18

19

20

21

22   Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                       255 West Main Street, Suite 304
23                     Charlottesville, Virginia  22902
                       434.296.9284
24
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25   TRANSCRIPT PRODUCED BY COMPUTER.
```

Sines, et al. v. Kessler, et al., 3:17CV72, 11/12/2021

```
 1   APPEARANCES CONTINUED:

 2   For the Plaintiffs:        NICHOLAS A. BUTTO, ESQUIRE
                                KAREN L. DUNN, ESQUIRE
 3                              MAKIKO HIROMI, ESQUIRE
                                WILLIAM A. ISAACSON, ESQUIRE
 4                              JESSICA E. PHILLIPS, ESQUIRE
                                Paul, Weiss, Rifkind, Wharton &
 5                              Garrison LLP
                                2001 K Street, NW
 6                              Washington, DC  20006

 7   For the Defendants:        DAVID L. CAMPBELL, ESQUIRE
                                Duane, Hauck, Davis, Gravatt &
 8                              Campbell, P.C.
                                100 West Franklin Street, Suite 100
 9                              Richmond, VA  23220
                                804.644.7400
10
                                CHRISTOPHER CANTWELL, PRO SE
11                              #00991-509
                                USP Marion
12                              4500 Prison Road, PO Box 2000
                                Marion, IL  62959
13
                                BRYAN J. JONES, ESQUIRE
14                              Bryan J. Jones, Attorney at law
                                106 W. South Street, Suite 211
15                              Charlottesville, VA  22902
                                540.623.6952
16
                                JAMES E. KOLENICH, ESQUIRE
17                              Kolenich Law Office
                                9435 Waterstone Blvd., Suite 140
18                              Cincinnati, OH  45249
                                513.444.2150
19
                                WILLIAM E. REBROOK, IV, ESQUIRE
20                              The ReBrook Law Office
                                6013 Clerkenwell Court
21                              Burke, VA  22015
                                571.215.9006
22
                                JOSHUA SMITH, ESQUIRE
23                              (Appearing via Zoom)
                                Smith LLC
24                              807 Crane Avenue
                                Pittsburgh, PA  15216
25                              917.567.3168
```

```
 1   APPEARANCES CONTINUED:

 2   For the Defendants:          RICHARD SPENCER, PRO SE
                                  P.O. Box 1676
 3                                Whitefish, MT  59937

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX OF WITNESSES

 2    WITNESSES ON BEHALF OF THE PLAINTIFF:              PAGE

 3    SHARON L. REAVIS

 4      Direct Examination by Ms. Phillips               12
        Cross-Examination by Mr. Campbell                28
 5
      ELIZABETH SINES
 6
        Direct Examination by Ms. Conlon                 43
 7      Cross-Examination by Mr. Cantwell                76
        Cross-Examination by Mr. ReBrook                107
 8      Cross-Examination by Mr. Spencer                113
        Cross-Examination by Mr. Jones                  126
 9      Cross-Examination by Mr. Kolenich               127

10    NADIA WEBB, PH.D.

11      Direct Examination by Ms. Phillips              136
        Cross-Examination by Mr. Campbell               149
12      Cross-Examination by Mr. Cantwell               157
        Cross-Examination by Mr. ReBrook                158
13      Cross-Examination by Mr. Campbell               165

14    BURT COLUCCI (Video deposition played.)

15    JEFF SCHOEP

16      Direct Examination by Mr. Isaacson              166
        Cross-Examination by Mr. Spencer                247
17      Cross-Examination by Mr. Campbell               249
        Cross-Examination by Mr. Jones                  250
18      Cross-Examination by Mr. Smith                  251
        Cross-Examination by Mr. Cantwell               253
19

20

21

22

23

24

25
```

```
 1                          INDEX OF EXHIBITS

 2    EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3         EXHIBIT:              Marked      Received

 4         4020                   20           20

 5         4021                   23           23

 6         4022                   26           26

 7         4023                   28           28

 8         3204A                  52           52

 9         3204B                  54           54

10         3204C                  56           56

11         3204D                  57           57

12         3204E                  58           58

13         3346                   70           70

14         3207A                  71           71

15         1476A                 173          173

16         1481                  172          173

17         1970                  175          175

18         2460                  178          178

19         1816                  178          179

20         2783                  180          181

21         2781                  182          183

22         2924B                 190          190

23         2924C                 190          190

24         2924D                 191          191

25         2203                  191          223
```

```
 1                    INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3        EXHIBIT:              Marked    Received

 4        2464                    192       192

 5        1563                    195       195

 6        2200                    197       197

 7        1424                    198       198

 8        1410                    199       199

 9        3210E-2                 203       203

10        3210E-1                 203       203

11        2258                    208       209

12        1536                    209       209

13        1591                    211       212

14        1488                    211       212

15        1979                    214       214

16        1982                    214       214

17        3236A                   218       218

18        1483                    220       220

19        3236B                   222       222

20        1468                    224       224

21        1594A                   226       226

22        1467                    226       --

23        2768                    238       238

24        3236C                   239       239

25        3236D                   240       240
```

```
 1                          INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3   EXHIBIT:                 Marked     Received

 4         3236E                           242          242

 5         2750                            243          243

 6         1596                            244          244

 7         1484                            244          245

 8         1810                            251          251

 9

10   EXHIBITS ON BEHALF OF THE DEFENDANTS:

11         EXHIBIT:                   Marked    Received

12         CC-3207                     88         88

13         CC-3202                     89         89

14         CC3200A251                  92         92

15         RS-1012251                 117        117

16         LOS-3236                   251        251

17

18

19

20

21

22

23

24

25
```

1   (Proceedings commenced, 8:56 a.m.)

2           THE COURT:  Good morning.  Call the case, please.

3           THE CLERK:  Yes, Your Honor.  This is Civil Action

4   Number 3:17-cv-00072, Elizabeth Sines and others versus Jason

5   Kessler and others.

6           THE COURT:  Plaintiffs ready?

7           MS. KAPLAN:  We are, Your Honor.

8           THE COURT:  Defendants ready?

9           MR. KOLENICH:  Yes, sir.

10          THE COURT:  Before we begin, I will remind everyone

11  that under Standing Order 2020-12 and 2013-8, the Court's

12  prohibition against recording and broadcasting court

13  proceedings remains in force.  Attorneys, parties, and their

14  staff, and any members of the public or press accessing this

15  proceeding today, may not record or broadcast it.  That means

16  no photography, no using of any video or audio recording

17  device, no rebroadcasting, livestreaming, or otherwise

18  disseminating any live or recorded video or audio of this

19  proceeding.

20          Anything before the jury comes back?

21          MR. CANTWELL:  Judge, Christopher Cantwell.  I know I

22  had previously stated an objection to the plaintiffs keeping

23  their case open because I wanted to submit a Rule 50 motion.

24  Your Honor said that I could still submit that motion.

25          The additional challenge here is that I don't know

1  how to present my defense unless I know what evidence is in
2  against me.  Right now there isn't any, as far as I can tell,
3  and so for that reason, there's not much reason for me to put
4  on a case, but if the plaintiffs can basically wait until the
5  end and then call me adversely after I've decided to not put on
6  a case, then I think that that presents an unfair disadvantage
7  to me, especially as a *pro se* defendant who is incarcerated and
8  doesn't have access to the resources that they have.

9        THE COURT:  All right.  You can make your motion, and
10 if you are persuasive enough, I'll let you out of the case.

11       MR. CANTWELL:  I'm sorry.  This is not about the
12 Rule 50 motion.  The challenge is that for me to know what case
13 I'm going to put on, for me to put on a defense, I have to know
14 what the evidence is.  And so this whole thing shocks me.  The
15 idea is that they should be able -- they should have to put on
16 all the evidence before I have to put on a defense.  And if
17 they get to keep their case open and I just decide not to take
18 the stand, then they can just call me adversely at the end, is
19 my understanding, which puts me at an unfair disadvantage.

20       THE COURT:  Well, you have a right to make your
21 Rule 50 motion here, like in any case.  If the motion is
22 decided against you and you are persuaded that the judge is
23 wrong, it's a risk you run.  I don't see the prejudice.

24       MR. CANTWELL:  This is not about the Rule 50 motion.
25       THE COURT:  Okay.  All right.  All right.

1              MR. CANTWELL:  The challenge that I'm faced with is

2    knowing what the evidence against me is so that I can put on a

3    defense.  And if they get to keep their case open, then that's

4    a black box that waits until the end of trial.

5              THE COURT:  Well, you can make the motion at the time

6    that their case has ended.  I mean, they're not going to keep

7    their case open until after he puts his case on.

8              MR. CANTWELL:  My understanding is that's the goal.

9              THE COURT:  Well --

10             MR. CANTWELL:  Am I misunderstanding something?

11             THE COURT:  I don't understand that.  I thought it

12   had to do with Mr. Kessler and --

13             MR. KOLENICH:  Your Honor, I'll try to be of some

14   help here.

15             Mr. Cantwell obviously is *pro se*.  He's done a way

16   above-average job in trial in presenting his case, I think, but

17   he's -- you know, Rule 50 is a little bit convoluted.  We can't

18   put it in until the plaintiffs' case is over, but yet they can

19   have a rebuttal case.  There's the old distention that inmates

20   are likely limited to -- you know, the inmate libraries and the

21   books between pre-evidence and post-evidence rules and all this

22   stuff.  So I think that's what's confusing Mr. Cantwell.  He's

23   used to being a criminal defendant.  The state has to rest and

24   then that's it, you can make a criminal motion.

25             In this case, the plaintiffs, you know, they can put

11

1    in a rebuttal case.  They can keep talking and putting in

2    evidence even after we make a Rule 50, technically speaking, if

3    they say, well, okay, we see those holes and we'd like to put

4    in a case.  That's what's confusing him.

5              THE COURT:  Okay.

6              MR. KOLENICH:  I don't think he has any problem, he

7    can follow us when we make our Rule 50s and that'll be that.

8              THE COURT:  Okay.  Call the jury.

9              Mr. Cantwell, I know you've made an objection to two

10   experts who are to testify today.  And I think the Court has

11   already ruled on that.

12             MR. CANTWELL:  I think the expert has already

13   testified.  It's a moot point now.

14             THE COURT:  There's two this morning.

15             MR. CANTWELL:  Two experts?

16             THE COURT:  Nadia Webb and Julie Convisser.

17             MS. DUNN:  If this is helpful, these are experts with

18   regard to damages.

19             THE COURT:  Right.

20             MS. DUNN:  As distinct from the expert that testified

21   yesterday, Dr. Simi.

22             MR. CANTWELL:  Yeah, I was under the impression that

23   the Court had already ruled that these experts were admissible.

24   I don't have any current objection to them.

25             THE COURT:  I just wanted to take care of that before

S. Reavis - Direct

1   the jury.

2          MR. CANTWELL:  Thank you.

3          MS. DUNN:  Thank you.

4          THE COURT:  Thank you.

5   **(Jury in, 9:02 a.m.)**

6          THE COURT:  All right.  Good morning, ladies and

7   gentlemen.  Happy to see you all here today.  We are ready to

8   proceed.  Next witness?

9          MS. KAPLAN:  Your Honor, plaintiffs call Sharon

10  Reavis to the stand.  And I think Ms. Dunn just went outside to

11  get her.

12         SHARON L. REAVIS, CALLED BY THE PLAINTIFFS, SWORN

13         MS. PHILLIPS:  May I begin?

14         THE COURT:  You may proceed.

15                     DIRECT EXAMINATION

16   BY MS. PHILLIPS:

17  Q    Good morning, Ms. Reavis.

18  A    Good morning.

19  Q    Will you please state your full name?

20  A    Sure.  Sharon L. Reavis, R-E-A-V-I-S.

21  Q    Ms. Reavis, will you please describe your educational

22  background?

23  A    I'm a registered nurse.  I'm a graduate from a

24  hospital-based school of nursing.  I have a bachelor's degree

25  in healthcare administration, a master's degree in

13

S. Reavis - Direct

1   rehabilitation counseling, and postgraduate work in

2   rehabilitation counseling as well.

3   Q    Ms. Reavis, does your educational background as a

4   rehabilitation counselor and a nurse include information

5   regarding the evaluation of disabilities and the corresponding

6   requirement for services?

7   A    Yes.  That was a long question.

8   Q    It was.

9   A    That's what I do.  And my field professions of nursing and

10  rehabilitation counseling work together in allowing me to

11  examine people who have disabilities, work with people who have

12  both disabilities and chronic illnesses, to create

13  rehabilitation plans or provide medical case management for

14  various disabilities.  So that's pretty much what I do every

15  day.

16  Q    Can you please describe your employment background for the

17  jury?

18  A    Okay.  I'll be brief, because I've been in the -- I've

19  been in the work force since 1966.  I started in hospital

20  nursing as an intensivist, and that was coronary care,

21  intensive care, and transplant.  And because I had worked in

22  the third coronary care unit in the entire country, I was

23  recruited to go to the Medical College of Virginia and start

24  their first coronary care unit a long time ago, and work on the

25  first heart transplant, which I think was the second heart

S. Reavis - Direct

1   transplant in the entire country.

2       So I did nursing and hospital-based nursing for a period

3   of time.  Again, all of it intensive nursing.  And then began

4   to work as a medical case manager later on when I had three

5   kids and three shifts of nursing didn't work too well.  And

6   then I've worked in medical case management and provided those

7   services both in the public and private sector since sometime

8   in the late '70s.  I've been doing that continuously and

9   worked -- and in addition worked in the chronic pain,

10  hospital-based chronic pain program.  Actually had three jobs

11  at the time:  Teaching graduate school, working in chronic

12  pain, and doing what I do now.

13  Q   Thank you.  What licenses and certifications, if any, do

14  you hold?

15  A   I'm licensed as a registered nurse in Virginia and

16  reciprocity in 23 other states, and that's because of the

17  shortage of nurses.  And I'm also licensed as a rehabilitation

18  provider by the state of Virginia.  I'm a certified

19  rehabilitation counselor, and that's a national board

20  certification.  I'm a certified case manager.  That's also a

21  national board certification.  I'm a certified counselor, which

22  is more of a general counseling specification.  It includes

23  family counseling, etc.  And I'm a senior disability analyst.

24  I think that's all.

25  Q   Thank you.  What is a case manager and what duties and

S. Reavis - Direct

1   responsibilities follow that position?

2   A    Case management became -- was put into play, I guess I

3   should say, during the managed care era of healthcare because

4   individuals -- it was a good era beginning -- that was in the

5   '70s -- because we were able to have much more sophisticated

6   diagnostic tools, like MRIs etc, many more options for care,

7   lots of specialties.  It became very difficult for the

8   individual person trying to access healthcare to know, well,

9   where to go, how to prepare, for instance, discharge from a

10  hospital, what kinds of services were available, how did they

11  get to these services, etc.

12      So medical case managers became a factor in hospitals and

13  for discharge planning and doctors' offices in the community

14  and other entities.  And they are the people who traverse the

15  healthcare system for the patient and the patient's family.

16  That's what they're supposed to do.

17  Q    Thank you.  How does your role as a case manager relate to

18  the development of information relative to the cost of medical

19  care?

20  A    Well, that's the other thing that happened.  When we have

21  many different new services and continually new products, etc,

22  then there has to be the issue of:  Are these products or

23  services -- do they have a value?  And what should the charge

24  be?  I don't know if you've ever had to be in the hospital and

25  looked at your hospital bill, but it's not too easy to

S. Reavis - Direct

1  navigate.

2       And also, when you go to a doctor, you know, what's your

3  bill going to be and what's it related to?  If you're in a

4  nursing home -- I've overseen a number of people in nursing

5  home facilities and have audited the bills of hospitals, etc.

6       So the medical case manager is the person to go to if you

7  want to see, well, what's this going to cost and is it

8  appropriate?  Is it the appropriate cost?  Or if you need a

9  particular wheelchair, shall we say, is it one that's going to

10  last and is it a good quality product, and what should it cost?

11  If you're going to have a surgery, what should it cost?

12       So cost has to be an integral part of the healthcare

13  system.  It already is, but you have to have help sometimes in

14  knowing what you're paying for.

15            THE COURT:  Is that an issue in this case?

16            MS. PHILLIPS:  Yeah, it is, Your Honor.  I'm trying

17  to establish Ms. Reavis as an expert in this field so she can

18  provide the life care plan summaries that she provided for four

19  of our plaintiffs in the damages case.

20            MR. CAMPBELL:  We're happy to stipulate to her

21  qualifications.

22            MR. KOLENICH:  Yes.  It's our understanding that

23  Ms. Reavis testifies this way and has qualified repeatedly in

24  Virginia courts.

25            THE COURT:  All right.

S. Reavis - Direct

1         MS. PHILLIPS:  Thank you.  Then, Your Honor, I would

2    offer Ms. Reavis under Rule 702 to testify as an expert in the

3    fields of rehabilitation counseling and life care planning.

4         THE COURT:  She may so testify.

5    BY MS. PHILLIPS:

6    Q    Ms. Reavis, were you retained by plaintiffs to give your

7    expert opinion in this case?

8    A    Yes.

9    Q    For which plaintiffs?

10   A    Mr. Baker, Mr. Martin, Ms. Alvarado and --

11   Q    Ms. Romero?

12   A    Romano -- Romero.  Yes.

13   Q    And have you submitted life care plans in this matter for

14   those four plaintiffs?

15   A    I have.

16   Q    Did you review those life care plans in preparation for

17   your testimony today?

18   A    Yes.

19        MS. PHILLIPS:  Your Honor, may I approach and hand

20   her those plans?

21        THE COURT:  You may.

22        MS. PHILLIPS:  Just in case you need it.

23    BY MS. PHILLIPS:

24   Q    Ms. Reavis, did you prepare a life care plan for Mr. Baker

25   in this case?

18

S. Reavis - Direct

1   A     I did.

2   Q     Can you please briefly describe how you developed this

3   plan?

4   A     Yes.  I have a methodology with all of my plans, and that

5   is to review the medical records that are relevant to the

6   individual who requires care.  And I did so in the case of

7   Mr. Baker, as well as the other cases.  If there is a treating

8   doctor, I make an attempt to speak with that particular doctor

9   to collaborate in the development of the plan.  And I did that

10  in this case, which is Dr. Gwathmey.

11      I had a Zoom interview because this was during COVID.  I

12  did a Zoom interview, which is an interview that I conduct with

13  everybody I work with.  It's a structured interview.  And it

14  entails their medical history, what services they have; for

15  instance, if they're taking medications, I go over their

16  medications, go over their work history, go over their family

17  and social history and do a complete evaluation of what their

18  current situation is within their household and what other

19  issues they may have that may not have been presented in the

20  medical records.

21      I did that with Mr. Baker.  I actually did twice with

22  Mr. Baker, once in 2020 and once in 2021.  And I've had a

23  number of phone calls with him as well because I have to check

24  up on people every so often to determine if things have

25  changed.

S. Reavis - Direct

1        And then I went about developing the life care plan by

2   having a conference with Dr. Gwathmey, who was his surgeon, and

3   still is, at UVA.  And we collaborated on the plan and then I

4   brought Mr. Baker in on the plan to see if that was a plan he

5   was willing to follow and felt that it was helpful to him.

6        After that I went about to develop the cost of the care

7   and to find the services; in other words, where was he going to

8   get this and what was it going to cost?  And the way I do that,

9   I have a market survey that I utilize.  That means I talk

10  directly to the providers to determine what the care would cost

11  and if they have the availability and the proper qualifications

12  to provide the care.  And then I do comparisons.

13       And medical care is coded.  For instance, if you go to

14  your doctor and it's just a short visit, you know, under 20

15  minutes, then he's going to charge you a 99213 CPT code.

16  That's the codes they go by.  If you go in the hospital,

17  they're going to give you an ICD-9 code.  So those are the

18  things that identify what service you're getting, the extent of

19  service, and what the cost would be, so I can go back and make

20  comparisons based on what is available and whether it's a

21  reasonable cost within that particular code.

22  Q   Ms. Reavis, may I show you a chart we marked PX-4020.

23  Mr. Spalding, if you'd bring up the first slide, please.

24       Is this a chart summarizing your life care plan for

25  Mr. Baker?

S. Reavis - Direct

1    A    Yes.

2    Q    Okay.  And have you reviewed the underlying documents that

3    this chart is based on?

4    A    Yes.

5    Q    Is this chart accurate?

6    A    Yes.

7            MS. PHILLIPS:  Your Honor, we'd move to admit

8    Plaintiffs' 4020.

9            THE COURT:  Be admitted.

10           MR. CAMPBELL:  Your Honor, just briefly, I have an

11   objection to admitting just that document without the

12   underlying life care plan that breaks down what individually

13   these things are for.  That's going to come up in cross.

14           MS. PHILLIPS:  We'd be happy to admit those as well.

15   We'll put those all under 4020 and we will mark those.

16           MR. CAMPBELL:  And I just mean the chart --

17           MS. PHILLIPS:  Understood.

18           MR. CAMPBELL:  -- not the actual records.

19           MS. PHILLIPS:  Understood.

20           MR. CAMPBELL:  Thank you, ma'am.

21           THE COURT:  Thank you.

22           (Plaintiff Exhibit 4020 marked.)

23           (Plaintiff Exhibit 4020 admitted.)

24   BY MS. PHILLIPS:

25   Q    Ms. Reavis, there are categories listed on this slide.

S. Reavis - Direct

1  Can you please describe the first category, home services?

2  A    Sure.  Well, let me give a little overview of what this

3  is.  This particular plan is all prophylactic.  The purpose is

4  to allow Mr. Baker to be as functional at possible but to avoid

5  any exacerbation of his condition, his chronic pain, and to

6  hopefully avoid a hip replacement in the future.

7      So the first category, home services, allows some help

8  within his household, to provide lawn care and some minor home

9  maintenance, not a contractor to come in and build anything.

10 It's just such things as cleaning gutters, etc.  He has a

11 really hard time being able to keep his lawn because he's built

12 into a hillside with 30 steps to get to where he needs to go,

13 and steps are a problem for him.

14     So the idea is to provide this service for him so that he

15 can hopefully avoid any more complex surgeries, although he

16 will have to have some surgeries in the future.

17 Q    So speaking of those surgeries, do one of the categories

18 that you've listed here cover future surgeries?

19 A    Yes.

20 Q    Which one is that?

21 A    Medical interventions.

22 Q    And can you briefly describe medical routine and medical

23 services, those categories?

24 A    Medical routine or medical interventions?

25 Q    Sorry, medical routine and medical services.

S. Reavis - Direct

1   A    Okay.  Medical services are the X-rays.  He'll have to be

2   followed by his orthopaedist every so often.   That's

3   Dr. Gwathmey, or it could be Dr. Weiss because both of them are

4   involved in it, but it's usually Dr. Gwathmey.  He'll have

5   X-rays every so often every one to two years until age 55 and

6   then once a year because after you hit age 55 and you already

7   have an injury, things get a little bit more difficult and

8   he'll have to be watched more closely.

9        And then of course Dr. Gwathmey will follow him as well.

10  Every time he goes in, he'll be seen by Dr. Gwathmey.  And of

11  course if he needs intermittent, he will be seen

12  intermittently.

13  Q    Ms. Reavis, what is the lifetime total cost reflected in

14  this chart for Mr. Baker's life care plan?

15  A    $493,513.

16  Q    Does this life care plan make provisions for all of the

17  medical care and services that Mr. Baker will require?

18  A    No.  It doesn't have anything to do with his general

19  health.  He'll have other health issues.  And you can't really

20  specify complications.  This assumes his surgeries will be

21  without complications and go well.

22  Q    And these are needs that are stemming from the injuries

23  that he suffered on August 12th, 2017?

24            MR. CAMPBELL:  Objection, Your Honor.  This witness

25  is not a medical doctor and cannot testify to medical

S. Reavis - Direct

1    causation.

2                MS. PHILLIPS:  I'll withdraw the question.

3                Can you go to slide 2, Mr. Spalding, please.

4    BY MS. PHILLIPS:

5    Q    Ms. Reavis, did you also prepare a life care plan for

6    Mr. Martin?

7    A    I did.

8    Q    And did you develop the life care plan for Mr. Martin in

9    the same way that you developed the life care plan for

10   Mr. Baker?

11   A    Yes.  And interesting enough, they have the same doctors.

12   Q    Ms. Reavis, this chart is marked Plaintiffs' 4021.  Is

13   this a chart summarizing your life care plan for Mr. Martin?

14   A    It is.

15   Q    And have you reviewed the underlying documents that this

16   chart is based on?

17   A    Yes.

18   Q    And we will include those underlying documents in

19   Plaintiffs' 4021 as well.

20               (Plaintiff Exhibit 4021 marked.)

21   BY MS. PHILLIPS:

22   Q    Is this chart accurate?

23   A    Yes.

24               MS. PHILLIPS:  Your Honor, we'd move Plaintiffs'

25   4021.

24

S. Reavis - Direct

1          THE COURT:  Be admitted.

2                (Plaintiff Exhibit 4021 admitted.)

3   BY MS. PHILLIPS:

4   Q    Ms. Reavis, there are some additional categories listed

5   under Mr. Martin's life care plan that we did not see, for

6   example, in Mr. Baker's.  Can you describe, for example, the

7   vocational services category?

8   A    Sure.  Mr. Martin has an injury to his right ankle that

9   has been problematic ongoing.  He did have surgical procedures,

10  but he continues to have chronic pain.  And there are areas

11  that are difficult for him and areas he should avoid.  He's had

12  several occupations that haven't been successful for him.  And

13  just recently he started another job, which is heavy equipment.

14  It does allow him to be sedentary, but he has difficulty

15  getting in and out of the equipment because he has to slide

16  down out of the heavy equipment so that he won't re-injure his

17  ankle and avoid pain.  And it's also probably not the best job

18  for him because of the vibration.  He has trouble with uneven

19  terrain, etc.

20          So I really think the best thing for him, and in

21  discussion with Dr. Gwathmey, is to have some counseling to see

22  if we can find a job that might be a little less rigorous for

23  him and not aggravate his chronic pain.  It might require

24  retraining, it might require additional education, but that

25  would be in his best interest to avoid potential other surgical

S. Reavis - Direct

1    procedures if we can.

2        It's the same philosophy for Mr. Martin, trying to put him

3    on a program which limits some of his activities, which he has

4    already limited his physical activity, so that he will have

5    other surgical procedures, but may not have to have an ankle

6    fusion, which would be unfortunate.

7    Q    Thank you.  What is the lifetime total cost reflected in

8    this chart for Mr. Martin's life care plan?

9    A    Okay.  $197,973.

10   Q    And does this plan make provisions for all the medical

11   care and services that Mr. Martin will require?

12   A    No.  Again, it's not his general health and any issues he

13   would have there.  And for the surgeries that he's going to

14   have in the future, it wouldn't include any complications, if

15   there were any.

16   Q    Thank you.

17       Mr. Spalding, if we can go to the next slide.

18       Ms.  Reavis, did you also have an opportunity to prepare a

19   life care plan for Ms. Alvarado?

20   A    Yes.

21   Q    And did you develop that plan in the same manner that you

22   developed Mr. Baker and Mr. Martin's life care plans?

23   A    Yes, I did.

24   Q    And Ms. Reavis, there are again additional categories

25   listed in this life care plan that do not appear in the other

S. Reavis - Direct

1  two; for example, community living services.  Can you describe

2  what that is?

3  A    Yes.  Community living services engage the case manager to

4  help the individual to get what we call wrap-around services;

5  in other words, if the individual requires psychiatric care,

6  which she does, and medication management and community

7  services, as well as psychological services, counseling and

8  cognitive therapy, etc, then the wrap-around services keep

9  everything going, and makes certain that she receives the

10 services that she needs.  That would be the community-based

11 program.

12 Q    Mr. Spalding, can you put -- oh, slide 3 is up.

13      This chart is marked Plaintiffs' 4022.  Is this a chart

14 summarizing your life care plan for Ms. Alvarado?

15 A    I'm not finding that one in my packet here.

16 Q    If you look up on the screen.

17 A    That chart, yes.  But I don't have the total here.

18 Q    Have you reviewed the underlying documents that this chart

19 is based on, Ms. Reavis?

20 A    Yes.  That's the right total.  I just don't have a copy of

21 it in here.

22 Q    Great.  You just answered my question.  Is the chart

23 accurate?

24 A    Yes.

25          MS. PHILLIPS:  We would move to admit Plaintiffs'

S. Reavis - Direct

1  4022, again with the underlying charts.

2          THE COURT:  Be admitted.

3          (Plaintiff Exhibit 4022 marked.)

4          (Plaintiff Exhibit 4022 admitted.)

5   BY MS. PHILLIPS:

6  Q    Ms. Reavis, what is the lifetime total cost reflected in

7  this chart for Ms. Alvarado's care?

8  A    $590,253.61.

9  Q    And does the plan make provisions for all the medical care

10 and services Ms. Alvarado will require?

11 A    No.  We can't do that.  It's based on her needs, and there

12 could be changes that require additional services, or changes

13 and complications that we don't know about, and it doesn't

14 include her regular health needs.

15 Q    If you can put up the next slide, Ms. Spalding.

16      Ms. Reavis, lastly, have you had an opportunity to prepare

17 a life care plan for Ms. Natalie Romero in this case?

18 A    Yes.

19 Q    And did you develop that plan in the same manner that you

20 developed the other plans?

21 A    Yes.

22 Q    On your screen should be a chart marked Plaintiffs' 4023.

23 Is this chart summarizing your life care plan for Ms. Romero?

24 A    Yes.

25 Q    And have you reviewed the underlying documents this chart

                              S. Reavis - Cross

1   is based on?

2   A     Yes.

3   Q     And is the chart accurate?

4   A     Yes, it is.

5           MS. PHILLIPS:  We would move to admit Plaintiffs'

6   4023, again with the supporting documentation, the underlying

7   charts.

8           THE COURT:  Be admitted.

9           MS. PHILLIPS:  Thank you.

10          (Plaintiff Exhibit 4023 marked.)

11          (Plaintiff Exhibit 4023 admitted.)

12  BY MS. PHILLIPS:

13  Q    Ms. Reavis, what is the lifetime total cost reflected in

14  this chart for Ms. Romero's care?

15  A    $311,430.

16  Q    And I'll ask you this one last time.  Does this plan make

17  provisions for all the medical care and services that

18  Ms. Romero will require?

19  A    No, of course not.

20          MS. PHILLIPS:  Thank you very much.  No further

21  questions.

22          THE COURT:  Cross.

23                        CROSS-EXAMINATION

24   BY MR. CAMPBELL:

25  Q    Good morning, Ms. Reavis.

S. Reavis - Cross

1   A      Good morning.

2   Q      I represent James Fields in this case and I had a few

3   questions for you about the life care plans that were just

4   submitted under your testimony.

5          Before I begin -- and I certainly don't mean this in any

6   way to demean your vast experience, but you're not a medical

7   doctor; is that correct?

8   A      No.

9   Q      And as a result of that, as you know probably better than

10  I do, under Virginia law, you're not permitted to give a

11  diagnosis or evidence that someone requires a future surgery,

12  correct?

13  A      I rely upon the doctor for the medical diagnosis.

14  Q      Yes, ma'am.

15         All right.  Thank you.  Would you agree there is inherent

16  speculation in your life care plans?  As you said, someone

17  could get worse and require more care.  Conversely, someone

18  could get better and require less care?

19  A      No, I don't believe there's any speculation here.  This is

20  the care that's required.  And again, I can't build in

21  complication, but the care that's required is required and has

22  been carefully thought out.

23  Q      Understood.  All right, ma'am.  For example, if I could

24  direct you first to Mr. Martin.  And I apologize if that's not

25  the order in which you have the supporting documentation.

S. Reavis - Cross

1      And please just take your time and tell me whenever you

2  get to that portion of your record.  Let me know.

3  A    They're double-sided.  That's why I'm having a little

4  trouble finding the categories and the right page.

5  Q    Yes, ma'am.  Take your time.

6  A    But I'll get it.

7       Okay.  You can go ahead.

8  Q    Thank you, ma'am.

9       You agree that the life care plan has $65,000,

10 approximately, in bills for MRI and ankle fusion, and I believe

11 it's referred to as "if needed"?

12 A    Okay.  Can you tell me which page that is?

13 Q    I can certainly attempt to.

14 A    It's under medical interventions.

15      Okay.  I got it.

16 Q    And you're not aware of any medical doctor testifying to a

17 reasonable degree of medical probability in this case that

18 Mr. Martin will require that MRI or ankle fusion in the future,

19 correct?

20 A    That's why they're in brackets.

21 Q    Yes, ma'am.

22 A    They're in brackets because they're not included in the

23 total.  The idea, the whole idea is he's going to have these

24 surgical procedures first with the steroid injection and then

25 leading to the repair of the labrum and then the arthroscopy,

S. Reavis - Cross

1   and then hopefully not the total hip, but if he had it, that's

2   what it would cost.  But I'm not putting that in the total.

3   That's the whole reason it's not in there.

4   Q    So your answer to the question is yes, that it's correct

5   that you're not aware of any medical doctor that's provided a

6   medical opinion to a reasonable degree of medical probability

7   that any of that will be required?

8   A    Any of what?  The arthroplasty?

9   Q    The ankle fusion and the MRI that are designated as "if

10  needed" in your report.

11  A    Oh, you're talking about Mr. Martin?

12  Q    Yes, ma'am.

13  A    Yes.  If they're in brackets, it's not going to be in the

14  total cost.

15  Q    And in fact, for any surgery, you're not aware of any

16  evidence that's been presented -- medical evidence to a

17  reasonable degree of medical probability in this case to any

18  future surgery for Marcus Martin; isn't that right?

19  A    I have to look at Mr. Martin's plan.  I'm out of sync

20  here.

21  Q    So, for example, if you look at the same page that has the

22  ankle fusion, which I believe is -- I'm sorry, I don't see page

23  numbers on the report.

24  A    They're on the bottom left, but it's just that there's --

25  they're double pages, so it's a little hard to --

S. Reavis - Cross

1   Q     I see it now.  Thank you, ma'am.

2         Three, it would be category medical intervention.  So

3   there's the ankle fusion that's in parens, as you indicated.

4   So now I'm asking you about the other two entries in that

5   medical intervention, the ankle hardware removal and the

6   arthroscopy?

7   A     Yes.  Those are planned.

8   Q     Right, but there's no medical evidence in this case that

9   those procedures are required to a reasonable degree of medical

10  probability that you're aware of; is that correct?

11  A     That's why I discussed it with Dr. Gwathmey, and that's

12  his plan.

13  Q     Okay.  But you're not allowed to testify to that, though,

14  ma'am.  A, it would be hearsay if the doctor told you

15  something; and, B, you're not a medical doctor, so you can't

16  give that opinion, right?

17  A     No.  I relied upon him.

18  Q     Okay.  But do you know whether he has presented evidence

19  in this case?

20  A     I don't know, because I haven't been here.

21  Q     Great.  Thank you, ma'am.

22        So if Dr. Gwathmey hasn't provided evidence in this case

23  that that procedure is required to a reasonable degree of

24  medical probability in the future, you agree your numbers can't

25  come in?

33

S. Reavis - Cross

1  A    That would be a legal determination, not mine.  I just do

2  the plan.

3  Q    Very good.  Yes, ma'am.

4       Mr. Martin's plan also includes, I believe, a YMCA

5  membership until he's 76 years old; is that correct?

6  A    Right.

7  Q    That's in your numbers, your projected future --

8  A    Yes, that is accurate.

9  Q    -- life care plan?  Okay.

10      And it also includes four times a year, at a cost of

11  $1,440, counseling fees for the next 44 years; is that correct?

12  A    I'm sorry.  Would you repeat that?

13  Q    Yes, ma'am.  Your life care plan for Mr. Martin also

14  includes four times a year, at a cost of $1,440, counseling for

15  the next 44 years?

16  A    I'm going to have to follow that in his numbers, which are

17  all in different places here.

18  Q    I'm going to try and find the page number for you, ma'am.

19      I believe it would be page 6, individual counseling with

20  Anderson Counseling Services in Lynchburg, Virginia.

21  A    I don't have that document in this notebook.

22  Q    Page 6 of --

23  A    Well, this was a notebook, but I don't have that document.

24  Q    -- Mr. Martin's life care and rehabilitation plan?

25      That would include -- there's physical therapy listed for

34

S. Reavis - Cross

1  the next -- maybe 43 years, rather than 44 years, individual

2  counseling.  It also includes the YMCA monthly fees on that

3  page.

4  A    I'm going to have to have somebody provide me a copy.

5  Q    I can show you -- I only have a PDF.  I can approach and

6  show you an electronic copy, but I do not have a paper copy.

7  A    Okay.  I found it.  What page are you on?

8  Q    Wonderful.  Thank you, ma'am.  And take your time.

9        Again, I believe it's page 6.

10  A    Okay.  I thought you were reading it wrong.  That's why I

11  was trying to find it.  And I didn't want to say you were.

12        That's only four times over life.  It's not -- the way

13  this reads, it's 12 sessions four times over life, not every

14  four years or whatever you were saying.

15  Q    Okay.  And the purpose -- well, it says 12 sessions, but

16  what you're saying is that this actually means only four times

17  over his life?

18  A    Yes.  I'm sorry.  I just...

19  Q    No, not at all.  I apologize.  That's my misunderstanding.

20  A    I just wanted to make sure I was right.

21  Q    Yes, ma'am.  Thank you.

22        All right.  So are you aware in the last four years,

23  between the date of the incident and today, whether Mr. Martin

24  has had any such counseling at Anderson Counseling Services?

25  A    He had had some very minimal counseling after the event,

S. Reavis - Cross

1   closely after the event, but he hasn't had any since then.

2   Q    And yet you're projecting that he needs counseling for the

3   next 40 years, correct?

4   A    No.  Four times over life.

5   Q    Do you see the date, the term, 2021 to 2064?

6   A    Yes.

7   Q    So that's --

8   A    Oh, I'm sorry.  Did you say 40?  I thought you said four.

9   Q    2064?

10   A    Right.

11   Q    That's the term.  So the term would be from this year

12   through 2064?

13   A    Right.

14   Q    Needs counseling that he hasn't had in the four years from

15   the date of incident to present, correct?

16   A    No.  Because PTSD is reoccurring.  And therefore, it is

17   appropriate to have counseling --

18   Q    Ma'am, I apologize.  I'm going to have to cut you off.

19   That's a medical opinion that, again, I don't believe you're

20   permitted to give.  So I don't -- I would respectfully -- and

21   counsel may disagree and may attempt to get into that further

22   with you, but that's not really responsive to my question.  I

23   don't believe you're permitted to give medical evidence that --

24           THE COURT:  Just ask the question.

25           And just answer his question.

S. Reavis - Cross

1        MR. CAMPBELL:  Thank you.

2    BY MR. CAMPBELL:

3    Q    And as another preliminary matter, all of this -- all of

4    these medical treatments and all of the care that you're doing

5    in your life plan, none of this has happened to date, right?

6    It's all projected for the future?

7    A    Right.

8    Q    So these aren't incurred expenses for treatment that

9    anyone has had; they are predictions going forward?

10   A    Yes.  That's the way that it's appropriate to handle.

11   These are future, not past, medical expenses.

12   Q    Yes, ma'am.  I just wanted -- you and I both know that

13   very well.  I just wanted to make sure the jury understood

14   that.

15   A    Sure.

16   Q    If you could, ma'am, please move on to Ms. Alvarado's life

17   care plan.

18   A    Okay.

19   Q    There are projections here for a sleep study for

20   Ms. Alvarado, correct?

21   A    Yes.

22   Q    In the four years since the date of this incident that has

23   not occurred, that -- she hasn't had a sleep study in the last

24   four years, right?

25   A    I don't believe so.

S. Reavis - Cross

1    Q     And similarly, a neuropsych -- or a psychiatric

2    evaluation, you have that in the plan, that she's going to

3    require that in the future, but she hasn't had one in the last

4    four years, correct?

5    A     Yes, she has.

6    Q     All right.  We'll take a look at that and take that up as

7    we need to.

8          You also have a life coach?

9    A     Yes.

10   Q     At a cost of $2,520 a year for the next 60 years; is that

11   right?

12   A     Right.

13   Q     And she hasn't had a life coach in the last four years,

14   right?

15   A     No.

16   Q     You may not know this, Nurse Reavis.  So Ms. Alvarado

17   claims $26,000 in medical treatment for the last four years,

18   from the date of the incident through today.  And so my

19   question is:  Does the past medicals in any way affect your

20   projections for future medicals?

21   A     No, because there are many reasons why individuals haven't

22   had access to healthcare in the past.

23   Q     Well, that may be neither here nor there.  I believe

24   Ms. Alvarado has followed all of the recommendations and the

25   treatment that physicians have asked her to have.

S. Reavis - Cross

1     My question is:  She has $26,000 in incurred medical bills

2  and your life care plan for her is $590,000, which vastly

3  exceeds Mr. Baker, who had surgery and hardware, Mr. Martin,

4  who had surgery and hardware, and Ms. Romero, who had a skull

5  fracture.  So why would Ms. Alvarado's future life care plan be

6  double and triple the plans for people who had serious

7  surgeries?

8  A    Oh, all of these injuries are serious.  A surgical

9  procedure is one thing, but being able to function and to

10  continue to function in life is something else.  She needs a

11  lot of support.  She's very fragile, and she is trying her best

12  to do -- the whole idea here is you want people to be able to

13  continue to work and have quality of life.  And this is the

14  support that she needs to be able to do that.

15  Q    But again, that includes a life care plan that has

16  60 years of a life coach, and she hasn't had a life coach in

17  the last four years, correct?

18  A    No.

19  Q    If you could move on to Mr. Baker, please.

20  A    Mr. Baker.  Okay.

21  Q    And I believe you testified to this earlier, but just to

22  make sure it's clear:  His life care plan includes $3,500 a

23  year for the rest of his life for lawn care, correct?

24  A    Wait a minute.  I'm not there yet.

25  Q    I apologize.

S. Reavis - Cross

1    A    It's all right.

2         That's correct.  Home maintenance and lawn.

3    Q    Mr. Baker's life care plan also has a future hip surgery

4    included in it.  Let me try and get you the page.  I believe

5    it's page 2.  And it would include labrum transfer, right hip,

6    debridement of right hip?

7    A    Yes.

8    Q    And not -- and I understand the distinction you made, and

9    I appreciate that, so I'm not asking about the total hip

10   arthroplasty that's in parens and that is if needed.  So that's

11   not included in your total.  So I understand the distinction.

12   I'm not asking about that.

13        I'm asking about the two -- the debridement of right hip

14   at a cost of $34,418 and the labrum transfer, right hip, at a

15   cost of $51,957.  Do you see those?

16   A    Yes.

17   Q    And the same thing again -- and I know you're not aware --

18   you have been fortunate enough not to have been here for the

19   entire three weeks have already occurred in this trial, but you

20   agree that, without medical evidence that that surgery is

21   required to a reasonable degree of probability, you need the

22   doctor to make that opinion in order to support your cost

23   projection?  Would you agree if I phrased it that way?

24   A    Yeah.  That's why I worked with Dr. Gwathmey.

25   Q    And then Mr. Baker's life care plan also includes about

S. Reavis - Cross

1  $50,000 for a gym membership at ACAC?

2  A    Yes.  Over time, not one membership.

3  Q    Yes, ma'am.  No, that's right.  But -- and these are

4  probably larger numbers than usual because these are young

5  people, right?

6       So if you're, you know, older, the projections for years

7  don't keep going as long as they would for a young person?

8  A    That's right.

9  Q    Similarly, the physical therapy post-surgery, you agree

10 that you're relying on a doctor who has to provide evidence to

11 a reasonable degree of medical probability that the surgery is

12 required in order to need physical therapy post-surgery?

13 A    Yes.

14 Q    And I think I may be running into the same not problem,

15 but correction -- thank you very much for helping me out -- you

16 also have individual counseling for Mr. Baker four times over

17 the remainder of his life, not four times a year?

18 A    Right.

19 Q    And are you aware if he's had any of that counseling in

20 the four years from the date of the incident through today?

21 A    I don't believe so.

22 Q    And yet it's your prediction he needs that --

23 A    Yes.

24 Q    -- going forward in his life?  All right.

25      If you could move on to Ms. Romero, please.

S. Reavis - Cross

1   A    Okay.

2   Q    The neuropsych evaluation, are you aware of whether

3   there's been any medical evidence to support a referral or need

4   for the neuropsych evaluation for Ms. Romero that's on page 2

5   of your life care plan for her?

6   A    I did discuss that with Dr. Webb.

7   Q    Well, ma'am -- well, you know, Dr. Webb is to come in this

8   case.  So that may be an open question that may be addressed.

9   But, again, I wouldn't be asking for hearsay.  I would be

10  asking for whether you're aware of medical testimony given in

11  the case.

12      But I think Dr. Webb is forthcoming, so I'll move on on

13  that one.

14  A    Okay.

15  Q    Are you aware there's been no treatment for Ms. Romero

16  since 2018 per the medical evidence submitted in this case?

17  A    I think that's accurate.  She doesn't have resources for

18  treatment of any kind.

19          MR. CAMPBELL:  Judge, I'd move to strike as

20  nonresponsive and violation of the collateral source rule.

21          THE COURT:  Strike that last answer.

22          Members of the jury, disregard that last answer.

23   BY MR. CAMPBELL:

24  Q    And Ms. Romero, you have predicted in your life care plan

25  that she needs case management, $5,000 a year for the next

S. Reavis - Cross

1   five years, correct?

2   A    That's correct.

3   Q    And you agree she has not had that in the past

4   four years --

5   A    No, she hasn't.

6   Q    -- since the date of the incident through today?

7        There is a mention in your life care plan on page -- it's

8   in "Therapies," page 5 --

9   A    Yes.

10  Q    -- of psychotherapy with Laura Wagner.  Are you aware if,

11  in the past four years, Ms. Romero has seen Laura Wagner?

12  A    No, she hasn't seen -- I don't think she's had any

13  psychotherapy.

14          MR. CAMPBELL:  Thank you very much, ma'am.  I don't

15  have any additional questions.

16          THE COURT:  Anyone else?

17          MR. JONES:  No questions, Your Honor, from me.

18          MR. REBROOK:  No, Your Honor.

19          THE COURT:  Mr. ReBrook?  Is he on the phone?

20          THE CLERK:  He's here.

21          THE COURT:  Any questions?

22          MR. REBROOK:  None, Your Honor.  Thank you.

23          THE CLERK:  And none from Mr. Smith.

24          THE COURT:  All right.  Thank you.

25          Any redirect?

E. Sines - Direct

1          MS. PHILLIPS:  No, sir.

2          THE COURT:  Thank you.  You may step down.

3          THE WITNESS:  May I be excused?

4          MS. KAPLAN:  Yes, Ms. Reavis.  I couldn't hear.

5          THE COURT:  Call the next witness.

6          MS. KAPLAN:  Plaintiffs call Plaintiff Elizabeth

7  Sines, Your Honor.

8          THE COURT:  Is she on the way?

9          MS. KAPLAN:  I'm checking right now, Your Honor.

10          Is it okay, Your Honor, if we just check outside?

11  Would that be okay, Your Honor, to just check outside the door

12  for me?

13          THE COURT:  I'm sorry.

14          MS. KAPLAN:  I'm sorry, Your Honor.  Is it okay if I

15  just check outside the door?

16          THE COURT:  Yes.  Is the witness outside?

17          BAILIFF:  No, sir.

18          MS. KAPLAN:  I'm told that they're coming.

19  Ms. Phillips nodded at me, Your Honor.

20        ELIZABETH SINES, CALLED BY THE PLAINTIFFS, SWORN

21                      DIRECT EXAMINATION

22   BY MS. CONLON:

23  Q    Good morning.

24  A    Good morning.

25  Q    Could you please introduce yourself to the jury?

E. Sines - Direct

1  A     My name is Elizabeth Sines.

2  Q     Where did you grow up?

3  A     Oakland, Maryland.  It's a really small town in the

4  Appalachian Mountains, in Maryland, about five minutes from the

5  West Virginia border.

6  Q     How old are you?

7  A     I'm 27.

8  Q     Have you ever lived here in Charlottesville?

9  A     I did.  I lived here from 2016 to 2019, when I went to law

10 school here.

11 Q     At UVA?

12 A     Yes.

13 Q     Did you graduate?

14 A     I did.

15 Q     Why did you choose to come to UVA for law school?

16 A     I love Charlottesville.  I think it's beautiful.  It

17 reminds me a lot of where I grew up, like, with its natural

18 beauty.  But I also wanted somewhere a little bigger than my

19 hometown with a lot more to do.  So it's like the perfect fit.

20 Q     Please tell the jury why you're here today.

21 A     I am here because of the harm that was done to me on

22 August 11th and August 12th at the torchlight rally and the car

23 attack.  And I'm here because I would like those who have

24 harmed me to be held accountable.

25 Q     I want to take you back to the summer of 2017.

E. Sines - Direct

1    Can you tell us what you were doing that summer prior to

2  August 11th and 12th?

3  A    Yeah.  I was in Baltimore working at the Homeless Persons

4  Representation Project, or HPRP.  I was working -- specifically

5  doing veterans benefits work.

6  Q    How did you wind up doing that?

7  A    There are a lot of veterans in my hometown, and there are

8  also a ton of homeless veterans in Baltimore.  So I thought it

9  was really important work.  And basically, we were connecting

10 veterans, homeless veterans, with services through the VA and,

11 like, filing for their benefits.  So it was really fulfilling.

12 Q    So you were living in Baltimore at the time.  How did you

13 wind up back in Charlottesville for August, or for parts of the

14 summer?

15 A    So I had on-campus recruiting coming up in the fall, which

16 is, like, a big career fair and job interviews.  So I had a

17 meeting with my career services office.  And I also wanted to

18 come back to counter-protest the KKK rally that was happening

19 at that time, too.

20 Q    What month are we talking about?

21 A    It was July of 2017.

22 Q    Why did you want to come back to Charlottesville for the

23 KKK rally?

24 A    Community is really important to me.  My dad was a public

25 servant.  And to me --

E. Sines - Direct

1           MR. KOLENICH:  Objection, relevance.

2           THE COURT:  Sustained.

3           THE WITNESS:  Community is really important to me,

4    and so I --

5    BY MS. CONLON:

6    Q    Sorry, Ms. Sines.  I'll ask you another question.

7           THE COURT:  Ask another question.

8           THE WITNESS:  Sorry.  Thank you.

9     BY MS. CONLON:

10   Q    That's okay.

11        Had you ever been to a KKK rally before?

12   A    No.  Absolutely not.

13   Q    Had you ever had any encounters with the KKK prior to July

14   of 2017?

15   A    Where I was growing up there was a lot of KKK activity.

16   They recruited a lot in my hometown, like with fliers and

17   things like that.  So I had never been, like, anywhere near a

18   KKK rally, certainly not anywhere near my hometown.  So, yes, I

19   knew that the KKK was active, and -- yeah.

20   Q    Had you ever had any encounters with the KKK in

21   Charlottesville prior to July of 2017?

22   A    No.  Not at all.

23   Q    So you attended the KKK rally?

24   A    Yes.

25   Q    What did you see when you were there?

47

E. Sines - Direct

1  A    The first thing I saw were the counter-protesters.  I saw,

2  like, them singing.  They were picketing, dancing, chanting.

3  Q    Did you see any KKK members?

4  A    Yeah, eventually I did.  I saw them walk out.  Yes, I did.

5  Q    And how could you tell that they were KKK members?

6  A    They were in full Klan robes.  They were in full Klan

7  robes.  It was really shocking.

8  Q    How did attending the event affect your desire to attend

9  the events on August 11th and 12th?

10  A    I think that made it -- it felt, like, all the more

11  important to me to go on August 11th and August 12th, because I

12  did not witness any violence at the KKK rally, and I attribute

13  that to how large the counter-protest was, like, how far

14  outnumbered the KKK was at that.  I felt that it was important.

15  I thought that large counter-protests were an important part of

16  safety.

17  Q    Did you leave Charlottesville after the KKK rally in July?

18  A    I did, yes.

19  Q    And went back to Baltimore?

20  A    Yes.

21  Q    When were you next in Charlottesville?

22  A    I was in Charlottesville the second week of August.

23  Q    What brought you back here?

24  A    On-campus recruiting.  I came back to do my interviews.

25  Q    Turning to August 11th, when did you first learn about the

E. Sines - Direct

1  torchlight rally for that night?

2  A    I believe I had found out about it on Twitter around the

3  same time of the KKK rally.

4  Q    You learned about the August 11th rally from Twitter when

5  you learned about the KKK rally?

6  A    Yeah, earlier in the summer, I mean.

7  Q    Do you mean August 11th or August 12th?

8  A    August 12th specifically.  Sorry.

9  Q    That's okay.

10        So talking about the torchlight rally, when did you first

11 learn that that was happening?

12 A    Yeah, I didn't find out about that until the night of,

13 like, that night, of August 11th.

14 Q    And how did you learn about it?

15 A    On Twitter as well.

16 Q    How did you react when you saw that was happening?

17 A    I think I was shocked, and also wanted to know if it was

18 true.

19 Q    What was shocking about it to you?

20        MR. KOLENICH:  Objection, relevance.

21        MS. CONLON:  Your Honor, I'm happy to respond.

22        THE COURT:  Overruled.  Go ahead.

23  BY MS. CONLON:

24 Q    What was shocking about it to you to learn that there was

25 going to be a torchlight rally happening on the UVA campus?

E. Sines - Direct

1  A    It was totally a surprise.  Like, school was not back in

2  session.  My law school class was, I mean, to my knowledge, one

3  of the only classes that had come back.  And I couldn't believe

4  that it was happening on campus.  That was really alarming to

5  me.  I was worried about people's safety.

6  Q    Had anything like that happened on campus in the time that

7  you had been a UVA student?

8  A    Not on campus, no.

9  Q    So what did you do?

10 A    I asked my friend if she wanted to go to the

11 counter-protest with me, because I assumed there would be a

12 counter-protest.  Like, I thought, if I saw it on Twitter, I

13 thought other people had as well.  And we went to campus.

14 Q    Did you find a counter-protest when you got there?

15 A    No, I did not.

16 Q    So where did you go?

17 A    So we walked -- we parked our car, like, around the

18 Corner -- like, if you're not familiar with the campus, there's

19 an area of campus called "the Corner," not like around the

20 corner of campus.

21       So we parked there and we walked, if you're facing the

22 Rotunda, kind of along the left side, and through one of, like,

23 the passageways that leads to what's called the Lawn, which is

24 like the heart of campus.

25 Q    Why did you go to the Lawn?

E. Sines - Direct

1  A    I wasn't -- I was a law student, and I didn't spend a lot

2  of time on the undergrad campus.  And so I just kind of went to

3  the place that I knew to be, like, the center of campus,

4  because I figured that would be a good place to start.

5  Q    What did you see when you got there?

6  A    At first, really nothing.  But then you heard it before

7  you saw it.  You would look, like, down the entire stretch of

8  the Lawn, which is pretty long, and you could hear chanting.

9  And at first I couldn't hear it, but as they got closer, I

10 heard "You will not replace us" and "Jews will not replace us."

11 And I could see the torches, and it was just like shadowy

12 figures coming up with the torches in a single-file line.

13 Q    What did you do when you saw a line of people marching

14 toward you holding torches?

15 A    I think I froze.  I think I was obviously incredibly

16 nervous.  I had never seen anything like that before.  And I

17 was worried.  My friend Leanne, she's Asian.  And we just truly

18 did not know what to expect or anticipate.  Yeah.

19 Q    So what did you do in response?  Did you stay there?  What

20 did you do?

21 A    So we didn't see a counter-protest.  We stood right where

22 we were.  We, like, kept our feet planted.  We didn't move.

23 And I think that we didn't know what else to do.  Like, I'm not

24 a seasoned protester.  I had, like, been to hardly any protests

25 in the past.  And so I felt like the only thing in that moment

E. Sines - Direct

1    that I could do was record.  It felt like, okay, if there's not

2    a counter-protest here that I can join, I can pull out my phone

3    and I can record this and let people know that it's happening.

4         That felt really important to me because at that point we

5    didn't really see anyone else.  Like, there were random other

6    people who weren't part of the torchlight rally, but we didn't

7    really see anyone.  It was like, do people know that this is

8    happening?  So it felt really important to record and also to

9    let people know.

10   Q    So how did you record?

11   A    Yeah, I recorded on my phone with -- it's called Facebook

12   Live.  It's like a feature on Facebook that you can use to kind

13   of send a livestream or, like, take a video in real time that

14   your friends and family can see.  So yeah, it seemed like the

15   best way.

16        And honestly, like, in that moment I think that I, like --

17   it was like I didn't know what else to do.  And so in my mind

18   I, like, decided to report on the events, like, I figured I

19   needed to let people know.  And so I thought of like a reporter

20   in, like, a war zone or, like, covering a hurricane.  And so I

21   just, like, narrated it into my phone.

22             MS. CONLON:  Mr. Spalding, could we please pull up

23   PX-3204 for the witness.

24   BY MS. CONLON:

25   Q    Ms. Sines, I'm showing you a video.

E. Sines - Direct

1          (Video playing.)

2    A     Yes.

3    Q     And we can pause there, if that's okay.  Thank you.

4          Do you recognize the video that was just on the screen in

5    front of you?

6    A     Yes, I do.  This is the video I took on August 11th.

7              MS. CONLON:  Your Honor, I'd like to enter PX-3204

8    into evidence and publish it to the jury.

9              THE COURT:  You may.  Be admitted.

10             (Plaintiff Exhibit 3204A marked.)

11             (Plaintiff Exhibit 3204A admitted.)

12             (Video playing.)

13   BY MS. CONLON:

14   Q     When did you take this clip?

15   A     This is pretty much right when they got by us as they're

16   passing us from the Lawn.  This is probably in the middle of

17   the people who were passing us.

18   Q     And which way are they heading on campus as they pass you

19   here?

20   A     Yeah, so they are heading up towards the Rotunda, walking

21   up the Lawn towards the Rotunda, and they're going around the

22   left side of the Rotunda, if you're standing on the Lawn,

23   around the other side to the statue.

24   Q     About how far away from them are you when you took this

25   video?

E. Sines - Direct

1  A    I would say probably maybe -- I'm pretty bad at estimating

2  numbers.  I think it was probably like 15 to 20 feet.  We tried

3  to keep our distance while still being able to record what was

4  happening.

5  Q    Can you give us a sense of how the quality of the video

6  that the jury just saw compares to what you were able to see?

7  A    Definitely.  Obviously this is pretty blurry and very

8  dark.  It was much -- that's, like, a function of the way I was

9  recording.  I could see much more clearly than this.

10 Q    So you're standing on the Lawn.  You're recording them

11 walking past you.  What happens next?

12 A    So when the tail end of the marchers went up, we kind of

13 followed around to the left side of the statue -- not the left

14 side of the statue, the left side of the Rotunda, kind of the

15 same way that they went, and stood on the viewing platform

16 overlooking everything.

17 Q    So just to make sure I understand, you walked beyond the

18 Lawn on the Rotunda, facing at that point the Thomas Jefferson

19 statue?

20 A    Yeah.  I was, like, up on a viewing platform, like,

21 looking over everything like a bird's eye view.

22 Q    What did you see once you were on the viewing platform?

23 A    I saw that -- well, the first thing I saw was them

24 encircling the statue, and there was probably like ten people

25 deep on all sides, like a big ring around the statue.  But

54

E. Sines - Direct

1  within a few minutes, Leanne saw students at the base of the

2  statue.  She pointed them out to me and I could see them in the

3  center.  From where I was I could see maybe about ten students.

4  And I thought they were students because they were holding a

5  banner like this with their head down, like tucked behind, kind

6  of.  And the banner said "VA students act against white

7  supremacy."

8  Q    And when you said that there was a group of people

9  surrounding the statue, who were you referring to?  Or could

10 you describe them for us?

11 A    Yeah.  The Nazis, the torch holders.

12         MS. CONLON:  Mr. Spalding, if we could pick back up

13 with PX-3204 from 5:55 to 6:11, please, for the witness.

14         (Video playing.)

15         MS. CONLON:  Sorry.  We should play it for the

16 witness without audio.  And I should correct for the record the

17 first clip we played should be PX-3204A, just the clip.  Thank

18 you.

19         THE COURT:  Be admitted.

20         (Video playing.)

21  BY MS. CONLON:

22 Q    Ms. Sines, did you see the clip on your screen that played

23 just now?

24 A    I did.

25 Q    Do you recognize it?

55

E. Sines - Direct

1   A    I do.

2   Q    Is this part of the video you took that night?

3   A    Yes.

4        MS. CONLON:  At this time we move to admit PX-3204B

5   into evidence and ask that it be published to the jury.

6        (Plaintiff Exhibit 3204B marked.)

7        (Plaintiff Exhibit 3204B admitted.)

8        (Video playing.)

9   BY MS. CONLON:

10  Q    Ms. Sines, you mentioned a banner.  Could you use your

11  finger to circle the banner if you see it on the screen.

12       You just touch it.  It's like a touch screen.

13  A    (Witness complies.)

14  Q    Can you tell us what we saw in this clip as you recall,

15  seeing it live?

16  A    Yeah, this was what I kind of explained earlier.  This is

17  when they began to fill in the circle around.  You see, like,

18  the tail end of marchers kind of reaching in and kind of like

19  distributing themselves evenly around it.  And when I say "it,"

20  I mean the statue, and the students in the center.

21  Q    Could you hear the marchers saying anything?

22  A    Yes.  Like, right as they were finishing circling, they

23  began to chant "white lives matter."

24  Q    Did you hear them say anything else?

25  A    Not that I can recall now.

56

E. Sines - Direct

1  Q    I'm going to play you another clip.

2          MS. CONLON:  If we could show the witness PX-3204

3  from 7:20 to 8.

4          (Video playing.)

5   BY MS. CONLON:

6  Q    That was 40 seconds but it feels long when no one can see

7  it.  Did you see the clip that was just played to you?

8  A    Yes.

9  Q    And do you recognize it?

10  A    Yes, it's part of the same video.

11          MS. CONLON:  We move to admit PX-3204C, which is 7:20

12  to 8, and we'd like to publish it.

13          THE COURT:  Be admitted.

14          (Plaintiff Exhibit 3204C marked.)

15          (Plaintiff Exhibit 3204C admitted.)

16          MS. CONLON:  Thank you, Your Honor.

17          (Video playing.)

18   BY MS. CONLON:

19  Q    What were you reacting to when you said "whoa whoa whoa"

20  on the clip we just saw?

21  A    Yeah, so when the -- like, the tail end of the marchers

22  finally finished coming down the stairs, like, to me it felt

23  like seconds.  You saw it and it was, like, systematic.  They

24  would pull one student from the statue and they would beat

25  them, punch them.  Like, I saw full swing punches, kicks.  I

57

E. Sines - Direct

1  saw people, like, throwing liquids on them that I thought

2  might, like, be pepper spray.  People threw their torches at

3  them, used their torches to hit them.  And it was like, one by

4  one, they'd drag and like -- Leanne said later it was like

5  watching, like, cancer cells attack a healthy cell:  It was one

6  by one until you just couldn't even see them anymore.  They had

7  just been swarmed.

8          MS. CONLON:  Can we show the witness the next clip,

9  PX-3204, 8:20 to 8:50.

10          (Video playing.)

11          Sorry.  I'm going to ask Mr. Spalding to pause.

12      PX-3204, 8:20 to 8:50.  Thanks for bearing with us.

13      (Video playing.)

14 BY MS. CONLON:

15 Q    Ms. Sines, were you able to see that clip?

16 A    Yes, I was.

17 Q    Is it part of the same video?

18 A    Yes, it is.

19          MS. CONLON:  We move to admit PX-3204C, which is 8:20

20 to 8:50, and ask that it be published to the jury.

21          THE CLERK:  Is that D?

22          MS. CONLON:  C as in cat.

23          THE CLERK:  I thought C had been admitted.

24          THE COURT:  Be admitted.

25          MS. CONLON:  Oh, I'm being corrected.  D as in dog.

E. Sines - Direct

1              (Plaintiff Exhibit 3204D marked.)

2              (Plaintiff Exhibit 3204D admitted.)

3              (Video playing.)

4    BY MS. CONLON:

5    Q    What was happening at the time you took this video?

6    A    It's kind of hard to tell in this video, but, like, it was

7    like the torches went out in a wave, like they just were, like,

8    across the crowd, like they just went out kind of like in

9    sections.  It's hard to explain, but the torches were being

10   extinguished in, like, a weird manner.  Sorry.

11   Q    That's okay.  Are you finished?

12   A    I was also going to say they started to celebrate.  Like,

13   they were cheering, chanting.  They seemed happy about what was

14   happening.

15   Q    I think we can show you a clip of that.  Can we show the

16   witness PX-3204, 9:19 to 9:32, please.

17        (Video playing.)

18   Q    Did you see the clip just now?

19   A    Yes, I did.

20   Q    Part of the same video?

21   A    Yes, it is.

22        MS. CONLON:  We move to admit PX-3204 from 9:19 to

23   9:32 as 3204E.

24        THE COURT:  Be admitted.

25          (Plaintiff Exhibit 3204E marked.)

E. Sines - Direct

1          (Plaintiff Exhibit 3204E admitted.)

2          MS. CONLON:  Can we please play it for them.

3          (Video playing.)

4    BY MS. CONLON:

5    Q    Is this what you were just describing to us, the

6    celebration you saw?

7    A    Yes.

8    Q    Did you see any of the defendants that night?

9    A    Yes, I did.

10   Q    Who did you see?

11   A    I saw Richard Spencer.

12   Q    Do you see him here?

13   A    Yes, I do.

14   Q    Can you point him out for us?

15   A    Yes, I can.  He's right here.

16   Q    How do you recognize -- how did you recognize Mr. Spencer

17   on August 11th?

18   A    I first recognized him by his haircut and then when he got

19   closer to me, his face.

20   Q    Did you see Mr. Spencer do anything that night?

21   A    Yes, I did.  He came, kind of like out of this chaos, and

22   walked up the stairs and stood on the same side of the viewing

23   platform as us.  So he got maybe about ten feet away from us,

24   and then he began to give a speech, or at least he tried to.

25   Someone came out with a megaphone to give it to him.  It didn't

E. Sines - Direct

1  have any batteries.

2      He said, it's out of juice, it's out of juice.  When it

3  didn't work he yelled something like "we have claimed a

4  historic victory."  Like "these are our streets," or something

5  like that.

6  Q    What did you see Mr. Spencer do after making a speech?

7  A    Almost immediately, it was really abrupt, he turned and

8  began to leave.  I think he was, like, fleeing from the scene.

9  Q    So I want to turn your attention now to the next day,

10 August 12th.  Did you become aware of the plans -- withdrawn.

11     You mentioned earlier you learned about the plans for

12 August 12th on Twitter; is that right?

13 A    Yes.

14 Q    And you mentioned you wanted to counter-protest?

15 A    Yes.  I think after I -- you know, after the KKK rally and

16 after I had seen what happened on August 11th, I thought it was

17 even more important to counter-protest.  Again, because I

18 believe counter-protest means safety.  So yes, I did want to

19 counter-protest on August 12th.

20 Q    Did you end up doing that?

21 A    Yes, I did.

22 Q    Tell us about your morning on August 12th before you went

23 to the counter-protest.

24 A    So I had a meeting in the morning at my law school.  So I

25 didn't make it downtown until around noon.  Yeah.

E. Sines - Direct

1   Q    And when you got downtown, did you find a counter-protest

2   to join up with?

3   A    We tried to.  We were kind of like walking around and

4   eventually we made our way to Emancipation Park right as the

5   state of emergency had been declared.  So they were moving

6   people from the area.  But that's, like, where we first, like,

7   saw any kind of, like, group of counter-protesters.

8   Q    And when you say "we" who are you referring to?

9   A    Leanne and I.  Sorry.

10  Q    That's your same friend from the night before?

11  A    Yes.

12  Q    And when you went to look for a counter-protest, why did

13  you go to Emancipation Park?

14  A    We -- I had heard that that was where the rally was going

15  to be.  So I assumed that the counter-protest would be there as

16  well.

17  Q    So you mentioned when you got there it was already shut

18  down.  Can you tell us sort of what you saw when you arrived

19  there?

20  A    Yeah.  So there were -- there was kind of just like

21  random, like, smaller groupings of people.  It was like a mixed

22  bag.  You saw counter-protesters and, like, mini demonstrations

23  of, like, Nazis.  Some were drumming, chanting, waving flags,

24  giving the -- I don't know what the real term is, but like, the

25  Hitler salute.  Like, just kind of walking around, but they

E. Sines - Direct

1  weren't, like, really at that point interacting with each

2  other, if that makes sense.

3  Q    Did you notice anything about the way the rally-goers were

4  dressed?

5  A    It was varied, especially in the smaller groups.  Like,

6  sometimes the groups were dressed similarly, but it was varied

7  across the board.  I did see some people in, like, the khakis

8  and the white polo.  But I also saw people who maybe were just,

9  like, in plain clothes and the only reason I knew who they were

10 is, like, they were holding some kind of sign or flag.

11 Q    What kind of flags do you recall seeing?  Can you describe

12 them for us?

13 A    As I sit here today, not really.

14 Q    It's okay.

15 A    I'm not, like, familiar with, like, hate symbols or, I'm

16 sorry, like, the Nazi symbols.

17 Q    Insignia of various groups?

18 A    Yeah, I'm not very familiar with them, so I can't really

19 describe them with any accuracy.

20 Q    Did you see the rally-goers holding anything other than, I

21 think you mentioned signs and you've now mentioned flags.  Did

22 you see them holding anything else?

23 A    Yes.  I saw flags, signs, sometimes, like, poles and some

24 drums and guns.  I saw a lot of guns that day, both, like, very

25 large guns -- I'm not, like, very familiar with guns, so I

E. Sines - Direct

1    don't know what kind they were, but very big guns, but also

2    some smaller guns, like handguns on people's hips.  I didn't

3    see anyone, like, holding a gun, though, other than, like, the

4    large guns.  The smaller guns were holstered.

5    Q    The night before -- you told us already that the night

6    before it felt important to record what you saw.  Did you end

7    up doing the same thing on August 12th?

8    A    Yes, I did.

9    Q    How did you record on August 12th?

10   A    The same way, through, like, my Facebook livestream.

11   Q    Moving ahead in the day of the 12th, were you in the area

12   of Fourth and Water Street that day?

13   A    Yes, I was.

14   Q    And what were you doing over there?

15   A    So I had found a counter-protest and it was -- it had,

16   like, converged with another large counter-protest.  So people

17   were, like, dancing and singing.  It was really, like, happy

18   because at that point I didn't see any white nationalists or

19   Nazis or anyone in that area.  And so that's why it was like a

20   celebration.

21   Q    And were you recording during the celebration?

22   A    Yes, I was.

23   Q    For anyone who is not familiar, could you give us a sense

24   of the geography or area around Fourth Street?  Like, could you

25   describe the street for us?

E. Sines - Direct

1   A    Yeah.  Like -- like, Water Street is kind of like a main

2   street in downtown.  Specifically where we were -- I don't know

3   if I can really describe it very well.

4            THE COURT:  We have all sorts of pictures of the

5   area.

6            MS. CONLON:  Sure.  We won't burden the witness with

7   the demonstrative.

8   BY MS. CONLON:

9   Q    I'd really like to just get a sense of how the crowd

10  compared to the width of Fourth Street.

11  A    Fourth Street is pretty narrow.  Like, it is, I would say

12  much narrower than an ordinary street.  And it's, like,

13  buildings on both sides.  So it, like -- I kind of think it

14  adds to the feeling of it being pretty narrow.

15           THE COURT:  This is the same street that everyone

16  else has testified to, right?

17           MS. CONLON:  Your Honor, I'm not sure if any other

18  witness has described the narrowness of Fourth Street.

19           THE COURT:  Put the pictures up and show it.  This

20  thing of -- this is unnecessary.

21           MS. CONLON:  We can move on.

22           THE COURT:  You don't have to move on, but show the

23  picture.  It's your case, but --

24           MS. CONLON:  We want to make it as clear --

25           THE COURT:  I think this is not the way to do it.

E. Sines - Direct


1              MS. CONLON:  We want it to be clear for everyone, so,

2      Mr. Spalding.  Thank you.  Can you take us to Fourth and Water

3      on the map.

4              Okay.

5      BY MS. CONLON:

6      Q    Ms. Sines, are you able to point out Fourth Street and

7      Water Street looking at this demonstrative?

8      A    I believe so.  Yes.  Fourth Street is the one I believe

9      going up.

10     Q    You can use your finger to touch the screen.

11     A    Oh, sorry.  This one.

12     Q    Okay.  And can you identify Water Street looking at this?

13     A    It would be this one.

14     Q    And how does -- from having been there on that day,

15     looking at Fourth Street for a moment, how would you describe

16     the size of the crowd in relation to the width of the street?

17     A    There were -- it was, like, packed.  Like, there were a

18     lot of us, like, all in a line, like a big group.  So it was

19     like a tight squeeze from going, like, from -- I'm sorry, if I

20     can still touch it, from this area to this area, like, we had

21     to converge and kind of like, I don't know how to describe it

22     best, take a big group and put it into something smaller, so it

23     got, like, longer.

24     Q    Like a funnel?

25     A    Yeah.

E. Sines - Direct

1          MS. CONLON:  Thanks.  We can take it down.

2     BY MS. CONLON:

3     Q     So thank you for describing it.  You said that you were

4     walking around Water and Fourth.  Can you talk about what

5     happened when you turned up Fourth Street?

6     A     Yeah.  So we were chanting and singing and, you heard it

7     before you saw it.  I'm sorry.

8     Q     Take your time.  Take your time.  It's absolutely okay.

9     A     You heard it before you saw it.  Something I'll never

10    forget.  It sounded like if you would take, like, a metal

11    baseball bat and slide it across, like, a wooden fence.  It was

12    just like thuds, and you hear people screaming and the crowd

13    began to part.  And I don't know how I got to the side of the

14    road, but I did.  I jumped, if you're going up, to the right

15    side of the road.  And I turned around and it was like -- in my

16    mind, I can still see it, like, in slow motion.  I'm sorry.

17          And you just see a car fly down the road and hit, like,

18    this large group and crash into, like, a car that had been at

19    the base.  And at first, like, you think it's an accident.

20    Like I thought it was an accident.  I couldn't believe that

21    anyone would do something like that.  But then when he started

22    to reverse and run over the people who he had hit, we knew that

23    it was -- I mean, I knew -- it felt like he was trying to kill

24    as many people as possible.

25          So it was just panic.  It was just, like, people trying to

E. Sines - Direct

1   get out from, like, this incredibly narrow street it felt like

2   in that moment.  And someone screamed, "go to the alleys."  And

3   so we ran into the alley.  And someone said get up onto the

4   staircase.  There was this big concrete staircase, and we just

5   stood there because we didn't know if he was going to be able

6   to come back into the alley.  We just didn't know what was

7   going to happen.  So we just stayed on the stairs.  We just

8   stayed on the stairs and just, like, waited.

9   Q    I'm sorry to take you back to this, but before you made it

10  to the alley, when you were standing in the street, about how

11  close to the car were you?

12  A    At first I was like -- from the car -- and then when I

13  kind of pressed myself up against the building on the right

14  side -- again, I'm not great with numbers, but maybe four feet,

15  five feet.

16  Q    Once you made it clear of the car?

17  A    Yeah.

18  Q    And you said something about jumping over people.  Can you

19  tell us what you mean?

20  A    Yeah.  There were bodies just like flying that had been

21  hit, like up above, like, further up along the street.  And I

22  jumped over someone who had been hit who was, like, unconscious

23  on the road.

24  Q    When you made it to the alley, what did you do?

25  A    So we stood on the staircase for a while.  When I say a

E. Sines - Direct

1  while, this is, like, a matter of minutes.  Maybe even less.

2  It just felt like it was simultaneously happening so fast and

3  slow.  There was a group of people who came into the alley, and

4  it was a woman who had just seen her friend get hit by the car,

5  and she was with two people who were helping her because she

6  was so upset she could, like, barely walk.  And we helped her

7  onto the staircase and we just, like, stood and hugged each

8  other and, like, tried to comfort her in that moment.

9  Q    Where did you go when you left the alley?

10 A    Yeah.  We saw people running out of the back of the alley

11 and we realized it was like an L, like there was an opening we

12 could get out of.  So we ran to the back down the L, and then

13 you could look back up at Fourth Street.  You were able to,

14 like, walk back onto Water Street and look up at Fourth Street.

15 Yeah.

16 Q    What did you see?

17 A    It was just, like, carnage.  Like, there were people

18 having, like, panic attacks everywhere.  There were people

19 obviously very severely injured, blood.  You saw people trying

20 to, like, shield -- shield people receiving medical treatment

21 with their banners.

22 Q    I'm going to show you a short video.

23        MS. CONLON:  Can we show the witness PX-3346, please.

24        THE COURT:  Why don't we take a break now for about

25 20 minutes.

E. Sines - Direct

1  **(Jury out, 10:29 a.m.)**

2          (Recess.)

3          THE COURT:  Call the jury back.

4  **(Jury in, 10:54 a.m.)**

5          THE COURT:  You may be seated and you may proceed.

6   BY MS. CONLON:

7  Q    Ms. Sines, before the break I was about to show you

8  something.

9          MS. CONLON:  I'd like to show the witness PX-3346,

10  please.

11  BY MS. CONLON:

12  Q    Are you able to see something on your screen?

13  A    Yes, I am.

14  Q    And do you recognize it?

15  A    Yes, I do.

16  Q    How do you recognize it?

17  A    I went to a documentary screening, like, years after the

18  events of 8-11 and 8-12, and this was blown up really big on

19  the screen.

20  Q    And what do you recognize it to be?  Understand the jury

21  isn't seeing this right now; just you.

22  A    This is a picture immediately before the car attack.

23          MS. CONLON:  Move to admit Exhibit 3346 and publish

24  it to the jury.

25          THE COURT:  Admitted.

E. Sines - Direct

1            (Plaintiff Exhibit 3346 marked.)

2            (Plaintiff Exhibit 3346 admitted.)

3   BY MS. CONLON:

4   Q    Ms. Sines, could you please circle yourself on this

5   picture?

6   A    Yes.  (Witness complies.)  I am right here.

7   Q    About how far were you from the car at the moment this

8   picture is taken, as you remember it in real time?

9   A    I really don't know.  It was -- it all happened very

10  quickly.  But I was right in front of it.  I don't know how far

11  away it is from me, like, distance-wise.

12  Q    How were you able to get out of the way?

13  A    I don't know.  I don't know.  I don't know how I did it.

14  I think Leanne might have pulled me over to the side of the

15  road, but I don't -- I don't remember that moment.

16            MS. CONLON:  I'd like to show Ms. Sines a video now.

17            Mr. Spalding, could we pull up PX-3207?

18            (Video playing.)

19  BY MS. CONLON:

20  Q    Ms. Sines, do you recognize the first few seconds you just

21  saw there?

22  A    Yes, I do.

23  Q    How do you recognize it?

24  A    This is the video that I took of the car attack.

25            MS. CONLON:  Your Honor, we'd move to admit PX-3207

E. Sines - Direct

1    from 5:45 to 7:14 as 3207A.

2              THE COURT:  It will be admitted.

3              MS. CONLON:  If we could please publish that for the

4    jury.

5              THE COURT:  You may.

6              (Plaintiff Exhibit 3207A marked.)

7              (Plaintiff Exhibit 3207A admitted.)

8              (Video playing.)

9     BY MS. CONLON:

10   Q    Can you describe what happened in real time during the

11   video we just saw?

12   A    Yeah.  That's the video of the car attack and us running

13   into the alley and getting up on the stairs, and I think maybe

14   even when the people came into the alley and we were helping

15   them.

16   Q    At the end of the video, you're just sort of silent and

17   staring at the phone?

18   A    Yeah.

19   Q    Can you tell us what you were feeling at that moment?

20   A    Yeah, I -- I think I just was in shock.  Like, I was in

21   disbelief.

22   Q    When you say "disbelief," disbelief about what had

23   happened?

24   A    No.  I just think that, at that point in time, I just

25   couldn't wrap my head around anyone doing something like that.

7.2

E. Sines - Direct

1  Q    Can you describe for us how everything that you saw and

2  experienced on the 11th and the 12th affected you in the weeks

3  that followed?

4  A    Yeah.  So the first thing is that I just couldn't sleep in

5  the, like, days after.  And it extended, like -- it's something

6  that I still experience, although less severe.  I couldn't

7  sleep.  Sometimes I'd be up until like 4 or 5.  And when I had

8  early classes, sometimes I just wouldn't sleep.  If I could

9  fall asleep, I'd wake up with a nightmare oftentimes of the car

10 attack, just like reliving it again, and, like, seeing myself

11 in that moment.

12      And then within probably like a few weeks, I started

13 getting panic attacks.  And I had had panic attacks before in

14 my life, but I never had anything like these.  It was like I

15 would feel fine.  I would be doing something, like, with my

16 friends.  Like, I would be, like, out at a movie or something

17 like that, and when I would come home, I would walk into my

18 room and I'd be alone, and it would just wash over me like a

19 wave.  I would just feel it all at once.  I would feel so much

20 panic and I would have a panic attack.  That was unlike

21 anything I had ever experienced before.

22      And I think, like, it was very soon, in that time period,

23 too, where I just was so scared all the time.  Like, I was just

24 so anxious about what could happen.

25 Q    Did you feel anxiety in any particular settings?

73

E. Sines - Direct

1  A    Yeah, I definitely felt very anxious in crowds.  Very

2  anxious in crowds.  But also I think the worst part of it was I

3  was anxious in my own house.  I was anxious in my own house.  I

4  lost the ability to feel safe in my home because I was worried

5  that the people would find me.  When I say "the people," I mean

6  the Nazis.  I was worried the people would find where I lived

7  or find out where my family lived and they would harm them.

8  Q    You mentioned panic attacks.  About how often did you

9  suffer from panic attacks in the, say, six months that followed

10  August 11th and 12th?

11  A    Yeah, I'd have several a week.  I think, like, probably at

12  their worst, maybe about three times a week.

13  Q    How about now?

14  A    I still have panic attacks, especially around, like,

15  anniversaries or, like -- mainly around anniversaries and

16  particularly stressful events, especially when they're related

17  to 8-11 and 8-12.

18  Q    When you say anniversaries you mean of August 11th and

19  August 12th?

20  A    Yes.

21  Q    So you mentioned difficulty sleeping after August 11th and

22  12th.  Had you struggled with insomnia before August of 2017?

23  A    No, I did not.

24  Q    In addition to difficulty falling asleep, did you suffer

25  from any nightmares?

E. Sines - Direct

1  A    Yes.  I had nightmares of the car attack, and later on I

2  started having nightmares, like, if I had been at the statue

3  during the torchlight rally, like, if I had been one of the

4  students there.

5  Q    Are you still struggling with insomnia?

6  A    Around, like, stressful events related to those days, yes.

7  Yes, but not how it was then.  Not every night.  Just mainly

8  around those -- like, those time periods.

9  Q    What about nightmares?

10 A    Yes.  It's the same answer.  It's right around those time

11 periods as well.

12 Q    Have you received any professional treatment for the

13 difficulties you've mentioned?

14 A    Yeah.  So when things would get really bad in law school,

15 I went to -- we had a school psychiatrist at UVA Law, and I

16 also saw a therapist at the undergrad.  It's called CAPS.

17 Q    Were you receiving regular treatment at that time?

18 A    No, not at that time.

19 Q    Why not?

20 A    Mental health is really, like, stigmatized where I come

21 from.  And I just thought, like, things would get better

22 eventually.  I thought, like, maybe if I just had more time or

23 maybe if I, you know, could just, like, find a thing that

24 worked for me, I would be able to feel better.  But they didn't

25 get better.  And so I started seeing someone a few months ago.

E. Sines - Direct

1  And I see her regularly now.

2  Q    Was there anything that particularly prompted you to start

3  therapy?

4  A    Yeah.  I think things were just getting -- like, it was

5  just getting a lot tougher to be able to focus on my work.  And

6  I was here this summer for a few days because my friends --

7  well, I guess it was only one day.  We were on a road trip and

8  we stopped in Charlottesville, and I was walking right on the

9  corner with my friends.  We picked up Roots, and we were --

10 which is a restaurant, bringing food from a restaurant.  We

11 were talking towards the statue and I had, like, a flashback of

12 everything that had happened and I started to have a panic

13 attack.  And I had never had a panic attack in public before.

14 That was very new to me.  And it just felt like I needed help.

15 And I finally realized, like, I wasn't going to be able to do

16 it on my own.

17 Q    Have you received any diagnoses in the treatment you were

18 getting?

19 A    Yes, I have.  I've been diagnosed with PTSD from the

20 events of 8-11 and 8-12, and major depressive disorder related

21 to my PTSD.

22 Q    What kind of symptoms do you have associated with the

23 PTSD?

24 A    Yeah, I have flashbacks, nightmares, and just generalized

25 anxiety about those events.

E. Sines - Cross

1    Q    And what about the depression, how has that affected you?

2    A    It's made it very difficult to focus, and it's also just

3    kind of robbed me of the ability to take care of myself in the

4    way that I used to be able to.  It's been sometimes just, like,

5    really difficult to even get out of bed and brush my teeth or

6    cook myself a meal, just basic things that used to come so easy

7    have become much more difficult.

8              MS. CONLON:  Thank you.  Nothing further.

9              MR. SPENCER:  We do have questions.  I think

10   Mr. ReBrook would like to go first.

11             MR. CANTWELL:  I'm going -- Cantwell's going first.

12             MR. SPENCER:  Okay.  I will go at some point.

13                        CROSS-EXAMINATION

14    BY MR. CANTWELL:

15   Q    Hello, Ms. Sines.  You said you found out about the --

16   well, let's go back, actually.

17        You attended the July 8th Klan rally in Charlottesville,

18   right?

19   A    Yes, I did.

20   Q    And you described that as a peaceful event?

21   A    Yeah, from -- what I viewed was peaceful as far as I can

22   recollect, yes.

23   Q    Did you view 23 people get arrested?

24   A    No.  I did not.

25   Q    Are you aware that 23 people got arrested?

E. Sines - Cross

1  A    I was not.

2  Q    You're aware the police deployed tear gas?

3  A    I think I may have read about that, but I -- I don't

4  recall.

5  Q    You don't recall if police deployed tear gas at your

6  peaceful demonstration?

7           MS. CONLON:  Objection, asked and answered.

8           THE COURT:  Sustained.

9   BY MR. CANTWELL:

10  Q    So because that was such a smashing success, then you

11  wanted to go to the August 11th event, right?

12          MS. CONLON:  Objection, argumentative.  And I hope

13  that won't be the tone for this entire examination.

14  BY MR. CANTWELL:

15  Q    You heard about the August 11th event on Twitter?

16  A    I did, yes.

17  Q    Do you recall which Twitter account?

18  A    I do not recollect, no.

19  Q    You don't recall who told you about the August 11th thing.

20       Do you follow itsgoingdown.org on Twitter?

21  A    I think I -- yes, I do.

22  Q    You follow itsgoingdown.org on Twitter.  Why?

23  A    I follow a number of accounts, like, for news.  I use

24  Twitter for news.  So I follow a lot of accounts maybe

25  similarly to that with local news.

E. Sines - Cross

1  Q    So is it your testimony today that itsgoingdown.org is a

2  news site?

3  A    I don't really know.  I've never, like, focused on any of

4  their tweets, I guess.  Like, I can't remember any particular

5  tweet I've seen.

6  Q    Did you hear about the August 11th torch march from

7  itsgoingdown.org?

8  A    No.  I heard about the torchlight march from, like, a

9  local -- like a Charlottesville account.

10 Q    Was it Emily Gorcenski?

11 A    No.

12 Q    Do you know who Emily Gorcenski is?

13 A    I have since come to know her, like, through Twitter, but

14 that's -- I don't know her personally.  It's just another

15 account I follow.

16 Q    Okay.  So on August 11th you did not know Emily Gorcenski,

17 but today you follow her on Twitter?

18 A    Yes, that is correct.

19 Q    But all you can tell me about who did notify you of the

20 August 11th thing was that it was -- that it was a local

21 account?

22 A    Yes.  I remember it was one of the Charlottesville news

23 sites I follow.  Maybe not news sites is the best word, but one

24 of the Charlottesville accounts I follow, but I don't remember

25 which one.

79

E. Sines - Cross

1  Q     Was it an activist group?

2  A     I truly do not recall.

3  Q     Are you involved with any activist groups in

4  Charlottesville?

5  A     No, I am not.

6  Q     Are you aware of a group called SURJ?

7  A     Yes, I am aware of them.

8  Q     What does SURJ stand for?

9  A     I think it's Showing Up for Racial Justice.

10 Q     Showing Up for Racial Justice.  Are you aware of

11 Solidarity C'ville?

12 A     Yes, I am.

13 Q     Do you follow them on Twitter?

14 A     I believe so, yes.

15 Q     Was it one of them that told you about the August 11th

16 torch march?

17 A     I cannot recall.

18 Q     But you knew that the August 11th torch march was supposed

19 to be a secret, right?

20 A     I didn't know -- it was a secret to me.  I didn't know

21 about it.

22 Q     In descriptions that you posted of the event afterwards

23 did you say that we weren't expecting counter-protesters?

24 A     That you specifically weren't expecting

25 counter-protesters?

E. Sines - Cross

1   Q     That the August 11th torch march, that the rally-goers

2   were not expecting counter-protesters?

3   A     I believe I said something along the lines of because it

4   was held when there were no students on campus, there was

5   not -- I believed that you did not expect a counter -- like a

6   big counter-protest that you would have if school had been in

7   session.

8   Q     And in the video that we have from you for August 11th,

9   you arrive after the torch bearers have already surrounded the

10  statue, right?

11  A     No, that is incorrect.

12  Q     Your video, I think that's 3204, right?

13        I mean, I'm sorry, you get to the area where the Thomas

14  Jefferson statue is when they've already surrounded the statue;

15  is that fair?

16  A     Yes, that is correct.

17  Q     Okay.  You saw them march across the Lawn and the video

18  begins before that, but when you approached the Jefferson

19  monument, they've already surrounded the monument?

20  A     Yes.  That is correct.

21  Q     Do you know who started the fighting at the Jefferson

22  monument?

23  A     What I saw, I did not -- because the students had their

24  hands like this with their sign, holding, I did not see a

25  single student, like, reach out and start any violence.  I

E. Sines - Cross

1   specifically saw the Nazis at the statue pull them down,

2   unsolicited or unprovoked, full-swing punches, kicks, hits,

3   fluids, yes.

4   Q    And you described this as systematic, that they did it one

5   by one, right?

6   A    I mean, it was kind of chaotic.  It was interesting to me

7   that it kind of in my view happened very quickly one by one.

8   Q    Well, I'm sorry, one moment you said that it was

9   systematic and the next minute you said it was chaotic.  Which

10  one was it?

11  A    I think it was both.  I think what I'm trying to describe

12  is it was very quick, but dragging each student down one by one

13  very quickly.

14  Q    And you happened to know that all those people who weren't

15  Nazis were students, right?

16          MS. CONLON:  Objection, mischaracterizes testimony.

17  Ms. Sines has testified that she saw people holding a banner.

18          THE COURT:  Look.  Don't instruct her.  If he

19  misquotes you, say that you didn't say that.  Let her take care

20  of it.  Thank you.

21          THE WITNESS:  Can you repeat your question?

22  BY MR. CANTWELL:

23  Q    Are you certain that all those people down there were

24  either Nazis or students?

25  A    I saw the banner, which said "Students against white

E. Sines - Cross

1  supremacy," and they looked like students to me.  But no, I do

2  not know if all of them were students.  I didn't know them.

3  Q    So when you keep on saying the Nazis attacked students,

4  you don't actually know, right?

5  A    I know that there were students there now after the fact.

6  I know that.

7  Q    But you now know who Emily Gorcenski is, right?

8  A    I -- I do because of Twitter, but I didn't know her then.

9  Q    Okay.

10  A    And I didn't see her then.

11  Q    Are you aware that Emily Gorcenski was there?

12  A    I was not aware, no.

13  Q    That was not the question.  Today while you're testifying,

14  are you aware that Emily Gorcenski was there?

15  A    I --

16          MS. CONLON:  Objection, relevance.

17          THE COURT:  Overruled.

18          THE WITNESS:  I know that because of you.  Outside of

19  that, I didn't know that.

20  BY MR. CANTWELL:

21  Q    Before I said this today, you had no idea that Emily

22  Gorcenski was at that statue?

23  A    I believe I've seen you say that before, so I've known

24  this before I was sitting here today, but I heard it from you.

25  Q    Okay.  Do you believe that Emily Gorcenski was a student

E. Sines - Cross

1  on August 12th, 2017?

2          MS. CONLON:  Objection, badgering, argumentative and

3  relevance.

4          THE COURT:  Overruled.  Answer.

5          THE WITNESS:  I don't know her very well.  So I don't

6  know if she was a student, but I don't -- I don't know.  I

7  don't know her very well.

8  BY MR. CANTWELL:

9  Q    Okay.  Who is Thomas Massey?

10 A    I don't know.

11 Q    You don't know?

12 A    I don't know who Thomas Massey is.

13 Q    Who is Thomas Keenan?

14 A    I don't know who that is.

15 Q    Who is Lindsey Elizabeth Moers?

16 A    I don't know who that is.

17 Q    Who is Paul Minton?

18 A    I don't know who that is.

19 Q    Suffice it to say you don't know everybody who was around

20 that statue?

21 A    No, I do not --

22         MS. CONLON:  Objection, lack of foundation.  There's

23 no facts in evidence about those people having been there.

24         THE COURT:  Overruled.  He can ask the question.  If

25 she doesn't know the answer, she can say I don't know.

84

E. Sines - Cross

1          MS. CONLON:  Your Honor, the issue is that
2    Mr. Cantwell is testifying.  He's saying --
3          THE COURT:  He's not testifying.  He's asking her the
4    question.  Does she know.  They're leading questions.  I mean,
5    the witness can take care of herself.  She's a smart lady.  She
6    can answer these questions.
7     BY MR. CANTWELL:
8    Q    Would it be fair to say that if one of the names I just
9    mentioned started the fight, you wouldn't know?
10   A    I saw the Nazis attack the students or the people at the
11   statue.  I did not witness anyone who had been at the statue
12   holding the banner attack anyone else.
13   Q    So it's your testimony today that you are certain that
14   Thomas Massey didn't start the fight?
15         THE COURT:  Well, wait a minute.  She said she didn't
16   know these people.  So --
17         MR. CANTWELL:  What she's testifying to, Judge, is
18   that she saw the Nazis start the fight.  She's making a
19   positive assertion about something, and she's -- it's
20   contradicted by evidence that's already --
21         THE COURT:  All right.  Well, she's answered your
22   question.
23         MR. CANTWELL:  Okay.  Fine.  All right.
24    BY MR. CANTWELL:
25   Q    Have you watched video that was closer up of that fighting

E. Sines - Cross

1  since then?

2  A    I try to avoid it.  So no, I have not.

3  Q    You try to avoid it.  So after witnessing this scene, you

4  decided that you would go back for more the next day, right?

5  A    I believed it was important to go.  As I testified

6  previously, I believed it was important to go for other

7  people's safety and my own.

8  Q    So because the big crowd at July 8th managed to prevent

9  violence, you figured another big crowd on August 12th would

10 prevent violence, right?

11 A    Yeah.  I'm not a seasoned protester.  So that was my

12 experience at that time, yes.

13 Q    On August 12th, have you by that time read news reports

14 that 23 people had been arrested on July 8th?

15           MS. CONLON:  Objection.

16           THE COURT:  Sustained.  You've already gone through

17 that.

18  BY MR. CANTWELL:

19 Q    If I -- do I recall correctly that by the time you arrived

20 at what was Lee Park, the crowd had already dispersed, right?

21 A    Yeah, like -- I mean, maybe "disperse" isn't the right

22 word.  There were obviously still people around, but they

23 weren't in any kind of, like, organized way, if that makes

24 sense.

25 Q    All right.  And then you started a Facebook Live video,

E. Sines - Cross

1  right?

2  A    I believe I started it before and during that, but yes, I

3  was on Facebook Live.

4  Q    Okay.  Where are you when your Facebook Live video begins?

5  A    Walking to the area, walking to Emancipation Park.

6  Q    Did you broadcast more than one Facebook Live video on

7  August 12th?

8  A    Yes, I did.

9  Q    So you broadcasted a Facebook Live video en route to

10  Emancipation Park, and then that was -- was that your first

11  Facebook Live video of the day?

12  A    Yes.  I believe so, yes.

13  Q    Where were you when you started your second Facebook Live

14  video?

15  A    It's difficult for me to recall right now, but I believe

16  it was McGuffey Park.

17  Q    It was at McGuffey Park?

18  A    Yeah.

19  Q    How about your third video?

20  A    That would have been the car attack.

21  Q    And where were you when you started that video?

22  A    The car attack video?

23  Q    Yeah.

24  A    I believe that would also have been started at McGuffey

25  Park, walking from McGuffey Park to Fourth and Water.

                              E. Sines - Cross


1    Q     Is McGuffey Park on Water Street?

2    A     No, it is not.

3    Q     I'm sorry, I'm not very familiar with the layout here.

4    Any chance -- could I ask plaintiffs' counsel to pull up their

5    demonstrative --

6                   THE COURT:  Yes.

7                   MR. CANTWELL:  -- of the area with the parks?

8                   THE COURT:  Yes.

9     BY MR. CANTWELL:

10   Q     Can you please circle McGuffey Park?

11   A     I do not believe that I can.  I do not believe it is on

12   this map, but I believe it is up -- it would have been up

13   around this corner, like out, if that makes sense.

14   Q     Let me try this.  Or in the other direction?

15   A     I believe that is where it is.

16   Q     All right.  So did you start another Facebook Live video

17   when you were walking down here?

18   A     I started it in McGuffey Park and I -- I would have -- I

19   continued filming as I walked.

20   Q     Okay.  Let's try this.  I'm going to show you Plaintiffs'

21   Exhibit 3207.

22         Now, I believe that -- now, I think your attorneys played

23   a clip of this when you were at Fourth Street.  Do you

24   recognize this video?

25                   (Video playing.)

E. Sines - Cross

1  A    Yes, I do.  I believe this is the video that I took

2  walking from McGuffey Park.

3  Q    Okay.

4         MR. CANTWELL:  I would move to admit the entirety of

5  Plaintiffs' Exhibit 3207 into evidence and publish it to the

6  jury.

7            THE COURT:  You may.

8            (Defendant Cantwell Exhibit 3207 marked.)

9            (Defendant Cantwell Exhibit 3207 admitted.)

10           (Video playing.)

11        MR. CANTWELL:  Actually, let's take my screen off for

12  a second.  There's something else I want to show the witness

13  before we do this.

14   BY MR. CANTWELL:

15  Q    This video, this was a Facebook Live video, right?

16  A    Yes, it is.

17  Q    And when you go to Facebook Live it makes a Facebook post

18  that says so-and-so is live, right?

19  A    I'm not familiar.  I don't know what really happens.

20  Q    I'm showing you Plaintiffs' Exhibit 3202.  Now, during the

21  break I had asked plaintiffs' counsel if they have a higher

22  quality color copy of this.  I don't know if that was --

23           MS. CONLON:  Your Honor, we don't have another copy

24  of it.

25           THE COURT:  All right.

E. Sines - Cross

1  BY MR. CANTWELL:

2  Q    So I apologize for the grainy black and white nature of

3  this, but does this look at all familiar to you, Ms. Sines?

4  A    It looks like a Facebook -- it looks like a Facebook

5  comment thread.

6  Q    And does that appear to be your Facebook profile?

7  A    Yes, it does.

8  Q    And do you remember that you went live on August 12th,

9  2017 at -- well, this says 10:35 a.m, but it's UTC minus 7,

10  which I guess would be like 12:35 Eastern Time I'm thinking.

11  Right?  Does that sound about right?  12:35?

12  A    I don't know the times on that day.

13  Q    But that's your Facebook profile and that's your picture

14  and you went live on August 12th, right?

15  A    Yes, I did.

16  Q    Okay.

17        MR. CANTWELL:  I would move Plaintiffs' Exhibit 3202

18  into evidence and publish it to the jury.

19        THE COURT:  Okay.  Be admitted.

20        (Plaintiff Exhibit 3202 marked.)

21        (Plaintiff Exhibit 3202 admitted.)

22  BY MR. CANTWELL:

23  Q    So that's like the thumbnail image, the preview of the

24  video, right?  So if we were on Facebook and we hit that, that

25  would hit play, right?

E. Sines - Cross

1    A     I don't know how it works.

2    Q     And it's -- down here, somebody makes a comment and they

3    post that image.  Do you see that?  Do you recognize that this

4    image at the bottom is a larger version of this image up at the

5    top?

6    A     I can't really see with any certainty.  It's grainy.

7    Q     I understand.  And so can you recognize this scene at all?

8    A     Is this a clip from the video?

9    Q     This appears to be the thumbnail from your Facebook Live

10   video that day.  Do you recognize this scene at all?

11   A     I don't -- I don't really recognize it, but I -- if it's a

12   thumbnail of the video, it's a thumbnail.  I don't...

13   Q     Well, let's try this.  Do you recognize this man in the

14   corner?

15   A     I see him, but I don't know him.

16   Q     Does he appear to be wearing a helmet and a camouflage

17   jacket?

18   A     I cannot make out anything in this photo.  I apologize.

19   Q     All right.  But you don't remember making this post?

20   A     I remember going live.

21   Q     Do you remember deleting it?

22   A     No.  I believe it is -- it's still on my Facebook, I

23   believe.

24   Q     If we could take this down from the jury.

25         I'm showing you Plaintiffs' Exhibit 3200.  Do you remember

E. Sines - Cross

1  making this Facebook post?

2  A    I don't recall making it, but I can see that I posted

3  this, yes.

4           MR. CANTWELL:  I would move to put Plaintiffs'

5  Exhibit 3200 into evidence and publish it to the jury.

6           THE COURT:  What's the relevance of it?

7           MR. CANTWELL:  This is the witness's Facebook post

8  where she says that she had taken her Facebook post down and

9  she posted her friend Leanne's video for people.

10          THE COURT:  Well, what about all the names below the

11  line there?

12          MR. CANTWELL:  These appear to be people who have

13  reacted to the post, such as --

14          THE COURT:  Well --

15          MR. CANTWELL:  I would be happy to see those

16  redacted.

17          THE COURT:  I think they should be redacted.

18          MR. CANTWELL:  Does plaintiffs' counsel have the

19  capacity to do that?

20          THE COURT:  I don't know, but they should be

21  redacted.

22          MS. CONLON:  Mr. Spalding, is there a way to black

23  out what is below the top of the document?

24          Your Honor, may I confer with Mr. Spalding for one

25  moment to see if we can make that happen?

E. Sines - Cross

1              THE COURT:  Yes.

2              MR. CANTWELL:  While they work on that --

3              MS. CONLON:  Your Honor, I would just ask that he

4    wait --

5              THE COURT:  All right.  Go ahead.  Not you, but her.

6              MS. CONLON:  If the Court will permit Mr. Spalding to

7    now share his screen with the Court, he can -- we believe we

8    have a solution to the problem.

9              THE COURT:  All right.

10             MR. CANTWELL:  If we can label this as -- I don't

11   know -- 3200A or something like that and move that into

12   evidence and publish that to the jury, does that work?

13             THE COURT:  All right.

14             (Defendant Cantwell Exhibit 3200A marked.)

15             (Defendant Cantwell Exhibit 3200A admitted.)

16    BY MR. CANTWELL:

17   Q    And so this was posted the next day, where you say that

18   you took your post down; do you remember that?

19   A    This has reminded me that yes, I did.

20   Q    And in the post, you say that you took that post down

21   because you felt it was too graphic and you wanted to protect

22   peoples' identities, right?

23   A    Yeah, it was the video of me being hit by the car -- or,

24   I'm sorry, almost being hit by the car, and other people being

25   hit by the car.  And it seemed really disturbing to me.  So

93

E. Sines - Cross

1  yes, I wanted to take it -- or make it only my view on my

2  Facebook.

3  Q    So just so we're clear, you weren't hit by the car, right?

4  A    No, I was not.

5  Q    Okay.  So you thought that Leanne's video of the crash

6  would be less disturbing for people to watch, right?

7  A    Yes.

8  Q    Were any of the people that you were marching with

9  carrying weapons?

10  A    Not that I can recall, no.

11  Q    Were any of the people that you were marching with wearing

12  helmets?

13  A    I do believe I remember seeing helmets, yes.

14  Q    Do you remember if it was approximately -- was it a hot

15  day, August 12th, 2017?

16  A    Yeah, I think it was pretty hot.

17  Q    So you saw people wearing helmets on a hot day.  Did you

18  see anybody wearing goggles?

19  A    Not that I can recall right now.

20  Q    Now, just so we're clear about the weapons, I'm not just

21  talking about firearms here.  Did you see anybody carrying

22  baseball bats?

23  A    As I sit here today, no, I don't recall that.

24  Q    Did you see anybody carrying flagpoles?

25  A    I do not recall seeing -- I mean, I saw people with flags,

E. Sines - Cross

1   and a lot of them were on poles.  So yes, I remember seeing

2   flags on poles, yes.

3   Q    And do you remember anything conspicuous about any of the

4   poles?

5   A    It's very foggy in my memory.  So no, I don't.

6   Q    Did you see anybody with pepper spray?

7   A    No.  Not that I saw.  Not that I can remember, no.

8   Q    See anybody wearing masks?

9   A    Not that I can recall, no.

10  Q    Did you see anybody wearing bandannas?

11  A    Not that I can recall, no.

12  Q    So let's -- if I could go and once again share my screen

13  with the jury.  And let's take a look at Plaintiffs'

14  Exhibit 3207 in its entirety.

15       And when you were marching, were people chanting?

16  A    Yes.

17  Q    Can you remember some of the chants that they were doing?

18  A    I remember -- I'm sorry.  I can't remember any right now.

19  But I do remember chanting, yes.

20  Q    Okay.  Do you know what Antifa is?

21  A    I don't know exactly what it is, but I've heard the term.

22  Q    Did you know the term on August 12th, 2017?

23  A    I believe so.  I believe I had known the term then, but I

24  think it's the same; I wasn't quite sure what it was.  I had an

25  idea that they were people who were anti-fascist, like from the

E. Sines - Cross

1  name, but I don't -- I didn't know much about them then and I

2  don't know much about them now.

3  Q    Did you understand -- on August 12th, 2017, did you

4  understand Antifa to sometimes use violence against fascism?

5  A    I don't know what I -- I don't recall what I knew about

6  Antifa in 2017.

7  Q    Do you know that now?

8  A    I truly do not know.  Like, I don't know anyone in Antifa.

9  I don't know what they, like, stand for as a -- if they are a

10  group, I don't know what they stand for.

11  Q    So it's your testimony today that as you're in this

12  courtroom right now, you have no idea if Antifa uses violence?

13  A    Again, I am not familiar enough with Antifa to say it with

14  any amount of certainty.  I don't know what they believe in --

15  Q    Fair enough.

16  A    -- other than anti-fascism.

17  Q    And anti-fascism, that's something that you're on board

18  with, I take it?

19  A    Yeah.

20  Q    All right.  Let's watch this video.

21          (Video playing.)

22          MR. CANTWELL:  Please pardon my technical

23  difficulties while I straighten this thing out very quickly.

24          (Video playing.)

25  BY MR. CANTWELL:

E. Sines - Cross

1   Q    What's that guy got on his face right there?

2   A    I do see that he is wearing goggles.

3   Q    What's this guy got on his head right here?

4   A    I -- yes, I believe those are goggles.

5            (Video playing.)

6   Q    Now, you were chanting with them, I think, right there,

7   right?

8   A    Yes.

9   Q    What were they chanting?

10  A    It sounds like:  "When black lives are under attack, what

11  do we do?  Stand up, fight back."

12  Q    "Fight back."  What's this man have in his hand?

13  A    I'm not -- I'm not sure what that is.  I don't know what

14  that is.

15  Q    Okay.  Does this man appear to be wearing gloves?

16  A    Yes, he does.

17  Q    And again, it was a pretty hot day, August 12th, 2017,

18  right?

19  A    Yeah, it was a pretty hot day.

20  Q    That flagpole, does it look metal to you?

21  A    I cannot tell what it is made out of.  I don't know.

22  Q    Can you tell -- what color is that flagpole?

23  A    I would say it's whitish-gray.

24  Q    Okay.  Does that man appear to be covering his face with a

25  bandanna?

97

E. Sines - Cross

1   A    It looks like a gator.

2   Q    A gator?

3   A    But yeah, he's -- yes.

4   Q    And this man right here, tell me what you see above his

5   shoulders.

6   A    I'm sorry.  Could you be -- which shoulder?

7   Q    Above his shoulders, this -- I'm sorry.  I'll zoom in on

8   him a little more instead of the guy with the red bandanna

9   behind him.

10       This man right here, what do you see -- what is he wearing

11  above his shoulders?

12  A    I think I'm confused by your question.  I'm sorry.

13  Q    All right.  Do you see -- does this man appear to be

14  covering his mouth with something?

15  A    Yes.  It's blurry for me, but yes, it looks like his mouth

16  is covered.

17  Q    Does he appear to have sunglasses on?

18  A    Yes, he is.

19  Q    Does he appear to have, like, the brim of a baseball hat?

20  A    Yep.

21  Q    And does he appear to have a helmet on top of his baseball

22  hat?

23  A    Yes.

24  Q    And again, it was a pretty hot day, August 12th, 2017,

25  right?

E. Sines - Cross

1   A    Yeah, it was hot.

2   Q    And then there's that big old black flag behind him and

3   there's the man with the red bandanna.  And then this woman

4   right here, does she appear to have something in her hand?

5   A    Yes.

6   Q    What does it appear to be in her hand?

7   A    It looks like a flagpole to me.

8   Q    But we don't see a flag at the end of that pole, do we?

9   A    I can't really tell from this.  I don't see the flag in

10  this video, though, no.

11  Q    I gotcha.  Okay.

12      Let's see what else we find.  We are at 41 seconds in of

13  an 8-minute video.

14          (Video playing.)

15      Who is Josh?

16          MS. CONLON:  Objection, Your Honor.  This relates to

17  a motion in limine that we raised with Your Honor yesterday

18  again.

19          THE COURT:  Sustained.

20  BY MR. CANTWELL:

21  Q    Did you see many of these green hats there?

22  A    Not many.

23  Q    Did you happen to notice if those hats had "National

24  Lawyers Guild" written on them?

25  A    I didn't notice it then, but I am familiar with the

E. Sines - Cross

1  National Lawyers Guild.

2  Q    You are?

3       Do you know National Lawyers Guild to be a communist

4  group?

5  A    I don't know much about the National Lawyers Guild.  I

6  don't know much about them.  I was just saying, like, I know

7  those hats.

8  Q    Oh, so you do know that those are National Lawyers Guild

9  hats, then?

10 A    I know the bright green hats, yeah.  I know they say

11 "National Lawyers Guild" on them.

12 Q    Okay.  Thanks.

13          (Video playing.)

14      This guy right here, well, as a matter of fact, does he

15 appear to have something in his hand?

16 A    It's blurry.

17 Q    Yeah, we'll get a better shot of him soon.

18          THE WITNESS:  (Video playing.)

19      Now, you're chanting with them again, right?

20 A    Yes.

21 Q    And what's that chant?

22 A    I believe it's:  "Whose streets?  Our streets."

23 Q    Is "Whose streets?  Our streets," is that a violent chant?

24 A    I'm certainly committed to nonviolence.  So not to me.

25 Q    Let's clear our screen there.

E. Sines - Cross

1              (Video playing.)

2         Does this man appear to be carrying something in his hand?

3    A    Yes, but I can't see what it is.

4    Q    Right.  It's a little blurry.

5              (Video playing.)

6         We've got a little bit of a better view of that thing in

7    his hand now, don't we?

8    A    Yes.

9    Q    What does that appear to be?

10   A    I don't know what it is.  I don't know who that is.  So I

11   don't know what that is.

12   Q    But he's walking in front of you, right?

13   A    Yes, he is in front of me.

14   Q    And there's no flag on that pole there, right?

15   A    I don't know if it's a pole, but I do not see a flag.

16   Q    Well, what --

17             THE COURT:  The jury can see the photograph.

18             MR. CANTWELL:  Okay.

19             (Video playing.)

20   BY MR. CANTWELL:

21   Q    This man with the helmet, does he appear to be carrying

22   something in his hand?

23             MS. CONLON:  Your Honor, at this point I would

24   object.  As you said, the jury can see the photo, and I'm

25   concerned about the length of this video and how many different

E. Sines - Cross

1  people we're going to have to circle.

2          THE COURT:  You're not nearly as concerned as I am

3  about getting this case over with, but that's not the test.

4          Can you move along a little bit?  I mean, if she

5  doesn't remember seeing something, the photo speaks for itself.

6          MR. CANTWELL:  I think that we've got most of the

7  weapons --

8          THE COURT:  All right.

9          MR. CANTWELL:  -- and then once we get through them,

10  then --

11          THE COURT:  Okay.  Go ahead.

12          (Video playing.)

13  BY MR. CANTWELL:

14  Q    There's that man with the black helmet and the camouflage

15  again.  Remember him?

16          THE COURT:  Well, we've already seen him.  So let's

17  move on.

18          MR. CANTWELL:  All right.

19          (Video playing.)

20  BY MR. CANTWELL:

21  Q    Do you remember that chant?

22  A    I don't remember much of this video.  So I don't remember

23  it, no; but I can hear it now.

24  Q    Okay.  Do you know what that means?

25  A    No, I don't.

E. Sines - Cross

1  Q    You don't know what "anti-fascista" means?

2  A    I don't want to make an assumption.  It sounds like

3  "anti-fascist" to me.

4  Q    Okay.

5           (Video playing.)

6           MS. CONLON:  Objection.  Your Honor, objection.  I'm

7  asking that Mr. Cantwell stop playing the video and also stop

8  dancing to the song in it.  I understand that this is

9  entertaining to him, but this is a serious proceeding.  I'd ask

10 that he stop.  And it's a form of badgering Ms. Sines.

11          THE COURT:  Well --

12          MR. CANTWELL:  How about if I stand perfectly still

13 and play the video?

14          THE COURT:  Yes, that would be nice.

15  BY MR. CANTWELL:

16 Q    Can you read that sign to me, please?

17 A    It says, "Fuck y'all racists."

18          (Video playing.)

19 Q    How about this one?

20 A    It says, "No human being is illegal."

21          (Video playing.)

22 Q    I'll pause this here.  Let's go back to Plaintiffs'

23 Exhibit 3202, okay?  This is where you posted your Facebook

24 Live video on August 12th, 2017.  And that's the thumbnail of

25 the video.  And then down here, somebody shows you what that

E. Sines - Cross

1  thumbnail contains in a comment.  And then the next day -- oh,

2  I'm sorry, can we show your version of 3200?  I apologize.

3       And then the next day you delete it, because the thumbnail

4  showed the man in the black helmet with the camouflage jacket

5  who was carrying the baseball bat, and you didn't want to show

6  your friends, you didn't want to show the public, you didn't

7  want to show this jury, that you're walking around with people

8  with weapons on August 12th --

9            MS. CONLON:  Objection, Your Honor.

10            THE COURT:  Sustained.

11  BY MR. CANTWELL:

12  Q    -- chanting "anti-fascista."  Right?

13            THE COURT:  Sustained.  Look.  You can't add all that

14  stuff in.  You can ask her a question, but you can't badger

15  her.

16            MR. CANTWELL:  Okay.

17  BY MR. CANTWELL:

18  Q    Isn't it true that you deleted the video because you were

19  afraid of what the public would find out about its contents?

20  A    I deleted this video because of how graphic it is, and I

21  didn't want to see -- I didn't want my family and friends to

22  have to see me sobbing after almost getting hit by the car,

23  which is why I truthfully deleted it.

24  Q    You didn't want anybody to see you sobbing?

25  A    No, I did not.

E. Sines - Cross

1  Q    And you thought the video was too graphic?

2  A    It was graphic.  It --

3  Q    So Leanne's was not graphic, right?

4  A    It did not have the video of me.  I didn't want my family

5  and friends to have to see that.  It's very difficult to see.

6  Q    So real quick, let's pick this apart.  Leanne's video

7  caught the car crash, too, right?

8  A    Leanne's video does have the car crash, yes.

9  Q    So what you're testifying to today is that you deleted the

10 video because you didn't want your family to see you crying?

11 A    Because they'd see me in a really traumatic moment for me.

12 It's the worst moment of my life.  So I didn't want my family

13 to have to see that, no.

14 Q    So you were lying when you posted to Facebook that you

15 were removing it because it was graphic?

16 A    That means it's graphic to me.  That was graphic to me.

17 My reaction is considered graphic to me.

18 Q    Leanne's video captured the car crash, too, right?

19        MS. CONLON:  Asked and answered, Your Honor.

20        THE WITNESS:  Yes, it did.

21 BY MR. CANTWELL:

22 Q    So it wasn't -- you weren't trying to hide the car crash;

23 that's certainly something that you didn't want to hide from

24 the public, right?

25        (Reporter clarification.)

105

E. Sines - Cross

1           MS. CONLON:  I had an objection.  And the objection

2   was asked and answered, about Leanne's video, again.

3           THE COURT:  Okay.

4   BY MR. CANTWELL:

5   Q    The purpose of deleting your video was not to hide the

6   content of the crash from the public, right?

7   A    No.  It was not.

8   Q    But you were perfectly fine with everybody knowing that

9   you were marching with weapons and --

10           THE COURT:  Mr. Cantwell, you have asked.  She's

11   answered.  You've been over it enough.

12    BY MR. CANTWELL:

13   Q    How did you become familiar with the National Lawyers

14   Guild?

15           MS. CONLON:  Objection, asked and answered.

16           MR. CANTWELL:  I didn't ask that question.

17           THE COURT:  What's the relevance of that?

18           MR. CANTWELL:  People with the green hats that she

19   was marching --

20           THE COURT:  Well, it's not relevant.

21           MR. CANTWELL:  It's a group that she was marching

22   with.

23           THE COURT:  Well, if she's familiar with -- I mean,

24   she said she was familiar with it.

25    BY MR. CANTWELL:

E. Sines - Cross

1   Q    Are you a member of the National Lawyers Guild?

2   A    I was in law school.  I think I went to a meeting for the

3   National Lawyers Guild, but I don't remember much about that

4   meeting.  And I don't think I, like, signed up for anything.

5   So I do not believe so.  I've never, like paid dues to anything

6   or anything like that.

7   Q    Are you uncertain if you're a member of the National

8   Lawyers Guild?

9   A    I think that I, like -- like, I was in law school.  It's a

10  group of, like, law students that a lot of law students belong

11  to.  I remember going to a meeting in law school about the

12  National Lawyers Guild, but I don't really remember, like, the

13  content, really, of that meeting.  And I don't remember if I,

14  like, signed up for anything.

15      I don't, like -- I don't think I receive emails or

16  anything like that.  Like, I don't -- I don't know much about

17  them.

18  Q    What is the National Lawyers Guild?

19  A    Truly, I -- they're a collection of lawyers, I believe.

20  They do legal observing.  That's about all I know about them.

21  I know about the legal observing and their name.

22  Q    Did your attendance at the National Lawyers Guild meeting

23  come before or after August 12th?

24  A    After.

25  Q    After.  How long after?

E. Sines - Cross

1   A    I do not know.  I do not remember.

2   Q    I'm showing you Plaintiffs' Exhibit 3346, which I'd like

3   to publish and show it to the jury.  It's already in evidence.

4        Do you recall seeing that black flag while you were

5   marching?

6   A    I do not recall seeing that flag.

7   Q    Do you recall what was on any of these flags?

8   A    I can't recall the flags with any certainty.  They didn't

9   mean anything to me.

10            MR. CANTWELL:  We can take this down.

11            No further questions.

12            THE COURT:  All right.  Anyone else?

13            MR. REBROOK:  Yes, Your Honor.

14                        CROSS-EXAMINATION

15    BY MR. REBROOK:

16   Q    Ms. Sines, good morning.

17   A    Good morning.

18   Q    My name is Edward ReBrook.  I'm the attorney for Mr. Jeff

19   Schoep and the National Socialist Movement.

20        Ms. Sines, you've been quoted as referring to the

21   August 11th torch march as a "Klan rally"; is that correct?

22   A    I don't remember saying that.  I don't recall saying that.

23   Q    Do you recall in this courtroom referring to it as a "Nazi

24   march"?

25   A    Yes.

108

E. Sines - Cross

1  Q    Can you identify which members of the march were

2  self-identified Nazis, as opposed to Klan members or other

3  affiliated groups?

4  A    I don't really know the difference.

5  Q    So when you say "Nazis," it's more of a catchall phrase

6  for attendees?

7  A    Yes.

8  Q    So did you say in testimony that you went to these events

9  because you were worried about safety?

10 A    I wanted to join counter-protests.  I thought

11 counter-protests were important for safety for the reasons I

12 testified about earlier.

13 Q    Can you explain how being in the fray, if you will, is --

14 contributes to safety?

15 A    I think that it was important -- it felt important to me

16 to go.

17     I think I'm confused by your question.  Can you repeat it?

18 Q    Would it not have been safer to not have been around the

19 torch march?

20 A    Certainly.  But I felt it was still important to go.  I

21 thought it was the right thing to do to go.

22 Q    Okay.  So --

23        MR. REBROOK:  Court's indulgence, Your Honor.

24 BY MR. REBROOK:

25 Q    Ms. Sines, did you see Mr. Jeff Schoep at the torch march?

E. Sines - Cross

1    A    I didn't know any -- I didn't know Mr. Schoep at the time.

2    So if I saw him, I wouldn't have known him.

3    Q    He's in the courtroom right now.

4         MR. REBROOK:  Can you remove your mask for a moment,

5    Mr. Schoep?

6    BY MR. REBROOK:

7    Q    Now that you see him, do you remember seeing him at the

8    torch march?

9    A    I do not recall seeing him.

10   Q    Do you recall seeing him anywhere near the vehicle attack

11   of James Alex Fields?

12   A    I do not recall seeing him.

13   Q    Were you physically assaulted or beaten by the protesters?

14   A    No, I was not.

15   Q    Did you receive any injuries from James Alex Fields's car

16   attack?

17   A    I received no physical injuries from the car attack, no.

18   Q    Ms. Sines, your surname begins with the 19th letter of the

19   English alphabet; is that correct?

20        MS. CONLON:  Objection.  Relevance.

21        MR. REBROOK:  It comes to bear, Your Honor, if I

22   could get a little bit of latitude on this.  I'm trying to

23   establish why it is that Ms. Sines is the flagship name of the

24   plaintiffs' case.

25        MS. CONLON:  Your Honor, Ms. Sines would certainly

E. Sines - Cross

1    not be in a position to discuss our legal strategy with

2    Mr. ReBrook.

3              THE COURT:  You can ask her --

4              MR. REBROOK:  I'll withdraw it, Your Honor.

5     BY MR. REBROOK:

6    Q    Ms. Sines, are you claiming that your injuries from your

7    participation in these events are on par with that of the other

8    plaintiffs?

9              MS. CONLON:  Objection, Your Honor.

10             THE COURT:  Sustained.

11   BY MR. REBROOK:

12   Q    What are your actual damages from your exposure to the

13   Unite the Right rally?

14   A    I'm sorry.  My injuries?

15   Q    Yes.

16   A    As I've testified earlier, I've had a lot of trouble

17   sleeping, difficulty focusing, panic attacks and anxiety, like,

18   hypervigilance about Nazis attacking me or my family.

19   Q    Okay.  You mentioned that you saw guns both big and small.

20   Did you see anyone get shot with these guns?

21   A    No, I did not.

22   Q    Do you recall hearing a state of emergency being declared

23   over loudspeakers?

24   A    Yes, I do.

25   Q    And what was your response to that declaration?

E. Sines - Cross

1    A    To leave the area.

2    Q    So you left immediately?

3    A    I walked up, like -- I didn't ever go into the park.  I

4    was just on the outside.  I stayed on the street and I then

5    left the area.

6    Q    Was the state of emergency declared before or after the

7    vehicle attack?

8    A    Before.

9    Q    When did you graduate law school, Ms. Sines?

10   A    In 2019.

11   Q    And when did you take the bar exam?

12   A    Later that summer, in 2019 as well.

13   Q    So you took the one that was two months after graduating?

14   A    Yes.

15   Q    So you were able to pass the bar exam, correct?

16   A    Yes.  I was.

17   Q    The first time?

18   A    Yes.

19   Q    So you didn't have trouble focusing for the bar exam?

20   A    I certainly had plenty of trouble focusing for the bar

21   exam.  It was very difficult.  It was a very rough few months,

22   but yes, I did pass the bar.

23   Q    You mentioned you have difficulty getting out of bed.  Are

24   you currently employed?

25   A    I am.

E. Sines - Cross

1    Q    Who are you employed with?

2    A    Venable.  It's a law firm.

3    Q    A law firm.  Where is it located?

4    A    In Baltimore.

5    Q    Is it a large law firm?

6    A    Yeah, I'd say so.

7    Q    Roughly how many attorneys?

8    A    I'm sorry, I don't know.

9    Q    More than 100?

10   A    Yes.  I don't know if there are more than 100 at my

11   particular office, but there are more than 100 attorneys who

12   work for Venable, yes.

13   Q    Isn't it true that Venable LLC is one of the highest

14   grossing law firms in the world?

15          MS. CONLON:  Objection, relevance.

16          THE COURT:  Overruled.

17    BY MR. REBROOK:

18   Q    You can answer.

19   A    Unfortunately, I'm not very sure.  I don't know much about

20   that.  I'm sorry.

21          THE COURT:  Oh, you said grossing firm.  I thought

22   you said highest -- I was thinking rated firms.

23          MR. REBROOK:  I'm sorry, Your Honor?

24          THE COURT:  I thought you said it was one of the

25   highest rated firms.  I thought you were asking her the quality

E. Sines - Cross

1  of the firm, not about the gross of the firm.

2           MS. CONLON:  So I renew my objection.

3           THE COURT:  Well, okay.  I don't think it hurts

4  anybody.  But what's -- go ahead.

5           I take it you're trying to show she's in a very good

6  law firm.  Is that right?

7           MR. REBROOK:  That's correct, Your Honor.

8           THE COURT:  Okay.

9   BY MR. REBROOK:

10  Q    You're an associate attorney with that firm, correct?

11  A    Yes, I am.

12  Q    Are you regularly absent or late for work?

13  A    I work from home right now during the pandemic.  So it's

14  not -- there's not, like, really a way to be late for arriving,

15  if that makes sense.

16  Q    Do you regularly turn in assignments late?

17  A    Sometimes I do turn in assignments late, yes.

18  Q    Did I hear you laughing in the video that Mr. Cantwell

19  shared with the Court?

20  A    Did you hear me laughing?

21  Q    Yes.

22  A    I don't recall laughing, but I -- I'm sorry.  I don't

23  recall laughing.

24  Q    If you don't remember, you don't remember.

25           I don't have any further questions.  Thank you for your

E. Sines - Cross

1    time.

2              THE COURT:  All right.  Anyone else have any

3    questions?

4              MR. CAMPBELL:  No questions, Your Honor.

5                        CROSS-EXAMINATION

6     BY MR. SPENCER:

7    Q    Hello.  My name is Richard Spencer and I'm acting on my

8    own behalf.

9         So you attended a few demonstrations over the summer of

10   2017 as a counter-protester, the KKK rally that you described

11   and then the events on August 11th and 12th.  You have stated

12   in your testimony that a large counter-protest was an important

13   part of safety.

14   A    Uh-huh.

15   Q    Could you describe that a little bit in more detail?

16   A    Yeah.  So when I was at the KKK rally, what I saw was a

17   very large counter-protest.  They probably outnumbered --

18   again, I'm not great with numbers, but they probably

19   outnumbered the Klan members, like -- at least like 10, 20 to

20   1.  And to me, that felt like that was why there was no

21   violence.

22        The people who I was with -- I mean, I should say I'm

23   committed to nonviolence, and those counter-protesters, I did

24   not see them inflict any violence.  It felt like it kept, like,

25   the Klan in check, if you will.  Like why would they inflict

115

E. Sines - Cross

1  violence upon people if they were so far outnumbered?  And so

2  that's what I mean when I say that I think counter-protests are

3  an important part of safety.

4  Q    Okay.  Is another way of staying safe staying at home?

5  A    Sure.  It would have been safer to stay at home,

6  certainly.

7  Q    So did you want to go out into a hot political situation?

8  You thought -- you described that as outnumbering people or

9  rescuing them.  Is that proper?

10 A    I didn't feel like I needed to rescue anyone.  It was more

11 like I think it's important to use my voice to speak out

12 against injustice, what I perceive as injustice and hatred.

13 And that to me is being a good neighbor, standing with your

14 neighbors in the face of something like that.  So that's why I

15 felt it was important to be there.

16 Q    So we're not exactly talking about safety.  It's -- you

17 just described it as using your voice to speak out against

18 injustice.  I don't think anyone would be against that.  But

19 it's not about safety, right?

20 A    I think what I said about -- I believe -- I think those

21 are two different things that I'm talking about.  I'm sorry if

22 I'm misunderstanding your question.

23 Q    That's fine.

24     You actually described yourself as being like a reporter.

25 Is that how you thought of yourself when you were participating

E. Sines - Cross

1    in the events of 11th and 12th?

2    A    I certainly didn't, like, I think, consciously feel or

3    intend to be a reporter.  I think it was more like -- like the

4    adrenaline and not really knowing what else to do, and also

5    wanting people to know what was happening.  So I didn't, like,

6    seek out to be a reporter.  But I think that's what I'm trying

7    to say is that's what it became for me in that moment, because

8    I didn't know what else to do, specifically on August 11th.

9    Q    Did you engage in reportage, like, narration of your

10   videos?

11   A    Yes, I did narrate my videos.

12   Q    Do you remember talking to the media shortly after the

13   events of August 12th?

14   A    Yes, I do remember.

15   Q    Does MTV ring a bell?

16   A    Yes, it does.

17   Q    Are you seeing something on your screen right now?

18   A    I am not.

19   Q    Oh --

20   A    I see -- I see the little "play" thing now.

21   Q    Okay.  So you're seeing that?

22   A    Yeah, I see that now.

23   Q    All right.  Let me get this.

24        I'm sorry, I don't want to play the audio.  Let me turn

25   the audio off and then I'll play it so the witness can

E. Sines - Cross

1  recognize it.

2            (Video playing.)

3       Just that one screen, does that ring a bell about an MTV

4  report that you might have participated in?

5  A    Yes.

6  Q    So that's a fair and accurate representation of a video

7  that was widely shared on social media?

8  A    I don't -- I don't really -- I don't know if it was widely

9  shared.  I don't really know what they did with the videos that

10 we gave them.

11 Q    You did give an interview to MTV?

12 A    Yes.

13 Q    Okay.

14            MR. SPENCER:  I would like to publish this to the

15 jury as Defendants' Exhibit 1012.  And you could publish it to

16 the jury whenever you're ready.

17            THE COURT:  Okay.  No objection, it's admitted.

18            (Defendant Spencer Exhibit 1012 marked.)

19            (Defendant Spencer Exhibit 1012 admitted.)

20            MR. SPENCER:  Now the sound isn't working.  The sound

21 was just working and then now it's not.

22            I don't know why the sound is not now working.  I do

23 have it --

24            THE COURT:  Go on to another subject --

25            THE CLERK:  Try unplugging it and plugging it back

E. Sines - Cross

1   in.

2            MR. SPENCER:  Okay.  Let me try that real quick and

3   then I'll go on to another subject.

4            THE COURT:  All right.

5            (Video playing.)

6   BY MR. SPENCER:

7   Q    So you've testified that on August 12th you walked to

8   Emancipation Park around noon, and that's when the state of

9   emergency was called and the field was evacuated.

10  A    Yes.

11  Q    Right.  Okay.  So was your feeling that the UTR was over

12  at that point?

13  A    I mean, I don't really remember how I felt about it at the

14  time.  I don't really remember how I felt at that time.

15  Q    Okay.  And you also mentioned in your testimony that there

16  were other demonstrations going on at other parks that you were

17  aware of?

18  A    Yes.

19  Q    Okay.  But you decided not to go to those?

20  A    I'm sorry, I think I misunderstood.  When I got there,

21  like when I arrived, I wasn't aware of any other

22  counter-protest.  I just went to where I thought they might be.

23  But then when I walked around, I saw them at other places after

24  that.

25  Q    Okay.  Suffice it to say you didn't go there?

E. Sines - Cross

1  A    I did eventually go to other, like, counter-protests.  I
2  don't know if they were in any parks.  Well, I guess McGuffey
3  Park.  But, like, I just walked around and saw various counter
4  demonstrations.
5  Q    Okay.  Was that before the car attack or after?
6  A    That's before.
7  Q    Before.  Okay.  So after the car attack you went home, I
8  presume?
9  A    Yeah.
10 Q    Okay.
11 A    I eventually went home, yes.
12 Q    So in this interview that came shortly after for MTV, you
13 said that they wanted us to mobilize.  Who is "they" first, and
14 then what is mobilize?
15 A    So when I was in McGuffey Park, I was there -- there were
16 a lot of counter-protesters in McGuffey Park.  It was only
17 counter-protesters.  And there were -- I don't know who they
18 were, but there were people in the park who said that there
19 were people being attacked or -- I shouldn't say that.  There
20 were people who were being stuck in their homes in Friendship
21 Court because there were Nazis in the area and were
22 intimidating them.
23 Q    Okay.  You did say that they were being attacked, but now
24 under -- after reflection you're saying that people were
25 trapped in their homes?

120

E. Sines - Cross

1   A    I'm trying to say that I think they were fearful of being

2   attacked when leaving their homes.  I'm trying to just clarify

3   exactly what I heard in McGuffey Park.  And again, it was four

4   years ago.

5   Q    I get that.  Yeah.

6        So being trapped in your homes, is it dangerous to be in

7   your home?

8   A    I think if there are Nazis outside and you are black, I

9   would say that I would feel very intimidated and that it was

10  dangerous.

11  Q    But your home might be the safest place to be?

12  A    Not when you can't leave, and I would -- as I previously

13  testified, I am very scared of Nazis outside of my own home.

14  So I think it would be very scary to have Nazis outside of your

15  home.

16  Q    So I want to reverse a little bit and go back to August

17  11th at the torch march.  Other people have already asked you

18  about how you learned about it.  I won't belabor that.  You

19  said this is like our backyard.  You testified to that today

20  about the UVA campus.

21  A    I don't believe I said that, but I heard it in the video.

22  Q    You heard it in the video.  Okay.  I stand corrected.

23  A    Those aren't my words is what I'm trying to clarify.

24  They're Leanne's.

25  Q    Okay.  That's good.  And so you were -- correct me if I'm

121

E. Sines - Cross

1   wrong -- you were at the top of the steps of the Rotunda and

2   you were engaging in a Facebook Live video and reporting in the

3   way that people report now in the 21st century, right?

4   A     I was over, not right at the top of the stairs, but I was

5   over to the left of the stairs.

6   Q     Okay.

7   A     If you're -- I'm sorry.  If you were facing the Rotunda

8   like from the statue, it would be considered the right side.

9   It just depends on which way you're coming from.

10  Q     Okay.  And then you describe some events, and then you

11  have testified that you saw me.

12  A     Uh-huh.

13  Q     And so before August 11th, did you know who I was to some

14  degree?

15  A     Yes, to some degree I did.

16  Q     Okay.  And how did you know about that?

17  A     I think I just knew that you were a prominent Nazi.  I

18  would say a leader of the Nazi Party.  That's what I would have

19  said you were then, and still would.

20  Q     Okay.  That's fine.  I'm not a leader of the Nazi Party.

21  Do you understand that, that -- I mean, is that safe to say?

22  A     I don't understand that.

23         MS. CONLON:  Object.

24         MR. SPENCER:  I don't want to get into a back and

25  forth.

E. Sines - Cross

1           THE COURT:  Okay.  Go ahead.

2     BY MR. SPENCER:

3    Q    That's fine if that's your understanding.

4         So were you on social media?  You did Facebook Live

5    videos, but were you on social media at all during, let's say,

6    just 2017?

7    A    I was on social media on 2017, yes.

8    Q    Were you on Twitter?

9    A    Yes.

10   Q    Okay.

11   A    Yes.

12   Q    Did you become aware of me on Twitter?

13   A    I don't remember how I became aware of you.

14   Q    Okay.  Does the punch ring a bell?

15   A    I -- can you be more specific?

16   Q    The punch of Richard Spencer, a notable attack on January

17   20th where I was assaulted in broad daylight?  It became a huge

18   meme?

19   A    I am aware of that, but I don't know if that's how I

20   became aware of you.

21   Q    Did you ever retweet that?

22   A    I don't recall.  I retweet a lot.  I'm pretty active on

23   Twitter.  I don't recall.

24   Q    Okay.  Fair enough.  So let's go back to August 11th.  You

25   claim to have seen me as I came up the stairs of the Rotunda?

E. Sines - Cross

1    A    Yes.

2    Q    Do you remember what I was wearing?

3    A    I believe you were wearing a jacket, like a suit jacket, I

4    believe.

5    Q    Could I refresh your memory.  Would you like me to refresh

6    your memory?

7              THE COURT:  Well, she said she --

8              MR. SPENCER:  Okay.

9    BY MR. SPENCER:

10   Q    All right.  That's fine.  So could you give a little more

11   detail, like what -- you saw me -- was there other people

12   there?

13   A    Yes.  Yes, there were.

14   Q    Around --

15   A    With you.

16   Q    Around how many?

17   A    Maybe six or seven.

18   Q    Six or seven.  Okay.  And then you described that -- so

19   did we make eye contact?  I don't remember this at all, but did

20   we make eye contact?

21             MS. CONLON:  Objection, Your Honor.  I'd ask that

22   Mr. Spencer not interject his own recollections into his

23   questions.

24             THE COURT:  Sustained.  Go ahead.  Mr. Spencer.

25    BY MR. SPENCER:

E. Sines - Cross

1    Q    Point taken.

2    A    I don't know if you were aware of me.  We did not engage.

3    Q    We did not engage.  Okay.  And then you said that I was

4    ten feet away from you.

5    A    Again, I'm really bad with numbers, but we were -- I

6    could -- maybe from, like, here to where this gentleman is

7    sitting.

8    Q    Then you said I tried to give a bit of an impromptu speech

9    with a megaphone?

10   A    Yes, but the megaphone didn't work.

11   Q    Right.  "It was out of juice" I think is the language that

12   you remember hearing.

13        And I said something to the effect, this is an historic

14   victory?

15   A    Yes.

16   Q    What happened next?

17   A    You quickly left.  You quickly left, yeah.

18   Q    Why do you think that happened?

19   A    I believe that --

20            THE COURT:  Sustained.

21            MS. CONLON:  I would object.

22            MR. SPENCER:  I agree.  I agree.

23    BY MR. SPENCER:

24   Q    So there was nothing in the way of any kind of physical

25   altercation between me and anyone around me and yourself on

125

E. Sines - Cross

1  August 11th?

2  A    I'm sorry.  I think I'm confused by the question.  Could

3  you rephrase it.

4  Q    Okay.  Did I -- did I physically confront you at all on

5  August 11th when we were around 10 feet apart?

6  A    No, you did not.

7  Q    Did I yell invectives at you or anything like that while

8  we were 10 feet apart?

9  A    No, you did not.

10 Q    Okay.  On August 12th did we encounter each other in any

11 way?

12 A    No.  I do not recall seeing you on August 12th.

13 Q    Has anyone ever called you a commie?

14         MS. CONLON:  Objection, Your Honor.

15         THE COURT:  Sustained.

16 BY MR. SPENCER:

17 Q    You've referred to various defendants as "the Nazis,"

18 right?

19 A    Yes.

20 Q    Do you think that, upon further reflection, that that's

21 really a fair characterization, or maybe that's hot political

22 rhetoric?

23         MS. CONLON:  Objection to the form of the question.

24         THE COURT:  Overruled.

25         THE WITNESS:  I just kind of use "Nazi" as a catchall

E. Sines - Cross

1  for people who I believe hate other people on account of race

2  or religion.  So I don't -- I mean, obviously I know like the

3  Nazi Party.  Does that answer your question?

4  BY MR. SPENCER:

5  Q    Well, I understand -- are you referring to, like, a

6  historical entity?

7  A    I would say those are two separate things to me.  I don't

8  believe you were around in Nazi Germany.

9  Q    Okay.  If someone called you a commie, would you find that

10 a bit -- not to express who you are in full?

11         MS. CONLON:  Objection.

12         THE COURT:  Sustained.

13         MR. SPENCER:  I'll leave it at that.  Thank you.  No

14 further questions.

15         THE COURT:  Do you have questions?

16         MR. JONES:  Just a few, Your Honor, thank you.

17                    CROSS-EXAMINATION

18  BY MR. JONES:

19 Q    I represent Michael Hill, Michael Tubbs and the League of

20 the South.

21         Was it your testimony that you feel safer traveling or

22 being in groups as opposed to being alone?

23 A    I think in -- maybe not all the time, but like --

24 Q    On August 12th?

25 A    On August 12th.  I wasn't part of any group on August

E. Sines - Cross

1  12th.  I was just with my friend Leanne.

2  Q    But didn't you testify that one reason you went to August

3  12th is you felt that being -- counter-protesters being there

4  as a large group would be safer?

5  A    Yes, I believed that would be the case.

6  Q    Now, after August 12th, 2017, we saw you, you did a piece

7  with MTV; is that right?

8  A    Yes, I did.

9  Q    And did you speak to the *New York Times* as well?

10  A    Yes, I did.

11  Q    Did you speak to Glamour magazine as well?

12  A    I have spoken to Glamour magazine, yes.

13  Q    And did you speak to a publication called Pantsuit Nation?

14  A    I don't know if I would define it as a publication.  A

15  Facebook group.  But I did post in that Facebook group.

16          MR. JONES:  Thank you.  That's all the questions I

17  have.

18          THE COURT:  All right.  Did anyone else have

19  questions?

20          MR. KOLENICH:  Briefly, Your Honor.

21                    CROSS-EXAMINATION

22   BY MR. KOLENICH:

23  Q    Good morning, Ms. Sines.

24  A    Good morning.

25  Q    My name is Jim Kolenich.  I represent Jason Kessler,

E. Sines - Cross

1  Nathan Damigo, and Identity Evropa.  I just want to check a few

2  of the details on August 11th.

3      So you testified that you were near the Rotunda at some

4  point that evening?

5  A    Yes, I stood on the Rotunda overlooking the statue, yes.

6  Q    So the statue is downhill and then the Rotunda is up a

7  hill or an embankment of some kind?

8  A    No.  It's the Rotunda and then you walk down steps.  So --

9  and then it's just like flat.  There's no real hill.  It's just

10 like steps, if that makes sense.

11 Q    It does.  But nevertheless elevated from where the statue

12 is?

13 A    Yeah, I had a bird's eye view of the statue.

14 Q    You were at the top of the steps at least, right?

15 A    Yes.

16 Q    Similar type area?

17 A    Yeah.

18 Q    How far is that from where the statue is?

19 A    I'm really bad with numbers.

20 Q    No worries.  Let's try to guesstimate.  Do you see where

21 the judge is sitting?

22 A    Yes, I do.

23 Q    And do you see where the door is at the back of the

24 courtroom?

25 A    Yes, I do.

129

E. Sines - Cross

1  Q    Is that about the same distance, would you say?

2  A    Sure, yeah.

3  Q    Fair enough.  Now, you've testified, I believe, that you

4  saw persons being dragged down one by one by the Nazis?

5  A    Yeah, very quickly, yup.

6  Q    And then what happened to these persons that were dragged

7  down?  They were beaten?

8  A    Yeah.

9  Q    And you testified you saw guns?

10 A    I believe I saw guns on August 11th, but not like anywhere

11 near the amount that, like, I saw on August 12th.  And I only

12 saw, like, holstered guns.

13 Q    You saw holstered guns.  Restricting ourselves to August

14 11th, who had the holstered guns?

15 A    The Nazis.

16 Q    Only the Nazis?

17 A    From what I could see, yes.

18 Q    Do you recall Mr. Cantwell asked you a list of names,

19 Keenan, Thomas Keenan, Thomas Massey and so forth.  Do you

20 recall that?

21 A    I do recall him asking me that, yes.

22 Q    And you testified that you did not know these people?

23 A    Yeah, I do not believe I know those people.

24 Q    So you don't know what those people look like then; is

25 that fair?

Sines, et al. v. Kessler, et al., 3:17CV72, 11/12/2021

1   A    Fair.

2   Q    So you would not know if you were looking at one of those

3   people with a holstered weapon, would you?

4   A    I'm sorry?

5   Q    If you don't know who Thomas Massey is and you don't know

6   who Thomas Keenan is and you don't know who Lindsey Moers is,

7   then you would not know if you were looking at Thomas Massey,

8   Thomas Keenan or Lindsey Moers with a holstered weapon, would

9   you?

10  A    Yeah, the people I saw walking in the torchlight -- the

11  torch holders, I saw people with torches with the guns.

12  Q    Understood.  So your testimony is you saw no guns with the

13  people that were -- the not-Nazi people standing around the

14  statue?

15  A    I did not see any -- I did not see them have any guns, no.

16          MR. KOLENICH:  Thank you.  No further questions.

17          THE COURT:  All right.  Is that all?

18          All right.  Thank you.  You may step down.

19          We'll take a recess now.  It's about 12:30.  We'll

20  recess until 1:30 p.m.

21          Of course, do not discuss the case with anyone or

22  allow anyone to discuss it with you or remain within hearing of

23  anyone discussing it.

24          The jury may retire.

25  **(Jury out, 12:30 p.m.)**

Sines, et al. v. Kessler, et al., 3:17CV72, 11/12/2021

1      THE COURT:  All right.  I want to get straight what
2  we've got after lunch.
3      MS. DUNN:  Thank you, Your Honor.  We have a couple
4  of decisions to make because one of the witnesses who was going
5  to testify has to leave.  So we may not put that witness on.
6      We will definitely call Dr. Nadia Webb after lunch.
7      THE COURT:  Okay.
8      MS. DUNN:  We also have video remaining that we're
9  hoping to get finished with.
10      And then Mr. Schoep, we will call Mr. Schoep as a
11  hostile witness.  He's here today in the courtroom.
12      THE COURT:  All right.  Is that going to last the
13  afternoon?
14      MS. DUNN:  I think we have to count up the amount of
15  video, which we will do right now.
16      THE COURT:  Don't just fill the time.  I don't --
17      MS. DUNN:  No, we've cut it as much as possible and
18  will only play what we absolutely have to get --
19      THE COURT:  If I run out of something else, I'm going
20  to start reading some of these preliminary instructions about
21  credibility and all that, because there's so much to read
22  later.
23      MS. DUNN:  Yes.  On this topic, Your Honor had said
24  that at a certain point, which we think is probably now, you
25  would read the facts deemed as to "Azzmador" Ray and Kline.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/12/2021

1   And so we're preparing that as well.  And we'll get that

2   together over the lunch break.  But that is something that the

3   Court could read.

4            THE COURT:  All right.  I need to read it over before

5   I start reading it to the jury.

6            MS. DUNN:  Understood.  We'll get that to you.

7            MS. KAPLAN:  One more issue, Your Honor, kind of on

8   the same topic.  We all saw how long it took Mr. Cantwell to

9   use, I think it was an 8-minute video, in court today.  He's

10  got -- for his case, I think he's got a two-hour-plus video.

11  Again, I think it would be very helpful if arrangements could

12  be made so that he in advance can know the minute where he

13  wants to show something, the way the other lawyers do, so we

14  don't have to watch it the way we watched it, because two hours

15  could take four hours.

16           THE COURT:  I don't know what success we had with

17  him --

18           MR. CANTWELL:  Judge, the marshals brought me the

19  laptop in my cell this morning when I came into this building.

20  I'm not able to use it back at the CVRJ.  But I was able to cut

21  a couple of clips, and I think if I have another hour, I might

22  be able to do that.  It might help for -- there's a question

23  about this -- I'm sorry.  Couple of things.

24           For one, I don't think that we're going to have to

25  stop my video every two seconds because we're not pointing out

Sines, et al. v. Kessler, et al., 3:17CV72, 11/12/2021

1  weapons that people are lying about having.  So that is what

2  takes so long with an 8-minute video.  There are some

3  highlighted portions of my video that I can pull out and say,

4  okay, here's the parts that I want to show the jury.

5       I'm anticipating a problem, which is that I believe

6  that once I do that, my anticipation is -- and I haven't

7  discussed this with them yet -- but that the plaintiffs will

8  have portions of that video that they will want to show as

9  well.  And the portions that they will want to show will be --

10 to rebut that involves the injunction, because there's a plan

11 that happens if we don't have an injunction, and then we get

12 the injunction and the plan completely changes.

13      And so when we were about to get started, there was a

14 question of this motion in limine.  And at that time I brought

15 up, I had not been aware of that motion until that moment,

16 that, you know, this -- there's discussion of the injunction in

17 the video.  And I'm hoping that -- without going into great

18 detail about what happened in the Court, that I can keep that

19 part of the video in.

20      THE COURT:  Well, I don't see the relevance of that.

21      MS. KAPLAN:  Your Honor, we obviously intend to fully

22 comply with Your Honor's order on the motion in limine,

23 obviously.  And Mr. Cantwell should do the same.

24      MR. CANTWELL:  Well, obviously I'm going to comply

25 with the Court's orders, which is why I'm discussing it now,

Sines, et al. v. Kessler, et al., 3:17CV72, 11/12/2021

1    right?  And so perhaps before we get started, when we come back

2    from lunch, I could confer with plaintiffs' counsel again and

3    try to work this out between the two of us and -- between us

4    and then we'll discuss it with you if we need to.

5            THE COURT:  You probably won't get to that until

6    Monday, anyway.

7            MS. KAPLAN:  To be clear, Your Honor, we have

8    provided Mr. Cantwell with a sheet that has all the portions of

9    video that we think are governed by Your Honor's motion in

10   limine order.

11           THE COURT:  You showed that clip with all those names

12   on it I said to redact.  Do you have that?

13           MR. CANTWELL:  I -- this was a plaintiffs' exhibit

14   which I pulled up and it had the names in it.  Then they showed

15   a limited portion of it --

16           THE COURT:  Okay.

17           MR. CANTWELL:  -- which -- I don't know exactly how

18   to go about doing it, but I suggest that we could perhaps --

19           THE COURT:  That's all right.

20           MS. KAPLAN:  We'll take care of that, Your Honor.

21   That should be --

22           THE COURT:  All right.  We'll recess.

23           (Recess.)

24           (Sidebar.)

25           THE COURT:  I'm talking about a tweet we saw from

Sines, et al. v. Kessler, et al., 3:17CV72, 11/12/2021

1   Mr. Kessler had said that Marcus Martin had committed perjury
2   and had a picture of him playing basketball.  We don't know
3   when it was.  But anyway, the tweet is absolutely diametrically
4   opposed to what he was told yesterday, I assume by you, that he
5   shouldn't be doing.

6          MR. KOLENICH:  Yes, sir, Your Honor.  I think that
7   tweet was actually posted before we spoke yesterday and he was
8   instructed to pull it down.  I don't know why he did not.

9          I'm going to request one more run at Mr. Kessler.  He
10  is an interesting client to have, but he's not usually this
11  directly not in compliance with instructions.

12         THE COURT:  Well, maybe we need to get him down here
13  this afternoon so I can tell him directly.

14         MR. KOLENICH:  I don't know that he's in the
15  Charlottesville area physically, Your Honor.  He is due to be
16  here Monday morning.  So I will -- do you want me to ask him to
17  come in?

18         THE COURT:  Yeah.  I can issue a show cause.

19         MR. KOLENICH:  Yes, sir.  Will do.  I'll report what
20  he tells me his location is.

21         MS. DUNN:  The only other thing I would say is we
22  raised this after Your Honor gave his directive yesterday
23  afternoon, again, with Mr. Kolenich, who I'm sure communicated
24  it.  So at this point this has been raised not just once by the
25  Court, but several times.  That's all I would add.

136

N. Webb - Direct

1          THE COURT:  All right.

2          MS. DUNN:  Thank you.

3          (Sidebar concluded.)

4          THE COURT:  Call the jury.

5  **(Jury in, 1:39 p.m.)**

6          THE COURT:  All right.  Who's the next witness?  Is

7  the witness on the way?

8          MS. KAPLAN:  I believe so, Your Honor.  Our next

9  witness is Nadia Webb.

10          THE COURT:  You may be seated.  We lose a lot of

11  time.  Witnesses can be at the door.

12          MS. PHILLIPS:  I was told by the marshals that she

13  should wait in the witness holding area.

14      NADIA WEBB, PH.D., CALLED BY THE PLAINTIFFS, SWORN

15          THE COURT:  You may remove your mask.

16                      DIRECT EXAMINATION

17   BY MS. PHILLIPS:

18  Q    Good afternoon, Dr. Webb.

19  A    Good afternoon.

20  Q    Can you please state your full name for the record?

21  A    It's Dr. Nadia Webb.

22          MS. PHILLIPS:  And Your Honor, I was prepared to

23  establish Dr. Webb's credentials, but I've just been informed

24  that the defense side will stipulate to her credentials.

25          THE COURT:  All right.  You may state her expertise.

N. Webb - Direct

1          MS. PHILLIPS:  Thank you very much.

2          I would offer Dr. Webb under Rule 702 to testify as

3   an expert in the fields of neuropsychology and medical

4   psychology.

5          THE COURT:  She may so testify.

6          MS. PHILLIPS:  Thank you.

7    BY MS. PHILLIPS:

8   Q    Dr. Webb, were you retained by the plaintiffs to give your

9   expert opinion in this case?

10  A    I was.

11  Q    And what was the scope of that retention?

12  A    I was asked to evaluate the records of the individuals for

13  evidence of whether or not they had sustained any injuries,

14  psychological or from a traumatic brain injury, from the events

15  of the 11th and the 12th.

16  Q    And which plaintiffs in particular did you evaluate?

17  A    I evaluated Natalie, Devin, Marcus, and Chelsea.

18  Q    And is that Natalie Romero, Devin Willis, Marcus Martin,

19  and Chelsea Alvarado?

20  A    Yes, ma'am.

21  Q    And how would you summarize your conclusions?

22  A    Well, they all met the criteria for severe post-traumatic

23  stress disorder and a major depressive disorder, and three of

24  them met the criteria for a traumatic brain injury.  And they

25  had been diagnosed with PTSD and brain injury previously.

N. Webb - Direct

1   Q    You said three of the plaintiffs had been evaluated for

2   traumatic brain injury.  Which were those three plaintiffs?

3   A    That would be Chelsea, Natalie, and Marcus.

4   Q    Thank you.  Dr. Webb, what is PTSD?

5   A    It's short for post-traumatic stress disorder.

6   Q    And what is that?

7   A    It is a disorder that occurs when somebody has had a

8   traumatic experience.  It doesn't occur to everybody, but it

9   causes alterations in the brain and in how people think and

10  feel.

11  Q    How does PTSD cause alterations in the brain?

12  A    Well, it's something that was of interest to me -- I did

13  my dissertation on it -- which is neurobiological changes in

14  the brain in response to post-traumatic stress.  And you will

15  find parts of the brain atrophy that are involved in mood,

16  memory, thinking, and it also is involved over time with this

17  acute sort of stress response.

18       You essentially are poisoning the part of the brain that

19  turns off the fight-or-flight.  So people stay in a fairly

20  permanent or extended state of fight-or-flight, which is --

21  basically, you're cutting the brakes to turn off the

22  fight-or-flight mechanism.

23  Q    In your experience, what kinds of events can cause PTSD?

24  A    Well, there are things that could be natural disasters,

25  such as a hurricane, and there are also human-caused disasters.

N. Webb - Direct

1   And human-caused disasters are more likely to cause PTSD.  So

2   an assault where someone did something to you, or if somebody

3   didn't care to help when you were suffering and they allowed

4   you to suffer and they were sort of indifferent to it.

5   Q    Are there standard criteria used to evaluate PTSD and its

6   symptoms?

7   A    Yes.

8   Q    Can you please explain those criteria?

9   A    Certainly.  We have a book called the Diagnostic and

10  Statistical Manual of Mental Disorders, Fifth Edition, which is

11  a lot of words, so we all call it the DSM-5.  And that is the

12  shared diagnostic criteria used across mental health by

13  psychologists, physicians, counselors.

14  Q    How many criteria are there in the DSM-5 for PTSD?

15  A    There are -- there's one that is talking about the kinds

16  of stressors, and then there is a set of them that talks about

17  the specific kinds of symptoms.  It groups them so that you

18  have clusters.  And then it has to have an impact on your life

19  that's significant enough to warrant a diagnosis.

20  Q    Did you evaluate the four plaintiffs based on the DSM-5

21  criteria that you just spoke about?

22  A    I did.

23  Q    Dr. Webb, did you prepare a demonstrative in connection

24  with your testimony here today?

25  A    I did.

N. Webb - Direct

1          MS. PHILLIPS:  Mr. Spalding, would you please put

2     that up on the screen?  Thank you.

3     BY MS. PHILLIPS:

4     Q    Dr. Webb, does this slide lay out the first DSM criterion,

5     called "stressor"?

6     A    It is.  And I think some of these things are

7     self-explanatory, but I just wanted to make sure they were

8     clear to educate people about what this says.

9          Basically, one of the ways to develop PTSD is if you are

10    directly exposed to a situation in which you feel like you are

11    in danger of death or serious injury.

12         There is also witnessing, if you see this happen to

13    someone else, where there is, for example, threat of death or

14    significant injury, or if you find out that someone that you

15    love, that you're close to, was in such a position.

16    Q    How many of these exposures are required under this

17    criterion, stressor?

18    A    Only one; but based on the history, many of these would

19    apply to these four people, more than one.

20    Q    You anticipated my next question.  Did the plaintiffs, in

21    your evaluation, meet this first criteria?

22    A    Yes.

23    Q    All four of them?

24    A    Yes.

25         MS. PHILLIPS:  Mr. Spalding, if you could go to the

N. Webb - Direct

1   second slide, please.

2   BY MS. PHILLIPS:

3   Q    Dr. Webb, can you explain to the jury what this slide lays

4   out, please?

5   A    Certainly.  This is describing one of the clusters of

6   symptoms, which is called "intrusion."  And you're only

7   required to have one to meet this standard.  So you'll see if

8   you look at it and you'll hear some of the testimony that you

9   may see more than one that applies, but one is all it takes.

10        So flashbacks is one that all of them discussed, or

11  prolonged distress if they see something that's a reminder of

12  the traumatic event, or often they will be shaky or

13  physiologically reactive when they're exposed to a cue that

14  reminds them of what happened.

15  Q    And I think you hinted at this, but, again, did any of the

16  plaintiffs meet this second criteria for intrusion?

17  A    They all did.

18        MS. PHILLIPS:  Mr. Spalding, can we go to the third

19  slide, please?

20  BY MS. PHILLIPS:

21  Q    Dr. Webb, does this slide lay out the criterion avoidance?

22  A    Yes.  And this is sort of the gist of it, but it's often

23  the one that people are the most confused by, because people

24  will try to avoid being reminded of the event, and that means

25  they avoid talking about it.  So they may withdraw from talking

N. Webb - Direct

1  to friends and family because they don't want to be reminded.

2  They often will not seek medical care or talk to a psychologist

3  or counselor because that involves addressing why they're

4  there.  So they often have a reluctance to put themselves in

5  situations where they may have a reminder.  That may mean

6  avoiding places, people, things; but also, they will often seem

7  like they're not trying to engage, or they seem unaffected,

8  because they're trying to avoid addressing it, because they're

9  affected so much they tend to unravel when they do start to

10  talk about it.

11  Q    And did you see in your evaluation of any of the

12  plaintiffs symptoms for this particular criterion of PTSD?

13  A    Yes.  They all met this threshold.

14  Q    Under this avoidance criterion, is avoiding seeking

15  treatment for necessary care a symptom that would fall within

16  this avoidance criterion?

17  A    Yes.  And it's often classic.  People tend to delay

18  getting treatment and hope it will get better on its own; there

19  will be time; they'll start trying to do things.  But it often

20  doesn't, and it's difficult to treat on its own.

21  Q    Is social withdrawal also part of avoidance, this

22  particular criterion?

23  A    Yes.  And also, you'll see later that one of the things

24  that happens is things don't have the same joy or pleasure.  So

25  you often just don't care.  You don't want to do things because

143

N. Webb - Direct

1  you don't enjoy them.

2      Or here, the Mall, for example, is a major meeting point

3  for people if you're living in different counties, because I

4  used to live in this area.  This is actually -- my mother also

5  lived just over the Valley.  So we would meet here for theater;

6  for example, the Jefferson Theater is on the Mall.  So you're

7  going to end up having people invite you there.  But that means

8  if you want to see your friend to do this thing, you have to go

9  to a place that may have traumatic memories because of what

10 happened with Unite the Right.

11         MS. PHILLIPS:  Let's go to the next slide, please,

12 Mr. Spalding.

13 BY MS. PHILLIPS:

14 Q    Dr. Webb, what does this slide lay out for negative

15 alterations in cognitions and mood?

16 A    Yeah, this is a complicated phrasing, but it's actually a

17 relatively simple idea, which is, you'll see changes in how

18 people think and feel; so sometimes, because of the stress

19 hormones that are released, enhance memory, and some will

20 disrupt it.  People have periods of amnesia where they won't

21 remember key parts from the middle of the event, say.

22         They also have a change in their view of the world.  They

23 may view the world as much more dangerous than they did before

24 this traumatic event, particularly if it was human-caused.

25 They may have a sense of guilt or blame themselves for things

N. Webb - Direct

1    they could not have stopped.

2        So Devin talked about feeling badly that he wasn't there

3    with Natalie, that maybe he could have done something.  These

4    are the kinds of things that haunt people sometimes after a

5    traumatic event.

6        And when I mentioned the lack of interest in things people

7    previously enjoyed, that would be on here.

8        So you can see this is sort of a more technical way to

9    describe some of the things that I put in simpler terms.

10   Q    And did the plaintiffs meet this particular criterion,

11   Criterion D, in your evaluation?

12   A    Yes, they did.

13   Q    All four of them?

14   A    Yes.

15       MS. PHILLIPS:  Mr. Spalding, let's go to the fifth

16   and last slide, please.

17   BY MS. PHILLIPS:

18   Q    Dr. Webb, what does this slide lay out, please?

19   A    Well, one of the things that is another cluster is much

20   more physiological.  If you're on guard, if you're on edge,

21   it's exhausting, but you're often sort of keyed up because of

22   it.

23       So it's difficult to sleep.  You're often irritable.  If

24   there's a loud sound, you startle much more.  You can often

25   have difficulty concentrating.  You have trouble with,

N. Webb - Direct

1   sometimes, being angry; and for men in particular, depression

2   tends to present as more irritable than sad.  That just seems

3   to be a way that men cope slightly differently.

4   Q    Thank you very much.

5        MS. PHILLIPS:  You can take that down, Mr. Spalding.

6   BY MS. PHILLIPS:

7   Q    Dr. Webb, is the duration of the symptoms laid out in the

8   slides that we just reviewed relevant in evaluating PTSD?

9   A    Yes.  The diagnosis isn't applied until these symptoms

10  have persisted for a month, because right after, many people

11  have some of these symptoms.  But they become a problem when

12  they're becoming entrenched or persist.  So at a month, that's

13  the point where you might make the diagnosis of PTSD, but not

14  sooner.

15  Q    And what about the severity of symptoms?  Is that relevant

16  to a PTSD diagnosis?

17  A    The severity of them is you -- once you've met the

18  threshold, you've met the threshold.  But certainly severity

19  affects how it impacts you in daily life.  If it's in -- one of

20  the criteria is the functional impact, which is:  Is it

21  affecting you with your social relationships, your friendships,

22  your ability to work or find jobs or have jobs that are

23  consistent with your academic background, for example, or to do

24  things like get healthcare and organize your daily activities

25  in a way that you would normally be able to do?

146

N. Webb - Direct

1  Q    Did you reach any conclusions about the duration of the

2  plaintiffs' symptoms in terms of the four individuals that you

3  evaluated?

4  A    Well, I evaluated them in 2020, about 16 months ago.  And

5  they all had severe PTSD and severe depression based on

6  objective measures, as well as from the interview data and

7  reviewing the criteria from the DSM.

8  Q    Dr. Webb, did you evaluate the plaintiffs under any other

9  objective measures?

10 A    I did.  And I probably should explain that, because I just

11 said "objective measures" without say what they were.

12     I used two different ones.  The first one is called the

13 PAI, which stands for Personality Assessment Inventory.  The

14 PAI is something that matches people against the US Census --

15 essentially, people of their age -- and says:  Compared to a

16 normal person your age, how much depression, anxiety, PTSD do

17 you have?  And it's much more broad.  It scoops up a lot of

18 things that can be problems, because one of the things about

19 PTSD is it very rarely travels alone.  Usually, when you have

20 PTSD, you will also have major depression.  So a test that

21 would just look at PTSD wouldn't really capture the effect.

22     So the PAI is looking more broadly, and that is one of the

23 reasons, besides the interview, that I said the results of that

24 objective test said that they met a level of difficulty that

25 would be considered severe depression and severe PTSD.

N. Webb - Direct

1   Q    And was that with regard to all four plaintiffs?

2   A    Yes, it was.

3        And then it also captures things like, with Natalie, she's

4   very phobic.  She wasn't leaving her house.  And as you would

5   expect, this measure flagged that she was clinically showing

6   symptoms of significant phobic behavior; things like fear of

7   driving, fear of being in public.

8   Q    And you had discussed a second objective measure.  What is

9   that second objective measure?

10  A    The second one is something called the DAPS, which is the

11  Detailed Assessment of Post-traumatic Stress.  And that is much

12  more focused on PTSD, and it compares you to a different group.

13       So instead of comparing you to people your age who are

14  healthy, it compares you to people who experienced a stressor

15  that was sufficient to cause PTSD, so other traumatized people.

16  And compared to other traumatized people, these four had severe

17  PTSD.  So not just compared to normal, but compared to people

18  who had been through a trauma.

19       So I think it gives you a better sense of the burden that

20  they were managing.

21  Q    Dr. Webb, how is PTSD treated?

22  A    Well, it starts with a fairly intensive period --

23  particularly when you have complex PTSD and when it's lingering

24  like this, it's much harder to treat, or when it also comes

25  with additional burdens like depression or TBI.  So you usually

N. Webb - Direct

1  spend the first year doing very intensive work.  But this

2  requires lifelong support and therapy.

3  Q    Dr. Webb, you also mentioned evaluating plaintiffs for

4  symptoms of a TBI, and I believe you mentioned that you

5  evaluated Marcus Martin, Natalie Romero, and Chelsea Alvarado.

6      What conclusions did you reach with regard to whether

7  those individuals had symptoms of a traumatic brain injury?

8  A    Well, I think two things.  They had been previously

9  diagnosed with some concussion.

10     Just so people understand, the Center for Disease Control

11 is very explicit:  A concussion is a TBI.  So there's normal,

12 then mild, moderate, severe.  But when you say "concussion" or

13 "mild TBI," all you're arguing about is how bad the brain

14 injury is, not was there one.

15     So I wanted to check for myself to see:  Was there

16 evidence of this?  And they showed pathological patterns that

17 were consistent with the history of the diagnosis of

18 concussion.  And those were showing up when I saw them roughly

19 two years after what had happened, which means -- at that point

20 in the world of brain injury, this means that you have stable

21 and permanent impairments, because dead brain cells are dead

22 brain cells.  They don't come back.

23 Q    And how are TBIs treated?

24 A    Well, because dead brain cells don't come back, we can't

25 really fix it; but what we can do is try and help you have less

N. Webb - Cross

1    of an impact in your daily life from it.  So that's where some

2    of the things that Jim Reavis referred to are kinds of

3    therapies, treatments, aids, ways to teach people ways to

4    compensate for their impairments, because these were not

5    insignificant.

6    Q    How long does a TBI persist?

7    A    It is also permanent at this point.

8         MS. PHILLIPS:  I have no further questions.  Thank

9    you, Dr. Webb.

10        THE WITNESS:  Thank you.

11        THE COURT:  Any cross?

12                    CROSS-EXAMINATION

13    BY MR. CAMPBELL:

14   Q    Good afternoon, Dr. Webb.

15   A    Good afternoon.

16   Q    I represent James Fields, and I have some questions for

17   you regarding your testimony.

18        I just want to make sure that I understand:  You said you

19   were retained by the plaintiffs to give an opinion.  Are you a

20   treating physician for the four individuals that you're

21   discussing?

22   A    No.  I was retained as an expert.

23   Q    Okay.  So you haven't provided any treatment to these four

24   individuals?

25   A    That's correct.

N. Webb - Cross

1   Q    And when you evaluated them, did you evaluate them

2   personally?  Did you sit down with them, run them through a

3   battery of tests, and come up with a result?

4   A    I did.  And I used a colleague of mine who is an employee

5   to do some of the standardized testing, which is standardized.

6   So this is the typical practice.  It's like using a radiology

7   tech to run the radiology equipment.  And then my job is to

8   interpret and analyze it.

9   Q    When did you do that?  When was the tests?

10  A    The dates would be at the top of the report.  But for

11  Natalie Romero, July 1st, July 3rd and July 6th of 2020.  For

12  Devin Willis, 7-18 of 2020.  Chelsea Alvarado, 7-14 and 7-18 of

13  2020.  And Marcus Martin, 7-16 of 2020.

14  Q    Were those complimentary, Doctor?  Did you charge anything

15  for those?

16  A    I charge for my time.

17  Q    There isn't anything in the plaintiffs' statement of

18  damages that correlates to any treatment on those dates by you.

19  A    Well, sir, as I indicated, I was not a treater.  I did an

20  evaluation, but I did not treat.

21  Q    Fair enough.  All right.  So your charges would be expert

22  witness charges to the plaintiffs' attorneys?

23  A    They would be hourly fees for my time.

24  Q    All right.  And then I think you said you had reviewed

25  other medical records?

N. Webb - Cross

1   A    That's correct.

2   Q    Did you review any medical records for Mr. Willis?

3   A    I reviewed medical records for all of them.

4   Q    There aren't any medical records at all provided in

5   discovery or claimed as damages in this case for Mr. Willis.

6   So I'd just inquire as to what medical records you were

7   reviewing for him?

8   A    Well, they're listed as alphanumerics.  So I'm not really

9   in a position to describe the exact list of records with the

10  report that I have in front of me.

11  Q    Okay.  But there were some medical records you reviewed

12  for Mr. Willis?

13  A    Yes.

14  Q    Since August 12th of 2017?

15  A    That's correct.

16  Q    So you mentioned -- and I certainly appreciate that this

17  may just be motivated by time and attempting to keep this trial

18  and testimony brief, but is it your opinion that all four

19  sustained the same level of a PTSD diagnosis, and/or for the

20  three who had a traumatic brain injury diagnosis, were all

21  three of their diagnoses the same?

22  A    Well, that's a two-part question.  So let me take it piece

23  by piece.  In terms of PTSD, on objective measures they all

24  scored at or above the 99th percentile for the severity of

25  their PTSD.  So you can thin-slice how bad they are in that top

N. Webb - Cross

1   1 percent of severity of symptoms, but I think it's kind of a

2   moot point.

3        When it comes to TBI, the grading for TBI would place -- a

4   concussion would be considered a mild TBI.  For Natalie Romero,

5   because of her skull fracture and her 48 hours of

6   hospitalization, I think it would be -- the classic definition

7   of that would be shading to moderate.

8   Q    So loss of consciousness would be indicative, or a skull

9   fracture would be indicative of a higher level of TBI?

10  A    Correct.

11  Q    And how about -- so for the PTSD diagnosis, you said all

12  four are above the 99 percentile.  So to paraphrase, it would

13  be splitting hairs to really get into which were more or less

14  severe than the others, correct?

15  A    I would agree with that.

16  Q    So we have Ms. Romero who had a skull fracture and was hit

17  by a vehicle, and Mr. Willis who observed that event on TV and

18  it's your testimony that their PTSD diagnoses are both above

19  99th percentile and both essentially the same; is that correct?

20  A    No.  I think that is close.  I think one of the things

21  with Devin Willis is that he wasn't at the car attack.  So

22  that's not the source of his PTSD.  In his case, he believed

23  that he might potentially die when he was up on the statue and

24  people were throwing tiki torches at his feet and objects and

25  the fighting was happening.  And then when his friends were

N. Webb - Cross

1  having to be a human shield to protect him.  And when he also

2  saw Dean Groves, who had been speared in the arm, I think the

3  sense of safety when an authority figure for the university has

4  been speared, you now have significant distrust of the

5  likelihood these individuals are going to be, like, peacefully

6  protesting or following the laws and rules.  So at that point,

7  I think it made it even more terrifying.

8  Q    So that raises a great point.  So for each of these

9  four -- so it sounds like you're saying Mr. Willis's PTSD comes

10 exclusively from the torchlight rally; is that correct?

11 A    No.  I mean, that would be true if that was the only event

12 in which he was witnessing violence, being called racial

13 epithets.  There were things in both days that contributed to

14 it.  The entire context of what was happening contributed to

15 it.

16 Q    I thought I asked you a specific question as to seeing the

17 car attack on TV and I thought your response was it wasn't

18 that, rather, it was this, differentiating between the car

19 attack and instead pointing your opinion on the PTSD diagnosis

20 to the torchlight rally.  Did I misunderstand your testimony?

21 A    Yes.  The TV was not -- watching something on TV does not

22 meet the threshold for a stressor.  So by definition, it

23 couldn't be that.  It just means that if I'm saying that the

24 most telling example where he felt the greatest amount of

25 threat was when he was on the statue and people were throwing

N. Webb - Cross

1  tiki torches at his feet, I mean, he thought that he was going

2  to potentially be burned alive.  And when people are having to

3  shield him bodily to keep him safe, and he sees his dean

4  speared --

5  Q    Yes, ma'am.  I recall the testimony.

6  A    Okay.  Good.

7  Q    How about Mr. Martin.  He wasn't at the torch march.  So

8  that couldn't be a cause of the PTSD diagnosis for him,

9  correct?

10 A    Correct.

11 Q    So I would categorize -- and feel free to say if you think

12 I'm leaving out areas or potential causes.  So I would

13 categorize three things:  Torchlight, the rally, and the car

14 attack.  So I think with Martin, at least, we can exclude

15 torchlight march because he wasn't there.  Do you hold an

16 opinion as to whether your PTSD diagnosis is from the rally or

17 the car attack or both?

18 A    I think this falls in the category of E, all of the above,

19 because he also experienced racist epithets, witnessing

20 violence, feeling unsafe, and I think for legitimate reasons,

21 when you're seeing people in paramilitary gear.  And he also

22 was standing and was friends with Heather Heyer.  You know, he

23 lost his friend.  He was trying to push his fiancee out of the

24 way so she wouldn't die, and in the process he sustained severe

25 injuries to his ankle which not only -- there's a psychological

155

N. Webb - Cross

1  effect of being in chronic pain which is not negligible.

2  Q    All right.  So I think I understand for Mr. Martin.  We

3  would say not the torchlight march, but both rally and car

4  attack would lead to the diagnosis for Mr. Martin, correct?

5  A    It would certainly include those, yes.

6  Q    How about for Ms. Alvarado?  Of the three kind of ideas

7  I'm putting forth, do you know which or what combination of

8  those resulted in the diagnosis of PTSD for Ms. Alvarado?

9  A    I believe with Ms. Alvarado it's very similar with Marcus

10 Martin, that he also was -- I'm sorry, let me try that again.

11 She also was in the path of the car, sustained injuries, and

12 she witnessed Natalie being unconscious by the side of the road

13 and bleeding.  So that car was certainly a part of it, the car

14 attack.  But she also was in the crowds, and they were, again,

15 in paramilitary gear.  They described helmets, shields, a

16 uniform, sledgehammers.  I mean, collectively macing.  So all

17 of this was happening, and they were in that setting.

18 Q    And then same question for Ms. Romero.  It would be the

19 torch rally -- the torch march, the rally in general or the car

20 attack?

21 A    I believe she was there for both.  She was on that statue

22 as well, having people throwing things at her and calling her

23 racial epithets.  She was -- with the tiki torches, she also in

24 that setting thought she might die.  But she got that

25 Congressional Medal of -- or Medal of Valor and she's in the

N. Webb - Cross

1    Library of Congress.  So she's kind of a brave little person.

2         One of the things about the next day is then she was there

3    unfortunately in the path of the car and sustained significant

4    physical injuries, including two periods of loss of

5    consciousness that were documented, as well as the skull

6    fracture and the injuries to her face, to her body.

7    Q    Yes, ma'am.  All right.  So the TBIs obviously I think we

8    know which of the three events that those came from for the

9    three folks that you hold that opinion.  So I want to ask you,

10   the evaluation was done in 2020, July, August of 2020 for all

11   four of these people.  And I believe you referenced some of

12   Ms. Reavis's treatment, future care that is necessary for these

13   people as a result of these diagnoses, right?

14   A    Yes.

15   Q    So knowing that these people had these problems in July or

16   August at the latest of 2020, did you start anyone on any of

17   these treatments that you recommend they undertake to get

18   better?

19   A    I sure wish they could have access to them, but, as you

20   all know, that takes resources.  And in addition --

21            MR. CAMPBELL:  Judge, I'm going to object and move to

22   strike as nonresponsive and violating the collateral source

23   rule.

24            MS. PHILLIPS:  Your Honor, he asked the question.

25   She's answering the question.

157

N. Webb - Cross

```
 1            MR. CAMPBELL:  I didn't ask her for any indication

 2   of --

 3            THE COURT:  Well, withdraw the question and ask

 4   another question.

 5            MR. CAMPBELL:  That's all right.  Thank you, Judge.

 6   I don't have any more questions.  Thank you, Dr. Webb.

 7            MR. CANTWELL:  I have just a couple.

 8                         CROSS-EXAMINATION

 9    BY MR. CANTWELL:

10   Q    Hello, Ms. Webb.  I'm Christopher Cantwell.

11        Did I hear correctly that you said Marcus Martin, Devin

12   Willis and Natalie Romero were damaged by racial epithets?

13   A    Just to make a correction.  In this context, I think

14   "Dr. Webb" would probably be more appropriate than "Ms."

15   Q    Oh, yes.  Dr. Webb, did you say these people were damaged

16   by words?

17   A    I said that they were injured by the totality of it.  If

18   it was just words by itself, I think they have all been called

19   racial epithets before, but not in the context of tiki torches,

20   paramilitary gear, AK-47s.  That is not on equivalent.  Words

21   by themselves are obnoxious.  In that context they are

22   threatening.

23   Q    Right.  So it was the combination of the words combined

24   with marching with people who had weapons and helmets and that

25   sort of thing?
```

N. Webb - Cross

1   A    It was the totality of it.  It was a setting that was

2   terrifying, I think for some obvious reasons.

3   Q    And so were anyone other than Martin, Willis and Romero

4   damaged by racial epithets?  As far as the plaintiffs in this

5   case.  I should clarify.

6   A    Well, I think that you are slightly twisting what I said

7   because I indicated the racial epithets in themselves are not

8   damaging.  They're just rude.

9   Q    Right.  Okay.  So out of these bills that we've seen,

10  there's not like a line item for you got called a name, right?

11  A    No, that would be really silly.

12          MR. CANTWELL:  Okay.  Thanks.  That's it.

13          THE COURT:  Okay.  Anyone?  Mr. ReBrook?

14                      CROSS-EXAMINATION

15   BY MR. REBROOK:

16  Q    Dr. Webb, good afternoon.  I'm Edward ReBrook.  I

17  represent Mr. Jeff Schoep and the National Socialist Movement.

18  A    Good afternoon.

19  Q    Dr. Webb, thank you for coming in and giving your

20  testimony today and to help with the destigmatization of

21  persons who suffer with PTSD.

22  A    Thank you.

23  Q    Did you mention that persons who have experienced negative

24  traumatic-related emotions may experience horror, shame, and

25  guilt?

N. Webb - Cross

1  A    Yes.

2  Q    And you also mentioned avoidance of pre-trauma activities,

3  correct?

4  A    It can be.  Often it's actually that they can be a lack of

5  enjoyment in them and they just don't inspire anything.  And

6  sometimes there is also avoidance because of context.

7  Q    Would that include breaking off relations with persons

8  that they have been familiar with for many years?

9  A    Very much so.

10 Q    Did I understand you correctly that persons suffering from

11 PTSD may feel unwarranted feelings of shame and guilt?

12 A    Yes.

13 Q    By unwarranted do you mean that they feel shame and guilt

14 over the outcome of a traumatic event, even if they weren't

15 personally responsible for that event?

16 A    I think it's often termed survivor guilt, to put it in

17 more layperson's language, that sometimes people feel guilty.

18 Certainly I think one of the things is the people who were at

19 the car crash that I evaluated, at some point I believe all of

20 them said something along the lines of, what happened to me

21 wasn't so bad because other people were hurt so much worse.

22 And they would actively downplay it because of some shame that

23 there were people who were killed.

24 Q    Did you specifically mention physical assaults as a common

25 catalyst for PTSD?

N. Webb - Cross

1  A     It certainly can be, particularly if it's done

2  deliberately to hurt someone for some reason, either to hurt

3  them for its own sake or as an instrument to get something they

4  want.

5  Q     What issues do persons suffering from PTSD have, if any,

6  in gaining and keeping meaningful employment?

7  A     That is often affected.  That functional piece is

8  basically you can think of it as it's not a problem unless it's

9  a problem.  So if you have these symptoms and they are

10 significant, they will affect things like getting a job,

11 holding a job, getting along with coworkers.  The motivation to

12 go out and find work, sometimes it's exhausting when you're not

13 sleeping well to then try and be a chipper and appealing

14 interviewee.  If you are jumpy and edgy and uncomfortable or

15 lacking in the same trust.  Attacks or trauma that's

16 human-caused breaks trust.  So one of the things about most

17 jobs is they're jobs with people.

18 Q     And might a traumatic experience leading to PTSD

19 negatively affect a person's ability to perform their job?

20 A     Yes, absolutely.

21 Q     Are persons ever strengthened by traumatic experiences?

22 A     There's some debate.  There's an idea that some people

23 have post-traumatic growth, but usually those are people where

24 it's been a lesser trauma and also one that has not affected

25 their support system, their support community, because in this

N. Webb - Cross

1  case, for example, when Devin's friends were being a human

2  shield, they also were in a setting that was highly predictive

3  of causing PTSD, not in the full form, in partial form.  So

4  that means that you injured Devin -- and I'm saying "you" in

5  the abstract, not you personally -- but you also injured the

6  people who would take care of him or support him to potentially

7  help him grow beyond it.

8  Q    And you mentioned human-caused trauma is more likely to

9  lead to PTSD than natural trauma, a tornado, for instance; is

10 that correct?

11 A    Yes.

12 Q    What about intentional exposure to situations likely to

13 cause trauma, such as war?

14 A    Certainly, yes, war is probably the one we think of most,

15 combat in particular.

16 Q    You mentioned avoidance behavior.  Is it uncommon for

17 persons who have experienced trauma to do the exact opposite of

18 avoidance?

19 A    Yes.  And what that falls under is one of the categories

20 that was in the list was reckless behavior.  So people often

21 don't value their lives the same way and they take chances.

22 Q    So a person, for instance, volunteering to redeploy to a

23 war zone after having been injured in one, would that be an

24 example?

25 A    Yes.

N. Webb - Cross

1    Q    Is it unusual for persons who have experienced trauma

2    leading to severe PTSD to actively work in helping others

3    overcome trauma?

4    A    Well, when you get to the endpoint and hopefully you've

5    been able to get your own PTSD to a level that's more stable,

6    then some people do feel that's a way to find a silver lining

7    or to redeem some of what they went through that was so

8    traumatic.  So you will see people often put themselves in a

9    situation that is a reminder.  If you are working with other

10   survivors of something that caused trauma, you are often

11   exposing yourself to triggers again, but you're doing it

12   because the cause is meaningful enough to you and it helps

13   support your values, and that gives you a sense of somehow a

14   silver lining or a worth in what happened.

15   Q    Would a rape victim, for example, working as a rape

16   counselor be an example of that?

17   A    Yes.

18              MR. REBROOK:  Thank you very much, Doctor.

19              THE WITNESS:  Sure.  Thank you.

20              THE COURT:  All right.

21              MR. CAMPBELL:  Your Honor, I request a brief sidebar

22   before this witness is released.

23              THE COURT:  Yes.

24              (Sidebar commenced.)

25              MR. CAMPBELL:  Judge, so I asked this witness have

163

N. Webb - Cross

1  they had treatment that was recommended.  So she responded in a

2  manner that kind of hinted that they couldn't afford it.  And

3  so that's -- I was not asking her for why they haven't had the

4  treatment.  The question just asked have they had it.

5          Plaintiffs filed a motion in this court to prevent

6  collateral source.  And they mention in that motion that lots

7  of people have had money donated, GoFundMe fundraisers.  So

8  it's incorrect and inappropriate to leave the jury with the

9  impression that but for finances, at least without us really

10 going in deep to how much money each of these four people

11 fund-raised, in other words, to establish whether or not they

12 could have had that treatment.  I don't think that's an

13 appropriate path for any of us to go down.

14         I have two ideas to fix it.  Let me ask the question

15 have they had the treatment again, and she either says no, or

16 the Court could make an instruction to disregard Dr. Webb's

17 statements and she's not qualified to testify to the financial

18 situations of these four plaintiffs.

19         MS. DUNN:  Your Honor, I would just like Mr. Campbell

20 to say what the question and answer was again.

21         MR. CAMPBELL:  I don't have the dailies, but I'm sure

22 you guys could grab one of your screens.  Do you want me to do

23 that?  I only know the gist of it.

24         MS. DUNN:  I did not see it.

25         So the question was:  "So knowing that these people

N. Webb - Cross

1    had these problems in July or August at the latest of 2020, did

2    you start anyone on any of these treatments that you recommend

3    they undertake to get better?"

4           "I sure wish they could" -- this is the answer.  "I

5    sure wish they could have had access to them, but as you all

6    know, that takes resources.  And in addition" --

7           MR. CAMPBELL:  So the question is --

8           MS. PHILLIPS:  She testified she's not a treating

9    physician.  She testified that she's an expert.

10          MR. CAMPBELL:  I understand that, but that could have

11   been --

12          THE COURT:  She can't say -- she's insinuating that

13   the reason they weren't treated is --

14          MS. PHILLIPS:  Let's have you ask the question again.

15          MS. DUNN:  Your question would be --

16          MS. PHILLIPS:  I just don't want you to testify she's

17   a treating physician for them because she testified she's not.

18          MS. DUNN:  So Mr. Campbell, what's the question that

19   you propose?

20          MR. CAMPBELL:  If you would let me borrow that, I'll

21   ask the exact same one again.

22          MS. PHILLIPS:  My concern is did she -- she says

23   she's not a treating physician --

24          THE COURT:  She says she --

25          MS. PHILLIPS:  It's fine.  Let's just do it.

N. Webb - Cross

1           MR. CAMPBELL:  Do you want to just say disregard

2    Dr. Webb's statements?

3           MS. PHILLIPS:  Just one statement.

4           MS. DUNN:  What if Mr. Campbell said, you've

5    testified you're not a treating physician.  Just to be clear,

6    you didn't start any of these plaintiffs on treatments,

7    correct?  And then she would just say yes.

8           THE COURT:  She's already said --

9           MS. DUNN:  Oh, I see what you're saying.

10          THE COURT:  That's the problem.

11          MR. CAMPBELL:  I'm open to suggestions.  I think if

12   we open the door, we open the door, and none of us want that.

13          THE COURT:  Do you want to ask the question again and

14   you instruct her not to --

15          MS. DUNN:  I'll do that.

16          (End sidebar.)

17                    FURTHER CROSS-EXAMINATION

18    BY MR. CAMPBELL:

19   Q    Hello again, Doctor.  Just restating a previous question.

20   And again, I represent James Fields.

21          So knowing that these people had these problems in July or

22   August at the latest of 2020, did you start anyone on any of

23   these treatments that you recommend they undertake to get

24   better?

25   A    No.

166

J. Schoep - Direct

1          MR. CAMPBELL:  Thank you, Doctor.  I don't have any

2    more questions.

3          MS. PHILLIPS:  No redirect.

4          THE COURT:  Okay.  Thank you, Doctor.  You may step

5    down.

6          THE WITNESS:  Thank you, sir.

7          MS. KAPLAN:  So, Your Honor, plaintiffs are going to

8    play a very short video of Burt Colucci and then we're going to

9    call Mr. Schoep to the stand.

10          THE COURT:  All right.

11          (Video deposition of Burt Colucci played.)

12          MS. KAPLAN:  Plaintiffs call Defendant Jeff Schoep.

13          MR. ISAACSON:  May I proceed with the deposition,

14    Your Honor?

15          THE COURT:  You may.

16          JEFF SCHOEP, CALLED BY THE PLAINTIFFS, SWORN

17          THE COURT:  All right.  You may proceed.

18          MR. ISAACSON:  Thank you, Your Honor.

19                        DIRECT EXAMINATION

20    BY MR. ISAACSON:

21    Q    My name is Bill Isaacson, Mr. Schoep.  And you understand,

22    Mr. Schoep, that both you and the organization, the National

23    Socialist Movement, are defendants in this case?

24    A    Yes, sir.

25    Q    And you were a member of the National Socialist Movement

J. Schoep - Direct

1  for 27 years?

2  A    Approximately, yes.

3  Q    And you had a leadership position for 25 of those years

4  called "commander," the highest position in the National

5  Socialist Movement?

6  A    Yes, sir.

7  Q    And as commander, you were in charge of the National

8  Socialist Movement?

9  A    I just answered that.  Yes, sir.

10  Q    And the National Socialist Movement traces its roots back

11  to the original American Nazi Party; is that correct?

12  A    Yes, sir.

13  Q    Now, the National Socialist Movement had lower-ranked

14  officials than commander.  I think we just heard about

15  sergeant.  You had privates.  There were called stormtroopers.

16  You had sergeants, and it went up to captain and major; is that

17  right?

18  A    There was a rank structure in the organization, yes.

19  Q    You didn't have any colonels or generals, so other than

20  commander, am I right that major would have been the highest

21  rank?

22  A    As I recall.

23  Q    And the National Socialist Movement had a number of

24  divisions; one of that was the security division?

25  A    Correct.

J. Schoep - Direct

1  Q    And they also had a stormtrooper division for street
2  action and street activism; is that right?
3  A    That's correct.
4  Q    And the name "stormtroopers" was a historical reference
5  that went back to the German National Socialist Party, the Nazi
6  Party, correct?
7  A    I don't know if that's -- I'm trying to think of how to
8  state that.  That would be correct, but it would also be
9  correct that the organization was a continuation of George
10 Lincoln Rockwell's organization.  He called them stormtroopers;
11 so did we.
12 Q    And so the George Lincoln Rockwell organization was the
13 American Nazi Party, who also used the term "stormtrooper" as
14 well as Germany's Nazi Party; is that correct?
15 A    Correct.
16 Q    Now, during the time period of August 2017, you considered
17 yourself one of the most active organizers for white
18 nationalists in the entire country, correct?
19 A    Could you repeat that question?
20 Q    Sure.  So the time period is August 2017.  You considered
21 yourself one of the most active organizers for white
22 nationalism in the United States of America?
23 A    I suppose that would be accurate.
24 Q    And you also at that time considered yourself a warrior
25 for the interests of white Americans?

J. Schoep - Direct

1  A    At that time, that would be correct.

2  Q    And do you recall a statement that you made in 2016 or

3  2017 that, if you could meet Adolf Hitler, you would say:  "I

4  hope we have honored you in some small way by carrying on the

5  fight today"?

6  A    I don't recall what year that was or if or when I said

7  that.  It's possible.

8  Q    That would have been consistent with your beliefs at the

9  time?

10  A    At that time, yes.  They're not consistent with my beliefs

11  now.

12           MR. ISAACSON:  Your Honor, I would move to strike the

13  last comment.  It's subject to a prior motion and also

14  nonresponsive.

15           THE COURT:  Strike.

16           MR. ISAACSON:  And I would ask the witness, since

17  he's doing this, would be instructed not to discuss his present

18  beliefs, unless I ask about it.

19           THE COURT:  Well, he'll have to answer the questions.

20           MR. ISAACSON:  Yes.

21   BY MR. ISAACSON:

22  Q    Now, in 2016 and 2017, you would make statements like:

23  "International Jewry was in the thick of the evil that plagues

24  us"?

25  A    Are you making a statement?

J. Schoep - Direct

1  Q    That's a question.  In 2016 and '17 --

2  A    You're asking about the political standings of an

3  organization that I was once part of.  Is the political ideals

4  on trial here, or what?  What's going on?  Because that doesn't

5  seem relevant to me.

6  Q    Well --

7  A    Of course, that's not my place to say.

8       Sorry, Your Honor.

9            THE COURT:  Just a minute.

10           MR. ISAACSON:  Your Honor, I would ask that he be

11  instructed to answer the question, be told that the --

12           THE COURT:  All right.  Read the question back or

13  reask it.

14  BY MR. ISAACSON:

15  Q    In 2016 and 2017, you would make statements like:

16  "International Jewry was in the thick of the evil that plagues

17  us"?

18  A    It is possible I made statements like that in those

19  particular years.

20  Q    Well, you made a lot of statements like that at the time,

21  didn't you?

22  A    I was an avowed antisemite for a very long time, yes.

23  Q    And you were also an avowed white supremacist at the time?

24  A    I don't care for that characterization.

25  Q    Do you consider the National Socialist Movement to be a

J. Schoep - Direct

1   white supremacist group?

2   A     Do I consider it to be?

3   Q     Yes.

4   A     I suppose you could consider it that.

5   Q     If I can show you what's been marked as Plaintiffs'

6   Exhibit 1476A.  This will come on your screen.  This is just

7   for the witness.

8         Do you recognize this as the 25 points of American

9   National Socialism, the platform of the National Socialist

10  Movement, while you were commander?

11  A     This particular document changed quite a bit over the

12  years.  So it would be very difficult for me to say that that

13  is accurate or what year this is from or anything like that.

14  But this looks like it may have been part of the platform at

15  some point.

16  Q     So for example, point 4 of this platform:  "Only members

17  of the nation may be citizens of the state.  Only those of pure

18  White blood, whatever their creed, may be members of the

19  nation.  Non-citizens may live in America only as guests and

20  must be subject to laws for aliens.  Accordingly, no Jew or

21  homosexual may be a member of the Nation."

22        Was that one of the points of the platform for the

23  National Socialist Movement while you were commander?

24  A     At one time, it was.

25  Q     And point 7, in the second sentence, it says:  "We demand

J. Schoep - Direct

1  that all non-Whites currently residing in America illegally be

2  required to leave the nation forthwith and return to their land

3  of origin."

4       Was that also one of the points of your platform while you

5  were commander?

6  A    At one point, that might have been part of the platform.

7  Q    And while you were commander, the National Socialist

8  Movement was also friends with Klan groups; is that right?

9  A    That is correct.

10  Q    If I can ask you to look at what's been marked as

11  Plaintiffs' Exhibit 1481.

12       Do you recognize this as an announcement by the National

13  Socialist Movement from November 4th, 2016 regarding the use of

14  the swastika that was signed by you?  You can look at the

15  bottom.

16            (Plaintiff Exhibit 1481 marked.)

17            THE WITNESS:  The document on my screen does say --

18  it does have my name at the bottom of it.  I'm not sure where

19  this -- what this particular document is.

20            MR. ISAACSON:  Well, Mr. Spalding, if you can show

21  him, for example, the third paragraph.

22   BY MR. ISAACSON:

23  Q    If you take a look at this, is this consistent with an

24  announcement that was made by the National Socialist Movement

25  while you were commander?

173

J. Schoep - Direct

1   A    Give me just a minute to read it.

2   Q    Sure.

3   A    This does look like something that I authored at the time.

4            MR. ISAACSON:  I would move to admit Plaintiffs'

5   Exhibit 1481.

6            THE WITNESS:  Or if I can clarify:  The paragraph

7   that you have on my screen is something that -- looks like

8   something that I wrote at the time.  I didn't read the entire

9   document.  But this paragraph here, yes.

10            MR. ISAACSON:  I would move to admit Plaintiffs'

11   Exhibit 1481.

12            THE COURT:  Be admitted.

13            MR. ISAACSON:  And I failed to move 1476A, the last

14   document, as well.

15            THE COURT:  Be admitted.

16            (Plaintiff Exhibit 1476A marked.)

17            (Plaintiff Exhibits 1481 and 1476A admitted.)

18    BY MR. ISAACSON:

19   Q    In 2016, your organization for which you were commander

20   stopped using the swastika as its -- stopped using the swastika

21   as part of its -- what you were wearing and showing; is that

22   right?

23   A    Correct.

24   Q    And you replaced the swastika with something called the

25   Odal rune?

J. Schoep - Direct

1   A    Yes.

2   Q    And the switch from the swastika to the Odal rune was a

3   cosmetic overhaul, and you called it a "slight rebranding"; is

4   that right?

5   A    It was a rebranding, yes.

6   Q    And it was a cosmetic overhaul?

7   A    That sounds correct.

8   Q    And the reason you switched from using the swastika to the

9   Odal rune was to make the National Socialist Movement more

10  palatable to the public; is that right?

11  A    That would be one reason.

12  Q    I'm going to ask Mr. Spalding to show you on your screen a

13  photo, Plaintiffs' Exhibit 1970.

14       Do you recognize this as a picture from August 12th in

15  Charlottesville in 2017?

16  A    Yes, it appears to be.

17  Q    And is that symbol on the shield -- that's a National

18  Socialist Movement shield; is that right?

19  A    Correct.

20  Q    And the symbol there is the Odal rune?

21  A    Correct.

22       MR. ISAACSON:  I move to admit Plaintiffs'

23  Exhibit 1970.

24       THE COURT:  It will be admitted.

25       (Plaintiff Exhibit 1970 marked.)

J. Schoep - Direct

1          (Plaintiff Exhibit 1970 admitted.)

2          MR. ISAACSON:  Showing that to the jury, that's the

3  shield and the Odal rune that the witness was just discussing.

4  BY MR. ISAACSON:

5  Q    The Odal rune was significant to the Nazi Party during

6  World War II; is that correct?

7  A    You're asking me to speculate what the Odal rune was to an

8  organization based in Germany in the 1930s and '40s?  You're

9  asking me to speculate.

10 Q    Let me put it differently.  Let me -- I'm not going to ask

11 you to speculate.  I'll ask you what you believed.

12      You did believe that the Odal rune was significant to the

13 Nazi Party?

14 A    I'm not sure I know how to answer that question.  There

15 was a division of the Waffen-SS that used that particular rune,

16 if that's the historical information you're looking for in this

17 context.

18 Q    Yes.  That's the Wehrmacht?

19 A    Waffen-SS.

20 Q    The SS.  Okay.  Thank you.

21      Now, the name of another organization, the Nationalist

22 Front.  You were involved in helping to organize the

23 Nationalist Front; is that correct?

24 A    The Nationalist Front was an umbrella organization, not a

25 physical organization, but it was an organization in the sense

J. Schoep - Direct

1  of -- it was a coalition.

2  Q    I'm just asking you if you helped to organize the

3  Nationalist Front.

4  A    The National Socialist Movement, which was the

5  organization that I ran at the time, was part of the

6  Nationalist Front.

7  Q    And you, as commander, helped organize the Nationalist

8  Front?

9  A    There was no organizing of the Nationalist Front.  The

10  Nationalist Front was a coalition of organizations, as I just

11  explained.

12  Q    You were involved in helping to organize the alliance that

13  we're calling the Nationalist Front, correct?

14  A    I helped to facilitate an alliance between organizations.

15  Q    And you did more than just facilitate an alliance.  You

16  helped to organize that alliance, didn't you?

17  A    I think we're -- these are schematics.  Organize,

18  alliance -- I said I helped to facilitate an alliance between

19  organizations.  I can only speak for -- at that time, I can

20  only speak for the National Socialist Movement.  I cannot speak

21  for other organizations.

22  Q    I'm only asking about you at this point, sir.

23       Did you do organizational -- did you do organizational

24  work to help form that alliance that we're calling the

25  Nationalist Front?

J. Schoep - Direct

1    A    I don't know what you mean by that.

2    Q    All right.  Well, let me see if I can refresh your

3    recollection.

4         If you could look at your deposition at page 66, lines 15

5    through 24 -- actually, lines 15 through 18.  Were you asked

6    this question and did you give this answer?

7         "And you were involved in helping to organize the

8    agreement or alliance that we're calling the Nationalist Front.

9    Is that right?"

10        Answer:  "Yes."

11   A    I think that's what I just said. I helped facilitate.

12   Q    Did you --

13   A    You're mincing words with me here.

14   Q    Were you asked that question and did you give that answer?

15   A    That I helped to facilitate an alliance.

16   Q    Did you -- did you --

17        THE COURT:  Well, if the record shows that was the

18   question, that question was asked and he gave the answer.

19        MR. ISAACSON:  Thank you, Your Honor.

20    BY MR. ISAACSON:

21   Q    The member groups in the Nationalist Front included the

22   National Socialist Movement, correct?

23   A    Correct.

24   Q    And it included the defendant in this case League of the

25   South, correct?

J. Schoep - Direct

1   A     Correct.

2   Q     And it included the defendant in this case the

3   Traditionalist Worker Party, or TWP, correct?

4   A     Correct.

5   Q     And it included the defendant in this case Vanguard

6   America, or VA, correct?

7   A     I believe so.

8   Q     All right.

9           MR. ISAACSON:  Mr. Spalding, if we could show him

10  Plaintiffs' Exhibit -- well, actually, let's just nail this

11  down.  Can we show him Plaintiffs' Exhibit 2460?

12           (Plaintiff Exhibit 2460 marked.)

13   BY MR. ISAACSON:

14  Q     Do you recognize 2460 as a list of the membership --

15  member organizations of the Nationalist Front from the website

16  of the Nationalist Front?

17  A     That does appear to be accurate.

18  Q     And it does include defendant in this case Vanguard

19  America, correct?

20  A     Yes.

21           MR. ISAACSON:  Now, Mr. Spalding, can we show the

22  witness Plaintiffs' Exhibit 1816?

23           (Plaintiff Exhibit 1816 marked.)

24   BY MR. ISAACSON:

25  Q     At the top, do you recognize this as an email that you

179

J. Schoep - Direct

1    wrote to individuals that included Matthew Heimbach on May 4th,

2    2017?

3    A     I'm just reading it over here.

4          This does appear to be an email I sent on May 4th, 2017.

5               MR. ISAACSON:  I would move to admit Plaintiffs'

6    Exhibit 1816, Your Honor.

7               THE COURT:  Be admitted.

8               (Plaintiff Exhibit 1816 admitted.)

9    BY MR. ISAACSON:

10   Q     Now, looking at this on the screen, you can see the email

11   from you at the top, and in your email, your email name is

12   "Commander Schoep," correct?

13   A     Correct.

14   Q     And you're writing about the Nationalist Front site and

15   copying Mr. Heimbach on that, correct?

16   A     That's what it appears, yes.

17   Q     We're talking about the website for the Nationalist Front

18   now, correct?

19   A     Yes.

20   Q     And in the paragraph there you say, "Please add League of

21   the South to the groups listing for the Nationalist Front.  I

22   just spoke with Dr. Hill and he's on board to be an official

23   part of NF," the Nationalist Front, correct?

24   A     That's what it says.

25   Q     And in your signature block, if we can go to the bottom,

180

J. Schoep - Direct

1   that's the website for the National Socialist Movement, NSM88.

2       88 is a reference to Heil Hitler, correct?

3   A    Correct.

4   Q    Now, the Nationalist Front website was not owned by the

5   National Socialist Movement; it was owned by the Traditionalist

6   Worker Party, Mr. Heimbach's organization, correct?

7   A    Correct.

8   Q    And the Traditionalist Worker Party gave the National

9   Socialist Movement permission to use the website; is that

10  correct?

11  A    What do you mean by gave permission to use?

12  Q    They allowed you to put material on the website, for

13  example?  For example, you're saying -- you're writing, "please

14  add to the website," to Steve?

15  A    This is four years ago.  I don't recall exactly.  I guess,

16  what are you asking?

17  Q    I'm asking you:  Was the National Socialist Movement

18  actually working the website with the permission of the

19  Traditionalist Worker Party?

20  A    It appears so.  It appears so.  I don't actually remember

21  that from the time, but it appears so.

22           MR. ISAACSON:  Mr. Spalding, can we look at

23  Plaintiffs' Exhibit 2783?

24           (Plaintiff Exhibit 2783 marked.)

25   BY MR. ISAACSON:

J. Schoep - Direct

1   Q    Plaintiffs' Exhibit 2783.  Flip through these pages.

2        Do you recognize this as a list of the leadership of the

3   Nationalist Front from the Nationalist Front website?

4   A    These are pages from the Nationalist Front website.

5            MR. ISAACSON:  And I'd move to admit Plaintiffs'

6   Exhibit 2783, Your Honor.

7            THE COURT:  Be admitted.

8            (Plaintiff Exhibit 2783 admitted.)

9            MR. ISAACSON:  All right.  Please put this on the

10  screen.

11   BY MR. ISAACSON:

12  Q    So the leadership is listed there, and you're the first

13  leader there listed, correct?

14  A    I don't think the leadership was listed in any specific

15  order.  These were just the participating organizations.

16  Q    I just mean:  The first person we're looking at on this

17  page, that's you, correct?

18  A    I see that.  Correct.

19  Q    And you very likely -- and there's a biography of you.

20  You very likely would have reviewed your biography before it

21  was posted to the website; do you agree with that?

22  A    That sounds accurate.

23  Q    And then the other leaders -- there's Matthew Heimbach,

24  correct?

25  A    Correct.

J. Schoep - Direct

1  Q    And then there's -- that's Dillon Hopper, correct?

2  A    Well, it says "Dillon Irizarry" on the screen, but...

3  Q    You know him as Dillon Hopper, correct?

4  A    That would be accurate.

5  Q    Right.  And then also -- and he's -- he's with Vanguard

6  America; and then we have Dr. Michael Hill of the League of the

7  South, correct?

8  A    Correct.

9  Q    Now, Mr. Heimbach of the Traditionalist Worker Party was a

10 friend of yours for many years; is that right?

11 A    That would be accurate.

12 Q    I think you said this before, but let me make sure I have

13 the word correct that you used:  The Nationalist Front

14 described itself as a voluntary alliance of its members,

15 correct?

16 A    Are you asking if I said that, or is that an accurate

17 statement?

18 Q    I think you used the term "alliance," but is that an

19 accurate statement?  The Nationalist Front described itself as

20 a voluntary alliance?

21 A    That sounds accurate.

22         MR. ISAACSON:  Can we look at Plaintiffs'

23 Exhibit 2781?

24         (Plaintiff Exhibit 2781 marked.)

25 BY MR. ISAACSON:

J. Schoep - Direct

1  Q    Do you recognize 2781 as more material about the

2  Nationalist Front from the Nationalist Front website?

3  A    It looks to be from the website.

4         MR. ISAACSON:  All right.  I move to admit

5  Plaintiffs' Exhibit 2781.

6         THE COURT:  It will be admitted.

7         MR. ISAACSON:  We can show this to the jury.

8         (Plaintiff Exhibit 2781 admitted.)

9   BY MR. ISAACSON:

10 Q    The opening statement there, I gather you agree with:

11 "The Nationalist Front is a voluntary alliance that movement

12 leaders are encouraged to join in order to pool their talent,

13 resources, and manpower"?

14 A    That is what the document says.

15 Q    And if we move down to, I believe, the next paragraph:

16 "The Nationalist Front is not an organization in itself.  It's

17 an alliance of organizations.  Membership is only open to

18 organizations with a proven commitment to struggle for the

19 white nationalist vision."

20       That was a true description of the Nationalist Front; is

21 that correct?

22 A    That sounds accurate.  It's from the website.

23 Q    And then if we can look at the next page, at the bottom of

24 the paragraph that begins "no longer," the last sentence:  "The

25 Nationalist Front will leverage the power of solidarity and

J. Schoep - Direct

1    scale to raise our voices and our fists against the organized

2    left and the globalist Jewish oligarchs."

3        That was part of the mission of the Nationalist Front,

4    correct?

5    A    If that's from the website, that would be accurate.

6    Q    For efficiency, I'm going to ask you to look at your

7    deposition and tell me whether you were asked these questions

8    and gave these answers.

9        So if you look at page 60 of your deposition, lines 5

10   through 13, were you asked these questions and did you give

11   these answers?

12       "Was the Nationalist Front an agreement amongst member

13   organizations to work together and support one another?"

14       Answer:  "That sounds correct."

15       "And was it an agreement that when the organizations,

16   member organizations, conducted political activities, that they

17   would do so in a generally similar way?"

18       "That sounds accurate."

19       Were you asked those questions and did you give those

20   answers?

21   A    It appears so.

22   Q    And then, looking at page 62, beginning at line 23, were

23   you asked these questions and did you give these answers?

24       "The National Socialist Movement joined that agreement

25   that you described that was the Nationalist Front; is that

J. Schoep - Direct

1    correct?"

2         Answer:  "Correct."

3         "You knew the Traditionalist Worker Party was part of the

4    agreement that was the Nationalist Front?"

5         Answer:  "Yes."

6         "You knew the League of the South was a member of that

7    agreement that was the Nationalist Front; is that correct?"

8         Answer:  "Yes."

9         "Vanguard America was a member of that agreement of the

10   Nationalist Front; is that correct?"

11        Answer:  "Correct."

12        You were asked those questions and you gave those answers;

13   is that correct?

14   A    That appears to be correct, yes.

15   Q    Now, in 2017, did the Nationalist Front claim to reject

16   white supremacy?

17   A    I don't know about that.

18   Q    Well, did you believe -- do you believe that the

19   individual Nationalist Front member groups were white

20   supremacist groups in August 2017?

21   A    Did I believe that at that time, or do I believe that now?

22   Q    Do you believe that now?

23   A    That they're white supremacist groups?

24   Q    Yes.

25   A    I mean, that's one of those --

J. Schoep - Direct

1  Q    Actually, I'm not going to ask you it now.

2       At the time of your deposition, did you believe that they

3  were white supremacist groups?

4  A    There's -- I can't answer that "yes" or "no," because

5  there's -- in the movement, in the white nationalist movement,

6  a lot of people don't see themselves as white supremacists.

7       You ask me now, yeah, sure, it's white supremacy.  But

8  back then, I don't know what I would have answered.  I might

9  have said I was not a white supremacist.  And I can't speak for

10 those other organizations, as I said earlier.  I can only speak

11 for the organization -- from my own personal experience and the

12 organization that I was a part of at that time.

13 Q    All right.  Thank you.  Moving to a new topic.

14      Again, to save some time, I would ask you to look at

15 page 195 of your deposition, beginning at line 9.

16      In your deposition, were you asked this question and did

17 you give this answer?

18      Question:  "You referred to the rhetoric and party line of

19 the organization" --

20 A    Where are we at in the deposition?

21 Q    Page 195, line 9?

22 A    195, line 9.

23 Q    Are you with me?

24 A    Yep.

25 Q    "You referred to the rhetoric and party line of the

187

J. Schoep - Direct

1    organization, and you said not just about Charlottesville, but

2    before lots of rallies, so before lots of rallies, as part of

3    the rhetoric, there's going to be violence coming up if we're

4    going to achieve our goals?"

5        Answer:  "The best way I can answer that is to understand

6    the mentality and mindset of those on the far right, as they

7    often believe there's going to be a civil war or a race war or

8    a combination of these type of things in the country.  So

9    having that deep-held belief of future civil war, a future race

10   war, these type of things is paramount to the belief system of

11   the far right.  So they have that mindset.  So when they're

12   speaking about things, you know, hardening your resolve and

13   preparing for violence and things like that, it's things like

14   that.  It's almost like they have this world view that their

15   families are going to be killed and the government, whether

16   it's the system or whether it's their opposition from the left,

17   are going to be coming after their families and things like

18   that.  It's based on a lot of fear, fear of the other, a fear,

19   uncertainty for the future and things like that.  So a lot of

20   this rhetoric plays into that thought process of that echo

21   chamber or that groupthink."

22       Did you give that answer in response to that question?

23  A    That sounds accurate.

24  Q    All right.  Before August 2017 --

25           THE COURT:  Excuse me.  We'll take a recess now,

J. Schoep - Direct

1    about 20 minutes.

2              MR. ISAACSON:  Thank you, Your Honor.

3    **(Jury out, 3:00 p.m.)**

4              (Recess.)

5              THE COURT:  Before the jury comes back, talking about

6    his disavowing his former opinion, I ruled on that in the

7    context of there was going to be an expert who testified that

8    he had changed his opinion.  It seems to me it could be

9    relevant on the issue of punitive damages because punitive

10   damages are to teach a person a lesson so they won't do it

11   again.  And the jury has to determine that if they're going to

12   award punitive damages.  So it's not totally irrelevant.  It's

13   not a defense, but only on that issue of punitives.

14             MR. ISAACSON:  I think it would be important, Your

15   Honor, that the jury know it's not a defense.

16             THE COURT:  Well, right.  And I would so instruct

17   them.

18             MR. ISAACSON:  I think it would be good at the time

19   if that instruction was given, if they decide to take that

20   path.

21             THE COURT:  Okay.  If you could get the ruling --

22   call the jury back.

23             THE CLERK:  Just for you, Judge, Mr. Smith has some

24   cross and he wants to go last.

25             THE COURT:  Okay.

189

J. Schoep - Direct

1          THE CLERK:  On Zoom.

2          THE COURT:  All right.

3  **(Jury in, 3:24 p.m.)**

4          THE COURT:  All right.  You may be seated.  And

5  please proceed.

6   BY MR. ISAACSON:

7  Q    Mr. Schoep, in April 2017 the National Socialist Movement

8  held its national meeting in Pikeville, Kentucky; do you

9  remember that?

10 A    Yes.

11 Q    And you made a speech there, correct?

12 A    Correct.

13 Q    And National Socialist Media, or NSM Media was affiliated

14 with the National Socialist Movement, right?

15 A    Correct.

16 Q    It produced radio shows, YouTube videos, DVDs, that sort

17 of thing?

18 A    Correct.

19 Q    I want to show you on your screen Plaintiffs' Exhibit

20 2924A.  This will be -- I'm not going to show you the whole

21 excerpt.  I'm just going to put it up on the screen -- I'm

22 sorry, 2924B, which will be minute 3:09 to 3:30 of 2924.  Those

23 will be the time stamps.

24     Do you recognize this as you making a speech at the

25 Pikeville event?

J. Schoep - Direct

1   A    That looks accurate.

2               MR. ISAACSON:  I would move to admit 2924B.

3               THE COURT:  Be admitted.

4               (Plaintiff Exhibit 2924B marked.)

5               (Plaintiff Exhibit 2924B admitted.)

6               MR. ISAACSON:  If we can play this for the witness

7   and the jury.

8               (Video playing.)

9    BY MR. ISAACSON:

10  Q    Those were your words in Pikeville, correct?

11  A    Correct.

12              MR. ISAACSON:  And if we can, also from that day,

13  2924C, time stamp 5:19 to 5:27, it's from the same video so I

14  would ask that 2924C be admitted.

15              Your Honor, may I admit another clip from the same

16  speech?

17              THE COURT:  Yes.

18              (Plaintiff Exhibit 2924C marked.)

19              (Plaintiff Exhibit 2924C admitted.)

20              MR. ISAACSON:  2924C.  Mr. Spalding, if you would

21  play that for the jury.

22              (Video playing.)

23              And then also from 2924, this would be time stamp

24  5:42 to 5:56, I would ask that 2924D from the same speech be

25  admitted, Your Honor.

J. Schoep - Direct

1          THE COURT:  Be admitted.

2              (Plaintiff Exhibit 2924D marked.)

3              (Plaintiff Exhibit 2924D admitted.)

4              (Video playing.)

5   BY MR. ISAACSON:

6   Q    You were familiar with the Russian social networking site

7   called VK; is that right?

8   A    Yes.

9   Q    You had a VK account in 2017?

10  A    That sounds accurate.

11  Q    And if I can show you Plaintiffs' -- on your screen

12  Plaintiffs' Exhibit 2203.  Do you recognize this as a VK

13  posting that you made?

14      (Plaintiffs' Exhibit 2203 marked.)

15  A    I don't recall this.

16  Q    Do you recognize your identifier at the top that was used

17  for your VK page?

18  A    All I see on the screen is my name and you telling me that

19  this is from a VK posting.  I don't see anything that shows

20  this is from VK.

21          MR. ISAACSON:  My copy is slightly better.  May I

22  approach, Your Honor?

23          THE COURT:  You may.

24  BY MR. ISAACSON:

25  Q    I'm just going to show you at the top here.

J. Schoep - Direct

1   A     That looks like a deleted account is what that looks like.

2   Q     Do you recognize it as your VK insignia?

3   A     A deleted account emblem as my VK insignia?  No,

4   absolutely not.

5            MR. ISAACSON:  Can we pull up 2464.

6            (Plaintiff Exhibit 2464 marked.)

7   BY MR. ISAACSON:

8   Q     Do you recognize this as a photo of you in a group of

9   people from the Pikeville event?

10  A     Yes.

11           MR. ISAACSON:  I move to admit Plaintiffs' Exhibit

12  2464.

13           THE COURT:  Be admitted.

14           (Plaintiff Exhibit 2464 admitted.)

15  BY MR. ISAACSON:

16  Q     Do you recognize yourself in this photo?

17  A     Yes.

18  Q     Third from the left, the -- if you touch the screen, you

19  can circle yourself, if you like.

20  A     (Witness complies.)

21  Q     And that's Mr. Heimbach next to you?

22  A     Correct.

23  Q     And Mr. Hill next to Mr. Heimbach?

24  A     Correct.

25  Q     You're familiar --

J. Schoep - Direct

1              MR. ISAACSON:  You can take that down, Mr. Spalding.

2    BY MR. ISAACSON:

3    Q    You're familiar with the term "triggering"?

4         I don't know how to undo the green circle.

5         You're familiar with the term "triggering"?

6    A    Yes.

7    Q    It's basically the same concept as baiting someone?

8    A    I suppose that's one way you could define it.

9    Q    And the reason you -- one reason you knew of the concept

10   of triggering in 2017 was due to your familiarity with the

11   white supremacist community?

12   A    "Triggering" is a word that's commonly used in the media

13   and so on and so forth.  I don't know where I would have heard

14   that word first, if it was in 2017 or 2020 or 2010.  I can't

15   accurately answer that.

16   Q    Well, would you agree that it would be fair to say that

17   triggering was a concept you knew from your familiarity with

18   the white supremacist community?

19   A    I don't know that white supremacy and triggering

20   necessarily mesh together.  I know the word "triggering."  I

21   can say that.

22   Q    I would ask you to look at your deposition, page 155,

23   lines 14 through 18.

24   A    Whatever I said in my deposition, I'm not going to -- I'm

25   not going to deny.  I'm going to be as transparent as possible

J. Schoep - Direct

1  here today, so --

2  Q    Sir, there's no question pending.

3  A    Okay.

4  Q    The question to you is:  Were you asked this question and

5  did you give this answer?

6       "It was a concept that you knew from your familiarity with

7  the white" -- and you can see above that we're talking about

8  the word "triggering."

9       "It was a concept you knew from your familiarity with the

10  white supremacist community; is that fair?"

11      Answer:  "That's fair.  I mean, it's something you hear a

12  lot in online talk mostly now."

13      You were asked that question and you gave that answer,

14  correct?

15  A    I see triggering as something that was discussed as a

16  goal -- this was you, or the question:  "Triggering was

17  something that was discussed as a goal before Unite the Right,

18  correct?"  My answer was:  "I don't recall.  I don't recall

19  ever saying that."

20  Q    And you did -- you were asked the question whether

21  triggering was "a concept that you knew from your familiarity

22  with the white supremacist community; is that fair?"  You

23  answered:  "That's fair."

24      You gave that answer, correct?

25  A    Well, that's what it says here.  And as I said --

J. Schoep - Direct

1           MR. ISAACSON:  So, Mr. Spalding, can we put on the

2    screen Plaintiffs' Exhibit 1563?

3    BY MR. ISAACSON:

4    Q    Do you recognize this as an email chain between you and

5    Dr. Hill of the League of the South -- between you and Dr. Hill

6    of League of the South from June of 2017?

7    A    It appears -- that appears to be so, yes.

8           MR. ISAACSON:  I would move to admit Plaintiffs'

9    Exhibit 1563.

10          THE COURT:  Be admitted.

11          (Plaintiff Exhibit 1563 marked.)

12          (Plaintiff Exhibit 1563 admitted.)

13   BY MR. ISAACSON:

14   Q    If we can show everybody this on the screen, you'll see at

15   the bottom of page 1 there is an email on May 10th from Michael

16   Hill.  And because of the way email chains work, the email

17   itself is on the second page at the top.

18        And he's writing to you, Jeff; do you see that?

19   A    Yep.

20   Q    And you see in the second paragraph, he says:  "Right now,

21   we are in the initial planning stages for a rally in front of

22   the SPLC sometime this July or August.  We want to let the

23   Antifa, BLM, etc. know about it in hopes they will try to crash

24   our party."

25        That's what Michael Hill wrote to you, correct?

J. Schoep - Direct

1  A    It appears so.

2  Q    And then you responded on the first page on June 15th:

3  "Michael, hope all is going well with you and yours.  Just

4  wanted to touch base with you real quick and remind you about

5  the bio on yourself so we can list that on the Nationalist

6  Front website."

7      Does that help you recall that you were working on the

8  Nationalist Front website?

9  A    Well, not me personally, but apparently the webmaster must

10 have had access to that at that point, then, yeah.

11 Q    Then you say in the second paragraph:  "One more quick

12 thing I would like to touch base with you on.  I remember you

13 saying something about protesting the scum at the SPLC, and I

14 would like to be involved in that."

15     And the protest that you're referring to was the rally

16 that Dr. Hill said he wanted Antifa, BLM, et cetera, to know

17 about so they would crash the party; is that correct?

18 A    That appears to be so.

19 Q    If we can look at Plaintiffs' Exhibit 2200, do you

20 recognize this as your VK profile page?

21 A    That appears to be accurate.

22         MR. ISAACSON:  I'd move to admit Plaintiffs'

23 Exhibit 2200.

24         THE COURT:  It will be admitted.

25         (Plaintiff Exhibit 2200 marked.)

J. Schoep - Direct

1          (Plaintiff Exhibit 2200 admitted.)

2    BY MR. ISAACSON:

3    Q    And there is -- that's your picture in the upper left-hand

4    corner, correct?

5    A    Yes.

6    Q    And if we move down to "Beliefs," there's a section called

7    "Inspired By," and the two individuals listed there are Adolf

8    Hitler and Commander Rockwell.

9         Commander Rockwell was the individual that you discussed

10   earlier today as founding the American Nazi Party, correct?

11   A    Correct.

12   Q    And then at the bottom of the page there's a section

13   called "About Me."  And what you wrote there was:  "Do not

14   cross my path if you are a filthy anarchist, communist, Antifa,

15   or any other kind of degenerate.  Victory or Valhalla"; is that

16   correct?

17   A    That's what it says.

18   Q    Now, at some point -- you can take that down -- at some

19   point you heard about an event in Charlottesville in August

20   2017 that became Charlottesville 2.0, correct?

21   A    Correct.

22   Q    And you considered Mr. Kessler to be one of the organizers

23   of the rally, correct?

24   A    Correct.

25   Q    If we can look at Plaintiffs' Exhibit 1424, do you

J. Schoep - Direct

1   recognize this as a series of text messages between you and

2   Mr. Kessler on June 25th, 2017 -- June 25th and June 26th?

3   A    Yep, that appears so.

4   Q    And you initiate the text chain by saying, "Jason, this is

5   Jeff Schoep from NSM.  Matt Heimbach gave me your number."

6   Then you refer to "the event you have coming up in August."

7        That was Charlottesville 2.0, correct?

8   A    That would be correct.

9   Q    And he responds, "Hey, Jeff, just seeing your text now.

10  I'm available whenever you want to call."

11       And then you respond, "Nice speaking with you, brother.

12  Looking forward to attending your event," again referring to

13  the Charlottesville event; is that right?

14  A    That's what it says.

15           MR. ISAACSON:  I'd move to admit an exhibit I don't

16  think I moved to admit.  Sorry, Mr. Spalding.

17           Move to admit Plaintiffs' Exhibit 1424.

18           THE COURT:  Be admitted.

19           MR. ISAACSON:  Keep that highlighted on the screen,

20  and I'll just show that briefly to the jury.  I apologize for

21  not doing that while we were discussing it.

22           (Plaintiff Exhibit 1424 marked.)

23           (Plaintiff Exhibit 1424 admitted.)

24   BY MR. ISAACSON:

25  Q    If we could now show Plaintiffs' Exhibit 1410 to the

J. Schoep - Direct

1    witness.  This is an email exchange between you and

2    Mr. Kessler; is that correct, in July of 2017?

3    A    It appears to be.

4              MR. ISAACSON:  I move to admit Exhibit 1410.

5              THE COURT:  Be admitted.

6              (Plaintiff Exhibit 1410 marked.)

7              (Plaintiff Exhibit 1410 admitted.)

8              MR. ISAACSON:  If I could move to page 3 of the email

9    chain, because like email chains, it runs backwards.

10    BY MR. ISAACSON:

11    Q    Now, Mr. Kessler wrote you on June 26, 2017, "Here's the

12    invite to the Charlottesville Discord planning server,"

13    correct?

14    A    Correct.

15    Q    And then you responded beginning on the previous page.

16    That's you writing to Mr. Kessler when you say "Hail, Jason,"

17    right?

18    A    Uh-huh.  Yes.

19    Q    "Last year we formed up the Aryan Nationalist Alliance."

20        The Aryan Nationalist Alliance was the original name for

21    the Nationalist Front, right?

22    A    Correct.

23    Q    "Last year we formed up the Aryan Nationalist Alliance and

24    later changed the name to Nationalist Front, which is an

25    umbrella group of many organizations that all work together

J. Schoep - Direct

1  now.  Perhaps Matt Heimbach or Dr. Hill have let you know about

2  that, or Vanguard America, or one of our other partners.  It's

3  amazing to finally see everyone working together."

4       That was your view of the Nationalist Front in July of

5  2017, that you were amazed at how well they were working

6  together, correct?

7  A    Correct.

8  Q    And then moving down you ask, "Do you have a website or

9  link that's promoting your August event?  We will help promote

10  it through our websites, email lists, Twitter, VK, forums,

11  etc."

12      You were offering to promote Charlottesville 2.0, correct?

13  A    That would be standard operating procedure at the time,

14  yes.

15  Q    In fact, you did promote the event through all these

16  means, correct?

17  A    You're asking me to remember if I promoted an event

18  four years ago online.  It's possible.

19  Q    We'll come back to that.

20  A    Sure.

21  Q    And then you say in the paragraph that continues -- again,

22  you're writing to Mr. Kessler.  You say, "There are about 200

23  of us in Pikeville, Kentucky for our April national event

24  between NSM, TWP, LOS, VA, and other groups who are aligned

25  with us."  And then moving on, there's a sentence that begins a

J. Schoep - Direct

1  couple of lines from the bottom, "I would like you to see."  On

2  the line that has -- there you go.

3      "I would like you to see what we bring to the table

4  besides experience and men who are battle-tested in the

5  streets."

6      The "men who are battle-tested in the streets" you're

7  referring to were members of NSM, correct?

8  A    It appears so.  The NSM was a well-known street activist

9  organization for many years.

10 Q    And you told Mr. Kessler they were battle-tested in the

11 streets?

12 A    Politically.  Yes.

13 Q    And then on -- Mr. Kessler responds to you on your email.

14 This is on page 2.  "Thanks for your letter."  And he says in

15 the second paragraph, "It is truly humbling to think I can play

16 a part in helping to bring various factions together in a way

17 that folks have been working towards for 25 years or so.  I'm

18 so glad to hear that you have a preexisting alliance with

19 Dr. Hill and Matt, as they are both great and honorable men."

20      "Matt" referred to Matt Heimbach, correct?

21 A    Correct.

22 Q    Was it typical talk before an event during this period of

23 time for someone on the far right to say Antifa was going to

24 show up at the rally?

25 A    That was pretty typical.

J. Schoep - Direct

1   Q    Now, I just mentioned your friend Matthew Heimbach.  You

2   communicated extensively with him concerning Unite the Right,

3   correct?

4   A    I don't know if I'd use the term "extensively."  Unite the

5   Right wasn't my rally, so I didn't have anything to plan for;

6   really just show up.  "Extensively" is a loose word.  It

7   depends what you mean by "extensively."  I did have

8   communications with Matt about the rally.

9   Q    If we could look at PX-3210E-2, I think this is.

10        Now, we have phone records for Mr. Heimbach-- we have

11  phone records in this case that are about 1,500 pages long.  So

12  I'm not going to show you all 1,500 pages.  We have pulled out

13  this collection between two numbers.

14        Now, the 301 number here is Defendant Matthew Heimbach's

15  number.  Do you recognize that?

16  A    I wouldn't know whose number is what by looking at it.

17  Q    Well, I'll represent to you in this trial he has said that

18  that's his phone number.

19  A    Then that's his phone number.

20  Q    You do recognize your phone number as the 313 number?

21  A    Yes.

22  Q    And so -- and you'll see this is from the time period

23  June 4th to August 12th.  And these are calls between the two

24  of you.  Then you can see on the duration, in the months

25  leading up to Charlottesville, you had at least 17 calls with

J. Schoep - Direct

1  Mr. Heimbach for a total of four hours, correct?

2  A    I'm not sitting here and doing the math, but if the

3  numbers add up to that, that sounds right.  I talked to Matt

4  quite often.

5  Q    And then if we can look at Plaintiffs' Exhibit 3210E-1.

6       Now, this is an excerpt from the phone bill of text

7  messages between the same numbers.  And these go from May 29th

8  to either August 11th or 12th -- August 11th.  And there are 80

9  such texts.

10      Do you agree that you would have texted this often with

11  Mr. Heimbach during this period?

12 A    I would have texted often with him during any period.  I

13 don't think this -- I don't really understand that question.  I

14 texted him a lot.  So it would be during any period of time.

15           MR. ISAACSON:  That's fine.

16           I'll move to admit 310E-1 and E-2 [sic].  I move to

17 admit these collections of text messages.

18           THE COURT:  Be admitted.

19           MR. ISAACSON:  Just show the text messages, and then

20 show the durations in E-2, which I failed to show to the jury.

21           (Plaintiff Exhibits 3210E-1 and 3210E-2 marked.)

22           (Plaintiff Exhibits 3210E-1 and 3210E-2 admitted.)

23           MR. ISAACSON:  Just highlight the duration.

24 BY MR. ISAACSON:

25 Q    Another way you would communicate with Mr. Heimbach is you

J. Schoep - Direct

1   would text using an app named Signal, right?

2   A    I did use Signal.  I couldn't tell you who I texted with

3   through Signal.  It's possible that I texted Matt through

4   Signal.

5   Q    Well, let me see if I can refresh your recollection.

6        Looking at your deposition, page 96, lines 22 through 24,

7   were you asked the question:  "Did you use Signal to text with

8   Mr. Heimbach?"

9        Answer:  "I believe so"?

10  A    Okay.

11  Q    So does that help you remember that you were using Signal

12  to text with Mr. Heimbach?

13  A    If I said "I believe so," then that's accurate.

14  Q    And you used a Signal function that would delete messages

15  after a short period of time, correct?

16  A    I didn't say that.

17  Q    Well, if you look above on that same page at lines 17

18  through 21, do you see you were asked the question:  "Do you

19  remember what setting you were using when you had Signal?"

20       Answer:  "I believe it was the deleting messages."

21       Question:  "Deleting after a short period of time?"

22       Answer:  "Correct."

23       You were using a function that deleted your messages in a

24  short period of time, correct?

25  A    Where are you seeing that?

J. Schoep - Direct

1  Q    Same page, lines 17 through 21.

2  A    96?

3  Q    Page 96.

4  A    Okay.  That's what it says.

5  Q    And you were asked those questions and you gave those

6  answers, correct?

7  A    In July 2020, that's what it says.

8  Q    So there is no record of your text messages on Signal

9  because -- with Mr. Heimbach because of the instruction you

10  gave to Signal to delete them within a short period of time,

11  correct?

12  A    I don't recall either way.  It's saying here that I

13  believed I was using that at the time.  That was speculation.

14  Q    So when you said you believed that at your deposition,

15  your testimony now is that you were speculating; is that right?

16  A    I don't know either way because I don't remember that

17  conversation.

18  Q    I just would like the answer to the question.  When you

19  said "I believe" something at your deposition, does that mean

20  you were speculating?

21  A    I think that's a mischaracterization.

22  Q    All right.  I'm going to move on.

23       So the cell phone that you were using during this period,

24  is it your testimony that the cell phone that you were using

25  fell into a toilet?

J. Schoep - Direct

```
 1  A    Yeah, the cell phone that I had did fall into a toilet.
 2  Q    And you have not produced your emails from the NSM88 email
 3  account you had.  You have not produced your emails for this
 4  case from that account, correct?
 5  A    I produced everything you guys asked for that I recall.
 6  Q    But you didn't have those emails, did you?
 7  A    I don't recall what email addresses that I had at that
 8  time.  We saw the commander@newsaxon one; that was the primary
 9  address that I was using at that time.
10  Q    And the only materials, in fact, that you set aside for
11  this case was that phone that fell into the toilet, right?
12  A    You got that phone.  You got another phone, and you got
13  computers.  You got emails.  You got everything you asked for.
14  Q    You're not saying that you produced any emails from that
15  account, are you?
16  A    What account?
17  Q    The one that you were just referring from your NSM
18  account?
19  A    The commander@newsaxon.org?
20  Q    Yeah.
21  A    I don't recall what I -- exactly what emails.  You're
22  showing me emails from that account.
23  Q    Yes.  They were all produced from other people.
24  A    Okay.
25  Q    The Kessler email was from Mr. Kessler.  The Hill email
```

J. Schoep - Direct

1  was from Mr. Hill.  So don't take it from that that you've

2  produced any emails.  I gather it's your testimony you don't

3  know whether you produced any emails?

4  A    It was too long ago to remember exactly what emails and

5  email addresses.  I know that -- I mean, again, it's

6  speculating.  If you have it, then I produced it, I'm assuming.

7  Q    Moving on to a new topic.  At your deposition, if you

8  could look at page 204 at line 2, were you asked these

9  questions and did you give these responses --

10 A    What page?

11 Q    204 beginning at line 2.

12     "That was part of your attitude at the time, that you were

13 going to Charlottesville and you were going to be facing

14 thousands of Antifa?"

15     Answer:  "Was that a question or a statement?"

16     Question:  "That was a question.  That was your attitude

17 at the time, that you'll be going to Charlottesville and you'll

18 be facing thousands of Antifa there?"

19     Answer:  "Yes.  Anytime we did a rally, that was the

20 assumption.  Typically there was lots of opposition."

21     Question:  "But not specifically opposition, but Antifa

22 opposition?"

23     Answer:  "Well, as I explained earlier, that's kind of

24 how -- in the movement, that's how we saw things.  Even though

25 it wasn't all Antifa that's opposing, that was the broad brush

J. Schoep - Direct

1   that was painted."

2       Question:  "So when you're referring to thousands of

3   Antifa, you're referring to thousands of opposition using that

4   broad brush?"

5       Answer:  "I suppose that would be accurate."

6       Those are the questions you were asked and the answers you

7   gave, correct?

8   A   I'm not seeing it on the page because you were ahead of

9   me, but that sounds like something that I would have said, yes.

10  Q   Going back to this issue of whether you promoted

11  Charlottesville 2.0 on your social media, I would ask you to --

12  you were -- you do recall that you were promoting on social

13  media attending the Unite the Right event; is that right?

14  A   Yeah, that sounds accurate.

15  Q   And so if we could look at Plaintiffs' Exhibit 2258.  Do

16  you recognize this as a VK post that you made?

17  A   That's definitely from my VK account.  I don't remember

18  making this.  This is four years ago, but that's my account,

19  yeah.

20          MR. ISAACSON:  I move to admit Plaintiffs'

21  Exhibit 2258.

22          THE COURT:  Be admitted.

23          (Plaintiff Exhibit 2258 marked.)

24          (Plaintiff Exhibit 2258 admitted.)

25  BY MR. ISAACSON:

J. Schoep - Direct

1  Q    If we can show this on the screen.  You posted on your VK

2  account:  "We will be there.  Mobilize and organize comrades.

3  Get out and there and get active.  Hope to see you there on

4  August 2nd," right?

5  A    That would have been typical of any rally we were going

6  to.  Yes.

7  Q    And your VK followers included both National Socialist

8  Movement members and members of other organizations, correct?

9  A    That would be accurate.

10  Q    If we can look at Plaintiffs' Exhibit 1536.

11        (Plaintiff Exhibit 1536 marked.)

12  BY MR. ISAACSON:

13  Q    This is an email from you to NSM World at a Yahoo Group

14  account on August 9th, 2017; is that correct?

15  A    It appears to be.

16        MR. ISAACSON:  I move to admit Plaintiffs'

17  Exhibit 1536.

18        THE COURT:  Be admitted.

19        (Plaintiff Exhibit 1536 admitted.)

20   BY MR. ISAACSON:

21  Q    This is an email from you as Commander Schoep with -- and

22  you sent this email to nsmworld@yahoogroups.com.  That was a

23  membership list for the National Socialist Movement, correct?

24  A    That's not an accurate portrayal of what that is.  That's

25  a Yahoo Group.  So that was basically something anyone could

J. Schoep - Direct

1   sign up for and then get alerts on what was going on with the

2   group and so on and so forth.

3   Q    Yeah, I'm sorry.  I misstated it.  It's an email list for

4   NSM in Yahoo, right?

5   A    Not just for NSM, but it was called NSM World.  It was --

6   public information went through there.

7   Q    And on that Yahoo Group you were, again, promoting the

8   event?

9   A    That would be typical of any rally at the time, yes.

10  Q    And one of the things you wrote there in the first

11  paragraph was, "Do not just show up.  You will not be able to

12  get in.  If you are attending, contact NSM Chief of Staff now."

13       NSM had a system where members would contact you or

14  someone else in leadership if they were going to attend Unite

15  the Right; is that correct?

16  A    For any event that the NSM would participate in or have

17  anything to do with, these were standard security protocols.

18  Because of violence or potential for violence from

19  counter-demonstrators.

20            MR. ISAACSON:  I would move to strike the latter half

21  of the answer as not responsive, Your Honor.

22            THE COURT:  Motion granted.  Strike it.

23   BY MR. ISAACSON:

24  Q    You told NSM members that you personally would be

25  attending Charlottesville 2.0, correct?

211

J. Schoep - Direct

1  A    I do recall that, yes.

2  Q    You encouraged them to attend; is that correct?

3  A    That's -- yeah, that would be accurate.

4  Q    If we could look at Plaintiffs' Exhibit 1591.  Do you

5  recognize that as a flier for the Unite the Right event from

6  the National Socialist Movement and the Nationalist Front?

7  A    Yeah, I don't remember seeing this, but it's clearly

8  something that the group put out.

9          MR. ISAACSON:  I'd move to admit Plaintiffs' Exhibit

10  1591.

11          (Plaintiff Exhibit 1591 marked.)

12  BY MR. ISAACSON:

13  Q    And that's the Nationalist Front insignia at the top of

14  the page, correct?

15  A    Yes.

16  Q    And that's the National Socialist Movement's insignia with

17  the Odal rune on the right top, correct?

18  A    Correct.

19          MR. ISAACSON:  If we can look at Plaintiffs'

20  Exhibit 1488.

21          (Plaintiff Exhibit 1488 marked.)

22          MR. ISAACSON:  I'm told that the record, Your Honor,

23  didn't reflect you admitting 1591.

24          THE COURT:  Be admitted.

25          MR. ISAACSON:  Thank you.

J. Schoep - Direct

1          (Plaintiff Exhibit 1591 admitted.)

2    BY MR. ISAACSON:

3    Q    Plaintiffs' Exhibit 1488.  Do you recognize this as a VK

4    messaging that you were doing with someone named Chad

5    Radkersburg in August of 2017?

6    A    It appears to be, yes.

7              MR. ISAACSON:  I move to admit Exhibit 1488.

8              THE COURT:  Be admitted.

9          (Plaintiff Exhibit 1488 admitted.)

10   BY MR. ISAACSON:

11   Q    In the middle it says, you, at 12:46, "I will be there

12   driving down from Detroit on August 1st." Do you see that?

13   A    Yep.

14   Q    It goes on and says, "We will be in black BDUs, NSM

15   uniform," in the middle of the second line.  Do you see that?

16        "BDU" refers to "battle dress uniform," correct?

17   A    Correct.

18   Q    And you're describing the plans for arriving.  You say,

19   "We will meet up with all the Nationalist Front groups and

20   march in together.  It's all set already.  Should be a great

21   event."  And then in all capital letters you say, "THIS IS

22   STRICTLY NEED TO KNOW," couple of exclamation points.  "ONLY

23   PERSONS GOING NEED THE INFO," exclamation points.

24        That's what you were telling NSM members, that the

25   information about when you were arriving and how was on a need

J. Schoep - Direct

1  to know basis, correct?

2  A    Absolutely.  Security protocols, once again.

3  Q    Now, on August 12th your group from National Socialist

4  Movement and other Nationalist Front groups first met in a

5  parking lot by a fabric store called JoAnn Fabrics, correct?

6  A    I do recall that, correct.

7  Q    Then, as a group, the Nationalist Front group traveled to

8  a parking garage in Charlottesville, correct?

9  A    I believe there was a carpool from that area by JoAnn

10  Fabrics to a parking garage.

11  Q    And there were other alt-right groups other than

12  Nationalist Front who also traveled to the park, but they came

13  in their own separate travel arrangements, correct?

14  A    Could you repeat that?

15  Q    There were other alt-right groups that went to the rally

16  that day, but they weren't traveling as part of your

17  carpooling, I think -- did you say carpooling?

18  A    No, there was -- yeah, there was separate groups.

19  Q    They just came in in separate groups, going to the same

20  place?

21  A    The alt-right groups, yeah, I can't speak for those other

22  organizations.

23  Q    If we could look at Plaintiffs' Exhibit 1979.  This is a

24  true and accurate photo of -- on Charlottesville on August

25  12th; is that right?

J. Schoep - Direct

1   A    Yes.

2            MR. ISAACSON:  I move to admit Plaintiffs' Exhibit

3   1979.

4            THE COURT:  Be admitted.

5            (Plaintiff Exhibit 1979 marked.)

6            (Plaintiff Exhibit 1979 admitted.)

7   BY MR. ISAACSON:

8   Q    That's a National Socialist Movement banner there,

9   correct?

10  A    Correct.

11  Q    And there are also individuals wearing National Socialist

12  Movement shields, and there are also insignias with the Odal

13  rune for the National Socialist Movement, correct?

14  A    Yes.

15  Q    If we could look at Plaintiffs' Exhibit 1982.

16           (Plaintiff Exhibit 1982 marked.)

17  BY MR. ISAACSON:

18  Q    This is another fair representation of August 12th in

19  Charlottesville, correct, this photo?

20  A    That photo is from Charlottesville, yes.

21           MR. ISAACSON:  I move to admit 1982.

22           THE COURT:  Be admitted.

23           (Plaintiff Exhibit 1982 admitted.)

24   BY MR. ISAACSON:

25  Q    The National Socialist Movement is in the bottom left of

J. Schoep - Direct

1  this photo, correct, carrying the same flags we were just

2  looking at?

3  A    I see some National Socialist Movement people there, yes.

4  Q    And in front of them are people carrying a white flag with

5  a black X.  That's the flag for League of the South, correct?

6  A    That is a symbol used by League of the South.

7  Q    And as you marched on August 12th, the Nationalist Front

8  groups generally tried to stick together until you entered

9  Emancipation Park, correct?

10 A    If I recall, yes.  Yes.

11 Q    And one of the people marching in your group somewhere was

12 a Major Culpepper of the National Socialist Movement, right?

13 A    Yes, I believe he was there, yes.

14 Q    Again, to save some more time, I'm going to put this

15 testimony into the record.  If you look at page 186 of your

16 deposition, beginning at line 6, in your deposition were you

17 asked this question and did you give this response:  Question:

18 "How many people were in the collective group, not just the NSM

19 but the League of the South, the American Vanguard, the

20 Traditionalist Worker Party" --

21 A    What page are you on?

22 Q    I'm sorry.  Page 186, line 6.  Are you with me?

23 A    Yes.

24 Q    "How many people were in the collective group, not just

25 the NSM, but the League of the South" -- it should say

J. Schoep - Direct

1  "Vanguard America, the Traditionalist Worker Party that you

2  worked there together with?"

3       Answer:  "How many people?"

4       Question:  "If you could give me a reasonable estimate."

5       Answer:  "I think what we said after the event is there

6  were like a thousand people, and this was strictly a

7  guesstimate, but like a thousand people from the right, an

8  equal number or more from the left.  Again, that's speculation.

9  I've heard other people saying there was more like hundreds.

10 Again, I wasn't counting.  There was a lot going on."

11      Question:  "Is it safe to say there were at least hundreds

12 in allied groups that you were there marching with that day?"

13      Answer:  "I think that's fair speculation."

14      Did you give those answers in response to those questions?

15 A    Yes.

16 Q    One way you would identify your allies that day was by the

17 uniforms they were wearing, correct?

18 A    Typically.

19 Q    NSM members were wearing all black, sometimes with NSM,

20 National Socialist Movement insignia, correct?

21 A    Some of them, yes.

22 Q    And Traditionalist Worker Party was wearing all black,

23 correct?

24 A    I can't speak for the other organizations.

25 Q    But you knew the Traditionalist Worker Party had a uniform

J. Schoep - Direct

1  of all black, correct?

2  A    Typically they were in black, yes.

3  Q    And League of the South was typically wearing black with

4  khaki pants, correct?

5  A    Yes.

6  Q    Again, I'm going to ask you, if you can look at page 125

7  of the deposition, beginning at line 7.  In your deposition

8  were you asked this question and did you give this response:

9  "But if you saw Vanguard America there with their uniforms, you

10  would consider them to be part of your alliance in

11  Charlottesville, correct?"

12      Answer:  "They were part of the Nationalist Front."

13      Question:  "And that was an alliance that you were part

14  of, the Nationalist Front?"

15      Answer:  "Yeah.  The paper alliance of groups, I suppose."

16      Question:  "And that alliance was there at Unite the

17  Right, correct?"

18      Answer:  "I suppose so."

19      You gave those answers in response to those questions,

20  correct?

21  A    That sounds like everything I've just repeated several

22  times up here today, yes.

23  Q    All right.  I want to show you -- if we could put on the

24  screen for you Plaintiffs' Exhibit 3236.

25      Don't play it -- you can stop.  Do you recognize this as a

J. Schoep - Direct

1   video by NSM Media on August 12, 2017?

2   A    I am not sure if it's from NSM Media or where it's from.

3   Q    But you do recognize it as a fair representation of August

4   12, 2017 and the National Socialist Movement marching?

5   A    It looks like it.

6              MR. ISAACSON:  I move to admit Plaintiffs' Exhibit

7   3236.

8              THE COURT:  Be admitted.

9              (Plaintiff Exhibit 3236A marked.)

10             (Plaintiff Exhibit 3236A admitted.)

11             MR. ISAACSON:  Actually, I would like to admit 3236A,

12  which would be time stamp beginning at second 46 and going to

13  one minute.  And if you could play that, Mr. Spalding.

14             (Video playing.)

15  BY MR. ISAACSON:

16  Q    Now, what we saw there was the National Front Alliance

17  marching out of the parking garage, correct?

18  A    It appears so.

19  Q    And we saw National Socialist Movement flags, correct?

20  A    Correct.

21  Q    And from the parking garage you marched to Emancipation

22  Park, correct?

23  A    I believe that's what the park was called, yes.

24  Q    And you recognize League of the South flags that were in

25  front of the National Socialist Movement?

J. Schoep - Direct

1  A    Yes.

2  Q    And the Traditionalist Worker Party was generally behind

3  you in this march, although eventually you started to get kind

4  of mixed up; is that fair?

5  A    That sounds accurate.  The memory is fuzzy from four years

6  ago.

7  Q    I will again ask you if you could look at page 262 of your

8  deposition at line 17.

9  A    262?

10  Q    262.  In your deposition were you asked this question and

11  did you give this response:  "And during that Saturday in

12  Charlottesville did you hear racist comments which you now

13  consider to be racist comments from the people you were

14  marching with?"

15      Answer:  "There was a lot of racism that day."

16      You gave that answer in response to that question?

17  A    Yeah.  What page?  I'm seeing 262.  What line?

18  Q    262, line 17 through 21.

19  A    Yeah, there was a lot of racist comments that day.

20  Q    I would like to show you Plaintiffs' Exhibit 1483.  Do you

21  recognize these as VK messages between you and Ike Baker of the

22  League of the South?

23  A    That looks accurate.

24           MR. ISAACSON:  I move to admit Exhibit 1483.

25           THE COURT:  Be admitted.

J. Schoep - Direct

1           (Plaintiff Exhibit 1483 marked.)

2           (Plaintiff Exhibit 1483 admitted.)

3    BY MR. ISAACSON:

4    Q    And on August 18th in the middle, you write -- so this is

5    August 18th, after the events of August 12th:  "It was truly an

6    honor to stand with our brothers in League of the South.  You

7    guys are amazing and true street activists and I am extremely

8    happy we are all working together.  You have some really solid

9    men in your org."  That's what you were writing to Ike Baker of

10   the League of the South, correct?

11   A    That sounds accurate.

12   Q    And you also told him next, "Spencer marched back with us

13   in the last group to get to the ramp and I was really impressed

14   by him."

15        Do you see that?

16   A    Yes.

17   Q    And then you also refer to Michael Tubbs, who apparently

18   you met that day, correct?

19   A    I have met Michael Tubbs before, yes.

20   Q    And you said, "Michael Tubbs, who I had not met before,

21   clearing the way to get into the park was like a bulldozer.  I

22   really liked him too."

23        That's what you told Mr. Baker, correct?

24   A    That's what it says.

25   Q    And Mr. Baker responded on August 23rd at the top, "I

J. Schoep - Direct

1  forwarded the above message to Dr. Hill.  He asked that I

2  convey his sincere thanks for your kind words and for the

3  comradeship between us.  His words verbatim to me:  'It was an

4  honor to stand with them.'"

5      That was the message from Dr. Hill to you, correct?

6  A    That's what it says.

7  Q    And also as part of this message to you Dr. Hill said, "I

8  have come to the sincere belief that we who were present in

9  Charlottesville that day and who fought the Jew-directed

10 communist horde was present for the very genesis of the

11 resurrection of our folk.  The future will bring other similar

12 days."

13     That was the message he gave to you?

14 A    We're both reading that, yes.

15 Q    And he went on to say, "I have sent a report to you about

16 future matters via encrypted email."  Do you see that?

17 A    Uh-huh.

18 Q    What happened to those encrypted emails?

19 A    You're asking me about where an email from four years ago

20 went?  I have no idea.

21 Q    You did start having encrypted emails with League of the

22 South at that point, correct?

23 A     If I recall, all the email was encrypted around that time

24 period.

25 Q    All right.

J. Schoep - Direct

1  A    Well, not all.  Excuse me.  Anything that would have been

2  going through those -- like the Commander account.

3  Q    Now, if we can look at 3236B.  This is time stamp 16:20 to

4  16:41.  Do you recognize this as a video from Emancipation Park

5  on August 12th?

6           (Video playing.)

7  A    I don't know where this is.  This is in Charlottesville,

8  but I don't know if it's -- where exactly.

9  Q    All right.  You recognize that as being in Charlottesville

10 on August 12th?

11 A    Yes.

12           MR. ISAACSON:  I move to admit 3236B.

13           THE COURT:  Be admitted.

14           (Plaintiff Exhibit 3236B marked.)

15           (Plaintiff Exhibit 3236B admitted.)

16           MR. ISAACSON:  And if we can put that on the screen.

17           (Video playing.)

18 BY MR. ISAACSON:

19 Q    Do you recognize -- you saw people in black and khakis

20 there from the League of the South, as you've discussed,

21 correct?

22 A    There was League of the South members there, yes.

23 Q    And you saw yourself there in that video also?

24 A    No, I didn't.

25 Q    You saw members of NSM, though?

J. Schoep - Direct

1   A     It appeared that there was.  I don't know if I was in that

2   part or not.  I wasn't looking for myself in the video.

3   Q     Do you recall being together with members of the

4   Nationalist Front in Emancipation Park on August 12th?

5   A     Yes.

6   Q     I want to return to 2203, which has not been admitted.  I

7   represent to you, sir, that this was produced by you in

8   discovery.  And it has your name on it from a VK -- from VK.

9        So I will move -- on the basis that it was not objected

10  to, Your Honor, and it was produced by this witness, I would

11  move to admit it into evidence.

12            THE COURT:  Be admitted.

13            (Plaintiff Exhibit 2203 admitted.)

14   BY MR. ISAACSON:

15  Q     This is what you wrote on June 1st, 2017 --

16  A     I already explained to you, you said this is from VK and

17  then you showed me --

18  Q     Sir, there's no question.  There's no question pending.

19  It's been admitted into evidence.

20  A     Okay.

21  Q     The document says at the end, "One of my main goals in

22  this movement has been to get everyone on our side to fight

23  side by side against the enemies of our folk.  And those of you

24  standing against that mission, you stand in the way of

25  progress, and we are running out of time as a race.  So those

J. Schoep - Direct

 1  of you who want to fire into our own trenches are worse than

 2  any Zionist pig could ever hope to be.  See you soon.  We are

 3  rising and if we fail our race dies.  Simple as that."

 4      Is that consistent with words you would have been saying

 5  at that period of time?

 6  A    During that period of time, when I was in the movement,

 7  that's consistent with things that I would have said.

 8          MR. ISAACSON:  I would ask if we can put up 1468.

 9          (Plaintiff Exhibit 1468 marked.)

10  BY MR. ISAACSON:

11  Q    Do you see on your screen a Unite the Right after action

12  report from August 2017, sir?  Do you see that?

13  A    Yes.

14  Q    And that's written by Major Brian Culpepper.  I think

15  you're aware of that, right?

16  A    Okay.

17  Q    You recognize this document as an after action report

18  prepared by the National Socialist Movement following the

19  events in Charlottesville from the NSM website, correct?

20  A    I vaguely recall Brian writing something for an after

21  action report, yes.

22  Q    And after action reports were prepared quite often after

23  events that the NSM participated in, in order to inform your

24  membership and others about what was said at the event,

25  correct?

J. Schoep - Direct

1   A    Almost always.

2   Q    And after action reports were part of the regular business

3   of the National Socialist Movement?

4   A    Yes.

5             MR. ISAACSON:  I move to admit 1468.

6             THE COURT:  Be admitted.

7             (Plaintiff Exhibit 1468 admitted.)

8   BY MR. ISAACSON:

9   Q    I'm going to come back to this, but I also want to show

10  you Plaintiffs' Exhibit 1594A.  You had a magazine called NSM

11  Magazine -- the National Socialist Movement had a magazine

12  called NSM Magazine, correct?

13  A    Correct.

14  Q    We haven't put together the whole magazine here, but if

15  you look at 1594A, is that a copy of the magazine with the

16  table of contents, and then if you flip forward a few pages,

17  the after action report is there?

18  A    Okay.

19  Q    That's the same -- in addition to putting these things on

20  your website, you would also put them in your magazines,

21  correct?

22  A    This was all public information, correct.

23            MR. ISAACSON:  I move to admit Plaintiffs' Exhibit

24  1594A.

25            THE COURT:  Be admitted.

J. Schoep - Direct

1              (Plaintiff Exhibit 1594A marked.)

2              (Plaintiff Exhibit 1594A admitted.)

3   BY MR. ISAACSON:

4   Q    Now, Major Brian Culpepper, he had recently been promoted

5   from captain; is that right?

6   A    I don't know what year that took place.

7   Q    Could we show him Plaintiffs' Exhibit 1467.  This is just

8   to refresh.  This is an after action report dated July 2017.

9   So this is one month before the after action report we were

10  just looking at.  And if you see in the third paragraph there's

11  a reference to Captain Brian Culpepper?

12             (Plaintiffs' Exhibit 1467 marked.)

13  A    Okay.

14  Q    And in August he's signing his report "Major Brian

15  Culpepper."  Would you agree with me he had been promoted to

16  the highest rank you can achieve short of commander in the NSM?

17  A    As I stated earlier in my testimony, I believe major was

18  the highest rank we had at that time.

19  Q    So Plaintiffs' Exhibit 1468, let's go back to that.  This

20  is the after action report.  Looking at the third paragraph,

21  there's a discussion of August 11th.

22       It says, "Still, on Friday evening a torchlight march was

23  held in Charlottesville that went as planned with pro-white

24  supporters meeting almost no opposition in the streets."

25       That's what the after action report was reporting to the

J. Schoep - Direct

1  membership, correct?

2  A    Is this written by Culpepper or are you saying this was

3  written by me?

4  Q    I said this is an after action report written by

5  Culpepper, and this is what was being reported to the

6  membership, correct?

7  A    It appears so.

8  Q    Then in the next paragraph, you'll see now there's a

9  discussion of Saturday, August 12th.  And then in the paragraph

10  after that:  "As the formation moved out into the streets we

11  were met by a sight that is all too familiar to the streetwise

12  NSM and NF group" -- Nationalist Front -- "an unruly mob of

13  filthy left wing degenerates that exhibit the worst traits of

14  human character imaginable.  It was an unholy alliance of

15  homosexuals and blacks and self-hating whites were in the mix

16  as well as hardcore communists."

17      That's how NSM was describing the counter-protesters on

18  August 12th to its membership, correct?

19  A    If this is from an after action report, that would be

20  correct.

21  Q    And then in the next paragraph it says, "As the orderly

22  and disciplined Nationalist Front formation approached the

23  permitted rally area, a number of fistfights and other physical

24  confrontations broke out as leftists began a feeble effort to

25  try to stop the forward progress of the determined Nationalist

J. Schoep - Direct

1   Front column to reach our permitted rally point."

2       That attempt to stop you was described to your membership

3   as a feeble effort, correct?

4   A    That was typical rhetoric and marketing at the time, yes.

5   Q    Marketing?

6   A    Absolutely.  It's propaganda.

7   Q    Propaganda.  You're using the word "propaganda"?

8   A    Rhetoric, propaganda, marketing.

9   Q    So let me understand that.  Was propaganda --

10  A    But you're asking me to comment on Mr. Culpepper's

11  statement.  So this is speculation.

12  Q    I'm now going to ask you to comment on your own words.

13  A    Oh, so Culpepper's words are my words?  Is that what you

14  just said?

15  Q    Sir, let me ask you a question.  You used the term

16  "propaganda."  Are you saying that propaganda was something

17  that the National Socialist Movement used on a typical basis?

18  A    I would say that now, yes.  It is definitely propaganda.

19  Q    And when you say "propaganda," do you mean that they were

20  making false statements?

21  A    You would have to talk about a very specific thing.

22  You're asking me to speculate on specifics now.

23  Q    I want to know what you mean when you use the word

24  "propaganda."  When you use the word "propaganda," do you mean

25  the statement is false?

J. Schoep - Direct

1  A     Not necessarily.

2  Q     When you use the word "propaganda," do you mean the

3  statement is misleading?

4  A     When I'm talking about propaganda I'm talking about when a

5  movement group is talking about demonstrations and things like

6  that, there is embellishment.  There is making it sound

7  amazing.  I think I explained this in my original deposition

8  too, how these things work in these movements.

9  Q     I'm trying to understand what you're saying about truth

10 and falsity and what's misleading.  You used the word

11 "propaganda," you used the word "embellishment."  When you use

12 that, are you saying the statements are misleading, that they

13 should not be believed?

14 A     It depends what you're asking about.

15 Q     Was propaganda something typically used by the Nationalist

16 Front also?

17 A     I don't believe I said the Nationalist Front --

18          (Overlapping speakers.)

19          THE COURT:  Wait.  Wait.  Can you just answer the

20 question, was it used?

21          THE WITNESS:  Was propaganda used?

22 BY MR. ISAACSON:

23 Q     Yes.

24 A     What was the question?

25 Q     Was propaganda used by the Nationalist Front?

J. Schoep - Direct

1   A     I think propaganda is probably used by most organizations.

2   Q     And what about you individually?  When you were speaking

3   were you using propaganda as a tool?

4   A     At times.

5   Q     And is it your testimony that when the Nationalist -- that

6   the National Socialist Movement would use propaganda to

7   minimize the violence of your opponents?

8   A     I don't understand what you mean by that.

9   Q     So we just were looking at language saying your opposition

10  was feeble.  And you said that was propaganda.  Are you saying

11  that National Socialist Movement used propaganda to minimize

12  the strength of your opponents?

13          MR. REBROOK:  Objection, Your Honor.  Counsel is

14  testifying and misstating what's written in the document.  My

15  client has never referred to the opposition as feeble.  He said

16  their effort was feeble.

17          MR. ISAACSON:  He referred to that language as

18  propaganda, Your Honor.

19          THE COURT:  Overruled.  Go ahead.

20   BY MR. ISAACSON:

21  Q     What I'm asking is, when you said propaganda is being

22  used, are you saying the National Socialist Movement used

23  propaganda to minimize the strength of the opposition from your

24  opponents?

25  A     There's context here that needs to be explained.

J. Schoep - Direct

1   Q    Can I get a yes or no answer first?

2   A    I don't know if I can answer yes or no on that.

3   Q    Did sometimes -- did you -- was it a general tactic,

4   propaganda tactic of the National Socialist Movement to

5   minimize the strength of your opponents?

6   A    In that sense making the opponents sound weaker than they

7   really are, is that what you're asking me?

8   Q    Yes.  Yes.

9   A    Oh, all the time, sure.

10  Q    And is it your testimony that the National Socialist

11  Movement would also attempt to minimize any violence from

12  anything called Antifa?

13  A    What do you mean by that?

14  Q    Would you use propaganda to minimize any allegations of

15  violence against Antifa?

16  A    The National Socialist Movement was a legal organization

17  when I was running it.  I can't speak for what they do now.

18  But I can say that no one was allowed to attack anyone.  That's

19  why not one NSM member was arrested.

20  Q    You must be misunderstanding my question.

21  A    Perhaps.

22  Q    Okay.  So in describing violence by Antifa, would you use

23  propaganda and say, oh, it wasn't much, and minimize it as

24  opposed to emphasize it?

25  A    If I'm understanding your question or understanding your

J. Schoep - Direct

1  statement correctly, no, we wouldn't minimize what Antifa was

2  doing because Antifa was very violent.

3  Q    So you didn't use propaganda to minimize any violence by

4  your opponent, correct?

5  A    You're mincing words and I'm getting confused by it.

6  Q    So let's go back to Plaintiffs' Exhibit 1468, the after

7  action report by Major Culpepper.

8  A    So you're asking me to speculate what Mr. Culpepper --

9  Q    I'm going to ask you a question, sir.  It says on that

10 first page in that same paragraph, "Commander Schoep himself

11 decked a red with a single blow in self-defense after being

12 shoved by that individual."

13      Was that a true statement?

14 A    I was punched or shoved by somebody.  So I defended

15 myself.  That -- with that explanation --

16 Q    And then you decked the individual; you agree with that

17 statement?

18 A    I can't speculate -- you're asking me to speculate --

19 Q    I'm not asking you to speculate, sir.  I'm asking you to

20 tell me what you did.

21 A    I was struck and I defended myself.

22 Q    And did you deck that individual?

23 A    It depends what "deck" means.  You're asking me to

24 speculate what he means by "deck."

25 Q    Did you knock them to the ground?

J. Schoep - Direct

1    A    I was struck and I defended myself.

2    Q    And when you defended yourself, did you knock that person

3    to the ground?

4    A    There was things going on, violence going on --

5           THE COURT:  Well, don't you know -- if you remember

6    the person shoving you, if you hit him, did he go to the

7    ground?

8           THE WITNESS:  I believe so.

9     BY MR. ISAACSON:

10   Q    All right.  If we could look at page 2 of this report.  It

11   says in the first full paragraph:  "Our admiration and thanks

12   go out to the professionalism exhibited by the highly trained

13   men of the League of the South who took point in the shield

14   wall that pushed through the line of red opposition."

15       You remember that shield wall pushing through the

16   opposition that's described as red here, correct?

17   A    Again, we're reading from Mr. Culpepper's words?

18   Q    Yeah.  And you remember that shield wall pushing through

19   what are described here as a line of reds?

20   A    I don't recall.

21   Q    Then it says the skin crews that were there -- I'm sorry.

22   "As well as the very tough groups of skins that were right

23   there with them fighting their way through."

24       The Hammerskins and Blood & Honour Social Club, two skin

25   groups, were there with you on August 12th, correct?

J. Schoep - Direct

1   A    I don't recall every single group that was there.  If I

2   said that somewhere, then apparently they were there.

3   Q    Well, you knew the Hammerskins were a skinhead group,

4   right?

5   A    Sure.

6   Q    And you knew the Blood & Honour Social Club was a skinhead

7   group, correct?

8   A    Sure.  Yes.

9   Q    And you knew they were there on August 12th, correct?

10  A    They could have been there.

11  Q    And then you go on -- the report goes on to say in the

12  last sentence, "A few did get pepper spray or tear gas

13  injuries, but other than that they came away unscathed and once

14  again proved their mettle and value in these sort of street

15  confrontations."

16       In terms of what happened to your allies that day, you

17  came out pretty much unscathed; isn't that correct?

18  A    Again, you're asking me about Brian Culpepper's words, not

19  my own words.

20  Q    I'm asking you --

21  A    I can only speak for myself.

22  Q    I'm asking you to speak for yourself, sir.  Your after

23  action report says your people came out unscathed.  That's

24  consistent with your memory, isn't it?

25  A    I can speak for myself and I can say that some liquid was

J. Schoep - Direct

1  thrown on me.  My arms were burned that day and I was

2  physically attacked, as we just discussed.  And a lot of people

3  around me were physically attacked.  There was balloons and

4  things being thrown through the air.  There was chemical

5  agents.  There was stuff that burned your skin.  People around

6  me were covered in what smelled like urine that was being

7  thrown through balloons and things like that.  It was a

8  terrible day.  It was horrible.

9  Q    I would ask you to look at your -- I want to introduce

10 into the record your deposition, page 231, line 7 through 15.

11     Were you asked these questions -- 231, sir, lines 7

12 through 15.  "And when you left the rally, where did you

13 eventually go to?"

14     Answer:  "Back to the motel."

15     Question:  "Now at the motel were you with any injured

16 people?"

17     Answer:  "I don't think so."

18     Question:  "Do you recall anybody needing any medical

19 assistance at the motel?"

20     Answer:  "No."

21     Were you asked those questions and did you give those

22 answers?

23 A    Yes.

24 Q    I can ask you to look at page 169 of your deposition, line

25 22.  The question:  "Do you know any of your allies who were

J. Schoep - Direct

1  injured?"

2       Answer:  "I don't recall."

3       Were you asked that question and did you give that answer?

4  A    Apparently.

5  Q    If we can go back to Plaintiffs' Exhibit 1468, the after

6  action report.  And if we can go down to the paragraph towards

7  the bottom that begins "after we had assembled at McIntire

8  Park."  In the second sentence it says, "There was an incident

9  involving a vehicular death which now looks like it was in an

10 effort to disengage from an attacking mob of leftists against

11 an individual."

12      That's how you're reporting -- that's how the NSM was

13 reporting what happened with the car attack on August 12th to

14 its membership, correct?

15 A    This is from Mr. Culpepper's statement?

16 Q    Yes.

17 A    And what was the date on that particular statement?

18 Q    This is August 2017 after August 12th.

19 A    If you would like me to speculate on that statement, what

20 I believe he's saying there is --

21 Q    All I'm asking you is:  Is this what was said to the

22 membership about what happened with the car attack?

23 A    Apparently.  Like I said, I don't remember this.

24 Q    At the bottom of that page it says, "There were a few

25 minor incidents along the way in which the leftists lost

J. Schoep - Direct

1   miserably, as when they are not in masses they are typically

2   pathetically weak."

3        That's what was told to the membership, correct?

4   A    That would be typical rhetoric.

5   Q    Well, I'm sorry, I'm getting confused about rhetoric and

6   propaganda.  I thought you said that you would not minimize

7   violence by your opponents.  It was propaganda.  And here you

8   are saying there are only a few minor incidents along -- I'm

9   sorry, the report is saying there are only a few minor

10  incidents along the way in which leftists lost miserably, and

11  that they were pathetically weak.

12       That is not the type of thing that propaganda was doing,

13  minimizing violence by your opponents, right?

14  A    Again, you're asking me what Brian Culpepper is saying,

15  not what I said.  If you have something that I said, I can

16  clarify that.

17  Q    I'll move on because the record is, I think, fairly

18  complete about what you said earlier.

19       All right.  If we can look at Plaintiffs' Exhibit 2768.

20  Do you recognize this as a tweet from your account on

21  August 13th, 2017?

22  A    Yes.

23            MR. ISAACSON:  All right.  I move to admit 2768.

24  Your Honor.  I move to admit the tweet that is 2768.

25            THE COURT:  Be admitted.

238

J. Schoep - Direct

1           (Plaintiff Exhibit 2768 marked.)

2           (Plaintiff Exhibit 2768 admitted.)

3    BY MR. ISAACSON:

4    Q    If you look up at the screen, what you said the day after

5    is, "Self-defense is beautiful.  I knocked out an Antifa

6    scumbag who attacked us in Charlottesville.  Laid him out in

7    the street."

8         That's the same incident that you were referring to when

9    you said you knocked someone to the ground after you -- in

10   self-defense, right?

11   A    Correct.

12   Q    And you wrote, "Self-defense is beautiful"?

13   A    Yes, I said that.

14   Q    Right.

15           MR. ISAACSON:  I want to go back to the video, 3236.

16   And if we could look at 3236C.  This is from the same march

17   that we were looking at before.  This would be time-stamped

18   3:10 to 3:25.  And I would therefore move for its admission.

19           THE COURT:  Be admitted.

20           (Plaintiff Exhibit 3236C marked.)

21           (Plaintiff Exhibit 3236C admitted.)

22           MR. ISAACSON:  Please play this, Mr. Spalding.

23           (Video playing.)

24   BY MR. ISAACSON:

25   Q    That's a League of the South flag to your right and a

J. Schoep - Direct

1  Traditionalist Worker Party flag just -- I'm sorry.

2      You and a column of people are walking here and that's

3  Emancipation Park up ahead, right?

4  A    I don't see me in there.

5  Q    No, I didn't say -- this is your group, right?  This is a

6  column of people walking into Emancipation Park with the flags

7  of their organizations, correct?

8  A    It is from Charlottesville.  Appears to be, yes.

9  Q    All right.  And the next thing I would like to show you is

10 from the same video, time-stamped 3:29 to 3:35, 3236D.

11             MR. ISAACSON:  I would move to admit 3236D.

12             THE COURT:  Be admitted.

13             MR. ISAACSON:  All right.  We're going to have to do

14 this slowly, because it's six seconds.

15             (Plaintiff Exhibit 3236D marked.)

16             (Plaintiff Exhibit 3236D admitted.)

17 BY MR. ISAACSON:

18 Q    I would ask you to look in the middle.  Freeze it after a

19 couple of seconds.

20             (Video playing.)

21      Do you see yourself there?

22 A    No.

23 Q    Over on the right?

24 A    That's tough to say.

25 Q    All right.  Let's keep moving and see if you recognize

J. Schoep - Direct

1    yourself.

2            (Video playing.)

3        Stop.

4        Do you recognize yourself?

5    A    That's tough to say.

6    Q    All right.  Let's move it back and start it over.

7            (Video playing.)

8        That was you decking a counter-protester, right?

9            MR. REBROOK:  Objection, Your Honor.

10           THE WITNESS:  I didn't say that was me.

11    BY MR. ISAACSON:

12   Q    That's a question.

13       Let's run it through slow again for him.

14   A    You're asking me to identify someone from the back of

15   their head.

16           MR. ISAACSON:  Let's go back to 2:54 to 3:10.  And

17   this would be 3236E.

18           I move to admit 3236E.

19           THE COURT:  Be admitted.

20           (Plaintiff Exhibit 3236E marked.)

21           (Plaintiff Exhibit 3236E admitted.)

22           (Video playing.)

23    BY MR. ISAACSON:

24   Q    Do you recognize yourself?

25   A    That appears to be me here.  But I --

J. Schoep - Direct

1  Q    All right.  Let's go back to 3236D.

2  A    Now you're splicing the video together?

3  Q    Your counsel has the entire video.

4         (Video playing.)

5      That's your face there, isn't it?

6  A    I have a hard time identifying myself.

7         MR. ISAACSON:  Let's play it back.

8         THE COURT:  Were you in that group?  Were you in that

9  group, immediate group, walking with those people?

10        MR. ISAACSON:  Matt, can you freeze when the face

11 turns?  Keep going.

12 BY MR. ISAACSON:

13 Q    That's you, right?

14 A    I don't know.  It's tough to say.

15        THE COURT:  Well, look.  Sir, would you stand up and

16 turn your back to the jury?

17        THE WITNESS:  Sure.

18        THE COURT:  I think they can tell whether it's you or

19 not.

20        MR. ISAACSON:  And then would you give them a profile

21 also?

22        THE COURT:  Okay.  Okay.  Now let's move on.

23        MR. ISAACSON:  Yes, Your Honor.

24  BY MR. ISAACSON:

25 Q    Moving on, I would you to look at page 151 of your

J. Schoep - Direct

1   deposition, lines 10 through 19.  In your deposition were you

2   asked this question and did you give this answer?

3       Question:  "How many Antifa masks did you observe in

4   Charlottesville?"

5       Answer:  "How am I supposed to know that?  I mean, there

6   were tons of people there.  And, again, not everyone that was

7   there in opposition was Antifa, communists, anarchists, or

8   Black Lives Matter.  There was regular people as well as some

9   church groups or things like that.  So to guess how many were

10  violent and how many were not violent, I mean, I don't want to

11  speculate."

12      Did you give that answer in response to those questions?

13  A    Yes.

14          MR. ISAACSON:  Can we look at Plaintiffs'

15  Exhibit 2750?

16          (Plaintiff Exhibit 2750 marked.)

17  BY MR. ISAACSON:

18  Q    Is this a tweet by you on August 13th, 2017?

19  A    Yes.

20          MR. ISAACSON:  And I move to admit 2750.

21          THE COURT:  Be admitted.

22          (Plaintiff Exhibit 2750 admitted.)

23  BY MR. ISAACSON:

24  Q    There you say, "It was an honor to stand with you all in

25  Charlottesville," and you named the various groups.  And that

J. Schoep - Direct

1    includes CHS, the Confederate Hammerskins, the skinhead group,

2    correct?

3    A    Correct.

4    Q    If we can look at Plaintiffs' Exhibit 1596.  This is the

5    NSM magazine from the spring and summer of 2018 with a picture

6    of you on the bottom on the cover, correct?

7    A    Correct.

8    Q    All right.

9           MR. ISAACSON:  I move to admit 1596.

10          THE COURT:  Be admitted.

11          (Plaintiff Exhibit 1596 marked.)

12          (Plaintiff Exhibit 1596 admitted.)

13   BY MR. ISAACSON:

14   Q    You're in the bottom photo, because if we look at --

15   that's with Dr. Hill and others, correct?

16   A    Correct.

17   Q    And awards were being given at a League of the South

18   conference for valor at the Charlottesville rally; do you

19   remember that?

20   A    I don't recall what the League of the South was giving

21   awards for.

22   Q    Well, if you look at page 4, at the bottom it says awards

23   were given for valor in last year's Charlottesville rally by

24   Dr. Hill himself.

25          MR. ISAACSON:  It's in the very last line,

J. Schoep - Direct

1    Mr. Spalding.

2              THE WITNESS:  Okay.

3    BY MR. ISAACSON:

4    Q    You were there for those award presentations, correct?

5    A    I was there.

6    Q    Did you get an award?

7    A    I don't recall getting an award.

8    Q    All right.

9              MR. ISAACSON:  Plaintiffs' Exhibit 1484.

10             (Plaintiff Exhibit 1484 marked.)

11   BY MR. ISAACSON:

12   Q    This is a VK message between you and someone named Richard

13   on September 14th, 2017, correct?

14   A     Profile messages.

15   Q    Oh, I'm sorry.  I'm going to skip that.

16             MR. ISAACSON:  Let's move to 1810.

17             (Plaintiff Exhibit 1810 marked.)

18             MR. REBROOK:  Your Honor, I object to this entire

19   line of questioning as duplicative, cumulative, and irrelevant.

20   He's been on the stand now for hours.

21             MR. ISAACSON:  He has not been on the stand now for

22   hours.

23             MR. REBROOK:  It's now --

24             THE COURT:  Overruled.  Overruled.

25             Go ahead.

J. Schoep - Direct

1    BY MR. ISAACSON:

2    Q    Plaintiffs' Exhibit 1810 is an email that you wrote on

3    August 15th, 2017 to Mr. Heimbach, correct?

4    A    It appears to be.  I would not remember what email I sent

5    four years ago if my life depended on it.

6    Q    Well, let's see what you wrote here, sir.  This is

7    three days after August 12th.  That's your email address

8    writing to your friend Mr. Heimbach, correct?

9    A    That's what it appears to be.

10   Q    And you say in the middle where there's -- in the middle

11   it says, "This weekend we absolutely must keep up what we are

12   doing."

13            MR. ISAACSON:  Oh.  I move to admit 1810.

14            THE COURT:  Be admitted.

15            (Plaintiff Exhibit 1810 admitted.)

16            MR. ISAACSON:  In the middle, can you find there, "We

17   absolutely must keep up what we are doing"?  About ten lines

18   down and in the middle, "We absolutely must keep up."

19            A little higher, Mr. Spalding.  A little higher.

20   Keep going.  Right above "awesome."

21   BY MR. ISAACSON:

22   Q    "We absolutely must keep up what we are doing.  The

23   alliance between NSM, TWP, and the League is really awesome.

24   Dillon from Vanguard America also came over before the

25   barricades were pushed down looking for me to bring me over to

J. Schoep - Direct

1   the other side."

2       That's discussing what happened on August 12th, right?

3   A    According to the time stamp on the email.

4   Q    And if you move down a little bit, it says, "Your men and

5   the League fought well, brother.  I am going on NSM Radio and

6   Sonny's shows and other ones and I will be telling everyone of

7   the glory and bravery of the Nationalist Front groups and

8   leaders."

9       That's what you wrote to Mr. Heimbach, right?

10  A    That appears to be what I wrote at the time, yes.

11  Q    And then if we move down towards the bottom you write, "We

12  are actually finally fucking winning, and that's because we are

13  all on basically the same page."

14      That's what you told him, your view of what had happened

15  on August 12th, right?

16  A    That's a mischaracterization.

17  Q    Well, that's what you wrote him, right?

18  A    You're taking things out of context.  When I'm saying

19  we're winning, bringing the groups together at that period in

20  time -- white nationalist groups, they bicker.  They don't get

21  along.  So bringing groups together was a great victory, the

22  way I saw it at the time.

23  Q    Yeah.  Exactly.  And the other thing you thought at the

24  time was, it goes on to say, "We movement groups" -- the next

25  line, far left, right underneath "basically" -- "We movement

247

J. Schoep - Cross

1   groups have got to remain united or the enemy will fucking

2   destroy us.  And it's not Antifa I'm concerned about.  It's the

3   ZOG system that concerns me the most."

4        And "ZOG system" refers to Zionist occupied government

5   system, correct?

6   A    That's correct.

7             MR. ISAACSON:  I don't have any further questions.

8             THE COURT:  Well, wait, Mr. ReBrook.  You're

9   representing him.  Do others want to cross-examine first?

10            MR. SPENCER:  I have some brief questions.

11            Do you want to go first?  No?  Okay.

12            THE COURT:  Okay.  I just figured you could sum up,

13  Mr. ReBrook.

14            Go ahead.

15                      CROSS-EXAMINATION

16   BY MR. SPENCER:

17  Q    Hello.  My name is Richard Spencer and I'm representing

18  myself.

19       Mr. Schoep, until this very moment, have we ever met each

20  other?

21  A    No, sir.

22  Q    Have I ever been a member of any organization that you

23  have ever been involved with?

24  A    Not to my knowledge.

25  Q    Have we ever communicated in any digital platform?

248

J. Schoep - Cross

1   A      No.

2   Q      Mention was made, there was a -- is it called VR or VK,

3   Russian Facebook?

4   A      VK.

5   Q      Okay.  Ike Baker claimed that I had -- I don't see the

6   Plaintiffs' Exhibit right now, but this happened 15 minutes

7   ago.  I don't think I need to refresh your memory.

8         There was a claim made by Ike Baker that I -- or you,

9   perhaps, that I marched with you at some point.  Was that kind

10  of imaginative?

11  A      Yeah, I don't even recall seeing --

12             MR. ISAACSON:  Your Honor, objection, leading.

13             MR. SPENCER:  Do you remember that?

14             THE COURT:  It's not.

15             Go ahead.  Answer the question.

16   BY MR. SPENCER:

17  Q      Do you remember that at any point?

18  A      Marching with you?

19  Q      Yes.

20  A      No.

21  Q      Would it be fair to say that was maybe a bit imaginative?

22  A      I don't even know where that came from.

23  Q      Okay.  You don't even know where it came from.

24         Did I see you on August 11th?  That was the night of the

25  torch march?  Did our paths ever cross?

J. Schoep - Cross

1   A    No.  I was not at the torch march.

2   Q    You weren't at the torch march.

3        On August 12th, did our paths ever cross at any point?

4   A    Not that I'm aware of.

5   Q    Okay.  Who was the organizer of the Unite the Right rally?

6   A    Jason Kessler was the permit holder.

7   Q    Okay.  Who was your point man when you needed to talk to

8   someone about bringing your men to the rally?

9   A    Probably mostly Heimbach, Matt Heimbach.

10  Q    Mostly Heimbach?  Okay.  In terms of --

11  A    Well, let me explain that.  As far as, like, carpooling to

12  the JoAnn Fabrics and that sort of thing.

13  Q    Okay.  So in terms of carpooling.  In terms of the rally

14  itself, who was the point man for that rally, someone you or

15  Heimbach might have needed to talk to?

16  A    But that's -- I mean, I'd be speculating, because I

17  don't -- I don't know.  Kessler was the person that was the

18  permit holder.  I did have a couple of emails and one or two

19  phone conversations with him about it.

20            MR. SPENCER:  Thank you.  No further questions.

21            THE COURT:  Any other short questions?

22                      CROSS-EXAMINATION

23   BY MR. CAMPBELL:

24  Q    Good afternoon, Mr. Schoep.  I represent James Fields.

25        Prior to August 12, did you even know the name James

250

J. Schoep - Cross

1  Fields?

2  A    No, I didn't.

3  Q    Had you ever met or, to your knowledge, communicated in

4  any manner with James Fields?

5  A    No.

6  Q    Have you seen news articles, internet postings, and that

7  sort of thing so that you now recognize James Fields' face?

8  A    Yes.

9  Q    Does that give you any recollection, in your 25 years of

10 being involved in the movement, had you ever seen James Fields

11 before at any kind of event or anything along those lines?

12 A    Not that I recall.

13        MR. CAMPBELL:  Thank you, sir.  I don't have any

14 additional questions.

15        THE COURT:  Okay.

16                    CROSS-EXAMINATION

17  BY MR. JONES:

18 Q    Sir, plaintiffs' counsel asked you about this video by NSM

19 Media.  Do you recall that?

20 A    I recall them asking me, yes.

21 Q    And NSM Media was run by the National Socialist Movement

22 at the time of Charlottesville?

23 A    Correct.

24        MR. JONES:  Your Honor, I'm going to move to

25 introduce the entire video PX-3236 into evidence.

J. Schoep - Cross

1              MR. ISAACSON:  No objection.

2              THE COURT:  Be admitted.

3              (Defense LOS Exhibit 3236 marked.)

4              (Defense LOS Exhibit 3236 admitted.)

5    BY MR. JONES:

6    Q    Now, when you marched with the group of -- from Market

7    Street parking garage to the park -- do you recall marching?

8    A    Yes.

9    Q    Vanguard America was not part of that group, were they?

10   A    Correct.  They were not.

11   Q    And from where you were standing, were you able to see

12   Michael Tubbs in the front of the line?

13   A    I don't recall.  I don't recall for sure.

14   Q    You were -- do you recall where you were standing in

15   relation to the League of the South and the front of the line?

16   A    Somewhere behind the League of the South, but I moved

17   around fluid.  So I wasn't in one place at one time.

18   Q    But you don't have any memory of seeing Michael Tubbs at

19   the front of the column?

20   A    I don't recall for sure.

21              MR. JONES:  Thank you.  That's all the questions I

22   have.

23              THE CLERK:  Mr. Smith would like to go.

24              THE COURT:  All right.  Mr. Smith?

25              Mr. Smith?

J. Schoep - Cross

1        Okay.  If he's not here, we'll move on.

2        THE CLERK:  It's me not hitting the button right.

3   I'm sorry.

4        Now.

5        MR. SMITH:  Hi, Your Honor.  Can you hear me okay?

6        THE COURT:  Yes.

7                    CROSS-EXAMINATION

8    BY MR. SMITH:

9   Q    Okay.  I just have a couple of questions.  Mr. Schoep, can

10  you hear me?

11  A    Yes.

12  Q    Great.  So this Nationalist Front thing, was there ever a

13  formal document outlining the scope of what the organization --

14  what the organization, like, did for its member groups or

15  anything like that?

16  A    Not that I recall.  It's possible, but I don't recall.

17  It's been a few years.

18  Q    Nothing that was ever, like, signed by all the parties or

19  something like that, right?

20  A    Not that I recall, anything like that.

21  Q    Okay.  And was there ever any kind of understanding that

22  the organization -- that such an organization would be somehow

23  responsible for the activities or actions or conduct of the

24  member organizations?

25  A    No.  In fact, there was -- if I'm recalling correctly,

253

J. Schoep - Cross

1  there was some sort of -- some sort of statement that basically

2  said that all of the groups that were part of the Nationalist

3  Front functioned independently and on their own, and that there

4  was no leader of the Nationalist Front, per se, that all groups

5  operated independently, had their own customs, culture, so on

6  and so forth.

7  Q    I see.  So it was really just like a political alliance,

8  right?

9  A    Yes.

10       MR. SMITH:  Okay.  Thank you.  No further questions.

11       THE COURT:  Mr. Cantwell, you have about

12  five minutes.

13       MR. CANTWELL:  I'll start.

14       THE COURT:  All right.

15                    CROSS-EXAMINATION

16  BY MR. CANTWELL:

17  Q    Hello, Mr. Schoep.

18  A    Hello.

19  Q    You attended a rally in Pikeville, Kentucky, right?

20  A    Yes.

21  Q    Anybody get hurt in Pikeville?

22  A    No.

23  Q    Do you remember some talk about a phrase, "the Pikeville

24  model"?

25  A    Vaguely.

J. Schoep - Cross

1  Q    Do you have any recollection of what the Pikeville model

2  was or what it referred to?

3  A    Probably a peaceful demonstration.

4  Q    Did it have anything to do with law enforcement?

5  A    I'm not sure if I know the specific document, but

6  typically these rallies were peaceful and the police kept both

7  sides separate and that's how they went.

8  Q    Plaintiffs played for you a video of your speech from

9  that.  I'm not going to pull it up because we're short on time,

10 but do you recall something about the police being there to

11 protect them?

12 A    Yeah.

13 Q    Can you describe what the police barrier was in Pikeville

14 that day?

15 A    In Pikeville they had some metal; if I remember correctly,

16 they had metal fences.  They had police blocking both sides.

17 Typically when these groups come together there's violent

18 clashes, and as you demonstrated earlier today, a lot of them

19 were carrying weapons.  So this is why people carry shields.

20 Q    Did anybody --

21        MR. ISAACSON:  Objection to him testifying about what

22 Mr. Cantwell did earlier today, Your Honor.  I would ask that

23 that be stricken.

24        THE COURT:  All right, if he did so testify.

25        MR. ISAACSON:  He's now referring to things

J. Schoep - Cross

1  Mr. Cantwell said in questions earlier today and calling them

2  things that Mr. Cantwell demonstrated.

3         THE WITNESS:  I assumed that was evidence, Your

4  Honor.  That's why I --

5         THE COURT:  All right.  Start another question.

6   BY MR. CANTWELL:

7  Q    Why did you want the police to keep us separate?

8  A    So there wouldn't be violence.

9  Q    And was it your understanding that law enforcement had

10 been coordinated with when you came to Charlottesville?

11 A    I didn't -- I really didn't have anything to do with that

12 part of things for Charlottesville.  It wasn't my rally.  So I

13 was just showing up.  I assumed all that was taken care of.

14 Q    Did you understand Charlottesville -- who did you

15 understand to be handling the arrangements?

16 A    I would have assumed Jason Kessler would be handling that.

17 He was the permit holder.

18 Q    Okay.  So you understood Jason Kessler to have obtained

19 the permit?

20 A    I understood that much, yes.

21 Q    Okay.  At Pikeville, did you and I meet?

22 A    I'm not sure.

23 Q    Would it be fair to say if we met, it was unmemorable?

24 A    It was -- if we met, it would have been very brief.

25 Q    Okay.  Have I ever been a member of the National Socialist

256

J. Schoep - Cross

1   Movement --

2   A    No.

3   Q    -- to the best of your knowledge?

4   A    No.

5   Q    Are you aware of an effort to recruit me into the National

6   Socialist Movement?

7   A    No, I wasn't.

8   Q    Okay.

9         MR. CANTWELL:  No further questions.

10        THE COURT:  Okay.  Thank you.  All right.

11        Mr. ReBrook, have you got more than three minutes?

12        MR. REBROOK:  It's substantially more, Your Honor.

13        THE COURT:  I'm sorry.

14        MR. REBROOK:  Quite a bit more, Your Honor, yes.

15        THE COURT:  Okay.  Well, we may as well start on

16  Monday.

17        Members of the jury, we're going to recess now until

18  Monday morning at 9 o'clock.  Ask you to be back -- meet at the

19  appropriate place at 9 o'clock.  Do not discuss -- be here in

20  court at 9, anyway.

21        Do not discuss the case or allow anyone to discuss it

22  with you.  Do not remain within hearing of anyone discussing

23  the case.  Do not read, listen, or otherwise obtain any

24  information about the case.

25        So recess court until 9 o'clock Monday morning.

J. Schoep - Cross

1    **(Jury out, 4:57 p.m.)**

2    (Proceedings adjourned, 4:57 p.m.)

J. Schoep - Cross

1                   C E R T I F I C A T E

2        I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3   the United States District Court for the Western District of

4   Virginia, appointed pursuant to the provisions of Title 28,

5   United States Code, Section 753, do hereby certify that the

6   foregoing is a correct transcript of the proceedings reported

7   by me using the stenotype reporting method in conjunction

8   with computer-aided transcription, and that same is a

9   true and correct transcript to the best of my ability and

10   understanding.

11        I further certify that the transcript fees and format

12   comply with those prescribed by the Court and the Judicial

13   Conference of the United States.

14        /s/ Lisa M. Blair              Date: November 12, 2021

15

16

17

18

19

20

21

22

23

24

25