Sines, et al. v. Kessler, et al., 3:17CV72, 11/15/2021

1                      UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF VIRGINIA
2                        CHARLOTTESVILLE DIVISION


3   **************************************************************

4   ELIZABETH SINES, ET AL.,     CIVIL CASE NO.:  3:17CV72
                                 NOVEMBER 15, 2021, 8:59 AM
5                                JURY TRIAL, DAY 16
            Plaintiffs,
6   vs.

7                                Before:
                                 HONORABLE NORMAN K. MOON
8   JASON KESSLER, ET AL.,       UNITED STATES DISTRICT JUDGE
                                 WESTERN DISTRICT OF VIRGINIA
9
            Defendants.
10
    **************************************************************
11
    APPEARANCES:
12

13  For the Plaintiffs:      ALAN LEVINE, ESQUIRE
                             COOLEY LLP
14                           1114 Avenue of the Americas, 46th
                             Floor
15                           New York, NY  10036
                             212.479.6260
16
                             DAVID E. MILLS, ESQUIRE
17                           COOLEY LLP
                             1299 Pennsylvania Avenue, NW,
18                           Suite  700
                             Washington, DC  20004
19                           202.842.7800

20

21

22  Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                     255 West Main Street, Suite 304
23                   Charlottesville, Virginia  22902
                     434.296.9284
24

    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25  TRANSCRIPT PRODUCED BY COMPUTER.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/15/2021

1  APPEARANCES CONTINUED:

2  For the Plaintiffs:            YOTAM BARKAI, ESQUIRE
                                  MICHAEL L. BLOCH, ESQUIRE
3                                 EMILY C. COLE, ESQUIRE
                                  ROBERTA A. KAPLAN, ESQUIRE
4                                 Kaplan Hecker & Fink LLP
                                  350 Fifth Avenue, Suite 7110
5                                 New York, NY  10118
                                  212.763.0883
6
                                  KAREN L. DUNN, ESQUIRE
7                                 MAKIKO HIROMI, ESQUIRE
                                  WILLIAM A. ISAACSON, ESQUIRE
8                                 ARPINE S. LAWYER, ESQUIRE
                                  JESSICA E. PHILLIPS, ESQUIRE
9                                 Paul, Weiss, Rifkind, Wharton &
                                  Garrison LLP
10                                2001 K Street, NW
                                  Washington, DC  20006
11
   For the Defendants:           DAVID L. CAMPBELL, ESQUIRE
12                                Duane, Hauck, Davis, Gravatt &
                                  Campbell, P.C.
13                                100 West Franklin Street, Suite 100
                                  Richmond, VA  23220
14                                804.644.7400

15                                CHRISTOPHER CANTWELL, PRO SE
                                  #00991-509
16                                USP Marion
                                  4500 Prison Road, PO Box 2000
17                                Marion, IL  62959

18                                BRYAN J. JONES, ESQUIRE
                                  Bryan J. Jones, Attorney at law
19                                106 W. South Street, Suite 211
                                  Charlottesville, VA  22902
20                                540.623.6952

21                                JAMES E. KOLENICH, ESQUIRE
                                  Kolenich Law Office
22                                9435 Waterstone Blvd., Suite 140
                                  Cincinnati, OH  45249
23                                513.444.2150

24

25

1   APPEARANCES CONTINUED:

2   For the Defendants:          WILLIAM E. REBROOK, IV, ESQUIRE
                                 (Appearing via Zoom)
3                                The ReBrook Law Office
                                 6013 Clerkenwell Court
4                                Burke, VA  22015
                                 571.215.9006
5
                                 JOSHUA SMITH, ESQUIRE
6                                (Appearing via Zoom)
                                 Smith LLC
7                                807 Crane Avenue
                                 Pittsburgh, PA  15216
8                                917.567.3168

9                                RICHARD SPENCER, PRO SE
                                 P.O. Box 1676
10                               Whitefish, MT  59937

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
1                         INDEX OF WITNESSES

2    WITNESSES ON BEHALF OF THE PLAINTIFF:              PAGE

3    JEFF SCHOEP (Continued)

4     Cross-Examination by Mr. ReBrook                   14
      Redirect Examination by Mr. Isaacson              40
5
     JASON KESSLER
6
      Direct Examination by Ms. Dunn                     49
7     Cross-Examination by Mr. Spencer                  160
      Cross-Examination by Mr. Cantwell                 178
8     Cross-Examination by Mr. Campbell                 187
      Cross-Examination by Mr. ReBrook                  188
9     Redirect Examination by Ms. Dunn                  189

10   CHRISTOPHER CANTWELL

11    Direct Examination by Mr. Bloch                   195
      Cross-Examination by Mr. Spencer                  272
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3        EXHIBIT:              Marked    Received

 4        2771                    42        42

 5        2267                    46        46

 6        1382                    51        51

 7        0552                    52        53

 8        0551                    55        55

 9        1395                    57        57

10        1461B                   58        59

11        3548                    62        62

12        0968                    63        63

13        3879                    70        70

14        1460B                   71       156

15        0190                    71        71

16        3258O                   78        78

17        3258O.01                79        79

18        3258O.02                80        80

19        1433A                   85        86

20        1431A                   85        86

21        1437B                   86        86

22        3560                    87        88

23        1432A                   90        90

24        1034                    92        92

25
```

```
 1                    INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3        EXHIBIT:                Marked      Received

 4        0952                      94          94

 5        1461C                     95          95

 6        0699                      97          98

 7        1444A                     98          98

 8        1444C                    100         100

 9        1444D                    102         102

10        1458A                    104         104

11        1458B                    104         104

12        1458C                    104         104

13        1458D                    104         104

14        1460D                    105         105

15        1396                     107         107

16        3841                     109         109

17        1306A                    111         111

18        1306B                    111         111

19        1306C                    111         111

20        0973                     113         113

21        2348                     121         121

22        2676                     124         124

23        1031                     130         131

24        2082                     131         131

25        3797                     132         132
```

```
 1                           INDEX OF EXHIBITS

 2    EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3    EXHIBIT:                 Marked    Received

 4          1458J                         133        133

 5          1458K                         133        133

 6          1458L                         133        133

 7          1458M                         133        133

 8          1458N                         133        133

 9          2165                          138        138

10          3805                          139         139

11          3247A                         140         140

12          3795                          141         141

13          3927                          143         143

14          3925                          143        143

15          1925A                         145        145

16          2538B                         146        146

17          1450                          147        147

18          1458O                         148        148

19          1458P                         149        149

20          1458Q                         149        149

21          0332                          151        151

22          1448                          153        153

23          2016A                         153        153

24          3934                          155        155

25          1458S                         158        158
```

```
 1                        INDEX OF EXHIBITS

 2   EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3        EXHIBIT:                Marked     Received

 4        3253B                     159        159

 5        1458J                     191        191

 6        3098A                     192        192

 7        2760                      193        193

 8        3523                      194        194

 9        3524                      195        195

10        3889                      197        197

11        2658                      199        199

12        2664                      200        200

13        3885                      202        ---

14        2707A                     203        203

15        2713A                     204        204

16        2712A                     205        205

17        2706A                     206        206

18        2644                      207        207

19        2633                      209        ---

20        1886A                     211        211

21        2584                      212        212

22        2710A                     215        215

23        1981                      219        219

24        0185                      221        221

25        0187                      222        222
```

```
 1                            INDEX OF EXHIBITS

 2  EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3        EXHIBIT:                  Marked      Received

 4        0191                         223          223

 5        2610                         229          229

 6        2912                         230          230

 7        2571                         231          232

 8        2243                         232          232

 9        2612                         233          ---

10        3348A                        236          236

11        2103A                        241          241

12        0325A                        242          243

13        0188                         245          245

14        2721                         247          247

15        CCEX153F                     249          ---

16        0184                         251          251

17        2103B                        252          252

18        CCEX0004A                    253          253

19        CCEX0004B                    253          253

20        2103B                        255          255

21        1329                         258          258

22        2103F                        260          260

23        1994                         260          260

24        2250                         267          267

25        2705B                        268          268
```

```
1                        INDEX OF EXHIBITS

2    EXHIBITS ON BEHALF OF THE DEFENDANTS:

3         EXHIBIT:                Marked    Received

4         2137                     271       271

5         RS-1001                  173       173

6         CC-10                    183       183

7         RS-1005                  276       276

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   (Proceedings commenced, 8:59 a.m.)

2              THE COURT:  Call the case.

3              THE CLERK:  Yes, Your Honor.  This is Civil Action

4   Number 3:17-cv-00072, Elizabeth Sines and others versus Jason

5   Kessler and others.

6              THE COURT:  Plaintiffs ready?

7              MS. KAPLAN:  We are, Your Honor.

8              THE COURT:  Defendants ready?

9              MR. KOLENICH:  Yes, Judge.

10             THE COURT:  Before we begin, I will remind everyone

11  again that under Standing Order 2020-12 and 2013-8, the

12  prohibition against recording and broadcasting court

13  proceedings remains in force.  Attorneys, parties, or their

14  staff, and any members of the public or press accessing this

15  proceeding today, may not record or broadcast it.  That means

16  no photography, no using of any video or audio recording

17  device, no rebroadcasting, livestreaming or otherwise

18  disseminating any live or recorded video or audio of this

19  proceeding.

20             Now, there are several matters -- first of all, I got

21  a letter concerning Mr. Schoep's post-litigation repudiation of

22  white supremacy.  And I'm going to adhere to the ruling I made

23  yesterday.  I note the main authority cited by the plaintiffs,

24  *Swinton v. Potomac,* held that a district court may in its

25  discretion allow a defendant to introduce evidence of remedial

12

1  conduct as a means to mitigate punitive damages.  And I think

2  an appropriate limiting instruction should be given.

3         Secondly, the Court is aware that plaintiff will be

4  continuing to present their case in chief today.  Now, you can

5  finish up today, can you not?

6         MS. KAPLAN:  I don't think so, Your Honor.  We now

7  have to call --

8         THE COURT:  Did you plan to take the whole four

9  weeks?

10         MS. KAPLAN:  No.

11         THE COURT:  Well, how could you possibly have tried

12  this case in four weeks and not give time for instructing and

13  jury argument and the jury to deliberate?

14         MS. KAPLAN:  So Your Honor, my understanding is I

15  still think the case will end in four weeks.  I think if

16  Mr. Spencer -- let me back up.  If Mr. Cantwell and Kessler are

17  going to give their testimony as part of our exam, which is now

18  what I understand, then what I understand is left for the rest

19  of this week is -- let me try to get to it from memory,

20  Mr. Spencer, Mr. Hamblin, Mr. Newberry, and potentially

21  Messrs. Parrott and Heimbach.  We believe that all can get done

22  this week.

23         THE COURT:  All right.

24         MR. CANTWELL:  Judge, I'm not sure we're seeing eye

25  to eye here.  This is Christopher Cantwell.

13

1            THE COURT:  Well, I mean, I don't think there need be

2    any discussion.  I'm just going to tell the plaintiff, try to

3    finish your case today.  I mean, when you, you know, call

4    somebody as an adverse witness, you don't have to spend 80

5    percent of the time trying to impeach the witness.  Call them

6    and -- the idea of calling an adverse witness is they know

7    something that will help your case.  Just to attack their

8    credibility I don't think is what it's all about.

9            MS. KAPLAN:  We will do our best, Your Honor.

10            THE COURT:  I thought it was a great improvement on

11    Friday in that respect.

12            MS. KAPLAN:  We saw that you saw that, Your Honor.

13    We'll do our best.  Obviously we have facts we need to prove

14    through adverse witnesses, but we will certainly do our best.

15            THE COURT:  All right.  Okay.  Call --

16            MR. CANTWELL:  There's another small matter, Judge.

17    I conferred with Mr. Bloch over the weekend about this issue

18    with my body camera video and mentions of the injunction in it.

19    Whether they call me or I call myself, I suspect that that's

20    going to come up and I think that we're going to need Your

21    Honor to issue a ruling on what portions of this are going to

22    be admissible before that happens.

23            THE COURT:  Is that coming up today?  Well, look, we

24    don't have to take it up now.  We have a jury that's angry, I'm

25    telling you.  So let's get them in here and we'll take it up...

                            J. Schoep - Cross

 1              MR. CANTWELL:  Okay.

 2              THE CLERK:  The first witness will be Mr. Schoep

 3    again, with cross by his attorney on video.  So both of them

 4    will be on the screen.

 5              THE COURT:  Mr. ReBrook there?

 6              THE CLERK:  Yes, they're both here.  It's just -- it

 7    only shows the last one.

 8    **(Jury in, 9:04 a.m.)**

 9              THE COURT:  All right.  Good morning, ladies and

10    gentlemen.  Happy to see you back this morning.  We'll proceed

11    with the witness who was on the stand Friday.

12              Mr. ReBrook, you may proceed.

13              MR. REBROOK:  Thank you, Your Honor.  Can you hear me

14    okay?

15              THE COURT:  Yes.

16              MR. REBROOK:  Excellent.

17       JEFF SCHOEP, CALLED BY THE PLAINTIFFS, PREVIOUSLY SWORN

18                          CROSS-EXAMINATION

19    BY MR. REBROOK:

20    Q    Mr. Schoep, good morning.

21    A    Good morning.

22    Q    Am I pronouncing your name correctly, Schoep?

23    A    Yes, sir.

24    Q    Okay.  As discussed on Friday, you were the former head of

25    the National Socialist Movement; is that correct?

J. Schoep - Cross

1  A     That's correct.

2  Q     Is that the same thing as the NSDAP, the National

3  Socialist Democratic Workers' Party?

4  A     The National Socialist German Workers Party has not

5  existed since 1945.  It was defunct in '45.  So it's not the

6  same.

7  Q     How old were you when you initially became involved in

8  white nationalism?

9  A     My interest in white nationalism came at a very young age,

10  about 12 years old, around that time period.  My grandfather

11  had fought in the German army during World War II, my great

12  uncle did as well.  So I had a fascination with white

13  nationalism from a very young age.

14          MR. ISAACSON:  Your Honor, I apologize for

15  interrupting.  The jury can't see this.

16          THE COURT:  Did you cut it on?

17          THE CLERK:  It's on.

18          MS. KAPLAN:  Now it's on.

19          THE CLERK:  Thank you.

20          THE COURT:  Thank you.  Go ahead.

21          MR. REBROOK:  Good to go?

22          THE COURT:  Go ahead.

23   BY MR. REBROOK:

24  Q     Okay.  Mr. Schoep, you mentioned in your testimony on

25  Friday that you no longer support white nationalism.  You do

J. Schoep - Cross

1  realize, of course, that your culpability in this case has

2  nothing to do with your current beliefs, correct?

3  A    Correct.

4  Q    Okay.  Was there a conspiracy that you recall?

5  A    I don't recall any conspiracy whatsoever regarding this

6  case or this matter.  I wouldn't have participated in something

7  that involved any sort of conspiracy.

8  Q    Does your change of world view have anything to do with

9  the fact that you are being sued right now?

10  A    Absolutely not.  A person does not change their entire

11  world view or their entire life -- in my case, I was involved

12  in this stuff unfortunately for 27 years.  You don't change

13  your entire life because you've been sued in a lawsuit.

14  Q    Does it have anything to do with the outcome of the rally

15  itself?

16  A    I wouldn't say so.  I mean, obviously the rally was, you

17  know, heartbreaking.  No one should ever, ever lose their life

18  or be injured in a horrific way like what took place at Unite

19  the Right.  It's heartbreaking, you know.  But to answer your

20  question, no, it doesn't have anything to do with -- my change

21  of view doesn't have anything to do with this lawsuit.

22  Q    So how do you feel about the -- about what happened to the

23  persons injured by James Alex Fields?

24  A    I think it's horrific.  It doesn't make sense to me how

25  anyone could go to an event and plan to harm somebody.  It just

J. Schoep - Cross

 1  didn't register.  When I found out about it --

 2          MR. CAMPBELL:  Objection, Your Honor.  The witness is

 3  speculating about the mindset of another.

 4          THE COURT:  Sustained.

 5          MR. REBROOK:  I'll move on.

 6          THE COURT:  He can testify to the change of his

 7  views, but with respect to anyone else, he may not testify.

 8   BY MR. REBROOK:

 9  Q    Okay.  On Friday you had mentioned --

10          THE COURT:  Let me say one other thing on this

11  particular subject to instruct the jury.  And I've told you

12  this before, but under the rules of evidence, some evidence may

13  be admitted only for a limited purpose.  Mr. Schoep was allowed

14  to testify about his alleged renunciation of his white

15  supremacy and related conduct, all of which occurred over a

16  year after the events at issue in this case.

17          That testimony is not a defense to any of the claims

18  in this case.  As a result, that testimony may only be

19  considered for the sole and limited purpose of determining the

20  proper amount of punitive damage, if any, only against

21  Defendant Schoep.

22          All right.  You may proceed.

23          MR. REBROOK:  Thank you, Your Honor.

24   BY MR. REBROOK:

25  Q    On Friday the plaintiffs went through some verbal back and

J. Schoep - Cross

1   forth with you about the meaning of the words "propaganda,"

2   "rhetoric," and "hyperbole."  Can you clarify that for me a

3   little bit?

4   A    Well, I'm not an English teacher as far as that goes, but

5   what I can say about rhetoric and things of that nature is at

6   rallies over the years, you could have a rally with two guys,

7   three guys on a street corner and it would have been an utter

8   failure.  And you would say in the movement, or we would say, I

9   would say that the rally was a great success, even though two

10  or three people showed up.  Obviously, it was a horrible

11  failure in a case like that, but the rhetoric or the

12  propaganda, the things that the movement would say would be to

13  classify it as a great victory or winning a great battle.

14  We've heard a lot of talk of these kind of words, victory,

15  battles.  These are common in any sort of political arena.

16  Q    So would "spin" be a more accurate way of describing that?

17  A    "Spin" is a perfect way of describing it, yes.

18  Q    Okay.  Do you still agree that Unite the Right was a

19  success, as you tweeted the day after the rally?

20  A    Absolutely not.  It was a horrible disaster.  As I said --

21  and that would be the spin or the rhetoric there, you know, at

22  the time, as the leader of the National Socialist Movement, it

23  was my job, per se -- or I felt it was my job -- to make

24  anything that we participated in sound like a great success.

25  But in my heart and in reality it certainly wasn't.

J. Schoep - Cross

1    Q    Okay.  So without any spin at all, what in your mind does

2    a successful rally look like?

3    A    A successful rally would be something where the people

4    that hold the permit, the permit-holders get out there and have

5    their say, right or wrong, and the other side can come out

6    there and protest peacefully, and everyone gets to go home safe

7    and sound.  That's typically, over my 27-year history in the

8    white nationalist movement, that was the typical thing that

9    would take place at rallies such as this.

10   Q    Okay.  And roughly how many white nationalist rallies have

11   you participated in over the years?

12   A    It's hard to put an exact number on that, but I would say

13   somewhere in the lines of 70, 80 events total, maybe 50 events

14   that I led from the -- from NSM-sponsored events, and then an

15   additional 20, 30 events that I attended from other

16   organizations.

17   Q    Okay.  And at all the rallies you attended, how many NSM

18   members have been arrested over the years at those rallies?

19   A    None.  And that is something that I --

20          MR. ISAACSON:  Objection, Your Honor.  Objection.

21   Move to strike.  You've ruled before on this issue.

22          THE COURT:  Sustain the objection.  Strike the

23   answer.

24    BY MR. REBROOK:

25   Q    In one of the plaintiffs' exhibits someone had mentioned

J. Schoep - Cross

1  that you decked a guy, and you wrote that self-defense was a

2  beautiful thing.  Can you go into a little more detail about

3  that for me?

4  A    Well, the organization that I was part of that I led, we

5  had at the time -- there was very strict rules in place against

6  doing anything illegal, especially at a rally.  No one was ever

7  arrested at a rally from the side of NSM.

8            MR. ISAACSON:  Objection.  Your Honor.  Objection.

9  Move to strike.

10            THE WITNESS:  This is absolutely relevant to my

11  defense.

12            THE COURT:  Mr. Schoep, the Court will have to rule.

13            Members of the jury, we are here about what happened

14  at the Unite the Right rally, not what happened at others.  I

15  mean, it's -- the question is was there a conspiracy to come to

16  this rally and commit racially motivated violence.  And so the

17  fact that people, as I've told you, were arrested, not

18  arrested, but if they -- I'm not going to tell you to totally

19  disregard whether in the past.  The question is was this --

20  what they planned to do when they came to this particular

21  rally, not what was done in other rallies.

22   BY MR. REBROOK:

23  Q    Let me clarify my question for you, Mr. Schoep.  I'm

24  asking you to specifically tell me what happened where you

25  ended up striking a person.

J. Schoep - Cross

1   A    I was assaulted, so I defended myself.

2                THE COURT:  Go back, Mr. ReBrook.  You have shown

3   that there was violence at other rallies.  You've put on -- the

4   plaintiffs have put on evidence that there was violence at

5   other rallies.  Correct?

6                MR. REBROOK:  Are you asking me, Your Honor?

7                THE COURT:  No.  I'm asking the plaintiff.

8                THE WITNESS:  If there was violence at other rallies?

9                THE COURT:  You're not the plaintiff.

10                MR. ISAACSON:  Yes, Your Honor, we have -- for

11   example, the --

12                THE COURT:  Why wouldn't it be relevant if --

13                MR. ISAACSON:  My objection was to whether someone

14   was or was not arrested at any event, which you have ruled on.

15                THE COURT:  Well, what I ruled on the arrest is that

16   the arrest has nothing to do with the guilt or innocence of the

17   person in the civil case.  But if his experience with the way

18   he conducted himself -- if he did the same thing in this case

19   that he did in others, then that may be relevant.

20                MR. ISAACSON:  Yet my objection was --

21                THE COURT:  If he says that was --

22                MR. ISAACSON:  My objection was specific to the issue

23   of whether people were arrested or not arrested, which you have

24   ruled on.  I'm not objecting to the rest of the testimony.

25                THE COURT:  Okay.  The fact that someone was arrested

J. Schoep - Cross

1  doesn't make any difference.  The question is violence, is the

2  point I've tried to make, the fact that whether there was

3  violence at this incident, Unite the Right, does not depend on

4  who or who was not arrested, nor would it depend on who or who

5  was not arrested at some previous event.  Violence is violence,

6  irrespective of charges or convictions that may have come out

7  of it.

8        All right.  You may proceed.

9        MR. REBROOK:  Thank you, Your Honor.

10  BY MR. REBROOK:

11  Q   We saw a video on Friday that showed someone punching

12  someone.  Was that you?

13  A   I don't want to speculate if that was me or not.  We went

14  over that on Friday.  But I do want to say that I did defend

15  myself that day after I was assaulted.

16  Q   Okay.  And when you defended yourself, what was -- can you

17  recall the ethnicity of the person you punched?

18  A   I believe the person was white.

19  Q   Okay.  So it wasn't racially motivated?

20  A   Absolutely not.

21  Q   The plaintiff showed a communication where you said that

22  you would be prepared for violence.  What did you mean by that?

23  A   That was a standard operating procedure, and I do feel

24  like I need to clarify that, as I feel my words were twisted on

25  that, or misrepresented, excuse me.

23

J. Schoep - Cross

1      When I say -- when I put out messaging at that time when I

2  was involved in the movement about preparing for violence, that

3  was preparing for violence against us.  Because of the nature

4  of some of the violence at -- through my experience over all

5  those years, self-defense was very important.  A lot of times

6  there was projectiles, including at Unite the Right.  The other

7  side was well armed with clubs, baseball bats, poles, you name

8  it.  There was so much pepper spray and tear gas and other

9  chemicals in the air, it was unbelievable.  So when I say we

10 were prepared for violence, it was to prepare for violence

11 against us.

12 Q    So have you had previous experiences, either in or out of

13 rallies, where you had been attacked?

14 A    Yes.  I've had attempts on my life from the extreme far

15 left.  I've got scars across the back of my head when they

16 attempted to murder me back in the late '90s.

17 Q    Hold on a second.  Someone attempted to murder you?

18 A    Yes.

19        MR. ISAACSON:  Objection, Your Honor, to events in

20 the late '90s.

21        THE COURT:  Overruled.

22 BY MR. REBROOK:

23 Q    Can you go into a little more detail on what happened

24 there?

25 A    So I was struck in the back of the head with a tire iron,

24

J. Schoep - Cross

1  which split my -- the back of my scalp down to my skull, the

2  back flap of the skin that was hanging off the back of my head,

3  it felt like a sponge when I put my hand there like this.  And

4  what happened was I was hit from behind by -- back then it was

5  called ARA, Anti-Racist Action.  Today they go by Antifa.

6      So I was struck across the back of the head with that tire

7  iron and they said, "we are here to kill you."  That's just one

8  of many incidents of violence.

9  Q    Did you have to go to the hospital for that?

10 A    Absolutely.  I had two layers of stitches to hold my scalp

11 together, basically.

12 Q    How did you know that they were ARA?

13 A    They announced themselves when they hit me.

14 Q    Was this at a rally?

15 A    No.  That was -- this was in a parking lot, or on a busy

16 street in front of a parking lot.

17 Q    What was your actual role in planning the Unite the Right

18 rally?

19 A    I had no role whatsoever in planning the Unite the Right

20 rally.  I simply attended and encouraged NSM members to attend.

21 Q    If you didn't plan it, why are you a defendant in this

22 case?

23         MR. ISAACSON:  Objection, Your Honor.

24         THE WITNESS:  That's a good question.

25         MR. ISAACSON:  Objection, Your Honor.

J. Schoep - Cross

1        THE COURT:  Sustain the objection.

2   BY MR. REBROOK:

3   Q    Moving on, I'll ask something else.

4        Did you give a speech at the Unite the Right rally?

5   A    I did not give a speech at the Unite the Right rally.  In

6   fact, in those email exchanges that the plaintiffs were

7   showing, if -- I don't know if the whole emails were shown or

8   if things were cherrypicked out of it.  But in those email

9   exchanges --

10        THE COURT:  Well, the question was -- Mr. Schoep, the

11   question was did you give a speech and you said no.  That's the

12   answer.

13        THE WITNESS:  No.

14   BY MR. REBROOK:

15   Q    Okay.  Let me ask you another question.  Did you want to

16   give a speech?

17   A    Yes.

18   Q    Do you typically give speeches at rallies like this?

19   A    At any event that the NSM would have done, I would have

20   given a speech.  I was -- that was one of the things that I did

21   when I was in the movement was speak.  So yes, if I was in any

22   way any sort of a planner, I would have been speaking and I

23   would have been on that speakers list and I was not.

24   Q    So you were not asked to be a speaker; is that correct?

25   A    I was asked not to speak.

                              26

                     J. Schoep - Cross

1    Q     You were asked not to speak.

2          Okay.  And what was your involvement in the torch march?

3    A     I wasn't at the torch march.  I didn't have any

4    involvement in that whatsoever.

5    Q     Was NSM at the torch march?

6    A     There was no NSM members there that I was aware of, nobody

7    that was with me was there, no.

8    Q     Now, when you heard the announcements of a state of

9    emergency and were told to disperse, what did you do?

10   A     Dispersed.

11   Q     Where were you when James Alex Fields ran his car into the

12   crowd?

13   A     As far as I know, when that took place I was well out of

14   town by that time already.

15   Q     Did you at any point encourage James Alex Fields to do

16   what he did?

17   A     Absolutely not.  I didn't know James Alex Fields or have

18   any knowledge or experience with him whatsoever, or any

19   communications ever with him, for that matter.

20   Q     You've never talked to him at all?

21   A     No.

22   Q     So let's shift topic a little bit and talk about

23   discovery.  Did you cooperate with the plaintiffs regarding

24   discovery?

25   A     To the best of my ability, I did cooperate.  I can

J. Schoep - Cross

1  elaborate on that, if --

2  Q     Please do elaborate.

3  A     So I did have a phone that fell in a toilet.  I saved that

4  because I knew that it was needed during discovery.  So I sent

5  that in.  I also sent in a second phone because that was asked,

6  which that phone was only in use long after Charlottesville,

7  and I felt like I shouldn't have had to sent it in, but I sent

8  it in anyway.  So I did send in my email addresses, computer.

9  Basically I feel like everything that they asked for, I sent

10 in.

11 Q    Okay.  And why didn't you give them your Discord

12 communications?

13 A     I was never in the Discord.  I was not -- I wasn't in it.

14 So I couldn't -- I can't give them something I didn't have.

15 Q     Okay.  Did -- IDS was the group that did the analysis on

16 the equipment; is that correct?

17 A     That's my understanding, yes.

18 Q     And did they discover anything incriminating on any of

19 your devices?

20        MR. ISAACSON:  Objection, Your Honor.

21        THE COURT:  Sustained.

22  BY MR. REBROOK:

23 Q     Let me ask a different question.  Did they do a complete

24 forensic analysis on the phone that you had dropped in the

25 toilet?

28

J. Schoep - Cross

1          MR. ISAACSON:  Objection, Your Honor, calls for

2    hearsay.

3          THE COURT:  Sustained.

4     BY MR. REBROOK:

5    Q    Were you informed by IDS that they could do a more

6    thorough investigation of your phone?

7          MR. ISAACSON:  Objection, hearsay.

8          THE COURT:  Sustained.

9     BY MR. REBROOK:

10   Q    Did you delete any computer or email accounts?

11   A    I don't recall deleting any accounts whatsoever.

12   Q    Didn't we hear testimony on Friday from Burt Colucci from

13   the recording of his deposition that he had erased some

14   accounts?

15   A    I believe we did hear that yesterday.

16   Q    Okay.  Did you order him to delete or erase anything?

17   A    No.  I wouldn't have been in any position to order him to

18   do anything at that point.  I was not -- I was no longer with

19   the NSM.

20   Q    Okay.  So when you told him that you no longer needed your

21   NSM accounts, was that the same as saying delete these

22   accounts?

23   A    No.

24   Q    Why did you no longer need your accounts?

25   A    I was no longer affiliated with the organization, so at

J. Schoep - Cross

1    that point my corporate responsibility with the organization

2    was done and over with.  And in 2019, I started speaking out

3    against white supremacy and countering extremism, is what I do.

4    Q    Did you specifically tell him not to erase anything?

5    A    Earlier on in the case when we spoke, I said that -- you

6    know, I explained what -- that all these different things were

7    needed for the case.  So I believe the answer is correct, I

8    told him that things needed to be saved for this case.

9    Q    Shifting back to the day of the rally itself, we saw a

10   video on Friday from Ms. Elizabeth Sines showing some

11   counter-protesters wearing masks or gaiters, as she called

12   them.  Did you wear a mask at Unite the Right?

13   A    I did not wear a mask at Unite the Right.  I had no

14   reason --

15   Q    How about any of the NSM members?

16   A    As far as I know, no NSM members were covering their faces

17   either.  It was supposed to be a legal -- legally picketed --

18   excuse me, legally permitted rally.  There was no reason to

19   hide our faces.  We were not going there to commit crimes or do

20   anything illegal.  So standard operating procedure was to show

21   our faces, as usual.

22   Q    What was your relationship, or what is your relationship

23   with Jason Kessler?

24   A    I don't have any relationship with Jason Kessler, other

25   than there was a couple of email exchanges and I believe maybe

J. Schoep - Cross

1   one phone call about --

2   Q    What were the contents of those communications?

3   A    I believe they were admitted evidence, or whatever.  I

4   believe -- basically, it was just about attending the rally.

5   That would have been the only communications.

6   Q    What about Richard Spencer, do you have a relationship

7   with him?

8   A    I didn't know Richard Spencer.

9   Q    And you met him for the first time when?

10  A    In court.  Friday at the court.

11  Q    What about Elliot Kline or AKA Eli Mosley, do you have a

12  relationship with him?

13  A    I don't know him.

14  Q    So you're not friends with any of those gentlemen?

15  A    I don't know them.  No, I'm not friends with them.

16  Q    Did you have any interactions with them during the rally

17  itself?

18  A    No, I didn't even see them at the rally.

19  Q    Plaintiffs brought up a VK message between you and Ike

20  Baker.  In it you mentioned walking back with Spencer.  Was

21  that Richard Spencer?

22  A    That was not Richard Spencer.  That was someone by the

23  name of Spencer that was at that time affiliated with the

24  League of the South.  It was not Richard Spencer.

25  Q    That was their first name?

J. Schoep - Cross

1   A      Their first name was Spencer, yes.

2   Q      In general, what is your opinion of law enforcement?

3           MR. ISAACSON:  Objection.

4           THE WITNESS:  Generally --

5           MR. ISAACSON:  Asking for an opinion about an

6   irrelevant subject.

7           THE COURT:  Sustained.

8    BY MR. REBROOK:

9   Q      Did you want law enforcement present at the rally?

10  A      Absolutely.

11  Q      Why?

12  A      Law enforcement keeps these volatile sides separated, and

13  when they're separated, like the rallies I attended for 27

14  years, there is much less of an opportunity for violence, for

15  people getting hurt, and things of that nature.  So we would

16  always want law enforcement present at these events because

17  it's in the best interest of the community and everyone that's

18  attending from both sides.

19  Q      So were they present at Unite the Right?

20  A      That depends on what you would call present.  There was

21  some standing around and things of that nature, but as far as

22  anything that I saw, there was no efforts being made to keep

23  the sides separate whatsoever.  It was like nothing I had ever

24  seen before.

25  Q      So can you explain a little bit more about that?  Do you

J. Schoep - Cross

1  feel that they did what you expected them to do or what you had

2  seen them do in the past at Unite the Right?

3          MR. ISAACSON:  Objection, relevance.

4          THE COURT:  Wait just a minute.

5          (Pause.)

6          Sustain the objection.

7   BY MR. REBROOK:

8  Q    What did you see law enforcement do at Unite the Right?

9  A    I saw law enforcement do very little to nothing at Unite

10  the Right until the state of emergency was declared and there

11  was voices over loudspeakers saying "leave the park, leave the

12  park."  At that point, from what I could tell, there was two

13  entrances in and out of the park, one on the right and one on

14  the left if you were facing forward.  I just remember like this

15  crowd being pushed down the stairs on the right, which is the

16  direction that I ended up following in and walking down that

17  way.  And it was directly into hostile counter-protesters.

18  Q    Did NSM bring firearms to Unite the Right?

19  A    Not to my knowledge.

20  Q    Was anyone shot during Unite the Right?

21  A    Not to my knowledge.

22  Q    What about clubs, did any NSM member carry a club?

23  A    Not to my knowledge.  That would have been against our

24  operating procedures.

25  Q    How about edge weapons, swords, axes, knives, those sorts

J. Schoep - Cross

1  of things?

2  A    Absolutely not.  That would have been against our

3  operating procedures.

4  Q    What about flagpoles?

5  A    Flagpoles, yes.  And the flagpoles were made out of PVC.

6  That's the thin plastic.  They're hollow.  One whack with a

7  flagpole, the flagpole breaks.  It's not a weapon.  It's

8  strictly -- these were things that we -- over the years, law

9  enforcement had suggested to us as far as compromises because,

10 you know, there was rallies -- people would put all kinds of

11 things on flagpoles.  So the PVC was used to -- to comply and

12 show this is not a weapon.  This is a very lightweight item

13 that you can hang your flag on.

14 Q    We've heard the plaintiffs discuss or allude to the use of

15 shields as weapons.  Did NSM have shields?

16 A    The NSM did have a few shields.  They were made out of a

17 lightweight plastic.  It would be very difficult to use

18 something like this as a weapon.  It was a defensive tool.

19 Typically, the NSM shields you could see in pictures or things

20 like that, they were chipped up.  The paint was peeling off of

21 them.  And I can tell you from experience that was from rocks,

22 bricks, all kinds of projectiles being hurled through the air.

23 That's why those shields were all banged up.  The most those

24 shields could do was deflect rocks.

25 Q    Specifically at Unite the Right, did you have to use the

J. Schoep - Cross

1   shields to deflect anything?

2   A    I personally was not carrying a shield, but at most

3   rallies the shields were used to deflect rocks.  I don't recall

4   asking each person who had a shield how many rocks they

5   deflected, but there was stuff flying through the air all day

6   long.

7   Q    At Unite the Right there was stuff flying --

8   A    Yeah, at Unite the Right.  Absolutely, yes.

9   Q    What kind of stuff was flying through the air?

10  A    As I mentioned yesterday, the people that were around me

11  had gotten hit with different things that smelled like urine.

12  So urine balloons.  I'm assuming it was urine.  I didn't test

13  it or anything like that, but it sure smelled like that.  There

14  was some kind of fluid that was thrown through the air that

15  was -- my arms were burned red for a couple of days after that.

16  There was everything you can imagine.  Chunks of rocks.

17  Q    Something caustic was thrown at you; is that what you're

18  saying?

19  A    Something that burned, yeah, absolutely.

20  Q    Let's talk about the Nationalist Front for a moment.  What

21  was the Nationalist Front, in your own words?

22  A    The Nationalist Front was basically a loose collection or

23  a loose alliance of different organizations that agreed to --

24  basically they were all -- all held their autonomy.  There was

25  no leader of the Nationalist Front.  Basically it was a

J. Schoep - Cross

1  coalition of organizations that agreed to assist one another if

2  it came to -- you know, at public demonstrations or things like

3  that.  It was just a loose-knit collection.

4  Q    So could an individual person join the Nationalist Front?

5  A    Well, there was really no joining, per se.  Like you

6  couldn't fill out an application and join.  It was just an

7  agreement between groups that they would work together in

8  public.  So an individual wouldn't -- wouldn't be a member

9  because there was no membership.

10 Q    Okay.  So you said they could agree to join.  So was there

11 a written formal agreement in place?

12 A    For a group that wanted to affiliate with the Nationalist

13 Front, is that what you're asking?

14 Q    Yes.

15 A    If a group wanted to affiliate, they would typically write

16 through the website or something like that.  This was, you

17 know, four years ago.  So basically the other member groups

18 would have to say if they thought that this group was somebody

19 they would -- everybody would agree to bring on, if I recall.

20 Q    You mentioned a website.  Who hosted the website for

21 Nationalist Front?

22 A    I believe TWP.

23 Q    That's the Traditionalist Worker Party?

24 A    Yeah.

25 Q    Did you author the language on the site?

36

J. Schoep - Cross

1  A    It's been too long for me to speculate on that, who wrote

2  what for the website.  I really don't recall on everything.

3  There's certain things I may have written.  There's certain

4  things Matt Heimbach may have written.  I really don't know.

5  Q    Did you decide what order the people or groups would be

6  listed on the site?

7  A    No, I don't recall anything like that.  I think it was

8  just random.

9  Q    And does the Nationalist Front still exist?

10  A    Not to my knowledge it doesn't, no.  It's defunct.

11  Q    Was there, to your memory, a section of the Nationalist

12  Front website that ordered members to be violent?

13           MR. ISAACSON:  Objection.  Calls for hearsay.

14           THE COURT:  Sustained.

15   BY MR. REBROOK:

16  Q    Did you author any sort of section that ordered members to

17  be violent?

18  A    Absolutely not.  I would have done the opposite.  As I

19  said, there was strict rules in place, standard operating

20  procedures for nonviolence.

21  Q    Okay.  And how about the NSM website, same question.

22  A    That would be the same -- that would be the same thing.

23  There was actually a section on the NSM website that

24  specifically went into that, that the organization was

25  nonviolent, that it was political, again.  And before every

J. Schoep - Cross

1    rally, typically, that was -- that was a message that was put

2    out to the members.  If a member was at an event and ran into

3    the audience and attacked someone, that person would have been

4    thrown out of the organization.  That is why for 27 years

5    involved in that, that type of activity, that I was never

6    criminally charged with anything violent.

7              MR. ISAACSON:  Objection, Your Honor.  Move to

8    strike.  He's been instructed on this before.

9              THE COURT:  Sustained.  Strike the last --

10    BY MR. REBROOK:

11   Q    You mentioned standard operating procedure.  Prior to

12   rallies, would you or any of your leadership typically give a

13   briefing to the attendees?

14   A    Yes, that was standard.

15   Q    Okay.  Can you tell me what the typical content of one of

16   those briefings would be?

17   A    The content of one of those briefings before an event

18   would be that you do not attack anyone at any sort of rallies.

19   You only defend yourself if you are attacked.

20   Q    To your knowledge, did any of the members of your

21   organization encourage James Alex Fields, Jr. to run a vehicle

22   into a crowd?

23   A    Absolutely not.

24   Q    In your mind, is calling yourselves "shock troops" the

25   same thing as being violent?

J. Schoep - Cross

1   A    Again, that's rhetoric.  That's just -- that's wording.

2   That's not violence.

3   Q    Plaintiffs' attorneys brought up phone records and text

4   records.  Is it possible to discuss matters over phone and text

5   other than the Unite the Right rally?

6   A    Absolutely.  As I mentioned, there was very little talk or

7   planning on my end that had anything to do with Unite the Right

8   other than what hotel, where I'm supposed to meet, that sort of

9   thing.  So lots of conversations with all kinds of different

10  people from all walks of life.  And everything did not revolve

11  around Unite the Right.  For me, it was just another rally.

12  When planning ahead for going, it was just another event.

13  Q    Okay.  Let's talk about Signal for a moment, the

14  communications application Signal.  Was it standard operating

15  procedure to use that kind of platform or was that specific to

16  Unite the Right?

17  A    That was standard operating procedure to use that.  It had

18  nothing to do with Unite the Right.

19  Q    Okay.  So they mentioned an auto-delete function for text.

20  Did you set that up specifically to hide Unite the Right

21  information?

22  A    Absolutely not.

23  Q    So how does it do the auto-deleting?  Would it delete

24  anything you talked about, or could you set it up to delete

25  specific things?  How did that work?

J. Schoep - Cross

1    A    No, you can't set it up to delete specific things, to the

2    best of my knowledge.  I'm not very tech-savvy, but it would

3    delete everything, not just certain messages.

4    Q    So a text message about your favorite color and your

5    nephew's birthday would be deleted?

6    A    Yeah, that could be deleted, too, yeah.

7              MR. REBROOK:  Could we bring up Plaintiffs'

8    Exhibit 1591, the invitation to Unite the Right?

9              THE COURT:  Okay.  Mr. ReBrook?

10             Did we lose him?

11             THE CLERK:  Yes.

12             (Pause.)

13             THE COURT:  If we take down the exhibit, can we get

14   him back and he can talk about it?

15             (Pause.)

16             MS. KAPLAN:  Your Honor, might I suggest, given the

17   technology problems, that we just move forward without the

18   exhibit and see if they can get that up.  I obviously want to

19   work in the interest of time and hate to have this delay.

20             THE COURT:  That's what he's -- he's trying to work

21   it out.

22             THE CLERK:  Matt, is 1591 on the screen?  Can you put

23   it up?

24             (Pause.)

25             THE COURT:  Can you the just get them back on the

J. Schoep - Redirect

1  screen without the exhibit?  We can go on.

2          THE CLERK:  We can do that.

3          Okay.  Mr. ReBrook, we can't get the exhibit up.

4          MR. REBROOK:  No worries.

5   BY MR. REBROOK:

6  Q    Mr. Schoep, can you recall what the purpose of the Unite

7  the Right rally was?

8  A    The purpose of the Unite the Right was a permitted event

9  regarding historical statue there in the city of

10  Charlottesville.

11  Q    Okay.  So the purpose wasn't to go beat up people of

12  different races?

13  A    Absolutely not.  That would be -- that would defeat the

14  purpose of any sort of public rally.  It just -- that doesn't

15  make any sense.

16          MR. REBROOK:  I don't have any further questions.

17  Thank you for your time, Mr. Schoep.

18          THE COURT:  All right.  Any redirect?

19                REDIRECT EXAMINATION

20   BY MR. ISAACSON:

21  Q    Mr. Schoep, it's Bill Isaacson.  Can I ask you where you

22  are today, sir?

23  A    I'm at home.

24  Q    That's in Michigan?

25  A    Yes.

41

J. Schoep - Redirect

1  Q    You said that you changed your beliefs about white

2  supremacy.  When did you do that?

3  A    Well, I officially left the movement in early 2019.  I

4  started speaking out in August/September of 2019.

5  Q    So was it -- you identified the change in your beliefs

6  as -- well, did you leave the movement because of your change

7  in beliefs?

8  A    Yes, I left the movement because of my change of beliefs.

9  Absolutely.

10 Q    The -- I would like -- I'm hoping the technology works

11 here.  I would like to put on the screen PX-2771.

12       And, Mr. Schoep, are you able to see that?

13          THE CLERK:  Is it admitted?

14          MR. ISAACSON:  No.  I'm going to show it to the

15 witness first.

16          THE CLERK:  Can you tell him what it is?

17          MR. ISAACSON:  He can't hear me.

18          THE CLERK:  He can hear you, but he can't see it.

19          MR. ISAACSON:  He can't see this?

20          THE CLERK:  No.

21          THE COURT:  Well, read it to him.

22          MR. ISAACSON:  That's fine.  I just want to

23 understand the situation.

24  BY MR. ISAACSON:

25 Q    Mr. Schoep, this is a public release dated March 1st, 2019

J. Schoep - Redirect

1  from the NSM website.  It is a note to "Fellow Patriots of the

2  NSM" that ends at the end with the words "Respectfully, Jeff

3  Schoep."

4          MR. ISAACSON:  So I'm going to move, Mr. ReBrook, to

5  admit Plaintiffs' Exhibit 2771.

6          THE COURT:  Be admitted.

7          (Plaintiff Exhibit 2771 marked.)

8          (Plaintiff Exhibit 2771 admitted.)

9          MR. ISAACSON:  If we can bring Mr. Schoep back and

10  take the exhibit down, I will read from the exhibit for him.

11  BY MR. ISAACSON:

12  Q    Mr. Schoep, when you left the National Socialist Movement,

13  you remember writing to -- making a public release about

14  leaving the movement, correct?

15  A    Correct.  I believe I made two.

16  Q    Yes.  I'm going to read to you from one of them.

17          This is March 1st, 2019.  And you begin with, "I'm writing

18  to offer an explanation of recent events which affect our

19  party, the movement, and the future of our organization."  You

20  go on to say, "As many of you know, NSM as an organization,

21  numerous other persons, groups, and myself are named defendants

22  in an ongoing frivolous lawsuit stemming from events that

23  occurred at the Unite the Right rally in August 2017."

24          Your change -- you left -- when you left the movement and

25  you said you were changing your beliefs, you were complaining

J. Schoep - Redirect

1    to your members about a lawsuit, this lawsuit, that you said

2    was frivolous, right?

3          MR. ISAACSON:  I think we're cut off from him.  We

4    have to take the exhibit down.

5          THE CLERK:  He can still hear you.

6          MR. ISAACSON:  I know.  I need him to speak.  So

7    don't put the exhibit up.

8     BY MR. ISAACSON:

9    Q    Did you hear my question, sir?

10   A    Yes.  I answered it.

11   Q    I didn't hear your answer.

12   A    I said that I did state those things, yes.

13   Q    All right.  Thank you.

14        And in fact, you told your members that "Due to this

15   ongoing litigation, I cannot address every issue at this time."

16        You were not going to tell them everything you knew,

17   correct?

18   A    That's a misinterpretation of what I said.  What I said is

19   clearly stated there in the record.

20   Q    The other thing you said was that you were "deceived by an

21   individual, Mr. James Stern, who convinced me that in order to

22   protect our membership from the ongoing lawsuit, I should sign

23   over NSM's presidency to him."

24        You told your members that the reason you were giving up

25   the NSM precedency was to protect NSM from the lawsuit,

44

                        J. Schoep - Redirect

1    correct?

2    A    Whatever I stated at the time in the letter, I stand by

3    those statements.  I made those statements at the time.  I'm

4    not going to speculate or have you cherry-pick words out of it.

5    The statement stands.

6    Q    The other thing you said -- went on to say is, "I would

7    never purposely damage the organization I have spent so many

8    years serving."  That's referring to NSM, correct?

9    A    Correct.

10   Q    And you then said, "As for all of the vultures, snakes,

11   and international banking and media interests who have

12   attempted to damage NSM and me personally, you have shown your

13   true colors."

14        That's what you said as you were announcing that you were

15   giving over the presidency of NSM, correct?

16   A    Again, I stand by the statements that I made at that time

17   as what I said at that time.  This was your testimony the other

18   day, too.  You're just rereading stuff that I've said.

19   Q    Right.  And you also stand by your final statement to your

20   members in that letter, "I ask you all to be patient and remain

21   loyal as we formulate our plan for the future"?  You stand by

22   those statements, right?

23   A    This was a letter --

24   Q    Do you stand by those statements, sir?

25   A    Not today, I don't stand by those statements, no.

J. Schoep - Redirect

1  Absolutely not.

2  Q    You told your -- you told your counsel that you cooperated

3  in discovery and turned over your phone that fell in the

4  toilet, as well as a second phone, and you did that

5  voluntarily; that's what you said today, right?

6  A    I turned in those phones because the Court asked me to

7  turn in the phones.

8  Q    The Court didn't ask you, sir, did it?  What happened was

9  there were discovery requests for those phones, you refused to

10 comply, and the Court ordered you to produce those, right?

11 A    The Court ordered me to produce those items, yes.

12 Q    And the Court actually said, "Schoep's track record of

13 failing" --

14            THE COURT:  Wait.  Wait, wait.

15            MR. ISAACSON:  He's opened the door to this, Your

16 Honor.

17            THE COURT:  Sir, you may not read every order that's

18 been entered in this case.

19            MR. ISAACSON:  I understand.  I don't intend to.

20            THE COURT:  Nor that one.

21            MR. ISAACSON:  I'll move on, then, Your Honor.  But I

22 thought he had opened the door to it.

23            THE COURT:  Well, I don't.

24  BY MR. ISAACSON:

25 Q    When did you decide that the UTR, the Unite the Right

J. Schoep - Redirect

1  rally, was a horrible disaster?

2  A    I feel that -- personally, I feel that it was a disaster

3  the moment I heard someone lost their life.

4  Q    And so when you tweeted --

5         MR. ISAACSON:  And this would be Plaintiffs'

6  Exhibit 2267, which is another tweet, which I would ask to be

7  admitted from Jeff Schoep on August 13th.  I would ask that

8  this be admitted, Your Honor.  And I can read it to him.

9         THE COURT:  Well, is there any objection?  I don't

10  know what --

11         MR. ISAACSON:  It's a tweet from Mr. Schoep.

12         THE COURT:  Okay.  No objection.  It's admitted.

13         (Plaintiff Exhibit 2267 marked.)

14         (Plaintiff Exhibit 2267 admitted.)

15         MR. ISAACSON:  Take it down and I'll read it to him.

16         THE CLERK:  He can hear you.

17         MR. ISAACSON:  I just want to make sure he can

18  respond.

19         THE CLERK:  He can hear you and he can speak to you

20  when the exhibit is up.

21         MR. ISAACSON:  All right.  And I'm told this is a VK

22  post -- I'm sorry -- not a tweet.

23  BY MR. ISAACSON:

24  Q    Mr. Schoep, in a VK post you said on August 13, "NSM and

25  myself were there, battled our way through the streets along

J. Schoep - Redirect

1   with our allies in the Nationalist Front, TWP, League of the

2   South, and many other groups were there fighting alongside of

3   us, East Coast Knights, Vanguard America, Confederate

4   Hammerskins, Blood & Honour Social Club, other Klan groups,

5   militia alt-right groups, etc.  It was a glorious day for white

6   solidarity in America's largest rally in years."

7        That's the date on which you said you had already decided

8   the Unite the Right was a horrible disaster; is that right?

9   A    It's tedious.

10  Q    I'm sorry.  I didn't hear your answer, sir.

11  A    I said, it's tedious.  You're repeating everything.

12  Q    I appreciate your commentary, sir, and I apologize that

13  you find this process tedious, but would you answer my

14  question?

15  A    I just did.

16            THE COURT:  We couldn't hear you.  You'll have to

17  repeat it.

18            THE WITNESS:  So that whole statement that I made,

19  nobody heard that?

20  BY MR. ISAACSON:

21  Q    All I want to know, sir, is:  When you made this statement

22  on August -- when you made this VK post on August 13th, it's

23  your testimony that on that day you believed the Unite the

24  Right rally was a horrible disaster?

25  A    Well, I'll try to repeat myself.  What I said was I

J. Schoep - Redirect

1    personally felt that the Unite the Right rally was a disaster

2    because someone lost their life.  What I said publicly would

3    have been spin and rhetoric, making things sound like they were

4    better than they were.  This was typical operating procedure.

5    Q    Was it spin when you said the rally was about white

6    solidarity in America?

7              THE COURT:  Well, he --

8              THE WITNESS:  No.  At the time that would have been

9    an accurate portrayal of what I believed it to be.

10   BY MR. ISAACSON:

11   Q    Right.  So it wasn't just about Confederate statues, was

12   it?  It was, as you say, about white solidarity in America?

13   A    Again, I was not the permit holder.  Whatever the permit

14   holder advertised the rally as was out of my hands.  The rest

15   is just speculation or how I felt about it at the time.  I can

16   comment on that.

17             MR. ISAACSON:  I don't have any further questions,

18   Your Honor.

19             THE COURT:  All right.  Thank you.

20             All right.  Call the next witness.

21             MS. KAPLAN:  Your Honor, plaintiffs call Defendant

22   Jason Kessler.

23             MS. DUNN:  Your Honor, may we approach with the

24   deposition?

25             THE COURT:  Yes.

J. Kessler - Direct

1          JASON KESSLER, CALLED BY THE PLAINTIFFS, SWORN

2                        DIRECT EXAMINATION

3          THE COURT:  I'm sorry.  I thought you wanted a

4    sidebar.

5          Okay.  I misunderstood.

6          MS. DUNN:  I apologize, Your Honor.  We just would

7    like to approach with the depositions.

8          THE COURT:  All right.

9          MS. DUNN:  Thank you.

10         THE COURT:  Thank you.

11   BY MS. DUNN:

12   Q    Good morning, Mr. Kessler.

13   A    Good morning.

14   Q    We're just handing you a copy of your deposition, in case

15   you need it.

16   A    Thank you.

17   Q    All right.  So, Mr. Kessler, you attended the University

18   of Virginia, correct?

19   A    Yes, ma'am.

20   Q    And in 2016, you were living in Charlottesville?

21   A    Yes.

22   Q    And at some point in 2017, you decided that you wanted to

23   be the leader of the event that became Charlottesville 2.0,

24   correct?

25   A    I wanted to hold the event, yes.

J. Kessler - Direct

1  Q    And so you and Eli Kline were the principal organizers and

2  coordinators of Charlottesville 2.0, correct?

3  A    At different times we were definitely integral organizers

4  of the event.

5  Q    And so when you were asked in your deposition, sir, "You

6  and Mr. Mosley were the principal coordinators for the Unite

7  the Right rally on August 11th and 12th, correct," you said,

8  "Yes."  Do you recall being asked that question and --

9  A    Yes.

10 Q    -- giving that answer?

11 A    Right.

12 Q    And you do not consider Jewish people to be white,

13 correct?  You believe that they are a distinct ethnic group

14 from white people?

15 A    Yeah, probably.

16 Q    And so when you were asked in your deposition, "Well, do

17 you include Jews as white people," you said, "I think Jews are

18 a distinct ethnic group from white people."  Do you recall

19 being asked that question and giving that answer?

20 A    Yeah, I think that's what I just said a few seconds ago,

21 too, but I said it in the deposition as well.

22 Q    Great.  Just want to make clear for the record.

23      All right.  So you believe Western civilization was built

24 by white men and they should have majority ownership over their

25 birthright?

J. Kessler - Direct

1    A    That's fair, yeah.

2    Q    Right.  And you also believe that the idea that there are

3    not mental differences between the races is a New Age-y fairy

4    tale?

5    A    I don't know what you're talking about.  I do think that

6    there are different IQ differences or whatever.

7    Q    Okay.  So let's show you PX-1382.

8              (Plaintiff Exhibit 1382 marked.)

9    BY MS. DUNN:

10   Q    This is a post that has your name, Jason Kessler; do you

11   see that?

12   A    Yes.

13             MS. DUNN:  Your Honor, we move to admit 1382.

14             THE COURT:  Be admitted.

15             (Plaintiff Exhibit 1382 admitted.)

16   BY MS. DUNN:

17   Q    You say here, Mr. Kessler, "To think that there are

18   differences in skin tone, height, and bone structure and all

19   these physical things, but no difference in mental development

20   is a New Age-y fairy tale"; do you see that?

21   A    Yes.

22   Q    You gave a speech at Charlottesville 1.0 on May 13th of

23   2017 where you thanked your co-defendants, Richard Spencer,

24   Nathan Damigo, Matthew Heimbach, as well as the groups Identity

25   Evropa, Traditionalist Worker Party, and League of the South.

52

J. Kessler - Direct

1  You thanked them all for coming to Charlottesville, correct?

2  A    If you represent that as accurate, I have no reason to

3  disbelieve you.

4  Q    And following Charlottesville 1.0, you had the idea to

5  plan another, much larger event in Charlottesville that

6  ultimately became Charlottesville 2.0?

7  A    Unite the Right.  I don't refer to it as

8  "Charlottesville 2.0," but yeah.

9  Q    Just during this trial we've been referring to it as

10  "Charlottesville 2.0."  So when I say that, we'll have an

11  agreement that you understand what I mean?

12  A    Sure.  But for me it's Unite the Right, but I'll

13  understand what you mean.

14  Q    Okay.  And in your deposition when you were asked:  "And

15  you wanted to be the leader, the organizer of that rally," and

16  you answered, "Yes, sir," you remember being asked that

17  question and giving that answer, correct?

18  A    I don't remember, but that seems, like, fair, yeah.

19          MS. DUNN:  Mr. Spalding, can we show Mr. Kessler

20  Plaintiffs' Exhibit 0552, please?

21          (Plaintiff Exhibit 0552 marked.)

22  BY MS. DUNN:

23  Q    Mr. Kessler, do you see that as a post where you announce

24  on Discord your idea for Charlottesville 2.0?  It's a post from

25  May 21st, 2017.  Do you see that?

J. Kessler - Direct

1  A    Yes, ma'am.

2              MS. DUNN:  Your Honor, we move PX-552.

3              THE COURT:  Be admitted.

4              (Plaintiff Exhibit 0552 admitted.)

5  BY MS. DUNN:

6  Q    So in this post, Mr. Kessler, you begin by saying

7  "@everyone."  So you direct your post to every single person in

8  the #alt-right-events-projects server; do you see that?

9  A    Yes, ma'am.

10  Q    Then you go on to say, "I think we need to have a Battle

11  of Berkeley situation in Charlottesville."

12  A    Yes.

13  Q    "Bring in the alt-right, Proud Boys, Stickman, Damigo,

14  Spencer, and fight this shit out."  You see that?

15  A    Yes, ma'am.

16  Q    All right.  And Nathan Damigo, the jury has heard, has

17  become nationally known at this time for punching a

18  counter-protester that you refer to as Moldylocks.

19  A    I don't know what he has or hasn't done.  He did punch a

20  woman that was referred to as Moldylocks, yes.

21  Q    And Stickman is Kyle Chapman, who also had become known

22  for striking a counter-protester with a leaded stick.  You know

23  that, right?

24  A    He got into some fights in Berkeley.

25  Q    And he's called Stickman because he hit somebody with a

J. Kessler - Direct

1  leaded stick.  You know that, right?

2  A    Yes.

3  Q    And you say that we should bring them in and fight this

4  shit out.  You see that?

5  A    Yes, ma'am.

6  Q    And you go on to say, "The Antifa are totally

7  disrespecting us and the media is playing the mayor's fiddle.

8  Just like in Berkeley, the city council is directly tied to

9  Antifa.  I think we need a publicized event at this time.  They

10 bring everything they've got and we do too."

11      You see that you say that, right?

12 A    Yes, ma'am.

13 Q    And when you say "they bring everything they've got,"

14 you're referring to Antifa, correct?

15 A    Yes, the violent left wing extremists --

16 Q    And you wanted Antifa to bring everything that they've

17 got.  You see that, right?  That's what you're saying?

18 A    They do that always.

19 Q    And you're saying, that's your idea, they bring everything

20 we've got.  And then you say, we do too.  And when you say "we

21 do too" refers to the alt-right, correct?

22 A    Yes, to the permitted demonstration we will defend

23 ourselves --

24 Q    Thank you, Mr. Kessler.  Your counsel will have --

25           THE COURT:  You answered the question.  Go ahead.

55

J. Kessler - Direct

1             MS. DUNN:  Thank you, Your Honor.

2      BY MS. DUNN:

3    Q    And you wanted the event to be publicized.  In all caps

4    you write that.  You see that?

5    A    Yes, ma'am.

6    Q    And so you would also agree, would you not, that if there

7    was fighting in the streets, that would create more publicity?

8    A    It probably would, yeah.

9    Q    All right.  Let's show Mr. Kessler PX-551.

10            (Plaintiff Exhibit 551 marked.)

11     BY MS. DUNN:

12   Q    So Mr. Kessler, you'll recognize this as a Discord post

13   from May 20th, the day before your previous post, the post that

14   we just saw.  Do you see that?

15   A    Yes.

16   Q    All right.  And I assume we can agree you went by

17   MadDimension on Discord?

18   A    Right.

19   Q    Sometimes you went by Zebo, right?

20   A    Yes, ma'am.

21            MS. DUNN:  Move to admit 551, please.

22            THE COURT:  Be admitted.

23            (Plaintiff Exhibit 551 admitted.)

24   BY MS. DUNN:

25   Q    So in this post, which is the day before you propose an

56

J. Kessler - Direct

1  event where "we fight this shit out," you wrote, "The alt-right

2  is a dangerous movement.  It feeds on the chaos energy of our

3  unchecked racism bantz but in IRL activism" -- that's in real

4  life -- "you have to be more like a civil rights movement for

5  whites.  It's difficult to say that you can contain that manic

6  energy and maintain the enthusiasm."

7       You say, "I'm not really sure but I wonder about it.  I

8  would go to the ends of the earth to secure a future for my

9  people with or without the funny bantz.  This is war."

10      Do you see that you said that?

11 A    Yes, ma'am.

12 Q    And bantz refers to banter or joking, right?

13 A    Exactly.

14 Q    It's like lulz?

15 A    Yes.

16 Q    And you didn't need jokes, Mr. Kessler.  You didn't need

17 the bantz because this was serious to you, correct?

18 A    I don't -- I'm not really clear on what you mean.

19 Q    What I mean is that you said, "I would go to the ends of

20 the earth to secure a future for my people with or without the

21 funny bantz."

22 A    Well, what I'm saying is that the alt-right has a lot of

23 edgy humor online and I think it's counterproductive.  That's

24 why I was saying I think it's better for us to be a civil

25 rights movement for whites.  So I was discouraging doing the

J. Kessler - Direct

1  racist humor that they do online.  I was saying we need to drop

2  that and be serious.

3  Q   Right.  Exactly.  You didn't need the bantz; for you this

4  was war.  That's what you said?

5  A   That's what I said, yeah.

6  Q   And the day before your post about fighting this shit out,

7  you say, "the alt-right is a dangerous movement."  You see that

8  you said that?

9  A   Yes.

10         MS. DUNN:  All right.  Mr. Spalding, let's show

11  Mr. Kessler PX-1395, please.

12         (Plaintiff Exhibit 1395 marked.)

13  BY MS. DUNN:

14  Q   So Mr. Kessler, you recall that initially you had a secret

15  Facebook chat group to plan Charlottesville 2.0?

16  A   Secret.  So by saying "secret," you make it sound like

17  people normally publicize their chats to everybody on the

18  Internet.  I did have a chat group.

19  Q   Mr. Kessler, do you recognize this PX-1395 as a text that

20  you sent on June 5th to somebody named Baked Alaska?

21  A   Yes.

22         MS. DUNN:  All right.  Move to admit 1395.

23         THE COURT:  Be admitted.

24         (Plaintiff Exhibit 1395 admitted.)

25

J. Kessler - Direct

1  BY MS. DUNN:

2  Q    And Mr. Kessler, in this text of June 5th, 2017, you say,

3  "Are you on Facebook?  A lot of our planning is happening in a

4  secret chat."  Do you see that?

5  A    Yes, ma'am.

6  Q    And when you're talking about planning, you're talking

7  about planning for Charlottesville 2.0, correct?

8  A    Probably so at this time period, yeah.

9  Q    Okay.

10           MS. DUNN:  Mr. Spalding, can we show Mr. Kessler

11  PX-1461B, please.

12           (Plaintiff Exhibit 1461B marked.)

13   BY MS. DUNN:

14  Q    All right.  So Mr. Kessler, I'm sure you'll agree with me

15  you posted an incredible amount on social media.

16  A    Yeah.  Way too much.

17  Q    And in Facebook you went by the name "Ambien Falcon,"

18  correct?

19  A    At times, yes.

20  Q    So you recognize -- you can see your name, Ambien Falcon,

21  there, and you're talking to a group of people.  Do you see

22  that?

23  A    Yes.

24           MS. DUNN:  Move to admit 1461B.

25           THE COURT:  Be admitted.

59

J. Kessler - Direct

1           (Plaintiff Exhibit 1461B admitted.)

2   BY MS. DUNN:

3   Q    And just for the sake of the jury and all of us, the

4   Facebook chats you have to read from the bottom up, whereas

5   Discord posts you read from the top down.

6           So in this chat from May 22nd, at noon you say, "I just

7   got off the phone with Based Stickman and he's on board."  Do

8   you see that?

9   A    Yes.

10  Q    And then you go on to say, "Communists deserve to be

11  culled."  Do you see that?

12  A    Yes.

13  Q    And then you say, "There is no getting along.  We have to

14  fight for our future."

15  A    Right.

16  Q    Do you see that?

17  A    Yes.

18  Q    And at your deposition you were asked whether Stickman,

19  who we've identified as Kyle Chapman, who had struck somebody

20  with a leaded stick, whether he ultimately attended the Unite

21  the Right, and you said he did not, correct?  Do you remember

22  that?

23  A    That sounds accurate.

24  Q    Right.  And you remember that you said that he didn't want

25  to share the stage with the less moderate people, correct?

J. Kessler - Direct

1  A    Right.

2  Q    And you were asked, "And the more extreme people want out

3  as far as the tone of the rally, correct?"  And your answer was

4  "Yes."  Do you recall that?

5  A    Can you repeat that.

6  Q    You were asked this question, Mr. Kessler, and you gave

7  this answer:  "And the more extreme people want out as far as

8  the tone of the rally, correct?"  Answer:  "Yes."

9  A    Okay.  I trust you.  If I said that, I said it.

10  Q    And so Based Stickman, who had hit someone with a leaded

11  stick, is the more moderate in that statement --

12  A    We're talking about ideologically.  His politics are much

13  more like a Trump supporter.  He's not like a white advocate or

14  something.

15  Q    Right.  But when you say more moderate, you're talking

16  about Based Stickman as opposed to the people who --

17          MR. KOLENICH:  Objection, asked and answered.

18  Q    -- ultimately attended?

19          MR. KOLENICH:  It's asked and answered, Your Honor.

20          THE COURT:  Overruled.  Go ahead, answer.

21  BY MS. DUNN:

22  Q    Correct?

23  A    Can you repeat the question.

24  Q    I said, when you talk about more moderate, you're talking

25  about Based Stickman as opposed to the people who ultimately

J. Kessler - Direct

1    attended?

2    A    Yes.  Based Stickman's views, correct.

3    Q    So ultimately, in addition to the secret Facebook chats,

4    you had a Discord server for Charlottesville 2.0, correct?

5    A    Yes.

6    Q    We've talked a lot about that in this case.  And you were

7    identified, Mr. Kessler, as the event coordinator and as a

8    moderator for the Charlottesville 2.0 server, correct?

9    A    I was definitely an event coordinator and a moderator.

10   Q    And as the event coordinator, you knew you had the ability

11   to manage the channels and the messages, right?

12   A    Yeah, there were some functions like that.

13   Q    Right.  And you knew that you had the ability to do that?

14   A    Yes.

15   Q    And you also had the ability to remove or ban members from

16   the Discord chats, right?

17   A    Correct.  Any moderator did.

18   Q    Right.  And so if we see somebody posting on the

19   Charlottesville 2.0 server, that's someone you had the ability

20   to ban, but you did not?

21   A    Theoretically.

22   Q    Fair to say, though, right?

23   A    Yes.

24   Q    From June 7th to August 11th you were on the

25   Charlottesville 2.0 Discord server every day?

J. Kessler - Direct

1  A    Probably, yeah.

2  Q    Well, not just probably, Mr. Kessler.  Actually, right?

3  A    That sounds right.

4  Q    Okay.

5         MS. DUNN:  Mr. Spalding, can we show the witness

6  3548, please.

7         (Plaintiff Exhibit 3548 marked.)

8   BY MS. DUNN:

9  Q    Mr. Kessler, you recognize this as a Discord chat from

10 yourself in the #general channel of the Discord Stuff server,

11 correct?

12 A    Yes.

13        MS. DUNN:  Your Honor, move to admit 3548 and show

14 the jury.

15        THE WITNESS:  Be admitted.

16        (Plaintiff Exhibit 3548 admitted.)

17 BY MS. DUNN:

18 Q    So, Mr. Kessler, this is a post by you where you tell

19 everybody on Discord that Unite the Right would also be known

20 as the Battle of Charlottesville; do you see that?

21 A    Yes.

22 Q    And publicly you did call it Unite the Right, but on

23 Discord and privately you called it the Battle of

24 Charlottesville?

25 A    It looks like I called it both here.

J. Kessler - Direct

1  Q    But you don't disagree that publicly you didn't make

2  posters that said the Battle of Charlottesville, right?

3  A    No, I didn't make any posters like that.

4           MS. DUNN:  Mr. Spalding, if we could show the witness

5  968.

6           (Plaintiff Exhibit 968 marked.)

7  BY MS. DUNN:

8  Q    And you recognize this to be a post by you as well, right?

9  A    Yes.

10          MS. DUNN:  Your Honor, we move 968 to show the jury.

11          THE COURT:  Be admitted.

12          (Plaintiff Exhibit 968 admitted.)

13 BY MS. DUNN:

14 Q    And you called Charlottesville in Discord the East Coast

15 Berkeley, correct?

16 A    Yes.

17 Q    And we recall that you had initiated this conversation in

18 the post we saw earlier by saying "we need to have a Battle of

19 Berkeley situation in Charlottesville."  You remember that?

20 A    Yes.

21 Q    And you tell everybody on Discord to assemble every --

22 let's say every person you can.  Do you see that?

23 A    Yeah, it says "assemble every motherfucker you can."

24 Q    We can take that down, Mr. Spalding.  Let's show the

25 witness 1455.  Actually, we can also show the jury.  This has

J. Kessler - Direct

1  been previously admitted.

2       This is the text exchange that the jury has already seen

3  between Mr. Kessler and Mr. Spencer.  And it's a text exchange

4  from June 5th of 2017.  You tell Mr. Spencer that you're going

5  to start promoting Charlottesville 2.0, Unite the Right, the

6  Battle of Charlottesville; do you see that?

7  A    Yes.

8  Q    And if you scroll down in this text chain, you say to him,

9  "We're raising an army my liege for free speech, but the

10  cracking of skulls if it comes to it."  You see that, correct?

11  A    Yes.

12  Q    All right.  Well, let's talk about the army.  One of the

13  first people that you reached out to was Matthew Heimbach, the

14  chairman of the Traditionalist Worker Party.  Do you remember

15  that?

16  A    No, I don't remember if he was the first one, but I did

17  reach out to him.

18  Q    Right.  You reached out to him on May 22nd, so the day

19  after you had told everybody on Discord that you wanted to

20  fight this shit out in Charlottesville.  Does that ring a bell?

21  A    If you say that that's accurate, I have no reason not to

22  believe you.

23  Q    Great.  That document is already admitted and the jury has

24  seen it.  So I won't take our time.

25       With respect to Mr. Heimbach, at your deposition were you

J. Kessler - Direct

1   asked these questions and did you give these answers:

2   Question:  "But you just said that there were members of the

3   alt-right that espoused neo-Nazi views; isn't that right?"

4         Answer:  "There are."

5         Question:  "And Mr. Heimbach is one such person, isn't

6   he?"

7         Answer:  "He's close to the line."

8         Do you remember that?

9   A    I have no reason to doubt that.

10  Q    And no reason to doubt that even sitting here today,

11  correct?

12  A    Let's just assume anything that you say about the

13  transcript, I believe you.

14  Q    I appreciate that.

15  A    I have no reason to doubt you.

16  Q    Thank you, Mr. Kessler.

17        Okay.  So when you invited Mr. Heimbach you knew that his

18  group, the Traditionalist Worker Party, was going to come with

19  him, right?

20  A    Yes.

21  Q    And you also communicated with others who were part of the

22  Traditionalist Worker Party, and that included Matthew Parrott,

23  right?

24  A    True.

25  Q    And you spoke very frequently to somebody named Derrick

J. Kessler - Direct

1   Davis, who was the regional director of the Traditionalist

2   Worker Party, who you also considered a friend, right?

3   A    At times I guess I did.  That's fair.

4   Q    You recall you called him your friend and you talked to

5   him extensively, right?

6   A    Okay.  I said that's fair.

7   Q    Okay.  Great.  We'll talk about him a little later.  You

8   also spoke in your planning to somebody named Dillon Hopper.

9   He's the leader of Vanguard America, or was at the time.  You

10  talked to him about attending Charlottesville 2.0, correct?

11  A    Yes.

12  Q    And at your deposition with respect to Vanguard America

13  you were asked this question and you gave this answer:  "And

14  what is Vanguard America?  What's their identity?"

15       "That is another white identity far right probably fascist

16  group."

17       Do you remember that?

18  A    That sounds right.

19  Q    And Mr. Spalding, if we could publish 953, which has been

20  admitted, so we can show that to the jury.

21       You will recognize this as a conversation between yourself

22  and White-PowerStroke(Dillon), who is Dillon Hopper?

23  A    Yes, it looks like we're both in there.

24  Q    Right.  I think we need to scroll down.  You're talking

25  about the event, the Charlottesville 2.0 event.  And Mr. Hopper

J. Kessler - Direct

1  tells you he would give a six-word speech:  "Gas the kikes,

2  race war now."  Do you see that?

3  A    Yes.

4  Q    And that's something that you were made aware of on June

5  8th of 2017?

6  A    He said that.

7  Q    He did say that.

8      All right.  And you also spoke with Mr. Schoep of the

9  National Socialist Movement.

10 A    Yes.

11 Q    Who had gotten your phone number from Mr. Heimbach, about

12 Charlottesville 2.0.  Do you recall that?

13 A    That's probably correct, yes.

14 Q    And you wouldn't deny that you had text message exchanges

15 with Mr. Schoep?

16 A    No, I wouldn't.

17 Q    Okay.  You also spoke to Mr. -- or Dr. Michael Hill of the

18 League of the South about the League of the South's

19 participation.  Do you remember that?

20 A    Yes, ma'am.

21 Q    All right.  And Michael Hill has already testified that he

22 had multiple one-on-one conversations with you.  And so you

23 don't disagree with that?

24 A    I definitely remember talking to him.

25 Q    And you spoke on the phone with Michael Hill and you also

J. Kessler - Direct

1  spoke to him in the secret Facebook chats.  You recall that as

2  well?

3  A    If you say so.  It's been four years.  I have no reason

4  not to believe you.

5  Q    Okay.  Well, do you recall a chat where you reached out to

6  Denny Durham of League of the South, and you said, "Someone

7  contacted me under another name and said it was Mike Hill."

8       And Denny Durham says, "I'm not sure what he's using right

9  now.  Was it James Matros?"

10      And you said, "Yes, that's it.  Why does he use an alias

11 account when he's here under his real name?"

12      And Denny Durham says, "Because he gets put in Facebook

13 jail so much."

14      Do you see that -- or I'm sorry, do you recall that?

15 A    Yeah, vaguely.

16 Q    All right.  So in addition to the groups that we just

17 talked about, Traditionalist Worker Party, Vanguard America,

18 League of the South, and also we talked about Mr. Spencer, you

19 also coordinated with Nathan Damigo and Eli Kline.  You recall

20 that, right?

21 A    Yes, more with Kline than Damigo.

22 Q    And Nathan Damigo and Eli Kline were both leaders of

23 Identity Evropa and they joined you and Mr. Spencer for weekly

24 planning calls for Charlottesville 2.0?

25 A    I don't think that's accurate.

J. Kessler - Direct

1   Q    All right.  So in your deposition, Mr. Kessler, you were

2   asked this question and you gave this answer:  "And you had a

3   weekly call with Mr. Spencer, Mr. Damigo, and Mr." -- oh, I

4   apologize.  I'm reading you someone else's deposition.

5   A    Yeah.

6   Q    So if Mr. Kline said that he had phone calls with you and

7   Mr. Damigo and Mr. Spencer, you're saying that's false?

8   A    No.  He's a liar.  He's a known liar.

9   Q    Okay.  All right.  So Mr. Spencer also participated in the

10  Discord #leadership channel through his designees, Eli Kline,

11  Kurt Lipper and Bryan Brathovd?

12  A    I think that's accurate.

13  Q    And you took steps with Mr. Kline to get invitations out

14  to all of these groups and to other groups, correct?

15  A    Yes.

16  Q    And you wanted to make sure all the groups were there and

17  represented at Charlottesville 2.0, right?

18  A    Yeah, all the groups.

19  Q    And you wanted to make sure they brought a lot of their

20  people to --

21  A    I wanted as many people as possible to attend the event.

22  Q    Right.  And all of these organizations we have discussed

23  were invited into the Charlottesville 2.0 Discord server,

24  right?

25  A    A lot of organizations.  I think all the ones that we've

J. Kessler - Direct

1  talked about today definitely were in there.

2  Q    Okay.  Let's talk for a second, then, about Mr. Cantwell.

3          THE COURT:  Let's take a 20-minute recess right now.

4          MS. DUNN:  Thank you, Your Honor.

5  **(Jury out, 10:29 a.m.)**

6          (Recess.)

7          MS. KAPLAN:  While we wait for the jury, just to do

8  some housekeeping Your Honor -- I apologize.  While we wait for

9  the jury, I just wanted to let the Court know that with respect

10  to the Colucci video that was played last week, we didn't have

11  any exhibits, but the clip report is Plaintiffs' Exhibit 3879.

12          THE COURT:  All right.

13          MS. KAPLAN:  Thank you, Your Honor.

14          THE COURT:  Be admitted.

15          (Plaintiff Exhibit 3879 marked.)

16          (Plaintiff Exhibit 3879 admitted.)

17  **(Jury in, 10:49 a.m.)**

18          THE COURT:  You may be seated and resume the

19  examination.

20          MS. DUNN:  Thank you, Your Honor.

21   BY MS. DUNN:

22  Q    Mr. Kessler, let's talk for a second about Mr. Cantwell.

23      Mr. Cantwell also participated in discussions related to

24  Charlottesville 2.0, correct?

25  A    He was at a meeting on August 11th where we discussed the

71

J. Kessler - Direct

 1  rally.

 2  Q    That's correct.  And more generally, he participated in

 3  other discussions having to do with Charlottesville 2.0?

 4  A    I didn't have a lot of conversations with him.  I did meet

 5  up with him a few days before the event, and it was mostly just

 6  talking about the speeches we were going to give.  We were kind

 7  of giddy with excitement because it was a big day for us.

 8  Q    You recall that you invited Mr. Cantwell to the Facebook

 9  chat group?  You recall that?

10  A    If you say that I did, I did.  I don't remember him being

11  a major participant there, but he very well could have been in

12  there.

13  Q    Well --

14            MS. DUNN:  Let's show the witness 1460B.  And I'm

15  looking for the chat that says June 6th.

16            (Plaintiff Exhibit 1460B marked.)

17  BY MS. DUNN:

18  Q    Do you see it says "Welcome Christopher Cantwell"?

19  A    Yes, ma'am.

20  Q    You and Mr. Cantwell also exchanged some emails.

21            MS. DUNN:  Let's show the witness PX-190.

22            THE COURT:  Be admitted.

23            MS. DUNN:  Thank you, Your Honor.

24            (Plaintiff Exhibit 190 marked.)

25            (Plaintiff Exhibit 190 admitted.)

72

J. Kessler - Direct

1   BY MS. DUNN:

2   Q    So these are emails that you exchanged with Mr. Cantwell

3   on June 13th of 2017.  Do you see this?

4   A    Yes.

5   Q    And in your email to him, that says, "Like I was saying on

6   the phone, Charlottesville is a liberal shitshow"; do you see

7   that?

8   A    Yes, ma'am.

9   Q    So that indicates you had a phone call with Mr. Cantwell

10  sometime around June 13th.  You invited him to Charlottesville

11  and he accepted your invitation, correct?

12  A    Yes.

13  Q    And you agree that you met with Mr. Cantwell prior to the

14  events on August 11th and 12th?

15  A    Yeah, we got sandwiches or something.

16  Q    Right.  And you talked about the event, correct?

17  A    Yes.

18  Q    And you also agree that you and Mr. Cantwell exchanged

19  text messages.  The jury has already seen those.

20         MS. DUNN:  So let's publish for the jury,

21  Mr. Spalding, if you could, Plaintiffs' Exhibit 3317.

22  BY MS. DUNN:

23  Q    These are Mr. Cantwell's -- Mr. Cantwell produced these

24  text messages to us, and you recognize that you texted with

25  Mr. Cantwell from August 7th to August 17th, right?

73

J. Kessler - Direct

1  A    Yes.

2  Q    And I won't go through all these, but just directing your

3  attention to your text to Mr. Cantwell on August 12th at

4  2:18 p.m; do you see that one?

5  A    "11 Langford Place," yes.

6  Q    Sorry.  The other text that you sent him at 2:18 on

7  August 12th?

8  A    "We're still meeting at the afterparty"?  That one?

9  Q    Correct?

10 A    Yes, ma'am.

11 Q    It says, "We're still meeting at the afterparty location

12 at 5 p.m.  Capacity is only 150, so leaders and essential

13 people only.  We need to talk about how we move forward.

14 Potentially having a press conference in the near future to get

15 our side of the story out."  Do you see that?

16 A    I see it.

17 Q    And 2:18 on August 12th, that's about a half an hour after

18 the car attack, right?

19 A    I don't recall exactly what time that happened.

20 Q    It happened at 1:41.  And you invited leaders and

21 essential people, which included Mr. Cantwell, correct?

22 A    Yes.

23 Q    Mr. Cantwell says to you, "I can't make it.  I think I

24 should keep a low profile until I know if I've got legal

25 problems."  Do you see that?

J. Kessler - Direct

1  A    Yes.

2  Q    And you don't respond, "What are you talking about, legal

3  problems?"  You respond, "Gotcha.  Let me know if there's

4  anything I can do to help."  You see that, correct?

5  A    Yes, ma'am.

6  Q    All right.  Now, you also discussed with Mr. Kline getting

7  the participation at Charlottesville 2.0 of *The Daily Stormer*;

8  you remember that?

9  A    I don't recall exact -- that was a topic of contention.

10 So I don't recall the exact details of that.

11 Q    In your opinion deposition you were asked:  "And you

12 discussed with Eli Mosley in the beginning of June getting the

13 participation of *Daily Stormer* for the Unite the Right rally,

14 correct?"

15      Answer:  "Yes."

16 A    Okay.

17 Q    With respect to *The Daily Stormer*, Mr. Kessler, you were

18 also asked this question:  "What is *The Daily Stormer*?"

19      Answer:  "It's a website, neo-Nazi website."

20      You remember it?

21 A    I don't remember it, but I trust you.

22 Q    Well, if you need -- I want to make sure that you avow

23 your testimony.  So the deposition is right in front of you.

24 A    I stipulate that if it says that in the deposition, that's

25 what I said.

J. Kessler - Direct

1          MS. DUNN:  Your Honor, may the record reflect this is

2     what he said?

3      BY MS. DUNN:

4     Q    Now, Defendant Robert Ray, who also goes by "Azzmador," is

5     associated with *The Daily Stormer*.  You know that, right?

6     A    Yes.

7          MS. DUNN:  Let's show Mr. Kessler PX-506, which is

8     previously admitted.

9          THE COURT:  Ms. Dunn, when you said "let the record

10    show," it does show.

11         MS. DUNN:  Thank you, Your Honor.

12         Let's show, Mr. Spalding, the witness and the jury

13    PX-506, which has been admitted.

14    BY MS. DUNN:

15    Q    This is a Discord post from July 28th.  It is a post by

16    Robert Ray, who goes by "Azzmador."  He says he just got done

17    with an hours-long chat with some of the event organizers and

18    he feels better about the thing.  He says that "the plan is the

19    same:  Gas the kikes, PR war now, plenty of trolling and lulz."

20         You see that, Mr. Kessler?

21    A    Yeah, I see that he said that.

22    Q    Right.  But he's talking about the event organizers, and

23    you and Mr. Kline were the primary event organizers, correct?

24    A    We were, but Mr. Ray is a scumbag, and I was trying to

25    keep him out of the event, so that's what he was referring to,

J. Kessler - Direct

1  is these people staged a mutiny against me and forced to have

2  this guy as part of the event.

3          MS. DUNN:  Your Honor, move to strike.

4          THE COURT:  Sustained.

5          MS. DUNN:  Thank you.

6  BY MS. DUNN:

7  Q    Mr. Kessler, my question is whether this chat talks about

8  an hours-long chat that Azzmador had with the event organizers.

9  That's my question.

10  A    All I can tell you is I see what he said right here.

11  Q    I do, too.  And you don't disagree that, ultimately,

12  Robert Ray, "Azzmador," attended this event, right?

13  A    Yes, ma'am.

14  Q    Okay.  And you don't disagree that, ultimately, you agreed

15  to that, right?

16  A    I agreed to give him a limited speaking spot, yes.

17  Q    You agreed to have him there, correct?

18  A    I just said I agreed to have him have a small speaking

19  spot at the event.

20  Q    Right.  And one of the reasons you did that is because you

21  wanted the Stormers to be there, and you knew that if you lost

22  Robert Ray, you would lose the Stormers.

23  A    I don't think that's accurate.  I think the reason was

24  because he was threatening to have these people come in and say

25  stuff like that, "gas the kikes" and do Sieg Heils and stuff,

J. Kessler - Direct

1  and I was trying to keep that out of my event.  This guy

2  threatened me that he would do that.

3  Q    Mr. Kessler, my question to you is simply:  Did you want

4  the Stormers to come to the event?

5  A    At first, I might have, but by the time I realized what

6  this guy and his crew was about, I wasn't so hot on it.

7  Q    Okay.  One other thing I wanted to ask about this,

8  Mr. Kessler:  You don't dispute that Mr. Ray was there on

9  August 11th?

10 A    I've seen pictures of him there, so I believe he was.

11 Q    Right.  And one of the pictures you may have seen is with

12 his arm outstretched, macing somebody, right?

13 A    Yes.

14 Q    Right.  Something that you know that he has referred to as

15 "gas the kikes."  You know that?

16 A    I've heard you guys make that argument.  He was a very bad

17 person.  And I don't think he should have been at the event.

18 I'll never associate with him again.

19 Q    Okay.  My question, Mr. Kessler, is -- well, actually,

20 maybe I should ask you this:  Have you not seen the video where

21 Azzmador says on August 12th, "I personally gassed half a dozen

22 kikes"?  Have you seen that with your eyes?

23 A    Yeah.  It was disgusting.

24 Q    Thank you, Mr. Kessler.

25        Let's talk for a second about your communications with the

7.8

J. Kessler - Direct

1    other defendants.

2        You produced your phone records in this case.  They are

3    voluminous, as you would expect.  I'd like for you to identify

4    them.

5            MS. DUNN:  Mr. Spalding, can you show Mr. Kessler

6    3258-O.

7    BY MS. DUNN:

8    Q    Do you see this?

9    A    Yes, ma'am.

10   Q    Are these your phone records?

11   A    It looks that way, yes.

12           MS. DUNN:  Your Honor, we move to admit PX-3258-O.

13           THE WITNESS:  Be admitted.

14   BY MS. DUNN:

15   Q    Now, by the way, are you going to dispute that in these

16   phone records there are phone calls with Robert Ray?

17   A    It could be, yeah.

18           (Plaintiff Exhibit 3258-O marked.)

19           (Plaintiff Exhibit 3258-O admitted.)

20   BY MS. DUNN:

21   Q    Okay.  You also spoke with Richard Spencer over the phone

22   regarding planning for Charlottesville 2.0?

23   A    That's correct.

24   Q    You know that.

25           I'm going to show you 3258-O.01.  These are your phone

J. Kessler - Direct

1  calls.

2          MS. DUNN:  And, Your Honor, we'd ask -- these are all

3  calls within Mr. Kessler's phone records that have already been

4  admitted.  We'd ask to be able to show these to the jury.

5          THE COURT:  You may.

6          MS. DUNN:  Thank you.

7          (Plaintiff Exhibit 3258-O.01 marked.)

8          (Plaintiff Exhibit 3258-O.01 admitted.)

9  BY MS. DUNN:

10  Q    Mr. Kessler, these are your phone calls between May 24th

11  and August 12th with Defendant Spencer; do you see that on the

12  screen?

13  A    Yes.

14  Q    So you spoke to Mr. Spencer a number of times when you

15  began planning Charlottesville 2.0 in May of 2017?

16  A    Yes.

17  Q    You spoke to him on the days leading up to

18  Charlottesville 2.0?

19  A    Yes.

20  Q    Okay.

21          MS. DUNN:  Let's put up 3258-O.02?

22          MR. SPENCER:  Was that admitted into the record?  I'm

23  sorry.  I --

24          MS. DUNN:  That's okay, Mr. Spencer.

25          Your Honor, we have several of these charts that just

J. Kessler - Direct

1  sort phone calls with the co-defendants.  We'd ask for these

2  charts to be admitted, and that will make this much more

3  time-efficient.

4            THE COURT:  Be permitted.

5            MS. DUNN:  Thank you.

6            (Plaintiff Exhibit 3258-O.02 marked.)

7            (Plaintiff Exhibit 3258-O.02 admitted.)

8            MS. DUNN:  Let's show Mr. Kessler his calls with

9  Mr. Cantwell.

10 BY MS. DUNN:

11 Q    Do you recognize Mr. Cantwell's phone number?

12 A    I don't, but I trust you.

13 Q    All right.  So, specifically, you spoke to Mr. Cantwell 13

14 times.  The first time was when you invited him to join the

15 planning of Charlottesville 2.0.  That was on June 13th.  And

16 then, starting on August 7th of 2017, you spoke to Mr. Cantwell

17 every single day.  You see that there, right?

18 A    Yeah, but I'd just like to clarify that when it says one

19 minute, I don't agree with you that that was a conversation.

20 Q    Yeah, that's fair.  Those are likely voicemails?

21 A    I don't know.

22 Q    All right.  Let's talk about Mr. Heimbach.

23       If we could put up the chart with Mr. Heimbach, these are

24 the calls that you had with Mr. Heimbach.  They -- and also

25 voicemails.  They take place between May 22nd and August 12th,

J. Kessler - Direct

1   and you can see that there are some calls here for an extended

2   period of time.  There's one for 53 minutes, one for

3   37 minutes, 20 minutes, and some voicemails.  Do you see that?

4   A    Which part are you referring to?

5   Q    If you look at the right-hand column it just lists the

6   duration of the phone calls.

7   A    Were you referring to a specific time period, though?

8   Q    Yes.  These are between May 22nd, the date that you first

9   reached out to Mr. Heimbach.  This was the day after your post

10  about "fighting this shit out" on the 21st.  You reach out to

11  him on the 22nd, and then you speak to him continually via

12  telephone until the 12th of August.  Do you see that?

13  A    Yes, ma'am, I see.

14  Q    Okay.  And just for clarity, apparently when it's a

15  voicemail it says "VM deposit."  So there are -- you are

16  actually having some one-minute phone calls?

17  A    Okay.  I see.

18  Q    All right.  Let's show Mr. Kessler the chart of his phone

19  calls with Michael Hill.

20       These are your phone calls with -- between you and

21  Mr. Hill.  And you spoke to Michael Hill on the phone eight

22  times between May 21 -- that's the date of your original "fight

23  this shit out" post -- and August 12th of 2017; do you see

24  that?

25  A    Yes, I talked to Dr. Hill.

82

J. Kessler - Direct

1  Q    And sometimes for some number of minutes.

2       Now let's put on the screen Mr. Kessler's phone calls with

3  Mr. Kline.

4       And these are all the phone calls that you had with Eli

5  Kline between May 21 and August 12th of 2017.  And as you can

6  see, this list goes on for quite a long time.

7       I don't -- heeding the earlier warning about not wanting

8  to be tedious, I'll just say that there are calls in here; some

9  of them last for an hour or more than an hour.  You talked to

10 him constantly.  And in the week leading up to

11 Charlottesville 2.0, you spoke to him every single day?

12 A    I know I talked to him a lot, and I believe what's in the

13 records.

14 Q    And I don't think we need to go through this, but you

15 would agree with me, sir, that there were some days where you

16 talked to many of the co-defendants in a series?

17 A    I talked a lot about it, but I could only speculate about

18 what you're referring to in a particular conversation.

19 Q    Right.  No, I'm not asking you about the conversations at

20 this point.  All I'm asking you is:  There were some days where

21 you talked to many of these people one after another.  You

22 wouldn't disagree with that?

23 A    I talked to them a lot, yeah.

24 Q    Right.  I agree.

25              MS. DUNN:  Okay.  So we can take that down,

J. Kessler - Direct

1  Mr. Spalding.

2  BY MS. DUNN:

3  Q    According to Mr. Kline's testimony, you also handled most

4  of the promotional materials for Charlottesville 2.0; is that

5  fair?

6  A    I did some of the promotional materials for sure.

7  Q    Right.  And you approved promotional materials, correct?

8  A    Yes, I did approve some of them.  Not all of them, but

9  some of them.

10 Q    Okay.  I just want to ask you about one in particular.

11        MS. DUNN:  Mr. Spalding, can you put up 198, please?

12 It's been admitted, so we can show to it the jury.

13 BY MS. DUNN:

14 Q    This is a poster that you distributed, Mr. Kessler, right?

15 A    Yes.

16 Q    And you might have not done the original design, or all of

17 the original design, but you approved this, correct?

18 A    Right.  I didn't do the design, but I did approve it.

19 Q    Right.  And you sent this poster to Mr. Spencer.  You

20 remember that?

21 A    I trust you.

22 Q    Well, I think for the record --

23 A    I don't remember it, but I probably did.

24 Q    All right.  And you also sent this to Mr. Heimbach, right?

25 A    Once again, I don't remember, but I probably did.

J. Kessler - Direct

1    Q    Okay.  Can we look at 1433 -- oh, I just also want to say:

2    Do you see -- so, first of all, my understanding of this poster

3    is the original image had a tank on it and then that was taken

4    off.  Do you recall that?

5    A    I don't recall.

6              MR. KOLENICH:  Objection, relevance, Your Honor.

7              MS. DUNN:  It's okay.  Your Honor, it's not worth the

8    time.

9              THE COURT:  Excuse me?

10             MS. DUNN:  It's okay.  I can move on.

11   BY MS. DUNN:

12   Q    You see on this poster, Mr. Kessler, it says "March on

13   Charlottesville, Virginia."  Do you see that?

14   A    Yes.

15             MS. DUNN:  Mr. Spalding, can we show Mr. Kessler

16   Plaintiffs' Exhibit 1433A?

17   BY MS. DUNN:

18   Q    So do you see this -- do you recognize this as a Facebook

19   chat that you're a participant in?  Do you see this?

20   A    Yes.

21   Q    Including various people, including Derrick Davis of TWP

22   and others.  Do you see that?

23   A    Yeah.  There's, like, dozens of people in this one.

24   Q    Right.  I agree with that.  And I'm looking for the part

25   of this chat that references the Battle of Berkeley.

85

J. Kessler - Direct

1     It's on June 9th, 2017.  It says, "If you watch the

2  footage that made Battle of Berkeley great, almost all the

3  action is taking place in the streets."  Do you see that?

4  A    Yeah.

5          MS. DUNN:  Thank you, Mr. Spalding.

6          Let's show the witness 1431A, if you would.

7  BY MS. DUNN:

8  Q    So this is another Facebook chat that you had involving a

9  number of people, one of whom is Evan Thomas -- he's a member

10  of Identity Evropa -- the other of whom is Derrick Davis of

11  Traditionalist Worker Party.  Do you see that?

12  A    Yes.

13          MS. DUNN:  Your Honor, we move to admit both 1433A,

14  the prior document, and this document, 1431A.

15          THE COURT:  Be admitted.

16          Let me say something.  Mr. Kolenich, when I'm looking

17  at the screen, if you don't speak up louder, I don't hear.  I

18  didn't hear your objection last time.

19          MR. KOLENICH:  Yes, sir, Your Honor.  The objection

20  was late by about one question and then she moved on, so I

21  didn't --

22          THE COURT:  Well, just sort of yell out if I'm not

23  looking at you.

24          MR. KOLENICH:  Will do, Your Honor.

25          (Plaintiff Exhibits 1433A and 1431A marked.)

J. Kessler - Direct

1          (Plaintiff Exhibit 1433A and 1431A admitted.)

2    BY MS. DUNN:

3    Q    We just discussed this is a Facebook chat involving

4    various people, including Evan Thomas of IE and Derrick Davis

5    of TWP.  And on May 10th, 2017 you write, "Antifa is irrelevant

6    now.  They aren't willing to escalate violence.  That's all

7    they're good for is making the other liberals look bad and

8    instigating a righteous civil war."

9          Do you see that you wrote that --

10   A    Yes.

11   Q    -- Mr. Kessler?

12        And this was written 11 days before you proposed

13   Charlottesville 2.0, correct?  You can see the date, May 10th?

14   A    May 10th.

15   Q    Right.  Mr. Kessler, we're going to show you Plaintiffs'

16   Exhibit 1437B.

17          (Plaintiff Exhibit 1437B marked.)

18   BY MS. DUNN:

19   Q    This is another Facebook chat involving yourself, Ambien

20   Falcon.  Do you see that?

21   A    Yes.

22          MS. DUNN:  Your Honor, move to admit 1437B.

23          THE COURT:  Be admitted.

24          (Plaintiff Exhibit 1437B admitted.)

25

J. Kessler - Direct

1  BY MS. DUNN:

2  Q    Now, this is a Facebook chat from June of 2017 with

3  somebody named Colton Merwin, who was associated with the

4  Maryland chapter of the Proud Boys.  Mr. Merwin asks you -- and

5  remember, we have to read these from the bottom up.  So

6  Mr. Merwin asked you on June 28th, "What's the situation with

7  Antifa?  Are they coming?"

8       And you respond, "I don't know yet.  I hope so."

9       And then this is an anomaly in Facebook chats, sometimes

10 you can't tell who's saying what.  But one of you says, "I'm

11 ready to throw down."  Was that you or Mr. Merwin, do you

12 recall?

13 A    I don't recall.

14 Q    And then you respond, "It's really up to the Antifa not to

15 respond and not be pussies."  Do you see that you wrote that?

16 A    Yes.

17 Q    "I would suggest taunting them a little on social media."

18 Do you see that?

19 A    Yes.

20       MS. DUNN:  All right.  Mr. Spalding, we can take that

21 down.  Please show Mr. Kessler 3560.  These are Mr. Kessler's

22 posts.

23       (Plaintiff Exhibit 3560 marked.)

24  BY MS. DUNN:

25 Q    Mr. Kessler, these are your posts from July 14th in the

J. Kessler - Direct

 1  Charlottesville 2.0 server #general channel.

 2  A    Got it.

 3           MS. DUNN:  Your Honor, move to admit 3560.

 4           THE COURT:  Be admitted.

 5           (Plaintiff Exhibit 3560 admitted.)

 6  BY MS. DUNN:

 7  Q    If we could go to the page with the photo.  Thank you,

 8  Mr. Spalding.

 9      All right.  Mr. Kessler, your first post here asks,

10  "Anyone from New York can invite this guy to the rally?"  And

11  then you post a photo with a label that says "Antifa manlet emo

12  screamer Nicholas says meme Antifa to get them to play the

13  event."  Do you see that?

14  A    Yes.

15  Q    Then you say, "I want to talk shit but as the event

16  organizer I can only do so much.  People need to bullycide them

17  into confronting the alt-right in Charlottesville."  Do you see

18  that?

19  A    Yes.

20  Q    And you did not feel that as the organizer you could

21  bullycide Antifa, correct?

22  A    Yes.

23  Q    Well, I guess"?

24  A    That's what I said.

25  Q    Is that what you said?

J. Kessler - Direct

1   A     Yes.

2   Q     Yes.  And you would agree, Mr. Kessler, that as the

3   organizer of the event there were things that you would not do,

4   and instead other people would do them, correct?

5   A     I don't know.  It depends on the context.

6   Q     I'm asking you generally.  As the organizer of the event,

7   there were things that you did not do and instead you asked

8   other people to do them?

9   A     I definitely delegated some tasks.

10  Q     Right.  Because there were things you didn't want to do as

11  the organizer, correct?

12  A     I definitely delegated some tasks.

13          MS. DUNN:  Your Honor, please direct the witness.  We

14  ask the Court to direct the witness to answer the question.

15          THE COURT:  Well, I don't know it's -- he can

16  explain.  You're asking him to agree to something more than yes

17  or no.

18  BY MS. DUNN:

19  Q     So, Mr. Kessler, as the organizer of the event, there were

20  things that you -- like in this Discord post, you wanted to

21  keep separate from yourself and you wanted other people to do

22  them, right?

23  A     I wouldn't agree with your statement, "like in this

24  Discord post."  I was horsing around here.  This was not a

25  serious discussion.

J. Kessler - Direct

1  Q    How about generally?

2  A    Yeah, generally, yes, I did delegate some tasks that I

3  didn't have time to do or whatever.

4  Q    Or you didn't want to do.  You didn't think you should do

5  as the organizer, right?

6  A    I was very busy.  I was fighting a battle with the ACLU at

7  a certain point in this situation.  I had serious duties.  I

8  was talking with the police.

9  Q    Okay.

10         MS. DUNN:  Mr. Spalding, will you show Mr. Kessler

11 1432A, please.

12  BY MS. DUNN:

13 Q    Mr. Kessler, you'll recognize this as another Facebook

14 conversation in the group RVA Anticom that you were a part of,

15 yes?

16 A    Let me look and make sure.  I'm trying to do this quickly.

17 I'll just stipulate that I'm in there if you say, so we can get

18 moving.

19         MS. DUNN:  Your Honor, we move to admit 1432A.

20         THE COURT:  Be admitted.

21         (Plaintiff Exhibit 1432A marked.)

22         (Plaintiff Exhibit 1432A admitted.)

23         MS. DUNN:  Mr. Spalding, if we could show Mr. Kessler

24 the conversation that begins, "We need a new way to tip off

25 Antifa."  Do you see that?

J. Kessler - Direct

1  BY MS. DUNN:

2  Q    All right.  Mr. Kessler, on June 14th of 2017 you posted,

3  "We need a new way to tip off Antifa when we want them to show

4  up somewhere.  Someone who can send photos and tips to their

5  members.  Either with a fake account or some apolitical normie

6  who will do it on our behalf."

7      And then Shane Goode says, "I can probably get my girl to

8  use her account to do it.  Just let me know what to do."  And

9  then you respond, "That would be cool.  We definitely want to

10  play these people into our hands Saturday in Charlottesville."

11  Do you see that?

12  A    Yes, ma'am.

13  Q    And Saturday in Charlottesville is August 12th?

14  A    I'm not sure about that because this is way back in June.

15  So I couldn't say about that.

16  Q    Okay.  So it's possible that you were trying to get Antifa

17  to come to other events before Charlottesville 2.0 and you're

18  talking about some other event here?

19  A    It's possible.  My memory is not perfect on this issue.

20  This is really in the weeds.

21  Q    Okay.  So you're going to deny that that Saturday in

22  Charlottesville is some other Saturday when you were planning

23  some sort of event in Charlottesville --

24          MR. KOLENICH:  Objection.  Mischaracterizes what he

25  said.  He said his memory is not perfect on this issue.  He

92

J. Kessler - Direct

1    didn't say he was denying anything.

2              THE COURT:  Okay.  You can ask him a question and

3    clear it up.

4     BY MS. DUNN:

5    Q    Thank you.  Mr. Kessler, you're going to deny that

6    "Saturday in Charlottesville" meant Saturday, August 12th in

7    Charlottesville?

8    A    As I said, I don't remember.

9    Q    Let's show Mr. Kessler Plaintiffs' Exhibit 1034.  You'll

10   recognize this as a Discord post in the #announcements channel

11   of Charlottesville 2.0 Discord server?

12   A    Yes, I do.

13             MS. DUNN:  Your Honor.  I move to admit PX 1034,

14   please?

15             THE COURT:  Be admitted.

16             (Plaintiff Exhibit 1034 marked.)

17             (Plaintiff Exhibit 1034 admitted.)

18   BY MS. DUNN:

19   Q    So this is another message you write to @everyone in the

20   Discord server.  And it's from June 7th of 2017, and it's under

21   the heading "Regarding self-defense"; do you see that?

22   A    Yes, ma'am.

23   Q    You write, "Sticks and shields.  I recommend you bring

24   picket signposts, shields and other self-defense implements

25   which can be turned from a free speech tool to a self-defense

J. Kessler - Direct

1  weapon should things turn ugly."

2       You were referring here to picket signposts, shields and

3  other implements as self-defense weapons, right?

4  A    They could potentially be if things turned ugly.  That's

5  the key phrase.

6  Q    That's what you say, correct?

7  A    Yes.

8  Q    Then under the topic "Open Carry," you say, "Please do not

9  open carry.  We want to avoid that optic for both the media and

10  Antifa.  We ultimately don't want to scare them from laying

11  hands on us if they can't stand our peaceful demonstration."

12  You see that?

13  A    That's correct.

14  Q    Right.  Because it's fair to say you didn't want to scare

15  Antifa from laying hands on you and your group, right?

16  A    Ma'am, this is a common tactic that even Martin Luther

17  King used, was to put people out front and be attacked --

18            MS. DUNN:  Your Honor, move to strike.

19            THE COURT:  Just answer the question.

20            THE WITNESS:  Yes.

21  BY MS. DUNN:

22  Q    Yes is your answer?

23  A    Yes.

24  Q    Yes.  All right.

25            MS. DUNN:  Mr. Spalding, please show Mr. Kessler

94

J. Kessler - Direct

1  PX-952.

2  BY MS. DUNN:

3  Q    You'll recognize this as another exchange with you and

4  other people from the #general channel of the Charlottesville

5  2.0 server.  Do you recognize that?

6      If you scroll down, Mr. Spalding, Mr. Kessler can see his

7  name.

8  A    I see my name is there, yes.

9          MS. DUNN:  Your Honor, move to admit 952, please.

10          THE COURT:  Be admitted.

11          (Plaintiff Exhibit 952 marked.)

12          (Plaintiff Exhibit 952 admitted.)

13   BY MS. DUNN:

14  Q    So these are posts from the next day, June 8th, on the

15  Charlottesville 2.0 server.  Someone named Saint Charles posts

16  on June 8th of 2017, "It's not even about optics.  If we want a

17  chance to beat down Antifa, showing off guns so that it's just

18  a screaming match isn't the way to do it.  If we want something

19  decisive, we shouldn't have something deterring them from

20  attacking us."  Do you see that?

21  A    I see.

22  Q    And if you go down to page 7 of this Discord chat, you can

23  see your response.  You say -- you say, "I 100 percent agree

24  with @SaintCharles.  If you want a chance to crack some Antifa

25  skulls in self-defense, don't open carry.  You will scare the

95

J. Kessler - Direct

1   shit out of them and they'll just stand off to the side."  Do

2   you see that?

3   A    I see that I said that, yes.

4   Q    Let's look at PX-1461C.  This is a Facebook chat involving

5   you.  Do you see that?

6   A    Yes.  I do.

7   Q    Okay.

8            MS. DUNN:  Your Honor, move to admit 1461C.

9            THE COURT:  Be admitted.

10           (Plaintiff Exhibit 1461C marked.)

11           (Plaintiff Exhibit 1461C admitted.)

12   BY MS. DUNN:

13   Q    All right.  And here you're in a Facebook group chat with

14   a group, Charlottesville Anticom.  And again we're reading from

15   the bottom up.  You write on July 7, 2017 to @CJ Ross:  "Can

16   you guys conceal carry?  I don't want to scare Antifa off from

17   throwing the first punch."  Do you see that?

18   A    Antifa throwing the first punch, yes, I do see that.

19   Q    You wrote that?

20   A    Yes.

21   Q    You say, "We are going to have lots of armed military vets

22   in attendance.  So we're not going to be lacking for fire

23   power."  Do you see that?

24   A    Yes.

25   Q    And then CJ Ross responds about the concealed carry.  He

J. Kessler - Direct

1  says, "Some people are fighting him on that.  They want to open

2  carry."  Do you see that?

3  A    Yes.

4  Q    "If that's the case, perhaps we can get together with them

5  and coordinate somewhere to put them until anything breaks

6  out."  Do you see that?

7  A    Yes.

8  Q    And when it says "put them," that's talking about the

9  guns?

10 A    This is another --

11 Q    So I just want to make sure --

12 A    I don't know who this guy is.  I mean, I talked to him,

13 but it's been a long time.

14 Q    Okay.  But I understand that you spoke to people who

15 sometimes you didn't know their identities.  I'm just asking in

16 this post, where he says "Some people want to open carry.  If

17 that's the case, perhaps we can get together with them and

18 coordinate somewhere to put them until anything breaks out."

19 And I want to ask you whether the "them" is referring to the

20 guns?

21 A    It could be.  I can't -- I can only speculate as to what

22 another individual intended.

23 Q    Okay.  Well, let's then look at your next post.  You say,

24 "The main thing is I just don't want a lot of big scary guns

25 out there that will keep Antifa away.  I want them to start

J. Kessler - Direct

1    something."

2         Do you see that, Mr. Kessler?

3    A    Yes.

4    Q    And you wrote that, "I want them to start something"?

5    That's something you wrote --

6    A    Yes, ma'am.

7    Q    -- in July of 2017?

8    A    Yes.

9    Q    All right.  We talked a little bit before about Derrick

10   Davis.  You said that you acknowledged he was somebody you

11   considered a friend, and he was also the regional director of

12   the Traditionalist Worker Party.  And I, just for the sake of

13   the jury, I'd like to put up 2435 that's been admitted into

14   evidence so that they can see who Derrick Davis was.

15        So that's Derrick Davis, right?

16   A    Yes.

17             MS. DUNN:  All right.  And Mr. Spalding, if you would

18   show Mr. Kessler 699.

19             (Plaintiff Exhibit 699 marked.)

20   BY MS. DUNN:

21   Q    Mr. Kessler, you can see from this Discord chat that in

22   the list of PR representatives who were going to work on

23   Charlottesville 2.0, Derrick Davis is the Traditionalist Worker

24   Party representative?

25   A    Yes.

J. Kessler - Direct

1  Q    Do you see that?  Eli Kline is the Identity Evropa

2  representative, for example?

3  A    Yes.

4  Q    All right.  Mr. Spalding, can you show Mr. Kessler --

5            MS. DUNN:  Oh, I apologize.  Move to admit 0699.

6            (Plaintiff Exhibit 699 admitted.)

7  BY MS. DUNN:

8  Q    Let's show Mr. Kessler PX-1444A, please.  This is -- you

9  had quite a lot of Facebook messages directly with Derrick

10 Davis.  You don't disagree with that, do you?

11 A    I definitely talked to him on Facebook.

12 Q    And sometimes it was just the two of you, right?  Like in

13 this conversation it says at the top, "conversation with

14 Derrick Davis"?

15 A    Looks that way, yes.

16            MS. DUNN:  Your Honor, move to admit 1444A.

17            THE COURT:  Be admitted.

18            (Plaintiff Exhibit 1444A marked.)

19            (Plaintiff Exhibit 1444A admitted.)

20 BY MS. DUNN:

21 Q    And on June 7th, which was -- is actually the same date as

22 some of the posts we were just looking at earlier, you say, "It

23 may take a little extra prodding to get" -- I want to make sure

24 Mr. Spalding can find this.

25        It's June 7th at 3:59.

J. Kessler - Direct

1    "It may take a little extra prodding to get SURJ out to

2    the Double Horseshoe."  Do you see that?

3    A    Yes.

4    Q    And SURJ is Stand Up for Racial Justice, right?  That's

5    the acronym?

6    A    Yes.  That's what it stands for.

7    Q    And Double Horseshoe is a bar?

8    A    Yes.

9    Q    And you say, "I know how to make sure SURJ shows up."  You

10   see that, right?

11   A    Yes.

12   Q    "Tell them you think we're with Richard Spencer."

13   A    Yes.

14   Q    And Derrick Davis says, "All right, then.  You got anyone

15   who could pass for Spencer from behind?"  Do you see that?

16   A    Yes.

17   Q    And then you say, "I don't think so, really."  There's

18   only one Richard Spencer, right?  You don't say that, but

19   that's the case, right?

20   A    I say "I don't think so really."

21   Q    Right.  And then you say -- you put a quote because this

22   is what you're saying should be posted, "Jason Kessler and his

23   group of fascists are meeting with Richard Spencer right now at

24   Double Horseshoe.  They're talking about the August 12th

25   event."

J. Kessler - Direct

1        Do you see that?

2    A    Yes.

3    Q    And Derrick Davis says, "I was thinking along those

4    lines."

5        And that's something you wanted posted so that SURJ would

6    see it and go to the Double Horseshoe, correct?

7    A    Apparently, yes.

8            MS. DUNN:  Let's move to 1444B.  Oh, actually, I

9    apologize, 1444C.

10           (Plaintiff Exhibit 1444C marked.)

11   BY MS. DUNN:

12   Q    This is another chat between you and Derrick Davis.  Do

13   you see that?

14   A    Yes.

15           MS. DUNN:  Your Honor, move to admit 1444C.

16           THE COURT:  Be admitted.

17           (Plaintiff Exhibit 1444C admitted.)

18   BY MS. DUNN:

19   Q    Mr. Spalding, if we could show the witness and the jury

20   the text that -- or the chats that begin with -- I think you

21   need the two from the other page.

22       It starts with, "Should we alert Antifa for Thursday's

23   meet-up or just the Proud Boys event on Saturday?"  Do you see

24   that?

25   A    Yes.

J. Kessler - Direct

1  Q    And Derrick Davis says, "Your call."  Up to you, right?

2  A    Yes.

3  Q    And you respond, "Tell them something like Kessler's group

4  is meeting on the Downtown Mall Thursday night.  Even more

5  troubling is that he's organizing the neo-Nazi Proud Boys group

6  to meet downtown on Saturday, presumably to plan for his August

7  12th rally.  As we've already seen, militia leader Based

8  Stickman has retweeted Kessler about the event."  You see that

9  you said that?

10 A    Yes.

11 Q    And that's the quote you're offering to be posted,

12 correct?

13 A    Yes.

14 Q    You also say, "We have to resist the Proud Boys coming to

15 our city.  Anyone who says that we should back down to these

16 terrorists is supporting their violence and racism being

17 normalized in our communities."

18      That's what you're suggesting Derrick Davis make sure be

19 posted, correct?

20 A    Yes.

21 Q    One question.  On the Proud Boys, that you refer to the

22 neo-Nazi Proud Boys, you were a member of the Proud Boys at

23 this time, correct?

24 A    Very briefly, but I don't think that they're a neo-Nazi

25 group.  This was all in quotes.  This is the way I view

J. Kessler - Direct

1    liberals as speaking about events.

2    Q    I understand.  And this is what you wanted posted.  That's

3    why it's in quotes, right?

4    A    Yes.

5    Q    Okay.  Let's show Mr. Kessler PX-1444D, please.

6              (Plaintiff Exhibit 1444D marked.)

7              MS. DUNN:  This is another Facebook chat that you had

8    with Derrick Davis.

9              Your Honor, we'd move to admit 1444D.  The witness

10   recognizes it.

11             THE COURT:  Be admitted.

12             (Plaintiff Exhibit 1444D admitted.)

13   BY MS. DUNN:

14   Q    All right.  So on June 18th of 2017, you write to

15   Mr. Davis, "Do you have a pole or something I can wave this

16   rebel flag from?"  Do you see that at the bottom?

17   A    Yes.

18   Q    And Mr. Davis says, "I mean, you can get a Walmart pole

19   for like 7 bucks."  You say, "I guess a thin pole would fit but

20   it seems made to use those brass holes."  Then you say -- he

21   says, "Walmart poles have brass grommet holders."  And you say,

22   "Is this the kind of thing you had in mind?  Doesn't seem that

23   aesthetic."  Then Mr. Davis says, "What are you talking about,

24   my dude?"  Do you see that?

25   A    Yes.

J. Kessler - Direct

1   Q    And you say "Flagpole."

2   A    Yes.

3   Q    And then if we go to the next page, he says -- you say

4   something we can't see.  And then he says, "No, the cheaper

5   one.  Can be weaponized."  You see that?

6   A    That's what he says.

7   Q    Right.  And he's talking about the flagpole, correct?

8   A    Yes.

9        MS. DUNN:  Okay.  We can take that down,

10  Mr. Spalding.

11   BY MS. DUNN:

12  Q    Mr. Kessler, you would agree with me, wouldn't you, that

13  it was important to be completely forthcoming with the police

14  about Charlottesville 2.0, right?

15  A    Yes.

16  Q    We'd like to show you text exchanges between yourself and

17  Defendant Kline.  They're 1458A through D.  And it may be that

18  the quickest way to do this is to hand them to you, rather than

19  try to show you four exhibits on the screen.  That will take

20  time.

21       So I'm going to ask Ms. Lawyer to hand you -- or to hand

22  the marshal.  And just let us know, Mr. Kessler, if you

23  recognize those as text exchanges you had with Defendant Eli

24  Kline from July 11th.

25  A    Yes.

J. Kessler - Direct

1        MS. DUNN:  All right.  Your Honor, move to admit

2   1458A through D please.

3        THE COURT:  Be admitted.

4        (Plaintiff Exhibit 1458A through D marked.)

5        (Plaintiff Exhibit 1458A through D admitted.)

6   BY MS. DUNN:

7   Q    So the first message in this exchange is from you to

8   Defendant Kline, saying, "Cops want to talk to me about the

9   rally."  Do you see that?

10  A    Yes.

11  Q    So in mid July the police had reached out to you and

12  wanted to know your plans.  You agree with that?

13  A    I had many discussions with the police.

14  Q    Right.

15  A    During this time as well.

16  Q    And you see that in the next text exchange, Mr. Mosley

17  says, "Just hold them off until we can talk about our plan a

18  bit more."  You see that, right?

19  A    Yes.

20  Q    And then you respond, "I told them all I can say is basic

21  stuff about Antifa trying to disrupt our setup in the morning

22  and block entrance to the park."  You see that?

23  A    Yes.

24  Q    And then in the next exchange you respond to Mr. Kline,

25  you say, "It would be helpful to give them a security liaison

J. Kessler - Direct

1    who can tell them what we want them to know."

2          You see that?

3    A    Yes.

4    Q    Let's show Mr. Kessler Plaintiffs' Exhibit 1460D.

5          Now, this is another Facebook conversation in which you

6    participated.  You can see your name there, right?

7    A    Yes.

8               MS. DUNN:  Your Honor, move to admit 1460D.

9               THE COURT:  Be admitted.

10              (Plaintiff Exhibit 1460D marked.)

11              (Plaintiff Exhibit 1460D admitted.)

12   BY MS. DUNN:

13   Q    And I'm going to direct your attention to the chats from

14   July 18th of 2017.

15         And actually, if you can get the -- those two and the one

16   right above it, Mr. Spalding.  Thank you.

17         You say, "If the police ask you how many people we have

18   coming, don't tell them.  If they think we have more than 400

19   they might be able to help the city pull our permit."  Do you

20   see that?

21   A    Yes.  I didn't want people speaking off the cuff and

22   saying something that they weren't qualified to speak on, like

23   attendance, that would screw up the legal issues.

24   Q    So your testimony is you didn't want people talking about

25   this because they weren't qualified?

J. Kessler - Direct

1   A    Yeah, they had no idea.  People could just randomly

2   speculate and it wouldn't be based on anything factual.

3   Q    Okay.  And you say, "Just say you don't know."

4        And then somebody named Wade Garrote says, "Are you guys

5   aware of Cantwell's conversation with Charlottesville PD?  He

6   played a recording of it on his show last night.  Sounds like

7   she might have been fishing for an expected number of

8   attendees."  Do you see that?

9   A    Yeah.  They were fishing for somebody to say the wrong

10  thing about the attendance that they had no idea about.  Like

11  they would just randomly speculate and then they would use that

12  to try and deny us our permit.

13  Q    Mr. Kessler, do you recall that after this in this

14  Facebook chat you say, "Privately, we can tout the 800 to a

15  thousand number, better for our enemies to underestimate us"?

16  Do you remember that you wrote that?

17  A    It's possible I said that at the time.  That wasn't the

18  actual attendance number, though.  Those numbers fluctuated

19  throughout the event.

20  Q    We'll talk about that, but you certainly agree that it's

21  possible you said that "Privately they should tout the 800 to a

22  thousand number because it's better for our enemies to

23  underestimate us," correct?

24  A    Can I see that?

25  Q    We'll pull it up.

J. Kessler - Direct

1      I'm going to move on while Mr. Spalding and Ms. Lawyer

2  find that for you.

3      If you could look at PX-1396.

4  A    It could have been a completely different time period.

5  That's why I want to know.  You're making it sound like these

6  things were at the same time.  So...

7  Q    We'll find it for you.  It's immediately after this.

8      Let's look at PX-1396.  This is another Facebook

9  conversation -- I apologize.  This is a text message between

10  you and Augustus Invictus.  Do you see this?

11  A    Yes.

12          MS. DUNN:  Move to admit 1396.

13          THE COURT:  Be admitted.

14          (Plaintiff Exhibit 1396 marked.)

15          (Plaintiff Exhibit 1396 admitted.)

16  BY MS. DUNN:

17  Q    In your text message to Augustus Invictus -- by the way,

18  who is Mr. Invictus?

19  A    He is one of the -- he was one of the scheduled speakers

20  at the event.

21  Q    And you say, "If you get a chance to speak to Detective

22  Kirby of the Charlottesville PD, if he asks you how many people

23  are coming with you, say you don't know."  Do you see that?

24  A    Yes.  This had to do with the legal issues surrounding the

25  permit.  When two parties are in --

J. Kessler - Direct

1   Q    Your Honor --

2   A    -- an adversarial situation in --

3   Q    Your Honor.

4   A    -- litigation, that's --

5   Q    Mr. Kessler.  Mr. Kessler.

6            THE COURT:  Just answer her narrow question.

7            MS. DUNN:  Your attorney has time to ask you

8   questions.

9            THE COURT:  Go ahead.  Just ask the question.

10           MS. DUNN:  Thank you.

11    BY MS. DUNN:

12  Q    You say to Mr. Invictus, "If Detective Kirby asks you how

13  many people are coming with you, say you don't know."  You see

14  that, correct?

15  A    Yes, ma'am.

16  Q    So this doesn't pertain to the general attendees.  These

17  are people who were coming with Mr. Invictus.  And you're

18  saying, say you don't know.  You see that, right?

19  A    I see what I said, but the larger interpretation, I don't

20  know if you're accurate about.

21  Q    Okay.  Let's show -- you have this?

22       All right.  Mr. Spalding, please show Mr. Kessler where on

23  Tuesday, July 18th of 2017, he says -- on the next page, where

24  he says, "Privately we can tout the 800 to thousand number.

25  Better for our enemies to underestimate that."  You see that

J. Kessler - Direct

1   you posted that, correct, Mr. Kessler?

2   A    Yes.

3           MS. DUNN:  Let's show Mr. Kessler PX-3841.

4           (Plaintiff Exhibit 3841 marked.)

5    BY MS. DUNN:

6   Q    Mr. Kessler, this is your permit application for

7   Charlottesville 2.0.  Do you recognize it?

8   A    Yes.

9   Q    Great.

10          MS. DUNN:  Your Honor, move to admit 1341.

11          THE COURT:  Be admitted.

12          (Plaintiff Exhibit 1341 marked.)

13          (Plaintiff Exhibit 1341 admitted.)

14  BY MS. DUNN:

15  Q    So this is the permit.  You can see, Mr. Kessler, that's

16  your signature, right?

17  A    Yes.

18  Q    Your permit is for August 12th of 2017.  Let's show the

19  jury the date.  Do you see that?

20  A    Yes.

21  Q    And it's for 10 a.m. to 5 p.m.  You see that?

22  A    Yes.

23  Q    And if you look above that, there is a space where you can

24  enter the location for which -- to which the permit applies,

25  and it says "Lee Park."  Do you see that?

J. Kessler - Direct

1  A    Yes.

2  Q    It doesn't say anything there other than Lee Park,

3  correct?  That's what it says?

4  A    It says Lee Park, yes.

5  Q    And if you look at the application, it has an option to

6  request street closings.  And you've checked "no."  You see

7  that?

8  A    Right.

9  Q    And the permit application also asks you to estimate the

10 number of participants.  And you say 400.  Do you see that?

11 A    Yeah, it looks like I did estimate that number.

12 Q    Yes.  Okay.  We can take that down, Mr. Spalding.

13      All right.  Mr. Kessler, let's talk about August 11th.

14 You led the torch march on Friday, August 11th, right?

15 A    False.  Eli Kline did.  Elliot Kline did, and Richard

16 Spencer.

17 Q    Okay.  So just to be completely clear, you deny that you

18 led the torch march?

19 A    I deny that.  I was there.  I did not lead it.

20 Q    Okay.  Got it.  Your testimony is that you didn't think a

21 torch march was associated with the KKK, and that instead,

22 people standing around would think this is like a Viking

23 demonstration from Europe back centuries ago.  Do you recall

24 that testimony in your deposition?

25 A    Yes, that sounds accurate.

J. Kessler - Direct

1   Q    Right.  And your testimony is that the decision on the

2   torch march was not made until the night of August 11th.

3   That's your testimony?

4   A    That's right.  We had preparations, but the decision to

5   actually do it was August 11th.

6   Q    Let's show Mr. Kessler the text between himself and

7   Mr. Kline.  It's 1306A through C.  And Mr. Kessler, we're

8   handing these to you.

9        Okay.  Do you see that those are your text messages with

10  Eli Kline?

11  A    Yes.

12          MS. DUNN:  And Your Honor, move to admit 1306A

13  through C.

14          THE COURT:  Be admitted.

15          (Plaintiff Exhibit 1306A through C marked.)

16          (Plaintiff Exhibit 1306A through C admitted.)

17   BY MS. DUNN:

18  Q    And you write on July 10th of 2017, "We have to change up

19  the torches plan."  Do you see that?

20  A    Yes.

21  Q    And Mr. Kline writes you back, "I agree with your Friday

22  night idea.  I think we may do that."  Do you see that?

23  A    That's what he says.

24  Q    So you don't disagree, Friday night was your idea, right?

25  A    I did come up with the idea of doing a torch march, but

J. Kessler - Direct

1  the leadership was taken from me on both August 11th and on

2  August 12th.  Elliot Kline and Richard Spencer were in control.

3  Q    Okay.  Look at the next text message, please.  You say,

4  "We could do it Friday in front of the Thomas Jefferson statue

5  at UVA's Rotunda."  Do you see that?

6  A    Yes.

7  Q    So you're not going to deny that it was your idea to do a

8  torch march in front of the Thomas Jefferson statue at the UVA

9  Rotunda on UVA's campus?

10  A    Correct.  I don't deny that it was my idea originally.

11  Q    Right.  And we can agree that, by July 10th, you and

12  Mr. Kline were planning a torch march there, correct?

13  A    He did help with some of the planning, yes.  He ultimately

14  took control of that.

15  Q    Mr. Kessler, please just answer my questions.  Your

16  counsel has time to ask you for any additional material.  Okay?

17     But we are agreed that, as of July 10th, you and Defendant

18  Kline are planning a torch march on the UVA campus at the

19  Thomas Jefferson statue, correct?

20  A    Yes.

21  Q    Okay.

22         MS. DUNN:  Let's show Mr. Kessler PX-0973.

23         (Plaintiff Exhibit 0973 marked.)

24  BY MS. DUNN:

25  Q    These are Discord posts with yourself and others in the

113

J. Kessler - Direct

1  #general channel of the Charlottesville 2.0 server.  Do you see

2  that?

3          THE WITNESS:  Yes.

4          MS. DUNN:  Your Honor, move to admit 973.

5          THE COURT:  Be admitted.

6          (Plaintiff Exhibit 0973 marked.)

7          (Plaintiff Exhibit 0973 admitted.)

8          MS. DUNN:  Thank you.

9   BY MS. DUNN:

10  Q    So these posts are from July 14th of 2017.  This is

11  several days after your text with Mr. Kline and almost a month

12  before the torch march.

13      Tyrone, who the jury has already heard is Mr. Chesny, asks

14  you whether there is a standardized torch to use.  Do you see

15  that?

16  A    Yes -- no, no, no.  I don't.  That's Some Guy 9112.

17  Q    I apologize.  Some Guy says, "Do we have a standardized

18  torch to use?"  You're asked that, right?

19  A    Yes.

20  Q    And you would agree, then, that by July 14th you had told

21  other people on Discord about the torch march, right?

22  A    Yes.  We had preparations for it.

23  Q    Right.  And you would agree that, by July 14th, you told

24  people in the #general channel of Discord, people you don't

25  even know, who -- that there was going -- that there were

J. Kessler - Direct

1  preparations for a torch march.  You agree with that, right?

2  A    Yes, there were preparations.

3  Q    Right.  And you did not see fit at this time to tell

4  anybody at UVA or the police that preparations were in train

5  for a torch march, right?

6  A    I was not in any communication with the UVA police.  I was

7  planning the rally that was in Charlottesville, which was a

8  different jurisdiction.

9  Q    Did you tell any police or anybody associated with the

10  administration of University of Virginia that there was going

11  to be a torch march on their campus, preparations were in train

12  as of July 14th?  Did you tell anybody that?

13  A    No.  I told them later.

14  Q    Okay.  All right.  And instead, you advised everybody on

15  the #general channel of the Charlottesville 2.0 Discord server,

16  "What would be useful is for all the groups to order their

17  tikis in batches online and have them shipped to someone here

18  in Virginia to bring to Charlottesville.  Is there anyone who

19  can help us transport tikis?"

20      And so at this point you would agree with me that the plan

21  was concrete enough that you're discussing ordering and

22  shipping tiki torches to Charlottesville, Virginia, right?

23  A    That was part of the discussions, the preparations, yes.

24  Q    That's right.

25          MS. DUNN:  And, Mr. Spalding, let's show Mr. Kessler

J. Kessler - Direct

1    PX-375.

2                (Plaintiff Exhibit 0375 marked.)

3    BY MS. DUNN:

4    Q    Now, these are Discord posts in the Azzmador channel --

5    I'm sorry, the Azzmador server in the #general channel.

6                MS. DUNN:  This exhibit has already been admitted and

7    we can show it to the jury.

8                THE COURT:  Be admitted.

9    Q    And here, Azzmador -- who you've referred to as a terrible

10   person?

11   A    Yes.

12   Q    -- says, "@everyone, go to your local Dollar Store or

13   Walmart and get cheap tiki torches for the Charlottesville

14   event.  There will be a torch march."  And you see that he says

15   that on July 31st, right?

16   A    This is the first time I've seen this.  This is not in my

17   Discord server, but it appears that he did say it to his

18   private group of supporters.

19   Q    Right.  But you are not going to dispute, sir, that as of

20   July 31st, Robert "Azzmador" Ray had enough knowledge to tell

21   people that they should buy tiki torches for the

22   Charlottesville event, right?  You can't deny that?

23   A    Absolutely.  Azzmador was in close communication with Eli

24   Kline, and Eli Kline and Azzmador staged a mutiny against me at

25   this event, with other people.

J. Kessler - Direct

1                MS. DUNN:  Your Honor, move to strike.

2                THE COURT:  All right.

3                MS. DUNN:  Move to strike.

4    BY MS. DUNN:

5    Q    My question, Mr. Kessler, is:  You are not going to

6    dispute, sir, that as of July 31st, Robert Azzmador Ray had

7    enough knowledge to tell people that they should buy tiki

8    torches for the Charlottesville event, right?

9    A    I see that's what he says on that date.  So it must be so.

10   Q    Right.  And he had knowledge, but nobody at the police and

11   nobody at the University of Virginia had that knowledge that he

12   had on July 31st?

13               MR. KOLENICH:  Objection to what Azzmador did or

14   didn't know.

15               THE COURT:  Sustained.

16   BY MS. DUNN:

17   Q    And at one point, you estimated 500 marchers on

18   August 11th in the march; do you recall that?

19   A    Can you show it to me?

20   Q    In your deposition you were asked this deposition and you

21   gave this answer?

22        Question:  "And you estimated about 500 marchers,

23   correct?"

24        Answer:  "In this document, that was my estimate."

25        Question:  "But the estimate is of the marchers, correct?"

J. Kessler - Direct

1     Answer:  "Yes."

2     Question:  "So you believed you had about 500 marchers?"

3     Answer:  "It's difficult to say.  I've heard it between

4  200 to 500.  In this one I put 500."

5     You were asked that question and you gave that answer, and

6  the document there that you're talking about is a Court

7  filing --

8          THE COURT:  Let him agree with the record.  Correct.

9  BY MS. DUNN:

10 Q   Do you recall that this was said at your deposition?

11 A   Sorry, I lost your train.  It's like I'm -- I'm testifying

12 about something that I saw then and now I'm testifying about my

13 testimony about the thing I saw.  So it's a little --

14 Q   Mr. Kessler, your deposition was under oath testimony.

15         THE COURT:  Now, wait a minute.  The deposition shows

16 that the question was asked and he gave the answer.  So the

17 record shows that.  So we'll move on.

18         MS. DUNN:  Thank you, Your Honor.

19  BY MS. DUNN:

20 Q   When you say you called the police on August 11th, the

21 individual you called was Patrol Lieutenant Angela Tabler of

22 the University of Virginia Police Department.  That's who you

23 say you called, correct?

24 A   Not exactly.  I called my liaison with the Charlottesville

25 Police Department, Wendy Lewis.  I also called Victor Mitchell,

J. Kessler - Direct

1 another captain with the Charlottesville Police Department, and

2 they forwarded me to her.

3 Q    Okay.

4 A    So she called me, but it was after they had contacted her

5 on my behalf.  So that's how it worked.

6 Q    Right.  But just to be completely clear, those calls that

7 you're talking about where they forwarded you to Lieutenant

8 Tabler were the night of August 11th; they were not before

9 that?

10 A    Yes, ma'am.  We called them on August 11th before we did

11 the march.

12 Q    At night, right?

13 A    Yes.  It was in the evening.

14 Q    Correct.

15      All right.

16          MS. DUNN:  Mr. Spalding, please show Mr. Kessler

17 PX-3258-O.

18 BY MS. DUNN:

19 Q    Mr. Kessler, these are your phone records again.  We've

20 located the only phone call with Lieutenant Tabler.

21 Mr. Spalding can show it to you.

22      It's August 11th at 7:46 p.m.  It's an incoming call -- In

23 other words, she called you; you did not call her -- and it

24 lasts for five minutes.  Do you see that?

25 A    Yes, that's exactly what I was testifying to before.

J. Kessler - Direct

1  Q    All right.  Let's show --

2           MS. DUNN:  Okay.  We can take that down,

3  Mr. Spalding.  I guess we never put it up.

4  BY MS. DUNN:

5  Q    All right.  So you're aware, Mr. Kessler, that Lieutenant

6  Tabler has said under oath that when she called your phone

7  Mr. Mosley answered -- that's Mr. Kline -- and told her that

8  the marchers would proceed directly up University Avenue to the

9  Thomas Jefferson statue, where they would assemble for

10 15 minutes and leave?

11      You're aware that she has said that under oath, correct?

12 A    The only thing I remember from that is she said that she

13 called me five times, which was a lie.

14 Q    Your Honor --

15 A    And you can look at those phone records and see that.  I

16 don't recall what else she said in that transcript or whatever.

17 Q    So you don't recall that she said Mr. Mosley answered and

18 told her the marchers would proceed up University Avenue and

19 would assemble for 15 minutes?

20 A    I would consider what Lieutenant Tabler said under oath to

21 be highly suspect.  What my memory is is that I called --

22           MS. DUNN:  Your Honor --

23           THE COURT:  Wait.  You don't agree with it?

24           THE WITNESS:  I don't agree.  Well, I don't know if

25 it's -- my memory is that I answered the call --

J. Kessler - Direct

1          THE COURT:  Well, wait a minute.  She asked you if

2   you agreed and you don't agree.

3          MS. DUNN:  I'm just asking if he's aware.

4          THE COURT:  Let's move on.

5          MS. DUNN:  I'm just asking if he's aware.

6          THE COURT:  Okay.

7    BY MS. DUNN:

8   Q    So are you aware she said this?

9          THE COURT:  No, no, it doesn't make any difference if

10  he's aware.  That's not evidence.

11         MS. DUNN:  Okay.  All right.

12  BY MS. DUNN:

13  Q    In any event, Mr. Kessler, we can agree that the torch

14  march did not proceed directly up University Avenue to the

15  Thomas Jefferson statue, assemble for 15 minutes, and leave,

16  right?

17  A    It was more chaotic than that.

18  Q    Right.  But you're aware that the route -- and the jury

19  has already seen the route in this trial.  It goes very much

20  around, past many university buildings, and it comes all the

21  way down the Lawn, right?

22  A    Yes.  That's because Eli Kline was leading the march and

23  he's not from this area.  He was leading people in a weird

24  direction.  And then Mr. Spencer --

25         MS. DUNN:  Your Honor, move to strike.

J. Kessler - Direct

1              THE COURT:  Sustained.

2              MS. DUNN:  Thank you.

3    BY MS. DUNN:

4    Q    Let's show Mr. Kessler Plaintiffs' Exhibit 2348.

5         So this is a photo of the torch march.  And you can see

6    yourself in this photo, correct, Mr. Kessler?

7    A    Yes.

8    Q    There you are.

9              MS. DUNN:  And let's move to admit 2348 and show the

10   jury.

11             THE COURT:  Be admitted.

12             (Plaintiff Exhibit 2348 marked.)

13             (Plaintiff Exhibit 2348 admitted.)

14   BY MS. DUNN:

15   Q    All right.  Mr. Kessler, there you are; right?  That's

16   you?

17   A    Yes.

18   Q    And you can see all those people behind you.  You see

19   that?

20   A    There are people behind me.

21   Q    Lots of people.  And I think if we look closely, we can

22   see Mr. Spencer as well.  Are we able to see Mr. Spencer in

23   this photograph?  Do you see him?

24   A    I don't see him in this particular photograph.

25   Q    But he was very close to you during this torch march,

J. Kessler - Direct

1   correct?

2   A    He was near the front as well.

3   Q    Right.  And in your deposition, you were asked, "Which of

4   the defendants in this case was marching with you?"  And you

5   answered:  "Cantwell was nearby.  Eli Mosley was at least

6   within site in a number of instances."

7        Question:  "Was Spencer there?"

8        Answer:  "Yes, he was."

9        And you knew, Mr. Kessler, that students live on the

10  historic UVA Lawn where you marched.  You went to school here,

11  so you know that, right?

12  A    I know they do, but I didn't know at that time.  It was

13  off-season.

14  Q    So you knew people lived there, but you're saying that you

15  thought maybe on August 12th, like there just -- people

16  wouldn't be there?

17  A    I didn't even think object it, to be honest.  The thought

18  one way or the other didn't cross my mind.

19  Q    So you didn't pay -- you paid no -- you paid no attention

20  to the fact that people lived there, right?

21  A    No.  It wasn't part of any of my decision-making process.

22  Q    Okay.  And in your deposition you were asked, question:

23  "And you believed that burning crosses was wrongful behavior;

24  is that correct?"

25        Answer:  "It depends on where it's done.  If it's done on

J. Kessler - Direct

1   private property, that's lawful, but I think that burning it on

2   someone else's lawn, on their property, would be an act of

3   intimidation."

4         You were asked that question and you gave that answer?

5   A    Yes.

6   Q    You were also asked these questions and gave these

7   answers.

8         Question:  "But you understand, do you not, that the KKK

9   invokes fear in black people and Jews; is that right?  You know

10  of American history?"

11        Answer:  "Yeah, sure."

12        Question:  "To know that the KKK stands for antiblack and

13  antisemitic opinions; isn't that right?"

14        Answer:  "I know that they don't make blacks and Jews

15  comfortable.  That's true."

16             MS. DUNN:  Mr. Spalding, let's show Mr. Kessler --

17  BY MS. DUNN:

18  Q    Oh, I'm sorry.  Do you remember giving that testimony?

19  A    I trust you if I said it.  Let's move on.

20  Q    All right.

21             MS. DUNN:  Let's go to Plaintiffs' Exhibit 2676.

22  Show Mr. Kessler this photograph that he produced to us.

23  BY MS. DUNN:

24  Q    Mr. Kessler, this is a photo of you.  Do you recognize

25  yourself?

J. Kessler - Direct

1  A    Yes, ma'am.

2          MS. DUNN:  Move to admit 2676.

3  BY MS. DUNN:

4  Q    This is a photo of you holding a torch and walking up the

5  steps of the Rotunda.  You can see yourself here.  Then this is

6  Ben Daley of the Rise Above Movement all the way to the right,

7  and you recognize him, correct?

8  A    I don't know that man.  I don't recognize him.

9  Q    All right.  Let's talk, then --

10          MS. DUNN:  Oh, I'm sorry.  Your Honor, I move to

11  admit 2676 so the jury can see.

12          THE COURT:  All right.  Be admitted.

13          (Plaintiff Exhibit 2676 marked.)

14          (Plaintiff Exhibit 2676 admitted.)

15   BY MS. DUNN:

16  Q    Mr. Kessler, let's talk about the moment when you got to

17  the top of the Rotunda and looked down.

18      I'd like to show 2695, which is already admitted.  And

19  it's a picture of people, but including this banner that was

20  visible from the top of the Rotunda as you come down?

21  A    Uh-huh.

22  Q    So when you got to the top of the Rotunda, you saw that

23  there were approximately 20 people surrounding the statue with

24  this banner that said "VA students act against white

25  supremacy," right?  That's what you saw?

J. Kessler - Direct

1    A    I don't know that my attention was drawn to the sign.  I

2    did see that there were what you would call counter-protesters

3    there at the base of the statue.

4    Q    Right.  So your testimony is that somehow you missed this

5    big banner?

6    A    There was a lot going on.  I wasn't paying attention to

7    the banner, no.

8    Q    Okay.  And so -- but your testimony at your deposition was

9    that, when you got to the top of the Rotunda and you looked

10   down, you were very concerned, right?  That's your testimony?

11   A    I was, yeah.

12   Q    Right.  And you testified that you were so concerned that

13   you did everything within your power to try to stop the torch

14   marchers from coming into the plaza.  You recall that you

15   testified to that?

16   A    Yeah, that's my memory.

17   Q    Right.  But everything in your power did not include

18   leading the marchers in a different direction, correct?

19   A    That was not within my power.  I tried.  I put up my

20   hands.  I said, "Stop."

21   Q    Okay.

22   A    It didn't do anything.  There was another guy named Eli

23   Kline who had a megaphone and was directing them.

24   Q    And everything in your power, Mr. Kessler, did not include

25   trying to communicate to the students, right?

J. Kessler - Direct

1  A    Well, when I came down there, my attention was not on the

2  students.  To be clear, there were a number of very large

3  tattooed people carrying guns who had mace, and my attention

4  was on those people, because they scared me.

5          MS. DUNN:  Your Honor, move to strike.

6   BY MS. DUNN:

7  Q   I'm just asking, when you say everything in your power,

8  Mr. Kessler, we want to understand what you're talking about.

9  And everything in your power did not include trying to

10  communicate to the students or counter-protesters, correct?

11  A    Everything in my power was I -- when I got to the top of

12  those steps, I thought there were going to be police down there

13  keeping us separate.  That was what I was told.  I did that for

14  the safety of both sides.  When I saw that that wasn't

15  happening, I put up my hands and I said, "Stop."  I had a torch

16  in my hand and I said, "Stop."

17  Q    And Mr. Kessler, everything in your power did not include

18  calling the police, who you say you called all the time.  Your

19  phone records reflect you did not call them?

20  A    There was no time for that.

21  Q    And everything in your power did not include contacting

22  Eli Kline about this, who you said had a megaphone, right?  You

23  said you were looking around.  You couldn't find him.  He had a

24  megaphone.  You didn't --

25  A    Ma'am, I was in total shock.  We had called the police,

J. Kessler - Direct

1  and I was expecting them to be there and keeping the

2  separation.  We never would have done this thing --

3          THE COURT:  Okay.  Ask him if he tried to tell Kline

4  to stop.

5          THE WITNESS:  I didn't see Kline.

6  BY MS. DUNN:

7  Q   Right.  But your phone records will reflect that you spoke

8  by phone to Eli Kline six times during the torch march, and

9  that's -- and your phone records are already in evidence.  And

10  you didn't call him and say, "This has gone horribly awry and

11  there are people there and we need to keep separation.  I'm

12  doing everything in my power."  You did not do that, did you,

13  Mr. Kessler?

14  A   My recollection of the phone calls is not so good.  It was

15  a very short period of time between, like, when we were at the

16  top of the steps and people started being down there.  Like --

17  Q   Okay.  All right.

18          MS. DUNN:  Let's show Mr. Kessler PX-2344.

19          (Plaintiff Exhibit 2344 marked.)

20  BY MS. DUNN:

21  Q   This is a picture, Mr. Kessler, of the torch march.  Do

22  you see this?

23  A   Yes.

24  Q   Okay.

25          MS. DUNN:  Can we admit 2344 and publish it to the

J. Kessler - Direct

1  jury, Your Honor?

2           THE COURT:  Yes.  It's admitted.

3           (Plaintiff Exhibit 2344 admitted.)

4  BY MS. DUNN:

5  Q    All right.  Mr. Kessler, do you see this photo of the

6  torch march?

7  A    Yes.

8  Q    And you see yourself?

9  A    Yes.

10 Q    Can you circle yourself?

11 A    How do I do that?  Is it a touchscreen?

12 Q    It's a touchscreen.

13 A    Okay.  Right here.

14      (Witness complies.)

15 Q    Sir, is this before or after you did everything in your

16 power to stop this?

17 A    This is after.

18 Q    Now, during the torch march -- so by this point you had

19 given up?

20 A    At that point I had seen the Antifa with firearms, which

21 they're not supposed to have on the property.  I had seen them

22 with mace.  I had seen big tattooed people giving me the middle

23 finger, and I tried to get away from that situation, because

24 that wasn't a good situation.

25 Q    One second, Mr. Kessler.

J. Kessler - Direct


1      Mr. Kessler, you said that you saw counter-protesters with

2  guns?

3  A    Yeah.

4  Q    That was your testimony?

5  A    There was one individual who had a gun, at least.

6  Q    All right.  We'll come back to that.

7      During the torch march, the white nationalists chanted

8  "you will not replace us," and some chanted "Jews will not

9  replace us."  You know that, right?

10 A    Yes.  I do.

11 Q    And you participated in the chanting, right?

12 A    I said "you will not replace us."  I never would have done

13 that second chant.

14 Q    Okay.  And why wouldn't you have done that chant?  What's

15 wrong with that?

16 A    Because I don't agree with that.  I don't agree with these

17 people that are so focused on Jews.  It really doesn't enter

18 into my thought process very much.  I was trying to do a white

19 civil rights rally.

20 Q    And you would agree that there were many peopled very

21 focused on the Jews?

22 A    Yeah, there were.

23 Q    And that many of those people were part of your march,

24 right?

25 A    They were.

J. Kessler - Direct

1  Q    And that many of those people were part of your event,

2  correct?

3  A    They were.

4  Q    All right.

5          MS. DUNN:  And let's show Mr. Kessler PX-1031.

6          (Plaintiff Exhibit 1031 marked.)

7  BY MS. DUNN:

8  Q    So you recognize this?  This is a post that you made in

9  the #chants channel of the Charlottesville 2.0 server?

10 A    Yes.

11 Q    And in this Discord chat from June 6th, Tyrone tells you

12 that "'You will not replace us' is super-triggering.  I know

13 that from experience."  Do you see that?

14 A    Yes.  He suggested a chant, it looks like.

15 Q    So by the torch march on August 11th, you knew that this

16 chant was super-triggering.  Someone had told you that, right?

17 A    People are triggered by everything the alt-right does, all

18 their speech.

19 Q    Okay.

20 A    Everything.

21 Q    And at your deposition you were asked:  "And do you agree

22 that a chant 'Jews will not replace us' and 'Sieg Heil' chants

23 are intimidating to Jews?"

24     And your answer was:  "I can't say.  It's offensive to

25 them, certainly."

J. Kessler - Direct

1      You remember saying that, right?

2  A    If you say I did, I did.

3  Q    Well, I want to make sure for the record that you're not

4  just taking my word for it.

5  A    I don't dispute it.  I don't dispute it.

6           MS. DUNN:  Let's show Mr. Kessler PX-2082.

7           We'll move to admit this last exhibit, Your Honor.

8           THE COURT:  Be admitted.

9           (Plaintiff Exhibit 1031 admitted.)

10 BY MS. DUNN:

11 Q    PX-2082.  This is your tweet from August 11th.  Do you see

12 this?

13 A    Yes, ma'am.

14           MS. DUNN:  Your Honor, move to admit 2082.

15           THE WITNESS:  Be admitted.

16           (Plaintiff Exhibit 2082 marked.)

17           (Plaintiff Exhibit 2082 admitted.)

18 BY MS. DUNN:

19 Q    Mr. Kessler, after the violence of Friday night, where you

20 claim you tried to do everything in your power to prevent it,

21 you tweeted that this was "an incredible moment for white

22 people."  You see that?

23 A    I said it, but it wasn't about being after the violence.

24 It was after a civil rights march, in my view.

25 Q    And you don't dispute that this tweet came after all the

J. Kessler - Direct

1   events we saw on August 11th, that night, right?

2   A    That's accurate.

3   Q    And the banner we talked about, the student banner, is

4   even visible in this tweet.  Do you see that?

5   A    I can see a portion of it, yeah.

6   Q    Okay.

7          MS. DUNN:  Let's show Mr. Kessler PX-3797.

8          (Plaintiff Exhibit 3797 marked.)

9   BY MS. DUNN:

10  Q    Do you recognize this as a tweet from August of this year?

11  Do you see this?

12  A    Yes.

13  Q    Okay.

14         MS. DUNN:  Move to admit 3797.

15         THE COURT:  Be admitted.

16         (Plaintiff Exhibit 3797 admitted.)

17  BY MS. DUNN:

18  Q    And Mr. Kessler, even from August of this year, you're

19  still tweeting, "And looking back with pride on August 11th"?

20  A    I think that the march and everything was historic, and it

21  was a civil rights march protected by the First Amendment.  I

22  am not in favor of any of the violence that happened.

23  Q    And so, Mr. Kessler, let me ask you this:  On a scale from

24  0 percent to 100 percent, how much responsibility do you think

25  that you bear for what happened on Friday night?

J. Kessler - Direct

1  A    On Friday night, I don't think that I bear any

2  responsibility.  I tried my best.  I contacted the police.  We

3  had a meeting before where I told people that it was important

4  to be nonviolent on both August 11th and on August 12th because

5  of the legal battle that we've been through.  I told people we

6  had to look like the good guys.  Besides that, I put out an

7  operational document which told people not to use the tikis --

8             MS. DUNN:  Your Honor, move to strike.

9             THE COURT:  You asked that question.  I don't know

10  why you didn't expect that answer.

11             THE WITNESS:  Can I finish my answer, Your Honor?

12             THE COURT:  No.  Don't.  I think you're through.

13             MS. DUNN:  Thank you, Your Honor.  Okay.

14             So let's show Mr. Kessler 1458J, K, L, M, and N.

15  These are his texts with Eli Kline the night of August 11th.

16             THE CLERK:  Is that 1458, Ms. Dunn?  1458?

17             MS. DUNN:  1458.  My apologies.

18             (Plaintiff Exhibits 1458J, K, L, M, and N marked.)

19             THE COURT:  Be admitted.

20             (Plaintiff Exhibits 1458J, K, L, M, and N admitted.)

21  BY MS. DUNN:

22  Q    So 1458K is a text message from Eli Kline to you -- I'm

23  sorry, 1458J is a text message from you to Eli Kline at 10:12;

24  do you see that?  It says, "Come around the front of the

25  statue"?

J. Kessler - Direct

1    A    Yes.

2    Q    And 1458K is a text message from Eli Kline to you at 11:15

3    that night; do you see that?  He says, "Great work.  Rest

4    easy."

5    A    I see that's what he said.

6    Q    Right.  And then he says -- you say, "When and where are

7    we meeting tomorrow?"  He says, "I will be at McIntire Park at

8    5 or 6 a.m.  I'll let you know which."  Do you see that?

9    A    Yes.

10   Q    And then there is a text message from you to Eli Kline

11   where you say, "And thanks.  You've done excellent work too.

12   Let's knock this out of the park tomorrow."  Do you see that?

13   A    Yes.

14   Q    So by 11:16 p.m., the torch march is over and your texts

15   to him don't say one word to your co-organizer about the fact

16   there was so much violence at the torch march and about how to

17   prevent more from happening the next day.  That is not what you

18   write to him.  You say "excellent work," right?

19   A    When you look at the picture that you put up of me, I'm

20   way on the outside.  I didn't see what was going on around that

21   statue.  All I saw was some pepper spray flying, and I don't

22   condone either side doing that stuff.  It didn't factor into

23   what I'm saying about that event whatsoever.

24   Q    Okay.  So your testimony is that you just didn't see any

25   of the violence?

J. Kessler - Direct

1    A    Yeah.  I mean, now I've seen all the videos, just like

2    what you play in court, like in HD right there.  I didn't see

3    that at the time.

4    Q    Okay.

5    A    I tried to stay away from it once I saw the people with

6    the weapons.

7    Q    Thanks, Mr. Kessler.

8         On August 12th -- let's talk about August 12th.  You

9    arrived at McIntire Park by 9 a.m.?

10   A    I'm sorry.  Can you repeat the question?

11   Q    On August 12th, you arrived at McIntire Park by 9 a.m.?

12   A    I don't remember what time I arrived.

13   Q    And even though -- do you remember this?  Even though you

14   came west from McIntire Park, you didn't go in the southwest

15   entrance.  You went in the southeast entrance; do you recall

16   that?

17   A    I don't know which one is southwest or whatever, but,

18   like, if you're on Market Street looking at the park, there's

19   one on the left and one on the right.  And at first we went

20   into the one on the right, and then I guess we figured that we

21   were going to leave, and we went around to the other side of

22   the park.

23   Q    Okay.  So if you're looking at the park -- thanks, Matt.

24        Can you tell me which entrance you're talking about when

25   you're talking about "the one on the right"?

J. Kessler - Direct

1   A    Is this Market Street right here?

2   Q    No.

3   A    Where is Market Street?

4   Q    I believe Market Street is -- although someone can correct

5   me if I'm wrong -- is this.

6   A    The first time we went in here, and then we left and we

7   went into this side.

8   Q    Okay.  So your testimony is you went in both these

9   entrances?

10  A    Yeah.  We went in the first one and then, for whatever

11  reason, we left and went to the other one.

12  Q    And so your testimony in your deposition is that when you

13  got to Market Street, you saw a lot of counter-protesters, but

14  they didn't notice you because of the big column of Nationalist

15  Front people marching toward the park at that time?

16  A    Yes, that's what I remembered.

17  Q    Okay.  And so to be clear, what you're saying is you saw

18  the column of Nationalist Front people before you entered the

19  park?

20  A    I saw that people were marching down Market Street, yeah.

21        MS. DUNN:  And can we put up 2435?  Now, I'm trying

22  to figure out how to -- there we go.

23  BY MS. DUNN:

24  Q    Was this the column you saw?

25  A    It could have been.  They were pretty far away.

J. Kessler - Direct

1  Q    Okay.  But your testimony is that nobody noticed you

2  because they were all looking at this column?

3  A    Yeah, thank God.

4  Q    And you see that people in this column are carrying

5  flags -- flagpoles and shields, right, like you talked about in

6  your Discord post, right?

7  A    They have flags and shields.

8  Q    And you recognize some of the people that we've talked

9  about today here:  Mr. Heimbach; Mr. Hill; this is Mr. Tubbs,

10 who works with Mr. Heimbach -- or I'm sorry, Mr. Hill; and

11 that's Derrick Davis.  You recognize all those people, right?

12 A    Yes.

13 Q    And so your testimony is that after you saw the column,

14 you were able to enter the park because one of the clergy who

15 was there unlinked his arms so you could slip through.  You

16 recall that testimony?

17 A    Sure, yeah.

18 Q    And are you talking about the clergy line with Cornel

19 West?

20 A    It may have been.  I didn't -- like, there's just so much

21 information going on in an environment like that.  I remember

22 some clergy generally, but not West specifically.

23 Q    Okay.

24 A    But I remember we tried not to engage with them and we

25 just went through or around them or whatever.

J. Kessler - Direct

1   Q    Okay.

2              MS. DUNN:  Let's look at 2165.

3              (Plaintiff Exhibit 2165 marked.)

4   BY MS. DUNN:

5   Q    Do you recognize this as a picture of yourself?

6   A    Yes.

7   Q    This is a photo taken of you on August 12th of 2017.

8              MS. DUNN:  Your Honor, we move to admit 2165.

9              THE COURT:  Be admitted.

10             (Plaintiff Exhibit 2165 admitted.)

11  BY MS. DUNN:

12  Q    So, Mr. Kessler, you're pictured here with Eli Kline, your

13  co-defendant, right?

14  A    Yes.

15  Q    You see he has this ear piece?

16  A    Yes.

17  Q    And do you know who he's connected to?  Is he connected

18  with your security person who is right behind you or somebody

19  else?

20  A    He was not connected with -- what I know is that he had

21  text messages with Richard Spencer where he said that all the

22  leadership was reporting to him, and so I think that that's

23  what was going on.  And --

24  Q    Do you see in this picture we can see there is blood on

25  his pocket?  Do you see that?

J. Kessler - Direct

1    A     I see it could be.  I don't know.  He's got a stain,

2    that's clear.

3    Q     But you didn't ask him about that at the time, right?

4    A     That thing is tiny.

5    Q     Okay.

6    A     And if you look at the context of this, this guy is being

7    intimidating toward me.  This is not a friendly conversation.

8    This guy is saying I'm in charge here, buddy.  Get in line.

9    Q     Okay.  Let's look at 3805.

10          You recognize yourself in this video?

11   A     Yes.

12              MS. DUNN:  Your Honor, move to admit 3805.

13              THE COURT:  Be admitted.

14              MS. DUNN:  And we'd like to play that for the jury.

15              THE COURT:  You may.

16          (Plaintiff Exhibit 3805 marked.)

17          (Plaintiff Exhibit 3805 admitted.)

18

19          (Video playing.)

20    BY MS. DUNN:

21   Q     All right.  So you see yourself there with Azzmador Ray,

22   who you said is a terrible, horrible person, right?

23   A     Yes.

24   Q     You say, "We broke through Cornel West.  Cornel West

25   BTFO."  And BTFO stands for "blown the fuck out," right?

J. Kessler - Direct

1    A    Yes.

2    Q    And you say, "Come at me, bro.  Come at me, Cornel West."

3    And then Ray says, "That's right, I looked Cornel West in the

4    face and told him he was for the rope."  Right?

5    A    That's what Ray says.  It's not me.

6    Q    He's for the rope.  You know what that means, though,

7    right?

8    A    Yeah.

9    Q    Right.  Let's look at 3247A.

10            (Plaintiff Exhibit 3247A marked.)

11   BY MS. DUNN:

12   Q    You recognize yourself in this video, Mr. Kessler?

13   A    Yes.

14            MS. DUNN:  Move to admit 3247A.

15            THE COURT:  Be admitted.

16            (Plaintiff Exhibit 3247A admitted.)

17            MS. DUNN:  Let's play that for the jury, please.

18            (Video playing.)

19            MS. DUNN:  Let's show Mr. Kessler 3795.

20   BY MS. DUNN:

21   Q    Mr. Kessler, do you see yourself in this photograph?

22   A    Yes.

23   Q    Who is this person?

24   A    I have no idea.  I've never seen that guy before.  Or at

25   least I didn't notice him on the day of the event.

J. Kessler - Direct

1            MS. DUNN:  Your Honor, move to admit 3795.

2            THE COURT:  Be admitted.

3            (Plaintiff Exhibit 3795 marked.)

4            (Plaintiff Exhibit 3795 admitted.)

5   BY MS. DUNN:

6   Q    Mr. Kessler, just a moment ago you said two times that you

7   saw guns on August 11th at the torch march?

8   A    Yes.

9   Q    At your deposition you were asked this question and you

10  gave these answers.  Question:  "Okay.  And did you actually

11  see any firearms that night?"

12        Answer:  "No.  I tried to -- "

13        Question:  "Okay.  Did you see --"

14        "-- stay away as far from the counter-protesters."

15        And then the question is:  "-- any firearms that night?"

16        And the answer is "No."

17        And just so we're clear from the record, because there was

18  some interruption, the question was asked of you, "Did you

19  actually see any firearms that night?"  And your answer was

20  "No."

21  A    I was talking about the protesters.  The Unite the Right

22  protesters did not have firearms.

23  Q    I'm sorry, Mr. Kessler.

24        The question you were asked was about the 20 to 30

25  protesters, which in your deposition the 20 to 30 was what

J. Kessler - Direct

1   we've been calling in this case counter-protesters, the 20 to

2   30 that you acknowledged.  And about those 20 to 30, you said

3   they had firearms.  And the question was:  "You didn't know

4   that at the time?"  And your answer was, "I didn't know that at

5   the time."  You were talking about the 20 to 30.  And that's in

6   your deposition.

7   A    I think I was talking about the UTR protesters.

8           MS. DUNN:  Your Honor, let the record reflect what

9   the deposition actually shows, please.

10          THE COURT:  Well, wait.  Show it to him and let's be

11  sure because he's disputing it.

12   BY MS. DUNN:

13  Q    Sure.  Mr. Kessler, this is at page 340 of your

14  deposition, line 23.  It continues to page 341, line 11.

15          MR. KOLENICH:  What was the date of the deposition?

16  He was deposed over two days.

17          THE WITNESS:  Perhaps I misremembered it.  I've seen

18  the picture a million times.  I know that they did have

19  firearms.  I could be mistaken about whether I saw it that

20  night or not.

21          THE COURT:  All right.  Then there's no dispute about

22  the record, correct?

23          THE WITNESS:  Right.

24          THE COURT:  Okay.

25          MS. DUNN:  Thank you, Your Honor.

J. Kessler - Direct

1          Let's show Mr. Kessler PX-3927.  It's a tweet of his

2    from November 1st.  So the beginning of this trial.

3               (Plaintiff Exhibit 3927 marked.)

4          MS. DUNN:  Your Honor, move to admit 3927.

5          THE COURT:  Be admitted.

6               (Plaintiff Exhibit 3927 admitted.)

7    BY MS. DUNN:

8    Q    Mr. Kessler, this is a tweet that you posted during this

9    trial, during the testimony of Plaintiff Devin Willis.  You

10   made this post after Mr. Cantwell asked Devin Willis for the

11   full names of the people who Mr. Willis rode with in the car to

12   the torch march.  You say, "This is Ibby Han, one of the

13   comrades Willis snitched on today."

14        And you suggest that Ibby is wearing what you refer to as

15   an Antifa bandanna.  Do you see that?

16   A    Yes.

17   Q    I'd like to show you 3925, which is a screenshot where

18   this picture comes from -- of the website from where this

19   picture comes from.

20        And Your Honor, we'd move to admit 3925.

21               THE COURT:  Be admitted.

22               (Plaintiff Exhibit 3925 marked.)

23               (Plaintiff Exhibit 3925 admitted.)

24   BY MS. DUNN:

25   Q    Now, at the top of this page where this picture that you

J. Kessler - Direct

1   used comes from, it says "UVA Public Service."  Do you see

2   that?

3   A    Yes.

4   Q    And it's announcing a community dinner series at UVA which

5   is hosted by the university.  Ibby Han will be one of the

6   speakers.  So this page describes Ibby Han.  And it says, "Ibby

7   is a street medic and coordinated the community medical

8   response to July 8th and August 12th of 2017."  Do you see

9   that?

10  A    Yes.

11  Q    Are you aware, Mr. Kessler, that Ibby is a trained --

12  trained as an EMT?  Are you aware of that?

13  A    I know that a lot of the Antifa were trained medics there

14  and they only provided support for their side.  And they

15  obstructed the actual EMTs that were working with the

16  government.

17  Q    I'm just asking you if you are aware that Ibby Han, this

18  person who you tweeted about, is a trained EMT.  Are you aware?

19  A    No, I wasn't aware.

20  Q    Okay.  And are you contending that Ibby Han, this person

21  who UVA is announcing for their community dinner series, is a

22  violent terrorist?  Is that your contention?

23  A    I didn't say that she's a violent terrorist, but she's

24  advocating with some very violent symbols, the black power

25  fist, the Antifa bandanna.  This is showing her solidarity with

J. Kessler - Direct

1    violent groups.  Antifa has something known as diversity of

2    tactics, which is a mixture of --

3              MS. DUNN:  Your Honor, at this point -- the first

4    answer was fine but this is on a new topic he's bringing up.

5              THE COURT:  All right.  Go ahead.

6              MS. DUNN:  Let's show Mr. Kessler PX-1925, which is a

7    picture from August 12th.

8              While Mr. Spalding looks for that, maybe we can show

9    Mr. Kessler 2538B.  Oh, great.  This is 1925A.

10        (Plaintiff Exhibit 1925A marked.)

11   BY MS. DUNN:

12   Q    Do you see this?

13   A    I see the image, yes.

14   Q    This is from Emancipation Park, Lee Park, from August

15   12th.

16              MS. DUNN:  Your Honor, move to admit 1925A.

17              THE COURT:  Be admitted.

18        (Plaintiff Exhibit 1925A admitted.)

19    BY MS. DUNN:

20   Q    And if you look, Mr. Kessler, you can see that here's --

21   this is very -- it gets too pixillated when you blow it up,

22   Mr. Spalding, but I think you can look and see that there's a

23   man here in this group of people, he's very close to somebody

24   in a TWP shirt and he's wearing a red bandanna.  Can you see

25   him?

146

J. Kessler - Direct

1   A      I see the guy you're referring to.

2   Q      He has a big camera and might be a member of the media.

3   Do you see that?

4   A      Yeah, could be.

5   Q      Could be.  All right.  Let's show Mr. Kessler 2538B.

6          This is a photo where you can see that there is a man --

7   oh, I'm sorry.  This is also a picture from the rally that we'd

8   like to move to admit, 2538B.

9          MR. JONES:  Your Honor, we won't object if the

10  plaintiffs don't object to us introducing pictures and videos

11  without the proper foundation.

12          THE COURT:  Sustained.

13          MS. DUNN:  I would object to that and I agree with

14  the objection.  So I'm just going to ask Mr. Kessler if he

15  recognizes this photo.  And if he doesn't have foundation, we

16  certainly would not admit it.

17          THE WITNESS:  I don't recognize it.

18          MS. DUNN:  Okay.  Then let's move on.

19          (Plaintiff Exhibit 2538B marked.)

20   BY MS. DUNN:

21  Q    Mr. Kessler, the jury has already heard that at 1:41 p.m.

22  on August 12th James Fields intentionally drove his car into a

23  group of counter-protesters on Fourth Street.  And we saw

24  earlier your text messages with Mr. Cantwell that at 2:18 p.m.

25  you invited him to a leadership meeting of leaders and other

J. Kessler - Direct

1   essential people in the alt-right.  You recall that, right?

2   A    Yes.

3   Q    So one of the first things you did after you heard about

4   the car attack was to call a meeting of leaders and other

5   essential people, which included a number of the defendants in

6   this case, right?

7   A    That could be correct, yeah.  I remember we were very

8   panicked and shocked by it.

9   Q    And one of the first things you did was call a meeting,

10  right?

11  A    I think so.

12  Q    Okay.  Let's look at PX-1450, please.  This is a text

13  message from yourself to a number of people including your

14  co-defendants, Defendant Kline, Defendant Spencer, Defendant

15  Hill, Defendant Cantwell.  Do you see this?

16  A    Yeah.

17         MS. DUNN:  Move to admit 1450.  You can see --

18  publish for the jury the names at the top, please,

19  Mr. Spalding.  One name that's missing is Mr. Cantwell's, but

20  that's his number, 631 is his phone number.

21         THE COURT:  Is that admitted?  Be admitted.

22         MS. DUNN:  Thank you, Your Honor.

23         (Plaintiff Exhibit 1450 marked.)

24         (Plaintiff Exhibit 1450 admitted.)

25

J. Kessler - Direct

1   BY MS. DUNN:

2   Q    And so these were some of the leaders and essential people

3   that you invited to the meeting after you heard about the car

4   attack, right?  This is your text inviting them.  Can you see

5   that?

6   A    I see those people in a message exchange.  I'm just a

7   little confused because I didn't actually attend a meeting with

8   most of these people.

9   Q    That's okay.  My question at this point was just you were

10  inviting them to your meeting of leaders and essential people?

11  A    It could be.  If that's what it says, I trust that.

12  Q    Well, it says that in your text.  We can show you if

13  there's any doubt.

14       Okay.  Do you see that?

15  A    Yeah.

16  Q    All right.  Let's show Mr. Kessler 14580.

17       This is a text message that you sent to Mr. Kline at 2:54

18  p.m. on August 12th.  Do you see that?

19  A    Yes.

20            MS. DUNN:  Move to admit 14580, Your Honor.

21            THE COURT:  Be admitted.

22            (Plaintiff Exhibit 14580 marked.)

23            (Plaintiff Exhibit 14580 admitted.)

24  BY MS. DUNN:

25  Q    At 2:54 p.m. on August 12th, about an hour after the car

J. Kessler - Direct

1  attack, you write, "We need to shut down the Discord."  Do you

2  see that?

3  A    Yes.

4  Q    Okay.  And then we'll show you 1458P, which is also a text

5  message from yourself to Mr. Kline on August 12th of 2017.

6  This one is at 11:45 p.m., because when Mr. Kline didn't

7  respond to you, your text saying to shut down the Discord, you

8  texted him again that evening saying, "We definitely need to

9  delete the Discord."  Do you see that?

10            (Plaintiff Exhibit 1458 P marked.)

11  A    Yes.

12  Q    All right.  And now let's show Mr. Kessler 1458Q.

13            (Plaintiff Exhibit 1458Q marked.)

14  BY MS. DUNN:

15  Q    And this is a text message from you to Mr. Kline.  Do you

16  see that?

17  A    Sure.

18            MS. DUNN:  Move to admit, Your Honor.

19            THE COURT:  Be admitted.

20            (Plaintiff Exhibits 1458P and 1458Q admitted.)

21   BY MS. DUNN:

22  Q    And this is on the 14th, and you say, "We still need to

23  delete the Charlottesville server."  Do you see that?

24  A    Yes.

25  Q    And in this text, just to be clear, you don't say "shut

J. Kessler - Direct

1  down."  You say "delete," right?

2  A    It says that, yes.

3  Q    Right.  And your testimony in this case, Mr. Kessler, is

4  that the reason you needed to delete the Discord was because

5  people were making offensive jokes.  That was your testimony?

6  A    People were saying highly inappropriate things in there.

7  Q    Right.  And after all the Discord posts we've seen in this

8  case, it's your testimony that the reason you needed to delete

9  it right after the car attack was because it contained

10  offensive jokes.  That's your testimony?

11  A    Specifically people were mocking Heather Heyer, and I

12  wasn't okay with that.  I said to another moderator, these

13  people are pretty sick.  This isn't a joke.  And that was my

14  concern, is I didn't want this Discord to be a platform for

15  these trolls to say things like that.

16  Q    Right.  So your moderator instincts kicked in on August

17  12th after the car attack?

18  A    Well --

19  Q    Withdrawn.

20  A    You know, there's a lot of fantasy-based stuff that's in

21  the Discord.

22          MS. DUNN:  Mr. Kessler, I withdraw the question.

23          THE COURT:  She's withdrawn the question.

24          MS. DUNN:  It was argumentative, obviously.

25

J. Kessler - Direct

1  BY MS. DUNN:

2  Q     So you just testified that the reason you wanted to shut

3  down the Discord server was because you were concerned that

4  there were these offensive comments about Heather Heyer.

5  A     Yeah.  At the time I didn't think it was appropriate.

6  Q     But the real reason you needed to delete the Discord

7  server is because people on it were talking about committing

8  violence; isn't that true?

9  A     No.  I didn't take anything that was said in that server

10  very seriously.  But when somebody died and then people are

11  mocking a dead person, you know, at that time I was -- I was

12  not okay with that.

13          MS. DUNN:  Okay.  Let's show Mr. Kessler 332.

14          (Plaintiff Exhibit 332 marked.)

15  BY MS. DUNN:

16  Q     This is a Discord chat that you recognize, presumably?

17  A     Yes.

18  Q     You're Zebo in this chat?

19  A     Yes.

20          MS. DUNN:  Move to admit, Your Honor, 332.

21          THE COURT:  Be admitted.

22          (Plaintiff Exhibit 332 admitted.)

23  BY MS. DUNN:

24  Q     This is a private Discord message to you from August 14th

25  in which this person says, "I'm sure you've seen the deal with

J. Kessler - Direct

1   Sessions investigating the alt-right.  The Charlottesville

2   server needs to be deleted.  It's compromised and has people

3   talking about committing violence.  It's filled its purpose.

4   We are able to coordinate without it."

5        And Sessions is Attorney General Jeff Sessions, correct?

6   A    Yes.

7   Q    All right.  Your testimony, sir, is that the reason after

8   the car attack you wanted to delete the Discord was out of

9   concern for Heather Heyer, right?

10             THE COURT:  That's been asked and answered.

11             MS. DUNN:  I apologize, Your Honor.

12             THE COURT:  You get in an argument every time.

13             MS. DUNN:  You're right.  You're right.

14    BY MS. DUNN:

15   Q    But Mr. Kessler, am I right that your family and Heather

16   Heyer's family used to go to the same church?

17   A    I don't have any recollection of that.

18   Q    Let's show Mr. Kessler 1448.

19        Do you recognize this?

20   A    Yes.

21   Q    Okay.  So the tweets that we just discussed, or the

22   comments we just discussed were from August 12th and August

23   14th.  This is a tweet of yours from August 18th.

24             MS. DUNN:  Your Honor, we move to admit and publish

25   to the jury PX-1448.

153

J. Kessler - Direct

1           THE COURT:  Be admitted.  And published.

2           (Plaintiff Exhibit 1448 marked.)

3           (Plaintiff Exhibit 1448 admitted.)

4  BY MS. DUNN:

5  Q    In your tweet, Mr. Kessler, you say, "Heather Heyer was a

6  fat, disgusting communist.  Communists have killed 94 million.

7  Looks like it was payback time."

8       And you tweet out an article that's from *The Daily*

9  *Stormer,* a neo-Nazi website, as you've described it.  Do you

10 see that?

11 A    Yes.  At the time I didn't have full information.

12 Q    Sir, there's no question pending.

13      Let's show Mr. Kessler 2016A.

14          (Plaintiff Exhibit 2016A marked.)

15 BY MS. DUNN:

16 Q    This is another one of your tweets from August 24th of

17 2017.  Do you see this?

18 A    Yes.

19          MS. DUNN:  Okay.  Move to admit 2016A, Your Honor.

20          THE COURT:  Be admitted.

21          (Plaintiff Exhibit 2016A admitted.)

22 BY MS. DUNN:

23 Q    And in this tweet you say, Mr. Kessler, on August 24th of

24 2017, after some days had passed, "To reclarify:  I 100 percent

25 believe Heather Heyer was to blame for participating in an

154

J. Kessler - Direct

1   armed mob blocking traffic during a state of emergency."

2       You see that you said that, Mr. Kessler, correct?

3   A    Yes, I said that.

4           MS. DUNN:  Your Honor, I don't know if you would like

5   to take our break at this time.  I have very little left.

6           THE COURT:  Well, I'm going to break at 12:30.  We

7   have two minutes.

8           You don't have to worry about me breaking.  I keep up

9   with that.

10  BY MS. DUNN:

11  Q    Mr. Kessler, you did gather with Defendants Kline, Spencer

12  and Damigo on the night of August 12th.  You recall that,

13  correct?

14  A    Yes.

15  Q    And you heard a speech that was given by Defendant

16  Spencer?  You heard that, right?

17  A    Yes, he was interrupting me.

18  Q    Notwithstanding, and the speech that you heard him make,

19  I'm not going to recite the whole thing, but this is the one

20  where he says "Little fucking kikes, little fucking octoroons.

21  My ancestors fucking enslaved those little pieces of fucking

22  shit.  I rule the fucking world.  Those people get ruled by

23  people like me"?  That's what you heard?

24  A    Yeah.  He's a sociopath.

25  Q    And let's show Mr. Kessler 3934.

J. Kessler - Direct

1      You recognize your tweet?

2   A     Yes.

3   Q     You sent this tweet in 2019?

4   A     Yes.

5   Q     Okay.

6             MS. DUNN:  Your Honor, move to admit 3934.

7             THE COURT:  Be admitted.

8             (Plaintiff Exhibit 3934 marked.)

9             (Plaintiff Exhibit 3934 admitted.)

10            MS. DUNN:  Let's show the jury.

11  BY MS. DUNN:

12  Q     Mr. Kessler, this is your tweet from November 3rd of 2019.

13  And this is a tweet where you're I think distributing the audio

14  of Mr. Spencer's rant that leaked to the public; do you see

15  that?

16  A     Yes.

17  Q     You say, "Mr. Spencer is a narcissist and a sociopath."

18  Do you see that?

19  A     Yes.

20  Q     You say you have stories about the real Richard Spencer?

21  A     Yes.

22  Q     And you say, "This is that man."  Do you see that?

23  A     Yes.

24  Q     And by "this is that man," you mean that the person who

25  said those things that I just repeated in this speech, that's

J. Kessler - Direct

1   the real Richard Spencer?

2   A    Yeah, I think so.

3          THE COURT:  If you're just about finished -- how long

4   are you going to take?

5          MS. DUNN:  Your Honor, I think it will be faster if I

6   can collect -- whittle it down over the break.  I'm going to

7   have very little.

8          THE COURT:  Members of the jury, we're going to

9   recess for lunch now until 1:30.  Do not discuss the case with

10  anyone or allow anyone to discuss it with you.  Do not remain

11  within the hearing of anyone discussing it.  You may retire.

12  Thank you.

13  **(Jury out, 12:31 p.m.)**

14          (Recess.)

15          THE COURT:  Anything before we call the jury?

16          MS. DUNN:  Yes, Your Honor.

17          MS. KAPLAN:  Not that I'm aware of, Your Honor.

18          THE COURT:  All right.  Call the jury.

19  **(Jury in, 1:34 p.m.)**

20          THE COURT:  All right.  You may be seated and may

21  resume.

22          MS. DUNN:  Thank you, Your Honor.  Just very quickly

23  we move to admit 1458A through D, 1460B and 0699.

24          THE COURT:  Be admitted.

25          (Plaintiff Exhibits 1458A through D, 1460B and 0699

J. Kessler - Direct

1   admitted.)

2    BY MS. DUNN:

3   Q    Mr. Kessler, after the events of August 11th and 12th, you

4   reached out via telephone to James Fields while he was in

5   prison, correct?

6   A    Yes.

7   Q    And do you remember how many times you called him?

8   A    I think twice, but my recollection is fuzzy.  It was a

9   long time ago.

10  Q    Okay.  So our records reflect four phone calls where you

11  spoke with him and at least five voicemails.  Does that sound

12  accurate?

13  A    It could be.

14  Q    And you told Mr. Fields that you thought he was not

15  guilty, right?

16  A    Yes, I believe so.

17  Q    And you told him to reach out to you and talk to you for

18  any reason at all?

19  A    Probably, yeah.

20  Q    And you put money on his phone account so he could reach

21  you at any time, right?

22  A    I don't recall that.

23  Q    And you asked him to put you on his visitors list,

24  correct?

25  A    I don't recall.

J. Kessler - Direct

1  Q    We talked before the break about a text that you sent to

2  Defendant Kline on August 14th.  You texted him:  "We still

3  need to delete the C'ville server."  Do you remember we talked

4  about that?

5  A    Yes.

6          MS. DUNN:  Mr. Spalding, can we show Mr. Kessler

7  1458S.

8          (Plaintiff Exhibit 1458S marked.)

9          MS. DUNN:  We can also hand it to Mr. Kessler through

10  the marshals while we get that on the screen.

11   BY MS. DUNN:

12  Q    Mr. Kessler, you see this?  This is a text from Mr. Mosley

13  to you on August 14, 2017.  He's responding to your earlier

14  text.

15  A    Yes.

16  Q    Do you see this?

17      And he texts you back:  "All right, the Discord is

18  handled."  Do you see that?

19  A    Yes.

20          MS. DUNN:  Your Honor, we move to admit 1458S.

21          THE COURT:  Be admitted.

22          (Plaintiff Exhibit 1458S admitted.)

23  BY MS. DUNN:

24  Q    So he texts you, "all right, the Discord is handled" on

25  August 14th.

159

J. Kessler - Direct

1        You understand, Mr. Kessler, that the only reason why we

2   have records of Discord in this case is because Discord, the

3   company, restored the documents from their databases as they

4   existed.  Do you know that?

5   A    I don't know what Discord did or didn't do.

6   Q    But you do know you received this text from Eli Kline,

7   correct?

8   A    Yes.

9   Q    We talked before the break about Robert Azzmador Ray?

10  A    Yes.

11  Q    Also known in your view as a terrible, horrible person.

12  I'd like to show you Plaintiffs' Exhibit 3253B.  We're going to

13  just ask you to identify the video, whether you see yourself.

14            (Video playing.)

15        Do you see that?

16  A    Yes.  You played this video earlier, didn't you?

17  Q    We played what Mr. Ray said about you, but we didn't play

18  what you said.  And we'd like to do so now, Your Honor.  Move

19  to admit 3253B and publish to the jury, please.

20            THE COURT:  You may.

21            (Plaintiff Exhibit 3253B marked.)

22            (Plaintiff Exhibit 3253B admitted.)

23            (Video playing.)

24            MS. DUNN:  Thank you, Your Honor.  I pass the

25  witness.

J. Kessler - Cross

1          THE COURT:  All right.  Who's first?  Mr. Spencer?

2                    CROSS-EXAMINATION

3   BY MR. SPENCER:

4   Q    Hello, Mr. Kessler.  My name is Richard Spencer and I'm

5   acting on my own behalf.

6        Where did you grow up, Mr. Kessler?

7   A    I was born in Charlottesville at the old Martha Jefferson

8   Hospital down the street.  I spent some time in New Mexico as

9   well, and then I went to high school and middle school in

10  Fluvanna County.

11  Q    And you attended the University of Virginia?

12  A    That's correct.

13  Q    Did you graduate from the University of Virginia?

14  A    I did.

15  Q    You did.  Okay.  When was that?

16  A    2009.

17  Q    Okay.  When did you first become aware of me?

18  A    I think it was with the Hail Trump speech.

19  Q    So November 2017?

20  A    Something like that.

21  Q    Did you reach out to me once you became aware of me?

22  A    Not at first.  I think that I did try to contact you at

23  some point.

24  Q    In 2016.  To correct the record, I think I stated November

25  2017.  I meant November 2016.

J. Kessler - Cross

1      So in 2016, do you remember reaching out to me?

2  A    I don't remember whether it was 2016 or 2017, but I do

3  remember reaching out --

4           THE COURT:  November 2017 was after the march.

5           THE WITNESS:  What?

6           THE COURT:  November 2017 was --

7           THE WITNESS:  Oh, I didn't hear the November part.  I

8  just heard 2016 or 2017.

9           So, to clarify, I don't know whether it was late 2016

10 or early 2017.

11 BY MR. SPENCER:

12 Q    Okay.  And what were you reaching out to me about?

13 A    I don't recall.

14 Q    Okay.  Does a battle of the Charlottesville City Council,

15 does that ring a bell?

16 A    Not really.

17 Q    Okay.  So how were you involved in what's called

18 Charlottesville 1.0?

19      So there was -- to remind everyone, there was a flash

20 mob -- or a flash demonstration in May of 2017 in

21 Charlottesville.  There was also a torchlight march.  So this

22 was a number of months before Unite the Right.  Did you attend

23 those events?

24 A    Yeah, I was there at the May event.

25 Q    Okay.  So there was a day May event where some speeches

J. Kessler - Cross

1   were given.  And did you give a speech that day?

2   A    Afterwards, not at the actual event --

3   Q    So I'm asking:  So there was a May Charlottesville 1.0

4   event --

5   A    Uh-huh.

6   Q    -- organized with Identity Evropa and so on.  Did you

7   participate in that in the sense of giving a speech or being a

8   leader?

9   A    At the actual demonstrations, no.

10  Q    Okay.  So mention was made earlier by Ms. Dunn about a

11  speech you gave.  In what context was that speech?

12  A    The speech, I don't know.

13  Q    Does an afterparty ring a bell?

14  A    Yeah, I did give a speech at a dinner function.

15  Q    "Talk" maybe is more accurate?

16  A    Yeah, I guess so.  I basically just read some notes that

17  somebody gave to me.

18  Q    You read some notes that someone gave to you?

19  A    Yeah, Eli Kline gave them to me.  I mean, I extrapolated

20  and added some embellishment.  He said, "Here's a list of

21  people that we want you to thank," and that's basically what I

22  did.

23  Q    Were you involved intimately in the organizing of

24  Charlottesville 1.0?

25  A    Not really.

163

J. Kessler - Cross

1   Q    So was it after -- it was Charlottesville 1.0 that gave

2   you the idea for Unite the Right and Charlottesville 2.0,

3   right?

4   A    It was one of the inspirations.

5   Q    Okay.  What were some other inspirations?

6   A    There were a number of free speech events that had

7   happened in Berkeley where violent anti-fascists had shut down

8   speaking events.

9   Q    You can just name off some things.  You don't have to

10  describe them.

11  A    Also, we did a demonstration in Washington, DC that was

12  very much line with what I was hoping to do in Charlottesville.

13  We gave some speeches in front of the Lincoln Memorial.

14  Q    Would you say that Charlottesville 2.0 was kind of a way

15  of doing Charlottesville 1.0 over again, but you're in charge?

16  A    I don't know about that.

17  Q    Did you want to be a leader of the alt-right movement?

18  A    Yeah, sure.

19  Q    And Charlottesville 2.0 was kind of your ticket to fame?

20  A    Well, I don't know about fame, but I was trying to help

21  organize the rally.  So there is a certain amount of leadership

22  that's inherent in that.

23  Q    How else would you be perceived as a leader?

24  A    I don't think in any other way.

25  Q    Agreed.

J. Kessler - Cross

1      Did we have much communication -- and I guess we can focus

2  in on that May through August period.  Were we talking on the

3  phone a lot?

4  A    Not talking on the phone a lot.  I did have some

5  conversations with you, but I wouldn't characterize it as "a

6  lot."

7  Q    Okay.

8          MR. SPENCER:  Mr. Spalding has been very helpful

9  giving me a little bit of analysis they did.  So this is

10 already in evidence.  I can release this to the -- or I don't

11 know if I even have to.  We could publish this to the jury,

12 or -- is this evidence, or is this just a helpful tool?

13         MS. DUNN:  We moved them in.

14         Your Honor, we moved these into evidence.  So no

15 issue showing to it the jury.

16         THE COURT:  All right.

17         MR. SPENCER:  Okay.  I opened this in numbers, so

18 it's been kind of changed a little bit.  It's the same thing.

19  BY MR. SPENCER:

20 Q    So this is showing up.  I'm just going to search for my

21 number right here.  So 527, I don't think there are going to be

22 any other examples of that.

23         THE COURT:  Was there a chart just between him and

24 Mr. Spencer?

25         MR. SPENCER:  No.

J. Kessler - Cross

1          MS. DUNN:  Your Honor, we did have a chart that was

2    just him and Mr. Spencer.  We are happy for Mr. Spencer to use

3    that if he wishes.

4          We also moved into evidence all the phone records,

5    which -- I think this is that.

6          MR. SPENCER:  Well, actually, it would be a little

7    more helpful for the jury.  I was going to use the search

8    function here.  So if Mr. Spalding could call up the chart just

9    with the phone calls between Mr. Kessler and myself, that would

10   be a little bit clearer to the jury.

11         So Mr. Spalding just took over my screen.

12         Okay.

13   BY MR. SPENCER:

14   Q    So let's go through these.

15        May 24th, phone call of one minute.  Do you remember

16   anything about that?

17   A    No.  I remember calling you a number of times and you

18   didn't pick up.  That's probably what it was.

19   Q    Sounds like --

20   A    Could have been a voicemail, perhaps, but I often remember

21   calling and not getting an answer.

22   Q    Sounds like me.

23        You got ahold of me, ten-minute phone call.  Do you

24   remember anything about that?

25   A    I remember conversations, but I can't say whether it was

J. Kessler - Cross

1    this call on the graph or not.

2    Q    Okay.  Next, one minute; one minute; one minute; two

3    minute; two minute to voicemail; one minute to voicemail; one

4    minute to voicemail; one minute to voicemail; one minute to

5    voicemail; nine minute.

6         Do you remember anything there?  So that's the August 7th.

7    A    It probably had something to do with the permit, because

8    that seems like the day that they revoked the permit.

9    Q    Okay.  And it's seven minutes the next day.  That was kind

10   of around the permit time?

11   A    Yeah.

12   Q    Okay.  August 12th, one minute, and August 12th,

13   three minutes.

14        Okay.  So is it -- were we in deep contact at any point

15   during the month of August?

16   A    No.  You used go-betweens like Mr. Kline.

17   Q    Okay.  I used go-betweens.

18   A    Yeah.  He was your agent.

19   Q    My agent.  Okay.  All right.  So yet you have -- you have

20   referred to Eli Kline as a -- my designee.  You used that word

21   in your deposition and here today.

22   A    Yeah, I mean, that's the way he represented himself to me,

23   and that's the impression that I always got from you.

24   Q    But he's a liar, isn't he?

25   A    He is a liar, but he's a liar that you depended on and you

J. Kessler - Cross

1  told me you depended on.

2  Q     When did I tell you that?

3  A     Sometime during the summer months.

4  Q     Sometime.  Yeah.

5        You had intense communication with Eli over the summer of

6  2018 [sic]?

7  A     I talked to him quite a bit.  He was one of the organizers

8  of Unite the Right.

9  Q     When you gave your deposition you were asked the

10  question -- well, actually, I think you said it.  I can call it

11  up if you want.

12       You contacted Eli about the rally first in order to get me

13  on board, in those exact words, and I can bring up your

14  deposition if you like.

15            MR. SPENCER:  Mr. Spalding, could I take back control

16  of the screen?  Thanks.

17  BY MR. SPENCER:

18  Q     Did you contact Eli Mosley as a way of trying to get me on

19  board at the rally?

20  A     I don't recall exactly.

21  Q     Did you remember testifying to that effect?

22  A     I don't recall.

23  Q     Okay.  Well, I can read it.

24       Question:  "You wanted Mosley to get Spencer on board,

25  right?"

J. Kessler - Cross

1       Okay.

2  A     I accept that.

3  Q     Okay.  And then you had intense communication with Mosley

4  throughout the summer?

5  A     I had communications with him.  There were many

6  communications.  I don't dispute that.  But also, there were

7  long periods of time where he would go incommunicado and I had

8  no idea what he was doing.  Everybody that was in the Discord

9  that I talked to about this were saying, where did this guy go?

10 Q     I want to bring you to the rant from hell.  So this is

11 something that's been played now three or four times.  It will

12 be played again, no question.  But it includes insane talk like

13 "I rule the fucking world" and so on.  Do you --

14         MS. DUNN:  Objection, Your Honor, just to the

15 characterization.

16         THE COURT:  Sustained.  Just go ahead.

17         MR. SPENCER:  Okay.

18 BY MR. SPENCER:

19 Q     It was characterized by Ms. Dunn as a speech.  Do you

20 remember the context of that --

21         MR. SPENCER:  What word is -- is "rant" okay?  That

22 seems --

23         MS. DUNN:  Your Honor, we don't object to that

24 question.

25         MR. SPENCER:  Well, okay.

169

J. Kessler - Cross

1          THE COURT:  Go ahead.

2          MR. SPENCER:  I'm going to use that word.

3   BY MR. SPENCER:

4   Q    Tell us a little bit about the context of that rant.

5   A    The only thing I recall is that sometime preceding that,

6   we heard on the news, or actually I remember somebody coming up

7   to me --

8   Q    I'm going to stop you.  So when I mean context, where was

9   it, who was there, et cetera?

10  A    It was sometime in the countryside of Virginia outside

11  Charlottesville at an afterparty, a house.  And we went into a

12  room to discuss -- basically, people were panicked.  They were

13  scared about the James Fields thing.

14  Q    So it was a private conversation.  How many people were

15  there?

16  A    I don't recall.  You know, it could be as many as ten.

17  Q    As many as -- so ten maximum?

18  A    Ten or less, I would say.

19  Q    So it was a private meeting of half a dozen, maybe ten

20  people, right?

21  A    You could say that, yeah.

22  Q    Okay.  Would you characterize that as a speech, as that

23  term is usually used?

24  A    I think "rant" is applicable.

25  Q    It was not meant for public consumption; is that correct?

                        J. Kessler - Cross

1    A    No.

2    Q    So how -- how did it -- so it was a private conversation

3    in a private room.  How did that outburst ever reach the light

4    of day?

5    A    Somebody recorded it and then released it to Milo

6    Yiannopoulos.

7    Q    Interesting.  Well, Mr. Kessler, I have to ask:  Did you

8    record it?

9    A    No.

10   Q    You didn't?

11   A    No.

12   Q    Do you know who did?

13   A    Yeah, I do.

14   Q    Who is that person?

15   A    His handle was -- went by Davey Crockett or something.  I

16   don't remember his real name.

17   Q    Dave Reilly ring a bell?

18   A    Yeah, that's the guy.

19   Q    That's the guy.  Okay.  So do you -- talk a little bit

20   about the context of the release of that rant, because only

21   about a minute was released.  It's not like it was in context.

22        So you mentioned Milo Yiannopoulos.  Who is that guy?

23   A    He as a speaker.  You know, he's characterized alternately

24   as being an alt-right or alt-lite or whatever.

25   Q    Okay.  Does Milo -- is he a fan of Richard Spencer?

171

J. Kessler - Cross

1   A    No.

2   Q    Okay.  So is it safe to say that it was put out there as a

3   kind of "we're going to end Richard Spencer once and for all"

4   kind of thing?

5   A    It was meant to embarrass you, I think.

6   Q    Right.  So you -- it's self-serving, yes, but it is what

7   it is.

8           MS. DUNN:  Foundation, Your Honor.  Just foundation

9   as to the intentions of others.

10          THE COURT:  Sustained.

11   BY MR. SPENCER:

12   Q    So you claimed -- so when that was released in 2019 --

13   right?  In the fall of 2019?

14   A    Whenever it was released.  I can't recall exactly.

15   Q    Does that sound about right?

16   A    Could be.  I don't know.

17   Q    Well, we can call up the tweet, if you'd like, but

18   that's -- it's the tweet where you say that "Richard Spencer is

19   a sociopathic narcissist"?

20   A    Yes.

21   Q    So that was 2019.  I believe it was the fall of 2019.

22   A    I seem to recall 2019 on the tweet.  I wasn't really

23   zeroed in on that.

24   Q    So when did you determine that I was a sociopathic

25   narcissist?

J. Kessler - Cross

1  A    Well, it was over a long period of time.

2       I recall one of the first times I met you, you sort of

3  made my skin crawl.  You were, like, a very slimy, cold

4  individual, like inhuman, like speaking to a robot or a serial

5  killer or something.  And you just were, I mean, despicable to

6  everybody who you ever came in contact with.

7       You know, I know that your views on a lot of things are

8  not in line with my own, but in terms of how the rally went

9  down, that's really what solidified it, because you and Eli

10 Mosley were accusing me of being a Jew because I wouldn't Sieg

11 Heil with you.  Like --

12 Q    This is enough, Jason.  This is enough.

13      So I think my question -- you determined -- so you

14 determined that I was a sociopathic narcissist previous to the

15 release of the rant?

16 A    Yes.

17 Q    And you determined that in 2017?

18 A    As the evidence in this case has been leaked out, I didn't

19 really know much about you --

20          MS. DUNN:  Objection, Your Honor.  Objection, Your

21 Honor.  If the witness's answer is based on evidence in this

22 case that has leaked out, we would object to foundation.

23          THE COURT:  Sustained.

24  BY MR. SPENCER:

25 Q    All right.  So let's go -- this is -- do you see what's on

J. Kessler - Cross

1  your screen as -- these are text messages.  These are the full

2  correspondence of text messages between yourself and me.

3  A    Yes.  I see text messages.

4  Q    You recognize that.  So it's January 2017.  I think that

5  might have been the first text message?

6  A    Okay.

7  Q    It says, "I'm in talks with the VA legislature."  Do you

8  recognize this as a fair and accurate representation of our

9  entire textual -- text correspondence?

10 A    I don't recall this text message, but I have no doubt that

11 this is correct.

12 Q    Okay.

13          MR. SPENCER:  So I would move to admit this as

14 Defendants' Exhibit 1001.

15          THE COURT:  Be admitted.

16          MS. DUNN:  This exhibit, I think, is already

17 admitted.  But no objection to its readmission.

18          (Defendant Spencer Exhibit 1001 marked.)

19          (Defendant Spencer Exhibit 1001 admitted.)

20 BY MR. SPENCER:

21 Q    When I call you to the stand, I might go through this just

22 so we can get a better understanding, but I'll focus on what

23 you testified about today.

24      So let's go to May 27th, 2018.  We actually had not spoken

25 for a year.  And I'll just read this to you.  So I text you,

J. Kessler - Cross

1    "So what's up?"  I guess I ignored another one of your calls.

2    And you said, "We're planning a rally in both Charlottesville

3    and Washington, DC for August 12th."

4         So that's the Unite the Right 2 rally for 2018, in the

5    summer of 2018.  And I said, "Let me seriously consider this."

6    And then you gave a thumbs up.

7         So I guess, should we infer that you wanted to hold a

8    rally in favor of sociopathic narcissism in Washington?  Is

9    that what you wanted to do?

10   A    I wasn't fully aware of your duplicity at that point.  As

11   I was trying to say before, the text messages between you and

12   Kline where you stabbed me in the back and accused me of being

13   Jewish because that's, like, the most --

14   Q    That's enough.  That's enough.

15   A    -- hideous thing to you, I didn't know about all that.

16   Q    That's enough.

17        So then on August 13 -- so this is the day after Unite the

18   Right 2, you hosted a rally -- I'm not sure it actually was

19   ever in Charlottesville.  I think it was in Washington DC.  You

20   hosted a rally and you said, "Eat my dust, you jealous bitch."

21             THE COURT:  Mr. Spencer, a minute ago you said

22   something about you would call him later and go over this.

23   This is the time to finish him.  If you're going into --

24   because this wasn't brought up on direct.

25             MR. SPENCER:  Okay.

J. Kessler - Cross

1        THE COURT:  So if you're making him your witness for

2    these purposes, it's fine.  I hope you will.  But go ahead and

3    finish.

4        MR. SPENCER:  Good enough.

5     BY MR. SPENCER:

6    Q    I would like to look into something -- this is quite

7    revelatory for me.  So this is --

8        MS. DUNN:  Objection to Mr. Spencer characterizing --

9    he will have an opportunity.

10       MR. SPENCER:  I'm sorry.

11       THE COURT:  Go ahead.

12       MR. SPENCER:  I apologize for that.

13    BY MR. SPENCER:

14   Q    So this is Plaintiffs' Exhibit -- this has already been

15   admitted, Plaintiffs' Exhibit 1444.  This was discussed in your

16   testimony today.

17   A    Okay.

18   Q    Please indulge me.  I'm sorry.  This is -- do you remember

19   discussions of the Horseshoe Bar?

20   A    Yeah.  We saw this earlier.

21   Q    Okay.  So help me out.  What was -- oh, yes.  What was

22   going on there?  So I was not in town in June 10th, but you

23   wanted to find someone to impersonate me in order to create a

24   fight at a bar?

25   A    No.  That's a mischaracterization.  I didn't say I was

J. Kessler - Cross

1    trying to start a fight at a bar.

2    Q    Well, what were you trying to do?

3    A    I was trying to get attention for my political message.

4    Q    By having someone impersonate Richard Spencer by your

5    side?

6    A    Well, the thing is, so many people hate you that it makes

7    so people want to pay attention because they like to, you know,

8    see you get punched and things like that.

9    Q    So you wanted the person who's impersonating me to get

10   punched and then you --

11   A    No, I don't want anybody to get punched.

12   Q    -- get more attention?

13   A    That's not what happened.  We were trying to get people

14   riled up to pay attention to the political message.

15   Q    You just want them riled up, but not punched, but you

16   wanted to find a Spencer impersonator in order to get people

17   riled up so that you could get more attention; is that right,

18   Mr. Kessler?

19   A    Yeah, I think that was the deal, trying to get attention

20   for our political meeting, for our organization.

21   Q    Is this kind of your MO, in a way, to use people like me

22   to get other people riled up?

23   A    I think it's good to have a provocative message sometimes,

24   because then it helps you to break out of the bubble.  There's

25   a suppression of any kind of pro-white message.  So a little

J. Kessler - Cross

1  bit of controversy goes a long way.

2  Q    Have you ever heard of the psychological term

3  "projection"?  Does that mean anything to you?

4  A    I've heard of it.

5  Q    What does it mean?

6  A    I don't know.  You can tell me, I guess.

7  Q    Well, you're the one testifying.

8  A    So I don't know.

9  Q    I could represent that it means actions of yourself that

10  you kind of project onto other people.  So you were trying to,

11  at the very least, create outrage with a Richard Spencer

12  impersonator in Charlottesville.  Does that strike you, maybe,

13  as, I don't know, sociopathic narcissism?

14  A    No.  I was trying to get attention for a message.  But we

15  didn't actually do that.  As you can see from these messages,

16  there was a lot of stupid --

17  Q    Spam --

18        (Overlapping speakers.)

19  A    -- careless talk that really doesn't go anywhere.

20  Q    Have you ever been diagnosed with mental illness?

21            MS. DUNN:  Objection, relevance.

22            THE COURT:  Sustained.

23            MR. SPENCER:  No further questions.

24                        CROSS-EXAMINATION

25   BY MR. CANTWELL:

J. Kessler - Cross

1    Q    Hello, Jason.

2    A    Hello.

3    Q    Was it your decision to invite me to the so-called

4    leadership meeting on August 11th?

5    A    I don't recall how that chain of events happened.

6    Q    Do you recall if you deliberated that invitation with

7    anybody else?

8    A    I don't recall a lot about, like, how people learned about

9    that meeting.

10   Q    Okay.  If I showed you text messages, would you remember

11   inviting me to that meeting?

12   A    I would -- if you have text messages, I have no reason to

13   doubt them.

14   Q    Okay.  But from what you've said so far, would I be right

15   to gather that you do not recall inviting me?

16   A    I don't recall.

17   Q    Whose idea was it to invite me to Unite the Right?

18   A    That, I don't recall, either.  It could have been mine,

19   but I don't recall.

20   Q    Do you recall any deliberative process about inviting me?

21   A    Well, I remember that you are renowned as an entertainer,

22   and you had a fan base, and that is why I thought Christopher

23   Cantwell should be one of the speakers at Unite the Right.

24   Q    Please describe for the jury what role, if any, I had in

25   planning Unite the Right.

J. Kessler - Cross

1  A    Zero.

2  Q    How important was Discord in organizing the Unite the

3  Right event?

4  A    They're exaggerating how -- the plaintiffs are

5  exaggerating how important it was.  There was a lot of careless

6  chatter --

7              MS. DUNN:  Objection.

8              THE WITNESS:  Like, pretty much all the stuff --

9              THE COURT:  Just a minute, Mr. Kessler.

10             Strike what he said about plaintiffs are

11  exaggerating.

12             THE WITNESS:  My apologies.

13             The Discord was -- it served some functions.  I don't

14  want to deny that.  It allowed us to communicate messages

15  sometimes, but the vast volume of those messages, like, in the

16  #general chat were just hogwash.  It's people what they call

17  shitposting, saying things to get their shits and giggles, to

18  laugh, to say outrageous things.

19             Really, the organizing is stuff that we haven't even

20  talked about, like my conversations with the police, the fact

21  that I got the permit.  I do think that there was some crucial

22  stuff that happened at the August 11th, quote/unquote,

23  "leadership meeting" as far as getting the police involved and

24  discussing the importance of being nonviolent after the legal

25  battle we had gone through with the ACLU.

J. Kessler - Cross

1          MS. DUNN:  Objection, Your Honor, subject to your

2    ruling.

3          THE COURT:  Well, I don't know where he is on the

4    question.  Go ahead.

5     BY MR. CANTWELL:

6    Q    Let's stick with Discord for the moment.

7    A    Okay.

8    Q    You were a moderator or administrator on the Discord,

9    right?

10   A    Yes.

11   Q    On the Charlottesville 2.0 Discord?

12   A    Yes, I was one of them.

13   Q    Do you know what role, if any, the Radical Agenda Discord

14   had in organizing the Unite the Right rally?

15   A    None, to my knowledge.

16   Q    Do you know if I was a moderator or administrator on the

17   Charlottesville 2.0 Discord?

18   A    I don't believe you were.

19   Q    There was a -- I believe the channel was called

20   #leadership-discussion on the Charlottesville 2.0 Discord.

21   Does that ring a bell to you?

22   A    Yes.

23   Q    Was I a member of the #leadership-discussion channel?

24   A    I have not seen you in there.

25   Q    Do you recall we had a lunch, I believe it was on August

J. Kessler - Cross

1  9th, a couple of days before the event?  Do you recall that?

2  A    Yes, vaguely.

3  Q    Do you think it would stand out in your mind if you and I

4  discussed a plan to commit racially motivated violence at that

5  meeting?

6  A    Yes, it would.  That absolutely was not something that

7  came up.

8  Q    At any point did you inform me of any plan to break the

9  law?

10 A    Absolutely not.

11 Q    Did you tell me how many people you put on your

12 application for the permit?

13 A    No.  I don't think so.

14 Q    To the best of your knowledge, have I ever seen the permit

15 application?

16 A    I don't think so.

17 Q    So you recall that we had this so-called leadership

18 meeting on August 11th at McIntire Park, right?

19 A    Yes, I do.

20 Q    Okay.  There's still some discussion going on about the

21 video from that.  But I have two audio clips which I disclosed

22 to plaintiffs' counsel in January of 2020.  I'd like to play

23 one of them now.  This is CCEX-10.  This would have been

24 Exhibit 10 on the original exhibits list that I gave you folks.

25      So Mr. Bloch just walked in.  I'll restate what I was

J. Kessler - Cross

1  saying.  There's still some deliberation going on about what

2  portions of the body camera video are going to come in.  I have

3  two audio clips from that meeting that I gave to plaintiffs'

4  counsel in January of 2020.  The one I want to play right now

5  would be Exhibit 10 on the exhibits list that I gave you

6  pretrial.

7           MS. DUNN:  Your Honor, we'd request a brief sidebar.

8           THE COURT:  All right.

9           (Sidebar commenced.)

10          MR. BLOCH:  Judge, I'm not sure what the content of

11 this is based on there's 3,000 exhibits.

12          MR. CANTWELL:  So the thing that I'm talking about

13 playing right now was what I gave to you guys in January 2020.

14 This is -- it's me and Jason Kessler talking about informing

15 the police about the August torch march.

16          MR. BLOCH:  What context?

17          MR. CANTWELL:  It's at the August 11th planning

18 meeting.

19          MR. BLOCH:  Oh, it's at the leadership meeting?

20 What's the time?

21          MR. CANTWELL:  I don't have the time stamps.  This is

22 a clip that I gave you almost two years ago.

23          MR. BLOCH:  This is from the leadership meeting.

24          MR. CANTWELL:  I think you and I are trying to figure

25 out what portions are going to get played.  Figured these

J. Kessler - Cross

1    portions in January of 2020 would be safe.

2            MR. BLOCH:  You keep saying that.  I don't think

3    there's any foundation issue at all.  There are portions of

4    that video that go into issues that you've already ruled

5    inadmissible in the injunction, and there is hearsay on the

6    video.  I don't know -- I don't have a foundation question

7    issue.  But I don't know if that portion includes any of those

8    problems.

9            THE COURT:  I can't do anything about it.  Can you

10   not stop when you get to the part you're not supposed to?

11           MR. CANTWELL:  I don't believe there's any

12   discussion --

13           MR. BLOCH:  How long is it?  How many minutes?

14           MR. CANTWELL:  I can tell you on the computer.

15           THE COURT:  Put it on there.  Let's go.

16           MR. CANTWELL:  It's nothing about the injunction.

17           (Sidebar concluded.)

18           (Defendant Cantwell Exhibit 10 marked.)

19           (Defendant Cantwell Exhibit 10 admitted.)

20    BY MR. CANTWELL:

21   Q    Jason, I'm going to play for you an audio clip from that

22   meeting, and then I'd like to discuss it with you once you've

23   had an opportunity to do that.

24        (Audio playing.)

25        Do you recognize that voice?

184

J. Kessler - Cross

1    A    That's you and me speaking.

2         (Audio playing.)

3    Q    Do you recall that conversation, Jason?

4    A    Yes.

5    Q    And so after that conversation I think that plaintiffs'

6    counsel showed you some phone records, said that you had a

7    phone call from Angela Tabler after that?

8    A    Yes.

9    Q    And so was it after that conversation that you contacted

10   law enforcement about the torchlight march?

11   A    It was.  I contacted Captain Wendy Lewis and Captain

12   Victor Mitchell and they had her call me.

13   Q    And is it your understanding that Mr. Kline spoke to

14   Ms. Tabler?

15   A    Yes.

16   Q    And were you there for the duration of the meeting?

17   A    I don't recall.  I recall that exchange and I remember a

18   celebration when we found out the permit was back in place

19   because we thought the police were going to protect the event

20   and we were going to have a safe, you know, First Amendment

21   protected demonstration after that.  I don't remember too much

22   else.

23   Q    Do you remember Mr. Kline saying that the walk from

24   Nameless Field to the Jefferson monument was, quote, like five

25   seconds?  Does that ring a bell to you?

J. Kessler - Cross

1   A    I don't recall.

2   Q    Are you aware of the -- what changed about the planned

3   route for the torchlight march?

4   A    Basically, Eli Kline was leading that thing.  He was the

5   one who had the bullhorn.  I tried to step off and lead people

6   and no one was following me.  So Eli is not from UVA.  I don't

7   know that he's ever been to Charlottesville before.  So he was

8   meandering all over the place.  And I remember at some point

9   Richard Spencer came up from behind and was like -- he just

10  growled at me like, "do something.  Tell him where to go."  And

11  I remember telling somebody like this is -- you're going the

12  wrong way.  Go this way.  And that's when we finally got back

13  on course.

14  Q    Is it -- your testimony is that your plan was to take a

15  shorter route than we ended up taking; is that what you're

16  saying?

17  A    I never had anything to do with the route, you know.  I

18  mean, Elliot Kline was totally the one organizing all that.

19  But on the fly when I was asked how do we get to the Rotunda, I

20  knew because I had been a UVA student.

21  Q    When you approached the planning meeting when we had that

22  conversation, were you aware that my body camera was recording?

23  A    No.

24  Q    Did you know that I had the body camera on?

25  A    No.

186

J. Kessler - Cross

1  Q    At some point after the events in this dispute did you

2  become aware that I was speaking to the FBI?

3  A    I -- I don't --

4         MR. BLOCH:  Objection.

5         MS. DUNN:  Objection, Your Honor.

6         THE COURT:  Sustained.

7  BY MR. CANTWELL:

8  Q    Do you recall when the first time you and I met was?

9  A    I think it might have been, there was a protest in

10  Washington, DC around June.  This was the one that was in front

11  of the Lincoln Memorial.  And I think I met you there.

12  Q    You say you think you met me there.  Would it be fair to

13  say that any interaction that we had at that was thoroughly

14  unmemorable?

15  A    That's correct.  I do remember talking to you, but I have

16  no idea what we talked about.  It was so short.

17  Q    How about between that first meeting and that lunch that

18  we had on August 9, did we interact frequently?

19  A    I can't recall.  Nothing substantive that sticks out to

20  me.

21  Q    During the events did you use Signal as your SMS app?

22  A    I don't believe I was even aware of it at that time.

23  Q    Is race your only disagreement with Antifa?

24  A    No.

25  Q    Is race your only concern with regard to immigration?

J. Kessler - Cross

1    A    No.

2    Q    Do you think abolishing the police would be a great idea

3    in a white ethnostate?

4    A    No.

5              MS. DUNN:  Objection, Your Honor.

6              THE COURT:  Sustained.

7              MR. CANTWELL:  No further questions.

8                        CROSS-EXAMINATION

9     BY MR. CAMPBELL:

10   Q    Good afternoon, Mr. Kessler.  I represent James Fields.

11        Prior to August 12th, 2017, had you ever heard the name

12   James Fields?

13   A    No.

14   Q    Had you ever communicated with or met James Fields before

15   August 12th of 2017?

16   A    Absolutely not.

17   Q    Having seen his pictures and Internet posts and blogs all

18   over the country since then, does it refresh your recollection,

19   did you ever see him, James Fields, at any other white

20   nationalist event, any other protest, any political event?

21   A    Absolutely not.

22             MR. CAMPBELL:  Thank you.  I don't have any more

23   questions.

24             THE COURT:  Anyone else?

25             MR. JONES:  I don't have any questions.

188

J. Kessler - Cross

1          THE COURT:  Mr. ReBrook wishes to question?

2          MR. REBROOK:  Hello, Your Honor.  Yes, I have a few

3  questions.

4          THE COURT:  Go ahead.

5          MR. REBROOK:  Can you hear me okay?

6          THE COURT:  Yes.

7                      CROSS-EXAMINATION

8  BY MR. REBROOK:

9  Q    Okay.  Mr. Kessler, with regard to your essential leader

10 meeting invite that you sent out after the Unite the Right

11 event, was Jeff Schoep invited?

12 A    Probably not, but I don't recall.  I didn't commit that

13 list of names to memory.

14 Q    Okay.  Would you categorize Jeff Schoep as an organizer of

15 Unite the Right?

16 A    No.  I was embarrassed by NSM once I learned that they

17 were a Nazi group and I didn't want them to come.  I tried to

18 separate myself from Mr. Schoep as much as possible.

19         MR. REBROOK:  Okay.  Well, then I have no further

20 questions.  Thank you.

21         THE COURT:  All right.  Anyone else in the courtroom

22 or on the line?

23         All right.  Thank you.  Mr. Kessler, you may step

24 down.

25         MS. DUNN:  Your Honor, I just have --

J. Kessler - Redirect

1           THE COURT:  Oh, I'm sorry.

2           MS. DUNN:  I apologize.  I thought you were asking

3   the defense.

4           THE COURT:  I'm sorry.  Okay.

5           MS. DUNN:  Court's indulgence, Your Honor.

6                     REDIRECT EXAMINATION

7    BY MS. DUNN:

8   Q    Thank you.  This will be very brief.

9        Mr. Kessler -- actually, Mr. Spalding, do we have the map

10  of UVA somewhere?  Thank you.

11       So Mr. Kessler, this is a demonstrative that the jury saw

12  in opening, and it shows the route that the torch march took

13  from Nameless Field to the Thomas Jefferson statue.

14       You just said that you were not responsible for this route

15  and that you tried to talk to Eli Kline about it, but you could

16  not, during the march.

17       Do you recall that?

18  A    I don't recall.  I know that I didn't -- I didn't create

19  the route for the thing, but I don't recall whether I spoke to

20  Elliot Kline or somebody else.  I remember trying to tell

21  somebody, hey, we're going the wrong way.  We need to correct

22  course here.

23  Q    But under questioning from defense counsel you just said

24  you had tried to address this with Mr. Kline and you were

25  unable to do that, couldn't get in touch with him?

J. Kessler - Redirect

1  A    If it was him, it was him.  My memory is not great on

2  this.  It was four years ago.

3  Q    I'd like, Mr. Spalding, for the jury to see the chart of

4  Mr. Kessler's phone calls with Mr. Kline just for this period

5  of time.

6       So you see, Mr. Kessler, your phone calls on the night of

7  August 11th with Mr. Kline.  And there is one at 7:11.  That's

8  before the torch march.  One at 9:23, 9:40, 9:48, 10:17, 10:51

9  and 10:52.  And some of those calls it looks like were

10 connected.  Do you see that?

11 A    Yeah, some of them were connected.  There's an awful lot

12 of missed calls, though.

13 Q    There's actually only one voicemail, but you see you did

14 call him several times?

15 A    Yes, I called.

16 Q    And do you recall that after the torch march was complete

17 that evening at 11:15, Mr. Kline texted you, "Great work, rest

18 easy."  You're aware of that?

19 A    Yes.

20 Q    And that you responded, "Thanks, you've done excellent

21 work too.  Let's knock this out of the park tomorrow."  You

22 recall that?

23 A    Yes.  We went over that at least a few times already.

24 Q    And you're not contending you sent him any kind of text

25 message that says, hey, Eli, you're going the wrong way?  You

J. Kessler - Redirect

1   don't contend that text message exists, do you?

2   A    I wasn't using my phone to text in that sort of

3   environment.  You're in a protest march and you're going to

4   pull out a phone and text and call people while those chants

5   are as loud as they are?  I don't think so.

6   Q    Well, how about this text, then, Mr. Kessler, 1458J.  This

7   is a text message from yourself to Mr. Kline at 10:12 that

8   night, during the torch march.

9        Your Honor, move to admit 1458J.

10           THE COURT:  Be admitted.

11           (Plaintiff Exhibit 1458J marked.)

12           (Plaintiff Exhibit 1458J admitted.)

13  BY MS. DUNN:

14  Q    You see this, Mr. Kessler, that you are in fact

15  emailing -- or I'm sorry, texting Mr. Kline during the torch

16  march, where you tell him, "come around the front of the

17  statue."

18  A    You're incorrect.  The march was over.  And I was

19  stationary.  We were just hanging around the plaza there around

20  the Rotunda.  It's different doing a text message when you're

21  stationary than when you're in a march and all these people are

22  chanting and stuff.

23  Q    Okay.  And --

24  A    There's no way that had anything to do with telling him

25  how to go on the march.

J. Kessler - Redirect

1   Q    Okay.  I appreciate that testimony, Mr. Kessler.  Thank

2   you.

3        You also mentioned how vital it was that you had this

4   permit.  Do you recall that?

5   A    Yes.

6   Q    Okay.  And that was -- you were very focused on the

7   permit, right?

8   A    I was.

9   Q    Okay.

10          MS. DUNN:  Mr. Spalding, let's show Mr. Kessler

11   3098A.

12          (Plaintiff Exhibit 3098A marked.)

13   BY MS. DUNN:

14   Q    Mr. Kessler, you'll recognize this as a series of tweets

15   from yourself, replying to Mr. Damigo and Mr. Brad Griffin, who

16   also went by occdissent; do you see that?

17   A    Yes.

18          MS. DUNN:  Your Honor, we move to admit 2098A [sic]

19   and publish to the jury.

20          THE COURT:  Be admitted.  You may.

21          (Plaintiff Exhibit 3098A admitted.)

22   BY MS. DUNN:

23   Q    Just for clarity, Nathan Damigo is from IE, Identity

24   Evropa.  Brad Griffin, occidentaldissent, is from League of the

25   South.  And at this point you are telling them, "City council

J. Kessler - Redirect

1   has canceled the permit for #unitetheright, but we're holding

2   it in Lee Park anyway."  Do you see that?

3   A    Yes.

4   Q    And you see you say, "Nothing will stop us," correct?

5   A    Yes.

6             MS. DUNN:  Let's show Mr. Kessler PX-2760, please.

7             (Plaintiff Exhibit 2760 marked.)

8   BY MS. DUNN:

9   Q    Do you recognize this as a tweet where you tweet and

10  Mr. Schoep responds to you?

11  A    I don't recognize it, but I see what it is.

12  Q    Is this a tweet where you've tweeted and Mr. Schoep

13  responds to you?

14  A    It looks like it is.

15            MS. DUNN:  Your Honor, move to admit.

16            THE COURT:  Be admitted.

17            (Plaintiff Exhibit 2760 admitted.)

18  BY MS. DUNN:

19  Q    You can see here, Mr. Kessler, that you say

20  "Charlottesville city council has canceled the permit but we're

21  holding it in Lee Park anyway."  And you can see that Jeff

22  Schoep, who goes by @nsm88, says, "Yet another reason to be in

23  VA for Unite the Right.  Mobilize, no excuses.  Be there."  You

24  see that, correct?

25  A    I didn't see it at the time.  I see it now.

194

J. Kessler - Redirect

 1          MS. DUNN:  Let's show Mr. Kessler another one,

 2    PX-3523.

 3          (Plaintiff Exhibit 3523 marked.)

 4    BY MS. DUNN:

 5    Q    This is a post by you in the #general channel of the

 6    Charlottesville 2.0 server on August 8th, 2017.  Do you see

 7    this?

 8    A    Yes.

 9          MS. DUNN:  Your Honor, move to admit 3523.

10          THE COURT:  Be admitted.

11          (Plaintiff Exhibit 3523 admitted.)

12    BY MS. DUNN:

13    Q    Here you're not just speaking to individuals; you're

14    speaking to @everyone; do you see that?

15    A    Yes.

16    Q    You say, "The event is still proceeding as planned no

17    matter what," right?

18    A    Yes.

19    Q    Then finally, 3524, another post by you in the #general

20    channel of the Charlottesville 2.0 Discord server.  Do you see

21    that?

22    A    Yes.

23          MS. DUNN:  Move to admit 3524.  And here --

24          THE COURT:  Be admitted.

25          (Plaintiff Exhibit 3524 marked.)

J. Kessler - Redirect


1            (Plaintiff Exhibit 3524 admitted.)

2   BY MS. DUNN:

3   Q    -- same day, August 8, you say to everyone, "We're still

4   going, no matter what.  Make sure everyone gets that message."

5   You see that, Mr. Kessler?

6   A    Yes, I absolutely said that.

7            MS. DUNN:  All right.  Your Honor, no further

8   questions.

9            THE COURT:  Thank you.

10           MS. DUNN:  Thank you very much.

11           THE COURT:  You may step down, Mr. Kessler.

12           Call the next witness.

13           MS. KAPLAN:  Your Honor, plaintiffs call Christopher

14  Cantwell.

15           MR. CANTWELL:  Am I allowed to take notes during

16  this?

17           THE COURT:  It's rather unusual.  Most people can't

18  do it and pay attention at the same time.  I mean, you can't

19  stop and wait.  You've got to be answering questions.

20           MR. CANTWELL:  Maybe just let me jot down exhibit

21  numbers so I can reference it later.

22           THE COURT:  Okay.

23      CHRISTOPHER CANTWELL, CALLED BY THE PLAINTIFFS, SWORN

24                        DIRECT EXAMINATION

25   BY MR. BLOCH:

J. Kessler - Redirect

1   Q     Good afternoon, Mr. Cantwell.

2   A     Good afternoon, Mr. Bloch.

3   Q     Mr. Cantwell, in 2013 you began your own radio show called

4   Some Garbage Podcast, right?

5   A     Sounds about right.

6   Q     And in 2015 you rebranded that podcast into the show that

7   you have now, called Radical Agenda, correct?

8   A     If I was asked the year I'd probably say 2014, but I --

9   that's possible.  Right around that time.

10  Q     Fair.  But importantly, Some Garbage Podcast was rebranded

11  to be called Radical Agenda, right?

12  A     That's right.

13          MR. BLOCH:  Judge, may I have one moment to deal with

14  a technical issue?  I apologize.

15          THE WITNESS:  And before we get started again, I

16  think that's my water up on your podium there.  I wonder if I

17  might be able to retrieve that.

18          MR. BLOCH:  Sure.

19          May I approach the witness?

20          THE WITNESS:  Thank you, Mr. Bloch.

21   BY MR. BLOCH:

22  Q     My apologies.

23          Mr. Cantwell, in your opening statement you told this jury

24  that the Radical Agenda is, quote, marketed as fiction; isn't

25  that right?

J. Kessler - Redirect

1  A     It is.

2  Q     And if I could just show Mr. Cantwell PX-3889, which is an

3  episode of Radical Agenda.  I guess if we could play a very

4  short portion of it so Mr. Cantwell can hear whether it is, in

5  fact, him.

6              (Plaintiff Exhibit 3889 marked.)

7              THE WITNESS:  I'm sorry?

8              THE COURT:  Are you going to play it?

9              THE WITNESS:  Do you want me to put headphones on; is

10  that the idea?

11             THE CLERK:  No.  I think you said you were just going

12  to play a little --

13             MR. BLOCH:  Yeah, a brief moment.  It's audio.

14             THE CLERK:  Yes.

15             THE WITNESS:  I don't object to the jury hearing my

16  voice.  I'm reasonably confident that we're going to hear my

17  voice.

18             MR. BLOCH:  Appreciate that.  So let's move PX-3889.

19  PX-3889, I would like to move into evidence and publish for the

20  jury.  It's the first 33 seconds.

21             THE COURT:  All right.  Be admitted.  Go ahead.

22             (Plaintiff Exhibit 3889 admitted.)

23             (Audio playing.)

24  BY MR. BLOCH:

25  Q     Mr. Cantwell, was that your voice on the first episode of

J. Kessler - Redirect

1  the Radical Agenda on April 19th, 2015?

2  A    That's it.  That's me.

3  Q    And you say that there's a little rebranding going on,

4  Some Garbage Podcast was marketed as satire but we were talking

5  about some very serious subjects so it's been changed and now

6  this is the Radical Agenda.  Right?  Didn't you say that?

7  A    I said it.

8  Q    You use your real name on the show, correct?

9  A    I do.

10 Q    In 2017 you did the show three days a week?

11 A    Yes.

12 Q    And at the time you had somewhere between 10,000 and

13 20,000 listeners; is that right?

14 A    Depending on your measurement, that's fair.

15 Q    And you agree with me that your audience includes some

16 armed extremists; isn't that right?

17 A    That's fair to say.

18 Q    One of the things that you discuss on Radical Agenda is

19 white nationalism, correct?

20 A    Yes.

21 Q    And you advocate for a white ethnostate on the Radical

22 Agenda?

23 A    Yes.

24 Q    And you advocate for that seriously; isn't that true?

25 A    I do.

J. Kessler - Redirect

1  Q    Now, you're aware that what you say on your show can

2  influence people's behavior, right?

3  A    Yes.

4         MR. BLOCH:  And if I could show Mr. Cantwell PX-2658.

5  BY MR. BLOCH:

6  Q    This is an article that you wrote; is that right,

7  Mr. Cantwell?

8  A    It is.

9         MR. BLOCH:  I would move PX-2658 into evidence, Your

10  Honor, and publish to the jury, please.

11         THE COURT:  Be admitted.

12         (Plaintiff Exhibit 2658 marked.)

13         (Plaintiff Exhibit 2658 admitted.)

14  BY MR. BLOCH:

15  Q    Mr. Cantwell, this is an article that you wrote that,

16  generally speaking, is about mass shootings; isn't that right?

17  A    Yes.

18  Q    And on page 3 you state, "Thousands of people listen to

19  what I say," in the third paragraph down.  "I'm certain that if

20  I called for them to engage in such acts, some number of them

21  would."

22         Didn't you write that?

23  A    I wrote that.

24         MR. BLOCH:  And if I could show Mr. Cantwell PX-2664,

25  please.

J. Kessler - Redirect

1  BY MR. BLOCH:

2  Q    This is an article you wrote, right, Mr. Cantwell?

3  A    It is, yes.  That's an article I wrote.

4        MR. BLOCH:  I would offer PX-2664 into evidence and

5  publish to the jury, Your Honor?

6        THE COURT:  You may.  Admitted.

7        (Plaintiff Exhibit 2664 marked.)

8        (Plaintiff Exhibit 2664 admitted.)

9  BY MR. BLOCH:

10 Q    Mr. Cantwell this is an article you wrote, the title of

11 which is "This is Not About Optics," right?

12 A    Yes.

13 Q    And on page 2, paragraph 4, you write, "I sincerely hope

14 that every man who listens to the sound of my voice takes his

15 cause seriously enough to kill and die for it.  I sincerely

16 hope that if I called on them to do so, that they would answer.

17 I have little doubt that if I went on the Radical Agenda and

18 started praising the Pittsburgh shooting, I'd soon see the

19 results plastered all over cable news."  And then it goes on.

20      And you say, "Because of this, I try (and often fail) to

21 be cautious when discussing violence.  A man with the nerve to

22 willingly give up his life in pursuit of our salvation is

23 exceedingly valuable."

24      Did you write that?

25 A    I wrote that.

J. Kessler - Redirect

1  Q    Now --

2           MR. BLOCH:  We can take that down.  Thanks,

3  Mr. Spalding.

4  BY MR. BLOCH:

5  Q    You told this jury, Mr. Cantwell, that you have a

6  disclaimer at the introduction to your show, correct?

7  A    I do.

8  Q    And you agree with me that there was a period of time

9  where you had the show with no disclaimer at the beginning,

10 correct?

11 A    Yes.

12 Q    In fact, you introduced that disclaimer at the beginning

13 of your show for the very first time on July 14th, 2017; isn't

14 that right?

15 A    Was it that late in the -- I don't know when it was

16 exactly, but I remember we had this conversation already, and

17 so I take it that that's when it was.

18 Q    Sound about right, about mid-July 2017?

19 A    If I was going to guess, I would have said it was probably

20 sooner than that, actually, but...

21 Q    Do you mean later than that?

22 A    I mean, like, sooner in time, like earlier in the year.

23 Q    Can we agree that you added the disclaimer about one month

24 before Charlottesville?

25 A    Yes.

J. Kessler - Redirect

1 Q    And you told the jury that the content of the disclaimer

2 was, quote, "The listener is hereby warned to interpret as

3 fiction anything they're not able to verify in a more reliable

4 fashion."  That's the quote.  That's what you said, right?

5 A    That's what I said.

6         MR. BLOCH:  If we could just show the next exhibit --

7 do we have a clip?  Do we have a clip of the disclaimer?

8         We can come back to it.

9 BY MR. BLOCH:

10 Q    Let me just read it and you tell me if these are, in fact,

11 the words of the disclaimer.

12     The disclaimer actually says -- Mr. Cantwell, tell me if

13 this is correct -- "What follows is a privileged, copyrighted,

14 fictional, private, legally protected, and whatever other

15 terminology one might assign to a meaningless wall of light and

16 sound one is not looking forward to hearing aloud in a

17 courtroom."  Isn't that actually what the disclaimer says?

18 A    That is definitely part of one version of the disclaimer,

19 yes.

20         MR. BLOCH:  Could we just play PX-3885, please?

21         (Plaintiff Exhibit 3885 marked.)

22         (Audio playing.)

23         MR. BLOCH:  Let's move on.  That's the wrong exhibit.

24 We'll come back to it.

25         THE COURT:  We've gone through the disclaimer twice

J. Kessler - Redirect

1   already.  Do we have to see it a third time?

2           MR. BLOCH:  We don't, Judge.  I'll move on.

3    BY MR. BLOCH:

4   Q    Now, you claim, Mr. Cantwell, that you are just an

5   entertainer, right?

6   A    I don't say I'm just an entertainer; but I'm an

7   entertainer.  I'm a professional entertainer.  That's an

8   accurate statement.

9           MR. BLOCH:  Could we play -- This is a clip from

10  Radical Agenda.  So, without objection, I will just move into

11  evidence PX-2707A.

12          THE COURT:  Be admitted.

13          (Plaintiff Exhibit 2707A marked.)

14          (Plaintiff Exhibit 2707A admitted.)

15          (Audio playing.)

16   BY MR. BLOCH:

17  Q    Those are your words, right, Mr. Cantwell?

18  A    I said that.

19  Q    And this was a recording of a conversation that you had in

20  2017 with, I believe, someone you described as a former love

21  interest; is that right?

22  A    Yes, that's what the female voice is, yes.

23  Q    Correct.  Isn't it true, Mr. Cantwell, that you, in fact,

24  advocate violence on the Radical Agenda?

25  A    Yes.

J. Kessler - Redirect

1            MR. BLOCH:  And if I could show -- or move into

2   evidence PX-2713A.

3            THE COURT:  Yes.

4            (Plaintiff Exhibit 2713A marked.)

5            (Plaintiff Exhibit 2713A admitted.)

6            THE WITNESS:  What was that number?

7            MR. BLOCH:  PX-2713A.

8            (Audio playing.)

9   BY MR. BLOCH:

10  Q    Mr. Cantwell, were those your words on a show that aired

11  on June 17th, 2017?

12  A    Well, I'm in no position to say what date these things

13  occurred on, but that's my voice, yes.

14  Q    And do you agree with me that you -- that comes from an

15  episode that you entitled "Political Violence"?

16  A    I'm familiar with that episode.  I don't remember all the

17  words to it.

18  Q    Meaning that you're familiar that you did an episode

19  entitled "Political Violence," correct?

20  A    Yes, I did an episode titled "Political Violence."

21  Q    Does it refresh your recollection, Mr. Cantwell, if I

22  could just read from your deposition from page 219?  We played

23  that clip and I asked you, question:  "Did you say those words,

24  Mr. Cantwell, on the Radical Agenda on June 17th, 2017?"

25            Answer:  "Yeah."

J. Kessler - Redirect

1      Did you give that testimony?

2  A    I'm sure I did.

3  Q    Now, I'd like to discuss what you've said to your

4  listeners about a race war, okay?

5  A    Okay.

6  Q    You had an episode of Radical Agenda in January 2017 with

7  a guy named weev, right, a guy who's called "weev"?

8  A    The Jewish fellow.  Yeah.

9  Q    Is that right?

10  A    Yeah.

11  Q    And weev was a contributor to *The Daily Stormer*, right?

12  A    Yes.

13         MR. BLOCH:  Now, if I could show or move into

14  evidence PX-2712A, a Radical Agenda episode from January 2017.

15         THE COURT:  Be admitted.

16         THE WITNESS:  What was that number?

17         MR. BLOCH:  2712A.

18         (Plaintiff Exhibit 2712A marked.)

19         (Plaintiff Exhibit 2712A admitted.)

20         (Audio playing.)

21  BY MR. BLOCH:

22  Q    Mr. Cantwell, there were two voices on that call, right?

23  A    Yes.

24  Q    And weev is the one who said, "Dylann Roof is the kind of

25  guy that had no future anyways.  This is exactly the kind of

J. Kessler - Redirect

1   person who should be committing acts of mass murder,

2   basically," right?

3   A    Yes.

4   Q    And you're the one who said, "That's a very solid point,

5   actually.  I'll absolutely grant you that.  Not everyone are

6   going to be a professional propagandist, shall we say.  Some of

7   us got to be fucking cannon fodder for the race war," right?

8   A    Yes.

9   Q    Dylann Roof, you agree, is the person who murdered nine

10  African Americans in a church in South Carolina, right?

11  A    Yes.

12  Q    I'd like to talk a little bit about what you said on

13  Radical Agenda regarding driving cars into counter-protesters,

14  okay?

15  A    Okay.

16        MR. BLOCH:  If I could move into evidence PX-2706A, a

17  Radical Agenda episode from February of 2017.

18            THE COURT:  Be admitted.

19            (Plaintiff Exhibit 2706A marked.)

20            (Plaintiff Exhibit 2706A admitted.)

21            (Audio playing.)

22  BY MR. BLOCH:

23  Q    Did you state those words, Mr. Cantwell?

24  A    I did.

25            MR. BLOCH:  Could we introduce, or show first to

207

J. Kessler - Redirect

1   Mr. Cantwell, PX-2644?

2              (Plaintiff Exhibit 2644 marked.)

3   BY MR. BLOCH:

4   Q    Did you post this on Telegram, Mr. Cantwell?

5   A    I did.

6              MR. BLOCH:  And I would offer this in evidence and

7   ask to publish it to the jury.

8              THE COURT:  It's admitted.

9              MR. BLOCH:  Thank you, Judge.

10             (Plaintiff Exhibit 2644 admitted.)

11    BY MR. BLOCH:

12  Q    Mr. Cantwell, what you posted is a photograph of a person

13  standing in the middle of the road, correct?

14  A    Well, we're looking at a still image.  Actually, what I

15  posted is a video.

16  Q    A video.  But what we see here is a still from that video?

17  A    Yes.

18  Q    And you wrote, "Hey, communist, remember this like your

19  life depends on it, because it does.  Blocking traffic is not

20  peaceful protest and every person who reminds you of that

21  without using his car is giving you more slack than you fucking

22  deserve."  Right?

23  A    Yes.

24             MR. BLOCH:  We can take that down.  Thanks,

25  Mr. Spalding.

J. Kessler - Redirect

1  BY MR. BLOCH:

2  Q    One of the things that you have also discussed is

3  something that you call, quote, "defensive force," right?

4  A    Yes.

5  Q    And defensive force -- an example of defensive force as

6  you have written is, quote, "It is my honest opinion that a

7  driver would be morally justified in shooting a police officer

8  at the moment the police officer's lights go on to pull that

9  driver over," correct?  Did you say that?

10 A    You're discussing something devoid of context, but yes, I

11 wrote that.

12 Q    Now, at one point you actually considered yourself going

13 on a shooting spree; isn't that true?

14 A    Sure.

15 Q    And you were specifically asked in 2017 whether you

16 disavowed the words that I read about being able to shoot

17 police officers when you get pulled over, right?

18 A    I'm sorry.  Could you -- can you state that question

19 again?  I apologize.

20 Q    Sure.  In 2017, you were asked whether you disavow the

21 words that you said about being able to shoot police officers,

22 right?

23 A    I don't have any recollection of that.

24       MR. BLOCH:  Do we have PX-2633?  If I could just show

25 Mr. Cantwell to refresh --

J. Kessler - Redirect

1   BY MR. BLOCH:

2   Q    Tell me if this refreshes your recollection.  This is an

3   article you're familiar with, right?

4        (Plaintiff Exhibit 2633 marked.)

5   A    Yes.

6            MR. BLOCH:  And if we could go to the middle of

7   page 4.

8            Do you see -- if you could highlight for Mr. Cantwell

9   the words.

10  BY MR. BLOCH:

11  Q    Does that refresh your recollection that you were asked

12  whether you disavow those words, and your response was that

13  your focus has "shifted away from cops to Jews, blacks, and

14  leftists"?  Does that refresh your recollection?

15  A    So you're using somebody else's words here, and you're

16  well aware that this person does haven't my best interests at

17  heart.  So if you want to quote my words, I'm happy to quote my

18  words, but if you want to quote Stephen Lemons, that's going to

19  be a different story.

20  Q    So if I could just --

21           THE COURT:  Well, he doesn't agree with it.  So you

22  can't just bring up what somebody else said if he doesn't agree

23  with it.

24           MR. BLOCH:  Understood, Judge.

25  BY MR. BLOCH:

J. Kessler - Redirect

1  Q    If I could just read from your deposition testimony,

2  page 87, line 24, you were asked this question and you gave

3  this answer.

4      Question:  "Do you agree with me that the SPLC asked if

5  you disavow those words and you said your focus has shifted

6  away from cops to Jews, blacks, and leftists?"

7      Answer:  "That sounds accurate."

8      Did you give that testimony?

9  A    That testimony, I gave, which is decidedly different from

10  the question you asked me.

11         THE COURT:  Now, look, Mr. Bloch, we can take forever

12  with this witness or we can do it the way your colleagues have

13  done it.  Tell him right up front what you've got and ask him

14  to avow or disavow.  And I promise you it will be faster and

15  more effective.

16         MR. BLOCH:  Understood, Judge.

17   BY MR. BLOCH:

18  Q    Mr. Cantwell, let's talk about your views of Jewish

19  people.

20      Would you agree with me that you have referred to Jewish

21  people on Radical Agenda as, quote, "oven-dodging kikes"?

22  A    I have.

23  Q    And is that a reference to the systematic murder of Jewish

24  people during the Holocaust?

25  A    That's -- yes, that's the reference.

J. Kessler - Redirect

1            MR. BLOCH:  If I could show Mr. Cantwell PX-1886A,

2    please.

3    BY MR. BLOCH:

4    Q    Did you write this, Mr. Cantwell?

5    A    Yes.

6            MR. BLOCH:  I would ask that this be moved into

7    evidence and published to the jury.

8            THE COURT:  Be admitted.

9            (Plaintiff Exhibit 1886A marked.)

10           (Plaintiff Exhibit 1886A admitted.)

11   BY MR. BLOCH:

12   Q    If we could move -- this is a fairly difficult copy to

13   read, but did you write, Mr. Cantwell, if you can read this --

14   this --

15   A    Would you like me to read it?

16   Q    -- this document, "The Jew is the enemy of the human

17   race"?

18   A    Yes.

19   Q    And it goes on to the next page and it says, "You thought

20   you would destroy our history, but you were wrong.  Sooner or

21   later, pal, one way or another, you will become it"?

22   A    Yes.

23   Q    You said, "Our records will stand.  Your final chapters

24   are already being written," right?

25   A    Yes.

J. Kessler - Redirect

1          MR. BLOCH:  If we could show PX-2584.

2    BY MR. BLOCH:

3    Q    Mr. Cantwell, is this something that you posted?

4    A    Yes.

5          MR. BLOCH:  And I would offer PX-2584 into evidence

6    and publish to the jury.

7          THE COURT:  Be admitted.

8          (Plaintiff Exhibit 2584 marked.)

9          (Plaintiff Exhibit 2584 admitted.)

10   BY MR. BLOCH:

11   Q    Is this a Gab post, Mr. Cantwell?

12   A    It appears to be, yes.

13   Q    And you stated, "Anders Breivik, Dylann Roof, Robert

14   Bowers, and Brenton Tarrant all had fundamentally the same

15   complaints.  President Trump got elected because a majority of

16   this country has the same complaints as well.  The stupid

17   fucking Jews, instead of paying attention and altering course,

18   just scream the global threat of white nationalism, 'Blame

19   Trump.'  This is how you fucking kikes get with the pogrom.

20   You're a tiny ethnic minority and you cannot tell us what to do

21   in the countries, especially not while you do the opposite in

22   the one we gave you.  Your scams have a limited life span, and

23   when enough people figure out what you're doing, cooler heads

24   will not prevail."

25          Did you write that?

J. Kessler - Redirect

1   A     I did.

2   Q     To clarify, Anders Breivik, who is the first person you

3   cited there, killed 77 people in Norway, right?

4   A     I understand him to be a mass murderer of some sort, yes.

5   Q     And Robert Bowers killed 11 people at the Tree of Life

6   Synagogue in Pittsburgh?

7   A     That's my understanding.

8   Q     Brenton Tarrant killed 57 Muslim worshipers at two mosques

9   in Christchurch, New Zealand, right?

10  A     Yes.

11  Q     And a pogrom is mass violence along ethnic lines,

12  especially towards Jews, right?

13  A     Yes.

14  Q     You also --

15        MR. BLOCH:  You can take that down, Mr. Spalding.

16  Thank you.

17  BY MR. BLOCH:

18  Q     You sold copies of *Mein Kampf* to your listeners in 2017,

19  correct?

20  A     Yes.

21  Q     And you actually called me a Jew during this litigation;

22  isn't that right?

23  A     At least -- at least once, yeah.

24  Q     And if I could show the next exhibit.

25        (Video playing.)

J. Kessler - Redirect

1       Is that you, Mr. Cantwell?

2  A    Yeah.

3            MR. BLOCH:  If I could move that into evidence.

4  BY MR. BLOCH:

5  Q    This is a clip from your deposition in this case, right?

6  A    Yes.

7            THE CLERK:  Does it have a number?

8            MR. BLOCH:  Is there a number?

9            MR. CANTWELL:  Actually, before you publish that, can

10 we discuss this, please?

11           THE COURT:  Yes.  We'll let the jury go for

12 20 minutes while we take this up.

13           Come around, please.

14 **(Jury out, 3:03 p.m.)**

15           (Sidebar commenced.)

16           THE COURT:  Yes, sir.

17           MR. CANTWELL:  So I don't have any problem with you

18 introducing the words or the audio that's taken in the prison.

19 I'm in the prison uniform.  I'd rather just not play the video.

20           MS. KAPLAN:  We'll just --

21           THE COURT:  I don't see why you've become a part

22 of -- a witness to the case.

23           MS. KAPLAN:  We'll withdraw it.

24           THE COURT:  All right.  We'll recess.

25           (Sidebar concluded.)

J. Kessler - Redirect

1              (Recess.)

2              THE COURT:  Bring the jury back.

3    **(Jury in, 3:24 p.m.)**

4              THE COURT:  All right.  You may be seated and you may

5    proceed.

6              MR. BLOCH:  Thank you, Judge.

7     BY MR. BLOCH:

8    Q    Mr. Cantwell, one of the things you speak about on Radical

9    Agenda is race, correct?

10   A    Yes.

11   Q    And if I could introduce PX-2710A, please, and play it for

12   the jury.

13             THE COURT:  All right.

14             (Plaintiff Exhibit 2710A marked.)

15             (Plaintiff Exhibit 2710A admitted.)

16             (Audio playing.)

17    BY MR. BLOCH:

18   Q    Mr. Cantwell, those were your words that you said to your

19   Radical Agenda listeners, right?

20   A    They are.

21   Q    And you in fact invited those listeners to join you at

22   Unite the Right in Charlottesville, correct?

23   A    I did.

24   Q    Now, I want to talk to you about your relationships with

25   your co-defendants, okay?

216

J. Kessler - Redirect

1  A    Okay.

2  Q    You told this jury, quote, "I really don't know my

3  co-defendants and I knew them even less on August 11," correct?

4  A    I did.

5  Q    Let's talk first about Mr. Spencer.  If we could show

6  PX-3317, please.  These are text messages, Mr. Cantwell,

7  between you and Mr. Spencer, correct?

8  A    They are.

9  Q    And generally speaking, over the course of the summer,

10  July 2017, would it be fair to say that you guys are discussing

11  collaborating on some white nationalist projects prior to Unite

12  the Right, correct?

13  A    Yes.

14  Q    On July 8th you said, at row 429, "Can I call you?"

15  Right?

16  A    You know, if I could --

17  Q    The question --

18  A    Excuse me.  I'd like to clarify what I just said, which is

19  I was reaching out to him about collaborating.  We never

20  actually did engage in a project together.  That's all.  Go

21  ahead.

22  Q    Understood.  And on July 8th you said, "Can I call you?"

23  Right?

24  A    Yes.

25  Q    And he said at that point, "My daughter is asleep in the

J. Kessler - Redirect

1   other room.  Let's talk this evening," right?

2   A    Yes.

3   Q    And you then continued the conversation back and forth

4   about this collaboration, right?

5   A    Yes.

6   Q    You've also had Mr. Spencer as a guest on Radical Agenda

7   multiple times, right?

8   A    That's probably true.

9   Q    And you saw Mr. Spencer at the free speech rally in June

10  2017, right?

11  A    Yes.

12  Q    You communicated with him in the summer of '17 about Unite

13  the Right, correct?

14  A    I mean, yeah, I mean, like, right before the event we

15  certainly did, yeah.

16  Q    Well, you communicated with him, in your words,

17  preparatory to Charlottesville, right?

18  A    I'm sorry, what?

19  Q    Your words were that "Preparatory to Charlottesville

20  Mr. Cantwell spoke to Jason Kessler, Eli Mosley, a/k/a Elliot

21  Kline, Richard Spencer and an individual known to Cantwell as

22  Kurt," correct?

23  A    I believe those are the words of my attorney, yes.  That's

24  accurate that in the lead-up to Charlottesville I spoke to

25  Mr. Spencer.

J. Kessler - Redirect

1   Q    And if we could go back to the text, at cell 451, on

2   August 5th you said, "I'm planning my travels for C'ville.

3   Might spend tomorrow in Alexandria.  Would you be interested in

4   catching up there with me if I do?  What about having lunch or

5   dinner with some Radical Agenda listeners?"  Right?

6   A    Yes, that's what the --

7   Q    You texted that to Mr. Spencer on August 5th, right?

8   A    Yes.

9   Q    And then the next -- the next entry we see on your text

10  messages, you said, "On another note, Signal is an app that I

11  use to encrypt my SMS.  Check it out," right?

12  A    Yep.

13  Q    You then met Mr. Spencer for lunch in Virginia on August

14  6th, right?

15  A    A little after I said "I'm beginning to think you don't

16  like me," yeah, then later we met.

17  Q    You met for lunch and discussed Unite the Right, correct?

18  A    I really don't remember what we discussed at the meeting.

19  I'm certain that we discussed the events, yes.

20  Q    And we've listened to recordings that you made in this

21  case, but you didn't record that lunch with Mr. Spencer, right?

22  A    No.  We were at a restaurant.  That would have been

23  terribly inappropriate.

24  Q    You also met Matt Heimbach at the Pikeville rally in April

25  of 2017, right?

J. Kessler - Redirect

1    A    Yes.

2    Q    You gave a speech there where Mr. Heimbach introduced you,

3    right?

4    A    I did.

5    Q    And if we could show PX-1981 which I believe is in

6    evidence.  That's a photograph of you, Mr. Cantwell.  If we

7    could show the jury as well.

8              THE CLERK:  1981?  I'm not finding it.

9              MR. BLOCH:  I apologize.  I thought this was in

10   evidence.  If it's not, I'm happy to move it in.

11             THE CLERK:  I'm trying to find it.  I'm not finding

12   it.

13             THE COURT:  It will be admitted.

14             (Plaintiff Exhibit 1981 marked.)

15             (Plaintiff Exhibit 1981 admitted.)

16   BY MR. BLOCH:

17   Q    Mr. Cantwell, this is a photograph of you with

18   Mr. Heimbach at the Pikeville rally, right?

19   A    Yes.  To clarify, actually, this is not at the rally

20   itself.  This was at an event nearby on some private property,

21   but close enough.

22   Q    So this is at a private event that you attended with

23   Matthew Heimbach?

24   A    Yes.

25   Q    And he's introducing you for you to give a speech to the

J. Kessler - Redirect

1  listeners there, right?

2  A    Yes.

3  Q    And you're wearing a hat, right?

4  A    Yes.

5  Q    Does the hat say "RWDS" on it?

6  A    Yes.

7  Q    And that stands for "Right Wing Death Squad," right?

8  A    That's what it says.

9  Q    The banner you're standing in front of is a National

10 Socialist Movement banner?

11 A    It appears to be.

12 Q    And in addition to this meeting, you've had Mr. Heimbach

13 on as a guest on Radical Agenda?

14 A    I have.

15 Q    You've had Dillon Hopper on as a guest, right?

16 A    Yes.

17 Q    You've had Robert Ray on as a guest, right?

18 A    Yes.

19 Q    You've had Jason Kessler on as a guest, right?

20 A    Yes.

21 Q    If we could talk more specifically about your

22 communications with other organizers.  You're familiar with

23 Augustus Sol Invictus?

24 A    Yes.

25 Q    He was involved in organizing Unite the Right, correct?

J. Kessler - Redirect

1   A     That's my understanding, yes.

2              MR. BLOCH:  If we could show Mr. Cantwell PX-0185.

3              (Plaintiff Exhibit 0185 marked.)

4   BY MR. BLOCH:

5   Q     This is an email that you received from Invictus, correct?

6   A     Yes.

7              MR. BLOCH:  I would move PX-0185 into evidence.

8              THE COURT:  Be admitted.

9              (Plaintiff Exhibit 0185 admitted.)

10   BY MR. BLOCH:

11  Q     On July 31st, Mr. Cantwell, you asked -- I'm sorry, on

12  July 26th you asked Mr. Invictus, "How long should I be writing

13  for in Charlottesville," right?

14  A     Yeah.

15  Q     And Invictus says "Kessler says you can take as much time

16  as you want, bro.  It's your time to shine," right?

17  A     Yes.

18  Q     So you understood that Invictus was working or in

19  communication with Mr. Kessler regarding Unite the Right,

20  correct?

21  A     I gathered that from the message, yes.

22  Q     And if we could show -- go back to the text messages, row

23  1, just to identify your communications with Mr. Invictus.  You

24  received a text message from Invictus on June 6, 2017, and he

25  says, "Yo, N word, I know you're coming to Charlottesville,

222

J. Kessler - Redirect

```
 1  right?  You want to make a speech?"
 2  A    Yeah, he called me the N word and invited me to a Nazi
 3  rally.
 4  Q    Right.  And then you called him right away, right?
 5  A    Yeah, about that, yeah.
 6  Q    Invictus then told you about the Charlottesville 2.0
 7  server, right?
 8  A    He did.
 9  Q    And he immediately then emailed you an invite to that
10  server, correct?
11  A    I know that there is an email to that effect.  I don't
12  know when he sent me the email invite.  I know I have the
13  invite in my email as well, yes.
14  Q    Let's just show PX-0187.  This is an email from Invictus
15  to you on June 6, 2017, correct?
16  A    Yes.
17          MR. BLOCH:  Your Honor, I move PX-0187 into evidence
18  and show the jury.
19          THE COURT:  Be admitted.
20          (Plaintiff Exhibit 0187 marked.)
21          (Plaintiff Exhibit 0187 admitted.)
22  BY MR. BLOCH:
23  Q    And this is Invictus sending you a link on June 6 to the
24  Charlottesville 2.0 server, correct?
25  A    Yep.
```

J. Kessler - Redirect

1  Q    Now, you -- if we could show PX-0191.  This is an email

2  from you -- an exchange back and forth including you, right?

3  A    Yes.

4        MR. BLOCH:  If I could offer PX-0191 into evidence.

5        THE COURT:  Be admitted.

6        (Plaintiff Exhibit 0191 marked.)

7        (Plaintiff Exhibit 0191 admitted.)

8  BY MR. BLOCH:

9  Q    Now, you had been -- Mr. Cantwell, if we could go to the

10 email below, you got an invite from altright.com and it said,

11 "On behalf of Richard Spencer's altright.com I'd like to extend

12 you an invitation to the new site's Discord server.  Many

13 well-known names in the alt-right are already here including

14 Richard Spencer, Henrik Palmgren and Millennial Woes," correct?

15 A    Yeah.  This was sent through the public contact form on my

16 website, yes.

17 Q    And you responded, "Thanks, I'm on there using the name

18 Radical Agenda and this email address," right?

19 A    Yes.

20 Q    So you were on Discord under that handle as of June 12th,

21 2017, correct?

22 A    Yes.

23 Q    And if I could -- we can take that down.  Thanks,

24 Mr. Spalding.

25      Let's talk about your communications with Mr. Kessler.

J. Kessler - Redirect

1   And if we could show PX-0190, which is an email I believe we

2   saw this morning.  This is an email exchange between you and

3   Mr. Kessler in June of 2017, right?

4   A    Yes.

5   Q    And it references a phone call -- I believe we heard about

6   that this morning -- that you had with Mr. Kessler?

7   A    I don't recall the reference from this morning, but I take

8   it that we discussed having a phone call.

9   Q    Well, this email makes reference to a call that you had

10  with Mr. Kessler, right?

11  A    Okay.

12  Q    And in your deposition testimony you were asked this

13  question and you gave this answer, page 148, line 22, question:

14  "Do you recall having a conversation with Mr. Kessler where you

15  referred to Wes Bellamy using slurs?"

16       Answer:  "Seems like something that might have happened."

17       Question:  "And you agreed with Mr. Kessler that you would

18  help promote Unite the Right by having him on Radical Agenda,

19  correct?"

20       You gave that testimony?

21  A    Yes.

22  Q    You also -- well, you continued to communicate with

23  Mr. Kessler throughout the summer about Unite the Right,

24  correct?

25  A    Yes.

225

J. Kessler - Redirect

1   Q    You communicated with him on Facebook, right?

2   A    That's entirely possible.

3   Q    Do you recall testifying that you communicated with him on

4   Facebook?

5   A    I do not recall testifying that I communicated with him on

6   Facebook.

7   Q    Do you agree with me that you texted with him, as we've

8   seen in PX-3317, throughout the summer?

9   A    Yes.

10  Q    If I could just refer to cell 642 of PX-3317.  On July

11  8th, Mr. Kessler texted you, "Be ready for Charlottesville.

12  It's going to be a BLM/Antifa shitshow with hundreds of guys --

13  hundreds of our guys on the opposite side.  If you want, I can

14  come on Radical Agenda and fill in the details for your

15  audience," correct?

16  A    Yes.

17  Q    And you did, in fact, promote Unite the Right on the

18  Radical Agenda, right?

19  A    Yes.

20  Q    You promoted Unite the Right on your website, right?

21  A    Yes.

22  Q    And on August 9th you met Mr. Kessler for lunch; isn't

23  that true?

24  A    Yes.

25  Q    And you discussed Unite the Right at that lunch, right?

J. Kessler - Redirect

1   A    Yes.

2   Q    That's another meeting that you did not record; isn't that

3   right?

4   A    Again, we're inside a restaurant.  That would be entirely

5   inappropriate.  Yes.

6   Q    You met him first at his apartment, right?

7   A    Yes.

8   Q    And then you walked to a restaurant?

9   A    I think that we drove.

10          MR. BLOCH:  If I could show PX-3317.

11  BY MR. BLOCH:

12  Q    Again, this is your text message at cell 240 or row 240.

13       This is a text from Mr. Kessler on August 9th where he

14  says, "Here's the number for the Vice reporter Elle Reeve.

15  Just let her know that you want to represent Unite the Right in

16  an interview," and then he passes along a phone number, right?

17  A    Yes.

18  Q    And then you did, in fact, agree to an interview with Vice

19  Media, right?

20  A    Yes, I did.

21  Q    In addition --

22          MR. BLOCH:  We can take that down for the moment.

23  BY MR. BLOCH:

24  Q    In addition to Mr. Spencer, Invictus, Mr. Kessler, you

25  also communicated with Mr. Kline, as we discussed briefly,

J. Kessler - Redirect

1  right?

2  A    Yes.

3  Q    And at the time that you were communicating with him, you

4  knew that he was one of the lead organizers, correct?

5  A    I'm sorry, at the time I was communicating with Mr. Kline?

6  Q    Correct.

7  A    Yeah.

8  Q    And you had met Mr. Kline a month earlier at an event you

9  did in Washington, DC, right?

10  A    Yes.

11  Q    And you saw him again at the leadership meeting, right?

12  A    Yes.

13  Q    Just going back to your statement in opening, "I don't

14  really know my co-defendants," isn't it true that you, in fact,

15  lived with Mr. Kline from December of 2017 to the spring of

16  2018?

17  A    Yes.

18  Q    Let's just talk very briefly about terminology.  You often

19  refer to your political enemies as "communists," right?

20  A    The ones that are communists.

21  Q    Well, would you agree with me that you've referred to

22  counter-protesters at Unite the Right as commies, leftists,

23  Antifa, kikes, and the N word?  Isn't that true?

24  A    I probably wouldn't have said "N word," but I probably

25  said the N word.  But yeah, I've almost certainly said that and

J. Kessler - Redirect

1    a whole lot worse about the people who were counter-protesting

2    at the Unite the Right rally.

3    Q     Do you agree with me, Mr. Cantwell, that when you talk

4    ability somebody whose purpose is to advocate for minority

5    rights, that is somebody that you would refer to on the Radical

6    Agenda as a communist?

7    A     Not on the basis that they are advocating for minority

8    rights, but it just so happens to be that communists happen to

9    be the loudest, most annoying people who do that, yes.

10   Q     On page 79, line 7, were you asked this question and did

11   you give this answer?  "Would it be fair to say that somebody

12   whose purpose is to advocate for minority rights is somebody

13   you would refer to as a communist?"

14        Answer:  "On the Radical Agenda I would almost certainly

15   do that, yeah."

16        Did you give that testimony?

17   A     I suppose I did.

18        MR. BLOCH:  Judge, can the record reflect that the

19   record reflects that testimony?

20        THE WITNESS:  If you're going to ask me to reference

21   a deposition page, it would help if I had mine.  I've got Jason

22   Kessler's up here.

23        MR. BLOCH:  Do we have another?

24        MS. DUNN:  May I approach, Your Honor.

25        THE COURT:  You may.

J. Kessler - Redirect

1    BY MR. BLOCH:

2    Q    I was referring to page 79, lines 7 through 12, and the

3    question was:  Did you give that testimony?

4    A    Yes.  I said that.

5    Q    Now, I want to talk about some of the advocacy you did in

6    the summer of 2017.

7         MR. BLOCH:  If I could show PX-2610.

8    BY MR. BLOCH:

9    Q    Do you recognize that, Mr. Cantwell, as a clip from your

10   website?

11   A    Yes.

12        MR. BLOCH:  I would move 2610 into evidence and show

13   the jury, please.

14        THE COURT:  Be admitted.

15        (Plaintiff Exhibit 2610 marked.)

16        (Plaintiff Exhibit 2610 admitted.)

17   BY MR. BLOCH:

18   Q    Mr. Cantwell, we had talked earlier about the episode of

19   Radical Agenda called "Political Violence," right?

20   A    Yes.

21   Q    And does this refresh your recollection that it did, in

22   fact, occur on June 17th, 2017?

23   A    That appears to be the case.

24   Q    And was that four days after you agreed with Mr. Kessler

25   to be involved in Unite the Right?

J. Kessler - Redirect

1   A    Was it four days after that?

2   Q    The email we saw between you and Mr. Kessler was on

3   June 13th; isn't that right?

4   A    Okay.

5          MR. BLOCH:  Now -- we can take that down.  Thanks,

6   Mr. Spalding.

7   BY MR. BLOCH:

8   Q    We discussed briefly a white nationalist event in

9   Washington, DC that you attended, right?

10  A    That was marketed as a free speech rally.  I don't know

11  that it was a white nationalist event.

12         MR. BLOCH:  Okay.  Well, let's show PX-2912, which I

13  believe is -- maybe it's not in evidence.

14  BY MR. BLOCH:

15  Q    Mr. Cantwell, do you recognize that?

16  A    Yes.

17  Q    Is that a photograph of you at that event?

18  A    It is.

19         MR. BLOCH:  I would move PX-2912 into evidence.

20         THE COURT:  Be admitted.

21         (Plaintiff Exhibit 2912 marked.)

22         (Plaintiff Exhibit 2912 admitted.)

23   BY MR. BLOCH:

24  Q    Mr. Cantwell, this is a photograph of you at the event,

25  however you describe it, in Washington, DC prior to Unite the

J. Kessler - Redirect

1   Right, correct?

2   A     Yes.

3   Q     In fact, this is about -- this is on June 25th, 2017,

4   right?

5   A     Okay.

6   Q     Isn't that right?

7   A     Mike, I don't remember the dates of all this stuff.  We're

8   going to be here for a while.  It was in the summer of 2017.

9   Q     Now, the -- you're on stage giving a speech, right?

10  A     I am.

11  Q     And with you is Mr. Kessler, right?

12  A     Yes.

13  Q     Mr. Spencer?

14  A     Yes.

15  Q     Mr. Damigo?

16  A     Yes.

17  Q     Somebody named Baked Alaska, right?

18  A     Yeah.

19  Q     And a number of flags of your co-defendants; isn't that

20  right?

21  A     Yes.

22          MR. BLOCH:  Now, if we could show PX-2571 to

23  Mr. Cantwell.

24          (Plaintiff Exhibit 2571 marked.)

25  BY MR. BLOCH:

232

J. Kessler - Redirect

1  Q     That's a post that you did on Minds; isn't that right?

2  A     It is.

3  Q     Minds is another social media platform, right?

4  A     Yes.

5  Q     It's similar in functionality to Twitter, in some sense,

6  right?

7  A     Loosely, yeah.

8          MR. BLOCH:  And if I can move, Judge, PX-2571 into

9  evidence and show the jury.

10          THE COURT:  Be admitted.

11          (Plaintiff Exhibit 2571 admitted.)

12   BY MR. BLOCH:

13  Q    On July 15th, 2017, Mr. Cantwell, you posted this post

14  that says, "America will never be free until the last kike is

15  strangled with the entrails of the last male Democrat," right?

16  A    Yes, I did.

17          MR. BLOCH:  And if we could show PX-2243, please.

18          (Plaintiff Exhibit 2243 marked.)

19  BY MR. BLOCH:

20  Q    This is another post by you on Minds, correct?

21  A    It is.

22          MR. BLOCH:  I would move 2243 into evidence, Your

23  Honor, and show the jury.

24          THE COURT:  Be admitted.

25          (Plaintiff Exhibit 2243 admitted.)

J. Kessler - Redirect

1   BY MR. BLOCH:

2   Q    So this post is now 11 days after the one we just saw

3   about strangling Jewish people, right?

4   A    Yes.

5   Q    And this is July 26.  So it's about two and a half weeks

6   prior to Unite the Right?

7   A    Yes.

8   Q    And you posted a photograph of a post that has some

9   graffiti on it that says "kill a commie, save a life"?

10  A    It used to say "kill a cop, save a life," and so I fixed

11  it.

12  Q    Right.  And you, quote, "fixed it" to say "kill a commie,

13  save a life," right?

14  A    Yeah.  I was repairing the image.

15          MR. BLOCH:  If we could show PX-2612, please.

16          (Plaintiff Exhibit 2612 marked.)

17  BY MR. BLOCH:

18  Q    This is a post, Mr. Cantwell, an exchange by you as well,

19  right?

20  A    I have not the vaguest idea what this is.

21  Q    Well, this is a --

22  A    We went over this at my deposition.  I don't have the

23  vaguest idea what this is.

24  Q    Well, this is a social media post by someone with the

25  handle "Cantwell," right?

234

J. Kessler - Redirect

1   A    Yeah.

2   Q    And there's a photograph next to the handle and that's a

3   photograph of you, right?

4   A    Yes.

5   Q    And you have used that photograph as a photograph with

6   social media accounts, correct?

7   A    I have.

8              MR. BLOCH:  Your Honor, I would offer PX-2612 into

9   evidence.

10             MR. CANTWELL:  I object.  We don't even know what

11  website this is from.

12             MR. BLOCH:  Your Honor, I'm happy to discuss this

13  further at sidebar, if necessary.

14             THE COURT:  It's cumulative anyway.  Who's going

15  to --

16             MR. CANTWELL:  This is getting cumulative anyway.

17             THE COURT:  Who's going to authenticate it?

18             MR. BLOCH:  Well, I believe the foundation -- I

19  believe he already has enough to authenticate it.  Just so --

20             THE COURT:  Well, is it his website?  I mean, he's

21  not the only person named Cantwell.

22             MR. BLOCH:  Well, Mr. Cantwell purports to not

23  remember this post.  I'm happy to sidebar.

24             THE COURT:  Well, maybe we should --

25             MR. SPENCER:  I would add, if I may --

J. Kessler - Redirect

1          THE COURT:  No, no.  No, don't add anything.

2          MR. BLOCH:  Just so Your Honor can see in terms of

3  the cumulative point, the response by what appears to be

4  Mr. Cantwell, if you could show the Judge -- okay, there it is.

5  I can circle it.

6          THE COURT:  Okay.  I see that.

7          It's cumulative and I don't think the foundation is

8  laid if he doesn't admit that's his website.

9          MR. BLOCH:  May I ask a couple more questions, Judge,

10  regarding foundation?

11          THE COURT:  Oh, Lord, yes.  Go.

12   BY MR. BLOCH:

13  Q   The general discussion of this topic, Mr. Cantwell, is,

14  quote, "free helicopter tours," correct?

15  A   That's what you're showing me on the screen, which I have

16  no idea what it is.  And if you want to testify, maybe you

17  should do that.

18  Q   And do you agree with me that you -- free helicopter tours

19  is something you discuss frequently in your advocacy?

20  A   I don't think that I frequently advocate for helicopter

21  tours, no, actually.  I sell T-shirts with a guy getting thrown

22  out of a helicopter only because it's a funny gag.

23          MR. BLOCH:  Your Honor, I would move again.  I do

24  think -- I understand he's purporting not to remember this

25  post, but I do think -- happy to discuss this further -- that

J. Kessler - Redirect

1    the foundation has been laid under Rule --

2               THE COURT:  Denied.

3               MR. BLOCH:  -- 901.

4               THE COURT:  Denied.

5     BY MR. BLOCH:

6    Q    Now, Mr. Cantwell, you had an episode of Radical Agenda on

7    August 4th, 2017; isn't that right, called "Cosmopolitan Bias"?

8    Does that ring a bell?

9    A    That rings a bell.

10              MR. BLOCH:  And if we could play PX-3348A, please.

11   This is just the first 39 seconds of that episode.

12              (Plaintiff Exhibit 3348A marked.)

13              (Plaintiff Exhibit 3348 admitted.)

14              (Audio playing.)

15   BY MR. BLOCH:

16   Q    Now, right before you say you're going to Charlottesville,

17   Virginia, you use a phrase called -- where you say, "gassing

18   the cosmopolitans and starting the war of white Russians post

19   haste," right?

20   A    Yes.

21   Q    And that is a coded reference for something else, right?

22   A    It is.

23   Q    What is that a coded reference for?

24   A    That is -- well, I'm trying to figure out where I get the

25   "white Russians" thing from, but it is a reference to the

237

J. Kessler - Redirect

1    catchphrase "gas the kikes, race war now."

2    Q    And you had another Radical Agenda episode on August 7th,

3    right?

4    A    About three days apart, that sounds right.

5    Q    And on that episode you did have Mr. Kessler on as a

6    guest; isn't that right?

7    A    Sounds about right.

8    Q    And you began the show -- or at some point in the show,

9    right before you had Mr. Kessler on the show, you read a number

10   of quotes that you had been quoted in an article by the SPLC,

11   right?

12   A    Which episode number is this?  Do you have that?

13   Q    I believe it's 340.

14   A    Yeah, 340.  Yes, I know exactly what you're talking about.

15   Yes.

16   Q    And the quotes you read on that show four days before

17   Unite the Right were as follows:  "If you listen to the first

18   time I was on the show, I did not get the Jew thing.  I thought

19   of Jews as white people with bad ideas. I had no idea Karl Marx

20   was a Jew.  I had never associated Jews with communism, and the

21   second I made that connection I was like, they all have to

22   die."  And then you laugh.  "I'm not even a Hitlerite, but I'm

23   like, let's fucking gas the kikes and have a race war, because

24   once I realized they were responsible for communism, I was

25   like, oh, wait, wait a second, yeah, that's a fucking really

J. Kessler - Redirect

1  good reason to fucking genocide a group of people."  And then

2  you laughed again; is that right?

3  A    Yes.

4  Q    You read another quote where you said, "I never wanted to

5  jump over a counter and attack a fucking hotel clerk because he

6  didn't fucking speak proper English, but what it is now is I

7  see it as a fucking threat.  I feel like my country is being

8  fucking invaded.  I'm being outbred.  That guy probably has 12

9  kids at home," right?

10 A    Yes.

11 Q    You read another quote.  I think this is from something

12 you had posted on Facebook:  "I think chemical and biological

13 weapons can do a great deal of good for mankind.  Releasing

14 nerve gas or some kind of lethal virus into a left-wing protest

15 could prepare the bodies for physical removal without making a

16 big scene for the cameras and destroying anything of value,"

17 right?

18 A    Yes.

19 Q    And finally you said, quote, "It's the right thing to be

20 concerned about the immigration, because you see these fucking

21 hordes of unwashed religious fanatics pouring across the border

22 with no resources thinking they're going to collect welfare and

23 fuck our women and fucking breed us out of existence.  That

24 makes me want to bash people's skulls open.  I understand."

25       Did you read those quotes on the Radical Agenda on

J. Kessler - Redirect

1   August 7?

2   A    Yes.  I read those quotes.  I believe I was reading from

3   the Southern Poverty Law Center.

4   Q    That was quoting you, right?

5   A    Yes.

6   Q    And the same day, you also reached out to Richard Spencer,

7   right?

8   A    The same day?

9   Q    If we could show PX-3317.

10  A    Yes.  August 7th.

11  Q    On August 7th.  And you stated -- just to be clear for the

12  jury on these text messages, 2 -- in Column G where it says 2,

13  that's a text message from you, right?

14  A    Yes.

15  Q    And where it says 1 is the response from Mr. Spencer?

16  A    Yeah.  1 is where he blows me off.

17  Q    And so you say, "Checkout is at noon.  Then I'm heading

18  towards Charlottesville to get a lay of the land and do an

19  episode of Radical Agenda with" -- Morrakiu?

20  A    Yeah, Morrakiu.

21  Q    "You got a time for a phone call in a little while?  I

22  want to talk to you about this permit issue."  And he says,

23  "Could you talk with somebody else and have them relay the info

24  to me?"

25       You said, "I was interested in exchanging ideas with you

J. Kessler - Redirect

1    on the subject, but whatever, I'll just deal with Kessler."  He

2    says, "Do you know a lawyer in Virginia?"  You say, "Can't say

3    I do."  You say, "My concern is Kessler wants to do it there

4    regardless, and I want to have his back, by I can't risk my

5    carry permit"?

6    A    Yes.

7    Q    He says, "We must proceed as planned."  You say, "Sounds

8    like the plan just went up in smoke.  How far do we deviate

9    seems to be the question, and I agree that it must be minimal."

10   You say, "I'm willing to risk a lot for our cause, including

11   violence and incarceration.  Many in my audience would follow

12   me there, too, but I want to coordinate and make sure it's

13   worth it to our cause."

14        And he says, "It's worth it, at least for me."

15        Correct?

16   A    Yeah, that's the conversation.

17   Q    And you then say, "You're sure it's worth the risk of

18   violence and imprisonment, but not worth a phone call with a

19   guy who drove eight hours to get here and invite his audience

20   of 10,000 people to follow him?  I know you're busy, but with

21   all due respect, it makes me question your value judgments,"

22   right?

23   A    That's what I said.

24   Q    And when you refer to -- when you say that you invited

25   your audience of 10,000 people to follow him, that's the

J. Kessler - Redirect

1   reference to the Radical Agenda audience, right?

2   A    It's the podcast downloads, roughly, yes.

3        MR. BLOCH:  We can take that down.  Thanks,

4   Mr. Spalding.

5    BY MR. BLOCH:

6   Q    You brought a number of weapons with you to

7   Charlottesville; isn't that right?

8   A    I did.

9        MR. BLOCH:  And if we could show PX-2103A --

10        THE COURT:  You may.

11        MR. BLOCH:  -- to the witness.

12        (Plaintiff Exhibit 2103A marked.)

13   BY MR. BLOCH:

14   Q    Do you recognize this clip, Mr. Cantwell?

15   A    Yes, I do.

16   Q    I'm going to move -- this is you, right?

17   A    Yes.

18        MR. BLOCH:  I'd like to move 2103A into evidence, and

19   I'd like to show the jury from 19:09 to 19:39.

20        THE COURT:  Be admitted.

21        (Plaintiff Exhibit 2103A admitted.)

22        (Video playing.)

23   BY MR. BLOCH:

24   Q    Is that you, Mr. Cantwell, on August 13th?

25   A    Yeah, that's me on the Home Box Office channel.

242

J. Kessler - Redirect

1  Q    And you're also -- you're familiar with what's known as a

2  kubotan, right?

3  A    Yes.

4  Q    And a kubotan is like a 5-inch metal rod that you can

5  attach to a key chain, right?

6  A    Yes.

7  Q    And a kubotan can be used as a weapon, right?

8  A    It can.

9  Q    And before you left for Charlottesville, isn't it true

10 that you also grabbed a bunch of kubotans and brought them with

11 you?

12 A    I did.

13 Q    And you also grabbed a bunch of canisters of pepper spray

14 and you brought those with you, right?

15 A    I did.

16         MR. BLOCH:  And if we could introduce PX-0325A.

17         (Plaintiff Exhibit 0325A marked.)

18 BY MR. BLOCH:

19 Q    This is a direct message between you and somebody named

20 Kurt, right?

21 A    It is.

22         MR. BLOCH:  If I could introduce and publish to the

23 jury, please.

24         THE COURT:  Be admitted.

25         THE WITNESS:  0325A?

J. Kessler - Redirect


1          MR. BLOCH:  Correct.

2          (Plaintiff Exhibit 0325A admitted.)

3    BY MR. BLOCH:

4    Q    This is a direct message conversation between you and

5    someone named Kurt, right?

6    A    Yes.

7    Q    Just to be clear -- first of all, this is on Discord,

8    right?

9    A    Yes.

10   Q    And direct message means it's one-on-one, nobody else can

11   see the conversation, right?

12   A    Yes.

13   Q    Now, Kurt --

14   A    Apparently not.

15   Q    Well, at the time you --

16   A    That's the theory.

17   Q    Right.  And Kurt begins by saying, "Hey, I'm the logistics

18   coordinator for C'ville," right?

19   A    Yes, that's what he says.

20   Q    And you also testified in your deposition that Kurt, the

21   logistics coordinator, was affiliated with Richard Spencer,

22   right?

23   A    That's what I gathered, yeah.

24   Q    You testified to that, right?

25   A    That was my impression of it.  The truth of the matter is

J. Kessler - Redirect

1    I don't know shit about Kurt.  Kurt messaged me on August 5th

2    and said, "Hey, I'm the logistics coordinator."  I don't know

3    Kurt.  That was the impression that I had, was that he was with

4    Spencer.

5    Q    And you said to Kurt, if we could go to the bottom -- I

6    think is there more -- can we go to the next page?

7         You said, "Is there a place for vendors to set up or

8    anything like that?"  Right?

9    A    Yeah.

10   Q    And then you say, if you go to the bottom, "I have a

11   handful of kubotans and pepper sprays I was considering

12   throwing on the table just to grab the extra bucks and better

13   arm our people.  But I'm not married to that idea."  Right?

14   A    Next to the bumper stickers and hoodies and stuff.

15   Q    Now, regarding your participation in the

16   Charlottesville 2.0 server --

17             MR. BLOCH:  If we could -- if we could show PX-43 --

18   4034.  Do we have that?

19   BY MR. BLOCH:

20   Q    Well, while we're waiting, let me ask you this,

21   Mr. Cantwell.  Do you agree with me that you began posting in

22   the Charlottesville 2.0 server in the week before Unite the

23   Right?

24   A    I know that it was less than two weeks, is my recollection

25   of the time that I was in there.

J. Kessler - Redirect

1   Q    Okay.  And do you recall posting on August 8th, quote,

2   "What do you think about setting up a parallel event somewhere

3   other than Lee Park for women and children?"

4   A    Yeah, I remember that post.

5   Q    Now, we talked about how you had organized a meetup with

6   your followers from Radical Agenda, correct?

7   A    Yes.

8   Q    And you announced that event on your website behind the

9   paywall, right?

10  A    That's right.

11         MR. BLOCH:  And if we could introduce PX-0188, or

12  show Mr. Cantwell first.

13         It's an email between you and Mr. Kessler.

14         THE COURT:  Be admitted.

15         (Plaintiff Exhibit 0188 marked.)

16         (Plaintiff Exhibit 0188 admitted.)

17  BY MR. BLOCH:

18  Q    On August 10th, 2017 you emailed Mr. Kessler, subject,

19  "Meetup."  And this is the information that you posted about

20  the pre-event you did with your Radical Agenda listeners,

21  right?

22  A    Yes.

23  Q    And you sent to him the text that you put behind your

24  paywall, and you said to Mr. Kessler, "You can relay this to

25  anyone who has been reasonably vetted"; isn't that right?

J. Kessler - Redirect

1  A     That's what I said.  This is 188?

2  Q     This is PX-0188.

3           MR. BLOCH:  We can take that down, Mr. Spalding.

4   BY MR. BLOCH:

5  Q    In addition to your Radical Agenda listeners, you also

6  invited a number of your co-defendants to this pre-event,

7  right?

8  A     Yes.

9  Q     You invited Invictus, right?

10  A     Yes.

11  Q     Heimbach, right?

12  A     Yes.

13  Q     Spencer?

14  A     Yes.

15  Q    And if we could show PX-3317, row 490 -- sorry, 489, you

16  say to Mr. Spencer on August 9th, "Friday afternoon, I'm

17  looking to schedule up a meetup with Radical Agenda listeners,

18  some portion of which I'll invite media to.  Are you interested

19  in attending?"  Right?

20  A     Yes.

21  Q    And Mr. Spencer responded, "Sorry, but I'll have to

22  decline.  Way too dangerous this weekend.  I must focus,"

23  right?

24  A     Yes.

25  Q    You also -- if we could go up and show cell 102, another

J. Kessler - Redirect

1  text message regarding this meetup, you were in communication

2  at that point with Elle Reeve from Vice Media, correct?

3  A    Yes.

4  Q    And if we can go to 102, you said to Elle Reeve on

5  August 10th, the day before the meetup, quote, "And I've got to

6  organize an unknown number of armed extremists I've never met

7  through a hostile environment with death threats and legal

8  intimidation.  We all have our crosses to bear," right?

9  A    That's what I said to the reporter from HBO, yeah.

10 Q    You then did an interview in McIntire Park, correct?

11 A    Yes.

12 Q    And you discussed the purpose of Unite the Right, correct?

13 A    Seems more than likely.

14 Q    You discussed race, correct?

15 A    Definitely.

16 Q    And one of the things that --

17          MR. BLOCH:  If we could just introduce PX-2721.

18          THE COURT:  It's admitted, I guess.

19          (Plaintiff Exhibit 2721 marked.)

20          (Plaintiff Exhibit 2721 admitted.)

21 BY MR. BLOCH:

22 Q    Tell me if you remember this quote.  You said, "We want to

23 be separate.  If we can't be separate, we need to fight.  Other

24 races don't believe in our way of life and so we have to be

25 separate.  Separatism or violence, those are the only two

J. Kessler - Redirect

1  options."  Did you say something to that effect to Elle Reeve

2  on August 11th, 2017?

3  A    Sounds vaguely familiar.

4  Q    Later that day -- if we could show cell 243 -- you got a

5  text message from Mr. Kessler inviting you to the leadership

6  meeting, right?

7  A    Yes.

8  Q    And you said "Kurt just called me and told me.  Thanks.

9  See you then," right?

10 A    Yes.

11 Q    And Kurt was the logistics coordinator we talked about

12 earlier, right?

13 A    Yep.

14 Q    That was about the meeting at McIntire Park which you

15 attended, right?

16 A    Yes.

17 Q    And also present at that meeting was Mr. Kessler, right?

18 A    Yes.  Kessler was present.

19 Q    Mr. Kline was present, right?

20 A    Yes.  Kline came a little bit later but I think it's fair

21 to say he was there for most of the meeting.

22 Q    Azzmador and Invictus were present, right?

23 A    Invictus was there the whole time.  Azzmador got there

24 much later.

25 Q    David Duke was there, right?

J. Kessler - Redirect

1    A    Yes.

2    Q    Thomas Ryan Rousseau, right?

3    A    That's where I met him for the first time, yes.

4    Q    And now, you played a portion of audio from the beginning

5    of that meeting earlier today, right?

6    A    I did.

7    Q    And you actually -- you said to this jury in opening that

8    when I came to Charlottesville I wore a body camera, right?

9    A    I did.

10   Q    And you wore that body camera to that meeting, right?

11   A    I did.

12   Q    And that's what the audio we heard earlier was from?

13   A    That's one segment of it.

14   Q    You testified this morning that you actually asked -- I'm

15   sorry, you didn't testify.  You asked Mr. Kessler if he knew

16   that you had a body cam on, right?

17   A    Yes.

18   Q    And he said that he didn't, right?

19   A    I think that's what his answer was, yeah.

20   Q    If we could just show a clip from 2:41 to 2:49.  It's

21   CCEX153F.

22        Let me ask you this, Mr. Cantwell --

23        (Plaintiff Exhibit CCEX153F marked.)

24   A    I think we might want to discuss which clips we're playing

25   from the thing if we're not going to play the whole thing.

J. Kessler - Redirect

1  Q    Well, understood.  Let me ask you, this is in regards to

2  your asking Mr. Kessler whether he knew you were recording.

3  And if we could play 2:41 to 2:49.

4          (Video playing.)

5  Q    So very early on in the meeting you announced to everybody

6  there that you were recording, right?

7  A    Yeah, and if you play the video straight through, which

8  was my intent, if you play the whole thing, what you see is

9  Kessler arrives after that.

10 Q    Now, you went from there to Nameless Field, correct?  You

11 had the leadership meeting, and later on you went to Nameless

12 Field for the torch march, the beginning of the torch march,

13 right?

14 A    To be precise, I did not go from there to Nameless Field.

15 I went back to my hotel room, and then I went to Nameless Field

16 shortly after that.

17 Q    You went to Nameless Field after the leadership meeting;

18 is that fair?

19 A    It was subsequent to the leadership meeting, yes.

20 Q    And you say you had a body cam on then too, right?

21 A    Yes.

22 Q    And that you kept it on during the torch march, right?

23 A    I did.

24 Q    You don't have any footage from Nameless Field, right?

25 A    I -- I have footage in my exhibits list, but not from my

J. Kessler - Redirect

1  body camera, no.

2  Q    Fair.  There is no footage from your body camera from

3  either Nameless Field or the torch march, right?

4  A    No.

5  Q    And I think you said that's because it was stolen, right?

6  A    Yes.

7          MR. BLOCH:  If we could just show PX-0184.

8          (Plaintiff Exhibit 0184 marked.)

9  BY MR. BLOCH:

10 Q    This is an email exchange between you and someone named

11 Boggs Vandal on 8-13-2017?

12 A    That's what it appears to be.

13         MR. BLOCH:  If I can move 0184 into evidence.

14         THE COURT:  Be admitted.

15         (Plaintiff Exhibit 0184 admitted.)

16 BY MR. BLOCH:

17 Q    Mr. Boggs emails you, and he says he was "on Mr. Kessler's

18 security detail during the actual torch march.  You and I got

19 into it with the F reporter from Unicorn Riot that kept

20 shouting at Jason to define white genocide.  I was the guy in

21 the khakis and white button-up that threw him down with you

22 while telling him to go fuck off.  I'm wondering if you're

23 going to release any of that GoPro footage because I really

24 want to have a copy of the video to show my grandkids one day

25 when I'm telling them where I was when the new war of

J. Kessler - Redirect

1    independence kicked off.  Physically removing a queer reporter

2    with Chris Cantwell is one of the highlights of my weekend."

3    Right?

4    A    Yeah, that's what that other guy said.

5    Q    And you responded, "The camera got lost in the melee at

6    the statue, sadly.  It was an honor to serve by your side.  I

7    regret that our memories will have to make do for our

8    posterity," right?

9    A    Yeah, that's what I said on August 13th, 2017.

10   Q    Now, after the leadership meeting -- withdrawn.

11        From Nameless Field -- well, at Nameless Field, you agree

12   that you saw Mr. Kessler and Mr. Kline there, right?

13   A    Yes.

14   Q    And then you marched, right?

15   A    Yes.

16            MR. BLOCH:  And if we could just show Mr. Cantwell

17   PX-2103B.

18            (Video playing.)

19            MR. BLOCH:  I would move 2103B into evidence.

20            THE COURT:  Be admitted.

21            (Plaintiff Exhibit 2103B marked.)

22            (Plaintiff Exhibit 2103B admitted.)

23   BY MR. BLOCH:

24   Q    Is this you, Mr. Cantwell, during the torch march?

25   A    Sure is.

J. Kessler - Redirect

1       (Video playing.)

2   Q    You then marched to the Thomas Jefferson statue, right?

3   A    We sure did.

4            MR. BLOCH:  And if I could introduce CCEX004A and

5   004B.

6            THE COURT:  Be admitted.

7            (Defendant Cantwell Exhibits 004A and 004B marked.)

8            (Defendant Cantwell Exhibits 004A and 004B admitted.)

9            (Video playing.)

10  BY MR. BLOCH:

11  Q    Just pause for one second.  That's -- well, that's you,

12  right, Mr. Cantwell?  You just pepper-sprayed somebody?

13  A    I definitely just pepper-sprayed somebody.  I'm not trying

14  to evade that.  I didn't follow myself in the thing and it's

15  blurry.  So it could be.  Black shirt, bald head.  Looks like

16  me.

17  Q    That's fair.  Can we play it.

18           (Video playing.)

19  A    That's me go back in.  I try to spray Massey.

20  Q    And that was you throwing a number of punches?

21  A    Yeah, that was me beating up Tom Massey.

22           MR. BLOCH:  Is there a second one?

23           (Video playing.)

24  BY MR. BLOCH:

25  Q    That's another angle, right, Mr. Cantwell, of you throwing

J. Kessler - Redirect

1   punches?

2   A    Yep.

3   Q    In your words you described this as "beating the shit out

4   of somebody," right?

5   A    Yeah, I was beating the shit out of Thomas Massey.

6   Q    You then celebrated what happened on August 11th, right?

7   A    Yes.

8   Q    You texted Elle Reeve and offered to give her a

9   "post-brawl interview," right?

10  A    Yes.

11           MR. BLOCH:  And if we could introduce PX-3880.

12           THE COURT:  Admitted.

13           MR. BLOCH:  Do we have that?

14           We can come back to that.

15  BY MR. BLOCH:

16  Q    Let's talk briefly about August 12th.  Mr. Cantwell, at

17  around noon -- well, withdrawn.

18       You arrived at Emancipation Park sometime between 9 and 10

19  a.m; is that right?

20  A    I'm not exactly sure what time I arrived.

21  Q    Sometime in the morning, fair to say?

22  A    Sometime in the late morning.  I know I was late.  And so

23  I think that if I recall correctly, I was supposed to be there

24  at 9 a.m. and I was admonished for not being there at 9 a.m.

25  And so I don't know precisely what time it was.

J. Kessler - Redirect

1  Q    And you had one of your handguns with you, right?

2  A    Yes.

3  Q    And now, at noon the unlawful assembly was declared,

4  right?

5  A    Yeah.

6              MR. BLOCH:  If we could introduce PX-2103D.

7              THE COURT:  Be admitted.

8              (Plaintiff Exhibit 2103D marked.)

9              (Plaintiff Exhibit 2103D admitted.)

10             (Video playing.)

11 BY MR. BLOCH:

12 Q    Is that you, Mr. Cantwell, on August 12th after the

13 unlawful assembly was declared?

14 A    That's me.

15 Q    And you then got in a van, right, with Mr. Ray?

16 A    I did.

17 Q    And you went to McIntire Park?

18 A    Yes.

19 Q    And you saw Mr. Kline at McIntire Park, right?

20 A    I'm not sure if I saw Mr. Kline at McIntire Park off the

21 top of my head.  I believe that he was there, but I'm not sure

22 if I'm remembering a video of him or me seeing him.

23 Q    Did you give this testimony, Mr. Cantwell?  Question:  "At

24 McIntire Park you were with Elliot Kline, correct?"

25        Answer:  "I saw Elliot Kline at McIntire Park."  Did you

J. Kessler - Redirect

1  give that testimony?

2  A    I'm certain that I said that I saw Elliot Kline at

3  McIntire Park.  Is this in the context that I saw him after the

4  thing?

5  Q    Yes.

6  A    Okay.  Then I guess I said that.

7  Q    Now, I believe we talked this morning, Mr. Kessler

8  testified about texting you about a half an hour after the car

9  attack about a leadership meeting, right?

10  A    I think he said it was an afterparty.

11  Q    Can we just show PX-3317, cell 245.

12      He said, "We're still meeting at the afterparty location,

13  right, for leaders and essential people only?"

14  A    Yeah, so the afterparty is what he invited me to in that

15  text message, and so yes.

16  Q    And you say, at 4:34, "I can't make it.  I think I should

17  keep a low profile until I know if I've got legal problems,"

18  right?

19  A    Yes.

20  Q    He writes, "Gotcha.  Let me know if there's anything I can

21  do."  And you say, "Just laying low for now.  Keep me posted,

22  especially to anything involving law enforcement," right?

23  A    Yes.

24  Q    If we go to cell 69, at 4:24 you got a text from Invictus

25  asking if you were coming to the same meeting, right?

J. Kessler - Redirect

1  A     That's what it appears to be.

2  Q     You said, "I don't think it's a good idea for me to be out

3  and about," right?

4  A     Yes.

5  Q     And he said, "Probably true, man.  Good call.  I'll hit

6  you up after the meeting to let you know what happens."  Right?

7  A     Yes.

8  Q     You then left Virginia within 24 hours, right?

9  A     Yes.

10  Q     And you went to North Carolina, right?

11  A     I did.

12  Q     Now, you learned on August 16th that there was a warrant

13  for your arrest, right?

14  A     So to be precise, I think I had first heard about this on

15  August 12th, but it was from some Antifa trainees

16  livestreaming.  I wasn't sure that that was an accurate source

17  of information.  They said that Richard Spencer had been

18  arrested and that there was a warrant for my arrest.  So I

19  doubted the veracity of the claim.

20      What I think you're referring to is at a later time I tell

21  somebody I just confirmed I had a warrant, which was after I

22  spoke to the Federal Bureau of Investigation.

23  Q     So if we go to cell 257, you texted Mr. Kessler.  After

24  you say, "I'm just across the North Carolina border" on August

25  13th, you then texted him on August 16th and said "I've got a

J. Kessler - Redirect

1   warrant out of UVA," right?

2   A    Yes.  Yes.

3   Q    And then Mr. Kessler called you, right?

4   A    Yes.

5   Q    You also texted Mr. Spencer and Mr. Heimbach to tell them

6   that you had a warrant the same day, right?

7   A    Sounds right.

8   Q    And if we go to cell 353, Mr. Heimbach says, "Let me know

9   what I can do, brother.  I've got your back 100 percent."  You

10  said, "Thanks."  He says, "Victory or death, brother," right?

11  A    That's what he said.

12  Q    Do you recall Mr. Spencer texted you back to "stay

13  strong"?

14  A    Sounds right.

15           MR. BLOCH:  And if we could introduce PX-1329.

16           THE COURT:  Be admitted.

17           (Plaintiff Exhibit 1329 marked.)

18           (Plaintiff Exhibit 1329 admitted.)

19  BY MR. BLOCH:

20  Q    This is a text that you sent Elliot Kline on August 23rd.

21  "I'm at the Lynchburg magistrate waiting to turn myself in."

22  Right?

23  A    Yes.

24  Q    Now, I want to talk about some of the things that you did

25  and said about what happened in Charlottesville.  If we could

J. Kessler - Redirect

1   show the -- do we have the Vice documentary from 19:41,

2   PX-2103P -- sorry.  2103F from 19:41 to 21 --

3        (Video playing.)

4             MR. BLOCH:  Could we move that in and publish to the

5   jury.

6             THE WITNESS:  What are the time stamps you're trying

7   to do here?

8             MR. BLOCH:  19:41 to 21:35.

9             THE WITNESS:  Okay.  Just, if I could, a brief

10  housekeeping matter here.  I don't think I have all your clips.

11  I know I have 2103.  I don't think I have A through F or

12  whatever.  If I could get those from you.

13  BY MR. BLOCH:

14  Q    You have this entire documentary, right?

15  A    I do.  But I don't have your clips, so when you're

16  referencing these things, I can't go back and look at them

17  easily.  If I could get them, I appreciate it.

18  Q    Fair enough.  And we went over this in your deposition,

19  right?  These clips?

20  A    I don't remember which clips we went over, but I'm fairly

21  certain you asked me about the contents of this piece from the

22  Home Box Office company.

23  Q    I'm happy to provide it again, if we could move in this

24  clip and play it.

25             THE COURT:  It's admitted.

J. Kessler - Redirect

1              (Plaintiff Exhibit 2103F marked.)

2              (Plaintiff Exhibit 2103F admitted.)

3              (Video playing.)

4    BY MR. BLOCH:

5    Q    That was you, right, Mr. Cantwell?

6    A    That was excellent television that I put together, yes.

7    Q    If we could show PX-1994.  I believe this is audio.  If we

8    could introduce PX-1994, which is a Radical Agenda episode.

9    A    Can you tell me what episode?

10   Q    It's with Andrew Anglin, episode, I believe -- it's from

11   January 25th, 2018.  I don't have the number.  And if we could

12   play it.

13             THE CLERK:  Mr. Bloch, is it admitted?

14             THE COURT:  Did you move its admission?

15             MR. BLOCH:  Oh, please.  I would like to move it in

16   and publish to the jury.

17             THE COURT:  All right.  It will be admitted.

18             (Plaintiff Exhibit 1994 marked.)

19             (Plaintiff Exhibit 1994 admitted.)

20             (Audio playing.)

21   BY MR. BLOCH:

22   Q    You said that, Mr. Cantwell, on January 25th, 2018?

23   A    I definitely said that.

24   Q    And you specifically celebrated the car attack by your

25   co-defendant James Fields; isn't that true?

261

J. Kessler - Redirect

1   A    I think "celebrated the car attack" is not accurately

2   worded, but I posted memes about the car crash.

3           MR. BLOCH:  Could we introduce PX-2250.

4           THE COURT:  Yes.  Be admitted.

5           THE WITNESS:  No, this is not admitted because this

6   says it was posted yesterday at 5:42 p.m.  This is not in

7   evidence.  It should not be in evidence.  I don't remember

8   posting this.  Yesterday at 5:42 p.m. I was on my way home from

9   this courtroom and not on Facebook.  Objection.

10          THE COURT: All right.  Not admitted until --

11  BY MR. BLOCH:

12  Q    I'm sorry.  If I could just direct you to page 377, line

13  20 of your deposition.  Were you asked this question and did

14  you give this answer?  Question: "Is Plaintiffs' 54 a

15  photograph that you posted on your Facebook account?"

16      Answer:  "That's what this looks like, yeah."

17      Question:  "Well, is that what it is?"

18      Answer:  "Yeah."

19      Did you give that testimony?

20  A    I don't think I did.  What is the page?

21  Q    377, line 20 to 24.

22  A    You will remember, Mike, that we had a dispute about this

23  image during the deposition, don't you?  377 you're telling me?

24  Q    Are you now denying you posted this to Facebook?

25  A    I don't have any recollection of posting this to Facebook,

J. Kessler - Redirect

1    which is what I told you at the deposition.  And if we have to

2    go through the pages to read it, then we're going to do that.

3    And I'll go find them.  Okay?

4    Q    Did I read that testimony correctly?

5    A    I am trying to find the page, sir.  377, are you telling

6    me?

7    Q    Correct.

8    A    "Well, to be clear, this certainly couldn't have happened

9    before it.  This says it happened yesterday, and that's

10   impossible, so -- but this photo came from that, and so it

11   couldn't have happened before that."

12        "Right."  You asked me:  "Right.  This is a photograph of

13   James Fields driving into counter-protesters, right?"

14        "Right."

15        "And -- "

16        Webex dropped.

17        You ask:  "So let's go forward.  Mr. Cantwell, I was

18   asking you about Plaintiffs' 54."

19        "Okay.  And so --"

20        "Well, let me just make -- let me get a question on the

21   record."

22        Okay.  "Sure."

23        "So you wrote over this photograph, this is what democracy

24   looks like, correct?"

25        I answer:  "I don't know that to be true.  As a matter of

263

J. Kessler - Redirect

1  fact, I highly doubt that's the case."

2      Question:  "Well, you posted this meme on Facebook, and

3  the meme says this is what democracy looks like over a

4  photograph of James Fields driving his car through the

5  counter-protesters at Unite the Right; is that correct?"

6      Answer:  "So that is closer to accurate, but again, for

7  like the 20th time, I don't know every social media post that I

8  ever made.  And since this thing says that it was posted

9  yesterday at 5:42 p.m., the only thing that I can assume is

10  that somebody who doesn't have my best interest at heart is

11  taking pictures of these things and then providing them to you

12  and then you come with them later on, okay?  Which means it's

13  entirely possible that that's not mine.  I don't know.  When

14  you provide me with this -- I don't know.  I can tell you, if

15  it's helpful, that I was posting James Fields memes on Facebook

16  after this happened."

17      Question:  "You understand, Mr. Cantwell, that the time

18  reflected on these social media posts are the time that those

19  posts are captured, correct?"

20      Answer:  "By whatever dishonest criminal is stalking my

21  Facebook post collecting this shit for later, yeah, that's the

22  time that they did this."

23      Question:  "Let me ask you --"

24      "This says -- "

25      Answer:  "This says this is August -- this says that this

J. Kessler - Redirect

1   is August 17th."

2       Question:  "Mr. Cantwell --"

3       Answer:  "I have no idea what year that is.  All right?

4   So the factual -- that's what I'm presented with, okay?"

5       And now I'm getting to the -- I think we're moving on to

6   something else at the point that I'm reading this.

7       But as I said, Mr. Bloch, I highly doubt it.  I have no

8   recollection of making this Facebook post.  And as you're well

9   aware, sir, there's a major problem with people who impersonate

10  me on the Internet, and the people who feed you this nonsense

11  don't have my best interest at heart.

12      So as I told you during the deposition, sir, I have no

13  recollection of making this Facebook post.  And this is not

14  authenticated.  It says it was posted yesterday at 5:42 p.m.

15  And if somebody wants to tell me when this post was made and

16  authenticate the thing, then I'll be happy for you to admit it

17  into evidence.

18  Q   So a few questions, Mr. Cantwell.  Number one, you agree

19  that you testified that this photograph is a photograph you

20  posted on your Facebook.

21      Answer:  "That's what this looks like, yeah."

22      "Well, is that what it is?"

23      You said, "Yeah."

24      You didn't just read that part.  Do you agree that you

25  said those things?

J. Kessler - Redirect

1   A    And then I went on to read everything else I read,

2   Mr. Bloch.

3   Q    And then --

4   A    And so, when you are --

5   Q    Mr. Cantwell?

6   A    -- pestering me with this nonsense -- I don't care about

7   the fucking photo, Mike.  Okay?  I don't give a shit.  All

8   right?  I'm trying to be accurate and you're being an asshole

9   because you know we went through this already --

10          THE COURT:  Okay.  Let's cut -- all right.

11   Ultimately he did not admit that it was -- he posted it.

12          MR. BLOCH:  He did, Judge.  And what he took issue

13   with was whether or not he is the person that wrote the

14   language on the meme.

15          THE WITNESS:  Put the thing into evidence.  I don't

16   care.  I withdraw the objection.  Give him the thing.  I don't

17   care.

18          MR. BLOCH:  I move --

19          THE WITNESS:  I've said a hundred times worse than

20   this --

21          THE COURT:  Mr. Cantwell, did you post --

22          THE WITNESS:  -- I don't care.

23          THE COURT:  Mr. Cantwell, did you post it?

24          THE WITNESS:  I have no recollection of making this

25   post.

J. Kessler - Redirect

1          THE COURT:  Okay.  Well, what did you say at the

2    deposition?

3          THE WITNESS:  I said at the deposition I had no

4    recollection of making this post.

5          MR. BLOCH:  Judge, he said a lot.  He said a number

6    of --

7          THE COURT:  I know he said a lot, but did he say that

8    he posted it?

9          MR. BLOCH:  Yes.

10          (Overlapping speakers.)

11          THE WITNESS:  Then you asked me to clarify and I

12    clarified.

13          MR. BLOCH:  He said -- Question:  "Is Plaintiffs' 54

14    a photograph that you posted on your Facebook?"

15          Answer:  "That's what this looks like, yeah."

16          Question:  "Well, is that what it is?"

17          Answer:  "Yeah."

18          THE COURT:  All right.  That's what the record shows.

19          THE WITNESS:  Go ahead.  Put it into evidence, Mike.

20          THE COURT:  It's on page 377, line 20, through about

21    24.

22          MR. BLOCH:  If we could publish this to the jury,

23    please.

24          THE COURT:  All right.  You may.

25          (Plaintiff Exhibit 2250 marked.)

J. Kessler - Redirect

1           (Plaintiff Exhibit 2250 admitted.)

2           MR. BLOCH:  Thanks.

3    BY MR. BLOCH:

4    Q    Now, you stated, Mr. Cantwell, in your opening statement

5    that you thought it was a, quote, sad thing that there was a

6    girl dead, right?

7    A    Yeah.

8    Q    And isn't it also true that you referred to Heather

9    Heyer's grave as a urinal?

10   A    I did.

11          MR. BLOCH:  If we could also show Mr. Cantwell -- I

12   believe it's 2705B.

13          (Audio playing.)

14          MR. BLOCH:  Could we move in 2705B, please, Radical

15   Agenda episode?

16          THE COURT:  All right.  Be admitted, assuming you can

17   authenticate it.

18          THE WITNESS:  Well, that's my voice.  How long of a

19   clip from what episode are you trying to introduce?  If you

20   go -- so that we're clear, okay, if you go introducing entire

21   episodes of Radical Agenda, every time you play the sound of my

22   voice, that's going to occupy a lot of these folks' time that's

23   really not worth it.  Are you playing a short clip?  Are you

24   putting a short clip into evidence, or are you putting an

25   episode into evidence?

J. Kessler - Redirect

1       MR. BLOCH:  I'm happy to put the whole episode in.

2  I'm not playing it.

3       THE COURT:  No, you're not.  Just say how much time

4  from when to --

5       MR. BLOCH:  It's two and a half minutes.

6       THE WITNESS:  Is the two and a half minutes what

7  you're seeking to put into evidence --

8       MR. BLOCH:  Yes.

9       THE WITNESS:  -- or should I object that you're

10  inputting irrelevant evidence?

11       MR. BLOCH:  That's all I want to put in.  You're free

12  to put in the rest of the episode if you like.

13       THE WITNESS:  I'm just trying to understand, Mike.

14  Thanks.

15       All right.  Let's go.

16       THE COURT:  Play it.

17       (Plaintiff Exhibit 2705B marked.)

18       (Plaintiff Exhibit 2705B admitted.)

19       (Audio playing.)

20       THE WITNESS:  Can you tell me what episode number --

21       (Audio playing.)

22       MR. BLOCH:  I think that's good.

23  BY MR. BLOCH:

24  Q    Did you say that?

25  A    I said that.

269

J. Kessler - Redirect

1  Q    Now, agree with me that -- Mr. Cantwell, that you have

2  continued to contact Mr. Kessler since Unite the Right?

3  A    It has happened a few times, yes.

4  Q    In fact, you've spoken to him half a dozen times in the

5  last year, from prison, right?

6  A    Roughly.

7  Q    And you've also been visited in Virginia, where you lived

8  with Mr. Kline, by Mr. Heimbach, right?

9  A    Yes.

10  Q    Michael Chesny also came to visit you and Mr. Kline in

11  Virginia, right?

12  A    Yes.  Yes.

13  Q    And after that, you moved in with Derrick Davis, the

14  quartermaster for TWP, right?

15  A    Yes.

16  Q    You also were incarcerated for a period of time after

17  Charlottesville, right?

18  A    Yes.

19  Q    And you shared a cell block with James Fields; isn't that

20  true?

21  A    For, like, less than five minutes, literally.

22  Q    And you knew at the time that you shared the cell block

23  with Mr. Fields that he had driven his car through a crowd of

24  counter-protesters; isn't that right?

25  A    No.  I knew that Mr. Fields's car was attacked by a mob of

J. Kessler - Redirect

1   rioters and that he hit the gas to get out of there.  That's

2   what I knew.

3   Q    You knew what he was in jail for, right?

4   A    I knew what he was in jail for.

5   Q    And you also knew that he shared your views on white

6   nationalism, right?

7   A    I actually didn't know that.

8   Q    Did you give this testimony on page 210, line 16?

9        Question:  "You knew at the time that you shared the cell

10  block with James Fields that he was at least an advocate for

11  white people; is that fair to say?"

12       Answer:  "Yeah."

13       Question:  "He shared some similar views about white

14  nationalism as you did, correct?"

15       Answer:  "That was my understanding of it."

16       Did you give that testimony?

17  A    Yes.

18  Q    And when you saw Mr. Fields, isn't it true that you gave

19  him a Nazi salute and a hug?

20  A    Those are two separate instances; but yes, when I saw him

21  when I was still in intake, before we were on the cell block, I

22  saw him go in the shower, and I gave him the salute.  And then

23  when I saw him on the cell block, I gave him a hug and I said,

24  "I'm really sorry this happened to you."

25              MR. BLOCH:  If we could show PX-2137.

J. Kessler - Redirect

1  BY MR. BLOCH:

2  Q    Mr. Cantwell, do you agree this is a Facebook post that

3  you posted?

4  A    Yes.

5         MR. BLOCH:  I offer this into evidence and publish to

6  the jury.

7         THE COURT:  Be admitted, and you may publish.

8         (Plaintiff Exhibit 2137 marked.)

9         (Plaintiff Exhibit 2137 admitted.)

10 BY MR. BLOCH:

11 Q    Mr. Cantwell, you posted this on Facebook after Unite the

12 Right, correct?

13 A    Some number of -- I believe this to be several days later,

14 yes.

15 Q    Well, this post was specifically in reference to the

16 violence committed at Unite the Right, correct?

17 A    It most certainly was, sir.

18 Q    And what you said was, quote, "If you think the alt-right

19 is insignificant, you might want to ask the bleeding commie

20 filth we sent to the morgue and hospitals how insignificant we

21 are."  Right?

22 A    That's what I said.

23 Q    And when you say "the people we sent to the morgue," you

24 meant Heather Heyer, right?

25 A    Yes.

J. Kessler - Redirect

1          MR. BLOCH:  Nothing further, Judge.

2                    CROSS-EXAMINATION

3    BY MR. SPENCER:

4    Q    Hello, Mr. Cantwell.  This is Richard Spencer and I'm

5    acting on my own behalf.

6    A    Hello, Mr. Spencer.

7    Q    Your background is in libertarianism, right?

8    A    It is.

9    Q    Could you describe some of the literature that inspired

10   you to go off and become a public intellectual, an entertainer,

11   or whatever you want to think of yourself as?

12   A    A lot of the works by Murray Rothbard and also Hans Hoppe,

13   Lew Rockwell; those are the authors.  It's more collections of

14   essays than the entire book titles, but *Democracy:  The God*

15   *That Failed* is one of my favorites, and *Human Action* by Ludwig

16   von Mises.

17   Q    Interesting.  So you started off in that radical Austrian

18   school, radical anarchism, in fact?

19   A    To be precise, I sort of started off in the Tea Party

20   before I stumbled upon libertarianism.  But, yeah, that would

21   be -- you could say that my affinity for radicalism was founded

22   in libertarianism.

23   Q    Hans-Hermann Hoppe been interested in right-wing ideas of

24   all sorts, even though he is a committed libertarian?

25   A    Hans Hoppe is -- might be described as a right-wing

J. Kessler - Redirect

1  libertarian, I think it would be fair to say.

2  Q    Was Rothbard -- Murray Rothbard, do you want to describe

3  him?

4  A    Murray Rothbard was sort of a -- Jewish fellow, worth

5  mentioning -- was -- he went left and right depending on which

6  way he thought the wind was blowing, I think it would be fair

7  to say, but they were what would be described as

8  anarcho-libertarians.  They believed in the privatization of

9  all state services under the -- under the guiding principle

10 that the state is a coercive entity, that it uses violence to

11 achieve its goals and is therefore -- that it initiates

12 violence to achieve its goals, and is therefore an

13 unjustifiably coercive entity that should be privatized.

14 Q    You said Murray Rothbard went left, went right, whichever

15 way the wind was blowing, but he did go right.  Did he have

16 some nice things to say about controversial figures?

17 A    Yeah.  As a matter of fact, one of the things that nudged

18 me towards the alt-right was a piece by Murray Rothbard

19 entitled "Right-Wing Populism," and he specifically mentioned

20 David Duke, which might seem odd if you know a thing about

21 David Duke and Murray Rothbard.  You wouldn't expect them to be

22 the best of friends.  But he spoke very highly of David

23 Duke's -- I believe it was a Congressional campaign where David

24 Duke sought public office, and Murray Rothbard, though he was a

25 Jewish libertarian, seemed to think that Mr. Duke's program

J. Kessler - Redirect

1  would be a lot better for society than the current left-wing

2  trend.

3  Q    Would you say that your career has been Rothbardian, kind

4  of translating some of that energy?

5  A    Yeah, it was definitely more heavily influenced by

6  Rothbard than, I would say -- it would be fair to describe Hans

7  Hoppe as Rothbard's protege, and I was then more heavily

8  influenced by Hoppe, and that sort of was my ideological

9  trajectory.

10 Q    So these are intellectual matters, but would you say you

11 were a shock jock?

12 A    Yeah.  The Radical Agenda, which -- as we noted before,

13 was started off as Some Garbage Podcast.  It was styled after

14 the Opie and Anthony Show, which was itself sort of accused of

15 being a spinoff of Howard stern.

16 Q    Do you entertain extreme ideas because it makes good radio

17 or television or theater?

18         MR. BLOCH:  Object to the leading.

19         THE COURT:  That's not in controversy.  Go ahead.

20         THE WITNESS:  So the idea behind it -- to be precise,

21 my ideas are well outside of the mainstream, and I'd be the

22 last one to deny that.  But the aim of the Radical Agenda is to

23 make entertainment.  That's the whole entire point, which is

24 why sometimes I appear in blackface or wearing a rabbi's

25 costume or pretending to be transgender or any number of

J. Kessler - Redirect

1   different things.  The aim of the product is to entertain the

2   audience.  And in the process of that, I'm pursuing an activism

3   project in which I am transmitting sincerely held beliefs and

4   those ideas are exaggerated for the benefit of the

5   entertainment product.

6   BY MR. SPENCER:

7   Q    Would you say that showing good taste is one of your

8   strong suits?

9   A    I would not say that it has been a strong suit of my

10  public persona, no.  The whole entire point is to obtain free

11  media attention by offending people.  That's the whole point.

12  Q    You've testified that I appeared on the Radical Agenda

13  podcast.  Do you remember those?

14  A    So I definitely remember an episode titled "Heckler's

15  Veto" right before -- right before Auburn, but I think that

16  there was -- as I looked at the plaintiffs' exhibits, I noticed

17  that there was an earlier episode titled "Richard Spencer," I

18  think.  And so if I'm right, you've been on twice.

19  Q    Okay.  Did anything hot or salacious come out of those

20  things?

21  A    Depending on your -- not hot for the Radical Agenda, no.

22  I mean --

23            THE COURT:  Let's --

24            THE WITNESS:  The idea that Richard Spencer would

25  be --

J. Kessler - Redirect

1          THE COURT:  Let's move on to this case.

2          MR. SPENCER:  Okay.  I'll move on.  I'll move on.

3    BY MR. SPENCER:

4    Q    Do you recognize this text exchange?  This is just a

5    different version of what you were looking at on a spreadsheet.

6    A    Yeah.

7    Q    Okay.  So that's a fair and accurate representation of our

8    texts?

9    A    Yes.  Yes.  I recall this.

10   Q    Okay.

11          MR. SPENCER:  I would move to enter this into

12   evidence as Defendants' Exhibit 1005.

13          THE COURT:  Be admitted.

14          (Defendant Spencer Exhibit 1005 marked.)

15          (Defendant Spencer Exhibit 1005 admitted.)

16   BY MR. SPENCER:

17   Q    So I have downloaded all of my messages.  Do you remember

18   being -- you see this right here, July 2nd?  Do you remember

19   being in communication with me before then?

20   A    Do I remember being in communication with you before this

21   first message was exchanged?

22   Q    Right.  I guess --

23   A    So this is on July 2nd.  I believe your Auburn event was

24   prior to July 2nd.  And I had to have been in touch with you

25   prior to that.  And I'm just not certain how.

J. Kessler - Redirect

1  Q    Sent me an email, perhaps?

2  A    It could have been an email.  I think if I had you on the

3  show, I definitely used Skype for the audio.  It could have

4  been that.

5  Q    Okay.  Let me go to August 6.  This is the meeting that we

6  had.  Okay.

7       So this is August 5th.  And you state, "I'm planning my

8  travels for C'ville, and I might spend tomorrow in

9  Alexandria" -- that's Alexandria, Virginia, where I was living.

10  "Would you be interested in catching up with me there?  What

11  about having lunch or dinner with some Radical Agenda

12  listeners?"

13      And then you said, "On another note, Signal is an app that

14  I use to encrypt my SMS.  Check it out."

15      Then the next day you write, twice, what?

16  A    "I'm beginning to think you don't like me."

17  Q    Why might you have said that?

18  A    Because you weren't responding to my messages.  And if I

19  recall correctly, I probably called you a couple of times, and

20  didn't get an answer, either.

21  Q    Is it safe to say that we weren't communicating via

22  Signal?

23  A    No, we definitely weren't communicating via Signal.  As a

24  matter of fact, in my messages you at some point install

25  Signal, and I get a notification of that, and that is well

278

J. Kessler - Redirect

1    after all of the events at the heart of this dispute have

2    transpired.

3    Q    Interesting.

4         I respond, "Dude, I'll get back to you and I like you.

5    Friends are over now."

6         Now, this is also, to put into context, August 9th.  So

7    you remember coming to Alexandria, Virginia and we ate lunch.

8    That's how you testified, right?

9    A    Yes.

10   Q    Do you remember what we discussed?  If I show you this, it

11   might refresh your memory.  Paywall, does that ring a bell?

12   A    Yeah, so what I remember discussing with you -- I don't

13   even have to look at the messages.  I know that I was in sort

14   of a business dispute with the guys at therightstuff.biz

15   because we had talked about being partners on paywall

16   memberships, and I had been hoping to sort of bring everybody

17   into this so that we're not all competing for market share, and

18   I was hoping to get you on board with that idea.

19   Q    Right.  So you wanted to create a big paywall that we

20   would all share the income from?

21   A    Yeah, I don't know if I mentioned it specifically in these

22   messages with you, but I -- not a popular thing to say in

23   right-wing circles, but I used the examples of, like, porn

24   megasites that you have one passport for all of them.  And I

25   thought that that would be a business model that the alt-right

J. Kessler - Redirect

1    could replicate because at the time you had, like -- a bunch of

2    people were launching these things.  If you're paying five, ten

3    bucks a month for all these --

4    Q    So it's safe to say that our conversation was mostly about

5    business?

6    A    Yeah, it was about -- it was about business.  It was

7    about -- I imagine that we probably discussed the events, but

8    the thing that stands out in my mind was the paywall thing.

9    Q    Sure.  Okay.  So also during your cross-examination an

10   email was shown to you from altright.com inviting you to join a

11   Discord server.  Do you remember that?  It was about a half

12   hour ago.

13   A    So to be precise, somebody sent that through the contact

14   form of my website.  It wasn't a thing the altright.com website

15   dispatched to me, but somebody sent an invite from altright.com

16   in the public contact form for christophercantwell.com.  Yes.

17   Q    Right.  It said "Join Richard Spencer's altright.com."  Do

18   you think I wrote that or do you think that was a form email?

19   A    I'm 100 percent certain that someone else copied and

20   pasted that into a form.

21   Q    Okay.  Did any form of planning for UTR, to your

22   knowledge, go on on that Discord server?

23   A    The only thing that I remember about being on that Discord

24   server was a post that they brought up for one of their

25   experts.  I don't have -- I don't know anything that went on on

J. Kessler - Redirect

1   that server.

2   Q    Okay.  Did we ever engage in logistical planning for the

3   UTR rally?

4   A    No.

5   Q    Who invited you to the UTR rally?

6   A    It was -- I believe it was first Augustus Invictus and

7   then it was followed up by Jason Kessler.

8   Q    Okay.  In that Vice video you're really into guns, right?

9   A    Yeah.

10  Q    Are you a gun nut?

11  A    I think that might be a popular term, yeah.

12  Q    Have you ever discussed guns with me?

13  A    Not that I can recall.

14  Q    Okay.  In your estimation, am I a gun nut?

15  A    I don't think I've ever seen you hold a firearm.

16  Q    Okay.

17       Oh, last thing:  Kurt.  Who is this Kurt that gets brought

18  up in these chats?

19  A    I could ask you the same question.  Kurt introduced

20  himself to me some number of days before the event on -- I

21  forget whether he first contacted me on Discord or sent me a

22  text message first.  But he says, "Hey, I'm Kurt.  I'm the

23  logistics" -- manager or coordinator, whatever it was;

24  logistics something or other.  He says this to me sometime in

25  August of 2017, which is the first time I get acquainted with

Sines, et al. v. Kessler, et al., 3:17CV72, 11/15/2021

1  Kurt.

2  Q    Was it unusual in the alt-right at the time for people to

3  just assert that they are logistics managers of some kind of

4  security experts?

5  A    You know --

6           MR. BLOCH:  Objection.

7           THE COURT:  Sustained.

8  BY MR. SPENCER:

9  Q    Did Kurt show you any credentials or something like that

10  or did he merely assert something?

11  A    He just simply sent me a message unsolicited that said,

12  I'm Kurt and this is my title.

13  Q    Okay.  Did you know of any connection between this Kurt

14  fellow and myself?

15  A    No.

16           MR. SPENCER:  Thank you.  No further questions.

17           THE COURT:  All right.

18           Members of the jury, we'll recess now until 9 o'clock

19  tomorrow morning.  And do not discuss the case with anyone or

20  allow anyone to discuss it with you or remain within hearing of

21  anyone discussing it.

22           See you at 9 o'clock.  Thank you.

23  **(Jury out, 5:00 p.m.**)

24

25

Sines, et al. v. Kessler, et al., 3:17CV72, 11/15/2021

1             C E R T I F I C A T E

2      I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3 the United States District Court for the Western District of

4 Virginia, appointed pursuant to the provisions of Title 28,

5 United States Code, Section 753, do hereby certify that the

6 foregoing is a correct transcript of the proceedings reported

7 by me using the stenotype reporting method in conjunction

8 with computer-aided transcription, and that same is a

9 true and correct transcript to the best of my ability and

10 understanding.

11      I further certify that the transcript fees and format

12 comply with those prescribed by the Court and the Judicial

13 Conference of the United States.

14      /s/ Lisa M. Blair                Date: November 15, 2021

15

16

17

18

19

20

21

22

23

24

25