Sines, et al. v. Kessler, et al., 3:17CV72, 11/16/2021

1                    UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF VIRGINIA
2                      CHARLOTTESVILLE DIVISION

3    ************************************************************

4    ELIZABETH SINES, ET AL.,     CIVIL CASE NO.:  3:17CV72
                                  NOVEMBER 16, 2021, 8:59 AM
5                                 JURY TRIAL, DAY 17
           Plaintiffs,
6    vs.

7                                 Before:
                                  HONORABLE NORMAN K. MOON
8                                 UNITED STATES DISTRICT JUDGE
     JASON KESSLER, ET AL.,       WESTERN DISTRICT OF VIRGINIA
9
           Defendants.
10
     ************************************************************
11
     APPEARANCES:
12

13   For the Plaintiffs:      ALAN LEVINE, ESQUIRE
                              COOLEY LLP
14                            1114 Avenue of the Americas, 46th
                              Floor
15                            New York, NY  10036
                              212.479.6260
16
                              DAVID E. MILLS, ESQUIRE
17                            COOLEY LLP
                              1299 Pennsylvania Avenue, NW,
18                            Suite  700
                              Washington, DC  20004
19                            202.842.7800

20

21

22   Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                      255 West Main Street, Suite 304
23                    Charlottesville, Virginia  22902
                      434.296.9284
24
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25   TRANSCRIPT PRODUCED BY COMPUTER.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/16/2021

```
 1   APPEARANCES CONTINUED:

 2   For the Plaintiffs:          MICHAEL L. BLOCH, ESQUIRE
                                  EMILY C. COLE, ESQUIRE
 3                                ROBERTA A. KAPLAN, ESQUIRE
                                  Kaplan Hecker & Fink LLP
 4                                350 Fifth Avenue, Suite 7110
                                  New York, NY  10118
 5                                212.763.0883

 6                                KAREN L. DUNN, ESQUIRE
                                  WILLIAM A. ISAACSON, ESQUIRE
 7                                Paul, Weiss, Rifkind, Wharton &
                                  Garrison LLP
 8                                2001 K Street, NW
                                  Washington, DC  20006
 9
     For the Defendants:          DAVID L. CAMPBELL, ESQUIRE
10                                Duane, Hauck, Davis, Gravatt &
                                  Campbell, P.C.
11                                100 West Franklin Street, Suite 100
                                  Richmond, VA  23220
12                                804.644.7400

13                                CHRISTOPHER CANTWELL, PRO SE
                                  #00991-509
14                                USP Marion
                                  4500 Prison Road, PO Box 2000
15                                Marion, IL  62959

16                                BRYAN J. JONES, ESQUIRE
                                  Bryan J. Jones, Attorney at law
17                                106 W. South Street, Suite 211
                                  Charlottesville, VA  22902
18                                540.623.6952

19                                JAMES E. KOLENICH, ESQUIRE
                                  Kolenich Law Office
20                                9435 Waterstone Blvd., Suite 140
                                  Cincinnati, OH  45249
21                                513.444.2150

22                                WILLIAM E. REBROOK, IV, ESQUIRE
                                  (Appearing via Zoom)
23                                The ReBrook Law Office
                                  6013 Clerkenwell Court
24                                Burke, VA  22015
                                  571.215.9006

25
```

```
 1   APPEARANCES OF COUNSEL:

 2   For the Defendants:          JOSHUA SMITH, ESQUIRE
                                  (Appearing via Zoom)
 3                                Smith LLC
                                  807 Crane Avenue
 4                                Pittsburgh, PA  15216
                                  917.567.3168
 5
                                  RICHARD SPENCER, PRO SE
 6                                P.O. Box 1676
                                  Whitefish, MT  59937
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           INDEX OF WITNESSES

2    WITNESSES ON BEHALF OF THE PLAINTIFF:                    PAGE

3    CHRISTOPHER CANTWELL (Continued)

4     Cross-Examination by Mr. Campbell                       16
      Cross-Examination by pro se Defendant Mr. Cantwell   21, 32
5     Redirect Examination by Mr. Bloch                       38

6    BENJAMIN DALEY (Video deposition played)                 30

7    BRAD GRIFFIN (Video deposition played)                   31

8

9    WITNESSES ON BEHALF OF THE DEFENDANTS:

10   RICHARD SPENCER

11    Direct Examination by pro se Defendant Spencer          51
      Cross-Examination by Mr. Bloch                          86
12    Cross-Examination by Mr. Kolenich                       91
      Cross-Examination (in James Alex Fields, Jr.'s case in
13    chief) by Mr. Campbell                                  98
      Cross-Examination by Mr. ReBrook                       102

14
     JAMES ALEX FIELDS, JR. (Evidence read into the record by
15   Mr. Campbell)

16   SAMANTHA FROELICH (Video deposition played.)            105

17   CHRISTOPHER CANTWELL

18    Direct Examination by pro se Defendant Cantwell        106
      Cross-Examination by Mr. Bloch                         150
19    Cross-Examination by Mr. Smith                         162
      Cross-Examination by Mr. Jones                         163

20

21

22

23

24

25

```
 1                            INDEX OF EXHIBITS

 2  EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3          EXHIBIT:                   Marked      Received

 4          3274                         18          18

 5          3280                         18          18

 6          3285                         18          18

 7          3287                         18          18

 8          3278                         18          18

 9          3288                         18          18

10          0130                         18          18

11          0135B                        18          18

12          3358                         18          18

13          0116                         18          18

14          0117                         18          18

15          3659                         18          18

16          3837                         18          18

17          3449                         18          18

18          0135A                        18          18

19          3447                         18          18

20          3660                         18          18

21          3836                         18          18

22          1525                         19          19

23          1527                         19          19

24          1529                         19          19

25          1530                         19          19
```

```
 1                         INDEX OF EXHIBITS

 2    EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3         EXHIBIT:                Marked    Received

 4         1531                      19        19

 5         1532                      19        19

 6         1516                      19        19

 7         3458                      19        19

 8         3457                      19        19

 9         0145                      19        19

10         0147                      19        19

11         0143                      19        19

12         0146                      19        19

13         3454                      19        19

14         3455                      19        19

15         3453                      19        19

16         0148                      19        19

17         0144                      19        19

18         3055                      19        19

19         3056                      19        19

20         3057                      19        19

21         3058                      19        19

22         3478                      19        19

23         3651                      19        19

24         3943                      19        19

25         3567                      19        19
```

1                         INDEX OF EXHIBITS

2    EXHIBITS ON BEHALF OF THE PLAINTIFF:

3    EXHIBIT:                  Marked      Received

4          0047                            19          19

5          0048                            19          19

6          0045                            19          19

7          3471                            19          19

8          3393                            19          19

9          1745                            20          20

10          1757                            20          20

11          1798                            20          20

12          1799                            20          20

13          3470                            20          20

14          3477                            20          20

15          1800                            20          20

16          3941                            39          39

17          3911                            39          39

18          2655                            39          39

19          1949                            39          39

20          2906                            39          39

21          2659                            39          39

22          1965                            39          39

23          3808                            39          39

24          3530                            39          39

25          0693                            39          39

1                           INDEX OF EXHIBITS

2  EXHIBITS ON BEHALF OF THE PLAINTIFF:

3          EXHIBIT:                 Marked      Received

4          3344                        39          39

5          1959                        39          39

6          2675                        39          39

7          1955                        39          39

8          2583                        39          39

9          3960A                       88          88

10         3960B                       88          88

11         3960C                       88          88

12         3960D                       88          88

13         3960E                       88          88

14         3960F                       88          88

15         3960G                       88          88

16         3960I                       88          88

17         3960J                       88          88

18         3960U                       88          88

19         3960DD                      88          88

20         3960EE                      88          88

21         3880                       153         153

22         3956C                      153         153

23         3956A                      154         154

24         CCEX24                     154         154

25         CCEX153G                   161         161

1                          INDEX OF EXHIBITS

2    EXHIBITS ON BEHALF OF THE DEFENDANTS:

3           EXHIBIT:                 Marked      Received

4           CC-2713                    22           22

5           CC-125                     25           25

6           CC-132A                    32           33

7           CC-135A                    32           33

8           RS-1032                    59           59

9           RS-1031                    60           60

10          RS-1033                    62           62

11          RS-1016                    63           63

12          RS-1015A                   67           67

13          RS-1015B                   67           67

14          RS-1015C                   67           67

15          RS-1015D                   67           67

16          RS-1017                    68           68

17          RS-1018                    69           69

18          RS-1039                    73           73

19          RS-1019                    74           74

20          RS-1021                    76           76

21          JK-10                      93           93

22          JF-1                      104          104

23          CC-164                    106          106

24          CC-024A                   109          109

25          CC-114                    116          116

1                          INDEX OF EXHIBITS

2    EXHIBITS ON BEHALF OF THE DEFENDANTS:

3           EXHIBIT:                    Marked      Received

4           CC-111                       116          116

5           CC-152                       120          120

6           CC-120A                      126          126

7           CC-161B                      128          128

8           CC-161C                      129          129

9           CC-126                       130          130

10          CC-166A                      143          144

11          CC-6                         145          145

12          CC-7                         147          147

13          CC-9                         148          148

14          CC-166B                      149          149

15

16

17

18

19

20

21

22

23

24

25

11

1   (Proceedings commenced, 8:59 a.m.)

2              THE COURT:  Good morning.  Call the case, please.

3              THE CLERK:  Yes, Your Honor.  This is Civil Action

4   Number 3:17-cv-72, Elizabeth Sines and others versus Jason

5   Kessler and others.

6              THE COURT:  Plaintiffs ready?

7              MS. KAPLAN:  We are, Your Honor, although -- oh,

8   sorry.

9              There are a number of housekeeping matters I thought

10  we should raise.

11             THE COURT:  Defendants ready?

12             MR. KOLENICH:  Yes, sir.

13             MR. SPENCER:  Same.

14             THE COURT:  Before we begin, I will remind everyone

15  that under Standing Order 2020-12 and 2013-8, the Court's

16  prohibition against recording or broadcasting court proceedings

17  remains in force.  Attorneys, parties and their staff and any

18  members of the public or press accessing this proceeding today

19  may not record or broadcast it.  That means no photography, no

20  using any video or audio recording device, no rebroadcasting,

21  livestreaming or otherwise disseminating any live or recorded

22  video or audio of this proceeding.

23             All right.  Okay.  What is the matters we need to

24  take up?

25             MS. KAPLAN:  A few things I thought would be worth

12

1    raising, Your Honor, as we get close to the end.  First of all,

2    we didn't hear from defense.  We asked them yesterday who their

3    witnesses were for today after Mr. Cantwell.  We don't know.

4    We'll make it work, but obviously it would be helpful in the

5    future to get notice on that.

6              Two, we would like to raise -- we sent a letter in

7    this morning.  Mr. Cantwell has asked to recross, essentially,

8    Devin Willis and Natalie Romero.  For the reasons stated in our

9    letter, we think that would be inappropriate, but obviously

10   knowing the scope of what's left would be helpful.

11             Similarly, Your Honor, Mr. Spencer has asked to call

12   essentially a new witness.  She was previously on the list.

13   She was withdrawn and now she's being renoticed by Mr. Spencer,

14   and we have a letter on that.

15             MR. SPENCER:  I'm sorry to have made you write a

16   letter, but I have also dropped it for reasons.

17             MS. KAPLAN:  Well, that makes that very easy, Your

18   Honor.

19             A couple of issues on documents.  We made a -- let me

20   do the easy one.  We have a chart for all the medical records

21   that were going to be admitted.  We've been speaking overnight

22   with Mr. Campbell.  He requested two redactions which we are

23   happy to make.  So we will provide a chart to Ms. Wheeler of

24   all those exhibits so she has them.  I'm not sure we need to

25   read them out loud.  It's a long list, but whatever Your Honor

13

 1  prefers.

 2           Similarly, we asked plaintiffs -- and I can hand it

 3  up, Your Honor, if you'd like -- to stipulate to the applicable

 4  UVA fire policy for having open flames on campus that was in

 5  effect in August 2017.  We have a custodian of records

 6  affidavit from UVA saying this was the policy.  I believe

 7  Mr. Jones objects to that but I'm happy to either make a letter

 8  submission or hand it up.

 9           And we're wondering, Your Honor, so we can be

10  prepared, if Your Honor intends to have a charging conference,

11  if that's your normal practice, so we can be prepared for that.

12           THE COURT:  I'll give you a chance, but I hope I'll

13  be able to give you a pretty good set of instructions so that

14  we won't spend a lot of time talking about it.

15           MS. KAPLAN:  That's what I assumed, Your Honor.

16  Thank you.

17           Then finally -- I couldn't read my notes, but now I

18  understand -- Joshua Smith yesterday proposed to us last night

19  that if we stipulate to a certain video recording of

20  Mr. Heimbach, then he will not -- no longer be seeking to

21  re-call either Mr. Parrott or Mr. Heimbach.  We are working

22  with him on that, but again, as you see, we're limiting very

23  much what's left to do in our discussions with the other

24  parties.

25           And thank you, Mr. Spencer, about Hannah.  So I

14

1   really think we've made a lot of progress on those issues, Your

2   Honor.

3           THE COURT:  All right.

4           MR. SPENCER:  I have one issue, Your Honor.  So it's

5   possible that the plaintiffs will rest today or by this

6   afternoon.  And so I will be presented as a *pro se* litigant

7   with this unusual task of presenting evidence and seemingly

8   cross-examining myself.  So I have asked a number of people and

9   received a number of different answers, but perhaps I should

10  just ask you:  Would you allow me to present from the podium as

11  opposed to being in the witness box?  That just seems -- it was

12  how the plaintiffs presented evidence.  Of course, I'll be

13  doing a little bit more.  I will be testifying to the evidence

14  as well.

15          THE COURT:  I don't have any problem.  Any objection

16  to that?  I don't see any problem with that.

17          MR. SPENCER:  Okay.

18          MS. KAPLAN:  I'm sorry, Your Honor, I apologize.

19  Mr. Bloch was telling me something in my other ear.  What's the

20  proposal?

21          THE COURT:  He would like to, when he presents his

22  case, instead of being in the witness box, be at the podium, or

23  the lectern.

24          MS. KAPLAN:  I don't think there's any problem with

25  that, Your Honor.  You obviously can't be in both places at

1   once, Mr. Spencer.

2          MR. SPENCER:  True.  And I won't be asking myself

3   questions as well.

4          MR. CANTWELL:  Yeah, I had intended to cross-examine

5   myself, so to speak, from that position as well, because I have

6   some exhibits that I'd like to bring up.  And I have only had

7   just the briefest moment to skim through the letter from

8   plaintiffs' counsel regarding my desire to call Ms. Romero and

9   Mr. Willis.

10          I said when I was questioning them that I'd be

11   seeking to call them during my case in chief.  And part of the

12   reason that I did that is because plaintiffs seem to be

13   mistaken stating that I had these exhibits at the time.  I was

14   actually still attempting to get my data into the courtroom.

15          THE COURT:  You can re-call them, but it's not a time

16   to go back and go through things already covered, just cover

17   new material.

18          MR. CANTWELL:  Understood.

19          MS. KAPLAN:  Your Honor, I would ask that you read

20   our letter because everything he's seeking to question them

21   about is things that were already covered on their

22   cross-examination.

23          THE COURT:  Well, he hasn't had time to read the

24   letter.

25          MS. KAPLAN:  I understand that.  I just would like

C. Cantwell - Cross

1   consideration of those issues.  Happy to argue it.

2            THE COURT:  Anything else?

3            All right.  Call the jury.

4   **(Jury in, 9:07 a.m.)**

5            THE COURT:  You may be seated.  Good morning, ladies

6   and gentlemen.  Glad to have you back.

7            Okay.  You were on the stand.

8         CHRISTOPHER CANTWELL, CALLED BY THE PLAINTIFFS,

9                         PREVIOUSLY SWORN

10           THE COURT:  You may proceed.

11           MR. CAMPBELL:  Thank you, Your Honor.

12                      CROSS-EXAMINATION

13   BY MR. CAMPBELL:

14   Q    Good morning, Mr. Cantwell.  I represent James Fields.

15   Prior to August 12, 2017 had you ever heard the name James

16   Fields before?

17   A    No.

18   Q    Had you ever met or communicated in any way to your

19   knowledge with James Fields prior to August 12, 2017?

20   A    No.

21   Q    Having seen his pictures all over social media, blogs,

22   websites, that sort of thing, does that refresh your

23   recollection that you ever interacted with Mr. Fields at any

24   political event or at any other time?

25   A    I have certainly never met James Fields before I saw him

Sines, et al. v. Kessler, et al., 3:17CV72, 11/16/2021

1   in the Albemarle Charlottesville Regional Jail.

2               MR. CAMPBELL:  Thank you, sir.  I don't have any

3   additional questions.

4               THE COURT:  All right.  Anyone else?

5               MR. CANTWELL:  Nobody else?  Then I'll take the

6   podium?

7               THE COURT:  Not yet.  If there are -- any redirect?

8   If not, you may step down.

9               MR. CANTWELL:  Step down?

10              THE COURT:  Yes.

11              All right.  Next witness?

12              MS. KAPLAN:  Your Honor, I thought our understanding

13   was that Mr. Cantwell was going to go now and complete the

14   Cantwell and then we would close.

15              THE COURT:  No, he's going to put his case on after

16   he makes his Rule 50 motion.

17              MS. KAPLAN:  Okay.  So in that case, Your Honor, we

18   have two very short videos we'd like to show to the jury and

19   then we rest.

20              THE COURT:  All right.  I need to read this modified

21   instruction on sanctions.

22              MS. KAPLAN:  Do you want to do it after the videos,

23   Your Honor?

24              THE COURT:  No.  I'll read it prior.

25              MS. KAPLAN:  Your Honor, Mr. Spalding thought we were

18

Sines, et al. v. Kessler, et al., 3:17CV72, 11/16/2021

1   proceeding the other way, so he needs a few minutes.  So in the

2   meantime, if that's okay, I will read the medical records for

3   Ms. Wheeler and then Your Honor can make the instruction and we

4   should be ready to play the videos.  Does that work?

5        Okay.  So, Ms. Wheeler, by stipulation among the

6   parties and subject to redaction on a couple of documents,

7   plaintiffs admit the following -- or seek to admit the

8   following medical records.  I'm going to do it plaintiff by

9   plaintiff.

10       Plaintiff Seth Wispelwey, Plaintiffs' Exhibit 3274,

11  3280, 3285, and 3287.  And there are two additional documents

12  that contain certifications for some of those records.  Those

13  are 3278 and 3288.  The other certifications are contained in

14  the documents already mentioned.

15       (Plaintiff Exhibits 3274, 3280, 3285, 3287, 3278, and

16  3288 admitted.)

17       MS. KAPLAN:  For Plaintiff Thomas Baker, Plaintiffs'

18  Exhibit 130, Plaintiffs' Exhibit 135B, Plaintiffs'

19  Exhibit 3358, Plaintiffs' Exhibit 116, Plaintiffs' Exhibit 117,

20  Plaintiffs' Exhibit 3659, Plaintiffs' Exhibit 3837, and the

21  certifications are Plaintiffs' Exhibit 3449, 135A, 3447 -- if

22  I'm speaking too quickly, Ms. Wheeler, I apologize -- 3660 and

23  3836.

24       (Plaintiff Exhibits 130, 135B, 3358, 116, 117, 3659,

25  3837, 3449, 135A, 3447, 3660, and 3836 admitted.)

Sines, et al. v. Kessler, et al., 3:17CV72, 11/16/2021

1          MS. KAPLAN:  Now, for Plaintiff Marcus Martin, the

2    medical records are Plaintiffs' Exhibit 1525, 1527, 1529, 1530,

3    1531, 1532, and the certifications for Mr. Martin are at 1516,

4    3458, 3457.

5          (Plaintiff Exhibits 1525, 1527, 1530, 1531, 1532,

6    1516, 3458, and 3457 admitted.)

7          MS. KAPLAN:  For Marissa Blair, the exhibits are

8    Plaintiffs' Exhibit 145, 147, 143, 146 and 144.  The

9    certifications with respect to Ms. Blair are Plaintiffs'

10   Exhibit 3454, 3455, 3453, and 148.

11         (Plaintiff Exhibits 145, 147, 143, 146, 144, 3454,

12   3455, 3453, and 148 admitted.)

13         MS. KAPLAN:  For Natalie Romero, the records are

14   Plaintiffs' Exhibit 3055, 3056, 3057, 3058, 3478, and 3651.

15   The certifications for Ms. Romero are Plaintiffs' Exhibit 3943

16   and 3567.

17         (Plaintiff Exhibits 3055, 3056, 3057, 3058, 3478,

18   3651, 3943, and 3567 admitted.)

19         MS. KAPLAN:  For Plaintiff Chelsea Alvarado, the

20   medical records are Plaintiffs' Exhibit 47, Plaintiffs'

21   Exhibit 48, and Plaintiffs' Exhibit 45.  The corresponding

22   certifications are Plaintiffs' Exhibit 3471 and 3393.

23         (Plaintiff Exhibits 47, 48, 45, 3471, and 3393

24   admitted.)

25         MS. KAPLAN:  And finally, for Plaintiff April Muñiz,

Sines, et al. v. Kessler, et al., 3:17CV72, 11/16/2021

1   the medical records are Plaintiffs' Exhibits 1745, 1757, 1798,

2   1799, Plaintiffs' Exhibit 3470, and 3477.  And the relevant

3   certifications for Ms. Muñiz are Plaintiffs' Exhibit 1745,

4   Plaintiffs' Exhibit 1757, Plaintiffs' Exhibit 1800, Plaintiffs'

5   Exhibit 3470, and Plaintiffs' Exhibit 3477.

6                (Plaintiff Exhibits 1745, 1757, 1798, 1799, 3470,

7   3477, and 1800 admitted.)

8                MS. KAPLAN:  And if I may approach, Your Honor, to

9   make it much easier for Ms. Wheeler, I'll hand a chart of that

10  up to her.

11               MR. CAMPBELL:  Your Honor, I'd just like to add in

12  the record that the two that are subject to additional

13  redaction pursuant to the negotiation are Blair 143 and Muñiz

14  1757.

15               MS. KAPLAN:  We agree with that, Your Honor.

16               THE CLERK:  Could you repeat those, Mr. Campbell?

17  I'm sorry.

18               MR. CAMPBELL:  Yes, ma'am, certainly.

19               The two subject for the redaction are Plaintiffs'

20  Exhibit 143 as to Ms. Blair and Plaintiffs' Exhibit 1757 as to

21  Ms. Muñiz.

22               THE CLERK:  Thank you.

23               MR. CAMPBELL:  Thank you.

24               THE COURT:  All right.  Mr. Cantwell?

25               MR. CANTWELL:  Yes.

C. Cantwell - Cross

1      THE COURT:  You did have a right, if you wish, to

2 cross-examine yourself.

3      MR. CANTWELL:  Would that preclude me from testifying

4 in my own case later?

5      THE COURT:  No.  Not to duplicate things.

6      MR. CANTWELL:  Yeah, no, I would like to -- if I may,

7 I'd like to answer some of the things that I was questioned

8 about now and then present my case subsequently.  Does that

9 work?

10      THE COURT:  You may do so.

11      MR. CANTWELL:  Okay.

12      THE COURT:  Ladies and gentlemen of the jury,

13 Mr. Cantwell is representing himself, so he has to ask himself

14 questions and then answer the questions, and he's going to be

15 allowed to stand at the lectern there to proceed.

16      He's still a witness.  This is cross-examination, his

17 cross-examination of himself, after he was called as a witness

18 for the plaintiffs, as an adverse witness.

19                    CROSS-EXAMINATION

20      MR. CANTWELL:  Pardon me, but is it necessary that I

21 literally ask myself questions, or may I --

22      THE COURT:  You can preface what subject you're going

23 into.

24      MR. CANTWELL:  Okay.

25      So one of the things that came up yesterday was an

C. Cantwell - Cross

1  episode of the Radical Agenda titled "Political Violence."

2  This aired shortly before the events at the heart of this

3  dispute, and given the clip that was played, one might get the

4  impression that this was an endorsement of political violence.

5  Given the -- subsequently, Mr. Spencer asked me about

6  libertarianism.  Some of you will recall I had a bit of an

7  ideological exchange with Mr. Spencer about that subject.

8        I would like to play for you some of that episode of

9  the Radical Agenda.  It was episode 318, and it was titled

10  "Political Violence."  It aired, I think, in -- I think we

11  actually say on here.  I think it was July 17th, 2017.

12        This is Plaintiffs' Exhibit 2713.  I would seek to

13  admit the entire recording into evidence, but I'm going to skip

14  through it so that we're not playing the entire two hours of

15  audio, if that works.

16        THE COURT:  All right.

17        MR. CANTWELL:  Does that work?

18        THE COURT:  Be admitted.

19        MR. CANTWELL:  Okay.

20        (Defendant Cantwell Exhibit 2713 marked.)

21        (Defendant Cantwell Exhibit 2713 admitted.)

22        (Audio playing.)

23        MR. CANTWELL:  I'll skip ahead a little bit through

24  the advertising.

25        (Audio playing.)

C. Cantwell - Cross

1          THE COURT:  Mr. Cantwell, that seems to be repeating.

2          MR. CANTWELL:  I'll fast-forward.

3          (Audio playing.)

4          THE COURT:  Other people's opinions --

5          MR. CANTWELL:  This is not -- what I'm attempting to

6  do is not convey Tucker Carlson's opinions.  There is a

7  discussion on what I'm referring to when I'm discussing

8  political violence.  And the message being conveyed here is

9  that politics is violence, which is a theme that has come up in

10  this trial repeatedly throughout, that it is a use of force.

11  And that was a discussion that was common in the alt-right

12  lexicon, which has been, in my view, sort of abused during the

13  course of this case.

14          I can move on.  I'll fast-forward.

15          THE COURT:  All right.

16          MR. CANTWELL:  The title of this episode actually

17  came from something titled "Political Violence Is A Game The

18  Right Can't Win."

19          (Audio playing.)

20          THE COURT:  Mr. Cantwell --

21          MR. CANTWELL:  I'll stop.  I'll stop.  So the --

22          MS. KAPLAN:  Your Honor, maybe it would be helpful to

23  approach and have a discussion.

24          MR. CANTWELL:  I'm just going to close it.  Okay?

25  The point has been made.

C. Cantwell - Cross

1          THE COURT:  All right.

2          MR. CANTWELL:  The point of the episode which they

3    portrayed to you as an endorsement of political violence is

4    precisely the opposite of that.  And that is all I meant to

5    convey.  And I'm sorry that, you know, I do a two hour-long

6    radio show and it's sometimes difficult to sum up a point in

7    the brevity preferable to the late stages of a civil trial.

8          And that discussion about the libertarian ideological

9    framework colors everything that I say, that it's -- you know,

10   you're justifying a use of force in the context of any

11   political action, whether it's to -- whether it's to raise

12   taxes, whether it's to make a traffic stop, that's what -- that

13   colors the discussion of force in the context of the Radical

14   Agenda all the time.  If somebody is blocking traffic, as was

15   brought up in one of these stops, you know, it's perfectly

16   normal that the police would come and remove those people from

17   the highway.

18          There's a question, I think, in some people's minds

19   as to whether it's appropriate for a private citizen to do

20   that, but in the context of the Radical Agenda, which is

21   marketed as an entertainment product, I'm not so careful in how

22   I discuss it.  And the associated social media properties are

23   extensions of the entertainment product, and they always have

24   been.  It's not something I came up with after this lawsuit.

25   This was recorded, I think it was -- I think we said June.  I

C. Cantwell - Cross

1  think we said July.  It's actually June 2017, I believe.  And

2  so this was two months before I even came to Charlottesville,

3  I'm talking about this stuff.

4          They brought up the camera thing.  So let's do this.

5  I want to move into evidence and show -- publish to the jury

6  CCEX-125.  This is Exhibit 125 on the exhibit list I gave you

7  originally.  This is about the body camera.

8          (Defendant Cantwell Exhibit 125 marked.

9          MR. BLOCH:  Judge, if I understand what's about to be

10  played -- this is a video that you have yourself edited, right?

11          MR. CANTWELL:  Yes.

12          MR. BLOCH:  It has been slowed down.  It has got some

13  font on it.  It's got a number of different --

14          MR. CANTWELL:  I can play the originals if you

15  prefer.  This is just an easy way to show it.  Do you want me

16  to play the originals?

17          MR. BLOCH:  We would prefer the originals.

18          MR. CANTWELL:  Okay.  Pardon me while I grab a piece

19  of paper from over in my area.

20          I wonder if plaintiffs' counsel would -- I don't know

21  if these are in already or not.  But would plaintiffs' counsel

22  consider stipulating to the authenticity and admissibility of

23  132 and 135 in their entirety?  It would be News to Share and

24  Getty.

25          MR. BLOCH:  I'm sorry?

C. Cantwell - Cross

1          MR. CANTWELL:  132 and 135 on my exhibits list.  I

2    believe that's the Getty video and the News to Share video.

3    That's what the clips are sourced from for 125.

4          MR. BLOCH:  We would object to anything that there's

5    not proper foundation for.  So we would not wholesale

6    stipulate.

7          THE COURT:  What's 132?  Which one do you want to

8    play?  And let's take them up separately.

9          MR. CANTWELL:  All right.  132, CCEX-132, this is a

10   video compilation of August 11th, the UVA incident, from an

11   outlet called News to Share.  I can queue up the thing at hand.

12   It just becomes a little bit more clumsy.  So just bear with

13   me.

14         THE COURT:  Well, okay.  What's the problem with it?

15         MR. CANTWELL:  There's --

16         THE COURT:  No, not -- I'm asking the defendant

17   [sic].

18         MR. BLOCH:  Judge, my understanding of what he's

19   about to show is a video taken by a third party that

20   Mr. Cantwell, I believe, is not a percipient witness to.

21         THE COURT:  Can you authenticate it?  That's the

22   problem.

23         MR. CANTWELL:  The portion that I mean to use, I can.

24   I'm in it.

25         THE COURT:  Okay.

27

C. Cantwell - Cross

1          MR. CANTWELL:  What I -- I was trying to make things

2     simpler by having them admit the entire video, and they're not

3     willing to do that.

4          THE COURT:  Okay.  Well, go to the part that you --

5          MR. CANTWELL:  That's what I'm about to do, Judge.

6     Thanks.

7          (Pause.)

8          MR. CANTWELL:  I apologize for my technical

9     difficulties.  It should be going in just a moment.

10          On second thought, I may have to reboot my computer.

11     I'm very sorry.

12          MS. KAPLAN:  Your Honor, if it would help move things

13     along, we're okay with Mr. Cantwell doing this on his direct

14     examination in his case just so that we don't -- to move things

15     efficiently.  It's, of course, up to Your Honor and

16     Mr. Cantwell.

17          MR. CANTWELL:  Efficiently would be playing 125.  I

18     just need to reboot the computer.

19          THE COURT:  If there's anything else, you can take

20     that up now.

21          MR. CANTWELL:  I'm sorry.

22          THE COURT:  I mean, if you can't get this going --

23          MR. CANTWELL:  I just need to reboot the computer and

24     I should be able to get it up.  There was something wrong with

25     the media player.  When I closed it and reopened it, it didn't

C. Cantwell - Cross

1  reopen.  I'm rebooting the computer.  They've had this problem

2  a couple of times during the trial.

3          THE COURT:  Is it rebooting now?

4          MR. CANTWELL:  It is rebooting right now.  It says

5  "restarting" on the screen as we speak.  So once it restarts,

6  then I should be able to pull up the video.  This is a

7  reasonably short thing, and then I can -- and then I can let

8  them move on.  This is just to rebut something that came up

9  during the course of my direct examination.

10          THE COURT:  All right.

11          (Pause.)

12          THE COURT:  How much longer do you think this is

13  going to be?

14          MR. CANTWELL:  It should already have happened.  Why

15  it's making me log in for a third time, I don't know.  Let me

16  give this one more shot, then I'll sit down.  If it doesn't

17  work -- I don't know.  This is not my computer.  I'm doing the

18  best I can.

19          MS. KAPLAN:  Your Honor, I know it's unconventional,

20  but if you want us to play the videos now, we could do that.

21          THE COURT:  Excuse me?

22          MS. KAPLAN:  I know it's unconventional, but if you

23  want us to play those two short videos, we're ready to do that

24  whenever.

25          MR. CANTWELL:  I think it's going in now.  Is

C. Cantwell - Cross

1   plaintiffs' counsel offering to play the videos, is this what I

2   understand?

3           THE COURT:  No, she's offering to play her own.

4           MS. KAPLAN:  Not your videos, our videos.

5           MR. CANTWELL:  Oh, you're offering -- I understand.

6           MS. KAPLAN:  Excuse me for addressing Mr. Cantwell,

7   Your Honor.

8           MR. CANTWELL:  Do I understand the proposal to be

9   that plaintiffs' counsel will play their videos and I can work

10  on my technical issues, and then after their video, I'll return

11  to dealing with this problem?

12          THE COURT:  Yes.

13          MR. CANTWELL:  That's agreeable to me, Your Honor.

14          THE COURT:  Okay.  Thank you.

15          MS. KAPLAN:  Thank you, Your Honor.

16          Your Honor, plaintiffs are going to play two short

17  videos to conclude our case.  The first is Brad Griffin.  These

18  are third-party witnesses.

19          MR. JONES:  Your Honor, we don't have an agreement on

20  what portions of this video can be played.  Which portions are

21  you -- I don't know which portions they're planning on playing.

22          MS. KAPLAN:  I believe we provided you with notice of

23  this, Mr. Jones, as we have with all our designations, but

24  we're happy to hand it over to you again.

25          Again, I'm sorry, Your Honor.  I apologize.

C. Cantwell - Cross

1          MR. JONES:  They made timely deposition designations

2    and then over the weekend changed the deposition designations

3    and I objected to their changes.  So I don't know if they're

4    including the new designations that are untimely or if they're

5    just using the old ones.

6          MS. KAPLAN:  Every designation made over the weekend,

7    Your Honor, was shortening the designations we had already

8    made, in the interest --

9          MR. JONES:  That's inaccurate.  They added portions

10   of the video to their new deposition designations.

11         MS. KAPLAN:  Let's -- here's a proposal, Your Honor.

12   We'll play the video in which we believe there's absolutely no

13   dispute.  I apologize.

14         THE COURT:  Play that which there's no dispute.

15         MS. KAPLAN:  Which is third-party witness Ben Daley.

16   And while that's playing we'll try to work it out with

17   Mr. Jones.  Would that make sense?

18         THE COURT:  Go ahead.

19         (Video deposition of Ben Daley played.)

20         MS. KAPLAN:  Your Honor, as I understand it with

21   respect to the last video, which is Brad Griffin, we've worked

22   out an agreement with Mr. Jones.  We're just going to add --

23   Mr. Spalding needs to add a couple of seconds to the tape,

24   which he's doing right now.  It should only take about

25   ten seconds, Your Honor, and then we can play that.

C. Cantwell - Cross


1           THE COURT:  All right.

2           MS. KAPLAN:  Mr. Spalding is ready and he'll play the

3  tape.

4           THE COURT:  Go ahead.

5           (Video deposition of Brad Griffin played.)

6           MS. KAPLAN:  Your Honor, that concludes our videos.

7  And I believe that, subject to the completion of the

8  cross-examination of Mr. Cantwell by himself --

9           THE COURT:  With regard to that last deposition, was

10  that one that Mr. Cantwell is affected by and should not --

11          MS. KAPLAN:  I believe the answer is yes.

12          Is that correct?  Mike?

13          Yeah, I believe both of them -- okay, not the first

14  one, but yes to the second one.

15          THE COURT:  All right.

16          Members of the jury, I'm going to read this

17  instruction I've read several times about depositions taken

18  when Mr. Cantwell did not have notice or attend.

19          I remind you that each party is entitled to have the

20  case decided solely on the evidence that applies to that party.

21  Some of the evidence in this case is limited under the rules of

22  evidence to some of the parties and cannot be considered

23  against others.

24          The plaintiff introduced the deposition of

25  Mr. Griffin, the last one you just heard.  Such deposition

C. Cantwell - Cross

1   testimony may not be considered by you in connection with

2   Defendant Christopher Cantwell, but it may be used -- may be

3   considered by you in connection with the other defendants.

4              All right.  Mr. Cantwell, did you find your --

5              MR. CANTWELL:  I'm ready, sir.

6              THE COURT:  All right.  Do it.

7                          CROSS-EXAMINATION

8              MR. CANTWELL:  So I also made use of the additional

9   time that I was provided to actually cut these clips out of the

10  video.  So I have separate files and exhibits, which I have yet

11  to provide to plaintiffs' counsel and the clerk, but I'll

12  gladly give to them as soon as I'm done with my presentation

13  here.

14             These will be CCEX-132A and CCEX-135A, which are

15  clips from the indicated exhibits wherein I will be able to

16  authenticate them through seeing myself in them.

17             THE COURT:  All right.

18             (Defendant Cantwell Exhibits 132A and 135A marked.)

19             MR. CANTWELL:  I'll start with 132.

20             THE CLERK:  Mr. Cantwell, just to be clear, is the

21  clip in its entirety just what you want to show, or do I need

22  time stamps for this?

23             MR. CANTWELL:  You do not need time stamps.

24             So 132A is the one I'm about to pull up.  And you

25  don't have this file yet, but I'll give it to you.  And the

C. Cantwell - Cross

 1  entire clip is the --

 2              (Video playing.)

 3              MR. CANTWELL:  Okay.  I'm going to do this at normal

 4  speed.  This is a 19-second clip and a lot happens in it.  So

 5  we have to go through this a couple of times for you to see

 6  exactly what happens.  I'm going to play it at normal speed

 7  first.

 8              THE CLERK:  And they're admitted, Your Honor?

 9              THE COURT:  Yes.

10              (Defendant Cantwell Exhibits 132A and 135A admitted.)

11              MR. CANTWELL:  I'm also going to -- since this seems

12  to be lighter on my screen than elsewhere, I'm just going to

13  increase the brightness using the VLC Media Player, if there's

14  no objection to that --

15              THE COURT:  Go ahead.

16              MR. CANTWELL:  -- just to see this.

17              (Pause.)

18              MR. CANTWELL:  And with that done, in the first frame

19  of the video, I'm going to call everybody's attention right

20  here.  I will make that circle a little bit bigger.

21              Specifically, this expandable baton in that woman's

22  hand.  I'm about to try and disarm her.

23              (Video playing.)

24              This is me.  You might recognize the logo on my

25  shirt.  We've seen it a couple of times.

34

C. Cantwell - Cross

1          (Video playing.)

2          "Take that shit from her, take that shit from her,

3   get that fucking stick."  You hear me say that.  Okay?

4          Now that you have the audio in your head, I can put

5   it into slow motion and we can get a better grasp of what's

6   going on here.

7          The woman I'm attempting to disarm I've identified as

8   Lindsey Elizabeth Moers of Philadelphia.  She's not a UVA

9   student --

10          MR. BLOCH:  Objection to the foundation.

11          THE COURT:  How do you know it's who you say it is?

12          MR. CANTWELL:  This was discovered in the course of

13   my criminal defense investigation.

14          MR. BLOCH:  Objection.

15          THE COURT:  Well, who told you that's who it was?

16          MR. CANTWELL:  My attorney primarily was a man by the

17   name --

18          THE COURT:  Well, you didn't know that night who she

19   was.

20          MR. CANTWELL:  No, not at the time.  No.  Okay.

21   Anyway --

22          THE COURT:  Go ahead.

23          (Video playing.)

24          MR. CANTWELL:  Call the jury's attention to the thin

25   wrist grabbing my collar right there.

C. Cantwell - Cross

1          You hear a man say, "Cantwell, you've got a gun on

2     you."  That man is mistaken.  He knows me to carry a pistol.  I

3     did not have a pistol at UVA.

4          I'll play that one more time before I show it to you

5     from a different angle.

6               (Video playing.)

7          You hear somebody scream "mace, mace, mace," and you

8     see me go like this.  The reason I'm trying to get out of there

9     in such a hurry is because I've just been soaked with pepper

10    spray.

11         Now I'll go to 135A, which is a clip from 135,

12    CCEX-135A.

13              (Video playing.)

14         So this is the same scene, just from a different

15    angle, and pardon the water mark.  This is from a company

16    called Getty Images.

17              (Video playing.)

18         I'm sure you all recognize me by now.

19              (Video playing.)

20         Here's the woman with the baton.

21              (Video playing.)

22         You can see her bringing it down to strike.

23         Over here is the man I pepper-sprayed in the video

24    that was played by plaintiffs' counsel earlier, and he's now

25    spraying pepper spray in that direction.

C. Cantwell - Cross


1              (Video playing.)

2              You may recall the man with the blue shirt with the

3     orange sleeves.  Here he is fighting another man.

4              (Video playing.)

5              I may have to -- two things I want to catch in this

6     video that happened.

7              MS. KAPLAN:  Your Honor, is this being played -- I'll

8     ask Mr. Cantwell.

9              Is this being played in slow motion?  I can't really

10    tell.

11             MR. CANTWELL:  Yes, it is being played in slow

12    motion.

13             MS. KAPLAN:  Okay.  Just so the record will reflect

14    that.

15             MR. CANTWELL:  Yeah.

16             (Video playing.)

17             I'm going to rewind that a little bit and slow it

18    down one more notch.  A lot happens here.

19             (Video playing.)

20             This is the man that I pepper-sprayed in the earlier

21    video.

22             (Video playing.)

23             That's him deploying pepper spray at me.

24             (Video playing.)

25             And this is a little bit blurry, but if you keep your

C. Cantwell - Cross

1  eye right here, you'll see the woman's hand on my shirt,

2  stealing the body camera.

3          MR. BLOCH:  Objection.

4          MR. CANTWELL:  I'm sorry?

5          MR. BLOCH:  Object to the characterization, Judge --

6  I'm sorry.  Objection to the characterization of what she was

7  attempting to do.

8          THE COURT:  Well, I mean, you can tell why you think

9  she was doing something.

10          MR. CANTWELL:  So here you'll see where my body

11  camera used to be.  Then you'll see a woman's hand there, and

12  then there won't be a body camera there anymore.  I'll leave it

13  to you to figure out her intent.

14          (Video playing.)

15          So those are 132A and 135A.  I won't do this over and

16  over again.  If -- I hope that the jury sees fit that they can

17  be instructed on how to do slow motion, because there's

18  obviously a lot going on in that video.

19          I think there's just one other thing that I want to

20  address before I step down, and then I can -- what little, if

21  anything, I have left, I can deal with when I present my own

22  case.

23          You know what?  No further questions.

24          THE COURT:  Okay.  Is that all?

25          MS. KAPLAN:  Your Honor, I think Mr. Bloch has one

                    C. Cantwell - Redirect

1  question --

2            THE COURT:  Okay.

3            MS. KAPLAN:  -- to ask Mr. Cantwell.

4            THE COURT:  Come around back.  We're going to take a

5  break in just a second.

6            (Pause.)

7            MR. BLOCH:  The clips you just made, I want to show

8  them now.

9            THE COURT:  Oh.  Well, we'll take a break.  We'll

10  take a 20-minute recess.

11  **(Jury out, 10:32 a.m.)**

12            (Recess.)

13            THE COURT:  All right.  Mr. Cantwell, come on around.

14  And get the jury.

15  **(Jury in, 10:53 a.m.)**

16            THE COURT:  All right.  You may be seated and

17  proceed.

18            MR. BLOCH:  Thank you, Judge.

19                    REDIRECT EXAMINATION

20  BY MR. BLOCH:

21  Q    If we could just pull up a screenshot from the video you

22  just showed.  This is a screenshot from Exhibit 135A, the video

23  that you just showed; is that correct?

24  A    Yes.

25  Q    And you were here this morning when the deposition of

C. Cantwell - Redirect

1  Benjamin Daley was being played, right?

2  A    Yes.

3  Q    And you agree with me that this that I'm circling is you

4  in this video, right?

5  A    Yes.

6  Q    And this is Benjamin Daley, right?

7  A    It's my first time noticing, but yes.

8         MR. BLOCH:  Nothing further, Judge.

9         THE COURT:  Is that it?

10        MS. KAPLAN:  Your Honor, I have to read in some

11  exhibits from the videos.  That's all for Mr. Cantwell, yes.

12        Ms. Wheeler, for the Griffin video, all we have is a

13  clip report, and that's Plaintiffs' Exhibit 3941.

14        For Mr. Daley, the clip report is 3911 and the

15  exhibits that we seek to introduce as a result of the video

16  played are the following:  Plaintiffs' Exhibit 2655, 1949,

17  2906.

18        THE CLERK:  Wait a second.  I'm sorry.  After 1949 it

19  was what?

20        MS. KAPLAN:  2906, 2659, 1965, 3808, 3530, 0693,

21  3344, 1959, 2675, 1955, and 2583.

22        We'd ask that they be admitted into evidence, Your

23  Honor.

24        THE COURT:  All right.

25         (Plaintiff Exhibits 3941, 3911, 2655, 1949, 2906,

C. Cantwell - Redirect

1  2659, 1965, 3808, 3530, 0693, 3344, 1959, 2675, 1955, and 2583

2  admitted.)

3          THE COURT:  Okay.  You ready?

4          MS. KAPLAN:  Subject to the facts deemed, we're

5  absolutely ready, Your Honor.

6          THE COURT:  Members of the jury, I'm going to read

7  this instruction to you at this time pertaining to Defendants

8  Elliot Kline and Robert Azzmador Ray, Vanguard America,

9  National Socialist Movement, and Matthew Heimbach, who failed

10  to comply with discovery obligations, and as a result I will

11  issue appropriate sanctions against each of them.

12          But one of those sanctions specifically concerns

13  Defendants Elliot Kline and Robert Azzmador Ray.  On account of

14  Defendant Elliot Kline's failure to comply with his discovery

15  obligations in this case, I have imposed as a sanction that the

16  following facts are to be deemed established as true against

17  Defendant Elliot Kline for purposes of this case:

18          One, Defendant Kline was one of the leaders of

19  Identity Evropa from April 2017 through at least August 2017.

20          Two, Defendant Kline entered into an agreement with

21  one or more co-conspirators to engage in racially motivated

22  violence in Charlottesville, Virginia, on August 11 and 12,

23  2017.  Whether such conspirator or conspirators are or are not

24  a defendant or defendants is a question for the jury.

25          Three, Defendant Kline was motivated by animus

C. Cantwell - Redirect

1  against racial minorities, Jewish people and their supporters

2  when conspiring to engage in acts of intimidation and violence

3  on August 11 and 12, 2017 in Charlottesville, Virginia.

4           Four, it was reasonably foreseeable to Defendant

5  Kline and intended by him that co-conspirators would commit

6  acts of racially motivated violence and intimidation at the

7  events in Charlottesville on August 11 and 12, 2017.  Whether

8  such conspirator or conspirators are or are not a defendant or

9  defendants is a question for the jury.

10          Five, after the Unite the Right event in

11  Charlottesville, Virginia on August 11 and 12, 2017, Defendant

12  Kline ratified the racially motivated violence at the event.

13          On account of Defendant Robert Azzmador Ray's failure

14  to comply with his discovery obligations in this case, I will

15  impose as a sanction that the following facts be deemed

16  established as true against Defendant Robert Ray for purposes

17  of this case.

18          One, Defendant Ray was a writer for *The Daily Stormer*

19  from at least July 2016 through at least March 2020.

20          Two, Defendant Ray entered into an agreement with one

21  or more co-conspirators to commit racially motivated violence

22  in Charlottesville, Virginia on August 11 and 12, 2017.

23  Whether such conspirator or conspirators are or are not a

24  defendant or defendants is a question for the jury.

25          Three, Defendant Ray was motivated by animus against

C. Cantwell - Redirect

1   racial minorities, Jewish people and their supporters when

2   conspiring to engage in acts of intimidation and violence on

3   August 11 and 12, 2017 in Charlottesville, Virginia.

4          Four, it was reasonably foreseeable to Defendant Ray

5   and intended by him that the conspirators would commit acts of

6   racially motivated violence and intimidation at the events in

7   Charlottesville on August 11 and 12, 2017.  Whether such

8   co-conspirator or co-conspirators are or are not a defendant or

9   defendants is a question for the jury.

10         Five, after the Unite the Right rally in

11  Charlottesville on August 11 and 12, 2017, Defendant Ray

12  ratified the racially motivated violence that occurred at Unite

13  the Right.

14         The Court will instruct you at a later time with

15  respect to the particular nature of other sanctions imposed

16  against Defendants Elliot Kline, Robert Azzmador Ray, Vanguard

17  America, National Socialist Movement, and Matthew Heimbach.

18         You are cautioned, however, that each party is

19  entitled to have the case decided solely on the evidence that

20  applies to that party.  The facts deemed established which I

21  have just listed are admitted only as to Defendants Elliot

22  Kline and Robert Azzmador Ray respectively.  Thus, taking those

23  facts as true for this case against Elliot Kline and Robert Ray

24  does not relieve plaintiffs of their burden to prove by a

25  preponderance of the evidence that the conduct committed by the

C. Cantwell - Redirect

1  other defendants in the case.

2          All right.  That's your case?

3          MS. KAPLAN:  Your Honor, subject to the UVA policy

4  issue I mentioned this morning, plaintiffs rest their case.

5          THE COURT:  Are you ready to proceed?

6          MR. SPENCER:  Yes.

7          MR. CANTWELL:  I'd like to make a Rule 50 motion.

8          THE COURT:  All right.  Members of the jury, this is

9  probably going to take about ten minutes.  I'm going to let you

10  go back to the jury room.  You have heard the plaintiffs have

11  rested their case and now it shifts to the defendants, but

12  there will be some motions we have to take up before we get to

13  the defendants' case.  So allow the jury to go back to the jury

14  room until we're ready.

15          These motions have to be taken up out of the presence

16  of the jury.

17  **(Jury out, 11:03 a.m.)**

18          THE COURT:  All right.

19          MR. CANTWELL:  Judge, I move to dismiss the case

20  against me, the plaintiffs' claims against me pursuant to Rule

21  50.  I think it's plain to see that they have not -- as best I

22  can tell, they haven't even alleged that I've been involved in

23  a conspiracy.  There's no allegation that I had an agreement

24  with anybody to do anything unlawful.  There has been no

25  evidence that I attempted to harm a racial minority or that

44

C. Cantwell - Redirect

1   that was my intent.  It is simply that I have unfashionable

2   political views and I showed up in a place where violence

3   ensued despite my best efforts.  And so I think that that is a

4   plain situation as a matter of law.

5          I also, to the extent applicable, would seek to

6   incorporate by reference the arguments that I made in some of

7   my motions in limine, which were dismissed as -- or denied as

8   untimely dispositive motions, specifically that animus against

9   Antifa is not an invidiously discriminatory animus in the

10  definition of 1985(3), and that the plaintiffs' claims arose *ex*

11  *turpi causa* and are barred *in pari delicto* as a result of their

12  own immoral or unlawful actions.

13         We have seen video after video where the plaintiffs

14  get up on the stand and they tell us that they were not around

15  anybody who had any weapons and that this was a joyful,

16  celebratory crowd, and then we go one by one and circle the

17  weapons, though they deny seeing them right in front of their

18  faces.

19         So for those reasons, Judge, I think as a matter of

20  law, the plaintiffs' case fails and should be dismissed without

21  troubling these defendants or the jury any further.  Thank you.

22         THE COURT:  All right.  Did anyone else have a

23  motion?

24         MR. KOLENICH:  Your Honor, we are going to file Rule

25  50(a) motions, but we're going to do it in writing prior to the

45

C. Cantwell - Redirect

1  jury receiving the case.

2          THE COURT:  Prior to what?

3          MR. KOLENICH:  Prior to the jury being charged and

4  retiring.

5          THE COURT:  All right.

6          MR. SPENCER:  I would also like to move for a Rule 50

7  motion.  This is a complicated case in the sense that it's an

8  allegation of a conspiracy, but it's very clear that each of

9  the defendants has a unique story to tell about how he was

10  invited to join in this rally, a different story to tell in

11  terms of his own actions before, during, and immediately after

12  the event.

13          Much as with Mr. Cantwell, there hasn't really been

14  an attempt to demonstrate that I conspired with anyone to

15  commit violence.  There are -- there is certainly video that's

16  quite disturbing about people who were -- clearly had bad

17  motives and so on.  There was not even an attempt made to

18  demonstrate that I had any contact with these people or

19  knowledge of them.

20          Professor Simi has testified on the stand that he has

21  spent a thousand hours going over the Discord server where the

22  rally was logistically planned and organized.  He has testified

23  that I was not -- I was not a participant at all in that

24  server.  I have no connection with James Fields outside of him

25  tweeting at me.

C. Cantwell - Redirect

1              At the end of the day, the plaintiffs' case is based

2    on my bold speech saying that we're engaging in a situational

3    war and so on.  That is obviously protected by the First

4    Amendment.  They have not attempted to demonstrate that I

5    conspired with anyone or that I sought out to harm any of the

6    plaintiffs.

7              Thank you.

8              THE COURT:  All right.  Since you raised it, I'll

9    respond to it.  But at this point the Court looks at -- is

10   charged by the law to look at the evidence only in the light

11   most favorable to the plaintiffs.  So disregarding any evidence

12   that you might put on contrary to what they say.  And

13   Mr. Cantwell, just how this looks from the standpoint of the

14   law, in the days leading up to Unite the Right, you exchanged

15   text messages with Defendant Spencer in which you stated, "I'm

16   willing to risk a lot for our cause, including violence and

17   incarceration.  Many in my audience would follow me there, but

18   I want to coordinate and make sure it's worth it to our cause."

19             Mr. Spencer responded, "It's worth it, at least for

20   me."  That is, I believe, PX-3317, referenced in trial

21   testimony yesterday at transcript 239:24 through 240.  To be

22   sure, other explanations of that exchange have been offered by

23   Mr. Cantwell and Mr. Spencer; however, that statement, along

24   with the other evidence in the case could be taken at face

25   value that Mr. Cantwell and Mr. Spencer were willing to risk

47

C. Cantwell - Redirect

1   violence and incarceration for their cause, but wanted to

2   coordinate ahead of time to do so.

3           The Court also notes evidence that Mr. Kessler texted

4   Mr. Cantwell on July 8, 2017:  "Be ready for Charlottesville.

5   It's going to be a BLM/Antifa S show," PX-3317.  Afterward

6   Mr. Cantwell promoted Unite the Right on his podcast and

7   website.  Transcript 225.  Mr. Cantwell has also admitted that

8   he seriously advocates for a white ethnostate and he advocates

9   violence on his podcast.  Indeed, in a podcast less than a week

10  before Unite the Right, Mr. Cantwell admitted he used coded

11  language for the catch phrase, quote, "gas the kikes, race war

12  now."  That's at transcript 236 through 37.  Mr. Kessler was a

13  guest on that program.

14          And on that show Mr. Cantwell again said explicitly,

15  let's have a race war.  He thought there was a good reason to

16  genocide a group of people, referring to Jews.  He made a

17  string of other violent remarks against minorities or others,

18  stating he thought chemical or biological weapons can do a

19  great deal of good for mankind, and saying that immigration

20  makes him want to bash peoples' skulls open.  When Mr. Cantwell

21  left for Charlottesville, he brought with him a bunch of

22  canisters of pepper spray and metal rods that can be used as

23  weapons.  And I know he said that he was maybe going to sell

24  them, but he also said it was for others to use.

25          In the day before Unite the Right, Mr. Cantwell gave

C. Cantwell - Redirect

1  an interview in which he said, "I've got to organize an unknown

2  number of armed extremists I've never met through a hostile

3  environment with death threats and legal intimidation."

4  Transcript 247.

5          On August 11, 2017, Mr. Cantwell marched in a torch

6  march, then pepper-sprayed and beat up someone at the Thomas

7  Jefferson statue.

8          Now, you've got an explanation for all these things,

9  but there's no -- there's no self-defense after you're not in

10  danger.  Because somebody hits you, that doesn't give you the

11  right to beat them to death or beat them within an inch of

12  their life.  There's no self-defense whatsoever to anything

13  Mr. Fields did.  There's just absolutely nothing to justify

14  that.

15          And the fact that you might -- you know, this jury

16  could find -- and this is a theory, I think, of the plaintiffs'

17  case -- that this was a plan to come to Charlottesville with

18  the idea of provoking a fight and apply overwhelming response

19  to it based on racial animus.  And I think there's ample -- you

20  know, construing the evidence in the light most favorable to

21  the plaintiffs, it's a jury issue as to whether you all

22  conspired to do so.

23          And if you listen to that instruction I gave on

24  conspiracy, you don't have to be at the meeting and plan

25  anything.  If you know what the other people are planning and

C. Cantwell - Redirect

1  you go along -- you join in with it, you don't have to do very

2  much.  Just get in there and be there, go along with it,

3  support it; you're part of the conspiracy.

4       I mean, you have a misunderstanding, I'm afraid, of

5  what the law of conspiracy is.  It's a long instruction, but

6  I've read it several times.

7       So I'm denying all the Rule 50 motions at this time.

8       MR. CANTWELL:  Very good.

9       MR. JONES:  Your Honor, I just want to bring up a

10  scheduling issue.  I have a couple of witnesses that I will

11  call.  I did not anticipate that we would get through the

12  plaintiffs' case this quickly, and there's a good chance that

13  the defense -- the other defendants will get through their case

14  fairly quickly today so that we'll have some time.

15       My witnesses won't be here until 9 o'clock tomorrow

16  morning.  They're coming from out of town -- my one witness is

17  coming from out of town.  It will take about half an hour for

18  my case tomorrow morning.

19       THE COURT:  Well, I think if they're coming at 9

20  o'clock in the morning, it's going to be safe to say that we

21  will not be instructing the jury by then.

22       MR. JONES:  Well, I actually don't know that we'll

23  have enough defense evidence to make it even until lunch today.

24  I don't know what the other defense counsel and defendants are

25  doing, but --

C. Cantwell - Redirect

1          THE COURT:  Well, if we don't, I'll be the happiest

2    person in the world.

3          MR. JONES:  I was just going to suggest that perhaps

4    we could work on jury instructions.

5          THE COURT:  I'll feel so good, I won't mind.  All

6    right.

7          MR. JONES:  Anyway, we can perhaps work on jury

8    instructions or something else in the afternoon.

9          THE COURT:  Okay.  We'll do that.  Thank you.

10          All right.  Anything else before we call the jury

11    back?

12          MS. KAPLAN:  Not from the plaintiffs, Your Honor.

13          THE COURT:  You may call the jury.

14          THE CLERK:  Mr. ReBrook has something.

15          MR. REBROOK:  I'll also make a Rule 50 motion, but

16    we'll be doing it in writing.

17          THE COURT:  You may.

18          MR. SMITH:  Your Honor, Josh Smith.  Same here.

19          THE COURT:  Okay, Mr. Smith.

20          MR. SMITH:  Thank you.

21          THE COURT:  Thank you.

22          Call the jury.

23          MS. KAPLAN:  As the jury comes in, Your Honor -- it

24    would really help if Mr. Spencer heard this -- if before he

25    starts a line of questioning, he could say the subject, so we

R. Spencer - Direct

1  can think about any objections we may have.

2        THE COURT:  All right.  The purpose of asking the

3  question, the purpose is so that the other party knows what

4  you're going -- seeking, so they'll know whether to object to

5  it or not.

6        MR. SPENCER:  I don't think there are going to be any

7  surprises in what I'm presenting.

8  **(Jury in, 11:16 a.m.)**

9        THE COURT:  All right.  You may be seated.

10        Are you first, Mr. Spencer?  All right.

11      RICHARD SPENCER, CALLED BY DEFENDANT SPENCER,

12                    PREVIOUSLY SWORN

13                  DIRECT EXAMINATION

14      MR. SPENCER:  My name is Richard Spencer and I'm

15  acting on my own behalf, so I'm in a somewhat unusual position

16  of presenting evidence and also testifying to it.  It's a bit

17  like I'm asking myself questions in a cross-examination.

18        MS. KAPLAN:  I apologize, Your Honor.  Doesn't

19  Mr. Spencer need to be sworn in?

20        THE COURT:  Need what?

21        MS. KAPLAN:  I think Mr. Spencer needs to be sworn

22  in.  Doesn't Mr. Spencer need to be sworn in for his testimony?

23        THE CLERK:  She's asking if he needs to be sworn in,

24  but he was previously sworn.

25        MS. KAPLAN:  Okay.  As long as that's an

R. Spencer - Direct

1    understanding.

2              MR. SPENCER:  So I've been previously sworn in, so

3    this will be like testimony.

4              I am -- with your indulgence, I'm going to try to

5    change the way this is appearing on my screen.  It is very

6    blurry and I can't quite read it.  Let me -- what I might do is

7    just go in and out, if that's okay, because I can read

8    everything just fine here.

9              Okay.  I'm going to begin with a piece of evidence

10   that was already introduced.  This is Defense Exhibit 1001.

11   And this is my correspondence with Mr. Kessler.

12             Already admitted.  Could we publish this to the jury,

13   please?

14             THE COURT:  Yes.

15             MR. SPENCER:  Okay.  I'm going to go to June 5th

16   through the 15th.  So as you see here, this is the text message

17   just above.  This is shortly after C'ville 1.0.  Mr. Kessler

18   has decided that he wants to do his own rally and we had a

19   short conversation about that.  On June 5th he says, "We are

20   going to start the promotional material for Charlottesville

21   2.0, Unite the Right, Battle of Charlottesville.  Is your name

22   going to be one of the headliners?"  And I say, "Firm date?"

23   He says, "August 12 it is brother."  I ask if Enoch, Damigo --

24   I'm kind of getting a sense, if this is going to be like the

25   other events that I've participated in, much like give

53

R. Spencer - Direct

1   speeches, make a big show, get out.  It was just another gig

2   for me.

3          "If they deny the permit, Bristow and I will keep

4   them in court to the point" -- this is Mr. Kessler just saying

5   stuff.

6          He did send me a:  "We're raising an army, my liege,

7   for free speech, but the cracking of skulls if it comes to it."

8   A bit concerning.  I did not respond to that message.  The

9   flowery language made it quite weird to me.

10         Now I want to show you two things that go along.

11         So this is part of the same exhibit.  It's actually

12  embedded in the text messages.  I simply wanted to show this to

13  you right here.  This is actually the first Unite the Right

14  poster that was presented.  It's very similar to the one that's

15  been shown to you a number of times.  My name is not on it.

16  Okay.  And that is what is in that image 4099 right there, JPG.

17         Mr. Kessler responds, "We're ready to add your name

18  when you give us the go-ahead."  My response is, "Give me a few

19  hours.  Lots of people have told me that my name on the poster

20  would make the event dangerous.  Let me ask some people first."

21         So my concern here is that this seems to be kind of a

22  public event.

23         Charlottesville 1.0 was what could be called a --

24  sometimes called a flash mob or a flash protest.  Basically,

25  it's not announced publicly.  You flash in, as it were, do a

R. Spencer - Direct

1   demonstration of some sort, take some photos, post it on social

2   media, and then flash out.  This is a way of avoiding

3   counter-protesting.

4          I did have a sense that Jason wanted something

5   different, and my concern here is at that point I was at the

6   height of my fame, or infamy, depending on your perspective.  I

7   was well-known.  At a rally I had been at in April that was

8   actually about Donald Trump's missile strike on Syria -- I

9   think you might remember that -- Antifa entered the rally

10  chanting my name --

11          MR. BLOCH:  Objection to foundation, "Antifa."

12          MR. SPENCER:  I was there.  I was there, Your Honor.

13          THE COURT:  All right.  Go ahead.

14          MR. SPENCER:  Antifa entered chanting my name and had

15  a bit of a "we're going to get you"-type vibe.

16          So my sense was that -- at this point with

17  Mr. Kessler, my perception was that he wanted to have this

18  Unite the Right, a big tent, all are welcome.  I think what he

19  was attempting at this point was to bring in --

20          MR. BLOCH:  Objection to what he thinks Mr. Kessler

21  was intending --

22          MR. SPENCER:  I'm talking about my perception.

23          THE COURT:  Just a minute.

24          What Mr. Kessler -- he thinks Mr. Kessler is telling

25  him affects him.  So he's talking about his state of mind.  And

R. Spencer - Direct

1  it's permissible, not to prove that Mr. Kessler meant what

2  Mr. Spencer thought he meant, but Mr. Spencer reacts based on

3  what he thinks Mr. Kessler means.  And that's why the evidence

4  comes in.

5          MR. BLOCH:  That's fine, Your Honor.  Thank you.

6          THE COURT:  Go ahead.

7          MR. SPENCER:  Mr. Kessler can speak for himself.  My

8  perception at the very beginning of this stage was that he

9  wanted to have this big tent, bring in lots of people,

10 conservatives, the kind of people who were known as the

11 alt-lite at the time.  That is people who, well, were -- didn't

12 take firm positions, really, on anything and had achieved a

13 kind of e-celebrity.

14         What I was suggesting here is that if I were there,

15 that this could -- this would definitely attract Antifa.

16 Antifa have come to my home, et cetera.  This would make the

17 rally something -- something different.  And that concerned me.

18         Mr. Kessler responded very firmly, "We'll literally

19 fight for your right to speak at this event and I'm not the

20 only one."  And I said, "I know that.  It's a matter of

21 discretion."  I asked to give an hour.

22         And then he suggested -- he's clearly trying to coax

23 me into doing this -- "We have the full cooperation of the

24 police if you need it."

25         And I said, "I know.  Be patient, Jason."

R. Spencer - Direct

1          Well, I took a little more than an hour and then I

2     said, "I'm 100 percent in.  Please put my name on the fliers

3     for the event.  Thank you for your steadfastness.  I really

4     respect and appreciate it."

5          Later on -- and this is, again, embedded in the

6     message chain -- we see a new poster which you have seen

7     before.  And this is a refurbished one.  My name is on the top

8     of it.

9          I want to go to July 23rd.  I am directing him --

10    Eli, to my understanding -- this is Eli Mosley, or Eli Kline,

11    who has defaulted in this case.  It was my understanding -- he

12    was a very energetic activist who -- he was part of Identity

13    Evropa.  That's how I met him.  But he was talking to everyone

14    endlessly and involving himself this way and that.

15         The name right there is interesting.  It says "Greg

16    Ritter."  He'll show up in some photographs in a little bit.

17    His actual name is Greg Conte; he simply went by "Greg Ritter"

18    on Twitter as kind of a pseudonym.  I said, "They make all the

19    decisions for me."  Eli was involved deeply in the promotion

20    and organization, logistical planning of Charlottesville.  I

21    was out of the loop.  Greg Ritter, or Greg Conte, is a friend.

22    He's someone who was working for me.  He was involved in my

23    security.  Again, you'll see him later on.  Apparently they

24    were having a falling-out, according to that message.  I have

25    no idea whether that's true or not.

R. Spencer - Direct

1          Here -- this is August 7th.  Mr. Kessler is saying,

2     "We're going to need to put up a legal challenge."  There was

3     an issue with the permit in the city.  And I said that I'll

4     call Sam.

5          Sam Dickson is a lawyer in Georgia who I knew, and I

6     was simply suggesting that he talk to Sam Dickson -- that is, a

7     lawyer --

8          MR. BLOCH:  Objection, Judge.

9          THE COURT:  What is the objection?  Does it really

10    hurt your case?

11         MR. BLOCH:  I'll withdraw, Judge.

12         THE COURT:  Okay.  Go ahead.

13         MR. SPENCER:  Okay.

14         We now go on later that day into August 8th.

15    Mr. Kessler sends me a message.

16         So just to give you a kind of overview, these are the

17    kinds of things that Kessler would talk to me about regarding

18    the rally, big-picture stuff, or, in this case, legal matters

19    that have nothing to do with the logistics.  "There's a First

20    Amendment attorney in Richmond that may be willing to take the

21    case, but he's gonna require $8,000.  If we all push this on

22    social media we could raise it at RootBocks," some kind of

23    fundraising platform.  I said, "No doubt.  Hold on a moment."

24    Then later he responds, a little bit later that day, hour and a

25    half later, "Now the ACLU is saying they're going to represent

R. Spencer - Direct

1  us in conjunction with Kyle."  That is Kyle Bristow, who is a

2  lawyer in Michigan.  I said, "Amazing.  Let's work with them."

3  I think that was an amazing idea.  "Still awaiting approval

4  from their board, but I was contacted by one of their attorneys

5  and it seems like a very high probability they will take our

6  case" -- "take the case."  Excuse me.

7          This -- now we are getting to the day of the rally,

8  and I am going to -- this will be the last thing.  I'm going to

9  move on to talking about my time on August 11th and then

10 August 12th.

11         "There's a leadership meeting tonight at 7 p.m. in

12 McIntire Park."  I didn't respond and I did not attend.

13         Later on -- this is, I think, right before the

14 torchlight rally was getting started, unless I'm mistaken.

15 There were a number of people gathering in Nameless Field, and

16 I suggested to Jason, "Come out front.  Let's get this

17 started."

18         Later on, there are additional -- you could examine

19 this entire thing.  Later on, there are additional discussions

20 of -- after the event I gave a press conference.  Jason gave

21 his own press conference in Charlottesville and got chased

22 around.  It is basically a:  I'm going to just do my own thing

23 now, Jason.  You can read that, if you would like.

24         I'm going to unplug this real quick and plug back in

25 occasionally.  The only reason is that my screen manifests on

R. Spencer - Direct

1  this screen in this very blurry fashion.

2          Okay.  So let's go to August 11th.  This is a fair

3  and accurate depiction of a tweet I sent.

4          And I would like -- I would submit it as Defendants'

5  Exhibit 1032 and publish it to the jury.

6          THE COURT:  Be admitted.

7          THE CLERK:  1032?

8          MR. SPENCER:  Yes.

9          (Defendant Spencer Exhibit 1032 marked.)

10         (Defendant Spencer Exhibit 1032 admitted.)

11         MR. SPENCER:  This is a photo of myself in front of

12  Nameless Field.  It was tweeted at 10:42 p.m. Eastern time.  I

13  think that suggests that I took the photo and then tweeted a

14  little bit later.  But this, I think, captures a great deal of

15  my experience throughout August 11th.

16         I saw some pushing and shoving here and there.  As

17  you will notice in all of these videos that are showing

18  violence, I am not in any of these videos, at least to my

19  knowledge.  And this, I think, is a good expression of my state

20  of mind at the time.

21         I'd now like to submit for evidence a text exchange

22  with a *Washington Post* reporter named Joe Heim.  And this is

23  1031.  Let me call it up and I'll recognize it and then I'll

24  submit it.  I'm somehow reading the numbers on this screen.

25         So this is a fair and accurate representation of my

R. Spencer - Direct

1    text exchange with a *Washington Post* journalist.  And I submit

2    it into evidence as 1031 and would like to publish it to the

3    jury.

4              THE COURT:  You may.  Be admitted.

5              (Defendant Spencer Exhibit 1031 marked.)

6              (Defendant Spencer Exhibit 1031 admitted.)

7              MR. SPENCER:  At the time, Joe Heim was a reporter at

8    the *Washington Post*.  He got my number somehow and --

9    journalists tend to be able to do that -- and he sent me this

10   message, and we spoke a little bit about the Charlottesville

11   rally.

12             Going down, this is on August 11th at 8 p.m.  So this

13   is before the torchlight rally began.  And Joe Heim sent me a

14   message.  "It's Joe Heim from the Post.  I'm in town.  Is there

15   happening tonight that you know of?"

16             And I said, "Yeah..."

17             I said, "I'll keep you up to date.  I'd be near

18   campus tonight, if I were you."

19             So I'm basically giving him a tip.

20             "Good to know.  Thanks.  Time frame?"

21             I said, "After 9 p.m."

22             He said, "The Lawn?"

23             I said, "Nameless Field."  That's, my knowledge at

24   the time, where everyone was congregating.  Then I said, "We

25   are starting there and marching to the statues at UVA.

R. Spencer - Direct

1  Hundreds and torches."

2          Then we move on a little bit later in the evening.

3          Now, I think it is -- why I'm bringing this into

4  evidence is I invited a reporter from the *Washington Post* to

5  the event.  The notion that I was expecting some kind of awful

6  activity or malign conspiracy for whatever that I was involved

7  in, I don't think, holds much water.  I wanted to promote

8  myself, and I'm inviting what could be fairly said to be a

9  hostile journalist.  I am not in the slightest bit implying

10  that Joe Heim agrees with me on anything.  He probably

11  disagrees with everything.  I wanted him to be there.

12          Joe says this:  "Well, I've already been called a

13  kike and a faggot, so this is going well."

14          Now, that's sarcasm, obviously, but I think it also

15  does get to a bit of the vibe of the alt-right in 2017.  It was

16  all about being juvenile, stupid, and edgy.

17          I said, "Fun and games."  And I said, "Did I see

18  you?"  I said, "I don't think so."  And I said, "Everyone is

19  safe, right?"  And he said, "Yup."  And I gave him a thumbs up.

20  I was concerned about his safety.

21          I'm going to return to this a little bit later, but I

22  would like now to move to August 12th and show you a little bit

23  of my experience during that day.

24          This is a fair and accurate depiction of a tweet I

25  sent at 9:21 a.m. on August 12th.  And I would like to enter it

R. Spencer - Direct

1    into evidence as Exhibit 1033 and publish it to the jury.

2              THE COURT:  You may.  Be admitted.

3              (Defendant Spencer Exhibit 1033 marked.)

4              (Defendant Spencer Exhibit 1033 admitted.)

5         MR. SPENCER:  I think this is an accurate depiction

6    of my state of mind at the time.  I published this on Twitter.

7    I was happy, confident, ready to go.  I said, "Let's do this.

8    #charlottesville."

9              Things would change.

10             I am now going to play some audio for you.  This

11   audio was taken from -- I recorded this audio myself.  It was

12   taken from a Periscope video.  Now, Periscope is no longer

13   offered by Twitter.  I was able to download it.  So what has

14   happened is I've lost the video, but I still have the audio.  I

15   wish I had the video.

16             Do you have the video?  It's a ten-minute video.

17   Okay.

18             I would play the video for you.  It simply amplifies

19   the situation.  But actually, the audio is very interesting.

20   And you have to listen close.  I might stop here and there to

21   point something out.  But I want you to listen closely to it.

22             MS. KAPLAN:  Your Honor, before Mr. Spencer does

23   this, I was unclear from the testimony.  Can we confirm it's

24   Mr. Spencer's voice on the audio?

25             MR. SPENCER:  More than my voice, but I will point

R. Spencer - Direct

1  out my voice.  Yeah.  I'll stop it just to make everything

2  clear.

3           This is 1016.  This is so hard to see.  I'm just

4  going to unplug real quick and plug back in.  Here it is.

5           So I put this photo there.  This is a photo that was

6  actually submitted by the plaintiffs, so I don't think they

7  would object.  It actually is -- that photo was taken around

8  this time.

9           THE CLERK:  Just so we're clear, this is admitted,

10  Mr. Spencer?

11          MR. SPENCER:  Oh, sorry, it's not admitted.  So this

12  is Defendants' Exhibit 1016.  This is a fair and accurate

13  depiction of audio recorded at around 12 noon on Saturday,

14  August 12th, and I would like to submit it into evidence and

15  publish to it the jury.

16          THE COURT:  Be admitted and you may publish.

17          (Defendant Spencer Exhibit 1016 marked.)

18          (Defendant Spencer Exhibit 1016 admitted.)

19          MR. SPENCER:  Let me check here to make sure.  I

20  think this is going to work in terms of audio, but if not,

21  we'll have to work that out.

22          (Audio playing.)

23          Okay.  That is my voice, as you might perceive.  I am

24  speaking to the assembling police from the state of Virginia

25  who were -- as you can see in this photo, militarized.  And as

R. Spencer - Direct

 1  I said, I said, "Don't do it.  You don't want to do this."

 2            (Audio playing.)

 3            Now, around this time, this is after the state of

 4  emergency has been declared.  This was of course before any

 5  speeches were given at the Unite the Right rally.  And I would

 6  say at this time most everyone had already left Emancipation

 7  Park and had gone into Market Street.

 8            (Audio playing.)

 9            I'm talking to the police at this moment.

10            (Audio playing.)

11            I'll just stop right there.  I cannot recognize who

12  is saying that.  It's someone who is nearby, he's saying,

13  "You're pushing us out into Antifa."

14            (Audio playing.)

15            So at the time when I was saying "we're not going

16  anywhere," I was planning on engaging in a kind of passive

17  resistance, you could say.  You're going to have to push us off

18  the field, basically.  You'll hear more about that as the audio

19  goes on.

20            (Audio playing.)

21            I told other people nearby, I said, if you're not

22  willing to be arrested, just go, because this is getting really

23  bad.  The police were out in force.  They were marching us off

24  the field.

25            (Audio playing.)

R. Spencer - Direct

1        I'm talking to the police when I say, "I don't hate

2   you," just to make that clear.

3        (Audio playing.)

4        At that time my perception was that the ACLU had our

5   backs in a legal case.

6        (Audio playing.)

7        I could show this to you, I don't think I need to.  I

8   was sprayed with mace as I was entering the park.  It wasn't

9   that bad.  Someone jumped out of the crowd and sprayed in the

10  air.  Not nice, nothing that terrible, but it is an assault.

11  So that happened before I entered the park.  So that was around

12  11 a.m. or so.  Again, we're here just after noon.

13        (Audio playing.)

14        That is passive resistance.

15        (Audio playing.)

16        Okay.  Now, you hear kicking.  They were kicking us.

17  They had shields.  They were expelling us from the yard and

18  they were kicking us in the shins under the shield.  You can

19  actually hear that and you can hear me go (indicating sound).

20  So that's what's happening right now.

21        (Audio playing.)

22        I'm again speaking to the police, "We're not going to

23  resist you.  Please calm down."

24        (Audio playing.)

25        Just to make clear, I'm saying, "I'm not going to

R. Spencer - Direct

1   hurt you, man," to the police.  As the old saying goes, when

2   you fight the law, the law usually wins.  We are being kicked

3   and brutally expelled from Emancipation Park.  They won.

4            (Audio playing.)

5            At this point I had been maced by the police.  It was

6   bear spray in the face.  That got my attention.  I was

7   discombobulated.  You actually heard Greg Conte -- I'm all but

8   certain that's Greg Conte's voice, and it's in the background,

9   you just heard it, "We've got to protect Richard."  So now

10  we're going to make our movement out of the park.

11           (Audio playing.)

12           Okay.  That's the first time I said "We need to go."

13  I had been maced in the face.  There was talk of "get fresh

14  water."  I think soap would come a little bit later.  That's

15  when I said we need to get out of this park.

16           So again, I engaged in passive resistance with the

17  police.  That is the most violence I was involved in that

18  entire weekend.  And we are making a run for it effectively

19  because at this point chaos was beginning to descend.

20           (Audio playing.)

21           Greg Conte said "This is not going to work out for

22  us."

23           (Audio playing.)

24           That's it.  That last voice was Greg Conte's again,

25  "Richard, let's go, Richard, let's go."  There are also people,

R. Spencer - Direct

1    I don't think Greg said that, but someone else around said
2    "we're surrounded."  That's not a reference to the police.
3    That's being surrounded by chaos, I'm sure counter-protesters,
4    but just chaos, all on Market Street.  That's where we're being
5    pushed.  You know the layout of the park.
6              I would like to now publish some photos that --
7    they're all going to be 115A through E.  They're actually all
8    taken from the same Instagram account.  I will just open them
9    all and then I'll show them to the jury.
10             THE CLERK:  Move for their admission, Mr. Spencer?
11             MR. SPENCER:  Yes.  So these are fair and accurate
12   depictions, and I would move for their admission as Defendants'
13   Exhibit 1015A through E and publish them to the jury.
14             MS. KAPLAN:  While we don't think they were
15   previously produced, Your Honor, we don't have any objection.
16             THE COURT:  Be admitted and you may publish.
17             (Defendant Spencer Exhibits 1015A through 1015E
18   marked.)
19             (Defendant Spencer Exhibits 1015A through 1015E
20   admitted.)
21             MR. SPENCER:  This is immediately upon leaving the
22   park.  The shirt I was wearing is covered in a combination of
23   sweat and mace.  And I have clearly been maced again by the
24   police.
25             This is someone, I don't know who, but he's pouring a

R. Spencer - Direct

1  water bottle after I had been maced.

2          That's a similar shot.  There's me getting doused

3  with water.

4          This is Greg Conte.  When I talked about planning for

5  Charlottesville, it was basically Greg and me getting in and

6  out safely.  This is Greg.  I was -- he was not maced.  I was

7  completely discombobulated at the time.  And this is us finally

8  getting past Market Street and out.

9          Okay.  I'm now going to play another Periscope video.

10  And because this one is shorter, the video, not just the audio,

11  was saved when I got it from Twitter.  So this -- you'll see

12  audio in this as well.

13          And -- all right.  This is a fair and accurate

14  depiction of a video that I took, and I would like to submit it

15  as evidence as Defendants' Exhibit 1017 and publish it to the

16  jury.

17          THE COURT:  You may publish.

18          (Defendant Spencer Exhibit 1017 marked.)

19          (Defendant Spencer Exhibit 1017 admitted.)

20          (Video playing.)

21          MR. SPENCER:  I think there's more to that one.  I

22  might find -- with your indulgence, that one got cut off a

23  little bit.  It might have been when I rendered it.  There's

24  just a little bit more.

25          Okay.  I'm just going to play this in a different

R. Spencer - Direct

1  file format, but it is the same thing.  And I will fast forward

2  ahead so I don't duplicate anything.  So this is the same

3  exhibit.  And I'll clean up anything on the back end.  I'll get

4  to a part where we were.

5           I'm no longer hearing it.  Oh, right, because I

6  haven't plugged it in.

7           (Video playing.)

8           Well, the same thing happened.  I think there was

9  just a little bit more.  Yes, so what is happening there is

10  that I was expressing very strong frustration.  I said -- the

11  cliche I was using was "expect the unexpected."  You should

12  always have a plan B or an escape route, etc.  I never imagined

13  that what was going to happen was going to happen.  The idea

14  that we were planning -- or I was at the very least planning on

15  this chaos is simply undermined by my very visceral reaction at

16  the time.

17           I would like to enter in my own defense the audio

18  rant that has been played for you previously a few times.  I

19  will apologize to you for making you listen to it again.  It is

20  a fair and accurate representation of my voice.  It is -- my

21  copy is Defendants' Exhibit 1018.  I would like to submit it

22  into evidence and publish it to the jury.

23           THE COURT:  Be admitted, and you may publish.

24           (Defendant Spencer Exhibit 1018 marked.)

25           (Defendant Spencer Exhibit 1018 admitted.)

R. Spencer - Direct

1      MR. SPENCER:  Let's just play it once more.  This was

2  taken later on that day, after the death of Heather Heyer had

3  been known to the public, probably after the first time I ever

4  heard the name James Fields in my life.  And I think it's

5  important that you get the truth and the whole truth.  And the

6  whole truth is not always nice.  The whole truth sometimes

7  contains a lot of warts.  And these are mine.

8      MS. KAPLAN:  Your Honor, I understand he's *pro se* and

9  it's difficult, but can we just limit the discussion to facts

10 rather than truth, whole truth.

11     THE COURT:  Right now just put on evidence.  Don't

12 comment.

13     MR. SPENCER:  Fair enough.

14     (Audio playing.)

15     Okay.  I want to put that into context.  I began

16 saying, "I can't believe they did this, I'm so fucking angry

17 right now."  I was so fucking angry at that point with the

18 Charlottesville and state police for destroying what I thought

19 was going to be yet another stop on the Spencer promotional

20 tour.  It was another point where I would be able to say things

21 that I sincerely believe in, that are provocative, and that

22 would certainly gain attention and promote my career.  And I

23 felt that the Charlottesville police had destroyed that, and I

24 was also morally outraged at the fact that they did this.

25     In a -- when I was feeling powerless, feeling

R. Spencer - Direct

1 extremely frustrated, I descended into an infantile,

2 despicable, and shameless rant.  That rant was heard by, I

3 believe Mr. Kessler agreed, half a dozen to ten people in a

4 private room.  That rant was given after I had experienced what

5 I had experienced on August 12th, after it had -- it was

6 dawning on me that this thing was a disaster, and that it was

7 going to be viewed not as the latest stop on the Spencer tour,

8 but as something deeply shameful.  I descended into a childlike

9 rage.

10          I'm going to have to live with this.  It's true.  It

11 is me.  It is certainly the worst part of me, but there it is.

12 I enter that in my defense as an expression of my shame,

13 outrage, fear, and similar emotions with -- regarding to how

14 the event turned out.  That is one of the most awful things in

15 the world, but it might actually be a real one.

16          MS. KAPLAN:  Your Honor, same objection.  He's

17 putting it in.

18          MR. SPENCER:  I'm testifying.

19          THE COURT:  He's explaining why he said it.  It's in

20 evidence.

21          MR. SPENCER:  I am now going to return -- this has

22 already been admitted.

23          This is, you might remember, my correspondence with

24 the *Washington Post* reporter, Joe Heim.  On August 12th, 2017

25 at 1:10 p.m., he says that -- I had gone to McIntire Park.  I

72

R. Spencer - Direct

1  had actually spoken to reporters and supporters -- supporters

2  and the media, and he had heard that.

3         Then we move to August 12th.  "Did you happen to know

4  the driver of the car, James Alex Fields?"  This is around the

5  time when his name had first reached recognition.

6         I said, "No, never heard of him."

7         "Do you have any comment on his actions that left one

8  dead and 19 injured?"  And I'm sorry this gets cut off a little

9  bit, but it's still legible.  "And do you believe you bear any

10 responsibility for this happening?"

11        I said, "I absolutely bear no responsibility.  I'm

12 deeply saddened by the actions.  But we need to let the dust

13 settle.  We don't really know what happened."

14        MS. KAPLAN:  Your Honor, can we get a similar

15 instruction that this is limited only to Mr. Spencer's state of

16 mind and can't be offered for the truth?

17        MR. SPENCER:  Oh, yeah.  Oh, yeah.  That's how I'm

18 presenting it.

19        MS. KAPLAN:  It's classic hearsay, Your Honor, so if

20 it's for state of mind, that's one thing, but...

21        MR. SPENCER:  It's my state of mind as I'm

22 communicating it.

23        THE COURT:  He can explain how he felt.  There's lots

24 of evidence about how -- the reaction to this, and he can tell

25 us his personal feelings.

73

R. Spencer - Direct

1          MR. SPENCER:  Right.

2          THE COURT:  But it's not necessarily true.  If he

3   describes something else, that's not admissible for the truth

4   of it, but only as to how it affected him.

5          MR. SPENCER:  I recognize this as a fair and accurate

6   depiction of a tweet I made at 12:38 p.m, and I would like to

7   submit it into evidence as Defendants' Exhibit 1039 and publish

8   it to the jury.

9          THE COURT:  Be admitted, and you may publish.

10         MR. SPENCER:  So this was shortly after being

11  expelled from the field.  This is 12:38 p.m, as you can see, on

12  August 12th.

13         (Defendant Spencer Exhibit 1039 marked.)

14         (Defendant Spencer Exhibit 1039 admitted.)

15         MR. SPENCER:  This is also coming after I made that

16  car video where I was describing what happened and expressing

17  outrage.  I certainly had some bad moments that day, but I also

18  had some good moments.

19         This is a tweet that went out at 12:38 p.m.  That is

20  roughly 45 minutes to an hour before the death of Heather

21  Heyer, but after it had become clear to me that chaos was

22  beginning to reign in Charlottesville.  And I tweeted this out

23  publicly to anyone who would read it.  Of course, the people

24  who were my supporters at Unite the Right would probably be

25  more likely to read it, but at this point I have tons of

74

R. Spencer - Direct

1  people -- I'm sure hundreds of thousands.  "My recommendation:

2  Disperse.  Get out of Charlottesville city limits.  State of

3  emergency has been called."

4          I had some bad moments; I had some good moments.  I

5  made the right call.  If that call had been heeded, much less

6  violence would have occurred.

7          MS. KAPLAN:  Again, Your Honor, he's getting close to

8  argument.  I understand he's *pro se*, but it's starting to sound

9  more like a closing than testimony.

10         THE COURT:  Sustained.

11         MR. SPENCER:  Okay.  Your Honor, I have one more

12  thing that I want to do, but if you would like to break now, I

13  could do that afterwards, or I could get started, depending

14  on --

15         THE COURT:  We can go on to 12:30 at least.

16         MR. SPENCER:  Okay.  One last tweet.

17         I think you saw this yesterday.  This is -- or you

18  saw one part of this yesterday.

19         This is a fair and accurate depiction of a tweet I

20  made on August 18th, 2017.  I would like to submit it to

21  evidence as Defendants' Exhibit 1019 and publish it to the

22  jury.

23         THE COURT:  Be admitted.  Publish it.

24         (Defendant Spencer Exhibit 1019 marked.)

25         (Defendant Spencer Exhibit 1019 admitted.)

75

R. Spencer - Direct

1          MR. SPENCER:  Well -- I'll read it for you first.

2          So a few days after the event, at least for me,

3  emotions had subsided.  Kessler tweeted out, "Heather Heyer was

4  a fat, disgusting communist.  Communists have killed

5  94 million.  Looks like it was payback time."  And he links to

6  *The Daily Stormer*.

7          I saw this, and I guess in about an hour after it had

8  been published, I tweeted this:  "I will no longer associate

9  with Jason Kessler; no one should.  Heyer's death was deeply

10  saddening.  Payback is a morally reprehensible idea."

11          Now, to be fair to Mr. Kessler, emotions are high,

12  and I can to some degree -- being that --

13          MR. KOLENICH:  Objection.  This is argument, not

14  evidence.

15          THE COURT:  Sustained.  Just a minute.

16          THE CLERK:  Never mind.  I'm sorry.

17          MR. SPENCER:  Can I also describe my state of mind at

18  the time?

19          THE COURT:  Well, you -- but your state of mind about

20  you, not about Mr. Kessler or anything like that.

21          MR. SPENCER:  Fair enough.

22          THE COURT:  You'll have an opportunity to argue in

23  your closing argument.

24          MR. SPENCER:  Good.

25          I -- this was days after the event.  I wanted to get

7.6

R. Spencer - Direct

1  as far away from Jason Kessler as possible.  I don't think

2  there's much more that needs to be said.

3         Okay.  I don't want to turn this into a lecture or

4  anything like that, but I am going to now show you a short

5  piece that the plaintiffs actually brought up during my

6  cross-examination.  It's a piece that I published on

7  August 11th that was made in collaboration with some other

8  people, sure, but it was certainly my words.  I think it

9  expresses the way that I was thinking at the time, and it also

10 expresses what I wanted to gain from the event.  And that is a

11 piece that's already been showed to you -- well, I don't even

12 need to show it.  I tweeted it out on August 11th.  I don't

13 need to show that.

14        Let me find this.  Here it is.  Okay.  1021.  This is

15 so blurry.

16        So this is Defendants' Exhibit 1021.  It is a fair

17 and accurate representation of an article that I penned called

18 "What It Means To Be Alt-Right" published on August 11th, 2017.

19 And I would like to submit it to the jury -- sorry, submit it

20 into evidence and publish it to the jury.

21        THE COURT:  All right.  Be admitted.

22        (Defendant Spencer Exhibit 1021 marked.)

23        (Defendant Spencer Exhibit 1021 admitted.)

24        MR. SPENCER:  This is -- this was published the day

25 of the torchlight rally, a day before the August 12th event.  I

R. Spencer - Direct

1    got a feeling that this was going to be a very large rally,

2    that there was a tremendous amount of interest, and I wanted to

3    kind of sum up how we felt at the time.  Now, my thoughts have

4    evolved a bit since then, but this is accurate, what I was --

5    how I thought at the time.

6              This is a -- I think 20 points -- 18.  This basically

7    took up some major topics and communicated how I think we

8    should think about them.

9              Race.  Race is real.  Race matters.  Race is the

10   foundation of identity.  White --

11             THE COURT:  Are you going to go through this whole

12   thing?

13             MR. SPENCER:  I am.

14             THE COURT:  No.  It's already in evidence and it's

15   just not -- you can sum it up, but you're not entitled to --

16             MR. SPENCER:  Your Honor, the plaintiffs have taken

17   three and a half weeks of going through all sorts of --

18             THE COURT:  Well, I know, but this -- this is -- this

19   is -- it's in evidence if the jury wants to read it.  Now, you

20   can highlight it, but not go through the whole thing.  I mean,

21   you all discussed it in your direct.  You were asked about it.

22   You testified about it.

23             MR. SPENCER:  Okay.  That's fair.

24             THE COURT:  All right.

25             MR. SPENCER:  This is a definition.  I began with the

R. Spencer - Direct

1   definition of race as a foundation of identity, as something

2   that we are born into and that is -- as I understood it at the

3   time, is a kind of basis for our identity as we achieve it

4   afterwards.  You can have many different forms of personal

5   identity.  You can have duties, loyalties, hobbies, all sorts

6   of things.  But your family that you are born into is

7   paramount.  There is a concept of Indo-European or Aryan that

8   is a very large genetic cluster, including the Europeans,

9   including many people who are now Hindus, and so on.  It's a

10  language group, mostly.  And I also define European as a kind

11  of Celtic, Germanic, Hellenic, Latin, Nordic, and Slavic.  That

12  is all the people of Europe, and I think they have, maybe, a

13  more closely aligned identity within that.

14          I define -- now, obviously talking about Jews is --

15  at least in this context -- is rather controversial, but I

16  think you can examine how I was depicting them.  My thoughts

17  have evolved on this a bit, but this is accurate for the time.

18  They're an ethnoreligious people.

19          MS. KAPLAN:  Your Honor --

20          MR. SPENCER:  You know, I'm not going to be perfect.

21          MS. KAPLAN:  I know.  I understand.

22          Your Honor, relevance on how his thoughts have

23  evolved, or that they have evolved.

24          MR. SPENCER:  Okay.  Well, I'll cut that off.

25          THE COURT:  He just said it.  But --

R. Spencer - Direct

1          MR. SPENCER:  Well, I'll actually mention this:  I am

2   not claiming to you that I have somehow seen the light and I'm

3   now going to speak out against antiracism like you have heard

4   from Jeff Schoep and Samantha Froelich.  To be frank, I don't

5   buy it for those people, to be frank, both of them.  I am

6   still, no doubt, an ideological radical, but there is also a

7   way that I can evolve, and I imagine, to be honest, the failure

8   and disaster of Charlottesville had something to do with that.

9   But I am not claiming that you should not punish me because I'm

10  now a liberal.  I'm not.  I will always be honest.

11          MS. KAPLAN:  I ask that that be stricken.

12          MR. SPENCER:  You asked for it.

13          THE COURT:  Go ahead, Mr. Spencer.

14          MR. SPENCER:  At various times, Jews have existed

15  within European societies, but I think I was asked at one point

16  in 2016, "Are Jews white?"  And my answers was:  "Jews are

17  Jews."  I think what is unique about them is the fact that they

18  have remained a people over millennia is one of the greatest

19  miracles in the world.  It has quite a bit to do --

20          THE COURT:  All right.  That's not --

21          MR. SPENCER:  Okay.  Fine.  I mean, Your Honor, they

22  have taken up so much time.

23          THE COURT:  It makes no difference.

24          MR. SPENCER:  Well, it does make a difference.

25          THE COURT:  That doesn't give you three weeks because

R. Spencer - Direct

 1  they took three weeks.  I have done my best to try to keep this

 2  to evidence that's only admissible on the issues in this case.

 3  Now, I know I've failed many times, but the fact that I might

 4  have let something come in that shouldn't have come in doesn't

 5  change the rules.  I have to try every time.  And this is going

 6  beyond the scope of this trial.

 7          The questions are -- the issue is:  Did you conspire

 8  with anyone to come here and commit racial animus-based

 9  violence?  And that's what the defense ought to be.

10          MR. SPENCER:  I get it.

11          THE COURT:  You may not come and justify your

12  beliefs.  No one is entitled to do that.  We are sticking to

13  the elements of the case that the plaintiff has to prove.

14          MR. SPENCER:  Your Honor, with respect to my case,

15  the plaintiffs have never stuck to the real truth, because they

16  have not even attempted to demonstrate that I was conspiring to

17  commit violence.  They stuck to my ideology and claiming that

18  I'm a terrible human being.

19          THE COURT:  Okay.

20          MR. SPENCER:  And that should be enough.  And I'm

21  trying to humanize myself, and I'm going to do it in a very

22  reasonable amount of time.

23          THE COURT:  Okay.  But right now we're going to go to

24  lunch.  Think about it and try to adhere to what I've said.

25          MR. SPENCER:  Yes, sir.

R. Spencer - Direct

1          THE COURT:  We're going to take one hour now for

2     lunch.  Come back at 1:30.

3          Do not discuss the case with anyone or allow anyone

4     to discuss it with you or remain within hearing of anyone

5     discussing it.

6     **(Jury out, 12:31 p.m.)**

7          (Recess.)

8          THE COURT:  All right.  Mr. Spencer, just to follow

9     up on what I told you earlier:  The reason the plaintiff in

10    this case took three weeks -- and maybe they took more time

11    than they needed to, but they have the burden of proof.

12         MR. SPENCER:  Fair.

13         THE COURT:  They have nine plaintiffs they have got

14    to prove in a case against 21 defendants.  You are one person,

15    not, you know, all of them.  And if the tables were turned, if

16    there were Jewish people who came to Charlottesville and

17    attacked or had a fight with Christians and the Christians

18    wanted to sue the Jewish people, they would have to prove that

19    the Jewish people acted with religious or racial animus.  And

20    they would take -- they would be in the same position as the

21    plaintiffs.

22         MR. SPENCER:  Okay.

23         THE COURT:  The fact -- I mean, I know it hurts your

24    reputation to be in this situation, but the fact that you're a

25    nice person is not -- not a defense.  The defense has to be

R. Spencer - Direct

1   that you didn't -- you did not conspire, and if you did

2   conspire, you planned to come here only for --

3            MR. SPENCER:  Right.

4            THE COURT:  -- peaceful reasons.

5            MR. SPENCER:  Can I say two things really quick?  And

6   I'll keep it very brief.

7            I have not asked for a character witness to come in

8   at any point.  So I'm not really claiming that I'm a nice

9   person, because I'm kind of a very flawed person, so I've

10  actually kept character out of this.

11           I'm talking about this because this is published the

12  day of the rally.  If I were sending out messages to people,

13  it's going to be here.  That's why I'm doing it.

14           But I do hear you, and I will respect what you just

15  said.

16           THE COURT:  All right.  But the issues in the case,

17  the main thing is:  Did you join a conspiracy that may have

18  already existed?

19           MR. SPENCER:  Right.

20           THE COURT:  Were you a part of it?  And were you

21  motivated -- was the conspiracy -- not so much you, but was the

22  conspiracy motivated by racial or religious animus?

23           MR. SPENCER:  Correct.

24           THE COURT:  Okay.  Let's call the jury back.

25  **(Jury in, 1:33 p.m.)**

R. Spencer - Direct

1          THE COURT:  All right.  You may be seated.

2          And you may proceed, Mr. Spencer.

3          MR. SPENCER:  I will be brief.  I'm going to focus on

4    two key ideas.

5          Again, this essay is short.  It's available for you

6    to read.  I'm going to submit two additional essays by me that

7    are kind of summarized in this document.  You could read those,

8    if you'd like.

9          I would remind you, now that we're back, this was

10   published the day of the torchlight rally in the morning.  It

11   was the most-viewed article on that website called

12   alt-right.com.  So this is about as timely and relevant as you

13   can get.  This was viewed by many different people, but I think

14   it's fair to say that it was viewed absolutely by the people

15   attending the rally.  I can't estimate, but it's fair to say

16   that -- I don't know -- a third or a half of them actually read

17   this on the day it was published.  And so I think it is quite

18   relevant in that sense.

19         I'm going to focus on two things.  One is the concept

20   of the ethnostate, and the other is metapolitics.

21         It's been suggested by the plaintiffs that

22   Charlottesville was about a racial ethnostate, and maybe even

23   creating one at the time and so on, by engaging in, you know,

24   fights with Antifa.

25         Now, I can't speak for everyone who attended and I

R. Spencer - Direct

1    cannot speak for all of the defendants.  Throughout my career

2    and certainly on the day of the event, my message to everyone

3    was that the ethnostate is a big government -- governmental

4    concept.  You don't create an ethnostate by getting in

5    fisticuffs with Antifa.  An ethnostate could only exist on that

6    highest plane of politics, which is the level of the state.

7            I'm going to just read two very short paragraphs and

8    that's it.

9            "Nations must secure their existence and uniqueness

10   and promote their own development and flourishing.  The state

11   is an existential entity."

12           I actually agree with Christopher Cantwell in the

13   sense that, on some basic level, politics is violence, in the

14   sense that politics isn't consensual.  When the government

15   makes you pay a parking ticket or when the government puts you

16   in prison, it is using force.  And who is able to use force is

17   the fundamental political question.

18           So the state is an existential enemy -- the state is

19   an existential entity, excuse me.  You can't get away from it.

20   It is, at best, a physical manifestation of the people's being,

21   order, and will to survive.  Racially or ethnically defined

22   states are legitimate and necessary.

23           I did purposely use generalized language.  There are

24   racial and ethnically defined states right now.  Japan is an

25   excellent example.  Israel is an excellent example.  To a

R. Spencer - Direct

1   degree, Sweden is a state for the Swedish people.

2           The other thing I wanted to stress, and then I'll

3   move on, is the concept of metapolitics.  Now, this essay is

4   called "A metapolitical manifesto for the alt-right movement."

5   "Meta" is a Greek word that means "over" or "across."  You know

6   words like "metaphor."  You might know a word like

7   "metaphysics."  I won't go into it, but Plato, the idea that

8   there are -- you know, the ideal of beauty is out there.  There

9   are things that are beautiful, but there is beauty in itself

10  somewhere.  That is metaphysics.  Deeply Christian concept as

11  well, for what that's worth.

12          I am making a metaphysical -- a metapolitical or

13  metaphysical, you could say, statement.  Spirit is the

14  wellspring of culture, and politics is downstream of that.  So

15  culture and politics emerge from spirit, or you could say

16  psyche.  The alt-right wages a situational and ideological war

17  on those deconstructing European history and identity.

18          So spirit is at the core of this.  And in that realm,

19  as I imagined it at the time, the alt-right is engaging in a

20  situational and ideological war.  There has been a lot of talk

21  about declaring war and so on.  This, if you determine it, is

22  an expression of what I meant by that.

23          I hope that was brief, and I'll leave it there.

24          THE COURT:  All right.  Thank you.

25          All right.  Will you take the stand so that you can

R. Spencer - Cross

1  be cross-examined?

2        MR. SPENCER:  Yes.

3        MS. KAPLAN:  Would you like us to go first, Your

4  Honor?

5        THE COURT:  Yes.

6        (Pause.)

7        MR. BLOCH:  My apologies, Judge.

8                        CROSS-EXAMINATION

9   BY MR. BLOCH:

10 Q    Good afternoon, Mr. Spencer.

11 A    We meet again.

12 Q    Mr. Spencer, could we pull up the tweet that -- the

13 retweet about Heather Heyer.  I believe it was D -- is it 1039?

14 1019?

15       Could we pull that up, Mr. Spalding.

16       It's possible that -- do you have --

17 A    I could help you out if you want me to, but I would have

18 to leave this box.  It's up to you.

19       MR. BLOCH:  Do you have a hard copy?

20  BY MR. BLOCH:

21 Q    I believe I'm referring to D1019, and this was a tweet

22 that you just showed where you were retweeting what Mr. Kessler

23 tweeted about Heather Heyer, right?

24 A    Correct.  Correct.

25 Q    And Mr. Kessler tweeted about Heather Heyer at August

R. Spencer - Cross

1   18th, 2017 at 11:25 p.m; is that right?  Do you need to see

2   this to refresh your recollection?

3   A    I'll take your word for it.

4   Q    And you then retweeted Mr. Kessler's tweet, and your tweet

5   was, "I will no longer associate with Jason Kessler.  No one

6   should.  Heather's death was deeply saddening.  Payback is a

7   morally reprehensible idea."  Right?

8   A    Yes.

9   Q    And you tweeted that at 12:38 a.m. on August 19th, 2017;

10  is that right?

11  A    That sounds right.

12  Q    Isn't it true, Mr. Spencer, that the reason why you

13  tweeted that was as a tactical move to improve your legal

14  situation?

15  A    No.  I had no idea about my -- this case came months

16  afterward.  No, that is an honest move.  That kind of

17  discussion, particularly written, that is gross.

18  Q    And just to be clear, you were involved -- there was a

19  lawsuit against you at that time that had already been

20  initiated, right?  We talked about that?

21  A    That might be true.  Yeah, I do remember a kind of lawsuit

22  that emerged almost immediately, I think.  It withered on the

23  vine.

24  Q    Okay.  If I could introduce PX-3960A, 3960B, 3960C, D, E,

25  F, G, I, J, U, DD, and EE.  And I believe -- is there another

88

R. Spencer - Cross

 1  copy so I can give this to Mr. Spencer?

 2          MR. BLOCH:  May I approach the witness, Your Honor?

 3          THE COURT:  You may.

 4   BY MR. BLOCH:

 5  Q    Mr. Spencer, I've handed you a series of text messages,

 6  right?

 7  A    Yes.

 8  Q    And these are text messages -- and now it's up on the

 9  screen -- between you and Elliot Kline, right?

10  A    Uh-huh.

11          MR. BLOCH:  And if I could just move all of these

12  into evidence and publish to the jury.

13          THE COURT:  Without objection, they'll be admitted.

14          (Plaintiff Exhibits PX-3960A, 3960B, 3960C, 3906D,

15  3906E, 3906F, 3906G, 3906I, 3906J, 3906U, 3906DD, and 3906EE

16  marked.)

17          (Plaintiff Exhibits PX-3960A, 3960B, 3960C, 3906D,

18  3906E, 3906F, 3906G, 3906I, 3906J, 3906U, 3906DD, and 3906EE

19  admitted.)

20   BY MR. BLOCH:

21  Q    Mr. Spencer, 3960A is a text from you to Elliot Kline,

22  right?

23  A    Right.

24  Q    And the time stamp is 8-19 -- August 19, 2017, and it says

25  12:39 a.m. UTC-4, right?

R. Spencer - Cross

1  A    Okay.

2  Q    Do you understand the time that's reflected on there is

3  UTC time, which means it's four hours behind the time that's

4  depicted?  So in fact, this tweet -- this text was sent by you

5  to Mr. Kline at 8:39 p.m.?

6  A    Okay.  That's that...

7  Q    And you said -- let's just go one at a time.  You said,

8  "It's time to dump on Kessler," right?

9  A    Yes.  I probably meant it's time to dump Kessler, but

10 that's what I wrote.  So whichever.  More or less the same

11 thing.

12 Q    And if we could go to the next tweet, you say -- text,

13 sorry -- "he just praised the death of Heyer," right?

14 A    Right.

15 Q    And then Mr. Kline says to you, "What a fucking idiot,"

16 right?

17 A    Sounds right.

18 Q    And then you say, "Let's unload."

19 A    Uh-huh.

20 Q    Right?

21 A    "Let unload."  I'm sure I meant let's unload.

22 Q    Sure.  "Let's unload everything," right?

23 A    Yeah.

24 Q    Then Mr. Kline says, "Yeah, gotcha."  He says, "He's

25 already getting slammed a great deal from all other sides.

R. Spencer - Cross

1   Should be easy."  Right?

2   A    Right.

3   Q    And you said, "He wants to go to jail apparently"?

4   A    Yeah.

5   Q    And Mr. Kline says, "Should I text him now and tell him to

6   delete it and claim he was hacked," right?

7   A    Uh-huh.

8   Q    And you didn't agree with that idea, did you?

9   A    I don't remember agreeing to that, lying, no.

10  Q    And then you say, "I'll tweet too," right?

11  A    Right.

12  Q    And then you sent that tweet, right?

13  A    Yeah.  Is that the right order?  I'll take your word for

14  it.  The tweet came after that exchange?

15  Q    Correct.

16  A    Yes, right.

17  Q    And then Mr. Kline texted you the next day -- this is from

18  Mr. Kline to you at 8-19 -- August 19th, right?

19  A    Uh-huh.

20  Q    And he says, "Weev did not hack it, but claimed he did

21  because he knew we were in a lawsuit and knew he could take the

22  fall.  He fell on a grenade for us and gave us plausible

23  deniability.  He believes that Kessler was hacked based on his

24  password being the same as it was on Red Ice most likely

25  because there have been a few accounts that's happening to.  I

R. Spencer - Cross

1  think Kessler is just a crazy moron and tweeted it.  He was

2  freaking out to me earlier.  Either or, it doesn't matter.  We

3  did the right move tonight."  Right?

4  A    Yeah.

5  Q    And then you respond -- we may not have it on the screen,

6  but do you agree with me that you respond, "Good"?

7  A    That sounds right.

8           MR. BLOCH:  Nothing further, Judge.

9           THE COURT:  All right.  Thank you.  Anyone?

10          MR. KOLENICH:  Yes, Your Honor.

11                      CROSS-EXAMINATION

12   BY MR. KOLENICH:

13  Q    Good afternoon, Mr. Spencer.

14  A    Good afternoon.

15          MR. KOLENICH:  Could I show the witness the screen?

16  Q    Do you see the screen, Mr. Spencer?

17  A    Not yet.

18  Q    Not yet.

19          THE CLERK:  We did HDMI, didn't we?

20          MR. KOLENICH:  Yeah.  There we go.  Thank you.

21   BY MR. KOLENICH:

22  Q    Mr. Spencer, early on in your testimony you showed tweets

23  that were attached to your discovery responses from when you

24  were represented by counsel; do you recall that?

25  A    Right.

R. Spencer - Cross

1  Q    These are additional pages from that document.  I'll

2  direct your attention to page 25, as listed on the bottom of

3  the page.  These are not the ECF page numbers, but the page

4  numbers your attorney attached?

5  A    Right.

6  Q    Your tweets are on the right-hand side of the page in

7  black; would you agree?

8  A    No, those aren't tweets.  This is a text exchange.  So

9  it's a private text exchange.  Who is it between?

10 Q    I'll scroll up.  It appears to be EM, Eli Mosley.

11 A    Eli Mosley.  Yes.

12 Q    Do you agree with that?

13 A    Yes.

14 Q    You see Mr. Mosley has advised you that there is a woman

15 named Evelyn Goldberg whose maiden name was Kessler?

16 A    Right.

17 Q    Mr. Mosley further advises you, "He -- he's Jewish.  This

18 is his grandma.  Lol."  That would be a reference to Jason

19 Kessler, would it not?

20 A    Yes.

21 Q    Further down on the right you say, "I was right to see his

22 lack of Sieg Heiling as a sign"; is that what it says?

23 A    Yes.

24 Q    Can you explain to the jury what that's in reference to?

25         THE CLERK:  Mr. Kolenich, is this a previously

93

R. Spencer - Cross

1 admitted exhibit?

2          MR. KOLENICH:  Yeah, but I'll admit each page as a

3 separate exhibit in rebuttal.

4          THE CLERK:  I just want you to know they are not

5 seeing it at this point.

6          MR. KOLENICH:  Your Honor, he has identified this

7 page, 25.  I'd move it in as Kessler Rebuttal Exhibit 10.

8          THE COURT:  Be admitted.

9          MR. KOLENICH:  Thank you.  May I publish to the jury,

10 please?

11          THE COURT:  You may.

12          (Defendant Kessler Exhibit 10 marked.)

13          (Defendant Kessler Exhibit 10 admitted.)

14 BY MR. KOLENICH:

15 Q    Now the jury can see it as well, Mr. Spencer.  "I was

16 right to see his lack of Sieg Heiling as a sign."  Can you

17 explain what you meant by that?

18 A    Sure.  So again, I don't know the veracity of any of these

19 allegations, and I don't care.  The "I was right to see his

20 lack of Sieg Heiling as a sign" is a reference to -- there is a

21 video that I think the jury was shown about the Charlottesville

22 1.0 afterparty where there was a lot of drinking and, you know,

23 frat boy behavior, to be frank, including Sieg Heiling and so

24 on, doing Roman salutes or Hitler salutes, whatever you want to

25 call it.

R. Spencer - Cross

1      Yeah, I remember some discussion that he was kind of

2  scurrying around in the back and not kind of participating in

3  this group stupidity.  So that is what that was a reference to.

4  Hardly definitive about anything.

5  Q    More alt-right joking around, Mr. Spencer?

6  A    Yeah.  If you want alt-right joking around, that is maybe

7  the best example of it, yes.

8  Q    Very well.  So you'll agree with me that these texts were

9  sent on July the 27th, 2017?

10 A    Yes.

11 Q    Would you further agree with me that you were not working

12 with Mr. Kessler, at least from that point?

13 A    Well, I would agree with that.  I mean, I was -- I have

14 given all of our -- the texts between Kessler and me, I put the

15 whole thing into evidence.  The jury can judge the degree to

16 which we were ever working together.  I mean, he invited me to

17 participate in his rally.  I was not intimately or actively

18 working with him in terms of logistics or so on.

19 Q    We understand you --

20 A    But in a sense of --

21 Q    Mr. Spencer, you've answered it.  That will be enough.

22 A    Okay.

23 Q    He would not do the Sieg Heil salute and therefore you

24 didn't trust him; isn't that correct?

25 A    No.  No.  It was kind of like I did not really want to

R. Spencer - Cross

1    have anything to do with Kessler from my brief interactions

2    with him.  This was hardly definitive.  It was kind of bashing

3    on a private message channel.

4    Q    Thank you.

5         Turning to page 27.  On the left, this is again Eli Kline?

6    A    Uh-huh.

7    Q    "I've removed Kessler from all operational calls starting

8    today.  All the security and leadership are getting orders from

9    me.  Oh, and the Jews canceled my Airbnb, etc."  Your response

10   is "thumbs up"; is that correct?

11   A    Right.

12   Q    Could you please explain to the jury why Mr. Kline is

13   reporting his operational moves to you rather than to Nathan

14   Damigo or Identity Evropa?

15   A    He -- Eli Kline was a very energetic person who I guess

16   uncharitably you could say was kissing my butt and trying to

17   talk to me all the time and so on.  He's reporting this.  I

18   don't know how accurate that is.  Eli Kline was pretty loose

19   with the truth.  He's simply telling me -- and this is bold

20   stock talk.  "I'm in charge now," etc.  I said, good call.

21   Whatever.  Nothing more than that.  I presume he was reporting

22   to Nathan Damigo as a member of Identity Evropa too.

23   Q    You presume?

24   A    I don't have any evidence for that.  I'm not in their

25   private messages.

96

R. Spencer - Cross

1  Q    You didn't tell him, go tell Damigo, you sent the message

2  to the wrong guy, did you?

3  A    No.  But I --

4  Q    And that's not because he was your employee; is that your

5  testimony?

6  A    He was never my employee.

7  Q    Understood.

8  A    That is my testimony.

9  Q    Understood.  Turning to page 39, same document.  All

10 right, this is a conversation, as you can see at the top, with

11 Jason, JK.  Would you agree that's Jason Kessler?

12 A    Yes.

13 Q    On the right-hand side you say, "I'm sorry, but I won't

14 attend the press conference today.  You're not listening to

15 leadership."

16      Could you please explain to the jury what leadership you

17 were referring to there?

18 A    Yes, I was referring to me, because I was the alt-right.

19 Q    The answer is you're referring to you?

20 A    Yeah.

21 Q    You're the alt-right?

22 A    Mr. Kolenich, throughout 2017, that was how I saw it.  And

23 I --

24 Q    Fair enough.

25 A    -- created a press conference that occurred that Nathan

R. Spencer - Cross

1   Damigo --

2   Q     Mr. Spencer?

3   A     I'm going to complete it.

4   Q     That's your answer.  That's your answer.  You were the

5   leadership over Mr. Kessler's head that you're referring to?

6   A     Of the alt-right broadly, not of the UTR conference.

7           MR. KOLENICH:  Very well.  No further questions.

8   Thank you.

9           THE COURT:  Okay.  All right.

10          MR. CAMPBELL:  Your Honor, I have like five minutes

11  of a completely different inquiry that isn't responsive to his

12  direct testimony that I wanted to put in in my case in chief.

13  Shall I do it now?

14          THE COURT:  Yes.  I mean, you can put it in through

15  him, through Mr. Spencer?

16          MR. CAMPBELL:  Yes, Your Honor.

17          THE COURT:  Okay.  Sure.

18          MR. CAMPBELL:  Could we, other than just my

19  statement, maybe let the jury know this is in Fields's case in

20  chief rather than a continuation of the other questioning.

21          THE COURT:  Yes.  You consider the questioning here

22  by Mr. Campbell of Mr. Spencer as part of Mr. Fields's case.

23  If you want to do it now rather than call Mr. Spencer back

24  later to do it.  So this is part of Mr. Fields's case.  Go

25  ahead.

98

R. Spencer - Cross

1         MR. CAMPBELL:  Thank you very much, Your Honor.

2                     CROSS-EXAMINATION

3  BY MR. CAMPBELL:

4  Q   Good afternoon, Mr. Spencer.  Do you have Twitter?  Do you

5  have a Twitter account?

6  A   Yes.

7  Q   Did you have a Twitter account back in 2017?

8  A   Yes.

9  Q   Did you have -- when did you first get Twitter, if you

10  recall?

11  A   I think 2011.

12  Q   So you've been familiar with the platform for a decade?

13  A   Yes.

14  Q   All right.  And generally savvy with social media?

15  A   Yes.

16  Q   Seems like you have a number of different platforms and

17  you're posting things relatively frequently?

18  A   Twitter was the main one.  That's what I always focused

19  on.

20  Q   And I think you had testified earlier that kind of 2017

21  was the height of your fame?

22  A   Yes, or infamy.

23  Q   Do you recall how many followers you had on Twitter back

24  in 2017?

25  A   Well, around the time of the conference, I was over 70,000

R. Spencer - Cross

1  followers.  And certainly individual tweets, when they either

2  were controversial or someone was tweeting at me who was a

3  celebrity or something, these would have a reach in the

4  hundreds of thousands.  But 70,000 followers right at the time

5  of the UTR.

6  Q    Did you know each and every one of those 70,000 followers?

7  A    Not even close.

8  Q    Did you have any idea of the actual names of the vast

9  majority of the 70,000 followers?

10  A    No.

11  Q    Can you give the jury some idea of the level of your

12  interaction with followers you knew, that you personally knew?

13  A    Well, if there's someone that either I know personally or

14  someone who has at least offered a lot of thoughtful responses,

15  I will very often get into a conversation with someone on

16  Twitter.  And again, maybe half and half of people who I know

17  who they are or people who have just kind of proven to me that

18  they're smart and they're contributing, I will definitely get

19  into strings where I'll have a conversation with them.

20  Q    Okay.  So you would have some interaction, some in-depth

21  interactions even with followers you didn't know?

22  A    Yeah.

23  Q    Do you have some idea of the percentage of your 70,000-ish

24  Twitter followers whom you knew versus who you did not?

25  A    Well, the people I knew personally, one percent at the

R. Spencer - Cross

1   very most.  Maybe 25.  I'm just guessing here, but, you know,

2   two dozen people who I knew who they were.  Really knew, yes.

3   Q    Fair to say the vast majority --

4   A    The vast majority I have no idea who they are, yes.

5   Q    I'm sure you recall seeing some tweets put into evidence

6   by plaintiffs' counsel that were from an account

7   @TheNewGiantDad wherein that Twitter user tweeted at you?

8   A    Right.

9   Q    Could you tell the jury a little bit about what, if any,

10  notification you would get when one of 70,000 Twitter followers

11  tweeted at you?

12  A    So on the Twitter app there's a section called "Mentions"

13  and you might get a notification there.  Very often, if it's an

14  account with very few followers, you won't get any

15  notification, actually.  If it's an account you follow or if

16  it's a big account, you in all likelihood will get a

17  notification.

18       I was also verified at the time.  So I could actually

19  separate mentions to only people who were verified.  So

20  obviously that account, which we presume is Mr. Fields, was not

21  verified.  So again, the vast majority of mentions that I get,

22  I do not look at and they just kind of escape my notice.

23  Q    Can you give the jury some estimate of how many

24  notifications of retweets you might have gotten on an average

25  day in the summer of 2017?

R. Spencer - Cross

1   A    Well, it would vary wildly, but that was the height of

2   notoriety.  It was way too many to look at during the day.  And

3   on certain times, say, around UTR or the time that I was

4   punched in January 20th of 2017, it was so many, I don't think

5   anyone could have handled it.  I just didn't even bother.

6   Q    Do you have any recollection at all of having any

7   knowledge that an account @TheNewGiantDad ever tweeted at you?

8   A    I have no recollection.

9   Q    I think you alluded to this earlier in your testimony.

10  Until you heard during the evidence in this case you had no

11  idea that the Twitter account @TheNewGiantDad was associated

12  with James Fields?

13  A    Correct.

14  Q    Does that notification, that that Twitter account is or

15  was associated with James Fields, does that change your

16  testimony in any way that you've never met or heard of James

17  Fields prior to August 12th, 2017?

18  A    Doesn't change it at all.

19           MR. CAMPBELL:  Thank you, sir.  I don't have any more

20  questions.

21           THE COURT:  All right.  Anyone else?

22           Okay.  Anyone on?

23           THE CLERK:  No.

24           THE COURT:  Thank you, Mr. Spencer.  Please step

25  down.

R. Spencer - Cross

1          THE CLERK:  Wait a second.

2          THE COURT:  Wait just a minute.

3          THE CLERK:  Mr. ReBrook?

4          THE COURT:  Mr. ReBrook?  Do you have questions?

5          MR. REBROOK:  Yes, Your Honor, I do.

6          THE COURT:  Go ahead.

7                    CROSS-EXAMINATION

8   BY MR. REBROOK:

9   Q    Mr. Spencer, good afternoon.

10  A    Good afternoon.

11  Q    Mr. Spencer, did I hear your testimony correctly on Friday

12  that that was the first day you had ever met Mr. Jeff Schoep?

13  A    Yes.  In this court, yes.

14  Q    Can you describe the nature of your relationship with him?

15  A    Nothing.

16         MR. REBROOK:  No further questions.  Thank you.

17         THE COURT:  You may step down.  Who's next?

18         MR. CAMPBELL:  Your Honor, other than Mr. Spencer's

19  testimony, I just wanted to put one exhibit in, but I did need

20  just a very brief moment to conference with plaintiffs' counsel

21  about how to actually get that in.

22         THE COURT:  You may.

23         MR. CAMPBELL:  Thank you, Your Honor.

24         MR. KOLENICH:  Judge, I have just a brief additional

25  deposition testimony, but it won't be ready until tomorrow.  I

R. Spencer - Cross

1   can't put it in today, video deposition.

2          THE COURT:  Why is it not ready?

3          MR. KOLENICH:  I'm depending on the plaintiffs --

4          MS. KAPLAN:  I'll take the blame for that, Your

5   Honor.  He wanted a few minutes of us to cut for him of the

6   Samantha Froelich deposition.  We've just been overwhelmed

7   finishing our case, but we will have it ready for him tomorrow.

8   I apologize.  That way Mr. Spalding can play it.

9          MR. CAMPBELL:  Thank you, Your Honor.  So the only

10  exhibit we'll be putting in in James Fields's case is a

11  certified copy of the amended judgment in his criminal case in

12  this court, and we have made redactions, and that is in

13  agreement with plaintiffs' counsel.

14         So what I propose to the Court is sort of to describe

15  the document very generally and briefly to the jury, move it

16  into evidence, and then we would submit the actual document

17  following the edits that's going to be in evidence.

18         THE COURT:  All right.

19         MR. CAMPBELL:  With the assistance of plaintiffs'

20  counsel.

21         THE COURT:  You may proceed.

22         MS. KAPLAN:  No objection, Your Honor.  And I'm just

23  told by Mr. Spalding that the Froelich clip is in fact ready if

24  we want to play that.

25         MR. CAMPBELL:  So Judge, Fields would move into

R. Spencer - Cross

1   evidence a certified copy of the August 9, 2021 -- I'm sorry,

2   that's the certification date -- the October 1, 2019 amended

3   judgment in a criminal case, United States of America versus

4   James Alex Fields, Jr.  And in that the defendant has pled

5   guilty to Counts One and Two through Twenty-Nine, and has been

6   sentenced to imprisonment, life without the possibility of

7   release as to Count One, life without the possibility of

8   release as to Counts Two through Twenty-Nine, said terms to run

9   concurrently to each other, but consecutively to the term

10  imposed in Count One.  And we'll put the actual exhibit in, but

11  I just move it into evidence.

12          THE COURT:  All right.

13          THE CLERK:  What will that number be?

14          MR. CAMPBELL:  Fields 001, if that's okay.  That's

15  how it's named in the Box submission.

16          THE COURT:  It will be admitted.

17          (Defendant Fields Exhibit 1 admitted.)

18          MR. CAMPBELL:  Thank you, Your Honor.  Fields rests.

19          MR. CANTWELL:  Judge, in addition to my desire to

20  question Mr. Willis and Ms. Romero again, I have a brief

21  presentation that I can put on, but I could also do well to

22  confer with plaintiffs' counsel very briefly if I could have a

23  chance to do that.

24          THE COURT:  Yes.

25          MS. KAPLAN:  Your Honor, would you like us to play

R. Spencer - Cross

1  the Froelich video as they're doing that?

2          THE COURT:  I'm sorry.  Can't hear you.

3          MS. KAPLAN:  Would it be efficient for us to play the

4  Froelich designations while they're doing that?

5          THE COURT:  Yes.

6          MS. KAPLAN:  Okay.  We'll do that, if that's okay,

7  Mr. Kolenich.

8          MR. KOLENICH:  Yes, that's fine.  Thank you.

9          (Video deposition of Samantha Froelich played.)

10          THE COURT:  All right.

11          MR. KOLENICH:  Judge, could I confer quickly, Your

12  Honor?

13          THE COURT:  Yes.

14          (Off the record discussion.)

15          MS. KAPLAN:  There may be a piece of Ms. Froelich

16  that's missing, Your Honor.  We're just trying to confirm.

17          (Off the record discussion.)

18          MR. KOLENICH:  Sorry, Your Honor.  It's going to take

19  a few minutes to get the list of designations.

20          MS. KAPLAN:  We apologize, Your Honor.  Mr. Spalding

21  may be the busiest man in this case, and he's just adding the

22  extra stuff now.

23          THE COURT:  All right.

24          (Pause.)

25          MS. KAPLAN:  We're ready, Your Honor.  Can we play?

C. Cantwell - Direct

1          THE COURT:  You may.  Is this the deposition you were

2   speaking of?

3          MR. KOLENICH:  Yes, Your Honor.  It's just more of

4   the same one we were just viewing.

5          THE COURT:  Thank you.

6          (Video deposition of Samantha Froelich played.)

7          MR. KOLENICH:  Thank you, Your Honor.  Defendants

8   Kessler, Damigo, and Identity Evropa rest.

9          THE COURT:  Thank you.

10          All right.  Anyone else?

11          MR. CANTWELL:  I'll go, Judge.  Mr. Cantwell.

12          THE COURT:  Mr. Cantwell now is testifying on his own

13   behalf, and we're going to allow him to stand at the lectern

14   and theoretically question himself and answer his questions.

15                    DIRECT EXAMINATION

16          MR. CANTWELL:  Hello, Mr. Cantwell.  Good to see you

17   again.  Yes.

18          I think somebody else has this screen.

19          All right.  Now, I'd like to start with -- I

20   conferred with plaintiffs' counsel earlier.  I have this as

21   CCEX-164.  This is episode 340 of the Radical Agenda.  And I'd

22   like to play from 55:41 to 1:03:53.  This is an interview with

23   Jason Kessler while I was en route to Charlottesville,

24   Virginia.

25          MR. BLOCH:  No objection, Judge.

C. Cantwell - Direct

1        THE COURT:  Be admitted.

2             (Defendant Cantwell Exhibit 164 marked.)

3             (Defendant Cantwell Exhibit 164 admitted.)

4             (Audio playing.)

5        MR. BLOCH:  Objection.

6        MR. CANTWELL:  This is offered not for the truth, but

7    my understanding of what happened.  This is what Jason Kessler

8    told me.  If I have an unlawful purpose and Jason Kessler is

9    telling me that he's speaking to the police and this is what

10   they're telling him --

11       THE COURT:  Go ahead.  Overrule the objection.

12            (Audio playing.)

13       MR. CANTWELL:  So that is the portion I wish to play

14   of CCEX-164.

15       A brief technical note:  I still don't have the

16   ability to edit audio.  So I have that as the entire audio

17   file.  I can edit videos, but not audio.  So if there's some

18   capacity to do that before we actually give that file to the

19   jury, I'll work with the technical people to accomplish that

20   goal.

21       The next thing -- and I played that because I wanted

22   to put in context the text messages between Mr. Spencer and I,

23   okay?  I sent this man a text message that says, "I'm willing

24   to risk violence and incarceration."  And when I say that I'm

25   willing to risk something, it means that I don't find the thing

C. Cantwell - Direct

1   that I'm risking desirable.

2           I don't want violence.  I don't want to go to jail.

3   But when I'm talking about the possibility that I might get in

4   trouble, I'm talking about this conversation that I had with

5   what I understood to be the principal organizer of the event

6   that, as you're gathering, there was -- we ended up having a

7   permitted event, but there was some controversy about the

8   permit.  Okay?  And so this was part of a deliberation that we

9   had.  And, you know, there was the potential, there was the

10  discussion of this becoming an act of civil disobedience, that

11  you're in the park, they're telling you to get lost, and you're

12  saying -- as I believe Mr. Spencer did and other people did --

13  you're staying in the park and you're going to be removed by

14  law enforcement.  And that is a -- it's not legal, but it's not

15  racially motivated violence, to be certain.  It's a horse of a

16  different color, pardon the pun.

17          And so the next thing I want to show you is -- what

18  do I want to show you next?

19          This is CCEX-024A.  This is a slightly redacted

20  version of CCEX-024.  I don't think there's any objection from

21  plaintiffs' counsel to this being admitted into evidence and

22  published to the jury.

23          MR. BLOCH:  My understanding is that there were

24  certain redactions made to this document.  Is that the same

25  document?

C. Cantwell - Direct

1          MR. CANTWELL:  Yes.  024A is the redactions that I

2    just showed plaintiffs' counsel over there.

3          THE COURT:  Be admitted, then.

4          (Defendant Cantwell Exhibit 024A marked.)

5          (Defendant Cantwell Exhibit 024A admitted.)

6          MR. CANTWELL:  So this is a blog post titled "Unite

7    the Right Updates."  This was published August 8th, 2017 and

8    then it was updated on August 9th, 2017.  When members of the

9    jury are able to look at this in evidence, they'll notice that

10   the update is at the top.  But I'm going to scroll down to the

11   original post so that you can understand it in time order as I

12   explain to you my experience here.

13         And so the blog post reads:  "I'm on my way to

14   Charlottesville, Virginia for the Unite the Right Free Speech

15   Rally this Saturday, August 12th at Noon.  The event is planned

16   to take place at what was once called Lee Park, later renamed

17   Emancipation Park by the leftists who now want to remove a

18   monument to the park's original namesake" --

19         (Reporter clarification.)

20         MR. CANTWELL:  -- "who want to remove a monument to

21   the park's original namesake, General Robert E. Lee, a Southern

22   defender in the War of Northern Aggression.

23         "A lot of things are going on right now with this

24   event, and I'll try to update this post as information can be

25   made public, so bookmark this page and check back from time to

C. Cantwell - Direct

1  time for information.  If you haven't already done so, get on

2  my email list, as I will update people there as well.  You can

3  follow the event's primary organizer, Jason Kessler, on Twitter

4  and the event's Facebook page for updates and more information.

5       "The Southern Poverty Law Center, a Jewish communist

6  propaganda publication, has called this event 'the largest

7  hate-gathering of its kind in decades in the United States.'

8  While the Cosmopolitans at the SPLC are known for deceit and

9  hyperbole, and the event has nothing to do with 'hate' on our

10  part, they are not exaggerating the importance of the

11  gathering.  As far as they are concerned, this is like the KKK

12  rising back up in America and they are only wrong insofar as

13  this is about something very different than the Klan (though

14  they will be there).  Few if any of the speakers would shy from

15  the far overused title of racist, because we've had it with

16  white interests being assigned some sort of special wickedness

17  by other ethnic and racial groups seeking to undermine us in

18  our own countries.

19       "With such disreputable enemies, it should come as no

20  surprise that threats of violence are made against us.

21  Left-wing activists are calling for thousands to descend upon

22  Charlottesville to shut us down, and in typical leftist

23  fashion, some have decided to engage in threats, violence,

24  deceit, and other criminality to accomplish that goal.  Using

25  these excuses" -- redacted until end of sentence.  "Responding

C. Cantwell - Direct

1  to what has been described as an unprecedented number of phone

2  calls, the company providing liability insurance for the event

3  canceled the policy as well.  The city is now insisting it must

4  be -- instead be held at a location far from the Lee monument

5  the demonstration is centered around.

6          "Jason Kessler has rightly said he will not move the

7  event, and he and other organizers are seeking legal remedies.

8  There is a good possibility we will find one as well, just like

9  Richard Spencer managed to get a legal injunction against

10  Auburn University in Alabama this past April.  If you are an

11  attorney in Virginia, or if you know one who would like to help

12  us, please contact me or the event organizers.

13          "It is more important than ever that people come to

14  Charlottesville and attend this event.  We need to make our

15  presence felt.  We need to make sure the city knows that we are

16  not going to be silenced so easy.  We need as many people here

17  as possible.

18          "In the meanwhile, we are proceeding as close to

19  originally planned as possible.  The police have said they will

20  still cooperate with us by keeping Antifa and other

21  opponents" -- I'm sorry -- "by keeping out Antifa and other

22  opponents, setting up barricades, and doing their best to

23  maintain peace and order in the city.  The possibility exists

24  though, that if we do not get legal remedy, it could be

25  declared an unlawful assembly and we could be ordered to leave.

C. Cantwell - Direct

1  If that happens, those staying would be engaged in an act of

2  civil disobedience, risking arrest, exposure to tear gas, and

3  other hazards which present themselves in such scenarios.

4          "Virginia is a state with relatively accommodating

5  gun and self-defense laws with wide reciprocity of carry

6  permits and no prohibition against open carry for those not

7  prohibited from possessing a firearm.  Most of" -- many of

8  us -- not most -- "many of us plan on being armed, not only for

9  general purpose and display, but to deal with the very real

10 threat of violent communist agitators who have proven dangerous

11 throughout the country.

12         "Civil disobedience and guns do not go well together,

13 however.  No matter what anyone else says, if you never take

14 another word of advice from me again, heed this warning:  If

15 you are coming armed, obey the law and the orders of law

16 enforcement, no matter what.  You cannot tell the cops to go to

17 hell with a gun on your hip.  It puts all of us and our cause

18 at risk.  If you are considering disobeying the authorities,

19 you must leave your firearms secured elsewhere.  Whatever

20 violent ideas we entertain on the Radical Agenda are not to be

21 carried out here.  The Radical Agenda is an entertainment

22 program, and if you try to start a revolution this weekend, it

23 will not be the revolution you bargained for, I promise.  If

24 you want to prove yourself a warrior, show some discipline

25 first.

C. Cantwell - Direct

1          "If we end up in a position where we are opposed by

2    communists and cops alike and we are disarmed, the potential

3    for violence is very real.  It is my advice that women,

4    children, and men who are not fit for combat do not attend the

5    main event at Lee Park unless" -- redacted -- comma.  "And then

6    I have -- and even then, I have serious concerns.  I will see

7    what they can do elsewhere to help make our presence felt, but

8    I have female companions who wish to attend this, and I am not

9    permitting them to as a result of this threat.

10         "Jason Kessler called into the Radical Agenda today

11   (Episode 340) to discuss the matter, and that segment of the

12   program has been embedded at the bottom of this blog post.  If

13   you have a Baofeng, Puxing, or other handheld two way radio,

14   please bring it.  I have a couple of my own and they could be

15   useful for coordinating movements.

16         "If you can't come, but you want to help, please send

17   money.  (That page contains ways" -- there's a link to another

18   page.  It says "ways to send money to me directly, not the

19   event organizers).

20         "This is about all I feel confidential saying at this

21   juncture.  I will know more soon and I will update this blog

22   post with new developments as I can make them public.  I will

23   also send out emails and be active on social media."

24         Now, I will scroll back up to the top and read you

25   the update which was posted on August 9th.

C. Cantwell - Direct

1        "I am just outside of Charlottesville right now.

2   I've checked into my motel and had dinner with Jason Kessler,

3   the organizer of the event.  Here is where things stand now, to

4   the best of my understanding."  And please pardon the redacted

5   following paragraph.

6        "*The Daily Stormer* has issued a call for people to

7   show up, permit or none, and give some advice -- given some

8   advice on what to bring and not to bring.  Their advice is to

9   leave your firearms at home, and if you must bring a firearm,

10  please conceal it.

11       "Many of you have asked about meeting up with me

12  personally.  Since the main event is likely to be chaotic, we

13  might have trouble catching up at the main event.  I am working

14  on coordinating a meetup for Radical Agenda listeners on

15  Friday, but I have to be careful about how the details are

16  announced.  Sadly, anything I say to you here, I also say to

17  the media, communists, and other criminal elements.  For this

18  event, I encourage those with the legal authority, to carry a

19  concealed firearm."

20       To be clear, what I'm talking about is -- the event

21  that I'm discussing here is what will later be referred to as

22  the Radical Agenda listeners meetup.

23       "Open carry will draw more unnecessary attention to

24  us so if you do not have a license to carry, please secure your

25  firearms elsewhere and let us worry about defense.  I'll update

C. Cantwell - Direct

1   you sometime on Thursday.  Thanks."

2          Now you have heard, save for the agreed-upon

3   redactions, the entirety of the UTR updates blog post.

4          What I just referred to as the Radical Agenda

5   listeners meetup is an event that I put together for listeners

6   of my podcast.  And the way that I did this to prevent

7   confrontations with counter-protesters was to publish it as

8   paywall content.  We mentioned earlier that I have a feature on

9   my website in which content on the website can be limited to

10  paying customers only.  And the way that I handled this was to

11  disable new sign-ups before I announced the meetup event so

12  that somebody couldn't, like, find out about the meetup and

13  then pay the $10 to find out, okay?  So the idea being that

14  only -- the only people who would find out about it, at least

15  from my website, would be people who had been paying customers

16  prior to the announcement.

17          And I thought that that would be a reasonable way to

18  deter confrontations at the Radical Agenda listeners meetup

19  because that was very important to me.  There was a notable

20  exception to this, as plaintiffs' counsel showed earlier, when

21  they were questioning me, which is I sent Jason Kessler an

22  email.  And I said to Jason Kessler, you can tell anyone who

23  has been reasonably vetted about this event.  Again, trying to

24  make a sincere effort not to have the sort of confrontations

25  that we're accused of provoking.

C. Cantwell - Direct

1            So what I would like to show to the jury now is --

2     there's two files I want to show one right after the other so

3     I'll get it out of the way this way, CCEX-114 and CCEX-111.

4     I'd like to publish -- admit both of these into evidence and

5     publish them to the jury so that I can begin explaining what

6     they are.

7            THE COURT:  Be admitted.

8            (Defendant Cantwell Exhibits 114 and 111 marked.)

9            (Defendant Cantwell Exhibits 114 and 111 admitted.)

10           MS. KAPLAN:  Your Honor, can we just confirm these

11    are both materials on his website?  We just don't know what

12    they are.

13           MR. CANTWELL:  These were disclosed in January 2020.

14    They're on the exhibits list.

15           THE COURT:  Okay.

16           MS. KAPLAN:  I know, but I don't have any -- that

17    kind of memory, that I could tell him what it is.  If he could

18    just tell us what they are.

19           MR. CANTWELL:  These are blog posts from my website.

20    One of them is a capture from, it looks like the Wayback

21    Machine, and the other is I believe a direct PDF printout from

22    christophercantwell.com.  CCEX-114 is the -- as it appears to a

23    nonmember.  So you see "to access this content you must

24    purchase" -- it's not perfect, but you must purchase a basic

25    membership is what it's explaining there, the highlighted

C. Cantwell - Direct

1  portion.

2           And this is -- the other, CCEX-111, is what it looks

3  like to a member, which is the entire blog post.

4           MS. KAPLAN:  Just to clarify, Your Honor, as I

5  understand, the Wayback Machine means it's no longer available

6  on Mr. Cantwell's website so he had to go back to reconstruct

7  it.  Is that correct?

8           MR. CANTWELL:  That is not actually the case.  When I

9  did this -- you make a legitimate point.  I probably could have

10  done this in a more efficient way.  I am usually logged into my

11  website.  So when I look at my website, what I see is what the

12  administrator sees.  No.  No.  No.  I want to correct myself.

13          The reason I did this was to show what it looked like

14  closer to the time.  That's why I did it using the Wayback

15  Machine.  That's why this is -- I believe I created this file

16  in 2019 and I was trying to get it as close to what it looked

17  like on August 12th, 2017, which is, for the Wayback Machine, I

18  got August 21st.

19          MS. KAPLAN:  With that explanation, Your Honor, no

20  objection.

21          THE COURT:  Okay.  Go ahead.

22          MR. CANTWELL:  So this is just to demonstrate the way

23  this works.  You see here is my website.  These are -- you

24  know, you can see my social media links there.  And then as we

25  scroll down, we have -- the title of the blog post is "The

C. Cantwell - Direct

1   Charlottesville Meetup."  "I'm in Virginia for the Unite the

2   Right rally this coming Saturday.  Since we have been meeting

3   so much opposition from both the criminal element and the

4   municipal government alike, we've had to exercise a great deal

5   of caution in terms of operational security.  So I have

6   temporarily disabled new member sign-ups and made this post

7   available only to existing paying members. I am in

8   communication with a reporter who is covering the event and

9   wants exclusive access to" -- and then what you see there is,

10  "to access this content, you must purchase basic."  That is the

11  basic membership.  If I recall correctly it was like $5 a

12  month.  And if you -- at this time, if you had clicked on that

13  basic link and you tried to purchase the basic membership, it

14  would have told you that it was out of stock because I had

15  disabled new sign-ups.  This was one of the security measures

16  that I took to avoid being confronted at this Radical Agenda

17  listeners meetup.

18          Now we're looking at CCEX-111.  And this is what that

19  looks like to a member.  And so there's the photograph of me by

20  the monument.  You can see my body camera.  I still have it at

21  this point.  And so I will pick up where I left off on the

22  other blog post.

23          "I'm in communication with a reporter who is covering

24  the event and wants exclusive access to a social gathering

25  outside the main event.  I've offered to provide exactly this

C. Cantwell - Direct

1    in exchange for promotion of the Radical Agenda.  I realize not

2    all of you will want to be on camera or otherwise risk this

3    kind of exposure.  So I want us to meet up in their absence for

4    a more intimate gathering.  Then I will invite the reporter to

5    come join us after those of you who wish to have had a chance

6    to depart.  I am working with the reporter on getting a signed

7    agreement that they will not expose the faces or identities of

8    anyone not explicitly offering to be exposed."

9         "Let's plan on meeting Friday, August 11th, in the

10   Walmart parking lot at 975 Hilton Heights Road,

11   Charlottesville, Virginia, 22901, at noon local time.  We'll

12   all meet there, wait a half an hour or so for any stragglers,

13   and then head off to our next destination.  I'll update this

14   post with more details when the time draws near."

15        But as of the time I created this PDF, there were no

16   updates to add to that -- well, quite a bit happened, but no

17   need to update the members-only blog post in any case.

18        And so the next thing that I want to go to is

19   CCEX-152.  This is the body camera video from the Walmart

20   meetup, all right?  And this is like a 47-minute video.  I'm

21   not looking to play the whole thing, but I would like to add --

22   I would just like to submit the entire video -- I would like

23   the entire video admitted into evidence and published to the

24   jury so that I can skip ahead to a few points in it.

25        There is -- it's one of these things where there is a

C. Cantwell - Direct

1  distinct absence of something, and I'm not going to put the

2  Court through the trouble of sitting there waiting for

3  something not to happen.  If that works for everybody.

4         MS. KAPLAN:  Your Honor, we certainly have no

5  objection to the portions of this video that Mr. Cantwell

6  intends to show.  Again, I don't have the kind of photographic

7  memory that I've seen the whole video and don't know whether

8  there are any objections.  But we'll try to work that out with

9  Mr. Cantwell.

10        THE COURT:  If it becomes necessary, we'll have to

11  redact maybe part of it.

12             (Defendant Cantwell Exhibit 152 marked.)

13             (Defendant Cantwell Exhibit 152 admitted.)

14        MR. CANTWELL:  For the benefit of the Court I'll note

15  that I don't think -- I'm reasonably certain there is nothing

16  to do with any of our motions in limine in this video.

17        THE COURT:  All right.

18        MR. CANTWELL:  This is CCEX-152.

19             (Video playing.)

20        MR. CANTWELL:  Now, I'll note for the record here the

21  time stamps on this video, unlike the one of the so-called

22  leadership meeting, are actually 12 hours off.  This says

23  23:47:28 on August 11th.  It's actually noon, not -- it's

24  closer to noon than midnight, I should say.  But it's August

25  11th.

C. Cantwell - Direct

1          (Video playing.)

2          I'll skip ahead.  I'm going to try to find -- there's

3   a confrontation that happens here.  And I want to record that

4   confrontation for you.  This is where -- 13 minutes in.

5          (Video playing.)

6          I'm going to rewind a little bit behind that.  12

7   minutes.

8          (Video playing.)

9          For the record, that's my voice saying "Don't

10  interact with them if you don't have to.  Leave them alone."

11         (Video playing.)

12         If you can, try to remember that face.  And also

13  remember that black and white Adidas shirt.

14         (Video playing.)

15         For the sake of time alone, I'm going to fast forward

16  to the moment when the police arrive.

17         (Video playing.)

18         In the interest of time I'll just testify that this

19  doesn't get more interesting.  The police send us on our way.

20  They don't find their complainant.  They did not ask me for the

21  body camera video because they didn't have a complaint.

22  Without a complaining witness, they didn't have a case.  They

23  didn't ask me for the evidence, okay?

24         At that point, I reconvened with my listeners in the

25  Walmart parking lot.  The police came up to us with the manager

C. Cantwell - Direct

1  from the Walmart and said that they would like us to leave the

2  premises.  And we said -- and I said to my listeners, let's

3  respect their property rights, and we were on our way.

4          And then, given this disturbance, I had indicated at

5  some point that I wanted to try to go see if we could sit down

6  in a restaurant with me and my listeners, but after this, I

7  didn't think that that was going to be a particularly great

8  idea.  And so I decided that we'd go straight to McIntire Park

9  to meet with the reporter from Vice News, Elle Reeve.  And that

10 brings us to the next piece of evidence which I would like

11 to --

12          THE COURT:  Let's take a recess right now.

13          MR. CANTWELL:  Very good.

14 **(Jury out, 3:05 p.m.)**

15          (Recess.)

16          MS. KAPLAN:  Your Honor, we have a couple of

17 scheduling matters that we think would be worth discussing, but

18 we can wait until the jury has been excused at the end of the

19 day.

20          THE COURT:  Let me get to this matter of these two

21 plaintiffs' witnesses, Mr. Cantwell, you want to re-call.  I

22 don't quite -- I read the letter.  I mean, what would they be

23 testifying to that's not already in evidence or that anyone

24 else couldn't testify to?

25          MR. CANTWELL:  There is a specific photograph that I

C. Cantwell - Direct

1   want to get into evidence which I believe can be authenticated

2   by Mr. Willis or Ms. Romero.  There is a video.

3          THE COURT:  Well, can that be agreed to, the two

4   photographs?

5          MS. KAPLAN:  I was going to suggest that, Your Honor,

6   if Mr. Cantwell wants to show us the photos, we would be happy,

7   if they can authenticate them, to stipulate to them.

8          MR. CANTWELL:  All right.  I guess I'll give this a

9   shot.  I -- Mr. Bloch is aware of the photo that I'm talking

10  about.  This has been discussed at some length already, but

11  I'll give it another shot.  I'm happy to do that.

12         MS. KAPLAN:  Well, Your Honor, there's no reason to

13  believe that, if they say they can't authenticate it to us,

14  they're going to somehow authenticate it on the stand.  We're

15  officers of the Court.  If they tell us they can authenticate,

16  we'll stipulate.

17         THE COURT:  Will the witness authenticate the

18  photograph?

19         MS. KAPLAN:  Yeah, I don't know.  I have to show it

20  to them.

21         THE COURT:  What does the photograph show?

22         MR. CANTWELL:  The purpose of the photograph is that

23  there's someone standing in front of them with a firearm, a

24  woman by the name of Holly Zoller, and she's not a white

25  nationalist, and she's not a student at UVA, either.  She's

C. Cantwell - Direct

1   carrying a gun illegally on a campus, and she's with the

2   counter-protesters.

3          THE COURT:  Was she asked about that at the time she

4   testified?

5          MR. CANTWELL:  I'm sorry.  Ms. Zoller has not

6   testified, Your Honor.

7          THE COURT:  No, I mean the witness you want to call

8   back.

9          MR. CANTWELL:  No.  This is -- I did not have this

10  photograph at the time.  So my data was -- I was not

11  reconnected with my data until Mr. Willis and Ms. Romero had

12  already testified.

13         THE COURT:  What's the problem with the photograph

14  coming in?

15         MS. KAPLAN:  There probably isn't.  I don't think

16  they're going to be able to -- as I understand, it's blurry,

17  and I don't think they can agree that's a gun or a firearm.

18  But they can say that's a photo of Friday night, if that's what

19  he's talking about.

20         I think to bring them back to try to identify a

21  blurry supposed firearm, which I doubt, given their other

22  testimony, when they were asked to identify blurry things, they

23  said they couldn't -- I think it's highly unlikely, and it's

24  really a burden on them.

25         MR. CANTWELL:  The goal is not to have them identify

C. Cantwell - Direct

1  the firearm.  It's to authenticate the scene so I can show the

2  firearm to the jury.

3       MS. KAPLAN:  If that's all it is, Your Honor, I'm

4  pretty certain we'll be able to stipulate.

5       THE COURT:  To stipulate?

6       MS. KAPLAN:  Yes, that it's the scene on --

7       THE COURT:  Then let's get that out of the way,

8  because if they're going to have to testify, I want to get them

9  down here so we can do it.

10       MS. KAPLAN:  I'm happy to authenticate it.  I think

11  we would probably be happy to authenticate that photo as being

12  from Friday night.

13       THE COURT:  It just seems to me there's nothing in

14  their testimony that they need to be here.

15       MR. CANTWELL:  So if I could give plaintiffs' counsel

16  a thumb drive.

17       THE COURT:  All right.  Is the jury ready?

18       Bring them on around.

19       MS. KAPLAN:  Is this the photos?

20       MR. CANTWELL:  That has all of my exhibits as of the

21  most recent edits.

22       MS. KAPLAN:  And the exhibit numbers are?

23       MR. CANTWELL:  There's three.  I discussed with

24  Mr. Bloch on the phone, and now I'm discombobulated and I've

25  got to start over again.

C. Cantwell - Direct

1        MS. KAPLAN:  Mr. Cantwell can present them to us

2    after court, because I understand the jury is -- Mr. Cantwell

3    can tell us after court, because I understand -- the marshal

4    just told me the jury is on the way.  And as soon as we get

5    them, we'll be happy to provide a stipulation.

6        THE COURT:  All right.

7    **(Jury in, 3:26 p.m.)**

8        THE COURT:  All right.  You may be seated.

9        You may proceed, Mr. Cantwell.

10       MR. CANTWELL:  Queuing this up.

11       Okay.  This is pretty brief.  I'm going to play for

12   you a clip from the Vice News interview that was not aired on

13   TV.  I carried a personal voice recorder with me during these

14   events, as well as the body camera.  And during the Vice News

15   interview I kept my own unedited recording of that, which I

16   later published on my website.

17       This is a very brief segment from that, which goes

18   from -- I have this in as CCEX-120, and it's from 24:51 to

19   25:43, which I'll edit into CCEX-120A and submit into evidence

20   and play for the jury.

21           (Defendant Cantwell Exhibit 120A marked.)

22           (Defendant Cantwell Exhibit 120A admitted.)

23           (Audio playing.)

24       MR. CANTWELL:  "So, Mr. Cantwell, did you think it

25   was a good idea for you to get involved in violence at the

C. Cantwell - Direct

1    Unite the Right?"

2              "Absolutely not."

3              So that interview went on for a while, but I

4    obviously won't trouble you with the entirety of it.

5              After the Vice News interview, I go back to my hotel;

6    I get the text message from Jason Kessler and the notification

7    from a gentleman named Kurt telling me about the so-called

8    leadership meeting at McIntire Park.  I already played a clip

9    of that for you when we had Jason Kessler on the stand, and I

10   will briefly play a short portion of that same audio clip,

11   which is already in evidence as -- this is CCEX-10.

12             MS. KAPLAN:  Just to clarify, Your Honor, if

13   Mr. Cantwell could clarify exactly what we're about to hear

14   and --

15             MR. CANTWELL:  So this is the beginning of the body

16   camera video audio.  I'm just using the audio because it's

17   already in evidence.  Mr. Bloch was aware we've cut up some

18   clips, but before we had any agreement about that, I just

19   played the audio, because that was already disclosed.

20             This is from the very beginning of the meeting.  It's

21   two minutes and 27 minutes long, and it just discusses

22   involving the police at UVA.

23             MS. KAPLAN:  No objection, Your Honor.

24             THE COURT:  Go ahead.  Be admitted.  Go ahead.

25             (Video playing.)

C. Cantwell - Direct

1           MR. CANTWELL:  That is the voice of Jason Kessler.

2           (Video playing.)

3           Now, some of you will recall that name, itsgoingdown.

4    I understand itsgoingdown.org to be a website that serves as a

5    clearinghouse for violent communist propaganda.  Okay?  So I,

6    on top of already feeling threatened because somebody tried to

7    frame me for a crime earlier that day, now I am being told that

8    this website that is notorious for broadcasting violent

9    communist propaganda is being made aware of our plans for the

10   evening, which was supposed to be secret, I remind you.

11           (Video playing.)

12           I'll stop it there just for the sake of time.  You'll

13   recall that I tell Mr. Kessler that, if I'm going to involved,

14   I want the cops involved.

15           Subsequently during that meeting, I am informed by

16   Mr. Kline that he has spoken to the University of Virginia

17   police.  And that interaction is captured in CCEX-161B, which I

18   would like to move into evidence and publish, show to the jury.

19           MS. KAPLAN:  No objection.

20           THE COURT:  Be admitted.  You may.

21           (Defendant Cantwell Exhibit 161B marked.)

22           (Defendant Cantwell Exhibit 161B admitted.)

23           (Video playing.)

24           MR. CANTWELL:  That is -- I know that to be the voice

25   of Eli Mosley -- Elliot Kline, a/k/a Eli Mosley.

C. Cantwell - Direct

1           (Video playing.)

2           MR. CANTWELL:  I will represent to you that this

3   video does not get more interesting in the next 28 seconds and

4   I'll stop it here.

5           CCEX-161C is a very brief clip of me getting

6   introduced to -- I don't think -- Rousseau is not a defendant

7   in this case, right?  He is a defendant?

8           Okay.  This is me being introduced for the first time

9   to my co-defendant Thomas Ryan Rousseau.  Without objection

10  I'll move this into evidence and publish it and show it to the

11  jury.

12          THE COURT:  Be admitted.

13          (Defendant Cantwell Exhibit 161C marked.)

14          (Defendant Cantwell Exhibit 161C admitted.)

15          (Video playing.)

16          MR. CANTWELL:  "Tom from Vanguard," that's me getting

17  introduced to my co-defendant Thomas Ryan Rousseau for the

18  first time.  Someone else says "Nick from Vanguard" and there's

19  a couple of other introductions here.

20          (Video playing.)

21          This is only a two-minute video, but I'm going to

22  skip ahead because there's something that I want to show you

23  image-wise, which is the black gentleman who is at the

24  leadership meeting of the Unite the Right rally, right there at

25  1:15.  And I'll close this video out.

C. Cantwell - Direct

1          After this meeting I went back to my hotel room and I

2    downloaded these videos from the body camera to my computer.

3    That's why we have these videos.  When I cross-examined myself

4    before, you saw the videos of the body camera -- well, you saw

5    the videos of a woman grabbing my shirt.

6          The next time that I interact with my co-defendants

7    is at the University of Virginia.  And that is captured -- the

8    moment that I arrive at the University of Virginia campus is

9    captured in a video which I have labeled CCEX-126, which I

10   would like to move into evidence, publish and show to the jury.

11         THE COURT:  Okay.  Be admitted.

12         (Defendant Cantwell Exhibit 126 marked.)

13         (Defendant Cantwell Exhibit 126 admitted.)

14         MR. CANTWELL:  This video, you may notice there are

15   parts where you hear the words and then see the lips move

16   afterwards.  This is a flaw in the video prior to my obtaining

17   it.  This is a livestream video to the Periscope channel of one

18   Emily Gorcenski which I downloaded from the Internet in 2017.

19         (Video playing.)

20         That voice saying "Crowd around, crowd around, crowd

21   around," that man right there, I know him to be Elliot Kline,

22   a/k/a Eli Mosley.

23         And before we start this, I should ask myself a

24   couple of questions about the prior video, actually.

25         Mr. Cantwell, did Mr. Mosley tell you anything about

C. Cantwell - Direct

1  attacking racial minorities or their supporters?  No.

2          Okay.  Let's move on to the next video of Mr. Mosley

3  giving instructions.

4          (Video playing.)

5          That hooting and hollering that you hear is at the

6  people who are lined up with the torches have just seen me

7  arrive over the hill at Nameless Field.  I am arriving on the

8  scene right now.

9          MS. KAPLAN:  So, Your Honor, I'm not trying to be

10  difficult, but there's no foundation for what he just put in.

11  He says he's just arriving now.

12          MR. CANTWELL:  What you are about to see -- he's

13  going to repeat all these instructions.  I'm just trying to

14  catch the moment prior to my arrival.  The question that I

15  asked myself is not about --

16          THE COURT:  Go ahead.  Go ahead.  Go ahead.

17          MS. KAPLAN:  Withdrawn, Your Honor.  I understand.

18          (Video playing.)

19          MR. CANTWELL:  That's me.

20          (Video playing.)

21          MS. KAPLAN:  Two comments, Your Honor.  One, the

22  commentary of the person who is recording this is all hearsay

23  and I don't think is admissible for any purpose.

24          THE COURT:  Sustained.

25          MS. KAPLAN:  And two, there's no conceivable way that

C. Cantwell - Direct

1  Mr. Cantwell was there the entire time.  This was being filmed

2  by another person.  Unless he was right next to her the entire

3  night, there's no foundation for it.

4          MR. CANTWELL:  I am somewhere in this group of people

5  right here.  This is filming me.  And I take your point about

6  the hearsay commentary.  There is an upcoming portion that I

7  would like to get to.  If you like, I'll skip ahead.

8          THE COURT:  Go ahead.  Skip ahead.

9          (Video playing.)

10          MS. KAPLAN:  Maybe the sound should be turned off.

11          MR. CANTWELL:  I'll turn the sound off until I get to

12  the part that --

13          (Video playing.)

14          MR. CANTWELL:  There's an interaction between myself

15  and the person recording which I'd like to show to the jury.

16          (Video playing.)

17          There I am.

18          (Video playing.)

19          MS. KAPLAN:  Your Honor, again, the volume should not

20  be on.  This is pure hearsay.

21          MR. CANTWELL:  I'm interacting with the recorder

22  right now.

23          THE COURT:  All right.

24          MR. CANTWELL:  That's me in the camera frame as we

25  speak.

C. Cantwell - Direct

1          THE COURT:  Okay.

2          MR. CANTWELL:  I'm just going to go back a few

3   seconds to capture the part we spoke over.

4          (Video playing.)

5          I take that to be a reference to the secret Walmart

6   meetup, which was infiltrated and somebody tried to frame me

7   for a crime.  I felt threatened by this interaction.

8          (Video playing.)

9          In the interest of time, I'll stop the video here.

10  From there, we march off.

11          MS. KAPLAN:  Your Honor, just move to strike all the

12  hearsay on that tape other than the exchanges with

13  Mr. Cantwell, which of course are not hearsay.  But most of it

14  is.

15          THE COURT:  Sustained.  Your conversation is okay.

16          MR. CANTWELL:  The instructions from Mr. Kline I

17  heard, they were something that I understood.  And so that

18  portion I would seek to keep in.

19          THE COURT:  All right.

20          MR. CANTWELL:  If I recall correctly, CCEX-134 is

21  already in evidence in its entirety.  Does that sound right to

22  everybody here?

23          MS. KAPLAN:  Ms. Wheeler knows.  I don't know if we

24  know.

25          THE CLERK:  Video of August 11th, march on campus?

C. Cantwell - Direct

1        MR. CANTWELL:  Yes.

2        THE CLERK:  It's in evidence.

3        MR. CANTWELL:  So I am going to pull up CCEX-134 and

4   show it to the jury so that I can point myself out in a portion

5   of it.

6        (Video playing.)

7        I recognize this person in this video that -- the

8   person in all black here was at the Walmart meetup.  He was one

9   of the people who was there.  And it's difficult to see him in

10  this video, but I saw him wearing -- you can sort of tell he's

11  wearing all black here and he's wearing a black skull cap and

12  he's wearing sunglasses.  And it's August 12th, 2017.  It was

13  hot outside.  That is a very conspicuous outfit for a man to be

14  wearing, even at night, especially with the sunglasses.  That's

15  what I saw when I started coming down the stairs here.

16        (Video playing.)

17        This is me right here.  It's difficult to see but

18  you'll be able to notice the logo on the back of my shirt as we

19  move forward.  Right in front of me is the woman in the

20  sunglasses who I earlier showed you took my body camera.

21        THE CLERK:  Do you have the time stamp for that,

22  Mr. Cantwell?

23        MR. CANTWELL:  This is happening at 5:05 into

24  CCEX-134.

25        I thought it was suspicious that she was wearing a

135

C. Cantwell - Direct

1    long-sleeve jacket, a hat pulled low and sunglasses, as did the

2    people behind the signs had their hats down low behind the

3    sign.

4               (Video playing.)

5               So I started to walk around.  Now I'm back here.  And

6    those two white lines on the black shirt, that is Radical

7    Agenda, that's the logo of the podcast.

8               (Video playing.)

9               This video jumps.  That is not the result of my

10   editing.  This is the video as I obtained it from the Internet.

11   Now you're about to see me come around here.  I'll identify

12   myself when I appear.

13              (Video playing.)

14              Okay.  I'm actually going to bring it back a little

15   bit and I'm going to tell you what you're looking for.  Right

16   here you'll see a flashlight come out from behind people.

17   That's where I am.

18              (Video playing.)

19              That's my flashlight right there.  You might have

20   been able to notice it, you might have not.  It's not terribly

21   important for you to see, but I was just pointing at somebody.

22   The person I was pointing at was the man in the Adidas, black

23   and white Adidas shirt from the Walmart body cam footage.  I

24   just saw him, and he yelled something at me about Walmart.  I

25   said, are you the one who called in the false report?  He

C. Cantwell - Direct

 1   responded to me in the affirmative.

 2              (Video playing.)

 3              That made me both angry and afraid.  So not wanting

 4   to get into a fight, I walked away.  Those two white lines on

 5   the black shirt are me walking away from that conflict.

 6              (Video playing.)

 7              That's me again, walking away rather than making an

 8   effort to encircle these students, so-called.

 9              MS. KAPLAN:  Objection, Your Honor.

10              THE COURT:  Don't add those comments.

11              MR. CANTWELL:  You got it.

12              THE COURT:  Disparaging comments.

13              MR. CANTWELL:  All right.

14              (Video playing.)

15              MR. CANTWELL:  Here I am.  I'm looking over here

16   because I sense trouble.

17              (Video playing.)

18              You might have noticed, trouble just happened.  If

19   you didn't notice, I'll go back and show you again.

20              (Video playing.)

21              That's at 6:09 that that scuffle breaks out.

22              (Video playing.)

23              The frame changes here and I'm not in this, but

24   that's when I run back over towards the statue.

25              The instructions that Mr. Kline gave us at the park

C. Cantwell - Direct

1    and at Nameless Field were to keep the counter-protesters away

2    from the torches.  If you recall the audio clip that I played

3    for you when I was speaking with Mr. Kessler about getting law

4    enforcement involved for the torch march, I said, "We need the

5    cops involved because if they attack us, we're going to fucking

6    hurt them."  I don't want to hurt them, which is why I want law

7    enforcement there, to make sure that we don't get into a fight.

8    Somebody else says, "especially with torches" and we all -- all

9    right, it's kind of like our brand of humor, oh, fire and

10   fighting, that's kind of funny.

11        But you hear Mr. Kline tell us to keep the

12   counter-protesters away from the torches because we do not want

13   to create a fire hazard and set people on fire.  And so when

14   this guy starts a conflict with me, I walk away from it.  When

15   I see that there's a problem over by the torches, I go to get

16   between the problem and the torches.  And that's when I get

17   into this thing that you have seen a couple of times.

18        This is -- I'm not sure if this is in evidence as

19   CCEX-138.  I believe plaintiffs have the exact same video.

20   This is the Unicorn Riot video from August 11th evening.

21            THE CLERK:  It's in evidence.

22            MR. CANTWELL:  It is in evidence?  Okay.  And so with

23   that already in evidence, I'll pull it up and I would like to

24   publish it and show it to the jury.

25            THE COURT:  You may.

C. Cantwell - Direct

1              (Video playing.)

2              MR. CANTWELL:  You see me there.  This is -- the

3  video -- this is edited video, okay, and it's edited by people

4  who don't have my best interests at heart.  But I am now in the

5  crowd because I had seen that conflict break out.  I'm keeping

6  my eye on who I believe the troublemakers to be.

7              (Video playing.)

8              I am going to put this into slow motion.  I'll slow

9  this down three times.  Now, you can see in this video who

10  exactly throws the first punch here.  I'll just admit it's

11  obscured.  It's my perception as I'm looking at this happen

12  that this man starts the fight, okay?

13              (Video playing.)

14              As this man is getting up, he's looking at me, and I

15  think that he's going to come towards me.  And I also -- I

16  mistake him for the one -- so there's two guys with beards

17  here, all right?  One of them, we've seen him in other images;

18  he has the blue short-sleeved shirt and the orange long-sleeved

19  shirt underneath it, and you can actually see that sleeve right

20  here.  When the fight breaks out, this guy is involved in it,

21  and we can see him try to pepper-spray me later, but I think

22  that he is the other guy because I'm just looking at the

23  beards.

24              (Video playing.)

25              I come towards this guy.  I've got my pepper spray

C. Cantwell - Direct

1   out.  He cocks his hand back.  I let him have it.

2                (Video playing.)

3                I pull back.

4                (Video playing.)

5                This guy runs in with the tracksuit pants.  I have no

6   idea who that guy is at the time that this is recorded.

7                (Video playing.)

8                The guy who goes down -- the guy who went in, he's

9   down.  The guy with the orange long sleeves, that's his foot

10  kicking that guy in the head.  I see that.  I go in.

11               (Video playing.)

12               Now, I'm attempting to pepper-spray this guy, the one

13  with the long orange sleeves.  But all these other people rush

14  in at the same time.  They push my arm up.

15               (Video playing.)

16               My thumb goes up off the pepper spray because I'm not

17  trying to pepper-spray innocent people.  I'm trying to pepper

18  spray the guy who's fighting.

19               (Video playing.)

20               I get my arm back down.  I reach in, trying to get

21  the pepper spray closer to him.

22               (Video playing.)

23               But I'm out of pepper spray.  These guys ain't.

24  They're letting the crowd have it.

25               (Video playing.)

C. Cantwell - Direct

1          You heard me testify earlier that I beat the shit out

2   of Tom Massey.  This is me punching Tom Massey, because Tom

3   Massey is in this pile of guys and Tom Massey is still

4   fighting, okay?  I'm not beating the hell out of somebody

5   because this is how I get my enjoyment.  The guy's still

6   fighting.

7               (Video playing.)

8          Here's the guy that I just pepper-sprayed.  Keep an

9   eye on his hand.  He's got pepper spray in his hand.  He's

10  attempting to pepper-spray me right now.

11              (Video playing.)

12         Something goes wrong.  He brings it back to look at

13  it.

14              (Video playing.)

15         Somebody out of frame pepper-sprays these people.

16              (Video playing.)

17         Now, this gets kind of hard to see, but this is

18  another angle of essentially the same thing going on.  I'm in

19  there.

20              (Video playing.)

21         Again, this is the same guy with the orange sleeves

22  there.  I'm not running around attacking people because that's

23  my idea of a good time.  This is the guy who I saw fighting,

24  and he's fighting.

25              Here's the guy that I pepper-sprayed pointing his

C. Cantwell - Direct

1    pepper spray at me.

2                (Video playing.)

3                Another fellow pushes him off the statue.

4                (Video playing.)

5                You can see me right there.

6                Now, what's fascinating about this experience is when

7    we go through each video, you can see everything that happens.

8    It's sort of a complex project, and it's difficult for me to

9    show to you, but that's what I'm attempting to do right now,

10   that we go from that angle of the fight, where you could see me

11   pepper-spray the guy from the side profile, to up above you see

12   me coming around the statue, and now we go back to what I

13   showed you earlier, okay?

14               And I won't waste your time playing this 100 times,

15   but I'll show you the video again where the woman grabs my

16   camera.

17               You see I'm coming around the statue, and that's

18   where it picks right up right there.  It goes from one frame to

19   the other.  I pepper-spray that guy who was in the fight with

20   the guy with the orange sleeves.  The guy with the orange

21   sleeves kicks somebody in the head.  I try to pepper-spray him.

22   My can is out.  He jumps into a pile.  I hit that guy.  As I'm

23   coming around, I'm hitting the same guy.  He's still fighting.

24               For the purpose of continuity here, we'll go to --

25   CCEX-132A is already in evidence.  I'd like to publish it and

C. Cantwell - Direct

1   show it to the jury again.

2           (Video playing.)

3           And this is still in slow motion, okay?  This person

4   right here is the same person who just said to me, "Hey, Chris,

5   how was your Walmart meetup?"  Okay.  This is a transgender

6   person.  I have no interest in causing this person any harm.

7   If this was the type of thing they're making it out to be, this

8   person would not be safe walking around in this crowd.

9           (Video playing.)

10          I'm sure you're all familiar with me by now.  Look at

11  her playing with her phone.

12          (Video playing.)

13          I go to get the stick.

14          (Video playing.)

15          "Mace, mace, mace."  She grabs the collar of my

16  shirt.  My body camera goes missing.

17          Go to 135A, CCEX-135A, already in evidence.

18          Let's put this back into slow motion three times.

19  CCEX-135A, from Getty Images.

20          (Video playing.)

21          Here's the guy I pepper-sprayed before.  Here's the

22  baton.

23          (Video playing.)

24          There's the guy with the orange sleeves that I was

25  fighting before.

143

C. Cantwell - Direct

1          (Video playing.)

2          Do you see her trying to bring that baton down?  This

3  guy right behind that torch, he's spraying pepper spray.

4          (Video playing.)

5          That's the guy I just pepper-sprayed.  So he's

6  putting him in a headlock and he's deploying pepper spray as we

7  speak.

8          (Video playing.)

9          I get pepper-sprayed.

10          (Video playing.)

11          I hope you can hear the urgency in my voice of "get

12  that fucking stick," because when I'm watching her bring that

13  thing down on people -- that's a metal rod and she's bringing

14  it down like this.  She's trying to brain guys with this thing.

15  I thought people's lives were in danger.

16          (Video playing.)

17          "Take that shit from her.  Get that fucking stick."

18          I'm going to play a very brief clip from Plaintiffs'

19  Exhibit 2103.  This is just me getting treated for getting

20  sprayed for pepper spray in the Vice video.  I have this as

21  CCEX-166A.

22          I can -- if you'd like, I can mute it and show it to

23  you guys before I publish it to the jury.  It's very brief and

24  just getting treated for pepper spray.  It cuts in and out a

25  little bit.

C. Cantwell - Direct

1              (Defendant Cantwell Exhibit 166A marked.)

2              THE CLERK:  Is this going to be admitted?

3              MR. CANTWELL:  I've got the volume off so you guys

4      can see it.  Can I -- is this okay?  Okay.

5              MS. KAPLAN:  We don't have any objection.

6              THE COURT:  Go ahead.

7              MR. CANTWELL:  CCEX-166A is a clip from Plaintiffs'

8      Exhibit 2103.  I'd like to publish it and show to it the jury

9      and move it into evidence.

10              THE COURT:  You may.

11              (Defendant Cantwell Exhibit 166A admitted.)

12              (Video playing.)

13              MR. CANTWELL:  That's me.

14              (Video playing.)

15              I couldn't partake in any celebration that took place

16      afterwards.  That's more or less the evening of August 11th for

17      me.

18              I'll bring up CCEX-018.  That's my text messages.

19      Plaintiffs have an actually better exhibit, but I just need to

20      show one thing, in any case.

21              What is plaintiffs' exhibit with my produced text

22      messages?

23              MR. BLOCH:  3317.

24              MR. CANTWELL:  3317?  Okay.  Let me pull that one up,

25      actually.

C. Cantwell - Direct

1         As it turns out, my first text message ever with Eli

2    Mosley, apparently, is, "What number should I call to speak

3    with the police about tonight?"  That was sent at 1:10 a.m. on

4    August 12th.  And then two minutes later he replies, "I'm

5    trying to figure out which PD is handling still.  I'll let you

6    know."  And I reply, "Thanks."

7         I guess this answers another question that we had

8    earlier.  I wasn't sure -- during earlier questioning I wasn't

9    sure what time I got to McIntire Park, and I just found out

10   that I woke up at 10:17 a.m. for the sake of the record on

11   that.

12        So after this thing, I go back to my hotel room.  I

13   text Eli Mosley.  I say, hey, you know, which law enforcement

14   agency should I speak to about the fight tonight?  And he says,

15   I'll get back to you.  And then the next thing I know, it's

16   August 12th.  And August 12th was kind of a short day for me.

17        On August 12th, I got pepper-sprayed pretty early.

18        I would move to admit CCEX-006 into evidence, publish

19   it, and show it to the jury.  This is one of two videos of me

20   being pepper-sprayed on my way to what was Lee Park on the

21   morning of August 12th.

22             THE COURT:  All right.  Be admitted.  Go ahead.

23             (Defendant Cantwell Exhibit 006 marked.)

24             (Defendant Cantwell Exhibit 006 admitted.)

25             MR. CANTWELL:  So there's two videos that I'm going

C. Cantwell - Direct

1  to show you.  This one was taken by a man who was walking

2  behind me.  All right?

3         To give you the orientation, this is -- if I'm

4  walking down Market Street towards Emancipation Park and the

5  library is on my right -- right?  Does that sound -- okay.  So

6  I'm walking down Market Street towards Emancipation Park.  The

7  library is on my right, and this is what you're about to see

8  from the man who's walking behind me.

9         (Video playing.)

10        You may recall the logo from my shirt there.

11        (Video playing.)

12        That happened pretty quick.  So let's go in slow

13  motion again.

14        (Video playing.)

15        Recall that in 2017 it was unusual to wear masks in

16  public.  Hopefully you remember that Adidas shirt from the

17  Walmart video, like I asked you to earlier, and you can see

18  that that man's hand appears to be pressing a button.

19        And that's the can of pepper spray that's getting

20  unloaded into my eyes.

21        (Video playing.)

22        I'm going to show you that from another angle, which

23  is CCEX-007.  Having been deprived of my body camera earlier --

24  oh.

25        I move to admit CCEX-007 into evidence and publish it

C. Cantwell - Direct

1   and show to it the jury.

2          THE COURT:  Admitted.  You may publish.

3          (Defendant Cantwell Exhibit 007 marked.)

4          (Defendant Cantwell Exhibit 007 admitted.)

5          MR. CANTWELL:  Having been deprived of my body camera

6   the prior evening, I brought a handheld camera, a Kodak.  I

7   think the model name was PlayFull.  It was a handheld HD camera

8   that I was holding as I walked towards the park because, again,

9   I thought it was important to collect evidence, because we were

10   in danger.

11          So same scene, but this time it's me holding the

12   camera.

13          (Video playing.)

14          I'm going to again put that in slow motion so we can

15   catch how sneaky this was.  This was completely -- I never saw

16   this coming.

17          This guy comes up out of the crowd.

18          (Video playing.)

19          That's the guy right there that's about to

20   pepper-spray me.  He's behind these people.  He walks forward.

21   He sees me coming.

22          (Video playing.)

23          MS. KAPLAN:  Your Honor, I'm no video technician, but

24   I assume given the way they're speaking this is going at

25   half-speed.

C. Cantwell - Direct

1          MR. CANTWELL:  Yeah, this is going in slow motion.

2   That was the idea.

3          So we can see, right behind that other person, that

4   the can of pepper spray is produced.

5          (Video playing.)

6          You see the Adidas logo.

7          (Video playing.)

8          Ladies and gentlemen, that is every bit as painful as

9   it sounds.

10         I would now like to show you a video of me receiving

11  first aid in the park.  This is CCEX-009.  This takes place

12  pretty much immediately after I've been pepper-sprayed.

13         THE COURT:  Are you waiting on me?

14         MR. CANTWELL:  No.  No.  I'm waiting for the video to

15  come up.  But while you mention it, I should have probably said

16  the magic words.

17         I would like to admit CCEX-009 into evidence and

18  publish it and show it to the jury.

19         THE COURT:  All right.

20         (Defendant Cantwell Exhibit 009 marked.)

21         (Defendant Cantwell Exhibit 009 admitted.)

22         MR. CANTWELL:  Okay.

23         (Video playing.)

24         If you didn't hear that -- I'd like you to -- I asked

25  this man, "Are we surrounded right now?"  Because I'm

C. Cantwell - Direct

1  terrified, because I can't see.

2          (Video playing.)

3          Now, if you didn't catch that, I'd like you to.

4  These guys say, "We're going to kill them.  We're going to

5  fucking kill them."  And my response is, "Don't fucking kill

6  anybody.  You're going to make it worse."

7          (Video playing.)

8          That's the last thing I thought, that -- was that

9  anybody dying was going to improve our station.

10         (Reporter clarification.)

11         MR. CANTWELL:  The last thing I thought was that

12  anybody dying was going to improve our station any.

13         Finally, I'll play -- this is a different image of me

14  getting treated for my pepper spray injury.  This is CCEX-166B.

15  It's another clip from Plaintiffs' Exhibit 2103.  It's just a

16  clip from the Vice thing of me getting treated for pepper spray

17  and the reporter asked me who pepper-sprayed me.

18         If there is no objection, I would like to move

19  CCEX-166B into evidence and publish it and show it to the jury.

20         THE COURT:  Be admitted.

21         (Defendant Cantwell Exhibit 166B marked.)

22         (Defendant Cantwell Exhibit 166B admitted.)

23         (Video playing.)

24         MR. CANTWELL:  That's more or less my day on August

25  12th.  You saw the plaintiffs play for you a clip from that

C. Cantwell - Direct

1   same Vice News piece where I'm walking down the street with no

2   shirt on, and surprisingly enough, I appear to be sort of

3   unhappy because I've just been pepper-sprayed twice in two days

4   after going through substantial effort to make sure that

5   nothing like that happened.

6          And so if you'll pardon my language, I didn't feel

7   very fucking good about it.

8          That's all I have.  Thank you.

9          THE COURT:  All right.  Mr. Cantwell will take the

10  stand for any cross-examination.

11         MR. CANTWELL:  Can I put this back over at my station

12  over there real quick?

13         THE COURT:  You may.

14                    CROSS-EXAMINATION

15   BY MR. BLOCH:

16  Q    Mr. Cantwell, just a few questions.  I want to start with

17  the clip you played of the leadership meeting.  Okay?

18  A    Yeah.

19  Q    You showed a clip of Elliot Kline talking about having

20  called UVA police before the torch march, right?

21  A    Yes.

22  Q    And this was from the video we talked about yesterday

23  where you announced to everybody at the beginning that you were

24  recording, right?

25  A    Yes.

C. Cantwell - Direct

1  Q     And we saw Mr. Kline -- Mr. Kline is standing right in

2  front of you, right?

3  A     Yes.

4  Q     And your body cam is right on your chest, right?

5  A     It is.

6  Q     He says something about they're going to have -- they're

7  going to send almost all of their police officers they have on

8  duty and getting some from overtime to join you at the torch

9  march, right?

10 A     Yes, that's what Mr. Kline told me.

11 Q     Right.  And then you went to Nameless Field for the

12 beginning of the torch march, right?

13 A     Yes.

14 Q     And there in fact were not any police there at all, right?

15 A     That was the case.

16 Q     And there were not any police there at all for the torch

17 march, right?

18 A     No, not along the path.  I saw police later.

19 Q     So your testimony is that somebody called the UVA police,

20 told them that there was going to be a torch march of 500 white

21 nationalists on their campus marching through and not a single

22 police officer actually showed up, right?

23 A     My testimony is that Mr. Kline told me that.  And if

24 Mr. Kline lied to me, I wouldn't be the first guy he lied to.

25 Q     Now, when you saw no police at the -- at Nameless Field,

C. Cantwell - Direct

1  you didn't call police, right?

2  A    No.

3  Q    You just kept marching, right?

4  A    Yeah.

5  Q    If we could show one additional clip from that video.  I'd

6  like to show -- I assume you have no objection to CCEX-153G.

7  This is a clip from 1:26:55 to 1:27:28.

8  A    I'm sorry, what is this?

9  Q    This is a 30-second clip from the leadership meeting

10 video.

11 A    I think I am going to object to this.  I'm anticipating

12 what this is.  So perhaps we should sidebar.

13 Q    I'll move on.  I'll come back to it.

14      Turning to the torch march, the fight at the statue

15 itself, you gave testimony that you were in fact defending

16 yourself and others, correct?

17 A    Yes.

18 Q    You agree with me that you in fact pled guilty to two

19 counts of assault and battery for what you did that night?

20 A    I did.

21 Q    If I could show and introduce PX-3880.

22      Did you post this on social media, Mr. Cantwell?

23 A    I did.

24           THE CLERK:  Was it admitted?

25           MR. BLOCH:  I'd like to admit it and publish it,

153

C. Cantwell - Direct

1  please.

2          MR. CANTWELL:  Yes.  No objection.

3          THE COURT:  Be admitted.

4          (Plaintiff Exhibit 3880 marked.)

5          (Plaintiff Exhibit 3880 admitted.)

6  BY MR. BLOCH:

7  Q    So Mr. Cantwell, just showing the jury, you posted this

8  photograph on social media on your Minds account on August

9  20th, 2017.  You said, "I hope to see you all soon.  If not,

10 it's been a great privilege to serve alongside you all," right?

11 A    Yes.

12 Q    Now, turning to the -- we can take that down.

13 A    Can you tell me what exhibit that is, please?

14 Q    This is PX-3880.

15 A    3880.

16 Q    You played a clip of eight minutes from a Radical Agenda

17 episode from August 7th where you had Jason Kessler on the

18 show, correct?

19 A    Yes.

20 Q    I would just like to play two additional clips that you

21 did not play.  Could we show -- or move into evidence PX-3956C,

22 please, and play it for the jury.

23          THE COURT:  Yes, go ahead.

24          (Plaintiff Exhibit 3956C marked.)

25          (Plaintiff Exhibit 3956C admitted.)

C. Cantwell - Direct

1           MR. BLOCH:  Thank you, Judge.

2           (Audio playing.)

3    BY MR. BLOCH:

4    Q    Did you also say that, Mr. Cantwell, on that Radical

5    Agenda episode with Jason Kessler?

6    A    Yes, I said that.

7    Q    And if we could play PX-3956A, just the first sentence.

8           THE COURT:  Go ahead.

9           MR. BLOCH:  Thank you, Judge.

10          (Plaintiff Exhibit PX-3956A marked.)

11          (Plaintiff Exhibit PX-3956A admitted.)

12          (Audio playing.)

13   BY MR. BLOCH:

14   Q    That's how you ended the show, right, with Mr. Kessler?

15   A    Was that the end of the show?

16   Q    My question is did you say that on that show?

17   A    I said that on that show, yeah.

18   Q    Now, you also made mention of a blog post.  You showed the

19   jury a blog post that you did in the days leading up to

20   Charlottesville, correct?

21   A    Yes.

22   Q    And if we could just show, I believe it was CCEX-24.

23   A    I think CCEX-24A was the one with the redactions.

24          (Defendant Cantwell Exhibit CCEX-24 marked.)

25          MR. BLOCH:  24A is fine.  Do you have 24?  We'll do

C. Cantwell - Direct

1   24.  I'm not showing a part that should be redacted.

2           THE WITNESS:  Okay.

3           MR. BLOCH:  If you could scroll down, Mr. Spalding,

4   to -- scroll down.  There's a portion that says something about

5   the ideas that we entertain on Radical Agenda.  Maybe go again.

6   Try one more.  Sorry, if you go back up.

7   BY MR. BLOCH:

8   Q    Okay.  So if you look at the second paragraph from the

9   bottom, and what you say here is -- this is the blog post that

10  you showed the jury earlier that you posted on August 7th,

11  right?

12  A    Yes.

13  Q    And what you say is, "Whatever violent ideas we entertain

14  on the Radical Agenda are not to be carried out here," right?

15  A    Yes.

16  Q    Now, the words "violent ideas we entertain on the Radical

17  Agenda," that's actually a link, right?

18  A    Yes, that's a link to episode 318 of the Radical Agenda,

19  I'm fairly confident.

20  Q    Well, it's a link to the episode we talked about the other

21  day when you testified called "Political Violence," right?

22  A    Yes.

23  Q    If we could show PX-2610.

24       That's the episode that you linked to, right?

25  A    Yes.

156

C. Cantwell - Direct

1    Q    And that's the one we played for the jury -- that I played

2    for the jury about how you want to be prepared -- you want

3    people to be prepared to go out and hurt people, right?

4    A    Yes.

5            MR. BLOCH:  We can take that down.

6     BY MR. BLOCH:

7    Q    Now, you showed the jury the footage from your handheld

8    camera on August 12th as well, right?

9    A    Yes.

10   Q    And you showed a second video that captures essentially

11   the exact same scene, right?

12   A    Yes.

13   Q    So you had another camera you say you took on August 12th,

14   right?

15   A    Yes.

16   Q    And what you showed -- the handheld camera I'm talking

17   about.  And what you showed the jury is about a minute and ten

18   seconds of footage from that camera, right?

19   A    Yes.

20   Q    And it shows you getting maced, right?

21   A    Yes.

22   Q    And then according to you, that camera also disappeared,

23   right?

24   A    The video was sent to my attorney while I was

25   incarcerated.

C. Cantwell - Direct

1   Q    Well, so the camera itself you were carrying in your hand,

2   right?

3   A    Yeah.

4   Q    And somehow you lost it that day, right?

5   A    Yeah.  I was being treated for the pepper spray.

6   Q    But -- you say it was while you were getting treated for

7   the pepper spray?

8   A    Yeah.  So I was on the ground screaming in pain and I lost

9   track of my camera.

10  Q    But somehow you got it back, you say, right?

11  A    Yeah.  Somebody sent it to my lawyer.  Somebody who was in

12  the park sent it to my lawyer while I was in jail.

13  Q    Isn't it true, Mr. Cantwell, you actually don't have any

14  idea how you got it back?

15          THE COURT:  Well, what difference does it make?

16  BY MR. BLOCH:

17  Q    Well, according to you, you just got it back at some

18  point, but you don't know how and you don't know when.

19          THE COURT:  That's not -- let's move on.

20  BY MR. BLOCH:

21  Q    And the only footage that was on it was that minute and

22  ten seconds of you getting maced, right?

23  A    No.  There was a longer video that led up to that.  This

24  is a clip -- this was produced during my criminal defense

25  investigation.  That's what that clip is.

C. Cantwell - Direct

1           MR. BLOCH:  Your Honor, the only question I have left

2   is the 30-second clip.

3           THE COURT:  Well, play it.

4           MR. BLOCH:  Can I have one moment, Judge, to confer

5   with my co-counsel?

6           THE COURT:  Mr. Smith, are you there?

7           Yes, go ahead.

8           Mr. Smith, if he wants to question, tell him it's

9   now.

10          MR. SMITH:  Yes, I'm here, Your Honor.

11          THE COURT:  All right.  Stand by.  Stand by.

12          MR. SMITH:  Sure.

13          THE COURT:  All right.  Do you have a question?

14          MS. KAPLAN:  Could we have a quick sidebar, Your

15  Honor?

16          THE COURT:  Okay.

17          (Sidebar commenced.)

18          MR. BLOCH:  The video that I would like to play, I'm

19  not sure Mr. Cantwell will have an objection to it.  It's not

20  what you think it is.  It's the one of Kline talking to

21  Azzmador about an hour and three minutes in.  There's a

22  30-second conversation where he says, "Be here at 5 and bring

23  your fighters."

24          THE COURT:  Is he in it?

25          MR. BLOCH:  He's taking it.

C. Cantwell - Direct

1              MR. CANTWELL:  Yeah, it's my body camera video.

2              I have the same problem with it, though.  And so the

3    thing is, I don't -- it doesn't matter to me.  And so I'm

4    inclined to let it go.  But I don't want to see the argument

5    for you to go do the other thing.  Does that make sense?

6              MR. BLOCH:  See the argument what?

7              MR. CANTWELL:  I don't want to see the argument for

8    truck of peace.

9              MR. BLOCH:  I won't play truck of peace or talk about

10   truck of peace.

11             MR. CANTWELL:  Okay.  You just want to play the

12   Azzmador or Kline thing?

13             MR. BLOCH:  Yeah.

14             MR. CANTWELL:  That's fine with me.

15             THE COURT:  Okay.  Let's go.

16             MR. CANTWELL:  If you want to do that, then I want to

17   bring in the final clip, which is the -- after we get the

18   announcement of the injunction, the plan that happens after

19   that, okay?

20             MS. KAPLAN:  Whatever he wants to do has got to be

21   responsive to something you do on cross.

22             MR. BLOCH:  I don't believe it's responsive.

23             MR. CANTWELL:  So the thing is, what you're trying to

24   bring in is something that -- is a plan that got discarded,

25   okay?

C. Cantwell - Direct

1          MR. BLOCH:  No, it's different.  This isn't the plan.

2          MR. CANTWELL:  I understand that you're bringing up

3    something different.  When Eli is speaking to Azzmador and

4    saying you have to have your fighters here by 5 o'clock, or

5    something like that, that plan goes completely out the window

6    when we get the injunction.

7          MR. BLOCH:  I don't think that's right.

8          MR. CANTWELL:  We are told -- you know what?  I --

9          THE COURT:  Well, is it impeaching him?

10         MS. KAPLAN:  No.  It has nothing to do with him.

11         THE COURT:  Hasn't this been in existence before?

12         MS. KAPLAN:  Yeah, but this video came in through --

13   this is a video that he recorded that came in through his

14   direct.

15         THE COURT:  Well, it's not -- every other video is

16   not coming in just because somebody played part of it.

17         MR. BLOCH:  No.  He just played a portion of the

18   video, and I think this sort of casts a different tone from

19   what he just played.

20         MR. CANTWELL:  And I would argue differently.

21         THE COURT:  Okay.  Play it.  It's admissible.

22         MR. BLOCH:  Are you putting anything else in if I

23   play it?

24         THE COURT:  No.  That doesn't -- everything -- all

25   the evidence stands on its own.

C. Cantwell - Direct

1              (Sidebar concluded.)

2              THE COURT:  All right.

3     BY MR. BLOCH:

4     Q    If I could just play CCEX-153G.  And just -- this is also

5     from the leadership meeting, isn't that right, Mr. Cantwell?

6     A    It is.

7     Q    And to set this up, this is Elliot Kline, right?

8     A    Yes.

9     Q    And this is Robert Azzmador Ray, correct?

10    A    Yes.

11             THE CLERK:  Mr. Bloch, I don't mean to beat a dead

12    horse, but you're going to move for the admission?

13             MR. BLOCH:  I'm sorry.  I move to move this into

14    evidence and ask that it be published.

15             THE COURT:  Go ahead.

16             (Defendant Cantwell Exhibit 153G marked.)

17             (Defendant Cantwell Exhibit 153G admitted.)

18             (Video playing.)

19    BY MR. BLOCH:

20    Q    Mr. Cantwell, does Elliot Kline say "anyone who is a

21    fighter needs to be here at 5 a.m."?

22    A    That's what he says in that video.

23             MR. BLOCH:  I have nothing further.

24             THE COURT:  Okay.  Thank you.  Mr. Smith?

25             THE WITNESS:  Now, I actually have I guess redirect

C. Cantwell - Direct

1  or a response to what we just went through there.

2          THE COURT:  Okay.  Go ahead.

3          MR. CANTWELL:  That plan changed substantially after

4  that conversation takes place.  There was an initial plan that

5  we were going to be able to get our vehicles up to the park and

6  people were going to be able to get right out and we weren't

7  going to have the sort of problems that we ended up having.

8          That problem was -- that plan went out the window

9  when there was some deliberation about the permit.  After that

10 clip, our permit was intact, we were informed that we would be

11 able to get -- or I was informed by Mr. Kline that we were

12 going to be able to get the vehicles up and we weren't going to

13 have any of these problems.

14         Whether Mr. Kline was informed about that or not

15 is -- you know, he's not here to testify, but that's what

16 Mr. Kline told me after that.  And of course we were not able

17 to get our vehicles up.  And so all the troubles that we

18 witnessed unfold the next day nonetheless unfolded.

19         THE COURT:  Okay.  Mr. Smith?

20         MR. SMITH:  Yes, Your Honor.

21         THE COURT:  Ask your questions.

22         MR. SMITH:  Yes, thank you.  Mr. Cantwell, can you

23 hear me okay?

24         THE WITNESS:  I hear you fine.

25                         CROSS-EXAMINATION

C. Cantwell - Direct

1   BY MR. SMITH:

2   Q    Okay.  So this leadership meeting, the one that you

3   recorded, was either David Matthew Parrott, Matthew Heimbach or

4   any member of Trad Worker present for that?

5   A    I do not recall any presence of Matthew Heimbach or

6   Matthew Parrott.  And I believe that I would if they were

7   there.  I have no way of knowing if a member of TWP was there.

8           MR. SMITH:  Okay.  Thank you.  No further questions,

9   Judge.

10          THE COURT:  Okay.  Is that all?

11          All right.  Thank you.

12          MR. JONES:  I have a brief question, Your Honor.  It

13  can wait until tomorrow.

14          THE COURT:  I don't want to wait.  If you've got one

15  question, don't wait.

16          MR. JONES:  Okay.

17                        CROSS-EXAMINATION

18   BY MR. JONES:

19  Q    Mr. Cantwell, I am pulling up what's been previously

20  admitted as PX-3239.

21  A    Okay.

22  Q    Can you see it on your screen yet?

23  A    Not yet.

24          MR. JONES:  Ask that it be shown to the witness and

25  also published to the jury.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/16/2021

1          THE COURT:  Is this a video?

2          MR. JONES:  I'm just going to show him a quick clip

3    and ask that one question.

4          (Video playing.)

5     BY MR. JONES:

6    Q    Mr. Cantwell, do you recognize this, what this video

7    depicts?

8    A    I do, sir.

9    Q    Now, you testified that you were maced; is that right?

10   A    I was.

11   Q    And that was when you were walking along that sidewalk

12   right there, isn't it?

13   A    Yes.  That's exactly where I was.

14         MR. JONES:  That's all the questions I have.  Thank

15   you.

16         THE COURT:  Okay.  Thank you.  Members of the jury,

17   I'm going to excuse you now until 9 o'clock tomorrow morning.

18   I understand that we only have two short witnesses tomorrow.

19   Then we're going to another phase of the trial where I will

20   instruct you on the law, and then closing arguments, and then

21   you will deliberate.

22         So we're coming toward the end, but not -- it's not

23   going to end tomorrow or Thursday.  We'll be here at least

24   through Friday, I'm sure.  But anyway, we're coming toward the

25   end.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/16/2021

1          So you're excused now.  Do not discuss the case with

2    anyone or allow anyone to discuss it with you.  Do not remain

3    within hearing of anyone discussing it.  Thank you.

4    **(Jury out, 5:01 p.m.)**

5          MS. KAPLAN:  Your Honor, a couple housekeeping

6    things.

7          THE COURT:  Okay.  We'll take that up.

8          MS. KAPLAN:  So number one, Your Honor, I'm pleased

9    to say that believe it or not, we've reached a stipulation with

10   Mr. Smith with respect to a certain document that we will work

11   out the details of which and inform Your Honor tomorrow.  That

12   means, I understand, that neither Mr. Parrott nor Mr. Heimbach

13   will take the stand.  So it should only be those two witnesses

14   tomorrow.

15         We would recommend, Your Honor -- obviously Your

16   Honor is the boss, but one thing we thought is if tomorrow ends

17   early, maybe the afternoon could be spent in some kind of a

18   charging conference if Your Honor is amenable to that.

19         THE COURT:  I don't take that much time.  You're

20   going to have a set of instructions either late tonight or

21   tomorrow morning.  I'm going to give you an opportunity to

22   argue about it, but I don't take like an afternoon or anything.

23         MS. KAPLAN:  So Your Honor, we propose then -- we'll

24   try to get you some proposals for charges tonight for sure.

25         THE COURT:  You've sent in things, both sides, and

Sines, et al. v. Kessler, et al., 3:17CV72, 11/16/2021

1   we've been working on it.

2           MS. KAPLAN:  Okay, Your Honor.  The only other thing

3   I said is I had a conversation with Mr. Campbell and

4   Mr. Kolenich about closings.  I think the parties are generally

5   amenable to doing half a day each side, and our hope would be

6   to do that on Thursday, Your Honor.

7           THE COURT:  All right.  Well, if we can start

8   tomorrow, that would be -- I don't think the jury can finish

9   this case in a day, to deliberate.  I think we've got to use

10  that time.

11          MS. KAPLAN:  It's 5 o'clock, Your Honor.  And I have

12  to -- I need some time to prepare a closing.  I'd really

13  appreciate if we could do it Thursday.

14          MR. KOLENICH:  We're in agreement with that, Judge.

15          MS. KAPLAN:  I don't think anyone wants to have to

16  pull an all-nighter.

17          THE COURT:  I'm trying to get this case over with in

18  the week.  I don't want to waste the jury's time.  They don't

19  want to come back and be here until Thanksgiving, I know.

20          MS. KAPLAN:  Understood.  We think that the jury will

21  probably -- Friday will be enough time, Your Honor, for them to

22  reach a --

23          THE COURT:  I've seen this verdict form.  I don't

24  know how on earth they'd get through that.  They're going to

25  have --

Sines, et al. v. Kessler, et al., 3:17CV72, 11/16/2021

1          MS. KAPLAN:  We can talk to -- that's the agreement

2  that we reached with defendants.

3          THE COURT:  You have a 23-day trial and only...

4          MR. KOLENICH:  Your Honor, the only thing I would add

5  is we have Rule 50s we've got to put in and maybe some

6  supplemental jury requests.

7          THE COURT:  All right.  Let's move on and see what we

8  can do.

9          MR. KOLENICH:  It's going to be difficult for us to

10  close if they close Wednesday and all of a sudden I've got to

11  get up.

12          THE COURT:  All right.

13          MS. KAPLAN:  We definitely wouldn't take up the whole

14  day Wednesday.  I think it's going to present a problem for you

15  guys too.

16          THE COURT:  Well, let's move on.

17          MS. KAPLAN:  That's all I have, Your Honor.

18          MR. SPENCER:  Would you mind if I just get a little

19  bit of clarity here because I'm a layman.  So the way things

20  are tending is that you would present your summation on perhaps

21  Wednesday afternoon?

22          MS. KAPLAN:  No, I think if -- to be clear, if the

23  judge decides to do it tomorrow, I think both sides -- you will

24  start and not finish tomorrow and we would finish tomorrow,

25  because as I understand, the two witnesses that are left will

Sines, et al. v. Kessler, et al., 3:17CV72, 11/16/2021

 1  take very little time.  We could be done with them by 10.

 2            MR. JONES:  We should be done well before ten even

 3  with the witnesses.

 4            MS. KAPLAN:  So I think the defendants would have to

 5  do most if not all of their closings as well tomorrow.  That's

 6  why --

 7            MR. SPENCER:  We're going to do closing arguments

 8  tomorrow afternoon?  Is that what you're saying?

 9            THE COURT:  No.

10            MR. SPENCER:  Okay.

11            THE COURT:  I mean, I'm saying if we can finish --

12  I've got to instruct the jury.

13            MR. SPENCER:  Right.

14            THE COURT:  And after I instruct the jury, I hate to

15  not use that time.

16            MR. SPENCER:  I'm sorry if I'm annoying anyone.  I

17  just simply -- if I just know what I need to prepare for, I can

18  just focus and get it done.  So if you just give me a --

19            THE COURT:  Well, start preparing.  The case, you've

20  heard all the evidence, probably.

21            MR. SPENCER:  That's true, but I really like to know

22  what's happening so that I can get my mind --

23            THE COURT:  Well, I know, but we've got 50 people or

24  so waiting.

25            MR. SPENCER:  I am one of them.

1        THE COURT:  I know, but they're not going to all

2   stand by waiting for you.

3        MR. SPENCER:  I'm not asking them to.  I'm simply

4   asking to give me a good window.  I want to get home for

5   Thanksgiving as much as everyone here, for my kids.

6        THE COURT:  I don't want the jury to rush through

7   this verdict thing and try to get through on Friday.  I mean,

8   that's what -- I mean, I'd be happy --

9        MR. SPENCER:  All I'm asking is a little bit.

10        THE COURT:  That's the thing.  I think the jury is

11   going to be tired and want to get out of here and I think all

12   of you want the jury to give as much time to the verdict as

13   they need.  And I just think it's going to take a lot of time.

14   So --

15        MR. SPENCER:  So should I prepare my summation for

16   tomorrow afternoon?

17        THE COURT:  No.  I mean, they're going to go first.

18        MR. SPENCER:  I know.

19        THE COURT:  And they're not likely -- even if they go

20   at all, they're not likely to get to you.

21        MR. SPENCER:  So I'm thinking Thursday.

22        THE COURT:  Well, think Thursday.  I would.

23        MR. SPENCER:  That's what I -- thanks.

24        MS. KAPLAN:  Your Honor, if we were to make ours

25   shorter, would that allow us to start Thursday morning?  We

Sines, et al. v. Kessler, et al., 3:17CV72, 11/16/2021

1    could cut it to two hours.  It's just going to be -- there's

2    three weeks of testimony.  I can't -- I've got a night, Your

3    Honor.  I mean, I'm a very efficient worker, but I have to tell

4    you, I'm not that efficient.

5            THE COURT:  I mean, you know, I mean, look, I can

6    come back Monday.  It's not a problem to me.  But I don't like

7    to have an unhappy jury.

8            MS. KAPLAN:  Understood, Your Honor.  Understood.

9    We'd just like to give this the attention it deserves on the

10   closing.  And starting at 5 o'clock tonight to go tomorrow,

11   that only gives me between now and 9 a.m. tomorrow, which is

12   not a lot of time.

13           THE COURT:  All right.

14           MS. KAPLAN:  I'm very fast, but I'm not that fast,

15   Your Honor.

16           THE COURT:  I thought this case should have your

17   closing argument already in your head for the last three years.

18           MS. KAPLAN:  There's a lot of testimony that's come

19   in, Your Honor.  We obviously want to point to the evidence.

20           THE COURT:  Okay.

21           MS. KAPLAN:  Thank you, Your Honor.  My heart just

22   stopped beating out of my chest.  I appreciate that, Your

23   Honor.  Thank you.

24           THE COURT:  Okay.

25           Could you take about three hours a side?

Sines, et al. v. Kessler, et al., 3:17CV72, 11/16/2021

1           MS. KAPLAN:  That's what I'm thinking.

2           THE COURT:  That's about all we'd get in anyway.  I'd

3   like to let the jury at least get together and select a

4   foreman.

5           MS. KAPLAN:  That's what we agreed with, actually,

6   with Mr. Cantwell and Kolenich.  That was our proposal.  If you

7   wanted to cut it by half an hour or something, we could do that

8   as well.

9           THE COURT:  Is everybody on the defense side --

10          MR. CAMPBELL:  To be fair, Judge, we didn't clear it

11  with everyone else.  We did kind of get time estimates that

12  made it seem feasible, but no one else has agreed to it that

13  I'm aware of.

14          MR. JONES:  I think if plaintiffs were willing to

15  maybe shave off another -- make it two and a half hours, that

16  would be, with five of us, four or us, however many --

17          MR. CANTWELL:  I'm sorry.  Is the deliberation now

18  three hours for the plaintiffs and three hours for the defense

19  in total?

20          THE COURT:  How many closing arguments do we have?

21          THE CLERK:  I believe Mr. Smith and Mr. ReBrook would

22  be two more.

23          MS. KAPLAN:  I tell you what, Your Honor.

24          THE COURT:  Mr. Smith will be here, but Mr. ReBrook,

25  I don't know.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/16/2021

1          MR. CANTWELL:  I would just like to point out, I

2    don't think all the defendants are so similarly situated as are

3    the plaintiffs.  And so I think it would be --

4          THE COURT:  Well, the plaintiffs have got nine.

5    They've got nine people they've got to talk about damages and

6    all that.  And --

7          MR. CANTWELL:  That's true, but they only have one

8    theory to pursue, right?

9          MS. KAPLAN:  Your Honor, I'm going to borrow

10   something from that old '70s TV show, Let's Make a Deal.  If we

11   can start Thursday morning, we'll cut ours to two and a half.

12   That gives them an extra half an hour.

13         THE COURT:  All right.  You all try to figure out how

14   to divide up the time.  If you can't do it, I can do it.  But I

15   think some of you need less than others.  That's giving you all

16   four hours and she's taking two and a half.  That's pretty

17   good.

18         MS. KAPLAN:  I thought it was three and a half for

19   them.

20         THE COURT:  Three and a half?

21         MS. KAPLAN:  Three and a half for them, two and a

22   half for us.

23         THE COURT:  All right.

24         MR. SPENCER:  Maybe they should just be forced to

25   have an all-nighter just so it will be fair.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/16/2021

1            MS. KAPLAN:  Mr. Spencer, the days since I spent

2     all-nighters have long time passed.

3            (Laughter.)

4            Thank you, Your Honor.

5            THE COURT:  Thank you all.

6     (Proceedings concluded, 5:11 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sines, et al. v. Kessler, et al., 3:17CV72, 11/16/2021

1               C E R T I F I C A T E

2        I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3    the United States District Court for the Western District of

4    Virginia, appointed pursuant to the provisions of Title 28,

5    United States Code, Section 753, do hereby certify that the

6    foregoing is a correct transcript of the proceedings reported

7    by me using the stenotype reporting method in conjunction

8    with computer-aided transcription, and that same is a

9    true and correct transcript to the best of my ability and

10   understanding.

11       I further certify that the transcript fees and format

12   comply with those prescribed by the Court and the Judicial

13   Conference of the United States.

14       /s/ Lisa M. Blair              Date: November 16, 2021

15

16

17

18

19

20

21

22

23

24

25