Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

```
 1              UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF VIRGINIA
 2                 CHARLOTTESVILLE DIVISION

 3  ***************************************************************

 4  ELIZABETH SINES, ET AL.,    CIVIL CASE NO.:  3:17CV72
                                NOVEMBER 17, 2021, 8:59 AM
 5                              JURY TRIAL, DAY 18
         Plaintiffs,
 6  vs.

 7                              Before:
                                HONORABLE NORMAN K. MOON
 8                              UNITED STATES DISTRICT JUDGE
    JASON KESSLER, ET AL.,      WESTERN DISTRICT OF VIRGINIA
 9
         Defendants.
10
    ***************************************************************
11
    APPEARANCES:
12

13  For the Plaintiffs:     ALAN LEVINE, ESQUIRE
                            COOLEY LLP
14                          1114 Avenue of the Americas, 46th
                            Floor
15                          New York, NY  10036
                            212.479.6260
16
                            DAVID E. MILLS, ESQUIRE
17                          COOLEY LLP
                            1299 Pennsylvania Avenue, NW,
18                          Suite  700
                            Washington, DC  20004
19                          202.842.7800

20

21

22  Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                     255 West Main Street, Suite 304
23                   Charlottesville, Virginia  22902
                     434.296.9284
24
    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25  TRANSCRIPT PRODUCED BY COMPUTER.
```

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   APPEARANCES CONTINUED:

2   For the Plaintiffs:          MICHAEL L. BLOCH, ESQUIRE
                                 EMILY C. COLE, ESQUIRE
3                                RAYMOND P. TOLENTINO, ESQUIRE
                                 Kaplan Hecker & Fink LLP
4                                350 Fifth Avenue, Suite 7110
                                 New York, NY  10118
5                                212.763.0883

6                                WILLIAM A. ISAACSON, ESQUIRE
                                 Paul, Weiss, Rifkind, Wharton &
7                                Garrison LLP
                                 2001 K Street, NW
8                                Washington, DC  20006

9   For the Defendants:          DAVID L. CAMPBELL, ESQUIRE
                                 Duane, Hauck, Davis, Gravatt &
10                               Campbell, P.C.
                                 100 West Franklin Street, Suite 100
11                               Richmond, VA  23220
                                 804.644.7400
12
                                 CHRISTOPHER CANTWELL, PRO SE
13                               #00991-509
                                 USP Marion
14                               4500 Prison Road, PO Box 2000
                                 Marion, IL  62959
15
                                 BRYAN J. JONES, ESQUIRE
16                               Bryan J. Jones, Attorney at law
                                 106 W. South Street, Suite 211
17                               Charlottesville, VA  22902
                                 540.623.6952
18
                                 JAMES E. KOLENICH, ESQUIRE
19                               Kolenich Law Office
                                 9435 Waterstone Blvd., Suite 140
20                               Cincinnati, OH  45249
                                 513.444.2150
21
                                 WILLIAM E. REBROOK, IV, ESQUIRE
22                               (Appearing via Zoom)
                                 The ReBrook Law Office
23                               6013 Clerkenwell Court
                                 Burke, VA  22015
24                               571.215.9006

25

3

 1   APPEARANCES OF COUNSEL:

 2   For the Defendants:          JOSHUA SMITH, ESQUIRE
                                  Smith LLC
 3                                807 Crane Avenue
                                  Pittsburgh, PA  15216
 4                                917.567.3168

 5                                RICHARD SPENCER, PRO SE
                                  P.O. Box 1676
 6                                Whitefish, MT  59937

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF WITNESSES

2   WITNESSES ON BEHALF OF DEFENDANTS:                   PAGE

3   RICHARD HAMBLEN

4    Direct Examination by Mr. Jones                    11
     Cross-Examination by Mr. Levine                    22
5    Cross-Examination by Mr. Cantwell                  37
     Cross-Examination by Mr. Smith                     38
6
    CAPTAIN WILLIAM NEWBERRY
7
     Direct Examination by Mr. Jones                    40
8    Cross-Examination by Mr. Isaacson                  42

9   NATALIE ROMERO

10   Direct Examination by Mr. Cantwell                 47

11  DEVIN WILLIS

12   Direct Examination by Mr. Cantwell                 65
     Cross-Examination by Mr. Jones                     79
13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         INDEX OF EXHIBITS

 2    EXHIBITS ON BEHALF OF THE PLAINTIFF:

 3          EXHIBIT:                Marked      Received

 4          0195                      24           24

 5          3961                      31           32

 6          1438                      84           --

 7          3864                      40           40

 8          0378                      40           40

 9          3254                      40           40

10    EXHIBITS ON BEHALF OF THE DEFENDANTS:

11          EXHIBIT:                Marked      Received

12          LOS-072A                  14           14

13          LOS-072B                  17           17

14          TWP-2533                  46           80

15          CC-137A                   64           64

16          CC-167                    71           71

17          CC-140A                   74           74

18          CC-157                    78           78

19

20

21

22

23

24

25
```

1  (Proceedings commenced, 8:59 a.m.)

2          THE COURT:  Good morning.  Call the case, please.

3          THE CLERK:  Yes, Your Honor.  This is Civil Action

4  Number 3:17-cv-00072, Elizabeth Sines and others versus Jason

5  Kessler and others.

6          THE COURT:  Plaintiffs ready?

7          MR. ISAACSON:  Yes, Your Honor.

8          THE COURT:  Defendants ready?

9          MR. KOLENICH:  Yes, Your Honor.

10          MR. SMITH:  I am, Your Honor.

11          MR. CANTWELL:  This is Christopher Cantwell.  I

12  suppose that depends on our definition of "ready."  I'm in the

13  middle of a discussion with plaintiffs' counsel about

14  stipulations and witnesses that I'm seeking to call in the

15  absence of them, and I have just been handed some papers and a

16  bunch of things that haven't been figured out yet.  So

17  depending on what I'm being asked if I'm ready for, yes or no.

18          THE COURT:  Okay.  Do you have other witnesses to

19  call?

20          MR. CANTWELL:  I'm seeking to call Romero and Willis.

21  They're trying to get me not to.

22          THE COURT:  What's the situation on that?

23          MR. MILLS:  Your Honor, it's David Mills.  They are

24  available.  We have filed a letter with the Court asking that

25  they not be permitted to testify --

1          THE COURT:  Okay.

2          MR. MILLS:  -- and explaining, and offering --

3          THE COURT:  What do you want to ask them?  That's the

4   question.

5          MR. CANTWELL:  I have several things I'd like to ask

6   them.  I said when I was questioning them at the beginning that

7   I wanted to call them again.  I said that when I was

8   questioning them at the beginning.  There is evidence that I

9   want to bring in through them.  I've asked the plaintiffs to

10  stipulate to them.  They told me last night that they lost the

11  piece of paper that I gave them.  Then I called Michael Bloch

12  and we talked about it on the phone.

13          And then this morning when I walk in here, they give

14  me this folder with a letter that I have not yet read, and then

15  they tell me they can't find the thumb drive that I gave it to

16  them on, and then they tell me that they have it.  And, you

17  know, it would just be -- if they're available, I could just

18  question them, and we could solve the problem.

19          THE COURT:  You have no right not to put -- I mean,

20  he can call a witness now.

21          MR. MILLS:  I understand.  My --

22          (Overlapping speakers.)

23          THE COURT:  -- take the deposition here before we

24  start the testimony.  You can object.

25          MR. MILLS:  I understand, Your Honor.  What

1   Mr. Cantwell said isn't entirely accurate, but the important

2   thing is that our understanding is he wants to authenticate

3   certain things.  He wants to re-call witnesses -- he's already

4   asked the same witnesses about most of the same exact --

5              THE COURT:  Well, I don't know that.

6              Is that true, Mr. Cantwell?

7              MR. CANTWELL:  I want to bring in evidence that is

8   not in evidence.  They are in the evidence.  And it's

9   important.  And I did not have that data.

10             THE COURT:  Who is your first witness?

11             MR. CANTWELL:  I call Natalie Romero.

12             THE COURT:  Okay.

13             MR. MILLS:  We will have them brought to the Court.

14  They've been told to be ready and we'll have them here.

15             THE COURT:  Where are they?

16             MR. MILLS:  They are down the street.  We had filed a

17  letter with the Court to have them excluded, but we will bring

18  them to court forthwith.  I understood that there were two

19  witnesses that were ready this morning and available for

20  Mr. Jones' case --

21             THE COURT:  Well, if Cantwell hasn't finished his --

22             MR. MILLS:  I understand.  If it's possible we can

23  call the other witnesses first.

24             THE COURT:  Mr. Cantwell, we're going to take them

25  out of turn.

1        MR. CANTWELL:  That's fine with me, Judge.

2        THE COURT:  Okay.  Mr. Jones?

3        MR. JONES:  Mr. Hamblen is ready to testify now, so

4   we can do that while we're waiting on the other witnesses.

5        MR. LEVINE:  Your Honor, in respect of the witness

6   Mr. Hamblen, we filed a letter with the Court.  We'd like to

7   have a discussion with the Court before the jury comes in over

8   the admissibility of the video that they propose to show.

9        THE COURT:  All right.  Is that all he's going to

10  testify, is to a video?

11       MR. JONES:  To an audio clip from the video and the

12  video, yes; essentially.  I mean, I have a couple other

13  foundational questions.

14       THE COURT:  I've read the letters.  I understand the

15  situation.  Do you have any -- what authority do you rely upon

16  that would allow him to authenticate the video?

17       MR. JONES:  He's in the video and witnessed the

18  things that are in the video, the overwhelming majority of the

19  things in the video.  And that's -- this Court has admitted

20  countless video exhibits on that basis in this trial.

21       THE COURT:  Okay.  Like I've said over and over and

22  over, the fact that I admitted evidence to which there was no

23  objection doesn't make it admissible when there is an

24  objection.

25       MR. LEVINE:  Your Honor, I think the letter that

10

1   Mr. Jones put in yesterday in response to our arguments makes

2   clear how inadmissible this video is, because he intends to

3   argue --

4            THE COURT:  Don't lose the witness, now.

5            MR. LEVINE:  He intends -- essentially, he wants to

6   bring the video in for the truth, and there isn't the

7   foundation to admit the video for the truth.  And the video --

8   the conduct that he's looking to argue here is the conduct of,

9   if you will, the counter-protesters along the street and what

10  they said and did.  And he's alleging, in effect, that those

11  random people are, quote, "associates" of DeAndre Harris, and

12  that that somehow explains the garage attack for DeAndre

13  Harris.

14           But the witness can't possibly have seen all of the

15  conduct, because the video is a six-minute video of the League

16  of the South column marching back to the garage.  So the column

17  is at least a block long and they take six minutes to walk down

18  the street.  And most of the video, Your Honor, is in the back

19  of the column, and Mr. Hamblen is in the front of the column.

20  So -- and most of the -- most of the taunting that he wants to

21  argue from takes place behind Hamblen.  So he can't

22  authenticate what he can't see.

23           THE COURT:  Okay.

24           MR. LEVINE:  He can't be a foundation witness for

25  those people.

R. Hamblen - Direct

1           THE COURT:  I read all that.

2           MR. LEVINE:  And it's hearsay, Your Honor.

3           MR. JONES:  It's just not true.  He can authenticate.

4  He turned around and looked.

5           THE COURT:  Okay.  Call him in and we'll --

6           MR. JONES:  It will be quicker just to have him --

7           MR. LEVINE:  No, Your Honor --

8           THE COURT:  Listen.  You said it.  You tell me.  He

9  tells me.

10          MR. LEVINE:  Apologize, Your Honor.

11          THE COURT:  Why not look at the evidence?

12          Let's call the jury.

13  **(Jury in, 9:07 a.m.)**

14          THE COURT:  All right.  You may be seated.

15      RICHARD A. HAMBLEN, CALLED BY THE DEFENDANTS, SWORN

16                      DIRECT EXAMINATION

17   BY MR. JONES:

18  Q    Good morning, sir.  Would you please state your name for

19  the jury?

20  A    Richard A. Hamblen.

21  Q    Thank you, sir.  Are you a member of the League of the

22  South?

23  A    Yes, sir.

24  Q    What year did you join the League?

25  A    1995.

                              R. Hamblen - Direct

1   Q      Did you come to Charlottesville in August of 2017?

2   A      Yes, sir.

3   Q      And were you involved in the torch march on Friday,

4   August 11th?

5   A      No, sir.

6   Q      When did you come into the city on that August 12th

7   morning?

8   A      It was in the middle of that Friday afternoon.

9   Q      Where did you go?

10  A      We just drove -- when we got to town we drove past just to

11  see the area, and then drove out to our lodging Friday night.

12  Q      And did you attend the Unite the Right rally on that next

13  morning?

14  A      Yes.

15  Q      And why did you decide to attend the rally?

16  A      I was all about the monument and saving the monument.  My

17  father and grandfather were both named for General Lee, and it

18  was actually kind of personal.  I was trying to stand up for

19  the South.

20  Q      I'm going to play you an audio clip.  It's been marked as

21  Defense 072A.  I'll just play the beginning of it and ask you

22  if you recognize it.

23  A      All right.

24         (Audio playing.)

25  Q      Do you recognize what that is?

R. Hamblen - Direct

1    A    Yes, sir.

2    Q    What is that?

3    A    It is the audio of the retreat down Market Street back to

4    where our vehicles were.

5    Q    Were you in the crowd that was walking?

6    A    Yes.  I was part of the League of the South group.

7    Q    Okay.  And where were you walking?

8    A    I was walking probably in the middle of a group.

9    Q    So you recognize the audio in this?

10   A    Yes.

11           MR. JONES:  Your Honor, I'm going to move to admit

12   Defense Exhibit 072A, and I'll start from the beginning of the

13   audio clip and go to 04:05 and ask that it be published to the

14   jury.

15           MR. LEVINE:  Objection, Your Honor.

16           THE COURT:  All right.

17           MR. LEVINE:  No foundation.

18           THE COURT:  Okay.  Lay it.

19    BY MR. JONES:

20   Q    Can you hear everything that's being played in this audio?

21   A    Yes.

22   Q    And you heard everything that's played in the audio

23   because -- where were you stationed relative to the person who

24   was recording the audio?

25   A    I had to be fairly close.

R. Hamblen - Direct

1        MR. JONES:  Can we play this and publish this to the

2   jury?

3        THE COURT:  You may.

4        (Defendant LOS Exhibit 072A marked.)

5        (Defendant LOS Exhibit 072A admitted.)

6        MR. JONES:  Can we play it through my computer here?

7        (Audio playing.)

8        MR. JONES:  I'm going to move forward here to the

9   2:40 mark.

10       MR. SMITH:  Are we just listening to audio at the

11  moment or is there video?

12       MR. JONES:  Just audio to lay the foundation.

13       (Audio playing.)

14   BY MR. JONES:

15  Q   Mr. Hamblen, can you describe what we're listening to?

16  A   Well, I heard the state trooper or Charlottesville PD or

17  whoever it was declaring unlawful assembly and telling us to

18  vacate the streets.  So we were attempting to vacate the

19  streets through the only exit, egress that was available to us,

20  which unfortunately pushed us --

21       MR. LEVINE:  Objection, Your Honor.  He's not

22  answering the question.

23       MR. JONES:  I asked him what he's hearing in the

24  video, so he's simply describing -- or in the audio.  I don't

25  see that that's a valid objection.

R. Hamblen - Direct

1        THE COURT:  Well, you can ask him what the

2   circumstances were going on at the time.

3    BY MR. JONES:

4   Q    So just specifically I'm going to draw your attention here

5   to this clip starting at 2:40.

6            (Audio playing.)

7        Do you hear that individual yelling there?

8   A    Yes.

9   Q    Was he a member of your group or was he a member of a

10  group of counter-protesters following you?

11  A    He was a counter-protester.

12       (Audio playing.)

13  Q    So all those voices that we heard there, were those the

14  voices of the people in your group or were they the voices of

15  the counter-protesters following you up the road?

16  A    They were the voices of the counter-protesters.

17  Q    And what were some of the things they were shouting at

18  you?

19  A    Vague threats, obscenities, they were calling us names,

20  that sort of thing.

21       (Audio playing.)

22  Q    So there's somebody there saying "Do something, my N word,

23  do something, my N word."  Who was that directed at?

24  A    It was directed at me.

25  Q    And where were you when he was saying those things to you?

R. Hamblen - Direct

1    A    I had my back to him when he said that and we were

2   marching down toward the parking garage.

3    Q    Was he somebody in your group or was he one of the --

4    A    No.

5    Q    -- counter-protesters?

6    A    No.  He was a counter-protester.

7    Q    Did he do anything at that point as he was saying those

8   things?

9    A    Yes.  He or somebody next to him attempted to trip me.

10        (Audio playing.)

11   Q    That last statement there, did you hear that?

12   A    Yes, I did.

13   Q    What were they saying?

14   A    They're saying "You can't be racist if you're scared."

15   Q    Now I'm going to show you a video clip of that same

16   incident.  This has been marked as Defense Exhibit 72B.  Do you

17   see that on your screen there, Mr. Hamblen?

18   A    Yes, I do.  I do.

19   Q    And do you recognize who is portrayed in that video?

20   A    Could you repeat that.

21   Q    Do you recognize what's portrayed in that video?

22   A    Yes.

23   Q    Is that a fair and accurate representation of what

24   occurred on Market Street --

25   A    Yes.

R. Hamblen - Direct

1  Q    -- on August 12th, 2017?

2  A    Yes, sir.

3         (Video playing.)

4  Q    Did you hear what those people were saying there?

5  A    Yes, sir.

6  Q    What were they saying?

7  A    "Shields up."

8  Q    And was that the group of League of the South?

9  A    For the most part.

10 Q    And why were they saying that?  Why were you guys saying

11 that?

12 A    Throughout the day a lot of stuff had been flying through

13 the air, and it continued to fly through the air, directed at

14 us.

15 Q    Now, do you see yourself in the video currently?

16 A    Yes.

17 Q    Could you circle yourself on the touch screen there?

18 A    Yes.

19       MR. JONES:  Your Honor, I'm going to move to

20 introduce Defense Exhibit 72B into evidence.

21       THE COURT:  It will be admitted.

22       (Defendant LOS Exhibit 72B marked.)

23       (Defendant LOS Exhibit 72B admitted.)

24       (Video playing.)

25       MR. JONES:  I guess for the benefit of the jury I'll

R. Hamblen - Direct

1    go back and start from the start.

2              (Video playing.)

3     BY MR. JONES:

4    Q    Who is that person?

5    A    That's Michael Tubbs.

6    Q    And if you wouldn't mind just briefly restating, where are

7    you guys going?

8    A    We're -- in pursuant with the police orders, we're leaving

9    the park.

10   Q    And the jury didn't see it when you did it before, but is

11   this you right there?

12   A    Yes, sir.

13             (Video playing.)

14   Q    Now, Mr. Hamblen, are you part of this group right here

15   that's marching up Market Street?

16   A    I'm a little bit to the right of this scene in the

17   picture.

18   Q    Now, as you're marching up Market Street, were you only

19   looking forward or did you look behind you?

20   A    I kept glancing behind us because counter-protesters,

21   photographers and who knows what was intermingled with us.

22             (Video playing.)

23   Q    Do you recognize this individual right here?

24   A    Yes.  He was swinging that -- it looks like a stick

25   throughout the day.

R. Hamblen - Direct

1   Q    Did you see him --

2   A    I didn't see him at this particular point, but I saw him

3   when we got closer to the garage.

4            (Video playing.)

5   Q    Are you a part of this group just in front of the camera

6   marching up towards the Market Street garage; is that right?

7   A    Yes.

8   Q    I'll move up to the 2:00.

9            (Video playing.)

10       Do you recognize anybody in this image?

11  A    Yes.  I see my compatriot Gene Andrews on the extreme

12  right.  And I saw some individuals follow us down to the

13  garage.

14  Q    Do you know who that person is?

15  A    I subsequently found out it's DeAndre Harris.

16           (Video playing.)

17  Q    Is this DeAndre Harris right here?

18  A    It appears to be.  Here he appears to wear the same

19  clothes he was seen with later.  Yes.

20           (Video playing.)

21  Q    Who is this right here?

22  A    That's me, sir.

23           (Video playing.)

24  Q    Is this you again right there?

25  A    Yes, sir.

R. Hamblen - Direct

1  Q    So do you turn around there and start heading back towards

2  the garage?

3  A    Yes, sir.  I was waiting for my friend Gene Andrews to

4  catch up.

5            (Video playing.)

6  Q    So that voice there, who's he directing those words

7  towards?

8  A    Sounded like it came in my direction.  It was right behind

9  me.

10 Q    Was this when he tried to trip you?

11 A    Yes.

12           (Video playing.)

13 Q    Do you know who that individual is there on the ground?

14 A    Yes, sir, he was a League of the South member named Alex

15 from Florida.

16 Q    I'm going to show you an image that's previously been

17 admitted as Defense Exhibit 2066.  Is that Alex?

18 A    Yes, sir, that's the same man.

19 Q    Was this after that incident there where he fell in the

20 garage?

21 A    Correct, it was after the scuffle.

22 Q    Is that Michael Tubbs?

23 A    Yes, sir.  He was administering first aid.

24 Q    Let me show you what's been previously admitted as Defense

25 Exhibit 073.  Who is that?

R. Hamblen - Direct

1   A     That's Alex from Florida.

2   Q     Is that how he looked after that Market Street incident?

3   A     I didn't see him until he got bandaged up.  But yes, he

4   had a big bandage on his head.

5               (Video playing.)

6   Q     Was that you just a second ago over on this part of the

7   screen?

8   A     Yes.

9               (Video playing.)

10  Q     Who is this person right there?

11  A     That is me, sir.

12  Q     If you could just describe what's happening right here.

13  What happened right before the camera panned around?

14  A     We were walking down the street, proceeding with the

15  procession, and these three individuals in black darted past me

16  and attempted to take my flag.  And I resisted them and then

17  they turned around on me and beat me down.

18              (Video playing.)

19  Q     Is this you right here?

20  A     Yes, sir.

21  Q     And you said there were three individuals.  Is this one of

22  those individuals?

23  A     Yes, sir.  That's the one that assaulted me directly.

24              (Video playing.)

25  Q     What did she do with her foot there?

22

R. Hamblen - Cross

1  A    Sir?

2  Q    What did she do with her foot?

3  A    She kicked my upper thigh and was holding onto my canteen

4  strap and threw me to the ground.

5        (Video playing.)

6  Q    What was she doing there in that portion of the video?

7  A    She proceeded to punch me in the head.

8        (Video playing.)

9  Q    Sir, do you know who James Fields is?

10  A    I do now.

11  Q    When did you learn who he was?

12  A    That afternoon.

13  Q    The afternoon of August 12th?

14  A    Yeah, towards the evening when the news reports hit.

15  Q    Are you aware of the League being involved in a conspiracy

16  to commit racially motivated violence in Charlottesville?

17  A    No, sir.

18        MR. JONES:  Thank you.  That's all the questions I

19  have.

20        THE COURT:  Okay.

21                    CROSS-EXAMINATION

22  BY MR. LEVINE:

23  Q    Mr. Hamblen, you testified that you joined the League of

24  the South in 1995; is that right?

25  A    Yes, sir.

R. Hamblen - Cross

1   Q    And by -- and you were in the Tennessee chapter?

2   A    Yes, because I lived in Tennessee.

3   Q    And by 2017, at the time of Unite the Right, you were

4   president or chairman of the Tennessee chapter, correct?

5   A    Yes, sir, I was state chair.

6   Q    And Michael Hill was president of the League?

7   A    Yes.

8   Q    And you joined the League in 1995 because you shared

9   Michael Hill's belief about white Southern nationalism, I

10  assume; is that right?

11  A    No, sir.  I joined because I believed in the

12  organization's stated beliefs in securing the independence of

13  the South by any means honorable.

14  Q    Did you run -- the Tennessee League had a Facebook post,

15  didn't it?

16  A    I don't recollect, honestly.

17  Q    In 2017, didn't the League use a Facebook post for the

18  League's activities?

19  A    Yes.  Yes, we did.

20  Q    Okay.

21       Can we show the witness Plaintiffs' Exhibit 195.  And did

22  you -- can you identify that?

23  A    Yes, it looks like a League post.

24  Q    And were you -- you were chairman of the League in July of

25  2017, Tennessee chapter, correct?

R. Hamblen - Cross

1   A    Yes, I had just taken over.

2   Q    So did you do -- actually physically do the Facebook posts

3   or did you approve them?

4   A    I'm not sure if I did either.

5   Q    Well, this was a post of your chapter of the League of the

6   South, correct?

7   A    Correct.

8            MR. LEVINE:  We offer it in evidence, Your Honor.

9            THE COURT:  Be admitted.

10            MR. LEVINE:  Ask that it be published for the jury.

11            THE COURT:  You may.

12            (Plaintiff Exhibit 195 marked.)

13            (Plaintiff Exhibit 195 admitted.)

14   BY MR. LEVINE:

15   Q    This says -- this is dated July 9th, 2017, correct?

16   A    Yes, sir, that's what it says.

17   Q    And it says, "August 12th must be a defining point for our

18   people.  We need you to stand in solidarity with us against the

19   enemies of our folk, our blood, our soil, our kith, and our

20   kin."  Isn't that what it says?

21   A    Yes, sir.

22   Q    And when the Tennessee chapter -- you're leading it.  Is

23   it your testimony that you didn't have -- you weren't familiar

24   with the Facebook posts of your chapter?

25   A    Not this particular one, but I agree with it.

R. Hamblen - Cross

1   Q    You do agree with it?

2   A    Yes, sir.

3   Q    And you agree with it as the meaning of August 12th in

4   Unite the Right?

5   A    Yes, sir.  It was about the monument for us.

6   Q    Now, this says "we stand" -- "we need you to stand in

7   solidarity with us against the enemies of our folk."  Who are

8   the enemies of your folk at that time?

9   A    Yankees and communists.

10  Q    Does that include Jews and black people?

11  A    Not necessarily.

12  Q    Isn't that a principle of Dr. Hill's League of the South?

13  A    His principles aren't necessarily mine, sir.

14  Q    When you say "our blood, our soil," does that refer to

15  white people's rights to the soil of the South?

16  A    Not necessarily white people, but our people, Southern

17  people.

18  Q    Southern people?

19  A    Yes, sir.

20  Q    And those Southern people include black Southern people?

21  A    Sure.

22  Q    It did?

23  A    Yes, sir.

24  Q    So if -- and what were those enemies of our folk going to

25  do?

R. Hamblen - Cross

1  A    They were trying to erase our history.

2  Q    And there's nothing in here about the monuments, is there?

3  Yes or no, sir?

4  A    No, sir.

5  Q    This talks about coming to Charlottesville to stand in

6  solidarity with us against the enemies of our folk, our blood,

7  our soil, our kith and our kin, right?

8  A    Yes, sir.  Just like we did at New Orleans.

9  Q    On Saturday morning you marched in the column behind

10 Michael Hill and Michael Tubbs, correct?

11 A    Yes, sir.

12 Q    And you met with people from the Traditionalist Worker

13 Party at JoAnn Fabrics in the morning before you got to the

14 garage, right?

15 A    Yes.  We had a rally at the shopping center.

16 Q    And you heard Ike Davis speak to all those assembled,

17 correct?

18 A    I don't recall hearing him specifically.

19 Q    Do you recall Ike Davis -- Ike Baker saying this was "the

20 greatest collection of white identitarians" that he had ever

21 seen?

22 A    No, sir, I don't recall that.  Are you talking about Ike

23 Baker or Ike Davis?

24 Q    Ike Baker.

25 A    Okay.  Yes, sir.

R. Hamblen - Cross

1    Q    Now, you marched with Mr. Tubbs that day?

2    A    I marched behind him, yes.

3    Q    And after a certain period unlawful assembly was declared,

4    right?

5    A    Yes.

6    Q    And you then turned and walked back to the garage, right?

7    A    Not exactly like that.

8    Q    At some point you walked back towards the garage, right?

9    A    We were pushed out of the park by the police into the

10   crowd on the street.  At first we went toward the east and then

11   we about-faced and started toward the parking garage.

12   Q    And you were walking down in the long column; is that

13   right?

14   A    It was more of a mob by that time.

15   Q    Now, you identified some people along the way in the

16   video.  There was one man in a blue shirt who had that pole,

17   right?

18   A    Was it a blue shirt or a gray shirt?

19   Q    Well, the man that you said was swinging the pole as you

20   were marching?

21   A    Can you show me the picture again?

22   Q    Do you recall?

23   A    I recall the black man in kind of a gray shirt with a

24   pole.

25   Q    And did you ever see him strike anyone with that pole?

28

R. Hamblen - Cross

1    A      No.

2    Q      And did you see, shortly after Mr. Jones showed you that

3    video, around 2 and a half minutes when a League member or one

4    of the people you were marching with maced one of the people

5    you were identifying as counter-protesters?

6    A      I didn't see that myself.

7    Q      You didn't see that?

8    A      No.

9    Q      Just reached out of -- moved out of the column, went to

10   the side, and maced one of the counter-protesters.  You didn't

11   see that?

12   A      No, not specifically.  It wasn't a column, Mr. Levine.

13   Q      Now, you also identified DeAndre Harris; is that your

14   testimony?

15   A      The person I later came to know as DeAndre Harris.

16   Q      So you didn't know Mr. Harris at the time, right?

17   A      I didn't know most of the people there, Mr. Levine.

18   Q      And when you were walking down that column, did you -- do

19   you recall seeing Mr. Harris, or was it only looking at the

20   video after the fact that you found Mr. Harris?

21   A      No.  I remember seeing him at the garage.

22   Q      You do?

23   A      Yes.

24   Q      At the garage?

25   A      Yes.

29

R. Hamblen - Cross

1  Q     But during the entire march, did you see him?

2  A     There were a crowd of people following us.  There were a

3  lot of people that mixed together.

4  Q     I take from your answer you didn't see him?

5  A     Specifically him?

6  Q     Yeah.

7  A     Not that I recall.

8  Q     Okay.  So you don't know what Mr. Harris was saying or

9  doing during that entire march down the street; isn't that

10 right?

11 A     No, sir.  I only know that somebody was insulting me.

12 Q     But there were a lot of people around during that time,

13 right?

14 A     Yes, sir.

15 Q     And it was six minutes in length; isn't that right, the

16 walk?

17 A     Approximately.

18 Q     And so -- and you can't testify here to this jury that you

19 actually saw Mr. Harris do anything during that entire period

20 of time; isn't that right?

21 A     Not until we got up to the garage where the fight broke

22 out.

23 Q     And you never actually saw the fight in the garage, did

24 you?

25 A     I didn't catch the very first seconds of it, but I turned

30

R. Hamblen - Cross

1   to the noise and saw what was going on.

2   Q    But from the video, you were, like, across on the other

3   side of the street, a little far away from the entrance, actual

4   entrance to the garage, weren't you?

5   A    I was probably as far from it as I am from you right now.

6   Q    But there were a lot of people in the middle, right?

7   A    There were lots of people there.

8   Q    So you didn't -- you didn't see the fight, did you?

9   A    Yes.

10  Q    You did see the fight?

11  A    Yes, I did see the fight.

12  Q    And were you behind Mr. Tubbs or --

13  A    No, I was --

14  Q    -- next to him?

15  A    Mr. Tubbs was ahead of me.

16  Q    Mr. Tubbs was right there, standing over the fight, wasn't

17  he?

18  A    By that time, yes, sir.

19  Q    And did you go to try to stop that fight?

20  A    By the time I got there it was already over.

21  Q    Now, you testified that a counter-protester tried to take

22  your flag, right?

23  A    Yes, sir.

24  Q    And you just testified -- I think I have it accurately --

25  "I resisted, they took me down, and she assaulted me"?

R. Hamblen - Cross

1   A     Yes.

2   Q     Now, the fact of the matter is, you actually assaulted her

3   before she assaulted you; isn't that right?

4   A     No, sir.  All I did was try to push her away.

5   Q     Isn't it a fact that you actually struck her with your

6   pole, what ended up in her ear, and that's why she dragged you

7   down?

8   A     Is that what happened?

9   Q     Isn't that what happened, Mr. Hamblen?

10  A     I don't know.  I don't know if I connected that way or

11  not, sir.

12  Q     Isn't it a fact, Mr. Hamblen, that that's what you told

13  Michael Hill happened several months later?

14  A     I don't recall.

15        MR. LEVINE:  Can we show the witness a plaintiffs'

16  exhibit which we're going to mark right now as 3961?  May I

17  approach, Your Honor?

18        THE COURT:  You may.

19        (Plaintiff Exhibit 3961 marked.)

20  BY MR. LEVINE:

21  Q     Isn't it a fact, Mr. Hamblen -- withdrawn.

22        This is an exchange of emails between you, a gentleman by

23  the name of David Harris, and Michael Hill, isn't it?

24  A     Yes, sir, it looks like it.

25  Q     And it's from October 2017; is that right?

R. Hamblen - Cross

1  A    Yes, sir.

2              MR. LEVINE:  We offer it, Your Honor.

3              THE COURT:  Be admitted.

4              MR. LEVINE:  I ask that it be published for the jury.

5              THE COURT:  You may.

6              (Plaintiff Exhibit 3961 admitted.)

7  BY MR. LEVINE:

8  Q    Going right down there in the middle, on Wednesday,

9  October 11, Mr. Hamblen, don't you say to Mr. Hill, "The

10 sequence is, she came up behind me, grabbed at the flag,

11 tearing the lower attachment loose, went past, I lowered the

12 staff" -- that, I assume, is the pole of the flag?

13 A    Yes, sir, that would be correct.

14 Q    "I lowered the staff, caught her in the ear hole of her

15 helmet, and she spun around and attacked me."

16      You said that, right?

17 A    Yes.

18 Q    That's the sequence, right?

19 A    Yes, sir.  I knew I struck her helmet.

20 Q    The sequence is she grabbed your flag and you rammed the

21 pole at her head and it went in the hole of the helmet in her

22 ear, and that's why she turned and threw you to the ground --

23              MR. JONES:  Your Honor, October.  He's leaving out a

24 significant portion of the actual statement in his question.

25 BY MR. LEVINE:

R. Hamblen - Cross

1   Q    Isn't that right, Mr. Hamblen?  Isn't that what happened?

2   A    I'm confused.  What did you say?

3   Q    Isn't it a fact, Mr. Hamblen, that the sequence -- your

4   words are that she came behind you, grabbed your flag, was

5   walking past, you lowered the pole, your staff, jammed it to

6   her head, it went in the ear hole of the helmet, and that's why

7   she threw you to the ground and punched you?

8           MR. JONES:  Objection, that's not what it says in the

9   document.

10          MR. LEVINE:  I'm entitled to ask the question, Your

11  Honor.

12          MR. JONES:  And I'm entitled to --

13          THE COURT:  You're purporting to be relying upon this

14  quote, I gather.  And you're not quoting it accurately.

15  BY MR. LEVINE:

16  Q    Isn't that what happened, Mr. Hamblen?

17  A    I don't agree with completely how you characterized it,

18  but that's more or less the events.

19  Q    And, in fact, don't you also say to Mr. Hill a little

20  lower down, "My one and only concern is the existence of a

21  photo or a video showing me striking the Myles woman with the

22  tip of my flag staff"?  Didn't you also say that?

23  A    Yes.

24  Q    So the last thing -- you say, "The last thing I want is to

25  be hit with a charge from her claiming self-defense from an act

                         R. Hamblen - Cross


1    of aggression from me."  Didn't you say that?

2    A    Correct.  But I was never charged --

3    Q    Because isn't it a fact, Mr. Hamblen, you knew that you

4    started that altercation with that woman; isn't that right?

5            MR. JONES:  Your Honor, again, he's

6    mischaracterizing.  It clearly says she grabbed at his flag,

7    tearing the lower attachment loose.  That's what started the

8    altercation.

9            THE COURT:  All right.

10           Mr. Hamblen, you answer the question.  You can

11   testify as to what happened.  Do you agree?

12           THE WITNESS:  What I said here is accurate, correct.

13   BY MR. LEVINE:

14   Q    And then when she pulled you to the ground and hit you, it

15   was her colleagues that took her off you; isn't that right?

16   A    Actually, I think a policeman chased them off.

17   Q    There was actually a policeman viewing all of this, wasn't

18   there?

19   A    There were about 20 policemen viewing all of this.

20   Q    But one of them literally came over to you when you stood

21   up and walked you away from the scene, right?

22   A    Two came out.  The first one came out and said, "Here,

23   y'all get out of here."  And then the second one picked me up

24   and walked me back and said, "You're too old to be doing this."

25   Q    And within seconds when the police are walking you away

R. Hamblen - Cross

1   from the scene, do you go into the police station right there

2   and file a police report?

3   A    No.  I sat down on the steps to catch my breath.

4   Q    And you didn't file a police report --

5              MR. JONES:  Your Honor, we're getting far afield.

6   It's not relevant whether someone was charged or whether

7   someone wasn't charged.

8              THE COURT:  Sustained.

9              MR. LEVINE:  Your Honor, I would like to go in an

10  area that I believe is opened by this video.

11             THE COURT:  Well --

12             MR. LEVINE:  Can I ask a question?

13             THE COURT:  You asked him if he went to file a

14  charge.  He said no.

15             I mean, this incident is not relevant to the damages

16  the plaintiffs are seeking in this case.  As far as I can

17  determine, the injuries sustained by the plaintiffs were when

18  Mr. Fields struck seven of them in the street, on the night of

19  the march at the Thomas Jefferson statue, and I think the

20  Reverend possibly claims that somebody pushed him in the park

21  on August 12th.  But that's where all the injuries took place

22  that are the subject of this suit.

23             MR. LEVINE:  Your Honor, the --

24             THE COURT:  This is all collateral and that sort of

25  thing.  It's not -- it shows -- it's brought in to show -- give

36

R. Hamblen - Cross

1  a context and a picture.  And I know the animus and conduct of

2  the people on both sides.  But we don't need to go past and

3  start talking about things that are remote from the issues in

4  the case.

5          MR. LEVINE:  Your Honor, the plaintiffs have proved

6  up the beating of DeAndre Harris, which he testified about on

7  direct, as a racially motivated act of violence in the

8  conspiracy that we allege.  Mr. Hamblen is here testifying

9  about --

10          MR. JONES:  He offered no opinion on that issue, and

11  I was careful to avoid that.

12          THE COURT:  Mr. Harris, I mean, is not a plaintiff in

13  this case.

14          MS. DUNN:  That's right.

15          THE COURT:  It's just part of the melee that was

16  going on there.  But we don't have to trace -- we don't have to

17  spend a lot of time on Mr. Harris.

18          The jury has seen the evidence about it and heard

19  from both sides now.  And we don't have to go past that.

20          MR. LEVINE:  Can I ask just one follow-up question,

21  Your Honor?

22          THE COURT:  Tell me what the question is.

23          MR. LEVINE:  Mr. Hamblen, isn't it a fact that it was

24  Mr. Kessler that was prodding you to file a police report?

25          MR. JONES:  Objection, Your Honor, not relevant.

R. Hamblen - Cross

1          THE COURT:  Sustained.  That has nothing to do with

2    it.

3          MR. LEVINE:  No further questions.

4          THE COURT:  Wait.  Wait just a minute.  I'm going to

5    let him answer that question.

6          THE WITNESS:  No.  Not completely.  He wasn't the

7    driving force behind it.  I was waiting to see how the outcome

8    of Harold Crews' incident went.  And as I understand it, the

9    statute of limitations on assault probably is three years.  So

10   I did file a complaint and sent the information --

11         THE COURT:  Look.  You've answered the question.

12   You've answered the question.

13         THE WITNESS:  Thank you, sir.

14    BY MR. LEVINE:

15   Q    You just said in your answer --

16         THE COURT:  Strike the answer.  Strike the answer.

17   No.  I'm not going to just keep on with this.

18         MR. LEVINE:  Okay.  No further questions.

19         THE COURT:  The answer was no to Mr. Kessler.

20         Okay.

21         MR. CANTWELL:  I have some questions.  Christopher

22   Cantwell.

23                         CROSS-EXAMINATION

24    BY MR. CANTWELL:

25   Q    Hello, sir.  Thank you for your testimony.  My name is

R. Hamblen - Cross

1   Christopher Cantwell.

2   A    Good morning.

3   Q    I'm attempting to show you Defense Exhibit 72B, which you

4   just reviewed with Mr. Jones.  And I want to call your

5   attention to something and ask you a question about it.  So

6   stand by while I bring that part up.

7          (Video playing.)

8      Sir, did you notice this logo on the helmet, by any

9   chance?

10  A    Yes.  It looks like some kind of three-line device.

11  Q    Do you recognize that logo, sir?

12  A    Only from the testimony here at the trial.

13  Q    Only from the testimony at the trial?

14  A    Yeah.

15          MR. CANTWELL:  No further questions.  Thank you.

16          Oh, I meant to leave this up here for Mr. Smith, I

17  think.

18          MR. SMITH:  I just have one question, Your Honor, on

19  that same topic.  It will just take me a second.

20                      CROSS-EXAMINATION

21   BY MR. SMITH:

22  Q    Good morning, Mr. Hamblen.

23      That logo on the helmet -- do you see what I'm talking

24  about?

25  A    Yes.

                              R. Hamblen - Cross

1   Q     If we can just zoom in there --

2               THE CLERK:  Excuse me one minute.  Can I ask:  Was

3   that a previously admitted exhibit?

4               MR. SMITH:  Oh, yes.

5               MR. CANTWELL:  Yes.  It's Defense Exhibit 72B, which

6   Mr. Jones was playing.

7               THE CLERK:  Thank you.  Okay.  Thank you.

8               MR. CANTWELL:  You're not able to zoom in.

9               MR. SMITH:  How do I clear the -- just tap it?  Oh.

10  Okay.  Thank you.

11   BY MR. SMITH:

12  Q     So how many -- would you describe that logo for me, if you

13  can see it?

14  A     Well, it looks like a circle with three lines in it.

15  Q     Three lines?

16  A     They may have points on it.  It's hard to tell from the

17  photograph.

18  Q     Is it possible it could be three arrows?

19  A     The lines are consistent with them being arrows, yes.

20  Q     So you're familiar with the Traditionalist Worker Party,

21  right?

22  A     Yes.

23  Q     And their logo?

24  A     Yes.

25  Q     And that's not the Traditionalist Worker Party logo, is

W. Newberry - Direct

1    it?

2    A     No.

3              MR. SMITH:  Okay.  Thank you.  No further questions.

4              THE COURT:  Thank you.  Any other questions?

5              May this witness be excused, then?

6              Thank you, sir.  You may step down.

7              MR. JONES:  Call Captain William Newberry.

8              MR. ISAACSON:  Your Honor, maybe while we're waiting

9    for the witness I can read some exhibits into the record.

10             THE COURT:  All right.

11             MR. ISAACSON:  During the deposition of Benjamin

12   Daley, the video, there was an erroneous reading of an exhibit

13   as Plaintiffs' Exhibit 2675.  That should be Plaintiffs'

14   Exhibit 2477.

15             In addition, from the Thomas Rousseau video

16   deposition that was played November 8th, three exhibits were

17   not moved into admission, Plaintiffs' Exhibit 3864, Plaintiffs'

18   Exhibit 378, and Plaintiffs' Exhibit 3254.

19             (Plaintiff Exhibits 3864, 378, and 3254 marked.)

20             (Plaintiff Exhibits 3864, 378, and 3254 admitted.)

21             THE COURT:  Okay.  Anything else, we'll move later.

22             Can we swear the witness, please?

23      CAPTAIN WILLIAM NEWBERRY, CALLED BY THE DEFENDANTS, SWORN

24                        DIRECT EXAMINATION

25   BY MR. JONES:

W. Newberry - Direct

1  Q    Good morning, sir.  You can remove your mask so we can

2  hear you.

3       Could you please state your name for the jury?

4  A    William Newberry.

5  Q    And where do you work?

6  A    Charlottesville Police Department.

7  Q    And were you so employed on August 12th of 2017?

8  A    I was.

9  Q    What was your role with the Charlottesville Police

10 Department on August 12th, 2017?

11 A    I was a detective sergeant.  I was assigned to the

12 investigation bureau.

13 Q    Leading up to the August 12th Unite the Right rally, did

14 you perform some research on the groups that it was anticipated

15 would come?

16 A    I did.

17 Q    Was the Charlottesville Police Department researching both

18 protesters and counter-protest groups?

19 A    We were.

20 Q    And was one of the groups that you were assigned the

21 League of the South?

22 A    Yes.

23 Q    Were you able to make any contact with anybody in the

24 League of the South before August 12th?

25 A    I was.

W. Newberry - Cross

1  Q     And what form of contact was that?

2  A     Over the phone.  I don't remember the name of the person.

3  I was able to obtain a contact number offline and I called that

4  and spoke to an individual.

5  Q     Were you ever able to reach any of the other groups that

6  you were looking into?

7  A     I was only assigned to two groups.  This was the only

8  contact that I recall.

9            MR. JONES:  Thank you, sir.  That's all the questions

10 I have.

11           THE COURT:  All right.  No other questions.  Thank

12 you, sir --

13           MR. ISAACSON:  Your Honor, if I may.

14                       CROSS-EXAMINATION

15  BY MR. ISAACSON:

16 Q     What's your title today, sir?

17 A     Captain.

18 Q     And I'm Bill Isaacson.

19 A     Yes, sir.

20 Q     You were asked if you had any contacts with groups you

21 researched before August 12th.  Did you have contact with any

22 of the groups there other than the ones you researched?

23 A     Yes.

24 Q     And who did you have contact with other than who you

25 researched?

W. Newberry - Cross

1   A    An individual I was provided a contact for by the name

2   of -- the name provided to me was Jack Pierce.

3   Q    So you talked to Jack Pierce before August 12th about the

4   upcoming Unite the Right?

5   A    I did.

6   Q    And what was your understanding of who Jack Pierce was?

7           MR. JONES:  This is beyond the scope, and I think

8   it's hearsay.

9           THE COURT:  Sustained.

10          MR. ISAACSON:  I'm not sure which objection has been

11  sustained, Your Honor.

12          THE COURT:  Well, it's beyond the scope.

13          MR. ISAACSON:  He asked him for contacts, and I

14  believe by doing that, the complete contacts should be

15  disclosed, because he has not said what his complete contacts

16  were with groups who were there that day.

17          THE COURT:  Okay.  Go ahead.

18   BY MR. ISAACSON:

19  Q    I just want to know, from your discussions with

20  Mr. Pierce, what was your understanding of his duties?

21  A    Head of security for the speakers.

22  Q    The head of security for the speakers --

23          MR. JONES:  Your Honor, it's a lack of foundation and

24  it's hearsay.  It's not admissible.

25          MR. ISAACSON:  I asked him his understanding based on

W. Newberry - Cross

1  his conversations with Mr. Pierce.

2         THE COURT:  Well, that's hearsay.

3   BY MR. ISAACSON:

4  Q    All right.  What did Mr. Pierce tell you?

5         THE COURT:  Well, that's hearsay.

6         MR. ISAACSON:  It's not being admitted for the truth.

7         THE COURT:  What's it being admitted for?

8         MR. ISAACSON:  For what the individual represented

9  his job was to the officer.

10         THE COURT:  I don't see how that could be anything

11  but hearsay.

12         MR. ISAACSON:  All right.

13  BY MR. ISAACSON:

14  Q    What did you discuss -- actually, did you -- did you

15  inform Mr. Pierce about any proposals for security on the

16  morning of August 12th?

17         MR. JONES:  Your Honor, I'll object.  This is well

18  beyond the scope now.  He can say he had contact with him, but

19  as far as the --

20         THE COURT:  All right.  That's sustained.

21         MR. ISAACSON:  I have no further questions, Your

22  Honor.

23         THE COURT:  Okay.  Is that all?

24         All right, sir.  You may be excused.  Thank you.

25         Okay.  Is the witness available that Mr. --

W. Newberry - Cross

1  Mr. Jones, did you have any other evidence?

2          MR. JONES:  No, Your Honor.

3          THE COURT:  Anyone other than Mr. Cantwell have

4  any --

5          THE CLERK:  No, sir.

6          THE COURT:  All right.  Mr. Cantwell, which witness

7  are you calling?

8          MR. CANTWELL:  I call Natalie Romero.

9          MR. ISAACSON:  I'll go downstairs and get them, Your

10  Honor.

11          THE COURT:  Excuse me?

12          MR. ISAACSON:  I will go downstairs and get the

13  witness.

14          (Off the record discussion.)

15          MR. LEVINE:  Your Honor, as I understand it, the

16  witnesses are still on their way to the courthouse.  The

17  instruction went out as soon as Your Honor ordered it, ten

18  after nine, but they're not physically here.  So can we take an

19  early morning coffee break?

20          THE COURT:  Do you have any other evidence we could

21  put in at this time?

22          All right.  Members of the jury, you may retire

23  until --

24          MR. SMITH:  Your Honor, there was one exhibit that we

25  wanted to enter that we have a stipulation for, Plaintiffs'

W. Newberry - Cross

1   Exhibit 2533.

2             (Defendant TWP Exhibit 2533 marked.)

3             THE COURT:  2533?  What is it?

4             MR. SMITH:  It's a video, Your Honor.  We don't wish

5   to publish it to the jury at this time, but we'd like it to be

6   admitted.

7             THE COURT:  All right.  Is there any objection to

8   2533?

9             MR. LEVINE:  Your Honor, Mr. Smith has been dealing

10  with Mr. Bloch, so I prefer that that be held under advisement

11  until the end of the break and then we'll respond.

12            THE COURT:  All right.  Members of the jury, I'm

13  going to allow you to go to the jury room.  It might be ten or

14  15 minutes.

15            (Recess.)

16            THE COURT:  Call the jury.  Is the witness here?

17            MR. MILLS:  Yes, Your Honor, the witness is here.

18  **(Jury in, 10:23 a.m.)**

19            THE COURT:  Before we swear the witness, members of

20  the jury, because of some of the remarks I made earlier at the

21  end of when Mr. Levine was cross-examining the witness Hamblen,

22  I want to remind you it is your duty to find what the evidence

23  and the facts are.  You and you alone are the judges of the

24  facts.  Then you will have to apply those facts to the law as I

25  give it to you.  You must follow that law, whether you agree

N. Romero - Direct

1   with it or not.

2           Nothing I may say or do during the course of the

3   trial is intended to indicate or should be taken by you to

4   indicate what your verdict should be.

5           And when I sustained the objection, that was just

6   talking to the lawyers.  You're not to draw any inference from

7   anything I might have said.

8           All right.  Would you swear the witness in?

9           NATALIE ROMERO, CALLED BY THE DEFENDANTS, SWORN

10                      DIRECT EXAMINATION

11   BY MR. CANTWELL:

12   Q     Hello, Ms. Romero.

13   A     Hello.

14   Q     Would you mind removing your mask.  Thanks.

15         I'm showing you a frame from --

16           THE COURT:  Say the witness' name again.

17           MR. CANTWELL:  Ms. Romero.  That's right, right?

18           THE COURT:  Well, because -- for the record, we need

19   her name.

20   BY MR. CANTWELL:

21   Q     Could you state your name for the record, please?

22   A     Natalie Romero.

23   Q     Okay.  Ms. Romero, I'm showing you a still frame from

24   Plaintiffs' Exhibit 3267, which I'm sure is already in evidence

25   which I'd like to publish and show to the jury, please?

48

N. Romero - Direct

1        THE COURT:  All right.

2   BY MR. CANTWELL:

3   Q    Is this you right here?

4   A    Yes.

5   Q    And do you have a black bandanna on?

6   A    Yes.

7   Q    Wrapped around your neck?

8   A    Yes.

9   Q    Is there any particular reason you have a black bandanna

10  wrapped around your neck?

11  A    Of course.

12  Q    Why?

13  A    The night before when I was maced, I wanted to make sure I

14  had something to protect my face.

15  Q    Okay.  And did you go purchase it on August 12th or did

16  you have it around?

17  A    Nope.  I have bandannas of many colors.

18  Q    And do you have any relationship with the National Lawyers

19  Guild?

20  A    No.

21  Q    What's -- can you tell me about the green whistle?

22  A    Is that what that is?  Yeah.  I don't recall having a

23  green whistle.

24  Q    You don't recall having a green whistle?

25  A    No.

49

N. Romero - Direct

1   Q    Do you recall seeing anybody else with a green whistle?

2   A    No.

3             (Video playing.)

4   Q    Does that refresh your memory?

5             MR. MILLS:  Your Honor, I don't know whether this is

6   the same exhibit.

7             MR. CANTWELL:  This is 3267.  This is plaintiffs'

8   exhibit.  It's already in evidence.  I'm seeing multiple people

9   in a line with green whistles.  The National Lawyers Guild is

10  wearing green hats.  I'm wondering if there's anything --

11            THE COURT:  Well, just ask her.

12            THE WITNESS:  No.

13  BY MR. CANTWELL:

14  Q    Okay.  Doesn't ring a bell.  Okay.

15       Now I'm showing you 3207.  This is already in evidence as

16  well.  This is a livestream video from Elizabeth Sines.  Is

17  that you right there?

18  A    Looks like me.

19  Q    And is that you blowing your green whistle there?

20  A    I guess so.  It doesn't look the same from what you showed

21  before.

22  Q    It doesn't look the same?  It's a different video.

23       So when you were marching down Water Street, did you merge

24  with another group of marchers?

25  A    Yes.

50

N. Romero - Direct

1  Q    Okay.  And were you part of the group that turned right

2  onto Water Street or were you part of the group that was going

3  straight on Water Street when that merge happened?

4  A    I believe I was a part of the group that went left.

5  Q    You were a part of the group that went left?

6  A    (No verbal response.)

7  Q    I think -- so where the two groups merged, you went left?

8  A    Yes.

9  Q    You went left onto what street?

10 A    Onto Fourth.

11 Q    Okay.  I understand that people -- to be clear, people

12 started chanting "go left, go left," and then you turned onto

13 Fourth Street right before the car crash, right?

14 A    Yes.

15 Q    Prior to that, prior to that, when the marchers were

16 coming down, it was -- Fourth and Water is the corner where the

17 crash happened, right?

18 A    The attack, yes.

19 Q    And so when you're marching down Water Street before you

20 reach Fourth Street, do you recall a time when two crowds

21 merged?

22 A    Yes.

23 Q    And what street was that at?

24 A    Fourth and Water.

25 Q    Okay.  We're talking about two different things.  I'm

N. Romero - Direct

1   going to rewind this video to an earlier stage and see if you

2   recall.

3            (Video playing.)

4        You testified last time that you didn't see anybody

5   carrying any weapons, right?

6   A    That's correct.

7            (Video playing.)

8   Q    Do you remember this chant, Ms. Romero?

9   A    Yes, I've heard it before.

10  Q    Do you remember this chant while you were marching?

11  A    I can't say that I do.

12  Q    Okay.

13           (Video playing.)

14  Q    Do you recognize this intersection right here where this

15  march is?  Do you know this area?

16  A    Yeah, I don't know the names, but I know where that is.

17  Q    Okay.  But it's not Fourth Street, right?

18  A    No.  That's coming up.  That's when people turned left.

19  Q    Yeah.

20           (Video playing.)

21  Q    So is it your testimony you don't recall the merger of

22  crowds at this intersection here?

23  A    No.

24  Q    Okay.

25           (Video playing.)

52

N. Romero - Direct

1      Are you familiar with that chant?

2  A    I've heard it before.

3  Q    I'm sorry?

4  A    I've heard it before.

5  Q    You've heard it before?

6  A    Yes.

7  Q    Did you hear it on August 12th?

8  A    I heard it with the court when listening to the case.  The

9  last time you played the video.

10 Q    Okay.  So you heard it during the course of this trial?

11 A    Yes.

12 Q    But you didn't hear this on August 12th, 2017?

13 A    I can't remember.

14 Q    You can't remember?

15 A    This is like literally a couple seconds before we get hit.

16 Q    Right.  So a couple of seconds before you get hit, people

17 are chanting "antifascista."

18 A    They were chanting a lot of things.

19 Q    Yeah.  Okay.  So you don't remember the antifascista

20 chant, but you're sure nobody you were with was carrying

21 weapons, right?

22         MR. MILLS:  Objection, compound, argumentative.

23         THE COURT:  Sustained.

24         MR. CANTWELL:  Okay.  If we could take this down from

25 the jury, I'd like to show Ms. Romero CCEX-137A.

53

N. Romero - Direct

1          (Video playing.)

2    BY MR. CANTWELL:

3    Q    If you see yourself -- are you wearing a hood in this

4    video, Ms. Romero?

5    A    No.

6    Q    Okay.  Can you see yourself in this video?

7    A    Not yet.  I'm wearing a tank top, some shorts and flip

8    flops.

9    Q    Maybe if I turn the brightness up a little bit, that might

10   help you, I'm thinking.

11        Does that appear to be Mr. Willis right there?

12   A    Yes.

13   Q    Would that make that you?

14   A    Yes.

15        MR. CANTWELL:  I'd like to move CCEX-137A into

16   evidence and publish it to the jury.

17        MR. MILLS:  Objection, Your Honor, to any portion

18   that she cannot authenticate.  The portion she can authenticate

19   we do not object to.

20        THE COURT:  Okay.  Sustain.  Anything she can

21   authenticate.

22        MR. CANTWELL:  Well, it's a minute and 33 seconds

23   long.

24    BY MR. CANTWELL:

25   Q    Ms. Romero, when you testified earlier, did you testify

N. Romero - Direct

1  that students were systematically taken off the statue and

2  beaten one by one?

3  A    I believe that was someone else's testimony.

4  Q    Right.  You did not testify to that, right?

5  A    No, I guess --

6  Q    And you were on the statue, right?

7  A    Yes.

8  Q    Did you see students taken off the statue and beaten one

9  by one systematically?

10 A    I guess not one by one.  It happened kind of all together.

11 Q    Okay.  So you saw the students all get taken down off the

12 statue and beaten all together?

13 A    We weren't standing on the statue.  We were around the

14 base.

15 Q    Okay.

16 A    We jumped up on the statue once people started beating on

17 people.

18 Q    You jumped on the statue once people started beating on

19 people?

20 A    To, like, get away from the flames and the punches.

21       MR. CANTWELL:  Okay.  So I guess, how do you want to

22 handle this?  Do you want me to play the video and we'll say --

23 do you want me to stop, and we'll cut that off before the jury?

24 How does plaintiffs' counsel propose that we cut off this 1:33

25 video?

55

N. Romero - Direct

1        MR. MILLS:  We had tried to work this out before.  We

2   can start from here, because she identified herself, and you

3   can ask her.  Try to lay a foundation for as much as she can

4   fairly identify.

5            (Video playing.)

6    BY MR. CANTWELL:

7   Q    Do you remember that chant, Ms. Romero?

8   A    Unfortunately.

9   Q    And that's -- you remember that fight breaking out in

10  front of you, I imagine, right?

11  A    Yeah.

12  Q    Okay.

13           (Video playing.)

14      This man in the blue shirt who is getting beat up, do you

15  know him to be a UVA student?

16           MR. MILLS:  Objection to the characterization.

17           THE COURT:  Sustained.

18           THE WITNESS:  I can't see who that is.

19   BY MR. CANTWELL:

20  Q    Do you know who that man in the blue shirt is?

21  A    I can't see.

22           (Video playing.)

23  Q    I'm sorry?

24           MR. MILLS:  There's no question pending.

25           MR. CANTWELL:  I heard her say something, so I

56

N. Romero - Direct

1   stopped the video.  That's all.

2              (Video playing.)

3              MR. CANTWELL:  I think that she's out of the video at

4   this point.  Do you want to say we'll cut it off at 1:04?

5              MR. MILLS:  Your Honor, I think the witness is the

6   one who has to authenticate whether she saw this.

7              MR. CANTWELL:  I'm happy to keep it going.

8              THE COURT:  Well --

9              (Video playing.)

10             THE WITNESS:  I'm not in the video anymore.  Can we

11  please stop it?

12             MR. CANTWELL:  So shall we stop it at 1:26, then?

13             THE COURT:  All right.

14             MR. CANTWELL:  Okay.  So CCEX-137A from 0:00 to 1:26,

15  we'll add to evidence.  Work?

16             THE COURT:  Yeah.

17             MR. MILLS:  Your Honor, the witness should be asked

18  whether she saw all this.  That's the point of the

19  authentication.  So I object unless -- if she can authenticate

20  that, then we do not object.

21             THE COURT:  Well, she said she saw the fight, didn't

22  she?

23             MR. MILLS:  She did say that part, yes.  That portion

24  of it was much earlier.

25             THE COURT:  Well --

N. Romero - Direct

1          MR. MILLS:  He can ask the witness.  I'm just trying

2    to talk to you instead of Mr. Cantwell.  But he can ask her --

3          THE COURT:  You know what -- I take it you all --

4          MR. MILLS:  I don't think she can.  I don't think she

5    saw that part.

6          THE COURT:  Okay.  Didn't you look at this video?

7    You said you all -- you should know at what point to

8    interject --

9          MR. MILLS:  Yes, Your Honor.

10          THE COURT:  -- and say that she was not there.

11          MR. MILLS:  This is a clip that Mr. Cantwell created.

12    I asked this morning for the time stamp so that we could do

13    that, and he did not have them yet.  So I tried to.

14          THE COURT:  Okay.  Ask the witness, how much of this

15    did you see?

16     BY MR. CANTWELL:

17    Q    So, Ms. Romero --

18          MR. MILLS:  Well -- go ahead.

19          MR. CANTWELL:  I'll tell you what:  I have the video

20    in evidence.  I can use it in my closing argument.  I don't

21    need to ask her any more questions about it, right?

22          MR. MILLS:  I mean, I don't think this is in

23    evidence, but that's fine.

24          MR. CANTWELL:  Is it not in evidence?  I thought we

25    agreed to 1:26.

58

N. Romero - Direct

1          THE COURT:  I thought it was in evidence and you

2    wanted to stop when she no longer could authenticate it.  I

3    assumed you would know that and object to it.

4          MR. MILLS:  She's only authenticated the portion at

5    the beginning until the point where she saw the fight.  That's

6    all she's authenticated.

7          THE COURT:  Well, did she -- how much did you -- when

8    the fight started, what did you do?

9          THE WITNESS:  I think if you go back, you see when

10   Devin --

11         THE COURT:  Well, go back and tell us -- start it

12   over and tell us to stop when -- did you leave or what

13   happened?  Did it all happen in front of you?

14         THE WITNESS:  Yes.

15         THE COURT:  Were you there when it happened?

16         THE WITNESS:  Yes.  I think if you go back in the

17   video, you see when Devin and I are running away.

18         MR. CANTWELL:  Shall I play the video and then --

19         THE COURT:  You tell us to stop when you no longer

20   were watching what was going on.

21         MR. CANTWELL:  Okay.

22         (Video playing.)

23         THE WITNESS:  So then you start seeing that they're

24   on top of us and they're fighting near us.

25   BY MR. CANTWELL:

N. Romero - Direct

1   Q    Okay.  So you're still in the video at this point, then,

2   right?

3   A    Yes.

4             (Video playing.)

5        And then someone with the flame is starting to hit us, and

6   then another one, and then that's when we just -- and that's

7   it.

8   Q    Okay.

9   A    And it looks like you were literally -- is that you?  Can

10  you go back a frame?

11  Q    Go back a frame.

12            (Video playing.)

13  A    No.  It was a little bit before then.

14  Q    Go back again?

15  A    More.  You can go back more.

16  Q    Sure.  How far back?

17            (Video playing.)

18  A    Right there.  Is that you?

19  Q    That's me hitting this guy.

20  A    Right.  But right before then, there's a couple of hits --

21  Q    Hits what?

22  A    We're, like, right next to this person.  So we're getting

23  a bunch of those hits.

24  Q    So you're telling me that I punched you; is that your

25  testimony today?

N. Romero - Direct

1  A    I'm just telling you that I see you in this video.

2  Q    I'm in the video.  Are you telling the jury that I punched

3  you?

4  A    Go back.  Play it in slow motion.

5  Q    Are you telling the jury that I punched you?  Yes or no?

6  A    I cannot confirm that, but if you go back --

7  Q    Are you telling the jury that I punched you?

8  A    I said I cannot confirm that, but if you play that again

9  in slow motion --

10  Q    Before today, you've never testified that I punched you,

11  right?

12  A    No, but you're showing me this video now.

13  Q    I'll play this video 100 times if you want.  I'm asking

14  you if you ever told anyone that I punched you before today?

15          MR. MILLS:  Your Honor, argument between counsel and

16  the witness.

17          THE COURT:  Sustained.  But she needs to answer the

18  question.  Did he punch you?

19          THE WITNESS:  I didn't say that.

20          THE COURT:  Okay.  Well, did he?  Say yes or no.

21          MR. CANTWELL:  I'll put the video in slow motion.

22  How about -- can we put --

23          THE COURT:  Well, let's get it straight:  Did

24  Mr. Cantwell punch you?

25          THE WITNESS:  I never said that he punched me.

N. Romero - Direct

1          THE COURT:  I didn't ask you did you say it.

2          THE WITNESS:  No, Judge.

3          THE COURT:  Did he?  Did he punch you.

4          THE WITNESS:  I can't confirm that, but it looks like

5   in that video that he's right next to us, and so that's why I

6   was wondering if he could run it back.

7          THE COURT:  Okay.  Well, that's all right.

8          THE WITNESS:  Because I don't know who's hitting on

9   us that day.

10  BY MR. CANTWELL:

11  Q    Without saying who punched you, where did you get punched

12  and how many times?

13  A    I can't tell you.  It all happened so quick.  But we were

14  taking hits.

15  Q    On what part of your body were you punched?

16  A    I can't say that I was punched, like, on site, but we were

17  getting, like, sideswiped by the fight that was happening right

18  next to us.

19  Q    So just so we're clear, were you punched or not?

20  A    I said that we were hit.  I'm not sure I was punched

21  directly.

22  Q    Okay.  Because you asked a question, which was:  "Did you

23  just punch me?"  That's what you said.

24          MR. MILLS:  Objection.  That's not a question.  This

25  should be an examination by counsel.

N. Romero - Direct

1            THE COURT:  Overruled.

2            We'll get this straight.  I think she's said now --

3    she's answered the question.

4     BY MR. CANTWELL:

5    Q    So before today, how many people did you tell that you got

6    punched?

7            MR. MILLS:  Objection.  That's not her testimony.

8    She clarified this, Your Honor.

9            THE COURT:  He's asked her that question.  She can

10   answer the question.

11    BY MR. CANTWELL:

12   Q    Before today, how many people did you tell that you got

13   punched on August 11th?

14   A    I said that we were hit by the fight.  I didn't say I was

15   punched directly.  I'm also only saying that because you're

16   showing me this clip, and that looked like you, and that's us

17   running away.  So that's all I brought that up for.

18   Q    All right.  So I've got the video in slow motion.  Let's

19   try to figure out if I hit you.  Sound good?

20            (Video playing.)

21        Just while we're at it, that guy in the blue shirt who's

22   getting punched by all those guys, do you know who that man is?

23   A    No.

24   Q    Okay.

25            (Video playing.)

N. Romero - Direct

1   A     This is when they start, like -- are you watching that?

2            MR. MILLS:  Is there a question pending, Your Honor?

3            MR. CANTWELL:  We're waiting to find the part where I

4   punch Ms. Romero.  So if that's the part, let me know and I'll

5   rewind.

6            MR. MILLS:  Objection.  She clearly testified she did

7   not say you punched her.

8            MR. CANTWELL:  Okay.  So should we move on to

9   something else, then?

10           THE COURT:  Yes.  I mean, that's the whole --

11           MR. CANTWELL:  Is CCEX-137A admitted into evidence

12  and published to the jury?

13           MR. MILLS:  Do we have the time stamp at this point?

14  I do not object up to this point.

15           MR. CANTWELL:  Let's keep on going until it's no

16  longer okay, all right?

17  BY MR. CANTWELL:

18  Q     Tell us -- I'll tell you what:  Ms. Romero, I'm going to

19  continue to play this video.  And I want you to tell me to stop

20  when you're no longer part of this scene, okay?  Thank you.

21           (Video playing.)

22  A     Now I'm not in there.

23  Q     Okay.  So at 0:53, you're no longer part of this.

24           MR. CANTWELL:  So CCEX-137A until 0:53.

25           MR. MILLS:  What was the starting point,

                          N. Romero - Direct

1  Mr. Cantwell?

2              MR. CANTWELL:  0:00 to 0:53.

3  BY MR. CANTWELL:

4  Q    Ms. Romero, do you know who this person is --

5              THE CLERK:  Are we ready to admit and show it to the

6  jury, Mr. Cantwell?

7              THE COURT:  Yes.

8              MR. CANTWELL:  Please.

9              THE COURT:  Be admitted.

10             (Defendant Cantwell Exhibit 137A marked.)

11             (Defendant Cantwell Exhibit 137A admitted.)

12 BY MR. CANTWELL:

13 Q    Do you know who that person is circled?

14 A    It's a woman.

15 Q    It's a woman?  Do you know that woman's name?

16 A    Yes.  Emily.

17 Q    Huh?

18 A    Yes.

19 Q    It's Emily Gorcenski, right?

20 A    Yes.

21 Q    Do you know if Emily Gorcenski is a UVA student?

22 A    No.

23 Q    Okay.  Do you know who this man is?

24 A    No.

25 Q    Do you know if he's a UVA student?

D. Willis - Direct

 1   A     No.

 2   Q     Okay.

 3              MR. CANTWELL:  I have no further questions for

 4   Ms. Romero.

 5              THE COURT:  All right.  Any redirect?

 6              MR. MILLS:  No, sir.

 7              THE COURT:  Okay.  Thank you.

 8              Ms. Romero, you may step down.

 9              MR. CANTWELL:  Should I stay here while we wait for

10   Mr. Willis?

11              THE COURT:  Oh.  Yes.

12              Call the next witness.

13              MR. MILLS:  The next witness is on his way, Your

14   Honor.

15          DEVIN WILLIS, CALLED BY THE DEFENDANTS, SWORN

16                     DIRECT EXAMINATION

17    BY MR. CANTWELL:

18   Q    Hello, Mr. Willis.

19   A    Good morning.

20   Q    Mr. Willis, I'm showing you what I have marked as

21   CCEX-167.  It is a clip from Plaintiffs' Exhibit -- I believe

22   that's -- 2103 is the Vice News thing, right?  Yes, Plaintiffs'

23   Exhibit 2103.

24          (Video playing.)

25      Do you recognize this man?  Have you seen this guy?

D. Willis - Direct

1  A    I do not know who that is.

2  Q    Okay.  Do you remember seeing him on August 11th?

3  A    I do not.

4            (Video playing.)

5  Q    Is that you right there?

6  A    That is me.

7            MR. CANTWELL:  This is a ten-second clip from the

8  Vice News video.  I would like to admit the entire ten-second

9  clip into evidence without objection.

10           MR. MILLS:  I would object until it's authenticated,

11 Your Honor.

12           MR. CANTWELL:  All right.  Then this one still

13 frame --

14           THE COURT:  Well, okay.  The jury doesn't have to see

15 it yet.  Just play it and see if he can do it.

16           MR. CANTWELL:  I know in advance that Mr. Willis is

17 in and out of the frame here.

18           THE COURT:  Well, he doesn't have to be --

19           MR. MILLS:  I also object to the subtitles that are

20 added to this video.  So I think there's reasons why this

21 should not be admitted into evidence, Your Honor.

22           THE COURT:  Well, let me see the exhibit.  Play the

23 ten seconds.

24           (Video playing.)

25           THE COURT:  Well, he was there, right?

D. Willis - Direct

1          MR. MILLS:  He was there with his head down, Your

2     Honor.

3          THE COURT:  Could he see -- sir, could you see what

4     was going on down the steps?

5          THE WITNESS:  Pardon?  Would you repeat the question?

6          THE COURT:  When you're up on the Rotunda porch or

7     whatever -- is that where you were?

8          THE WITNESS:  The statue?

9          THE COURT:  Is that the statue?

10         THE WITNESS:  Yeah, I was on the statue.

11         THE COURT:  You were on the statue?

12         THE WITNESS:  Yes, sir.

13         THE COURT:  Okay.  You're looking down, can you see

14    what -- you're facing down?

15         THE WITNESS:  Yeah, I'm facing the floor, and I can't

16    really see much of what's going on.  I see flames, and then

17    when the brawl breaks out, I feel people attacking me and I'm

18    trying to leave.

19         MR. CANTWELL:  Judge, with regard to the scene that's

20    on the steps, that's just actually between two frames that I'm

21    attending to catch here.  It's inconsequential.

22         THE COURT:  Right.  I think it is.

23         MR. MILLS:  If you could show a still frame, that's

24    fine, that he's in, you know, if he wants to ask him about it.

25         MR. CANTWELL:  Could we get a brief sidebar?

D. Willis - Direct


1              THE COURT:  I think -- look, I'm going to admit it.

2    He's up there.  It's ten seconds.  I don't know what -- what's

3    objectionable that's in there?

4              MR. MILLS:  It's a news clip.  It's not something he

5    saw.

6              THE COURT:  Okay.  But are you saying it did not

7    happen?

8              MR. JONES:  Plaintiffs introduced this same news

9    clip, just a different portion with the ominous background

10   music, and now they're objecting.

11             MR. CANTWELL:  All I'm trying to do is get two faces.

12             THE COURT:  Well, just a minute.  Just a minute.

13             MR. MILLS:  That's fine.  I don't object to you

14   showing him the faces and asking if he knows them.  That's

15   fine.

16             THE COURT:  Come up here.

17             (Sidebar commenced.)

18             MR. CANTWELL:  All I'm trying to get here -- all I am

19   attempting to accomplish right now is to get two faces,

20   pictures of those faces into evidence, because he's in the

21   frame with them.  That's all I'm trying to accomplish, and then

22   I'll go on to the other thing, okay?

23             But this is -- there's nothing happening in this

24   video.  The only thing that I need this for is so I have those

25   two faces so I can pull them up in my closing arguments.  I

D. Willis - Direct

 1  need to tie them to other things.

 2          MR. MILLS:  This is exactly what I was concerned

 3  about, Your Honor.  This witness cannot identify this person.

 4  And Mr. Cantwell is trying to get something in evidence.

 5          THE COURT:  Show him and ask him the question.  Why,

 6  when he's trying to introduce an exhibit, can the Court not

 7  look at it and have him testify about it and say -- answer

 8  questions about it before it goes to the jury?

 9          MR. MILLS:  Absolutely.

10          THE COURT:  Okay.  We'll do it that way.  But look,

11  he -- certainly his ears were open, and that's what -- those

12  subtitles down there, do you object to -- if he can say he

13  heard those things?

14          MR. MILLS:  If he says that, that's fine.  I will not

15  object to that.

16          MR. CANTWELL:  I don't need the subtitles.  I just

17  need the faces.

18          THE COURT:  Well, you can't get them off the screen.

19          MR. CANTWELL:  I gave you the screenshots.  This is

20  ridiculous, okay?  And you know that it is.

21          THE COURT:  Let me tell you --

22          MR. CANTWELL:  I gave you the screenshots.

23          THE COURT:  Just be quiet.

24          This stuff, it looks like -- I'm sure the jury thinks

25  that is what you do:  You show something, cut it off, and you

70.0

D. Willis - Direct

1  don't want to show anything else.  It looks like -- it's coming

2  across badly.  And I think it's not hurting you.  There's

3  nothing on those ten seconds that hurts you.  And I don't know

4  why you just insist on grabbing this --

5          MR. MILLS:  I think Mr. Cantwell is trying to

6  introduce things into evidence that don't belong.  But that's

7  fine.

8          THE COURT:  No, it's not.  He wants to get in two

9  people's identification.  And is there any -- what's

10  prejudicial in that frame for you?

11          MR. MILLS:  He doesn't know the people.  But that's

12  fine.

13          THE COURT:  Of course he doesn't know everybody

14  there.  But you all have put in all this.  And the defendants

15  have not objected to all this filler that's in these things.

16  And you all are cutting this thing off.  And I tell you, it's

17  not good for you.

18          (Sidebar concluded.)

19          THE COURT:  Mr. Cantwell, what you're going to do now

20  is play the thing, ask him what he can identify, and then

21  whether he can or cannot.

22          Go ahead.

23   BY MR. CANTWELL:

24  Q    Mr. Willis, do you recognize this scene?

25  A    Yes.

71

D. Willis - Direct

1          MR. CANTWELL:  I'll put this on regular speed instead

2    of slow motion.  Stand by.

3               (Video playing.)

4    BY MR. CANTWELL:

5    Q    Do you remember people chanting "no Nazis, no KKK, no

6    fascist USA"?

7    A    Yes.

8               (Video playing.)

9    Q    Do you remember seeing people march down those stairs with

10   torches?

11   A    I will never forget it.

12   Q    Okay.

13   A    Yes, I remember that.

14              (Video playing.)

15   Q    Is that you in that -- I'm sorry.

16              (Video playing.)

17        And that's you right there, right?

18   A    Yes.

19          MR. CANTWELL:  Okay.  I would move for CCEX-167 to be

20   admitted to evidence and published to the jury.

21          MR. MILLS:  No objection.

22          THE COURT:  Admitted.

23          MR. CANTWELL:  Thank you.

24          (Defendant Cantwell Exhibit 167 marked.)

25          (Defendant Cantwell Exhibit 167 admitted.)

D. Willis - Direct

1  BY MR. CANTWELL:

2  Q    Do you know that man?

3  A    I do not know who that man is.

4  Q    Do you know that man?

5  A    Him neither.  No.

6  Q    Do you know this woman?

7  A    I do not.

8  Q    How about this individual?

9  A    No.

10  Q    How about this man?

11  A    I do not know him.

12  Q    This man right here?

13  A    No.

14  Q    Okay.  Have you ever seen any of those people around

15  campus and you just don't know their names, or are they

16  completely unfamiliar to you?

17  A    I wouldn't know who they are.

18  Q    Okay.  Mr. Willis, do you remember seeing students torn

19  down off the statue one by one and beaten systematically that

20  evening?

21  A    I have one memory of someone in a wheelchair being grabbed

22  and pepper-sprayed at close range, but I wasn't looking at

23  every single student and what was happening to them.

24  Q    You have a memory of someone in a wheelchair being grabbed

25  and pepper-sprayed at close range?

D. Willis - Direct

1    A    Yes.

2    Q    Did you testify to that before today?

3    A    No.  I've never been asked if people were pulled one by

4    one until today.

5    Q    Do you know if there's any video of the woman in the

6    wheelchair being grabbed and pepper-sprayed?

7    A    I don't.  That's from my memory.

8    Q    Okay.  All right.

9         MR. CANTWELL:  We can unpublish my screen, please.

10   BY MR. CANTWELL:

11   Q    I'm showing you what he was been marked CCEX-140A.  Do you

12   recognize this scene, Mr. Willis?

13   A    I recognize the scene.

14   Q    Are you in this?

15   A    Probably.  I can't see myself, though.

16   Q    Can you point to approximately where you think you are?

17   A    So this is just my best guess -- well, actually, hold on.

18        So I'm next to Natalie.  So -- and I think I see Natalie

19   in this photo.  So...

20   Q    Is that Natalie?

21   A    I believe so.

22   Q    Okay.  And so you'd be right behind her?

23   A    Right next to her.

24        MR. CANTWELL:  Okay.  I would move to admit CCEX-140A

25   into evidence and publish and show to it the jury.

D. Willis - Direct

1          THE COURT:  Be admitted.

2              (Defendant Cantwell Exhibit 140A marked.)

3              (Defendant Cantwell Exhibit 140A admitted.)

4   BY MR. CANTWELL:

5   Q    Mr. Willis, do you remember testifying that you saw people

6   with holstered handguns at the demonstration?

7   A    Yes, I do.

8   Q    Is this one of the handguns that you saw?

9   A    I don't know if that's -- I don't know what that is,

10  but --

11  Q    You don't know --

12  A    -- that looks like a handgun.  There were several.  So...

13  Q    Does that look like a handgun to you?

14  A    It looks like one.

15  Q    Okay.  One more quick thing.

16      Mr. Willis, where geographically, like, in the orientation

17  of the statue, did you see the woman in the wheelchair get

18  grabbed and pepper-sprayed at close range?  Where was she?

19  A    To the right of me.  So on the north face of the statue,

20  that would have been.

21  Q    So -- actually, let me just use this to orient ourselves.

22      She would have been to the right of you.  So, like, over

23  here?

24  A    Yeah.

25  Q    Okay.  And I guess for you to have seen something that

75

D. Willis - Direct

1  happened over here, that would have had to happen substantially

2  later; that's after you had escaped around the other side?

3  A    Probably, yeah.

4  Q    Okay.

5      I'm showing you CCEX-137A, which has been admitted into

6  evidence already, until 0:53.

7          MR. CANTWELL:  I'm going to kill the volume here.

8  You can pull this down from the jury screen.  Let's see if --

9  just show it to Mr. Willis for now.

10         (Video playing.)

11 BY MR. CANTWELL:

12 Q    And so I'm sure you recall this scene happening right in

13 front of you, right?  And then you went towards the "VA

14 students act against white supremacy" sign, right?

15 A    Yes.

16 Q    Do you know -- can you recognize where you are in this

17 photo -- in this frame?

18 A    I really can't.

19 Q    Okay.

20         (Video playing.)

21 A    Oh, I see myself.

22 Q    Okay.  Let me know when you're no longer part of this

23 scene, okay?

24 A    I'll do my best, yeah.

25 Q    All right.  Thank you.

D. Willis - Direct

1          (Video playing.)

2    A     Probably now.

3    Q     Okay.

4          MR. CANTWELL:  So we had admitted it to 0:53 before.

5    Can we have it until 0:58?

6          MR. MILLS:  No objection.

7          MR. CANTWELL:  Okay.

8          THE COURT:  Be admitted.

9          MR. CANTWELL:  We've just got one more thing here.

10    BY MR. CANTWELL:

11   Q    The last time you testified do you remember saying -- I

12   think you recall somebody saying "heads down, y'all, heads

13   down"?

14   A    I don't recall.

15   Q    You don't recall that?

16   A    Yeah.

17   Q    This is -- I'm showing you CCEX-157.  Conscious of the

18   plaintiffs' objection, I'm going to fast-forward a little bit

19   in this video.

20        I'm going to start this at 0:09.

21          (Video playing.)

22        You remember that chant, right?

23   A    I couldn't even hear it.

24   Q    Do you remember hearing people chant "Jews will not

25   replace us"?

77

D. Willis - Direct

1   A    Yes.

2             (Video playing.)

3   Q    And do you recognize this scene roughly about where this

4   is happening?

5   A    I know the location, but I don't recognize this scene.

6   Q    You recognize the location.  Where is this being filmed?

7   A    This looks like the east side of the Rotunda at the base.

8             (Video playing.)

9   Q    And that's -- I know it's a little bit blurry, but that's

10  aiming towards where the statue is, right?

11  A    Yeah, that's North Plaza, yeah.

12  Q    Do you believe you're down there at this point?

13  A    I don't know.

14  Q    Okay.

15            (Video playing.)

16       Does that ring a bell?

17  A    No.

18            (Video playing.)

19  Q    That sounds more familiar, right?  The chant?

20  A    I only recognize the chant.  I don't know if I was

21  listening to this in the moment.

22            (Video playing.)

23            MR. CANTWELL:  So I would move to admit --

24            THE COURT:  I thought this was already admitted.

25            MR. CANTWELL:  I don't believe that it is.

D. Willis - Direct

1          MR. MILLS:  157?

2          MR. CANTWELL:  Yes.  CCEX-157.

3          MR. MILLS:  No objection.

4          THE COURT:  Be admitted.

5          (Defendant Cantwell Exhibit 157 marked.)

6          (Defendant Cantwell Exhibit 157 admitted.)

7          MR. CANTWELL:  So I'm going to rewind that a little

8    bit.  We're at 0:48 in this.

9          (Video playing.)

10    BY MR. CANTWELL:

11   Q    You don't remember that, somebody saying "this is

12   important to all of us"?

13   A    I really don't.

14          (Video playing.)

15   Q    And correct me if I'm wrong:  Was it your testimony last

16   time that you know who Emily Gorcenski is today, but you did

17   not on August 12th?

18   A    That's correct.

19   Q    Do you know who recorded this video?

20   A    I do not.

21          (Video playing.)

22   Q    Can you think of any reason Emily Gorcenski would have

23   known you on August 11th?

24   A    I can't think of one.

25   Q    Do you think it's at all odd that she hides everybody's

7.9

D. Willis - Cross

 1    faces except for you and Ms. Romero's?

 2              MR. MILLS:  Objection.

 3              THE COURT:  Sustained.

 4              (Video playing.)

 5              MR. CANTWELL:  No further questions.

 6              THE COURT:  All right.  Any redirect?

 7              MR. MILLS:  No, sir.

 8              THE COURT:  Any cross?

 9              MR. JONES:  Your Honor, can I ask one question?

10              THE COURT:  Yes.

11              MR. JONES:  Thank you.

12              I'd like to show him what's been marked as Defense

13    Exhibit 1 and ask to publish this to the jury.

14              MR. MILLS:  Has this been admitted?

15                        CROSS-EXAMINATION

16     BY MR. JONES:

17    Q    Mr. Willis, is that you in that image?

18              MR. MILLS:  Objection, beyond the scope of the

19    examination, Your Honor.

20              THE COURT:  Well, he's a party.  I think that's a

21    little different.  Go ahead.

22     BY MR. JONES:

23    Q    Did you answer the question?

24    A    Yeah, I said wrong person.  No.

25    Q    That's not you?  Okay.  Do you see yourself anywhere in

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  this line?

2  A    No.

3           MR. JONES:  Thank you.

4           THE COURT:  All right.  Is that all?

5           All right.  Thank you, Mr. Willis.  You may be

6  excused.

7           All right.  Any other evidence?

8           MR. SMITH:  Yes, Your Honor.  Like we were talking

9  about before we took the morning break, we'd like to admit --

10  we'd like to move to admit Plaintiffs' Exhibit 2533 into

11  evidence.

12           MR. ISAACSON:  This is your video?

13           MR. SMITH:  Yes, this is the video we stipulated to.

14           MR. ISAACSON:  No objection, Your Honor.

15           THE COURT:  Be admitted.

16           MR. SMITH:  Thank you, Your Honor.

17           (Defendant TWP Exhibit 2533 admitted.)

18           THE COURT:  Any rebuttal?

19           MR. ISAACSON:  Your Honor, may I approach?

20           THE COURT:  Yes.

21           (Sidebar commenced.)

22           MR. ISAACSON:  Your Honor, the only thing we'd like

23  to do in rebuttal is re-call Captain Newberry.  And I didn't

24  want to surprise you with this because of the colloquy we were

25  having when I was doing cross-examination.  Mr. Spencer as part

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  of this case, along with the other defendants, have said they

2  cooperated with the police.  This gentleman will testify as to

3  what level of cooperation that was from Mr. Pierce, who has

4  been identified by Mr. Spencer as his head of security, also

5  known as Ajax.  That is in the record.

6          We don't believe that when the head of security for

7  Mr. Spencer who has been -- the record shows uses

8  intermediaries, communicates with the police, that that's

9  hearsay because his statements themselves reflect cooperation

10  or noncooperation.  And that's the whole -- it doesn't matter

11  whether the person --

12          THE COURT:  Why didn't you tell me this?  I didn't

13  even know who Pierce was.

14          MR. ISAACSON:  Because there was the issue -- there

15  was the additional issue of whether this was in the scope of

16  the very limited direct.  And he's here right now.

17  Mr. Newberry has stayed and he can walk right in.  I believe

18  the marshals have him and we can get this done in a short

19  amount of time.  It's not going to cause a delay.

20          THE COURT:  Tell us, is there going to be any

21  objection to it?

22          MR. KOLENICH:  Your Honor, Jim Kolenich.  He's

23  identified Pierce or Ajax as referring to Mr. Spencer, which of

24  course I have no interest in one way or the other.  If it leaks

25  over into any of my clients, I do intend to object.  I don't

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   believe Newberry was on their witness list, for one thing.  But

2   aside from that, I believe this testimony would amount to

3   hearsay.

4            MR. ISAACSON:  It can't be hearsay if the issue is

5   cooperation.  These folks have said what they have said to the

6   police, and that's not being admitted for truth.  That's just

7   their statements to the police.

8            THE COURT:  Well, they just said -- what did they

9   say, they cooperated?

10            MR. ISAACSON:  Right.  We told them what we were

11   going to do.  We wanted to be safe.  There were numerous

12   things.

13            THE COURT:  He only knows -- he doesn't know who they

14   talked to.

15            MR. ISAACSON:  He knows specifically what

16   Mr. Spencer's head of security told to him and what he said to

17   Mr. Spencer's head of security.  And that's what he would

18   testify to.

19            THE COURT:  No.  You're not -- that's not impeachment

20   of Mr. Spencer, then.

21            MR. ISAACSON:  It's not impeachment.  It's rebuttal.

22   It's rebuttal of Mr. Spencer's testimony that he cooperated

23   with the police.

24            THE COURT:  That Mr. Spencer cooperated?

25            MR. ISAACSON:  Yes.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1      THE COURT:  All right.  Well, what has Mr. Newberry

2  telling Mr. Pierce something got to do with what has --

3      MR. ISAACSON:  Because Mr. Pierce -- well, two

4  things.  First of all, Mr. Pierce is not cooperating.  And the

5  second thing is that the other thing that Mr. Spencer has said

6  and that the other defendants have said is that we did not have

7  a safe entrance into Emancipation Park.  And Mr. Newberry will

8  testify that they were offered a safe entrance.  The speakers

9  were offered a safe entrance into the park, which some of the

10  speakers did not use.

11      MR. JONES:  I don't recall there being evidence where

12  Mr. Spencer said that it was Jack Pierce that he was talking

13  about when he said he coordinated with the police.

14      MR. KOLENICH:  Your Honor, there's additional

15  rebuttal to this testimony if the Court allows this beyond

16  Spencer.  I would have to call another police officer who I

17  haven't subpoenaed because we didn't anticipate this.  Now,

18  it's a Charlottesville police officer, presumably I could get

19  her here.  The testimony would have to be taken tomorrow.  If

20  you limit him to Spencer and what the man says about Spencer, I

21  don't care.

22      MR. CANTWELL:  Is Mr. Spencer able to hear us right

23  now?

24      MR. KOLENICH:  Mr. Spencer is not here.

25      MR. DERISE:  Is he on Zoom?  Mr. Spencer?

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1       THE CLERK:  No.

2       THE COURT:  Okay.  I'm not -- I'm not going to allow

3  it.  I just think you're expanding this.

4       MR. ISAACSON:  It's ten minutes.

5       THE COURT:  No.  You've gone far beyond.  You could

6  have done this when he was in cross-examination.  You could

7  have brought it up.  You're bringing it up now and it's too

8  late.

9       MR. ISAACSON:  Thank you, Your Honor.  That's why I

10  wanted to do it at sidebar.

11       (Sidebar concluded.)

12       THE COURT:  All right.  Is there any other evidence

13  that has not been admitted?

14       MR. TOLENTINO:  Your Honor, yes.  This is Ray

15  Tolentino.  We have one piece of evidence that we raised in a

16  letter that we filed with respect to the UVA fire policy.  The

17  docket number is 1438 and we have a custodial affidavit

18  attesting to its authenticity.

19       (Plaintiff Exhibit 1438 marked.)

20       MR. KOLENICH:  We have an objection to that, Your

21  Honor.  Perhaps we should approach again.

22       THE COURT:  Okay.  Members of the jury, I'm going

23  to -- at this point in the trial, you're going to be going in

24  and out of the courtroom a number of times because there are

25  things that are going to come up.  I'm going to let you go back

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  to the jury room and then call you back in not too long, 15

2  minutes, and then I'm going to read some instructions to you.

3  Then we'll recess for lunch and then I'll read more

4  instructions to you.

5         But let the jury retire and we'll take this up now.

6  **(Jury out, 11:23 a.m.)**

7         THE COURT:  All right.  Mr. Kolenich, state your

8  objection.

9         MR. KOLENICH:  Thank you, Your Honor.  As an initial

10  matter, we don't believe this was on their exhibit list.  So

11  it's late.  They haven't demonstrated why they didn't know

12  about it in time to identify it.

13         Secondly, this would be tantamount to allowing them

14  to amend the complaint.  The state court, at least, the state

15  law claim regarding conspiracy, the instruction or the law in

16  Virginia says that you can -- you conspire to do an unlawful

17  thing or a lawful thing by unlawful means.  Now, their

18  complaint, their operative complaint only says that they

19  conspired to commit violence.  It doesn't say they conspired to

20  do a lawful thing by unlawful means.

21         So they're trying to get this in.  It's tantamount to

22  an amendment because it's as much as handing them unlawful

23  means on August 11th.

24         As a third matter, there isn't any evidence of record

25  that any of the defendants knew about this policy.  So they had

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  a discussion about you couldn't have guns on UVA campus on

2  August 11th, but there was no discussion whatsoever of evidence

3  in this case that they didn't know you could light torches on

4  August 11th on the UVA campus.

5         THE COURT:  That you couldn't light torches?  You

6  said didn't know -- I think maybe I didn't hear you right.  I

7  thought you said they did not know that you could light

8  torches.

9         MR. KOLENICH:  I'm sorry, did not know you could not,

10  Your Honor.

11         THE COURT:  You probably said it right.

12         All right.

13         MR. KOLENICH:  Thank you.

14         MR. JONES:  If I could also be heard, Your Honor.

15         THE COURT:  Yes.

16         MR. JONES:  The reason that the late disclosure issue

17  is relevant and prejudices us is that we haven't had an

18  opportunity to go into this with any witness that's testified

19  until this late disclosure of their plan to admit this.  So it

20  does prejudice us by not having included this in their exhibit

21  list, in addition to the reasons Mr. Kolenich mentioned.

22         THE COURT:  Okay.  Do you want to respond?

23         MR. TOLENTINO:  Sure, Your Honor, if I may, a couple

24  of responses.  The first is with respect to Mr. Kolenich's

25  suggestion that we're trying to amend our complaint, that's

87

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   just false.  We think this is particularly relevant with

2   respect to the claims that we've made.  They put this at issue

3   by suggesting repeatedly that what they were doing was legal.

4   And what this shows is that it wasn't.  It was against the

5   university policy.

6        Now, this is a public record.  It's clearly

7   authentic.  We have a custodian who attests to --

8        THE COURT:  I'm not worried about that.  That's not

9   been raised.

10       MR. TOLENTINO:  Sure, Your Honor.  But with respect

11  to both the relevance and the disclosure issue, we think that

12  sort of the document speaks for itself.  It should go into

13  evidence.  The policy is the policy.  And so, you know, to the

14  extent that the argument is that what they did on August 11th

15  with respect to bringing tiki torches to -- without any

16  authorization from the university on university grounds, this

17  is highly relevant and probative as to an issue that they put

18  into issue repeatedly throughout this trial.

19       They're arguing repeatedly that what they did was

20  lawful.  They've submitted a jury instruction that says it's

21  okay to protest on grounds --

22       THE COURT:  Did you just discover -- I mean, you knew

23  they were going to say it was lawful, didn't you?

24       MR. TOLENTINO:  That's right, Your Honor.  But with

25  respect to this, we only submitted it when they put it at

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   issue.  So with respect to the late disclosure --

2           THE COURT:  Well, you knew that was going to be an

3   issue.

4           MR. TOLENTINO:  Well, we knew it was going to be at

5   issue, Your Honor, but we obtained the policy when we obtained

6   the policy from the university grounds.  We don't think it's

7   prejudicial.  They've already suggested repeatedly that this

8   was a lawful protest, and it simply wasn't by the university's

9   policy.  And so I think it would be prejudicial for us not to

10  be able to point to the policy that they broke in by bringing

11  lit tiki torches to the grounds without obtaining prior

12  authorization.  And we should be able to sort of submit

13  evidence to that effect.

14          THE COURT:  Well, the tiki torches didn't hurt

15  anybody, did they?

16          MR. TOLENTINO:  With respect, Your Honor, I think we

17  do have evidence that they did hurt people with the lit torches

18  and there was testimony --

19          THE COURT:  They didn't burn anybody, though.

20          MR. TOLENTINO:  -- that individuals were hurt --

21          THE COURT:  They didn't burn anybody, though.

22          MR. TOLENTINO:  Well, there was testimony they swung

23  tiki torches --

24          THE COURT:  They didn't burn any of the plaintiffs,

25  right?

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1    MR. TOLENTINO:  I don't recall off the top of my head

2  whether or not anyone is alleging they were burnt.  But

3  certainly that was part of the allegation, part of the sort of

4  scheme of violence that they perpetrated on the plaintiffs.

5  And even if they weren't specifically touched by the flames,

6  the flames evoked a horrific incident that certainly is

7  relevant to punitive damages and damages generally.

8    THE COURT:  Okay.  Well, I think it's too late.  Just

9  on the last matter that you said, it's relevant to punitive

10  damages, if they didn't know they were violating whatever the

11  policy is, then that would be -- they would have a right to say

12  they didn't know.  That would tend to mitigate any punitive

13  damages they might be entitled to.  But you didn't have it on

14  your list and I think it comes up too late and it just reopens

15  this case to --

16    MR. TOLENTINO:  If that's the case, Your Honor, then

17  we would respectfully request that they shouldn't be able to

18  argue that the torchlight march was legal.  This is rebuttal

19  evidence with respect to that assertion.

20    THE COURT:  They can say they thought it was legal,

21  but, right, you can't --

22    MR. TOLENTINO:  As long as -- I'm sorry, Your Honor.

23    THE COURT:  I'm sorry, go ahead.

24    MR. TOLENTINO:  I was just saying we would be fine

25  not having this in evidence if they stipulate not to argue to

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  the jury that the torchlight march, which was in secret and

2  unauthorized, was not legal.

3          MR. CANTWELL:  To the best of my understanding, it

4  was authorized by the police.  Now, granted, I'm told that by

5  Elliot Kline.

6          THE COURT:  Well, the police can't alter -- I mean,

7  unless -- I don't think the police can alter a university

8  policy.  They can't make something that's illegal legal just by

9  saying so.  And we don't know -- I mean --

10         MR. CANTWELL:  My understanding is -- and I'm not

11 intimately familiar with the policy, but I think there is some

12 dispute over whether or not --

13         THE COURT:  Well, okay, but I've already ruled on it,

14 unless you want to snatch defeat from the jaws of victory.

15         MR. CANTWELL:  I certainly don't aim to do that, but

16 if we're prohibited from arguing that what we did was legal --

17         THE COURT:  Well, I mean, you can argue you had no

18 reason to believe it wasn't legal.  But you shouldn't be saying

19 it was legal.  I mean, that's -- because then that's not an

20 accurate statement, apparently, because the policy --

21         MR. KOLENICH:  Your Honor, at the same time I don't

22 think plaintiffs should be allowed to argue that it was

23 unlawful.  There's no proof of that in the record.

24         MR. TOLENTINO:  Your Honor, that's flatly incorrect.

25 Our claims are that this is all unlawful action.  They have

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1    conspired to commit racially motivated violence --

2              THE COURT:  That is unlawful.  But you can't argue

3    that it was -- you cannot argue the fire policy.

4              MR. TOLENTINO:  Well, just one question, Your Honor.

5    If they argue that the torchlight march was lawful and they

6    were allowed to have tiki torches, would it be permissible on

7    closing for us to argue that it was, in fact, not lawful,

8    according to university policy?

9              THE COURT:  I've said, I think, they can argue that

10   they thought it was lawful.  You cannot say that it was lawful.

11   Understood?

12             MR. KOLENICH:  Understood, Your Honor.

13             THE COURT:  Everybody?

14             Okay.

15             MR. TOLENTINO:  Okay, your Honor.  Thank you very

16   much.  We have a couple of objections to Mr. Kolenich's

17   supplemental jury instructions.  We can handle those now or

18   later.

19             THE COURT:  Well, what I propose to do now is read

20   those general instructions, some of the boilerplate that we do,

21   because my voice I know will give out.  And I'd like to have a

22   break in between.

23             MR. TOLENTINO:  Totally understood, Your Honor.

24             THE COURT:  What we'll do is we'll recess and take

25   that up and take a shorter -- take a shorter lunch break, if

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   it's all right, and go over any objections to instructions.

2           Now, do you know Mr. DeRise has sent out the other

3   instructions to work from?

4           MR. SMITH:  Yes, Your Honor.

5           THE COURT:  So we'll take that up.

6           MR. TOLENTINO:  Thank you, Your Honor.

7           THE COURT:  Thank you.  All right.  Do you all need

8   any break?  I'm going to read about 20 pages, I believe.

9           Rob, let me be sure I've got the right stuff.

10          MR. CAMPBELL:  Yeah, a brief break would be great,

11   Your Honor.  Even if it's only five minutes.

12          THE COURT:  Let's take five minutes.

13          (Recess.)

14          THE COURT:  We'll take up the Rule 50 motions before

15   I read the second set of instructions.

16          You said you had some objection to -- just tell us

17   which ones they are and then we can be looking at them already.

18   I don't want an argument.

19          MR. TOLENTINO:  Sure.  The two instructions to which

20   we object are the second instruction on ECF 1442 filed by

21   Mr. Kolenich.  It's entitled "Protest march through a

22   residential area."  And then the second, I believe the docket

23   number is 1446, and it's entitled "Advocacy of violence."

24          THE COURT:  Entitled what?

25          MR. TOLENTINO:  "Advocacy of violence," Your Honor.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1           Those are the two particular instructions that we
2  would object to.  We think that the proposed instructions that
3  Mr. DeRise sent earlier with respect to these issues are
4  correct as a matter of law.  So we would object to these two.
5  And I'm happy to argue them if you'd like.
6           THE COURT:  We'll argue that later.
7           MR. TOLENTINO:  Thank you, Your Honor.
8           THE COURT:  Okay.  You can bring the jury on in.
9           Is my voice picking up okay?
10          MR. SMITH:  I can hear you fine, Your Honor.
11          (Pause.)
12          THE COURT:  There's an instruction on privilege by
13  defendant.  Does that apply to anybody?
14          MR. SMITH:  I wasn't sure about that, Your Honor.  It
15  said a defendant may have invoked a privilege.
16          THE COURT:  I'm not going to read that right now.
17  We'll take that up later.
18  **(Jury in, 11:45 a.m.)**
19          THE COURT:  Members of the jury, now you've heard all
20  the evidence in the case, and it's my duty to instruct you on
21  the law.  It's your duty to follow the instructions.  These
22  will tell you further about the finding of facts.
23          It will appear on the screen.  I know sometimes I
24  might misspeak, but the instruction will be what you see, not
25  what I say.  You'll have a copy of the instructions in the jury

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  room, but if you see that I missed a word or misspoke, it's

2  what you see on the screen.  That's the instruction.  That's

3  what will be in the courtroom.  If I do anything really bad, I

4  hope somebody will call it to my attention.

5          All right.

6          Now that you have heard all the evidence in the case,

7  it becomes my duty to instruct you on the rules of law that you

8  must follow and apply in arriving at your decision.  You will

9  follow and apply these rules of law after you have heard the

10  final arguments of the lawyers for the parties.  It is your

11  duty as jurors to follow the law as stated in my instructions

12  and to apply the rules of law, so given, to the facts as you

13  find them from the evidence in the case, and solely the

14  evidence presented to you.

15          Counsel may, quite properly, refer to some of the

16  governing rules of law in their arguments.  If, however, any

17  difference appears to you between the law as stated by me and

18  these instructions, you are governed by the instructions I am

19  about to give to you.  You must follow all the rules as I

20  explain them to you.  You may not follow some and ignore

21  others.

22          You are not to single out one instruction alone as

23  stating the law, but must consider the instructions as a whole.

24  Neither are you to be concerned with the wisdom of any rule of

25  law stated by the Court, regardless of any opinion you may have

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  as to what -- I'm going to read that sentence over.

2       Regardless of any opinion you may have as to what the

3  law ought to be, it would be a violation of your sworn duty to

4  base a verdict upon any other view of the law than given in the

5  instructions; just as it would be a violation of your sworn

6  duty as judges of the facts to base a verdict upon anything but

7  the evidence in the case.  You must not base your verdict on

8  prejudice, sympathy, guesswork, or speculation, but on the

9  evidence and on the rules of law I have given you.

10      Justice through trial by jury must always depend on

11 the willingness of each individual juror to seek the truth as

12 to the facts from the same evidence presented to all the jurors

13 and to arrive at a verdict by applying the same rules of law,

14 as given in the instructions of the Court.

15      As stated earlier, it is your duty to determine the

16 facts, and in so doing you must consider only the evidence I

17 have admitted in the case.

18      The evidence in the case includes the sworn testimony

19 of the witnesses, regardless of who may have called them; all

20 exhibits received in evidence, regardless of who may have

21 produced them; all depositions read or played into the record,

22 regardless of who may have introduced them; and all facts which

23 may have been admitted or stipulated.

24      Remember that statements, objections, or arguments

25 made by the lawyers are not evidence in the case, and you may

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   not consider any question which contained any statement of fact

2   as evidence of that fact, unless it was agreed to by the

3   witness.

4           The function of the lawyers is to point out those

5   things that are most significant or most helpful to their side

6   of the case, and in so doing to call your attention to certain

7   facts or inferences that might otherwise escape your notice.

8   In the final analysis, however, it is your own recollection and

9   interpretation of the evidence that controls in the case.

10          What the lawyers say is not binding upon you.  And

11  during the course of the trial, I occasionally made comments to

12  the lawyers or asked questions of a witness or admonished a

13  witness concerning the manner in which he or she should have

14  responded to the questions of counsel.  Do not assume from

15  anything I may have done or said during the trial that I have

16  any opinion concerning any of the issues in this case.  Except

17  for my instructions on the law, you should disregard anything I

18  may have said during the trial in arriving at your own findings

19  as to the facts.

20          You are the judges of the facts, the credibility of

21  the witnesses, and the weight of the evidence.  You may

22  consider the appearance and manner of the witnesses on the

23  stand, their intelligence, their opportunity for knowing the

24  truth and for having observed the things about which they

25  testified, their interest in the outcome of the case, their

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   bias, and, if any have been shown, their prior inconsistent

2   statements or whether they have knowingly testified

3   untruthfully as to any material fact in the case.

4          You may not arbitrarily disregard believable

5   testimony of a witness.  However, after you have considered all

6   the evidence in the case, then you may accept or discard all or

7   part of the testimony of a witness as you think proper.

8          You are entitled to use your common sense in judging

9   any testimony.  From these things and all the other

10  circumstances of the case, you may determine which witnesses

11  are more believable and weigh their testimony accordingly.

12         While you should consider only the evidence, you are

13  printed to draw such reasonable inferences from the testimony

14  and exhibits as you may feel are justified in light of common

15  experience.  In other words, you may make deductions and reach

16  conclusions that reason and common sense lead you to draw from

17  the facts which have been established by the evidence.

18         You should not be concerned about whether the

19  evidence is direct or circumstantial.

20         Direct evidence is the testimony of one who asserts

21  actual knowledge of a fact, such as an eyewitness.

22         Circumstantial evidence is proof of a chain of events

23  and circumstances indicating that something is or is not a

24  fact.

25         The law makes no distinction between the weight you

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  may give to either direct or circumstantial evidence.  It only

2  requires that you weigh all of the evidence in reaching your

3  verdict.

4          It is your job to decide if a party with the burden

5  of proof on an issue has proven that issue by a preponderance

6  of the evidence.  In so doing, you must consider all of the

7  evidence.  This does not mean, however, that you must accept

8  all the evidence as true and accurate.

9          You are the sole judges of the credibility or

10  believability of each witness and the weight to be given to the

11  witness' testimony.  An important part of your job will be

12  making judgments about the testimony of the witness who

13  testified -- witnesses who testified in this case.  You should

14  decide whether you believe all or part of what each person had

15  to -- had to say, and how important that testimony was.

16          In making this decision, you should consider -- and I

17  know this is repetitious of something I've already read -- did

18  the witness impress you as honest?  Did the witness have any

19  particular reason not to tell the truth?  Did the witness have

20  a personal interest in the outcome of the case?  Did the

21  witness have any relationship to either party -- either the

22  plaintiff or the defense?  Did the witness seem to have a good

23  memory?  Did the witness clearly see or hear things about which

24  the witness testified?  Did the witness have the opportunity

25  and ability to understand questions clearly and answer them

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   directly?  Did the witness' testimony differ from the testimony

2   of other witnesses or other evidence in the case?

3          These are a few of the considerations that will help

4   you determine the accuracy of what each witness said.

5          Your job is to think about the testimony of each

6   witness you have heard and decide how much you believe of what

7   each witness had to say.  In making your mind --

8          (Video playing.)

9          MR. CANTWELL:  Sorry.  Sorry.  Sorry.

10         THE COURT:  In making up your mind in reaching a

11   verdict, do not make any decision simply because there were

12   more witnesses on one side than the other.  Do not reach a

13   conclusion on a particular point just because there were more

14   witnesses testifying for one side on that point.

15         The testimony of a witness may be discredited or

16   impeached by showing that the witness testified falsely, or by

17   evidence that at some time the witness said or did something,

18   or failed to say or do something, which is inconsistent with

19   the testimony the witness gave at this trial.

20         During the course of the trial you heard the

21   testimony of a number of witnesses, some of whom are employees

22   of the state, law enforcement officers, and ordinary civilians.

23   The testimony of a government employee or a law enforcement

24   officer is not necessarily deserving of more or less

25   consideration, or greater or lesser weight, than that of an

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  ordinary civilian witness.

2          As I explained to you at the beginning of the trial,

3  unless otherwise instructed, plaintiffs bear the burden of

4  proving their claims against each defendant by what is called

5  the preponderance of the evidence.  This burden applies to all

6  plaintiffs' claims, except their claims for intentional

7  infliction of emotional distress, which will be discussed

8  later.

9          In the same vein, each defendant has the burden to

10  prove any affirmative defenses that they may advance by a

11  preponderance of the evidence.

12          The term "preponderance of the evidence" means

13  evidence which, as a whole, shows that the fact sought to be

14  proven is more probable than not.  In other words, a

15  preponderance of the evidence means each evidence -- such

16  evidence that persuades you that a fact is more likely true

17  than not.  In your mind, you might think of this as 51 percent,

18  or more likely than not.

19          You may have heard of the term "proof beyond a

20  reasonable doubt."  That is a stricter standard that is

21  applicable in criminal cases.  It does not apply in a civil

22  case such as this.  You should, therefore, put it out of your

23  minds.

24          In determining whether any fact at issue has been

25  proven by a preponderance of the evidence, you may, unless

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   otherwise instructed, consider the testimony of all witnesses,

2   regardless of who called them; all exhibits received in

3   evidence, regardless of who may have produced them; and all

4   depositions read into the record, regardless of who may have

5   introduced them.

6          If you conclude that a party who has the burden of

7   proof on an issue establishes his or her position by a

8   preponderance of the evidence, you must decide the issue --

9   that issue for the party.

10         The rules of evidence provide that if scientific,

11  technical, or otherwise specialized knowledge might assist the

12  jury in understanding the evidence or in determining a fact at

13  issue, a witness qualified as an expert by knowledge, skill,

14  expertise, training, or education may testify and state his or

15  her opinion concerning such matters.

16         During the trial, you heard from four expert

17  witnesses, including Dr. Deborah Lipstadt, who was qualified as

18  an expert on antisemitism, including the history, rhetoric,

19  language, and symbols of antisemitism; Dr. Paul Simi, who was

20  qualified as an expert in the white supremacist movement and

21  the culture of the white supremacist movement; Ms. Sharon

22  Reavis, who was qualified as an expert in the fields of

23  rehabilitation counseling and life care planning; and Dr. Nadia

24  Webb, who was qualified as an expert in the fields of

25  neuropsychology and medical psychology.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1          You should consider each expert opinion received in

2    this case and give it such weight as you think it deserves.

3    You should decide that -- you should decide that the opinion of

4    an expert -- I'm sorry.  Strike that.

5          If you should decide that the opinion of an expert

6    witness is not based upon sufficient education and experience,

7    or if you should conclude that the reasons given in support of

8    the opinion -- reasons given in support of their opinion are

9    not sound or that the opinion is outweighed by other evidence,

10   then you may disregard the opinion.

11         You must not consider any matter that was stricken by

12   the Court.  It is not evidence and should be disregarded.

13         A deposition is a witness' sworn testimony that is

14   taken before trial.  During a deposition, the witness is under

15   oath and swears to tell the truth, and the lawyers for each

16   party may ask questions.  A court reporter is present and

17   records the questions and answers.

18         During trial, you heard the deposition testimony of

19   various witnesses.  Deposition testimony is entitled to the

20   same consideration as live testimony, and you must judge the

21   same way -- judge it the same way as if the witness was

22   testifying in court.

23         Some of the deposition testimony that you heard was a

24   video recording of the deposition.  Other deposition testimony

25   that you heard may have been read out loud by an attorney.  If

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  the deposition testimony was read out loud, you should not

2  place any significance on the behavior or tone of voice of any

3  person reading questions or answers.

4        Under the Fifth Amendment of the United States

5  Constitution, a person has the right to refuse to answer

6  questions that tend to incriminate him in criminal activity.

7  During this case, you heard deposition testimony from certain

8  non-party witnesses, including Benjamin Daley and Vasilios

9  Pistolis, who refused to testify or answer questions by

10 exercising their Fifth Amendment privilege against

11 self-incrimination.

12       With respect to each witness' refusal to testify, you

13 may, but are not required to, infer that their testimony would

14 have been unfavorable to a defendant associated with that

15 witness if you find that the witness is sufficiently associated

16 with that defendant so as to justify the adverse inference.

17       Where the witness is sufficiently associated with a

18 party to justify an adverse inference depends upon all the

19 circumstances of the case.  For example, a witness who is a

20 past or present employee, officer, or agent of a party may be,

21 but is not necessarily, sufficiently associated with that party

22 to justify an adverse inference.  Likewise, a conspirator may

23 be sufficiently associated with a party to permit the drawing

24 of an inference to the party if the conspirator refuses to

25 testify.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1          If, however, you find that the witness is not

2    sufficiently associated with the party, you are instructed that

3    you are not to attach any significance to the witness' refusal

4    to testify.  In other words, you should not make any assumption

5    or speculate why the witness chose to exercise his

6    constitutional privilege.

7          In addition, if the witness is not sufficiently

8    associated with either of the parties, you are not to infer

9    anything adverse or unfavorable to either party in the case

10   because the witness refused to testify.

11         Now, at that point, they are more the general

12   instructions that you would hear in this case.  There's more

13   specific instructions relating to the charges, the counts in

14   this case, you will hear after lunch.  I'm going to allow you

15   to go to -- take a recess now for lunch.

16         And I'm going to tell you, it might be more than --

17   longer than an hour in this case, because we do have matters

18   that have to be brought up before the final instructions are

19   read to you.  We'll try to move it along as fast as possible,

20   but it may be -- I do anticipate it will be more than an hour

21   before you're called back.

22         So you may go with the marshal.  We'll just remain in

23   the courtroom.

24   **(Jury out, 12:04 p.m.)**

25         THE COURT:  All right.  I want to take up the Rule 50

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  motions.  You all have filed them, the ones that have been

2  filed.

3       MR. SMITH:  Your Honor, if I could be heard real

4  quick on that.  I have not filed the Rule 50 motion yet, but I

5  don't want the Court to -- I don't care if the Court denies it.

6  I just want to preserve any later issues.

7       THE COURT:  All right.  I assume that all of you

8  believe that the evidence is insufficient to support a verdict

9  on any of the counts.

10       MR. KOLENICH:  We do, Your Honor, but I also have not

11  filed in writing yet, which I will do today.

12       THE COURT:  All right.  But anyway, I think that it's

13  a jury issue.  And, you know, the theory, as I understand, of

14  the case is that the defendants conspired by planning to come

15  to Charlottesville with the idea that Antifa or protesters

16  would be provoked into committing acts of violence possibly, or

17  something regarding the defendants, and that would justify the

18  defendants taking retaliation against those persons who caused

19  violence.

20       And I think the jury could infer from all the

21  evidence, the expert testimony and all the evidence in the

22  case, construing the evidence in the light most favorable to

23  the plaintiffs, disregarding y'all's explanations, which I must

24  do, and decide that the idea was to provoke violence but

25  respond in greater degree than was necessary for self-defense

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1    or anything of that sort.  And I think the jury -- I think

2    there's sufficient evidence, if the jury believes it, that they

3    could arrive at a verdict against the defendants.

4              MR. JONES:  Your Honor, if I could just briefly be

5    heard.  I understand Your Honor's ruling on the conspiracy

6    elements.  I do think, though, that on the 1986 claim about our

7    clients -- my clients in particular being able to prevent the

8    Fields car attack or the torch march, I don't think that

9    there's been, even viewed in the light most favorable to the

10   plaintiffs, evidence that my clients could have prevented that.

11   So just submit that in addition to the arguments I submitted in

12   my motion.

13             THE COURT:  Well, the issue -- I mean, the question

14   would be, if you anticipate a violent reaction, the question

15   is:  Was Fields's conduct foreseeable?  And there's evidence

16   that there had been talk on the Internet about car --

17   someone -- whether someone could drive a car through a crowd of

18   demonstrators that might be blocking the street.  And there was

19   evidence that these things have happened.  Particularly,

20   there's evidence that a number of the defendants congratulated

21   Fields and supported Fields, which would indicate -- be

22   evidence that such conduct by Fields could have been

23   anticipated as a part of violence connected with the

24   conspiracy.

25             It may not have been planned by anybody, but that it

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   was foreseeable that violent acts would happen and you can't

2   predict necessarily what they would be.  But the question is

3   was it within the realm of foreseeability.

4          Yes, sir?

5          MR. KOLENICH:  Yes, Your Honor.  My clients are

6   moving for Rule 50 dismissal, but I think the argument goes

7   beyond what's been stated so far.  I don't think the

8   plaintiffs' complaint states that they planned to induce

9   violence and then overreact to that violence.  Rather, it says

10  they planned to come here and affirmatively engage in violence,

11  regardless of what the counter-protesters did or didn't do.

12          Secondarily -- and we're going to talk about the jury

13  instructions, but it is First Amendment protected activity, as

14  long as you don't initiate violence, as long as you are

15  peaceful up to that point, to be as provocative as you want.

16  Yes, they know the Antifa are offended by their existence and

17  by their politics and they know that the good people of

18  Charlottesville, the non-Antifa, normal people, are also deeply

19  offended and will come out and protest them.

20          And maybe they're not all that great about telling

21  the two apart.  But the argument that defendants intend to make

22  is that they didn't do anything until the Antifa attacked them.

23  They did not hit anybody.  They did not do anything offensive

24  until they were attacked.

25          Now, if that's all a defendant agreed to do -- you

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  know, in the prior events that plaintiffs have put into

2  evidence, there's pushing, there's shoving, there's fistfights,

3  there's hitting people.  There's no car attack, there's no

4  shooting.  There's no fatal violence, which goes to the issue

5  of foreseeability and what specifically a defendant agreed to

6  do.

7          We've got to work on the jury instructions, but if

8  the instruction goes in that if you agreed to do anything

9  unlawful then you're responsible for anything a co-conspirator

10 does, I think that's as much as just handing the case to the

11 plaintiffs.

12         THE COURT:  You're only liable for what was

13 foreseeable.  And I think --

14         MR. KOLENICH:  I don't think the jury instructions

15 say that at this point, Your Honor.

16         THE COURT:  Well, that's what --

17         MR. KOLENICH:  That would be our argument, that this

18 in no way, shape, or form was foreseeable aside from the

19 lack --

20         THE COURT:  I don't think any specific type of

21 violence has to be foreseeable, but is it in the realm.

22         MR. KOLENICH:  Agreed.

23         THE COURT:  Is it in the realm of possibility that

24 these things are going to happen?  I mean, anything that has

25 happened and things that are being discussed, I think the

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   jury -- and in spite -- I hear what you're saying, but the

2   rhetoric -- now, you explained -- defendants explained their

3   rhetoric, but the words -- the jury doesn't have to buy the

4   explanation.  They can take the words at face value.

5            MR. KOLENICH:  That's very true, but I think we have

6   to find some way -- you know, the jury are not lawyers.  If all

7   we say is violence without distinguishing lawful versus

8   unlawful, or the degree -- you know, if you hit somebody once

9   with a fist, that's different from knocking him down and

10   standing on his head and hitting him with a stick.

11            THE COURT:  All right.  I understand.

12            MR. KOLENICH:  That's my only point.

13            THE COURT:  I think it has to be foreseeable.

14            MR. CANTWELL:  I think we might be venturing more

15   into jury instruction territory than the Rule 50 motion at this

16   point, but it occurs to me that, to give a simple example,

17   Mr. Kessler mentioned in an interview with him that if you're

18   in the park and there was -- you might end up with a disorderly

19   conduct charge or something like that.  Somebody who

20   acknowledged that possibility, you know, I don't think is

21   entering into an unlawful purpose that makes one a conspiracy

22   to a car crash later that afternoon.  For example.

23            THE COURT:  Well, you might not think so.  And I

24   might agree with you.  I wouldn't have -- probably wouldn't

25   have anticipated it either.  But you invite people to come to

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   the situation and that happens.  And it's certainly -- you

2   know, there was talk, chatter about this on the Discord, I

3   believe.  You know, somebody raised -- I forgot the guy's name

4   from North Carolina -- said North Carolina law allows you to

5   run through a crowd.  What about Virginia law?

6           No one said don't do that, to my knowledge.  That

7   was -- somebody was out there thinking about it and it was all

8   over the Internet.

9           MR. CANTWELL:  I understand that dot connection.

10  What I'm trying to understand is a question of conspiracy.  Let

11  me give an example more distant from this.  If Mr. Kolenich and

12  I conspire to break the speed limit and somebody who we had a

13  conversation with about breaking the speed limit goes out and

14  shoots somebody, we don't become responsible for the murder.

15          THE COURT:  No.

16          MR. CANTWELL:  And --

17          THE COURT:  But just read -- read the conspiracy

18  instruction.  I think it's clearly Virginia law.  I've been

19  giving this instruction many, many years.  And I don't believe

20  it's going to change now.  It's been -- I'm sure it's been

21  upheld many times.  So we're going to get past the Rule 50

22  motion now.

23          MR. CANTWELL:  Okay.

24          THE COURT:  But if you all want to -- tell me now the

25  instructions that -- again, that you object to, the plaintiff,

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1    the defendants, to be sure we've got them down.

2            MR. TOLENTINO:  Sure, Your Honor.  I think our

3    position is simply that the circulated instructions with

4    respect to the First Amendment should be given as drafted.

5    Mr. Kolenich has filed a series of supplemental proposed jury

6    instructions, and the two to which we take most objection are

7    ECF number 1442, protest march through residential area, and

8    1446, advocacy of violence.  I can take each in turn, if you'd

9    like.

10           Sure.  So the first instruction we think is

11   irrelevant, highly misleading and is precisely why we wanted

12   the UVA fire policy intact.

13           THE COURT:  Okay.

14           MR. TOLENTINO:  Which is --

15           THE COURT:  Wait, just a minute.  I want to go back

16   and focus on the instruction.  I don't have it in front of me

17   right now.  I just want to know what you object to and what the

18   defendants object to.  Then we're going to take our lunch

19   break, come back and talk about them for a few minutes.

20           MR. TOLENTINO:  Sounds good, Your Honor.  Sorry about

21   that.

22           MR. KOLENICH:  We understand about the Virginia

23   conspiracy instruction, but the federal conspiracy instruction

24   seems way too plaintiff-favorable to us, in that it's not

25   drawing clearly enough for a juror to understand the

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   distinctions that we were just talking about.  I think if we

2   could just add even a single sentence that makes a little bit

3   more plain that, you know, the substance of the thing you're

4   agreeing to is relevant to whether or not you conspired, or if

5   a co-conspirator goes well beyond the violence or the actions

6   that you anticipated or could have foreseen when you entered

7   the conspiracy, then you're not responsible for that act.

8            While I'm standing, I also have other proposed jury

9   instructions, or one other one that they don't seem to be

10  objecting to regarding organizational liability.  And we'd like

11  that to be considered by the Court because the case law that

12  I've cited makes very plain that a corporate officer can

13  conspire with the corporation if he's off on his own doing his

14  own thing, but that if the corporation doesn't conspire --

15           THE COURT:  That's the law.  It's clearly Virginia

16  law.  But how does it apply to other organizations?

17           MR. KOLENICH:  We've -- so I guess in this trial we

18  didn't actually put into evidence that Identity Evropa is

19  actually a corporation at the relevant times, but the Court

20  knows that and found that in separate litigation.  This Court

21  found that.  So I don't know if we can get a --

22           THE COURT:  It was proven that something was a

23  corporation.

24           MR. KOLENICH:  I don't think it matters.  The way the

25  instructions read, association in effect and incorporation is

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   basically the same law, they have to authorize it or they're

2   not responsible.

3          THE COURT:  I'm familiar with the instruction.

4          MR. KOLENICH:  Thank you.

5          MR. TOLENTINO:  Your Honor, just before we break, I

6   think, again, with respect to that instruction, we think the

7   Court should give the instruction that was circulated earlier

8   today, which is consistent with the instruction you've

9   previously given in many cases for organizations.  So we would

10  oppose the change to any of those instructions, just to make it

11  clear on the record.

12          THE COURT:  Yes, sir.

13          MR. JONES:  Thank you, Your Honor.  Just to reiterate

14  what Mr. Kolenich said, I'd ask if during lunch break we

15  could -- the defense counsel could get together and come up

16  with some suggestions on the federal conspiracy instruction,

17  because it may be that all the statements in there are correct

18  and law, but if they basically just lay out the plaintiffs'

19  theory of the case without instructing the jury on some of the

20  things that we are going to be asking the jury to consider, I

21  think it is prejudicial and I think it sort of slightly lowers

22  their actual burden of proof to just continually repeat over

23  and over in the instructions plaintiffs are not required to do

24  this, plaintiffs are not required to prove this.

25          Anyway, I'm just asking if we could get together

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

 1   during lunch and submit a proposed -- some proposed amendments

 2   to that instruction.

 3            THE COURT:  Okay.  I think that's about all we can do

 4   right now.  We'll take -- can we take about a 30-minute lunch

 5   break?  Is that all right?

 6            MR. SMITH:  Yes.

 7            MR. KOLENICH:  Yes.

 8            MR. TOLENTINO:  Yes.

 9            THE COURT:  Okay.

10            (Recess.)

11            THE COURT:  Let's go to the proposed instructions.

12   The document says "Anticipated Final Instructions."

13            Mr. Kolenich, you objected to number 2?

14            MR. KOLENICH:  The federal conspiracy instruction,

15   yes, sir.  Mr. Jones has prepared --

16            THE COURT:  Number 12, I'm sorry.

17            MR. KOLENICH:  Yes, sir, number 12.

18            MR. JONES:  I think it's number 13, Your Honor,

19   existence of a conspiracy.

20            THE COURT:  Oh, okay.

21            Yes, sir.  I understand that -- the part that

22   plaintiffs do not have to prove?

23            MR. JONES:  Well, Your Honor, if I can -- initially

24   we're requesting some language relating to foreseeability.

25   That would be a sentence that states, "the law holds

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   conspirators liable for all the reasonably foreseeable acts of

2   their co-conspirators in furtherance of the conspiracy."  That

3   would be based on *United States* --

4           THE COURT:  Okay.  Where in the instruction?

5           MR. JONES:  We can put that at the end.

6           THE COURT:  You cited the *Bradley* case.  Did you all

7   take something out of that instruction?

8           MR. TOLENTINO:  Your Honor, I'm not entirely sure

9   to -- what Mr. Jones is referring to.  We did cite the *Bradley*

10  case, and we adhered to it pretty faithfully.  With respect to

11  the reasonable foreseeability, we just put it in the injuries

12  sustained element, because that's what --

13          THE COURT:  It's got to be in the conspiracy part.

14          MR. TOLENTINO:  Well, the whole thing is the

15  conspiracy.

16          THE COURT:  Well, I know, but it's very important.  I

17  mean, we're talking about Fields particularly.

18          MR. TOLENTINO:  Understood, Your Honor.  I think

19  that's why we --

20          THE COURT:  Well, okay.  We've got to put that in

21  there.  All right.

22          MR. JONES:  And then, Your Honor, there's a sentence

23  that states, "All plaintiffs must show is that an overall

24  unlawful objective was shared."  And I think without including

25  language that it's not just that they shared an unlawful

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  objective, but that they had an agreement to act in furtherance

2  of that unlawful objective, I think that's in other -- that

3  language is in other places, so we would just request that that

4  sentence be removed.

5           MR. TOLENTINO:  Your Honor, we don't think it should

6  be removed.  We think we should keep it right where it is.

7           THE COURT:  Tell me where you're reading that, what

8  page.

9           MR. JONES:  It's page 3.  It's the last sentence of

10 the last full paragraph.

11          THE COURT:  You say "the last sentence"...

12          MR. JONES:  Last sentence of the second paragraph.

13          THE COURT:  All plaintiffs must show is an overall

14 unlawful objective was shared.

15          MR. TOLENTINO:  Your Honor, if I may, we took that

16 straight from Modern Federal Jury Instructions, paragraph

17 87.04.  It's also consistent with Your Honor's opinion on the

18 motion to dismiss 324 F. Supp. 3d at 783, where you wrote, "It

19 simply must be shown that there was a single plan, the

20 essential nature and general scope of which was known to each

21 person who is to be held responsible for its consequences."

22          So we think it should stay right where it is.

23          THE COURT:  All right --

24          MR. JONES:  Your Honor, it's that word "all."  It

25 implies the only thing they have to prove is that an overall

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   unlawful objective was shared, which is an incorrect statement

2   of the law.

3            THE COURT:  It has to be shared to promote the

4   violence based on racial animus.

5            MR. JONES:  And it also has to be shown that there

6   was an agreement, not just that people showed up with the same

7   objective.

8            THE COURT:  I follow you on that.

9            MR. TOLENTINO:  Your Honor, we think that's clear

10  from the context.

11           THE COURT:  Well, it may be.  I'll look at it.

12           MR. JONES:  The next sentence after that, Your Honor,

13  states, "Plaintiffs are also not required to show that all the

14  defendants they alleged as members of the conspiracy were, in

15  fact, parties to the alleged agreement."

16           I think what the purpose of that sentence is, is to

17  say that you can find some defendants part of the conspiracy

18  and some defendants not part of the conspiracy.  But it's a

19  little bit misleading in the sense that it seems to suggest

20  that you can find some -- it says they're not required to show

21  that all the defendants they alleged as members of the

22  conspiracy were in fact parties to the alleged agreement.  To

23  be part of the conspiracy, you have to be part of the

24  agreement.

25           MR. CANTWELL:  If I could chime in on that.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   Christopher Cantwell.  I was looking at that and --

2            THE COURT:  Let me read it.

3            MR. CANTWELL:  Okay.

4            THE COURT:  All right.  What were you going to say?

5            MR. CANTWELL:  I was going to say, as a non-attorney

6   who just read this, I was like, how can I be part of a

7   conspiracy that I haven't agreed to?  And that's what it seems

8   to say there.  So I would be chiming in on that sentence and

9   that's all.

10           MR. TOLENTINO:  Judge Moon, may I be heard?  We took

11  this from United States versus Stallings, which is a case you

12  presided over.  It's Case Number 6:17-CR-008.  The jury

13  instruction was from February 28th, 2019, just a couple of

14  years ago.  We think it's correct and it's your instruction,

15  Your Honor.  And it's clear from the rest of the instructions

16  that you have to be a member of the conspiracy to be liable.

17  So the concerns raised by Mr. Cantwell and Mr. Jones will be

18  solved by other instructions.

19           THE COURT:  Okay.  We'll take a look at it again.

20           MR. JONES:  Your Honor, in the next paragraph, the

21  first sentence of the next paragraph is, "By its very nature a

22  conspiracy is clandestine and covert, thereby frequently

23  resulting in little evidence of such an agreement."  I don't

24  doubt that's a correct statement of law in the majority of

25  conspiracy cases, but this is such a unique case involving

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  perhaps a hundred, multiple co-conspirators.  Not all of them

2  have been charged, or sued, of course.  But I don't think that

3  language is necessary, and I think it's misleading.

4          THE COURT:  Okay.  Well, I think that's generally the

5  law.  I think it's a proper statement.

6          Okay.  Anything else?

7          MR. DERISE:  Mr. Jones, can I ask you to say what was

8  your proposed sentence again, with respect to the reasonable

9  foreseeability?

10         MR. JONES:  Sure.  "The law holds conspirators liable

11  for all the reasonably foreseeable acts of their

12  co-conspirators done in furtherance of the conspiracy."  That's

13  based on United States versus Cummings, 937 F. 2d 941, page

14  944.

15         THE COURT:  Okay.  Moving on to instruction 14.  15?

16  Does anyone -- any defendant claim to have withdrawn from the

17  conspiracy, should there be one?

18         MR. JONES:  Your Honor, we would request that this

19  instruction remain because --

20         THE COURT:  Okay.

21         MR. JONES:  -- it's our theory that Fields

22  conducted -- anyway, yes, we would ask that this remain.

23         THE COURT:  Okay.  Racial animus, number 16.  Number

24  17, purpose of a conspiracy.  Covert act, 18.  Injury

25  sustained, 19.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1        All right.  Organizational defendants, and

2   incorporated associations.  I think what Mr. Kolenich suggested

3   needs to be incorporated into that instruction or given

4   separately.  But I think it's best to incorporate it in there.

5   So we'll do that.

6        MR. TOLENTINO:  Your Honor, just so it's clear on the

7   record, we would oppose inclusion of that.  Mr. Kolenich

8   himself just conceded that they didn't put in the evidence that

9   would make that particularly relevant.  So just for the record,

10  we understand your ruling, but I just want to note my

11  objection.

12       THE COURT:  Okay.  What's the basis, then, if you --

13  I understand you conceded --

14       MR. KOLENICH:  Judge, there's two weeks worth of

15  trial.  I'm just thinking that it's possible we didn't actually

16  put in explicit evidence that Identity Evropa is in fact a

17  corporation.  For purposes of the law what I meant to concede

18  was if it's an unincorporated or association, it really doesn't

19  matter, the legal standard doesn't change.

20       THE COURT:  Well, there's at least one corporation

21  involved, because I remember it being --

22       MR. KOLENICH:  The other part of that requested

23  instruction is what we think is most critical, in that the law

24  allows a finding of conspiracy between an officer of the

25  company -- of an organization, whatever we're going to call it,

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1    and the organization itself, if that officer is off doing his

2    own thing and has an independent personal stake in the

3    conspiracy.  That's basically where our entire defense

4    regarding Elliot Kline has gone in this trial.  So this

5    instruction is pretty critical to Defendant Identity Evropa,

6    particularly since Kline, but not Identity Evropa, is a

7    sanctioned party in this case.

8          So we request at least that part of the instruction

9    be given, that they can find against Kline without finding

10   against Identity Evropa.  They can find Kline operated on his

11   own and that Identity Evropa is not responsible.  So it's

12   relatively vague as is, and I think the proposed instruction

13   makes that a little bit -- a little bit more understandable to

14   the jury.

15         MR. TOLENTINO:  Your Honor, again, we object.  He

16   didn't provide the sufficient evidence to make that relevant.

17   You kept out the UVA policy because it was late.  The same

18   reasoning should hold true here with respect to that.

19         THE COURT:  I don't understand that reasoning.  This

20   is not evidence he's offering.

21         MR. TOLENTINO:  Well, he didn't offer any evidence to

22   justify the inclusion of that clarifying language.  That's the

23   point I'm making.

24         THE COURT:  Well, I don't necessarily buy it, but

25   Mr. Kline threw Mr. Kessler out -- I'll take a look at it.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1          MR. TOLENTINO:  Thank you, Your Honor.

2          THE COURT:  I'm not sure that the evidence supports

3  it.  But anyway, I'll look.

4          Now, 21 is organizational defendants.  Anything --

5  incorporated -- is anything about that wrong?  I don't think

6  so.

7          What about 22, failure to stop a conspiracy?  Any

8  evidence of that?  Who would that be applicable to?

9          MR. TOLENTINO:  Your Honor, is that a question for

10  us?

11          THE COURT:  Yes.

12          MR. TOLENTINO:  We allege this claim with respect to

13  all of the defendants.  The only exception to that is

14  Ms. Chelsea Alvarado doesn't bring that claim against defendant

15  James Fields.  But the theory on this is that we have presented

16  evidence that there was a significant amount of racially

17  motivated violence and a conspiracy to do so, and the jury

18  should decide whether or not any of the defendants could have

19  had the power to stop the conspiracy.

20          THE COURT:  Well, what evidence is there that any of

21  them could have stopped it?

22          MR. TOLENTINO:  Well, we have -- well, I think Your

23  Honor has ruled on this in rejecting the Rule 50 motions, but

24  I'm happy to walk through it with respect to each of the

25  defendants.  I think my colleagues are probably better prepared

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   to do this.

2          THE COURT:  I'm just saying tell me one that could

3   have done something to stop the conspiracy.

4          MR. TOLENTINO:  Well, I can name a couple.

5          THE COURT:  Well, just one.

6          MR. TOLENTINO:  Sure.  Mr. Cantwell, you know,

7   perpetrated violence, he told his supporters to --

8          THE COURT:  Well, could he have stopped the

9   conspiracy or just himself?

10          MR. TOLENTINO:  He could have stopped the conspiracy.

11   He could have told other people to stop.  There was a

12   leadership meeting in which individuals could have told each

13   other to stop racially motivated violence.  There's a lot of

14   connections between TWP members and NSM, League of the South.

15   So, with respect, Your Honor, I think our whole case is sort of

16   predicated on this.

17          THE COURT:  All right.  Thank you.

18          MR. CANTWELL:  If I may, there is video of that

19   leadership meeting, and we've had it in the courtroom.  And at

20   the meeting I said I want the police involved.  And so is that

21   not an attempt to stop a conspiracy?  I'm not aware of a

22   conspiracy to stop.

23          THE COURT:  You're not the only defendant.  No one

24   else -- I mean --

25          MR. CANTWELL:  He used the example --

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1          THE COURT:  You can argue that you did try to stop

2     the conspiracy.

3          MR. CANTWELL:  I was the cited example and the body

4     camera video of the meeting is --

5          THE COURT:  What about 23, civil conspiracy under

6     Virginia law?

7          24, violation of Virginia code 801.421.

8          MR. JONES:  Sorry, Your Honor, we would request a

9     foreseeability -- in the instruction on -- instruction number

10    23, civil conspiracy under Virginia law.

11         MR. TOLENTINO:  Judge Moon, if I may, I think the

12    last sentence of the -- the last sentence of the instruction

13    is, "I previously instructed you as the law governing the

14    existence of conspiracy and membership therein, including

15    instructions 13 through 15, and those principles are applicable

16    here."  So we think --

17         MR. JONES:  That's right.  Withdrawn, Your Honor,

18    thank you.

19         THE COURT:  Okay.  All right.  24?  Violation of

20    Virginia code.  I think the last sentence we would take out

21    about vandalism.  There's no evidence of vandalism.

22         MR. TOLENTINO:  Your Honor, I think we should keep it

23    in.  It's part of the statute and also it's arguable and we may

24    argue in closing that the conduct on August 11 might have

25    constituted vandalism.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1    THE COURT:  But the university is not a party to the

2    case and no plaintiff can recover for vandalism.

3    MR. TOLENTINO:  Well, with respect, Your Honor, I

4    think the theory is that, you know, vandalism can cover the

5    property of the individual plaintiffs.  And so to the extent

6    that any of their private property --

7    THE COURT:  There's no evidence of that.  I'm going

8    to strike it because it's not -- you need evidence to support

9    destruction.  It doesn't take away from your case to take that

10   out.

11   MR. TOLENTINO:  Understood, Your Honor, just

12   preserving it for the record.

13   THE COURT:  Okay.  25, assault and battery.  26,

14   intentional infliction of emotional distress.  Evidentiary

15   sanctions against Kline and Ray.  We've already done that.

16   MR. KOLENICH:  Your Honor, we would request some sort

17   of -- and I don't know if it's further down in here, but a

18   limiting instruction that the jury cannot find against Kline's

19   organization because Kline has been sanctioned.  These

20   sanctions are for Kline only.  Since they've got one of the

21   first things, that Kline was an officer of Identity Evropa for

22   whatever time period, which is factually true.  But we don't

23   want the jury to become confused and find against Identity

24   Evropa because their officer is here being -- has adverse

25   inferences against him.  That was the subject of a pretrial

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   motion in limine which the Court granted.

2            THE COURT:  Okay.

3            MR. TOLENTINO:  Your Honor, that's already covered on

4   page 30 where you give the spillover instruction.  And so we

5   don't think it's necessary to give it twice.  It reads, "The

6   facts deemed established which I just listed are admitted only

7   as to Defendants Elliot Kline, Azzmador Ray respectively."

8   There's no mention of Identity Evropa so it's clear from your

9   instruction that it wouldn't spill over to them.

10           MR. KOLENICH:  We don't think it's especially clear.

11   That's further down in the same instruction where the very

12   first -- if I'm reading this correctly.  Maybe I'm not.

13           THE COURT:  Well, put it in that it only applies to

14   Kline.  Doesn't hurt to say it doesn't apply to the other.

15           Okay.  28, evidentiary sanctions against Kline, Ray,

16   those things.  Then First Amendment, number 30, 31.

17           MR. KOLENICH:  Your Honor, we are requesting some of

18   my most recently submitted proposed instructions on the subject

19   of the First Amendment, specifically that it is lawful to

20   advocate for violence.  In and of itself that's not an unlawful

21   act.  And the other, that it's lawful to parade through a

22   residential neighborhood.

23           THE COURT:  All right.

24           MR. TOLENTINO:  May I be heard on this, Your Honor?

25   Okay.  So I think let's start with the second one first, which

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1    is the protest march through the residential neighborhood.  I

2    think the proposed instruction is irrelevant and misleading.

3    It suggests that it's lawful for protesters to march through a

4    residential area under any circumstances.  That's exactly why

5    we tried to put the UVA policy into evidence to show it was

6    unlawful for them to do so.  The whole theory of our case is

7    that what they were doing was an unlawful conspiracy to engage

8    in racially motivated violence, and this would simply confuse

9    the jury if a statement that it is lawful for protesters to

10   march through a residential area is included.

11          The second point I'd make is that this is wholly

12   unsupported by the case law that they cite.  So they cite to

13   *Cohen versus California,* but as Your Honor knows, that's a

14   First Amendment case about whether a person could wear a jacket

15   with the words "F word the draft" in a public courthouse.  It

16   has nothing to do with a residential area.

17          The second case they cite is that *Skokie* case, but in

18   that case the court simply held that the First Amendment didn't

19   permit a city to say you can't have swastikas showing.  And

20   that's not our claim.  Our claim is you can't commit racially

21   motivated violence.  And your motion to dismiss opinion was

22   very clear on this, that says the First Amendment does not

23   protect violence.  And it would simply confuse the jury to make

24   them think that our theory is anything differently.

25          So Your Honor's First Amendment instruction is

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1    perfectly correct, and they're not citing any case law to

2    support their theory, and it would be, we think, error for you

3    to include it.

4              THE COURT:  I think the law is adequately stated in

5    30.

6              MR. KOLENICH:  Your Honor, if I could, they put on

7    evidence of this Diane D'Costa witness which arguably shouldn't

8    have been admitted, but it was, and it was all about how she

9    lived there and she was petrified by the sight of people

10   marching with the torches and everything.

11             Now, it seems to us that, contrary to what they just

12   said, that this case law supports the idea that, as poor of a

13   legal doctrine as it may be, that you can march through

14   residential neighborhoods.  In fact, you can march through a

15   neighborhood known to be heavily populated with Jewish

16   residents wearing swastikas and intentionally scaring them.

17             So if the D'Costa evidence wasn't in, I guess that

18   would be one thing.  But since it is, I think this instruction,

19   or at least some version of it, is important.

20             MR. TOLENTINO:  Your Honor, unless you want to hear

21   further, I think you've made the correct decision with respect

22   to the First Amendment.  I think it would be highly misleading,

23   and those cases just don't support the proposition Mr. Kolenich

24   wants them to support.

25             THE COURT:  We'll take a look at it.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1          Self-defense?  I think that's right.  Negligence, the

2     defenses do not apply.

3          MR. KOLENICH:  Judge, could I be heard on the

4     self-defense, jury instruction 31?  It states in the second

5     paragraph, "If plaintiffs prove the alleged conspiracy was

6     motivated in part by discriminatory animus, it is no defense

7     that defendants also possess some other motive such as a desire

8     to join for mutual protection."

9          While that is true, and while it's equally true that

10    self-defense can't be used as an excuse for wrongful violence,

11    this instruction taken as a whole seems to be saying that

12    self-defense can't be successfully raised in this case.  If,

13    however --

14          THE COURT:  Well, how could it be?

15          MR. KOLENICH:  If all Kessler, for example, agreed to

16    do was, if attacked, you know, defend yourself, that's it.

17          THE COURT:  Well, this covers that, doesn't it?  It

18    says you can do --

19          MR. KOLENICH:  It limits it to the state court case,

20    though, Your Honor.  It limits it to the Virginia law

21    conspiracy case.  It excludes it from the federal.  It seems to

22    me it excludes it from the federal.

23          THE COURT:  I think it should be included, probably,

24    with regard to all the -- U.S.C. 1985(3), doesn't it --

25          MR. KOLENICH:  On page 35, the last paragraph on

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   page 35 that you granted, it says, "Separately, principles of

2   self-defense may be relevant in determining the plaintiffs'

3   claims under Virginia state law."

4          So it pretty much explicitly excludes this

5   self-defense argument from the federal conspiracy claim.

6          MR. TOLENTINO:  Your Honor, this is bedrock

7   conspiracy law.  Self-defense is not a defense to a conspiracy

8   to commit racially motivated violence.  It's not an affirmative

9   defense because you can have multiple unlawful objectives,

10  which is an instruction you're already giving.

11         THE COURT:  I'll -- you made your objection.  I'll

12  take a look at it.

13         MR. KOLENICH:  Thank you.

14         THE COURT:  But I'm not saying I'm going to change

15  it.

16         MR. TOLENTINO:  Thank you, Your Honor.

17         THE COURT:  Negligence, 32, negligence defenses do

18  not apply.  And damages generally, any objection to 33?  34,

19  duplicate damages.  We're working on the verdict form, trying

20  to cut out some of those -- I mean, combine some stuff, not

21  trying to cut it out.

22         MR. TOLENTINO:  Your Honor, while you're on the topic

23  of the verdict form, we just filed a revised proposed verdict

24  form.

25         THE COURT:  I understand.  I haven't seen it.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1           MR. TOLENTINO:  Afterwards I'll hand it to

2   Mr. Cantwell, because I don't think he's seen a copy.  And I'll

3   also give copies to opposing counsel.  But we emailed it.

4           THE COURT:  All right.  Duplicate damages, I think

5   that's so far appropriate considering what I've seen.

6           Collateral source rule, any objection to that?

7   Punitive damages?  Seems to be okay.

8           Then we get to the foreperson.  I probably will read

9   that just before the jury retires to deliberate.  And also the

10  unanimous verdict.

11          All right.  Anything else anybody wants to say?

12  We'll go back and try to --

13          MR. TOLENTINO:  Your Honor, just one instruction for

14  the record.  We requested an instruction with respect to the

15  sanction issued against Defendant James Fields.  As you know,

16  Judge Hoppe and then you imposed a sanction against Mr. Fields

17  that he couldn't testify in his own defense, and we requested

18  an instruction that said Mr. Fields didn't testify because he

19  refused to testify at a properly noticed deposition.  So it's

20  similar to the other sanctions-type instructions.

21          THE COURT:  Any objection to that instruction?

22          MR. CAMPBELL:  Yes, sir.  And the Court has already

23  ruled on this.  I stated an objection and Your Honor ruled on

24  that and said it wasn't going to happen.  Thank you, Your

25  Honor.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1      MR. TOLENTINO:  Just preserving it for the record.

2  But we think it's very important for the jury to understand why

3  Mr. Fields is not here.  It's not because he didn't choose to

4  testify.

5      THE COURT:  I mean, I didn't keep him from coming.

6      MR. TOLENTINO:  Your Honor affirmed Judge Hoppe's

7  ruling that he couldn't testify in his own defense.

8      THE COURT:  Well, he couldn't testify.  But he could

9  be here.

10      MR. TOLENTINO:  So we just want that explanatory

11  instruction to clarify for the jury why he's not here.  He's

12  one of the -- and also, why we didn't call him.  We could have

13  called him, and they might think, why didn't the plaintiffs

14  call Defendant James Fields.  The reason is we couldn't.

15      MR. CAMPBELL:  Your Honor, this is just a second bite

16  at the apple.  Your Honor has ruled on this.

17      THE COURT:  I mean, I don't have any rule against

18  reconsidering my rulings.

19      MR. TOLENTINO:  Your Honor, we would request that you

20  reconsider.

21      THE COURT:  I'll consider.

22      MR. TOLENTINO:  Thank you.

23      MR. KOLENICH:  Your Honor, I apologize.  I have a

24  note here that we forgot something on 13, the conspiracy

25  element, which is, in Your Honor's ruling on the motions to

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  dismiss, you included a section that each defendant -- there's

2  a requirement that plaintiffs prove each defendant entered into

3  an agreement with a specific co-conspirator to engage in

4  racially motivated violence.  We request that that be included

5  in at least the federal conspiracy section.

6           MR. TOLENTINO:  Your Honor, we think that's already

7  covered by the rest of the instruction.

8           MR. KOLENICH:  If it's already in there and I missed

9  it, I'm okay --

10              (Overlapping speakers.)

11          THE COURT:  Wait, wait, wait.

12          MR. TOLENTINO:  I'm sorry to talk over you,

13  Mr. Kolenich.

14          We think it's already adequately covered in the

15  instructions with respect to how you have to be a member of the

16  conspiracy and what you can be held liable for.

17          MR. KOLENICH:  We very much disagree with that.  This

18  specific language from the Court's ruling is definitely not in

19  the existing jury instruction and we request that it be added.

20          THE COURT:  All right.  Say that again, what should

21  be added.

22          MR. KOLENICH:  Each defendant -- or plaintiffs must

23  prove each defendant entered into an agreement with a specific

24  co-conspirator to engage in racially motivated violence at the

25  Unite the Right event, or August 11th and 12th event.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1           MR. TOLENTINO:  Your Honor, we don't think it's

2    necessary to give that instruction.  But if Your Honor is

3    inclined to -- well, first of all, on page 4 we say if

4    plaintiffs -- or you say, I should say, "If plaintiffs

5    establish that at least two defendants agreed to act toward a

6    common unlawful goal, the fact that the conspiracy was made up

7    of persons from allegedly rival groups does not disprove the

8    conspiracy's existence."

9           So we think it's pretty clear that you have to

10   engage -- you have to reach an agreement with another

11   individual to engage in a conspiracy.  It's very clear from the

12   instruction.

13          THE COURT:  Okay.

14          MR. CANTWELL:  If I could chime in on this.

15   Christopher Cantwell.  I recall from the discussion over the

16   plaintiffs' expert witnesses that there was the concern that

17   they were trying to use the discussion of a white supremacy

18   movement as a shortcut to conspiracy.  And one of the

19   assurances that we were given from the Court in denying that

20   motion to exclude was that they would have to prove that each

21   defendant entered into a conspiracy to commit racially

22   motivated violence with a specific co-conspirator.

23          So in addition to the motion to dismiss, this was

24   addressed in Your Honor's decision on the motion to exclude the

25   white supremacy experts.  And so I think that language is

135

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   important because I do believe that part of the theme here,

2   admitted or not, is that this movement is itself a conspiracy.

3   And I don't think that that's legally sound.  I don't think

4   that they are facially arguing that, but I think it's an

5   implication and I think it should be solved with a jury

6   instruction specifically.

7            THE COURT:  Okay.  We'll take a recess, and I don't

8   know how long it will take.

9            When I come back with the instructions I'll read them

10  to the jury, then give you an opportunity to raise objections

11  again to anything in the instructions, or if I make a mistake,

12  try to get me to correct it.  And if I do, I'll tell the jury.

13           MR. CANTWELL:  I'm sorry, did we address

14  Mr. Kolenich's advocacy of violence instruction?

15           MR. KOLENICH:  He's considering it.

16           MR. CANTWELL:  He's considering it.  Okay.  Thank

17  you.

18           (Recess.)

19           THE COURT:  Did you see the change about the Virginia

20  statute?  Section 801-421.  We dismissed some claims as to some

21  defendants.

22           (Pause.)

23           THE COURT:  Okay.  Call the jury.

24           MR. TOLENTINO:  Your Honor, before the jury comes

25  back, just to be clear, this is the Virginia hate crime

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  statute?

2  THE COURT:  Right.

3  MR. TOLENTINO:  Could we just get a second to take a

4  look at it.  Could we get a sense of Your Honor's reasoning

5  just so we understand it?

6  THE COURT:  We dismissed these claims, right?

7  MR. DERISE:  Trying to track the defendants and

8  claims left standing from the original motion to dismiss

9  opinion.

10  MR. TOLENTINO:  Oh, okay.

11  THE COURT:  This was in the July 9, 2018 case.

12  MR. TOLENTINO:  Understood, Your Honor.  If you've

13  already ruled on this with respect to a motion to dismiss, then

14  that's the ruling.

15  THE COURT:  All right.  Call the jury.

16  **(Jury in, 2:34 p.m.)**

17  THE COURT:  Members of the jury, I'm about to read

18  the final instructions to you, after which you will be released

19  for the day and tomorrow morning we'll start the closing

20  arguments, which I anticipate will probably take most, if not

21  all, of the day.  And then on Friday morning you will begin

22  deliberating on the verdict.  That appears to be the best

23  schedule I can tell you now.  I hope we can keep to it.

24  If you would direct your attention to the screen

25  again.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1     Plaintiffs claim that defendants conspired to commit

2 racially motivated violence in violation of 42 U.S.C. 1985(3).

3 All plaintiffs except Chelsea Alvarado bring this claim against

4 all defendants.  Plaintiff Alvarado brings this same claim

5 against all defendants except James Fields.

6     To prove this claim, plaintiffs must prove:  First,

7 the existence of a conspiracy of two or more persons; second,

8 the persons involved in the conspiracy were motivated, in whole

9 or part, by animus against black or Jewish individuals, or

10 motivated, in whole or part, because plaintiffs were advocates

11 or supporters of black and Jewish individuals; third, a purpose

12 of the conspiracy was to deprive plaintiffs of their right to

13 be free from racially motivated violence; fourth, at least one

14 person involved in the conspiracy took an overt act in

15 furtherance of the conspiracy; and fifth, as a result of the

16 conspiracy, plaintiffs were injured.

17     I will take these elements in turn.

18     First -- the first element is the existence of a

19 conspiracy.  A conspiracy is an agreement between two or more

20 persons to join together to accomplish some unlawful purpose.

21 It is a kind of unlawful partnership in which each member

22 becomes the agent of every other member.

23     While the plaintiffs must prove that the conspiracy

24 had an unlawful objective, plaintiffs need not prove that the

25 conspiracy had only an unlawful purpose.  Co-conspirators may

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   have legal as well as unlawful objectives.  A conspiracy may

2   have several objectives, but if any one of them, even if it is

3   only a secondary objective, is to violate the law, then the

4   conspiracy is unlawful.

5           Plaintiffs do not need to prove that the alleged

6   conspirators entered into any formal agreement or that they

7   directly stated between themselves all the details of the

8   scheme.  Plaintiffs are not required to produce a written

9   contract, or even produce evidence of an express oral agreement

10  spelling out all the terms of the understanding.  An informal

11  agreement may be sufficient.  All plaintiffs must show is a

12  shared objective to cause racially motivated violence.

13          Plaintiffs are also required to show that all the

14  defendants they alleged as members of the conspiracy were, in

15  fact, parties to -- strike that.  I may have misread that.

16          Plaintiffs also are not required to show that all the

17  defendants they allege as members of the conspiracy were, in

18  fact, parties to the alleged agreement, or that all of the

19  members of the alleged conspiracy were named or alleged in this

20  lawsuit, or that all of the people whom the evidence shows were

21  actually members of the conspiracy agreed to all the means or

22  methods set out in the complaint.

23          By its very nature, a conspiracy is clandestine and

24  covert, thereby frequently resulting in little evidence of such

25  an agreement.  Therefore, plaintiffs may prove a conspiracy by

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1    circumstantial evidence.

2            Circumstantial evidence tending to prove a conspiracy

3    may include evidence of a defendant's relationship with other

4    members of the alleged conspiracy, the length of any such

5    association, the defendant's attitude and conduct, and the

6    nature of the alleged conspiracy.

7            Simply put, to find that an agreement existed between

8    conspirators, you must be convinced, by a preponderance of the

9    evidence, that there was a mutual understanding, either spoken

10   or unspoken, between the conspirators to commit at least one

11   unlawful act.

12           A conspiracy can be made up of persons from allegedly

13   rival groups, and that does not disprove the conspiracy's

14   existence.  The law holds co-conspirators liable for all the

15   reasonably foreseeable acts of their co-conspirators done in

16   furtherance of the conspiracy.

17           Because there are multiple defendants in this case,

18   you will also need to consider which, if any, of the defendants

19   was a member of the alleged conspiracy.

20           One may become a member of a conspiracy without

21   knowing all the details of the unlawful scheme or the

22   identities of all the other alleged conspirators.  If a person

23   understands the unlawful nature of a plan or scheme and

24   knowingly and intentionally joins in that plan or scheme on one

25   occasion, that is sufficient to prove him as being a member of

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  the conspiracy, even though the person had not participated

2  before, even though he played only a minor part.

3          The extent of a defendant's participation, if any,

4  has no bearing on the issue of a defendant's membership, if

5  any.  A conspirator's membership is not measured by the extent

6  or duration of his participation.  Indeed, each member may

7  perform separate and distinct acts and may perform them at

8  different times.  Some conspirators play major roles, while

9  others play minor parts in the scheme.  An equal role is not

10  what the law requires.  In fact, even a single act may be

11  sufficient to draw a defendant within the ambit of the

12  conspiracy.

13          Moreover, once a conspiracy is established, even a

14  slight connection between the defendant and the conspiracy

15  could be sufficient to include him in the plan.

16          To be clear, that does not mean the plaintiffs'

17  burden of proof is slight.  Before the jury may find that the

18  defendant, or any other person, became a member of the

19  conspiracy, the evidence in the case must show, by a

20  preponderance of the evidence, that the defendant knew the

21  purpose or goal of the agreement or understanding of that

22  conspiracy and then deliberately entered into the agreement,

23  intending in some way to accomplish the goal or purpose of this

24  common plan or action -- joint action.

25          In attempting to prove a defendant's membership in

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   the alleged conspiracy, plaintiffs may rely on all direct and

2   circumstantial evidence, including the nature of the alleged

3   conspiracy, the defendant's association with other members of

4   the alleged conspiracy, if any, the defendant's conduct,

5   before, during, and after the relevant events, and the

6   defendant's presence at the scene, if applicable.

7           Now, I read all that about conspiracy.  But remember,

8   in this case, what we're talking about, the conspiracy we're

9   talking about is a conspiracy with a purpose to deprive

10  plaintiffs of their right to be free from racially motivated

11  violence.  That is the conspiracy, not just -- not any other --

12  conspiring to do anything else.

13          The second element plaintiffs must prove is that the

14  defendants were motivated by some discriminatory animus.  In

15  this case, that means the plaintiffs must prove the defendants

16  were motivated either by dislike or hate -- oh.  Sorry.

17          To find that a defendant has withdrawn from or

18  abandoned a conspiracy, the defendant must prove that he:  One,

19  undertook affirmative steps inconsistent with the object of the

20  conspiracy, to disavow or defeat the goal or purpose of the

21  conspiracy; and, two, either acted in a manner reasonably

22  calculated to notify co-conspirators that he was no longer

23  operating in the conspiracy or disclosed the conspiracy to law

24  enforcement authorities.

25          Mere inactivity is not proof of withdrawal.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1        Furthermore, even if a defendant tells others of his

2   intention to withdraw, he has not withdrawn if he continues to

3   act in furtherance of the object of the conspiracy.

4        If you have concluded that a defendant was a member

5   of a conspiracy, that defendant bears the burden of proving, by

6   a preponderance of the evidence, that he withdrew from the

7   conspiracy.  There must be evidence of some affirmative act of

8   withdrawal.

9        The second element is that plaintiffs must prove that

10  the defendants were motivated by some discriminatory animus.

11  In this case, that means that plaintiffs must prove that

12  defendants were motivated either by dislike or hate for black

13  or Jewish people, or by hatred or dislike towards persons

14  because of their advocacy or support for black or Jewish

15  people.

16       This discriminatory reason does not have to be the

17  sole basis for the defendant's asserted dislike or hate of the

18  plaintiffs.  As long as the dislike or hatred is not wholly

19  personal to a specific individual -- that is, as long as there

20  is some intent to discriminate against black people, Jewish

21  people, or their supporters as a class -- you may find that the

22  defendants acted with sufficient discriminatory animus.

23       If you find that the defendants acted, at least in

24  part, with at least one of the types of discriminatory animus,

25  you must find for the plaintiffs on this element, even if

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   defendants also possessed some other motive, such as a desire

2   to join together for mutual protection.  That is because, as

3   mentioned above, co-conspirators may have legal as well as

4   unlawful objectives.

5        The purpose of Section 42 U.S.C. -- or 42 U.S.C.

6   Section 1985(3) is to deter two or more people from conspiring

7   to deprive persons of their rights because they are members of

8   a racial group or supporters of the rights of racial

9   minorities.  In this case, plaintiffs allege that the

10  defendants interfered with their Thirteenth Amendment right to

11  be free from racially motivated violence.  If you find that

12  plaintiffs have shown by a preponderance of the evidence that

13  this right has been violated, you must find for the plaintiffs

14  on the third element of their claim, which requires that they

15  prove that a purpose of the conspiracy was to deprive them of

16  their right to be free from racially motivated violence.

17       The fourth element is that at least one of the

18  defendants took an overt act in furtherance of the alleged

19  conspiracy.

20       An overt act means some type of outward objective

21  action performed by one of the members of the conspiracy which

22  evidences that agreement.  An overt act may be an act which is

23  entirely innocent when considered alone, but which is knowingly

24  done in furtherance of some object or purpose of the

25  conspiracy.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1        All plaintiffs must prove is a single overt act by

2   just one of the alleged conspirators.

3        The fifth element is that the plaintiffs show that

4   they suffered injuries as a consequence of the alleged

5   conspiracy.   Injuries in this context include physical

6   injuries, pain and suffering, and demonstrable emotional harms

7   and any economic losses resulting therefrom.   Plaintiffs may

8   satisfy this element by showing that a member of the conspiracy

9   did, or caused to be done, the acts which injured plaintiffs.

10        To make this showing, plaintiffs need not identify a

11   particular person who caused their injuries.   Instead, it is

12   sufficient if plaintiffs offer specific evidence which shows

13   that their injuries were proximately caused by defendants'

14   overt and unlawful actions.

15        An act is a proximate cause of an injury if it was a

16   substantial factor in bringing about the injury, and if the

17   injury was a reasonably foreseeable consequence of the

18   defendant's act.

19        Moreover, a defendant need not have foreseen the

20   precise nature of an injury in order to be held liable for it;

21   the defendant can be liable so long as the injury was "of the

22   same general nature as foreseeable risk created by" his

23   conduct.

24        In making this showing, each plaintiff need not be

25   able to point to an injury caused by each member of the

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   conspiracy.  Indeed, the law holds conspirators liable for all

2   the reasonably foreseeable acts of their co-conspirators.  In

3   other words, a defendant may be held liable even if he did not

4   personally participate in the acts or plans of his

5   co-conspirators, even if the defendant did not have actual

6   knowledge of those acts or plans, so long as those acts or

7   plans were reasonably foreseeable to the defendant.  The reason

8   for this is simply that a co-conspirator is deemed to be the

9   agent of all other members of the conspiracy.  Therefore, all

10   of the co-conspirators bear responsibility for acts or plans

11   that are undertaken to further the goals of the conspiracy.

12         Recall also that plaintiffs are not required to show

13   that all of the members of the alleged conspiracy were named or

14   alleged in this lawsuit.  Regardless of whether a person was

15   named in this lawsuit, if you find by a preponderance of the

16   evidence that he was a member of the conspiracy, then any acts

17   done or statements made in furtherance of the conspiracy by

18   that person may also be considered against the defendants.

19         Some of the defendants that plaintiffs seek to hold

20   liable may be organizations called "unincorporated

21   associations."

22         An unincorporated association is a voluntary group of

23   persons joined together by mutual consent for the purpose of

24   promoting some stated object.  Generally, unincorporated

25   associations have the ability to prescribe the conditions or

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  qualifications of their membership or their duties, to enlarge

2  or reduce their membership, to enlarge or decrease the scope of

3  their activities, and to dissolve their association.  Thus, to

4  find that one of these defendants was an unincorporated

5  association, you must find that it was an organized group made

6  up of persons who became members of it voluntarily and who were

7  subject to certain rules or bylaws.

8       Any defendant who you find qualifies as an

9  unincorporated association may be liable for the actions of any

10  of its leaders or members who took part in and joined in the

11  conspiracy, if that person acted with the authorization of the

12  association and to promote the association's purpose; but an

13  unincorporated association cannot be held liable for the acts

14  of members which it did not control or authorize, unless the

15  association subsequently ratified the member's actions.

16       An intention to ratify may be inferred by words,

17  conduct, or silence on the part of the association through its

18  officers or members which reasonably indicates the

19  association's desire to affirm the unauthorized actions.

20  Ratification can only occur if the ratifier has full knowledge

21  of the material facts surrounding the act in question.

22       In addition, if you find an organizational defendant

23  liable, a defendant who is a member of that organization may

24  also be held liable if the defendant personally participated in

25  the unlawful acts, or if the defendant set proceedings in

147

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   motion or agreed to a course of action which culminated in the

2   wrongful conduct.

3           Mere membership in an unincorporated association is

4   insufficient, however.  Rather, plaintiffs must show that the

5   association possessed unlawful goals and that the defendant

6   held a specific intent to further those unlawful aims.

7           Some of the plaintiffs seek to hold liable may be

8   corporations -- some of the defendants that plaintiffs seek to

9   hold liable may be corporations.

10          Under the law, a corporation is considered to be a

11  person.  It can only act through its employees, agents,

12  directors, or officers.  Therefore, a corporation is

13  responsible for the acts of its employees, agents, directors,

14  and officers performed within the scope of authority.

15          An agent is a person who performs services for a

16  corporation under an express or implied agreement and who is

17  subject to the corporation's control or right to control the

18  manner and means of performing the services.  A corporation may

19  be liable for the acts of its agents even if the agent does not

20  receive compensation for its services.

21          For you to find a corporate defendant liable,

22  plaintiffs must prove three elements by a preponderance of the

23  evidence:  First, that the unlawful conduct was committed by an

24  employee or agent of the corporation; second, that in

25  committing the unlawful conduct, the employee or agent was

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  acting within the scope of his employment or within the

2  apparent authority; and, third, that in committing the unlawful

3  conduct, the employee or agent was acting on behalf of or for

4  the benefit of the corporation.

5       The term "scope of employment" is defined to include

6  all those acts falling within the employee's or agent's general

7  line of work, when they are motivated, at least in part, by an

8  intent to benefit the corporation.  An agent may act for his

9  own benefit while also acting for the benefit of the

10 corporation.

11      While the act of an employee or agent is within the

12 scope of his employment or within the scope of his apparent

13 authority, the corporation is held legally responsible for it.

14 This is true even though the actions of the employee or agent

15 may be unlawful and contrary to the corporation's actual

16 instruction.  A corporation may be responsible for the action

17 of its agents done or made within the scope of their employment

18 even though the conduct of the agents may be contrary to the

19 corporation's actual instruction or contrary to the

20 corporation's stated position.

21      In addition, a corporation that ratifies the acts of

22 someone who was purporting to act as the corporation's agent

23 will be liable for the acts of that purported agent, provided

24 that the principal made a conscious and affirmative decision to

25 approve the relevant acts of the purported agent while in

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  possession of full and complete knowledge of all the relevant

2  events.

3       It is possible for an organization to conspire with

4  its agent, officer, or employee if that person had an

5  independent personal stake in the conspiracy.  However, the

6  organization must have acted through a different agent,

7  officer, or employee than the one with an independent personal

8  stake in the conspiracy in order to so conspire.

9       It is also possible for the agent, officer, or

10  employee who has an independent personal stake in the

11  conspiracy to conspire with other persons besides his own

12  organization.

13      All plaintiffs except Chelsea Alvarado bring a claim

14  under 42 U.S.C. 1986 against all defendants.  Plaintiff

15  Alvarado brings this claim against all defendants except James

16  Fields.

17      A defendant may be liable under Section 1986 for

18  failing to prevent a conspiracy to commit racially motivated

19  violence even if he was not involved in that conspiracy.

20  Defendants charged under Section 1986 with neglecting to

21  intervene in a Section 1985(3) conspiracy do not have to

22  personally share the same discriminatory animus.

23      To prevail on their Section 1986 claim against any

24  given defendant, a plaintiff must prove the existence of a

25  Section 1985(3) conspiracy and prove each of the following

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  three elements by a preponderance of the evidence:  First, that

2  the defendant knew about the wrongs conspired to be done in the

3  Section 1985(3) conspiracy, even if he was not involved with

4  the conspiracy; second, that the defendant had the power to

5  prevent or aid in preventing the wrongs committed as part of

6  such conspiracy; and third, that the defendant either neglected

7  or refused to prevent such wrongs.

8        In other words, this claim does not require

9  plaintiffs to prove that a defendant actually was involved in

10  the conspiracy.  It only requires plaintiffs to prove that a

11  defendant knew of the conspiracy, had the power to prevent the

12  wrongs to be done, and either neglected or refused to prevent

13  those wrongs.

14        In addition to plaintiffs' claim that defendants

15  conspired to commit racially motivated violence in violation of

16  Section 1985(3), which is a claim under federal law, plaintiffs

17  also bring a claim that defendants violated Virginia state law

18  by conspiring to commit a variety of unlawful and tortious

19  actions against them.

20        All plaintiffs except Chelsea Alvarado bring this

21  claim against all defendants.  Plaintiff Alvarado brings the

22  same claim against all defendants except James Fields.

23        Under Virginia law, persons who conspired together to

24  commit one or more unlawful acts may be held liable for the

25  injuries that result from that conspiracy.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1    Plaintiffs allege the defendants conspired with one

2    or more persons to commit one or more of the following unlawful

3    acts:  Subjecting persons to actions of intimidation or

4    harassment motivated by racial, religious, or ethnic animosity,

5    in violation of Virginia Code Section 8.01-42.1, often referred

6    to as Virginia's hate crimes statute; directing violence at

7    another person motivated by racial, religious, or ethnic

8    animosity, in violation of Virginia Code Section 8.01-42.1;

9    directing -- I'm going to strike -- there is no evidence of

10   vandalism in the third paragraph, and I want to strike that --

11   committing an unwanted touching that was neither consented to,

12   excused, or justified, which is a battery; engaging in an overt

13   act intended to inflict bodily harm or intended to place the

14   victim in fear or apprehension of bodily harm, an assault; and

15   causing a reasonable apprehension that force will be used

16   unless a person willingly submits, and causing him to submit,

17   to the extent that he is denied freedom of action, false

18   imprisonment.

19   Each of these unlawful and tortious acts has its own

20   specific elements that plaintiffs must prove.

21   For example, false imprisonment is an intentional

22   restriction of a person's freedom of movement without legal

23   right.  A false imprisonment results from the intentional use

24   of force, words, or acts which the person restrained is afraid

25   to ignore or to which he reasonably believes he must submit.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   It is not a legal defense to a claim of false imprisonment that

2   one had an honest or reasonable belief that he was acting

3   lawfully in restricting another's freedom.  Any intentional

4   restriction of a person's freedom that is without legal right

5   is a false imprisonment.

6          Importantly, plaintiffs need only prove that

7   defendants conspired to commit one of these underlying acts to

8   impose liability.  And, unlike plaintiffs' 1985(3) claim,

9   plaintiffs' Virginia law conspiracy claim only requires

10  plaintiffs to prove that defendants harbored discriminatory

11  animus if that is an element of the underlying unlawful or

12  tortious act.

13         For example, discriminatory animus is not required to

14  prove assault and battery, and is thus not required to prove a

15  conspiracy to commit assault and battery.

16         Soon I will instruct you on the elements that

17  plaintiffs must prove for the other unlawful or tortious acts

18  alleged by plaintiffs, which include assault and battery and

19  violations of the Virginia hate crimes statute.

20         Plaintiffs must prove by a preponderance of the

21  evidence that an agreement to commit any one of these objects

22  of the alleged conspiracy existed.  It would be sufficient if

23  plaintiffs prove by a preponderance of the evidence that the

24  alleged conspiracy existed to commit one of these offenses.  I

25  previously instructed you as to the law governing the existence

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  of a conspiracy and membership therein, including in

2  instructions 13-15, and those principles are applicable here.

3        As previously mentioned, plaintiffs allege that

4  defendants engaged in a civil conspiracy to violate Virginia

5  Code Section 8.01-42.1, often referred to as Virginia's hate

6  crimes statute.

7        Plaintiffs Romero and Willis also bring a standalone

8  claim against Defendants Kline, Spencer, Kessler, Ray, and

9  Cantwell under Virginia Code Section 8.01-42.1 for racial,

10  religious, or ethnic harassment or violence.

11        Additionally, Plaintiffs Romero, Muñiz, Wispelwey,

12  Sines, Blair, Martin, and Willis bring a standalone claim

13  against Defendant Fields under Virginia Code Section 8.01-42.1.

14        To prove this claim, plaintiffs must prove by a

15  preponderance of the evidence that, one, defendants subjected

16  them to acts of intimidation and/or harassment, or violence

17  directed at their persons -- only one of these acts,

18  intimidation or harassment, need be shown; two, defendants'

19  actions were motivated by racial, religious, or ethnic

20  animosity.

21        Acts of intimidation need not involve violence in

22  order to satisfy the first element of the statute.  For

23  example, an act of intimidation or harassment can include the

24  use of slurs, threats, or other intimidation tactics.

25        The term "violence" has its ordinary meaning and can

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1    also include, but is not limited to, an assault or a battery by

2    defendants against plaintiffs, as will be defined in one

3    minute.

4         As previously mentioned, plaintiffs claim that

5    defendants engaged in a civil conspiracy to commit assault and

6    battery.  Plaintiffs Muñiz, Sines, Blair, Martin, Baker and

7    Romero also bring a standalone claim for assault and battery

8    under Virginia state law against Defendant Fields.

9         Battery means an intentional and unwanted touching of

10   another without justification, excuse, or the consent of the

11   other.  Assault means any threatening act that is intended to

12   put another person in reasonable fear of imminent physical

13   injury.  Words alone are never assault.

14        To succeed on their claim of assault and battery,

15   Plaintiffs Muñiz, Sines, Blair, Martin, Baker and Romero must

16   prove by a preponderance of the evidence that, one, a defendant

17   engaged in an act intended to inflict bodily harm on

18   plaintiffs; two, as a result of defendants' actions, plaintiffs

19   experienced apprehension of harmful and of offensive bodily

20   contact or experienced such contact; and three, plaintiffs did,

21   in fact, experience bodily contact that was not consented to,

22   justified, or excused.

23        Under Virginia law it is not necessary for plaintiffs

24   to prove that the unwanted touching resulted in injury to their

25   bodily persons.  For the purposes of assault and battery, it is

155

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  sufficient to establish that the bodily contact harmed their

2  mind or feelings.

3          Intentional infliction of emotional distress.

4  Plaintiffs Muñiz, Sines, Blair, Martin, Baker and Romero also

5  bring a claim for intentional infliction of emotional distress

6  against Defendant Fields.  As I mentioned earlier, to prove

7  this claim, plaintiffs must meet a different standard of proof

8  than the preponderance of the evidence standard, which applies

9  to all plaintiffs' other claims.

10          Plaintiffs must prove this claim by clear and

11  convincing evidence.  Clear and convincing evidence is the

12  measure of proof that will produce in the mind of a juror a

13  firm belief or conviction that he has proved the issue.  It is

14  an intermediate standard requiring more than a preponderance of

15  the evidence, but not requiring the extent of such certainty as

16  is required beyond a reasonable doubt in a criminal case.  It

17  does not mean clear and unequivocal.  It simply means that you

18  are convinced that it is highly probable that it is true.

19          Thus, to prove a claim for intentional infliction of

20  emotional distress, plaintiffs must show by clear and

21  convincing evidence each of the following four things:  One,

22  that the defendant had the specific purpose of inflicting

23  emotional distress upon the plaintiff; intended specific

24  conduct and knew, or should have known, that his conduct would

25  likely result in emotional distress; two, the defendant's

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1    conduct was outrageous or intolerable in that it offends

2    generally accepted standards of decency and morality; three,

3    that the plaintiff suffered severe emotional distress.  Severe

4    emotional distress is emotional distress so severe that no

5    reasonable person could be expected to endure it; and four,

6    that the plaintiffs' emotional distress was proximately caused

7    by defendant's conduct.

8         No physical injury is needed to establish a claim for

9    emotional distress.  Again, this standard of proof applies only

10   to this claim.  In proving emotional injuries resulting from

11   any other claim in this case, plaintiffs need only prove those

12   injuries by a preponderance of the evidence.

13        In a federal civil action like this, parties are

14   entitled to the disclosure of all relevant, non-privileged

15   evidence the other side possesses or controls, including

16   relevant documents and electronically stored information.  This

17   pretrial process is known as discovery.

18        During the discovery process in this case, the Court

19   has found that Defendants Elliot Kline and Robert Azzmador Ray

20   failed to comply with their discovery obligations.

21        On account of Defendant Elliot Kline's failure to

22   comply with his discovery obligations in this case, I have

23   imposed as a sanction that the following facts are to be deemed

24   established as true against Defendant Elliot Kline for purposes

25   of this case:  One, Defendant Kline was one of the leaders of

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  Identity Evropa from April 2017 through at least August 2017.

2  Two, Defendant Kline entered into an agreement with one or more

3  co-conspirators to engage in racially motivated violence in

4  Charlottesville, Virginia, on August 11 and 12, 2017.  Whether

5  such conspirator or conspirators are or are not a defendant or

6  defendants is a question for the jury.

7          Three, Defendant Kline was motivated by animus

8  against racial minorities, Jewish people, and their supporters

9  when conspiring to engage in acts of intimidation and violence

10  on August 11 and 12, 2017 in Charlottesville, Virginia.  Four,

11  it was reasonably foreseeable to Defendant Kline and intended

12  by him that co-conspirators would commit acts of racially

13  motivated violence and intimidation at the events in

14  Charlottesville on August 11 and 12, 2017.  Whether such

15  co-conspirator or co-conspirators are or are not a defendant or

16  defendants is a question for the jury.  Five, after the Unite

17  the Right event in Charlottesville, Virginia, on August 11 and

18  12, 2017, Defendant Kline ratified the racially motivated

19  violence at the event.

20          On account of Defendant Robert Azzmador Ray's failure

21  to comply with his discovery obligations in this case, I have

22  imposed as a sanction that the following facts are deemed

23  established as true against Defendant Robert Ray for purposes

24  of this case:  Defendant Ray was a writer for *The Daily Stormer*

25  from at least July 2016 through at least March 2020.  Two,

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  Defendant Ray entered into an agreement with one or more

2  co-conspirators to commit racially motivated violence in

3  Charlottesville, Virginia on August 11 and 12, 2017.  Whether

4  such co-conspirator or co-conspirators are or are not a

5  defendant or defendants is a question for the jury.

6          Three, Defendant Ray was motivated by animus against

7  racial minorities, Jewish people, and their supporters when

8  conspiring to engage in acts of intimidation and violence on

9  August 11 and 12, 2017, in Charlottesville, Virginia.  Four, it

10  was reasonably foreseeable to Defendant Ray and intended by him

11  that the co-conspirators would commit acts of racially

12  motivated violence and intimidation at the events in

13  Charlottesville on August 11 and 12, 2017.  Whether such

14  co-conspirator or co-conspirators are or are not a defendant or

15  defendants is a question for the jury.  Five, after the Unite

16  the Right event in Charlottesville on August 11 and 12, 2017,

17  Defendant Ray ratified the racially motivated violence that

18  occurred at Unite the Right.

19          You are cautioned, however, that each party is

20  entitled to have the case decided solely on the evidence that

21  applies to that party.  The facts deemed established, which I

22  just listed, are admitted only as to Defendants Elliot Kline

23  and Robert Azzmador Ray respectively.  Thus, taking those facts

24  as true for this case against Elliot Kline and Robert Azzmador

25  Ray does not relieve plaintiffs of their burden to prove by a

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  preponderance of the evidence the conduct committed by other

2  defendants in the case, nor does taking those facts as true as

3  against Elliot Kline, specifically, have any bearing on

4  plaintiffs' burden of proof as against Defendant Identity

5  Evropa.

6        During the discovery process in this case, the Court

7  found that Defendants Elliot Kline, Robert Azzmador Ray,

8  Matthew Heimbach, Vanguard America, National Socialist

9  Movement, failed to comply with their discovery obligations,

10  specifically in that they intentionally withheld or destroyed

11  documents and electronically stored information they were

12  required to produce to plaintiffs.

13        On account of Defendant Elliot Kline, Robert Azzmador

14  Ray, Matthew Heimbach, Vanguard America, National Socialist

15  Movement's failures to abide by their discovery obligations in

16  this case, I have imposed as a sanction that you are permitted,

17  but not required, to infer that they intentionally withheld or

18  destroyed documents and electronically stored information

19  because they were aware that such documents and electronically

20  stored information contained evidence that they each conspired

21  to plan racially motivated violence at Unite the Right.

22        You are cautioned, however, that each party is

23  entitled to have the case decided solely on the evidence that

24  applies to that party.  Sanctions against these parties have no

25  bearing on the other parties.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1           As I instructed you throughout the trial, I will

2     remind you again that each party is entitled to have the case

3     decided solely on the evidence that applies to that party.  And

4     some of the evidence in this case is limited under the rules of

5     evidence to some of the parties and cannot be considered

6     against the others.

7           Plaintiffs introduced deposition testimony from

8     Robert Isaacs a/k/a Ike Baker, Samantha Froelich, Bradley

9     Griffin, Dillon Hopper, Vasilios Pistolis and Thomas Rousseau,

10    which may not be considered by you in connection with Defendant

11    Christopher Cantwell because of his inability to be at the

12    deposition and lack of notice thereof.  However, it may be

13    considered by you in connection with other defendants.

14          Certain defendants make a claim that their activities

15    constituted free speech and assembly protected by the First

16    Amendment to the United States Constitution.

17          The First Amendment does not provide a defense to

18    conspiracy to engage in unlawful conduct.  If you find that the

19    defendants have engaged in violations of law I have instructed

20    you on, including a conspiracy as alleged by plaintiffs, you

21    may not find that the defendants' actions were protected by the

22    First Amendment.  The violations of law I have instructed you

23    on are not protected by the First Amendment.

24          The fact that an agreement to engage in illegal

25    conduct necessarily takes the form of words and does not confer

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  upon it or upon the undertaken conduct -- I'm going to read

2  that last sentence over.

3       The fact that an agreement to engage in illegal

4  conduct necessarily takes the form of words also does not

5  confer upon it, or upon the underlying conduct, protection

6  under the First Amendment.

7       Certain defendants have claimed that much of their

8  conduct, including preparations they made in advance of, and

9  actions they took during the events in Charlottesville,

10  Virginia, on August 11 and 12, 2017 were motivated by

11  considerations of self-defense.

12       As I mentioned earlier, if plaintiffs prove that the

13  alleged conspiracy was motivated, at least in part, by

14  discriminatory racial animus, then it is no defense that

15  defendants also possessed some other motive, such as a desire

16  to join together for mutual protection.  Thus, if you find that

17  plaintiffs proved by a preponderance of the evidence each of

18  the elements of their claim under 42 U.S.C. Section 1985(3),

19  consideration of self-defense will not defeat that claim.

20       But in deciding whether plaintiffs have proved their

21  Section 1985(3) claim, you may consider defendants' assertions,

22  along with any supporting evidence from any party, that they

23  were motivated solely by self-defense, rather than by any

24  racial animus or desire to commit racially motivated violence.

25       Separately, principles of self-defense may be a

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  relevant consideration in determining whether defendants should

2  be liable for plaintiffs' claims under Virginia state law for

3  civil conspiracy; racial, religious, or ethnic harassment or

4  violence; and assault and battery.

5          The following law governs defendants' claims of

6  self-defense:

7          Self-defense is an affirmative defense which a

8  defendant bears the burden to prove by a preponderance of the

9  evidence.  The law recognizes that a person who suffers, or is

10 threatened with, an assault or battery that he did not provoke

11 has a right to use as much force in self-defense as is

12 reasonably necessary to protect himself.  A person who is being

13 assaulted, however, may not react with reasonable force unless

14 he has reason to believe, and does believe, that it is

15 necessary to avoid threatened bodily injury.  A person who is

16 being subjected to a battery may use such reasonable force as

17 is necessary to repel the threat of bodily injury.

18         Force is reasonable only if it is no more or no

19 greater force or means than the person in fact believed

20 reasonably necessary, and no more or no greater force or means

21 than that which would appear to a reasonable person, under like

22 circumstances, to be necessary in order to prevent bodily

23 injury to himself.

24         Additionally, self-defense is not available if the

25 defendant provoked or initiated the conflict.  In other words,

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  a defendant can only claim self-defense for his actions if they

2  were in response to an unprovoked attack.

3         Thus, to prove self-defense, a defendant bears the

4  burden of proving by a preponderance of the evidence that:

5  One, a person, unprovoked, threatened the defendant with

6  assault or battery such that the defendant reasonably believed

7  that the person was going to inflict bodily injury on him; two,

8  the defendant, in order to avoid bodily injury, used force;

9  three, the amount of force the defendant used was no greater

10  than the amount he believed was necessary to prevent bodily

11  injury; and four, the amount of force the defendant used was no

12  greater than the amount or means a reasonable person would have

13  used in like circumstances in order to prevent bodily injury.

14         A defendant may only use the amount of force

15  reasonably necessary to avoid the harm he believes will be

16  inflicted upon himself.  If a defendant reasonably believes

17  that non-deadly force will be used against him, a defendant may

18  only use non-deadly force against that person in self-defense.

19  Deadly force is only allowable as a defense when a defendant

20  reasonably believes deadly force will be used upon himself.

21         Negligence defenses, including assumption of risk,

22  contributory negligence, and sudden emergency, are not valid

23  defenses to any of the claims that plaintiffs bring against

24  defendants.  I instruct you to disregard these defenses when

25  assessing defendants' liability.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1          If a plaintiff has proven one or more of their

2    claims, then you must determine the damages to which plaintiffs

3    are entitled.  However, you should not infer that plaintiffs

4    are entitled to damages merely because I am giving you these

5    instructions.  I give you these instructions on damages merely

6    because I am required to charge you on all phases of the case

7    that you might have to consider.

8          Under the law, the purposes of damages is to award,

9    as far as possible, just and fair compensation for the losses

10   which resulted from defendants' unlawful conduct.  If you find

11   the defendants are liable on the claims as I have explained

12   them, you must award plaintiffs sufficient damages to

13   compensate them for all injuries proximately caused by

14   defendants' conduct.

15         These damages are known as compensatory damages.

16   Compensatory damages seek to make a plaintiff whole; that is,

17   to compensate the plaintiff for damages he or she has suffered.

18   In determining the compensatory damages to which plaintiffs are

19   entitled, you shall consider any of the following injuries that

20   you believe plaintiffs have proven by a preponderance of the

21   evidence were caused by the defendants' unlawful actions:  One,

22   any bodily injuries they sustained and their effect on

23   plaintiffs' health according to their degree and probable

24   duration; two, any physical pain, suffering, mental anguish or

25   emotional distress they suffered in the past and any they are

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  reasonably certain to experience in the future; three, the

2  reasonable value of any medical expenses incurred in the past

3  and any that may be reasonably expected to occur in the future;

4  four, any disfigurement or deformity and any associated

5  humiliation or embarrassment; five, any inconvenience caused in

6  the past and any that probably will be caused in the future;

7  six, any earnings that plaintiffs lost because they were unable

8  to work at their callings; seven, any loss of earnings and

9  lessening of earning capacity, or either, that plaintiffs may

10 reasonably be expected to sustain in the future; or eight, any

11 property damage plaintiffs sustained.

12         Your verdict shall be for a sum that will fully and

13 fairly compensate plaintiffs for the damages sustained as a

14 result of the defendants' unlawful actions.

15         Plaintiffs are not required to prove the exact amount

16 of their damages, but they must show sufficient facts and

17 circumstances to permit you to make a reasonable estimate of

18 each item.  If plaintiffs fail to do so, then they cannot

19 recover for that item.

20         During the trial, some of the lawyers may have argued

21 that plaintiffs should be awarded a specific -- well, no one

22 has done this yet, but in case a lawyer may argue that

23 plaintiffs should be awarded a specific amount of damages.  As

24 I have instructed you before, the arguments of counsel,

25 including any statements about the appropriate damages award,

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  are not evidence.  You as the jury must determine the

2  appropriate measure of damages based solely on the evidence

3  before you.

4          If you find that plaintiffs are entitled to damages,

5  you must be careful not to award double or duplicate damages.

6  Double or duplicate damages means more than one award of money

7  for the same loss, injury, violation, wrong, or damage.  In

8  this case, plaintiffs are seeking damages from defendants under

9  a number of claims.  Where the same act caused the same injury

10  or loss to plaintiffs under more than one claim, the plaintiffs

11  may recover only once for that injury or loss.  To recover

12  damages under more than one of the claims, plaintiffs must

13  prove defendants' liability for each of those claims and must

14  present evidence of distinct, separate injuries or losses under

15  those claims.

16          With respect to punitive damages, however, you may

17  make separate awards on each claim that is established.

18          If you find for plaintiffs on liability, in

19  determining the damages to which plaintiffs are entitled, you

20  shall not reduce a plaintiff's damages award based on any

21  evidence tending to show that he or she has received insurance

22  benefits, employment or governmental benefits, or gratuities to

23  help offset the losses he or she incurred as a result of

24  defendants' unlawful conduct.

25          Punitive damages are awarded, in the discretion of

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  the jury, to punish a defendant for extreme or outrageous

2  conduct, and to deter or prevent a defendant and others like

3  him from committing such conduct in the future.

4       You may award plaintiffs punitive damages if you find

5  that the acts or omissions of a defendant were done maliciously

6  or wantonly.  An act or failure to act is maliciously done if

7  it is prompted by ill will or spite towards the injured person.

8  An act or failure to act is wanton if done with a reckless or

9  callous disregard for the rights of the injured person.

10       Plaintiffs have the burden of proving, by a

11  preponderance of the evidence, that a defendant acted

12  maliciously or wantonly with regard to the plaintiffs' rights.

13       If you find by a preponderance of the evidence that a

14  defendant acted with malicious intent to violate plaintiffs'

15  federal rights or unlawfully injure him, or if you find the

16  defendant acted with a callous or reckless disregard of

17  plaintiffs' rights, then you may award punitive damages.  An

18  award of punitive damages, however, is discretionary; that is,

19  if you find that the legal requirements for punitive damages

20  are satisfied, then you may decide to award punitive damages,

21  or you may decide not to award them.

22       That sentence refers only to plaintiffs' federal

23  rights.  I'm going to strike the word "federal."  That should

24  be just plaintiffs' rights because it would apply to any claim

25  that fits the definition of an action that entitles one to

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   punitive damages.

2          In making this decision, you should consider the

3   underlying purpose of punitive damages.  Punitive damages are

4   awarded in the jury's discretion to punish a defendant for

5   outrageous conduct or to deter him and others like him from

6   performing similar conduct in the future.  Thus, in deciding

7   whether to award punitive damages, you should consider whether

8   a defendant may be adequately punished by an award of actual

9   damages only, or whether the conduct is so extreme and

10  outrageous that actual damages are inadequate to punish the

11  wrongful conduct.

12         You should also consider whether actual damages,

13  standing alone, are likely to deter or prevent this defendant

14  from similar wrongful conduct in the future, if it was in fact

15  wrongful, or whether punitive damages are necessary to provide

16  deterrence.  Finally, you should consider whether punitive

17  damages are likely to deter or prevent other persons from

18  performing wrongful acts similar to those the defendant or any

19  defendant may have committed.

20         If you decide to award punitive damages, the same

21  purposes should be kept in mind as you determine the

22  appropriate sum of money to be awarded as punitive damages.

23  That is, in fixing the sum to be awarded, you should consider

24  the degree to which the defendant should be punished for his

25  wrongful conduct, and the degree to which an award of one sum

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  or another will deter defendant or persons like him from

2  committing wrongful acts in the future.

3      All right.  Happily, I'm at the end of those

4  instructions.

5      Members of the jury, I'm going to ask you to go back

6  to the jury room, and you can bring your stuff with you to

7  leave or not.  But I'm going to -- I'll have to bring you back

8  just for a few minutes.  This will not take long, I promise.

9  **(Jury out, 3:34 p.m.)**

10      THE COURT:  All right.  I think we can allow the

11  plaintiff any objections you want to make at this time.

12      MR. MILLS:  Your Honor, we'd renew our request for

13  the instruction on Mr. Fields.  We think it's appropriate

14  because the other defendants who committed infractions of the

15  discovery rules of similar nature were included in the

16  instructions and Mr. Fields was not.  I think it's prejudicial

17  to the plaintiffs.

18      THE COURT:  All right.  Anyone on this side?

19      MR. KOLENICH:  Your Honor, starting with instruction

20  27 -- and this is I suppose my fault, but it says, "taking

21  those facts as true as against Elliot Kline specifically have

22  no bearing on plaintiffs' burden of proof as against Defendant

23  Identity Evropa."

24      We'd request it also says "or Defendant Nathan

25  Damigo" at the end of that sentence.  I did not request that

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1    before.   That's entirely my fault.   Just requesting it now.

2           As to the rest, we --

3           THE COURT:   Wait.

4           (Discussion off the record.)

5           MR. KOLENICH:   In addition, Your Honor -- I think

6    we're back on 13, the conspiracy.   We had requested that it

7    doesn't say "separately" and then go into the Virginia

8    conspiracy instructions, but that the foreseeability apply to

9    both.   And I don't think that was accomplished.

10          MR. DERISE:   Instruction 13?

11          MR. KOLENICH:   Is it 13?

12          (Discussion off the record.)

13          MR. KOLENICH:   Your Honor, that might not be 13.   I

14   apologize.

15          In 13 we had requested the instruction from the

16   motion to dismiss that each defendant must have conspired with

17   a "specific co-conspirator," and we would just renew our

18   request that that be added in.   I'm going to request a minute

19   to find the other one that I mentioned about the "separately,"

20   but apparently that's not 13.

21          MR. CANTWELL:   While he looks, I'll just bring up

22   again -- I mean, that was pretty specifically stated in

23   response to the denial of the motion to exclude the testimony

24   of Blee and Simi, that that seemed to be curative of the

25   concern that Simi's testimony was essentially to shortcut the

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1    conspiracy requirement.

2                THE COURT:  Plaintiffs wish to say anything?

3                MR. TOLENTINO:  Yes, Your Honor, a couple of things.

4                First, with respect to the reference to the "specific

5    co-conspirator" language in the motion to dismiss --

6                THE COURT:  Let's be sure that I know which

7    instruction we're talking about.

8                MR. KOLENICH:  That one is 13 that he's addressing.

9                THE COURT:  It is 13?

10               MR. KOLENICH:  Yes, sir.  I'm looking for the

11   "separately" issue that I haven't found yet.

12               MR. TOLENTINO:  So, Your Honor, I just want to note

13   that our position is that defendants are taking that language

14   entirely out of context and your instruction is modeled after

15   the patterned instructions.

16               When you said -- when Your Honor said "plaintiffs

17   must allege each defendant entered into an agreement with a

18   specific co-conspirator," what you were differentiating that

19   from was saying that we can't envelop all of the rally-goers

20   into the conspiracy.  But it isn't part of conspiracy law to

21   say that you have to identify a specific co-conspirator every

22   time.  In fact, you gave the correct instruction that an

23   informal agreement is sufficient, and that would be plainly

24   inconsistent with this request.

25               Now, this was a different stage of the pleadings, and

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1    your instruction as written is entirely legally correct.

2            THE COURT:  That was not deliberately -- that was not

3    accidentally omitted.  I thought the instruction we gave was

4    proper.  I understand your objection.

5            MR. KOLENICH:  Thank you, Your Honor.  My objection

6    is on the record.

7            THE COURT:  Yes.  I understand.

8            MR. KOLENICH:  The section I'm looking for, but

9    failing to find, is the self-defense section.  It says,

10   "separately, self-defense may be considered" for the Virginia

11   state civil conspiracy claims.  But it gives the distinct

12   impression that we can't make any self-defense argument

13   whatsoever as to the federal claims.  And I think that's error

14   because, if they've agreed to wait until they had a lawful

15   reason, a self-defense-type reason, before they act, that would

16   apply to each, both the federal and the state claims, it would

17   seem.

18           THE COURT:  Well, I think that sounds right.  I don't

19   know why it would be any different.

20           MR. TOLENTINO:  Your Honor, you gave the correct

21   discussion.  Mr. Kolenich, again, is misrepresenting what you

22   said, with respect.  You gave the instruction --

23           THE COURT:  Which instruction?

24           MR. TOLENTINO:  This is instruction 31.  And what you

25   said, Your Honor, is:  "In deciding whether plaintiffs have

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   proved their Section 1985(3) claim, you may consider

2   defendants' assertions, along with any supporting evidence from

3   any party, that they were motivated solely by self-defense."

4   So we don't think that's error.

5          And it's classic conspiracy law that even if you have

6   a legal motive and an illegal motive, you can still establish

7   the conspiracy.  That's all that we're trying to say with

8   respect to the federal conspiracy, is that if they say "one of

9   our motives is self-defense," but they also conspired to commit

10  racially motivated violence, it's not a defense to the claim.

11  And it's just bedrock conspiracy law.  And Your Honor has given

12  that instruction multiple times in other types of cases.

13         MR. CANTWELL:  If I could chime in on this:  I don't

14  think anybody is trying to assert that self-defense gives you a

15  right to conspire to commit racially motivated violence.  I

16  think that the assertion being made is that people -- there's a

17  lot of discussion about preparations for the use of force, and

18  that the preparations for the use of force and the force that

19  was indeed exercised was done in self-defense.  And therein, I

20  think, is the -- I don't know if "confusion" is the right word,

21  but I think the obfuscation that's entering here.

22         MR. KOLENICH:  Your Honor, we're not objecting to the

23  instruction.  As plaintiffs are stating, this is generally a

24  correct statement of law, but the word "separately --

25  "separately, principles of self-defense may be a relevant

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1    consideration."  If you simply said "principles of self-defense

2    may also be a relevant consideration" in getting into the state

3    section, then I would have no objection.  It's just -- it seems

4    to us, and that is the basis of this objection, that you're

5    excluding --

6           THE COURT:  You're objecting just to the word

7    "separately"?

8           MR. KOLENICH:  Essentially, Your Honor, yes.  We'd

9    like it not to have that stark difference between the state and

10   the federal instruction.

11          THE COURT:  All right.  We can make that -- I don't

12   think that changes the instruction.

13          MR. CANTWELL:  Is consideration of a claim of

14   self-defense genuinely an optional thing for a jury to do?

15          THE COURT:  Excuse me?

16          MR. CANTWELL:  So -- I'm sorry.  It's in the second

17   paragraph of jury instruction 31, the final sentence here:

18   "But in deciding whether plaintiffs have proved their 1985(3)

19   claim, you may consider defendants' assertions, along with any

20   supporting evidence from any party, that they were motivated

21   solely by self-defense rather than by racial animus or a desire

22   to commit racially motivated violence."  It says "may."  "You

23   may consider."

24          Is it an optional -- is it optional for the jury to

25   consider claims of self-defense?

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1          THE COURT:  Well, they have to find, if they find
2     that it's self-defense, it was necessary.
3          MR. CANTWELL:  Isn't it -- isn't part of their civic
4     duty to consider the assertions?
5          THE COURT:  They don't have to assert it unless they
6     find that circumstances would have justified what it is.
7          MR. CANTWELL:  I'm not suggesting that --
8          THE COURT:  I think I understand what you're talking
9     about.  I'm trying to find where the exact words you used.
10         MR. CANTWELL:  Specifically, I'm concerned about the
11    word "may" in the final sentence of the second paragraph.
12         THE COURT:  Well, I say they may be relevant.
13         MR. TOLENTINO:  Your Honor, I'm sorry to chime in
14    here.  I think it's correct to say "may" as Your Honor was
15    alluding to.  If you replace that with "must," it makes it
16    sound like they've already established self-defense, and that's
17    incorrect.
18         THE COURT:  Yeah, that's telling -- that would be
19    telling the jury that the Court believes -- I don't think -- I
20    think it's -- I don't think it's confusing.  I think it's
21    proper.  And you can argue that.
22         MR. CANTWELL:  If I could say one more thing about
23    it, and then I'll drop it.  I just want to suggest -- I'm not
24    suggesting that it says "you must find."  I'm saying it says --
25    right now it says "you may consider."  And I understand that if

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  it said "you may find," then that would be the finding.  "You

2  may consider" sounds like it's optional to even take into

3  consideration the assertion.

4          THE COURT:  I understand what you're saying.

5          "You may consider" -- I don't know of anything I see

6  to do to correct it.

7          MR. CANTWELL:  May I suggest?

8          THE COURT:  Yeah.

9          MR. CANTWELL:  I would suggest either "may find" or

10  "must consider."  Either way gives them the option, once they

11  have considered the claim.  The issue is not that they must

12  find or that they -- obviously, that is a genuine issue of

13  material fact for a jury to decide.  But if they are not -- if

14  it is not part of their obligation to consider the claim, then

15  it would seem that they are being given an option of ignoring a

16  material element of the case.

17          MR. TOLENTINO:  Your Honor, we object to that.  We

18  think it's clear as is.  You gave it to the jury already.  If

19  you replace "consider" with "find," the sentence makes no

20  sense.  It says "you may find defendants' assertions."

21          So, you know, I think we're quibbling here.  Your

22  Honor gave a very clear instruction that won't confuse the

23  jury.  The use of "may" versus "must" -- I think you have to

24  use "may" because otherwise the jury is confused into thinking

25  they have to find self-defense.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1        MR. CANTWELL:  No.  They are thinking that they must

2   consider.  Consider and find are two different things.

3        THE COURT:  This is the last word on it.  I'm going

4   to add a sentence at the end of the paragraph saying, "You must

5   consider all relevant evidence as stated in other

6   instructions."

7        MR. CANTWELL:  Okay.  Thank you, Judge.

8        THE COURT:  Rob, can you make it legible and just --

9   so you can go to the Elmo and put it up there, strike out -- in

10  that last paragraph on 36, strike out the word "separately" and

11  above it, add the sentence, "You must consider all relevant

12  evidence as stated in other instructions."

13       And then I'm going to give this Fields instruction

14  about -- wait a minute.

15       MR. CAMPBELL:  I maintain my objection, just so it's

16  clear for the record.

17       THE COURT:  Okay.  I think I will tell the jury why.

18       MR. TOLENTINO:  One very small housekeeping thing.

19       On instruction number 24, which is the hate crime

20  statute, Plaintiff Elizabeth Sines' name is spelled Wines, and

21  we just wanted to correct that for the record.  I believe it's

22  in the third or fourth sentence.  It's just a small typo.

23       THE COURT:  Okay.  Tell me what --

24       MR. TOLENTINO:  It's final jury instruction number

25  24.  And the name Sines, Elizabeth Sines, is spelled with a W,

178

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   Wines.  We just want to make that clear for the record.

2          THE COURT:  Would it be all right if we just correct

3   that when we hand it to the jury?

4          MR. TOLENTINO:  Yes, Your Honor.  I think the other

5   thing we wanted to ask is if the jury could have copies of the

6   final jury instructions.

7          THE COURT:  They will.

8          MR. TOLENTINO:  Thank you.

9          MR. JONES:  Your Honor, if I could just for purposes

10  of the record renew the objections I had previously made about

11  instruction 13, and then join in the request of Mr. Cantwell

12  and Kolenich for that language about defendants needing to

13  specifically agree with another co-conspirator.  Thank you.

14         THE COURT:  I'm having trouble hearing everything.

15  Repeat for me.

16         MR. JONES:  I was just renewing the objections I had

17  made about instruction 13.  I had requested that the second

18  paragraph, the last sentence, "All plaintiffs must show is a

19  shared objective to cause racially motivated violence."  It's

20  also required that they show an agreement for an objective.  So

21  just renewing that.

22         Also, the first sentence of that next paragraph,

23  "Plaintiffs are also not required to show that all the

24  defendants they alleged as members of the conspiracy were, in

25  fact, parties to the alleged agreement," I just think that's

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  misleading about what they actually have to prove.  They're

2  required to prove that each of the defendants was a party to

3  the agreement.

4          THE COURT:  Well, I think -- I mean, you could have

5  the -- you don't have to prove everybody was a member of the

6  conspiracy.  If you can prove five out of six, you don't -- you

7  can get a judgment against five, but not number six.

8          MR. JONES:  I think that's right, and I think that's

9  what that language is trying to show, but my concern is that

10  it's misleading and could potentially lead the jury to believe

11  that that's not the case.

12          MR. TOLENTINO:  Your Honor, we object to that.  You

13  previously ruled that the full context of the instructions

14  solved that problem.

15          THE COURT:  I'm going to leave that like it is.  "All

16  plaintiffs must show."

17          Any other objections?

18          THE CLERK:  Mr. Smith has no objections, but you

19  might want to ask Mr. ReBrook.

20          THE COURT:  Mr. Smith has objections?

21          THE CLERK:  No, he does not have any, but

22  Mr. ReBrook, you might want to inquire about.

23          THE COURT:  Mr. ReBrook?

24          Mr. ReBrook?

25          I just don't think this is going to work.  He can

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   file his objections.

2           THE CLERK:  I'll keep trying.

3           (Pause.)

4           THE COURT:  I'm making a change to 31, add the

5   sentence about "must consider all relevant evidence."  Changing

6   "all plaintiffs must show," instead of "shared objective," "an

7   agreement to cause racially motivated violence," and giving the

8   instruction about why Fields is not testifying.

9           MR. TOLENTINO:  Thank you, Your Honor.  We just want

10  to take the position that your original instruction on 13 was

11  correct.

12          THE COURT:  Okay.

13          MR. CANTWELL:  If I could just inquire as to the fate

14  of Mr. Kolenich's proposed instruction on advocacy.

15          THE COURT:  On what?

16          MR. CANTWELL:  Mr. Kolenich proposed an

17  instruction --

18          THE COURT:  Well, my thought was if you prove the

19  elements, then that's out of the picture.  If they don't prove

20  it, they don't recover.

21          MR. CANTWELL:  Okay.

22          MR. KOLENICH:  Your Honor, are you removing the word

23  "separately" from instruction 31?

24          THE COURT:  Yes.

25          You got that, Rob?

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1          Okay.  Let's call the jury back.

2          THE CLERK:  And Mr. ReBrook has no objections, nor

3  Mr. Smith.

4          THE COURT:  Very good.

5          Call the jury.  I'm not going to read these

6  instructions totally over.  I'm just going to tell them by

7  number.

8  **(Jury in, 3:59 p.m.)**

9          THE COURT:  Members of the jury, I'm going to make

10  two corrections in the instructions and then read a very short

11  instruction.

12          First -- I'm not going to read the whole

13  instructions -- they were long -- but you'll have them in the

14  jury room.  Jury instruction number 13, at the second

15  paragraph, the last sentence that said "all plaintiffs must

16  show is a shared objective to cause racially motivated

17  violence," that should read, "all plaintiffs must show is an

18  agreement to cause racially motivated violence."

19          Then, in instruction number 31, at the end of the

20  second long paragraph there, I want to make it clear that you

21  must consider all relevant evidence as stated in other

22  instructions.  And then in the first line of the last paragraph

23  there, I'm removing the word "separately."  And the sentence

24  will begin and read, "principles of self-defense may be a

25  relevant consideration in determining whether defendants should

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1   be liable for plaintiffs' claims under Virginia state law for

2   civil conspiracy; racial, religious, or ethnic harassment or

3   violence; and assault and battery."

4          And then, finally, I'm going to give you a short

5   instruction about Mr. Fields.

6          You may have noticed that Defendant Fields, unlike

7   other defendants, did not testify at trial in his own defense.

8   That is not because he chose not to testify.  Defendant Fields

9   refused to testify at a properly noticed deposition during the

10  discovery process in this case.  To level the evidentiary

11  playing field that may have been skewed as a result of

12  Defendant Fields's misconduct, the Court issued appropriate

13  sanctions against him and prohibited him from testifying in his

14  defense at this trial.

15         All right.  I'm going to excuse you now until

16  tomorrow morning at 9 o'clock.  And, as I said, tomorrow

17  morning we will begin with the closing arguments.  Probably

18  will last nearly all day.  And then on Friday early morning,

19  the case will be submitted to you for your deliberation.

20         You're excused at this time.  Thank you very much.

21  **(Jury out, 4:02 p.m.)**

22         THE COURT:  All right.  Unless there's something

23  else -- nothing else?

24         MR. TOLENTINO:  Thank you, Your Honor.

25         MR. KOLENICH:  Thank you.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

1  (Proceedings adjourned, 4:03 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sines, et al. v. Kessler, et al., 3:17CV72, 11/17/2021

C E R T I F I C A T E

1

2    I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3  the United States District Court for the Western District of

4  Virginia, appointed pursuant to the provisions of Title 28,

5  United States Code, Section 753, do hereby certify that the

6  foregoing is a correct transcript of the proceedings reported

7  by me using the stenotype reporting method in conjunction

8  with computer-aided transcription, and that same is a

9  true and correct transcript to the best of my ability and

10 understanding.

11    I further certify that the transcript fees and format

12 comply with those prescribed by the Court and the Judicial

13 Conference of the United States.

14    /s/ Lisa M. Blair                Date: November 17, 2021

15

16

17

18

19

20

21

22

23

24

25