Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

```
 1                  UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF VIRGINIA
 2                    CHARLOTTESVILLE DIVISION


 3   *************************************************************

 4   ELIZABETH SINES, ET AL.,    CIVIL CASE NO.:  3:17CV72
                                 NOVEMBER 18, 2021, 9:01 AM
 5                               JURY TRIAL, DAY 19
            Plaintiffs,
 6   vs.

 7                               Before:
                                 HONORABLE NORMAN K. MOON
 8                               UNITED STATES DISTRICT JUDGE
     JASON KESSLER, ET AL.,      WESTERN DISTRICT OF VIRGINIA
 9
            Defendants.
10
     *************************************************************
11
     APPEARANCES:
12

13   For the Plaintiffs:      ALAN LEVINE, ESQUIRE
                              COOLEY LLP
14                            1114 Avenue of the Americas, 46th
                              Floor
15                            New York, NY  10036
                              212.479.6260
16
                              DAVID E. MILLS, ESQUIRE
17                            COOLEY LLP
                              1299 Pennsylvania Avenue, NW,
18                            Suite  700
                              Washington, DC  20004
19                            202.842.7800

20

21

22   Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                       255 West Main Street, Suite 304
23                     Charlottesville, Virginia  22902
                       434.296.9284
24
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25   TRANSCRIPT PRODUCED BY COMPUTER.
```

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  APPEARANCES CONTINUED:

2  For the Plaintiffs:          MICHAEL L. BLOCH, ESQUIRE
                                ROBERTA A. KAPLAN, ESQUIRE
3                               Kaplan Hecker & Fink LLP
                                350 Fifth Avenue, Suite 7110
4                               New York, NY  10118
                                212.763.0883
5
   For the Defendants:          DAVID L. CAMPBELL, ESQUIRE
6                               Duane, Hauck, Davis, Gravatt &
                                Campbell, P.C.
7                               100 West Franklin Street, Suite 100
                                Richmond, VA  23220
8                               804.644.7400

9                               CHRISTOPHER CANTWELL, PRO SE
                                #00991-509
10                              USP Marion
                                4500 Prison Road, PO Box 2000
11                              Marion, IL  62959

12                              BRYAN J. JONES, ESQUIRE
                                Bryan J. Jones, Attorney at law
13                              106 W. South Street, Suite 211
                                Charlottesville, VA  22902
14                              540.623.6952

15                              JAMES E. KOLENICH, ESQUIRE
                                Kolenich Law Office
16                              9435 Waterstone Blvd., Suite 140
                                Cincinnati, OH  45249
17                              513.444.2150

18                              WILLIAM E. REBROOK, IV, ESQUIRE
                                The ReBrook Law Office
19                              6013 Clerkenwell Court
                                Burke, VA  22015
20                              571.215.9006

21                              JOSHUA SMITH, ESQUIRE
                                Smith LLC
22                              807 Crane Avenue
                                Pittsburgh, PA  15216
23                              917.567.3168

24                              RICHARD SPENCER, PRO SE
                                P.O. Box 1676
25                              Whitefish, MT  59937

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1                                     INDEX

2      CLOSING ARGUMENTS

3      ON BEHALF OF PLAINTIFFS:

4       Ms. Kaplan                                                8

5       Ms. Dunn                                                 11

6       Ms. Kaplan                                               59

7      ON BEHALF OF DEFENDANTS JASON KESSLER, NATHAN DAMIGO, AND
       IDENTITY EVROPA:
8
        By Mr. Kolenich                                          99
9
       ON BEHALF OF JAMES ALEX FIELDS, JR.:
10
        By Mr. Campbell                                         113
11
       ON BEHALF OF RICHARD SPENCER:
12
        By Mr. Spencer                                          129
13
14     ON BEHALF OF MICHAEL HILL, MICHAEL TUBBS, AND LEAGUE OF THE
       SOUTH:
15
        By Mr. Jones                                            141
16
       ON BEHALF OF JEFF SCHOEP AND THE NATIONAL SOCIALIST MOVEMENT:
17
        By Mr. ReBrook                                          153
18
19     ON BEHALF OF MATTHEW HEIMBACH, DAVID MATTHEW PARROTT, AND
       TRADITIONALIST WORKER PARTY:
20
        By Mr. Smith                                            164
21
       ON BEHALF OF CHRISTOPHER CANTWELL
22
        By Mr. Cantwell                                         187
23
       ON BEHALF OF THE PLAINTIFFS:
24
        By Ms. Dunn                                             216
25

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  (Proceedings commenced, 9:01 a.m.)

2          THE COURT:  Good morning.  Call the case.

3          THE CLERK:  Yes, Your Honor.  This is Civil Action

4  Number 3:17-cv-00072, Elizabeth Sines and others versus Jason

5  Kessler and others.

6          THE COURT:  Plaintiffs ready?

7          MS. KAPLAN:  We are, Your Honor.

8          THE COURT:  Defendants ready?

9          MR. KOLENICH:  Yes, Your Honor.

10          MR. SMITH:  Yes, Your Honor.

11          MR. JONES:  Yes, Your Honor.

12          THE COURT:  I'll remind you that the Court's

13  prohibition against recording and broadcasting and so forth

14  remains in force.

15          I don't know that you got it.  Did you get this

16  little amendment to instruction number 30?

17          MS. KAPLAN:  I don't know about the amendment to

18  instruction number 30.  I think we want to talk about the

19  verdict form which we've agreed with the defendants to make

20  some changes to.

21          THE COURT:  Okay.  This is instruction number 30,

22  First Amendment.  I've added basically one sentence.  "Certain

23  defendants made the claim that their activities constituted

24  free speech and assembly protected by the First Amendment to

25  the United States Constitution.  The abstract advocacy of

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  lawlessness or mere advocacy of the use of force is protected

2  speech.  However, if you find the defendants have engaged in

3  the violations of law I have instructed you on, including a

4  conspiracy as alleged by plaintiffs" -- it's the same all the

5  way through.

6        I thought an effort to incorporate plaintiff's theory

7  on that, which I think is necessary to grant.

8        All right.  Do you all have time -- how long do you

9  wish to argue your opening?

10       MS. KAPLAN:  We're going to stick to our deal, Your

11  Honor, and we're planning to stick to the two and a half hours.

12       THE COURT:  I'm sorry?

13       MS. KAPLAN:  Your Honor, we're going to do our best.

14  As I said, let's make a deal to stick to two and a half hours.

15  I can't promise you, but that's certainly our intention.

16       THE COURT:  Well, I'm going to stop you because the

17  jury is going to leave at 5, I hope.

18       MS. KAPLAN:  I understand.

19       THE COURT:  I don't want to, but --

20       MS. KAPLAN:  One other thing, Your Honor.  Would it

21  make sense to have the plaintiffs come up now before the jury

22  is here?

23       THE COURT:  Sure.  But do you want to notice the

24  time -- because I do -- I've got to stick to time because

25  otherwise --

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1          MS. KAPLAN:  We understand, Your Honor.  We actually

2   made time reminders, so Ms. Dunn and I --

3          THE COURT:  You all are keeping up with it?

4          MS. KAPLAN:  Yes.  I don't have a yellow light yet or

5   red light, but we're going to try to do the equivalent.

6          THE COURT:  Okay.  The first thing I'm going to do is

7   put this new instruction in.  Have you all -- ready to call the

8   jury in?

9          Have you all agreed on how you're breaking up the

10  time?

11         MR. SMITH:  I think so, Your Honor.

12         MR. KOLENICH:  Yes, Your Honor.

13         THE COURT:  All right.

14         MS. KAPLAN:  Your Honor, is it okay if the plaintiffs

15  are coming up in terms of a collision with the jury?

16         THE COURT:  Yes, sure.  It's better if they come on

17  up.  Are the plaintiffs coming up now?

18         MS. PHILLIPS:  Yes, they are.

19         THE COURT:  All right.  As soon as the plaintiffs get

20  to the door and they're in, start the jury on around.

21         You can call the jury in.

22         MS. KAPLAN:  Your Honor, is it okay for me to go to

23  the lectern?

24         THE COURT:  Yes.  Well, let him -- I'm going to read

25  this instruction first.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1          MS. KAPLAN:  Okay.

2          THE COURT:  Do you have any idea how long you'll go

3   first?  I'm just thinking about a good time to take a break.

4          MS. KAPLAN:  Your Honor, I'm doing about a

5   three-minute introduction and then Ms. Dunn will go for the

6   first half.  And then I'll finish.  I'm the closer on this one.

7          THE COURT:  All right.  Do you know how long you're

8   going to be?  I want to take a break in about an hour and a

9   half.

10          MS. DUNN:  That will be fine, Your Honor.

11          THE COURT:  I don't want to unnecessarily break up...

12          MS. DUNN:  We appreciate that very much.  I think

13   that will be fine.

14   **(Jury in, 9:07 a.m.)**

15          THE COURT:  All right.  Good morning, ladies and

16   gentlemen.  All have a seat.

17          I'm going to -- there's an instruction number 30, and

18   I'm going to reread it to you because there's been a little

19   amendment to it.  And you're not to give it any more

20   significance than any other instruction because I'm reading it

21   now.  This is just to correct or add something by way of

22   explanation.  It's important, but not -- no special attention

23   should be given to it now because I'm reading it now instead of

24   yesterday.

25          You may put the instruction down.  Is it up?

                                                                                    8

                Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1           Certain defendants make the claim that their

2    activities constituted free speech and assembly protected by

3    the First Amendment to the United States Constitution.  The

4    abstract advocacy of lawlessness or mere advocacy of the use of

5    force is protected speech.  However, if you find that the

6    defendants have engaged in the violations of law I have

7    instructed you on, including a conspiracy as alleged by

8    plaintiffs, you may not find that the defendants' actions were

9    protected by the First Amendment.  The violations of law I have

10   instructed you on are not protected by the First Amendment.

11          The fact that an agreement to engage in illegal

12   conduct necessarily takes the form of words also does not

13   confer upon it, or upon the underlying conduct, protection

14   under the First Amendment.

15          All right.  We're now ready to begin the closing

16   arguments.

17              MS. KAPLAN:  May I proceed, Your Honor?

18              THE COURT:  You may.

19              MS. KAPLAN:  Ladies and gentlemen, thank you so much

20   for serving on the jury in this important case.  It's been a

21   long month.  We've heard from 36 witnesses, watched countless

22   videos, some over and over again, and reviewed many hundreds of

23   documents.  And believe me, I know a lot -- I know that a lot

24   of what you've been presented with has been hard to watch and

25   hard to hear.  On behalf of all nine plaintiffs sitting in the

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   jury box right now -- what used to be the jury box right now --

2   and our entire legal team, we are so grateful to you for your

3   time, your patience with us, and your careful attention.  But

4   we're now finally about to turn the case over to you.

5           Under our system of justice, the case will be in your

6   hands, and that's how it should be.  It will be up to the 12 of

7   you and the 12 of you alone to hold these defendants

8   accountable for what they have done and the lasting damage that

9   they have caused.  It's up to you to demonstrate loud and clear

10  that, contrary to what defendants would have you believe, none

11  of this is funny and none of it is a joke.

12          Throughout the morning we are going to summarize all

13  that you've heard over the course of this trial, and each of

14  the defendants will then get a chance to do the same.  After

15  hearing those presentations, we think that the conclusion will

16  be obvious:  The defendants are liable for conspiring to commit

17  racially motivated violence at Charlottesville 2.0, or what the

18  defendants called the Unite the Right on the weekend of August

19  11 and 12, 2017.

20          To start, you will hear from my co-counsel, Karen

21  Dunn.  She will walk you through the evidence of the conspiracy

22  in this case, who was in the conspiracy, how it worked, the

23  structure of the conspiracy, and the actions that defendants

24  and their co-conspirators took in furtherance of the

25  conspiracy.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    As she promised in her opening, Karen will remind you

2  of the testimony and the evidence you've seen that proves that

3  the defendants planned, executed, and then celebrated racially

4  motivated violence.

5    After Karen, I'll come back and I will walk you

6  through the evidence that explains why the defendants did what

7  they did.  Defendants were not planning a peaceful rally, but

8  they were instead planning with their co-conspirators to commit

9  racially motivated violence.  Next, I'll walk you through the

10 arguments that defendants have made about why they think you

11 shouldn't hold them accountable, and I'll tell you why each and

12 every one of them is wrong under the law, under the facts, and

13 under common sense.  Finally, I'll remind you who our nine

14 brave plaintiffs are and will walk you through their damages.

15    Before turning it over to Karen, I'd like to offer

16 one final introductory note.  Defendants in this case have

17 repeatedly suggested that they are not criminals, and that what

18 they did in planning and attending Unite the Right does not

19 amount to a crime.  It is important for you to remember that

20 this is not a criminal case.  You've likely all heard that

21 someone can only be convicted of a crime if they are found

22 guilty beyond a reasonable doubt.

23    That standard does not apply in this case.  Rather,

24 as Judge Moon has already instructed you, the defendants are

25 liable if you conclude that plaintiffs' claims are supported by

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    what's called a preponderance of the evidence.  That's 51

2    percent, ladies and gentlemen.  In other words, plaintiffs need

3    only prove that it is more likely than not that defendants

4    engaged in a conspiracy to commit racially motivated violence.

5              And with that, I'll turn it over to Karen.

6              MS. DUNN:  Thanks, Robbie.

7              Good morning, ladies and gentlemen.  To echo Robbie,

8    we are extremely grateful to you.  Your service as jurors is

9    essential to our larger justice system, and it's foundational

10   to our system of law.  Without those laws, our system would

11   sink into lawlessness and chaos.

12             Over the past several weeks we have spent together,

13   we have seen what kind of pain that that lawlessness can cause.

14   Lives have been turned upside down.  And so today, Robbie and I

15   are not just here to stand up for the plaintiffs -- and we

16   are -- we're also here to stand up for the law that Judge Moon

17   has instructed you.

18             So, this morning Robbie and I are going to walk you

19   through some of the law.  We're going to apply it to the

20   evidence in this case.  And as we talked about in opening, the

21   evidence in this case has been overwhelming.  And I mean that

22   in every sense of the word.  The evidence that we will show you

23   today, it all comes directly from the record that you saw.  All

24   the slides that you will see have citations to the record.

25   This is all evidence that we saw in this case.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1       First, though, I'm going to start with the law that

2  Judge Moon has instructed.  That begins with the law of

3  conspiracy.

4       So Judge Moon has instructed you about the existence

5  of a conspiracy.  So a conspiracy is an agreement between two

6  or more people to join together to accomplish some unlawful

7  purpose.

8       So, you don't have to agree with everyone.  You have

9  to agree with one person.  You could agree with more.

10      Co-conspirators may have a legal -- they may have

11  legal and unlawful objectives.  So they can have both.  And a

12  conspiracy may have several objectives, but if any one of them,

13  even a secondary objective, is to violate the law, then the

14  conspiracy is unlawful.

15      So even if one objective here was to have a rally,

16  but another objective was to cause racially motivated violence,

17  that would be unlawful under the law that Judge Moon has

18  instructed.

19      The instructions -- I won't read them all to you, but

20  I am going to go through a few parts that I think are very

21  important.  Plaintiffs do not need to prove that the defendants

22  in this case entered into any formal agreement.  We don't need

23  to show that there's any written contract or produce evidence

24  of any express agreement that spells out all the details of

25  understanding.  All we need to show is a shared objective to

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  cause racially motivated violence.  And notice that the

2  instruction before you does not say "commit."  It says "cause."

3         We are also required to show that parties to an

4  alleged agreement, not all of them had to be named in this

5  lawsuit.  And you have certainly heard about co-conspirators

6  that are not named in this lawsuit.

7         The judge has told you that conspiracies by their

8  very nature are clandestine and covert, and so thereby result

9  in little evidence of an express agreement, and so we may rely

10 on circumstantial evidence.

11        You can look at, as this instruction shows, the

12 question of what was reasonably foreseeable to the defendants.

13 So what that means is that, as it says in the last sentence

14 here, the law holds co-conspirators liable for all the

15 reasonably foreseeable acts that their co-conspirators have

16 done in the conspiracy.  And we'll talk a little bit more about

17 this.

18        So you don't have to cause the violence yourself.

19 The violence just needs to be reasonably foreseeable to you.

20        I'm also going to talk a little bit up front about

21 membership in a conspiracy.  And that's what you're seeing on

22 the screen.  So as we talked about, you need to agree with one

23 other person.  You could agree with more.

24        One may become a member of a conspiracy without

25 knowing all the details of the scheme or without knowing all

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  the identities of the alleged co-conspirators.  And that's

2  certainly going to be the case here where some co-conspirators

3  went under aliases and hid their true identities.

4        So if a person understands the unlawful nature of the

5  plan and knowingly joins the plan or scheme on one occasion --

6  one occasion -- that is sufficient.  And we saw much more than

7  that in this case.

8        Co-conspirator membership is not measured by the

9  extent or duration of a co-conspirator's participation.  Each

10 member may perform separate and distinct acts, and they can

11 perform them at different times.  Some conspirators will play

12 major roles.  Others will play minor roles.  Even a single act

13 may be sufficient to draw a defendant into the conspiracy.

14       And then I do want to draw your attention to the last

15 paragraph, which says that we may rely, in proving our case by

16 a preponderance of the evidence, on all direct and

17 circumstantial evidence, including the nature of the alleged

18 conspiracy, the defendant's association to other members of the

19 alleged conspiracy, if any, the defendant's conduct before,

20 during, and after the relevant events, and the defendant's

21 presence at the scene of an event.  So that's going to be

22 important here:  Before, during, and after, and whether a

23 defendant was present at the event.

24       So some of the defendants in this case, as you know,

25 have pointed out that they didn't participate in the torch

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  march or they weren't on Discord.  But under the law that Judge

2  Moon has instructed you, that doesn't matter.  They're still

3  part of the conspiracy, and their co-conspirator's actions are

4  still attributed to them if they were reasonably foreseeable.

5      So one example that people sometimes use is a drug

6  conspiracy.  So it doesn't matter if you're a big fish or a

7  small fish.  It doesn't matter if you're the big fish and you

8  know what the small fish are doing down the block.  It doesn't

9  matter that there is not going to be a written agreement.  And

10 it doesn't matter if you take one act to join that conspiracy,

11 if you do it at any time.  It doesn't matter if you sold the

12 drugs on a Saturday or on a Friday or at the beginning or the

13 end.  And once you join the conspiracy at any time, you're

14 liable for the whole conspiracy and any reasonably foreseeable

15 acts of your co-conspirators, which in this case is causing

16 racially motivated violence.

17     So we'll talk a little bit more about this, but I

18 want to make sure that we show you what the law actually is in

19 this case.  And that's the law as Judge Moon has instructed.

20     Now, Judge Moon has already found a conspiracy --

21 Mr. Spalding is going to help me out.  Judge Moon has already

22 found a conspiracy as to Defendants Eli Kline and Robert

23 Azzmador Ray, following those two defendants' refusal to

24 participate in this lawsuit.  And so that means that Kline and

25 Ray, as the Court has said, each conspired with at least one or

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  more co-conspirators.  The Court has made findings that they

2  were each motivated by racial animus, that the violence was

3  reasonably foreseeable to each of them, and that they both

4  ratified the violence after August 11th and 12th.

5       So we're here today to talk to you about who else was

6  part of a conspiracy.  Who else acted with racial animus.  Who

7  else ratified the violence, and for who else was violence

8  reasonably foreseeable.  And the answer, ladies and gentlemen,

9  as we will submit to you before you deliberate, that the

10  evidence has shown the answer is yes as to each and every one

11  of the defendants in this case.

12       So let's talk about some of the evidence.  This is

13  where it all began.  Jason Kessler posted on May 21st to

14  everyone on Discord.  He says, "We need to have a Battle of

15  Berkeley situation in Charlottesville.  Bring everything we've

16  got and fight this shit out in the streets."

17       He wanted the event to be publicized so that everyone

18  could see what an unbeatable fighting force the alt-right was.

19  Kessler would be a hero and take his place among the national

20  leadership of the white supremacist movement.  And as you've

21  heard, Kessler built an army for that battle, complete with

22  organizers, group leaders, and promoters who would bring

23  hundreds of followers who were armed and foot soldiers who

24  would carry out the mission.  They all shared a common,

25  unlawful purpose, as required by the instructions, to cause

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   racially motivated violence at the Battle of Charlottesville.

2           Now, you also saw this post by Mr. Kessler.  This

3   post is from the day before Mr. Kessler launched his idea for

4   the Battle of Charlottesville.  He recognizes expressly that

5   the alt-right is a dangerous movement.  He recognizes that it's

6   a movement that needs what he calls "unchecked racism bantz" --

7   that's like joking -- to maintain its energy.  Kessler says, "I

8   can do without the bantz because for me this is war."

9           He would go to the ends of the earth for his cause.

10  And that is something that we have seen Jason Kessler and the

11  defendants -- the other defendants in this case -- had in

12  common.

13          As you've heard, Eli Kline was Kessler's

14  co--organizer.  The judge has already made findings about

15  Mr. Kline.  He worked at a pest control company, but he said he

16  would rather exterminate Jews.  He had deep contacts in the

17  alt-right movement.  He was Richard Spencer's right-hand guy

18  and his actual friend.  And Spencer empowered Kline to make

19  decisions for him.  You saw that text.

20          Working with Kline would help Jason Kessler attract

21  the star power of Richard Spencer and others so that he could

22  attract as many soldiers as possible for his battle.  So Kline

23  and Kessler agreed to plan the Battle of Charlottesville

24  together.  And as you've heard and seen in the phone records,

25  from May 2017 through August 11th and 12th, those two spoke all

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  the time.

2          So you well know at this point, ladies and gentlemen,

3  that the inspiration for the Battle of Charlottesville was the

4  Battle of Berkeley, which happened in April of 2017.  Nathan

5  Damigo, the leader of Identity Evropa, became a celebrity for

6  punching a counter-protester that they called Moldylocks, and

7  the white supremacist movement saw an opportunity out of this

8  to get out of the shadows and to dominate the streets.  And

9  that is exactly what Kessler had in mind.  You can tell that

10  from this Facebook chat that he posts.  He says, "If you watch

11  the footage that made Battle of Berkeley great, almost all the

12  action is taking place in the streets."

13          So, for all his talk about a permit in the park, that

14  was never the point.  The point was to "fight this shit out in

15  the streets," provoke a confrontation and to bring an

16  overwhelming fighting force that could not and would not be

17  defeated.

18          Now, this post from Matthew Heimbach helps us

19  understand why this is.  Dr. Joseph Goebbels was Adolf Hitler's

20  chief propaganda minister, and he said, "Whoever can conquer

21  the street will one day conquer the state."  Heimbach puts that

22  is in his post and adds this part himself:  "If we are to win,

23  we must take public space.  We must push our enemies off the

24  streets."

25          And you heard Matthew Heimbach took this very

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   seriously.  He told you that, when his newborn son was born,

2   the first thought he had was of Adolf Hitler.  This is what he

3   and the other co-conspirators believed at the time.  This is

4   Jeff Schoep before his much later alleged deradicalization.

5             (Video playing.)

6             Now, Richard Spencer, of course, has a more lofty way

7   of saying exactly the same thing.  This is what he said after

8   the Battle of Berkeley.  He says, "Occupying space means

9   physically, by force."  What happened at Berkeley was, quote,

10  "a new normal, a world of politicized violence.  Politics is

11  fundamentally nonconsensual.  It's about the use of force."

12            Don't let the political theory fool you, ladies and

13  gentlemen.  This person rose to be the leader of the alt-right.

14  He told you he was the alt-right in 2017.  He speaks very well.

15  But he is saying the exact same thing as everybody else.  This

16  is about the use of force, this is about occupying space

17  physically, and that was the plan for the Battle of

18  Charlottesville, a common unlawful purpose at the heart of this

19  conspiracy.

20            Now, Spencer, who you've heard described in this

21  trial as a narcissist and a sociopath, did lead the alt-right

22  in 2017, and he believed deeply in a white ethnostate.  So this

23  quote from him at the bottom -- he says, "For us, it's conquer

24  or die."

25            It's hard to overestimate how deeply this was felt.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1          You saw Mr. Heimbach sit there in the witness stand,

2    and he described to us what the ethnostate would be like only

3    for white people.  And that's what they want North America to

4    become.  So many of us in this room would not be allowed in the

5    ethnostate.  We would be aliens without rights, including the

6    right to vote.  And this was the first principle of Defendant

7    Traditionalist Worker Party.

8          Now, the ethnostate was not going to come easily.  As

9    you've heard from numerous defendants in this case, it could

10   only be achieved through a race war.  And this is where the

11   racially motivated violence comes in.  This is why the battles

12   are necessary.  Why else would anybody risk the consequences of

13   so much violence?  And the answer is, as you've heard in this

14   trial, to achieve the goals of the white supremacist movement.

15         The defendants in this case in 2017 repeatedly said

16   they felt they were facing an existential crisis of white

17   genocide.  To conquer the state, they would have to conquer the

18   streets with physical force.  And here is what Mr. Schoep said.

19   He said, "This was the mentality and mindset of those on the

20   far right.  So having that deep held belief of future civil

21   war, a future race war, these things are paramount to the

22   belief system of the far right.  And so they would talk about

23   hardening your resolve and preparing for violence and things

24   like that."

25         So as foreign as this may sound to some of us, this

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  was the deeply held belief, the goal, and the purpose of what

2  was going on at that time.

3          Now, as we heard the evidence in this case, an

4  extremely important theme emerged about what it would take to

5  dominate the streets.  Over and over and over, we heard the

6  defendants in this case say that they had the belief that, if

7  counter-protesters were in your way, you were entitled to plow

8  them over.  And this is a post and testimony from Dillon

9  Hopper, the leader of Vanguard America, where he says, "Don't

10  block fucking traffic."  He was asked, "In your view, if

11  protesters are blocking traffic, then it's their fault that

12  they get hit?"  And his answer was, "Absolutely."

13          Michael Hill and others say basically the same thing.

14  Time and again we saw that this was true.  When

15  counter-protesters were in their way, the defendants beat them

16  with lit torches.  They plowed through them using their bodies

17  on Market Street.  They charged through people with shields.

18  And finally, they plowed through people with a car.

19          It's all a version of the same thing, ladies and

20  gentlemen.  Defendants in this case have been working so hard

21  to distance themselves from James Fields without ever once

22  telling you that the common purpose of this conspiracy that

23  they all shared was that, if counter-protesters were in your

24  way, including standing peacefully with their arms linked, at

25  the base of a statue, on Market Street, on Fourth Street, these

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    defendants believed that they were entitled to run them down.

2    And that is, in fact, what you saw happen.

3         Now, that brings me to another part of the judge's

4    instructions.  To have a conspiracy, you need to have what's

5    called an overt act.  So an overt act means that -- it's some

6    type of outward objective action performed by one of the

7    members of the conspiracy that evidences an agreement.

8         So it's very important to understand the first

9    sentence here, which is, at least one of the defendants in the

10   conspiracy had to take an overt act.  That is not one act per

11   defendant.  That is one act for the whole conspiracy.  So an

12   overt act is something that might be entirely innocent when

13   considered alone, but which is knowingly done in furtherance of

14   some object or purpose of the conspiracy.  And all we need to

15   prove is just one single overt act by just one of the alleged

16   conspirators.  And so we have proved that, ladies and

17   gentlemen.  We have proved it in exponents.  The overt acts are

18   just what we talked about in opening, when we said we were

19   going to tell you and show you about the planning, execution,

20   celebration, and ratification of racially motivated violence.

21        So let's talk a little bit first about the planning.

22        So when Jason Kessler reached out to Richard Spencer

23   to invite him to the Battle of Charlottesville he said in this

24   text message, "We are raising an army, my liege.  For free

25   speech, but the cracking of skulls if it comes to it."  And

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  Richard Spencer showed you on text message that he agreed to

2  this relatively quickly.

3          Now, on this topic of raising an army for the battle,

4  Samantha Froelich, who used to live with Eli Kline when he

5  planned this event, she told you that Eli Kline had also said

6  that he would build an army for Richard Spencer.

7          So Mr. Spencer spent so much time trying to convince

8  you he has just nothing to do with this, but is it any surprise

9  that somebody who viewed themselves as a celebrity would

10  deputize other people like Eli Kline to do the dirty work?  And

11  is it any surprise that Jason Kessler and Eli Kline, who --

12  where Kessler is referring to Spencer as "my liege," would be

13  trying to please him?  Those things, based on what we now know,

14  are utterly unsurprising, ladies and gentlemen.

15          One of the first things that Mr. Kessler did was

16  reach out to Mr. Heimbach.  And you can see this text message.

17  It's from May 22nd, the day after Jason Kessler's original post

18  about "fighting this shit out in the streets."  And

19  Mr. Heimbach testified that Jason Kessler told him to invite

20  the Hammerskins and the Blood & Honour Social Club, who we

21  learned are skinhead groups.  And one of the many, many,

22  unbelievable things that was said in this trial by the

23  defendants is that more skinheads would lead to less violence.

24  So, ladies and gentlemen, just remember that the person who

25  told you that is the same person who told you that he runs a

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  group where the uniform is to wear all black because then you

2  can't see the blood.

3          So in addition to bringing the skinheads to the

4  Battle of Charlottesville, Heimbach invites the Nationalist

5  Front members.  That's League of the South, National Socialist

6  Movement, and Vanguard America.  And he testifies that he had

7  communications with all of the leadership, with Michael Hill,

8  with Jeff Schoep, and with the Vanguard America leadership.

9          Now, the Nationalist Front was an alliance -- they

10 already had an agreement, actually, in this case -- of groups

11 that had a common enemy.  So this is from their website.  They

12 say that they're an alliance.  The purpose is to pool talent,

13 resources, and manpower.  And the goal was also a shared goal.

14 They're going to "leverage the power of solidarity and scale to

15 raise their voices and their fists against the organized left

16 and the globalist Jewish oligarchs."

17         Jeff Schoep was asked about this, and he acknowledged

18 it's an agreement to work together.  It's an agreement to work

19 with the Traditionalist Worker Party.  It's an agreement with

20 League of the South and it's an agreement with Vanguard

21 America.  And so we saw posts like this one on Discord in the

22 planning of Charlottesville 2.0, where Matthew Heimbach and

23 Dillon Hopper, the leader of Vanguard America, are talking to

24 each other and Heimbach says, "We've got 90 percent of all the

25 real orgs in America together."  He says, "Leadership is you,

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

 1   me, Jeff" -- that's Jeff Schoep -- "and Dr. Hill.  Now all we

 2   need is Spencer and Damigo," Richard Spencer and Nathan Damigo,

 3   head of IE.  And Matthew Heimbach says, "This is where

 4   Charlottesville comes in.  We're all doing it together."

 5           So after that, over the course of June and July,

 6   co-conspirators recruited co-conspirators.  League of the

 7   South, Michael Hill, puts out a call to his people.  "If you

 8   want to defend the South and Western civilization from the Jew

 9   and his dark-skinned allies, be at Charlottesville on 12

10   August."

11           All of these leaders brought their troops to the

12   battle.  As Jason Kessler put it when he addressed literally

13   everybody on Discord, "We are having East Coast Berkeley and

14   you need to assemble every motherfucker you can."

15           This is the call that Traditionalist Worker Party put

16   out.  They quote Adolf Hitler and they say, "Those who want to

17   fight, who want to struggle, will be victorious.  So be there

18   August 12th in Charlottesville, and let us tell the world with

19   a mighty and triumphant voice, we will not be replaced."

20           Jeff Schoep, he put out a call for men battle-tested

21   in the streets.  This is his email to Jason Kessler where he

22   tells Jason Kessler that his men are battle-tested in the

23   streets, and Jason Kessler will be pleasantly surprised at what

24   they can bring.

25           Now, during this period of time Jason Kessler also

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  reached out to Chris Cantwell.  That happened on June 13th.

2  And Mr. Cantwell, who I feel we all know pretty well by the end

3  of this trial, would have you all believe that he was invited

4  because he was just so incredibly entertaining.  And he worked

5  very hard during this trial to demonstrate that.  But all we

6  need to do, ladies and gentlemen, is look at Mr. Cantwell's own

7  statements that are in evidence to see what's really going on.

8        Mr. Cantwell had an audience that he said was 10,000

9  to 20,000 people, and that some of those people, he knew, were

10 armed extremists.  And he also said that he knew, if he called

11 them to engage in violence, that a number of them would.

12       So let us not be deceived.  He was there not just to

13 be a compelling speaker, but he was there because he had an

14 enormous following of armed extremists.  He could promote,

15 facilitate, and execute violence.

16       This text between Eli Kline and Richard Spencer from

17 the day after Chris Cantwell gets invited, June 14th, puts a

18 pretty fine point on it.  "This is going to be a violent

19 summer."  And Mr. Spencer and Chris Cantwell have this

20 exchange, which you've heard about quite a lot, where

21 Mr. Cantwell says, "I'm willing to risk a lot for our cause,

22 including violence and incarceration.  Many in my audience

23 would follow me there, too, but I want to coordinate and make

24 sure it's worth it to our cause."

25       Ladies and gentlemen, this has every element in this

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    one message:  Racially motivated violence and coordination.

2              And Mr. Spencer responds, "It's worth it, at least

3    for me."

4              Now, we also talked a lot about tools of the

5    conspiracy.  And this is what I talked with you about in

6    opening, that there were weapons used in the conspiracy that

7    seemed like they're self-defense or innocuous things.  But, in

8    the words of Michael Hill at this trial, anything can be used

9    offensively.  And we saw in the evidence that each one of these

10   things were.  So I'm going to go through some of this.  You saw

11   some of it in opening as well.

12             But before I do that, I want to just touch base again

13   on the reasonable foreseeability instruction.

14             So when plaintiffs need to show injury in this case,

15   we don't need to identify a particular person who caused the

16   injuries in this case.  We can show that a member of the

17   conspiracy did or caused to be done acts which injured the

18   plaintiffs.  And so, what this means is that you don't have to

19   be James Fields to be liable for injuries that occurred in the

20   car attack.  And this goes on to explain why that was.

21             A defendant need not have foreseen the precise nature

22   of the injury in order to be held liable for it.  The defendant

23   can be liable so long as the injury was of the same general

24   nature as foreseeable risk created by his conduct.

25             Now, car attacks were reasonably foreseeable.  We

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  will talk about that, too.  Almost every defendant talked about

2  it ahead of time.  But it is enough to know that they went

3  about causing violence on this scale.  That was reasonably

4  foreseeable to them.

5          All right.  But let's start with the shields.

6          As you heard, on August 12th the Nationalist Front

7  was charged with taking the ground early.  This is a

8  conversation between Thomas Ryan Rousseau of Vanguard America

9  and Matthew Heimbach.  Now, we saw this conversation with

10  Mr. Heimbach and a guy named Furor_Tuetonicus where

11  Furor_Tuetonicus is saying to Matthew Heimbach, "I think I have

12  a great use for those riot shields in our hands.  I'll tell you

13  over call.  Best to leave sensitive planning to voice whenever

14  possible."  So this conversation is so sensitive it cannot even

15  be had on direct message on Discord, an already private secret

16  platform.  And Mr. Heimbach conveniently forgot who -- or

17  couldn't recall who this person was he was talking to in this

18  very sensitive conversation.  And he also couldn't recall any

19  details of the conversation.  But from the Discord messages, we

20  can tell exactly what happened next.

21          This is a message that happens two days later, where

22  Vanguard America's security representative is reaching out to

23  Mr. Heimbach, and he says, "As you're probably aware, we have

24  to remove commie from Lee Park.  It's going to be up to

25  Vanguard, TWP, League of the South, the Stormers and the TRS

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   guys and other unaffiliated allies."  So they're trying to get

2   an estimate of how many shields would be necessary to remove

3   commies from the park.

4           Remember, when they say "commies," that means

5   basically anybody who is opposed to them, including Jews,

6   minorities, the supporters of Jews and minorities; that is

7   encompassed in this concept of "commies."  So that's also quite

8   a lot of groups to remove commies from the park.  This is

9   talking about a physical removal.

10          This makes it even more clear, which is that these

11  text messages continue, and this person says, with

12  Mr. Heimbach, that "the only people who can be relied upon to

13  take the park early are the hard right."  And you'll recall

14  that Matthew Heimbach actually tried to tell you guys that this

15  just meant "get there early."  And the hard right were the only

16  people who could be relied upon just to get there early, like

17  somehow they wake up at 5 in the morning.

18          So that's not credible, ladies and gentlemen.  You

19  are the judges of the credibility of the witnesses in this

20  case.  And so the Nationalist Front was charged with taking the

21  ground early, removing commies from the park, and they planned

22  to use shields for that.

23          They also planned to use mace, which they called gas,

24  which you've learned is also a reference to the Holocaust.  And

25  here is a post by Mr. Cantwell from August 5th, just before the

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  events in this case, where he's talking about having a handful

2  of kubotans and pepper sprays that he wants to throw on the

3  table to better arm our people.  We also learned in this case

4  what a kubotan is, which is a 5-inch-long metal rod that you

5  attach to a key chain, and that Mr. Cantwell had to acknowledge

6  could be used as a weapon.

7          So, actually, on the topic of gas, we heard this all

8  the time, this catchphrase, "gas the kikes, race war now."  And

9  here you see Mr. Hopper saying that he's going to give a

10  six-word speech, "gas the kikes, race war now."  That is a

11  communication he's making to Jason Kessler.  So Jason Kessler

12  is fully aware of that.

13         And on the bottom you see that "Azzmador," Robert

14  Ray, says he had "just got off an hours-long chat with some of

15  the event organizers and that the plan is the same:  Gas the

16  kikes."  This is not a catchphrase, ladies and gentlemen.  This

17  was an actual plan.

18         Eli Kline -- we've seen this before -- he says,

19  "We're going to see some blood on these white polos," meaning

20  the uniform that everyone wore.  And we did, in fact, see blood

21  on polos, including Eli Kline's.

22         The co-conspirators in this case also prepared for

23  the Battle of Charlottesville with flagpoles.  You saw Jason

24  Kessler communicate with Derrick Davis, who is the regional

25  director of the Traditionalist Worker Party.  This is the guy

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  who marched literally with his hand on Matthew Heimbach's

2  shoulder all of August 12th.  And they're talking about

3  flagpoles, and Derrick Davis says, "They can be weaponized."

4          We heard essentially the same thing from Samantha

5  Froelich, who told you about parties at Richard Spencer's house

6  in the summer of 2017.  She said, "With regard to flagpoles, it

7  would look like a defense weapon, but it would have a knife

8  tucked into it, and you could tape it in there, or cauterize it

9  if you need to, you know, have -- poke holes in your flagpole

10  so that you can hit faster or have a heavy one so that you can

11  hit harder, which is better."

12          Now, in addition to all those weapons, the

13  co-conspirators in this case also discussed running over

14  counter-protesters with cars.  And this was also discussed at

15  those parties at Richard Spencer's house during the summer of

16  2017.  We saw this post by Mr. Cantwell where he says, "Hey

17  communist, remember this like your life depends on it, because

18  it does:  Blocking traffic is not peaceful protest, and every

19  person who reminds you of that without using his car is giving

20  you more slack than you fucking deserve."

21          This is exactly what we're talking about, ladies and

22  gentlemen.  If you are a counter-protester and you're standing

23  there like this person in the picture, it's your fault.  We are

24  entitled to run you down.

25          Same thing for Matthew Heimbach.  "Leftist protests

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   blocking the road with weapons, threats, and violence while
2   making you fear for your life?  #HitTheGas."  He actually tried
3   to tell you all that this was a reference to getting dragged
4   out of your vehicle, even though on the post there is a picture
5   of a guy with his foot on the gas.  This testimony just is not
6   credible.  This is not about some incident in 1992. this is
7   about what was going on in the lead-up to the Battle of
8   Charlottesville.

9        We saw this on the Discord, too.  Open discussions
10  about whether running over protests blocking roadways was
11  legal.  It's not, by the way.  And so this is reasonable
12  foreseeability.

13       This is Tyrone, a co-conspirator who worked with
14  Jason Kessler -- he was, ironically, in charge of
15  transportation -- talking about running over protesters with
16  cars.  This is reasonable foreseeability.  And all of the
17  members of this conspiracy, if they agreed one time to be part
18  of it and did one act, are liable for this.

19       And I think it's important that we all see what
20  reasonable foreseeability is with a normal person as compared
21  to a member of this conspiracy.

22       So this is Marissa Blair on the top.  What she said
23  is, "Nobody expected or would expect for your friend to be
24  killed for standing up for what she believes in right in front
25  of you."  And that's when her friend Heather Heyer was run

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   over.  Nobody would have expected that.

2         Well, let's look at what Dillon Hopper has to say.

3   He "felt bad that somebody had to die.  It's always a tragedy.

4   But at the same time, you're at this rally where violence is

5   more than likely imminent.  And so you can't go there expecting

6   not to be potentially injured.  So the way I see it, it's kind

7   of like a surfer.  A surfer goes out into the ocean and surfs

8   waves.  He shouldn't be surprised if he gets attacked by a

9   shark, because he chose to do this.  That was that woman's

10  choice, was to go out there, and it was the surfer's choice to

11  go surfing in the ocean with sharks."

12         This is astonishing.  It is Heather Heyer's own

13  fault, according to defendants in this case, that she was on

14  Fourth Street, in a parade, basically, as a counter-protester,

15  and that somebody ran her over with a car.  This is a tactic of

16  this conspiracy.

17         Now, another tactic of the conspiracy was to

18  encourage violence by talking about Antifa.  And Robert Ray

19  probably put it best when he said, "All that shit's an excuse."

20  And it was.  Because we saw lots of messages, including this

21  one here by Michael Tubbs and this one here by Michael Chesny,

22  who went by Tyrone, that, really, they wanted opposition.  They

23  wanted somebody to show up so that they could provoke a

24  confrontation.  And Tyrone lays it out pretty clearly where he

25  says, "What if we want them to show up for ... self-defense

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    purposes?"

2           And you saw this in Jason Kessler's own secret

3    Facebook chats:  "What's the situation with Antifa?  Are they

4    coming?  I don't know yet.  I hope so.  I'm ready to throw

5    down.  It's really up to the Antifa to respond and not be

6    pussies."  And so he recommends taunting them a little on

7    social media.

8           This is not the only time where Jason Kessler said

9    that Antifa were weak and unwilling to escalate violence.  You

10   saw that he said that, and you've seen that other people said

11   it, too.

12          Here is a conversation between Michael Hill and Jeff

13   Schoep.  This is about a different event, because this was a

14   tactic.  "We want to let Antifa, Black Lives Matter, etc., know

15   about our event in hopes they will try to crash our party."

16          So this was a general tactic of the alt-right, and it

17   certainly applied to this case and when it came to planning the

18   Battle of Charlottesville.

19          This is another Facebook chat with Jason Kessler, who

20   went by Ambien Falcon.  He says, "I don't want to scare Antifa

21   off from throwing the first punch.  I want them to start

22   something."

23          And so Jason Kessler thought:  I can't have a battle

24   unless I have an enemy, even if it's a fake enemy that I think

25   is unwilling to escalate violence, and I'm going to bring an

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    armed fighting force to overwhelm anybody, including

2    counter-protesters just standing there, with a degree of force

3    that would be violent, injurious, and deadly.

4            Now, just to be clear, because I'm sure we'll hear a

5    lot about self-defense, this is what Michael Hill had to say.

6    This was in sworn documents that he submitted to the Court.  "I

7    am not personally aware of any acts of violence committed

8    against any of the defendants.  And so all that shit, it was an

9    excuse."  That was accurate.

10           Sometimes there is a little more candor from people

11   who refuse to participate in this case, because they haven't

12   been able to come to trial and tell you that these things they

13   said weren't true when they were.

14           So let's talk about August 11th and some more of the

15   overt acts.

16           Now, you all saw -- you're very familiar with the

17   route that this torch march took on March [sic] 11th, so I

18   won't go through that.  But we heard testimony from both Jason

19   Kessler and Richard Spencer that they both understood that this

20   torch march would evoke the Ku Klux Klan and racial

21   intimidation.  And it doesn't take a political scientist really

22   to understand that.

23           One clue that the leadership of this conspiracy knew

24   that what they were doing was unlawful, threatening, violent,

25   and wrong was that they didn't tell anyone in the police or at

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   the university until the very last minute that they planned to

2   march all around the campus, past historic wooden buildings,

3   down the lawn where students and faculty lived, with 500 lit

4   torches and racist chants.  They failed to mention that.  Of

5   course, they did tell everybody on Discord to make sure that

6   they could plan to bring their torches and send them to

7   Virginia in advance.

8           Now, at the torch march itself, Defendants Kline,

9   Spencer, Cantwell and Ray were all there, and so were other

10  members of Vanguard America, League of the South,

11  Traditionalist Worker Party, and Identity Evropa.  And they all

12  surrounded the students at the Jefferson statue on August 11th.

13          Now, Mr. Spencer responded to this tweet on August

14  11th.  The tweet says, "They surrounded us at the statue.  They

15  wouldn't let us out."  And Mr. Spencer's response:  "Fact

16  check, true."  And this is something that Mr. Spencer couldn't

17  walk away from here because he tweeted it in real time on the

18  night of August 11th.

19          So this is what we saw.  We saw Robert Ray Azzmador

20  macing people with his hand out.  And he said the next day, as

21  you heard, "I personally gassed a half dozen kikes."

22          And we saw Chris Cantwell.  And what he said when he

23  was asked whether he agreed that he had, in fact, pled guilty

24  to two counts of assault and battery for what he did this

25  night, he said he did.  So I'm sure that Mr. Cantwell is going

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    to show you the video again later today that he's played a lot

2    before.  But no matter how many times he plays it and no matter

3    how much he slows it down, we have still never seen him do

4    anything that meets the definition of self-defense.

5           You are going to have the jury instructions, ladies

6    and gentlemen, in the deliberation room with you, and we

7    encourage you to look at them and to read this instruction and

8    the other instructions.

9           Now, Jason Kessler, what does he say about the torch

10   march?  So he says that when he got to the top of the Rotunda

11   and looked down, he was very concerned.  And he said he did

12   everything in his power to stop it, but everything in his power

13   did not include calling the police, who he was supposedly in

14   contact with.  It didn't include diverting the march.  It

15   didn't include calling Eli Kline, who he says had a megaphone,

16   even though he called Eli Kline six other times that same

17   night.  Everything in his power was he said "I put up my hands

18   and I said stop."  And actually, then he said "I put up just

19   one hand" because he had a torch in the other one.  So that is

20   not believable in the first instance.

21          But then he says he didn't even see the violence when

22   I showed him this picture.  So after saying how concerned he

23   was, he did everything in his power, he somehow missed all of

24   the violence.

25          Now, whatever the defendants say now, the evidence in

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   this case is crystal clear that this plan went as intended.

2                   (Video playing.)

3            That's Mr. Spencer declaring victory after he climbed

4   up on the statue.  And this is a text between Eli Kline and

5   Jason Kessler after the events.  Eli Kline says, "Great work,

6   rest easy."  And Jason Kessler does not say, I was very

7   concerned and there was so much violence and this didn't go

8   well.  He says, "Thanks.  You've done excellent work too.

9   Let's knock this out of the park tomorrow."  Then he tweets it

10  out, "Incredible moment for white people."  And so do others,

11  including James Fields, when he says, "Our people on the

12  march."

13           So that brings us to August 12th.  And you've seen

14  this picture quite a lot.  This is a picture of the column of

15  the Nationalist Front members as they approached, walking west

16  on Market Street.  And you've seen this video as well.

17                  (Video playing.)

18           Matthew Heimbach gives the "shields up" order, and

19  Michael Hill, Michael Tubbs lead the charge into the crowd that

20  is standing there.  Now, I asked Mr. Heimbach whether it was

21  true that we saw in that video somebody, on his order of

22  shields up, stabbing somebody else with a flagpole, and he said

23  he couldn't affirmatively say they did anything other than move

24  a flagpole vigorously.  And then when I pointed out that it was

25  rolled up and ready to use, he said well, this was an effort to

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    prevent somebody from capturing our banner as a sick trophy.

2           So that wasn't true.  But this was.  This is what

3    they tweeted in real time.  This is a tweet by Derrick Davis,

4    Commander Davis, who stood with Matthew Heimbach that day.  And

5    this is what he tweeted out on August 13.  He says, "This was

6    in memory of plowing through a human wall of communists."

7           Each one of these things, ladies and gentlemen --

8    we'll show some more -- is an overt act of this conspiracy,

9    just as each act of planning was an overt act in this

10   conspiracy.

11          Michael Hill acknowledges, there I was in the middle

12   of it all leading the column that smashed through the leftist

13   barricade.

14          That's exactly what we're talking about, leading a

15   column that smashed through the leftist barricade.  You are

16   entitled to smash through people if they are standing there.

17          (Video playing.)

18          So that's Michael Tubbs you heard shout "follow me"

19   and lead a charge.  And that is a person that, he testified

20   here, and you heard how Michael Hill, his boss, praised him for

21   being quite the warrior that day.  And Michael Tubbs told you

22   that he wouldn't change a thing.  This was one of the proudest

23   days of his life.

24          This is another attack with a flagpole by Vasilios

25   Pistolis, who is a co-conspirator.  He had spoken also with

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    Mr. Kessler, as you saw.  And when he was asked if the reason

2    he brought the flagpole was to use it as a weapon, he pled the

3    Fifth.  But in real time he called it the best fight of his

4    life, and he said he cracked three skulls open with virtually

5    no damage to himself.

6           These are pictures of Eli Kline, head of -- who was

7    part of Identity Evropa, leading Ben Daley and other guys from

8    the Rise Above Movement.  And you heard Mr. Daley testify.  He

9    also repeatedly invoked his Fifth Amendment rights against

10   self-incrimination, including as to acts he took with

11   Mr. Kline.

12          (Video playing.)

13          That is a video of Jeff Schoep.  And who can really

14   forget when Mr. Schoep refused to identify himself in this

15   video when we could all tell that it was him.  And he was asked

16   to stand up so that the jury could see the back of his head and

17   his profile.

18          (Video playing.)

19          So BTFO means blow the fuck out.  They're talking

20   about Cornel West, a black civil rights activist.  When I asked

21   Mr. Kessler if he knew what "he was for the rope" meant, he

22   said yeah, of course.

23          Now, you also saw a truly heartbreaking attack in the

24   Market Street garage where a special education aide named

25   DeAndre Harris was viciously beaten by members of the

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  Traditionalist Worker Party, Vanguard America, and League of

2  the South.  These pictures show all of the logos of those

3  groups.  And you can see that Michael Tubbs is in the middle

4  there.

5       So this, too, is an overt act supporting the

6  conspiracy.  And the defense here never showed any need for

7  self-defense against Mr. Harris, and beating a man who is on

8  the ground with fists and sticks cannot be self-defense based

9  on the instruction that the judge has given you.

10      Now, as you all know, at 1:41 p.m. that day, James

11  Fields intentionally, and motivated by the same shared beliefs

12  as his co-conspirators, rapidly accelerated his Dodge

13  Challenger into a crowd, injuring seven people, who are in the

14  jury box with us today, and killing Heather Heyer.  We're going

15  to talk a little bit about James Fields.

16      So just like his co-defendants, James Fields thought

17  that Heather Heyer was an enemy, a communist, even though she

18  was neither of those things.  He shared common beliefs with the

19  other co-conspirators in this case.  This is a text that James

20  Fields sent to his mother.  And what he's texting his mother is

21  a dehumanizing meme about Charlottesville's vice mayor, Wes

22  Bellamy, that Richard Spencer had tweeted, depicting himself.

23      James Fields also promoted Charlottesville 2.0.  He

24  tweeted out this same poster that you heard Jason Kessler had

25  approved and tweeted out himself.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1      You also heard that James Fields really wanted to be

2  there for the event.  He really wanted to be at the Battle of

3  Charlottesville.  And he considered himself part of the "we"

4  and the "us" of the army of violent white supremacists, and he

5  was looking at this as an opportunity.  These are again texts

6  he sent to his mother.  She says, "Be careful."  He says,

7  "We're not the ones who need to be careful."

8      The next day, August 12th, he says, "Our guys had a

9  couple hundred while Antifa put out only 20."  He's talking

10  about the torch march.  "We're expecting around a thousand for

11  today's event."  So James Fields knew information about this

12  event and he is texting his mother because he feels he is a

13  part of this.

14      Now, the next day, after James Fields drives through

15  the night, he arrives here in Charlottesville and he marches

16  and chants shoulder to shoulder with Vanguard America and other

17  defendants in the Vanguard America uniform and the shield.  And

18  those are pictures that you see of Eli Kline and Thomas Ryan

19  Rousseau, the head of Vanguard America.  So if James Fields had

20  joined a foreign army or the Nazi army in World War II, put on

21  their uniform, marched with them, carried their shield, there

22  would be no question that he had joined the army.  And when the

23  army is a conspiracy, you get the same answer, ladies and

24  gentlemen.  Fields joined the march with Vanguard America and

25  he joined the conspiracy.

43

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1       And actually, the head of Vanguard America, Dillon

2   Hopper, was deposed in this case.  And he gave testimony and he

3   said that Thomas Ryan Rousseau, who had taken over for him as

4   the head of Vanguard America, and was the head of Vanguard

5   America on August 12th, actually invited Mr. Fields into the

6   Vanguard group.  So Mr. Fields is there at Mr. Rousseau's

7   invitation.

8       This is a post by James Fields in May of 2017.  And

9   this is months before he actually runs his car into a group of

10  protesters, and it is eerily similar to the actual photo of

11  what happened.  Like the other defendants, he is posting about

12  hitting counter-protesters with cars.  This is more reasonable

13  foreseeability.

14      But ladies and gentlemen, I want to draw your

15  attention to a hashtag on the bottom.  Mr. Fields posts this

16  post with the hashtag "shut it down."  On August 12th, less

17  than one hour before he commits the car attack, Fields was with

18  his co-defendants in McIntire Park.  And what does he do?  He

19  sends this communication, with a picture that appears to be

20  McIntire Park, to three other people who were in the park with

21  him:  David Duke, Brad Griffin of League of the South who goes

22  by Occidental Dissent, and Richard Spencer.  And he uses that

23  same phrase that he posted with the car running into the

24  counter-protesters:  "Shut it down."

25      Now, we can also learn a lot from Vanguard America's

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    reaction to what happened.  Now, Vanguard America, Dillon

2    Hopper told you, made a point of not keeping any member

3    information, no list, no identities, expressly so that if

4    something happened, they could have deniability for themselves

5    and for their members.  So purposely not keeping any membership

6    information so that your people can't be identified if

7    something happens is a good indicator that your conduct is not

8    above board.  Again, reasonable foreseeability.

9         And these are texts -- I'm sorry, these are Discord

10   posts that Dillon Hopper is part of with people in Vanguard

11   America.  And one of them says, "If he's not Vanguard America,

12   how does that explain him being surrounded by Vanguard America

13   and him being dressed like us?"  Good question.  And then that

14   same person says, "Because for all it's worth, we fucking

15   killed someone."

16        And so then Vanguard America makes a plan in Discord

17   to cover it up.  They create a story.  "All right.  So the

18   official story is he was a plant."  And Dillon Hopper says,

19   "Yes.  That's our story."

20        Now, as I said before, ladies and gentlemen, the jury

21   instructions tell you to look at conduct before, during, and

22   after the events in question.  And so after the events of

23   August 11th and 12th, many of the defendants in this case

24   reached out to James Fields, who they considered to be one of

25   their group.  Chris Cantwell saw him in prison, gave him a hug

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   and a Nazi salute, which reinforces that their beliefs were

2   shared.

3        Jason Kessler called James Fields many times, told

4   him he believed he was innocent, gave him money, and told

5   Fields to reach out to him anytime.  Vanguard America sent

6   James Fields a Christmas card.  And Matthew Heimbach sent

7   Mr. Fields a letter that he read for us on the stand which

8   leaves no question that James Fields was part of this

9   conspiracy.

10        And this evidence that we've showed you, ladies and

11   gentlemen, any part of it is evidence that James Fields was

12   part of this conspiracy.  But this letter is particularly

13   powerful.  Mr. Heimbach says, "I know why you went to

14   Charlottesville."  And I asked him, is that because you shared

15   his beliefs?  And Matthew Heimbach said yes.

16        Mr. Heimbach says, "You are a prisoner of war in this

17   fight.  We have marched into battle together.  You will be

18   given a hero's welcome when you come home."  He even put in his

19   letter a song, a poem to Fields about men who have been taken

20   captive by their enemies.

21        He said, "I once had a comrade.  You will find no

22   better.  The drum called to battle.  He walked at my side.  You

23   stay true, my good comrade."  This is a common unlawful

24   purpose, an agreement and ratification and an overt act.

25        It's also very telling, ladies and gentlemen, how the

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   rest of the co-conspirators acted when they learned that this

2   time plowing into counter-protesters, something that had gone

3   on all weekend, had killed somebody.  So within a half hour of

4   the car attack, Jason Kessler calls a leadership meeting.  He

5   includes Eli Mosley -- Kline -- Mr. Spencer, Michael Hill and

6   Chris Cantwell, who's the 631 number.  He sends them a text:

7   "This meeting is for leaders and essential people only."  And

8   those people were leaders and essential people he wanted at

9   this meeting.

10          The second thing he did within an hour was to reach

11  out to his close colleague and co-conspirator, Eli Kline.  He

12  says, "We need to delete the Discord."  And you saw that when

13  Mr. Kline didn't answer him right away, he kept texting

14  Mr. Kline.  "We need to delete the Discord."  And Mr. Kessler

15  actually tried to tell all of you that he wanted the Discord

16  deleted because there were offensive jokes in there.  I don't

17  know where Mr. Kessler thinks we have all been for the past

18  three weeks, that somehow offensive jokes are the reason to

19  delete the Discord.  No, that's not true.  The reason he wanted

20  to delete the Discord is because of culpability, because of

21  liability.

22          And Nathan Damigo wanted to do the same thing.

23  Nathan Damigo, head of Identity Evropa, that set up the

24  Discord, is asked, "Should I shut down the Intel server?

25  Should I issue an announcement reminding our members to not

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   talk to the police?"  And Mr. Damigo says yes on both accounts.

2            Now, thankfully, Discord, the company, enabled us to

3   recover the evidence that we have in this case.  But if it had

4   been up to the defendants, up to the members of this

5   conspiracy, we wouldn't have had any of that at all.

6            Another thing that happened right away is Mr. Spencer

7   made a strategic decision.  And we saw the text from August

8   13th that Mr. Spencer sent to his deputies, Greg Conte and Evan

9   McLaren, that proposes a strategy to separate from Mr. Kessler.

10  So when we hear Mr. Spencer say, I wasn't part of this

11  conspiracy, that's something he's saying now in the middle of a

12  trial.  But on August 13th, when he knew he had to separate

13  from Jason Kessler, he knew that he was a part of it.

14           And we asked him, what were the talking points you

15  came up with?  Were they:  Police broke up peaceful rally,

16  forced us into dangerous space with Antifa?  And those were the

17  talking points that they came up with right after the events of

18  August 11th and 12th.  These are the same talking points that

19  we heard at this trial and then the same talking points that

20  we're likely to hear when the defense gets up in closing.

21           So we've talked about planning.  We've talked about

22  execution of violence.  Let's talk quickly about celebration

23  and ratification.

24           Now, all of the defendants in this case ratified the

25  violence, celebrated the violence.  That's a finding that the

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   judge already made with regard to Eli Kline and Robert Azzmador

2   Ray.  And it's true of everybody.

3          This is a post by Michael Hill:  "Our warriors

4   acquitted themselves as men."  So in his testimony, he was

5   asked, well, no speeches, no rally, just a lot of violence, and

6   yet you called it a huge success.  Because for their cause, it

7   was.  This is exactly what the plan was, to have a battle with

8   foot soldiers willing to carry out the violence.

9          Mr. Hill, Dr. Hill, wrote a pretty pointed email

10  after the fact.  He said, "We wanted a public confrontation in

11  Charlottesville for the world to see, and we got it."

12         I will say sometimes Dr. Hill's honesty was a

13  refreshing change for all of us.  He did not at all walk away

14  from his beliefs.  He did not at all try to walk away from his

15  deep belief in white supremacy.  And here he does not walk away

16  from the idea that they wanted a public confrontation and

17  that's what they got.

18         Matthew Parrott, who was Matthew Heimbach's best

19  friend, the behind-the-scenes guy, he described himself as the

20  underboss, he put out this post after Charlottesville.  He

21  said:  "Charlottesville was a tremendous victory.  The

22  alt-right is not a pathetic and faceless internet fad, but a

23  fearsome street-fighting force."  This was the vision from the

24  beginning:  A fearsome street-fighting force.

25         Richard Spencer, he told the *New York Times* on

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  August 13th, right after this happened:  "This was a huge moral

2  victory in terms of a show of force."

3          Remember, Richard Spencer wanted to dominate the

4  streets.  He said that this was about the show of force.  So he

5  is saying loud and clear on August 13th, this was a huge moral

6  victory in terms of the show of force.

7          This is Jeff Schoep.  He names all the other groups

8  that he was with -- NSM, the Nationalist Front, Traditionalist

9  Worker Party, League of the South, Vanguard America and others.

10          And this is Michael Tubbs.  He tweeted six times,

11  "James Fields did nothing wrong."  And he told you that when he

12  came here.

13          Now, the first thing that Mr. Fields's own lawyer

14  said when he came to this case and he did his opening is that

15  Mr. Fields had said he did something wrong, that Mr. Fields

16  intentionally ran his car into a crowd of people.  And yet, one

17  by one by one by one, all of the defendants came to tell you

18  that James Fields did nothing wrong.  And that includes the

19  leaders of Vanguard America with whom James Fields marched.

20          These are things that Dillon Hopper said before he

21  realized that James Fields was -- this is Dillon Hopper's

22  words -- before he "realized James Fields was connected to our

23  group."  And here's something that Thomas Ryan Rousseau, who

24  had invited James Fields to march with them, said:  "Fields

25  didn't do nothing, to be honest."

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1          Chris Cantwell:  "If you think the alt-right is
2    insignificant, you might want to ask the bleeding commie filth
3    we sent to the morgue and hospitals how insignificant we are."
4          And Jason Kessler:  "Heather Heyer was a fat,
5    disgusting communist.  Communists have killed 94 million.
6    Looks like it was payback time."  That's what he said.  He
7    didn't say it on August 12th.  He said it on August 18th, after
8    he had time to think about it for a little while.
9          Now, we have seen, for all of the defendants in this
10   case at this point, overwhelming evidence that they were part
11   of a conspiracy to cause racially motivated violence.  But as I
12   said at the beginning, they did not all play the same role.
13   And that's okay under the instructions that Judge Moon read to
14   you and that we've already talked about.  Some people played
15   major roles.  Some people played minor roles.
16         So at the beginning of this trial we had fewer
17   co-conspirators, but now you know about a lot more people.  You
18   know about the leaders of the conspiracy who are on the top.
19   You know that they brought in over time other group leaders and
20   promoters, people who could bring large audiences, people like
21   Chris Cantwell who knew that he had armed extremists who would
22   follow him here, people like Robert Ray and Michael Hill and
23   Jeff Schoep.
24         Then you learn about the foot soldiers in the battle,
25   because you can't have a battle without any soldiers.  You

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  can't have a battle without people who will commit acts of

2  violence at the battle.  And that's what Jason Kessler talked

3  about on the stand.  There are things that he couldn't do as

4  the organizer that other people did.  And that includes Michael

5  Tubbs and James Fields and Matthew Parrott, Brad Griffin, Ben

6  Daley, who you saw his video, Ike Baker, who we have not even

7  talked about.

8       This person did security for both League of the South

9  and the Traditionalist Worker Party.  He's the guy who actually

10  took aerial reconnaissance photos and drones to survey the

11  scene in Charlottesville before the battle.

12       You heard about Michael Chesny, who was named Tyrone

13  in the Discord; he was in charge of transportation but couldn't

14  seem to help himself from constantly writing about running over

15  people with cars.  You heard about Vasilios Pistolis; like

16  Daley, he's pled the Fifth.  Derrick Davis, who you saw

17  extensively communicated with Jason Kessler and talked about,

18  you know, infiltrating Antifa and weaponizing flagpoles.  And

19  Greg Conte, who was one of the people Richard Spencer

20  deputized, along with Eli Kline, to make decisions for him.

21       So this is the conspiracy, ladies and gentlemen.  At

22  the beginning of this case, I showed you this map.  There's

23  some more people on it.  We'll talk about it again in a few

24  minutes.  But these are the people in this conspiracy.  As I

25  told you at the beginning, plaintiffs didn't sue all the people

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   who came here to march and to speak and to have a rally.  We
2   did not do that.  We sued the people who are responsible, the
3   leaders, the promoters, the group leaders, the people who
4   brought the army, the people who were the most violent members
5   of the army.  Those are the people who we ask you to hold
6   accountable today.

7         And so we have listed out for each of these
8   defendants all of -- well, not all, actually, a representative
9   list of their connections to this conspiracy.  And I don't want
10  to go through all of them because we have talked about some
11  number of them at great length already this morning, and you
12  have so much more to come today.  But I will talk about a
13  couple of them.

14        So Jason Kessler I feel like we have talked about a
15  lot and he just testified.

16        Mr. Spencer.  So Mr. Spencer was the leader of the
17  alt-right movement.  He communicated with Kessler, Kline, and
18  Damigo.  They had weekly calls.  There is testimony he shared
19  Kline's objectives.  He worked through his intermediaries who
20  were on Discord who were making decisions.  He knew -- when
21  Jason Kessler said "we're building an army," he knew that
22  Kessler was talking about committing violence.  He talked to
23  Mr. Cantwell and said violence for the cause was worth it.  He
24  admitted under oath he was at the lead of the August 11 torch
25  march.  You saw his victory speech.  He declared it "only the

53

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   prequel."  And he admitted that Charlottesville was about

2   occupying space and dominating the streets.

3           Now, one thing I want to talk about with regard to

4   Mr. Spencer is, you know, he did try to walk away from his

5   communications with the other defendants.  And I think that at

6   this point there can be no question about that.  You know, we

7   counted it up.  He said he had 26 instances of communication,

8   which really was like a whole lot of actual messages.  And then

9   he also said that he had a lot fewer phone calls.

10          But I think much more relevant is what did he tell

11  you about this.  This is what he said on the night of

12  August 12th.  And I'm not going to play it again because you've

13  heard it many times.  But what did Mr. Spencer tell you about

14  this when he said, "Little fucking kikes, they get ruled by

15  people like me, little fucking octoroons, I rule the fucking

16  world"?  What did he tell you?  He said he was frustrated with

17  the police and he was frustrated he didn't get to promote

18  himself enough.

19          That's not what this says.  This, ladies and

20  gentlemen, this is the real Richard Spencer.  It may have been

21  the 7-year-old Richard Spencer, as he told you, but it also was

22  the Richard Spencer of 2017.  And why do you think that he got

23  up and played this for you himself when it was his turn to put

24  on his case?  It can't be that he didn't think you'd heard it

25  enough.  He's playing it for you because, as Samantha Froelich

                    Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    told you very early in this case, desensitization is a tactic

2    of the conspiracy; that if you hear this enough, it won't be

3    shocking anymore.  And it won't be as terrible.  But it is just

4    as terrible.

5              And so, ladies and gentlemen, we are asking you, when

6    you go to deliberate, even though we have all been together for

7    so long, hearing this stuff over and over and over again, we

8    ask you not to be desensitized to the racially motivated

9    violence that happened in Charlottesville.

10             Nathan Damigo -- I'll go through some of these very

11   quickly -- he was the leader of IE during the planning period.

12   He also shared beliefs with the other co-conspirators.  He was

13   on the weekly calls with Mr. Spencer, Mr. Kessler, and

14   Mr. Kline.  Of course, his violence was the inspiration for the

15   battle of Charlottesville.  He approved the battle gear for the

16   IE members to wear during the battle of Charlottesville.  He

17   celebrated and ratified the violence.  And when it was all

18   over, he gave the directive to shut down the intel server and

19   to not talk to the police.

20             Now, he also was not forthcoming about the weekly

21   calls.  He said they were just about college tours, but

22   Mr. Kline told you otherwise.  Those were weekly calls to plan

23   the Unite the Right.

24             This is the slide about Matthew Heimbach, who I also

25   will go through, because we talked about him so much this

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   morning.  But he said he wasn't even on speaking terms with

2   Mr. Kline or Mr. Kessler by the time of August 11th and 12th.

3   And of course the evidence showed otherwise.  We looked at his

4   phone records, and we have photos.  He said that he didn't even

5   speak to Mr. Kline in Emancipation Park on August 12th.  But

6   there they are together in Emancipation Park, and you saw that.

7          Matthew Parrott of the Traditionalist Worker Party,

8   you know, he was and is right here.  So he still is very

9   technologically capable.  So he was the behind-the-scenes guy.

10  He was the one who reminded people to try to keep the hardliner

11  stuff off public chat and told anybody who needs to convey

12  "shady shit" to message him on Telegram.  He marched with

13  Heimbach and TWP at Charlottesville 2.0.  And he encouraged

14  anybody who was involved in any altercation in Charlottesville

15  that they should disable their social media.

16          And he went further than that.  He scrubbed all the

17  Traditionalist Worker Party documents, except the five emails

18  that he thought would help him out --

19          MR. SMITH:  Objection, Your Honor, objection.  That

20  is absolutely not supported by the record.

21          THE COURT:  Okay.  Members of the jury, you will have

22  to recall what the evidence is -- in the case is and draw

23  inferences from the evidence.

24          MS. DUNN:  And Mr. Parrott and Mr. Heimbach made sure

25  that, even though they talked every single day, that we don't

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   have any of their text messages.  We don't have records of what

2   they talked about.  They made sure of that.  And the judge has

3   instructed you about what happens when people destroy evidence

4   and the inferences that you can draw from that.

5           Matthew Parrott also put out this tweet after the

6   events.  He said, "This didn't have anything to do with us

7   because we weren't even invited until the last minute."  Well,

8   that's not true, because you all saw the text where Jason

9   Kessler reaches out to Matthew Heimbach on May 22nd.  He's one

10  of the first contacts that Jason Kessler makes to invite

11  Matthew Heimbach, his best friend, and coleader Matthew Parrott

12  to come to Charlottesville 2.0 and to help him plan it.

13          Now, let's talk briefly about Mr. Cantwell.

14          Mr. Cantwell, there was -- first of all, about

15  Mr. Cantwell, the questions that Mr. Cantwell asked are not

16  evidence.  The evidence was Mr. Cantwell's testimony and the

17  documents that came in for Mr. Cantwell.  And those documents

18  showed that he admitted he advocated violence on the Radical

19  Agenda.  He hopes his listeners take his cause seriously enough

20  to kill and die for it.  His texts showed coordination with

21  Mr. Kessler and Mr. Spencer.  And he told Mr. Spencer he was

22  willing to risk violence and incarceration for his cause.

23          He brought weapons.  He fought and took violent

24  action at the August 11th torch march.  He admitted to "beating

25  the shit out of" a counter-protester on August 11th.  And on

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   August 12th, he said, "We're not nonviolent.  We'll fucking

2   kill all of these people if we had to."  And he, too, of course

3   ratified Mr. Fields's car attack.

4          All right.  We've also shown that Vanguard America,

5   the group that James Fields marched with, was a member of the

6   conspiracy.  They shared the beliefs.  They were a neo-fascist

7   and racist organization.  They instituted a uniform that James

8   Fields wore.  They participated in the planning of

9   Charlottesville 2.0 on Discord and other platforms.  They

10  planned to bring concealed weapons, shields, and firearms.

11  They marched on August 11th.  They attended on August 12th and

12  marched in uniform with the Nationalist Front.  And they

13  celebrated the violence that occurred at Charlottesville 2.0.

14  And we've already gone through all of the ways in which, in the

15  words of Dillon Hopper, "James Fields was connected" to their

16  group.

17         I will skip over, in the interest of time, Michael

18  Tubbs and Michael Hill, because there's already been extensive

19  evidence about them.  And similarly Mr. Schoep, who was also

20  part of the agreement and the Nationalist Front.

21         I will pause, though, to say the after action report

22  by the National Socialist Movement was very interesting,

23  because it recapped the events of August 11th and 12th and

24  confirms a conspiracy to commit violence.  It says, "There was

25  almost no opposition in the streets.  There were a few minor

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    incidents in which the leftists lost miserably."  He says that

2    "a large number of injuries were inflicted of the pathetic

3    reds" -- those are the commies -- and he shouted out to League

4    of the South, "who took point in the shield wall that pushed

5    through the line of red opposition, as well as the very tough

6    group of skins" -- those are the skinheads, Hammerskins that

7    Matthew Heimbach invited -- "that were right there fighting

8    their way through."

9            This, ladies and gentlemen, was exactly the point and

10   exactly what they wanted.  So this is -- this is the last thing

11   I'm going to say to you before we break, which is that:  I told

12   you in the opening that at the close of the evidence in this

13   case, you are going to be able to make all of these connections

14   yourself among all of these co-conspirators.  You are going to

15   tell who met in person, who had weekly calls, who communicated

16   on Discord, who communicated via other social media like Jason

17   Kessler's private Facebook chat, who communicated through

18   emails and letters, phone calls and texts, and of course you've

19   heard extensive evidence about how every one of these

20   co-conspirators celebrated and ratified each other's racially

21   motivated violence, including James Fields's car attack.

22           Now, ladies and gentlemen, thank you so much for your

23   patience and for listening to us.  We are beyond grateful.

24           In opening statement, Mr. Spencer said something that

25   really caught my attention.  He said that plaintiffs were going

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  to argue that you should find for them because we're on the

2  side of the angels.  I just want to make clear that that is not

3  what we are asking you.

4        We are asking you to find for the plaintiffs in this

5  case because of the law that Judge Moon has instructed and

6  because of the evidence that you have seen with your own eyes

7  over the past few weeks, because if you consider the law and

8  the evidence, there will be only one verdict that is supported

9  by that evidence, and that is a verdict for the plaintiffs.

10        Thank you.

11        THE COURT:  Members of the jury, we will take a

12  recess now, 20 minutes, and we'll really going to start back in

13  20 minutes, no matter who's not here.

14        You may retire to the jury room.

15  **(Jury out, 10:31 a.m.)**

16        (Recess.)

17  **(Jury in, 10:50 a.m.)**

18        THE COURT:  You may be seated and come to order.

19        All right.  Ms. Kaplan?

20        MS. KAPLAN:  Good morning, everyone.

21        As I said earlier, I'm going to start off now where

22  Karen left off, and I'm going to begin with the concept of

23  racial animus.

24        As Judge Moon has already explained to you, the

25  plaintiffs in this case must prove that the defendants were

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   motivated by racial animus.  What this means as a practical

2   matter, if we can go to the next slide, is that plaintiffs must

3   prove that defendants were motivated either by hatred for black

4   or Jewish people or by hatred or dislike for people who may not

5   be black or Jewish, but who nevertheless support the equal

6   dignity of black or Jewish people.

7           Just so you understand, this has been the law in this

8   country for 150 years.  That's why the statue at issue in this

9   case that we've all been talking about is called the Ku Klux

10  Klan Act of 1871.

11          The defendants in this case aren't shy about their

12  views, as you've seen, and I know you've heard quite a lot

13  about them during trial, but I want to make two initial points

14  right at the outset.

15          First, when we talk about animus, we aren't talking

16  about defendants' political views.  This isn't about what they

17  think about immigration policy or COVID or abortion or any

18  other topic.  It's not even about whether they're racist or

19  antisemitic.  The point is that the defendants were so

20  motivated by their hatred of black or Jewish people or their

21  supporters that they were willing to use violence.  In other

22  words, as you heard Professor Simi explain, we're not talking

23  about your uncle who may have had one or two too many drinks at

24  Thanksgiving and makes racist statements at the dining table.

25          Second, the defendants made a lot of noise at this

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   trial about why they think their views of black and Jewish

2   people and other minorities are justified.  They went on and on

3   and on about the philosophers, the political scientists, the

4   historical figures who inspired them or who they claim would

5   agree with them.  They even tried to defend Adolf Hitler.

6          Whatever you think of this, the truth is, again, none

7   of it really matters.  It doesn't matter whether the

8   defendants' beliefs are right or wrong, although my personal

9   view, of course, is that they are very, very wrong.  What

10  matters is whether the defendants were motivated by those

11  discriminatory beliefs to behave violently.  And as the

12  evidence shows, they certainly were.

13         Let's -- I want to go through the defense -- we're

14  going to go defendant by defendant, and I'm going to start with

15  the obvious ones.  Let's start with James Fields, who as you've

16  heard, marched with Vanguard America on August 12th.

17         As you have already heard, Mr. Fields pleaded guilty

18  to 29 counts of hate crimes.  In connection with that guilty

19  plea, he had to specifically agree that he had expressed and

20  promoted the view that white people are superior to other races

21  and peoples, that he supported the racial and social policies

22  of Adolf Hitler, and he espoused violence against African

23  Americans, Jewish people, and members of other groups he

24  perceived to be nonwhite.  That's easy.

25         Let's go on to Jeff Schoep and the National Socialist

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   Movement.  Moving to Jeff Schoep or the National Socialist

2   Movement, the National Socialist Movement is an explicitly Nazi

3   organization.  It's right there in the name:  National

4   Socialist Movement, just like the German National Socialist, or

5   Nazi, Party.  Mr. Schoep himself testified that in 2017 he was

6   inspired by Adolf Hitler and he considered himself to be a

7   warrior for the interests of white Americans.

8           Here, in this manifesto you see for NSM, they spell

9   out exactly who can be a member of the future ethnostate.

10  "Members must have pure white blood and no Jew may be a

11  member."

12          Let's move on to Matthew Heimbach, Matthew Parrott

13  and the Traditionalist Worker Party.  Like Mr. Schoep and his

14  organization, Defendants Matthew Heimbach, Matthew Parrott and

15  the Traditionalist Worker Party revere Adolf Hitler.  They

16  spoke frequently and proudly of their hatred of Jews and racial

17  minorities.  You saw that evidence in this case.  Here,

18  Heimbach is referring to the total destruction of Jewry as the

19  only way to ensure that we will no longer be plagued by the

20  eternal enemy of all mankind.

21          And you heard Professor Lipstadt talk about why it

22  precisely is for centuries now that the Jews have been the

23  eternal enemy of all mankind, and why it's so deep-seated and

24  so believable to these defendants.

25          Matthew Heimbach referred to Hitler as one of the

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    greatest European men ever to live.  And as you heard Professor

2    Simi, that kind of celebration or adulation of Adolf Hitler is

3    central to the white supremacist movement.

4             Matthew Parrott was even blunter.  As you can see

5    here in the next slide, he said, "I don't hate dogs for being

6    stupid.  Most of the hatred of Negroes is rooted in trying to

7    pretend they're something they are not."  And he said, "Fuck

8    the Jews.  They're the problem."

9             Let's move on to Hill, Tubbs, and League of the

10   South.  As with the other defendants, Defendants Michael Hill,

11   Michael Tubbs, and League of the South are open and proud in

12   espousing their racial, ethnic, and religious animus.  You

13   heard Karen talk about that in her opening.  Hill said that

14   Negroes are incapable of creating or sustaining anything

15   resembling Western civilization.

16            But that's not all.  He's proud of these views.  He

17   wrote his very own pledge of allegiance, and in that pledge of

18   allegiance he says, "I pledge to be a white supremacist, a

19   racist, an antisemite, a homophobe, a xenophobe, an

20   Islamophobe, and any other sort of 'phobe that benefits my

21   people, so help me God."  I'm sure you remember exactly when he

22   said that from the witness stand in this courtroom.

23            Let's go on to Elliot Kline and Identity Evropa.  The

24   Court -- with respect to Mr. Kline, the Court has already

25   instructed you that it has already been established that

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   Mr. Kline was motivated by animus against racial minorities,

2   Jewish people and their supporters.  And you saw plenty of

3   evidence of his animus as well.  For example, Samantha

4   Froelich, his former girlfriend, testified that Kline believed

5   black people were subhuman.  He also would say to her that he

6   wished he was killing Jews instead of cockroaches, and that he

7   was excited to kill Jewish people, and that he would gas the

8   kikes forever.

9         Mr. Cantwell, you have heard extensive evidence of

10  Mr. Cantwell's animus against people of color and Jews.  He

11  said it many times and in many different ways in this

12  courtroom, completely unapologetically.  On his podcast he

13  said, "I'm not even a Hitlerite, but I'm like, let's fucking

14  gas the kikes and have a race war, because once I realized they

15  were responsible for communism, I was like, oh, wait, wait a

16  second, yeah, that's a fucking really good reason to fucking

17  genocide a group of people."

18        As for black people, he has said, "It's not even that

19  I want to hate, it's not even that I do hate, black people.

20  It's that they are a fucking problem for me.  They are a threat

21  to my fucking existence, my identity.  I need to be protected

22  against this, and I will do what is necessary to stop that from

23  happening."

24        Moving on to Mr. Kline.  Mr. Kline speaks for

25  himself, by the way.  As everyone knows, he's associated with

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    *The Daily Stormer*, probably one of the most radical

2    publications in the white supremacist movement.  As with

3    Mr. Kline, the Court has already instructed you that he was

4    motivated by animus against racial minorities, Jewish people,

5    and their supporters.  But you don't even need that.  There is

6    extensive evidence in this case of Mr. Ray's animus.

7            Here is an image that you've seen before that you

8    heard Professor Simi talk about that he posted on Discord in

9    July of 2017 that presents black people in, honestly, the most

10   degrading, dehumanizing way that I have ever seen.

11           That brings me to defendants like Jason Kessler and

12   Richard Spencer; those who, unlike the other defendants,

13   actually tried to distance themselves somewhat from the extreme

14   racism and antisemitism you heard from the others.  They may

15   have tried to use optics to present a cleaner-cut and less

16   extreme image.  But let me remind you that those defendants are

17   not so different from the others.  You heard Karen talk about

18   this earlier as well.

19           For example, Jason Kessler believes that Western

20   civilization was built by white men, and that they should have

21   majority ownership over their birthright.  As for Mr. Spencer,

22   you have seen evidence and heard for yourselves how he tried to

23   disavow overt white supremacism in this courtroom.  But you

24   also saw evidence that things were different on what Pete Simi

25   called the backstage, when Spencer was in private, or at least

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  thought he was in private.  You saw him participating in those

2  "Sieg Heil" chants with the other defendants after

3  Charlottesville 1.0, and of course you remember his speech that

4  Karen also referred to when he thought the public wasn't

5  listening, making it clear his true beliefs on the night of

6  August 12th.  As Karen said, that's the true Richard Spencer.

7          And I want to point something else out about this

8  speech.  Do you remember how Mr. Spencer explained it?  He said

9  he was mad when he gave that speech.  And he clearly was.  He

10  wasn't mad about the death of Heather Heyer.  He wasn't mad

11  about the injuries of other protesters, counter-protesters.  He

12  wasn't even mad about the alleged injuries of Unite the Right

13  participants.  What was he mad about?  He was mad about the

14  fact that he'd lost a chance to promote himself.  Think about

15  that.  Think about what that means about someone's character.

16          And remember one other thing about this rant.  He did

17  it in a room full of his co-defendants.  Jason Kessler was

18  there.  Elliot Kline was there.  Nathan Damigo was there.  They

19  all listened to him give that rant on August 12th.

20          Let me go to the next slide.  As Professors Lipstadt

21  and Simi have explained to you, and as Karen referred to as

22  well, members of the white supremacist movement believe in a

23  theory known as "white genocide" or "white replacement."  The

24  essence of this theory is that white people are somehow being

25  replaced and that they honestly believe that they must fight

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  back to prevent their extinction.

2           And what is the source of this threat to their

3  existence?  That threat stems from Jewish people and people of

4  colors -- people of color.  As you heard Professor Lipstadt

5  explain, Jews, like they have been for hundreds of years, are

6  supposedly the master puppeteers, masterminding an

7  international globalist conspiracy and using people of color as

8  their helpers.

9           No discussion about racial animus in this case would

10  be complete without a discussion of *Mein Kampf*.  Think back on

11  the defendants' testimony.  How many times did you hear about

12  Hitler's book*, Mein Kampf*?  I would guess that you probably

13  heard about it more in this trial than you've ever heard about

14  it before, and hopefully than you'll ever hear about it again.

15           The defendants testified about it over and over

16  again.  They talk about it like a preacher talks about the

17  Bible.  And that's because for them, in some sense, it is.  And

18  by the way, remember when Matthew Parrott tried to explain that

19  what he liked about *Mein Kampf* was only Hitler's economic and

20  social policies?  What did Pete Simi say about that when I

21  asked him?  He said that he's never seen a member of the white

22  supremacist movement, in all the materials he's reviewed both

23  in his career and in this case, talk about *Mein Kampf* that way.

24  What they truly admire about *Mein Kampf* and Hitler was his

25  Jew-killing policies.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    And remember again that chant when the white

2  nationalists were slamming through Reverend Seth Wispelwey and

3  the other clergy on August 12th.  What did they chant as they

4  were passing through?  "Roof.  Roof.  Roof."  Who is that?  You

5  heard Professor Simi explain it.  That is Dylann Roof, the man

6  who massacred black worshipers in a church in South Carolina.

7    And I remember one of the defendants when talking

8  about this actually had the audacity to ask Professor Simi,

9  isn't it true that those black worshipers who were killed

10  invited Mr. Roof in to worship with them?

11    Another point:  Defendants in this case have also

12  said that they were not motivated by racial, ethnic, or

13  religious hatred, but they're truly motivated by something

14  else, by communism or Antifa.  But you also heard evidence that

15  when defendants say "communist" -- excuse me.  Get my voice

16  back.

17    When defendants say "communist," what they mean is

18  Jew.  And that defendants refer to all of their enemies, all of

19  their perceived enemies of the white race, interchangeably, as

20  communists, as Antifa, as Jews, as kikes.  So remember, when

21  you hear or see in the evidence defendants use any of these

22  terms, even if they claim that it's somehow political, that is

23  exactly what they mean.  They're expressing the same racial,

24  ethnic, and religious animus.

25    Finally, it goes without saying that you've heard

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  time and time again defendants claim that the statements

2  expressing racial or religious hatred was, like a lot of what

3  they said, just a joke.  I think Richard Spencer himself called

4  it tough talk, bad words, and juvenile humor.  You will

5  probably hear the same thing from them again today when they do

6  their own closings.  But you know by now that this is not true.

7  The evidence in this case showed the defendants' use of humor

8  was a cover, an explicit tactic that they used to hide their

9  true beliefs.

10        You saw it for yourself spelled out in detail in *The*

11  *Daily Stormer* style guide, which provided members of the white

12  supremacist movement with explicit instructions on how to use

13  humor to conceal what they really mean.  As the style guide

14  explains, humor is meant to convey double meanings.  Defendants

15  are instructed to use a light tone and to come across as

16  half-joking in their communications.  But, as the document

17  explains, "this is obviously a ploy, and I actually do want to

18  gas kikes."

19        Ms. Froelich again confirmed this.  As she explained,

20  optics were paramount.  Through this use of humor and other

21  similar strategies, defendants, as Froelich explained, were

22  wolves in sheep's clothing.

23        I now want to move on to defendants and violence and

24  their glorification of violence that, again, you've seen in

25  this trial and you heard Professor Simi explain.  I'm going to

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  start with some of the instructions the judge already gave you.

2         As you heard yesterday from the judge, a purpose of

3  the conspiracy at issue here must be to deprive the plaintiffs

4  of their right to be free from racially motivated violence.  So

5  what does that mean?  In simple terms, it means that we must

6  show that defendants intended that someone commit racially

7  motivated violence.  This intention for someone to commit

8  violence may not be the sole purpose of the defendants'

9  agreement, just one purpose.

10         So for example, if they came to Charlottesville and

11  they wanted to give speeches, they wanted to recruit new

12  members, they wanted, as you heard Mr. Spencer say, promote

13  themselves, but they also wanted someone to commit racially

14  motivated violence, that's enough.  And every defendant or

15  member of the conspiracy need not engage in the actual

16  violence.  It is enough if the defendants intended for someone,

17  like the foot soldiers that Karen told you about, to do it.

18         We believe the evidence here is overwhelming that at

19  least one of the defendants' purposes in planning Unite the

20  Right was that it result in racially motivated violence.  And

21  as you saw, that's exactly how it played out.

22         Finally, remember that the law doesn't remember [sic]

23  conspirators to know about their co-conspirators' acts of

24  violence in advance.  Instead, the law holds conspirators

25  liable for all the reasonably foreseeable acts of their

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  co-conspirators done in furtherance of the conspiracy.

2          I want to go back to Professor Simi because I think

3  he's really an important witness that you heard in this case.

4  So you heard from Professor Simi, who explained how violence is

5  the way that white supremacists understand the world.  They

6  view it as required for their existence.  A way to think about

7  it is it's like woven into the fabric of their lives the way

8  yarn is woven into a quilt.  This is borne out by the idea of

9  the race war, which according to Professor Simi, is actually

10  meant to be literal, literally a race war, and concrete.

11          You heard from Professor Simi, in the words of the

12  defendants themselves, that they believe a race war is

13  necessary in realizing their ultimate goal of a white

14  ethnostate.

15          Now, Defendant Spencer made plain what Professor Simi

16  told you.  He told you that an ethnostate would only ever arise

17  after a cataclysm of geopolitical nature.  Again, as Karen

18  noted, that's Richard Spencer-speak, but it stands -- it's

19  Richard Spencer-speak for a race war.

20          A number of the defendants also called for race war

21  in connection with Unite the Right.  Here, for example, is an

22  example from Defendant Heimbach calling for a race war

23  explicitly at Unite the Right.  Take them at their word.  Race

24  means race and war means war.  Violence that is based on race.

25  It's racially motivated violence.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1          Let's talk for a minute -- and I know Karen talked

2    about this briefly -- on the role Mr. Cantwell played in this

3    conspiracy.  As you know, Mr. Cantwell hosts a podcast called

4    Radical Agenda.  On that podcast, as we have shown, he

5    repeatedly calls for his listeners to engage in violence.

6    Critically, although he told you and made it seem throughout

7    this trial that he is just an entertainer, he is very well

8    aware that there are people in his audience, some of whom he

9    realizes are armed extremists, that would in fact commit the

10   very violence he advocates.  Having flooded his listeners three

11   times a week with rage, racism and repeated calls for violence,

12   Cantwell then invited them to all join him and his

13   co-defendants at Charlottesville.

14          That's exactly what Jason Kessler wanted when he

15   invited Cantwell.  In other words, Cantwell supplied the event

16   with the promotion and the foot soldiers necessary to do the

17   violent bidding of the leadership.  People that Mr. Cantwell

18   referred to on the Radical Agenda as cannon fodder for the race

19   war.

20          You can see here -- I'm not going to play it for you

21   because you've heard it too many times, but you can see here a

22   podcast from Mr. Cantwell, having talked about the race war,

23   and said, "gas the kikes, race war now," just days before he

24   left for Charlottesville.

25          Now, I want to talk a little bit more about the way

73

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  the defendants use and talk about violence.  Are there tons of

2  examples of this in the record in the case?  Of course there

3  are.  And Karen Dunn already showed you quite a few.  But here

4  are a couple Professor Simi went through that I think are

5  particularly illustrative.

6        On July 24, 2017, on the Charlottesville 2.0 server,

7  the logistics coordinator, Kurt, discusses how impaling people

8  is always the best option.  Co-conspirator Michael Chesny, who

9  as we know went by the hashtag Tyrone on Discord, provided an

10  Amazon link to purchase poles.  This obviously provides strong

11  evidence of what they wanted the poles for.  But crucially,

12  this juxtaposition or mix between the ordinary; i.e. where to

13  buy a pole on Amazon, and the extreme, i.e. impaling people on

14  sticks, is typical of the way the defendants operated.  It is

15  one of the ways they sought to normalize violence.

16        Similarly, another example, also Michael Chesny that

17  Karen talked about, you saw this play out on the

18  Charlottesville 2.0 server in real time.  You might remember,

19  again, the July 17, 2017 Charlottesville 2.0 Discord post from

20  Chesny, also known as Tyrone, calling for a multi-lane

21  protester digester.  Tyrone left no doubt, or Michael Chesny

22  left no doubt that he wasn't joking about this. he wrote in the

23  same chain of posts, "Is it legal to run over protesters

24  blocking roadways?  I'm not shitposting.  I would like a

25  clarification.  I know it's legal in North Carolina and a few

74

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  other states.  I'm legitimately curious for the answer."

2          There's also discussion in this chain about

3  carpooling.  Again we see the same kind of mix between the

4  mundane and the extreme:  How to arrange carpools to

5  Charlottesville, and how to run over protesters, and whether

6  running over protesters is legal.  Again, it's about the

7  normalization of violence.

8          Now, defendants posted throughout 2017 about their

9  vivid hopes for violence.  Thomas Rousseau, the head of

10 Vanguard America, said in this Discord post early in 2017 that

11 he wanted to see "jackboots on commie skulls, blood on the

12 pavement."  And you know what?  He got his wish.  At the bottom

13 of the slide is a photograph for after the events of

14 August 12th.  And as you may recall, that blue drum is the drum

15 that Chelsea Alvarado was playing when James Fields's car

16 struck her, and the blood on the street right next to it is the

17 blood of Plaintiff Natalie Romero.

18         Now -- let me just take one sip of water.

19         You heard Professor Simi tell you about triggering.

20 It's a tactic commonly used within the white supremacist

21 movement that involves provoking an aggressive response so that

22 someone can react with a disproportionate amount of violence.

23 It's another tactic toward creating what defendants and their

24 co-conspirators refer to as plausible deniability.  And here's

25 what Professor Simi said about it, and you heard that.

1          Here, the defendants -- it is clear that the

2     defendants were well familiar with this tactic.  And Defendant

3     Spencer admitted that it was one of the goals of the white

4     nationalist rallies in 2017.  You see that there on the slide.

5          Karen referred to the violence of Mr. Pistolis, and

6     you see here what he testified to.  He invoked the Fifth

7     numerous times in this case.  But critically, he invoked the

8     Fifth when he was asked:  "Did Michael Tubbs encourage you to

9     crack three skulls open?"  And he invoked the Fifth.

10         In reality, ladies and gentlemen of the jury, while

11    as Karen explained, the statute at issue in this case does not

12    require that every single defendant engage in an overt act --

13    well, they all have to engage in an overt act but they don't

14    have to engage in an overt act of violence -- the reality here

15    is that most of the defendants did.  I'm not going to go

16    through this chart, but you see here all the violence that the

17    very defendants in this case engaged in.

18         Now, I want to turn now to talk about some of

19    defendants' arguments and why we believe they just don't work.

20    Let me start with -- and I bet you've predicted what I'm going

21    to say first.  Let me start with their defense of self-defense.

22    Throughout this trial defendants have raised the prospect that

23    their acts were somehow justified because they were committed

24    somehow in self-defense.  In their view, they were the victims,

25    not the plaintiffs, even though it was the plaintiffs, not the

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  defendants, who were injured.

2          To start, as the judge instructed you yesterday,

3  self-defense is not generally a defense to a conspiracy claim.

4  As Judge Moon explained, if plaintiffs prove that the

5  conspiracy was motivated at least in part by discriminatory

6  racial animus, then it is no defense that defendants also

7  possessed some other motive, such as desire to join together

8  for mutual protection.

9          And even if you believe that the defendants had acted

10 in self-defense, their arguments still would fail.  That's

11 because in order to have a legitimate claim of self-defense, a

12 person must be in imminent danger.  An act of self-defense

13 can't happen later in time.  As you have heard for yourselves,

14 all the supposed acts of self-defense here were done after time

15 has passed.  As my son's pre-K teachers used to tell him when

16 he was in preschool, what the defendants had time to do was

17 walk away.  And when you have time to walk away, you have no

18 argument for self-defense.

19         Now, you have heard testimony from the defendants

20 themselves that what happened on August 11th and August 12th

21 was not self-defense.  With respect to August 11th, Richard

22 Spencer, who was right there at the statue, as you've seen,

23 told you that he didn't see any of the students do anything

24 threatening or aggressive to the alt-right on August 11th.

25 Therefore, it was not self-defense.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1            And taking a step back, let's look at how the

2    defendants actually described self-defense.  As you'll see,

3    it's not really self-defense at all.  It's unprovoked violence.

4    Take Defendant Michael Hill, for example.  He told you that

5    unilaterally running into a -- let me try that again.  He told

6    you that unilaterally running into a crowd of

7    counter-protesters with shields was self-defense.

8            With respect to that date, that same incident,

9    Defendant Parrott told you that when they gathered in the

10   Market Street garage, they learned there were

11   counter-protesters blocking their path.  Mr. Parrott also told

12   you that he had no idea who was blocking the path.  He told you

13   that they had planned for that contingency.  They had planned

14   to put their members with shields in front of the formation and

15   push through the counter-protesters.  Again, that is not

16   self-defense.  That is an agreement to commit racially

17   motivated violence.

18            What about Mr. Cantwell?  Mr. Cantwell had the nerve

19   to tell you that he was acting in self-defense as he

20   pepper-sprayed this counter-protester on August 11th.  And he

21   also had the further unmitigated audacity to tell you that he

22   believes that James Fields, despite his plea agreement, despite

23   his guilty plea, acted in self-defense, repeatedly pointing

24   with witnesses to a video where it looks like someone

25   justifiably tried to hit one of the back tires of Fields's

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  Dodge Challenger as he was speeding toward the crowd.

2        And what about Marcus Martin and Tom Baker who you

3  see in this picture?  Do you think that James Fields was acting

4  in self-defense against them?

5        You have heard a lot about Antifa from the

6  defendants.  They claim that they were acting in self-defense

7  in response to threats from Antifa.  But these explanations are

8  nothing more than a smokescreen.  They're a pretext for their

9  own violence.  Professor Simi explained this idea when he

10  discussed triggering.  Triggering occurs when an individual

11  tries to provoke an aggressive response in someone else with

12  the goal of responding with violence themselves.  After the

13  fact, they can then claim it was just self-defense.  And you

14  see in this slide Mr. Kessler saying exactly that.

15        Look at what Mr. Kessler says.  He said, "We

16  triggered this Jew into attacking one of our guys and charged

17  him with assault."  Couldn't be plainer than that, ladies and

18  gentlemen.

19        This case is literally chock full with defendants

20  using Antifa as a justification for committing violence.  And

21  they were open about this.  They're open about their desire to,

22  as you heard Karen mention, to trigger Antifa into fighting

23  with them.  Look at what Mr. Parrott said.  "This Antifa picked

24  to fight a Trad Worker.  Try to remind folks not to throw the

25  first punch or to be too aggressive.  It's important for

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  lawfare and optics that we be going about our business and they

2  instigate."

3       Mr. Kessler:  "Can you guys conceal carry?  I don't

4  want to scare Antifa off from throwing the first punch."

5       Again Mr. Kessler:  "If you want a chance to crack

6  some Antifa skulls in self-defense, don't open carry.  You will

7  scare the shit out of them and they'll just stand off to the

8  side."

9       Now, the evidence in this case goes even farther than

10  what you've just seen.  There's multiple instances of

11  defendants talking about creating fake Antifa accounts before

12  Unite the Right.  When defendants -- in other words, when

13  defendants weren't trying to trigger Antifa, they created their

14  own fake Antifa so they could use that as a pretext for

15  violence.

16       Defendants -- in this slide Defendants Matthew

17  Parrott and his fellow TWP members Max Macro and Commander

18  Derrick Davis discussed creating a fake Antifa page and then

19  using that to antagonize the militias and send out Antifa mobs

20  in Charlottesville.  This itself, ladies and gentlemen, is

21  evidence of a conspiracy.  They agreed to send around false

22  information about Antifa to justify their violent actions at

23  Unite the Right.  In other words, they wanted Antifa to be

24  there.  They desperately wanted Antifa to be there so they

25  could use that as a pretext for violence.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1          Another example.  Nathan Damigo did the same thing.

2   He told as many people as possible to create multiple fake

3   accounts and to get followers to make them look more realistic.

4   What he wanted was a fake Antifa army.  And even during Unite

5   the Right itself -- this is just unbelievable evidence -- even

6   then they were involved in this plan involving, quote/unquote,

7   "fake Antifa."  Elliot Kline says on August 11th that he tried

8   to create a fake Antifa account during Unite the Right.

9          Now, what is Antifa, according to the defendants?

10  Putting aside all the triggering, all the fake Antifa, all the

11  fights with Antifa, the triggering of Antifa, let's look at

12  what defendants, particularly Mr. Cantwell, actually told you

13  about Antifa at Unite the Right.

14         Here's what he suggested:  That Antifa was anyone

15  wearing black, anyone wearing dark sunglasses, anyone wearing

16  any kind of helmet other than members of Unite the Right

17  wearing helmets, anyone carrying a flagpole other than members

18  of Unite the Right carrying flagpoles, anyone carrying red

19  flags, anyone holding flags or signs that had a fist -- even

20  though many of those related to Black Lives Matter -- anyone --

21  here's where it really gets absurd -- anyone with a green

22  whistle -- and, of course, the now-infamous anyone wearing a

23  bandanna.

24         Who was telling you this at trial, ladies and

25  gentlemen?  Who was saying this?  Not any purported members of

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  Antifa.  Not the plaintiffs, who were questioned exhaustively

2  on Antifa and their supposed ties to Antifa, which you heard

3  were nonexistent; not an expert on Antifa, the one we put on,

4  Professor Simi, to explain about the white supremacist

5  movement.  They're all coming from a man who is filled to the

6  brim with conspiracy theories, who is a talk radio host, who,

7  as he acknowledges, is an entertainer who does this for a

8  living.

9         Now, let's take this little bit farther.  The

10  defendants literally showed you, or Mr. Cantwell literally

11  showed you dozens of pictures of red bandannas and tried to

12  make it seem nefarious.  In fact, Mr. Cantwell, you'll see

13  here, asked each and every one of the plaintiffs if they were

14  wearing bandannas.  Some of them explained that it was because

15  it was a hot day.  Some of them had other explanations.  But

16  the most important explanation was that one you heard yesterday

17  from Natalie Romero.  What did she say when asked why she was

18  wearing a bandanna?  She said, "Because the night before, when

19  I was maced, I wanted to make sure I had something to protect

20  my face."

21         Ladies and gentlemen of the jury, Natalie Romero is

22  not a member of Antifa.

23         Simply, you also heard about Ibby Han, who

24  Mr. Cantwell accused -- she was with -- a friend of Devin

25  Willis's -- who Mr. Cantwell accused of being Antifa based on

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    the fact that she, too, wore a bandanna.  We later learned, as

2    you see in this slide, that she was a medic on August 12th.

3    And look at the picture, ladies and gentlemen, next to this.

4    Look at the picture of Natalie Romero after the car struck her

5    on the streets of Charlottesville on August 12th.  See a medic

6    trying to help her out?  What does that medic have around her

7    neck?  A red bandanna.

8          Now, moving on to another argument of defendants:

9    Another one, obviously, as you've heard over and over again, is

10   the permit and the First Amendment.  You have heard a lot in

11   this case from the defendants about how they were only trying

12   to have a peaceful protest in Emancipation Park.  In essence,

13   they hide behind the First Amendment the same way that they use

14   self-defense to claim that their conduct at Unite the Right was

15   somehow justified.  Don't be fooled.  It was not.

16         The First Amendment does not protect acts of

17   violence.  It does not protect planning for violence.  And it

18   does not provide a defendant -- a defense to engaging in

19   unlawful conduct or a conspiracy to engage in unlawful conduct.

20         To make this plain, think about a bank robbery.

21   Obviously, a gang of bank robbers planning to rob a bank have

22   to use words and speech to coordinate their illegal actions.

23   But the fact that they use speech to talk to each other to plan

24   their crime does not mean that the First Amendment is a defense

25   to a case of grand larceny.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1        Similarly, let's talk about what defendants did
2   argue.  You heard Jason Kessler and other defendants talk over
3   and over again about the permit.  But, just like the First
4   Amendment, a permit is not a license to commit violence.  A
5   permit does not excuse or authorize defendants' violent actions
6   that they had planned in advance for months.  There is no such
7   thing as a permit to commit violence.  That's entirely beside
8   the point.

9        But even if we look at the permit, Mr. Kessler only
10  applied to demonstrate in Lee or Emancipation Park on
11  August 12th.  He not only lied about the expected number of
12  attendees, but he had no permit on Market Street, and he had no
13  permit to exclude anyone else on Market Street, where
14  Defendants Heimbach, Parrott, Tubbs and Hill marched and led a
15  violent charge into counter-protesters.

16        MR. SMITH:  Objection, Your Honor.  They were on
17  their way to their permitted event.

18        THE COURT:  Do not interrupt.  The jury will recall
19  the evidence.

20        Go ahead.

21        MS. KAPLAN:  Thank you, Your Honor.

22        And there was clearly no permit on Fourth Street,
23  where James Fields used his car as a weapon of murder.  And
24  there was no permit after the state of emergency was declared
25  in the entire city.  The permit is not an issue here.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1          And if we go back to the torch march on August 11th,

2     you'll have heard no evidence or testimony to suggest that

3     defendants had a permit at all for August 11th, giving them any

4     right to march on the UVA campus with tiki torches, the way

5     they say they had a permit for August 12th.

6          Taking a step back, it's important to remember what

7     could have happened on August 11th.  The defendants could have

8     expressed their views without attacking Mr. Willis, Ms. Romero,

9     and the other students.  They could have marched and then

10    stopped at the Lawn.  They could have marched and then stopped

11    at the Rotunda.  They could have stopped without surrounding

12    the students at the statue.  And they could have left.

13         But they did none of those things.  As Mr. Spencer

14    said, they wanted to dominate the students.  And the defendants

15    and their co-conspirators did much more than dominate.  As you

16    heard Devin Willis and Natalie Romero testify, they beat the

17    students with their fists, their legs, and torches.  And you

18    saw numerous videos that corroborate all of that.

19         Next defense:  Blame the police.  The defendants have

20    also suggested that the real problem here was the police who

21    failed to keep everyone safe at Unite the Right.  But that,

22    too, is a red herring.

23         I'm not here, ladies and gentlemen, to defend

24    everything the police did or didn't do that weekend.  We all

25    know that there were many moments of chaos on August 11th and

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   August 12th and that police officers, like the rest of us, are

2   only human.  But what the defendants cannot do is blame the

3   police for not stopping them at Unite the Right.  It doesn't

4   absolve them of responsibility for planning and executing a

5   violent conspiracy.

6         To use the bank robber analogy again, a robber can't

7   hold up a bank and then blame the bank and its faulty alarm

8   system for not catching him first.

9         This is all underscored by the fact the defendants

10   didn't actually want the police to be there in the first place.

11   They lied to them and they lied to you.  If anything, once

12   again, they used the specter of contacting the police to give

13   them a false cover for their illicit actions.  Remember again

14   what Professor Simi explained to you about the concept of

15   plausible deniability.

16         Let's take the defendants' own words.  Look at

17   Mr. Parrott.  As he watched the police keep the peace at the

18   Auburn rally, about which you heard during this trial, he

19   stated on Discord, "Looks like the cops are actually doing

20   their jobs this time, unfortunately.  Wanted to watch Heimbach

21   chimp out" -- and we all know what that means -- "on

22   livestream."

23         Does this really sound like someone who wants the

24   police to be there?

25         Let's turn to August 12th.  Here, I have to admit,

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   the finger-pointing gets a little crazy.  Mr. Parrott was asked

2   if he coordinated with the police at all.  His response:  "No.

3   It was the Nationalist Front and the League of the South who

4   did."

5          Next slide, Mr. Tubbs -- what happened when Michael

6   Tubbs at the League of the South was asked the same question?

7   He said he didn't speak to the police.

8          What about Matthew Heimbach?  Matthew Heimbach said

9   it was primarily handled by Ike Baker, another member of League

10  of the South.

11         But what did Ike Baker say?  You heard from Ike Baker

12  himself.  Sure enough, he stated that he was not in contact

13  with the police on the morning of August 12th and that he did

14  not expect any assistance from the police.  Sounds like the

15  only one telling the truth about what the defendants wanted

16  with respect to the police was Matthew Parrott when he was

17  talking about the Auburn rally.

18         Going back to August 11th, here's what we know about

19  August 11th:  The defendants hid their plans for the torch

20  march and planned it in secret.  The first time that either the

21  UVA or the Charlottesville police even heard about it was that

22  very evening.  And the defendants lied to them about the true

23  nature of their plans.

24         Use your common sense here.  Does anyone really

25  believe that the UVA police would have failed to show up after

87

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  a proper warning was given to them when their very job is to

2  protect their undergraduates on campus?  I don't think so.

3         You also heard Mr. Cantwell make a very big deal

4  about how he told Kessler that he wanted the police to be

5  there.  But you also heard him admit that when he arrived at

6  Nameless Field, there wasn't a single police officer in sight.

7  What did Cantwell do?  He kept marching anyway.

8         Make no mistake:  The police aren't to blame here.

9  The blame rests on the defendants.

10        Throughout this trial, you have heard defendants

11  attempt to evade liability by claiming that there is

12  insufficient evidence to establish a conspiracy.  Just like

13  passengers jumping off the Titanic, defendants have tried to

14  distance themselves from the conspiracy and each other.

15  They've blamed one another.  They've lied about their

16  friendships and the extent of their communications.  They've

17  destroyed or refused to turn over evidence.

18        But rather than helping their defense, all these

19  actions show is that defendants were conscious of their own

20  guilt.  They knew they had done something wrong, so they took

21  steps to cover it up.  And now they are pointing to those very

22  steps as evidence that they're not liable for engaging in a

23  racially motivated conspiracy to commit violence.

24        Let me start with defendants' lies about their ties

25  to each other.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1          You heard defendants repeatedly claim that they could

2    not have conspired because they didn't know each other well

3    enough to do that.  First, as Karen told you, under the law,

4    people do not need to have a close relationship or even know

5    one another in order to be co-conspirators.  Second, as you

6    know from sitting through this trial, what the defendants told

7    you is simply not true.  Many of the defendants had close

8    relationships and communicated regularly.

9          Let's start with Matthew Heimbach.

10         Matthew Heimbach told you that he had not been on

11   speaking terms with his co-conspirators Eli Kline and Jason

12   Kessler in the lead-up to the rally.  But what's the truth?

13   The truth is that his phone records tell a very different

14   story.  You saw Mr. Heimbach's phone records, which are an

15   exhibit that you have, that he spoke to Eli Kline and Jason

16   Kessler over that summer before the rally.  Mr. Heimbach also

17   told you that he did not speak with Eli Kline in Emancipation

18   Park on August 12th.  But then you saw video showing the two of

19   them talking to each other.

20         Richard Spencer similarly also repeatedly and vastly

21   underreported his interactions with his co-conspirators.  He

22   did it the very first time he ever spoke to you in this case in

23   his opening statement.  He said that he shared 26 messages and

24   7 phone calls with Mr. Kessler, but his phone records prove

25   that Mr. Kessler and Mr. Spencer engaged in 149 messages and 13

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  phone calls.  He also told you that he shared a few text

2  messages, maybe 7 in total, with Cantwell.  But you saw the

3  phone records, and you know in reality that they exchanged 88

4  text messages.

5        Let's focus for a second on Mr. Cantwell.  You also

6  may remember that Mr. Cantwell said in his opening that he

7  doesn't really know his co-defendants all that well.  But

8  you've heard evidence that, in fact, Mr. Cantwell's connections

9  to his co-conspirators are deep and numerous.  He attended

10  rallies with his co-defendants prior to Unite the Right.  He

11  hosted them on his podcast, Radical Agenda, that you've heard

12  so much about.  He communicated with them over the phone and in

13  person in the lead-up to Unite the Right.  And, perhaps most

14  strikingly, despite Mr. Cantwell's claim that he does not know

15  his co-defendants, he actually lived with Defendant Eli Kline

16  for a period of three months soon after Unite the Right took

17  place.

18        You heard these and countless other

19  misrepresentations by defendants about how little they knew

20  each other.  They repeatedly downplayed their connections when

21  many of them had known each other for years.  Their repeated

22  claims beg the question:  If the nature of these relationships

23  had been purely lawful, why would defendants feel so compelled

24  to cover them up?

25        Now, this is an issue that Karen touched on as well,

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   but I want to address it another time.  In addition, throughout

2   this litigation, defendants have systematically destroyed the

3   most important form of evidence in any conspiracy case:  Their

4   communications.

5          You heard that Matthew Parrott posted on Facebook in

6   February 2018 that if you're involved in any altercation in

7   Charlottesville and you haven't disabled your social media, you

8   should do so.  Weeks later, he wrote, "All of the information

9   systems are completely air gapped and will be destroyed within

10  a few hours in order to guarantee all membership information

11  literally no longer exists anywhere."

12         These postings have sparked a veritable cascade of

13  evidence destruction.

14         Defendant Parrott subsequently deleted his text

15  messages with his best friend and co-defendant Matthew

16  Heimbach.  Matthew Heimbach, in turn, destroyed all of the

17  electronic devices used to discuss Unite the Right, leaving us

18  with a single text message between Mr. Parrott and

19  Mr. Heimbach.  Mr. Heimbach also destroyed multiple social

20  media accounts he used to communicate about the events, blaming

21  two of his wives, at different times, of course, for the

22  evidence destruction.

23         Other defendants followed suit.  Defendant Schoep's

24  phone supposedly, as you heard him say, fell in the toilet.

25  You heard that Defendant Vanguard America, who marched with

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   Defendant James Fields, also did not comply.  Elliot Kline,

2   Robert "Azzmador" Ray, and the National Socialist Movement all

3   failed to comply with their discovery in this case.  The judge

4   has instructed you on this, and you may infer that -- certain

5   facts with respect to certain defendants as a result of their

6   failure to comply with discovery.

7            Now, even before the Unite the Right rally took

8   place, defendants were proactively finding ways to evade

9   responsibility for their unlawful behavior.  You heard from

10  Dr. Simi about how defendants' actions in preparation for Unite

11  the Right were consistent with the common tactics in the white

12  supremacy movement that provide, again, plausible deniability

13  for racially motivated violence.  And you also heard from the

14  defendants about actions they took to outwardly distance

15  themselves from each other while continuing in reality to act

16  in concert with each other.

17            For example, you heard Richard Spencer claim time and

18  again that he could not have been a co-conspirator here because

19  he did not participate in the Charlottesville Discord server.

20  But this week you learned the truth.  You learned that, while

21  Spencer's own Discord username may not have been active, you

22  heard Jason Kessler tell you that Spencer participated in the

23  Discord channel through his agents, including co-conspirator

24  Elliot Kline.  This very arrangement gave Spencer the cover to

25  deny participating in the planning of Unite the Right, but to

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   not actually limit his role in the conspiracy.

2          Richard Spencer also told you he did not lead the

3   torch march on August 11th, but you saw a video for yourselves.

4   He and Kessler and Kline were right up front.

5          Similarly, Defendant Matthew Heimbach told you that

6   he had withdrawn from the #leadership-discussion channel in

7   Discord two weeks before Unite the Right, presumably to try to

8   show that he played a limited role in organizing the event.

9   However, you also saw the Discord records, and they establish

10  that Heimbach remained an active participant in the channel

11  until as late as August 8th, three days before he arrived in

12  Charlottesville for the rally.

13         You also saw a tweet that Defendant Matthew Parrott

14  wrote after Unite the Right where he claimed the Traditionalist

15  Worker Party was not even invited until the last minute.  This

16  tweet, again, gave the outward appearance, the front-stage

17  appearance, that Mr. Parrott and the Traditionalist Worker

18  Party had a small role in planning for the rally, when, in

19  fact, what you now know is Matthew Heimbach, the coleader of

20  the Traditionalist Worker Party, was one of the very first

21  people who Jason Kessler reached out to about planning for the

22  event in May 2017.

23         Now, Defendants Parrott, Heimbach, and the

24  Traditionalist Worker Party have also claimed or have developed

25  a theory that they had an entirely separate plan from the plan

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  that Elliot Kline, Jason Kessler, and Identity Evropa had.  The

2  evidence shows this to be false.

3       Matthew Parrott testified that as they were fighting

4  on Market Street, Identity Evropa sent a detachment of fighters

5  to help them and to relay intelligence to Jason Kessler.  We

6  saw the video of TWP walking into Emancipation Park with the

7  leader of Identity Evropa, Nathan Damigo, beside them.

8       Matt Parrott was in communication on August 13th with

9  Mr. Kessler regarding Mr. Heimbach's whereabouts, and the three

10  of them together started the Charlottesville Defense Fund once

11  they started getting sued.

12       As if there were any doubt, Mr. Parrott posted on

13  social media just a week after Unite the Right, "I still stand

14  with Jason Kessler."

15       Now, throughout this trial, the defendants have

16  suggested that they were not responsible for the plaintiffs'

17  injuries on a theory that's similar to the fact that defendants

18  somehow assumed the risk of being harmed merely by showing up.

19  According to defendants, plaintiffs, I guess, deserved whatever

20  happened to them because they had the audacity to show up and

21  peacefully counter-protest.

22       Now, this is particularly important with respect to

23  the plaintiffs who were there on Friday night and then showed

24  up on August 12th.  You'll recall how they asked Devin and

25  Natalie and Reverend Wispelwey, "Why did you show up on

94

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   August 12th after what had happened on August 11th?"  And you

2   heard very cogent, very serious answers from each one of them,

3   including answers that explained, "We thought about it a lot,

4   but we wanted to stand up for our community."

5        Now, as you heard from Karen, Dillon Hopper's

6   statement here perhaps best encapsulates this theory.  He

7   compares Heather Heyer, as you've heard, to a surfer.

8   According to him, peaceful counter-protesters like the

9   plaintiffs and Ms. Heyer shouldn't be surprised if they get

10  attacked by a shark because they went surfing in an ocean with

11  sharks.  Ladies and gentlemen, I respectfully submit that that

12  is ludicrous.

13       If someone attended a protest about a different

14  topic, like the Women's March or a march about climate change,

15  and someone drove a car into the crowd at the march, would

16  anyone ever suggest that the protester assumed the risk of

17  injury just by showing up?

18       The First Amendment, and I agree with defendants on

19  this, protects all peaceful protests, whether you're protesting

20  for women's rights or racial equality, or even white

21  supremacism.  What the defendants did here was unlawful, and

22  they are entirely responsible for it.

23       Now, as a legal matter, this defense doesn't apply

24  here in any event.  Certain defenses, including negligence

25  defenses or assumption of risk, don't apply.  In other words,

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   defendants cannot claim that they are not liable because

2   plaintiffs assumed the risk of injury just by showing up.

3          I'm going to now talk to you a bit about the

4   plaintiffs.  I won't rehash all of their testimony, because I

5   am confident that you were listening carefully and remember

6   what they said.  But I want to make a few points about them.

7          First, I hope that you can appreciate how incredibly

8   difficult it was for some of the plaintiffs to come here and

9   tell you their stories, especially when telling you their

10  stories meant being cross-examined by Mr. Cantwell and

11  Mr. Spencer, two people many of them have been afraid of for

12  the last four years.

13         Second, I want to address head-on defendants'

14  repeated, unsupported claim that the plaintiffs are somehow

15  members of Antifa.  They are not.

16         Seth Wispelwey is a clergy member who, you heard him

17  explain, is a pacifist and believes in his heart and bones in

18  nonviolence.

19         Natalie, Devin, and Liz were all UVA students.

20         Marissa, Marcus, Thomas, Chelsea, and April were all

21  effectively innocent bystanders, just people who live in this

22  town and who cared about it and wanted to show up to support

23  their community.

24         Most of them had not ever been to a protest before.

25  Not a single one of them brought weapons.  You haven't heard a

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   shred of evidence that any of them behaved violently, because

2   they didn't.  Instead, what they did is they chanted, they

3   sang, they played the drums, they walked around, they took

4   videos and pictures, and then they got attacked.

5         Third, I want to emphasize, as you heard them say for

6   themselves on the stand, that every single plaintiff in this

7   case was injured, physically, mentally, sometimes both, by the

8   defendants' conspiracy.

9         Now I'm showing you a slide, just so you can keep it

10  organized in your heads, as to which plaintiffs were injured by

11  which events.

12        As you can see, some of them, Natalie and Devin in

13  particular, were injured both on August 11th and 12th.  And I

14  want to show you what I call the before and after picture of

15  Plaintiff Natalie Romero.

16        On the left you can see how Natalie Romero looked

17  before the car attack.  And on the right you can see how she

18  looked immediately after James Fields' Dodge Challenger crashed

19  into the counter-protesters.  Natalie's physical injuries have,

20  for the most part, healed, but as she told you in a very moving

21  way, every single time that she looks in a mirror, she sees the

22  scars on her face, and she will always remember what happened

23  to her.

24        But it's not just Natalie.  Every single plaintiffs'

25  life was marked by what happened to them that weekend.  Some,

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   like Marcus Martin, have literal scars, or Natalie.  Others

2   have chronic pain that -- like Tom or Marcus -- that reminds

3   them daily of August 12th.  Every single one of them has some

4   form of PTSD and are haunted by flashbacks, nightmares, and

5   debilitating anxiety, as you heard Dr. Webb explain.

6           I'm going to turn to damages.  There are a variety of

7   categories of damages in this case.  I'm just going to walk you

8   through those briefly.

9           First I want to talk about what are called

10  compensatory damages.  These are damages that are intended to

11  make the plaintiffs whole, or to put them in a position that is

12  as close to the position they would have been in if the

13  defendants had not harmed them.  On this chart -- you can go to

14  the next slide -- what we're talking about here are their past

15  and future expenses and -- their past and future expenses, as

16  well as -- we could have done this a little better -- their

17  past medical expenses and costs, their future medical expenses

18  and rehabilitation, and their past lost wages.  Those are all

19  compensatory damages.

20          In addition, you -- what we're talking about today

21  for the first time that's on this chart is a damages award for

22  what's called plaintiffs' pain and suffering.  You have the

23  right to award the plaintiffs an amount of money that, in your

24  good judgment, will remediate their pain and suffering.  This

25  amount of money should compensate them for the harm they

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    suffered.

2              These kinds of things, of course, are difficult to

3    quantify.  It's hard to put a number on what you would need to

4    be paid to be willing to -- if any amount -- to be willing to

5    experience what the plaintiffs experienced here.  But courts,

6    unfortunately, and human beings, unfortunately, don't have

7    other ways of making people whole.  And coming up with a number

8    is the best that we can do.

9              We suggest that, for those plaintiffs who were hit by

10   James Fields's car, the pain and suffering damage should amount

11   somewhere in the range of 7 to 10 million dollars.  For those

12   who were injured on August 11th and 12th in other ways,

13   including because of the trauma they experienced and continue

14   to experience, we are asking you to award them for pain and

15   suffering in a range of 3 to 5 million dollars.

16             But you are not limited to awarding only compensatory

17   damages and only damages for pain and suffering.  You can also

18   award what are known as punitive damages.  These are exactly

19   what they sound like:  Punitive damages.  In other words, you

20   are entitled to award damages to punish the defendants if you

21   have found them to engage in extreme and outrageous conduct and

22   you want to send a message to deter or prevent similar future

23   conduct.

24             Punitive damages are appropriate where a defendant

25   acted maliciously and with an ill will or spite towards the

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  injured person, or when they acted wantonly, which means

2  recklessly or with a callous disregard for the rights of the

3  injured plaintiffs.

4          Punitive damages are particularly appropriate where

5  you determine that compensatory damages would be insufficient

6  to deter similar future conduct or to punish the defendants.

7          I'm not going to give you a number here.  That's

8  entirely to your judgment.  In our country, we leave matters

9  like this to the good judgment of the jury.  But when you're

10  deciding what that number should be, ask yourselves this:  What

11  would it take to make sure that defendants and their

12  co-conspirators never, ever do anything like this ever again?

13          Thank you for your time.

14          THE COURT:  All right.  Who's first?

15          MR. KOLENICH:  What time does the Court break for

16  lunch?

17          THE COURT:  12:30.

18          MR. KOLENICH:  I'll go first.

19          Good morning.

20          As you have heard the last, what, three and a half to

21  four weeks, the plaintiffs were badly injured, many of them.

22  As you have heard, there was awful rhetoric, a rally that

23  resulted in the death of one woman and injuries to all these

24  plaintiffs.  There was bravery on the part of the plaintiffs

25  that day.  You heard from Plaintiff Willis, Devin Willis --

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1           You heard from Plaintiff Devin Willis, the young man

2    who, taking after his civil rights ancestors, showed up to

3    oppose all this rhetoric, and then when surrounded by a large

4    group of persons bearing torches, wondered if he was doing it

5    right, became concerned.

6           You heard testimony about Marcus Martin, who took a

7    bullet that was aimed at his then-fiancee, pushed her out of

8    the way, and was hit by the car.  An act of bravery, an act of

9    selflessness.  When you're hearing all this testimony, you're

10   hearing all this from the plaintiffs, I want you to say, so

11   what?  I want you to pay attention and realize you have jobs to

12   do as jurors.  The bravery of the plaintiffs and the horrific

13   injuries that many of them suffered don't prove a conspiracy.

14   And the plaintiffs never claimed they did.

15          They've thrown out all kind of exhibits and all kind

16   of video and they've gone over again and again and again the

17   fact that these guys know each other, they talk to each other,

18   and they say all kinds of ridiculous things and believe all

19   kinds of ridiculous things -- not even ridiculous, offensive,

20   deeply offensive and even dangerous things.  None of that

21   proves a conspiracy.

22          Now, we can't as defendants go toe to toe, syllable

23   for syllable or exhibit for exhibit with these plaintiffs.

24   It's not even possible.  Any time we say anything, they've got

25   20 exhibits that call it into question.  You've seen all that

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   throughout the trial.

2          But what they've actually done, ladies and gentlemen,

3   is overwhelm you with three and a half weeks' or four weeks'

4   worth of irrelevant alt-right trivia.  They've proven to you

5   that the alt-right is the alt-right.  They're racists; they're

6   antisemites.  No kidding.  You knew that when you walked in

7   here.

8          All of you folks are from the community.  You know

9   what went down at Unite the Right.  You know what the alt-right

10  is about.  It is about racism and antisemitism and opposition

11  to what the modern United States is as far as ethnicities of

12  the various people who live here.  But what does that do to

13  prove a conspiracy?

14         Now, you saw your jury instructions.  A conspiracy

15  must be agreement and it must be foreseeable.  Agreement and

16  foreseeability.  They have to have known that they were

17  entering a conspiracy to do violence to these -- well, to

18  persons who ended up being these plaintiffs.  If they did not

19  know that, they could not have conspired.

20         And the damages had to be foreseeable.  That is in

21  your jury instructions.  They have to have been able to tell

22  that this was going to happen.  And let's be specific: that the

23  car attack had to be foreseeable to them.  Now, obviously, if

24  you attack somebody with a car, you have a very good likelihood

25  of badly injuring or killing them.  So if the car attack was

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   foreseeable, no problem, then the damages from it are

2   foreseeable.  That's not the defense argument.

3         What we're saying is that there is no agreement from

4   my clients, which again are Kessler, Damigo and Identity

5   Evropa.  And there is no foreseeability, even if they did agree

6   to engage in triggering or violence to Antifas, and even if

7   they have a hard time telling who's an Antifa and who isn't, or

8   even if they don't care who's an Antifa or who isn't

9   particularly well.  And you heard the plaintiffs explain -- the

10  defendants got up here, some of them, and said, well, were you

11  wearing a helmet?  Were you wearing a bandanna?  They're not

12  really narrowing down the list of people who might be Antifa.

13        Nevertheless, you heard other testimony.  You heard

14  much testimony that Antifa shows up to alt-right events, that

15  they throw rocks, they throw bottles, they throw balloons

16  filled with who knows what, and that they will come out any

17  time the alt-right shows up to have a political rally.  And the

18  alt-right doesn't like them.  Jason Kessler doesn't like them.

19  Nobody in the alt-right likes them.  And yes, the alt-right

20  would like to fight them, if they have a lawful reason to do

21  so.

22        There is much testimony in this case that they

23  examined the laws of the jurisdiction that they were operating

24  in.  Is it legal in Virginia to carry a gun?  Is it legal to

25  carry a knife?  Is it legal to carry mace?  Can we carry guns

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  on UVA campus?  No, you cannot.  So they weren't supposed to

2  bring guns.  They were explicitly told in these chats, don't

3  bring guns.  You can't carry guns on UVA campus.  But they do

4  want to trigger the Antifas.  You've heard that testimony.

5        The plaintiffs want you to believe that Kessler

6  conspired, Jason Kessler.  And maybe you walk in here wanting

7  to believe that.  But what does the evidence in this case

8  actually show?  Exhibit after exhibit after exhibit shown to

9  Jason Kessler when he testified has him saying what?  It is up

10 to the Antifa whether we get to fight or not.  If they don't

11 start it, we can't do anything.

12       Now, yes, he said we want them to start it so that we

13 can fight with them.  So don't carry guns, because if you carry

14 guns they won't attack us.  Jason Kessler said that.  The

15 plaintiffs want you to believe that's part of a giant

16 conspiracy, that that's what they intend all the time.  It's a

17 crime.  It's this, it's that.  No.  It's them planning to

18 trigger the Antifa so that they can fight with them.

19       They are the alt-right.  You heard Professor Simi:

20 Violence is sort of intrinsic to the movement.  They do want to

21 fight the Antifas.  But they want to get away with it.  They

22 want to have a legal reason and a legal justification for

23 fighting, not plausible deniability, as their expert would have

24 it and as their case would have it, but an actual legal reason.

25       And ladies and gentlemen, you've heard from the

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  plaintiffs about prior alt-right events:  Battle of Berkeley

2  and so forth and so on, where violence occurred, and where

3  they, in fact, got away with it.  Where the local authorities

4  apparently considered it to be lawful.

5       You saw the picture of Nathan Damigo punching a

6  female in the face at the Battle of Berkeley.  You've seen the

7  pushing and shoving in various pictures.  You've seen them

8  fighting over flags.  Nathan Damigo is in a picture pulling a

9  flag away from somebody.

10       Circle back now to the idea of foreseeability.  When

11  they're talking about violence, when they're talking about

12  fighting, when they're talking about blood in the streets or

13  anything else, that's what they're talking about:  Pushing,

14  shoving, fighting, fistfights, maybe even some sticks, rocks,

15  bottles, balloons, that sort of thing.  They are not talking

16  about a car, a gun, shooting anybody or doing anything that

17  anybody could foresee would kill or badly injure another human

18  being.

19       Now, it's very true, if you punch somebody in the

20  nose, they might get badly hurt.  I stand before you an old man

21  with gray hair.  If one of these young guys punches me in the

22  head, I very likely will need to go to the hospital.  But young

23  people don't know that, do they?  They haven't lived long

24  enough to know that.  And when they get into a fistfight and

25  get punched, they shake it right off.  Doesn't mean anything to

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   them as it means to older people.

2         Now, they did talk about cars and car attacks and

3   what's the legality of running over people that are blocking

4   the street?  Again, what is the legality of it?  If you're

5   conspiring to do something and you intend to cover it up, you

6   don't care what the legality is.  It doesn't mean anything to

7   you.  But they talked about what the legality is.  And it's

8   sadly true that in some jurisdictions they passed laws -- North

9   Carolina being one that was in the Discord -- that said it's

10  legal.  They all asked, is it also legal in Virginia?  No, it

11  is not, thankfully.

12        So what does that say about their willingness to

13  engage in a conspiracy to run a car into somebody?  They didn't

14  agree to attack anybody offensively.  And there is no evidence

15  in this case that they did.  There is no testimony from

16  plaintiffs that they did.  There is no testimony from

17  defendants that they did.  Now, the plaintiffs stood up here a

18  minute ago and they told you the League of the South and the

19  Nationalist Front and this and that, and they've got red lines

20  going everywhere pointing at all the defendants and all the

21  groups agreed to run people over.

22        Okay.  Even if they agreed to do that, it was pushing

23  through them on a sidewalk.  It wasn't running them over with a

24  car.  They did it in prior events.  They were going to do it

25  here.  There is no foreseeability to this.  None.  None of

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    these defendants could have foreseen what James Fields did.

2    Ladies and gentlemen, there is no justice in blaming people who

3    didn't do it for what James Fields did.  James Fields ran over

4    the people.  James Fields injured these plaintiffs.  James

5    Fields killed Heather Heyer.  And he did it by himself.

6           Now, yes, the plaintiffs have produced evidence that

7    Fields was a member of an alt-right group, Vanguard America,

8    which is a member of Nationalist Front, which is not Identity

9    Evropa.  It is not -- Kessler is not a member of those

10   organizations.  But what they have not produced any evidence of

11   is any communication that reached Fields, other than alt-right

12   rhetoric, that would have constituted an agreement to do this.

13          And I want to leave you -- again, we can't go exhibit

14   for exhibit.  I can't put up 500 things professionally produced

15   and underlined and highlighted for you.  We don't have the

16   budget for that on the defense side.  But what I can do is

17   leave you with a visual that I think will be helpful.

18          If you examine -- excuse me.  If you envision the

19   alt-right as, instead of the horrible rhetoric and political

20   rallies and envision them as a softball team, they're going to

21   go to the field and play softball.  Now, the Antifa hate

22   softball in this example and they're going to show up and

23   counter-protest the softball, and softball is offensive to

24   people in this example.  So the good people of Charlottesville

25   are going to show up and counter-protest as well with the

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  Antifas.

2          They show up with their uniforms on, right, like

3  softball teams do.  Alt-right wears their uniforms.  They've

4  got bats, they've got balls.  That's incident to playing

5  softball.  Alt-right has got flags, they've got this, they've

6  got that.  They go out to the field.  Rocks are thrown, bottles

7  are thrown, this is thrown, that is thrown.  There's pushing,

8  there's shoving, and eventually the umpires say all you guys

9  get out of here.  No softball today.  Umpires obviously are the

10  police in this example.  It's too much.  There's too many

11  people.  There's too much pushing and shoving.  There's too

12  much chaos.  Get lost.  The game is canceled.  All of you.

13          And they do.  A little bit of objecting to what the

14  police said, a little bit of pushing and shoving with Damigo

15  and Spencer and pushing on the shields.  And that brings up a

16  very nice point, doesn't it?  As has been pointed out.  If

17  African American people did that, would the police have been

18  quite so calm?  Probably not.  But the police were calm.

19          The alt-right eventually leaves.  One or two of them

20  got tickets.  Mr. Damigo was actually taken into custody for a

21  few minutes and they let him go with a ticket.  And then an

22  hour and a half, per the evidence in this case, an hour and a

23  half to two hours later, while the counter-protesters are

24  celebrating canceling the softball game, James Fields runs into

25  a crowd of them in the parking lot of the softball field.  Rams

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  right into them.  Heather Heyer is dead.  Plaintiffs are

2  injured.  What is the alt-right reaction?  That guy might have

3  been one of us.

4       Now, they want you to believe that the reaction

5  proves conspiracy.  But does it?  Is there not a more innocent

6  explanation for the alt-right reaction to James Fields?  He

7  might have been one of us.  Maybe he had an excuse for what he

8  did.  Maybe there's some justification.  It seems ridiculous

9  now, four years later, when the man has been convicted and

10 sentenced to 400 years plus in prison.

11      But in August 12, 2017, what did we know other than

12 what was on the news?  And importantly, what evidence did the

13 plaintiffs put in about what Jason Kessler knew on August 18th

14 when he made that tweet, or what he knew when he sent money to

15 his jail account, or what he knew when he said you can call me

16 whenever.  All Kessler knew then as far as this case tells you

17 is that he might have been one of them.

18      Why wouldn't he support a supporter of his politics?

19 Why wouldn't the organization circle the wagons and say who is

20 this guy?  What should we do?  Were any of our people in

21 communication with him?  Should we support this man?  Is there

22 any defense for what he did?  The plaintiffs leave you guessing

23 about what they knew on August 18th and what they didn't, or

24 subsequently, September, October.

25      But what the plaintiffs also have not told you is

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   that as time goes on, as more evidence comes out, as better

2   video that we have now of what Fields actually did, backing the

3   car up and getting a running start, the whole thing comes out,

4   they stopped talking to him.  There is no defense.  Yes, at

5   that point they start saying, well, he's not really one of us

6   anymore.

7          Was he in Vanguard?  I don't know.  Does plaintiff's

8   evidence establish that?  That's up to you.  But even if he

9   was, what's that got to do with my clients:  Kessler, Damigo,

10  and Identity Evropa?

11         Now, let's talk a little bit more about Identity

12  Evropa.  The plaintiffs' entire case against them is that

13  Elliot Kline was an officer of Identity Evropa.  Yes, he was.

14  In August of 2017, he was an officer of the company Identity

15  Evropa, the organization.  But the evidence in this case shows

16  very clearly that -- and your jury -- let me back up.

17         Your jury instructions inform you that if an

18  individual has an independent personal stake in the conspiracy,

19  that the corporation or the organization he belongs to can't be

20  blamed for that.  The law excuses the corporation, per your

21  jury instructions, from any liability for the acts of this

22  individual, if you find he had an independent personal stake in

23  the conspiracy.

24         The evidence in this case shows that Elliot Kline

25  answered to Richard Spencer, not to Nathan Damigo or anyone

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  else in Identity Evropa during the course of these events.  You

2  recall that Spencer testified in this case, you recall he said,

3  no, no, no, Kline didn't work for me.  That's really cute, he

4  says.  But Spencer testified, you know, he knew who was in the

5  hierarchy of Identity Evropa.  He identified who the chief of

6  staff was of Identity Evropa.  And then he later, when he

7  testified a second time, said that Kline was never around me

8  during August 2017.

9       However, the evidence showed that Kline told him when

10  he cut Kessler off the #leadership channel.  He reported that

11  fact to Spencer.  And Spencer admitted that other people who

12  were in the hierarchy of Identity Evropa, Evan McLaren, Greg

13  Conte, etc, had job responsibilities towards Spencer.

14       So Mr. Kline was operating for his own benefit in

15  August of 2017.  He was not doing anything he was authorized to

16  do by Identity Evropa.  And therefore, pursuant to the law,

17  pursuant to your jury instructions on organizational liability,

18  you cannot sink Identity Evropa based on the activities of

19  Elliot Kline.  If you're to find against them, you must find

20  some other reason.

21       Now, to finish up, because we're not going to take as

22  long as the plaintiffs obviously, as defendants, I told you at

23  the beginning of this case, I'm defense.  I don't have to prove

24  a single solitary thing to any of you to win this case.  They

25  have to prove things.  They have to prove agreement by Jason

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  Kessler to hit people with a car.

2          Now, they have proven that Jason Kessler said all

3  sorts of stupid things, and that he knows a lot of these other

4  defendants, and they have proven that Jason Kessler doesn't

5  care very much about violence towards people he doesn't like,

6  at least Antifas.  But what they have not proven is that Jason

7  Kessler agreed to attack anybody in such a fashion.

8          Now, all right, admittedly, the law doesn't require

9  that Kessler agree that it's a car.  It could be anything

10 that's equivalent to that, anything that can deliver equivalent

11 force against another human being would be good enough.  That

12 would constitute foreseeability.  But ladies and gentlemen, I

13 suggest to you that the evidence in this case shows that

14 whether it's Kessler or whether it's Damigo or anybody else

15 who's capable of binding Identity Evropa, which is not Elliot

16 Kline, that the evidence shows that all they agreed to do was

17 get in a fistfight, pushing and shoving and hitting, and that

18 sort of thing, which they had done before and which they

19 expected to be able to do again.  Yes, they looked forward to

20 doing it.  Yes, they don't mind it.  Yes, they hate the

21 Antifas.  Yes, they want to fight the Antifas.  They did not

22 foresee that this would happen.

23         I'll close with this thought -- well, excuse me.  The

24 plaintiffs put in evidence of after-event activity by

25 Mr. Kessler, the tweet and then deleting the Discord.  Now, the

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    tweet we've already discussed a little bit.  The plaintiffs

2    gave you no evidence of what Kessler did or didn't know about

3    James Fields's liability when he made that tweet.  That's left

4    for you to guess at, and speculation is not something the jury

5    is supposed to do.  But as to deleting the Discord, it doesn't

6    prove what they think it proves.

7            What it proves -- Kessler texted Elliot Kline not

8    once, not twice, but three times before Kline answered him.

9    Why didn't Kline answer him right away?  Because he was

10   communicating with Richard Spencer to ask if he should do it or

11   not, his boss.  That's why.  Now, did -- at that point Kline,

12   not Kessler, deletes the Discord.  Kessler couldn't delete the

13   Discord.  If he could, he wouldn't have had to talk to Kline.

14           You heard Richard Spencer's testimony:  In August of

15   2017, I am the alt-right.  I'm above Kessler's head.  I'm the

16   leadership above Kessler's head.  They had to ask Spencer.

17           Now, you don't have to guess at what was in that

18   Discord.  The plaintiffs don't get to come up here and say,

19   hey, we've got sanctions against Kessler too, because they got

20   it all.  Yes, they got it despite Mr. Kessler's deletion of it,

21   or attempted deletion of it, but they got it all.  Look at the

22   evidence they put in from that Discord.  Find when you're back

23   there in the jury room any evidence that they agreed to do

24   something that is equivalent to a car attack.  If you can, if

25   it was foreseeable to them, you know what to do.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1        But if you cannot, ladies and gentlemen, all the

2   pictures of broken bodies and injuries, all the bravery that

3   some of these plaintiffs showed, all the alt-right rhetoric

4   doesn't justify a verdict for the plaintiffs here.  You've got

5   to find that evidence of foreseeability and of the agreement to

6   do something equivalent to the car attack, not pushing and

7   shoving, not punching, not rocks and bottles and shields and

8   balloons.  That's not good enough.  And if that's all they

9   agreed to do, they are not liable to these plaintiffs.

10        I suggest to you that that's the case.  I urge a

11  verdict for the defendants.  Ladies and gentlemen, thanks for

12  paying attention to me, it has been my absolute pleasure to

13  come to Charlottesville and present this case.  Whatever it is,

14  I look forward to your verdict.  Thank you.

15        THE COURT:  I think -- who's next?

16        MR. SPENCER:  Your Honor, I'll speak for at least 30

17  minutes.

18        THE COURT:  Is anyone going to be shorter?

19        MR. CAMPBELL:  Yes, sir.

20        THE COURT:  Would you?

21        MR. CAMPBELL:  Yes, sir, happy to.

22        Ms. Moody, could I get HDMI up on the screen.  I'll

23  go ahead and start, but I do need that up whenever you can.

24        Good afternoon, ladies and gentlemen of the jury.  As

25  you know, I represent James Fields in this case.  And as I told

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   you at the beginning of the case, I'm not here to represent

2   hate.  I'm not here to represent white supremacy.  I'm not here

3   to tell you anything along the lines of anything other than

4   James Fields intentionally drove his car into a crowd of people

5   and severely injured many of these plaintiffs.

6         I also told you that I wasn't going to make an issue

7   in this case of any past medical damages incurred by any of the

8   plaintiffs struck by Mr. Fields's vehicle.  And that in my mind

9   really this case as to Fields is significantly different from

10  the case as to the other defendants.  There is no doubt that

11  James Fields committed racially motivated violence in

12  Charlottesville on August 12th of 2017.  That is not a question

13  in anyone's mind.

14        The question as to Fields is the amount of

15  compensatory damages.  You do, you must award compensatory

16  damages to anyone struck by Mr. Fields's car.  Second, a

17  conspiracy, to the extent you believe plaintiffs have proved

18  Fields's participation in a conspiracy.  And third, I'll

19  briefly address punitive damages at the end.

20        And let me begin discussing the compensatory damages

21  with you by saying that literally my job is to make argument to

22  you as to the damages.  That's going to come off as minimizing

23  the pain and suffering that these plaintiffs have suffered as a

24  result of the actions of Mr. Fields.  That is literally my job.

25  So please bear that in mind as you listen to the closing

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  argument.

2       I want you to focus on a few of the Court's

3  instructions to the jury.  General instructions, you're sworn

4  to be fair, obviously, at the beginning of this case.  To avoid

5  a verdict based on prejudice, sympathy, guesswork, or

6  speculation.  Now, that doesn't mean you have to be inhuman,

7  but you have to be fair and use common sense.  You're the

8  finders of fact and judges of the credibility of the witnesses

9  and must use common sense in your deliberations and in

10  evaluating the evidence that's been presented to you.

11       Instruction, I believe it's number 18, you're the

12  ones who consider each expert opinion and give it the weight it

13  deserves.  If you should conclude the reasons given in support

14  of an expert opinion are not sound, you may disregard that

15  opinion.  You don't just have to say, well, an expert said that

16  so I have to believe it and it's the law of the case.  That's

17  not the case.

18       There is what's called -- I believe this is

19  instruction number 34.  And it's called a duplicate damages

20  instruction.  Now, this is important as to Fields, right?  It

21  says you can't compensate any plaintiff twice for the same

22  injury.  So like I said, you have to award damages against

23  Fields for any injury sustained by the people he struck with

24  his car, and you certainly may award damages for injuries

25  against Fields to people not struck by his car.  I'm not saying

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   one excludes the other result.

2           But then you've compensated those plaintiffs for

3   those injuries in the amount you felt was appropriate as to

4   Fields.  You can't then tag more money on as to Fields should

5   you find him in another count, that he's also liable for

6   something else, a different count in the case, because that

7   would run afoul of the duplicate damages instruction that

8   you've had from the Court.

9           And finally, the last instruction that didn't make it

10  onto the slide that I want you to consider is instruction 30

11  that the Court reread to you this morning, that said the

12  agreement to engage in unlawful conduct necessarily takes the

13  form of words.  That was in the instruction talking about --

14  well, we'll get into it a little bit later.

15          So I want to go on, and all I'm trying to do in this

16  case is I'm going to attempt to be as fair as I possibly can

17  and present you with what I believe the evidence you have

18  before you shows as to injuries sustained by each of the

19  plaintiffs.

20          Now, the injuries are vastly different, is all I'm

21  trying to point out here with respect to the plaintiffs.

22  Certainly they were all injured, and you have evidence of that,

23  by the totality of the acts that occurred, which I kind of

24  think of as August 11th, the torch march, August 12th, the

25  rally, and then the car attack.  So I'm not saying that anyone

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    not on this slide is not injured as a result of the totality of

2    the evidence and everything that you've heard about in this

3    case.  I'm just trying to demonstrate to you that there are

4    variations in the injuries.

5           Marcus Martin was directly struck by the car, severe

6    physical injuries.  Thomas Baker, directly struck by the car,

7    severe physical injuries.  Natalie Romero, directly struck by

8    the car, severe physical injuries.  Marissa Blair, physical

9    injuries as a result of avoiding the car as a result of

10   Mr. Martin's heroic act, selfless act in shoving his fiancee

11   out of the way rather than immediately attending to his own

12   safety.  So that's as good as directly struck by the car for

13   sure.  And the same with Chelsea Alvarado, sustained physical

14   injuries when the drum she was holding was struck by the car.

15          Now, the plaintiffs not physically injured by the car

16   attack, Elizabeth Sines has -- was not struck by the car, no

17   physical injury, and even on the last slide you saw from

18   plaintiffs' counsel as to damages, no claimed medical bills, no

19   claimed lost wages.  Then you have Mr. Willis, Devin Willis.

20   No physical injury, no prior medical bills claimed, but there

21   are some future medical bills claimed in his.  Seth Wispelwey,

22   no physical injury and no wage loss claim.  But he does have

23   past medical treatment claim that we're not disputing, and

24   those claims are for therapy and counseling.  April Muñiz, no

25   physical injury, and similarly, she does have past medical

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   treatment claimed for therapy and counseling, not disputing

2   those in any way.

3           But then, even amongst the people who are directly

4   struck by the car, basically all I'm trying to impress on you

5   is to actually look at the circumstances of each individual

6   plaintiff rather than see them as a collective group because

7   there are great disparity in the injuries sustained.

8           Ms. Alvarado's damages -- and I'll go through these

9   quickly -- 28,000 in past medical expenses and 2,400 in lost

10  wages over the last four years.  And you'll have the

11  documentation.  So I'm using rough numbers.  I'm hopefully

12  rounding up.  I'm definitely trying not to round down and

13  understate the damages.  This is just to give you kind of a

14  representative example to compare the injuries sustained rather

15  than -- definitely don't use my numbers.  Go back and look at

16  the exhibits you have in the back.  Chelsea Alvarado with

17  $28,000 in past medical expenses claims over $256,000 in future

18  medical treatment, including life coach, $2,500 a year for the

19  next 60 years.

20          So, as I said, I'm not contesting any of the past

21  medical treatment that anyone has had.  I will point out things

22  that I think you should consider in evaluating whether future

23  medical treatment that is claimed in the case is appropriate to

24  award, especially if that treatment hasn't occurred in the last

25  four years, but then is claimed going forward for many years.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1        And then also, she was diagnosed with PTSD in the

2   99th percentile of the nation.  And that would be, obviously,

3   the top 1 percent.  And the 99th percentile of the nation would

4   include military, people coming back from overseas war zones,

5   domestic abuse, rape victims.  The testimony was she's in the

6   99th percentile, so the top 1 percent of the most severe of all

7   people that suffer PTSD in this country, was their expert's

8   testimony.

9        Moving on to Thomas Baker, he has $65,000,

10  approximately -- again, please use the actual numbers -- in

11  past medical expenses -- and I'm attempting to go in

12  alphabetical order here.  There's not any plan or anything like

13  that with the order in which I'm going through the plaintiffs

14  here.

15       Thomas Baker, $65,000 in past medical expenses,

16  including hip surgery, hardware, scarring, no doubt.  $5,000 in

17  lost wages.  And then the life care plan includes $3,500 per

18  year for lawn care for the rest of his life and $50,000 for a

19  gym membership.

20       It also includes -- and this is a little bit of an

21  important distinction just for Mr. Baker and Mr. Martin's

22  future medical claims -- it includes $86,000 for future hip

23  surgery not supported by any medical doctor.  So in Virginia,

24  Nurse Reavis can't diagnose or provide causal relationship for

25  a future surgery, as is attempted to be done here.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1        And in saying that, I'm not trying to say that

2    Mr. Baker may not need that surgery.  I'm not trying to say

3    Mr. Baker or his counsel are attempting to do anything

4    inappropriate in claiming that surgery.  I'm just saying that

5    surgery lacks foundation, that no medical doctor has provided

6    you any medical evidence that that surgery will be required to

7    a reasonable degree of medical probability, which is what has

8    to happen in Virginia.  And I'm not saying that plaintiffs

9    forgot to call an expert for that, because there isn't an

10   expert that holds that opinion, to my review of all of the

11   medical records.  So it's just -- it's a too-early-to-tell kind

12   of thing.  And that's not enough in Virginia to award damages

13   for that.

14        Marissa Blair, again, thankfully wasn't injured,

15   physically injured, nearly as she would have been had her

16   fiance not gotten her out of the way of the car.  But we're

17   presented with the case as it is, and her current claim is

18   $1,100 in past medical expenses, no lost wage claim, and

19   recently passed the bar exam, which is wonderful.  But she of

20   course has a claim for emotional trauma as the result of the

21   passing of her friend, the injury to herself, witnessing the

22   events that day, and of course the injuries to her fiance at

23   the time, and then later husband, Mr. Martin.

24        Mr. Martin, $35,000 in past medical expenses.

25        And let me say, overarching:  I'm not going to

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    suggest to you anything as to what is an appropriate award for

2    these folks.  That is entirely your decision.  I'm just trying

3    to point to the variations and the differences in the

4    medical -- the injuries sustained.  But I'm not going to tell

5    you, "I think this person should get this."  That is not my

6    place, for sure, in this case.

7              Mr. Martin had $21,000 in lost wages.  Lower leg

8    fractures -- I believe "shattered" is how it was described --

9    and surgery with hardware, certainly scarring, and diagnosed

10   with PTSD as well.  Just pointing out for your consideration

11   that all of the future claim is not equal.  So I would just ask

12   that you look at those individually and kind of see what they

13   consist of in this case.  It includes YMCA membership and

14   treatments that Mr. Martin hasn't had in the last four years,

15   but projecting he'll need them for the remainder of his life.

16   His also contains a future hardware surgery -- a future surgery

17   for hardware removal -- I apologize -- that is not supported by

18   medical evidence.  Again, it's not that the plaintiffs missed

19   it.  It's that no doctor holds an opinion to the reasonable

20   degree of medical probability that's required under Virginia

21   law, in anything that I've seen, and certainly not in any

22   evidence that's been presented to you.

23             Ms. Muñiz's damages:  Not hit by the car and no

24   physical injury.  She has $7,000 in past medical expenses and

25   claims $205,000 in lost wages as a result of no physical injury

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  from the incident.  Fortunately was, you know, narrowly missed

2  by the car.  All of her treatment is therapy.  And similarly,

3  she was diagnosed by Dr. Webb with PTSD in the 99th percentile

4  from seeing the car attack.

5        Ms. Romero's damages:  Obviously another catastrophic

6  injury.  Skull fracture, concussion, $62,000 in past medical

7  expenses, and certainly wouldn't quibble whatsoever with PTSD

8  in the 99th percentile for what Ms. Romero has been through.

9  And diagnosed with a moderate traumatic brain injury, which is

10  actually pretty darn severe.  Right?  So "moderate" doesn't

11  mean -- you know, it's the second of three levels, but it's

12  severe.  And then just mentioning her future life care plan

13  includes mostly treatment and therapy that she hasn't had over

14  the last four years, but is projected by Nurse Reavis to need

15  for the rest of her life.

16        Ms. Sines's damages:  Not hit by the car, no

17  physical -- fortunately.  Of course, in all of these cases that

18  weren't hit by the car, it's fortunate they weren't.

19  Fortunately not hit by the car, no physical injury, no claim

20  for any medical expenses, no lost wages.  That I'm aware of,

21  the evidence didn't show any delay in graduation from UVA law

22  school or passing the bar, and then she's a highly successful

23  attorney at a large international firm.  I only mention that to

24  indicate that requires a high level of functioning, certainly

25  much higher than mine.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1          Mr. Devin Willis's damages:  No medical expenses or

2    wage loss related to Fields claimed in this case.  Right?  So

3    this one is a little bit different.  So Mr. Willis has a claim

4    of $37,800 in future medical expenses for treatment of PTSD and

5    that he hasn't had any of that treatment in the last

6    four years, but it's claimed -- it's projected that he will

7    need it going forward.  And importantly, the expert in that

8    regard specifically testified that Willis could not get PTSD

9    from watching the car attack on TV.  And to my recollection,

10   she basically related that diagnosis that requires the future

11   medical treatment to the torch march, to Mr. Willis' attendance

12   at the torch march.  So in that regard, I don't think damages

13   for the future medical treatment are properly returned against

14   Mr. Fields; however, any other associated damages you find

15   related to Mr. Fields certainly are permissible and at your

16   discretion.  And then also diagnosed with PTSD in the 99th

17   percentile from events at the torch march, which I believe -- I

18   don't want to say it involved no physical injury, because I

19   think there was talk of bruises and perhaps cuts, but no

20   significant physical injury at the torch march, but certainly

21   PTSD would be more of emotional trauma.  But again, that one,

22   the 99th percentile, it's up to you all to ascribe what you

23   think of experts' opinion.

24          Seth Wispelwey's damages:  Not hit by the car.  No

25   physical injury claimed in the medical evidence.  He has

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  $32,000 in past medical treatment, which I'm not arguing is not

2  appropriate and that you shouldn't base an award on those

3  numbers, and it certainly include no wage loss claim documented

4  in any of the evidence, despite a little testimony regarding

5  effect on employment.  He claimed to attend the event with

6  apparent pretty in-depth knowledge of what was going on.  He

7  did a video shoot for a national TV news show in advance of

8  UTR, and I believe had a mic during the event.  And all of the

9  claimed medical treatment for Reverend Wispelwey is counseling,

10 other than an emergency room visit for a panic attack in 2020.

11      All right.  Briefly, as to Fields's role in any

12 conspiracy, right, we've had just voluminous discovery in this

13 case.  Obviously, you've seen a lot, but certainly there's more

14 that you haven't seen.  Evidence of communications, Discord

15 posts, tweets, direct messages, texts between individual cell

16 phones of defendants, and none of that for Defendant Fields

17 other than tweeting at Richard Spencer and, I believe, David

18 Duke on a couple of occasions, and then maybe another fellow

19 who may or may not be a defendant in the case, but regardless,

20 was kind of in this whole world.

21      As you heard from Mr. Spencer, tweeting at doesn't

22 mean the other person ever even read that tweet, or ever even

23 saw what you attempted to communicate to them, and, in

24 Mr. Spencer's case, I think he said didn't.  Not only that, but

25 the handle in no way -- the Twitter handle, the way the account

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  is named, in no way references James Fields's name.  There's

2  zero evidence that anyone ever heard of or knew James Fields

3  until they saw, as we all did, the news coverage of the

4  horrible car attack on August 12th.  So nobody knew who that

5  guy was at all.

6        So there's no planning.  So, as I said, the agreement

7  to engage in unlawful conduct necessarily takes the form of

8  words, right?  So where is the evidence of any words?

9  Clandestine -- you know, it's basically, the plaintiffs are

10  asking you to speculate that, because he got there in a white

11  pole shirt and a pair of khakis and held a shield, that he had

12  to have been involved in planning and had a role in this

13  conspiracy.

14        He didn't go to the torch march because that was

15  secret.  That wasn't just on the regular, you know, Facebook or

16  Twitter feeds of the defendants.  And so he's not there because

17  he doesn't know of it.

18        Now, he certainly celebrated it when he saw video

19  that evening or saw images.  He certainly celebrated the torch

20  march, but he wasn't there because he's not in -- he's not in

21  the "in" crowd.  He's not part of the group or the conspiracy.

22        You heard evidence in this case that the Vanguard

23  America leadership thought the two guys, Rousseau and -- I'm

24  blanking on the other fellow's name, but they fought over why

25  Fields was given a shield and permitted to walk with the group.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   And -- Dillon Hopper was the other leader of Vanguard.  And

2   they're arguing with each other:  Why did you give that guy a

3   shield and why did you let him walk with our group?  And the

4   Rousseau guy said, "I just wanted to make us look bigger and

5   like we had more members for the media, so I handed the guy a

6   shield and he walked with us."  That's it.

7            Now, I'm sure plaintiffs are going to say that's

8   enough, and that's enough to be a part of the conspiracy, that

9   you never knew anyone, never heard of anyone, never knew who

10  you were, but I submit that's not an agreement to engage in

11  unlawful conduct in the form of words.  And, at most, it would

12  be an agreement to participate in the Unite the Right rally,

13  not -- unless there's evidence that I missed, there hasn't been

14  any evidence that anyone spoke words with Fields at the rally

15  and said, "Hey, go hit a crowd of people with a car down the

16  street, if you could help us out with the goal we're trying to

17  accomplish."  That's just not there.

18           So, basically, Fields has no role in communicating,

19  planning, anything like that, for the Unite the Right rally.

20  Attends, and certainly shared the white supremacist beliefs of

21  the rally organizers.  Not disputing any of that, that he was a

22  fan of Richard Spencer, that he espoused all of these same

23  beliefs.  But he didn't organize or plan.  He was merely an

24  attendee.  And at most, even if you can kind of drag him into

25  the conspiracy to have the Unite the Right rally, it's clearly

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   a lone wolf attack two hours later and blocks away, on his own.

2   The rally is over.  Unlawful -- it never got started, to frank.

3   It was before noon when the unlawful assembly is declared, and

4   the Unite the Right rally is scheduled to start at noon.  And

5   then it's about 1:45 when Mr. Fields intentionally drove his

6   car into a crowd of people, including many of the plaintiffs.

7          That's terrible.  It's horrible.  But it requires you

8   to speculate to tie him in to the conspiracy.

9          There's certainly a conspiracy of the co-defendants.

10  They definitely conspired to have the Unite the Right rally to

11  varying extents.  But, I mean, it's far afield to say that

12  Fields participated in a conspiracy for he as a lone wolf to

13  drive his car into a crowd of people.

14         So what I would ask -- I'm almost done, Your Honor --

15  the question I would ask you is that:  Just because Fields saw

16  a public posting and went to the event, does that mean everyone

17  who went to the event, not as a member of any of these groups,

18  just to protest the removal of the Lee statue, are all

19  responsible for Fields's act?  And I think that answer is no.

20         Thank you very much for your time.  We appreciate

21  your attention over these long four weeks.

22         THE COURT:  All right.  Members of the jury, we'll

23  take our lunch break.

24         MR. CAMPBELL:  I'm sorry, Your Honor.  Can I have one

25  more minute, maybe 30 seconds?

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1          So the last thing would be as to the punitive

2     damages.  As I discussed previously and as there is a document

3     in evidence, and you heard me read that document to you from

4     the stand, the punitive damages are just to punish and prevent

5     someone from doing a similar act in the future.

6          James Fields is in prison for life for -- he has been

7     given 30 life sentences, plus years.  And there's no need to

8     deter him from doing additional acts by any punitive damage

9     award.  To the extent that any punitive damage award against

10    Fields is requested to deter others from doing similar acts, I

11    think the news coverage of the many, many life sentences does

12    that just fine.

13          Thank you very much.

14          THE COURT:  All right.  Members of the jury, we'll

15    take a lunch recess now for an hour.  I've got 12:35.  We'll

16    come back at 1:35.

17          Do not discuss the case with anyone or allow anyone

18    to discuss it with you or remain within the hearing of anyone

19    discussing it.

20          You may recess.

21    **(Jury out, 12:36 p.m.)**

22          (Recess.)

23    **(Jury in, 1:35 p.m.)**

24          THE COURT:  You may be seated.

25          Mr. Spencer, you may proceed.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1          MR. SPENCER:  Thank you.

2          Well, this is it.  It's the end of the road, and in a

3   few hours this case will be in your hands.  I want to get back

4   home for Thanksgiving as much as you do.

5          There haven't been very many Charlottesville rallies

6   for me over the past few years.  I have spent many, many more

7   hours as a T-ball instructor, amateur bowling coach, and pizza

8   party organizer than I have doing a big rally, taking the

9   stage, and I want to get back to that.

10          This has been a very difficult case for me.  At

11   moments I've hated it.  I've sometimes expected them to bring

12   out a stockade so that everyone could throw vegetables at me.

13   Thankfully, they have not done that.  But it has felt a lot

14   like character assassination.  That being said, I am ultimately

15   deeply grateful that this has happened, because a case like

16   this was bound to happen sooner or later.  And what I mean by

17   that is that at some point a lawsuit would arise that directly

18   touched on what you could call extreme rhetoric or marginal

19   people or radicals of all kind, and that the task when that

20   occurred was to look at the law squarely and apply it fairly

21   and precisely.  And that is your job.

22          If the law is not applied fairly and precisely, I'm

23   afraid to say that lawsuits like this can be used as a weapon

24   against free speech.

25          THE COURT:  Mr. Spencer, I started out this case

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   saying this jury has this lawsuit.

2              MR. SPENCER:  I know.

3              THE COURT:  And don't -- and there are issues in the

4   case that I've instructed the jury on.  And they're not to be

5   worried about anything outside of this particular case.

6              The law is served if everyone does their duty.  And

7   that's all the jury should be thinking about here, is following

8   the instructions of the law.

9              MR. SPENCER:  Well, I'll talk about this case.

10              You've probably heard the line that "war is politics

11  by other means."  That was actually said by a man named

12  Clausewitz, who was a general himself.  He was also an

13  historian and theorist.  His point was that war isn't just

14  about blood and guts and the rest; that war is the continuation

15  of policy -- that is, it has particular aims.

16              This lawsuit, like war, is politics by other means

17  unless you apply the laws in question fairly and strictly.

18              Counsel for the plaintiffs, Roberta Kaplan, was

19  interviewed by a magazine not too long ago and she was asked to

20  discuss this case, not any kind of damages --

21              THE COURT:  Wait, wait, wait.  Is that in evidence in

22  this case?

23              MS. KAPLAN:  It is not, Your Honor.

24              THE COURT:  No.  You may not go outside the evidence

25  in this case.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1          MR. SPENCER:  Okay.

2          You might remember this exchange from some text

3    messages that were put into evidence in this case.

4          Christopher Cantwell said, "I'm willing to risk a lot

5    for our cause, including violence and incarceration."  And my

6    response was, "It's worth it."

7          When someone says that they're willing to risk

8    violence and incarceration, that should not be equated with any

9    desire for those things to occur.

10          Now, in terms of Christopher Cantwell's actions

11    during August 11th and 12th, he's going to have to deal with

12    those himself, but I absolutely endorse that sentiment.  A

13    cause is worth risking violence and incarceration.

14          What is that cause?

15          Professor Simi has attempted to equate any kind of

16    white nationalist feeling or impulse with violence, and it's a

17    rather slippery slope to conclude that if you have these

18    thoughts, you must be up to something malign.

19          I can tell you how I feel and I can tell you how I

20    understand white nationalism.

21          White nationalism is about family.  It's about us.

22    It's about feeling a part -- it's about being a part of

23    something bigger than your individual self and desiring and

24    being willing to risk things and being dedicated something so

25    that that can survive further.  That's what it's about, in a

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  nutshell, to get the heart of the matter, at least for me.

2  That absolutely is a cause that I would risk quite a bit for.

3          That basic impulse is something that people around

4  the world would embrace.  Billions of people.  But as we know,

5  for some reasons I don't need to go into, it is highly

6  controversial, if not criminalized, when white people express

7  those sentiments.  But that is something that I sincerely

8  believe in, and that is something that I am willing to risk

9  things for.

10         If law is not applied precisely and fairly, we

11  really -- in this case, we really do run the risk of

12  encroaching on free speech.  And simply declaring that any form

13  of white nationalism is, if not criminal exactly, malign --

14  you've heard the plaintiffs say today, well, Spencer's speech

15  is -- lofty, I think is the word they used, fancy, but don't be

16  fooled.  It's the same thing.  It doesn't really matter, in the

17  words of Roberta Kaplan.

18         Well, it actually does matter quite a bit.  It does

19  matter what your sincerely held beliefs are, what motivates

20  you, what inspires you, why you're willing to do something kind

21  of crazy and stupid like go to a rally and face off against the

22  police and get expelled from a park and all that.  It actually

23  does matter.

24         James Fields has admitted to, effectively, racially

25  motivated violence in his car attack.  James Fields is a man I

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    had no real communication with and so on.

2           But it really does matter what inspires me.  It

3    really does matter how I behaved at moments of crisis during

4    that day.

5           So what happened?

6           I was invited in June of 2017 to participate in what

7    was called, almost immediately, the "Unite the Right rally," by

8    Jason Kessler.  I agreed.  As I have told you, it felt like the

9    next stop on the Spencer tour that was going on throughout

10   2017.  I spoke at multiple universities.  Antifa would show up.

11   I hosted what were effectively academic conferences.  Antifa

12   showed up.  But with all of those, I was never accused of being

13   involved with some kind of conspiracy that ultimately derived

14   from my beliefs.

15          Those events before Charlottesville were, in fact,

16   great, if not perfect.  I loved getting up on stage and talking

17   with someone who vehemently disagreed with me.  I loved

18   bringing my message, which I was frustrated about being

19   marginalized for all these years, toiling away in obscurity.  I

20   loved bringing that message and making a headline, feeling like

21   I could be a public figure.  That is what I agreed to when

22   Jason Kessler invited me to speak at the Unite the Right rally.

23   That is absolutely what I wanted.  And the last thing in the

24   world that I wanted by agreeing to speak at Unite the Right was

25   an event that became a catastrophe that involved the tragic

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   death of a young woman, that involved the injuries to the

2   plaintiffs, and that will forever remain a stain on the cause

3   that I sincerely believe in.

4           What was unique about Unite the Right, I think, is

5   there in the very name, "Unite the Right."  Previous to that,

6   events that I attended were, again, academic-style conferences.

7   I organized, I don't know, ten or so of those.  Previous to

8   that, events were myself on stage at a university talking to

9   students and having it out in a great way.  Previous to that,

10  events that I participated in were flash mob, as it's called,

11  events where you -- this is Charlottesville 1.0.  You don't

12  announce it publicly.  You come in, you get out, you make a

13  spectacle, make a splash on social media, et cetera.

14          What was unique about Unite the Right was that Jason

15  Kessler was actually attempting -- the title of the event -- to

16  bring in everyone.

17          After Charlottesville, Donald Trump got into quite a

18  bit of trouble when he said, as I'm sure you know, there were

19  good people on both sides.

20          THE COURT:  Mr. Spencer, there's no evidence of that.

21  You may not bring in comments --

22          MR. SPENCER:  That's common knowledge, Your Honor.

23          THE COURT:  No.  Mr. Spencer, you have to follow --

24          MR. SPENCER:  I can tell them that he said this.

25          THE COURT:  Well, you may not bring in -- you may not

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   go there.  It's not lawful.

2            MR. SPENCER:  I'm not saying -- I'm not doing what I

3   think you might think I'm doing.

4            THE COURT:  No.  I'm telling you, we're not -- we

5   can't go back to law school here.  We've got -- you have to

6   follow the rules, and I'm telling you the rules.  There's no

7   evidence of what Mr. Trump said and you may not refer to it.

8            MR. SPENCER:  Okay.

9            I agree with the sentiment that there were good

10  people on both sides.  I think some good people are among the

11  plaintiffs, to be honest.  Natalie Romero has been in my

12  thoughts over the past month.  And the reason is that I found

13  her to be a good person, and I know that she suffered.  And

14  that is disturbing.

15           But if I were to tell you the whole truth of the

16  matter, there were some bad people on both sides.  That is the

17  whole truth.  I'm, of course, referring to entities like Antifa

18  and so on.  I don't think we need to go into that.

19           But James Fields' attack on a crowd was an

20  extremely malign thing.  Figures like Vasilios Pistolis,

21  Mark [sic] Chesny, from what I've learned from them during this

22  trial, they're bad people.  Some of my co-defendants who aren't

23  here haven't complied with discovery.  They aren't facing up to

24  the facts.  They aren't having their day in court.  You can

25  make of that what you will.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1        What was unique about UTR was that it was trying to

2   create this massive tent of people, the good and the bad.  I

3   did not recognize that at the time for, among other reasons, I

4   was not involved in the slightest bit with the Discord planning

5   server.

6        Professor Simi has spent a thousand hours, gone over

7   half a million messages.  There is no evidence that I

8   participated in any way in that private server.  There is no

9   way that I could have prevented that rhetoric from getting out

10  of hand.  There is no way that I could have been knowledgeable

11  about what was going on.  I didn't know about the existence of

12  that thing, and there's no evidence to the contrary.

13       But we do have evidence of how I dealt with a very

14  difficult situation on August 12th.  And I think this speaks

15  volumes to what my motivations were in agreeing to that event,

16  what my motivations were at the time, and what my motivations

17  were in the immediate aftermath.  I'll just use this picture

18  just to remind you -- I played you audio that I was recording

19  live.  When I went to Lee Park, or Emancipation Park, to speak

20  my mind, to get the message out there, and a state of emergency

21  was called before a single word had been spoken, I passively

22  resisted getting expelled from the park.  I told the cops

23  there, "Don't do it, don't do it.  I'm not going to harm you.

24  I'm not going to fight back.  Don't do it."

25       Well, needless to say, they won.  I ended up maced,

137

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   among other things.  And my security team, which is the kind of

2   organizing that I was involved in, we thankfully got out of

3   there.  I passively resisted the police, sure.  I did not harm

4   anyone.  I did not order anyone to be harmed.  The kind of

5   violence that I participated in was done on me, and you can see

6   it there.

7        At 12:30 p.m, one hour before James Fields's car

8   attack that killed Heather Heyer and injured plaintiffs

9   occurred, I tweeted out the following.  This is a public

10  message.  I had 70,000 followers.  I was at the height of my

11  fame or infamy.  Everyone was watching Charlottesville at the

12  time.  I don't know how many people saw this, but I don't think

13  I've probably ever had a tweet that could have had more

14  notoriety.  "My recommendation" -- this is an hour before the

15  car attack, this is an hour before Heather Heyer's untimely

16  death.  "My recommendation:  Disperse.  Get out of

17  Charlottesville city limits.  State of emergency has been

18  called."

19       That is, get out of town and obey the law.  That was

20  my message.  If I'm a general in some evil army to inflict

21  violence on people, well, let's say I'm a really bad one.  I

22  send a lot of mixed messages, don't I?  If you want a terrible

23  group of people to go inflict violence on others, you don't

24  want Spencer in charge because he's going to do stuff like

25  this.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1         At a point -- I am not a perfect person.  I'm

2    actually a deeply flawed personal person -- a deeply flawed

3    person.  But at a moment of crisis, this was my reaction.

4         I have never uttered the phrase, "James Fields did

5    nothing wrong."  James Fields did do something wrong, to put it

6    mildly.  I have not attempted to contact him.  I have not

7    attempted to present him as a martyr, and I don't even like

8    that concept.

9         Again, days after an event that I was invited to --

10   and which, frankly, I didn't properly understand -- this was my

11   response to the type of rhetoric that was promoting the car

12   attack, as we can see here, by Mr. Kessler.  I don't have to

13   read it, but he's basically saying it was payback time.

14   Payback, as I tweeted, is a morally reprehensible idea.  This

15   isn't what I signed up for.

16        Now, the plaintiffs have claimed that I'm motivated

17   in some kind of scheme.  I don't like Kessler.  I want to get

18   rid of him.  Maybe there's something to that.  But it doesn't

19   matter.  The fact is, in life no one is perfect.  We make

20   mistakes.  We misanalyze situations.  We don't understand what

21   we're getting into, all of that.  But there are crucial times

22   of crises when you have to make a call.  And here are my calls

23   that I made in public to millions of people.  This is how I

24   responded.  Does that sound like someone involved in some evil

25   conspiracy to harm someone?

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    Again, if you want to take the plaintiffs' word for

2  it, I'm sending some very, very mixed messages.

3    I'm going to leave you with two points.  Your task is

4  to fairly, accurately, precisely apply the law.  I offer this

5  as a kind of big picture of how that can be done at its best.

6  I think there are two concepts of justice that inform our

7  application of the law.  One of those concepts is very old, and

8  it still has a strong psychological tug on us.  You might have

9  heard the phrase "scapegoating."  I'm sure you have.  You might

10  be surprised to learn that that is exactly what people in the

11  ancient world did.  There would be a poor little innocent goat,

12  and the tribe would cast all of its bad feelings and sins, rage

13  onto that goat and they'd shove him out into the wilderness or

14  into the desert to die.

15    This is entirely irrational, but I think it actually

16  probably was psychologically effective.  We all need a

17  catharsis to stamp out something that's bad.  But there is --

18  so that type of justice is you could say all too human.  We're

19  all susceptible to it on some level.

20    There's another type of justice that is uniquely

21  human, and for the sake of this I'll call it Newtonian justice,

22  after Isaac Newton, who discovered that there are rational,

23  discernable laws of the universe that apply everywhere.  That

24  is your task over the next day or so, to pursue Newtonian

25  justice, the fair, rational and precise application of law, and

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  not to give in to that older form.  And that, for anyone, is a

2  difficult task.

3          Now, these two conceptions of justice have -- when

4  I've been thinking about these over the last few days, have

5  brought up a figure, perhaps the most unique figure in human

6  history.  That is Jesus.  And I am speaking about him purely in

7  a historical sense.  What made Jesus a radical, an extremist?

8  What got him executed?  What made him the object of hatred by

9  his own community, not just --

10          THE COURT:  Mr. Spencer, I don't know where you're

11  going.

12          MR. SPENCER:  Your Honor, you can't cut me off when

13  I'm making --

14          THE COURT:  Yes.  Yes.  Yes.  I can tell you, if you

15  get out of line, I have to.

16          MR. SPENCER:  I'm going to finish this point.  This

17  is a point about the notion of justice.  It's about the task

18  that we're involved in here.  You can't cut me off for using

19  poetry.  That's absurd.

20          THE COURT:  Look, Mr. Spencer, don't start that now.

21  Look, I'm telling you, argue this case, the law.

22          MR. SPENCER:  I am arguing this case.

23          THE COURT:  Okay.

24          MR. SPENCER:  It's within my right, particularly at

25  summation, to give people the big picture.  If I can't do it

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    now, when can I do it?

2            THE COURT:  I've told you, Mr. Spencer, stick to this

3    case.  I don't know where you're going with this --

4            MR. SPENCER:  You'll see where I'm going if you don't

5    interrupt me.

6            THE COURT:  Don't argue anything but the law of this

7    case, okay?

8            MR. SPENCER:  Well, it's difficult and I'm going to

9    finish.

10           THE COURT:  All right.  Try.

11           MR. SPENCER:  Jesus was a teacher of the law of

12   Moses.  And what was radical about him was that he claimed that

13   this law did not just apply to his own community, but applied

14   to everyone.  That at this day is a radical statement.

15           Your task -- and it's a difficult one -- is to apply

16   the law fairly and precisely even to those whom you might

17   despise, even to those who you think might not even be

18   deserving of it.  That is your task.  And for the next day or

19   two, I am in your hands.  Thank you.

20           THE COURT:  All right.

21           MR. JONES:  Good afternoon.  I represent Michael

22   Hill, Michael Tubbs and the League of the South.

23           At the beginning of this case, I suggested two issues

24   to focus on for my clients.  The first issue is whether they're

25   responsible for what happened at the torch march.  The second

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  issue is whether they're responsible for the car attack that

2  James Fields perpetrated.  And now we've been instructed on the

3  law and so we know that in order for Michael Hill, Michael

4  Tubbs and the League of the South to be responsible for the

5  torch march, they must have conspired, entered into an

6  agreement with people at the torch march to cause racially

7  motivated violence.

8         In order for Michael Hill, Michael Tubbs and the

9  League of the South to be responsible for James Fields's car

10  attack, they would have had to enter into an agreement and

11  James Fields would also have to have been part of that

12  agreement.  I'm going to take those two issues in turn.  And

13  I'll start with the torch march.

14         You'll be able to review the exhibits that have been

15  introduced as evidence with you when you're deliberating.  This

16  is Defense Exhibit 10.  Two hours before the torch march, a

17  member of the League of the South emailed Michael Hill and

18  said, "Torchlight rally time and location have been leaked and

19  Antifa is posting that they will be there.  If League of the

20  South is in attendance, be cautious."

21         What was Michael Hill's response to this private

22  email, before anything had happened, before he had any reason

23  to suspect that anyone would ever see this email again?

24  "Thanks, but this is not our game."

25         You cannot be more explicit than that.  You cannot be

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    more explicit that there is no agreement for the League of the

2    South for Michael Hill, for Michael Tubbs to be in part of a

3    conspiracy to commit racially motivated violence at a torch

4    march.

5           He follows it up and he says, "we are sending two

6    observers."  Does sending two observers change anything about

7    that?  Let's talk about that for a minute.  We heard evidence

8    in this case that Devin Willis went to the torch march as an

9    observer.  Remember the words of some of the plaintiffs, they

10   went to stand witness.  That's another word for saying they

11   went to observe.  Elizabeth Sines went to the torch march to

12   observe.  Natalie Romero went to the torch march to observe.

13   Being an observer does not make you part of an agreement to

14   commit racially motivated violence.

15          So after four years of litigation, three weeks of

16   testimony, plaintiffs have failed to meet their burden to prove

17   that Michael Hill, Michael Tubbs, or the League of the South

18   conspired to commit racially motivated violence at the torch

19   march.

20          As you're deliberating, please review Defense Exhibit

21   10.

22          Now let's go to the Fields car attack.  The

23   plaintiffs' burden, significant burden on that point is they

24   have to prove that James Fields had an agreement with somebody

25   else, and that Michael Hill, Michael Tubbs and League of the

144

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  South were part of that agreement, and that the car attack was

2  a foreseeable outcome.

3       Let's start with the basics of the car attack, the

4  when, the who, and the where.  When did the car attack take

5  place?  As you've heard, it was at 1:41 p.m. that Saturday.

6  Unlawful assembly was declared at 11:30 a.m.  That's two hours

7  and 11 minutes after the rally.  If you watch closely one of

8  the videos, right before the car attack, you'll hear somebody

9  in the crowd say, "there's not a white nationalist in sight."

10  Everybody had left except James Fields, acting alone.

11       The next question is who perpetrated the car attack?

12  Was James Fields with any of the co-defendants?  No.  He was

13  alone.  He was driving the car by himself.  We've heard private

14  jail phone calls between James Fields and his mother.  We've

15  seen dozens of tweets.  We've seen pictures of his bedroom at

16  home.  We've seen texts between him and his mother.  Not one

17  time has James Fields said, I was part of a conspiracy, there

18  was an agreement with somebody to drive my car into those

19  protesters.

20       Professor Simi reviewed half a million Discord posts.

21  He testified that the rally was centrally planned on Discord.

22  We have no evidence of a single Discord post by James Fields.

23  So who was James Fields communicating with on August 11th and

24  August 12th?  He was communicating with his mom.  He wasn't

25  texting any of the co-defendants.  He was talking to his

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   mother.

2        Where did the car attack take place?  This is the

3   second page of Jason Kessler's permit application for the

4   rally.  You'll notice under the section where it says "event

5   location," Jason Kessler wrote "Lee Park."  The car attack was

6   not at Lee Park.  The car attack was at the intersection of

7   Fourth and Water Street.

8        So after four years of litigation and discovery,

9   combing through phone records, computer records, what evidence

10  do the plaintiffs have on that crucial question about whether

11  James Fields entered into an agreement -- remember, an

12  agreement is between two people.  It's not somebody tweeting at

13  somebody else.  That's not an agreement.

14       Well, the plaintiffs have proved that the car attack

15  was a horrible, horrible incident that caused many people,

16  including many of the plaintiffs, significant injuries.

17  They've proved that point.  They've proved that many people who

18  attended the rally did so, and that they had views that are

19  offensive.  They've proved that James Fields is serving 30 life

20  sentences now.

21       But what about the conspiracy and what about the

22  agreement?  This is the evidence that they have on that.

23  They've shown it to you in their opening and they showed to you

24  again in their closing.  This is the best that they have.

25  Plaintiffs' conspiracy theory is not an actual agreement as

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  required by the law.  It's a virus that's transmitted without

2  knowing.  If you go too close to James Fields at the rally,

3  you're part of the plaintiffs' conspiracy theory.  It's a virus

4  that passes without knowledge and binds you and makes you

5  responsible for everything James Fields does.

6          Plaintiffs haven't told us how long the virus stays

7  with you.  Could be days, could be weeks.  James Fields is

8  driving north on 29 in Albemarle County at 5 p.m. on Saturday,

9  October 12th.  Sees an Antifa, the car next to him, drives him

10  off the road.  Is that part of the conspiracy theory?  Are

11  Michael Hill, Michael Tubbs and the League of the South

12  responsible for that, too?  Because James Fields stood next to

13  one of the other co-defendants in this case at the rally?

14          One sentiment that I'll agree with the plaintiffs is

15  that this case is important, that the law in this case is

16  important.  It's important because the law protects us.  And

17  the most important protection of the law in this case is an

18  agreement.  You're not responsible for somebody's actions just

19  because you've attended a rally with them, just because you've

20  stood next to them or just because somebody walked past them on

21  the telephone.

22          Plaintiffs have failed to meet their significant and

23  substantial burden to prove that James Fields entered into an

24  agreement to perpetrate the car attack.  For that reason,

25  Michael Hill, Michael Tubbs and the League of the South are not

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  responsible for his actions.

2          I want to spend a minute talking about what

3  actually -- what the League, what Michael Hill and Michael

4  Tubbs actually were planning for the rally.  You've heard no

5  evidence, you've seen not a single post of Michael Hill,

6  Michael Tubbs or the League of the South on Discord, where

7  Professor Simi testified the rally was centrally planned.

8  That's an important fact.

9          What we do have is another private email that nobody

10 thought would see the light of day.  This is Plaintiffs'

11 Exhibit 1551.  And I ask you when you deliberate to review

12 Plaintiffs' Exhibit 1551.  This is a private email one month

13 before Charlottesville, one month before James Fields drove his

14 car into a crowd of people, a month before there was any reason

15 to be worried about liability, before there was a motive for

16 them to fabricate.

17         What does Michael Hill email Michael Tubbs?  He says,

18 "Had a good talk with Ike Baker tonight.  On-the-ground

19 planning for Charlottesville is coming along nicely.  Still a

20 lot to do, but the Pikeville template, on a larger scale, looks

21 like it will work well there.  He will be in touch."

22         What does the Pikeville template mean?  You've heard

23 some evidence about what happened in Pikeville.  There was no

24 James Fields in Pikeville, there was no car attacks in

25 Pikeville, there was no violence, no injuries in Pikeville.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   Antifa and counter-protesters were separated behind barricades

2   by the police.  This is the opposite of a violent conspiracy.

3   You cannot be more explicit as far as what your plans are when

4   Michael Hill says the Pikeville template looks like it will

5   work.  That means nonviolent protest.

6          We've also got, five days before the rally, this is

7   Defense Exhibit 035, Defense Exhibit 35, a post on the League

8   of the South's website by Michael Hill.  He says, "All members

9   of the League and our Southern defense force who attend this

10  event will be required to abide by the following legal and

11  moral constraints."  And he lists: obeying the laws, being

12  respectful, not inciting violence.  Again, five days before

13  James Fields's car attack, before he had any reason to believe

14  he would need to be creating some alternative narrative.

15         So what actually happened when the League arrived in

16  Charlottesville?  Plaintiffs talked about communists and Antifa

17  as being sort of like fabrications of the defendants'

18  imagination, like they're not real.  This is the sight that

19  greeted Michael Hill and Michael Tubbs and the League of the

20  South when they arrived down Market Street.  Mr. Levine

21  suggested that instead of going through the group of

22  protesters, they should have simply squeezed their 100 or so

23  person column in between some of the cars and walked on the

24  sidewalks, as if these peaceful counter-protesters, in the

25  words of the plaintiffs, would have simply stayed there.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1          Of course, Chris Cantwell did that, actually.  Chris

2    Cantwell went on the sidewalk and he was single file and

3    vulnerable and he was maced when he walked on the sidewalk.

4          So what are all these peaceful counter-protesters

5    doing across the road?  Here we've got people with red

6    bandannas, apparently medics, according to plaintiffs.  What

7    are all these medics doing blocking a public roadway?  What are

8    these people with flagpoles, communist insignia doing?  Are

9    these fake figments of the defendants' imagination?  What about

10   this communist flag in the background?  When the defendants

11   talk about communism, this is what they mean.  People show up

12   at their rallies waving communist flags, wearing communist

13   colors and trying to obstruct the exercise of their First

14   Amendment rights.

15         What are these four or five communist flags doing at

16   the corner of Market Street in the middle of the rally?  Are

17   the plaintiffs being honest with you when they talk about the

18   communist counter-protesters being fake, not real?

19         I want to spend a minute talking about Michael Hill's

20   tweet after the rally, where he, to paraphrase him, said

21   something to the effect of this was a success.  Our warriors

22   acquitted themselves as men, God be praised.  What did he mean

23   by that?

24         I mentioned it a little bit just now, but whenever

25   Michael Hill, Michael Tubbs and League of the South go to a

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    protest, battalions of Antifa show up as well.  It's always a

2    risk for them to show up and protest the removal of historical

3    monuments that they think are important.  So any time they're

4    actually able to gain access, to stand in front of the

5    monument, is a success for them.

6              I'm not talking about James Fields.  That has nothing

7    to do with them.  He was separate.  It was after the rally.

8    That's what he meant by that.

9              I spent some time talking about who has the burden in

10   this case.  As you know, the plaintiffs carry the significant

11   burden of proving their case.  One of the themes that has

12   emerged from this case, though, I would suggest to you, is that

13   plaintiffs are not telling you the true story, that they're

14   hiding something from you.

15             Why is it that, time and time again, you don't get

16   the true and the full story until after we've had a chance to

17   ask their witnesses questions?  Why is it that, time and time

18   again, you don't get to see a full video until it's our turn to

19   introduce evidence?  It's because they're hiding something from

20   you.  It's because they don't want you to know what really

21   happened in Charlottesville.

22             Why did you have to wait until it was my turn to

23   present evidence to see the full DeAndre Harris video?  Why did

24   you have to wait until it was our turn to ask Reverend

25   Wispelwey questions to find out that, actually, Charlottesville

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   had battalions of Antifa carrying community defense tools in

2   opposition?  Why did you have to wait until it was our turn to

3   ask Devin Willis questions to find out that, actually, the

4   counter-protest really wasn't just a bunch of UVA students

5   reading poetry in the park?

6           But it's not just that you're having to wait until

7   it's our turn to present evidence or it's our turn to ask

8   questions.  We're still waiting.  We're still waiting for

9   plaintiffs to call any of these people as witnesses, to bring

10  them into court and talk about the racially motivated violence

11  that they experienced.  Where are these people?

12          When Richard Hamblen testified yesterday morning,

13  Alan Levine asked him questions about whether, when he was

14  kicked to the ground, facing down on the ground, being punched

15  multiple times, whether that woman was acting in self-defense.

16  Where is she?  Where is she to tell you about whether that was

17  self-defense or not?  Where is DeAndre Harris to tell you about

18  what happened?  That video is Defense Exhibit 072B.  That is

19  the full video of the DeAndre Harris incident.

20          Under plaintiffs' conspiracy theory, Charlottesville

21  was a one-sided, violent, racist riot, and yet, when it was

22  their turn to present their evidence, when they had three weeks

23  before we were able to present a single witness, they couldn't

24  come up with a single Charlottesville police officer to

25  corroborate their conspiracy theory.  They couldn't come up

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

 1  with a single Virginia state trooper to corroborate their

 2  conspiracy theory.  They couldn't come up with a single

 3  independent witness who is not on their payroll to corroborate

 4  their conspiracy theory.  The reason for that is because their

 5  conspiracy theory is not true, and they are hiding things from

 6  you.

 7          At the beginning of the case I likened plaintiffs and

 8  their evidence to a commercial fishing vessel that throws over

 9  a giant net into the water, drags it along the ocean floor,

10  bring it back up, and dumps it on the deck.  Plaintiffs are

11  trying to tell you that everything in the net belongs there.

12          They're right that they have caught James Fields.

13  James Fields is there.  We know that he's responsible for the

14  car attack.  We know he must answer for his actions.  When

15  Natalie Romero sent this text about three weeks after the

16  accident, she knew who was responsible for her injuries.

17          Plaintiffs have to prove an agreement.  An agreement

18  is not a virus that passes unknowingly between people who

19  participate in a rally, people who walk too close to somebody

20  else at a rally.

21          Ms. Dunn said something that I believe needs

22  correcting this morning.  She said -- in reference to whether

23  James Fields was a member of this conspiracy or not, she said,

24  "If James Fields would have put on a uniform and carried a

25  shield, he could have been a member of the military."  I wonder

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  if Ms. Dunn asked an actual member of our proud armed services

2  whether that's all it took to become a member of the military.

3  Is that all they are?  Just a coat hanger, just somebody who

4  puts on a uniform?  Never mind the sacrifice, the training?

5          James Fields didn't do any of that.  James Fields had

6  never been to a Vanguard America event.  He's never been to a

7  rally.  He's never done anything that would qualify him to be

8  compared to a member of the military.  He showed up in

9  Charlottesville wearing a white polo and khakis, stood next to

10  some members of Vanguard America, and then on his way out of

11  town, alone, two hours after the rally, perpetrated the car

12  attack.

13          There's no conspiracy with Michael Hill, Michael

14  Tubbs, and the League of the South.  I'm going to ask you to

15  find for the defense.

16          Thank you.

17          THE COURT:  Thank you.

18          All right.  Who's next?

19          MR. REBROOK:  Ladies and gentlemen of the jury, we

20  are very near the finish line.  I ask for a little bit more of

21  your time and attention.

22          This trial has been one of the most stressful

23  experiences of my life.  I figuratively told my wife the other

24  night that this was my Iraq war, and I was in the Iraq war.  So

25  I feel your pain for having to sit here for four long weeks and

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   listen to this.  I promise you we're near the end.

2           Conspiracy.  The word is a highly charged and

3   evocative one.  It means different things to different people

4   and changes depending on the circumstance.

5           For example, under Virginia criminal law, conspiracy

6   requires two or more people to agree to commit a crime and that

7   one person within the group performs an act in furtherance of

8   that crime.

9           Today is the 18th of November.  Four days from now

10  will mark the 58th anniversary of the assassination of

11  President Kennedy, an atrocity that shook our country's

12  collective consciousness and, for many, marked the end of our

13  country's innocence.  As a younger man, I always believed in my

14  heart that Kennedy's murder was a conspiracy.

15          MS. KAPLAN:  Judge, criminal law?  Kennedy's murder?

16          THE COURT:  All right.  Go ahead.

17          MR. REBROOK:  Well, in 2006, upon being discharged

18  from the army, my late father and I took the long drive from

19  Fort Hood, Texas back to Charleston, West Virginia.  And we

20  stopped in Dealey Plaza, where Kennedy was murdered, and I

21  actually stood on the grassy knoll and I went up to the sixth

22  floor of the book depository building and looked out the window

23  where Oswald had fired his shots, and I was struck by how small

24  the area was.  Now, I'm a trained marksman, but it became very

25  clear to me that any person with marginal shooting ability

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   could have done what Oswald did.  But I wanted to spread the

2   blame around.  I wanted to believe that the Mafia had to be

3   involved, or the Soviets, or the CIA.  I couldn't reconcile how

4   a man as --

5           THE COURT:  Mr. ReBrook, I don't know where you're

6   headed here.  But don't -- let's talk about this case.

7           MR. REBROOK:  Very well.

8           It's an indisputable fact that James Alex Fields ran

9   his car into a crowd of innocent people, ending the life of a

10  young woman and irreparably harming numerous others.  The life

11  he took and the lives he scarred are all greater, individually

12  and collectively, than James Alex Fields, whose name I hope

13  we'll all forget.  And we probably won't, sadly.

14          Our minds can't make sense of the disparity between a

15  small, insignificant man and the huge tragedy he caused.  We

16  want balance.  We can't make sense of it because it's

17  senseless; senseless, horrible, appalling, and shameful.  But,

18  ladies and gentlemen, that doesn't mean that there was a

19  conspiracy.  And even if there was a conspiracy, there's zero

20  evidence that my clients, the National Socialist Movement and

21  Jeff Schoep, knew about it, agreed to it, or participated in

22  it.

23          The plaintiffs' attorneys know that the defendants

24  range from controversial to outright loathable.  That's why so

25  much of this trial is focused on their ugly and fringe beliefs

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  and their racist rhetoric and their backwards world views.

2          I say "views," plural, because no matter how hard the

3  plaintiffs try to paint all the defendants with a single

4  villanous broad brush, an axis of evil, they're not.  Many of

5  them don't like each other or know each other.

6          Plaintiffs' counsel have proven only that self-avowed

7  racists are, in fact, racists.  They admire Hitler.  They hate

8  Jews and minorities.  Some deny the Holocaust, while others

9  think it's the crowning achievement of the white race.  If

10 racism alone were a crime, the defendants would all be guilty

11 of that, but we don't have thought crime in this country.  In

12 this country, you're allowed to like Hitler.  And even if it

13 means that certain people are going to go to hell, you're even

14 allowed to be happy about the outcome of the Unite the Right

15 rally.  That's just the way it is.  But as long as we're a

16 country by, of, and for the people, guilt should still be

17 defined by one's actions, not by one's thoughts.

18         It's precisely because we're not in a criminal court

19 and because of the complete absence of evidence linking the

20 horrific death of Heather Heyer to anyone except James Alex

21 Fields that so much of this trial has been spent talking about

22 Hitler, swastikas, Nazi salutes, and the 14 Words.

23         Folks, if the plaintiffs' case were so crystal-clear,

24 why do we have all this filler?

25         Time and again, we've heard testimony from the

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    plaintiffs and defendants that my clients, Mr. Jeff Schoep and

2    the NSM, were not present for the infamous torch march or for

3    the vehicular atrocity that caused so much suffering.  Time and

4    again, we've heard witnesses and organizers say they either

5    didn't know or barely knew Mr. Schoep before the Unite the

6    Right rally.  They couldn't identify him.  Neither could the

7    plaintiffs.  And they couldn't differentiate one white

8    nationalist group from another.  Time and again, we've heard

9    that no postings on the Discord could be linked to any member

10   of the NSM.

11          What do we know?

12          We know that Jeff Schoep was not a planner of Unite

13   the Right.  The NSM was invited to attend, but Mr. Schoep was

14   not even asked to speak.

15          We know my client was not at the leadership meeting

16   before or after the rally.  My client has attended nearly 80

17   rallies, as he told you.  Some of them had scuffles.  But none

18   ended up like this.  He had no reason to think this would be

19   any different.  And that's why he insisted on the participation

20   and the presence of law enforcement.

21          We know that, unlike many of the armed

22   counter-protesters we saw in the plaintiffs' own video, the NSM

23   didn't carry weapons.  Out of the 24 NSM present, four had

24   small plastic shields, and eight had flags mounted on flagpoles

25   made of lightweight PVC.  If these were their weapons, why have

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   half your people not armed?

2          We have no evidence of anyone being gassed.  We have

3   no evidence of anyone being impaled; even though there are text

4   messages and other things talking about impaling people, no one

5   was impaled.  We have no evidence of anyone other than James

6   Alex Fields hitting someone with a car.

7          We know that my clients, unlike many of the

8   counter-protesters -- not the plaintiffs, but the

9   counter-protesters -- did not cover their faces.  Why?  Because

10  they weren't planning on doing anything illegal.

11         We know my clients never had a single communication

12  with James Alex Fields.  They didn't even know the guy existed

13  until after they heard the news, like the rest of us did.  The

14  only communication between my client and the planners of the

15  Unite the Right rally was to discuss dress code and parking

16  arrangements.

17         We heard from the actual planners that they had no

18  relationship with Mr. Schoep.  Last Friday was the first time

19  Mr. Spencer and Mr. Schoep had ever met.  It would seem very

20  odd indeed to me to plan an illegal conspiracy with people you

21  both don't know and don't trust.

22         My client, on the record, openly admits that he

23  punched an unidentified white counter-protester after that

24  protester shoved him.  That's not racially motivated violence,

25  and it certainly didn't contribute to the death of Heather

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  Heyer or the terrible injuries suffered by many of the

2  plaintiffs.

3          Can any of us honestly say we've never been in a

4  fight before, rightly or wrongly?  Should that mean we're then

5  responsible for what somebody does hours later that you never

6  met and never knew of?

7          No one has come forward claiming that they were hit

8  by Mr. Schoep.  None of the plaintiffs have, and no member of

9  the general public has.  I have to wonder:  Is this because

10  this unidentified counter-protester knows he might have been

11  culpable in the incident himself?  We'll never know.

12          It's true that upon resigning from the NSM, my client

13  told its new leader, Burt Colucci, that he no longer needed his

14  NSM email accounts.  Why would he?  I don't have access to any

15  of my old emails.

16          Now, bear in mind, that's 19 months after the Unite

17  the Right rally, and it's six months after the filing of the

18  lawsuit.  So the vehicular murder and getting sued didn't

19  prompt my clients to delete evidence.

20          My client says that he dropped his phone in a toilet.

21  That happened 16 months after the rally and three months after

22  the lawsuit was filed.  So, again, if he was trying to delete

23  evidence, wouldn't he have done it at the time of the incident?

24  Just something to think about.

25          Also, Mr. Colucci, he was not at the Unite the Right

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   rally.  He wasn't even in the state of Virginia at the time.

2   So after taking over the leadership of this organization, which

3   you don't have to like, why would he then embroil himself into

4   a conspiracy?  Maybe the guy is just not that bright.  Maybe

5   he's not the criminal mastermind they're trying to make him out

6   to be.

7          It seems that the plaintiffs are saying that the

8   defendants are all extremely clever conspirators, but they're

9   also stupid enough to, apparently, openly destroy evidence and

10  admit to it in depositions.  There's a disconnect there.

11         To believe in this conspiracy theory, you're being

12  asked to ignore key facts and to invent ones where the evidence

13  is lacking.  I would think that a would-be conspirator in a

14  major conspiracy would aim just a bit higher than punching a

15  single white guy at the rally.  It's just not common sense.

16         My late father, who was also a trial lawyer, taught

17  me that trials are often not about the law.  They're about

18  assigning blame.  Most notably, Heather Heyer's life was

19  stolen.  It was stolen from her friends, from her community,

20  and from her mother.  It is only natural that we want to insist

21  that someone be blamed for that.  But, ladies and gentlemen,

22  someone has already been blamed for that and is serving

23  multiple life sentences for his actions.  Don't diminish his

24  blame by spreading it around amongst people who are admittedly

25  guilty of harboring ugly beliefs, but who are innocent of

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  conspiracy.

2          Inferences and rhetoric don't create truth from thin

3  air.  If we paint every defendant with the same broad brush,

4  then we're no better than they are for painting racial

5  minorities with the same broad brush.  Shouldn't we be showing

6  we're better than that?

7          If, in your heart of hearts, you cannot abide James

8  Alex Fields's crimes resting with him alone, then I ask you to

9  ask yourself these questions:  Who failed in their sworn duty

10  to enforce appropriate safeguards to separate groups as

11  diametrically opposed in their world views as oil and

12  plutonium?  Who failed in their duty to protect and serve the

13  protesters, the counter-protesters, and this beautiful city

14  through either malfeasance, apathy, unpreparedness, or

15  old-fashioned incompetence?  Then ask yourself:  Why are a

16  group bound by oaths and cloaked with immense authority not

17  defendants in this case?  And when, if ever, will they be held

18  accountable for their failures?

19          And if you can answer any of that, I have another

20  question for you:  Where is David Duke?  Where is the most

21  prominent white nationalist in the last 40 years who we know

22  was at the rally?  Not here.

23          I want you to imagine for a minute that you're a

24  conspirator and you decide to get your other conspirators that

25  live in different states across the country and you're going to

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   cross multiple state lines because you're intent on

2   participating in racially motivated violence.  And then you get

3   here and you skip the most violent, most high-visibility

4   events.  You aren't at the torch march and you aren't around

5   for the vehicular homicide.  All you have to show for your

6   efforts and your personal risk that you've taken is punching a

7   single unidentified white guy that is not a plaintiff.

8           You've seen the weapons carried by the

9   counter-protesters from their own video.  You've heard multiple

10  defendants testifying to being hit with balloons filled with

11  urine and an unidentified blue liquid that burned the skin.

12  Now, I'm not saying that remotely comes close to what the

13  plaintiffs experienced from James Fields.  It doesn't.  If

14  we're talking about just what happened during the time of the

15  rally, some pushing, shoving, and punching are not furtherance

16  of a conspiracy to cause racially motivated violence.  And I'll

17  be honest, I'd be a little on edge myself if anyone threw urine

18  or any sort of burning solution on me.  Yet at the height of

19  white nationalist numbers in this city, during the actual rally

20  or movement to where the rally was supposed to be, my clients

21  exercised tremendous restraint.  And when they were told to

22  leave by the authorities, that's exactly what they did.  They

23  packed up and left, and they were about two hours away, in

24  their vans heading home, when they heard about what James Alex

25  Fields did over the radio.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1          Ladies and gentlemen of the jury, honor demands that
2   you uphold your duty.  You can't do more, and you should never
3   wish to do less.
4          Thank you.
5          THE COURT:  All right.  Members of the jury, I think
6   we'll take a break now and take a 20-minute recess.
7   **(Jury out, 2:45 p.m.**)
8          MS. KAPLAN:  Your Honor, one issue before the jury
9   comes in.  You may not have noticed, Judge, but I was super
10  careful with my timing.  So we've saved 15 minutes in our time,
11  and we'd like to do that at the very end on rebuttal, if that
12  would be okay.
13         THE COURT:  All right.  Okay.
14         The jury will want to deliberate in here.  I think
15  I'll probably give them final instructions today and they can
16  go across the hall, and then I'll ask everybody -- we'll clean
17  up our spaces so the jury can -- it's presentable.
18         THE CLERK:  We had talked about -- I mentioned to
19  Mr. DeRise the other day, Judge, we can allow them to
20  deliberate -- we have the mechanics to be able to allow them to
21  deliberate where they are if they would like.  We can do either
22  space.
23         THE COURT:  I think we ought to tell them.
24         THE CLERK:  Okay.
25         THE COURT:  We'll start them off in there, and if

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    they have any problem...

2    **(Jury in, 3:05 p.m.)**

3             THE COURT:  You may be seated.

4             You may proceed, Mr. Smith.

5             MR. SMITH:  Thank you, Your Honor.

6             Ladies and gentlemen, of course it goes without

7    saying, thank you very much for sitting through this trial.

8    It's been pretty lengthy, but we're almost done.

9             I'd like to talk about TradWorker.  When I say

10   "TradWorker," I mean David Matthew Parrott, Matthew Heimbach

11   and the organization they started together, which is the

12   Traditionalist Worker Party, or TradWorker.  They're also known

13   as TWP to some people.

14            The Traditionalist Worker Party is an FEC registered

15   political party.  This makes it rather unusual in the white

16   nationalist movement, with the motto of "Faith, Family, Folk"

17   and the slogan, "Local solutions to the globalist problem."

18            It was founded in 2013.  Now, Mr. Parrott had been

19   doing political advocacy before that, but in 2013 they started

20   TWP, TradWorker, to peacefully and legally advocate for faith,

21   family and folk.  And neither Matthew nor David Matthew have

22   ever hid their faces or their true beliefs.  The plaintiffs

23   during their presentation talked a lot about, I think,

24   front-stage, backstage, and I never really quite understood

25   what they were getting at exactly -- exactly how that worked.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    But what I do know is that, unlike maybe other
2  organizations which don't say what their real politics are,
3  don't say what their purpose is, TradWorker is very explicit
4  about what their purpose is, what they believe, and what their
5  expectations are of members.  And they've been that way for
6  years, and it has always led to safe, peaceful rallies that
7  they've put on for years across the country, safe and legal
8  events in lots of different places.

9    Of course, you'll see they're concentrated sort of in
10  the Midwest.  That's where TradWorker and its leadership is
11  from.  But they have developed over a period of time, five,
12  seven years, protocols for doing these kinds of rallies
13  successfully.  You heard of the Pikeville template.  That is
14  the protocol that they came up with that evolved over time in
15  order to be the most successful protocol for putting on a
16  peaceful rally for white nationalist causes.

17    Of course, these kinds of rallies come with specific
18  kinds of protocols that are necessary to protect everyone
19  involved because wherever they go, they get followed.  And
20  wherever they go, people show up.  Whether it's because they're
21  just curious -- I remember there was, I believe, one plaintiff
22  who that was the first time they went to a Klan rally.  I think
23  they said they were curious about it.  There are people that go
24  because they vehemently oppose what white nationalists believe
25  and stand for.  And that's fine, except you can't deprive them

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  of their right to free speech.  You can't deprive them of their

2  ability to speak and to protest and to conduct First Amendment

3  activities in line with the Constitution of the United States.

4        There's a lot of reasons here why TradWorker should

5  prevail, but there are five main reasons.  First of all, in

6  this case -- at first I thought we had minimal plaintiff

7  interaction there because I thought, well, I believe Devin

8  Willis was at that general area on the 12th where TradWorker,

9  the League of the South and NSM, which we'll call the Market

10 Street crew, because they went -- they wanted to go in through

11 the Market Street entrance.  I believe Devin Willis said he was

12 over in that area.  But as it turns out, as it turns out -- so

13 you see -- by the way, there's literally, again, nothing on

14 August the 11th because neither Matthew or David Matthew nor

15 any member of TWP attended that torch rally.  They were, in

16 fact, as we've discussed, they were told about it very last

17 minute.  They said no, this isn't what we do.  We do permits.

18 We do permitted events.  We always have.  That's how we roll.

19 And they refused to go, and they told their members, they said

20 no one will go to this torchlight rally, period.  And nobody

21 did.  They said, we'll see you on Saturday.

22        So what happened on Saturday?  Well, again, no

23 interaction with any of these plaintiffs except maybe Devin

24 Willis, maybe?  But it turns out no.  He was actually -- so

25 there's this picture you've seen, right?  Now, at first I

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   thought, so there's some people with red bandannas.  And by the

2   way, there's a lot of people with red bandannas.  That's not a

3   coincidence.  The color of the bandanna is important.  The fact

4   that lots of people chose that color is important.  The

5   plaintiffs would try to have you believe otherwise, but that's

6   just -- we all know that.

7          But what you're seeing in this picture is Devin

8   Willis isn't here.  I thought at first like maybe he was that

9   guy in the center there, or something, but no.  He's actually

10  way off, way off of the picture out to the right.  Nowhere near

11  the front.  But as you can see, they are blocking the road.

12         Now, Devin Willis did testify at some point that he

13  was singing -- he said, I was talking to this drummer guy.  I'm

14  singing their song, "shut it down, don't back down, shut it

15  down," referring to the park.  What is he saying there?  Is he

16  saying that -- is he saying that he was encouraging people to

17  shut down the rally, to stop them from engaging in their

18  protected speech?  Let's remember, there is a permit for this

19  rally.  This permit had to be -- had to be upheld by a court.

20  There was an attempt to renege on the permit and a court had to

21  get involved and a federal court said you must honor this

22  permit.  That really should have been all that everyone needed

23  to hear.

24         MS. KAPLAN:  Objection, Your Honor.

25         THE COURT:  They had a permit to be there.  You don't

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  have to get into anything.

2         MR. SMITH:  I understand, Your Honor.

3         So what comes with that permit is if people try to

4  interfere with that permit, well, they are kind of depriving

5  someone of their First Amendment rights to engage in protected

6  political speech.  Now, here, what I'm looking at in this

7  picture is a group of people that have agreed to -- well, it

8  appears to join hands in some way.  Now, why they chose that

9  particular spot, I think we all know why they chose that

10 particular spot.  That joining hands, that's an agreement

11 amongst those people to do something very specific.  And that

12 is to prevent the permitted rally-goers from entering the park

13 and thus attending their permitted rally.

14        This is illegal.  This is a conspiracy to deprive the

15 rally-goers of their First Amendment rights.  That's what the

16 plaintiffs claim to be suing the defendants over.  That's

17 weird.  You'll see that this is a pattern.  The plaintiffs

18 suing for things that they've themselves done.  That's one

19 example.

20        So Mr. Willis did admit to obstructing the assembly.

21 Mr. Wispelwey admitted to that with other people.  But again,

22 my clients didn't have any interaction with any of these

23 plaintiffs, including Mr. Willis.  Mr. Willis wasn't injured.

24 He said so himself, that his only injuries were from the

25 torchlight rally and the car.  He said that he was not injured

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  in any other way that weekend.

2          TradWorker followed the police plan.  Now, this is of

3  course part of the Pikeville template.  You have to coordinate

4  these kinds of things with law enforcement.  This is an intense

5  political situation on the ground.  Everybody knows that.

6  Everybody's experienced -- law enforcement is generally

7  experienced with this kind of thing.

8          But you have to coordinate with them.  You have to

9  communicate so, for example, everything can be scripted

10 properly.  You have large groups of people.  You need to move

11 them efficiently in and out.  It helps to have them in a

12 formation where they can sort of march all in line, all

13 together, so that people don't get separated and perhaps

14 injured when they're separated.

15         So they had -- they coordinated with the police.  The

16 police said enter in the Market Street entrance.  They said

17 walk down Market Street.  Park in the garage there, walk down

18 Market Street, enter in the Market Street entrance.  And lo and

19 behold all these people are blocking their way.

20         Now, it was apparently claimed during this trial that

21 they could have just turned and gone a different direction.

22 That's ridiculous.  I don't even think that should be

23 entertained with a serious response.  They were not going to

24 let them pass.  There is no way.  Now, as we heard,

25 Mr. Cantwell tried to walk by and was maced.  So make of that

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   what you will.

2           There is no racial motive that's been established

3   here.  TradWorker wants to put on public rallies to advance

4   white nationalist causes.  In this particular instance, this

5   rally, in what I believe is now called Market Square Park, was

6   about the statue.  There would have been no reason to hold the

7   rally in Charlottesville if it wasn't about the statue.  Of

8   course it was about the statue.  There are other issues that go

9   along with that, but fundamentally, the reason everyone was

10  there in Lee Park was because of the statue.  If it wasn't

11  because of the statue, they could have been in any other park.

12  I think when the city wanted to change the park, the reason why

13  you can't really change the park for this particular event is

14  because it's about that statue in that park.

15          Speaking of other events, we remember from earlier in

16  the trial, there were other events that were alternative

17  programming, I think it was called, other events that were

18  scheduled at other parks, for example McGuffey Park.  Devin

19  Willis, in fact, talked about how he was proud that he had

20  planned that alternative programming at McGuffey Park.  The

21  problem is that all that alternative programming was available.

22  And yet all of a sudden here Devin Willis is right outside the

23  Market Street entrance to this park, blocking the way of the

24  permitted rally-goers.

25          How did that happen?  What about McGuffey Park?  What

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    about the PARJ, right?  What about the PARJ?  It does seem odd

2    that all that work in preparing that and then he just abandons

3    it.  But again, it really doesn't matter because he was so far

4    away.  No interaction with my clients whatsoever.  Not a single

5    plaintiff in this case has any interaction.

6            So there was the testimony regarding Devin Willis's

7    injuries.  "So all of your injuries from that weekend were from

8    either the torch march or the car attack; is that right?"  He

9    says "yes."

10           Second reason why TradWorker should prevail here:

11   There was no participation in the torchlight rally.  Again, as

12   I said, TradWorker is very -- they are very serious about this.

13   They're very strict about this.  They do permitted events.

14   Everything starts and ends with the permit because it can't

15   really be any other way.  This kind of -- this kind of advocacy

16   is difficult and tricky in a lot of ways.  You have to

17   coordinate with the police.  You can't possibly just not do any

18   of that.  It's a recipe for disaster.

19           At the torchlight rally, neither David Matthew or

20   Matthew were present.  Cesar Ortiz, the head of security for

21   TradWorker, was not present, either.  Nobody was present.

22   There was in a video one unidentified person.  Nobody knows who

23   he is.  Neither of the plaintiffs have identified him, and

24   neither have David Matthew or Matthew been able to identify

25   this person.  But they were wearing what appears to be a

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    TradWorker T-shirt.  Trad Worker T-shirts were available on the

2    internet for purchase and there were a lot of people that

3    purchased them.  Presumably this is somebody that did that

4    because, well, if I'm wearing a Metallica T-shirt, that doesn't

5    make me a member of Metallica, does it?

6           David Matthew and Matthew were told about the

7    torchlight rally just mere hours before it.  They didn't plan

8    it.  They didn't promote it.  They didn't attend it, and they

9    forbade attending it.  And that kind of thing is taken very

10   seriously within TradWorker.  You don't disobey orders like

11   that.  And this isn't disputed, that TradWorker wasn't at the

12   torchlight rally.  It's not disputed.

13          "At any point in the preparations for August 11th and

14   12th" -- this is asked to Matthew Heimbach.  "Fair enough.  At

15   any point in the preparations for August 11th and 12th or

16   either one of those days were you taking orders from Jason

17   Kessler?"

18          "Absolutely not."

19          "How about from Eli Mosley?"

20          "Absolutely not."

21          "What do you know about the command organization and

22   structure of Identity Evropa?"

23          "Absolutely nothing."

24          "What do you know about what Eli Mosley was supposed

25   to be doing for Identity Evropa on August 11th and 12th in

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  Charlottesville, Virginia?"

2          "Nothing.  This was an entirely separate organization

3  that was often hostile with my own.  So nothing."

4          And that's true.  White nationalist organizations are

5  not a monolith.  There is a lot of internal division over

6  everything from actual political issues to personal disputes.

7  This is common in any political movement, I think.

8          Third, no link to James Fields.  This is uncontested,

9  really.  You see in the letter that Matthew wrote to James:

10  "Dear James, we've never met and you might not know who I am."

11  It seems that James Fields was aware of the existence of

12  Richard Spencer probably through the media, but that's really

13  the only knowledge of anybody in this case that he had.  There

14  is no evidence whatsoever that he communicated with any of the

15  defendants in this case ever for anything.

16          And this is not a situation where, I guess, nobody

17  found -- you know, he must have secretly been doing it and

18  nobody found the actual message.  No, the FBI was very, very

19  thorough when he was arrested and charged.  They seized his

20  devices.  They searched his devices.

21          THE COURT:  Mr. Smith --

22          MS. DUNN:  None of this is in evidence, Your Honor.

23          THE COURT:  We know nothing about the FBI.  Nothing

24  about the FBI in this case.

25          MR. SMITH:  Well, I'll move on.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

 1          There is no conspiracy to commit racially motivated

 2   violence.  The important thing here to remember is that it's

 3   not just that you have an agreement to attend a political rally

 4   generally.  You have to have an agreement to do the specific

 5   thing that is alleged to be wrong or illegal.  In this case you

 6   have to agree to commit racially motivated violence, okay?

 7          And while, as the plaintiffs note, there are a lot of

 8   loose aspects to conspiracy in that, for example, you don't

 9   need a formal agreement.  It's not like it needs to be reduced

10   to writing, I agree to do whatever, but that doesn't mean that

11   you can't -- that doesn't mean that no agreement is okay.

12   There has to be an agreement.  Whether formal or informal,

13   there has to be an agreement.  And there has to be a meeting of

14   the minds of that agreement where they have to agree to do a

15   specific thing.  In this case, to commit racially motivated

16   violence.

17          There is not an iota of evidence that Matthew

18   Heimbach, David Matthew Parrott, or any member of TradWorker

19   intended to commit racially motivated violence or sought to

20   commit racially motivated violence or agreed to do so.

21          TradWorker were not the organizers of Unite the

22   Right.  A lot of talk about how Jason Kessler reached out to

23   Matthew Heimbach first.  Well, I think Jason Kessler probably

24   needed a lot of phone numbers, and Matthew Heimbach was known

25   as the guy who had a big Rolodex, and so he asked him to

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    connect Jason Kessler with some other people.  And Matthew did.

2    But he wasn't planning this event.  He wasn't taking actions to

3    do anything other than attend the event with his organization.

4         If I attend a political rally, I don't think it's

5    appropriate for me to be held responsible for what any random

6    person does at that rally.  I think this is readily apparent,

7    probably, to most of you.

8         TradWorker went with an entirely separate plan.  They

9    decided, okay, so this Unite the Right thing, we'll go, but

10   we're going to stick to the Pikeville template.  We're going to

11   stick to the way we do things.  Kessler has a permit.  Okay.

12   We're going to coordinate with the police to figure out how

13   we're supposed to get in so we can do the rally and then get

14   out.  That's how TradWorker thinks about these things.

15        TradWorker's plan was to follow the permit.  There is

16   a rally at the park; it's going to be X number of hours; and

17   then, after that, everyone goes home.  That's what this is for.

18   It's not for anything else.  TradWorker doesn't believe in

19   these kinds of things being used for any other kind of purpose.

20   TradWorker takes its advocacy, its pro-white advocacy, very

21   seriously.  It has for years.

22        TradWorker's plan was ultimately successful, in that

23   there was nobody that went to that -- to the UTR rally from

24   TradWorker that was injured in any way.  There was some

25   fighting that broke out.  They were not injured.  In that

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    sense, it was very successful.  They were able to largely parry

2    any kinds of threats.  They were able to make it into the park

3    safely, ultimately, even though their way was blocked.

4    Overall, it was a successful day for them.

5            Obviously, there were things that happened long after

6    the rally had been declared an unlawful assembly that are very

7    unfortunate.  But as far as TradWorker was concerned, they had

8    already been on their way home for hours at that point.  They

9    thought the rally was long over.

10           You've probably heard a term, "the hard right."

11   TradWorker is one of the organizations we would consider a

12   member of the hard right.

13           What makes up these kinds of hard right

14   organizations?

15           Well, there's a more formal membership structure.

16   You can't just claim to be in it.  You have to be a member.

17           More experienced leadership, people that are serious

18   about their advocacy and want that from their members.  They

19   expect everyone to be professional and to represent the

20   organization well.

21           More event management experience.  As you saw, there

22   were all those events they put on across the country.

23           More open and honest politics; less irony.  By that

24   we mean that, unlike some of these other organizations you

25   might see where it might be -- they might say, well, we're

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  accepting of everybody, or, we don't have any problem with

2  Jews, or -- I don't know, some of the other irony kinds of

3  posts that you saw, they don't -- that's not how they do

4  things.  There's no front-stage/backstage with them.  They tell

5  you right up front:  Here's what you're getting.  If anything,

6  behind the scenes there's joking, but they're still very

7  serious about everything they believe in and stand for and they

8  say they stand for.  At no point in time are they

9  misrepresenting their views.

10        The Market Street crew would be the Traditionalist

11  Worker Party, League of the South -- you remember, Dr. Hill and

12  Mr. Tubbs -- and the National Socialist Movement.  These

13  organizations have been around for a long time.  The NSM has

14  been around since 1974, for example; League of the South since

15  1994.  These are people who have been around white nationalist

16  politics and heavily involved in white nationalist politics for

17  decades.  I don't know -- I thought that -- I remember that

18  expert, Mr. Simi, Dr. Simi, and I remember thinking, because I

19  had read some article that said he was embedded with the Nazis

20  for 20 years, and I thought, "Well, this guy seems

21  experienced."  Well, it turns out that he was actually only

22  embedded with the Nazis for, like, seven years and I'm sure

23  that that wasn't a full-time -- like, a constant thing, like,

24  he was literally living with them for seven years.  It was

25  ethnographic fieldwork.  So, ultimately, it seems like he went

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   to Nazi camp for a few weeks every six months or something like

2   that, but ultimately, I'm hard-pressed to believe that he's an

3   expert, whereas Dr. Hill, who has been involved in white

4   nationalist politics for three times that long, somehow isn't.

5            I think I'll leave it at that with Mr. Simi.

6            The Nationalist Front -- you've heard Nationalist

7   Front before -- is a loose political alliance of hard right

8   nationalist organizations that attended UTR.  It was an

9   unincorporated association sort of in progress, trying to

10  figure out how to bring these hard right nationalist

11  organizations together in order to be able to apply the

12  Pikeville template for all of them, to attend rallies safely

13  together, to essentially assist each other with pro-white

14  advocacy, which I think is a perfectly reasonable goal in

15  political organizations.  It's done all the time.

16           The Nationalist Front or the League of the South,

17  Vanguard America, I believe that the logo was displayed earlier

18  in the case as a swastika.  That is not the current logo that

19  they use.  They use -- well, whatever that is on the right.

20  And, of course, the Traditionalist Worker Party, which has the

21  pitchfork logo.

22           The Nationalist Front was comprised of several

23  independent organizations that all agreed to attend UTR

24  following their own time-tested safety protocols, the Pikeville

25  plan.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1       This was what we call the Market Street crew:  David

2   Matthew Parrott, pro-white essayist and organizer, over a

3   decade of event organizing experience, and Matthew Heimbach,

4   who was the face of the organization.  David Matthew likes to

5   be more of a behind-the-scenes guy.  Matthew likes to -- well,

6   let's face it:  He is a media -- I don't know what the word is,

7   but he loves the media.  He loves the media.  He was all over

8   the media at one point.  But that's -- that's his role in the

9   organization.  Both of them wanted a safe, peaceful event.

10      David Matthew strictly abided by the permit's

11  parameters.  He was involved in no fighting -- zero plaintiff

12  interaction, like I said earlier -- and he was fully discovery

13  compliant.  Nobody alleged that Mr. Parrott committed any

14  discovery violations.

15      Matthew also wanted a safe, peaceful event, strictly

16  abided the permit's parameters, wasn't involved in any

17  fighting.  Zero plaintiff interaction.  There was comprehensive

18  discovery, but Matthew had a situation with his -- I believe

19  that you were told about this -- his ex-wife threw out a lot of

20  his belongings.  That included some stuff that was under

21  subpoena in the case.  Ultimately, the judge -- Judge Moon had

22  no choice.  He had to sanction Matthew for that.  And he is

23  saying that you are allowed to draw adverse inferences against

24  him; however, those adverse inferences are permissive.  You are

25  not required to draw them.  You are under no obligation to draw

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    them.  You simply may.

2           Now, in our view, the plaintiffs have -- they had

3    this supposedly super-secret Discord where Dr. Simi said all of

4    the central planning took place.  Well, if that's the case, it

5    really seems disingenuous for the plaintiffs to claim,

6    actually, it was this other super-secret place that Matthew

7    Heimbach was planning the whole thing, even though Matthew

8    Heimbach was just trying to get his own organization to attend.

9    He wasn't planning the event.  It wasn't his event.  He didn't

10   put it on.

11          Ultimately, what you get when you put all these

12   things together is that TradWorker simply isn't liable here.

13   There's a lot of unfortunate aspects to this whole situation.

14   I think I talked about some of them in the opening.  Just the

15   sheer odds of the whole thing is bizarre.

16          But that said, this case is challenging to you, I'm

17   sure, because there will be an impulse to -- you know, you want

18   to compensate the plaintiffs.  People were hit by a car.  You

19   want to give them money for that.  You want to compensate them

20   for their loss.  But the question is:  Who is responsible for

21   paying those damages?  In this case, it's not David Matthew,

22   Matthew, or TradWorker.  There are defendants -- a defendant or

23   defendant that are responsible, but it isn't Matthew, David

24   Matthew, or TradWorker.

25          The five Charlottesville event coordination e-mails

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   exonerate TradWorker, proving they wanted a safe, legal event.

2   We read these to you a little earlier; for example, the first

3   one where -- I need some water; sorry about this -- the first

4   email where he said, "This is a peaceful event and we ask that

5   you think it through before you carry your arms into the event

6   grounds."

7          Now, by the way, I'm just going to say this:

8   Virginia is an open carry state.  There were apparently -- with

9   the bickering between the parties, there were apparently people

10  from both sides that had guns, that brought guns, because

11  they're allowed, right?  Ultimately, at the end of the day,

12  even though this was supposedly some sort of conspiracy to

13  commit an orgy of racially motivated violence, no shots were

14  fired the entire day.  And -- I don't know, I think that's -- I

15  think that says something.

16          "This is a peaceful event and we ask that you think

17  it through before you carry your arms into the event grounds.

18  We are trying to not only be peaceful, but to give that

19  impression to all gathered.  There will not be chanting of any

20  sort or exchanges of vulgarities with Bolsheviks or

21  neoliberals.  We will not devolve the rally into a shouting

22  match.  The use of the Roman salute is completely forbidden on

23  the grounds, as is the open showing of Nationalist Socialist

24  regalia, pins, and items related to the Third Reich."  And this

25  isn't because they're trying to hide their beliefs; it's simply

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  because, in this particular situation, that would probably be a

2  distraction from the other issues at hand.  Not everything has

3  to be about World War II, or the Holocaust.  Sometimes it can

4  be about the statue.

5        The second email was as a reminder to all attendees

6  that followed shortly thereafter, a few days after the first

7  email.  "As a reminder to all attendees:  If the enemy comes to

8  oppose us" -- which, of course, they would -- "we must under

9  all circumstances follow the law and work to deescalate

10  conflict.  Do not bring any weapons, tools, or implements that

11  are illegal.  Comrades who have concealed carry permits that

12  are valid in Virginia are allowed to carry.  If we are

13  attacked, we will follow the laws and defend ourselves and/or

14  comrades, but under no circumstances will we aim to provoke or

15  incite conflict.  This means we will not be screaming at,

16  cursing, insulting, or name-calling Antifa while at the event."

17        TradWorker means business with this.  They are not

18  there to tell jokes or get ridiculous headlines for saying

19  outrageous -- they are there to do pro-white advocacy.

20        The fourth email they sent out was shortly before the

21  event.  It says, "Our intel suggests at this moment that our

22  numbers will be strong enough and our law enforcement will be

23  numerous" -- the fourth email was, "Our intel suggests at this

24  moment that our numbers will be strong enough and law

25  enforcement will be numerous enough that the event will only

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  have some isolated scuffles, if anything.  Be safe.  Use the

2  buddy system.  Don't get separated.  And watch your back before

3  and after the event, as that's where our intel is suggesting

4  the most safety risk right now."

5          Actually, that turned out to be pretty true.

6          "We're necessarily preparing for the worst, but don't

7  be alarmed by all of the tactical planning."

8          And finally, right before the event:  "We have

9  received numerous reports, many confirmed, of violence breaking

10 out already today.  It's vital that you avoid any confrontation

11 before the event, both for your personal safety and because we

12 need you with us at the rally."

13         TradWorker sent these emails out to its members.  Its

14 members received each of these emails.  This was the way in

15 which the leadership of TradWorker communicated with its

16 members.  This is what they told everyone that was going to be

17 attending with TradWorker at the rally.

18         There was something we'll call the DeAndre Harris

19 situation.  You saw a video with DeAndre Harris, and for a

20 while you were probably wondering, what seems to be -- what's

21 everyone dancing around here with this DeAndre Harris thing?

22 Well, I believe you saw it.  DeAndre Harris, before that

23 incident in the garage, it turns out that he clubbed an old man

24 over the head with a Maglite.

25         Now, that doesn't justify as a self-defense matter

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

 1   what happened in that garage.  That's not what we're saying.

 2   But what I am saying is that this guy, DeAndre Harris, hit this

 3   old man, who had friends there, over the head with a Maglite.

 4   He could have killed him.  I'm going to tell you, because I

 5   know this, DeAndre Harris was going to get beat up regardless

 6   of what his skin color was after he did that to their friend.

 7   It wasn't racially motivated at all.  The plaintiffs probably

 8   should have brought that up with you.

 9           MS. DUNN:  Your Honor, we object.

10           THE COURT:  I don't believe there's anything in the

11   record.  Is there anything in the record to support what you're

12   saying?

13           MR. SMITH:  Sidebar?  Can we do a quick sidebar?

14           (Sidebar commenced.)

15           MR. SMITH:  The video.

16           MS. DUNN:  Your Honor, look, this has happened now

17   five or six times during Mr. Smith's closing.

18           THE COURT:  What is this objection about?

19           MS. DUNN:  He doesn't -- he's says "I know this"

20   about what happened to DeAndre Harris.  How on earth could he

21   know that?

22           MR. SMITH:  I see what you're saying.  When I said "I

23   know" I --

24           MS. KAPLAN:  We'd prefer the judge say it.  You

25   already said it.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1          MR. SMITH:  Sorry.

2          THE COURT:  Is that all?

3          MS. DUNN:  I do want to put on the record:  Mr. Smith

4     has done things he must know are impermissible.

5          THE COURT:  Okay.

6          (Sidebar concluded.)

7          MR. SMITH:  Finally, the fifth key here:  There's no

8     agreement to engage in racially motivated violence.

9          I defy you to find something, something in this pile

10    of evidence the plaintiffs have presented, that demonstrates

11    that there was an agreement by Matthew, David Matthew, or any

12    member of TradWorker to engage in racially motivated violence

13    at the UTR rally.  There just isn't.  There was an agreement to

14    attend a political rally, that's for sure, but that is not

15    wrongful conduct in itself.

16         The plaintiffs want to distract you here.  They want

17    to show you a whole bunch of racially insensitive posts and

18    they spent, well, in my opinion, way too much time throughout

19    the course of the trial talking about people's racially

20    insensitive posts on social media or statements that they made

21    in the past.  You got the picture pretty quickly.  But, again,

22    neither Matthew, David Matthew, or TradWorker ever attempted to

23    hide their views.

24         What the plaintiffs want you to believe somehow is if

25    they pile up enough of these racially insensitive statements

186

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   that somehow, somewhere, it magically becomes a conspiracy or

2   it magically becomes something that's legally actionable.

3   That's not true.  It doesn't matter how many racist posts they

4   show you on social media.  That's all one big zero.  No matter

5   how many they show you, any number times zero is still zero.

6   And zero doesn't win you a case.

7           If you want to know the real reason why TradWorker

8   went to this rally, all you have to do is watch this video.

9   This was made on July the 8th, 2017.  It was posted to

10  TradWorker's YouTube account.

11          Listen to their words.  They'll tell you exactly why

12  they went to the Unite the Right rally.

13          (Video playing.)

14          Sorry, we need some sound here.  Is there a reason

15  why it's not playing?

16          THE CLERK:  Do you have the little sound cord plugged

17  in?

18          MR. SMITH:  I don't know.

19          THE CLERK:  It should be right there.

20          MR. SMITH:  Sorry.

21          (Discussion off the record.)

22          (Video playing.)

23          MR. SMITH:  Listen to their words.  There's no code

24  in that.

25          Thank you.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1          THE COURT:  All right.

2          MR. CANTWELL:  Hello.  Thank you very much for your

3    time.  As you're entirely too well aware right now, my name is

4    Christopher Cantwell and I'm representing myself in this case.

5          I told you at the beginning that I did not conspire

6    to commit racially motivated violence and I did not conspire to

7    do anything illegal on August 11th or 12th in Charlottesville,

8    Virginia, August 2017.  You already know this because you've

9    been paying attention.

10          Firstly, there is the history before the events at

11   the heart of this dispute, some which I attended and some of

12   which I did not.

13          There was the DC free speech event.  I attended.

14   There was no violence.

15          There was Charlottesville 1.0.  I did not attend.

16   There was no violence.

17          There was the event in Pikeville in Kentucky.  I did

18   attend.  There was no violence.

19          I did not go to Berkeley, and from what I've seen, I

20   made the right call not going.

21          You need to remember, as you evaluate the evidence in

22   this case, that me and my co-defendants are different people

23   who did not all share the same motives.  You heard

24   Mr. Kolenich, who represents Jason Kessler, Nathan Damigo, and

25   Identity Evropa, say, yes, the alt-right wanted to fight the

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  Antifa.  They wanted to do so legally.

2        I did not want to fight with the Antifa, legally or

3  otherwise.  I have better things to do with my life.  I have

4  a -- I had a carry permit in August of 2017, and I would not

5  have risked it for the joy of punching some communist

6  degenerate.  That's not my idea of a good time.

7        You heard discussion of the Pikeville template or the

8  Pikeville model, because that was something we sought to

9  emulate going forward from that date.  Close coordination with

10 law enforcement resulting in a successful event, that success

11 being defined by a lack of violence and us managing to have our

12 say.

13       You heard segments of Radical Agenda Episode 318,

14 published in the lead-up in the events to this dispute, which

15 was titled "Political Violence."  That's CCEX-165 in evidence.

16 The plaintiffs want you to think that me publishing something

17 titled "Political Violence" is evidence of my unlawful attempt

18 to commit racially motivated violence, but you heard the

19 audio -- what I was able to play of it, anyway.  I put the

20 entire unedited and unredacted episode into evidence, not that

21 I expect you to listen to the whole thing.  Your time is too

22 valuable for that.  And the episode's title derives from a

23 piece which you heard me start to read on the air titled

24 "Political Violence is a Game the Right Can't Win," by David

25 Hines at Jacobite magazine.  Far from calling for political

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   violence, I was saying precisely the opposite.  And there's a
2   lot of that going on in this case.  I was saying, we cannot
3   behave like the people that we oppose; it will not work for us.
4   And I went into some detail about why that is.

5           In keeping with that obvious reality, you have heard
6   audio of me and Jason Kessler when I was on my way to
7   Charlottesville, Virginia.  That's CCEX-164A in evidence,
8   Radical Agenda Episode 340.

9           Because I value your time and it's late in the day,
10  I'm not going to bother playing each of these things for you.
11  I trust you to have paid attention during the course of this
12  trial, and the things that I bring up here you will already
13  have seen, for the most part.

14          I discussed with Jason his communications with law
15  enforcement during that interview.  Jason told me that he was
16  actively coordinating with them, and that even if we lost our
17  permit, the police would still put up barricades and protect
18  us.  Somebody who wants racially motivated violence would find
19  such impediments unwelcomed, but I, in contrast, was comforted
20  by the news because, as you heard me say, I did not want to be
21  put in a position where I might have to defend myself.  I
22  discussed my carry permit with Jason, and I indicated I did not
23  want to put it at risk, or all of the potential consequences of
24  a self-defense situation, such as the one that we're in today.

25          You have seen my entire SMS history with Richard

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   Spencer.  That's in evidence as Plaintiffs' Exhibit 3317.

2   That's all of my text messages with my co-defendants.  And I

3   gave those up voluntarily, by the way.  And the plaintiffs have

4   called your attention to me telling Mr. Spencer that I was

5   willing to risk violence and incarceration for our cause.  You

6   subsequently heard Mr. Spencer and I both say that we do not

7   think of it as a risk to get what we want.  And so the

8   implication of this message is that I do not desire violence,

9   racially motivated or otherwise, nor do I desire the

10  incarceration that tends to accompany violence.

11          You have seen video of the violence that I

12  nonetheless got.  And you have heard testimony that I was in

13  jail, both of which were outcomes I sought to avoid through

14  coordination and cooperation with the authorities.  My desire

15  to cooperate with law enforcement was also illustrated by my

16  use of a body camera.  You'll recall seeing the video where I

17  offered the SD card to the police to prove that I had not drawn

18  my weapon on several men who had confronted members of my --

19  who confronted my members-only listener meetup in the Walmart

20  parking lot in Charlottesville on August 11th.

21          That entire video is in evidence as CCEX-152.  You

22  see me all alone.  You see me with my listeners.  You see the

23  confrontation with Antifa.  You see the police arrive.  You see

24  no brandishing, just a false accusation.

25          You heard me testify that I was afraid, and rightly

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  so, after having been falsely accused of a crime before we even

2  got started.  You saw the paywall feature on my website, which

3  was used to hide the meetup details from the public so we would

4  not have these kinds of confrontations.  That's in evidence as

5  CCEX-114 and CCEX-111.  Nobody should have known where we were

6  except paying customers.  So how did these guys find us?  I had

7  good reason to be afraid of them.

8          You saw a blog post from me titled "Unite the Right

9  updates."  That's in evidence as CCEX-024A, in which I told my

10 listeners what Jason told me, specifically that, quote, "The

11 police have said they will still cooperate with us by keeping

12 Antifa and other opponents" -- I'm sorry, "by keeping out

13 Antifa and other opponents, setting up barricades, and doing

14 their best to maintain peace and order in the city.  The

15 possibility exists, though, that if we do not get legal remedy,

16 it could be declared an unlawful assembly and we could be

17 ordered to leave.  If that happens, those staying would be

18 engaged in an act of civil disobedience, risking arrest,

19 exposure to tear gas and other hazards which present themselves

20 in such scenarios," end quote.

21         Knowing that, like me, many of my listeners are

22 concealed carry permit holders, I told my listeners, quote,

23 "Civil disobedience and guns do not go well together, however.

24 If you are coming armed" -- I'm sorry.  "No matter what anyone

25 else says, if you never take another word of advice from me

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    ever again, heed this warning.  If you are coming armed, obey

2    the laws and the orders of law enforcement, no matter what.

3    You cannot tell the cops to go to hell with a gun on your hip.

4    It puts all of us and our cause at risk.  If you are

5    considering disobeying the authorities, you must leave your

6    weapon -- you must leave your firearms secured elsewhere.

7    Whatever violent ideas we entertain on the Radical Agenda are

8    not to be carried out here."

9         "The Radical Agenda is an entertainment program and

10   if you try to start a revolution this weekend, it will not be

11   the revolution you bargained for, I promise."  End quote -- I'm

12   sorry.  Not end quote.  Continuing the quote:  "If you want to

13   prove yourself a warrior, show some discipline first."

14        That's what I said to my audience.  Is that

15   front-stage behavior?  It most certainly is.  But there's

16   nothing contradicting it, either.

17        The plaintiffs have access to the Radical Agenda

18   Discord server, and you will notice that there is a serious

19   scarcity of posts therefrom.  This is the message I sent to the

20   public, and it is the only messaging I sent on the subject.

21   Mr. Simi did not tell you that this was secret Nazi code talk,

22   and you wouldn't believe him if he did because it's obviously

23   very straightforward.

24        Like the Radical Agenda listeners meetup, the torch

25   march was supposed to be a secret, too.  You heard evidence and

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   testimony of that.  But you heard audio of Jason Kessler saying

2   that it was posted to itsgoingdown.  That's itsgoingdown.org.

3   You've heard me ask several of the plaintiffs about that

4   website.  You heard me testify that I know itsgoingdown.org to

5   be a website devoted to violent communist propaganda.  That's

6   partly why you also heard audio of me telling Jason Kessler

7   that if we're going to do it at all, I want the cops involved.

8   That's in CCEX-032.  And that's a quote.  I said, quote, "If

9   we're going to do it at all, I want the cops involved."  End

10  quote.

11        You heard Jason agree with me.  You heard him say

12  that we should avoid violence.  We should avoid even drama

13  arguments, that we should behave like, quote, civilized white

14  people, end quote.  You heard Jason testify that he did not

15  know that the body camera was running when we had this

16  exchange.  And after plaintiffs' counsel showed a clip of me

17  announcing the camera, I testified under oath that Jason had

18  not arrived at the time that that clip was recorded.

19        You saw Defendant Elliot Kline tell me that just

20  before -- that he had just talked to the police, and that they

21  were allowing us to conduct the torch march, that they would

22  protect us from Antifa while we did the event, and that they

23  would actually be sending extra police with overtime to do so.

24  That's in evidence as CCEX-161B.  And it may well be the most

25  important piece of evidence regarding me.  So I hope you

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   remember that one.

2        Ms. Kaplan in her closing argument today told you

3   there was no evidence or testimony that we had a permit for the

4   August 11th event at UVA.  But you did hear the audio recording

5   of Elliot Kline telling me and others that police had okayed

6   the event, and once again, Ms. Kaplan is deceiving you because

7   the truth is not on her side.

8        During that briefing, you heard me ask about the

9   legality of weapons and armor, because I wanted to obey the

10  law.  I specifically asked about a helmet because I was worried

11  about getting hit in the head with a bike lock.

12       Now, maybe you believe that Jason and Elliot were

13  telling the truth, or maybe you think that they were lying.

14  But what you know for certain, because you've heard the audio

15  and seen the video, is that that was the information that I had

16  available to me when I made the decision to participate.

17       I told you in my opening statement that I met

18  Azzmador for the first time on August 11th.  That statement has

19  not been refuted.  You saw me get introduced to Tom from

20  Vanguard for the first time, right before you saw a black man

21  at the leadership meeting for the Unite the Right rally.

22  That's also -- that's on CCEX-161C.

23       You saw a subsequent section of the same body camera

24  video where Elliot Kline tells Azzmador to bring his fighters

25  at I believe it was 5 a.m.  I told you under oath while I was

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  on the stand that this plan changed after that video was

2  recorded because the concerns about us losing our permit had

3  been alleviated.

4          You heard several people testify that this was a

5  permitted event on August 12th.  This is an uncontested fact of

6  this case.  I testified under oath that as of the end of that

7  meeting, the plan was for us to be able to get our vans, ride

8  up to the park so we would not have to come into contact with

9  the counter-protesters.  You heard Nathan Damigo testify that

10 this was his understanding as well.

11         While that turned out not to be the case, the reason

12 that it turned out not to be the case is a mystery to us.  We

13 have not heard evidence of why I got dropped off several blocks

14 away or why we weren't able to get our cars up there.  That

15 evidence has not been produced here, sadly.  I would like to

16 know as much as all of you would.

17         But you know that this is what I was told because I

18 told you under oath.  If my words were contradicted by that

19 body camera video, you definitely would have seen it.  I told

20 you in my opening statement that I wanted to play that whole

21 video.  That was not possible.  I'm sorry for breaking that

22 promise.  But believe me when I tell you, if I was lying to

23 you, they would have made sure you saw it.

24         You have heard the plaintiffs' expert witness

25 Mr. Simi testify about front-stage and backstage behavior,

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  optics and what he calls doublespeak.  Mr. Simi testified that

2  he had a chance to review hundreds of thousands of Discord

3  messages.  He reviewed deposition testimony and discovery in

4  this case including private emails and text messages.  At no

5  point did Mr. Simi tell you that my body camera, the ultimate

6  backstage pass to the so-called leadership meeting, was

7  doublespeak, did he?  He did not testify to that.

8         He did not tell you that calling the police was some

9  kind of code word for hate crime, did he?  He was silent on

10  that subject, and for good reason.  It did not fit his

11  narrative, which assigns violent and evil motivations to his

12  political enemies, whom he has made a career out of defaming

13  with his veneer of academic respectability.

14         You saw the moment that I arrived on the University

15  of Virginia campus on August 11th.  You heard the instructions

16  that I got from Defendant Elliot Kline.  He told me and

17  everyone else who did not have a torch to stand on the outside

18  of the formation and that it was our job to keep Antifa away

19  from the torches.  The instructions were not, notably, to

20  attack racial or religious minorities.  The instructions were

21  not to bait people into fistfights and respond with

22  overwhelming force.  We were to keep the counter-protesters or

23  Antifa away from the torches.  That was a totally reasonable

24  safety concern which, though you heard us chuckle about it at

25  the so-called leadership meeting, we sincerely wanted to avoid

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  coming to fruition.

2          Remember what you saw on that video when I arrived at

3  UVA.  That's in evidence as CCEX-126.  When Gorcenski

4  approaches me, Gorcenski isn't afraid of us at all.  He comes

5  within arm's reach, with no fear whatsoever, speaking in

6  mocking tones.  You heard me talking about bike lock guy to one

7  of the other attendees.  During the course of this trial I've

8  asked several defendants who is Eric Clanton, and they told you

9  it's bike lock guy, who hospitalized somebody at a Trump rally

10 by bashing their head open with a bike lock, not long before

11 the events at the heart of this dispute.

12         I was afraid of that outcome happening to me, which

13 is why I wanted the police there, and I was afraid when I

14 didn't see them and I was telling another guy, be careful.

15 Doesn't matter if we outnumber them.  It only takes one bike

16 lock guy.

17         Gorcenski mocked our concerns, calling them a myth,

18 and then asked me, "How was your Walmart meetup, Chris?"  Here

19 I am worried I might get my head bashed open, and somebody I

20 don't know is asking me about the moment I was framed for a

21 crime earlier in the afternoon at the event that was supposed

22 to be a secret.  It scared me, and rightly so.

23         Now, remember, the torch march was also supposed to

24 be a secret.  Here's Gorcenski at it.  Why does Gorcenski know

25 what I'm doing before I do?  I testified that the totality of

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  the video from the evening of August 11th allows the viewer to

2  see every moment of every angle around the Thomas Jefferson

3  statue during the fighting.  I demonstrated my mastery of that

4  subject by showing you my actions from various different angles

5  throughout the course of that conflict.

6       In my opening statement I told you that no video

7  would show me pepper-spraying Kristopher Goad or Emily

8  Gorcenski.  You have not seen any video which showed this.  I

9  did tell you that I no less pleaded guilty to two counts of

10 assault, one on each of those names, and this fact was raised

11 by plaintiffs' counsel when they cross-examined me toward the

12 end of this trial.

13       Neither of those people are party to this suit, and

14 those convictions, even if they were based on true claims,

15 would not be proof of the plaintiffs' claims against me in this

16 case.  I am not going to waste your time, contra Ms. Dunn,

17 showing you the video over and over again about what I did.  It

18 does not matter what I did.  I do not need to prove that I was

19 defending myself against Thomas Massey at the Jefferson statue.

20 You could conclude that after Thomas Massey started the fight,

21 which you saw, which Mr. Willis acknowledged while watching the

22 video, you could conclude that after the other side started it,

23 I totally exceeded the boundaries of self-defense and you could

24 think I was a horrible, violent, terrible person who deserved

25 to go to jail over that incident.  And it wouldn't make a lick

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  of difference to this case because they still need to prove

2  that it was racially motivated, and that this racially

3  motivated violence caused their damages.  That's the issue

4  here.

5          They can't do that because it's not true.  Who did

6  you see me fighting?  Not Devin Willis.  Not Natalie Romero.

7  Not Elizabeth Sines.  You saw me pepper-spray a white man.  You

8  saw me punch another white man.  You saw me run right past

9  Emily Gorcenski while I was trying to disarm the white woman

10 with the baton.  You saw me get pepper-sprayed by the same

11 white man I just pepper-sprayed moments ago, and then you saw

12 the white woman with the baton grabbing my shirt collar where

13 the body camera used to be.

14          I wonder why that counter-protester didn't give that

15 body camera to the plaintiffs.  Hmm.  The video of her taking

16 my camera and swinging that baton, two different angles of it,

17 are in evidence as CCEX-132A and CCEX-135A.  You saw that baton

18 coming down from on high like an axe ready to literally, not

19 figuratively crack skulls.  This was not a text message.  She

20 was coming down with that thing like this to break men's heads

21 open, like a bike lock, like the bike locks you heard me and

22 other defendants repeatedly expressing our concerns about.

23          Then you saw me receiving first aid from the pepper

24 spray that I had suffered that night.  And that's in evidence

25 as CCEX-166A.  And you saw that when I was asked who maced me,

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  I said "commies."  Not Jews, not blacks, not supporters of

2  racial or religious minorities.  Commies.  Then you saw my text

3  message to Defendant Elliot Kline in Plaintiffs' Exhibit 3317,

4  which appears to be, for what it's worth, the first text

5  message I've ever sent to Elliot Kline, asking for his contact

6  at the police department so I could talk to them about the

7  fight.  He said he would get back to me.  But then August 12th

8  happened and this concern, shall we say, got back-burnered.

9       You know my entire experience of August 11th.  I have

10 no secrets from that day.  I have not been accused of defying

11 the discovery orders in this case.  Did you see Mr. Willis or

12 Ms. Romero get injured in any way on the evening of August

13 11th?  Did you see them receiving first aid?  Did you find it

14 odd that after more than four years Mr. Willis decided to

15 accuse me without evidence of pepper-spraying him in this

16 courtroom?  Did you find it odd that Ms. Romero just yesterday,

17 after more than four years and after already being questioned

18 by me at the start of this trial, suddenly thought maybe, just

19 maybe, I had punched her.  Did you think it odd that she might

20 want to check the video before elaborating on that allegation?

21 She withdrew it, of course, you'll recall.

22       Do you recall seeing a woman in a wheelchair being

23 pepper-sprayed?  Do you recall seeing students pulled down from

24 the statue and systematically beaten one by one as Ms. Sines

25 testified to?  Do you really think the lawyers on the other

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1 side would have left that out of their opening statement if it

2 had happened?  Do you really think you wouldn't have seen that

3 video?

4        I'm not going to go through all of the different

5 exhibits in this case.  But one we just added yesterday and I

6 am going to ask you to look at, okay?

7        This is the man.  We've seen him several times,

8 usually from the back.  He's got the blue shirt on with the

9 orange long-sleeve shirt underneath, he's got the beard, he's

10 got the baseball hat, okay?

11        This guy, we've talked less about.  His name is not

12 in evidence, so I can't tell it to you.  But he's wearing a

13 blue button-up shirt and a baseball cap, and you can tell, not

14 that I'm one to talk, but the guy is sort of overweight.

15        This is in evidence as CCEX-137A.  I'm going to pull

16 this up on the other video player.  I'm sorry.

17        Witness after witness from August 11th has come up

18 here and failed to identify those two men and several other

19 people as students of the University of Virginia, okay?

20 They're not students at the University of Virginia.  Nobody

21 believes that they are students at the University of Virginia.

22 Yet, plaintiffs' counsel even today in their closing arguments

23 keep referring to these as students with their arms linked

24 around the statue.  That should tick you off.

25        Now, this is the side of the statue where the

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  fighting I was involved in happens.  And this is also the side

2  of the statue that Ms. Sines would have been looking at --

3  we'll momentarily look at Ms. Sines's video, too.  This is the

4  moment -- this is what Ms. Sines was looking at that she says

5  was Nazis taking students off the statue one by one and beating

6  them.  That's what Ms. Sines described this as.  Let's see if

7  you see that.  As a matter of fact, I'll put it -- I'll do the

8  slow thing for us, okay?  CCEX-137A.

9          (Video playing.)

10          Try to keep an eye on this man.  That's who I pointed

11  out to you before was wearing the blue button-up shirt, and

12  until it got knocked off his head just now, he was wearing a

13  baseball cap.

14          (Video playing.)

15          This guy right here, I know it's a little blurry as I

16  pause it, that's the guy I pepper-sprayed a little while ago.

17  He's not a UVA student, either.

18          (Video playing.)

19          You see me punching the guy with the blue shirt with

20  the orange shirt underneath it.  Not a UVA student.  We go

21  right past here, while the guy I just pepper-sprayed is on the

22  statue trying to pepper-spray me.

23          (Video playing.)

24          I'll stop it there, because I don't need to prove to

25  you that that is okay.  You can believe that that's a crime.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    And it doesn't help the plaintiffs one bit unless they can

2    prove that it's racially motivated and that it caused their

3    damages.

4            I wonder if you find something else odd.  It's been

5    really troubling me.  And that's in CCEX-157, which I'm also

6    going to play for you, not in slow motion.

7            (Video playing.)

8            This clip was played by plaintiffs' counsel.  I

9    forget if it was in their opening statement but it was

10   definitely when they questioned Melissa Romero at the

11   beginning.  This is a longer version of that clip.  It was

12   filmed by Emily Gorcenski.

13           (Video playing.)

14           Somebody shouts, "They're coming up the lawn."

15   They've got scouts.

16           (Video playing.)

17           "This is important to all of us."  A little pep talk

18   for those students who have their arms linked around the

19   statue.  "Heads down, y'all."

20           (Video playing.)

21           "There's a fucking lot of them."

22           (Video playing.)

23           Ladies and gentlemen, the chants have started because

24   the cameras have arrived.  It's showtime, okay?

25           Why is Gorcenski filming these people's feet?

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1           (Video playing.)

2           Why are these the only faces that Gorcenski wants to

3    show?  If you don't recognize them, that's Mr. Willis; that's

4    Ms. Romero.

5           (Video playing.)

6           You wouldn't want to film the woman in the

7    wheelchair.  "This is what we have, activists and students."

8           (Video playing.)

9           This is what I was talking about when I told you,

10   ladies and gentlemen, about the diversity of tactics.  This is

11   a scam.  It's a lie.  It's a trick on you, and it should upset

12   you.  A diversity of tactics.  We have the sympathetic victims

13   embedded with the criminal conspirators, and then they say,

14   "Oh, my God, these monsters hurt us."  It's classic.  It's not

15   new.  And Mr. Wispelwey knows about it.

16          That's why Mr. Willis, Ms. Romero, and Ms. Sines all

17   testified that they can't remember who told them about the

18   formerly secret torchlight march.  Right?  I asked Mr. Willis

19   if he knows the name of Paul Revere.  Nobody forgets Paul

20   Revere's name, right?  "The British are coming.  The British

21   are coming."  But nobody can remember who told them that the

22   Nazis are coming?  Really?  Do you believe that?  I don't.  You

23   shouldn't, either.

24          We did get Ms. Sines to admit that she follows

25   itsgoingdown.org on Twitter.  And Ms. Sines said that

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  itsgoingdown.org is a news site.  Ms. Sines said that

2  itsgoingdown.org is a news site.  I said it's violent communist

3  propaganda.  It's a he said/she said so far as the evidence of

4  this case is concerned, ladies and gentlemen, and you're going

5  to have to decide who's telling the truth, because one of us is

6  lying to you.

7          Mr. Willis said he was psychologically traumatized by

8  this event because he could no longer pretend that his race

9  didn't matter.  But Mr. Willis was already a member of the

10 Black Student Alliance and People's Action for Racial Justice.

11 Nobody who thinks race doesn't matter gets involved with

12 something that has race -- "racial justice" in the title.

13 That's not true, and you should not believe it.

14         Mr. Willis -- I'm sorry, Ms. Romero told you that she

15 was not into politics.  She just moved to Charlottesville

16 because she wanted to be close to the White House; loves

17 history, she says.  She assured us that the red bandannas on

18 the so-called street medics indicated they were, quote,

19 "nonpartisan."  And she worked for a nonprofit that promoted

20 civic engagement.  And if you believe all that civic engagement

21 was devoid of ideological motives, then I've got a bridge to

22 sell you.

23         It's easy to forget that Ms. Sines was even there

24 when this happened.  Traumatized though she claims to be by the

25 whole thing, she livestreamed the fighting from a safe

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   distance, seeking to go viral.  That video is PX-3204, and it's

2   one of the few things I am going to show you before we get done

3   here.  3204.

4                (Video playing.)

5                Now, I'm not going to do this whole thing.  This is a

6   half hour video, okay?  Look at how close Ms. Sines is to all

7   these dangerous people.

8                (Video playing.)

9                Do you see this?  She's right next to everybody.

10  Nobody is a threat to her.  She's not afraid of them.  But

11  Ms. Sines appears to be privy to some inside information here.

12               (Video playing.)

13               Ms. Sines knows better than to go down there.

14  Ms. Sines doesn't want to go down the stairs.  She was real

15  comfortable being next to everybody while they were up there.

16  She didn't feel threatened by any of the torchbearers while she

17  was walking right next to them.  But right down there, she knew

18  better than to get down into that mess because she knew what

19  was waiting because she follows itsgoingdown.org on Twitter and

20  she knew exactly what was about to happen.

21               Traumatized though they all claim to be, none of this

22  stopped Willis, Romero, and Sines all from showing up on

23  August 12th, too.  Not that I got to see them.  I was maced

24  first thing in the morning by one of those guys who confronted

25  me at the Walmart parking lot, the same guy I argued with on

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   UVA before I walked away to avoid a fight.  Now he's here and

2   is in the same black and white Adidas T-shirt with a pepper

3   spray ambush waiting to take me out.

4           Ms. Kaplan in her opening statement today told you,

5   quote:  "It was the plaintiffs, not the defendants, who were

6   injured."  End quote.  These people live in their Twitter

7   mentions.  All their critics have been banned from social

8   media, and they have no idea how ridiculous they look to normal

9   people.

10          Mr. Willis testified that the people with their arms

11  linked blocking the street were only making a symbolic gesture.

12  The rally-goers could have just gone on the sidewalk, right, or

13  chosen a different entrance?  Well, I tried to walk on the

14  sidewalk, and you saw what happened to me.  You saw it from two

15  different angles.  I never saw it coming.  It was completely

16  without provocation of any sort.  All this talk about, we're

17  there to bait Antifa into a fight -- I'm walking down the

18  street.  Some nutcase maces me out of nowhere.  I screamed and

19  I had to be dragged by my associates into the park.  Terrified,

20  you heard me ask the guy who was giving me first aid:  "Are we

21  surrounded right now?"  Wondering if I was about to get my

22  skull cracked open by a bike lock or a baton.  The people who

23  were treating me assured me that we were okay.  And then a man

24  said, "We're going to kill them."  And I, unable to identify

25  the speaker through my blindness, said, "Don't kill anybody.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   You'll make it worse."

2          Asked by the reporter who pepper-sprayed me for the

3   second time in as many days, I said, "I don't know.

4   Communists."  And sure enough, you saw that hammer and sickle

5   flag outside the park.  You saw the raised left fist and

6   countless signs, including one carried and produced by

7   Mr. Willis.  You saw the Industrial Workers of the World flag,

8   the honorable communist red and black flags, signs with

9   far-left catchphrases like "no human being is illegal" and

10  "solidarity."

11         Now, I could stop here.  I did not conspire to commit

12  racially motivated violence.  I told my listeners to obey the

13  law.  I told event organizers I wanted the cops involved.  I

14  asked Elliot Kline --

15         Did somebody object to something?

16         Okay.

17         I asked Elliot Kline for his police contact after the

18  fighting at UVA.  I asked about the laws of Virginia with

19  regard to defensive items.  I obviously was not here to break

20  the law, and all of you know that.  I was not active on

21  Discord.  I was not in the #leadership-discussion channel.  I

22  was not a moderator or administrator.  I was not a leader or a

23  member of any organization.  I had my own hotel room where I

24  spent most of the time you have not heard about during that

25  weekend.  Each defendant who was questioned, I asked what role

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  I played in their plans, and they all said I played no role.  I

2  asked Jason Kessler what role I played in planning UTR.  He

3  said, "None."

4          So perhaps I should just sit down and shut up because

5  I won.  But I told you at the beginning of this trial that I

6  have higher ambitions than simply escaping liability.  I wanted

7  you to know what happened.  I wanted to cut through the lies

8  which have enabled so much trouble over the last four years.

9          I told you in my opening statement that this case is

10  about hate speech.  Plaintiffs' counsel lied to you by saying

11  that they and their clients believe in freedom of speech.  They

12  do not.  You already know this.

13          And to be clear, I am not arguing that the First

14  Amendment gives me some affirmative defense to the allegation

15  of conspiracy.  I am not saying I have a constitutional right

16  to injure people.  That's a red herring that the plaintiffs are

17  using to try to trick you.  What I am saying is that my speech

18  was not an unlawful conspiracy.  I am saying that it lacked the

19  requisite intent and alleged connection to the plaintiffs'

20  supposed damages.

21          In fact, Judge Moon gave you a very specific

22  instruction this morning, quote:  "Abstract advocacy of

23  lawlessness or mere advocacy of the use of force is protected

24  speech."  End quote.  He didn't have to tell you that talking

25  about race is protected speech because you're smart enough to

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   already know that, even if the plaintiffs don't.

2           I am very familiar with this legal standard.  I need

3   to be, because I make my living by exploiting it.  What I do

4   for a living is illegal in most countries.  The alt-right would

5   be illegal in most countries.  They are not illegal in this

6   country, but they will be if you do not protect us from abuses

7   like the one at work in this suit.  That is why --

8           THE COURT:  Wait.  Wait.  Wait.  Now, let's -- you

9   may not argue that -- just argue this case, not any greater

10  outside --

11          MR. CANTWELL:  This is not to confuse you about the

12  issues in this case.  If we conspired to commit racially

13  motivated violence in Charlottesville, Virginia on August 11th

14  and 12th, that's illegal, and the First Amendment provides us

15  no relief.  But neither does conspiracy law provide relief to

16  the plaintiffs, because there was no conspiracy.

17          The plaintiffs know there was no conspiracy.  They

18  knew it when they filed this lawsuit, and it was confirmed all

19  throughout the discovery process.  They hired their experts in

20  the summer of 2020; after years of abusing the legal system,

21  failed to produce any evidence of a conspiracy because they

22  needed somebody to redefine the plain meaning of words in an

23  effort to deceive you and avoid liability for filing this

24  meritless lawsuit.

25          If the plaintiffs could sue us for hate speech, they

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    would.  Since they cannot, they're suing us for a nonexistent

2    conspiracy.  They are trying to shoehorn size-12 hate speech

3    allegations into size-5 conspiracy heels, but they do not fit,

4    ladies and gentlemen.

5           I say terrible things on the Radical Agenda.  Far

6    worse than most of my co-defendants.  But that's front-stage

7    behavior, as the plaintiffs' white supremacy expert, Mr. Simi,

8    put it.  That's the dangerous bad-boy image I have cultivated

9    for my entertainment product.  My private backstage

10   communications are about calling the cops and obeying the law

11   and purchasing insurance.  That's the truth.  And it is

12   reflected in my communications with my co-defendants.

13          The plaintiffs' experts did tell us something

14   important, though.  Ms. Lipstadt said there is no such thing as

15   an innocent racist joke.  In her view, a racist joke is never

16   just a joke.  It's an attack on somebody's identity and it's

17   never okay.  That's her motivation for giving her testimony.

18          Ms. Kaplan said none of this was funny and none of it

19   was a joke in her closing argument today.  Mr. Simi told you

20   that jokes are doublespeak.  You hear a tasteless joke, but the

21   people who we're trying to silence, they're a violent racist

22   conspiracy.  So we've got to stop them from joking.

23          I asked Mr. Simi if he had ever written or spoken in

24   favor of hate speech laws, and you'll recall that he said, "Not

25   unless you can prove that I have."  Talk about doublespeak.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1        Plaintiff Thomas Baker swore to tell the truth, the

2    whole truth, and nothing but the truth.  Then he said the

3    defendants in this case had a history of racist and antisemitic

4    violence.  When I asked him to provide details, he had to admit

5    that he couldn't come up with any actual examples of this.  And

6    what he meant to say was that Jason Kessler had said racist

7    things.

8        Plaintiff Devin Willis said nobody is required to

9    listen to hate speech.  Today, your verdict should inform

10   Mr. Willis that people who show up to the Nazi rally are

11   required to listen to hate speech.  They can't shut it down.

12   If they don't want to listen to hate speech, they have other

13   options than showing up at the Nazi rally.  So no, nobody is

14   required to listen to it.  They have plenty of choices.

15       Plaintiff Natalie Romero said white supremacy was

16   systemic and that offensive symbols should be removed if they

17   upset people.  When I asked her if that meant the majority of

18   the people, she declined to elaborate and said symbols which

19   offend her should be removed.

20       Plaintiff Marissa Blair said she came to the rally

21   thinking it was about hate speech.

22       Plaintiff Wispelwey said hate speech leads to

23   violence.  And we see that in CCSW-008, which is on your screen

24   right now.  So can we -- "In other news, hate speech leads to

25   physical violence, and some upcoming cases are going to set a

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   good precedent on that."

2          He testified in this courtroom that he couldn't

3   remember what cases he was referring to.  But I think you're

4   smart enough to know that he was talking about this case, and

5   you should not set that precedent.

6          The fact is that, to the extent hate speech leads to

7   violence, it's only because people like the plaintiffs in this

8   case perpetrate, aid, and abet that violence.

9          MS. KAPLAN:  Your Honor, may we approach?  May we

10  approach, Your Honor --

11         THE COURT:  Well, let's -- just a minute.

12         MR. CANTWELL:  I'm talking about his tweet.  It's in

13  evidence.

14         (Sidebar commenced.)

15         MS. KAPLAN:  Two issues, Your Honor.  I believe that

16  the defendants are now at their time.  They had 3.5 hours.

17         THE COURT:  He's got about -- well, we took a break.

18  I've been trying to keep time.  I think you've got about two

19  minutes.

20         MR. CANTWELL:  Two minutes.  All right.

21         MS. KAPLAN:  The second issue, Your Honor -- and I

22  understand he's incarcerated, so I haven't brought it -- I know

23  you don't want to interrupt.  But I'm very concerned at this

24  point about juror intimidation.  The way he's yelling at people

25  and pointing is scary to a normal person, and it really isn't

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   appropriate, Your Honor.

2            THE COURT:  Well, I think it's just his speech style.

3   I don't think anybody --

4            MS. KAPLAN:  He hasn't screamed in this courtroom the

5   whole trial.

6            THE COURT:  He has a loud voice.

7            MS. KAPLAN:  The jurors don't look too happy about

8   it, Your Honor.

9            MR. CANTWELL:  That's my problem.

10           THE COURT:  Well, if they don't, they'll take care of

11   it.

12           MS. KAPLAN:  Okay.  I just wanted it for the record.

13           (Sidebar concluded.)

14           MR. CANTWELL:  Let's stay with Plaintiff Wispelwey

15   for a minute.  He came in here, swore to tell the truth, and

16   told you that he was a mainline Protestants and then said,

17   "Jesus is Antifa."  Not "Jesus opposes fascism."  Not "Jesus

18   tends to vote Democrat."  "Jesus is Antifa."

19           Now, the Christians in this audience will recall that

20   Jesus said "I am the way, the truth, and the life."  Wispelwey

21   says Jesus is a mob of armed communist degenerates who assault

22   people they disagree with.  Jesus said, "Turn the other cheek."

23   Antifa says, "Watch your fucking back."

24           Ms. Sines told you that the people she was marching

25   with did not have weapons.  They were not wearing goggles.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   Some people might have had helmets, but they were totally

2   peaceful.  Mr. Baker told you the crowd was joyous.  Ms. Romero

3   was marching with the same crowd, as were Ms. Blair and

4   Mr. Martin.  They all denied the crowd was armed.  They all

5   denied the crowd was violent.  They all denied the crowd was

6   Antifa.  They all denied they were wearing masks or doing

7   anything wrong.  But you saw Ms. Sines's video from August 12th

8   which is in evidence as Plaintiffs' Exhibit 3207.  And the

9   chant:  "Ah, anti, anti, anti-fascista.  Ah, anti, anti,

10  anti-fascista."  Now, I want you to imagine that you're walking

11  down that street and you see that mob coming towards you.

12          Someone testified -- I forget who it was -- that that

13  was maybe 200 people.  I think that would be about two

14  battalions, as Seth Wispelwey put it.

15          THE COURT:  You're about out of time.

16          MR. CANTWELL:  All right.

17          That's the intersection.  You heard that chant.  You

18  think those people didn't hear that chant?  You think those

19  people didn't know that there were weapons there?  They did.

20  It's a lie.  This whole case is a lie.

21          And if I -- very, very briefly, Judge.  You heard

22  them talk some degree about ratification of violence.  And I

23  want to talk to you about that very briefly because I'm out of

24  time.

25          THE COURT:  No.  Your time is up.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1          MR. CANTWELL:  I did not ratify racially motivated

2    violence.  I told you, James Fields, I thought he was innocent.

3    You saw me tell a reporter that somebody hit that car with a

4    club.  You saw the video of them hitting that car with a club.

5          Maybe I'm wrong.  I don't know what was in James

6    Fields's heart.  But I never said that I endorsed the murder of

7    Heather Heyer.  I never said I endorsed racially motivated

8    premeditated murder.  I never said that.  I said I thought the

9    man was innocent.  I think an innocent man is in prison --

10          THE COURT:  Mr. Cantwell --

11          MR. CANTWELL:  I'm out of time --

12          THE COURT:  You're -- you're --

13          MR. CANTWELL:  Thank you for --

14          THE COURT:  Mr. Cantwell, you're on the defendants'

15    [sic] time.  They've got 15 more minutes, and that will take us

16    to 5 o'clock.

17          (Pause.)

18          THE COURT:  You may proceed.

19          MS. DUNN:  Thank you, Your Honor.

20          So, ladies and gentlemen, the good news is we're

21    almost done.

22          The other good news is that, in the courts of law in

23    our country, there is law and there is evidence.  And that's

24    what matters.  And so in our last remaining minutes together,

25    that's what I'm going to talk about.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1        But the first thing that I'm going to say is I'm

2   going to direct your attention to what's on the screen.  It's a

3   post by Mr. Cantwell and it says, "If you think the alt-right

4   is insignificant, you might want to ask the bleeding commie

5   filth we sent to the morgue and hospitals how insignificant we

6   are."  And I was really interested to hear how Mr. Cantwell

7   ended his closing, because he said he didn't ratify the

8   violence and he didn't ratify James Fields.

9        And so, in just this one post you can see that he did

10  ratify it.  You can see that he says "the commie filth we sent

11  to the morgue," so he's part of a group.  He's part of a

12  conspiracy.  And you can see that he's talking precisely about

13  what James Fields did, because Heather Heyer is the woman sent

14  to the morgue.  And the plaintiffs in this case, many of them

15  were sent to the hospital.

16       So while I can't in the remaining time go through

17  everything that the defendants said that were not supported by

18  evidence, that are directly contradicted by evidence, that are

19  completely contradicted by the law that you are charged with

20  applying, I can put up this post that says this violence

21  happened, it was reasonably foreseeable, and the defendants in

22  this case were involved as part of a conspiracy.

23       So we put on three weeks of evidence.  The defendants

24  in this case put on a day and a half.  Everybody had access to

25  the same videos.  Everybody can send out subpoenas.  And I

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1  think at this point, ladies and gentlemen, you've seen the

2  evidence.  You know this case.  You know the facts as well as

3  we do.  And so I want to spend the little time I have to try to

4  do two things.  And one is to look at the law of conspiracy.

5         Conspiracy is a legal concept.  You can't just scream

6  and yell your arms and say there's no conspiracy, okay, because

7  the law actually says what a conspiracy is.

8         And these are instructions 13, 14, and 19.  They'll

9  be in the jury room with you.

10        Co-conspirators can have legal as well as unlawful

11 objectives.  If any one of the objectives is unlawful, then the

12 conspiracy is unlawful.

13        The instructions plainly say -- number 13 says all

14 plaintiffs must show in order to prove an agreement is a shared

15 objective to cause racially motivated violence.

16        MR. CAMPBELL:  Objection, Your Honor.  I believe you

17 changed that instruction, and that is not the current

18 instruction.  The "shared objective" is now replaced by "an

19 agreement."  I apologize for interrupting.

20        THE COURT:  Which one?

21        MS. DUNN:  This is 13, Your Honor.  What's your

22 objection?

23        MR. CAMPBELL:  That that's not the operative

24 instruction at the moment, that the judge changed that

25 following our objections.

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1          MS. DUNN:  I'm sorry.  An agreement to cause

2     racially -- that's fine, too.  We are good with that, that all

3     the plaintiffs must show is an agreement to cause racially

4     motivated violence.

5          And in looking at the agreement that existed, you can

6     look at the evidence that is both direct and that is

7     circumstantial, and that is all the evidence.  So you can look

8     at the relationship that a defendant had with other members of

9     the conspiracy, the length of their association, the

10    defendants' attitude and conduct, and the nature of the alleged

11    conspiracy.

12         Members of a conspiracy do not have to know each

13    other.  So everybody that says, "I wasn't at the torch march.

14    I wasn't on Discord.  I wasn't here.  I wasn't there," it

15    doesn't matter.  All you need to do to be part of a conspiracy

16    is to join the conspiracy on one occasion, and all you need to

17    do to have an overt act is to have any conspirator take that

18    overt act.

19         Members may perform separate and distinct acts at

20    different times.  So the fact that some people did something at

21    some time and James Fields did something at a different time,

22    that doesn't matter.  And a single act can be sufficient to

23    draw a defendant within the conspiracy.

24         Now, very important to the law of conspiracy is the

25    idea of reasonable foreseeability.  And here, the defendants

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1    misled you an incredible amount.

2          You were told that you would have to be able to tell

3    if the car attack was going to happen, that plaintiffs had to

4    prove that defendants had an agreement to hit people with a

5    car.  But that's not true.  And so we're putting on the screen

6    the law about reasonable foreseeability.

7          The law holds co-conspirators liable for all of the

8    reasonably foreseeable acts of their co-conspirators that are

9    done in furtherance of the conspiracy.  A defendant need not

10   have foreseen the precise nature of an injury in order to be

11   held liable.  The defendant can be liable so long as the injury

12   was of the same general nature as foreseeable risk created by

13   this conduct.

14         So reasonable foreseeability doesn't mean to foresee

15   a car attack -- even though, by the way, they did, and we

16   showed you evidence of that.  Reasonable foreseeability in this

17   case needs to foresee violence of a certain nature.

18         So, contrary to what Mr. Kolenich told you, this was

19   not about a little fistfight, a little scuffle.  This was about

20   raising an army for the cracking of skulls.

21         Mr. Cantwell actually posted -- and Matt, if you can

22   put that on the screen -- this was what he posted after 2018.

23   After, by the way, all of the discussion of cracking of skulls

24   by Jason Kessler when he reached out to Richard Spencer at the

25   beginning, by other co-conspirators about how they cracked

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   skulls.  Mr. Cantwell says that "This would not have happened
2   if you did not have people out there saying, 'Let's go break
3   some fucking skulls.'"  Okay?  So they cannot get up and argue
4   this to you.

5         And by the way, this is not a hypothetical thing.
6   Natalie Romero actually had her skull fractured.  This is stuff
7   that has been talked about in this conspiracy the entire time.
8   So this is not about -- apologies.  This is from the Radical
9   Agenda.  It's not a post.  And it's from 2018, after the event.

10        So the important thing to understand about the
11  general nature of the violence that was reasonably foreseeable
12  is how major it was.

13        We saw people have torches thrown on them with
14  lighter fluid.  We saw people use shields meant for riot gear,
15  plow through other humans.  We saw people stab people with
16  flagpoles, and testimony that flags could include knives in
17  them.  We saw mace used at very close range.  We saw a person
18  beaten with shields, with fists and kicks to the head and the
19  body.  We saw Eli Kline lead Ben Daley and members of the Rise
20  Above Movement and mercilessly beat and choke people.  These
21  acts of violence are just as grievous and can cause foreseeable
22  injury like the injuries received by the plaintiffs in this
23  case in the car attack.  So that's one thing.  This whole thing
24  about reasonable foreseeability is very important to understand
25  and you were very much misled.  So please read this instruction

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   number 19.

2            Second of all, you saw the posts that were all over

3   the place talking about hitting people with cars.  They

4   believed they were entitled to do this.  You saw Matthew

5   Heimbach's posts, you saw Chris Cantwell's posts, you saw James

6   Fields's posts.  You saw posts all over Discord where they are

7   literally, overtly talking about, "Can we hit people with

8   cars?"

9            You saw Vanguard America's leader admit that this was

10  foreseeable, that you had to expect somebody would die, you had

11  to expect this kind of injury.  This is like going into the

12  sharks.

13           So many of the defendants had access to these

14  communications, and even if they didn't, they were part of this

15  conspiracy.  And so they tried to argue to you that James

16  Fields was not part of an agreement.  Well, that is not true.

17  And the heads of Vanguard expressly told you this in sworn

18  testimony.  The fact is the head of Vanguard America invited

19  James Fields to march with them.  James Fields accepted and

20  under the law that I just showed you on the screen and that

21  will be with you in the jury room, that is an agreement.

22           After that, you saw that Vanguard America discussed

23  that they were responsible for the car attack.  Somebody in

24  Vanguard America discussed with the head of Vanguard America

25  where they said "We fucking killed somebody."  And they came up

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   with the story that they would say James Fields was a plant.

2   We didn't have anything to do with them.

3           Now, of course, James Fields and Vanguard America are

4   connected, as the testimony said.  But Vanguard America is

5   connected to the rest of the defendants in this case in other

6   ways, as you have heard.  And all you need is to agree with one

7   or more other people or other defendants.

8           So Vanguard America had an agreement to march with

9   the Nationalist Front.  They were all in agreement.  They were

10  all in a conspiracy together.  And the Nationalist Front was

11  connected by invitation to all the other defendants in this

12  case, including Mr. Kolenich's clients, Identity Evropa, Eli

13  Kline, and Jason Kessler.  They were all in it together as you

14  have heard.

15          The other part, ladies and gentlemen, that connects

16  people to the conspiracy -- and this is in the instructions --

17  is that you can look at conduct before, during, and after the

18  events.  And we showed you the judge's findings about Eli Kline

19  and Azzmador Ray where the judge made findings about

20  ratification.  And those are findings that you need to decide

21  separately about these defendants, but you can make them too,

22  because ratification after is part of the conspiracy.

23          And there is so much evidence of ratification in this

24  case.  It's not just Chris Cantwell's post that establishes

25  ratification and conspiracy and ownership over what James

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   Fields did.  It's Jason Kessler's many phone calls to James

2   Fields in jail, the money that they sent him, the financial

3   support.  Chris Cantwell hugging him and giving him a Nazi

4   salute, saying, we share your beliefs.  The public praise, the

5   many tweets, "James Fields did nothing wrong."  Calling him a

6   POW, calling him a martyr, calling him someone who died for our

7   cause.  It's Matthew Heimbach's letter to him with a poem in it

8   that says "I know why you went to Charlottesville," and his

9   testimony that they had shared beliefs.

10          The idea that somehow this person is not connected,

11   when you can look at that evidence and that ratification and

12   the acknowledgment of the heads of Vanguard America, is

13   completely incorrect.  It's contradicted by the evidence and by

14   the law, and we are going to argue and we are going to submit

15   to you in just a couple of minutes on the evidence and on the

16   law.

17          So, ladies and gentlemen, I had originally thought

18   that I would have time to go through the verdict form with you.

19   And maybe I'll just attempt to do that a little bit.  Because

20   we have focused, and everybody has focused, really, on only the

21   first claim on the verdict form.  And so, happily, we didn't

22   keep you here for all the weeks it would take to go through all

23   the other claims, but I just want you to see it and tell you

24   what those claims are.

25          But the most important thing I can tell you, ladies

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   and gentlemen, is these claims have been proven.  They have

2   been proven as to every single defendant.  If you look at those

3   conspiracy instructions, there will be no doubt because you

4   know all the evidence and you at this point can apply the law

5   to the --

6          MR. KOLENICH:  Your Honor, the form on the screen has

7   verdicts already checked.  Request that the blank form be shown

8   to the jury.

9          MS. DUNN:  We're happy to do that, Your Honor.

10          Let me just start by saying the first claim on the

11  verdict form that you'll see has to do with the conspiracy to

12  commit racially motivated violence.  And there's a box you can

13  check for all defendants.  And if you don't believe all

14  defendants, there are defendants' individual names.

15          The second claim on the verdict form is a different

16  statute.  It's under statute 1986.  And this statute applies if

17  defendants were not part of the conspiracy, but they knew about

18  it and failed to stop it, even though they were in a position

19  to do so.  And so we think the answer to this is obvious

20  because the answer to the first question at this point is also

21  obvious.

22          The third claim on the verdict form is a Virginia

23  state law civil conspiracy claim.  And for this claim,

24  actually, the unlawful act doesn't even have to be racially

25  motivated violence.  It can be intimidation, it can be

                 Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   harassment, it can be violence, it can be any unlawful act.

2          And so you'll have jury instructions on all these

3   claims, but I just wanted you to know these claims are

4   different than the first claim on the form so you know to look

5   for the instructions.

6          You'll then be asked to address damages.  And there

7   will be space for compensatory damages and punitive damages.  I

8   want to make two points here in the remaining seconds, which is

9   that the duplicate damages instruction Mr. Campbell showed you

10  doesn't apply to punitives.  Punitives is also not about

11  deterring these particular defendants.  It's about sending a

12  general message that this conduct should never happen again.

13         I think, given the time, I'll let you look at the

14  other claims yourselves, and close by saying, ladies and

15  gentlemen, I can't appropriately express our gratitude to you.

16  Your patience truly knows no bounds.  Thank you for giving this

17  case the consideration that it deserves.  Please look at the

18  law.  Please apply it to the evidence that you actually saw.

19  Thank you so much.

20         THE COURT:  Ladies and gentlemen of the jury, it's 5

21  o'clock now, or just a minute before.  We're going to recess

22  now and come back at 9 o'clock in the morning.  And you will be

23  given the verdict forms and retire to the jury room to start

24  your deliberations.

25         Now, generally deliberations will go like from 8 to 5

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1   as normal.  Now, the only time I change that is if all the

2   jurors agree and want to go beyond that, we can accommodate

3   that.  We want you to give the case as much time as you need to

4   decide it and be fair to both sides.

5            But anyway, tomorrow we'll be here 9 o'clock in the

6   morning.  Overnight do not discuss the case with anyone or

7   allow anyone to discuss it with you or remain within hearing of

8   anyone discussing it.

9            I'm going to excuse you now and we'll recess until 9

10  o'clock in the morning.

11  **(Jury out, 5:00 p.m.)**

12           THE COURT:  I think right now the plan is for them to

13  deliberate where they are.

14           THE CLERK:  I'm sorry.  Mr. DeRise has told me I was

15  wrong about that.

16           THE COURT:  Yeah, take all your stuff.

17           MS. KAPLAN:  When we come back tomorrow, Your Honor,

18  do you want us to come here?

19           THE COURT:  Yeah, come back here because the jury is

20  going to come in and I'm going to read more instructions and

21  show them the verdict form too.  Then they'll go deliberate.

22           MS. KAPLAN:  Your Honor, one more question.  After

23  the jury starts deliberating, do you want us to be in the

24  courthouse or do we have to be here within a certain amount of

25  time?

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1          THE COURT:  I'd like you to have somebody here all

2    the time because I hate to -- the jury has to -- we run into

3    trying to find somebody on both sides.  A lot of the questions

4    are sort of innocuous sometimes.  It doesn't require everyone

5    to be here.

6          MS. KAPLAN:  I take it, Your Honor, we can still have

7    the room on the second floor that we've been using?

8          THE COURT:  Yes.

9          MS. KAPLAN:  Thank you.

10         MR. SPENCER:  Would you like all defendants to remain

11   in the courthouse from 9 to 5?  Is that what I heard?

12         THE COURT:  I wouldn't mind if you all agree on

13   somebody to be a spokesperson for them, that's okay.

14         MR. SPENCER:  Oh, okay.

15         MR. SMITH:  No problem, Your Honor.

16         THE COURT:  I just don't want to be trying to run

17   somebody down because I don't want to hold things up.

18   (Proceedings concluded, 5:02 p.m.)

19

20

21

22

23

24

25

Sines, et al. v. Kessler, et al., 3:17CV72, 11/18/2021

1              C E R T I F I C A T E

2       I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3   the United States District Court for the Western District of

4   Virginia, appointed pursuant to the provisions of Title 28,

5   United States Code, Section 753, do hereby certify that the

6   foregoing is a correct transcript of the proceedings reported

7   by me using the stenotype reporting method in conjunction

8   with computer-aided transcription, and that same is a

9   true and correct transcript to the best of my ability and

10  understanding.

11      I further certify that the transcript fees and format

12  comply with those prescribed by the Court and the Judicial

13  Conference of the United States.

14      /s/ Lisa M. Blair              Date: November 18, 2021

15

16

17

18

19

20

21

22

23

24

25