In The United States District Court
For The Western District of Virginia
Charlottesville Division

CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

DEC 06 2021

JULIA C. DUDLEY CLERK
BY: _____
DEPUTY CLERK

Sines, etal, Plaintiffs vs.
Kessler, etal, Defendants
Civil Action No. 3:17-cv-00072

Defendant's Motion for Judgement as a matter
of Law, and/or a New Trial, and/or Remittitur

Comes now, the Defendant, Christopher Cantwell,
and he moves this Court for a Judgement as a
matter of Law, and/or a New Trial, and/or
Remittitur. In support he states as
follows.

## Background

1) Cantwell is an indigent, incarcerated pro se
Defendant, whose troubles preparing for trial due to
Plaintiffs' conduct, the circumstances of his confinement
and the circumstances of his being transported for
trial, could fairly be described as "extraordinary", and
were entirely beyond his control. Those troubles
are not the primary grounds for this motion,
but they do impact its circumstances.
Cantwell accordingly ~~hereby~~ incorporates by reference
herein the records of those troubles, and asks that
they inform the Court's interpretation of
the following.

— 1 —

2.) In addition to those documented troubles, Cantwell offers the attached sworn declaration dated 11-26-2021, to update the record with troubles that have arisen since last updated. Specifically, That Cantwell is, at the time of this writing, without access to the operative complaint, verdict form, or jury instructions and throughout the trial was sent USB drives through postal service by Plaintiffs' Counsel, Which he could not review due to circumstances at the Central Virginia Regional Jail.

3.) By the time of trial, Plaintiffs' operative complaint alleged six counts, only four of which were against Cantwell.

4.) The jury deadlocked on the first two Counts, which were the federal conspiracy allegations under 1985 (3) and 1986 alleging a conspiracy to commit racially motivated violence.

5.) During deliberations, the jury at one point declared themselves deadlocked as to Count 3, the Virginia Civil Conspiracy allegations, under which racially motivated violence need not have been the unlawful purpose. Rather, any conspiracy to violate several Virginia statutes would suffice.

6.) The Court instructed the jury to continue deliberations, and the jury subsequently sent the Court a question. Cantwell is without the benefit of a transcript from which to quote; but from memory, the thrust of the question was whether or how the jury might allocate the distribution of punitive damages on Count 3. The Court stated, in essence, that the jury lacked the power to so allocate, but that only Plaintiffs awarded compensatory damages would be share in punitive awards.

7.) The jury returned a verdict of liability for all Defendants on Count 3, and awarded compensatory damages of $1 to all Plaintiffs except Sines and Wispelwey. Sines and Wispelwey were awarded "$0" and, to clarify, they specifically wrote a zero with a strike through, which, being absent in other zeros, may be construed as emphasis.

8.) Sines and Wispelwey were both thoroughly discredited during Cantwell's cross examinations of them. While the full scope of this is beyond the scope of this document, it may suffice in brief to state that Sines denied seeing weapons in the hands of the people she was marching with, though they were visible to the jury and the Court from

her own video, PX-3207, in which also the chant of "Ah-Anti-Anti Antifascista!" is loudly heard. Wispelwey was similarly discredited by his enthusiastic support for Antifa violence, evidenced by his tweets and submission to Slate Magazine, CCEX052.

9.) The jury also awarded $500,000 in punitive damages from each individual defendant and $1,000,000 from each organizational Defendant on Count 3.

10.) On Count 4 Virginia Code 8.01-42.1 the jury returned a verdict of liability for all defendants named in that count. The jury awarded $250,000 each to Plaintiffs Romero and Willis in compensatory damages. The jury also awarded Punitive damages of $200,000 from Defendants Spencer, Kessler, Ray, Kline, and Cantwell.

11.) Count 5 awarded compensatory damages to all Plaintiffs named except for Sines and $6,000,000 in punitive damages against Defendant Fields.

12.) Count 6 awarded compensatory damages to all Plaintiffs named, and punitive damages of

—4—

$6,000,000 from Defendant Fields.

Argument #1: Damages Are Excessive

13.) Virginia law limits punitive damages to $350,000, as Cantwell expects to be capably argued by Attorney Campbell on behalf of Defendant Fields. To the extent applicable, those arguments are incorporated by reference herein, to those damages awarded against Cantwell.

14.) The United States Supreme Court has ruled repeatedly that punitive damages must have some relationship to compensatory damages, lest they violate the Defendant's due process rights under the 14th amendment to the United States Constitution. Specifically, a ratio of 9:1 Punitive to Compensatory appears to push the boundaries, and 10:1 is almost certainly unconstitutional. See State Farm v. Campbell 538 U.S. 408, 2003. See also BMW v. Gore 517 U.S. 559, 1996. See also Cooper v. Leatherman 532 U.S. 424, 2001.

15.) Cantwell anticipates attorneys Smith, Rebrook, and Jones to argue for a dramatic reduction of their clients' liability per Count 3, in

accordance with the case law cited in para 14. To the extent applicable, those arguments as well as any raised by Defendant Spencer or Attorney Kolenich are incorporated by reference herein, to damages against Cantwell.

16.) Specifically, compensatory damages totaling $7 to all Plaintiffs, illustrates a frightening disconnect from the $500,000 and $1,000,000 punitive damages on that Count, from each Defendant.

17.) Cantwell, also anticipates, however, that Plaintiffs' counsel will raise the obvious point that the jury clearly intended something very different than a strict ratio application to Count 3 would produce. If the jury were to be asked how they felt about an organizational Defendant's punitive damages being reduced to $70, one need not a crystal ball to predict the result.

18.) Yet, short of bringing the jury back in to ask them, it is hard to imagine a different outcome that does not violate the due process rights of Defendants found liable on Count 3, especially given the deadlock on Counts 1 and 2.

(9.) The civil conspiracy of Count 3 alleged a conspiracy to violate any one or more of several different Virginia statutes, and lacking a verdict on Counts 1 and 2, we must infer that racially motivated violence was not the conspiracy the jury found the Defendants liable for. The parties are now left to ponder just what law the Defendants were found to have conspired against, and as applied in this verdict form, such a question left unanswerable seems to render the law's application unconstitutionally vague. How can the Court consider a reduction in the punitive damages without knowing what law or laws each Defendant did or did not conspire to violate? More to the point, how can the court know whether to reduce the damages absent this vital clue? Clearly, it cannot, and since it apparently must nonetheless, it seems a new trial on this issue is the proper remedy.

See Atlas Food Sys. + Servs. v. Crane Nat'l Vendors 99 F.3d 587, 1996 "Indeed, if a Court finds that a jury award is excessive, it is the Court's duty to require a remittitur or order a new trial"

See also Connally v. Gen. Constr. Co. 269 U.S. 385, 1926 "A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."

In this instance, the Court and the Parties knew not even which statute to guess at, and on that basis alone, the verdict ought to be set aside. The millions of dollars in punitive awards with zero relationship to compensatories only serve as that many exclaimation points to point out the severity of the problem.

21.) Plaintiffs may assert a connection between the civil conspiracy of Count 3 and Fields's car wreck, but this seems contrary to the Jury's deadlock on Counts 1 and 2.

22.) The awards, compensatory and punitive, as to Count 4, are no less excessive. It strains credibility to suggest Willis and Romero are owed greater compensatory damages, even for the totality of events on August 11th, than Romero is entitled to for for the assault

and battery of being struck by an allegedly weaponized vehicle the next day

23.) And yet, since Count 4 lacks any conspiracy element, no Defendant can be held liable for the totality of those events. Virginia Code 8.01-42.1 as applied to Count 4 can only hold individuals liable for ~~their own~~ damages caused by their own actions. Any other interpretation would ~~be~~ render Count 4 duplicative of Count 3.

24.) Precisely zero evidence was offered that Spencer, Kessler, Kline, or Ray, had any interaction with Willis or Romero, and neither Plaintiff alleged any Defendant caused their alleged damages on August 11th at UVA, on direct examination.

25.) Cantwell is without the benefit of a transcript from which to quote, but from memory, ~~on~~ Plaintiff Willis made a half hearted suggestion of the possibility that he may have been affected by Cantwell's pepper spray when Cantwell attempted to spray Thomas Massey, ~~but could not say so definitively,~~ based on the video then playing in the courtroom, but he could not state this definitively,

-9-

numerous other pepper spray deployment
were visible in the same video, and Cantwell's
Uncontested testimony is that his keychain
pepper spray canister was empty when he
attempted to spray Massey, hence the punches
that followed. Notably, Plaintiffs' counsel
declined to pursue this narrative, it was
not part of the operative complaint, and
Willis never mentioned it before that
moment in the Courtroom. Also, Willis
testified that he told a reporter
from the Daily Progress that he was
"unharmed" on August 11th.

26.) Also from memory, Plaintiff Romero
named Moore Defendant as the cause of her
damages on direct or cross examination
during Plaintiffs' case in chief. When recalled
by Cantwell after Plaintiffs had rested,
Romero implausibly attempted to recreate
the Courtroom drama of Willis's earlier
cross examination. Specifically, Romero
suggested Cantwell may have punched her, based
on video then playing. Cantwell stopped the
video and probed for specifics. "Where did
I punch you?" "How many times did I
punch you?" Romero declined to say, and
asked to see the video again, Cantwell

-10-

played the video back in slow motion, and invited accusations, which were not forthcoming. Notably, Plaintiffs' counsel, ~~presumably not eager to~~ declined to pursue this narrative.

27.) Even if the Court opted to interpret these half hearted suggestions, contradicted by video, as the source of Willis and Romero's damages on August 11th, no evidence was offered that Cantwell's use of force on August 11th was racially motivated, as would be required by 8.01-42.1. In either case it would have been an unintended consequence of Cantwell's clash with Thomas Massey, a white man who initiated the violence of that evening. It is Cantwell's uncontested testimony, supported by video, that he was motivated by Massey's violent behavior, and even if Cantwell exceeded the boundaries of self defense, or failed to meet the burden of such an affirmative legal defense, it remains uncontested that Cantwell's motives that night were entirely race neutral, so far as his use of force was concerned.

28.) Since the jury found all the named Defendants, equally liable on Count 4, and there is no

-11-

allegation that Kessler or Spencer used force at any time on August 11th or 12th, and no allegation that Kline or Ray ever came into proximity of Romero or Willis, the only reasonable inference is that the jury was not aiming to compensate Romero or Willis for Cantwell's use of force.

29.) This, again, leaves the Court and the parties to ponder, just what individual acts of what Defendants caused what dollar amount of damages, to which individual Plaintiff? Without this information, we are reduced to blindfolded dart throwers even as to compensatory rewards, and we are even less informed as to the appropriateness of the punitive damages. All we know for certain is that this Count alleged nothing so serious as an intentional car crash, and that the damages were obviously excessive on that basis alone.

## Argument #2 - Errors from Assumption of Conspiracy

30.) Throughout the course of this litigation, the Court has focused on the allegations of a racially motivated violent conspiracy, and this has resulted in errors regarding Count 4, which

—12—

lacked any conspiracy element.

31.) Specifically, Cantwell, Spencer, and others raised Rule 50 motions when Plaintiffs rested their case, and in an oral order dated 11-19-2021 at ECF 1464, the Court noted in its denial that the "Plaintiffs' evidence had raised a jury issue whether Defendants Cantwell and Spencer had conspired to engage in racially motivated violence." The Court further denied Cantwell's motion for a judgement as a matter of law, per his previously raised motions in limine at ECF 1066 and 1090.

32.) Cantwell's Rule 50 motion, however, was not limited to the conspiracy allegations. Cantwell moved to dismiss all of the claims against him, including those in Count 4, which lacked any conspiracy element.

33.) At the time the Rule 50 motion was made, there was not even the hint of a suggestion that any Defendant had directly caused Romero's 8/11 damages, and Willis's half hearted suggestion of a potentiality, contradicted by video, was hardly sufficient to warrant mentioning here. It certainly did not form a sufficient basis for liability on Count 4, much less an award of $250,000 in

compensatory damages much less the collective $1,000,000 in punitive awards.

34.) That Cantwell failed to specifically argue the point as to Count 9 at the time may be considered excusable neglect. See Pioneer Inv. Servs. v. Brunswick Assocs. Ltd P'ship, 507 U.S. 380, (1993 "the determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include, as the Court of Appeals found, the danger of prejudice to the debtor, the length of the delay, and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith."

35.) Cantwell is an incarcerated pro se Defendant whose circumstances during this litigation have been extraordinary. His motions ought to be interpreted liberally, and it could hardly be imagined bad faith that he neglected to argue the dismissal of a claim against him forcefully enough.

36.) Count 9 should have been dismissed at the time of the rule 50 motions, if not sooner.

-14-

37.) The jury instruction regarding negligence defenses was erroneous regarding Count 4. While assumption of risk, contributory negligence and sudden emergency do not confer a right to an unlawful conspiracy, they most certainly apply to the allegations of count 4, which includes potential liability for harassment or "slurs". One cannot reasonably expect to avoid being called names when they intentionally seek out a confrontation with racists who have gone to great lengths to avoid them.

38.) Especially since the negligence instruction told the jury to "disregard" those defenses, this improperly informed the jury's decision regarding punitive damages on all counts, but in particular on Count 4, which contained no conspiracy element. If a Defendant sought out a Plaintiff and subjected them to harassment, this is an entirely different matter than when a Plaintiff seeks out a confrontation, and then sues the person he set out to confront, based on mere "slurs". This instruction was clearly based on the conspiracy assumption, which was not proven, as evidenced by the deadlock on Counts 1 and 2.

39.) The uncontested testimony of all Defendant is that they sought to avoid a confrontation with Plaintiffs and their violent extremist associates. These uncontested assertions are backed by audio, video, and documentary evidence beyond dispute. Most notably CCEX10, and CCEX161b, as to August 11th, which is the thrust of Count 4.

Quoting from Pac. Mut. Life Ins. Co. v. Haslip (499 U.S. 1, (991 "The Due Process Clause does not permit a State to classify arbitrariness as a virtue. Indeed, the point of due process -- of the law in general -- is to allow citizens to order their behavior. A State can have no legitimate interest in deliberately making the law so arbitrary that citizens will be unable to avoid punishment based solely upon bias or whim"

There can be no other interpretation of holding Defendants liable for "harassment" or "slurs" exchanged during a confrontation they sought diligently to avoid, and the negligence instruction creates precisely this peril when applied to Count 4. Accordingly, the verdict as to Count 4 should be set aside.

~16~

Argument #3 - Any Retrial on Counts 1 and 2 should be Conditioned on a Retrial of All Counts

40.) Plaintiffs' Counsel Cantwell has heard, have made Public statements indicating they intend to continue pressing their unproven federal conspiracy claims.

11.) To press such a claim, Plaintiffs will need to allege damages, but all of their compensatory demands have either been met, exceeded, or in the case of Wispelwey, appropriately discarded by the jury.

12.) If the Plaintiffs wish to press their claim with Wispelwey alone, Cantwell most certainly welcomes the challenge, but there are ~~certainly~~ just as certainly better things that this Court could be doing with its valuable time. To press ahead with any other Plaintiff, without setting aside the awards from this trial, would be a pursuit of duplicate damages.

Argument #4 - A New Trial is in order on Grounds of Incredible Witness Testimony.

43.) In the Court's decision on Cantwell's Rule 50 motion, the Court rightly noted that it could not make assessments of witness credibility on such a motion, as regarding the arguments that Antifa is not a protected class and that the Plaintiffs' claims arose ex turpi causa and were barred in pari delicto. The same is not so in a motion for a new trial, or remittitur.

44) That Plaintiffs' testimony was dishonest is not a subject of dispute, and Plaintiffs' counsel doubtlessly knew this before choosing to put a fake priest on the stand.

45.) Even after finding all Defendants liable on each count they could reach a verdict on, Wispelwey's dishonesty was so obvious that he was awarded nothing by the Jury.

46) Elizabeth Sines, the namesake of this case, swore to tell the truth, stated that she saw no weapons in the hands of the people she was marching with, had no reason to believe any of the people in her company were involved with Antifa in any way, and that she did not delete her Facebook live video.

47.) In the moments that immediately followed, Ms. Sines was shown the Facebook post of her Facebook live video, the thumbnail of which showed the man who was carrying a baseball bat while wearing a helmet, mask, and long sleeved camoflauge jacket on a hot August day. She was then shown the facebook post announcing that she had deleted the video, to "protect the identities" of her co conspirator. Those posts are in evidence as PX3200 and 3202. While the Court and the jury watched, Ms. Sines denied seeing the weapons, which were plainly visible in the hands of the people she was marching with in her deleted video, PX3207. Ms. Sines was literally surrounded by armed and armored rioters, as she suggested she might bring the mob to the home of a man named Josh, whom Cantwell has since learned is Judge Moon's law clerk.

Weapon, after weapon, after weapon was circled on the screen, and each time Ms. Sines denied being able to tell what it was.

She was lying each time and everybody who watched it unfold, knew this.

48.) While Ms. Sines was ultimately granted the consolation prize of uncollectable damages on count six, the jury sent a very clear message by denying Ms. Sines any compensation under Count 3, her dishonesty was plainly evident to them.

49.) The deceptions of other Plaintiffs were less obvious, but every Plaintiff save for Willis and Wispelwey were in the same mob that Ms. Sines was filming in the since deleted Facebook video.

PX 1353 is a helicopter still frame taken just before the car wreck. The mob covered approximately one city block.

The idea that Baker, Blair, Martin, Alvarado, ~~and Muñiz did not see those weapons~~ Romero, and Muñiz did not see those weapons is not credible. The idea that they did not hear the "Antifascista!" chant captured on Ms. Sines's video is absurd, but Ms. Romero swore to tell the truth, denied hearing it anyway and moments later was captured on the same video.

Every participant in that mob lied on the stand.

50.) Plaintiffs who choose to block public roadways with an armed mob are not entitled to the assistance of the Court. Claims arising from ~~such~~ such behavior arise ex turpi causa, and are barred in pari dilecto.

51.) ~~People~~ An armed mob chanting "Ah, Anti! Anti, Antifascista!" is basically the defining characteristic of Antifa. One could hardly ask for a more obvious example of Antif a activity. Animus against Antifa is not an invideously discriminatory animus under 1985(3), nor is it "racial, religious, or ethnic animosity" under Virginia Code 8.01-42.1

52.) The Court now has occasion to assess the credibility of witnesses, and Justice clearly demands that the Defendants not be held liable for a fraud upon this Court, by an armed mob.

Argument #5 - The Dixon Confession Video Should Have Been Admitted For A Limited Purpose.

53.) A major component of Plaintiffs' conspiracy claims pertained to alleged

−21−

"ratification" of James Fields's car crash. Especially their push for punitive damages.

54) Numerous posts from Discord, Twitter, and elsewhere stated that Fields "did nothing wrong" and similar statements were solicited during cross examination of Defendants.

55.) In her closing argument, Ms. Kaplan stated that "even now" some Defendants refused to condemn Fields.

56.) Plaintiffs' counsel are all too well aware that Defendants ~~do~~ who support Fields do so for the belief that he is innocent, not because they support racially motivated intentional homicide. They took unfair advantage.

57.) Dixon's repeated admissions, not just from the video, but also a corroborating Facebook post screen capped by Defendant Kessler form in large part the basis for that belief.

58.) Not only was the video excluded, but a line of questioning on this subject by Cantwell of Heimbach was also cut off. To the extent this inquiry addresses the ~~states~~ mindset ~~fee~~ of Defendants, it should have been allowed.

−22−

Argument #6 - Evidence and Testimony of the Permit Litigation and Injunction Should Have Been Allowed for a Limited Purpose.

59.) Based upon a motion in limine Cantwell was not served with and heard about for the first time in the Courtroom when it was denied, evidence and testimony about litigation surrounding the permit for the event and the resulting injunction were excluded before trial.

60.) The Court rightly held that an injunction on the permit did not confer a right to unlawful conspiracy, but went too far in declaring the matter to be irrelevant.

61.) This decision made much of Cantwell's body camera video unusable, since all plans hinged on whether or not Defendants, with the help of the ACLU, prevailed in Court.

62.) The contrast could hardly be clearer between the operative complaint, which alleged planned racially motivated violence at the meeting, and the reality, which was a video of Defendants celebrating a legal victory for civil rights.

-23-

63.) To the extent this was demostrative of the Defendants' State of mind, it should have been allowed.

64.) The prejudicial effect of this decision became painfully evident at the very end of the trial, when Plaintiffs introduced a portion of the body camera video in which Kline tells Ray to "bring your fighters" early in the morning to take the park.

65.) Moments after that scene, in the full video, Cantwell is introduced to Ray for the first time, and immediately after, word of the injunction is announced, Defendants celebrate "Hail Victory" and Kline announces an entirely different plan based on contact with law enforcement which does not involve a need or even an ability to "take the park". Kline announces that the "original plan" is back on, which an earlier segment explained involved getting vehicles up to the park to avoid contact with counter protesters

66.) Excluding mention of that injunction left Cantwell to rebut the implication of

Plaintiffs' out of context clip with his own words describing some vague change of circumstances. It also left Cantwell looking like he was covering for Ray and Kline, who were the subject of adverse inferences, when he was just referencing the very next moments of a video the jury should have seen for themselves.

67.) If the jury thinks Cantwell went along with a plan that invoked "Bring your fighters" when the reality is he went along with something very different, then this incorrect assessment of Cantwell's mindset taints the jury's verdict on Count 3, at minimum.

## Conclusion

The jury's verdict in this case borders on incoherent. The trial went over schedule because exposing the lies of the Plaintiffs proved both necessary and time consuming. This left the jury pressed to reach a verdict on the day before the eve of a holiday. They clearly rushed and the Parties and the Court joined them in doing so for similar reasons

-25-

In the following days, the effort to decipher the verdict has proven futile. There is no racially motivated violent conspiracy on Count (one), but there's a conspiracy on Count 3, and racial motives on Count 4, which lacks a conspiracy element. That violence ensued is not in dispute, but aside from blaming Defendant Fields for the car wreck, the jury has not made clear who was responsible for the broader chaos of that historic weekend.

Defendant Cantwell was prejudiced by Plaintiff's 14 month long period of conspicuously selective correspondence, followed by clearly unlawful and intentional interference in this case by the United States Bureau of prisons, and then by the circumstances of his transportation for trial, and conditions at the Central Virginia Regional Jail.

The last minute severance motion, which gave him no chance to research the issues or contemplate the ramifications, did not remedy the issues.

Witnesses were clearly caught lying in Court under oath.

Important evidence and testimony were improperly excluded.

The jury instructions, which Cantwell did not have a proper chance to review or object to, were plainly erroneous.

The verdict form, which Cantwell did not have a proper chance to review or object to, was plainly erroneous,

Antifa is not a protected class

The Plaintiffs are Antifa.

For the foregoing reasons, the jurys verdict should be set aside.

If there remain any doubt as to the truth, a new trial should be held.

And at the very least, a man who has nothing to take, ought not be made to owe violent dishonest criminals $800,000, just because his efforts to avoid them were thwarted.

Respectfully Submitted,
Christopher Cantwell  11-29-2021

-27-

Central Virginia Regional Jail neither censored nor inspected this item therefore Central Virginia Regional Jail does not assume responsibility for its content.



Christopher Cantwell
Inmate #042171
Central Virginia Regional Jail
13024 James Madison Hwy
Orange, VA 22960

Office of the Clerk
U.S. District Court for
the Western District of VA...
Charlottesville Division
255 West Main Street   Room 304
Charlottesville, VA 22902