CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
02/10/2022
JULIA C. DUDLEY, CLERK
BY: H. Wheeler
DEPUTY CLERK

In The United States District Court
For The Western District of Virginia
Charlottesville Division
Sines, et al, Plaintiffs vs.
Kessler, et al, Defendants
Civil Action No 3:17-cv-00072

Supplement to Defendant's 11-29-2021
Motion for Judgment as a Matter of
Law and/or New Trial and/or Remittitur
Dated 2-7-2022

Comes now the Defendant, Christopher
Cantwell, and he supplements his
11-29-2021 motion as follows

A. Generally ~ pre-trial

1.) This filing aims to act as though
appended, essentially tacked onto the
end of, Cantwell's 11-29-2021 post
trial motion.

2.) Cantwell seeks ideally, ~~seeks~~ the Court
see the wrong done, and end this abuse
by entering a judgment as a matter of
law in his favor, Only failing this a
new trial, and only failing this, remittitur.

3.) Cantwell is an indigent, incarcerated, pro se
Defendant, and not by his own choosing,
Cantwell was bankrupted by Plaintiffs'
calumny, unable to pay his attorneys,
then falsely accused of threatening Plaintiffs'
counsel in a meritless sanctions motion,
Cantwell's counsel moved to withdraw, and
lent credibility to Plaintiffs' meritless false
accusation as a means to withdraw for non
payment, leaving Cantwell with no choice but
~1~

to fire them.

4.) Near simultaneous to Plaintiffs' meritless false accusation, the FBI went in search of another, less transparently fraudulent accuser, Benjamin Lambert, aka "Cheddar Mane". Lambert, who worships Charleston, SC church shooter Dylann Roof as a "Saint" is a member of an offline neo-Nazi group called the "Bowl Patrol" and set out to destroy Cantwell for his lack of support for mass murder, Lambert posted a private conversation in which both men used abusive language online, and the FBI threatened to ruin his life unless he told them what they wanted to hear about Cantwell, Lambert complied. Cantwell denied ~~his statements'~~ criminal intent, and went to trial, and was convicted on 2 of 3 counts on the indictment.

5.) Cantwell's felony convictions are being appealed, and at the time of this writing, oral arguments are scheduled for 3-9-2022. Cantwell claims he was wrongly convicted based in part on the Government's unlawful use of hearsay at trial, and improper jury instructions

6.) Throughout, Cantwell has been incarcerated since his arrest in a predawn raid on January 23rd 2020.

7.) Plaintiffs ~~promptl~~ promptly notified the Court of Cantwell's arrest, almost as if they had advanced notice. Plaintiffs repeatedly updated the court at each stage of Cantwell's trial, such as when he was denied bail, when he was convicted, and when he was sentenced.

8.) Cantwell updated his contact information with the Court after his arrest, and the court updated its records accordingly.

9.) When the Plaintiffs had discovery demands, they sent them to Cantwell at the jail where he was held.

10.) When the Plaintiffs benefited from Cantwell's silence, they did not send those communications to the jail where Cantwell was being held.

11.) After Plaintiffs' misconduct was discovered, they sent a 2 terabyte encrypted hard drive to the jail where Cantwell was being held. Cantwell moved for sanctions

12.) Less than 3 weeks later, the US Marshals stripped Cantwell of his property and transported him to a private prison in Tallahatchie, MS. Sanctions motion wrongly denied.

13.) Before Cantwell could reconnect with his property, he was shipped to USP Marion about a month later.

~3~

14.) Cantwell arranged to have the hard drive sent to him at USP Marion, and in September moved for a continuance.

15.) Cantwell also filed an IFP application in response to the Court's order regarding the costs of his transportation for trial.

16.) The Court did not act on Cantwell's motion to continue before he was transported on October 5th 2021. The Court has still not acted on Cantwell's IFP application.

17.) When Cantwell was transported, he was not allowed to take any papers or the hard drive with him. He asked that these materials be sent to him where he was being held for trial. USP Marion sent Cantwell his "Objection to Evidentiary Sanctions Against Defendant Kline" and a totally different USB hard drive which Cantwell had never seen before, but not the materials he needed for trial.

18.) Cantwell was held at the Grady County Jail in Oklahoma for approximately 10 days before being moved to the Central Virginia Regional Jail, which further obstructed his trial preparations.

19.) At the CVRJ, Cantwell was denied access to computer resources, while flooded with papers and USB drives by Plaintiffs Counsel,

-4-

20.) All of Cantwell's many requests for the Court to right these wrongs ~~were~~ were functionally ignored, until the enormity of the problem became too obvious in the courtroom immediately prior ~~to~~ to jury selection.

21.) On a Saturday night, Cantwell was instructed by CVRJ staff to call Plaintiffs' Counsel Michael Bloch. Over the phone, Mr. Bloch read aloud a letter from his office to Judge Moon, proposing to sever Cantwell's trial from that of his codefendants. Cantwell was given until the following Monday to decide his position on the request.

22.) Lacking time and other resources to fully process the implications, Cantwell proposed a perfectly reasonable alternative, if Plaintiffs wish to move against him separately, they should refile their claims against him separately, knowing this would not survive a motion to dismiss.

23.) The Court gave Cantwell a binary choice, procede or sever, decide now, as the jury pool waited outside the courtroom. Cantwell made clear that he did not consent to either, but between the two, he would proceed.

24.) Plaintiffs asserted, and the Court wrongly agreed, that Cantwell waived rights by declining.

-5-

25.) Cantwell did not waive any rights or procedural complaints. Cantwell correctly asserted that Plaintiffs' misconduct and complimentary interference by their cooperative allies in the government entitled him to relief from the Court, and Cantwell was willing to delay trial until such relief could resolve the many problems created by Plaintiffs' and the Government's misconduct.

26.) The Court's refusal to right these wrongs irreparably prejudiced Cantwell's defense, and Cantwell ought not be held liable for the outcome of an unfair trial.

B.  Generally – Post Trial

27.) Following the unfair trial, and consequently unjust verdict, Plaintiffs again wilfully excluded Cantwell from correspondence in this litigation. Plaintiffs subsequently, according to a familiar pattern, falsely informed the court that they had obtained the consent of the parties to a post trial schedule. Plaintiffs do not deny this.

28.) Cantwell first heard about this schedule when the Court issued an order implementing it. By this time, Cantwell had already submitted his 11-29-2021 motion.

29.) The CURJ subsequently deprived

~6~

Cantwell of law library access.

30.) Subsequently, Cantwell was stripped of all his papers for the 5th time in a year, and transported back to USP Marion.

31.) USP Marion is preventing Cantwell from accessing his legal documents.

32.) The Court has denied Cantwell's requests for a transcript and other documents.

33.) Cantwell has moved to delay post trial deadlines by 12 months.

34.) Post trial motions are due today.

35.) This is obviously unfair and abusive.

C. This entire case was transparently fraudulent, and made scant effort to pretend otherwise.

36.) The Plaintiffs' Second Amended Complaint exceeded 100 pages of outrageous and preposterous accusations, almost none of which they even attempted to prove at trial. Cantwell's lack of access to documents prevents him from fully demonstrating this fact in this writing, but will certainly articulate those details to an appellate Court should the District Court let this injustice stand.

~7~

37.) The clearest example of this that Cantwell can recall from memory was referenced in the letter proceeding his rule 50 motion. A document Cantwell believes was titled "Statement of Facts" filed by Plaintiffs at the start of trial, went Defendant by Defendant stating what Plaintiffs intended to prove at trial. Compare the paragraph about Cantwell in this document to the section pertaining to Cantwell in Judge Moon's decision on the first motion to dismiss. The difference is night and day, and the latter contains no accusation.

38.) The Plaintiffs never made any secret of their intent. They wanted to make Defendants' lives miserable for their political views, and they lied about violence to accomplish this Goal.

39) Plaintiffs' own exhibits showed Plaintiffs' co-conspirator Thomas Massey initiating the violence on August 11th. This was conveniently left out of Plaintiffs' complaint which laughably alleged Defendants "charged" peaceful "students" knowing in advance that this was untrue, on both the "peaceful" and the "student" parts as well as the "charge" and all implications of innocence on their part.

40.) Plaintiffs own exhibits showed Sines, Baker, Romero, Blair, Martin Muniz and others marching with an armed violent mob chanting "Antifascista!"

-6-

41.) Knowing these facts, the complaint and Plaintiffs' perjured testimony described all of Plaintiffs + criminal accomplices as peaceful "students" and "moms"

42.) The Plaintiffs who lied on the stand should be referred for criminal prosecution for perjury and contempt.

43.) Plaintiffs' counsel should be disbarred for knowingly deceiving the Court and the public so willfully and brazenly.

44.) Judge Moon knows this is true, his statements during and after the testimony of Sines and Wispelwey made it clear that he knew these Plaintiffs were lying on the stand. The Court is obligated to prevent the injustice of liability based on obvious perjury.

45.) At the time of this writing, Cantwell has no access to the Federal Rules of Civil Procedure, but is reasonably confident that said rules prohibit filing a complaint with no intention of proving its demonstrably false allegations, just so one can fraudulently survive a motion to dismiss, tear their political opponents' lives apart with absurd discovery demands, and then try to prejudice their racially motivated jury selection into holding them liable for first amendment protected speech and opinion.
~9~

D. The Jury Foreman Should Have Been Stricken For Cause

46.) Without the benefit of a transcript, and working from memory, Cantwell is under the impression that the Jury Foreman ended up being the juror he objected to on the grounds that his Pro-Antifa views on politically motivated violence were disqualifying.

47.) This argument stands even if this juror was not the foreperson, but as the foreperson, his influence was magnified and the prejudice to Defendants' case was disqualifying to equal measure.

E. The Jury Likely Held Defendants Liable for Protected Speech, Assembly, and Opinion.

48.) In keeping with Plaintiffs' intent, the jury likely held Defendants liable for exercising their First Amendment Rights.

49.) Though the case was based on allegations of a violent racially motivated conspiracy, such was not proven per the verdict.

50.) All of the Court's rulings on the Virginia statutes were premised on the assumption of the federal conspiracy claims being true, specifically the first motions to dismiss and League of the South's motion for Summary Judgment.

~10~

50.5) The Jury at one point asked if violence were a form of violence an Antifa excuse for violence.

51.) Indeed, if the jury had found defendants liable for a racially motivated conspiracy, at least count 3, if not Count 4, would have made sense. But without liability on the ~~con~~ federal conspiracy claims, it is clear the jury held Defendants liable for something other than violence, such as speech.

52.) Liability on Counts 3 and 4 are thus both unconstitutionally vague, and based on passion and prejudice against Defendants' political views, and right to speak and assemble.

53.) The Court erred in prohibiting Defendants from arguing against this perfectly foreseeable outcome, which was always the Plaintiffs' deceptive and unlawful and publicly stated intent.

F. Plaintiffs Deposition Designations were inadmissible against Cantwell, and the limiting instruction was insufficient to cure this prejudice.

54.) This case was premised on allegations of a conspiracy. Any alleged proof of the conspiracy's existence, or the acts or intentions of alleged conspirators, is evidence against all alleged members of the conspiracy, they are inseparable by nature.

55.) This was by no means lost on the

~11~

Plaintiffs, as they invoked testimony from those depositions repeatedly in their closing arguments

56.) Despite knowing these depositions were inadmissible against Cantwell, Plaintiffs included references to Cantwell in the segments they chose to play for the Jury, because they knew the jury would ignore the insufficient instruction.

57.) Cantwell preserved his objection to the inadmissible depositions.

G. The Jury Instructions for Adverse Inferences Did Not Limit Spillover Sufficiently, Especially In Light of Plaintiffs' Impermissible Closing Argument.

58.) Prior to trial, there was much talk of "Spillover" resulting from adverse inferences against some Defendants.

59.) Plaintiffs affirmatively sought spillover, that was the whole point of their demands. They specifically sought adverse inferences stating that Default judgments against certain Defendants would not account for the supposed "evidentiary gap" created by their non-compliance with discovery.

60.) This case was always premised on allegations of a conspiracy. Evidence of the conspiracy is evidence against all alleged conspirators.

— 12 —

61.) Plaintiffs knew it was improper to argue that the existence of a conspiracy was proven by the adverse inferences. They had included this improper language in one version of the jury verdict form, but removed it as shown by a redlined version Cantwell now references by memory for lack of access to the record.

62.) Despite knowing this, Plaintiffs impermissibly stated in their closing argument that the Court already determined the existence of a conspiracy based on the adverse inferences.

63.) Cantwell objected to this argument, and the Court improperly asserted that this was cured by the instruction that lawyers' statements were not evidence and that each Defendant was entitled to be judged by the evidence against him.

64.) This was not a question of evidence, it was an obviously and intentionally improper legal instruction. It was ~~willful~~ willful misconduct by Plaintiffs counsel, as evidenced by all of their preceding conduct.

65.) The existence of a conspiracy was the most important element of the Plaintiffs' claims. They could not and did not prove it and attempted to cheat through this impermissible and prejudicial tactic.

H. The testimony of Peter Simi should not have been allowed

66.) Cantwell's co-defendants objected to Simi's testimony, in part on the grounds that it is not typically allowed that an expert is called in to call someone a liar.

67.) Cantwell still has not seen this objection or the Plaintiffs' response to it. He operates based on his memory of the Court's decision on his co-defendants' objection, which is how Cantwell learned of Simi and Blee in the first place.

68.) While the Court specifically stated that this was not the purpose of Simi's testimony, that is the thrust of what Simi testified to. Simi simply called the Defendants' statements "Doublespeak" instead of using the words "You're a racist liar".

69.) The other principle purpose of Simi's testimony was to expose the jury to hearsay from a Jewish criminal who pretends to be a Nazi for fun. Plaintiffs sought to introduce the jury to inadmissible hearsay from Andrew "Weev" Aurenheimer in the form of a blog post titled "Operational Security for Right Wing Rallies" from the pages of the Daily Stormer. This was a backdoor to adverse inferences to imply evidence was destroyed to explain the staggering lack of

-14-

evidence to support their demonstrably false claims.

70.) The Plaintiffs falsely portrayed Simi as an expert who could help the jury understand coded messages written in secret Nazi coded language, but his testimony was devoid of any such redeeming value. The prejudicial impact of his testimony predictably outweighed it's imagined probative value, as Defendants stated when his sham testimony was first proposed.

71.) Notably, Simi had nothing to say about the ultimate back stage pass. Cantwell's body camera.

I. The Court Erred By Stopping Cantwell From Questioning Simi About Critical Race Theory

72.) ✳ Noting again that Cantwell is operating from memory without benefit of a transcript, Simi admitted that the works of Michelle Alexander, Ibram X Kendi, and Robin Deangelo influenced his work, and that these works could be categorized as critical race theory.

73.) Doubtlessly recognizing this as the subject of recent political controversy, the Court interrupted Cantwell's questioning, stating that the witness was not there to testify

—15—

on the merits of white supremacy, whether it was good or bad, true or false.

71.) Cantwell responded that this was not the purpose of his inquiry. Critical race theory asserts that "white supremacy" or "systemic racism" is ubiquitous throughout society. It is not a violent conspiracy in the unlawful sense, but it is every bit as coercive as the state itself.

75.) Defendants largely agree, and thus Sines's efforts to paint "white supremacy" as a violent unlawful conspiracy is undermined by this course of inquiry.

76.) Plaintiffs, largely agree as well. Romero said white supremacy was "systemic", Peoples' Action For Racial Justice of which Willis was a participant, said "This is about Statutes, not statues"! Willis himself said "No Justice No Peace No Racist Police!" To name few examples.

77.) Plaintiffs are adherents and/or fellow travelers with Antifa anarchist criminals who do street violence as part of their war on civilization, which they view as a relic of this much tamer vision of "white supremacy".

78.) Sines said he was familiar with this school of thought and that it influenced his work, and was thus qualified to answer.

—16—

J. Lipstadt's testimony should have been excluded.

79.) Cantwell presently struggles to recall what ostensibly legitimate purpose Plaintiffs' Holocaust® expert was supposed to serve, but it clearly never materialized.

80.) Plaintiffs' "expert" if any thing, backfired. Rather than confirm their absurd claim that Defendants' torches were some obvious symbol of a violent conspiracy, Lipstadt testified that "a Historian" would obviously get the torch reference, when Cantwell asked if a non Historian would see it the same way, she said no. When Cantwell asked "What about somebody who had just read Mein Kampf?" Lipstadt replied in the negative, Again, speaking from memory for lack of a transcript.

81.) In keeping with Plaintiffs openly admitted improper purpose, Lipstadt's purpose was entirely ~~prejud~~ prejudicial and devoid of probative value. She was there to imply that Defendants speech would result in an undesirable, though lawful, political outcome, such as that of Hitler's Germany. This was reflected in the verdict.

82.) Cantwell generally reasserts his pretrial objections to Lipstadt's testimony,

—17—

K. Plaintiffs Claims Arose Ex Turpi Causa and Thus Are Barred In Pari Delicto

83.) In Cantwell's response to the 2nd Amended Complaint, and in his Objection to Evidentary Sanctions Against Defendant Kline, Cantwell showed that Plaintiffs either were or were in the company of, the initiators of the violence at issue in this case.

84.) Such evidence was further developed at trial, ~~and~~ as the Court and thee Jury saw Thomas Massey start the violence of August 11th, and Ms. Sines filmed herself and her co-conspirators blocking public roadways after a dispersal and emergency order with an armed mob chanting "Antifascista" and attacking vehicles in the street.

85.) To the extent any plaintiff can claim to have been harmed by words, those words are protected speech and Plaintiffs in any case sought out those confrontations which Defendants sought to avoid.

86.) Cantwell generally reasserts the arguments in his Motion in Limine for a determination that Plaintiffs' claims arose ex turpi Causa and are thus barred in pari delicto, which are incorporated by reference herein.

87.) Because this Court does not want to aid and abet communist terrorism, it

must not continue to perpetrate this attack on the Defendants.

L. In Support of Remittitur

88.) In an interview, Roberta Kaplan said "And when we met with the Plaintiffs, we said that we think a lawsuit needs to be ~~filed~~ brought against the people who actually did this. Um, but many of you have been very injured and you may have other lawsuits you want to think about. You may want to think about suing the police department or suing others. And we understand that. And if you do that, that's fine, because many of you may need costs for your medical costs etcetera. But if you do that, you can't be in our case. And if you're in our case, you're probably not gonna get a lot of money at the end".

89.) Roberta Kaplan told "Jewish World" in 2020 "We absolutely can and will bankrupt these groups. And then we will chase these people around for the rest of their lives. So if they try to buy a new home, we will put a lien on the home. If they get a new job, we will garnish their wages. The reason to do that is because we want to create a deterrence impact. So we send a message to other people that if you try to do something like this, the same thing will

-19-

happen to you. <u>And it already has been a deterrence.</u>

90.) In 2019 Kaplan bragged to the Jewish Telegraphic Agency that while she had no expectation of collecting any money, she considered the espionage value of this fraud a fine consolation prize.

91.) The Plaintiffs, in short, have no expectation of collecting any money. Kaplan's politically motivated ambulance chasing should jeopardize her law license, and this court should not reward her with any more money than she has already stolen from her donors by fraudulently claiming this case was about racially motivated violence against innocent people.

92.) Cantwell is currently represented by a public Defender in his criminal appeal, and was represented by a public defender in his criminal trial.

93.) Cantwell is indigent and has filed an IFP application with this court.

94.) Cantwell tried to avoid Plaintiffs, but they pursued him and his associates

95.) The Plaintiffs have already bankrupted Cantwell,

96.) The lies that this lawsuit advanced on destroyed Cantwell's business, his personal relationships, and subjected him to endless threats, harassment, and discrimination

99.) Such was Roberta Kaplan's unlawful and malicious and dishonest intent when she went about her ambulance chasing, recruiting criminals and fake religious figures to commit perjury. in support of the lies exposed in the courtroom.

98.) On August 11th, Sines, Romero, and Willis were in the company of armed criminals who initiated the violence of that evening on video

99.) On August 12th, Sines filmed the armed mob she chose to march with, the same mob holding the black Antifa flag, chanting "Anti-fascista!" as they blocked the roads after a dispersal and emergency order, attacking cars along the way before coming into contact with Mr. Fields, whom Cantwell had never met before weeks later, in jail.

100.) Cantwell has nothing to take, the Plaintiffs are owed nothing, and they have no expectation of collecting. This Court should not give Kaplan ammunition to pursue her ethnic animus against Defendants.

~21~

101.) Cantwell was pepper sprayed by Plaintiffs'
co-conspirator, and his body camera was stolen
by Plaintiffs' other co-conspirator, Lindsay
Elizabeth Moers, as he attempted to disarm her
of her expandable baton on August 11th.

102.) The next day Cantwell was pepper sprayed
again, by Plaintiffs' co-conspirator
Mike Longo Jr., this time in a cold
blooded ambush while Cantwell walked
toward Lee Park.

## In Conclusion

This case was brought on the basis of
a lie, and for four years, Roberta Kaplan
has defamed the Defendants on the basis
of that lie, as she enriched herself to the
tune of millions of dollars by defrauding
her #SueANazi donors. Knowing that
Plaintiffs made a decision to associate
with armed, violent criminals who attacked
Defendants and others without provocation,
this team of prolific liars, knowingly and
repeatedly insisted to this Court and the
public that they were perfectly innocent,
and that the Defendants intricately planned
a premeditated, racially motivated, intentional
homicide in public, as just one of their
many crimes.

Then, in this Courtroom, we saw the videos,
and the stories fell apart, and the Plaintiffs
lied in open court while contradicted by videos

-22-

This shameless, disgusting display failed to convince the jury that a racially motivated violent conspiracy existed, but after asking the Court if "words were a form of violence" opted to punish Defendants anyway for their constitutionally protected speech, opinions, and assembly.

The Defendants have unpopular political views. That is all Plaintiffs proved in Court. That is all they intended to prove. The Defendants are being persecuted for those views by the government, by giant corporations, ~~and~~ by ethnocentric ~~████~~ political lawyers with an axe to grind, and the media.

Every element of power was aligned against the Defendants in this case. ~~The~~ Plaintiffs' obvious bad faith and willful misconduct was overlooked by the Court over and over again.

And yet, they still failed to prove their lies.

Instead, the Plaintiffs have been shown to be the aggressors, as the Defendants have stated from the beginning.

This Court is obligated in the interest of Justice not to allow their crimes and abuses of the legal system to bring them financial rewards, and the means to continue their unjustified assault on the targets of their enmity.

C Cantwell

~23~

Respectfully Submitted
Christopher Cantwell
2-7-2022