Richard Spencer
734 Clearwater Dr.
Whitefish, MT 59937

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

CHARLOTTESVILLE DIVISION

| | |
|---|---|
| ELIZABETH SINES *et al.*, | Case No: 3:17-cv-00072-NKM |
| Plaintiffs | |
| vs. | **POST TRIAL MOTION** |
| JASON KESSLER, *et al.*, | |
| Defendants | |

Defendant Richard Spencer, *pro se*, files the following post-trial motion pursuant to Civil Rules 50(B), 54, and 59, and the Court's Scheduling Order.

The verdict, issued on November 23, 2021, was not comprehensive. The jury failed to reach decisions on Claims I and II. On Claims III and IV, the Jury found for the Plaintiffs, against Mr. Spencer. (Claims V and VI did not affect Mr. Spencer.). As will be demonstrated, the Verdict is logically incoherent and inconsistent, making applications of laws unconstitutional. On Claims III and IV, Mr. Spencer moves for Judgements Notwithstanding the Verdict in his favor. Absent that, Mr. Spencer moves for a new trial. Regardless, punitive damages should be strongly reduced, in light of operative Supreme Court rulings and Virginia law.

POST-TRIAL MOTION - 1

## 1. Claim III

Claim III involves the Virginia civil conspiracy to violate statutes; it is derived from

Common Law:

> *A conspiracy consists of an unlawful combination of two or more persons to do*
> *that which is contrary to law, or to do that which is wrongful and harmful towards*
> *another person. It may be punished criminally by indictment, or civilly by an*
> *action on the case in the nature of conspiracy if damage has been occasioned to*
> *the person against whom it is directed. It may also consist of an unlawful*
> *combination to carry out an object not in itself unlawful by unlawful means.*
> *(Werth v. Fire Companies' Adjustment Bureau, Inc., 160 Va. 845 (1933))*

Due to the fact that the Jury remained undecided on Claims I and II (regarding 42 U.S.C.

§1965 and §1986), the Court has no guidance as to what exactly was malign or unlawful about

the Claim II conspiracy. What statutes were violated?

Virginia law holds that "there can be no conspiracy to do an act the law allows" (*Werth v.*

*Fire*). No one denies that Mr. Spencer was involved in a "conspiracy" to participate in the Unite

The Right rally (UTR). On June 5, 2017, he was invited to attend the rally as a speaker by Co-

defendant Jason Kessler; by June 15, Mr. Spencer had firmly committed. He spoke occasionally

with Mr. Kessler and other Defendants about the event between that time and August 11-12,

2017. There is simply no tort in agreeing to participate in a political rally, no matter how

controversial it might be. There is no tort in engaging in or witnessing bold talk, even the

advocacy of violence, so long as that discussion does not involve the directing or inciting or

producing imminent lawless actions (see *Dunlap v Cotton Tranmissions Systems* (2014)). Thus,

Mr. Spencer's witnessing Mr. Kessler's pronouncements on "cracking skulls" or Mr. Spencer's

chanting "Moldylocks" simply does not rise to the level of tortious speech.

POST-TRIAL MOTION - 2

The depth of Mr. Spencer's involvement in the planning and organizing, or inspiring, of UTR was in dispute in trial. But so much is certain. Mr. Spencer asked members of The Nationalist Front (The League of the South, Traditionalist Workers Party, and National Socialist Movement) to testify whether they had been involved with Mr. Spencer or communicated with him in the days leading up to the event or during the event itself. Their responses were uniformly "no" (see M. Heimbach — Cross, p. 210). Mr. Spencer asked Mrssr. Heimbach, Parrott, and Schoep whether they had been invited to participate in UTR by Mr. Spencer or coordinated with him. Again, their answers were "no" (J. Schoep — Cross, p. 247) Mr. Schoep and Mr. Spencer had, in fact, never met until they appeared together in Court.

Mr. Spencer asked the expert witness Dr. Peter Simi—who had spent countless hours studying the Discord server used to organize the rally—if Mr. Spencer had participated in it in any fashion. Dr. Simi was clear: there was no evidence that Mr. Spencer played any part:

> ***Mr. Spencer:*** *What was my handle or username on Discord?*
>
> ***Dr. Simi:*** *We were not able to determine that. . . . I have no idea whether you were using Discord or not.*
>
> ***Mr Spencer:*** *[D]o you have any reason to believe that I was involved in the Unite the Right server, or any related server, on Discord?*
>
> ***Mr. Simi:*** *No.*
>
> *(P. Simi — Cross, pp. 144-115)*

Additionally, Plaintiffs made no suggestion that Mr. Spencer held a correspondence—that is, two-way communication—with Defendant James Fields, who was found liable on Claims V

POST-TRIAL MOTION - 3

and VI. The Plaintiffs merely presented evidence of Mr. Fields occasionally talking about Mr.

Spencer and posting propaganda directed at him on social media. Mr. Fields might have had an

unhealthy fascination with Mr. Spencer, but this is obviously outside Mr. Spencer's control. The

Plaintiffs did not attempt to connect Mr. Fields's vehicular attack to Mr. Spencer, outside of

vague insinuation. Taking the most favorable possible view towards the evidence presented by

the Plaintiffs, perhaps Mr. Fields felt that Mr. Spencer would have wanted him to engage in a

violent assault. Even in this hypothetical, Mr. Fields' actions were beyond Mr. Spencer's control.

### 1.A Damages

It is significant that the jury determined that the damages awarded to the Plaintiffs for

Claim III were the bare minimum of $1, and, in the case of Ms. Elizabeth Sines and Rev. Seth

Wispelwey, nothing at all. Apparently, the appreciable damage the conspiracy inflicted on the

Plaintiffs was minimal. Punitive damages—punishment to discourage further actions of this kind

by Mr. Spencer and others—were a different story; they were grotesque. The jury assessed

$500,000 against Mr. Spencer.

Virginia code 8.01-38.1 limits punitive damages to $350,000. In *State Farm Mutual

Automobile Insurance Co. v. Campbell* (2003), The Supreme Court ruled that punitive damages

must be less than 10 times the size of compensatory damages; the Court adds that four times the

compensatory damage award is "close to the line of constitutional impropriety." The current ratio

for Mr. Spencer is 500,000 to 1; needlessly to say, this is grossly out of whack. Additionally,

Virginia law holds, "Because punitive damages are in the nature of a penalty, they should be

awarded only in cases of the most egregious conduct . . . Willful and wanton negligence . . .

POST-TRIAL MOTION - 4

1  reckless indifference to the consequences . . . that the [Defendant's] conduct probably would

2  cause injury to another" (*Griffin v. Shively* (1984)). "If a punitive damages award is

3  unconstitutionally excessive, it is [the court's] obligation to order a remittitur or award a new

4  trial (*EEOC v Federal Express Corporation* (2008)).

5      Notably, in Claim III, the Jury assessed $500,000 for each individual and double that

6  amount, $1 million, for each organization. The Jury's likely intended message was that

7  organizations are more impactful than individuals. This is reasonable. Organizations bring in

8  people and supplies; they handle logistics and promotion; they make events more regimented

9  and, potentially, confrontational. Mr. Spencer was probably the most well known figure who

10  attended UTR; however, the rally would not have become "Charlottesville" if only Mr. Spencer

11  had shown up. It would have been yet another of his media appearances. The organizational

12  Defendants, many of which came bearing uniforms, shields, and banners, made UTR something

13  else entirely. In light of *State Farm v. Campbell*, the outcome of the Jury's assessment would be

14  that each organization owes dozens of dollars (e.g., $1 x 7 x 10 = $70). Surely, this was not the

15  Jury's intent—especially since it doubled punitive damages for organizations. The Plaintiffs

16  would likely agree.

17      In conclusion—so many questions remain: What exactly was unlawful about Mr

18  Spencer's participation in UTR? What unlawful means did Mr. Spencer use? What was the

19  conspiracy all about? Whom did Mr. Spencer seek to harm? Did he pursue a lawful objective by

20  unlawful means—if so, how? Since the Jury was silent on Claims I and II, should we conclude

21  that the UTR conspiracy was, in fact, *not* a conspiracy to interfere with civil rights? Again, there

is simply no guidance on any of these questions. Taking into account the oversized punitive

POST-TRIAL MOTION - 5

damages, it is apparent that the Jury dislikes very much the UTR rally and does not want something like that to occur again. But the Court is left to guess at what statutes Mr. Spencer violated. Holding Mr. Spencer accountable in this way is to violate his due process. At the very least, a new trial is in order.

## **2. Claim IV**

Claim IV involves the Friday-night torch rally and relies on Virginia Code §8.01-42.1:

> *An action for injunctive relief or civil damages, or both, shall lie for any person who is subjected to acts of (i) intimidation or harassment, (ii) violence directed against his person, or (iii) vandalism directed against his real or personal property, where such acts are motivated by racial, religious, gender, disability, gender identity, sexual orientation, or ethnic animosity.*

The Jury assessed $200,000 against Mr. Spencer.

Critically, Claim IV is *not* a conspiracy charge. Virginia Code §8.01-42.1 addresses direct, racially motivated violence and vandalism. The Court has already observed that the August 11 torchlight march becomes actionable when it is *combined with* the violent activity that took place surrounding the Jefferson Statue. Otherwise, the march itself amounts to constitutionally protected speech.

Damages in Claim IV were awarded to Plaintiffs Romero and Willis. During trial, Mr. Spencer questioned these Plaintiffs on the stand. They both claimed to have known about or read about Mr. Spencer before UTR. They thus likely could have recognized him on the night of the march, and surely would have remembered him if he had ever "gotten up close and personal." Yet both Plaintiffs were *at the very most* vague and noncommittal about seeing Mr. Spencer on the night of August 11, 2017.

POST-TRIAL MOTION - 6

From Mr. Spencer's cross-examination of Plaintiff Romero:

> *Mr. Spencer: You attended the torchlight rally on August 11th. Did you at any point see me during those activities?*
>
> *Ms. Romero: I don't remember who I really saw. Like, if I saw pictures of people, maybe I could, you know, but —*
>
> *Mr. Spencer: Well, I understand that, but you seem to at least have a pretty good familiarity with what I look like. Did you see me at all during that torch rally?*
>
> *Ms. Romero: What were you wearing that night?*
>
> *Mr. Spencer: I was wearing a blue shirt.*
>
> *Ms. Romero: If you showed me, like, maybe what you looked like, I could…*
>
> *Mr. Spencer: Well, I'm right here.*
>
> *(Romero — Cross, p. 88)*

From Mr. Spencer's cross-examination of Plaintiff Willis:

> *Mr. Spencer: [B]eing that I'm here now, so you can recognize me -- I look more or less like I did then -- did you recall seeing me?*
>
> *Mr. Willis: My memory is not that strong. I couldn't tell you if you were one of the hundreds of faces, you know.*
>
> *(Willis — Cross, p. 73)*

Plaintiffs Sines is not included in Claim IV, but her testimony is relevant. Ms. Sines remembered being near Mr. Spencer on the night of August 11:

> *Mr. Spencer: [D]id I physically confront you at all on August 11th when we were around 10 feet apart?*
>
> *Ms. Sinese: No, you did not.*

POST-TRIAL MOTION - 7

**Mr. Spencer:** *Did I yell invectives at you or anything like that while we were 10 feet apart?*

**Ms. Sines:** *No, you did not.*

**Mr. Spencer:** *On August 12th did we encounter each other in any way?*

**Ms. Sines:** *No. I do not recall seeing you on August 12th.*

Even if Mr. Spencer had planned the August 11 march (he did not), and even if Mr. Spencer boasted about "being in the lead" of the march (he did, on a video posted that evening), Claim III is not a conspiracy charge. Thus, Mr. Spencer must have directly harmed the Plaintiffs, or expressly ordered someone to harm them, for Virginia Code § 8.01-42.1 to be operative. No evidence was presented at trial that suggested either of those possibilities. In fact, the Plaintiffs testified to the contrary.

The problem of applying this law is even more glaring when Mr. Spencer's behavior is compared to that of Co-defendant Christopher Cantwell. Throughout the trial, hours were dedicated to carefully, even excruciatingly, examining footage of the torchlight march. This included a great deal of footage of Mr. Cantwell pushing, shoving, pepper-spraying, and manhandling counter-protestors. (Mr. Spencer does not express an opinion on Mr. Cantwell's actions other than clearly both sides sinned and were sinned against.) What is important is that, manifestly, Mr. Spencer was not involved in any of these altercations. In fact, Mr. Spencer does not seem to have appeared in a single frame of the copious footage of the fracas. It is exceedingly unfair to assess equal punitive damages to Messrs. Cantwell and Spencer. In the end, Mr. Spencer finds himself in the unenviable position of being found liable for actions that the Plaintiffs testified he did not do.

POST-TRIAL MOTION - 8

## 2.A Direct Verdict

At trial, after the Plaintiffs rested, Mr. Spencer made a Rule 50 motion to decide the case as a matter of law. In Mr. Spencer's words, "They [the Plaintiffs] have not attempted to demonstrate that I conspired with anyone or that I sought out to harm any of the plaintiffs" (C Cantwell — Redirect, p. 46). The Plaintiffs instead relied upon the voluminous store of outrageous public statements Mr. Spencer has made over the years. In briefly making his case orally, Mr. Spencer neglected to urge the Court to decide on the non-conspiracy Claim IV. Pursuant to Federal Rules of Civil of Procedure 50(b), a district court may grant judgement notwithstanding the verdict if there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party (See *Cline v. Wal-Mart Stores* (1998)).

When Mr. Spencer made his Rule 50 motion, Judge Moon referenced a text-message exchange between Messrs. Spencer an Cantwell:

> **Mr. Cantwell:** *I'm willing to risk a lot for our cause, including violence and incarceration…*
>
> **Mr. Spencer:** *"It's worth it. At least for me.*
>
> *(August 7, 2017; PX-3317)*

The "cause," as stipulated at trial, is the political and social ideology of White Nationalism. That Messrs. Catwell and Spencer share a common cause or way of thinking does not mean that they are equally liable for actions that Mr. Cantwell did alone, under his own free will. The Jury seems to have been operating on an assumption of a conspiracy, due to the preeminence of Claims I and II and, possibly, the public and highly controversial nature of the trial: in other words, "All of the White Nationalists must have been in on it!" In the end, the law

POST-TRIAL MOTION - 9

is what it is. And the Court should take the Plaintiffs' word for it—Mr. Spencer did not harm them.

## **Conclusion**

In examining a verdict such as this, it is appropriate to ask, "What happened?"—even if that question can only be answered through speculation. To be sure, both the Unite The Right rally and *Sines v. Kessler* evoke intense and mixed emotions. Various opinions about the events abound, but the Jury made clear, through its awarding of punitive damages, that it wanted to discourage strongly rallies like UTR from taking place in the future. How this could be accomplished through the law was contentious and ambiguous. At one point, the Jury announced that it was deadlocked on Count III, before resolving. One juror had to be excused due to his child contracting Covid-19, perhaps affecting the balance. This situation the Jury found itself in was made more difficult—in a way unintended by the Court or any party—due to the trial's scheduling, as it ran up against the Thanksgiving holiday (November 23, 2021). After days of deliberation and deadlock, the Jury was faced with the prospect of being done with business, and free to enjoy time with friends and family, if a verdict—*any verdict*—were reached. Otherwise, the Jury faced returning after the holiday to continue deliberations.

The Plaintiffs might counter: Would Mr. Spencer suggest all of this if the Jury had decided in his favor? In other words, "Heads, I win; tails, you lose." Such a rejoinder is not convincing. The Verdict is fatally inconsistent *in itself*. This is true regardless of the role scheduling, emotion, faulty assumption, and urgency might have played. (The preceding paragraph should be read as informed speculation, and not a legal argument; as such, the Court

POST-TRIAL MOTION - 10

can take it or leave it.) The absence of decisions on Claims I and II offer no guidance to how Claim III should be understood with regard to Mr. Spencer. Applying §8.01-42.1 in Count IV would mean holding Mr. Spencer accountable for actions Plaintiffs testified he did not do—and thus would ultimately mean holding him accountable for constitutionally protected speech.

Mr. Spencer moves that Claim IV be decided in his favor in a direct verdict. Claim III should also be rendered in this way. Absent that, a new trial should be initiated, in which it and Claims I and II could be litigated, so as not to leave the matter up to guesswork.

Mr. Spencer incorporates arguments made by attorneys Kolenich, Rebrook, and Jones, as well as *pro se* litigant Cantwell. (With the latter, Mr. Spencer discards the unnecessary and unfortunate insults, which distract from sound argumentation. )

MARCH 9, 2022

Richard B. Spencer, *Pro Se*

POST-TRIAL MOTION - 11

**CERTIFICATE OF SERVICE**

I certify that on MARCH 9, 2022, a true and correct copy of the foregoing Motion for Summary Justice was mailed to the Clerk of the Court, which will provide electronic notice to all counsel of record.

_____

Richard B. Spencer, *Pro Se*

I further hereby certify that on MARCH 9, 2022, I also served the following non-ECF participants, via electronic mail, as follows:

Christopher Cantwell christopher.cantwell@gmail.com

Robert Azzmador Ray azzmador@gmail.com

Elliott Kline a/k/a Eli Mosley eli.f.mosley@gmail.com deplorabletruth@gmail.com

Vanguard America c/o Dillon Hopper dillon_hopper@protonmail.com

Matthew Heimbach matthew.w.heimbach@gmail.com

POST-TRIAL MOTION - 12