# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

| | |
|---|---|
| ELIZABETH SINES, SETH WISPELWEY, MARISSA BLAIR, TYLER MAGILL, APRIL MUÑIZ, HANNAH PEARCE, MARCUS MARTIN, NATALIE ROMERO, CHELSEA ALVARADO, and JOHN DOE, <br><br> Plaintiffs, <br><br> v. <br><br> JASON KESSLER, RICHARD SPENCER, CHRISTOPHER CANTWELL, JAMES ALEX FIELDS, JR., VANGUARD AMERICA, ANDREW ANGLIN, MOONBASE HOLDINGS, LLC, ROBERT "AZZMADOR" RAY, NATHAN DAMIGO, ELLIOTT KLINE a/k/a/ ELI MOSLEY, IDENTITY EVROPA, MATTHEW HEIMBACH, MATTHEW PARROTT a/k/a DAVID MATTHEW PARROTT, TRADITIONALIST WORKER PARTY, MICHAEL HILL, MICHAEL TUBBS, LEAGUE OF THE SOUTH, JEFF SCHOEP, NATIONAL SOCIALIST MOVEMENT, NATIONALIST FRONT, AUGUSTUS SOL INVICTUS, FRATERNAL ORDER OF THE ALT-KNIGHTS, MICHAEL "ENOCH" PEINOVICH, LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN, and EAST COAST KNIGHTS OF THE KU KLUX KLAN a/k/a EAST COAST KNIGHTS OF THE TRUE INVISIBLE EMPIRE, <br><br> Defendants. | Civil Action No. 3:17-cv-00072-NKM |

## DECLARATION OF DAVID C. DINIELLI IN SUPPORT OF
## PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS

I, David C. Dinielli, on this 9th day of March, 2022, pursuant to 28 U.S.C. § 1746, declare as follows:

**I.      Introduction**

1.     My name is David C. Dinielli. I am an active member of the State Bar of California, which I joined in 1995. I also am admitted to multiple federal District Courts and Courts of Appeals.

2.     I have been asked by Plaintiffs' counsel in this matter to provide an opinion on the reasonableness of the total amount of fees Plaintiffs seek. Plaintiffs make their fee request in the following context: Plaintiffs prevailed on four of six causes of action set forth in the complaint that was operative as of trial; one of the causes of action on which Plaintiffs prevailed arose under a statute that provides for an award of attorneys' fees to prevailing plaintiffs; and the facts underlying each cause of action were interrelated with the facts underlying all other causes of action.

3.     Prior to this engagement, I knew Plaintiffs' lead counsel, Roberta Kaplan, as a professional acquaintance. Both of us have worked on matters related to LGBTQ rights as well as matters relating to right-wing extremism.

4.     Our dealings have been casual and mostly spontaneous, with an occasional scheduled call on a matter of mutual professional focus or interest, such as strategies for challenging laws that disadvantage LGBTQ people in the Deep South, or impediments to collecting evidence from the chatrooms where extremists congregate.

5.     I never have served as co-counsel in any matter with any of the law firms providing services to Plaintiffs in this case, nor, to my knowledge, with any of the individual lawyers at these firms who have provided services in connection with this case. I have not to my knowledge been

"opposing counsel" to any of the lawyers or firms representing any of the Defendants or had other professional or personal connection to any of them.

6. I have not received and do not expect to receive any compensation for time spent drafting this declaration or developing the opinions offered herein.

7. I have no pecuniary interest in any fee award in this case nor in any judgment to be collected nor in any other element of the case in any way.

8. I have not sought and do not currently intend or expect to seek employment or to attempt to enter into any other paid relationship with any of the law firms representing Plaintiffs.

9. I am not currently involved in any way in any case that raises, or that potentially could raise, issues similar to those presented here, i.e., how to calculate a fee award in a fact-intensive, multiple-defendant, civil-rights conspiracy case in which plaintiffs prevailed on fewer than all claims and seek fees pursuant to a fee-shifting provision applicable to just one of the claims.

10. Indeed, I do not currently represent any party in any piece of litigation who, upon prevailing, would be entitled to a fee award pursuant to a statutory fee-shifting provision.

**II.    General Background**

11. By way of background, I have been a litigator for over 25 years in a variety of settings, including as a partner at a leading national law firm (Munger, Tolles & Olson LLP), as Special Counsel to the Antitrust Division of the Department of Justice, as Deputy Legal Director of a nationally recognized civil rights organization (Southern Poverty Law Center), and, most recently, as the founding supervisor of the Tech Accountability & Competition Project, a new clinical offering at the Yale Law School addressing social, societal, and competitive harms caused

by the business models and practices of the large digital platforms and other firms' undue exercise of power in digital markets.

12. I have represented plaintiffs and defendants, appellants and appellees, petitioners and respondents, as well as intervenors, third parties, and *amici curiae*. I have litigated cases both small and sprawling. I have led, or been the next most senior member of, teams representing parties in jury trials (lead), bench trials, a trial before a private judge (lead), arbitrations (lead), and other contested evidentiary proceedings in federal (lead) and state courts (lead), as well as in administrative settings. I have examined witnesses in courtrooms from Anchorage, Alaska to Santa Monica, California to Macon, Georgia to Jersey City, New Jersey.

13. I have submitted fee petitions, and I have challenged them as excessive or not authorized by law.

### III. Experience Litigating Cases of This Type

14. In addition to this general background, I have recent experience with special relevance to the opinions I offer here.

15. As deputy legal director at the Southern Poverty Law Center (SPLC) in Montgomery, Alabama from 2013-2019, I represented plaintiffs in complex civil rights cases and other "impact" cases that bore important similarities to this case.

16. One such case, which is ongoing, involves the allegation of years of efforts undertaken by a group of co-conspirators to frustrate the parental rights of a lesbian mother, which culminated with the kidnapping of a child who then was kept in hiding in Central America for years in order to prevent the child's contact with the lesbian mother living in Vermont. Another was a case against a notorious neo-Nazi who orchestrated a massive, antisemitic "troll storm" against a Jewish woman in Montana as retaliation for a purported dispute with the mother of an

equally notorious white nationalist, whose family has a vacation home in the Montana town. Another was a case against a number of leaders of so-called Patriot groups who organized a campaign of harassment and trespass directed at churches in Arizona providing lawful assistance to immigrants. And yet another was a case on behalf of several young gay men and certain of their mothers against several leaders of a New Jersey business that had harmed hundreds of gay men by defrauding them and their families about the purported benefits and success rates of so-called "reparative therapy" while delivering treatments that in fact were harmful and abusive.

17. As is true with this case, the outcome and ultimate success of those cases often depended as much or more on the extent and quality of the factual record we developed as it did on legal questions put to the court. For the sake of this declaration, I term these cases "fact-driven impact cases," in contrast to those cases in which the principal goal is to change the understanding or meaning of a particular constitutional or statutory right, which I will call "rights expansion cases."

18. This case constitutes a paradigmatic example of a fact-driven impact case. When Ms. Kaplan and her small team arrived on-site soon after Unite the Right, the world had seen contemporaneous images of torch rallies, chants, and violence. The world had not yet seen or heard about the planning and coordination that enabled the conflagration, however. Understanding the planning and coordination was important not just for the sake of completing the historical record; it also was crucial to understanding who bore responsibility for the events and who should be forced to pay damages for injuries suffered as a result. This was the central undertaking for the team of lawyers. Given the scope of the events, the variety of groups involved, and the number and severity of injuries inflicted, the undertaking was, quite obviously, enormous, "fact-driven," and designed for maximum impact.

19. As an illustration of the contrast between these "fact-driven" and "rights expansion" impact cases, consider cases on behalf of same-sex couples and surviving spouses who challenged limitations on the freedom to marry imposed by state law. Those cases certainly were *informed* by record facts about the litigants' lives, but the cases generally did not hinge on those facts. Judges struggled in deciding whether marriage restrictions violated the due process and equal protection clauses, but the struggles generally were unrelated to factual questions such as who called whom how quickly after the couple's first date, or whether one would-be spouse had said she "would like to get married" or rather that she "would consider getting married."

20. By contrast, this case and many of the cases I litigated at SPLC are fact-driven. If a defendant's liability turns on whether he authorized or ratified someone else's conduct, it plainly is necessary to gather and evaluate written communications between the two people in the days and maybe weeks or months before and after the relevant conduct.

21. It does not matter in these cases that it might be difficult to collect and review all the potentially relevant communications. The people whose relationship you are investigating might have spoken in person, or by phone, or used WhatsApp or Telegram or exchanged messages in a Discord chatroom using pseudonyms. The responsible plaintiffs' lawyer will gather all those materials, mostly from third parties. The lawyers will then piece it together using timelines and other techniques that help them draw connections that reveal insights about the individuals' intent and motivation. This is the way you build a factual record in a case such as this. The process is tedious and time-consuming, and it demands precision and patience.

22. In my experience, three features of these fact-driven impact cases, especially when used to combat right-wing extremism, set them apart from other cases in ways that require substantially more attorney and other timekeeper hours than other sorts of cases.

a. First, the factual settings of fact-driven impact cases typically are complex. Explaining "what happened" requires explaining a web of relationships and conduct that is interrelated and interdependent. It therefore is often the case that you need to learn everything that happened to fully understand any of it. The universe of potentially relevant facts is not just large, it also is diffuse. The "truth" of what happened exists in bits and pieces in the recollections of tens or hundreds of potential witnesses, along with the images and words and sounds stored in their devices (and related clouds and backup tapes and portable media). The only way to develop the accurate narrative of what happened is to scrape all those sources and then piece the information together until "what happened" finally begins to reveal itself.

b. The difficulty of piecing together the record in these fact-driven impact cases can be multiplied when defendants and other witnesses are motivated by extremist ideologies. I have particular experience litigating cases involving parties and witnesses who adhere to right-wing extremist ideologies. In my experience, this category of defendants and allied witnesses, and sometimes even their counsel, tend to resist, resent, and reject court authority and the various processes overseen by the court. This reflects a commonality among right-wing ideologies – that the government is *an*, if not *the principal*, enemy. The constant resistance to the normal processes that move litigation along makes routine matters – such as scheduling a meet-and-confer or eliciting foundational facts at a deposition – burdensome and time-consuming. Passive resistance often is paired with outright mockery, especially by the most well-known figures of the extreme right, who figuratively hijack proceedings to turn the spotlight that should

- 6 -

be directed at the case and the victims instead on themselves. Grandiose gestures of this sort also delay and complicate proceedings. I have read accounts, and have been told, of outbursts, tantrums, and displays in this case too, similar to my experiences with certain parties and witnesses and counsel.[1]

    c.  The complex and diffuse factual record, when combined with the particular difficulties of litigating against extremists, make it impractical if not impossible for one advocacy organization, or one law firm, to take on one of these fact-driven impact cases on its own. This is especially the case given (1) the significant cash outlay required to take the necessary discovery, (2) the time delay between the outlay and when judgment might be entered, (3) the uncertainty whether the judgment will be favorable, (4) the uncertainty whether the judgment will be based on a statute or other bases that permits fee shifting, and (5) the uncertainty whether any fee award would be collectible. In my judgment, no rational law firm or advocacy organization would take any fact-driven impact case on without a partner to share the burdens and the risks. I never considered doing so while at SPLC, even though SPLC was widely known at the time to have a substantial endowment and to be on sound financial footing.  There are also substantial non-cash costs to a firm or organization that commits to litigating a case like this on its own, not least being

---

[1] The majority of extremists with whom I have had interactions through litigation have no connection to the Unite the Right events or this case. However, some do – Andrew Anglin and Richard Spencer, both of whom were named as defendants in this case and both of whom also were integrally involved in a case I litigated while at SPLC. Mr. Anglin was the defendant in that case; Mr. Spencer was a non-party witness. In the case I litigated, Mr. Anglin refused to authorize his attorney to accept service of process, requiring months of efforts to locate and serve him, ultimately by publication, while his lawyer asserted in various filings that Mr. Anglin had established his domicile in one country and then another. Mr. Anglin also refused to appear for deposition in the United States (while offering to appear in Cuba, or Belarus, or (generously) Venezuela, just days after the United States had recalled its entire diplomatic staff due to unrest). Mr. Anglin's disruptive behavior was sufficiently extreme that the court eventually entered his default as a discovery sanction. But it also was, in my experience, perfectly representative of the type of litigation-related behavior I have experienced in other extremist litigants as well. Moreover, press accounts and filings in this case reveal patterns of misconduct that are similar to those I have experienced in many of my own cases, including wildly insufficient document productions, deposition no-shows, and refusal to cooperate in scheduling.

the opportunity costs associated with committing to a case requiring expansive and expensive discovery and with no viable settlement solution.

IV. **In Fact-Driven Impact Cases, the Number of Causes of Action Has Little Bearing on the Number of Hours That Are Reasonable**

23. It is important to emphasize that the features of these fact-driven impact cases that make them complex, risky, and time-consuming obtain almost without regard to the substantive nature of the claims or how many separate claims are alleged.

24. Here is an illustration of why that is the case. Imagine that, when drafting a complaint, I am not certain that I have sufficient information to allege that Individual B intentionally provided "substantial assistance" to Individual A, who was captured on film committing what plainly appears to be a battery. A reasonable attorney will use various discovery tools to explore the various facts and circumstances about Individuals A and B and their interactions that could shine light on whether Individual B did indeed intend to provide assistance. The reasonable attorney might explore whether Individuals A and B shared values, or whether they had reached a mutual-aid agreement in advance of the melee, or whether, to the contrary, there were other circumstances that made it less likely that Individual B would have intended to provide Individual A assistance in committing the battery.

25. That discovery, however, is the same as the discovery the reasonable attorney would have sought if she *had* alleged that Individual B intentionally provided substantial assistance to Individual A.

26. I do not mean to stake out the extreme and inaccurate position that the number of causes of action in a complaint has literally no bearing on the complexity of proceedings or the number of hours that reasonably should be spent litigating a case. Jury instructions and verdict

forms for ten claims, for example, presumably will require more time to prepare than instructions and forms for two claims.

27. The more modest claim I make here is that, given the broad universe of facts that plaintiffs in a fact-driven impact case such as this one must discover and analyze, the number of causes of action set forth in a complaint has little bearing on the reasonable number of hours required to do the necessary discovery and related factual analyses. The complexity of the facts determines the amount and type of discovery necessary to uncover them, not the number of claims.

28. This is the reason why it is entirely logical and proper for Plaintiffs to seek a fee award that reflects their full lodestar – separate and apart from the fact that applicable law expressly permits it in this case because the claims all rely on the same interrelated facts.

29. Indeed, it would be arbitrary and unfair to chop the award down based on the number of claims on which Plaintiffs did not prevail or based on the fact that only one of the claims on which they did prevail provides for fee-shifting. Neither of those facts alone – that the jury hung on two claims, or that only one of the winning claims can support the fee award – says anything about whether the total hours spent litigating this fact-driven impact case were reasonable.

**V.     Ultimate Conclusions**

30. I set forth my ultimate conclusions regarding the fee application submitted by Plaintiffs in these following paragraphs.

31. In forming these conclusions, I have relied on my personal experience from litigating and participating in cases similar to this one; conversations with former SPLC colleagues who also have litigated or participated in cases similar to this one; my review of certain case documents and other materials provided by Plaintiffs' counsel, such as the operative complaint and orders of the Court granting sanctions against Defendants (*e.g.*, ECF 910, 936, 982, 1106,

1295, 1437); conversations with certain of Plaintiffs' counsel; and certain orders of the Court approving rates compensable to certain timekeepers in pre-trial proceedings.

32. Based on my experience and review of these materials, it is my opinion that:

a. In the context of this fact-driven impact case, it is reasonable for Plaintiffs to claim 46,950.2 hours as their lodestar, or total hours for which Plaintiffs seek an award of fees;

b. In the context of this fact-driven impact case, there is no apparent justification in logic or in the record or in law for reducing the lodestar because the Plaintiffs prevailed on fewer than all claims;

c. In the context of this fact-driven impact case, there is no apparent justification in logic or in the record or in law for reducing the lodestar because only one of the claims on which Plaintiffs prevailed includes a fee-shifting provision;

d. It was reasonable and prudent for the lead law firm to work in partnership with two other law firms, given the complexities and demands of this fact-driven impact case;

e. It was reasonable and prudent for the law firms to staff this fact-driven impact case in the manner they did, each with a mix of seniorities, because that staffing arrangement, which is consistent with arrangements I have used in similar cases, allows each firm to address any sort of issue that can arise in this sort of case, thereby taking advantage of intra-team efficiencies that arise from familiarity and process consistency within those teams;

f. It was reasonable and prudent for the each of the law firms to exclude some timekeepers who worked on this matter from the group of timekeepers for whom the firms seek

compensation, as an accommodation for the possibility that some inefficiencies may increase along with an increase in the number of timekeepers; and

      g.    In the context of this fact-driven impact case, the total fee request of $12,726,103.85 is reasonable and any amount that is substantially less would be unreasonable.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  March 9, 2022
                   Washington, D.C.

David Dinielli