**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

| | |
|---|---|
| ELIZABETH SINES, SETH WISPELWEY, MARISSA BLAIR, APRIL MUÑIZ, MARCUS MARTIN, NATALIE ROMERO, CHELSEA ALVARADO, DEVIN WILLIS, and THOMAS BAKER,<br><br>               Plaintiffs,<br><br>v.<br><br>JASON KESSLER, et al.,<br><br>               Defendants. | **Civil Action No. 3:17-cv-00072-NKM** |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS CHALLENGING THE
PUNITIVE DAMAGES AWARD**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 3

    I.    Defendants Conspired to Commit, and Committed, Malicious and Wanton Acts of Racial and Religious Violence Against Plaintiffs and Others. ......................................... 3

    II.   The Jury Held Defendants Accountable for Their Actions by Awarding Punitive Damages. ..................................................................................................................... 5

ARGUMENT ........................................................................................................................ 6

    I.    Virginia's Statutory Punitive Damages Cap Does Not Support Defendants' Challenges to the Jury Award. ...................................................................................... 6

        A.   The Court Should Not Apply the Statutory Cap to Defendants' Egregious Misconduct. ............................................................................................ 7

        B.   Even If the Statutory Cap Applies, It Applies on a Per-Plaintiff Basis. ................... 8

           1.   The Statutory Text and Context Supports a Per-Plaintiff Application of the Punitive Damages Cap. ........................................................................... 9

           2.   Principles of Judicial Efficiency, Predictability, and Fairness Support a Per-Plaintiff Application of the Cap. ..................................................................... 12

           3.   Interpretations of Analogous State Punitive Damages Caps Support a Per-Plaintiff Application. ........................................................................................ 14

    II.   The Punitive Damages Award Is Constitutional. ......................................................... 15

        A.   Defendants' Misconduct Was Severely Reprehensible. ........................................... 16

        B.   Plaintiffs' Harm Is Proportional to the Punitive Damages Award. ......................... 17

        C.   Comparable Case Law Supports the Award. .......................................................... 22

    III.   The Punitive Damages Award Comports with Virginia Law. ...................................... 23

CONCLUSION .................................................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Action Marine, Inc. v. Cont'l Carbon Inc.*,
481 F.3d 1302 (11th Cir. 2007)............................................................ 22

*Al-Abood ex rel. Al-Abood v. El-Shamari*,
217 F.3d 225 (4th Cir. 2000)................................................................ 9

*Aleman v. Chugach Support Servs., Inc.*,
485 F.3d 206 (4th Cir. 2007)................................................................ 13

*Andrews v. Ring*,
266 Va. 311 (2003)............................................................................... 7

*Atlas Food Sys. & Servs., Inc. v. Crane Nat'l. Vendors, Inc.*,
99 F.3d 587 (4th Cir. 1996)........................................................... 23, 24

*Bagley v. Shortt*,
261 Ga. 762 (1991).............................................................................. 14

*Baldwin v. McConnell*,
273 Va. 650 (2007).............................................................................. 24

*Blake v. Commonwealth*,
288 Va. 375 (2014)............................................................................... 9

*BMW of N. Am., Inc. v. Gore*,
517 U.S. 559 (1996) ............................................................... 15, 18, 21

*Brin v. A Home Come True, Inc.*,
79 Va. Cir. 33, 2009 WL 7388844 (2009) ........................................ 19

*Bulala v. Boyd*,
239 Va. 218 (1990)....................................................................... 11, 12

*Carson v. City of Prichard*,
709 So. 2d 1199 (Ala. 1998) .............................................................. 15

*Cawlo v. Rose Hill Rsrv. Homeowners Ass'n, Inc.*,
106 Va. Cir. 235, 2020 WL 10315418 (2020) ................................... 13

*Clehm v. BAE Sys. Ordnance Sys., Inc.*,
No. 7:16 Civ. 12, 2018 WL 6594612 (W.D. Va. Dec. 14, 2018) ....... 24

*Coalson v. Canchola*,
   287 Va. 242 (2014) ................................................................................................ 18

*Commonwealth v. Doe*,
   278 Va. 223 (2009) ................................................................................................ 12

*Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*,
   281 Va. 561 (2011) ................................................................................................ 24

*Corti v. Storage Tech. Corp.*,
   304 F.3d 336 (4th Cir. 2002) ................................................................................. 25

*Cuccinelli v. Rector, Visitors of Univ. of Va.*,
   283 Va. 420 (2012) .................................................................................................. 9

*Cutaia v. Radius Eng'g Int'l*,
   No. 5:11 Civ. 77, 2014 WL 3359368 (W.D. Va. July 9, 2014) .............................. 19

*Doddy v. Zedd Auctioneers, Ltd.*,
   77 Va. Cir. 272, 2008 WL 8201371 (2008) ........................................................... 25

*Downer v. CSX Transp., Inc.*,
   256 Va. 590 (1998) ................................................................................................ 24

*Dumpson v. Ade*,
   No. 18 Civ. 1011, 2019 WL 3767171 (D.D.C. Aug. 9, 2019) ................................ 22

*Fastenal Co. v. Crawford*,
   609 F. Supp. 2d 650 (E.D. Ky. 2009) ............................................................ 18, 19

*Gazette, Inc. v. Harris*,
   229 Va. 1 (1985) ................................................................................................... 23

*Gen. Inv. Co. of Conn. v. Ackerman*,
   37 F.R.D. 38 (S.D.N.Y. 1964) ............................................................................... 10

*Hohlbein v. Heritage Mut. Ins. Co.*,
   106 F.R.D. 73 (E.D. Wis. 1985) ............................................................................. 10

*In re C.R. Bard, Inc., MDL. No. 2187, Pelvic Repair Sys. Prods. Liab. Litig.*,
   810 F.3d 913 (4th Cir. 2016) ................................................................................. 21

*In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prod. Liab. Litig.*,
   No. 11MD 2244, 2017 WL 3841608 (N.D. Tex. June 28, 2017) ........................... 21

*In re Exxon Valdez*,
   236 F. Supp. 2d 1043 (D. Alaska 2002) ............................................................... 23

*In re USA Com. Mortg. Co.*,
  802 F. Supp. 2d 1147 (D. Nev. 2011) ............................................................... 22

*Irwin v. Town of Ware*,
  392 Mass. 745 (1984).......................................................................................... 15

*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018) .......................................................................................... 12

*Jordan v. Osmun*,
  No. 16 Civ. 501, 2017 WL 2837143 (E.D. Va. June 29, 2017) ............................. 24

*Kory v. McCluney*,
  59 Va. Cir. 74, 2002 WL 31989032 (2002) .......................................................... 24

*Legard v. EQT Prod. Co.*,
  771 F. Supp. 2d 607 (W.D. Va. 2011) .................................................................... 9

*Livingston v. County of Fairfax*,
  No. 08 Civ. 8875, 2009 WL 7339863 (Va. Cir. Ct. Apr. 28, 2009).......................... 10

*Magalios v. Peralta*,
  No. 19 Civ. 6188, 2022 WL 407403 (S.D.N.Y. Feb. 10, 2022) ........................ 20, 21

*Martinez Garcia v. Mega Auto Outlet*,
  No. 20 Civ. 945, 2021 WL 1015816 (E.D. Va. Feb. 23, 2021) ............................... 17

*Merrick v. Paul Revere Life Ins. Co.*,
  594 F. Supp. 2d 1168 (D. Nev. 2008) .................................................................... 21

*Moore v. Rohm & Haas Co.*,
  497 F. Supp. 2d 855 (N.D. Ohio 2007) .................................................................. 10

*Morris v. Bland*,
  666 F. App'x 233 (4th Cir. 2016)..................................................................... 17, 21

*Owens v. DRS Auto. Fantomworks, Inc.*,
  288 Va. 489 (2014)............................................................................................... 13

*People Helpers Found., Inc. v. City of Richmond, Va.*,
  12 F.3d 1321 (4th Cir. 1993)................................................................................ 25

*Pollard v. E.I. DuPont De Nemours, Inc.*,
  412 F.3d 657 (6th Cir. 2005)................................................................................ 18

*Progressive Mins., LLC v. Rashid*,
  No. 07 Civ. 108, 2010 WL 11520168 (N.D. W. Va. Mar. 25, 2010) ...................... 17

*Rhyne v. K-Mart Corp.*,
    149 N.C. App. 672 (2002)................................................................................................ 15

*Rhyne v. K-Mart Corp.*,
    358 N.C. 160 (2004)........................................................................................................ 15

*S.D. Warren Co. v. Me. Bd. of Env't Prot.*,
    547 U.S. 370 (2006) .......................................................................................................... 7

*Saccameno v. Ocwen Loan Servicing, LLC*,
    372 F. Supp. 3d 609 (N.D. Ill. 2019) ......................................................................... 18, 19

*Saunders v. Branch Banking & Tr. Co. of Va.*,
    526 F.3d 142 (4th Cir. 2008).................................................................................. 15, 16, 17

*Saval v. BL Ltd.*,
    710 F.2d 1027 (4th Cir. 1983).......................................................................................... 10

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) ............................................................................................... passim

*Stoots v. Dee Dee Corlette Grady*,
    No. 09 CL 3994, 2010 WL 3198640 (Va. Cir. Ct. July 8, 2010)...................................... 24

*Thomas v. Psimas*,
    101 Va. Cir. 455, 2019 WL 3884212 (2019) ................................................................... 24

*Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*,
    682 F.3d 292 (4th Cir. 2012)............................................................................................ 18

*TXO Prod. Corp. v. All. Res. Corp.*,
    509 U.S. 443 (1993) ................................................................................................... 17, 19

*United Mine Workers of Am. v. Gibbs*,
    383 U.S. 715 (1966) ........................................................................................................ 13

*Wackenhut Applied Techs. Center, Inc. v. Sygnetron Prot. Sys., Inc.*,
    979 F.2d 980 (4th Cir. 1992)....................................................................................... 8, 22

*Worrie v. Boze*,
    198 Va. 533 (1957).......................................................................................................... 19

*Zedd v. Jenkins*,
    194 Va. 704 (1953).......................................................................................................... 25

**Statutes**

42 U.S.C. § 1983 ............................................................................................................ 23

Ga. Code § 51-12-5.1 ..................................................................................................... 14

N.C. Gen. Stat. § 1D-25 ................................................................................................. 14

Va. Code § 8.01-267.1 ................................................................................................... 13

Va. Code § 8.01-267.5 ............................................................................................. 10, 13

Va. Code § 8.01-38.1 ............................................................................................... passim

Va. Code § 8.01-42.1 ............................................................................................... 6, 7, 11

Va. Code § 8.01-581.15 ................................................................................................. 11

**Rules**

Fed. R. Civ. P. 20 ................................................................................................... 10, 13

Fed. R. Civ. P. 59 ............................................................................................................ 1

Va. Sup. Ct. R. 5:40 ........................................................................................................ 9

**Other Authorities**

7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure
§ 1652 (3d ed. 2021) ............................................................................................... 10

Moore's Federal Practice—Civil § 20.02 (2022) ........................................................ 10

Plaintiffs respectfully submit this opposition to Defendants' different motions under Federal Rules of Civil Procedure 59(a) and (e) challenging the jury's punitive damages award. *See* ECF Nos. 1488, 1522, 1536, 1542–43, 1548, 1550–51, 1555–57. For the reasons set forth in this opposition, the Court should deny those motions.[1]

## PRELIMINARY STATEMENT

At the end of trial, this Court instructed the jury that "[p]unitive damages are awarded in the jury's discretion to punish a defendant for outrageous conduct or to deter others like him from performing similar conduct in the future." *See* ECF 1461 ("Instructions") at 46. The jury internalized that instruction, exercised its discretion, and, after carefully reviewing the evidence, awarded against the Defendants at trial $24 million in punitive damages, in addition to more than $2 million in compensatory damages. In doing so, the jury sent a loud and clear message: the heinous acts of racially motivated violence and harassment perpetrated by Defendants must never happen again. *See* ECF 1478 ("Verdict") at 5–9. In their motions, Defendants seek to evade a full reckoning for their deplorable conduct based on three meritless arguments.

*First*, they invoke Virginia's statutory cap on punitive damages as a basis to reduce Plaintiffs' punitive damages award to $350,000. *See* Va. Code § 8.01-38.1. But that cap should not apply here. This is not the type of run-of-the-mill tort suit the General Assembly had in mind when it sought to limit punitive damages in 1987. Here, Plaintiffs proved that Defendants conspired to commit (and committed) racial, religious, and other violence and intimidation against Jewish and Black people and their supporters. *See* Verdict at 3–7. Tellingly, Defendants cannot cite (and Plaintiffs have not found) a single decision applying the punitive damages cap in circumstances anything like those present here.

---

[1]   Defendants' motions seeking judgment as a matter of law and/or a new trial based on other grounds are addressed in a separate brief filed concurrently with this opposition.

But even if the Court were to apply the statutory cap, it should not do so in the extraordinary manner proposed by Defendants. They argue that the cap limits the total amount of punitive damages to $350,000 *for all Plaintiffs*. But that reading of the statute cannot be squared with its text and context, principles of judicial efficiency and predictability, precedent from other jurisdictions, and common sense. If this Court were to accept Defendants' sweeping interpretation of the statutory cap, then no plaintiff would ever join in an action with other plaintiffs, even when their claims arose from the same acts/occurrences because doing so would reduce the plaintiff's potential for recovery of punitive damages. Defendants do not (and cannot) provide any reason to embrace such a reading of the statute.

*Second*, Defendants contend that the punitive damages award violates the federal Due Process Clause. But that contention is meritless in these circumstances. On balance, the relevant considerations under the *State Farm* test weigh heavily in favor of preserving the jury's verdict. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). Defendants engaged in a sustained and deliberate attack on racial and religious minorities and their supporters, resulting in severe emotional and physical injuries to Plaintiffs and many others. Defendants' conduct was no accident; it was coordinated, reprehensible, reckless, repeated, and malicious. To account for these extraordinary circumstances, the jury imposed an extraordinary verdict and awarded millions of dollars in punitive damages in an amount proportional to the severity of Defendants' misconduct. There is nothing constitutionally infirm about that award of punitive damages (especially if the Court applies the statutory cap on punitive damages).

*Third,* Defendants challenge the jury's punitive damages award based on their unsupported inability to pay it and an allegation that the compensatory damages are too low to support any punitive damages award. But Defendants have submitted no evidence on their inability to pay and

the jury's award of compensatory damages supports its punitive damages assessment.

## BACKGROUND

I.   **Defendants Conspired to Commit, and Committed, Malicious and Wanton Acts of Racial and Religious Violence Against Plaintiffs and Others.**

In 2017, hundreds of white supremacists, white nationalists, and neo-Nazis descended upon Charlottesville, Virginia to take part in the "Unite the Right" rally—or, as Defendants called it, the "Battle of Charlottesville." PX-3548; *see* PX-0552 (Defendant Kessler tweeted, "I think we need to have a Battle of Berkeley situation in Charlottesville."). Defendants spent months planning this event, in the hope that it would spark a "race war." 11/15 Trial Tr. 236:16–37:1.

Although Defendants belonged to different white nationalist organizations and came from different parts of the country, they were united by a profound hatred for religious and racial minorities. They idolized Hitler, *see* PX-3575; 11/2 Trial Tr. 28:16–24; admired his book *Mein Kampf*, *see* 11/2 Trial Tr. 27:3–5; 11/9 Trial Tr. 54:9–12; glorified violence against Black and Jewish people, *see* PX-0426; and longed for a white ethno-state, *see* PX-2728; *see also* PX-1566A ("I pledge to be a white supremacist, a racist, an anti-Semite, a homophobe, a xenophobe, an Islamophobe, and any other sort of 'phobe that benefits my people."). Through text messages, emails, and an online messaging platform called Discord, Defendants mobilized hundreds of white nationalists and white supremacists from across the country and set out to "gas the kikes," 11/15 Trial Tr. 236:16–37:1, and "dominate the streets" of Charlottesville, 11/4 Trial Tr. 47:14–17.

To achieve those ends, Defendants encouraged rally attendees to bring weapons and engage in violence under the guise of self-defense. *See* PX-3839 ("[I]t would be things, like, what can you bring that if you're caught with it, it would look like a defense weapon. What is it if—I think someone brought up, you know, bring a flagpole, but, then, like, tape a—like, have a knife tucked in it and, like, tape it in there or, you know, whatever, cauterize it if you need to."); PX-0952 ("If

you want a chance to crack some Antifa skulls in self-defense don't open carry. You will scare the sh*t out of them and they'll just stand off to the side"). They even prepared to run counter-protestors over with cars. PX-3895 ("Is it legal to run over protestors blocking roadways?"); PX-1144 ("Introducing John Deere's New Multi-Lane Protestor Digestor"); *see also* PX-2644 (Defendant Cantwell: "Blocking traffic is not peaceful protest, and every person who reminds you of that without using his car, is giving you more slack than you f**king deserve.").

Then, on a harrowing weekend in August 2017, Defendants followed through on their plans. They stormed Charlottesville and committed repeated acts of racially motivated violence against Plaintiffs and others. On Friday, August 11, Defendants marched through the UVA campus alongside hundreds of neo-Nazis, wielding torches and chanting "Jews will not replace us" and "blood and soil." 10/29 Trial Tr. 172:20–23. When they arrived at UVA's Thomas Jefferson statue, they encircled a group of peaceful counter-protestors (including two of the Plaintiffs), pinned them against the statue, and refused to let them leave, PX-2500, as a "sign of dominance," 11/14 Trial Tr. 156:9–12. They threw torches and fluid at the counter-protestors, leading them to believe that they were going to be "burn[ed] [] alive," 10/29 Trial Tr. 181:15–19, and kicked, punched, pepper-sprayed, and verbally harassed them, *id.* at 176:20–184:18.

The next morning, Defendant Richard Spencer—one of the ringleaders of the conspiracy—wrote an email celebrating the previous day's violence and declaring that August 11 was "only the prequel." 11/14 Trial Tr. 163:17–20. Just as Spencer had hoped, the violence resumed and intensified on August 12. Defendants and their foot soldiers rampaged through Charlottesville and unleashed a full-on attack against Plaintiffs and many others. They used fists, PX-1468, shields, PX-1888, flags, *id.*, clubs, PX-2373, and other weapons to attack peaceful counter-protesters—breaking through their lines, spitting on them, knocking them down, and dousing them with foul

liquids, *see* 10/29 Trial Tr. 40:1–19. The brutality culminated in Defendant James Fields driving his car into a group of counter-protestors, killing Heather Heyer and injuring many others, including many of the Plaintiffs.

Afterwards, Defendants hailed this bloodshed as a "moral" and "tremendous victory," 11/4 Trial Tr. 190:14–17; 11/9 Trial Tr. 163:10–14; PX-2379. They called it a "huge success." 11/10 Trial Tr. 203:21–23. They proclaimed that it was "an Honor to stand with [their co-conspirators] in C'ville," PX-2750, that they "would not go back and change a thing," PX-1904, and they vowed to come back to Charlottesville "every f**king weekend," PX-2489. They expressed no remorse for the life they took and the numerous lives they had permanently altered. And they hailed Defendant Fields as a martyr. They said he "did nothing wrong," PX-2867C, referred to him as a prisoner of war, sent him Christmas cards in prison, and when Defendant Cantwell saw him after they were both arrested, Cantwell gave him a Nazi salute and a hug, 11/15 Trial Tr. 270:18–24. But for Plaintiffs, of course, the events of August 11 and 12 were nothing short of a nightmare. As a result of Defendants' wanton violence, Plaintiffs suffered grievous injuries, both physical and emotional—including a skull fracture, a shattered leg, concussions, traumatic brain injuries, lacerations, PTSD, anxiety, and depression. *See* ECF 1554 (Pls. Mot. for Default J.) at 19–24.

## II.    The Jury Held Defendants Accountable for Their Actions by Awarding Punitive Damages.

At the end of trial, the Court instructed the jury on the standard for awarding punitive damages. *See* Instructions at 45–46. Specifically, the Court explained that "[p]unitive damages are awarded … to punish a defendant for outrageous conduct or to deter him and others like him from performing similar conduct in the future." *Id.* at 46. In providing those instructions, the Court did not inform the jury about the cap on punitive damages, consistent with the relevant statute. *See* Va. Code § 8.01-38.1 ("The jury shall not be advised of the limitation prescribed by this section.").

On November 23, 2021, the jury returned a verdict in the following amounts:

- *Count III (civil conspiracy)*: Compensatory damages of $1 to each Plaintiff (except Plaintiffs Sines and Wispelwey) and punitive damages of $500,000 against each individual Defendant and $1 million against each organizational Defendant. ECF 1478 (Verdict) at 3–5.

- *Count IV (violation of Va. Code § 8.01-42.1)*: Compensatory damages of $250,000 each to Plaintiffs Romero and Willis, and punitive damages of $200,000 against each of Defendants Cantwell, Kessler, Kline, Ray, and Spencer. *Id.* at 6.

- *Count V (assault or battery)*: Total compensatory damages of more than $800,000 to Plaintiffs Baker, Blair, Martin, Muñiz, and Romero, and punitive damages of $6 million against Defendant Fields. *Id.* at 8.

- *Count VI (intentional infliction of emotional distress)*: Total compensatory damages of more than $700,000 to Plaintiffs Baker, Blair, Martin, Muñiz, and Romero, and punitive damages of $6 million against Defendant Fields. *Id.* at 9.[2]

## ARGUMENT

## I.    Virginia's Statutory Punitive Damages Cap Does Not Support Defendants' Challenges to the Jury Award.

Several decades ago, the Virginia General Assembly passed legislation to limit the recovery for punitive damages. *See* Va. Code § 8.01-38.1 (1987). The text of the statute provides:

> In any action accruing on or after July 1, 1988, including an action for medical malpractice under Chapter 21.1 (§ 8.01-581.1 et seq.), the total amount awarded for punitive damages against all defendants found to be liable shall be determined by the trier of fact. In no event shall the total amount awarded for punitive damages exceed $350,000. The jury shall not be advised of the limitation prescribed by this section. However, if a jury returns a verdict for punitive damages in excess of the maximum amount specified in this section, the judge shall reduce the award and enter judgment for such damages in the *maximum* amount provided by this section.

*Id.* (emphasis added). Contrary to Defendants' assertions, that cap should not apply in the extraordinary circumstances presented here. But even if it did, the Court should apply the cap on a per-plaintiff basis, in which case the total punitive damages award would amount to $2,800,000

---

[2]   Plaintiffs filed a motion requesting that (1) the Court assess the same amounts of punitive damages against the Defaulted Defendants for Counts III and IV as the jury awarded against the Answering Defendants, and (2) all Defendants be held jointly and severally liable for the damages assessed against them. ECF 1554.

(since only eight of the nine Plaintiffs here seek punitive damages).[3]

### A. The Court Should Not Apply the Statutory Cap to Defendants' Egregious Misconduct.

As a threshold matter, Defendants assert that the punitive damages cap applies *ipso facto* to the jury's verdict. But that assertion is mistaken. To be sure, the statutory cap applies "[i]n any action accruing on or after July 1, 1988, including an action for medical malpractice[.]" Va. Code § 8.01-38.1. But that text alone does not establish that the cap applies here. The General Assembly could not have contemplated, let alone intended, for this punitive-damages cap to apply to a case like this, where nine Plaintiffs conclusively established that seventeen Defendants conspired to commit, and actually committed, heinous acts of racial and religious violence over the course of two days, in violation of Virginia's hate-crime statute, Va. Code § 8.01-42.1. *See* Verdict at 3–7. That is especially true given that the hate-crime statute that Defendants violated was not passed until a year *after* the statutory cap had been enacted—confirming that the General Assembly did not intend (and could not have intended) to limit punitive damages for the claims at issue here.[4]

The statutory language confirms this sensible and limited construction of the statutory cap. It is well established that words are known by the company that they keep (a principle of statutory interpretation often referred to as "*noscitur a sociis*"). *See S.D. Warren Co. v. Me. Bd. of Env't Prot.*, 547 U.S. 370, 378 (2006); *Andrews v. Ring*, 266 Va. 311, 319 (2003) (similar). And, here, the statutory term "action" keeps a very specific sort of company: "an action for medical malpractice." Va. Code § 8.01-38.1. That specific statutory language strongly supports the

---

[3]   Plaintiff Wispelwey was not awarded compensatory damages and therefore is not seeking an award of punitive damages. *See* Verdict at 3–9.

[4]   In fact, the hate-crime statute at issue here includes a relatively rare provision for the prevailing party to recover attorneys' fees. Va. Code § 8.01-42.1(B). Plaintiffs have moved this Court for an award of $12,726,103.85 under that provision. ECF 1552. It would seem highly illogical and anomalous for the statute to have such a fee-shifting provision, intended by the legislature to act as a deterrent, and then to simultaneously cap punitive damages for the same violent misconduct.

conclusion that the General Assembly intended to cover run-of-the-mill tort actions that resemble medical malpractice claims—not a multi-plaintiff civil rights lawsuit alleging a conspiracy to commit racially motivated harassment, violence, and intimidation.

The available legislative history further reinforces this straightforward understanding of the statutory text. The punitive damages cap was passed in 1987 as part of legislative tort-reform designed to enable insurance companies to more readily estimate the dollar amount of claims they might need to pay for personal-injury lawsuits. *See* The Liability Insurance Crisis and the Need for Tort Reform, Report to the Governor and the General Assembly of Virginia at 4–5, S. Doc. No. 11 (1987); *see also Wackenhut Applied Techs. Center, Inc. v. Sygnetron Prot. Sys., Inc.*, 979 F.2d 980, 984 (4th Cir. 1992) (discussing purpose of bill).[5] Many sources confirm what the statutory text and context make clear: the intent of the punitive damages cap was to ensure predictability and stability for the insurance industry in addressing payouts for garden-variety torts (like medical malpractice claims)—not to curtail damages for civil rights plaintiffs who suffered severe injuries based on racially and religiously motivated harassment and violence at the hands of violent neo-Nazis and white supremacists. Given this clear legislative intent, it is no surprise that Defendants have failed to cite a single case applying the cap under circumstances remotely resembling those present here.

### B.  Even If the Statutory Cap Applies, It Applies on a Per-Plaintiff Basis.

Because the statutory cap should not be extended to Plaintiffs' claims at all, the Court

---

[5]   *See also, e.g.*, Michael Hardy, *Senate Gets Jitters Before Backing Tort Package*, Richmond Times-Dispatch, Feb. 10, 1987, at A6 ("The Senate endorsed a 'tort reform' package yesterday . . . . Its sponsors predict the limitation on dollar recovery would reduce rates charged by insurance companies."); Jeanne Cummings, *Damage Cap Compromise Being Forged*, Richmond Times-Dispatch, Feb. 20, 1987, at 5 ("The [punitive damages] cap is the only element remaining in limbo of a *package of bills aimed at reducing insurance premium rates* and making insurance more available.") (emphasis added); Betty Booker & Dale Eisman, *Focus on Limits in Injury Awards May Be Shifted*, Richmond Times-Dispatch, Feb. 20, 1987, at A9 ("The industry is pushing for a limit on damage awards in an effort to lower costs and to slow the rapid increase in liability premiums.").

should deny Defendants' motions. If, however, the Court is inclined to apply the cap in this case, it should do so only on a per-plaintiff basis—which means that *each* of the eight Plaintiffs seeking punitive damages would be entitled to a punitive-damages award in the maximum amount of $350,000.

As the Fourth Circuit has recognized, the issue of whether the Virginia state-law cap applies on a per-plaintiff basis remains an open question of law. *See Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 237 n.10 (4th Cir. 2000) ("We express no opinion on how the cap would be applied in a case involving multiple plaintiffs."). But the answer to that open question is clear based on the statutory text and context; principles of judicial efficiency, fairness, and predictability; and legal authority from other jurisdictions.[6]

       1.    *The Statutory Text and Context Supports a Per-Plaintiff Application of the Punitive Damages Cap.*

Virginia's cap on punitive damages applies to an "action" that accrues after the effective date of the statute. Va. Code § 8.01-38.1. But the statutory text does not expressly state how courts should apply that cap in a proceeding where, as here, multiple plaintiffs join to file one lawsuit against the same defendants. Thus, the central interpretative question is whether the statutory term "action" refers to the proceeding as a whole or, instead, to each plaintiff's right of action. In answering that question, this Court must adhere to the cardinal rule of statutory construction that "[s]tatutes are not to be considered as isolated fragments of law," but rather "as parts of a great connected, homogenous system." *Blake v. Commonwealth*, 288 Va. 375, 383 (2014) (citation omitted); *see also Cuccinelli v. Rector, Visitors of Univ. of Va.*, 283 Va. 420, 425–26 (2012). And

---

[6]   This Court can and should adopt Plaintiffs' proposed per-plaintiff interpretation because there is sufficient guidance in existing law to "supply[] assistance for this court's benefit in predicting Virginia law." *See Legard v. EQT Prod. Co.*, 771 F. Supp. 2d 607, 610 (W.D. Va. 2011). Of course, the Court may, in its discretion, certify this state-law question to the Virginia Supreme Court. *See* Va. Sup. Ct. R. 5:40 (certification procedure).

here, the statutory context confirms that, in a multi-plaintiff lawsuit like this one, the cap on punitive damages applies to the individual "action" of *each plaintiff separately*, not to the overall lawsuit in which those actions have been filed. *See* Va. Code § 8.01-38.1.

To begin, the per-plaintiff reading follows neatly from bedrock principles of civil procedure. When multiple plaintiffs join in a single proceeding under Federal Rule of Civil Procedure 20 or under Virginia's Multiple Claimant Litigation Act ("MCLA"), each plaintiff's "action" remains separate and distinct as a substantive matter. *See* Fed. R. Civ. P. 20 (federal permissive joinder); Va. Code § 8.01-267.5 (state permissive-joinder provision). Although this so-called "joinder" of actions enables "parties with similar substantive claims" to jointly assert their substantive rights against defendants, it is a "procedural device" that does not affect the substantive rights that the parties are asserting. *See Saval v. BL Ltd.*, 710 F.2d 1027, 1030 (4th Cir. 1983). Thus, "rights that are separate and distinct under the governing law are not transformed into joint rights when plaintiffs join" together and bring a single lawsuit; rather "*each plaintiff's right of action remains distinct*, as if it had been brought separately." 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1652 (3d ed. 2021) (emphasis added).[7] Virginia law similarly establishes "*procedural* requirements" for joinder in multi-plaintiff proceedings. *See, e.g.*, *Livingston v. County of Fairfax*, No. 08 Civ. 8875, 2009 WL 7339863, at *5 (Va. Cir. Ct. Apr. 28, 2009) (emphasis added). Taken together, these rules establish two interrelated points: (i) that the statutory term "action" refers to each individual plaintiff's action (which remains substantively distinct from other plaintiffs' actions); and (ii) that the $350,000

---

[7]    *Accord* Moore's Federal Practice—Civil § 20.02 (2022) ("[S]ubstantive rights of the parties remain separate and are treated as though sued on separately."); *Hohlbein v. Heritage Mut. Ins. Co.*, 106 F.R.D. 73, 78 (E.D. Wis. 1985) ("The Rule regarding permissive joinder of parties is wholly procedural in nature and does not create nor alter the substantive rights of the parties."); *Moore v. Rohm & Haas Co.*, 497 F. Supp. 2d 855, 859 (N.D. Ohio 2007) (similar); *Gen. Inv. Co. of Conn. v. Ackerman*, 37 F.R.D. 38, 41 (S.D.N.Y. 1964) (similar).

limit applies to each plaintiff's substantively separate action.

Virginia's hate-crime statute—the heart of this lawsuit (and the jury's verdict)—confirms that the word "action" should be understood on a per-plaintiff basis. That statute provides that "[a]n *action* for injunctive relief or civil damages, or both, shall lie for *any person* who is subjected to acts" of racial or religious intimidation or violence (among other acts), and that "[a]ny aggrieved *party* who initiates and prevails *in an action* authorized by this section shall be entitled to damages, including punitive damages." Va. Code § 8.01-42.1 (emphasis added). In other words, if several hate-crime victims join in a lawsuit, each plaintiff has a substantively distinct "action" for relief. And to obtain that relief, each plaintiff would carry the burden of proof and cannot simply piggyback off the substantive rights of her co-plaintiffs. By the same logic, the $350,000 cap on punitive damages applies to each plaintiff's "action"—not to the entire lawsuit as a whole.

The Virginia Supreme Court's interpretation of an analogous statutory damages cap further bolsters a per-plaintiff application of the punitive damages cap. *See Bulala v. Boyd*, 239 Va. 218, 231 (1990). The General Assembly has imposed a cap on damages arising from medical malpractice suits against healthcare providers. Va. Code § 8.01-581.15 (listing amounts for different time ranges). That statutory cap (like the statutory cap on punitive damages at issue here) applies to "an action for malpractice." *Id.* In *Bulala*, the Virginia Supreme Court interpreted that language and held that when multiple plaintiffs join in the same medical malpractice proceeding, the cap applies to each plaintiff with an independent claim against the defendants. *See* 239 Va. at 231. In that case, parents and a child born with birth defects brought a joint federal action (in the U.S. District Court for the Eastern District of Virginia) against an obstetrician gynecologist and other medical professionals for failing to provide proper medical care during labor and delivery. *Id.* at 224. The jury returned a verdict for the plaintiffs and awarded damages that, when combined

across the three plaintiffs, exceeded the medical-malpractice cap at that time ($750,000). *Id.* at 225. The defendants urged the federal court to reduce the total damages award to $750,000, and the Fourth Circuit certified the case to the Virginia Supreme Court. *Id.* The Virginia Supreme Court rejected the defendants' position and adopted a per-plaintiff interpretation of the damages cap; in doing so, the court explained that more than one plaintiff in the same proceeding could receive a $750,000 damages award. *Id.* at 229–31. *Bulala*'s reasoning applies with equal force in this case. Just as in *Bulala*, each of the eight Plaintiffs seeking punitive damages has prevailed in their "action" against Defendants, and each is entitled to $350,000 under the statute.[8]

Finally, this per-plaintiff understanding of the statute avoids raising significant constitutional questions. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) ("[W]hen statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems."); *Commonwealth v. Doe*, 278 Va. 223, 229 (2009) ("[W]henever possible, [the Virginia Supreme Court] will interpret statutory language in a manner that avoids a constitutional question."). Eschewing a per-plaintiff reading of the statutory cap would separate plaintiffs into higher and lower damages classes based solely on whether they brought their suits individually or jointly—a baseless distinction that arguably violates equal-protection and due-process principles under the federal and state constitutions. Rather than inject that constitutional defect into the statute, the Court should apply the punitive damages cap on a per-plaintiff basis.

> 2.   *Principles of Judicial Efficiency, Predictability, and Fairness Support a Per-Plaintiff Application of the Cap.*

Adopting a per-plaintiff construction of Virginia's statutory cap on punitive damages is

---

[8]   To be sure, *Bulula* held that a non-patient plaintiff (whose claims derive from the injuries of another plaintiff) is not entitled to a separate application of the medical-malpractice cap. *See* 239 Va. at 230. But that holding has no application where, as here, each Plaintiff has suffered distinct injuries based on Defendants' misconduct.

necessary to promote the efficient, just, and predictable resolution of civil disputes in state and federal courts. *See Owens v. DRS Auto. Fantomworks, Inc.*, 288 Va. 489, 497 (2014) (recognizing "rules of statutory construction that discourage any interpretation of a statute that would render any part . . . absurd"). If Virginia's cap did not apply on a per-plaintiff basis, then multiple plaintiffs asserting a right to relief and seeking punitive damages for the same occurrence would have no incentive to join their claims. Joining would limit each plaintiff's potential recovery in punitive damages to a fraction of $350,000 (*i.e.*, $350,000 divided by the number of plaintiffs), while proceeding individually would preserve each plaintiff's ability to recover a full $350,000 punitive damages award. A rational plaintiff therefore would have little incentive to join in a single lawsuit—no matter how efficient or convenient doing so would be. Defendants' construction of Virginia's cap would therefore lead to perverse incentives and burden the courts with duplicative lawsuits. That state of affairs would be particularly wasteful in cases like this one, where multiple plaintiffs are asserting a right to relief with respect to causes of action that arise from the same nucleus of operative facts in a single civil trial that the Court has noted was the longest ever to take place in the Western District of Virginia. *See* Fed. R. Civ. P. 20(a); Va. Code §§ 8.01-267.1, 8.01-267.5; *Aleman v. Chugach Support Servs., Inc.*, 485 F.3d 206, 218 n.5 (4th Cir. 2007) (joinder rules "promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits" (citation omitted)); *Cawlo v. Rose Hill Rsrv. Homeowners Ass'n, Inc.*, 106 Va. Cir. 235, 2020 WL 10315418, at *8 (2020) (MCLA is intended to "avoid unnecessary duplication"); 11/23 Trial Tr. 20:1–3. And it would collide with guidance from the Supreme Court and the Fourth Circuit that "joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966); *see also Aleman*, 485 F.3d at 218 n.5. This Court should decline Defendants' invitation to adopt an interpretation of Virginia's statutory

cap on punitive damages that would encourage multiple overlapping lawsuits and trials, waste judicial and party resources, and risk inconsistent judgments on the same factual and legal matters.

       3.    *Interpretations of Analogous State Punitive Damages Caps Support a Per-Plaintiff Application.*

Persuasive authority from other jurisdictions provides additional support for a per-plaintiff reading of the punitive damages cap in multi-plaintiff actions. The Georgia Supreme Court has adopted a per-plaintiff construction of Georgia's statutory cap on punitive damages, Ga. Code § 51-12-5.1, which mirrors Virginia's in its reference to *any action*: "For any tort action [with certain exceptions] in which the trier of fact has determined that punitive damages are to be awarded, the amount which may be awarded in the case shall be limited to a maximum of $250,000.00." *See Bagley v. Shortt*, 261 Ga. 762, 763 (1991). In *Bagley*, the Georgia Supreme Court held that this language "means that $250,000 is the maximum amount of money that the finder of fact may award to any one plaintiff as punitive damages—regardless of the number of defendants and regardless of the number of theories of recovery arising out of the same transaction, occurrence, or series of transactions or occurrences." *Id.* (citation and emphasis omitted). Notably, the *Bagley* court backed this holding with a specific rationale that exposes the fatal flaw in Defendants' interpretation here: "the problem with" applying the cap to the overall action, "without regard to the number of plaintiffs" is that "this interpretation" is "likely" to "produce a proliferation of case filings. It would encourage the splitting of causes of action with sophistry and quibble that would rival medieval Schoolmen. Surely, it was not the intent of the [Georgia] General Assembly to stimulate the maximum number of civil actions relating to a single occurrence." *Id.*

Similarly, the Supreme Court of North Carolina has adopted a per-plaintiff construction of North Carolina's statutory cap on punitive damages, N.C. Gen. Stat. § 1D-25, which again resembles Virginia's by referencing an "action": "In all actions seeking an award of punitive

damages, the trier of fact shall determine the amount of punitive damages separately from the amount of compensation for all other damages"; "[p]unitive damages awarded against a defendant shall not exceed three times the amount of compensatory damages or two hundred fifty thousand dollars ($250,000), whichever is greater." *See Rhyne v. K-Mart Corp.*, 358 N.C. 160, 167 (2004). In so holding, the court affirmed the ruling of the appellate court below, which had fleshed out the policy implications: "Our courts have encouraged parties to join in lawsuits to better consolidate and facilitate cases. [The defendant's] proposal would *discourage* parties from joining. Plaintiffs would not take the chance that their possible recoveries would be diluted, not by any defect in their claims, but solely because there was more than one plaintiff." *Rhyne v. K-Mart Corp.*, 149 N.C. App. 672, 687 (2002), *aff'd,* 358 N.C. 160 (2004).[9]

## II.     The Punitive Damages Award Is Constitutional.

Defendants also bring a federal constitutional challenge to the punitive damages award here, arguing that the award violates the Fourteenth Amendment's Due Process Clause. To determine whether a punitive damages award passes constitutional muster, courts consider "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized [or] imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). The United States Supreme Court has made clear that the first factor—degree of reprehensibility—is the "most important indicium of the reasonableness of a punitive damages award." *Id.* at 419 (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)); *see also Saunders v. Branch*

---

[9]     *See also Carson v. City of Prichard*, 709 So. 2d 1199, 1205 (Ala. 1998) (holding that a $100,000 statutory limit on damages "does not limit all plaintiffs" to "an aggregate recovery of $100,000" (emphasis omitted)); *Irwin v. Town of Ware*, 392 Mass. 745, 766 (1984) (concluding that a "$100,000 limitation on liability be applied on a per-plaintiff basis").

*Banking & Tr. Co. of Va.*, 526 F.3d 142, 154 (4th Cir. 2008) (holding that it does not offend substantive due process for a court to ensure that a punitive damages award remains "of sufficient size to achieve the twin purposes of punishment and deterrence" (citation omitted)). Under these guideposts, whether the Virginia punitive damages cap is applied not at all, or per plaintiff, Defendants' argument has no merit.

### A.    Defendants' Misconduct Was Severely Reprehensible.

To assess the degree of reprehensibility of a defendant's conduct for purposes of this analysis, the Supreme Court instructs that courts are to consider whether: (1) "the harm caused was physical as opposed to economic"; (2) "the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others"; (3) "the conduct involved repeated actions or was an isolated incident"; (4) "the harm was the result of intentional malice, trickery, or deceit, or mere accident"; and (5) "the target of the conduct had financial vulnerability." *State Farm*, 538 U.S. at 419. The presence of even one of these five factors "can provide justification for a substantial award of punitive damages." *Saunders*, 526 F.3d at 153.

As discussed above, and as proven at trial, Defendants' misconduct and the injuries it caused satisfy at least the first four factors listed above. Defendants planned the UTR rally for months, and they engaged in sustained and deliberate acts of racial and religious intimidation and violence over the course of a weekend, *see supra* pp. 3–5, satisfying factors two through four. Specifically, on August 11, 2017, Defendants encircled, attacked, pepper sprayed, taunted, and spat on counter-protesting students and residents, including several Plaintiffs. *See* 10/29 Trial Tr. 40:1–19, 181:8–19; 11/2 Trial Tr. 167:12–17; 11/14 Trial Tr. 156:9–12. And on August 12, 2017, among other violence and harassment, Defendant Fields drove his car into a group of counter-protestors, killing one and injuring countless others, again including several Plaintiffs. *See* ECF 1554 at 19–22. As a result of Defendants' malicious actions, Plaintiffs suffered severe physical

injuries, including a skull fracture, a shattered leg, concussions, traumatic brain injuries, lacerations, PTSD, anxiety, and depression, *see supra* p. 5, all of which satisfy factors one and two. At bottom, Defendants' conduct was extremely reprehensible, far exceeding the level of misconduct that has supported punitive damages awards in other cases. *Cf. Saunders*, 526 F.3d at 153 (misreporting credit information was "not extraordinarily blameworthy but [was] sufficiently reprehensible to justify an award of punitive damages"); *Martinez Garcia v. Mega Auto Outlet*, No. 20 Civ. 945, 2021 WL 1015816, at *7 (E.D. Va. Feb. 23, 2021) (contractual misconduct, which involved misleading plaintiff and falsifying documents, was reprehensible); *Progressive Mins., LLC v. Rashid*, No. 07 Civ. 108, 2010 WL 11520168, at *9 (N.D. W. Va. Mar. 25, 2010) (fraudulent conduct interfering with plaintiff's efforts to obtain financing was reprehensible).

**B.      Plaintiffs' Harm Is Proportional to the Punitive Damages Award.**

To evaluate the disparity between a plaintiff's actual or potential harm and the punitive damages award, courts use a particular rule of thumb: they look to the ratio of punitive damages to compensatory damages. *See State Farm*, 538 U.S. at 424. While "single digit ratios generally do not present a constitutional issue," *Morris v. Bland*, 666 F. App'x 233, 241 (4th Cir. 2016), "awards that exceed a single digit ratio when compared to compensatory damages generally do present constitutional problems," *Saunders*, 526 F.3d at 154. Still, the Supreme Court has instructed that "there are no rigid benchmarks," *State Farm*, 538 U.S. at 425, and has upheld ratios as high as 526:1, *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 453 (1993); *see also* ECF 1542 at 4 (conceding that courts approve of "single-, double-, or rarely, triple-digit multiples"); ECF 1522 at 8 (same for ratios of 53:1 and 125,000:1). The Supreme Court's precedents illustrate that higher ratios are warranted where, as here, a "particularly egregious act has resulted in only a small amount of economic damages," where the "injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine," or where the compensatory damages

award is low. *BMW*, 517 U.S. at 582; *see also Coalson v. Canchola*, 287 Va. 242, 253 (2014) (finding 17.86:1 ratio "not excessive" because defendant "demonstrated a need for stronger medicine to cure his disrespect for the law").

In contending that the punitive damages award in this case violates their due process rights, Defendants fundamentally miscalculate the relevant ratio of punitive to compensatory damages. Without citing to a single case to support this approach, Defendants suggest that the Court should compare the compensatory and punitive damages that the jury awarded on a claim-by-claim basis. *See, e.g.*, ECF 1542 at 4 (arguing that the ratio of compensatory to punitive damages for individual defendants on Count III was 1 to 500,000); ECF 1550 at 4 (same). But because the jury found Defendants liable on multiple claims, the Court should calculate the ratio by comparing the aggregate compensatory damages for which each Defendant is liable (across all claims) against the aggregate punitive damages award against that Defendant (across all claims). *See, e.g.*, *Pollard v. E.I. DuPont De Nemours, Inc.*, 412 F.3d 657, 668 (6th Cir. 2005) (combining compensatory damages from separate claims for ratio, despite punitive damages award for only one claim); *Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 657–60 (N.D. Ill. 2019) (same); *Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650, 661 (E.D. Ky. 2009) (observing that an "aggregate calculation rather than a claim-by-claim calculation is the proper approach").

The above aggregate approach is particularly appropriate here for several reasons. For one, the jury found Defendants liable for a *civil conspiracy*. As discussed in Plaintiffs' Motion for Default Judgment, co-conspirators are "jointly and severally liable for all acts of coconspirators taken in furtherance of the conspiracy." *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 312 n.10 (4th Cir. 2012) (citation and punctuation omitted) (applying Virginia law); *see also* ECF 1554 at 17–22. Co-conspirators are also "jointly and severally liable for all

damage resulting from the conspiracy." *Brin v. A Home Come True, Inc.*, 79 Va. Cir. 33, 2009 WL 7388844, at *2 (2009) (citing *Worrie v. Boze*, 198 Va. 533, 540 (1957)). Further, when a jury does not award compensatory damages on all counts for which it finds the defendants liable, it is "reasonable to read" the jury's total damages award to reflect the full measure of damages for all claims because "[t]he jury might well have concluded that [the plaintiffs] would unjustifiably receive a double recovery if damages were awarded under [more than one] theor[y] of recovery." *Cutaia v. Radius Eng'g Int'l*, No. 5:11 Civ. 77, 2014 WL 3359368, at *3 (W.D. Va. July 9, 2014). This conclusion is particularly "reasonable" in this case because the jury was instructed to avoid awarding a double recovery. Instructions at 43. Finally, the Supreme Court has instructed that courts should compare the punitive damages award with actual or *potential* harm. *See State Farm*, 538 U.S. at 424 (instructing that the ratio is "between harm, or potential harm, to the plaintiff and the punitive damages award"); *TXO*, 509 U.S. at 460 ("It is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred."). If the inquiry is "not limited to compensatory damages that actually occurred in calculating the ratio, it follows that a court is not confined only to the compensatory damages under particular claims and instead can look at damages found by a jury on related claims." *Fastenal*, 609 F. Supp. at 661; *accord Saccameno*, 372 F. Supp. 3d at 660.

Applying the aggregate approach here results in the following calculations:

*Calculating the compensatory-damages liability for each Defendant.* On Counts III, IV, and V, the jury awarded Plaintiffs $1,303,284 in compensatory damages—an amount for which all Defendants are jointly and severally liable. *See* Verdict at 3–8; ECF 1554 at 19. On Count VI, the jury awarded Plaintiffs $701,459 in compensatory damages—an amount for which Defendant

Fields is liable. *See* Verdict at 9. Thus, the compensatory-damages liability for each Defendant except for Defendant Fields is $1,303,284, and the compensatory-damages liability for Defendant Fields is $2,004,743, as reflected in the charts attached hereto as Appendix 1.

*Calculating the punitive-damages liability for each Defendant.* The total punitive-damages liability for all Defendants (including the damages Plaintiffs moved this Court to assess against the Defaulted Defendants, *see* ECF 1554 at 4, 23–24) is $30,200,000, and the awards against each Defendant range from $500,000 to $12,500,000. These calculations are reflected in Appendix 1A. Alternatively, if the Court chooses to apply the $350,000 punitive damages cap for each of the eight Plaintiffs seeking punitive damages, then the total punitive-damages liability for all Defendants would be $2,800,000. Because seven Plaintiffs were awarded compensatory damages on Counts III–V (the counts for which all Defendants are jointly and severally liable), the Court should apportion $2,450,000 ($350,000 x 7 Plaintiffs) across all Defendants in proportion to the punitive damages that the jury assessed against the Answering Defendants and that Plaintiffs moved this Court to assess against the Defaulted Defendants for Counts III–V. *See* ECF 1554 at 4, 23–24. In addition, because Plaintiff Sines was awarded compensatory damages on Count VI only (for which Defendant Fields is individually liable), the Court should add $350,000 to the punitive damages award against Defendant Fields. As reflected in Appendix 1B, this calculation results in punitive-damages liability ranging from $40,562.91 to $1,364,072.85 per Defendant.

*Calculating the ratio.* Because Defendants are jointly and severally liable for the entire compensatory award for Counts III–V, Plaintiffs calculate the ratios here by comparing the total compensatory damages award against each Defendant with the individual punitive damages award against each Defendant. *See, e.g.*, *Magalios v. Peralta*, No. 19 Civ. 6188, 2022 WL 407403, at *5 (S.D.N.Y. Feb. 10, 2022) (comparing per-defendant punitive damages with total compensatory

damages in joint and several liability case), *appeals docketed*, No. 22-519 (2d Cir. Mar. 11, 2022) & No. 22-541 (2d Cir. Mar. 14, 2022); *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prod. Liab. Litig.*, No. 11MD 2244, 2017 WL 3841608 (N.D. Tex. June 28, 2017) (same); *Merrick v. Paul Revere Life Ins. Co.*, 594 F. Supp. 2d 1168, 1191 (D. Nev. 2008) (same).

This is the correct approach because "joint and several liability, by its nature, imposes on each wrongdoer responsibility for the *entire* damages awarded, even though a particular wrongdoer's conduct may have caused only a portion of it," whereas punitive damages "serve to punish a *particular defendant.*" *Magalios*, 2022 WL 407403, at *5 (cleaned up).

Regardless of whether (or how) the Court applies Virginia's punitive damages cap here, the ratios of punitive to compensatory damages pass constitutional muster. To start, if Virginia's punitive damages cap is not applied at all, the ratios would satisfy *State Farm*. The ratios for all Defendants except for Fields would range from 0.383:1 to 0.767:1. *See* App. 1A. Because the ratios do not even approach 1:1, they do not pose any due process concerns. *See, e.g.*, *In re C.R. Bard, Inc., MDL. No. 2187, Pelvic Repair Sys. Prods. Liab. Litig.*, 810 F.3d 913, 931 (4th Cir. 2016) (holding that a "seven-to-one ratio was not constitutionally excessive"); *Morris*, 666 F. App'x at 241 (upholding punitive damages awards that were five and ten times the compensatory damages awards). Nor does Defendant Fields's ratio of 6.235:1 offend the mandates of *State Farm*. *Morris*, 666 F. App'x at 241 ("single digit ratios generally do not present a constitutional issue"). In any event, a larger punitive damages award is justified by Defendant Fields's "particularly egregious act" of plowing his car into counter-protestors. *See BMW*, 517 U.S. at 582. Alternatively, if the punitive damages cap is applied, the punitive damages award would similarly comply with *State Farm*, as the ratio of punitive to compensatory damages for each Defendant would range

from .031:1 (for, *e.g.*, Defendant Anglin) to 0.68:1 (for Defendant Fields).[10] *See* App. 1B.

### C.     Comparable Case Law Supports the Award.

Defendants have made no showing that the jury's punitive damages award is out of step with awards in comparable cases. To the contrary, the jury's punitive damages award in *Dumpson v. Ade*, No. 18 Civ. 1011, 2019 WL 3767171 (D.D.C. Aug. 9, 2019), shows that the award here is no outlier. In *Dumpson*, one day after the plaintiff was inaugurated as the "the first female, African-American student government president at American University (AU), a masked man hung nooses with bananas inscribed with racist and derogatory messages around the AU campus." *Id.* Andrew Anglin and Moonbase Holdings—Defendants in this case—posted racist messages about the plaintiff on their website, the Daily Stormer, and directed their followers to harass the plaintiff. *Id.* They (and one other defendant) were found liable for intentional infliction of emotional distress, and the court awarded $500,000 in punitive damages. *Id.* at *8. Surely, under *Dumpson*, the coordinated and violent racist conduct by Defendants in connection with UTR justifies at least a $350,000 punitive damages award to each Plaintiff, if not significantly more.[11] *See also* Stipulated Amended Verdict at 3, *Crown Coal & Coke Co. v. Compass Point Res. LLC*, No. 07 Civ. 1208 (W.D. Pa. May 28, 2010), ECF 170 (awarding $925,000,000 in punitive damages to one plaintiff where defendants were found liable for, among other claims, a civil conspiracy to breach the duty of loyalty, tortiously interfere in business relations, and misappropriate trade secrets); Verdict

---

[10]   Even if the Court were to compare the ratio of each Defendant's pro rata share of the total compensatory damages to that Defendant's punitive damages award, the ratios in this case would still pass constitutional muster, ranging from 9.2 to 18.4 (no punitive damages cap) and from 0.74 to 1.8 (applying the punitive damages cap per Plaintiff). These ratios would be even lower if the Court followed the practice of including any "post-trial awards of prejudgment interest and attorneys' fees, costs, and expenses" in the compensatory damages total. *In re USA Com. Mortg. Co.*, 802 F. Supp. 2d 1147, 1188–89 (D. Nev. 2011); *see also Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1321 (11th Cir. 2007).

[11]   If the Court decides to apply Virginia's $350,000 statutory cap, it would "insulat[e] a punitive damages award against a constitutional attack based on unbridled jury discretion and infringement of substantive due process rights." *Wackenhut Applied Techs. Ctr., Inc.*, 979 F.2d at 985.

Form, *Auvenshine v. Troy Sch. Dist.*, No. 5:02 Civ. 60223 (E.D. Mich. July 26, 2006), ECF 54, 64

(awarding punitive damages of $600,000 to former employee for race or national origin

discrimination in violation of 42 U.S.C. § 1983); Verdict Form, *Macedonia v. Christian Knights

of the Ku Klux Klan*, No. 96-CP-14-217 (S.C. Ct. Com. Pl. Clarendon County, 1998) (awarding

$21.5 million in punitive damages against members of the Christian Knights after they burned

down a Black church in South Carolina).[12]

### III.    The Punitive Damages Award Comports with Virginia Law.

Defendants raise two additional challenges based on Virginia law. They contend that:

(1) their unestablished inability to pay the punitive damages award renders the verdict excessive,

*see* ECF 1556 at 5–6; and (2) the compensatory damages are too low to support *any* punitive

damages award, *see* ECF 1542 at 3–4; ECF 1548 at 2–3. Neither argument passes muster.[13]

Here, the Court's task is "to determine whether the jury's verdict is within the confines set

by state law, and to determine, by reference to federal standards developed under Rule 59, whether

a new trial or remittitur should be ordered." *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l. Vendors,

Inc.*, 99 F.3d 587, 593 (4th Cir. 1996) (citation and punctuation omitted). Pursuant to Virginia law,

this Court may set aside an award only if "the damages are so excessive" that they "shock the

---

[12]    To the extent Defendants contend that the ability to pay is a fourth factor of the *State Farm* analysis, *see* ECF 1556 at 5–6, they are wrong. Their sole support for this proposition is *In re Exxon Valdez*, 236 F. Supp. 2d 1043 (D. Alaska 2002), a case that was vacated and that did not consider whether to reduce a punitive damages award based on a party's inability to pay. In any event, Defendants did not establish their inability to pay at trial and, thus, have provided no reason to alter the punitive damages award on this basis. *See infra* pp. 24–25.

Defendants also argue that the punitive damages award infringes on their First Amendment rights. But the lone case they cite for that proposition, *Gazette, Inc. v. Harris*, 229 Va. 1 (1985), is inapposite. *Gazette* concerned damages for libel, a claim that requires careful consideration of First Amendment protections. *See id.* at 49.

[13]    Defendants Kessler, Damigo, and Identity Evropa's Post Trial Motion contains a discussion of willful and wanton negligence. ECF 1522 at 6–7. To the extent this passage is intended to argue against the threshold applicability of punitive damages in this case, that argument should be rejected outright. To start, intentional, rather than negligent, conduct is at issue here. The jury, moreover, was instructed that it could award punitive damages only if it found that Defendants' acts or omissions "were done maliciously or wantonly." Instructions at 45. After considering the extensive evidence detailing Defendants' egregious acts in this case, *see supra* pp. 3–5, the jury implicitly found that Defendants acted maliciously or wantonly in assessing punitive damages against them.

conscience" and "create the impression that the jury has been influenced by passion or prejudice or has in some way misconceived or misinterpreted the facts or the law." *Downer v. CSX Transp., Inc.*, 256 Va. 590, 594 (1998). The question is "whether the jury's award is so excessive as to work" a "miscarriage of justice." *Atlas Food Sys.*, 99 F.3d at 594–95.

First, Defendants have failed to show that this Court should alter the jury's punitive damages award based on any purported inability to pay.[14] The Virginia Supreme Court has made clear that this factor is not relevant where, as here, Defendants "did not introduce evidence of their financial situation at trial." *Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*, 281 Va. 561, 581 (2011); *see also Thomas v. Psimas*, 101 Va. Cir. 455, 2019 WL 3884212, at *7 (2019) (declining to consider this factor "because of the absence of any relevant evidence"); *Kory v. McCluney*, 59 Va. Cir. 74, 2002 WL 31989032, at *8 (2002) ("The burden of proving financial worth is on the Defendants, and the lack of evidence regarding Defendants' net worth will not defeat a punitive award."). In any event, "the low threshold for ability to repay is more than met in this case," particularly given the exacting standard. *Jordan v. Osmun*, No. 16 Civ. 501, 2017 WL 2837143, at *8 (E.D. Va. June 29, 2017); *see also Stoots v. Dee Dee Corlette Grady*, No. 09 CL 3994, 2010 WL 3198640, at *1 (Va. Cir. Ct. July 8, 2010) (holding that a $50,000 punitive damages award (reduced from $100,000) was appropriate where the defendant

---

[14]   Under Virginia law, "judicial review of the amount of punitive damages upon [a] motion for remittitur requires … consideration of [1] reasonableness between the damages sustained and the amount of the award, [2] the measurement of punishment required, [3] whether the award will amount to a double recovery, [4] the proportionality between the compensatory and punitive damages, and [5] the ability of the defendant to pay." *Baldwin v. McConnell*, 273 Va. 650, 658 (2007). Defendants raise only the proportionality factor, already discussed above, *see supra* pp. 17–22, and the inability to pay factor, and thus Plaintiffs need address only the latter here. Even so, the remaining factors—some of which overlap with the due-process analysis above—all support the damages award. *See supra* pp. 3–5 (discussing Defendants' malicious, wanton, and reprehensible conduct); *see also supra* p. 19 (discussing double recovery); *Clehm v. BAE Sys. Ordnance Sys., Inc.*, No. 7:16 Civ. 12, 2018 WL 6594612, at *10 (W.D. Va. Dec. 14, 2018) (finding no suggestion of double recovery based on "the pellucidly clear delineation of the basis for each award in the instructions and the reasonable basis supporting each award").

was on full disability and only had $27/month for discretionary expenses and a twelve-year old car as the only asset in her name).

Second, while Defendants suggest that the punitive damages assessed on Count III are invalid because "a finding of compensatory damages is a prerequisite to an award of exemplary damages," *Zedd v. Jenkins*, 194 Va. 704, 706–07 (1953), that principle is irrelevant here. Plaintiff Wispelwey, to whom the jury did not award compensatory damages, is not seeking punitive damages. *See* Verdict at 3–9. And although the jury awarded $1 in compensatory damages on Count III to other Plaintiffs, *see id.* at 4, a nominal award can support punitive damages. *See Doddy v. Zedd Auctioneers, Ltd.*, 77 Va. Cir. 272, 2008 WL 8201371, at *2 (2008); *Zedd*, 194 Va. at 708.

In any event, *Zedd*'s principle applies only in cases, unlike this one, where the jury awarded no compensatory damages on a claim because the plaintiff failed to establish "actionable harm" associated with that claim. *People Helpers Found., Inc. v. City of Richmond, Va.*, 12 F.3d 1321, 1327 (4th Cir. 1993). But here, Plaintiffs established that they had suffered an actionable harm associated with Count III, since the jury awarded compensatory damages on Counts IV and V, the predicate acts for the Count III conspiracy. In fact, it stands to reason that the jury awarded Plaintiffs substantial compensatory damages on the predicate acts of the conspiracy instead of for the conspiracy itself so as to comply with this Court's instruction to avoid double recovery. *See supra* p. 19. Because this is not a case where Plaintiffs would receive a windfall in punitive damages untethered from any actionable harm, the lack of compensatory damages on Count III is a red herring. *See, e.g.*, *Corti v. Storage Tech. Corp.*, 304 F.3d 336, 341–43 (4th Cir. 2002) (upholding jury's punitive damages award in Title VII case, despite absence of compensatory damages, because jury had shown finding of actionable harm through backpay award); *see also supra* pp. 18–21 (discussing aggregation of compensatory damages across claims).

25

## CONCLUSION

This Court should reject Defendants' challenges to the punitive damages awarded by the jury and instead enter judgment awarding $30,200,000, and certainly no less than $2,800,000, in punitive damages to Plaintiffs.

Date: April 13, 2022

Respectfully submitted,

Roberta A. Kaplan
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Telephone: (212) 763-0883
rkaplan@kaplanhecker.com

*Counsel for Plaintiffs*

Of Counsel:
Julie E. Fink (*pro hac vice*)
Gabrielle E. Tenzer (*pro hac vice*)
Raymond P. Tolentino (*pro hac vice*)
Yotam Barkai (*pro hac vice*)
Emily C. Cole (*pro hac vice*)
Alexandra K. Conlon (*pro hac vice*)
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: (212) 763-0883
jfink@kaplanhecker.com
gtenzer@kaplanhecker.com
rtolentino@kaplanhecker.com
ybarkai@kaplanhecker.com
ecole@kaplanhecker.com
aconlon@kaplanhecker.com

Nicholas A. Butto (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990
nbutto@paulweiss.com

Karen L. Dunn (*pro hac vice*)
Jessica Phillips (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Arpine S. Lawyer (*pro hac vice*)
Matteo Godi (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Fax: (202) 223-7420
kdunn@paulweiss.com
jphillips@paulweiss.com
wisaacson@paulweiss.com
alawyer@paulweiss.com
mgodi@paulweiss.com

Robert T. Cahill (VSB 38562)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
rcahill@cooley.com

Alan Levine (*pro hac vice*)
Philip Bowman (*pro hac vice*)
Daniel Philip Roy, III (*pro hac vice*)
Amanda Liverzani (*pro hac vice*)
COOLEY LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6260
Fax: (212) 479-6275
alevine@cooley.com
pbowman@cooley.com
droy@cooley.com
aliverzani@cooley.com

David E. Mills (*pro hac vice*)
Joshua M. Siegel (VSB 73416)
Caitlin B. Munley (*pro hac vice*)
Samantha A. Strauss (*pro hac vice*)
Alexandra Eber (*pro hac vice*)
Allegra Flamm (*pro hac vice*)
Gemma Seidita (*pro hac vice*)
Khary Anderson (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Fax: (202) 842-7899
dmills@cooley.com
jsiegel@cooley.com
cmunley@cooley.com
sastrauss@cooley.com
aeber@cooley.com
aflamm@cooley.com
gseidita@cooley.com
kjanderson@cooley.com

J. Benjamin Rottenborn (VSB 84796)
WOODS ROGERS PLC
10 South Jefferson St., Suite 1400
Roanoke, VA 24011
Telephone: (540) 983-7600
Fax: (540) 983-7711
brottenborn@woodsrogers.com

*Counsel for Plaintiffs*

**Appendix 1A**

| Calculating the Punitive-to-Compensatory Damages Ratio for Each Defendant Total joint-and-several compensatory damages award compared against punitive damages award (without punitive damages cap) | | | |
|---|---|---|---|
| | **Compensatory Damages** | **Punitive Damages** | **Ratio** |
| **Andrew Anglin** | $1,303,284.00 | $500,000.00 | 0.383646235 |
| **Augustus Invictus** | $1,303,284.00 | $700,000.00 | 0.537104729 |
| **Christopher Cantwell** | $1,303,284.00 | $700,000.00 | 0.537104729 |
| **Elliot Kline** | $1,303,284.00 | $700,000.00 | 0.537104729 |
| **James Alex Fields Jr.** | $2,004,743.00 | $12,500,000.00 | 6.235213192 |
| **Jason Kessler** | $1,303,284.00 | $700,000.00 | 0.537104729 |
| **Jeff Schoep** | $1,303,284.00 | $500,000.00 | 0.383646235 |
| **Matthew Heimbach** | $1,303,284.00 | $500,000.00 | 0.383646235 |
| **Matthew Parrott** | $1,303,284.00 | $500,000.00 | 0.383646235 |
| **Michael Hill** | $1,303,284.00 | $500,000.00 | 0.383646235 |
| **Michael Tubbs** | $1,303,284.00 | $500,000.00 | 0.383646235 |
| **Nathan Damigo** | $1,303,284.00 | $500,000.00 | 0.383646235 |
| **Richard Spencer** | $1,303,284.00 | $700,000.00 | 0.537104729 |
| **Robert "Azzmador" Ray** | $1,303,284.00 | $700,000.00 | 0.537104729 |
| **East Coast Knights** | $1,303,284.00 | $1,000,000.00 | 0.76729 |
| **Fraternal Order of the Alt-Knights** | $1,303,284.00 | $1,000,000.00 | 0.76729 |
| **Identity Evropa** | $1,303,284.00 | $1,000,000.00 | 0.76729 |
| **League of the South** | $1,303,284.00 | $1,000,000.00 | 0.76729 |
| **Loyal White Knights** | $1,303,284.00 | $1,000,000.00 | 0.76729 |
| **Moonbase Holdings** | $1,303,284.00 | $1,000,000.00 | 0.76729 |
| **National Socialist Movement** | $1,303,284.00 | $1,000,000.00 | 0.76729 |
| **Nationalist Front** | $1,303,284.00 | $1,000,000.00 | 0.76729 |
| **Traditionalist Worker Party** | $1,303,284.00 | $1,000,000.00 | 0.76729 |
| **Vanguard America** | $1,303,284.00 | $1,000,000.00 | 0.76729 |

| | **Compensatory** | **Punitive** | **Compensatory & Punitive** |
|---|---|---|---|
| **TOTAL** | $2,004,743.00 | $30,200,000.00 | $32,204,743.00 |

Appendix 1B

| Calculating the Punitive-to-Compensatory Damages Ratio for Each Defendant Total joint-and-several compensatory damages award compared against punitive damages award (with per-plaintiff punitive damages cap) | | | |
|---|---|---|---|
| Andrew Anglin | $1,303,284.00 | $40,562.91 | 0.031123618 |
| Augustus Invictus | $1,303,284.00 | $56,788.08 | 0.043573066 |
| Christopher Cantwell | $1,303,284.00 | $56,788.08 | 0.043573066 |
| Elliot Kline | $1,303,284.00 | $56,788.08 | 0.043573066 |
| James Alex Fields Jr | $2,004,743.00 | $1,364,072.85 | 0.680422802 |
| Jason Kessler | $1,303,284.00 | $56,788.08 | 0.043573066 |
| Jeff Schoep | $1,303,284.00 | $40,562.91 | 0.031123618 |
| Matthew Heimbach | $1,303,284.00 | $40,562.91 | 0.031123618 |
| Matthew Parrott | $1,303,284.00 | $40,562.91 | 0.031123618 |
| Michael Hill | $1,303,284.00 | $40,562.91 | 0.031123618 |
| Michael Tubbs | $1,303,284.00 | $40,562.91 | 0.031123618 |
| Nathan Damigo | $1,303,284.00 | $40,562.91 | 0.031123618 |
| Richard Spencer | $1,303,284.00 | $56,788.08 | 0.043573066 |
| Robert "Azzmador" Ray | $1,303,284.00 | $56,788.08 | 0.043573066 |
| East Coast Knights | $1,303,284.00 | $81,125.83 | 0.062247237 |
| Fraternal Order of the Alt-Knights | $1,303,284.00 | $81,125.83 | 0.062247237 |
| Identity Evropa | $1,303,284.00 | $81,125.83 | 0.062247237 |
| League of the South | $1,303,284.00 | $81,125.83 | 0.062247237 |
| Loyal White Knights | $1,303,284.00 | $81,125.83 | 0.062247237 |
| Moonbase Holdings | $1,303,284.00 | $81,125.83 | 0.062247237 |
| National Socialist Movement | $1,303,284.00 | $81,125.83 | 0.062247237 |
| Nationalist Front | $1,303,284.00 | $81,125.83 | 0.062247237 |
| Traditionalist Worker Party | $1,303,284.00 | $81,125.83 | 0.062247237 |
| Vanguard America | $1,303,284.00 | $81,125.83 | 0.062247237 |

| | Compensatory | Punitive | Compensatory & Punitive |
|---|---|---|---|
| TOTAL | $2,004,743.00 | $2,800,000.00 | $4,804,743.00 |

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2022, I filed the foregoing with the Clerk of Court through the CM/ECF system, which will send a notice of electronic filing to:

Elmer Woodard
5661 US Hwy 29
Blairs, VA 24527
isuecrooks@comcast.net

James E. Kolenich
Kolenich Law Office
9435 Waterstone Blvd. #140
Cincinnati, OH 45249
jek318@gmail.com

*Counsel for Defendants Jason Kessler, Nathan Damigo, and Identity Europa, Inc. (Identity Evropa)*

David L. Campbell
Justin Saunders Gravatt
Duane, Hauck, Davis & Gravatt, P.C.
100 West Franklin Street, Suite 100
Richmond, VA 23220
dcampbell@dhdglaw.com
jgravatt@dhdglaw.com

*Counsel for Defendant James A. Fields, Jr.*

Bryan Jones
106 W. South St., Suite 211
Charlottesville, VA 22902
bryan@bjoneslegal.com

*Counsel for Defendants Michael Hill, Michael Tubbs, and League of the South*

William Edward ReBrook, IV
The ReBrook Law Office
6013 Clerkenwell Court
Burke, VA 22015
edward@rebrooklaw.com

*Counsel for Defendants Jeff Schoep, National Socialist Movement, Nationalist Front, Matthew Parrott, Traditionalist Worker Party, and Matthew Heimbach*

Joshua Smith
Smith LLC
807 Crane Avenue
Pittsburgh, PA 15216-2079
joshsmith2020@gmail.com

*Counsel for Defendants Matthew Parrott, Traditionalist Worker Party, and Matthew Heimbach*

I further hereby certify that on April 13, 2022, I also served the following non-ECF participants, via electronic mail and U.S. mail, as follows:

Richard Spencer
richardbspencer@icloud.com
richardbspencer@gmail.com

Vanguard America
c/o Dillon Hopper
dillon_hopper@protonmail.com

Christopher Cantwell
Christopher Cantwell 00991-509
USP Marion, 4500 Prison Rd.
P.O. Box 2000
Marion, IL 62959

Robert "Azzmador" Ray
azzmador@gmail.com

Elliott Kline a/k/a Eli Mosley
eli.f.mosley@gmail.com
deplorabletruth@gmail.com
eli.r.kline@gmail.com

_____
Roberta A. Kaplan (*pro hac vice*)
KAPLAN HECKER & FINK LLP

*Counsel for Plaintiffs*