# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

ELIZABETH SINES, SETH WISPELWEY, MARISSA BLAIR, APRIL MUÑIZ, MARCUS MARTIN, NATALIE ROMERO, CHELSEA ALVARADO, JOHN DOE, and THOMAS BAKER,

<div align="center">Plaintiffs,</div>

v.

JASON KESSLER, RICHARD SPENCER, CHRISTOPHER CANTWELL, JAMES ALEX FIELDS, JR., VANGUARD AMERICA, ANDREW ANGLIN, MOONBASE HOLDINGS, LLC, ROBERT "AZZMADOR" RAY, NATHAN DAMIGO, ELLIOTT KLINE a/k/a/ ELI MOSLEY, IDENTITY EVROPA, MATTHEW HEIMBACH, MATTHEW PARROTT a/k/a DAVID MATTHEW PARROTT, TRADITIONALIST WORKER PARTY, MICHAEL HILL, MICHAEL TUBBS, LEAGUE OF THE SOUTH, JEFF SCHOEP, NATIONAL SOCIALIST MOVEMENT, NATIONALIST FRONT, AUGUSTUS SOL INVICTUS, FRATERNAL ORDER OF THE ALT-KNIGHTS, MICHAEL "ENOCH" PEINOVICH, LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN, and EAST COAST KNIGHTS OF THE KU KLUX KLAN a/k/a EAST COAST KNIGHTS OF THE TRUE INVISIBLE EMPIRE,

<div align="center">Defendants.</div>

**Civil Action No. 3:17-cv-00072-NKM**

## PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' RULE 50(b) and RULE 59(a) POST-TRIAL MOTIONS

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................ 1

BACKGROUND ............................................................................................... 1

LEGAL STANDARD ......................................................................................... 3

ARGUMENT ................................................................................................... 4

I.      THE COURT SHOULD DENY THE MOTION FILED BY DAMIGO,
        IDENTITY EVROPA, AND KESSLER ...................................................... 4

        A.      The Evidence Overwhelmingly Supports the Verdict Against Damigo ................. 5

        B.      The Evidence Overwhelmingly Supports the Verdict Against Identity
                Evropa ................................................................................................ 8

        C.      The Evidence Overwhelmingly Supports the Verdict Against Kessler ............... 11

II.     THE COURT SHOULD DENY DEFENDANT CANTWELL'S MOTION ................. 17

        A.      The Evidence Overwhelmingly Supports the Verdict Against Cantwell. ............ 17

        B.      Cantwell Identifies No Error, Let Alone a "Miscarriage of Justice"
                Warranting a New Trial. ........................................................................ 22

                1.      The Verdict is Neither Against the Clear Weight of the Evidence,
                        Nor Based Upon Evidence Which Is False. ..................................... 22

                2.      Cantwell Identifies No Error That Would Warrant a New Trial. ............ 22

III.    THE COURT SHOULD DENY SPENCER'S MOTION ................................... 30

        A.      Substantial Evidence Supports the Jury's Finding that Spencer Conspired
                with Others to Accomplish Unlawful and Tortious Acts .............................. 30

        B.      Substantial evidence supports the jury's finding that Spencer violated Va.
                Code § 8:01-42.1 ................................................................................. 34

IV.     THE COURT SHOULD DENY THE MOTION FILED BY HILL, TUBBS, AND
        LEAGUE OF THE SOUTH ................................................................... 36

        A.      The LOS Defendants' Post-Verdict Motions on Count I Must Be Denied
                Because Plaintiffs Put Forth Substantial Evidence Supporting their Section
                1985(3) Claim Against the LOS Defendants. ............................................ 36

                1.      Substantial Evidence Shows that the LOS Defendants Conspired
                        with their Co-Defendants in Connection with Charlottesville 2.0 ........... 37

                        (a)     Substantial Evidence Shows that the LOS Defendants were
                                Motivated by Racial Animus and Entered the Conspiracy
                                with a Purpose to Commit Racially Motivated Violence. ............ 38

                        (b)     Substantial Evidence Shows that the LOS Defendants and
                                Their Co-Conspirators Committed Numerous Overt Acts in
                                Furtherance of the Conspiracy. ....................................... 40

(c)     Sufficient Evidence Shows that the LOS Defendants Ratified the Relevant Conduct. ...................................................... 44

(d)     Sufficient Evidence Shows that Plaintiffs were Injured as a Result of the Conspiracy. ............................................................ 46

2.     Plaintiffs Put Forth Substantial Evidence Supporting their Section 1986 Claim Against the LOS Defendants................................................. 47

3.     The LOS Defendants' Post-Verdict Motions on Count III Must Be Denied Because Sufficient Evidence Supports the Jury's Finding that the LOS Defendants Were Liable for Common-Law Conspiracy. .............................................................................................. 47

CONCLUSION.................................................................................................................. 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almy v. Grisham*,
273 Va. 68 (2007) ...................................................................................................5

*Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*,
99 F.3d 587 (4th Cir. 1996) ..................................................................................4

*Benner v. Nationwide Mut. Ins. Co.*,
93 F.3d 1228 (4th Cir. 1996) ................................................................................3

*Berry v. Target Corp.*,
214 F. Supp. 3d 530 (E.D. Va. 2016) ..................................................................31

*Bonner v. Dawson*,
404 F.3d 290 (4th Cir. 2005) ..............................................................................35

*CaterCorp, Inc. v. Catering Concepts, Inc.*,
246 Va. 22 (1993) ..................................................................................................5

*Chaudhry v. Gallerizzo*,
174 F.3d 394 (4th Cir. 1999) ..............................................................................24

*City of Richmond v. Atlantic Co.*,
273 F.2d 902 (4th Cir. 1960) ................................................................................3

*Clark v. Coleman*,
448 F. Supp. 3d 559 (W.D. Va. 2020) ..........................................................35, 48

*Cline v. Wal-Mart Stores, Inc.*,
144 F.3d 294 (4th Cir.1998) .................................................................................3

*Commercial Bus. Sys., Inc. v. Bellsouth Servs., Inc.*,
249 Va. 39 (1995) ..................................................................................................5

*DeMaine v. Bank One, Akron, N.A.*,
904 F.2d 219 (4th Cir. 1990) ................................................................................3

*Durham v. Jones*,
No. CIV. WMN-10-CV-2534, 2012 WL 3985224 (D. Md. Sept. 10, 2012),
*aff'd*, 737 F.3d 291 (4th Cir. 2013) ....................................................................18

*Eberhardt v. Integrated Design & Constr., Inc.*,
167 F.3d 861 (4th Cir. 1999) *superseded by statute on other grounds*, 31
U.S.C. §3730(h) ....................................................................................................3

*Gelber v. Glock*,
  293 Va. 497 (2017) ...........................................................................................32

*Herald Co. v. Seawell*,
  472 F.2d 1081 (10th Cir. 1972) ...............................................................10, 38, 40

*Johnson v. Harron*,
  1995 WL 319943 (N.D.N.Y. May 23, 1995) ...............................................47

*Lee v. Nationwide Mut. Ins. Co.*,
  255 Va. 279 (1998) ...........................................................................................23

*Liberty Univ, Inc. v. Citizens Ins. Co. of Am.*,
  16 F. Supp. 3d 636 (W.D. Va. 2014), *vacated on other grounds*. 792 F.3d 520
  (4th Cir. 2015)..........................................................................................9, 38

*New Hampshire v. Maine*,
  532 U.S. 742 (2001)..........................................................................................29

*NAACP v. Claiborne Hardware*,
  458 U.S. 886 (1982).............................................................................16, 17, 45

*United States v. Newsome*,
  322 F.3d 328 (4th Cir. 2003) ........................................................................32, 40

*Noel v. Artson*,
  641 F.3d 580 (4th Cir. 2011) ...........................................................................24

*United States v. Osborne*,
  532 F. Supp. 857 (W.D. Va. 1982) ...................................................................41

*Poynter v. Ratcliff*,
  874 F.2d 219 (4th Cir. 1989) ...........................................................................26

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000)............................................................................................3

*Rush v. Virginia Dep't of Transp.*,
  208 F. Supp. 2d 624 (W.D. Va. 2002) .............................................................27

*Shirvinski v. U.S. Coast Guard*,
  673 F.3d 308 (4th Cir. 2012) .............................................................................5

*Tobacco Tech., Inc. v. Taiga Int'l N.V.*,
  626 F. Supp. 2d 537 (D. Md. 2009), *aff'd*, 388 F. App'x 362 (4th Cir. 2010) .........................9

*Williams v. Harrison*,
  255 Va. 272 (1998) ...........................................................................................25

*Washington v. Wilmore,*
    No. 3:02CV00106, 2006 WL 2471611 (W.D. Va. Aug. 23, 2006)..........................................3

**Statutes**

42 U.S.C. § 1985.......................................................................................................................47

42 U.S.C. § 1985(3).........................................................................................................2, 31, 48

42 U.S.C. § 1986.......................................................................................................................31

Va. Code § 8:01-42.1..........................................................................................................31, 34

Va. Code § 8:01-42.1(A) ...........................................................................................................31

Virginia Code § 8.01-42.1 .................................................................................................*passim*

**Other Authorities**

Fed. R. Civ. P. 50(a) ...................................................................................................................3

Fed. R. Civ. P. 50(b) ...............................................................................................................1, 3

Fed. R. Civ. P. 59(a) ..........................................................................................................1, 3, 27

Fed. R. Civ. P. 61.....................................................................................................................27

Restatement (Second) of Torts § 496A (1965) ...........................................................................25

Plaintiffs respectfully submit this opposition to Defendants' motions under Federal Rules of Civil Procedure 50(b) and 59(a).[1] *See* ECF Nos. 1488, 1522, 1536, 1549, 1550, 1557. For the reasons set forth in this opposition, the Court should deny those motions.

## PRELIMINARY STATEMENT

The Court should deny the Rule 50(b) and Rule 59(a) post-trial motions seeking judgment as a matter of law and/or a new trial filed by Defendants Nathan Damigo, Identity Evropa, Jason Kessler, Christopher Cantwell, Richard Spencer, Michael Hill, Michael Tubbs, and League of the South (collectively, "Defendants") because Defendants do not and cannot satisfy the high standard required for the relief they seek. The jury unanimously found that Defendants engaged in a civil conspiracy in violation of Virginia law. That verdict is supported by the overwhelming evidence adduced at trial and should not be disturbed. Through their motions, Defendants seek to disrupt the jury's unanimous findings and evade accountability for their heinous acts of violence and hatred. The Court should reject those efforts and deny Defendants' motions.

## BACKGROUND

On October 25, 2021, Plaintiffs proceeded to trial on their claims before a jury in this Court. After approximately fourteen days of trial, during which thirty-five witnesses testified (including by deposition) and 798 exhibits were admitted, Plaintiffs rested their case. Defendants then moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). *See* ECF Nos. 1441 (Hill, Tubbs, and League of the South), 1451 (Spencer), 1455 (Damigo, Identity Evropa, Kessler), 1462 (Cantwell); *see also* Day 17 Tr. at 45:6-46:7 (Spencer); 43:19-44:21 (Cantwell). The Court denied Defendants' motions. Specifically, the Court "concluded that none of the [Defendants] established that a reasonable jury would not have a legally sufficient evidentiary basis to find for

---

[1] Defendants' motions challenging the jury's punitive damages awards are addressed in a separate brief filed concurrently with this opposition.

the Plaintiffs on the issues so raised," but "[r]ather, the evidence presented raised a triable issue for the jury on the issue whether the movant Defendants had conspired to commit racially-motivated violence at the Unite the Right rally on August 11 and 12, 2017." ECF No. 1463 (denying motion filed by Damigo, Identity Evropa, Kessler, Hill, Tubbs, and League of the South); *see also* ECF No. 1464 (denying Cantwell's motion and noting the oral denial of Spencer's motion).

On November 19, 2021, the Court gave the final jury instructions. Specifically, relevant here, the Court instructed the members of the jury that to rule for Plaintiffs on Count III, they were required to find only that Defendants conspired to commit assault, battery, false imprisonment, or conduct proscribed by Virginia Code § 8.01-42.1, including acts of intimidation and/or harassment or violence motivated by racial, religious, or ethnic animosity.[2] Final Jury Instructions, ECF No. 1461, at 38-40. The Court further instructed the jury that to rule for Plaintiffs on Count IV, the jury needed to find only that Kline, Spencer, Kessler, Ray, and Cantwell subjected Plaintiffs Romero and Willis to intimidation, harassment, or violence motivated by racial, religious, or ethnic animosity.[3] *Id.* at 41-42. The jury began their deliberations that same day.

On November 23, 2021, after two days of deliberations, the jury returned a verdict in favor of Plaintiffs on four of their six claims (Counts III, IV, V, and VI) and awarded Plaintiffs over $25 million in damages. *See* ECF No. 1478.[4]

Thereafter, Defendants filed their motions seeking renewed judgment as a matter of law

---

[2] Defendants do not challenge the jury verdicts as to Counts V and VI.

[3] Count IV also includes a claim brought by seven Plaintiffs under Virginia Code § 8.01-42.1 against Defendant Fields. The jury's verdict on this portion of Count IV is not at issue. Defendant Fields did not make a Rule 50 or Rule 59 motion on this count.

[4] The jury did not reach a verdict on Count I, whether Defendants conspired to commit racially motivated violence in violation of 42 U.S.C. § 1985(3), or Count II, whether Defendants had knowledge of the conspiracy in Count I and failed to prevent it.

under Federal Rule of Civil Procedure 50(b) and/or a new trial under Rule 59(a) under Federal Rules of Civil Procedure 50(b) and 59(a). *See* ECF Nos. 1488, 1522, 1536, 1549, 1550, 1557.

## LEGAL STANDARD

On a renewed motion for judgment as a matter of law under Rule 50(b), "the Court simply determines whether substantial evidence supports the jury's verdict." *Washington v. Wilmore*, No. 3:02CV00106, 2006 WL 2471611, at *1 (W.D. Va. Aug. 23, 2006) (Moon, J.) (citing *Bonner v. Dawson*, 404 F.3d 290, 295 (4th Cir. 2005)). The Court must not make credibility determinations or reweigh the evidence; rather, it must view the evidence in the light most favorable to the non-moving party (here, Plaintiffs). *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 866-67 (4th Cir. 1999) *superseded by statute on other grounds*, 31 U.S.C. §3730(h). This means that the Court must credit evidence favorable to Plaintiffs unless it is "totally incredible on its face," *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir.1998) (citations omitted), and the Court must reject evidence favorable to Defendants except for uncontradicted, unimpeached testimony by a disinterested witness, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). The verdict must stand as long as it has "a legally sufficient evidentiary basis." Fed. R. Civ. P. 50(a). In other words, the Court may substitute its judgment for the jury's only if "there can be but one reasonable conclusion as to the proper judgment." *Benner v. Nationwide Mut. Ins. Co.*, 93 F.3d 1228, 1234 (4th Cir. 1996) (citation omitted). While Rule 50(b) permits a party to move for judgment as a matter of law on claims where the jury fails to return a verdict, the Court must deny the motion unless it finds that the non-moving party "failed to adduce substantial evidence in support of" their claims. *DeMaine v. Bank One, Akron, N.A.*, 904 F.2d 219, 220 (4th Cir. 1990).

Motions for a new trial under Rule 59(a) are committed to "the sound discretion of the trial court." *City of Richmond v. Atlantic Co.*, 273 F.2d 902, 916 (4th Cir. 1960). The Court may only

grant a new trial if the movant demonstrates that "the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice." *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996) (quoting *Aetna Casualty & Sur. Co. v. Yeatts*, 122 F.2d 350, 352-53 (4th Cir. 1941)) (numbering omitted).

## ARGUMENT

The Court should deny Defendants' Rule 50(b) and Rule 59(a) post-trial motions seeking judgment as a matter of law and/or a new trial. First, the motion by Defendants Damigo, Identity Evropa, and Kessler, arguing for a directed verdict as to the conspiracy claims, should be denied because they have not demonstrated that Plaintiffs "failed to adduce substantial evidence" in support of their claims as to Counts I and II and they cannot show that there was "no evidentiary basis" for the jury's verdict as to Count III. ECF No. 1552. Kessler's motion to overturn the jury's verdict as to Count IV must be denied because he has not met his burden of showing a lack of an evidentiary basis for the jury's verdict. *Id.* Defendant Cantwell's motions should be denied for the same reasons. ECF Nos. 1488, 1536, 1557.

Defendant Spencer's motion arguing for a directed verdict as to Counts III and IV should be denied because substantial evidence supports the jury's verdict against him. ECF No. 1550.

Finally, the motions by Defendants Hill, Tubbs, and League of the South, arguing for directed verdicts as to all conspiracy claims, should be denied because they cannot show Plaintiffs did not adduce substantial evidence in support of their claims as to Counts I or II, nor have they met their burden to overturn the jury's verdict as to Count III. *See* ECF No. 1549.

## I.   THE COURT SHOULD DENY THE MOTION FILED BY DAMIGO, IDENTITY EVROPA, AND KESSLER

The motion filed by Defendants Damigo, Identity Evropa, and Kessler should be denied because overwhelming evidence supports the jury's verdict against them.

### A.      The Evidence Overwhelmingly Supports the Verdict Against Damigo

Damigo argues that he "is entitled to a directed verdict as to all conspiracy claims" because the evidence introduced at trial against him was insufficient to allow the jury to find either an unlawful agreement or foreseeability of any acts that injured any plaintiff. ECF No. 1522 at 4. The jury did not reach a verdict on the federal conspiracy claims in Counts I and II but found Damigo liable under Count III for conspiracy under Virginia law. To overturn the jury's verdict as to Count III and to succeed on his renewed motion for judgment as a matter of law as to Counts I and II, Damigo must show that substantial evidence does not exist in the record that supports Plaintiffs' conspiracy claims. Damigo cannot meet this burden and his motion must be denied.

A common-law conspiracy under Virginia law "consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *Commercial Bus. Sys., Inc. v. Bellsouth Servs., Inc.*, 249 Va. 39, 48 (1995); *see also Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 320 (4th Cir. 2012). A civil claim for common-law conspiracy "requires proof that the underlying tort was committed," *Almy v. Grisham*, 273 Va. 68, 80 (2007), and that the plaintiffs suffered damages from those acts, *see CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 28 (1993) ("The gist of the civil action of conspiracy is the damage caused by the acts committed in pursuance of the formed conspiracy and not the mere combination of two or more persons to accomplish an unlawful purpose or use unlawful means." (citation omitted)). Similarly, a conspiracy under federal law "is an agreement between two or more persons to join together to accomplish some unlawful purpose," and co-conspirators can be held "liable for all the reasonably foreseeable acts of their co-conspirators done in furtherance of the conspiracy." Final Jury Instructions, ECF No. 1461, at 21-22.

Damigo first contends that there is "no evidence of what the contents of any communications Mr. Damigo was proven to have was" and that any such contents were

"innocuous." *See* ECF No. 1522, at 4. In so arguing, Damigo seems to contend that Plaintiffs were required to introduce direct evidence of an agreement in order to prove conspiracy. Damigo is wrong on the law and the facts.

Plaintiffs were not required to introduce direct evidence of a formal agreement to prove their conspiracy claims. As the Court instructed the jury, "[b]y its very nature, a conspiracy is clandestine and covert, thereby frequently resulting in little evidence of such an agreement. Therefore, Plaintiffs may prove a conspiracy by circumstantial evidence. Circumstantial evidence tending to prove a conspiracy may include evidence of a Defendant's relationship with other members of the alleged conspiracy, the length of any such association, the Defendant's attitude and conduct, and the nature of the alleged conspiracy." ECF No. 1641, at 22. At trial, Plaintiffs introduced ample circumstantial evidence of Damigo's role in the conspiracy. Damigo concedes that Plaintiffs adduced evidence at trial that he was friends with Richard Spencer, that he had weekly calls with Spencer's friends and associates; that he was present at Alt-Right parties at Spencer's home where planning for Unite the Right was discussed; that Damigo asked for fake Antifa accounts to be set up; and that "he and/or Identity Evropa were 'working with other Alt Right groups as to August 11th and 12th.'" PX-0920; Day 13 Tr. At 176:15-21; ECF No. 1522, at 4.   Damigo also vaguely concedes that "other substantially similar evidence" of his role in the conspiracy was introduced through the depositions of Elliot Kline, one of the primary architects of the conspiracy and a close associate of Damigo's, and Samantha Froelich, a former member of Damigo's group, Identity Evropa. *See id.* at 3-4. This evidence alone is sufficient to support the jury's finding of Damigo's liability for civil conspiracy under Virginia law.

Additionally, Plaintiffs adduced evidence at trial that Damigo advocated for a white ethnostate (Day 13 Tr. 158:8-9); that Damigo believed that violence might be needed to create that

white ethnostate (Day 13 159:4-7); that Damigo had weekly calls with at least three other named co-defendants about Charlottesville 2.0 (PX-3819, at 293:10-293:13; 296:23-298:2); that Damigo knew that Kline was planning the event with Kessler and that Kline updated Damigo from time to time about his work with Kessler (Day 13 Tr. 186:7-15); that Damigo created and was the owner of the IE server where IE members discussed the plans for Charlottesville 2.0 (Day 13 Tr. 167:15-21); that, at Kessler's request, Damigo agreed to promote Charlottesville 2.0 to Identity Evropa members (Day 13 Tr. 184:10-21); that Damigo approved battle gear for Identity Evropa members to wear on August 12, 2017 (Day 13 Tr. 196:12-22); that, in the wake of Charlottesville 2.0, Damigo declared it to have been a "huge success" (Day 13 Tr. 203:21-23); that Damigo, Kline, and Spencer organized a private press conference for August 14th (Day 13 Tr. 204:2-6); and that Damigo instructed his co-conspirators to "shut down the intel server" and issue an announcement instructing Identity Evropa members "not to talk to the police" (PX-1851A, PX-1851B).

This overwhelming evidence was more than sufficient for the jury to find Damigo liable under Virginia Code § 8.01-42.1 and it demonstrates that Damigo has failed to meet his burden to show that substantial evidence does not exist in the record that supports Plaintiffs' conspiracy claims under Counts I and II.

Damigo next argues that no evidence adduced at trial would "allow the jury to find . . . foreseeability of any acts that injured any plaintiff." *See* ECF No. 1522, at 4. But contrary to Damigo's undeveloped argument, as the Court previously found in denying Damigo's Rule 50(a) motion, Plaintiffs presented substantial evidence that "it was foreseeable that violent acts would happen," including "talk on the Internet about . . . whether someone could drive a car through a crowd of demonstrators that might be blocking the street." Day 18 Tr. 106:13-107:3. Indeed, Damigo's co-conspirators planned all manner of violence (*see, e.g.*, PX-1455 ("we're raising an

army my liege. For free speech, but the cracking of skulls if it comes to it."); PX-1827 ("we must send a message to the Jewish oligarchs and their hordes of minions that we will not go silently into the night as they desire – no, we will fight them, we will defeat them, and we will secure our people's destiny."); PX-0727 ("I think we are gonna see some serious brawls at cville next month too and we'll see blood on some of these white polos."); PX-0376 ("I will be both elated and humbled to stand with you men and address the media and fight the hordes of filth and scum"); PX-0506 ("the plan is the same, gas the kikes, pr war now, plenty of trolling and lulz"), including preparing to run counter-protestors over with cars. *See, e.g.*, PX-1119 ("Is it legal to run over protestors blocking roadways?"); PX-1144 (describing a "multi-lane protestor digestor" and discussing whether laws were on the books "that driving over protestors blocking roadways isn't an offense"); PX-2644 (Defendant Cantwell: "Blocking traffic is not peaceful protest, and every person who reminds you of that without using his car, is giving you more slack than you f**king deserve.").

Damigo's motion should be denied.

## B.     The Evidence Overwhelmingly Supports the Verdict Against Identity Evropa

Identity Evropa ("IE") also summarily argues that there is no evidence from which a jury could properly find it liable for conspiracy. ECF No. 1522 at 5. IE contends that "Plaintiffs' claims of conspiracy against [it] appear to depend entirely on the activities of" Elliott Kline but that Kline was acting outside of the scope of what IE authorized him to do. *See* ECF No. 1522, at 4-5. IE's argument fails for three reasons.[5]

---

[5] It is unclear whether Defendant IE is seeking to overturn the jury's verdict as to Count III or renewing its motion for judgment as a matter of law as to Counts I and II, or both. IE's arguments fail regardless because there is substantial evidence in the record that supports Counts I and II as well as the jury's verdict as to Count III.

*First*, IE can be held liable for the actions of Kline, who was a member and leader of IE in 2017 and was not acting outside the scope of what he was authorized to do on behalf of the organization. (Day 13 Tr. 184:19-21) Organizations can be held liable for the actions of their agents if those agents acted with actual or apparent authority. An agent acts with actual authority when the principal has given consent, expressly or impliedly, for the agent to act on her behalf. *Liberty Univ, Inc. v. Citizens Ins. Co. of Am.*, 16 F. Supp. 3d 636, 660 (W.D. Va. 2014), *vacated on other grounds*. 792 F.3d 520 (4th Cir. 2015).  An agent acts with apparent authority "if a third person could reasonably interpret acts or omissions of the principal as indicating that the agent has authority to act on behalf of the principal." *Tobacco Tech., Inc. v. Taiga Int'l N.V.*, 626 F. Supp. 2d 537, 548 (D. Md. 2009), *aff'd*, 388 F. App'x 362 (4th Cir. 2010) (citing *Crothers v. Commodity Futures Trading Comm'n*, 33 F.3d 405, 410 (4th Cir. 1994)).

Here, the evidence at trial showed that Kline had both actual and apparent authority to act on IE's behalf. Damigo testified that he had given Kline the authority to approve activism for IE and that he had a number of conversations with Kline about what Damigo expected of him. Day 13 Tr. 185:15-25. Damigo also testified that he was well aware that Kline was planning Charlottesville 2.0 with Kessler and that Kline checked in with Damigo from time to time giving him updates on that planning. Day 13 Tr. 186:4-15.  In addition, Damigo nominated Kline to be the IE PR representative for Charlottesville 2.0. PX-1303A; PX-1303B.  And Damigo testified that IE paid Kline a salary during the time period that Kline was planning Charlottesville 2.0 with Kessler. Day 13 Tr. 188:15-189:8; PX-1273C.

The evidence further showed that Kline was one of the primary architects of the unlawful conspiracy. The Court found prior to trial that Kline conspired with at least one co-conspirator, that he was motivated by racial animus, that the violence of August 12 was foreseeable to him, and

that he ratified the violence that occurred. *See, e.g.*, PX-3114 (text from Kline to Spencer stating "[t]his is going to be a violent summer"); PX-0727 (Discord post by Kline, "we are gonna see some serious brawls at cville next month too and we'll see blood on some of these white polos"); PX-2477 (photo depicting Kline involved in brawl on August 12).

At no point did Damigo testify that Kline had acted outside of the scope of authority that Damigo gave Kline when he planned Charlottesville 2.0 on behalf of IE and engaged in civil conspiracy in violation of Virginia state law. To the contrary, Damigo confirmed that after the events of Charlottesville 2.0, Damigo celebrated Kline for doing "an excellent job and deserving the highest praise from the entire organization." Day 13 Tr. 210:7-21. And shortly after the Unite the Right rally, Damigo turned Identity Evropa over to Kline as the CEO. Day 13 Tr. 211:9-12. In short, Plaintiffs presented substantial evidence at trial that Kline was acting on behalf of, and under instruction from, Damigo and Identity Evropa, and IE cannot point to a single piece of evidence in support of its baseless assertion that Kline was acting outside the scope of his authority when he and other members of IE, including Damigo, engaged in an unlawful conspiracy.

*Second*, IE can also be held liable for the actions of Damigo, its CEO and founder. *Herald Co. v. Seawell*, 472 F.2d 1081, 1094 (10th Cir. 1972) (holding that the relationship between a corporation and its CEO is that of principal and agent). The evidence at trial demonstrated that Damigo was the leader of IE during the planning period for Charlottesville 2.0, that he had a rule that IE members were not allowed to partake in any activism without express permission, and that he and Kline had the authority to approve activism for IE members. Day 13 Tr. 185:6-21. Damigo also testified at trial that "pretty much anywhere I went generally . . . as the founder of the organization, it was generally considered I was representing the organization." Day 13 168:5-8. Damigo confirmed that, at Kessler's request, he agreed to promote the event to IE members so that

they would attend Charlottesville 2.0. Day 13 Tr. 184:10-13. And after the event of Charlottesville 2.0, IE members praised and ratified the actions of their leader. PX-0848 ("Thanks for everything you did for our people this weekend @Fashy Haircut.").

*Finally*, Plaintiffs presented at trial a wealth of evidence directly connecting IE and its members to the unlawful civil conspiracy, regardless of Kline's or Damigo's actions. Evidence demonstrated that "the ultimate goal of Identity Evropa was to create or participate in the creation of an ethnostate" (PX-3839, at 20:09-20:14; Day 13 Tr. 166:5-7); that IE held the same racist and anti-Semitic views that Damigo held (Day 13 Tr. 166:24-167:1); that IE helped with a lot of the planning and organizing for UTR (Day 13 Tr. 195:12-16); that IE planned Charlottesville 2.0 on the IE Discord server (Day 13 Tr. 167:2-18); that IE "sent a detachment of fighters" to assist Kessler and other Unite the Right organizers on August 12 (Day 12 Tr. 155:10-17); that IE members collaborated and conspired with Richard Spencer (Day 9 Tr. 49:3-7; 200:9-13); and that IE members celebrated and ratified the violence perpetrated on August 12 (Day 13 Tr. 203:15-23; 205:2-4; PX-0891 ("Today we won and took control of the narrative."); PX-0892 ("Excellent work out there tonight @everyone. This is just the beginning. It is afraid, but the war goes on."); PX-0844 ("Honestly, this is a huge victory."); PX-0846 ("Today is a net victory all of our guys who were there are great men.").

IE's motion should be denied.

## C. The Evidence Overwhelmingly Supports the Verdict Against Kessler

Kessler moves for a directed verdict as to all conspiracy claims (Counts I, II, and III) and as to the claim against him for racial, religious, or ethnic harassment or violence (Count IV). ECF No. 1522 at 5-6. Kessler's motion should be denied.

First, as to the conspiracy claims, Kessler argues that Plaintiffs failed to prove an unlawful agreement or foreseeability as to any act that damaged any plaintiff. *See id.* at 6. Kessler is wrong.

The evidence against Kessler as the primary conspirator and architect of the violence planned and perpetrated by himself and his codefendants was overwhelming. Plaintiffs proved that Kessler, along with Kline, was the principal organizer and coordinator of Charlottesville 2.0 (Day 16 Tr. 50:1-11); that Kessler was an event coordinator and a moderator of the Charlottesville 2.0 server on Discord, who had the ability to manage the posts and to remove or ban members from the channels (Day 16 Tr. 61:3-17); that Kessler was on the Charlottesville 2.0 Discord server every day from June 7, 2017, to August 11, 2017 (Day 16 Tr. 61:24-62:4); that Kessler believed that there are differences in mental development between the races (Day 16 Tr. 51:17-21; PX-1382); that Kessler wanted to have a "Battle of Berkeley situation" in Charlottesville where the Alt-Right could fight individuals he considered to be Antifa (Day 16 Tr. 53:6-54:12; PX-0552); that Kessler wanted to secure a future for white people at any cost, including war (Day 16 Tr. 55:25-57:9; PX-0551); that Kessler invited violent individuals to Charlottesville 2.0 (Day 16 Tr. 53:21-54:2; 59:6-9; PX-0552; PX-1461B); that Kessler believed opponents of the Alt-Right deserved to be "culled" (Day 16 Tr. 59:10-12; PX-1461B); that Kessler was raising an army for Richard Spencer for the "cracking of skulls" (Day 16 Tr. 64:8-11; PX-1455); that Kessler communicated with and invited his co-defendants, including Richard Spencer, Nathan Damigo, Elliott Kline, Matthew Heimbach, the Traditionalist Worker Party, Matthew Parrott, Vanguard America, Jeff Schoep, National Socialist Movement, Michael Hill, League of the South, Robert "Azzmador" Ray, and Chris Cantwell in the planning of Charlottesville 2.0 (Day 16 Tr. 64:12-22; 65:21-24; 66:7-11; 67:8-68:21; 70:22-73:1; 75:15-23; 78:21-23; 80:22-82:23; PX-0190; PX-0506; PX-1460B; PX-3317; PX-3258.O); that Kessler approved and distributed the promotional materials for Charlottesville 2.0, including the poster that said "March on Charlottesville, Virginia" (Day 16 Tr. 84:12-14; PX-0198); that Kessler did not believe individuals he considered to be Antifa were willing to escalate

violence (Day 16 Tr. 86:3-10; 87:14-16; PX-1431A; PX-1437B); that Kessler would encourage individuals to taunt or "bullycide" individuals he considered to be Antifa into being violent against the Alt-Right (Day 16 Tr. 87:17-19; 88:15-19; PX-1437B; PX-3560); that Kessler wanted individuals he considered to be Antifa to attend Charlottesville 2.0 and has previously tipped them off when he wanted them to show up somewhere (Day 16 Tr. 91:2-6; 99:1-100:7; 100:22-101:20; PX-1432A; PX-1444A; PX-1444C); that Kessler encouraged the Alt-Right to bring sticks and shields as weapons to Charlottesville 2.0 (Day 16 Tr. 92:23-93:7; PX-1034); that Kessler encouraged the Alt-Right to not open carry because he did not want scare individuals he considered to be Antifa from attacking Alt-Right (Day 16 Tr. 93:8-23; 94:22-95:3; 96:23-97:8; PX-1034; PX-0952; PX-1461C); that Kessler was not forthcoming with the police about the torch march on August 11, 2017, or Charlottesville 2.0 (Day 16 Tr. 104:7-105:3; 105:17-106:9; 108:12-15; 108:22-109:2; 114:9-13; PX-1458A-D; PX-1460D; PX-1396); that Kessler had planned the torch march on August 11, 2017, as early as July 10, 2017 but kept it secret (Day 16 Tr. 112:11-20; PX-1306A-C); that Kessler knew the chants during the torch march on August 11, 2017, were offensive to Jewish people (Day 16 Tr. 130: 21-131:5; PX-1031); that Kessler considered the torch march on August 11, 2017, to be "an incredible moment for white people" (Day 16 Tr. 131:19-132: 2; PX-2082); that Kessler praised Kline for the excellent work he did on August 11, 2017 (Day 16 Tr. 134:10-13; PX-1458N); that Kessler "broke through" a line of counter-protestors, including Cornel West, on August 12, 2017 (Day 16 Tr. 139:24-140:1; PX-3805); that Kessler wanted Kline to delete the Charlottesville 2.0 Discord server, which he did (Day 16 Tr. 148:25-150:2; 158:17:19; PX-1458O-Q; PX-1458S); that Kessler ratified the actions of his co-defendant James Fields by tweeting that the death of Heather Heyer was payback and that she was to blame (Day 16 Tr. 153:5-11; 153:23-154:3; PX-1448; PX-2016A); and that Kessler reached out to Fields

in jail multiple times (Day 16 Tr. 157:3-13). This extensive evidence against Kessler not only supports the jury's verdict as to Count III but is more than sufficient for the Court to deny Kessler's renewed motion for judgment as a matter of law as to Counts I and II as well. In addition, Kessler's arguments regarding foreseeability fail for the same reasons Damigo's do.

Kessler contends that he could not be held liable for any conspiracy because he "limited his plans for physical altercation to legitimate self-defense" and "was careful to include warnings that Antifa must start any fights or there could be no Battle of Charlottesville though he was confident Antifa could be relied on to give the Alt Right a legal reason to fight them." ECF No. 1522, at 5-6. As the Court instructed, self-defense is an affirmative defense which a Defendant bears the burden to prove by a preponderance of the evidence." Final Jury Instructions, ECF No. 1461, at 54-56. The jury was permitted to "consider Defendants' assertions, along with any supporting evidence from any party, that they were motivated solely by self-defense, rather than by racial animus or a desire to commit racially motivated violence." Final Jury Instructions, ECF No. 1461, at 54. In addition, "self-defense is not available if the Defendant provoked or initiated the conflict. In other words, a Defendant can only claim self-defense for his actions if they were in response to an unprovoked attack." Final Jury Instructions, ECF No. 1461 at 55.

As the Court previously stated with regard to Kessler's self-defense argument, "the jury could infer from all the evidence, the expert testimony and all the evidence in the case, . . . and decide that the idea was to provoke violence but respond in greater degree than was necessary for self-defense" and there is "sufficient evidence, if the jury believes it, that they could arrive at a verdict against the defendants." Day 18 Tr. 105:20-106:3. The Court was correct that Plaintiffs adduced a mountain of evidence from which a jury could conclude that Defendants, including Kessler, encouraged rally attendees to bring weapons and engage in violence under the guise of

self-defense, and that Kessler himself encouraged his co-conspirators to "bullycide" those he believed to be Antifa into starting violence so that he and others could respond in greater degree than necessary. *See* PX-3839, at 148:08-149:24 ("Yeah. I mean, it would be things, like, what can you bring that if you're caught with it, it would look like a defense weapon. What is it if—I think someone brought up, you know, bring a flagpole, but, then, like, tape a—like, have a knife tucked in it and, like, tape it in there or, you know, whatever, cauterize it if you need to."); PX-0952 ("If you want a chance to crack some antifa skulls in self-defense don't open carry. You will scare the shit out of them and they'll just stand off to the side."); PX-1461C (Kessler stating, in a Facebook message dated July 7, 2017, that he did not "want to scare Antifa off from throwing the first punch," that he did not "want a lot of big scary guns out there that will keep Antifa away," and that he "want[s] them to start something"); PX-1455 ("We're raising an army my liege. For free speech, but the cracking of skulls if it comes to it"); PX-1431A ("Antifa is irrelevant now. They aren't willing to escalate violence. That's all they're good for is making the other liberals look bad and instigating a righteous civil war. They keep saying they're bringing guns and they're going to hit Nazis but they punk out"); PX-1437B ("What's the situation with Antifa are they coming. I don't know yet. I hope so. I'm ready to throw down. It's really up to Antifa to respond and not be pussies. I would suggest taunting them a little on social media"); PX-3560 ("People need to bullycide [Antifa] into 'confronting the alt-right' in Charlottesville"); PX-1432A ("We need a new way to tip off Antifa when we want them to show up somewhere . . . We definitely want to play these people into our hands Saturday in Charlottesville.

As to the jury's conclusion that Kessler violated Virginia Code § 8.01-42.1 for racial, religious, or ethnic harassment or violence (Count IV), Kessler argues that the jury improperly found that he was responsible for the injuries sustained by Plaintiffs Natalie Romero and Devin

Willis on August 11, 2017. To find Kessler liable under Count IV, the jury needed to find only that he subjected Plaintiffs Romero and Willis to *intimidation*, *harassment*, or violence motivated by racial, religious, or ethnic animosity. Kessler contends that the evidence of Kessler's activities at the torch march were limited to him engaging in First Amendment-protected expressive activity. Kessler again ignores the extensive record against him. Plaintiffs proved that Kessler knew the chants during the torch march on August 11, 2017, were offensive and intimidating (Day 16 Tr. 130: 21-131:5; PX-1031); that Kessler and Spencer were at the forefront leading the group of white supremacists hundreds deep as they surrounded Mr. Willis and Ms. Romero (and other counter-protesters), pinned them against the statue, and refused to let them leave (PX-2500) as a "sign of dominance" (Day 9 Tr. 156:9-12); that (after trapping Mr. Willis and Ms. Romero and the other counter-protesters) Kessler praised Kline for the excellent work he did on August 11, 2017 (Day 16 Tr. 134:10-13; PX-1458N), and that Kessler declared the torch march on August 11, 2017, to be "an incredible moment for white people" (Day 16 Tr. 131:19-132: 2; PX-2082). This is more than sufficient for the jury to have found that Kessler intimidated and harassed Mr. Willis and Ms. Romero. Moreover, as the case law that Kessler cites makes clear, an individual may be liable for the unlawful conduct of others by "authoriz[ing] [or] direct[ing]" the conduct, or by engaging in speech that was "likely to incite lawless action." *NAACP v. Claiborne Hardware*, 458 U.S. 886, 927 (1982). Despite Kessler's implausible claim that he put his hands up to try to stop his co-conspirators from coming into the plaza, the jury found that the myriad evidence presented at trial, including Kessler's own testimony, undermined his credibility and weighed in favor of a finding against him. *See* PX-2348, Day 16 Tr. 112:7-10, 113:23-114:2; 114:14-23.

Finally, Kessler also argues that there is no evidence that he belonged to any group whose actions he could ratify. The only case law that he cites does not say that a defendant must belong

to a group whose conduct he ratifies in order to be held liable. It does say that an individual may be held "responsible for the consequences" of unlawful conduct of others if he "authorized, directed, or ratified" the activity.  *NAACP*, 458 U.S. at 927.  Moreover, Kessler was, in fact, part of a group—the group of his co-conspirators, whose violence he ratified both from the August 11 torchlight rally, PX-2082, and the deadly car attack of August 12, PX-1448. Taking into account Kessler's actions "before, during, and after the events" and his "presence at the scene of the events," the jury correctly applied the law in finding Kessler liable.  Final Jury Instructions, ECF No. 1461, at 24.

## II.     THE COURT SHOULD DENY DEFENDANT CANTWELL'S MOTION

The evidence at trial showed that Cantwell is a racist, anti-Semitic white supremacist whose casual bigotry commands the attention of tens of thousands of alt-right listeners and viewers. Cantwell knew that many of his listeners were ready and willing to foment violence in an effort to advance their shared vision of a white ethnostate—and he wholeheartedly endorsed both the means and the end. He conspired with other alt-right personalities to descend upon Charlottesville, weapons in hand, intending to harass and intimidate religious and ethnic minorities and to provoke a fight with his opponents. After the Defendants caused the tragedies they had hoped and planned for, Cantwell celebrated what he saw as a victory alongside his fellow soldiers in the race war and gloated about having sent many of his enemies to the hospital and the morgue. In sum, the evidence Plaintiffs adduced against Cantwell overwhelmingly supports the jury's verdict in this case. The Court should deny Cantwell's post-trial motions for judgment as a matter of law and a new trial in their entirety.

### A.     The Evidence Overwhelmingly Supports the Verdict Against Cantwell.

Cantwell moves for a renewed motion for judgment as a matter of law on all of the conspiracy counts (Counts I, II, and III) as well as the claim under Virginia Code § 8.01-42.1 for

racial, religious, or ethnic harassment or violence. The Court must reject Cantwell's renewed motion for judgment as a matter of law on all four claims because, as to Count IV, Cantwell failed to move under Rule 50(a) on Count IV and because the jury's verdict is supported by substantial evidence.

Cantwell argues that the Court erred in denying his original motion for judgment as a matter of law because the Court did not separately address Count IV. ECF No 1488, at 12-13. He is mistaken; it was incumbent upon Cantwell to explicitly identify the bases for his motion, and he concedes that he did not move on Count IV. Indeed, this not only undermines his argument that the Court erred by denying his original motion; it also precludes a renewed motion for judgment as a matter of law as to Count IV. While the Fourth Circuit requires no magic words at the time of the Rule 50(a) motion, the Fourth Circuit does require a moving party, through his Rule 50(a) motion, to "provide[] sufficient notice to his opponent of the alleged deficiencies in the opponent's case." *Durham v. Jones*, No. CIV. WMN-10-CV-2534, 2012 WL 3985224, at *2 (D. Md. Sept. 10, 2012), *aff'd*, 737 F.3d 291 (4th Cir. 2013) (quoting *Wallace v. Poulos*, 861 F.Supp.2d 587, 595 (D. Md. 2012)). Cantwell's Rule 50(a) motion made no mention of Count IV, so he may not file a renewed motion on that basis.

In any event, the evidence plainly establishes Cantwell's liability on Counts III and IV, and was more than sufficient to preclude judgment as a matter of law on Counts I and II. Indeed, the jury hardly had to make any credibility determinations: Cantwell's concessions alone supported the verdict.

Cantwell concedes that he seriously advocates for a white ethnostate, Day 16 Tr. 198:21-23, and that he advocates for achieving that end through violence, including on his podcast, the *Radical Agenda*, *id.* 203:22-25. He has told his listeners, for instance, that "[s]ome of us got to be

fucking cannon fodder for the race war." *Id.* 206:4-8. He also posted that "[b]locking traffic is not peaceful protest and every person who reminds you of that without using his car is giving you more slack than you fucking deserve." *Id.* 207:18-23. He has sported gear bearing the acronym for "Right Wing Death Squad." *Id.* 220:3-8. And he wrote to co-Defendant Spencer in the days before Charlottesville 2.0 that he was "willing to risk a lot for our cause, including violence and incarceration" and that "[m]any in my audience would follow me there, too, but I want to coordinate and make sure it's worth it to our cause." PX-3317.

Cantwell openly touts his racism and antisemitism, referring to Jews as "oven dodging kikes," Day 16 Tr. 210:20-22, claiming that "[t]he Jew is the enemy of the human race," *id.* 211:16-18, and proclaiming "gas the kikes, race war now," *id.* 236:16-237:1; *see also* 237:16-238:3 ("I'm not even a Hitlerite, but I'm like, let's fucking gas the kikes and have a race war, because once I realized they responsible for communism, I was like, oh, wait, wait a second, yeah, that's a fucking really good reason to fucking genocide a group of people."); PX-2571 ("America will never be free until the last kike is strangled with the entrails of the last male Democrat.").

During summer 2017, in the lead-up to Charlottesville 2.0, Cantwell invited Spencer and several other Defendants and co-conspirators to speak on his podcast. Day 16 Tr. 217:6-8; 220:12-20. Co-Defendant Augustus Invictus asked Cantwell to make a speech in Charlottesville. *Id.* 221:1-222:3. Kessler warned Cantwell by text, "Be ready for Charlottesville. It's going to be a BLM/Antifa shitshow with hundreds of guys -- hundreds of our guys on the opposite side. If you want, I can come on Radical Agenda and fill in the details for your audience." *Id.* 225:10-16. Cantwell agreed, inviting Kessler on his podcast, and he began promoting the Unite the Right rally. *Id.* 225:17-19. Kessler also encouraged Cantwell to "represent Unite the Right in an interview" with Vice Media, which Cantwell did. *Id.* 226:12-17.

Before leaving for Charlottesville, Cantwell grabbed a bunch of Kubotans—a handheld baton weapon—and a bunch of canisters of pepper spray. *Id.* 242:1-15. Cantwell explained that he wanted to "better arm our people." *Id.* 244:10-14. In a message on the Charlottesville 2.0 server, Cantwell suggested "setting up a parallel event somewhere other than Lee Park for women and children." *Id.* 245:1-4. Cantwell did not want women and children at the main event because, as he explained to Vice Media, "I've got to organize an unknown number of armed extremists I've never met through a hostile environment with death threats and legal intimidation. We all have our crosses to bear." *Id.* 247:4-9.

While in Charlottesville, Cantwell actively participated in the violence he had planned. On Friday, August 11, Cantwell marched through the UVA campus alongside hundreds of neo-Nazis, wielding torches and chanting "Jews will not replace us." Day 5 Tr. 172:20-23. When the Defendants, including Cantwell, arrived at UVA's Thomas Jefferson statue, they encircled a group of peaceful counter-protestors, pinned them against the statue, and refused to let them leave, PX-2500, as a "sign of dominance," Day 9 Tr. 156:9-12. Plaintiffs Devin Willis and Natalie Romero were among those who were surrounded. Defendants threw torches and fluid at the counter-protestors, including Willis and Romero, leading them to believe that they were going to be "burn[ed] [] alive," Day 5 Tr. 181:15-19 (Willis), and kicked, punched, pepper-sprayed, and verbally harassed them, *id.* at 28:18-29:16 (Romero); 176:20-184:18 (Willis).

Cantwell does not dispute his involvement.  Photographic and video evidence shows Cantwell indiscriminately pepper-spraying, including in front of Mr. Willis and Ms. Romero, and punching other counter-protesters.  Cantwell also conceded at trial that he "beat[] the shit out of" someone, Day 16 Tr. 254:5.  Cantwell pleaded guilty to two counts of assault and battery for his crimes on August 11, 2017.

After the events on August 12, 2017, Cantwell joined his co-conspirators in celebrating their heinous acts. For example, when a co-conspirator told him, "Physically removing a queer reporter with Chris Cantwell was one of the highlights of my weekend," Cantwell responded, "It was an honor to serve by your side." PX-0184. Cantwell later referred to Heather Heyer's grave as a urinal. Day 16 Tr. 267:8-10. And when he was ultimately incarcerated alongside co-defendant Fields for a time, Cantwell gave him a Nazi salute and a hug. *Id.* 270:18-24. Summing up his pleasure at having participated in the deliberate, premeditated, racially motivated violence at Unite the Right, Cantwell later wrote, "[i]f you think the Alt-Right is insignificant, you might want to ask the bleeding commie filth we sent to the morgue and hospitals how insignificant we are." PX-2137.

Substantial evidence, therefore, supported a finding that Cantwell and his codefendants, along with others, conspired to commit racially motivated violence at the Unite the Right rally—a civil conspiracy in violation of federal and Virginia law. Furthermore, substantial evidence demonstrated that Cantwell and his co-defendants knowingly failed to prevent said conspiracy from taking place. Finally, substantial evidence demonstrated that Cantwell and his codefendants subjected counter-protesters, including Willis and Romero to intimidation, harassment, and violence motivated by racial, ethnic, and religious animosity.

For these reasons, Cantwell cannot credibly claim that the jury's verdict on Counts III and IV was unsupported by substantial evidence, nor can he claim that no reasonable jury court have ruled for Plaintiffs on Counts I and II; his renewed motion for judgment as a matter of law must be denied.

**B.**     **Cantwell Identifies No Error, Let Alone a "Miscarriage of Justice" Warranting a New Trial.**

Because insufficiency of the evidence is the only basis for judgment as a matter of law, Plaintiffs construe the remainder of Cantwell's post-trial arguments to be in support of a motion for a new trial. That motion, too, should be denied.

**1.**     ***The Verdict is Neither Against the Clear Weight of the Evidence, Nor Based Upon Evidence Which Is False.***

Although the Court has greater discretion to weigh the evidence on a motion for a new trial and need not strictly draw every inference in the non-moving party's favor, that distinction is irrelevant where, as here, the evidence of liability (recited above) is overwhelming. Furthermore, to the extent Cantwell claims that Plaintiffs' evidence is somehow "false" because Plaintiffs are "lying terrorist Antifa members," Cantwell repeatedly made this argument at trial and during his cross-examinations of Plaintiffs. Plaintiffs presented overwhelming evidence that none of them are members of Antifa, and the jury clearly credited Plaintiffs' testimony and rejected Cantwell's spurious assertions. The Court should not disturb the jury's determinations.

**2.**     ***Cantwell Identifies No Error That Would Warrant a New Trial.***

Mistaking quantity for quality, Cantwell authored a catalogue of post-trial grievances, attacking nearly every aspect of the trial. But he identifies no true errors—let alone errors that would constitute a "miscarriage of justice" warranting a new trial.

First, Cantwell effectively seeks to litigate a thirteenth-hour motion to dismiss. He argues that Plaintiffs' claims are barred by the void-for-vagueness doctrine, the First Amendment, and the *in pari delicto* doctrine. The Court should refuse to entertain these arguments because they are untimely. As the Court held the last time Cantwell raised these arguments, Cantwell "was aware of the Court's deadlines," including the August 7, 2020, deadline for dispositive motions. Order Denying Defendant Cantwell's Untimely Dispositive Motions, ECF No. 1344, at 1. He "should

have raised [these dispositive issues] in a properly supported motion for summary judgment rather than in" a post-trial motion. *Id.* at 3 (quoting *Witness Sys. Inc. v. Nice Sys., Inc.*, 2008 WL 2047633 at *1 (N.D. Ga. May 10, 2008) (alteration in original)).

In any event, Cantwell's dispositive arguments quickly founder on the merits:

- Cantwell claims that the jury's deadlock on Counts I and II, combined with its verdict of liability on Count III, "seems to render [Virginia's civil conspiracy law] unconstitutionally vague" because "[t]he parties are now left to ponder just what law the Defendants were found to have conspired against. . . ." ECF No. 1488, at 7. Cantwell's argument is nonsensical. The civil conspiracy law is clear, and the Court's jury instructions were crystal-clear regarding the alleged objects of the conspiracy—*i.e.*, intimidation, harassment or violence in violation of Virginia's hate crime statute; battery; assault; and false imprisonment. Final Jury Instructions, ECF No. 1461, at 38-39. And the Court was equally clear that "Plaintiffs need only prove that Defendants conspired to commit one of these underlying acts to impose liability." *Id.* at 39. The fact that there are multiple possible predicates for conspiracy does not mean that the conspiracy is vague as a result. Moreover, the civil conspiracy law has been repeatedly applied by courts for many years. And, to the extent that Cantwell means to suggest that the Court was constitutionally required to include an interrogatory on the verdict form—asking which of these unlawful acts was the object of the conspiracy—he offers no authority for that remarkable proposition, which would upend the centuries-old practice of general verdicts.

- As to the First Amendment, Cantwell speculates, in light of the jury's inability to reach a verdict on Counts I and II, that "the jury held Defendants liable for something other than violence, such as speech." Cantwell Supp. to Post-Trial Mot., ECF No. 1536 ("Cantwell Supp."), at 11. However, the Court's instructions carefully distinguished between "[t]he abstract advocacy of lawlessness" or "force"—which, the Court explained, is protected speech—and "[t]he violations of law" plaintiffs alleged, which are "not protected by the First Amendment." Final Jury Instructions, ECF No. 1461, at 53. In light of the Court's instructions, a fair inference is that the jury found Cantwell liable for "violations of law," not "advocacy." And correctly so: a mountain of evidence shows that Cantwell's conduct fell on the unprotected side of the line: he conspired not merely to speak and peaceably assemble but to commit racially motivated violence.

- Cantwell's final dispositive argument is that "Plaintiffs' claims arose *ex turpi causa* and thus are barred *in pari delicto*." Cantwell Supp. 18. In other words, Cantwell maintains that plaintiffs were harmed through their own "immoral or illegal acts," ECF No. 1090, at 1, and therefore cannot recover. The Court has previously rejected this dispositive argument, and should do so again. ECF No. 1344, at 4. Cantwell asserts that plaintiffs "either were or were in the company of the initiators of the violence. . . ." Cantwell Supp. 18. But the rarely used "in pari delicto" doctrine bars recovery only where the defendant proves that "the plaintiff freely and voluntarily consented to participation in [an] illegal act, without duress or coercion." *Lee v. Nationwide Mut. Ins. Co.*, 255 Va. 279, 282-83 (1998). Thus,

for example, Virginia has held that a car thief cannot recover for injuries sustained as a result of the theft and subsequent joyride. *Id.* at 285. Here, there is no evidence to support Cantwell's claims that plaintiffs came to the rally to engage in violence or "terrorism." ECF 1488, at 18. Rather, all of the evidence from trial was to the contrary.[6] Thus, even if Cantwell had timely raised this defense, he did not carry his burden of proof at trial—let alone carry his burden so convincingly that this verdict was a miscarriage of justice.

Second, Cantwell takes issue with some of the Court's jury instructions. A party challenging jury instructions after trial bears a "heavy burden." *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011). Mere "semantic fencing" is insufficient; after all, "[i]t is easy enough to pick at words, phrases, and sentences in a charge, but that overlooks the fact that the charge in its totality was what the jury heard." *Id.* Thus, "[t]he test of the adequacy of jury instructions is whether the jury charge, construed as a whole, adequately states the controlling legal principle without misleading or confusing the jury." *Chaudhry v. Gallerizzo*, 174 F.3d 394, 408 (4th Cir. 1999). Here, the jury charge was more than adequate.

- Cantwell argues in conclusory fashion that "[t]he jury instruction regarding negligence defenses was erroneous regarding Count 4" because "assumption of risk, contributory negligence, and sudden emergency . . . apply to the allegations of Count 4." ECF No. 1488, 15. Cantwell argues that "[o]ne cannot reasonably expect to avoid being called names when

---

[6] Day 5 Tr. 20:22-23 (Natalie Romero on why she went to the Rotunda on August 11: "I guess I wanted to be there with friends and people that made me feel safe"); Day 5 Tr. 93:2-4 (on why she went to Charlottesville on Saturday: "I mean, Saturday was supposed to be like people gathering to sing and stuff."); Day 5 Tr. 157:24-158:3 (Devin Willis: "[T]hese people want to, like exercise their right to use hateful speech and spread hateful ideologies. And, like, that's protected. Whatever. That's fine. I would like to use my right to express the opposite viewpoint."); Day 10 Tr. 193:8-12 (Thomas Baker: "[B]eing a new member of this city, I want[ed] to show support and be present for them and with them."); Day 11 Tr. 64:22-65:7 (Marissa Blair: "I personally didn't want any type of drama or confrontation or arguments. . . I just wanted to find people that were happy and supporting people that may not be like them."); Day 12 Tr. 11:22-12:4 (Chelsea Alvarado: "[B]eing born in Virginia, grown up in Virginia, attended college in Virginia . . . I wanted to represent what I believed Virginia was – you know, what it stands for."); Day 13 Tr. 55:24-56:5 (Seth Wispelwey: "[I]n the midst of singing and praying [] it was part of our goal to visibly represent – physically represent our motto of love over fear. . . And prayer or kneeling in my tradition and many others is a form of supplication, of saying we are vulnerable, but we are also not afraid."); Day 14 Tr. 216:18-23 (April Muniz: "[I] really wanted to stand up with my community. I wanted to bear witness to the events of the day. I wanted to support the local businesses who indicated that they were fearful that they were going to lose business that day.").

they intentionally seek out a confrontation with racists who have gone to great lengths to avoid them." *Id.* at 15. Cantwell is doubly mistaken. As a legal matter, he neglects to mention "the familiar principle that contributory negligence is not a defense to an intentional tort." *Williams v. Harrison*, 255 Va. 272, 275 (1998) (citing Restatement (Second) of Torts § 481 (1965)). Similarly, the assumption-of-the-risk doctrine applies only where the defendant is accused of negligence or recklessness—not intentional conduct. *See* Restatement (Second) of Torts § 496A (1965). But Count IV alleged, and plaintiffs proved at trial, that Cantwell and his co-conspirators *intentionally* subjected Romero and Willis to acts of intimidation, harassment, and violence and that their unlawful acts were *motivated* by racial, religious, and ethnic animosity. Because Plaintiffs did not allege negligence or recklessness, the Court properly instructed the jury that these doctrines did not apply.

- Cantwell also argues that the Court's adverse inference jury instructions as to Defendants Kline and Ray had "spillover effects," and that Plaintiffs exploited this through improper closing arguments. Cantwell Supp. 12. Cantwell is mistaken. As a threshold matter, Cantwell claims that he objected to Plaintiffs' closing arguments on this ground, *id.* at 13, but he raised that objection a day late, after closing arguments were complete. Day 20 Tr. 6:1-18. The Court declined to address the untimely objection, except to note to Cantwell that the Court would inform the jury that "closing arguments are not evidence." *Id.* This decision was well within the Court's discretion. In any event, Cantwell identifies not a single statement during Plaintiffs' closing argument that impermissibly suggested that the jurors should hold these adverse inferences against Cantwell. And the jury instruction was plainly proper, containing the following admonishment:

> You are cautioned, however, that each party is entitled to have the case decided solely on the evidence that applies to that party. The facts deemed established, which I just listed, are admitted <u>only</u> as to [certain defendants] . . . [and] does not relieve Plaintiffs of their burden to prove by a preponderance of the evidence the conduct committed by the other Defendants . . . .

Final Jury Instructions, ECF No. 1461, at 49-50.

- Finally, Cantwell correctly notes that certain of Plaintiffs' deposition designations were inadmissible as to Cantwell because of Cantwell's inability to attend and lack of notice of the deposition. However, Cantwell concedes (as he must) that the Court issued a limiting instruction on this very topic. Captioned "Limited Use of Depositions as Against Defendant Cantwell," the instruction explicitly forbade the jury from considering the applicable testimony when deliberating about Cantwell. Final Jury Instructions, ECF No. 1461, at 52. Furthermore, the Court issued the same admonishment repeatedly throughout the trial when pertinent deposition testimony was received. *E.g.*, Day 17 Tr. 31:16-32:3 ("Members of the jury, I'm going to read this instruction I've read several times about depositions taken when Mr. Cantwell did not have notice or attend. I remind you that each party is entitled to have the case decided solely on the evidence that applies to that party. . . .

[Certain] deposition testimony may not be considered by you in connection with Defendant Christopher Cantwell . . . ."). Cantwell does not articulate any error with the abundantly clear jury instructions precluding the jury's reliance on these depositions in connection with Cantwell.

Third, Cantwell argues that the Court erred by refusing to strike a juror for cause. "A trial judge has very broad discretion in deciding whether to excuse a juror for cause and his decision will not be overturned except for manifest abuse of that discretion." *Poynter v. Ratcliff*, 874 F.2d 219, 222 (4th Cir. 1989). When the judge's decision turns on the juror's statements at *voir dire*, "assessing the credibility of those statements" also rests "within the district judge's discretion." *Id.*

Cantwell argues, without elaboration or authority, that the Court erred by denying Cantwell's motion to strike for cause a juror whose supposed "pro-Antifa views on politically motivated violence were disqualifying." Cantwell Supp. 10. Cantwell erroneously states that he is referring to the foreperson, Juror Number 275, but Cantwell did not challenge Juror Number 275 for cause. Cantwell appears to be referring to Juror Number 220, who "described [his] view on Antifa as being extremely favorable" and explained that he "would consider [himself] an anti-fascist . . . just like a GI in World War II is an anti-fascist." Day 2 Tr. 43:8-17. Cantwell moved to strike the juror for cause, arguing that "somebody who has an extremely favorable view of a group that hunts the defendants like dogs in the street, I think, is going to be a problem as a juror," *Id.* 48:18-49:2. The Court denied the motion, crediting the juror's statements "that he could set aside any preconceived notions and try the case solely according to the law and evidence." *Id.* 50:14-16; *see Id.* 48:4-9 (juror confirming that he could "set aside those preconceived opinions and try this case solely according to the law and the evidence [he] [would] hear in the courtroom"). The Court

acted well within its discretion by assessing the juror's credibility and determining, based on that assessment, that he was qualified.[7]

Fourth, Cantwell seeks to relitigate a host of evidentiary disputes. Read in tandem, Federal Rules of Civil Procedure 59(a) and 61 permit—but do not require—a trial court to reconsider its evidentiary rulings after trial. Even when a Court elects to do so, a new trial is only appropriate if the court erred **and** that error affected a party's substantial rights. Fed. R. Civ. P. 61; *see Rush v. Virginia Dep't of Transp.*, 208 F. Supp. 2d 624, 630 (W.D. Va. 2002) (Moon, J.). Cantwell offers no persuasive reason to revisit any of these evidentiary disputes. He has not shown that any of the Court's rulings were erroneous. And, in light of the overwhelming weight of the evidence, he cannot show that any evidentiary error harmed his substantial rights.

- Cantwell argues that Peter Simi's testimony should have been excluded under Rule 403 because its unfairly "prejudicial impact . . . outweighed its imagined probative value." Cantwell Supp. 15. The Court has repeatedly rejected this argument, including in a thoroughly reasoned 26-page Memorandum Opinion, ECF No. 941; *see also, e.g.*, ECF No. 1347, ECF No. 937, T2805. Cantwell offers no basis to revisit the Court's prior conclusion that the testimony "falls well within the types of testimony courts routinely hold admissible; that such proposed testimony will be relevant and helpful to a jury in this case; and that no unfair prejudice will result from its introduction." ECF No. 937.

- Cantwell argues that the Court improperly precluded him from questioning Simi about critical race theory. Cantwell Supp. 15. But the Court permitted Cantwell to ask several questions regarding critical race theory. When Simi testified that he himself "really ha[s]n't necessarily specifically utilized the framework of critical race theory," Day 14 Tr. 185:1-7, Cantwell then asked, "Would it be fair to say that critical race theory views American society as a fundamentally white supremacist institution?" *Id.* 185:8-10. Plaintiffs objected on relevance grounds, noting that the questioning was straying "far afield," and the Court sustained that objection. *Id.* 185:11-12. The Court's ruling was sound. Cantwell's line of questioning about critical race theory has no relevance to the case. Cantwell's post-trial theory, Cantwell Supp. 16, that critical race theorists and white supremacists agree that "'systemic racism' is ubiquitous" and that, therefore, white supremacy "is not a violent conspiracy in the unlawful sense" borders on the incoherent.

---

[7] In a single cursory phrase, Cantwell describes Plaintiffs' jury selection as "racially motivated," Cantwell Supp. 9, without offering any evidence or any more specific argument on the matter.  Even for a pro se party, his complete lack of argument on this topic fails to put either Plaintiffs or the Court on notice concerning what aspects of the jury selection process he challenges as racially motivated.  This argument must therefore be rejected.

- The Court properly permitted testimony by defendant Lipstadt over Cantwell's objection. *See* Order, ECF No. 1347. Lipstadt offered testimony useful to the jury—relying on her expertise to contextualize the rally and the alt-right symbolism used. Cantwell's odious remarks about Lipstadt's testimony—including his heinous reference to "Hitler's Germany" as "an undesirable, though lawful, political outcome," Cantwell Supp. 17—offer no basis for reconsidering the Court's prior ruling.

- The Court properly denied Cantwell's motion in limine to permit introduction of a video showing non-party Dwayne Dixon reading from a piece of paper. As the Court correctly noted, even setting aside authenticity issues, the video would have been inadmissible hearsay, could have misled the jury, and would have wasted time. Order, ECF No. 1345, at 1-2. Cantwell speculates that the video tends to show that Fields is innocent and that this is the reason that some of the defendants even now support Fields. ECF No. 1488, at 21-22. Neither of these assertions survives even the faintest scrutiny.

- Finally, Cantwell argues that the Court erred by precluding evidence regarding the rally organizers' litigation seeking a permit. ECF No. 1488, at 23-25. Cantwell argues that evidence concerning the litigation showed the defendants' innocent state of mind. But the evidence showed that the defendants' receipt of a permit did not prevent them from fomenting violence, as they had always planned. PX0867; PX2760; PX3523; PX3524. Cantwell also argues, more narrowly, that his inability to introduce evidence relating to the litigation left Kline's statement to "bring your fighters" without necessary context, since that plan was supposedly scrapped when the injunction was issued. But that narrower dispute is moot because on redirect the Court permitted Cantwell to make precisely that point. T3752 ("[T]hat plan went out the window when there was some deliberation about the permit.  After that clip, our permit was intact . . . .").

Fifth, Cantwell raises a hypothetical dispute about potentially duplicative damages awards at a second trial, claiming that a retrial on Counts I and II should be conditioned on a retrial of all counts.  ECF No. 1488, at 17.  Cantwell offers no authority for this extraordinary request and it should be rejected.

Finally, Cantwell argues that the trial was "unfair," Cantwell Supp. 3-6, given the alleged difficulty he faced in accessing certain documents while incarcerated. Cantwell has raised, and the Court has rejected, such arguments on more than a half-dozen occasions. *E.g.*, ECF Nos. 1084, 1099, 1162, 1255, 1301, 1303. Cantwell's argument here does not demonstrate that the verdict in this case was a miscarriage of justice requiring a new trial for three reasons.

As an initial matter, Cantwell waived this argument. Recognizing that Cantwell contended that he was having issues obtaining documents, and noting that documents would need to be exchanged among the parties in real time during trial, plaintiffs moved to sever their claims against Cantwell and to defer his trial. *See* ECF No. 1306. The Court asked Cantwell his position and he said he was opposed to severance.  Day 1 Tr. 7:11-12.  Plaintiffs' counsel warned that if Cantwell chose to proceed, he would waive his due process argument. The Court then left the matter entirely up to Cantwell, telling him, "the Court is willing to sever the case and allow you the time you want for your case." *Id.* at 10:15-16. But Cantwell decided to "stay in the case as it is." *Id.* at 10:24. Accordingly, the Court denied plaintiffs' motion to sever, *id.* at 11:2, and denied as moot Cantwell's motions to delay the trial. ECF No. 1371. In light of Cantwell's knowing, voluntary choice to proceed with the trial as scheduled, he has waived his due process argument.

Furthermore, even if Cantwell had not waived this argument, he would be judicially estopped from raising it. "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . ." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)). Permitting Cantwell to advance now a litigation position inconsistent with his position at the beginning of trial would "risk . . . inconsistent court determinations" and "undermin[e] the integrity of the judicial process." *Id.* at 755. Cantwell opposed plaintiffs' severance motion. He should not be permitted, in the face of an adverse verdict, to take the opposite position and advocate for a second bite at the apple.

Even if waiver and judicial estoppel were no bars, Cantwell's due process claim would fail on the merits. Cantwell was present in court each day, heard all the evidence against him, and was afforded broad latitude to elicit testimony, lodge objections, and make motions. The Court took

extra steps to ensure Cantwell's ability to effectively litigate his claims, including providing him with computer access and ordering Plaintiffs' counsel to provide Cantwell with all exhibits in advance of trial. These measures were effective; as the Court knows, Cantwell was sufficiently prepared to vigorously cross-examine witnesses and to otherwise press his claims. His alleged inability to access certain pretrial documents does not change the fact that the Court, in overseeing this civil trial, ensured that Cantwell had notice of the claims against him and a full and fair opportunity to be heard on those claims. The Due Process Clause requires no more.

## III.    THE COURT SHOULD DENY SPENCER'S MOTION

Spencer's post-trial motion argues that there is no evidence he engaged in unlawful conduct that could form the basis for the jury's verdict finding him liable for conspiracy (Count III), and that there is no evidence he engaged in racially motivated intimidation, harassment or violence (Count IV). This argument wholly ignores both the jury verdict and the evidence.   The jury explicitly found (a) Spencer engaged in unlawful conduct, and (b) his co-conspirators engaged in unlawful conduct for which he is liable.  And the record is replete with evidence Spencer conspired to plan an event that would be "hugely traumatic" and "violent"; that he led the torch-wielding mob intent on intimidating minorities and causing violence; and that he and his co-conspirators were, by his own admission, in Charlottesville "to destroy this fucking town." *See e.g.*, PX-2570 at 1:10:08; PX-3114; Day 9 Tr. 146:19-22; PX-2121 at 1:56; PX-2489.

### A.    Substantial Evidence Supports the Jury's Finding that Spencer Conspired with Others to Accomplish Unlawful and Tortious Acts.

The Court should deny Spencer's motion because the evidence overwhelmingly supports the jury's finding that he engaged in an unlawful conspiracy.

Spencer does not deny that he and his co-defendants formed an agreement.  His argument is narrow, *i.e.*, that he could not have conspired to accomplish an unlawful or tortious act under

Case 3:17-cv-00072-NKM-JCH   Document 1574   Filed 04/13/22   Page 37 of 58   Pageid#: 30435

Virginia law because the jury did not find that he acted in violation of any Virginia statute.  ECF No. 1550, at 2.  This is incorrect as a matter of law.

Spencer argues the Court cannot ascertain what unlawful or tortious acts were committed by the conspirators because the jury was unable to reach a verdict on Plaintiffs' federal claims under 42 U.S.C. §§ 1985(3) and 1986.  ECF No. 1550, at 2.  This is misguided.  That the jury was unable to reach a verdict on Plaintiffs' federal conspiracy claims has no bearing on their verdict on Plaintiffs' state-law conspiracy claim, which is predicated on the violation of one or more state laws.  The jury was instructed on the underlying unlawful objectives of the conspiracy (Final Jury Instructions, ECF No. 1461, at 38-44),  and, in addition to finding Spencer and his co-conspirators liable on Plaintiffs' state conspiracy claim, found them liable for several standalone claims under state tort and statutory laws.

*First*, Spencer and four of his co-conspirators were all found liable for violating Va. Code § 8.01-42.1, Virginia's prohibition on subjecting persons to acts of intimidation, harassment, or violence motivated by racial, religious, or ethnic animosity.  ECF No. 1478, at 7 (Verdict Form, p. 6); *see also* Va. Code § 8:01-42.1(A) ("An action for injunctive relief or civil damages, or both, shall lie for any person who is subjected to acts of (i) intimidation or harassment, [or] (ii) violence directed against his person . . . where such acts are motivated by racial, religious, gender, disability, gender identity, sexual orientation, or ethnic animosity."); *Berry v. Target Corp.*, 214 F. Supp. 3d 530, 535 (E.D. Va. 2016) (Va. Code § 8.01-42.1 "prohibits intimidation or harassment 'motivated by racial . . . animosity'").  That alone is sufficient to support the jury's verdict that Spencer (and his co-defendants) agreed to act with a "criminal or unlawful purpose" under Virginia law.

*Second*, the jury found James Fields liable for violating Va. Code § 8:01-42.1 .  ECF No. 1478, at 8.  The jury found that Fields intentionally drove his car into a crowd of peaceful counter-

protesters—a crowd that included most of the Plaintiffs—and was motivated by racial, religious, or ethnic animosity.  *Id.*  The jury also found that Spencer and Fields were both members of the conspiracy.  *Id.* at 4.  As the jury was instructed, it is black-letter law that all members of a conspiracy are liable for the foreseeable acts of other members.  Final Jury Instructions, ECF No. 1461, at 38 ("persons who conspired together to commit one or more unlawful acts may be held liable for the injuries that result from that conspiracy"); *see also United States v. Newsome*, 322 F.3d 328, 338 (4th Cir. 2003) (citing *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946)) ("[U]nder conspiracy law, [a defendant] is liable for the conduct of all co-conspirators that was in furtherance of the conspiracy and reasonably foreseeable to him."); *Gelber v. Glock*, 293 Va. 497, 534 (2017) ("The object of a civil conspiracy claim is to spread liability to persons other than the primary tortfeasor.").

And ***third***, the jury found that James Fields committed assault and battery.  ECF No. 1478, at 9.  Again, the jury found that Spencer and Fields were both members of the conspiracy.  *Id.* at 4.

Thus, contrary to Spencer's argument, the Court has clear guidance directly from the jury on what it found unlawful about the conspiracy.

In addition, Plaintiffs presented ample evidence at trial that fully supports the jury's finding that Spencer was a member of the conspiracy and that he and his co-conspirators committed unlawful and tortious acts in violation of Virginia law in furtherance of the conspiracy.  Plaintiffs presented evidence that Spencer predicted and wanted Charlottesville 2.0 to be "hugely traumatic" for the people of Charlottesville.  PX-2570 at 1:10:08.  In fact, two months before the rally, Spencer texted co-conspirator Elliott Kline of Identity Evropa, "[t]his is going to be a violent summer."  PX-3114.  His prediction was not merely prescient; he and his co-conspirators made sure it became

a reality. Spencer knew that his co-conspirators were interested in fighting counter-protesters, Day 9 Tr. 61:17-62:4, 72:9-73:1, and he told co-conspirator Christopher Cantwell that violence to advance the cause of white nationalism was "worth it." PX-3149B-D; Day 9 Tr. 121:13-18.

Spencer testified at trial that he was "at the lead" of the August 11 torch march. Day 9 Tr. 146:19-22; *see also* PX-2121 at 1:56 (video in which Spencer says of the torch march, "I was at the lead."). Spencer led the torch-wielding mob, chanting "blood and soil" and "Jews will not replace us," to the Jefferson statue, where they completely surrounded a group of counter-protestors which included Plaintiffs Romero and Willis. Day 5 Tr. 24:22-25:2; 172:7-23. During the time he was planning and leading the torch march, Spencer knew that the Ku Klux Klan had used torches as a symbol of racial intimidation, and that the Nazi party used torch marches in 1930s Germany. Day 9 Tr. 66:9-67:2.

Shortly after the conclusion of the August 11 torch march, Spencer responded to a tweet that said, "They surrounded us at the statue[.] They wouldn't let us out." PX-2500. Spencer's response said, "Fact check: true." *Id.* At trial, Plaintiffs asked Spencer, "And would you agree with me, Mr. Spencer, that the reason why you were trying to pin them in at the statue was as a sign of dominance?" Spencer answered, "Yes." Day 9 Tr. 156:9-12. After the torch mob violently expelled counter-protesters – including Romero and Willis – from the area, Spencer climbed up on the Jefferson statue above where Romero and Willis had been standing with other counter-protestors and declared, "this is what victory looks like," as protestors invoked the Nazis by yelling, "hail Spencer" and "hail victory." Tr. Day 9 159:25-160:19; PX-2117 at 24:42.

In the hours after the violence and intimidation of August 12 and the violent car attack committed by co-conspirator Fields that injured and traumatized several Plaintiffs and others, Spencer declared the events of August 12 to be a huge moral victory in terms of the show of force.

Day 9 Tr. 190:14-17.  That night, Spencer made clear the message of intimidation, harassment, and violence that he and his co-conspirators were in Charlottesville to deliver in person:

> We are coming back here like a fucking hundred times.  I am so mad.  I am so fucking mad at these people.  They don't do this to fucking me.  We are going to fucking ritualistically humiliate them.  I am coming back here every fucking weekend if I have to.  Like this is never over.  I win!  They fucking lose!  That's how the world fucking works.  Little fucking kikes.  They get ruled by people like me.  Little fucking octoroons … I fucking … my ancestors fucking enslaved those pieces of fucking shit.  I rule the fucking world.  Those pieces of shit get ruled by people like me.  They look up and see a face like mine looking down at them.  That's how the fucking world works.  We are going to destroy this fucking town.

PX-2489.

Plaintiffs also presented abundant evidence that supports the jury's finding that Plaintiffs suffered significant physical, emotional and economic damages as a result of the acts of Spencer and his co-conspirators in furtherance of the conspiracy. *See*, *e.g.*, Day 5 Tr. 52:17-79:22 (Natalie Romero); Day 6 Tr. 9:24-17:17 (Devin Willis); Day 10 Tr. 212:23-225:8 (Thomas Baker); Day 11 Tr. 75:19-82:6 (Marissa Blair); Day 12 Tr. 23:12-34:14 (Chelsea Alvarado); Day 13 Tr. 19:11-30:5 (Marcus Martin), 65:2-67:18 (Seth Wispelwey); Day 14 Tr. 223:8-234:14 (April Muñiz); Day 15 Tr. 72:1-76:7 (Elizabeth Sines).

The evidence presented at trial amply supports the jury's finding that Spencer and his co-conspirators came together to accomplish the unlawful purposes of racially motivated intimidation and harassment and assault and battery, and that their conduct caused Plaintiffs significant physical, emotional and economic damages.  Accordingly, the jury's verdict should stand.

### B.    Substantial evidence supports the jury's finding that Spencer violated Va. Code § 8:01-42.1.

Spencer argues that there was insufficient evidence to support the jury's finding that he engaged in racially motivated acts of intimidation, harassment or violence in violation of Va. Code § 8:01-42.1.  Specifically, Spencer argues that he cannot be liable under this statute because

Plaintiffs Romero and Willis could not testify definitively that they recalled seeing Spencer at the August 11 torch march.  ECF No. 1550 at 6-8.  This argument misconstrues the standard of evidence necessary to support a verdict.

There is no legal requirement that the targets of intimidation or violence personally identify each participant in the misconduct.  Thus, it is of no moment that Romero and Willis do not recall every face they saw during the traumatic events of August 11, 2017.

Rather, the question is whether there is sufficient evidence (from any source) that Spencer engaged in the unlawful conduct.  *See Bonner v. Dawson*, 404 F.3d 290, 295 (4th Cir. 2005) (asking whether there is "enough evidence *in the record*" to support the jury's verdict) (emphasis added).  In this respect, Plaintiffs introduced ample evidence of Spencer's personal participation and conduct.  *See e.g.*, PX-2500, PX-2121 at 1:56, PX-2117 at 24:42 (video and documentary evidence identifying Spencer).  This includes abundant evidence that Spencer personally (i) led the August 11 torch march, chanting racist and antisemitic slogans and invoking the intimidation tactics of Nazi Germany and the Ku Klux Klan; (ii) surrounded Romero, Willis and the other counter-protestors at the Jefferson statue; and then (iii) declared victory after the counter-protestors had been violently expelled by the torch-wielding mob, who celebrated Spencer's victory by again invoking the Nazis with shouts of "hail Spencer" and "hail victory."

In light of this abundant and uncontradicted evidence, Spencer has not met and cannot meet his burden of showing that "the evidence presented supports only one reasonable verdict, in favor of the moving party."  *Clark v. Coleman*, 448 F. Supp. 3d 559, 568 (W.D. Va. 2020) (citation omitted).  Plaintiffs presented substantial evidence that Spencer personally engaged in racially motivated acts of intimidation and harassment against Romero and Willis.

Lastly, Spencer incorporates by reference "arguments made by attorneys Kolenich, ReBrook, and Jones, as well as *pro se* litigant Cantwell."  ECF No. 1550 at 11.  To the extent any of the arguments included in these motions are relevant to Spencer, Plaintiffs likewise incorporate by reference to their responses in opposition to those motions.

Spencer has not met the high burden required for the Court to grant a motion for judgment as a matter of law notwithstanding the verdict or a motion for a new trial.  Spencer's motion should be denied.

## IV.     THE COURT SHOULD DENY THE MOTION FILED BY HILL, TUBBS, AND LEAGUE OF THE SOUTH

The post-trial motion filed by Hill, Tubbs, and League of the South ("LOS" and, together with Hill and Tubbs, the "LOS Defendants") seeks judgment as a matter of law on Counts I, II, and III.  ECF No. 1549.  Although the jury did not reach a verdict on Counts I and II, it found the LOS Defendants liable under Count III, for civil conspiracy in violation of Virginia state law.  The LOS Defendants argue that judgment as a matter of law should be granted as to them on each of these claims.   Their motion should be denied because Plaintiffs' claims are supported by substantial and overwhelming evidence.

### A.     The LOS Defendants' Post-Verdict Motions on Count I Must Be Denied Because Plaintiffs Put Forth Substantial Evidence Supporting their Section 1985(3) Claim Against the LOS Defendants.

The LOS Defendants argue that Plaintiffs failed to provide sufficient evidence that they were part of a Section 1985(3) conspiracy because they attended the Unite the Right rally in Charlottesville, Virginia, "for reasons other than as part of a conspiracy to commit racially motivated violence."  ECF No. 1549 at 2.  Because the evidence overwhelmingly shows that Hill, Tubbs, and LOS (by and through its members, including Hill and Tubbs) conspired with their co-

defendants to commit racially motivated violence at Charlottesville 2.0 on August 11 and 12, 2017, the LOS Defendants' motion should be denied.

### 1. *Substantial Evidence Shows that the LOS Defendants Conspired with their Co-Defendants in Connection with Charlottesville 2.0.*

Hill is the president of LOS, and Tubbs is the Chief of Staff.  Day 10 Tr. 67:18-23; 82:22-25. In the months prior to Charlottesville 2.0, Hill and members of LOS under his direction—including Tubbs—were intimately involved in the conspiracy and assisted in planning and preparation. Hill agreed with Kessler to speak at Charlottesville 2.0, agreed to help Kessler recruit additional participants, and "offered" LOS's participation for the event.  Day 10 Tr. 80:3-81:17; 88:16-89:3. Hill and LOS helped promote Charlottesville 2.0 and recruited participants.  Hill used the LOS website and social media to encourage LOS members (and members of the public) to attend. *See, e.g.*, PX-2858; PX-2101. Hill's attendance was promoted on fliers distributed across social media alongside defendants Kessler, Spencer, Invictus, Cantwell, and Heimbach. PX-0198 (Charlottesville 2.0 flyer); Day 10 Tr. 81:18-82:17.

While Hill maintained the lead strategy and supervision role for the organization, he assigned LOS members to lead different aspects of LOS's participation in Charlottesville 2.0.  Day 10 Tr. 82:18-21.  Hill appointed LOS member Brad Griffin to handle public relations on behalf of LOS and placed Tubbs in command of general operations for the event. Day 10 Tr.  82:22-83:6. Tubbs testified at trial that he agreed to assist Hill. *See* Day 11 Tr. 22:10-12; PX-1539.  In order to "promote a unified appearance at Charlottesville 2.0," Tubbs circulated a uniform directive to LOS members requiring a military-like uniform. Day 11 Tr. 23:9-18; PX-1553 (email chain including communications with Defendant Tubbs and LOS members).

Hill also appointed LOS member Ike Baker to serve as a liaison with other Defendants and assist with operations.  Hill knew that Discord was being used by other Defendants for planning

purposes, and he asked Baker to monitor the Charlottesville 2.0 Discord server.  Day 10 Tr. 83:7-84:6.  The month before Charlottesville 2.0, in addition to ongoing planning discussions, Baker attended the NSM National Conference and delivered a message to Defendant Schoep and members of the NSM on behalf of Hill and LOS, which included the Fourteen Words.[8]  PX-1554.  Baker, on behalf of Hill and LOS, also discussed Charlottesville 2.0 logistics with Heimbach, Schoep, and "others in the Nationalist Front."  Day 10 Tr. 130:3-17.

In addition, LOS is liable for the actions of its members taken with actual or apparent authority on behalf of LOS.  *See Liberty Univ, Inc.*, 16 F. Supp. 3d at 660.  As described above, Hill acted in his capacity as president of LOS to direct Tubbs, Griffin, and Baker to take various actions in furtherance of the conspiracy on behalf of LOS.  *See Herald Co*, 472 F.2d at 1094.

On the eve of Charlottesville 2.0 during the torch march, the LOS Defendants, Defendant Heimbach, Defendant TWP, and others met to further plan and coordinate the arrival of the Nationalist Front (NF) alliance the next day so they could march in unison.  *See, e.g.*, Day 11 Tr. 24:23-25:1; 25:10-26.

      (a)      <u>Substantial Evidence Shows that the LOS Defendants were Motivated by Racial Animus and Entered the Conspiracy with a Purpose to Commit Racially Motivated Violence.</u>

As part of the LOS Defendants' preparation for Charlottesville 2.0, they planned for and expected to commit racially motivated violence.  Hill, Tubbs and, on Hill's decision, LOS joined the conspiracy because of their animus against Black and Jewish individuals, and against supporters of these individuals. Hill unabashedly identifies as a white supremacist, racist, and anti-Semite, as stated in the pledge of allegiance he posted on the LOS website. Day 10 Tr. 68:24-

---

[8] The Fourteen Words are as follows: "We must secure the existence of our people and a future for white children." Plaintiffs' expert on antisemitism, Professor Deborah Lipstadt, explained the significance of the Fourteen Words, describing it as a "call to arms" and "battle" to secure the existence of white people and their children.  Day 8 Tr. 165:12-20.

69:14; PX-1566A. Hill founded and has led LOS as "an uncompromising movement of real blood and soil Southern/white nationalists" that believes "Dixie is and should be White Man's Land" and stands "firm on the Negro Question and the Jew Question." PX-1899; *see also* Day 10 Tr. 69:15-21. Tubbs confirmed in his testimony at trial that he shares Hill's racist ideology, including his statement about "Dixie." Day 11 Tr. 16:10-18:2.  LOS calls for the expulsion of Jews from the South, *see, e.g.*, PX-1921A, and for the return of African-Americans to their status under Jim Crow, *see* PX-1564.  Hill and Tubbs share the view that they "stand for the white race against all our enemies, particularly the Jew." PX-1921A; Day 11 Tr. 21:23-24.  Tubbs also testified at trial that he pledged to "oppose the enemies of [his] race, [his nation] . . . and to "dedicate [his] life to fostering the welfare of the white Aryan race."  Day 11 Tr. 14:9-15; 15:7-8.  Tubbs offered, unprompted, that he accepted the pledge as his feelings on the date of his testimony.  *Id.*  Plaintiffs also offered evidence of tweets and retweets published on Defendant Tubbs' twitter page in which he expressed racist sentiments.  *See* PX-2865; PX-1914.

As president of LOS, Hill has supported and advocated violence, including a willingness to "fight, kill, and die," to achieve LOS's goals (PX-1567), and implored LOS members that they needed "to become warriors" because they are "at war already," (PX-1923C; *see also* Day 10 Tr. 78:8-13 ("Q: And your view is that you and your League members are going to have to use violence or have to be prepared to use violence to achieve the white nationalist society that you envision? A: We are prepared to do whatever is necessary to preserve our civilization[.]")).  In furtherance of this racist and militant ideology, Hill implored LOS members to go to Charlottesville on August 12, 2017, "to defend the South and Western civilization from the Jew and his dark-skinned allies." PX-2101.  Again, because Hill made these statements to members of LOS in his capacity as

president of LOS, this evidence of racial motivation can be imputed against LOS. *See Herald*, 472 F.2d at 1094.

Preparations for Charlottesville 2.0 by the LOS Defendants further evidence that they anticipated violence.  Hill approved the making of LOS shields and admitted that these shields could be used offensively against the peaceful counter-demonstrators on August 12.  Day 10 Tr. 112:7-22.  Moreover, LOS carried flagpoles that could be "used as a weapon" (Day 10 Tr. 114:4-7), and which, as video footage showed, were used as weapons (*see* PX-3239A). Tubbs likewise not only anticipated that there would be violence at Charlottesville 2.0, but "hoped for" it.  PX-1553. Despite Defendants' allegations that they sought to cooperate with the police, presumably to avoid violence, the evidence adduced by Plaintiffs shows LOS had no productive calls or prior coordination with the police, and Baker testified that LOS expected no police assistance on August 12.  Day 10 Tr. 130:23-131:16; PX-4000.

<div style="margin-left: 2em;">

(b)    <u>Substantial Evidence Shows that the LOS Defendants and Their Co-Conspirators Committed Numerous Overt Acts in Furtherance of the Conspiracy.</u>

</div>

Plaintiffs offered overwhelming evidence that the LOS Defendants and their co-conspirators committed multiple overt acts in furtherance of the conspiracy to commit racial violence on August 11 and August 12.

**August 11.**  The LOS Defendants argue that the overt acts that took place at the August 11 torch march were not acts in furtherance of the conspiracy because LOS "had no role in its planning or execution," ECF No. 1549 at 4, and Tubbs did not have "advance notice" of the event, *id*. at 5. This argument misunderstands the law of conspiracy.  The LOS Defendants are "liable for the conduct of *all* co-conspirators that was in furtherance of the conspiracy and reasonably foreseeable" to it.  *Newsome*, 322 F.3d at 338 (emphasis added); Final Jury Instructions, ECF No. 1461, at 28 ("All Plaintiffs must prove is a single overt act by just one of the alleged

conspirators."); Final Jury Instructions, ECF No. 1461, at 29-30 ("[I]f you find by a preponderance of the evidence that [a person] was a member of the conspiracy, then any acts done or statements made in furtherance of the conspiracy by that persons may also be considered against the defendants.").  The evidence shows not only that the torch march was reasonably foreseeable, but that Hill and LOS were aware that it was taking place beforehand.  Hill sent LOS members to the torch march as "observers" on behalf of LOS (Day 10 Tr. 122:9-15), and other LOS members attended the torch march, including Brad Griffin, who was wearing a polo shirt with the LOS logo on it (PX-2857), and members of the LOS Florida Chapter (PX-2883A).  That Plaintiffs did not present evidence showing that Tubbs knew about the torch march before it took place is of no moment, because Plaintiffs are not required to demonstrate that every member of the conspiracy knew of every distinct act in furtherance of that conspiracy. *See United States v. Osborne*, 532 F. Supp. 857, 861 (W.D. Va. 1982) ("[I]t is not necessary [to] . . . prove that a defendant knows of the existence of criminal activities in order to convict him of a conspiracy.").

**August 12.**  On August 12, the LOS Defendants left the LOS campsite where they had been staying since arriving in Charlottesville and met in the parking lot of a Joann Fabrics store outside of downtown Charlottesville along with their fellow Nationalist Front members so they could form a convoy together to the Market Street parking garage as planned by LOS member Baker.  Day 11 Tr. 32:5-33:15.  Plaintiffs offered evidence that, at Joann Fabrics, Baker gave a speech where he said, "We're going to assemble in that parking garage, and we're headed to the top floor so that we've got open air around us.  We're going to assemble there.  We're going to march as a mass.  This is the greatest assemblage of white identitarians I've personally ever seen. We're going to take that park." PX-1409; Day 11 Tr. 32:20-33:12.

Evidence offered by Plaintiffs also shows that the LOS Defendants and the Nationalist Front arrived at the Market Street parking garage dressed in their military-type uniforms and carrying flagpoles and shields, and that Hill and Tubbs led the Nationalist Front column, comprised of LOS, NSM, TWP, and Vanguard America, as they marched down Market Street. *See* PX-3239A; *see also* Day 11 Tr. 34:20-35:15. Tubbs led the large column into a line of unarmed, peaceful, stationary counter-demonstrators without stopping and totally unprovoked. PX-3239A; Day 11 Tr. 36:16-19; PX-1888A; PX-3800A. These peaceful counter-demonstrators, who had linked their arms, included Plaintiff Natalie Romero. PX-3267. After violently plowing through these counter-demonstrators, Tubbs helped the Nationalist Front column regroup to prepare for another charge. PX-3239C. Even once the column made its way to Emancipation Park, Tubbs continued to lead his co-defendants into violent confrontations with counter-demonstrators. Video evidence shows that Tubbs yelled, "Follow me," and beckoned his men to charge into the counter-demonstrators, for no apparent purpose other than to cause violence. PX-2001A. This video shows the fighting that ensued, including Tubbs throwing a counter-demonstrator to the ground. *Id.* The evidence adduced by Plaintiffs shows Tubbs was central to the street violence on August 12. Indeed, he was praised by his co-defendants for the same. Hill described marching "with someone like Mike Tubbs" as one of the proudest days of his life "because we showed the enemy on that day we are here and we are not backing down from you or anyone else." PX-1923F; *see also* PX-3801 ("Tubbs was everywhere the chaos was."); PX-1562 (Calling Tubbs "much the warrior" in response to an email that "Tubbs was on FoxNews leading the troops into battle and coordinating attack."). Defendant Parrott described Tubbs as "an especially imposing League Organizer" who "towered over and pushed through the antifa like a Tyrannosaurus among raptors as [LOS] fighters

with shields put their training to work." Day 12 Tr. 155:4-9.  At no point did Tubbs try to stop the violence being perpetuated by his co-conspirators.

In addition, Hill testified that "there were some League members that engaged in some violence that they initiated" on August 12 and that pepper spraying a defenseless woman "was not an act of self-defense by a League member."  Day 10 Tr. 149:16-19; 154:1-10.

Following the state of emergency declaration, members of LOS and TWP brutally beat DeAndre Harris, a black man, in the Market Street parking garage.  PX-2368.  Tubbs witnessed the beating, but made no effort to help.  *See* PX-1920.  Tubbs clearly understood the significance of the brutal garage attack because, in February 2018, he encouraged LOS members to delete their prior communications with Tyler Davis, a fellow LOS member who partook in the beating and was subsequently arrested for it.  *See* PX-1600 (Chat with LOS member Charleen Braun, Tubbs writes: "You are friends with Tyler Davis . . . You need to remove him from your friends list immediately and delete any conversations you might have had with him via Signal, Messenger, or any other format."); Day 11 Tr. at 52:1-53:3 (Tubbs sent the same message to LOS members Jessica Reavis, Bryan McCoy, and Brad Griffin).

The LOS Defendants further argue that Plaintiffs failed to provide sufficient evidence to establish that the car attack committed by co-defendant James Fields "was an overt act in furtherance of a conspiracy to commit racially motivated violence" and reasonably foreseeable by the LOS Defendants.  ECF 1549 at 3.  In making this argument, the LOS Defendants ignore the substantial evidence introduced at trial.

The evidence shows that the LOS Defendants agreed to conspire with Vanguard America (in addition to other defendants), that Fields was a member of Vanguard America, and that Fields marched with Vanguard America on August 12.  Hill testified that Vanguard was a member of the

Nationalist Front, as were Hill, Tubbs, and LOS.  Day 10 Tr. 90:25-91:5.  Vanguard's leader, Thomas Rousseau, invited Fields to march with Vanguard, to wear a Vanguard polo, and to wield a Vanguard shield on August 12.  PX-3862.  Fields accepted that invitation.  At Charlottesville 2.0, Fields marched and chanted with Vanguard and other members of the Nationalist Front, including LOS.  PX-2389; PX-2390; PX-2864.  Furthermore, despite the LOS Defendants' argument to the contrary, the car attack was a reasonably foreseeable act in furtherance of the conspiracy.  PX-3583 (Fields' text stating that "We're not the one who need to be careful"); PX-3573 (Fields' Instagram post showing a car driving into a crowd of protestors with the hashtags #HitlerWasRight and #ShutITDown); PX-3606 (Fields' Tweet from Charlottesville on August 12, 2017 tagging Richard Spencer and LOS member Brad Griffin exclaiming "Shut it down"); PX-1553 (the LOS Defendants anticipated violence at Charlottesville 2.0 and Tubbs hoped for it); Day 10 Tr. at 112:7-22; 114:4-7 (LOS members brought weapons with them to Charlottesville 2.0); PX-2858 (Announcing LOS' participation at Charlottesville 2.0 "I want an excellent turnout of Southern Nationalists . . . Antifa, BLM, et al will be there to greet us! Don't miss out on the fun!"); Day 10 Tr. at 114:15-16 (Hill carried a gun at Charlottesville 2.0); PX-1560 (Statement by Hill, "For instance, we wanted a public confrontation in Charlottesville for the world to see, and we got it.").

<div align="center">(c)    <u>Sufficient Evidence Shows that the LOS Defendants Ratified the Relevant Conduct.</u></div>

The LOS Defendants argue that the evidence shows that they attended Charlottesville 2.0 only for reasons other than as part of a conspiracy to commit racially motivated violence (ECF No. 1549 at 3), but this is a fictional re-writing of their involvement as evidenced by Hill's and Tubbs's statements and conduct not only before and during Charlottesville, but also in its wake.  The evidence supports Plaintiffs' conspiracy claims against the LOS Defendants because the LOS

Defendants ratified and praised the violence that took place in furtherance of the conspiracy, including the car attack by Fields. *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982) ("[A] finding that [a defendant] authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity.").

After Charlottesville 2.0, Hill declared the event a success for LOS and stated that he "couldn't be happier" with the outcome, PX-1379B, despite the fact that he did not deliver a speech in Emancipation Park and the only thing that occurred on August 12 was chaos and street violence. Day 10 Tr. 145:14-19 ("Q: You never spoke that day and no one gave any speech that day in Emancipation Park where the rally was supposed to be; isn't that right? A: That's right. Q: Just a lot of violence, right? A: There was a good deal of violence that day, yes."). Hill also proudly exclaimed that he "would not go back and change a thing" about Charlottesville 2.0. PX-1904; *see also* PX-2063 (Hill tweet stating that the "League of the South had a good day in Charlottesville, Virginia. Our warriors acquitted themselves as men.").

Tubbs also personally celebrated the violence committed by him and other Defendants involved in the conspiracy. On numerous occasions, Tubbs tweeted "James Fields did nothing wrong" from his personal Twitter account. *See e.g.*, PX-2867A; PX-2867B; PX-2867C; PX2867D; PX2867E; PX2867F. Review of these exhibits leaves no doubt that Tubbs endorsed the violent car attack by Fields that killed a counter-demonstrator, Heather Heyer, at Charlottesville 2.0 and injured and traumatized multiple Plaintiffs, since several of these Tweets were made in response to other car attacks on demonstrator-victims. *See* PX-2867A (Tweet in response to a car attack in San Jose, California); PX2867-B (Tweet in response to a car attack on BLM protestors in downtown Tallahassee, Florida on May 30, 2020); PX-2867-F (Tweet in response to a car attack on protestors in downtown Portland on June 17, 2020). Plaintiffs also

offered evidence that Tubbs accepted praise from LOS members, including Charleen Braun, for his conduct at Charlottesville 2.0 and said he hoped he could live up to the stories she told to recruit more men to join LOS.  PX-1600, at 3 (Braun: "Really hate that you won't be in Tennessee with us . . . You will be missed, especially if there is confrontations.  Your presence is always a great thing to witness." Tubbs: "I pray I don't miss any good violence*.*" Braun: "I must admit, when recruiting . . . I share pictures of Charlottesville and of you and your, uh, background if you will.  What a total badass you are.  You helped me recruit twenty something guys." Tubbs: "I pray I can live up to the stories.").  These tweets and chats are not the words of someone who disavowed the violence of Charlottesville 2.0 or tried to prevent it, but of someone who was integral to the violence of that day and was proud of what transpired.

(d)    Sufficient Evidence Shows that Plaintiffs were Injured as a Result of the Conspiracy.

Plaintiffs' injuries were caused by the overt acts committed in furtherance of the conspiracy.  Plaintiffs suffered a multitude of physical, emotional and economic injuries due to the conduct of the LOS Defendants and their co-conspirators on August 11 and 12, 2017 in Charlottesville. *See*, *e.g.*, Day 5 Tr. 52:17-79:22 (Natalie Romero); Day 6 Tr. 9:24-17:17 (Devin Willis); Day 10 Tr. 212:23-225:8 (Thomas Baker); Day 11 Tr. 75:19-82:6 (Marissa Blair); Day 12 Tr. 23:12-34:14 (Chelsea Alvarado); Day 13 Tr. 19:11-30:5 (Marcus Martin), 65:2-67:18 (Seth Wispelwey); Day 14 Tr. 223:8-234:14 (April Muñiz); Day 15 Tr. 72:1-76:7 (Elizabeth Sines).

Because Plaintiffs adduced substantial evidence in support of their claim against the LOS Defendants, the Court should deny the LOS Defendants' motion as it relates to Plaintiffs' claim under Section 1985(3).

46

### 2.   *Plaintiffs Put Forth Substantial Evidence Supporting their Section 1986 Claim Against the LOS Defendants.*

Evidence that supports judgment in Plaintiffs' favor on their Section 1985(3) claims is sufficient to support a judgment in Plaintiffs' favor on their Section 1986 claims because Section 1986 "merely gives a remedy for misprision of a violation of 42 U.S.C. § 1985." *Johnson v. Harron*, 1995 WL 319943, *26 n.39 (N.D.N.Y. May 23, 1995) (quotes omitted)).   The only elements of a Section 1986 claim that are distinct from a Section 1985(3) claim are that Defendants had knowledge of the underlying Section 1985 conspiracy and had the power to prevent or aid in the prevention of the conspiracy but failed to do so.   *See id.*   Substantial evidence adduced by Plaintiffs at trial shows that the LOS Defendants were not only aware of the conspiracy but were active and willing participants in its planning and committed various acts in furtherance of the conspiracy.   *See supra* Section IV.A.   Defendants took no steps to prevent the conspiracy, and despite the violence that took place at Charlottesville 2.0, they celebrated the events of the conspiracy after the fact.   *See supra* Section IV.A.   Because Plaintiffs adduced substantial evidence in support of their claim against the LOS Defendants on Count I, the Court should deny the LOS Defendants' motion for judgment as a matter of law on Count II as well.

### 3.   *The LOS Defendants' Post-Verdict Motions on Count III Must Be Denied Because Sufficient Evidence Supports the Jury's Finding that the LOS Defendants Were Liable for Common-Law Conspiracy.*

The LOS Defendants also moved to overturn the jury's verdict on Plaintiffs' common law conspiracy claim, but their motion must be denied.   The elements of a Section 1985(3) claim are substantially the same as the elements of a common-law civil conspiracy under Virginia law. *Compare* Final Jury Instructions, ECF No. 1461, at 20 (listing the elements of a U.S.C. § 1985(3) claim), *with id.*, at 38-39 (listing the elements of a civil conspiracy claim).   The Final Jury Instructions note the pertinent differences between the two conspiracy counts.   While Count I

(§1985(3) conspiracy) requires that "The persons involved in the conspiracy are motivated, in whole or in part, by animus against Black or Jewish individuals, or motivated, in whole or part, because Plaintiffs were advocates of supporters of Black and Jewish individuals," Final Jury Instructions, ECF No. 1461, at 20,  Count III "only requires Plaintiffs to prove that Defendants harbored discriminatory animus if that is an element of the underlying unlawful or tortious act [that is the subject of the conspiracy]," *id.*, at 39.  The Final Jury Instructions further clarify that the following unlawful acts can be the subject of a civil conspiracy under Virginia law: intimidation or harassment motivated by racial, religious or ethnic animosity in violation of Virginia Code § 8.01-42.1; directing violence motivated by racial, religious, or ethnic animosity in violation of Virginia Code § 8.01-42.1; battery; assault; and false imprisonment.  The evidence adduced by Plaintiffs at trial in support of their Section 1985(3) claim discussed *supra* in Section IV.A supports the jury's verdict that the LOS Defendants conspired for an unlawful purpose; specifically, to commit racially motivated intimidation, harassment, and violence in violation of Virginia Code § 8.01-42.1.  Moreover, the jury's verdict on Plaintiffs' civil conspiracy claims may be overturned only if LOS shows that judgment in its favor is the "only one reasonable verdict"— a burden it has not met.  *Clark*, 448 F. Supp. 3d at 568.  Indeed, the only reasonable verdict is the verdict that the jury returned, *i.e.,* that the LOS Defendants engaged in an unlawful conspiracy. As demonstrated above, Plaintiffs have put forth overwhelming evidence in support of their claims against the LOS Defendants.  Accordingly, the Court should also deny the LOS Defendants' Rule 50(b) motion on Count III.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Defendants' post-trial motions.

Dated: April 13, 2022

Respectfully submitted,

*/s/ Karen Dunn*

Karen L. Dunn (*pro hac vice*)
PAUL WEISS RIFKIND WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006

Roberta A. Kaplan (*pro hac vice*)
Julie E. Fink (*pro hac vice*)
Gabrielle E. Tenzer (*pro hac vice*)
Raymond P. Tolentino (*pro hac vice*)
Yotam Barkai (*pro hac vice*)
Emily C. Cole (*pro hac vice*)
Alexandra K. Conlon (*pro hac vice*)
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: (212) 763-0883
rkaplan@kaplanhecker.com
jfink@kaplanhecker.com
gtenzer@kaplanhecker.com
rtolentino@kaplanhecker.com
ybarkai@kaplanhecker.com
ecole@kaplanhecker.com
aconlon@kaplanhecker.com

Karen L. Dunn (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Jessica Phillips (*pro hac vice*)
Arpine S. Lawyer (*pro hac vice*)
Matteo Godi (*pro hac vice*)
PAUL WEISS RIFKIND WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Fax: (202) 223-7420
jphillips@paulweiss.com
kdunn@paulweiss.com
wisaacson@paulweiss.com
alawyer@paulweiss.com
mgodi@paulweiss.com

Alan Levine (*pro hac vice*)
Philip Bowman (*pro hac vice*)
COOLEY LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6260
Fax: (212) 479-6275
alevine@cooley.com
pbowman@cooley.com

Nicholas A. Butto (*pro hac vice*)
PAUL WEISS RIFKIND WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990
nbutto@paulweiss.com

David E. Mills (*pro hac vice*)
Joshua M. Siegel (VSB 73416)
Caitlin B. Munley (*pro hac vice*)
Samantha A Strauss (*pro hac vice*)
Alexandra Eber (*pro hac vice*)
Allegra K. Flamm (*pro hac vice*)
Gemma Seidita (*pro hac vice*)

Robert T. Cahill (VSB 38562)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100

Khary J. Anderson (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Fax: (202) 842-7899
dmills@cooley.com
jsiegel@cooley.com
cmunley@cooley.com
sastrauss@cooley.com
aeber@cooley.com
aflamm@cooley.com
gseidita@cooley.com
kanderson@cooley.com

rcahil@cooley.com

J. Benjamin Rottenborn (VSB 84796)
WOODS ROGERS PLC
10 South Jefferson St., Suite 1400
Roanoke, VA 24011
Telephone: (540) 983-7600
Fax: (540) 983-7711
brottenborn@woodsrogers.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2022, I filed the foregoing with the Clerk of Court through the CM/ECF system, which will send a notice of electronic filing to:

Elmer Woodard
5661 US Hwy 29
Blairs, VA 24527
isuecrooks@comcast.net

James E. Kolenich
Kolenich Law Office
9435 Waterstone Blvd. #140
Cincinnati, OH 45249
jek318@gmail.com

*Counsel for Defendants Jason Kessler, Nathan Damigo, and Identity Europa, Inc. (Identity Evropa)*

David L. Campbell
Justin Saunders Gravatt
Duane, Hauck, Davis & Gravatt, P.C.
100 West Franklin Street, Suite 100
Richmond, VA 23220
dcampbell@dhdglaw.com
jgravatt@dhdglaw.com

*Counsel for Defendant James A. Fields, Jr*

Bryan Jones
106 W. South St., Suite 211
Charlottesville, VA 22902
bryan@bjoneslegal.com

*Counsel for Defendants Michael Hill, Michael Tubbs, and League of the South*

William Edward ReBrook, IV
The ReBrook Law Office
6013 Clerkenwell Court
Burke, VA 22015
edward@rebrooklaw.com

*Counsel for Defendants Jeff Schoep, Matthew Heimbach, Matthew Parrott, Traditionalist Worker Party, National Socialist Movement, and Nationalist Front*

Joshua Smith
Smith LLC
807 Crane Avenue
Pittsburgh, Pennsylvania 15216
joshsmith2020@gmail.com

*Counsel for Defendants Matthew Parrott, Matthew Heimbach, and Traditionalist Worker Party*

I hereby certify that on April 13, 2022, I caused to serve the following non-ECF participants via mail or electronic mail:

Richard Spencer
richardbspencer@icloud.com
richardbspencer@gmail.com

Vanguard America
c/o Dillon Hopper
dillon_hopper@protonmail.com

Elliott Kline a/k/a Eli Mosley
eli.f.mosley@gmail.com
deplorabletruth@gmail.com
eli.r.kline@gmail.com

Christopher Cantwell
Christopher Cantwell 00991-509
USP Marion, 4500 Prison Rd.
P.O. Box 2000
Marion, IL 62959

*and*

Christopher Cantwell 00991-509
Grady County Law Enforcement Center
215 N. 3rd St.
Chickasha, OK 73018

Robert "Azzmador" Ray
azzmador@gmail.com

Dated: April 13, 2022

*/s/ Karen Dunn*

Karen L. Dunn (*pro hac vice*)

PAUL WEISS RIFKIND WHARTON & GARRISON LLP
*Counsel for Plaintiffs*