CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
12/30/2022
LAURA A. AUSTIN, CLERK
BY: s/ C. Amos
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| ELIZABETH SINES, CHELSEA ALVARADO, THOMAS BAKER, MARISSA BLAIR, MARCUS MARTIN, APRIL MUÑIZ, NATALIE ROMERO, and SETH WISPELWEY,<br><br>*Plaintiffs*,<br><br>v.<br><br>JASON KESSLER, RICHARD SPENCER, CHRISTOPHER CANTWELL, JAMES ALEX FIELDS, JR., VANGUARD AMERICA, ANDREW ANGLIN, MOONBASE HOLDINGS, LLC, ROBERT AZZMADOR RAY, NATHAN DAMIGO, ELLIOTT KLINE (a/k/a ELI MOSELY), MATTHEW HEIMBACH, MATTHEW PARROTT (a/k/a DAVID MATTHEW PARROTT), TRADITIONALIST WORKER PARTY, MICHAEL HILL, MICHAEL TUBBS, LEAGUE OF THE SOUTH, JEFF SCHOEP, NATIONAL SOCIALIST MOVEMENT, NATIONALIST FRONT, AUGUSTUS SOL INVICTUS, FRATERNAL ORDER OF THE ALT-KNIGHTS, LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN, and EAST COAST KNIGHTS OF THE KU KLUX KLAN (a/k/a EAST COAST KNIGHTS OF THE TRUE INVISIBLE EMPIRE),<br><br>*Defendants.* | CASE NO. 3:17-cv-00072<br><br><br>MEMORANDUM OPINION<br><br><br>JUDGE NORMAN K. MOON |

This matter is before the Court on numerous post-trial motions arising out of Plaintiffs' injuries suffered during the Unite the Right rally in Charlottesville on August 11 and 12, 2017.

The jury found Defendants liable for their conduct planning and participating in Unite the Right, including finding all Defendants liable for Virginia state law civil conspiracy; finding Jason Kessler, Richard Spencer, Elliott Kline, Robert "Azzmador" Ray, Christopher Cantwell, and James Alex Fields, Jr., liable for racial, religious, or ethnic harassment or violence; and finding Fields liable for assault and battery and intentional infliction of emotional distress.

The Court affirms the jury verdict finding all Defendants liable, reduces the punitive damages award as compelled by the Virginia statutory cap on punitive damages, and otherwise affirms the jury verdict.

### Standard of Review

Rule 50(b) of the Federal Rules of Civil Procedure permits a party to bring a renewed motion for judgment as matter of law after the jury has returned its verdict. Fed. R. Civ. P. 50(b). "When a jury's verdict has been returned, judgment as a matter of law may be granted only if, viewing the evidence in the light most favorable to the non-moving party (and in support of the jury's verdict) and drawing every legitimate inference in that party's favor, the only conclusion a reasonable jury could have reached is one in favor of the moving party." *Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, 3 F.4th 605, 610 (4th Cir. 2021) (quoting *Int'l Ground Transp. v. Mayor & City Council of Ocean City, Md.*, 475 F.3d 214, 218–19 (4th Cir. 2007)). The court "may not make credibility determinations or weigh the evidence," as those "are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (citation omitted).

Rule 59 permits a party aggrieved by a jury verdict to request a new trial. "A district court may grant a new trial only if the verdict: (1) is against the clear weight of the evidence; (2) is based upon false evidence; or (3) will result in a miscarriage of justice." *E.E.O.C. v. Consol.*

*Energy, Inc.*, 860 F.3d 131, 145 (4th Cir. 2017) (citing *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996)). A district court's decision on a Rule 59 motion is a discretionary one. *See Consol. Energy*, 860 F.3d at 145.

## Trial

The jury trial in this case lasted more than four weeks—comprising twenty-two trial days. The nine Plaintiffs proceeding to trial were represented by numerous firms and dozens of lawyers, seeking to try their claims against twenty-three Defendants, of which thirteen appeared at trial and presented an active defense. Separate defense counsel represented five different groups of Defendants. Two defendants (Christopher Cantwell and Richard Spencer), represented themselves *pro se*. Two defendants (Cantwell and James Alex Fields, Jr.) were incarcerated at the time of trial—Cantwell appeared in person in court with Marshals present, while Fields was represented in person by counsel.

Nearly 50 motions in *limine* or other pretrial motions were filed and resolved by this Court and the Magistrate Judge, in addition to dozens more filings relating to the trial. The parties admitted 917 exhibits during trial, and 35 witnesses were called to testify, or depositions played to the jury, and some counsel examined witnesses remotely by videoconference. In addition, as this trial was being conducted in the midst of the COVID-19 pandemic, the Court issued a number of directives related to preventing the risk of spread of the virus. These included providing proof of vaccination or negative tests and limiting the persons in the Courthouse and Courtroom—measures that appear to have been successful. Given the many challenges inherent in conducting a trial of this scope and magnitude at that unique point in time, the Court considers that the collegiality of counsel and their efforts to present their cases in a constructive and

efficient manner were indispensable to completing this trial. After three days of deliberations, the jury returned its verdict.

## Jury Verdict

The jury returned a verdict finding that Plaintiffs had proven each element of their Virginia state law civil conspiracy claim against all Defendants, including that each Defendant was a member of that conspiracy, and therefore finding all Defendants liable for Virginia state law civil conspiracy (Count III). Dkt. 1478 at 3. The jury did not reach a verdict on Plaintiffs' claim that Defendants conspired to commit racially motivated violence in violation of 42 U.S.C. § 1985(3) (Count I), or Plaintiffs' claim that Defendants had knowledge of a conspiracy under § 1985(3) and failed to prevent it, in violation of 42 U.S.C. § 1986 (Count II). Dkt. 1478 at 1–2. On Count III, the jury awarded nominal damages to Plaintiffs (except Elisabeth Sines and Seth Wispelwey) and awarded punitive damages of $500,000 against each individual Defendant and $1,000,000 against each organizational Defendant. *Id.* at 5.

The jury also returned a verdict in favor of Plaintiffs Natalie Romero and Devin Willis, finding Defendants Jason Kessler, Richard Spencer, Elliott Kline, Robert "Azzmador" Ray, and Christopher Cantwell liable for racial, religious, or ethnic harassment or violence, in violation of Virginia Code § 8.01-42.1 (Count IV). Dkt. 1478 at 6–7. On Count IV, the jury awarded Plaintiffs Romero and Willis each $250,000 in compensatory damages, and awarded $200,000 in punitive damages each against Kessler, Spencer, Kline, Ray and Cantwell. *Id.* at 6. On Count IV, the jury also found Defendant James Alex Fields, Jr., liable for violating § 8.01-42.1, but did not assess any compensatory or punitive damages against him on that Count specifically. *Id.* at 7.

The jury returned a verdict in favor of Plaintiffs Natalie Romero, April Muñiz, Thomas Baker, Marissa Blair and Marcus Martin, finding Defendant Fields liable for assault and battery

(Count V), and determined total compensatory damages to be $803,277. Dkt. 1478 at 8.[1] On Count V, the jury further assessed $6,000,000 in punitive damages against Fields. *Id.*

Finally, the jury returned a verdict in favor of Plaintiffs Romero, Muñiz, Baker, Sines, Blair, and Martin, finding Defendant Fields liable for intentional infliction of emotional distress (Count VI), and calculating total compensatory damages in the amount of $701,459. Dkt. 1478 at 9.[2] On Count VI, the jury further assessed $6,000,000 in punitive damages against Fields.

## — LIABILITY —

### Jason Kessler, Nathan Damigo, and Identity Evropa

Defendants Jason Kessler, Nathan Damigo, and Identity Evropa argue in their post-trial motions that they are entitled to a directed verdict on Plaintiffs' conspiracy claims. Dkt. 1522 at 1–6. They argue that Plaintiffs failed to prove their participation in any unlawful conspiracy. *Id.* Defendant Kessler separately contends that he is entitled to a directed verdict on Count IV. In his view, Plaintiffs' evidence of his activities at the torch march on August 11, 2017, established nothing more than his "engaging in First Amendment protected expressive activity," and he says he "had nothing to do with the violence at the Rotunda" on that date. *Id.* at 8–9.

The jury heard not only substantial but overwhelming evidence that Kessler, Damigo, Identity Evropa, and their codefendants planned for months to provoke Antifa and its followers into a violent battle at Unite the Right—which they called the "Battle of Charlottesville." And

---

[1] The jury found Defendant Fields liable for the following compensatory damages on Count V: Romero ($217,715), Muñiz ($108,000), Baker ($318,575), Blair ($2,000), and Martin ($156,987). The jury did not award Sines any compensatory damages specifically on this count. Dkt. 1478 at 8.

[2] The jury found Defendant Fields liable for the following compensatory damages on Count VI: Romero ($155,715), Muñiz ($50,000), Baker ($246,757), Sines ($50,000), Blair ($100,000), and Martin ($98,987). Dkt. 1478 at 9.

they strategized how any punch thrown by an Antifa supporter would give them the chance to respond with brutal and overwhelming violence, as the Unite the Right supporters would be prepared to do battle in helmets, shields, and body armor, and armed with weapons. Upon its review of the evidence and the parties' arguments, the Court concludes that substantial evidence and a legally sufficient evidentiary basis supported the jury's verdict on Count III finding Kessler, Damigo, and Identity Evropa liable for Virginia state law civil conspiracy, and further that they are not entitled to a directed verdict on Counts I or II. The Court also concludes that substantial evidence and a legally sufficient evidentiary basis supported the jury's verdict finding Kessler liable for racial, religious, or ethnic harassment or violence in violation of Virginia Code § 8.01-42.1 on Count IV.

### A.  Nathan Damigo

Defendant Nathan Damigo argues that Plaintiffs have failed to prove his participation in an unlawful conspiracy, and so he is entitled to a directed verdict as to all the conspiracy claims. Dkt. 1522 at 3–4. The Court disagrees. There is more than substantial evidence to support the jury's verdict finding Damigo liable for Virginia state law civil conspiracy, and Damigo is not entitled to a directed verdict on any of the conspiracy counts.

In Virginia, common law civil conspiracy "consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *CBS v. Bellsouth Servs., Inc.*, 453 S.E.2d 261, 267 (Va. 1995); *The Country Vintner,  Inc. v. Louis Latour, Inc.*, 634 S.E.2d 745, 751 (Va. 2006) (same); Dkt. 1461 at ECF 38–40 (jury instructions). At the outset, the Court notes that Damigo has conceded that he (1) "was friends with Richard Spencer and Spencer's friends and associates," (2) "had weekly calls with Richard Spencer's friends and associates," (3) "was present at Alt Right parties where planning for Unite the Right was discussed," (4) "asked for

fake Antifa accounts to be set up," and (5) "admitted that he and/or Identity Evropa were working with other Alt Right groups as to August 11th and 12th." *Id.* at 3–4 (grammatical marks omitted). However, Damigo contends that this and other "substantially similar evidence" is not evidence that "would allow the jury to find either unlawful agreement or foreseeability of any acts that injured any plaintiff." *Id.* at 4. He argues that the content of his communications was either not proven or was "innocuous[,] such as 'working with other Alt Right groups.'" *Id.* He also cites testimony from Samantha Froelich that "she never heard any plans calling for [Identity Evropa] members to engage in any violence at Unite the Right." *Id.*

The facts that Damigo concedes are far from innocuous and do much work toward establishing the requisite factual basis for the conspiracy finding. And, significantly, Damigo overlooks other substantial evidence in the record from which the jury could find both his participation in an unlawful conspiracy and foreseeability of the acts that injured Plaintiffs. Damigo was the founder and the leader of Identity Evropa in the Summer of 2017—the period when Unite the Right was being planned. Dkt. 1419 (Nov. 10) 166:3-4, 185:6-8, 211:22-24; Dkt. 1397 (Nov. 4) 35:24-25. Damigo testified that he considered himself to be a white supremacist and that in 2017 he was advocating for "a white ethnostate." Dkt. 1419 (Nov. 10) 158:2-9. In fact, Damigo founded Identity Evropa to promote a white ethnostate. Dkt. 1419 (Nov. 10) 166:3-7. Only "white people of European heritage" were allowed to join Identity Evropa—Black and Jewish persons would be excluded. *Id.* at 166:14-23. Damigo also testified that he believed violence might be necessary to secure that white ethnostate. Dkt. 1419 (Nov. 10) 158:20–159:16.

Damigo communicated regularly with the lead figures in the "Alt-Right" and white supremacist groups involved in planning Unite the Right. For instance, Damigo and Richard Spencer communicated regularly in the Summer of 2017, including about Unite the Right.

Dkt. 1397 (Nov. 4) 100:12–101:5. Jason Kessler invited Damigo to Unite the Right, and by July 2017, Damigo agreed to attend and further agreed to promote Unite the Right to Identity Evropa members. *Id.* at 101:16-18; Dkt. 1419 (Nov. 10) 181:23–182:5, 184;10-18. Damigo was well known to Spencer, Kessler, and the other organizers of Unite the Right. Damigo had gained some notoriety for violence on account of the "Battle of Berkley" a few months earlier, in which video of Damigo punching a woman and knocking her down at that event became, in Spencer's words, something of an "iconic moment" for the Alt-Right. Dkt. 1397 (Nov. 4) 48:18–50:1.

Identity Evropa members were not permitted to engage in activism without Damigo's express permission, or that of Elliott Kline—then in Identity Evropa leadership—who was heavily involved with Kessler in planning Unite the Right. Dkt. 1419 (Nov. 10) 185:6-25. Damigo gave Identity Evropa members permission to attend Unite the Right, and some did. Dkt. 1419 (Nov. 10) 196:7-11. Indeed, Damigo testified that "[a] lot of members" of Identity Evropa were involved with organizing Unite the Right. *Id.* at 195:12-16. Damigo personally approved equipment for Identity Evropa members to wear at Unite the Right—including shields, helmets, and gloves. Dkt. 1419 (Nov. 10) 196:12-22.

In addition, Damigo was the owner and creator of the Identity Evropa server on Discord, which Identity Evropa members often used to communicate about Unite the Right or other topics in the Summer of 2017. Dkt. 1419 (Nov. 10) 167:2-21. Everyone on that Discord server was an Identity Evropa member. *Id.* at 204:13-16. Later, on August 12, 2017, Identity Evropa members took to Discord to trumpet what they saw was akin to a battlefield victory: "Excellent work out there tonight @everyone. This is just the beginning. … but the war goes on." PX 892; *see also* PX 891 ("Today we won and took control of the narrative."); PX 844 ("Honestly, this is a huge victory."); PX 848 ("… this is a great organization." "I am proud to be a part of it. Hail victory."); Dkt. 1419 (Nov. 10) 204:10–208:13. In the wake of Unite the Right, Damigo also

said that he believed that it was a "huge success." Dkt. 1419 (Nov. 10) 203:21-23. Just days after

Unite the Right, Damigo exchanged texts with another member of Identity Evropa, in which

Damigo directed that the Discord server be shut down, and "reminding" Identity Evropa

members "not to talk to the police." Dkt. 1419 (Nov. 10) 209:2-18; PX 1851 (Patrick Casey:

"Should we shut down the intel server? Should I issue an announcement reminding our members

not to talk to the police?" Nathan Damigo: "Yes, on both counts."). In other words, the jury also

had before it some evidence that Damigo sought to conceal Identity Evropa's role in planning of

and participation in Unite the Right—the type of behind-the-scenes evidence which often isn't

uncovered in a conspiracy.

Damigo's position appears to be that the law required direct evidence of an explicit or

formal agreement to conspire. But that's not the law, and Damigo cited no cases supporting such

a proposition. Indeed, even in criminal cases, direct proof of an explicit agreement is not

required, and circumstantial evidence may be used to establish a conspiracy. *E.g.*, *United States*

*v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996) (en banc) (explaining that a conspiracy is often

"clandestine and covert, thereby frequently resulting in little direct evidence of such an

agreement"); *Floyd v. Commonwealth*, 249 S.E.2d 171, 174 (Va. 1978) (explaining that "a

conspiracy may be proved by circumstantial evidence," and that "from the very nature of the

offense, it often may be established only by indirect and circumstantial evidence"); Dkt. 1461

at ECF 7, 21–22, 40 (jury instructions). Ample evidence supported the jury's conclusion that

Damigo conspired with his codefendants. The jury certainly could reasonably find that Damigo

was liable for Virginia state law civil conspiracy in Count III. Similarly, such evidence further

undermines any argument that Damigo was entitled to a directed verdict on Counts I or II.

Finally, Damigo argues that there was no evidence that any act of violence committed by

the co-conspirators would be foreseeable by him. Dkt. 1522 at 3–4. The Court disagrees. Such

violence was certainly foreseeable. Indeed, the communications between the Unite the Right organizers were replete with candid statements by Damigo and others in Identity Evropa, as well as the other Unite the Right organizers, demonstrating that they shared expectations of, hoped for, planned for, and purposefully sought to instigate violence at Unite the Right—including discussing whether someone could drive a car through a crowd of demonstrators that might be blocking the street. *See, e.g.*, PX 892 (posting on Identity Evropa Discord server that "the war goes on"); PX 882 (Damigo posting on Identity Evropa Discord server that "[t]he lines between politics and violence is blurring. Welcome to 4th generational warfare."); PX 727 (Kline, subsequent head of Identity Evropa, posting on Discord: "I think we are gonna see some serious brawls at cville next month too and we'll see some blood on some of these white polos lol"); *see also* PX 3114 (Spencer texting Kline, "This is going to be a violent summer."); PX 1455 (Kessler texting Spencer: "[W]e're raising an army my liege. For free speech, but the cracking of skulls if it comes to it"); PX 1119 ("Is it legal to run over protestors blocking roadways?"); PX 1144 (Discord post of image of a tractor, captioned as a "multi-lane protestor digestor"); *id.* (Discord post of image of buses driving through crowds, writing "This will be us"); PX 2644 (Cantwell, stating: "Blocking traffic is not a peaceful protest, and every person who reminds you of that without using his car, is giving you more slack than you fucking deserve.").

For these reasons, the Court will deny Damigo's motion for a directed verdict on Plaintiffs' conspiracy claims. *See* Dkt. 1522 at 3–4.

### B.  Identity Evropa

Defendant Identity Evropa argues that "there is no evidence from which a jury could properly find [Identity Evropa] liable for conspiracy." Dkt. 1522 at 4–5. In its view, Plaintiffs' conspiracy claims "depend entirely on the activities of defendant Elliott Kline." *Id.* at 4. But, Identity Evropa contends, "the law does not allow for liability if Mr. Kline was acting 'outside

the scope' of what [Identity Evropa] authorized him to do or had his own personal stake in the conspiracy." *Id.* at 4–5. Identity Evropa argues that Kline "was actually working[ ] for his own purposes, with or for defendant Richard Spencer," and not acting in the organization's interests. *Id.* at 5. Identity Evropa also notes that Kline, rather than Identity Evropa or Damigo, was the subject of evidentiary sanctions and an adverse jury instruction. *Id.* Accordingly, Identity Evropa contends, "there is no evidence from which a jury could properly find [it] liable for conspiracy." *Id.* The Court disagrees, the law supports the jury's finding of liability against Identity Evropa for conspiracy, and substantial evidence supported the verdict.

An organization can be held liable for its own tortious conduct. *See Dana v. 313 Freemason*, 587 S.E.2d 548, 553 (Va. 2003) ("Thus, it is axiomatic that when a corporation causes injury as a result of an unlawful action, it is the corporation that is directly liable for any judgment obtained against it by the injured party."). In addition, the actions of Damigo (Identity Evropa's then-leader) and Elliott Kline (Identity Evropa's subsequent leader and in the leadership at the time of Unite the Right), may result in personal tort liability in their own right. *See Borg v. Warren*, 545 F. Supp. 3d 291, 325 (E.D. Va. 2021) (quoting *In re Ellison*, 296 F.3d 266, 271 (4th Cir. 2002) ("And while an officer of a corporation is in no way personally liable for corporate torts solely on account of his corporate position, where the officer actually participates in or otherwise sanctions the tortious acts, personal liability may lie.")). And Damigo's and Kline's conduct may result in liability to the organization for their torts, including intentional torts, under traditional principles of vicarious liability and *respondeat superior*. *See Roughton Pontiac Corp. v. Alston*, 372 S.E.2d 147, 149 (Va. 1988).

With these principles in mind, Identity Evropa's arguments lack force that it can't be held liable for Kline's actions because there was "no evidence that [it] ever authorized Mr. Kline to enter into an unlawful conspiracy," or that Kline was acting "for his own purposes" or on

Spencer's behalf. Dkt. 1522 at 5. Put simply, ample evidence in the record demonstrates that Kline *was* acting on behalf of Identity Evropa and within the scope of its authority in planning Unite the Right. In 2017, Kline was not only a member but a leader of Identity Evropa. Dkt. 1419 (Nov. 10) 184:19-21. During that same "planning period" for Unite the Right, Damigo was "the leader" of Identity Evropa. *Id.* at 185:3-8. And Damigo testified that he *delegated to Kline* authority to "approve activism" for Identity Evropa and for its members, *id.* at 185:15-21; that he explained to Kline what was acceptable and what wasn't in terms of activism, *id.* at 185:22–186:3; that he knew that Kline was not only working with Kessler to organize Unite the Right, but was "very, very involved with Kessler on it," *id.* at 186:4-10; that he relied on Kline for any information involved with making decisions about Identity Evropa participating in Unite the Right, *id.* at 186:11-25; that he told Kessler to talk to Kline and that Kline would fill him (Damigo) in about Unite the Right, *id.* at 190:7-13; and that he worked to get Kline on Identity Evropa's payroll, *id.* at 188:15–189:12. In addition, evidence in the record from the codefendants showed that Kline and Damigo were Identity Evropa's representatives coordinating on its behalf with other organizations in planning Unite the Right. *See* Dkt. 1431 (Nov. 15) 97:21–98:2 (Kessler describing that Kline was Identity Evropa's representative on Discord chat planning Unite the Right). In view of this and other substantial evidence that Kline was acting on behalf of Identity Evropa in the planning of Unite the Right and lacking any contrary evidence,[3] the Court rejects Identity Evropa's unsupported argument that Kline was acting outside the scope of

---

[3] Identity Evropa's suggestion that Kline was acting on behalf of Spencer rather than Identity Evropa is unsupported by the record evidence. *See* Dkt. 1522 at 5 n. 4. The testimony cited in support of the assertion does not establish that Kline *was* acting on behalf of Spencer. Nor does it tend to show that he *was not* acting on behalf of Identity Evropa. In any event, even if there were a conflict of evidence on the point—and there is not—it is not such evidence as would *compel* a conclusion that Kline was acting on his own behalf rather than on behalf of Identity Evropa.

his authority.[4] Moreover, evidence in the record substantiated that Damigo also spoke for the organization and operated with its authority. Damigo himself testified that because he was "the founder of the organization," "pretty much anywhere [he ] went … it was generally considered [that he] was representing the organization." Dkt. 1419 (Nov. 10) at 168:3-11.

Substantial evidence in the record further supported the jury's conclusion that Identity Evropa as an organization conspired with the other Defendants and is thus liable under Count III, even aside from Kline and Damigo. For instance, it wasn't just Kline and Damigo, but "[a] lot of members" of Identity Evropa "were involved with the organizing" of Unite the Right. Dkt. 1419 (Nov. 10) 195:12-16.[5] Identity Evropa members planned their participation in Unite the Right on Discord. *See id.* at 167:2-21. A "detachment of fighters" from Identity Evropa showed up at Unite the Right on August 12, 2017. *See* Dkt. 1413 (Nov. 9) 154:15–155:18. (Damigo had personally approved the use of shields, helmets, and gloves for Identity Evropa members at Unite the Right. Dkt. 1419 (Nov. 10) 196:12-22.) After Unite the Right, Identity Evropa members took to Discord to celebrate the "huge victory," PX 844, and for example, cheering "[h]ail Nathan [Damigo]," "[t]his is a great organization," "I am proud to be a part of it. Hail victory," PX 848, but cautioning that "[t]his is just the beginning," and "the war goes on." PX 892; *see also* PX 846 (celebrating their "victory").

---

[4] *Cf. BellSouth Servs.*, 453 S.E.2d at 265 ("It is well settled that, when an agency relationship has been proven, the burden is on the principal to show that the agent was not acting within the scope of his authority when he committed the acts complained of, and, if the evidence leaves the question in doubt, it becomes an issue for determination by a jury.").

[5] In addition, Damigo testified that *Kline* was "very involved" as one of the primary organizers. Dkt. 1419 (Nov. 10) 195:17-20. And Spencer testified that he and *Damigo*, among others, communicated regularly in the summer of 2017 about Unite the Right. *See* Dkt. 1397 (Nov. 4) 100:12–101:5.

In sum, there is substantial evidence in the record to demonstrate that Identity Evropa, as well as its then leader Damigo and its future leader Kline entered into the conspiracy, all supporting the jury's finding Identity Evropa was liable on Count III. The Court rejects Identity Evropa's arguments to the contrary.

### C.  Jason Kessler

Defendant Kessler first challenges the jury's verdict finding him liable for Virginia state law civil conspiracy. Dkt. 1522 at 5–6. Kessler concedes that he was "a major organizer of the Unite the Right event," and he "was physically present at relevant locations" on August 11–12, 2017. Dkt. 1522 at 5. But he argues that his "mere rhetoric is constitutionally protected if it does not amount to unlawful agreement or foreseeability," and contends that "[t]he evidence at trial showed that [he] limited his plans for physical altercation to legitimate self defense." *Id.* In Kessler's telling, "[h]e was careful to include warnings that Antifa must start any fights or there could be no Battle of Charlottesville," and "he was confident Antifa could be relied on to give the Alt Right a legal reason to fight them." *Id.* at 5. Kessler argues that Plaintiffs failed to prove any "unlawful agreement or foreseeability as to any act that damaged any plaintiff," and thus contends that he "is entitled to a directed verdict as to all conspiracy claims." *Id.* at 5–6. Because there was more than substantial evidence supporting the jury's verdict finding Kessler liable for Virginia state law civil conspiracy, and because Kessler is not entitled to a directed verdict on any conspiracy count, the Court rejects Kessler's arguments.

Kessler concedes he was "a major organizer" of Unite the Right Dkt. 1522 at 5. And substantial evidence supported Kessler's central role organizing Unite the Right. Dkt. 1431 (Nov. 15) 50:5-11. Indeed, many of his codefendants testified that Kessler was *the* organizer or a

*lead* organizer of Unite the Right, along with Elliott Kline.[6] During the run-up to the rally and at the rally, Kessler had a prominent and highly visible position. Significantly, on August 11, 2017, Kessler, along with Spencer, Kline, and Cantwell, led hundreds wielding lit tiki torches and chanting "You will not replace us," "Jews will not replace us," "Blood and soil," and "Sieg Heil,"[7] through University of Virginia grounds up to the Rotunda and down to the Thomas Jefferson statue where the marchers surrounded counter-protestors (including Plaintiffs Romero and Willis) where they were prevented from escaping, pepper sprayed, and subjected to racist insults, before they were finally able to flee to safety. *See, e.g.*, PX 2348, 2676; Dkt. 1431 (Nov. 15) 121:4–126:16.

Unite the Right was the culmination of substantial preparations by Kessler and his coordination with various Alt-Right and white supremacist organizations. The online communications platform Discord was a focal point for much of the Unite the Right planning. Kessler served as event coordinator and moderator for the Unite the Right server on Discord; as such, he had the ability to remove members from Discord chats and to ban anyone from posting. Kessler was on the Unite the Right Discord server every day from June 7 to August 11, 2017. *See* Dkt. 1431 (Nov. 15) 61:3–62:3.

For Kessler, violence would be a central feature of Unite the Right. He sought to organize a repeat of the "Battle of Berkeley"—violent clashes that had taken place in Berkeley,

---

[6] *See, e.g.*, Dkt. 1419 (Nov. 10) 221:20-22 (Spencer: "Who, to your knowledge, was the organizer of … Unite the Right …?" Damigo: "That would be Kessler."); Dkt. 1401 (Nov. 10) 179:24 – 180:1 (Spencer: "To your understanding, who was the chief organizer of the Unite the Right rally?" Dr. Michael Hill: "Jason Kessler."); Dkt. 1413 (Nov. 9) 216:6-7 (Spencer: "[W]ho was the organizer of Unite the Right?" Matthew Parrott: "On paper, it was Mr. Kessler."); Dkt. 1428 (Nov. 12) 197:22-24 (Q. "And you considered Mr. Kessler to be one of the organizers of the rally, correct?" Jeff Schoep: "Correct.").

[7] Kessler knew these chants were offensive to Jewish persons. *Id.* at 130:21–131:5.

15

California several months prior. In May 2017, Kessler wrote on Discord that "**I think we need to have a Battle of Berkeley situation in Charlottesville. Bring in the Alt-Right, Proud Boys, Stickman, Damigo, Spencer and fight this shit out**." PX 552 (emphasis added).[8] Kessler knew Damigo had punched a woman at the "Battle of Berkley," and that another individual, Kyle Chapman, got the nickname "Stickman" because he hit somebody with a leaded stick at Berkeley. Dkt. 1431 (Nov. 15) 53:4–54:5. Kessler wanted a "publicized event" in Charlottesville where Antifa would "bring everything they've got and we do to[o]." PX 552. Kessler acknowledged "[t]he alt-right is a dangerous movement" that "feeds on the chaos energy of our unchecked racism bantz[9] but [in real life] activism you have to be more like a civil rights movement for whites. Its [sic] difficult to say that you can contain that manic energy and maintain the enthusiasm." PX 551. However, Kessler "would go to the ends of the earth to secure a future for my people with or without the funny bantz." Kessler believed: "**This is war**." *Id.* (emphasis added).

In early June 2017, Kessler invited people interested in attending Unite the Right—which he dubbed, "**The Battle of Charlottesville**"—to join the Discord server. PX 3548 (emphasis added). Elsewhere, he called it: "East Coast Berkeley." PX 8652 (Kessler: "Assemble every motherfucker you can."); *see also* Dkt. 1431 (Nov. 15) 62:16–63:23. And so, in the months leading up to Unite the Right, Kessler began contacting codefendants to invite them and their organizations to participate in the rally in Charlottesville. This included: from Traditionalist Worker Party, Matthew Heimbach, Matthew Parrott, and Derrick Davis; from Vanguard

---

[8] Kessler went by several handles (usernames) on Discord, including "MadDimension" and "Zebo," and he posted under the name "Ambien Falcon" on Facebook. Dkt. 1431 (Nov. 15) 55:16-20, 58:17-19.

[9] Kessler testified that "bantz" refers to "banter or joking." Dkt. 1431 (Nov. 15) 56:1-13.

America, Dillon Hopper; from National Socialist Movement ("NSM"), Jeff Schoep; from

League of the South, Dr. Michael Hill; from Identity Evropa, Elliott Kline and Nathan Damigo;

Richard Spencer, sometimes directly and through his designees; Christopher Cantwell; Robert

"Azzmador" Ray; and many others. *See, e.g.*, Dkt. 1431 (Nov. 15) at 64:12-17, 65:17–66:11,

67:8-16, 67:17–68:15, 68:16-20, 69:9-13, 72:1-17, 79:14-19; PX 190. Kessler wanted "all the

groups … as many people as possible to attend" Unite the Right. *Id.* at 69:18-21. Kessler talked

to Cantwell, Heimbach, Hill, Kline and many others numerous times about planning and

preparations for Unite the Right. *See, e.g.*, Dkt. 1431 (Nov. 15) 80:13–82:23; *see also id.* at

82:17, 23 (Kessler: "I talked a lot about it … I talked to them a lot, yeah."). On June 5, 2017,

Kessler wrote to Spencer: "**[W]e're raising an army my liege. For free speech, but the

cracking of skulls if it comes to it**." PX 1455 (emphasis added).

As numerous private social media messages reflect, Kessler undertook several steps

ahead of time to try to spark violence at Unite the Right between the rally-goers and "Antifa."

When someone asked Kessler, "[w]hat's the situation with Antifa", and "are they coming[?]"

Kessler responded: "I don't know yet. I hope so. … It's really up to the Antifa to respond and

not be pussies. I would suggest taunting them a little on social media[.]" PX 1437-B at 2; *see id.*

(another responding, "I'm ready to throw down"). Kessler enlisted others to help when he felt

somewhat constrained in what he could do "as the event organizer." PX 3560 at 2 ("I want to

talk shit but as the event organizer I can only do so much."). His directions were that "[p]eople

need to bullycide [sic] them into 'confronting the alt-right' in Charlottesville. *Id.*; Dkt. 1431

(Nov. 15) 86:24–89:1. In another private social media message,  Kessler wrote that "[w]e need a

new way to tip off Antifa when we want them to show up somewhere," suggesting having

someone "send photos and tips to their members," perhaps through "a fake account." PX 1432-A

at 3;[10] *accord* PX 1444C at 3 (Kessler: "Should we alert Antifa for Thursday's meetup or just the Proud Boys event on Saturday?"). They discussed in considerable detail what information to provide, through what channels and in what manner, in order to spark the desired response. Per Kessler: "We definitely want to play these people into our hands Saturday in Charlottesville." PX 1432-A at 3.

Kessler made sure those attending Unite the Right would be well prepared to fight. In a post to "@everyone" in the Unite the Right Discord server entitled, "regarding self-defense," Kessler advised: "I recommend you bring picket sign posts, shields and other self-defense implements which can be turned from a free speech tool into a self-defense weapon should things turn ugly." PX 1034.[11] However, Kessler wanted to dissuade rallygoers from openly carrying firearms, writing: "We ultimately don't want to scare [Antifa] from laying hands on us if they can't stand our peaceful demonstration." *Id.* This was a consistent theme. For instance, another user wrote on the Unite the Right Discord server: "It's not even about optics, if we want the chance to beat down antifa, showing off guns so that it's just a screaming match isn't the way to do it. If we want something decisive we shouldn't have something deterring them from attacking us." PX 952 at 1. Kessler "100% agree[d]," and wrote: "**If you want the chance to crack some Antifa skulls in self-defense don't open carry.**" *Id.* at 7 (emphasis added); PX 1461C at 2 (Kessler: "The main thin[g] is I just don't want a lot of big scary guns out there that

---

[10] Indeed, creating and using fake social media accounts to try to drum up conflict points between the "Alt Right" and "Antifa" was a tactic long known to Defendants. In 2016, Damigo wrote on the Identity Evropa Discord server: "I need a small, fake antifa army," and further, "as many people as possible need to create accounts. Create multiple if possible. Make them as realistic as you can, and then post the link to the account here so other people can follow them making them look more realistic." *See* PX 881.

[11] In a Facebook conversation with Derrick Davis from Traditionalist Worker Party, Kessler asked Davis if he had "a pole or something [he] could wave this Rebel Flag from?" PX 1444D at 3. Davis suggested Kessler get a flagpole that "[c]an be weaponized." *Id.* at 2.

will keep Antifa away. I want them to start something."); *id.* (Kessler: "I don't want to scare Antifa off from throwing the first punch.").

Kessler planned the torch march for months. It would ultimately occur on August 11, 2017, but Kessler kept it secret including from police, who reached out to Kessler about the rally itself planned for August 12. *E.g.*, Dkt. 1431 (Nov. 15) 104:7-23, 112:15-20. Kessler also was less-than-forthcoming to the police about the rally—for instance keeping the total number of anticipated number of attendees from the police. *Id.* at 105:17-21 (Kessler: "If the police ask you how many people we have coming, don't tell them. If they think we have more than 400 they might be able to help the city pull our permit.").

Just as Damigo had the Identity Evropa Discord server deleted after Unite the Right, Kessler similarly directed that the "Charlottesville 2.0" Discord server be deleted two days after Unite the Right. Kessler was alerted by another user on Discord to a concern that the then-Attorney General "was investigating the alt right," and that "**[t]he Cville server needs to be deleted. Its** [sic] **compromised and has people talking about committing violence**. Its [sic] filled its purpose. We are able to coordinate without it." PX 332 (emphases added); Dkt. 1431 (Nov. 15) 151:13 – 152:6. Kessler agreed and directed Kline to delete the server, which he did. *See* Dkt. 1431 (Nov. 15) 158:1–19 (Kessler: "We still need to delete the C'ville server." Kline: "All right, the Discord [server] is handled.").

In other words, Kessler was by his admission a lead organizer of Unite the Right, in which he sought to reprise the violent "Battle of Berkeley" into the "Battle of Charlottesville"; Kessler knowingly invited violent people to Unite the Right, including those like Damigo who gained notoriety for violence in Berkeley; Kessler professed to be "raising an army" for Richard Spencer, for "the cracking of skulls if necessary"; Kessler encouraged attendees to bring signposts, shields and other "self-defense implements" which could transformed from "free

speech tool[s] into [ ] self-defense weapon[s] should things turn ugly"; Kessler believed Antifa wouldn't initiate the fight, and so he schemed to provoke violence with Antifa; and after Unite the Right, Kessler tried to delete the record of their digital communications planning Unite the Right on Discord, though he ultimately failed in that endeavor. And after Unite the Right, Kessler reiterated his support for codefendant James Fields, and expressing numerous times that Heather Heyer—who Fields killed in his car attack on August 12, 2017—was to blame for her own death. *See, e.g.*, Dkt. 1431 (Nov. 15) 153:5-11 (Kessler, calling Heyer "a communist," "[c]ommunists have killed 94 million. Looks like it was payback time."); *id.* at 153:23–154:3 ("To reclarify: I 100 percent believe Heather Heyer was to blame for participating in an armed mob blocking traffic during a state of emergency.").

Kessler argues that his conduct never amounted to anything more than self-defense or preparing for himself and the other participants in Unite the Right rally to be prepared to defend themselves. Dkt. 1522 at 5–6. The jury was instructed about Kessler's (and the other defendants') self-defense theory at considerable length. Dkt. 1461 at ECF 54–56. The jury simply didn't believe it. That's unsurprising. The evidence of Kessler's participation in a civil conspiracy to commit numerous unlawful acts—which resulted in widespread violence during weekend of August 11–12, 2017, including Plaintiffs' injuries—was absolutely overwhelming. There's no error in the jury finding Kessler liable for Virginia state law civil conspiracy in Count III.

Finally, Kessler argues that the jury improperly found him liable for racial, religious, or ethnic harassment or violence in violation of Virginia Code § 8.01-42.1, and therefore seeks a directed verdict on Count IV. Dkt. 1522 at 8–9. Kessler argues that the evidence of his activities at the torch march only show him "engaging in First Amendment protected expressive activity."

*Id.* He asserts that participation in "the torch march itself, without the violence at the rotunda," was "lawful activity," and that he "had nothing to do with the violence at the Rotunda." *Id.* at 9. Kessler also argues that neither Plaintiff Romero or Willis claims to have heard or seen him at the torch march, further supporting his argument for a directed verdict. The Court disagrees. Kessler is not entitled to a directed verdict on Count IV.

The jury could find Kessler liable under § 8.01-42.1 if it found, by a preponderance of the evidence, that he subjected Plaintiffs Romero and Willis to acts of intimidation, harassment, or violence directed at their persons, and that his actions were motivated by racial, religious, or ethnic animosity. *See* Va. Code § 8.01-42.1(A); Dkt. 1461 at ECF 41 (jury instructions). There was such evidence and more in the record. Kessler testified that it was originally his idea to hold the torch march the evening of August 11, 2017. Dkt. 1431 (Nov. 15) 111:14–112:10. Kessler planned and organized the torch march in the preceding months, including notifying potential attendees on the Charlottesville 2.0 Discord server and making sure attending groups would have tiki torches. *Id.* at 113:10–114:23. Then, on the evening of August 11, 2017, Kessler, along with Spencer and Kline, *led* the hundreds carrying lit torches and chanting "You will not replace us," "Jews will not replace us," "Blood and Soil," through University of Virginia grounds, down its historic Lawn, and up the steps of the Rotunda. Dkt. 1431 (Nov. 15 Tr.) 121:4–122:8, 125:22-23; Dkt. 1397 (Nov. 4) 147:24-25 (Spencer: "I was in the lead, I think that's fair"), *id.* at 148:8-14; PX 2348, 2676. Kessler conceded at trial that the chants used during the torch march, including "Jews will not replace us," and "Sieg Heil," were offensive and intimidating to Jewish persons. Dkt. 1431 (Nov. 15) 130:11–131:5.

When Kessler, leading the torch-wielding marchers, approached the top of the Rotunda steps, he saw a small group of counter-protestors surrounding the Thomas Jefferson statue down below. Dkt. 1431 (Nov. 15) 125:1-3. Those included Plaintiffs Romero and Willis, who had

linked arms with others around the statue. Dkt. 1378 (Oct. 29) 23:19–25:2, 170:1-17. Then, Willis described an "ocean of light and flames just starts spilling over both sides of the steps, and it's washing down," and "they basically just rushed the entire area and surrounded all of us in a matter of seconds." *Id.* at 172:7-13. The Unite the Right rallygoers yelled at Romero, Willis, and the other counter-protestors: "go back to where you came from," "stupid bitch," "blood and soil," "Jews will not replace us," "you will not replace us"; and they made "[m]onkey noises" at them. *Id.* at 25:17-23, 172:22–173:12, 176:22-25; *see, e.g.*, PX 3474A; PX 2680, 3011; CCEX0004B. Willis, who is black, testified that he "was really scared because it looked like a lynch mob." Dkt. 1378 (Oct. 29) 176:1-2. Romero testified that the rallygoers threw a torch at her that landed centimeters from her foot and sprayed mace at her and the other counter-protesters. *See id.* at 29:1-14. Willis testified that he was pepper-sprayed, which left him struggling to breathe, and "someone from the direction of the mob threw … mysterious fluid" that appeared to be tiki torch lighter fluid at him. *Id.* at 181:1-19. He feared the mob was trying "to burn [them] alive." *Id.* After the event, Defendant Spencer blithely acknowledged that the crowd they had assembled refused to let the surrounded counter-protestors leave. *See* Dkt. 1397 (Nov. 4) 155:22–156:8 (responding "Fact Checked: True" to tweet that evening: "They surrounded us at the statue. They wouldn't let us out"); PX 2500. As Defendant Spencer testified, their actions pinning the counter-protestors at the statue were meant to be "a sign of dominance." Dkt. 1397 (Nov. 4) 156:9-12.

Kessler argues that his involvement was nothing more than conduct and expression protected by the First Amendment. Dkt. 1522 at 8–9. However, conduct that "authorized" or "directed" tortious activity, or speech "likely to incite lawless action," are not protected. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982). To be sure, Kessler testified that he tried unsuccessfully to turn the crowd descending the steps of the Rotunda from the counter-protesters

by putting up his hands and saying "Stop." Dkt. 1431 (Nov. 15 Tr.) 125:17-20; *see also id.* at 126:11-17 ("I had a torch in my hand and I said, 'Stop.'"). But Kessler said "[t]hat was not within my power. I tried," and he tried to deflect blame elsewhere. *Id.* 126:19-23 ("There was another guy named Eli Kline who had a megaphone and was directing them."). The jury was not required to believe Kessler's testimony on this or any other point. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from facts are jury functions"). Indeed, that testimony is all the more incredible given that it runs counter to the substantial evidence that Kessler had labored ceaselessly for months to create a violent racial flashpoint in Charlottesville that weekend. Moreover, the jury could have further found Kessler's contention that he tried to stop any violence less-than-credible given his comments immediately after the torch march, which belied no such concern. He saw it as "an incredible moment for white people," Dkt. 1431 (Nov. 15. Tr.) 131:14–132:2. And despite Kessler's attempt at trial to throw Kline under the bus, at the time he praised Kline's "excellent work" on the torch march. *Id.* at 134:10-13. The torch march mob Kessler devised, assembled and personally led through campus surrounded, intimidated, harassed and injured counter-protestors including Plaintiffs Romero and Willis. There was more than ample evidence upon which the jury could find Kessler liable to Plaintiffs Romero and Willis for intimidation, harassment or violence that was motivated by racial, religious, or ethnic animosity, in violation of Virginia Code § 8.01-42.1.

### **Christopher Cantwell**

Plaintiffs introduced more than substantial evidence to support the jury's verdict finding Christopher Cantwell liable for Virginia state law civil conspiracy (Count III), and committing

religious or ethnic harassment or violence, violating Virginia Code § 8.01-42.1 (Count IV).[12]

Moreover, Cantwell has not shown he is entitled to directed verdicts on either Counts I or II.

Accordingly, Cantwell's post-trial motions will be denied as to their challenges to liability.

### A.  Substantial Evidence Supports the Verdict

Cantwell testified that in 2017, his podcast had between 10,000 and 20,000 listeners,

including some "armed extremists." Dkt. 1431 (Nov. 15) 198:10-17. Cantwell advocated for a

white ethnostate and called for violence on his podcast. *Id.* at 198:18-25, 203:23-25. Cantwell

candidly acknowledged that what he said on his podcast could influence people's behavior,

including committing violence. *See id.* at 199:1-3; *see also id.* at 200:10-25; PX 2664. In one

episode of his podcast, for example, a caller said: "Dylann Roof is the kind of guy that had no

future anyways. This is exactly the kind of person who should be committing acts of mass

murder[.]", to which Cantwell responded: "That's a very solid point … Not everyone [is] going

to be to be a professional propagandist, shall we say. **Some of us got to be fucking cannon**

**fodder for the race war**." *Id.* at 205:13–206:11 (emphasis added). Cantwell further posted a

video supporting running over protestors with cars. *See id.* at 207:10-23; PX 2644 (posting video

of protestor standing in middle of street, writing: "Hey, communist, remember this like your life

depends on it, because it does. Blocking traffic is not peaceful protest and every person who

reminds you of that without using his car is giving you more slack than you fucking deserve.").

Cantwell was invited to speak at Unite the Right by Augustus Sol Invictus and Jason

Kessler. Dkt. 1431 (Nov. 15) 220:21–224:25, 280:5-7. Cantwell invited listeners of his podcast

---

[12] As Plaintiffs argue, because Defendant Cantwell did not move for directed verdict on Count IV, he cannot file a renewed motion for directed verdict on that specific count. Dkt. 1574 at 18. In any event, more than substantial evidence supports the jury's findings of liability on Count IV, for the reasons that follow.

to join him at Unite the Right, and he promoted the rally on his podcast and website. Dkt. 1431 (Nov. 15) 215:21-23, 225:10-21. On his podcast and elsewhere, Cantwell made many wildly antisemitic statements including that "[t]he Jew is the enemy of the human race," Dkt. 1431 (Nov. 15) 211:1-25; PX 1886A; *see also, e.g.*, Dkt. 1431 (Nov. 15) 210:18-25; *id.* at 1-24; PX 2584, saying that Jewish persons were "responsible for communism," and Cantwell believed "that's a fucking really good reason to fucking genocide a group of people," Dkt. 1431 (Nov. 15) 237:12–238:3, and statements denigrating black persons and other minorities, *see, e.g.*, Dkt. 1431 (Nov. 15) 215:8-20; PX 2710A. Cantwell communicated with Spencer, Kessler, Kline, and others about Unite the Right in the lead-up to the rally. *See, e.g.*, Dkt. 1431 (Nov. 15) 217:6-25, 224:17-25, 226:24–227:12. Cantwell and Kessler discussed Kessler coming onto Cantwell's podcast to promote Unite the Right. *E.g.*, Dkt. 1431 (Nov. 15) 224:1-25; PX 190. Among others, Cantwell had Kessler, Spencer, Heimbach, Robert Ray, and Dillon Hopper as guests on his podcast. Dkt. 1431 (Nov. 15) 220:12-20.

Cantwell told Spencer he was "**willing to risk a lot for our cause, including violence and incarceration**," and **"[m]any in my audience would follow me there, too, but I want to coordinate to make sure its** [sic] **worth it to our cause**." Dkt. 1397 (Nov. 4) 121:13-16 (emphases added); Dkt. 1431 (Nov. 15) 240:7-16; PX 3317.[13] In the weeks before the rally, Cantwell began posting on the Unite the Right Discord server, including suggesting organizing a separate "parallel event somewhere other than Lee Park for women and children"—further

---

[13] Spencer responded: "It's worth it, at least for me." Cantwell continued, in this vein: "You're sure it's worth the risk of violence and imprisonment, but not worth a phone call with a guy who drove eight hours to get here and invite his audience of 10,000 people to follow him?" Dkt. 1431 (Nov. 15) 240:7-23.

evidence demonstrating Cantwell anticipated violence at Unite the Right. Dkt. 1431 (Nov. 15) 244:20–245:4.

Cantwell brought numerous weapons to Charlottesville for Unite the Right. PX 2103A. In addition to firearms, he brought "Kubotans"—metal rods attached to keychains that can be used as weapons—and canisters of pepper spray. Dkt. 1431 (Nov. 15) 241:6–242:15. Cantwell planned to sell them to "better arm our people," while making some "extra bucks." *Id.* at 243:1–244:14; PX 325A. Cantwell explained to a reporter: "I've got to organize an unknown number of armed extremists I've never met through a hostile environment with death threats and legal intimidation. We all have our crosses to bear." Dkt. 1431 (Nov. 15) 247:4-10.

On the night of August 11, 2017, Cantwell marched with Kessler, Spencer and the hundreds of others with lit tiki torches chanting "Jews will not replace us" and other slogans. As the marchers surrounded Plaintiffs Willis and Romero and the other counter-protesters at the Thomas Jefferson statue, Cantwell began, in his words, "beating the shit out of" somebody and pepper-spraying them. *Id.* at 253:11-16 ("I definitely just pepper-sprayed somebody. I'm not trying to evade that."); *id.* at 253:19–254:5. Cantwell admitted to the language he used against counter-protesters at Unite the Right: "I probably wouldn't have said 'N word,' but I probably said the N word. … I've almost certainly said that and a whole lot worse about the people who were counter-protesting at the Unite the Right rally." Dkt. 1431 (Nov. 15) 227:24–228:2.

After the rally, Cantwell gave Fields a Nazi salute, when he was briefly incarcerated in proximity to Fields. Dkt. 1431 (Nov. 15) 270:8-24. Later, Cantwell "gave [Fields] a hug" and told him, "I'm really sorry this happened to you." *Id.* Cantwell also referred to Heather Heyer's grave as a "urinal." *Id.* at 267:8-10. At bottom, there was more than substantial evidence that underlays the jury's finding that Cantwell was liable for Virginia state law civil conspiracy in

Count III, and religious or ethnic harassment or violence violating Virginia Code § 8.01-42.1 in Count IV. Nor has Cantwell shown he was entitled to a directed verdict on Counts I or II.

### B.  Legal Challenges Seeking a New Trial

Cantwell also seeks to raise a number of arguments that he might have, but did not, timely raise as a motion to dismiss or dispositive motion much earlier in the case. As this Court previously held, Cantwell was aware of the dispositive motions deadline of August 7, 2020, but he did not file a dispositive motion on these issues. *See* Dkt. 1344 at 1–2. Having failed to do so, Cantwell sought to improperly shoehorn these arguments into motions in *limine*. *Id.* at 3; *see also Witness Sys., Inc. v. Nice Sys., Inc.*, 2008 WL 2047633, at *1 (N.D. Ga. May 10, 2008) ("Defendants should have raised [the dispositive issue] in a properly supported motion for summary judgment rather than in a motion in limine on the eve of trial."). Undeterred, Cantwell seeks to raise these untimely arguments again in post-trial motions.

Cantwell argues that Plaintiffs' claims "arose *ex turpi causa* and thus are barred *in pari delicto*." Dkt. 1536 at 18. Cantwell contends that the evidence "showed that Plaintiffs either were or were in the company of the initiators of the violence at issue in this case." *Id.* Thus, Cantwell seeks to invoke the general rule that "a party who consents to and participates in an illegal act may not recover from other participants for the consequences of that act." *Lee v. Nationwide Mut. Ins. Co.*, 497 S.E.2d 328, 329 (Va. 1998). The doctrine is based on the view that "no one should profit from his illegal act." *Williams v. Harrison*, 497 S.E.2d 467, 470 (Va. 1998). The defense "bar[s] recovery if the evidence shows that the plaintiff freely and voluntarily consented to participation in the illegal act, without duress or coercion." *Lee*, 497 S.E.2d at 329. In *Lee*, for instance, a car thief could not recover from injuries resulting from the theft of the car and subsequent joyride. The party raising the defense has the burden to establish it. *Id.* Even if the defense was timely raised, it fails. There was *no* evidence that Plaintiffs came

to Unite the Right to cause violence or "terrorism," as Cantwell contends, much less such evidence as could have satisfied Cantwell's burden to establish the defense. Dkt. 1574 at 24 n. 6. The Court even permitted Cantwell to examine Plaintiffs and other witnesses about whether Plaintiffs had seen or been a party to any violence on August 11 and 12. Despite his consistent efforts to try to find some link with Antifa or any violence, there was absolutely no evidence that the Plaintiffs were anything other than innocent counter-protestors who went to the rally to peacefully voice their opposition to Defendants' messages. Moreover, the verdict reflects that the jury found that Defendants initiated the violence that led to Plaintiffs' injuries, and overwhelming evidence supports that finding.

Cantwell challenges the jury's verdict finding him liable for civil conspiracy in Count III. *See* Dkt. 1488 at 7–8. Cantwell argues that, because the jury did not reach a verdict on either Counts I or II, "the parties are now left to ponder just what law the Defendants were found to have conspired against." *Id*. at 7. Cantwell's argument lacks merit. The Virginia state law civil conspiracy instructions clearly described the elements of the offense. *See* Dkt. 1461 at ECF 38–40 (Instruction 23). And indeed, Cantwell does not contend otherwise. Cantwell's argument in this respect does nothing more than attempt to fabricate an inconsistency or ambiguity in the verdict when there is none. The jury found Cantwell liable for conspiracy. The jury also found Cantwell liable for one of the one of the listed predicate unlawful acts—racial, religious, or ethnic harassment or violence, in violation of Virginia Code § 8.01-42.1 (Count IV). Dkt. 1478 at 6–7. Put simply, Cantwell identifies no error at all in the Virginia state law civil conspiracy jury instructions, much less any basis to believe that he would have met his burden of showing the jury was not adequately informed based upon the entirety of the jury charge. Nor has Cantwell identified any basis to challenge the jury verdict form or the jury's verdict, which was consistent and not at all vague in its application against any Defendant, much less Cantwell.

Cantwell also argues that given the fact that the jury didn't reach a verdict on Counts I or II, that the jury must have found Defendants "liable for something other than violence, such as speech." Dkt. 1536 at 11. However, the Court contrasted "abstract advocacy of lawlessness, or mere advocacy of the use of force, which is protected speech" under the First Amendment, from whether Defendants committed the specific violations of law that Plaintiffs alleged, including a conspiracy alleged by Plaintiffs, which "are not protected by the First Amendment." Dkt. 1461 at ECF 53 (Instruction 30). The jury found Cantwell and the other Defendants liable for Virginia state law civil conspiracy, racial, religious or ethnic harassment or violence in violation of Virginia Code § 8.01-42.1, and other counts (for Fields). Juries are presumed to follow the court's instructions, *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009), including here that they found Defendants liable on Counts III and IV upon finding the elements of those claims satisfied, and not based upon mere advocacy or advocacy lawlessness or use of force.

### C.  Challenge to Juror

Cantwell raises a cursory challenge to this Court's refusal to strike a juror for cause. *See* Dkt. 1536 at 10. It appears Cantwell is challenging the Court's refusal to strike Juror 220. *See id.*; *see also* Dkt. 1324 (Oct. 26) 41–50. Cantwell argues that this juror expressed "pro-Antifa views on politically motivated violence," which he believed were "disqualifying." Dkt. 1536 at 10.

The Fourth Circuit has stated that "[a] trial judge has very broad discretion in deciding whether to excuse a juror for cause and his decision will not be overturned except for manifest abuse of that discretion." *Bright v. Coastal Lumber Co.*, 962 F.2d 365, 370 (4th Cir. 1992) (quoting *Poynter v. Ratcliff*, 874 F.2d 219, 222 (4th Cir. 1989)). "A juror is presumed impartial and the existence of a preconception is insufficient to rebut this presumption if the juror can 'lay

aside his impression or opinion and render a verdict based on the evidence presented in court." *Poynter*, 874 F.2d at 221 (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)).

While Cantwell has argued that Juror 220's "pro-Antifa views" meant that he had "an extremely favorable view of a group that hunts the defendants like dogs in the street," Dkt. 1324 at 48–49; Dkt. 1536 at 10, the juror expressed no such thing. To the contrary, the juror candidly explained that to the extent he had an "extremely favorable" view of "Antifa," it was based on his understanding of "Antifa as being abbreviated 'anti-fascist,'" and so he explained that: "I would consider myself an anti-fascist, in that sense, just like a GI in World War II is an anti-fascist." Dkt. 1324 at 43. That historically grounded answer, as well as the juror's demeanor in response to questioning proposed by the parties, belied no partiality. In any event, Juror 220 repeatedly and credibly answered that, regardless of his opinion(s) concerning Black Lives Matter and Antifa, he could set aside his personal opinions about those groups and that those personal opinions would not affect his reaching a verdict in the case. *See, e.g.*, *id.* at 45; *id.* at 48 (The Court: "Irrespective of any preconceived opinions you might have about any organization, can you set aside those preconceived opinions and try this case solely according to the law and the evidence you hear in the courtroom?" Juror 220: "I believe I can, yes."). In other words, Cantwell's conclusory arguments provide no sound reason to conclude that Juror 220 had to be struck for cause. Further still, Defendants ultimately used a peremptory strike to remove Juror 220 from the panel, and Cantwell has not even attempted to argue, let alone demonstrated, that "using a peremptory challenge on [Juror 220] prevented them from challenging another undesirable juror." *See Bright*, 962 F.2d at 370. This argument is therefore rejected.

### D.  Challenges to Jury Instructions

Cantwell also raises a number of challenges to the Court's jury instructions. In considering a challenge to jury instructions, the Fourth Circuit asks "whether the instructions

construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Baily v. Cnty. of Georgetown*, 94 F.3d 152, 156 (4th Cir. 1996) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1395 (4th Cir. 1987)). "The party challenging jury instructions faces a heavy burden." *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011).

     ***Negligence Defenses.*** Cantwell challenges this Court's instruction that negligence defenses, including assumption of risk, contributory negligence, and sudden emergency, were not valid defenses to Plaintiffs' claims. Dkt. 1461 at ECF 57 (Instruction 32). Cantwell argues in his post-trial motions that these defenses applied to Count IV. *See* Dkt. 1488 at 15. But it is a "familiar principle that contributory negligence is not a defense to an intentional tort," *Williams*, 497 S.E.2d at 469, and assumption of risk is a defense "from the negligent or reckless conduct of the defendant," not an intentional tort, *see* Restatement (Second) of Torts § 496A (1965). Cantwell cites no authority to the contrary. Count IV was for the commission of an intentional tort, and the jury found, based on overwhelming evidence at trial, that Cantwell and Defendants subjected Plaintiffs to intentional acts of harassment, intimidation, or violence, motivated by racial, religious, or ethnic animosity. The jury was properly instructed that negligence defenses did not apply, and Cantwell identifies no error in this regard.

     ***Adverse Inference Instruction.*** Next, Cantwell challenges the general jury instruction on evidentiary sanctions and adverse inferences, both of which were allowed against certain defendants. *See* Dkt. 1536 at 12. Cantwell argues that the instruction did not sufficiently limit any improper "spillover" effects on those Defendants who were not subject to evidentiary sanctions, including himself. *Id.* at 12–13. The jury instruction was proper. It stated to the jury, in pertinent part and in plain language: "You are cautioned, however, that each party is entitled to have the case decided solely on the evidence that applies to that party. *Sanctions against these*

*parties have no bearing on other parties*." Dkt. 1461 at ECF 51 (Instruction 28) (emphasis

added). The jury was elsewhere reminded of this same admonition, especially with respect to

other evidence that could not be considered as against Cantwell. *Id.* at ECF 52 (Instruction 29)

("As I instructed you throughout the trial, and I will remind you again that each party is entitled

to have the case decided solely on the evidence that applies to that party, and some of the

evidence in this case is limited under the rules of evidence to some of the parties and cannot be

considered against the others."). Again, juries are presumed to follow the court's instructions.

*Hensley*, 556 U.S. at 841. While Cantwell argues that, at one point, Plaintiffs tried to skirt this

instruction in their closing arguments, Dkt. 1536 at 12–13, he failed to raise a contemporaneous

objection to the issue, Dkt. 1469 (Nov. 19) 6:1-18. In any event, the Court further instructed the

jury that closing arguments weren't evidence. Simply put, Cantwell offers no basis to conclude

that the jury ignored the Court's repeated and express limiting instructions, such that he suffered

any improper spillover from the evidentiary sanction instructions.

  ***Limitations on Use of Depositions***. Cantwell also argues in a conclusory fashion that

some of Plaintiffs' deposition designations were inadmissible against him, "and the limiting

instruction was insufficient to cure this prejudice." Dkt. 1536 at 11–12. This argument has no

merit. Indeed, the Court included a specific instruction entitled "Limited Use of Depositions as

Against Defendant Cantwell." Dkt. 1461 at ECF 52 (Instruction 29). It specifically explained

that Plaintiffs introduced deposition testimony from a number of specified witnesses, "which

may not [be] considered by you in connection with Defendant Christopher Cantwell, because of

his inability to be at the deposition and lack of notice thereof. However, it may be considered by

you in connection with the other Defendants." *Id.* Moreover, the Court repeatedly gave this

instruction when the relevant deposition testimony was played.[14] Again, juries are presumed to

follow the Court's instructions, and Cantwell's cursory argument offers no basis to challenge

either the instruction itself or to believe it was insufficient to limit the jury's consideration of

evidence as against him.

### E.  Evidentiary Challenges

Cantwell raises a host of challenges to the Court's evidentiary rulings. None have merit.

***Professor Peter Simi***. Cantwell argues that the Court should not have allowed the

testimony from Plaintiffs' expert, Dr. Peter Simi. *See* Dkt. 1536 at 14–15. Cantwell writes that

an expert generally cannot be "called in to call someone a liar." *Id.* at 14. According to Cantwell,

"the purpose of Simi's testimony," and "the thrust of what Simi testified," is that Defendants'

statements were "Doublespeak," which effectively was calling them "a racist liar" using other

verbiage. *Id.* at 14. Defendants previously raised this issue, the Court thoroughly considered it,

and denied Defendants' motion to exclude Dr. Simi on this basis. *See* Dkt. 937, 941. The Court

explained that "[e]xpert testimony has long been allowed to explain to a jury the meaning of

coded language," and Professor Simi's testimony concerned "strategies [that] are akin to coded

language meant to deceive outside groups about the meaning of conversations …." Dkt. 941 at 2.

Accordingly, the Court concluded that the testimony was "grounded in numerous specific

examples, and it fit[ ] well within the types of specialized knowledge that courts have regularly

---

[14] *See, e.g.*, Dkt. 1443 (Nov. 16) 31:16-23 ("Members of the jury, I'm going to read this instruction I've read several times about depositions taken when Mr. Cantwell did not have notice or attend. I remind you that each party is entitled to have the case decided solely on the evidence that applies to that party. Some of the evidence in this case is limited under the rules of evidence to some of the parties and cannot be considered against others. The plaintiff introduced the deposition of Mr. Griffin … Such deposition testimony may not be considered by you in connection with Defendant Christopher Cantwell, but it … may be considered by you in connection with the other defendants.").

found helpful to a jury." *Id.* Nonetheless, the Court explained that Defendants would be afforded the "traditional and appropriate means" of challenging expert testimony, including the ability to conduct "vigorous" cross examination, to present any contrary evidence, and that the jury would be carefully instructed about expert testimony. *See id.* at 25. Cantwell and the other Defendants were afforded that substantial opportunity to conduct that vigorous cross examination. Dkt. 1422 (Nov. 11) 93–208. Cantwell's arguments on this point do not provide any basis for the Court to reconsider its prior rulings on this issue.

Cantwell also contends the Court improperly refused to permit him from asking Dr. Simi questions about "critical race theory." Dkt. 1536 at 15–16. Cantwell had substantial opportunity to cross examine Dr. Simi. Dkt. 1422 (Nov. 11) 178–209. Notably, the Court did not forbid Cantwell from asking Dr. Simi about critical race theory. He asked several questions about the topic, which the Court allowed, overruling Plaintiffs' initial objection to the line of questioning. *Id.* at 183:25–185:7. To be sure, the Court did sustain Plaintiffs' following objection that Cantwell's line of questioning was "really getting far afield." *Id.* at 185:11-23. Given the extremely marginal (if any) relevance Cantwell's questioning on this topic had to the legal claims and fact issues before the jury, there was no error in stating that Cantwell should "go on" from this topic. *Id.* at 186:2. Moreover, Cantwell was able to question Dr. Simi at length about his views whether "white supremacy" was categorized by violence, *id.* at 186:3–188:14, undermining any argument that he was precluded from asking Dr. Simi such questions that he believed were material to his defense, *see* Dkt. 1536 at 15–16.

**Dr. Deborah Lipstadt**. Cantwell also argues that the testimony of Plaintiffs' expert Dr. Lipstadt should have been excluded. Dkt. 1536 at 17. Dr. Lipstadt testified without objection as an expert in antisemitism, and its history, rhetoric, language, and symbols. Dkt. 1393 (Nov. 3) 146:12-17. Cantwell argues that her testimony served no "legitimate purpose." Dkt. 1536 at 17.

However, using her expertise, Dr. Lipstadt examined substantial materials concerning the Unite

the Right rally (including emails, podcasts, videos, and written material) to look for evidence of

and expressions of antisemitism and Nazi symbolism. Dkt. 1393 (Nov. 3) 146:22–147:3. And

Dr. Lipstadt concluded that in her opinion, "there was a great deal of overt antisemitism and

adulation of the Third Reich … throughout the evidence that [she] looked at." *Id.* at 147:18-21.

Such evidence was relevant and particularly material to, among other things, the issue of

Defendants' motive. *See* Dkt. 1461 at ECF 26 (Instruction 16 – 42 U.S.C. § 1985(3) – Racial

Animus); *id.* at ECF 41 (Instruction 24, describing elements of violation of Va. Code § 8.01-

42.1, including that "Defendants' actions were motivated by racial, religious, or ethnic

animosity"). Contrary to Cantwell's argument, there was certainly a "legitimate purpose" to the

expert testimony of Dr. Lipstadt.

      Cantwell further contends that Dr. Lipstadt's testimony should have been excluded

because it was prejudicial. Dkt. 1536 at 17. The Court concludes that the probative value of the

testimony outweighed any such prejudice. *See* Fed. R. Evid. 403 (providing that "[t]he court may

exclude relevant evidence if its probative value is substantially outweighed by a danger of one or

more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay,

wasting time, or needlessly presenting cumulative evidence"). Moreover, the challenged

testimony was not "unfairly prejudicial" to Cantwell or Defendants, such as would cause an

"undue tendency to suggest a decision on an improper basis." Fed. R. Evid. 403 & advisory

committee's note (1972 proposed rules). The "mere fact that the evidence will damage the

defendant's case is not enough—the evidence must be *unfairly* prejudicial, and the unfair

prejudice must *substantially* outweigh the probative value of the evidence." *United States v.*

*Hammoud*, 381 F.3d 316, 341 (4th Cir. 2004) (en banc) (emphasis in original), *vacated on other*

*grounds*, 543 U.S. 1097 (2005), *relevant part of prior opinion reinstated*, 405 F.3d 1034 (4th

Cir. 2005); *see also United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998) (explaining that "[e]vidence that is highly probative invariably will be prejudicial to the defense," but that Rule 403 only excludes "unfair" prejudice). Upon consideration of Cantwell's arguments and the relevant testimony, the Court determines there is no basis to conclude that there was any unfair prejudice, much less any unfair prejudice that would substantially outweigh the probative value of the evidence.

The Court previously rejected Cantwell's pre-trial motion to exclude Dr. Lipstadt's testimony. *See* Dkt. 1347 at 2–3. While Cantwell apparently raises those arguments again by reference, he does not develop any argument challenging that prior decision (much less provide any valid basis to do so). *See* Dkt. 1536 at 17 (stating, in full, "Cantwell generally reasserts his pretrial objections to Lipstadt's testimony.").

***Video Evidence***. Cantwell contends that it was error for this Court to exclude video evidence he sought to introduce, showing a non-party Dwayne Dixon reading from a sheet of paper. *See* Dkt. 1488 at 21–22. Cantwell contends that the video helps explain why some Defendants believed that Fields "did nothing wrong." *Id.* at 22. Subject to a pretrial motion, the Court excluded the video evidence because Cantwell had not authenticated it under Fed. R. Evid. 901(a); it would be inadmissible hearsay; and, even if relevant, there was a high risk of misleading the jury and wasting time on unrelated issues. *See* Dkt. 1345 at 1–2. However, the Court denied Cantwell's motion *without prejudice*, and wrote that, "[i]f Cantwell can fix the evidentiary issues described here, he may be able to introduce the video at trial." *Id.* at 2. Cantwell does not argue, much less substantiate, how he could have fixed any—much less all— of these barriers to admissibility. Accordingly, there was no error in the Court's exclusion of the video evidence. Moreover, the jury heard ample evidence that some Defendants believed Fields

did "nothing wrong" when he plowed his car through the counter-protestors, killing one and seriously injuring dozens of others. *See, e.g.*, PX 2867A, 2867B, 2867C.

 ***Rally Permit Litigation Evidence***. Cantwell argues that evidence and testimony concerning the litigation relating to the city-issued permit for the Unite the Right rally "should have been allowed for a limited purpose." Dkt. 1488 at 23. Cantwell acknowledges, as he must, that "an injunction on the permit did not confer a right to unlawful conspiracy," but he argues that did not make the matter irrelevant. *Id.* Rather, he argues that it was relevant to Defendants' state of mind, and that his body-camera footage showed that they were celebrating "a legal victory" rather than "plann[ing] racially motivated violence." *Id.* Therefore Cantwell contends that "much of" his body camera footage was rendered "unusable," since it concerned the permit litigation. *Id.* There are a number of reasons why Cantwell's argument lacks force. Evidence of the underlying permit litigation would greatly risk confusing the issues and misleading the jury, which risks substantially outweighed any marginal relevance. *See* Fed. R. Evid. 403 & advisory committee's note (1972 proposed rules). In any event, Cantwell argues that he was prejudiced by not being able to play his body camera footage in greater length because it allowed Plaintiffs to introduce Kline's statement to "bring your fighters," without necessary context. Dkt. 1488 at 24 (¶¶ 64–65); Dkt. 1574 at 34 (point 3). Cantwell did not object at trial to Plaintiffs playing that specific clip from his body camera footage. Dkt. 1443 (Nov. 16) 159:11-15. And, after Plaintiffs introduced that video, Cantwell was able to testify to the very context he states he needed to provide—i.e., "that plan went out the window" when, "[a]fter that clip," they learned that "[their] permit was intact." *Id.* at 161–62; CCEX153G. In other words, the very prejudice

Cantwell says he experienced did not materialize, from Plaintiffs' introduction of a piece of evidence Cantwell agreed could be admitted.[15]

### F.  Challenge to "Unfairness" of Trial

Finally, the Court rejects Cantwell's argument that his trial was "unfair" because he was incarcerated from January 2020 until trial, and afterward. *See, e.g.*, Dkt. 1536 at 2–6. Cantwell alleges that during the period when he was incarcerated, Plaintiffs sent him materials where he was held when Plaintiffs "had discovery demands" of him, but when "Plaintiffs benefitted from Cantwell's silence," they did not send those communications to his jail. *Id.* at 3. Cantwell argues that when this "misconduct was discovered," Plaintiffs sent him a "2 terabyte encrypted hard drive to the jail where Cantwell was being held." *Id.* Cantwell complains that subsequently he was "stripped … of his property" by the U.S. Marshals and transported to another prison in Mississippi, and then about a month later, transported to USP Marion in Illinois. *Id.* And, he contends that while he "arranged to have the hard drive sent to him at USP Marion, [ ] in September [2021], [he] moved for a continuance. *Id.* at 3–4. Cantwell asserts that "[w]hen [he] was transported, he was not allowed to take any papers or the hard drive with him," and that his subsequent move to Central Virginia Regional Jail "further obstructed his trial preparations." *Id.* at 4.

Cantwell cannot avoid the consequences of one indelible fact—that he was offered the choice to sever his trial from that of his co-Defendants and thus a continuance, to afford him the opportunity to remedy any difficulties he'd experienced preparing for trial (real or perceived) on account of his incarceration. On the eve of trial, Plaintiffs filed a letter motion requesting that the

---

[15] Cantwell provides no sound reason why this Court can, let alone must, engage with his argument that a retrial on Counts I and II should be conditioned on a retrial of all counts—which is a hypothetical and speculative argument. *See* Dkt. 1488 at 17; Dkt. 1574 at 28.

Court sever Cantwell's case from that of the other Defendants pursuant to Fed. R. Civ. P. 21. *See* Dkt. 1305. Plaintiffs took the position that, given Cantwell's "repeated complaints … about his lack of access to documents and pleadings in this case as a result of his incarceration," Plaintiffs saw "the best way to resolve the tension between the need to proceed to trial and Mr. Cantwell's due-process arguments would be for the Court to sever Plaintiffs' claims against Mr. Cantwell from their claims against the other Defendants …." *Id.* at 1. The Traditionalist Worker Party Defendants, Damigo, Kessler and Identity Evropa filed letters opposing the request. *See* Dkts. 1307, 1309.

On the morning of the first day of trial, before jury selection started, the Court heard argument on Plaintiffs' motion to sever and afforded Cantwell numerous chances to have his case severed and thus have his trial continued. Dkt. 1317 (Oct. 25) 6:10–7:13. Cantwell began by explaining that he believed he had "ample grounds for appeal" if he was found liable by the jury and so he "move[d] this Court to sanction the plaintiffs." *Id.* at 8:1-11. The Court explained "there's one issue before the Court right now. Nothing else. Do you want this case severed or not?" Cantwell responded, "I do not." *Id.* at 8:12-15. The Court next heard from Plaintiffs who asserted that, given their interests in proceeding to trial but also seeking to ensure Cantwell is afforded "documents in real time or in as real time as possible as he can to prepare" for trial, they were "trying to come up with the best possible solution under the circumstances." *Id.* at 9:14–10:12. However, Plaintiffs warned that they believed that if "Mr. Cantwell is now saying he does not want severance, we believe that he has then thereby waived any due process arguments for appeal."

The Court then engaged in the following colloquy with Cantwell:

The Court: Mr. Cantwell, the Court is willing to sever the case and allow you the time you want for your case. I will not continue any other case. We're going forward with this case today as set. I am willing to sever this case as to you. Now,

39

to make it perfectly clear: You're asking the Court not to sever you. You prefer to stay in this case as it is?

Mr. Cantwell: Given the choice between those two things, I'll stay in the case as it is. I don't prefer either of those things, but given that binary choice, we'll go forward.

The Court: Okay. I will deny the motion.

*Id.* at 10:15–11:2.

The Court concludes that Cantwell knowingly and voluntarily opted to proceed to trial at that time and under any constraints of access to evidence he'd experienced and argued against his severance and his trial's continuance. As such, Cantwell *waived* any due process arguments that he was prejudiced on account of his inability and delays in access to evidence prior to and at trial, and he cannot now seek to re-raise them following that waiver. *See, e.g.*, *In re Varat Enters., Inc.*, 81 F.3d 1310, 1317 (4th Cir. 1996) ("traditional waiver principles come into play when a party voluntarily or intentionally relinquishes a known claim right"). Moreover, and separately from waiver, Cantwell is estopped from reraising any due process arguments following his decision to proceed to trial and oppose severance and continuance.[16] The Court

---

[16] Plaintiffs argue that "judicial estoppel" is the precise doctrine that prevents Cantwell's continued attempt to raise due process arguments in this posture. Dkt. 1574 at 29. And their invocation of judicial estoppel is understandable, which holds that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). And under those principles, the Court agrees that Cantwell cannot "play[ ] fast and loose" with the Court and this case, by being allowed to take "inconsistent positions during the course of litigation" as to severance and the continuance—which this Court expressed it would have allowed for Cantwell, absent his objection. *See Fed. Dep. Ins. Corp. v. Jones*, 846 F.2d 211, 234 (4th Cir. 1988) (cleaned up). However, the Court is mindful that courts generally invoke *judicial* estoppel only when "the position sought to be estopped" is "one of fact rather than law or legal theory." *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996). Accordingly, equitable estoppel principles more closely capture the nature of Cantwell's attempted change-of-position. *See Jones*, 846 F.2d at 234 (defining equitable estoppel as "[t]he vital principle" that "he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such

further notes that, in another respect, much of the difficulty Cantwell asserts in terms of his access to files in the weeks leading up to the trial, Dkt. 1536 at 4–5 (¶¶ 14–20), were again occasioned by his own decision to request that he be transported from USP Marion in Illinois to Charlottesville to attend the trial in person. Dkt. 1015. The Court *granted* Cantwell's request, directing the U.S. Marshal's Service to transport Cantwell to Charlottesville for trial and further to transport Cantwell at no expense to himself with costs to be borne by the United States as he was then held in federal custody. Dkts. 1031, 1032, 1104, 1105. The Court further specifically directed that "[t]o the extent practicable and consistent with applicable security considerations, Cantwell shall be able to retain any case-related materials and papers he may possess while being transported to Charlottesville." Dkt. 1105 at 4.

The Court finds that Cantwell was able to fully prepare for and participate in the trial notwithstanding his incarcerated status. The Court granted his request to be transported to trial and he was therefore able to attend, in person, for this multi-week trial at no expense to himself. Dkts. 1031, 1032, 1104, 1105. Given Cantwell's incarcerated status and recognizing delays inherent in mail to prisons, in advance of trial, the Court took the extraordinary step of allowing Cantwell to file any submission with the Clerk's Office through electronic means, including by fax or email. Dkt. 1401. Cantwell took full advantage of the opportunity and access to the Court in advance of trial, even though he was incarcerated, filing a multitude of pre-trial motions—

---

person to loss or injury by disappointing the expectations upon which he acted"). Plaintiffs sought severance of Cantwell's case and a continuance to permit him the time that he said he needed to adequately prepare for trial. Cantwell objected to Plaintiffs' request and opted to proceed with trial, thus leading Plaintiffs to proceed with what they otherwise would not have done. Allowing Cantwell to backtrack from his prior position would prejudice Plaintiffs. In any event, considered under either legal framework, Cantwell is estopped from the about-face he seeks to make, claiming now that his trial is unfair due to logistical problems on account of his incarceration when he voluntary decided to go to trial under those very same circumstances.

many more than any other Defendant, or the combined other Defendants—all of which this Court or the Magistrate Judge (if a motion was directed to him) fully considered and resolved. *See, e.g.*, Dkt. 1056, 1062, 1063, 1066, 1077, 1084, 1085, 1088, 1090, 1096, 1098, 1099, 1102, 1157, 1158, 1159, 1160.  Plaintiffs provided him with all exhibits in advance of trial.  The Court provided Cantwell access to a computer throughout trial, including time before and after trial every day so that he could prepare any exhibits.

By this Court's own observation, Cantwell was prepared and engaged in his defense of Plaintiffs' claims against him throughout the entirety of this multi-week trial, using exhibits, his computer, and court technology, and was sufficiently prepared to present his own defense and evidence as well as cross examine and challenge Plaintiffs' evidence. Cantwell was certainly afforded a full and fair opportunity to present his case and challenge Plaintiffs' case—and in practice, Cantwell was afforded more than what the Due Process Clause requires.

Accordingly, there was no unfairness in his trial, and Cantwell's arguments are rejected in this regard as well. *See* Dkt. 1536 at 2–6.

### Richard Spencer

Richard Spencer also challenged the jury's verdict finding him liable for Virginia state law civil conspiracy (Count III) and for racial, religious, or ethnic harassment or violence, in violation of Virginia Code § 8.01-42.1 (Count IV). *See* Dkt. 1550 at 1–4, 6–11; Dkt. 1595. The Court rejects Spencer's arguments as the jury's verdicts against him were lawful and supported by more than substantial evidence.

First, Spencer seeks to overturn the jury verdict that he committed Virginia state law civil conspiracy because, he contends, there was no proof that he was engaged in a conspiracy to do anything "malign or unlawful." *Id.* at 2. Rather, Spencer argues that he had only "agree[d] to participate in a political rally," but "[t]here is no tort in engaging in or witnessing bold talk, [or]

even the advocacy of violence, so long as that discussion does not involve the directing or inciting or producing imminent lawless actions." *Id.* Spencer also contends that he had not communicated with certain members of the Nationalist Front (The League of the South, Traditionalist Workers Party, and National Socialist Movement) "in the days leading up to [Unite the Right] or during the event itself." *Id.* at 3. Moreover, Spencer cites a statement from Plaintiffs' expert witness Dr. Peter Simi, where Dr. Simi stated that he did not believe Spencer was involved in the Unite the Right Discord server. *Id.*

Spencer's challenge to the jury's verdict finding him liable on Count III lacks merit. To be sure, Virginia state law civil conspiracy "generally requires proof that the underlying tort was committed." *Almy v. Grisham*, 639 S.E.2d 182, 188 (Va. 2007). But Spencer's argument that the Court can't discern what tortious conduct or illegality the jury concluded that he had conspired to commit makes little sense. Here, the Court need look no further than the jury's additional finding that he (Spencer) and his co-conspirators Kessler, Kline, Ray, and Cantwell engaged in racial, religious, or ethnic harassment or violence, violating Virginia Code § 8.01-42.1 (Count IV). Dkt. 1478 at 3, 6 (jury verdict). That's a "criminal or unlawful purpose" of the conspiracy. *See Bellsouth Servs.*, 453 S.E.2d at 267; Va. Code § 8.01-42.1 ("An action for injunctive relief or civil damages, or both, shall lie for any person who is subjected to acts  (i) intimidation or harassment, (ii) violence directed against his person, …where such acts are motivated by racial, religious, gender, disability, gender identity, sexual orientation, or ethnic animosity.").

There's more. The jury also found that Fields, Spencer, and the other Defendants were coconspirators; that Fields intentionally drove his car into the crowd on August 12, 2017, injuring numerous Plaintiffs; and that Fields (as well as Spencer, et al.) were liable for racial religious or ethnic harassment or violence under Va. Code § 8.01.42.1, and that Fields was liable

for assault and battery. Dkt. 1478 at 6–9. That's another criminal or unlawful purpose of the

conspiracy. The jury found that Spencer and Fields were both members of the conspiracy, and

the jury was instructed that members of a conspiracy were liable for the foreseeable acts of their

co-conspirators done in furtherance of the conspiracy. Dkt. 1461 at ECF 22, 38–40 (jury

instructions); *La Bella Dona Skin Care, Inc. v. Belle Femme Enters., LLC*, 805 S.E.2d 399, 406

(Va. 2017) (explaining that "civil conspiracy is a mechanism for spreading liability amongst

coconspirators for damages sustained as a result of an underlying act that is itself wrongful or

tortious") (cleaned up). At bottom, the jury's finding that there were numerous criminal or

unlawful purposes of the conspiracy is manifest on the face of the verdict sheet. Spencer's claim

that they can't be discerned lacks merit.

      To the extent Spencer argues that the evidence did not support the jury's conclusion

finding him liable for Virginia state law civil conspiracy (Count III), the Court disagrees. There

was more than substantial evidence in the record to support such a finding. Communications

between Spencer and the other Defendants and planners and organizers of Unite the Right

preceding the event evidenced an intent to spark violence at Unite the Right. For example,

Spencer wrote to Elliott Kline two months before Unite the Right that "[t]his is going to be a

violent summer." PX 3114. In the lead-up to Unite the Right, Christopher Cantwell texted

Spencer that he (Cantwell) was "**willing to risk a lot for our cause**, **including violence and

incarceration**. **Many in my audience would follow me there too, but I want to coordinate

and make sure it's worth it to our cause.**" Dkt. 1397 (Nov. 4) 121:13-16 (emphasis added);

PX 3149-B-D. Spencer responded: "**It's worth it, at least for me.**" *Id.* at 121:17-18 (emphasis

added). There were various other communications between Spencer and co-Defendants to

similar effect. *See* Dkt. 1574 at 32–36 (Plaintiffs' post-trial merits briefs) (citing

communications). Indeed, Spencer testified that "one of the goals of the white nationalist rallies

in 2017" was "triggering" other people, *i.e.*, "sending a message that provokes an angry

response." Dkt. 1397 (Nov. 4) 48:10-18. And substantial evidence showed that Spencer's

codefendants, including Kessler, shared similar motives and sought various methods to spark

violence at which point Unite the Right rallygoers would be prepared to respond with

overwhelming force and violence. *See, e.g.*, PX 1461 (Kessler, asking in a Facebook post

whether rallygoers could "conceal carry," because he didn't "want to scare Antifa off from

throwing the first punch," and he didn't want to "keep Antifa away," because he "want[ed] them

to start something"); PX 1432-A (Kessler, writing "[w]e need a new way to tip off Antifa when

we want them to show up somewhere," and asking whether someone could "with a fake account

or some apolitical normie" could "send photos and tips to their members," because "[w]e

definitely want to play these people into our hands Saturday in Charlottesville.").

Evidence showed that these were not mere one-off communications between Spencer and

the Unite the Right organizers. Ample evidence showed Kessler and the other Unite the Right

organizers considered Spencer a key organizer or a "VIP" of the event. *See, e.g.*, Dkt. 1397

(Nov. 4) 134:15–136:9 (text message chain including Spencer also included Kessler, Cantwell,

Damigo, Michael Hill, and others whom Spencer identified were leaders of Unite the Right); *id.*

at 136:3-9 (Kline writing Spencer on August 11, that they were "canceling the afterparty to the

general public, but still having one for leadership and VIP"); PX 3115, 3146. Spencer testified

that he regularly held calls with Damigo, Kline, Greg Conte, and others in the summer of 2017,

regarding Unite the Right. Dkt. 1397 (Nov. 4) 100:14–101:5; *see also* Dkt. 1550 at 2 (Spencer

acknowledging he "[s]poke occasionally with Mr. Kessler and other Defendants about [Unite the

Right] between [June 2017] and August 11-12").[17] And even when Spencer did not go to certain "leadership meetings" in preparation for Unite the Right, Spencer was invited, and he sent representatives such as Conte to attend in his stead and report back to him. *See, e.g.*, Dkt. 1397 (Nov. 4) 137:18–138:10 (Spencer testifying that Conte attended the "leadership meeting" the night of the torch march on August 11, 2017; and reported back to him the marchers were meeting at Nameless Field). And even if Spencer personally was not active on Discord, as he argues, Dkt. 1522 at 4, the jury heard other evidence that he participated in the Discord #leadership channel through several "designees," Dkt. 1431 (Nov. 15) 69:9-12.

At the torch march on August 11, and at the Unite the Right rally on August 12, evidence showed Spencer to be a central figure. Spencer—along with Kessler and Kline—*led* the hundreds carrying lit torches and chanting "You will not replace us," "Jews will not replace us," "Blood and Soil," through University of Virginia grounds, down its historic Lawn, and up the steps of the Rotunda. Dkt. 1431 (Nov. 15) 121:4–122:8, 125:22-23; Dkt. 1397 (Nov. 4) 147:24-25 (Spencer: "I was in the lead, I think that's fair, at the front of the torch march."), *id.* at 148:8-14; PX 2348, 2676.[18] Spencer testified that the Unite the Right crowd quickly surrounded counter-protestors at the base of the Thomas Jefferson statue (which included Plaintiffs Romero and Willis), and that their pinning the counter-protestors at the statue was meant to be "a sign of dominance." Dkt. 1397 (Nov. 4) 156:9-12. And again, Spencer flippantly acknowledged that the crowd they had assembled refused to let the surrounded counter-protestors leave. *See* Dkt. 1397

---

[17] On August 13, 2017, the day after Unite the Right, Spencer texted Kessler in an apparent attempt to distance himself from Kessler, saying: "You're not listening to leadership." PX 3502. This would be further evidence that Spencer considered himself among "leadership" with respect to the Unite the Right rally.

[18] At 10:15 p.m. that evening, Kessler texted Spencer to "Come out front" of the torch march. Dkt. 1397 (Nov. 4) 147:11-14; PX 3107.

(Nov. 4) 155:22–156:8 (responding "Fact Check: True" to tweet that evening: "They surrounded us at the statute[.] They wouldn't let us out"); PX 2500. After the counter-protesters had been driven off, Spencer stood at the base of the Thomas Jefferson statue and shouted: "Alt Right! We own these streets! We occupy this ground! We won!" The mob chanted "Hail Spencer!", "Hail Victory!" and "You will not replace us!" Dkt. 1397 (Nov. 4) 160:9-22; PX 2117 at 0:05– 0:35. Spencer retweeted Kessler's post that the torch march was an "[i]ncredible moment for white people who've had it up to here & aren't going to take it anymore." PX 2500.

On the night of August 12, 2017, after Unite the Right—after police called an unlawful assembly, crowds were dispersed and after Fields drove his car into a crowd of peaceful protestors including numerous Plaintiffs—Spencer was a in a room with codefendants, including Nathan Damigo, Jason Kessler, Elliott Kline, and other white nationalists, when Spencer went on a racist tirade which was recorded:

> We're coming back here like a fucking hundred times. I am so mad. I am so fucking mad at these people. They don't do this to fucking me. We are going to fucking ritualistically humiliate them. I am coming back here every fucking weekend if I have to. Like this is never over. I win! They fucking lose! That's how the world fucking works. Little fucking kikes. Little fucking octoroons … my ancestors fucking enslaved those pieces of fucking shit. I rule the fucking world. Those pieces of shit get ruled by people like me. They look up and they see a face like mine looking down at them. That's how the fucking world works. We are going to destroy this fucking town.

PX 2489. Spencer's racist invectives made behind closed doors to the Unite the Right organizers in its immediate aftermath, his stated intent to "ritualistically humiliate" those in Charlottesville who had opposed him including Jewish and African American persons (to whom he referred by racial epithets), and to "com[e] back here every fucking weekend" and "destroy this fucking town," *i.e.*, Charlottesville, all provided strong evidence to the jury that Spencer and his codefendants had been co-conspirators engaged in a Virginia state law civil conspiracy to commit various unlawful acts, including racial, religious, or ethnic violence and intimidation in

violation of Va. Code § 8.01-42.1. Indeed, such behind-the-scenes statements are often notoriously hard to uncover in conspiracy cases, increasing its potential salience and force here. *Cf. Burgos*, 94 F.3d at 857 ("By its very nature, a conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement."). And to be sure, while Spencer attempted on the stand to explain away the tirade—as "captur[ing] [his] most childish, embarrassing sentiments, the animal brain," for which he was "ashamed," but had merely said things that were "obviously absurd," Dkt. 1397 (Nov. 4) 46:21–47:4—the jury was not required to accept the credibility of his testimony on this, or indeed any other, point.

Plaintiffs also testified and presented substantial evidence showing that they suffered physical injuries, emotional and other damages, on account of Spencer's acts in furtherance of the conspiracy, and those of his coconspirators. *See, e.g.*, Dkt. 1378 (Oct. 29) 176:1-2, 177:5-11, 180:10-14, 181:1-24 (Plaintiff Willis describing how during the torch march he could not leave the Jefferson statue because he "was surrounded on all sides by tiki torches," "tiki torches, still on fire, were being thrown in our direction," he was pepper-sprayed, and liquid that "appeared to be a tiki torch canister" was thrown at his feet and splashed his shoes, which caused Willis to fear "their strategy was going to be to burn us alive," and then finally when he was able to "crawl[ ] off the statue" surrounded by his friends, he watched them "take punches and kicks to their backs," and "take pepper-sprays at point-blank range directly into their eyes"); *see also id.* at 176:1-2 (Plaintiff Romero testifying that the rallygoers threw a torch at her that landed centimeters from her foot and sprayed mace at her and the other counter-protesters).

Spencer also challenges the jury's verdict on Count IV, finding him liable for acts of intimidation, harassment, or violence directed at Plaintiffs Romero and Willis, and that his actions were motivated by racial, religious, or ethnic animosity. *See* Va. Code § 8.01-42.1(A); *see also* Dkt. 1550 at 6–8 (Spencer's brief). Spencer argues that he should not be held liable on

this count because Plaintiffs Romero and Willis were "vague and noncommittal" about seeing Spencer on the night of the torch march. Dkt. 1550 at 7–8; *see also* Dkt. 1595 at 2–3 (similar). Spencer asserts that, to be liable on Count IV, he had to "directly harm[ ] the Plaintiffs, or expressly order[ ] someone to harm them." Dkt. 1550 at 8. Spencer writes that there was no evidence to support either of those possibilities. *Id.* In Spencer's telling, unlike the evidence of Cantwell "pushing, shoving, pepper-spraying, and manhandling counter-protestors," he (*i.e.*, Spencer), "was not involved in any of those altercations," and accordingly should not be held liable on Count IV. *Id.*

The fact that Plaintiffs Romero and Willis themselves could not personally identify Spencer and any tortious conduct he committed on the night of the torch march is unsurprising, considering their testimony (and photographic and video evidence) that they and the other counter-protestors were surrounded by what they perceived to be "a lynch mob" of hundreds waving lit tiki torches in their faces, throwing lit torches at them, shouting at them and calling them racial epithets, and spraying them with pepper spray. *See* Dkt. 1378 (Oct. 29) 29:1-19, 176:1-2, 180:11–81:3. Willis testified he was "trying to keep [his] head down" to protect himself against "pepper spray and things that were being thrown," and to avoid becoming a victim of "doxing." *Id.* at 176:10–177:9; *see also* PX 2680 (counter protestors surrounded), PX 2695 (counter protestors' heads down). Romero testified that they "covered [them]selves and tried to run out," while the Unite the Right crowd "were literally spraying, throwing stuff," "violently swinging" torches. Dkt. 1378 (Oct. 29) 30:8-11. In any event, there is no evidentiary requirement that Plaintiffs Romero and Willis specifically had to testify that they saw Spencer commit acts prohibited by Va. Code § 8.01-42.1(A), rather than other evidence in the record support liability.

Again, ample testimonial, video and other evidence demonstrated that Spencer (as well as codefendants Kessler and Kline) led the mob at the torch march to the Rotunda and down to

the Jefferson statue as they chanted "You will not replace us," "Jews will not replace us," and "Blood and Soil"; surrounded the counter-protestors including Plaintiffs Willis and Romero and pinned them to the statue preventing them from leaving as a sign of dominance; shouted at Romero, Willis, and the other counter-protestors: "go back to where you came from," "stupid bitch," other chants, and they made "[m]onkey noises" at them; thrust lit tiki torches at them and pepper sprayed them; and when Romero, Willis and the other counter-protestors were driven off following a barrage of punches, kicks and pepper-spray, Spencer gave a speech touting their victory ("We own these streets! We occupy this ground! We won!"), to which the mob chanted "Hail Spencer!", "Hail Victory!" That constitutes more than substantial evidence that Spencer personally committed intimidation, harassment, or violence directed at Plaintiffs Romero and Willis, and that his actions were motivated by racial, religious, or ethnic animosity. In addition, Spencer's argument that he was merely engaged in "constitutionally protected speech" even if many around him were more directly engaged in violence—like Cantwell, who he agreed was "pushing, shoving, pepper-spraying, and manhandling counter-protestors, Dkt. 1550 at 6, 8— ignores that an individual may be liable for the unlawful conduct of others by "authoriz[ing] [or] directing" the unlawful conduct, or engaging in speech that was "likely to incite lawless action." *Claiborne Hardware*, 458 U.S. at 927.

Spencer's motion for a directed verdict or a new trial on Counts III or IV will be denied. Dkt. 1550.

### The League of the South, Michael Hill, Michael Tubbs

The jury found the League of the South, Dr. Michael Hill and Michael Tubbs liable for Virginia state law civil conspiracy in Count III. However, the jury did not reach a verdict on Counts I and II. Dkt. 1478 at 1–3 (jury verdict). In their post-trial motions, the League of the South, Michael Hill, and Michael Tubbs (the "League of the South Defendants") have moved for

directed verdicts on Counts I, II, and III. Dkt. 1549. For the following reasons, the Court concludes that the League of the South Defendants are not entitled to a directed verdict on any count, and that substantial evidence supported the jury's finding that they were liable on Count III.

Hill is the founder and President of League of the South. Dkt. 1401 (Nov. 5) 66:18-23. Hill expressed his beliefs on the League of the South website in "My Pledge of Allegiance," in which he stated: "I pledge to be a white supremacist, a racist, an anti-Semite, a homophobe, a xenophobe, an Islamophobe, and any other sort of 'phobe that benefits my people, so help me God!" Dkt. 1401 (Nov. 5) 68:17-21; PX 1566-A. The League of the South seeks to "create a white homeland," and to that end, Hill has advocated for "[s]ome degree of segregation – perhaps total – and the restoration of white dominance through various Jim Crow-type laws." Dkt. 1401 (Nov. 5) 69:15-21, 70:16–71:8. The League billed itself as "the heart and soul of the hard right, an uncompromising movement of real blood and soil Southern/white nationalists who will not compromise our vision of a Southern homeland for whites." Dkt. 1401 (Nov. 5) 74:12-21. Because, to them, "Dixie is and should be white man's land," they wrote: "We are firm on the Negro question and the Jew question." *Id.*

In the months preceding Unite the Right, League of the South began working as part of the "Nationalist Front"—an umbrella organization comprised of individual white supremacist organizations including codefendants Traditionalist Worker Party, National Socialist Movement, and Vanguard America. *Id.* at 89:9–91:9. In May 2017, Hill announced on the League of the South website that "[t]he League is now working with several other nationalist groups on the right," and that they "have the same common enemy." PX 1918. That month, Hill issued "an official call for resistance" to League of the South members, saying "I have spoken with many of you at length, face to face, about the nature of such resistance. You know what it means," and

cautioning that he "want[ed] no discussion here or elsewhere online of resistance strategies, tactics, logistics, plans, operations, or after action reports," which "all will be handled through secure channels." PX 1537. Indeed, in July 2017—one month before Unite the Right—Hill wrote an address which Ike Baker delivered at the Nationalist Front meeting in Tennessee, in which Hill stated

> As it is said: 'We must secure the existence of our people and a future for white children.'
>
> But we are compassed around with enemies who seek our destruction. From above, in the form of the international Jew and his white gentile traitor allies, to below, in the dark shape of the negro, Mestizo, and Muslim street thug, we are beset by those who despise us and all we hold dear.
>
> The time has come when white men of the West must put aside their petty differences and unite for our very survival and well-being.

PX 1554. The League of the South and its Nationalist Front allies would have a key role in instigating widespread fighting on the streets of Charlottesville on August 12, 2017.

Jason Kessler invited Hill to speak at Unite the Right, and Hill not only accepted but offered League of the South's participation at the rally. Dkt. 1401 (Nov. 5) 80:3-7. A flyer for Unite the Right advertised Hill (as well as codefendants Richard Spencer, Jason Kessler, Christopher Cantwell, and Matthew Heimbach) as speakers at Unite the Right. *Id.* at 81:10–82:17; PX 198. Hill deputized others in League of the South to assist in its preparations for Unite the Right. These included Tubbs (his "chief of staff") to support the League's operations that day, Brad Griffin to handle public relations, and Ike Baker to monitor the Discord server regarding Unite the Right planning and report back. Dkt. 1401 (Nov. 5) 82:22–84:6.

The League of the South Defendants first argue that Plaintiffs failed to introduce evidence that Hill, Tubbs, or the League of the South attended Unite the Right as part of a conspiracy to commit racially motivated violence and failed to prove the "content" of any of

their communications supporting the existence of such a conspiracy. Dkt. 1549 at 2. In their view, allowing a jury to draw the inference that their communications included an agreement to commit racially motivated violence would be "speculative and unreasonable," and "have a chilling effect on actions and speech that are protected by the First Amendment." *Id.* League of the South Defendants also appear to argue that they didn't commit any act in support of the conspiracy. *See* Dkt. 1549 at 2 (arguing that "Plaintiffs' evidence has shown that Hill was part of a group of protestors who pushed through a human barricade which blocked a public roadway," which is "insufficient evidence" of a "conspiracy to commit racially motivated violence"). These arguments fail because substantial evidence established that the League of the South Defendants conspired with their codefendants to commit racial violence and to commit unlawful acts, and they undertook numerous acts in support of that conspiracy.

In public and private statements, Hill and League of the South emphasized the racial motivation for participating at Unite the Right, encouraging participation to "defend" "Western civilization" and "white men" against perceived "enemies"—specifically, Jewish persons, Black persons, and their "white gentile traitor allies." *See, e.g.*, PX 2101 (Hill, tweeting "**If you want to defend the South and Western civilization from the Jew and his dark-skinned allies, be at Charlottesville on 12 August**.") (emphasis added); Dkt. 1401 (Nov. 5) 116:7–117:18.

Moreover, the jury heard other substantial evidence supporting a finding that League of the South Defendants anticipated, hoped for, prepared for, and plotted to spark violence at Unite the Right. For instance, in announcing the League's participation at Unite the Right, Hill wrote that he "want[ed] an excellent turnout of Southern nationalists for this event. Antifa, BLM, et al will be there to greet us! Don't miss out on the fun! – Michael Hill." PX 2858. Indeed, League of the South Defendants acknowledged using similar tactics as their codefendants to "bait" Antifa, Black Lives Matter, or other groups to "come out as public opposition." PX 1560. Behind the

scenes, Tubbs wrote that "I think we all assumed there would be," "and maybe even hoped for," "violence." PX 1553. They "wanted a public confrontation in Charlottesville for the world to see," and they "got it." PX 1560. Hill testified that he wanted League of the South men to wear the same uniform to present "strength and discipline," and a "unified appearance." Dkt. 1401 (Nov. 5) 114:8-14; PX 1553. They brought flagpoles to the rally, which could be used as weapons. Dkt. 1401 (Nov. 5) 114:4-7; PX 3239A (video showing Tubbs leading League of the South and Nationalist Front allies carrying flagpoles into brawl with stationary counter-protesters). And after Unite the Right, League of the South Defendants reveled in engaging in violence that day. *See, e.g.*, PX 3801 (Hill, posting on social media, "Yes, Mr. Tubbs was everywhere the chaos was," and writing "Tubbs will be the first to say that he fought beside many brave warriors that day"). Days after Unite the Right, when someone wrote Hill to express appreciation for Tubbs' "leading the troops into battle and coordinating attack," and the League's "impressive and inspiring" presence at the rally, Hill agreed that "Mr. Tubbs indeed was very much the warrior, as were all of our men who joined us in Charlottesville. I could not have been prouder of them." PX 1562.

   To the extent League of the South Defendants argue that "Plaintiffs have failed to prove that the content of Hill's communication with some of his codefendants constituted an agreement to commit racially motivated violence," Dkt. 1549 at 2, that argument fails as well. Again, proof of an explicit agreement to conspire is not required, and circumstantial evidence may be used to establish a conspiracy. *E.g.*, *Burgos*, 94 F.3d at 857; *Floyd*, 249 S.E.2d at 174. League of the South's communications—both in public and in private—more than substantiate that they agreed with their codefendants to commit racially motivated violence and conspired to commit numerous unlawful acts at Unite the Right.

Next, League of the South Defendants argue that there was not sufficient evidence that they were "part of any conspiracy to commit racially motivated violence *at the Torch March*" on August 11, 2017. Dkt. 1549 at 4 (emphasis added). For instance, they argue that "Hill did not attend the Torch March and had no role in its planning or execution," and that there was "no evidence that Tubbs had advance notice of the Torch March." *Id.* at 4–5. Thus, League of the South Defendants argue that they are entitled to judgment as a matter of law on Plaintiffs' § 1985(3) conspiracy claim and § 1986 claim (for failure to prevent a conspiracy). *Id.* These arguments fail. As previously described, it is not necessary that every defendant have notice of every act in furtherance of the conspiracy. Rather, "the law holds conspirators liable for all the reasonably foreseeable acts of their co-conspirators." Dkt. 1461 at ECF 29–30 (Instruction 19); *United States v. Newsome*, 322 F.3d 328, 338 (4th Cir. 2003) ("[U]nder conspiracy law," a defendant "is liable for the conduct of all co-conspirators that was in furtherance of the conspiracy and reasonably foreseeable to him."). League of the South Defendants were aware of the Torch March beforehand. Indeed, Hill concedes that he sent two League of the South "observers" to the march. Dkt. 1549 at 4; Dkt. 1401 (Nov. 5) 122:13-15. Brad Griffin, a League member in charge of their "public relations," was at the Torch March as one of those "observers." *Id.* at 122:21–123:9; *id.* at 83:4-6; PX 2857 (photo of Griffin); *see also* Def. Ex. 10 (Hill email about Torch March). Others from the League were at the Torch March as well. *See, e.g.*, PX 2883A ("Still getting chills from this, Fla League was there that night before the rally"). Because the Torch March was certainly reasonably foreseeable (and indeed, League of the South Defendants knew about it beforehand and Hill sent observers), this argument fails.

To the extent that League of the South Defendants argue they didn't commit any acts in support of a conspiracy to commit racial violence and unlawful acts, that argument fares no better. Indeed, few organizations or individuals (besides Fields) were as prominent in the

violence of August 12, 2017, as League of the South, Tubbs and Hill. The League of the South as well as the other members of the Nationalist Front gathered at a predetermined meeting point outside Charlottesville to organize and arrange for coordinated transport to the rally. Dkt. 1401 (Nov. 5) 128:25–192:13; 130:17 (Hill: "[Ike] Baker was coordinating the logistics."). There, Baker told those assembled that the "convoy" would travel to Market Street parking garage in downtown Charlottesville, and further exclaimed: "We're going to assemble there. We're going to march as a mass. This is the greatest assemblage of white identitiarians I've personally ever seen. We're going to take that park!" PX 1409 (0:00–1:07). When League of the South Defendants and their Nationalist Front allies (National Socialist Movement, Traditionalist Worker Party, and Vanguard America) convened on Market Street, they formed as a column in their respective uniforms and began marching. Tubbs led their column as they charged into a line of stationary counter-protesters, which included Plaintiff Natalie Romero. *See* PX 1888A, 3239A. After initiating that first widespread brawl, Tubbs helped Nationalist Front members regroup and prepare for another charge out of Emancipation Park, whereupon Tubbs bellowed "Follow me!" and led the second column charging into a crowd assembled outside the park, prompting another melee. PX 2001A. Indeed, "Tubbs was everywhere the chaos was." PX 3801. Moreover, video establishes and Hill's own testimony at trial conceded that "there were some League members that engaged in some violence *that they initiated*." Dkt. 1401 (Nov. 5) 149:16-19 (emphasis added). Hill also conceded at trial that when a League member pepper sprayed a female counter-protester, it was not done in self-defense. *Id.* at 154:5-10; PX 1888A (0:55 – 1:00).[19] At bottom, Plaintiffs' evidence established numerous acts committed by League of the

---

[19] Plaintiffs also rely on a separate later incident, in which League members beat a black man, DeAndre Harris, in the Market Street parking garage following the declaration of a state of emergency. *See* Dkt. 1574 at 43.

South Defendants, both before and during the Unite the Right rally, taken in furtherance of a conspiracy to commit racial violence and other unlawful conduct at Unite the Right.

League of the South Defendants also contend that Fields' car attack was not connected to any conspiracy. They argue that there was insufficient evidence "to establish that the Fields car attack was an overt act in furtherance of a conspiracy to commit racial violence," or that "the Fields car attack was a reasonably foreseeable result of any conspiracy" they could have been a part of, or that Fields "conspired with any [other] defendant to commit racially motivated violence." Dkt. 1549 at 3–4. These arguments lack merit. There was more than substantial evidence in the record to establish these points. League of the South and Vanguard America were both members of the Nationalist Front. Dkt. 1401 (Nov. 5) 90:11–91:2. They were, in Hill's words, "nationalist allies," working against "the same common enemy," which included Jewish persons. *Id.* at 91:6 – 92:20; PX 1918. At Unite the Right, Fields marched and chanted with Vanguard America, as well as other members of the Nationalist Front (including League of the South). PX 2389, 2390, 2864. Fields wore a Vanguard America polo and carried one of its shields. *See id.*; *see also* PX 3862 at 9. As described above, League of the South Defendants stated that they anticipated and even hoped for violence. *See, e.g.*, PX 1560 (Hill: "we wanted a public confrontation in Charlottesville for the world to see, and we got it."). And further still, running over protestors was a constant theme on the Unite the Right Discord channel and elsewhere. *See, e.g.*, PX 1119 ("Is it legal to run over protestors blocking roadways?"); PX 1144 (Discord post of image of a tractor, captioned as a "multi-lane protestor digestor"); *id.* (Discord post of image of buses driving through crowds, writing "This will be us"); PX 2644 (Cantwell, posting: "Blocking traffic is not a peaceful protest, and every person who reminds you of that without using his car, is giving you more slack than you fucking deserve."); PX 3573 (Fields posted on Instagram a picture of a car driving into a crowd of protestors, with the hashtags

"#HitlerWasRight and #ShutItDown); PX 3606 (Fields posted on August 12, 2017, "Shut it down", tagging Richard Spencer and League of the South member Brad Griffin).

In addition, League of the South Defendants further ratified the violence after Unite the Right, including Fields' car attack. *See Claiborne Hardware*, 458 U.S. at 927 ("[A] finding that [a defendant] authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity."). Hill, head of the League of the South, declared after Unite the Right that he "couldn't be happier" with the outcome, that he "would not go back and change a thing" about it, and that the "League of the South had a good day in Charlottesville, Virginia. Our warriors acquitted themselves as men." PX 1379B, 1904, 2063. Tubbs repeatedly tweeted after Unite the Right that Fields "did nothing wrong." *See, e.g.*, PX 2867A, 2867B, 2867C.

Lastly, League of the South argues that there was no evidence that Plaintiffs Sines, Willis, Muñiz, and Wispelwey's injuries were caused by overt acts in furtherance of a conspiracy to commit racially motivated violence. As explained below in considerable detail below, Plaintiffs sustained significant physical and emotional (as well as financial) injuries on account of the actions of Defendants, including League of the South Defendants, on August 11 and 12, 2017. *See, e.g.*, Dkt. 1419 (Nov. 11 Tr.) 12:11-23 (Martin); Dkt. 1407 (Nov. 8 Tr.) 70:18–71:2 (Blair); Dkt. 1401 (Nov. 5 Tr.) 208:11–209:7, 213:9–214:6 (Baker); Dkt. 1378 (Oct. 29 Tr.) 49:20–51:7 (Romero); Dkt. 1413 (Nov. 9 Tr.) 17:23–18:6 (Alvarado); Dkt. 1428 (Nov. 12 Tr.) 75:19-21 (Sines); Dkt. 1378 (Oct. 29) 181:1-19 (Willis); *id.* at 29:1-14 (Romero); Dkt. 1422 (Nov. 11) 223:8–234:14, 225:12–229:25, 230:1–234:4 (Muñiz).[20]

---

[20] Unlike the other Plaintiffs, the jury awarded Plaintiff Wispelwey no damages in its verdict.

League of South Defendants' motions for a directed verdict or a new trial are without merit and will be denied. Dkt. 1549.[21]

*     *     *

For these reasons, no Defendant has shown that they were entitled to a directed verdict or a new trial on any count. The verdict as to liability will stand against each of the Defendants as it was returned by the jury.

## — DAMAGES —

### Virginia Cap on Punitive Damages

The parties dispute the effect that Virginia's statutory cap on punitive damages, Va. Code § 8.01-38.1, has on the jury's damages award.

On Count III, for Virginia state law civil conspiracy, the jury awarded punitive damages of $500,000 against each individual defendant, and $1,000,000 against each organizational defendant, totaling $11,000,000. Dkt. 1478 at 5. On Count IV, for racial, religious, or ethnic harassment or violence, in violation of Virginia Code § 8.01-42.1, the jury awarded $200,000 in punitive damages each against Kessler, Spencer, Kline, Ray and Cantwell. Dkt. 1478 at 6. On

---

[21] League of the South Defendants challenge the jury's finding of liability against them for Virginia state law civil conspiracy on Count III, for the same reasons as those advanced in support of a directed verdict on Counts I and II. *See* Dkt. 1549 at 6. No separate argument is made in the slightest. The Court concludes that, for the reasons set forth above, and based on the same evidence noted and otherwise advanced at trial, more than substantial evidence supported the jury's verdict finding League of the South Defendants liable for Virginia state law civil conspiracy. The jury was properly instructed on the latter claim and the jury could properly find that these defendants conspired to engage in numerous unlawful acts, including intimidation or harassment, or directing violence, motivated by racial, religious or ethnic animosity (in violation of Virginia Code § 8.01-42.1), as well as assault, battery, and false imprisonment. League of the South Defendants have failed to raise any meritorious argument for why they were entitled to a directed verdict on this, or any other claim, or that they would be entitled to a new trial on Count III.

Count V, for assault and battery, the jury awarded punitive damages of $6,000,000 against Fields

*Id.* at 8. And on Count VI, for intentional infliction of emotional distress, the jury rendered an

award of another $6,000,000 in punitive damages against Fields. *Id.* at 9. Thus, the jury awarded

a total of $24,000,000 in punitive damages in its verdict.

Defendants contend that Virginia law caps punitive damages in any action to no more

than $350,000, even if, as here, there are multiple plaintiffs in the same action. Plaintiffs raise

two counterarguments. First, they argue that Virginia's punitive damages cap does not apply in a

case involving a conspiracy to commit racial violence. Second, Plaintiffs assert that even if the

statutory cap applies, it applies only on a "per-plaintiff" basis, meaning that a total of $2,800,000

in punitive damages should be awarded, i.e., $350,000 for each of the eight plaintiffs seeking

punitive damages.

Virginia's cap on punitive damages in civil lawsuits reads as follows:

> In any action accruing on or after July 1, 1988, including an action for medical
> malpractice under Chapter 21.1 (§ 8.01-581.1 et seq.), the total amount awarded for
> punitive damages against all defendants found to be liable shall be determined by
> the trier of fact. *In no event shall the total amount awarded for punitive damages
> exceed $350,000.* The jury shall not be advised of the limitation prescribed by this
> section. However, if a jury returns a verdict for punitive damages in excess of the
> maximum amount specified in this section, the judge shall reduce the award and
> enter judgment for such damages in the maximum amount provided by this section.

Va. Code § 8.01-38.1 (emphasis added).

When the language of a statute is unambiguous, the statutory text is given its plain

meaning. *Advanced Marine Enters., Inc. v. PRC Inc.*, 501 S.E.2d 148, 159 (Va. 1998). That

means the court will "take the words as written," without "resort[ing] to the history of a

particular enactment, extrinsic facts, or to general rules of construction of enactments that have a

doubtful meaning." *Bray v. Brown*, 521 S.E.2d 526, 528 (Va. 1999). Accordingly, in interpreting

a statute, a court applies the plain meaning "unless the terms are ambiguous or applying the plain

meaning would lead to an absurd result." *JSR Mech., Inc. v. Aireco Supply, Inc.*, 786 S.E.2d 144, 146 (Va. 2016) (quoting *Baker v. Commonwealth*, 733 S.E.2d 642, 644 (Va. 2012)). However, "[i]f a statute is subject to more than one interpretation, this Court must 'apply the interpretation that will carry out the legislative intent behind the statute.'" *JSR Mech., Inc.*, 786 S.E.2d at 146 (citation omitted).

### A. Whether Virginia Cap Applies to Claims Covering Defendants' Conduct

Plaintiffs argue that the Court should not apply Virginia's statutory cap on punitive damages "to Defendants' egregious misconduct." Dkt. 1572 at 14. Plaintiffs assert that Virginia's General Assembly "could not have contemplated, let alone intended, for this punitive-damages cap to apply in a case like this"—where the jury found Defendants conspired to commit and committed "heinous acts of racial and religious violence over the course of two days, in violation of Virginia's hate-crime statute." *Id.* In Plaintiffs' view, § 8.01-38.1's language shows that Virginia's General Assembly "intended to cover run-of-the-mill tort actions that resemble medical malpractice claims." *Id.* at 15. Plaintiffs further assert that the statute's legislative history shows that it was "designed to enable insurance companies to more readily estimate the dollar amount of claims they might need to pay for personal-injury lawsuits," but not to "curtail damages for civil rights plaintiffs …." *Id.*

The Fourth Circuit has rejected a similar contention that Virginia's cap on punitive damages "should apply only in unintentional tort cases." *Wackenhut Applied Techs. Ctr., Inc. v. Sygnetron Protection Sys., Inc.*, 979 F.2d 980, 984 (4th Cir. 1992) (concluding that the same argument had "no merit"). As the Fourth Circuit explained, the drafters of § 8.01-38.1 "chose the phrase 'any action' to define the class of cases to which the statute would apply"—a phrase that "was unequivocal," and there was "no definitional language indicating that the term 'any action' is limited to unintentional tort actions." *Id.* Like Plaintiffs here, the defendant in

*Wackenhut* argued that the legislative history of the statute evidenced the legislature's concern "with the liability insurance crisis and the need for tort reform." *Id.*; *see also* Dkt. 1572 at 8. But the Fourth Circuit found clear the "plain meaning of the statute" that "the punitive damages cap be applied 'in any action,'" and not just ones for unintentional torts. *Wackenhut*, 979 F.2d at 984–85.

The Court concludes that the plain language of § 8.01-38.1 applies "[i]n any action," and does not draw any distinction like that proposed by Plaintiffs, such that it would only "cover run-of-the-mill tort actions that resemble medical malpractice claims." Dkt. 1572 at 14–15. The statutory language plainly applies "[i]n any action," which would cover this suit. The fact that the statute further specifically clarifies, "*including* an action for medical malpractice …," simply provides an example of an action to which the statutory cap applies. *See Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) (an "including" clause introduces "illustrative application[s] of a general principle"); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 15, at 132 (2012) ("The verb to include introduces examples."). The including clause cannot reasonably be read to greatly cabin the scope of the broader phrase, "in any action."

But, Plaintiffs argue, it is "well established that words are known by the company they keep," the principle of statutory interpretation known as *noscitur a sociis*. Dkt. 1572 at 7. And that is true, as far as it goes. It is a general principle that "an *ambiguous* term may be given more precise content by the neighboring words with which it is associated." *United States v. Stevens*, 559 U.S. 460, 474 (2010) (quotation marks omitted) (emphasis added); *Andrews v. Ring*, 585 S.E.2d 780, 784 (Va. 2003) (articulating the canon of construction for interpreting "the meaning of doubtful words in a statute"). However, the Fourth Circuit concluded that the phrase "any action" is *unambiguous*. *Wackenhut*, 979 F.2d at 984. Plaintiffs' proposed construction, if not

unworkable, at a minimum also risks introducing confusion into the statutory scheme concerning what actions would qualify as "run-of-the-mill tort actions" like medical malpractice claims, and which wouldn't qualify—all without a textual basis for the distinction.[22] As the Fourth Circuit rejected a similar attempt to limit § 8.01-38.1's application only to unintentional torts, this Court also concludes that Plaintiffs' proposed limitation must be rejected. Section 8.01-38.1 applies "[i]n any action." That includes this one.

### B.  Whether Virginia Cap Applies on a Per-Plaintiff Basis

Plaintiffs argue that, even if Virginia's statutory cap applies, it applies "on a per-plaintiff basis." Dkt. 1572 at 8. In Plaintiffs' view, "*each* of the eight Plaintiffs seeking punitive damages would be entitled to a punitive-damages award in the maximum amount of $350,000," resulting in a total punitive damages award of $2,800,000 for all Defendants. *Id.* at 6, 9, 20. Plaintiffs note that the Fourth Circuit left open the question whether Virginia's punitive damages cap applies on a per-plaintiff basis in *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 237 (4th Cir. 2000). However, they argue that "the answer … is clear based on the statutory text and context; principles of judicial efficiency, fairness, and predictability; and legal authority from other jurisdictions." *Id.* Defendants counter that since punitive damages awards "are capped at

---

[22] Plaintiffs also argue that since the Virginia hate-crime statute "includes a relatively rare provision for the prevailing party to recover attorneys' fees," it would "seem highly illogical and anomalous for the statute to have such a fee-shifting provision, intended by the legislature to act as a deterrent, and then to simultaneously cap punitive damages for the same violent misconduct." Dkt. 1572 at 7 n. 4. To the contrary, that would be no more anomalous than, for instance, Congress providing that in Title VII intentional discrimination cases the prevailing party may recover attorneys' fees but also capping punitive damages based on the size of the company. *See* 42 U.S.C. § 1981a(b)(3) (limitations on punitive damages based on number of defendant's employees); *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999) ("Congress provided for additional remedies, including punitive damages, for certain classes of Title VII and ADA violations"); *Fairfax v. CBS Corp.*, 2 F.4th 286, 297 (4th Cir. 2021) ("a prevailing Title VII plaintiff is presumptively entitled to recover attorney's fees").

$350,000 by statute," "[t]he jury awards for all Defendants for all counts may not exceed $350,000," and therefore, the Court must "reduce the total punitive damages awards to Virginia's statutory cap." Dkt. 1551-1 at 6.

While the Fourth Circuit may have left the issue open, this Court is not writing on a blank slate. To begin, the statutory text states, in part, that "[i]n *any action* … the total amount awarded for punitive damages against all defendants found to be liable shall be determined by the trier of fact. In no event shall the total amount awarded for punitive damages exceed $350,000. …." Va. Code § 8.01-38.1 (emphasis added). Plaintiffs assert that the "central interpretative question is whether the statutory term 'action' refers to the proceeding as a whole, or, instead, to each plaintiff's right of action." Dkt. 1572 at 9. Plaintiffs' phrasing of the question would appear to suggest the answer. The statutory cap only says that it applies "in *any action*," not "*a plaintiff's* action," or "*each plaintiff's* right of action," suggesting the legislature did not mean the former to mean the latter, *see Barr v. Town & Country Properties, Inc.*, 396 S.E.2d 672, 674 (Va. 1990) ("[w]e must … assume … the legislature chose, with care, the words it used when it enacted the relevant statute"). *See generally* Va. Code § 8.01-2(1) ("'Action' and 'suit' may be used interchangeably and shall include *all civil proceedings* whether upon claims at law, in equity, or statutory in nature and whether in circuit courts or district courts.") (emphasis added); *id.* § 8.01-272 ("In *any civil action*, a *party* may plead as many matters, whether of law or fact, as he shall think necessary. … The court, in its discretion, may order a separate trial for *any claim*.") (emphasis added); Fed. R. Civ. P. 3 ("A civil *action* is commenced by filing a complaint with the court.") (emphasis added).

The Fourth Circuit has already resolved the related issue whether Virginia's punitive damages cap applies to the action as a whole, or as against each defendant. In *Al-Abood*, the Fourth Circuit "predict[ed] what the Supreme Court of Virginia would decide were the issue

64

presented to it," and, "find[ing] no ambiguity" in the text of § 8.01-38.1, "conclude[d] that its plain meaning dictates that the cap on punitive damages awards applies *to the action as a whole*, and not to each defendant." *Al-Abood*, 217 F.3d at 237 (emphasis added). While part of the statutory analysis relied on the "against all defendants" language, the Fourth Circuit also explained that, "even without the 'against all defendants' phrase, the statute refers to the 'total amount awarded' '[i]n any action.'" *Id.* Accordingly, the Fourth Circuit held that, "[g]iving this language its plain meaning," "the statute mandates that *the entirety of the punitive damages* awarded in the action amount to no more than $350,000." *Id.* (emphasis added). To be sure, the Fourth Circuit in *Al-Abood* "express[ed] no opinion on how the cap would be applied in a case involving multiple plaintiffs." *Id.* at 237 n. 10. However, the reasoning in *Al-Abood* as well as its conclusion that the punitive damages cap "applies to the action as a whole," both strongly indicate that Virginia's cap "applies to the action as a whole," and not, as Plaintiffs argue, as to each plaintiff.

Plaintiffs also rely on *Bulala v. Boyd*, 389 S.E.2d 670 (Va. 1990), a case in which the Supreme Court of Virginia considered whether another damages cap (the medical malpractice cap)[23] applied to damages awarded to each eligible plaintiff or to the action overall. That case was brought by a child born with birth defects and its parents against the mother's obstetrician and gynecologist. One issue on appeal certified by the Fourth Circuit was, "[w]here there are two or more plaintiffs entitled to recover damages arising from the same act or acts of medical malpractice, does § 8.01-581.51 apply individually to each plaintiff or overall to two or more

---

[23] The medical malpractice cap contained the following language:

"In any verdict returned against a health care provider in an action for malpractice where the act or acts of malpractice occurred … the total amount recoverable for any injury to, or death of, *a patient*, shall not exceed seven hundred fifty thousand dollars." *Bulala*, 389 S.E.2d at 674 (citation omitted) (emphasis added); *accord* Va. Code § 8.01-272.

such plaintiffs?" *Id.* at 672. In answering the question, the Supreme Court of Virginia construed

that damages cap "to mean that in a medical malpractice action, the total damages recoverable

for injury to a '*patient*' are limited to the statutory amount, regardless of the number of legal

theories upon which the claims are based." *Id.* at 675 (emphasis added). A further key issue in

the court's "determination on the existence of a single cap" was the definition of the meaning of

the word "patient" in the statute. *Id.* The Supreme Court of Virginia held that, because "the

mother had a physician-patient relationship" with the obstetrician, "she was a 'patient' within

the meaning of the Act and entitled to the benefit of one statutory cap for her compensatory

damage claim." *Id.* Because the court also found that "the infant is the obstetrician's 'patient'"

as well, it further concluded that "a separate statutory cap for compensatory damages applies to

the child's case." *Id.* at 676. So the Supreme Court of Virginia in *Bulala* held that the mother

and the child had "separate statutory cap[s]." *Id.* But that holding was based upon the specific

language of that statute—which capped "the total amount recoverable for any injury to, or death

of, *a patient*"—and the court's ruling that the mother and the child each was the defendant's

patient. Section 8.01-38.1, by contrast, caps punitive damages "[i]n any action," and does not

include comparable language linking capped punitive damages to the claims of any given

plaintiff or number of plaintiffs. If anything, *Bulala* thus provides further support for interpreting

§ 8.01-38.1 as applying to an entire action, not on a per-plaintiff basis.[24]

Plaintiffs also invoke the principle that statutes should be construed to avoid "significant

constitutional questions." Dkt. 1572 at 12. In their view, "a per-plaintiff reading of the statutory

---

[24] The Court notes that Plaintiffs have not advanced a "per-claim" construction of the
statute. Any such construction would appear to be foreclosed by *Bulala*, which held that "in a
medical malpractice action, the total damages recoverable for injury to a 'patient' are limited to
the statutory amount, *regardless of the number of legal theories upon which the claims are
based*." 389 S.E.2d at 675 (emphasis added).

cap" is necessary to avoid "separat[ing] plaintiffs into higher and lower damages classes based solely on whether they brought their suits individually or jointly—a baseless distinction that arguably violates equal protection and due-process principles under the federal and state constitutions." *Id.* They argue that, rather than "inject[ing] that constitutional defect into the statute," the Court "should apply the punitive damages cap on a per-plaintiff basis." *Id.*

 This argument isn't persuasive for two reasons. First, "[t]he canon of constitutional avoidance 'comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction.'" *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (quoting *Clark v. Martinez*, 543 U.S. 371, 385 (2005)). But where, as here, ordinary textual analysis based on binding precedent supplies but "one plausible construction, the canon [of constitutional avoidance] simply has no application." *Id.* at 842 (internal quotation marks omitted). Second, although Plaintiffs invoke the specter of "significant constitutional questions" raised by reading § 8.01-38.1 to cap punitive damages allowed in an entire action rather than on a per-plaintiff basis, they do not develop any argument why that reading would present serious constitutional questions. Nor do they cite any authority that would support such an argument. Nor is any such constitutional concern readily apparent for that matter, especially considering that "courts have routinely rejected substantive due process challenges to statutory damages caps, and, consequently, affirmed that these statutes serve proper governmental purposes." *Wackenhut*, 979 F.2d at 985.

 Plaintiffs also argue that "a per-plaintiff construction of Virginia's statutory cap on punitive damages is necessary to promote the efficient, just, and predictable resolution of civil disputes in state and federal courts." Dkt. 1572 at 12–13. They contend that "[i]f Virginia's cap did not apply on a per-plaintiff basis, then multiple plaintiffs asserting a right to relief and seeking punitive damages for the same occurrence would have no incentive to join their claims."

*Id.* at 13. Plaintiffs have cited cases from Georgia and North Carolina, arguing that these states' highest courts have construed their punitive damages caps to apply on a per-plaintiff basis. *See Bagley v. Shortt*, 410 S.E.2d 738, 739 (Ga. 1991); *Rhyne v. K-Mart Corp.*, 594 S.E.2d 1, 19–21 (N.C. 2004).[25] And those two state courts concluded that similar policy concerns against encouraging a "proliferation" of lawsuits supported the per-plaintiff interpretations of those statutes. *See Rhyne*, 594 S.E.2d at 21 (citing *Bagley*, 410 S.E.2d at 739). Plaintiffs' efficiency argument is not without force, as a matter of policy. Future plaintiffs would have less incentive to join their claims arising out of a single occurrence if the Virginia statute capped punitive damages for an entire action, as opposed to on a per-plaintiff basis. However, similar efficiency concerns were raised to the Fourth Circuit in *Al-Abood* in favor of a per-defendant cap on punitive damages rather than a cap on the entire action. *See* Ans. Br. of Cross-Appellee at 50, *Al-Abood v. El-Shamari*, 217 F.3d 225 (4th Cir. 2000) (Nos. 99-1939, 99-1940), 2000 WL 34012231, at *50 ("What is clear is that a rule applying the punitive damages cap as the El-Shamaris propose would encourage plaintiffs to bring *separate actions* against each defendant, thereby multiplying litigation."). Nonetheless, the Fourth Circuit held that there was "no ambiguity" in the statute and "its plain meaning dictate[d] that the cap on punitive damage awards applies to the action as a whole, and not to each defendant." *Al-Abood*, 217 F.3d at 237. Such policy or efficiency arguments did not support a contrary conclusion. *See id.* So too here.

---

[25] Alabama and Massachusetts cases to which Plaintiffs cited are inapposite, containing materially different statutory language that compelled those courts' conclusions that statutory damages limits applied on a per-plaintiff basis. *See Carson v. City of Prichard*, 709 So.2d 1199, 1203–05 (Ala. 1998); *Irwin v. Town of Ware*, 467 N.E.2d 1294, 1307 (Mass. 1984).

Efficiency or other policy considerations cannot supplant the plain meaning of the statute guided by Fourth Circuit published precedent and are more suited to other fora besides this Court.[26]

There is authority from some Virginia circuit courts and federal district courts that have considered Virginia's $350,000 statutory cap as applying to an action regardless whether there are one or more plaintiffs.[27] And, notably, Plaintiffs have not pointed the Court to any example of a Virginia case in which multiple plaintiffs were each awarded a separate $350,000 statutory cap on punitive damages.[28] Were Plaintiffs to have advanced a construction of Virginia's statutory cap commonly accepted by Virginia courts rather than a novel interpretation of the statute, one would have expected examples of punitive damages awards capped on a per-plaintiff basis to be quite commonplace.

---

[26] *See, e.g.*, *NAPCO, Inc. v. Landmark Technology A, LLC*, 555 F. Supp. 3d 189, 203 (M.D.N.C. 2021) ("In predicting how the highest court of a state would address an issue, this court 'should not create or expand a [s]tate's public policy.'") (quoting *Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp.*, 506 F.3d 304, 314 (4th Cir. 2007)).

[27] *See, e.g.*, *Foster v. Wintergreen Real Estate Co.*, No. CL09000086, 2010 WL 8696177, at *11–12 (Va. Cir. Ct. Nelson Cnty., Nov. 16, 2010) (holding that the punitive damages cap "applies to the entire lawsuit rather than to each individual defendant," and thus $350,000 was the statutory cap in case with multiple plaintiffs, but issue wasn't raised whether the cap could have applied separately for each plaintiff); *see also Transition, Inc. v. Austin*, No. 3:01-cv-103, 2002 WL 1050240, at *2 (E.D. Va. Mar. 15, 2002) (Dohnal, M.J.) (explaining in *dicta* that, "although the Fourth Circuit has specifically reserved ruling on the issue of the impact of the statutory cap as applied to multiple plaintiffs as opposed to multiple defendants, it is difficult to discern a difference … given the explicit language of § 8.01-38.1 …").

[28] Dicta in at least one case could be interpreted as lending support to Plaintiffs' position. *See Fidelity Nat. Title Ins. Co. v. Wash. Settlement Grp., LLC*, No. CL-2012-4793, 2013 WL 9541969, at *15 (Va. Cir. Ct. Fairfax Cnty. Sept. 4, 2013) ("while Virginia Code § 8.01-38.1 places a $350,000 statutory cap on punitive damages, by the clear language of the statute, the cap pertains to the amount of punitive damages that may be recovered *by a successful party*, not the amount that may be sought in the complaint and to which a jury may find a defendant liable") (emphasis added).

At bottom, considering the language of Virginia's statutory cap, the Fourth Circuit's precedent in *Al-Abood*, and lacking subsequent precedent from the Supreme Court of Virginia or the Fourth Circuit clarifying the application of the statutory cap in multiple-plaintiff cases,[29] the Court concludes that Virginia's $350,000 statutory cap on punitive damages applies to the action as a whole, and not on a per-plaintiff basis. Accordingly, the jury's punitive damages award will be reduced to $350,000 against all Defendants found liable on Counts III, IV, V and VI.

### C. Whether Punitive Damages Award Exceeds Constitutional Grounds

Defendants also argue that the punitive damages award violates their right to due process under the Fourteenth Amendment. The jury's punitive damages award capped pursuant to Va. Code § 8.01-38.1 at $350,00 violates no defendant's due process rights.

Compensatory and punitive damages, although typically awarded at the same time by the same decisionmaker, serve different purposes. While compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct," "punitive damages serve a broader function"—specifically, "they are aimed at deterrence and retribution." *State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (citations omitted). Punitive damages may be imposed to punish unlawful conduct and deter its repetition. *BMW of N.A., Inc. v. Gore*, 517 U.S. 559, 568 (1996). It is "[o]nly when a punitive

---

[29] Virginia's statute governing certifications of questions of law provides that the Supreme Court of Virginia may answer a certified question "if a question of Virginia law is determinative in any proceeding pending before the certifying court and it appears there is no controlling precedent on point in the decisions of [the Supreme Court of Virginia] or the Court of Appeals of Virginia." Va. Sup. Ct. R. 5:40(a). Application of Virginia's punitive damages cap in cases of multiple plaintiffs is a significant question on which it appears there is no controlling Virginia precedent on point. But given the challenges to the merits of the jury verdict and other federal and state law challenges to the damages award, this Court must conclude the question is not at this juncture "determinative" in the pending proceeding. *See United States v. White*, 987 F.3d 340, 342 (4th Cir. 2021) ("We observe that under Supreme Court of Virginia Rule 5:40, the question we certify must be determinative of the proceeding.").

damages award can fairly be categorized as 'grossly excessive' in relation to these [legitimate interests in punishment and deterrence] does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *Id.*

The Court must consider three "guideposts" in assessing the constitutionality of a punitive damages award: "(1) the degree of reprehensibility of the defendant's conduct; (2) any disparity between the actual or potential harm suffered by the plaintiff and the amount of the punitive award; and (3) any difference between the award and civil penalties that are authorized or imposed in comparable cases." *E.E.O.C. v. Fed. Express Corp.*, 513 F.3d 360, 376 (4th Cir. 2008) (citing *Campbell*, 538 U.S. at 418). Here, Virginia's statutory cap on punitive damages has reduced the punitive damages award to $350,000 against all Defendants, which is a factor that operates to insulate the award against constitutional challenge. *Wackenhut*, 979 F.2d at 985 (explaining, "we have indicated that a statutory cap is one factor that might be considered in insulating a punitive damages award against constitutional attack based on unbridled jury discretion and infringement of substantive due process rights"); *Romano v. U-Haul Int'l*, 233 F.3d 655, 673 (1st Cir. 2000) ("a punitive damages award that comports with a statutory cap provides strong evidence that a defendant's due process rights have not been violated"). So too here, the "statutory cap of [$350,000] provided [Defendants] with fair notice" of the range of punitive damages liability they faced on Plaintiffs' Virginia state law claims. *See Fed. Express*, 513 F.3d at 378 (citing *Romano*, 233 F.3d at 673). Upon consideration of these guideposts, the Court concludes that the capped punitive damages award is not grossly excessive or was any individual punitive damages award. Rather, the Court has little difficulty concluding the capped award passes constitutional muster.

1.  Degree of Reprehensibility

The first guidepost whether a punitive damages award is unreasonably excessive is "the degree of reprehensibility of the defendant's misconduct." *Campbell*, 538 U.S. at 418. That is because punitive damages "should reflect the enormity of the offense." *Gore*, 517 U.S. at 575 (cleaned up). To that end, the Supreme Court has explained that "[p]erhaps the *most important* indicum of the reasonableness of a punitive damages award is the *degree of reprehensibility* of the defendant's conduct." *Id.* (emphases added). Because "some wrongs are more blameworthy than others" in this analysis, those "marked by violence or the threat of violence" are more reprehensible than nonviolent wrongs, and those involving "trickery and deceit" are more reprehensible than negligence. *See id.* (citations omitted). In weighing the reprehensibility of a defendant's conduct, courts must ask whether "[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Campbell*, 538 U.S. at 419.

Some Defendants (Fields, Traditionalist Worker Party, Parrott and Heimbach) offer little to challenge the reprehensibility of their conduct. *See, e.g.*, Dkt. 1551-1 (Fields); Dkt. 1556 at 4–6 (Traditionalist Worker Party, Parrott and Heimbach). Others argue that their conduct was not reprehensible largely because *they* did not cause any injury to Plaintiffs or put their health or safety at risk, or that they only engaged in "speech and action that is largely protected by the First Amendment." *See, e.g.*, Dkt. 1542 at 3 (Schoep); Dkt. 1548 at 5 (League of South Defendants).

Defendants' arguments fail. Because significant evidence in the record supports the presence of four of the factors, a jury could reasonably find Defendants' conduct reprehensible

and warranting a substantial punitive damages award.[30] That would be clear in any event—and especially so considering the trial evidence is viewed in the light most favorable to Plaintiffs as the prevailing parties. *See Fed. Express*, 513 F.3d at 377. First, the harm caused to Plaintiffs was clearly physical. Plaintiffs suffered grievous injuries – the product of callous violence. On August 12, 2017, Defendant Fields drove his car into a group of counter-protestors, killing one and injuring many others, including Plaintiffs Marcus Martin, Marissa Blair, Thomas Baker, Natalie Romero and Chelsea Alvarado. Dkt. 1419 (Nov. 11 Tr.) 12:11-23 (Martin); Dkt. 1407 (Nov. 8 Tr.) 70:18–71:2 (Blair); Dkt. 1401 (Nov. 5 Tr.) 208:11–209:7, 213:9–214:6 (Baker); Dkt. 1378 (Oct. 29 Tr.) 49:20–51:7 (Romero); Dkt. 1413 (Nov. 9 Tr.) 17:23–18:6 (Alvarado). Marcus Martin's left leg was shattered, his ankle fractured, he had ligament damage in his foot, scrapes on his right leg, and he was diagnosed with traumatic brain injury and PTSD. Dkt. 1419 (Nov. 11 Tr.) 19:11-19, 24:15-25. Martin threw his then-fiancée Marissa Blair from Fields' car's path. She suffered a hematoma on her leg, scrapes and cuts, and injured ribs. Dkt. 1407 (Nov. 8 Tr.) 75:24–77:9. Thomas Baker suffered a concussion, lacerations and bruising all over his body, a torn ligament in his left wrist and a right hip labral tear. Dkt. 1401 (Nov. 5 Tr.) 216:18–22. Natalie Romero suffered a fractured skull, a severe concussion, a shattered tooth root, lip laceration, and cuts and bruises all over her legs. Dkt. 1378 (Oct. 29 Tr.) 57:23–58:2. Chelsea Alvarado suffered a concussion, contusions on her upper thighs, a hematoma on her left knee, and cuts and scrapes on her hands and arms. Dkt. 1413 (Nov. 9 Tr.) 23:12-17, 24:14-22. Following her narrow escape from the path of Fields' car and witness to the carnage that

---

[30] Plaintiffs do not argue that the fifth factor identified in *Campbell*, concerning financial vulnerability, is implicated. *See* Dkt. 1572 at 16–17.

followed, Elizabeth Sines was diagnosed with PTSD and major depressive disorder related to her PTSD. Dkt. 1428 (Nov. 12 Tr.) 75:19-21.

The prior evening of August 11, at the torch march, Plaintiffs Romero and Willis were surrounded at the base of the Thomas Jefferson statue by a mob organized and led by Jason Kessler, Richard Spencer, Elliott Kline, and others. Romero and Willis were encircled, spat on, cursed at, called racially discriminatory names, and were otherwise battered by the crowd those Defendants and others had instigated. Richard Spencer called it a victorious day afterward.

Those Defendants arguing that they did not *personally* injure any of these Plaintiffs nonetheless committed tortious conduct evidencing "indifference to or a reckless disregard of the health or safety of others." *Campbell*, 538 U.S. at 419. The jury found that those Defendants entered into a conspiracy with Defendant Fields and others. *See* Dkt. 1478 at 4 (jury verdict). Some Defendants acknowledged that their liability for conspiracy supported to some extent a reprehensibility finding for purposes of assessing punitive damages. *See* Dkt. 1542 at 3 (Schoep); Dkt. 1542 at 3 (NSM).

Moreover, the tortious conduct at issue in this case was no "isolated" or passing incident. *Campbell*, 538 U.S. at 419. Rather, evidence showed that Defendants' conduct sparked days of violence and multiple violent encounters. On August 11, Defendants Kessler, Spencer, Kline and Cantwell organized and led the tiki torch-wielding mob which culminated in attacking, pepper spraying, racial and ethnic slurs, harassment and intimidation of Plaintiffs Romeo and Willis; on August 12, columns of Nationalist Front groups led by Defendants Tubbs, Hill, Heimbach, and League of the South, marching in battle formation, charged into a line of stationary counter-protestors and used flagpoles and shields as weapons and pepper spray in the melee that followed, injuring among others, Plaintiff Romero. Later that day, Defendant Fields plowed his car into a peaceful crowd of counter-protestors, injuring the Plaintiffs. More than substantial

evidence showed that this violence was the product of intentional malice, rather than "mere accident." *Campbell*, 538 U.S. at 419. Plaintiffs introduced substantial evidence that Defendants sought violence, planned for violence, sparked violence, engaged in violence, and afterwards, glorified the violence.

In other words, on both days, the conduct was violent and physical (as opposed to economic); demonstrated deliberate indifference to a great risk of harm; stretched over a substantial period on August 11 (and again on August 12); and was deliberate and intentional and the product of malice (as opposed to merely negligent). The evidence of Defendants' conduct far exceeds the standard of conduct deemed reprehensible in the courts. *See, e.g.*, *Saunders v. Branch Banking & Trust Co of Va.*, 526 F.3d 142, 153 (4th Cir. 2008). Accordingly, under the evidence, the jury was entitled to conclude that Defendants acted reprehensibly such as to support a sizable award of punitive damages.

2. Punitive Damages Ratio

The second guidepost "is the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." *Campbell*, 538 U.S. at 418. The Supreme Court has declined to "impose a bright-line ratio which a punitive damages award cannot exceed." *Id.* at 425. To be sure, the Supreme Court has explained that "few awards exceeding a single-digit ratio between punitive and compensatory damages" will satisfy due process. *Id.* The Fourth Circuit and other circuits have applied those principles and explained that "when a jury only awards nominal damages or a small amount of compensatory damages, a punitive damages award may exceed the normal single digit ratio because a smaller amount 'would utterly fail to serve the traditional purposes underlying an award of punitive damages, which are to punish and deter.'" *Saunders*, 526 F.3d at 154 (quoting *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1364–65 (11th Cir. 2004)).

Defendants argue that the jury awarded punitive damages in a ratio to compensatory damages awarded that was unconstitutionally excessive, violating their due process rights. *See, e.g.*, Dkt. 1542 at 1–4 (Schoep); Dkt. 1555 at 1–2 (Damigo, Identity Evropa, Kessler); Dkt. 1556 at 4–5 (Traditionalist Worker Party, Parrott and Heimbach). Defendants' arguments on this issue are predicated upon challenging the ratio between *the jury's* punitive and compensatory damages awards, rather than the ratio between the statutorily capped $350,000 in punitive damages and the jury's compensatory damages awards. *See id.* Defendants also generally advocate for a claim-by-claim analysis of the ratio between punitive and compensatory damages. *See, e.g.*, Dkt. 1542 at 1–4 (arguing that 500,000-to-1 ratio for Count III is unconstitutionally excessive); Dkt. 1550 at 4 (same). Plaintiffs, for their part, argue that the Court should not compare the ratio of punitive damages to compensatory damages on a "claim-by-claim basis." Dkt. 1572 at 18. Rather, they contend that, "[b]ecause the jury found Defendants liable on multiple claims, the Court should calculate the ratio by comparing the aggregate compensatory damages for which each Defendant is liable (across all claims) against the aggregate punitive damages award against that Defendant (across all claims)." *Id.*

Plaintiffs' aggregate approach to calculating the punitive to compensatory damages ratio is appropriate, well supported, and accords with the posture of this case. *See* Dkt. 1572 at 18–21. At the outset this approach is especially appropriate considering that the jury found Defendants liable for a civil conspiracy. Under Virginia law, the jury's finding of liability on the civil conspiracy claim "meant that [Defendants] were held jointly and severally liable for the damages award." *See Tire Eng'g & Dist., LLC v. Shandong Linglong Rubber Co., Ltd.*, 682 F.3d 292, 312 n. 10 (4th Cir. 2012); *see also Worrie v. Boze*, 95 S.E.2d 192, 198 (Va. 1956) ("The conspirators are jointly and severally liable for all damage resulting from the conspiracy."), *abrogated in part on other grounds*, *Station #2, LLC v. Lynch*, 695 S.E.2d 537, 541 (Va. 2010). "The object of a

civil conspiracy claim is to spread liability to persons other than the primary tortfeasor." *Gelber v. Glock*, 800 S.E.2d 800, 820 (Va. 2017); *see also La Bella Dona Skin Care, Inc.*, 805 S.E.2d at 406 (explaining that "civil conspiracy is a mechanism for spreading liability amongst coconspirators for damages sustained as a result of an underlying act that is itself wrongful or tortious"). While Defendants Damigo and Identity Evropa argue that Plaintiffs' "argument regarding joint and several liability [ ] misses the mark," Dkt. 1593 at 4, they present no contrary law to dispute Plaintiffs' authorities that under Virginia law, Defendants, as coconspirators, are liable for all damages resulting from the conspiracy. In addition, Plaintiffs' aggregate approach makes particular sense where, as here, the jury did not award compensatory damages on all counts for which it found Defendants liable, and thus, the total damages award reflects the jury's assessment of the full measure of damages, and that the jury reasonably sought to avoid awarding any double recovery. *See Cutaia v. Radius Eng'g Int'l*, No. 5:11-cv-77, 2014 WL 3359368, at *3 (W.D. Va. July 9, 2014); Dkt. 1461 at ECF 61 (Instruction 34 – instructing that jury "must be careful not to award double or duplicate damages"). The Court is persuaded that, under "*State Farm*, *BMW*, and *TXO* … a court can aggregate compensatory damages from multiple related causes of action when comparing compensatory damages to punitive damages." *Fastenal Co. v. Crawford*, 609 F. Supp. 3d 650, 661 (E.D. Ky. 2009) (citing *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 460 (1993)).

The jury awarded Plaintiffs compensatory damages in the amount of $1,303,284 on Counts III, IV and V—the counts for which all Defendants are jointly and severally liable. *See* Dkt. 1478 at 4–8.[31] The jury awarded Plaintiffs compensatory damages in the amount of

---

[31] These counts include Count III (Virginia state law civil conspiracy), as well as Count IV (violation of Virginia's hate crime statute) and Count V (assault and battery)—both of which the Court instructed the jury would constitute predicate unlawful acts of the conspiracy. *See* Dkt.

$701,459 on Count VI (intentional infliction of emotional distress)—a sum for which Fields is solely liable. *Id.* at 9. Accordingly, the total compensatory damages liability for all non-Fields Defendants is $1,303,284, and the total compensatory damages liability for Fields is $2,004,743. *See id.* at 4–9.

As discussed above, applying Virginia's statutory punitive damages cap, the total punitive damages liability for Defendants is $350,000. No party argues that the Court should apply anything other than the pro-rata portion of each Defendant's responsibility of the total punitive damages awarded for purposes of calculating the applicable ratio. No ratio comes anywhere close to raising due process concerns of an excessive punitive damages award. Here, Fields has the highest ratio of punitive to compensatory damages—the jury held him responsible for 52 percent of total punitive damages (i.e., $182,000)—and it still is well below a 1-1 ratio: 0.091 of punitive to compensatory damages. That does not present any constitutional issue of an excessive punitive damages award—far from it. *See, e.g.*, *Morris v. Bland*, 666 F. App'x 233, 241 (4th Cir. 2016) ("single digit ratios generally do not present a constitutional issue"). The others' ratios are even less consequential. Far from their protestations of an unconstitutionally excessive 500,000-to-1 ratio, Kessler, Spencer, and Cantwell, for their part, would owe a pro rata portion of punitive damages amounting to $10,208, resulting in a 0.0078 ratio of punitive to compensatory damages. Hill, Tubbs, Schoep and Damigo would owe a pro rata portion of punitive damages of $7,292, resulting in a smaller-still ratio of 0.0056 ratio of punitive to compensatory damages. League of the South, National Socialist Movement and Traditionalist Worker Party would each owe $14,583.33 in punitive damages, resulting in a 0.011 ratio of

---

1478 at 4–8; Dkt. 1461 at ECF 38–39; *accord La Bella Dona Skin Care, Inc.*, 805 S.E.2d at 406 (explaining that "civil conspiracy is a mechanism for spreading liability amongst coconspirators for damages sustained as a result of an underlying act that is itself wrongful or tortious").

punitive to compensatory damages. Each of these falls well below even a 1:1 ratio of punitive to compensatory damages, which only further serves to support a conclusion that their imposition comports with due process. *See Campbell*, 538 U.S. at 425 ("Single-digit multipliers are more likely to comport with due process").

While the Court has concluded that Plaintiffs' aggregate approach is the most instructive to the Court's consideration of the constitutionality of the punitive damages award—especially given the Defendants' joint and several liability—even under Defendants' preferred "claim-by-claim" approach, the punitive to compensatory damages ratios readily pass muster.

Under a "claim-by-claim" approach for Count IV, the jury found Defendants Kessler, Spencer, Kline, Ray, and Cantwell, each responsible for $100,000 in compensatory damages, and each responsible for $200,000 in punitive damages. *See* Dkt. 1478 at 6 (jury verdict). As a percentage of the total capped $350,000 punitive damages award, each of the five Defendants would be responsible for about $2,916 in punitive damages on this count, resulting in a 0.029 ratio of punitive to compensatory damages for this count. For Count V, the jury found Defendant Fields responsible for $803,277 in compensatory damages, and as a capped percentage of the total punitive damages award, $87,500 in punitive damages, resulting in a 0.11 ratio of punitive to compensatory damages. *See id.* at 8. And for Count VI, the jury found Defendant Fields responsible for $701,459 in compensatory damages, and, as a capped percentage of the total punitive damages award, $87,500 in punitive damages, resulting in a 0.12 ratio of punitive to compensatory damages. *See id.* at 9. Again, each falls well below even a 1:1 ratio, further showing their imposition comports with due process.

Defendants' arguments fare no better with respect to Count III. First, a number of Defendants whom the jury had found liable for Virginia state law civil conspiracy in Count III— but no other counts—have challenged punitive damages imposed upon them as excessive. These

include individual Defendants Nathan Damigo, Matthew Heimbach, Matthew Parrott, Michael Hill, Michael Tubbs, and Jeff Schoep, as well as the organizational Defendants Vanguard America, League of the South, Identity Evropa, Traditionalist Worker Party, and Nationalist Socialist Movement. Dkt. 1478 at 3–5 (jury verdict). On this count, the jury awarded nominal damages to seven Plaintiffs, awarded $500,000 in punitive damages against each of the abovementioned individual Defendants, and awarded $1,000,000 in punitive damages against each of the organizational Defendants. *Id.* Numerous moving Defendants have argued that this results in an impermissible 500,000-to-1 ratio for the individual Defendants, and 1,000,000-to-1 ratio for the organizations. *See, e.g.*, Dkt. 1542 at 1 (Schoep); Dkt. 1543 at 1 (NSM); Dkt. 1548 at 5–6 (League of the South Defendants). However, again, Virginia law capped the punitive damages award in this action at $350,000 against all Defendants found liable. Therefore, even applying Defendants' proposed claim-by-claim approach for purposes of this analysis, as a pro rata portion of the total punitive damages awarded in the action, Defendants Nathan Damigo, Matthew Heimbach, Matthew Parrott, Michael Hill, Michael Tubbs, and Jeff Schoep would each be responsible for about $7,292 in punitive damages. Defendants Vanguard America, League of the South, Identity Evropa, Traditionalist Worker Party, and Nationalist Socialist Movement, would each be responsible for $14,583—resulting in a 7,292:1 ratio for individual defendants, and 14,583:1 ratio for the organizational defendants. Also, under a "claim-by-claim" approach for Count III, Kessler, Spencer, and Cantwell, would each be responsible for $7,292 in punitive damages—resulting in a 7,292:1 ratio.

The Court concludes that these ratios—while significantly exceeding more standard single- or double-digit ratios—are not excessive using Defendants' proposed claim-by-claim approach, considering that the jury awarded only nominal damages on the civil conspiracy count. The Fourth Circuit's admonition is readily applicable here, that "when a jury only awards

80

nominal damages or a small amount of compensatory damages, a punitive damages award may exceed the normal single digit ratio because a smaller amount 'would utterly fail to serve the traditional purposes underlying an award of punitive damages, which are to punish and deter.'" *Saunders*, 526 F.3d at 154 (citation omitted). Single, double, or even triple-digit ratios in this claim-by-claim approach would "utterly fail" to "punish and deter" these Defendants and others from engaging in similar conduct. To be sure, it might be argued that between $7,000 and $15,000 in punitive damages is also insufficient to achieve that the purposes of punishment and deterrence, especially when the jury would have imposed awards of punitive damages many orders of magnitude greater ($500,000 and $1,000,000). However, again, that outward limit on punitive damages available is the product of Virginia's statutory cap which limited the *entirety of the punitive damages* awarded in the action amount to no more than $350,000. Accordingly, the Court has concluded these ratios do not give rise to constitutional concerns even utilizing Defendants' preferred "claim-by-claim" approach.

The Court further notes that even if it applied a claim-by-claim approach as to the punitive damages awards for Kessler, Spencer, and Cantwell,[32] as to Count III, the Court would still conclude that because nominal damages were awarded, an award of $7,292 in punitive damages as against each does not raise concerns about excessive punitive damages. Especially as to those Defendants who included many of the primary organizers and architects of Unite the Right's violence, the Court finds that even triple-digit ratios would utterly fail to punish and deter them (and others) from engaging in similar conduct in the future.

---

[32] The analysis applies to Kline and Ray as well, however, the Court does not separately address them as they have been absent from court proceedings and have not affirmatively raised these (or any other) arguments at trial or in post-trial motions.

"[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Campbell*, 538 U.S. at 426. The ratios of capped punitive damages to compensatory damages on any or all of Counts III, IV, V and VI do not give rise to concerns of excessiveness. The Court similarly concludes that the measure of punishment is both reasonable and proportionate to the harms inflicted upon Plaintiffs. Moreover, an award of punitive damages within the Virginia statutory cap further offers some measure of protection from constitutional attack. *See Wackenhut*, 979 F.2d at 985.

3.   Civil or criminal penalties

Lastly, the Court considers "any difference between the award and civil penalties that are authorized or imposed in comparable cases." *Fed. Express*, 513 F.3d at 376 (citing *Campbell*, 538 U.S. at 418); *see also Gore*, 517 U.S. at 583 ("Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness."). The parties offer comparatively little argument concerning this last "guidepost" in the Court's analysis assessing the constitutionality of the punitive damages award. Indeed, they have not identified any appropriately analogous civil or criminal statutes or described the statutory penalties authorized or imposed in such cases.

Plaintiffs identify punitive damages awards in several other cases and argue that if those awards were upheld under the facts of those cases, Defendants' reprehensible conduct in this case deserves at least $350,000 in punitive damages. Dkt. 1572 at 29–30. For instance, Plaintiffs cite a case in which two of the same Defendants as in this case (Andrew Anglin and Moonbase Holdings) were found liable for intentional infliction of emotional distress and ordered to pay $100,000 in compensatory and $500,000 in punitive damages, after they directed their followers to harass the plaintiff—the first female, African American student government president at

American University. *See Dumpson v. Ade*, No. 18-cv-1011, 2019 WL 3767171, at *1 (D.D.C. Aug. 9, 2019). For their part, Defendants' arguments primarily focus on the second "guidepost," the ratio between punitive and compensatory damages, and they offer little if any argument as to this factor. *See* Dkt. 1551-1 at 2–5 (Fields). The Court concludes that the argument concerning punitive damages awards imposed in other cases is not helpful in this case, given, at a minimum, significant factual differences between the underlying conduct at issue.[33] More significant is the fact that the Virginia legislature determined that punitive damages in a civil case may be awarded in the amount of $350,000 (the cap), and that the Court has reduced the punitive damages to that cap. *See Fed. Express*, 513 F.3d at 378 (explaining that the fact that the damages award was within the statutory cap "provides additional support for the reasonableness and constitutionality of the punitive damages award"); *Gore*, 517 U.S. at 583 ("substantial deference" afforded to "legislative judgments concerning appropriate sanctions for the conduct at issue"). This offers further support to the constitutionality of the punitive damages award, although the Court concludes that the other two guideposts offer more useful analyses here. *See also Wackenhut*, 979 F.2d at 985.

The Court concludes that no Defendant has any meritorious due process challenge to the constitutionality of the punitive damages awards. Defendants' conduct is reprehensible and satisfies four of the relevant factors in making that determination. Any ratios of punitive damages to compensatory damages are well within the realm of reasonableness, supported by

---

[33] The Court also notes that some authority has held that other punitive damages awards are simply not relevant to this third guidepost, which concerns "civil or criminal *penalties*," and therefore meant to discern *legislative intent* on appropriate punishments, instead of any punitive damages awards in other cases. *See, e.g.*, *Bach v. First Union Nat'l Bank*, 149 F. App'x 354, 367 n. 2 (6th Cir. 2005) (unpublished).

precedent, and necessary to achieve the goals of punishment and deterrence. And the Court has capped punitive damages at $350,000 as set forth by Virginia statute.

### D.  Whether Punitive Damages Award Is Permissible Under Virginia Law

Defendants also argue that Virginia law does not permit any punitive damages award as against them, or that, if it does, the Court should reduce the punitive damages award as excessive under Virginia law. Dkt. 1542 at 4–6 (Schoep); Dkt. 1543 at 4–6 (NSM); Dkt. 1548 at 2–4 (LOS, Hill, Tubbs); Dkt. 1551 at 5–6 (Fields); Dkt. 1556 at 1–2 (Parrott, Heimbach, TWP). The Court disagrees. The award of punitive damages reduced to the Virginia statutory cap is not excessive under Virginia law.

Under Virginia law, the purpose of punitive damages is "to provide protection to the public," "punishment to [the] defendant," and to serve as "a warning and example to deter him and others from committing like offenses." *Coalson v. Canchola*, 754 S.E.2d 525, 528 (Va. 2014). "The general rule is that there is no fixed standard for the measure of exemplary or punitive damages and the amount of the award is largely a matter within the discretion of the jury." *Baldwin v. McConnell*, 643 S.E.2d 703, 707 (Va. 2007) (quoting *Worrie*, 95 S.E.2d at 201). Courts that review a punitive damages award under Virginia law must consider various factors, including: (1) the "reasonableness between the damages sustained and the amount of the award," (2) "the measurement of punishment required," (3) whether "the award will amount to a double recovery," (4) "the proportionality between the compensatory and punitive damages," and (5) "the ability of the defendant to pay." *Baldwin*, 643 S.E.2d at 707. A court considering a request under Virginia law for remittitur of a punitive damages award must view the evidence in the light most favorable to the party who received the jury verdict. *Caldwell v. Seaboard Sys. R.R., Inc.*, 380 S.E.2d 910, 914–15 (Va. 1989). The Supreme Court of Virginia "ha[s] repeatedly held that a jury's award of damages may not be set aside … as excessive," unless the damages

"are so excessive … as to shock the conscience and to create the impression that the jury has been influenced by passion or prejudice or has in some way misconceived or misinterpreted the facts or the law which should guide them to a just conclusion." *Downer v. CSX Transp., Inc.*, 507 S.E.2d 612, 614 (Va. 1998).

Several Defendants argue that under Virginia law, punitive damages can be awarded only where the jury has awarded "actual or compensatory damages," not "nominal damages." *See, e.g.*, Dkt. 1548 at 2–3 (League of the South Defendants); Dkt. 1556 at 1–2 (Parrott, Heimbach, Traditionalist Worker Party). However, notwithstanding the distinctions under Virginia law between compensatory and nominal damages, *Kerns v. Wells Fargo Bank, N.A.*, 818 S.E.2d 779, 785 (Va. 2018), Virginia precedent is clear that punitive damages can be awarded if the jury has awarded either compensatory *or* nominal damages, *Valley Acceptance Corp. v. Glasby*, 337 S.E.2d 291, 297 (Va. 1985) ("Here, neither compensatory damages nor nominal damages were awarded against Valley. Consequently, punitive damages could not be awarded."); *Gibson v. Boy Scouts of Am.*, 163 F. App'x 206, 211 (4th Cir. 2006) (unpublished, per curiam) (citing *Glasby* for the proposition that "under Virginia law, punitive damages are not proper absent an award of compensatory or nominal damages."); *Syed v. ZH Techs., Inc.*, 694 S.E.2d 625, 634 (Va. 2010) (quoting *Zedd v. Jenkins*, 74 S.E.2d 791, 793 (Va. 1953)) (explaining a punitive damages award was "illegal" without a "finding that plaintiff was entitled to any compensatory, or even nominal, damages").[34] Because Plaintiffs are not seeking recovery of punitive damages

---

[34] Defendants' reliance on precedent setting aside a punitive damages award in the absence of compensatory damages—and where *no* nominal damages were awarded—does not support a contrary conclusion. *See Gay v. Am. Motorists Ins. Co.*, 714 F.2d 13, 16 (4th Cir. 1983). In any event, later Virginia precedent confirmed that nominal damages can support an award of punitive damages. *E.g.*, *Glasby*, 337 S.E.2d at 297; *Syed*, 694 S.E.2d at 634; *Doddy v. Zedd Auctioneers, Ltd.*, No. CL07-4965, 77 Va. Cir. 272, 2008 WL 8201371, at *2 (Va. Cir.

for Plaintiff Wispelwey, to whom the jury did not award any compensatory or nominal damages, Dkt. 1478 at 3–9 (jury verdict), this Virginia state law limitation did not bar an award of punitive damages in favor of any of the other Plaintiffs.

Regardless, some Defendants argue that even if nominal damages are sufficient to award punitive damages, the punitive damages award is excessive as to those Defendants against whom the jury awarded *only* nominal (no compensatory) damages. For example, League of the South Defendants argue that "Virginia law requires a reasonable ratio between compensatory damages and punitive damages." Dkt. 1548 at 3–4. They argue that the punitive damages award as against them on Count III, even capped by Va. Code § 8.01-38.1, was disproportionate to the nominal damages award. *See id.* This argument is unpersuasive. Viewed in the light most favorable to Plaintiffs as the prevailing parties, ample evidence supported the conclusion that substantial punitive damages were required against these Defendants to "provide protection to the public," "punishment" to Defendants, and to serve as a "warning and example to deter [them] and others from committing like offenses." *See Coalson*, 754 S.E.2d at 528. To a large extent, whether the punitive damages award is excessive tracks the Court's analysis above. And, in any event, the sums awarded, especially reduced to fall within the statutory cap, certainly are not "so excessive … as to shock the conscience." *Downer*, 507 S.E.2d at 614.

Moreover, this is not a case in which any of the Plaintiffs who were awarded nominal damages on some counts were awarded nominal damages only because they "failed to demonstrate actionable harm." *People Helpers Found., Inc. v. City of Richmond, Va.*, 12 F.3d 1321, 1327 (4th Cir. 1993). While on the Virginia state law civil conspiracy count (Count III),

---

Ct. Norfolk City) (2008) ("an award of nominal damages will support an award of punitive damages").

the jury awarded Plaintiffs Romero, Muñiz, Baker, Blair, Martin, Alvarado, and Willis nominal damages in the amount of $1.00, Dkt. 1478 at 4, the jury also awarded each of those Plaintiffs substantial compensatory damages for the underlying predicate violent and tortious acts, namely religious, or ethnic harassment or violence, violating Virginia Code § 8.01-42.1 (Count IV), assault and battery (Count V), and intentional infliction of emotional distress (Count VI), Dkt. 1478 at 5–9.

Some Defendants also argued that the punitive damages awards should be further reduced because of their purported inability to pay. *See, e.g.*, Dkt. 1556 at 5 – 6 (Traditionalist Worker Party, Parrott and Heimbach). However, these Defendants cite no evidence in the record to substantiate their argument that they lack the ability to pay, and therefore the Court concludes that it does not support any further reduced punitive damages award. *See Condominium Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condominium, Inc.*, 709 S.E.2d 163, 175 (Va. 2011) (holding that a defendant who "contends that it was experiencing financial difficulties," but "did not introduce evidence of their financial situation at trial … cannot prevail before this Court on its claim that the amount of punitive damages would be oppressive"). Defendant Schoep argues that, "[h]ad Plaintiffs' counsel allowed testimony of the defendant's current work to be heard, the jury would have been better equipped to 'determine the proper amount of punitive damage, if any only against Defendant Schoep.'" Dkt. 1542 at 7 (citing Dkt. 1431 (Nov. 15) 17:19-21)). However, Schoep does not identify any evidence that he argued should be introduced to show his alleged inability to pay punitive damages that was excluded. Having failed to "introduce evidence of [his] financial situation at trial," he cannot now prevail on his

claim that the amount of punitive damages would be oppressive.[35] *See Condominium Servs.*, 709 S.E.2d at 175. In any event, this argument also fails because no defendant asserting this issue has demonstrated such an inability to pay, based upon the totality of their financial circumstances, especially with respect to the punitive damages award reduced to comply with the Virginia statutory cap. *Cf. Baldwin v. McConnell*, 643 S.E.2d 703, 707–08 (Va. 2007) (considering value of defendant's stocks in determining ability to pay); *Jordan v. Osmun*, No. 1:16-cv-501, 2017 WL 2837143, at *8 (E.D. Va. June 29, 2017) (affirming a $100,000 punitive damages award, and rejecting argument that defendant "do[es] not have that kind of money, because "neither party has presented a clear record of the financial condition of the Defendants," and noting Virginia's "low threshold for ability to repay").

Because Defendants have not raised any valid reason that the punitive damages award, capped at the statutory threshold, should be further reduced under Virginia law, the Court will deny Defendants' arguments for such relief.

---

[35] Schoep argues that, had Plaintiffs not objected, he would have introduced testimony from a witness Daryl Davis concerning Schoep's "current work," which would have given the jury a basis to determine he was unable to pay punitive damages. *See* Dkt. 1542 at 7–8. But the basis upon which Schoep sought to introduce Davis's testimony was that he "could potentially humanize Defendant Schoep," and that he would testify about "the state of mind of [Schoep] and his propensity, or lack of, for violence." Dkt. 1267 at 2–3. Not inability to pay punitive damages. Indeed, though Defendant Schoep had not raised the issue of relevance to punitive damages, the Court allowed Schoep to introduce evidence regarding his subsequent alleged repudiation of white supremacy and related conduct for the limited purpose of determining the amount of punitive damages. Dkt. 1431 (Nov. 15) at 17:6-21; Dkt. 1428 (Nov. 12) 188:5-13. In other words, Schoep's (suggestion) that he was not permitted to introduce evidence that he was unable to pay fails, both because (1) he did not timely argue that he wanted to introduce such evidence for that purpose, (2) in any event, he was afforded the opportunity to introduce evidence to that effect, and (3) he does not articulate the argument, much less substantiate such argument, as to how his "current work" renders him unable to pay.

**Conclusion**

The Court has affirmed the jury verdicts as to liability against all Defendants. The Court has further affirmed the compensatory damage awards as imposed by the jury. The jury's punitive damages award will be reduced to $350,000, Virginia's statutory cap on punitive damages. An appropriate Order will issue.

The Clerk of Court is directed to send this Memorandum Opinion to the parties.

ENTERED this ___30th___ day of December, 2022.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE